**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, DC  20530_

April 10, 2014

The Honorable Richard J. Berry
Mayor
City of Albuquerque
One Civic Plaza NW, 11th Floor
Albuquerque, NM  87102

    Re:  Albuquerque Police Department

Dear Mayor Berry:

  We write to report the findings of the Department of Justice's civil investigation of the Albuquerque Police Department ("APD" or "the department").  Our investigation focused on allegations of use of excessive force by APD officers under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").  Section 14141 makes it unlawful for government entities, such as the City of Albuquerque and APD, to engage in a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or laws of the United States.  The investigation was conducted jointly by the Civil Rights Division and the United States Attorney's Office for the District of New Mexico.  This letter is separate from, and does not address, any federal criminal investigation that may be conducted by the Department of Justice.

  Based on our investigation, we have reasonable cause to believe that APD engages in a pattern or practice of use of excessive force, including deadly force, in violation of the Fourth Amendment and Section 14141.  Our investigation included a comprehensive review of APD's operations and the City's oversight systems.  We have determined that structural and systemic deficiencies—including insufficient oversight, inadequate training, and ineffective policies— contribute to the use of unreasonable force.  At the conclusion of this letter, we outline the remedial measures that we believe are necessary to ensure that force is used in accordance with the Constitution.  In some instances, these recommendations build on measures and initiatives that are already underway within the department.

  We recognize the challenges faced by officers in Albuquerque and in communities across the nation every day.  Policing can be dangerous; at times, officers must use force, including deadly force, to protect themselves and others in the course of their work.  The use of force by police is guided by the need to protect public safety and the duty to protect individuals from unreasonable searches and seizures under the Fourth Amendment.  While most force used by APD officers is within these strictures, a significant amount falls short of these requirements. Although APD has taken steps to allay the public's concerns about the department's use of force,

1

these initiatives have been insufficient to ensure consistent accountability.  They also have not addressed longstanding deficiencies that have allowed a culture of indifference to constitutional policing and insularity to develop within the department.

We are aware that the release of our findings occurs at a time of transition for the department's leadership and amid continued tension around recent officer-involved shootings.  In particular, fatal confrontations with individuals experiencing mental health crises continue to cause significant public concern over the department's ability and willingness to consider the safety and well-being of the individuals in distress.  Throughout our investigation, APD leadership has been receptive to our preliminary feedback and technical assistance.  However, as outlined in this letter, more work is necessary to ensure that officers have the proper tools, guidance, training, and supervision to carry out their law enforcement responsibilities safely and in accordance with individuals' federal constitutional rights.  We appreciate your expressed willingness to embrace many of the changes we have highlighted in our conversations with APD.  We will continue to work collaboratively with you, the department's leadership, and other stakeholders to develop sustainable reforms that will resolve our findings.  However, if we cannot reach an appropriate resolution, Section 14141 authorizes the Department of Justice to file a civil lawsuit to "eliminate the pattern or practice" of police misconduct.  42 U.S.C. § 14141.

We thank you, APD, and other city officials for your cooperation and professionalism during our investigation.  We received invaluable assistance from the department's leadership, counsel, and rank-and-file officers.  We also thank community members for bringing relevant information to our attention and for sharing their experiences with us.  We are encouraged by the many individuals who took an active interest in our investigation and who offered thoughtful recommendations.  We appreciate those individuals who came forward to provide information about specific encounters with APD, even when recounting such events was painful.  We know that many residents care deeply about preventing the types of incidents described in this letter and have a genuine interest in supporting the many men and women of APD who uphold their oaths and keep Albuquerque safe.  Based on this extensive cooperation and participation, we stand ready, and are encouraged that we will be able, to work together with the City, APD, and other stakeholders to address our findings  methodically and expeditiously.  By promoting constitutional policing, we will make APD more effective and will help restore the community's trust in the department.

## I.  SUMMARY OF FINDINGS

While officers may be required to use force during the course of their duties, they must do so respecting constitutional guarantees against unreasonable searches and seizures.  For too long, Albuquerque officers have faced little scrutiny from their superiors in carrying out this fundamental responsibility.  Despite the efforts of many committed individuals, external oversight is broken and has allowed the department to remain unaccountable to the communities it serves.  Based on our investigation, we find that the department engages in a pattern or practice of using excessive force during the course of arrests and other detentions in violation of the Fourth Amendment and Section 14141.  We find this pattern or practice in the following areas:

(1) Albuquerque police officers too often use deadly force in an unconstitutional manner in their use of firearms.  To illustrate, of the 20 officer-involved shootings resulting in fatalities from 2009 to 2012, we concluded that a majority of these shootings were

unconstitutional.  Albuquerque police officers often use deadly force in circumstances where there is no imminent threat of death or serious bodily harm to officers or others.  Instead, officers used deadly force against people who posed a minimal threat, including individuals who posed a threat only to themselves or who were unarmed.  Officers also used deadly force in situations where the conduct of the officers heightened the danger and contributed to the need to use force.

(2) Albuquerque police officers also often use less lethal force[1] in an unconstitutional manner.  We reviewed a random sample of the department's use of force reports completed by officers and supervisors between 2009 and early 2013.  Our sample consisted of over 200 force reports.  We find that officers frequently misused electronic control weapons (commonly referred to by the brand name "Tasers"),[2] resorting to use of the weapon on people who are passively resisting, observably non-threatening but unable to comply with orders due to their mental state, or posed only a minimal threat to the officers.  Officers also often used Tasers in dangerous situations.  For example, officers fired Tasers numerous times at a man who had poured gasoline on himself.  The Taser discharges set the man on fire, requiring another officer to extinguish the flames.  This endangered all present.  Additionally, Albuquerque police officers often use unreasonable physical force without regard for the subject's safety or the level of threat encountered.  Officers frequently use takedown procedures in ways that unnecessarily increase the harm to the person.  Finally, officers escalate situations in which force could have been avoided had they instead used de-escalation measures.

(3) A significant amount of the force we reviewed was used against persons with mental illness and in crisis.  APD's policies, training, and supervision are insufficient to ensure that officers encountering people with mental illness or in distress do so in a manner that respects their rights and is safe for all involved.

(4) The use of excessive force by APD officers is not isolated or sporadic.  The pattern or practice of excessive force stems from systemic deficiencies in oversight, training, and policy.  Chief among these deficiencies is the department's failure to implement an objective and rigorous internal accountability system.  Force incidents are not properly investigated, documented, or addressed with corrective measures.

---

[1]     For purposes of this letter, "less lethal force" means a force application not intended or expected to cause death or serious injury and which is commonly understood to have less potential for causing death or serious injury than conventional, more lethal police tactics.  Nonetheless, use of less lethal force can result in death or serious injury.

[2]     The Department uses the Taser brand electronic control weapons.  Throughout this report, we will refer to these weapons as Tasers.

We found only a few instances in the incidents we reviewed where supervisors scrutinized officers' use of force and sought additional investigation.  In nearly all cases, supervisors endorsed officers' version of events, even when officers' accounts were incomplete, were inconsistent with other evidence, or were based on canned or repetitive language.  The department has also failed to implement its force policies consistently, including requirements that officers properly document their use of force, whether by lapel cameras, audio tapes, or in reports.  The department does not use other internal review systems, such as internal affairs and the early intervention system, effectively.  These internal accountability and policy failures combine with the department's inadequate training to contribute to uses of excessive force.  Additionally, serious limitations in the City's external oversight processes have allowed many of these deficiencies to continue unabated.

As a result of the department's inadequate accountability systems, the department often endorses questionable and sometimes unlawful conduct by officers.  The prior criminal history and background of individuals who are the subject of police force also typically receive greater scrutiny than the actions of officers.  These practices breed resentment in the community and promote an institutional disregard for constitutional policing.  For example, in a 2011 civil trial involving the shooting death of Andrew Lopez in which a state court found that an officer used unreasonable force, the City's expert, a training officer, testified that the officer's actions were "exemplary and that he (the expert) would use this incident to train officers on the proper use of deadly force."[3]  The court concluded that the deadly force training provided to APD officers "is designed to result in the unreasonable use of deadly force."[4]  We found other examples of similar praise or approval by police supervisors in force investigations we reviewed.

We recognize that the department started to institute some preliminary reforms to address our concerns before the conclusion of our investigation.  However, the recent remarks by the police chief in response to the James Boyd shooting on March 16, 2014, demonstrate that more work is needed to change the culture of APD.[5]  It is imperative that the department continue to build on these reforms and improve its training, recruitment, and internal review mechanisms.  The failure to take meaningful remedial action places residents at risk of excessive force and promotes a culture of unjustifiable aggression that further alienates the department from the communities it serves.  Making constitutional policing a core agency value and building systems of accountability to carry out that value will support the many APD officers who strive to and do uphold their oaths.  This, in turn, will engender greater trust and confidence in APD from the community.

---

[3]     Findings of Fact and Conclusions of Law, *Higgins v. City of Albuquerque*, No. CV-2009-0915 (N.M. 2d Judicial Dist. filed on Aug. 19, 2009), ¶67.

[4]     *Id.* at ¶66.

[5]     On March 21, 2014, APD Chief Gorden Eden told reporters at a news conference that the force used against James Boyd was justified after officers responded to reports that an individual was camping illegally in the Sandia foothills.  The Boyd shooting is under criminal investigation and is not addressed in this letter.  Dan McKay, *Camper Turning from Officers When Shot*, Albuquerque Journal, Mar. 22, 2014, *available at* http://www.abqjournal.com/372844/news/video-camper-turning-away.html.

## II.    BACKGROUND

A well-functioning police department has the trust of the residents it protects, functions as a part of the community rather than insulated from it, and cultivates legitimacy when the public views it as engaging with them fairly and respecting the rule of law.[6]  We started this investigation in November 2012 amid serious public concerns about APD's ability and willingness to fulfill these precepts.

In particular, the department faced community apprehension about its respect for constitutional guarantees against unreasonable force and its ability to protect the safety of all residents.  These concerns stemmed from a number of high-profile incidents suggesting unreasonable conduct by some officers, including:  (1) a high rate of shootings,[7] including more than 25 shootings in the two-year period before our investigation started; (2) high profile uses of less lethal force, including Taser deployments and physical force captured on video; (3) a large number of judgments and settlements[8] against the City signifying that many uses of force were unjustified; and (4) concerns raised by local leaders and advocates culminating in a City Council measure seeking an outside investigation by DOJ.[9]  .

In September 2010, the Police Executive Research Forum ("PERF") started a nine-month study of the department's use-of-force policies and training, as well as the department's

---

[6]    *See* generally Tom Tyler & Jeffrey Fagan, *Legitimacy and Cooperation:  Why Do People Help the Police Fight Crime in their Communities?*, 6 Ohio St. J. Crim. L. 231 (2008) (finding that cooperation with the police increases when the public views the police as respecting procedural justice and therefore as legitimate authorities); Tom Tyler, WHY PEOPLE OBEY THE LAW 138 (2006) (finding, in a study of over 1,500 Chicago residents, that "[i]nferences about efforts to be fair were the most important criterion of procedural fairness; concerns about politeness and rights (jointly labeled ethicality) were the second-most important"); Jason Sunshine & Tom Tyler, *The Role of Procedural Justice and Legitimacy in Shaping Public Support for Policing*, 37 Law & Soc'y Rev. 513, 519-21 (2003) (study concluding that police treatment of the public and adherence to procedural fairness, such as accurately applying the law, has a stronger effect on police legitimacy than effectiveness in addressing crime).

[7]    Dan Frosch, *Justice Dept. to Investigate the Police in Albuquerque*, N.Y. Times, Nov. 27, 2012, *available at* http://www.nytimes.com/2012/11/28/us/justice-dept-to-investigate-the-police-in-albuquerque.html?_r=0; Michael Haederle, *In Albuquerque, An Uproar Over Shootings by Police*, Los Angeles Times, Apr. 14, 2012, *available at* http://articles.latimes.com/2012/apr/14/nation/la-na-albuquerque-police-20120415.

[8]    Jeff Proctor, *Ellis Case Would Boost APD Payouts*, Albuquerque Journal, Apr. 7, 2013, *available at* http://www.abqjournal.com/186038/news/ellis-case-would-boost-apd-payouts.html; Jeff Proctor, *Police Misconduct Costly*, Albuquerque Journal, Feb. 6, 2012, *available at* http://www.abqjournal.com/85625/news/police-misconduct-costly.html.

[9]    Council Bill No. R-11-247 (August 2011) (requesting a DOJ investigation into "whether there have been incidents or patterns of civil rights violations by the Albuquerque Police Department").  You vetoed the measure, citing the City's request for a review of the department by the Police Executive Research Forum.  Mayor Berry's Veto Message on R-11-247 (Aug. 18, 2011), *available at* http://www.cabq.gov/mayor/news/read-mayor-berrys-veto-message-on-r-11-247/.

management systems.  PERF did not evaluate whether officers used force appropriately.[10]
Indeed, the report noted that "[r]einvestigating officer-involved shooting cases was outside the
scope of this study as specified by the city."[11]  Instead, PERF focused on "common factors" in
the shootings and trends and patterns in the uses of less lethal force, such as frequency of
weapons use, officer and subject demographics, and the types of force used.[12]  The PERF report
noted that shootings increased, even though "both violent crime and assaults on officers have
been on a downward trend."[13]  The PERF report found that multiple officers were present at 81%
of the shooting incidents they reviewed.[14]  Given the level of misconduct we uncovered, the
presence of multiple officers is significant because officers have a duty to intervene to prevent
other officers from using excessive force.  *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210
(10th Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009) (internal citations omitted).  The report also
noted that in only a small percentage of shooting incidents (11%) did the officer employ less-
lethal options before resorting to deadly weapons.[15]  The PERF report also noted the significant
use of Tasers and pointed out serious limitations in APD's ability to track accurate force data.[16]
Our investigation, which included incidents occurring after PERF's review, revealed similar
problems.

     The Albuquerque Police Department is the largest law enforcement agency in New
Mexico, with approximately 1,000 sworn officers and over 600 civilian employees.[17]  We
recognize that it is a modern policing agency that has made efforts to implement innovative
programs, such as the Crisis Intervention Team ("CIT") and the Crisis Outreach and Support
Team ("COAST"), which work to diffuse potentially harmful situations and assist people in
crisis by providing them with access to mental health care.  The department has also partnered
with other agencies to maintain the Family Advocacy Center, a safe space that focuses on the
needs of victims of domestic violence, sexual abuse, and other trauma.  The department has
received national accreditation by law enforcement executive associations[18]   and has invested in
technologies, such as lapel cameras, to address community concerns about officer accountability.

