IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,         )
           )
        Plaintiff,         )
           )
v.           )
           )
THE CITY OF ALBUQUERQUE,         )
           )      No. CIV 14-1025 RB/KK
        Defendant,         )
           )
v.           )
           )
THE ALBUQUERQUE POLICE OFFICERS'    )
ASSOCIATION,         )
           )
        Intervenor.       )

## MEMORANDUM OPINION AND ORDER

The United States Department of Justice and the City of Albuquerque negotiated a Settlement Agreement to resolve the allegation that the Albuquerque Police Department has a pattern and practice of using excessive force. (Doc. 9.) Having reviewed the parties' submissions and arguments, the objections of the Intervenor, and the community's reactions, the Court **APPROVES** the Settlement Agreement and enters it as an Order of the Court.

### I.      BACKGROUND

Based on reports of police misconduct, the United States Department of Justice initiated an extensive investigation into the Albuquerque Police Department's use of force in November 2012. (Compl. Ex.1 at 2-3, Doc. 1-1.) On April 10, 2014, the Department of Justice released the results of that investigation, finding that the Albuquerque Police Department ("APD") excessively uses

deadly and non-lethal force.  (*Id.*)   In the findings, the Department of Justice detailed several remedial measures to address the issues it found.  (*Id.* at 41-45.)

Subsequently, as authorized by the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, the United States of America filed a Complaint against the City of Albuquerque, claiming that the City's police force engages in a pattern or practice of excessive force in violation of the Fourth Amendment.  (Compl.)   Specifically, the Complaint alleges (1) that the City's police force engaged in a pattern or practice of using unreasonable deadly force; (2) that the City's police force engaged in a pattern or practice of using unreasonable non-lethal force; and (3) the City failed to correct these systematic deficiencies.  (*Id.*)   In particular, the Complaint faults the City for disregarding the rights of persons with mental illness.  (*Id.* ¶¶ 10, 15, 20.)   As a remedy, the Complaint sought equitable and declaratory relief.  (*Id.*)

On November 14, 2014, the parties filed a Settlement Agreement and a joint motion to approve it.  (Doc. 9.)   The Settlement Agreement represents over five months' negotiation between the two parties.  (*Id.* at 2.)   The parties estimate that they spent hundreds of hours conducting in-person and telephone conferences.  (*Id.*)   Both sides consulted with police experts and subject matter experts to ensure that the reforms would be efficacious and feasible.  (*Id.* at 4-5.)   The Agreement sets up a comprehensive framework for reform with proposed "revisions to policies, procedures, and practices to address the allegations in the United States' Complaint . . . ." (*Id.* at 6.)   The Agreement's provisions pertain to the use of force, specialized units, crisis intervention, training, misconduct investigations, supervision, recruitment, officer health, and community engagement.  (Agmt., Doc. 9-1.)   On November 6, 2013, the Albuquerque City Council unanimously voted to endorse the Agreement.  (Doc. 9 at 2.)   The Court provisionally

2

approved the Agreement on December 17, 2014.   (Doc. 35.)

After accepting "a significant number" of applications and conducting further negotiations, the parties were able to agree upon the appointment of an Independent Monitor.   (Doc.76 at 2.) The Monitor will function as the eyes and ears of the Court.   The parties selected Dr. James Ginger, deeming him to have the necessary qualities to serve as the Monitor.   (Doc. 76 at 2-3.) After meeting with Dr. Ginger and hearing the Amici's concerns, the Court approved Dr. Ginger's appointment.   (Doc. 103.)   He and his team will be responsible for assessing whether the parties fulfill their obligations under the consent decree.   (Agmt. ¶ 294.)

Before finally approving any settlement, the Court must first determine that the Agreement is, as a whole, a fair, adequate, and reasonable means of resolving the claims raised in the Complaint.   To help the Court assess whether the Agreement meets that standard, the Court invited interested parties to express their views.   (Doc. 35.)   Seven groups, representing various interests within the community, presented their arguments at the fairness hearing on January 21, 2015.   (Doc. 90.)

After the fairness hearing, the Court turned its attention to several motions to intervene. (Docs. 14, 16-33, 36-40.)   The Albuquerque Police Officers' Association ("Union") claimed a sufficient interest in the suit and its remedy to intervene into the action as a matter of right.   (Mot. Intervene at 3, Doc. 41.)   The Union aired part of its intervention argument at the fairness hearing. (Hr'g Tr. 14:25-21:12.)   Separate from the Union's motion, several concerned citizens filed motions to intervene.   (Docs. 14, 16-33, 36-39.)   The Court determined that the Union could intervene as a matter of right, but denied the motions to intervene from the concerned citizens. (Doc. 102.)

Three months later, in March 2015, an additional three community groups, Disability Rights New Mexico, the American Civil Liberties Union of New Mexico, and the Native American Voters Alliance Education Project, sought permission to intervene.  (Doc. 107.)   The current parties opposed the motion.  (Docs. 117, 120, 121.)  The Court denied the motion to intervene in a separate order.

As part of its order granting the Union the right to intervene, the Court ordered the Union to specifically state its objections to the Agreement.  (*Id.* at 13.)  The Union filed its objections on March 5, 2015.  (Doc. 105.)  Each of the Union's objections is addressed below.

## II.     LAW AND ANALYSIS

"Because the issuance of a consent decree places the power of the court behind the compromise struck by the parties," the Court must independently review the Agreement's provisions.  *United States v. State of Colorado*, 937 F.2d 505, 509 (10th Cir. 1991).  Before approving the Agreement and entering a consent decree, the Court must be satisfied that the Agreement is fair, adequate, reasonable, and in keeping with public policy.  *Id.* (citing *United States v. City of Miami*, 664 F.2d 435, 440 (5th Cir. 1981)).  Courts have recognized a general policy in favor of settlements.  *See Marek v. Chesny*, 473 U.S. 1, 10 (1985) ("[S]ettlements rather than litigation will serve the interests of plaintiffs as well as defendants.").  "The value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental [wrongdoing] is of unique importance."  *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 290 (1986) (O'Connor, J., concurring).

