IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THE CITY OF ALBUQUERQUE, ) | |
| ) | No. CIV 14-1025 RB/KK |
| Defendant, ) | |
| ) | |
| v. ) | |
| ) | |
| THE ALBUQUERQUE POLICE OFFICERS' ) | |
| ASSOCIATION, ) | |
| ) | |
| Intervenor. ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the parties' Joint Stipulation Modifying Certain Deadlines in the Settlement Agreement and Joint Brief Explaining Modifications. (Doc. 140.) Pursuant to the Settlement Agreement, stipulated modifications "shall be effective, absent further action from the Court, 45 days after a joint motion has been filed with the Court." (Doc. 9-1 ¶ 338.) To avoid uncertainty during the balance of the 45 day default period and to promote momentum in meeting the new deadlines, the Court accepts the Joint Stipulation effective immediately.

**I.     BACKGROUND**

The Settlement Agreement, entered by the Court, addresses Department of Justice findings of systematic deficiencies in the Albuquerque Police Department (APD) that contributed to a pattern or practice of excessive lethal and non-lethal force by APD officers. (*Id.*

at ¶ 4.) The Agreement set forth clear reforms with aggressive interim deadlines, compliance within two years, and sustained full and effective compliance for four years. (*See id.* at ¶ 342.) The Agreement also seeks to "strengthen public confidence in APD" and "engage collaboratively with a broad spectrum of stakeholders on an ongoing basis. (*Id.* at 5.)

The Court has facilitated significant outside involvement. Individual community members, represented pro se, filed twenty-four pro se motions to intervene or request that the court dismiss the Joint Motion to Approve Settlement. (Docs. 14–33; 36–39.) The Albuquerque Police Officers' Association (APOA) also filed a motion to intervene. (Doc. 40.) To help evaluate the fairness of the Agreement, the Court invited interested parties to express their views on the Agreement by filing amici briefs and presenting oral argument. (Doc. 35.) Seven groups presented their arguments at the fairness hearing on January 21, 2015. (Doc. 90.) Meanwhile, the parties jointly selected an Independent Monitor and notified the Court within the timeline outlined in the Settlement Agreement. (*See* Docs. 76; 9-1 ¶ 327.)

Yet, this community involvement took additional time. On February 19, 2015, the Court issued two orders, one granting APOA's motion to intervene and denying the concerned citizens' motions to intervene (Doc. 102) and the other appointing Dr. James D. Ginger as Independent Monitor (Doc. 103). The Court then provided a timeline for APOA to file objections. (Doc. 102 at 10–11.) After two extensions, one for the original parties and one for APOA (*see* Docs. 46; 96), APOA filed its objections on March 5, 2015. (Doc. 105.) After APOA filed its objections, the American Civil Liberties Union sought to intervene. (Doc. 107.) The original parties sought an extension to respond to the American Civil Liberties Union's Motion (Doc. 111) and the United States requested an extension to respond to APOA objections (Doc. 118). Briefs on both issues were completed by May 11, 2015. (*See* Docs. 127; 130.) After considering all pending

issues, the Court entered its Memorandum Opinion and Order to approve the Settlement Agreement and to enter it as an order of the Court on June 2, 2015.  (Doc. 134.)

The Independent Monitoring Team conducted its first site visit in June, 2015.  (Doc. 140 at 5.)  During the first visit, the Monitoring Team determined that although the City of Albuquerque "had made substantial efforts at compliance," all parties would benefit from guidance "at every step of the reform process."  (*Id.* at 5.)  The parties, with concurrence from Dr. Ginger and APOA, now stipulate to a proposed modification to extend certain interim deadlines imposed by the agreement.  (*Id.* at 3.)  The modification would not affect the two year deadline for comprehensive compliance, November 14, 2016, or the four year deadline for sustained compliance, November 14, 2018.  (*Id.* at 5–6.)

## II.     LEGAL STANDARD

Courts may review modifications to consent decrees according to the language in the agreement.  *See United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("Power to modify the decree was reserved by its very terms . . . ."); *U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 352 U.S. 457, 463 (1957) ("First, we think that Article X of the 1951 decree . . . provided a fully adequate basis for the jurisdiction exercised below.").  Even so, the Court retains an important discretionary role in reviewing proposed modifications.  *See United States v. Am. Cyanamid Co.*, 719 F.2d 558, 564–65 (2d Cir. 1983) ("[W]hile it is generally true that contract law provides that parties to a contract may, by agreement, subsequently modify the contract without court approval, . . . this is not the case with respect to consent decrees, since modification thereof always requires court approval due to their quasi-judicial nature.")  Moreover, "modifications of a consent decree should only be made to further the original goals of the agreement.  *United States v. State of Colo.*, 937 F.2d 505, 510 (10th Cir. 1991).

The language in the Settlement Agreement provides continued jurisdiction "[t]o ensure that the requirements of this Agreement are properly and timely implemented." (Doc. 9-1 at 101.) The Agreement provides that parties may stipulate to modifications "which shall be effective, absent further action from the Court, 45 days after a joint motion has been filed with the Court." (*Id.* at 102.) The Agreement encourages modifications if the Independent Monitor determines that the Agreement "is not furthering the purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose." (*Id.*)

### III.   DISCUSSION

While an extension will postpone certain changes, this careful investment of time early on will better halt unconstitutional practices in the long term. (*See* Doc. 140 at 7.) The parties originally selected the deadlines to "allow the City to begin implementing the Agreement's requirements the day it was signed and submitted to the Court . . . ." (Doc. 139 at 4–5.) In fact, the City of Albuquerque proceeded expeditiously, even before the parties finalized the Settlement Agreement, to reform APD practices. (Docs. 9-1 at 8; 139 at 4.) Yet such aggressive deadlines brought their own unforeseen challenges, namely insufficient guidance from the Independent Monitor at foundational stages of implementation. (*See* Doc. 139 at 7.) As Dr. Ginger notes, this guidance is necessary for the City of Albuquerque to move forward "swiftly and competently." (*Id.*)

Indeed, outside input is necessary to ensure that the City of Albuquerque achieves final compliance not only "timely" but also "properly." (*See* Doc. 9-1 at 101.) Throughout this process, the parties and the Court have maintained this tenuous balance. The process depends on the input of outsiders, through both informed community involvement and dedicated independent monitoring. (*See* Docs. 35 at 2; 103 at 1; 134 at 3, 14.)

The Court emphasizes the importance of achieving substantial compliance by November 14, 2016 and sustained full and effective compliance by November 14, 2018. (*See* Doc. 140 at 3–4.) The parties have rightly determined that a modification to extend interim deadlines will not impact the final deadlines. (*Id.*)

## IV. CONCLUSION

The parties, with the approval of the Independent Monitor and the consent of APOA, have filed a Joint Stipulation Modifying Certain Deadlines in the Settlement Agreement. (Doc. 140.) Having reviewed the proposed modification and the underlying rationale, the Court accepts the modification.

**THEREFORE**,

**IT IS ORDERED** that the Joint Stipulation Modifying Certain Deadlines in the Settlement Agreement (Doc. 140) is accepted effective immediately.

_____
**ROBERT C. BRACK**
UNITED STATES DISTRICT JUDGE