# Special Report of the Independent Monitor

**Use of Force Policy, Supervision and Management at the**

**Albuquerque Police Department**

**September 16, 2016**

**James D. Ginger, Ph.D.**

**Independent Monitor**

**Peter C. Sarna**

**Phil Coyne**

# Table of Contents

**Topic**                                                        **Page**

**Introduction:**         **1**

**Section 1.0:  Achieving Operational Compliance**     **4**

**Section 2.0:  Special Report Context**     **5**

**Section 3.0: Methodology**     **8**

**Section 4.0:  The Nature of Systemic Failure**     **9**

**Section 5.0:  Common Failure Modes**     **10**

**Section 6.0:  System Purpose, Components, and Work Flow**     **12**

**Section 7.0: Distraction Strike "Knee to the Head" - UOF2015-1**     **13**

**Section 8.0: Operational Compliance**     **16**

**Section 9.0: Recommendations**     **20**

**Section 10.0:  A Final Note**     **23**

**APPENDICES**

**Appendix A:  Timeline of Significant Events**     **25**

**Appendix B:  Two Examples of Cultural Influences - Profanity**

      **and Distraction Strikes by APD Officers**     **38**

**Appendix C:  Open Follow-up Issues in UOF 2015-1**     **42**

**Appendix D:  Monitoring Team Findings**     **45**

**Appendix E:  Unreciprocated Command Effort to Address**

      **Major Deficiencies**     **48**

**Appendix F:  Lost and Forfeited Opportunities**     **50**

---

### The Concept of Systemic Failure and APD's Existing Use of Force Oversight and Accountability System

---

*"I've used distraction strikes plenty of times (and never reported them)."*[1]
APD PO-1 (2016)

*"Officer AO-1 maintains that he did not strike the suspect in the head and would not entertain the possibility that he did so inadvertently. In his report and his interviews he continued to minimize the event. He has yet to accept any responsibility for his actions."*[2]

CO-1 (2016)

## Introduction

The purpose of this "special report" is to provide APD with insights[3] gained by the monitoring team during its review of several use of force complaints during the third reporting period. The monitoring team is well aware of the fact that many of the issues discussed here occurred before the agency developed critical new policy and training related to use of force processes within the APD. The events discussed in this report, however, and the finding developed by the monitoring team based on those events, are, in our opinion, absolutely critical to developing workable systems to identify, assess, analyze, categorize, and correct officer behavior that is non-compliant with established (recently developed) policy and procedure within APD.

We note in this report sixteen critical issues that APD must address thoughtfully and meticulously if it is to be successful in migrating from its current systems of force monitoring—a system found unacceptable by the US DOJ in its findings letter, and by the monitoring team in its in-depth and comprehensive work with APD. The report is divided into nine sections:

---

[1] This statement was directly taken from APD officer PO-1's official recorded statement to Internal Affairs. The connotation for APD's use of force oversight system, and the veracity of data it collects, is profound. The monitoring team has expressed concern on several occasions that the term "distraction strike" or "distraction technique" is an APD euphemism for physical force on a person. It more often than not is force that goes unreported and uninvestigated by supervisors.

[2] This excerpt is taken from Commander CO-1 Findings Memo after he reviewed the internal investigation into PO-1's knee strike of a suspect he was attempting to arrest.

[3] While the precipitating incidents giving rise to this report occurred in 2015, the monitoring team's assessment of APD's response to those incidents, and incidents involving similar issues through July, 2016, lead the team to believe that the problems identified in this report continue to be salient issues with APD operations.

1. Achieving Operational Compliance;
2. Special Report Context;
3. Methodology;
4. The Nature of Systemic Failure;
5. Common Failure Modes;
6. System Purpose, Components and Workflow;
7. The Concept of "Distraction Techniques;"

8. Operational Compliance Issues; and
9. Recommendations.

Each of these sections is discussed in detail below.

The reader should note that the names of those officers, supervisors and command officers involved in this analysis have been given pseudonyms so that the monitoring team can make critical issues clear without pre-judging potential supervisory, disciplinary and/or positive remedial efforts that APD may, eventually, need to take as it assumes "command" responsibility for remediating personal, supervisory, managerial and executive oversight for the events that are discussed in this report. A "key" identifying pseudonyms used in this report has been provided to the APD to facilitate its response to the issues noted herein.

## Section 1.0: Achieving Operational Compliance

Sound policy and comprehensive, top-notch training are necessary but not sufficient conditions for a department to provide consequential oversight and hold officers accountable for the judicious, restrained use of force that will achieve lawful policing objectives. As the Albuquerque Police Department (APD) finishes establishing[4] the first two conditions, the challenges in achieving the third and most critical --- a viable system for use of force oversight and accountability ---- loom ever larger, especially in light of past and on-going deficiencies, at the center of which appears to be a culture of low accountability. In fact, APD has been put on notice on more than one occasion of the shortcomings in their use of force accountability systems. The following observations were made by the Department of Justice (DOJ), and communicated to APD, on April 10, 2014:

> Our investigation included a comprehensive review of APD's operations and the City's oversight systems. We have determined that structural and

---

[4]Of course there is ongoing work necessary to maintain such a system at a high level of performance and ensure its integrity. This includes scheduled and unscheduled periodic audits.

systemic deficiencies—including insufficient oversight, inadequate training, and ineffective policies— contribute to the use of unreasonable force.[5]

The use of excessive force by APD officers is not isolated or sporadic. The pattern or practice of excessive force stems from systemic deficiencies in oversight, training, and policy. Chief among these deficiencies is the department's failure to implement an objective and rigorous internal accountability system. Force incidents are not properly investigated, documented, or addressed with corrective measures.[6]

We found only a few instances in the incidents we reviewed where supervisors scrutinized officers' use of force and sought additional investigation. In nearly all cases, supervisors endorsed officers' version of events, even when officers' accounts were incomplete, were inconsistent with other evidence, or were based on canned or repetitive language.[7]

The department does not use other internal review systems, such as internal affairs and the early intervention system, effectively. These internal accountability and policy failures combine with the department's inadequate training to contribute to uses of excessive force.[8]

As a result of the department's inadequate accountability systems, the department often endorses questionable and sometimes unlawful conduct by officers.[9]

## Section 2.0: Special Report Context

The independent monitoring team has worked with APD for over a year, and during its engagement reviewed numerous internal reports and investigations into officer uses and shows of force.  As reported extensively in IMR-2 and IMR-3, many of the same observations by DOJ are consistent with the findings of the monitoring team.  Still evident in the operational component of APD's force oversight system are critical failures in supervisory --- and organizational --- oversight of officer conduct relating to force. The problem seen by the monitoring team is fundamental and speaks to the legitimacy of the systems APD has put in place and how they are applied.  In short, to effect the cultural change that will be necessary to reach compliance with the CASA,

---

[5] Letter from Ms. Jocelyn Samuels, Acting Assistant Attorney General, US Department of Justice, Civil Rights Division, and Damon P. Martinez, then Acting U.S. Attorney for the District of New Mexico, to Mayor Richard Berry, City of Albuquerque, entitled "Albuquerque Police Department", dated April 10, 2014, Page 1 (aka the DOJ Findings Letter).

[6] Ibid. Page 3

[7] Ibid. Page 4

[8] Ibid. Page 4.

[9] Ibid. Page 4.

APD must institute a culture of accountability, and fairly and universally enforce policy provisions. In the opinion of the monitoring team, that will only occur after the highest ranking members of the organization apply a significant, persistent and genuine downward pressure of accountability, where supervisors at all ranks are routinely held to a high standard of performance. Supervisors at the front line of supervision are the linchpin for APD's success as it relates to use of force and other issues, and therefore must be called to task for failures in their oversight of officer performance in the field. This, of course, requires that they be trained first to a high level of knowledge and skill.

Thus, even though APD has put key features of an accountability system in place, most of these features are nominal at best at this stage of reform, and still require exceptional amounts of work and rethinking to enable these accountability functions, individually and collectively, to function at a sustained, high level of effectiveness. The monitoring team routinely provides feedback on APD accountability systems and processes. For its part, APD appears receptive to that feedback and continues to demonstrate professionalism during our interactions. A lack of effort on the part of APD is not the issue; instead, high activity at APD is often confused with progress --- at least in terms of force reporting, investigations and oversight.

Events in the recent past, (including issues reported in the April 2010 DOJ Findings Letter and previous Independent Monitor Reports), raise serious questions about the department's capability to transform itself in the remaining months of 2016 into a culture of high accountability.[10] This special report provides an opportunity to illuminate critical performance issues, to review past deficiencies that persist, and to examine what is required for APD to become a culture of high accountability. While numerous cases have been reported on over the past year, the events surrounding the use of force by PO-1 on October 30, 2015, and the numerous organizational breakdowns in handling that case, are exceptionally alarming to the monitoring team. Likewise, critical breakdowns by supervisors up and down his chain of command, lost opportunities within APD's Early Intervention System (EIS) and the quality of the Internal Affairs Section investigation into the event are all equally troubling.

To understand what first drew the attention of the monitoring team to this case, consider the following sequence of events:

1.    Beginning in the summer of 2015, and continuing up to and including June of 2016, the monitoring team was alarmed with APD's failure to properly handle a specific serious use force investigation --- that case included multiple Taser

---

[10] The term "high accountability" is not meant in any fashion to be synonymous with punitive or a "culture of blame". The central principle underpinning the concept of accountability, as we define it, is unceasing improvement through organizational learning, i.e., the embodiment of self-correcting oversight and supervision.

cycles and an unreported neck hold by an APD officer.[11]  It was only through the persistence of the monitoring team that this case was ever investigated by APD. Even today, despite extensive effort and oversight by the monitoring team that case lingers as having been only "adequately" handled.  The monitoring team was in the process of attempting to persuade APD that this "neck hold" case was not investigated properly --- parenthetically, APD eventually agreed with the monitoring team after months of discussion --- when several other improperly handled cases of serious use of force involving PO-1 and PO-2. came to our attention.

2.      On October 30, 2015, PO-1 and PO-2 assisted with the apprehension of a suspected car thief.  After a brief pursuit the suspect exited the vehicle and ran from the police.  At least four officers eventually caught the suspect, who initially resisted arrest.  Depicted on lapel videos are clear uses of force by each officer, and several knees strikes (euphemistically referred to as "distraction techniques") by PO-2.  While the suspect's head was extended out over the curb --- and up to three other officers are on the suspect's back --- a lapel video captures PO-1 throwing a knee strike to the left side of the head/facial area of the suspect.  The suspect appears to immediately stop moving and began to groan.  The officers then finished handcuffing the suspect.  Officer lapel videos show obvious and significant bleeding coming from the suspect's facial area.  The uses of force by these officers went unreported and uninvestigated at the time of the event.

After a series of conversations between two different commands over the course of a week, SGT-1 finally initiated a use of force investigation.  That investigation was deficient in many ways and was in conflict with CASA provisions --- even though it was done after the CASA was operational.  Each of the first three levels of supervision --- sergeant, lieutenant, and commander --- deemed the use of force as within policy and reasonable.  Such a determination is problematic for several reasons, not the least of which is that it occurred nearly a year after the CASA was signed and agreed to on the part of the City.  The case was eventually forwarded to APD's CIRT team by PO-1 and PO-2's commander.  A month and a half after the incident a CIRT investigator flagged the case as problematic and it was eventually turned over to IA.

