IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                          No. 1:14-cv-1025 RB-SMV

THE CITY OF ALBUQUERQUE,

      Defendant

v.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

      Intervenor.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Albuquerque Police Officers Association's (APOA) Notice of Objection to APD Promotional Policy and Request for Status Conference (Doc. 198), filed on August 25, 2016. Having considered the submissions of counsel and relevant law and hearing oral argument on the matter, the Court will **GRANT IN PART** the APOA's requests as described herein.

**I.    Background**

This case revolves around a Court-Approved Settlement Agreement (CASA), which the parties developed to resolve Department of Justice (DOJ) findings that the Albuquerque Police Department (APD) has demonstrated a pattern and practice of using excessive force. (*See* Doc. 9-1, at ¶ 4 (CASA), *as modified by* Docs. 143, 157, 166, 179, 230; *see also* Doc. 134 at 1.) The CASA provides a comprehensive framework for APD reform. The provisions at issue here address

1

the process by which APD will develop, review, and implement policies and procedures (*see* CASA ¶¶ 138–61), and more specifically, those policies and practices regarding promotion and evaluation of APD officers (*see id.* ¶¶ 241–46). Pursuant to these provisions of the CASA, the APD drafted a revised APD Promotional Process Policy (the Policy) in 2015. (Doc. 206 at 2–4.)

The City also has a Collective Bargaining Agreement with the APOA. (*See* Doc. 206 at 3 (citing City of Albuquerque and [APOA] Collective Bargaining Agreement (CBA), https://www.cabq.gov/humanresources/documents/albuquerque-police-officers-association-jul-9-2016.pdf (last visited Nov. 28, 2016).) Section 2.5 of the CBA provides that "[i]f the City anticipates the implementation of policies or directives related to its agreement discussions [sic] with the DOJ that impacts Officers' terms or conditions of employment, the City will notify the APOA of its anticipated changes and provide APOA the opportunity to meet and confer with the City in a timely manner on the anticipated changes." (Doc. 206 at 3 (quoting CBA § 2.5).) In accordance with section 2.5 of the CBA, the City and the APOA held a "meet-and-confer" on August 25, 2015. (*Id.* at 4.) On September 8, 2015, counsel for the APOA submitted written input to the City on the proposed policy. (*Id.*) The City considered the APOA's comments when it drafted and submitted the Policy to the DOJ and the Monitor for review and comment on December 2, 2015, pursuant to paragraph 147 of the CASA. (*Id.*)

The APOA filed objections regarding the Policy on February 17, 2016. (*Id.*) The City reviewed these objections, addressed them "to the extent the City found appropriate[,]" and submitted a revised draft of the Policy on March 6, 2016. (*Id.*) The APOA submitted additional objections on March 10, 2016. (*Id.*) The DOJ did not file objections "and conveyed that the proposed Policy met all requirements of" paragraphs 241–42 of the CASA. (*Id.*) In an email sent to the City, the DOJ, and the APOA, the Monitor directed "[a]ny party who disagrees with the

Monitor's resolution of objections and intends to seek judicial review of the Monitor's resolution must notify the Monitor and the other parties of its intention to seek judicial review by close of business (5:00 p.m.) on or before March 23, 2016." (*Id.* at 4–5 (quoting Doc. 206-A at 1).)

On March 21, 2016, the Monitor advised the City to revise certain language in the Policy relevant to an APOA concern about "officers' level of involvement in pending litigation." (*Id.* at 5 (citing Doc. 206-B).) The City made the suggested revisions and provided the new proposed Policy on March 22, 2016. (*Id.*) The City and counsel for the APOA met on April 6, 2016, to discuss APOA concerns. (*Id.*) On May 20, 2016, the Monitor emailed the parties and found that the proposed Policy "generally" complied with best practices, but the Monitor agreed with the APOA that the definition of "serious discipline" in section 21(B)(3)(b) of the Policy should be more clearly defined. (*Id.* at 6[1].) The City asserts that it revised the Policy according to the Monitor's direction, and it made another revision to address a separate APOA concern. (*Id.*)

Pursuant to a City ordinance, "the City published notice that it intended to revise its Policy" on June 15, 2016. (*Id.* (citation omitted).) The City held a Public Comment Hearing on June 29, 2016. (*Id.* at 7.) Counsel for the APOA provided verbal and written comments to the City. (*Id.*) After discussions between the City, APD, and HR, "[t]he City declined to adopt the APOA's further suggestions, however it did" make certain other revisions, some based on APOA concerns. (*Id.*) Counsel for the City and APOA met again on July 14, 2016, and discussed the new draft. (*Id.* at 8.) The City then sent the new Policy to the Monitor for review. The Monitor approved the Promotional Policy on July 18, 2016, and the Policy went into effect on July 19, 2016. (*Id.*) The City of Albuquerque asserts that the Policy "not only comports with the minimum requirements

---

[1] The City cites to a May 20, 2016 email from the Monitor in support of this assertion, but neither party submitted the email as an exhibit. *See* Doc. 206 at 6.

