United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

14-CV-1025 RB/SMV

*CERTIFIED ORIGINAL TRANSCRIPT*

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

THE CITY OF ALBUQUERQUE,

      Defendant.

vs.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

      Intervenor.


PUBLIC HEARING
9:07 a.m.
May 10, 2017
Federal Courthouse
Albuquerque, New Mexico


BEFORE:  JUDGE ROBERT C. BRACK


REPORTED BY:  Deborah E. Trattel, NM CCR #153
      TRATTEL COURT REPORTING & VIDEOGRAPHY
      P.O. Box 36297
      Albuquerque, New Mexico 87110

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 2

```
 1              A P P E A R A N C E S

 2
      MONITORS:
 3
         Dr. Ginger
 4       Ms. Laurie Owens

 5
      FOR THE CITY OF ALBUQUERQUE:
 6
         Ms. Espinoza
 7       Assistant Chief Huntsman
         City Attorney Ms. Hernandez
 8       Judge Garcia
         Police Chief Eden
 9       Major Tyler
         Mr. D'Amato, APOA
10       Ms. Jacobi
         Mr. Willoughby
11
12    FOR THE GOVERNMENT:

13       Mr. Saucedo
         Mr. Killibrew
14       Ferda
         Mr. Sanders
15       Ms. Keegan
         Mr. Ryals
16       Ms. Martinez

17
18
19
20
21
22
23
24
25
```

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 3

1                         I N D E X

2
                                PAGE
3

    PRESENTERS:
4

5     Dr. Ginger                    7

6     Mr. Cubra                    37

7     Mr. Simonson                  51

8     Mr. Harness                  63

9     Ms. Fine                     70

10    Mr. Miera                    73

11    Ms. Martinez                 81

12    Mr. Saucedo                  85

13

14    MR. D'AMATO                   107

15    MS. ESPINOZA                  119

16    MR. EDEN                     137

17    MS. HERNANDEZ                  142

18    MS. JACOBI                   167

19    MS. HERNANDEZ                  168

20    DR. GINGER                   170

21    MS. BAUTISTA                  175

22

23    CERTIFICATE OF REPOTER         183-184

24

25

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 4

1          THE COURT:  This is United States of America

2     vs. the City of Albuquerque.  We're here for the

3     Monitor's fifth report today.  Let me begin by

4     announcing appearances.

5          Dr. Ginger and Ms. Owens; is that correct?

6          MS. OWENS:  Yes.

7          THE COURT:  Are in the jury box, the Monitor.

8     Ms. Espinoza, the Communication Director for the city is

9     here.  Assistant Chief Huntsman, Ms. Hernandez, Judge

10    Garcia, Chief Eden, Major Tyler, Mr. D'Amato is -- there

11    he is.  Ms. Jacobi.  And I'm not sure who the gentleman

12    there is.

13         MR. WILLOUGHBY:  Shaun Willoughby, Albuquerque

14    Police Officers Association.

15         THE COURT:  And for the government,

16    Mr. Saucedo, Mr. Killibrew, Mr. Sanders, Ms. Keegan,

17    Mr. Ryals, Ms. Martinez, and I can't read Diana's

18    handwriting.  The lady at the back, the table there.

19         Thanks everyone for being here.  Sorry we're a

20    little more cramped than usual when we're over at Gold

21    Street.  That courtroom wasn't available.  We'll just

22    make due.

23         So we're here for the Monitor's fifth report,

24    as I said.  Let me kind of lay out for you what the day

25    looks like.  We're going to hear from Dr. Ginger to

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 5

1        begin.  And at that point, when he concludes, we're

2        going to break with prior process and hear from the

3        Amici at that point.  We're trying this out a little

4        differently than we've done in the past.  I think I'm

5        going to ask that the Amici try to keep their comments

6        to about 15 minutes.  That's our goal this morning.

7               At that point, we'll hear from the government,

8        with Ms. Martinez and Mr. Saucedo taking the lead, I

9        think.  And then, in sequence, we'll hear from the APOA.

10       The City of Albuquerque will then comment, and then

11       Dr. Ginger will close the day with response to the

12       parties' comments.

13              We are getting a little bit of a late start

14       this morning.  We had some technological issues, and

15       that screen was put up for the benefit of the gallery so

16       that everyone could see the PowerPoint presentations

17       that are going to be done this morning.  But it's a

18       visual block for some of you, to see some of the players

19       and to see me.  I assume there are people sitting behind

20       that screen.  I'm sorry.  There's a little give and take

21       there.

22              And you're free to move about, if you like, to

23       follow all the action.  So we will go until about 10:20

24       this morning.  At that point, we'll take a 20-minute

25       break.  We'll work until noon and then we'll reconvene

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 6

1    at 1:15.  We'll have a 20-minute break somewhere

2    mid-afternoon.  We will finish sooner if possible, but

3    no later than 4:30 this afternoon.  So that's what the

4    day looks like.

5          Dr. Ginger, glad to hear from you.

6          DR. GINGER:  Thank you, your Honor.

7          MS. MARTINEZ:  Your Honor, as a housekeeping

8    matter while Dr. Ginger is coming up, I have requested

9    that Dr. Ginger and the city provide their PowerPoint to

10   us so that we can make sure that those are made

11   available to the community.  So for those that are not

12   able to get a good look through the screen, we will make

13   sure we post those two presentations and make them

14   available that way to the community.

15         THE COURT:  Any objection to that process?

16   Have we got copies of the PowerPoints available?

17         MS. HERNANDEZ:  No objection to that, your

18   Honor, and we will make them available.

19         THE COURT:  Sure.  Thanks.  Dr. Ginger, let me

20   just make the record that I have -- I have scanned, with

21   great interest, the fifth report.  I have not read it

22   all word for word.  I'm just being candid.  But I have

23   been through all of it. And I have also read all of the

24   Amici letters and generally brought myself back up to

25   speed, as required.

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 7

1              Diana reminds me that I didn't acknowledge the

2       presence this morning of the Amici.  Let me do that.

3       Sorry to borrow your time.  From APD Forward,

4       Mr. Simonson and Ms. Koenigsberg.  There they are.

5       Thank you.  Mr. Cubra from the McClendon subclass.

6              MR. CUBRA:  Good morning, Judge.

7              THE COURT:  Good morning.  From CPOA and the

8       Police Oversight Board, Ms. Fine and Mr. Harness.  Thank

9       you all for being here.

10             And Mr. Miera from the MHRAC.  There he is.

11      Thank you for your -- well, not just for being here this

12      morning, but for your participation in this process, in

13      all of your effort.

14             Now, Dr. Ginger, please.

15             DR. GINGER:  Thank you, your Honor.  Given the

16      nature of the fifth report, I've changed up my process a

17      bit as well.  Usually my reports appear narrative.  The

18      fifth report is a data-intensive report, so we've gone

19      to PowerPoint, hopefully to aid folks in understanding

20      what it is that's actually happening, and where we stand

21      on the trail to compliance.

22             The graph that probably everybody has seen, I

23      think it was even in the paper, is a graph of long-term

24      compliance since Day 1 with this project all the way

25      from the end of IMR-5.  The dark-colored orange bar is

Page 8

1      primary compliance, the next lightest bar is secondary

2      compliance, and the lightest bar is operational.  Excuse

3      me.  So you get a good thumbnail sketch of where we

4      stand in the compliance effort.

5           Just to review, that's reasonably decent

6      process on policy.  We've started moving things through.

7      We have some tougher policies coming up for the

8      six-month review period, but we shall get through those

9      and -- APD is in pretty decent shape on their policy

10     situation.

11          Secondary usually relates to training or

12     on-the-job training or coaching, the sorts of things

13     that an agency will do to make sure that people know

14     what's expected of them and are able to fulfill those

15     duties.

16          And then primary -- I'm sorry, operational is

17     -- it's part of the day-to-day business routine of the

18     police agency, that it virtually runs on itself or by

19     itself without outside assessment and comment.  And that

20     means that APD will continue, to the extent necessary

21     and proper, to implement the reforms.

22          That's just so everyone can understand where we

23     are when we talk about these things.  This is the same

24     slide in data format.  The most critical piece of the

25     CASA is the use of force component and it's up -- as up

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 9

1        first.  Let me explain our methodology, first of all, so

2        that everyone can understand how we got to these

3        numbers.

4                We selected a sample of 16 use-of-force cases.

5        The complete case, not just the officer's report, not

6        just the arrest report, but the complete case, including

7        video and any other supporting documentation.  And we

8        reviewed each of those for compliance with the

9        requirements of the CASA.

10               The first piece up is the use of force piece,

11       and pieces that we're looking at are advisement before

12       use of force, where possible.  It's not always possible.

13       Sometimes it just has to happen.  But that asks for the

14       police officer to give directions that indicate that,

15       you know, if you don't calm down, if you don't start

16       listening to what we have to say, we're going to have to

17       physically put hands on you.  And that's required by the

18       CASA.

19               Second is deescalation, which is a well known

20       20 years back, I guess almost, process that police

21       officers can, if they have the time available, use to

22       calm the situation down, slow the pace of events, and

23       try to give the suspect or the arrestee time to

24       understand his situation, process it and comply.

25               The third piece is to allow, where time

United States of America, et al. v. The City of Albuquerque, et al.                                    May 10, 2017
Public Hearing                                                                                          14-CV-1025 RB/SMV

Page 10

1    permits, allow the suspect to submit.  It means -- it

2    may be even just a small break and all of a sudden

3    you're met by some resistance.  But where time is

4    available, that should happen.

5         We looked at neck holds, leg sweeps, arm bars,

6    force against handcuffed persons in custody, lawful

7    commands prior to use of force:  Stop resisting, turn

8    around, put your hands behind your back, those sorts of

9    things; pointing a firearm; and then inspecting the

10   suspect or arrestee for injuries after the arrest has

11   been made.

12        Now, the numbers that you see in the right-hand

13   column are the compliance levels that we found in those

14   16 cases, 16 use-of-force cases that we sampled.  So for

15   example, just to help folks read the chart, 81 percent

16   of the time, there was an advisement before use of

17   arrest.  That's a good, high solid number, 81 percent.

18   It's not 95 percent, which is what we need to see, but

19   it's still a good number.

20        So we took a beat and tried to let the suspect

21   understand he's going to be arrested, there's no sense

22   in making it difficult to do.  So 81 percent of the

23   time.

24        93 percent of the time, which is also a really

25   good solid number, there was a deescalation involved.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 11

1    The officer would try to talk down the suspect, would

2    try to take that one or two beat moment to let the

3    suspect get his head square, know where he's going,

4    realize what was happening and not resist.

5           Allowed to submit.  In other words, we don't

6    just swoop in, apply force immediately unless it's

7    tactically necessary.  88 as well.  Pretty good numbers;

8    still not in compliance.  There were no neck holds this

9    period.  That's a very positive thing.

10          The policy was followed a hundred percent of

11   the time regarding leg sweeps and arm bars.  So

12   obviously that's compliant and a stellar performance on

13   the part of APD.

14          Use of force against handcuffed persons in

15   custody:  64 percent of the time it was done right,

16   which is a reasonable number, but it shows APD there's

17   work that needs to be done.  Lawful commands prior to

18   the use of force, a hundred percent of the time, which

19   is more than a good number, it's excellent.

20          Pointing a firearm:  We found no instances

21   where a firearm was brandished in the 16 cases that we

22   looked at; no incidences where a firearm was brandished

23   or pointed at a suspect in order to get him to surrender

24   or her to surrender.  And then inspections after arrest

25   for injury, critical piece, 100 percent, good solid

Page 12

 1      number.

 2          So you can look at that chart and you can see

 3      where APD is doing well, and they are, and you can see

 4      where they're doing poorly.  And it's a really good aid

 5      to see where we're headed, where we are, where we're

 6      headed in this process.

 7          Take a look at self-reporting use of force.

 8      The policy requires an officer who uses use of force to

 9      report it to his superiors.  The question is, did we do

10      it or did we not.  81 percent of the time -- yes, sir.

11          THE COURT:  Excuse me.  Does this slide and the

12      following slides relate to the 3 of 16 notation?

13          DR. GINGER:  Yes, all of these first of

14      introductory slides are the use of force, the 16 cases.

15          THE COURT:  You're going to get back to the

16      complete failure of the 3 to 16, you're going to get

17      back to that?

18          DR. GINGER:  Yes, sir, eventually.  I can pick

19      the pace up if the Court prefers.

20          THE COURT:  I'm fine.  Just trying to follow.

21          DR. GINGER:  I just wanted to try to highlight

22      the fact that it's not that they've ignored what they've

23      been asked to do, it's just they're falling short.  We

24      do have some issues, but for the most part, APD has

25      tried to implement the policies and practices that are

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 13

1      dictated by the creed.

2            The question is how effective are they.  They

3      need to get to 95 percent.  We're at 81 percent of the

4      primary officers who use force actually report it.  Now,

5      that's a fairly -- that's almost a 20 percent failure

6      rate.  That's fairly significant.

7            And 75 percent of officers who witness other

8      officers use force report it as a use of force.  So

9      those numbers are relatively low for the place we are in

10     this process at this point in time, and we'd like to see

11     them go up.

12           Next up is accurately reporting use of force.

13     That's a paragraph number in parentheses.  You can see

14     if you look down, look down the table, the percent in

15     compliance.  For example, the report includes a reason

16     for the initial police presence.  Officers received a

17     call to such-and-such an address regarding a breaking

18     and entry.  That's what's asked for there.

19           That's in there a hundred percent of the time.

20     Describing and justifying use of force, however, is in

21     there 69 percent of the time.  That's still over

22     two-thirds, but it's an area where APD needs to improve.

23     I guess the next one we would want to talk about would

24     be the -- where did it go?

25           Here it is.  Narratives free of a boilerplate.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 14

1     Boilerplate to us is it's sort of the same narrative,

2     almost a limerick narrative every time that you read a

3     report.  And what these reports need to do is to be

4     specifically addressed to the nature of the call for

5     service, the nature of the resistance, and the nature of

6     force applied, as opposed to cutting and pasting from

7     old reports and that sort of thing.

8          So 75 percent of the time they did fine, the

9     other 25 percent, they need work.  So basically anything

10    in this column that doesn't say 95, there's work yet to

11    be done.  Most of that should have been caught by

12    supervisors before we caught it and a large chunk of

13    that wasn't.  So had the supervisors caught it, we would

14    have counted it as a right.  But since they didn't, it's

15    an error.

16         So I guess the best thing to do is for APD to

17    police itself, beat us to the punch on these things and

18    make sure that the supervisors are doing their jobs, and

19    that the command and the mid-managers are doing theirs.

20         I'll take each one of those slides in a smaller

21    chunk at this point and give you some information about

22    what we found.  The accurately reported use of force 12

23    out of 16 times.  We had 16 cases, 16 uses of force.  It

24    was accurately reported, accurately reported 12 of those

25    times.  So we missed 4.  Again, 76 percent, it's not

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 15

1       horrible, but it needs to come up.

2               They failed to report 4 of 16 noted injuries

3       based on our review of those 16 cases.  That's

4       problematic.  It needs to be a hundred percent.  That's

5       the goal, for obvious reasons.  There are civil

6       liability issues, health issues.  That's an important

7       oversight.

8               We have a 25 percent error rate in reporting.

9       In other words, we saw things that happened in the

10      officer's use of force process of reviewing OBRDs, body

11      cams, that wasn't reported in the report.  And that's

12      one of the things that we're working with APD right now,

13      is to try to punch up its supervisory presence in the

14      reporting area.  And comparing video to what's in the

15      report, that's got to be step one.  And until we can get

16      that done, we're going to continue to have problems.

17              Unfortunately, 4 of those got through.  None of

18      those were caught by lieutenants or commanders at the

19      command area station review level.  So that's an issue

20      for us, because it shows problems in that review process

21      at the supervisory level.

22              Next up is on-body camera activations.  The

23      requirement is under certain circumstances, all officers

24      have to activate their camera.  Our review was to see if

25      that's what's happening during use-of-force events that

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 16

1    were reviewed by us using body cam video, and officers'

2    reports after the fact.

3          There were 3 of 16 case -- I'm sorry, there

4    were 4 cases -- there's an error my fault -- 4 of 16

5    cases that that did not happen.  And again, it was a

6    hundred percent error rate at the mid-management

7    lieutenant and the command level, where we would find

8    things that had not been noted and placed in the file by

9    command staff, which they are supposed to be reviewing

10   these use-of-force reports.  That's concerning to the

11   monitoring team.  I'm sure it's concerning to APD and to

12   the Court as well.

13         This next piece I think, as the old saying

14   goes, in the opinion of the Monitor, which is where the

15   rubber meets the road at this point in the process, and

16   that's supervisory review and investigation of officer

17   use of force.  If we can fix this, we can fix a huge

18   chunk.

19         And I'd like to remind the Court, we sampled 16

20   cases, we found 4 to be problematic in multiple areas.

21   So it's not like this is intentional, but what it is is

22   a failure of supervision and management to find it and

23   correct it.  And until we can get that done, we're not

24   going to go anywhere, we're going to be back in the

25   Court every six months making presentations.

United States of America, et al. v. The City of Albuquerque, et al.                                    May 10, 2017
Public Hearing                                                                                          14-CV-1025 RB/SMV

Page 17

1             So to me, this is the piece that's most

2     critical.  And we've had conversations with APD since

3     day one about the necessary focus on supervisory

4     process.  Again, we studied 16 events.  We found 2 of

5     those 16 events that were handled properly all the way

6     through.  So 2 out of 16, a hundred percent.

7             The sergeants did what they did, they noted

8     things that the officer may have left out of his or her

9     report; the lieutenant did what he or she was supposed

10    to do; if the sergeant missed something, the lieutenant

11    called him on it; and the command staff did the same

12    thing.

13            We saw that in two places, so that means

14    they're doing it.  All we need to do is grow it and make

15    sure they're doing it everywhere.  I thought that was a

16    good finding.  I mean, the raw numbers are not good, but

17    there is process in place, and there are supervisors and

18    lieutenants reviewing use of-force reports the way they

19    are expected to do it.

20            Another requirement is random and directed

21    audits.  And in my experience as a Monitor, and in my

22    experience as a police officer, that's the best way to

23    change practice, is to have something in place that gets

24    command level personnel, supervisory level personnel

25    involved in what's going on in the field, and taking a

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 18

1    look at video, reading police reports, and going, "Wait

2    a minute, that's not what the policy says.  So here I've

3    got a problem.  How am I going to deal with Officer

4    Ginger because he made this mistake?"

5         There's a whole level of things they can do.

6    We don't want to dictate to them what they have to do.

7    This is their police department.  If they think a verbal

8    warning on a relatively innocuous error is enough, so be

9    it, we won't question that.  If it's a very serious

10   transgression, a verbal warning probably won't make it,

11   but you know, if it's rationalized and the management

12   reports about why we did X instead of Y, we read those

13   and we listen to what they have to say, because as we

14   say, it is their shop.

15        The problem is, we didn't see any evidence of

16   random directed audits.  Now, we saw supervisors take a

17   look at reports and catch things, but from an overall

18   standpoint, we found, in effect, no -- none is a bad

19   statement.  We found ineffective review of use of force

20   from an audit standpoint, which is getting, on the left-

21   hand side of the sheet, the list of all the things that

22   needs to be done at a certain type of a use-of-force

23   incident, and on the right side of the sheet, a space

24   for a narrative that says completed, not completed, and

25   why you think it's not completed, so that those can be

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 19

1    kicked upstairs to train.

2         Because that's the next step.  If we're not

3    doing what we need to do in the field, even though we've

4    already had training -- and they have -- if we're not

5    doing what they're doing in the field, if we continue to

6    see a wide range of officers making the same mistake,

7    that calls for retraining.

8         So it may be just a three-hour course on

9    handcuffing, or notice, or whatever it might be.  But

10   that's a critical piece.  And we haven't found anything

11   in the record that that's happening yet.  I understand

12   it's under development.  And we encourage APD to push

13   forward with that.

14        Excuse me, your Honor.  APD should be engaging

15   in a system of random and directed audits.  I tend to

16   prefer random, because it tends to come through every

17   time.  But it's their shop, they need to do it the way

18   they want.  They could do both.  They could do only

19   random, or they could do more routinized about it.  But

20   at this time, there's some serious difficulties with

21   those audit processes.

22        If you've read the report, you know we found

23   substantial difficulties with those 16 use-of-force

24   cases.  The problem, as we see it at APD at this point

25   is that that disconnect is not being followed up the

United States of America, et al. v. The City of Albuquerque, et al.          May 10, 2017
Public Hearing                                                              14-CV-1025 RB/SMV

Page 20

1    chain of command, so that the area commander understands

2    wow, I had X instances of officers that were using force

3    against handcuffed individuals.  This is hypothetical.

4    Not making any claims, just as an example.

5           Can I do a video?  Can I get the use of force

6    sergeant to come out to the area command and do a

7    two-hour course?  What can I do?  Looking for patterns

8    is job one for management.

9           And we have a substantial number of automated

10   information systems that are either in place or being

11   put in place to help them with that.  And when those

12   come online that might improve their performance, but at

13   this stage, it's certainly suboptimal.

14          The CASA articulates three different types of

15   audit processes APD should be engaged in.  We found in

16   the written record that we reviewed, we found no

17   evidence that that was happening, and I think it's an

18   important next step.  If it's not being planned already,

19   it probably should.

20          I'd like to move, if I can, your Honor, from

21   sergeant level to lieutenant and command level.  Those

22   are the folks that basically run the area stations.

23   Command oversight requires commanders and lieutenants to

24   review and document errors in use of force in the field,

25   and for the cases of commanders to do exactly the same

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 21

1      thing for their sergeants who may have missed something

2      that the commander caught.

3           So there's a multiple tier, or should be a

4      multiple tier level of review.  And if APD falls short

5      anywhere, it falls short here.  And quite frankly, the

6      numbers we saw were really concerning.  But I'll caution

7      everybody to remember those were 16 cases.  Some of

8      those cases were that thick, so there's a lot of good

9      information in them, and we feel it's better -- it's

10     better for APD, for us to mine that data as carefully as

11     possible, so that as early as possible, we can catch

12     events that are preventable, or that we can train out of

13     the system, or that we can supervise out of the system,

14     or that we can discipline out of the system.

15          So I think that's the next great spot for APD

16     to focus, is to get their sergeants in the right

17     mindset, with the right tools, to get their command

18     level entities to the point that they need to know, or

19     that they know they know what they need to look at when

20     they read a sergeant's investigation of use of force,

21     and the types of things they need to keep close track

22     on.

23          One of the things we've noted in this report

24     that is really concerning to us, the entire monitoring

25     team, is that the disconnect between what we expect of

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 22

1    our lieutenants and our commanders seems to be

2    remarkably high at this point in time.  A lot of the

3    failures that we note in this report sit at that level,

4    and those are the two most critical levels.

5         Anyone who's ever worked a police department

6    knows that the fellow who decides, or the woman who

7    decides what days off you can take off your overtime is

8    your sergeant.  You've got to have those guys involved.

9    Next up are the lieutenants and the commanders who need

10   to be sure that the sergeants are supposed to be doing

11   what they are supposed to be doing.  We found some

12   pretty substantial shortcuts there.

13        We found that to be effective, that command

14   level review to be effective 6 percent of the time.  In

15   other words, they do catch stuff, but it's not pervasive

16   yet.  So what we need to do is figure out what those --

17   it may be one commander, from the look of the numbers,

18   but what that one commander knows and does that

19   everybody else needs to be doing, use him or her as an

20   example and get that pushed down into deeper levels of

21   the department.

22        Failure rate on taking corrective action on the

23   cases that we looked at, at the command level, between

24   the time the case was processed and the time we looked

25   at the records, the failure rate was 19 percent, with 81

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 23

1      percent compliance.  I don't mean to say that APD is

2      purposefully not doing its job.  That's not my point at

3      all.  But we have a failure rate that's, in some cases,

4      remarkably high.

5            We need to figure out what causes it.  We need

6      to figure out if it's a training issue, if it's a

7      commitment issue, if it's an ability issue, and we need

8      to get that fixed.  That would be job one, from my

9      perspective.

10           But 19 percent of the time at command level

11     really concerns me.  It concerns me a great deal.  Talk

12     now about another piece of the oversight process, and

13     that's the Force Review Board.  We have reviewed dozens

14     of cases that go through FRB to make sure that they're

15     doing what the CASA specifies them to do.

