IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                           No. 1:14-cv-1025 RB/SMV

THE CITY OF ALBUQUERQUE,

    Defendant,

v.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

    Intervenor.

## MOTION REQUESTING EVIDENTIARY HEARING REGARDING NEUTRALITY OF INDEPENDENT MONITOR

### I.    INTRODUCTION

Defendant City of Albuquerque ("City"), by and through Jessica M. Hernandez, City Attorney, William W. Zarr, Managing Assistant City Attorney, Christopher J. Tebo, Managing Assistant City Attorney, and Jeramy I. Schmehl, Assistant City Attorney, and Jerry A. Walz, Walz and Associates, requests that the Court hold an evidentiary hearing regarding certain conduct of Dr. James Ginger, the court-appointed Independent Monitor ("Monitor"), which raises questions about the Monitor's ability to fairly, neutrally, and objectively perform his duties. The City brings this motion pursuant to Paragraph 335 of the Court Approved Settlement Agreement ("CASA"), which allows any party to petition the Court for appropriate relief when the Monitor has not fulfilled his obligations satisfactorily. Because certain statements and conduct by the Monitor and monitoring team members raise questions of potential bias, the City believes that the appropriate course of

action is to provide the Court with this information and request that the Court hold an evidentiary hearing to inquire into these matters to ensure that the monitoring process is fair, impartial, and unbiased.

The City conferred with the United States Department of Justice ("DOJ") and the Albuquerque Police Officers' Association ("APOA") (collectively with the City, the "Parties") regarding this Motion. The DOJ takes no position on this Motion at this time. The APOA agrees that this Motion raises serious issues which should be heard by the Court. The City also informed the Monitor of its intent to file this Motion.[1]

## II. A FAIR, IMPARTIAL, AND UNBIASED MONITOR IS ESSENTIAL TO THE INTEGRITY OF THE REFORM PROCESS IN THIS CASE.

Fair, neutral, objective, and unbiased assessments and reports by the Monitor are essential to the integrity of the reform process of the Albuquerque Police Department ("APD" or the "Department"). Any bias by the Monitor in carrying out his duties is a threat to the integrity of the reform process itself.

The Monitor is appointed by the Court and acts as an arm of the Court in reporting on the progress of the City in its reform efforts under the CASA. As an extension of the Court, the Monitor's role carries significant authority over the Parties and the process. Because of that position of authority, it is imperative that the Monitor's interactions and dealings with the Parties be fair, impartial, and unbiased. The need for fairness and impartiality in the monitor role is much like that of a judge or a special master. Although not identical, those familiar legal standards provide reference points for the Court's review and evaluation of the Monitor's neutrality in this case.

---

[1] It is the City's understanding that the Monitor has previously communicated with the Court regarding this case without the Parties present. Due to the sensitive nature of this Motion, the City respectfully requests that the Court allow the Parties to be present for any communications between the Court and the Monitor on this subject matter and be allowed the opportunity to respond to those communications.

2

The legal authority governing the neutrality of courts and those acting under their authority emphasizes the importance of impartiality and the absence of bias. "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). In addition, disqualification is appropriate "[w]here he has a bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.*

In typical circumstances, where a judicial adjunct (such as a special master) is appointed, he or she would be bound by the Code of Judicial Conduct for Judges and 28 U.S.C. § 455, which governs impartiality and circumstances necessitating disqualification of a judge. Federal Rule of Civil Procedure 53(a)(2) applies § 455 to special masters. *See* Fed.R.Civ.P. 53(a)(2) ("A master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification."); *Paycom Payroll, L.L.C. v. Richison,* 758 F.3d 1198, 1208 (10th Cir. 2014), quoting *Guardian Pipeline L.L.C. v. 950.80 Acres of Land,* 525 F.3d 554, 556 (7th Cir. 2008) ("[C]ircuits have disagreed about the application of § 455 to special masters and land commissioners. To resolve this conflict the Supreme Court amended Fed.R.Civ.P. 53(a)(2) in 2003 to subject special masters to the requirements of § 455." (citations omitted)).

