# Monitor's Sixth Report

# Compliance Levels of the Albuquerque Police Department and the City of Albuquerque with Requirements of the Court-Approved Settlement Agreement

## No. CIV 14-1025 RB/KK

November 2, 2017

Prepared by: Public Management Resources, Inc.
James D. Ginger, Ph.D. Independent Monitor

**Table of Contents**

| Topic | Page |
|---|---|
| 1.0 INTRODUCTION | 1 |
| 2.0 Executive Summary | 3 |
| 3.0 Synopsis of Findings | 10 |
| 4.0 Current Status | 16 |
| 4.1 Overall Status Assessment | 16 |
| 4.2 Dates of Project Deliverables | 17 |
| 4.3 Format for Compliance Assessment | 17 |
| 4.4 Compliance Assessment | 18 |
| 4.5 Operational Definition of Compliance | 18 |
| 4.6 Operational Assessment | 20 |
| 4.7 Assessing Compliance with Individual Tasks | 20 |
| 5.0 Summary | 407 |

## 1.0 Introduction

The following document constitutes the Independent Monitor's sixth status report detailing the status of the monitoring function of the Albuquerque Police Department's (APD) response to the Court Approved Settlement Agreement (CASA) between the United States Department of Justice (DOJ) and the City of Albuquerque (the City). The document consists of five sections:

1. Introduction;
2. Executive Summary;
3. Synopsis of Findings;
4. Compliance Assessments; and
5. Summary.

On November 14, 2014, the United States Department of Justice entered into a settlement agreement (SA) with the City regarding changes the Parties agreed to make in the management and operations of the APD. This agreement consisted of 278 requirements accruing to the APD, the City of Albuquerque, and related entities, including, for example, the City of Albuquerque's Citizens' Police Oversight Agency (CPOA), and the City of Albuquerque's Police Oversight Board (POB). After approval of the Settlement Agreement by the Court in November 2014, on January 14, 2015, the Parties selected an independent monitor to oversee and evaluate the APD's response to the requirements of the CASA on January 14, 2015. Dr. James Ginger (CEO of Public Management Resources), and his team of policing subject matter experts (SMEs) in the areas of police use of force, police training, police supervision and management, internal affairs, police-community relations, crisis intervention, and special units were tasked with the responsibility of developing and implementing a monitoring methodology designed to, where possible, evaluate quantitatively each of the 276 individual requirements of the CASA. The monitoring team's proposed methodology was submitted to the parties (The USDOJ, the City of Albuquerque, the APD, and the Albuquerque Police Officers' Association) in March 2015. The Parties were given time to review and comment on the draft, and the monitor revised the methodology document that were meaningful and suggested an improved document in terms of accuracy, understandability, and style. A Court Order modifying deadlines for the CASA was approved by the Court and filed on September 24, 2015. This document reflects those comments and represents an attempt by the monitoring team to produce the most accurate assessment possible.

In the pages that follow, the monitoring team presents to the Court, the Parties and the residents of the City of Albuquerque, its findings

1

developed from its sixth site visit.  We have noted previously that the monitor's first report, in effect, represents a "baseline" from which improvements can be tracked.  This sixth report represents an assessment of the progress made since the beginning of compliance efforts.  Full disclosure of the monitor's reports will be made by presentation in Court, by in-person discussions with the Parties and by publication of the report on the Web.  The reader is reminded that this document is the sixth step in a multi-year and multi-phased organizational development and planned change process.

While the style of this reporting modality may be a bit technical, the reader should note that it is meant to inform the Court, applicable law enforcement professionals, and the Parties about the monitor's assessment of the current levels of performance by the APD on the 276 specific tasks required of the City and the APD over the coming years. The monitor's reports allow the reader to actually assess progress made by APD since the reform process was initiated in January 2015. Thousands of man-hours have gone into developing this report in the form of planning, data collection, data analysis, report writing, staffing and production.  The sixth report served as a review of the effectiveness of the organizational development process engaged in by the APD during the period of February 2017 through July 2017 (inclusive). Similar processes will be used over the remaining life of the CASA.

## 2.0  Executive Summary

This is the sixth monitor's report, covering February 2017 through July 2017.  Under the Court-Approved Settlement Agreement (CASA), the monitor is to issue public reports on the City's progress over the remaining years, by which point the City intends to have reached substantial and sustained compliance with all provisions of the CASA.

As this report discusses in detail, significant challenges lie ahead for the Albuquerque Police Department and the City of Albuquerque. This executive summary provides an overview of what the monitoring team has observed so far in the APD's compliance efforts, and is a synopsis of a fuller discussion of compliance, which can be found in the body of the report. The summary then provides an explanation of where we are in the process, given some modifications that the City and the Department of Justice requested the Court to make to deadlines in the CASA. Finally, the summary explains more about how this report is organized and where the reader can find more information about specific components of the CASA.

## 2.1  Overview of This Report's Conclusions

This summary covers the nine substantive areas laid out in the CASA:

      I.  Use of Force;

     II.  Specialized Units;

    III.  Crisis Intervention;

    IV.  Policies and Training;

     V.  Misconduct Complaint Intake, Investigation, and Adjudication;

    VI.  Staffing, Management and Supervision;

   VII.  Recruitment, Selection, and Promotions;

  VIII.  Officer Assistance and Support; and

    IX.  Community Engagement and Oversight.

While each of these topics is covered in greater detail in the body of the report, this executive summary will provide an overview of our conclusions from the core components of the CASA.

### 2.1.1  Use of Force

As the monitoring team noted in its first five reports, and a Special Report submitted to the Court in September of 2016, fostering the constitutional use of force is the primary goal of this entire effort, and every provision of the CASA is aimed, directly or indirectly, at achieving that goal.

The APD continues to work under an overarching use of force policy. As we noted in IMR-5: "Use of force policy has been a difficult mechanism to master for the APD, and we continue to see residual issues as that policy comes into its six-month review processes.  We continue to see issues related to use of force in the areas of neck holds, distraction strikes, and "shows of force".  In fact, treatment of each of these issues has led to delays in our ability to assure that APD crafts a revised use of force policy that addresses the issues the monitoring team have noted over the past months.  We also continue to note training-related issues regarding use of force, and supervisory issues related to reviewing and identifying out-of-policy uses of force, and reciprocal issues in supervision, command review, and administrative assessment and regulation of uses of force."

For the most part, APD has managed to resolve these issues during this reporting period, and we have noted that the agency has produced a reasonably clean set of policies relating to use of force.  We do note, with some trepidation, however, that the latest (approved) use of force policy suite included a relatively innocuous "definition" related to the concept of *De Minimis* force, a term used by other police agencies also under CASA-like processes to relate to minor uses of force, such as guiding an un-handcuffed prisoner, etc.  Under the current policies, approved by the monitor, APD provides no guidance to its officers (in policy) relating to *De Minimis* force, and relates that guidance to its definitions section, placing an extreme burden on the training and supervisory processes to identify, classify, guide, and implement the concept into actions in the field.  We note that this new definition, while simple on the surface, is already generating problematic issues in in-field implementation, indicating a lack of effective training at the officer, supervisor, and command level relative to the definition, articulation, implications and impact on in-field operations of the APD's implementation of the concept in the field.

We could find no specific training (or evaluation of training) that APD had provided during the sixth reporting period relating to *De Minimis* force that would guide officers, supervisors, command-level personnel or other employees as they use, supervise, or assess the effectiveness of officer performance relating to the concept of *De Minimis* force.  We see this as a potentially problematic issue.

Further, this reporting period, we again note serious supervisory and command-level and administrative (Internal Affairs, Force Review Board) failures relating to APD's willingness and ability to identify out-of-policy force events and to take

4

appropriate remedial action.[1]  These include (but are not limited to) problematic lapses in supervisory and command oversight of use of force.  More importantly, we have noted during the sixth reporting period that APD has not been accurately reporting the total number of uses of force executed by APD personnel.  For IMRs 2 through 6, the monitor requested of APD a listing of *all* use of force cases that occurred during the given monitoring periods (2 through 5).  This request included both serious uses of force (cases that are investigated by CIRT/FIT and reviewed by the Force Review Board) and supervisory uses of force (cases reviewed and resolved by field supervisors).

From that list of cases the monitoring team would select a random sample of cases to review.  We learned in May 2017, during our work for IMR-6, that APD was reporting only those cases (serious uses of force) that were closed, not all cases that were reported.  That shielded the fact that there were numerous cases pending[2] and those cases left significant gaps in the data.  It also raised serious questions as to why cases were pending for such extended periods of time.  Even more troubling, we found that even the Chair of APD's Force Review Board (an assistant chief of police) claimed ignorance of this discrepancy!

During the course of the monitor's other monitoring projects there was also a substantial "backlog" in police performance regarding investigation of civilian complaints and uses of force, but in those other projects the affected police department was aware of the backlog and its impact on investigations.  To find that, at this late date, the *chair* of the Force Review Board was unaware of this "backlog" is more than puzzling.  It is extremely troublesome, and reflects a significant lack of awareness and focus on use of force issues at APD.  We also uncovered during this reporting period, a significant backlog of supervisory use of force investigations dating back to January 2017, which effectively prevents the monitoring team from making an objective assessment of overall investigative outcomes since the cases are not yet submitted and complete.  Arguably, cases that are incomplete for extended periods of time are of greater interest since they may reveal deficiencies from many different perspectives.[3]  To suggest that we are concerned about such "oversights" puts it mildly.

In the past, APD has been given extensive feedback and technical assistance concerning their inability to report effectively, track, and investigate legitimate use of force cases.  Likewise, the monitoring team has predicted many of the issues APD has, and is, encountering.  None was more prevalent than when we alerted APD to significant deficiencies in its use of force training in early 2016.  It is not surprising to the monitoring team that APD has continued to struggle

---

[1] Our concerns over the reporting and investigating of show of force events extend back to the beginning of the monitoring team's engagement with APD.

[2] We learned that some supervisory use of force cases were still pending and in the chain review process 4-5 months after the original event occurred.

[3] As of August 1, 2017, none of the reported supervisory use of force cases for the months of May, June or July 2017 were completed.

during this monitoring period, since, in our opinion, many supervisors and command personnel continue to view their activities (related to force and organizational accountability) through the same lens that got them into their current situation.

## 2.1.2  Specialized Units

Specialized units at APD have, for the past five reports, led the way in terms of assessing the CASA's requirements, identifying relative strengths and weaknesses, and building on strengths while eliminating or ameliorating weaknesses.  All of APD's specialized units are at or nearing full compliance, with the only outstanding issues having been resolved during this reporting period (reporting and analysis protocols for canine bites).  APD's specialized units continue to shine in terms of planning, oversight, and, where needed, remedial interventions.

## 2.1.3  Crisis Intervention

APD's Crisis Intervention Units (CIT, E-CIT, etc.) continue work toward compliance with the requirements of the CASA.  In IMR-5, we noted a marked improvement over past practice in training development for e-CIT "advanced" training, noting clearly articulated learning objectives, training modalities, and implementation strategies.  Work remains to be done to integrate applicable CIT and E-CIT policies and practices with non-specialized units.  We noted in IMR-5 that "APD should ensure that each of the [CIT] related paragraphs conform with the goals articulated in [paragraph 111-137] conform with the goals articulated in [paragraph 110] and are articulated sufficiently to Command and supervisory level personnel."  That remains the case for IMR-6.  APD has reached full compliance with requirements for consultation and coordination with service providers on issues related to provision of services to those with mental health issues (paragraph 111).  The same applies to the requirement to engage mental health professionals (112), coordination with the community regarding the chronically homeless (116), provision of state-mandated behavioral health training to all cadets (119), training of officers regarding (120), training of tele-communicators regarding CIT practices (121).  Substantial work remains to be done on all remaining paragraphs (113-115, 117-119, and 120-127).  Much of the "documentation" provided by APD for CIT components was not "normal course of business" documentation, as required by the monitor's methodology (and shared with APD and the Parties early in this project).  Such "purpose built" documentation of compliance efforts, such as spreadsheets created after the fact, are not acceptable as "course of business" documentation.  The "to do list" for CIT training and operational requirements remains daunting.  Much remains to be done before attaining overall compliance, and most of it relates directly to staffing, training, documentation of policies and training, and maintenance of acceptable "course of business" documentation.  Provision of spreadsheets of attendees absent supporting testing modality descriptions and test scores is

6

unacceptable.  APD was put on notice of these requirements by the monitor's methodology, submitted to APD and the Parties early-on in this project timeline.

## 2.1.4  Policies and Training

Policy and training have been persistent issues with APD since the inception of the monitoring process.  APD has made significant strides in the policy development and promulgation process, with multiple revised policies having been approved by the monitoring team during this reporting period, and other policies, including the often-problematic use of force policy "suite," approved after the close of this reporting period. While often delayed, APD policy production, review and revision is now reasonably routinized, with monitor review generally consisting of less critical assessments, and fewer notices of needed changes or revisions prior to monitor approval.  Training processes, however, continue to exhibit problems and issues.  We have noted since the early days the APD's tendency to "shortcut" accepted training practices and cycles, and have devoted hundreds of team-hours to reviewing and critiquing (directly to APD Academy managers) what we found to be substandard practices in training development, documentation, and evaluation.  Despite the work product provided by the monitor to APD regarding training, we still find training product that fails to meet nationally accepted practice, and/or monitor-communicated standards.

Very early on in the monitoring process, we provided APD and managers at the training academy outlines and examples of field-based pattern and practice in police training development, including the needs assessment-development and documentation processes used by agencies such as the California Police Officers Standards and Training agency (CALPOST).  CALPOST is a widely recognized source of leadership in delivery of law enforcement training.  Despite this early guidance, the APD academy continues to eschew such routine processes as documenting goals, objectives, modalities and outcomes.  We also note that testing at the APD academy routinely show unusually high mean scores (well above 95 percent) which indicates to us either remarkably easy assessment tools or coaching.  While one would expect high marks from professional training (and while the acceptable "pass rate" articulated in the monitor's training assessment methodology requires that greater than 95 percent of those tested "pass,") an average score of 95-plus percent is a statistically worrisome outcome, potentially indicating an overly easy testing mechanism.  If 95% of those who took the test "passed" (e.g., a 70 or above) that would be one matter, but if the average score is 95 that is a different, and suspect "outcome."

## 2.1.5  Misconduct Complaint Intake, Investigation and Adjudication

APD has developed systems for the intake, investigation and adjudication of misconduct complaints.  These systems, on the surface, are designed to conform to the requirements of the CASA.  Implementation of these systems has

fallen short of articulated and required CASA requirements, however.  While APD's complaint receipt, classification, investigation and adjudication systems designed to ensure compliance with the CASA are substantial, complex, and, on the surface, designed to ensure compliance with the CASA, these systems fall short repeatedly when it comes to implementation.  For example, during the sixth monitoring period, a routine monitoring audit of outstanding IA cases has revealed a substantial and persistent (and unreported) backlog of IA cases, particularly related to uses of force, that have lingered for excessively long periods of time without attention from APD.  This backlog is discussed extensively in the body of IMR-6 (at pp. 79 and following).

### 2.1.6  Staffing Management and Supervision

For APD, the paragraphs relating to staffing, management and supervision of its personnel remains a critical area of short-fall.  In IMR-5, the monitor noted that supervisory ranks were a critical component whose performance led to direct and critical failures in compliance efforts.  All oversight levels of patrol operations were identified as weak links when the monitor assessed APD's ability to identify, classify, and respond to out-of-policy uses of force, with sergeants, lieutenants, and commanders routinely failing to note and respond to uses of force that were clearly out of policy.  During this reporting period, we note the same issues with APD's administrative systems, including the CIRT, FIT, and IA investigative processes, and, more troubling, the APD's Force Review Board functions.  Each of these critical elements of supervision and administrative identification and response to improper uses of force have fallen short of performing the tasks assigned to them, at times in worrying modalities.

### 2.1.7  Recruitment, Selection and Promotions

Paragraphs 232 through 241 identify specific CASA-established objectives for APD's recruiting processes.  Our review of APD's performance related to this paragraph indicate that the agency has achieved full compliance with ten paragraphs.  The APD recruit-training process continues to be a strong point of performance and CASA compliance for this IMR-6, as it was during last reporting period.  Internal supervision and oversight of the recruit training process has led to excellent results.

### 2.1.8  Officer Assistance and Support

Paragraphs 242 through 254 deal with APD officer assistance and support requirements of the CASA.  To date, APD has completed policy related to performance evaluations, has a policy pending monitor's review regarding promotions and has completed (and had approved by the monitor) the earlier policy regarding performance evaluations.  APD also has an approved and implemented policy relating to officer mental health and support (paragraph 247), as well best practices-compliant provision of mental health services for officers.  Field-standard practices related to confidentiality of mental health

services make operational compliance difficult to quantify; however, we have confidence that the *programs* implemented by APD's Behavioral Science Section are industry standard and compliant.  BSS remains involved with development and screening of recruit training related to mental health issues, and are accessible to line personnel.  A list of internal and external mental health resources has been complied and circulated by BSS.  We continue to see focused, dedicated and professional responses to the requirements of the CASA from BSS.

## 2.1.9  Community Engagement and Oversight

Paragraphs 255-268 accrue to APD's community outreach function.  The APD has reached secondary compliance in a large majority of its outreach function paragraphs, with eleven of the 14 required showing secondary compliance. The three "outliers" consist of measuring officer "outreach," (paragraph 259), measuring attendance at CPC meetings (paragraph 263) and establishing effective criteria for selecting CPC members (paragraph 267).  Of the three remaining roadblocks to compliance, only one seems a problematic task.  Paragraph 267 requires a delicate balance between representative membership and member background checks.  APD continues to work through this process.

## 2.1.10  Summary

We continue to note pervasive lapses in processes related to use-of-force oversight at the Area Command-level, and at the force-review and response mechanisms within the administrative processes of APD.  In short, even after hundreds of man-hours of consultation, reports, recommendations and repeated (sometimes intense) conversations with APD leadership over a two-year period, APD continues to fall seriously short of CASA requirements relating to management and supervision—particularly regarding use of force-related issues.  Arguably, some of these lapses can be attributed to staffing issues.  Nonetheless, performance on tasks outlined in these sections of the CASA remain out of compliance, despite the monitoring team's two years of intensive consultation, documentation, and suggestion.  We found problematic performance in supervisory training regarding response to use of force, computerized systems designed to "flag" problematic officer behavior, internal "oversight" mechanisms relating to use of force, management of force-review functions, and over-arching leadership of the department related to uses of force in-field practices, supervision, training, oversight, and leadership.  Considering that use of force is one of the main areas of focus of the CASA, issues encountered this reporting period related to uses of force identification, classification, investigation, assessment, findings development and remediation are troublesome.

### 3.0  Synopsis of Findings

As with our previous reports, this section provides a summary of the monitoring team's findings regarding compliance with specific requirements of the CASA during the sixth reporting period (February 2017 through July 2017).  Section 3.0 of the monitor's report is divided into two main parts:

- Accomplishments; and
- Outstanding Issues.

Each of these areas is reported in some detail below, and in greater detail in Section 4.0, the main body of the report.

3.1  Accomplishments

As we noted in IMR-5, during the last reporting period (August, 2016 through January, 2017) APD completed its initial policy development activities.  The issues related to six-month review of approved policies that we noted last reporting period (difficulties coming to agreement between the APD and the monitoring team (and other Parties) continued well into the sixth reporting period, particularly as it related to use of force and supporting policies.  Most of those issues were resolved by the latter part of the sixth reporting period, and we are now making reasonable progress regarding policy development and promulgation.  The monitor does note that the backlog in policies continued into the latter parts of IMR-6's reporting period, and production has been somewhat delayed by the preparation and production of IMR-6 itself.

Further, APD appears to have broken the policy backlog.  The monitor currently has a substantial selection of revised APD policies that are pending approval, and which will be effectuated within the coming weeks.  Despite this unintended delay, the good news is that policy development is moving with a renewed alacrity at APD, and in this case, it is the monitor (and production of IMR-6) that has caused the delay, not APD.  The monitor made the decision to defer policy response so that APD could have the earliest possible access to the draft findings of IMR-6.  Given past difficulties with policy development, the monitor personally reviews all proposed APD policy as opposed to simply obtaining assessments from subject matter experts on the monitoring team.  This process, necessitated by APD's former resistant response to policy guidance, has slowed policy review and comment processes.

We noted in IMR-5 that APD has reduced the span of control of patrol sergeants to 8:1 or lower, as required by the CASA.  That continues for IMR-6.  What remains to be done in this area (supervision) entails training, coaching, organization and assessment of supervisory practices, particularly as they relate to use of force documentation and assessment.

In addition, APD's community involvement processes are beginning to coalesce, and we see the emergence of a meaningful, if nascent community engagement process.

## 3.2  Outstanding Issues

In IMR-4 and IMR-5 we noted:

"Critical outstanding issues" remain. APD is still in the formative stages of assessment, development, and response to the full requirements of the CASA, and such systems, in the previous experience of the monitor, take time, careful planning, attentive development, and critical self-evaluation."

The outstanding issues identified at that point were:

1. Building strong administrative systems to support compliance with the CASA;
2. Building a meaningful "Command and Control" function, and review and assessment of Field Operations activities;
3. Building meaningful developmental systems for integrating training, supervision, discipline, and follow-up process development; and
4. Creating a culture of accountability within APD.

Despite the passage of time, and intensive APD-monitoring team interactions on these four pending processes, as of the end of the sixth reporting period, these four outstanding issues from IMR-4 and IMR-5 are still pending.  While substantial progress has been achieved "around the edges," the key issues confronting APD in IMRs four and five, for the most part, remain for IMR-6: administrative systems remain weak (as they relate to the CASA); Command and Control continues to need substantial improvement; integrated developmental systems for training, supervision, discipline and follow-up process development have not been addressed, and, in the monitor's professional opinion, based on six-decades of experience in law enforcement on the local and national level, a culture of accountability is markedly absent at APD.

On these critical systems: compliance administration (command and control, integration of CASA-related practices, and building a culture of accountability within APD), scant progress has occurred this reporting period.  In IMR-5 we noted substantial failure at the supervisory, mid-management, and senior management levels of APD when it comes to training about, supervising, and controlling use of force at the operational level.  This reporting period, we note those concern extend to the management and administrative levels of the agency, including the FRB.

11

In IMR-5 we noted five steps APD needs to take to move forward with CASA compliance.  It has made substantive progress this reporting period in only one of those:  policy development and promulgation.  This progress came only after substantive, focused and substantial intervention by the monitor to require that APD policy be congruent with the CASA and best practices in the field.  It was, in the monitor's opinion, begrudging progress, made only after the monitor refused to "yield" on problematic proposed APD policy changes.  We do note, in the last few weeks, a softening of APD's resistance levels regarding development of effective policy, and see that as a marked improvement in APD practice regarding policy development.

Unfortunately, little, if any, progress has been noted in four specific areas of improvement to administrative practice at APD.  Considerable progress remains to be made in the areas of:

1.  Routine, methodical, and pervasive assessments of citizen-police interactions to ensure that policing practice conforms to policy;

2.  Identification and clear and consistent remediation of interactions that do not conform to policy;

3.  Establishment of "learning cycles" designed to assess interactions that do not conform to policy, identify how and why those interactions occurred (focusing on supervisory, command and administrative functions), and develop responses to ensure, to the extent possible, they do not occur again; and

4.  Development of feedback loops between policy-training-supervision-discipline-administration-leadership to foster "early warning" of, and response to, trends that run counter to established policy and practice.

Progress on these remaining issues, we noted in IMR-5, requires "focused, determined, and continual leadership from all levels of management and executive staff."  We are aware that a new leadership cadre may be incoming at APD after the October elections.  We stand ready to work with that new leadership to the extent necessary to ensure it understands existing issues and is offered a range of processes and activities to address them.

### 3.2.1  Routine, Methodical, and Pervasive Assessments

One of the more serious deficiencies we noted at APD in our IMR-5 report was "Assessment of citizen-police interactions to ensure that policing practice conforms to policy."  We noted during monitoring team interactions with APD

during the IMR-6 reporting period, a stiffened resistance to crafting policy that would lead to compliance with the CASA. The monitor found that, on several occasions, he simply had to refuse APD-proposed changes to policy that in the monitor's opinion, would not comply with the requirements of the CASA. In other instances, APD attempted to revise previously approved policies in ways designed carefully to weaken previously approved policy versions. We can only describe these attempts as carefully thought-out resistance to the requirements of the CASA. In one case, for example, APD cut its EIRS review period in half (from 12 months to six) while leaving the trigger level (the number of events of a given type that required administrative review of an officer's "pattern and practice" on a given trigger event, uses of force, for example) at the level agreed to by the monitor and Parties in the previously approved policy version. If the monitor had not noted the "minor revision" and refused to approve it, the "minor change" would have, in effect, doubled the trigger level of the given EIRS policy process, e.g., requiring six uses of force in six months, instead of six in twelve months! Some might argue that such discrepancies are mere oversights; however, when they consistently accrue to a reduced level of review, we are not persuaded by that argument.

We also noted during the IMR-5 reporting period, an attempt by APD to "walk back" the number of On-Body Recording Device (OBRD) reviews supervisors were required to conduct on a regular basis, reducing the number of review substantially. Had the monitor not noted and refused the overt attempt to reduce the number of reviews required by supervisory personnel, oversight of patrol activities by supervisory personnel would have been substantially reduced.

Again, we have noted, during the past month, a lessening of such attempts to walk back policy in this manner. Nonetheless, such processes have delayed progress, and consumed valuable time that the monitoring team could have committed to review, assessment, and correction of actions in violation of policy by field personnel.

### 3.2.2  Remediating Interactions that Do Not Conform to Policy

In IMR-5, we reported:

"Again, we note that we have seen little evidence of a coherent "command and control" function designed to foster clear, attainable, and reasonable processes for supervisory and command review of officers' in-field actions relating to policing practices, particularly use of force." The majority of problematic instances noted in the last five site visits have not tended to result in appropriate supervisory and/or command-level responses, i.e., reviews, assessments, findings, and responses to behavior that occurs in contradistinction to the requirements of the CASA."

This continues to be the case for IMR-6.  Our noted failures of APD oversight, particularly of use of force incidents, during this reporting period, based on our review of material submitted by APD for this reporting period, extend beyond the supervisor and command level and engulf the administrative processes and functions of APD.  During our site visit with APD in preparation for writing IMR-6, we observed a Force Review Board meeting that addressed a case with which the monitoring team was very familiar:  a serious use of force involving a handcuffed prisoner.  Not only did the supervisory, mid-management, and management levels of patrol operations apparently miss the seriousness of this use of force, and miss deliberate attempts to rationalize the use of force by the officer, when APD's investigation into the event was presented at the Force Review Board it resulted in a state of entropy, with no (at the time) findings or recommendations related to the use of force and the agency's response to same.  We are unaware of any action taken directly by APD at this point to address the inappropriate use of force against a handcuffed prisoner.  Nor are we aware of any steps to counsel, reprimand, or discipline the levels of supervision and/or command who simply "missed" an inappropriate and out-of-policy use of force by an APD officer.  This case, perhaps, is the perfect symbol of APD's current problems with oversight of improper use of force:  the agency has a difficult time knowing an improper use of force when it sees it.

### 3.2.3   Building Meaningful Learning Cycles to Spur Developmental Systems for Integrating Training, Supervision, Discipline, and Follow-up Process Development

In IMR-4, the monitor noted:  "Based on the monitor's experience in assessing compliance in other police agencies, the process of compliance requires an integrated approach to organizational development and planned change.  Creation of disparate and un-related individual "systems" simply does not work.  A complete whole is needed to address fully the issues raised in the CASA.  To date, the product produced by the City, and under evaluation at this point in time, appears to be a "collection of parts," as opposed to what is needed:  an integrated system consisting of policy-driven policing, well supervised, carefully self-audited, self-correcting, and evolving along carefully thought-out paths as the policing environment changes, i.e., a learning organization, responding to nascent situational cues in a thoughtful, coherent, integrated manner."  In IMR-5, we noted, again, that "Based on the information we have reviewed for the fifth monitor's report, the APD has yet to forge a concept of what the "complete whole" would look like, and accordingly has not yet forged a holistic approach to reform."

The entropy noted in the Force Review Board session we attended for IMR-6 indicates that nothing seems to have improved relative to APD's ability to recognize improper (or even illegal) use of force used by some of its officers.  This inability or unwillingness extends well into the command level at APD.

14

### 3.2.4  Creating a Culture of Accountability within APD:  Feedback Loops and Trend Analysis

In the monitor's Fifth report, we noted:  "The critical issue confronting the monitoring team and the APD is to identify why critical components of CASA compliance are continually running behind expectations, and, as a result push problems "down-line."  This is particularly critical given the accelerated timeline the City has given itself for compliance with the CASA."

We further noted in IMR-5 that "the one critical thing still missing from APD's compliance efforts is the insistence to carefully and neutrally assess behavior based *against articulated expectations*" e.g., policies and training.  Again, with IMR-6 the monitoring team has noted 'clusters' of mismanaged opportunities to note problematic behaviors related to use of force, to respond to those in a meaningful way, and to articulate those response processes as expected behavior among supervisory and command personnel.

The entropy at APD related to its ability to recognize improper use of when it sees it extends beyond sergeants, lieutenants, and commanders.  It pervades its administrative force-review systems as well:  FIT, CIRT, FRB and other mechanisms designed, purportedly, to identify, "call," and correct improper uses of force.  Based on the monitor's past experience, such failures are cultural, and as such are difficult to exterminate without substantial change at command levels and administrative systems.

A careful reader of the monitor's reports will recall that during IMR-4 we recommended a specific set of assess-and-respond options that would assist APD in meeting the requirements of the CASA.  Few of those have been adopted by the APD at this point.  In IMR-5 we included 324 specific recommendations for APD as it plans responses to issues it confronts.  We view those as long-term recommendations.

As of this reporting period, we consider APD's force management system to be in a severe state of entropy, exhibiting problems that extend well beyond supervision and involve issues of leadership, command reliability, and critical systems support mechanisms such as FIT, CIRT, the Force Review Board, and administrative support mechanisms.  These issues are discussed in greater detail in the treatment of individual paragraphs of Section 4.0, below.

## 4.0  Current Status

As part of the monitoring team's normal course of business, it established a base-line assessment of all paragraphs of the CASA for the Independent Monitor's first report, (IMR-1). This was an attempt to provide the Parties with a snapshot of existing compliance levels and, more importantly, to provide the Parties with identification of issues confronting compliance as the APD continues to work toward full compliance. As such, the baseline analysis is considered critical to future performance in the APD's reform effort as it gives a clear depiction of the issues standing between the APD and full compliance. This report, IMR-6, provides a similar assessment, and establishes a picture of progress on APD goals and objectives since the last report.

## 4.1 Overall Status Assessment

Section 4.1 provides a discussion of the overall status of APD as of the Sixth reporting period.  As of the end of the Sixth reporting period, APD continues to make progress overall, having achieved primary compliance in 97 percent of the tasks it agreed to by implementation of the CASA process with the Department of Justice.  Primary compliance relates mostly to development and implementation of acceptable policies (conforming to national practices). APD is in 71 percent Secondary Compliance as of this reporting period, which means that effective follow-up mechanisms have been taken to ensure that APD personnel understand the requirements of promulgated policies, e.g., training, supervising, coaching, and disciplinary processes to ensure APD personnel understand the policies as promulgated and are capable of implementing them in the field.  APD is in 53 percent Operational compliance with the requirements of the CASA, which means that 95 percent of the time, field personnel either perform tasks as required by the CASA, or that, when they fail, supervisory personnel note and correct in-field behavior that is not compliant with the requirements of the CASA.

Figure 4.1.1, below depicts APD's compliance performance over the last six reporting periods.

Figure 4.1.1 indicates some deceleration from compliance findings exhibited previous monitor's reports, as APD's failure to follow-through on recommendations on those reports have resulted in loss of compliance in some paragraphs for this reporting period.  Again, we cannot emphasize enough that APD needs to stop viewing monitoring reports as "events," ending with issuance of the report, and needs to begin to see this as a process, requiring assessment, planning, and follow-up on each issue identified in each monitor's report.

16

Figure 4.1.1 Percentage Compliance by Reporting Period



## 4.2 Dates of Project Deliverables

Project deliverables are defined by the Settlement Agreement governing the parties' response to the CASA, (DOJ, the City, APD, and the Albuquerque Police Officers' Association (APOA). Each deliverable is discussed in detail below in section 4.7.

## 4.3 Format for Compliance Assessment

The Monitor's Reports are organized to be congruent with the structure of the Agreement, and specifically reports, in each section, on the City's and APD's compliance levels for each of the 276 individual requirements of the CASA.

For example, the monitor's reports will be structured into nine major sections, following the structure of the Agreement:

   I.   Use of Force;

  II.   Specialized Units;

 III.   Crisis Intervention;

 IV.   Policies and Training;

  V.   Misconduct Complaint Intake, Investigation and Adjudication;

 VI.   Staffing, Management, and Supervision;

   VII.   Recruitment, Selection and Promotions;

  VIII.   Officer Assistance and Support; and

   IX.   Community Engagement and Oversight;

All future monitor's reports will deal with each of these nine major areas in turn, beginning with APD's response and performance regarding reporting, supervising, and managing its officers' use of force during the performance of their duties, and ending with APD's efforts at community engagement and its ability to facilitate community oversight of its policing efforts.

## 4.4 Structure of the Task Assessment Process

Members of the monitoring team have collected data concerning the APD's compliance levels in a number of ways:  through on-site observation, review, and data retrieval; through off-site review of more complex items, such as policies, procedures, testing results, etc.; through review of documentation provided by APD or the City which constituted documents prepared contemporaneously during the normal daily course of business.  While the monitoring team *did* collect information provided directly by APD in response to the requirements of the Agreement, those data were *never* used as a sole source of determination of compliance, but were instead used by the monitoring team as explanation or clarification of process.  All data collected by the monitoring team were one of two types:

- Data that were collected by using a structured random sampling process; or

- Selecting *all* available records of a given source for the "effective date."

Under no circumstances were the data selected by the monitoring team based on provision of records of preference by personnel from the City or APD.  In every instance of selection of random samples, APD personnel were provided lists of specific items, date ranges, and other specific selection rules, or the samples were drawn on-site by the monitor or his staff. The same process will be adhered to for all following reports until the final report is written.

## 4.5 Operational Definition of Compliance

For the purposes of the APD monitoring process, "compliance" consists of three parts:  primary, secondary, and operational.  These compliance levels are described below.

- **Primary Compliance**:  Primary compliance is the "policy" part of compliance.  To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA.  As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.

- **Secondary Compliance**:  Secondary compliance is attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the department for doing so.  By definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the agency.

- **Operational Compliance**:  Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff.  In other words, the APD "owns" and enforces its policies.

As is true, in the monitor's experience, with all of these complex organizational change projects, change is never simple or quick.  A great deal of work lies ahead.  The monitoring team is committed to assisting APD command staff by working closely with the APD in forging new, and revising old policies, articulating clear guidelines and practices for APD's intensive training of the department's supervisors and managers, assisting APD in building assessment tools designed to identify problematic behaviors, and advising on "best practices" that can be adapted by APD as it moves forward in its efforts to meet the individual and global requirements of the CASA.

### 4.6 Operational Assessment

The following sections of the Monitor's Sixth Report articulate processes and findings related to each of the 276[4] active elements of the CASA.

The APD and the City have agreed to comply with each of the articulated elements.  The monitoring team has provided the Parties with copies of the team's monitoring methodology (a 299-page document) asking for comment.  That document was then revised, based on comments by the Parties. This document reflects the monitor's decisions relative to the parties' comments and suggestions on the proposed methodology, and is congruent with the final methodology included in Appendix One of the monitor's first report[5].  The first operational paragraph, under this rubric, is paragraph 14, as paragraph 13 is subsumed under paragraph 14's requirements.

### 4.6.1 Methodology

The monitor assessed the City and APD's compliance efforts during the third reporting period, using the *Monitor's Manual*, included as Appendix A, in the monitor's first report (see footnote 7).  The manual identifies each task required by the CASA and stipulates the methodology used to assess compliance.

### 4.7 Operational Assessment

APD's compliance with individual tasks for the sixth reporting is described in the sections that follow.

### 4.7.1  Assessing Compliance with Paragraph 14

Paragraph 14 stipulates:

**"Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:**

**a)    Officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;**
**b)    Force shall be de-escalated immediately as resistance decreases;**
**c)    Officers shall allow individuals time to submit to arrest before force is used whenever possible;**

---

[4] Tasks accruing to the United States or the Monitor were not included in this methodology, as the monitor sees his role as evaluating APD and the City entities supportive of APD in meeting its responsibilities under the CASA.

[5] Available at: https://www.justice.gov/usao-nm/file/796891/download

   d) **APD shall explicitly prohibit neck holds, except where lethal force is authorized;**
   e) **APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject;**
   f) **APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;**
   g) **Officers shall not use force to attempt to effect compliance with a command that is unlawful;**
   h) **Pointing a firearm at a person shall be reported in the same manner as a use of force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and**
   l) **immediately following a use of force, officers, and, upon arrival, a supervisor, shall inspect and observe subjects of force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care. This may require an officer to provide emergency first aid until professional medical care providers arrive on scene."**

## Methodology

APD SOP's related to use of force[6] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained under negotiation until June 2017, when the monitor approved each of the four (4) use of force related policies.  While the policies included substantive structural changes (i.e. The use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain critical topics that have lingered for APD were resolved[7] in terms of policy provisions:  Specifically, 1) "Low Ready" was defined to help clarify what constitutes a reportable show of force; and 2) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated[8] in SOP 2-54-5-B (This

---

[6] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

[7] Our intent here is to list changes to the policies that are relevant to this paragraph and not every policy change that occurred.

[8] Later we comment about our concern that APD leaving a supervisor response to the scene of a show of force up to their discretion as a probable critical shortcoming in their operating procedures.

has definition had been a significant obstacle to APD's compliance efforts).

Over the course of our engagement with APD, our reviews have consistently revealed serious deficiencies in the oversight and accountability process, particularly with respect to force reporting, supervisory-level investigations and chain of command reviews, which we reported in IMR-2, IMR-3, IMR-4, and IMR-5, as well as in a Special Report that was first provided to APD on August 19, 2016.  As detailed herein, the monitoring team was presented with a case during this reporting period that, in our opinion, implicated and amplified deficiencies throughout the entire APD use of force oversight system.  That case, **[IMR6-001]** was of such significance to the monitoring team that it had a direct impact on the team's approach to assessing multiple paragraphs.

During IMR-5 we introduced Tabular reporting of data, which we used in great measure to provide operational feedback on use of force reporting and case reviews.  In keeping with past activities, the monitoring team requested use of force report ledgers, use of force reports and related materials to conduct case reviews that would serve as an additional assessment of APD's progress.  Ultimately, for IMR-6 the monitoring team did not conduct case reviews for the following reasons:

1.  During this reporting period the monitoring team learned, for the first time, that APD has not been accurately reporting the total number of use of force cases.  In preparation of past reports the monitoring team requested a list of use of force and show of force cases that occurred during a specific timeframe.  From that list of cases, the monitoring team would select a random sample of cases to review.  We uncovered the fact in May 2017 that APD was only reporting those serious use of force cases that were closed, not all cases that were reported.  That shielded the fact that there were numerous cases pending[9] and those cases left significant gaps in the data available to the monitor.  This "force gap" also raised serious questions as to why cases were pending for such extended periods of time.

2.  We met with the Chairperson of APD's Force Review Board (FRB) during our June 2017 site visit.  At that time, we alerted him to the use of force reporting data discrepancy and the fact that the monitoring team had not been provided accurate data for the past five monitoring periods.  During our meeting, we asked if the 10% sample of supervisory use of force cases the FRB reviews is from the entire list of cases, or only those that are completed.  We learned that neither he, nor another command level representative of the FRB, knew that the FRB was not reviewing a 10% sample of all use of force cases.  In fact, it took an APD analyst to come to the meeting to make them aware of this fact.  Such a lack of operational awareness at the highest levels

---

[9] We learned that some supervisory use of force cases were still pending and in the chain review process 4-5 months after the original event occurred.

of APD is more than a bit troubling to the monitor. The ten percent FRB sample was approved by the monitor in advance. What concerns us is that leadership of APD seems to be unaware of the fact that they are only reviewing a "sample" of a "sample," e.g. ten percent of completed cases, and not the complete universe of serious use of force complaints. Further, it appears there is no meaningful administrative review of supervisory use of force investigations. We noted in IMR-5 clear and distinct failures at the supervisory and command levels of APD. That failure extends now to the highest levels of the organization.

3. There is a significant backlog of supervisory use of force investigations dating back to at least January 2017, which effectively prevents the monitoring team from making an objective assessment of the investigative outcomes since the cases are not submitted and complete. Arguably, cases that are incomplete for extended periods of time are of greater interest since they may reveal deficiencies from many different perspectives.[10] Nonetheless, the process established by APD was substantively different from the process suggested by the monitoring team when we first discussed sampling methodologies with APD. This system needs a serious and substantial "reset" before monitoring team review of use of force cases will be accurate and meaningful.

4. APD has received more-than-extensive feedback over the course of the past two years on the quality of their force reporting and investigation capabilities. There is a trove of information they can consider, so providing more similar feedback seems unnecessary for this reporting period. To date many of the lessons learned and reported to APD from our review of sampled cases have gone un-assessed and un-responded to by APD, so these exercises are, unfortunately, of little value at this point in time.

5. Follow-up activities by APD associated with past feedback the monitoring team has provided has been, and continues to be, deficient in the extreme. One would not be exaggerating to label follow-up as deliberately non-responsive.

6. APD training gaps still exist, and as of the date of this report, complete, focused, and highly defined feedback provided to APD about its training processes (particularly related to use of force) has been virtually ignored by APD. As a result, the organization is still not in Secondary Compliance on many paragraphs related to use of force. This, by definition, precludes assessment of Operational Compliance relating to use of force processes, which cannot be evaluated for this reporting period. Use of force case reviews, especially given APD's substantial resistance to following up on advice provided by the monitor, have been repetitive for the last five reports,

---

[10] As of August 1, 2017, none of the reported supervisory use of force cases for the months of May, June or July 2017 were completed.

with the same problems being noted over and over, and with APD seemingly refusing to remedy issues brought to their attention.

7. APD has introduced the concept of "*De Minimis* force" that we believe will have a direct and negative impact on APD's compliance in force reporting, as well as investigating and oversight of uses of force. We note that this concept was introduced merely as a definition with no observed policy, procedure, appropriate training or implementation modalities supporting the change. We have long argued that this type of policy promulgation is a recipe for failure. This, in and of itself, violates hard-won "practice" modifications at APD based on the monitoring team's provision of unprecedented (in the monitor's experience) technical assistance and coaching on the use of force issues confronting APD. As an example of the difficulties engendered by this insertion of a poorly defined concept, we note that APD began training on the concept in January 2017, even though the "*De Minimis"* force definition was not approved by the monitor until June 2017. This violates every accepted training practice known to the monitor. The *sine qua non* of every effective function is that it first must be underpinned by acceptable policy before training begins. We are befuddled by APD's process on this point, given that we provided models of effective course planning and description processes early on in the monitoring process.

8. APD has presented a case **[IMR6-001]**, that involved both a use of force and a serious use of force. That case was mishandled from the initial event up to and including the FRB review of the case.[11] The case represents an indictment of the effectiveness of APD's entire use of force oversight and accountability system, to include IA.[12] To date, we have accurately and copiously noted APD's failures relating to use of force investigations and process. Adding more copiously annotated "notice" is not an effective use of the monitoring team's time, until such time that APD exhibits an ability to do something about the critical issues we note in our reports. To date that ability seems to have been deliberately suppressed.

9. Following IMR-5's feedback and the monitoring team's June 2017 site visit we believe APD is currently re-assessing its entire force reporting system. We will reserve comment on individual cases until we receive the APD's recommendations regarding that re-assessment.

A more comprehensive explanation is provided in the Paragraph 14 Opening section of this report.

---

[11] Following the FRB meeting the monitoring team met with several APD commanders that described the FRB meeting, and the handling of this case, as "embarrassing" and a "complete debacle".

[12] Details surrounding **[IMR6-001]** are provided elsewhere within this report.

**Results**

In the past, APD has been given extensive feedback and technical assistance concerning their inability to effectively report, track, and investigate legitimate use of force cases.  In the monitor's experience, which now covers reform at four different agencies, the Los Angeles (CA) Police Department, the Pittsburgh (PA) Police Department, the New Jersey State Police and the APD, APD's response to that feedback has been deliberately indifferent.  Likewise, the monitoring team have predicted many of the issues APD has, and is, encountering.  None were more prevalent than when we alerted APD to significant deficiencies in its use of force training in early 2016.  This "alert" has gone un-remedied to this day, despite repeated discussions with APD's training command about these difficulties over the past 18 months.  It is not surprising to the monitoring team that APD has continued to struggle during this monitoring period, since in our opinion many supervisors and command personnel continue to view their activities (related to force and organizational accountability) through the same lens that got them into their current situation in the first place.

APD retained its Primary Compliance on all the requirements set forth in this paragraph with the monitor's approval of APD's use of force suite of policies in June 2017.  The monitoring team made three separate data requests related to this paragraph and reviewed submissions that APD made in response to those requests.    The data submissions consisted principally of training materials and records, and in response to our third request a number of use of force case files were provided.  First, the information provided was reviewed by the monitoring team to determine if the specific training gaps that were identified in IMR-5 (and prior) were remediated through supplemental training.  As delineated in Paragraphs 86–88, some training gaps were closed and others were opened during this reporting period.  As such, APD has not yet achieved Secondary Compliance with this paragraph.  We are now in the third year of this project, and to have training gaps remain that were noted to APD early on in the monitoring process is inexplicable.  We can only view this discrepancy as deliberate, given the number of warnings, the amount of coaching provided, and the number of "mentions" in previous reports.

A specific treatment of "pending" training compliance areas are made in Paragraphs 86 through 88, below.

An area that has lingered with APD policy and training compliance has centered on show of force procedures and clarifying the term "low-ready".  As noted above, the use of force suite of policies has been approved, and those policies included definition refinements and procedures for the report and investigation of show of force cases.  The monitoring team has reviewed these procedures and noted that APD has left to the discretion of supervisors whether they will respond to the scene of a show of force.  During our June 2017 site visit the monitoring team expressed concern over this provision of the policy, and we offer technical assistance again here as a cautionary message.  The ability to

25

remotely screen events and ensure that a proper assessment of facts is a technical skill that requires a great deal of knowledge, experience and focus. Knowing what probing questions to ask to ensure that a full, accurate and clear picture of an event is gathered by a supervisor, is not a strength of APD supervisors at this point in the APD reform process.  As with other issues the monitoring team has noted, we are concerned that allowing supervisors the latitude to decide whether to respond to a reported show of force may create "blind spots" to proper oversight.  Those "blind spots" may create Operational Compliance issues down the road for APD.   In our experience, the axiom in police reform is "trust but verify."  In our work with APD since mid-2015, it is clear that APD has prodigious amounts of trust in its supervisors, but has insufficient policy, training and practice to verify that trust.  This continues, despite warnings to APD command by the monitoring team highlighting weak policy, procedure and process among its supervisory levels (see IMRs 1-5).

During past reporting periods the monitoring team conducted in-depth reviews of APD use of force cases that involved various types of force. The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  For IMR-5 the monitoring team conducted in-depth case reviews for this paragraph and then calculated a compliance rate for sixteen (16) use of force cases that was 81%.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions have a direct and serious negative impact on APD's Secondary Compliance status for this reporting period.  Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and additional work is needed to bring all related use of force training into alignment with the CASA.

Primary: **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.1a:  We reiterate that APD should develop and implement a comprehensive training plan to simultaneously address all training gaps that are delaying Secondary Compliance.***

***Recommendation 4.7.1b:  Training for downstream units, such as CIRT, FIT, etc. should also be assessed in light of the persistent failures we have noted in IMRs 3, 4, and 5.***

### 4.7.2   Assessing Compliance with Paragraph 15:  Use of Force Policy Requirements

Paragraph 15 stipulates:

**"APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices. The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal, that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units. The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate. The use of force policy will incorporate the use of force principles and factors articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability.**"

### Methodology

APD SOP's related to use of force[13] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016.  During past site visits we met with representatives of APD and communicated our concerns for certain critical omissions in their policies and how APD must reconcile those issues to properly influence field performance of its officers and supervisors.  APD policy has been silent to certain crucial topics (i.e., Distraction Strikes) until very recently, and we have cautioned that once the issues were resolved in policy, meaningful training must follow. During its November 2016 site visit, the monitoring team met with APD personnel and city attorneys to discuss their policy development process and modifications APD intended to propose for their use of force suite of policies; however, we specifically centered our attention on SOP 2-52. At that time, we were told that APD intended to include many of the recommendations we made during a June 2016 site visit.  The update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally approved each of the four (4) use of force related policies.  While the policies included substantive structural changes (i.e., The use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain critical topics that have lingered for APD were resolved[14] in terms of policy provisions:  Specifically, 1) "Distraction Technique" was included and recognized as a reportable use of force; 2)

---

[13] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

[14] Our intent here is to list some of the more critical changes to the policies and not to list every policy change that occurred.

"Low Ready" was defined to help clarify what constitutes a reportable show of force; 3) "Neck Hold" was further defined and clarified; 4) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated in SOP 2-54-5-B (This has been a significant obstacle to APD's compliance efforts); and 5) A term, "*De Minimis* force" was introduced to APD policy[15].

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that these policy revisions were introduced while APD remained in non-compliance, APD's Secondary Compliance status for this reporting period was impacted.

The monitoring team requested information from APD to determine if they closed the gap on training issues that were identified and documented in IMR - 5. In preparation of this report the monitoring team requested a host of training materials centered on determining whether APD had reached Secondary Compliance.  The status of APD training gaps related to use of force and supervisory force investigations have been reported on extensively in paragraphs 86 – 88.

## Results

During the monitoring team's June 2016 site visit, we identified a set of concerns that impacted Secondary Compliance.  We communicated our concerns extensively in numerous communications[16] leading up to, during, and after the delivery of APD's 2016 40-hour Use of Force and 24-hour Supervisory Force Investigation Courses.  Since APD left certain policy provisions unclear, and other provisions were not developed (i.e. Show of Force procedures), Secondary Compliance was not achieved until supplemental training was developed and delivered to clarify those provisions.[17]

During one site visit the monitoring team sat through the 40-hour course to assess compliance and to assess the quality of the training. Likewise, the monitoring team has previously reviewed videotaped portions of the 24-hour supervisory use of force course.[18]   Following our

---

[15] This concept was introduced, strangely enough, by insertion into the "definitions" section of the Use of Force main policy.  We also note that the "De Minimis" force definition was included at the last possible minute, and included no examples or structured *policy* to guide implementation.

[16] We provided technical assistance through emails, memorandum and in person meetings on numerous occasions.  We have also recommended that APD develop a comprehensive training plan in the past four monitor reports.  To date, we have been provided no evidence that APD has completed a comprehensive organizational training plan.

[17] The areas of concern have been communicated to APD on several occasions both before, during and after the delivery of the courses that are cited.

[18] This course occurred outside a normal site visit.  It was through the review of the videotaped 24-hour Supervisory Use of Force Course that we found blocks of instruction not associated with

review of the 40-hour training course we met with and discussed specific concerns that we had with the training curriculum content and delivery. APD was responsive to the feedback and adjusted the training curriculum midstream.  We cautioned then that by doing this APD created two populations of people, one that received the original curriculum and the second that received updated material.   We alerted APD, at that time, that it would be critical for them to identify those two populations of people and determine how they would mitigate the inconsistent information delivered to the two groups.   We have asked APD to provide information that demonstrates they have made efforts to distinguish the two populations of people, but to date have been provided no data that delineates what specific training (i.e., Lesson Plans, etc.) APD officers received during its 2016 training programs. Issues such as these inform the treatment of supervisory training in Paragraph 209.  This fits a long-standing pattern at the Training Academy, of seeming to note our concerns, but failing to respond to them.  We note here, for example, the Academy's continued refusal to respond to our discussions, document production, and suggestions related to preparing Academy lesson plans in a manner reflective of national standards and practices, i.e., appropriately constructed lesson plans that follow accepted practice (see for example, the Law Enforcement Management Institute's "Developing Effective Lesson Plans for Training Law Enforcement," Northwestern University's "Training the Teachers for Police …Training" lesson plan, etc.  The monitor has personally provided the training academy director with the CALPOST (California Police Officer Standards and Training) lesson plan for cadet training.  Despite all of this technical assistance, we find that APD's academy "lesson plans" are simply outlines of the "talk" to be given, absent any performance standards, measurements to ensure learning has taken place, or listing of resources to be used.  We provided our first TA to the Academy on this gap in 2015.  Two years later we see virtually no results of our multiple attempts to get acceptable lesson planning processes integrated into Academy training product.  At this stage, we can only consider this significant and troubling refusal as deliberate.

In IMR-4 and IMR-5, in our work related to this paragraph, we listed four separate pending training issues that have been left unresolved.[19]   The training gaps remain, but APD is making strides to close those gaps. We cannot stress more emphatically that APD should develop a comprehensive organizational training plan that collects all unresolved training issues, and identifies appropriate responses to same.  In our

---

the topic, instructors including information not contained in lesson plans and ad hoc comments inconsistent with the CASA.  These items were all reported in IMR – 4.
[19] We noted numerous other training gaps in other paragraphs and collected them in Paragraphs 86-88.

opinion, only then will APD be able to clearly demonstrate they have met the training requirements to achieve Secondary Compliance.  Thus far, APD has approached training remediation in a disconnected, haphazard and non-strategic manner. Those open training gaps from IMR-5 are serious, and included:

1. Show of Force – APD's definition of a show of force, and "low-ready" needed to be remediated through training.  To wit: Show of force procedures and pointing a firearm at a person and "acquiring a target" had not been addressed and remediated through training. Procedures have been implemented, and some training has occurred following the approval of APD's use of force suite of policies, but we provide a cautionary note to APD concerning their procedure of allowing an APD supervisor the discretion of responding to the scene of a show of force.  We see this as a potential operational issue and comment more extensively on our concerns elsewhere in this report.

2. TWO SCOTUS firearms cases were included in the instruction of the 40-hour Use of Force training, though they do not align closely with APD use of force policy. In response to our comments in IMR-4 and IMR-5, we were provided with an APD interoffice memorandum, dated October 24, 2016, from the instructor of that block of instruction. Instead of taking cognizance of the feedback provided by the monitoring team, and simply mitigating the issue with some form of supplemental training, APD provided this memorandum to justify the initial delivery of the training.

3. Distraction Strikes – As we previously noted, there was significant confusion about the place of a distraction technique in APD's tactical array and its classification as a reportable use of force.

4. Un-resisted handcuffing and escort holds required further clarification.  As noted in IMR – 4 and IMR - 5, the term "secondary action" was used in APD's 2016 24-hour Supervisory Use of Force Investigations Curriculum in an attempt to demarcate the point at which those two techniques escalate to a reportable use of force or a serious use of force.  While "secondary action" was not defined in policy or procedures, APD may have been on the right track by using that term.  Instead, APD has pivoted to the adoption of the term "De Minimis force" in its use of force assessents.  We write extensively in Paragraphs 86-88 on APD's adoption of this concept and how it has created significant enough training gaps to keep APD out of Secondary Compliance.

With the monitor approval of APD's use of force policies we find APD to be in Primary Compliance. We have written previously of APD's propensity to train to "proposed policy revisions", and have cautioned against that practice.  We noted that type of activity continued during this reporting period.  APD continues that practice, which we have seen in no other police department, to this day.  The monitoring team reports its impression of APD training overall in Paragraphs 86-88.  Any training of "proposed policy revisions" was not considered when determining if a past training gap was remediated or that a new policy provision was properly delivered through training.  (We note, well past the point of tedious repetition, that training without proper policy, procedure, and planning is not an accepted modality.)  We have alerted APD on several occasions that until a policy is written and approved, training will not count toward Secondary Compliance.  To accept training of organizational policies in that manner would be inconsistent with widely recognized training standards and would be the endorsement of a broken business process.  We simply refuse to do so, and have advised APD repeatedly of that fact.

As documented extensively in Paragraphs 86-88, APD will not achieve Secondary Compliance until open training issues (enumerated above and in other sections of this report) are settled with appropriate supplemental training.

As we noted in IMR-5:  "Issues such as these inform the treatment of supervisory training in Paragraph 209. The reader is reminded of the differences in training for patrol officers (addressed here) and for supervisory personnel (addressed in Paragraph 209)."  We have found, and still find, APD's training academy deliberately resistant to national practice on this point.

> Primary:      **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.2a: Develop an organization-wide training plan that contemplates all identified training gaps.  Based on that plan, and any other training needs that are identified, develop an audience appropriate curriculum to close all the pending gaps we have identified in this report.  This recommendation continues, having not been addressed since it was made in IMR-5.***

***Recommendation 4.7.2b:  APD should immediately cease the practice of training "proposed policy revisions".  This recommendation continues, having not been addressed since it was made in IMR-5.***

***Recommendation 4.7.2c: APD should adopt the CASA language of "anything above un-resisted handcuffing" into its use of force***

*calculus to better delineate the type of activities that constitute a reportable use of force.  That language should be included in APD policies and training.*

*Recommendation 4.7.2d: Any APD training centered on "De Minimis force" should include practical scenarios, video and case reviews, and include "lessons learned" from APD use of force cases.  The training program should include a legitimate mechanism to measure a transfer of knowledge in the classroom and pre-established field implementation measures.*

### 4.7.3 Assessing Compliance with Paragraph:  Weapons Protocols

Paragraph 16 stipulates:

**"In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below. The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy."**

### Methodology

APD SOPs related to use of force[20] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016.  During past site visits we met with representatives of APD and communicated our concerns regarding certain critical omissions in their policies and procedures, and how APD must reconcile those issues to properly influence field performance of its officers and supervisors.  APD policy had been silent regarding certain crucial topics (i.e. Show of force procedures, and the proper instruction of "low-ready" weapon positions) and we cautioned that once the issues were resolved in policy, meaningful training must follow.  During its November 2016 site visit, the monitoring team met with APD personnel and city attorneys to discuss their policy development process and the modifications APD intended to propose for their use of force suite of policies.   We were told that APD intended to include many of the recommendations we made during a June 2016 site visit.  The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies.  While the policies included substantive structural changes (i.e. the use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain critical topics that have lingered for APD were resolved[21] in

---

[20] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".
[21] Our intent here is to list changes to the policies that are relevant to this paragraph and not every policy change that occurred.

terms of policy provisions.  Specifically, 1) "Low Ready" was defined to help clarify what constitutes a reportable show of force; and 2) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated[22] in SOP 2-54-5-B (These have been significant obstacles to APD's compliance efforts).

**Results**

Notwithstanding concerns with some elements of APD training, in IMR-4 the monitoring team found that APD is in both Primary and Secondary Compliance on the requirements in Paragraph 16.  APD will retain Secondary Compliance status, but as we note elsewhere, with the promulgation of new policies and investigative procedures related to "show of force" APD must now communicate those provisions through effective training.  We will look to the IMR-7 reporting period to ensure APD has communicated the new policy requirements to its personnel.  Operational compliance will require evidence that APD is thoughtfully, routinely and effectively responding to events not in compliance with use of force requirements that should be noted and corrected at the field (sergeant's) and managerial (lieutenant and commander) level.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.3a:  Ensure new procedures are appropriately trained to retain Secondary Compliance.***

### 4.7.4 Assessing Compliance with Paragraph 17:  Weapons Modifications

Paragraph 17 stipulates:

**"Officers shall carry only those weapons that have been authorized by the Department. Modifications or additions to weapons shall only be performed by the Department's Armorer as approved by the Chief. APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons."**

**Methodology**

The monitoring team reviewed more than two hundred entries on APD's SharePoint database for supervisors' monthly inspection reports.  No indications were found regarding an officer carrying non-agency or altered/modified firearms or ammunition. Based on the information provided to the monitor to date, APD

---

[22] Later we comment about our concern that APD leaving a supervisor response to the scene of a show of force up to their discretion as a probable critical shortcoming in their operating procedures.

appears to have adopted recently a formalized audit/review/reporting policy or process for these data.

**Results**

The City's comments on this paragraph, as well as paragraphs 18 and 19 indicate a need for "clarification on how this assessment relates to the compliance definition and sources" from the Methodology.  The "sources" identified in the Methodology are:  policy, training, officer-supervisor use of force statements, OBRD reviews, and supervisor use of force statements and field observations.   The monitor makes note of no formalized audit/review/reporting or process for inspections of authorized and non-modified weapons.

Secondary Compliance would require APD to be able to point to specific *training* for supervisors related to how they are expected to review this requirement (by roll-call inspection, by "drive-by" in-field inspections, by OBRD review comments, etc.)  Despite specific requests, the APD has not provided the monitoring team with documentation of any APD training, policy or other mechanism currently established to effect such inspection, review, and remediation, other than some policy and practice processes that require after-the-fact official inspection of firearms used in officer-involved shootings.  After-the-fact inspections are not routinely viewed as acceptable policy implementation.  Further, we note no internal audit of these after-the-fact field supervisory inspections.

In effect, we have no documentation that APD has changed this process or provided any type of training to supervisors regarding the inspection process or documentation of same, since our report in IMR-5.

We note with concern that the Department's performance on this issue is unchanged since our site visit for IMR-5, despite clear articulation to the department regarding the problematic nature of their process for compliance with this paragraph, which was clearly noted in IMR-5.

Primary:        **In Compliance**
Secondary:      **Not In Compliance**
Operational:    **Not In Compliance**

*Recommendation 4.7.4a: APD should evaluate modalities for developing formal audit/review/reporting policy for "carry and use" assessments and inspections regarding modified or altered weapons outlined in this paragraph, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work (CSW)[23].*

---

[23] The monitor has provided APD with an example of CSW applied to law enforcement issues, and recommends this format be followed in all CSW recommendations contained in this—and future—reports.  All suggested CSW documents should be submitted to, and reviewed and annotated by, the Chief of Police prior to submission to the monitor.

*Recommendation 4.7.4b: APD should develop formal policy, training, supervision, inspections and audit, and response modalities to ensure conformance and compliance processes with this paragraph.*

*Recommendation 4.7.4c: APD should transition to a routinely reported "inspections and audit" process responsive to this paragraph's requirements.*

### 4.7.5 Assessing Compliance with Paragraph 18:  On-duty Weapons

Paragraph 18 stipulates:

**"Officers shall carry or use only agency-approved firearms and ammunition while on duty."**

### Methodology

The monitoring team reviewed hundreds of entries on APD's SharePoint database for supervisors' monthly inspection reports.  No indications were found regarding an officer carrying non agency-approved firearms or ammunition. Based on the information provided to the monitor to date, APD appears not to have a formalized audit/review/reporting policy or process for this data. While APD reports "inspections" we see no evidence of any organized system of tracking, analyzing or responding to issues when noted.  The existing "system" suffers from incomplete documentation and tracking.

### Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not in Compliance** |
| Operational: | **Not in Compliance** |

*Recommendation 4.7.5a:  APD should evaluate modalities for developing formal audit/review/reporting policy for "carry and use" assessments and inspections regarding modified or altered weapons outlined in this paragraph, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work.*

*Recommendation 4.7.5b: APD should transition to a routinely reported "inspections and audit" process responsive to this paragraph's requirements.*

### 4.7.6 Assessing Compliance with Paragraph 19:  On Duty Weapons

Paragraph 19 stipulates:

**"APD issued Special Order 14-32 requiring all officers to carry a Department- issued handgun while on duty. APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns."**

### Methodology

Paragraph 19, sub-section b) requires APD to provide sufficient training courses to allow officers to gain proficiency and meet qualification requirements.  During the June 2017 site visit, members of the IMT attended firearms training.  APD Range Staff have changed range hours to enable officers to practice firearms in a low-light environment and integrated monitoring team recommendations into its policy and procedures.  During the last reporting period, the monitoring team found documentation of at least 2 officers who failed to qualify and then failed an immediate requalification attempt.  These officers were ordered to surrender their firearms and police vehicles and placed in an administrative position until they returned to the range to qualify.  Additionally, documentation was found that officers failing to qualify with rifle or shotgun were required to surrender the firearm until they returned to the range to qualify.  The monitoring team sees this as a positive example of a staff making changes in order to meet the requirements of the CASA.  We note that during this reporting period, the monitor approved a "Special Order" clarifying established procedure on this process, and take this as a positive sign.

Paragraph 19, sub-section c) requires APD to develop a protocol to "track and control the inventory and issuance of handguns."  The monitoring team was provided a copy of an Interoffice Memorandum from an APD Fiscal Officer to the APD Planning unit, dated January 8, 2016, that verified that the required tracking system is fully in place.  APD also continues to work with the City Department of Technology to upgrade the current system to enhance security and streamline annual inventory procedures.  During future site visits, the monitoring team will meet with the appropriate personnel and conduct a walk-through of the system to further validate and/or elevate compliance levels under the planned new system.

The monitoring team also reviewed APD Administrative Order 3-75 Department Property, dated November 6, 2012, which set forth detailed procedures for the issuance and control of Department property,

including all items within the Department's Tactical Array. APD has reviewed and updated this order to ensure that it is consistent with any changes to related policies and CASA requirements.

**Results**

A database for the Supervisors Monthly Inspection Report has been created and is in use by APD Supervisors.  Monthly firearm inspection is included in this database; however, APD has not created a review/audit/reporting process for the data**.**  Collecting the inspections into a database is only the first step. The monitoring team expects APD to utilize the data to identify and correct violations of policy, if any.  This would be required to attain Operational Compliance.

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

*Recommendation 4.7.6a:  APD should evaluate modalities for developing formal audit/review/reporting policy for "on duty weapons" assessments and inspections regarding modified or altered weapons outlined in this paragraph, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work.*

*Recommendation 4.7.6b: APD should transition to a routinely reported "inspections and audit" process responsive to this paragraph's requirements.*

**4.7.7 Assessing Compliance with Paragraph 20:  Weapons Qualifications**

Paragraph 20 stipulates:

**"Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year. Officers who fail to qualify on their primary weapon system shall complete immediate remedial training. Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify. Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment.**"

**Methodology**

Members of the monitoring team reviewed firearms training records related to this paragraph.  It was discovered that on May 9, 2017—4 officers failed to qualify and records indicated a requalification attempt the following day, in violation of the CASA requirement of immediate remedial training.  The Academy Commander explained that extreme weather conditions prohibited an immediate requalification and the next day, all officers re-qualified.  The monitoring team finds this to be an acceptable explanation for the incident, but suggest that APD document future similar incidents on the requalification sheet showing the reason for dates other than "Immediate remedial training".

**Results**

Based on the CASA requirements and recommendations of the monitoring team, the APD Firearms staff have made commendable strides in their efforts to train, retrain, document and evaluate their operation.  During the monitoring teams site visit to the APD range, we met a professional staff open and willing to explain any issues and accept recommendations. APD Firearms Training for the 2017 cycle has been completed, excluding the personnel on various types of leave: medical, military, etc.  The monitoring team finds APD in continuing compliance with the requirements of this paragraph.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

### 4.7.8 Assessing Compliance with Paragraph 21:  Firearms Training

Paragraph 21 stipulates:

**"APD training shall continue to require and instruct proper techniques for un-holstering, drawing, or exhibiting a firearm."**

**Methodology**

APD SOP's related to use of force[24] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016.  During past site visits we met with representatives of APD and communicated our concerns for certain critical omissions in their policies and procedures, and how

---

[24] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

APD must reconcile those issues to properly influence field performance of its officers and supervisors.  APD policy has been silent to certain crucial topics i.e. Show of force procedures, and the proper instruction of "low-ready" weapon positions, and we cautioned that once the issues were resolved in policy, meaningful training must follow.  During its November 2016 site visit, the monitoring team met with APD personnel and city attorneys to discuss their policy development process and modifications APD intended to propose for their use of force suite of policies.   We were told that APD intended to include many of the recommendations we made during a June 2016 site visit.  The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies  While the policies included substantive structural changes (i.e. The use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain critical topics that have lingered for APD were resolved[25] in terms of policy provisions:  specifically, 1) "Low Ready" was defined clearly to help clarify what constitutes a reportable show of force; and 2) "Show of Force" was more clearly defined and supervisor investigative responsibilities relating to Show of Force events were delineated[26] in SOP 2-54-5-B (This has been a significant obstacle to APD's compliance efforts).

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  In preparation of this report the monitoring team requested a host of training materials centered on determining whether APD had reached Secondary Compliance.  While training to incumbent police officers is crucial, we additionally saw the need to train academy cadets to new policy provisions as well.  We specifically requested the following[27]:

a. Provide any changes that have been made to the academy's lesson plan entitled, "Handgun Training and Certification".

b. Copy of any COB documentation (Staff Work) related to paragraph 21 compliance, outlining compliance issues and developing recommendations to remedy those activities.

c. Copy of the current academy lesson plan that teaches holstering, un-holstering and low-ready.

---

[25] Our intent here is to list changes to the policies that are relevant to this paragraph and not every policy change that occurred.
[26] Later we comment about our concern that APD leaving a supervisor response to the scene of a show of force up to their discretion as a probable critical shortcoming in their operating procedures.
[27] Training materials provided by APD relative to Paragraphs 86 – 88 were also reviewed.

d.  Copy of academy attendance and performance records (For any cadet classes in this time frame) that correlate training of that lesson plan (Daily recruit schedules and performance reports)

APD's monitor approved Use of Force policy covers the requirements of this paragraph.  The monitoring team reviewed Basic Academy lesson plans for the 117th and 118th Cadet classes. The first, entitled, "Handgun Training and Certification – Instructor Guide" was prepared by the APD Academy staff. We also reviewed a "2016 Revision - Basic Firearms" lesson plan which was prepared by the New Mexico DPS Training Center. In addition, we reviewed firearms handling performance records of Academy cadets, which included remediation comments by Academy instructors when there were identified performance deficiencies. During our June 2017 site visit, members of the monitoring team met with Academy staff who are responsible for implementing the provisions of this paragraph. As with past visits we found the Academy staff to be engaged and fully committed to their work.

**Results**

The lesson plans that we were provided break down the various steps for holstering, drawing, exhibiting a firearm, and placing a firearm in a "low-ready" position.  As we noted in IMR-5, during academy classes, cadets are required to pass a Limited Scope Performance Test (LSPT) where they must demonstrate their proficiency in this area.  The LSPT is a practical examination where each cadet is expected to demonstrate their skills, and is provided two opportunities to do so while being observed by an academy instructor. The results of the instructor's observations are captured on a performance scoring sheet, where instructors indicate whether a cadet passed a performance competency on the first or second attempt, and provide written comments where necessary. The monitoring team reviewed training records for 34 cadets of the 117th class and found that 34 of the 34 (100%) cadets passed the performance competencies on either the first or second attempt.[28] Throughout the training records the monitoring team saw examples of the academy documenting cadets needing more than one attempt to pass different performance competencies, and examples of instructors providing comments of their observations of a recruit's performance.

We note that within the lesson plan we reviewed was the definition of "low ready" which, as noted in IMR-4 and IMR-5, has had direct relevance to APD's performance with respect to show of force.   As noted in IMR-4 and 5, the APD lesson plan is clear that a "low-ready" position means "…

---

[28] The tests were conducted on February 17, 2017.  We note that similar records for the 118 the class were not available for monitor review.  We saw similar records and results for the 116th class during the IMR-5 reporting period.

The handgun is driven forward and downward at an approximate 45 degree angle (below the level of the feet of the target, or so the muzzle does not cover anything you have made the decision to destroy), depending on the proximity to the suspect being challenged, or the terrain being searched."[29]  Now that the definition of "low-ready" and show of force reporting and investigation procedures are codified in SOP 2-54 and 2-55, those provisions need to be addressed through training for the entire population of APD officers, since they are clearly methods of "exhibiting" a firearm. Since the policies were approved in June 2017, any "proposed policy provisions" that were trained by APD before the monitor approved the policies was not accepted. To do so, would be to endorse a training business process that is inconsistent with national standards. APD's propensity for training programs that include anticipated policy changes has been addressed in Paragraphs 86-88.  We consider this to be a serious flaw in training process, and know of no other police agency in the United States that allows such risky and erratic training processes.

> Primary:          **In Compliance**
> Secondary:   **Not In Compliance**
> Operational:  **Not In Compliance**

***Recommendation 4.7.8:  APD should train all academy cadets and incumbent officers on the new approved policy provisions related to show of force, show of force investigation procedures and low-ready position.  Training before approved policies are available is remarkably risky, and exposes APD to certain and inevitable litigation risks.***

### 4.7.9 Assessing Compliance with Paragraph 22:  Firearm Discharges from Moving Vehicles

Paragraph 22 stipulates:

**"APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person. Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle."**

---

[29] The monitoring team noted that the definitions are different between the policy and lesson plan, but did not see the difference as significant.

**Methodology**

In IMR – 5 we recommended that APD "…*produce a piece of Completed Staff Work assessing why it has been unable to meet the requirements of paragraph 22, and recommending a way forward on this critical oversight paragraph.  The CSW should be presented to the Chief of Police for review, comment and action.*"  Therefore, in preparation for this report we submitted three separate data requests for the following type of information:

During our June 2017 site visit we were advised that APD *intended* to develop a mechanism to capture and record instances of firearms discharges related to vehicles. We were provided no COB "proofs" of record keeping as articulated by the CASA for this paragraph.

In response to our first data request, APD submitted a copy of its expired SOP 2-52 Use of Force policy, which certainly does not meet our request—in spirit or in fact.  In response to our third request the monitoring team was provided two separate items to review. The first, was a "ledger" that displays discharged firearms at/from a motor vehicle and included three separate APD cases ranging from June 2016 to January 2017. Also, the monitoring team was provided a series of screenshots from its IA Pro system to demonstrate that APD is capturing information relevant to this paragraph. What the monitoring team was not provided was a piece of "completed staff work".  In short, compliance efforts related to this paragraph for this reporting period were haphazard, incomplete, incoherent, and inconsistent.  We are befuddled by this ineffectual response to a clear and articulated serious flaw in APD's compliance efforts.

**Results**

We have previously reported our concern at the lack of record keeping for "firearms discharges from moving vehicles," as articulated by the CASA. That lack of routinized record keeping and reporting could expose APD to the vagaries of "narrative report review" as its only mechanism to identify, review, assess, categorize, and report various firearms discharges. APD's failure to put time toward a "completed staff work" process demonstrates one of two things: 1) They do not understand the value of that type of critical assessment and approval process, or 2) They do not intend to use the product of that type of critical assessment and approval process.  When the monitor makes this type of recommendation, it is not just an administrative exercise to create "busy work".  Approaching tasks through systematic means can many times reveal critical shortcomings for an organization within processes they have in place that may have a direct impact on the issue at hand.  Departmental needs can be better assessed.  There was no specific requirement that APD follow the

recommendation of the monitor; however, we will refer to that recommendation should there be shortcomings with any system APD puts in place to capture information relevant to this paragraph.  Again, we refer APD to a plethora of sources on completed staff work, including, but not limited to: GovernmentLeaders.org's outline at http://govleaders.org/completed-staff-work.htm .  A simple Google search will provide APD with more than 15 million "how to" resources on this topic.  We are befuddled by APD's continued failure to follow up on our recommendations for meaningful work on this topic, as firearms discharges at moving vehicles is prohibited by the CASA, and presents serious liability, training, supervision, and leadership issues in policing. At this point we judge this non-compliance to be deliberate.

The ledger that was provided included notations in the final column that included, "Vehicle was in motion, offender pointed gun at officer, officer returned fire while in motion, offender not hit" **[IMR6-044]**; "Vehicle Pit, offender fired rounds at officers, officers returned fire at offender in vehicle" **[IMR6-045]**;  "Vehicle was stopped at red light, offender held gun to drivers (sic) head, officers fired to protect driver" **[IMR6-046]**.  It is unclear, based on the ledger that was provided, to what extent APD made specific assessments as to the appropriateness of these events. We caution, that even in cases that have been presented to the District Attorney's Office, who will principally be evaluating cases from a legal perspective, APD has the additional responsibility to assess these cases against their governing policies and the CASA.  Those responsibilities are more stringent and require close Command-level oversight.  In preparation for IMR – 7, the monitoring team will ask APD to provide documentation that ensures that these specific assessments were made, at the time of the investigation, for those three cases.

The IA Pro screenshots that APD provided to the monitoring team were reviewed. It appears that APD has created a mechanism to capture firearms discharges that are at a person, at a vehicle, from a vehicle, at an animal and discharges that are accidental in nature. The screenshots are helpful and demonstrate progress on APD's part. There are serious and substantive policy distinctions between capturing data, tracking data and analyzing data that are not self-evident in the documents we were provided.  In future data requests we will ask APD to provide specific policy provisions related to this new system and how APD intends to use the data to meet the provisions of this paragraph.  We note that APD, while it tends to collect massive amounts of data, appears not to be a data-driven organization.  We refer the reader to our "Paragraph 298 report, published in August of 2017 for a full treatment of this issue.

With the promulgation of APD's new use of force policies, APD is in primary compliance with Paragraph 22. Secondary Compliance will be achieved once all training for mediation efforts are completed.

Primary:    **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation 4.7.9a: APD should produce a piece of Completed Staff Work assessing why it has been unable to meet the requirements of paragraph 22, and recommending a way forward on this critical oversight paragraph.  The CSW should be presented to the Chief of Police for review, comment and action.*

*Recommendation 4.7.9b: APD should ensure that any shooting case that implicates the provisions of this paragraph includes a specific, investigative assessment articulated in reports as to whether provisions of APD policy related to this paragraph were appropriate and objectively reasonable.*

*Recommendation 4.7.9c: APD should ensure that information captured in its IA Pro system is tracked and analyzed.  The manner in which this information is captured, tracked and analyzed should include an auditing schedule and be specifically codified in policy.*

**4.7.10 Assessing Compliance with Paragraph 23:  Tracking Firearm Discharges**

Paragraph 23 stipulates:

**"APD shall track all critical firearm discharges. APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its use of force annual report."**

**Methodology**

As in the last three monitoring reports, we noted that APD has been attempting to build a comprehensive Early Intervention and Reporting System (EIRS) and an accompanying EIRS policy to meet the requirements of Paragraph 23.  In preparation for this report the monitoring team requested the following:

"Any new/updated EIRS related policy (monitor approved)/procedure/Special Order or memo issued by APD related to P23 compliance."

In response to our data request the monitoring team was provided a draft of its EIRS policy, dated January 21, 2017, and a series of screenshots from its "Early Intervention" function within the IA Pro system.  The monitoring team was also provided an Interoffice Memorandum dated June 6, 2017, to review.

44

As of the end of this monitoring period APD, had not yet submitted a workable EIRS policy that the monitor could approve. APD will remain out of compliance with this task until this issue is resolved.

**Results**

The Interoffice Memorandum provided to the monitoring teams stated, "A new EIRS updated policy is currently being reviewed by the legal department. The internal affairs department regularly requests updates regarding the review status. Upon completion of review, further action will be taken from Internal Affairs in the effort of finalizing the new EIRS policy." It appears there may be a disconnect between the policy development and operational component within IA, who has the ultimate oversight of the system. The monitoring team reviewed the draft Early Intervention and Recognition System SOP 3-33. We did not see a specific reference to the provisions of this paragraph in the draft policy.

In the screenshots of the "Early Intervention" function within IA Pro there is a mechanism in place to capture firearms discharges. The documentation we were provided stated, "As you can see there is no differentiation between types of discharges in the screenshot, so all entries added under the Firearm Discharge Incident Type Will be accounted for in the Early Intervention [system]." The monitoring team will explore further why there would not be a function in the system to differentiate between discharge types, and will follow-up this information during our next site visit.[30] We note that the thresholds for the data APD does highlight in the documents it sent, do allow for the manipulation of thresholds, and since proper thresholds for APD's EIRS have not been resolved this paragraph remains pending.

We previously highlighted the need for the proper implementation of a comprehensive Early Intervention Reporting System (EIRS). We have commented extensively in past reports that APD's EIRS will be only a part of an overarching performance and force oversight system. It is not intended to be a "catch all" solution. That said, the proper adoption and implementation of a meaningful EIRS is essential to APD's overall compliance, particularly in terms of operational performance in the field. The monitor has advised APD on numerous occasions that their proposed review frequencies do not comply with national standards, yet we continue to be faced with resistance in revising the policy to meet acceptable standards. That resistance continued through APD's submission of the latest version of its EIRS policy, which the monitor found deliberately non-compliant and refused to approve. Once resolved, APD must remediate existing training gaps (in Paragraphs 86 – 88) and

---

[30] Within the screenshots APD also provided an illustration taken from the Use of Force Annual Review for 2015 wherein they documented information concerning firearms discharges at a person, animals and vehicles.

train its personnel in the provisions of any new EIRS policy to achieve Secondary Compliance.

Primary: **In Compliance[31]**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation 4.7.10a:  Write a revised EIRS policy that can be approved by the Parties and the monitor as responsive to established policy in the field, e.g., New Orleans PD and Seattle PD.*

*Recommendation 4.7.10b: Ensure provisions of this paragraph are contemplated and included in any revised EIRS policy.*

### 4.7.11 Assessing Compliance with Paragraph 24:  Use of ECWs

Paragraph 24 stipulates:

**"ECWs shall not be used solely as a compliance technique or to overcome passive resistance. Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered. Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range."**

### Methodology

APD SOP's related to use of force[32] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were due for review in December 2016. This use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies, inclusive of 2-53 (Electronic Control Weapon).

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" materials, inclusive of its lesson plan, PowerPoint, and watched its corresponding videos. This review is captured more specifically in Paragraph 87. While we will not restate verbatim the detailed review noted in Paragraph 87, we will highlight here how the ECW instructor addressed how historical ECW training

---

[31] APD will maintain compliance based on the extant policy, which was approved by the monitor, as long as there are no recurrences of "trigger shutdowns," etc. are noted again by the monitor.
[32] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

encouraged the utilization of a five second "window of opportunity" to handcuff a person under power of an ECW.  Instructing away from that concept, the instructor highlighted how this time period may have inadvertently created a sense of urgency on officers to close the gap on a suspect too early in an event.  The instructor's handling of this particular issue coincided well with officer safety and reinforced ways to avoid unnecessary uses of force. Addressing this type of issue is one of the reasons why providing officers with annual ECW recertification and updates is so important.

APD's Use of Force Phase I training, which contains the ECW recertification component, has been completed for 2017.  98.5% of APD personnel have attended training, with only those few on various leaves (military, medical, etc.) to attend training upon their return to duty.  The ECW curriculum effectively covered the requirements of this paragraph, (and other ECW related paragraphs) and the testing materials were also adequate.

During past reporting periods, the monitoring team conducted in-depth reviews of APD use of force cases that involved the use of ECWs.  The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  APD's subsidiary policy on Electronic Control Weapons (ECW) was approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36. These Paragraphs are also presently in Operational Compliance.

**Results**

We commend APD on its integration of ECWs into its force continuum, and recommend the process of that integration be used with other, still-pending, use of force policies and practices.  Figure 4.7.11, below, reports in detail the compliance elements and performance of APD's ECW integration, as noted by our assessments this reporting period.

During IMR-5, our review of APD's operational ECW practices indicated that across reviews of eight known uses of ECWs that reporting period, APD officers' performance with the ECW application and use conformed with established policy and training 100 percent of the time.  Out of the reviewed cases, we found no instances in which APD personnel used an ECW as a pain compliance instrument, nor any indications that APD personnel used ECWs to overcome passive resistance.  In none of the eight incidents involving ECW applications did we find it used for any reason other than to protect the officer or others.  Similarly, we found each of the ECW uses to contain evidence that other, less intrusive means were considered prior to use of the ECW, e.g., verbal de-

escalation, etc.  Further, we found ECWs to have been used to control
overt resistance only, as required by best practices and APD policy on
Electronic Control Weapons.  ECW uses were 100 percent in
compliance with the requirements of policy and training, and were used
in lieu of other techniques more likely to cause injury to the suspect.  Our
findings regarding ECW for IMR-5 hold true for IMR-6.  Training and
supervision regarding ECW applications continues to be in compliance
with the requirements of the CASA

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

## 4.7.12 Assessing Compliance with Paragraph 25:  ECW Verbal Warnings

Paragraph 25 stipulates:

**"Unless doing so would place any person at risk, officers shall
issue a verbal warning to the subject that the ECW will be used
prior to discharging an ECW on the subject. Where feasible, the
officer will defer ECW application for a reasonable time to allow the
subject to comply with the warning."**

## Methodology

APD's subsidiary policy on Electronic Control Weapons (ECW) was
previously approved by the monitor and DOJ in January 2016, bringing
APD into policy compliance on CASA requirements in Paragraphs 24
through 36.  These Paragraphs are also presently in operational
compliance.

## Results

APD SOP 2-53 (Electronic Control Weapon) was due for review in December
2016. This SOP remained pending until June 2017, when the monitor approved
this SOP, along with three other policies within APD's use of force suite of
policies.

During IMR-5, our review of APD's operational ECW practices related to
this paragraph indicated that across reviews of eight known uses of
ECWs that reporting period, APD officers' performance with the ECW
application and use conformed with established policy and training 100
percent of the time.

The monitoring team reviewed the "2017 Electronic Control Weapon
Update and Recertification" training materials and watched its
corresponding videos. This review, which is captured more specifically in

Paragraph 87, revealed a well-constructed training video demonstrating an officer providing verbal warnings to a subject that the ECW will be used prior to discharging an ECW on the subject. The video also demonstrated the officer giving very clear instruction to the subject about complying with warnings and direction he provided. The written test for the Use of Force also addressed this issue of verbal warnings.

Our review of in-field applications of ECW indicates that practice follow policy and training.

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.13 Assessing Compliance with Paragraph 26:  ECW Limitations

Paragraph 26 stipulates:

**"ECWs will not be used where such deployment poses a substantial risk of serious physical injury or death from situational hazards, except where lethal force would be permitted. Situational hazards include falling from an elevated position, drowning, losing control of a moving motor vehicle or bicycle, or the known presence of an explosive or flammable material or substance."**

### Methodology

APD's subsidiary policy on Electronic Control Weapons (ECW) was previously approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36.  These Paragraphs are also presently in operational compliance.

### Results

APD SOP 2-53 (Electronic Control Weapon) was due for review in December 2016. This SOP remained pending until June 2017, when the monitor approved this SOP, along with three other policies within APD's use of force suite of policies.

During IMR-5, our review of APD's operational ECW practices related to this paragraph indicated that across reviews of eight known uses of ECWs that reporting period, APD officers' performance with the ECW application and use conformed with established policy and training 100 percent of the time.

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" materials and watched its corresponding

videos. This review, which is captured more specifically in Paragraph 87, revealed discussion about the use of an ECW and specific references to increased deployment risks attributed to the situational hazards outlined in this Paragraph. Our review of OBRD tapes for this reporting period indicate no compliance issues with ECW applications.

> Primary:        **In Compliance**
> Secondary:     **In Compliance**
> Operational:   **In Compliance**

## 4.7.14 Assessing Compliance with Paragraph 27: ECW Cycling

Paragraph 27 stipulates:

**"Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power. Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power). After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary. Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Officers shall also weigh the risks of subsequent or continuous cycles against other force options. Officers shall independently justify each cycle or continuous cycle of five seconds against the subject in Use of Force Reports."**

## Methodology

APD's subsidiary policy on Electronic Control Weapons (ECW) was approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36. These Paragraphs are also presently in operational compliance.

## Results

APD SOP 2-53 (Electronic Control Weapon) was due for review in December 2016. This SOP remained pending until June 2017, when the monitor approved this SOP, along with three other policies within APD's use of force suite of policies.

During IMR-5, our review of APD's operational ECW practices related to this paragraph indicated that across reviews of eight known uses of ECWs that reporting period, APD officers' performance with the ECW application and use conformed with established policy and training 100 percent of the time.

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" materials and watched its corresponding videos. This review, which is captured more specifically in Paragraph 87, revealed numerous references to the continuous cycling of ECW's as outlined in this Paragraph. The training material also contained references to best practices in law enforcement that established 15 seconds of exposure (attributable to multiple applications or continuous cycling) as a significant safety point, thus buttressing the efficacy of the provision of this Paragraph.

Our review of OBRD tapes for this reporting period indicate no compliance issues with ECW applications.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.15 Assessing Compliance with Paragraph 28:  ECW Drive-Stun Mode

Paragraph 28 stipulates:

**"ECWs shall not be used solely in drive-stun mode as a pain compliance technique. ECWs may be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject, so that officers can consider another force option."**

### Methodology

APD's subsidiary policy on Electronic Control Weapons (ECW) was approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36. These Paragraphs are also presently in operational compliance.

### Results

APD SOP 2-53 (Electronic Control Weapon) was due for review in December 2016. This SOP remained pending until June 2017, when the monitor approved that SOP, along with three other policies within APD's use of force suite of policies.

During IMR-5, our review of APD's operational ECW practices related to this paragraph indicated that across reviews of eight known uses of ECWs that reporting period, APD officers' performance with the ECW application and use conformed with established policy and training 100 percent of the time.

51

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" materials and watched its corresponding videos. This review, which is captured more specifically in Paragraph 87, revealed numerous references to the restrictions associated with utilizing an ECW in the "drive-stun mode."

Our review of OBRD tapes for this reporting period indicate no compliance issues with ECW applications related to "drive-stun mode".

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.16 Assessing Compliance with Paragraph 29:  ECW Reasonableness Factors

Paragraph 29 stipulates:

**"Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options. ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons. In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others. Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations."**

### Methodology

APD's subsidiary policy on Electronic Control Weapons (ECW) was approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36. These Paragraphs are also presently in operational compliance.

### Results

APD SOP 2-53 (Electronic Control Weapon) was due for review in December 2016. This SOP remained pending until June 2017, when the monitor approved that SOP, along with three other policies within APD's use of force suite of policies.

During IMR-5, our review of APD's operational ECW practices related to this paragraph indicated that across reviews of eight known uses of ECWs that reporting period, APD officers' performance with the ECW application and use conformed with established policy and training 100 percent of the time.

52

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" materials and watched its corresponding videos. This review, which is captured more specifically in Paragraph 87, revealed discussion about the use of an ECW and specific references to the increased deployment risks attributed to the vulnerable populations enumerated in this Paragraph. Our review of OBRD tapes for this reporting period indicate no compliance issues with ECW applications.

      Primary:      **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.17 Assessing Compliance with Paragraph 30:  ECW Targeting

Paragraph 30 stipulates:

**"Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury."**

### Methodology

APD's subsidiary policy on Electronic Control Weapons (ECW) was approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36. These Paragraphs are also presently in operational compliance.

### Results

APD SOP 2-53 (Electronic Control Weapon) was due for review in December 2016. This SOP remained pending until June 2017, when the monitor approved that SOP, along with three other policies within APD's use of force suite of policies.

During IMR-5, our review of APD's operational ECW practices related to this paragraph indicated that across reviews of eight known uses of ECWs that reporting period, APD officers' performance with the ECW application and use conformed with established policy and training 100 percent of the time.

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" materials and watched its corresponding videos. This review, which is captured more specifically in Paragraph 87, did detail a concern with a lack of clarity as it pertained to "preferred target areas" for an ECW. However, the X26 User Course we reviewed

does specifically and properly address the target zones addressed in this Paragraph.

Our review of OBRD tapes for this reporting period indicate no compliance issues with ECW applications.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.18 Assessing Compliance with Paragraph 31:  ECW Restrictions

Paragraph 31 stipulates:

**"ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective."**

APD's subsidiary policy on Electronic Control Weapons (ECW) was approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36. These Paragraphs are also presently in operational compliance.

**Results**

APD SOP 2-53 (Electronic Control Weapon) was due for review in December 2016. This SOP remained pending until June 2017, when the monitor approved this SOP, along with three other policies within APD's use of force suite of policies.

During IMR-5, our review of APD's operational ECW practices related to this paragraph indicated that across reviews of eight known uses of ECWs that reporting period, APD officers' performance with the ECW application and use conformed with established policy and training 100 percent of the time.

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" materials and watched its corresponding videos. This review, which is captured more specifically in Paragraph 87, revealed discussion about immediately ceasing any force once a subject has surrendered or is captured, handcuffed, and controlled.

Our review of OBRD tapes for this reporting period indicate no compliance issues with ECW applications.

Primary:       **In Compliance**
Secondary:   **In Compliance**

Operational:   **In Compliance**

### 4.7.19 Assessing Compliance with Paragraph 32:  ECW Holster

Paragraph 32 stipulates:

**"Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm."**

**Methodology**

In our review of the 2017 ECW recertification training curriculum and testing materials, we noted the requirements of this paragraph were thoroughly covered. Members of the monitoring team have reviewed scores of APD sworn personnel during site visits to Area Commands and in multiple reviews of On Body Recording Device video.  We noted no instances of violations of this requirement during this reporting period.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.20 Assessing Compliance with Paragraph 33:  ECW Certifications

Paragraph 33 stipulates:

**"Officers shall receive annual ECW certifications, which should consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes' and scenario- and judgment-based training."**

**Methodology**

The 2017 training cycle for ECW recertification, Use of Force, Phase I has been successfully completed for 886 of 899 APD personnel—(98.5%).  The remaining personnel are on various types of leave—i.e. military, medical, etc., and all personnel missing duty more than 30 days are required to attend and complete any missed training prior to returning to duty. The monitoring team reviewed APD training and testing materials and found the training incorporated the ECW provisions of this paragraph.

Additionally, during its June 2017 site visit members of the monitoring team continued to interact with APD officers in a host of settings, including conducting visits at Area Commands, meetings at headquarters, and informal observations of APD uniformed officers

during site visits.  We found no instances of violations of approved ECW provisions (weak side carry) during those video reviews or site visits.

**Results**

Based on previous performance and "current" observations, APD remains in compliance with this task.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.21 Assessing Compliance with Paragraph 34:  ECW Annual Certification

Paragraph 34 stipulates:

**"Officers shall be trained in and follow protocols developed by APD, in conjunction with medical professionals, on their responsibilities following ECW use, including:**

**a)      removing ECW probes, including the requirements described in Paragraph 35;**

**b)      understanding risks of positional asphyxia, and training officers to use restraint techniques that do not impair the subject's respiration following an ECW application;**

**c)      monitoring all subjects of force who have received an ECW application while in police custody; and**

**d)      informing medical personnel of all subjects who: have been subjected to ECW applications, including prolonged applications (more than 15 seconds); are under the influence of drugs and/or exhibiting symptoms associated with excited delirium; or were kept in prone restraints after ECW use."**

**Methodology**

APD SOP's related to use of force[33] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies. While the policies included substantive structural changes (i.e. The use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain

---

[33] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

critical topics that have lingered for APD were resolved[34] in terms of policy provisions:  Specifically, 1) "Low Ready" was defined to help clarify what constitutes a reportable show of force; and 2) "Show of Force" was defined better, and supervisor investigative responsibilities relating to Show of Force events were delineated[35] in SOP 2-54-5-B (This has been a significant obstacle to APD's compliance efforts).

During IMR-5 the monitoring team requested copies of all reports and associated materials related to ten (10) ECW cases, which constituted 15% of an entire data set.[36]  A comprehensive review and assessment was conducted of each reported case, and a comparison was made between the activities of APD officers, with respect to ECW use, and the provisions of this paragraph.

Additionally, during its June 2017 site visit members of the monitoring team interacted with APD officers in a host of settings, including conducting visits at Area Commands.

**Results**

With the monitor's approval of SOP 2-53, APD retains Primary Compliance with this paragraph.  We note one issue that should be considered in future policy revisions.  While reviewing various training materials APD provided, we saw that an instructor drew a distinction between an ECW deployment and an ECW application.  This distinction is critical in the assessment of whether or not an ECW use of force is considered a serious use of force.[37]  We reviewed APD's SOP 2-55, which contains definitions pertaining to the use of force suite of policies. We found no definition of "Application;" however, CASA Paragraph 12t defines an "ECW application" as follows: "…the contact and delivery of an electrical impulse to a subject with an Electronic Control Weapon." We note that APD's instruction was correct and recommend that the definition be adopted into SOP 2-55.

---

[34] Our intent here is to list changes to the policies that are relevant to this paragraph and not every policy change that occurred.

[35] Later we comment about our concern that APD leaving a supervisor response to the scene of a show of force up to their discretion as a probable critical shortcoming in their operating procedures.

[36] There was a discrepancy in initial reporting into cases reviewed by the monitoring team. Therefore, for purposes of this paragraph we report the results of 8 ECW cases.  APD provided documentation that they fixed the reporting error and in the process identified two additional cases that were improperly reported as an ECW use of force.  The monitoring team was notified that a programmatic shortcoming of their system did not allow officers to properly input ECW shows of force.  That technological issue has since been resolved.

[37] CASA Paragraph 12qq defines (in part) a serious use of force to include more than two applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different officers.

In Paragraph 88 we reported the monitoring team reviewed training curriculum, specifically, the Phase 1 2017 Use of Force Review, that contained topics relevant to this Paragraph.  A separate lesson plan was created to specifically address the requirement that APD officers receive an annual ECW recertification and update.  The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" lesson plan and watched its corresponding video.  Generally, the lesson was well delivered by the instructor.  He directly addressed the requirement that Tasers be worn on an officer's weak side away from their primary weapon.  He also addressed how historically ECW training encouraged the utilization of a five second "window of opportunity" to handcuffed a person under power of an ECW.  He instructed away from that concept indicating that it may have inadvertently created a sense of urgency on officers to close the gap on a suspect too early in an event.  His handling of that particular issue coincided well with officer safety and reinforced ways to avoid unnecessary uses of force.

The monitoring team did note that an illustration within the PowerPoint and lesson plan, which depicts "preferred target areas" for an ECW, did not specifically preclude an intentional targeting of a subject's genital area.  The lesson plan stated, "When deploying the ECW reasonable attempts should be made to avoid striking sensitive target areas with the probes. The back is always the preferred target zone."  We note this deficiency, but the monitoring team does not see the issue as significant, as the instructor later stated the requirement to not intentionally target a suspect's groin area.  However, like past training programs the monitoring team has reviewed, we cannot be certain that distinction was made in every training program because it is not specifically included in the course materials.  We note this issue here as a cautionary message to APD that precision in its training materials is critical to their ability to retain Secondary Compliance.  This is an issue that we have experienced and noted with APD training during our first site visit, and have provided several pieces of illustrative technical assistance regarding preparation of "lesson plans," which APD seems to have simply ignored.

Following our review of cases in IMR-5, APD's performance related to this paragraph resulted in a 100% compliance rate for the eight cases we reviewed.  Overall, APD demonstrated strong operational compliance with respect to the provisions of this paragraph.  APD officers were seen to routinely, and immediately seek medical attention in cases involving ECW deployment.  For reasons enumerated in the Paragraph 41 Overview, the monitoring team did not specifically review ECW cases during this monitoring period; therefore, the status of Operational

Compliance remains in place for this reporting period.  The monitoring team will revisit ECW case reviews for the next reporting period.

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.22 Assessing Compliance with Paragraph 35

Paragraph 35 stipulates:

**"The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel."**

### Methodology

APD SOP's related to use of force[38] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies. The monitoring team also reviewed training that APD provided to its members during the Phase 1 2017 Use of Force Review that related to this paragraph.

During IMR-5 the monitoring team requested copies of all reports and associated materials related to ten (10) ECW cases, which constituted 15% of an entire data set.[39]  A comprehensive review and assessment was conducted of each reported case, and a comparison was made between the activities of APD officers, with respect to ECW use, and the provisions of this paragraph.

Additionally, during its June 2017 site visit members of the monitoring team interacted with APD officers in a host of settings, including conducting visits at Area Commands.

---

[38] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

[39] There was a discrepancy in initial reporting into cases reviewed by the monitoring team. Therefore, for purposes of this paragraph we report the results of 8 ECW cases.  APD provided documentation that they fixed the reporting error and in the process identified two additional cases that were improperly reported as an ECW use of force.  The monitoring team was notified that a programmatic shortcoming of their system did not allow officers to properly input ECW shows of force.  That technological issue has since been resolved.

**Results**

With the monitor's approval of SOP 2-53, APD retains Primary Compliance with this paragraph.  In Paragraph 88 we reported the monitoring team reviewed training curriculum, specifically, the Phase 1 2017 Use of Force Review, that contained topics relevant to this Paragraph.  A separate lesson plan was created to specifically address the requirement that APD officers receive an annual ECW recertification and update.  The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" lesson plan and watched its corresponding video.  Previously identified concerns notwithstanding, we determined that APD retained its Secondary Compliance.

Following our review of cases in IMR-5, APD's performance related to this paragraph resulted in a 100% compliance rate for the eight cases we reviewed.  Overall, APD demonstrated strong operational compliance with respect to the provisions of this paragraph.  APD officers were seen to routinely, and immediately seek medical attention in cases involving ECW deployment.  For reasons enumerated in the Paragraph 41 Overview, the monitoring team did not specifically review ECW cases during this monitoring period, therefore, the status of Operational Compliance remains in place for this reporting period.  The monitoring team will revisit ECW case reviews for the next reporting period.

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.23 Assessing Compliance with Paragraph 36:  ECW Notifications

Paragraph 36 stipulates:

**"Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges)."**

**Methodology**

APD SOP's related to use of force[40] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved

---

[40] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

each of the four (4) use of force related policies.  The monitoring team also reviewed training that APD provided to its members during the Phase 1 2017 Use of Force Review that related to this paragraph.

During IMR-5 the monitoring team requested copies of all reports and associated materials related to ten (10) ECW cases, which constituted 15% of an entire data set.[41]  A comprehensive review and assessment was conducted of each reported case, and a comparison was made between the activities of APD officers, with respect to ECW use, and the provisions of this paragraph.

Additionally, during its June 2017 site visit members of the monitoring team interacted with APD officers in a host of settings, including conducting visits at Area Commands.

**Results**

With the monitor's approval of SOP 2-53, APD retains Primary Compliance with this paragraph.  In Paragraph 88 we reported the monitoring team reviewed training curriculum, specifically, the Phase 1 2017 Use of Force Review, that contained topics relevant to this Paragraph.  A separate lesson plan was created to specifically address the requirement that APD officers receive an annual ECW recertification and update.  The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" lesson plan and watched its corresponding video.  Aside from previously identified concerns we determined that APD retained its Secondary Compliance.

Following our review of cases in IMR-5, APD's performance related to this paragraph resulted in a 100% compliance rate for the eight cases we reviewed.  Overall, APD demonstrated strong operational compliance with respect to the provisions of this paragraph.  APD officers were seen to routinely, and immediately seek medical attention in cases involving ECW deployment.  For reasons enumerated in the Paragraph 41 Overview, the monitoring team did not specifically review ECW cases during this monitoring period, therefore, the status of Operational Compliance remains in place for this reporting period.  The monitoring team will revisit ECW case reviews for the next reporting period.

       Primary:       **In Compliance**
       Secondary:   **In Compliance**

---

[41] There was a discrepancy in initial reporting into cases reviewed by the monitoring team. Therefore, for purposes of this paragraph we report the results of 8 ECW cases.  APD provided documentation that they fixed the reporting error and in the process identified two additional cases that were improperly reported as an ECW use of force.  The monitoring team was notified that a programmatic shortcoming of their system did not allow officers to properly input ECW shows of force.  That technological issue has since been resolved.

Operational:   **In Compliance**

**4.7.24 Assessing Compliance with Paragraph 37:  ECW Safeguards**

Paragraph 37 stipulates:

**"APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy. APD agrees to implement a protocol for quarterly downloads and audits of all ECWs. APD agrees to conduct random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's Use of Force Reports. Discrepancies within the audit should be addressed and appropriately investigated."**

**Methodology**

APD's subsidiary policy on Electronic Control Weapons (ECW) SOP 2-53 was approved in January 2016, but the specific provisions of this paragraph were not included.  APD's use of force suite of policies, which included SOP 2-53, was reviewed and re-approved by the monitor in June 2017. During its June 2017 site visit members of the monitoring team met with APD representatives responsible for this paragraph to discuss their progress with respect to conducting random and directed audits of ECW data.   APD COB documentation was also reviewed and compared against the requirements of this paragraph.

Previously, APD submitted to the monitoring team an internal memo dated August 29, 2016, that was directed to the Chief of Police outlining an audit agenda for downloaded ECW data.  We were also provided with an audit methodology APD developed for an "audit program" that was dated August 30, 2016.  Finally, the monitoring team reviewed a comprehensive memorandum, dated September 30, 2016, from APD's Audit Coordinator that was directed to the Chief of Police. These documents were all reviewed and compared against the provisions of this paragraph to conduct a qualitative determination if APD has met a compliance standard with the provisions of Paragraph 37.  Our impressions concerning this documentation were reported in IMR -5.

In preparation of this report the monitoring team made three separate requests for information as requested the following documentation:

a.  "IMR-5 documented an internal memo entitled "Electronic Control Weapon Download Data Audit", in which the Chief of Police was provided specific, actionable recommendations based on the outcome of the assessment. Please provide any COB documents that demonstrate APD has followed up these recommendations and implemented changes as a result.

b.  Copies of any new directed ECW Audits. COB documentation that demonstrates downloaded data was compared against use of force reports by officers.

c.  Copies of any random ECW audits. COB documentation that demonstrates downloaded data was compared against use of force reports by officers.

d.  Copies of any COB documentation that demonstrates APD has developed processes, articulated in written policy and supported with protocols that guide the audit unit as it compares operational requirements with operational practice, allowing the audit unit to identify and address any discrepancies in audit reports via recommendation of training or retraining, follow-up, or discipline, if necessary and appropriate.

e.  COB documentation that demonstrates that APD has remedied the two reporting discrepancies of ECW use of force reports as reported in IMR-5 (See relevant ECW paragraphs), if those remedies exist.

f.  COB documentation (I.e. Policy / training / counseling) as to how APD has addressed the issue of the incorrectly reported ECW cases documented in IMR-5 to alleviate the possibility of it occurring in the future.

g.  COB on any other case where a discrepancy existed, and any follow up activities that were taken by APD.

APD provided in response to our requests, an Interoffice Memorandum and an Excel spreadsheet for a June 7, 2017 ECW Quarterly download.

**Results**

As we documented in IMR-5, the monitoring team reviewed a comprehensive matrix and protocol to conduct directed, quarterly audits of ECW data.  Likewise, APD's Audit Coordinator delivered a comprehensive assessment of audit findings to the Chief of Police in the form of an internal memo entitled, "Electronic Control Weapon Download Data Audit." The memorandum specifically indicated that the purpose of the audit was to assess compliance with department policies and procedures as they relate to quarterly ECW downloads, spark test protocols, and the comparison of ECW download data to use of force reports.[42]  The Chief of Police was provided specific, actionable recommendations based on the outcome of the assessment.  We commented, "If replicated and continued, this audit methodology and findings stand as a strong foundation for APD to demonstrate operational compliance with respect to *directed audits* conducted at the

---

[42] We note that the audit included comparisons of downloaded ECW data against show of force cases as well.

organizational level.  The report presented to the monitoring team included an outline of its methodology, a summary of findings, specific objectives, and comparison data that were used to asses reported use and show of force reports.  The report contained specific findings that led to recommendations to the Chief of Police concerning potential follow-up actions he could take. The monitoring team is interested to see what follow-up activities occurred as a result of this audit, specifically, what APD did in response to the recommendations of ECW use audit."

We asked APD to supply documentation to demonstrate that the recommendations to the Chief were acted upon (or responded to), but APD provided no data to suggest that the report that was prepared had any meaning to the leadership to the organization.   In IMR-5 we wrote, "The ultimate value of the audit will be found in follow-up activities wherein APD should demonstrate they have "closed the loop" on their assessment.  The follow-up activities will show if APD has the capacity to replicate this process in the future, and reveal if the program has a meaningful place in an overarching oversight and accountability process."  We see the lack of responsiveness as a critical shortcoming to the audit function in APD, which delegitimized the value of the auditing report that was prepared.   It also negated the attempts the report made to set protocols for ECW audits.  We do not presuppose that every recommendation within a particular audit report can be implemented, however, we do expect that there would be some level of documented responsiveness to the reports that are prepared to "close the loop".   If not, the report constitutes a one-off product that does not serve as a course of business document.  As a consequence, APD cannot demonstrate it has a legitimate business process in place when these types of audits cannot, or are not, replicated.   Frankly, we are befuddled that APD continues to balk at taking meaningful action when they are confronted by written, well-documented notice of critical issues (whether outlined in monitor's reports or internal audit processes).  Such refusal to act leads inevitably to non-compliance.

While on-site in June 2017, the monitoring team met with members of APD's Audit Unit.  As usual, we find them to be engaged and sincerely interested in doing their job to the top of their ability.  We learned that members of the Audit Unit have been assigned to different areas of the organization (i.e. The training Academy) which we believe is a positive step in the auditing function of the organization.  Regular communication between these different organizational functions will be an important aspect of their job responsibilities. The sharing of information within and among organizational units that have an audit function should have a positive impact on APD's future. We highly recommend that APD consider routine reporting of information to the training Academy and IA using these auditors.

Work still remains for APD to reach compliance with this paragraph. While APD developed the makings of a comprehensive, directed audit program, the product they produced has not been followed up in any meaningful way. We mentioned in IMR-5, "The steps they (APD) took need to be codified in policy, and followed up by implementation and routinization of current and suggested policy and practice. Absent these steps, their positive activities could end up being an *ad hoc* assessment and not a required and routine process." Our concerns appear to have come to pass. SOP 2-53-4-J does contain protocols for quarterly administrative uploads of ECW data, but the auditing function remains a work in progress for APD. We see this as one of the most critical issues keeping APD from compliance with a (relatively large) number of paragraphs.

The monitoring team has not been provided evidence (as of the close of this reporting period) that effective procedures and policy have been developed for random reviews of ECW data. In the new ECW policy there is reference to random audits, but there are no protocols listed for those types of audits. While on-site in June 2017, members of the monitoring team learned that APD's intent is to perform quarterly downloads of ECW data and then conduct a single audit of the information at the end of the calendar year. We cautioned APD that conducting business in this fashion could leave unaddressed ECW issues unresolved for extended periods of time. We have neither seen nor heard a response to that concern.

In IMR-5 the monitoring team discovered that within its use of force reviews there were two cases where APD officers incorrectly recorded using their ECW. We requested documentation to ensure that these reporting discrepancies were fixed. In response to our request, APD provided an Interoffice Memorandum indicating that the two instances have been fixed within their systems. In addition, APD found additional cases with similar reporting discrepancies.[43] We also learned that the reporting discrepancies resulted from a technology shortcoming in their reporting mechanisms that has since been rectified.

We reiterate, the monitoring team found APDs auditing team to be engaged and invested in the development of procedures to meet the provisions of Paragraph 37. We feel that this unit, if supported properly, could be the centerpiece of APD's organizational reform efforts. That said, APD still has unresolved issues regarding the "random and directed audits." Processes need to be developed, articulated in written policy, and supported with protocols that guide the Audit Unit. When the Audit Unit identifies discrepancies or performance deficiencies in audit

---

[43] Both Interoffice Memorandums are dated May 22, 2017, from an APD Program Analyst to the Lieutenant of the CIRT.

reports, their recommendations need to be addressed through training or retraining, policy reviews or assessments, process modifications, procurement follow-up, or discipline, if necessary and appropriate.  The table below outlines "checkpoints" for the work remaining to be done.

**Table 4.7.24**

| Pending Process | Develop Integrity Audit Processes | Articulate Audit Protocols | Develop Random and Directed Audit Protocols | Compari-son of Down-loaded Data viz. a viz UoF Reports | Address and Investigate Discre-pancies Download v. Report |
|---|---|---|---|---|---|
| Implement Y/N? | N | N | N | N | N |
| Report Y/N | N | N | N | N | N |
| Follow-up & Evaluate Y/N | N | N | N | N | N |

We note with a modicum of frustration that this is the same table we produced for APD in IMR-5.  We have seen no movement on this critical issue, despite clear and well documented evidence to APD that a response is required.  As a result, we find the non-compliance to be deliberate.

> Primary:          **In Compliance**
> Secondary:     **Not In Compliance**
> Operational:   **Not In Compliance**

***Recommendation 4.7.24:  Develop needs assessments, articulate needed improvements in written policy, and support with protocols that guide the audit unit as it compares operational requirements with operational practice, allowing the audit unit to identify and address any discrepancies in audit reports via recommendation of training or retraining, follow-up, or discipline, if necessary and appropriate***.

## 4.7.25 Assessing Compliance with Paragraph 38:  ECW Reporting

Paragraph 38 stipulates:

**"APD agrees to include the number of ECWs in operation and assigned to officers, and the number of ECW uses, as elements of the Early Intervention System. Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force, and whether officer and subject injuries are affected by the rate of ECW use. Probe deployments, except those described in**

**Paragraph 30, shall not be considered injuries. APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis. ECW data analysis shall be included in APD's use of force annual report."**

## Methodology

APD's SOP on Electronic Control Weapons (ECW) 2-53 was approved by the monitor and DOJ in January 2016.  The monitor approved a revised version of SOP 2-53 in June 2017.  APD's EIRS SOP 3-33 had not been approved by the close of this monitoring period.   The provisions of this paragraph are not currently addressed in either standing policy.  During its June 2017 site visit, members of the monitoring team met with APD representatives responsible for this paragraph to discuss their progress with respect to compliance.  In preparation for this monitoring report we requested that APD provide the following:

"COB (course of business) documentation that demonstrates that APD is conducting the type of analysis required by this (P38) paragraph."[44]

Documentation provided by APD in response to our request was reviewed and compared against the requirements of this paragraph.

## Results

As noted in previous monitoring reports, Paragraph 38 stipulates that APD conduct several types of analyses to determine the level of ECW use over time, the rate of suspect and officer injuries in relation to the rate of ECW use, and the effect of ECW "painting and arcing" on compliance rates.  We believe there are APD personnel capable of doing the required analysis with appropriate direction, training, and expert support.  Members of the APD Audit Unit have the capacity and interest to conduct these assessments with the proper staffing and organizational support.  APD must look across the entire CASA and strategically approach the auditing role within the organization.  While on-site, we recommended APD consider developing an "auditing plan" to ensure all the relevant CASA requirements are covered and redundancies of effort are eliminated.  We have not been presented with any auditing plan to date, but highly encourage APD consider that approach to their work.

We have previously reported the lack of credibility of APD's use and show of force data, and that relying on that data for purposes of determining CASA compliance will not be possible until such time that the department expends its full effort toward greater accountability in its reporting of use

---

[44] The monitoring team asked for additional documentation concerning ECW reporting discrepancies.  We comment on their response in Paragraph 37 and elsewhere in this report.

of force.  As we reported in IMR-5, the monitoring team reviewed a total of ten (10) ECW uses of force and found two of the events reported as ECW cases did not actually include the use of an ECW against a person. While APD provided an Interoffice Memorandum indicating the issue was resolved, those type of discrepancies in reporting certainly impact the credibility of APD's data reporting.

With the components of APD's EIRS still unresolved in both policy and practice, this paragraph remains not in compliance.  In IMR-5 the monitor recommended that APD "…commission externally or complete internally a focused, thoughtful and meaningful "Completed Staff Work" document analyzing this problem and submit it to the Chief of Police for review, assessment and action." We are unaware of any effort APD put toward that recommendation.

**Table 4.7.25**

| Reporting Period No. | # ECWs Assigned | ECW Uses/ Mo | Use Data in EIRS | Analysis of ECW Effect on Force Rate | Impact of ECW on Injuries | Track Painting & Arcing | ECW Use in Annual Report |
|---|---|---|---|---|---|---|---|
| | **No** | **No** | **No** | **No** | **No** | **No** | **No** |

Primary:      **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.25a: We reiterate, APD should either commission externally or complete internally a focused, thoughtful and meaningful "Completed Staff Work" document analyzing this problem and submit it to the Chief of Police for review, assessment and action.***[45]

***Recommendation 4.7.25b: APD should develop a comprehensive auditing plan that contemplates all their CASA and policy related requirements.***

### 4.7.26 Assessing Compliance with Paragraph 39:  Crowd Control Policies

---

[45] The monitor has previously provided APD with nationally accepted formats and "product" for these CSW projects, so that they can be familiar with expectations of such documents. We recommend a format similar to the one the monitor provided APD from the Tyler, Texas Police Department. *We see it as entirely conceivable that individuals from APD command and staff levels may need external training on this process, which they should contract for with reputable outside consultants and trainers.*

Paragraph 39 stipulates:

**"APD shall maintain crowd control and incident management policies that comply with applicable law and best practices. At a minimum, the incident management policies shall:**

  a) **define APD's mission during mass demonstrations, civil disturbances, or other crowded (sic) situations;**
  b) **encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses;**
  c) **require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and**
  d) **continue to prohibit the use of canines for crowd control."**

## Methodology

APD SOP 1-46 Emergency Response Team (ERT) was approved by the monitor and DOJ on May 12, 2016, bringing the Department into primary compliance on the requirements in Paragraph 39.  As we noted in prior monitoring reports, although a brief block of instruction was provided in the 40-hour Use of Force Curriculum in mid-2016, that was based upon a single-page directive (this appeared to be a Field Services Bureau (FSB) SOP) that was outdated and extremely limited in content. The ERT SOP 4-21 was retitled as *Response to First Amendment Assemblies* and was approved by the monitor on May 23, 2016.  We note the need for supplemental training based upon the approved, more extensive FSB policy in our review of the 40-hour Use of Force Curriculum later in this report.

In preparation for this report the monitoring team made five separate data requests for the following:

a. Any documentation that APD has conducted a multi-agency review and assessment of the incidents surrounding the May 2016 Trump rally that focuses on policy guidance for after-action event assessments, after-action upgrades to policy, training, and multi-agency responses,

b. Any newly developed policy / procedure / guidance that is responsive to partner-agency concerns guiding after-action reviews, assessments, and revisions to existing policy.

c. Any documentation that demonstrates APD has submitted policy/procedures to partner agencies for review and comment, and any changes that were made to accommodate partner agency concerns (or explain why changes were not made).

d. Copies of any training materials that are responsive to the comments in IMR-5. After action upgrades to policy, practice and training.

e.  Copies of any training materials and attendance records related to SOP 1-46.

In response the monitoring team received and reviewed the following: 1) Lesson Plan entitled, "Use of Force-Crowd Control Policies: Albuquerque Police Academy Core Curriculum"; 2) Video tape of APD's 2017 Use of Force Review wherein the lesson plan was delivered; 3) Donald Trump Presidential Rally After-Action Report, dated May 26, 2017, prepared by an ERT Commander; 4) A Multi-Agency Review and Assessment report prepared by a Captain from the Bernalillo County Sheriff's Office; 5) APD Interoffice Memorandum, dated June 10, 2016, from an ERT lieutenant to the Chief of Police entitled, "Lessons learned from Trump Rally/New Demonstration Protocol; 6) APD Interoffice Memorandum, dated April 7, 2017, from an ERT lieutenant to a member of the monitoring team entitled, "Independent Monitor Report 5 Response"; 7)   An "After – Action Report for the Presidential Candidate Donald Trump Rally on May 24, 2016, prepared by an APD commander, dated July 28, 2017; and 8) An APD Incident Action Plan and After-Action Report, dated March 8, 2017, for an UNM Women's March.  Members of the monitoring team also met with ERT personnel responsible for the provisions of this paragraph while on site in June 2017.

We note here that APD must satisfy the provisions of Paragraph 87 that also carries a mandate to provide training on crowd control in the context of use of force, constitutional principles and APD policy.

**Results**

The monitoring team has communicated the need for a legitimate and formal review of the May 2016 Trump Rally in the past two monitoring reports, due to obvious failures on the part of APD's coordination and response efforts toward that event.  The after-action report was imperative in view of apparent failures and the need to extract every lesson that the Department can glean from the experience.  Like other follow up activities that linger with APD, this is a task that should have been resolved many months ago.  As we commented in IMR-5, the Trump Rally incident underscored the fact that well-conceived and well-written policies are not self-executing. At the heart of the issues APD encountered was the fact that an effective policy was not in place, nor had the agency provided meaningful training to its individual units that could be expected to respond to a significant demonstration event.  Weaknesses in pre-event preparation and incident command shortfalls, in the monitoring team's judgment, were major contributing factors in APD's problematic response to the Trump Rally/protests. The monitoring team initially reviewed an internal After-Action Review of the Trump Rally/Protest that was prepared by an ERT Lieutenant, which was unusable as a true "course of business" document.

We viewed the report as a reasonable effort, but the report was written solely from the perspective of the APD Lieutenant.  There was no section explaining

the report's methodology or listing of the participants who provided input on its content, and there were no specifics regarding key decisions and the responsible decision-makers. We know from our engagement with APD that there were significant shortcomings with the event  (shortcomings felt by other external law enforcement agencies that provided personnel and assets for the event) that went virtually unchecked for lessons learned.  We provided extensive feedback concerning that initial After-Action review in IMR-5 and outlined specific activities that needed to be conducted before APD would receive either secondary or operational compliance with this paragraph.  Specifically, we stated in IMR-5 that: "APD's current policies on after-action critiques of responses to Civil Disorder appear to need substantial review and revision, particularly where they deal with multi-agency responses and organized civil unrest.  APD will not be in Secondary Compliance or Operational Compliance on the requirements in Paragraph 39 until a full, competent review of the Trump Rally response is completed and appropriate actions are taken, including incident command training, to improve its capabilities to plan for, manage, and extract important lessons from each experience.   Any remediation should include authentic, scenario-based incident command exercises that stress advance planning and preparation, command post operations, and large-scale tactical maneuvering to respond to dynamic aspects of modern-day protests while operating within Constitutional bounds."

In late May 2017, members of the monitoring team were contacted by an ERT commander who was tasked with the responsibility of following up the comments we provided with respect to the initial 2016 Trump Rally After-Action Report.[46]  Following that conversation the monitoring team received a second iteration of an After – Action Report pertaining to the May 2016 Donald Trump Presidential Rally.  Members of the monitoring team reviewed that second report and on June 5, 2017 (a week prior to our site visit) the monitoring team provided specific feedback concerning the quality of the After-Action Report.  The monitoring team found certain deficiencies with the report and provided APD with a number of different resources that they could turn to when deciding how to properly structure and write an effective After-Action report.  Specifically, we noted a lack of a methodology for the report, the fact that there was no timeline of events, and the fact that the report was still APD – centric and did not sufficiently take into consideration feedback from "partner agencies" who supported the event.  Another observation we made was the fact that the writing style of the document was difficult to read and did not lend itself to easily extracting "lessons learned" from the event.  That would make difficult the task

---

[46] We note that this communication with the ERT commander took place after the delivery of IMR-4 and the draft of IMR -5 to the parties.  The apparent disinterest to follow up on the initial comments the monitor provided concerning the 2016 Trump Rally After Action Report are evidenced in the timing of this communication.  However, we note that this disinterest is centered on the organizational coordination of the issue not the attitude of this specific commander.  We note that when we met with the Commander during our June 2017 site visit we learned that he was only tasked with the responsibility of following up on monitor comments weeks before we arrived; that time frame coincided with the late May 2017 communication.

of taking the lessons learned and collating, tracking and building policy revisions and using those lessons to develop organizational training programs centered on crowd control and uses of force related to crowd control.  This latter fact is critical for building effective business processes that result in meaningful policy revisions and training that help the organization avoid repeating past mistakes.

Prior to our June 2017 site visit the monitoring team made a request to meet with ERT members responsible for the terms of this paragraph.   While on site we met with the Commanding Officer who authored the most recent iteration of the 2016 Trump Presidential Rally After – Action Report.  Our impression of the Commander, based on our conversation, was that he was a well-qualified and professional member of the organization.  He was very receptive to feedback the monitoring team provided during the meeting.[47]  By no fault of his own, it was evident that he was tasked with preparing a report "as quickly as possible", to satisfy monitoring team comments and to meet self-imposed APD time-lines that were obviously the result of poor coordination when responding to monitoring team feedback.  This prevented the Commander from preparing a more thoughtful, well-structured and comprehensive report.  We note the Commander indicated that the report he initially submitted to the monitoring team was meant to be a "draft".  We would appreciate that perspective were it not for the fact that work related to this task has been lingering with APD for nearly a year.

The monitoring team reviewed training materials related to APD's crowd control policy and a video of the delivery of that lesson plan to its members.  This material was provided to the monitoring team in response to our request for training related to this paragraph.  That training was included in APD's Phase 1 "2017 Use of Force Review" that commenced in late January 2017.[48]  The training lesson plan documented three specific "Instructional Objectives", and stated that "Upon completion of this block of instruction the participant will be able to:

1.  Discuss objectively reasonable and justified uses of force related to crowd control.
2.  Analyze known situations for appropriate levels of force related to crowd control.
3.  Discuss crowd control policies as stated in SOP and CASA."

In the monitoring team's opinion, the lesson plan and training provided to APD failed to meet objectives #1 and #2, and in fact focused no attention on those

---

[47] We note that he has been moved to an operational command that would not necessarily continue his ERT responsibilities.

[48] We have noted in past monitoring team reviews of APD training curriculum that training is assessed on the content AND quality to ensure it includes the proper policy provisions and applicable law, and that the training meets qualitative standards that can reasonably be expected to impact operations in the field.  We have seen several instances where an APD instructor has either gone "off script" or delivered materials not contained in a lesson plan. Quality of training is equally important as the content of the material being presented.

objectives.  The entire lesson plan was focused on a quick recitation of APD SOP 4-21.  This was done despite the importance of this topic to APD's compliance, and the extensive writing we have provided in the past two monitoring reports.  APD relegated, on paper, the topic of "Use of Force - Crowd Control" to a 30-minute presentation within the "2017 Use of Force Review".  However, a review of the actual video of the training showed that APD condensed the topic further, as the video we watched was only 16 minutes in length.  There were certain qualitative aspects of the training that were deficient as well. For instance, the instructor opens his presentation by saying that the topic was "repetitive and a little bit boring" which certainly sets the tone for the block of instruction.  Likewise, the instructor provided very little in terms of instructional dynamics and provided little perspective outside of the content within the PowerPoint slides.  The instructor relied heavily on reading each PowerPoint slide to the audience without providing any APD context or contemporary "lessons learned".  Also, the monitoring team saw no interaction between the instructor and the audience.  In our view, this block of instruction is critically important to all members of the organization, not just ERT members. We mention this for a host of reasons; however, one specific issue stands out among the rest. Within the training material APD indicated that it will take "approximately one hour" for various critical resources to reach APD field personnel for an event that was not pre-planned.  Within the list of agencies they list that could take an hour to respond was APD's own Emergency Response Team. That fact is crucial when deciding how much time to commit to this topic of instruction.  There were no scenarios, practical exercises or other hands-on instructional techniques when delivering this block of instruction.  Likewise, the training did not meet the instructional objectives.  The monitoring team sees this training to be ineffective and note that it does not meet an acceptable compliance standard.  Likewise, APD provided no clear documentation to demonstrate how lessons learned from APD responses to events connected to its training or policy revisions.

The monitoring team reviewed the "After – Action Report for the Presidential Candidate Donald Trump Rally" that was prepared on July 28, 2017 by an APD Commander.  While certain refinements are still needed for future After Action reports, we feel APD has adequately addressed monitoring team comments with respect to follow-up activities by the department.  In his report the Commander noted nine (9) specific issues with corresponding recommendations for APD to implement.  The monitoring team will follow up, during the next year, with APD to determine what specific activities they took to address the nine recommendations included in its after-action report.[49]

---

[49] The monitoring team will follow up to determine what type of policy revisions occurred, and what specific learning objectives related to future APD crowd control training, that relate to these recommendations. This will assess whether APD's ERT responses and after-action critiques contain specific business processes that "close the loop" when modifications to operations are appropriate. That said, the monitoring team will look for different types of internal COB documents that meet that specific end.

Finally, the monitoring team was provided one After-Action Report entitled, "UNM Women's March", dated March 8, 2017. This particular event took place before APD received its most recent monitoring team feedback concerning the content and structure of its After-Action Reports. Consequently, the quality of this documentation was considerably below what we found in the final iteration of the 2016 Trump Rally critique. We caution APD, and strenuously recommend, they ensure that all ERT After-Action Reports follow a consistent and structured outline, and incorporate the Multi-Agency Review and Assessment form they eveloped. In the past, we have recommended to APD that it avoid stand-alone reports, like the Multi-Agency Review and Assessment form, and instead append that document to its corresponding SOP. That should help the agency with consistency and accountability for its use.

APD will achieve Secondary and Operational Compliance on the requirements in Paragraph 40 only when it demonstrates that it has in place standardized procedures to conduct objective, thorough reviews of protest events and the police response to each, and appropriate training incorporating that policy.

### Table 4.7.26

| Topic | Yes | No | Comment |
|---|---|---|---|
| 1.  Define Mission Statement | 1 | 0 | Achieved in policy 1-46 |
| 2.  Encourage Peaceful & Lawful Gatherings | 1 | 0 | Achieved in policy 1-46 |
| 3.  Safeguard Fundamental Rights | 1 | 0 | Achieved in policy 1-46 |
| 4.  Prohibit Canines for Crowd Control | 1 | 0 | Achieved in policy 1-46 |
| 5.  "Train" the Policy | 0 | 1 | We were presented an unacceptable training product related to SOP 1-46 |
| 6.  After-action Event Assessments | 0 | 1 | |
| 7.  After-action upgrades and revisions to policy and training | 0[50] | 1 | |
| 8.  After-action modifications to practice based on event assessments, policy revisions and training | 0 | 1 | |
| N, %=Y/N | .50 | .50 | |

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

---

[50] We are not aware of after-action upgrades to departmental capacity for response to civil demonstrations in the form of revised policy, improved Multi-Agency response planning, or incident evaluation-assessment-critique-practice modification.

*Recommendation 4.7.26a: APD must develop and deliver a meaningful training program to its Field Services members that is centered on crowd control policies.  That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans.*

*Recommendation 4.7.26b: APD should append its Multi-Agency Review and Assessment form to its corresponding SOP.*

*Recommendation 4.7.26c: APD must ensure that its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy and training within the agency.*

*Recommendation 4.7.26d: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.*

### 4.7.27 Assessing Compliance with Paragraph 40:  After-Action Reviews

Paragraph 40 stipulates:

**"APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures."**

### Methodology

APD SOP 1-46 Emergency Response Team (ERT) was approved by the monitor and DOJ on May 12, 2016, bringing the Department into primary compliance on the requirements in Paragraph 39.  As we noted in prior monitoring reports, although a brief block of instruction was provided in the 40-hour Use of Force Curriculum in mid-2016, that was based upon a single-page directive (this appeared to be a Field Services Bureau (FSB) SOP) that was outdated and extremely limited in content. The ERT SOP 4-21 was retitled as *Response to First Amendment Assemblies* and was approved by the monitor on May 23, 2016.  We noted the need for supplemental training based upon the approved, more extensive FSB policy in our review of the 40-hour Use of Force Curriculum later in this report*.*

In preparation for this report the monitoring team made three separate data requests for the following:

a.  Copies of any after-action reports prepared during this time frame to a mass demonstration, civil disturbance or crowd control that are relevant to P40.

b.  Copies of any COB documents that demonstrate APD have incorporated lessons learned from AA reports into policy and procedures, and/or training.

c.  Copies of any ERT specific training materials and attendance records for SOP 4-21 and 1-46.

d.  Copy of any APD-wide training materials and attendance records for SOP 4-21 and 1-46 (if different than c)

e.  COB ledger of all APD responses to mass demonstrations, civil disturbances, or other crowded situations.

In response the monitoring team received and reviewed the following: 1) Lesson Plan entitled, "Use of Force – Crowd Control Policies: Albuquerque Police Academy Core Curriculum"; 2) Video tape of APD's 2017 Use of Force Review wherein the lesson plan was delivered; 3) Donald Trump Presidential Rally After – Action Report, dated May 26, 2017, prepared by an ERT Commander; 4) A Multi – Agency Review and Assessment report prepared by a Captain from the Bernalillo County Sheriff's Office; 5) APD Interoffice Memorandum, dated June 10, 2016, from and ERT lieutenant to the Chief of Police entitled, "Lessons learned from Trump Rally/New Demonstration Protocol; 6) APD Interoffice Memorandum, dated April 7, 2017, from an ERT lieutenant to a member of the monitoring team entitled, "Independent Monitor Report 5 Response"; 7)   An "After – Action Report for the Presidential Candidate Donald Trump Rally on May 24, 2016, prepared by an APD commander, dated July 28, 2017; 8) An APD Incident Action Plan and After-Action Report, dated March 8, 2017, for an UNM Women's March.  Members of the monitoring team also met with ERT personnel responsible for the provisions of this paragraph while on site in June 2017.

We note here that APD must satisfy the provisions of Paragraph 87 that also carries a mandate to provide training on crowd control in the context of use of force, constitutional principles and APD policy.

**Results**

The monitoring team reviewed training materials related to APD's crowd control policy and a video of the delivery of that lesson plan to its members.  This material was provided to the monitoring team in response to our request for training related to this paragraph.  That training was included in APD's Phase 1 "2017 Use of Force Review" that commenced in late January 2017.[51]  The

---

[51] We have noted in past monitoring team reviews of APD training curriculum that training is assessed on the content AND quality to ensure it includes the proper policy provisions and applicable law, and that the training meets qualitative standards that can reasonably be

training lesson plan documented three specific "Instructional Objectives", and stated that "Upon completion of this block of instruction the participant will be able to:

1. Discuss objectively reasonable and justified uses of force related to crowd control.
2. Analyze known situations for appropriate levels of force related to crowd control.
3. Discuss crowd control policies as stated in SOP and CASA."

In the monitoring team's opinion, the lesson plan and training provided to APD failed to meet objectives #1 and #2, and in fact focused no attention on those objectives.  The entire lesson plan was focused on a quick recitation of APD SOP 4-21.  This was done despite the importance of this topic to APD's compliance, and the extensive writing on these topics we have provided in the past two monitoring reports.  As noted in Paragraph 39, The monitoring team saw this training to be ineffective and failing to meet an acceptable compliance standard.  Further, APD provided no clear documentation to demonstrate how lessons learned from APD responses to events connected to its training or policy revisions.

The monitoring team reviewed the "After – Action Report for the Presidential Candidate Donald Trump Rally" that was prepared on July 28, 2017 by an APD Commander.  While certain refinements are still needed for future After-Action reports, we feel that the report has adequately addressed monitoring team comments with respect to follow-up activities by the department.  In his report the Commander noted nine (9) specific issues he identified in APD's response, with corresponding recommendations for APD to follow up.  The monitoring team will follow up with APD to determine what specific activities they took to address these nine (9) recommendations.[52]

Finally, the monitoring team was provided an After-Action Report entitled, "UNM Women's March", dated March 8, 2017. This event took place before APD received its most recent monitoring team feedback concerning the content and structure of its After-Action Reports. Consequently, the quality of this documentation was considerably below the quality we found in the final iteration of the 2016 Trump Rally critique. We caution APD, and strenuously recommend, they ensure that all ERT After-Action Reports follow a consistent and structured

---

expected to impact operations in the field.  We have seen several instances where an APD instructor has either gone "off script" or delivered materials not contained in a lesson plan. Quality of training is equally important as the content of the material being presented.

[52] Specifically, the monitoring team will look to see what type of policy revisions occurred, and specific learning objectives within future APD crowd control training that relate to these recommendations. This will demonstrate that APD's ERT responses and After – Action critiques contain specific business processes that "close the loop" when modifications to operations are appropriate. That said, the monitoring team will look for different types of internal COB documents that meet that specific end.

outline, and incorporate the Multi-Agency Review and Assessment form they developed. In the past, we have recommended to APD that it avoid stand-alone reports, like the Multi-Agency Review and Assessment form, and instead append that type of document to its corresponding SOP. That should help the agency with consistency and accountability for its use.

As noted above, when preparing to assess this paragraph the monitoring team requested: 1) Copies of any after-action reports prepared during this timeframe to a mass demonstration, civil disturbance or crowd control that are relevant to paragraph 40 of the CASA; and 2) COB ledger of all APD responses to mass demonstrations, civil disturbances, or other crowded situations.  We received only one (1) After-Action Report (detailed herein) and we were not provided a ledger that captured all APD responses to demonstrations.  That said, we expect that APD has provided all documentation that would have been responsive to our request, and that no other After-Action reports relative to our request exist.  By inference, that would mean there were no other APD responses to mass demonstrations, civil disturbances, or other crowded situations during the monitoring period.  We will follow up with APD to obtain any COB ledger that captures these types of events to ensure our data are complete.

 APD will achieve Secondary and Operational Compliance on the requirements in Paragraph 40 when it demonstrates that it has in place standardized procedures to conduct objective, thorough reviews of protest or disturbance events and the police response to each, and appropriate training incorporating that policy.

> Primary:      **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.27a: APD must develop and deliver a meaningful training program to its members that is centered on crowd control policies. That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events.  Training must meet the instructional objectives documented within APD lesson plans.***

***Recommendation 4.7.27b: APD should append its Multi-Agency Review and Assessment form two it's corresponding SOP.***

***Recommendation 4.7.27c: APD must ensure that its After – Action Reports follow a standard structure and include mechanisms for communicating revisions to policy and training within the agency.***

***Recommendation 4.7.27d: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle***

*wherein APD can demonstrate it adequately "closes the loop" on lessons learned.*

**Assessing Compliance with Paragraph 41-59:  Supervisory Review of Use of Force Reporting (Overview)**

The series of related Paragraphs 41 through 59 encompasses requirements for reporting, classifying, and investigating uses of force that require a supervisory-level response based upon the type and extent of force used.  The CASA delineates this larger group of paragraphs into three separate sub-groups:  Use of Force Reporting – Paragraphs 41-45; Force Investigations – Paragraphs 46-49; and Supervisory Force Investigations – Paragraphs 50-59.

Over the course of our engagement with APD, our reviews have consistently revealed serious deficiencies in the department's oversight and accountability processes, particularly with respect to force reporting, supervisory-level investigations and chain of command reviews, on which we reported extensively in IMR-2, IMR-3, IMR-4, IMR-5 as well as in a Special Report that was first provided to APD on August 19, 2016.

As detailed herein, the monitoring team was presented with a case during this reporting period that, in our opinion, implicated and amplified deficiencies throughout the entire APD use of force oversight system.  That case **[IMR6-001]** was of such significance to the monitoring team that it had a direct impact on its approach to assessing multiple paragraphs.  The fact that APD mishandled this case in such significant ways, on so many levels, is a watershed moment for APD's various failures in its organizational reform efforts.  Considering the significance of this case, in the opinion of the monitoring team, APD would be wise to step back and take stock of its entire use of force oversight system, and implement a department-wide, omnibus assessment-revision-retraining-documentation-evaluation reform effort.  We realize this is a significant recommendation, but we fear without such an omnibus assessment, APD is condemned to a continuing cycle of failure in its use-of-force decision-making processes.  We come to this conclusion based on our work in previous IMRs, our special report, and our process review for IMR-6.

In keeping with past activities, the monitoring team requested use of force report ledgers, use of force reports and related materials to conduct case reviews that would serve as an assessment of APD's progress.  Ultimately, for IMR-6 the monitoring team decided not to conduct detailed case reviews for the following reasons:

1. During this reporting period the monitoring team learned, for the first time, that APD has not been accurately reporting the total number of use of force cases.  In preparation of past reports the monitoring team requested a list of use of force and show of force cases that occurred during a specific timeframe.  From that list of cases, the monitoring team would select a

random sample of cases to review.  We learned in May 2017 that APD was only reporting closed cases, not all cases that were reported.  This reporting methodology shielded the fact there were numerous cases pending[53] and those cases left significant gaps in the data.  It also raised serious questions as to why cases were pending for such extended periods of time.

2. We met with the Chair of APD's Force Review Board (FRB) during our June 2017 site visit.  At that time, we alerted him to the problematic discrepancies in the use of force reporting methodology and the fact that the monitoring team had not been provided accurate data for the past monitoring periods.  During our meeting, we asked if the 10% sample of supervisory use of force cases the FRB reviews is from the entire list of cases, or only those that are completed.  We learned that neither he, nor another command level representative of the FRB, knew that the FRB was not reviewing a 10% sample of all use of force cases.  In fact, it took an APD analyst to come to the meeting to make them aware of this problematic methodology that also undermined their own accountability structure.

3. There is a more than significant backlog of supervisory use of force investigations dating back to January 2017, many of which effectively prevent the monitoring team from making an objective assessment of the investigative outcomes since the cases are not submitted and complete. We have found that APD cases that are incomplete for extended periods of time are of greater risk for failure, since they often reveal deficiencies from many different perspectives.

4. APD has received extensive feedback from the monitoring team over the course of the past two years regarding the quality of their force reporting and investigation capabilities.  In those recommendations, there is a trove of information APD can consider, so providing more similar feedback is redundant until APD exhibits an ability to assess and implement the monitor's recommendations that have already made, and, where appropriate, implemented.

5. Follow-up activities by APD associated with past feedback the monitoring team has provided have been, and continue to be, deficient, and in some cases, non-existent.

6. APD training gaps still exist more than two years into the implementation phase, and as a result, the organization is not in Secondary Compliance in many aspects of its use of force and related training, removing previous assessments of Operational Compliance for this reporting period.

---

[53] We learned that some supervisory use of force cases were still pending and in the chain review process 5-6 months after the original event occurred.

7. APD has introduced the concept of "*De Minimis* force" that we believe will have a direct and negative impact on APD's compliance in force reporting, as well as investigating and oversight of uses of force.

8. APD has presented a case **[IMR6-001]**, that involved both the use of force and serious use of force. That case was mishandled from the initial event, up to and including the FRB review of the case.[54]  Many of the elements we identified as problematic with this case reflected on systems recently established by APD to review uses of force.  The case represents an indictment of the effectiveness of APD's entire use of force oversight and accountability system, to include IA.[55]   Based on APD's response to this case, we consider the use of force review, assessment and response functions at APD to be ineffective and unworkable.

9. Following IMR-5 feedback and the monitoring team's June 2017 site visit it appears APD is currently reassessing its entire force reporting system.  To date this seems to be an internal process.  We strongly recommend that our salient comments from IMRs 3-6 be an integral part to this self-assessment.

In the past, APD has been given extensive feedback and technical assistance concerning their inability to effectively report, track, and investigate legitimate use of force cases.  Likewise, the monitoring team has predicted many of the issues APD has encountered, and is encountering.  None was more prevalent than when we alerted APD to significant deficiencies in its use of force training in early 2016.  It is not surprising to the monitoring team that APD has continued to struggle during this monitoring period, since in our opinion, many supervisors and command personnel continue to view their activities (related to force and organizational accountability) through the same lens that got them into their current situation, and was reflected in early training.

The monitoring team feels strongly that these continued breakdowns are systemic and cultural in nature.  We do not believe many in APD's leadership team have ever embraced this idea of systemic and cultural non-compliance.  That said, throughout our entire interaction with APD we have consistently been met by command level personnel who treat our team professionally.  The apparent disconnect attributed to some of the command level attitudes, words and actions leads us to believe that systemic and cultural dynamics, i.e. a direct and deliberate resistance to change, are factors influencing APD failures.  The monitoring team is optimistic this disconnect is not attributable to all of the rank and file members nor is it attributable to all command level personnel. We collectively believe, and have at times observed the fact that, *some* command

---

[54] Following the meeting the monitoring team spoke with several APD commanders anecdotally who described the FRB meeting, and the handling of this case, as "embarrassing" and a "complete debacle."
[55] Details surrounding **[IMR6-001]** are provided within this report.

level staff seem to be able to affect change in a positive and meaningful way. Unfortunately, the opposite is also true at times.

A lack of strategic intent by the leadership of the organization has resulted in a disconnected approach to compliance. The organization mires itself in work that at times competes against the monitoring team's efforts instead of complementing our efforts.  For instance, APD tends to focus an exorbitant amount of effort to debating feedback they receive from the monitoring team, as opposed to accepting feedback as an objective assessment of their operational compliance.  If APD continues to view and assess their compliance through the same lens that resulted in their current situation, they will plod along in a manner that will only serve to frustrate officers at the operational level and build self-imposed obstacles to success.  These comments are not meant to diminish the strong efforts of some people within the organization, both enlisted and civilian, including some command level personnel, who simply "get it" and want meaningful change for APD.  As we have noted in the past, we continue to be met with professionalism in many corners of the organization, but significant work is left to be done.  Marshaling the positive forces and retraining or retiring the negative forces is a critical task for APD.

As noted in this report, APD continues to struggle to gain compliance with the training programs they deliver to their officers.  This issue has persisted for years, in our experience.  When some training gaps are closed, other gaps are opened.  In addition to failing to address some training gaps that were identified by the monitor, during this reporting period the monitoring team learned that APD introduced a new concept into their use of force calculus, complicating it even further.[56]  That term, "*De Minimis* force," was apparently derived from conversations APD had with representatives from the Seattle and Cleveland police departments. It is the monitoring team's opinion that introducing this concept, based on APD's current capacity to develop salient policy, report and investigate uses of force, could be a significant step backwards in their reform. APD has not demonstrated the ability to properly train their officers in a timely and meaningful manner in the past; therefore, this concept being introduced at this stage will require a strategic approach to properly train officers and supervisors to report, investigate and decide what actions constitute "*De Minimis* force".  Since this concept was not mentioned to the monitoring team during its June 2017 site visit, we doubt that it has been implemented strategically. Defining the term and dropping it into a policy in the "definitions" section, with no elaboration in the policy itself, and then simply communicating the definition to APD officers and supervisors, has, in our opinion, little chance for positive operational results.  There are many issues APD must consider when implementing such a concept.

---

[56] SOP 2-55 "Use of Force Appendix" now contains a definition for "De Minimus Force" not found in the CASA.

To date, APD has struggled significantly in determining how to identify the threshold for when an officer's actions constitute force at the lower end, mostly because they have failed to include basic terms of the CASA, specifically "un-resisted handcuffing".[57] To date, despite numerous suggestions, in numerous settings, APD has yet to accept this relatively straightforward concept.[58]  The failure to accept this language has resulted in training gaps, operational deficiencies and substantial confusion by officers and supervisors in the field.  Instead of accepting our past technical assistance, APD appears to have instead turned to the concept of "*De Minimis* force" to accomplish the task.  Equally troubling is that APD trained "*De Minimis* force" *before* it was articulated, defined and approved in clear APD policy, *and* before the concept was discussed with the monitoring team.[59]  To be clear, based on our experience with APD, the monitoring team feels they could be traveling a path that leads to manifold difficulties in training and operational compliance in the field.

We cannot emphasize enough how the improper implementation of the concept of "*De Minimis* force" could result in further self-imposed obstacles on the path toward operational compliance.  The monitoring team has already seen one instance where this concept was incorrectly applied in a use of force event[60], and then was reinforced up to and including the command review of a case.  Command simply failed to grasp key issues involved with the *De Minimis* force concept.  Our concerns have already been communicated to APD.

As an example of how APD may have applied this concept incorrectly, or incompletely, consider that the Seattle Police Department uses the term "*De Minimis* force*," which is defined and articulated clearly and procedurally in its use of force policy.  However, Seattle PD also has a use of force reporting table that specifically connects the term "un-resisted handcuffing" to "*De Minimis* force" to help operationalize the concept and galvanize the types of actions (meaning trivial or insignificant) that fall into that category. That metric was not adopted by APD policy, and, while we understand that an SOP cannot be fully

---

[57] CASA Paragraph 12yy - "Use of force" means physical effort to compel compliance by an unwilling subject **above un-resisted handcuffing**, including pointing a firearm at a person. (Emphasis added)

[58] While on site in June 2017 the monitoring team met with APD's use of force expert and broke the concept of "…anything above un-resisted handcuffing" into three questions that could help APD.  Our technical assistance appeared to resonate with the instructor and it was clear our suggested approach illuminated a training pathway for him.  Specifically, we broke the issue into a three-part assessment: 1) Is the officer handcuffing a suspect (or is the suspect handcuffed)?; 2) Is the suspect resisting arrest by APD definition?; 3) Is that officer performing any of the activities that constitute force within their policy?  We note that APD is not confined by this calculus, but to date it seems unclear that they have attempted to break this force assessment down in any manner.  It was obvious that the APD use of force expert understood the technical assistance and indicated he could translate it into training.

[59] APD's propensity to train "proposed policy changes" presents concerns and serves as a means to confuse operations in the field.  We have seen APD train "proposed policy changes" in the past and highly discourage the practice.

[60] The case is detailed herein.

83

adopted from one agency to another, since agencies bring their own unique needs and problems, we note that APD needs similarly "controlling and limiting" language if the implementation of policy is to be effective.  We are drawing no conclusion on the effectiveness of this term and its operational use in any organization other than APD.  We know, from our experience, that APD regularly falls short in its oversight of use of force, its ability to instill accountability as a cultural principle, its capacity to objectively assess facts centered on uses of force, and its ability to effectively train use of force concepts to officers and supervisors.  It is for that reason that we amplify this cautionary message to APD.

Further we note that the tasks confronting APD are no different from those that confronted LAPD and the Pittsburgh police, yet those agencies were able to define, operationalize their definitions, train, supervise, and where necessary discipline their way into compliance.  The present APD approach of not operationalizing their definitions through training, of developing substandard training "plans" and documentation, of poorly assessing "learning," and of poorly supervising uses of force are a recipe for continuing failure.

In IMR-5, the monitoring team reported on a number of use of force cases that contained deficiencies in performance, reporting errors, and failures to report uses of force.  In preparation of this report the monitoring team made specific requests for data to determine what activities APD undertook to remediate certain deficiencies we identified.  Specifically, we asked for the following:

1.  "In IMR-5, **[IMR-5-011& IMR-5-012]** were incorrectly labeled as ECW cases.  Please provide COB documentation if that administrative discrepancy was corrected."

2.  "In IMR-5, **[IMR-5-008]** was deemed to have had unreported uses of force.  Please provide copies of any/all COB documentation, internal memos and investigative reports related to APD follow up activities related to this case. Please include any APD training and/or counseling records of personnel involved, if they exist."

With respect to cases **[IMR-5-011 and IMR-5-012]**, APD prepared an Interoffice Memorandum detailing their remediation efforts for the reporting discrepancies in those cases. The memorandum, prepared by a Program Data Analyst within Internal Affairs and dated May 22, 2017, details how APD's Blue team system was incapable of differentiating between the display of an ECW and the application of an ECW when an officer made an entry into the system. The memorandum goes on to indicate that a selection entitled "ECW-Painting" has been added to the system and is now being utilized in the field to properly capture this data.  The monitoring team is satisfied that this issue is being remediated, but point out that this type of discrepancy has a direct impact on the credibility of data collected by the organization since there may be other similar

instances APD has not self-identified.[61]  The issue of these specific cases being improperly categorized defeats APD's oversight measures, was only uncovered when the monitoring team highlighted it, and diminishes monitoring efforts due to data and methodology flaws.  Simply put, even at this relative late date in the reform process, APD has yet to build a critical self-assessment, analysis, problem-identification, or problem-solving capacity when it comes to use of force.

Conversely, the monitoring team is confounded by APD's lack of remediation efforts with case **[IMR-5-008]**, and feel APD has instead "doubled down" and improperly applied and relied upon the term "De Minimis" to explain away a reporting and investigative deficiency.[62] The case in question involved four APD officers, one of whom utilized his ECW when assisting the other three, since they were struggling with a suspect who was actively resisting arrest.   The subject was ultimately charged with myriad crimes including resisting an officer and domestic abuse.  The monitoring team noted in IMR-5 that APD only reported the ECW as a use of force, and commented that three additional uses of force went unreported in the same incident.  We find it remarkable that APD can charge an individual with resisting arrest, and at the same time contend that no force was used in effecting the arrest.  To anyone familiar with the basic processes of policing, this contention simply defies all logic, yet APD continues to insist no reportable force was used leading up to the use of the ECW.

In response to our request for additional information, APD submitted an interoffice memorandum, dated May 1, 2017 (a date that was before the monitor approved the definition of De Minimis in APD's use of force policy submission) that was prepared by an Area Commander.  In his memorandum the Commander stated, "In this case the first three Officers' actions were considered De-Minimis in nature and hence separate blueteam (sic) reports were not completed."  The Commander went on to reinforce his position by stating, "A shortfall that I did identify is that the evaluation of the first three officers (sic) de-minimis actions, which did not rise to a level that required a use of force entry, should have been documented in BlueTeam." The monitoring team views this review as deficient, and based on the facts of the case clearly demonstrated that the application of the term "De Minimis" in the context of a use of force is unclear to APD officers and command-level staff.   The Commander noted within his report that a separate "Non-Use of Force" memorandum was prepared by a lieutenant (Dated May 1, 2017, well after the original event) and was appended

---

[61] We note that in another memorandum APD did self-identify additional cases that were improperly reported, however, that does not satisfy potentially incorrect reporting over the past several reporting periods that may still be unresolved.

[62] In IMR-5 the monitoring team did not expound upon this case, but simply pointed out that unreported uses of force existed. We fully expected that APD would review the case, recognize the mistake and take remedial action. Apparently, that never happened.

to his report.[63]  It is unclear to what extent the Commander legitimately followed up on this case.  At best, the monitoring team views his effort as perfunctory and as reflecting a lack interest in the remediation of a reporting error and performance deficiency.  We note that this Commander met with the monitoring team while we were on site and we found him to be professional and engaging, so it is particularly troublesome that his interpretation of the facts and circumstances of this case would lead him to believe that the actions of the officers did not rise to the level of a reportable use of force.[64]  Based on our read of the memorandum, we are equally concerned that he may have relied solely on a review by his lieutenant instead of independently returning to the case to review all the available data.  Whichever is the case, the response reveals significant issues relating to APD's ability to timely receive information and properly remediate performance deficiencies on a 2016 case.[65]  We note this appears to continue to be a substantial and recurring issue, as described elsewhere in this report.

The monitoring team was ultimately provided and reviewed the memorandum prepared by an area command lieutenant, who was apparently tasked with following up with this case.  In his memorandum he stated, "I noted a couple of times that the suspect was physically contacted by officers that were *De Minimis* in nature and did not constitute a use of force."  As with case assessments we have previously reported to APD, we could provide exhaustive detail as to the events of the case, as well as comments made by officers within the case, to illustrate why the actions of the three officers rose to the level of a use of force under APD's use of force policy and the provisions of the CASA.  We will not do that here, but want to make clear that the memorandums prepared by these two APD commanders, in our professional opinion, are not an accurate reflection of the incident, nor do they adequately resolve many basic questions.[66]  In our opinion, they represent a deliberate attempt to "recast" the events documented in this case and to minimize what, in our studied opinion, constituted clear and convincing use of force.  This is an exceptionally serious concern to the monitoring team.  In the calculus these Commanders used to determine that the actions the officers were "*De-Minimis*" they do not resolve obvious conflicts of facts.  For instance: 1) If the first three officers' actions were *De Minimis*, and a

---

[63] The monitoring team was not provided a copy of the appended memorandum, despite the unambiguous request we made for data.  A subsequent, more specific, request was necessary to obtain the "Non-Use of Force" memorandum that was prepared by the lieutenant.

[64] This shortcoming is indicative of the type of assessments we reported on in IMR – 5, where Command level reviews were found to be entirely deficient.

[65] We note that the memo provided by the commander was dated May 1, 2017, and was delivered in Microsoft Word.  A review of the "properties" of the document indicate it was created on June 19, 2017.  It is unclear when the memo was created, but as we have seen in the past it is most probable that it was created in response to our data request, which was delivered toward the latter part of May 2017.

[66] Had these commanders simply applied the basic concept that anything "above un-resisted handcuffing" as defined in CASA paragraph 12yy, as well as "active resistance" as defined in CASA Paragraph 12g, and "use of force reporting" as defined in CASA Paragraph 12aaa, it may have been clearer to them.

86

proportionate response to resistance they encountered from the suspect, then how was it also objectively reasonable for the fourth officer to use his ECW against the same suspect?  2) If the actions of the three officers were reasonable, which the monitoring team believe they were, was the use of the ECW by the fourth officer objectively reasonable and the minimum amount of force necessary under the circumstances?  3) If so, how is that fact reconciled against the notion that the officers were using "De Minimis" tactics before the suspect was Tased?  4) If not, what was done to address the fact that an APD officer used a Taser against a person whose actions only required a "De Minimis" response by the first three officers? 5) How do the Commanders reconcile that, during the event, the resistance by the subject was significant enough that one of the first three officers called for the use of the ECW? These issues are emblematic of the troubles APD is visiting on itself with the concept of *De Minimis* force.

The Commanders either never considered, or ignored, the fact that the actions of the suspect were significant enough that three officers could not control him. In fact, the officer who ultimately used his ECW on the subject immediately perceived the situation as needing an ECW response, thus debunking the notion that the three officers' could have been engaged in any type of "de minimis" encounter with the suspect.  Likewise, the actions of the suspect were so significant that one of the initial three officers verbally called for the use of a "Taser" during the altercation.[67]

In the opinion of the monitoring team there were unreported uses of force that have still gone unreported by APD, despite our expressed concerns.  We also believe that the actions of the initial three officers were objectively reasonable under the circumstances.  However, if APD views the actions of these three officers as being "*de minimis*" in nature and not constituting a reportable use of force, then their perspective has seriously problematic implications. **[IMR-5-008]** will be followed up by the monitoring team during its next site visit to determine what remediation efforts have occurred in terms of reporting, training, and interventions for all members involved in this matter, inclusive of those who reviewed this case. Inclusive in this follow-up in IMR-7, the monitoring team will be looking for the specific learning elements in an APD training course the supervisors/commanders relied upon in forming their rationale to support their conclusions.

The monitoring team requested the data set for supervisory level use of force cases that were reported between February 1, 2017, and July 31, 2017, to conduct a comprehensive review of a sample of those cases.   From that list we intended to select a random sample of cases to review for a given reporting

---

[67] Even after the initial use of ECW the three officers still struggled with the subject to the extent that subsequent warnings were necessary so the suspect understood he would be "Tased" again if he did not stop resisting.

period.[68]  However, in May 2017 we received an initial data set from APD where they reported use of force cases.  We immediately noticed a significant number of cases that were incomplete dating back to the beginning of 2017.  In past data submissions, we found uninterrupted listings of case numbers, where in this instance we observed significant gaps.[69]  This caused the monitoring team to suspend requesting specific cases to be reviewed for this reporting period.  As of August 2017, the monitoring team made the following observations of the data reported by APD:

1. APD reported a total number of 211 distinct use of force cases involving 307 officers.
2. As of August 1, 2017, none of the reported supervisory use of force cases for the months of May, June or July 2017 were completed!
3. As of August 1, 2017, there were still approximately twenty (20) reported supervisory use of force cases pending from January 2017.[70]
4. Data was requested concerning reported show of force cases for the timeframe of February 1 through April 30, 2017.[71]  When the data were reported in May 2017 there were still twelve (12) incomplete show of force investigations for the month of February.

The monitoring team feels these statistics demonstrate that APD's oversight of use and show of force has passed the point of critical failure.  At this rate, the quality of work associated with the investigation of cases will undoubtedly be adversely impacted, given the passage of time.[72]  Likewise, this type of case backlog will undoubtedly result in instances of unaddressed performance deficiencies (at all levels), out of policy uses of force, or even instances where there is potential criminality on the part of officers.  We see this as a clear, serious and critical breakdown of oversight of use of force.

### Review of Case [IMR6-001]

In preparation for its June 2017 site visit the monitoring team requested that APD schedule a Force Review Board (FRB) meeting that centered on the review of supervisory use of force investigations or serious use of force investigations

---

[68] We note that we also made a request for use of force and show of force cases.  However, the factors that influenced our decision to not review those cases for this reporting period were not fully understood until after the cases were received and reviews began.

[69] During our site visit we learned that APD was now generating their case lists from Blue Team, which presented the information in a complete manner.

[70] We say "approximately", instead of being more precise, due to the confusing manner in which APD lists information.  Regardless, numerous cases reported at the supervisory level are pending in January 2017.

[71] Because the data were presented differently, the data set reported on is more limited than the cases of use of force; however, the numbers are further illustrations of the significant and unacceptable investigative backlogs APD currently holds.

[72] When reviewing cases for IMR-5 we noted one case in which a commander indicated that a case was "delayed" due to him being 37 use of force cases behind!

conducted by CIRT. Whenever possible, the monitoring team appreciates the opportunity to sit in on routine meetings that are held by the FRB.  Shortly after our request, the monitoring team was made aware that, while we were on site, the FRB would conduct a meeting that centered on the review of two serious use of force cases. We requested materials related to those cases and were provided a limited record.[73]  We followed up with APD and requested that all officer lapel videos associated with the case be provided, since the FRB was only being provided a significantly condensed version of the available lapel videos.  It is important to note that the monitoring team did not dictate what cases should be heard while we were on site; the cases were picked entirely at the discretion of APD.

**Case Facts:**  On May 10, 2016, an APD officer (O1) was detailed to a Walmart for a reported shoplifting complaint. Upon his arrival, he met with store employees and was provided a description of two suspects. Shortly thereafter, the officer observed the two subjects walking out of the store, so he approached them to investigate further.  One suspect (S1) immediately ran away, while the second suspect (S2) followed the officer's directions and remained at the scene. S1 was never identified or located, and S2 was placed into handcuffs. S2 was charged with several crimes including fraud, identity theft and battery on a police officer (*et. al*).  S2 immediately alerted the officer to a preexisting injury to his shoulder that made wearing handcuffs behind his back, and sitting in the patrol car, painful.  S2 exhibited an excited demeanor, and the officer's ill-advised and unprofessional attitude toward S2 appeared to contribute to, and exacerbated, S2's conduct, which quickly became combative and uncooperative.

On May 12, 2016, the officer's immediate supervisor prepared an Interoffice Memorandum to a sergeant in CIRT indicating that he had just been told by another supervisor that two days earlier O1 had been involved in a use of force on a handcuffed person.  As a result of that use of force, the suspect sustained lacerations to the face and head.  The supervisor indicated that he reviewed the lapel video of O1 and identified actions that he believed "…fall within the parameters of [an unreported] Serious Use of Force."

On May 17, 2016, a CIRT detective forwarded an Interoffice Memorandum to his sergeant, and simply alerted him to the fact that the Interoffice Memorandum from the officer's sergeant was received and that the Serious Use of Force Report and 24-hour Notification reports to the Chief of Police were delayed. There is no other indication that the CIRT detective conducted an independent investigation at that time, despite the fact that O1's supervisor alerted CIRT to an unreported serious use of force.

---

[73] Despite numerous recommendations that the FRB review a complete data set for cases they hear in their meetings, the FRB continues to review a limited record.  Specifically, the FRB relies entirely on reports, presentations by CIRT and watching condensed clips of lapel videos (instead of all available officer lapel videos).  We have seen this as a critical failure on the part of APD since the monitoring team has consistently found performance deficiencies by watching the complete inventory of officer lapel videos relative to specific incidents.

On July 11, 2016, a CIRT sergeant submitted an Interoffice Memorandum to the Commander of the Professional Accountability Division requesting an extension for the investigation.  He wrote, "The reason for this request is to have the report completed prior to submitting it to the Force Review Board to ensure compliance with policy and procedure."  In his memorandum, the sergeant incorrectly referred to the event as a use of force, not a serious use of force.  Despite obvious and serious policy violations APD failed to initiate an internal affairs investigation.

On March 10, 2017, by way of interoffice memorandum, an APD CIRT lieutenant unilaterally "suspended" the provisions of a monitor approved policy related to misconduct investigations.  His memo indicated that from that point forward, if misconduct is identified by CIRT during a serious use of force investigation, the CIRT detective would retain the investigation of misconduct and not refer the case to IA,[74] a *direct violation* of approved policy.  We are simply befuddled that a lieutenant would, and more importantly *could*, "suspend" approved policy in this matter.

The investigation into this serious use of force lay dormant, with no investigative steps by CIRT, until February 2017, an unexplained delay of seven months![75] The investigation was not submitted by the CIRT detective until April 28, 2017 (Nearly a year after the event).  The CIRT detective identified numerous policies violations, but determined that the use of force against a handcuffed person was reasonable!

The case was reviewed by a CIRT lieutenant on April 28, 2017.  The lieutenant wrote, "… Forcefully pushing an individual into the wall, where the individual has no ability to break that contact, raises the level of intrusiveness and risk."  The lieutenant comes up short of finding that the force was not objectively reasonable, but noted a recommendation to the FRB that the case be referred to the Chief of Police for discipline and/or corrective action."  At this point APD still had not initiated an internal affairs investigation.

On May 4, 2017, the IA Commanding Officer prepared a report and outlined issues with the investigation.  He noted an "apparent out of policy use of force" (though not specific) and how the officer's actions contributed to the need to use force.  He acknowledged the lack of timeliness of the investigation, and noted

---

[74] The process by which APD moves serious use of force investigations and the investigation of misconduct around was self-imposed.  The monitoring team has commented about the inefficient manner in which APD approaches these cases on numerous occasions.  The issue is not the appropriateness of the content of the CIRT lieutenant's memorandum, it's the fact that APD unilaterally suspended the provisions of a monitor-approved policy.  Also, APD did not alert the parties to the action, or communicate the change in procedure internally to its own members. It remitted to the monitor the function of "catching the error."

[75] We note that the Evidence.com audit logs show the officer's lapel video was reviewed by APD and a city attorney in October and November 2016.

that he conducted a review of O1's activities; his review showed that O1 was the "…top user of force for a six-month period from November of 2016 through April 2017." At this point APD still had not initiated an internal affairs investigation!

The following is a non-exhaustive list of issues and failures related to the use of force, force reporting, supervisory investigation, CIRT investigation, and FRB oversight.

<u>Failure to Report Force</u>

1. O1's attitude and demeanor was unprofessional from the beginning of the incident and contributed to the need to use force against a person.
2. O1 failed to properly address the complaints of pain by S1, and simply ignored and dismissed his complaints.
3. O1 failed to report a use of force at the scene of the Walmart.
4. O1 used force against a handcuffed person at the police station by forcefully swinging the handcuffed suspect face-first into a masonry wall. Since S1 was defenseless because he was handcuffed (hands posterior), the actions of O1 caused obvious injuries to the suspect's face and head. O1 failed to report the serious use of force.
5. In the memorandum prepared by O1's immediate supervisor he wrote, "(Supervisor 2) did not recognize the incident as a serious use of force and was going to initiate a general use of force investigation, which explains the delay in notifying CIRT." This is not supported by the statement by Supervisor 2 or the investigation later conducted by CIRT, and could constitute false reporting by Supervisor 2.
6. O1 wrote a report related to the uses of force inconsistent with the facts. O1's supervisor approved O1's initial report with the inconsistencies.
7. Supervisor 2 failed to address O1's use of force or serious use of force when it occurred.
8. Supervisor 2 failed to accept a complaint from S1 that O1 slammed his head against a wall.
9. At no point is there any intervention by a lieutenant or commanding officer that supervises the sergeants and officers involved in this case. The initial interactions appear to be confined to sergeants from an area command and CIRT. To date, we have been presented with nothing that suggests that the lieutenant or Commander responsible for this Area Command interceded to ensure that proper accountability occurred.

<u>CIRT Investigation Follow Up</u>

1. CIRT failed to immediately initiate an internal affairs misconduct investigation, despite obvious and serious policy violations.
2. The investigation conducted by the CIRT detective did not constitute a legitimate IA investigation and can best be described as a quasi-IA investigation.

3. CIRT failed to actively investigate an obvious serious use of force (that went unreported initially) for approximately 8 months.
4. A CIRT detective found reasonable an obvious out of policy serious use of force.
5. A CIRT detective failed to identify a use of force.
6. A CIRT detective failed to identify all policy violations associated with the case.
7. A CIRT detective failed to obtain a prosecution declination from the District Attorney before interviewing O1. This placed both the investigation and the officer's rights in jeopardy.
8. During his interview of O1 the CIRT detective allowed the officer to read his own *Garrity* rights into the record.[76]
9. A CIRT detective and chain of command failed to identify obvious candor issues on the part of the officer.
10. Despite the CIRT detective identifying numerous policy violations against O1 and two sergeants he stated, "Due to multiple policy violations, the case will be reviewed by the Force Review Board for any follow up actions at that time."  By policy (and by accepted practice) there should have been an immediate referral to IA for an investigation.
11. There are obvious inconsistencies in and between the recorded CIRT statements of O1 and the supervisors.
12. CIRT failed to interview the other officers that where present in the station when S1 was under arrest.

IA Supervision and Investigation Follow Up

1. IA leadership failed to properly supervise this investigation and hold accountable CIRT personnel for failing to properly investigate the event.
2. IA allowed an unreported serious use of force to go uninvestigated for more than 8 months, thus impacting officer and supervisor accountability.
3. IA failed to initiate an internal investigation when they became aware of numerous, serious policy violations.  Instead, the case was deferred to a FRB meeting on June 14, 2017 (more than a year after the event).
4. IA failure may lead to an inability to discipline an officer for using excessive force against a handcuffed person.
5. IA failed to identify obvious candor issues within the report and interview of O1.

FRB Meeting

1. The FRB failed to review a full investigative record to make a meaningful determination.
2. The CIRT lieutenant described the officer's actions as an "unreasonable application of force".

---

[76] APD has struggled significantly with the proper application of *Garrity* rights.

3. A member of the FRB expressed concern that APD introduced an assessment of the officer's force that was unrelated to the case at hand. Consequently, he felt voting by the board may be tainted. An APD commanding officer argued against that perspective.

4. When the meeting began the Chairperson of the FRB asked if everyone had an opportunity to review the videos associated with the case. That question was met by a positive response in the room. Later in the meeting, when the presentation of the case was obviously becoming unraveled, a member of the monitoring team asked a similar question about whether the FRB members watched all the videos associated with the investigation, some members shook their heads no, others remained silent and one said explicitly that they could not open some of the videos.

5. The presentation by CIRT at the FRB meeting was not an accurate reflection of the event, thus validating the monitoring team's recommendation that FRB members review all available data for a case.

6. It was obvious to the monitoring team that aside from members of CIRT and IA, other members of the FRB were unaware that CIRT unilaterally suspended provisions of the SOP related to misconduct investigations.

7. APD self-imposed a practice where the FRB is not a "safety net" to ensure an IA referral resulting from a use of force occurred (when appropriate), or that the lower level assessments of force were appropriate, but instead a place to make those types of determinations. Building a system in that manner is unsustainable and creates an atmosphere where performance management is ineffective and accountability nearly non-existent.

8. The case was centered on the use of force, thus omitting the many other policy violations that existed. Had the officer's force been deemed reasonable by the FRB, it appears unlikely that the case would have been advanced to IA for other charges.

The 44 failures associated with this case cross commands, ranks and organizational disciplines, and represent clear systemic failures in APD's force oversight. It seems inconceivable, given where we are in this multi-year process (half-way through the four-year proposed life cycle of the CASA) that APD could commit a combined 44 errors in a case that involves a clear and compelling set of facts indicating serious applications of force against a handcuffed prisoner.

Numerous members of the organization interacted with this case up to and including the June 14, 2017 FRB meeting and no commander interceded to ensure the case was properly handled. Following the FRB meeting, members of the monitoring team interacted with several APD personnel, all of whom expressed some degree of embarrassment or confusion over the handling of the case. In the summer of 2016 the monitoring team prepared a Special Report outlining systemic failures by APD when addressing a specific series of uses of force and a serious use of force incident by two officers. At the time, APD took umbrage to the notion that systemic and cultural issues existed within the department. Instead, APD suggested that the monitoring team was not taking into consideration significant strides the organization had made following the

delivery of use of force and force investigation training courses.[77] It is important to note, those conversations occurred at the same point in time as the case reported here was being mishandled alarmingly.  If so inclined, the monitoring team could write a Special Report about this case that rivals that which we prepared in 2016.  The cases related to the 2016 Special Report were mishandled, and when done, APD's IA admitted that the time for disciplining the officers in those cases had passed; APD instead would have to rely on misconduct in subsequent cases involving the same officer to execute discipline.  The case reported here may result in the same outcome, especially since the monitoring team has been advised the officer in this case was APD's top user of force for a six-month period from November 2016 through April 2017.[78]  It is unclear what follow-up activities APD took toward this officer, or others, after discovering this fact about O1.  The monitoring team will request evidence that APD has conducted legitimate remedial action with respect to O1 and other personnel that demonstrated performance deficiencies in this matter, including supervisory and command level officers.

We did review counseling memorandums prepared by an APD major to members of IA and CIRT following the June 14, 2017, FRB Meeting.  The monitoring team does not find the effort at remediation compelling, and instead believe it was done improperly and incompletely.  APD continues to react tepidly to critical mistakes involving important CASA related activities, and therefore, should not be surprised if meaningful change in performance does not occur.  We are, frankly, befuddled by such timid and ineffectual supervisory, command, and executive responses to clear and convincing violations of policy and potential criminal activity.

The monitoring team specifically requested APD provide official documents or communications from the FRB following the June 14, 2017, FRB meeting.  We were interested to see what activities they took to remediate the issues that existed.  We were provided a one-page Interoffice Memorandum, dated June 15, 2017, entitled, "Request for an Administrative "I" Number.  The memorandum listed a number of policy violations by O1, as well as one other officer and two supervisors associated with the case.  As noted above, we are also aware that counseling memorandums were delivered to two IA/CIRT personnel.  The monitoring team could comment extensively about the shortcomings of these responses, but will reserve comment until APD reports that it has completed its efforts to remediate the performance deficiencies for all officers, detectives, supervisors and commanding officers.  Shortly after the June 14, 2017, FRB meeting, APD was put on notice that there were significant concerns with the handling of the case.  The monitor requested that APD provide a plan for

---

[77] We note that those cases were deemed deficient and still have outstanding gaps.  We alerted APD to issues with the training prior to the delivery but APD plunged forward in spite of technical assistance the monitoring team attempted to provide.

[78] It is unclear is a more comprehensive analysis was completed for this officer for other periods of time, specifically, the time frame when the event in this case occurred.

addressing the many facets of the case that need to be handled, but none was ever presented for review.   We consider this clear and convincing deliberate non-compliance.

In IMR-5 the monitoring team provided general, but common, issues we observed when we conducted our reviews of cases.  Some of those observations included:

- A significant issue is the manner [in which] supervisors approach suspects to get statements concerning the use of force.  We saw a situation (that was particularly troubling) where, in our opinion, the supervisor's approach and demeanor toward the suspect would not reasonably lead to the suspect providing a statement concerning the use of force.
- We encountered instances where all uses of force within a same event were not reported and investigated as force.  Instances where the focus of an investigation was on an ECW deployment and there was a failure to document physical force in the same event.
- Failures to address how an officer conducted the initial contact and how that may have contributed to the need to use force.
- Failure to address tactical issues in a timely manner. In one case, a specific officer failed to properly control a situation by separating a suspect from potential victims/witnesses. That loss of control of the situation was a contributing factor to him ultimately resorting to an ECW deployment.
- Some information in reports was not consistent with the videos we reviewed, for instance, in one case the officer documented that he asked to pat a suspect down, when in fact he told the suspect he was going to pat him down. This same officer did not identify what his reasonable articulable suspicion was to believe that the suspect was armed with a weapon.[79]
- In a case involving a highly-intoxicated person, while placing the suspect in the back of the patrol car (while handcuffed) the suspect's face struck the top of the door frame and he fell to the ground.  The officer should have taken more care after the initial incident, but didn't, and when trying to put the person in the back of the car their face hit the top of the door frame a second time.  This was not properly addressed during the chain of command reviews.
- In one case supervisors *at every level* failed to adequately reconcile an injury to a suspect's eye against officer actions that were obvious from review of the officer's lapel video.[80]
- A commander indicated that a case was "delayed" due to him being 37 use of force cases behind.

---

[79] We saw in more than one case that officers fail to properly articulate their RAS for conducting a frisk.

[80] The officer's actions in the case were not unreasonable, but the chain of command seemed predisposed to attribute an injury to an event that occurred prior to the officers arriving on the scene.  At an absolute minimum, the officer's actions had to be addressed and discussed as a possible contributing factor to the injury.

95

- A supervisor and the chain of command missed a material inconsistency in a report. One officer documented in his report that a suspect (who had resisted arrest and was handcuffed) lunged at the door with his head while being walked outside a business establishment in handcuffs. We saw on a lapel video that the suspect apparently struck the door with his face/head area, and that there was a vocal reaction by the suspect, but it was not identified or addressed by the supervisor or chain of command.[81] That factor and inconsistency among reports was not noted and addressed at any level of supervision. We also noted that it is documented in one report, but not in the reports of other officers that were in the position to see it.

We requested data from APD to demonstrate that issues (as listed above) were addressed appropriately by APD following the delivery of IMR-5.  In the opinion of the monitoring team, the data submitted does not adequately address monitor remarks, or address performance deficiencies, but constitutes a half-hearted, "check the box" response by APD.  Frankly, we do not believe APD knows what to do at this point, and may be overwhelmed as new use of force cases and monitor feedback on cases accumulate behind them.  We believe that progress has been made to address the significant backlog of CIRT serious use of force cases, but if the work done to accomplish that task is commensurate with that we saw in **[IMR6-001]** then APD must question "What was actually accomplished?"  In the opinion of the monitoring team, providing more feedback on cases to APD for this reporting period would have marginal value at best.  We believe APD has reached a point where they are over-saturated with annotated errors and omissions.  We see it as critical that the agency rethink and re-assess its entire use of force oversight system and the attitudes of supervisors and commanders within that system.  To date, this is the most mission-critical deficiency we have noted in the agency:  supervisory, managerial, and executive personnel often do not realize excessive, unwarranted and/or improper use of force when they see it.

### 4.7.28 Assessing Compliance with Paragraph 41:  Use of Force Reporting Policy

Paragraph 41 stipulates:

**"APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices. The use of force reporting policy will**

---

[81] The event itself was obvious to the monitoring team when watching the lapel video of an officer walking behind two officers that were escorting the suspect outside.  It is unknown how it could be missed by the chain of command, especially because it was specifically noted in one of the officer's reports.

**require officers to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force. Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor. This reporting requirement also applies to off-duty officers engaged in enforcement action."**

## Methodology

APD SOP's related to use of force[82] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies. This delay was due principally to "debates" by APD regarding what constituted approvable policy on these topics.  While the policies included substantive structural changes (i.e. The use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain critical topics that have lingered for APD were resolved[83] in terms of policy provisions:  Specifically, 1) "Low Ready" was defined to help clarify what constitutes a reportable show of force; and 2) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated[84] in SOP 2-54-5-B (These issues had been significant obstacles to APD's compliance efforts).

The monitoring team made three separate data requests related to this paragraph and reviewed submissions that APD made in response to those requests.

## Results

In Paragraphs 87 and 88, we report outstanding training gaps that exist for APD that are applicable to this Paragraph. We will not repeat here those comments set forth in Paragraphs 87 and 88 in this section. Instead, one issue will be addressed to demonstrate how recurring or unresolved training gaps are obstructing reasonably good efforts to gain Secondary Compliance.

Previously we noted that APD's "blank sheet" approach to report writing lacked the structure commonly used to ensure reporting consistency and

---

[82] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

[83] Our intent here is to list changes to the policies that are relevant to this paragraph and not every policy change that occurred.

[84] Later we comment about our concern that APD leaving a supervisor response to the scene of a show of force up to their discretion as a probable critical shortcoming in their operating procedures.

completeness in a wide range of settings.  We suggested, and have seen APD shift to implementation of checklists. We previously noted that SO 16-99 made mandatory the use of the job aids (checklists) that were introduced during the "Standardizing Use of Force Investigations" course that was delivered in December 2016.

We have commented in past reports on the importance of reviewing a complete record of lapel videos at the command level as well as with the Force Review Board.  We recognize the burden this places on higher levels of review, since they are the central review point for all uses of force under their scope of influence.  However, as demonstrated in **[IMR6-001]** (and evidenced in case reviews we conducted for IMR - 5) there are still significant shortcomings in APD officers reporting and supervisors identifying uses of force.  By only requiring bookmarked sections to be reviewed at the command level, APD's reliance upon frontline and chain of command reviews will be critically important to their Operational Compliance.  We noted in IMR-5 the lack of effectiveness of supervisory, mid-management, and command reviews, and consider this a critical issue moving forward.

We caution again, that this could ultimately impact APD in the future and we see this as something essential for them to regularly assess and consider fully as they move forward.  We have provided technical assistance in this area, but have not seen evidence that APD has operationalized any suggestions the monitoring team has provided.  We continually see many of our suggestions simply ignored or marginalized.  Specifically, we have recommended on numerous occasions that APD consider implementing an independent "Review Team" whose sole responsibility is to conduct reviews of uses of force and serious uses of force cases.  This team of APD personnel would review all cases of reported uses of force, and provide, presumably, an independent assessment of cases across the organization.  This would also help APD with disparate handling of cases across organizational commands.  While the FRB should serve that purpose, we have not seen evidence that the FRB is capable of addressing that issue.  Nor do we find it willing to do so.

Parenthetically, the monitoring team discussed this concept with a Deputy Chief following the IMR-6 reporting period and believe that he is having internal discussions on this topic.  The Deputy Chief hoped to have a team of people working from his office who will conduct directed and random reviews of use of force cases.  Had he been successful, significant change would have occurred gradually, and APD should have seen positive dividends in the future.  We cautioned the Deputy Chief that adding a level of review is less important than ensuring that the reviews they conduct are truly objective and a "legitimate" assessment.  If not, the effort will end up as an exercise in futility.  Based on current information

available to the monitoring team, that review process was never approved and implemented by the chief of police.

During past reporting periods the monitoring team conducted in-depth reviews of APD use of force cases that involved various types of force. The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  For IMR -5 the monitoring team conducted in-depth case reviews for this paragraph and the calculated compliance rate for sixteen (16) use of force cases was 75%.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance on training, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and additional work continues to be needed to bring all related use of force training into alignment with the CASA.  Training on these topics has been fragmentary, disjointed and piecemeal, and needs to be completely reassessed, revised, and reviewed by APD to ensure that all applicable elements of the CASA's use of force paragraphs are covered.  We strongly caution APD that "gap training" mistakes not be repeated in this new training calculus, and that training is supported with actual lesson plans responsive to the GO-MAPS process we have outlined for APD's training personnel on multiple occasions:  Goals, Objectives, Measures, Assessments, and Product that has Sustainability.  Despite our repeated admonitions to the Academy, the City has simply refused to provide consistent proposed training product in a manner that complies with standards and practices in the field.  The results of those refusals are training "plans" that have no resemblance to accepted work product related to organization, structure, and content of law enforcement training plans.  We have repeatedly reminded the City and the management cadre at the Academy of this deficiency.  We have reason to believe this continued non-compliance is deliberate.

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.28a:  Ensure that all lapel video is viewed at some point by trained and effective review staff, and that any noted "policy outliers" are noted, in writing, and forwarded up the chain of command.***

***Recommendation 4.7.28b:  Ensure that Area Commanders consider and track these "policy outliers" as part of their command***

*oversight function, e.g., increasing "review rates," increasing supervisory field contacts with triggered personnel, increasing report review and assessment frequency for triggered personnel, assigning remedial training, ordering increased review frequencies, etc.*

*Recommendation 4.7.28c: APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases.  Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.*

*Recommendation 4.7.28d:  Revise training academy work processes related to use of and supervision of the use of force training by developing lesson plans congruent with national practice, and ensure that all training product conforms to the processes articulated in response thereto.*

### 4.7.29 Assessing Compliance with Paragraph 42:  Force Reporting Policy

Paragraph 42 stipulates:

**"The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the investigation. The written or recorded narrative will include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject's behavior; (d) the level of resistance encountered; and (e) a description of each type of force used and justification for each use of force. Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force."**

### Methodology

APD SOP's related to use of force[85] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies. While the policies included substantive structural changes (i.e. the use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), and

---

[85] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

certain critical topics that have lingered for APD were finally resolved,[86] in terms of policy provision:  Specifically, 1) "Low Ready" was defined to help clarify what constitutes a reportable show of force; and 2) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated[87] in SOP 2-54-5-B (This has been a significant obstacle to APD's compliance efforts).

**Results**:

The requirements in Paragraph 42 are included in APD's approved suite of force-related policies that recently received monitor approval.

During past reporting periods the monitoring team conducted in-depth reviews of APD use of force cases that involved various types of force. The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  For IMR -5 the monitoring team conducted in-depth case reviews for this paragraph and the calculated compliance rate for sixteen (16) use of force cases was 38%. As demonstrated in **[IMR6-001]** for this reporting period (and evidenced in case reviews we conducted for IMR-5) there are still significant shortcomings in APD officers reporting and supervisors identifying uses of force.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and additional work is needed to bring all related use of force training into alignment with the CASA.

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.29a:  Prioritize the most frequent and most serious use of force "misses," and develop a response plan, using***

---

[86] Our intent here is to list changes to the policies that are relevant to this paragraph and not every policy change that occurred.

[87] Later we comment about our concern that APD leaving a supervisor response to the scene of a show of force up to their discretion as a probable critical shortcoming in their operating procedures.

*the Completed Staff Work model, and present the results to the Chief of Police for review, comment, and action.*

*Recommendation 4.7.29b:  Continue these prioritized reviews until the error rate drops below five percent.*

*Recommendation 4.7.29c: APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases.  Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.*

### 4.7.30 Assessing Compliance with Paragraph 43:  Reporting Use of Force Injuries

Paragraph 43 stipulates:

**"Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action."**

### Methodology

APD SOPs related to use of force[88] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies.

### Results

The requirements in Paragraph 43 are included in APD's approved suite of force-related policies that remain under review and are pending approval.

During past reporting periods the monitoring team conducted in-depth reviews of APD use of force cases that involved various types of force. The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  For IMR -5 the monitoring team conducted in-depth case reviews for this paragraph and the calculated compliance rate for sixteen (16) use of force cases was 75%.

---

[88] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

As demonstrated in **[IMR6-001]** (and evidenced in case reviews we conducted for IMR-5) there are still significant shortcomings in APD officers reporting, and supervisors identifying, uses of force, and accurately reporting injuries to persons they arrest.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and substantial additional work is needed to bring all related use of force training into alignment with the CASA.

> Primary:       **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.77.30a:  Identify, in routine monthly reports, officers who failed to report, or incompletely reported, a given Use of Force, and supervisors who missed that failure, and provide appropriate progressive discipline to the officers, supervisors, and commanders.***

***Recommendation 4.77.30b:  Reports responsive to this recommendation should be compiled as part of APD's CASA-required reports, along with a listing of corrective responses required by APD.***

***Recommendation: 4.77.30c APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases.  Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.***

### 4.7.31 Assessing Compliance with Paragraph 44:  Medical Services and Force Injuries

Paragraph 44 stipulates:

**"APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle."**

**Methodology**

APD SOP's related to use of force[89] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when, after protracted discussions and revisions, the monitor approved each of the four (4) use of force related policies.

**Results**

The requirements in Paragraph 44 are included in APD's approved suite of force-related policies that recently received monitor approval.

During past reporting periods the monitoring team conducted in-depth reviews of APD use of force cases that involved various types of force. The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  For IMR-5 the monitoring team conducted in-depth case reviews for this paragraph and the calculated the compliance rate for sixteen use of force cases; that compliance rate was 92%.  As demonstrated in **[IMR6-001]** (and evidenced in case reviews we conducted for IMR-5) there are still significant shortcomings in APD officers reporting and supervisors identifying uses of force, and accurately reporting injuries to persons they arrest.  These difficulties reach all the way to APD's Force Review Board. That said, we see APD officers routinely requesting medical assistance when force is used against a person.  That is a positive change that should be continually reinforced by commanders in the field.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and additional work is needed to bring all related use of force training into alignment with the CASA.

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

---

[89] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

*Recommendation 4.7.31a:  Compliance statistics were near full compliance, and outliers appear to be unusual, which would mitigate for counseling of the individual officers(s) involved, rather than full-scale organizational or unit interventions.*

*Recommendation 4.7.31b: APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases.  Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.*

*Recommendation 4.7.31c:  APD should conduct a detailed failure analysis of use of force cases that do not meet the requirements of the CASA (noted in detail in every monitor's report) and identify where the failure(s) occurred, what caused the failure (policy-training-supervision-oversight).*

*Recommendation 4.7.31d:  Where failures "cluster," in the reporting for 4.7.31c, above, APD should prepare Completed Staff Work documents identifying the failures, the cause of the failures, and providing recommendations for policy, training, structural, or disciplinary responses to each failure.*

### 4.7.32 Assessing Compliance with Paragraph 45:  OBRD Recording Regimens

Paragraph 45 stipulates:

**"APD shall require officers to activate on-body recording systems and record all use of force encounters.  Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination."**

### Methodology

Members of the monitoring team reviewed SOP 1-39 Use of On-Body Recording Devices, and subjected it to best established-practices in the field, and to the requirements stipulated in the CASA.  The monitoring team provided extensive technical assistance to APD to guide development of policies that would meet the provisions of the CASA.

### Results

APD was found in non-compliance on this task in IMR-5, and to date we have seen no substantive work product that indicate that any of the

remedial work we recommended in IMR-5 has been started or completed.  APD remains in non-compliance for secondary and operational levels.

>Primary:     **In Compliance**
>Secondary:  **Not In Compliance**
>Operational: **Not In Compliance**

### 4.7.33   Compliance with Paragraph 46:  Force Investigations

Paragraph 46 stipulates:

**"All uses of force by APD shall be subject to supervisory force investigations as set forth below. All force investigations shall comply with applicable law and comport with best practices. All force investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy."**

### Methodology

We note that the use of force polices were due for review and revision in December 2016. Substantive issues previously reported in IMR-5 needed to be resolved with respect to APD policies related to use of force before the policies can be approved. Previously noted training gaps need to be resolved for APD to achieve Secondary Compliance.

### Results

The update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally was able to approve each of the four (4) use of force related policies.  While the policies included substantive structural changes (i.e., the use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain critical topics that have lingered for APD were resolved in terms of policy provisions. Some of the more critical changes to the policies resulted in the inclusion of "Distraction Techniques" as a reportable use of force; "Low Ready" was defined to help clarify what constitutes a reportable show of force; "Neck Hold" was further defined and clarified; SOP 2-54-5-B now contains a better definition of "Show of Force" and supervisor investigative responsibilities relating to Show of Force events were better delineated, and "*De Minimis* force" was introduced into APD policy.

In Paragraphs 87 and 88, we report outstanding training gaps that exist for APD that are applicable to this Paragraph. As noted in these Paragraphs, the monitoring team reviewed training curriculum, specifically the 2017 Use of Force Review, that contained topics relevant to this Paragraph. While all of the issues set forth in Paragraphs 87 and 88 will not going to be restated in this section, one issue will be

addressed to demonstrate how recurring or unresolved gaps are obstructing reasonably good efforts to gain Secondary Compliance.

This issue or gap has been APD's ability to adequately train the concept of "un-resisted handcuffing" as a *de facto* line of demarcation when determining whether an officer's actions constitute a reportable use of force.  In the opinion of the monitoring team, the 2017 Use of Force Review training did not address the specific training gap we have identified relative to "un-resisted handcuffing."

We note that the foregoing open training issues have direct influence on the Secondary Compliance of numerous other paragraphs. After careful analysis and review, we find APD not in Secondary Compliance with this Paragraph.

In looking forward to the next monitoring period, it should be noted that a number of documents submitted pursuant to data requests from the monitoring team for this reporting period were not completely responsive to the data requests and often did not adhere to the period of time listed in the data requests. As an example, a data request asked for documentation for organizational assessment or remedial training during the period of February 1 through April 30, 2017 that was responsive to the Paragraph 46 commentary in IMR-5. An electronic folder for "April 2017" received by the monitoring team contained Additional Concerns Memos (ACM's) pertaining to OBRD's (not mentioned in the Paragraph 46 commentary in IMR-5) from November and December 2016, as well as ACM's from February and March of 2017, but nothing from April 2017. This is pointed out merely to assist APD in honing its data submission efforts to enhance its future efforts of attaining compliance.

> Primary:       **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.33a: APD should immediately cease the practice of training "proposed policy provisions."***

### 4.7.34 Assessing Compliance with Paragraph 47:  Quality of Supervisory Force Investigations

Paragraph 47 stipulates:

**The quality of supervisory force investigations shall be taken into account in the performance evaluations of the officers performing such reviews and investigations**.

**Methodology**

Members of the monitoring team reviewed multiple copies of APD proposed Use of Force Policies, including SOP 2-54 Use of Force Reporting and Supervisory Investigation Requirements, and subjected them to best established pattern and practice in the field, and to the requirements stipulated in the CASA.  The monitoring team provided extensive technical assistance to assist APD in developing force policies that would meet the provisions of the CASA. During the fourth site visit, members of the monitoring team attended "Talent Management" (Performance Evaluations) training.

**Results**

This requirement is included in approved APD SOP 2-54 Use of Force Reporting and Supervisory Force Investigation Requirements, which moved the Department into Primary Compliance.  The automated Performance Evaluation system was scheduled to debut in October 2016, with all training having been completed.  Initial review of the system and the training indicate that it meets these requirements. During future site visits, the monitoring team will assess whether this provision is being reflected in performance reviews when a supervisor continues to conduct sub-standard use of force investigations, such as those we noted in Section 4.7.33, above.

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.34a:  Given the scope of the failure rate on the cases noted in 4.7.33 above, it is highly unlikely they are supervisor or command specific; however, APD should carefully assess, through Completed Staff Work processes, where these errors occurred, what supervisory and command structure permitted them, and should design a carefully thought out response plan to ensure that the errors are communicated to the appropriate command, that the command(s) assess(es) the errors and submit(s) to the Chief of Police realistic responses designed to eliminate an 87% error rate in such a critical process' oversight, review and remediation.***

***Recommendation 4.7.34b:  Develop policy changes to APD's use of force policy that address distraction strikes, neck holds, and show of force and include these topics in follow-up training to all personnel.***

108

### 4.7.35 Assessing Compliance with Paragraph 48:  Force Classification Procedures

Paragraph 48 stipulates:

**APD agrees to develop and implement force classification procedures that include at least two categories or types of force that will determine the force investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to optimize APD's supervisory and investigative resources on uses of force. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents: (a) officer-involved shootings; (b) serious uses of force as defined by the Memorandum of Understanding; (c) in-custody deaths; and (d) other incidents resulting in death at the discretion of the Chief.**

### Methodology

We note that the use of force polices were due for review and revision in December 2016. They were finally submitted in acceptable form, and were approved by the monitor in January 2017.  Substantive issues previously reported in IMR-5 needed to be resolved with respect to APD policies related to use of force before the policies could be approved. Previously noted training gaps need to be resolved for APD to achieve Secondary Compliance.

### Results

As set forth in our analysis of Paragraph 46, the update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally approved each of the four (4) use of force related policies.

In Paragraphs 87 and 88, we report outstanding training gaps that exist for APD that are applicable to this Paragraph. While all the issues set forth in Paragraphs 87 and 88 will not be restated in this section, we reiterate that APD needs to conduct training consistent with the revised polices and address the training gaps noted in Paragraphs 86 – 88 before Secondary Compliance can be granted for this paragraph. We note that the foregoing open training issues have direct influence on the Secondary Compliance of numerous other paragraphs, and that these open issues have lingered for several reporting periods, despite clear and timely notice to APD. After careful analysis and review, we find APD not in Secondary Compliance with this Paragraph.

The monitoring team does take cognizance that APD conducted training in July 2017 for its members assigned to FIT. The training, entitled, "FIT

Manual Gap Training," was provided to FIT's four newest members. An attendance sheet and a five-question multiple choice test were reviewed. The test was entitled, "Force Investigation Team Unit Handbook." This differed from the name of the course on the attendance sheet.[90] Included in the documents along with the "FIT Manual Gap Training," was a "Primary Training Requirements" form, an "On The Job Training Requirements" form, and a "New Employee Orientation Checklist." These documents and forms were consistent with the spirit and content of the CIRT training the monitor commented on in Paragraph 60. What was missing from the package of documents reviewed was the actual FIT Handbook, the PowerPoint or classroom presentation of the training program, course curriculum complete with learning objectives, and the job-task analysis for FIT detectives. Again we note the Academy's strong and deliberate penchant for ignoring the monitoring team's request for acceptable course documentation processes.  We have continually advised APD that its current training modalities fail to conform to nationally accepted practice.  To date, we have seen no attempt on the training academy's part to resolve this long-outstanding issue.  FIT is clearly starting to demonstrate that they are training FIT personnel on its own policies and protocols. Once the issues cited in Paragraphs 86-88 are addressed and the appropriate work is documented and provided for the FIT course as noted above, APD will be approaching Secondary Compliance for this Paragraph.

As described elsewhere in this report, APD has adopted in policy "*De Minimis* force" as a classification level by inserting language into the definitions section of the policy.  We note again the questionable wisdom of introducing topics with wide ranging effects via mere definitions.  The concept of *De Minimis* force was drastically underdeveloped in terms of the organizational "roll out" and training effectiveness.  Notwithstanding the fact APD has not achieved Secondary Compliance with this Paragraph, the monitoring team cautions that if not properly addressed through training and supervisory oversight, APD ultimately will encounter great difficulty in its attempts to achieve Operational Compliance during future reporting periods.

APD's participation in the MATF, addressed in this Paragraph as well, is more fully addressed in Paragraphs 81-85. Those Paragraphs continue to be in Operational Compliance status.

> Primary:        **In Compliance**
> Secondary:    **Not In Compliance**
> Operational:  **Not In Compliance**

---

[90] Subtle differences in course names and test names have been commented on before with other courses by the monitoring team.

*Recommendation 4.7.35a: APD should cease immediately the practice of training "proposed policy changes" for all policies that require monitor approval.*

*Recommendation 4.7.35b: Resolve at the soonest point possible the manner in which "De Minimis" force will be trained to the organization, including written training plans with goals, objectives, measures of learning, etc.  All training development product should comply with the GO-MAPS outline the monitor previously provided APD.*

*Recommendation 4.7.35c:  Perform a careful, comprehensive, inclusive Job-Task Analysis (JTA) for FIT personnel.*

*Recommendation 4.7.35d: Once the JTA is complete, develop a listing of needed skills and competencies;*

*Recommendation 4.7.35e:  Identify current skill-sets possessed by current IA personnel, and conduct a "Gap Analysis;"*

*Recommendation 4.7.35f:  Determine what missing skill-sets need to be remediated or developed;*

*Recommendation 4.7.35g:  Assess external training modalities to identify in advance which ones to train to and develop the missing skill sets;*

*Recommendation 4.7.35h:  Either develop the needed training in-house or procure it by sending IAB personnel to external training events that are known to provide needed skill sets that will fill IAB's skill-set deficiencies.  Make no assignments to external training unless APD can verify that the training venue or provider actually has a plan and or course syllabus that includes an effective treatment of the designated skill set.*

*Recommendation 4.7.35i:  Maintain records regarding skill set deficiencies and external training events skills training, and follow-up with post-training analyses of each externally trained employee's ability to meet performance goals related to "new" skill sets.*

## 4.7.36 Assessing Compliance with Paragraph 49

Paragraph 49 stipulates:

**Under the force classification procedures, serious uses of force shall be investigated by the Internal Affairs Bureau, as described below. When a serious use of force or other incident is under**

**criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Bureau will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Task Force shall periodically share information and coordinate with the Internal Affairs Bureau, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of serious uses of force. Uses of force that do not rise to the level of serious uses of force or that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force.**

## Methodology

We note that the use of force polices were due for review and revision in December 2016. Substantive issues previously reported in IMR-5 need to be resolved with respect to APD policies related to use of force before the policies can be approved. Previously noted training gaps need to be resolved for APD to achieve Secondary Compliance.

## Results

As set forth in our analysis of Paragraph 46, the update of APD's use of force suite of policies remained pending until June 2017, when the monitor received approvable versions each of the four (4) use of force related policies.

In Paragraphs 87 and 88, we report outstanding training gaps that exist for APD that are applicable to this Paragraph. While all of the issues set forth in Paragraphs 87 and 88 are not going to be restated in this section, we reiterate that APD needs to conduct training consistent with the revised polices and address the training gaps noted in Paragraphs 86 – 88 before Secondary Compliance can be confirmed.

APD continues to participate in the Multi-Agency Task Force (MATF) under the terms of the original agreement.

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.36:  Provide training as recommended in Paragraphs 87 and 88 for members of the MATF.***

## 4.7.37 Assessing Compliance with Paragraph 50:  Supervisory Response to Use of Force

Paragraph 50 stipulates:

**"The supervisor of an officer using force shall respond to the scene of the use of force to initiate the force investigation and**

**ensure that the use of force is classified according to APD's force classification procedures.  For serious uses of force, the supervisor shall ensure that the Internal Affairs Bureau is immediately notified and dispatched to the scene of the incident."**

## Methodology

We note that the use of force polices were due for review and revision in December 2016. Substantive issues previously reported in IMR-5 needed to be resolved with respect to APD policies related to use of force before the policies could be approved. Previously noted training gaps need to be resolved for APD to achieve Secondary Compliance.  APD policy in this area was finally approved by the monitor, after extensive debate, revision and re-write, in June 2017.

## Results

As set forth in our analysis of Paragraph 46, the update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally was able to approve each of the four (4) use of force related policies.

As described elsewhere in this report, APD has adopted in policy "*De Minimis* force" as a classification level.  That concept was underdeveloped in terms of the organizational "roll out" and training effectiveness.  Notwithstanding the fact that APD has not achieved Secondary Compliance with this Paragraph, the monitoring team cautions that if *De Minimis* force is not properly addressed through training and supervisory oversight, APD will ultimately encounter great difficulty in its attempts to achieve Operational Compliance during future reporting periods.  As noted earlier in this report we have seen many instances in the past, as with **[IMR6-001]**, where APD supervisors fail to meet the provisions of this paragraph and that failure is not caught by the chain of command.

In Paragraphs 87 and 88, we report outstanding training gaps that exist for APD that are applicable to this Paragraph. While we will not restate all of the issues set forth in Paragraphs 87 and 88 in this section, we reiterate that APD needs to conduct training consistent with the revised polices and address the training gaps noted in Paragraphs 86 – 88. Therefore, APD remains in Primary Compliance with respect to this Paragraph. Once this policy-compliant training is completed, Secondary Compliance will be considered.

Primary:  **In Compliance**
Secondary:  **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.37:  Complete policy-compliant training congruent with recommendations provided in paragraphs 86-88, above.***

### 4.7.38 Assessing Compliance with Paragraph 51:  Self-Review of Use of Force

Paragraph 51 stipulates

**"A supervisor who was involved in a reportable use of force, including by participating in or ordering the force being reviewed, <u>shall not</u> review the incident or Use of Force Reports for approval."**

### Methodology

We note that the use of force polices were due for review and revision in December 2016. After extensive debate and revision, those policies were approved by the monitor in June of 2017.  Substantive issues previously reported in IMR-5 needed to be resolved with respect to APD policies related to use of force before the policies could be approved. Previously noted training gaps need to be resolved for APD to achieve Secondary Compliance.

### Results

As set forth in our analysis of Paragraph 46, the update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally was able to approve each of the four (4) use of force related policies.

In Paragraphs 87 and 88, we report outstanding training gaps that exist for APD that are applicable to this Paragraph. While all of the issues set forth in Paragraphs 87 and 88 are not going to be restated in this section, we reiterate that APD needs to conduct training consistent with the revised polices and address the training gaps noted in Paragraphs 86 – 88. Therefore, APD remains in Primary Compliance with respect to this Paragraph. Once this policy-compliant training, i.e., the "gap training" is completed and satisfactorily addressed the gaps identified by the monitor, Secondary Compliance will be reassessed.

> Primary:       **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.37:  Complete policy-compliant training congruent with recommendations provided in paragraphs 86-88, above.***

### 4.7.39 Assessing Compliance with Paragraph 52: Supervisory Force Review

Paragraph 52 stipulates:

**"For all supervisory investigations of uses of force, the supervisor shall:**

    **a)   Respond to the scene, examine all personnel and subjects of use of force for injuries, interview the subject(s) for complaints of pain after advising the subject(s) of his or her rights, and ensure that the officers and/or subject(s) receive medical attention, if applicable**

    **b)   Identify and collect all relevant evidence and evaluate that evidence to determine whether the use of force was consistent with APD policy and identifies any policy, training, tactical, or equipment concerns;**

    **c)   Ensure that all evidence to establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;**

    **d)   Ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses are to be encouraged to provide and sign a written statement in their own words;**

    **e)   Ensure that all officers witnessing a use of force incident by another officer provide a use of force narrative of the facts leading to the use of force;**

    **f)   Separate all officers involved in a use of force incident until each has been interviewed and never conduct group interviews of these officers;**

    **g)   Ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;**

    **h)   Conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;**

    **i)   Utilize on-body recording systems to record all interviews;**

    **j)   Review all use of force narratives and ensure that all Use of Force Reports include the information required by this Agreement and APD policy;**

    **k)   Consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;**

115

**l)   Make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects;**

**m)  Obtain a unique tracking number; and**

**n)   Where a supervisor determines that there may have been misconduct in the use of force, immediately notify the Area Commander and the Internal Affairs Bureau."**

## Methodology

We note that the use of force polices were due for review and revision in December 2016. Substantive issues previously reported in IMR-5 needed to be resolved with respect to APD policies related to use of force before the policies could be approved by the monitor (which occurred in June 2017). Previously noted training gaps need to be resolved for APD to achieve Secondary Compliance.

## Results

As noted in the preceding paragraphs, the update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally was able to approve each of the four (4) use of force related policies.

In Paragraphs 87 and 88, we report outstanding training gaps that exist for APD that are applicable to this Paragraph. While we will not restate all the issues set forth in Paragraphs 87 and 88, we reiterate that APD needs to conduct training consistent with the revised polices and address the training gaps noted in Paragraphs 86 – 88. Therefore, APD remains in Primary Compliance with respect to this Paragraph. Once this policy-compliant training is completed, Secondary Compliance will be assessed.

In IMR-5, we commented on our observations about APD's performance on this Paragraph yielding some of the poorest test scores the monitoring team had observed to date. We further commented that APD's substantial level of non-compliance with this paragraph questions the quality of related training, oversight, and management of the requirements relating to supervisory and managerial response to incidents of use of force.

In the opinion of the monitoring team, these significant concerns of non-compliance and problems pertaining to the efficacy of training, oversight and management were demonstrated at a June 14, 2017, Force Review Board (FRB) meeting. A Use of Force case presented to the FRB

outlined a matter where an APD member used force against a handcuffed arrestee who was injured as the result of the force used by the officer. In our opinion, the video evidence of the force utilized (documented on the officer's on-body recorder) contradicts the officer's written report. Despite the existence of this contradictory video evidence, a supervisor who articulated he thought the officer's Use of Force was problematic, didn't notify Internal Affairs, but instead approved the officer's inaccurate report.  We find such procedure inexplicable, unacceptable, and in violation of the CASA.  To date, APD has taken no remedial actions.

The supervisor presenting this case to the FRB stated the case "sat on the shelf" for several months before the case was investigated.[91] This same supervisor advised the FRB how the in-field supervisor that did the initial supervisory review on this matter had not been to supervisory use-of-force training.[92]  Since this investigation "sat" for such an extended period of time, despite the knowledge (or acknowledgment) of problematic officer and supervisory actions and inactions, it is inconceivable that this case took 8 months to be assigned to an investigator to conduct the Serious Use of Force investigation.  Even then, when a question arose about the officer's conduct possibly rising to the level of criminality, a FIT investigator was asked to review the case for possible criminal actions; not a prosecuting entity or command-level officer. This represents the convergence of problematic training, oversight and management efforts. Furthermore, it underscores deficiencies in considering all relevant evidence, resolving material inconsistencies between the statements of officers, subjects, and witnesses to make credibility determinations, and proactively pursuing appropriate interventions. In this particular case at the FRB, over one year had passed since the Use of Force by the officer and no final determination had been made about the actions of the officer and no interventions or discipline had occurred during that intervening period of time.

We note that three data requests were submitted to APD requesting "any remedial action taken toward any officer, supervisor, or commander related to cases reported in IMR-5." No data or documents were provided to the monitoring team, only comments on a spreadsheet indicating, "Pending further case review;" "Nothing for this reporting period;" and "No responsive documents for July."  We are befuddled by such responses, given the obvious officer, supervisor, and command deficiencies we revealed in this case.  To the monitor, this is reflective of complete entropy of APD's use of force review processes at this point in time.

Special Order 17-75 for "Mandatory Supervisor Use of Force Gap Training" was

---

[91] As we note elsewhere the case remained dormant from May 2016 until February 2017, and was not submitted by an investigator until April 28, 2017.

[92] The monitoring team dismisses this explanation as insufficient.  Based on the facts and circumstances of this case, the failures and actions of the officer involved in this event would be self-evident to any objectively reasonable officer or supervisor.

submitted to the monitoring team as a response to address recommendations related to this Paragraph in IMR-5. A detailed analysis of this training and its pending issues are fully set forth in Paragraph 88.

APD's behavior on this case is remarkably similar to behavior the monitor has seen in other problematic police departments:  a "bury it until it burns" approach that simply ignores problematic in-field behavior until the internal policy-based "statute of limitation" runs out, then dispense of it with findings and a notation that no corrective action was ordered due to an expiration of the allowable investigative timeline.  Such defensive measures are common in poorly run organizations, based on the monitor's experience.  APD appears to have made an operational decision to resolve problematic events in this matter on a routine basis.  Obviously, we find this unacceptable and deliberate non-compliance.

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendation 4.7.39a:  APD should assess, analyze, and "re-vision" its force review processes, including reporting, intake, assessment, classification, assignment, review and investigation, outcome development and reporting, and findings development. This assessment should be executed with all due diligence and speed.*

*Recommendation 4.7.39b:  The talent to develop this assessment may require an outside consultant; however, whoever is tasked with this assessment should be required to produce an actionable report designed to build a system that can meet the quality and timeline requirements of the CASA, and should take into consideration "best practices" in the field.*

*Recommendation 4.7.39c:  APD's recent site visit to other PD's undergoing similar process as the CASA should be assessed for "lessons learned" that could be adapted to APD's internal affairs and disciplinary/retraining processes.*

*Recommendation 4.7.39d:  APD, eventually should develop a clearly articulated plan for repairing its overwhelmed internal investigative processes, replete with goals, objectives, timelines and costs.*

*Recommendation 4.7.39e:  The developed plan should be implemented and achievement of goals and objectives should be clearly and impartially evaluated for implementation.*

**4.7.40 Assessing Compliance with Paragraph 53:  Force Review Timelines**

Paragraph 53 stipulates:

**Each supervisor shall complete and document a supervisory force investigation Force Report within 72 hours of completing the on-scene investigation. Any extension of this 72-hour deadline must be authorized by a Commander. This Report shall include:**

   **a)   all written or recorded use of force narratives or statements provided by personnel or others;**

   **b)   documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**

   **c)   the names of all other APD employees witnessing the use of force;**

   **d)   the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options; and**

   **e)   documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.**

Paragraph 53 perhaps best represents the problems with data requests to and data provision from, APD.  All requests for data by the monitor are submitted in a format agreed to by the Parties, based on direct requests from the APD.  Data provided to the monitors are often not the data requested, and at times, not in the format requested.  Data request and provision issues were significant this reporting period.  Paragraph 53 is a good example.

We note that we submitted data requests for 69 paragraphs, including paragraph 53, for February and March 2017 to APD on 12 April, 2017, based on a new data format and request transmission protocols requested by APD, and outlined in detail by the monitor, in writing to the Parties.  The new modality was agreed to by the Parties.  As of 5 May 2017, the monitoring team member making the data request had received *none of the requested data* (18 days after the request).  On 14 May 2017 the monitoring team member responsible for the

data analysis for Paragraph 53 notified the monitor that, as of 14 May 2017 no data had been received.  On 14 May, a day later, Director Slauson sent the monitor's data request for April 2017.  Nine days later, on 24 April, the monitor is sent a collection of "links" for seven paragraphs, none of which included paragraph 53, and all of which required multiple additional steps to locate, isolate, open, and download the links provided. On 2 June, 19 days after the Paragraph 53 request, the monitor received an e-mail from a senior member of APD's Planning and Analysis unit.  That e-mail attachment included "ledgers" for February, March, and April.  Despite a request for cases, not ledgers, and despite a 51-day delay in APD's response, we never received the cases we asked for in writing.  *This is simply unacceptable, and we believe deliberate.*

Instead of providing the data requested for this paragraph, APD provided the data it wanted to provide:  ledgers, not reports.

During our site visit in June, the monitoring team advised APD of the problems with data provision, and specifically reinforced the nature of the request for case files, not "ledgers."

Despite reinforcing the nature of the request through in-depth personal discussions in June, when we requested "cases" again.  We followed up that June discussion with a request for "cases" for the June reporting period (1 June-30 June).  In June's data submission, APD submitted all data requested by the monitor, *except the data for Paragraph 53! We specifically asked, in writing and in our June meeting for "every other" report of Use of Force.* The data requested in no way required a "completed" force review, but only assessed whether they were reported within 72 hours, or an extension request and commander approval of same.  What we were provided was APD self-created "ledgers," not the reports as requested.  Given the level of obtusity of APD's response to a clear and direct written request, we were never provided the data we asked for relating to this paragraph.  The monitor notes with some exasperation similar problems with other data requested and provided under the "new system" requested by APD, and adhered to by the monitor.

We are deeply concerned about APD's new data provision protocols, and can see no reason why APD would reply with "self-generated" legers instead of the Use of Force Reports requested.

For the month of July, the monitor was supplied with 19 use of force cases. Seven of those did not meet the requirements of the paragraph within the material supplied to the monitor. See case numbers: **[IMR6-002, IMR6-003, IMR6-004, IMR6-005, IMR6-006, IMR6-007 and IMR6-008]**

The compliance rate calculated for the use of force investigations that were submitted is 78%, well below the required 95% threshold. The monitor accepted the July reports for this reporting period even though the material was not

submitted with the initial request and was subsequently submitted in mid August upon a second request.

Such delays, confusions, and failures to respond directly to requests made by the monitor, without explanation or reason are of serious concern to the monitor. There are still issues that have to be cleared up with APD in reference to paragraph 53 in addition to receiving material in timely fashion. The monitoring team must be assured that it is receiving only the data requested and that only material asked for is sent to monitor. Many folders are included in the data submission and embedded in those folders are numerous files causing the monitoring team to review extensive amounts of unnecessary material. The material provided by APD to the monitor must be streamlined so the monitoring team can assess the information requested without reviewing this unnecessary and often un-related barrage of data.  APD's provision of data for this reporting period are strongly reminiscent of an old tried-and-true procedure of police departments flooding the requestor with un-related (and unrequested) "data," thus creating a "hunt-for-it" process that is unnecessarily time consuming and laborious.  We remind APD that we cannot accept "purpose-built" summaries, but must be provided data that is created during the normal course of daily business, a fact we covered with them very early on in the monitoring process. Ledgers instead of requested official reports are unacceptable.

In addition to a serious lack of timeliness, there are still issues that need to be clarified regarding Paragraph 53 specifically, and other paragraph's data in general.  Data provided by APD are often "nested," requiring the monitor to open and assess multiple pieces of material to determine if any of it includes a response to the monitor's original request.  We will work with APD to insure that data provided in response to the monitor's requests are specifically tailored

      Primary:     **In Compliance**
      Secondary:  **Not In Compliance**
      Operational: **Not In Compliance**

***Recommendation 4.7.40:  APD should carefully provide to the monitor data that is directly responsive to the monitor's requests, and is appropriately labeled and structured.***

### 4.7.41 Assessing Compliance with Paragraph 54:  Command Review of Force

Paragraph stipulates:

**Upon completion of the Use of Force Report, investigating supervisor shall forward the report through his or her chain of command to the Commander, who shall review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The**

121

**Commander shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.**

## Methodology

APD SOP's related to use of force[93] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor was finally able to approve each of the four (4) proffered use of force-related policies.

In preparation of this report the monitoring team requested the following:

1. "Any retraining that has occurred in response to recommendations in IMR-5 related to this paragraph.

2. COB documentation concerning any newly established monitoring system, process or procedure concerning the implementation of any executive level review protocols for Commander use of force reviews. If so implemented, copies of any executive level reviews and reports demonstrating the protocol has been implemented."

## Results

The requirements in Paragraph 54 are included in APD's approved suite of force-related policies that remain under review and are pending approval.  During past reporting periods the monitoring team conducted in-depth reviews of APD use of force cases that involved various types of force.  The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  For IMR -5 the monitoring team conducted in-depth case reviews for this paragraph and the calculated compliance rate for sixteen (16) use of force cases was 0%. As demonstrated in **[IMR6-001]** (and evidenced in case reviews we conducted for IMR - 5) there are still significant shortcomings in APD officers' reporting, and supervisors' and commanders' identifying uses of force.  We expect this to be exacerbated by new provisions in APD's use of force policies. i.e. creation of a new category of force, *De Minimis.*

---

[93] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

We are aware that APD developed and delivered a training course directed at APD commanders (Delivered on June 1, 2017), but we were provided no evidence that APD collated the data they received in IMR-5 and conducted a specific and targeted training and/or counseling to individual commanders, lieutenants or sergeants.  The results from IMR-5 should have prompted an in-depth review of cases, which would have resulted in some degree of precise counseling and remediation throughout the FSB chains of command.[94]  We have seen no data in the record indicating that occurred.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and additional work is needed to bring all related use of force training into alignment with the CASA.

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.41a: Establish by policy, training, and internal monitoring specific requirements for command review of supervisory force reviews, ensuring that the new policy, training and internal monitoring conform to the requirements of the CASA for this paragraph.***

***Recommendation 4.7.41b:  Ensure that policy outliers are brought to the attention of commanders failing to conform, and to their immediate superiors and the Chief of Police.***

***Recommendation 4.7.41c:  Require commanders who fail to conform with Paragraph 54's requirements to undergo retraining in policy requirements and to develop a correction-plan for ensuring that policy adherence is achieved.***

***Recommendation 4.7.41d:  Executive-level personnel for those commanders completing such retraining and corrective planning measures should monitor commanders under their supervision to ensure they meet the requirements of Paragraph 54's stipulations relative to are brought into compliance.***

---

[94] The lack of specific remediation though counseling and/or training could mean: 1) APD saw the generalized training of all commanders as being sufficient; 2) APD reviewed the cases and still sees no performance deficiencies to remediate, which presents a different set of issues.

*Recommendation 4.7.41e:  Executive-level personnel so tasked should develop quarterly reviews of commanders under their chains of command, stating their levels of compliance with Paragraph 54's requirements.  Those reviews should be forwarded to the Chief of Police, for development of actions plans to remedy identified issues.*

### 4.7.42 Assessing Compliance with Paragraph 55:  Force Review Evidence Standard

Paragraph 55 stipulates:

**"Where the findings of the Use of Force Report are not supported by a preponderance of the evidence, the supervisor's chain of command shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation. The supervisor's superior shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. Commanders shall be responsible for the accuracy and completeness of Use of Force Reports prepared by supervisors under their command.** "

### Methodology

APD SOP's related to use of force[95] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor was finally able to approve each of the four (4) use of force related policies.

In preparation of this report the monitoring team requested the following:

1. Any COB document, Special Order or policy that implements a procedure or protocol that proposes specific, tangible, and evaluable policy revisions, supervisory and commander re-training or discipline to rectify errors related to command level reviews of uses of force.

2. COB documentation that demonstrates APD has been responsive to the specific recommendations provided in IMR-5 related to this paragraph.  Please correlate any documentation to the relevant recommendation.

---

[95] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

**Results**

The requirements in Paragraph 55 are included in APD's approved suite of force-related policies that recently gained approval by the monitor.

Previously, we noted that the movement of use of force cases throughout the chain of command is captured in Blue Team and can be published and collated in a way that can provide meaningful oversight data. The data APD collects could provide an understanding of performance deficiencies and allow APD to determine the frequency that an officer, lieutenant or sergeant has their reports "kicked back" for corrections, and the reasons it occurred. To date, we are unaware of APD conducting routine internal analysis or auditing, at either the organizational or Area Command levels, to identify officers or supervisors that commonly submit reports through Blue Team that are incomplete, contain deficiencies or need better articulation. Considering the considerable backlog of use of force investigations, these are areas that need to be explored in detail if APD is ever to connect individual performance (related to use of force or force investigations) to employee work plans. During our June 2017 site visit we learned that the Blue Team system can be used for this purpose, but currently APD has not conducted a comprehensive assessment.

We are aware that APD developed and delivered a training course directed at APD commanders (Delivered on June 1, 2017), but we were provided no evidence that APD collated the data they received in IMR-5 and conducted a specific and targeted training and/or counseling to individual commanders, lieutenants or sergeants. The results from IMR-5 should have prompted an urgent and in-depth review of use of force cases reported on in IMR-5, which would have resulted in some degree of precise counseling and remediation throughout the FSB chains of command.[96] We have no record that such a review was conducted or used.

APD provided an Excel spreadsheet that was prepared by a FSB lieutenant who has also been tasked with assisting with administrative needs related to CASA compliance. The monitoring team reviewed the document, entitled "IMR-5 Recommendations" which breaks down FRB recommendations from IMR-5, and includes a number of related categories related to a recommendation, including a category "Proposed Solution". We see this as a good step toward organizing feedback APD receives in monitoring reports. We encourage this approach and expect that the spreadsheet will be refined over time. However, like many other internal processes APD puts into place, the value will result from

---

[96] The lack of specific remediation though counseling and/or training could mean: 1) APD saw the generalized training of all commanders as being sufficient; or, 2) APD reviewed the cases and still sees no performance deficiencies to remediate, which presents a different set of issues.

documented outcomes and "closing the loop" on recommendations.  We will follow up with APD on the progress they make with this approach during the next monitoring period.

For IMR-5 the monitoring team conducted in-depth case reviews for this paragraph and the calculated compliance rate for sixteen (16) use of force cases was 6%.  As demonstrated in current **[IMR6-001]** (and evidenced in case reviews we conducted for IMR - 5) there are still significant shortcomings in APD officers reporting, supervisors and commanders identifying uses of force.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and additional work is needed to bring all related use of force training into alignment with the CASA.

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.42a:  Identify the factors causing the most errors in command review and require a completed CSW document that proposes specific, tangible, and evaluable policy revisions, supervisory and commander re-training or discipline to rectify given error categories.***

***Recommendation 4.7.42b:  Forward the CSW document to the Chief of Police for review, assessment and implementation of remedial processes.***

***Recommendation 4.7.42c:  Require follow-up and analysis to determine if recommended processes have alleviated the identified problems, and repeat steps a through c until issues have been reduced to less than 95 percent.***

**4.7.43 Assessing Compliance with Paragraph 56:  Force Review Quality**

Paragraph 56 stipulates:

**"Where a supervisor repeatedly conducts deficient supervisory force investigations, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with**

**performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules. Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force investigation immediately and notify the Internal Affairs Bureau and the Chief. The Internal Affairs Bureau shall immediately take over the administrative."**

### Methodology

APD SOP's related to use of force[97] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally was able approved each of the four (4) use of force related policies.

In preparation of this report the monitoring team requested the following:

1. COB documentation that demonstrates APD automated systems relating to paragraphs 41-56 have provided a meaningful recording, assessment, and tracking system to ensure that each incident of a noted failure to comply within the command structure is documented, addressed, and followed up to ensure such errors are mitigated. (I.E. Beginning to end documentation of events where errors were identified by APD); and

2. COB documentation demonstrating corrective action was taken with command and/or supervisory personnel concerning each deficient use of force investigation or review that was identified in IMR-5.

### Results

The requirements in Paragraph 56 are included in APD's approved suite of force-related policies that recently gained approval by the monitor. We reviewed documentation APD provided in response to our data requests and found it to be insufficient to show that APD has built, or is building, the type of processes and systems to collect and connect supervisory performance (related to use of force investigations) with employee work plans; we also found no evidence that individual supervisors or command level personnel have received appropriate counseling or discipline as a result of conducting deficient supervisory

---

[97] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

force investigations.  We do not believe APD conducts any internal analysis or audit, at either the organizational or Area Command levels, to identify supervisors that commonly submit use of force reports that are incomplete, contain deficiencies or need better articulation (for example). These are all areas that need to be explored if APD is ever to connect individual performance (related to use of force or force investigations) to employee work plans.  We believe that the makings of this type of internal assessment are possible with the adoption of Blue Team; however, many additional components of such a system need to be built, codified, trained, implemented and provided oversight at the command level.  We have seen no indication that APD has conceptualized or implemented such a quality control process.

Based on our review of materials, APD remains in Primary Compliance with respect to this paragraph, and additional work is needed to bring all related use of force training into alignment with the CASA.

> Primary:       **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.43a:  Ensure that APD automated systems relating to paragraphs 41-56 are supported by a meaningful recording, assessment, and tracking system to ensure that each incident of a noted failure to comply within the command structure is documented, addressed, and followed up to ensure such errors are mitigated and reduced to a level below five percent.***

***Recommendation 4.7.43b:  Ensure that deficiencies in APD's systems relating to paragraphs 41-56 are monitored and noted, and result in corrective action taken with the responsible command and supervisory personnel.***

***Recommendation 4.7.43c:  If necessary, consult with external resources to design a formalized system of monitoring supervisory and command-level responses to policy violations.***

### 4.7.44 Assessing Compliance with Paragraph 57:  Force Review Board

Paragraph 57 stipulates that:

**"When the Commander finds that the supervisory force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board. The Force Review Board shall review the supervisory force investigation to ensure that it is complete and that the findings are supported by the evidence. The Force Review**

**Board shall ensure that the investigation file is forwarded to the Internal Affairs Bureau for recordkeeping."**

## Methodology

APD SOP's related to use of force[98] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation;" and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor was finally able to approve each of the four (4) use of force related policies. The Force Review Board was recast as SOP 2-56, which better aligns it within the use of force suite of SOPs.

In preparation of this report the monitoring team requested the following:

1. Any COB documentation in the form of a recommendation(s) for agency-wide, or officer, supervisor or commander training that resulted from a case reviewed by the FRB.  Include any return documentation that demonstrates the FRB request was implemented or followed up.

2. Any COB documentation in the form of a recommendation for an IA investigation that resulted from a FRB case review.  Please include the specific request and guidance given to IA by the FRB in those instances, and any IA investigative plans related to those cases, if they exist.

3. The monitoring team reviewed the documentation APD provided.

## Results

As we noted previously, the first requirement in this paragraph appears to conflict with the Force Review Board's (FRB) practice of reviewing a 10% sample of supervisory force investigations every 90 days.  Through discussions with the Parties that issue was resolved and was reiterated during our November 2016 site visit.  The Parties agreed that the review of a 10% random sample of use of force cases is acceptable dependent upon the quality of the methodology used to select those cases.  During this reporting period the monitoring team learned, for the first time, that APD has not been accurately reporting the total number of use of force cases.  In preparation of past reports the monitoring team requested a list of use of force and show of force cases that occurred during a specific timeframe.  From that list of cases the monitoring team would select a random sample of cases to review.  We learned in May 2017 that APD was only reporting those cases that were closed, not all cases that were

---

[98] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

reported.  That shielded the fact that there were numerous cases pending[99] and those cases left significant gaps in the data.  It also raised serious questions as to why cases were pending for such extended periods of time.

During our June 2017 site visit we met with the Chairperson of APD's Force Review Board (FRB).   At that time, we alerted him to the use of force data discrepancy and the fact that the monitoring team had not been provided accurate data for the past monitoring periods.  During our meeting, we asked if the 10% sample of serious use of force cases the FRB reviews is from the entire list of cases, or only those that are completed.  We learned that neither he, nor another command level representative of the FRB, knew that the FRB was reviewing a 10% sample of all use of force cases.  In fact, it took an APD analyst to come to the meeting to make them aware of this fact.  This is a critical failure on the part of APD's FRB process, and the fact that there is a significant backlog of serious use of force investigations (dating at least back to January 2017) effectively negates the legitimacy of the FRB's methodology of choosing cases.  If a random sample of cases is going to be legitimate, every use of force case reported during a set timeframe must have an equal chance of being chosen for review.  Arguably, cases that are incomplete for extended periods of time are of greater interest since they may reveal more significant policy violations or other salient issues.  That fact appears to have been completely lost on APD, and the fact that the commanders specifically responsible for the implementation of the FRB 's were unaware of this critical shortcoming is incomprehensible to the monitor.

As of August 2017, the monitoring team made the following observations of the use of force data reported by APD:

1.  APD reported a total number of 211 distinct use of force cases involving 307 officers.
2.  As of August 1, 2017, none of the reported supervisory use of force cases for the months of May, June or July 2017 were completed.
3.  As of August 1, 2017, there were still approximately twenty (20) reported supervisory use of force cases pending from January 2017.[100]
4.  Data were requested concerning reported show of force cases for the timeframe of February 1 through April 30, 2017.[101]  When the data

---

[99] We learned that some supervisory use of force cases were still pending and in the chain review process 4-5 months after the original event occurred.

[100] We say "approximately", instead of being more precise, due to the confusing manner APD lists information.  Regardless, numerous cases reported at the supervisory level are pending in January 2017.

[101] Because the data was presented differently the data set reported on is more limited than the cases of use of force, however, the numbers are further illustrations of the significant investigative backlogs APD currently holds.

were reported in May 2017 there were still twelve (12) incomplete show of force investigations for the month of February.

The monitoring team feels that these statistics demonstrate that APD's FRB oversight of use and show of force has reached a point of critical failure.

For IMR-5 the monitoring team reviewed FRB reports from their August 23, 2016, meeting. We documented numerous deficiencies in the manner the FRB is conducted and issues related to FRB member comments in their reporting sheets. For instance, we saw examples where the FRB documented board members "refraining from answering". Whether the instances of FRB members "refraining from answering" are oversights, or are purposeful, was left as an open question. We commented that the fact that we saw "refrained from answering" on more than one occasion and during more than one FRB meeting was disconcerting. We followed up on this fact during our June 2017 site visit. While meeting with the Chairperson of the FRB we opened the meeting by asking if he had any specific questions or concerns from IMR - 5 (related to the FRB). He commented that he did not agree with some of the feedback we provided, and when asked to provide an example he specifically stated that he disagreed that some members of the FRB "refrained from answering" during meetings. When told that that specific phrase was taken directly from documents APD provided he appeared to be completely unaware of that fact.

On a positive note, during this reporting period, the monitoring team reviewed twelve (12) FRB referrals that resulted from meetings APD conducted in March 2017. We see evidence that APD is assigning specific responsibilities that result from FRB meetings and found documentation that FRB referrals are being addressed in the field. This is a significant step and demonstrates that this aspect of the FRB is continuing to improve. Likewise, APD provided an Excel spreadsheet that was prepared by a FSB lieutenant who has also been tasked with assisting with administrative needs related to CASA compliance. The monitoring team reviewed the document, entitled "IMR-5 Recommendations" which breaks down FRB recommendations from IMR-5, and includes a number of related categories related to a specific recommendation, including the category "Proposed Solution". We see this as a good step toward organizing feedback APD receives in monitoring reports.

Secondary compliance for this paragraph is not attained due to training gaps that previously existed or emerged during this monitoring period (See Paragraphs 86 - 88). These items will need to be remediated before APD achieves secondary compliance with this paragraph. Until Secondary compliance is attained Operational compliance will remain pending.

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation 4.7.44a: APD should ensure that the FRB process is integrated and methodical, requiring each "out of policy" action to be assessed for causes, remaining issues, and recommended responses to ensure that organization-wide implications are addressed in their problem response modalities as well as officer-specific, supervisor-specific and command-specific responses;*

*Recommendation 4.7.44b:  APD should assess other similar processes in other police agencies known to be effective at dealing with such issues and review their processes for "lessons learned" that can be applied to APD's processes.*

*Recommendation 4.7.44c:  APD should make it clear that "refrain from answering" is not a viable response.  If APD cannot get a decision about a given use of force issue at this level, it suggests either a lack of training, a lack of structuring of the process, or a lack of commitment to improving.*

*Recommendation 4.7.44d.  APD should assess its FRB panelists to ensure they understand current policy and practice and are clear about the FRB's purpose.  To the extent that they find members who continually "refrain from answering" they should be re-trained or removed from FRB participation, with appropriate notation why in their APD personnel files.*

### 4.7.45 Assessing Compliance with Paragraph 58:  Reassignment of Force Review

Paragraph 58 stipulates that:

**"At the discretion of the Chief, a supervisory force investigation may be assigned or re-assigned to another supervisor, whether within or outside of the Command in which the incident occurred, or may be returned to the original supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing."**

## Methodology

APD SOP's related to use of force[102] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and

---

[102] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the recently submitted four use of force related policies. The Force Review Board was recast as SOP 2-56, which better aligns it within the use of force suite of SOPs.

**Results**

Secondary compliance is not attained due to items missing or processes incorrectly done during the Use of Force and Supervisory Investigation of Use of Force training identified in the "Gap Analysis" provided to the City).[103]  These items will need to be remediated before APD achieves secondary compliance with this paragraph.

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendation 4.7.45a:  APD should initiate a systems-wide failure analysis regarding this case and determine at what points the most critical systems failed to perform as expected or required.*

*Recommendation 4.7.45b:  Once the failure points are identified, a thorough review of any cases with similar fact circumstances, similar command reviews, or other similar issues are noted.*

*Recommendation 4.7.45c:  Once the failure analysis is complete, APD should identify lessons learned and recommend policy, training, systemic, supervisory, and/or management oversight systems that need to be revised, upgraded, or otherwise modified. Recommendation 4.7.45d:  Assessments outlined above should not be restricted to the case giving rise to these recommendations, but should address all similarly situated FRB reviews.*

*Recommendation 4.7.45e:  Revise policy, training, supervision and command issues reflecting similar outcomes accordingly.*

**4.7.46 Assessing Compliance with Paragraph 59:  Abuse of Force Discipline**

Paragraph 59 stipulates:

---

[103] See Paragraphs 86 - 88.

**"Where, after a supervisory force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

## Methodology

APD SOP's related to use of force[104] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016. The update of APD's use of force suite of policies remained pending until June 2017, when the monitor approved each of the four (4) use of force related policies. The Force Review Board was recast as SOP 2-56, which better aligns it within the use of force suite of SOPs.

## Results

Operational compliance is not calculated for this paragraph because of outstanding training issues.  However, we note that this paragraph builds upon information that would be gleaned from data contained in earlier paragraphs of the CASA.  APD can gain insight as to their current operational compliance posture by reviewing past feedback the monitoring team has provided and the tables of compliance in IMR - 5.

Secondary compliance is not attained due to training gaps that still exist or emerged during this reporting period.  These items will need to be remediated carefully before APD achieves Secondary Compliance with this paragraph.

Primary: **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation 4.7.46a:  APD should initiate a systems-wide failure analysis regarding [IMR6-001] and determine at what point the most critical systems failed to perform as expected or required.*

*Recommendation 4.7.46b:  Once the failure points are identified, a thorough review of any cases with similar fact circumstances, similar command reviews, or other similar issues should be conducted.*

---

[104] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

*Recommendation 4.7.46c:  Once the failure analysis is complete, APD should identify lessons learned and recommend policy, training, systemic, supervisory, and/or management oversight systems that need to be revised, upgraded, or otherwise modified.*

*Recommendation 4.7.46d:  Assessments outlined above should not be restricted to the case giving rise to these recommendations, but should address all similarly situated FRB reviews.*

*Recommendation 4.7.456e:  Revise policy, training, supervision and command issues reflecting similar outcomes accordingly.*

*Recommendation 4.7.46f: APD must ensure that specific performance deficiencies, throughout the chain of command, associated with [IMR6-001] are properly addressed through counseling, training and/or discipline.*

### Assessing Compliance with Paragraph 60-77:  Force Investigations by the Internal Affairs Bureau

The series of related Paragraphs 60 through 77 encompasses requirements for Internal Affairs. These requirements direct members of Internal Affairs to respond to the scene and conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to Internal Affairs by the Chief.

APD's Professional Accountability Bureau (PAB) oversees the Internal Affairs Division (IAD), which has three subordinate units, the Internal Affairs Section and Critical Incident Review Team (CIRT) Unit, and also, the Force Investigation Team (FIT).  CIRT handles all administrative investigations, focusing on "lessons learned" from its case reviews, and is the initial IA responder to investigate serious uses of force. Thus, APD has functionally placed CIRT in the center of the duties and responsibilities the agency carries with respect to CASA compliance. APD uses its Force Investigation Team (FIT) to investigate all criminal implications of uses of force, the underlying incident that led to a specific serious use of force, Officer-Involved Shootings (OIS), or In-custody Deaths, and as APD's representative on the Multi-Agency Task Force (MATF). Both CIRT and FIT typically respond to the same incidents, but for different purposes. This is not a function of the CASA, but an APD construct for addressing its CASA responsibilities.

In the ensuing paragraphs related to IA, the monitoring team determined, based on a careful review of training materials provided by APD, that the organization has reached Secondary Compliance within this series of paragraphs.  In keeping

135

with past activities, the monitoring team requested serious use of force report ledgers, use of force reports and related materials to conduct case reviews that would serve as an assessment of APD's operational progress.  During this monitoring period, notable occurrences have reinforced the opinion of the monitoring team that significant work is left to be done in APD's investigations into serious uses of force.  The monitoring team requested five separate serious use of force investigations to review.[105]  Based on a number of key observations we have made concerning the current state of APD's overall use of force oversight system, the monitoring team did not conduct in-depth reviews of each of the serious use of force cases we were presented.[106]

The monitoring team has commented in past reports and during site visits on the extraordinary workload that is often placed on CIRT and FIT.  In the professional opinion of the monitoring team, the increased responsibilities placed on personnel assigned to these Units strained staffing levels given the CASA imposed deadlines and quality requirements, and the organizational culture in which CIRT and FIT operate on a daily and long-term basis.  Each of these factors contribute to our consistently noted serious deficiencies in the oversight and accountability process, particularly with respect to force reporting, supervisory-level investigations and chain of command reviews.  The monitoring team reviewed an Excel spreadsheet that APD provided in response to a data request.  The specific request was to provide the monitoring team with a ledger of serious use of force cases that occurred throughout the year, up to and including July 31, 2017.  APD accommodated that requested and provided a detailed Excel spreadsheet that listed 38 separate CIRT case numbers, the date that each case was opened by CIRT and/or FIT, the date that the case was closed, and the date that the serious use of force case was delivered to the FRB (et.al.).  A review of that ledger revealed that as of August 1, 2017, APD had 31 separate serious use of force cases were open/pending in one manner or another.  Between the dates of January 1, 2017 and June 1, 2017, APD reported 23 serious use of force cases, 17 of which (74 percent) were still pending.[107]  The ledger reviewed illustrated that APD's responses to serious use of force events are still untimely overall.  As we have articulated in previous reports, we believe that this is a result of three problems:  insufficient staffing, lack of effective training, and ineffective business processes (policies, procedures and processes).

---

[105] We intended to include **[IMR6-001]** for a total of six serious use of force reviews.  That case was provided prior to the June 2017 site visit concerning a FRB meeting we attended, and is detailed in more detail elsewhere in this report.

[106] In addition to specific separate points of justification noted in Paragraphs 14 and 41, two serious use of force cases that were reviewed inform this decision. **[IMR6-001 & IMR6-009]**

[107] These numbers translate to a 13.5% case completion rate within 60 days of a reported serious use of force.  Paragraph 71 requires IA to complete an administrative investigation within two months after learning of the use of force.  Investigations are not complete until final approval occurs.

As detailed earlier in this report, the monitoring team was presented with a case during this reporting period that, in our opinion, implicated and amplified deficiencies throughout the entire APD use of force oversight system.  That case **[IMR6-001]** was of such significance to the monitoring team that it had a direct impact on its approach to assessing multiple paragraphs. Considering the significance of this case, in the opinion of the monitoring team, APD would be wise to step back and take cognizance of its entire use of force oversight system including the handling of serious uses of force.  A "failure analysis" is highly recommended (see for example: http://research.me.udel.edu/~jglancey/FailureAnalysis.pdf. )

Another critical issue the monitoring team encountered is the initial handling and follow-up activities of **[IMR6-009].** This use of force took place on March 26, 2017. An officer from the Northeast Area Command was the principal officer in the incident and the only officer who utilized physical force; by all accounts a non-complex application of force. A sergeant conducted the front-line supervisory use of force investigation, a lieutenant conducted the Lieutenant's Review, and a commander conducted the Commander Review. Everybody who reviewed the case was apparently comfortable in handling the case as a supervisory use of force investigation and subsequently closing the case.

Three months after this incident occurred, an Albuquerque Assistant City Attorney completed a critical review of the closed investigation and forwarded to an APD staff member in the Field Services Bureau (FSB) 22 problems or questionable behaviors he gleaned from his review. These 22 points included a failure to activate the OBRD consistent with SOP, a supervisor providing an officer with a *Garrity* card as well as failing to obtain a phone number and address for civilian witnesses (and discouraging a written statement from at least one civilian), and a number of points that support his claim of a superficial investigation and analysis of the incident. The City Attorney specifically pointed out that when being interviewed by the sergeant, the officer's description of his knee slipping into the subject's jaw is not supported by the recording of a civilian cell phone video. The Assistant City Attorney found the officer can be seen in that video holding the subject's arm into the air while he places his knee directly onto the side of the subject's head, pinning him to the concrete, after which the subject's head "began to bleed more profusely." The Assistant City Attorney opined there is no slipping and the placement of the knee on the head was intentional.

The commander who conducted the initial Commander's Review in this case is now assigned to APD Headquarters. This commander, in his new role, received the communication from the Assistant City Attorney and then coordinated communications with the acting commander of the Northeast Area Command on this matter in which he was directly involved in handling and making a final determination. At a minimum, best practices in law enforcement and government operations dictate that this member had a duty to recuse himself from further

137

oversight of this matter. However, he stayed in the communication "loop" throughout the subsequent reviews, inclusive of communicating with CIRT.

A review of the various communications pertaining to this incident and subsequent field "re-reviews" reveals field supervisors allege CIRT was contacted immediately after the use of force incident and CIRT declined to respond. When providing additional clarification on June 30, 2017, about his actions and inactions pertaining to this incident, the sergeant who contacted CIRT the night of the incident affirmed that he supported the decision of CIRT not to respond to the scene. Even though this response to the scene is a responsibility of CIRT and a determination to be made by CIRT, the sergeant articulated in his memo that he recommended "...it was not a CIRT callout."

Interestingly, a review of case facts as peripherally discussed here reveals the problematic confluence of formal and informal communications, and directives and their collateral, sometimes unintended, adverse impacts. This use of force incident occurred approximately two weeks after the CIRT supervisor proclaimed in a March 10, 2017, memo that his Unit would handle misconduct investigations (despite a recognizably heavy workload with a troublesome backlog), instead of handing them off to a more traditional Internal Affairs group whose responsibility by SOP is to handle misconduct.[108] While on one hand CIRT decided on its own to take on the added burden of continuing CIRT investigations and investigating misconduct (without taking an "I" case number to identify and track a misconduct case), it appears members of CIRT shirked their responsibility to respond for the callout of this incident at a time when they were embarking on also handling misconduct.

What the monitoring team views as a culturally hypersensitive approach to investigating misconduct seems to be taking its toll on APD resources. This use of force seems to be another exemplar of this organizational attribute. Despite an Assistant City Attorney pointing out significant issues (including legal implications) in the way a use of force was used, investigated, reviewed, and closed, the communication was not transmitted in a confidential manner to Internal Affairs, but by email to a wide swath of individuals. Notably, none of these individuals are CIRT, IAD, or PAB personnel. The first person to respond to the email (two minutes after receiving the email) is the same person who conducted the Commander Review of the supervisory investigation in the first place. This person did not send or formally notify CIRT, IAD, or PAB personnel about this communication from the Assistant City Attorney; he immediately sends it back to the same chain of command involved in the initial supervisory investigation.

---

[108] Although CIRT decided it would handle misconduct cases in March 2017, the May 2017 Internal Affairs Force Investigation Training provided by the CIRT supervisor asserted CIRT is "NOT A MISCONDUCT UNIT."

Nothing we have reviewed here indicates any improper intent on the part of this APD member. We simply illustrate this point to demonstrate how APD seems to have an intense cultural resistance to referring matters to Internal Affairs that should be referred. In fact, when the FSB representative finally refers the "re-review" of this matter outside of the FSB, he sends it to CIRT and affirms that this should have been a CIRT case. More importantly, when the CIRT supervisor receives the email transmittal of documents pertaining to this case, he communicated immediately with the IAD Commander, the logical command that should have received this information in the first place. The CIRT supervisor briefly summarized the dilemma as he saw it, adding "I would think now that the case is closed by the Commander, it would take reassignment by the Chief to IA if it is to be further investigated (whether that happens through FRB or simply the Chief himself).

This "referral" is further complicated in that there is an apparently false claim by the chain of command that CIRT was consulted on the night of the use of force, but the supervisor ultimately classified the case as non-serious." Two points to highlight here about this communication are: 1) The CIRT supervisor believed the only way this debacle gets investigated is by request of the Force Review Board (FRB) or the directive of the Chief; and 2) The fact that CIRT may have violated SOP by not responding to the scene on the night of the incident. Across the nation, law enforcement executives empower their internal affairs professionals to initiate internal affairs misconduct investigations when there is indicia of administrative or criminal conduct. This seems to be a problematic concept for APD. Furthermore, the information that indicated CIRT was contacted on March 26, 2017, when this incident occurred and did not respond for whatever (possibly legitimate) reasons, would provide internal affairs professionals the impetus to recuse themselves from participating in this reinvestigation. However, as documents provided to the monitoring team indicate, CIRT opened an investigation into this matter on June 27, 2017, and began the investigation while at the same time the FSB was conducting its re-review.[109] The FSB re-review concluded one week later. As of August 10, 2017, the CIRT investigation was not available to the monitoring team because it was still being reviewed by the CIRT chain of command.[110]

The amount of time this case has consumed, the carefully constructed memos provided by various APD personnel (especially above the rank of officer), and

---

[109] In the same manner how CIRT and FIT respond to the same incidents, but for different purposes, can confound law enforcement professionals and efficiency experts alike, here a CIRT (not administrative misconduct) case is initiated at the very same time field commanders are reviewing their work and recasting their previous lack of diligence in the form of another quasi-supervisory investigation. Again, just like the CIRT/FIT joint response for differing purposes is not a function of the CASA, but an APD construct, the simultaneous initiation of the CIRT investigation while the field reinvestigation of the incident is occurring is not only not CASA-driven, but inefficient and improper.

[110] Since this case was still be reviewed, we have intentionally refrained from commenting on the original investigation and review of this incident, inclusive of the scope and verbiage of the memos provided to date.

the vulnerabilities it has revealed generate extreme concerns among the monitoring team.  Certainly, future data requests will contemplate these vulnerabilities. We believe the continued deference to Area field command personnel on CASA-audited actions central to the CASA (e.g., what constitutes force, reprieves for OBRD noncompliance, etc.) will continue to deliver variability that will make full compliance a remarkably elusive goal.  APD should also take pause to consider a critically central and wide-ranging concern:

> *The APD has reached a point where they must consider the efficacy of their entire use of force oversight system and how it aligns with the reform progress to date, especially given the attitudes of supervisors and commanders within that system to excuse behavior that contravenes and undermines compliance efforts.*

### Follow-Up - Past Monitoring Reports:

The monitoring team, over the last several reports, turned to members of IA/CIRT to provide us with an understanding of the follow-up activities APD took with respect to three specific use of force cases[111] **[IMR-5-22, IMR-5-024, IMR-5-023[112]].** These cases, all of which include the use of an ECW, were first reported in Paragraph 46 for <u>IMR-3</u>, then reiterated in <u>IMR-4</u>, wherein the monitoring team expressed deep concerns over the content and accuracy of the initial reports by the officers and follow-up investigations conducted by their supervisors. Initially, the monitoring team intended to address these cases during its June 2016 site visit, but as we have previously reported IA/CIRT had just received IMR-3 days before the visit and they did not have an opportunity to review our comments.[113]  We deferred our discussion for a later time with the expectation that APD would appropriately address the cases, and our concerns, in some legitimate fashion.

In preparation for our site visit in November 2016, we provided APD with a proposed schedule and indicated within that schedule that we wanted to discuss the same three cases. When we met with members of IA/CIRT it was apparent

---

[111] This practice has been the most effective because of the significant interrelationship IA/CIRT has with all use of force investigations.

[112] We note that **[IMR-5-023]** was reported as being satisfactorily handled in IMR – 5, save for counseling that we believe was appropriate, but APD was not aware of that determination by the time the monitoring team arrived on site in June 2017.

[113] Excerpt from Paragraph 46, IMR-4: "With respect to the Use of Force and Show of Force cases reported in IMR-3, the monitoring team notes that APD did not have an adequate amount of time to read and assess the information in that report prior to our June 2016 site visit --- since the report had only been provided a few days before that visit.  Typically, the monitoring team will review the cases it comments on with APD, particularly if cases had significant deficiencies. Since the monitoring team provided sufficient detail in IMR-3 for APD to self-assess and make determinations as to the proper follow up actions that may be necessary in each case, we will review these cases in detail during our November 2016 site visit to determine any follow up activities APD has conducted and report on those activities in IMR-5."

not only that they were unfamiliar with the cases, but more importantly, it was immediately clear to the monitoring team that nothing had been done to address the multiple critical issues raised by those cases. Instead, we were referred to the Area Commands to determine what had been done with the cases, but there was no indication that any referral had been made back to the Area Commands (following our previous reports)!  We find such a conundrum unsupportable in a modern American police department.  Since the issue was not reconciled during the site visit we followed up that meeting with an additional data request in preparation for IMR-5.  In response, we were provided with a two-page interoffice memorandum from APD, dated January 23, 2017.  The memoranda acknowledged the conversation that occurred while the monitoring team was at APD in November 2016 and the fact that these three cases were discussed.

In IMR-5 we noted, "It is nearly incomprehensible that after five attempts[114] to prompt a legitimate follow-up on cases that the monitoring team has identified as problematic, two of the three remain unresolved after nine months."  We also noted: "At a minimum, these findings denote a basic failure to receive and comprehend information the monitoring team provides (either through monitoring reports, Special Reports or in-person meetings), break that information down into tasks to be addressed by members of the department, address issues meaningfully, ensure that proper remediation of performance deficiencies occurs, and document the process."  In the interim, that situation has only become worse!

Along a similar vein, while on site in June 2017, APD requested a meeting with the monitoring team to discuss steps they had taken toward reconciling concerns the monitoring team raised in past reports about **[IMR-5-022, IMR-5-024, IMR-5-023]**.  This was an impromptu meeting, and the monitoring team were not provided copies of reports ahead of time.  Shortly into the presentations the meeting ended and the monitoring team requested copies of the reports that were prepared to have an adequate opportunity to assess the actions that APD took to remediate concerns the monitoring team first documented in IMR -3.  (Parenthetically, we note that IMR-3 was filed with the Court in July 2016, nearly a year prior.)

As noted in IMR-5, the concerns raised concerning **[IMR-5-023]** were adequately addressed by APD, as that case principally involved a reporting discrepancy over the duration of an ECW deployment in the initial supervisory force investigation.  The investigating supervisor indicated that the ECW deployment of an officer lasted 30 seconds, where ECW ledgers indicate the cycle lasted 5 seconds.  If the incident did include a 30 second cycle of an ECW it would have constituted a serious use of force.  The follow up activities, and the findings therein, were consistent with observations the monitoring team made of

---

[114] 1) Reported in IMR-3; 2) Discussed during our June 2016 site visit; 3) Listed in our proposed November site visit schedule; 4) Discussed at our November 2016 site visit; 5) Requested any follow up in preparation for IMR-5.

the lapel camera footage, but since the documentation indicated otherwise the discrepancy needed to be documented.

The monitoring team reviewed an Interoffice Memorandum dated, July 5, 2017, that documented efforts an Area Commander took to review monitor comments related to **[IMR-5-024].**  That memorandum addressed potential performance deficiencies he recognized with the initial event.  Essentially, the Area Commander agreed with each of the assessments the monitoring team reported[115], and made eight separate "Recommendations" as a result of his observations. However, there is nothing in the documentation the monitoring team reviewed to suggest that any of the "Recommendations" have been followed up.  This is certainly a serious incident of failing to "close the loop!"

The monitoring team reviewed an Interoffice Memorandum dated May 12, 2017, and associated materials, that documented efforts an Area Commander took to review monitor comments related to **[IMR-5-023]**.  Within the associated materials were additional Interoffice Memorandums prepared by members of APD's Academy staff.  In our opinion the documentation related to this case, and the actions taken to remediate this case, are unacceptable.  The reports we reviewed failed to adequately address basic elements of the actions taken by officers involved in the event, and reconcile those actions against those officers' official reports.  We have long since passed the point in time where any meaningful performance remediation can occur in this case since the cases date back to December of 2015!  APD has offered perspectives on this case that we may have to refer to in future reports.

For the past year and a half the monitoring team has been following up these cases with the ultimate goal that some measure of meaningful oversight and review would occur. There will be times that the views of APD personnel and the monitoring team will differ, but in the end APD has a responsibility to ensure that cases are properly reported, investigated and documented.  It is clear in the documentation of all three cases that APD recognized that proper documentation, and proper investigation, did not occur.  The monitoring team does not believe that any further reporting on these cases will reveal meaningful value.  However, we will follow up with Academy personnel during our next site visit to discuss the perspectives offered in response to monitoring team feedback.

### 4.7.47 Assessing Compliance with Paragraph 60:  IAB Force Review

Paragraph 60 stipulates that:

---

[115] The Area Commander did not agree that officers at the scene "lost control" of the situation at the scene.  At this point we see little value trifling over such a detail since the Area Commander validates each other observation by the monitoring team.

"The Internal Affairs Bureau shall respond to the scene and conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Bureau by the Chief. In cases where the Internal Affairs Bureau initiates a criminal investigation, it shall ensure that such investigation remains separate from and independent of any administrative investigation. In instances where the Multi-Agency Task Force is conducting the criminal investigation of a serious use of force, the Internal Affairs Bureau shall conduct the administrative investigation."

## Methodology

The Internal Affairs "suite of policies" has been re-numbered, and now includes policies covering several different entities related to the administrative and/or criminal investigation of uses of force, misconduct that may be identified as a result of those investigations, and the imposition of discipline.  SOP 2-05 has been recast as SOP 7–1; IA has instituted a handbook; the Critical Incident Review Team (CIRT) responsibilities are now codified in SOP 7-2; the Force Investigation Team (FIT) responsibilities are now codified in SOP 7-3; Complaints Involving Department Policy or Personnel is now codified in SOP 3-41; and the Discipline System is now codified SOP 3-46.  We note that the Investigative Response Team (IRT) has reverted back to its previous name, the Force Investigation Team (FIT). Because these policies provide the foundation for training and field implementation, the monitoring team requested copies of any documentation pertaining to training PAB personnel have received with respect to their relevant SOP's, during the IMR 5 reporting period.  The monitoring team was provided with two "lesson plans" (actually little more than outlines) and PowerPoint presentations, PowerDMS records related to a number of IA related policies and also an interoffice memorandum, dated October 12, 2016, entitled "Garrity Advisements" authored by the commander of IAD to his personnel.  We were provided with numerous certificates of attendance, primarily originating from courses developed outside of APD, which we expect were intended to demonstrate their personnel were appropriately trained.  We were also provided with a series of interoffice memorandums that were prepared by a member of FIT.   These memorandums were purported assessments of external training courses attended by FIT personnel, presumably with the intention of demonstrating the content of the courses met certain provisions of the CASA.

To reach Secondary Compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols, inclusive of the handbook, or "System Manual," that was created by IA. While external training is important, it cannot, by definition, fill this critical "systems" need.

**Results**

In preparation of this report the monitoring team requested numerous sets of data for this Paragraph. Many of the requested records pertain to this Paragraph, as well as other Paragraphs within this section of the report that focus on Internal Affairs and use of force investigations. Our review of these records will appear in the various "Results" sections of subsequent Paragraphs. What immediately follows is the analysis of records submitted to the monitoring team that allows us to evaluate how APD approaches its continuing responsibility to train their own policies and procedures. This is a cornerstone of reaching Secondary Compliance for this as well as several other paragraphs. Therefore, we address this matter of Internal Affairs training in this paragraph.

During our site visit, the monitoring team was briefed on the emergence of a number of policies and procedures that were approved and being implemented in the weeks before our site visit and planned for the period immediately following our visit. This included the May 10, 2017 delivery of the "IA Force Investigations Training Program." This one-day training program was tailored for the CIRT.  Attendance records reveal all active duty sergeants and detectives assigned to CIRT attended the training. Additionally, supervisory personnel and detectives assigned to the Internal Affairs Section (IAS) also attended the training. The 110-slide PowerPoint presentation addressed the elements of supervisory force investigations inclusive of critical tasks for investigators, such as: ensuring investigations include information required by the CASA; considering all relevant evidence and making credibility determinations, and making reasonable efforts to resolve material inconsistencies between officers and other involved persons. The training materials included small group exercises, samples of reports, a video from an OBRD during an interview and subsequent use of force incident, and a multiple-choice test (for which the average test score was 97.4). Objectives for the training program (as listed in the program's syllabus) focused on:  1.  The policies and procedures of the unit, 2.  the Supervisory Force Investigation process; 3.   Similarities as well as differences between CIRT and Supervisory Investigations; 4. How to make credibility determinations 5. Analyzing officer actions (and documenting this in a Supervisory use of force investigation); and 6. How to identify and follow-up on areas of concern. The objectives were written slightly differently in the "Instructor's Outline." For example, Objective #4 in the program's syllabus states, "Demonstrate the methodologies for making credibility determinations." Objective #4 in the "Instructor's Outline" states, "Explain how to make credibility determinations." While the language used in the two versions of the same learning objective might seem slight, the learning activities associated with reinforcing this objective in a training course are quite different, item construction (test questions) for each version of the

144

learning objective will be different, and the expected performance in the field from this type of variation in the learning objective language can be compromised.  This incongruity needs to be resolved. Similarly, objective #5 in the program's syllabus states, "Explain how to properly prepare a Serious Use of Force narrative write-up," while Objective #5 in the "Instructor's Outline" states, "Analyzing officer actions and documenting a Supervisory Use of Force investigation." The analysis of officer actions and preparation of a written narrative are different learning objectives. This needs to be clarified or corrected.  We are seriously concerned that, this late in the compliance process, we have the need to "explain" such rudimentary issues to training staff.

While nuances with the learning objectives need to be addressed to optimize the efforts put forth in developing and delivering the training, APD has demonstrated it has adequately conducted a needs assessment and subsequently trained PAB personnel on its own policies and protocols. This is further evidenced by the CIRT Handbook being disseminated at this training and being central to the training program's learning objectives. Included in this handbook were copies of relevant SOP's, inclusive of: 2-8 (Use of On-Body Recording Devices/ Management of Recordings); 2-52 (Use of Force); 2-53 (Electronic Control Weapon--ECW); 2-54 (use of force Reporting & Supervisory Force Investigation Requirements); 2-55 (use of force Appendix); 2-56 (Force Review Board); 7-1 (Internal Affairs Section), 7-2 (Critical Incident Review Team – CIRT); 7-3 (Force Investigation Team - FIT); and pertinent paragraphs from the USDOJ Settlement Agreement.

Based on the records we reviewed for this and other related courses as noted in other Paragraphs of this monitoring report, APD has demonstrated they have developed and delivered adequate training to address their governing policies, procedures and processes, thus securing secondary compliance for this Paragraph.

APD has required courses in its training matrix for personnel assigned to the PAD. A number of these courses, to include courses by IPTM and John Reid and Associates, are well-known and highly regarded within professional law enforcement circles. However, no evidence was provided or reviewed that established APD's efforts to vet or conduct due diligence on externally provided courses and how they may impact CASA-required actions as they relate to force and misconduct investigations. We have noted this critical issue repeatedly. This effort must be prioritized because even reputable programs developed by private vendors will provide instruction that may not be consistent with New Mexico state law, the directives contained in the CASA and/or APD policy.  This fact has been communicated in the form of technical assistance to APD on numerous occasions in the past, yet it still remains an issue. At the risk of being redundant, developing a systematic vetting

process for external training is vital to securing long-term compliance. This type of training oversight system will protect APD from exposing its members to external training sources that provide content inconsistent with its reform efforts, policy or state law.  Despite the import of these recommendation, we still note resistance to that advise.  We can only see this as deliberate, given the number of times we have raised this with APD.

During our site visit, APD members advised members of the monitoring team of FIT's fluctuating staffing levels. APD members indicated in November 2016, FIT had four detectives doing serious Use of Force investigations. Subsequently, staffing rose to ten investigators, but FIT was currently staffed by eight investigators of which six investigators are currently assigned to conduct serious Use of Force investigations.

The monitoring team also learned that Internal Affairs Division personnel apparently unilaterally suspended parts of the APD directive on CIRT investigations, thus placing CIRT protocols in conflict with monitor-approved policy regarding misconduct investigations related to Use of Force investigations. Internal Affairs Division personnel also discussed not taking an Internal Affairs Section "I number" when a serious Use of Force case had indicia of misconduct, instead waiting for the Force Review Board to rule on the matter. Documents submitted to the monitoring team pertaining to these matters have been reviewed. These documents, which affirm the monitor was not advised about amending any policy, include the actual March 10, 2017 memo from the CIRT supervisor suspending parts of the APD policy on CIRT investigations, as well as rescission orders neutralizing the March 10 memo. The rescission order (made only after the monitor notified APD of the issue) neutralizing the March 10 memo was addressed in weekly briefings to CIRT members on June 27 and July 11, 2017, and followed up with a written order from the CIRT supervisor on July 12, 2017. The issue of not taking an "I number" when a serious Use of Force case had indicia of misconduct was addressed and guidance provided (consisting of a referral to IAS) during the July 11, 2017 weekly CIRT meeting. Additionally, the monitoring team reviewed written documentation of "coaching" provided to two senior APD members to ensure an Internal Affairs Section "I number" is taken when a serious Use of Force case had indicia of misconduct.

We have noted repeatedly that our impression is that staffing currently may be sub-optimal to handle the present workload, based upon the work flow data we have reviewed.  As we have noted previously, this causes concern for several reasons:  Timely feedback is delayed, which means that deficiencies take longer to detect and remediate.  We have noted that this is especially crucial during early stages of an organizational reform process.  Although the Force Review Board (FRB) does review a

small sample of investigations, for a number of reasons, the monitoring team does not regard that as a sufficiently robust level of oversight. During IMR-5 the monitoring team was advised of a proposal to create a "Central Oversight Unit" that may address some of these issues. The monitor's requests for copies of the proposal to create this Unit and information about where the Unit would reside within the APD table of organization have not been produced to date. This seems to be a recurring problem at APD under present leadership:  we frequently hear of extenuating "plans" designed to ameliorate a given problem identified by the monitoring team, only to find a failure to follow through with specific remedial efforts.  We remind APD yet again, we monitor execution, not intention.  This is but another indication of organizational entropy at APD.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.47a:  The language of the learning objectives need to be addressed to optimize the efforts put forth in developing and delivering the "IA Force Investigations Training Program."***

***Recommendation 4.7.47b:*  Prioritize efforts to vet or conduct due diligence on externally provided courses and how they may impact CASA-required actions as they relate to force and misconduct investigations.**

**4.7.48 Assessing Compliance with Paragraph 61:  Criminal and Civil Force Investigations**

Paragraph 61 stipulates:

**"The Internal Affairs Bureau will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60. The Internal Affairs Bureau shall include sufficient personnel who are specially trained in both criminal and administrative investigations."**

**Methodology**

The Internal Affairs "suite of policies" have been re-numbered, and now include policies covering several different entities interconnected to the administrative and/or criminal investigation of uses of force, misconduct that may be identified as a result of those investigations, and the imposition of discipline.

As we have noted previously, from our reviews and discussions with FIT, CIRT and IA staff, APD has erected a strong firewall that permits a one-way flow from FIT to IA, but not the reverse.  During our November 2016 site visit the monitoring team discussed information breakdowns that occurred in a specific, previously reported, serious use of force case and how a FIT investigation into potential criminal liability was hindered (even diminished) because they were not privy to the same information as another organizational entity**.**  The monitoring team respects APD's desire to segregate the information between criminal and administrative investigations, and the differences between voluntary and compelled statements. We were told that APD continues to refine the interaction between FIT and CIRT and have discussed extensively how the two units will interact and share information appropriately and within policy.  We have seen no tangible results of those intents.

**Results**

APD has demonstrated they have developed and delivered adequate training to address their governing policies, procedures and handbook, thus securing Secondary Compliance for Paragraph 60.

Despite APD choosing not to perform a careful, comprehensive, and inclusive job task analysis of all currently assigned IA job classes, a review of documents by the monitoring team revealed a critical job task analysis was conducted for CIRT. This analysis considered the primary function of CIRT and appropriately categorized the critical tasks/functions. This information was utilized to develop a list of knowledge, skills, and abilities needed for current CIRT staff. An April 21, 2017 memo discussed the unorganized and costly manner in which early training efforts prepared personnel for performing their duties in CIRT. This recognition and understanding by management and leadership at APD of where it was in the early phases of its court-approved reform efforts is an important milestone in its organizational development along a reform continuum. The memo that cites this recognition and understanding, in addition to other supporting documentation, contribute to a needs assessment for, and outline the creation of, a standardized training progression for CIRT personnel. This three-tiered training regimen includes a mandatory primary training level, a subsequent "Secondary Enhancement Training" phase, followed by a subsequent professional development component of training.  The mandatory, primary training phase consists of mostly APD developed training courses, augmented by external courses by reputable providers such as IPTM and John Reid and Associates.  For APD members who attend training provided by external vendors, a vetting rubric reportedly is currently being developed. The rubric will be utilized to determine if APD will send other employees to the external courses and if APD should examine and/or incorporate any information from such courses

into its current practices and protocols. This type of rubric, if properly developed and utilized, could be a standardized way for assessing training opportunities. Such training oversight systems should be assessed and considered for agency-wide implementation by the training academy.

The review of the Internal Affairs Handbook and applicable Standard Operating Procedures, as well as a guided supervision of case preparation, management, and processing are all part of the APD-developed training courses. Additionally, a new employee orientation checklist was developed to ensure newly assigned CIRT staff are properly outfitted for and briefed on their new roles. Newly assigned members are also evaluated on various tasks relative to their new position. Supervisors must sign off on this new checklist, thereby providing supervisory oversight of the qualifications and "readiness" of their personnel to conduct use of force investigations. The monitoring team has seen evidence of checklists like this in other areas of APD (e.g., SID) and considers this type of supervisory oversight a positive development in the reform efforts of the agency. The monitoring team will inquire about the implementation of this new checklist and its organizational impact through data requests for future IMR's.

Collectively, these measures have secured Secondary Compliance for Paragraph 61.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not In Compliance**

***Recommendation 4.7.48:  Complete the development cycle by ensuring the training recently delivered is implemented.***

### 4.7.49 Assessing Compliance with Paragraph 62:  Revision of IAB Manual

Paragraph 62 stipulates:

> **"Within six months from the Effective Operational Date, APD shall revise the Internal Affairs Bureau manual to include the following:**
>
> **a) definitions of all relevant terms;**
>
> **b) procedures on report writing;**
>
> **c) procedures for collecting and processing evidence;**
>
> **d) procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled**

149

**subject officer statements;**

**e)   procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;**

**f)   scene management procedures; and**

**g)   management procedures."**

## Methodology

To reach Secondary Compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols, inclusive of its handbook – or System Manual - that was created by IA. We focused our review accordingly.

## Results

The review of the Internal Affairs Handbook and applicable Standard Operating Procedures, as well as a guided supervision of case preparation, management, and processing are all part of the APD-developed training courses. In addition to a myriad of policies contained within the handbook, the monitoring team takes cognizance of APD's positive efforts to emphasize certain aspects of the handbook. For example, although definitions are listed throughout various policies contained within the handbook, a separate, reference list of definitions was incorporated into the handbook as a *quick reference guide*. Additionally, a new employee orientation checklist, derived from elements of the handbook, was developed to ensure newly assigned staff are properly outfitted for and briefed on their new roles. Newly assigned members are also evaluated on various tasks relative to their new position. Supervisors must sign off on this new checklist, thereby providing appropriate supervisory oversight of the qualifications and "readiness" of their personnel conducted use of force investigations.

As noted in previous paragraphs, the CIRT Handbook was disseminated at the May 2017 delivery of the "IA Force Investigations Training Program" and was central to the training program's learning objectives. Included in this handbook were copies of relevant SOP's, inclusive of: 2-8 (Use of On-Body Recording Devices/Management of Recordings); 2-52 (Use of Force); 2-53 (Electronic Control Weapon -  ECW); 2-54 (Use of Force Reporting & Supervisory Force Investigation Requirements); 2-55 (use of force Appendix); 2-56 (Force Review Board); 7-1 (Internal Affairs Section), 7-2 (Critical Incident Review Team – CIRT); 7-3 (Force Investigation Team - FIT); and pertinent paragraphs from the USDOJ Settlement Agreement. These SOPs and directives succinctly address

the seven elements outlined in this Paragraph, thus securing Secondary Compliance for Paragraph 62.

Data requests for future IMRs will focus on assessing the organizational impact of implementing the elements (e.g., procedures for report writing, collecting and processing evidence, etc.) of this Paragraph for purposes of determining Operational Compliance.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.49:  Integrate policy and training and implement operations required therein on a routine basis.***

### 4.7.50 Assessing Compliance with Paragraph 63:  Staffing IAB

Paragraph 63 stipulates:

**"Within ten months from the Effective Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Bureau to fulfill the requirements of this Agreement. APD shall ensure that all serious uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary. At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Bureau."**

### Methodology

To reach Secondary Compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols, inclusive of its handbook, or System Manual, that was created by IA.

### Results

As noted in previous paragraphs, the CIRT Handbook was disseminated at the May 2017 delivery of the "IA Force Investigations Training Program" and was central to the training program's learning objectives. Included in this handbook were copies of relevant SOP's.

The monitoring team assumes the question of whether IAD has sufficient trained personnel to handle its workload, to ensure the timely processing of quality force investigations and CIRT reviews, is a continual APD assessment. As noted

earlier, we see adequate staffing and training for personnel as a critical issue in the compliance process. For these reasons, a comprehensive, inclusive job-task analysis of all IA job classes would be beneficial to future planning efforts to improve the efficiency and quality of IAD investigations. A workload analysis will also help define the human resources (both investigative as well as supervisory members) needed to address APD's struggles with its current case backlog and future projected caseloads.  APD may need to enlist external resources to complete these processes.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.50 Integrate policy and training and implement operations required therein on a routine basis***

### 4.7.51 Assessing Compliance with Paragraph 64:  Training IAB Personnel

Paragraph 64 stipulates:

**"Before performing force investigations, Internal Affairs Bureau personnel shall receive force investigation training that includes, at a minimum, the following areas: force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques. Internal Affairs Bureau personnel shall also receive force investigation annual in-service training."**

### Methodology

To reach Secondary Compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols, inclusive of its handbook – or System Manual - that was created by IA.

### Results

With respect to Compliance levels with this paragraph, as noted in previous paragraphs, the CIRT Handbook was disseminated at the May, 2017 delivery of the "IA Force Investigations Training Program" and was central to the training program's learning objectives. Included in this handbook were copies of relevant SOP's, inclusive of: 2-8 (Use of On-Body Recording Devices/Management of Recordings); 2-52 (Use of Force); 2-53 (Electronic Control Weapon -  ECW); 2-54 (Use of Force Reporting & Supervisory Force Investigation Requirements); 2-55 (Use of Force Appendix); 2-56 (Force Review Board); 7-1 (Internal Affairs

Section), 7-2 (Critical Incident Review Team – CIRT); 7-3 (Force Investigation Team - FIT); and pertinent paragraphs from the USDOJ Settlement Agreement. A combination of the training courses (inclusive of annual in-service training) and the SOP's and directives previously discussed in this report succinctly address the call-out and investigative protocols; proper roles of on-scene counterparts, and investigative equipment and techniques needed for force investigations. Therefore, the monitor notes Secondary Compliance for Paragraph 64.

Data requests for future IMR's will focus on assessing the organizational impact of implementing the elements (e.g., call-out and investigative protocols, etc.) of this Paragraph for purposes of determining Operational Compliance.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.51:  Continue implementation of training and supervisory process to ensure compliance to extant policy and training.***

### 4.7.52 Assessing Compliance with Paragraph 65:  Referral of Force Investigations to MATF

Paragraph 65 stipulates:

**"Where appropriate to ensure the fact and appearance of impartiality and with the authorization of the Chief, APD may refer a serious use of force or force indicating apparent criminal conduct by an officer to the Multi-Agency Task Force for investigation."**

### Methodology

In preparation for this report, the monitoring team made three separate data requests for the following:

- Case ledger that lists any/all serious use of force cases that were referred to the MATF for investigation.

- Copies of any MATF investigated serious use of force investigation (To include, documents, reports and videos, as well as final determinations) submitted and completed during this time frame.

153

**Results**

During our site visit, members of the monitoring team attended a meeting with members of the various agencies that comprise the Multi-Agency Task Force (MATF). It was outlined to us that during a MATF investigation, CASA-centric tasks (the canvassing of neighborhoods, separating witnesses, etc.) remain with APD members on the task force or MATF personnel are partnered with APD members when these tasks are handled. Personnel from the New Mexico State Police stated the task force is operating better now than it ever has in the past due to the coordination and collaboration of all the partner agencies. An Assistant District Attorney from Bernalillo County was present at the meeting and discussed the backlogged cases at his office.

The monitoring team learned during the meeting that members of the MATF from other agencies had never been formally briefed on all of the provisions of the CASA. MATF members seemed uninformed of the many requirements APD must meet, thus exposing APD to potential CASA compliance risks during investigations.  APD members responsible for compliance with this Paragraph indicated they planned on formally briefing MATF members at a future meeting about the expanse of APD'S CASA-related responsibilities. Documents provided to the monitoring team subsequent to our June site visit revealed this formal briefing occurred on July 10, 2017. Members of the MATF from the New Mexico State Police, Bernalillo County Sheriff's Office, and Rio Rancho Department of Public Safety were briefed on the elements of the MATF Memorandum of Agreement, as well as FIT's applicable CASA-related responsibilities, and CIRT's responsibilities. Written meeting minutes note the questions that were raised and addressed at the briefing (e.g., call-out protocols, general MATF member responsibilities, etc.) or subsequent to the briefing. MATF members were asked to formally brief other members from their respective agencies that were not present at the briefing.

Data received from APD reveals seven APD cases were submitted to the MATF for investigation during this monitoring period. At the close of the period, six cases were listed as "pending" and one case was listed as "complete." Two MATF "Investigative Briefing/Call Out - Sign In" sheets were submitted to fulfill a monitoring team data request. One of the sheets reflected the date of 02/10/17, which coincided with an officer involved shooting on the same date (as listed on the APD ledger of MATF cases). The other sheet reflected a date of 03/06/17. This date was not reflected as the 'date of incident" on any APD ledger listing MATF cases.  At this time, we cannot explain this incongruity.

The policy and training components of this Paragraph have been demonstrated and Secondary Compliance is hereby noted.

Data requests for future IMR's will examine the conditions (e.g., ensure fact, ensure the appearance of impartiality, etc.) on which a referral is made to the MATF.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not in Compliance**

***Recommendation 4.7.52a:  Assess timeliness and completion of MATF investigations and identify causes of delays, inconsistencies and related issues.***

***Recommendation 4.7.52b:  Develop recommendations to eliminated avoidable delays and improve reporting and review process.***

### 4.7.53 Assessing Compliance with Paragraph 66:  MATF Assistance to IAB

Paragraph 66 stipulates:

> **"To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Internal Affairs Bureau or the Multi-Agency Task Force in the investigation of any serious use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs."**

### Methodology

The monitoring team requested data on any internal procedures or protocols implemented regarding the flow of information between CIRT and FIT, based upon previously discussed information breakdowns in IMR 5.

### Results

To address this matter of interaction and information sharing/security, a January 16, 2017 memo from CIRT to the APD Emergency Communications Center requested Communication protocols to be revised so Communications personnel notify both CIRT and FIT at the same time for callouts for serious use of force occurrences. Another January 16, 2017 memo notes that CIRT will begin their investigation immediately upon being notified of any serious use of force matter (except for lethal matters such as an officer involved shooting) to avoid inefficiencies when investigating and managing CIRT investigations.

155

Documentation reviewed by the monitoring team was indicative of FIT's support of CIRT and the MATF. As evidenced by their close working relationship with the MATF, FIT members briefed MATF members (at the July 10, 2017 briefing) about their CASA-related roles and how they can ensure the goals of the MATF Memorandum of Agreement (MOA) and CASA can be jointly served.

Based upon the foregoing information, Secondary Compliance has been attained by APD for Paragraph 66.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

*Recommendation 4.7.53a:  Perform a careful, comprehensive, inclusive Job-Task Analysis of all currently assigned IA job classes (this may require external assistance).*

*Recommendation 4.7. 53b: Once the JTA is complete, develop a listing of needed skills and competencies;*

*Recommendation 4.7. 53c:  Identify current skill-sets possessed by current IA personnel, and conduct a "Gap Analysis;"*

*Recommendation 4.7.53d:  Determine what missing skill-sets need to be developed;*

*Recommendation 4.7. 53e:  Assess external training modalities to identify in advance which ones train and develop the missing skill sets;*

*Recommendation 4.7.53f:  Either develop the needed training in-house or procure it by sending IAB personnel to external training events that are known to provide effectively needed skill sets that will fill IAB's skill-set deficiencies.  Make no assignments to external training unless APD can verify that the training venue or provider actually has a plan and or course syllabus that includes an effective treatment of the designated skill set.*

*Recommendation 4.7. 53g:  Maintain records regarding skill set deficiencies and external training events skills training, and follow-up with post-training analyses of each externally trained employee's ability to meet performance goals related to "new" skill sets.*

**4.7.54 Assessing Compliance with Paragraph 67:  Notice to External Agencies of Criminal Conduct in Use of Force**

Paragraph 67 stipulates:

**"The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation."**

### Methodology

The monitoring team requested APD provide copies of any documentation that demonstrates they are consulting with either the District Attorney's Office or the US Attorney's Office.  The request was to determine whether APD, during the course of a serious use of force investigation, seeks an opinion where there is potential criminal liability for an APD officer.

### Results

The monitoring team was provided with copies of ledger entries revealing 12 cases have been submitted to the District Attorney's Office for review. Absent from this list was CIRT **[IMR6-010].** However, other records submitted to the monitoring team reveal this case was sent to the District Attorney's Office for review of the potential criminality of actions in this matter or prosecution/declination determinations. These records reveal the District Attorney's Office received this case for review via Evidence.com on July 19, 2017.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not In Compliance**

***Recommendation 4.7.54a***: *APD should develop policy and training requiring such referrals to track the exact inventory of items that go back and forth for these reviews and provide more specificity and accuracy.*[116]

### 4.7.55 Assessing Compliance with Paragraph 68:  Consultation with External Agencies and Compelled Statements

**"If the Internal Affairs Bureau determines that a case will proceed criminally, or where APD requests a criminal prosecution, the Internal Affairs Bureau will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186. No other part of the investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation."**

---

[116] Receipts of information may exist but they were not provided to the monitoring team.

**Methodology**

For this monitoring period, the monitoring team requested copies of any documentation that demonstrated that APD is consulting with either the District Attorney's Office or the US Attorney's Office. Specifically requested were:

a.  Ledgers depicting any/all pending IA cases (including, at a minimum, date, officers involved, case number (s) where officers involved are currently under prosecution criminally; and

b.  List/ledger of any IA cases closed during this time frame that were originally held pending a criminal prosecution.

**Results**

Cases that implicate the consultation requirement with the DA clearly should call for high-level review and approval.  It is still unclear to the monitoring team at what level this decision is currently being made. As we noted in IMR-4 and IMR-5, if the decision is never elevated expressly to the Chief Executive's level, it will be impossible for APD to comply with the requirements in Paragraphs 67 and 68. Thus, policy work remains to be done.

During our site visit in June 2017, a presentation was made by a CIRT member to the Force Review Board (FRB). The case involved what the monitoring team finds to be a number of problematic behaviors on the part of the officer involved, supervisors, and the way APD executive-level failed to prioritize the case or take any disciplinary action. During the presentation, the monitoring team asked if the case was ever reviewed by the City Attorney's office or the District Attorney's office about the existence of criminality. Such a case reasonably needs this type of review to determine if the case will proceed criminally, or where APD will need to delay any compelled interview of the target officer(s). The CIRT member presenting the case responded by stating he contacted a sergeant from FIT (not the District Attorney or City Attorney) to determine criminality. The sergeant reviewed the video where an officer used substantial physical force against a handcuffed male, injuring his head, face and arm on the exterior wall of the police station, and determined no criminality was involved in the matter, inclusive of the officer's subsequent failure to accurately report the force used and what appears to be obvious candor issues in the officer's report. Therefore, no legal review was obtained on the matter and no prosecutorial declination was obtained on any of the issues with the case. Therefore, the viability of the case and the procedural due process rights of the officer may be potentially compromised, especially since over one full year has passed since the

158

incident and no officer or supervisor has been disciplined or even brought up on charges. The monitor sees this as a serious force review lapse of a potentially criminal matter.

Data received pursuant to the monitoring team requests for documents reveal a haphazard response of disparate and incomplete information indicative of a lack of prioritization. The first data request for the period of February 1 through April 30, 2017 sought ledgers depicting any/all pending IA cases (including, at a minimum, date, officers involved, and case numbers) where officers involved are currently under prosecution criminally. The spreadsheet provided for this period listed the names of officers involved and eight "I" case numbers, but no dates. The second data request for the period of May 1 through June 30, 2017 sought ledgers depicting any/all pending IA cases (including, at a minimum, date, officers involved, and case numbers) where officers involved are currently under prosecution criminally. This data request was filled by providing the monitoring team with a one page Word document, which clearly is not a COB document and contributes to a haphazard manner of tracking important data and filling data requests for the monitoring team. This form of "data" transmittal is absolutely unacceptable, and APD was advised of this very early on in the monitoring process. This document contained dates for three cases, but no names of officers and case numbers that were not "I" cases (as were provided in the first data request). The final (third) data request for this period requested the same information as the first two requests for data. The spreadsheet provided looked different than the previous two submissions, but contained the requested information. The issue with this spreadsheet, though, was it contained cases dating back to August 2016, requiring a manual search of the list for the six cases that were opened during the month of July 2017. APD needs to ensure that all of its data submission match agreed-upon protocols.

Observation of the FRB during our June site visit headlined that the way APD determines criminality in cases and the disparate manner in which data requests are filled will continue to preclude APD from reaching secondary compliance with this Paragraph. APD must have effective policy on how a case will proceed criminally, who makes the determination about criminality, and who on behalf of APD communicates with a prosecuting entity for purposes of requesting a criminal review. Personnel need training in such policies and procedures and they have received it. Documents received from APD reveal that a June 15, 2017 memo documents a Major counseling or "coaching" a Lieutenant about consulting with a Sergeant about evaluating an officer's criminal exposure in a misconduct investigation. This investigation was a focal point in a FRB presentation the monitoring team observed. The takeaway from the advice provided to the lieutenant is to ensure the FIT personnel providing guidance on criminality do so not just verbally, but in

writing so it can be included in the case file. This advice, or "coaching," neglects to offer what APD has written in policy, trained to, and what is the guidance of generally accepted best law enforcement practice in such matters: misconduct matters with indicia of criminality get reviewed by a prosecuting entity, thus allowing the entity to also provide guidance on the parameters of obtaining statements in such matters.  APD needs to closely monitor the impact of the training in this area of misconduct, criminality, immunity, and compelled statements. What may be the most important point in this matter is that the recommendation of a law enforcement executive overseeing integrity issues for APD steers clear of counseling a subordinate to obtain appropriate prosecutorial review in such cases of possible criminality in favor of having investigative personnel offering an unqualified opinion about criminality and simply providing written justification for this opinion.

Table 4.7.55, below, depicts APD's performance in correctly providing the monitoring team the data it requests.  We note a 35 percent success rate, obviously well below acceptable standards.  Such "lapses" are absolutely unacceptable.  If APD data provision is 65 percent inaccurate, monitor's reports cannot provide good guidance to the consumers of those reports regarding problem assessment-response-evaluation processes needed to achieve compliance.

**Table 4.7.55**

| Data Request # | Yes | No | Comment |
|---|---|---|---|
| **Data Request #1**<br>Date, Names, Case # | 0 | 8 | No dates |
| **Data Request #2**<br>Date, Names, Case # | 0 | 3 | No names or "I" case # |
| **Data Request #3**<br>Date, Names, Case # | 6 | 0 | All requested info present |
| N, %=Y/N | 35% | 65% | |

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

*Recommendation 4.7.55a: APD must develop and deliver meaningful policy and procedures that delineate roles and responsibilities for assessing criminality in a case and how referrals to determine criminality are made.*

*Recommendation 4.7.55b: APD must develop and deliver a meaningful training program that delineates roles and responsibilities for assessing criminality in a case and how referrals to determine criminality are made.*

*Recommendation 4.7.55c: APD executive level staff need to monitor and take an active role in referrals to prosecuting entities to determine if criminality exists in a case.*

*Recommendation 4.7.55d: APD should standardize its records to facilitate a coherent and consistent procedure to satisfy data requests.*

*Recommendation 4.7.55e:  APD should develop a clear, demonstrative, objective process to ensure that data provided to the monitor are responsive to given requests, accurately completed and compiled, and clearly labeled as to what request the data are responsive.*

## 4.7.56 Assessing Compliance with Paragraph 69:  IAB Responsibilities in Serious Uses of Force

Paragraph 69 stipulates:

> **"In conducting its investigations of serious uses of force, as defined in this Agreement, the Internal Affairs Bureau shall:**
>
> **a) respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;**
>
> **b)  ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;**
>
> **c)  ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses should be encouraged to provide and sign a written statement in their own words;**
>
> **d)  ensure, consistent with applicable law, that all officers witnessing a serious use of force by another officer provide a use of force narrative of the facts leading to the use of force;**
>
> **e)  ensure that all officers involved in a use of force incident remain separated until each has been interviewed and never conduct group interviews of these officers;**
>
> **f)  review all Use of Force Reports to ensure that these**

**statements include the information required by this Agreement and APD policy;**

**g) ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;**

**h) conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;**

**i) record all interviews;**

**j) consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;**

**k) make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and**

**l) train all Internal Affairs Bureau force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors."**

## Methodology

During previous reporting periods, the monitoring team was provided with PowerDMS records, numerous certificates of attendance (primarily originating from externally-developed courses), and a series of interoffice memorandums that were prepared by FIT intended to demonstrate the content of courses met certain provisions of the CASA. A review of these documents did not demonstrate that APD adequately trained PAB personnel on its own policies and protocols.

During previous reporting periods, the monitoring team was provided with PowerDMS records, numerous certificates of attendance primarily originating from externally-developed courses, and a series of interoffice memorandums that were prepared by FIT intended to demonstrate the content of courses met certain provisions of the CASA. A review of these documents for IMR-5 concluded APD did not demonstrate that PAB personnel were adequately trained on its own policies and protocols.

## Results

To reach Secondary compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols.

During our site visit, the monitoring team was briefed on the emergence of a number of policies and procedures that were approved and being implemented in the weeks before our site visit and planned for the period immediately following our visit. This included the May 10, 2017 delivery of the "IA Force Investigations Training Program." Based on the records we reviewed for this and other related courses as noted in preceding paragraphs of this monitoring report, APD has demonstrated they have developed and delivered adequate training to address their governing policies, procedures and handbook, thus securing Secondary Compliance in this Paragraph.

     Primary:     **In Compliance**
     Secondary:   **In Compliance**
     Operational: **Not In Compliance**

***Recommendaiton 4.7.56:  Implement diligently approved policy and training, and evaluate performance, identify out-of-policy processes, and engineer practices to bring out-of-policy processes into conformance.***

### 4.7.57 Assessing Compliance with Paragraph 70:  Use of Force Data Reports

Paragraph 70 stipulates:

**"The Internal Affairs Bureau shall complete an initial Use of Force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force."**

### Methodology

Members of the monitoring team reviewed IAB training records related to completion of the Initial Use of Force Data Report.

### Results

Based on the records we reviewed, including records for the May 10, 2017 delivery of the "IA Force Investigations Training Program," as well as for other related courses as noted in preceding paragraphs of this monitoring report, APD has demonstrated they have developed and delivered adequate training to address the completion of the Initial Use of Force Data Report as specified in their governing policies, procedures and handbook.

Data requests for future IMR's will examine the completeness and timeliness of the initial Use of Force Data Report.

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.57:  Formalize and document IAB training protocols relative to internal policy requirements.  Such training cannot be outsourced to external training providers unless they are specifically tailored to APD IAB internal policy requirements.***

### 4.7.58 Assessing Compliance with Paragraph 71:  IAB Investigative Timelines

Paragraph 71 stipulates:

**"The Internal Affairs Bureau shall complete administrative investigations within two months after learning of the use of force. Any request for an extension to this time limit must be approved by the commanding officer of the Internal Affairs Bureau through consultation with the Chief or by the Chief. At the conclusion of each use of force investigation, the Internal Affairs Bureau shall prepare an investigation report. The report shall include:**

**a)  a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Internal Affairs Bureau's independent review of the facts and circumstances of the incident;**

**b)  documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying Use of Force Data Reports. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**

**c)  the names of all other APD officers or employees witnessing the use of force;**

**d)  the Internal Affairs Bureau's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options;**

**e)  if a weapon was used by an officer, documentation that the**

officer's certification and training for the weapon were current at
the time of the incident; and

f) the complete disciplinary history of the target officers involved
in the use of force."

## Methodology

PAB SOP 2-05 was approved by the monitor on June 5, 2016, bringing
APD into Primary Compliance on the requirements in Paragraph 71. The
monitoring team will assess if the PAB has developed and delivered
adequate training to address its own governing policies, procedures and
handbook.  The monitoring team will also assess APD data to determine
if CIRT use of force investigations comply with the requirements of this
Paragraph.

## Results

Based on the records we reviewed as set forth in previous Paragraphs,
APD has in fact demonstrated they developed and delivered adequate
training to address their own governing policies, procedures and
handbook.

The monitoring team requested data on serious use of force investigations that
occurred between February 1, 2017, and July 31, 2017 and reviewed records
compiled by FIT and CIRT.  For 34 CIRT cases opened during this period, FIT
reported they handled 24 of these cases. As of July 31, FIT reported it had
closed 18 of their 24 cases, while six cases were still pending. The average
completion time to close the 18 cases is 34 days. In IMR 5, the average amount
of days it took FIT to complete their investigation was 14 days from an incident
date.  During the last site visit for IMR 5, the monitoring team discussed different
contributing factors to the overall delay of serious use of force investigations
being submitted and CIRT noted the initial investigation conducted by FIT has a
direct impact on their ability to complete the administrative investigation into a
specific case. The monitoring team had this same conversation with CIRT and
others during the June 2017 site visit. APD outlined various actions it had taken
to mitigate the amount of time it takes to complete FIT investigations and the
adverse impact on CIRT cases. Obviously, the actions of APD has not had the
desired effect and during this period the length of time to complete a FIT
investigation has more than doubled. This pattern is troubling and will be
detrimental to compliance efforts.

Of the 34 CIRT cases (involving 66 officers) opened during this period, all of the
cases initiated since April 17 are still pending. For the 20 cases that exceeded
the sixty-day mark at some point during the monitoring period, Extension
Request Memos have been provided for all but two **[IMR6-047 and IMR6-048]**
of the cases, a 10 percent "error rate". On May 23, 2017, the Chief of Police
issued a memo to the Internal Affairs Commander as a standing authorization

for the Commander to approve extensions on CIRT cases provided the Commander continues to verbally consult with him and provide the Chief of Police with a verbal summary of extensions on a regular basis. The Chief of Police notes in his memo that he understands "…the need for extensions on backlogged CIRT cases. I understand that CIRT has changed their processes and are able to now complete most cases within timelines."

Despite the belief of the Chief of Police that CIRT completes most of its cases within CASA guidelines, CIRT reported that on July 31, 2017, it had closed only 5 of the 34 cases it opened between February 1 and July 31, 2017. The average amount of time to close these five cases is 87 days. One of these, 5 closed cases was classified as a non-serious use of force case. When this one case is backed out of the five closed cases to reflect only closed serious use of force cases, the average number of days for CIRT to complete a serious use of force case swells to 101 days. Three of the 5 closed CIRT cases were completed in less than 60 days (29, 54, and 59 days). The CIRT case closed in 29 days was the case classified as a non-serious use of force. This would equate to a 60% compliance rate in completing investigations within a two-month period. On face value, this might seem to be a considerable improvement over the 11% compliance rate noted in IMR 5. However, that compliance rate for closed CIRT cases examined the total cases closed during the period of IMR 5, not just cases that were opened in the period. For the period encompassing IMR 6, CIRT closed a total of 31 cases. Of these 31 cases, only three were completed in less than 60 days, equating to a 9.7% compliance rate. Most disappointing is the fact that two of the three cases completed in less than sixty days were not assigned to CIRT at the time of the serious use of force. One serious use of force occurred 14 months before being assigned to CIRT; the other serious use of force occurred two months before being assigned to CIRT. When those two cases are discounted, only one of the 31 CIRT cases was truly completed within sixty days of the force being used. This results in a 3% compliance rate. Again, such minimal compliance is indicative of entropy in the CIRT process.

To put the state of closing CIRT cases into perspective, the 31 cases closed between February 1 and July 31, 2017 were open for an average of 7.3 months. Data reviewed by the monitoring team revealed the six CIRT cases closed between May 1 and June 30, 2017 took almost 10 months to close. This was during the time period that CIRT had suspended the provisions of the monitoring team-approved SOP to optimize investigative efficiencies. It is also noted that as of June 30, only two of these six cases were addressed by the Force Review Board. This has compounding, detrimental impacts on the positive intent of any timely remediation on performance deficiencies in the field and the imposition of appropriate discipline.  Numbers such as these militate for upgraded staffing, supervision and/or management.  APD should carefully consider which of these are the case and respond accordingly.  We view the ballooning case back log as critical and highly probable to affect compliance.  It affects the ability of APD to perform one of its most critical internal functions, and reflects, further, entropy of the current system.

The monitoring team has previously commented on several significant concerns that we believe are general in nature.  These issues have included APD improperly extending *Garrity* provisions to witness officers, and extending *Garrity* provisions much earlier than required by case law or standard practice in the field. In December 2016, CIRT delivered a supervisor course entitled, "Standardizing Use of Force Investigations" wherein the application of *Garrity* was addressed. On September 6, 2016, the monitoring team was asked by APD to review and comment on a training video they prepared concerning the department's use of *Garrity* in its business processes.  It was our understanding that the video would be shared with the entire department. While most major points were correctly addressed, there were refinements that we felt were necessary and would further clarify APD's use of *Garrity* in the future.

Data reviewed by the monitoring team reveals the revised video and curriculum delivered via PowerDMS (entitled, "What is Garrity?") was revised in February 2017. A "signature summary" reveals the names of 847 APD members. Another document represents 889 members completed the ten-question true/false test for the training video. Although this meets the 95% threshold, APD needs to address how 889 of its members took the test when only 847 members logged in to view the video!  This will be the focus of a future data request.  Obviously, this is a serious issue deserving immediate audit, assessment and resolution. The monitor should be copied on the work product of this process.

The monitoring team will continue to evaluate APD's use of *Garrity* to ensure it is applied properly during use of force investigations.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.58a:  Complete or contract for a detailed workload and staffing analysis for CIRT.  Said analysis should be completed according to established standards for such work, and a copy should be submitted to the monitor.***

***Recommendation 4.7.58b:  Deal with the discrepancy in PowerDMS record keeping re test takers and number logged in to view the subject matter of the test.  Provide results in writing to the monitor.***

**4.7.59 Assessing Compliance with Paragraph 72:  IAB Report Review**

Paragraph 72 stipulates:

**"Upon completion of the Internal Affairs Bureau investigation report, the Internal Affairs Bureau investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Bureau. The Internal Affairs Bureau commanding officer shall review the report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance of the evidence standard. The Internal Affairs Bureau commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings. "**

## Methodology

To reach Secondary compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols.

## Results

A review of the Internal Affairs Handbook, applicable Standard Operating Procedures, and the guided supervision of case preparation, management, and processing that are components of the APD-developed training course, "IA Force Investigations Training Program," reveals APD sufficiently addressed the elements needed for Secondary compliance for this Paragraph. The "Mandatory Use of Force Job-Aids" addressed in the December 2016 training bolsters the standardization needed in force investigations across APD. This is manifested in a job-aid (Supervisory Checklist) that notes in six different areas that the standard by which conclusions and determinations are made shall be based upon a preponderance of evidence. Additionally, the new Internal Affairs employee orientation checklist, derived from elements of the handbook, was developed to ensure newly assigned staff are properly outfitted for and briefed on their new roles. Newly assigned members are also evaluated on various tasks relative to their new position. Supervisors must sign off on this new checklist, thus appropriately providing supervisory oversight of the qualifications and "readiness" of their personnel conducting use of force investigations. APD executive staff will need to monitor this "readiness" and evolving staff needs to maintain and enhance compliance for this Paragraph.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.59:  Implement approved policies via effective management and supervisory oversight focused on approved policy and training.***

## 4.7.60 Compliance with Paragraph 73:  IAB Findings Not Supported by Preponderance of the Evidence

Paragraph 73 stipulates:

**"For administrative investigations, where the findings of the Internal Affairs Bureau investigation are not supported by a preponderance of the evidence, the Internal Affairs Bureau commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report. The commanding officer of the Internal Affairs Bureau shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it. The Internal Affairs Bureau commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Bureau."**

### Methodology

To reach Secondary compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols.

### Results

As noted in the preceding Paragraph, a review of the Internal Affairs Handbook, applicable Standard Operating Procedures, and components of an APD-developed training course reveals APD sufficiently addressed the elements needed for Secondary compliance for this Paragraph. However, recommendations from IMR-5 succinctly outlined how 95% of all IAB investigators must score at least a passing score on tests applicable to their assignment. A review of test scores supplied by APD for the Garrity training that commenced in March 2017 revealed investigators (at the Detective rank) assigned to Internal Affairs Division averaged only an 84 on the test, with two members failing the test and no test score provided for another Detective. While this test average may seem disappointing, the average score of the executive/command staff listed on the 2017 Organizational Chart for the Internal Affairs Division (dated May 26, 2017) was only an 80, with one member failing the test. The failure of key personnel precludes APD from obtaining Secondary Compliance for this Paragraph. Such issues need to be addressed. APD executive staff, especially the Internal Affairs Bureau Commanding Officer, will need to monitor and respond to any training need or trends of inaccurate or incomplete investigation reports prepared by members of the Internal Affairs Bureau in order to secure Secondary Compliance for this Paragraph.

Data requests for future IMR's will examine how the Commanding Officer of the Internal Affairs Bureau takes appropriate action to remediate

testing failures of persons assigned to Internal Affairs. These performance factors are of critical concern to the monitor.

See Table 4.7.60, below.

**Table 4.7.60**

| "What is Garrity" Test | | | |
|---|---|---|---|
| | **Pass** | **Fail** | **Comment** |
| **Investigators** | **6** | **2** | No test results for one investigator |
| %=Y/N | **75%** | **25%** | |

Primary:          **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

*Recommendation 4.7.60a:  Ensure that >95% of all IAB investigators score at least a passing score on the issued exam process outlined in 4.7.59 of IMR 5 Report.*

*Recommendation 4.7.60a:  Implement a quality control function in IA case investigation, documentation and reporting process and develop and identify-classify-rectify cycle to ensure quality improvement.*

**4.7.61 Assessing Compliance with Paragraph 74:  IAB Quality Control**

Paragraph 74 stipulates:

**"Where a member of the Internal Affairs Bureau repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal from the Internal Affairs Bureau in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules."**

**Methodology**

Members of the monitoring team reviewed IAB training records.
**Results**

To reach Secondary compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols. Based on the records we reviewed, including records for the May 10, 2017 delivery of the "IA Force Investigations Training Program," as well

as for other related courses as noted in preceding paragraphs of this monitoring report, APD has demonstrated they have developed and delivered adequate training to its Internal Affairs personnel.   However, a substantial number of "trainees" failed the exams on the training proffered.  This remains to be remediated, either through remedial training, coaching, supervision or transfer.

Primary:          **In Compliance**
Secondary:     **Not In Compliance**
Operational:   **Not In Compliance**

***Recommendation 4.7.61:  Comply with recommendations in sections 4.7.59-4.7.60, above.***

### 4.7.62 Assessing Compliance with Paragraph 75:  IAB Quality Control

Paragraph 75 stipulates:

**"When the commanding officer of the Internal Affairs Bureau determines that the force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board with copy to the Chief."**

### Methodology

Records were analyzed to determine when and if closed CIRT cases are forwarded to the FRB and the Chief.

### Results

Analysis of the ledger data supplied by APD reveals CIRT closed 25 CIRT investigations of serious uses of forces between February 1 and July 31, 2017. All of the cases were forwarded to both the FRB as well as the Chief.  The average amount of time that elapsed between when the cases were closed to the transmittal date of the case to the FRB and the Chief was 19 days.  This seems inordinately lengthy to the monitoring team.  APD should perform an internal assessment of the reasons for these delays, and copy the monitor on same.

See Table 4.7.61

**Table 4.7.61**

| | Closed CIRT Cases | Closed CIRT Cases to FRB & Chief | Comment |
|---|---|---|---|
| **CIRT S/UOF Investigations** | **25** | **25** | Average amount of time elapsed between case closed date and the transmittal date to the FRB and Chief is 19 days. |
| | | **1.00** | |

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.63 Assessing Compliance with Paragraph 76:  Force Investigations by MATF or FBI

Paragraph 76 stipulates:

**"At the discretion of the Chief, a force investigation may be assigned or re- assigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations, or may be returned to the Internal Affairs Bureau for further investigation or analysis. This assignment or re-assignment shall be confirmed in writing.**"

### Methodology

Records are analyzed to determine when and if APD serious use of force cases are referred to the MATF or FBI for investigation.

### Results

The monitoring team requested data for any serious use of force cases that were referred to and/or investigated by the MATF between February 1 and July 31, 2017.  We were provided with internal case ledgers that indicated five officer-involved shootings and three in-custody death cases were referred to the MATF for investigation. Additionally, member agencies of the MATF (specifically BCSO) submitted four officer-involved shootings to APD for investigation. It is our understanding that all but one of these cases is still pending investigation. Additionally, the ledgers indicate two of the four cases referred to APD by the BCSO are complete. Data requests for future IMR's will examine written confirmations of assignments and re-assignments of investigations.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.63a:  Train or re-train IAB personnel based on the expectations for performance related to SOPs 2-05, SOP 7-1, SOP 7-2, SOP 7-3 and SOP 3-41, and test for learning as outlined in sections 4.7.59-4.7.60, above.***

### 4.7.64 Assessing Compliance with Paragraph 77:  Discipline on Sustained Investigations

Paragraph 77 stipulates:

**"Where, after an administrative force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Bureau or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate. The Chief need not delay the imposition of discipline until the outcome of the criminal investigation. In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

### Methodology

To reach Secondary compliance, APD must first demonstrate that it adequately trained PAB personnel on its own policies and protocols. Records were analyzed to determine if any APD members consulted with the District Attorney's Office or the U.S. Attorney's Office to review any serious use of force cases.

### Results

The monitoring team requested APD to provide copies of any documentation that demonstrates they are consulting with either the District Attorney's Office or the US Attorney's Office.   The request was made to determine whether APD, during the course of any serious use of force investigations, sought an opinion about potential criminal liability for an APD officer.  Information received from APD indicated no such consultations occurred with either entity during the period of February 1 and July 31, 2017. However, when specific information was requested about any such consultation occurring for **CIRT [IMR6-049]** relating to the criminality of actions in this matter or prosecution/declination determinations, a copy of a "District Attorney Case Review List" was presented. The document indicates the District Attorney's Office received this case for review via Evidence.com on July 19, 2017. At a minimum, the monitoring team finds APD's

lack of responsiveness with the general request for this information indicative of a haphazard approach to seeking and providing this information, and at worst, a complicity (within APD) in a lack of transparency when it comes to disclosing its interactions or referrals to prosecuting entities. For this reason, future requests for APD's consultation with prosecuting entities will also be copied to the respective prosecuting entities.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.65a:  Train or re-train IAB personnel based on the expectations for performance related to SOPs 2-05, SOP 7-1, SOP 7-2, SOP 7-3 and SOP 3-41, and test for learning as outlined in sections 4.7.59-4.7.60, above.***

***Recommendation 4.7.65b:  APD should commission an in-depth review of FRB policy, staffing, leadership and operations to ensure that the issues addressed in the paragraph are assessed internally, and, for each issue identified above, APD should craft a thoughtful, detailed, and effective piece of Completed Staff Work.***

***Recommendation 4.7.65c:  APD should reach out to other similarly situated police agencies to discuss successful modalities for overcoming such critical issues as we have observed with the FRB.***

***Recommendation 4.7.65d:  APD should conduct a careful needs assessment of the skill sets needed for FRB participation, and develop training to ensure that FRB members receive this training prior to assuming their FRB-related duties.***

**4.7.65 Assessing Compliance with Paragraph 78:  Force Review Board Responsibilities**

Paragraph 78 stipulates that:

> **"APD shall develop and implement a Force Review Board to review all uses of force. The Force Review Board shall be comprised of at least the following members: Assistant Chief of the Professional Accountability Bureau, the Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigations Bureau, a Field Services Major, the Training Director, and the Legal Advisor. The Force Review Board shall conduct timely, comprehensive, and reliable reviews of all use of force investigations. The Force Review Board shall:**
>
> **a)  review each use of force investigation completed by the Internal Affairs Bureau within 30 days of receiving the investigation report to ensure that it is complete and, for**

administrative investigations, that the findings are supported by a preponderance of the evidence;

b)   hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident. The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Bureau investigation, shall not be present;

c)   review a sample of supervisory force investigations that have been completed and approved by Commanders every 90 days to ensure that the investigations are complete and timely and that the findings are supported by a preponderance of the evidence;

d)   order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings. For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;

e)   determine whether the use of force violated APD policy. If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;

f)   determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;

g)   document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation, or 15 days of the review of sample supervisory force investigation; and

h)   review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis."

## Methodology

APD SOP 3-67 Force Review Board (FRB) was approved by the monitor on April 25, 2016, which brought the Department into Primary Compliance on the requirements in Paragraph 78.  That policy was recast as SOP 2-56 while APD continued refining its SOP cataloguing system.  SOP 2-56 was due for review in October 2016, but that review remained pending through this reporting period. The monitoring team has reported extensively on FRB activities in IMR–3, IMR–

4, and IMR–5.  Those reports provided insight as to issues we found with FRB business processes, case reviews and FRB activities during meetings.  We attended a June 14, 2017[117] FRB meeting and during its June 2017 site visit the monitoring team met with representatives of the FRB, including the Chairperson of the FRB.  Finally, the monitoring team requested various records for SOD deployment reviews, as well as supervisory and serious use of force cases that were reviewed by the FRB between the dates of February 1, 2017 and July 31, 2017 and were provided those records. The records included FRB meeting agendas, meeting minutes, referrals that occurred during meetings, additional concern memorandums, as well as reports and videos from cases that were reviewed. The monitoring team was also provided with a Site Visit report that was prepared by an APD representative following conversations and meetings with members of the Seattle Police Department.  Finally, the monitoring team reviewed an Excel spreadsheet that was designed to track IMR–5 FRB recommendations and follow-up activities on the part of APD related to those recommendations.

**Results**

SOP 2-56 dictates that FRB representatives will be provided "case packets" one week before a meeting.[118] Their responsibilities include reviewing the written case report and during the meeting each case is presented by a lead investigator from CIRT.  The chief obligations the FRB has, as per SOP 2 – 56, include reviewing each case to determine:

1. Whether it is thorough and complete;
2. Whether the force was consistent or inconsistent with department policy and training;
3. Whether the investigator's findings are supported by a preponderance of evidence; and
4. Whether there are equipment, tactical, training, policy or supervision considerations that need to be addressed.

During its November 2016 site visit, the monitoring team met with representatives of the FRB to discuss its status and reported its findings in IMR–5.  As noted above, the monitoring team requested APD schedule a FRB meeting while we would be on site in June 2017. APD accommodated our request and scheduled a CIRT FRB meeting for June 14, 2017. Prior to our visit APD forwarded to the monitoring team the same materials FRB members were provided to consider in their review prior to that meeting. The monitoring team

---

[117] We previously attended a FRB meeting focused on SOD operations on June 8, 2016.  Prior to our June 2017 site visit we specifically requested that APD schedule a FRB meeting focused on either supervisory or CIRT force investigations.  APD accommodated that request by scheduling a FRB focused on CIRT investigations.  At the meeting two separate cases were reviewed.

[118] Based on our conversations with APD it appears that the "case packets" do not include a complete inventory of officer and supervisor lapel videos.

made a subsequent request for all officer lapel videos associated with **[IMR6-001]**.[119]

As we note elsewhere, for IMR-6 the monitoring team did not conduct comprehensive case reviews and delineated nine reasons for consideration. Some have a direct relationship to the FRB and deserve to be repeated here and include[120]:

1.  During this reporting period the monitoring team learned, for the first time, that APD has not been accurately reporting the total number of use of force cases.  In preparation of past reports the monitoring team requested a list of use of force and show of force cases that occurred during a specific timeframe. From that list of cases the monitoring team would select a random sample of cases to review.  We learned in May 2017 APD was only reporting those cases that were closed, not all cases that were reported.  That shielded the fact that there were numerous cases pending[121] and those cases left significant gaps in the data.  It also raised serious questions as to why cases were pending for such extended periods of time.

2.  We met with the Chairperson of APD's Force Review Board (FRB) during our June 2017 site visit.  At that time, we alerted him to the use of force reporting data discrepancy and the fact that the monitoring team had not been provided accurate data for the past monitoring periods.  During our meeting, we asked if the 10% sample of supervisory use of force cases the FRB reviews is from the entire list of cases, or only those that are completed.  We learned that neither the Chairperson, nor another command level representative of the FRB, knew that the FRB was not reviewing a 10% sample of all use of force cases.  In fact, it took an APD analyst to come to the meeting to make them aware of this fact. Previously, the parties and monitor agreed that the strict language of the CASA suggested that APD would review all use of force cases, however, with a legitimate review methodology APD could review a 10% sample of cases which would be more operationally manageable.  We now know that there is a significant number of use of force cases, particularly within the category of supervisory-reviewed uses of force, that simply appear to be "lost" in APD's databases.  These cases are significantly difficult to find and quantify at this point, and some of them, apparently, have been mired in the supervisory review

---

[119] We have reported extensively that we believe that the FRB's reliance on a limited record impacts the quality of their review and final decisions.  APD has responded that to review entire records of lapel videos would be time prohibitive.  We recognize the time commitment associated with reviewing entire case files, but at this point of APD's reform and based on the extensive feedback they have received, the FRB should have little confidence that there is a consistently proper application of force related policies by APD.  The monitoring team did not dictate which cases should be presented during our visit.

[120] We note that these factors are a reflection of the process and not individual members assigned to the FRB.

[121] We learned that some supervisory use of force cases were still pending and in the chain review process 5-6 months after the original event occurred.

177

period for at least five months.  We strongly recommend APD conduct a "damage assessment," and identify:

    a.  The number of supervisory use of force investigations that are overdue;

    b.  The nature of, length of delay, and command structure responsible for "tardy" supervisory use of force investigations;"

    c.  The reasons for the delays; and

    d.  Articulation of remedial actions to be taken and a timeline for those actions.

3.  There is a significant backlog of supervisory use of force investigations dating back to January 2017 which effectively prevents the monitoring team from making an and complete, and consequently, prevents us from making a comprehensive assessment of the appropriateness of cases the FRB reviews. Arguably, cases that are incomplete for extended periods should be of greater interest to the FRB since they may reveal serious deficiencies from many different perspectives.[122]  It is obvious that this fact has not been contemplated by APD when choosing cases to review for a FRB meeting.

4.  APD training gaps still exist and as a result the organization is not in Secondary Compliance, therefore, Operational Compliance could not be achieved for this reporting period.

5.  APD has introduced the concept of "de minimis force" that we believe will have a direct impact on APD's compliance in force reporting, as well as investigating and oversight of uses of force up to and including the FRB.

6.  APD has presented a case **[IMR6-001]**, that involved both the use of force and serious use of force. That case was mishandled from the initial event up to and including the FRB review of the case.[123]  The case represents a serious indictment of the effectiveness of APD's entire use of force oversight and accountability system, to include IA.[124]

7.  Following IMR–5 feedback and the monitoring team's June 2017 site visit we believe APD is currently re-assessing its entire force reporting system. Additionally, as of August 2017 the monitoring team made the following observations of the data reported by APD:

---

[122] As of August 1, 2017, none of the reported supervisory use of force cases for the months of May, June or July 2017 were completed.
[123] Following the meeting the monitoring team met with several APD commanders that described the FRB meeting, and the handling of this case, as "embarrassing" and a "complete debacle".
[124] Details surrounding **[IMR6-001]** are provided in the Paragraph 41 Overview within this report.

178

1.  APD reported a total number of 211 distinct use of force cases involving 307 officers.

2.  As of August 1, 2017, none of the reported supervisory use of force cases for the months of May, June or July 2017 were completed.

3.  As of August 1, 2017, there were still approximately twenty (20) reported supervisory use of force cases pending from January 2017.[125]

4.  Data was requested concerning reported show of force cases for the timeframe of February 1 through April 30, 2017.[126]  When the data were reported in May 2017 there were still twelve (12) incomplete show of force investigations for the month of February.

The monitoring team feels these statistics demonstrate that APD's oversight of use and show of force has reached a point of critical failure.  At this rate, the quality of work associated with the investigation and oversight of use of force cases will undoubtedly be adversely impacted, as will the legitimacy of oversight the FRB maintains in the process.[127]  Likewise, this type of case backlog will undoubtedly result in instances of unaddressed performance deficiencies (at all levels), out of policy uses of force, or even instances where there is potential criminality on the part of officers.  These failures are more evidence of organizational entropy when it comes to use of force review.

With respect to the handling of **[IMR6-001]**, in the Paragraph 41 Overview we outlined concerns as to how the case was handled from the perspective of the FRB.[128]  The issues pertaining to the FRB include:

1.  The FRB failed to review a full investigative record to make a meaningful determination.

2.  The CIRT lieutenant described the officer's actions as an "unreasonable application of force."  Along with other policy violations, IA was not alerted to take an "I" number until following the FRB meeting on June 14, 2017.  During this visit, we learned that even despite obvious and serious policy violations some cases are being delayed a referral to IA until they are

---

[125] We say "approximately", instead of being more precise, due to the confusing manner APD lists information.  Regardless, numerous cases reported at the supervisory level are pending in January 2017.

[126] Because the data was presented differently the data set reported on is more limited than the cases of use of force, however, the numbers are further illustrations of the significant investigative backlogs APD currently holds.

[127] When reviewing cases for IMR – 5 we noted one case where a commander indicated that a case was "delayed" due to him being 37 use of force cases behind.

[128] We note that during the CIRT presentation of the case there were very insightful questions asked by members of the FRB and APOA. The questions we heard served to amplify concerns the monitoring team found leading up to the actual June 14, 2017 FRB meeting.

reviewed and referred by the FRB.  Parenthetically, the monitoring team was provided an Interoffice Memorandum from IA to the FRB Chair wherein a sustained, out of policy, neck hold occurred.[129]  The purpose of the memorandum was to "…recommend that [Sergeant Name] be sustained in regard to a violation of the use of force policy regarding neck holds."  We acknowledge there is an attempt to holding an officer accountable for a serious policy violation, but question its timeliness and efficiency by having such decisions deferred to the FRB.

3. A member of the FRB expressed concern that APD introduced an assessment of the officer's force (for a set period) that was unrelated to the case at hand.  Consequently, he felt voting by the board may taint the outcome of the case under review.  An APD commanding officer argued against that perspective.  The issue seemed unresolved when the FRB made its recommendation to IA.

4. When the meeting began the Chairperson of the FRB asked if everyone had an opportunity to review the videos associated with the case.  That question was met by a positive response in the room.  Later in the meeting, a member of the monitoring team asked a similar question about whether the FRB members watched all the videos associated with the investigation, some members shook their heads no, others remained silent and one said explicitly that they could not open some of the videos.[130]

5. The presentation by CIRT at the FRB meeting was not an accurate reflection of the event, thus validating the monitoring team's recommendation that FRB members review all available data for a case.

6. It was obvious to the monitoring team that, with the exception of members of CIRT and IA, other members of the FRB were unaware that CIRT unilaterally suspended provisions of the SOP related to misconduct investigations.[131]

7. APD self-imposed a practice where the FRB is not a "safety net" to ensure an IA referral resulting from a use of force occurred (when appropriate), or that the lower level assessments of force were appropriate, but instead interjected the FRB into the normal supervisory and command review of use of force, effectively removing the responsibility from supervision and command to make those types of determinations.  In doing so, APD has built a system that is unsustainable

---

[129] Dated May 24, 2017, reference  **IMR6-011.**

[130] This exchange is reflected in the Meeting Minutes prepared by APD following the meeting.

[131] This concerns the March 10, 2017, Interoffice Memorandum that was prepared by CIRT that is discussed elsewhere in this report.

and creates an atmosphere where performance management is
ineffective and accountability nearly non-existent.

Parenthetically, the monitoring team reviewed reports that were prepared by
APD following the June 14, 2017, FRB meeting. It is our understanding that
**[IMR6-001]** was referred to IA on June 15, 2017, by the FRB[132] (More than one
year after the event!) and that counseling notices were prepared for members of
CIRT and IA.  Within the same Force Review Board Referral, in the section
entitled, "Corrective Action Taken" there is a narrative that states, **[IMR6-012]**
was officially opened.  The case is complete and has been sent out to the
respective area commands for disciplinary recommendations up the chain of
command to the Chief."  The monitoring team reviewed the initial CIRT report.
We caution, that if that constitutes the entirety of the investigation that was
conducted into the case, there is a strong possibility that all relevant policy
violations have not been identified, or all investigative steps have been
exhausted.  The monitoring team also reviewed the "Meeting Minutes" APD
prepared following the meeting and found them to be a generally accurate
reflection.[133]  Investigative processes employed by CIRT on this case were
remarkably substandard.

The following are a sample of points we highlighted in IMR–5 and a brief
commentary following our review of materials for this report:

1.  The monitoring team continues to see strong involvement in the FRB and
    note the meeting turnout and the participation of high-ranking members.  We
    also note that APD use-of-force subject matter experts are present and
    participate fully.  These continue to be important factors in the future of the
    FRB's success.

2.  In IMR–5 we reported on one serious use of force case reviewed by the FRB
    that was very familiar to the monitoring team, as it was interrelated to a
    Special Report APD was presented during the summer of 2016.  In a review
    of the CIRT investigation, the IA Commander identified seven (7) separate
    and distinct issues with the handling of this case.  One such issue was under
    the section "Discipline" where he stated, "The window for effective and timely
    corrective action in this case has passed. Significant issues were dealt with
    in a manner inappropriate for the specific officer. Issues with the specific
    officer are being addressed in more current cases. The opportunity for early
    intervention lay with the chain of command, and the commander who set the
    tone for that command is ultimately responsible."  The monitoring team
    concurred with the IA commander's assessment and note that APD's overall
    response to **[IMR6-001]** could have the same result.

---

[132] Force Review Board Referral June 15, 2017.  There is a notation that the referral was
received by CIRT on June 27, 2017.
[133] We noted one comment attributed to the monitoring team that was partially inaccurate, but of
little significance overall.

3. We commented that when reviewing cases, we saw several instances where FRB members "refrained from answering" (without providing a reason or qualification) critical questions in the review process.  We questioned the Chairperson of the FRB during our June 2017 site visit and he seemed unaware that language was found within FRB paperwork.  We were later told a FRB member may have a conflict with a case and not vote, but that wasn't captured anywhere in the documentation we reviewed.  We saw one example in data that was provided for IMR–6[134] where a sergeant on the FRB recused himself from a case review that he investigated.  We stand by our original concern.

4. The monitoring team notes again that PowerPoint presentations and abbreviated lapel video reviews are, by themselves, "thin" representations of any incident.[135]  To appreciate each incident in detail, it is essential that the officer's reports, the supervisor's investigation, and the chain of command reviews be read in conjunction with complete video reviews.  We appreciate the administrative burden this creates, but until lower level case reviews can be relied upon, the FRB cannot have confidence that the presentation they receive is complete.  We did note that within the FRB data presented for IMR-6 we were presented with some cases that included the actual officer lapel video footage.  We cannot, however, assume that the videos presented represent all videos that are available for a case.

5. The FRB has (in the past) maintained a narrowly focused approach to its force oversight, meaning, *it is principally concerned with reviewing cases*.  We discussed with APD different additional ways that the FRB could have a direct impact on operational compliance.  We reported that we saw this as a critically missed opportunity if the scope of influence the FRB maintains is over case reviews alone.  However, our review of data for IMR-6 revealed some strides are being made.   We saw the FRB making recommendations for case follow-up by supervisors in the field, remedial training, policy reviews, and referrals to APD commands (to include IA). We also saw responses from supervisors concerning activities they took to address performance the FRB identified as questionable or problematic.  Because comprehensive reviews were not conducted of the specific cases we cannot determine if the corrective actions were comprehensive or sufficient, but the fact that this type of coordination between the FRB and field commands is occurring is a positive sign.  The monitoring team saw one other positive referral[136] concerning the policy question "What is considered a successful Taser deployment?" following a specific case review.  While the data reviewed did not include an answer to that question, the monitoring team reviewed use of force training (reported elsewhere in this report) where this

---

[134] FRB Agenda for June 21, 2017.
[135] **[IMR6-001]** is a perfect example of what the monitoring team means.
[136] Force Review Board Referral, dated July 4, 2017 pertaining to a policy question.

question was answered.[137]   This is a positive training outcome from a question in a FRB meeting.

6. We reported that we were advised that APD intended to assign six (6) new sergeants to conduct case reviews to increase the number of use of force cases that are reviewed under the umbrella of the FRB.  It was our understanding that the assignment of those six sergeants was pending at the time of our site visit, so we decided to follow this potential activity up during our IMR-6 monitoring period to see if it ever occurred.  APD provided the monitoring team with an Interoffice Memorandum, dated June 2, 2017, wherein we were made aware that APD assigned six sergeants to perform those activities to CIRT and that our understanding that those six sergeants would be assigned to the FRB was a miscommunication.

7. The FRB has considered including the Commander and/or sergeant of an officer whose force is being reviewed in future meetings.  The purpose would be to provide real-time feedback for investigations that were done properly or had performance deficiencies.  Based on the record provided to the monitoring team it appears that the FRB is now including Commanders and sergeants associated with specific cases being reviewed in their meetings.  Again, the monitoring team finds this to be a positive stride.  We are hopeful that requiring field supervisors to make presentations of their own cases to the FRB will hopefully influence the way that supervisor approaches work in the field.  However, we caution: based on APD's current capacity to fully and properly investigate uses of force, some cases presented may reveal minor or serious policy infractions.  It will be the responsibility of the FRB to ensure that such cases are handled appropriately and that proper IA referrals occur prior to the presentation of any case to the FRB.  Presumably, in those cases an APD member involved in the case will not be asked to conduct the presentation.

The monitoring team reviewed an Excel spreadsheet that was created to capture the recommendations the monitoring team made during IMR–5.  It appears that the purpose of this spreadsheet is to document and track recommendations the monitoring team has made to APD regarding the FRB and proposed solutions to those recommendations.  Many of the comments we reviewed are pending further action, but the spreadsheet is a positive administrative step to catalogue and track monitoring team feedback.

The monitoring team also reviewed a Site Visit Report, dated July 31, 2017, that was prepared by APD following their meetings with representatives from the

---

[137] We noted in Paragraphs 86 – 88 that ECW Application was clarified in supervisory use of force training in July 2017.  We note, however, that precision of terms is critical since there have been instances during past case reviews where we've seen officers interchanging the terms "display", "discharge", and "deploy".

Seattle Police Department.[138]  In that report APD documented summaries of meetings that occurred with the following personnel/divisions at the Seattle Police Department:

1.  Introduction to Compliance
2.  Education and Training Section
3.  Office of Professional Accountability
4.  Policy Development
5.  Force Review Unit
6.  Force Investigation Team
7.  Force Review Board
8.  Community Outreach

The monitoring team reviewed this report and find it to be a thoughtful report. The report outlined several components of an Action Plan and recommendations for APD to consider regarding its current business processes.  The report documented:

"The site visit provided us with a perspective on how SPD has resolved many of the same issues that we have yet to successfully resolve at APD.  Not all of their processes or procedures are implementable at APD because of significant structural and contractual differences between the two agencies."  The report continued, "Some of the changes would require significant personnel investment from the Department (which could be mitigated somewhat by repurposing personnel already within certain areas). Additionally, some of the major changes would require agreement amongst the Parties to modify the Settlement Agreement and then overhaul existing policies. The Department may not wish to go this route but based on what I have seen with regard to our current process, and based on coming off delivering the latest in (sic) training to supervisors for use of force, I am convinced we will not achieve compliance with the Settlement Agreement unless significant process overhaul is done."

Notwithstanding the reference to altering the terms of the Settlement Agreement, we feel that this report has succinctly encapsulated APD's current state of affairs and we take cognizance of the author essentially acknowledging that which the monitoring team has been communicating to the department in the past several monitoring reports.  The monitoring team feels strongly the alteration of the Settlement Agreement is not a necessary condition to APD achieving compliance. This report represents the most contemplative and professional approach to organizational reform we have seen to date at APD. We have written extensively on creating strategic plans to properly organize the many issues that APD is experiencing relating to its use of force oversight.  It is noteworthy to cite another direct excerpt from the "Introduction" section of the report. It stated the following:

---

[138] APD reported that the visits took place on July 17 & 18, 2017, following our last site visit.

"The Albuquerque Police Department recently appointed an APD Deputy Chief to oversee the implementation phase of the Settlement Agreement. [Monitor's Note: That appointment lasted only a few weeks.]  The Department has had particular difficulty implementing an effective and sustainable process to investigate, review, and appropriately follow-up on officer Uses of Force. On a larger scale, the problems with the Use of Force investigation (sic) are symptoms of a systemic failure thus far in the reform process: we have not yet successfully engineered processes that ensure effective, trackable documentation between various sections of the Department. In simpler terms, the interrelated paragraphs of the SA require the coordination of multiple chains of command within APD and our current lack of organized information flow has resulted in one section of the Department (such as training) not always being aware of what another section (such as FSB) needs in order to improve their identified problems in a timely manner."

While the monitoring team will reserve comment on the efficacy and implementation of the recommendations within the report, we do acknowledge the importance of this report since it demonstrates an affirmative step forward in acknowledging the current state of affairs for APD.  We previously commented that the June 14, 2017, FRB meeting (and improper handling of **[IMR6-001]** could be a watershed moment.   Since this report was authored at the very end of this reporting period, we will track the progress APD makes with respect to assessing and implementing recommendations contained within this report.

For IMR-5 the monitoring team reviewed 50% (three of six cases) of the supervisory use of force investigations and 43% (three of seven) serious use of force cases that the FRB reviewed within our data set.[139]  We have made several key observations that demonstrate that the FRB still has work ahead of it before it reflects the capacity to provide meaningful oversight of all force related issues facing APD.[140]  As documented extensively in Paragraphs 86-88, APD will not achieve Secondary Compliance until open training issues (enumerated above and in other sections of this report) are settled with appropriate supplemental training.  At this point, inadequate, incomplete, and ineffective training is creating a significant and difficult obstacle to compliance by not clearly, effectively, and efficiently responding to the monitor's notices of "gaps" or ineffective training documentation processes.

### Results

Primary:      **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

---

[139] We purposely chose three supervisory use of force investigations that the FRB reviewed that occurred at the end of, or after, APD's 40-hour Use of Force and Supervisory Use of Force training courses concluded.

[140] The overall compliance rate was determined to be 25% for IMR–5.

*Recommendation 4.7.65:  APD should conduct a careful needs assessment of the skill sets needed for FRB participation, and develop training to ensure that FRB members receive this training prior to assuming their FRB-related duties.  That training should be documented and "tested" based on national best practices.*

### 4.7.66 Assessing Compliance with Paragraph 79:  Annual Use of Force Report

Paragraph 79 stipulates that:

**"At least annually, APD shall publish a Use of Force Annual Report. At a minimum, the following information should be included in the Annual Use of Force Report:**

**a)        number of calls for service;**

**b)        number of officer-initiated actions;**

**c)        number of aggregate uses of force;**

**d)        number of arrests;**

**e)        number of custodial arrests that involved use of force;**

**f)        number of SWAT deployments by type of call out;**

**g)        number of incidents involving officers shooting at or from moving vehicles;**

**h)        number of individuals armed with weapons;**

**i)        number of individuals unarmed;**

**j)        number of individuals injured during arrest, including APD and other law enforcement personnel;**

**k)        number of individuals requiring hospitalization, including APD and other law enforcement personnel;**

**l)        demographic category; and**

**m)        geographic data, including street, location, or Area Command."**

### Methodology

The provisions of this Paragraph were contained within SOP 2-05 which was approved by the monitor in June 2016 and was recast as SOP 7-1-14C as APD changed its cataloging system over the past year.  We

requested APD provide us with their Annual Use of Force Report for 2016, but to date, nine months after the close of 2016, that report has not been completed.

In past reports the monitoring team has requested data sets for supervisory level use of force cases to conduct comprehensive reviews of a sample of those cases.   While the purpose is to assess the quality of force reporting and supervisory force investigations in the field, we also obtain valuable information that has a direct impact on the quality of data reporting.  We have noted that until officers completely and accurately report their uses of force, and until supervisors review those reports with an eye toward adherence to established policy (and eventually training or retraining), the APD's use of force "statistics" will remain problematic, in the monitor's view.

**Results**

The results of our review of the Annual Use of Force Report for 2015 were reported extensively in IMR-4.  APD's 2016 Annual Use of Force Report was not completed by the close of this reporting period.  As APD prepares their 2016 report we expect they will take cognizance of the feedback they previously received.  APD has previously indicated that they are not only collecting the data, but are taking steps to verify the validity of the data before completing their report.  Understanding the validation process APD used in preparing the 2016 Annual Use of Force Report will be critical to compliance determinations in this paragraph since we have written extensively in this and past reports about the lack of accuracy of APD use of force and show of force reporting.  Similar problems proved to be exceptionally difficult to resolve in preparation of the monitor's "298 Report," which includes a global analysis of use of force reporting and assessment.

There are no substantive training requirements associated with this paragraph. Primary Compliance was established previously and the provisions of this paragraph are now found in SOP 7-1-14C.  Therefore, the monitoring team will assess Operational Compliance in the next monitoring period to determine if APD can adjust their Annual Report consistent with previous feedback they have received from the monitor, and that legitimate and effective quality assurance mechanisms have been put in place to address the reoccurring issue of accurate force reporting. Again we refer the reader to the monitor's 2017 "Outcomes Assessment" report for additional discussion of the complexities and reliability issues related to APD use-of-force reporting.

Primary:      **In Compliance**
Secondary:   **Not Applicable**
Operational: **Not In Compliance**

*Recommendation 4.7.66a: APD should conduct a comprehensive assessment of all policy and CASA provisions that require EIRS analysis and/or Annual Reporting to ensure that the 2016 report includes all necessary data points.*

*Recommendation 4.7.66b:  APD should conduct a comprehensive assessment of the monitor's "Outcomes Assessment" report to ensure that it identifies and corrects issues with data quality outlined in that report.*

### 4.7.67 Assessing Compliance with Paragraph 80:  Tracking System for Officer Use of Force

Paragraph 80 stipulates that:

**APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force investigations carried out by supervisors, the Internal Affairs Bureau, or Multi-Agency Task Force; and all force reviews conducted by the Force Review Board. APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary.**

### Methodology

During its November 2016 and June 2017 site visits the monitoring team met members of APD responsible for the provision of this paragraph. APD's Blue Team implementation was discussed to determine what the current status of its operational use was in the Area Commands.   In response to a data request we reviewed spreadsheets entitled, "Paragraph 298H Blue Team Communication Review" and a series of Excel spreadsheets documenting data sets for uses of force for the 2016 calendar year.  The monitoring team was also provided with a Site Visit report that was prepared by an APD representative following conversations and meetings with members of the Seattle Police Department.  Finally, we note here that APD's EIRS policy is still being revised and has not been approved by the monitor.

### Results

The monitoring team reviewed "Paragraph 298H Blue Team Communication Review" reports for the date range of May 1, 2017 and July 31, 2017.  This is a report that was run from within the Blue Team system which allows APD to capture data concerning the movement of use and show of force cases through the chain of command. The report provided two views of information:

1) "Communication Summary by Month" that gave a summary of data as follows: by year, number of incidents, incidents with no problems, number of problems detected, number of transactions.

2) "Communication Detail by Incident" that provided a summary of information by each APD incident number. The data included: the date an incident occurred, the number of "bounce backs", the number of communications, and the number of participants involved in those communications.

As we noted in IMR-5, the statistics contained in the report are meaningful, and allow APD to get a general overview of the movement of cases throughout the chain of command and the number of times a case is moved back and forth because of issues within the report.  Like any statistic, the report is limited in its utility to the command staff and its ability to make operational and administrative decisions.  As we have noted in previous monitoring reports, the value of statistical data will be found by asking the question, "what does this information mean?"  For instance, it would be equally important to segregate this information not only by incident number but also by officer, supervisor and commander. APD may find positive or negative performance trends, pockets of excellence at various commands, or problematic officers or supervisors. That type of detailed and meaningful review of the data would allow APD to identify personnel who were experiencing performance deficiencies in their reporting and/or investigation of use of force or show of force events.  This process allows the isolation of data and APD can strategically focus its resources to address specific issues.

The other documents reviewed by the monitoring team included a series of Excel spreadsheets that are designed to act as cross-referencing tools when verifying the validity of use of force reporting. We know that an exorbitant amount of time and effort goes into the completion of these documents and recognize that there is valuable information collected and documented in these spreadsheets. That said, the spreadsheets we reviewed are limited by the quality of information that is collected in the field, documented within APD computer systems and overseen by APD's use of force systems.  Compliance with this paragraph is intrinsically connected to the reliability of information that is collected in the field and investigated by an officer's chain of command.

The monitoring team also reviewed a Site Visit Report, dated July 31, 2017, that was prepared by APD following their meetings with representatives from the Seattle Police Department.  The monitoring team reviewed this report and find it to be a well-constructed synopsis of events.  The report outlined several components of an Action Plan and recommendations for APD to consider regarding its current business processes.  The report documented:

189

"The Albuquerque Police Department recently appointed [APD Deputy Chief] to oversee the implementation phase of the Settlement Agreement."[141]  [Monitor's Note:  that Deputy Chief resigned that appointment about a month later] "The Department has had particular difficulty implementing an effective and sustainable process to investigate, review, and appropriately follow-up on officer Uses of Force. On a larger scale, the problems with the Use of Force investigation (sic) are symptoms of a systemic failure thus far in the reform process: we have not yet successfully engineered processes that ensure effective, trackable documentation between various sections of the Department. In simpler terms, the interrelated paragraphs of the SA require the coordination of multiple chains of command within APD and our current lack of organized information flow has resulted in one section of the Department (such as training) not always being aware of what another section (such as FSB) needs in order to improve their identified problems in a timely manner."

The "down-stream" implications will be significant if APD is to ever rely on EIRS triggers, CIRT data or Force Review Board recommendations when attempting to remediate performance in the field or develop meaningful training.  Likewise, APD's Annual Use of Force reporting will be adversely impacted if force reporting and data tracking are not accurate and verifiable through clear and succinct data sources and linked to the APD EIRS.  We refer the reader to the monitor's "298 Report" regarding data reliability and utility.  There are no substantive training requirements associated with this paragraph.  During the next reporting period the monitoring team will request data proofs to determine if the EIRS and use of force tracking systems are integrated and used in preparation of the Annual Use of Force Report. We note the monitor was unable to approve the APD's latest provided EIRS policy due to problems with "trigger" thresholds, and removal of key "cross checks" on EIRS reporting.

Primary:        **In Compliance**[142]
Secondary:    **Not Applicable**
Operational:   **Not In Compliance**

***Recommendation 4.7.67: APD should conduct a comprehensive assessment of all policy and CASA provisions that require EIRS analysis and/or Annual Reporting to ensure that the 2016 includes all necessary data points.***

## 4.7.68 Assessing Compliance with Paragraph 81:  MATF Participation by APD

---

[141] That appointment has recently been rescinded.

[142] The existing EIS policy remains operational until approval of the new policy is attained.

Paragraph 81 of the CASA stipulates:

**"APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist. APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that govern the Multi-Agency Task Force are current and effective. APD shall ensure that the inter-governmental agreements are consistent with this CASA."**

### Methodology

No changes in the MATF requirements and agreement have been made since the last reporting period.  APD remains in compliance based on past performance.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.69 Assessing Compliance with Paragraph 82:  Investigative Protocols for the MATF

Paragraph 82 stipulates that:

**"APD agrees to consult with participating jurisdictions to establish investigative protocols for the Multi-Agency Task Force. The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities."**

### Methodology

No changes in the MATF requirements and agreement have been made since the last reporting period.

Documentation reviewed by the monitoring team was indicative of APD's support of the MATF. As evidenced by their close working relationship with the MATF, APD members briefed MATF members (at the July 10, 2017 briefing) about their CASA-related roles and how they can collectively ensure the goals of both the MATF Memorandum of Agreement (MOA) and CASA can be jointly served.

APD remains in compliance with this Paragraph.

**Results**

     Primary:     **In Compliance**
     Secondary:   **In Compliance**
     Operational:  **In Compliance**

### 4.7.70 Assessing Compliance with Paragraph 83:  Coordination with MATF

Paragraph 83 stipulates:

**"APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel."**

### Methodology

No changes in the MATF requirements and agreement have been made since the last reporting period.  APD remains in compliance based on past performance.

**Results**

     Primary:     **In Compliance**
     Secondary:   **In Compliance**
     Operational:  **In Compliance**

### 4.7.71 Assessing Compliance with Paragraph 84:  Briefing with MATF

Paragraph 84 of the CASA stipulates:

**"APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force."**

### Methodology

No changes in the MATF requirements or agreement have been made since the last reporting period.
Documentation reviewed by the monitoring team reveals eight (8) different briefings conducted by the MATF during this monitoring period. APD was in attendance at each briefing.

APD remains in compliance with this Paragraph.

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.72 Assessing Compliance with Paragraph 85:  Expiration of MOU re MATF

Paragraph 85 stipulates:

**"If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding. This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in- custody deaths."**

### Methodology

No changes in the MATF requirements and agreement have been made since the last reporting period.  APD remains in compliance based on past performance.

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.73 Assessing Compliance with Paragraph 86:  Review of Use of Force Policies and Training

Paragraph 86 stipulates:

**"APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and provisions of this Agreement.  APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy."**

### Methodology

193

APD SOP's related to use of force[143] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016.  During past site visits we met with representatives of APD and communicated our concerns regarding critical omissions in their policies and how APD must reconcile those issues to properly influence field performance of its officers and supervisors.  APD policy has been silent to certain crucial topics (i.e., Distraction Strikes) and we cautioned that once the issues were resolved in policy, meaningful training must follow.  During its November 2016 site visit the monitoring team met with APD personnel, and city attorneys, to discuss their policy development process and modifications APD intended to propose for their use of force suite of policies; however, we specifically centered our attention on SOP 2-52.   At that time, we were told that APD intended to include many of the recommendations we made during a June 2016 site visit.  The update of APD's use of force suite of policies remained pending until June 2017, when the APD finally submitted policies that the monitor could approve.  These policies consisted of four (4) use of force related policies.  The policies approved by the monitor included substantive structural changes (i.e., The use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), as well as resolution of certain critical topics that have lingered for APD.  These included, specifically, the following revisions:
1) "Distraction Technique" was included and recognized as a reportable use of force; 2) "Low Ready" was clearly operationally defined to help clarify what constitutes a reportable show of force; 3) "Neck Hold" was further defined and clarified; 4) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated in SOP 2-54-5-B (This has been a significant obstacle to APD's compliance efforts); and 5) A term, "*De Minimis* force", was introduced, by "definition" to APD policy, sans process, structure, or elaboration.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that all of these policy revisions were introduced while APD remained in non-compliance on use of force issues and policies, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.

In preparation of this report the monitoring team requested a host of training materials centered on determining whether APD had reached

---

[143] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

194

Secondary Compliance[144].  The status of APD training gaps related to use of force and supervisory force investigations have been collectively reported in Paragraphs 15 and 86 – 88 in past monitoring reports. Examples of the type of materials the monitoring team requested for this reporting period included:

a. In IMR -5 the monitor identified four (4) specific training gaps related to Paragraph15.  We asked APD to provide any **new** training materials, and attendance records, that address the specific gaps identified in IMR - 5.  We further requested APD to identify and highlight the specific training section/provisions in the materials that APD developed to address the gaps identified **in IMR-5**.[145]

b. Copies of any updated policy, or Special Order, memos or other COB documentation that was promulgated related to Use of Force or Show of Force reporting or supervisory investigations.[146]

c. Video tapes of the Standardizing Use of Force investigations and 2017 Use of Force Review courses.

d. Training materials and attendance records for the training programs in "c," above.  If training materials for either program changed **AFTER** the programs commenced, please direct to and highlight the changes.[147]

e. If APD has disseminated their videotape (or updated version) concerning handcuffing procedures and guidance (previously reviewed by the monitor), please provide the associated training materials and attendance records.

f. Copies of all Training Committee meeting agendas and minutes.

---

[144] The training function at APD has been plagued from the outset of the reform project by fragmented, incoherent, and poorly documented process, leading to multiple, frequent, and, at times, seriously deficient and poorly documented training practices.  Over the years, we have documented serious "gaps" in APD's training product and have repeatedly recommended that the agency ameliorate these "gaps."  APD's progress toward that end, to date, has been fragmented, poorly documented and structured, and still leaves substantial deficiencies in training support of CASA required processes.

[145] The latter "direct and highlight" request was made to benefit APD, since their training materials are commonly disorganized, uncoordinated and/ or incomplete.  We reiterated that specific request on two occasions during our June 2017 site visit.  We note that despite this specific request APD did not provide the materials in a manner that made compliance determinations less complicated.

[146] In response to this request APD provided the newly enacted SOP 2-52, but no other updated use of force policy.

[147] Ibid.

g. Copy of any needs assessments related to use of force training for either recruits or active members of the APD.

h. Attendance records and any after action report (s) from training programs.

i. We also noted that "IMR-5 noted numerous paragraphs that did not meet training compliance and required that either initial or supplemental use of force training was necessary.  Likewise, the concept of developing a training plan (completed staff work) to track and address these specific gaps was recommended in IMR-5. Please provide any training plan (completed staff work) that was developed to address the gaps identified in IMR-5 during this time frame."

j. Training materials and attendance records for use of force training delivered **during this time** that APD believes addresses each of the gaps identified in IMR-5 (P15 & 86-88). Please direct to and highlight the specific provisions in the materials for each gap that was addressed: (i.e., Gap identified in IMR – 5; How that gap has been addressed through training. (I.e. Methods, block of instruction and/or course name); Copy of **specific** training materials that address **each** gap; Please highlight the specific place in the materials that the gap was addressed; attendance records.[148]

In response to our data request the monitoring team received various materials from several different training courses including: 1) "Standardizing Supervisory Use of Force Investigations" – December 2016; 2) "2017 Use of Force Review" – Delivered in phases throughout 2017[149]; 3) A "June 1 Commander Course"[150] – Focused on high level commanders of APD; 4) "Supervisor Force Investigation Training Supplemental"[151] – July 2017; and 5) Training Committee Materials for

---

[148] Ibid.

[149] We note that we were provided a lesson plan for the Phase 1 Classroom portion of the 2017 Use of Force Review.  That lesson plan addressed use of force topics, specifically ECW. However, no lesson plan for the Phase 2 RBT portions of the training were provided.  We did, however, receive numerous rosters and practical exercise scoring sheets for Phase 2, which we comment on in this paragraph.

[150] While training materials were provided, there was no lesson plan that accompanied those materials.  We were, however, provided a PowerPoint presentation and "Instructor's Outline". Despite concentrated and repeated efforts, we have yet to have APD's training academy submit to us a single training plan that conforms to accepted national standards.  We have repeatedly advised the training academy's directing major of this deficiency.  Those advisements notwithstanding, we continue to receive training "outlines" that fail to conform to established practice for such documents.  By this point, we have no choice but to assess this lack of compliance as deliberate.

[151] We noted some instances in APD's documentation where this course was referred to as "2017 Supervisor Use of Force Gap Training".  While on-site in June 2017 we discussed with APD the importance of ensuring course materials, in particular the name of a course, remain

February 8 and May 3, 2017.  In addition to the materials we reviewed we had an opportunity to meet with and discuss the status of APD's training development, and gap remediation efforts, with the Academy Commander while we were on site in June 2017.

## Results

As reported in both IMR-4 and IMR-5, APD has a host of outstanding training gaps that have gone effectively un-addressed over multiple reporting periods. This has had a serious and an adverse impact on secondary compliance in numerous paragraphs of the CASA.  During this monitoring period, we have found that APD has developed training to address some of these gaps.  In most instances, the gaps remain, because sufficient people have not been trained in a particular topic, training materials were not produced to the monitor (as requested), the quality of training was unsatisfactory, or the training was provided prior to the promulgation of an approved policy.  APD has demonstrated a propensity for training "proposed policy changes" before they are reviewed and approved by the monitor.  We reiterate again, well past the point of monotony, the danger of such unconventional practices.  We have cautioned APD about this practice in the past, since those being trained will receive mixed messages as to the standard by which they should report or investigate uses of force.  Additionally, the monitoring team cannot accept business practices that do not adhere to nationally accepted standards for training development.  Specifically, policy must be in place before training is delivered by APD, and that training must be documented in a form that allows individual assessment of individual training blocks by reviewing course documentation before the training can receive Secondary Compliance.  To accept any other method would leave the effectiveness of training to chance, happenstance, and luck, and would not inculcate a sustainable business process.

A perfect example is APD's inclusion of the concept of "*De Minimis* force" in its 2017 Use of Force Review.[152]  The monitoring team has communicated its significant concerns to APD as to its adoption of this

---

consistent.  This may seem like a small administrative nuance, but cross-referencing materials, rosters and attendance records becomes a cumbersome task that can expose APD to errors.  We experienced one such error when we received two separate interoffice memorandums (Dated July 28 & August 11, 2017) entitled "2017 Supervisory Use of Force Gap Training" that reported attendance records for the same course.  Although the memorandums are less than two weeks apart they report two different sets of statistics.  The latter memo was submitted to the monitoring team in direct response to our request for attendance records for the "Standardizing Use of Force Investigations" course that was given in December 2016. (Monitor Data Request 3 — Dated July 30, 2017 — Item P-15/008).

[152] The updated SOP 2-55 that included this term and definition was not approved by the monitor until June 2017, while the training commenced in January 2017.  Further we note that the term was not actually included in policy, but in the "definitions" section.  Hardly effective policy management.

concept, as opposed to adopting the controlling language in the CASA that would help APD clarify issues concerning reportable uses of force.[153] We realize this concept has been adopted by other organizations that are in similar situations to APD.  We make no determination on the appropriateness, proper adoption and application of this concept by any other police department.  However, our engagement with APD leads us to believe that the concept will further complicate their calculus to determine what activities constitute a reportable use of force.  Therefore, the inclusion of the concept "*De Minimis* force" in the manner in which APD has chosen to implement it (by simple definition as opposed to a full policy-relevant definition supported by in-field implementation criteria, has left a large and problematic training gap to be filled before Secondary Compliance can be achieved.[154]  We note this is not the first time we have noted "gaps" in APD training policy and practice.  On the whole, training, as currently operationalized at APD suffers substantial and serious deficiencies in planning, operationalization, documentation, and at times, delivery and assessment of effectiveness.  We have had innumerable "conversations" with training command staff regarding these issues to little avail.  We see these (apparently deliberate) gaps in training process to be a key contributor to APD's failures in critical aspects of the CASA.

In addition, for the past two years the monitoring team has provided extensive feedback, in both written format, as well as during site visits, (to include our June 2017 site visit) to APD concerning the quality and content of their policies.  Likewise, we have provided extensive technical assistance as to the quality and content of training programs they proposed to deliver.  We have found that, at times, APD is deliberately impervious to technical assistance provided by the monitor regarding its training practices.  A typical example is our recurring recommendation that APD develop a comprehensive training plan.  As noted above we specifically requested APD "Please provide any training plan (completed staff work) that was developed to address the gaps identified in IMR-5 during this time frame."  We received nothing that resembled an organization-level training plan.[155]  Once again, when reviewing data submitted by APD, disentangling information to assess the organization for Secondary Compliance has been an arduous task, made more difficult by deliberate decisions on the part of APD to not change flawed business practices and management processes at the Training Academy.  Given the frequency and duration of these problems, we can only believe that this is deliberate.  In the opinion of the monitoring team, to date APD has

---

[153] Specifically, that "anything above un-resisted handcuffing" constitutes a use of force.

[154] Interestingly, Seattle PD uses the term "un-resisted handcuffing" as an example of "*De Minimis* force" which APD has not adopted.

[155] APD submitted one document related to its July 2017 Supervisor Use of Force Gap Training that resembled a component of a plan, but not an entire organizational training plan.

not developed a coordinated, cohesive and sustainable training development process that can effectively implement its use of force policies.  We note here, again, that we have addressed these issues multiple times with Academy leadership, department leadership, and legal only to find our "advise" being responded to in unreceptive and unresponsive ways.  Problems with Academy business processes continue unabated to this day.

Of particular note, there does not appear to be an organizational "center point" for the quality assurance and oversight of training programs APD develops, in particular those required to reach Secondary Compliance.[156] Despite numerous recommendations on the part of the monitoring team, APD has still not instituted a system that adequately collects and assesses organizational training needs (which include gaps identified within monitoring reports); develops those needs into a comprehensive, cohesive and coordinated training program; evaluates those training programs for effectiveness, and documents the entire process in the form of an analytic assessment document.[157] We see signs of these activities, but they are nascent at best.  As a consequence, we believe that APD does not currently possess the requisite skills and competencies to develop training that can be effectively implemented in the field.  It is obvious that APD has no meaningful mechanism in place to measure the effectiveness of their training and its impact on field implementation.  What we see, generally, is an effort to "check a box" with respect to training.  Fortunately, we continue to see professionalism in the delivery of training, even if that training possesses deficiencies in its development, documentation, delivery and assessment methodologies.

One specific area that APD has been unwilling or unable to resolve and clarify for its members is the concept of "anything above un-resisted handcuffing" which is a component of CASA Paragraph 12yy - "Use of force."  Despite specific language in the CASA, and despite extensive monitoring team guidance and recommendations, the phrase ""anything above un-resisted handcuffing" is still absent from APD policy revisions. We cannot comprehend why APD has been resistant to including the

---

[156] In our view the APD academy should be responsible for all APD training and be held accountable for all CASA related training content regardless of who developed and delivers the training.  For instance, much of the CASA related training related to use of force is developed by CIRT.  Quality assurance and verifying appropriate training content seems to occur passively, and has a disjointed appearance.

[157] During past reporting periods the monitoring team has mentioned directly to the APD training Commander on numerous occasions the concept of instituting a "training cycle" that includes a "Step-6 Report".  We have directed them to the New Jersey State Police (NJSP) model of training development and oversight as a means of developing a sustainable system that results in meaningful course of business documentation.  The NJSP previously implemented a 7 Step Training Cycle that, at Step 6, collects all relevant information for the delivery of training programs.  That document becomes the basis for future training development, accounts for necessary follow up activities and can serve as a final status report that can be easily digested.

phrase "anything above un-resisted handcuffing" in its policies.  Instead, APD has pivoted away from that basic concept and introduced a new and (we predict) more complicated concept to implement, specifically, "*De Minimis* force."

The training implications of introducing the use of "*De Minimis* force" into APD's use of force oversight and accountability system are significant, and have implications with any CASA component regarding oversight responsibilities of APD's use of force.[158]  We do not believe APD has fully contemplated the implications of potential confusion and complexity that may soon follow this new policy provision.  Again, we note the concept of *De Minimis* force was not treated in policy, but simply added into APD's use of force policy's "definitions" section.  We find this a remarkably "back door" way of making what we believe will become unworkable (for APD at least) policy.

In past monitoring reports, we have predicted problems APD would encounter.  We do so again here, and highly caution APD on its adoption of this concept at this stage of its reform process, particularly since across the organization its officers, detectives, supervisors and commanders have exhibited an inability to identify even the most obvious instances of use of force.  Without first installing proper supervision, oversight and accountability measures for this concept[159], and building effective training around it, the subjective elements to the "*De Minimis* force" analysis may render obscure obvious uses of force that continue go unreported by officers because supervisors are never alerted.   We see this as a critical issue, and will monitor it closely in coming monitoring processes and reports.

As we have reported previously, almost to the point of monotony, only through the collection and analysis of field implementation data will APD be able to customize its training to the areas of the organization that have the closest influence on operational compliance with the CASA.  Based on the documentation we reviewed concerning APD's Training Committee meetings, our assessment is that they are at the very early stages of using those meetings as a means to identify training needs.[160]

---

[158] We note that in recent conversations with APD commanders it appears that the organization is currently reviewing its use of force oversight process and may make substantive changes in the near future.  That too implicates the status of training implementation and Secondary Compliance.

[159] We have commented regularly that APD's current systems fail routinely.

[160] We also noted that during the February 2017 training committee meeting a CIRT/IA representative reported that "…under use of force is still an issue. The fear of the Ferguson effect still exists."  The term "under use of force" continues to reveal itself in APD meetings without context or substance to be evaluated. We refer the reader to our earlier treatments of this issue in IMR-4.  APD has never documented an "under use of force."  It is a red herring we noted early on, yet one that APD refuses to acknowledge as based on no analysis, no

Within the documentation we reviewed, we saw no evidence that issues raised within the meetings were referred for inclusion in specific training programs.  As with many APD initiatives, a good idea has simply been "absorbed" by poor analysis, assessment, implementation, oversight and control.  Likewise, close attention to feedback provided in monitoring reports is essential if APD is to succeed, and as of yet, we see no clear indications that this is part of the training planning process.

The process of identifying organizational training needs is labor intensive, and requires the academy staff to be diligent and precise when assessing successes and failures in the field.  Use of lessons from the field, and understanding how to best collect that information, will be essential as APD develops future training curriculum.  The monitoring team has provided extensive feedback to APD training command, both in theoretical discussions and from case reviews that we have conducted, that should be a trove of information that could be exploited for meaningful training development on a host of critical training topics.

In IMR-5 we noted our concern that the 2017 Use of Force training commenced while certain critical issues (i.e. neck hold definition and distraction strikes) were unresolved.  We have continuously cautioned APD to slow its development process (for both policies and training) and to employ a more deliberate, data-based, and professional approach to training development. To date, we have seen no evidence that they have taken this technical assistance into practice.  As a consequence, we have seen training programs rushed with piecemeal approaches to critical topics within the area of use of force, force reporting and supervisory force investigations.  This has led to failure after failure at the training level, and has set compliance timelines back substantially.  In fact, it is the monitor's considered opinion that failures in training processes and product are a substantial contributor to APD's failures to make progress "in the field" on CASA requirements.

This paragraph remains in Primary Compliance following the monitor's approval of the revised use of force suite of policies.  Secondary Compliance will occur once APD has demonstrated to the monitoring team that the APD have adequately addressed training gaps previously identified and any new provisions in APD's use of force SOPs are formally trained.  Those gaps are communicated in Paragraph 88.

Primary:       **In Compliance**
Secondary:  **Not In Compliance**

---

assessment, no documentation, and no "proof."  This constitutes yet another example of deliberate non-compliance on APD's part with the use of force provisions of the CASA.  If APD were able to identify (by case number and process) events of "under-use of force," we would be able to analyze and assess this undocumented contention.  To date, they have been unable or willing to do so.

Operational:  **Not In Compliance**

*Recommendation 4.7.73a:  As we have suggested multiple times in the past, APD should develop a comprehensive training plan, based in part on information contained within the monitoring reports, and draw direct lines between policy, the CASA, training gaps identified by the monitoring team and the specific areas within their training curriculum where these issues are addressed. The plan should include a table to ensure that the right topics are delivered to the right audience of people.*

*Recommendation 4.7.73b: Training Committee meetings should include specific recommendations to be included in specific training programs. Topics they identify should be tracked until they are included in a particular program.*

*Recommendation 4.7.73c: APD should immediately cease the practice of training "proposed policy changes," and should move forward with training only after policy has been approved and adapted.*

*Recommendation 4.7.73d: Resolve at the soonest point possible the manner in which "De Minimis" force will be trained to the organization:  officers, supervisors, commanders, and upper management.*

### 4.7.74 Assessing Compliance with Paragraph 87:  Use of Force Training Based on Constitutional Principles

Paragraph 87 stipulates:

**"APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:**

   a) **search and seizure law, including the Fourth Amendment and related law;**

   b) **APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;**

   c) **use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;**

   d) **use of de-escalation strategies;**

   e) **scenario-based training and interactive exercises that**

**demonstrate use of force decision-making and de-escalation strategies;**

f)  **deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;**

g)  **crowd control; and**

h)  **Initiating and disengaging foot pursuits."**

## Methodology

APD SOP's related to use of force[161] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016.  Final policy approval occurred in June 2017. During past site visits we met with representatives of APD and communicated our concerns for certain critical omissions in their policies and how APD might reconcile those issues to properly influence field performance of its officers and supervisors.  APD policy has been silent to certain crucial topics (i.e., Distraction Strikes) and we cautioned that once the issues were resolved in policy, meaningful training must follow. During its November 2016 site visit the monitoring team met with APD personnel, and city attorneys, to discuss their policy development process and modifications APD intended to propose for their use of force suite of policies; however, we specifically centered our attention on SOP 2-52. At that time, we were told that APD intended to include in policy many of the recommendations we made during a June 2016 site visit.  The update of APD's use of force suite of policies remained pending until June 2017, when APD finally crafted use of force policies that the monitor was able to approve.  The policies included substantive structural changes, and certain critical topics that have lingered for APD were finally resolved[162] in terms of policy provisions:  specifically, 1) "Distraction Technique" was included and recognized as a reportable use of force; 2) "Low Ready" was defined to help clarify what constitutes a reportable show of force; 3) "Neck Hold" was further defined and clarified; 4) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated in SOP 2-54-5-B (this has been a significant obstacle to APD's compliance efforts); and 5) A term, "*De Minimis* force", was introduced to APD policy.

Since APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that all of these policy revisions

---

[161] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".

[162] Our intent here is to list some of the more critical changes to the policies and not to list every policy change that occurred.

were introduced while APD remained in non-compliance, the new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.  We note several specific problems with APD's CASA-related training programs elsewhere in this report.

**Results**

In Paragraph 88's discussion of this document, we report the outstanding training gaps that exist for APD. The monitoring team reviewed training curriculum, specifically, the 2017 Use of Force Review, that contained topics relevant to this Paragraph.  We wish to comment on the professionalism and quality of training that was provided by the primary instructors for Phase 1 of the training that centered on a number of use of force topics.  A separate lesson plan was created to specifically address the requirement that APD officers receive an annual ECW recertification and update, and a final block of instruction centered on crowd control was delivered. The monitoring team received a PowerPoint of the crowd control block of instruction, and had an opportunity to watch a video of the training; however, despite repeated notice to APD of what constitutes a "training plan," we were not provided with a lesson plan for that block of instruction.  At this point, these recurring failures relating to lesson plan development and submission can only be viewed by the monitor as deliberate and intentional.

The primary block of instruction, entitled, "2017 Use of Force Review" included topics on: Fourth Amendment issues related to use of force; a review of case law; discussing what comprises the "totality of circumstances" of an event; issues surrounding show of force; defining "minimum amount of force necessary" and how that standard is being implemented by APD; strategies that may reduce or minimize the necessity to use force; use of force against handcuffed persons; implications of a subject's mental illness on the analysis of objective reasonableness; and how to write a comprehensive use of force report.

While documentation fell short, the monitoring team was impressed with the content of the training program. The training satisfactorily explained "minimum amount of force necessary," which is been a continual issue obstructing APD's Secondary Compliance in training.  We also found that the program's attention to the topic of mental impairment and its relationship to the objective reasonableness standard was well covered. An outstanding issue for Secondary Compliance has been APD's ability to train adequately the concept of "un-resisted handcuffing" as a *de facto* line of demarcation when determining whether an officer's actions constitute a reportable use of force.  In the opinion of the monitoring team the training did not address that specific training gap we have identified relative to "unresisted handcuffing".  We forecasted this assessment in IMR-5, based on a cursory review of materials for this

topic.[163]  We noted that the instructor did a good job articulating the need for good report writing, and provided appropriate recommendations for properly "painting the picture" of an incident.  Finally, in the opinion of the monitoring team the instruction concerning show of force did not close that pending training gap, especially since the policy provisions concerning show of force and show of force investigations had not been approved by the monitor at the time of the training!  APD remains the only law enforcement agency known by the monitor to begin training before policy is developed (and approved).  This is a serious issue that has been addressed interminably with APD's training command, to no avail.  At this point, we can only consider this lapse to be deliberate and intentional.

The monitoring team reviewed the "2017 Electronic Control Weapon Update and Recertification" lesson plan and watched its corresponding video. Generally, the lesson was well delivered by the instructor.  He directly addressed the requirement that Tasers be worn on an officer's weak side away from their primary weapon.  He also addressed how historically ECW training encouraged the utilization of a five second "window of opportunity" to handcuff a person under power of an ECW. He instructed away from that concept indicating that it may have inadvertently created a sense of urgency on officers to close the gap on a suspect too early in an event.  His handling of that particular issue coincided well with officer safety concepts, and reinforced ways to avoid unnecessary uses of force.  The monitoring team did note that an illustration within the PowerPoint and lesson plan, which depicts "preferred target areas" for an ECW, did not specifically preclude an intentional targeting of a subject's genital area.  The lesson plan states, "When deploying the ECW reasonable attempts should be made to avoid striking sensitive target areas with the probes. The back is always the preferred target zone."  We note this deficiency, but the monitoring team does not see the issue as significant, as the instructor later stated the requirement to not intentionally target a suspect's groin area. However, like past training programs the monitoring team has reviewed, we cannot be certain that distinction was made in every training program because it is not specifically included in the course materials!  We note this issue here, again, as a cautionary message to APD that precision in its training materials is critical to their ability to attain Secondary Compliance.  As with many of our admonitions to APD, that advice in the past has fallen on deaf ears.

We reiterate here that which is articulated in Paragraphs 39 and 40 of this report, that the training material and instruction pertaining to "crowd

---

[163] The monitoring team was not provided copies of the training program prior to the instillation of this training curriculum.  Since the training commenced during the last week of the IMR-5 reporting period we deferred any detailed assessment and comment.

control" was insufficient and ineffective and has resulted in a training gap that must be remediated, and remediated soon, before it creates unwarranted liability for the agency.

After careful analysis and review, the monitoring team identified several open issues that continue to require some follow-up or supplemental training. As a result, we find APD not in Secondary Compliance. The monitoring team wants APD to understand that to achieve Secondary Compliance, APD has a continuing responsibility to address lingering or emerging use of force training issues. We note that this message has been delivered clearly and succinctly ever since the monitoring team arrived in Albuquerque, yet for some inexplicable reason, it seems not to have been received, processed or acted upon. At this point, critical failures in training are having direct, serious, and at times grievous impact on in-field operations.

> Primary:      **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.74a:  APD should implement a careful review of IMR-3, IMR-4, IMR-5 and, and note gaps in provided training, policy, or supervision and develop, where appropriate, specific training modalities to positively affect remediation of those gaps. Application of the concept of "completed staff work" should be directed toward each identified area or topic that must be remediated, resulting in specific recommendations to the Chief of Police designed to remediate identified training gaps.***

***Recommendation 4.7.74b: APD should develop and deliver training concerning crowd control that takes cognizance of feedback provided in Paragraphs 39 and 40.***

***Recommendation 4.7.74c:  Given the fact that training command seems to put little credence in the monitor's recommendations regarding training in past monitoring reports, APD should consider, develop and implement mechanisms to ensure the recommendations are assessed, evaluated, and written plans for implementation are developed.  For those monitor's recommendations that will not be implemented, APD should identify alternative processes for achieving the results required by the CASA.***

## 4.7.75 Assessing Compliance with Paragraph 88:  Annual Supervisory In-Service Training

Paragraph 88 stipulates:

206

**"Supervisors of all ranks, including those assigned to the Internal Affairs Bureau, as part of their initial and annual in-service supervisory training, shall receive additional training that includes:**

a)   **conducting use of force investigations, including evaluating officer, subject, and witness credibility;**

b)   **strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force;**

c)   **incident management; and**

d)   **supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force. "**

## Methodology

APD SOP's related to use of force[164] (2-52 "Use of Force"; 2-53 "Electronic Control Weapon"; 2-54 "Use of Force Reporting and Supervisory Force Investigation"; and 2-55 "Use of Force Appendix") were previously approved by the monitor and were due for review and revision in December 2016.  Acceptable policy was not developed by APD until June of 2017.  During past site visits we met with representatives of APD and communicated our concerns about certain critical omissions in their policies and how APD must reconcile those issues to properly influence field performance of its officers and supervisors.  APD policy has been silent to certain crucial topics (i.e., Distraction Strikes) and we cautioned that once the issues were resolved in policy, meaningful training must follow.  During its November 2016 site visit, the monitoring team met with APD personnel and city attorneys to discuss their policy development process and modifications APD intended to propose for their use of force suite of policies; however, we specifically centered our attention on SOP 2-52.   At that time, we were told that APD intended to include many of the recommendations we made during a June 2016 site visit.  The update of APD's use of force suite of policies remained pending until June 2017, when the monitor finally approved each of the four (4) use of force related policies. While the policies included substantive structural changes (i.e., The use of force "Definitions" section of SOP 2-52 was moved to the front of SOP 2-55), certain critical topics that have lingered for APD were resolved[165] in terms of policy provisions.  Specifically: 1) "Distraction Technique" was included and recognized as a reportable use of force; 2) "Low Ready" was defined

---

[164] APD and the monitoring team have commonly referred to their use of force policies collectively as the "use of force suite of policies".
[165] Our intent here is to list some of the more critical changes to the policies and not to list every policy change that occurred.

to help clarify what constitutes a reportable show of force; 3) "Neck Hold" was further defined and clarified; 4) "Show of Force" was defined better and supervisor investigative responsibilities relating to Show of Force events were delineated in SOP 2-54-5-B (this has been a significant obstacle to APD's compliance efforts); and 5) A term, "*De Minimis* force", was introduced to APD policy without consultation with the monitor.

APD has been unable to achieve Secondary Compliance because of lingering training gaps, and the fact that most of these policy revisions were introduced while APD remained in non-compliance with critical force-related policies.  The new policy provisions have a direct impact on APD's Secondary Compliance status for this reporting period.

In preparation of this report the monitoring team requested a host of training materials centered on determining whether APD had reached Secondary Compliance.  The status of APD's training gaps related to use of force and supervisory force investigations have been collectively reported in Paragraphs 15 and 86-88 in past monitoring reports. Examples of the type of materials the monitoring team requested for this reporting period are listed in Paragraph 86.

**Results**

We specifically noted during IMR-4 and IMR-5 that there were numerous paragraphs that did not meet training compliance and that either initial or supplemental use of force training was necessary.  As we noted in past reports, over the course of the past two years, the monitoring team has brought up, frequently (both in writing and during in person meetings) the value of developing training plans. That fact was reiterated in our data request.  We asked for copies of any training plans that APD developed to address training gaps that were identified in IMR-5. Despite that request, we were not provided a single document that conforms to established practice and format for law enforcement training plans. Through an assessment of the materials that were provided and through conversations with APD personnel we find that training gaps continue exist, more than two years into the compliance process.[166]

On January 24, 2017 APD launched its 2017 Use of Force Review, which consisted of two separate phases. The monitoring team had an opportunity to review video recordings of the in-classroom portion of Phase 1.  The Phase 1 in-classroom portion of the program continued throughout the Spring of 2017. The monitoring team was also provided

---

[166] While on-site during our June 2017 site visit the monitoring team met with the new Commanding Officer of the training academy.  We went point-by-point through the standing training gaps and he directed our attention to specific courses for how those gaps would be remediated.

with course rosters and a July 28, 2017, Interoffice Memorandum that documented that of 899 officers, a total of 886 attended the training (a 98.55% compliance rate).  Based on the documentation we have been provided, Phase 2, which consists primarily of Reality-Based Training (RBT), is being provided over 74 separate sessions and is approximately 50% complete.  In a July 28, 2017 Interoffice Memorandum, APD reported that of a total of 899 officers, 463 attended the training (a 51.5 percent compliance rate). While these interoffice memorandums are helpful, in the opinion of the monitoring team they constitute a "Special Report", not a "Course of Business" documentation, since they appear to be created in response to a data requests by the monitoring team instead of being the part of an established business process.

The monitoring team also reviewed documentation APD provided related to a course entitled, "June 1 Commander Course".  We believe that this course was developed in direct response to the compliance outcomes reported in IMR-5 related to command level personnel.  Since we were not provided a lesson plan for the training program[167], and the Academy Commanding Officer did not direct our attention to this course as an intended means to remediate IMR-5 listed training gaps, we will not comment further here on the quality of the training.  However, within the materials provided was a document entitled, "Course Needs Assessment Rough Lesson Plan" that provided a good template for the Appendix of future "training plans" APD may develop. We commend APD on this process.

The monitoring team reviewed Department Special Order 17 – 75, dated July 3, 2017, entitled, "Mandatory Supervisor Use of Force Gap Training"[168]. The Special Order mandated supervisors attend a four-hour training session on the topic of supervisory use of force investigations. It stated, "The training is meant to address identified gaps in the original 2016 24-hour Supervisory Force Investigations training conducted by Internal Affairs.  We also reviewed the lesson plan entitled, "Supervisor Force Investigation Training Supplemental" that was delivered on five separate dates during the month of July 2017.  The materials are comprehensive and included topics related to previously identified training gaps that were reported by the monitoring team in IMR-5.  That said, the monitoring team made several observations of the training materials that are potentially problematic:

---

[167] It is possible that the lesson plan entitled, "Supervisor Force Investigation Training Supplemental" (Also referred to as the "2017 Supervisory Use of Force Gap" training was used as the lesson plan for the June 1 Commander Course, but that fact is not self-evident by the materials we were provided.  These are the type of issues that make compliance determinations a difficult task, and place an undue burden on APD to "explain" rather than document training product.

[168] This is the third potential name for the same course of training.

1. Under the section "Target Audience" the author of the lesson plan listed "Certified Law Enforcement Supervisors".  As such, it is our understanding this lesson plan was not intended for an audience beyond APD supervisors/commanders.  There are topics covered within this lesson plan that are necessary to be communicated to the entire agency in order for certain training gaps to be remediated.  We have discussed this need *ad nauseum* with APD training commanders, yet, for some inexplicable reason, see no change in their established practice.

2. The date of the lesson plan is listed as being created is December 2016.  That date is before the revision of several APD use of force policies.  There are several APD SOPs appended to the lesson plan that were outdated at the time the training was delivered! Such oversights are remarkably problematic. Specifically, SOP 2-52 (Effective 4/1/16 and Expired 10/1/16); and SOP 2-54 (Effective 4/28/16 and Expired 10/25/16), which were revised and approved by the monitor in June 2017.  The updated 2-53 "Electronic Control Weapon" and 2-55 "Use of Force Appendix" SOP's were not included in the materials provided to the monitor.

3. The instructor ratio is listed as 1:10. Training professionals typically predetermine the appropriate number of people who should attend a training course, based on the curriculum, to ensure that there is an effective transfer of knowledge to the students.  Of the five course rosters we reviewed the numbers of people who attended this course were 29, 21, 39, 21, and 23.  Thus the actual trainee-to-instructor ratios were, for some classes three times the established ratio!  We expect that these numbers will have a direct impact on the quality of training that was received.  Again, in the opinion of the monitor, these overloaded classes reflect APD's rush to compliance, and overlook the critical need for the supervisors exposed to the training to take valuable insight back to their duties.  This is exactly the type of slap-dash training we have cautioned APD about interminably, to no avail.

4. Under the section "instructional goals" the author of the lesson plan stated, "The course presumes the student is already familiar with the methodologies of conducting and evaluating a supervisory level use of force."  Based on APD's current success rates with investigating uses of force it is unknown to the monitoring team why that presumption would be made.

5. The lesson plan muddled the terms "*De Minimis* use of escort holds" and "*De Minimis* force", which are at the heart of the issues APD currently has with the CASA provision that "anything above un-resisted handcuffing" constitutes a reportable use of force.

Such errors are critical and concerning.  Specificity is the is the *sine qua non* of effective training.

6. The multiple-choice test at the end of the lesson plan consisted of nine (9) questions.  In the opinion of the monitoring team it is likely this test (based on the number of questions to topics covered ratio, the quality of the questions, and the manner the topics were addressed) did not provide a sufficient measure to determine if a meaningful transfer of knowledge occurred.  As a consequence, APD should not be surprised if field implementation is not achieved.

The following topics were covered appropriately in the lesson plan (Supervisor Centric):

1. Making credibility determinations of officers, subjects and witnesses;
2. Determining if a preponderance of evidence exists;
3. Making assessments as to whether proper de-escalation occurred
4. Making determinations for minimum amount of force; and
5. Determining areas of concern and taking appropriate courses of action with Additional Concern Memos

We want to comment that the quality of this specific lesson plan and approach to training was more contemplative and exceeds many others the monitoring team has reviewed in the past.  There was clearly an attempt to collect training gaps into a group and address those gaps in a meaningful way.  That is evidenced in the fact that, in the opinion of the monitoring team, several training gaps have been either fully remediated or are in need of little additional work.[169]  While there is still work to be done, we do not want to miss an opportunity to express that progress has been made.  Compared to lesson plans the monitoring team was presented a year ago, the lesson plans and course materials we are being presented more recently are a significant improvement!

Based on emerging policy revisions, and having reviewed materials that were presented to the monitoring team for this report, we still find open issues that require supplemental training to bring APD into Secondary Compliance with this paragraph.  While some of the training gaps we previously found have been remediated fully, we find that Secondary Compliance is still pending on a number issues. Those are listed in the following table, along with an explanation of why the monitoring team believes more work remains to be done, and what that work is, in order for APD to reach satisfactory compliance status.

---

[169] However, there are still some substantive areas to be addressed more fully.

*Table 4.7.75.1: Assessment of Pending Training Issues*

| | **Open Training Issues[170]:** | **Status** |
|---|---|---|
| **1.** | Review of problematic FRB case involving profanity, serious use of force re-classification | **Still pending** follow-up training to remediate improper information that was provided during previous training. This topic was covered in the Supervisor Force Investigation Training Supplemental that was delivered on five separate dates during the month of July 2017; however, APD reported less than 95% attendance of supervisors AND this training gap must be addressed to the entire agency since it is relevant to all APD officers. |
| **2.** | Credibility determinations | **Still pending** follow-up training.  This topic was covered in the Supervisor Force Investigation Training "Supplemental" that was delivered on five separate dates during the month of July 2017; however, APD reported less than 95% attendance of supervisors during the monitoring period. |
| **3.** | Show of Force language confusion, i.e., "Pointing a firearm at a person…and acquiring a target", procedures for reporting and investigation, and reconciling "low-ready," and elimination of the concept of "high-ready" | **Still pending** follow-up training to remediate improper information that was provided during previous training. Any training that occurred before the policy revisions in the newly approved use of force suite of policies was not considered.  Business processes *must occur* where policy is developed before training is delivered. |
| **4.** | Minimum amount of force necessary | The monitoring team determined this training gap was remediated through the 2017 Use of Force Review and Supervisor Force Investigation Training Supplemental that was delivered on five separate dates during the month of July 2017. |
| **5.** | Default to *Graham's* objective | The monitoring team determined this training gap was remediated through the 2017 Use of Force Review and |

---

[170] Initially these gaps pertained specifically to the 2016 24-hour Supervisory Use of Force Investigation Course and 40-hour Use of Force Course, however, as time passes and Secondary Compliance lingers additional training gaps have emerged.  Critical to APD's compliance will not only be delivering the appropriate training, but ensuring the appropriate audience receives the training.

| | reasonableness (OR) standard | Supervisor Force Investigation Training Supplemental that was delivered on five separate dates during the month of July 2017. |
|---|---|---|
| | | |
| 6. | Un-resisted handcuffing issue | **Still pending** follow-up training to remediate improper information that was provided during previous training. This topic was not adequately covered in any of the training programs reviewed by the monitoring team.  This is an issue that has had direct implications to the monitoring team's assessment of use of force reporting and investigations.  This topic is directly related to the pending training gap related to "*De Minimis* force" (noted below). |
| | | |
| 7. | Preponderance of Evidence Standard | <u>**Still pending**</u> follow-up training.  This topic was covered in the Supervisor Force Investigation Training Supplemental that was delivered on five separate dates during the month of July 2017, however, APD reported less than 95% attendance of supervisors. |
| | | |
| 8. | De-escalation Assessment | <u>**Still pending**</u> follow-up training.  This topic was covered in the Supervisor Force Investigation Training Supplemental" that was delivered on five separate dates during the month of July 2017, however, APD reported less than 95% attendance of supervisors during the monitoring period. |
| | | |
| 9. | Neck Holds | <u>**Still pending**</u> follow-up training to remediate previous training.  This topic was covered in the Supervisor Force Investigation Training Supplemental that was delivered on five separate dates during the month of July 2017, however, APD reported less than 95% attendance of supervisors AND this training gap must be addressed by the entire agency since it is relevant to all APD officers. Any training that occurred before the policy revisions in the newly approved use of force suite of policies was not considered. Business processes must occur where policy is developed before training is delivered. |
| | | |
| 10. | Distraction Strikes | <u>**Still pending**</u> follow-up training to remediate previous training.  This topic was covered in the Supervisor Force Investigation Training Supplemental that was delivered on five separate dates during the month of July 2017, however, APD reported less than 95% attendance of supervisors AND this training gap must be addressed by the entire agency since it is relevant to all APD officers. Any training that occurred before the policy revisions in the newly approved use of force suite of policies was not |

| | | considered.  Business processes must occur where policy is developed before training is delivered.  We believe this topic is critical to be addressed thoroughly with an assessment of past practices and how those practices constitute a reportable use of force.  APD has several cases they could openly review as practical exercises.  (Note - Training in RBT tends to focus on practical applications of force and not reporting requirements) |
|---|---|---|
| | | |
| **11.** | SCOTUS Cases | **Still pending** follow-up training to remediate previous training.  This topic was covered in the Supervisor Force Investigation Training Supplemental that was delivered on five separate dates during the month of July 2017, however, APD reported less than 95% attendance of supervisors AND this training gap must be addressed by the entire agency since it is relevant to all APD officers. |
| | | |
| **12.** | Crowd Control | **Still Pending** for all APD officers following an insufficient delivery of training during the 2015 Use of Force Review.  See Paragraphs 39 and 40 for details. |
| | | |
| **13.** | *De Minimis* Force | **Still Pending** for all APD officers.  This topic will require extensive training through the use of scenarios, practical exercises, video reviews, etc., to include specific training for supervisors to help them differentiate between APD's definitions of force and *De Minimis* force, enable them to competently make assessments related to an officer's intentions and the reasonable likelihood that their actions would cause injury or pain. Finally, this topic must be reconciled and put into its logical order with the CASA requirements that "anything above un-resisted handcuffing" constitutes a use of force, which in turn must be reported.  Any training delivered prior to or following the 2-55 policy provision being approved in June 2017 has been determined to be insufficient. Business processes must occur where policy is developed before training is delivered. |

As noted in previous reports, supervisory training curriculum is a key component of the strategy to improve the quality of both supervisory use of force investigations and chain of command reviews.  That is a key reason we focus so heavily in this area during our reviews.  For the past two years we have provided exhaustive technical assistance to APD on its training development and delivery processes, as well as the content of the programs themselves.  It is our hope that APD, as a general rule, begins to embrace feedback they receive.  As one will note from the table above, that has not yet occurred.  We recognize that at times some requirements may seem insurmountable, but with the establishment of

strong systems, coupled with diligence, perseverance, and a strict attention to detail, APD's training programs could prevail as the champion of its organizational reform.  Parenthetically, we will add that a "rush" to training, absent careful needs assessment, design, content assessment and delivery leads to failure, as identified in the table above.

We reiterate: the open issues identified above must be addressed if APD is to achieve Secondary Compliance.  We note that the open training issues have direct influence on the Secondary Compliance of numerous other paragraphs.  Further, we have been dealing with this issue of "training gaps" for an unsupportable length of time.  One can "fail" only so long before it becomes deliberate.  What we are asking of APD is nothing different than any competent and effective police agency does on a daily basis, yet we find failure in remediation with12 of the 13 gaps we identified to APD's academy.

**Results**

       Primary:     **In Compliance**
       Secondary:  **Not In Compliance**
       Operational: **Not In Compliance**

*Recommendation 4.7.75a:  We reiterate, yet again, APD should consider developing a comprehensive training plan, based on information contained within what now is six monitor's reports, and draw direct lines between training gaps we identify and specific areas within their training curriculum.   This process should result in a piece of completed staff work that identifies specific issues and recommends steps to resolve those issues and is submitted to the Chief of Police for action.*

*Recommendation 4.7.75b:  We recommend that APD cease the practice of training "proposed policy provisions," and use the same development cycle as virtually every other police agency in America:  Policy, Training, Implementation, Supervision, Assessment, Repeat (PTISAR).*

*Recommendation 4.7.75c: APD consider implementing a "training cycle" as their established training business process.*

*Recommendation 4.7.75d: The APD Academy should have legitimate, and codified, oversight of all organizational CASA related training.  Every piece of training related to CASA provisions should be subjected to and controlled by the PTISAR model.*

*Recommendation 4.7.75e: The APD Academy should establish a stand-alone unit with the specific responsibility of quality assurance*

*for all organizational training requirements.  That unit should report directly to the Chief of Police with feedback loops to the Training Academy.*

### 4.7.76 Assessing Compliance with Paragraph 89:  Annual Firearms Training

Paragraph 89 stipulates:

**"Included in the use of force training set out above, APD shall deliver firearms training that comports with constitutional principles and APD policy to all officers within 12 months of the Operational Date and at least yearly thereafter. APD firearms training shall:**

**a)  require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms, as necessary, on an annual basis;**

**b)  require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;**

**c) Incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program; and**

**d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times."**

## Methodology

Members of the monitoring team attended firearms training with staff from the Firearms Training Unit during the site visit for and found that, based on our earlier interactions with them on this paragraph, the FTU had made the policy changes necessary to comply with CASA requirements of paragraph 89.  The FTU clearly and effectively addressed the "return to work" issue related to firearms training.  They have developed an electronic form to document the remedial training process, and they have replaced Procedural Orders which appeared to be in conflict.

216

**Results**

The 2017 training cycle has been completed and the Firearms Staff has compiled extensive data to document all that is required and all that they have accomplished in order to meet/exceed the CASA requirements.  We view this as excellent work that easily could, and should, be emulated by other APD staff as they consider how to respond to monitoring team findings.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.77 Assessing Compliance with Paragraph 90:  Management of Specialized Units

Paragraph 90 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances, provides for effective command-level accountability, and ensures force is used in strict compliance with applicable law, best practices, and this Agreement. To achieve these outcomes, APD shall implement the requirements set out below.**

**Methodology**

The policies pertaining to the organization, staffing, and operation of APD's tactical units were approved in May and June of 2016, bringing the Department into Primary Compliance with all the policy-related requirements in this and other paragraphs in this section.  Those policies are currently due for review. The Special Operations Division (SOD) continues to provide comprehensive records that demonstrate their commitment to providing services that meet or exceed APD policy, applicable law and best practices in law enforcement. We previously advised APD command staff that only through the establishment and implementation of quality policies, processes and systems can high performance be replicated routinely.  By ensuring that the processes and systems put in place are not only set in policy, but become a part of the culture within SOD, APD can ensure that performance survives changes in command. SOD commanders continue to be exceptionally receptive to feedback and openly willing to implement business processes that meet CASA requirements. In fact, we now find enthusiasm within the command where they appear to look forward to monitor visits to showcase their performance and to highlight their business processes, which continue to evolve and be refined.  We reported in IMR-5 that the SOD commander (who instituted many of the current business

practices we have reported on) and whom we have communicated with most regularly, was promoted out of the unit. We learned that he is functionally located above the SOD even in his new capacity.  While this, on its surface, provides impetus for the continuity of SOD operations, we cautioned that changes in command will test the stability of the processes and systems that have been put in place.

We met with the current SOD commander during our past two site visits, including June 2017, and we have found that the level of engagement at the command level remains strong and the commitment to the reforms they have instituted has not wavered.  Monitoring team meetings with SOD prove to be more forward looking than other areas of the organization, save for the Special Investigation Division (SID) (reported later in this report).  Therefore, instead of having to routinely look backward at shortcomings identified in past monitoring reports, the monitoring team has robust conversations about sustainability and refinements SOD has considered.  This provides a platform for excellence and the technical assistance provided by the monitoring team is forward leaning, instead of an exercise in how to "clean up" past mistakes.  This atmosphere is only possible because SOD appears conditioned to anticipate issues and problems, instead of constantly reacting to them.  It would behoove APD to replicate this model in other commands within the agency.

The information that has been provided to, and reviewed by, the monitoring team suggests that the quality of performance by SOD has continued.  As we have noted in the past, the responsibilities of SOD units, and their practices relating to use of force, require deep consideration on the part of APD when they are deciding who can be assigned to those units, and more importantly, who can supervise and manage those units.

Because this paragraph only sets forth high-level operational goals, there is no extensive training required.  However, as noted previously APD has created various mechanisms, such as the Search Warrant Risk Matrix, tactical activation consultation procedures, informative databases, and extensive unit-level review and reporting practices that constitute Secondary Compliance. Likewise, the monitoring team has reviewed COB documentation that shows SOD routinely takes information gleaned from tactical operations and builds it back into unit specific training opportunities.  This continued during this monitoring period.  In the opinion of the monitoring team, it is now time for SOD to build upon its current foundation and begin to enhance the quality of the documentation related to its internal training.  From the onset of our engagement with APD we have provided extensive technical assistance related to the development and refinement of training based on operational experiences. We encourage SOD to employ a training development methodology that resembles a "cycle" of training wherein best practices and lessons learned from the field can be woven back into SOD training curriculum as a part of their business process.  The monitoring team will continue to work

with SOD in this area, since we see their needs as being refinements to their training processes.

**Results**

Special Operations Division (SOD) staff continue to refine operational capabilities to handle high-risk tactical incidents in a measured, adaptive, and agile manner.   For IMR-5 the monitoring team was provided, and reviewed, a COB document entitled, "Tactical Annual Policy/Operations/Training Review for 2016", that was dated January 25, 2017.[171]  The internal memorandum was from the new commanding officer of SOD to the Major of the Special Services Bureau.  The document outlined the purpose of their annual review, and provided a mechanism to allow SOD to look at trends that may develop over the course of the year that may have been missed when each incident was evaluated on its own.  As we reported in IMR-5, that type of critical review is crucial for the future success of SOD, and should serve as a model for other divisions within APD.  It is unclear whether APD took cognizance of our comments and whether other commands now employ a similar annual internal assessment.[172]  Internal reviews prove to be beneficial to organizations as a whole, as we suspect will be true for APD.  The benefit to the organization is that it demonstrates an internal capacity and commitment toward critical assessments and helps create a culture where APD is in a constant state of critical self-evaluation.  We were told SOD will complete a similar annual review for 2017, therefore, we will seek an opportunity to review the report at the latter part of the IMR-7 reporting period.

During our June 2017 site visit, we met with SOD civilian and enlisted personnel in their business offices and were impressed with the apparently seamless nature of the communication throughout the unit.  The lead civilian staff member within SOD met with the monitoring team to highlight a reporting system and business processes they developed with their enlisted counterparts that captures CASA relevant SOD deployment data.  We reviewed a COB ledger that tracks the status of every SOD request for deployment or actual deployment.  The ledger tracks each incident from the initial event, through the Force Review Board presentation, and only closes when SOD demonstrates that it has addressed and documented any recommendation that emanated from the Force Review Board.  The monitoring team has written extensively about "closing the loop", and this APD business process appears to be the best example, to date, of an organizational unit not only understanding the concept,

---

[171] The requirement to conduct an SOD Annual Review is codified in section 6-8-3-Z of the Special Tactical Units SOP.   This report has relevance to IMR – 6 as well and therefore it is mentioned here.

[172] The recommendation that a unit/division specific Annual Report was communicated directly to the SID commander.  We feel confident, based on the reception our technical assistance receives from SID that this recommendation will be adopted and implemented by them following the 2017 calendar year.

but embracing it.  The SOD uses a color-coded filing system to catalogue the various types of deployments they encounter, with specific checklists for each deployment type.  The monitoring team reviewed several files and found that each SOD file began with the relevant checklist which allows for uniformity --- which is an essential quality that eludes many APD commands --- and the effective tracking of SOD deployments.

The monitoring team has previously catalogued the many factors that underpin SOD's successes, and how SOD practices have directly impacted the operation of other specialized units.  Specifically, tactical activations have been based upon explicit risk criteria to minimize unnecessary activations.  These risk criteria have been distilled into a Risk Matrix that has been used by SOD for more than a year and a half.  During our past visits with other organizational entities (i.e. the Special Investigations Division and Field Services Bureau) we found they have adopted the SOD Risk Matrix into their business practices and policies, and rely upon it when making the decision whether to call out SOD. During our June 2017 site visit, the monitoring team inquired if SOD conducts audits of other commands that use the Risk Matrix, since the matrix itself is an SOD creation and tool focused on their deployments to events.  We learned that such an audit has not been conducted, but the concept was met with a positive response.  The monitoring team sees the need for internal oversight of the Risk Matrix, across commands, as critical, since there is an inherent connection between SOD compliance and the prohibition of SID personnel from conducting tactical responses to critical situations where a specialized tactical unit is required.  We highly encourage regular Command-level internal audits of any APD unit that conducts or records operational deployments where the Risk Matrix was utilized.  This should be viewed as an enterprise-wide assessment, or "cross-check and balance" to ensure operational compliance is being independently validated within the agency itself.  Based on our meetings with SID, for instance, we highly expect they would welcome any business process or practice that makes them better.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.78 Assessing Compliance with Paragraph 91:  Composition of Specialized Tactical Units

Paragraph 91 stipulates:

**"APD's specialized tactical units shall be comprised of law enforcement officers who are selected, trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units. The specialized tactical units shall consist of SWAT, Canine, and Bomb Squad/EOD."**

**Methodology**

Special Operations has developed and implemented certain policies (Bomb SOP 4-03, SWAT SOP 4-04, K-9 SOP 4-12, and CNT SOP 2-43) that have been reviewed and approved by the monitor and address the requirements set forth in paragraph 91.

**Results**

Special Operations conducts regular, extensive training at numerous levels, including but not limited to Individual, Unit, and Team training.  A review of the training conducted took place during the period of February 1st, 2017 through July 31st, 2017. Results of that training review are reported in Table 4.7.78.

**Table 4.7.78  Review of Training for Specialized Tactical Units**

| Case Number | A. APD's specialized tactical units shall be comprised of law enforcement officers who are selected | B. Trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units | C. The specialized tactical units shall consist of SWAT, Canine, and Bomb Squad/EOD | # in-compli-ance | % in Compli-ance |
|---|---|---|---|---|---|
| Personnel Circular 17-28 | 1 | N/A | N/A | 1 | 100. |
| Personnel Circular 17-12 | 1 | N/A | N/A | 1 | 100 |
| Personnel Circular 17-30 | 1 | N/A | N/A | 1 | 100 |
| Training Documentation 2/17 | N/A | 1 | 1 | 2 | 100 |
| Training Documentation 3/17 | N/A | 1 | 1 | 2 | 100 |
| Training Documentation 4/17 | N/A | 1 | 1 | 2 | 100 |
| Training Documentation 5/17 | N/A | 1 | 1 | 2 | 100 |
| Training Documentation 6/17 | N/A | 1 | 1 | 2 | 100 |
| Training Documentation 7/17 | N/A | 1 | 1 | 2 | 100 |
| **Number in Compliance Total all Incidents** | **3** | **6** | **6** | **15** | |
| **Number in Compliance Total all Incidents** | **100%** | **100%** | **100%** | | **100%** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.79 Assessing Compliance with Paragraph 92:  Training of Specialized Tactical Units

Paragraph 92 stipulates:

222

**"APD shall ensure that specialized tactical units are sufficiently trained to complete the following basic operational functions: Command and Control; Containment; and Entry, Apprehension, and Rescue."**

## Methodology

A review of the Special Operations training conducted by the monitoring team confirmed that the operational functions included in this paragraph are regularly covered and documented.  The monitoring team reviewed the Excel spread sheet (2017 Tactical Files) that displays training by officer, by unit, and by operational function trained that correspond to those listed in paragraph 92.

## Results

Result of that review are reflected in the table.

### Table 4.7.79

| Source | A. APD shall ensure that specialized tactical units are sufficiently trained to complete the basic operational function of Command and Control | B. To complete the basic operational function of Containment | C. To complete the basic operational function of Entry | D. To complete the basic operational function of Apprehension | E. To complete the basic operational function of Rescue | # in-compliance | % in Compliance |
|---|---|---|---|---|---|---|---|
| Training Documentation 2/17 | 1 | 1 | 1 | 1 | 1 | 5 | 100.0% |
| Training Documentation 3/17 | 1 | 1 | 1 | 1 | 1 | 5 | 100.0% |
| Training Documentation 4/17 | 1 | 1 | 1 | 1 | 1 | 5 | 100.0% |
| Documentation 5/17 | 1 | 1 | 1 | 1 | 1 | 5 | 100.0% |
| Training Documentation 6/17 | 1 | 1 | 1 | 1 | 1 | 5 | 100.0% |
| Training Documentation 7/17 | 1 | 1 | 1 | 1 | 1 | 5 | 100.0% |
| # in Compliance Total all Incidents | 6 | 6 | 6 | 6 | 6 | 30 | |
| % in Compliance | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | 100.0% |

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

### 4.7.80 Assessing Compliance with Paragraph 93:  Tactical Unit Missions and Policies

Paragraph 93 stipulates:

**"Each specialized tactical unit shall have clearly defined missions and duties. Each specialized tactical unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

### Methodology

All the SOD policies pertaining to the organization, staffing, and operation of APD's tactical units were approved in May and June of 2016 (Due for review in June 2017[173]), bringing the Department into Primary and Secondary Compliance on all the policy-related requirements in this and other paragraphs in this section.  The policies are currently under regularly scheduled review by APD, the parties and the monitor.  Included in the SOD suite of policies is Special Services Bureau Order 4-12, "K-9 Unit", which includes provisions pertaining to the calculations for bite ratios.  By mutual-agreement of the parties, APD agreed to collect data and provide their recommendation to the monitor to include a recommended bite ratio calculation.  On June 24, 2017, APD submitted a document to the parties and the monitor that served as their perspective on how bite ratios should be calculated.   On July 31, 2017, the monitor reported his final comments on SOP 4-12, K-9, and approved the policy.

As in IMR-5, for this reporting period, the monitoring team reviewed COB documentation in the form of an internal memorandum dated January 25, 2017, entitled, "Tactical Annual Policy/Operations/Training Review for 2016." The monitoring team reviewed a Tactical Activation Analysis ledger for 2017 that captured activation data from January 8, 2017 to June 2, 2017, as well as Tactical Deployment Sheets, Operational Plans, and After Action Reports for the same time frame.  The monitoring team reviewed sixteen (16) After Action Reports and training documents that were prepared by the SOD between February 2017 and July 2017.  In the past, the monitoring team has commended SOD for the quality of their After-Action Reports and the documentation they provide.

---

[173] We note that based on data supplied by APD the Special Services Bureau Order 6-7 "Explosive Ordnance Disposal Unit (Bomb Squad)" was scheduled for review on December 11, 2016.  Like other SOD policies, that policy remains in effect until such time that the suite of SOD policies are reviewed and approved by the monitor.

**Results**

Based on our review of the documentation that was provided, we determined that SOD remains in operational compliance with this paragraph, but as detailed herein we feel SOD must continue to ensure that certain information is captured within their After-Action Reports.

The SOD Annual Review, first reported on in IMR-5, is a comprehensive assessment of the current state of SOD, and includes an assessment of their SOPs, incorporation of Force Review Board recommendations that resulted from their deployments, as well as an analytical assessment of their tactical deployments over the course of the year.  The 2017 Tactical Activation Analysis ledger we reviewed captured data that included: 1) Whether SOD was activated for a particular request during an incident; 2) Which activation criteria a request met; 3) Whether a forced entry was used by SOD during the activation, 4) Data related to mental health diagnosis of suspects encountered during the event; 5) Whether domestic animals were in a residence or injured during an activation; and 6) The type of tactical equipment that was utilized during activation.  A total of 40 activations were captured in this ledger for the timeframe listed.  Of those 40 activation requests, SOD did not deploy in 5 incidents.  Some reasons listed by APD for non-deployments included, "The victim in this investigation refused to file charges", and "The information provided was not accurate and did not meet the requirements of an activation."

SOD continues to be diligent in their After-Action reporting; however, at times the monitoring team found the reports to be of variable quality, and made certain observations that are noteworthy and should be addressed by SOD before an issue develops.  The reports reviewed during this monitoring period are well-done overall, but at times exhibited a slight decline in the quality of detail in some areas.  The monitoring team encountered such statements as, "He (the suspect) was contacted by inner perimeter officers and placed into custody", or that SOD personnel were given "various duties" within an inner perimeter of an authorized SOD deployment.   The monitoring team cannot assess "was contacted" in the context of potential use of force incidents.  Combined with a few instances where better detail should be documented pertaining to the activities of officers at the scene prior to the arrival of SOD, the monitoring team feel that SOD should revisit the quality of these After-Action Reports to ensure the critical areas of an incident that relate to the CASA continue to be addressed and documented properly.

In one example, the author of the After-Action Report did a good job articulating the background of a suspect who barricaded himself in a residence.  The facts that the suspect was wanted for homicide and had barricaded himself in a residence were important and properly documented.  However, there is no detail as to the events that led up to the suspect being barricaded in the first place.  Specifically, the initial officers at the scene presumably observed some activity on the part of the suspect that was worthy of documenting and passing on to

SOD so their decision making could take into account all relevant issues.  Those activities presumably had a direct influence on their request for an SOD deployment and documenting these factors could prove to be critical to SOD if later in the event force is used against a suspect.  SOD should view their After-Action report as their personal collection of information that validates the need for a response and the factors they encountered along an event until a situation was resolved.  They should not presume that those factors can be found in other, non-SOD reports that are prepared by other commands.  We note these observations here for two key purposes: 1) SOD has worked hard to achieve operational compliance, and therefore needs to guard against potential slippage in the quality of their reporting which could expose them to potentially losing operational compliance in the future; and 2) The monitoring team will focus its attention on supervisory use of force investigations that result from SOD deployments during the next monitoring period.  We will cross-reference information contained within Operation Plans, Risk Assessment Matrix's and After-Action Reports to ensure accuracy in reporting.

Another important point to consider is that within the After-Action Reports we observed explicit statements as to when an authorization for an SOD deployment was given by command personnel, but at times it could have been made more clear what specific factors were considered when that decision was made.  The factors should be extrapolated from the broader narrative, since it would be much more meaningful to enumerate them at the front of the report.  SOD should consider separating and delineating the specific factors that led to deployment authorizations within their After-Action Reports. By doing so, they will better demonstrate to a reader how the decision-making process occurred at the time the decision was made, and make clear what factors they considered when giving that authorization.  Likewise, when organizational units utilize the Risk Assessment Matrix to determine whether a SOD deployment is warranted, the monitoring team observed that when the category "Location is fortified will require special breaching tools", which has been assigned 25 points within the Matrix, there is no area within the Matrix itself to articulate what those fortifications were.  While the monitoring team did find descriptions of fortifications being articulated within Operational Plans we reviewed, it would be wise to include this information within After-Action-Reports as well.

As reported in previous monitoring reports, we continue to see sustained emphasis on safely resolving incidents and a measured approach by SOD when dealing with critical events.  In one incident, an SOD commander contacted local schools to ensure that buses that serviced the area of the SOD activation did not bring children home to that area until the incident was resolved. In another, pre-planned SOD deployment an SOD commander learned that a female subject within a target residence suffered from Multiple Sclerosis. In his After-Action Report the SOD commander articulated that due to the woman's condition he felt it was unsafe to use chemical munitions because the female was bedridden and would have been unable to exit the residence in a safe manner.  These types of critical thinking, while an event is unfolding, demonstrate the type of

226

thoughtfulness the monitoring team has grown to appreciate within SOD.  We strongly commend SOD for its training, focus and dedication to "doing the right thing for the right reason."

The monitoring team reviewed SOD training records (developed "in-house") that directly resulted from deployments during this monitoring period. SOD maintains sign-in sheets and provides a training overview and synopsis for each training event they deliver. As SOD continues to refine their business practices the monitoring team will look to see a more robust and detailed training curriculum. Meaning, that they incorporate some of the basic tenets of a lesson plan consistent with national training practice.

      Primary:     **In Compliance**
      Secondary:   **In Compliance**
      Operational:  **In Compliance**

## 4.7.81 Assessing Compliance with Paragraph 94:  Tactical Units Policy and Procedure

Paragraph 94 stipulates:

**"APD policies and procedures on specialized tactical units shall include the following topics:**

**a)**    **Team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility;**
**b)**    **Coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed;**
**c)**    **Personnel selection and retention criteria and mandated physical and tactical competency of team members, team leaders, and unit commanders;**
**d)**    **Training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training;**
**e)**    **Equipment appropriation, maintenance, care, and inventory;**
**f)**    **Activation and deployment protocols, including when to notify and request additional services;**
**g)**    **Conducting threat assessments to determine the appropriate responses and necessary resources;**
**h)**    **Command and control issues, including a clearly defined command structure; and**
**i)**    **Documented after-action reviews and reports."**

**Methodology**

All the SOD policies pertaining to the organization, staffing, and operation of APD's tactical units were approved in May and June of 2016 (Due for review in June 2017[174]), bringing the Department into Primary and Secondary Compliance on all the policy-related requirements in this and other paragraphs in this section.  The policies are currently under regular review by APD, the parties and the monitor.  Included in the SOD suite of policies is Special Services Bureau Order 4-12, "K-9 Unit", which includes provisions pertaining to the calculations for bite ratios.  By mutual-agreement of the parties, APD agreed to collect data and provide their recommendation to the monitor to include a recommended bite ratio calculation.  On June 23, 2017, APD submitted a document to the parties and the monitor that served as their perspective on how bite ratios should be calculated.  On July 31, 2017, the monitor reported his final comments on SOP 4-12, K-9, and approved the policy.

The monitoring team reviewed a Tactical Activation Analysis ledger for 2017 that captured activation data from January 8, 2017 to June 2, 2017, as well as Tactical Deployment Sheets, Operational Plans, and After Action-Reports for the same time frame.  The monitoring team reviewed sixteen (16) After-Action Reports and training documents that were prepared by the SOD between February 2017 and July 2017.  In the past, the monitoring team has commended SOD for the quality of their After-Action Reports and the documentation they provide.

**Results**

Based on our review of the documentation that was provided, we determined that SOD remains in operational compliance with this paragraph, but commented in Paragraph 93 on specific areas that should be reinforced by SOD.  As noted in IMR-5, the SOD Annual Review is a comprehensive assessment of the current state of the SOD, and includes an assessment of SOD SOP's, incorporation of Force Review Board recommendations that resulted from their deployments, as well as an analytical assessment of their tactical deployments over the course of the year.  In our next report the monitoring team will review the 2017 SOD Annual Report that will presumably be completed in January 2018.  We expect it will follow the basic template we previously commented on in IMR-5, with appropriate enhancements.  Likewise, cross-referencing materials we were provided, we found that in each instance that SOD was activated they prepared an Operational Plan and After Action Report detailing their activities, and for planned events a Risk Assessment Matrix was completed in each instance.  APD as a whole could learn from a

---

[174] We note that based on data supplied by APD the Special Services Bureau Order 6-7 "Explosive Ordnance Disposal Unit (Bomb Squad)" was scheduled for review on December 11, 2016.  Like other SOD policies, that policy remains in effect until such time that the suite of SOD policies are reviewed and approved by the monitor.

review of SOD's After Action Reporting process.

Based on our review of materials, we have determined that SOD remains in operational compliance with this paragraph.

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.82 Assessing Compliance with Paragraph 95:  Annual Review of Tactical Policies

Paragraph 95 stipulates:

**"The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement."**

### Methodology

All the SOD policies pertaining to the organization, staffing, and operation of APD's tactical units were approved in May and June of 2016 (Due for review in June 2017[175]), bringing the Department into Primary and Secondary Compliance on all the policy-related requirements in this and other paragraphs in this section.  The policies are currently under regular review by APD, the parties and the monitor.  Included in the SOD suite of policies is Special Services Bureau Order 4-12, "K-9 Unit", which includes provisions pertaining to the calculations for bite ratios.  By mutual-agreement of the parties, APD agreed to collect data and provide their recommendation to the monitor to include a recommended bite ratio calculation.  On June 24, 2017, APD submitted a document to the parties and the monitor that served as their perspective on how bite ratios should be calculated.  On July 31, 2017, the monitor reported his final comments on SOP 4-12, K-9 which will have a direct impact on SOD compliance in CASA paragraphs related to K-9 deployments.  Also, for the monitoring team reviewed COB documentation in the form of an internal memorandum dated January 25, 2017, entitled, "Tactical Annual Policy/Operations/Training Review for 2016." The report was written well, organized logically, and covered substantive matters that directly relate to the success of SOD.

---

[175] We note that based on data supplied by APD the Special Services Bureau Order 6-7 "Explosive Ordnance Disposal Unit (Bomb Squad)" was scheduled for review on December 11, 2016.  Like other SOD policies, that policy remains in effect until such time that the suite of SOD policies are reviewed and approved by the monitor.

**Results**

SOD has put in place a variety of standard management practices that are important factors in achieving and sustaining CASA-related reforms.  During our June 2017 site visit we discussed the status for each SOD paragraph with SOD's Commander, along with other members of his staff.  As we commented on in IMR-5, there appears to be strong synergy between the current command staff of SOD, their civilian counterparts, and the previous Commander of the unit. This provides for strong oversight, sound business processes, camaraderie and a continuity of business that will hopefully solidify the strong business practices that have been put into place and a culture that is capable of retaining CASA compliance.  We have found that the current Commander's approach to running SOD is congruent with the established business practices we have written about in past monitoring reports.

During our June 2017 site visit we met with SOD civilian and enlisted personnel in their business offices and were impressed with the apparently seamless nature of the communication throughout the unit.  The lead civilian staff member within SOD met with the monitoring team to highlight a reporting system and business processes she developed with her enlisted counterparts that captures CASA relevant SOD deployment data.  We reviewed a COB ledger that tracks the status of every SOD request for deployment or actual deployment.  The ledger tracks each incident from the initial event, through the Force Review Board presentation, and the only closes when SOD demonstrates that it has addressed and documented any recommendation that emanated from the Force Review Board.  The monitoring team has written extensively about "closing the loop", and this APD business process appears to be the best example, to date, of an organizational unit not only understanding the concept, but embracing it.  The SOD uses a color-coded filing system to catalogue the various types of deployments they encounter, with specific checklists for each deployment type.  The monitoring team reviewed several files and found that each SOD file began with the relevant checklist which allows for uniformity-- which is an essential quality that eludes many APD commands-- and the effective tracking of SOD deployments.

The requirement of preparing an annual report is codified in APD's SOP "Specialized Tactical Units" 6-8, and as noted, SOD met the operational requirement to prepare that report for 2017.  We will look to January 2018 to receive the 2018 iteration of that same report.  APD tactical response policies have been approved and are currently under review for relevant updates.

Based on our review, we have determined that SOD remains in operational compliance with this paragraph.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.83 Assessing Compliance with Paragraph 96:  Documentation of Tactical Activities

Paragraph 96 stipulates:

**"In addition to Use of Force Reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations. After-action reports shall address any areas of concern related to policy, training, equipment, or tactics."**

### Methodology

For the timeframe of February 2017 – July 2017, the monitoring team was provided with seven operational plans and forty after action reports. Five Operational Plans and nine After Action Reports were reviewed for compliance for this paragraph.

### Results

The monitoring team reviewed the operational plans and after action reports for compliance with the provisions of this paragraph. SOD prepared a detailed synopsis of their involvement in the events, and analyzed the deployment for policy, training, equipment and tactical issues/concerns. Based on the records provided to the monitoring team APD is in compliance with the provisions of this paragraph. See Table 4.7.80.

Table 4.7.80

| Case Location | APD shall require specialized tactical units to document their activities in detail, including written operational plans | APD shall require specialized tactical units to document their activities in detail, including written after-action reports created after call-outs and deployments to critical situations | After-action reports shall address any areas of concern related to policy, training, equipment, or tactics." | # In Compliance | % In Compliance |
|---|---|---|---|---|---|
| **Ops Plan** Campbell Rd. | 1 | N/A | N/A | 1 | **100.** |
| **Ops Plan** Spanish Bit | 1 | N/A | N/A | 1 | 100 |
| **Ops Plan** Page Ct | 1 | N/A | N/A | 1 | 100 |
| **Ops Plan** Alb. Balloon Fiesta Park | 1 | N/A | N/A | 3 | 100 |
| **Ops Plan** Broadway Blvd. NE | 1 | N/A | N/A | 3 | 100 |
| **AAR** Dallas St. SE #4 | N/A | 1 | 1 | 2 | 100 |
| **AAR** Vista Del Pueblo St. SW | N/A | 1 | 1 | 2 | 100 |
| **AAR** Chama St. SE | N/A | 1 | 1 | 2 | 100 |
| **AAR** Moon St. NE | N/A | 1 | 1 | 2 | 100 |
| **AAR** Georgia St. SE #1 | N/A | 1 | 1 | 2 | 100 |
| **AAR** Valencia Dr. NE | N/A | 1 | 1 | 2 | 100 |
| **AAR** Coors Blvd. NW | N/A | 1 | 1 | 2 | 100 |
| **AAR** Ellison St. NE #202 | N/A | 1 | 1 | 2 | 100 |
| **AAR** Tyrone Ave. NW | N/A | 1 | 1 | 2 | 100 |
| **Number in Compliance Total all Incidents** | 16 | 16 | 16 | 48 | 100 |

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.84 Assessing Compliance with Paragraph 97:  Tactical Mission Briefings

Paragraph 97 stipulates:

**"APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment. APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations. All specialized tactical team members should have an understanding of operational planning."**

232

**Methodology**

The monitoring team verified Operational Compliance with this requirement by means of personal inspections, policy reviews, and discussions with the SOD commander. SOD conducted an Annual Review of their policies and procedures on January 25, 2017 their next inspection will be reviewed during the next reporting period.

**Results**

The monitoring team, based upon case reviews, acknowledged that Tactical Sectional Commanders, Supervisors and Officers have a working knowledge of operational planning and apply that understanding and skill to actual operations. During the June 2017 site visit the monitoring team requested documentation from APD that supports determinations of whether or not such training was being conducted. The monitoring team also requested any Operational Plans developed for this period. Special Operations continues to conduct extensive training at all levels and conforms to best practices nation-wide and to the specifics of this paragraph.

Table  4.7.81 reflects our analysis of these processes.

**Table 4.7.81**

| Case Location | A. APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment | B. APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations | C. All specialized tactical team members should have an understanding of operational planning | # in-compli-ance | % in Compli-ance |
|---|---|---|---|---|---|
| **Ops Plan** Campbell Rd. | 1 | 1 | 1 | 3 | **100.** |
| **Ops Plan** Spanish Bit | 1 | 1 | 1 | 3 | **100** |
| **Ops Plan** Page Ct | 1 | 1 | 1 | 3 | **100** |
| **Ops Plan** Alb. Balloon Fiesta Park | 1 | 1 | 1 | 3 | **100** |
| **Ops Plan** St. Josephs Ave. NW | 1 | 1 | 1 | 3 | **100** |
| **Ops Plan**  3rd St. SW | 1 | 1 | 1 | 3 | |
| **Ops Pla**Broadway Blvd. NE | 1 | 1 | 1 | 3 | **100** |
| **Number in Compliance Total all Incidents** | **7** | **7** | **7** | **121** | **100** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.85 Assessing Compliance with Paragraph 98:  Tactical Uniforms

Paragraph 98 stipulates:

**"All specialized tactical units shall wear uniforms that clearly
identify them as law enforcement officers."**

### Methodology

As with past reports, the monitoring team verified Operational Compliance with
this requirement by means of personal inspections, policy reviews, and
discussions with the SOD commander.  With the approval of all SOD policies in
May-June 2016, APD is now in Policy Compliance as well.  The monitoring team
reviewed SOP 6-8-3-F, G and H which codify the requirements of this
paragraph, and also reviewed six (6) Monthly Inspection Reports for the months
of February through July 2017.  Likewise, SOD conducted an Annual Review of
their policies and procedures on January 25, 2017.  We note there are no
significant training requirements in this paragraph.

### Results

The SOD Monthly Inspection Report captures information regarding uniform
cleanliness and completeness, equipment, as well as proper identification
markings and whether an officer's Taser video recorder is working properly. The
monitoring team reviewed six (6) Monthly Inspection Reports for the months of
February through July 2017 and found that APD reported all personnel within
SOD possessed the proper uniforms and equipment as required by this
paragraph.  We find that SOD conducts regular monthly inspections to ensure
that officers maintain uniform, equipment, and grooming standards.  During its
June 2017 site visit the monitoring team examined uniforms of SOD personnel
to verify compliance with the provisions of this paragraph.  SOD has put in place
a variety of standard management practices that are important factors in
achieving and sustaining CASA-related reforms.  Based on our review, we have
determined that SOD remains in operational compliance with this paragraph.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.86 Assessing Compliance with Paragraph 99:  Force Review Board Assessments

Paragraph 99 stipulates:

**"All specialized tactical unit deployments shall be reviewed by the Force Review Board in order to analyze and critique specialized response protocols and identify any policy, training, equipment, or tactical concerns raised by the action. The Force Review Board shall identify areas of concern or particular successes and implement the appropriate response, including modifications to policy, training, equipment, or tactics."**

## Methodology

The Force Review Board meetings involving the review of SWAT activations cases are presented by commanders of SOD and, if applicable, a Crisis Negotiation Team commander.  In all cases reviewed by the monitoring team, the Force Review Board evaluated the cases for appropriate response by SOD, including policy, training, equipment and tactical concerns. In the past, members of the monitoring team had an opportunity to attend a Force Review Board meeting that was centered on SWAT activations.  While on site in June 2017 APD conducted a SWAT centric Force Review Board meeting, however, the monitoring team was unable to attend due to other priorities. In preparation of this report the monitoring team requested the following data: 1) SOD activation logs for the timeframe of any deployment reviewed by the FRB for comparison purposes; 2) Copies of each FRB recommendation received by SOD during the time frame listed.  In response, APD provided, and the monitoring team reviewed, a 2017 Use of Force Board Recommendations form and a 2017 SWAT Activation Data Report, both of which are SOD created documents to track deployments and Force Review Board recommendations that result from those deployments.

## Results

As noted earlier SOD, through their Activation Data report, tracks all SOD deployments. That document, coupled with their Use of Force Board Recommendations form, tracks all SOD deployments and cases from their inception and through Force Review Board meetings.  The entries in these reports only close when recommendations that result from those meetings are completed.  The 2017 SWAT Activation Data report we reviewed listed forty (40) SWAT activations between February 1 and July 31, 2017.  Through its internal processes and reports SOD captures relevant data to ensure that each of their activations are presented to the Force Review Board. Their internal documentation captures the date a particular SOD activation was presented to the Force Review Board, the date that the event is closed, provides a hyperlink for any Force Review Board recommendation that occurs as a result of the meeting, and whether there was any specific training, equipment, tactics or supervision recommendations.

As we have noted previously, SOD has put in place a variety of standard management practices that are important factors in achieving and sustaining

235

CASA-related reforms.  The monitoring team has reviewed and discussed the status for each SOD paragraph with its commander during its June 2017 site visit.  Based on our review, we have determined that SOD remains in operational compliance with this paragraph.

     Primary:    **In Compliance**
     Secondary:   **In Compliance**
     Operational: **In Compliance**

### 4.7.87 Assessing Compliance with Paragraph 100:  Eligibility Requirements for Tactical Teams

Paragraph 100 stipulates:

**"APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria."**

### Methodology

Members of the monitoring team reviewed salient tactical unit documentation to assess compliance with the requirements of this Paragraph.

### Results

The Special Operations Division, which oversees specialized tactical units, has established policies that set selection criteria for team membership and training requirements for all members. Table below outlines the results of the monitoring team's analysis of those policies.

See Table 4.7.82.

236

**Table 4.7.82**

| Unit | A. APD shall establish eligibility criteria for all team members assigned to tactical units | B. They shall establish eligibility criteria for all team leaders assigned to tactical units | C. They shall establish eligibility criteria for all supervisors assigned to tactical units | D. APD shall conduct at least annual reviews of unit team members to ensure that they meet delineated criteria | # in-Compli-ance | % in Compli-ance |
|---|---|---|---|---|---|---|
| Bomb Squad (4-03) | 1 | 1 | 1 | 1 | 4 | 100 |
| SWAT (4-04) | 1 | 1 | 1 | 1 | 4 | 100 |
| K-9 (4-12) | 1 | 1 | 1 | 1 | 4 | 100 |
| K-9 Unit Memorandum (5-20-17) | 1 | N/A | N/A | N/A | 1 | 100 |
| SWAT Memorandum (7-6-17) | N/A | N/A | 1 | N/A | 1 | 100 |
| 2017 Command Staff Performance Management | N/A | N/A | N/A | 1 | 1 | 100 |
| 2017 K-9 Performance Management | N/A | N/A | N/A | 1 | 1 | 100 |
| 2017 SWAT Performance Management | N/A | N/A | N/A | 1 | 1 | 100 |
| 2017 Bomb Squad Performance Management | N/A | N/A | N/A | 1 | 1 | 100 |
| **Number in Compliance Total all Incidents** | **4** | **3** | **4** | **7** | **18** | |
| **% in Compliance Total by Category** | 100% | 100% | 100% | 100% | | 100% |

These are listed in the Bureau SOPs that cover Bomb Squad (4-03), K-9 Unit (4-12) and SWAT (4-04) that have been approved. This unit policy is in compliance with the requirements of paragraph 100 and constitutes a best practice in the management of tactical units and personnel.  APD has incorporated the "unit policies" into its formal policies related to these functions and continues to maintain compliance with this paragraph.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

237

### 4.7.88 Assessing Compliance with Paragraph 101:  Tactical Team Training

Paragraph 101 stipulates:

**"APD shall train specialized tactical units conducting barricaded gunman operations on competencies and procedures that include: threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders."**

### Methodology:

The monitoring team has reviewed the Tactical Section training and found that all subjects required in Paragraph 101 are covered in a wide array of training contexts, including but not limited to scenario-based training. CNT continues to be an essential operational component in tactical activations.

Training for the Tactical Section continues to be conducted on a regular basis in accord with national standards (NTOA) for high-risk tactical operations. APD tactical teams continued to demonstrate operational success in 2017. While the tactical units are in full compliance with this paragraph, Field Service Bureau units continue to lag behind in the training and supervision necessary to serve as first-responders in such events.

### Results

Table 4.7.83, below, reports the findings of the monitor's assessment of compliance efforts related to the requirements of this paragraph.

See Table 4.7.83.

238

## Table 4.7.83 Tactical Team Training

| Case No. | A. train re conduct-ing barricaded gunman operations on compe-tencies and procedures: threat assess. | B. train re conduct-ing barri-caded gunman ops on compe-tencies and mission analysis | C. train re conduct-ing barricade gunman ops ID criminal offense | D. train re conduct-ing barricade gunman ops & ID of mental illness | E. train re barri-caded gunman operations & procs: require-ments for search warrant | F. train re conducting barricaded gunman operations and procedures: Com procedures | G. train re conducting barricaded gunman &: integration of the Crisis Negotiation Team | H. train re barricaded gunman OPS, competenci es & procedures: integration of the Crisis Interventio n Unit | I. Train re barricaded gunman operations on compete-ncies and procedures: integration of crisis interventio n certified responders | # in Compli-ance | % in Compli-ance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Training Doc 2/17 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9 | 100 |
| Training Doc 3/17 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9 | 100 |
| Training Doc 4/17 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9 | 100 |
| Training Doc 5/17 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9 | 100 |
| Training Doc 6/17 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9 | 100 |
| Training Doc 7/17 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9 | 100 |
| in Compli-ance Total | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 54 | |
| % in Compli-ance | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | 100 |

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.89 Assessing Compliance with Paragraph 102:  K-9 Post Deployment Reviews

Paragraph 102 stipulates:

**"APD shall continue to require the Canine Unit to complete
thorough post- deployment reviews of all canine deployments."**

### Methodology:

The monitoring team reviewed COB documentation in the form of an internal memorandum dated January 25, 2017, entitled, "Tactical Annual Policy / Operations / Training Review for 2016."  The report was written well, organized logically, and covered substantive matters that directly relate to the success of SOD.  All the SOD policies pertaining to the organization, staffing, and operation

of APD's tactical units were approved in May and June of 2016 (Due for review in June 2017[176]).  The policies have been under regular review by APD, the parties and the monitor.  Included in the SOD suite of policies is Special Services Bureau Order 4-12, "K-9 Unit", which includes provisions pertaining to the calculations for bite ratios.  By mutual-agreement of the parties, APD agreed to collect data and provide their recommendation to the monitor to include a recommended bite ratio calculation.  On June 23, 2017, APD submitted a document to the parties and the monitor that served as their perspective on how bite ratios should be calculated.  On July 31, 2017, the monitor reported his final comments on SOP 4-12, K-9, and approved the policy. SOP 4-12-2-D of the "Definitions" section now indicates that a Bite Ratio is a "Calculation of the number of apprehensions involving PSD bites divided by the total number of deployments of PSDs for a given time period.  For the purpose of this calculation, PSD bites will include accidental or unintended bites, but will not include directed bites."

We also reviewed the "K-9 Ratio of Bites to Deployments" report as well as monthly COB documentation that captures K-9 deployments and apprehensions, and bite ratio calculations for the months of February - July 2017.

**Results**

With his approval of SOP 4-12, the monitor adopted SOD's recommended means of calculating bite ratios.  As noted in past monitoring reports, APD has limited post-deployment reviews of cases involving K-9 apprehensions, which are fully investigated as a serious use of force by the K-9 supervisor and Internal Affairs.  The current procedure is for CIRT to respond to the scene and accompany the supervisor throughout the field investigation.  The final report is then submitted to CIRT for review and concurrence.  The CASA requirement for serious use of force investigations falls to APD's IA, which include K9 bites, and places the ultimate oversight responsibility for use of force investigations on that organizational entity.  However, that does not alleviate SOD's responsibilities to conduct thorough post-deployment reviews since it has previously been acknowledged by the parties that due to the specialized expertise associated with K9 use, the initial review should still lie within the K9 Unit.

Additionally, all K-9 bites are reviewed by the Force Review Board as serious uses of force.   In past reports the monitoring team withheld compliance determination until such time as the Parties reached agreement on K9 bite ratio calculations, or the monitor made a final determination on the proper calculation

---

[176] We note that based on data supplied by APD the Special Services Bureau Order 6-7 "Explosive Ordnance Disposal Unit (Bomb Squad)" was scheduled for review on December 11, 2016.  Like other SOD policies, that policy remains in effect until such time that the suite of SOD policies are reviewed and approved by the monitor.

of bite ratios.  With the approval of SOP 4-12 in June 2017 SOD can carry forward with operational compliance with this and other K9 related paragraphs.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.90 Assessing Compliance with Paragraph 103:  Tracking K-9 Deployments

Paragraph 103 stipulates:

**"APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams."**

### Methodology

The monitoring team previously reviewed COB documentation in the form of an internal memorandum dated January 25, 2017, entitled, "Tactical Annual Policy / Operations / Training Review for 2016."  The report was written well, organized logically, and covered substantive matters that directly relate to the success of SOD.  All the SOD policies pertaining to the organization, staffing, and operation of APD's tactical units were approved in May and June of 2016 (Due for review in June 2017).  The policies have been under regular review by APD, the parties and the monitor.  Included in the SOD suite of policies is Special Services Bureau Order 4-12, "K-9 Unit", which includes provisions pertaining to the calculations for bite ratios.  By mutual-agreement of the parties, APD agreed to collect data and provide their recommendation to the monitor to include a recommended bite ratio calculation.  On June 23, 2017, APD submitted a document to the parties and the monitor that served as their perspective on how bite ratios should be calculated.  On July 31, 2017, the monitor reported his final comments on SOP 4-12, K-9, and approved the policy. SOP 4-12-2-D of the "Definitions" section now indicates that a Bite Ratio is a "Calculation of the number of apprehensions involving PSD bites divided by the total number of deployments of PSDs for a given time period.  For the purpose of this calculation, PSD bites will include accidental or unintended bites, but will not include directed bites."

We also reviewed the "K-9 Ratio of Bites to Deployments" report as well as monthly COB documentation that captures K-9 deployments and apprehensions, and bite ratio calculations for the months of February – July 2017.

**Results**

K-9 Units respond to a variety calls that APD has broken down into several different categories ranging from armed search, search assists, residential alarm calls and commercial alarm calls.  They also capture how many instances where a K-9 is muzzled and un-muzzled.  As you would expect, the total number of K-9 bites are again the smallest category reported by APD.[177]  For instance, the 2017 year to date total of K-9 call-outs is 533 and total number of bites is 10.  However, the reader should note that call-outs do not always result in the K-9 Unit being deployed for a law enforcement purpose, such as a building or area search.

Because SOD's database is timely and comprehensive, it is easy to calculate bite ratios. APD has been calculating a K-9 bite ratio by dividing searches by the total number of bites, and therefore the bite ratio for the data set reviewed by the monitoring team was once again below the 20% threshold for each K-9 handler and the unit as a whole. Overall, based upon our reviews over the course of our interaction with SOD, we believe that the present level of oversight and accountability exercised within SOD is exceptionally high and effective.  The lingering issue of the calculation method for determining bite ratios has been resolved with the monitor's approval of SOP 4-12.  That, coupled with our review of data we were provided we find SOD in compliance with the provisions of this paragraph.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

**4.7.91 Assessing Compliance with Paragraph 104:  Tracking K-9 Bite Ratios**

Paragraph 104 stipulates:

**"APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold, and require interventions as appropriate. Canine data and analysis shall be included in APD Use of Force Annual Report."**

---

[177] Again, we commend SOD staff on the quality and comprehensiveness of the database that it has created to track the activity and outcomes of APD's specialized tactical units.

**Methodology**

All the SOD policies pertaining to the organization, staffing, and operation of APD's tactical units were approved in May and June of 2016 (Due for review in June 2017).  The policies have been under regular review by APD, the parties and the monitor.  Included in the SOD suite of policies is Special Services Bureau Order 4-12, "K-9 Unit", which includes provisions pertaining to the calculations for bite ratios.  By mutual-agreement of the parties, APD agreed to collect data and provide their recommendation to the monitor to include a recommended bite ratio calculation.  On June 23, 2017, APD submitted a document to the parties and the monitor that served as their perspective on how bite ratios should be calculated.  On July 31, 2017, the monitor reported his final comments on SOP 4-12, K-9, and approved the policy. SOP 4-12-2-D of the "Definitions" section now indicates that a Bite Ratio is a "Calculation of the number of apprehensions involving PSD bites divided by the total number of deployments of PSDs for a given time period.  For the purpose of this calculation, PSD bites will include accidental or unintended bites, but will not include directed bites."

We also reviewed the "K-9 Ratio of Bites to Deployments" report as well as monthly COB documentation that captures K-9 deployments and apprehensions, and bite ratio calculations for the months of February – July 2017. Finally, we reviewed the components of Special Services Bureau SOP's 4-12 and 6-8, as well as APD SOP 3-33 "Early Intervention System".

**Results**

Since SOD's database is timely and comprehensive, it is easy to calculate bite ratios. APD has been calculating a K-9 bite ratio by dividing searches by the total number of bites, and a review of the available data for this monitoring period revealed the bite ratio for the data set reviewed by the monitoring team was once again below the 20% threshold for each K9 handler.  Overall, based upon our reviews over the course of our interaction with SOD, we believe that the present level of oversight and accountability exercised within SOD is exceptionally high and effective. The lingering issue of the calculation method for determining bite ratios has been resolved with the monitor's approval of SOP 4-12.  Special Services Bureau Order 4-12-3-N-2, 4-12-3-O, and Special Services Bureau Order 6-8 specifically mandate the elements of this paragraph.

Based on our review there were no instances of K9 handlers breaching the 20% threshold, and therefore there was no instance that required entry into APD's EIS system.  The lingering issue of the calculation method for determining bite ratios has been resolved with the monitor's approval of SOP 4-12.  We note that while the K-9 SOP contains the specific provision of reporting bite ratio data that exceeds 20 percent, APD's SOP 3-33 "Early Intervention System" neither mandates the

collection of the data, nor does it provide a mechanism to accept the data outside of the general EIS use of force indicator.  This disconnect has to be remedied to ensure sustained operational compliance. As noted earlier, there was no instance of a bite ratio by a single handler, or the entire K9 Unit, that elevated above the 20 percent threshold that would have implicated the requirement for an early intervention.  That, coupled with our review of data we were provided, leads us to find SOD in compliance with the provisions of this paragraph.

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.92 Assessing Compliance with Paragraph 105:  Analyzing Tactical Deployments

Paragraph 105 stipulates:

**"APD agrees to track and analyze the number of specialized tactical unit deployments. The analysis shall include the reason for each tactical deployment and the result of each deployment, to include: (a) the location; (b) the number of arrests; (c) whether a forcible entry was required; (d) whether a weapon was discharged by a specialized tactical unit member; (e) whether a person or domestic animal was injured or killed; and (f) the type of tactical equipment deployed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

### Methodology

The monitoring team reviewed the Division's Tactical Unit Deployment Tracking Sheet for the time period of February 1, 2017 through July 31st, 2017.  APD had 40 activations in this reporting period in 2017.  The functionality and operation of APD's SWAT Unit has been reviewed in several paragraphs of this agreement.  APD continues to monitor and analyze the number, type, and characteristics of deployments, and states a clear reason for each tactical deployment, as well as the number of arrestees in each deployment.

### Results

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.93 Assessing Compliance with Paragraph 106:  Specialized Unit Policies

Paragraph 106 stipulates:

**"Each specialized investigative unit shall have a clearly defined mission and duties. Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

## Methodology

Investigative Bureau SOP 3-01 Special Investigations Division (SID) was approved by the monitor on June 5, 2016, which brought APD into Primary Compliance with the requirements of this paragraph.  APD recast its SOP cataloging system and SOP 3-01 is now SOP 5-01, and was due for regular review and approval in January of 2017.[178]  As documented in IMR-4 and IMR - 5, SID took on the task of developing unit-level handbooks that set forth the unique standards, missions and duties for each of its subordinate units.  Those handbooks serve several purposes, including SID incorporating and reinforcing APD's use of force policies, including the provisions of this paragraph.  During its June 2017 site visit members of the monitoring team met with SID Commanders to discuss their progress toward compliance with this paragraph and were provided a series of documents and ledgers to demonstrate that SID routinely collects and tracks information related to their operations and deployments.  SID developed a tracking system within APD's SharePoint system to meet the requirements of this paragraph.  The monitoring team requested and was provided SharePoint documents for the months of February through July 2017; course of business documents in the form of Interoffice Memorandums entitled, "Investigative Responses Audit", "SharePoint Entries" and "Quarterly Investigative Responses Audit"; and memorandums documenting whether or not use of force or serious use of force investigations occurred during the timeframe. Likewise, the monitoring team received and reviewed operational plans for the months of February through July 2017 as well as training records that were compiled by SID.

## Results

As noted in previous paragraphs the monitoring team has worked closely with SID and our meetings tend to focus on forward leaning issues instead of looking back to past transgressions.  It is apparent that SID attempts to anticipate issues and forecast ways to meet the provisions of the CASA, with little need for technical assistance from the monitoring team.  We find SID openly, and without prompting, talking in terms of "sustainability" and embracing the basic principle of building systems and unit capabilities that allow reform to be passed to future

---

[178] The monitoring team notes that APD's schedule of policy reviews has lagged significantly behind in many areas of the organization, including SID, and therefore SOP 5-01 is still pending review and approval by the monitor.

APD commanders so positive organizational changes can survive. This mindset is refreshing and we feel it is directly attributable to the SID commanders we have encountered and Deputy Chief who has overseen the Special Investigations Bureau.  While we find professionalism in other areas of the organization, SID is the first we have encountered to talk openly and regularly about sustainability.  We look forward to the time where all of APD speaks in these terms across the many organizational units whose responsibilities are impacted by provisions of the CASA.  In IMR-4 and IMR–5, we commented that SID, like SOD, is actively engaged and making legitimate attempts to be responsive to the CASA.  That engagement continued to be evident this reporting period.  Likewise, SID continues to be exceptionally receptive to the feedback they receive from the monitoring team.  During our June 2017 site visit the monitoring team met with members of SID who are responsible for addressing the terms of this paragraph.

SID submitted training records, lesson plans and other course of business documentation wherein two newly assigned detectives received instruction from their supervisor using the SID "Proficiency Check List" and using the new Narcotics Unit handbook.  Further, two lieutenants received On Job Training (OJT) that included specific instruction in the required areas of this paragraph. The documentation we reviewed included a lesson plan entitled, "SID Standard Operating Procedures – Special Investigations Division Core Curriculum Instructor Guide".  The monitoring team reviewed "Proficiency of Training" documents wherein SID units capture training topics that emerge from after-action reports. The monitoring team found that among all units the "Proficiency of Training" documents prepared by the Narcotics Unit stood out as a good template for all SID units to consider. These documents layout hours of training, training schedules and objectives for the training.   Further, we note there are clear lessons to be learned by the APD Training Academy in reviewing SID training development and assessment modalities.  It is very unusual for us to find line units doing a better job of training assessment, development, testing, and improvement than an agency's training academy.  SID has done that.

The monitoring team reviewed the SID SharePoint tracker and determined that it captures data points relevant to this paragraph.  The monitoring team reviewed 14 SharePoint records that were generated during the reporting period.  This constituted a 50% sample of the ledger reports completed and submitted to the monitoring team during the reporting period. The results of this review are reported in Table 4.7.84.

**Table 4.7.84:  Compliance with Para 106**

| Case No. | Data Collected | Data Complete |
|---|---|---|
| IMR6-013 | 1 | 1 |
| IMR6-014 | 1 | 1 |
| IMR6-015 | 1 | 1 |
| IMR6-016 | 1 | 1 |
| IMR6-017 | 1 | 1 |
| IMR6-018 | 1 | 1 |
| IMR6-019 | 1 | 1 |
| IMR6-020 | 1 | 1 |
| IMR6-021 | 1 | 1 |
| IMR6-022 | 1 | 1 |
| IMR6-023 | 1 | 1 |
| IMR6-024 | 1 | 1 |
| IMR6-025 | 1 | 1 |
| IMR6-026 | 1 | 1 |
| % Compliant | 100% | 100% |

APD is in compliance with the requirement to track data relevant to this paragraph.  APD's Training Academy could learn from SID's processes in assessing operational data for the purpose of informing and structuring training modalities.

      Primary:    **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.94 Compliance with Paragraph 107:  High Risk Situation Protocols

Paragraph 107 stipulates:

**"APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required. APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response. The protocols shall include communicating high-risk situations and threats promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident."**

### Methodology

Investigative Bureau SOP 3-01 Special Investigations Division (SID) was approved by the monitor on June 5, 2016, and again in June 2017, which brought APD into Primary Compliance with the requirements of this paragraph.  APD recast its SOP cataloging system and SOP 3-01 is now

SOP 5-01.  As documented in IMR-4 and IMR - 5, SID took on the task of developing unit-level handbooks that set forth the unique standards, missions and duties for each of its subordinate units.  Those handbooks serve several purposes, including SID incorporating and reinforcing APD's use of force policies, including the provisions of this paragraph.  During its June 2017 site visit members of the monitoring team met with SID Commanders to discuss their progress toward compliance with this paragraph and were provided a series of documents and ledgers to demonstrate that SID routinely collects and tracks information related to their operations and deployments.  SID developed a tracking system within APD's SharePoint system to meet the requirements of this paragraph.  The monitoring team requested and was provided SharePoint documents for the months of February through July 2017; course of business documents in the form of Interoffice Memorandums entitled, "Investigative Responses Audit", "SharePoint Entries" and "Quarterly Investigative Responses Audit"; and memorandums documenting whether or not use of force or serious use of force investigations occurred during the timeframe. Likewise, the monitoring team received and reviewed operational plans for the months of February through July 2017 as well as training records that were compiled by SID.

**Results**

The monitoring team worked closely with SID as they developed their unit specific handbooks and the training to implement those handbooks.  We commented in IMR – 5 that the handbooks contained specific provisions that meet the requirements of this paragraph, specifically the prohibition of investigative units providing tactical responses to critical situations where a specialized tactical unit is required, and the requirement that SID members utilize the Risk Assessment Matrix originally developed by SOD.

SID received approval from the monitoring team regarding the unit handbooks they created and to deliver the training they developed for those handbooks at the latter part of January 2017.  On January 27, 2017, SID conducted its training during a three-hour session and delivered the unit specific handbooks to the SID.

SID submitted training records, lesson plans and other course of business documentation wherein two newly assigned detectives received instruction from their supervisor using the SID "Proficiency Check List" and using the new Narcotics Unit handbook; and two lieutenants received On Job Training (OJT) that included specific instruction in the required areas of this paragraph.  The documentation we reviewed included a lesson plan entitled, "SID Standard Operating Procedures – Special Investigations Division Core Curriculum Instructor Guide".

The monitoring team reviewed the SID SharePoint tracker and determined that it captures data points relevant to this paragraph.  The monitoring team reviewed 14 SharePoint records that were generated during the reporting period.  This constituted a 50% sample of the ledger reports completed and submitted to the monitoring team during the reporting period. The results of this review are reported in Table 4.7.85, below.

**Table 4.7.85:  Compliance with Para 107**

| Case No. | Data Collected | Data Complete |
|---|---|---|
| IMR6-013 | 1 | 1 |
| IMR6-014 | 1 | 1 |
| IMR6-015 | 1 | 1 |
| IMR6-016 | 1 | 1 |
| IMR6-017 | 1 | 1 |
| IMR6-018 | 1 | 1 |
| IMR6-019 | 1 | 1 |
| IMR6-020 | 1 | 1 |
| IMR6-021 | 1 | 1 |
| IMR6-022 | 1 | 1 |
| IMR6-023 | 1 | 1 |
| IMR6-024 | 1 | 1 |
| IMR6-025 | 1 | 1 |
| IMR6-026 | 1 | 1 |
| % Compliant | 100% | 100% |

APD is in compliance for the requirement to track data relevant to this paragraph.

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

### 4.7.95 Compliance with Paragraph 108:  Inspection of Specialized Units

Paragraph 108 stipulates:

**"Within three months of the Effective Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training. APD shall conduct re-inspections on at least an annual basis."**

### Methodology:

The monitoring team reviewed the Special Investigation Division's

annual inspection forms that were completed during the normal course of business in June of 2017.  Consistent with the unit's mission and training, a review of the individual inspection forms indicated that there was proper documentation of all weapons and equipment assigned or made accessible to SID.  An Interoffice Memorandum was submitted on June 21, 2017 to document SID's yearly inspection.  The Memorandum, completed during the normal course of daily business, stated in part that all sworn personnel were involved and no issues of concern were noted; additionally, all personnel were rated at satisfactory.  The monitoring of these inspections is set to continue on at least an annual basis.

**Results**

|            |               |
|------------|---------------|
| Primary:   | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.96 Assessing Compliance with Paragraph 109:  Tracking Specialized Unit Responses

Paragraph 109 stipulates:

**"APD agrees to track and analyze the number of specialized investigative unit responses. The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include: (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative unit member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

### Methodology

Investigative Bureau SOP 3-01 Special Investigations Division (SID) was approved by the monitor on June 5, 2016, which brought APD into Primary Compliance with the requirements of this paragraph.  APD recast its SOP cataloging system and SOP 3-01 is now SOP 5-01, and was due for regular review and approval in January of 2017.[179]  As documented in IMR-4 and IMR-5, SID took on the task of developing unit-level handbooks that set forth the unique standards, missions and duties for each of its subordinate units.  Those handbooks serve several purposes, including SID incorporating and reinforcing APD's use of force policies, including the provisions of this paragraph.  During

---

[179] The monitoring team notes that APD's schedule of policy reviews has lagged significantly behind in many areas of the organization, including SID, and therefore SOP 5-01 is still pending review and approval by the monitor.

its June 2017 site visit, members of the monitoring team met with SID commanders to discuss their progress toward compliance with this paragraph and were provided a series of documents and ledgers to demonstrate that SID routinely collects and tracks information required by this paragraph. SID developed a tracking system within APD's SharePoint system that was developed with the requirements of this paragraph in mind. The monitoring team requested and was provided SharePoint documents for the months of February through July 2017; course of business documents in the form of Interoffice Memorandums entitled, "Investigative Responses Audit," "SharePoint Entries" and "Quarterly Investigative Responses Audit"; and memorandums documenting whether or not use of force or serious use of force investigations occurred during the timeframe. Finally, the monitoring team received and reviewed operational plans for the months of February through July 2017 as well as training records that were compiled by SID.

**Results**

In IMR-5 we determined that SID reached Secondary Compliance with the provisions of this paragraph because of their implementation of training centered on their internal policies and unit handbooks they developed for each of their organizational units.[180] Our assessment of the records provided for this reporting period has resulted in a determination that SID continues to routinely train new personnel assigned to SID by providing each new member with a unit handbook relevant to their assignment, and ensuring that they meet each proficiency listed within an internal "Proficiency Checklist" that SID developed.[181]

The monitoring team reviewed the SID SharePoint tracker and determined that it captures each of the data points required by this paragraph. The monitoring team reviewed 14 SharePoint records that were generated during the reporting period. This constituted a 50% sample of the ledger reports completed and submitted to the monitoring team during the reporting period. The results of this review are reported in the table below. SID collects and tracks all required data points for deployments.

---

[180] We commented in IMR- 4 and IMR - 5 that the monitoring team worked closely with SID during the development of their unit level handbooks and the training they ultimately delivered to SID personnel. We reviewed records and found that SID completed their policy related training and provided handbooks (signed off on by each recipient) to all SID personnel.

[181] We note that SID was not required to implement a "Proficiency Checklist" but did so of their own initiative. The checklist serves as a quasi FTO program for newly assigned detectives where they must first demonstrate proficiency in several pre-determined areas related to their new assignment. The checklist is completed by a supervisor and once the new detective meets each proficiency they are authorized to assume their duties with less direct oversight. We see this process to be one APD should implement in other operational areas of the organization and see it as an emerging best practice.

**Table 4.7.86**

| Case No. | Data Points Collected | Data Complete |
|---|---|---|
| IMR6-013 | 1 | 1 |
| IMR6-014 | 1 | 1 |
| IMR6-015 | 1 | 1 |
| IMR6-016 | 1 | 1 |
| IMR6-017 | 1 | 1 |
| IMR6-018 | 1 | 1 |
| IMR6-019 | 1 | 1 |
| IMR6-020 | 1 | 1 |
| IMR6-021 | 1 | 1 |
| IMR6-022 | 1 | 1 |
| IMR6-023 | 1 | 1 |
| IMR6-024 | 1 | 1 |
| IMR6-025 | 1 | 1 |
| IMR6-026 | 1 | 1 |
| % Compliant | 100% | 100% |

APD is in compliance with their requirement to track data relevant to this paragraph.  The monitoring team also reviewed the available SharePoint entries for qualitative purposes. We found that SID collects additional information related to the use of a Risk Assessment Matrix that was developed by SID to ensure that a preset list of criteria is considered to determine if requesting SID assistance is appropriate. In three (3) instances we saw SID using the Risk Assessment Matrix appropriately, and could decipher from comments provided within the SharePoint entries why the Risk Assessment Matrix was not used in other events (i.e. Traffic stops or buy-bust operations). We found the use of the Risk Assessment Matrix to be appropriate based on the records we reviewed.

The monitoring team reviewed SID Interoffice Memoranda wherein SID demonstrated they are developing the systems and capacity to prepare meaningful audits of information they are required to track. APD is collecting the audit information in the form of course of business reports entitled, "Quarterly Investigative Response Audit" and "SharePoint Entries".  These documents serve to assess, validate and document information entered into SharePoint system.  The monitoring team found SID documented instances where they self-identified information discrepancies, but then remediated that discrepancy as a result of their analysis.  When we met with SID during our last site visit we were told that the aggregate assessment of these reports would be collected and documented into an SID Annual Report that would further meet the provisions of this paragraph.[182]  We find that the efforts of SID in this regard

---

[182] We requested a copy of APD's 2016 Annual Report, but note that at the time we were writing this report, the Annual Report for 2016 had not been completed.  It is unclear if the information being captured by SID within their SharePoint system will be included in that report once completed, since the SharePoint system was not in place for the entirety of 2016.  However, we note that this paragraph is not explicit as to what "annual report" is required to capture the

are sufficient to demonstrate they are collecting information that will needed for the required Annual Report.  In preparation of the monitoring team requested a copy of APD's regular Annual Report, but it is apparently still being constructed, and was not provided.

With respect to SID's requirement that their data analysis be entered into APD's EIS, the monitoring team notes that the data being collected and tracked for this paragraph do not directly correlate to any of the criteria found within APD's current and approved SOP 3-33 "Early Intervention System".  That policy was due for review by the parties in December 2016, but APD submitted the new policy for review late in this reporting period.  As of the close of the reporting period, in July 2017, the EIRS policy had not been approved by the monitor, as the APD seems to be having problems developing policy that is approvable by the monitor. Since use of force events would be otherwise captured within APD's EIRS system, it is our opinion that SID's Sharepoint tracker, quarterly and annual analysis reports will collectively meet the provisions of this paragraph. The monitoring team feels that based on the current practices within SID they have reached operational compliance with this paragraph.  Generally, uses of force within SID are too rare for trend analysis (SID reported less than five for the year 2017), therefore the most critical assessment of operational trends and patterns will result from a meaningful assessment of the data SID is now collecting.  SID's analysis of those data is necessary before we can note a direct impact on SID's ability to sustain compliance.

> **Primary:**          **In Compliance**
> **Secondary:**      **In Compliance**
> **Operational:**    **In Compliance**

### 4.7.97 Assessing Compliance with Paragraph 110:

Paragraph 110 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below."**

---

necessary data.  Therefore, as long as SID creates an annual report, similar to that we have seen with SOD, they will remain in compliance with this paragraph.

**Methodology**

This overarching paragraph refers to the paragraphs 111-137, below. As such, this paragraph will not be noted in compliance until such time that other related required paragraphs are found to be fully in compliance.

Members of the monitoring team assessed data from the relevant policies as noted in the table below.

**Table 4.7.87**

| Policy | Policy Name (Relevance to 110) |
|---|---|
| SOP 2-19 (previously 2-13) | RESPONSE TO BEHAVIORAL HEALTH ISSUES |
| SOP 2-20 (previously 2-42) | HOSTAGE, SUICIDAL/BARRICADED SUBJECT, AND TACTICAL THREAT ASSESSMENT |
| SOP 2-8 (previously 1-09) | USE OF ON-BODY RECORDING DEVICES / MANAGEMENT OF RECORDINGS (contains reference to people with mental illness) |
| SOP 5-3 (previously 3-06) | CRIMINAL INVESTIGATIONS DIVISION (contains referral to Crisis Intervention Section) |

**Results**

Not all related paragraphs are in compliance, thus, APD remains not in compliance for this "overarching" paragraph.

Primary:  **In Compliance**
Secondary:  **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.97a: APD should ensure that each of the related paragraphs, 111-137 below conform with the goals articulated in this paragraph and are articulated sufficiently to Command and supervisory-level personnel.***

**4.7.98 Assessing Compliance with Paragraph 111: Mental Health Response Advisory Committee**

Paragraph 111 stipulates:

**"Within six months of the Effective Date, APD and the City shall establish a Mental Health Response Advisory Committee (Advisory Committee) with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness."**

## Methodology

The monitoring team reviewed a 100% sample of MHRAC's reports, recommendations, communications, and processes created during this reporting period, as well as other data sources considered for this reporting period, which included: meeting minutes for each MHRAC meeting listed in table above; meeting minutes for subcommittee meetings, including the Training Subcommittee (July 3, 2016, August 22, 2016, November 21, 2016 and January 30, 2017) and the Information Sharing subcommittee (January 25, 2017); and various memos from APD to MHRAC written during the reporting period.

## Findings

MHRAC meetings occurred monthly during this reporting period.  Table 4.7.98, below, briefly describes contextual "minutes" covered during these meetings.

### Table 4.7.88

| Reporting period month | Meeting date | Issues discussed |
|---|---|---|
| February 2017 | 2/21/17 | Administrative Assistance for MHRAC; Behavioral Health Initiative (ABCGC) |
| March 2017 | 3/21/17 | APD-UNM MOU discussion; training for Crisis Negotiation Team. |
| April 2017 | 4/18/17 | BJA presentation; CASA status hearing; CNT training. |
| May 2017 | 5/16/17 | Mobile Crisis Teams; data presentation; CASA status hearing. |
| June 2017 | 6/13/17 | Administrative support position; APD-UNM MOU. |
| July 2017 | 7/18/17 | McClendon case; Schedule for training subcommittee reviews of APD curricula. |

**Results**

Primary:      **In Compliance**[183]
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.99 Assessing Compliance with Paragraph 112:

Paragraph 112 stipulates:

**"The Advisory Committee shall include representation from APD command staff, crisis intervention certified responders, Crisis Intervention Unit (CIU), Crisis Outreach and Support Team (COAST), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups."**

### Methodology:

We reviewed a 100% sample of MHRAC's reports, recommendations, communications, and processes.  Data sources considered: MHRAC meeting sign-in sheets for all monthly meetings.

### Results

All specified groups named in this paragraph regularly participated in MHRAC meetings during this reporting period, and minutes reflected well-structured treatments of agenda items designed to facilitate the goals of MHRAC.

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.100 Assessing Compliance with Paragraph 113

Paragraph 113 stipulates:

---

[183] APD currently is consulting with MHRAC and receiving MHRAC feedback.  At times the *process* is confusing or provides less than ample time for MHRAC to carefully assess proposed policies and processes prior to existing deadlines. During this reporting period, however, the MHRAC and APD agreed on a schedule for reviewing APD crisis- and mental health-related curricula on a regular, rotating basis.

**"The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event."**

## Methodology

Members of the monitoring team reviewed a 100% sample of MHRAC's reports, recommendations, communications, and processes, and conducted interviews with specific members of the MHRAC. In addition, we reviewed MHRAC monthly meeting agendas and minutes, and MHRAC subcommittee meeting minutes and memos.

## Results

The MHRAC continued to provide guidance to the City and APD regarding developing and expanding the number of CIT-certified responders as well as response strategies for interacting effectively with homeless individuals and people with mental illness. During this reporting period, the MHRAC considered and provided feedback on the APD's developing mobile crisis teams.  APD currently is consulting with MHRAC and receiving MHRAC feedback.  At times the *process* is confusing or provides less than ample time for MHRAC to carefully assess proposed policies and processes prior to existing deadlines. During this reporting period, however, the MHRAC and APD agreed on a schedule for reviewing APD crisis- and mental health-related curricula on a regular, rotating basis.  We will re-evaluate operational compliance for this topic in IMR-7.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not In Compliance**[184]

***Recommendation 4.7.100:  Assess MHRAC-APD information interfaces to identify ways of increasing lead times presented to MHRAC from APD related to issue review and consideration and development of recommendations.***

---

[184] APD is currently consulting with MHRAC and receiving MHRAC feedback.  According to MHRAC members, at times the *process* is confusing and, more importantly, tends to provide less than ample time for MHRAC to carefully assess proposed policies and processes prior to existing deadlines.

### 4.7.101 Assessing Compliance with Paragraph 114:

Paragraph 114 stipulates:

**"APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality."**

### Methodology

Members of the monitoring team reviewed a 100% sample of MHRAC's reports, recommendations, communications, and processes during the reporting period, assessing these documents for compliance with Paragraph 114.  The monitoring team also reviewed several draft versions of the MOU with mark-ups (tracked changes in Word). No MOU was signed nor executed during this reporting period.

### Results

Negotiations between the City of Albuquerque and the University of New Mexico Health System are on-going with regard to executing an MOU that governs the release and exchange of information; however, an MOU has not been executed during this reporting period.

> Primary:       **Not In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.101:  Complete MOU as planned, and implement provisions.***

### 4.7.102 Assessing Compliance with Paragraph 115

Paragraph 115 stipulates:

**"Within nine months of the Effective Dates, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also, within nine months of the Effective Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario-based training involving typical situations that occur when mental illness is a factor.**

**Methodology**

Members of the monitoring team reviewed a 100% sample of data provided to MHRAC by APD relating to provisions of Paragraph 115, including data analysis prepared by Dr. Winograd in the form of PowerPoint slides and a verbal presentation, and MHRAC and subcommittee meeting agendas and minutes.

**Results**

APD continued to work with staff to produce meaningful data analysis of the elements specified in paragraphs 129 and 137. APD has presented this data regularly to the MHRAC. The monitoring team has not yet been able to confirm that all behavioral health curricula is available to and being reviewed by the MHRAC, though APD and the MHRAC did agree to a schedule of review during this reporting period.  Operational compliance is pending submission by APD to the monitoring team of documentation verifying submission and review of all behavioral health curricula.

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **Not in Compliance**

***Recommendation 4.7.102:  Submit required COB documentation to MHRAC as well as documentation from MHRAC noting review and approval.  Ensure that documentation is responsive to relationship building and scenario-based training.***

**4.7.103 Assessing Compliance with Paragraph 116**

Paragraph 116 stipulates:

**"The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services."**

**Methodology**

Members of the monitoring team conducted a 100% sample of data provided to MHRAC by APD relating to enhancing coordination within and among MHRAC's service base, through a complete review of MHRAC meeting minutes.

**Results**

The MHRAC continued their work to enhance coordination of services for chronically homeless individuals and people experiencing mental health crisis. APD and the MHRAC revisited and updated their list of Albuquerque-area providers and list of services during the last reporting period (publication/printing date 1/20/17).

The monitoring team's review shows a substantial and tangible of interaction and cooperation between local behavioral health systems and the APD on this issue, as well as tangible results in systems improvement recommendations.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.104 Assessing Compliance with Paragraph 117

Paragraph 117 stipulates:

> **"Within 12 months of the Effective Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources."**

### Methodology

Members of the monitoring team conducted a 100 % review of data provided to MHRAC by APD, and reviewed the Advisory Committee's public report.

### Results

The MHRAC produced Annual Reports in 2016 and 2017, which also include annual reports from the Training, Information Sharing and Resource subcommittees. As of the writing of this report, the 2016 MHRAC annual report(s) were available on the City's website, but the 2017 reports were not available.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.104:  Ensure MHRAC reports are posted on relevant CABQ websites.***

### 4.7.105 Assessing Compliance with Paragraph 118 Behavioral Health Training

Paragraph 118 stipulates:

**"APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment."**

No evaluation methodology was developed for paragraph 118, as it is not a "requirement" for APD or City action, but simply states facts.

### 4.7.106 Assessing Compliance with Paragraph 119 Behavioral Health Training for all Cadets

Paragraph 119 stipulates:

**"APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by the end of 2015."**

**Methodology**

Members of the monitoring team reviewed a 100% sample of training records of APD relating to basic behavioral health training.

APD continues to provide state-mandated basic behavioral health training to cadets in the academy as well as 40 hours of basic CIT to academy graduates upon completion of the field training program and to all field officers, certifying 27 officers in their March 2017 class, for example.

**Results**

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.107 Assessing Compliance with Paragraph 120

Paragraph 120 stipulates:

**"The behavioral health and crisis intervention training provided to all officers will continue to address field assessment and identification, suicide intervention, crisis de-escalation, scenario-**

261

**based exercises, and community mental health resources. APD training shall include interaction with individuals with a mental illness and coordination with advocacy groups that protect the rights of individuals with disabilities or those who are chronically homeless. Additionally, the behavioral health and crisis intervention training will provide clear guidance as to when an officer may detain an individual solely because of his or her crisis and refer them for further services when needed."**

## Methodology

Members of the monitoring team reviewed a 100% sample of APD training records relating to basic behavioral health training. APD continues to utilize a training curriculum that addresses field assessment, identification, suicide intervention, crisis de-escalation, community mental health participation and scenario-based exercises and role play exercises appropriately and effectively. All training emphasizes the importance of community partnerships and appropriate referrals to services.

Data sources reviewed included:  APD CIU Monthly Reports; 40-hour CIT curriculum updates to PowerPoints, and meeting minutes for meetings in which APD refined training plans with peers and mental health experts.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.108 Assessing Compliance with Paragraph 121

Paragraph 121 stipulates:

**"APD shall ensure that new tele-communicators receive 20 hours of behavioral health training. This training shall include: telephonic suicide intervention; crisis management and de-escalation; interactions with individuals with mental illness; descriptive information that should be gathered when tele-communicators suspect that a call involves someone with mental illness; the roles and functions of COAST, crisis intervention certified responders, and CIU; the types of calls that should be directed to particular officers or teams; and recording information in the dispatch database about calls in which mental illness may be a factor."**

262

**Methodology**

Members of the monitoring team reviewed a100% sample of training records of APD relating to basic behavioral health training for tele-communicators.

**Results**

APD has designed 20 hours of behavioral health training for tele-communicators that includes all topics noted in paragraph 121 as well as role-play scenarios drawn from actual 911 calls fielded by APD tele-communicator personnel. The training meets the requirements of this paragraph.  Tele-communicator training occurred on the following dates: 4/10/17, 4/12/17, 4/19/17, and 4/21/17.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.109 Assessing Compliance with Paragraph 122

Paragraph 122 stipulates:

**APD shall provide two hours of in-service training to all existing officers and tele-communicators on behavioral health-related topics biannually.**

**Methodology**

Members of the monitoring team reviewed a 100% sample of training records of APD relating to basic behavioral health training for officers and tele-communicators.

**Results**

APD has developed a 2-hour in-service training curriculum that addresses the requirements of New Mexico House Bill 93, entitled "Police Training for Mental Impairments." It is unclear, based on the records we reviewed whether any two-hour bi-annual training sessions for either officers or tele-communicators took place during this reporting period, and if so, what the results were on testing on that training. The next "biannual training" is scheduled for August 2017, outside of this reporting period.  APD remains in compliance based on past performance in the first session of scheduled bi-annual training.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.110 Assessing Compliance with Paragraph 123 Crisis Intervention Certified Responders and Crisis Intervention Unit

Paragraph 123 stipulates:

**"APD shall maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis. APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives housed at the Family Advocacy Center whose primary responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future. APD agrees to expand both the number of crisis intervention certified responders and CIU."**

### Methodology

Members of the monitoring team reviewed training and assignment records for CIU officers for the reporting period.  According to course rosters, the APD CIU trained a total of 43 officers in e-CIT during this monitoring period, making them "certified responders" per this paragraph. As of the end of this reporting period, a total of 114 APD officers have completed the eCIT training and certification process. Members of the monitoring team also reviewed eCIT training in-service course sign-in sheets and eCIT training spreadsheets.

The APD maintains a Crisis Intervention Unit staffed with detectives housed at the Family Advocacy Center, with a total of ten sworn officers in the CIU during this reporting period, short of the 12 recommended in the "Albuquerque Police Department Comprehensive Staffing Assessment and Resources Study" conducted by Alexander Weiss Consulting, LLC (Final Draft Report, December 11, 2015).

We remain unaware of any specific methodology developed by APD to determine the department's definition of the "sufficient number" of crisis-intervention certified responders. The monitoring team's assessment is that staffing remains insufficient, based on the requirement that staffing for the advocacy center is below that articulated in the CASA.

264

**Results**

> Primary:      **Not In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.110a:  Develop and execute a data-based, methodologically appropriate workload and manpower planning analysis that ensures that reliable "staffing levels" for eCIT officers are calculated, reported, set as staffing goals, and attained.***

### 4.7.111 Assessing Compliance with Paragraph 124

Paragraph 124 stipulates:

**The number of crisis intervention certified responders will be driven by the demand for crisis intervention services, with an initial goal of 40% of Field Services officers who volunteer to take on specialized crisis intervention duties in the field. Within one year of the Effective Date, APD shall reassess the number of crisis intervention certified responders, following the staffing assessment and resource study required by Paragraph 204 of this Agreement.**

### Methodology

Members of the monitoring team reviewed related areas of the staffing plan produced by APD in response to this paragraph.

### Results

The current staffing levels of crisis intervention "certified responders" (a total of 114) falls short of the goal of 40% of field services officers.

> Primary:      **In Compliance**
> Secondary:   **Not in Compliance**
> Operational: **Not in Compliance**

***Recommendation 4.7.111:  Implement the recruitment, training and deployment plan for "Certified responders" that meets the articulated goal of 40 of Field Services Officers.***

### 4.7.112 Assessing Compliance with Paragraph 125

Paragraph 125 stipulates:

**"During basic crisis intervention training for field officers provided to new and current officers, training facilitators shall recommend officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals with mental illness to serve as crisis intervention certified responders."**

## Methodology

Members of the monitoring team reviewed recommendations obtained and assessed by training facilitators during the fifth reporting period.

## Results

The APD CIU instructors appear to identify and recommend field officers well suited for the Enhanced CIT (eCIT) course and recommend that they enroll. Unfortunately, compliance evidence provided by APD for this paragraph was not "Course of Business" data, e.g., copies of names of officers attending and scores on examinations, but was a "eCIT Recruitment Plan" (dated July 31, 2017). APD should submit "Course of Business" records, as requested by the monitoring team.

      Primary:      **In Compliance**
      Secondary:  **In Compliance**
      Operational: **Not In Compliance**[185]

***Recommendation 4.7.112a:  Submit COB training documentation for this particular training, e.g., routinely kept class rosters, exam scores, etc.***

### 4.7.113 Assessing Compliance with Paragraph 126

Paragraph 126 stipulates:

**"Within 18 months of the Effective Date, APD shall require crisis intervention certified responders and CIU to undergo at least eight hours of in-service crisis intervention training biannually."**

## Methodology

Members of the monitoring team reviewed training records for CIU personnel.

## Results

The CIU did not provide documentation supporting delivery of the 8-hour in-service "refresher" training during this reporting period.

---

[185] As we have advised APD repeatedly, course of business documentation must consist of normal course-of-business documents showing performance related to the paragraph, not an *ad hoc* memorandum stating something was done.

Primary:      **Not In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.113:  Submit training documentation for this particular training, e.g., routinely kept class rosters, exams, exam scores, etc.***

### 4.7.114 Assessing Compliance with Paragraph 127

Paragraph 127 stipulates:

**"Within 18 months of the Effective Date, APD will ensure that there is sufficient coverage of crisis intervention certified responders to maximize the availability of specialized responses to incidents and calls for service involving individuals in mental health crisis; and warrant service, tactical deployments, and welfare checks involving individuals with known mental illness."**

### Methodology

During this reporting period, APD CIU continued to deliver Enhanced CIT (eCIT) training to address the requirement for "certified responders." Response times to crisis calls will be calculated after training of new "certified responders" is completed.

### Results

SOP 2-19, entitled "Response to Behavioral Health Issues" was not updated during this reporting period; the most recent version is marked "Effective: 11/01/16 Expires: 11/01/17 Replaces: 06/07/16." The SOP language remains unchanged, clearly stating: "ECIT, MCT or CIU will take the lead in interacting with individuals in a behavioral health crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input from ECIT, MCT, or CIU on strategies for de-escalating, calming and resolving the crisis, when it is safe."  Since eCIT training is still in process, the secondary and operational elements of the policy are not in compliance. Review of critical CIU calls for process will begin after training of "certified responders" is completed.

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.114:  Complete eCIT training as designed, and evaluate performance via a reasonable testing procedure.***

267

### 4.7.115 Assessing Compliance with Paragraph 128

Paragraph 128 stipulates:

**APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so.**

### Methodology

Members of the monitoring team reviewed critical CIU calls for process, effectiveness and outcome.

### Results

SOP 2-19, entitled "Response to Behavioral Health Issues" was not updated during this reporting period; the most recent version is marked "Effective: 11/01/16 Expires: 11/01/17 Replaces: 06/07/16." The SOP language remains unchanged, clearly stating: "ECIT, MCT or CIU will take the lead in interacting with individuals in a behavioral health crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input from ECIT, MCT, or CIU on strategies for de-escalating, calming and resolving the crisis, when it is safe." Since eCIT training is still in process, the secondary and operational elements of the policy are not in compliance. Review of critical CIU calls for *process* will begin after training of "certified responders" is completed.

> Primary:       **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.115:  Establish a clear, meaningful protocol for CIU response; train that protocol; and supervise implementation.***

### 4.7.116 Assessing Compliance with Paragraph 129

Paragraph 129 stipulates:

**"APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
**a) date, shift, and area command of the incident;**
**b) subject's age, race/ethnicity, and gender;**

c) whether the subject was armed and the type of weapon;
d) whether the subject claims to be a U.S. military veteran;
e) name and badge number of crisis intervention certified
responder or CIU
detective on the scene;
f) whether a supervisor responded to the scene;
g) techniques or equipment used;
h) any injuries to officers, subjects, or others;
i) disposition of the encounter (e.g., arrest, citation, referral); and
j) a brief narrative of the event (if not included in any other
document)."

## Methodology

Members of the monitoring team reviewed APD's work product for this
paragraph. APD continues to regularly update its data analysis
workbook, and featured its data analysis relevant to this paragraph in a
presentation prepared for the 2017 CIT International Conference.  The
data analysis workbook provides analytics on the following: tracking the
number of CIT-related calls for service over time; analyzing uses of force
with people in CIU caseloads during encounters with field officers;
numbers of people contacted by COAST who claim to be veterans; and
monitoring the calls for service by time of day and day of week as well as
capturing the data elements required by this paragraph. This paragraph
will not be in operational compliance until APD clarifies how it is using
these data for "management purposes" pursuant to this paragraph.

### Results

    Primary:    **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

***Recommendation 4.7.116:  Develop, initiate, and describe the
results of APD's methodologies that use the results of data
collected for this paragraph for "management purposes," i.e.,
planning, organizing, staffing, directing, controlling, reporting and
budgeting for the CIT and COAST workload, service delivery
processes, and outcomes.***

### 4.7.117 Assessing Compliance with Paragraph 130

Paragraph 130 stipulates:

**"APD will utilize incident information from actual encounters to
develop case studies and teaching scenarios for roll-call,
behavioral health, and crisis intervention training; to recognize and
highlight successful individual officer performance; to develop
new response strategies for repeat calls for service; to identify
training needs for in-service behavioral health or crisis**

**intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis."**

## Methodology

Members of the monitoring team reviewed APD work product responsive to this paragraph, noting compliance or non-compliance issues during the review.

## Results

APD CIU continues to develop case studies based on actual encounters and incorporate them into training courses. During this reporting period, case studies were developed for the tele-communicator training, based on actual call-taker recordings.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

## 4.7.118 Assessing Compliance with Paragraph 131

Paragraph 131 stipulates:

**Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services.**

## Methodology

Members of the monitoring team reviewed the work product of the Advisory Committee and city personnel responsive to this paragraph. Procedural Order 2-20, "Hostage, Suicidal/Barricaded Subject, and Tactical Threat Assessment," was not updated during this reporting period. The most recent version is marked "Effective: 05/27/16 Expires: 11/23/16 Replaces: 04/25/16." The policy addresses: assessment of need for tactical response; ensuring backup officers are present; dispatch of the on-duty field supervisor; MCT or eCIT will take the lead on interactions; obtaining information from family and friends; responding to the scene; communicating by emphasizing de-escalation; disengagement procedures; tactical threat assessment; and the use of tactical units. This paragraph is not in compliance until it is revised or simply re-issued with a current "Expires" date.

**Results**

Primary:       **Not In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.118a:  The current policy guiding this paragraph is expired.  Change existing policy as appropriate, and promulgate the new policy.***

***Recommendation 4.7.118b:  Revise training and training evaluation protocols to reflect the new policy developed as per 4.7.118a, above.***

## 4.7.119 Assessing Compliance with Paragraph 132 Crisis Prevention

Paragraph 132 stipulates:

**APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers.**

### Methodology

Members of the monitoring team reviewed critical CIU/COAST calls for process and referrals, if any. Throughout this reporting period, the monitoring team held monthly teleconferences with the APD CIU and COAST personnel. Those conversations, along with CIU Monthly Reports indicate that APD continues to maintain regular contact with individuals known to them and work with them to connect them to services.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.120 Assessing Compliance with Paragraph 133

Paragraph 133 stipulates:

**COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at**

**risk of experiencing a mental health crisis and assist with follow-up calls or visits.**

## Methodology

Members of the monitoring team reviewed critical CIU/COAST calls for process and referral.

## Results

APD continues to manage its caseload through CIU and COAST with consistent outreach to individuals with a known mental illness, as detailed case-by-case in the monthly CIU/COAST reports. The monitoring team has reviewed the primary avenue the MHRAC and the APD are using to connect chronically homeless individuals and individuals in crisis with services--a small tri-fold resource card on which organization names and telephone numbers appear.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.121 Assessing Compliance with Paragraph 134

Paragraph 134 stipulates:

**APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options.**

## Methodology

Members of the monitoring team reviewed all known critical CIU/COAST calls for process and referral.

## Results

SOP 2-19 contains specific language to address these protocols: "B. Officers will complete an original incident report where required (e.g. there are charges filed, a CIU referral, or transport to the hospital). Regardless of whether an incident report is required, officers will complete a CIT contact sheet for any dispatch in which the subject's behavior indicates a behavioral health disorder or behavioral health crisis."  Review of in-field practice shows that this guidance is followed by responding CIT officers.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.122 Assessing Compliance with Paragraph 135

Paragraph 135 stipulates:

**"APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement. Within three months of completing the staffing assessment and resource study required by Paragraph 204 of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less."**

### Methodology

Members of the monitoring team reviewed critical CIU/COAST calls for process and referral to identify any "unacceptable" delays.  Call For Service data and correlating or related reports were also reviewed.

### Results

According to the CIU/COAST monthly "highlights" reports for this reporting period, there were a total of 10 sworn members of the CIU. Staffing requirements for this unit are not being realized. The unit is still short of required staffing.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.122a:  Upgrade CIU/COAST to the required staffing levels.***

### 4.7.123 Assessing Compliance with Paragraph 136

Paragraph 136 stipulates:

**"COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources**."

### Methodology

Members of the monitoring team, through conversations with CIU personnel and members of the MHRAC and review of meeting minutes, observed that communication and coordination is taking place, focused on improving outreach, service delivery, crisis prevention and referrals.

273

APD's COAST is developing ongoing outreach initiatives that aim to connect people to services. Beginning in March 2017 (and continuing throughout this monitoring period), COAST has held "strategic outreach" sessions in various district substations on a weekly basis during which crisis specialists are available to listen and make connections to community health resources and social services.

**Results**

Based on data provided by APD it appears that documentation does not exit for tracking incident reports completed by COAST and CIU to identify and address indicators of recurring issues and problems confronted by COAST and CIU.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

*Recommendation 4.7.123a:  APD should ensure that COAST and CIU personnel track incident reports involving their personnel for indications of recurring issues and problems that may be addressed by referral of clients to community health resources.*

*Recommendation 4.7.123b:  Once these opportunities are identified, train COAST and CIU personnel to implement, where appropriate referrals to outreach, service delivery, crisis prevention, and referrals to community health resources.*

**4.7.124 Assessing Compliance with Paragraph 137**

Paragraph 137 stipulates:

**"APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
**a) number of individuals in the COAST and CIU caseloads;**
**b) number of individuals receiving crisis prevention services;**
**c) date, shift, and area command of incidents or follow up encounters;**
**d) subject's age, race/ethnicity, and gender;**
**e) whether the subject claims to be a U.S. military veteran;**
**f) techniques or equipment used;**
**g) any injuries to officers, subjects, or others;**
**h) disposition of the encounter (e.g., arrest, citation, referral); and**
**i) a brief narrative of the event (if not included in any other document)."**

**Methodology**

Members of the monitoring team review each reporting period the steps taken as a result of review of data collected.

**Results**

Data is being collected and analyzed by CIU and COAST units (see findings in paragraph 129); however, we have found no specific indicators that data is collected or analyzed on the *topics* required by this paragraph.  Analytics are, however, informing changes to crisis prevention services.

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

*Recommendation 4.7.137a:  Collect, analyze and interpret the data elements above on a routine basis, and produce reports circulated to CIU and COAST personnel, through the chain of command, and eventually to the public via APD's web-site.*

*Recommendation 4.7.137b:  Memorialize these processes in policy and training.*

**4.7.125 Assessing Compliance with Paragraph 139[186]**

Paragraph 139 stipulates that:

**"APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices. APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically. "**

**Results**

We note above, in Paragraph 40, the issue of "De Minimis" force, and its potential impact on development and implementation of adequate policy related to use of force.  Again, we remind the reader that this concept was introduced without consultation with the monitor, and was contained only in the "definitions" section of the use of force policy.  We express serious concern about the impact the untrained "policy definition" will have on compliance efforts and status.  We are not convinced that the training offered, to date, which was not based on clear explanations of

---

[186] Paragraph 138 is judged to be prefatory to the following section on training, and as such established goals, but not quantifiable objectives.  These are dealt with in paragraphs 139-148.

the concept was organized or delivered in a manner that will engender compliance.

Primary:        **In Compliance**
Secondary:   **Not in Compliance**
Operational: **Not in Compliance**

***Recommendation 4.7.126:  Plan, organize, staff, and deliver training conforming to national practice related to the concept of De Minimis force, and its application in the field by APD officers.***

### 4.7.126 Assessing Compliance with Paragraph 140

Paragraph 140 stipulates:

**"APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference. APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format."**

### Results

APD has renumbered its policy manual, and produced new documentation of same.  Issuance of a new concept regarding use of force (*De Minimis* force) through use of the "definitions" section, without specific policy and training guidance, has introduced an extreme complication to APD's policy mechanism, given the lack of guidance on the concept in policy and training.  We will continue to monitor this issue in coming monitoring periods.

Primary:        **In Compliance**
Secondary:   **Not in Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.126a:  Develop approvable policy guidance on the concept of De Minimis force and its "fit" into existing policy.***

***Recommendation 4.7.126b:  Train all applicable personnel (officers, supervisors, command) on the new policy.***

***Recommendation 4.7.126b:  Assess impact of policy and training on service delivery related to De Minimis force.***

### 4.7.127 Assessing Compliance with Paragraph 141

Paragraph 141 stipulates:

**"Within three months of the Effective Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures."**

APD has made substantive changes to its policy development, review and comment on new and revised policy with the advent of the Office of Policy Analysis (OPA).  Current structure exists to allow substantive comment from line and staff officers to policy proposals.

## Results

Representatives of the APOA have access to every meeting held by the monitor to discuss relative policy changes and provisions.  We are concerned with APD's introduction of new and critical policy components that are dealt with only by "definitions," without articulation, explication, or setting of performance criteria.  We will continue to monitor this process in future monitoring reports.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

## 4.7.128 Assessing Compliance with Paragraph 142

Paragraph 142 stipulates:

**"Within three months of the Effective Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities. The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014)."**

## Methodology

The monitoring team review almost monthly output from the PPRB.  Notices of PPRB-related activity is posted almost weekly on APD's website and intranet, and PPRB appears to be functioning as required by this paragraph, including membership of a representative of the Technical Services Division.  We note that PPRB approved the "De Minimis" force issue about which we have expressed serious concern regarding the ability to implement, supervise, and correct problematic behaviors related to same.  We will continue to monitor this process for implementation issues beyond the mere issue of policy.

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.129 Assessing Compliance with Paragraph 143

Paragraph 143 stipulates:

**Within nine months of the Effective Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement. The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division.**

### Methodology

The monitoring team review almost monthly output from the PPRB. Notices of PPRB-related activity is posted almost weekly on APD's website and intranet, and PPRB appears to be functioning as required by this paragraph, including membership of a representative of the Technical Services Division.  We note that PPRB approved the "De Minimis" force issue about which we have expressed serious concern regarding the ability to implement, supervise, and correct problematic behaviors related to same.  We will continue to monitor this process for implementation issues beyond the mere issue of policy.  In the interim, APD remains in compliance with this task; however, we are concerned that PPRB did not see issues with "policy by definition."

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.130 Assessing Compliance with Paragraph 144

Paragraph 144 stipulates:

**"Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Effective Date. APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility. There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations."**

278

**Methodology**

The work required here was not completed within the timeline established by the CASA; however, all required initial policy work has been completed and approved by the monitor.   Many policies are cycling into their required review and revise periods.  We will continue to monitor closely APD's recent process of developing policy by "definition."

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

**4.7.131 Assessing Compliance with Paragraph 145**

Paragraph 145 stipulates:

**"The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law. The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews."**

**Methodology**

The monitoring team remains closely involved with the review and approval of APD's proffered policies.  Past issues noted with re-approval of critical policies such as Use of Force, Early Intervention Systems, and OBRD (body cams) were significant and meaningful; however, based on the monitor's knowledge and experience, none of these problems related to or are caused by PPRB processes, but instead revolve around an apparent shift in responsiveness to comments made by the monitoring team relevant to the high-risk, critical-task policies noted above. Of late, the DOJ and the monitor have had substantive, direct, and strong disagreements with APD over required six-month review and approval of existing policies, such as OBRD, EIRS, and Use of Force policies. These critical policies, as of the end of this monitoring period, remained in limbo, with the APD exhibiting reluctance to revise them, as suggested by DOJ and the monitor, to improve provisions of critical policies such as Use of Force, EIRS, and OBRD[187].   The required review and approval of these policies at their six-month point has not yet been completed as of

---

[187] Again, APD suspended eight "special orders" via Special Order 17-56 (Amended), on July 5, 2017, including the OBRD Special order.  As we have noted elsewhere, not all units and sworn employees were aware of this special order, based on our on-site observations for this report.

the end of this reporting period, and these critical policies are in limbo[188]. We note that critical policies, such as "Hostage, Suicidal, and Barricaded Suspects," On Body Recording Devices, Emergency Response Team, EIRS, and First Amendment Assemblies that are pending monitor review were submitted to the monitor in late August for review and approval. As of the date of the draft report, not all of these policies had been approved. Approved policy on On Body Recording Devices, Early Intervention Reporting Systems, was effectuated in October 2017, outside the dates for this reporting period.

**Results**

      Primary:      **In Compliance**
      Secondary:  **In Compliance**
      Operational: **Not In Compliance**

***Recommendation 4.7.131a:  Expedite policy review and revision policies and practices to ensure that current, reliable, and workable policies are in place to guide the actions of APD officers***

***Recommendation 4.7.131b:  Focus first on high-risk/critical task policies such as Use of Force, EIRS, and OBRD.***

***Recommendation 4.7.131c:  Where possible, adapt approved similar policies from other law enforcement agencies currently working through consent decrees, i.e., Seattle PD and New Orleans PD.***

***Recommendation 4.7.131d:  Ensure that termination of all residual Special Orders are effectively communicated to all field operations personnel, including supervisors and command-level personnel.***

### 4.7.132 Assessing Compliance with Paragraph 146

Paragraph 146 stipulates:

**"APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure. "**

### Methodology

We noted in IMR-5 that:

---

[188] APD submitted approvable OBRD, EIRS, and Use of Force policies in October, 2017, three months after the close of this reporting period.

"The monitoring team is closely involved with inputs and outputs from APD's policy apparatus, e.g., the Force Review Board, CIRT, Internal Affairs, PPRB, etc.  As noted in our treatment of several CASA paragraphs in this document, we are beginning to see issues related directly to Paragraph 146 in the oversight, discipline, and related follow-up practices at APD.  New procedures are becoming more difficult to negotiate to the point that they remain in compliance with the CASA, and supervisory and managerial response to the requirements of certain policies are starting to show salient and substantive issues with accountability and uniformity.  These issues are discussed more fully in paragraphs (4.72 Use of Force; 4.7.6 and 4.7.8 Show of Force, 4.7.9 Firing at motor vehicle, 4.7.10 EIRS etc.) elsewhere in this report.  We have noted since IMR-2 sporadic issues with accountability, and those issues seem to have become more frequent of late.  For example, FRB operations often stray substantively from existing policy in terms of their review outcomes and findings.  We have highlighted in IMR-2, IMR-3, IMR-4 and a special report on use of force, issues with policy violations, often serious and consequential, that have gone unaddressed by APD supervisory and command staff.  These issues, accompanied by APD's new-found resistance to effective revisions in Use of Force, Early Intervention, and On-Body Recording Device policies cause great concern to the monitoring team relative to the "accountability" provision of this paragraph."

During IMR-6's reporting period, APD still had not been successful in writing Use of Force and OBRD policies that could be approved by the monitor.  We continue to see potential issues with the submitted policy regarding use of force (see our comments above on *De Minimis* force), and note that the OBRD policy last proffered by APD finally approved after substantial monitor requested revisions in terms of review periods, notice to the monitor of changes, etc.  We find, in our experience, that policies that are not clear are often difficult to apply properly, impossible to supervise, and lead to sometimes serious problems.[189]

We do note that APD, after the close of IMR-6's reporting period was able to write and achieve approval of OBRD and Use of Force policies

**Results**

> Primary:        **In Compliance**
> Secondary:   **Not in Compliance**
> Operational:  **Not in Compliance**

### 4.7.133 Assessing Compliance with Paragraph 147

---

[189] Since the close of this reporting period, APD has resubmitted these policies, and they were approvalble (and approved) by the monitor and DOJ.

Paragraph 147 stipulates

**"APD shall submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ for review and comment before publication and implementation."**

## Methodology

During the IMR-5 reporting period, we found APD had promulgated several "Special Orders" that addressed critical CASA-related processes. These included special orders related to relating to shows of force, pointing a firearm, and OBRD operations, and other special orders that directly modify the CASA. Some of these Special Orders directly affected critical elements of the CASA, and were in direct contradistinction to approved elements of the CASA.

## Results

The monitoring team has asked for copies, and finally received a submission of all special orders written by APD focused on CASA related practices. We are currently reviewing those for potential impacts on CASA implementation. We will hold this paragraph's compliance findings until we finish a complete review of submitted "Special Orders" issued by APD. That process will be completed in time for inclusion in IMR-7, or, alternatively in a Special Report to the Court. We view this use of Special Orders by APD, especially when the "special orders" contradict or suspend monitor-approved policy, to be extremely problematic. As a result, we have asked APD to copy the monitor on all proposed Special Orders, and after the close of this reporting period have been provided policy revisions on these critical policies that were approvable, and thus approved.

> Primary: **In Compliance**
> Secondary: **Not in Compliance**
> Operational: **Not in Compliance**

**Recommendation 4.7.133a: APD should conduct an agency-wide review of all "special orders," and ensure they are CASA compliant.**

**Recommendation 4.7.133b: The reuslt of that review should be provided to the Parties and the monitor.**

**Recommendation 4.7.133c: All future "Special Orders" related in any way to the CASA should be provided to the Parties and the monitor contemporaneously with publication.**

### 4.7.134 Assessing Compliance with Paragraph 148

Paragraph 148 stipulates:

**"APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions. If, after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection. If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter. The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies. Factors to consider in making this determination include: 1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor. In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review. Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion."**

#### Methodology

We encountered several policies about which the monitor and APD could not come to agreement this reporting period.  These policies were Use of Force, OBRDs, and EIRS, some of the more critical APD policies related to the CASA.  After intense consultation and revision regarding these policies we were offered versions that we could approve, but only after the close of this reporting period.

#### Results

      Primary:     **In Compliance**
      Secondary:   **In Compliance**
      Operational: **In Compliance**

### 4.7.13 Assessing Compliance with Paragraph 149

Paragraph 149 stipulates:

**"Within two months of the Effective Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement."**

**Methodology**

The monitoring reviewed records related to all new APD employees (if any during the reporting period IMR 6) to ensure that they are briefed and presented the terms of the agreement. The monitoring team reviews PowerDMS entries to ensure all personnel signoff as acknowledgement that the material was reviewed and received. The City remains in compliance with this paragraph based on earlier performance.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.136 Assessing Compliance with Paragraph 150

Paragraph 150 stipulates:

**"Within three months of issuing a policy or procedure pursuant to this Agreement, APD agrees to ensure that all relevant APD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations. APD agrees to document that each relevant APD officer or other employee has received and read the policy. Training beyond roll-call or similar training will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy."**

**Methodology**

The City remains in compliance with this paragraph based on earlier performance.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.137 Assessing Compliance with Paragraph 151

Paragraph 151 stipulates:

284

**Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Effective Date, and annually thereafter.  Within six months of the Effective Date, APD shall set out a schedule for delivering all training required by this Agreement.**

## Methodology

Members of the monitoring team reviewed training records responsive to this task earlier in the monitoring process, and found the City in compliance.

## Results

The City remains in compliance with this paragraph based on earlier performance and maintains a current training requirement schedule fulfilling the requirements of this paragraph.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.138 Assessing Compliance with Paragraph 152

Paragraph 152 stipulates:

**"APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty."**

## Methodology

The monitoring team requested from APD copies of COB documentation related to this paragraph. During this reporting period (February 2017 through July 2017) APD had no new lateral hires. In IMR-5 APD had lateral hires that were absent the "certification" proofs but did provide that documentation for those lateral hires during following reporting periods. The monitoring team will revisit this issue in IMR-7 should APD have new lateral hires.  APD is in compliance based on previous performance.

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.139 Assessing Compliance with Paragraph 153

Paragraph 153 stipulates:

**"APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records. APD shall also maintain complete and accurate records of any audit, review, assessment, or evaluation of the sufficiency or effectiveness of its training programs. APD shall make these records available for inspection by the Monitor and DOJ."**

### Methodology

Monitoring team requests for records responsive to Paragraph 153 produced ample evidence that "curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records" are being maintained. The material reviewed for this reporting period (February 2017 thru July 2017) included but were not limited to: BSS documents (Dispute Intervention and Conflict Management Lesson Plan, Handling of Mentally Ill Lesson Plan, Barricaded Person and Hostage Situations Lesson Plan); and Firearms Qualifications conducted on June 14th, 2017 during the monitoring team site visit and attended by the monitoring team; Remedial Firearms Training documentation, and use of force training); and APD 118th Cadet Class Schedule. APD continues to maintain compliance by making records available for inspection by the monitoring team.

### Results

       Primary:     **In Compliance**
       Secondary:  **In Compliance**
       Operational: **In Compliance**

### 4.7.140 Assessing Compliance with Paragraph 154

Paragraph 154 stipulates:

**"APD shall ensure that changes in relevant case law and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and pre- service training."**

### Methodology

During the monitoring time frame for this paragraph, (February 1, 2017 thru July 31, 2017) the monitoring team found one change in case law (Department Special Order 17-53, Subject: Court Order in McClendon

and Arrest Procedures) that affected APD. The Advanced Training Unit tasked with this paragraph reviewed the material and entered the changes into PDMS for department wide dissemination as per the requirements of the agreement. The monitoring team reviewed PDMS entries to ensure all personnel sign off as acknowledgement that the material was reviewed and received. In addition to this case APD supplied (Department Special Order 16-51, Subject: *Birchfield v. North Dakota and Blood Draws*) that affected APD. This change in case law occurred during IMR-5 and was supplied to the monitoring team during the June 2017 site visit. The Advance Training Unit reviewed the material and entered the changes into PDMS for department wide dissemination as per the requirements of this paragraph.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.141 Assessing Compliance with Paragraph 155

Paragraph 155 stipulates:

**"APD shall supervise and manage its field-training program to ensure that new officers develop the necessary technical and practical skills required to use force in accordance with APD policy and applicable law. The field-training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community. Field Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics."**

### Methodology

During the monitoring site visit, members of the monitoring team met with the APD Training Academy personnel responsible for the Field Training and Evaluation Program (FTEP), as per S.O.P. 6-1 Training Division (dated June 14, 2016). APD, as reflected in paragraphs 156 through 161 has maintained compliance with the requirements of this paragraph. No known changes to case law, core principles, values or expectations were initiated this reporting period. The Academy has submitted revisions to the FTEP and currently is in the chain of command awaiting approval.

### Results

APD remains in compliance with the requirements of this paragraph based on current and past performance.

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.142 Assessing Compliance with Paragraph 156

Paragraph 156 stipulates:

**"APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field-training program early."**

### Methodology

The monitoring team reviewed records for officers undergoing FTO training and found 100 percent compliance for the requirements of this paragraph among that group of individuals. Special Orders 17-21 and 17-28 were the final phases for the 116th Cadet Class and Special Orders 17-31 and 17-38 are the 117th class, currently in the program and scheduled to finish training during IMR-7. The results of that class will be reviewed during that reporting period.

### Results

APD remains in compliance with the requirements of this paragraph, based on our review of existing course-of-business records.  Table 4.7.142 depicts the monitoring team's review of APD training records for the latest APD recruit class.

**Table 4.7.142**

| Item No. | A. APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy | B. Recruits will not be released from the field-training program early | # in-compli-ance | % in Compli-ance |
|---|---|---|---|---|
| OJT Matrix 2017 | 1 | 1 | 2 | 100 |
| Special Order Phase Final Phase and Ext 17-21 | 1 | 1 | 2 | 100 |
| Special Order Phase Final Phase and Ext 17-28 | 1 | 1 | 2 | 100 |
| Special Order Phase 1 17-31 | 1 | 1 | 2 | 100 |
| Special Order Phase 2 17-38 | 1 | 1 | 2 | 100 |
| Special Order Phase 3 | N/A | N/A | N/A | N/A |
| Special Order Phase 4 | N/A | N/A | N/A | N/A |
| **Number in Compliance Total all Incidents** | 5 | 5 | 5 | 100 |
| **% in Compliance Total by Category** | **100** | **100** | | **100** |

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.143 Assessing Compliance with Paragraph 157

Paragraph 157 stipulates:

**"APD shall revise the qualifications for Field Training Officers to require four years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism."**

## Methodology

During this reporting period (February 2017 through July 2017) there were no new Field Training Officers enrolled into the FTO program. All active APD personnel enrolled in the FTO program have been vetted by the APD, and have met the requirements for this paragraph in previous reporting periods. APD maintains compliance with this paragraph. The

monitoring team will continue to review additional members in future reporting periods to ensure the FTOs meet the requirements of this paragraph.

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.144 Assessing Compliance with Paragraph 158

Paragraph 158 stipulates:

**"New Field Training Officers and Area Sergeant Coordinators shall receive at least 40 hours of initial supervisory-level training and annual in-service training in the following areas: management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques. Field Training Officers and Area Sergeant Coordinators shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de-escalation techniques; and effective problem solving. APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators."**

### Methodology

During this reporting period (February 2017 thru July 2017) APD did not have any new FTOs enter the program. Members of the monitoring team reviewed records relating to this Paragraph for the information responsive to this Paragraph's requirements.  The results of this review are reported in Table 4.7.144.

**Table 4.7.144**

| Case No. | A. New FTOs and Area Sergeant Coordinators receive 40 hours of initial supervisory-level training and annual in-service training in the following required areas: | B. FTOs and Area Sergeant Coordinators shall maintain their proficiency in managing recruits and subordinates, practicing and teaching constitutional, community-oriented policing; de-escalation techniques; and problem-solving | C. APD shall maintain records of evaluations and training of FTOs and Area Sergeant Coordinators | # in-compli-ance | % in Compli-ance |
|---|---|---|---|---|---|
| FTO1 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO2 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO3 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO4 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO5 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO6 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO7 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO8 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO9 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO10 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO12 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO12 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO13 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO14 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO15 Training Records | N/A | 1 | 1 | 2 | 100 |
| FTO16 Training Records | N/A | 1 | 1 | 2 | 100 |
| ASGT1 Training Recs | N/A | 1 | 1 | 2 | 100 |
| ASGT2 Training Recs | N/A | 1 | 1 | 2 | 100 |
| ASGT3 Training Recs | N/A | 1 | 1 | 2 | 100 |
| **Compliance Total all Incidents** | **N/A** | **19** | **19** | **38** | |
| **% in Compliance Total by Category** | 100 | 100 | 100 | | 100 |

**Results**

Primary:       **In Compliance**
Secondary:     **In Compliance**
Operational:  **In Compliance**

### 4.7.145 Assessing Compliance with Paragraph 159

Paragraph 159 stipulates:

**"Recruits in the field-training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers."**

### Methodology

Members of the monitoring team reviewed Special Orders 17-21, 31, and 38, and sampled training records for field training recruits to assure policy and practice compliance with this paragraph.

### Results

Records of 30 recruits for the 116th Class, 22 recruits for the 117th Class indicate full compliance for this reporting period. These data are presented in Table 4.7.145, below.

### Table 4.7.145

| Item | A. Recruits in the field-training program shall be trained in multiple Area Commands | B. They shall be trained in multiple shifts | C. They shall be trained with several FTOs | # in-compliance | % in Compliance |
|---|---|---|---|---|---|
| FSB Special Order 17-21 | 1 | 1 | 1 | 3 | 100.0% |
| FSB Special Order 17-28 | 1 | 1 | 1 | 3 | 100.0% |
| FSB Special Order 17-31 | 1 | 1 | 1 | 3 | 100.0% |
| FSB Special Order 17-38 | 1 | 1 | 1 | 3 | 100.0% |
| **Number in Compliance Total all Incidents** | **4** | **4** | **4** | **15** | |
| **% in Compliance** | **100.0%** | **100.0%** | **100.0%** | | **100.0%** |

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.146 Assessing Compliance with Paragraph 160

Paragraph 160 stipulates:

**"APD shall provide a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the field-training program.  APD shall consider feedback and document its response, including the rationale behind any responsive action taken or decision to take no action."**

### Methodology

APD utilizes an anonymous survey process to comply with the requirements of this paragraph. The monitoring team reviewed the 116th Cadet Class evaluations dated 6-21-2017. The class consisted of 30 recruits, 30 responded to the survey.   Results of the monitor's analysis are presented in Table 4.7.146, below.

### Results

**Table 4.7.146**

| Case No. | A. APD I provide mechanism for confidential feedback regarding the quality of their field training | B.  extent to which their field training consistent with what they learned in the academy | C. Suggestions for changes training based upon experience in field-training | B. APD to consider feedback and response, including rationale behind action taken or decision to take no action | # in Compli-ance | % in Compli-ance |
|---|---|---|---|---|---|---|
| Survey for 116th Recruit Class | 1 | 1 | 1 | 1 | 4 | 100 |
| **# in Compliance Total all Incidents** | **1** | **1** | **1** | **1** | **4** | |
| **% in Compliance** | **100** | **100** | **100** | **100** | | **100** |

293

This survey is executed at the completion of the field training process, and has a high degree of participation by the recruits. During this reporting period the monitoring team paid particular attention the degree to which the Academy uses the input from this survey to improve delivery and effectiveness of Academy processes and to assess operational compliance. Multiple issues were raised in the survey that the Academy addressed and changes were implemented by APD based on those comments, and introduced to the 117th cadet class. The monitoring team will review future surveys to measure the results of such changes.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.147 Assessing Compliance with Paragraph 161

Paragraph 161 stipulates:

**"The City shall provide APD with the necessary support and resources to designate a sufficient number of Field Training Officers to meet the requirements of this Agreement."**

**Methodology**

The city of Albuquerque has an understanding with APD to supply necessary support and resources. The monitoring team continues to review all aspects of the program and, based on the documentation reviewed for this paragraph, have noted no deficiencies attributable to a shortage of staffing or support for the program. As of this reporting period there appears to be no significant backlog of required and timely reports and/or evaluations by FTOs of recruits, or other FTO-related documents, that would indicate understaffing for the FTO Program. The monitoring team will continue to assess this paragraph on future site visits and through data requests, as the monitoring project continues.

**Results**

Currently we note no indications that the requirements of this paragraph are being delayed or affected by staffing for this program at the academy.  The APD remains in compliance with this task.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.148 Compliance with Paragraph 162:  Accountability for Conduct

Paragraph 162 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system**."

### Methodology

The monitoring team view this paragraph as a policy statement, as opposed to a specific set of action-requirements, and thus no evaluation of this specific paragraph is necessary.  No compliance findings will be noted.  Implementation assessment is included in the paragraphs below.

### 4.7.149 Assessing Compliance with Paragraph 163:  Duty to Report Misconduct

Paragraph 163 stipulates:

**APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs "Bureau for review and investigation.  Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Bureau.  Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment."**

### Methodology

Members of the monitoring team found seven cases that had components of the requirements of this paragraph included in their "fact statements" available to the team.  We reviewed each of those seven cases for compliance with the requirements of this paragraph. Given the different ways misconduct comes to the attention of a supervisor and considering the fact that the reporting to IA is often times done in memorandum form, "immediately document and report" is interpreted in context of the case.  None of the referrals were "immediate" in the literal sense of the word, but all were adequate in the opinion of the monitor. The results of that review are reported, both numerically, and in written comments in Table 4.7.149.

**Table 4.7.149**

| Case No. | Requirement that officers and employees report misconduct | Supervisors immediately document and report alleged misconduct to IAB | Failure to report or document misconduct is grounds for discipline | # Compli-ant | % in Compli-ance by Case |
|---|---|---|---|---|---|
| **NA** | 1 | NA | 1 | 1 | 100 |
| IMR6-027 | NA | 1 | NA | 1 | 100 |
| IMR6-028 | NA | 1 | NA | 1 | 100 |
| IMR6-029 | NA | 1 | NA | 1 | 100 |
| IMR6-030 | NA | 1 | NA | 1 | 100 |
| IMR6-031 | NA | 1 | NA | 1 | 100 |
| IMR6-032 | NA | 1 | NA | 1 | 100 |
| IMR6-033 | NA | 1 | | | |
| **Number in Compliance Total all Incidents** | 1 | 7 | 1 | 9 | -- |
| **% in Compliance Total by Category** | 100 | 100 | 100 | 100 | 100 |

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.150 Assessing Compliance with Paragraph 164: Public Information on Civilian Complaints

Paragraph 164 stipulates:

**"Within six months of the Effective Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints."**

## Methodology

The monitor has reviewed the CPOA website, made visits to the CPOA office and IA office as well as City public buildings and places. The online complaint form makes clear that filing out the personal identifying information is optional, and the monitor notes that the Complaint and Commendation form, both hard copy and downloadable, English and

Spanish versions, have been modified to make clear that complaints can be made anonymously.

**Results**

It is now apparent that complaints and commendations can be filed anonymously. Although the one impediment to full compliance with this paragraph has now been removed, it would be even more clear if the monitor's previous recommendation regarding an icon for filing an anonymous complaint were followed.

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

**4.7.151 Assessing Compliance with Paragraph 165:  Availability of Complaint Forms**

Paragraph 165 stipulates:

**"APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall, public libraries, community centers, and the office of the Civilian Police Oversight Agency.  Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints.  Complaint forms, informational materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person.  Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above."**

**Methodology**

During the site visit for IMR-6, members of the monitoring team visited city properties, websites, and determined the availability of reporting "systems" (informational materials, brochures, posters, etc.).  We found all these to be "in place."  As noted above in paragraph 164, the online complaint form makes clear that filling out the personal identifying information is optional, and the monitor notes that the Complaint and Commendation form, both hard copy and downloadable, exist in both English and Spanish versions, and have been modified to make clear that complaints can be made anonymously. It is now apparent that complaints and commendations can be filed anonymously.

**Results**

APD has attained full compliance with this task.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.152 Assessing Compliance with Paragraph 166:  Public Information on Complaint Process

Paragraph 166 stipulates:

**"APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites.  The placard shall specify that complaints may be submitted anonymously or on behalf of another person.  APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles.  Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request.  If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint."**

### Methodology

During the site visit for the sixth reporting period, members of the monitoring team performed spot checks for compliance with Paragraph 166.  Further, based on our review of a stratified random sample of IA and CPOA investigations, we found no instances of allegations of refusal to provide name and badge numbers when requested.

### Results

Based on information reviewed by the monitoring team, all elements of this paragraph are in compliance.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.153 Assessing Compliance with Paragraph 167:  Duty to Accept Citizen Complaints

Paragraph 167 stipulates:

**"APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints.**"

### Methodology

As noted above in paragraph 164 and 165, it is now clear from revisions to the Complaint and Commendation form, as well as the City's website, that complaints can be filed anonymously. The monitoring team, in its review of IA and CPOA investigations in this monitoring period, as well prior reviews, has not identified any instances where APD has refused to accept complaints. The language on the complaint forms and instructions do not discourage the filing of complaints; however, we recommend that the language suggesting that a complainant "may be required" to appear at the CPOA or to provide other investigative assistance should be changed to "may be requested".

### Results

     Primary:     **In Compliance**
     Secondary:   **In Compliance**
     Operational:  **In Compliance**

### 4.7.154 Assessing Compliance with Paragraph 168:  Multi-Lingual Complaint Forms

Paragraph 168 stipulates:

**"Complaint forms and related informational materials shall be made available and posted in English and Spanish."**

### Methodology

The multi-lingual versions of APD's complaint forms are available in English and in Spanish on the APD and CPOA websites as well as hard copy versions in various locations. The website also provides for instruction in Spanish.

### Results

     Primary:     **In Compliance**
     Secondary:   **In Compliance**
     Operational:  **In Compliance**

### 4.7.155 Assessing Compliance with Paragraph 169:  Training on Complaint Intake

Paragraph 169 stipulates:

**"Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake**."

### Methodology

Consistent with prior performance, APD remains in compliance with this task.

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.156 Assessing Compliance with Paragraph 170:  Complaint Receipt Process

Paragraph 170 stipulates:

**"APD shall accept complaints regardless of when they are filed. The City shall encourage civilians to promptly report police misconduct so that full investigations can be made expeditiously and the full range of disciplinary and corrective action be made available."**

### Methodology

We have found no instances of APD not accepting complaints because of the length of time between incident and complaint. Timely complaints are encouraged, however untimely complaints are accepted.

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.157 Assessing Compliance with Paragraph 171:  Prohibition of Refusal to Take Complaint

Paragraph 171 stipulates:

300

**"The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint shall be grounds for discipline."**

## Methodology

We found no instances of APD or its employees refusing to accept a citizen complaint during this reporting period. It is well known policy among APD personnel that refusing to accept a complaint or the discouraging of a complaint are grounds for discipline.

### Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

## 4.7.158 Assessing Compliance with Paragraph 172:  Acceptance of Anonymous Complaints

Paragraph 172 stipulates:

**"APD and the Civilian Police Oversight Agency shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation.  Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail.  Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be provided with a complaint form in Spanish to ensure that the individual is able to make a complaint.  Such complaints will be investigated in accordance with this Agreement."**

## Methodology

The monitor met with IA and CPOA personnel and reviewed compliant log-in and classification information. Based on this and past reviews of a random sample of cases, we find that all misconduct complaints are accepted and investigated. As we have noted in Paragraphs 164-166, above, it is now clear that complaints can be made anonymously. Thus the APD and CPOA are now in compliance of this paragraph.

### Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.159 Assessing Compliance with Paragraph 173:  Inform Supervisors of Citizen Complaints

Paragraph 173 stipulates:

**"All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint.  All misconduct complaints shall be submitted to the Internal Affairs Bureau by the end of the shift following the shift in which it was received.**"

### Methodology

Members of the monitoring reviewed available completed cases for compliance to this paragraph.

### Results

We reviewed a total of 16 APD/CPOA cases available to the monitoring team this reporting period, and seven involved referrals to IA by supervisors.  Of those seven, all involved situations where referrals to IAB came from supervisory reviews. None involved situations where APD personnel received a complaint from a third party and then informed or failed to inform a supervisor within the appropriate time limitation. Thus, in light of APD's prior operational non-compliance, the monitor will rate this paragraph as operationally unobservable for this monitoring period.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **Not Observable**

### 4.7.160 Assessing Compliance with Paragraph 174:  Allegation by Judicial Officers

Paragraph 174 stipulates:

**"APD and the Civilian Police Oversight Agency shall develop a system to ensure that allegations by a judicial officer of officer misconduct made during a civil or criminal proceeding are identified and assessed for further investigation.  Any decision to decline investigation shall be documented."**

### Methodology

No cases were identified this site visit involving allegations by judicial officials of officer misconduct. The monitor notes that we have viewed in prior visits letters sent to the judiciary requesting notice of any

302

allegations of misconduct. We will re-work our methodologies regarding this paragraph to ensure that appropriate data are requested and reviewed; however, this marks the sixth report in which we have not noted issues related to this paragraph.  Should that continue, we will note operational compliance on this paragraph until such time that we (may) receive information to the contrary.

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not Observable**

## 4.7.161 Assessing Compliance with Paragraph 175:  Allegations Made by the Homeless or the Mentally Ill

Paragraph 175 stipulates:

**"APD and the Civilian Police Oversight Agency shall track allegations regarding misconduct involving individuals who are known to be homeless or have a mental illness, even if the complainant does not specifically label the misconduct as such."**

**Methodology**

Members of the monitoring team reviewed City systems responsive to this requirement, and we continue to find that this provision is currently being monitored and activated by APD's Blue Team IA management software.

**Results**

We found no instances this reporting period of complaints involving individuals known to be homeless or to have a mental illness not being referred/tracked appropriately by APD.  APD remains in compliance based on prior performance.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.162 Assessing Compliance with Paragraph 176:  Centralized Complaint Numbering System

Paragraph 176 stipulates that:

**"Within six months of the Operational Date, the Internal Affairs Bureau, in coordination with the Civilian Police Oversight Agency,**

303

**shall develop and implement a centralized numbering and tracking system for all misconduct complaints.  Upon the receipt of a complaint, the Internal Affairs Bureau shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant."**

### Methodology

IAB and CPOA have created centralized numbering and tracking systems, and continue to assign unique identification numbers to all received complaints.

### Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.163 Assessing Compliance with Paragraph 177:  IAB Complaint Data Management

Paragraph 177 stipulates:

**The Internal Affairs Bureau's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.  This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.**

### Methodology

Members of the monitoring team reviewed IAB complaints received, investigated, and resolved this reporting period for unique identifiers and provision of those identifiers to the complainant. The tracking system is being used appropriately, and appears to maintain accurate data, based on our comparisons with "known data."

### Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.164 Assessing Compliance with Paragraph 178:  Supervisors to Provide Complaint Information

Paragraph 178 stipulates:

**"Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Bureau.  All information should be referred to the Internal Affairs Bureau by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances."**

### Methodology

The monitoring team reviewed a sample of IA and CPOA cases completed during the monitoring period. The monitoring team also met with the Commander and members of IA and the Executive Director and members of CPOA.

### Results

This paragraph is closely linked to the results of paragraph 163. Members of the monitoring team found seven cases that involved referrals from supervisors to IA. These cases all initiated with supervisory reviews and were appropriately "filed" and investigated.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.165 Assessing Compliance with Paragraph 179:  Referral of Complaints to CPOA

Paragraph 179 stipulates:

**"Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Bureau shall refer the complaint to the Civilian Police Oversight Agency."**

### Methodology

Members of the monitoring team reviewed a random sample of 16 misconduct complaints for conformance to the three-business-days requirement for referral to COPA by the IAB, as well as the log of complaints received by IAB to determine date of referral to IAB.

**Results**

All cases we reviewed, and all logs we inspected indicate compliance with this task.

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.166 Assessing Compliance with Paragraph 180:  Handling of Internal Complaints by IAB

Paragraph 180 stipulates:

**"Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Bureau for review and classification.  The Internal Affairs Bureau shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Bureau for investigation.  In consultation with the Chief, the commanding officer of the Internal Affairs Bureau shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Bureau, the Multi- Agency Task Force, and/or referred to the appropriate federal law enforcement agency.**"

### Methodology

Members of the monitoring team met with the Commander and members of IAB and observed their operations and also reviewed a random sample of 16 IAB/CPOA Cases.

### Results

Based on its present and prior reviews, internal complaints are reviewed, classified and assigned by IAB as required by approved policy. Based on our review of a random sample of 16 cases for conformance with the requirements of this paragraph, we found two instances in which there was potential criminal conduct and in which the appropriate coordination required by this paragraph occurred.

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.167 Assessing Compliance with Paragraph 181:  IAB Classification Protocol

Paragraph 181 stipulates:

306

**"APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Bureau in determining where an internal complaint should be assigned."**

## Methodology

Members of the monitoring reviewed APD policy controlling for this task to ensure it complies with the requirements of Paragraph 181, and further insured that all complaints reviewed by the monitoring team this reporting period were properly classified.

## Results

All eight internal affairs cases assessed by the monitoring team for this reporting period were allegation-based

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

## 4.7.168 Assessing Compliance with Paragraph 182:  Prohibition from Self-Investigation

Paragraph 182 stipulates:

**"An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct."**

## Methodology

Members of the monitoring team reviewed random sample of 7 completed IA cases for the reporting period for evidence of any self-conducted investigations.  Of the seven cases we reviewed, we found none in which an investigation was conducted by a supervisor who was the subject of the investigation, or who was directly involved in the incident as a participant or supervisor.

## Results

APD remains in full compliance with this paragraph.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.169 Compliance with Paragraph 183:  Investigations Reach Reliable Conclusions

Paragraph 183 stipulates:

**"APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings. The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident, or involved in any significant event before or after the original incident, shall provide a written statement regarding their observations, even to state that they did not observe anything."**

### Methodology

Members of the monitoring team reviewed a sample of completed APD IA and CPOA investigated cases for compliance with this paragraph. This sample consisted of eight IA cases and eight CPOA cases.

### Results

#### Table 4.7.169

| Case No. | Invesitga-tions thorough | Interview of complainant | Interview recorded | Officers provide written statement | Total Compli-ant | % in Compli-ance by Case |
|---|---|---|---|---|---|---|
| IMR6-034 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-035 | 1 | 1 | 1 | 1 | 4 | 100% |
| IMR6-036 | **0** | **0** | NA | **0** | **0** | **0%** |
| IMR6-037 | 1 | 1 | 1 | 1 | 4 | 100% |
| IMR6-038 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-039 | 1 | 1 | 1 | 1 | 4 | 100% |
| IMR6-040 | 1 | NA | NA | NA | 1 | 100% |
| IMR6-041 | 1 | NA | NA | NA | 1 | 100% |
| IMR6-042 | 1 | NA | NA | NA | 1 | 100% |
| IMR6-031 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-032 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-027 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-043 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-029 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-030 | 1 | NA | NA | 1 | 2 | 100% |
| IMR6-033 | 1 | NA | NA | 1 | 2 | 100% |
| in Compliance | | | | | | |
| % Total by Category | | | | | | **93.8** |

Overall, we found a calculated "failure" rate of 6.2 percent for the selected cases.  Individually, we found one non-compliant investigation.

This was a matter that was administratively closed after initial investigation. Although the reason for administratively closing may have been appropriate, if the complaint was non-sustainable based on preliminary or initial investigation, an additional investigative step of viewing the video lapel or interviewing the officer was indicated but not completed. For the IA cases we found none that were non-compliant, and for the CPOA cases we found one that was non-compliant.  The overall compliance rate for CPOA was 87.5 percent, and APD IA was 100%. Overall compliance for the two units was 93.8%.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not in Compliance**

We view this non-compliance issue as an outlier related to sampling, but urge CPOA to be wary of the requirements of same and to redouble efforts to meet the requirements of this paragraph.

### 4.7.170 Assessing Compliance with Paragraph 184:  Investigations Documented in Writing

Paragraph 184 stipulates:

**"APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing.  APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation. Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct."**

### Methodology

Members of the monitoring team reviewed a total of 16 completed APD IA and CPOA investigated cases for compliance with this paragraph. This sample consisted of 8 IA cases and 8 CPOA cases.

### Results

We note that that a new mediation policy has been drafted and is being reviewed by the parties. This policy may be somewhat narrower than the current policy. Since the parties have not had enough time to review, agree on, or reject, the proposed policy, the monitor has not reviewed same and will not comment on it at this time. Of the cases selected this monitoring period by the monitor for review, none involved inappropriate

309

use of the mediation process. Thus, based on this and past reviews, the APD and CPOA remain in compliance of this paragraph subject to future review of the expected new policy and the APD and CPOA adherence to such policy in the event it is approved by the monitor.

The monitor notes practices that impact this paragraph that are not currently within policy. One such issue is the CPOA practice of using administrative closure of cases where the case does not technically meet the definition of an administrative closing or inactivation as provided for in this paragraph.  When the initial investigation clearly shows the allegations to be unsustainable (such as a video lapel recording that shows the allegations to be untrue), administratively closing the case is not appropriate within the CASA. The monitor realizes that investigative resources are finite and does not necessarily disagree with the wise use of discretion to close cases quickly that are clearly not sustainable in the initial stages of the investigation. Any expansion of the use of administrative closures beyond the definition of this paragraph must be put into written policy and made subject to review and approval by the parties and the monitor.

Another practice noted this reporting period is that of APD in issuing Additional Concerns Memoranda (ACMs). This practice arises out of supervisory reviews, and is used as a written reprimand for failing to activate body worn cameras, etc. where there is no other corresponding policy violation.  If there is a related area of concern or an alleged policy violation, then the failure to activate the OBRD is part of the IA investigation. ACMs that are issued are posted on an officer's retention card, and figure into the prior offense calculation for subsequent offenses where applicable. This practice currently is not based in written policy, and the monitor has been informed the practice is currently under review by APD.

> Primary:       **In Compliance**
> Secondary:    **Not In Compliance**
> Operational:  **Not In Compliance**

***Recommendation 4.7.170:  Revise appropriate policies to reflect the use of ACMs within the IA "outcomes" definitions and train personnel accordingly.***

### 4.7.171 Assessing Compliance with Paragraph 185:  Required Cooperation with IAB/CPOA

Paragraph 185 stipulates:

**"APD shall require personnel to cooperate with Internal Affairs Bureau and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or**

**Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control.  Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances."**

## Methodology

Cooperation with the internal affairs system is required of all APD personnel by regulation. The monitoring review of cases for the sixth reporting period found no instances in which APD officers refused to cooperate with the investigation.  APD is in compliance with this task.

### Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

## 4.7.172 Assessing Compliance with Paragraph 186:  Separate Administrative and Criminal Investigations

Paragraph 186 stipulates:

**"APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment.  When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement**."

## Methodology

In the data sampled by the monitoring team this reporting period, we found two cases that involved both criminal and investigative investigations.  APD handled each of those cases according to established policy and the requirements of the CASA.

### Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.173 Assessing Compliance with Paragraph 187:  Advisement of Officer Rights

Paragraph 187 stipulates:

**"Advisements by the Internal Affairs Bureau or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee**."

### Methodology

In the 16 cases sampled by the monitoring team this reporting period, we found no instances where cases were not handled according to established policy and the requirements of the CASA.  We note the issue of ACMs again here, and include it on our expected "action list" for APD policy development during the next reporting period.

### Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.174 Assessing Compliance with Paragraph 188:  Notification of Criminal Misconduct

Paragraph 188 stipulates:

**"If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the Internal Affairs Bureau commanding officer. If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Bureau.  The Internal Affairs Bureau commanding officer shall immediately notify the Chief. The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, the Internal Affairs Bureau shall continue with the administrative investigation of the allegation.  Consistent with Paragraph 186, the Internal Affairs Bureau may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Bureau deems such interviews appropriate**."

312

**Methodology**

Members of the monitoring team reviewed a total of 16 IAB/CPOA cases this monitoring period and met with members of IAB and CPOA to review and discuss current practices.

**Results**

None of the 8 cases selected for review involved CPOA cases that may have involved criminal conduct. Of the IA cases selected for review, two cases involved cases where coordination was necessary with prosecutorial authorities. In both cases the coordination was proper.

> Primary:      **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

**4.7.175 Assessing Compliance with Paragraph 189:  Provision of Public Safety Statements**

Paragraph 189 stipulates:

**"Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including Use of Force Reports and incident reports.  APD shall make clear that all statements by personnel in incident reports, arrest reports, Use of Force Reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements.  Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief**."

**Methodology**

Members of the monitoring team have reviewed APD policy requirement of this paragraph, and also reviewed 16 cases selected by the team for IAB/CPOA investigations to determine if any exhibited characteristics of the paragraph involving the invocation of Fifth Amendment privilege during a compelled or non-compelled interview. None were found.

**Results**

The APD is in compliance with the requirement that public safety statements and statements made in conjunction with APD's routine use of force process are routine professional duties and not compelled statements. Regarding the part of the paragraph regarding the invocation of Fifth Amendment privilege, no Fifth Amendment cases were found in the selection of 16 CPOA/IAB cases we reviewed. Absence of an applicable set of circumstances, e.g., employees availing themselves of a specific right, leads us to find this paragraph un-evaluable in terms of in-field practice this reporting period. Thus, we have determined the operational status for this paragraph as "not observable," which is obviously not the equivalent of not in compliance.

> Primary:     **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not Observable**

### 4.7.176 Assessing Compliance with Paragraph 190:  Considering All Relevant Evidence

Paragraph 190 stipulates:

**"In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence.  There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to be deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements."**

### Methodology

Members of the monitoring team reviewed 16 CPOA and IAB closed cases for indications that the investigations were in conformance with this paragraph.  The results of that review are described below.

**Results**

The monitor identified one CPOA case where additional evidence should have been considered.  Overall, the compliance rate is 93.75%, short of the required 95%.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

***Recommendation 190a:  CPOA should redouble its supervisory efforts to ensure routine compliance with this requirement.***

**4.7.177 Assessing Compliance with Paragraph 191:  90 Days to Complete Administrative Investigations**

Paragraph 191 stipulates:

**"All administrative investigations conducted by the Internal Affairs Bureau or the Civilian Police Oversight Agency shall be completed within 90 days of the initiation of the complaint investigation.  The 90-day period shall not include time for review.  An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief. Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation. To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations of the officer, and extended absences."**

**Methodology**

Members of the monitoring team reviewed 16 completed IAB and CPOA cases for compliance with the requirements of this paragraph.

**Results**

As noted in paragraph 281 of this report, the Monitor found 4 instances of CPOA assignments of investigations taking more than 7 days, including several instances where assignment took over 30 days. If these delays (excess of 7 days for assignment) were counted against overall investigatory time, there would be clear non-compliance with this paragraph. The IAB and CPOA are hereby put on notice that all delays in assignment in excess of 7 days are counted as investigatory time.

Once assignments are made investigations are generally timely. The monitor found four instances of investigations going beyond the allowed

time limitations; however, two of the cases contained unusual circumstances (e.g. several interview delays by complainant) and neither affected imposition of discipline, since both contained no sustained adverse findings; therefore, we note the several interview delays by the complainant as extenuating circumstances.

### Table 4.7.177 90 Days to Complete Administrative Investigations

| Case No. | All admin investigations by APD or CPOA must be completed in 90 days, excluding time for review | A written request for a 30 day extension may be granted if approved by the Chief | Review and final disciplinary determination must be made within 30 days of investigation completion | # Compliant | % in Compliance by Case |
|---|---|---|---|---|---|
| IMR6-034 | 1 | 1 | NA | 2 | 100 |
| IMR6-036 | 1 | 1 | NA | 2 | 100 |
| IMR6-035 | 1 | 1 | 1 | 3 | 100 |
| IMR6-037 | 1 | 1 | 1 | 3 | 100 |
| IMR6-038 | 1 | 1 | 1 | 3 | 100 |
| IMR6-039 | 1 | 1 | 1 | 3 | 100 |
| IMR6-040 | 1 | NA | NA | 1 | 100 |
| IMR6-041 | 0 | NA | NA | 0 | 0 |
| IMR6-042 | 1 | NA | 1 | 2 | 100 |
| IMR6-031 | 1 | NA | 1 | 2 | 100 |
| IMR6-032 | 1 | 1 | 1 | 3 | 100 |
| IMR6-027 | 1 | NA | NA | 1 | 100 |
| IMR6-028 | 1 | NA | 1 | 2 | 100 |
| IMR6-029 | 1 | NA | 1 | 2 | 100 |
| IMR6-030 | 1 | NA | 1 | 2 | 100 |
| IMR6-033 | 1 | NA | 1 | 2 | 100 |
| Number in Compliance Total all Incidents | 15 | 7 | 10 | -- | |
| % in Compliance Total by Category | 93.8% | 100 | 100 | -- | 93.8 |

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not in Compliance**

***Recommendation 4.7.177a:  Managers at CPOA and IAB should be cognizant of timelines for given investigations, and ensure that, when needed and appropriate, extensions are requested.***

*Recommendation 4.7.177b:  Timeline compliance rates should be included in CPOA's and IAB's monthly and/or quarterly management reports.*

*Recommendation 4.7.177c: When investigations are delayed for unusual circumstances, such as frequent cancellation of interviews by a complainant or a Family Medical Leave Act delay of a compelled investigation, it should be clearly set forth in an investigative timeline for supervisory review.*

### 4.7.178 Assessing Compliance with Paragraph 192:  Case Dispositions

Paragraph 192 stipulates:

**"APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:**

   a)   **"Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer;**
   b)   **"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;**
   c)   **"Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;**
   d)   **"Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training;**
   e)   **"Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or**
   f)   **"Administratively closed," where the policy violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint."**

### Methodology

Members of the monitoring team reviewed 16 completed IAB/CPOA cases for the reporting period, assessing them for compliance with disposition requirements articulated in the CASA.

Of the 16 cases we reviewed, IAB had one improper case (discipline not imposed due to erroneous calculation by a Supervisory Commander in

the supervisory chain).  This error was not attributed to IAB. CPOA had one case with an improper disposition (administrative closure where additional investigative steps were warranted).  Two errors of 16 cases constitutes a 12.5 percent error rate.

## Results

The overall compliance rate (14 of 16 cases) was 87.5 percent.  Overall, the city is not in compliance with this requirement for this reporting period.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not in Compliance**

***Recommendation 4.7.178a:  CPOA and APD should reinforce training and supervision of its personnel related to investigative timelines.***

## 4.7.179 Assessing Compliance with Paragraph 193:  Reopening Administrative Investigations

Paragraph 193 stipulates:

**"All administratively closed complaints may be re-opened if additional information becomes available.  The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened."**

## Methodology

The requirements related to this paragraph are contained in APD and CPOA policy. Members of the monitoring team assessed CPOA and IAB cases for any that accrued to this paragraph this reporting period, and found none.

## Results

CPOA and IAB remain in compliance on this task based on past performance.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.180 Assessing Compliance with Paragraph 194:  Training and Legal Standards

318

Paragraph 194 stipulates:

**"In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether:  (a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures.  This information shall be shared with the relevant commander(s)."**

### Methodology

Members of the monitoring team reviewed 16 completed IAB/CPOA cases for the reporting period, assessing them for compliance with disposition requirements articulated in the CASA.

### Results

Of those cases reviewed, all that were not administratively closed contained a form indicating that the case was reviewed for a determination of whether changes in policy, procedure or training were required.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational  **In Compliance**

### 4.7.181 Assessing Compliance with Paragraph 195:  Retaliation Prohibited

Paragraph 195 stipulates:

**"The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct."**

### Methodology

Retaliation is clearly prohibited both as a matter of City and APD policy. During this reporting period, the City received one complaint of retaliation as defined by this paragraph.  The complaint was received, assigned, and appropriately investigated.

319

**Results**

Members of the monitoring team reviewed 16 completed cases from IAB and CPOA relative to this paragraph, and found one, [IMR-5-035]**.**  The Albuquerque Code of Ordinances prohibits retaliation for reporting improper governmental action. Policy mandating compliance with this paragraph is also contained in GO 1-04 and AO 2-05 and 3-22. This constitutes primary compliance.  Performance on the retaliation complaint completed this reporting period was within expected parameters, thus the City is in secondary and operational compliance for this reporting period as well.

> Primary:        **In Compliance**
> Secondary:     **In Compliance**
> Operational:  **In Compliance**

### 4.7.182 Assessing Compliance with Paragraph 196:  Review of Anti-Retaliation Statements

Paragraph 196 stipulates:

**"Within six months of the Effective Date, and annually thereafter, the Internal Affairs Bureau and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation.  This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation. Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct."**

### Methodology

Policy mandating compliance with this paragraph is contained in GO 1-04, and AO 2-05 and 3-22.  This constitutes primary compliance. The monitoring team has determined that meetings involving CPOA and IAB, in which APD's anti-retaliation policy is reviewed, occur on an annual basis. Of the cases selected for review this monitoring period, none involved allegations or indications of retaliation. Based on this, and mindful of IAB performance in past retaliation complaints, operational compliance is achieved.

### Results

> Primary:        **In Compliance**
> Secondary:     **In Compliance**
> Operational:  **In Compliance**

### 4.7.183 Assessing Compliance with Paragraph 197:  Retaliation Grounds for Discipline

Paragraph 197 stipulates:

**Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds for discipline, up to and including termination of employment.**

### Methodology

Policy mandating compliance with this paragraph is contained in GO 1-04, and AO 2-05 and 3-22.  This constitutes primary compliance.  Of the cases selected for review this monitoring period, none involved allegations or indications of retaliation. Based on this, and IAB performance in investigation and resolution of past retaliation complaints, IAB is in operational compliance with the requirements of this paragraph.

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.184 Assessing Compliance with Paragraph 198:  CPOA Staffing

Paragraph 198 stipulates:

**"The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement. The City shall re-assess the staffing of the Internal Affairs Bureau after the completion of the staffing study to be conducted pursuant to Paragraph 204.  The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations."**

The monitoring team met with IAB and CPOA on several occasions including visits to their respective offices and inspection of physical space. The monitoring team also reviewed staffing charts and assessed the timelines of investigations that were randomly selected.

### Results

The CPOA Ordinance requires that it be given staff sufficient to carry out the agency functions contained in the Ordinance. Additional policy mandating compliance with this paragraph is also contained in GO 1-04, and AOs 2-05 and 3-22.

Currently, the staffing of IAB appears to be sufficient, as investigative timelines are generally being met. The CPOA staffing also appears to be sufficient as there are no current vacancies.  No requests for additional staff have been noted.

Despite the lack of significant vacancies, in the future the monitoring team will continue to review the completion times on selected investigations, and also has broadened its search to look at the time between receipt of complaint and assignment for investigation, as well overall processing time statistics.  No delays or quality control issues were noted that can be traced to staffing levels.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.185 Assessing Compliance with Paragraph 199:  IA Initial Training

Paragraph 199 stipulates:

**"All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Bureau, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

### Methodology

The monitoring team had several meetings during the site visit with the IAB Commander and his staff. The team also conducted a thorough review of training records, including syllabi, video recordings of training (if available) exams (if available) related to specified training and attendance rosters were also conducted in order to complete the review and approval process of the training required in this paragraph.  We found all assigned personnel to have had the required training, both preliminary 24 hour and the 8-hour in-service.

The challenge remains with the training of those in the Area Commands who may be assigned investigations but who are not members of IAB.  APD needs to develop specific workload analyses as well as and policy, staffing, and systems improvement recommendations regarding this issue.

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**

322

Operational:   **In Compliance**

### 4.7.186 Assessing Compliance with Paragraph 200:  CPOA Training

Paragraph 200 stipulates:

**"Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Effective Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

**Methodology**

Policy mandating compliance with this paragraph is contained in AO 3-22, and in 2-05, and Special Order 16-24. The monitor reviewed the initial training provided by CPOA's legal counsel, and found it to be well organized and delivered. It addresses all salient points of the CASA and of internal complaint investigations; however, there were no performance testing measures included in the training. Likewise, the annual training for the past year for CPOA investigators involved the annual NACOLE conference, for which testing measures and results could not be evaluated. The overall CPOA performance indicates that the training has been effective; however, going forward the monitor will expect more exact and immediate indications of effectiveness of training that is provided to CPOA personnel. We are unable to assess the overall effectiveness of the training. We will work with CPOA to develop an *ad hoc* assessment mechanism to remedy this issue.  Operational compliance is pending resolution of testing issues noted above.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not Observable**

### 4.7.187 Assessing Compliance with Paragraph 201:  Fact Based Discipline

Paragraph 201 stipulates:

**"APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently."**

323

**Methodology**

The monitoring team reviewed 16 current cases (eight from APD and eight for CPOA) for compliance with this requirement.

**Results**

We found APD to be out of compliance on three of eight cases relative to consistent and fair discipline, for an 87 percent compliance rate.

**Table 4.7.201 Fact Based Discipline**

| Case No. | Discipline is consistent, fair, & based on allegation | Mitigating & Aggravating factors applied | # Compliant | % in Compliance by Case |
|---|---|---|---|---|
| IMR6-034 | 1 | NA | 1 | **100** |
| IMR6-036 | 0 | NA | 0 | **0** |
| IMR6-035 | 1 | NA | 1 | **100** |
| IMR6-037 | 1 | NA | 1 | **100** |
| IMR6-038 | 1 | NA | 1 | **100** |
| IMR6-039 | 1 | NA | 1 | **100** |
| IMR6-040 | 1 | NA | 1 | **100** |
| IMR6-041 | 1 | NA | 1 | **100** |
| IMR6-042 | 1 | NA | 1 | **100** |
| IMR6-031 | **1** | **1** | **1** | **100** |
| IMR6-032 | 1 | 1 | 2 | **100** |
| IMR6-027 | 0 | 0 | 0 | **0** |
| IMR6-028 | 0 | 0 | 0 | **0** |
| IMR6-029 | 1 | NA | 1 | **100** |
| IMR6-030 | 1 | 1 | 2 | **100** |
| IMR6-033 | 1 | 1 | 2 | **100** |
| **Number in Compliance** | 13 | 14 | 27 | |
| **% in Compliance Total by Category** | **APD 75%; CPOA 88%** | | **APD 75%; CPOA 88%** | |

Relative to consistent application of mitigating and aggravating factors, APD was out of compliance on two of their eight cases. This constitutes a 75 percent compliance rate. For CPOA, we found an 88 percent compliance rate.

        Primary:     **In Compliance**
        Secondary:   **In Compliance**
        Operational: **Not In Compliance**

*Recommendation 4.7.187a:  The current practice of figuring the sanction level of any sustained policy violation and whether there are any prior offenses that by their level of sanction and date of imposition count as a prior offense, is complicated and subject to too much subjectivity (based on Supervisory Chain of Command input to the Chief per SOP 3-46-5). IAB and CPOA should make findings regarding the level of sanction and whether there are any applicable prior offenses. The SOP should be revised to provide for these determinations to be made by IAB and CPOA.*

*Recommendation 4.7.187b: Retention cards need to indicate the level of sanction associated with each sustained violation and the date of imposition of discipline.*

*Recommendation 4.7.187c:  Where a sustained violation (policy) has a sanction level that contains a range (e.g. 2-5), or where it has no associated sanction level, IAB and CPOA should make the sanction level determination in a finding and explain how the sanction level finding was reached.*

*Recommendation 4.7.187d:  Where an investigation that reaches sustained findings contains prior offenses on the officer's retention card, IAB and CPOA should make a finding whether those prior offenses count as a prior offense enhancement.*

*Recommendation 4.7.187e:  Once the above findings are made, APD and CPOA – utilizing the sanction level rows and prior offense columns of the disciplinary matrix - should make a finding as which box applies on the disciplinary matrix and the range of discipline associated with the box.*

*Recommendation 4.7.187f:  The findings recommended in this paragraph, as all other findings, shall be subject to review, comment and recommendation by supervisors of the subject officer in the supervisory review of the investigation.*

*Recommendation 4.7.187g: When discipline imposed after a PDH differs from the Chief's proposed findings and discipline, then the Final Decision on Discipline Letter, or a separate memo in the investigative file, should contain an explanation of the balancing of mitigating and aggravating circumstances occurring at the PDH, and an explanation for the final discipline as opposed to the proposed discipline.*

### 4.7.188 Assessing Compliance with Paragraph 202: Discipline Matrix

Paragraph 202 stipulates:

"**APD shall establish a disciplinary matrix that:**

a)  **establishes a presumptive range of discipline for each type of rule violation;**
b)  **increases the presumptive discipline based on an officer's prior violations of the same or other rules;**
c)  **sets out defined mitigating or aggravating factors;**
d)  **requires that any departure from the presumptive range of discipline must be justified in writing;**
e)  **provides that APD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and**
f)  **provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed."**

### Methodology

The monitoring team reviewed cases with imposed discipline occurring this reporting period to ensure that they comply with the requirements of the CASA.  We also reviewed the disciplinary policy itself for compliance with this paragraph.  We note that our prior recommendation has been followed and SOP 3-46 (with Appended Chart of Sanctions (Disciplinary Matrix)) sets forth that any departure from the presumptive range of discipline (appropriate range as established by the Chart of Sanctions) must be justified in writing (3-46-5B4). Although SOP 3-46 allows for the imposition of non-disciplinary action in addition to applicable discipline, it does not contain a warning that non-disciplinary corrective action should not be the only disposition where the matrix calls for the imposition of discipline. This is not the first IMR in which the Monitor has pointed out the non-compliance with subparagraph e of this paragraph.
APD has opined that the written record accompanying disciplinary records is included in and "briefed with" the findings; however, records as currently provided do not validate that assessment.  We have discussed this issue previously with APD, and remain unconvinced that their verbal claims are reflected in the written records regarding discipline.  Despite APD contentions, it seems the only "cure" for this incongruity is written policy, requiring compliance with this paragraph.

### Results

Primary:        **Not in Compliance**
Secondary:   **Not in Compliance**
Operational: **Not in Compliance**

326

***Recommendation 4.7.188a: Since the disciplinary policy is moot on the requirement that departures from the "presumptive range of discipline" must be justified in writing, APD should append such a declaration to the matrix.***

### 4.7.189 Assessing Compliance with Paragraph 203

Paragraph 203 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement the terms of this Agreement. APD shall also deploy a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally. APD shall revise and implement policies for supervision that set out clear requirements for supervision and comport with best practices.**"

### Methodology

We view this paragraph as an over-arching introductory statement for the following provisions of the CASA.  Thus, no specific evaluative modalities were used for this paragraph in the monitor's reports.

### 4.7.190 Assessing Compliance with Paragraph 204

Paragraph 204 requires:

**"In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission. APD therefore shall conduct a comprehensive staffing assessment and resource study. The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques. The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands. This staffing assessment and resource study shall be completed within one year of the Effective Date. Within six months of the completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement."**

**Methodology**

We note no change since our last reportage on this topic.  APD remains in compliance

**Results**

|            |               |
|------------|---------------|
| Primary:   | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.191 Assessing Compliance with Paragraph 205

Paragraph 205 stipulates:

**"First-line supervisors shall investigate officers' use of force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy."**

**Methodology**

Members of the monitoring team have conducted a detailed field-based data assessment of selected use-of-force incidents as required by Section IV of this agreement to determine if first-line supervisors are meeting the obligations of this paragraph. For IMR-5 there were no formalized and routinized processes for supervisory monthly reports. First-line supervisors received training in a new program, "MyPal," designed to capture all activities for personnel under their direct supervision. In this program, "Blue Team" is one of the categories. Embedded in this category are the use of force reports entered by the members under the supervisor's command. The training for this program took place in May 2017, additionally, training required by Department Special Order 17-75 (Mandatory Supervisor Use of Force Gap Training) was conducted in July 2017, with the last session ending on July 28, 2017.

**Results**

Due to the numerous recommendations listed in IMR-5 covering use of force, and because this training was conducted so late in this reporting period the monitoring team cannot adequately assess if the requirements of this paragraph are being met as a result of the training received.  We will address the outstanding issues here during IMR-7.  In the interim, APD retains its previous non-compliance statuses.

|            |                     |
|------------|---------------------|
| Primary:   | **In Compliance**       |
| Secondary: | **Not In Compliance**   |
| Operational: | **Not In Compliance** |

328

***Recommendation 4.7.191:  Assess the impact of the proffered training once related data are available on the effects of the training offered late in IMR-6's reporting period.***

### 4.7.192 Assessing Compliance with Paragraph 206

Paragraph 206 stipulates:

**"All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command. First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary command. Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department."**

### Methodology

Members of the monitoring team have conducted a detailed field-based data assessment of selected use-of-force incidents as required by Section IV of this agreement to determine if first-line supervisors are meeting the obligations of this paragraph. The monitoring team visited area commands during this visit and met with the Commanders or designees for each command to review SOP 3-9 (Supervisory Leadership) and ensure that the requirements of this paragraph were being met. The monitoring team requested the daily roster from each command to review and ensure that a first-line supervisor was assigned to the field officers on patrol. Daily rosters reviewed by the monitoring team reflected that a supervisor was assigned to each unit that was working and when the span of control for a supervisor exceeded eight (8) an additional supervisor was assigned to that shift.

### Results

For IMR-5 there were no formalized and routinized processes for supervisory monthly reports. First-line supervisors received training in a new program, "MyPal," designed to capture all activities for personnel under their direct supervision. The training for this program took place in May 2017.  Additionally, Department Special Order 17-75 (Mandatory Supervisor Use of Force Gap Training) was conducted in July 2017, the last session ending on July 28, 2017. Due to the numerous recommendations listed in IMR-5 covering use of force, and because this training was conducted so late in this reporting period, the monitoring team cannot adequately assess if the requirements of this paragraph are being met as a result of the training received.  We will revisit this issue in IMR-7.

The monitoring team visited six area commands during the fourth site visit and met with the Commanders or designees for each command to review SOP 3-9 (Supervisory Leadership) and ensure that the requirements of this paragraph were being met. The monitoring team requested the daily roster from each command to review and ensure that a first-line supervisor was assigned to the field officers on patrol. Daily rosters reviewed by the monitoring team reflected that a supervisor was assigned to each unit that was working, and when the span of control for a supervisor exceeded eight (8) an additional supervisor was assigned to that shift.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.193 Assessing Compliance with Paragraph 207

Paragraph 207 stipulates:

**"First-line supervisors shall ordinarily be assigned as a primary supervisor to no more than eight officers. Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary."**

### Methodology

Members of the monitoring team reviewed course-of-business staffing reports from APD, consisting of assessments of staffing levels at each Area Command.  Data reviewed during the monitor visit conducted in June 2017 and data received from APD during the reporting period (February 2017 through July 2017) indicated that the staffing issues have improved since the promotions during the IMR-5 reporting period, and has maintained APD in operational compliance with this paragraph. The monitoring team will continue to monitor levels of supervision during future visits.

### Results

Our analysis indicates that normal day-to-day operations of APD patrol units are supported and supervised at levels required by the CASA. Table 4.7.193, depict the results of our analysis.

330

**Table 4.7.193:  Supervisory Ratios**

| | A. First-line supervisors shall ordinarily be assigned as a primary supervisor to no more than eight officers | B. Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary | # in-Compli-ance | % in Compli-ance | Compli-ant |
|---|---|---|---|---|---|
| Report 1: February 2017 | 1 | 1 | 2 | 100.0% | Y |
| Report 2: March 2017 | 1 | 1 | 2 | 100.0% | Y |
| Report 3: April 2017 | 1 | 1 | 2 | 100.0% | Y |
| Report 4: May 2017 | 1 | 1 | 2 | 100.0% | Y |
| Report 5: June 2017 | 1 | 1 | 2 | 100.0% | Y |
| Report 6: July 2017 | 1 | 1 | 2 | 100.0% | Y |
| **Number in Compliance Total all Incidents** | **6** | **6** | **12** | | |
| **% in Compliance Total by Category** | **100%** | **100%** | **100%** | **100%** | |

Primary:　　　**In Compliance**
Secondary:　　**In Compliance**
Operational:　**In Compliance**

## 4.7.194 Assessing Compliance with Paragraph 208

Paragraph 208 stipulates:

**"APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command. APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement."**

## Methodology

Members of the monitoring team have conducted a detailed field-based data assessment of selected use-of-force incidents as required by Section IV of this agreement to determine whether or not Commanders and Lieutenants are meeting the obligations of this paragraph. For IMR-5 there were no formalized and routinized processes for supervisory monthly reports. For first-line

supervisors, Lieutenants and Commanders received training in a new program, "MyPal" designed to capture all activities for personnel under their direct supervision and respond to the reports. The training for this program took place in May 2017.  Additionally, Department Special Order 17-75 (Mandatory Supervisor Use of Force Gap Training) was implemented in July 2017, the last session ending on July 28, 2017.  Due to the numerous recommendations listed in IMR-5 covering use of force, and because this training was conducted so late in this reporting period, the monitoring team cannot adequately assess if the requirements of this paragraph are being implemented in the field as a result of the training received.  We will revisit this issue in IMR-7.

### Results

Primary:       **In Compliance**
Secondary:     **In Compliance**
Operational:   **Not In Compliance**

**Recommendation 4.7.194:  APD should collect and analyze course-of-business data relative to this paragraph to ensure that compliance levels are met.**

### 4.7.195 Assessing Compliance with Paragraph 209

Paragraph 209 stipulates:

**"Sergeant training is critical to effective first-line supervision. Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities."**

### Methodology

During this monitoring period records show that all sergeants had received 40 hours of mandatory supervisory training.

### Results

Results show that all sergeants assigned supervisory roles at APD received the required 40 of in-service training on the topics mandated by the CASA.  Members of the monitoring team have conducted a detailed field-based data assessment of selected use-of-force incidents as required by Section IV of the CASA to determine if first-line supervisors are meeting the obligations of the agreement. Department Special Order 17-75 (Mandatory Supervisor Use of Force Gap Training) was conducted in July 2017, the last session ending on July 28, 2017.  Due to the numerous recommendations listed in IMR-5 covering use of force and because this training was conducted so late in this reporting period

the monitoring team cannot adequately assess if the requirements of this paragraph are being met in the field as a result of the training received. We will revisit operational compliance on this issue in IMR-7.

> Primary: **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

**Recommendation 4.7.195:  APD should collect and analyze course-of-business data relative to this paragraph to ensure that compliance levels are met.**

### 4.7.196 Assessing Compliance with Paragraph 210

Paragraph 210 stipulates:

**"APD's sergeant training program shall include the following topics:**

**a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;**
**b) de-escalating conflict;**
**c) evaluating written reports, including those that contain canned language;**
**d) investigating officer uses of force;**
**e) understanding supervisory tools such as the Early Intervention System and on-body recording systems;**
**f) responding to and investigating allegations of officer misconduct;**
**g) evaluating officer performance;**
**h) consistent disciplinary sanction and non-punitive corrective action;**
**i) monitoring use of force to ensure consistency with policies;**
**j) building community partnerships and guiding officers on this requirement;**
**k) legal updates."**

### Methodology

Members of the monitoring team reviewed Academy training responsive to Paragraph 210 for compliance with the content of the training. Results are depicted below.

**Results**

**Table 4.7.195**

| Topic | 40-Hour Sgt's Training | In Compliance? |
|---|---|---|
| A. APD's sergeant training program shall include techniques for effectively guiding and directing officers and promoting effective and ethical police practices | Y | 1 |
| B. APD's sergeant training program shall include de-escalating conflict | Y | 1 |
| C. APD's sergeant training program shall include evaluating written reports, including those that contain canned language | Y | 1 |
| D. APD's sergeant training program shall include investigating officer uses of force | Y | 1 |
| E. APD's sergeant training program shall include understanding supervisory tools such as the Early Intervention System and on-body recording systems | Y | 1 |
| F. APD's sergeant training program shall include responding to and investigating allegations of officer misconduct | Y | 1 |
| G. APD's sergeant training program shall include evaluating officer performance | Y | 1 |
| G. APD's sergeant training program shall include evaluating officer performance | Y | 1 |
| I. APD's sergeant training program shall include monitoring use of force to ensure consistency with policies | Y | 1 |
| K. APD's sergeant training program shall include legal updates | Y | 1 |
| | % Compliant | 100% |

Although the above training program includes all categories required by this paragraph, members of the monitoring team have conducted a detailed field-based data assessment of selected use-of-force incidents as required by Section IV of this agreement to determine if first-line supervisors are meeting the obligations of the agreement. Department Special Order 17-75 (Mandatory Supervisor Use of Force Gap Training) was conducted in July 2017, the last session ending on July 28, 2017. The 32-hour in-service management training scheduled during this reporting period will extend to IMR-7. During the next reporting period, the monitoring team will assess if the training listed in this

paragraph needs modifications to remediate problematic errors related to training paragraphs.

Primary:        **In Compliance**
Secondary:   **Not Evaluable**[190]
Operational:  **Not Evaluable**

### 4.7.197 Assessing Compliance with Paragraph 211

Paragraph 211 stipulates:

**"All sworn supervisors shall also receive a minimum of 32 hours of in-service management training, which may include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement."**

## Methodology

Members of the monitoring team have conducted a detailed field-based data assessment of selected use-of-force incidents as required by Section IV of this agreement to determine if first-line supervisors are meeting the obligations of this paragraph. Department Special Order 17-75 (Mandatory Supervisor Use of Force Gap Training) was conducted in July 2017, the last session ending on July 28, 2017. The 32 hour in-service management training scheduled during this reporting period will extend to IMR-7, due to the numerous recommendations listed in IMR-5 covering use of force and because Special Order 17-75 training was conducted so late in this reporting period the monitoring team cannot adequately assess if the requirements of this paragraph are being met as a result of the training received.

## Results

Upon delivery of all training required in this paragraph, the monitoring team will observe and opine whether it meets the requirements of the CASA.  At that time we will produce recommendations, if needed, concerning revisions to training protocols related to this paragraph.

Primary:        **In Compliance**
Secondary:   **Not in Compliance**
Operational:  **Not in Compliance**

***Recommendation 4.7.197:  Pending a determination of the efficacy of the delivered training.***

---

[190] The "gap training" was offered late in the reporting period, and no reliable data depicting changes in APD performance are available at this time.

### 4.7.198 Assessing Compliance with Paragraph 212

Paragraph 212 stipulates:

**"Within nine months of the Effective Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers. APD supervisors shall be trained to proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being."**

### Methodology

Members of the monitoring team have reviewed multiple drafts of the proposed six-month update and revisions to the Department's Early Intervention and Recording System (EIRS).  As of the end of this reporting period, the monitor had not been presented with a policy that he could approve, as all submitted policy versions have, in one form or another, failed in meaningful ways to conform to the either the CASA or established practice regarding EIRS systems in policing, such as those currently in place in Seattle, Washington or New Orleans, Louisiana.  We continue to work with the City to craft acceptable policies that conform to national standards for this element.

### Results

As we have noted in previous reports, APD has on at least one occasion, "shut down" the EIRS system because it generated "too many alerts."  The current policy regarding EIRS was approved by the monitoring team in 2016.  The six-month revision of that policy is "pending" and well past due.  The monitor has serious concerns about the current proposed policy and cannot approve it until it has been significantly revised, as per the monitor's comments to the Parties. Unlike other cities who have embraced early intervention systems and set new standards in personnel management, APD continues to fail to grasp the concept of "early intervention."

The monitor is seriously concerned about the apparent inability of APD to proffer a proposed policy for EIRS that meets the requirements of the CASA.

Primary:      **Not In Compliance**[191]
Secondary:   **Not in Compliance**
Operational:  **Not in Compliance**

*Recommendation 4.7.198a:  APD should consider monitor feedback and not respond to that feedback positively while otherwise stepping backward in other sections of the policy, such as raising the thresholds or shortening the review period.*

*Recommendation 4.7.198b:  We understand APD has contacted NJSP, New Orleans PD, and Seattle PD to glean ideas about how this review regimen could be structured to meet the requirements of the CASA in the most efficient manner possible.  APD should develop specific, quantifiable, appropriate programmatic reform based on the information collected.*

### 4.7.199 Assessing Compliance with Paragraph 213

Paragraph 213 stipulates:

> **"APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties."**

### Methodology

During the fourth site visit, the monitor discovered that APD had removed all "thresholds" governing EIRS, in direct violation of paragraph 219, which stipulates:

> "The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement."

The City failed to notify the monitor or the Parties of this change, thus violating the requirements of this paragraph, and losing primary compliance.  To date, the monitor has not been able to agree with the City on proposed six-month revisions to the proposed EIRS policy.  The critical sticking point is "trigger points" that will require APD to make full reviews of officer performance *viz a viz,* established thresholds of critical events. Lack of an approved revised policy implicates primary compliance; however, the monitor will consider the currently

---

[191] The monitor is seriously concerned about the current backlog of pending high-impact policies such as OBRD, use of force, and EIRS, that have been delayed by City step-backs formerly approved policies.  We note this issue appears to have been resolved after expiration of the sixth reporting period, as several critical policies have been approved during IMR-7's reporting period.

approved policy as "in effect" until APD has had a reasonable amount of time to revise it. We remind APD that anticipated changes outlined in new policy must be "trained" to ensure performance in the field.

**Results:**

Primary:       **In Compliance (based on old policy)**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation 4.7.199:  APD should avoid making unilateral decisions regarding revisions to policies required by the CASA without notifying the Parties and the monitor of the need, import, and specifics of the "new" policy.*

**4.7.200 Assessing Compliance Paragraph 214**

Paragraph 214 stipulates:

**"APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review."**

APD continues to struggle to develop a meaningful policy that will meet the requirements of the CASA, meet standards set by other cities in similar situations, and can be approved by the parties.

The monitoring team has not been provided with a single example of an officer who had received an intervention for use of force prior to engaging in additional uses of force.  In several cases, officers had more than double the number of triggers before any type of intervention took place.

Current thresholds are established at rolling intervals.  We will continue to monitor the status of this critical issue in future reports.

**Results**

As noted in prior reports, the system implementation had appeared to be proceeding at a reasonable rate, given the complexity of the proposed system.  During the fourth site visit, the monitor discovered that APD had removed all thresholds from the system, thereby eliminating any triggers/notifications.  In addition, APD is now in the process of re-writing the EIRS policy and thresholds, and in current form (as of the close of the sixth reporting period) it is, in the opinion of the monitor ineffective and unsatisfactory.  We find this resistance to crafting acceptable EIRS

policy to be deliberate, and express grave concern with the APD's apparent unwillingness to implement the requirements of this paragraph.

A review of all EIRS triggers during this reporting period revealed at least six officers with "triggers" in the double digits—10 or more. APD provided review documentation for three of these officers, but these reviews were for only three or four of the incidents, and most of those were cases not yet completed. Supervisors therefore were unable or incapable of making any determinations of patterns, training issues or policy violations.

Secondary compliance is not attained, as the required six-month policy revisions have included verbiage that the monitor will not approve, such as unusually high trigger thresholds and poor definitions of what constitutes a "review" by supervisors. Without approved policy, training is not possible.

> Primary:      **In Compliance**
> Secondary:   **Not in Compliance**
> Operational: **Not in Compliance**

***Recommendation 4.7.200: Re-assess the role of EIRS within the overall process of supervision, and ensure that a mechanism exists to trigger detailed supervisory reviews of defined "outliers" systematically, reliably and effectively.***

### 4.7.201 Assessing Compliance Paragraph 215

Paragraph 215 stipulates:

**"The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum:**
**a) uses of force;**
**b) injuries and deaths to persons in custody;**
**c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy;**
**d) all civilian or administrative complaints and their dispositions;**
**e) all judicial proceedings where an officer is the subject of a protective or restraining order;**
**f) all vehicle pursuits and traffic collisions involving APD equipment;**
**g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system;**

**h) all disciplinary action taken against employees;**
**i) all non-punitive corrective action required of employees;**
**j) all awards and commendations received by employees,**
**including those received from civilians, as well as special acts**
**performed by employees;**
**k) demographic category for each civilian involved in a use of**
**force or search and seizure incident sufficient to assess bias;**
**l) all criminal proceedings initiated against an officer, as well as all**
**civil or administrative claims filed with, and all civil lawsuits served**
**upon, the City and/or its officers or agents, allegedly resulting from**
**APD operations or the actions of APD personnel; and**
**m) all offense reports in which an officer is a suspect or offender."**

## Methodology

Members of the monitoring team reviewed the OBRD policy for compliance to each of these 19 requirements and found two missing as of the latest review.

## Results

APD has not developed or presented to the monitor, a process to comply with sections (g) relating to prosecutors notifying APD of a failure to record with OBRD and section (k) relating to capturing demographic data for search and seizure incidents.  These required elements should be included in the revised version of EIRS.  Training will need to be developed for the revised EIRS, as well as systems for operational review of performance in the field.

> Primary:      **In Compliance**
> Secondary:   **Not in Compliance**
> Operational: **Not in Compliance**

*Recommendation 4.7.201a:  Clarify sections g and k of the current policy to reflect the requirements of the CASA*

*Recommendation 4.7.201b:  Ensure supervisors are cognizant of their responsibilities under Paragraph 215, and are trained to perform those responsibilities correctly.*

### 4.7.202 Assessing Compliance Paragraph 216

Paragraph 216 stipulates:

**"APD shall develop and implement a protocol for using the**
**updated Early Intervention System and information obtained from**
**it. The protocol for using the Early Intervention System shall**
**address data storage, data retrieval, reporting, data analysis,**
**pattern identification, supervisory use, supervisory/departmental**

**intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command."**

## Methodology

Compliance with this paragraph is assessed in conjunction with approved policy for EIRS systems.  To date, APD is attempting to develop policy and protocols to conform to Paragraph 216, and which the monitor can approve.  The monitor will review and comment on those elements as they are developed and provided to the monitoring team.

## Results

In reviewing data submitted to the monitoring team by APD during this reporting period, at least 6 officers had reached double digits in "triggers" for the EIRS system.  Several responses from Supervisors were submitted, but none of those reviewed by the monitor contained more than three or four indicators, and most of those indicators were for incomplete investigations.  Supervisors were therefore unable or incapable of rendering decisions on whether there were any patterns or concerns with officer behavior.

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not in Compliance** |
| Operational: | **Not in Compliance** |

*Recommendation 4.7.202a: Complete the development process to achieve an approved policy regarding EIRS implementation at the sergeant's level.*

*Recommendation 4.7.202b:  Develop an approved analysis and reporting system regarding EIRS triggers, and response protocols to those triggers.*

## 4.7.203 Assessing Compliance Paragraph 217

Paragraph 217 stipulates:

**"APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law. Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System. On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner."**

**Methodology**

The monitoring team has reviewed the existing policies supporting the EIRS and plans for additional development find that, as written, they support the requirements of this paragraph.

**Results**

APD is currently in compliance with the plans to support the five-year and "indefinite" requirement regarding records retention.  Operational compliance requires implementation, supervision, and analysis of the effectiveness of those plans.  The monitoring team will continue to assess progress with the requirements of this paragraph.

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.203:  Complete the planning process and submit a document outlining policy, procedures, training and oversight approvable by the monitor.***

**4.7.204 Assessing Compliance Paragraph 218**

Paragraph 218 stipulates:

**"APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system. APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command. Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior."**

**Methodology**

The monitoring team requested "supporting documentation" for all three levels of compliance on this paragraph.  APD provided a memorandum advising that the EIRS SOP is in the "revision stage," and APD had nothing to support activity related to Paragraph 218.

**Results**

It is clear to the monitor that EIRS is an "orphaned" system at APD. Virtually all policy versions submitted by APD during this reporting period

342

were designed to weaken or muddle the system to the point of diminished utility.  We have reason to believe this is part of a focused attempt by APD to weaken the utility of the EIRS system.  We see this as a critical failure.  While the monitor has steadfastly refused to accept evisceration of EIRS, we are seriously concerned about APD's attempts to build a system that is designed to not note critical trends and issues.

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.204:  Complete the planning process and submit a document outlining policy, procedures, training and oversight approvable by the monitor.***

### 4.7.205 Assessing Compliance Paragraph 219

Paragraph 219 stipulates:

**"Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate. The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement."**

### Methodology

Established protocols in Paragraph 219 require "…**The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement.**"

APD has proposed new policy revisions for EIRS, but each has limited the system's use as an "early intervention" system by either raising the threshold limits or reducing the time periods in which personnel would have to violate a requirement.  As of yet, those policy revisions have not been approved, as they fail to conform to established practice, national standards or the requirements of the CASA.

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

343

***Recommendation 4.7.205a:  Complete development of the revisions to APD's EIRS policy that are approvable by the Parties and the monitor.***

***Recommendation 4.7.205b:  Train the new policies as approved***

***Recommendation 4.7.205c:  Develop and implement a meaningful "inspections and audit" protocol and procedure to ensure internal field-assessment of operations in the field (i.e., sergeants, lieutenants and Area Commanders) relating to this policy.***

### 4.7.206 Assessing Compliance Paragraph 220

Paragraph 220 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems. Within six months of the Effective Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require:**
**a) specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;**
**b) officers to ensure that their on-body recording systems are working properly during police action;**
**c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning;**
**d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible;**
**e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;**
**f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits;**
**g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and**
**h) APD to retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved."**

## Methodology

OBRD policy is among several "high-risk, critical tasks" still being revised by APD.  As with many critical policies, of late, the Parties and the

344

monitor have experienced substantial difficulties coming to agreement on the changes APD had proposed for OBRD.  Foremost was the intentional and deliberate revision of the policy, in direct violation of the requirements of the CASA, by way of Special Order.  While APD contends that the Special Orders were rescinded, evidence to the contrary was discovered throughout the APD duty locations druing our last site visit.  Additionally, no training documentation was provided to prove new policy and protocol are in existence.  The monitor will continue to insist that revised policy not be a roadblock to effective oversight and assessment of APD's compliance systems.   Current policies will be enforced while the Parties and the monitor work on establishment of agreed upon policy requirements.  We view such issues as deliberate non-compliance with the requirements of the CASA.

**Results**

| | |
|---|---|
| Primary: | **In Compliance (based on old policy)** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendation 4.7.206a:  Complete policy development and approval processes as agreed to by the Parties and approvable by the monitor.***

***Recommendation 4.7.206b:  Complete training/retraining on the revised policy for officers and supervisors.***

**4.7.207 Assessing Compliance with Paragraph 221**

Paragraph 221 stipulates:

**"APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and implementation. Upon approval by the Monitor and DOJ, policies shall be implemented within two months."**

**Methodology**

During the development of IMR-5, the monitoring team learned of an APD Special Order 16-75.  SO-16-75 unilaterally (without notice to or approval by the monitor and the Parties) changed the required review rate for sergeants from two per month per officer, to two per squad per month.  The reader should note that the monitoring team discovered this out-of-channels process via review of APD's routine course of business documents, i.e., meeting minutes for the "APD Office of Policy Analysis Meeting Minutes Agenda for 16-06 OBRD, dated 11 OCT 16," which clearly stated: "Updated the policy to match Special Order 16-75 that supervisors are to review two recordings per month from their assigned

squad."  When the monitoring team asked for a copy of the "Special Order," which we asked for by number and topic, we were told "it doesn't exist," and that we "must be mistaken."  The monitoring team forwarded a copy of the meeting minutes date and memo number.  In July 2017, APD developed and distributed a "Special Order" noting recission of eight CASA-related "Special Orders."

During the June 2017 site visit, members of the monitoring team were informed that the Special Order that "didn't exist" had been fully rescinded.  During the first duty location visit, two Supervisors were asked to demonstrate documentation of their latest months video reviews (Investigations Unit).  Each provided proof that they had indeed reviewed two videos per officer in their unit.  Unfortunately, three subsequent duty location visits all demonstrated that supervisors had only conducted two video reviews per the unit, and to justify their actions, provided the monitoring team with a document directing this review-- Department Special Order 16-82, dated November 2, 2016 and signed by the Chief.   Such failures are unacceptable, and given the hugger-mugger fashion in which the change in video review rates was effectuated by APD, we believe them intentional.  Our latest "on-ground" observations indicate continued failure to meet approved policy.  Obviously, this is unacceptable and directly challenges the monitor's ability to execute his described duties, as well as the Court's oversight role.

We do note, again, that in July (the last month of this reporting period), APD did issue a "Special Order" (17-56) that rescined eight previous "special orders" affecting operations relative to the CASA.  These eight "special orders" affected a variety of CASA-related processes, including supervisory reviews of OBRDs, Power DMS (often used for CASA-related training), video review tracking, show of force procedures, the Force Investigation Team, and force investigation procedures.

**Results**

|            |                     |
|------------|---------------------|
| Primary:   | **Not in Compliance** |
| Secondary: | **Not in Compliance** |
| Operational: | **Not in Compliance** |

***Recommendation 4.7.207a:  APD should rescind effective immediately any and all "Special Orders" or other policy mechanisms that contradict the CASA and/or monitor- and Party-approved policy.***

***Recommendation 4.7.207b:  APD should examine any remaining "Special Orders" they have published over the past two years, that may be in violation of the CASA and rescind those "Special Orders" as well.***

**4.7.208 Assessing Compliance with Paragraph 222**

346

Paragraph 222 stipulates:

**"The Parties recognize that training regarding on-body recording systems is necessary and critical. APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff. APD will develop a training curriculum, with input from the Monitor and DOJ that relies on national guidelines, standards, and best practices."**

**Methodology**

Members of the monitoring team reviewed PSU training related to this paragraph.  The training included a "testing block" designed to verify learning.

**Results**

Since the initial OBRD policy had been approved by the parties, APD has revised and altered the policy, without submitting changes to the parties.  APD's use of Special Orders to over-ride policy that is reviewed and approved by the monitor and the Parties has caused confusion throughout the department.  These issues were noted again, despite direct and written notice to APD of their existence during IMR-5's site visits and in written communications since.  Supervisors differ in their understanding of the review process.  APD has not submitted any documentation to the monitoring team of supervisors being re-trained in exactly what the APD policy requires them to do.  The monitoring team will implement more rigid screening of operations in the field related to OBRD use and supervision.

We do note that APD has "rescinded" many of these Special Orders, by issuance of Special Order 17-56 in July 2017, shortly before this reporting period expired.  It remains to be seen what confustions, difficulties, and CASA violations have been generated by the "Special Order" process.

        Primary:       **In Compliance**
        Secondary:   **Not In Compliance**
        Operational:  **Not in Compliance**

***Recommendation 4.7.208a:  APD should cease, effective immediately, making policy changes related to requirements of the CASA via Special Order, or any similar mechanism, without notifying the Parties and the monitor.***

***Recommendation 4.7.208b:  APD should rescind effective immediately any and all "Special Orders" or other policy***

*mechanisms that contradict the CASA and/or monitor- and Party-approved policy.*

### 4.7.209 Assessing Compliance with Paragraph 223

Paragraph 223 stipulates:

**"APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order. Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor."**

### Methodology

APD reports that audit plans for the requirements of this paragraph are currently in development within the auditing group to evaluate this data on a regular basis.  The monitoring team reviewed several hundred Supervisor Monthly Inspection Reports during the preparation of IMR-5 and made recommendations to APD avout a serious concern among the monitoring team relative to the integrity of APD's "testing" for OBRD systems.  We will continue to monitor this paragraph accordingly.

### Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendation 4.7.209:  APD should conduct an immediate, thorough and complete audit protocol relative to proper testing and functioning of OBRD equipment.***

### 4.7.210 Assessing Compliance with Paragraph 224

Paragraph 224 stipulates:

**"Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy."**

**Methodology**

The monitoring team has requested the data to document APD's compliance with these requirements for the past several reporting periods.  The response to this period's data request was "being worked on by IA."  Testing systems, reviewing recordings and referring out of policy performance for investigation is critical for the success of the OBRD program. It is unclear why Internal Affairs is working on policy and procedures to govern what should be a Patrol supervisory function.  In preparation of IMR-6, the monitoring team reviewed all cases presented by APD with regards to failing to activate recording systems.  Supervisors continue to exhibit a lack of clear policy understanding in documenting failure to record.  No cases submitted to the monitoring team were referred for formal investigation.  Only two cases used the term "verbally counseled." All other reports used vague language such as "met with", "spoke with", "reminded of importance of recording incidents", and even a CIRT recommendation that an officer be "formally re-familiarized" with policy.  Clearly, supervisors are in need of additional training in this policy, the requirements of this paragraph, and the concept of progressive discipline.  Individual supervisors had their own language for the meeting held with regards to failure to record. There appears to be no regularized process implemented among the Area Commands on a critical APD job process.  This points to critical policy and training issues related to supervision.

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendation 4.7.210a:  Complete a monitor- and Parties-approved policy outlining an effective inspections and audit function in the Area Commands' patrol operations processes of auditing supervisory processes designed to implement OBRD "use" requirements.***

***Recommendation 4.7.210b:  Implement the policy and evaluate its effectiveness in identifying and remediating OBRD use that is outside policy.***

**4.7.211 Assessing Compliance with Paragraph 225**

Paragraph 225 stipulates:

**"At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed."**

## Methodology

As discussed in Paragraph 221, above, during APD changed the OBRD policy approved by the Parties and the Monitor, in violation of the requirements of Paragraph 221.  Using a flawed methodology and an extremely small sample number, APD missed the opportunity to determine if the OBRD program is effective at documenting high-level, quality service; ensuring officer safety and accountability; and promoting constitutional, effective policing.  During a 30-day period in the previous reporting period (October 5-November 5, 2016) only 25 videos were reviewed for the entire APD--less than 1 per day.  In the monitor's opinion, *this constituted deliberate non-compliance*. The latest policy dated June 2, 2017 reinstitutes the two video reviews per officer per unit per month—though with a time limit caveat of 7-10 minutes.  However, during the June 2017 site visit it was clear that supervisors throughout APD had differing information on the policy and the requirements.  No documentation has been presented by APD for the re-training of supervisors for the requirements of the policy or the CASA paragraphs, thus we assume this has not occurred.  A Special Order, dated July 5, 2017 was produced and distributed by APD that rescinded eight CASA-related special orders.

## Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |

*Recommendation 4.7.211a: Ensure that all supervisors have been (re)trained in the revised OBRD policy.*

*Recommendation4.7.211b:  Ensure that all internal changes to policies approved by the monitor and the Parties are noticed to the monitor and the Parties in writing and approved as per the requirements of the CASA.*

## 4.7.212 Assessing Compliance with Paragraph 226

Paragraph 226 stipulates:

**"APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent."**

**Methodology**

As noted above, review by the monitor and the Parties of proposed policies includes an assessment of compliance with existing laws and regulations.  Thus, all approved policies are deemed by the monitor and the Parties to comply with the requirements of Paragraph 226.  In IMR-5, we reported worrisome developments with internal changes to APD policy, without notice to the Parties or the monitor.   Also in IMR-5 we recommended that APD conduct a complete self-review of policies to ensure there are no other "outliers" among their policy promulgation systems, e.g., internal practice memoranda such as Special Orders in conflict with approved policy.  We have seen no product of such a review, and find that more than a bit worrisome.  As a result, our recommendations below continue to reflect the same need to reassess APD's policy development and audit functions to ensure no other outliers remain.  We have seen no work product that indicates APD has conducted such a self-assessment.

**Results**

|            |                    |
|------------|--------------------|
| Primary:   | **In Compliance**      |
| Secondary: | **Not in Compliance**  |
| Operational: | **Not in Compliance** |

***Recommendation 4.7.212a:  APD should conduct a complete self-review of policies to ensure there are no other "outliers" among their policy promulgation systems, e.g., internal practice memoranda in conflict with approved policy, etc.***

***Recommendation 4.7.212b:  APD should notify the Parties and the monitor if they find any other similar issues related to other elements of the CASA.***

***Recommendation 4.7.212c:  APD should provide the Parties and the monitor with copies of their review findings and actions taken to resolve any additional issues noted.***

**4.7.213 Assessing Compliance with Paragraph 227**

Paragraph 227 stipulates:

**"APD shall ensure that on-body recording system videos are properly categorized and accessible. On-body recording system videos shall be classified according to the kind of incident or event captured in the footage."**

**Methodology**

The monitoring team made monthly requests for documentation that videos are properly categorized and accessible.

**Results**

No documentation regarding this requirement was provided by APD during this reporting period.  Prior reports found an extremely high error rate of 96 percent, well outside of the articulated standard of five percent or less.  Again, this finding implicates a potential for training, supervision or discipline issues regarding supervisory personnel review of OBRD video.  This statistic is more than an artifact.  It is clearly demonstrable of extreme and troubling issues within APD's supervisory, mid management, and executive cadres.  The initial error led us to question APD's supervisory processes related to this paragraph.  We have no data to indicate anything has changed regarding OBRD management since IMR-5's recommendations. Again, supervision has failed; mid-management has failed; and senior management has failed.

> Primary:      **In Compliance**
> Secondary:    **Not In Compliance**
> Operational:  **Not In Compliance**

***Recommendation 4.7.213a:  Identify the training elements implicated in the findings on this Paragraph and assess whether they were delivered in a manner that was clear and correct enough to result in CASA-compliance in the field.***

***Recommendation 4.7.213b:  If training deficiencies or problems are implicated in this review, design remedial training, counseling, or discipline if required to directly affect the observed in-field supervisory under performance.***

***Recommendation 4.7.213c:  Once the remedial training, counseling, or discipline is implemented, close the loop by re-evaluating performance in the field.  Repeat until under-performance is eliminated.***

**4.7.214 Assessing Compliance with Paragraph 228**

Paragraph 228 stipulates:

**"Officers who wear on-body recording systems shall be required to articulate on camera or in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded. Intentional or otherwise unjustified failure to activate an on-body**

**recording system when required by APD policy shall subject the officer to discipline."**

## Methodology

The monitoring team's review of OBRD cases included one case that was specific to the requirements of this paragraph.  The CIRT team, in reviewing a Show of Force case, identified "Critical Issues" with two officers who failed to activate their OBRD as required by policy, and secondly failed to report why the incident was not recorded.  CIRT's recommendation for the officers was that they should "be formally refamiliarized" with the OBRD policy.  One officer received "remediation" and was explained the importance of using his OBRD and documenting when he fails to use it.  The other officer reviewed the SOP with his supervisor and was given a "verbal quiz" and he "demonstrated an acceptable knowledge" of the policy.  Also discussed was progressive discipline and that a record of this event would be maintained in his "unit file." We question whether "formally re-familiarized" constitutes discipline.  We have the same issues with the relationship between discipline and a "verbal quiz."  We will continue to monitor the requirements of this paragraph for evidence of effective discipline.

## Results

The monitor is still not convinced that the "Special Order" issue has been remediated.  Given the serious, and apparently pervasive nature of this problem (our June audit found issues related to paragraphs 225, 226, 227, and this paragraph) we believe APD needs to revisit policy, training, supervision, and discipline to ensure that compliance is instituted relative to paragraphs 225, 226, 227 and 228.  Other than a "Special Order" (SO 17-56) we have seen no documentation indicating any type of self-awareness or self-direction on these issues on APD's part at this point in time.

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendation 4.7.214a:  Using the Completed Staff Work method, develop policy, training, and audit protocols responsive to this paragraph.***

***Recommendation 4.7.214b:  Once developed, implement and re-evaluate to determine if the problem has been resolved.***

***Recommendation 4.7.214c:  Repeat until compliance is attained.***

### 4.7.215 Assessing Compliance with Paragraph 229

Paragraph 229 stipulates:

**"APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties. On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room)."**

### Methodology

Members of the monitoring team asked APD for policy, training, or related records supporting compliance on this task.  None were provided in response to the monitor's request.  APD is not in compliance with this paragraph.

### Results

>        Primary:      **Not In Compliance**
>        Secondary:   **Not In Compliance**
>        Operational: **Not In Compliance**

***Recommendation 4.7.215a: Using the Completed Staff Work method, develop policy, training, and audit protocols responsive to this paragraph.***

***Recommendation 4.7.215b:  Once developed, implement and re-evaluate to determine if the problem has been resolved.***

***Recommendation 4.7.215c:  Repeat until compliance is attained.***

### 4.7.216 Assessing Compliance with Paragraph 230

Paragraph 230 stipulates:

**"APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift. All images and sounds recorded by on-body recording systems are the exclusive property of APD."**

### Methodology

Members of the monitoring team made monthly requests for the data relative to the requirements of this paragraph. All data submissions from

APD related to paragraph 230 were marked either "NA" or "completed".
No work product was presented allowing the monitor to make
independent assessments of APD's assertions.  During prior reporting
periods, the monitoring team was provided with links to a share-point
database containing supervisor monthly inspection reports.  This period,
access logins and passwords failed and no documentation was
provided.  While we are perplexed at the reasons for these failures, there
is no doubt that they constitute a failure in the system.  Given
performance in other related paragraphs, we see this as deliberate.

**Results**

       Primary:     **In Compliance**
       Secondary:  **In Compliance**
       Operational: **Not In Compliance**

***Recommendation 4.7.216a:  APD should implement its own
"inspections and audit" process to ensure OBRD video are
appropriately stored by the end-of-shift.***

***Recommendation 4.7.216b:  Once developed, implement and re-
evaluate to determine if the problem has been resolved.***

***Recommendation 4.7.216c:  Repeat until compliance is attained.***

**4.7.217 Assessing Compliance with Paragraph 231**

Paragraph 231 stipulates:

**"The Parties are committed to the effective use of on-body
recording systems and to utilizing best practices. APD currently
deploys several different platforms for on-body recording systems
that have a range of technological capabilities and cost
considerations. The City has engaged outside experts to conduct a
study of its on-body recording system program. Given these
issues, within one year of the Effective Date, APD shall consult
with community stakeholders, officers, the police officer's union,
and community residents to gather input on APD's on-body
recording system policy and to revise the policy, as necessary, to
ensure it complies with applicable law, this Agreement, and best
practices."**

**Methodology**

Members of the monitoring team conducted a course-of-business review
of documents related to compliance-building activities relative to this
paragraph.  This review would have demonstrated APD's commitment to
compliance with the requirements of this paragraph.  Readers familiar
with the monitor's process and reports, however, are aware of the issues

we confronted with Special Order 16-82 related to OBRDs, which, *by order*, eviscerated the agreed-upon (by the City, the Parties, and the monitor) policy requirements for this paragraph, effectively revising and weakening the approved policy without the approval and knowledge—at the time—of the DOJ, APOA, or the monitor.  This was a direct, and we must assume, intentional violation of paragraph 221.  After we discovered this deliberate attempt to by-pass the requirements of the CASA, APD has rescinded those special orders (in another Special Order dated July 5, 2017, near the end of this reporting period) and have returned to the CASA-compliant policies the Parties had agreed to earlier.  Since that time, we have found no further intentional violations of agreed-to policy, although as we note repeatedly above, insertion of the concept of *De Minimis* force by policy "definition," absent specific training, is problematic.  We expect APD to methodically work through secondary (retraining) and operational (in-the-field) compliance in the coming months, as we see proof of change in day-to-day operations.

**Results**

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not in Compliance** |
| Operational: | **Not in Compliance** |

***Recommendation 4.7.217a:  Restore any policy, procedure, practice or custom revised, terminated, or implemented as a result of Special Orders as they relate to OBRD policies, procedures, custom or practice.  This needs to be done through both written policy and training of officers and supervisors.***

***Recommendation 4.7.217b:  Retrain any personnel/supervisors who were provided training responsive to of Special Order 16-75 and Special Order 16-82.***

***Recommendation 4.7.217c:  Review all Special Orders currently applicable to APD operations to ensure congruity with the CASA.***

**4.7.218 Assessing Compliance with Paragraph 232**

Paragraph 232 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts."**

**Methodology**

Members of the monitoring team reviewed APD responses related to this requirement in the form of policy, programs, and results.

**Results**

APD has been, and is currently attracting and hiring qualified individuals.

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.219 Assessing Compliance with Paragraph 233

Paragraph 233 stipulates:

**"APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross section of the community. The recruitment plan shall establish and clearly identify the goals of APD's recruitment efforts and the duties of officers and staff implementing the plan."**

**Methodology**

Members of the monitoring team met with Training Academy personnel responsible for the development and implementation of a strategic recruitment plan, and reviewed existing process for the recruitment plan.

**Results**

The APD Training Academy has provided the monitoring team with the "2017 Strategic Recruitment Plan" and continues to aggressively promote APD via web-based applications with expanded emphasis on minority group sites. Additionally, APD has provided documentation of attendance at many diverse community group events including Military, Faith Based, Educational, and Sports Related.  The "blind" online application process wherein an applicant can remain completely anonymous until they arrive for testing is a laudable process. The 2017 Strategic Recruitment Plan meets the requirements of Paragraph 233. The recruiting plan has been reasonably effective to date, and APD maintains its "in-compliance" status on this paragraph.

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.220 Assessing Compliance with Paragraph 234

Paragraph 234 stipulates:

**"APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community."**

### Methodology

Members of the monitoring team reviewed APD performance on this topic as related to the requirements above.

### Results

The University of New Mexico worked with the APD to develop a comprehensive recruiting plan.  The monitoring team has received a copy of the resulting "2017 Strategic Recruitment Plan." In addition to the initial APD test with related skills questions—the background questionnaires for both a candidate's former employers and personal references—contain questions related to the required skills/abilities in this paragraph. A random audit of applicant files found each one to contain the relevant questionnaires with answers to the specific questions related to the requirements of this paragraph.

>           Primary:     **In Compliance**
>           Secondary:   **In Compliance**
>           Operational: **In Compliance**

### 4.7.221 Assessing Compliance with Paragraph 235

Paragraph 235 stipulates:

**"APD's recruitment plan will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. APD shall create and maintain sustained relationships with community stakeholders to enhance recruitment efforts."**

### Methodology

Members of the monitoring team also assessed compliance with this paragraph though a review of recruiting documentation and results.

**Results**

The "2017 Strategic Recruitment Plan" lists a review of past strategies and enumerates goals/objectives and plans to attract a diverse pool of applicants for 2017.  APD has expanded its web-based advertising with more emphasis on minority group sites (National Black Officers website), in addition to the Military and the University communities. APD is continuing regular contact with board members of the Southern Christian Leadership Council. Feedback received from a recruiting summit was a determining factor in the reduction of the college credit requirements. APD has expanded its efforts with the High School "Career Enhancement Center" in an effort to recruit students into the Public Service Aide program, and furthered efforts to develop processes to transition from PSA into Police Officer.   APD has provided, and the monitoring team has reviewed, documentation that demonstrates changes to recruiting processes based on community feedback. Community Councils recommended that APD post Albuquerque demographic data on its website, and that was completed.  Additionally, the Councils recommended an instructional video to demonstrate the testing and hiring process.  Reportedly, this is currently in the early stages of production.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.222 Assessing Compliance with Paragraph 236

Paragraph 236 stipulates:

**"APD shall develop and implement an objective system for hiring and selecting recruits. The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws."**

**Methodology**

We found the APD "in compliance" for this task in IMR-4.  We continue to re-visit that issue and find no negative changes in APD's process. APD has developed a "blind" automated, on-line system that allows an applicant to remain completely anonymous until they arrive for testing. Recruiting and Hiring policies have been revised and approved. Non-automated Recruiting and Hiring policies appear to meet the requirements of Paragraph 236.

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.223 Assessing Compliance with Paragraph 237

Paragraph 237 stipulates:

**"APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and polygraph examination to determine their fitness for employment. APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers. The program shall continue to be designed to detect the use of banned or illegal substances, including steroids."**

### Methodology

Members of the monitoring team requested COB data related to this paragraph, and reviewed a random sample of five cadets' records.  In addition, for the requirement of testing existing officers—APD submitted documentation of random drug testing documentation for more than 80 sworn personnel who were tested from February to May 2017.

### Results

The results of that review, included in the Table below, indicate 100 percent compliance for this task.

See table 4.7.223.

**Table 4.7.223**

| Case No. | New recruits and lateral hires, to undergo a psychological examination to determine their fitness | New recruits and lateral hires, to undergo a medical examination to determine their fitness | New recruits and lateral hires, to undergo a polygraph examination to determine their fitness | Reliable and valid pre-service Drug testing for new officers and random testing for existing officers. | Detect the use of banned or illegal substances, including steroids. |
|---|---|---|---|---|---|
| Recruit 1 | 1 | 1 | 1 | 1 | 1 |
| Recruit 2 | 1 | 1 | 1 | 1 | 1 |
| Recruit 3 | 1 | 1 | 1 | 1 | 1 |
| Recruit 4 | 1 | 1 | 1 | 1 | 1 |
| Recruit 5 | 1 | 1 | 1 | 1 | 1 |
| Total | **5** | **5** | **5** | **5** | **5** |
| Number in Compliance Total all Incidents | **5** | **5** | **5** | **5** | **5** |
| % in Compliance Total by Category | **100%** | **100%** | **100%** | **100%** | **100%** |

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.224 Assessing Compliance with Paragraph 238

Paragraph 238 stipulates:

**"APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws. APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities."**

## Methodology

Members of the monitoring team requested COB data related to this paragraph, and reviewed a random sample of records for five cadets.

## Results

The results of that review, included in the Table below indicate 100 percent compliance for this task.

361

**Table 4.7.224**

| Case No. | Assessing a candidate's credit history | Assessing a candidate's criminal history | Assessing a candidate's employment history | Assessing a candidate's use of controlled substances | Assessing a candidate's ability to work with diverse communities |
|---|---|---|---|---|---|
| Recruit 1 | 1 | 1 | 1 | 1 | 1 |
| Recruit 2 | 1 | 1 | 1 | 1 | 1 |
| Recruit 3 | 1 | 1 | 1 | 1 | 1 |
| Recruit 4 | 1 | 1 | 1 | 1 | 1 |
| Recruit 5 | 1 | 1 | 1 | 1 | 1 |
| Total | 5 | 5 | 5 | 5 | 5 |
| **Number in Compliance Total all Incidents** | 5 | 5 | 5 | 5 | 5 |
| **% in Compliance Total by Category** | **100** | **100** | **100** | **100** | **100** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.225 Assessing Compliance with Paragraph 239

Paragraph 239 stipulates:

**"APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires. APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement."**

## Methodology

The monitoring team determined that there were six lateral-hire applicants who were in the background investigation stage, but there were no lateral hires during this reporting period.

## Results

APD met or exceeded all established requirements for this Paragraph in the past, and remains in compliance based on that performance.

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

## 4.7.226 Assessing Compliance with Paragraph 240

Paragraph 240 stipulates:

**"APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants."**

### Methodology

Members of the monitoring team received a copy of APD's 2016 annual training report and reviewed it for compliance with this Paragraph.  We find APD in full compliance with this task, based on the format and content of that report.

### Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

## 4.7.227 Assessing Compliance with Paragraph 241

Paragraph 241 stipulates:

**"APD shall develop and implement fair and consistent promotion practices that comport with best practices and federal anti-discrimination laws. APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant. APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions. These criteria should account for experience, protection of civil rights, discipline history, and previous performance evaluations."**

### Methodology

APD promoted ten members to the rank of lieutenant during the reporting period.  The monitoring team reviewed a random sample of 40 percent of those promotions (four officers) and found APD to be in full compliance with the requirements of this paragraph for all four

363

promotions we reviewed. Records were checked in Human Resources, Internal Affairs and the Training Academy.

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.228 Assessing Compliance with Paragraph 242

Paragraph 242 stipulates:

**"APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties in core substantive areas."**

### Methodology

APD developed and approved a new Promotional Practices Policy (July 19, 2016). The monitoring team had provided APD with templates for acceptable needs assessment and training outline processes, which we would expect to be followed as this process continues."

We note that the new Promotional Practices Policy is still under review at this time, with a resolution draft being submitted to the monitor so that differences between the City and the APOA can be resolved.  Until that process is complete, APD remains out of compliance with this task.

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Pending** |
| Operational: | **Pending** |

### 4.7.229 Assessing Compliance with Paragraph 243

Paragraph 243 stipulates:

**"Within six months of the Effective Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours."**

**Methodology**

APD developed and approved a new Promotional Practices Policy (July 19, 2016). The APOA and the City made substantial changes to the proposed policy and submitted a final version to the monitor. We note that the resolution version of Promotional Practices Policy is still under review by the monitor, at this time, with the resolution draft being submitted to the monitor so that differences between the City and the APOA can be resolved. Accordingly, APD remains out of compliance with this task.

**Results**

APD remains out of compliance on this issue until there is an approved policy, and practice has been implemented on promotions that follow the policy.

> Primary:        **In Compliance (based on current policy)**
> Secondary:    **Not in Compliance**
> Operational:  **Not in Compliance**

***Recommendation 4.7.229: No action is required at this time, as this issue is currently "in progress," and pending resolution by the monitor.***

**4.7.230 Assessing Compliance with Paragraph 244**

Paragraph 244 stipulates:

**"APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet performance goals. The evaluation system shall provide for appropriate corrective action, if such action is necessary."**

**Methodology**

APD has completed and promulgated policy regarding performance evaluations.  The policy provides guidance on use of the system, listing criteria to be used to assess achievement of performance goals, and outlining corrective action required if performance "falls short." Members of the monitoring team visited four separate duty locations and had supervisors demonstrate the Talent Management System.

**Results**

All supervisors' work with the policy indicated that they were fluent in their use of the system and had completed the requirements of the policy, the CASA and the system on time.

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.232 Assessing Compliance with Paragraph 245

Paragraph 245 stipulates:

**"As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates."**

**Methodology**

The review of the Talent Management System database of over 1200 records (sworn and civilian employees) revealed that only in two instances were the reviews conducted outside the timeframe (1 day and 4 days). The monitoring team considers this to be an insignificant number (<1 percent) and thus APD retains its compliance for this requirement.

**Results**

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.233 Assessing Compliance with Paragraph 246

Paragraph 246 stipulates:

**"As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period."**

366

**Methodology**

The supervisors at the visited duty locations all demonstrated complete knowledge and comfort with the system and had were able to show examples of work plans and achievements of subordinates.  The monitoring team finds APD in compliance with the requirements of this paragraph.

**Results**

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

**4.7.234 Assessing Compliance with Paragraph 247**

Paragraph 247 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources.  To achieve this outcome, APD agrees to implement the requirements below."**

**Methodology**

Members of the monitoring team reviewed the total number of services provided by The Behavioral Science Section for this reporting period. The types of services provided included Critical Incident Service, Therapy Service as well as Training. The numbers that were recorded for this reporting period show an increase in the use of the services offered to the APD. At this point this trend is a positive sign indicating a strong effort by BSS to maintain a quality service providing APD officers and employees ready access to mental health and support resources. As mentioned in IMR-5, this material is highly confidential and these reviews confirm that APD is actively engaged in compliance efforts for this paragraph. The BSS is scheduled to conduct another "Behavioral Science Survey" in the next monitoring period. The BSS has submitted a revised policy to drive programmatic revisions and upgrades to the BSU's operations and programs, the policy is pending approvals.

**Results**

At this point, the monitoring team is satisfied that the data in response to this paragraph are being executed and analyzed. As this process progresses, however, the monitoring will need to review future data based on the new revisions to the policy to see the programmatic changes and innovations based on "lessons learned" from this process.

367

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.234: Identify, using BSSs, to drive programmatic revisions and upgrades to the BSU's operations and programs and implement those implicated revisions.***

### 4.7.235 Assessing Compliance with Paragraph 248

Paragraph 248 stipulates:

**"APD agrees to develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, including: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations."**

### Methodology

Members of the monitoring team reviewed numerous course of business documents produced by the Behavioral Science Unit. This documentation included but was not limited to the following: the Peer Support Training Curriculum, documentation for the Peer Support Board's activities, Peer Support Special meetings, Quarterly Board Meetings, Program Expansion/Outreach, Introduction to Peer Support briefings conducted during shift briefings and Special Peer Support meetings conducted covering urgent issues involving the program. BSS supplied the Monitoring Team with initial analyses of the numbers and types of BSS activities for this reporting period. The Monitoring Team will continue to monitor progress of the Peer Support Program in future site visits. Primary compliance as well as Secondary compliance could be assessed at this point. As mentioned in IMR-5, this material is highly confidential and these reviews confirm that APD is actively engaged in compliance efforts for this paragraph. This confidentiality makes operational assessments related to compliance difficult if not impossible.  Field-standard practices related to confidentiality of mental health services make operational compliance difficult to quantify; however, we have confidence that the *programs* implemented by APD's Behavioral Science Section are industry standard and compliant.

### Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.236 Assessing Compliance with Paragraph 249

Paragraph 249 stipulates:

**"APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma."**

### Methodology

During this reporting period, there were no new APD members to train in Officer Support Protocols. BSU is scheduled to deliver training in the seventh reporting period and will schedule training for APD personnel on the next promotional list. The monitoring team will review documentation supporting the training requirements of this paragraph during the next period. Documentation reviewed in paragraphs 247 and paragraph 248 demonstrates support services are accessible to officers and that APD is actively engaged in compliance efforts for this paragraph.

### Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.237 Assessing Compliance with Paragraph 250

Paragraph 250 stipulates:

**"APD shall ensure that any mental health counseling services provided APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care."**

### Methodology

Members of the monitoring team reviewed the Behavioral Sciences "Privacy and Confidentiality Policy" and conducted an on-site review of BSS facilities, and verified visually that records of individuals assisted by the BSS are secured in a locked filing cabinet, with reasonable restrictions on who has access.

### Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.238 Assessing Compliance with Paragraph 251

Paragraph 251 stipulates:

**"APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families."**

### Methodology

Members of the monitoring team reviewed the processes involved in ten different BSU initiatives. All applicable programs show direct involvement of mental health professionals in developing and providing mental health-related issues. BSS conducted a forty (40) Crisis Intervention Team (CIT) training during this reporting period to thirty-four (34) of its members as well as delivering the required Academy Cadet Class blocks of instruction to the 118th class as required by this paragraph.

### Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.239 Assessing Compliance with Paragraph 252

Paragraph 252 stipulates:

**"APD shall develop and implement policies that require and specify a mental health evaluation before allowing an officer back on full duty following a traumatic incident (e.g., officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death) or as directed by the Chief."**

### Methodology

Members of the monitoring team requested and reviewed documentation verifying the fact that BSS providers are accessible to line personnel. The nature of this documentation is highly confidential, and only aggregate data were reviewed, where practicable. Where that was not practicable, notes taken by the monitoring team were devoid of any direct or circumstantial information that would allow an individual to be identified. The monitoring team will continue to closely monitor this process in this manner during future site visits.

### Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.240 Assessing Compliance with Paragraph 253

Paragraph 253 stipulates:

**"APD agrees to compile and distribute a list of internal and external available mental health services to all officers and employees.  APD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers."**

### Methodology

Members of the monitoring team reviewed COB documentation showing implementation and high levels of performance for BSS on this paragraph, including updated Excel spread sheets of available mental health professionals, and the APD BSS 2017 flyer that went out to all personnel, a listing of referrals made by BSS during 2017, and other items as they pertain to maintaining compliance with this paragraph.

### Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.240 Assessing Compliance with Paragraph 255[192]

Paragraph 255 stipulates:

**"APD agrees to ensure its mission statement reflects its commitment to community oriented policing and agrees to integrate community and problem solving policing principles into its management, policies, procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."**

### Methodology

Members of the monitoring team reviewed the updated and revised mission statement as reflected in Special Order 17-06, APD's website, assessed related Special Orders, continued to discuss this issue with members of Albuquerque's community policing councils, and reviewed other related actions by APD.

---

[192] Paragraph 254 is not evaluated as it is subsumed in 255 and following.

**Results**

Special Order 16-06, dated January 9, 2017 indicates that APD has revised its mission statement reflecting its commitment to community oriented policing, and this commitment has been observed "on the ground" through factual information gathered from the CPCs membership.  APD continues to make progress in integrating community policing principles into its management practices (policies, procedures, recruitment, training, deployment, tactics, and accountability systems). During this reporting period, APD increased its deployment through its PACT re-alignment to command areas and it initiated additional problem- oriented policing projects in its area commands.  Work continues to ensure that community participation, input and access are folded into the mix of policy-making, training development, goal-setting, in-field processes and tactics, supervision, command decision making, and program assessment.  It appears APD has firmed up its reviews and commentary on community generated recommendations for APD improvements. APD also reports that "members have changed their signature lines voluntarily to reflect the Department's commitment to new mission statement" and greater emphasis on community policing.

While APD is establishing better mechanisms to capture, review and provide commentary on community generated recommendations for APD improvements, integration of the approved recommendations into on-going APD operations and organizational priorities is still a work in progress.  There is little evidence that progress has been made in implementing this recommendation. Some departments conduct both internal and external surveys to ascertain receptivity and community perceptions. APD should consider requesting external technical assistance to help establish an ongoing evaluation program that captures data reflecting receptivity and responsiveness to community needs.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **Not In Compliance**

**Recommendation 4.7.240a**: *APD should "operationalize" its revised mission statement through actions such as those listed in b and c below.*

**Recommendation 4.7.240b:  APD should continuously focus on mechanisms to take issues identified through its community-based systems such as the CPCs and move those issues through internal processes to ensure that community opinions, needs, and critical issues are reflected in patrol plans, organizational priorities, and programmatic planning**.

*Recommendation 4.7.240c:  APD should plan, develop and assess programmatic processes and evaluation strategies to identify, implement, assess, and improve both the quality and perception of its receptivity to community input and its ability to implement policing initiatives responsive to articulated community needs.*

### 4.7.241 Assessing Compliance with Paragraph 256:  APD Response to Staffing Plan

Paragraph 256 stipulates:

**"As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem oriented policing."**

### Methodology

Members of the monitoring team reviewed relevant APD documentation, communications, and related updates, circulars and communications methods.  They also assessed the level of congruity between the CASA requirements and staff re-allocations with the department's PACT deployment requirements.  Members of the monitoring team again requested information from APD regarding changes to recruitment and hiring goals and staffing that reflected internal, process-compliance with this task. Monitoring members also specifically reviewed memoranda relating to PACT assignments to command areas in accordance with the PACT plan.

### Results

APD's PACT plan was approved on December 27, 2016, and staff re-alignment responsive to the plan was continued during this reporting period.  In addition, APD circulated COB documentation requesting applications for PACT positions during this reporting period. The monitoring team during this reporting period can document the assignment of Lieutenants to all of the area commands in accordance with PACT.  Additionally, Sergeants were added to some of the PACT teams as well. Staffing efforts continue and as overall staff numbers increase, APD reports that staff assignments to PACT as well will increase until full implementation. PACT leaders and community outreach staff during this reporting period began meeting every other week to discuss community policing plans and initiatives, started hosting more community events, and implementing PACT Tact Plans.  APD reported that during this reporting period 24 new officers graduated from the police academy and 49 started in a new class scheduled to graduate in November.  These actions represent progress but do not reflect full

implementation of PACT and staffing levels required to fully execute a department -wide community policing strategy.

During this reporting period, APD did not produce a "data-based strategy for staffing Area commands that re-assess specific patrol allocations and other staffing and training that are responsive to the requirements of this paragraph. APD may want to consider external technical assistance to develop specific area command community policing strategies, and submit for executive review.

Primary:     **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.241a:  Articulate a data-based strategy for staffing APD Area Commands so that the processes required in this paragraph related to in-field changes to patrol allocation, staffing (and training) are responsive to the requirements of this paragraph.***

***Recommendation 4.7.241b: This should result in a piece of Completed Staff Work (CSW) identifying goals, measurable objectives, and processes involved in meeting the requirements of this Paragraph.***

***Recommendation 4.7.241c:  The finished CSW should be provided to the Chief of Police for review and comment and action.***

**4.7.242 Assessing Compliance with Paragraph 257:  Geographic Familiarity of Officers**

Paragraph 257 stipulates:

**"APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders, engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality of life issues."**

**Methodology**

Members of the monitoring team continued to review APD patrol "bid packets" by conducting random assessments of the packets to determine if they contained evidence of conformance with this Paragraph's requirements.  The monitoring team also continued to review APD memoranda and other program documentation describing Problem Oriented Policing (POP) projects.  The monitor specifically

reviewed descriptions of POP projects for each of the six command areas including community stakeholder involvement.

**Results**

All of the six Area Commands provided data regarding signed bid packets. These packets include a list of neighborhood associations, meetings and community contacts. However, bid packets did not always include a listing and description of ongoing POP projects in their area command. APD documented having had POP projects in all of the six area commands.   However, the documentation provided makes it virtually impossible to determine current status and outcomes.  As such, the "documentation" is of little (if any) use to the monitoring team, and we suggest it is of similar utility to APD command and executive staff. APD did submit to the Monitoring team a detailed description of all POP projects including project description, community stakeholders, and strategies to address issues covering the six command areas.  APD still pledges to complete staff work identifying the scope and depth of POP development issues, and submit to Chief of Police for review.  We have seen no data collection, analysis or "production" related to that process.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not in Compliance**

*Recommendation 4.7.242a:  APD should develop a Completed Staff Work document identifying the scope and depth of POP development issues, including recommendations for solving the identified above.*

*Recommendation 4.7.242b:  The CSW document should be forwarded to the Chief of Police for review and comment.*

### 4.7.243 Compliance with Paragraph 258: Officer Outreach Training

Paragraph 258 stipulates:

**"Within 12 months of the Effective Date, APD agrees to provide 16 hours of initial structured training on community and problem oriented policing methods and skills for all officers, including supervisors, commanders, and executives   this training shall include:**

**a)  Methods and strategies to improve public safety and crime prevention through community engagement;**
**b)  Leadership, ethics, and interpersonal skills;**
**c) Community engagement, including how to establish formal partner ships, and actively engage   community organizations, including youth, homeless, and mental health communities;**

375

d) **Problem-oriented policing tactics, including a review of the principles behind the problem solving framework developed under the "SARA Model", which promotes a collaborative, systematic process to address issues of the community. Safety, and the quality of life;**

e) **Conflict resolution and verbal de-escalation of conflict and;**

f) **Cultural awareness and sensitivity training.**

**These topics should be included in APD annual in-service training.**

## Methodology

Members of the monitoring team reviewed updates to APD's training curriculum for recruits and for in service training, and compared it to the CASA-recommended training for APD officers.  We found several issues with the training product, as delivered, and recommended specific changes.

## Results

APD has continued to make improvements and revisions to its POP-related training curriculum, based on the monitoring team's comments. The COP/POP training during this reporting period, was presented to 907 of all sworn officers, above the 95 percent threshold established by the monitoring team.  In the monitoring team's assessment, the provided training now reflects industry standards for the field.  APD reports that 98.8 percent of the officers who took the APD post-test received a passing score.  Operational aspects of the APD's performance on this requirement will be assessed as the COP/POP training and procedures are reflected in operations and the monitoring team has an opportunity to assess outcomes associated with the new program.

The monitoring team did raise a concern about the post training assessment methodology and recommends that APD conduct review of these assessment methods to ensure alignment with industry standards and report findings to executive staff and the monitoring team.  The monitoring team will continue to monitor for operational compliance including evidence of the impacts of the COP/POP training.   APD has prepared summary descriptions of each of their POP projects but information provided does not always provide current status, outcomes, or measureable impacts. The monitoring team recommends revisiting reporting formats to capture more current status and outcome/impact information.  COP/POP efforts at summary descriptions of programmatic inputs and outputs are of highly varied quality at this point.  While APD took the first steps at improving reporting, not all projects reflect such critical items as goals, objectives, current status, outcomes or results.

Primary:        **In Compliance**

Secondary:      **In Compliance**
Operational:    **Not In Compliance**

***Recommendation 4.7.233a:  Prepare detailed operational reports assessing POP-related programs and projects, including analyses of outcomes and processes.***

**4.7.244 Assessing Compliance with Paragraph 259:  Measuring Officer Outreach**

Paragraph 259 stipulates:

**"Within six months of the Effective Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem solving partnerships, and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross section of stakeholders."**

## Methodology

Members of the monitoring team reviewed APD's community calendar, and samplings of social media, copies of MOU's between APD and community organizations.  Team members also reviewed correspondence reflecting community stakeholder outreach.  These data sources were reviewed to gauge the level and quality of "formalized partnerships" with stakeholders in the community.  We also reviewed documented problem-solving partnerships developed by APD with its various community stakeholders. We also looked at APD provided survey data reflecting assessing outreach efforts.

## Results

APD is still in the process of fully developing and implementing a system to capture non-enforcement officer contacts and measure officer outreach. No additional documentation for this effort was provided during this reporting period.   APD did provide community calendars depicting activity at various levels, and samplings of social media contacts to demonstrate non-enforcement contacts for the reporting period. APD reported that based on calendar data and other sources, APD officers and senior staff participated in an average of 30 non-enforcement community meetings per month during this reporting period. APD, as demonstrated in its electronic correspondence, has initiated some coordination with community stakeholders focused on toy drives and other similar events.  To date, no documented on-going partnerships (outside of the POP projects) with service-providing stakeholder groups have been documented by APD.  Moreover, no studies, assessments, or

377

other documents indicate preliminary planning to work with or generate on-going partnerships with stakeholders in the community, other than the CPCs.

In summary, APD's community oriented and problem oriented policing processes appear to be piecemeal and reflexive instead of consisting of a coherent overlay of problem assessments, response planning, execution, and evaluation.  We have repeatedly referred APD to the well documented SARA model (Scanning-Analysis-Response-Assessment) used by other police agencies for decades.  It appears the department has chosen to implement its own model, which at this time is difficult to discern in terms of goals, objectives, methods and measures.  It appears to be, instead, a less than coherent "collage" of ad hoc responses.

APD continues to struggle with implementing the tracking mechanisms to systematically capture community contacts, outreach activities, and ongoing partnerships.   Progress has been made in the log ins of community contacts through a recently enacted 10-Code 75/1 system.  What's missing is the capture of specific concerns raised, and outcomes from APD response.  APD has other ongoing collaborations and partnerships with service providing groups that need to be more clearly documented and updated and then included in information provided to the monitoring team.

We continue to be perplexed by APD's resistance to well-researched and proven effective methods in other agencies (such as the SARA model).  Nonetheless, that choice is APD's, and we will simply continue to report outcomes as we find them.  (We found similar resistance to using policies from other police departments, regarding use of force, for example).

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not in Compliance** |
| Operational: | **Not in Compliance** |

***Recommendation 4.7.244:  Document activities using Area Command tracking sheets, ensuring specifically that documented on-going partnerships are assessed and recommendations for reasonable improvement are included.***

### 4.7.245 Compliance with Paragraph 260:  PIO Programs in Area Commands

Paragraph 260 stipulates:

**"APD shall develop a Community Outreach and Public Information program in each area command."**

378

**Methodology**

Members of the monitoring team reviewed Area Command websites, social media data, samplings of social media interactions, descriptions of new community outreach programs including "4# at Tuesday Cop Talks", reviewed outreach videos, related internal memoranda, documentation of APD's Coffee with a Cop initiative and other outreach activities. Monitoring team members also reviewed minutes from CPCs involving APD information sharing presentations and proposed template for a proposed "Community Policing and Concerns memo."

**Results**

APD has established and continues to maintain CPC websites for each of the six command areas.  These sites currently capture crime information, agendas for upcoming CPC meetings, schedules of upcoming events, other news items, information on how to report crimes, and information regarding how to file complaints or recommendations for officer commendations.  APD has also established social media outreach that includes Facebook, Twitter, and netdoor.com.  APD, during this reporting period, hosted nine "Coffee with a Cop" events, and two "Chili Dog With a Cop" events.  The outreach program continues to evolve and expand with each reporting period.

> Primary:       **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

**4.7.246 Compliance with Paragraph 261:  Community Outreach in Area Commands**

Paragraph 261 stipulates:

**"The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command that is open to the public.  During the meetings, APD officers from the Area command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings."**

**Methodology**

Members of the monitoring team reviewed minutes from the CPC meetings during the reporting period.  Other documentation including meeting announcements, outreach efforts, and the power point

presentation by APD of the CASA requirements, updates on APD's progress and continued challenges in meeting CASA requirements. During this reporting period, APD Forward, coalition of local advocacy groups also provided presentations updating community members on APD progress and remaining challenges regarding implementation of the CASA and monitoring team members attended two of these presentations.

**Results**

Monitoring team members attended two of these required semi-annual meetings devoted to providing community members, summarized information from the most recent IMR highlighting both accomplishments and continuing challenging areas.  In both meetings attended by monitoring team members, there was extensive and vigorous discussion, valuable information sharing regarding CASA status, and opportunities for community feedback was provided.   APD's COB documentation and "on the ground" observations by monitoring team members indicate compliance for this paragraph has been achieved.

> Primary:        **In Compliance**
> Secondary:     **In Compliance**
> Operational:  **In Compliance**

**4.7.247 Compliance with Paragraph 262:  Community Outreach Meetings**

Paragraph 262 stipulates:

**"The Community Outreach and Public Information meeting shall, with appropriate safeguards to protect sensitive information, include summaries, of all audits and reports pursuant to this Agreement and any policy changes and other significant action taken as a result of this Agreement. The meetings shall include public information on an individual's right and responsibilities during a police encounter."**

**Methodology**

Members of the monitoring team reviewed APD website activity, semi-annual meeting PowerPoint presentations, meeting handouts, and meeting agenda.

**Results**

All CASA-related reports are posted on the APD website. The PowerPoint presentation for the semi-annual meetings does provide summary information on policy changes and actions taken by APD.

Further, APD has created a handout outlining individual rights and responsibilities for police encounters and made it available at the semi-annual meetings in each command area. Meetings were held in each of the six area commands during this reporting period.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.248 Compliance with Paragraph 263: APD Attendance at Community Meetings

Paragraph 263 stipulates:

**"For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area command shall attend at least two community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned."**

### Methodology

Members of the monitoring team reviewed APD's "Community Calendar," Officer monthly reports, CPC meeting attendance information, and social media efforts to capture non-enforcement contact, and POP project summaries.

### Results

APD previously established through SOP-3-02-1 the requirement and tracking mechanisms to implement this task. It continues to be unable to develop the capability to systematically track and capture salient information about participation in community meetings, and to document execution of this task.  APD is making other efforts to document non-enforcement community meetings, referencing community calendars, social media, and community meeting minutes.  Based on these less-than-precise metrics, they estimate APD is generating attendance at 30 community meetings a month department wide.  At this stage of the compliance process "estimates" are not acceptable evaluative data. APD reports that they are still in the process of fully implementing the TRACS system that will capture meting attendance and outcomes. APD should identify barriers and develop a plan to address them. It is clear that APD is making progress in increasing their community involvement based on the current documentation available.  However, APD still struggles with data capture and tracking of non-enforcement police activities.  We recommend APD seek external technical assistance in defining, capturing, measuring, tracking, and reporting on non-enforcement

activities, as recommendations made by the monitoring team seem not to be acted upon in a timely manner.

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.248a:  Develop the capacity, and begin using the capacity to systematically track and capture salient information about participation in community meetings, and document execution of this task.***

### 4.7.249 Compliance with Paragraph 264:  Crime Statistics Dissemination

Paragraph 264 stipulates:

**"APD shall continue to maintain and publicly disseminate accurate and updated crime statistics on a monthly basis."**

### Methodology

Members of the monitoring team reviewed the APD website and minutes of CPC monthly meetings.

### Results

The results of this reporting period have not changed from the previous reporting period. APD has contracted with a service that provides up to date crime mapping services based on "calls for service" that can be accessed on their website, a very useful tool.  However, it is not a CASA requirement.  The capture and reporting of aggregated monthly crime statistics is a CASA requirement.  While some of this information may be presented at monthly CPC meetings, it is not provided on the area command websites. Furthermore, accessing the information that is available is difficult and cumbersome.  Overall, City-wide Monthly crime numbers are provided on the city government website, but should be reported as well on the CPC command area website.

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.249a:  Document the capture and reporting of aggregated monthly crime statistics by Area Command.***

382

### 4.7.250 Compliance with Paragraph 265:  Posting Monitor's Reports

Paragraph 265 stipulates:

**"APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD website with reasonable exceptions for materials that are legally exempt or protected from disclosure."**

### Methodology

Members of the monitoring team reviewed the APD and City websites for evidence of compliance with this task.

### Results

All requirements stipulated by this paragraph continued to be met by the APD and the City.  Further, APD has developed reasonable guidelines for determining any reasonable exceptions to posting audits and reports relating to the CASA.

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.251 Compliance with Paragraph 266:  CPCs in Each Area Command

Paragraph 266 stipulates:

**"The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level. The Community Policing Councils shall meet, at a minimum, every six months."**

### Methodology

Members of the monitoring team reviewed CPC minutes, agenda, and attendance reports for CPC meetings, and attended four CPC meetings during this reporting period.

### Results

CPCs have been established in each of the six Area commands since November 2014.  During this and prior reporting periods, each of the six Councils met once a month.  Through extensive recruitment and outreach efforts, the CPCs overall increased their voting membership

during this reporting period.  Non- voting participation levels are not captured or documented in meeting minutes. Estimates in non- voting attendance have been requested for future CPC meetings.  There is some evidence that overall participation in most of the six CPCs has improved in this reporting period. However, ABQ still has not developed the capture and tracking mechanisms to document and report participation levels in CPC meetings.

Communication and dialogue with all relevant community stakeholders still remains a challenge, although in some CPCs efforts have been able to diversify membership to a greater extent and provide a broader and more representative range of perspectives on issues being presented and discussed at CPC meetings.  The broader and more diverse voting membership may in part address complaints by some meeting attendees that only APD perspectives on issues are presented at CPC meetings, and not providing opportunities for more balanced analysis and discussion. APD should continue work to broaden membership and participation by determining what factors are keeping "relevant stakeholders" from expressing their views at CPC meetings, and documenting attempts to address those factors.

APD has consistently exceeded CASA requirements with CPCs monthly meetings since their inception.  They continue to struggle with participation metrics and documentation, and voting membership diversification. APD has taken steps to broaden membership in CPCs. In conjunction with CPC leadership, they have helped conduct outreach to stakeholder groups, and utilized a variety of networks to recruit more voting members who also are broadening perspectives in some of the CPCs. More work on this recommendation is still required.

|                |                     |
|----------------|---------------------|
| Primary:       | **In Compliance**   |
| Secondary:     | **In Compliance**   |
| Operational:   | **Not In Compliance** |

***Recommendation 4.7.251a:  APD should continue work to broaden membership and participation by determining what factors are keeping "relevant stakeholders" from expressing their views at CPC meetings, and documenting attempts to address those factors***

### 4.7.252 Compliance with Paragraph 267:  Selection of Members of the CPCs

Paragraph 267 stipulates:

**"In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross**

**section of community members and APD officers, including for example representatives of social services providers and diverse neighborhoods, leaders in faith, business, or academic communities, and youth.  Members of the Community Policing Councils shall possess qualifications necessary to perform their duties, including successful completion of the Citizen Police Academy."**

## Methodology

Members of the monitoring team assessed the CPC survey data, APD's website, APD's CPC guidance document and reviewed them for compliance to the requirements of the CASA.  In addition, we audited posted CPC selection procedures and criteria, and interviewed CPC current leadership.

## Results

Selection mechanisms continue to evolve but now reflect CPC input. Each CPC is allowed now to establish their own selection criteria, but each voting member is still required to complete a background check. The background check requirements have reasonable excluding factors limited to current warrants and/or violent felonies in last three years. There remains a requirement to complete a 12-week course for the Citizen Police Academy during this reporting period, but efforts are underway to provide a shorter version for CPC voting members as an option.

CPC membership criteria is posted on the APD website.  However, each CPC can further refine voting membership criteria, so each CPC website should post its voting member selection criteria and procedures.  CPCs continue to need to recruit a more representative cross section of community members as CPC voting members.  Selection procedures and criteria for each CPC also need to be finalized, posted and publicized. We recommend that APD, working closely with CPC leadership, formulate a membership recruitment strategy aimed specifically at achieving more diversification in membership as required in the CASA.   APD in conjunction with CPC leadership has made inroads in reaching a broader cross-section of community members, both expanding the numbers and the diversity of CPC voting members. Additional efforts are required to achieve compliance.

 CPC voting member selection procedures continued to evolve with CPCs now weighing in, and APD offering more clarity regarding back ground checks.  APD is also considering modifying the requirement for completion of the 12-week Citizen Police Academy, and offering a shorter version as an option to CPC members. Other selection procedures and criteria are determined by each CPC and should be

posted along with the general requirements and criteria on each CPC website.

Primary:       **In Compliance**
Secondary:   **Not in Compliance**
Operational: **Not in Compliance**

***Recommendation 4.7.252a:  Improve and document efforts to recruit and retain a more representative cross section of community members as voting members of the CPCs***

***Recommendation 4.7.252b: Post selection procedures on the internet.***

### 4.7.253 Compliance with Paragraph 268:  Resourcing the CPCs

Paragraph 268 stipulates:

**"The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, APD shall provide appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure."**

### Methodology

Members of the monitoring team reviewed CPC guidelines, Facilitator invoices, and the CPC staffing memorandum.  Members also interviewed CPC leadership and CPC meeting observations.

### Results

During the last reporting period, APD assigned staff fully devoted to CPCs, and also provided over 100 hours of facilitation services for the CPCs.  The assignment of staff fully devoted to CPCs has resulted in expanded outreach activities producing more CPC voting members and apparently increasing participation by community members.  CPC meeting agenda, guest speakers and topics are increasingly reflective of CASA requirements. What is lacking is CPCs progress in capturing, organizing and posting CPC activities in an easily accessible and timely fashion.  Monitoring team members recommend APD assign staff to review and revise the CPC main website and in particular the website for each CPC, to ensure posting of CPC documentation in a timely fashion, and using a design to advance outreach efforts.

Many CPC compliance issues focus on inadequate documentation including timely posting of annual reports, CPC recommendations and APD responses, CPC participation metrics, updated and clearly explained voting membership procedures and criteria, and command area crime statistics. CPC topics and discussions at times touch on community policing efforts but APD, in conjunction with CPCs, still have not produced a comprehensive community policing approach for each command area.  APD commanders and their staffs have made themselves available to CPCs, and data and other information has generally been provided when requested by CPCs. Minimal progress has been made this reporting period in addressing this recommendation. APD may require external technical assistance to develop specific community policing strategies for each command area.

Primary:        **In Compliance**
Secondary:     **In Compliance**
Operational:   **Not In Compliance**

***Recommendation 4.7.254a:   APD should take the lead to ensure a comprehensive community policing approach is identified for each area command, based on CPC interaction, participation, and comment.***

**4.7.254 Compliance with Paragraph 269:  APD-CPC Relationships**

Paragraph 269 stipulates:

**"APD shall seek the Community Policing Councils assistance, counsel, recommendations, or participation in areas including:**

**a) Reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;**
**b)  Reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;**
**c)  Providing information to the community and conveying feedback from the community;**
**d) Advising the chief on recruiting a diversified work force**
**e) Advising the Chief on ways to collect and publicly disseminate data and information including information about APDs compliance with this Agreement, in a transparent and public – friendly format to the greatest extent allowable by law."**

**Methodology**

Members of the monitoring team have reviewed CPC meeting minutes, the APD website, and documentation relative to this requirement produced by the CPCs and the APD.  We have also audited CPC

agendas and CPC recommendations, and have reviewed APD feedback to the CPCs relative to this paragraph. Monitoring team members also attended four CPC meetings during this reporting period.

**Results**

The CPCs have made significant progress during this reporting period in addressing the areas identified in the CASA for CPC input.  The agenda items and CPC recommendations for several CPCs more closely align with the issues and topics identified in the CASA.  APD has started tracking and posting recommendations and some APD responses. Response and posting of those responses to recommendations by APD were inconsistent and not always timely during this report period. For some CPCs, topic areas covered in agendas and the focus of recommendations still need to be more responsive to CASA requirements such as advising the chief on diversifying the work force, specific feedback on APD policies and practices, and advancing community policing strategies.  APD, working with CPCs during this report period, have improved in their documentation of recommendations submitted to APD for approval.  A process has been developed including recommendation submission forms and timelines for APD response. The challenge now is for APD to build consistency in recommendation receipt and posting of the review in a timely manner.  APD through its CPCs are engaged in more discussion with community members about APD compliance and compliance challenges.  Progress remains slow.

>Primary:      **In Compliance**
>Secondary:   **In Compliance**
>Operational: **Not in Compliance**

***Recommendation 4.7.255a:  Using the CSW model, APD should assess specific "failure analyses" for the issues noted above, identify the cause of the failures, and articulate a written plan for resolving any outstanding requirements relating to compliance with this paragraph.***

**4.7.255 Compliance with Paragraph 270:  CPC Annual Reports**

Paragraph 270 stipulates:

**"The Community Policing Councils shall memorialize their recommendations in annual public report that shall be posted on the City website. The report shall include appropriate safeguards not to disclose information that is legally exempt or protected from disclosure."**

388

**Methodology**

Members of the monitoring team reviewed CPC annual reports and the APD website for information responsive to the requirements of this paragraph.

**Results**

APD has posted annual CPC annual reports for 2015 for several CPCs, posted several CPC annual reports for 2016.  There is an incomplete set of annual reports for both 2015 and 2016 posted on the website during this report period.  We recommended that staff be assigned to develop a more standard format for the CPC annual report and provide assistance to each CPC in producing its annual report. 2017 data need to be incorporated.

Primary: **In Compliance**
Secondary: **Not in Compliance**
Operational: **Not in Compliance**

***Recommendation 4.7.55:  Assigne staff to develop a more standard format for the CPC annual report and provide assistance to each CPC in producing its annual report. 2017 data need to be incorporated***.

**4.7.256 Compliance with Paragraph 271:  CPOA Implementation**

Paragraph 271 stipulates:

**"The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD.  The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force."**

**Methodology**

Members of the monitoring team reviewed online information regarding the CPOA and POB, met with the Director and members of the CPOA and the Chair and members of POB, and reviewed records from, to, and relating to CPOA operations this reporting period.

389

**Results**

It is clear from this review that the CPOA has been implemented, organized and is providing an independent review of the elements of police oversight articulated in this paragraph.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.257 Assessing Compliance with Paragraph 272:  Independence and Accountability of CPOA

Paragraph 272 stipulates:

**"The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance."**

### Methodology

Members of the monitoring team have ongoing communications with CPOA staff and leadership.  In addition, we review, every reporting period, the work product produced by CPOA as well as online information regarding meetings of the POB.

### Results

It is clear from this review that the CPOA has been implemented, organized and is providing an independent review of the elements of police oversight articulated in this paragraph.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.258 Assessing Compliance with Paragraph 273:  Requirements for Service of CPOA Members

Paragraph 273 stipulates:

**"The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque."**

390

The monitoring team reviewed the resumes and backgrounds of the appointed members of the CPOA (POB members) and the CPOA Ordinance, had several meetings during the site visit with members of the CPOA, and attended a POB meeting in which the member of the monitoring team met with the Chairperson and members of the POB and CPOA.

**Results**

As noted in IMR-4 the Ordinance sets forth the requirements of this paragraph for members of the Police Oversight Board.  The monitor was able to review the CVs and background of members of the POB.  The monitor finds their background and commitment to be in compliance with, and in many cases to exceed, the requirements of this paragraph.

       Primary:     **In Compliance**
       Secondary:  **In Compliance**
       Operational: **In Compliance**

**4.7.259 Assessing Compliance with Paragraph 274:  CPOA Pre-Service Training**

Paragraph 274 stipulates:

**"Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:**

   **a)  This Agreement and the United States' Findings Letter of April 10, 2014;**
   **b)  The City ordinance under which the agency is created;**
   **c)  State and local laws regarding public meetings and the conduct of public officials;**
   **d)  Civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;**
   **e)  All APD policies related to use of force, including policies related to APD's internal review of force incidents; and**
   **f)  Training provided to APD officers on use of force."**

**Methodology**

As noted in previous IMRs, members of the monitoring team reviewed training records of the appointed members of the CPOA (POB members) and the CPOA Ordinance, had several meetings during the site visit with the Director of the CPOA, visited the CPOA office, and met with the POB Chair and POB and CPOA members.  The monitoring team also reviewed, relative to a previous site visit, a PowerPoint presentation proposed by legal counsel to the CPOA regarding civil rights and Fourth Amendment training and the CASA.

**Results**

The Ordinance sets forth the initial training requirements (within the first six months of the member's appointment) required by this paragraph, although it does not specify that these training requirements must equal 24 hours.

The monitor's review of CPOA training records shows that the appointed members of the CPOA (POB members) are in compliance with the training requirements of this paragraph, including the 24-hour training requirement.

The monitor finds the proposed Civil Rights, Fourth Amendment and CASA training is professional and appropriately addresses the subject matter required by the CASA.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

## 4.7.260 Assessing Compliance with Paragraph 275:  CPOA Annual Training

Paragraph 275 stipulates:

**"The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement."**

**Methodology**

The monitor reviewed training records of the appointed members of the POB members, had several meetings during the site visit with the Director of the CPOA and visited the CPOA office, met with the POB Chair and members of the POB and CPOA.  The monitor also reviewed, relative to a previous site visit, a PowerPoint presentation proposed by legal counsel to the CPOA, of civil rights and Fourth Amendment training and the CASA. (See also, Methodology, paragraph 274).

**Results**

The CPOA is in compliance with the annual training requirement for members of the POB (appointed members of the agency).

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

392

### 4.7.261 Assessing Compliance with Paragraph 276:  CPOA Ride-alongs

Paragraph 276 stipulates:

**"The City shall require those appointed to the agency to perform at least two ride-alongs with APD officers every six months."**

### Methodology

The monitor had several meetings during the site visit with members of the CPOA and visited the CPOA office, reviewed the CPOA Ordinance and assessed CPOA training records.

### Results

The Ordinance forming and empowering the CPOA sets forth the requirements of this paragraph for members of the POB (appointed members).  CPOA member ride-along records support compliance with this paragraph.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.262 Assessing Compliance with Paragraph 277:  CPOA Authority and Resources to Make Recommendations

Paragraph 277 stipulates:

**"The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer- involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force**."

### Methodology

Members of the monitoring team reviewed staffing levels and case-completion times relative to civilian complaints, serious uses of force, and officer-involved shootings, and the general assessment of the discharge of CPOA duties. The monitor met several times with the Director of CPOA and visited the CPOA office and made observations of its members and their work.

**Results**

CPOA case completion times are reviewed in the treatment of Paragraph 198, above.  They show adequate levels of personnel and are completing cases in an expedited manner.

> Primary:         **In Compliance**
> Secondary:     **In Compliance**
> Operational:   **In Compliance**

### 4.7.263 Assessing Compliance with Paragraph 278:  CPOA Budget and Authority

Paragraph 278 stipulates:

**"The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws.  The agency shall have the authority to hire staff and retain independent legal counsel as necessary**."

**Methodology**

The monitoring team routinely assess this issue in its conversations with the Executive Director of CPOA, and through assessment of the discharge of CPOA responsibilities.

**Results**

The City remains in compliance with this paragraph based on past and current performance.

> Primary:         **In Compliance**
> Secondary:     **In Compliance**
> Operational:   **In Compliance**

### 4.7.264 Assessing Compliance with Paragraph 279:  Full-Time CPOA Investigative Staff

Paragraph 279 stipulates:

**"The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review of serious uses of force and officer-involved shootings.  The investigative staff shall be selected by and placed under the supervision of the Executive Director. The Executive Director will be selected by and work under the supervision of the agency.  The City shall provide the agency with adequate funding to ensure that the agency's investigative staff is**

**sufficient to investigate civilian complaints and review serious uses of force and officer-involved shootings in a timely manner."**

## Methodology

The monitoring team routinely monitors performance on this paragraph by reviewing case timelines and completion data. Funding is adequate; the investigative staff is actively supervised by the Executive Director who in turn reports to, and is supervised by, the POB. No substantial delays were noted based on staffing issues.

### Results

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.265 Assessing Compliance with Paragraph 280:  Receipt and Review of Complaints by CPOA

Paragraph 280 stipulates:

**"The Executive Director will receive all APD civilian complaints, reports of serious uses of force, and reports of officer-involved shootings.  The Executive Director will review these materials and assign them for investigation or review to those on the investigative staff.  The Executive Director will oversee, monitor, and review all such investigations or reviews and make findings for each.  All findings will be forwarded to the agency through reports that will be made available to the public on the agency's website."**

## Methodology

The monitor reviewed intake and resolution data responsive to this paragraph. The Executive Director's findings are published on the CPOA website.

## Results

CPOA remains in compliance with this task for this monitoring period.

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.266 Assessing Compliance with Paragraph 281:  Prompt and Expeditious Investigation of Complaints

Paragraph 281 stipulates:

**"Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible."**

### Methodology

Members of the monitoring team assessed a random sample of CPOA cases completed this reporting period to determine the date complaint was received, the date investigation was assigned, the date the investigation was started and date it was completed. The monitoring team also reviewed data consisting of CPOA cases completed during the monitoring period, and had meetings and follow up conversations with the Executive Director regarding workload and staffing.

### Results

We sampled eight cases completed this reporting period. All showed evidence of "as soon as possible" initiation after assignment, a 100% compliance rate. However, during the 6th site visit, the monitoring team discussed with the parties the issue of delay between date the complaint is received and the date the complaint is assigned for investigation. The parties and the monitor agreed, although the CASA does not deal directly with the issue of time to assign, a delay of more than seven working days for assignment is unreasonable and would affect the "expeditious" requirement of this paragraph. Of the eight cases reviewed, four cases took longer than seven working days to assign. Since this issue was discussed in June of 2017, and the initiation of cases reviewed herein preceded that agreement, the Monitor will not judge this issue as it relates to operational compliance for this reporting period. CPOA and APD are hereby put on notice that undue delay (in excess of seven working days) in assigning a complaint received for investigation will adversely impact the timeliness of investigations. Operational compliance of the "expeditious" requirement of this paragraph is also linked to the results of paragraph above. Of the eight cases reviewed, two were not completed within 90 days, a failure rate of 25 percent, far outside the allowable five percent.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.266a: Increase the levels of focus by managerial personnel on timelines for completed investigation.***

*Recommendation 4.7.266b:  Ensure that tardy investigations are noted, and discussed with the involved investigator(s) to ensure the reasons for delay were reasonable.*

*Recommendation 4.7.266c:  Develop a process that ensures all complaints are either assigned for investigation or administratively closed within 7 working days of receipt of complaint.*

*Recommendation 4.7.266d:  Increase the levels of focus by managerial personnel on timelines for completed investigation.*

*Recommendation 4.7.266e:  Ensure that tardy investigations are noted, and discussed with the involved investigator(s) to ensure the reasons for delay were reasonable.*

### 4.7.267 Assessing Compliance with Paragraph 282:  CPOA Access to Files

Paragraph 282 stipulates:

**"The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:**

**a)  all civilian complaints, including those submitted anonymously or by a third party;**
**b)  the identities of officers involved in incidents under review;**
**c)  the complete disciplinary history of the officers involved in incidents under review;**
**d)  if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);**
**e)  all APD policies and training; and**
**f)  if requested, documents, reports, and other materials for incidents that may evince an overall trend in APD's use of force, internal accountability, policies, or training."**

## Methodology

Members of the monitoring team met with the Executive Director and members of the CPOA staff, and received confirmation that there were no issues involved related to this paragraph for this reporting period.

**Results**

        Primary:      **In Compliance**
        Secondary:   **In Compliance**
        Operational:  **In Compliance**

## 4.7.268 Assessing Compliance with Paragraph 283:  Access to Premises by CPOA

Paragraph 283 stipulates:

**"The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director upon reasonable notice. The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement**."

### Methodology

Interviews with the Executive Director and CPOA staff indicate there were no issues with access to City premises experienced this reporting period.

**Results**

        Primary:      **In Compliance**
        Secondary:   **In Compliance**
        Operational:  **In Compliance**

## 4.7.269 Assessing Compliance with Paragraph 284:  Ensuring Confidentiality of Investigative Files

Paragraph 284 stipulates:

**"The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times."**

### Methodology

Members of the monitoring team reviewed these protocols during earlier monitor's reports.  CPOA has not reported any changes to these protocols during this reporting period.

**Results**

The agency remains in compliance based on past performance.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

### 4.7.270 Assessing Compliance with Paragraph 285:  Authority to Recommend Discipline

Paragraph 285 stipulates:

> **"The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed."**

### Methodology

Based on a review of CPOA cases as well as the redacted findings of the Executive Director and the POB Meeting Minutes posted on the CPOA website, it is evident that the Executive Director has the authority to recommend disciplinary action in the cases it investigates and reviews, and that the Chief retains the discretion to impose discipline.

This paragraph also requires the Chief to provide a written report articulating reasons why any disciplinary recommendations by the CPOA were not imposed.  Members of the monitoring team reviewed CPOA and APD records related to this paragraph and viewed the Chief's Non-Concurrence Letters received by CPOA for the monitoring period and published on the CPOA website. First the monitor would note several letters involving situations where the level of discipline was not impacted, such as non-concurrence in an Exoneration finding and instead imposing a finding of non-sustained. If the Chief wishes to adopt this practice of explaining deviations in findings that do not impact on the discipline or lack of discipline recommended by CPOA that is commendable, but it is not required by this paragraph.

What is required by this paragraph is an articulation of reasons when discipline is imposed different than the discipline recommended by CPOA/POB, that is, different findings that changes the discipline or same findings but a different level of discipline. Regarding those matters,

399

a review of the letters shows a majority with inadequate "articulation" of reasons why the CPOA/POB recommendations were not followed. These letters concluded cursory explanations such as "I do not concur with the findings … I believe a finding of … is more applicable in this matter."  This is language clearly non-compliant with the letter and spirit of this paragraph.  The monitor does note an improvement in articulating reasons for non-concurrence starting with the March 18 through the June 16 postings of non-concurrence letters received by the CPOA in 2017 and posted on its website. These letters come closer to fulfilling the requirement that the non-concurrence letters "provide a written report to the agency articulating the reasons its recommendations were not followed". The monitor will continue to assess whether non-concurrence letters adequately explain reasons for deviating from CPOA/POB disciplinary recommendations such that the CPOA/POB, APD and the public can readily understand the Chief's reasoning in deviating.

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendation 4.7.270a:  The Chief of police should continue the observed change his modalities of response to this paragraph to conform to the requirements stipulated in the paragraph, to ensure that the rationale for his decisions are clearly and fairly explained.***

***Recommendation 4.7.270b: APD should ensure that input from POB and CPOA is given full and complete consideration and assessment.***

***Recommendation 4.7.270c:  Where the Chief or his designee decides not to impose POB and CPOA disciplinary recommendations, the reasons for the decision not to impose should be communicated adequately for a clear understanding by the CPOA/POB, the APD and the public of the Chief's reasoning.***

**4.7.271 Assessing Compliance with Paragraph 286:  Documenting Executive Director's Findings**

Paragraph 286 stipulates:

**"Findings of the Executive Director shall be documented by APD's Internal Affairs Bureau for tracking and analysis."**

**Methodology**

Members of the monitoring team reviewed APD's internal databases responsive to the requirements of this task.  Documentation was available as required by this paragraph and APD policy. Redacted findings of the Executive Director are also published on the CPOA website.

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.272 Assessing Compliance with Paragraph 287:  Opportunity to Appeal Findings

Paragraph 287 stipulates:

**"The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency."**

**Methodology**

The monitor reviewed the Ordinance and had several meetings during the site visit with members of the CPOA and visited the CPOA office and reviewed the appeals listed in the minutes of the POB meetings and posted on the CPOA/POB website.

**Results**

The Ordinance contains the policy required by this paragraph, and permits a complainant to request reconsideration in the form of a hearing when dissatisfied with the findings and/or recommendations of the POB (findings of Executive Director to and approved by the POB).  The Ordinance also permits an appeal by the complainant to the Chief Administrative Officer of the final disciplinary decision of the Chief of Police.

A review of the CPOA website shows a clear explanation of the appeals process, as well POB meeting minutes wherein appeals of CPOA findings and recommendations are listed with disposition of appeals. It appears from the minutes that the City is in full compliance with this paragraph; however, the monitor, in following monitoring periods, will assess individual appeals in order to more fully determine whether "a meaningful opportunity to appeal" exists.

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |

Operational:  **In Compliance**

## 4.7.273 Assessing Compliance with Paragraph 288:  CPOA Recommendations Regarding APD Policies

Paragraph 288 stipulates:

**"The agency shall make recommendations to the Chief regarding APD policy and training.  APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes."**

Members of the monitoring team had several meetings during the site visit with members of the CPOA and visited the CPOA office, reviewed CPOA literature and documents related to the civilian complaint and CPOA process, and reviewed the CPOA website and public reports contained thereon, as well as a random sample of CPOA investigations that were completed during this monitoring period.

**Results**

The Ordinance provides CPOA with the authority to carry out the tasks of this paragraph. CPOA's authority is also contained in the CPOA Policies and Procedures, approved by City Council and the monitor.

Past monitoring reviews and the current review of recent completed CPOA cases show that CPOA makes training recommendations, where appropriate, along with its findings and disciplinary recommendations in individual cases.

Regarding the broader policy recommendations, CPOA and POB report that they feel they are still being marginalized in the policy development process, noting that "APD still does not provide a mechanism for the Board as a body to review changes made to policy. The Board made a policy recommendation to include the POB in the flowchart of policy changes, and the Chief [of Police] rejected the recommendation."  Further, POB notes they made policy recommendations to amend APD policy 3-1, designed to change the policy qualifications for the position of Chief of Police, and that this recommendation also appears to have been rejected by the Chief of Police.  See Paragraph 289, below for further discussion of this "collaboration" issue.  The monitor has witnessed in person APD's apparent resistance to inclusion and collaboration with POB and CPOA.

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

*Recommendation 4.7.273:  APD and CPOA/POB should investigate the possibility of requesting external technical assistance to study APD/CPOA/POB inter-organizational cooperation issues and to make recommendations for improvement in this area.*

*4.7.274 Assessing Compliance with Paragraph 289:  Explanation for not Following CPOA Recommendations*

**"For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded."**

## Methodology

The results of the analysis of this paragraph are related to operational compliance being achieved in paragraph 288. Policy and training recommendations can be made in one of two ways: through CPOA investigations or through a more formal written recommendation form the CPOA/POB. Regarding CPOA investigations, CPOA has informed the monitor that it does not receive feedback on policy and training recommendations made in its investigations. The monitor has found corroboration of this in its case review for this monitoring period. [CPC 174-2016] contained a recommendation that the subject officer be provided training on pat down searches. The investigative file is silent on whether the training was recommended or provided by APD, and CPOA has received no confirmation that it was or was not provided. If the recommendation was not followed, then no explanation was given under paragraph 285 or 289. Regarding more formal recommendations not made in the investigative case file, the CPOA website shows no non-concurrence letters from the current monitoring period. The policy recommendation non-concurrence letter posted on the CPOA website from the prior monitoring period shows an adequate response from the Chief in explaining his reasons for non-concurrence. At this point, APD is not in operational compliance with the requirements of this paragraph for this reporting period

## Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **Not In Compliance**

*Recommendation 4.7.274a:  APD should ensure that input from POB and CPOA is given full and complete assessment, and implemented where practicable.*

*Recommendation 4.7.274b:  In any instance in which APD decides it cannot implement the POB/CPOA recommendations, the reasons for the decision not to implement should be communicated fully to the POB and CPOA in writing.*

### 4.7.275 Assessing Compliance with Paragraph 290:  Regular Public Meetings

Paragraph 290 stipulates:

**"The agency shall conduct regular public meetings in compliance with state and local law.  The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD."**

### Methodology

Members of the monitoring team observed, in person and via the internet, CPOA presentations at POB meetings, and reviewed agendas and meeting minutes posted regarding these meetings.  We also reviewed agendas for these meetings.

### Results

CPOA remains in compliance with this task.

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.276 Assessing Compliance with Paragraph 291:  Community Outreach for the CPOA

Paragraph 291 stipulates:

**"The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status."**

### Methodology

Members of the monitoring team reviewed the CPOA/POB website and information regarding of the POB's Community Outreach Subcommittee

whose meeting notices, agenda, minutes and activities are posted on the CPOA website.  Community outreach activities are also contained in the CPOA Annual Report. Members of the monitoring team have reviewed sub-committee agenda and meeting minutes, as well as attending, during site visits, meetings of the sub-committee.  As noted in IMR-5, CPOA has hired a Community Engagement Specialist who continues to manage and improve the agency's outreach processes.

**Results**

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

### 4.7.277 Assessing Compliance with Paragraph 292:  Semi Annual Reports to Council

Paragraph 292 stipulates:

> **"The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:**
>
> a) **number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> b) **demographic category of complainants;**
> c) **number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> d) **number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> e) **policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;**
> f) **policy changes recommended by the agency, including any dispositions by the Chief;**
> g) **public outreach efforts undertaken by the agency and/or Executive Director; and**
> h) **trends or issues with APD's use of force, policies, or training."**

**Methodology**

The monitoring team's review of the CPOA website revealed the 2015 Civilian Police Oversight Agency Annual Report and the 2016 Semi Annual Report, as well as annual and semi-annual reports from prior years. Annual reports reflect activity in this area as required by the paragraph.

**Results**

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.279 Assessing Compliance with Paragraph 320: Notice to Monitor of Officer Involved Shootings

Paragraph 320 stipulates:

"**To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings. APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.**"

### Methodology

The monitor reviewed notices provided by the City to the monitor related to this paragraph.  We found no instances of an OIS that was not noticed to the monitor in writing by APD.

### Results

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 5.0    Summary

Overall, Primary compliance levels have reached a milestone this reporting period, for the first time posting a greater than 95 percent "in compliance" rating for that category of compliance.  The reader is reminded that compliance for APD's CASA categories are categorized as Primary (policy Guidance has been provided that is CASA-compliant, Secondary (adequate training has been provided to APD personnel in specific areas) and Operational (compliance actions have become regularized and routine.  Thus, in this summary, we report the following compliance levels:

> Primary:  97%
> Secondary: 71%
> Operational:  53%.

These compliance levels are depicted in tabular form in Table 5.1

**Table 5.1 Compliance Rates by Reporting Period 1-6**

| Task Type | IMR-1 | IMR-2 | IMR-3 | IMR-4 | IMR-5 | IMR-6 |
|-----------|-------|-------|-------|-------|-------|-------|
| Primary | 5 | 8 | 29 | 83 | 93 | **97** |
| Secondary | 1 | 3 | 6 | 41 | 63 | **71** |
| Operational | 1 | 3 | 5 | 25 | 47 | **53** |

Compliance levels for APD are depicted graphically for reporting periods 1 through 6, in Figure One on the following page.

Figure One:  Overall compliance levels, by percentage,
IMR-1 through IMR-6



APD has reached a major milestone this reporting period, accruing primary compliance for its policy work.  While some of the more critical policies (Use of force, On-Body Recording Devices, and Early Intervention and Recording Systems were not approved within the dates for this report (Februay-July 2017), they have also been approved by the monitor (and will be so reported in IMR-7).  Those final policies were approved outside IMR-6's "effective dates."

In effect the policy process has matured to the point that most critical-task policies are in compliance for the IMR-6 reporting period.  The remaining critical policies will be noted as "approved" for IMR-7.

In order to bring the remaining two categories of compliance into > 95 percent levels, considerable work remains to be done in the area of training, and substantial work remains to be done in the area of melding approved policy and training into in-compliance delivery of policing services on the street.  Compliance levels are depicted in Figure 5-1, on p. 427.

As with other IMRs, the critical "missing elements" leading to comprehensive compliance at the operational level are:

1.  Implementing field-standard and CASA compliant training practices; and

2.  Implementing field-standard supervisory-, command-, and executive-level review, assessment, and control of APD's in-field use of force practices.

In order to facilitate APD's continued work toward compliance, we have included a total of 277 recommendations for improvement in training, supervision, force

oversight, force investigation and documentation, discipline, and policy.  We urge APD's leadership to adopt an assertive plan to assess these 277 recommendations, identify outliers, and develop formal, documented action plans to resolve each of the issues that stand between them and "full compliance."  We are deep into the third-year of a four-year project, and if APD can assess and respond to the 277 recommendations we have made in this report, full compliance is within reach.

The critical elements standing between APD and full compliance at this point are:

- Training processes that comport with standard practices in needs assessment, planning, documenting, delivery, and evaluation of effective training practices, and

- Developing, implementing, testing, and refining modalities to identify, review, assess, identify and correct improper and out-of-policy uses of force.

The easy work is done.  Much remains to be accomplished, and it is some of the most difficult work in policing.  Nontheless, we stand ready to review, assess, and assist APD in re-building it's training practices, and in building strong supervisory and management modalities to identify and remediate problematic police actions.

## Appendix A:  Recommendations

1.  Recommendation 4.7.1a:  We reiterate that APD should develop and implement a comprehensive training plan to simultaneously address all training gaps that are delaying Secondary Compliance.

2.  Recommendation 4.7.1b:  Training for downstream units, such as CIRT, FIT, etc. should also be assessed in light of the persistent failures we have noted in IMRs 3, 4, and 5.

3.  Recommendation 4.7.2a: Develop an organization-wide training plan that contemplates all identified training gaps.  Based on that plan, and any other training needs that are identified, develop an audience appropriate curriculum to close all the pending gaps we have identified in this report.  This recommendation continues, having not been addressed since it was made in IMR-5.

4.  Recommendation 4.7.2b:  APD should immediately cease the practice of training "proposed policy revisions".  This recommendation continues, having not been addressed since it was made in IMR-5.

5.  Recommendation 4.7.2c: APD should adopt the CASA language of "anything above un-resisted handcuffing" into its use of force calculus to better delineate the type of activities that constitute a reportable use of force.  That language should be included in APD policies and training.

6.  Recommendation 4.7.2d: Any APD training centered on "De Minimis force" should include practical scenarios, video and case reviews, and include "lessons learned" from APD use of force cases.  The training program should include a legitimate mechanism to measure a transfer of knowledge in the classroom and pre-established field implementation measures.

7.  Recommendation 4.7.3a:  Ensure new procedures are appropriately trained to retain Secondary Compliance.

8.  Recommendation 4.7.4a: APD should evaluate modalities for developing formal audit/review/reporting policy for "carry and use" assessments and inspections regarding modified or altered weapons outlined in this paragraph, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work (CSW)[193].

---

[193] The monitor has provided APD with an example of CSW applied to law enforcement issues, and recommends this format be followed in all CSW recommendations contained in this—and future—reports.  All suggested CSW documents should be submitted to, and reviewed and annotated by, the Chief of Police prior to submission to the monitor.

9.  Recommendation 4.7.4b:      APD should develop formal policy, training, supervision, inspections and audit, and response modalities to ensure conformance and compliance processes with this paragraph.

10.  Recommendation 4.7.4c: APD should transition to a routinely reported "inspections and audit" process responsive to this paragraph's requirements.

11.  Recommendation 4.7.5a:  APD should evaluate modalities for developing formal audit/review/reporting policy for "carry and use" assessments and inspections regarding modified or altered weapons outlined in this paragraph, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work.

12.  Recommendation 4.7.5b: APD should transition to a routinely reported "inspections and audit" process responsive to this paragraph's requirements.

13.  Recommendation 4.7.6a:  APD should evaluate modalities for developing formal audit/review/reporting policy for "on duty weapons" assessments and inspections regarding modified or altered weapons outlined in this paragraph, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work.

14.  Recommendation 4.7.6b: APD should transition to a routinely reported "inspections and audit" process responsive to this paragraph's requirements.

15.  Recommendation 4.7.8:  APD should train all academy cadets and incumbent officers on the new approved policy provisions related to show of force, show of force investigation procedures and low-ready position.  Training before approved policies are available is remarkably risky, and exposes APD to certain and inevitable litigation risks.
16.  Recommendation 4.7.9a: APD should produce a piece of Completed Staff Work assessing why it has been unable to meet the requirements of paragraph 22, and recommending a way forward on this critical oversight paragraph.  The CSW should be presented to the Chief of Police for review, comment and action.

17.  Recommendation 4.7.9b: APD should ensure that any shooting case that implicates the provisions of this paragraph includes a specific, investigative assessment articulated in reports as to whether provisions of APD policy related to this paragraph were appropriate and objectively reasonable.

18.  Recommendation 4.7.9c: APD should ensure that information captured in its IA Pro system is tracked and analyzed.  The manner in which this information is captured, tracked and analyzed should include an auditing schedule and be specifically codified in policy.

19.  Recommendation 4.7.10a:  Write a revised EIRS policy that can be approved by the Parties and the monitor as responsive to established policy in the field, e.g., New Orleans PD and Seattle PD.

20.  Recommendation 4.7.10b: Ensure provisions of this paragraph are contemplated and included in any revised EIRS policy.

21.  Recommendation 4.7.10a:  Write a revised EIRS policy that can be approved by the Parties and the monitor as responsive to established policy in the field, e.g., New Orleans PD and Seattle PD.

22.  Recommendation 4.7.10b: Ensure provisions of this paragraph are contemplated and included in any revised EIRS policy.

23.  Recommendation 4.7.24:  Develop needs assessments, articulate needed improvements in written policy, and support with protocols that guide the audit unit as it compares operational requirements with operational practice, allowing the audit unit to identify and address any discrepancies in audit reports via recommendation of training or retraining, follow-up, or discipline, if necessary and appropriate.

24.  Recommendation 4.7.25a: We reiterate, APD should either commission externally or complete internally a focused, thoughtful and meaningful "Completed Staff Work" document analyzing this problem and submit it to the Chief of Police for review, assessment and action.[194]

25.  Recommendation 4.7.25b: APD should develop a comprehensive auditing plan that contemplates all their CASA and policy related requirements.

26.   Recommendation 4.7.25a: We reiterate, APD should either commission externally or complete internally a focused, thoughtful and

---

[194] The monitor has previously provided APD with nationally accepted formats and "product" for these CSW projects, so that they can be familiar with expectations of such documents.  We recommend a format similar to the one the monitor provided APD from the Tyler, Texas Police Department.  *We see it as entirely conceivable that individuals from APD command and staff levels may need external training on this process, which they should contract for with reputable outside consultants and trainers.*

meaningful "Completed Staff Work" document analyzing this problem and submit it to the Chief of Police for review, assessment and action.[195]

27.  Recommendation 4.7.25b: APD should develop a comprehensive auditing plan that contemplates all their CASA and policy related requirements.

28.  Recommendation 4.7.26a: APD must develop and deliver a meaningful training program to its Field Services members that is centered on crowd control policies.  That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans.

29.  Recommendation 4.7.26b: APD should append its Multi-Agency Review and Assessment form to its corresponding SOP.

30.  Recommendation 4.7.26c: APD must ensure that its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy and training within the agency.

31.  Recommendation 4.7.26d: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.

32.  Recommendation 4.7.27a: APD must develop and deliver a meaningful training program to its members that is centered on crowd control policies. That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans.

33.  Recommendation 4.7.27b: APD should append its Multi-Agency Review and Assessment form two it's corresponding SOP.

34.  Recommendation 4.7.27c: APD must ensure that its After – Action Reports follow a standard structure and include mechanisms for communicating revisions to policy and training within the agency.

---

[195] The monitor has previously provided APD with nationally accepted formats and "product" for these CSW projects, so that they can be familiar with expectations of such documents.  We recommend a format similar to the one the monitor provided APD from the Tyler, Texas Police Department.  *We see it as entirely conceivable that individuals from APD command and staff levels may need external training on this process, which they should contract for with reputable outside consultants and trainers.*

35.  Recommendation 4.7.27d: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.

36.  Recommendation 4.7.28a:  Ensure that all lapel video is viewed at some point by trained and effective review staff, and that any noted "policy outliers" are noted, in writing, and forwarded up the chain of command.

37.  Recommendation 4.7.28b:  Ensure that Area Commanders consider and track these "policy outliers" as part of their command oversight function, e.g., increasing "review rates," increasing supervisory field contacts with triggered personnel, increasing report review and assessment frequency for triggered personnel, assigning remedial training, ordering increased review frequencies, etc.

38.  Recommendation 4.7.28c: APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases. Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.

39.  Recommendation 4.7.28d:  Revise training academy work processes related to use of and supervision of the use of force training by developing lesson plans congruent with national practice, and ensure that all training product conforms to the processes articulated in response thereto.

40.  Recommendation 4.7.29a:  Prioritize the most frequent and most serious use of force "misses," and develop a response plan, using the Completed Staff Work model, and present the results to the Chief of Police for review, comment, and action.

41.  Recommendation 4.7.29b:  Continue these prioritized reviews until the error rate drops below five percent.

42.  Recommendation 4.7.29c: APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases. Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.

43.  Recommendation 4.77.30a:  Identify, in routine monthly reports, officers who failed to report, or incompletely reported, a given Use of

Force, and supervisors who missed that failure, and provide appropriate progressive discipline to the officers, supervisors, and commanders.

44. Recommendation 4.77.30b: Reports responsive to this recommendation should be compiled as part of APD's CASA-required reports, along with a listing of corrective responses required by APD.

45. Recommendation: 4.77.30c APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases. Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.

46. Recommendation 4.7.31b: APD should implement a "Review Team" that is an extension of the Chief's office, whose sole responsibility is to review complete records of random and directed use of force cases. Those reviews should be reported directly to the Chief of Police to ensure the organization's strategic intent related to the CASA is being implemented.

47. Recommendation 4.7.31c: APD should conduct a detailed failure analysis of use of force cases that do not meet the requirements of the CASA (noted in detail in every monitor's report) and identify where the failure(s) occurred, what caused the failure (policy-training-supervision-oversight).

48. Recommendation 4.7.31d: Where failures "cluster," in the reporting for 4.7.31c, above, APD should prepare Completed Staff Work documents identifying the failures, the cause of the failures, and providing recommendations for policy, training, structural, or disciplinary responses to each failure.

49. Recommendation 4.7.33a: APD should immediately cease the practice of training "proposed policy provisions."

50. Recommendation 4.7.34a: Given the scope of the failure rate on the cases noted in 4.7.33 above, it is highly unlikely they are supervisor or command specific; however, APD should carefully assess, through Completed Staff Work processes, where these errors occurred, what supervisory and command structure permitted them, and should design a carefully thought out response plan to ensure that the errors are communicated to the appropriate command, that the command(s) assess(es) the errors and submit(s) to the Chief of Police realistic responses designed to eliminate an 87% error rate in such a critical process' oversight, review and remediation.

51.  Recommendation 4.7.34b:  Develop policy changes to APD's use of force policy that address distraction strikes, neck holds, and show of force and include these topics in follow-up training to all personnel.

52.  Recommendation 4.7.35b: Resolve at the soonest point possible the manner in which "De Minimis" force will be trained to the organization, including written training plans with goals, objectives, measures of learning, etc.  All training development product should comply with the GO-MAPS outline the monitor previously provided APD.

53.  Recommendation 4.7.35c:  Perform a careful, comprehensive, inclusive Job-Task Analysis (JTA) for FIT personnel.

54.  Recommendation 4.7.35d: Once the JTA is complete, develop a listing of needed skills and competencies;

55.  Recommendation 4.7.35e:  Identify current skill-sets possessed by current IA personnel, and conduct a "Gap Analysis;"

56.  Recommendation 4.7.35f:  Determine what missing skill-sets need to be remediated or developed;

57.  Recommendation 4.7.35g:  Assess external training modalities to identify in advance which ones to train to and develop the missing skill sets;

58.  Recommendation 4.7.35h:  Either develop the needed training in-house or procure it by sending IAB personnel to external training events that are known to provide needed skill sets that will fill IAB's skill-set deficiencies.  Make no assignments to external training unless APD can verify that the training venue or provider actually has a plan and or course syllabus that includes an effective treatment of the designated skill set.

59.  Recommendation 4.7.35i:  Maintain records regarding skill set deficiencies and external training events skills training, and follow-up with post-training analyses of each externally trained employee's ability to meet performance goals related to "new" skill sets.

60.  Recommendation 4.7.36:  Provide training as recommended in Paragraphs 87 and 88 for members of the MATF.

61.  Recommendation 4.7.37:  Complete policy-compliant training congruent with recommendations provided in paragraphs 86-88, above.

62.  Recommendation 4.7.37:  Complete policy-compliant training congruent with recommendations provided in paragraphs 86-88, above.

416

63.  Recommendation 4.7.39a:  APD should assess, analyze, and "re-vision" its force review processes, including reporting, intake, assessment, classification, assignment, review and investigation, outcome development and reporting, and findings development.  This assessment should be executed with all due diligence and speed.

64.  Recommendation 4.7.39b:  The talent to develop this assessment may require an outside consultant; however, whoever is tasked with this assessment should be required to produce an actionable report designed to build a system that can meet the quality and timeline requirements of the CASA, and should take into consideration "best practices" in the field.

65.  Recommendation 4.7.39c:  APD's recent site visit to other PD's undergoing similar process as the CASA should be assessed for "lessons learned" that could be adapted to APD's internal affairs and disciplinary/retraining processes.

66.  Recommendation 4.7.39d:  APD, eventually should develop a clearly articulated plan for repairing its overwhelmed internal investigative processes, replete with goals, objectives, timelines and costs.

67.  Recommendation 4.7.39e:  The developed plan should be implemented and achievement of goals and objectives should be clearly and impartially evaluated for implementation.

68.  Recommendation 4.7.40:  APD should carefully provide to the monitor data that is directly responsive to the monitor's requests, and is appropriately labeled and structured.

69.  Recommendation 4.7.41a: Establish by policy, training, and internal monitoring, specific requirements for command review of supervisory force reviews, ensuring that the new policy, training and internal monitoring conform to the requirements of the CASA for this paragraph.

70.  Recommendation 4.7.41b:  Ensure that policy outliers are brought to the attention of commanders failing to conform, and to their immediate superiors and the Chief of Police.

71.  Recommendation 4.7.41c:  Require commanders who fail to conform with Paragraph 54's requirements to undergo retraining in policy requirements and to develop a correction-plan for ensuring that policy adherence is achieved.

72.  Recommendation 4.7.41d:  Executive-level personnel for those commanders completing such retraining and corrective planning measures should monitor commanders under their supervision to ensure they meet the requirements of Paragraph 54's stipulations relative to are brought into compliance.

73.  Recommendation 4.7.41e:  Executive-level personnel so tasked should develop quarterly reviews of commanders under their

74.  Recommendation 4.7.42a:  Identify the factors causing the most errors in command review and require a completed CSW document that proposes specific, tangible, and evaluable policy revisions, supervisory and commander re-training or discipline to rectify given error categories.

75.  Recommendation 4.7.42b:  Forward the CSW document to the Chief of Police for review, assessment and implementation of remedial processes.

76.  Recommendation 4.7.42c:  Require follow-up and analysis to determine if recommended processes have alleviated the identified problems, and repeat steps a through c until issues have been reduced to less than 95 percent.

77.  Recommendation 4.7.43a:  Ensure that APD automated systems relating to paragraphs 41-56 are supported by a meaningful recording, assessment, and tracking system to ensure that each incident of a noted failure to comply within the command structure is documented, addressed, and followed up to ensure such errors are mitigated and reduced to a level below five percent.

78.  Recommendation 4.7.43b:  Ensure that deficiencies in APD's systems relating to paragraphs 41-56 are monitored and noted, and result in corrective action taken with the responsible command and supervisory personnel.

79.  Recommendation 4.7.43c:  If necessary, consult with external resources to design a formalized system of monitoring supervisory and command-level responses to policy violations.

80.  Recommendation 4.7.44a: APD should ensure that the FRB process is integrated and methodical, requiring each "out of policy" action to be assessed for causes, remaining issues, and recommended responses to ensure that organization-wide implications are addressed in their problem response modalities as well as officer-specific, supervisor-specific and command-specific responses;

81.  Recommendation 4.7.44b:  APD should assess other similar processes in other police agencies known to be effective at dealing with such issues and review their processes for "lessons learned" that can be applied to APD's processes.

82.  Recommendation 4.7.44c:  APD should make it clear that "refrain from answering" is not a viable response.  If APD cannot get a decision about a given use of force issue at this level, it suggests either a lack of training, a lack of structuring of the process, or a lack of commitment to improving.

83.  Recommendation 4.7.44d:  APD should assess its FRB panelists to ensure they understand current policy and practice and are clear about the FRB's purpose.  To the extent that they find members who continually "refrain from answering" they should be re-trained or removed from FRB participation, with appropriate notation why in their APD personnel files.

84.  Recommendation 4.7.45a:  APD should initiate a systems-wide failure analysis regarding this case and determine at what points the most critical systems failed to perform as expected or required.

85.  Recommendation 4.7.45b:  Once the failure points are identified, a thorough review of any cases with similar fact circumstances, similar command reviews, or other similar issues are noted.

86.  Recommendation 4.7.45c:  Once the failure analysis is complete, APD should identify lessons learned and recommend policy, training, systemic, supervisory, and/or management oversight systems that need to be revised, upgraded, or otherwise modified.

87.  Recommendation 4.7.45d:  Assessments outlined above should not be restricted to the case giving rise to these recommendations, but should address all similarly situated FRB reviews.

88.  Recommendation 4.7.45e:  Revise policy, training, supervision and command issues reflecting similar outcomes accordingly.

89.  Recommendation 4.7.46a:  APD should initiate a systems-wide failure analysis regarding Case #IMR6-001 and determine at what point the most critical systems failed to perform as expected or required.

90.  Recommendation 4.7.46b:  Once the failure points are identified, a thorough review of any cases with similar fact circumstances, similar command reviews, or other similar issues should be conducted.

419

91.  Recommendation 4.7.46c:  Once the failure analysis is complete, APD should identify lessons learned and recommend policy, training, systemic, supervisory, and/or management oversight systems that need to be revised, upgraded, or otherwise modified.

92.  Recommendation 4.7.46d:  Assessments outlined above should not be restricted to the case giving rise to these recommendations, but should address all similarly situated FRB reviews.

93.  Recommendation 4.7.456e:  Revise policy, training, supervision and command issues reflecting similar outcomes accordingly.

94.  Recommendation 4.7.46f: APD must ensure that specific performance deficiencies, throughout the chain of command, associated with [Case #IMR6-001] are properly addressed through counseling, training and/or discipline.

95.  Recommendation 4.7.47a:  The language of the learning objectives need to be addressed to optimize the efforts put forth in developing and delivering the "IA Force Investigations Training Program."

96.  Recommendation 4.7.47b:  Prioritize efforts to vet or conduct due diligence on externally provided courses and how they may impact CASA-required actions as they relate to force and misconduct investigations.

97.  Recommendation 4.7.48:  Complete the development cycle by ensuring the training recently delivered is implemented.

98.  Recommendation 4.7.49:  Integrate policy and training and implement operations required therein on a routine basis.

99.  Recommendation 4.7.50 Integrate policy and training and implement operations required therein on a routine basis.

100.  Recommendation 4.7.51:  Continue implementation of training and supervisory process to ensure compliance to extant policy and training.

101.  Recommendation 4.7.52a:  Assess timeliness and completion of MATF investigations and identify causes of delays, inconsistencies and related issues.

102.  Recommendation 4.7.52b:  Develop recommendations to eliminated avoidable delays and improve reporting and review process.

103.  Recommendation 4.7.53a:  Perform a careful, comprehensive, inclusive Job-Task Analysis of all currently assigned IA job classes (this may require external assistance).

104.  Recommendation 4.7. 53b: Once the JTA is complete, develop a listing of needed skills and competencies;

105.  Recommendation 4.7. 53c:  Identify current skill-sets possessed by current IA personnel, and conduct a "Gap Analysis;"

106.  Recommendation 4.7.53d:  Determine what missing skill-sets need to be developed;

107.  Recommendation 4.7. 53e:  Assess external training modalities to identify in advance which ones train and develop the missing skill sets;

108.  Recommendation 4.7.53f:  Either develop the needed training in-house or procure it by sending IAB personnel to external training events that are known to provide effectively needed skill sets that will fill IAB's skill-set deficiencies.  Make no assignments to external training unless APD can verify that the the training venue or provider actually has a plan and or course syllabus that includes an effective treatment of the designated skill set.

109.  Recommendation 4.7. 53g:  Maintain records regarding skill set deficiencies and external training events skills training, and follow-up with post-training analyses of each externally trained employee's ability to meet performance goals related to "new" skill sets.

110.  Recommendation 4.7.54a: APD should develop policy and training requiring such referrals to track the exact inventory of items that go back and forth for these reviews and provide more specificity and accuracy.[196]

111.  Recommendation 4.7.55a: APD should develop and deliver meaningful policy and procedures that delineate roles and responsibilities for assessing criminality in a case and how referrals to determine criminality are made.

112.  Recommendation 4.7.55b: APD should develop and deliver a meaningful training program that delineates roles and responsibilities for assessing criminality in a case and how referrals to determine criminality are made.

113.  Recommendation 4.7.55c: APD executive level staff need to monitor and take an active role in referrals to prosecuting entities to determine if criminality exists in a case.

---

[196] Receipts of information may exist but they were not provided to the monitoring team.

114.  Recommendation 4.7.55d: APD should standardize its records to facilitate a coherent and consistent procedure to satisfy data requests.

115.  Recommendation 4.7.55e:  APD should develop a clear, demonstrative, objective process to ensure that data provided to the monitor are responsive to given requests, accurately completed and compiled, and clearly labeled as to what request the data are responsive.

116.  Recommendation 4.7.56:  Implement diligently approved policy and training, and evaluate performance, identify out-of-policy processes, and engineer practices to bring out-of-policy processes into conformance.

117._Recommendation 4.7.57:  Formalize and document IAB training protocols relative to internal policy requirements.  Such training cannot be outsourced to external training providers unless they are specifically tailored to APD IAB internal policy requirements.

118.  Recommendation 4.7.58a:  Complete or contract for a detailed workload and staffing analysis for CIRT.  Said analysis should be completed according to established standards for such work, and a copy should be submitted to the monitor.

119.  Recommendation 4.7.58b:  Deal with the discrepancy in PowerDMS record keeping re test takers and number logged in to view the subject matter of the test.  Provide results in writing to the monitor.

120.  Recommendation 4.7.59:  Implement approved policies via effective management and supervisory oversight focused on approved policy and training.

121.  Recommendation 4.7.60a:  Ensure that >95% of all IAB investigators score at least a passing score on the issued exam process outlined in 4.7.59 of IMR 5 Report.

122.  Recommendation 4.7.60a:  Implement a quality control function in IA case investigation, documentation and reporting process and develop and identify-classify-rectify cycle to ensure quality improvement.

123.  Recommendation 4.7.61:  Comply with recommendations in sections 4.7.59-4.7.60, above.

124.  Recommendation 4.7.63a:  Train or re-train IAB personnel based on the expectations for performance related to SOP 2-05, SOP 7-1, SOP

7-2, SOP 7-3 and SOP 3-41, and test for learning as outlined in sections 4.7.59-4.7.60, above.

Recommendation 4.7.65a:  Train or re-train IAB personnel based on the expectations for performance related to SOPs 2-05, SOP 7-1, SOP 7-2, SOP 7-3 and SOP 3-41, and test for learning as outlined in sections 4.7.59-4.7.60, above.

125.  Recommendation 4.7.65b:  APD should commission an in-depth review of FRB policy, staffing, leadership and operations to ensure that the issues addressed in the paragraph are assessed internally, and, for each issue identified above, APD should craft a thoughtful, detailed, and effective piece of Completed Staff Work.

126.  Recommendation 4.7.65c:  APD should reach out to other similarly situated police agencies to discuss successful modalities for overcoming such critical issues as we have observed with the FRB.

127.  Recommendation 4.7.65d:  APD should conduct a careful needs assessment of the skill sets needed for FRB participation, and develop training to ensure that FRB members receive this training prior to assuming their FRB-related duties.

128.  Recommendation 4.7.65:  APD should conduct a careful needs assessment of the skill sets needed for FRB participation, and develop training to ensure that FRB members receive this training prior to assuming their FRB-related duties.  That training should be documented and "tested" based on national best practices.

129.  Recommendation 4.7.66a: APD should conduct a comprehensive assessment of all policy and CASA provisions that require EIRS analysis and/or Annual Reporting to ensure that the 2016 report includes all necessary data points.

130.  Recommendation 4.7.66b:  APD should conduct a comprehensive assessment of the monitor's "Outcomes Assessment" report to ensure that it identifies and corrects issues with data quality outlined in that report.

131.  Recommendation 4.7.67: APD should conduct a comprehensive assessment of all policy and CASA provisions that require EIRS analysis and/or Annual Reporting to ensure that the 2016 system includes all necessary data points.

132.  Recommendation 4.7.73a:  As we have suggested multiple times in the past, APD should develop a comprehensive training plan, based in part on information contained within the monitoring reports, and draw

direct lines between policy, the CASA, training gaps identified by the monitoring team and the specific areas within their training curriculum where these issues are addressed.  The plan should include a table to ensure that the right topics are delivered to the right audience of people.

133.  Recommendation 4.7.73b: Training Committee meetings should include specific recommendations to be included in specific training programs. Topics they identify should be tracked until they are included in a particular program.

134.  Recommendation 4.7.73c: APD should immediately cease the practice of training "proposed policy changes," and should move forward with training only after policy has been approved and adapted.

135.  Recommendation 4.7.73d: Resolve at the soonest point possible the manner in which "De Minimis" force will be trained to the organization:  officers, supervisors, commanders, and upper management.  Recommendation 4.7.73a:  As we have suggested multiple times in the past, APD should develop a comprehensive training plan, based in part on information contained within the monitoring reports, and draw direct lines between policy, the CASA, training gaps identified by the monitoring team and the specific areas within their training curriculum where these issues are addressed.  The plan should include a table to ensure that the right topics are delivered to the right audience of people.

136.  Recommendation 4.7.73b: Training Committee meetings should include specific recommendations to be included in specific training programs. Topics they identify should be tracked until they are included in a particular program.

137.  Recommendation 4.7.73c: APD should immediately cease the practice of training "proposed policy changes," and should move forward with training only after policy has been approved and adapted.

138.  Recommendation 4.7.73d: Resolve at the soonest point possible the manner in which "De Minimis" force will be trained to the organization:  officers, supervisors, commanders, and upper management.

139.  Recommendation 4.7.74a:  APD should implement a careful review of IMR-3, IMR-4, IMR-5 and, and note gaps in provided training, policy, or supervision and develop, where appropriate, specific training modalities to positively affect remediation of those gaps.  Application of the concept of "completed staff work" should be directed toward each identified area or topic that must be remediated, resulting in specific

recommendations to the Chief of Police designed to remediate identified training gaps.

140.  Recommendation 4.7.74b: APD should develop and deliver training concerning crowd control that takes cognizance of feedback provided in Paragraphs 39 and 40.

141.  Recommendation 4.7.74c:  Given the fact that training command seems to put little credence in the monitor's recommendations regarding training in past monitoring reports, APD should consider, develop and implement mechanisms to ensure the recommendations are assessed, evaluated, and written plans for implementation are developed.  For those monitor's recommendations that will not be implemented, APD should identify alternative processes for achieving the results required by the CASA.

142.  Recommendation 4.7.75a:  We reiterate, yet again, APD should consider developing a comprehensive training plan, based on information contained within what now is six monitor's reports, and draw direct lines between training gaps we identify and specific areas within their training curriculum.   This process should result in a piece of completed staff work that identifies specific issues and recommends steps to resolve those issues and is submitted to the Chief of Police for action.

143.  Recommendation 4.7.75b:  We recommend that APD cease the practice of training "proposed policy provisions," and use the same development cycle as virtually every other police agency in America: Policy, Training, Implementation, Supervision, Assessment, Repeat (PTISAR).

144.  Recommendation 4.7.75c: APD consider implementing a "training cycle" as their established training business process.

145.  Recommendation 4.7.75d: The APD Academy should have legitimate, and codified, oversight of all organizational CASA related training.  Every piece of training related to CASA provisions should be subjected to and controlled by the PTISAR model.

146.  Recommendation 4.7.75e: The APD Academy should establish a stand-alone unit with the specific responsibility of quality assurance for all organizational training requirements.  That unit should report directly to the Chief of Police with feedback loops to the Training Academy.

147.  Recommendation 4.7.97a: APD should ensure that each of the related paragraphs, 111-137 (of IMR 6) conform with the goals articulated in this paragraph and are articulated sufficiently to Command and supervisory-level personnel.

148.  Recommendation 4.7.100:  Assess MHRAC-APD information interfaces to identify ways of increasing lead times presented to MHRAC from APD related to issue review and consideration and development of recommendations.

149.  Recommendation 4.7.102:  Submit required COB documentation to MHRAC as well as documentation from MHRAC noting review and approval.  Ensure that documentation is responsive to relationship building and scenario-based training.

150.  Recommendation 4.7.104:  Ensure MHRAC reports are posted on relevant CABQ websites.

151.  Recommendation 4.7.110a:  Develop and execute a data-based, methodologically appropriate workload and manpower planning analysis that ensures that reliable "staffing levels" for eCIT officers are calculated, reported, set as staffing goals, and attained.

152.  Recommendation 4.7.111:  Implement the recruitment, training and deployment plan for "Certified responders" that meets the articulated goal of 40 of Field Services Officers.

153.  Recommendation 4.7.112a:  Submit COB training documentation for this particular training, e.g., routinely kept class rosters, exam scores, etc.

154. Recommendation 4.7.113:   Submit training documentation for this particular training, e.g., routinely kept class rosters, exams, exam scores, etc.

155.  Recommendation 4.7.114:  Complete eCIT training as designed, and evaluate performance via a reasonable testing procedure.

156.  Recommendation 4.7.115:  Establish a clear, meaningful protocol for CIU response; train that protocol; and supervise implementation.

157.  Recommendation 4.7.116:  Develop, initiate, and describe the results of APD's methodologies that use the results of data collected for this paragraph for "management purposes," i.e., planning, organizing, staffing, directing, controlling, reporting and budgeting for the CIT and COAST workload, service delivery processes, and outcomes.

158.  Recommendation 4.7.118a:  The current policy guiding this paragraph is expired.  Change existing policy as appropriate, and promulgate the new policy.

159.  Recommendation 4.7.118b:  Revise training and training evaluation protocols to reflect the new policy developed as per 4.7.118a, above.

160.  Recommendation 4.7.122a:  Upgrade CIU/COAST to the required staffing levels.

161.  Recommendation 4.7.123a:  APD should ensure that COAST and CIU personnel track incident reports involving their personnel for indications of recurring issues and problems that may be addressed by referral of clients to community health resources.

162.  Recommendation 4.7.123b:  Once these opportunities are identified, train COAST and CIU personnel to implement, where appropriate referrals to outreach, service delivery, crisis prevention, and referrals to community health resources.

163.  Recommendation 4.7.137a:  Collect, analyze and interpret the data elements above on a routine basis, and produce reports circulated to CIU and COAST personnel, through the chain of command, and eventually to the public via APD's web-site.

164.  Recommendation 4.7.137b:  Memorialize these processes in policy and training.

165.  Recommendation 4.7.126:  Plan, organize, staff, and deliver training conforming to national practice related to the concept of De Minimis force, and its application in the field by APD officers.

166.  Recommendation 4.7.127a:  Develop approvable policy guidance on the concept of Di Minimus force and its "fit" into existing policy.

167.  Recommendation 4.7.127b:  Train all applicable personnel (officers, supervisors, command) on the new policy.

168.  Recommendation 4.7.127b:  Assess impact of policy and training on service delivery related to Di Minimus force.

169.  Recommendation 4.7.131a:  Expedite policy review and revision of policies and practices to ensure that current, reliable, and workable policies are in place to guide the actions of APD officers

170.  Recommendation 4.7.131b:  Focus first on high-risk/critical task policies such as Use of Force, EIRS, and OBRD.

171.  Recommendation 4.7.131c:  Where possible, adapt approved similar policies from other law enforcement agencies currently working through consent decrees, i.e., Seattle PD and New Orleans PD.
172.  Recommendation 4.7.131d:  Ensure that termination of all residual Special Orders are effectively communicated to all field operations personnel, including supervisors and command-level personnel.

173.  Recommendation 4.7.132:  Implement training and supervision for the approved OBRD policy.

174.  Recommendation 4.7.133a:  APD should conduct an agency-wide review of all "special orders," and ensure they are CASA compliant.

175.  Recommendation 4.7.133b:  The resuslt of that review should be provided to the Parties and the monitor.

176.  Recommendation 4.7.133c:  All future "Special Orders" related in any way to the CASA should be provided to the Parties and the monitor contemporaneously with publication.

177.  Recommendation 4.7.169:  CPOA should aware of the requirements of same and to redouble efforts to meet the requirements of this paragraph.

178.  Recommendation 4.7.170:  Revise appropriate policies to reflect the use of ACMs within the IA "outcomes" definitions and train personnel accordingly.

179.  Recommendation 14.7.176:  CPOA should redouble its supervisory efforts to ensure routine compliance with this requirement.

180.  Recommendation 4.7.177a:  Managers at CPOA and IAB should be cognizant of timelines for given investigations, and ensure that, when needed and appropriate, extensions are requested.

181.  Recommendation 4.7.177b:  Timeline compliance rates should be included in CPOA's and IAB's monthly and/or quarterly management reports.

182.  Recommendation 4.7.177c: When investigations are delayed for unusual circumstances, such as frequent cancellation of interviews by a complainant or a Family Medical Leave Act delay of a compelled investigation, it should be clearly set forth in an investigative timeline for supervisory review.
183.  Recommendation 4.7.178a:  CPOA and APD should reinforce training and supervision of its personnel related to investigative timelines.

184.  Recommendation 4.7.187a:  The current practice of figuring the sanction level of any sustained policy violation and whether there are any prior offenses that, by their level of sanction and date of imposition, count as a prior offense, is complicated and subject to too much subjectivity (based on Supervisory Chain of Command input to the Chief per SOP 3-46-5). IAB and CPOA should make findings regarding the level of sanction and whether there are any applicable prior offenses. The SOP should be revised to provide for these determinations to be made by IAB and CPOA.

185.  Recommendation 4.7.187b: Retention cards need to indicate the level of sanction associated with each sustained violation and the date of imposition of discipline.

186.  Recommendation 4.7.187c:   Where a sustained violation (policy) has a sanction level that contains a range (e.g. 2-5), or where it has no associated sanction level, IAB and CPOA should make the sanction level determination in a finding and explain how the sanction level finding was reached.

187.  Recommendation 4.7.187d:   Where an investigation that reaches sustained findings contains prior offenses on the officer's retention card, IAB and CPOA should make a finding whether those prior offenses count as a prior offense enhancement.

188.  Recommendation 4.7.187e:   Once the above findings are made, APD and CPOA – utilizing the sanction level rows and prior offense columns of the disciplinary matrix - should make a finding as which box applies on the disciplinary matrix and the range of discipline associated with the box.

189.  Recommendation 4.7.187f:  The findings recommended in this paragraph, as all other findings, shall be subject to review, comment and recommendation by supervisors of the subject officer in the supervisory review of the investigation.

190.  Recommendation 4.7.187g: When discipline imposed after a PDH differs from the Chief's proposed findings and discipline, then the Final Decision on Discipline Letter, or a separate memo in the investigative file, should contain an explanation of the balancing of mitigating and aggravating circumstances occurring at the PDH, and an explanation for the final discipline as opposed to the proposed discipline.

191. Recommendation 4.7.188a:  Since the disciplinary policy is moot on the requirement that departures from the "presumptive range of discipline" must be justified in writing, APD should append such a declaration to the matrix.

192.  Recommendation 4.7.194:  APD should collect and analyze course-of-business data relative to this paragraph to ensure that compliance levels are met.

193.  Recommendation 4.7.195:  APD should collect and analyze course-of-business data relative to this paragraph to ensure that compliance levels are met.

194.  Recommendation 4.7.197:  Pending a determination of the efficacy of the delivered training.

195.  Recommendation 4.7.198a:  APD should consider monitor feedback and not respond to that feedback positively while otherwise stepping backward in other sections of the policy, such as raising the thresholds or shortening the review period.

196.  Recommendation 4.7.198b:  We understand APD has contacted NJSP, New Orleans PD, and Seattle PD to glean ideas about how this review regimen could be structured to meet the requirements of the CASA in the most efficient manner possible.  APD should develop specific, quantifiable, appropriate programmatic reform based on the information collected.

197.  Recommendation 4.7.199:  APD should avoid making unilateral decisions regarding revisions to policies required by the CASA without notifying the Parties and the monitor of the need, import, and specifics of the "new" policy.

198.  Recommendation 4.7.200:  Re-assess the role of EIRS within the overall process of supervision, and ensure that a mechanism exists to trigger detailed supervisory reviews of defined "outliers" systematically, reliably and effectively.

199.  Recommendation 4.7.201a:  Clarify sections g and k of the current policy to reflect the requirements of the CASA

200.  Recommendation 4.7.201b:  Ensure supervisors are cognizant of their responsibilities under Paragraph 215, and are trained to perform those responsibilities correctly.

201.  Recommendation 4.7.202a: Complete the development process to achieve an approved policy regarding EIRS implementation at the sergeant's level.

202.  Recommendation 4.7.202b:  Develop an approved analysis and reporting system regarding EIRS triggers, and response protocols to those triggers.

203.  Recommendation 4.7.203:  Complete the planning process and submit a document outlining policy, procedures, training and oversight approvable by the monitor.

204.  Recommendation 4.7.205a:  Complete development of the revisions to APD's EIRS policy that are approvable by the Parties and the monitor.

205.  Recommendation 4.7.205b:  Train the new policies as approved

206.  Recommendation 4.7.205c:  Develop and implement a meaningful "inspections and audit" protocol and procedure to ensure internal field-assessment of operations in the field (i.e., sergeants, lieutenants and Area Commanders) relating to this policy.

207.  Recommendation 4.7.206a:  Complete policy development and approval processes as agreed to by the Parties and approvable by the monitor.

208.  Recommendation 4.7.206b:  Complete training/retraining on the revised policy for officers and supervisors.

209.  Recommendation 4.7.207a:  APD should rescind effective immediately any and all "Special Orders" or other policy mechanisms that contradict the CASA and/or monitor- and Party-approved policy.

210.  Recommendation 4.7.207b:  APD should examine any remaining "Special Orders" they have published over the past two years, that may be in violation of the CASA and rescind those "Special Orders" as well. 211.  Recommendation 4.7.208:  APD should cease, effective immediately, making policy changes related to requirements of the CASA via Special Order, or any similar mechanism, without notifying the Parties and the monitor.

212.  Recommendation 4.7.208:  APD should rescind effective immediately any and all "Special Orders" or other policy mechanisms that contradict the CASA and/or monitor- and Party-approved policy.

213.  Recommendation 4.7.209:  APD should conduct an immediate, thorough and complete audit protocol relative to proper testing and functioning of OBRD equipment.

431

214.  Recommendation 4.7.210a:  Complete a monitor- and Parties-approved policy outlining an effective inspections and audit function in the Area Commands' patrol operations processes of auditing supervisory processes designed to implement OBRD "use" requirements.

215.  Recommendation 4.7.210b:  Implement the policy and evaluate its effectiveness in identifying and remediating OBRD use that is outside policy.

216.  Recommendation 4.7.211a: Ensure that all supervisors have been (re)trained in the revised OBRD policy.

217.  Recommendation4.7.211b:  Ensure that all internal changes to policies approved by the monitor and the Parties are noticed to the monitor and the Parties in writing and approved as per the requirements of the CASA.

218.  Recommendation 4.7.212a:  APD should conduct a complete self-review of policies to ensure there are no other "outliers" among their policy promulgation systems, e.g., internal practice memoranda in conflict with approved policy, etc.

219:  Recommendation 4.7.212b:  APD should notify the Parties and the monitor if they find any other similar issues related to other elements of the CASA.

220.  Recommendation 4.7.212c:  APD should provide the Parties and the monitor with copies of their review findings and actions taken to resolve any additional issues noted.
221.  Recommendation 4.7.213a:  Identify the training elements implicated in the findings on this Paragraph and assess whether they were delivered in a manner that was clear and correct enough to result in CASA-compliance in the field.

222.  Recommendation 4.7.213b:  If training deficiencies or problems are implicated in this review, design remedial training, counseling, or discipline if required to directly affect the observed in-field supervisory under performance.

223.  Recommendation 4.7.213c:  Once the remedial training, counseling, or discipline is implemented, close the loop by re-evaluating performance in the field.  Repeat until under-performance is eliminated.

224.  Recommendation 4.7.214a:  Using the Completed Staff Work method, develop policy, training, and audit protocols responsive to this paragraph.

225.  Recommendation 4.7.214b:  Once developed, implement and re-evaluate to determine if the problem has been resolved.

226.  Recommendation 4.7.214c:  Repeat until compliance is attained.

227.  Recommendation 4.7.215a: Using the Completed Staff Work method, develop policy, training, and audit protocols responsive to this paragraph.

228.  Recommendation 4.7.215b:  Once developed, implement and re-evaluate to determine if the problem has been resolved.

229.  Recommendation 4.7.215c:  Repeat until compliance is attained.

230.  Recommendation 4.7.216a:  APD should implement its own "inspections and audit" process to ensure OBRD video are appropriately stored by the end-of-shift.

231.  Recommendation 4.7.216b:  Once developed, implement and re-evaluate to determine if the problem has been resolved.

232.  Recommendation 4.7.216c:  Repeat until compliance is attained.
233.  Recommendation 4.7.217a:  Restore any policy, procedure, practice or custom revised, terminated, or implemented as a result of Special Orders as they relate to OBRD policies, procedures, custom or practice.  This needs to be done through both written policy and training of officers and supervisors.

244.  Recommendation 4.7.217b:  Retrain any personnel/supervisors who were provided training responsive to of Special Order 16-75 and Special Order 16-82.

245.  Recommendation 4.7.217c:  Review all Special Orders currently applicable to APD  operations to ensure congruity with the CASA.

246.  Recommendation 4.7.229:  No action is required at this time, as this issue is currently "in progress," and pending resolution by the monitor.

247.  Recommendation 4.7.234: Identify, using BSSs, to drive programmatic revisions and upgrades to the BSU's operations and programs and implement those implicated revisions.

248.  Recommendation 4.7.240a:  APD should "operationalize" its revised mission statement through actions such as those listed in b and c below.

249.  Recommendation 4.7.240b:  APD should continuously focus on mechanisms to take issues identified through its community-based systems such as the CPCs and move those issues through internal processes to ensure that community opinions, needs, and critical issues are reflected in patrol plans, organizational priorities, and programmatic planning.

250.  Recommendation 4.7.240c:  APD should plan, develop and assess programmatic processes and evaluation strategies to identify, implement, assess, and improve both the quality and perception of its receptivity to community input and its ability to implement policing initiatives responsive to articulated community needs.

251.  Recommendation 4.7.241a:  Articulate a data-based strategy for staffing APD Area Commands so that the processes required in this paragraph related to in-field changes to patrol allocation, staffing (and training) are responsive to the requirements of this paragraph.

252.  Recommendation 4.7.241b: This should result in a piece of Completed Staff Work (CSW) identifying goals, measurable objectives, and processes involved in meeting the requirements of this Paragraph.

253.  Recommendation 4.7.241c:  The finished CSW should be provided to the Chief of Police for review and comment and action.

254.  Recommendation 4.7.242a:  APD should develop a Completed Staff Work document identifying the scope and depth of POP development issues, including recommendations for solving the identified above.

255.  Recommendation 4.7.242b:  The CSW document should be forwarded to the Chief of Police for review and comment.

256.  Recommendation 4.7.233a:  Prepare detailed operational reports assessing POP-related programs and projects, including analyses of outcomes and processes.

257.  Recommendation 4.7.244:  Document activities using Area Command tracking sheets, ensuring specifically that documented on-going partnerships are assessed and recommendations for reasonable improvement are included.

258.  Recommendation 4.7.248a:  Develop the capacity, and begin using the capacity to systematically track and capture salient information about participation in community meetings, and document execution of this task.

259:  Recommendation 4.7.249a:  Document the capture and reporting of aggregated monthly crime statistics by Area Command.

260.  Recommendation 4.7.251a:  APD should continue work to broaden membership and participation by determining what factors are keeping "relevant stakeholders" from expressing their views at CPC meetings, and documenting attempts to address those factors.

261.  Recommendation 4.7.252a:  Improve and document efforts to recruit and retain a more representative cross section of community members as voting members of the CPCs

262.  Recommendation 4.7.252b: Post selection procedures on the internet.

263.  Recommendation 4.7.254a:   APD should take the lead to ensure a comprehensive community policing approach is identified for each area command, based on CPC interaction, participation, and comment.

264.  Recommendation 4.7.255a:  Using the CSW model, APD should assess specific "failure analyses" for the issues noted above, identify the cause of the failures, and articulate a written plan for resolving any outstanding requirements relating to compliance with this paragraph.

 265.  Recommendation 4.7.55:  Assign staff to develop a more standard format for the CPC annual report and provide assistance to each CPC in producing its annual report. 2017 data need to be incorporated.

266.  Recommendation 4.7.266a: Increase the levels of focus by managerial personnel on timelines for completed investigation.

267.  Recommendation 4.7.266b:  Ensure that tardy investigations are noted, and discussed with the involved investigator(s) to ensure the reasons for delay were reasonable.

269.  Recommendation 4.7.266c:  Develop a process that ensures all complaints are either assigned for investigation or administratively closed within 7 working days of receipt of complaint.

270.  Recommendation 4.7.266d:  Increase the levels of focus by managerial personnel on timelines for completed investigation.

271.  Recommendation 4.7.266e:  Ensure that tardy investigations are noted, and discussed with the involved investigator(s) to ensure the reasons for delay were reasonable.

272.  Recommendation 4.7.270a:  The Chief of police should continue the observed change his modalities of response to this paragraph to conform to the requirements stipulated in the paragraph, to ensure that the rationale for his decisions are clearly and fairly explained.

273.  Recommendation 4.7.270b: APD should ensure that input from POB and CPOA is given full and complete consideration and assessment.

274.  Recommendation 4.7.270c:  Where the Chief or his designee decides not to impose POB and CPOA disciplinary recommendations, the reasons for the decision not to impose should be communicated adequately for a clear understanding by the CPOA/POB, the APD and the public of the Chief's reasoning.

275.  Recommendation 4.7.273:  APD and CPOA/POB should investigate the possibility of requesting external technical assistance to study APD/CPOA/POB inter-organizational cooperation issues and to make recommendations for improvement in this area.

276.  Recommendation 4.7.274a:  APD should ensure that input from POB and CPOA is given full and complete assessment, and implemented where practicable.

277.  Recommendation 4.7.274b:  In any instance in which APD decides it cannot implement the POB/CPOA recommendations, the reasons for the decision not to implement should be communicated fully to the POB and CPOA in writing.