# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                  No. 1:14-cv-1025 RB-SMV

THE CITY OF ALBUQUERQUE,

    Defendant

v.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

    Intervenor.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the City's Motion Requesting Evidentiary Hearing Regarding Neutrality of Independent Monitor (Doc. 311), filed on October 31, 2017. For the reasons explained at the public hearing on this matter on November 16, 2017, and for those described in this Memorandum Opinion and Order, the Court will deny the Motion.

**I.**      **The Monitor's Role and Responsibilities**

The City asks the Court to hold an evidentiary hearing to inquire into "certain statements and conduct by the Monitor and monitoring team members [that] raise questions of potential bias, . . . [and] to ensure that the monitoring process is fair, impartial, and unbiased." (Doc. 311 at 1–2.) The City begins by comparing the Monitor to a special master and argues that the Court

should examine his conduct pursuant to 28 U.S.C. § 455. (*Id.* at 3.) While the Court ultimately considers the City's allegations under this standard, the Court disagrees that the Monitor is a special master with quasi-judicial functions.

### A. The Monitor was appointed to assess and report.

The Parties laid out the Monitor's roles, responsibilities, and expectations in a Joint Report filed on February 10, 2017. (Doc. 249-1.) The Parties agree that the Monitor's "primary duties are to *assess* the City's compliance with the CASA in an independent, objective, and reliable manner, and to *report* on the City's progress toward full compliance and provide recommendations regarding the necessary steps to achieve compliance." (Doc. 249-1 at 1 (emphasis added).) The Monitor's duties derive from four documents: (1) the CASA (Doc. 247-1 (CASA)); (2) the February 19, 2015 Order of Appointment (Doc. 103); (3) the April 14, 2015 Order Accepting the Parties' Stipulation Regarding the Terms and Conditions of the Independent Monitor's Payment (Doc. 114); and (4) the Monitoring Methodology Dr. Ginger created pursuant to ¶ 300 of the CASA.[1]

### 1. The CASA

In the February 10, 2017 Joint Report, the Parties identified a variety of paragraphs that delineate the Monitor's "mandatory duties" (outlined in CASA ¶¶ 147, 148, 221, 222, 294, 295, 296, 297, 298, 300, 301, 302, 303, 304, 306, 307, 308, 309, 310, 311, 312, 314, 321, 324, 326, 330, 331, 334, 338), "discretionary duties" (outlined in CASA ¶¶ 299, 305, 320, 333), and a mix of "mandatory and discretionary duties" (outlined in CASA ¶ 313). In short, the Monitor's mandatory duties include: review, approve, and resolve objections to APD's new and revised policies/procedure/training/etc. (CASA ¶¶ 147–48, 221–22); assess and report on whether the

---

[1] The methodology is attached as Appendix One to the Monitor's first Report and is available at https://www.justice.gov/usao-nm/file/796891/download.

requirements of the CASA have been implemented, conduct reviews, audits, and assessments, make recommendations on outcome measures (*id.* ¶¶ 294–98, 302); create methodology for assessment/review (*id.* ¶ 303); review serious use of force/misconduct complaint investigations, conduct comprehensive compliance and outcome assessments at certain dates (*id.* ¶¶ 304, 306–09); communicate through monthly meetings, etc., meet with community stakeholders and hear community perspectives, maintain confidentiality, avoid conflicts of interest (*id.* ¶¶ 310–312, 314, 321, 324, 326); prepare annual budgets, inform parties of the need for technical assistance, confer on needed changes, modifications, and amendments to the CASA (*id.* ¶ 330–31, 334, 338).

The discretionary duties include: may use data collected by APD to conduct outcome assessments (*id.* ¶ 299); may make recommendations on measures to ensure implementation of the CASA objectives (i.e., training, etc.) (*id.* ¶ 305); may conduct on-site visits and assessments without prior notice to City (*id.* ¶ 320); may request permission to hire/contract with others who are necessary to perform tasks (*id.* ¶ 333). Paragraph 313 consists of a mix of mandatory and discretionary duties and is related to when members of the monitoring team may testify with respect to the CASA.