     While these measures are noteworthy, the public's confidence in the department remains
shaken over concerns that the department is unable to control its officers' use of excessive force.
The use of technology and other initiatives have had limited impact in increasing accountability
or promoting safer encounters with individuals suffering from mental illness.  For instance,

---

[10]     PERF, *Review of Use of Force in the Albuquerque Police Department*, 41, 48 (June 23,
2011), *available at* http://alibi.com/media/docs/Police%20Executive%20Research%20
Forum's%20review%20of%20APD%20shootings.pdf.
[11]     *Id*. at 10.
[12]     *Id.*
[13]     *Id*. at 2.
[14]     *Id*. at 14.
[15]     *Id.*
[16]     *Id*. at 48.
[17]     The Albuquerque Police Department's Strategic Plan Fiscal Year 2013 through Fiscal
Year  2017, available at http://www.cabq.gov/police/internal-reports.
[18]     For example, the department is accredited by the Commission on Accreditation for Law
Enforcement Agencies, Inc., which is the credentialing authority through organizations such as
the International Association of Chiefs of Police and the National Sheriff's Association, among
others.  We do not endorse such accreditation.  We simply note that such accreditation exists.

although the department is among a few of its size to mandate the use of lapel video cameras, the implementation has been highly inconsistent.  The availability of trained CIT officers has not kept up with the needs in the community, and de-escalation techniques employed by these officers are too easily dismissed by heavily-armed tactical units in situations where individuals under police scrutiny are not posing an immediate threat of harm.  The mental health professionals and staff on COAST teams operate in a larger mental health system with limited resources and options.  It is critical that the City and the department take additional measures to identify, address, and prevent excessive force to protect the public and rebuild the community's trust.  Recent shootings have heightened and confirmed the need for further reform.

## III.    METHODOLOGY AND LEGAL STANDARDS

We conducted our evaluation of the department's use of force in three major phases: fact-gathering, incident analysis based on applicable legal standards, and a comprehensive review of policies and practices to identify significant factors that cause or contribute to misconduct.  Our review was informed by many sources, including:  (1) individuals participating in community town hall meetings and separate witness interviews; (2) agency stakeholders, such as the department's officers, supervisors, and command staff; (3) other stakeholders in the City, including the officers' union representatives, police oversight commissioners and investigative staff, City officials, and community group leaders; (4) department documents, including use-of-force and shooting files; and  (5) information and insights provided by our expert police consultants.

During the first phase of our investigation, we sought relevant information on the department's use of force and worked to gain a comprehensive understanding of the department, including its leadership, systems of accountability, operations, and community engagement.  We conducted onsite tours in Albuquerque in December 2012, February and March 2013, and January 2014.  Collectively during these tours, we met with command staff and officers of various ranks; representatives from the officers' union; leadership and officers within the internal affairs department; the police academy; and each area command, among others.  We spoke to current and former officers in Albuquerque by video conference and telephonically.  We also met with stakeholders outside of the department, including the Independent Review Officer, members of the Police Oversight Commission, and community group leaders.[19]

In this fact-gathering phase, we also sought to learn more from those who had direct interactions with the department.  We held four community town hall meetings in different regions of the City and conducted initial and follow-up interviews of hundreds of people.  We also interviewed dozens of people through additional community outreach efforts.  We verified these accounts by reviewing available documentary, photographic, and video support, as well as department records.

In the second phase of our investigation, we carefully analyzed the information we obtained and applied the relevant legal standards to determine whether the department's use of force was justified under federal law.  We reviewed an extensive volume of documents provided to us by the department, including a random sample of more than 200 force reports from 2009

---

[19]     *See* a more in depth description of the Police Oversight Commission and the Independent Review Officer at B. 7 *infra*.

through early 2013.[20]  We also reviewed the files of officer-involved shootings between 2009 and 2012 that resulted in fatalities.  Our review of individual use-of-force complaints and reports informed our investigation into whether a pattern or practice of excessive force exists.

A pattern or practice may be found where incidents of violations are repeated and not isolated instances.  *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977) (noting that the phrase "pattern or practice" "was not intended as a term of art," but should be interpreted according to its usual meaning "consistent with the understanding of the identical words" used in other federal civil rights statutes).  Courts interpreting the terms in similar statutes have established that statistical evidence is not required.  *Catlett v. Mo. Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987) (interpreting "pattern or practice" in the Title VII context).  A court does not need a specific number of incidents to find a pattern or practice, and it does not need to find a set number of incidents or acts.  *See United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("The number of [violations] . . . is not determinative. . . .  In any event, no mathematical formula is workable, nor was any intended.  Each case must turn on its own facts.").

We assessed officers' conduct under the Fourth Amendment's "right of people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Courts apply the Fourth Amendment objective reasonableness standard to all claims of excessive force, including deadly force.  *Graham v. Connor*, 490 U.S. 386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985).  Under this standard, "the nature and quality of the intrusion on the individual's Fourth Amendment interests" is balanced against the "countervailing government interests at stake."  *Graham*, 471 U.S. at 396 (internal quotation marks and citations omitted).  Ultimately, in evaluating whether there are violations of the Fourth Amendment, the courts are tasked with determining whether the "officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397 (internal quotation marks and citations omitted); *see also Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).

Guiding this balancing of interests are several non-exclusive factors:  if a crime was suspected, the severity of that offense; whether the person posed an immediate threat to the safety of the officer or others; and whether the person was actively resisting arrest or attempting to evade arrest.  *Graham*, 490 U.S. at 396; *Garner*, 471 U.S. at 8-9.  The Tenth Circuit has also considered other factors, including:  whether the officer's own conduct contributed to the need to use force; whether the officer issued a warning and the person had the opportunity to comply; whether the person was mentally ill; and whether, during the course of the interaction, new facts developed requiring a change in the amount of force required.  *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (holding that repeated shooting at person is unreasonable where no threat remained); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010) ("It is not objectively reasonable to ignore specific facts as they develop (which contradict the need for this amount of force [Taser]), in favor of prior general information."); *Fogarty v. Gallegos*, 523 F.3d 1147, 1159-60 (10th Cir. 2008) (considering whether officers' conduct contributed to the need to

---

[20]     We reviewed incidents reported by APD as uses of force.  APD policy requires that officers report "police actions" that result in death, great bodily harm, or injury.  "Police action" is defined as "any offensive or non passive defensive action by an officer, or some intentional action under his/her immediate control."  APD Use of Force Policy, 02-52.

use tear gas); *Casey*, 509 F.3d at 1285 (considering whether a person was provided an opportunity to comply before an officer used a Taser); *Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997) (in shooting, considering person's suicidal state and officer's conduct prior to the person's threat of force); *Cardall v. Thompson*, 845 F. Supp. 2d 1182, 1192 (D. Utah 2012) (noting that person's "mental health also weighed against the use of a [T]aser"). Courts weigh these considerations to determine the reasonableness of the officer's conduct in light of the totality of the circumstances.

In essence, the courts evaluate the full context surrounding the force action. While refraining from engaging in a 20/20 hindsight judgment of the force used, courts review the situation and threat faced by the officer. This also includes the type of force used by the officer—whether that force was physical, the use of weapons such as a Taser or chemical agents, or the use of a firearm. More severe forms of force require more justification. *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) (reasoning that the "general dangers posed" by a reckless driver fleeing the police "does not justify a shooting that is nearly certain to cause the suspect's death"); *Cavanaugh*, 625 F.3d at 665 (holding that an officer's use of the "quiet severe" intrusion of a [T]aser against an unarmed misdemeanant who posed no threat was unreasonable); *Casey*, 509 F.3d at 1286 ("[I]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance."). Courts recognize that while some force may be required to apprehend a person, such force must be limited to what is "reasonably necessary to effect a lawful seizure." *Fisher v. City of Las Cruces*, 584 F.3d 888, 895 (10th Cir. 2009) (holding that a rough handcuffing of a person was unreasonable where no threat remained). We applied these legal standards in our review of APD's force incidents.

In the final phase of our review, we sought to evaluate the causes of, and the factors contributing to, the use of unreasonable force. We reviewed internal and external APD documents addressing a variety of operational issues, including policies and procedures, recruitment, training, internal accountability measures, assessment reports, task force evaluations, and investigations. We were aided in this determination by our expert police consultants who have significant experience in providing constitutional policing services, including reducing improper uses of force, ensuring officer safety and accountability, and promoting respectful police interactions with the community. These consultants joined us during our onsite tours of the department, participated in our town hall meetings, conducted in-person and telephonic interviews with civilians and officers, reviewed APD policies and procedures, and reviewed force and shooting reports. The experience and knowledge of these nationally-recognized law enforcement experts helped to inform our findings. In sum, we relied on a variety of sources to reach the conclusions reported here.

## IV.    FINDINGS

We have reasonable cause to believe that officers of the Albuquerque Police Department engage in a pattern or practice of use of excessive force, including unreasonable deadly force, in violation of the Fourth Amendment and Section 14141. A significant amount of the force we reviewed was used against persons with mental illness and in crisis. APD's policies, training, and supervision are insufficient to ensure that officers encountering people with mental illness or in distress do so in a manner that is safe and respects their rights. The use of excessive force by APD officers is not isolated or sporadic. The pattern or practice of excessive force stems from

systemic deficiencies in oversight, training, and policy.  Chief among these deficiencies is the department's failure to implement an objective and rigorous internal accountability system. Force incidents are not properly investigated, documented, or addressed with corrective measures.  Other deficiencies relate to the department's inadequate tactical deployments and incoherent implementation of community policing principles.

### A.  APD Engages in a Pattern or Practice of Unconstitutional Use of Deadly Force.

We find that the Albuquerque Police Department engages in a pattern or practice of unreasonable use of deadly force in officers' use of firearms.  We reviewed all fatal shootings by officers between 2009 and 2012[21] and found that officers were not justified under federal law in using deadly force in the majority of those incidents.  This level of unjustified, deadly force by the police poses unacceptable risks to the Albuquerque community.

As noted above, the Fourth Amendment permits police officers to use deadly force under certain circumstances, and the courts have identified specific factors they consider in determining the reasonableness of a use of force based on the totality of the circumstances. Those factors guided our analysis of each fatal police shooting in the 2009 to 2012 time frame. For each officer-involved shooting, we reviewed all police reports from the incident; interviews with witnesses and the officers involved; memoranda from the internal affairs division; reports by the Independent Review Officer and the Police Oversight Commission; reports from the District Attorney's Office; lapel camera footage and audio tape, if they were available; in some cases, accounts that witnesses and family members of those killed gave directly to us; and other relevant information.

Below is a discussion of the most prevalent factors that lead us to find police shootings to be unjustified under federal law, with examples drawn from some of those incidents.  We have identified other force incidents that further illustrate the pattern or practice of use of excessive force.

### 1.  Albuquerque police officers shot and killed civilians who did not pose an imminent threat of serious bodily harm or death to the officers or others.

Like other uses of force, the reasonableness of deadly force is evaluated through an objective standard:  whether a reasonable officer in the same circumstances—facing the same tensions and uncertainties, and forced to make split-second decisions—would have used deadly force.  *See Graham*, 490 U.S. at 396-97.  Police officers are permitted to use deadly force to prevent escape when they have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Garner*, 471 U.S. at 3; *Weigel v. Broad*, 544 F.3d 1143, 1151-52 (10th Cir. 2008).  The Tenth Circuit has cautioned that this statement must not be read too broadly:  "It does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death."  *Cordova*, 569 F.3d at 1190 (discussing *Scott v. Harris*, 550 U.S. 372 (2007)).  In *Cordova*, the Tenth Circuit determined that the general risks created by a motorist's fleeing from

---

[21]     Because we wanted to examine both the reasonableness of uses of force and the department's responses to them, we focused on cases closed by APD.

the police are, without more, insufficient to justify a shooting that is nearly certain to cause the suspect's death.

We identified several cases in which officers shot and killed civilians who did not pose an immediate threat of death or serious bodily injury to officers or others. For instance, in February 2009, an officer used unreasonable force when he shot and killed Andrew Lopez after officers attempted to pull Lopez over for driving with dim headlights and no tail lights. According to officers, they suspected the vehicle had been involved in a prior incident in which a gun was reported. However, the vehicle Lopez was driving did not match the make, color or type of vehicle that was reported earlier. After leading the officers on a low-speed vehicle chase for more than ten minutes, Lopez stopped the vehicle, exited, and ran toward a driveway of a residence where a truck was parked. One officer gave chase on foot, followed by approximately four other officers. The primary officer stated that he believed Lopez was armed with the biggest handgun he had ever seen and ordered him to drop it. When Lopez reached a fence and began to turn, the officer shot at Lopez three times. One of the shots struck Lopez, causing a non-lethal bullet wound. Lopez fell to the ground and lay motionless on his back. The officer walked around the truck and fired a fourth shot into Lopez's chest, piercing his lung and heart and causing his death. Lopez was unarmed. The officer fired the fourth and final shot when Lopez was not pointing anything at officers and while he lay on his back already wounded.

In a bench trial in state court, a judge found that the officers' testimony about the threat they perceived from Lopez was not credible. The judge concluded that the shooting was unreasonable. The judge further found that the training provided to APD officers on use of deadly force "is not reasonable and is designed to result in the unreasonable use of deadly force."[22] The judge found the City principally responsible for Lopez's death and awarded his estate approximately $4.25 million.

In another incident, in October 2009, an officer shot and killed Dominic Smith, who was unarmed and fleeing the scene of a robbery on foot. Smith did not pose a threat of death or serious bodily injury to officers or others. Smith used a threatening note to rob a pharmacy for drugs before fleeing on foot. No one at the pharmacy saw Smith with any kind of a weapon and he did not commit acts of violence during the alleged robbery. An officer apprehended Smith just minutes later across the street from the pharmacy and stated that Smith appeared heavily intoxicated. The officer stated that he saw no weapons. The officer, with his gun drawn, ordered Smith to stop, but Smith continued walking away from the officer. The officer returned to his car, retrieved an assault rifle, and again confronted Smith, who continued to disregard the officer's orders. With Smith just a few feet away, the officer claimed that Smith motioned near his waist, which the officer believed to indicate that Smith was reaching for a gun. The officer shot and killed Smith. Smith did not have a gun. A reasonable officer confronting Smith as he fled from the pharmacy thus would not have believed that Smith posed an immediate threat of death or serious bodily harm. As the Supreme Court stated in *Garner*, "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11.

In another use of deadly force, in May 2011, an officer shot and killed Alan Gomez, who would not allow his brother and his girlfriend to leave their house. Gomez was unarmed and did

---

[22]     Findings of Fact and Conclusions of Law, *Higgins v. City of Albuquerque*, No. CV-2009-0915 (N.M. 2d Judicial Dist. filed on Aug. 19, 2009), ¶66.

not pose an immediate risk of death or serious bodily harm to the individuals in the house or officers when he was shot. The incident began in the middle of the night when the girlfriend called APD because Gomez was refusing to let her and her boyfriend leave their house. Officers arrived and surrounded the house. As officers attempted to negotiate with Gomez, police dispatchers spoke on the telephone to the girlfriend who originally called the police. She initially told a dispatcher that Gomez was in possession of a gun. Before the shooting, she told the dispatcher that Gomez no longer had a gun. Officers observed Gomez as he walked in and out of the front door several times without incident. APD officers had not observed Gomez exhibiting any threatening behavior toward the police or the individuals in the house. After officers had been present for nearly an hour, Gomez again came out of the front door briefly and began to turn to go back inside. As he did so, an officer shot Gomez once and killed him. When officers approached Gomez to render aid, they saw that he was not holding a gun and no other object was found anywhere near him

When the officer shot Gomez, the circumstances would not have suggested to a reasonable officer that there was an immediate threat. The officers had not confirmed that Gomez was armed. With the exception of the shooting officer, who gave inconsistent statements, officers did not observe Gomez hold, raise, or aim a gun. No one's life was in immediate danger and an APD negotiator was on his way to the scene. There were insufficient facts to lead officers to believe that Gomez "pose[d] a significant risk of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. Even if officers were concerned that Gomez might have been going back to harm the individuals inside the house, that risk of future harm was not enough to justify the near certainty of Gomez's death from the firearm discharge. *See Cordova*, 569 F.3d at 1190. Gomez's family sued APD and in December 2013, the parties reached an out-of-court settlement in the amount of $900,000. This was the shooting officer's third shooting in the line of duty. He shot and killed a man in 2004 while serving with the New Mexico State Police and wounded another man in 2010. None of the three shooting subjects was armed. The officer joined APD in 2007 as a lateral hire.