The Court is satisfied that the Agreement is the result of fair and honest negotiation, not the result of fraud or collusion.  *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002) (stating factors courts should consider when evaluating a settlement agreement). The parties were both represented by zealous advocates who bargained in good faith on each party's behalf.  (Doc. 9 at 4-5.)   To determine if the provisions of the Agreement are otherwise a fair, adequate, and reasonable means of resolving the issues laid out in the Complaint, the Court turns to the concerns raised by Amici and the Intervenor.

### A.  Amici Concerns

On January 21, 2015, the Court heard from seven community groups who presented articulate and helpful testimony regarding the Agreement.  The groups included the Union; a coalition of community groups dubbed "APD Forward"; the Civilian Police Oversight Agency; plaintiffs in a class action challenging the City's treatment of people with mental and developmental disabilities in *McClendon v. Albuquerque*; a coalition of community groups including the Dr. Martin Luther King, Jr. Memorial Center; New Mexico's Law Office of the Public Defender; and Vecinos United.   A variety of concerns emerged during the hearing.   The Court addresses several matters below.

Amici question the independence of the Monitor.  Specifically, APD Forward urged the Court to ensure that the Monitor's quarterly compliance reports are transparent.  (Doc. 56 at 11-12.)   The group is concerned that provisions intended to protect police officers' private information could be used to remove the underlying data from the public eye.  (*Id.* at 12.)   Like the Amici, the Court expects the Monitor's reports to be comprehensive and edifying.  If the reports are lacking, the Court can address the issue then.  In the meantime, Dr. Ginger has

committed to keeping the community apprised and involved.   The Court will ensure that the Monitor does not collude with parties to suppress public information.

Many groups were concerned about the scope, powers, and appointments of the Civilian Police Oversight Agency, including the Agency itself.   The Court recognizes the vital role that the Agency must play in the Police Department's reform, especially considering that the Department of Justice intends to empower the Agency to oversee sustainable reform once the decree ends. (Hr'g Tr. 144:14-19, Doc. 91.)   Amici raised several outstanding questions about how the Agency will interact with the Internal Affair's investigations and how Agency reviewers will be appointed. The Agreement outlines requirements for the Agency, but does not detail how the Agency should function.   If the Agency is going to be the overseer of long-term reform, the parties need to ensure that it is setup to succeed.   That will be an on-going obligation.

Two groups, APD Forward and the *McClendon* plaintiff-subclass, raised concerns about APD's treatment of mentally and developmentally disabled persons.   According to the Complaint, APD has a history of unnecessarily escalating stressful incidents and resorting to excessive force when faced with people in mental health crises.   (Compl. ¶¶ 10, 15, 20.)   Amici argue that the Agreement will increase the number of encounters APD officers have with people in mental health crises, which will in turn lead to more excessive force.   This fear is based on APD's history of abuses.   The parties counter that the merit of the Agreement should not be evaluated based on APD's old practices.   They explain that the Agreement's approach to mental health is novel.   Once the Agreement's provisions are in place, the City claims that APD "will have the most wide-ranging and comprehensive provisions dealing with mental health issues of any police department in the country."   (Hr'g Tr. 46L14-17.)   The parties recognize that as a part of this

6

ambitious reform, many details still need to be refined.   (Hr'g Tr. 51:1-3; 52:1-3.)   Along the way, some provisions may need to be reevaluated.   Amici report that they have attended meetings of the Mental Health Response Advisory Committee, which was established to analyze and evaluate APD's reforms in mental health.   (Hr'g Tr. 40:15-18)   The Court hopes that Amici continue to be vigilant in ensuring that this ambitious new approach improves APD's responses to people in crisis and does not lead APD to regress.

Professor Alfred Mathewson, speaking on behalf of the Dr. Martin Luther King. Jr. Memorial Center and other community groups, asked the Court to consider the issue of biased policing practices in the Agreement.   The Agreement requires that APD collect demographic data on civilians and officers involved in police encounters, but does not otherwise address racial or ethnic tensions in APD policing.   (Agmt. ¶ 215(k).)   Professor Mathewson advises that the Agreement should include a non-biased policing clause.   (Doc. 71 at 11.)   When community organizations urged the Department of Justice to investigate APD, they specifically requested that the United States examine racial issues.   (*Id.* at 9.)   However, neither the Department of Justice's findings nor the Complaint address the issue.   Accordingly, the Court cannot now order the parties to include such a clause.   "[T]he consent decree must 'com[e] within the general scope of the case made by the pleadings.'"   *Local No. 93*, *Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (quoting *Pacific R. Co. v. Ketchum*, 101 U.S. 289, 297 (1880)).   The Court cannot ask the parties to include a non-biased policing provision, because the Complaint does not allege that there were biased policing practices.   However, the Court is pleased that the parties have agreed to gather data on the matter and urges the parties to use the data to evaluate and correct any biased practices.

7

Primarily, the Amici asked the parties to listen to community voices during the reform process.   As Professor Mathewson commented, "the Settlement Agreement is not the end; it's the beginning" (Hr'g Tr. 112:21-22), and the Amici wish to have a voice in the on-going reforms. Amici are wary, noting that the City has previously been unresponsive, requiring "month-long campaigns of direct civil disobedience to get the City's attention."   (Hr'g Tr. 139-149.)   Now, the City avows that it is "committed to continuing to seek input from all community stakeholders . . . ." (Doc. 93 at 17; Hr'g Tr. 146:11-14.)   The United States expressed a similar commitment "to engage with the community . . . ."   (Hr'g Tr. 146:2-4.)   The Agreement itself includes several provisions intended to foster community engagement.   (Agmt. Sec. XII.)   To achieve sustainable reform, the parties will need to seek out and secure community cooperation.

When determining whether the proposed consent decree is fair, adequate, and reasonable, the Court seriously considered the testimony presented at the Fairness Hearing.   The Parties committed to considering the community's needs as they develop policies and procedures.   As the consent decree is implemented, the Court and the Monitor will ensure that the parties remain true to their commitment.