3.      On December 3, 2015, PO-1 and PO-2 were again on patrol together when they saw an SUV driving through landscaping at a Walmart.  After attempting to conduct traffic stop the suspect ran from the vehicle with PO-1 giving chase. Reportedly, PO-1 caught up to the suspect, and attempted to handcuff him, but he initially resisted.  The suspect's arm apparently had to be pulled out from

---

[11] While reference is made to the monitoring team being alarmed with a specific case for purposes of this report, it is important to reiterate here that several other cases reviewed by the monitoring team also raised concern among the monitoring team over APD's force reporting and investigation capabilities.

under him for him to be handcuffed. Later, the suspect was found to have a broken arm. Despite the injury, APD IA was not contacted to respond and conduct the investigation. Each of the first three levels of PO-1's supervision --- sergeant, lieutenant and commander --- deemed the use of force as within policy and reasonable. In the opinion of the monitoring team, the use of force investigation and subsequent reviews were critically deficient and failed to meet several conditions of the CASA. The investigation and reviews were conducted more than a year after implementation of the CASA. This case is presently being reviewed by CIRT, as part of a comprehensive review of use of force incidents in which the two officers were involved over the past 18 months.

4.      On December 4, 2015, PO-1 and PO-2 were reportedly on patrol together again when they attempted to stop a vehicle that they determined to be stolen. The officers initiated a vehicle stop and a male driver exited the vehicle and attempted to flee on foot. Reportedly, both officers caught up to the driver "simultaneously" and tackled him to the ground --- both apparently landed on top of the suspect. The suspect refused to give the officers his hands and a struggle ensued. They eventually took the suspect into custody, after which he complained of pain to his shoulder. The suspect was later found to have a broken collarbone. SGT-2 responded, but failed to immediately contact APD IA to investigate the incident even though there was a serious injury to the suspect. SGT-2 eventually contacted a member of APD's Force Investigation Team (FIT) and spoke with SGT-3. It appears that due to the delay in notification FIT did not respond and take over the investigation. <u>In the opinion of the monitoring team, the use of force investigation and subsequent command reviews in this case were deficient and failed to meet several provisions of the CASA.</u>  This case, too, is part of the comprehensive review of cases involving the two officers now being conducted by CIRT.

## Section 3.0: Methodology

Contrary to what it may seem, the monitor is of the opinion that the case examined in this report is not  a "one-off" and, therefore, in the opinion of the monitor, it is more likely than not representative of the current state of APD's use of force oversight and accountability systems. Nor is it "stale" in the sense that APD has moved beyond past shortcomings. It is in fact just the opposite. Based on information in the possession of the monitoring team as late as August 17, it is a snapshot of then-current practices, gaps, and unsatisfactory outcomes through July, 2016. After reviewing several hundred cases ---- including Show of Force, Supervisory Use of Force, and Serious Use of Force investigations[12] --- the monitoring team has cataloged and

---

[12] Despite repeated requests, we have not yet been provided an OIS (save for an officer-on-officer shooting) case to include in our reviews. The reasons for this have been several, including backlogged cases and workload issues within the system. The monitoring team requested a specific OIS case before our June

reported on a range of serious investigative deficiencies that are both recurrent and widespread.[13] Virtually all are manifest in the case involving PO-1 and PO-2.

The standard response to this catalog of deficiencies has been that "these issues are history and APD is now operating under a new regime".   Another typical response has been to attribute these shortcomings to "transitional confusion" as the Department implements CASA-related reforms.  We beg to differ, as most of the deficiencies have little to do with the CASA and, instead, represent serious shortfalls in terms of basic, well-established oversight and accountability principles.  Moreover, most investigative lapses are straightforward and basic.  In our judgment, the majority of deficiencies are attributable to a culture of low accountability within APD.

We have included six appendices that elaborate on specific issues of importance, rather than including them in the main body of the special report.  This is done to avoid digressing too far from the central issue of systemic failure in this case.  The focus of our analysis runs the gamut from conceptual considerations to specific factual details that support individual findings and recommendations.  We believe strongly that both levels of knowledge are critically important to understand how systemic failure occurs and the steps that are required to prevent it.

## Section 4.0: The Nature of Systemic Failure

All organizations face risks that threaten their viability in some fashion.  Police agencies are no different and, accordingly, should create mechanisms to monitor and control such risks.  These mechanisms typically form a system --- at least in theory --- of interlocking components, each playing a vital role in the oversight and accountability process.  When one fails, the others compensate for that failure by providing a timely crosscheck and challenge to ensure integrity and reliability.  These are referred to as "defenses in depth".[14] Cultural norms, however, significantly influence how the systems actually work. Currently, they do not appear to be working well within APD.

Because constant slippage occurs in any system, executives must remain vigilant at every turn.  That is simply the nature of systems and human performance.  Policy and training are critical components, but provide only the illusion of oversight and accountability.  They are not self-executing and require a well-conceived and structured oversight and accountability process, two cornerstones of which are engaged field supervisors and an effective chain of command.  Because both occupy critical, early

---

2016 visit.  We learned that the initial investigation was still not submitted by the investigator, despite being more than a year old.  This raises serious concerns about a critical issue.

[13] We reported similar deficiencies in IMR-2, based upon a sample of supervisory use of force investigations, and again in IMR-3.  Based on information currently available to the monitoring team, the same issues are apparent for, and will be reported in, IMR-4. Based on information in the possession of the monitoring team as late as August 17, these issues are "current."

[14] For a primer on organizational risk, see James Reason, *Managing the Risk of Organizational Accidents* (1997).

points in the department's use of force oversight and accountability quality control chain, they warrant special emphasis. Both are in a position to catch slippage early, when small, and most remediable.[15]

At this point the monitoring team believes that even legitimately questionable use or shows of force cannot survive APD's process, since each step appears preconditioned to rationalize or explain away officer conduct. Likewise, it appears to the monitoring team that APD sees many of the missed opportunities as "water under the bridge" and not events that should be reinvestigated --- or in cases that were missed, investigated at all. The agency has almost no appetite for correcting behavior that violates existing policy. Therefore, it is nearly impossible at this point to rely on force data that APD reports.

## Section 5.0: Common Failure Modes

Systems in different work domains usually don't fail for random reasons. Rather, there are common failure modes that can be identified through rigorous data collection and analysis. For example, assigning a majority of low-seniority officers to a patrol squad under an inexperienced supervisor in an active sector on the late shift is a common failure mode. Because it is foreseeable, it is also responsive to basic risk management principles. An example of this type of failure was reported to APD by the monitoring team in previous IMR's, wherein we identified that the same supervisors and commander were connected to multiple use of force reporting and investigation failures. Despite the monitoring team's admonition concerning this issue, it went unnoticed by APD. Likewise, as will be discussed in greater detail later, APD's handling of what are perceived as low level performance issues within local commands has resulted in a failure to implement corrective actions even when problems are identified.

There are a small number of critical, high-risk tasks that encompass the majority of risks in policing.[16] The use of force is undoubtedly the most critical in terms of volume, adverse outcomes, and legitimacy. The designation of critical, high-risk tasks provides the basis for customizing the organization's system to defend against likely, foreseeable risks. For each failure mode, preventive measures, such as training and policy, should be assessed regularly to ensure their effectiveness. This should be an iterative process as the department learns continuously from its experiences and the analysis of data generated by the system's activities. It has become clear that although

---

[15] We would be remiss if we didn't underscore that the primary role of the system is to reinforce performance that meets or exceeds departmental standards. Providing feedback to the policy formulation process and the training function are also critical objectives to keep systems updated and promote constant learning and improvement.
[16] This is another example of the 20-80 rule.

APD appears committed to reaching CASA compliance, <u>the critical need to operationalize true accountability to support that commitment is currently lacking</u>.[17]

Relentless oversight is required to maintain a system's operations at a stable level of functioning, which is responsive to community needs and properly constrained by Constitutional and other boundaries. Because underlying conditions change, however, organizations must constantly scan for environmental shifts that signal the need for changes in policy, training, equipment, and operational practice. To ensure flexibility and resiliency, data collection and analysis must be timely, systematic, reliable, <u>and utilized by command as they develop ameliorative systems</u>.

Systemic failures invariably involve norms that feed a culture of low accountability.[18] At the most fundamental level this begins with a mindset that is predisposed to focus on mitigation, attenuation, and rationalization. In some cases, it involves outright advocacy of positions in conflict with official policy. Objective fact-finding, accordingly, often is degraded, though often unwittingly.[19] As a result, accountability is diluted and seldom survives in meaningful form. For this reason, high accountability cultures explicitly differentiate between the phases of fact-finding, adjudication, and case disposition in their corrective and disciplinary systems.

Well-designed and enacted systems would ideally be self-monitoring and self-regulating, but we know from experience that they are not. Individuals are prone to error and components degrade over time if not watched carefully and periodically reinvigorated[20]. The ability of an oversight and accountability system to perform at a high level is commonly referred to as "organizational or institutional capacity". <u>At present, in our judgment, APD does not have sufficient organizational capacity to guarantee that use of force investigations of all types conform to professional standards and CASA mandates.</u> APD recently completed the first stage of compliance with approval of numerous policies governing the use of force by its officers. Further, it has completed a majority of related training to bring the work force current with the new policy requirements. The last stage involves embedding the new standards and work practices in front-line policing at all levels, which won't happen overnight. Most critically, APD's use of force oversight and accountability systems will play a central role in overseeing the transition to operational reality. Getting it right, then, is of the utmost priority.

---

[17] During exit interviews with the parties the monitoring team has stressed on more than one occasion how difficult task is to reach operational compliance.

[18] Perhaps the most pernicious of these is that officers perceive that no one will hold them accountable for errors, substandard performance, or misconduct.

[19] The DOJ Findings Letter noted, "A number of systemic deficiencies contribute to the department's pattern or practice of use of excessive force. The most prevalent deficiency is the department's endorsement of problematic police behavior by failing to conduct thorough and objective reviews of officers' use of force." Page 23.

[20] Scheduled and unscheduled audits are a common tool for doing this.

## Section 6.0: System Purpose, Components, and Work Flow

The starting point in comprehending the nature of systemic failure as opposed to the failure of an individual human actor or a component, such as a single unit within a larger, complex system, is to define the end-to-end, multi-layered features of a process that requires tight coupling to achieve a specific purpose: ensuring that officers are capable of using appropriate, necessary force within Constitutional bounds and agency policy.

From the outset the monitoring team has stressed the importance of APD developing a comprehensive, accurate flow chart of its officer-accountability system (OAS). APD's resultant flow chart --- and the greater level of understanding about the system's functioning that it fosters ---- has gone through several iterations to clarify the role of each component, the sequence in which work is arranged, and the terminus or point of closure at which a case is officially closed by means of some action. The present version is close to final form, but the monitoring team has several concerns that require deeper consideration. For instance, the current terminus for supervisory use of force investigations, which amount to approximately 75% of the total use of force investigations, is the Area Commander. In effect, the approving authority for an investigation is also a working part of the chain of activity that created or allowed the failure to occur, which raises a question about the objectivity of oversight. Likewise, without organizational-level coordination and oversight, through some type of random review method,[21] Area Commands will be left to potentially develop divergent practices toward the supervision of force cases. <u>Such follow-up and "cross-checking," in the opinion of the monitoring team, is essential</u>.