3

agreed to by the parties in the [CASA], but [also] provides a plan beyond this minimum threshold to achieve sustained, long term reform within the Department." (*Id.* at 2.)

The APOA disagrees and argues that the lack of clear definitions and criteria provides APD's Command Staff with too much discretion to decide promotional eligibility. (*See* Docs. 198, 212.) The APOA asserts that despite the history of revisions, the APOA did not have "a meaningful opportunity to participate in the development of this policy . . . to ensure that criteria and practices were developed for purposes of implementing a promotional policy that is fair to all concerned." (Doc. 212 at 5.)

Paragraph 148 of the CASA confers authority on the Court to resolve disagreements between the parties[2] regarding new or revised policies, including the one at issue here. (CASA ¶ 148.)

## II. The Parties' Positions on the Policy

The APOA asserts that the Promotional Policy does not further the goals and objectives of the CASA. (Doc. 198 at 2.) The APOA raises three general types of objections: (1) several terms in the policy are not satisfactorily defined; (2) applying the policy retroactively is unfair if incidents that would not have affected officers' opportunities for promotion under the previous policy will now negatively impact them; and intertwined with the first two objections, the APOA argues that (3) the new policy grants the Chief of Police unbridled discretion in making promotional decisions. (*See* Docs. 198, 212.) The Court will examine the parties' positions on each of the APOA's objections below.

---

[2] The Court granted the APOA's motion to intervene as of right, giving the APOA party status pursuant to Federal Rule of Civil Procedure 24(a). (*See* Doc. 102 at 13.) *See also Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1239 (10th Cir. 2012) (finding that the basic purpose of intervention of right is to permit a non-party to protect its otherwise-inadequately-represented interest in the action, by conferring party status upon the non-party") (citing Fed. R. Civ. P. 24(a)). At oral argument, the parties and the Monitor all agreed that it is appropriate for the Court to consider the APOA's objections. (*See* Doc. 233 at 5:9–11:9.)

A.     **Definitions and Criteria**

The APOA argues in Objection I that paragraph 8 of the Policy, which defines certain relevant terms, lacks "any type of definition, criteria or restrictions on the ability of the Command Staff of the [APD] to determine that someone is not eligible for promotion." (*Id.* at 2.) The APOA asserts that the lack of definition allows the Chief of Police too much discretion to eliminate candidates for promotion. (*Id.* at 3–4.) For example, section 11(E)(1) allows the Chief to "exclude a candidate for just cause for any incident dating back five (5) years from the date of the written examination." (*Id.* at 3 (quoting Doc. 206-D[33] (Policy) ¶ 11(E)(1)).) Without clear criteria for what provides "just cause," the APOA argues that officers cannot know what incidents will work to exclude them from consideration for promotion. (*Id.* at 3–4.)

The Policy defines the term "just cause" as follows:

> Just cause . . . shall mean any of the following when they raise concerns regarding a candidate's ability to perform supervisory and management duties consistently with effective, **constitutional**, and **community-oriented policing**: 1) **sustained discipline**; 2) **patterns of complaints**, other than unfounded or exonerated, dating back two (2) years from the date of the written examination[;] 3) a pending lawsuit alleging specific acts of unconstitutional conduct by the promotional candidate or a judicial finding of unconstitutional conduct.

(Policy ¶ 8(W) (emphasis added).) The APOA argues that there are no clear definitions for the terms bolded above: "sustained discipline," "patterns," "complaints," "constitutional policing," and "community-oriented policing." (Doc. 198 at 2–3.) The APOA proposes that the definition include that "such discipline imposed be more than [100] hours in one year for the use of excessive force[,]" or "judicially sustained violations of civil rights or community-oriented principles." (*Id.* at 4.) The City points out that it has narrowed the definition of "just cause" after several meetings

---

[33] The APOA attached an earlier version of the Policy. (*See* Doc. 198-A.) The Court refers instead to the current version of the Policy, attached as Exhibit D to the City's response. (*See* Docs. 206 at 6 n.10; 206-D.)

with the APOA, and "[t]he final definition represents a balance of" what both parties desired while "achieving the objectives of the agreement." (Doc. 206 at 10.)