16           We're looking for the following things:

17     Complete, timely and accurate reporting and decision

18     making on use of force; ordering further investigations

19     when it's appropriate; using an appropriate standard of

20     evidence.  For us, it's preponderance of the evidence.

21     We don't need to have enough evidence to convict people,

22     we need to have a reasonable certainty that something is

23     afoot and needs to be fixed.

24           I think the FRB needs to make absolutely

25     certain that it forwards notice to the chief when they

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 24

1      find anything related to use of force that is not in

2      compliance with the policy, so that the chief has, to

3      the extent possible, day to day touch with what is it in

4      use of force that we need to be driving home to our

5      commanders, our lieutenants, our sergeants and our

6      patrol officers.  What is it?

7            And the Force Review Board is ideally designed

8      to do that.  We will have some comments about success

9      rates a little bit later.  And then finally identifying

10     training issues, policy issues, equipment issues,

11     tactical concerns and other things that are more

12     organizational-wide as opposed to officer-wide and

13     making sure that that information gets out to the

14     various command levels and the upper management

15     structure of the police department so that they know

16     they have a picture.

17            We had 16 cases.  Out of those 16 cases, 12 of

18     them failed.  What's the most prominent failure reason?

19     All right.  Here it is.  How can we fix it?  Well, we

20     could retrain everybody; we could put out a special

21     order.  You know, there are a whole host of different

22     things that can be done, but you have to know it's an

23     issue first.  And that's what Force Review Board, I

24     think, is best suited for.

25            So, you know, the whole list of the things they

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 25

1    need to look at for each one of these incidences is at

2    the very bottom of that slide, of the next slide, I'm

3    sorry. My bad. Identify training, policy, equipment,

4    tactical concerns and refer them for remedial action.

5           Now, sometimes that referral has to be

6    upstairs. I mean, but it's a chief's executive suite

7    issue. It's not really a command issue. It may involve

8    budget, it may involve staffing, it may involve any

9    number of things that an area commander can't fix. But

10   in a lot of cases, it will involve things an area

11   commander and a few good sergeants can fix. If we're

12   going to go anywhere, that's where we need to go with

13   the Force Review Board.

14          Requirements in the CASA for Force Review Board

15   are as follows: Document findings of receipt of

16   investigations within 15 days. In other words, we got

17   it, we know what it's about, we know what the complaint

18   is, and we've received it. It's in the hopper to be

19   processed.

20          What we found with the Force Review Board. The

21   next five statements. They complied with all the

22   requirements of the CASA 25 percent of the time. That's

23   remarkably low for an administrative oversight board.

24          Now let me say, having said that, it's still a

25   relatively new process, it's not been there very long,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 26

1    and I think the folks that run that board, the folks

2    that appear on that board are still sort of feeling

3    their way.

4         So it would behoove APD, if they haven't done

5    so already, to talk with other agencies who have been

6    through similar processes:  New Orleans, Seattle, folks

7    who are a little bit ahead of where they are because

8    they have been working longer.  Find out how they do

9    this.  The way they do it in New Orleans, not all that

10   great, but the way they do it in Seattle is if you could

11   just tweak and change a few things, we'd be doing a fine

12   job.

13        But overall, 25 percent compliance rate for a

14   Force Review Board process concerns us, concerns us a

15   great deal.

16        Sample completed investigations, we found that

17   effective 33 percent of the time.  Ordering more

18   investigation when needed.  Again, 33 percent of the

19   time success rate.  Using the preponderance of the

20   evidence standard.  That's a law enforcement staple for

21   30 years.  Preponderance of the evidence is a standard

22   that needs to be used.  And yet, we find a 50 percent

23   rate there.  It's concerning.

24        And in referring violations to the chief.  We

25   also find the Force Review Board should be making

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 27

1    recommendations if there is a need for new equipment, a

2    need for new training, or if there are tactical issues

3    that come to fore -- come to the fore during their

4    investigations.

5         This is sort of the quality control mechanism.

6    It was designed to be the quality control mechanism for

7    APD.  We're two years in, almost exactly two years in,

8    and we're at 25 percent on that.  So it's concerning.

9         Document your findings in a written report; 25

10   percent effective.  We found some critical issues with

11   Force Review Board.  We'll get into those in a second.

12   But if they don't document their findings and push it up

13   to the chief so that it can be analyzed and pushed back

14   down, for example, to training, or to the area

15   commanders, if that's where the problem needs to be

16   fixed, we're just in a circle.  You will never fix

17   anything.

18        So what needs to be done is when you start

19   seeing these data, you need to find out where are our

20   problems.  Our problems are in these 15 areas.  In those

21   15 areas, which ones are the top three.  Those three

22   right there.  How do we fix it?  Try to fix it, run it

23   for six months.  Does it work?  Great.  It's fixed.

24   Rates are down.  What's the next three?

25        Eventually, you get to where you're in really

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 28

1    decent shape on all your compliance issues.  So overall

2    compliance at Force Review Board stood at 34 percent.

3    We'll round it up.  33.5.

4         Take a look at the actual work of the Force

5    Review Board.  We reviewed seven cases that were

6    processed by the Force Review Board in 2016 and 2017.

7    The average time to complete was 34 weeks.  And that's

8    way too long.

9         Now, it's a new board.  We have to understand

10   that.  But 34 weeks is a long, long time to have

11   information on what might be a critical incident that

12   hasn't been assessed yet.  Two of the events took 12

13   months to resolve and get out.  One was completed in

14   four months, which is a lot closer to something we would

15   consider timely.

16        One of the things that -- and we'll deal with

17   APD on this in June when we come back for the next site

18   visit.  We saw a lot of members of the Force Review

19   Board, as many as a dozen of them, use a decision not to

20   comment on what they had reviewed.  And we don't know

21   why that is.  We don't know why that is.  We're going to

22   find out.

23        But if you were running that Force Review

24   Board, that would be of grave concern to me.

25   Particularly if it turned out the things that they

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)

07e93eed-c56b-4b8e-8a45-33a30f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                      14-CV-1025 RB/SMV

Page 29

1      weren't commenting on turned out to be problematic.  If

2      they're not commenting because they don't feel they have

3      the skills to do so, that's one thing.  So you either

4      train them up or you can replace them.

5             But if there's an event that obviously is

6      problematic, and they're declining to comment on it,

7      that's a grave concern to the monitoring team.  Probably

8      some of the most important stuff they'll have to work

9      through.

10            Enough said on that, I think.  I'm going to

11     shift gears a little bit and give the Court an

12     assessment of the overall quality of the entire

13     oversight system.  We'll choose to do that with numbers

14     from those same 16 cases that we talked about, the

15     use-of-force cases that we went completely through and

16     analyzed from point 1 to point 82, to make sure that

17     they were handled properly.

18            Let's see if I can -- that's in the report.  I

19     don't think it is in here.  Hang on one second.  I'm

20     sorry.  If you want to know where these data came from,

21     it's Table 4.7.191 in the Monitor's -- this Monitor's

22     report.  And the finding is 87 percent of the time the

23     system fails.  Now, that, to me, is a shocking number.

24     You know, we're two years in and we still have an 87

25     percent failure rate.

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)                           07e93eed-c56b-4b8e-8a45-33a3f0f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 30

1          It's concerning, but it's fixable.  It's

2     fixable by all those things we just talked about.  It's

3     fixable by the recommendations that we just made in this

4     last Monitor's report.  It's fixable by permanent,

5     focused, critical oversight of use of force.

6          And I mean, that should come from different

7     levels.  It should come from the supervisory level, it

8     should come from the management level, it should come

9     from the executive management level, and it should come

10    from the Force Review Board.

11         When we get to the point that the Force Review

12    Board is putting out reports that talk about trends and

13    use of force that are problematic to the command

14    structure, and those are then read by lieutenants and

15    sergeants, and there's something done in the field,

16    that's when we started making progress.

17         You know, we can write reports all day long.

18    APD can do studies all day long.  Until that information

19    gets down into the sergeants' pockets, we're not going

20    to go anywhere, and that's the critical piece of this.

21         I mentioned earlier 2 of those 16 cases passed

22    muster a hundred percent, at least 95 percent.  There

23    may be an odd error or two, but they were well done.  8

24    of the 16, or actually it's 14, because 2 of them were

25    okay, were 33 percent effective.  One 66 percent

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 31

1          effective.  And we already talked about the 2 that were

2          95 percent or higher effective.

3                    But that's a substantial failure rate, in my

4          mind, for an agency that has a board in place to answer

5          these questions.  And you know, if you were asked for a

6          reason for it, it goes back to that decline to vote

7          process.  A lot of these cases, the FRB produces to us

8          and we review are -- many of the cases that they produce

9          to us and we review are pretty clear and convincing

10         evidence that there's retraining that needs to be done,

11         or there's supervision that needs to be done, or there's

12         discipline that needs to be taken.  And it concerns us.

13         We'll track that down, we'll find out what's going on.

14         That's on our agenda for the next site visit.

15                   The final note on Force Review Board is that it

16         seems to be even less effective oversight in mid and

17         upper management level support review and comment than

18         we would have ever expected.  And it's new.  I give APD

19         that.  I understand that.  It's a cumbersome process.  I

20         understand that as well.  But that doesn't mean that

21         they don't need to get results.

22                   So I think the Force Review Board and the Force

23         Oversight System is the place where they need to be

24         spending their time in training, supervision, management

25         and command.  And if they can, you know, a hundred

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 32

1    percent, 88.9 percent, whatever it takes, but it's got

2    to be the big piece.  I think we'll start to see some

3    progress.  And we have seen progress.  I don't mean to

4    intimate that we haven't.  I'm surprised that we're at

5    this stage at this part of the game, but that doesn't

6    mean we can't accelerate.

7         Just to give you a little bit of an idea about

8    why the monitoring team is so concerned, these are the

9    different levels of review at APD, and their

10   effectiveness rates are the last column, second column.

11   So you can see, we have problems in supervision,

12   command, executives and systems.

13        For example, the EIRS system was shut down for

14   a long period of time without the Monitor even knowing

15   about it.  That's a systems issue.  It's critical.  I

16   know APD has reasons for it, but you know, nobody

17   bothered to talk with the monitoring team to say, "Hey,

18   we're having these issues, what do you think we should

19   do with it?"

20        I would have felt a lot better about it if it

21   hadn't just been shut down.  But in any event, my

22   systems levels, that's what I'm talking about, the

23   routine review of OBRD's, the routine review of EIRS

24   systems triggers that sort of thing.  Obviously, there's

25   great room for improvement there.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 33

1          Now, just so it's not all darkness and gloom,

2     we noticed a lot of things that APD is doing well.  And

3     by the way, those are in the report.  As I said, when I

4     interviewed for this job, if I see a mistake, I'll call

5     it a mistake.  If I see a success, I'll call it a

6     success.  These are they.

7          If you look at this, it's significant amount of

8     work.  I don't mean to intimate or suggest, by any

9     stretch of the imagination, that APD has been not

10    diligent.  There's a lot of work that went into this

11    stuff.  It's done, it's reasonably well done, and it's

12    working reasonably well.

13         What we haven't done is tackle use of force

14    yet, and as the Court knows, that's the main reason

15    we're here, is use of force.  They reduced their span of

16    control for sergeants to 8 to 1.  At one time it was up

17    in some cases over 12 to 1, depending on who got sick.

18    So that's a substantial achievement.  And I know it

19    wasn't easy.  It's hard to grow a sergeant.

20         They have excellent -- they could use it as

21    state of the art for the field -- electronic control

22    weapons, policies, training and procedures.  Absolutely.

23    Some of the best we've ever seen.  So another kudo to

24    APD.

25         The Behavioral Sciences Unit has been engaged

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                    14-CV-1025 RB/SMV

Page 34

1    almost from day one.  They have some new personnel on

2    over there who are doing a crackerjack job.  That's

3    another bright spot for APD.  MHRAC is hitting its

4    stride.  There's still work to be done there in terms of

5    getting unfiltered information to APD through MHRAC and

6    getting APD to assess it, understand it, deal with it,

7    work with it.  But that's a success.  It's working.

8    There is give and take going back and forth.

9         I think it's just going to be a matter of time

10   until that -- that's another one of the really bright

11   shining star of this process, is MHRAC.  The Crisis

12   Intervention Unit has developed a scenario in case-based

13   training modality that, again, is probably one of the

14   best I've seen in the country.  So kudos to APD for

15   that.  Really a nice job on it.  Particularly what we

16   had to worry with before, which I -- hopefully this new

17   process will clear up.

18        COAST and CIU are integrating regular contact

19   with individuals known to need help with an aggressive

20   campaign to get them to at least think about going to

21   get that help.  So that's another bright spot.

22        Policy development and process is -- there are

23   some cases where it's done extremely well; some cases

24   when it's very problematic; and right now all of the

25   easy stuff is done.  The low hanging free fruit is done,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 35

1      it's been picked, it's been harvested.  It has been

2      chopped up into little pieces and marketed.  But the

3      critical stuff, the use of force, multiple repetitive

4      violations of the same policy by a given officer, or set

5      of officers, those things have lagged behind.

6            And I mentioned it in the report.  We're

7      getting significant push back on some policies, use of

8      force, on body recording devices and the early

9      intervention systems.  Those are up.  We have a new

10     policy to the Monitor up for review right now on use of

11     force.  And we have one on EIRS as well.  And OBRD is on

12     the way.

13           So those will be coming back.  Most of those

14     are in resolution mode, which basically means I've got

15     to put the language in there that I'll live with.  We

16     should be able to move forward with that.

17           Training is another bright spot for APD.  We've

18     spent -- as a team, we've spent a substantial amount of

19     time out there, and I think if you read the last couple

20     of reports, you know that we value that training

21     process.  The ability for those folks to do what they do

22     with the resources they have is good.  It's really a

23     good process.

24           Now, we have training issues.  For example, use

25     of force, for example, on body recording devices, for

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 36

1     example, ERIS.  But the training that goes into basic,

2     the training that goes into lateral injury, the training

3     that goes into OJT, the standard routine daily, or

4     monthly, or weekly, or whatever it is training,

5     reasonably well done, reasonably well presented, and I

6     think we're starting to see results in the field.

7          One videotape -- I can't remember, I apologize,

8     your Honor, but I can't remember if it was this

9     reporting period or the previous, we came upon evidence

10    of two officers talking about what should have been

11    done, and it just happened to get caught.  But it was a

12    good example.  Well, you know, we could have, maybe we

13    should have.

14         And we encourage that kind of kind of thought

15    at the Academy.  I think that's where that came from.  I

16    think they trained it.  So that's a bright spot out

17    there.  I think it was a good system.

18         And the technical systems in Internal Affairs

19    are up and running reasonably well.  We're getting

20    access to our data fairly and efficiently.  Most of the

21    stuff that should be in it is in it.  So the technical

22    systems are there.

23         Where we're falling down is on the hard work,

24    which is looking somebody in the eye and saying, "I

25    don't like what you did here because it was wrong for

Page 37

1    these three reasons. Get up to speed."

2         It's difficult, nobody likes to do it, but

3    unfortunately, it's a job that has to be done at APD or

4    we're not going to make the changes that we need.

5         That's all I have, your Honor, unless you have

6    questions.

7         THE COURT: I have some. I'll save them,

8    actually. So thank you. Thanks very much.

9         DR. GINGER: Yes, sir.

10        THE COURT: I've misplaced my agenda. Who's up

11   on the Amici? There we go. Thank you. Mr. Cubra, I

12   think you're first up. As Mr. Cubra approaches the

13   podium, I'd ask that the city take good notes as we're

14   hearing from the Amici, because as I've read the

15   letters, I know that they have several specific concerns

16   and at some point, I'm going to ask the city to respond

17   to those concerns individually, and give me some sort of

18   written report and action plan over the next 30 days.

19        So please follow along.

20        Mr. Cubra?

21        MR. CUBRA: Thank you very much, Judge, as

22   always. I really appreciate you making this opportunity

23   for me to speak on behalf of my clients. Excuse me. To

24   remind you, there are roughly 8,000 individuals who get

25   arrested by the Albuquerque Police Department and booked

United States of America, et al. v. The City of Albuquerque, et al.                                           May 10, 2017
Public Hearing                                                                                                 14-CV-1025 RB/SMV

Page 38

1      into our jail annually who have mental or developmental

2      disabilities.  Those are the people I represent in the

3      McClendon case.

4            And with respect to the McClendon case, I just

5      wanted to quickly say that I told you in the past that

6      we had a pending motion against the city with respect to

7      several matters.  And we have happily reached a

8      settlement agreement, Judge.  It is subject to

9      presentation to Judge Parker for preliminary approval,

10     then a fairness hearing, because it's a class action,

11     and then ultimately, we hope that the Court will approve

12     that settlement agreement.  And I'll just say that

13     there's one particularly important piece that is

14     hopefully going to make your job easier here.

15           The city is agreeing that they will, going

16     forward over the next year or so, collaborate in good

17     faith with the city -- excuse me, with the County of

18     Bernalillo, to improve and increase behavioral health

19     services that hopefully will reduce the numbers of

20     encounters between law enforcement and the people I

21     represent.

22           And so, that agreement was reached in a way

23     that we've agreed that between now and next summer of

24     '18, the city will continuously meet with the county and

25     try and find ways to collaborate and hopefully

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 39

1    contribute financially toward more and better behavioral

2    health services, which would reduce our overutilization

3    of law enforcement to respond to people in a mental

4    health crisis.

5           And because I know that you have read my March

6    16 letter, I'm not going to reiterate anything there.

7    I'm trying to be mindful of our time limit today.  I

8    will just say this:  That on March 30, after I sent our

9    March 16 letter to the city, I had a very collaborative

10   meeting with quite a few city officials and with

11   representatives from the United States Attorneys'

12   office.  And we discussed the matters raised in my

13   letter with one exception.

14          The first point in our letter at the top of the

15   second page relates to the mayor's announcement last

16   fall that he was going to undertake a 14-point

17   initiative to reduce crime in the city, and the lawyers

18   for the city declined to discuss that, saying that they

19   don't see a nexus.

20          And in the interest of time, I'll just say

21   this:  That in our view, it is in fact the city policy

22   about what to do about crime that is one of the major

23   reasons why we've had in the past so many episodes of

24   unnecessary force.  And I continue to believe that the

25   city does have its law enforcement officials approach

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 40

1    and apprehend individuals who are impoverished, perhaps

2    homeless, oftentimes having a mental disability, as a

3    government expression of power in order to keep those

4    people out of sight and to not have them bother the rest

5    of us.

6         So I do believe actually that the city's

7    policies directly relate to how many episodes of

8    excessive force occur in this city.  Nonetheless, I

9    don't really know what the city's current plan is with

10   respect to their 14 initiatives to reduce crime.

11        I will then say this.  That one of the points

12   in our letter, I discussed with you last time and you

13   followed up with the city about it, it was that somebody

14   at the city issued a written report that said some

15   people in the police department think there's an

16   underuse of force.  And I said to you that I continued

17   to believe that that kind of attitude and that

18   communication to all APD employees undercuts this

19   initiative that we're all here to try and support.

20        And so, I did ask yet again who authorized the

21   distribution of that report so that police officers

22   would read it.  I still do not know.  And it's my

23   understanding that neither does your Monitor.  And so it

24   would be good to know who has taken it upon themselves

25   to say to law enforcement officials they're not using

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 41

1    force enough early enough or often enough, because I

2    think it undercuts our entire premise.

3        Now, I do want to talk about this aspect of the

4    fifth report because we focus on the needs of people

5    with mental disorders.  The report talks about several

6    things.  And the paragraphs with respect to our special

7    interests that I want to mention are paragraph 120.  The

8    Monitor has found that there is training in place that

9    quote, "Will provide clear guidance as to when an

10   officer may detain an individual solely because of his

11   or her crisis and refer them for further services when

12   needed."

13       And I will say this, and this is sort of the

14   ultimate theme.  From my experience in system reform

15   cases, that is our biggest problem here.  That while 93

16   percent of the policies that have been adopted under

17   this consent decree are now acceptable to the Monitor.

18   So we have primary compliance, 93 percent.

19       That really is only the starting line for this

20   race.  If you don't have written rules that are

21   adequate, nothing else happens.  And so, we now at the

22   two-year mark have policies, you know, in about 7

23   percent of the areas.  But in fact, this particular

24   policy referenced at paragraph 120, it's not being

25   followed.

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 42

1              Law enforcement officials continue to use our

2       jail as the place to take people because the police

3       officers believe that the individual needs mental health

4       treatment.  And as recently as January, at an APD

5       meeting that I attended, a sergeant who was assigned to

6       be there for the police department to talk about when do

7       you arrest people if there's an allegation of domestic

8       violence, that sergeant explicitly said taking people to

9       the mental health center, that doesn't work.

10             And so it is routine for us to take people to

11      the jail because we know they have treatment there and

12      we know that they can't walk away from there.  And so in

13      my view of it, even though the training has been found

14      to be in place, in fact, the training is not being

15      followed.

16             So in interviewing law enforcement officers,

17      we've come to realize that some of them do not

18      understand what is an objective basis for taking a

19      person to a mental health treatment or evaluation

20      facility under the state mental health code, and that

21      they don't comply with that.

22             So next.  I want to mention that Paragraph 136

23      does in fact require the specialized CIU detectives who

24      are full time working for people with mental disorders,

25      and the COAST team, they are required to make referrals

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                                  14-CV-1025 RB/SMV

Page 43

1      to Community Health Resources when appropriate.  There

2      is not a finding of compliance yet with respect to that.

3              And so, we'll see as their reporting processes

4      unfold, whether in fact even the specialists are showing

5      the necessary skills and the appropriate implementation

6      of the rules with respect to getting people into

7      treatment instead of incarceration.

8              Now, I want to say this, Judge.  That it was

9      very helpful that within the last year the city decided

10     to do what the consent decree required them to do, which

11     was designate specialists among law enforcement

12     officials who will be the go-to people who you try and

13     dispatch through the radio and get them to the scene of

14     behavioral crises in other cases where it's obvious the

15     person's mental disabilities are the cause of the

16     encounter.

17             But really, it took over two years after the

18     agreement was reached for them to get on to the right

19     path.  Because remember, for a period of time, they were

20     saying to you and to the Monitor, "Well, we've trained

21     everybody, so everybody's a specialist."  But that was

22     pointed out to them to not be what they agreed to, and

23     so we were very slow getting under way.

24             But now we have begun, and the report says as

25     to Paragraphs 123 and 124, that as of the end of the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 44

1      reporting period, there were 71 individuals who have now

2      been trained to be the specialist so that the radio

3      dispatchers can say, "I need an enhanced CIT officer to

4      go to this scene, a specialist."

5           And the APD's calculus is that they're going to

6      need to get to 40 percent, which is what the consent

7      decree requires, that they'll need 180.  And the city's

8      own report, based on their most recent data, is that

9      they now have 80, 9 more than is in the Monitor's report

10     because of the passage of time.  So we're still less

11     than 50 percent of the way there to having enhanced CIT

12     officers.

13          The other staffing problem identified at

14     Paragraphs 123 and 124 has to do with the CIU

15     detectives, the Crisis Intervention Unit.  These are

16     specialists, plain clothes officers, and all they do is

17     try and work with people who have had law enforcement

18     encounters to 1), clean up the mess after the encounter;

19     and 2), go and check on them to avoid a future

20     encounter, and see if they can encourage them into

21     treatment.

22          As I've said to you, we don't think that's

23     legitimate for armed law enforcement officials to be

24     doing that.  We think mental health professionals should

25     be doing that.  But I will say this:  That the officers

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)
07e93eed-c56b-4b8e-8a45-33a31f0f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 45

1    who are those detectives, I know many of them, respect

2    them, think that they're good people and have some good

3    skills, but we're still only at 7.

4          The consent decree requires 12.  You raised

5    this with the APD last time we were together.  And since

6    that time, I'm told by Assistant Chief Huntsman that

7    they've agreed to increase the rate of rolling those

8    people out and their projection is, under their most

9    hopeful scenario, by November of this year, they hope to

10   get up to the 12 that they had promised to get into

11   place.

12         Here's one problem.  The specialized field

13   service officers who are supposed to be enhanced CIT

14   officers, we seem to be slowing down on the tempo of

15   getting them to volunteer.  And so because these

16   specialists must serve as volunteers by the terms of the

17   consent decree, I questioned line officers, some union

18   representatives, and the leaders of the department about

19   this, and here's what I've been told.

20         Decades ago, when we created a CIT program for

21   officers.  An inducement to get people then to volunteer

22   was that they were told they would get $50 a month if

23   they took on this special assignment with extra

24   responsibilities.