Based on the nature of the Monitor's role in this case, including his court-granted authority over the Parties, neutrality and impartiality are essential for him to carry out his role as intended. It is even more essential to preserve these principles of neutrality and impartiality when the monitoring role is designed in a way that creates a financial incentive for a monitor to prolong the monitoring process with findings of non-compliance. The harm to the taxpayers could be significant if any bias

3

on the part of the Monitor is a potential factor in evaluations of the City's progress. For those reasons, the City requests that the Court hold an evidentiary hearing to evaluate the information in this Motion, as well as other related evidence the City will provide at the hearing. The Court can then determine what further relief, if any, is appropriate.

### III. ALTHOUGH RELUCTANT TO RAISE THESE ISSUES FOR FEAR OF RETALIATION, THE CITY IS OBLIGATED TO INFORM THE COURT OF INFORMATION INDICATING POTENTIAL BIAS ON THE PART OF THE MONITOR.

The City has been concerned about potential bias on the part of the Monitor since early 2016. However, the City has been reluctant to raise these issues publicly, primarily out of fear of retaliation from the Monitor. There is a pervasive perception throughout the City's implementation team that speaking out on this issue could lead to retaliatory actions by the Monitor. In spite of those fears, the City now believes it is obligated to bring these issues to the Court's attention because a new, very recent development has confirmed the City's concerns that ongoing bias exists.

The Court should have an opportunity to review and address these issues because bias in the monitoring process is damaging to the Department and its officers, the City and its taxpayers, and the community as a whole. At this point (and as detailed more fully below), the City has exhausted its other available options to address these issues informally and has no choice but to file a formal Motion. The City is filing this Motion as soon as possible after learning of this new information.

While in hindsight it may have been better to bring these concerns to the Court's attention earlier, the City believed it more appropriate at the time to attempt to resolve those issues informally if at all possible. The City did not inform the Court earlier of the Monitor's conduct or comments for two reasons. First, the City made the decision to continue focusing its efforts on the work of reform and hope that the Monitor's concerning behavior would correct itself over time. The City did not want to be viewed as publicly criticizing the Monitor. Also, as described in more detail below,

the City attempted to obtain assistance from the Department of Justice in addressing this issue without Court intervention.

Second, the City feared retaliation by the Monitor if it were to publicly raise its concerns. The City documented this fear of retaliation in e-mail correspondence to the Monitor and a member of his team immediately after the Monitor made certain threatening comments and again some time later when the Monitor and his team did not respond to the City's expressed concern.

Despite the City's hopes that these issues would resolve without Court intervention, very recent comments by a member of the monitoring team have revealed that these issues of potential bias have not resolved. The Monitor's own comments and behavior in early 2016, and his team member's recent comments, indicate the existence of a personal bias toward certain City officials which impairs the Monitor's ability to neutrally and objectively carry out his work of assessing the City's compliance with the CASA. The City's fear of retaliation can no longer be a reason to delay bringing these issues to the Court's attention. Bias on the part of the Monitor has the ability to undermine the integrity of the entire reform process. Such bias could also cause significant negative practical and financial consequences for the City, its Police Department, and the Albuquerque community by prolonging the monitoring process at significant expense to the taxpayers.

A. **The Monitor Admitted to Having Personal Bias Against a Certain City Official, Referred to His Handling of That Issue as a "Game" He Knows How to Play, and Told APD Leadership That the Department Would Be "Collateral Damage" in That Process.**

On the morning of March 18, 2016, the Monitor had a meeting with APD leadership to debrief a site visit the monitoring team was completing that week. During the course of the meeting, members of APD's leadership became concerned with the Monitor's behavior. Based on a concern that the Monitor's behavior was escalating, APD Assistant Chief Robert Huntsman turned his on-body camera on to record the remainder of the meeting. Chief Huntsman was lawfully permitted to

5

record this meeting. *See* NMSA 1978 § 30-12-1(c) and 18 U.S.C. § 2511(2)(d). Chief Huntsman's affidavit is attached. It explains his reasons for recording the meeting as well makes clear that this meeting is the only occasion when he has video-recorded a meeting with the Monitor. *See* Affidavit of Robert Huntsman, attached as Exhibit 1. Chief Huntsman did not originally intend to record this meeting, but he made that decision during the meeting based on the Monitor's behavior. Moreover, the City never intended to publicly release this video, as demonstrated by the time that has passed since its recording. However, it feels obligated to bring this issue to the Court's attention now based upon the recent comments by the monitoring team member discussed below.