### 2. February 19, 2015 Order of Appointment (Doc. 103)

The parties' filed a Joint Motion Requesting an Order Appointing Dr. James D. Ginger as Independent Monitor, which the Court granted on February 19, 2015. (Doc. 103.) The Court noted:

> Ultimately, the Independent Monitor will be responsible for assessing and reporting whether the parties are fulfilling their obligations under the consent decree. . . . Dr. Ginger will ensure that the decree's implementation will produce a police force that provides constitutional, effective, and high-quality service to all Albuquerque residents. To accomplish these critical tasks, Dr. Ginger will have the duty and authority to *conduct audits, gather data, analyze outcomes, make recommendations, and report his findings* to the parties, the Court, and the public.

(Doc. 103 at 1 (citing CASA ¶¶ 294–327) (emphasis added).)

### 3. April 14, 2015 Order Accepting the Parties' Stipulation Regarding the Terms and Conditions of the Independent Monitor's Payment (Doc. 114)

This Order, which includes the Parties' Stipulation Establishing the Independent Monitor's Office and the Payment of Monitoring Expenses, mentions that Section XIII of the CASA "outlines the Independent Monitor's specific duties, responsibilities, and authority, including conducting compliance reviews and audits; performing outcome assessments; reviewing use of force and misconduct investigations; preparing monitoring reports; providing technical assistance; and assisting the Parties with informal dispute resolution." (Doc. 114 at 2.) It defines the Independent Monitor's Office to include "the Independent Monitor and all employees, agents, or independent contractors selected pursuant to Paragraph 333 of the Settlement Agreement." (*Id.* at 3.) It further specifies that "[i]n addition to the duties, responsibilities, and authority set forth in the Settlement Agreement, *all employees, agents, or contractors of the Independent Monitor's Office will comply with the Code of Conduct for Judicial Employees*, as adopted by the Judicial Conference of the United States." (*Id.* at 4 (emphasis added).)

### i. Code of Conduct for Judicial Employees

The Code of Conduct for Judicial Employees[2] contains two rules relevant to the City's Motion, both in Canon 3, entitled "A Judicial Employee Should Adhere to Appropriate Standards in Performing the Duties of the Office."

First, Canon 3(C) provides in part:

> A judicial employee should be patient, dignified, respectful, and courteous to all persons with whom the judicial employee deals in an official capacity, including the general public, and should require similar conduct of personnel subject to the judicial employee's direction and control. A judicial employee should diligently discharge the responsibilities of the office in a prompt, efficient, nondiscriminatory, fair, and professional manner.

Code of Conduct for Judicial Employees, Canon 3(C).

Second, Canon 3(F)(2), which relates to conflicts of interest, provides:

> Certain judicial employees, because of their relationship to a judge or the nature of their duties, are subject to the following additional restrictions:
>
> (a) A staff attorney or law clerk should not perform any official duties in any matter with respect to which such staff attorney or law clerk knows that:
> (i) he or she has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . .
>
> (c) A probation or pretrial services officer should not perform any official duties in any matter with respect to which the probation or pretrial services officer knows that:
> (i) he or she has a personal bias or prejudice concerning a party . . . .

Code of Conduct for Judicial Employees, Canon 3(F)(2)(a)(i), (c)(i).

### B. The Monitor is not a "special master" with quasi-judicial functions.

The City argues the Monitor is akin to a special master who should be held to the standards developed for judges pursuant to 28 U.S.C. § 455. (*See* Doc. 311 at 2–3.) The City cites no authority for this theory.

---

[2] The Code of Conduct for Judicial Employees is available at http://www.uscourts.gov/sites/default/files/vol02a-ch03_0.pdf.