### 2. Albuquerque police officers used deadly force on individuals in crisis who posed no threat to anyone but themselves.

Just as officers are not reasonable in using deadly force when a person poses little or no threat to officers or others, officers are also unreasonable in using deadly force on individuals in crisis who pose a threat only to themselves. *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (concluding that there were sufficient facts to support a Fourth Amendment violation where the officer acted precipitously in shooting the subject who posed a danger only to himself when he held a box cutter to his wrists); *see Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699-701 (10th Cir. 1995) ("The reasonableness of [officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.") Although reasonable officers need not await the "glint of steel" before taking self-protective action, courts have looked at several factors to assess the threat to officers when an individual is armed and threatening harm to himself. *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260-61 (10th Cir. 2008) (internal citations omitted). These non-exclusive factors include: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the

officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect. *Id.* at 1260.

In January 2010, an officer shot and killed Kenneth Ellis, III, a 25-year-old veteran who was suffering from post-traumatic stress disorder. Officers suspected Ellis of vehicle theft and pulled him over in a parking lot. Ellis exited the vehicle holding a gun pointed to his head. Ellis continued to hold the gun to his head as he made several phone calls and the officers attempted to negotiate with him. After several minutes, an officer shot Ellis one time in the neck and killed him.

While it is true that Ellis was holding a gun and thus presented a clear threat of harm, there was never any indication from Ellis' words or actions that he intended to use the gun on anyone but himself. During his encounter with police, he held the gun to his own head and did not point at police or threaten them with harm. It was thus unreasonable for the officer to have used deadly force on Ellis. In addition, when officers are dealing with suicidal subjects, their failure to try to de-escalate the situation is a relevant factor in evaluating the reasonableness of any force they might use. *Allen*, 119 F.3d at 841-44. In February 2013, a judge in a state civil suit granted summary judgment in favor of the plaintiffs, finding that the shooting violated the Fourth Amendment.[23] A jury later returned a verdict finding the City and the officer who shot him liable for Ellis' death and awarding more than $10 million in damages.

### 3. Albuquerque police officers' own recklessness sometimes led to their use of deadly force.

In evaluating the totality of the circumstances surrounding an officer's use of deadly force, courts have considered "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (citations and internal quotation marks omitted). We reviewed several incidents that provide reasonable cause to believe that the officers were reckless and that their recklessness contributed significantly to their decision to use deadly force.

For example, in March 2012, an officer shot Daniel Tillison after approaching him without waiting for backup. The officer was responding to an anonymous call about an individual selling stereo equipment in a parking lot. When the officer arrived, Tillison was sitting in his car, which the officer believed might be stolen (he had received conflicting information prior to making contact with Tillison). The officer approached the driver's side of the car with his gun drawn. This is an important fact. If the officer believed Tillison posed such a threat to the officer or public safety that it was necessary to draw his weapon, it is not at all clear why the officer did not take cover and wait for other officers to assist him. There was no exigency that required the officer to act immediately; it was the officer who decided when to approach Tillison. The officer spoke to Tillison, recounting that Tillison was evasive and appeared to be reaching for something in the car. Tillison tried to get out of the car, but the officer pushed the door closed. Tillison then backed into the officer's vehicle and an adjacent truck. The officer shot at one of the vehicle's tires. As Tillison attempted to drive forward, the officer stated that he saw something that resembled a gun in Tillison's hand and that Tillison

---

[23]     Order on Motion for Summary Judgment, *Wharton v. City of Albuquerque*, No. CV-2010-06590 (N.M. 2d Judicial Dist. filed on May 28, 2010).

gave him a "warrior stare." The officer then shot directly at Tillison, killing him. The item in Tillison's hand was a cell phone; police found no guns in the car. Based on our review of the facts, Tillison did not pose an immediate threat of death or serious bodily harm and the shooting could have been avoided if the officer had waited for other officers to assist him. The officer was not in control of the situation because he approached Tillison alone and resorted to deadly force.

This incident bears striking similarities to the situation encountered by police in *Zia Trust v. Montoya,* 597 F.3d 1150, 1153 (10th Cir. 2010). In *Zia Trust,* an officer rushed up to a van that he believed was being driven by a domestic violence suspect. The officer had drawn his weapon and approached the van alone. *Id.* The suspect tried to drive his van at the officer, but it was stuck on a pile of rocks and could only move about a foot. *Id.* The officer shot the driver of the van, and he later died. *Id.* The Tenth Circuit found that the officer's recklessness in how he approached the driver could support a finding that the officer's use of deadly force was unreasonable. *Id.* at 1154-55.

In March 2010, a plainclothes detective shot and killed Mickey Owings after Owings' car was boxed in by an unmarked APD vehicle in a commercial parking lot. The encounter began because officers had received information that a stolen car was located in the parking lot. Several officers positioned unmarked cars in the parking lot around the suspected stolen car. Owings then drove a different car into the parking lot and parked directly next to the stolen car. A passenger got out of Owings' car and started to get in the stolen car, and officers drove one unmarked car directly behind Owings while the plainclothes detective approached Owings' car on foot. Owings backed his car into the unmarked police car and another civilian's car, and as he did so, the detective drew his gun, pointed it at Owings, and ran closer to Owings' car. Owings then drove straight forward into two parked cars. As he did so, the detective shot Owings. Owings continued driving forward and actually pushed the two empty, parked cars in front of him out of the way. Owings then drove out of the parking lot but soon seems to have lost consciousness on a nearby road. His car slowed to a stop, and when officers got to him, he had died. Owings was not armed.

The department's use of force policy permits officers to fire at the driver of a moving vehicle only when the car itself poses a threat of death or serious physical injury to the officer or others. (As noted below, the better policy, followed by many departments, is to prohibit officers from firing their weapons at cars altogether.) The use of force policy limits the circumstances in which officers may shoot at drivers because of the substantial risks that are involved: the officer may miss and hit an innocent civilian or fellow officer, or the driver may become incapacitated, leaving the moving car completely out of control. Owings did not pose a threat of death or serious physical injury to the officer or anyone else; he was driving straight into unoccupied, parked cars when he was shot. This damage to property, as serious as it was, did not justify taking Owings' life. The detective who shot Owings could very easily have missed and hit one of the innocent civilians walking through the parking lot; moreover, after Owings was shot, the probability that he would injure someone with his car increased dramatically. *Brosseau v. Haugen*, 543 U.S. 194, 199-201 (2004) (collecting federal appellate cases on police shootings at moving cars and acknowledging that such shootings can be unreasonable); *Vaughan v. Cox*, 343 F.3d 1323, 1333 (11th Cir. 2003) ("[A] reasonable officer would have known that firing into the cabin of a pickup truck, traveling at approximately 80 miles per hour on Interstate 85 in the morning, would transform the risk of an accident on the highway into a virtual certainty."). *But*

*see Scott*, 550 U.S. at 382-84 (2007) (noting that a car can itself be a deadly weapon that can justify the use of deadly force).

Other instances of officer recklessness that led to unreasonable uses of deadly force involved officers from the department's SWAT unit who acted without proper discipline or control.  SWAT stands for Special Weapons and Tactics, and officers assigned to SWAT units are generally among the most highly trained in a police department.  Officers in the SWAT unit are entrusted with complex weaponry and are called upon to handle the most dangerous situations that police encounter.  SWAT units typically operate under strict protocols and carry out operations in a highly planned and organized fashion.

In force incidents we reviewed, we found instances in which the SWAT unit did not operate with the discipline and control that would be expected of them, and this lack of discipline contributed to unreasonable uses of deadly force.  The officer who shot and killed Alan Gomez, for example, was assigned to the SWAT unit.  When he arrived on the scene, the officer took a position near the house where Gomez was keeping his brother and his girlfriend from leaving without consulting the commanding officer and without following any kind of a plan for handling the crisis.  He also did not seek or obtain the approval of the commanding officer before using deadly force.  He acted on his own authority from the moment he arrived on the scene until he fired his weapon.  The recklessness of his behavior at the scene supports our finding that his use of deadly force was unreasonable.  *Zia Trust*, 597 F.3d at 1154-55.

The officer who shot and killed Kenneth Ellis was not a member of the SWAT unit, but commanding officers within and over SWAT were present when Ellis was shot.  The department's reports on the shooting make it clear that the SWAT commanding officers failed to exert control over the scene, such as by making a plan for handling the crisis, determining where officers should be positioned, or deciding what roles each officer would fulfill, though our consultants would have expected them to take on these roles and establish control and lines of authority.  The lack of scene control contributed to a chaotic environment and allowed the shooting officer to act on his own accord when he shot and killed Ellis.  *See Allen*, 119 F.3d at 841-44 (noting that the failure to follow protocols can be a ground for liability for the use of deadly force).

## B.  APD Engages in a Pattern or Practice of Unconstitutional Use of Less Lethal Force.

We find that the department engages in a pattern or practice of unreasonable use of less lethal force.  There is a pattern of APD officers using force that is unnecessary and unreasonable against individuals who pose little, if any, threat, or who offer minimal resistance.  Officers too precipitously resort to the use of Tasers, prone restraints (referred to as "face-down stabilization techniques" by APD), leg sweeps, front kicks, face-down arm-bar takedowns, and strikes to legs and thighs.  We reviewed incidents where officers applied force against individuals who were unable to understand or yield to commands but posed a minimal threat to the officers.  Many subjects of excessive force had indications of mental illness, physical disabilities, intoxication, and other incapacity.  In most instances, these individuals were engaging in lawful activities or committing minor infractions.

We formed our conclusions about APD's practices based on a review of APD's own documentation.  This information enabled us to review the identical documents that APD

supervisors and internal affairs investigators used in making force determinations. This information also allowed us to assess the reasonableness of each incident and the supervisory or investigatory process that followed. In particular, we reviewed 200 incidents through a sampling of use of force reports and internal affairs investigations for a period spanning January 2009 through April 2013. Of the force incidents that we reviewed, APD identified less than 1% of these reports as unreasonable uses of force. In contrast, we concluded that approximately a third of the same incidents involved officer conduct that was unreasonable. The disparity between our conclusions is striking and strongly suggests a pervasive and deliberate leniency in supervisory oversight and accountability.

Although we found unreasonable uses of physical force, such as punches and kicks, the overwhelming majority of our use of force reviews involved inappropriate deployment of Tasers.[24] Residents have complained, and we were able to confirm, that APD officers used Tasers in a manner that was disproportionate to the threat encountered and in situations where lesser force options were more appropriate. Officers engaged in a pattern of using Tasers unreasonably, including in situations that placed individuals at risk of death or serious bodily harm; against individuals experiencing mental health crises, or who, due to inebriation or inability, could not comply; against subjects requiring medical treatment; against unarmed subjects; and against individuals in a punitive manner. We also identified instances where officers fired Tasers numerous times, even when multiple officers were present to help resolve the situation without the need for continued uses of force. The over-reliance on Tasers in situations where more effective and less extreme options, including verbal de-escalation techniques, were far more appropriate, contributes to the pattern or practice of excessive force. *Walter v. Gomez*, No. 12-1496, 2014 U.S. App. LEXIS 4493, at *48 (10th Cir. Mar. 11, 2014) ("Under prevailing Tenth Circuit authority, 'it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command— could not exact compliance.'") (quoting *Casey,* 509 F.3d at 1286).

A Taser is "a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain." *Cavanaugh*, 625 F.3d at 664. Any use of Tasers constitutes a severe intrusion of the interests protected under the Fourth Amendment. *Id.* at 665. The total amount of electricity and severity of the pain inflicted by a Taser depends on the type of application and how frequently electricity is fired into a subject. *See Casey*, 509 F.3d at 1285. Although a Taser may not constitute deadly force, its use unquestionably "seizes" a subject in an abrupt and violent manner. *Cavanaugh,* 625 F.3d, at 664. Inappropriate use of these weapons can result in death.[25] A Taser therefore should be considered, at a minimum, an intermediate level of force.

---

[24] APD's policies requiring officers to report uses of force with injury and an emphasis on weapons in its data collection process may account for the lower number of reports involving uses of physical force, such as punches, kicks, and takedowns. *See infra* Section IV.C.3. These deficiencies also suggest strongly that APD officers may be underreporting their use of force. PERF also identified missing data and other problems with APD's force tracking process, including incomplete data on the use of weapons. PERF Report, *supra* note 11, at 46-49.

[25] National Institute of Justice, *NIJ Special Report: Study of Deaths Following Electro Muscular Disruption*, (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/233432.pdf.

Most deaths and adverse reactions typically occur with multiple or prolonged deployments of Tasers.  Law enforcement research organizations have cautioned that continuous Taser activations of greater than 15 seconds, or three activation cycles, may increase the risk of death or serious injury.[26]  In cases we reviewed, officers used more than three cycles in encounters with individuals, without heightened scrutiny from supervisors.  Taser deployments can also potentially produce other secondary or indirect effects that may result in death (e.g., using a Taser against a person on a steep slope or tall structure, resulting in a significant fall; deploying a Taser near flammable materials such as gasoline, explosives, volatile inhalants, or flammable propellants used in pepper spray; and using a Taser on a person who is in water).  *Id.* at *6.*  Effective Taser training and oversight are essential to ensure that officers and supervisors understand the circumstances when Taser use is appropriate and when it needlessly exposes an individual to grievous harm.

### 1. Albuquerque police officers used force against individuals who were passively resisting and posed a minimal threat.

Albuquerque police officers used force that was disproportionate to the threat or resistance posed by civilians.  Even where some force is justified, the particular level of force used may still be excessive if it is disproportionate to the resistance or threat encountered.  *Casey*, 509 F.3d at 1282 (holding that where a person is suspected of committing a minor misdemeanor, this fact reduces the level of force that was reasonable for an officer to use); *Walker*, 451 F.3d at 1159-60 (no immediate threat where suspect had a knife if he "had not affirmatively led anyone to believe that he had a firearm and had not made any violent threats toward the officers or others"); *Diaz v. Salazar*, 924 F. Supp. 1088, 1094-95 (D.N.M. 1996) (a suspect's refusal to drop his knife is insufficient to establish an immediate threat where suspect does not lunge at the officers or otherwise threaten them).