### B.  Modifications to the Decree

After the Fairness Hearing, counsel representing the *McClendon* plaintiff-subclass, Mr. Peter Cubra, filed a supplemental amicus brief concerning the parties' rights to modify the Agreement and consent decree.   (Doc. 92.)   Mr. Cubra drew the Court's attention to Paragraph 338 of the Agreement, which provides, in part:

> The Parties may jointly stipulate to make changes, modifications, and amendments to this Agreement, which shall be effective, absent further action from the Court, 45 days after a joint motion has been filed with the Court. Such changes, modifications, and amendments to this Agreement shall be encouraged when the

8

Parties agree, or where the reviews, assessments, and/or audits of the Monitor demonstrate that the Agreement provision as drafted is not furthering the purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose. Where the Parties or the Monitor are uncertain whether a change to the Agreement is advisable, the Parties may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension. During this suspension, the Parties may agree to temporarily implement an alternative requirement. . . .

(Agmt. ¶ 338.)

The parties discussed this provision at the Fairness Hearing in response to the critique, raised by Mr. Cubra, that the Court should be careful to adopt and finalize the Agreement, because modifying final court orders is complex under Federal Rule of Civil Procedure 60(b).   (Hr'g Tr. 89:5-9; 91:19-92:10.)   Mr. Cubra argued that the Agreement is not a mere framework, as the parties suggested, but a proposed, binding court order.   Accordingly, Mr. Cubra urged the Court to ensure that the parties "perfect this agreement before" the Court signs it.   (Hr'g Tr. 89:8-9.) Pointing to Paragraph 338, the United States responded that the parties could in fact modify the Agreement without facing the hurdles in Rule 60(b).   The United States described the provision as part of the plan for "ongoing engagement with the community."   (Hr'g Tr. 91:19-92:1.)   As the parties and the community "identify things that need to be changed or could be done better," the United States explained, "the parties have the ability to stipulate to those changes, work with our monitor, and present it to [the Court]."   (Hr'g Tr. 92:2-5.)

Shortly after the Fairness Hearing, Mr. Cubra filed the supplemental brief arguing that Paragraph 338 of the Agreement violates both law and public policy.   (Doc. 92.)   Traditionally, litigants need to seek leave of the court before modifying a consent decree.   *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984).   The Second Circuit reasoned that modifying consent decrees "always requires court approval due to their quasi-judicial nature."

*United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983).   Based on this precedent, Mr. Cubra argues that Paragraph 338, permitting litigants to modify or suspend the decree, undermines the court's role as the guardian of the decree.   (Doc. 92 at 2-4.)

Courts have taken varied approaches to the modification of consent decrees.   *See generally* Timothy Stoltzfus Jost, *From* Swift *to* Stotts *and Beyond: Modification of Injunctions in the Federal Courts*, 64 Tex. L. Rev. 1101 (1986) (discussing various approaches to modifications of consent decrees and other injunctions).   Some of the divergence among courts can be explained by the dual nature of consent decrees.   "[C]onsent decrees 'have attributes both of contracts and of judicial decrees.'"   *Local No. 93*, 478 U.S. at 519 (quoting *United States v. ITT Continental Backing Co.*, 420 U.S. 223, 236 n.10 (1975)).   Although a court's approval of a consent decree acts as a final judgment of the court, *Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 193 (10th Cir. 1993), "it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all."   *Local No. 93*, 478 U.S. at 521.   Parties to a consent decree, like the parties here, have negotiated for reforms that are broader and more comprehensive than any legal judgment the Court could have ordered after litigation.   *See id.* at 525 (recognizing that consent decrees can include broader relief than a court could award after trial); *see also EEOC v. Safeway Stores, Inc.*, 611 F.2d 795, 799-800 (10th Cir. 1979) (same).

Generally, parties wishing to modify a court order must meet the requirements of Rule 60(b).   Fed. R. Civ. P. 60(b) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment . . . .").   Traditionally, relief under Rule 60(b) has been considered an "extraordinary" remedy that "may only be granted in exceptional circumstances."   *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 576 (10th Cir. 1996) (citing *Bud Brooks Trucking,*

*Inc. v. Bill Hodges Trucking Co.,* 909 F.2d 1437, 1440 (10th Cir. 1990)).   For instance, under

Rule 60(b), parties can ask the court to modify a consent decree if "a significant change either in

factual conditions or in law" renders continued enforcement "detrimental to the public interest."

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992).

Recently, the Supreme Court directed lower courts to take a different approach to public

reform litigation, where the parties' ability to modify decrees is crucially important.   *See Horne v.*

*Flores*, 557 U.S. 433, 447 (2009) (citing *Rufo*, 502 U.S. at 380) ("Rule 60(b)(5) serves a

particularly important function in what we have termed 'institutional reform litigation.'").   The

Supreme Court commanded courts to "take a 'flexible approach'" to modifications of public

reform decrees.   *Id.* at 450 (citing *Rufo*, 502 U.S. at 381).   Public reform decrees, or institutional

reform litigation, demand this flexible approach for several reasons:

> [I]njunctions issued in such cases often remain in force for many years, and the
> passage of time frequently brings about changed circumstances—changes in the
> nature of the underlying problem, changes in governing law or its interpretation by
> the courts, and new policy insights—that warrant reexamination of the original
> judgment.

*Id.* at 447-48.   Moreover, the Supreme Court reasoned that democratically-elected officials need

to be able to respond to issues with new ideas.   *Id.* at 449-50 (reasoning that consent decrees

should not limit future office holders' "ability to respond to the priorities and concerns of their

constituents").   "[A] court abuses its discretion 'when it refuses to modify an injunction or

consent decree in light of [meritorious] changes.'"   *Id.* at 447 (quoting *Agostini v. Felton*, 521

U.S. 203, 215 (1997)).

After reviewing the legal framework and precedent, the Court considers Paragraph 338 to

be a reasonable part of the decree.   First, the procedures in Paragraph 338 comport with the

Supreme Court's command to "take a flexible approach" to public reform decree modifications in *Horne v. Flores*. *Id.* at 450. In addition to the general concerns outlined by the Supreme Court, the Court believes that the facts of this decree call for a flexible approach.