As a form of semi-autonomous oversight, APD policy requires that its Force Review Board assess a ten per cent sample of supervisory investigations every 90 days. Whether the sampling process provides sufficient in-depth, representative case reviews is an open question, in our judgment, especially given the poor quality of supervisory investigations and chain of command reviews that we have found in a fairly large sample of cases.[22] Recent training may impact upon the quality of investigations in the months ahead, but ramped-up oversight is probably essential for a period to monitor progress closely and provide timely, actionable feedback.[23] We address this issue further in our recommendations, below.

## Section 7.0: Distraction Strike "Knee to the Head" - UOF2015-1

---

[21] The monitoring team recommends that APD implement a team that randomly selects and reviews use of force cases handled at the local command level.

[22] Based on information in the possession of the monitoring team as late as August 17, these issues are "current." and the monitoring team believes this trend continues.

[23] APD's poor ability to incorporate monitoring team feedback into its day-to-day operations is another area of concern.

This case came to the monitoring team's attention in response to a request for any use of force cases that were investigated outside CASA-required procedures---for example, any serious use of force cases that were investigated at the supervisory level. This was not unexpected since the reporting period covered the transition from old to new CASA-required procedures. Department Special Order 15-91 Use of Force Investigative Procedures was issued on October 20, 2015 and mandated that all APD personnel "…follow the requirements set forth in the Settlement Agreement". This included Paragraphs 41-45 that deal specifically with use of force reporting.[24] As mentioned earlier in this report, the incident under review occurred on October 30, 2015, while two additional cases involving the same two officers occurred on December 3 and 4, 2015. The monitor has often advised APD that such "policy by Special Order" is an ineffective method to effect change in officer behavior.

Our intent was to establish a baseline to monitor the changeover and ensure that cases are being handled at the appropriate level. As it turned out, we found that this case embodied oversight and accountability shortfalls that we had found in earlier reviews. Specifically, we identified the following issues at the outset focusing upon the precipitating incident, the use of force itself, and its subsequent handling:[25]

▪ The vehicle disengagement technology failed to activate, resulting in a high-speed pursuit, possibly in violation of policy. This is a major risk management issue that should have resulted in an evaluation of the technology failure and investigation of the possible pursuit violation.

▪ There was a serious discrepancy between the incident videos and the officer's report. (This re-surfaced again in the recent IAS investigation but, once again, was never addressed and resolved.)

▪ Both officers failed to report the use of force as required under the policy in force at the time. Note - to date, there are at least two additional officers who used force in this case whose force incidents were never reported or investigated.

▪ No on-scene supervisor identified the reporting issue, despite obvious injuries to the suspect.

▪ The reporting failure was "rationalized" by supervisory personnel by classifying the knee strikes as "distraction strikes" or "distraction techniques", which only required reporting ---unofficially ---- if there was a complaint of injury, although

---

[24] This memo appears to have been born from a FRB meeting, and was reported on in IMR-2. It is important to consider APD has the requirement to follow the CASA prior to this memo, but the fact it was codified and disseminated to the organization in October 2015 is still noteworthy.
[25] We did so without making any judgments. Rather, we flagged these simply as issues that should have been identified, addressed, and resolved in the primary investigation and successive chain of command reviews.

they clearly fall within the definition of force in the policy. Further, though the policy is silent on the term "distraction strikes", <u>strikes to the head with a hard object are covered</u>. A knee strike to the head of a defenseless suspect plainly qualifies in our judgment. Any professional law enforcement officer would, or should, recognize this as a clear use of force case from the onset. The suspect was bleeding profusely from the facial area. Likewise, by any definition, an officer purposely striking a person with a knee during an arrest is a reportable use of force.

▪ No one at the patrol supervisory level took the initiative to check with the Basic Academy on the issue of "distraction strikes" to determine the source of the unofficial policy (it had actually by then accreted into a custom or practice). The monitoring team picked up on these euphemistic terms several months ago. A single question to an APD <u>academy force instructor</u> during a site visit made clear that a "distraction technique", whether with a hand, elbow, knee or foot, is a use of force. This type of self-critical evaluation continues to elude APD. (APD's supervisory cadre seems to be ignoring this classification, almost globally.

▪ The primary (chain of command) investigation was substandard: The reporting officer was never interviewed; delays in the investigation caused the loss of potential evidence; critical video evidence was not reviewed; and serious discrepancies between the officer's report and video evidence went undetected or unreported, among other issues.

▪ Subsequent chain of command reviews were superficial, failed to detect any of these issues, and failed to kick back the primary investigation for additional work.

▪ The FRB failed to analyze data in its Fourth Quarter 2015 review that reflected a high incidence of force cases involving PO-1 (and PO-2, with whom he worked regularly). An APD analyst had provided use of force data by officer name in the report expressly for that purpose, but obvious patterns were either not identified or were ignored.

▪ Possible policy violations concerning the use of profanity, vehicle pursuits, and the use of OBRDs were not properly handled; nor were prior violations factored into the investigation to detect any potential on-going patterns of violations.

▪ The system for tracking the above policy violations and detecting patterns is unreliable.

▪ Questions about possible untruthfulness went unaddressed.

- Report writing deficiencies were not identified and remediated.

- No meaningful follow-up on any issues took place.

- An Acting Sergeant and Acting Lieutenant were placed in difficult positions and apparently lacked the requisite training to address key issues.

- Subsequent, reviews triggered by multiple EIS Alerts, were not timely, were perfunctory, and essentially ratified the officer's conduct by omission of remedial action.

- For some reason, the criminal complaint against the suspect was not signed and the suspect was released shortly after his arrest, raising questions ultimately about the involved detective's level of diligence and the operation's value in combating APD's serious auto theft problem.

None of the foregoing issues are esoteric; nor is special expertise required to identify and address most. They are generally self-evident and a matter of commonsense for any professional law enforcement supervisor --- if, and only if, sergeants and command officers are fully engaged, held to high standards, committed to high accountability, and well trained. To reach that end APD must first recognize "what right looks like" instead of relying on past notions of how performance should be managed. In the opinion of the monitoring team, while these characteristics exist in some APD commands --- again, reported on previously --- such as within the Special Operations Section, the overriding culture in field operations (as a whole) is sorely lacking in this critical area.[26]

## Section 8.0: Operational Compliance

Until APD demonstrates that the system and every component within it are effective, it will be impossible to evaluate operational compliance because the use of force database will be unreliable. The system also will continue to fail the three basic tests of effective risk management: Catch deviations early; catch them when they are small, and catch them when they are most remediable. In the monitoring team's experience, an underperforming use of force oversight and accountability system will increase the likelihood of the following outcomes:

- Problems will go undetected, or worse, tolerated or glossed over, with predictably bad future outcomes. Our findings with the current process bear this out.

---

[26] It is important to note that during Area Command visits --- thus far --- the monitoring team has been impressed with the professionalism of the commanders. This leaves the monitoring team with the distinct impression that when "what right looks like" is defined and enforced from the highest levels, the commanders will embrace it.

▪ APD will continue to expend finite resources in activities that produce little commensurate value in terms of accomplishing the Department's reform agenda. <u>Failures at the front end of supervision in the field are having a significant negative consequence on the resources currently assigned to the IAS.</u>

▪ The Department's ability to defend itself in legal proceedings will be seriously compromised.

▪ The Department will fail its employees in its responsibility to provide timely, actionable feedback to reinforce conformance to high work standards, commend exceptional performance in difficult circumstances, and interdict developing patterns of unsatisfactory work performance or conduct when coaching or lesser forms of discipline are suitable and effective, instead allowing problems to fester and grow to the point that indefensible civil-liability-incurring actions occur.

▪ Community trust will fall in the wake of preventable, adverse events and the seeming inability of the Department leadership to provide effective oversight and hold officers properly accountable for the use of force.

▪ Those in key oversight roles will lack the skills and perspectives essential to maintaining the system's integrity, creating significant deficits in the department's professional capabilities. Again, this is not intended to be a dispersion cast toward the professional demeanor commonly demonstrated by APD command staff. Instead, it speaks to a lack of understanding what the end state should be to accomplish operational compliance with the CASA.

▪ Important work will be done poorly or go undone. This will become a positive feedback loop that will repeat, possibly worsen, and continue to generate adverse events.[27]

▪ The system's present state <u>cannot</u> generate reliable, high quality use of force oversight and accountability.

▪ The inability to achieve the system's purpose reliably poses a major barrier to both near- and long-term operational compliance.

▪ Informed decision-making will be impeded by sub-par investigations at all levels and the unreliable organizational databases that are derived from those investigations.

---

[27] National Institute of Justice (NIJ) Sentinel Events in Policing (2007).

- The risk of serious adverse incidents will continue to be high.

- The cost of serious adverse incidents will increase because the system lacks the ability to capture normative deviations early, when they are relatively small, and when they are generally more remediable.

- Systemic failures will continue to be a significant factor in liability exposure.

- Without a culture that fosters high levels of oversight and accountability at all levels, the Department will fail to meet its professional obligations and continue to underserve both its work force and the citizens of Albuquerque.

Specifically, the monitoring team is highly concerned about the following issues that will confront APD based on our understanding of its internal processes related to use of force, The reader should note that <u>The monitoring team did not receive a full record of this case until after multiple requests for information</u>.  Notwithstanding that, we believe it to be a useful exercise, based upon the extant record and the preponderance of evidence standard, to render the following findings to achieve reasonable closure on key issues.  We, of course, reserve the right to amend any of our findings based upon new evidence or documents not previously disclosed to us by APD.  In doing so, our intent is to provide detailed support for the reform effort for APD's use of force oversight and accountability system, rather than creating a basis for any disciplinary action.  Without such an accountability system, success will continue to elude the Department.  This is not an exhaustive list:

1. A serious, reportable use of force occurred, but multiple subsequent reviews by supervisors as various ranks and commands failed to detect and classify it properly.  This initial failure was compounded by a deficient supervisory investigation and superficial chain of command reviews that failed to catch and correct earlier mistakes.  The use of force --- a knee strike to the head of a defenseless suspect --- was unnecessary and, arguably, amounted to a use of deadly force.  The officer provided no justification for its use in his official report.  <u>We see this as a critical issue</u>.

2. To rationalize improper conduct, during subsequent investigations justifications for an officer's uses of force were introduced by supervisory or command personnel that were never claimed by that officer.

3. The use of bait cars, if the deactivation technology is unreliable, is a high-risk tactic, especially if pursuits result.

4. APD's official policies have been undermined by successive rationalizations and unofficial, unapproved interpretations that dilute original intent with respect to profanity and distraction strikes. <u>We see this as a critical issue</u>.

5.  Across the board, the monitoring team has found that the components in APD's system for overseeing and holding officers accountable for the use of force largely failed.  Hence, the serious deficiencies revealed point to a deeply rooted systemic problem with significant cultural overtones.  <u>We see this as a critical issue.</u>

6.  The deficiencies, in part, implicate a low accountability culture at work, particularly in chain of command reviews.  <u>We see this as a critical issue</u>.