The APOA makes the overarching argument in Objection VI that the CASA requires APD to "develop objective criteria to ensure that promotions are based upon knowledge, skills and abilities that are required to perform supervisory management duties in core substantive areas." (Doc. 198 at 9–10 (quoting CASA ¶ 242).) Paragraph 244 of the CASA requires that the APD "develop and implement a fair and consistent practice to accurately evaluate the performance of all APD officers in areas relating to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet these goals." (*Id.* at 11 (quoting CASA ¶ 244).) The APOA argues that the Promotional Policy, with its poorly defined terms, fails to meet the CASA-mandated standards. (*Id.*)

### 1. Sustained Discipline

The City states that the term "sustained discipline" is equal to the term "disciplinary action," which is defined in the Policy as "an action taken . . . in response to a proven act of employee misconduct or uncorrected poor work performance. Disciplinary actions include, but are not limited to, written reprimands, suspension, demotion and discharge." (Doc. 206 at 10 (quoting Policy ¶ 8(P)).) The City asserts that this mirrors language from the 2014 policy. (*Id.* at 10–11; *compare* Docs. 206-4 at § 11; 206-5 at § 13 (discussing "sustained discipline").) Further, the City argues that officers understand "sustained discipline" is a term of art that means an investigation was done into an event, and evidence supported the disciplinary outcome. (Doc. 233 at 17:20–18:20.) The APOA argues that the term "sustained discipline" leaves several questions open: "what

6

type of conduct; over how long a period of time; how much discipline was issued to the officer; and how much time has passed since the incident?" (Doc. 212 at 8.)

### 2. Patterns of Complaints

The City contends the words "pattern" and "complaint" "are general knowledge and can be commonly defined as complaints that show a recurrent pattern of conduct." (Doc. 206 at 12.) The City asserts that the original draft defined "complaints" to include "'citizen complaints and IA complaints,'" and the City narrowed the language to "sustained complaints within the past two years" in response to the APOA's objections. (*Id.*) The APOA argues that "pattern" is not defined, in that it is unclear if a pattern would include two complaints in one year or something more. (Doc. 212 at 8–9.) The APOA also contends "complaint" is unclear, because it is possible to have complaints about a wide variety of conduct—from "being rude to using profanity [to] the use of force . . . ." (*Id.* at 9.)

### 3. Constitutional Policing

The City asserts that the term "constitutional policing" is commonly used by the parties "as a method of policing in which police policies and practices advance the broad constitutional goals of protecting civil rights and providing equal protection under the law." (Doc. 206 at 13.) The City notes that the CASA includes the term "constitutional policing" but does not point to a clear definition of the phrase in either the CASA or the Policy. (*See id.*) The APOA contends that without a clear definition of constitutional policing, there are no criteria to establish the conduct that demonstrates a lack of constitutional policing. (Doc. 198 at 4.)

### 4. Community-Oriented Policing

Community-oriented policing is defined in the CASA as "a policing philosophy that promotes and relies on collaborative partnerships between law enforcement agencies and the

individuals and organizations they serve to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts." (CASA ¶ 12(m).) The APOA asserts that this definition provides officers no understanding of how the term is used as a guideline to judge officers' conduct. (Doc. 212 at 6.)

### 5. Objections II and V

Two of the APOA's objections relate to how the terms at issue affect specific Policy provisions.

#### a. Objection II

Objection II concerns paragraph 10 of the Promotional Policy, which discusses "Eligibility to Participate in a Promotional Process—Generally." (Doc. 198 at 4.) This paragraph provides that to be eligible to participate in a promotional process, "[c]andidates must . . . have no disciplinary issues as defined in Section 11 or patterns of complaints, other than unfounded or exonerated, dating back two (2) years[,] . . . or which indicate a lack of constitutional policing, lack of community policing, or violations of civil rights . . . ." (Policy ¶ 10(B)(1).) The APOA asserts that "there is no definition or criteria as to what conduct shows a lack of constitutional policing, lack of community policing, or violation of civil rights," or what types of "disciplinary issues or patterns of complaints" will eliminate an officer from promotion. (Doc. 198 at 4–5.)

The City argues there is "an exhaustive list of disciplinary infractions" listed in section 21(B)(3)(b) that "may result in a candidate's removal from a promotional eligibility list."[4] (Doc. 206 at 6 (citing Policy ¶ 21(B)(3)(b)).)

---

[4] The Court notes that Section 21(B)(3)(b) is not referenced in paragraph 10.