25         Well, here we are, decades later, and it's

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)

07e93eed-c56b-4b8e-8a45-33a30f4e2f9

Page 46

1     still $50 a month.  And I fear that the plan that the

2     Monitor says the city must have in order to get the

3     adequate complement of officers is not going to be

4     successful if we continue to reward these people at the

5     rate of 25 cents an hour to take on these extra

6     responsibilities.  So I think we have a problem with

7     getting enhanced CIT officers in sufficient numbers to

8     comply with the court order.

9            So those are the comments I wanted to refer to

10    with specificity with respect to those paragraphs, those

11    provisions in the consent decree, but now I want to turn

12    to the overall points in the report this way.

13           If you heard what I heard, we should both be

14    worried, because what I think I just heard the Monitor

15    say is what we haven't done is tackle use of force.

16    Well, I thought that's why we were here.  And what seems

17    to me evident is that the leaders of the department are

18    not in fact going to get this job done.

19           And so, here's the way that I look at it.  The

20    things that have been accomplished now, at the two-year

21    mark after you approved the consent decree, all of those

22    were promised to be done by now, and everything else was

23    promised to be done by now.  The city set for itself a

24    two-year timeline to achieve a hundred percent of the

25    requirements in the consent decree.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing                                                                    May 10, 2017
                                                                                  14-CV-1025 RB/SMV

Page 47

1          According to this report, 47 percent of those

2     promised things have been accomplished at the

3     operational level.  53 percent of them are undone when

4     we reach their own target date.  87 percent failure rate

5     until we respond appropriately to use of force is what

6     Dr. Ginger just said to us.

7          And so, we are very, very far from where we

8     need to be, and I can tell you that based on decades of

9     experience and system reform cases, we've just gotten to

10    the moment that the hard work starts.  So we have

11    policies.  The hard part is always getting them

12    implemented.

13         And so training them out, and then having the

14    people who approve the policies enforce them, that's the

15    only way you ever get systems changed.  Remember, the

16    culture of violence, the culture of violence doesn't get

17    undercut or eliminated unless the leaders of the

18    organization give clear, consistent and persistent

19    leadership.  And that's just not been happening.

20         In other system reform cases that I've worked

21    in, cases oftentimes stall out at this juncture.  In the

22    Jackson case that Judge Parker works in, the department

23    there reached 70 percent compliance in 2000 and here we

24    are today.  And we're at the 80 percent range.

25         And so the hard work is just beginning, and

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 48

1    there are some very problematic things that have been

2    going on.  And that makes me very pessimistic.  As we

3    talked about last time, there's been active resistance.

4    This notion of under use of force.

5           During my meeting on March 31, members of the

6    Force Review Board explicitly said to me they continue

7    to believe not enough force is being used and it's not

8    being used early enough.  And that's what they're

9    telling the cops who we are trying to get them to change

10   their behavior.

11          There's also several things in the last report

12   of the Monitor, and this report that shows that the

13   leaders of this department, people sitting in this room

14   are undercutting this initiative by denying force

15   actually occurs when it occurs.  The use of the term

16   "distraction strike," that's a hit in the head.

17   Sometimes -- we talked last time about a poor fellow who

18   got -- he's down on the ground, and they kneed him in

19   the head and he needed stitches, and at the highest

20   level of the department, they said, "Well, that's not

21   even use of force."

22          And so, when that's the leadership's message to

23   the law enforcement officials who are supposed to be

24   changing their behavior, we have a huge problem on our

25   hands.  I would call this active resistance.  And yet,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 49

1     the problems that we're facing are such that the

2     department is also being passively resistant.

3           According to the report, there has been this

4     unfolding.  During the process of reviewing the policy

5     analysis office's meeting minutes, the monitoring team

6     learned that there was an APD Special Order 1675, which

7     unilaterally, without notice to or approval by the

8     monitoring parties, changed the required review rate

9     for sergeants from two per month, per sergeant, to two

10    reviews per the entire squad, per month.

11          And when the monitoring team asked for a copy

12    of this special order, which can only be issued by the

13    chief of police, we were told it doesn't exist and that

14    we must be mistaken.

15          And so the monitoring team forwarded a copy of

16    the meeting minutes to the department, and asked for the

17    memo, and they still don't have it.  Now, this kind of

18    behavior calls into question whether we're ever going to

19    get where we need to go.

20          And then, the last thing that I wanted to say

21    is that the problem is that the department is still

22    taking issue publicly with the Monitor's findings.  In

23    the May 2 article in the Albuquerque Journal, where

24    there's a report about what the report said, and

25    Dr. Ginger's report said, "There seems to be no one

United States of America, et al. v. The City of Albuquerque, et al.                                     May 10, 2017
Public Hearing                                                                                            14-CV-1025 RB/SMV

Page 50

1      person, unit or group with responsibility and command

2      authority to make change happen, and that there's been a

3      palpable shift in the police department's approach to

4      changes," the city's attorneys said, "I'm not sure why

5      he would say that."

6          It is sort of interesting to see the contrast

7      between his narrative, as opposed to just the raw

8      compliance findings.  And so, we are still trying to

9      kill the messenger, and that's bad news.

10         But here's my hopeful note.  October 3 of 2017

11     is when the city will have an election.  And October 3

12     of 2017 is when someone else will be chosen, and then on

13     December 1 of 2017 there will be a new mayor.  And many

14     of us anticipate that because it almost always happens,

15     that there will be a new police chief.

16         And so six months from now, when we come back

17     to see you next time, we will find out who is going to

18     be in charge of this show, and we'll find out if those

19     people bring a fresh approach to this.  Because those

20     are the people who either will or will not achieve

21     substantial compliance with the consent decree.

22         And I'm very hopeful that the next city

23     administration will pull all of their oars in the same

24     direction and achieve substantial compliance.  And so I

25     do hope, Judge, that you'll just keep riding this horse,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 51

1    because we're in this for a long haul.

2          THE COURT:  Thank you, Mr. Cubra.

3          Ladies and Gentlemen:  We're going to take a

4    break, 20 minutes.  We'll be back and we'll, at that

5    time, hear from Mr. Simonson and Ms. Koenigsberg.

6          (Recess taken from 10:19 to 10:40 a.m.)

7          THE COURT:  Ms. Koenigsberg?  Who's up?

8          MS. KOENIGSBERG:  Mr. Simonson will go first

9    and I'll be second.

10         THE COURT:  That will be great.

11         Mr. Simonson?

12         MR. SIMONSON:  Good morning, your Honor.  Peter

13   Simonson for the ACLU of New Mexico, here on behalf of

14   APD Forward.  I want to thank you for this opportunity

15   to address you today on behalf of APD Forward.  Our

16   coalition appreciates the opportunity to have a stake in

17   the conversation, the discussion that we're having

18   today, and to continually voice their opinions about the

19   reform process.

20         I just have two brief items that I wanted to

21   raise with you this morning, and then Nancy also had an

22   additional item on behalf of APD Forward that she wanted

23   to discuss.

24         So first item, APD Forward wants to add their

25   voice to the concerns that have been raised by the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 52

1     Police Oversight Board regarding the chief's responses

2     to the officer disciplinary recommendations.  Three

3     members of the APD Forward steering committee actually

4     sat on the City Task Force, which proposed changes to

5     the Albuquerque ordinance regarding the Citizen/Police

6     Oversight Agency.  And they were involved in the reform

7     effort all through the process.

8          The task force explicitly asked for language in

9     that ordinance that would require the chief not only to

10    respond with a decision of concurrence or

11    nonconcurrence, but also to explain in writing if he did

12    not concur with a disciplinary recommendation, why that

13    was.

14         And we asked for that requirement so that the

15    Police Oversight Board and the public could make an

16    independent determination of whether or not the chief's

17    decisions were being made on an arbitrary basis or were

18    based on sound reasoning.

19         And in light of Dr. Ginger's findings, that

20    command and supervisory staff regularly overlook,

21    minimize or rationalize out-of-policy behavior.

22    Regarding the use of force in particular, APD Forward

23    thinks that this requirement of the chief continues to

24    be imperative.

25         We raised this issue in our March 30 meeting

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 53

1     with the parties.  We were told that the POB and the

2     department were in discussion about how to ensure that

3     the chief continues to comply with the ordinance.  We

4     have not yet been informed about the outcome of those

5     discussions, but it is an issue that's of great

6     importance to us.

7          Second, the members of APD Forward were, I will

8     say, very pleased to read in the fifth Monitor's report

9     that APD has made significant headway in policies,

10    training and practices around the use of electronic

11    control weapons, and that the department has

12    substantively improved its CIT training.

13         However, we were quite alarmed by Dr. Ginger's

14    description of, and I use quotes here, "deliberate

15    indifference and deliberate noncompliance by APD

16    supervisors and command level staff."

17         It seems incredible to our coalition that APD's

18    leadership would refuse to remove neck holds in

19    particular from the department's use of force policy

20    when the CASA requires that in quotes again, "APD shall

21    explicitly prohibit neck holds except where lethal force

22    is authorized."

23         Lest we forget, Eric Garner, one of the most

24    widely publicized victims of police excessive use of

25    force in recent years, died from a neck hold applied

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 54

1    from a New York City police officer.  11 times he cried,

2    "I can't breathe" before suffocating to death.  And yet,

3    APD leadership insists on authorizing the routine use of

4    this violent technique.

5          The members of APD Forward wonder if we aren't

6    now reaching the end of APD's rope.  Has the leadership

7    gone as far as it's willing to go with reform?  Yes, we

8    have seen improvements in special tactical units, in the

9    deployment of electronic control weapons, and in CIT,

10   but for multiple reports now we have been reading that

11   supervisory and command staff persist in minimizing,

12   rationalizing and ignoring even the most obvious

13   violations of use of force policy.

14         This is the heart of reform.  Without a working

15   system of accountability, all of the other reforms that

16   APD has to put in place will eventually collapse.  We

17   can all celebrate the fact that the rate of officer

18   involved shootings has dropped, but at this moment, APD

19   has no reliable system of accountability, no safety net

20   to ensure that those trends won't one day return as

21   fiercely as they did before.

22         As Dr. Ginger noted in his report, it continues

23   to appear that this monitoring team is the only systemic

24   overseer of on-street activity of APD's officers.  APD

25   Forward has enlisted the assistance of a data scientist

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 55

1          to conduct a finer analysis of APD's compliance in the

2          most critical areas of reform like the use of Force

3          Review Board, the Critical Incident Review Team, and the

4          Use of Force Investigations and Reporting.

5                   The initial results from that analysis suggest

6          to us that we are not nearly as far long as the primary

7          compliance rate cited in Dr. Ginger's report would

8          suggest.  I mean, we would be happy to share the

9          analyses with the Court and with the parties.

10                  Finally, let me note.  We had intended to

11         discuss an Albuquerque Journal story regarding several

12         instances in which APD leadership criticized local

13         judges and media for problems within the department.

14                  The city asked us that we refrain from raising

15         that issue here in today's hearing.  And so we have

16         actually set up a separate meeting to discuss that issue

17         with the city and with the parties.  But I will note

18         that the issue was raised in our letter, and we raised

19         it because we felt like the issue goes straight to the

20         heart of questions around APD leadership and their

21         continued support of reform.

22                  So I'll stop there, and I'll invite -- with

23         your permission, I'll invite Nancy to come up and add a

24         further point.

25                  THE COURT:  Yes, sir.  I'm just interested on

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 56

1    how that dialogue on the last point came about.  Your

2    letter referenced those comments?

3            MR. SIMONSON:  Yes.

4            THE COURT:  Did the city reach out to you at

5    that point, after receiving your letter, and ask that

6    you refrain from discussing that today?

7            MR. SIMONSON:  Yes, your Honor.  In an e-mail

8    conversation that took place between myself and the

9    parties, all of the parties, they had seen our letter

10   and raised the particular issue.  I tried to explain

11   that we saw this issue as germane to the question of APD

12   leadership accepting responsibility for issues that it

13   was responsible for, like the questions that have caused

14   this reform process.

15           We were told that because the issue hadn't --

16   they hadn't actually had an opportunity to fully review

17   that part of our letter, that they would prefer to

18   discuss that independently in a meeting between the

19   parties.

20           THE COURT:  Thank you.  Ms. Koenigsberg?  Or is

21   it Koenigsberg?

22           MS. KOENIGSBERG:  Thank you.  Appreciate it.

23           THE COURT:  Of course.

24           MS. KOENIGSBERG:  Your Honor, Counsel Nancy

25   Koenigsberg from Disability Rights New Mexico and we're

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 57

1    a member of the APD Forward coalition.  I'm going to

2    expand a little bit on the use of force comments as it

3    relates to the CIU.

4         APD Forward continues to Monitor the data about

5    use of force when it involves individuals with mental

6    illness and other disabilities.  As everyone likely

7    knows, two of the coalition members are parents of men

8    with mental illness who were shot and killed, so it's of

9    particular interest to APD Forward.

10        So we're watching the data closely.  In our APD

11   Forward's March 24, 2016 letter to the Court, we

12   commented upon the city's fifth self report in which it

13   mentions the APD CIU data book.  And this is a little

14   background to the three points that I wanted to bring to

15   the Court's attention.

16        So the data book seems to be a compilation of

17   several different PowerPoints that took place prior to

18   October of 2016.  And this relates to Paragraph 129 of

19   the CASA, which lists the type of data that CIU was

20   supposed to collect when it encounters somebody in

21   crisis, or mental illness, or other disability.

22        And we believe the data, use of force, is

23   collected under Subparagraph G, which says "techniques

24   or equipment used."  So the data book is where this

25   information is to be compiled.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 58

1       The data book is in fact on the MHRAC, the

2    Mental Health Response Advisory Committee, subpart of

3    the police department's website.  So you have to

4    navigate to get there, but it's findable.  And the last

5    date again of that data book is October 5, 2016.

6       So to my points, one of the questions we had is

7    it's not clear if the types of force tracked in the data

8    book includes all of the possible types of use of force

9    discussed in the Monitor's report No. 5.

10       For example, page 67 of the data book says it's

11    tracking Taser use, handcuffs and OC, which I understand

12    is pepper spray.

13       Page 160 of that same data book lists the

14    Taser, use of foam, projectiles and canine; and page 35

15    talks about passive restraints and bean bags.

16       So when it comes to use of force in these

17    incidents, given the number of kinds of use of force,

18    it's hard to know what that label means and what it

19    includes.  And since data is so critical at this point

20    in time, we thought it was important to point that out.

21       We don't know whether the things that have been

22    called distraction strikes, the leg sweeps, pushes and

23    shoves have been used when the CIU encounters people in

24    the field.  Again, because it's not identified as a use

25    of force, it's hard to know if that's tracked in the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 59

1       data.

2               I believe the behavioral health training, which

3       has been discussed, is markedly improving, likely

4       minimizes these kind of uses of force.  But, however,

5       for accuracy's sake, I think it should be more

6       particularly identified in the CIU data book.

7               The second major point is the data book itself

8       is not complete.  On page 84, for example, of the data

9       book, it shows a graph of use of force CIU incidents

10      from January to April of 2016.  And each month has three

11      bars within the section to describe the use of force.  A

12      yes and a no, and a report in progress.

13              So in particular, January had -- '16 had 224

14      encounters with no use of force, which is great; 1 is a

15      yes, and 4 with a report in progress.

16              March was 177 encounters with no use of force,

17      which is again good.  1 yes; and 56 reports in progress.

18      April had 172 nos.  There were no yesses recorded, so I

19      would assume that meant none.  And there were 34 reports

20      in progress.

21              So we don't know how these other incidents,

22      excuse me, that were reports in progress were resolved.

23      I have not seen anything on the APD on that website that

24      follows through on that.  And this relates to -- it's a

25      related point.  The MHRAC web page does not contain

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 60

1    up-to-date data.

2         The last agenda posted is for September 2016,

3    and the last set of minutes is dated July 19, 2016.

4    Regarding use of force data in that time, the January

5    2016 minutes, not actual data given out, but statements

6    reported in the minutes, said that there was one use of

7    a bean bag, and one Tasing in the CIU encounter with

8    people with behavioral health issues.

9         February 2016, there's no data reported.  March

10   2016, no data reported.  April 2016, there were no uses

11   of force reported by CIU, but it was reported in the

12   minutes that Field Services' use of force in the

13   behavioral call was used, but it doesn't say what type.

14        And then I think, importantly, the May of 2016

15   minutes said data will be distributed on the MHRAC

16   website.  I looked at the website again this morning

17   just to make sure.  I'm not seeing any more up-to-date

18   data there.  Maybe it is, but I just was not able to

19   find it.

20        I think what's important here are a few things.

21   That as Dr. Ginger said, that the drill down right now

22   for the Monitor is data, so we want the data to be

23   accurate, we want it to be complete, and we want it to

24   be current.

25        So that's foremost.  I'd also think it's

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 61

1        important, since in last year's reports, there were

2        significant numbers of reports in progress about CIU

3        encounters with individuals in behavioral health crisis.

4        So we don't know how those resolved, whether there were

5        additional uses of force or not.  And it would be good

6        to have that updated.

7              I know there is a person on APD staff now whose

8        whole focus is the data compilation, so it seems like

9        that should be possible.  I also think it's really

10       important, given the discussion today, that there should

11       be a clear definition of what use in force includes,

12       since as I read, there are many different things that

13       were identified as potential use of force, or uses of

14       force, but the whole title, we don't know what all the

15       individual possibilities are in there, and which

16       particular uses of force are used at any one time, which

17       I think is helpful as we're trying to minimize the

18       number of contacts of people with individuals with

19       mental illness between the police, and that if they are

20       -- if those encounters are happening, then minimizing

21       the use of force.  So knowing the specifics I think is

22       really helpful.

23             In addition, as promised a year ago May, that

24       the report on use of force would be provided monthly to

25       the Mental Health Response Advisory Committee and posted

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 62

1       on the website.  That's where the public can see this

2       information.

3               One final comment, your Honor, is we read in

4       the paper, I think it was last week, that Deputy Chief

5       Garcia, who's been overseeing the CIU and Behavioral

6       Health Services Unit has been promoted.  And he has been

7       a staunch supporter of the development of improved CIU

8       and CIT training, and has facilitated the enhanced CIT

9       officer component.

10              He's also worked to develop more knowledge

11      about people with developmental disabilities and autism,

12      and wants to include that in the training in the CIU

13      training.  So his support has been invaluable, and we're

14      hoping the promotion is going to be helpful

15      department-wide.  I think it's important to note that

16      the person who will be taking his place, as I understand

17      it, from the report in the paper, is Shane Rodgers,

18      who's the brother of the former CIU contract

19      psychologist Troy Rodgers.

20              And we are hoping that he will provide the same

21      level of support that Deputy Chief Garcia has shown, and

22      that we will maintain the level of training that's been

23      developed since Dr. Rodgers has left.

24              So in closing, I think data is important.  I

25      think accuracy and timeliness of data is important,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 63

1    especially when it comes to involvement of CIU with

2    people with mental illness and crisis and other

3    disability.  We look forward to seeing that data updated

4    and constantly reported.

5         Thank you, your Honor.

6         THE COURT:  Yes, ma'am.  Thank you.  And

7    congratulations to the deputy chief on his promotion.

8    Ms. Fine and Mr. Harness.

9         MR. HARNESS:  Good morning, your Honor.  My

10   name is Edward Harness.  I'm the executive director of

11   the Civilian Police Oversight Agency for the City of

12   Albuquerque.  With me is Joanne Fine, the chairman of

13   the Police Oversight Board.  Thank you for this

14   opportunity to address some of the concerns that we

15   have.  And again, thank you for the designation of being

16   a stakeholder so that we have the opportunity to address

17   the Court.

18        First, let me say that there are not a harder

19   working group of volunteers then the members of the POB.

20   There's also not a more tenacious group.  They will

21   continue to fight to get APD to acknowledge and

22   cooperate with civilian police oversight in Albuquerque.

23        Your Honor, we presented to the Court two

24   letters drafted right after the conclusion of the

25   monitoring period.  The first letter expressed some of

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 64

1      our overall concerns; the second was expressly regarding

2      concerns with APD's Office of Policy Analysis.  As you

3      are aware, the independent review officer and the Police

4      Oversight Commission were found by the Department of

5      Justice to be too closely aligned with APD.

6          That's the genesis of the Police Oversight

7      Board and the CPOA being formed.  We strive every day to

8      maintain our independence and to meet our duty to the

9      community.  Transparency and accountability to the

10     citizens of Albuquerque are at the heart of the

11     settlement agreement reached between the parties.

12         The Albuquerque Police Department serves at the

13     behest of its citizens.  Therefore, the citizens of

14     Albuquerque must have a voice in how the department

15     comports itself while policing its citizens.  In other

16     words, the citizens must have a say in how policies are

17     developed, implemented, and how APD officers are held

18     accountable.

19         The settlement agreement, along with city

20     ordinances, envisions the Police Oversight Board as the

21     citizens' conduit to transparency and accountability.

22     It is well documented APD wrote the 37 policies related

23     to the CASA without input from the Police Oversight

24     Board.

25         It is our position that this was in direct

Page 65

1      violation of Paragraph 288 of the CASA, which states,

2      "The agencies shall make recommendations to the chief

3      regarding APD policy and training.  APD shall submit all

4      changes to policy related to this agreement, i.e., use

5      of force, specialized units, crisis intervention,

6      civilian complaints, supervision, discipline and

7      community engagement to the agency for review, and the

8      agency shall report any concerns it may have to the

9      chief regarding policy changes."

10              The agency in this case, the POB, attempted to

11     provide a solution to APD by recommending a change to

12     the policy development policy 3-29.  That recommendation

13     went to the chief on October 13 of 2016.  The POB's

14     recommendation was to insert itself into the policy

15     development flow chart.  The chief rejected that

16     recommendation.

17              I'm happy to report, though, as a result of

18     negotiations prior to this status conference, I believe

19     we've reached an agreement to give the POB an

20     opportunity to review policy changes and to come into

21     compliance with Paragraph 288.

22              In our second letter to the Court, we expressed

23     our concerns about the Office of Policy Analysis.  OPA

24     is purported to be the quote, "think tank," unquote.

25     The place where relevant data, best practices, Risk

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 66

1    Management, field experience, supervisor experience,

2    legal concerns and stakeholder input are all supposed to

3    come together to create policy.

4        I am a voting member of OPA and I can assure

5    you that none of that is happening.  What is happening

6    is OPA meets biweekly -- I'm sorry, yes, biweekly.  The

7    policy under consideration is already drafted with

8    changes.  In addition, the policy presented for me to

9    review may have other changes when actually presented to

10   the meeting.

11       Occasionally a department designated subject

12   matter expert, or the drafter of the policy, usually a

13   sergeant or lieutenant, might be there to go through the

14   policy with the attendees.

15       I use the word "attendee" intentionally.  The

16   only consistent attendees are the members of POB and

17   CPOA.  Other previously appointed APD participants may

18   or may not be there.  To phrase it properly, attendance

19   at this prestigious portion of the process has been

20   sparse.  APD's presentation of this process to the

21   public is akin to a bait and switch.

22       Last week, I attended the International

23   Association of Chiefs and Police Legal Advisors

24   conference.  In the section regarding policy

25   development, most agreed you cannot have a successful

Page 67

1       police department if your front-line supervisors and

2       middle managers, lieutenants, are writing and developing

3       your policies.  Sergeants and lieutenants can't be

4       dictating how your department comports itself.

5               IMR-5 correctly assessed the chief's failures

6       to report his nonconcurrence to the POB.  I am happy to

7       report the chief has begun to respond and explain why he

8       disagrees with the findings of the board.  The public

9       deserves to know where the chief stands on these issues.

10              Let me point out a few examples.  No. 1)

11      I-16915, the most recent officer involved shooting

12      reviewed by the board.  The board recommended a

13      suspension for an officer that accidentally fired his

14      weapon.  That accidental discharge resulted in an

15      innocent victim being struck in the neck with a bullet.

16      The board also recommended the on SANE supervisor

17      sergeant be investigated for an improper search.  The

18      chief in his nonconcurrence letter goes into great

19      detail as to why the search was proper.

20              During this discussion, he states quote, "The

21      suspect had no expectation of privacy," unquote.

22              That should be self-evident.  If the suspect

23      had an expectation of privacy in the residence, there

24      would be no burglary.  And that's why that subject was

25      arrested.  In addition, the officer will receive a

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 68

1    written reprimand for shooting an innocent man in the

2    neck.