At the conclusion of the meeting, the City Attorney asked the Monitor whether there were any issues that he intended to raise with the City Council during a study session that was scheduled that same afternoon on the topic of APD reform efforts. The Monitor said that he did plan to raise specific issues with the City Council, but he adamantly refused to identify or discuss them in advance. He stated that he would not share those issues in advance because he believed a member of the City's implementation team had made negative comments about him in a previous City Council meeting without advance notice to him. Based on that perception, he, in turn, wanted the opportunity to respond in a City Council meeting without any advance warning to APD and called this a "game."

| | |
|---|---|
| **Dr. Ginger:** | "That's part of the game. Now it's moved to City [C]ouncil. And if I don't do something about it, it will move somewhere else. So, it's fine, I can play the game. It's alright. I don't mind." |
| **Chief Huntsman:** | "I don't view this as a game." |
| **Dr. Ginger:** | "Well –" |
| **Chief Huntsman:** | "I view this as my department, my city, my community. It's not a game to me." |

Transcript of March 18, 2016 Meeting, at p. 5, lines 8-15, attached as Exhibit 2.[2] Several minutes after that exchange with the Assistant Chief, the Monitor again referred to this issue as "a game" and said, "It's fine. I can play the game, Jessica. I know how, and we can play it." Ex. 2 at p. 8, lines 11-12.

Multiple members of APD's leadership insisted that this was not a game and repeatedly asked the Monitor to reconsider his threats to escalate the issue. They explained to him that this manner of handling his personal frustrations would hurt the Department and the reform efforts. Some of those attempts to rationally address the issue during the March meeting include the following:

- "[T]his is entirely unproductive and I think it's just going to lead to additional issues, Doctor." (Executive Director Bill Slauson, Ex. 2 at p. 5, lines 20-22.)

- "And I think we're just trying to express to you the concern of, this is going to have far-reaching effects . . . [i]t's going to be more personal towards the Police Department and us than what is going to be the focus of what you are actually trying to accomplish." (Former Deputy Chief Will Roseman, Ex. 2 at p. 8, lines 1-8.)

- "We're just concerned that it's gonna actually spin it up more to where it's gonna make it harder [for] us to keep moving forward in a positive way." (Former Deputy Chief Roseman, Ex. 2 at p. 8, lines 20-22.)

In response to all of these requests that the Monitor refrain from escalating this issue at the upcoming City Council study session, the Monitor concluded the meeting with a statement that is very difficult to reconcile with the standards of neutrality and impartiality that he is bound to follow as a court-appointed independent monitor. The Monitor admitted a personal bias toward a member of the City's implementation team. The Monitor also made it clear that he would act on that personal bias even if it damaged the Department in the process:

---

[2] For the Court's reference, a video recording of the relevant segment of the March 18, 2016 meeting has been lodged with the Court as an exhibit. *See* DVD Recording of March 18, 2016 Meeting, lodged with Court as Exhibit 3.

7

> **Dr. Ginger:** "The problem is here. [Gesturing to one team member.] The problem isn't here. [Gesturing to the other team members.] <u>**And you guys, and you guys are gonna be collateral damage, and I understand it, right. But I didn't start this.**</u> I didn't start this."

Ex. 2 at p. 9, lines 2-5 (emphasis added).[3]

Not only did these comments convey the clear impression that the Monitor had a bias against the City, the comments also created a strong fear that the Monitor intended to retaliate against the Department based upon that bias. This conduct was especially surprising to the City because the Monitor had informed the Court during the March 3, 2016 public hearing that he would work through any concerns he had with the City, and the Court had specifically instructed the Monitor and City Attorney to work through any such issues. The City immediately informed the Monitor and the Deputy Monitor of these concerns via e-mail.

### B. The City Was Compelled to File This Motion When a Monitoring Team Member Recently Admitted That the Monitor Has "An Ax to Grind" Against Certain City Officials.