There are several obvious and important distinctions between the Monitor as the Parties chose to define and interpret the role in this case, and a "special master" as defined in Federal Rule of Civil Procedure 53. First, neither the parties nor the Court ever cite Rule 53 in any of the relevant documents. (*See*, *e.g.*, CASA, Docs. 1, 9, 103, 114, 249-1.) The Order appointing the Monitor neither cites Rule 53 nor complies with the strictures of Rule 53. (*See* Doc. 103.) For example, the Order does not direct the master to proceed with "all reasonable diligence," nor does it specify the limits on the Monitor's authority. *See* Fed. R. Civ. P. 53(b)(2), (b)(2)(A); *see also* Francis E. McGovern, Appointing Special Masters and Other Judicial Adjuncts: A Handbook for Judges, SN009 ALI-ABA 1911, 1914 (2007) (noting that "[a]n appointment order [under Rule 53] must include the 'magic words' directing the [special] master to proceed with all reasonable diligence"). Further, the Monitor did not file an affidavit under the Rule. *See* Fed. R. Civ. P. 53(b)(3)(A).

Second, the Monitor has not been given "quasi-judicial" responsibilities. "It is well-settled that when a special master accepts an appointment by the Court, the special master assumes the duties and obligations of a judicial officer." *Hofmann v. EMI Resorts, Inc.*, 689 F. Supp. 2d 1361, 1374 (S.D. Fla. 2010) (citing *In Re Gilbert*, 276 U.S. 6, 9 (1928)). Special masters often have "the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt." *Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009) (citing Fed. R. Civ. P. 53(c)–(d)) (subsequent citations omitted). "The master's responsibilities typically culminate in a report. If the report includes findings of fact, they are binding in non-jury actions unless clearly erroneous." *Id.* (citing Fed. R. Civ. P. 53(e)(2)).

Here, the Monitor's primary responsibilities are to assess and report. "These powers, like other investigatory powers, are not 'duties functionally equivalent to those performed by a judge.'" *Cobell v. Norton*, 237 F. Supp. 2d 71, 88 (D.D.C. 2003) (quoting *Jenkins v. Sterlacci*, 849 F.2d 627, 631 n.1 (D.D.C. 1988)). The duties are also "quite different from those of a Rule 53 special master." *Benjamin*, 343 F.3d at 45. The Monitor "was not appointed to hold hearings, subpoena witnesses, take testimony or rule on evidence." *Id.* No document that the Court has reviewed specifies that the Monitor's reports "legally entitled to deference." *Id.* The Monitor's reports both inform "the court of ongoing compliance efforts" and "facilitate the [Parties'] awareness of [the City's] compliance with [the CASA's] directives. In other words, [the Monitor] serves a monitoring function; [he] does not exercise quasi-judicial power." *Id.*

Third, special "[m]asters are subject to the Code of Conduct for United States Judges, with exceptions spelled out in the Code." Fed. R. Civ. P. 53, Advisory Committee's Notes, 2003 Amendments, Subdivision (a)(2) and (3). But here, the Parties explicitly specified in the Stipulation Regarding the Terms and Conditions of the Independent Monitor's Payment that the Independent Monitor's Office (which is defined to include the Monitor) "will comply with the Code of Conduct for Judicial Employees . . . ." (Doc. 114 at 3, 4.) If the Parties had intended for the Monitor to have the responsibilities of a special master, they would not have held him to the Code of Conduct for Judicial Employees, which applies to court employees—not special masters. The Court finds that the Parties did not contemplate that the Independent Monitor would function as a special master pursuant to Rule 53.