Albuquerque police used unreasonable force when they deployed a barrage of less lethal weapons at "Albert,"[27] a 60-year-old man who was intoxicated and began arguing with his friend in March 2009.[28]  The friend called police twice, the second time reporting that Albert had threatened him with a knife and a pellet gun.  Forty-seven officers responded to the scene, including snipers and officers from specialized tactical units.  After some delay, Albert complied with officers' orders to drop a knife that he was holding while standing at the doorway and walked outside unarmed.  After additional delay, he stopped and began to turn.  At that point, an officer was ordered to "bag him."  An officer fired five successive rounds of beanbags at Albert with a shotgun.  Another officer deployed a flash-bang grenade.  Another officer shot him with a canister of four wooden batons, two of which penetrated his skin.  Another officer deployed a police canine that bit Albert in the arm, tearing his flesh as the canine tried to pull him down.

---

[26]     *Id.* at 27; PERF, *2011 Electronic Control Weapon Guidelines*, 18, 20-21 (March 2011)

[27]     We use pseudonyms for individuals who were the subject of force in non-fatal encounters with APD officers to protect against disclosing personally-identifying information.

[28]     The tactics used by APD against Albert in 2009 resemble the response by officers in the March 16, 2014, shooting death of James Boyd.  Video released to the public of the Boyd incident shows officers using a flash-bang grenade, a Taser rifle, a police canine, multiple beanbag rounds, and firearms.  As noted above, the Boyd shooting is currently under investigation and is not addressed in this letter.

Albert grabbed onto a nearby fence.  Two officers fired Tasers at Albert; one of them fired six five-second cycles of electricity into him.  Albert finally collapsed, and officers carried him away unconscious, leaving behind a trail of blood and urine.  In an April 2012 order entering judgment as a matter of law in Albert's favor, District Judge Bruce Black found that "no reasonable person could believe that an inhibited, slow-moving, 60-year-old individual, who made no physical or verbal threats, and wielded no weapons, could constitute a threat to the safety of any of the forty-seven armed and shielded police officers who stood over twenty feet away."[29]

Our investigation uncovered other incidents in which APD officers used force disproportionate to the threat or resistance encountered.  An officer's Taser use on "Ben," a 75-year old man who used a cane to walk, illustrates this problem.  The incident happened in September 2012 after officers responded to a bus station because Ben refused to leave.  When officers arrived, they offered to take Ben to a homeless shelter and also called a Crisis Intervention Team officer to assist.  Ben sat on a bench and told officers that he was not going to leave peacefully and that he was angry with the bus company for refusing to let him board.  After officers tried to convince him to leave for about an hour, Ben threatened bus company employees and reached for his cane.  Officers ordered him to put his cane down, but he refused.  As Ben was trying to stand up using his cane (presumably for support), the CIT-trained officer shot Ben in the abdomen with his Taser.  He did so even though the threat from Ben was minimal:  Ben had trouble walking on his own, a sergeant and three officers were standing around him, and there were no indications that bystanders were near Ben.  The sergeant on the scene found the Taser use reasonable, as did other supervisors.  One supervisor praised the officers' conduct as "exceptional."  A higher-level commander called for an investigation of the incident, however there is no indication that one was completed.

An incident in which three officers and a sergeant used force against "Charles" – two using physical force and two officers firing Tasers multiple times – also illustrates this problem.  In June 2011, Charles, who was 22 years old and weighed approximately 165 pounds, was riding his bicycle and failed to stop at several stop signs.  Officers decided to pursue Charles for the misdemeanor violation.  An officer activated his emergency lights and ordered Charles to stop, but Charles continued riding away.  Charles then turned into a parking lot and told the officer, "I am just riding my bike."  According to officers' reports, one officer got out of his patrol car and again ordered Charles to stop.  Another officer then grabbed Charles.  As Charles pulled away, Charles and the officer fell to the ground, where Charles continued to move his arms to avoid being handcuffed.  The sergeant then fired his Taser at Charles and discharged three cycles.  Another officer also fired his Taser.  He reported that he discharged three or four Taser cycles.  A fourth officer arrived and grabbed Charles's arm and assisted in handcuffing him.  A witness stated that Charles was argumentative and trying to get away from the officers and that one of the officers knocked him down off of his bicycle.  No charges were ever filed against Charles, and none of the officers, including the sergeant, activated their belt or lapel recorders.

In April 2010, two officers went to an apartment complex after receiving a report about a domestic violence complaint.  The officers questioned the property manager and learned that an unauthorized occupant, "David," was inside one of the apartments.  The property manager then asked the officers to remove David from the apartment.  The officers entered the apartment and

[29]   Am. Mem. Opinion in Support of Judgment as a Matter of Law, *Nelson v. City of Albuquerque,* No. 10-0553 (D.N.M. filed on June 8, 2010), at 7.

found David hiding in the kitchen.  As the officers went in the kitchen, they observed David sitting on the floor behind the kitchen cabinets.  One officer told David to put his hands where they could see them as the other drew his weapon and grabbed David's arm because he reportedly failed to comply with commands.   While one officer was holding David's arm, the other drew his Taser and yelled at David three times before firing his Taser into David's chest and abdomen.  David immediately fell against the oven door, causing it to shatter.  David cut his face and head on the oven door and lay in a pool of blood before the paramedics arrived.  David was taken to the hospital and was later booked for misdemeanor charges.  David was unarmed and posed only a minimal threat to officers, who had drawn their weapons because David reportedly failed to comply with commands.

In other incidents, officers increased the risk of death or serious injury by deploying Tasers in dangerous situations that outweighed the threat posed by the subject.  *Asten v. Boulder*, 652 F. Supp. 2d 1188, 1203-04 (D. Colo. 2009) (observing that an officer's use of a Taser near broken glass became less reasonable because it would increase the risk of injury to an unresisting, non-threatening subject).

For example, officers used Tasers multiple times on "Edward" even though he had doused gasoline on himself and his home.  In December 2009, officers responded to a domestic violence call.  Once the officers arrived on the scene, they heard a man and a woman screaming inside an apartment.  The officers kicked down the door and immediately smelled a strong odor of gasoline.  Sheets, carpet, and even Edward, were saturated in gasoline.  One officer reported that he was struck in the face with an object that was later identified as a lighter that came from Edward's direction.  The officers tried to speak to Edward, but he refused to follow their commands.  An officer fired his Taser at Edward, striking him in the chest.  Edward fell to the ground, where he struggled to avoid being handcuffed.  Several officers then used their Tasers multiple times in "drive-stun mode"—meaning that they applied the Taser directly to his body instead of firing prongs from across the room—as other officers tried to handcuff Edward.  After the officers finally handcuffed him, they tried to remove him from the apartment.  As they were doing so, Edward began banging his head against the wall and attempted to kick at the officers.  At this point, an officer used his Taser again in drive-stun mode and ignited Edward's shirt in flames.  The fire had to be extinguished by another officer.  The officer set Edward on fire with his Taser despite clear indications that the apartment and Edward himself were saturated with gasoline.  Even if officers believed Edward posed a significant threat before he was handcuffed, once restrained, officers had other options available, such as leg restraints to prevent him from kicking.  Instead, officers exposed him and others to the extreme danger of catching fire from the Taser's electrical discharge.

In another example, officers fired Tasers at "Frank," causing him to fall on broken glass; he was shocked with Tasers repeatedly until one officer's Taser ran out of power.  In August 2009, two officers responded to a call after someone called 911 and hung-up.  Arriving at the address from which the call was made, officers learned that 16-year-old Frank was in the bathroom and had shattered the glass shower door and cut himself.  Frank was bleeding and standing on the glass in the bathroom when the officers approached him.  Officers commanded him to lay face down on the floor, but he refused.  He pounded on the walls with closed fists.  An officer reported that Frank "lunged" at the officers.  The officer then shot his Taser at Frank, and the Taser's prongs hooked into Frank's chest.  Frank fell to the ground, and the officer repeatedly fired his Taser at Frank until the battery died.  The officer did not report how many times he fired

his Taser, reporting only that Frank "continued to fight." While Frank was lying on broken glass, another officer shocked Frank with his Taser in drive-stun mode while his partner kneed Frank in the back several times. There were at least four officers on the scene. Finally the officers handcuffed and arrested Frank. It turns out that Frank had taken drugs and was experiencing the side effects of the narcotics. The officer who initially deployed his Taser did not use the weapon's auditing function to determine the number of five-second cycles he deployed and the supervisor's report was also missing the information. One of the officers reported that the officer who responded initially fired his Taser five times. Both of these incidents show officers' unreasonable use of their Tasers by exposing subjects to a risk of serious injury that far outweighed the danger posed by the subjects themselves.

### 2. Albuquerque police officers used excessive force against individuals with mental illness, against individuals with impaired faculties, and against individuals who require medical treatment.

Officers also used excessive force against individuals who suffered from mental illness or who were unable to comply with officers' commands for reasons beyond their control. The Tenth Circuit has recognized that a "detainee's mental health must be taken into account when considering the officers' use of force . . . under *Graham.*" *Cardall*, 845 F. Supp. 2d at 1190-91 (quoting *Giannetti v. City of Stillwater*, 216 Fed. Appx. 756, 764 (10th Cir. 2007) (unpublished)); *see also Estate of Mathis v. Kingston*, No. 07-2237, 2009 U.S. Dist. LEXIS 32040, at *13-14 (D. Colo. Apr. 16, 2009) (observing that when a subject's diminished capacity is immediately apparent there may be occasions when failure to follow commands may not constitute a refusal to comply). We reviewed many incidents in which we concluded that officers failed to consider an individual's physical, mental, or emotional state in making force determinations. Consequently, we found instances where individuals did not pose an immediate threat to the safety of the officer or the public, and officers deployed a level of force that was unreasonable under the circumstances.

In one example, officers fired Tasers, kicked, and beat "Greg," a 25-year-old man with a developmental disability who could not talk and was unable to follow officers' commands. In this March 2012 incident, two officers responded to a gas station after receiving information that Greg was taking off his clothes and opening packages of food in the gas station. The officers also knew that Greg had injuries to his face, and he was bleeding from his hands. When the officers arrived, they found Greg lying on the floor of the store, shoveling chips into his mouth. The officers ordered Greg to stand up and place his hands behind his back. Greg stood up, but he refused to put his hands behind his back. One of the officers gave Greg a front kick to the chest—an action the officer described as a "distraction technique"—that sent Greg to the ground. Greg rolled on the ground and moaned. The officer then fired his Taser in drive-stun mode into Greg's upper torso and neck. Greg struggled to his feet when a sergeant arrived and fired his Taser at Greg, causing him to fall back on the ground. Greg got up and walked away as an officer fired his Taser two more times at Greg's back. Greg continued moaning but moved outside. The officer then gave Greg another front kick in the upper torso, sending him once again to the ground. Greg stood up and continued walking in the parking lot. A fourth officer arrived on the scene and swept Greg's legs with a kick. The officers then attempted to forcibly hold Greg down to handcuff him as Greg made incoherent noises and bit. It was evident from Greg's bizarre behavior that he had a diminished capacity, yet officers needlessly fired Tasers,

kicked, and beat him.  The officers later learned that Greg had wandered away from a group home and had the mental capacity of a five-year old.  He was not charged with any crime.

In another example, an officer fired his Taser at "Harry," who could not follow the officer's commands because he was suffering from a severe drug reaction.  The incident occurred in November 2011 when an officer responded to a complaint that Harry was threatening suicide and had reportedly overdosed on drugs.  As the officer was interviewing Harry's mother, Harry climbed out of a window and tried to leave the house.  The officer then ordered Harry to get on the ground, but he refused and replied, "I haven't done anything."  The officer again ordered Harry to get on the ground.  Harry reportedly took a step toward the officer, and the officer fired his Taser into Harry's stomach, which caused Harry to fall.  While on the ground, Harry attempted to remove the probes as the officer continued to fire electricity into Harry's body.

An officer's decision to use his Taser on "Ivan" when he was obviously inebriated and prone on a couch is another example of this problem.  In April 2010, officers responded to a disturbing-the-peace call.  Officers arrived on the scene of a party and decided to break it up.  One of the officers approached Ivan, who was lying on a couch, apparently passed out.  The officer tried several times to awaken Ivan, including using a "sternum rub," which is a strike to the chest that causes a person to awaken and reflexively jerk their limbs.  Ivan woke up, struck the officer on the leg, and lay back down.  The officer then attempted to handcuff Ivan, despite the fact that Ivan was clearly intoxicated and unable to respond to the officer's commands.  As Ivan pulled away from the officer while still prone on the coach, the officer fired his Taser at Ivan and then used it in drive-stun mode three times before he finally arrested the man.

The officers' use of Tasers and other force in these incidents was not reasonable.  None of the subjects posed a significant threat to the officers' safety or that of anyone else.  *Graham*, 490 U.S. at 396.  Any offense they may have committed was minor.  Most importantly, the mental state of the individuals indicated an inability to comply with officers' commands, which did not justify using multiple Taser discharges or severe physical force, like kicking or beating.  *Cardall*, 845 F. Supp. 2d at 1192 (observing that courts have stressed that an officer should hesitate to deploy a Taser when the subject is incoherent and he does not appear to understand the officers' commands) (internal citations omitted).

Officers further used force, including Tasers, against individuals in medical crisis or who were otherwise physically vulnerable.  In the incidents we reviewed, officers used Tasers, physical blows, and other physical force when individuals with diminished capacity failed to comply with their commands.  It is important to note here that when officers use force after they have been called merely to check on a vulnerable person's welfare and not to investigate a crime, the reason for the call is a relevant consideration in determining whether the force used was reasonable.  *Mathis*, 2009 U.S. Dist. LEXIS 32040, at *12-14.  We found that officers used unreasonable force against individuals in medical crisis in a number of cases.

In one such example, officers fired Tasers, grabbed, and choked "Jeremy" after they were called to his house to check on his welfare in September 2012.  When the officers arrived, Jeremy was locked in the bathroom.  His mother told the officers that her son was unarmed and suffered from schizophrenia.  The officers asked Jeremy to open the bathroom door, but he refused.  The officers then kicked down the door, grabbed Jeremy, and tried to forcefully take

him out of the bathroom.  Jeremy pulled away from the officers and tried to run into another room.  One of the officers tripped him, and Jeremy fell to the floor.  Jeremy then jumped back up to his feet and tried to run back into the bathroom.  One of the officers shot her Taser at Jeremy, but missed.  The officers then returned to the bathroom and grabbed Jeremy by the head and kneed him several times in the leg.  One of the officers then began choking Jeremy until he stopped struggling, and he was arrested.  Again, Jeremy had committed no crimes when officers arrived.  They were called to check on the welfare of a man with mental illness and instead they used severe physical force against him.