The Court has good reason to believe that the circumstances of the parties may change over the course of the decree. For instance, the decree includes several provisions regarding body-worn cameras. As the technology evolves over the next half decade, conceivably, the decree may need to be updated. The Court is happy to give the parties flexibility in that regard. Additionally, the Court has repeatedly called on the parties to work with community members to implement the decree. To meet that obligation—and to fulfill the promise of community engagement in the decree—the parties may have to refine the details of the decree.

Second, and foremost, several procedural safeguards can help the Court guard the integrity of the decree. To start, contested changes will have to meet the Rule 60(b) standard. For all changes—contested or uncontested—the Court will have the insights of the Monitor, who will oversee and report on any developments. Where the modifications are uncontested, the Court will require the parties to follow a procedure. After all, permitting parties to modify decrees is not a complete departure from earlier precedent. The line of Second Circuit cases regarding modifications does not bar parties from offering jointly-stipulated modifications to consent decrees. Rather, the Second Circuit urged courts to implement systems which ensure that the court does not merely "rubber stamp[]" joint modifications. *Am. Cyanamid Co.*, 719 F.2d at 565 & n.7. Accordingly, the Court now announces its own procedures to accompany the provision outlined in Paragraph 338.

Should the parties wish to jointly modify the consent decree, they must file briefing explaining (1) the nature and purpose of the change; (2) a description of the practices or events necessitating the change; and (3) an explanation of why each party, separately, consents to the change.  *Cf. Am. Cyanamid Co.*, 719 F.2d at 565 n.7 (suggesting that courts should look to the Tunney Act, 15 U.S.C. § 16, for "useful guidance" on modification procedures for consent decrees).  This briefing will help the Court determine whether it will permit the change without further action or if the Court needs to examine the issue.  For example, if the change is merely technical, the Court will permit the modification without requiring more of the parties. Otherwise, the Court may order additional briefing from the Intervenor and Amici to help the Court evaluate the change.

As the Supreme Court ruled years ago:

> We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent . . . . A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.   The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.

*United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) (citations omitted).  The Court readily agrees that while some mandates in the Agreement are "provisional and tentative," other requirements should be "impervious to change" because they affect the constitutional rights at the heart of the litigation.  *See id.*   Taking this principle to heart, the Court will not sit idly by if the parties attempt to alter the underlying rights vindicated by the decree, as described in the Complaint.  If, however, changing circumstances reveal that the decree was the wrong way to achieve the goals of the litigation, then the Court is open to hearing proposed changes.

The Court has now repeatedly directed the parties to respond to community voices as they implement the decree.   Potentially, certain provisions of the decree may not fit comfortably with the Albuquerque community.   The Court hopes that the parties will respond and change the Agreement accordingly.   Neglect of community voices gave rise, in part, to the concerns stated in the Complaint.   The Court does not want that to be an on-going problem.   With this provision, the parties can collaborate and respond to changing circumstances and evolving needs.   With the additional procedural safeguards, the Court is satisfied that Paragraph 338 is a reasonable part of the decree.

### C.  Union's Objections

Based on the Union's authority as the exclusive bargaining representative of the police officers, and its collective bargaining relationship with the City, the Court granted the Union the right to intervene in this lawsuit.   (Doc. 102.)   As an Intervenor, the Union has a right to present objections to the proposed Agreement.   *See Local No. 93*, 478 U.S. at 529 (explaining an intervenor's due process rights when the original parties enter into a settlement agreement).   The Court cannot "enter a consent decree that imposes obligations" on the Union because it has not consented to the Agreement.   *Id.*   Additionally, the Court will not approve provisions of the Agreement that directly conflict with the Union's collective bargaining agreement ("CBA") or state law.   *See Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096, 1102, 1007-08 (10th Cir. 2004) (evaluating whether proposed settlement agreement violated the intervenor-union's rights under the CBA or state law).   However, "one party—whether an original party, a party that was joined later, or an intervenor—[cannot] preclude other parties from settling their own disputes . . . ."   *Local No. 93*, 478 U.S. at 529.

14

The Union correctly argues that the City cannot unilaterally alter the CBA.   *See AFSCME v. Albuquerque*, 304 P.3d 443, 446 (N.M. Ct. App. 2013) ("The LMRO does not permit the City to unilaterally impose conditions of employment once a CBA has expired.").   The provisions of the CBA remain in effect until the City and the Union reopen negotiations (CBA § 35.4.1, Doc. 94-4) or the City exhausts its labor law remedies, *AFSCME*, 304 P.3d at 446.   Yet the City has rights under the CBA, and under state law, to "manage and to exercise judgment on all matters" unless prohibited by the CBA or law.   Albuquerque Labor Management Relations Ordinance ("LMRO") § 2-2-5; CBA § 2.5.

Based on its objections to several provisions, the Union requests additional mediation. (Doc. 127 at 16.)   In the following section, the Court addresses each of the Union's objections in turn.   In sum, the Court does not find any direct conflicts with the CBA, state, or federal law.

### 1. *Investigation Procedures*

The Union objects that the investigation procedures outlined in the Agreement do not adequately preserve officers' rights to union representation during disciplinary meetings (Doc. 105 at 3; CBA § 2.3.1.4), to Fifth Amendment rights (Doc. 105 at 5-6), to due process rights when making compelled statements (*id.* at 3), or to notification of impending investigations (*id.* at 5; CBA 20.1.4).   The Union objects to the "oversight" of these important rights in the Agreement. (Doc. 105 at 6.)   Many of the Union's concerns were allayed by the United States' assurances that officers will be "given their full constitutional and legal rights" before being made to make compelled statements.   (Doc. 127 at 9.)   While the Agreement does not discuss these rights in detail, these rights are not undermined by the Agreement—these rights are enshrined in the Constitution, in court precedent, or memorialized in the CBA.   They do, and will continue to,

exist independent of the Agreement.   Both the City and the United States aver that officers will have the benefit of all their rights in the CBA, in labor law, and in the Constitution.   (Doc. 119 at 3, 5; Doc. 124 at 7.)   APD is, in fact, obligated to uphold these rights.