7.  The system also failed to identify and address other policy violations, including vehicle pursuits, use of OBRDs, and the use of profanity.  <u>We see this as a critical issue.</u>

8.  Because incidents were regarded as discrete, isolated events, prior cases were disregarded or overlooked, and no case integration occurred.  This resulted in a significant, developing pattern being missed in the case of the two involved officers.  <u>We see this as a critical issue.</u>

9.  Mistakes or misconduct led to reporting failures, delayed investigations, and the loss of potential evidence, including key statements currently plague the APD process.

10. Three months elapsed from the issuance of the first EIS Alert until any sort of intervention took place.  Intervening uses of force were not discovered, though additional EIS Alerts were issued over the course of the investigation.  Despite the issuance of multiple alerts, the Department's EIS failed to result in appropriate, effective supervisory or command reviews.    Finally, the follow-up actions taken were based upon incomplete data and were of little effect in changing the officer's underlying behavior.  <u>We see this as a critical issue</u>.

11. In two separate December 2015 memos, a sergeant and a lieutenant express concerns about the officer's extensive use of curse words (two separate uses of force, within two days, are involved).   The lieutenant described the officer's behavior as "an unconscious response to the stress of the situation."  Despite concerns about the officer's handling of job-related stress, he remained in an assignment where stressful encounters are common.  No meaningful follow-up action took place.  This approach is not sound in terms of risk management and behavioral health principles.  We see this as a critical issue.

12.     The IRT investigation resulted in a page and a half memo, with no interviews being conducted.  The investigation appeared based, for the most part, upon review of the original case reports, which, as we noted, were seriously deficient. The investigator gratuitously provided a justification for the use of force that was never articulated by the officer and was contradicted by video evidence.  We see this as a critical issue.  Further, the DA's Office was not consulted..

13.     Operational compliance cannot be properly assessed unless reliable data is generated by APD's use of force oversight and accountability system.  Based upon previous case reviews and this case, we have major reservations about the system's ability to produce high-quality, trustworthy data.  <u>This will impede operational compliance significantly</u>.  We see this as a critical issue, based on information available to and reviewed by the monitoring team as late as August 17, 2016.

14.     APD, at multiple levels and stages, missed significant opportunities to catch problems early, remediate and resolve them quickly, reinforce good practice, and provide invaluable feedback to the policy and training functions.  <u>We see this as a critical issue.</u>

15.     At two points in the system---the CIRT review and the newly-assigned Area Commander's level---APD staff acted properly and "did the right thing" in their handling of different case issues.  <u>These two points stand out in bold relief because every other point in the system failed</u>.

16.     An acting sergeant and acting lieutenant struggled to clarify what to them was an ambiguous, troubling situation---that is, whether distraction strikes without a complaint of injury were actual uses of force.  Their persistence, albeit somewhat circuitous, eventually brought the incident to light.  Their efforts, especially in a culture of low accountability, <u>should not go unnoticed</u>.  <u>The irony is that these two officers are apparently the only two other APD officers --- aside from PO-1 --- that received any type of counseling or discipline. The monitoring team identified several other APD officers and supervisors that were as, or more, implicated in the problems reflected in our analysis.</u>

17.     The monitoring team's preliminary review of the IAS investigation into this matter also revealed significant deficiencies.  Accordingly, after completion of an in-depth review of that file, we will review those fully in IMR-4.

## Section 9.0: Recommendations

In view of our assessment that APD currently falls well short of compliance in the performance of its use of force oversight and accountability system, we believe that some form of enhanced review is essential to overcome existing deficiencies and accelerate the pace of reform. The monitoring team acknowledges that recent training will support and accelerate compliance to some extent, but without frequent, timely, and emphatic supervisory and managerial feedback, improvements will proceed slowly and incrementally. However, without the proper nurturing and oversight at the command and executive level, even the best of policies and training cannot produce meaningful change in the field.

Existing assessment-feedback loops --- the 90-day FRB review and the 120-day monitor's reporting periods --- are far too elongated and infrequent to achieve dramatic performance gains in the short run. Although improvements should be seen immediately, gains at the higher end of the performance curve will be more difficult and slower, because of the increasing complexity and cognitive requirements of the work. Scenario one---the existing level of formal review--- assumes no form of enhanced review, relying solely upon the existing mechanisms. Under such a system, that curve rises slowly over time; hence, the compliance standard of 95% will take longer to achieve

The second scenario---an enhanced level of review--- assumes that APD will implement some form of intensive review that will, in effect, create far a more compressed and assertive assessment-feedback cycle, which should produce far steeper progress toward the compliance standard.[28] Moreover, because it is equally important to sustain compliance after achieving it, enhanced review may be necessary for an extended additional period to ensure that the improvements become institutionalized. The assumption, of course, is that at some point the Department's use of force oversight and accountability system[29] will perform well enough to sustain compliance.

In addition to our chief recommendation, the monitoring team believes that additional steps can be taken to intensify and strengthen the transitional process, including:

▪ Require investigating supervisors to present their cases during FRB quarterly reviews in-person. This will underscore the important role of supervisory investigations as the primary unit of work in the Department's oversight and accountability system. It will also reinforce in very direct fashion Departmental expectations and standards for supervisory investigations.[30]

---

[28] An example of an enhanced review would include the implementation of a random review team.
[29] We include both civilian oversight and APD's internal audit function as system components.
[30] We are not proposing that this take on punitive overtones. Hence, we recommend that presenters be provided a template (or sample presentation) and training from an experienced presenter before being tasked with an actual presentation.

▪ Require all investigating supervisors to complete the APD *Job Aid for Supervisors: Use of Force Incident Review*, sign off on it, and include it in their report. Review the current aid to ensure that it is comprehensive and provides clear, step-by-step guidance. For example, revise Checkbox #4 to remind investigators to review the videos of ALL officers who were at the incident scene.[31] Further, require chain of command reviewers to assess and verify by signature that the checklist has been satisfactorily completed. The purpose of this structured approach is to document that standards are being met and that policy and procedures are being encoded in long-term memory. APD may at some point simply decide to convert the checklist into a report format with standard elements organized logically. This would ensure consistency, completeness, and facilitate the work of reviewers.

▪ Define the terms of reference more precisely for chain of command reviews. The purpose of these reviews is not to either re-investigate the incident or simply regurgitate earlier narratives, <u>as is the common practice</u>. The purpose of later reviews is to ensure that all investigative steps have been properly completed, that <u>all significant issues and questions have been identified and resolved</u>, that any findings meet the <u>preponderance of evidence standard</u>, that any legal issues have been analyzed properly, that any discrepancies between the accounts of involved officer, witnesses, and video evidence have been addressed, that any <u>performance or misconduct issues have been identified and addressed</u>, and that any required follow-up action is taken and documented. Command officers should be required to verify the satisfactory completion of each by signature. If the primary investigation is deficient, it should be "kicked back" for further work.[32]

▪ Conduct immediate and intensive and extensive command-level training on the redefined terms of reference for chain of command reviews. Actual cases should be reviewed in an interactive, problem-solving format to focus upon higher order skills, such as analysis and synthesis.

▪ Develop a formal feedback report to supervisors summarizing common investigative deficiencies revealed in FRB and IMT reviews from the most recent period and, more importantly, reinforcing compliant and exceptional investigative practices. This report should provide an example of each deficiency and, as a

---

[31] This proved to be a major gap in several recent serious uses of force cases. Had all of the video evidence been reviewed at the outset, the investigation might have taken a far different, more appropriate course.
[32] Similarly, we see this as a supportive, coaching, and collaborative process, and not punitive in any sense. Obviously, a pattern of deficient investigations may warrant remedial training or even disciplinary action at some point.

counterpoint, demonstrate the correct version or practice. Additionally, exemplary practices should be highlighted in the report, which should be kept simple and lean for maximum effect.

▪ Develop an "iterative" training modality for supervisory and command personnel, repeating training, coaching, counseling until the vast majority are self-directed and self-initiating regarding chain of command force reviews.

## Section 10.0:    A Final Note

As with most of the monitoring team's reports, we were forced to set a cut-off date for the receipt of data that we had requested to prepare this report. Otherwise, analysis and report drafting would extend well past the point of marginal value and reason. Unfortunately, one report that is central to this case --- the IAS investigation into the use of force and other policy violations --- was not provided in readable form, despite two failed attempts, in time for the monitoring team to conduct a thorough, in-depth analysis. Consequently, we have not been able to incorporate pertinent revisions into the timeline of events or in the body of the report. Notwithstanding that, we were able to conduct a preliminary review of the file and determine that the investigation in no significant way affects our findings and conclusions in this report.

Quite frankly, our preliminary review of the IAS investigation has sparked another round of significant concerns about how APD conducts such investigations and the fallout from this case. But those are beyond the focus of this report and will be dealt with in IMR-4 in greater detail.

It is also important to note that had all of the involved officers reported accurately in the first instance, much of the confusion over reporting delays, the existence of injuries requiring reporting and investigation, and other irregularities might have been avoided. As substantiated by related IAS investigation, <u>faulty, misleading reporting occurred throughout the handling of this incident.</u> Whether this issue will be addressed emphatically and effectively remains an open question. <u>However, it bears profoundly on the integrity of APD's use of force oversight and accountability system. It also bears directly on the agencies ability to come into compliance with CASA requirements in this and related areas.</u>

## 10.  Summary

This "Special Report" is written in the spirit of problem-solving and "coached" growth, not as an exercise in finger-pointing and blame. APD is well past the point where it can point to a lack of time to identify and address such issues (we are now almost  two years into a projected four-year process). The monitoring team also note that APD appears tend to respond to such problems in a highly centralized and "command-oriented" manner, e.g., creating complex reporting protocols, assigning responsibility to "special units," and building complex systems to address issues that should be

addressed in a decentralized and supervision-oriented manner, using a strong understanding of policy and training requirements, and a one-on-one approach as simple as a sergeant saying to an errant officer: "I know what you did, and, frankly, it's not acceptable. What we need to do is…!" This seems simple, but it is, in fact, one of the most problematic organizational responses to "build" into a modern American police agency. While centralized systems, computer warnings, and data mining are "sexy," they are not always the answer to problems such as those APD confronts.

In the monitor's experience, nothing beats the observant hand of a well-trained, knowledgeable, observant, forthright, no-nonsense sergeant in a police agency's attempt to change officer behavior in the field. The Pittsburgh Bureau of Police came into compliance shortly after they promoted, trained, and tasked a new cadre of (additional) sergeants to observe, assess, identify and correct officer behavior that was outside the parameters of the department. The New Jersey State Police came into compliance shortly after they created the new rank of "Staff Sergeant," a group of senior people tasked with assessing line sergeants' abilities to observe, assess, identify and correct officer behavior that was outside the parameters of the department. In the monitoring team's opinion, APD will come into compliance only after they create a group of sergeants who can do the same.

| Appendix A: Timeline of Significant Events |
|---|

- **APD UOF2015-1**
- **Officers 1 and 2**

This timeline is based upon official APD files that the monitoring team has reviewed to date. The monitoring team reserves the right to reconsider any findings or recommendations if new documents come to light.

| October 20, 2015 |
|---|

Department Special Order 15-91 Use of Force Investigative Procedures (10/20/15) mandates that all APD personnel "…follow the requirements set forth in the Settlement Agreement". This included Paragraphs 41-45 that deal specifically with use of force reporting.