### b. Objection V

The APOA asserts that the criteria listed in paragraph 21, "Eligibility Lists for Promotion," which lists the "[s]erious disciplinary infractions [that] can be sufficient cause for the Chief of Police to remove a candidate from a promotional eligibility list[,]" includes categories that are too broad. (Doc. 198 at 9–10.) The City asserts that in response to APOA concerns and at the Monitor's suggestion, "the City changed its definition of 'serious discipline' in Section 21(B)(3)(b). This definition now provides an exhaustive list of disciplinary infractions which may result in a candidate's removal from a promotional eligibility list." (Doc. 206 at 6.)

## B. Retroactivity

In Objection IV, the APOA argues against retroactive application of the Promotional Policy. (*See* Docs. 198 at 8–9; 212 at 3–4.) The Policy is based on a "new philosophy" and novel "controlling concepts such as constitutional policing and community-oriented policing regarding the use of force[,]" and a new training, review, and discipline process. (Doc. 212 at 3.) The APOA contends that it would be "grossly unfair" to hold an officer who received discipline two years ago to a "new undefined and restrictive process concerning the eligibility to be promoted." (Doc. 198 at 9.) Moreover, the APOA contends that retroactive application would not only violate officers' due process rights, but it would also be a violation of the CBA. (Doc. 212 at 4.)

The City believes that it is important for the Chief of Police to make promotional decisions based on the policy at the time of the promotion. (Doc. 233 at 27:14–17.) The City is concerned that the previous policy, which was more formulaic, is not in line with the CASA and will enable officers to be promoted who would not be eligible under the new Policy. (*Id.* at 27:18–28:15.)

### C. Discretion

The balance of the APOA's objections relate to the amount of discretion given to the Chief of Police with respect to promoting or denying promotion to officers. For example, the APOA argues that the overall lack of definitions and criteria gives the Chief of Police broad discretion to eliminate officers from consideration for promotion. (*Id.* at 11–12.) The City counters that such discretion is necessary "to promote reform-minded leaders" and to "create strong leadership and direction . . . ." (Doc. 206 at 11.) The City believes that the Chief of Police's "discretion is a necessary management right that APD is not willing to waive and one that is necessary to comply with" paragraphs 241–43 of the CASA. (*Id.* at 14.)

Specifically with respect to the APOA's third objection related to paragraph 11, on "Eligibility to Participate in Promotional Process—Sustained Suspension or Disqualifying Event," the APOA asserts that the following terms lack clear definition: "sustained discipline," "just cause," "sustained suspension," or acts that are "egregious" or "implicate public safety concerns." (*Id.* at 6–8.) Because of this lack of definition, the APOA argues that the Chief of Police "has full discretion to pick [a disciplinary] event and use it as a bar to promotion." (*Id.* at 8.)

At oral argument on this matter, the City explained that under the previous policy, the requirements for promotion were, indeed, much more formulaic—if the officer passed a test and did not have certain suspensions, the officer would be eligible for promotion, even if there was some question about previous conduct. (Doc. 233 at 27:18–28:15.) There was much less discretion given to the Chief of Police. (*Id.*) The new Policy, argues the City, remedies that shortcoming and allows the Chief of Police to consider previous conduct that does not lend itself to the new philosophy and culture the APD is attempting to establish. (*Id.* at 29:3–10.) The City asserts that there is a built-in process for officers who raise concerns that they were unfairly denied promotion,

10

as they can either take their complaints up the chain of command, or they can file a claim in state court. (*Id.* at 28:22–29:1, 35:20–25.) The City argues that state court is the proper venue to decide the issue of the fairness of retroactivity, and that this Court is the proper venue to decide whether the new Policy complies with the CASA. (*Id.* at 29:2–8.)

**III.    Analysis**

The Monitor also provided input on the new Policy at oral argument. The Monitor agreed that the Chief of Police must have some discretion to take officers' history into account when making promotional decisions. (*Id.* at 33:8–11.) In light thereof, the Monitor also stated that he approved the Policy because it was "usable," even though it was not "ideal," and that there is room for improvement. (*See id.* at 33:5–15.)