3        No. 2, in my role as the executive director, I

4    make disciplinary recommendations.  In order to do that,

5    I must review the officer's disciplinary history.  In a

6    recent check of an officer's disciplinary history, an

7    officer received a verbal reprimand for accidentally

8    discharging his weapon while conducting quote, "a press

9    check" unquote, prior to reporting for duty.

10       That round went through his kitchen window and

11   into his neighbor's home.  By definition, that is

12   Negligent Use of a Deadly Weapon, New Mexico stats

13   30-7-4 (A) (1).

14       I acknowledge peace officers are exempt from

15   criminal liability while performing their lawful duties.

16   An argument can be made that he was not performing

17   lawful duties.  However, civil liability still applies.

18   The officer received a verbal reprimand.

19       No. 3.  I'm sorry.  Let me go back.  As a

20   result of discovering this, the board is going to take

21   up in its discussion in this next meeting a

22   recommendation that the Force Review Board also review

23   all accidental discharges of weapons, which occurs in

24   other jurisdictions.

25       No. 3:  CPC No. 131-16:  The board recommended

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 69

1      a lengthy suspension for an officer having an

2      extramarital affair with his supervisor from the real

3      Time crime center, a loss prevention worker at a

4      Wal-Mart, while on overtime.  And being untruthful to

5      the civilian/police oversight agency investigator.

6            Some of the evidence in the case was reviewed

7      by the -- was a video reviewed by the investigator that

8      the complainant refused to turn over.  The chief agreed

9      on the findings of the misconduct, but would not find

10     the officer untruthful because he had not reviewed the

11     video.  The untruthfulness was in the officer's recorded

12     statement contained in the investigatory file.

13           No. 4:  CPC 139-16.  The board recommended a

14     suspension for officers arresting two suspects on felony

15     warrants.  The arrests ultimately took place at a needle

16     exchange van.  The -- I'm sorry.  The investigation

17     revealed the officers failed to use the department's

18     arrest warrant risk assessment.  The chief exonerated

19     the officer stating, quote, "At no time were the

20     suspects barricaded," unquote.

21           The risk assessment matrix is a tool to help

22     officers operate safely.  The risk assessment states if

23     a score of 25 or higher is assessed to the subject of

24     the warrant, contact SWAT for assistance in executing

25     the warrant.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 70

1        A cursory review of the matrix showed a score

2    of 65 for each of these subjects.  In conclusion, let me

3    state that we concur with the Monitor's assessment

4    regarding the lack of accountability with APD.

5    Unfortunately, the chief sets that standard, and it

6    filters down to the rest of the department.  If it

7    Please the Court, I introduce Chair Fine.

8        THE COURT:  Mr. Harness, just a moment.  You

9    indicated that the chief was now responding, which was a

10   new development that we had gone for some time that he

11   was not responding as the POB believed he should.  When

12   did that happen?  When did this change occur?

13       MR. HARNESS:  The changes occurred over the

14   last 60 days.  So we have received nonconcurrence

15   letters with explanation for the last 60 days.

16       THE COURT:  All right.  So this was an issue at

17   an earlier meeting of ours, and it persisted in this

18   fifth report from the Monitor.  But within 60 days, now,

19   you're saying we've got some response?

20       MR. HARNESS:  That's correct, your Honor.

21       THE COURT:  Thank you.

22       Ms. Fine.

23       MS. FINE:  Again, I'm Joanne Fine.  I'm the

24   chair of the Police Oversight Board.  Good morning, your

25   Honor.  I'm grateful to have the opportunity to address

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 71

1    the Court on these matters which are so very important

2    to the people of Albuquerque.  I believe the Monitor's

3    current report is an accurate assessment of what has and

4    has not transpired in the reporting period.

5            As it relates to civilian oversight, the

6    obstructionist, dismissive and often disrespectful

7    behavior by APD leaders dates back to the beginning of

8    our volunteer term over two years ago.  It would seem

9    the parties, except for APD, are in some agreement that

10   APD is not interested in and certainly not committed to

11   reform.

12           As a community member, I do not expect fast

13   reform.  I did expect more significant reform this far

14   into the journey.  27 months in, the civilian oversight

15   process is still trying to secure a meaningful place for

16   our board in the APD policy process, a promise that has

17   recently been made, but again, not yet realized.

18           We are still awaiting for a reasonable amount

19   of time as a board to review serious use of force in

20   officer involved shooting cases, and still be within the

21   discipline time frames established by the APD union

22   contract.

23           We are still stymied by a lack of data either

24   because it is surprisingly not collected at all, or

25   because not much of it is retrievable or easily

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 72

1     accessible, or so we have been told.  We have been

2     patient.  We are extremely frustrated.

3          There is an old adage says that "There is

4     always time for the things at the top of your list."  At

5     this point, I am nearly certain civilian oversight,

6     civilian input, civilian concerns are not on any list

7     for APD leaders, let alone near the top.

8          Your Honor, I close with two questions for your

9     consideration at a time of your choosing.  I have been

10    told APD cannot reach compliance with the CASA without

11    meaningful civilian input.  I would like to know if you

12    agree with that, sir.

13         Secondly, I would like to know, on behalf of

14    the people who live here, what range of tools the Court

15    has at its disposal to encourage or demand that APD meet

16    its obligations of the CASA.  What happens if APD

17    leadership continues to drag its feet and obstruct this

18    process?  Thank you.

19         THE COURT:  Well, with regard to your first

20    question, yes.  And with regard to the second, I began

21    the day by saying I wanted the city to take particular

22    heed to what was said by the Amici, because within 30

23    days, I'm going to have an action plan presented from

24    the city to address each of your specific points.  And

25    we'll see if that tool at my disposal causes any change.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 73

1    And I'll keep you posted.

2         MS. FINE:  Well, I was encouraged by, and we

3    all feel hopeful that change will come at some point.  I

4    don't think the community should have to wait until

5    October for that to happen.  So I'm looking forward to

6    what the powers that be, in this circumstance, can do to

7    make change happen at a more reasonable pace and at a

8    higher quality.

9         THE COURT:  Thank you, Ms. Fine.

10        Mr. Miera?

11        MR. MIERA:  Good morning, your Honor.  Thank

12   you for hearing the MHRAC's report today.  We talk about

13   MHRAC a lot.  I think there are some individuals that

14   are not familiar with what MHRAC is, Mental Health

15   Resource Advisory Council.  And as such, your Honor, we

16   meet monthly.

17        These are individuals who are volunteer --

18   voluntarily coming to this monthly meeting.  I think

19   it's notable to talk about the meeting, because we

20   usually have at least 90 percent rate of the individuals

21   who are on that board, and there are many of us, up to

22   20 at any one particular time.  Sometimes mostly a

23   hundred percent attendance is normal.

24        Individuals that sit on that board come from a

25   variety of different resources, opportunities given to

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 74

1     the committee, and many are individuals with mental

2     illness themselves and are part of the board.

3          The police department is there all the time.

4     We have a great presence.  And they respond to questions

5     when asked, and we're very proud.  I think Nancy made a

6     good statement regarding one of the individuals who was

7     always there and responsible.  That captain,

8     unfortunately, is being promoted.

9          We're probably going to miss him very much,

10    because we've had great interactions during the meeting

11    and after the meeting.  We have subcommittee meetings

12    that meet as well on other time periods, and those

13    subcommittees give an important amount of the detailed

14    information that we need at the regular committee

15    meetings to be able to make some decisions.

16          Your Honor, I think as Peter Cubra stated

17    earlier, MHRAC has been working well with other related

18    programs and agencies outside of APD, and your Honor, I

19    think this is important.  Because as you can well

20    imagine, mental health is a big organization in and of

21    itself, whether at the University of New Mexico, at

22    the -- unfortunately, at the Metropolitan Detention

23    Center, or out in the community.

24          But as such, we had some changes with regards

25    to the funding through the county.  We had some

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 75

1    individuals who brought forth an idea that we should be

2    able to spend another 1/8 cents sales tax.  That went

3    forward and then had that opportunity to do that.  Those

4    new monies, about $20 million, have a significant impact

5    on what happens within the mental health in this

6    particular community, and then to impact MHRAC.  I'll

7    talk about that a little later on.

8         I think what's most important is there are

9    other agencies, even within the Metropolitan Detention

10   Center, that are also looking at what impact -- whatever

11   they're doing there has an impact on the community.  And

12   I think MHRAC sits in the middle being able to pick up

13   what it is that was asked of us by the CASA guidelines.

14   And we try to meet those guidelines as much as possible.

15        That being said, I think it was important, it

16   was maybe briefly talked about -- you heard the mobile

17   crisis team that is available right now, within the

18   facilities of APD, those are individuals who are well

19   trained and will be responding to individuals with

20   mental health problems in their communities, in their

21   homes, if necessary, which is not an unusual situation.

22   But as we try to move more forward to seeing if we can

23   keep them out of the detention facility, out of the

24   Bernalillo County mental health center facility, in and

25   of itself.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 76

1     These are individuals that are trained to

2     de-escalate and hopefully help these individuals not

3     have to attend either one of those particular

4     organizations.

5          That being said, I think it's important, is

6     that that is police-driven at the particular point in

7     time with regards to the mobile crisis teams.  And so,

8     there are opportunities in the future, with maybe even

9     to a different type of team that's going to want

10    individuals who are not related to the police

11    department, and may be able to help that community

12    engagement teams' individuals who will be able to go

13    out.

14         All of these have been looked at by MHRAC in a

15    limited basis, and I say that because those other

16    individuals are responsible, other teams, other places

17    are responsible for putting all that together.  I think

18    as we look at the overall issues with regards to mental

19    health, there's an awful lot out there, but I appreciate

20    the time that the individuals who are working with MHRAC

21    have given us to be able to have this kind of

22    conversation.

23         It's not the best.  We sometimes will miss

24    that.  But those individuals will come and speak to our

25    particular MHRAC meetings.  We do whatever we possibly

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 77

1       can.  MHRAC is open to the public.  As of this date, we

2       have yet had anybody have any complaints about their

3       inability to come and speak to us or inability to want

4       to listen to them.  We have open mic times and it's

5       utilized frequently that individuals don't feel like

6       they don't have a problem with their ability to talk to

7       the MHRAC.

8              As I move on to talk about maybe some other

9       issues that -- and these are small issues, because I say

10      small in terms of the impact that they may have is not

11      small.  But the smallnesses that we've talked about this

12      before, and it's a little above and beyond MHRAC's

13      opportunity to take a look at changing that.  That is

14      pretty much the information sharing subcommittee that we

15      have that has brought forth an awful lot of

16      opportunities to say what should we do now with what

17      information that we have.

18             We're talking specifically now about lapel

19      cameras.  As we look at individuals who have mental

20      health issues and the conflict between what the camera

21      picks up and what individuals have with regards to

22      having whether it's HIPPA, and the individuals, which

23      would be under the mobile crisis teams, or the community

24      engagement teams, these are professionals that are going

25      to go out and interact with individuals.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 78

1          Do they become their clients at that particular

2     point in time, which then HIPPA rules may or may not

3     appear or be of significance.  Or, police officers who

4     have a lapel camera on, that unfortunately the rules and

5     regulations, as we have them right now, say as you think

6     you're going to be individually coming into a contact

7     with a person who has mental illness, you have to turn

8     on that camera.

9          Does that camera become public information for

10    anybody else who wants to see that?  So there's an awful

11    lot too that we haven't resolved.  I bring this.  I

12    brought this before.  You remember that we brought this

13    before.  We bring this, at the Court to say we're going

14    to need some support as this thing moves on and as more

15    and more people go out of the way of getting into

16    situations where maybe just police officers are involved

17    with individuals with mental health issues, but people

18    going into their homes, etc.  So we may need some more

19    support on that particular issue, legal support,

20    otherwise as well.

21          Your Honor, I think I again want to go back to

22    what Nancy talked about before.  And I think it's

23    important, my final issue, and our revolving door issue

24    with you, your Honor, is that we need some

25    administrative support for MHRAC.

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)

07e93eed-c56b-4b8e-8a45-33a350f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 79

1          As I mentioned, these are people that are

2     volunteering their time, and as such, we don't have the

3     capabilities to have a professional secretary or

4     whatever else.  It may seem minor to you, your Honor,

5     but I tell you, if we're going to be able to keep up

6     with what Nancy talked about, putting things in, getting

7     them on the Internet, etc., etc., these are important

8     issues to us.  And as we get deeper and deeper into some

9     of these issues, we're going to need some of the support

10    that individuals are giving of their time.

11          I just hate to ask them, "Would you please go

12    home and do this extra set of stuff," that maybe a good

13    administrative secretary could do.  We're to the point

14    right now where I'm afraid, as was reported here

15    earlier, we don't have some of these where they should

16    be.  Needless to say, all the minutes have been taken

17    and they're all related.  They're all available to you

18    right now.

19          Where as I'm sure we wouldn't have gotten, as

20    Mr. Ginger said, we are the -- I shouldn't have to look

21    it up, but we are the shining star on this particular

22    issue.  We feel comfortable to be able to hear that

23    comment.  But we want to be better than that.  We want

24    to be able to be more than that.  And as such, we're

25    going to need that support staff.  And we've asked for

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 80

1    it, there's been talk about it, we've moved towards it.

2    It just doesn't happen yet.  It's a small part.

3         I'm hoping maybe it can be resolved by tomorrow

4    morning.  If that's the case, we don't have it today.

5    We'd like very much to have that.  Because as was

6    stated, data is useful.  And the only way we're going to

7    be able to capture that data and change the meetings

8    like we have been -- in fact, we changed meetings to

9    come out and talk to MHRAC and vice versa.  Individuals

10   can hear from MHRAC.  Those are the smaller issues that

11   make it the bigger issues, make MHRAC not the shining

12   star today, but in the future, your Honor.

13        THE COURT:  Mr. Miera, Ms. Koenigsberg did say

14   that the data on your website was out of date.  You're

15   acknowledging that, I guess.

16        MR. MIERA:  On the website, I am.  But we have

17   the minutes.  And everybody that's on MHRAC gets those

18   minutes.  We get them in e-mail sent to us, to all

19   individually.  You know, somebody just posting those

20   things where they should be on a timely basis and all

21   the information that we receive at MHRAC.  Because we

22   get a lot of information that comes to the meetings.

23   That too, whatever the information that has been brought

24   to by a variety of different individuals, that should be

25   posted on.

Page 81

1          We just haven't had that kind of flow of

2    information as we did.  So we would like to be able to

3    do that.  If we could have a professional secretary, not

4    just a part-time one, a full-time one, I think we could

5    keep them busy.  But we'll take what we can, your Honor.

6          THE COURT:  Thank you.  Thanks very much for

7    your volunteering and congratulations on that shining

8    star.

9          MR. MIERA:  Thank you, your Honor.

10          THE COURT:  Ms. Hernandez, two particular

11    issues there I'd like you to address later in your

12    comment, or with your action plan within 30 days.  This

13    issue of the automatic use of the audio cam when you

14    encounter someone that's suffering from a disability,

15    that's an issue that has persisted.  I'd like to put

16    that to bed.

17          And whether and to what extent you can assist

18    with administrative support for MHRAC, I'd hear you on

19    those things today or within 30 days.  Thank you.  I

20    think that concludes the remarks from the Amici.

21          Mr. Saucedo or Ms. Martinez, who's got the ball

22    for the government?

23          MS. MARTINEZ:  Elizabeth Martinez.

24          Good morning, your Honor.  May it please the

25    Court, Counsel for the City, Albuquerque Police

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 82

1    Department, and the Police Officers Association,

2    Dr. Ginger, colleagues from the Department of Justice,

3    members of the Albuquerque community:  We are gathered

4    again for the fifth time to discuss the progress that

5    the City of Albuquerque and the Albuquerque Police

6    Department have been making towards implementing the

7    reforms in the CASA.

8         My colleague, Luis Saucedo, will be addressing

9    that progress on behalf of the United States in a

10   substantive manner.  But before he does that, I would

11   like to take a few minutes to make some comment on

12   behalf of acting U.S. Attorney James Tierney, who

13   regrets that he could not be here this morning.

14        Before doing that, I would like to comment,

15   because I noticed that the Court responded and also the

16   Court's clerk when Mr. Harness indicated that there were

17   two letters from POB and CPOA.  I filed one letter and I

18   think there was a misunderstanding between me and

19   Mr. Harness.  I had inquired whether he expected both

20   letters to be filed, and I misunderstood.  I only filed

21   one.

22        So immediately after we conclude today's

23   hearing, I will make sure that you get that second

24   letter.  I am aware that all of the parties and

25   Dr. Ginger did receive that letter, and that second

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 83

1        letter is the one that addresses the Office of Policy

2        Development concerns that the board -- the Police

3        Oversight Board and CPOA have.  So I will make sure that

4        the record of this proceeding is complete as soon as I

5        can.

6               Judge, we greatly appreciate the fact that the

7        court shifted the agenda to permit our community

8        volunteers to speak before the Court, before the

9        parties.  As the Court can see from the folks who are

10       assembled here today, this reform process is extremely

11       important to this community.  There are a lot of people

12       in this community who are devoting substantial amounts

13       of their time, on a volunteer basis, not only to support

14       this reform effort, but also to be an integral part of

15       that process.

16              You have heard from some of those folks today,

17       and they include folks who serve as police on the

18       oversight board, the MHRAC, the community policing

19       councils who are not speaking here today, but there are

20       a number of those members in the audience today.

21              Obviously, APD Forward and the McClendon Amici.

22       I think that the voice they bring, which is the voice of

23       the community, is critically important, and the United

24       States -- and I believe all of the parties and the

25       Monitor greatly appreciate the value that they add to

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 84

1    this process and their important role in it.  So thank

2    you very much, your Honor, for making sure that this

3    process includes the community.

4        Jim Tierney has specifically asked me to thank

5    those volunteers not only on his behalf, but also on

6    behalf of the U.S. Attorney's Office and the Department

7    of Justice.  I also want to comment, Judge, that we also

8    have many members of our community who are here who may

9    not be involved in a formal way, but who have been

10   supportive not only of this reform process, but also are

11   men and women of our police department.

12       They are important to this process, and they

13   have made it clear, by attending many, many meetings and

14   regularly coming to these hearings, and we appreciate

15   the fact that they continue to support the process, and

16   that they continue to support our police department.

17       As Dr. Ginger has discussed, the city and APD

18   have made tremendous progress in a number of aspects of

19   this reform process, and Dr. Ginger has very graphically

20   demonstrated that process in the chart that he included

21   in his report, but he has also made clear that there are

22   significant areas that we need to continue to work on.

23       We want to thank the Albuquerque community for

24   supporting APD as it has made this very significant

25   progress.  And we also want them to stay with us and to

Page 85

1    continue to be involved, because our police department

2    will require their support as we go through the rest of

3    this process.

4         Mr. Tierney wants this court, the city, the men

5    and women of the Albuquerque Police Department, and the

6    Albuquerque community to know that the U. S. Attorneys'

7    Office and the Department of Justice remain fully

8    committed to this process, and they're fully committed

9    to working with APD and the city and the community to

10   make sure that this settlement agreement is fully and

11   effectively implemented.

12        Our support of this important reform process is

13   part of our continuing commitment to protecting the

14   civil rights of the Albuquerque community and to making

15   sure that our police officers work within a system that

16   gives them the tools to be safe and to help them

17   succeed.

18        And with that, Judge, I'm going to turn this

19   over to my colleague, Luis Saucedo.

20        THE COURT:  Mr. Saucedo.

21        MR. SAUCEDO:  Good morning, your Honor.  May it

22   please the Court:  Luis Saucedo for the United States.

23   Your Honor, I'd like to cover a couple of procedural

24   issues before I get into the substance, a response to

25   the substance of Dr. Ginger's report.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 86

1          But I would like to say that the United States

2     does have a positive outlook as far as the current state

3     of compliance.  The CASA now really, as you can -- as

4     you've heard this morning from people with different

5     experiences looking, who are responsible for different

6     aspects of the CASA, that the CASA does -- is serving as

7     a shared framework for discussing reform, for discussing

8     goals.

9          And that's really important.  Because I don't

10    think we were there a year ago or a couple of years ago.

11    And having MHRAC explain that they're moving forward,

12    that there's open communication among other entities

13    involved in this process is really good news, it's very

14    positive news.

15          The United States also has the experience of

16    working with other jurisdictions that have seen them go

17    through these same challenges.  This is difficult work.

18    But what's important is that they have found ways of

19    overcoming those challenges and coming into compliance

20    with the agreement.

21          So, I wanted to share that, your Honor, at the

22    outset.  Your Honor, the Monitor's reports now cover a

23    six-month period as opposed to a four-month period.

24    That was a request we made to the Court to expand that

25    review period.  That does give Dr. Ginger greater

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 87

1    opportunity to review the practices of APD in the field.

2    It also provides greater opportunities for feedback and

3    for corrective action to be taken by APD now that we

4    have most policies and training completed.

5         Like prior reports, the fifth report provides a

6    comprehensive assessment of each substantive paragraph.

7    The report reflects considerable work by the Monitor and

8    his entire team.  While we may not agree with every

9    conclusion that's reached by the Monitor, we do

10   appreciate their thoughtful review and analysis.

11        We also appreciate all the hard work of APD

12   officers, commanders and support staff.  As my colleague

13   Elizabeth Martinez said, the commitment of city

14   officials, oversight professionals and volunteers who

15   are all a part of this process.

16        Your Honor, there are two changes that

17   Dr. Ginger made to this report that we wanted to

18   highlight.  One of those changes is that he has now

19   included tables to represent the results of his review,

20   when he's looking at files on use of force, or when he's

21   looking at internal affairs files.

22        The tables he's providing, in our view, are

23   helpful and useful in trying to understand and to

24   pinpoint where the weaknesses are in the process.  So we

25   do appreciate that change that was made in this fifth

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 88

1    report.

2          We also appreciate that he has highlighted

3    recommendations in each area where he finds that there's

4    partial or noncompliance.  Those recommendations are

5    required by the CASA.  The city is free to choose from

6    those recommendations or to take other alternative

7    measures to reach compliance, but we require that the

8    Monitor include his insight and his experience to share

9    that insight and experience to help APD move forward.

10         These two changes are part of broader

11   commitments that were made by the Monitor, the parties,

12   APOA, and the United States.  We spent a considerable

13   amount of time earlier this year working on improving

14   communication and trying to make sure that the reports

15   are as accurate and as complete as possible.  And we

16   look forward to working with everybody, with Dr. Ginger

17   and the city, to determine whether we need to make any

18   additional changes to the report, so that they are more

19   complete and more accessible.

20         Your Honor, the fifth report evidence is

21   remarkable progress by APD.  As we saw in the Monitor's

22   presentation earlier, the Monitor has found increased

23   compliance in each compliance category:  Primary,

24   secondary and operational.  This is a positive trend

25   that we should keep in mind as we address the compliance

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 89

1     challenges that lay ahead.

2          And while not all paragraphs weigh the same,

3     some are more important to reaching sustainable reform

4     than others.  The big picture presents a positive

5     outlook for APD.  I'd like to take a moment to highlight

6     several key improvements that are included in

7     Dr. Ginger's report.

8          The first of those is seeing improved

9     deployment on electronic control weapons.  Those are

10    commonly known as Tasers.  Dr. Ginger did look at all

11    ten uses of Tasers.  I believe he found that two of

12    those were not uses of Tasers, so we ended up with

13    eight.  But based on his review, APD has made

14    considerable progress in deploying this less lethal

15    force in accordance with the CASA.

16         The city's in compliance with all but two

17    issues related to this less lethal weapon, and they

18    relate to internal audits and analyses that would help

19    APD better monitor the use of these weapons.

20         To remind everyone here, in 2014, when we

21    issued our investigative findings, we found serious

22    problems with APD's use of electronic controlled

23    weapons, including the deployment against individuals

24    who posed only minimal threat to officers and a lack of

25    internal controls.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 90

1          The fifth report provides evidence that APD's

2     using this tool to apprehend suspects in a safer and

3     more effective way.  That's an important achievement

4     that we see from Dr. Ginger's report.

5          We're also seeing continued improvement in the

6     management and oversight of specialized tactical unit.

7     APD continues to make commendable progress in the

8     management and operation of these units.  Dr. Ginger has

9     found them in compliance in all but one area, one

10    paragraph in the CASA.