Despite the City's previous efforts to move forward from the Monitor's earlier comments and to attempt to resolve these concerns without Court intervention, the City is now compelled to bring this issue to the Court. During the week of October 9, 2017, an APD staff member had a telephone conversation with a member of the monitoring team about the monitoring report that will soon be released. The monitoring team member indicated that his draft portions of the report contained positive information about APD's compliance progress but also that the Monitor changed those portions to read as more critical of APD before issuing the draft report to the Parties. The

---

[3] For the Court's reference, a video recording of the relevant segment of the March 7, 2016 City Council meeting has been lodged with the Court as an exhibit. *See* DVD Recording of March 7, 2016 City Council Meeting, lodged with Court as Exhibit 4. This recording contains the questions from City Council and responses by the City Attorney that the Monitor referenced during his comments during the March 18, 2016 meeting with APD leadership. The entirety of the City Council meeting is available online at file:///LG-5964/Users/e21560/Downloads/cabq_5bdfc7b1-4053-40f8-a5e9-f6f3c494b999.mp4.

8

monitoring team member went on to say something to the effect that "it is clear that Dr. Ginger has an ax to grind" against certain city officials, including the City Attorney and the Chief of APD.

This conversation was reported to APD's leadership on October 16, 2017. *See* Huntsman Aff., Ex. 1, at ¶¶ 10-11. On October 17, 2017, the Chief held a meeting in his office with several other members of the implementation team to gather additional information on this statement by the monitoring team member. *See* Huntsman Aff., Ex. 1, at ¶ 12; Affidavit of Gorden E. Eden, Jr., attached as Exhibit 5, at ¶ 7. During that meeting, the APD staff member recounted the same conversation, including the comment by the monitoring team member that the Monitor had "an ax to grind" against specific City officials. *See* Huntsman Aff., Ex. 1, at ¶¶ 11-12; *see also* Eden Aff., Ex. 5, at ¶ 8.

Although a report of this conversation was provided to APD's leadership shortly after it occurred, because of a perception of potential retaliation by the Monitor or his team, the APD staff member is reluctant to speak publicly. *See* Huntsman Aff., Ex. 1, at ¶ 13; *see also* Eden Aff., Ex. 5, at ¶9. There is also reluctance by the employee to become a part of a public dispute with the monitoring team. The employee, however, understands that it may be necessary to provide this information directly to the Court at a hearing on this issue.

This new information was the impetus for the City to file this Motion. The new information demonstrates that the Monitor's bias, as expressed during the March 2016 meeting, has not resolved. In addition, this statement by the monitoring team member is of grave concern to the City because it demonstrates that the Monitor apparently has conversations with his team members which convey this bias. The City has filed this Motion as soon as practical following this new development.

### C. The Monitor Has Referred to the Department of Justice Attorneys as "My Attorneys" and Has Treated Them in a Way That Indicates That the Monitor Does Not View or Treat the Parties as Equal Participants in This Process.

To be clear, the two issues described above are the reasons for the City's present Motion. However, because these issues are before the Court, there is a third, related issue that the City believes it is appropriate to bring to the Court's attention for consideration at any hearing on these issues. That issue is the nature of the relationship that has developed between the Monitor and the attorneys in the U.S. Attorney's Office and Department of Justice, and whether that relationship is consistent with the role of an independent monitor that is not intended to be aligned with either party in this case.

The Monitor is obligated to treat all parties to this process equally and fairly without special or preferential treatment to any party. However, on more than one occasion, the Monitor has referred to the DOJ attorneys as "my attorneys" and has treated them as serving in that role rather than as co-equal parties with the City in this process. *See* Huntsman Aff., Ex. 1, at ¶ 15; *see also* Eden Aff., Ex. 5, at ¶ 11. In addition to these comments by the Monitor, the nature and frequency of communications between the Monitor and DOJ attorneys (often to the exclusion of the City), and the role the DOJ attorneys take in handling issues of the Monitor in meetings, appear inconsistent with his intended independence. This has been a long-standing concern for the City.

When the City raised this concern with the DOJ attorneys, they agreed that it would be improper for the Monitor to view or treat the DOJ as having a special relationship with him and agreed that they certainly do not represent him. Although the DOJ expressed agreement with this concern, the City believes that the Monitor still views the DOJ in this role and treats the DOJ attorneys in a way that is not impartial as between the various parties in this case.

## IV. BEFORE FILING THIS MOTION, THE CITY MADE GOOD FAITH EFFORTS TO ADDRESS ITS CONCERNS, INCLUDING CONFERRING WITH THE DEPUTY MONITOR AND DEPARTMENT OF JUSTICE.