**III. The City's Motion**

    **A.    The City's charges of bias and impartiality.**

        **1.    March 18, 2016 Meeting**

The City reports that it first became "concerned about potential bias on the part of the Monitor [in] early 2016." (Doc. 311 at 4.) On March 18, 2016, the Monitor met "with APD leadership to debrief a site visit the monitoring team was completing that week." (*Id.* at 5.) The City submits an affidavit from Assistant Chief Robert Huntsman, who stated that "[d]uring the meeting, there was something about Dr. Ginger's behavior that made me begin to worry about what he might do or say. My impression was that he was irritated and was exhibiting signs of escalating behavior." (Doc. 311-1 ¶ 5.) Consequently, Assistant Chief Huntsman decided to secretly turn his on-body camera to record the meeting, which is not the normal practice at these meetings. (*Id.* ¶ 6.)

Some five minutes after Assistant Chief Huntsman surreptitiously began recording, the City's Attorney, Ms. Jessica Hernandez, made a comment that she, Dr. Ginger, and another person had "joked about no surprises becoming our motto" and asked Dr. Ginger to share what he planned to review at a City Council Study Session scheduled for later that day so that they would "not [] be surprised." (*See* Doc. 311-2 at 2:1–6.) Dr. Ginger replied that Ms. Hernandez had "made specific allegations in [her] presentation to council," and he was "going to address it." (*Id.* at 2:8–9.) Ms. Hernandez said she did not know what he was referring to and asked him to explain. (*Id.* at 2:11–12.) Dr. Ginger refused. (*Id.* at 2:17.) Ms. Hernandez said "it sounds like there were parts of [my presentation] that concerned you. Are you willing to share those with us?" (*Id.* at 3:4–5.) Dr. Ginger reiterated that he would not share and said, "You didn't consult with me, Jessica, before you laid the bomb on me. Why would I consult with you? . . . Now that

8

I've been surprised, we should stop surprising folks, right? Now that you blame all this stuff on me in a City council meeting, we should stop doing that, right? I don't think so." (*Id.* at 3:13–15, 4:3–6.) Ms. Hernandez responded, "I think that this dynamic is not helpful to the process." (*Id.* at 4:18–19.) Dr. Ginger replied, "I didn't think it was helpful, Jessica, when you blamed this entire process, the failure of this process so far on me in City council." (*Id.* at 4:20–22.)

Dr. Ginger continued, "Yeah, [this] is where we are. I regret it. I wish it hadn't happened, but it has. . . . I took the preemptive strike the first time in the City self-reports, fine, blame it on me. That's part of the game. Now it's moved to City council. And if I don't do something about it, it will move somewhere else. So it's fine, I can play the game. It's alright. I don't mind." (*Id.* at 5:2–11.) APD Assistant Chief Huntsman stated, "I view this as my department, my city, my community. It's not a game to me." (*Id.* at 5:14–15.) Dr. Ginger responded, "Chief, you should have had that conversation with your attorney before she started this in Council. . . . She, she made allegations in council. I'm going to respond to them. That's the way it works." (*Id.* at 5:16–17, 6:1–2.) Dr. Ginger made additional allegations that Ms. Hernandez's presentation to City Council was "premeditated and planned." (*Id.* at 6:22–23.) He summarized, "I'm not gonna give up on you guys. It's Jessica and I that have issues." (*Id.* at 7:3–4.) Mr. Roseman replied, "And, I get what you're saying. And I think we're just trying to express to you the concern of, this is going to have far-reaching effects . . . . It's going to be more personal towards the Police Department and us than what is going to be the focus of what you are actually trying to accomplish." (*Id.* at 8:1–3, 6–8.) Dr. Ginger said, "I understand that. And that's something your attorney should have thought about before she played this rope a dope blame the monitor game . . . . I can play the game, Jessica. I know how, and we can play it. . . . The problem is here [*likely indicating Ms. Hernandez*]. The problem isn't here [*likely indicating other APD leadership*].

9

And you guys, and you guys are gonna be collateral damage, and I understand it, right. But I didn't start this." (*Id.* at 8:9–12, 9:2–4.)