In another example, officers beat and fired Tasers at "Ken" who was suffering from a bad drug reaction and posed no threat to the officers.  In May 2010, officers responded to a disturbance call.  Ken reportedly was having an adverse reaction to his medications and drugs.  Once the officers entered his home, Ken was unarmed and naked.  He also seemed disoriented, and he said, "Bang bang!" to the officers as they approached him.  Ken then picked up a mop and said, "Boom boom!" as he approached the officers.  As Ken was turning away from the officers, one of them fired a Taser at Ken's back.  Ken fell to the ground, and officers beat him in an effort to restrain him.  Another officer fired his Taser into Ken's body in drive-stun mode, and Ken was then restrained and taken to the hospital.

Neither Jeremy nor Ken posed a significant threat to the officers.  Moreover, officers were called to assist the men, who were in obvious distress.  The unreasonableness of the force is exacerbated by the officers' neglect of Jeremy's and Ken's conditions, as well as the fact that no crime was involved.  *Graham*, 490 U.S. at 396; *Sevier*, 60 F.3d at 701 (observing that officers may precipitate the use of deadly force through their own reckless conduct by confronting a disturbed or suicidal subject with weapons drawn and without gathering more information).

An incident in which an officer fired a Taser at "Larry" repeatedly after he had a car accident, was convulsing in the car, and was non-compliant, provides another example of officers using disproportionate force.  In June 2010, officers responded to the scene where Larry had crashed his car.  Larry was convulsing inside the car when the officers approached.  An officer commanded Larry to open his door, and Larry indicated he would not get out of the car.  Larry was in the vehicle with his young child, and, fearing for the child's safety, the officers decided to shatter the passenger-side widow of the vehicle to get the child out of the car.  Once they opened the car door, officers again commanded Larry to get out.  After he refused, an officer fired his Taser into Larry's back and buttocks.  The officer cycled his Taser one time, and then Larry attempted to crawl out of the vehicle.  Larry then turned around and got back in the vehicle, and the officer fired his Taser again.  Once Larry was finally out of the vehicle, the officer fired his Taser yet again before placing Larry on the ground.  Larry drifted in and out of consciousness before an ambulance was able to get to the scene.

The incidents discussed in this letter are not exhaustive.  They illustrate the types of encounters that have resulted in a use of force that was not objectively reasonable.  We recognize that most encounters with police are resolved without the need to use force and that many APD officers carry out their duties in accordance with the Constitution.  However, in a significant number of force cases, force used by APD officers was excessive and placed the community at risk of future harm.

### C.  Systemic Deficiencies Cause or Contribute to the Use of Excessive Force.

A number of systemic deficiencies contribute to the department's pattern or practice of use of excessive force.  The most prevalent deficiency is the department's endorsement of problematic police behavior by failing to conduct thorough and objective reviews of officers' use of force.  Despite the use of technology and efforts to implement innovative intervention programs, problematic behavior continues to be viewed as reasonable, even exemplary, by supervisors.  These deficiencies demonstrate a failure to embrace policing fundamentals, namely, recognizing and enabling officers' duty to protect both the public's safety and civil rights.

Officers have an obligation to value the life and safety of the individuals they encounter as part of their core mission.  As written, APD's policy on use of force is consistent with this principle:  "It is the policy of this Department that officers shall use only that force which is reasonably necessary to protect the sanctity of human life, preserve and protect individual liberties, and to effect lawful objectives."  APD Procedural Order 2-52.  Police leaders must instill these values through accountability measures, training, policy, and the culture they inspire or tolerate.

However, based on our review, APD has failed to abide by these fundamental policing values.  We find this failure evident in the following systemic deficiencies: (1) a broken system of internal accountability; (2) inadequate training on use of force, community policing, and constitutional policing; (3) policy deficiencies; (4) an aggressive culture that undervalues civilian safety and discounts the importance of crisis intervention; and (5) insufficient leadership on tactical operations, community policing, and the importance of accountability to external oversight.

The contributing factors we discuss below evidence a breakdown in leadership that is responsible for ensuring that the agency functions in accordance with its mission and core values.  The department has invested significant resources to obtain thoughtful recommendations from independent reviews and has participated in discussions on policing issues of national importance over the years, yet it has failed to take basic steps to clarify policies, set expectations through consistent discipline, or ensure the effectiveness and integrity of its training programs.  Over the years, the department has reacted hastily in crafting certain measures, such as lapel cameras, which were deployed without making sufficient efforts to ensure the support of the rank-and-file, were not implemented with the necessary supervision and oversight to ensure proper implementation, and appeared directed only at placating public criticism.  As a result, there has been an inconsistent approach to reform, and critical systems intended to ensure constitutional policing remain deficient.

### 1.    The Department's Inadequate Internal Accountability Measures Contribute to the Pattern or Practice of Excessive Force.

We identified several deficiencies in APD's internal accountability mechanisms that contribute to the use of excessive force:  ineffective supervisory reviews, inadequate documentation of force, inadequate force investigations, and incomplete implementation of APD's internal review mechanisms, including internal affairs, the early intervention process, and the critical incident review process.  We did not assess hiring practices; however, we did receive information that causes us concern with regard to those practices.  We look forward to working

with the City to strengthen background checks and suitability assessments of new and lateral hires.

### a.     Supervisory reviews do not address excessive uses of force.

We found numerous instances where improper force was used, but the problems were neither identified nor addressed by the chain of command.  In nearly all of the incidents that we found problematic, we did not observe *any* findings by *any* supervisor—from the sergeant, who is a patrol officer's immediate supervisor, up through the entire chain of command—that the officer's use of force required corrective action.  Data produced by APD corroborates our finding.  APD reported 1,863 uses of force from 2010 to 2013.  Of these, supervisors found that only 14 uses of force, or less than one per cent, did not comply with agency policy.  Supervisors requested a further investigation of 39 uses of force, or two per cent.  The overwhelming majority of uses of force during this four-year period were endorsed by supervisors as reasonable.  Significantly, in 2010 and 2011, prior to the opening of our investigation, APD supervisors found only two uses of force that failed to comply with policy.  As set forth below, however, our investigation revealed numerous instances of policy violations.

APD policy does not require that supervisors conduct a thorough, rigorous and objective review of officers' use of force, including ensuring that officers provide a complete and accurate account of the facts surrounding their use of force.  Instead, supervisors are required to review and sign a two-page form (titled "Use of Force Report Form") that is designed to capture descriptive data about an incident rather than providing for a qualitative review of an officer's use of force.  The Use of Force Report Form provides a space for a supervisor to fill in, without more, whether the force was "reasonable" or whether "investigation [is] required."  The policy does not provide any guidance on the circumstances that would warrant further investigation; nor does it require that supervisors identify potential policy violations, corrective action, or other training or policy concerns.  A separate "Evaluation Form" requires more narrative information and is completed by the commander and the deputy chief after a review of the initial report.  However, a commander's responsibility for reviewing force is limited in APD policy to a generalized statement – without additional guidance -- requiring that the commander ensure that subordinates conform to the use of force policy.[30]  *See* APD Procedural Order 2-52-6(D)-(E).

Not surprisingly, the force reports that we reviewed—and we reviewed hundreds of them—were almost entirely devoid of any analysis of whether force was reasonable.  Supervisors marked as "reasonable" almost every use of force report form we saw.  Some reports were unmarked altogether.  Additionally, we saw few instances where the Evaluation Form was completed or even included, suggesting that these incidents were not subject to review up the chain of command.  The PERF report noted similar problems based on PERF's review of use of

---

[30]     As background, the force reports APD produced include the Use of Force Report Form, a Use of Force Evaluation Form ("Evaluation Form"), Incident/Offense Reports, Supplemental Incident Reports, witness statements, and supplemental memoranda.  The Evaluation Form requires more narrative information and is completed by the commander and the deputy chief after a review of the initial report.

force data and reports from 2007 through the first quarter of 2011.  For example, PERF found that the officer provided no reason for the force incident in 42% of the incidents reviewed.[31]

These superficial reviews evince the chain of command's disregard for detecting individual and aggregate patterns of unreasonable force by subordinates.  They also demonstrate the department's failure to identify and address officers who need correction and inadequate responses to serious policy infractions.  Indeed, we reviewed a number of instances that *required* corrective action under the department's policies, but none was taken.  For example, in the shooting involving Alan Gomez, the officer shot Gomez without verification of a threat and after receiving information that Gomez could not have been a threat because he was no longer armed.  This clearly violated the department's policy, which permits deadly force only where there is an "immediate threat of death or serious physical injury,"[32] but this policy violation was not addressed in the shooting review.  Similarly, in the force involving "Edward," it was evident that the officer's decision to fire his Taser at Edward violated the department's policy, which prohibits officers from using the weapon in "any environment where an officer knows that potentially flammable, volatile, or explosive material is present (including . . . gasoline . . .)."[33]  Edward was also handcuffed at the time he was shocked with the Taser.  The department's policy prohibits use of the Taser "on a handcuffed prisoner unless they continue to use physical force or violence against the officer, another person or themselves which cannot be controlled by other means."[34]  Despite evidence of both policy violations, the supervisor marked this incident as "reasonable" and conducted no additional investigation.

We identified other policy violations that went uninvestigated and uncorrected.  For instance, the policy allowing officers to use deadly force to disable a vehicle's tires was violated when officers shot directly at, and killed, Daniel Tillison and Mickey Owings.[35]  Other policy infractions that went uncorrected included the policy that fleeing should not be the sole justification for firing a Taser at an individual, the requirement that reports should be completed by all officers witnessing the use of force, and the prohibition of using a Taser against an individual who is passively resisting.[36]  We found improper and uncorrected uses of force in violation of all of these policies.  Supervisors failed to address these policy violations, either by taking corrective action or referring the incident for further investigation by Internal Affairs, allowing improper conduct to continue unchecked.

### b.    Force incidents are not properly documented.

Deficient documentation by officers using force and inadequate review of this deficiency up the chain of command contributes to the pattern or practice of excessive force.  This documentation deficiency includes failing to document incidents with recording devices, such as lapel cameras and belt tapes,[37] as well as failing to complete use of force reports, failing to

---

[31]    PERF Report, *supra* note 11, at 52.
[32]    Use of Force Policy, 2-52-3(B)(1).
[33]    Use of Force Policy, 2-52-8(G)(3)(a)(5).
[34]    Use of Force Policy, 2-52-8(G)(3)(a)(2).
[35]    Use of Force Policy, 2-52-3(B)(3).
[36]    Use of Force Policy, 2-52-8(G)(3)(a)(4); 2-52-6(B); and 2-52-8(G)(3)(b), respectively.
[37]    Before using lapel cameras in 2012, APD officers used belt tapes to capture audio of incidents.

accurately describe the force used in incident reports, and failing to report the use of force altogether.  The department's internal review mechanisms failed to correct these deficiencies.

For example, the department's use of force policy provides, "Upon firing the [Taser], the officer shall energize the subject the least number of times and no longer than necessary to accomplish the legitimate operational objective."[38]  However, officers routinely failed to specify the number of five-second cycles they deployed at an individual, despite the significant risk of serious harm posed by prolonged or repeated Taser deployment.  Professional law enforcement and research organizations have warned against continuous deployment of Tasers for more than three cycles, or 15 seconds, and the need for specific justification and investigation in such circumstances.[39]

We also reviewed numerous reports where officers and supervisors on the scene failed to turn on their lapel cameras or belt tapes.  Officers failed to record some incidents even when it was the officers themselves who initiated the contact, making their failure to switch on their cameras or recorders before beginning the encounter especially troubling.  For example, in an incident where officers fired Tasers at "Mike" after stopping him for speeding, none of the officers present recorded the incident.  Many of the reports include repetitive or standardized explanations for failing to record, such as "the immediacy of the situation" and "rapid and unexpected event."  These descriptions were provided where it was clear that the officer had a clear opportunity to record the event.  We found very few examples of officers being reprimanded for failing to record force incidents.  The fact that few officers were reprimanded for this failure suggests that supervisors have also failed to insist on this form of accountability.  The reports reflect some of the justifications we heard onsite for not recording force incidents.  We were informed, during our onsite visits and after, that some officers found the equipment cumbersome and difficult to operate.  However, we observed a number of officers successfully using the lapel cameras during our onsite tours.  In the time since our onsite tours, the department has procured new lapel cameras that are reportedly easier to operate.  We have not assessed officers' use of that new equipment.  However, the department's failure to record incidents consistently indicates that officers have not embraced these accountability mechanisms.

We also reviewed numerous reports that did not provide sufficient information to justify the force used, did not explain fully what type of force was used, and did not accurately describe the level of threat, if any, posed by those against whom force was used.[40]  Many of the reports included canned language, such as "aggressive posture" and "aggressive manner," but the overall

---

[38]     Use of Force Policy, 2-52-8(G)(6)(b).

[39]     NIJ Special Report, *supra* note 23, at 4 ("A preliminary review of deaths following [Taser] exposure found that many are associated with continuous or repeated shocks. There may be circumstances in which repeated or continuous exposure is required, but law enforcement officers should be aware that the associated risks are unknown. Therefore, caution is urged in using multiple activations."); PERF Guidelines, *supra* note 24, at 19, 21-22; International Association of Chiefs of Police ("IACP") Model Policy, Electronic Control Weapons, April 2010, and IACP National Law Enforcement Policy Center, Electronic Control Weapons, Concepts and Issues Paper, April 2010.

[40]     This issue was also noted by PERF.  PERF Report, *supra* note 11, at 48 ("[L]imitations to the data make it impossible to distinguish between events where a weapon was not needed and events where a weapon was used but the weapon use was not reported.").

description of the incident did not support such characterizations.  For example, obviously disoriented subjects were described as approaching officers in an aggressive manner.  In many instances where multiple officers witnessed an incident, officers did not complete supplemental reports as required by APD policy.[41]  Other common documentation deficiencies included:

- Failing to take a statement from the person who was subjected to force;

- Failing to provide photographic documentation of the injuries sustained; and

- Failing to investigate discrepancies in the report.

Despite these deficiencies, supervisors noted no problems with the reports, marking questionable force incidents as reasonable.  The reports also reveal that officers often failed to canvass for witnesses to the use of force, which led to reports that were usually one-sided.

Finally, the verified information we received from community witnesses indicates that officers underreport force incidents.  We note first that the policy effective during our review period required officers to complete reports only where the officer's actions resulted in an injury.[42]  This standard is too narrow and allows officers not to report force, even significant force, if they do not believe an individual was injured.  For example, we reviewed video of officers putting one man in a chokehold, but there was no force report completed regarding this encounter despite the risk of serious harm.  *See Walton v. Gomez*, No. 12-1496, 2014 U.S. App. LEXIS 4493, at *49 (10th Cir. Mar. 14, 2014) (noting that police training materials recommend against applying chokeholds for longer than one minute because brain damage or death could occur and observing that courts from various jurisdictions have held chokeholds on a non-resisting subject to be excessive).   In situations where officers do not use weapons, supervisors are only expected to review force from "hand-to-hand action resulting in injury,"[43] which excludes other significant physical force, such as kicks, leg sweeps, prone restraints, and other forceful takedowns.  Not surprisingly, we heard from credible witnesses who suffered injuries as a result of their encounters with officers, yet no force reports were completed.  The failure to provide clear policy guidance on reportable and reviewable force results in underreporting of force and contributes to the use of unreasonable force.