The Union also objects to the creation of the Force Review Board.   (Doc. 105 at 11; Doc. 127 at 13-14.)   The Force Review Board is a new entity charged with reviewing all investigations into officers' use of force, tracking use of force data, and referring cases that merit disciplinary or corrective action to the Chief of Police.   (Agmt. ¶ 78.)   The City responds that the Force Review Board's focus is on changing management procedures, a process which does not implicate the Union's rights.   (Doc. 119 at 10.)   The United States argues that the Force Review Board is not a substantial change from prior APD procedures because the Chief of Police will still be ultimately responsible for imposing discipline, regardless of the Force Review Board's recommendation. (Doc. 124 at 18.)   Specifically, the Union objects that the Force Review Board impermissibly creates another level of disciplinary review.   (Doc. 127 at 14.)   Yet, the CBA specifically contemplates that some APD body will have 30 days to conduct a "review process" of any administrative investigation.   (CBA § 20.1.16.)   The Force Review Board fits neatly into the process contemplated by the CBA.   The Union also objects that the Force Review Board's review violates the disciplinary timelines contained in the CBA.   (Doc. 127 at 7, 13-14.)   However, the Agreement incorporates the time period for review contained in the CBA.   *Compare* CBA § 20.1.16, *with* Agmt. ¶¶ 78(a), 191.   Thus, there is no conflict.

Finally, the Union objects that the Agreement provisions which require the Internal Affairs Bureau to conduct criminal investigations violate the CBA.   (Doc. 105 at 7.)   The CBA expressly states that "criminal investigation shall not be handled by the Internal Affairs unit, but by a

criminal investigative unit . . . ."   (CBA § 20.1.8.)   Primarily, the CBA only addresses criminal investigations based on formal citizen or officer complaints.   (CBA § 20.1.3.)   The Agreement contemplates a far more comprehensive scheme. Under the Agreement, APD will investigate "all uses of force."   (Agmt. ¶¶ 46, 49.)   These investigations will occur regardless of police misconduct.   The Agreement does mandate that the "Internal Affairs Bureau will be responsible for conducting both criminal and administrative investigations . . . ."   (Agmt. ¶ 61.)   Other provisions admonish that criminal investigations must be kept "separate from and independent of any administrative investigation."   (Agmt. ¶¶ 60, 186.)

The United States agrees with the Union that the Agreement's mandate that Internal Affairs conduct criminal investigations violates the CBA on its face.   (Doc. 124 at 21.)   The City, on the other hand, goes to great lengths to explain why the Agreement does not violate the CBA. (Doc. 119 at 3-5.)   The City explains that the Agreement creates a new procedure whereby supervisors will routinely investigate any use of force in order to create a Use of Force report. (Doc. 119 at 3.)   In turn, the Use of the Force reports will help the Force Review Board collect data and analyze trends.   (Agmt. ¶¶ 75, 78, 80.)   These investigations will often end without individual officers receiving corrective or disciplinary action.   In some cases, however, a use of force investigation may, when warranted, morph into an administrative or criminal investigation. The City argues that, "[u]ntil and unless there is a decision made that the evidence gathered warrants further administrative or criminal investigation, CBA § 20.1.8 is not implicated as no criminal or administrative charges would be pending."   (Doc. 119 at 3-4.)   During the routine investigation, Internal Affairs will have to determine whether a criminal investigation may be necessary.   (*Id.* at 4.)   The City argues, "[h]owever, that is distinct from actually conducting the

criminal investigation within Internal Affairs."   (*Id.*)   If a criminal investigation is warranted, the City avers that the Chief of Police "shall immediately consult with the prosecuting authority." (*Id.*)   The City promises that it will, as mandated in the Agreement, ensure that criminal and administrative investigations remain separate.   (*Id.*)

The City's interpretation of the Agreement is reasonable.   For each use of force, the supervisory officer will arrive on the scene to determine the seriousness of the force.   (Agmt. ¶ 50.)   Where the force was only minimal, the supervising officer will be responsible for submitting the Use of Force report.   (Agmt. ¶ 53.)   If an officer employed "serious force," the Internal Affairs Bureau will conduct an administrative investigation and prepare a Use of Force report. (Agmt. ¶¶ 49, 70.)   The Agreement repeatedly states that the Chief may assign the criminal investigation to the Multi-Agency Task Force or the Federal Bureau of Investigation.   (Agmt. ¶¶ 48, 49, 65, 67, 76, 85.)   It makes sense that the Internal Affairs Bureau investigators be trained in both criminal and administrative investigations, because officers' rights need to be protected during all investigations (Agmt. ¶ 61), in case the so-called routine investigation evolves into a criminal investigation.

Nothing in this court-approved Agreement supersedes the CBA.   Based on the City's explanation, the Agreement provisions do not violate the CBA.   On that ground, the Court will approve these provisions of the Agreement.   If, in practice, the City does breach the CBA, it will have to face unfair labor practice charges.   Notably, before any officer can be questioned as part of an interrogation that could result in disciplinary or criminal consequences, the officer's rights must be protected, as described in the CBA.   No off-the-record statements can be used in any official action against the officer.   (CBA § 20.1.7.)

18

To reduce the risk of committing unfair labor practices, the City may wish to renegotiate either the CBA or the Agreement.  The Union has voiced its willingness to negotiate.  The United States says it has no stake in Internal Affairs conducting criminal investigations—any unit can conduct the investigations so long as the investigation is professional and reliable.  (Doc. 124 at 21.)  Which instrument to renegotiate, if at all, is a policy decision best left to the City and the interested parties, not the Court.