> *The monitoring team commented on SO 15-91 in IMR-2, specifically concerning the distribution of organizational policy in this fashion --- especially policy related to the CASA. While top levels of the organization were still struggling through the development of basic policies on use of force, to disseminate a Special Order on a topic of this magnitude --- and expect front line personnel to implement it on their own --- was ill advised to say the least. That being said, many of the failures associated with this case are fundamental to basic principles of supervision and accountability.*

| October 30, 2015 |
|---|

➢ An auto burglary/theft bait car operation was conducted by detectives; the suspect fled in the bait vehicle; a brief pursuit followed; the cut-off switch in the bait car finally worked; patrol officers engage in a brief standoff as the suspect remained in the vehicle, and then the suspect fled on foot, and was apprehended after a brief foot pursuit.

> *There is a video of a pursuit that ends when the deactivation technology finally works after several failures. The pursuit appears to violate APD policy and is inconsistent with the officer's statements that he shut down his emergency equipment and discontinued the pursuit.*

➢ PO-3, in his supplemental report, stated that, "My Taser video [of the incident] was tagged into evidence."

> *In his IAS interview he stated that he started his report and the download that night, but it appears that he did not complete it until the next shift. While these types of discrepancies appear minor, in the monitor's experience, they can be critical.*

➢ Both Officers 1 and 2 in their supplemental reports stated that they each delivered 2-3 knee strikes to the suspect during the apprehension.[33] Neither reported the use of force to their supervisor or any on-scene supervisor. Both officers submitted Supplemental Reports to the auto theft report that documented their use of force --- both reported knee strikes to the suspect's torso and marked H on the body diagram when the Use of Force Data Report was completed later.

> *PO-1, when interviewed by SGT-1[34], indicated that he saw the suspect run face first into a mattress. He then delivered 1-2 knee strikes to the torso. PO-1 told SGT-1 the suspect most likely received his bloody nose from running into the mattress, "…as there was no contact or strikes delivered to the facial area." This explicit assertion is curious in light of the relevant monitoring team's case review.*

➢ CSI-1 is listed in the report as having taken photos of the injured suspect, <u>whose facial injuries are clearly seen in the frontal photos</u>. They were requested by DET-1 at the Prisoner Transport Center.

> *The monitoring team found nothing in the record that the Detective notified any field sergeant of the suspect's injuries and the photos. The suspect's injuries are also clear on SGT-4's video of the incident (see the footage following 3:53 on the video). Under 'types of injuries" in the Use of Force Data Report it is indicated that the suspect suffered a bloody nose and that EMS was called to the scene; however on the diagram there is no indication that the suspect's head or face was struck.*

➢ PO-4 noted in his supplemental report that he observed, "…bleeding from [the suspect's] upper lip and nose area." Further, he stated, "I could still see blood coming from his nose and he told me his face hurt."

> *Neither PO-1 nor PO-2 mentioned anything about the suspect's injuries in their supplemental reports. PO-1 does not report the knee strike to the suspect's face. He does report that his knee strikes were to the suspect's torso, marking location H on the body diagram in the Use of Force Data Report completed later.*

---

[33] Neither officer reported a concern that the suspect was armed with a weapon, nor did they suggest their use of force was due to a heightened concern after the recent shooting of a fellow APD officer. However, these two facts were introduced later by a commander during the IAS case review.
[34] The date PO-1 and PO-2 are interviewed is unclear since the report was initiated more than a week after the event.

➢ Although he was, in effect, the reporting witness, SGT-4 was never interviewed by SGT-1 during the use of force investigation. He did, however, mention the injuries in his supplemental report.

> *[SGT-4] stated in a recent IAS interview that he briefed LT-1 on the incident because <u>several officers had expressed concerns about the use of force that had occurred</u>. He further stated in the same interview that PO-5 had told him that distraction strikes were not a use of force unless there was a complaint of injury. PO-5 apparently consulted SGT-5, a relative, about the issue before speaking to SGT-4.*

Thus we appear to have a sergeant taking advice from a police officer about use of force issues! APD should consider this situation intolerable and ensure that acting sergeants either should not be tasked with such force reviews, or that **all sergeants** are sufficiently trained to do so effectively and correctly. Supervisory training regarding use of force was implemented after this event occurred, but given the monitoring team's review of same, we are not convinced it would have changed the outcome of this incident's supervisory and managerial review.

➢ Acting LT-1 spoke again with SGT-4 to determine more specifics about the incident and possible use of force. As a result, he called SGT-1 to advise him that the follow-up investigation was "his baby". (LT-1 does note in his IAS interview that he was taught in defensive tactics training that knee strikes with no complaint of injury were not uses of force.) Subsequently, LT-2 called LT-1 obviously upset and said that he had viewed the videos and saw no use of force. He then told LT-1 to write a memo to his command and he would do the same. LT-1 in turn watched all of the downloaded videos and instructed his officers to write supplemental reports.[35]

| **November 5, 2015** |
| --- |

➢ Acting LT-1 contacted SGT-1 and asked whether a Use of Force Data Report should be completed because the suspect was reportedly injured during the incident.

> *This information was committed to an "Additional Concerns" memo from LT-2 to CO-2 on November 16, 2015.*

➢ Acting LT-1 forwarded a memo to CO-3. He recounted the initial facts surrounding the events of UOF2015-1. He indicated that he reviewed lapel videos and observed PO-1 and PO-2 deliver knee strikes to the suspect. He wrote, "In all the videos I found that everything done by the officers on this call was in compliance with their training and within department SOP <u>and did not</u>

---

[35] The records that were used to create the above account are a bit confusing; thus, some of the dates may not be accurate, though the sequence of events appears accurate.

<u>meet the use of force criteria</u>." (Emphasis added)  Obviously, according to the training academy, this was not true at the time.

➢ LT-2 forwarded a memo to CO-2 indicating he had been contacted by Acting LT-1.  LT-1 wrote, "At the minimum, the question of a possible Use of Force situation and the question of whether a couple of knee strikes as a distraction technique would warrant a full use of force investigation, should have been addressed by SGT-5…"

> *Instead of taking the initiative to initiate a Use of Force investigation for the two officers under his supervision, and reviewing all the videos himself, a force investigation did not begin until 3 days later and LT-2 recommended that LT-1 (an acting lieutenant) review all the lapel videos (which would have been appropriate too).  Thus, LT-2 simply "kicked the can" to a less experienced lieutenant, instead of leading the less experienced lieutenant through proper protocols.*

| **November 8, 2015** |
| --- |

➢ Use of Force Data Report (UOF2015-1) was completed by SGT-1, listing PO-1 and PO-2 as the subject officers.[36]  In his report he notes the following:

- On October 31, 2015, at 0310 hours, LT-1 notified him by phone about a possible use of force incident that had occurred during a bait car operation.
- LT-1 further advised that Acting SGT-4 had reported the incident --- described in the report as "2-3 knee strikes" --- to him.  This occurred approximately 1.5 hours after the incident, according to LT-1.
- LT-1 also advised SGT-1 that the suspect apparently suffered a bloody nose during the incident.
- The Use of Force Data Report indicated that the subject suffered a bloody nose during the arrest.
  *There is no indication that SGT-1 conducted an interview SGT-4 or any of the other officers who were at the scene.  There is no indication that there were any attempts to identify or interview other witnesses that may have been in the area.  SGT-1 failed to initiate use of force investigations into at*

---

[36] The report is deceiving in the way it is worded.  While it is dated November 8, 2015, the narrative gives the impression that events occurred contemporaneous to the actual use of force.

*least two additional officers who assisted with the arrest and handcuffing of the suspect.*

➢ SGT-1's report indicated that LT-1 first reported the incident to him on 10-30-2015 at 0310 hours. The rest of the report appeared written from the same time perspective, though the report is actually dated 11-8-2015.

> *There is no explanation of this anomaly in the report or in the memo that he prepared in connection with the report. If he in fact did all that he sets forth in the 11-8-2016 report on the morning of the incident, it is unknown why the investigation, including the Use of Force Data Report, wasn't dated and completed during that shift. This timing issue should have been clarified in the report and follow-up chain of command reviews.*

➢ ASGT-1 concluded that both PO-1's and PO-2's knee strikes were "reasonable and within policy". However, he only looked at videos from the two officers, though there are seven others of the incident. The videos that capture the knee strike to the suspect head were never reviewed by SGT-1.

➢ Both officers stated that the suspect ran into the mattress, which collapsed, causing him to fall to the ground, according to Viers' report.[37]

| **November 9, 2015** |
| --- |

➢ SGT-1 prepared an Additional Issues of Concern memo regarding the incident. In it he expresses concern about the initial reporting failure, but placed responsibility for it upon SGT-4, and not on either of the two officers who actually used force (he mentions both as subject officers). He also notes a concern about the failure of detectives to direct the two officers to submit supplemental reports about their involvement in the incident. Both officers, however, did complete the reports. SGT-1 routes the memo directly to the Commander, and cc's LT-2 on it. He identified no other issues of concern.

| **November 16, 2015** |
| --- |

➢ LT-2's Brief (Review) of the Use of Force Data Report is dated some eight days later. He concluded that both PO-1's and PO-2's knee strikes were in compliance with policy.[38]

---

[37] During his IAS interview PO-1 indicated he did not know if the suspect ran into the mattress. An objective review of videos available to all APD supervisors and commanders show the suspect running to the mattress and crouching down, not running into it face first as indicated in police reports.

➢ LT-2 also completed an Additional Concerns memo in which he reported that SGT-1 advised him on 11-5-2015, "…that he had been contacted by LT-1…[about] whether a Use of Force Report should be done because the suspect was found to have a bloody nose after he was taken into custody." He went on to report that the incident details are "…outlined in the attached police reports and Use of Force Data Reports." He went on to explain his concerns about the initial reporting failure and the detectives' failure to direct the two officers to complete supplemental reports. He also reported that LT-1 told him that he hadn't reviewed any videos of the incident.[39]

➢ In his memo LT-2 did not explain his response to SGT-1's question, though he alluded to "police reports and Use of Force Data Reports". He also stated that "…[d]ue ot (sic) the fact that no supervisor at the scene, (sic) conducted a Use of Force investigation, it is unknown how or when any abrasion [to the suspect's face] occurred." This appears inconsistent with the 11-8-2015 Use of Force Data Report completed by SGT-1, which implied that he investigated the incident on the date of occurrence, though his investigation was delayed because the incident was not reported in a timely fashion.

> ***In the opinion of the monitoring team, no reasonable and objective investigation into this matter --- in particular one that included viewing all the lapel videos associated with the case --- would reach a conclusion other than the injury to the suspect's face occurred as a result of the knee strike delivered by PO-1.***

➢ LT-2 recommended that this incident be reviewed by the CIRT Team, but provided no specifics on what a CIRT review should focus on. Other than what appears to be the Commander's initials in the salutation of the memo, the Commander makes no substantive remarks. However, he does conclude that the force in the case was within policy and reasonable.[40] <u>There is no documentation on when the case was actually forwarded to CIRT and when it was received in IAS</u>.

> *It is important to note that by this time in the sequence of events multiple failures existed at the officer, sergeant, lieutenant and commander levels. Those failures also crossed into more than one organizational entity.*

---

[38] The Evidence.com ledger of videos that depict the knee strike to the head of the suspect documented that LT-2 viewed the videos on November 17, 2015, the day after he authored his memo.