The Court agrees there is room for improvement and believes that the parties—with the help of the Monitor and the City's consultant, Judge Lorenzo Garcia—are in the best position to move the Policy from "usable" to "ideal." To this end, the Court directs the parties to work together on two issues:

**A.    Definitions**

There are at least a dozen terms[5] related to discipline used throughout the Policy: "disciplinary action" (Policy ¶¶ 8(P), 11(E)(2), 11(F)(4), 14(A), 21(B)(3)(iv), 22(C)(2), 22(D)), "disciplinary infractions" (*id.* ¶¶ 11(D), 21(B)(3)(b)), "disciplinary issues" (*id.* ¶¶ 10(B)(1), 10(B)(3)), "just cause" (*id.* ¶¶ 8(W), 11(E)(1), 22(D)), "patterns of complaints" (*id.* ¶¶ 8(W), 10(B)(3), 14(A)), "patterns of sustained IA complaints," (*id.* ¶ 14(A)), "serious disciplinary infraction" (*id.* ¶ 21(B)(3)(b)), "serious discipline" (*id.*), "suspension" (*id.* ¶¶ 8(p), 11, 11(B), 11(F)), "sustained disciplinary action" (*id.* ¶ 11(F)), "sustained discipline" (*id.* ¶¶ 8(W), 11), and

---

[5] This list is admittedly incomplete. The Court did not include many discipline-related terms found throughout the policy, such as written reprimands, demotion, discharge, etc.

"sustained suspension" (*id.* ¶¶ 11(A), 11(C)). Some of these terms are not defined at all, others are loosely defined and incapable of providing sufficient guidance to officers.

The parties shall re-examine how these terms are used throughout the Policy in an effort to provide more uniformity and clarity. If the parties retain the terms "constitutional policing," "patterns of complaints," and "sustained discipline" (particularly as they relate to the term "just cause"), the parties shall provide more practical definitions for each. Officers need to have a more concrete idea of the types of incidents that will count against their opportunities for advancement. The current definitions (where they exist) are too vague to provide the "clear guidance" the CASA requires. (*See* CASA ¶ 241.) New definitions must comply with the requirement that "APD policies and procedures shall use terms that are defined clearly . . . ." (*Id.* ¶ 139.)

### B.     Retroactivity

Under the 2014 Policy, officers were ineligible for promotion if they had "sustained discipline resulting in suspension within the last twelve (12) months . . . ." (Doc. 206-5 § 13.) This section also gave the Chief of Police discretion to consider "any sustained suspension received within two (2) years of the written examination . . . ." (*Id.* at § 13(A).) The 2016 Policy increases this time period significantly: beyond the "sustained suspension received within two (2) years of the written examination[,]" (Policy § 11(A)), "[a]ny two (2) suspensions received within **five (5) years** of the written examination" as well as "[a]ny sustained suspension of forty (40) or more hours, to include time held in abeyance, within **five (5) years** of the written examination will also be considered and may, at the discretion of the Chief of Police, disqualify the candidate" (*id.* §§ 11(B)–(C) (emphasis added)). Further, "[t]he Chief of Police may exclude a candidate for just cause for any incident dating back **five (5) years** from the date of the written examination." (*Id.* § 11(E)(1) (emphasis added).) And even more striking, "the Chief of Police, at his or her discretion,

**may consider any disciplinary action throughout the candidate's career**, if the underlying action is egregious or implicates a public safety concern." (*Id.* § 11(E)(2) (emphasis added).) Essentially, this Policy is retroactive throughout every officer's entire career with absolutely no notice to the officers before July 19, 2016. This is unacceptable given that the CASA requires that promotion practices are "fair and consistent" and contain "objective criteria." (CASA ¶¶ 241–42.) Not only is the Court hard-pressed to find that complete discretion to consider past misconduct is "fair and consistent," but holding officers to a standard that denies promotional opportunities for some nebulous "egregious" misconduct that implicates a broad swathe of "public safety concerns" is the antithesis of "objective criteria."

The Court finds that the Policy should primarily be retroactive to the date the Court entered the CASA as an order. (*See* Doc. 134.) The Court agrees that it is important to put officers in supervisory positions who embody, believe in, and will promote the goals of the CASA. Officers should not, however, be obliged to bring suit for a court decision on the fairness of retroactivity until the Policy catches up with the notice. The parties must balance the Chief of Police's discretion to look at past misconduct with deference for officer mistakes that occurred before the CASA and which would not have counted against them under the former policy, but which will now negatively affect their promotional opportunities. A satisfactory solution to this issue will also work to assuage the APOA's concerns about the Chief of Police's discretion.

The CASA provides a framework for the parties to review the efficacy of the Policy and to find solutions for any problems that arise. Paragraph 145 provides that:

> The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law. The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews.

(*Id.* ¶ 145.) The six-month review of the Policy is fast approaching. The Court directs the Policy and Procedures Review Board to work with the parties, the Independent Monitor, and Judge Garcia to the extent necessary to carry out the recommendations in this order.

The parties shall provide a joint written memorandum updating the Court on the progress of the revisions no later than March 1, 2017.

**IT IS SO ORDERED.**

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**