11         This means that based on Dr. Ginger's review,

12    APD's specialized tactical units have developed

13    appropriate policies and training, and that they're

14    performing their duties accordingly.  And again, I go

15    back to where findings from 2014, your Honor, we noted

16    that there was a near absence of organizational

17    accountability of the Special Operations Division.

18         We found that officers were simply afforded too

19    much autonomy, insulating them from effective oversight

20    and management.  As of January 2017, this year, the

21    period covering this report, the Monitor has determined

22    that the Special Operations Division continues to

23    demonstrate that it meets or exceeds APD policy,

24    applicable law and best practices, and that it serves as

25    a model for other APD units.

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)                          07e93eed-c56b-4b8e-8a45-33a3f0f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 91

1          The one area that remains outstanding is the

2     appropriate calculation of bite ratios for the canine

3     unit.  Bite ratios are intended to help APD identify a

4     potential problem that may require corrective action.

5     We want to make sure that these ratios serve as useful

6     risk management tools for APD, and that they're working

7     in concert with other accountability systems.

8          We're working with the parties and the Monitor

9     to resolve these issues as part of the six-month policy

10    review process.  There are other notable improvements,

11    and we've heard about them today.  The Behavior Sciences

12    Unit has shown greater stability with new leadership.

13    The Special Investigations Division.  These are the

14    detectives and the staff, or the personnel who are

15    charged with investigating crime.  They're contributing

16    to better deployment of the specialized tactical units

17    through the use of a risk matrix.

18          And so these provide an objective way of

19    determining when specialized tactical units are

20    required, and the Special Investigations Division is

21    also showing progress in that area.  We're seeing better

22    or improved performance and greater stability with the

23    Mental Health Response Advisory Committee, or MHRAC.

24          The Monitor also found many other paragraphs in

25    other areas in full compliance related to recruitment,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 92

1      field training, performance evaluations, and civilian

2      oversight by the Civilian and Police Oversight Agency

3      and by the Police Oversight Board.  So we don't want to

4      lose focus that there are a lot of positive things in

5      this report.

6           The Monitor's ratings are not the result of

7      haphazard performance or implementation, but from the

8      sustained effort of many individuals who worked inside

9      and outside of APD.

10          I'd now like to turn to an area that is in need

11     of special attention that is essential to CASA, and that

12     is the force investigation process.  This process is

13     critical to strengthening the community's trust in APD,

14     because it demonstrates APD's ability to prevent use of

15     excessive force and to self-correct when they see

16     problems arise.

17          When mistakes are made, those are opportunities

18     to learn to prevent those mistakes.  When there are

19     positive outcomes, those are also learning

20     opportunities.  And what the CASA hopes to accomplish is

21     to be able to capture those experiences, those mistakes,

22     and those positive outcomes, so that we're using them to

23     prevent excessive use of force.

24          And I think this is one of the reasons why

25     Dr. Ginger really emphasizes this point in his

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 93

1    presentation and in his overall assessment, is that

2    APD's ability to self-correct and self-identify these

3    problems, even before the Monitor arrives on site, I

4    think is critical to demonstrating that we're in

5    compliance, and that those reforms that we're seeking to

6    achieve have actually taken hold.

7         Dr. Ginger and his team reviewed carefully a

8    sample of use of force incidents and APD's response to

9    those incidents.  The fifth report details Dr. Ginger's

10   findings, including weaknesses in each step along the

11   force investigation process.

12        While APD's performances investigating these

13   force incidents is of concern, it's not entirely

14   unexpected.  APD is undergoing significant overhaul of

15   this entire process.  If I can go back, as Dr. Ginger

16   explained, APD completed its new use of force policies

17   early last year.  This is early 2016.

18        And over the course of several months, APD has

19   sought to clarify new policy expectations through

20   training, instructional videos and bulletins.  This is

21   where APD had found that certain aspects of the policy

22   needed clarification.  We have seen those steps being

23   taken along the way.

24        APD has also trained officers on these new

25   policies.  So this reporting period, August 2016 to

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 94

1    January 2017, is really our first opportunity to see how

2    officers, as a whole, are applying all of these new and

3    revised policies to real encounters in the field, and

4    how supervisors are adjusting to the new oversight

5    process.

6         Dr. Ginger does offer a sobering assessment

7    that out of the 16 cases that his team reviewed, zero

8    percent showed an effective command level review of the

9    officer's use of force.  Dr. Ginger also found instances

10   where APD did identify problems early on, and he gave

11   them credit for that, because when APD finds mistakes or

12   finds problems, that's a sign that the process is

13   working.

14        And again, this is why I think it's really

15   important to emphasize the importance of command-level

16   reviews and the supervisory reviews that take place.

17   Dr. Ginger's compliance recommendations serve as a road

18   map for APD on how to respond to these findings and

19   ensure that APD is making continued progress.

20        I'd like to make one last observation, your

21   Honor, on where we are in the reform process and the

22   steps we need to go in the future.  We agree with

23   Dr. Ginger's opinion that the current state of

24   compliance is well described as a collection of parts,

25   as opposed to an integrated system.

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                                   14-CV-1025 RB/SMV

                                                                                                    Page 95

1              And while this may sound like a strong or harsh

2        criticism of nearly two years after this Court approved

3        the CASA, it is evidence that APD is on the right path,

4        because we now have confirmation that these parts exist

5        and that they're in place.

6              What are these parts?  Well, the CASA consists

7        of nine different sections.  In each of these,

8        Dr. Ginger has found significant improvement, and you

9        know, again, just to pull some of this together, we now

10       have a full set of compliant -- of policies that are

11       compliant with CASA.  Changes are being made to make

12       them stronger, but we have an initial set of policies

13       that the Monitor has found independently implement the

14       requirements of the CASA.

15             We have a strong recruitment program that is

16       attracting capable individuals.  We have an effective

17       preservice training program where cadets are seeing the

18       CASA as standard and essential.  We're not having to

19       change their mindset.  They haven't developed bad

20       habits.  These are individuals who are coming in and

21       seeing the CASA as something normal, and they become our

22       change agents within the police agency.

23             We have a group of engaged professionals on

24       MHRAC who have found their footing in the process, a

25       disciplined and well-trained specialized tactical unit

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 96

1    that is doing its part to prevent excessive force and to

2    minimize harm.  We have a robust oversight community

3    engagement that's supporting APD's efforts.

4           All of these parts are intended to work

5    together and to reinforce weaker areas that are

6    difficult to change, like the force and review process.

7    The next phase of implementation, as Dr. Ginger

8    describes, involves getting all these pieces or sections

9    working together to achieve measurable results as part

10   of an integrated system.

11          Your Honor, we're already seeing very promising

12   signs in this regard with fewer firearm discharges and

13   more appropriate uses of less lethal force.

14   Dr. Ginger's next report, which is due in early June,

15   will be looking at outcome measures, number of injuries,

16   number of uses of force.

17          I think it will be helpful for us to see what

18   the results of all of this effort are, what the results

19   are through this next report that Dr. Ginger will

20   provide.

21          Your Honor, I'm happy to address any questions

22   that you might have.

23          THE COURT:  Well, two things, Mr. Saucedo.

24   Ms. Martinez indicated a moment ago that Mr. Tierney,

25   the acting U.S. Attorney, had indicated that the U.S.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 97

1    Attorney was committed to this process, and I just

2    wonder to what extent that speaks beyond the local level

3    and up to Attorney General Sessions.  Is the Department

4    of Justice committed to this effort from the top down?

5         MR. SAUCEDO:  Your Honor, the United States is

6    committed and the Department of Justice is committed to

7    this process.  We have not received instructions to

8    change course.  We continue to enforce the decree.  Our

9    DOJ team that is made up of lawyers and staff from both

10   the Civil Rights Division and the U. S. Attorneys'

11   Office are here this morning, and they are going to be

12   here this week talking to APD, with APD and the

13   community.  And so we remain fully engaged and committed

14   to achieving the outcomes of the CASA.

15        THE COURT:  So thank you for that.  And I guess

16   you'll keep us posted of any developments.

17        MR. SAUCEDO:  Yes, your Honor.

18        THE COURT:  And gosh, by now, everyone should

19   know that I am interested in good news.  I like hearing

20   that things are working, and I like hearing that there

21   are some shining stars out there.  But there's a

22   elephant in this room that no one has talked about yet

23   this morning.  Language, specific language from the

24   Monitor's report that describes deliberate

25   noncompliance, deliberate indifference.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 98

1    And you have taken some time this morning to

2    talk about the positives, and acknowledge that, well,

3    that there is that use of force thing, you know, that we

4    have to talk about.  Well, where does this come from,

5    and how does it go uncommented on to this point in the

6    day?

7    MR. SAUCEDO:  Yes, your Honor.  The Monitor

8    does point to certain facts in his report to conclude

9    that APD is deliberately noncompliant.  He makes these

10   determinations on very specific issues.  And so I think

11   we're able to reconcile our view of things because we

12   are looking at the big picture where there is overall

13   compliance.

14   And those very specific issues where Dr. Ginger

15   has found that there is deliberate noncompliance, I

16   think we heard from him today, in some cases, he's not

17   seeing sort of purposeful retreat from the agreement,

18   that he's seeing diligent efforts.  All of those things

19   are important.

20   In some cases, Dr. Ginger said that if APD or

21   the city doesn't take action on a problem he's reported

22   over and over, that he would find evidence that there is

23   deliberate noncompliance.  And examples of those are the

24   inability of an individual to submit an anonymous

25   complaint.  So the city has been on notice that

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 99

1    currently, or as far as they reported during the

2    reporting period, that individuals are not able to

3    submit those complaints anonymously, and it has been

4    over the course of several reports where he's made that

5    finding.

6         And so, I think that would present a situation

7    where, if there is no progress, I think that would start

8    to demonstrate that sort of the deliberate

9    noncompliance.  I do want to address two specific things

10   that have been addressed or raised today, where

11   Dr. Ginger did refer to deliberate noncompliance.

12        One of those are neck holds.  We have not seen

13   the city or APD retreat from their commitment in

14   prohibiting neck holds, or saying that when they occur

15   they should not be investigated fully.  They are

16   considered serious uses of force.  Neck holds -- and

17   it's important to think about what they are.

18        Neck holds are techniques or actions taken by

19   officers to restrict the blood flow or air flow.  And

20   that's what causes them to be higher risk techniques.

21   And for those higher risk techniques, we are requiring a

22   high-level investigation.

23        What the city brought to us was their concern

24   that not every incidental contact with the neck was a

25   neck hold.  Not every contact with the neck restricted

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 100

1      blood flow or air flow that would raise the level of

2      risk for those individuals.

3             And so what APD and the city were looking for

4      was a way to better define those terms so that it was

5      clear to the officers and to the supervisors who were

6      looking at uses of force.  And we have discussed, as

7      part of the six-month review process, ways to address

8      those definitional issues.

9             I think we all need to be able to agree that

10     when there is a neck hold, that APD identifies it as a

11     neck hold, and that Dr. Ginger identifies it as a neck

12     hold.  And for that, we need to have very clear

13     definitions in policy, and that's where we're headed.

14            So in that specific instance, we're not

15     endorsing this view of deliberate noncompliance because

16     we continue to see that APD is committed to treating

17     those types of force incidents as very serious and that

18     require a high level of reviews.

19            The other point that I wanted to address is are

20     these special directives.  And I know that Dr. Ginger

21     described one such directive as covert.  I think we need

22     to understand that the city and APD need to be able to

23     -- and the chief need to be -- they need to be able to

24     manage APD.  And if they see a problem in policy,

25     especially one that involves some sort of safety issue,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 101

1    it would be impractical, and I don't think we would want

2    to go through the normal policy review process that

3    could take months.

4         And so, what we've seen, and what the city has

5    indicated to us, is that some of these directives have

6    been stopgap measures to address very practical or

7    serious concerns.  What's important is that some of

8    these stopgap measures might actually be proof that the

9    system is working, right, that they are identifying

10   problems and taking prompt action to fix them.

11        And so we're working with the city, with the

12   Monitor.  We discussed this at our last monthly meeting.

13   We discussed that we need to develop a process to make

14   sure that Dr. Ginger is aware of when these special

15   directives are issued, and that we understand sort of

16   the impact that they have.

17        But again, your Honor, in those two specific

18   instances, we've not seen APD retreat from its

19   commitment in the CASA.

20        THE COURT:  Well, with regard to neck holds,

21   we're two-plus years in and we don't have a definition

22   yet?  Is that what you're telling me?

23        MR. SAUCEDO:  Well, your Honor, the city is --

24   the city -- your Honor, it did take a long time to

25   address this issue.  And the solution that's been

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 102

1    identified is changes in the definition of neck holds

2    that we're seeing in the six-month review of this

3    policy.  So we do see that changing so that everyone is

4    -- we should try to -- we need to eliminate any

5    discrepancy between the Monitor and APD's review of

6    these incidents, right?

7          They should be looking at the same thing and

8    for the same thing.  And it really does go back to these

9    definitions.  And I think policy development really is a

10   continuous process.  And so I think we will be reviewing

11   a policy that does have a solution in it, and as part of

12   this process, we would be reviewing and approving that

13   policy.

14         THE COURT:  One or two other things, please.

15   At page 126 of the Monitor's report, he is referencing

16   the Monitor's circling back to APD about particular

17   cases.  And he says it's nearly incomprehensible that

18   after five attempts to prompt a legitimate follow up on

19   cases that the monitoring team has identified as

20   problematic, two of the three remain unresolved after

21   nine months.  It's unknown where the fault lies, but --

22   he goes on.

23         Have we had resolution -- this was as of

24   January.  Where are we on those, two of those three

25   unresolved cases?  Do you know where we are?  Can you

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 103

1        give me an update?

2              MR. SAUCEDO:  Your Honor, this is something

3        that we do want, need to talk to the city about, because

4        Dr. Ginger observes that the city takes his reports, has

5        taken his reports as water under the bridge.  In other

6        words, we move on to the next set of incidents, the next

7        sample of incidents.  And he has emphasized the need to

8        go back and see what action APD took in response to

9        these incidents.

10             We agree that it's taken a very long time.  We

11       need to find out from APD what action was taken with

12       respect to these two of the three incidences where he

13       says are outstanding.  The Monitor doesn't -- in

14       reviewing these incidents, doesn't resolve the incident.

15       There is no disposition of the incident.  That takes

16       place by action that's taken by the city.  And so it's

17       important for us to circle back and find out what

18       happened to those cases.

19             THE COURT:  Finally relating to this, the

20       special orders.  I don't have the particular number in

21       mind, but there was one reference this morning, that the

22       city allegedly denied its existence and when they saw

23       the minutes, they said something else about it.  But it

24       -- I'm told, in some of these materials, that the

25       content of that order ran counter to some of the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 104

1        provisions of the CASA.

2              So the fact that APD gets to manage itself as

3        it feels best, so long as its complying with this

4        agreement, and that's troubling to me.  Do you know

5        about the specifics of the order that was referenced

6        this morning?

7              MR. SAUCEDO:  Yes, your Honor.  That special

8        directive changed the number of recordings that would be

9        reviewed by a supervisor.  The policy that was approved

10       through the policy review process required that a

11       supervisor look at, on a monthly basis, review lapel

12       video of officers, of all officers in the unit.  And the

13       change that was made was that he would -- that the

14       supervisor would only look at a smaller number of those

15       per squad.  So not every officer, but a sample of

16       officers in the squad.

17             This relates to Paragraph 220 G in the CASA,

18       where supervisors are required to review recordings

19       regularly and to incorporate the knowledge gained from

20       the review in their ongoing evaluation and supervision

21       of officers.

22             And so, we understand that this presented a

23       workload issue for the city.  We have been working with

24       the city as part of our discussions.  This issue has

25       come up in our weekly meetings, and what we're seeing is

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 105

1    there are some underlying legitimate issues about the

2    workload and the burden on supervisors as part of this

3    process.

4         We do want to make sure that we're not

5    oversaddling our supervisors where they aren't able to

6    go out into the field or to think about the incidents

7    that they're coming across.  So we're working with the

8    city to try and address that specific issue.

9         We're also working with the city to make sure

10   that the special orders are brought to Dr. Ginger's and

11   the parties' attention early on, and that Dr. Ginger

12   doesn't have to sift through or come across something by

13   happenstance.  That is something important and something

14   we're going to be looking for with the city and

15   Dr. Ginger.

16        THE COURT:  So when this particular order, its

17   existence was brought to the attention of the city, are

18   you aware of their response?  Did they say it doesn't

19   exist until they drilled down some more?  Is that true?

20   On the reduced review, at the sergeant level or whatever

21   it was, of the on body recording devices, did the

22   city -- see, it's okay for them to prepare their orders,

23   but it's not okay to say they don't exist when they do,

24   and in fact, it contradicts elements of the CASA.

25        So that's what I'm concerned with.  Not the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 106

1   fact that there might be excessive work required of the

2   supervisors.  Of course, we have to be sensitive to

3   that.  But we don't get to -- the city doesn't get to

4   say because it's hard, we're going to do it differently

5   and we're not going to tell anybody about it.  That's my

6   concern.

7        MR. SAUCEDO:  Right.  Your Honor, Dr. Ginger

8   did say that when he asked about this special order that

9   it got the response that you just articulated, your

10  Honor.  My understanding is the city is not taking issue

11  to contradict that.

12       THE COURT:  We'll hear from the city after

13  lunch.  So actually, I guess in terms of the agenda that

14  the parties agreed to, we'll hear from APOA right after

15  lunch, and then the city following that.  And we will be

16  in recess then until 1:15.  Thank you all.

17       (Recess taken from 11:59 to 1:15 p.m.)

18

19

20

21

22

23

24

25

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)

07e93ead-c56b-4b8e-8a45-33a30f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 107

1                    RESUMPTION OF HEARING

2                         1:15 p.m.

3          THE COURT:  I think we're to that point in

4     the process where I'm going to hear from

5     Mr. D'Amato.

6          MR. D'AMATO:  Thank you, Your Honor.  On

7     behalf of the Albuquerque Police Officers'

8     Association, we'd like to thank you for the

9     opportunity you've given us, not only to address you

10    today, but also take part -- allowing us to take

11    part in the process of getting to full compliance.

12    So we want to thank you for that opportunity.

13          We would also like to thank Dr. Ginger

14    and his staff for the amount of -- of work that he's

15    put into this process, getting us to this point, and

16    as -- of course, as well as the City of Albuquerque

17    and the Department of Justice.

18          I thank the last two, in part, as a

19    formality but, also, Your Honor, to dispel any rumor

20    that these folks -- the parties, the Amici --

21    Amici -- are not taking part actively in this

22    process.

23          I have been involved in this process

24    for the last 60 to 90 days officially, and I have

25    not seen any evidence of either a party or a vested

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                        14-CV-1025 RB/SMV

Page 108

1     interest of the -- of a community member, a

2     non-profit group, that -- that's addressed this

3     Court this morning.  I believe every one of those

4     folks and organizations have worked diligently to

5     get to, not just compliance, but get to a working

6     operational system that can work at the highest

7     levels with the chief and his command staff as well

8     as the new recruit coming out of the Academy.

9              And that's what the Albuquerque Police

10    Officers' Association's -- Association focus is on,

11    the -- the officer coming out of the Academy that

12    will be impregned with the first two requirements,

13    his safety and community safety.  Those are the two

14    elements that drives the APOA primarily when we

15    review these policies.

16             Those are the things that we want to

17    see implemented that ensures a safe community and a

18    community that feels safe.  I don't think we're

19    there today, with a community that feels safe, for a

20    variety of reasons.

21             I do want to dispel some

22    representations made to you this morning.  Minor

23    ones but important for the Court to understand, as

24    well as those folks in the community.  The first one

25    primarily is, there is no deliberate indifference

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                         14-CV-1025 RB/SMV

Page 109

1       that I have seen on the part of the City, on the

2       part of any police officer, any supervisor, or

3       command staff.

4              Now, this is a difficult process,

5       getting to where we need to be.  It's very difficult

6       and highly charged.  Parties take certain positions

7       that are not necessarily irreconcilable but they

8       come from different perspectives.

9              The one word that I can think of to

10      advise you of why this disconnect occurs is the

11      subjective nature of the English language.  Now, we

12      talked about, earlier, about a neck hold.  The Court

13      Approved Settlement Agreement provides the

14      definition of a neck hold.  Making the jump from the

15      CASA, if you will, related definition for "neck

16      hold" into a workable policy is the product of so

17      many different viewpoints.  What may be a neck hold

18      to you when you view a lapel video is not

19      necessarily a neck hold that falls into the official

20      definition of, not only the City policy, but of the

21      Court Approved Settlement Agreement.  So that's, in

22      part, where the disconnect occurs, when we subject a

23      person's subjective view of a set of facts.

24              One of the reasons that occurs, in a

25      minor way, is the shift, or the drifting, I call it,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 110

1    away from the objective reasonable officer standard

2    enunciated in Graham vs Connor.  There are many

3    excellent points that IMR-5 make with regard to the

4    police department.

5            But I think the APOA's concern is that,

6    once you start injecting subjectivity into an

7    analysis, you're all over the board.  And when the

8    Monitor phrases that something in his report that

9    says use of force, Graham vs Connor should be one of

10   the other factors -- one of many factors that one

11   should consider.  And, so, the many factors are

12   taken by other folks to say, "well, subjectively, I

13   believe that's excessive use," and so we get into

14   chasing rabbit holes with regard to definitions.

15           And, so, from the beginning,

16   Mr. Mowrer, on behalf of the APOA, has tried

17   valiantly to eliminate the ambiguity in the use of

18   definition in terms.  And, again, I bring in the new

19   recruit coming onto the street with it, should be

20   simple for him or her.  They should be able to look

21   at a policy and understand it readily.  And that's

22   the transition we're getting to.

23           And part of the delay, as you know,

24   with some of the policies that the APOA has been

25   working with the City and the Department of Justice

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 111

1    on, is the meaning and intent of the language used.

2    It may work today but it may not work with the next

3    administration, or it may result in an ambiguity

4    that could result in the depravation of a

5    promotional policy, something that's important to

6    develop our troops coming up.

7            The Court, thankfully -- and I

8    appreciate the comment it made with, I think it was

9    Mr. Saucedo's presentation, that you should be

10   concerned -- we all should be concerned with

11   staffing issues.

12           So, currently -- it's almost like we

13   were talking at lunch and, sure enough, you have a

14   plate representing the Sergeant's responsibility

15   before the Department of Justice and the consent

16   decree was entered with a lot of responsibilities.

17   Now, we're putting more and more responsibilities on

18   these sergeants, these first-line supervisors.  I

19   think -- respectfully, it is our opinion, when doing

20   so, we lose sight of what a Sergeant's role is.  A

21   supervisor -- a front-line supervisor's role is to

22   keep his community safe with regard to response to

23   crime reporting, to keep his officers safe, and,

24   then, administration.

25           But I think we -- there's a perception,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 112

1    at least, that the priorities have been flipped a

2    little bit and you'll see this in future policies.

3    Right now, for example, when discussing the First

4    Amendment assembly policy, you can read the entire

5    policy and it's focused on the -- the respect for

6    the folks assembled, respecting their First

7    Amendment rights.  As long as it's lawful, they have

8    the First Amendment right.

9            There's nothing, really, to drive an

10   officer in the field with some confidence to say,

11   "Hey, this policy balances the interest between a

12   citizen's right and an officer's safety."  So that

13   will always be a discussion, whether there's a

14   consent decree in place or not.

15           One of the other representations made

16   to you, which is just flat wrong, a distraction

17   strike is not a strike to the head.  A distraction

18   strike -- I don't think there's anyone in this room,

19   at the tables, by the parties, would -- they would

20   not disagree that a distraction technique is a use

21   of force, clearly.

22           The breakdown occurs, in our opinion,

23   when you inject a subjective evaluation of whether a

24   strike may or may not be a serious use of force,

25   reportable use of force.  And that's where, when we

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 113

1    take the definition terms and try to implement them

2    into the reality, I think we're forgetting -- we're

3    not calculating the human nature side of this, that

4    one command -- one area commander may do an

5    excellent job in implementing the policies with -- a

6    certain way.  I think it would be an unsafe, or a

7    dangerous position to take, that that's the formula,

8    that's the algorithm that works and it will work in

9    every area command.

10          Each commander in his or her area

11    command is unique and they bring their own world

12    experiences to that job, to that position.  And just

13    by definition alone, I don't think you'll have a

14    consensus, unless we look at the objective standard

15    enunciated in Graham vs Connor.

16          So, if we get a shift away from that

17    recognized standard, I think we're creating more

18    problems than -- than necessary.