As outlined in detail above, the City first became concerned about the Monitor's neutrality in March 2016. The City Attorney made several efforts to address these issues through the Deputy Monitor. The Deputy Monitor was responsive to the concerns and agreed to talk to the Monitor about the concerns. However, no further discussions with the City have occurred which address the issues of concern. Eventually, the City believed it was necessary to take additional steps to address these issues because they were and continue to have a detrimental effect on the reform process.

In November 2016, the City raised these concerns with the Department of Justice. The Parties had a series of meetings over the course of November and December 2016, as well as into January 2017. The Parties informed the Court generally of these discussions during monthly status conferences, but did not present the Court with details of those discussions. *See* Clerk's Minutes of December 8, 2016 Status Conference, at p. 2, Item No. 4 [Doc. 240]; Clerk's Minutes of January 5, 2017 Status Conference, at p. 1-2, Item No. 1 [Doc. 244]. These efforts were also documented in the position statement that the City provided to the Parties and Monitor on January 17, 2017. That document represents an effort to comprehensively outline the City's concerns with the Monitor's previous comments about bias and "collateral damage" and to describe in detail how those factors affected the monitoring process.

At that time, the Monitor denied making those prior comments, including the "collateral damage" comment. Further, the DOJ did not take additional steps to investigate the appearance of bias by the Monitor. The City did not provide the DOJ with the video recording of the Monitor's statements at that time because it remained concerned about retaliation from the Monitor. The City was also concerned with appearing to publicly criticize the Monitor and wanted to avoid that if

11

possible.

The City never intended to make that video public, but believes it has no choice at this point because of the recent comment made by the monitoring team member. The video is evidence that corroborates the recent comment and warrants the Court's consideration and review.

In addition to discussions with the Parties and Monitor, the City requested mediation with the assigned magistrate judge in an effort to address these damaging issues. *See* Clerk's Minutes of January 5, 2017 Status Conference, at p. 1-2, Item No. 1 [Doc. 244]. The Department of Justice objected to participating in mediation to address these issues. Community groups publicly criticized the Department for having requested mediation. Eventually, the Parties agreed upon and filed a Joint Report with the Court that outlined specific steps the Parties and Monitor would take to improve communication. *See* Joint Report on the Roles Responsibilities, and Expectations of the Independent Monitor (Doc. 249, filed on February 10, 2017). However, this Joint Report did not address the underlying issues of potential bias that were of continuing concern to the City.

Following the submission of the Joint Report in February 2017, the City continued to experience interactions with the Monitor that raised concerns of potential bias and retaliation against the Department. For the reasons described above, the City remained hesitant to publicly raise these concerns. However, upon learning of the recent comments by a monitoring team member about the Monitor having "an ax to grind" against certain city officials, the City has no choice but to raise these issues now. In sum, the City has exhausted all the less formal options available and has been unable to achieve any resolution to these serious issues.

## V. CONCLUSION

For the reasons detailed above, the City respectfully requests that the Court hold an evidentiary hearing at its earliest opportunity to evaluate the neutrality and impartiality of the

Monitor, as well as determine whether there is any actual or perceived bias toward the City or any of its officials. As part of that process, the City believes it would be appropriate for the Court to obtain the draft report sections that monitoring team members have provided to the Monitor for inclusion in his full draft reports. Doing so will allow the Court and the Parties to evaluate the statement by the monitoring team member regarding changes made to those submitted drafts.

Respectfully submitted,

**CITY OF ALBUQUERQUE**
**Jessica M. Hernandez, City Attorney**

Electronically Filed

*/s/ Jessica M. Hernandez*
Jessica M. Hernandez
William W. Zarr
Christopher J. Tebo
Jeramy I. Schmehl
P.O. Box 2248
Albuquerque, NM 87103
(505) 768-4500
jmhernandez@cabq.gov
wzarr@cabq.gov
ctebo@cabq.gov
jschmehl@cabq.gov

WALZ AND ASSOCIATES

*/s/ Jerry A. Walz*
Jerry A. Walz, Esq.
133 Eubank Blvd NE
Albuquerque, NM 87123
(505) 275-1800
jerryawalz@walzandassociates.com

*Attorneys for Defendant City of Albuquerque*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 31st day of October, 2017, I filed the *foregoing pleading* electronically through the CM/ECF system, which caused the parties, counsel of record and independent monitor on the service list to be served by electronic means.

/s/ *Jessica M. Hernandez*
Jessica M. Hernandez