### 2. October 2017 Telephone Conversation

The City's next allegation of bias stems from a telephone conversation between an unnamed APD staff member and an unnamed member of the monitoring team. (Doc. 311 at 8.) During this call, "[t]he monitoring team member indicated that his draft portions of [IMR-6] contained positive information about APD's compliance progress but also that the Monitor changed those portions to read as more critical of APD before issuing the draft report to the Parties." (*Id.*) "The monitoring team member went on to say something to the effect that 'it is clear that Dr. Ginger has an ax to grind' against certain city officials, including the City Attorney and the Chief of APD." (*Id.* at 8–9.)

### 3. The Monitor's Relationship with the DOJ

The City's third complaint involves allegations that "the Monitor has referred to the DOJ attorneys as 'my attorneys' and has treated them as serving in that role rather than as co-equal parties with the City in this process." (Doc. 311 at 10 (citing Doc. 311-1 ¶ 15; Doc. 311-5 ¶ 11).) The City alleges that "the nature and frequency of communications between the Monitor and DOJ attorneys (often to the exclusion of the City), and the role the DOJ attorneys take in handling issues of the Monitor in meetings, appear inconsistent with his intended independence." (*Id.*)

## B. Dr. Ginger should not be disqualified pursuant to 28 U.S.C. § 455.

The City does not set out definitions of bias or impartiality, nor does it cite any authority to support an argument that the Monitor should be disqualified (indeed, it stops short of actually arguing the Monitor should be disqualified, instead seeking a public hearing to discuss its

tenuous allegations). Because the Monitor is not a special master under Rule 53, the City's allegations should not be examined pursuant to 28 U.S.C. § 455, which governs when a judge or a special master should be disqualified. But even if the Court held the Monitor to this standard, the Court finds that the City's allegations are insufficient to disqualify Dr. Ginger.

Section 455(a) provides that "any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists . . . ." *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (internal quotation omitted)); *see also United States v. Cooley*, 1 F.3d 985, 992 (10th Cir. 1993). "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" *Cooley*, 1 F.3d at 992 (quoting *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir. 1992) (internal quotation omitted) (subsequent citations omitted)). "The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom. In applying the test, the initial inquiry is whether a reasonable *factual* basis exists for calling the judge's impartiality into question." *Id.* (citations omitted).

The City argues that there is evidence that Dr. Ginger is partial to the DOJ, because he refers to them as "my attorneys." (Doc. 311 at 10 (citing Doc. 311-1 ¶ 15; Doc. 311-5 ¶ 11).) The City also makes vague allegations regarding the "the nature and frequency of communications between the Monitor and DOJ attorneys (often to the exclusion of the City) . . . ." (*Id.*) To the

11

extent the City complains that the Monitor has engaged in inappropriate ex parte communications with DOJ attorneys, the Court is dumbfounded. The Parties have not prohibited the Monitor from engaging in ex parte communications. (*See*, *e.g.*, CASA.) Moreover, the Court would be shocked if the Monitor and his team are not continuously communicating with the City outside of the presence of the DOJ. The Court finds there is no reasonable factual basis to call the Monitor's impartiality into question.

With respect to "personal bias or prejudice" under § 455(b)(1), the opinion in *Liteky v. United States*, 510 U.S. 540 (1994), is apropos. There, the Court found:

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S. Ct. 230, 65 L. Ed. 481 (1921), a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555–56.

Dr. Ginger may have expressed his consternation with Ms. Hernandez's tactics at the March 2016 meeting, and he may dislike her style of lawyering, but an objective person would not find his comments or conduct so antagonistic "as to make fair judgment impossible." *Id.* at 555. This is particularly true if Dr. Ginger's statements are equated to an opinion on her

12

credibility, a determination that would be reasonable for any judge to engage in during a case. *See*, *i.e.*, *Romero v. City of Albuquerque*, 190 F. App'x 597, 607 (10th Cir. 2006). In *Romero*, one of the parties asked the court "to review the judge's credibility determinations and infer from them bias in the judge's findings." *Id.* The court held that when a trial court's findings are based on credibility, we give them even greater deference than usual." *Id.* Here, Dr. Ginger's responses to Ms. Hernandez may very well represent his opinion on her credibility, as it is clear that he considered Ms. Hernandez's conduct to have violated a previous agreement not to blindside each other.