### c.    Shooting investigations are inadequate.

Officer-involved shooting investigations are conducted by the department's homicide detectives with the aid of a multijurisdictional team.[44]  While these investigations are more thorough than reviews of less lethal force incidents, we noticed several deficiencies in the investigations.  First, as a matter of policy, the department does not subject incidents where officers shoot to disable a vehicle to the same scrutiny as shootings of persons, despite the significant risks of death or serious injury to the occupants of the disabled vehicle or to

---

[41]    Use of Force Policy, 2-52-6(B).

[42]    Use of Force Policy, 2-52-6(A), (B).

[43]    Use of Force Policy, 2-52-6(D)(2).

[44]    The team includes homicide detectives, an internal affairs investigator, and representatives from the Sheriff's Office, the Independent Review Office, the District Attorney's Office, and the State Police.  A homicide detective leads the team.

bystanders.[45]  Although shooting at a vehicle's tires, as permitted by APD policy, may not pose the same certainty of death or serious injury as shooting at the driver himself, the risk is at least equal to, if not greater than, ramming a moving vehicle to disable it.  *See Scott*, 550 U.S. at 384 (observing that the term "deadly force" encompasses a range of applications of force, some more certain to cause death than others and noting that ramming a vehicle poses a "high likelihood" of death or serious injury to the driver); *see also Cordova*, 569 F.3d at 1188-89 (distinguishing the ramming technique in *Harris* to the near certainty of death or serious injury resulting from shooting a driver in the back of the head).  Given the significant risks involved when officers discharge their firearms at moving vehicles, APD should respond to such incidents with the same level of resources and heightened scrutiny as other firearm discharges.[46]

We also observed deficiencies in how detectives approached shooting incidents that were questionable, i.e., not clearly justified.  Based on our review, detectives approached these incidents with less scrutiny than required, such as by failing to canvass for witnesses, to test the officer's account, and to address contradictions.  For example, in the shooting of Dominic Smith, the review team failed to reconcile inconsistencies in the physical evidence when compared with the officer's statement.  The officer claimed that Smith came towards him and reached in his waistband.  However, the physical evidence indicated that Smith had a defensive wound and was shot through the forearm.  This discrepancy was not addressed in the shooting review.  In the shooting review of Daniel Tillison, detectives failed to canvass the area for witnesses even though the shooting occurred in a parking lot within sight of a number of residences.  In addition, in some reviews, the shooting officer's interview was attended by other officers who were involved in the incident.  This practice encourages collusion and discourages candor.  Finally, the reviews seemed biased in favor of clearing the officer as opposed to gaining a full understanding of the incident.  These deficiencies contribute to the pattern or practice of unnecessary uses of deadly force.

### d.   Internal review mechanisms are not implemented.

We observed additional deficiencies in the department's internal review mechanisms, including internal affairs reviews, the early intervention system, and the critical incident review board.  First, under the department's use of force policy, the internal affairs unit is responsible for reviewing all reported uses of force to determine whether:  (a) departmental policies, rules or procedures were violated; (b) the relevant policy was clearly understandable and effective to cover the situation; and (c) department training was adequate.[47]  However, we found no evidence that the internal affairs unit consistently carried out this critical task.  Nor does the internal affairs policy specify how the unit should conduct these substantive force reviews.  The internal affairs policy states explicitly that the unit is responsible for conducting administrative investigations of cases where an individual is killed or seriously injured, or an officer discharges his firearm.[48]  However, it is silent on how other uses of force should be reviewed.  The policy

---

[45]    Investigation of Shootings and the Use of Deadly Force Involving Department Personnel, 2-31.

[46]    Of course, it would be preferable to prohibit officers from shooting at moving vehicles altogether, as recommended by PERF and consistent with the practice of many other police departments.

[47]    Use of Force Policy, 2-52-7(B)(1).

[48]    Internal Affairs Policy, 3-41-3(A)(6), (7).

also fails to list force reviews or investigations as part of the internal affairs unit's major purposes.

Thus, in many cases, we found that the internal affairs unit did not make recommendations to the chain of command where officers clearly violated policy, despite its responsibility to "identify personnel guilty of misconduct so that proper corrective action may be taken."[49] We also found that the internal affairs unit relies too heavily on interviews conducted in the initial shooting review. We reviewed a number of files where internal affairs failed to re-interview civilian witnesses. The unit is thus deficient in carrying out one of its most basic duties.

Second, the department's implementation of the early intervention system is ineffective. An early intervention system should be non-punitive, proactive, and geared toward identifying officers who may require re-training and counseling. These officers may have had a number of force incidents, community complaints, policy violations, or other issues that indicate that they may need some level of supervisory intervention to prevent them from engaging in future improper conduct. Administrative Order 03-49 outlines APD's early intervention system. However, based on our interviews, the purpose of the early intervention process appears to be a mystery to line officers. During our onsite meetings, many officers expressed concern that the process was used to punish them instead of correcting or disrupting potentially problematic conduct. Their understanding of the system is disconnected from the policy itself and what we heard from commanders. This lack of clarity suggests a lack of buy-in by officers to the process. Part of the confusion may be due to the initial policy statement, which states that the early intervention system is an essential part of the department's overall discipline system, rather than a management tool that is non-disciplinary.[50] To be fully effective, early intervention must be accepted by officers, supervisory personnel, and the community as an important alternative and complement to the agency's discipline system.

Also, we are concerned with the early intervention policy's high threshold for reassigning officers who have been required to attend multiple early intervention meetings in a 12-month period. The threshold of five meetings—which means the officer engaged in more than 15 uses of force, or a combination of 25 other triggering events, including firearm discharges and missing court—is too high. The seven data elements or performance indicators captured by APD's early intervention system may also be too limited for APD's size and risk management needs. APD should consider adding elements related to vehicle pursuits, incidents involving resisting arrest, injuries, sick days and other absences.

The department is also not using the early intervention process in the way it was intended, which is to disrupt patterns of problematic behavior. We reviewed a sampling of the early intervention files and found lacking documentation, superficial reviews, and a failure of the supervisors to discuss underlying incidents with officers. For example, reports with officers flagged because of multiple force incidents did not include the underlying force reports, and many made no mention of supervisors having discussed the incidents with the officer. Many of the reports were so cursory that it was difficult to discern what was discussed with the officer in the meeting. We question the effectiveness of such meetings.

---

[49]    Internal Affairs Policy, 3-41-2(A)(2).
[50]    Early Intervention System Policy, 3-49.

Finally, the department's critical incident review board is ineffectively implemented. As with the early intervention system, the critical incident review board is a necessary and good idea. The board was established to identify deficiencies or required changes in policies and training through a review of serious incidents. The board consists of a diverse group, including commanders, a training representative, and a patrol supervisor. Despite the laudable purpose of the board, we are concerned with its effectiveness. Specifically, there is no communication to others within the agency about its findings, no documentation of the board's meetings, and no corrective actions stemming from the board's meetings. In sum, the process appears to be superficial. Such anemic internal review mechanisms contribute to the pattern or practice of unreasonable force.

## 2. The Department's Training Deficiencies Contribute to the Pattern or Practice of Unreasonable Use of Force.

In our review of the department's training programs, it was clear that the department has recently taken a number of steps to improve the training it provides to officers, most prominently by hiring a new training director. As we expressed to then-Chief Schultz during our meetings with him, we believe that the director is taking the training program in the right direction, and we commend the department for all of the support it has shown for the new director's efforts. Nonetheless, we found numerous deficiencies in the department's training program that have contributed to the pattern of unreasonable uses of force. While many of these deficiencies seem to be under review by the director, we will address them here because doing so provides a more complete picture of the department's approach to the use of force. Our observations about the training programs are based on on-site reviews of training materials and interviews with training staff; reviews of training curricula, lesson plans, and classroom materials; and consultation with our police practices consultants.

The most significant deficiency we observed in the department's training programs—both at the academy, where new recruits are trained, and in the ongoing training that officers receive regularly—is the over-emphasis on using force, especially weapons, to resolve stressful encounters, and insufficient emphasis on de-escalation techniques. Much of the training leads officers to believe that violent outcomes are normal and desirable. Even scenario-based trainings, where officers role-play in simulated interactions with civilians, tended to escalate to the use of force, even though scenario-based training can be very effectively used to teach officers how to diffuse tensions and end stressful civilian encounters peacefully. As in many police departments, Albuquerque officers are trained on a computer-assisted Firearms Training Simulator, and we note particularly that this simulator could be used more effectively to teach verbal de-escalation strategies.

Also concerning is that it is impossible to ensure that the training that officers receive accurately reflects the department's policies, the state of the law, and best practices in policing. Most of the individuals who deliver lectures during police academy sessions do not provide the department with lesson plans or classroom materials, which prevents the department from validating those materials to ensure that they are consistent with the department's policies and values. It is also impossible to tell whether the content of the training is the same from one academy session to the next, and thus whether officers come into the field with the same base of knowledge.

We understand that much of the department's training program is mandated by New Mexico's Peace Officer Standards and Training Program, and the department does not have complete flexibility in determining what training officers receive. However, the department can and does supplement the training required by the state, and has the ability to tailor the training program to its needs. We also know that APD's training director shares all of these concerns, and we commend the steps he is taking to remedy the problems, such as by hiring a curriculum writer who can create training programs that are fully documented and validated by the department. The department should also require any individuals who train its officers to provide their complete lesson plans, classroom materials, and any other information the department may require to ensure that the training provided meets the department's standards.

As mentioned above, the department offers training to new recruits at its police academy and to officers already working in the department through regular in-service, or annual training updates called "maintenance of effort," training. It appeared to us that the maintenance-of-effort training was largely a lost opportunity. Officers we spoke to perceived it as a waste of their time, and much of it seemed to focus on the use of weaponry. We believe that the maintenance-of-effort trainings are another area where the department also can focus on subjects that are not included in the training required by the state and can take a more active role in designing its own original curriculum.

We found a number of areas in which training seemed to be entirely lacking or at least dangerously deficient. It appeared that officers are not given refresher trainings on critical policies, such as the use-of-force policy, when those policies have been implicated in major incidents. Similarly, major incidents themselves do not give rise to new training scenarios, though many officers expressed a desire to see the department as a whole learn from such incidents.

In addition, when new or different policies are put into effect, or when officers are provided with new equipment, the department fails to provide new training to prepare officers for the changes, which predictably leads to policy violations and the misuse of equipment. For example, when the department issued lapel cameras and then added a new policy that required officers to record civilian encounters, our understanding is that officers were not provided sufficient training on the lapel camera policy or on how to use the lapel cameras, especially in situations in which the use of force is likely. As noted elsewhere in this letter, officers have consistently failed to follow the department's lapel camera policy and have failed to record critical encounters. The lack of training on the lapel cameras is partially to blame.

We also found that the department should provide substantially more training on constitutional law. It appears that officers receive only a few hours of training on constitutional standards at the police academy, and very little (if any) time is put into these topics during maintenance-of-effort trainings. We also note with concern that the legal training materials provided to officers contain a number of cartoons that are likely intended to break up the monotony of the material, but that nevertheless are unprofessional and, in some cases, offensive. These cartoons send the wrong message to officers about the importance of civilians' legal rights.

Officers should also receive more training on community policing—which is widely embraced by the field as effective at building community trust in police departments and in

31

ensuring public safety.  As noted below, officers at all levels of the chain of command seemed to have a poor understanding of what community policing is or how it can improve their encounters with civilians and better protect the public.  Any efforts the department takes to adopt a true community policing model should include robust training on what community policing is and how it should impact officers' work.

Because so much of the department's training program is not documented, it was difficult for us—as it is for the department itself—to fully evaluate most of the training that officers receive.  From our review of other aspects of the department, however, it is apparent that training is deficient in several other areas.  The department clearly has not provided sufficient training on the use of Tasers, including when their deployment may pose substantial risks to the safety of officers and the individuals on whom they are being used.  We also believe that the way officers have communicated with (or failed to communicate with) individuals in mental health crisis show a clear lack of appropriate training on mental illness.  In addition, the department should fully re-assess the training it provides to officers on how to write police reports, as well as its training for supervisors on how to review the police reports filed by their subordinates.  Several of the first- and second-line supervisors we spoke to (those at the ranks of sergeant and lieutenant) also expressed an interest in seeing the department offer training specifically for new supervisors.

### 3. The Department's Deficient Policies Contribute to the Pattern or Practice of Unreasonable Use of Force.

The department's use-of-force policies and procedures fail to provide its officers with the operational guidance they need to ensure constitutional policing.  These policy deficiencies begin with the failure to clearly define "force" in terms that allow officers to distinguish between reportable uses of force and non-reportable uses of force.  The department's definition of "force" should be articulated clearly to allow for consistent, practical applications.  In addition, the current definition of "police action" is too vague.  For instance, it is unclear if the definition includes escorting an individual, pointing a firearm, or placing an individual in a prone restraint. The absence of clear guidance on what force officers are required to report leaves significant gaps.  These gaps affect the quantity and quality of force reports that should be generated after force is used in incidents that do not result in fatalities.

APD's use of force policy is also too restrictive in requiring officers to report only force that results in injury.  The policy states that "in all instances where police actions are used which result in an injury, officers shall document the injury or alleged injury in the report of the incident."  The term "injury" is not sufficiently defined in the policy.  Not surprisingly, we found that officers have varied interpretations of the policy, and many seemed uncertain when a use of force should be reported.  We interviewed one sergeant who told us that no report was required where an officer used pepper spray.  He also stated that even officers' use of physical force did not require documentation where there was no obvious injury.  The varying interpretations of the current policy further limit the quantity of reports generated after incidents.  The broadly drafted and unclear policy is ineffective, encourages abuse, and allows officers to conceal uses of force that should ordinarily be reported and reviewed.

The department's policy regarding shooting at moving vehicles is outdated and inconsistent with best police practices.  As noted above, shooting at vehicles is generally a poor

tactical choice and exacerbates the chances of vehicles becoming more dangerous instruments. The department's policy does not prohibit firing at moving vehicles.  It specifically permits officers to fire at tires in certain situations.  Under policy 2-52-3(B), officers are permitted to disable the tires of a moving vehicle by shotgun or rifle in circumstances where the officers are protecting themselves or others from what is reasonably believed to be an immediate threat of death or serious physical injury or preventing the escape of one reasonably believed to have committed a felony.  This policy is inconsistent with modern and acceptable police practices; moreover, we found little evidence that officers have been following this policy.

Indeed, our review of incident reports revealed a practice of officers firing and injuring subjects in the cabin of their vehicle.  In the fatal shooting of Mickey Owings, an officer shot him through the passenger window as he attempted to leave a busy department store parking lot. Owings' vehicle eventually slowed down as he lost consciousness and then died.  The officer's action clearly violated the department's policy and placed citizens in the parking lot area in danger.  Although the department concluded that the officer's conduct was justified, it appears that the only immediate threat that Owings posed was property damage, and the officer could have employed other tactics to avoid having to use deadly force under these circumstances. Furthermore, it appears that the officer did not try to place himself in a tactically advantageous position, but instead reacted in a manner that was inconsistent with the department's own policies.