## 2. *Civilian Complaints and the Oversight Agency*

The Union objects to the process for accepting citizen complaints.  (Doc. 105 at 10.) Under the Agreement, citizen complaints can be verbal, anonymous, and made at any time. (Agmt. ¶¶ 170, 172.)   In contrast, although the CBA does not impose any time limits on complaints, it does make clear that official complaints generally must be written and signed by the complainant.  (CBA § 20.1.3.1.)   Informal complaints can be classified as "official" if they are "of such a serious nature as to warrant investigation or the charge is of a criminal nature."   (*Id.*) Only official complaints warrant administrative investigations and, thus, only official complaints can lead to discipline or corrective action against an officer.  (CBA §§ 20.1.3.1 - .2.)  These provisions, however, do not prevent APD from collecting unofficial complaints or from conducting "preliminary" investigations into these complaints.  (CBA § 20.1.3.2.)  The City and the United States wish to collect all citizen complaints to evaluate "overall trends within APD." (Doc. 119 at 9; Hr'g Tr. 65:2-66:7.)   Under the CBA, they may collect unofficial complaints for that purpose.   Before disciplining officers, however, APD must meet the procedural requirements in the CBA.   The parties recognize that stale, informal complaints will generally not, and generally cannot, result in a disciplinary investigation.  (Doc. 119 at 9; Hr'g Tr. 65:2-66:7.)   The

Agreement does not conflict with the CBA.

The Union also challenges the Albuquerque City Ordinance that created the Civilian Policy Oversight Agency.   (Doc. 127 at 15.)   In fact, the Union filed a separate suit to challenge the Ordinance under constitutional and labor law.   *See Albuquerque Police Officers' Assoc. v. Albuquerque*, 15-cv-149-JAP-KBM (D.N.M.).   Previously, the Union challenged the Ordinance before the Albuquerque Labor Management Relations Board.   (CBA § 20.1.19.)   Along the same lines, the Union objects to portions of the Agreement which refer to the Civilian Policy Oversight Agency and its ability to investigate misconduct.   (Doc. 105 at 7.)   However, these objections are more appropriately directed at the Ordinance, not the Agreement.   (Doc. 124 at 19.)   The legality of the Ordinance is beyond the scope of this litigation.

### 3.  *Officer Privacy*

The Union fears that the Agreement may violate officers' privacy.   (Doc. 105 at 9-10, 20-21.)   First, the Union objected to provisions which give the United States and the Independent Monitor access to officers' compelled statements.   (Doc. 105 at 9-10.)   Both the City and the United States explain that these provisions are necessary to ensure that the City is complying with the Agreement, but aver that all information will be kept confidential.   (Doc. 119 at 2-3, 7-8; Doc. 124 at 10.)   The Agreement expressly requires the Monitor and the United States to "maintain all non-public information provided by the City in a confidential manner."   (Agmt. ¶ 326.)   The Union acknowledges this provision assuages some of its concerns regarding confidentiality. (Doc. 127 at 8.)

Despite the assurances, the Union reaffirms its position that compelled statements should not be disclosed to any party outside APD.   (*Id.* at 2, 8.)   Under the CBA, compelled statements

are confidential, but can be released to APD, the City Attorney, and to the Civilian Police Oversight Agency.   (CBA § 20.2.10.)   Compelled statements can also be released pursuant to an order by a court of competent jurisdiction.   (*Id.*)   Accordingly, to avoid any confusion, this Court hereby orders that for the life of this Agreement and decree, compelled statements shall be released to the United States Department of Justice and to the court-appointed Independent Monitor.   The United States and the Independent Monitor must keep these statements confidential and may only use such statements for the limited purpose of assessing the City's compliance with the Agreement.   Neither the United States nor the Independent Monitor may use the compelled statements to prosecute or sue individual officers.

Next, the Union objects to proposed drug testing and to a mental health evaluation program.   (Doc. 105 at 20.)   The City avers that neither program is new and thus the Union has no basis for objecting to the program in the Agreement.   (Doc. 119 at 16.)   Moreover, the City recognizes its duty to maintain officers' privacy with regard to these evaluations and affirms that it will abide by federal law.   (*Id.*)   The Union admits that these programs exist in some form and do not per se violate the CBA.   (Doc. 127 at 14.)   Yet the Union requests more definition and a more robust policy.   (*Id.*)   That type of critique, however, will not defeat the Agreement.   The purpose of this Agreement is to create a framework to ensure that the City will not violate the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141(a).   Once the Agreement is in place, the City, the Union, and other interested parties will be charged with developing comprehensive policies and procedures to ensure that APD complies with the Agreement, city, state, and federal law.   So long as the Agreement as written does not violate existing legal mandates, the Court will approve it.

### 4. *Discipline Policy*

According to the Union, the Agreement takes a punitive approach to discipline, as opposed to a corrective approach—a shift which violates the spirit of progressive discipline. (Doc. 105 at 11.) However, the point of this Agreement is to improve APD management's practices, not to penalize officers. As the Union sagely notes, new standards are generally not implemented without imposing more discipline. (Doc. 105 at 17.) The Court appreciates the Union's point: generally new procedures create more rules that employees could potentially violate; which in turn leads to more discipline. While this is true, it misconstrues the purpose of the new rules. These rules are not meant to entrap the officers. The focus of the Agreement is to create a more professional, reliable, and predictable management for APD. Police officers, as a whole, will benefit from the improvement.

Specifically, the Union first objects to the Early Intervention System, claiming that it unfairly creates presumptive discipline levels. (Doc. 105 at 11-12.) The Early Intervention System is "a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers." (Agmt. ¶ 212.) As part of the Early Intervention System, the Agreement requires supervisors to collect data relating to several "indicators." (*Id.* ¶¶ 213, 215.) The Early Intervention System does not prescribe any form of discipline, nor does it create any new categories of discipline. (Doc. 119 at 10.) Rather, the Early Intervention System is a data aggregator—akin to a souped-up personnel file. APD has the right to evaluate its employees. LMRO § 2-2-5(B). This system does not interfere with the Union's rights.