[39] The Evidence.com ledger of the most critical video that depicts the knee strike to the head of the suspect documented that LT-1 did in fact view that video on November 5, 2015 --- the very day LT-2 documented he spoke with LT-1.

[40] **The Evidence.com ledgers show the commander did not review relevant lapel videos before reaching his conclusion that the force in this case was justified and within policy**.

| November 19, 2015 |
|---|

➢ CO-2's Commander Brief is dated three days after LT-2's Brief. He documented, "[t]he decision to initiate this use of force report was mine…." However, he provided no date on which he made the decision and to whom it was assigned. He provided no background to explain the reporting irregularities.

> *The Commander's Brief consisted of a brief concurrence and a conclusion that the use of force by PO-1 and PO-2 was within Department policy. Despite the many obvious deficiencies with the investigation, the case was passed along by the Commander without further probing or questioning.*

| November 24, 2015 |
|---|

➢ An EIS Hit/Alert was issued for PO-2.

| December 4, 2015 |
|---|

➢ An EIS Hit/Alert was issued for PO-1.

| December 8, 2015 |
|---|

➢ SGT-2 sent a memo to CO-2 regarding a use of force incident involving PO-1 that occurred on December 3, 2015.[41] SFT-2 identified two areas of concern. First, the two officers (PO-2 is paired with PO-1) continued to "pursue", in effect, even after shutting down their emergency equipment. (This may be a policy violation in itself. They also pursue a stolen bait vehicle in UOF2015-1, which is captured on PO-1's in-car video.) Second, he stated that PO-1 "utilizes a **plethora** (emphasis added) of curse words (numerous uses of "fuck", according to LT-2 complementary memo). He stated that he understood the "application of language (curse words) designed to illicit (sic) compliance from the suspect", but would like to see the officer work on this issue in the future. He also stated that he and SGT-1 formally counseled the officer about the use of curse words.

> *The monitoring team is not clear on the referent for the above memos. PO-1 was involved in use of force incidents on both December 3 and 4, 2015. Apparently, his cursing "stands out" on both videos. LT-2 stated that he concurred with SGT-2's findings, but it isn't clear in which case.*

---

[41] The incident was numbered UOF 2015-000156 (a different number is cited in the memo), and it appears in the EIS Hit/Alert issued on January 1, 2015. It, however, is not covered in the Commander's review of the EIS Hit/Alert issued on December 4, 2015.

*Policy and training should require a set of memos of concern for each case, or better yet, a single memo that is forwarded through the chain of command with comments added as appropriate. It is clear to the monitoring team that the informal handling of this type of performance deficiency that can lead to higher-level concerns is common within APD. The need for involved and careful front line supervision --- and allowing supervisors to remediate lower level performance deficiencies --- is critical to APD turning the tide on their culture. However, at the current time APD fails to properly document and track---if tracked at all --- recommendations supervisors make for performance monitoring of their officers.*

**December 17, 2015**

➢ LT-2 sent a memo to CO-2 on a different incident (UOF2015-2) and specifically stated that PO-1's use of profanity may be "an unconscious response to the stress of the situation". His action step was to have SGT-1 "routinely review" the officer's videos to monitor his future behavior and assist him "with consciously changing this response to high stress situations". He also stated that the officer was advised that failure to change his behavior "could result in disciplinary action".

*The monitoring team followed up with APD to obtain COB records that demonstrated APD followed up with the recommendation made by LT-2. APD could supply no record to substantiate that the required follow-up ever occurred.*

**December 17, 2015**

➢ CIRT Detective DET-2 sent a memo to CIRT SGT-6 that stated he began review of the case materials on December 16, 2015, almost a month after it was referred to CIRT by LT-2.[42]

*The monitoring team noted that during his initial review of the incident lapel videos, he concluded that the case raised an issue of concern "…regarding a serious use of force that was not documented." DET-2 specifically stated, " PO-1 uses a knee strike to the suspect's head and the suspect appears to lose consciousness." He ceased his review and referred the matter back to SGT-6, who then referred the matter to IAS.*

---

[42] The delay on the part of CIRT seems significant, but, in fairness, there was no apparent urgency that could be drawn from the memo, as the case was not referred for reasons of misconduct.

| **December 21, 2015** |
|---|

➢ APD's Investigation Response Team (IRT) initiated a criminal investigation into this case after the IAS Commander advised IRT that the case involved a serious use of force.

| **December 24, 2015** |
|---|

➢ The IRT investigation concluded that no probable cause exists to proceed criminally.

___*The investigative report consisted of a page and one-half memo and no interviews*___.    *The DA's Office is not consulted, nor were any witnesses interviewed.  The investigator relied solely upon his interpretation of the lapel videos and failed to mention the discrepancy between the officers' reports and the video evidence.   He gratuitously provided a rationale for the knee strike to the head in his memo, even though the subject officer never reported it or explained the justification for it in his report.*

*During its regular site visit with APD in June 2016, the monitoring team met with supervisors from CIRT, IA and IRT.  Aside from the blatant failures in the IRT investigation --- as many CASA requirements were not followed --- the monitoring team learned at that time that the IRT investigator was never provided any of the Use of Force Data Reports that were prepared by Sgt. Briefed by Sgt.  By design, IA and IRT operate in a manner where the sharing of Use of Force Data Reports does not occur.  They cited the need to keep investigative and administrative investigations separate.   To the monitoring team, it defied all logic that PO-1's and PO-2's entire chain of command, as well as IA up to and including the Chief's office, and CIRT were all privy to these documents, but the investigator charged with the responsibility of determining criminal culpability was not.*

| **December 24, 2015** |
|---|

➢ IAS began its Administrative Investigation into UOF2015-1, which was completed on May 20, 2016.[43]    The cycle time for the administrative investigation was approximately five months or 150 days, which exceeds the maximum tolling period

---

[43] The IAS case number was actually "pulled" on January 3, 2016.

for IAS cases --- 90 days, with a provision for a 30-day extension pursuant to the current City-APOA CBA.[44]

| **January 7, 2016** |
|---|

➢ The EIS Hit/Alert --- December 4, 2015, PO-1 --- was forwarded via memo from the Police Accountability Bureau (PAB) Commander to MAJ-1.   There is no documentation in the file indicating what action was taken by the Major.   <u>Five (5) additional EIS Hits/Alerts were generated on PO-1 between January 12, 2016, and May 5, 2016</u>.

➢ The EIS Hit/Alert --- November 24, 2015, PO-2 --- was forwarded via memo from the PAB Commander to MAJ-1.   There is no documentation in the file indicating what action was taken by the Major.   <u>Four (4) additional EIS Hits/Alerts were generated between December 4, 2015 and April 4, 2016</u>.

➢ SOP 2-52 Use of Force is approved by the monitor.

| **February 12, 2016** |
|---|

➢ SOPs 2-53 ECWs and 2-54 Use of Force Reporting are approved by the IM, Dr. Ginger.

| **March 3, 2016** |
|---|

➢ SEA Commander sent a memo to the IAS requesting that it initiate an investigation into PO-1's "camera use".   In the memo he identified three (3) performance issues: 1) Failure to follow his tactical training re backup; 2) Failure to record the incident with his OBRD; and 3) Poor report writing.   He also described investigative failures by SGT-1, but attributed them to "confusion over which use of force policy we were operating under".

*That statement, in the judgment of the monitoring team, seriously mischaracterizes the nature of the deficiencies in the sergeant's investigation, which are far more basic and have little to do with "transitional confusion".   As noted earlier in this report, the monitoring team has seen regular examples where APD supervisors (at all levels) <u>rationalize or explain away minor, as well as serious, performance issues</u>.*

---

[44] Source:  City of Albuquerque and APOA, Collective Bargaining Agreement, expires June 20, 2016, Article 20 INVESTIGATIONS and DISCIPLINE, sub-section 20.1.16.   The provision also allows 30 days for the internal review process once an investigation is completed.

| March 4, 2016[45] |
|---|

➢ A SEA Commander's memo --- which appears to be incorrectly dated[46] --- to the Commander of Internal Affairs (sic) documented that he met with PO-1 on 3-10-2016, and found the three (3) uses of force within policy, and determined that no further action was necessary.

> *It is not clear if the officer's immediate supervisor and lieutenant were involved at any point in the process. A little over three months elapsed between the EIS Hit/Alert and the Commander's "intervention" PO-1 was involved in four additional use of force incidents during that time. UOF2015-1 is one of the three cases covered in the Commander's review. It does not appear that the Commander checked for recent EIS activity. This finding by the commander illustrates serious disconnects within the oversight of force, especially when a simultaneous IA investigation is taking place --- one where allegations were ultimately sustained.*

| March 10, 2016 |
|---|

➢ SEA Commander meets with PO-2 and PO-1 in separate face-to-face meetings.

| April 4, 2016[47] |
|---|

➢ The SEA Commander sent a memo to the Commander, Internal Affairs (sic) documenting that he met with PO-2, found the three (3) uses of force within policy, and determined that no further action was necessary. It is not clear if the officer's immediate supervisor and lieutenant were involved at any point in the process.

> *Three months elapsed between the EIS Hit/Alert and the Commander's intervention. The officer was involved in four (4) additional use of force cases during that time. (If the 12-4-2015 EIS Hit/Alert is used, that number would be three (3). UOF2015-000150 is also included if that date is used.) The memo refers to three (3) uses of force, but there are four (4) uses of force listed on the EIS Hit/Alert dated 12-4-2015, which appears to accompany the PAB memo transmitting the case to MAJ-1. It does not appear that the Commander checked for recent EIS activity.*

---

[45] April 4, 2016 is probably the correct date. Accordingly, we have made a double entry of this event for both dates.
[46] The date of the memo precedes the date of the meeting it reports on.
[47] This is a double entry. See March 4, 2016 for a full explanation.

➢ There is a time stamp that apparently indicated the date on which the SEA Commander's March 4, 2016 memo was received in the PAB. The stamp is initialed. The April 4, 2016 memo shows the same time stamp.

| April 29, 2016 |
| --- |

➢ SGT-1 was removed as a subject (target) in the IA Investigation and reclassified as a witness.

> *The monitoring team can find no explanation of this action in the record, despite CO-1's 3-3-2016 Interoffice Memorandum to IAS flagging substandard investigative practices by SGT-1 in a separate case (Use of Force Report 15-0117657). The investigative shortcomings are similar to those in the instant case.*

| May 11, 2016 |
| --- |

➢ The monitor sent a letter of concern to Chief Eden regarding PO-1's involvement in three (3) serious use of force incidents in a matter of weeks --- all of which were improperly investigated.