19          The third -- again, I think I touched

20    on this -- was that, for someone to suggest

21    non-involvement -- for example, I think, if I

22    remember correctly, the Office of Policy Analysis --

23    I can't remember a meeting that either the APOA

24    attended at least with one person, or a City folk

25    were there -- I don't remember -- and Mr. Mowrer, I

United States of America, et al. v. The City of Albuquerque, et al.    May 10, 2017
Public Hearing                                                         14-CV-1025 RB/SMV

Page 114

1       know was there, as well as APOA.  So to suggest to

2       the Court, and to others or to the community that

3       the City of Albuquerque, or the Albuquerque Police

4       Department or any other party, DOJ -- not involved,

5       we don't care, we're indifferent to the endgame or

6       the goals of the CASA, is not only untrue, it's just

7       not fair to leave that impression with this Court

8       and the community.

9               I appreciate the APOA appreciates the

10      work Dr. Ginger and his staff did with regard to

11      this report, both in terms of the actual number

12      aspect, the analytics, if you will, and also

13      recognizing some of the realities of staffing and

14      things like that.

15              There was some discussion, earlier,

16      with regard to the Sergeant's review of videos.

17      Well, if you take away today's discussion -- take

18      away from the discussion the issues that have been

19      resolved since the last meeting, within the last 60

20      to 90 days, I think the -- the transcript of this

21      hearing would probably be cut and a half because

22      what you heard today was, "This used to be a

23      problem, your Honor, but it's fixed.  This used to

24      be a problem.  Now, the communication is greater."

25              And, so, I think, prospectively, we are

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 115

1       on the right path -- the Albuquerque Police

2       Officers' Association, the Department of Justice,

3       and the City of Albuquerque Police Department, we

4       are on the right path, and I believe, at least to my

5       experience, no one has shirked their responsibility

6       and, if anything, it goes to the other extreme.

7               An informal poll will probably reveal

8       that we're spending overtime -- DOJ overtime, City

9       of Albuquerque overtime, legal department as well as

10      the APOA -- trying to reach a resolution on certain

11      issues that pop up.

12              One of the Amici indicated that success

13      can't happen unless we have direct involvement by

14      the Amici.  I submit to that we can have the

15      involvement of every community organization from the

16      moment the process started to the endgame - 110%

17      involvement -- but we're not going to solve the

18      underlying problem until we have the staffing issues

19      resolved.

20              I think you'll hear from the City that

21      supervisors -- they're short.  They need sergeants

22      on the street.  They need people and they're

23      doing -- the City of Albuquerque is doing everything

24      they can with regard to recruiting.  But when we see

25      recruiting -- for example, 74 hired, 68 left and

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 116

1       retired so we have a net gain of three or four,

2       that's not going to work.  That's a formula that

3       does not suggest that we're going to come up with

4       policy-first compliance.  Second-level training,

5       we're there.  But when we get to the operational

6       phase, that's what the APOA represents, the folks in

7       the street trying to implement that which they've

8       learned through the Academy and the training.

9              So just keep in mind that there's a lot

10      of human frailty here.  There's a lot of human

11      subjectivity.  There's a lot of different folks

12      coming at this problem with their own perspective,

13      education, training, background, and experiences.

14             It's not going to be easy to reach

15      resolution but I think that it is doable.  And I

16      think that the next report you will see, I would

17      like to think, Dr. Ginger can make a little shorter,

18      but -- but -- and the table's helped.  But I think

19      along those lines, you'll see much more progress

20      made in the next report, in the next six months.

21             The body camera issue may not be that

22      big of an issue once the parties have exhausted the

23      negotiations and discussion about the language.

24      Again, we're looking at the language that is

25      correctly implemented in a policy that will avoid

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 117

1    safety issues in the future, liability issues, and

2    potential problems from within the Department, as

3    far as discipline, and appealing, to -- so that it's

4    avoided by the use of clear terms and not ambiguous

5    terms.

6            Very clear definitions, allocation of

7    scarce resources, and getting the numbers up in the

8    field will help alleviate some of the perceived

9    problems.  But I do not want this Court left with

10   the impression that the parties are not working

11   diligently to get to where they need to be.

12           We're going to disagree.  The APOA, the

13   Albuquerque Police Officers' Association, will

14   disagree with the City on certain things, DOJ on

15   certain things.  It's no secret that we did not

16   believe that there was a need at the time -- at the

17   close of the Department of Justice's investigation.

18   There was no pattern and practice; there's

19   certainly, we believe, not a culture of violence.

20   But I can assure you, today as we stand here, if

21   there was a culture of violence today, that --

22   today, that culture is extinct.  I don't think we

23   have that approach today.  I don't think that is

24   imprinted in the community.

25           (Note:  Comment made from gallery.)

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 118

1              There was one other comment made

2      about -- one other --

3          THE COURT:  Mr. D'Amato -- you know what,

4      I don't want to hear any comments from the gallery,

5      that's inappropriate.  And I -- it is distracting

6      and I'd rather you save that for a proper forum.

7      This isn't it.  Mr. D'Amato, please.

8          MR. D'AMATO:  One other point -- and I'll

9      close in a minute -- was that the culture of

10     violence is gone.  Although we have objected to the

11     entry of the Court Approved Settlement Agreement,

12     today we're part of that and we're doing everything

13     we can to comply with the terms.

14              I just think that, two years after its

15     entry, the City has made great progress -- great

16     progress given the scarcity of resources.  And I

17     think the scarcity of resources will be seen in the

18     future when we're overloading supervisors with

19     work -- administrative stuff.  Yes, there's a

20     need -- there is a need to review and to supervise

21     and bring it up the chain, but I think -- I do not

22     want to set the supervisors up for a failure for

23     failing to comply with that which is required.

24              After we have reached total compliance

25     on all three levels, the Department of Justice will

United States of America, et al. v. The City of Albuquerque, et al.                                    May 10, 2017
Public Hearing                                                                                          14-CV-1025 RB/SMV

Page 119

1          leave this jurisdiction, as far as this case goes.

2          As was indicated earlier, the City of Albuquerque

3          will have new management in, operating with new

4          leaders, but the officers that are members of the

5          Albuquerque Police Officers' Association will still

6          be here, and long after everything is settled.

7          Those police officers will be responding to calls,

8          taking calls, and dealing with the community.  And

9          I'm hopeful that everyone will work in some sort of

10         tandem agreement to get to where we need to be.

11                So I thank the Court again, and I thank

12         Dr. Ginger and his staff for the work that they're

13         doing.  Thank you.  Any questions, Your Honor?

14                THE COURT:  Not any -- no questions,

15         Mr. D'Amato, but I -- I just think it's fair comment

16         that all of our focus today has been on the report,

17         IMR-5, that concluded its period of analysis in

18         January of this year.  So -- so there may well have

19         been considerable progress -- I hope there's been

20         progress since then.  So, thank you, Mr. D'Amato.

21         Who's got the ball for City?  Ms. Espinoza?

22                MS. ESPINOZA:  Your Honor, I'm Celina

23         Espinoza.  I am the communication and community

24         outreach director for the Albuquerque Police

25         Department.  My job is to take what APD is doing and

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 120

1       be able to break it down and clearly communicate

2       that to the community and give them updates and

3       answer questions and be able to help with that.

4               Paragraph 261 of the CASA states that

5       APD will host a community outreach meeting

6       semiannually in each of the six area commands to

7       update progress compliance and answer questions.

8               So I'm going to give you the

9       presentation that we gave at each of those area

10      command meetings -- a little bit in brief so that

11      you're not here for an hour -- and simply so that

12      you can see what the community has been informed of

13      as to APD's progress.

14              The first was -- this slide was simply

15      a slide that Chief would like us to address because

16      we had been getting lots of questions of what

17      happens on the national level with the new -- new

18      leadership in place.

19              And it's simply that APD is committed

20      110% to this settlement agreement.  It's something

21      that we have great ownership of and that if there

22      was something that -- that APD was no longer bound

23      to the settlement agreement, we would still be

24      committed 110% to everything that's written in that

25      agreement, just to reassure the community that this

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 121

1        is something that we -- we truly believe in and

2        every reform written into that agreement is

3        something that we value and that we want to see to

4        fruition.

5               Where are we today?  APD has currently

6        met all of the Court Approved Settlement Agreement

7        deadlines when it comes to training and policies.

8        We talk a lot of about training.  Policy was the

9        first step; training, the second step; now, we're in

10       the operational phase or "is it working" step.

11              We approved, and the parties all

12       agreed, on 37 new policies, which are now currently

13       being reviewed.  And all the CASA-related training

14       has been completed and we are currently working on

15       updates.

16              We're also working on new technologies

17       and job aids to help with some of the supervision

18       concerns that the monitoring team has.

19              We're really focused on bringing

20       accountability to officers' application of use of

21       force and supervisory use of force.

22              When it comes to policy, we're

23       currently reviewing what we call the "use of force

24       policy suite."  So that's anything that has to do

25       with on-body cameras, electronic control weapons,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 122

1      our standard use of force policy, and that

2      supervisory use of force policy.

3              We've also updated some of our training

4      to address concerns when it came to show of force,

5      to make sure it's clear to the officers what that

6      means, how it's classified, and, then, communicated

7      to the community of what we are documenting, what a

8      show of force looks like and how we are tracking

9      that and how that data helps the Department learn

10     from the outcomes on the streets.

11             We're also tracking that when it comes

12     to our electronic control weapons, our tasers,

13     because as we've heard, over and over today, taser

14     is one of the highest levels of force that the

15     Department can use and we take that very seriously

16     and hold it in high regard.

17             We asked one of the local media

18     stations to come in -- they've been -- one of the

19     stations that has been most critical of the

20     Department's reform efforts -- to actually observe

21     and witness and take part in our use of force

22     training.  We wanted the public to be able to see

23     what it looks like from an unbiased perspective.

24             So -- lots of times, we have officers

25     talk about their training but they don't -- the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 123

1    public didn't get an opportunity to go through that

2    class but -- to look take at it -- so we asked a

3    reporter who's been very critical of the way the

4    Department has handled these reform efforts to come

5    in, look at that, and then present a piece on that.

6    So we showed that video to the community.

7            When it comes to new technologies to

8    help with supervision and use of force reviews,

9    we've implemented the BlueTeam technology, which --

10   I describe it as a big bucket, making sure that all

11   pieces of that use of force investigation are in

12   that bucket and that the supervisory chain can see

13   and access that bucket at all times to make sure, is

14   there a video, was this form properly filled out,

15   did the officer give the proper testimony and

16   witness conclusions, and were the proper questions

17   asked by supervisors on all levels.

18           So that use of that technology has

19   helped make sure that those investigations are not

20   only standardized but make sure that it gives our

21   supervisors a path and a direction of what needs to

22   be required within those investigations.

23           We've also implemented some things and

24   tools to help them ensure that they're communicating

25   directly with the officers on that first line, and

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 124

1       then on up, including an additional concern memo

2       which can get kicked back to that officer, or that

3       chain, multiple times to make sure that we're

4       documenting and tracking what's being identified,

5       where there are deficiencies and how they've been

6       corrected.

7               And, then, employee work plans.  This

8       is something that they do in the private sector and

9       something that we decided that needed to be done

10      within our agency.

11              We know that there are going to be

12      certain officers who might be "B" cops all of their

13      lives but what are their goals to their career?  If

14      they plan to stay in the southeast, work the

15      southeast and be on the same shift for 20 years, we

16      want them to have goals when it comes to that

17      long-term career, even if it's not promoting, just

18      goals within their -- their own -- their own

19      development.  Making sure that they're not being

20      stagnant.

21              We've also implemented other job aids

22      when it comes to inspections and different things

23      that the officers are required now to do per the

24      CASA.  And some of those forms are inspection checks

25      for -- simple uniform checks to taser cartridges and

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 125

1    expiration dates, and making sure that cars are

2    clean, and they have proper complaint intake forms.

3    We're standardizing those processes so supervisors

4    know what's required and the community knows how

5    we're holding our department accountable to that.

6         We've discussed much about the Use of

7    Force Review Board, and we went over this with the

8    Community Policing Councils, that every serious use

9    of force is reviewed by this team.  They review all

10   critical incident review team investigations and

11   they are now doing samples of supervisory

12   investigations.

13        So making sure that we're auditing,

14   essentially, those supervisors' investigations at a

15   random level and they're meeting above and beyond

16   what they had been prior to this reporting period.

17   So they're meeting about every two weeks, because

18   the case load is that vast and we need to get

19   through those cases and make sure that we're looking

20   for all of those concerns that the Monitor had

21   pointed out.

22        We discussed how they're comprised,

23   who's on that board, and that the Civilian Police

24   Oversight Agency is a main extension of that board,

25   and that the Civilian Police Oversight Agency and

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 126

1     the Police Oversight Board also reviews use of force

2     cases independently.  So you have an additional

3     level of oversight just besides what the police

4     department is doing internally.

5          When it comes to new training, we've

6     implemented some supervisory training, or leadership

7     training, because a lot of training that the

8     officers get is very much surrounded per policing.

9     But we wanted to give them different leadership

10    skills and leadership skills that might be out of

11    the box and -- this was at the suggestion of

12    Dr. Ginger, that we implement this Six Sigma-type

13    process within the police department.

14         So we asked outside agencies within our

15    community to come in and give some of this

16    leadership training.  And we've built wonderful

17    partnerships within our community to make sure that

18    we're giving our officers leadership skills, and

19    we're developing those skills and honing in on them

20    and improving our process, whether that be data

21    collection, the way we respond to calls for service,

22    the way officers review their own cases, and looking

23    for any inefficiencies to make them more efficient

24    on the streets, and, then, that service is better

25    used for the public.

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)

07e93eed-c56b-4b8e-8a45-33a3f0f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 127

1              We've also done training for this

2    reporting period on the complaint intake forms and

3    investigations so that when any citizen wants to

4    make a complaint, the officer is well versed on how

5    to direct the citizen to do that and help them

6    through the process and, then, where that complaint

7    should go.  So ensuring that they're familiar with

8    that process.

9              We've also updated our field training

10   officer program -- which you've heard about today --

11   and just making sure that everything that that

12   now-graduate from the Academy is held accountable to

13   is based on the core values of the Albuquerque

14   Police Department.

15             This reporting period, we developed a

16   really unique training for APD and it was based

17   around cultural sensitivity and ensuring that we are

18   preventing any sort of possible development of

19   biased-based policing.  That, we asked a panel from

20   an outside group put together by one of the task

21   forces within our City to bring together cultures

22   that are widely represented in our City.

23             So we looked at the Hispanic community,

24   the Native American community, the Asian American

25   community, and -- our African American community,

United States of America, et al. v. The City of Albuquerque, et al.                                                                    May 10, 2017
Public Hearing                                                                                                                                      14-CV-1025 RB/SMV

Page 128

1        and asked them to bring their own perspectives of

2        policing from a cultural standpoint within their

3        ethnicities and, then, to discuss the ways that they

4        have differences in communication styles.  So

5        that -- if an officer is interacting with an

6        individual, they can be more sensitive to the

7        different types of communication mechanisms that

8        maybe certain cultural groups would have and

9        understand the family structures and their own

10       individual histories of policing and we will have

11       better outcome and interactions.

12              We're also working to diversify that

13       training to include the transgender groups and

14       different religious ethnicities within our

15       community, so we're not just looking at simply

16       cultures, that we expand this across all kinds of

17       different diversity groups.

18              When it came to mental health, we did

19       take this into -- to heart that, in the last report,

20       Dr. Ginger mentioned that he really wanted us to

21       focus on mental health and the outcomes.  And I

22       think that you've heard today here, that those

23       outcomes have greatly improved and that's something

24       that the Department is very proud of, that all of

25       our officers are now crisis intervention trained --

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 129

1          which is additional training besides what the State

2          requires -- that we have an up-and-going crisis

3          intervention unit that is specifically working to

4          proactively help families and address issues and do

5          proactive policing in that community based policing

6          where we're giving them tools and resources, and

7          making sure that the right people are talking to

8          each other to prevent calls for service that could

9          increase escalations or situations that we -- we

10         might not want to see, the most favorable outcomes.

11                 We also -- our crisis outreach and

12         support teams have grown and are moving forward, and

13         those are comprised of civilians.  So our behavioral

14         health specialists and our clinicians, they work

15         hand-in-hand with the officers so that it's not just

16         a police officer responding to that crisis situation

17         or that individual that we know has -- or might not

18         have a diagnosed behavioral health diagnosis but

19         that we have interacted with in the past.  So we're

20         building those relationships and making sure that

21         they're getting the resources that they need.

22                 We talked a little bit -- you heard a

23         little bit about the mobile crisis teams and that

24         some of the Amici would like them to see less --

25         them be less police-driven, and that's exactly the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

## Page 130

1    goal of them.  They are comprised of Bernalillo

2    County, New Mexico State Police, Valencia County,

3    members from UNM, and our Family and Community

4    Services Division within the City.

5            So it's an officer that goes to ensure

6    that those agents are protected, but that it's the

7    interaction of resources with the individuals as

8    part of that mobile health crisis team and -- and,

9    really, that proactive approach just, making sure

10   that families know what the resources are and that

11   we're getting individuals help.

12           We also told the community that we do

13   have the goal of making sure that 40% of all field

14   officers are enhanced crisis intervention trained

15   and that's something that we're very dedicated and

16   committed to.

17           We've talked about MHRAC and our

18   partnership with them and how wonderfully they're

19   doing.  I don't think you need much more on that.

20   But for officers, we just hired a former police

21   officer to help with some of, maybe, behavioral

22   health issues that police officers would have after

23   a -- big incident or a -- arrest investigation

24   that -- that was hard or difficult for an officer to

25   deal with, making sure that they have resources so

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 131

1        that the outcomes on that next call are much more

2        positive, as well.

3               We've also hired a peer support

4        coordinator to ensure that these teams, if they

5        don't feel comfortable going to a clinician or a

6        physician, that they have somebody within the

7        Department that they can talk to and address

8        problems with and workout mental health situations,

9        or just need peer support.

10               We looked at mental health outcomes.

11       So from January through October of 2016, APD

12       responded to 2000 calls about -- that were some form

13       of crisis intervention related.  Of those calls,

14       about 1600 of them resulted in jail deference or

15       hospitalization.

16               So, that big red piece, 77% of them had

17       no arrests, and that's hooking these individuals up

18       with resources and being able to help provide

19       alternative outlets and support that individuals in

20       our community might need.

21               The next piece of the pie is 9%.  And

22       189 of those calls resulted in no transport, which

23       means that the officers were able to resolve the

24       situation on scene, work with the family members,

25       work with the individual, get that crisis averted,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 132

1        and get the situation peacefully resolved.

2               175 reports are -- or about 8% -- are

3        still in-process, or they're working with our COAST

4        team.  So they've been assigned a case worker and

5        we're working those cases protectively and making

6        sure that we're keeping contact with those

7        individuals.

8               Fifty-seven of those calls, or about

9        2%, were suicide-related.  Now, that doesn't mean

10       that the individual committed suicide, we just

11       classified "suicide" differently because it's not a

12       crime.  And, then, of the 2000 calls, 34 of them, or

13       about 1.65%, did result in an arrest or a detention.

14              Now, of those 2000 calls, only in 6 of

15       them was there some sort of force used.  Now, that

16       doesn't mean serious use of force, it's the basic

17       level of force all the way through.  So about 99.7%

18       of our calls when dealing with mental health issues

19       resulted peacefully in the streets and being able to

20       help in the proper way.

21              We've talked a little bit about the

22       Office of Policy Analysis.  They are currently up

23       and running.  They've received 45 recommendations

24       from community stakeholders, or people in the

25       community that tried to submit them.  And of those

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 133

1       45 recommendations, 47% of those recommendations

2       were accepted by the Department.  So about half of

3       the recommendations that we're getting from the

4       community, we're able to implement and really,

5       truly, put into policy.

6               APD is one of the only departments in

7       the nation where, literally, anybody in our

8       community can review a policy, write in a comment,

9       ask for it to be put into policy, and then get

10      direct response back from our Department.  And

11      that's the commitment, is -- if you take the time to

12      write us what your concern or your suggestion within

13      a policy, is we'll take the time to make sure that

14      you know what the outcome was, whether it got fully

15      adapted, partially adapted, or why it was not

16      adopted.

17              When it comes to staffing, we've

18      increased our graduation rate by more than 400%

19      since 2010.  It's a stat that we're very proud of.

20      We graduated 93 recruits last year.  That's the most

21      in more than a decade and we're really, truly

22      working to increase our staffing levels.

23              You have -- know that the staffing plan

24      was published in June of 2016, which has our

25      allocation for resources and how we see the goals of

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 134

1    the Department once fully staffed, and then those

2    are our numbers for where we stand -- this was last

3    month -- of the total sworn and where they're

4    allotted.

5           We've also increased the PSA, or Police

6    Service Aide, program to help with a stepping stone

7    for recruitment and ensure that we're opening doors

8    to individuals and getting to them early so that

9    they can make the best possible police officers in

10   our community.

11          We've discussed the ratio of sergeants

12   to supervisors so I'll skip over that one.  And,

13   then, we'll touch a little bit on your Community

14   Policing Councils.  Because APD believes that, if

15   the reform efforts, the settlement agreement, is

16   done, we are compliant in all measures, it'll be the

17   Community Policing Councils that hold us accountable

18   to the reforms that we've already implemented.  And

19   we really expect the community to hold us

20   accountable to what APD has said it will do and will

21   continue to do, no matter which administration might

22   be in place.

23          So one of the things that -- that we've

24   really committed to is, we -- we -- Chief Eden wrote

25   a letter stating that the Community Police Councils

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 135

1        are here in Albuquerque -- here to stay in

2        Albuquerque and that they're a very, very important

3        arm and extension of policing in our City.

4               We've made sure that our website has

5        the proper minutes and notations and development

6        there.  We hired a coordinator -- which you met, I

7        think at the last meeting -- and then we've also

8        done lots of advertising to help people get involved

9        in this process and have a place to come to voice

10       their concerns, ask questions of the officers, learn

11       about our policies and, really, what's going on

12       within the Department.

13              When it comes to community engagement,

14       we've opened our social media platforms to allow for

15       questions and answers.  We know that not everybody's

16       going to feel comfortable with face-to-face with a

17       police officers and asking a question so you can,

18       literally, do it online.  Anybody can send us a

19       message, ask us a question, ask where their report

20       is, ask why the police officers need a Use of Force

21       Policy, what that means to our Department, and they

22       get a direct response from either an officer or a

23       member of my team to ensure that that communication

24       is open and ongoing.

25              We've also launched different programs,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 136

1    whether that be Coffee with a Cop or different

2    outreach programs, so that they can have

3    face-to-face interactions with our -- our Department

4    and ask questions.

5           Officers are also now using a new

6    10-code, a 751, when they go to community meetings

7    or interactions so that we can track what types of

8    meetings they're going to.  Are we spending more

9    times in schools or more times with neighborhood

10   associations, or do we need to go to more sporting

11   events, whatever it might be, to ensure that our

12   community outreach is broad and extensive and what

13   the community would like it to be.

14          Some of the stats from this -- this

15   period that I think will be of note to the Court is,

16   our officer-involved shooting have decreased 53%

17   from 2010, and the numbers are there.  And our

18   overall firearms discharges have decreased 72% from

19   2010.  So those are both data points that we are

20   very, very proud of and that the outcomes are -- are

21   there for the community to see what it looks like

22   when it comes to data within APD.

23          And that's all I have for you.

24          THE COURT:  Thanks, Ms. Espinoza.  Thanks

25   very much.  Chief Eden?

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 137

1          MR. EDEN:  Good afternoon, Your Honor.

2    Since May of 2014, I'd just like to give you an

3    update on some of the things that have happened

4    within the Albuquerque Police Department.  Twelve of

5    the fourteen APD commanders that have been promoted

6    since June of -- I'm sorry, since May of 2014 have

7    been promoted into those positions fully aware of

8    the -- the CASA, the settlement agreement.  Since

9    2014, the promotional process is now included in the

10   promotional -- the CASA is included in the

11   promotional process.

12          In 2016, the Albuquerque Police

13   Department promoted 25 new sergeants and a new group

14   of lieutenants, all who have great knowledge and

15   leadership skills but, more important, are committed

16   to the CASA.

17          I can report to the Court that APD has

18   graduated well over 100 cadets who have been trained

19   in all of our new policies to include new use of

20   force policy suite in addition to the many elements

21   of the CASA.