Further, "[i]n *Liteky*, the Court stated that § 455(a) is subject to an 'extrajudicial source factor,' which at its base asserts that alleged bias or prejudice 'must stem from an extrajudicial source [or a source outside the judicial proceeding at hand] and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" *In re Bennett*, 283 B.R. 308, 322 (B.A.P. 10th Cir. 2002) (quoting *Liteky*, 510 U.S. at 545 & n. 1, 555, (internal quotation omitted)); *see also United States v. Page*, 828 F.2d 1476, 1481 (10th Cir. 1987) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). There is an exception to this "requirement of extrajudicial bias, when 'such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party.'" *Page*, 828 F.2d at 1481 (quoting *Davis v. Bd. of Sch. Comm'rs of Mobile Cty.*, 517 F.2d 1044, 1051 (5th Cir. 1975), *cert. denied*, 425 U.S. 944 (1976)) (citing *United States v. Bray*, 546 F.2d 851, 860 (10th Cir. 1976)). The City has made no allegation that suggests Dr. Ginger's bias or prejudice stems from an extrajudicial source or is "pervasive." *See Page*, 828 F.2d at 1481.

With respect to the City's objection based on the hearsay allegation that Dr. Ginger changed the IMR-6 to be more critical of the APD, the Court finds such speculation insufficient

to show bias or prejudice. A remark, speculating about the Monitor's state of mind, from an unidentified member of the monitoring team to an unidentified staffer for APD, as related to APD management, has less than zero evidentiary value. Further, it is the Monitor's responsibility to ensure the City is complying with the CASA, and it is in Dr. Ginger's discretion—not that of his staff—to present the facts of the City's compliance. Dr. Ginger, clearly, has the authority to make corrections to the draft report.

Finally, even if a reasonable person could conclude that the Monitor harbored any partiality in this case, the Court would still feel confident with Dr. Ginger continuing in his purely administrative role. The decision in *Hofmann v. EMI Resorts, Inc.*, 689 F. Supp. 2d 1361 (S.D. Fla. 2010), is instructive. There, the special master (appointed pursuant to Rule 53) was charged with quasi-judicial responsibilities. *Hofmann*, 689 F. Supp. 2d at 1366, 1373. The special master prepared a report that "outline[d] various instances of potentially criminal conduct[,]" and the court agreed with the defendants that, as a consequence of the report, the special master's "impartiality might reasonably be questioned . . . ." *Id.* at 1373, 1375. The court thus disqualified the special master "from performing 'judicial functions[,]'" but held that he was *not* "disqualified from performing administrative or monitoring functions." *Id.* at 1375 (citing *Jenkins*, 849 F.2d at 630–31).

The Court finds that neither the March 2016 video nor the unsubstantiated October 2017 allegations are evidence of disqualifying impartiality or bias. The total here is certainly not greater than the sum of its parts. Ultimately, the Court will deny the City's Motion, because there is no reason to question Dr. Ginger's impartiality under § 455(a) or attribute disqualifying bias or prejudice to him under § 455(b).

### C. Dr. Ginger should not be disqualified under a lesser standard.

The Monitor and monitoring team are bound to comply with the Code of Conduct for Judicial Employees. "The Code of Conduct for Judicial Employees sets forth specific rules governing . . . conflicts of interest." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1309 (10th Cir. 2015) (citing Code of Conduct for Judicial Employees § 320, Canon 3).

Canon 3(F)(2)(a), which applies to judicial law clerks, prohibits law clerks from "perform[ing] any official duties in any matter with respect to which" he or she "knows that . . . he or she has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."[3] Canon 3(F) does not define "personal bias" or "prejudice." There is little authority, from this circuit or elsewhere, on the issue of a law clerk's personal bias or prejudice.