The department has been aware of the problems with this policy and the risks associated with allowing officers to fire at vehicles since at least June 2011, when PERF recommended that the department prohibit officers from firing from or at moving vehicles under all circumstances.[51]  Despite PERF's guidance, APD has not revised its policy to address the likely dangers associated with allowing its officers to fire at moving vehicles.  This delay in implementing needed reform signals that APD does not acknowledge the dangers associated with firing at moving vehicles.  The department's failure to update its policy to conform to modern police practices places its officers and citizens at a higher risk of harm.

The use of force policy also includes terms that imply the justified use of force.  For example, officers are required to describe the force they use in an "offense" report, which suggests that the subject of force was committing or suspected of committing a crime.[52]  Based on our review, some individuals are the subject of force during welfare checks or when they are not engaged in criminal activity.  Subjects of force are also referred to as "combatants" in APD policy.[53]

As discussed earlier, the use of force policy is wholly inadequate in requiring thorough and objective supervisory reviews of force.  The policy does not describe the collection and preservation of evidence regarding an officer's use of force, canvassing the scene for witnesses, obtaining information from subjects of force, reviewing photographs and other demonstrative evidence, or referring a use of force for administrative or criminal investigation.  The policy also does not prohibit having those supervisors who used, authorized, or directed force subsequently review the reasonableness of the force.  We reviewed incidents in which supervisors who were

---

51      PERF Report, *supra* note 11, at 22-23.
52      Use of Force Policy, 2-52-6(B)(1).
53      Use of Force Policy, 2-52-6(B)(1)(d).

on the scene and participated in the use of force also determined that the force they used or authorized was reasonable and did not warrant further investigation.  Other policy deficiencies include permitting canines to be deployed for crowd control, which is inconsistent with contemporary policing practices.

Underreporting appears to be correlated with poor interpretations of the force policy and officers' resistance to reporting incidents.  Underreporting inhibits the department from learning from use-of-force incidents.  It also limits the quantity of incidents that supervisors could review, and it leads to officers not being held accountable for their actions.  The high number of force incidents involving Tasers in our review sample suggests either that Tasers are used with considerable frequency or, more likely, that other forms of force are being underreported.  APD's policy of requiring use of force reports when there is an injury allows officers to avoid reporting incidents where there is no visible or apparent injury.  We also obtained recordings of force provided by individuals without corresponding APD reports.  It appears that the department has failed to account for the full range of force that its officers use against its citizens.  This failure has a contributed to the pattern or practice of excessive force.

### 4.    Under-Use of the Crisis Intervention Team Contributes to the Pattern or Practice of Unconstitutional Force.

As noted above, the Crisis Intervention Team ("the Team") is a specialized unit in APD that is trained and equipped to create safer encounters with individuals who are in mental health crisis and may harm themselves or others.  After interviewing and observing the Team and some of the patrol officers they have trained and certified, we are encouraged by the innovations and passions that many on the Team have brought to the department.  In many ways, the Team provides a template for the department as it considers how to remedy its pattern of unreasonable uses of force.  Members of the Team demonstrate an understanding of the illnesses that individuals suffer, they are informed about the challenges those individuals face, and they approach encounters with an eye toward preserving the health and safety of everyone involved.

Given the Team's skills, the department could gain substantially—and could greatly impact its overemphasis on the use of force—by involving the Team in far more of its encounters than it currently does and by permitting the Team greater latitude in the course of an encounter to broker a peaceful outcome.  Reaching this goal may require adding personnel to the Team and training and certification of additional patrol officers across the city.  Our understanding is that currently, if officers encounter someone in mental health crisis, they can call for a Team member or a specially trained patrol officer assigned to their part of the city, but there is no guarantee that either will be available.  We recommend that the department conduct a staffing study to determine how many officers would need to be added to the Team, as well as how many patrol officers would need to be trained and certified, to ensure that someone with the appropriate skills is always available in all parts of the city when an encounter with someone in mental health crisis occurs.

The department could also make a significant impact on officers' tendency to use force during stressful encounters by providing officers more training on the use of de-escalation techniques.  The Team currently provides this kind of training to new recruits at the police academy, but our observations of, and interviews with, officers indicate that the Team's training has so far failed to make an impact on the overall culture of the department and the general

34

approach of most officers.  We also found it troubling that many officers did not seem conversant with the Team's function or its relevance to their encounters with those in mental health crisis.  A clear example of this lack of familiarity was evident in the use-of-force reports that we reviewed.  In far too many of those reports, officers encountered a person who was clearly in mental health crisis, but they made no attempt to contact the Team or patrol officers in their area who had been trained and certified by the Team.  Partially as a result of the officers' failure to use the resources available to them, far too many of these encounters had a violent outcome.

One area where we believe the department can immediately begin leveraging the skills and training of the Team is in what officers call "welfare checks"—where someone has called 911 to ask officers to check on a person who may be at risk of harming himself or who seems to be in crisis.  In the use-of-force reports we reviewed, far too many encounters that began as welfare checks ended in violence, and far too often the officers' use of force was unreasonable.  The inclusion of the Team or patrol officers trained and certified by the Team on welfare checks could make a substantial impact on the department's use of force and could lead to better overall outcomes for residents in mental health crisis.

### 5.    The Department's Ineffective Use of Its Tactical Deployments Contributes to the Use of Excessive Force.

Through our review of use-of-force reports, officer-involved shooting investigations, and interviews with citizens, we conclude that the department inadequately conducts tactical deployments.  Tactical deployments are a significant component of a police department's strategic response to high-intensity incidents.  These incidents include encounters with suicidal subjects, barricaded subjects, hostage situations, and high-risk traffic stops.

In our review of the Department's SWAT, we found deficiencies in the leadership of this specialized unit.  At the time of our review, the SWAT commander had not received adequate training and appeared to lack the experience to direct a disciplined and effective SWAT unit.  It is critical that supervisors be taught the skills necessary to oversee a specialized unit.  Beyond the commander's lack of SWAT experience, we note that the unit does not have clear command structure or deployment guidance.  As a consequence, we found that SWAT members do not have sufficient understanding of incident deployment, scene control, or proper reporting protocols.  We further noted a near absence of organizational accountability.  Officers are simply afforded too much autonomy, which has contributed to even greater insularity from the department's accountability systems, ineffective deployments and tragic shootings that could have been avoided.

SWAT's deficient on-scene supervisory oversight contributes to the pattern of unreasonable use of force.  Based on our review, SWAT officers failed to conduct any pre-deployment planning and rarely coordinated with patrol officers once they arrived on the scene of incidents.  We further found that SWAT officers were unable to provide operational or strategic guidance once they arrived on scene.  In many instances, despite being tactical experts, SWAT command failed to provide any meaningful assistance during dangerous situations.

In the fatal shooting of Alan Gomez, 26 officers responded to a possible hostage situation.  Even though SWAT responded to the scene, it appeared that SWAT command failed to establish scene control.  A SWAT officer acted independently in setting up on the scene, and it

appears that little, if any, coordination was conducted to ensure that patrol officers could effectively address the situation. The SWAT officer also failed to participate in negotiations, even though the discussions with Gomez lasted nearly one hour. While the patrol officers were negotiating with Gomez, the SWAT officer unilaterally took a shooting position near the house. As the officers continued to negotiate with Gomez, the SWAT team member shot Gomez before he received approval from a supervisor.

Similarly, we reviewed another incident where several patrol officers responded to a home after learning that "Steve" had been involved in multiple armed robberies and was staying at the home. As the patrol officers arrived on the scene, Steve left the home and was followed by multiple patrol officers. Steve reportedly had suicidal thoughts and was carrying a firearm in a duffle bag. The patrol officers were able to negotiate with Steve in an open field and to convince him to get on his knees, although he maintained control of the duffle bag. As the patrol officers continued to negotiate with Steve for over one hour, a SWAT officer arrived on the scene. The SWAT officer failed to coordinate with the patrol officers, and SWAT command seemed to play no role in handling the situation. The SWAT officer instead positioned himself in a tactical shooting position. The SWAT officer also failed to communicate with his supervisor, even though the supervisor was on his way to the scene. This lack of communication is a pervasive practice that has contributed to tactical shortcomings at APD. As the patrol officers were awaiting a SWAT supervisor, the SWAT officer shot Steve multiple times. Several officers reported that they were surprised that the SWAT officer shot Steve. This is another example of how a SWAT command failure and deployment failure led to a fatal shooting.

In addition to its lacking deployment oversight, we also identified a troubling trend where SWAT officers failed to document and videotape deployments. This stands in stark contrast to the canine unit, which is actually a component of the SWAT unit and which more consistently documents and evaluates deployments. SWAT has the ability to document and record deployments just as thoroughly as the canine unit, but it has not done so. Supervisors—and again, the same supervisors who oversee SWAT also oversee the canine unit—have therefore been unable to determine whether SWAT's actions were reasonable, appropriate, and complied with the department's standards. They also could not assess the tactical effectiveness of deployments. This deficient control and understanding of SWAT officers' conduct contributes to the pattern of unreasonable use of force.

### 6. The Department's Aggressive Organizational Culture Contributes to Excessive Force Incidents.

The department's lack of internal oversight has allowed a culture of aggression to develop. This culture is manifested in the routine nature of excessive force and lack of corrective actions taken by the leadership to address force incidents. This culture is evident in the department's training, permissive policy on weapons, under-utilization of its crisis intervention team, overuse of SWAT, and the harsh approaches to ordinary encounters with residents. The failure of the department's leadership to address unnecessary uses of force reinforces the aggressive culture.

A lack of accountability in the use of excessive force promotes an acceptance of disproportionate and aggressive behavior towards residents. We reviewed numerous incidents demonstrating this approach. For example, in the incident involving "Charles," where he was

stopped by officers for failing to stop at a sign while riding his bicycle, the officers escalated the situation and shocked him with Tasers multiple times.  According to the incident report, the officer essentially fired his Taser at Charles for failing to completely submit and obey commands.   The initial officer called for backup when Charles failed to stop his bicycle immediately upon the officer's command; ultimately three officers approached him.  Their use of force against a perplexed cyclist is just one of many episodes in which officers expressed hostility toward people not engaged in the commission of any crimes.  An officer's decision to use his Taser on Ivan is another example.  Ivan was unconscious on a couch during a party.  When he was roused by the officer and obviously confused, he started to struggle while still prone on the couch.  The officer escalated the situation instead of altering his approach given Ivan's condition.  Both of these incidents were approved by supervisors in subsequent reports that found the force reasonable.

As mentioned above, APD's training is focused so heavily on weaponry and force scenarios that officers do not get essential tools to engage in effective de-escalation methods.  The training is an element of the culture of aggression.  Once officers complete their training, they are allowed to carry non-standard issued weapons that are approved by the range master.[54]  We were informed that many officers purchase expensive, high-powered guns as soon as they are allowed, using their own money.  Officers see the guns as status symbols.  APD personnel we interviewed indicated that this fondness for powerful weaponry illustrates the aggressive culture.

This aggressive culture is also evident in many of the force reports that we reviewed, in incidents recounted to us by community witnesses, and in widely available videos of officers using force against non-combative individuals.  We interviewed numerous people who relayed accounts of harsh treatment by officers.  The incident involving "Nick" illustrates this point.  He provided video footage showing an officer choking him after he stepped out of his car during a stop for driving while intoxicated.  In another incident, an officer grabbed, yelled at, and attempted to handcuff "Omar" when he was helping an accident victim and did not get out of the officers' way quickly enough for the officer.  Omar tried to explain that he was compressing the victim's wound and using his training as an emergency medical technician, but the officer seemed concerned only with his immediate compliance.  Additionally, we have reviewed reports and publicly available videos of officers slamming a man's head against a tree plantar on a sidewalk, using a Taser on an obviously subdued man, and punching a man who had done nothing to the officer or anyone else.  Few supervisors tried to address these problems.  When supervisors did attempt to correct these officers, many complained about the dearth of support from department leadership when they attempted to address problematic conduct.  These incidents and the failure to require corrective action demonstrate a culture that emphasizes force and complete submission over safety.  The department's leadership does not address these issues and, as such, sends a message that such conduct is acceptable.  This culture contributes to the use of excessive force.

### 7.    The Department's Limited External Oversight Contributes to the Pattern or Practice of Unconstitutional Uses of Force.

Independent, external oversight of a police agency—oversight that is exercised by individuals or institutions that are not part of or beholden to the agency or its leadership—helps

---

[54]    Firearms and Ammunition Authorization Policy 2-22.

strengthen community trust.  Independent oversight can identify deficiencies in a police agency's own internal reviews, provide a transparent process for resolving complaints against an agency, and build confidence in an agency by bringing the public into the process of assessing and improving it.

Albuquerque has adopted an external oversight structure that has two primary components:  the Police Oversight Commission ("the Commission") and the Independent Review Officer ("the Review Officer").  Briefly, the Review Officer is appointed by the Mayor and paid by the City to investigate all officer-involved shootings and all complaints filed against the Department by civilians.  The Review Officer is assisted by a staff of paid investigators, and she reports her findings at public meetings of the Police Oversight Commission.  The Commission is made up of volunteer Commissioners from across the city appointed by the Mayor.  The Commission holds regular public meetings to consider the reports of the Review Officer and make recommendations to the Chief of Police on whether officers have violated the Department's policies.  The Chief retains complete discretion over whether policy violations in fact occurred and whether officers should be disciplined.

To assess the effectiveness of Albuquerque's external oversight structure, we interviewed the current Review Officer and members of the Commission.  We also reviewed the reports of the Review Officer and recommendations of the Commission for all fatal police shootings between 2009 and 2012 for which such reviews have occurred.  In addition, we analyzed the city ordinance that established and governs the Commission and the Review Officer, as well as other information we received.

Albuquerque's external oversight structure could do much more to address unreasonable uses of deadly force, and it is apparent from our review of documents and interviews that the failure to do so in the past has contributed to the pattern of unreasonable force that we have found.  Members of the Albuquerque community have expressed concern that the Commission does not provide meaningful oversight of the department and that the Commission and the Review Officer have not weighed the evidence from their investigations appropriately.

We note that the Commission's work is limited in some ways by the collective bargaining agreement reached between the City and the officers' union, the Albuquerque Police Officers Association.  That agreement limits the amount of information that the Commission can consider in reviewing specific cases, such as the identity of the officer whose alleged conduct is at issue and the officer's disciplinary history.  Knowing an officer's identity and disciplinary history could provide important context for individual allegations of misconduct and help the Commission assess whether there is a pattern of problematic behavior.

Albuquerque's independent oversight structure could also do far more to involve the community and to provide opportunities to be heard to those making allegations of misconduct.  Community members have limited opportunities to speak during the Commission's public meetings.  Those who have filed complaints against officers are not provided any opportunities to be heard at any of the Commission's meetings before a decision is made on their cases except in the very limited public comment period, and so they cannot meaningfully contribute to the Commission's decision-making process.