Next, the Union challenges the mention of a disciplinary matrix.   The Agreement mandates that APD establish a "disciplinary matrix" which sets objective criteria for imposing discipline for various rule infractions.   (Agmt. ¶ 202.)   The matrix is intended to increase transparency for the officers.   (*Id.* ¶ 201; Doc. 124 at 18.)   Contrary to the Union's allegation, the matrix does not presume officers guilty, it would merely create a rubric—that officers could track—to explain how and when discipline is imposed.   (Doc. 119 at 11; Doc. 124 at 18.)   Discipline is one of APD's obligations.   *See* N.M. Stat. Ann. § 10-7E-6(A); LMRO § 2-2-5(D). The Agreement does not create the discipline policy: the Agreement does not specify the level of discipline, the type of discipline, or the process for imposing discipline.   The Union asserts that it has a right to negotiate discipline systems.   (Doc. 127 at 4.)   That may be, but the Court will not unnecessarily decide which issues require mandatory bargaining. For now, the Agreement as written does not yet create a disciplinary system for the Union to challenge.

The Union also challenges the definitions of force and standards for using force.   (Doc. 105 at 15.)   Primarily, the Union demands that the officers be properly trained and that the definitions be clarified in order to avoid confusion.   (Doc. 127 at 13.)   That is a reasonable request that the City and Union can negotiate on their own terms.   The Union is also concerned that the definitions are more rigorous than constitutional baselines.   (Doc. 105 at 17-18.)   Yet, the "Agreement is not intended to limit the lawful authority of APD officers to use objectively reasonable force or otherwise to fulfill their law enforcement obligations under the Constitution and laws of the United States and the State of New Mexico."   (Agmt. ¶ 7.)   Police departments are free to set their own standards and policies.   Changing the definition of excessive force in a police handbook does not alter the constitutional standard and does not increase officers'

23

constitutional liability.   *See Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) ("We have, of course, recognized that claims based on violations of state law and police procedure are not actionable under § 1983.").   The definitions are meant to help supervisors categorize and investigate force incidents.   (Doc. 119 at 13-14.)   The various definitions do not violate the Union's rights.

### 5.   *New Policies Regarding Technology and Equipment*

The Agreement outlines new policies regarding Tasers, body cameras, and body camera footage, which the Union claims violate its collective bargaining rights.   (Doc. 105 at 13-14.) The Union does not object to the use of Tasers or body cameras, because both types of technology have been used in APD for years.   (Doc. 127 at 10; Doc. 124 at 12, 15.)   Instead, the Union objects to the discipline attached to the new policies.   (Doc. 105 at 13-14.)   The Agreement does not mandate any form or level of discipline.   It merely states that the failure to follow APD policy will result in discipline—an unremarkable proposition.   (Agmt. ¶¶ 46, 228.)

The Union further alleges that the technology policies are unclear and the resulting confusion could unfairly result in officer discipline.   (Doc. 105 at 13-14.)   As explained earlier, the Agreement is merely a framework.   Should the City and the Union determine that the technology policies require further clarification, they are free to adopt more detailed policies—so long as they comport with the baseline requirements in the Agreement.   Additionally, as the Union argues, new technology policies will require additional training and possibly additional hours.   (Doc. 105 at 13-14, 23.)   The City and the Union must negotiate over wages and hours for training and new work duties.   Those issues are beyond the scope of the Agreement. Presumably, the City and the Union will negotiate the impacts of the policies in their next

24

collective bargaining session.   (Doc. 119 at 12.)

Citing two grounds, the Union objects to the policies regarding camera footage.   First, the Union argues that it is bad policy to destroy video footage when there is no time limitation regarding citizens' complaints against officers.   (Doc. 105 at 10.)   The Agreement only requires body camera footage to be preserved for 60 days.   (Agmt. ¶ 220(h).)   If the City and the Union wish to keep the footage for longer than 60 days, that is an available policy choice.   This criticism does not undermine the validity of the Agreement.   Second, the Union expresses concern that supervisors will "troll" the footage and use select footage to discipline officers.   (Doc. 105 at 13-14.)   Under the Agreement, supervisors must periodically review recordings and "incorporate the knowledge" into their supervision and evaluation of officers.   (Agmt. ¶ 220(h).)   The footage is the property of APD and APD has the right to view the footage.   (Agmt. ¶ 230.)   Before imposing discipline, APD supervisors must follow the procedures in the CBA.   The Union's fears about trolling are unfounded.

### 6.  Promotions, Evaluations, and Assignments

The Union challenges perceived changes to the policies for promotions, evaluations, and assignments.   (Doc. 105 at 19, 20, 22.)   The Union argues that the Agreement violates officers' rights to bid on advertised positions.   (*Id.* at 19.)   Under the CBA, APD is requires to advertise all vacant positions (CBA § 17.1), and officers have the right to bid on the vacancies (CBA § 14.1). Meanwhile, the Agreement directs APD to assess whether it has "the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission."   (Agmt. ¶ 204.)   The City has a right to direct and assign its employees' work duties and determine staffing requirements.   *See* N.M. Stat. Ann. § 10-7E-6(A); LMRO § 2-2-5(D).

The Agreement provision does not undermine the CBA's requirements to advertise positions and permit bidding. (Doc. 119 at 15.)  The procedure for filling vacant positions remains intact. (*Id.*)

The Union further objects that the Agreement improperly creates new eligibility requirements for promotions, in violation of the CBA and Albuquerque Code. (Doc. 105 at 20.) The City argues that the Agreement does not create new promotional criteria, only mandates that the current policy be further developed. (Doc. 119 at 15-16.)  The Agreement does require APD to consider final disciplinary action when making promotional decisions. (Agmt. ¶ 243.) However, the Court cannot determine if this conflicts with current promotional criteria, because those criteria are not listed in the CBA.  The CBA uses the undefined term "final score standing." (CBA § 17.3.2.)  The CBA also discusses "justifiable cause," such as discipline, for deviating from the general bidding process. (CBA § 14.1.2.)  After diligently studying the CBA, the Court sees no conflict between the proposed eligibility criteria and the CBA.  Furthermore, the City has the right to promote and evaluate its employees.  *See* N.M. Stat. Ann. § 10-7E-6(A); LMRO § 2-2-5(B).  The Union demands a voice in the formulation of any evaluative criteria. (Doc. 105 at 23.)  Whether the City is obligated to negotiate promotional criteria is not a question properly before this Court.  As written, the Agreement does not violate the CBA or Albuquerque Ordinance.