➢

> *This letter was sent to Chief Eden shortly after the monitoring team discovered major issues in UOF2015-1. The letter also noted that the officer's immediate chain of command apparently had failed to detect and thoroughly investigate the use of force in one particular incident, which involved a knee strike to the suspect's head. The IM requested use of force records and EIS Hits/Alerts for both officers from January 2015 to date.*

| May 13, 2016 |
| --- |

➢ Director Slauson responded to the monitor and acknowledged receipt of the monitor's e-mail expressing concern about PO-1's use of force in UOF2015-1 and in several other cases in a five-week period. Director Slauson noted that APD had three (3) serious use of force investigations involving PO-1. He ended his e-mail by stating, "[PO-1] has been flagged for redirected assignment by his chain of command." No specifics were provided on what that entailed.

| **May 16, 2016** |
| --- |

PO-1 is assigned on TDY to the SE Impact Unit, pending review of his use of force history.  This action took place just three days after the IM sent a memo of concern to Chief Eden and four days before the IAS was completed.

| **May 20, 2016** |
| --- |

➢ IAS completed its Administrative Investigation of UOF 2015-1.[48]

> *Almost six months had elapsed since the original incident and the two involved officers had been involved in eight additional use of force incidents and nine EIS Hits/Alerts had been generated.*

| **June 1, 2016** |
| --- |

➢ CIRT issued an Awareness Report, titled *Under Use of Force*, which expresses concern that "officers are engaging in a dangerous trend."  The report appears to have not been data based, and lists no author.

> *The report is cast largely in generalizations and provided no specific guidance on safety rules that were breached and tactics and techniques that should have been used, but were not in actual cases.  Though the general principles were valid, they are meaningless without specific examples and guidelines.  Importantly, no distinction is made between under-use and restraint.  Further, the report provided no data on which the trend analysis is based (e.g., a rise in officer injuries, FRB cases, or data from Additional Memos of Concern by FSB supervisors and command officers), and failed to identify a methodology  conducting the analysis.  Nor did it identify the author, or the author's supervising agents.*

| **June 8, 2016** |
| --- |

➢ The monitoring team was advised by an IAS supervisor that the 90/30 day tolling period for investigations <u>does not apply</u> to allegations discovered during an investigation.  Rather, the original tolling period applies.

---

[48] The quality of the IAS investigation will be reported on for IMR-4.  However, the monitoring team has learned that as a result of sustained violations of the APD use of force policy PO-1 was given an 80 suspension with 20 hours held in abeyance.  That suspension has yet to be served by PO-1.

*For example, if an allegation of serious misconduct is uncovered one (1) day before the 90/30 day investigative tolling period ends, IA would only have one day to investigate that allegation and reach a conclusion. (This creates a 119th day problem as an extreme example of the rule's effect). The monitoring team was also advised that all witness statements are formally accorded Garrity protections. (We have not as yet found any authority for these "rules".) Obviously, the "rules" seem to inappropriately protect a target officer by reducing the time available to investigate new-found allegations.*

| June 10, 2016 |
|---|

The monitoring team advised APD and City Staff at the Mayor's Exit Briefing about this case in general terms, underscoring that it raises serious concerns about the Department's ability to oversee and hold officers accountable for the proper use of force.

*It was specifically noted that superficial chain of command reviews were especially troubling because that process is the main quality control mechanism in over three-quarters of use of force cases. The monitoring team stressed that when that process breaks down, it generates unreliable force-related data, which will seriously impede the achievement of operational compliance.*

| Appendix B: | Two Examples of Cultural Influences - Profanity and Distraction Strikes by APD Officers |
|---|---|

The monitoring team has conducted in-depth reviews of sizable samples of different types of APD use of force and show of force investigations, excluding OIS investigations.[49]   In addition to finding repeated investigative deficiencies, we have found several patterns that <u>implicate a culture of low accountability and represent serious erosions of original policy intent</u>.   In each, policy provisions appear to have undergone successive rationalizations as cases progressed --- to the point where the exceptions to the policy have now corrupted its original intent.   We explain specifically what we believe has occurred with respect to the issues of profanity and distraction strikes in the following sections.

<u>Profanity</u>

APD SOP 1-4 Personnel Code of Conduct, dated May 3, 2016 expressly prohibits "…coarse, violent, or profane…" language while interacting with other employees or members of the public.   Because officers often revert to curse words under stress, departments typically evaluate these low-level policy violations on a case-by-case basis to take into account understandable mitigating circumstances.  The intent of such policies, however, remains the same:  to minimize the habitual use of profanity in the conduct of official business.  We expect that APD's intent is the same.

*However, what we have seen in our APD case reviews is far different, as multiple exceptions to the policy appear to have been crafted over time to dilute the original intent of the Code of Conduct.  To our knowledge, these exceptions have undergone no official review and approval; thus, they fall into the realm of de facto custom or practice, which can prove problematic in several ways.  Specifically, we note five specific rationalizations---that in effect exempt officers from the Code of Conduct --- that we have found in different use of force investigations justifying the use of profanity:*

- The use of curse words constituted "tactical profanity".
- In using curse words, the officer simply was "mirroring" the subject's verbal behavior.
- The use of curse words was a justifiable "verbal escalation".
- The curse words were not overheard by the public or directed at any person in particular.

---

[49] As noted elsewhere, we have requested OIS files in the past, but none were provided because of backlogs within the system.  In one instance, we were provided the file, however, it turned out to be incomplete and, thus, not suitable for review.  It has since become dated and eclipsed by recent training events and the subject officer's retirement.

▪ The curse words were used to gain compliance from a resisting
suspect.

The relative severity of an APD officer cursing --- versus a use of force --- is
completely understood by the monitoring team. The important take away is the
propensity by APD supervisors to euphemize improper conduct, or rationalize it away,
since is currently permeates supervisory oversight.

The monitoring team commented on this issue in IMR-3 and stressed the need
for a formal internal review to discuss and resolve the blatant conflict between written
policy and front-line practice. We said:

> The FRB reviewed this case in its January Quarterly Use of Force Review
> (for the 4th quarter of 2015). Under Policy, Issues of Concern it states that
> the sergeant "was issued a verbal counseling for allowing the officer to use
> profanity". We find nothing in the record to support that conclusion or
> action. The following sentence, however, states "…verbal counseling was
> not appropriate because policy was not violated." Under a following bullet
> point, it notes that the "[u]se of profanity was a verbal escalation." We are
> aware of nothing in APD policy or training that supports such a statement,
> and it is incompatible with contemporary professional standards. (We
> found the term "tactical profanity" as a justification in another review.) <u>We
> recommend strongly that APD conduct a formal review of this issue and
> then put out definitive guidelines on it.</u> (Underlining in the original report)

Clearly, the present, ever shifting *de facto* approach is a slippery slope, which
tilts even steeper because APD tracks past policy violations involving profanity
haphazardly. This is understandable up to a point, as first-time violations are usually
dealt with informally. The lack of central documentation (history, in effect), however,
makes the detection of unacceptable patterns all the more difficult, except when the
same supervisor or command-level reviewer handles successive incidents involving
policy violations by the same officer.[50] The better approach, it seems to us, is to follow
the more common practice within the field, which is to prohibit the use of profanity
generally, and then handle violations on a case-by-case basis. Frankly, the present
state of affairs has turned the APD Code of Ethics upside down.

## Distraction Strikes

The subject matter of this second example is of far greater concern than profanity
because it means, if widespread, that APD is not, and has not been, capturing and
evaluating a large sub-category of incidents involving force. Distraction strikes --- using
strikes with hands, feet, elbows, or knees, particularly to vital body areas --- are serious
uses of force that warrant reporting, investigation, and adjudication. It appears to the

---

[50] We have found the same problem with tracking OBRD policy violations.

monitoring team that this sub-category of force was "invented" somewhere within the Department to circumvent existing policy definitions and reporting requirements. It, in effect, defined distraction strikes out of the Department's use of force policy. However, it clearly conflicts with both the spirit and letter of APD policy and CASA requirements.

> *The monitoring team finds it inexplicable, and astonishing, that a modern police department[51], any of its officers or supervisors within that department, could conclude that striking a person repeatedly with their knee --- or other body part --- during an arrest <u>does not constitute</u> a reportable use of force. Moreover, we find it incomprehensible that a department under intense scrutiny by a Federal Monitor and the U.S. Department of Justice would relegate such strikes, especially to the head, to the category of "Not a Use of Force".*

The immediate question is whether this misconception persists even subsequent to recent APD training on the use of force (both the 40-hour and 24-hour curricula). Because one officer reported that he had received defensive tactics training in which he was taught that distraction strikes are not considered uses of force **unless** there is a complaint of injury.

> *The instant case (UOF2015-1) even contradicts that erroneous rationale. Recall that the suspect in that case clearly was injured during the course of the arrest. This case contained another type of APD rationalization, where "…the suspect said he wasn't injured." This in clear conflict with the fact that the suspect sustained an obvious injury. Perhaps stating the obvious is necessary here --- Even in those instances where a suspect "claims to be uninjured", but there are clearly injuries following an officer's use of force, those uses of force must be reported.*

The first step is to have training staff assess this issue without delay.[52] Similarly, as seen in the opening quotation, the involved officer in this case stated that he believed that distraction strikes did not constitute a use of force. Importantly, the training review should also stress that distraction strikes to vital areas with a hard object, <u>which includes knees, elbows, feet, and portions of the hand</u>, may even constitute deadly force.

We have deep concerns about this second example because it goes to the core of oversight and accountability. It is one thing for a use of force oversight and accountability system to overlook possible policy violations on occasion, but it is particularly disconcerting when the system actually adopts unofficial, unapproved exceptions to established policy as valid inputs to its deliberations. This introduces

---

[51] By custom, practice, executive endorsement or official policy.
[52] The monitoring team raised the same issue during a site visit with training staff following a presentation of the 40-hour Use of Force Curriculum.

major inconsistencies, conflicts, and unacceptable variation into front-line practice.  It also raises fundamental questions about the integrity of the current oversight and accountability process.

## Appendix C: Open Follow-up Issues in UOF2015-1

The monitoring team has underscored many times that most critical organizational tasks involve repetitive activity cycles that include important feedback loops. We have found that APD frequently neglects to document and close such loops in its use of force oversight and accountability system. Accordingly, we have compiled a list of open feedback loops that exist in the instant case. It is possible that APD resolved some of these issues in the course of its investigation into this case and is currently working to resolve others. The list should not be viewed as exhaustive.

1.    The technology failure in the bait-car operation should be thoroughly investigated, along with the question of whether such a strategy, given its costs and risks, should be part of APD's program to combat auto theft. The issue of why the criminal complaint wasn't signed, leading to the suspect's premature release, should also be investigated.

2.    A possible violation of APD pursuit policy should be investigated and resolved. There is an in-car video showing that a pursuit occurred to the point where the bait vehicle was finally deactivated. There is also a question of whether the officer was truthful about discontinuing the pursuit in his IAS statement.

3.    In a formal memo to IAS, an Area Commander identified three issues requiring action: 1) A sergeant's use of force investigation was seriously deficient; 2) An officer needed additional training on foot pursuit tactics and report writing; and 3) IAS was asked to investigate an officer's pattern of OBRD policy violations. To our knowledge, all three remain open issues.

4.    The IRT investigation into this matter was superficial and insufficient. This case was not referred to the District Attorney for review despite obvious reasons to do so.

5.    Successive EIS Alerts were issued after initial alerts were forwarded to the Area Commander for follow-up. It is unclear what was done with later alerts to ensure that the Commander had full knowledge of additional incidents to include in his review.

6.    APD needs to address current practices, both *de jure* and *de facto*, with respect to profanity and distraction strikes.

7.    Because minor policy violations ---- particularly those involving profanity and OBRD use --- are not tracked systematically, serious patterns of misconduct go

undetected.    APD should evaluate means for tracking these histories without creating undue bureaucracy.