22          Why should that be important?  In my

23   visits to both Las Vegas in Los Angeles, and in

24   meeting with other departments that have been under

25   a settlement agreement or a content decree, they

Page 138

1      said it's very important to stress all your new

2      policies and all your new procedures to each and

3      every single recruit, make sure that those practices

4      and policies are clearly implemented in your field

5      training officer program, that is the way you will

6      sustain your efforts.  That's what the Department

7      has done.

8              In addition, the Academy staff has

9      worked with great commitment to identify training

10     gaps between the training Academy and the

11     application of what they've learned in the Academy

12     to the workplace.

13             The Academy staff works closely with

14     our field training officers, and our field training

15     officers' supervisors, to make sure that we take

16     immediate corrective action when it is needed.

17             These efforts by the Academy staff and

18     the field training officers are critical to the

19     long-term change that is needed within the

20     Albuquerque Police Department.

21             I would like to also inform the Court

22     that APD continues to include the critical elements

23     of the CASA, and we were developing our 2017

24     Sergeant's examination, making sure that the

25     critical elements are tested and included in the

1      interview process, the testing process, and also

2      into the realistic components of the assessment

3      center.

4              In the next few months, APD will have a

5      new budget and within that budget request is a study

6      to determine workload measures and outcomes for our

7      sergeants.

8              Paragraph -- I'm sorry, Your Honor.

9      Paragraph 207 requires an 8 to 1 ratio of sergeants

10     to officers.

11             We believe that that ratio is a good

12     ratio.  However, based on some of our preliminary

13     analysis, we need to make sure that our sergeants

14     are successful and that they need the resources to

15     be successful, also.  That ratio may change but it

16     will not drop or become different than what is

17     required in paragraph 207.

18             In the past months, the Albuquerque

19     Police Department staff has had one-on-one contact

20     with the Los Angeles Police Department, Seattle

21     Police Department, and New Orleans Police

22     Department.  I have personally made contact with the

23     leadership of these departments, as well as Las

24     Vegas Metropolitan Police Department, Portland,

25     Oregon police Department, and Oakland Police

United States of America, et al. v. The City of Albuquerque, et al.                                    May 10, 2017
Public Hearing                                                                                          14-CV-1025 RB/SMV

Page 140

1       Departments.  Together, we share our concerns about

2       the successful implementation of these agreements.

3               The men and women of the Albuquerque

4       Police Department respond to approximately 2000

5       calls for service each day.  These calls involve

6       various situations.  Some may appear to be minor,

7       some may be serious.  In domestic violence calls,

8       there may be underlying issues, from living

9       conditions, the people needing food, or other

10      special needs, child care issues, or mental health

11      issues.

12              Officers are required to take the

13      appropriate action given the facts of the case.  The

14      officers are charged with the responsibility to

15      investigate each and every domestic violence call.

16      If a battery or assault takes place, an arrest is

17      warranted.  Officers have a duty to remove the

18      threat and take the appropriate enforcement action

19      at these domestic violence situations.

20              One of the things that we will continue

21      to do is continue to evaluate all of our use of

22      force investigations.  In my dealings with both Las

23      Vegas, Portland, Oakland, and Los Angeles, their

24      original model has changed.  The goal is to have

25      successful, complete, and accurate use of force

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 141

1      investigations.

2            We are now into the sixth-month policy

3      review process.  I want to make it very clear to the

4      Court, under the definitions within the CASA, on

5      page 12, definition GG, is a very clear, concise,

6      and easy to train definition of a neck hold.  And in

7      that definition, which was carefully crafted by the

8      parties, it says "Neck holds shall be considered

9      lethal force."  Our police policy does not deviate

10     from that definition.

11           The Use of Force Policy was approved by

12     the parties and the Monitor in January of 2016.

13     There has not been, nor has there been, any

14     resistance by the Albuquerque Police Department when

15     it comes to the definition of a neck hold.

16           APD continues to acknowledge the hard

17     work and the input from the many volunteers who are

18     helping the Albuquerque Police Department through

19     the reform process.

20           The volunteers include members of the

21     CPOA, the POB, the CPCs, MHRAC, all of which we

22     consider to be very valuable partners and a very

23     important part of our community and to the APD

24     reform process.

25           Your Honor, the Monitor and his team

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                        14-CV-1025 RB/SMV

Page 142

1          will be in Albuquerque for another site visit in

2          June and we look forward to working with Dr. Ginger

3          and his team as we continue to move forward in our

4          reform process.  Thank you, Your Honor.

5              THE COURT:  Thank you, Chief.

6      Ms. Hernandez?

7              MS. HERNANDEZ:  Good afternoon, Your

8      Honor.  Thank you for your time this afternoon.

9      And, also, thank you to the parties and the Monitor

10     and -- as well as members of the community that have

11     been with us today and for taking the time to do

12     that.

13             I know that there has been a lot of

14     information presented today and I couldn't possibly

15     address all of it but I want to spend a few minutes

16     talking about the -- the progress the Department has

17     made, some of the challenges we are facing, and our

18     plan as we move forward as well as answer some of

19     the questions the Court has already raised and any

20     additional questions that you might raise, as well.

21             I first want to make -- want to start

22     by saying that while we recognize that there is a

23     significant amount of work ahead, I think that there

24     has also been a lot said today about the tremendous

25     progress that has also been made.

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)                          07e93eed-c56b-4b8a-8a45-33a3f0f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 143

1              And I wanted to -- to say that we

2        really appreciate Dr. Ginger and the other parties

3        working together with us on a couple of things in

4        the format of this report, which Mr. Saucedo also

5        referred to.  Those two things were starting to

6        include the tables that would show, in terms of the

7        percentages, where we are.  Because, as -- as you

8        know, and as -- as the monitoring team has been

9        working on overtime, our bar is 95%.  For every

10       paragraph in the settlement agreement, we are trying

11       to reach 95% compliance.  And in -- in past reports,

12       the -- the format did not show that percentage, and,

13       so, the parties and the monitoring team discussed

14       that together, and the Monitor agreed, which we

15       thought was very helpful, to start including the

16       tables that would show exactly where the Department

17       is.  So that was helpful to us.  We can see -- start

18       to see progress -- are we at 60%, 80%, 90% -- and

19       how much farther do we need to go.

20              The second portion that was helpful

21       were those recommendations.  Mr. Sauceda referred to

22       the paragraph of the settlement agreement that

23       discusses those recommendations and we appreciated

24       that those have been added in a new format to this

25       report.  So that was very helpful.  We also

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 144

1      appreciated Dr. Ginger including a -- a chart like

2      this in his report, that shows the trend over time.

3      This -- this chart is slightly different than the

4      one that Dr. Ginger has.  I think the only

5      difference being that, as you'll see in the chart --

6      I'm sorry, the table at the bottom that shows

7      percentages.  Dr. Ginger's table -- or bar chart,

8      I'm sorry, also showed percentages.  We used

9      paragraph -- numbers of paragraphs.  So it shows the

10     same thing but that is a small difference.

11            And this -- this shows the trend over

12     time, which -- I wanted to just point out a couple

13     of things that you can see from this.  The --

14     Mr. Saucedo pointed out what I thought was a very

15     important point that I wanted to -- to reiterate,

16     which is this fifth reporting period that you see,

17     from August of 2016 to January of 2017, is really

18     the first -- I think Mr. Saucedo referred to it as

19     the first opportunity to really start to see what

20     the operational compliance looked like.  And the

21     reason for that is because, starting in August of

22     2016, that's the first reporting period where the

23     policies were all completely in place and all of the

24     training had been completed.

25            So starting in August, those steps --

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 145

1      foundational steps were already complete and, for

2      the first time, this reporting period would start to

3      show how is that affecting day-to-day operations out

4      on the street with police officers.

5              So this is where we get to see the

6      first look of what the foundational steps have

7      started to -- to affect.  And I also want to say, on

8      behalf of the City and the Department, how much we

9      appreciate the -- the comments here today from the

10     Department of Justice and also from the Monitor

11     that -- that do recognize that -- that effort and

12     that progress.

13             I know that there were comments about

14     the Department of Justice's positive outlook and the

15     positive trend that this shows, and that these types

16     of efforts are clearly not the -- they don't happen

17     by themselves but they are results of sustained

18     effort by the City and the Department which are

19     absolutely happening.

20             Dr. Ginger also -- I appreciated the --

21     the comments that he made that -- that the

22     Department -- I think some of the things he said

23     today, that the Department has not ignored its

24     obligations here, that they are trying to implement

25     them, and they are -- we are just not quite there

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 146

1      yet, which we acknowledge.  We still have work to

2      do.

3                    And another thing that Dr. Ginger said

4      that we appreciated was that the Department is doing

5      those things but just needs to grow them.  In other

6      words, do them more, do them more consistently,

7      which is what we'll talk about a little bit more, in

8      a few minutes, on the supervisory use of force

9      investigations.

10                    And, so, I think that all of those

11     comments do show what this chart shows, which is the

12     trend over time is what we would hope, and what we

13     would expect, after those first four sort of

14     foundational time periods, we're now truly in

15     operational mode.  Now we need to build some

16     momentum, which is what we are going to be working

17     on.

18                    If we look -- I'd like to turn to what

19     the report really highlights as our next big area

20     to -- to address, which is how supervisors are

21     reviewing uses of force.  And this chart is really

22     just to provide a little bit of context for what we

23     are talking about.  This is just meant to provide

24     background information and overview.  What it is, is

25     a visual representation of the number of calls that

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 147

1    the Department would have received during that

2    reporting period, with each figure of a person

3    representing 1,000 calls.  And what you -- so the

4    total during that reporting period, as shown here,

5    is over 227,000 calls for service during the

6    reporting period.

7            In that final line, at the far right,

8    what you see is the visual representation of how

9    many of those calls involved some use of force and

10   the number shown here is 248.

11           And, so, while we're talking about how

12   the Department is reviewing uses of force, which is

13   important -- it's absolutely essential to this

14   reform effort that has our focus -- but I thought

15   that it would be important to take a step back and

16   provide the Court and the community with a larger

17   context of where those uses of force fit within the

18   overall work that the Department is -- is doing

19   every day.

20           So we see that during that reporting

21   period, of the over 227,000 calls, approximately 248

22   would have involved some use of force.  Those are

23   the ones that are reviewed by a supervisor.  You

24   see, in the box on the bottom on the right, are the

25   serious uses of force and that number is 34.  So of

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 148

1       the 227,000 calls for service, approximately 34

2       would have involved a serious use of force, which is

3       defined by the settlement agreement, and that is not

4       reviewed by a supervisor.  That goes to the next

5       level, and Internal Affairs and CIRT would be

6       involved and there would be a heightened level of

7       review on what the settlement agreement defines as

8       "serious," and those are nine specified categories

9       of force.

10           So about a 10th of a percent -- a 10th

11      of 1% of the calls for service during that reporting

12      period involved any use of force, which means that

13      over 99% did not.  And so that is just background

14      information.

15           So it's of the 248 that the monitoring

16      team would have taken that sample of 16, and -- and,

17      during that review of the sample, it did show that

18      there is significant work left to be done when it

19      comes to how supervisors are reviewing uses of

20      force.

21           A few things that I think it's

22      important for the Court, and -- and the community,

23      to know, that we are working on, even since then,

24      would be that -- as you've stated, this reporting

25      period ended January -- a few things have happened

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 149

1      in the interim, or just around that time, that we

2      think will continue to help in this area.  There was

3      an updated supervisor training that happened in

4      December of 2016, and, so, just at the end of this

5      reporting period, supervisors were receiving

6      additional training on what they should be looking

7      for when they are conducting these use of force

8      investigations of their officers' work.

9             Part of what that training included was

10     introducing new job aids, which is essentially a --

11     a new type of form or checklist or guide that would

12     help the supervisors as they're doing these reviews,

13     because we're introducing a whole new way of doing

14     these and we want to -- we want to help supervisors

15     understand what to include, what to look for.

16            And part of what we see is that they

17     have -- because they have not been doing them that

18     way in the past, they're still learning how to do

19     them and we acknowledge that.  And so I think that,

20     with the introduction of that new checklist form,

21     job aid in December of 2016 -- which was just at

22     the -- almost at the end of this reporting period --

23     so we would not have been able to see yet how that

24     is going to impact the supervisory reviews.  So I

25     think that that will show a positive impact as we

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 150

1      move forward with the next report.

2              The other thing that has happened in

3      the interim time is that there is training going on

4      for officers to act as a refresher course on the

5      original use of force training they received last

6      year.

7              So, as you'll recall, last year,

8      between January and June, all of the officers went

9      through the use of force training.  There was --

10     there's a new refresher happening now, between -- it

11     was January to March of 2016, so it's just

12     concluded -- where they -- all of the officers again

13     go through a shorter version of that that's meant to

14     be a refresher.  So that also has happened since

15     this reporting period that would not yet be

16     reflected in these results.

17             So the -- the efforts continue.  And we

18     acknowledge the work that still needs to be done,

19     but I just wanted to point out those two things

20     specifically for the Court so that you would know

21     what we're doing to try to address some of these

22     issues.  Because while -- of the 16 that the

23     monitoring team reviewed, I think that table showed

24     81% of them were within the guidelines of the

25     settlement agreement, that means we haven't hit the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 151

1    95% yet and, so, these are the kinds of steps that

2    we're taking to try to kind of push beyond and we

3    take very seriously the issues that were raised in

4    those.

5            And so one of the things that I think

6    that Ms. Koenigsberg mentioned was Deputy Chief

7    Garcia's new role.  He -- he is still a Deputy

8    Chief, the same role -- same title that he had

9    before but he's been given the specific assignment

10   of focusing full-time on the operational compliance

11   under the settlement agreement, which means that the

12   day-to-day things he typically did, someone else

13   will be assigned to do those so that Deputy Chief

14   Garcia can focus full-time on these issues.

15           So the kinds of things like really

16   drilling down on what the monitoring report raises

17   as concerns, figuring out what is at the root of

18   those problems, what do we need to do in terms of

19   our systems to make sure that those are not

20   recurring problems, those are the things that Deputy

21   Chief Garcia will be able to focus on.

22           And we thought that someone at that

23   level with that type of command control over

24   officers in the field and all of their chain of

25   command would be the appropriate person.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 152

1          And as you've heard from the Amici over

2    several meetings, Deputy Chief Garcia has -- has

3    worked very, very closely with a number of groups

4    involved in this process and has done really

5    phenomenal work.

6          And so we thought, because of his

7    position and also because of his personal efforts in

8    this case and his history with this case, he would

9    be the appropriate person to do that.  So we're

10   excited about his new ability to focus completely on

11   that because we've reassigned his -- his day-to-day

12   responsibilities.

13          So those are -- that's, again, just

14   another thing that we are doing to focus on this

15   area because we recognize that if we can really make

16   progress on the supervisory use of force reviews

17   that that's going to have just a tremendous impact

18   on -- on our progress and our compliance because it

19   will go toward what Dr. Ginger is describing about

20   catching and fixing our own mistakes, which is what

21   our goal is.

22          There was also some discussion of the

23   Force Review Board and Dr. Ginger mentioned that

24   it's still a relatively new process and that the

25   members are still getting their footing.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 153

1          Deputy Chief Garcia is a member of that

2     and, so, I think that helps, as well, that his -- he

3     will be directly involved in the Force Review

4     Board's work and looking at what we can be doing to

5     really focus their efforts, including what to do

6     when you identify a problem, you know, what kinds of

7     recommendations should be going back to -- to other

8     parts of the Department to deal with that.

9          Another thing that I wanted to touch

10    on -- Mr. Sauceda mentioned this, as well -- the

11    outcome assessments in paragraph 298.  Dr. Ginger

12    is -- has been working very hard on those and the

13    Department's been working alongside him to make sure

14    he has the data to -- to complete that review.  And

15    I think all the parties and the monitoring team are

16    really excited to see the results of that because it

17    will be another way of looking at the efforts.

18          One of the things that Mr. Saucedo said

19    is that -- he mentioned the pieces that have been

20    being put in place in terms of policy, training,

21    recruiting, civilian oversight, and that all of the

22    pieces now just need to start working together and

23    that we are already seeing results.  But this

24    outcome assessment, for the first time, is where

25    we're really going to see those quantified.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 154

1          And some of that you saw in -- in

2     Ms. Espinoza's presentation in terms of

3     officer-involved shooting numbers or firearm

4     discharge numbers.  I have a couple of slides that

5     will just show examples.  You know, this does not,

6     at all, try to predict what the outcome assessment

7     will show because it's a different timeframe and

8     stuff like that.  But this is just an example of --

9     with the data we have been gathering, we pulled some

10    data just to compare January through March of 2016

11    and compare that to the same three-month period in

12    2017.

13          So the dark green shows the 2016

14    timeframe and the light green shows the 2017 of the

15    same months.  And this just shows different

16    categories of force and it compares the numbers of

17    uses of force in those different categories.  And,

18    as you can see, most of those show that there are

19    far fewer of those types of uses of force in 2017

20    than in 2016.

21          It compares certain hand techniques,

22    takedowns, ECW usages, so -- this is just meant to

23    be an example to show that we're trying to gather

24    all of our data in one place so that comparisons are

25    more easy to access and make and learn from.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 155

1          And paragraph 287 lays out a whole list

2     of different types of outcomes that the Monitor will

3     be looking at, and this was just meant to show a few

4     examples.

5          We also did a slide that compared those

6     same three months in 2016 and 2017 of incidents with

7     citizen injury.  And you see that that -- in those

8     timeframes, it went from 55 incidents in those first

9     three months of 2016 to 22 in the first three months

10    of 2017.

11          Officer injuries, we did a similar

12    comparison of the same time periods and that went

13    from 26 down to 10.

14          So, again, those are just meant to be

15    examples of, you know, the types of things that the

16    outcome assessment will start to look at and -- and

17    we're looking forward to seeing that because I think

18    that, while, you know, the sort of more technical

19    compliance is important, I think that -- when the

20    negotiations happened, I think that the Department

21    of Justice and the City recognized that outcomes was

22    also -- outcomes and results were what we were

23    really looking for and I know that we are very much

24    looking forward to seeing what that -- what that

25    will show.

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)
07e93eed-c56b-4b8e-8a45-33a3f0f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 156

1              I also wanted to talk a little bit

2      about our plan as we go forward.  As I mentioned, it

3      was very, very helpful to have this report include

4      the extensive recommendations that it does.  Those

5      are throughout the report and, then, Dr. Ginger also

6      put them together in a list at the end.

7              And we have already, at the Department,

8      been taking those and assessing them and, you know,

9      dividing them into subject area so that we can

10     assign them to different people, evaluating them to

11     see where they might overlap or -- or be related,

12     and, then, developing some priority objectives that

13     would relate to each of those recommendations.

14             And one of things that we plan to do

15     is to -- to really use the next several months and

16     our weekly meetings with the parties and the Monitor

17     to keep them informed about what our plans are on

18     implementing those recommendations so that we can

19     get feedback from the parties and feedback from the

20     Monitor about any ideas or suggestions they have as

21     we move forward and, also, to -- to make sure that

22     there's an opportunity for the monitoring team to

23     let us know.  And like they have told us all along,

24     they are only recommendations and we recognize that

25     and we have to ultimately decide which to implement

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 157

1    or not.  But that feedback is incredibly helpful.

2            And so that's what we hope, over the

3    next several months we can do a lot of with the

4    parties and the monitoring team, is making sure that

5    they know how we are implementing those

6    recommendations so that there can be dialogue about

7    that before the next reporting period and before the

8    next report comes out.

9            We -- we prepared a couple of slides,

10   and I won't go through them or read them here,

11   but -- because -- just for the sake of time, and

12   this PowerPoint will also be available publicly.

13   But we've already started to look at which of those

14   recommendations we can implement now.  And so we

15   have started working on those and they'll be listed

16   in this PowerPoint that -- that we'll make publicly

17   available.

18            Some of these are very short, or

19   relatively short-term, and so we hope to accomplish

20   as many as we can before this current reporting

21   period ends at the end of July.  There are some that

22   will just take longer than that.  There's a natural

23   progression that is built into this and we -- we

24   can't do it all overnight, and, so, some of those

25   will just have to continue through the year and they

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 158

1     will not be done in time to be reported for the next

2     reporting period.

3              As you know, we're in a reporting

4     period, now, that will cover from February through

5     July, and, then, that will be included in the report

6     that comes out in November.  And so we'll get as

7     much done on the recommendations as we can before

8     that time period ends, but even if it's not reported

9     in the report that comes out in November, the

10    Department is committed to continuing those efforts

11    and those will have to be reported in a reporting

12    period in 2018.  So our -- that's where we are right

13    now.  And I think, as the Chief said, the Department

14    is completely committed to this process.

15              And the -- I think that the comments

16    today, from both the Monitor and the Department of

17    Justice, show that, as far as concerns -- and I know

18    you raised this question, too -- where does this

19    idea of deliberate noncompliance come from.  I think

20    from the comments here today, it's very clear that

21    it certainly does not relate to commitment to the

22    overall process or any unwillingness in that regard,

23    at all.  The -- the trend is -- is clear, from

24    the -- the compliance findings over time, and there

25    were two issues that came up that were very specific

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 159

1      issues, the neck holds and the -- the Special Order.

2      And I think that the comments today helped to put in

3      context, I believe, that concern of deliberate

4      noncompliance, that there were issues where there

5      had been a lot of discussion back and forth,

6      particularly on the neck holds, and so I don't think

7      that, after today, there -- there does not seem to

8      be any question or concern about whether the overall

9      commitment is -- is strong, because it is and I

10     think that -- that Dr. Ginger and the Department of

11     Justice said that.  You heard that from Mr. D'Amato,

12     as well.

13            On those two particular issues, I think

14     that Mr. Saucedo did an excellent job of describing

15     the neck holds discussion that had happened, and

16     Chief Eden touched on that, as well, that the

17     definition of "neck holds" has never changed.  It's

18     been in the settlement agreement from the beginning

19     and our policy has also prohibited it that entire

20     time.  So we have never tried to allow neck holds by

21     policy.  That has never happened.

22            Instead, there was a lot of discussion

23     about when will certain contact cross the line into

24     actually qualifying as a neck hold, constituting a

25     neck hold.  And so that was the discussion that took

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 160

1      place.

2              And so we -- we don't believe that we

3      were deliberately noncompliant on that issue, but I

4      think that -- that the conversation here today has

5      shown that there was -- there was just a lot of

6      discussion on it.  And -- but what's very clear is

7      that the policy has always prohibited it.  We've

8      never tried to -- to allow it by policy.  And I

9      think that, on that point, Mr. Sauceda said that --

10     I'll try to find his -- I think he said that he had

11     not seen that the Department had, in any way, tried

12     to back away from their commitment to prohibit them.

13             So we -- we have certainly made every

14     effort to comply on that issue.  That policy does

15     still need to be clarified so that it's clearer when

16     certain contact with the neck might cross over into

17     being a neck hold.

18             I was also able to get some information

19     on the Special Order, and you -- you raised a very

20     direct question about whether or not the Department

21     had ever denied that it had issued it.  And so I

22     wanted to address that very directly.  And I was

23     able to find the -- the e-mails where the request

24     came in and it looks like, from the outset, there

25     was confusion about what the monitoring team was

United States of America, et al. v. The City of Albuquerque, et al.                     May 10, 2017
Public Hearing                                                                           14-CV-1025 RB/SMV

Page 161

1         asking for because their -- their request came in on

2         February 24th and it asked Director Slausen to

3         "Please forward copy of Special Order 6-75."  And

4         the Special Order that deals with the video review

5         is Special Order 16-73.

6               And, so, it -- it was a different

7         number, which I think was just a mistake in the

8         request, but that did cause confusion when the

9         Department was trying to find it because they were

10        looking for a 6-75 when, as it turns out, what the

11        monitoring team wanted was 16-73.  So that took some

12        time to -- to determine.

13              We -- we first sent a Special Order

14        16-75, which dealt with a different topic, and we

15        just couldn't tell yet what they were asking for.

16        And, then, on -- three days later, on February 27th,

17        the monitoring team clarified their request and just

18        said, "Please just send us all Special Orders you've

19        issued that relate to the Settlement Agreement."

20        And, so, on March 2nd, we sent all the Special

21        Orders for a certain time period just so they would

22        have a complete set.

23              So it looks like within approximately a

24        week of the request, all Special Orders were

25        provided and if there was any confusion, it was just

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 162

1     because there was some mis-numbering that I'm sure

2     was inadvertent.  And, so, that was -- I do not

3     believe that there was ever a denial that the

4     Special Order had been issued, I think it was some

5     confusion over the numbering.  So I think that that

6     answers the Court's question on that.