In *Ohio Valley Environmental Coalition v. Fola Coal Co., LLC*, 120 F. Supp. 3d 509 (S.D.W. Va. 2015), a party accused a law clerk of harboring bias against it. *Ohio Valley Envtl. Coal.*, 120 F. Supp. at 514 n.4. The court found the concerns were "trivial at best," because even if the clerk had a bias, the clerk "merely acts in service of a supervising judge's discretion." *Id.* The same is true here, where the Monitor is merely providing a service to the Court, which ultimately has the discretion to issue decisions.

The City also protests that "the role the DOJ attorneys take in handling issues of the Monitor in meetings[] appear inconsistent with his intended independence." (Doc. 311 at 10.) The Court takes pains to note that had the City not engaged in contentious tactics over the course of this litigation, perhaps there would be no need for the DOJ to act as a buffer. Mindful, however, that the Monitor and the monitoring team are subject to Canon 3(C) of the Code of

---

[3] Canon 3F(2)(c)(i), which applies to probation and pretrial services officers, also prohibits these employees from performing any duties where "he or she has a personal bias or prejudice concerning a party . . . ."

15

Conduct for Judicial Employees, which requires that judicial employees "should be patient, dignified, respectful, and courteous . . . [and] should diligently discharge the responsibilities of the office in a prompt, efficient, nondiscriminatory, fair, and professional manner[,]" the Court will remind the Monitor and the monitoring team of their responsibilities under the Code of Conduct.

      **D.    The Court will deny the City's motion.**

The Court finds that the manner in which the City framed the March 18, 2016 meeting comes dangerously close to obstruction of this reform process. In his affidavit, Assistant Chief Huntsman swears that he turned on his on-body camera because of Dr. Ginger's "escalating behavior." (Doc. 311-1 ¶ 5.) The DVD of the 2016 meeting that the City produced to the court of public opinion via YouTube and the Albuquerque Journal, which is just shy of nine minutes, *could be* spun in support of Assistant Chief Huntsman's statement.[4] The City produced a different video, however, to the Court. (*See* Doc. 311-3.) The official video exhibit is approximately 14 minutes long, with the five additional minutes on the front end. (*See id.*) It is apparent why the City chose to cut these additional five minutes—they reflect an atmosphere of cordial conversation. There is certainly no evidence of irritation or "escalating behavior" from Dr. Ginger that would have concerned Assistant Chief Huntsman. The discrepancy between these two versions of the secret recording is the most damning evidence that the City and APD leadership has manipulated the video to cast Dr. Ginger in a light that allegedly demonstrates bias or prejudice. Again, the Court finds the last nine minutes are insufficient to show bias or prejudice, much less the full 14 minutes.

---

[4] *See* Ryan Boetel, *City questions monitor's fairness in APD reform case*, Albuquerque Journal, Oct. 31, 2017, available at https://www.abqjournal.com/1086115/city-questions-monitors-fairness-in-apd-reform-case.html; *see also Deputy Albuquerque Police chief secretly records oversight monitor in March Meeting*, YouTube, available at https://www.youtube.com/watch?v=ZGkZlAhucFc.

Moreover, if this video is not in direct contravention of paragraph 229 of the CASA, it is plainly not in keeping with the spirit of that paragraph, which restricts the use of lapel cams to official law enforcement duties. The City's decision to secretly record the Monitor in order to blindside him later is unacceptable. This type of conduct chills the possibility of candid communication in the future and erodes trust. To ensure that the City has not surreptitiously recorded other meetings for future use, the Court orders the City to immediately produce, *in camera*, all video and/or audio recordings and/or transcripts it has secretly obtained of either the Monitor, the monitoring team, or of this Court.

**IT IS SO ORDERED.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**