Along those same lines, citizen complaints are subject to strict limitations that keep the Commission from being able to address potentially serious allegations of misconduct.  The

ordinance that created the Police Oversight Commission requires complaints to be filed within 90 days of the incident or they will not be considered.  In addition, by an agreement between the City of Albuquerque and the Albuquerque Police Officers Association, complaints must be personally signed by the complainant for the department to consider them "official" complaints that will be taken through the full review process.  We believe these limitations unnecessarily restrict the work of the Commission and the ability of the public to bring police misconduct to light.

The ordinance that created the Commission and the position of the Review Officer directs the Review Officer to "play an active public role in the community." The current Review Officer has engaged in some public outreach, and we understand that her office would reach out to the public more frequently if it were able to hire a full-time staff member dedicated to community outreach.  We believe this is an important function of the Review Officer, and we urge the City to support her in these efforts.

Nonetheless, from our review it appears that the Review Officer is more closely aligned with the department than with the community that the Review Officer serves.  The Review Officer has failed to find violations of department policy in cases where it is more likely than not that violations clearly occurred, and, in at least one case, she has interpreted the department's policies in ways that are contrary to the policies themselves but favorable to officers.  This occurred in the case of Mickey Owings, which was discussed above and involved an officer who shot Owings while he was fleeing in a car.  The Review Officer interpreted the department's policy on firing at moving vehicles to apply only when an officer fires at the vehicle itself and not at the driver of a vehicle.  The point of the policy, however, is not to protect cars from being damaged by gunshots; it is to keep officers from firing their weapons where doing so poses substantial risks to public safety.  When an officer fires his gun at the driver of a moving vehicle, he is both firing at the vehicle and creating risks to public safety, issues that the Review Officer should have recognized.

The current Review Officer and her predecessor found very few violations of the department's policy on the use of deadly force in officer-involved shootings, which is at odds with the evidence as detailed in this letter.  If we had reached different conclusions in just a handful of cases, it might have been attributable to a difference of opinion on the very fact-intensive questions that arise when analyzing officers' use of force.  But we have reached different conclusions on far more than a handful of cases.  Nor can the different conclusions we reached be attributed to any difference in the underlying materials that we reviewed; the current Review Officer and her predecessor had at least as much access to reports, witnesses, and other pertinent information on force encounters as we did.  We are left with the conclusion that the current Review Officer and her predecessor have simply been too forgiving of the department's use of deadly force.  They thus deprived the department of critical opportunities to correct its course, which contributed to the overwhelming pattern of unconstitutional use of deadly force that we find.

### 8.      Inadequate Community Policing Contributes to the Department's Pattern or Practice of Unconstitutional Force.

Community policing is an effective strategy that enables law enforcement agencies and individuals and organizations they serve to develop solutions to problems and increase trust in

police.  The department's leadership does not prioritize community policing, has not communicated its importance throughout the agency, and tolerates a culture that is hostile to community partnerships.  These deficiencies have led to a mutual distrust between officers and the residents they encounter.  It has contributed to the pattern or practice of excessive force.

Despite references to community policing in its policies and officer evaluations, the department does not consistently support the concepts of community policing.  Community policing, also known as "smart policing," involves building partnerships between law enforcement and the people and organizations within its jurisdiction, engaging in problem-solving through proactive measures, and managing the police agency to support community partnerships and community problem-solving.[55]  The focus on developing partnerships with the community is to engender trust and encourage the public to participate in identifying and addressing public safety concerns.[56]  During our onsite tours, we observed that there was no consistent understanding of the department's community policing program within the ranks.  Even commanders had inconsistent understandings of the agency's program.  Moreover, commanders have no systems in place to analyze citizen contacts with officers outside of incident reports.  They do not consistently review complaints to measure how officers are engaging the community.

The lack of organizational support for community policing was evident in the numerous, credible complaints we reviewed regarding the aggressive behavior of officers.  Residents told us of encounters where officers were disrespectful and aggressive in their approach.  For example, "Steven" contacted APD after accidentally shooting his wife in the hip.  When officers arrived, they approached Steven in his front yard and immediately placed him in handcuffs.  Officers knocked on the front door and pointed their weapons at Steven's sister-in-law as soon as she opened the door.  The officers then entered the home and pointed their weapons at Steven's son, even though he was rendering aid to his mother.  In another example, an officer threw "Rita's" documents on the street after a traffic stop when she challenged the basis of the stop.  The citation was subsequently dismissed.  The "Omar" incident where the officer grabbed and yelled at a man providing medical aid to an accident victim also shows a disregard for the community.  These are but a few of the instances where residents expressed concerns about their negative interactions with officers.

A disconnect exists between officers and residents about the perception of overly aggressive conduct by officers.  We observed that many officers were dismissive of community concerns.  For instance, many officers complained that the media generated the complaints about

---

[55]  U.S. Department of Justice, Community Oriented Policing Services (COPS), COMMUNITY POLICING DEFINED (Undated) at 1; Drew Diamond and Deirdre Meid Weiss, ADVANCING COMMUNITY POLICING THROUGH COMMUNITY GOVERNANCE: A FRAMEWORK DOCUMENT (2009) at 4.
[56]  COMMUNITY POLICING DEFINED at 3; *see also* Tyler and Fagan, *Legitimacy and Cooperation,* 6 Ohio St. J. Crim. L. 231, 267 (cooperation with the police increases when the public views the police as fair and legitimate); Tyler, WHY PEOPLE OBEY THE LAW at 163 (study verified that people believed procedures to be fair and authorities legitimate when they were provided opportunities to participate in the decision-making process).

their perceived aggressiveness in citizen encounters.  Some officers also complained that the citizens were the ones who were aggressive towards them.  This perception persists even though the data suggests otherwise.[57]  These concerns suggest an unwillingness to embrace community policing.  This rejection of one of the basic elements of community policing contributes to the department's pattern or practice of unjustified force.

## V.     REMEDIAL MEASURES

     APD should implement the following remedial measures to address the deficiencies discussed in this letter:

A.     Use of Force Policies

     1.     Revise the use of force policy to require that officers report any use of force, including the active pointing of firearms, above un-resisted handcuffing, and, even in cases of un-resisted handcuffing, when the subject complains of injury or excessive force.

     2.     Revise the use of force policy to clearly define "force" and specify the types of physical force that must also be reported, such as chokeholds, prone restraints, kicks, takedowns, leg sweeps.

     3.     Revise the use of force policy to prohibit shooting at vehicles.

     4.     Revise the use of force policy to place more emphasis on de-escalation techniques and require officers to consider less-intrusive alternatives before employing force.

     5.     Revise the use of force policy to prohibit the use of canines for crowd control.

     6.     Revise the use of force policy to prohibit supervisors and officers who were involved in, ordered, or authorized a use of force from assessing the reasonableness of the force.

     7.     In addition to a comprehensive use of force policy that incorporates all force options, including deadly and less lethal force, develop specific policies for each of the following areas:  (a) deadly force; (b) firearms; (c) canines; (d) less lethal munitions; (e) Tasers; (f) chemical agents; (g) batons and impact weapons; (h) other force technology or  weapon authorized by the department.

     8.     Require that a failure to report a use of force or prisoner injury by an officer shall subject the officer, including supervisors and commanders, to disciplinary action.

     9.     Ensure that officers request medical services immediately when an individual is injured or complains of injury following a use of force.

---

[57]     PERF Report, *supra* note 11, at 39-40 (noting that while assaults against police officers rose between 2006 and 2007, they declined between 2007 and 2008 and overall during 2005 to 2008).  The FBI Law Enforcement Officers Killed and Assaulted reports from 2009 to 2011 show a steady rate of assaults on officers in the region; there was a slight increase in 2012. *See* FBI Law Enforcement Officers Killed and Assaulted *available at* http://www.fbi.gov.

10.     Establish policies regarding force reviews and investigations.  Require that force reviews and investigations determine whether the officer's conduct was justified and within agency policy.

11.     Develop a reliable and accurate tracking system for all officers' use of force, all force reviews conducted by supervisors, all force investigations conducted by the internal affairs unit, and all command-level reviews.

12.     Ensure that uses of force are promptly referred to the appropriate investigative unit or agency whenever a supervisor or reviewing officer finds evidence indicating apparent misconduct or criminal conduct by an officer.

B.     Interacting with Individuals with Mental Illness and other Disabilities

1.     Develop policies and implement procedures to improve the response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals.

2.     Develop and implement protocols with the Crisis Intervention Team on how to handle interactions with individuals with known or suspected mental health issues, including those observably undergoing a mental health crisis, individuals with developmental disabilities, and individuals who appear to be intoxicated or impaired.

3.     Require all officers to participate in crisis intervention training.

4.     Expand the number of officers trained on how to handle interactions with individuals with mental health issues and individuals who appear to be intoxicated.

5.     Review current policies and protocols concerning interactions with individuals with mental illness, developmental disabilities or other impairments to ensure they are consistent with applicable legal standards and generally accepted policing practice.

C.     Tactical Units

1.     Revise policies and procedures governing response to, and investigation of, high-risk incidents including specific guidance covering:  encountering suicidal subjects, barricaded subjects, hostage situations, and high-risk traffic stops.

2.     Require training for all tactical team members and supervisors in topics including: pre-deployment guidance and planning; incident deployment; scene control; and post-deployment reporting.

3.     Establish eligibility criteria for all staff and supervisors assigned to tactical units and conduct regular (at least annual) reviews of tactical team members to ensure that they meet delineated criteria.

4.     Provide tailored annual training to all staff and supervisors assigned to tactical units, including training on effective deployment, scene control, and post-deployment reporting.

D.     Training

    1.     Implement scenario-based training and role playing to ensure officers understand de-escalation techniques and when force is justified.  This should also include training on changes to policy, new equipment, and tactical methods.

    2.     Train officers to use appropriate hands-on techniques following the first application of less-lethal force, when feasible, to complete an arrest, and to use as few cycles of Taser as possible.

    3.     Train officers to avoid using more intrusive forms of force on individuals who do not pose a threat to the safety of the officers and others.

    4.     Train officers to give verbal warnings, where feasible, before using force.

E.     Internal Investigations and Civilian Complaints

    1.     Revise the civilian complaint policy to eliminate the 90-day reporting period, allow for the investigation of anonymous and third-party complaints, and eliminate the requirement that complainants sign the complaint.

    2.     Revise all forms and instructions on the civilian complaint process that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints.

    3.     Develop investigative standards and protocols for force investigations conducted by the internal affairs unit.

    4.     Require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another officer or employee to a supervisor or directly to the internal affairs unit for review and investigation.

    5.     Ensure that investigations of officer misconduct are thorough and that findings are consistent with the facts.

F.     Management and Supervision

    1.     Require that supervisors perform the following actions in response to any use-of-force incident:  (a) ensure that a medical unit report to the scene of every use of force resulting in injury, actual or complained; (b) conduct a thorough analysis of the incident based on all obtainable physical evidence, adequately descriptive use-of-force reports, witness statements, and independent investigation; (c) resolve any discrepancies in use-of-force reports or witness accounts and explain all injuries; (d) ensure that the recording policy was followed; and (e) complete a summary analysis regarding the reasonableness, proportionality, and legality of the force.  If the supervisor cannot resolve any factual discrepancies, determine the source of any injury, or determine the lawfulness of a use of force, the supervisor should refer the matter immediately and directly to his or her supervisor and to internal affairs.  Every level of supervision should be held accountable for the quality of the first-line supervisor's force investigation.

2.      Require a critical firearm discharge review process led by a command-level review team to evaluate all investigations involving critical firearm discharges.  The team should be chaired by the commanding officer.  The process should include specific determinations regarding whether the force used was consistent with the department's policy and training, whether lesser force alternatives were available, what non-disciplinary corrective actions should be taken, and what policy or training amendments should be effectuated.  An annual review of patterns in critical incidents should be completed and reported to the Chief.

3.      Require supervisors to review and take appropriate disciplinary or non-disciplinary corrective action, where warranted, in situations where he or she becomes aware of potential misconduct or criminal behavior by an officer.

4.      Expand the Early Intervention System to track supervisor and area command activity.  Require supervisors to conduct timely reviews that identify patterns in officer behavior and specific training deficiencies.

5.      Change the Early Intervention System thresholds by:  (a) adjusting thresholds based on comparison data that takes officer assignment into account; (b) creating single-event thresholds for events so critical that they require immediate department intervention; (c) implementing rolling thresholds, so that an officer who has received an intervention for use of force should not, for example, be permitted to engage in four additional uses of force before again triggering a review; (d) expand the elements or performance indicators tracked by the system; and (e) evaluate whether thresholds are in line with national standards.

6.      Monitor uses of force to ensure consistency with the policies, and enforce the policies when force is used inappropriately.

7.      Ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, provide officers with the direction and guidance necessary to improve and develop as officers, and to identify, correct, and prevent misconduct.

G.      Recruitment and Selection

1.      Ensure that the department's officer hiring and selection processes meet minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices that comport with generally accepted policing practices and federal anti-discrimination laws.

2.      Require that all candidates for sworn personnel positions, including new recruits and lateral hires, undergo a valid psychological, medical, and polygraph examination to assess  their fitness for employment.

3.      Ensure that thorough, objective, and timely background investigations of candidates for sworn personnel positions are conducted in accordance with generally-accepted policing practice and federal anti-discrimination laws.

4.      Develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas.  Provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion.  These criteria should account for experience, civil rights and discipline record.

5.      Establish procedures that govern the removal of officers from consideration from promotion for disciplinary action related to serious misconduct.

H.      Community Policing and Oversight

1.      Develop a comprehensive program of community outreach that emphasizes the department's role as part of the Albuquerque community and in partnership with and service to all residents of the City.

2.      Provide necessary information and sufficient resources to civilian oversight entities, so that they can meaningfully evaluate citizen complaints against officers and engage the community.

3.      Create robust community relationships and engage constructively with the community to ensure collaborative problem-solving and consistent feedback from diverse sectors of the community.

4.      Revise the civilian oversight process to ensure that an effective system of review and approval is implemented that includes review of serious uses of force and officer-involved shootings.  The oversight process should also have the resources and support necessary to assess and make recommendations regarding the department's operations and performance that need improvement.

*       *       *       *

We share your sense of urgency in ensuring that the City of Albuquerque has an effective, accountable police department that controls crime, ensures respect for the Constitution, and earns the trust of the public it is charged with protecting.  Recent events have galvanized many in the Albuquerque community to join the public discourse over the future of the Albuquerque Police Department and its relationship with the community.  We look forward to working with you, the department, and the community to address our findings and forge a path forward to restore public trust and promote constitutional policing in Albuquerque.  Those affected by our findings and the men and women of APD who serve the City honorably deserve no less.  Please note that this letter is a public document and will be posted on the Civil Rights Division's website.

We hope to hear from you soon to begin discussions of the necessary reforms.

                                                    Sincerely,

                                                    /s/

                                                    Jocelyn Samuels
                                                    Acting Assistant Attorney General
                                                    Civil Rights Division

                                                    /s/

                                                    Damon P. Martinez
                                                    Acting U.S. Attorney
                                                    District of New Mexico

cc:    Gorden E. Eden, Jr.
        Police Chief
        Albuquerque Police Department

        David Tourek, Esq.
        City Attorney
        City of Albuquerque