Challenging the wisdom of the decision, the Union objects to the Agreement's initial goal of training 40% of officers in crisis intervention. (Doc. 105 at 22.)  The Union does not argue that this decision violates the CBA or any law.  Rather, the Union suggests that this staffing decision may prolong response times. (*Id.*)  The City has the authority to direct its employee's

26

work and to determine staffing requirements.   *See* N.M. Stat. Ann. § 10-7E-6(A); LMRO § 2-2-5(D).

### 7. *Department Policymaking*

Finally, the Union objects to being excluded from several policymaking bodies.   First, the Union protests its exclusion from the Mental Health Response Advisory Committee.   (Doc. 105 at 21.)   The Mental Health Response Advisory Committee assembles a group of people, including APD officers and community health professionals, who have subject matter expertise and experience working with people who have mental illness or are in mental health crises.   (Agmt. ¶¶ 111-12.)   It is meant to give non-binding guidance and recommendations to the City.   (Agmt. ¶¶ 113-17.)   The City bluntly responds that the Union is not entitled to be on the Committee because it is not a subject matter expert.   (Doc. 119 at 18.)   The Union responds that it makes good policy sense to have a union representative on the Committee.   (Doc. 127 at 7.)   The Union does not claim, and the Court cannot find, any basis for demanding a legal entitlement to representation on the committee.   In general, the City retains the right to develop and implement Department policy. (CBA § 32.1.)   Whether the Union *should* be a member of the Committee is a policy question beyond the expertise of this Court.

Second, the Union demands a place on the Force Review Board.   (Doc. 127 at 13.)   This objection fails for a similar reason that the objection to the Committee fails.   The Force Review Board reviews investigations into officers' use of force and collects data on uses of force.   (Agmt. ¶¶ 78-80.)   These are not areas where the Union has traditionally had a voice, nor has the Union stated any legal basis for its demand.   This objection to the Agreement is overruled.

Third, the Union decries its exclusion from the Policy and Procedures Review Board. (Doc. 105 at 22.)   The City notes that the Union "has in fact been invited to attend and participate in meetings of the Policy and Procedures Review Board," but "has failed to attend."   (Doc. 119 at 18.)   In fact, as the United States points out, the Ordinance creating the Policy and Procedures Review Board reserves a voting position for a Union representative.   (Albuquerque Ord. § 3-65-2(E)(12), Doc. 124-2.)   This objection has no foundation.

As a final matter, the Union objects to the Agreement's Paragraph 338, which permits stipulated modifications to go into effect unless the Court intervenes.   (Doc. 105 at 23; Agmt. ¶ 338.)   The existence of this provision was one of the bases the Court cited for permitting the Union to intervene into this lawsuit.   (Doc. 102 at 8.)   Now that the Union is a party to the litigation, the Court is not concerned that this provision will impair the Union's interests.   If the City and United States propose a joint modification, the Union will have notice and an opportunity to respond.   In order to permit the Court time to consider the Union's objections to any stipulated modification, the Court ask the Union to file its objections, or its intent to file an objection, within 40 days of the proposed modification.   That timeline will permit the Court time to forestall passive approval of the modification.

### 8.  *Union's Objections Overall*

After considering the Union's objections, the Court has a better understanding of the Agreement and its impact on police officers.   The Court finds that the Agreement does not impose any mandatory obligations on the Union, *see Local No. 93*, 478 U.S. at 526, although the Union may choose to negotiate many of the specific policies and their implications.   Moreover, the Court finds no conflict with the CBA or state law.   *See Johnson*, 393 F.3d at 1107-08.   On that

28

basis, the Court overrules each of the Union's objections to the Agreement.

Incidents of unprofessional and violent policing tarnish the image of all officers—fairly or not.  With the help of this Agreement, APD will be in a better position to mold an exemplary police force that will benefit the City, the citizens of Albuquerque, and the officers who protect the City.  In order to ensure that this Agreement is effective, the City, the Union, and the United States will have to cooperate closely.  Going forward, the parties will have many items to negotiate as they implement the Agreement.

### III.    CONCLUSION

The Agreement lays a thoughtful foundation for building systematic reform in APD.  The Amici drew attention to several areas that could create difficulties down the line.  With vigilance and community participation, the parties can continue to improve upon the reform initiatives. Additionally, the Union raised several objections that elucidated how the Agreement will affect police officers.   In total, these criticisms and objections lend valuable insight into the Agreement and the state of the APD.   None of the criticisms undermined the integrity of the Agreement as a whole.

"Ultimately, the district court is faced with the option of either approving or denying the decree; 'the settlement must stand or fall as a whole.'"  *State of Colorado*, 937 F.2d at 509 (quoting *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 630 (9th Cir. 1982)).   The parties hope that the decree "will enhance Albuquerque police officers' ability to provide effective and constitutional policing, will promote officer and public safety, and will increase public confidence in the Albuquerque Police Department."   (Doc. 9 at 7.)   The Court shares this hope. Overall, the Court considers the Agreement to be fair, adequate, reasonable, and in keeping with

29

public policy.  *See State of Colorado*, 937 F.2d at 509.   The Court congratulates the parties on their efforts so far and is certain that the parties will maintain the same level of respect and professionalism when they implement these important reforms.   Accordingly, the Court approves the Agreement and enters its content as an Order of the Court.

   **THEREFORE,**

   **IT IS ORDERED** that the parties' Joint Motion Requesting Approval and Entry of the Settlement Agreement as an Order (Doc. 9) is **APPROVED** and the Settlement Agreement is hereby entered as an Order of the Court;

   **IT IS ORDERED** that the Parties and the Monitor appear before the Court at annual hearings, or more frequently if ordered by the Court, to report on the City's progress in substantially complying with the terms of the Agreement; and

   **IT IS FURTHER ORDERED** that the Court will retain jurisdiction to enforce the provisions of the Agreement, hereinafter referred to as the Consent Decree.

             _____
             **ROBERT C. BRACK**
             UNITED STATES DISTRICT JUDGE