8.      There is an open issue of whether officers were untruthful in their description of how the suspect suffered head injuries by "running into a mattress".  There is a further issue of whether the officers misrepresented the location of their knee strikes in their supplemental report and on the Use of Force Data Report body diagram in comparison to the video evidence.

9.      Deficient chain of command investigations and reviews by at least two supervisors have not be addressed or documented.

10.     In the opinion of the monitoring team there is an open question whether LT-2, who supervises SGT-1, PO-1 and PO-2, was physically present during this event. This issue was broached but not sufficiently probed by IA.

11.     A lieutenant's documented concern about the officer's ability to handle stress in high-risk encounters should be assessed further and resolved.  It should also be determined if the officer's sergeant actually conducted regular reviews of the officer's videos, as directed by the lieutenant, to ensure that his concern was being addressed.

12.     The role of the officer's representative in IAS interviews should be re-visited by the IAS.    In several interviews reviewed by the monitoring team, the representative appears to overstep customary boundaries on numerous occasions.  We see this as a critical issue.

13.     Garrity protections were extended inappropriately to witness officers.    APD should reassess this practice and make it consistent with applicable law and standard professional practices.  In the instances where officers were extended Garrity protections, it is entirely unclear to the monitoring team under what authority an APD IA is operating.  We see this as a critical issue.

14.     There is a question of whether sufficient training is provided to officers in acting assignments, and whether APD relies too heavily upon acting assignments to fill supervisory and command-level vacancies for protracted periods.  We see this as a critical issue.

15.     In the instant case at least two additional officers used force when arresting the suspect.  Those uses of force went unreported and uninvestigated by APD.

16.     It appears that both SGT-1 and LT-2 were logged off, either for the entire shift or the last half of the shift that morning, leaving the SE Area Command seemingly without adequate supervision and oversight. APD should look into this issue to ensure that informal attendance practices are not undercutting field supervision and oversight during critical periods. Further, because the two officers were not forthcoming initially about their duty status that morning, primary reports were incomplete, delayed, and confusing, especially with respect to the timing of key events. The monitoring team identified the timing anomalies, but did not learn that the two officers were absent that morning until reviewing the IAS report.

## Appendix D: Monitoring Team Findings

The monitoring team did not receive a full record of this case until after multiple requests for information. Notwithstanding that, we believe it to be a useful exercise, based upon the extant record and the preponderance of evidence standard, to render the following findings to achieve reasonable closure on key issues. We, of course, reserve the right to amend any of our findings based upon new evidence or documents not previously disclosed. In doing so, our intent is to provide detailed support to the reform of APD's use of force oversight and accountability system, rather than creating a basis for any disciplinary action. Without it, success will continue to elude the Department. This is not an exhaustive list:

1. A serious, reportable use of force occurred, but multiple subsequent reviews by supervisors as various ranks and commands failed to detect and classify it properly. This initial failure was compounded by a deficient supervisory investigation and superficial chain of command reviews that failed to catch and correct earlier mistakes. The use of force --- a knee strike to the head of a defenseless suspect --- was unnecessary and, arguably, amounted to a use of deadly force. The officer provided no justification for its use in his official report. We see this as a critical issue.

2. To rationalize improper conduct, during subsequent investigations justifications for an officer's uses of force were introduced that were never claimed by that officer.

3. The use of bait cars, if the deactivation technology is unreliable, is a high-risk tactic, especially if pursuits result.

4. APD's official policies have been undermined by successive rationalizations and unofficial, unapproved interpretations that dilute original intent with respect to profanity and distraction strikes. We see this as a critical issue.

5. Across the board, the monitoring team has found that the components in APD's system for overseeing and holding officers accountable for the use of force largely failed. Hence, the serious deficiencies revealed point to a deeply rooted systemic problem with significant cultural overtones. We see this as a critical issue.

6. The deficiencies, in part, implicate a low accountability culture at work, particularly in chain of command reviews. We see this as a critical issue.

7. The system also failed to identify and address other policy violations, including vehicle pursuits, use of OBRDs, and the use of profanity. We see this as a critical issue.

8. Because incidents were regarded as discrete, isolated events, prior cases were disregarded or overlooked, and no case integration occurred.  This resulted in a significant, developing pattern being missed in the case of the two involved officers.  <u>We see this as a critical issue</u>.

9. Mistakes or misconduct led to reporting failures, delayed investigations, and the loss of potential evidence, including key statements.

10. Three months elapsed from the issuance of the first EIS Alert until any sort of intervention took place.  Intervening uses of force were not discovered, though additional EIS Alerts were issued over the course of the investigation.  Despite the issuance of multiple alerts, the Department's EIS failed to result in appropriate, effective reviews.    Finally, the follow-up actions taken were based upon incomplete data and were of little effect in changing the officer's underlying behavior.  <u>We see this as a critical issue</u>.

11. In two separate December 2015 memos, a sergeant and a lieutenant express concerns about the officer's extensive use of curse words (two separate uses of force, within two days, are involved).  The lieutenant described the officer's behavior as "an unconscious response to the stress of the situation."  Despite concerns about the officer's handling of job-related stress, he remained in an assignment where stressful encounters are common.  No meaningful follow-up action took place.  This approach is not sound in terms of risk management and behavioral health principles.  <u>We see this as a critical issue</u>.

12. The IRT investigation resulted in a page and a half memo, with no interviews being conducted.  The investigation appeared based, for the most part, upon review of the original case reports, which, as we noted, were seriously deficient.  The investigator gratuitously provided a justification for the use of force that was never articulated by the officer and was contradicted by video evidence.  The DA's Office was not consulted.  <u>We see this as a critical issue</u>.

13. Operational compliance cannot be properly assessed unless reliable data is generated by APD's use of force oversight and accountability system.  Based upon previous case reviews and this case, we have major reservations about the system's ability to produce high-quality, trustworthy data.  <u>This will impede operational compliance significantly</u>.  <u>We see this as a critical issue</u>.

14. APD, at multiple levels and stages, missed significant opportunities to catch problems early, remediate and resolve them quickly, reinforce good practice, and

provide invaluable feedback to the policy and training functions.  <u>We see this as a critical issue.</u>

15. At two points in the system---the CIRT review and the newly-assigned Area Commander's level---APD staff acted properly and "did the right thing" in their handling of different case issues.  <u>These two points stand out in bold relief because every other point in the system failed</u>.

16. An acting sergeant and acting lieutenant struggled to clarify what to them was an ambiguous, troubling situation---that is, whether distraction strikes without a complaint of injury were actual uses of force.  Their persistence, albeit somewhat circuitous, eventually brought the incident to light.  Their efforts, especially in a culture of low accountability, <u>should not go unnoticed</u>.  <u>The irony is that these two officers are apparently the only two other APD officers --- aside from PO-1 --- that received any type of counseling or discipline --- where the monitoring team identified several other APD officers and supervisors that were as, or more, implicated in the problems reflected in our analysis.</u>

17. The monitoring team's preliminary review of the IAS investigation into this matter also revealed significant deficiencies.  Accordingly, after completion of an in-depth review of that file, we will review those fully in IMR-4.

| Appendix E:  Unreciprocated Command Effort to Address Major Deficiencies |
|---|

**Officer PO-2 - OBRD Policy**

**Non-Compliance**

| October 25, 2015 |
|---|

> SGT-1 sent a memo to Commander CO-2 that Officers PO-1 and PO-2 did not have their OBRDs activated for the entirety of a use of force incident.  He went on to note that he spoke with both officers, advised them that the memo would serve as formal documentation, and recommended that no further action be taken.

| October 29, 2015 |
|---|

> LT-2 sent a memo to CO-2 regarding a use of force incident involving PO-2 that occurred on October 23, 2015.  He stated that he concurred with SGT-1's findings (it is unclear if the October 25, 2015 above refers to the same incident).  He noted that, "…this is the second Use of Force incident in which PO-2 has not had his Taser camera activated…."  (He noted that the first incident was UOF-1, dated September 30, 2015).  He concluded by stating that both he and Sgt. 1 formally counseled PO-2 about the policy violation.  He also noted that the officer was advised that future policy violations "could result in disciplinary action."

| December 25, 2015 |
|---|

> SGT-1 sent a memo to CO-1 regarding another failure on PO-2's part to activate his OBRD during a use of force incident.  He concluded by stating that he believed the officer understood the OBRD's importance, that "…this is not an ongoing issue or pattern", and recommended that no further action be taken.

| December 30, 2015 |
|---|

> LT-2 sent a memo to CO-1 regarding another failure by PO-2 to activate his camera during a use of force incident (it is unclear if this involves the same incident in SGT-1's December 25, 2015 memo).   He spent three paragraphs explaining possible technical reasons for the OBRD malfunction, but made no recommendations, notwithstanding his statement in his October 29, 2015, incident that future violations "…could result in disciplinary action."

> *The monitoring team has independent concerns about the practice of supervisors sending memos directly to commanders without passing them*

*through the intervening or lieutenant's level.  The usual practice in hierarchies is that every memo proceeds through the chain, with successive comments being added as appropriate at each level.  This is more efficient and makes tracking easier.*

| March 3, 2015 |
| --- |

➢ CO-1 sent a memo to the Internal Affairs Section (IAS) in which he recommended that PO-2 receive four hours of remedial training on felony vehicle stops and report writing.  He also recommended that IAS initiate an investigation into PO-2's "camera use".

*No action, to our knowledge, has been taken on the Commander's noteworthy attempt to address several chronic performance issues.  <u>He apparently was informed that IAS does not deal with issues raised in Memos of Additional Concern</u>.  Whether the training issues were ever referred to the Basic Academy is unknown.  <u>This is obviously not an acceptable disposition of the Commander's memo, and remains a serious concern to the monitoring team.</u>*

## Appendix F: Lost and Forfeited Opportunities

The monitoring team's analysis is not simply a catalog of investigative deficiencies, extremely narrow perspectives, and the lack of engagement at critical points by key actors in the use of force oversight and accountability process. Beyond that, the monitoring team's analysis highlights valuable opportunities that were patently squandered. Success is built upon a repetitive cycle of reflection, learning, and performance improvement that capitalizes on every opportunity --- small or large --- to critique and raise the performance bar. Major opportunities that were missed include:

- A chance to reinforce, recognize, or commend exceptional and standard-compliant performance.

- Early capture of mistakes, errors, and tendencies to support prompt intervention and correction.

- Documentation of important events to provide a comprehensive database ("dot collection") for purposes of trend and pattern analyses and informed decision-making ("connecting the dots").

- Monitor major organization risks closely and protect vital department assets, including professional reputation and public trust.

- Identify significant policy, equipment, tactical, and training issues.

- Reinforce the practice of engaged, vigilant, supportive supervision at all levels, but especially at the level of front-line supervision.

- Ensure that Department quality control points, especially chain-of-command reviews, are functioning well and within established parameters.

- Maximize the synergies resulting from multiple uses of force oversight and accountability components functioning as an interlocking, interdependent, and mutually reinforcing system.

- Compensate for common failures in other components.

- Prevent grief, pain, harm, embarrassment, and hassle to the Department, its members, and the public.

- Deliver high-quality, constitutional police services to the community--- resorting only to serious levels of force when necessary and other lesser alternatives are infeasible---which fosters high levels of public trust and policing legitimacy.