7          THE COURT:  It does.  Thank you.

8          MS. HERNANDEZ:  I don't have any other

9     specific comments and would answer any questions

10    that the Court has.

11         THE COURT:  When Mr. Cubra was here, he

12    raised a topic that we've heard about, now, a couple

13    of times and that was the order on the use of force

14    utilization.  It was -- it was being

15    underutilized -- the use of force was being

16    underutilized.  And we talked about this the last

17    time, and I asked who had authored that and when.

18    And Mr. Cubra said we still didn't know.  I don't

19    recall getting an answer to that, but where are we

20    with that?

21         MS. HERNANDEZ:  On the answer to that

22    question specifically?

23         THE COURT:  Yes, ma'am.

24         MS. HERNANDEZ:  Your Honor, that report, I

25    believe -- or that memo that went out to officers

United States of America, et al. v. The City of Albuquerque, et al.                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 163

1        was June of 2016.  And it's my understanding that it

2        was authored by the sergeant who was over CIRT at

3        that time, and it was authored based on some cases,

4        that the Force Review Board had reviewed, that found

5        that, in some cases, a higher level of force ended

6        up being necessary in the end because the police

7        officer had not used a lower level of force early on

8        that might have contained the situation more quickly

9        and, so, any hesitating to use any force at all,

10       that escalated the situation and more force was

11       needed later.

12              So that was the purpose of the memo.

13       It was trying to remind officers, use appropriate

14       levels of force from the beginning of an

15       interaction.  That was the purpose of the memo.

16              There were some concerns by Amici that

17       the -- that it was encouraging officers to use more

18       force, and that -- that was never the intent.  The

19       intent was just to tell them, don't hesitate to use

20       appropriate levels of force when needed for your

21       safety and for the safety of the -- the person that

22       you're interacting with.

23              The Department decided that the -- the

24       best way to address that issue, going forward, was

25       through its regular use of force training,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 164

1    refreshers on use of force training.  So there has

2    not been a specific second memo that went out to

3    follow up on it.  It has been done through their

4    regular trainings about what the appropriate levels

5    of force should be in different situations.

6        THE COURT:  Thank you.  Mr. Harness talked

7    about the Chief responding to recommendations from

8    POB and that's been one of those issues that has

9    lingered.  And he said, within the last 60 days --

10   which is not in the time period we're talking

11   about -- that the Chief had begun to respond.  Flesh

12   that out for me a little bit, please.

13       MS. HERNANDEZ:  I'd be glad to do that,

14   Your Honor.  There -- this has been one of those

15   issues where there has definitely been a lot of

16   dialogue back and forth to try to get all of the

17   parties on the same page about what -- what each of

18   their responsibilities are.  And that's never been

19   because of an unwillingness on the part of APD.  APD

20   has always wanted to comply with these but I think

21   there were legitimate questions about when those

22   letters were supposed to be sent and what levels of

23   detail they needed to include.

24           And the -- the reason for that

25   confusion and the need for the discussion was

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 165

1       because there's -- there are paragraphs of the

2       Settlement Agreement that deal with this issue.

3       There's also an ordinance passed by the City Council

4       that establishes the Police Oversight Board and had

5       some overlapping, but not identical, obligations.

6       And then -- and so -- and then there were also

7       different categories, such as policy

8       recommendations, recommendations for discipline,

9       and -- there's one other category -- it might be --

10      there's another category of Internal Affair

11      investigations where the POB would be weighing in.

12              And, so, between those three

13      categories, it was not clear when the Chief was

14      supposed to send these letters because there is one

15      of those categories where the ordinance does not

16      require it and I don't think the Settlement

17      Agreement does, either, but two other categories, it

18      does.  So it was -- it was genuinely a

19      misunderstanding among the parties about whether

20      those letters had to go in all cases.

21              And, also, there was an issue where --

22      because the Department was actually not disagreeing

23      with a lot of the different recommendations, letters

24      were not going in those cases because the Department

25      thought, "If we're not disagreeing with the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 166

1       recommendation, we're not going to send a letter,"

2       but there were certain of those cases where the

3       Police Oversight Board was expecting some additional

4       explanation and that had not been occurring yet.

5               And so those were some of the issues

6       that needed to be fleshed out.  But we were always

7       willing to discuss it and I think we've now reached

8       a point where there's a common understanding about

9       what -- what types of letters require a response and

10      when.  And, then, the -- the new issue became the

11      level of detail, so we also reached a recent

12      agreement that the Chief would begin putting

13      additional detail.

14              There was some concern initially,

15      because these are personnel matters, that -- not all

16      of the information is -- is always publicly produced

17      in those because it's in the personnel file and has

18      to do with evaluation and discipline, that there was

19      still some concern about what level of detail was

20      appropriate.  And, so, there have been discussions

21      about that and, I think, a recent agreement on that

22      level of detail, as well.

23              THE COURT:  Thank you.  And I think the

24      last of my questions related to a comment from

25      Mr. Miera from MHRAC about the use of on-body

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 167

1    cameras in the interactions with folks that he

2    represents.  Where are we with that?

3         MS. HERNANDEZ:  Your Honor, I'm looking to

4    Ms. Jacobi because she's been much more involved in

5    that process.  If it's acceptable to you, I can ask

6    her to answer that question because I know she's

7    been directly involved in it, but it's my

8    understanding that policy has been revised, with

9    input from MHRAC and other groups, and is now

10   circulating with the parties.

11        THE COURT:  Ms. Jacobi, I'm glad to hear

12   from you if you have something to add other than

13   that.

14        MS. JACOBI:  Thank you, Your Honor.  That

15   is essentially correct.  Earlier this year, APD and

16   the parties met with several representatives from

17   MHRAC to work on language that has been

18   incorporated.  And I -- I recall that it was

19   approved by the individuals at MHRAC who

20   participated in those talks.  That policy, right

21   now, is just waiting final approval on how the

22   supervisors do their monthly reviews of videos,

23   because that -- the same policy covers both issues,

24   and, so, it'll be rolled out as soon as that issue

25   is concluded.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 168

1          THE COURT:  Good.  Thanks.  Ms. Hernandez,

2     I didn't have any other questions.  I -- just a

3     little shout out to Ms. Espinoza and her PowerPoint.

4     Mr. Cubra suggested that the default in dealing with

5     folks in mental health crisis was jail, and your --

6     the first, I think, of your slides suggested

7     otherwise and I thought that was effectively done.

8     Anything else from the City?

9          MS. HERNANDEZ:  Your Honor, just one point

10    to address a question you had raised earlier about

11    the -- the Special Order on the review of videos.

12    And I just did want to make clear to the Court that

13    the Settlement Agreement itself -- and this is in

14    paragraph -- I'm sorry, 220(G) -- it only says that

15    supervisors are to review recordings regularly.  So

16    it doesn't specify the number of the reviews and,

17    so, the Special Order that went out did not

18    contradict the Settlement Agreement, it -- it did

19    differ from the policy.

20              And so that is the part where we

21    have -- as you've heard already, it was a workload

22    issue because what was in the policy proved to be

23    completely unworkable for the sergeants, and that

24    has been discussed between the parties and the

25    monitoring team at length.  But I did want to make

United States of America, et al. v. The City of Albuquerque, et al.                                    May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 169

1     sure that you knew that it did not contradict the

2     Settlement Agreement.

3            And we've also worked together with the

4     Monitor and the other parties to talk about what

5     kind of process should we use to get an expedited

6     review of Special Orders like that, that -- so that

7     they don't have to go through the entire policy

8     process that can take many months, because it was a

9     very true operational issue that would have really

10    impeded the sergeants' ability to perform all of

11    their other supervisory responsibilities.

12           But the main point I wanted to make

13    just was that the Settlement Agreement did not have

14    anything that would be contradicted by that Special

15    Order.

16           THE COURT:  So are you taking the

17    position, then, that if it doesn't contradict

18    something in the CASA but it does go contrary to

19    something that was in policy that everyone's agreed

20    to, that the Monitor doesn't need to be alerted to

21    it?

22           MS. HERNANDEZ:  No -- no, Your Honor.

23    That would not be our position.  This -- this

24    Special Order should have been discussed with the

25    Monitor and the parties before it was issued and we

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 170

1    now have a process in place so that that does not

2    happen again.

3        THE COURT:  That's what I wondered.  Thank

4    you.  Thank you very much.  Dr. Ginger, this is your

5    opportunity to respond to things you've heard

6    throughout the day.

7        MR. GINGER:  Pardon me, Your Honor, I'm

8    down in the back.

9        THE COURT:  You looked, as you got up, as

10   I feel.  I'm having some back issues myself.  So

11   I'll stand while you take the podium.

12       MR. GINGER:  I apologize for my periodic

13   absences, your Honor, but I had to get up and walk

14   around once in a while -- back in the emergency

15   room.  Obviously, we will stand by our report.  I

16   think you heard a lot of good information this

17   afternoon that points us on our way forward.  That's

18   excellent.

19       You know, we had the issue with

20   Special -- with the Special Order.  We tried, as

21   best we could, to track it down.  Proved to no avail

22   and we'll see where we go from here.  But the

23   information in the report is accurate for the

24   reporting time.

25       THE COURT:  All right.  So, actually,

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 171

1     during one of your absences, I touched on this

2     deliberate indifference and deliberate -- I don't

3     know -- you used the adjective "deliberate" twice --

4     noncompliance -- and you didn't ever go there in

5     your remarks this morning -- but I actually asked

6     Mr. Saucedo about that because he didn't, either.

7     One of the Amici did, I think.

8         MR. GINGER:  Right.

9         THE COURT:  But you are -- well, after

10    reading this report, I can't say you're a man of few

11    words, but -- but you have always chosen your words

12    carefully.

13        MR. GINGER:  Yes, sir.

14        THE COURT:  And, so, that -- that phrasing

15    jumped out at me, as it did others, because it -- it

16    speaks to an attitude, and I -- I -- I can't have

17    that attitude.  This process can't bear that

18    attitude.  And so I've heard people address it

19    today, but do you stand by that and, if you do, why

20    didn't we talk about it this morning?

21        MR. GINGER:  I do stand by it, Your Honor.

22    The follow-up on my part is to find out if they've

23    stopped doing what they had been doing.  And if

24    that's the case, then it looks like we've worked

25    that out, that it's not going to happen anymore.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 172

1          I reserved that phraseology for things

2     that were either highly critical or had been asked

3     for by the monitoring team over a period of time and

4     never showed up.  That Special Order 75 is a

5     critical group.  There are other things that we had

6     to remind APD about on three occasions and never

7     happened.  That was the hack to the website to be

8     able to file anonymous complaints that -- that is

9     required by -- to be serviced by the CASA.

10          So I was very careful in my language.

11     It sounds to me like we're starting to fix most of

12     those problems and that's great.  If that's the

13     case, they're fixed and I'll report them as such.

14          As far as I'm concerned -- as I stand

15     here today, I'm still concerned about asking several

16     times and not getting responses.  That was hooked

17     in, if you recall, to the -- one of those

18     noncompliance findings was hooked into the

19     deliberate shutdown of the IRS system without notice

20     to the monitoring team, which we also viewed as

21     highly critical.  So I'm concerned about it.  We'll

22     continue to monitor it and I'll continue to report

23     it.

24          I hope it's over with.  I hope we don't

25     have to remind the City repeatedly to get things

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 173

1    done that are required by the CASA.  That will be a

2    good thing.  But as it stood the day that report was

3    written, those things were accurate.

4         THE COURT:  As it relates specifically to

5    the Special Order, you heard Ms. Hernandez address

6    that today and she said it was a function of

7    miscommunication, perhaps that initiated with you,

8    you cited a wrong number or something and -- in an

9    e-mail.  That's what she said just a moment ago.

10        MR. GINGER:  Right.

11        THE COURT:  And that could well explain

12   them not responding immediately, or not responding

13   over time, as they continued to track down this

14   Special Order.  Are you -- given that explanation,

15   are you still settled on this -- this deliberate

16   issue, or is it --

17        MR. GINGER:  I'll look into it, Your

18   Honor.  Obviously, I will.  That's my job.  My

19   people are fairly well trained.  All of these people

20   have been through this before.  They know what to

21   ask for and how to ask for it.  We'll look into it.

22   I'm not convinced the explanation is accurate, but I

23   don't have the facts on the ground right now to make

24   it a -- a determination one way or another.  What we

25   do know is that we specifically asked, not just by

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 174

1    category, but by -- or by number, but by category

2    and we were provided information that was incorrect.

3    So we'll -- we'll have to follow up on it.

4          THE COURT:  All right.  And I'd appreciate

5    being in that loop when you follow up.

6          MR. GINGER:  Yes, sir.

7          THE COURT:  Remind me when the outcome

8    assessments are due, please.

9          MR. GINGER:  The draft should be at the

10   City -- 4 June, I believe is the day.  The week of

11   4 June.

12         THE COURT:  And then final dissemination?

13         MR. GINGER:  It depends on how long the

14   City thinks it needs to go through and comment, and

15   we'll revise accordingly and get it out.  It's a top

16   priority right now.

17         THE COURT:  All right.  Anything else,

18   Dr. Ginger?

19         MR. GINGER:  No, sir.

20         THE COURT:  Mr. Saucedo, you had something

21   else?

22         MR. SAUCEDO:  Yes, Your Honor.  We

23   appreciate Ms. Hernandez's offer to keep the parties

24   informed about the action steps that they're taking

25   going forward during our weekly and our monthly

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 175

1     meetings.  We would ask, Your Honor, that the United

2     States have an opportunity to respond to the written

3     action plan that the Court has requested -- or

4     instructed the parties to submit within 30 days.

5          I -- I would ask that the United States

6     have an opportunity to respond if necessary, given

7     that we'll have some ongoing discussion about it on

8     the front end.  But, if necessary, that the United

9     States have 15 days to respond to that action plan.

10    And I'm sure the Amici may appreciate, or would

11    appreciate, also having that opportunity, as well.

12         THE COURT:  That -- that's probably a good

13    process.  Let's do that.  So, actually, get your

14    draft of your response and action plan to the rest

15    of the parties within 30 days and, then, at 45 days,

16    I'll expect something in writing.

17         MR. SAUCEDO:  Thank you, Your Honor.

18         THE COURT:  Anything else, then, from the

19    parties?  Well, there's someone raising their hand

20    in the gallery.  Yes, ma'am.

21         MS. BAUTISTA:  Yes, sir.  My name is Maria

22    Bautista.  We filed an Amici --

23         THE COURT:  Ma'am, come forward, please.

24    The court reporter can't hear you.  Thank you.  Yes,

25    ma'am.

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 176

1          MS. BAUTISTA:  Your Honor, my name is

2    Maria Bautista -- B-A-U-T-I-S-T-A.  Your Honor,

3    today, I stand before you, sir, to say --

4          THE COURT:  Let me stop you.  Let me

5    interrupt.

6          MS. BAUTISTA:  Yes, sir.

7          THE COURT:  I -- you said that you had

8    submitted an Amici letter.  There is a process in

9    place where Amici presents letters, the parties

10    respond, and -- and time is set aside at these

11    meetings for that -- for that purpose.

12          I don't know about your submission of a

13    letter.  I don't know whether you've abided by that

14    process or not.  And my concern is that the process

15    becomes pretty open-ended if I just open the -- the

16    room up to comment and it becomes a City Council

17    meeting instead of --

18          MS. BAUTISTA:  Yes, sir, and I'm not

19    trying to do that.

20          THE COURT:  Did you abide by the process,

21    that's what I want to know?

22          MS. BAUTISTA:  Sir, the -- may I have a

23    moment to say, please, sir, that -- we did file an

24    Amici brief and that our attorneys did follow the

25    process, and that the only thing that I wanted to

1    say to you, sir, was that Mr. D'Amato today

2    insinuated that we were not here and I wanted -- he

3    said the community -- the Amici are not here and we

4    are.  Sir, we've been here since 8:30 this morning.

5          Our attorney, unfortunately, was not

6    able to be here.  He's the dean of the law school

7    and we did have appropriate representation on behalf

8    of our Amici, which is a large community group, and

9    we were not able to get ahold of the Court in time

10   to be able to say we have another attorney who could

11   speak on behalf of that particular group of Amici,

12   just like APD Forward was able to speak, but we were

13   not able to because we're just lay people and I

14   wasn't sure how I would get that request to you.

15         And when our Amici group was not called

16   and then I heard Mr. D'Amato say that the

17   community's not here and not interested, I -- I just

18   wanted to say that we are here and -- and we --

19         THE COURT:  Who are you representing?

20         MS. BAUTISTA:  I'm with New Mexico OLOC,

21   but our Amici group was several community

22   organizations; Los Ranchos, the New Mexico

23   Association of OLOC with LULAC, with the Martin

24   Luther King, Jr., Association.  There was about 40

25   of us that filed that Amici and today's the first

United States of America, et al. v. The City of Albuquerque, et al.                                    May 10, 2017
Public Hearing                                                                                          14-CV-1025 RB/SMV

Page 178

1        day that our attorneys, who represented us, have not

2        been able to be here; Leon Howard, Dean Mathewson

3        from the Law School, and Mr. Steve Trujillo.

4               All I wanted to say was, to let you

5        know that we are here and I'm sorry if we missed

6        some document we had to present to you in -- because

7        we -- we found out late that they weren't going to

8        be able to be here.

9               And I wouldn't have even approached the

10       Court, Your Honor, except that Mr. D'Amato said,

11       "Well, it's obvious that the community isn't here,"

12       and that's not the case at all.  We're just lay

13       people.  We've sat here all day and we did have a

14       representative to speak for us but when the name

15       wasn't called -- and, then, Mr. D'Amato says, "Well

16       they're not even here and they're not interested" --

17       I think everybody here is interested, and I think we

18       all are community, and I think that that's not an

19       appropriate representation.  And I just appreciate

20       that our -- our attorney was here to be able to fill

21       in but we didn't hear the name.  We -- we didn't

22       know what to do.

23              THE COURT:  Ms. Bautista, I'm glad I've

24       heard from you.

25              MS. BAUTISTA:  Thank you.

United States of America, et al. v. The City of Albuquerque, et al.                     May 10, 2017
Public Hearing                                                                          14-CV-1025 RB/SMV

Page 179

1           THE COURT:  And, frankly, if you're

2    represented by Dean Mathewson, he understands the

3    process.  He has been a part of this process early

4    on.  And you can go to the DOJ website or the

5    Albuquerque -- City of Albuquerque website and

6    figure out how it is exactly you're supposed to

7    present your -- your letter, engage the parties

8    beforehand, and then -- and then get on the agenda

9    that way.

10          And, frankly, I didn't hear Mr. D'Amato

11   say whatever -- what you thought you heard.  I -- I

12   didn't understand him to be disparaging about a lack

13   of interest on the -- on the folks from the

14   community.

15          On the other hand, he commended many of

16   those volunteers that have been there.  So I

17   appreciate your comment and -- and, please, just

18   follow that normal process -- that process we've

19   laid out and all agreed to and, if -- if need be,

20   we'll hear from you next time.

21          MS. BAUTISTA:  I appreciate it very much.

22   Thank you.

23          THE COURT:  Yes, ma'am?

24          MS. MARTINEZ:  Your Honor.  When the

25   parties notified Counsel for the Amici process the

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 180

1      Court sets in place to participate in these public

2      hearings, we provide that notice to the attorneys

3      and not to the actual Amici.

4           I am aware that Mathewson and a couple

5      of other attorneys who represent the coalition of

6      organizations that Ms. Bautista belongs to did

7      receive that e-mail.  But, going forward, what I

8      will endeavor to do is to ensure that we also reach

9      out to some of the representatives from these

10     organizations so that if they do want to be in touch

11     with their counsel, they have that opportunity and

12     are able to participate in the process as the Amici

13     who did today.

14          THE COURT:  Thank you.  I think that will

15     facilitate the process and facilitate the

16     community's involvement.  Thank you very much.  Ms.

17     Hernandez?

18          MS. HERNANDEZ:  Your Honor, I'm sorry.

19     You asked to be kept in the loop as we work together

20     with Dr. Ginger on clarifying what had occurred with

21     the request for that Special Order.  Do you want

22     that submitted at a certain time in a certain way,

23     or with 30-day action plan?  I wanted to make sure

24     that I kept you in the loop appropriately.

25          THE COURT:  You know what, it's fine to

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 181

1    just include it in your letter that you're going to

2    get to me within the 30 days.  All right.  Thanks.

3              You know what, I'm -- the graphic is

4    still up from Ms. Hernandez's presentation, and that

5    shows progress and it doesn't show the progress

6    hoped.  We talked, early on, about a two-year

7    schedule and -- and understood at the time that that

8    was an aggressive sort of position to take, and

9    we've altered our expectation some in the meantime.

10             I -- I appreciate the airing of the

11   concerns that people had relative to the IMR-5

12   today.  I -- I heard some responsible sort of

13   feedback and -- and responses.  I'm -- I continue to

14   be optimistic because that's my nature, but someone

15   said, along the way today, "Now" -- "now the rubber

16   really hits the road and now is the acid test."

17   We've got policy.  We struggled through that process

18   and we got there.  And we've trained, and we had to

19   expedite the training but we got there.  And so,

20   now, it's implementation, now it's -- it's

21   compliance on the ground, and I'm -- I'm encouraged

22   by the numbers.  Shootings are down and use of force

23   is down.

24             And, yes, it's true the use of force

25   is -- is miniscule in terms of the number of calls

United States of America, et al. v. The City of Albuquerque, et al.                              May 10, 2017
Public Hearing                                                                                  14-CV-1025 RB/SMV

Page 182

1        that the APD gets every year, I understand that.  As

2        a percentage matter, though, it occurs to me that it

3        was a very insignificant percentage matter before

4        DOJ got involved, it was just at an unacceptable

5        level.

6               And so we are -- we're -- we're all

7        pulling in the same direction, that's what everyone

8        says.  I will continue to believe that until I see

9        proof otherwise.  And, in the meantime, thanks

10       everyone, for their efforts.  Thanks for the

11       volunteers.  Thanks to those from the Department of

12       Justice, the City, APOA, Dr. Ginger.  Of course,

13       I -- I appreciate everyone's efforts, and be careful

14       out there and I'll talk to you all soon.  Thank you,

15       we're adjourned.

16       (Note:  Court concluded at 2:53 p.m.)

17

18

19

20

21

22

23

24

25

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)                              07e93eed-c56b-4b8e-8a45-33a3f0f4e2f9

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 183

1     STATE OF NEW MEXICO     )
                              )   ss
2     COUNTY OF BERNALILLO    )

3

4          I, DEBORAH E. TRATTEL, Certified Court

5     Reporter for the State of New Mexico, hereby certify

6     that I reported, to the best of my ability, the

7     proceedings, 14-cv-1025 RB/SMV that pages numbered

8     1-79, inclusive, are a true and correct typewritten

9     transcript through Computer-Aided Transcription;

10    that on the date I reported these proceedings, I was

11    a New Mexico Certified Court Reporter.

12         Dated at Albuquerque, New Mexico, this

13    19th of May, 2017.

14

15

16         DEBORAH E. TRATTEL, NM CCR CA CCR

17         Certified Court Reporter #153
           License Expires:  12-31-17

18

19

20

21

22

23

24

25

United States of America, et al. v. The City of Albuquerque, et al.
Public Hearing

May 10, 2017
14-CV-1025 RB/SMV

Page 184

1      STATE OF NEW MEXICO    )
                               )  ss
2      COUNTY OF BERNALILLO    )

3

4          I, KENDRA K. SUTTON, Certified Court

5      Reporter for the State of New Mexico, hereby certify

6      that I reported, to the best of my ability, the

7      proceedings, 14-cv-1025 RB/SMV that pages numbered

8      1-79, inclusive, are a true and correct typewritten

9      transcript through Computer-Aided Transcription;

10     that on the date I reported these proceedings, I was

11     a New Mexico Certified Court Reporter.

12         Dated at Albuquerque, New Mexico, this

13     19th of May, 2017.

14

15

16
       KENDRA K. SUTTON, CSR, RPR
17     Expires: December 31, 2017

18

19

20

21

22

23

24

25

Electronically signed by Deborah Trattel (301-338-907-3060)
Electronically signed by Kendra Sutton (501-022-167-5892)

07e93eed-c56b-4b8e-8a45-33a310f4e2f9