1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

UNITED STATES OF AMERICA,        )
4                                 )
                     Plaintiff,   )
5                                 )
              vs.                 )   NO: 14-CV-1025 RB-SMV
6                                 )
THE CITY OF ALBUQUERQUE,         )
7                                 )
                     Defendant.   )
8

9

10                  TRANSCRIPT OF PROCEEDINGS
                  TELEPHONIC STATUS CONFERENCE
11           BEFORE THE HONORABLE ROBERT C. BRACK
                  UNITED STATES DISTRICT JUDGE
12               THURSDAY, JANUARY 18, 2018
                         11:10 A.M.
13           LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

14

15

16

17

18

19

20

21       (Proceedings recorded by machine shorthand and
     transcript produced by Computer-Aided Transcription.)
22
     REPORTED BY:      VANESSA I. ALYCE, RPR, NM CCR #259
23                     Federal Official Court Reporter
                       100 N. Church Street
24                     Las Cruces, NM  88001
                       Phone:  (575) 528-1430
25                     Email:  Vanessa_Alyce@nmcourt.fed.us

```
 1    TELEPHONIC APPEARANCES:

 2         FOR THE UNITED STATES:

 3                   UNITED STATES ATTORNEY'S OFFICE
                     District of New Mexico
 4                   201 Third St. NW, Ste. 900
                     Albuquerque, NM  87102
 5                   BY:  ELIZABETH M. MARTINEZ, ESQ.
                          RUTH FUESS KEEGAN, ESQ.
 6
                     and
 7
                     U.S. DEPARTMENT OF JUSTICE
 8                   Civil Division
                     601 D. Street NW, Room 5422
 9                   Washington, D.C. 20004
                     BY:  COREY M. SANDERS, ESQ.
10
                     and
11
                     U.S. DEPARTMENT OF JUSTICE
12                   Civil Division
                     950 Pennsylvania Ave. NW, PHB 5418
13                   Washington, D.C. 20004
                     BY:  LUIS E. SAUCEDO, ESQ.
14
                     and
15
                     U.S. DEPARTMENT OF JUSTICE
16                   905 Pennsylvania Ave. NW
                     Washington, D.C.  20579
17                   BY: STEPHEN RYALS, ESQ.

18                   and

19                   ALYSSA FERDA, Clerk, U.S. Attorney's Office

20         FOR THE CITY OF ALBUQUERQUE:

21                   CITY ATTORNEY'S OFFICE
                     One Civic Plaza NW, Fourth Floor
22                   Albuquerque, NM  87102
                     BY:  SAMANTHA HULTS, ESQ.
23                        JERAMY SCHMEHL, ESQ.

24

25
```

```
 1    TELEPHONIC APPEARANCES continued:

 2        FOR THE CITY OF ALBUQUERQUE:

 3                    WALZ AND ASSOCIATES
                      133 Eubank NE
 4                    Albuquerque, NM  87123
                      BY: JERRY A. WALZ, ESQ.
 5
          FOR THE INTERVENOR APOA:
 6                    JAMES D'AMATO, ESQ.
                      1112 Second St. NW
 7                    Albuquerque, NM  87102

 8                    and

 9                    SHAUN WILLOUGHBY, President APOA

10        Also Present:

11                    DR. JAMES D. GINGER
                      Court-appointed Independent Monitor
12
                      DEPUTY CHIEF ROGER BAÑEZ
13                    DEPUTY CHIEF HAROLD MEDINA
                      DEPUTY CHIEF ERIC GARCIA
14                    Albuquerque Police Department

15                    DIONNA K. FORD, Law clerk

16

17

18

19

20

21

22

23

24

25
```

1                    (On the Record at 11:10 A.M.)

2            COURT CLERK:  This is Jessica from Judge Brack's

3    Chambers.  Can you please announce who is on the line?

4            MS. MARTINEZ:  For the Government, this is

5    Elizabeth Martinez, Luis Saucedo, Stephen Ryals, Corey

6    Sanders, Ruth Keegan, and our assistant, Alyssa Ferda,

7    F-E-R-D-A.

8            MR. SCHMEHL:  And on behalf of the City of

9    Albuquerque, we have here in the room -- I'm Assistant City

10   Attorney Jeramy Schmehl.  We have Assistant City Attorney

11   Samantha Hults -- acting City Attorney Samantha Hults, my

12   apologies.  We also have Deputy Chief Roger Bañez, Deputy

13   Chief Harold Medina, Deputy Chief Eric Garcia, and then

14   also...

15           MR. D'AMATO:  On behalf of the Albuquerque Police

16   Officers Association, John D'Amato and Shaun Willoughby.

17   Good morning.

18           DR. GINGER:  And for the monitoring team, Jim

19   Ginger, Your Honor.

20           MR. WALZ:  And Jerry Walz.  I'm also attending at

21   a different location.  I'm an independent attorney on

22   contract with the City of Albuquerque.

23           THE COURT:  Thank you, everyone, for your

24   appearances this morning.

25               This is *United States of America versus City of*

1    *Albuquerque*, our monthly status conference.  I know that the

2    parties have developed an agenda for this morning's session.

3    I'm glad for us to begin with Item Number 1 on the agenda.

4              Dr. Ginger, are you in the midst of your site

5    visit?

6              DR. GINGER:  I am, Your Honor.  And for the

7    Court's information, things are going, at this point, quite

8    well, I think.

9              THE COURT:  Well, that's good news.  So the site

10   visit continues through tomorrow; is that right?

11             DR. GINGER:  It continues through the end of the

12   week.  And we'll be following up with some fairly intensive

13   phone and video conferencing in the coming weeks to make

14   sure that this transition goes smoothly.

15             THE COURT:  All right.  Anything else on the site

16   team update, then?

17             DR. GINGER:  I think that's the most of it right

18   now, Your Honor.  One of the other issues that we're working

19   on we're going to cover in the agenda, anyway, and that's

20   the transition process for moving from the old APD

21   administration to the new and insuring continuity of the

22   monitoring process and maintaining forward momentum.

23             THE COURT:  And at what point in the agenda are

24   we going to discuss that?

25             DR. GINGER:  It's the first item, Your Honor.

1    I'm ready, if you are.

2             THE COURT:  I am.  Let's go.

3             DR. GINGER:  I submitted a proposal to the

4    parties a couple of weeks ago on a way forward, given the

5    change of administration and, as a parenthetical, I think, a

6    highly positive change in attitude of current command staff

7    compared to what we had before.  The one thing that concerns

8    me is that this new command staff is new.  They're

9    confronting these problems for the first time.  And yet we

10   still have, you know, requirements of the CASA that need to

11   be met.  And toward that purpose, I proposed to the parties

12   a way forward that will allow us to, I think, more easily

13   blend in the new command staff and bring them up to speed so

14   that we can get continued forward momentum.

15            We've had, quite honestly, I'll characterize it

16   as a "sea change" in relationships between the monitoring

17   team and APD command staff over the past three days.  One

18   thing that has concerned me for quite some time:  We knew

19   this change was probably coming; we started trying to

20   prepare for it probably three months ago, I guess, in terms

21   of conceptually outlining a way forward with this.  The

22   issue that we have is, just like with the original APD

23   command staff, there's a huge lift involved in these

24   processes in bringing the new command staff up to speed with

25   the requirements of the CASA, the modalities of the

1    monitor's evaluation plan and assessment plans, and a great

2    deal of technical assistance that was given to the old APD

3    to sort of bring them up to speed on what we expected in

4    terms of our methodology, in terms of how we would identify

5    compliance and those sorts of nuts-and-bolts issues.  This

6    new administration, obviously, has not had benefit of that,

7    so what we need to do is, in effect, restart the process

8    with this new administration.  And I submitted a proposal to

9    the parties -- and we're going through it right now.  It

10   will eventually come to the Court for the Court's

11   approval -- that allows us to provide up-front technical

12   assistance, just like we did with the old APD, to this new

13   command staff and bring them up to speed and get them to the

14   point that they're ready to begin, you know, early

15   implementation processes, so that we don't get much of a

16   stutter in the compliance efforts.

17          I talked about that process with Chief Geier and

18   his command staff and they are amenable to it.  We have a

19   proposal under development right now to go to the Court in

20   writing in the form of a motion, currently scheduled due

21   date by 31 January, that outlines that process in detail.

22   But basically what it involves is a change in the monitoring

23   process and a switch back to a focus of technical assistance

24   and training up the new command staff and how this process

25   will move forward.

1          At the same time, we don't want to leave,

2     obviously, the Court out of the loop.  So I'm proposing we

3     schedule two mini reports, M-I-N-I reports, that will be

4     provided to the Court.  Hopefully, that will keep the Court

5     comfortable that we're moving forward, that we haven't lost

6     any more time that is absolutely necessary just to bring the

7     command staff up to speed.  So those reports would be coming

8     to report -- coming to the Court during the next -- I guess

9     the first one will go in -- I'm sorry, I'm lost in my notes.

10    First one will go in...March 31st; the second one, May --

11    thank you -- May 31st.  And that will keep -- basically be

12    a set of truncated monitor's reports that will bring the

13    Court up to speed of the monitoring team's view of APD's

14    status and process during that transition period.

15         We also will need to upgrade substantially our

16    technical assistance wing of the project because, obviously,

17    the new command staff did not have the benefit of the

18    massive amounts of technical assistance we provided to the

19    old APD in the early months of this -- initial months of

20    this project.  So what we're trying to do is, is to remove a

21    little bit of the reporting burden from the process and

22    transition that to technical assistance provided to APD

23    command on what the CASA is, what it requires, how the

24    monitoring team works, how we measure things, and what our

25    expectations are of APD command.

1          So that -- you know, that's sort of a transition

2     in the workload.  What we're proposing to do, so that we

3     don't bust the City's budget, is to back off of the

4     reporting requirements and spin up substantially new

5     technical assistance procedures that will get the new APD

6     sort of up to speed and ready to roll.  That will come -- as

7     I say, that will come to the Court in a detailed written

8     motion.  And we hope, with the approval of that, the

9     monitoring team and the City command staff are ready to move

10    forward with the new phase.

11          THE COURT:  Well, let me -- that looks to have

12    been Item Number 3 on the agenda that I have, this update on

13    the way forward.

14          Mr. Saucedo, let me hear from you, please, about

15    the Government's feel.

16          MR. SAUCEDO:  Yes, Your Honor.  Good morning.

17    This is Luis Saucedo.  The monitor has proposed -- and you

18    are correct, Your Honor, that this is Item Number 3 on the

19    agenda.  And what the monitor has proposed to the parties is

20    that, in lieu of submitting Independent Monitor Report

21    Number 7 that would cover August 2017 to January 2018 -- but

22    instead of that comprehensive report that covers -- that

23    we've been getting every six months, that he, instead, file

24    two -- these two mini reports on March 31st and May 31st

25    of 2018.  And that after that period, the monitor would

1    resume with IMR-8.  And IMR-8 would then cover -- excuse me,

2    here it is -- February through July of 2018.

3          The United States is supportive of this proposal

4    because of the work that will be needed in the next few

5    months.  The parties are working collaboratively to hit the

6    reset button here.  And what the City is undertaking in the

7    next several months is revamping its use-of-force process.

8    And we think that the entire process and the goals we've set

9    out as part of this CASA will be furthered if we suspend and

10   have a shift in the monitoring approach from one of simply

11   assessing and reporting to doing more technical assistance

12   up front by Dr. Ginger and his team.

13         And so, as we've laid out in Item Number 3, the

14   parties would be submitting to the Court for its

15   consideration a proposal where we'll set out clear dates on

16   when these reports are due and when we would resume the

17   monitoring reports for IMR-8.

18         THE COURT:  Thank you.

19         Mr. Schmehl, is the City on board with this

20   proposed change?

21         MR. SCHMEHL:  Good morning, Your Honor.  Yes, the

22   City is.  I think it's a very welcome opportunity for the

23   City to hit the reset button to address the sort of hand

24   that's been dealt the new administration.  I think there are

25   a lot of things going on.  As Mr. Saucedo pointed out, we

1   have the revamp of the use-of-force process, the

2   investigative process, and also the compliance plan, which

3   represents a change in mentality and an opportunity for this

4   project to be thoughtfully approached rather than thrust

5   upon the City and the Department, because I believe that

6   that was the challenge from before.  So yes, absolutely, the

7   City is fully on board with this and embraces the

8   opportunity to move forward in a much more positive fashion.

9            THE COURT:  Well, that certainly sounds good to

10  me, Mr. Schmehl.

11           And I want to get back to Item Number 2, the

12  compliance plan, in just a moment, but Mr. D'Amato, what

13  does APOA think about this revamp?

14           MR. D'AMATO:  We're excited and concur with the

15  direction the City and DOJ have taken.  Dr. Ginger spoke of

16  a "sea change."  It is apparent at almost every level, Your

17  Honor, and we're excited.  We're looking forward to some

18  successes here.

19           THE COURT:  Well, thank you.  And I will

20  anticipate and look forward to the motion, I guess.  You-all

21  still think it will be filed by the end of the month?

22           MR. SAUCEDO:  Yes, Your Honor.  At this point --

23           MR. D'AMATO:  Yes, Your Honor.

24           MR. SAUCEDO:  And the motion would address the

25  specific paragraphs of the CASA that would need to be

 1   modified in order to put into motion the proposal that

 2   Dr. Ginger has provided the parties.

 3          THE COURT:  Well, I'll look forward to seeing it.

 4   And to the extent that it is positive change and well

 5   received by all of the stakeholders, I doubt I'm going to

 6   throw a wrench in the works.

 7          I do have a concern, though, on the proposed

 8   agenda that I'm looking at.  I see the reference to the mini

 9   reports that are scheduled for, as you say, March 31st and

10   May 31st, in lieu of IMR-7, but the prospect of putting

11   off the next outcome assessment for an entire year, that

12   concerns me.  And I guess you're going to inform that

13   concern some more this morning as we talk about the

14   compliance plan and the audit and where we are with the

15   monitor's budget, but you know, very recently, I've heard

16   "we've extended a significant part of the budget and more

17   than you might have expected, given the amount of progress,"

18   but when we're talking about delaying things, the outcome

19   assessment, you know, until a year from now, that's got me

20   concerned, so I need to have that informed a little bit.

21          Let's talk about Item 2, the update on the

22   compliance plan.  Mr. Schmehl, I -- well, give me an update.

23   And I see that there's going to be a request for an

24   extension there, too.

25          MR. SCHMEHL:  Yes, Your Honor.  Thank you.  So I

1    think it's important to understand what's happened since

2    December the 1st.   There has been an obvious change in

3    leadership with the Department.   And with that change, as I

4    stated earlier, is a change in mentality and approach to

5    this project and the reform of the Albuquerque Police

6    Department.   And that's been driven by all the new

7    leadership.   So since that point, we've come together.   And

8    obviously, at the November hearing, you sent a clear message

9    that there needed to be a plan, responsible people, and

10   deliverables, and deadlines.

11           And so that conversation started with the City

12   and the Department's new leadership and the City's new

13   leadership right away.   And the first realization we came to

14   was that there wasn't any thoughtful planning or a

15   thoughtful approach to accomplishing the objectives in the

16   settlement agreement.   I think that's most -- most evidenced

17   or most obvious by the fact that there is not an

18   implementation unit to even address the challenges raised by

19   the settlement agreement.   There wasn't a multi-disciplinary

20   approach to any of those issues or concerns.

21           And so I explain that simply because that was

22   shocking -- quite frankly, was shocking because the

23   mentality was simply to look at tasks when they were thrust

24   upon the City and the Department and then really sort of

25   fumble around, and nothing was done, unfortunately.   I can

1    say that -- hopefully, not too bluntly -- that was pretty

2    much the culture and the approach to reform previously.

3           Now, the new administration, with the City and

4    with the Department, the approach is that this is our job.

5    And this is our -- these are our tasks to accomplish.  The

6    monitor's reports are not Earth-ending events because,

7    moving forward between monitor's reports and with this

8    compliance plan, we'll be making reform from the inside out.

9    And so I think that's important to understand.  And those

10   are the -- not "challenges."  The challenge is the culture

11   and changing that culture, because that mindset of having to

12   do those things that are just appearing every once in a

13   while has led to conversations at the Department level, the

14   City level that really show the mindset that has to be

15   changed, along with just the tasks that have to be

16   identified, thoughtfully addressed through timely -- you

17   know, timely deadlines and actual evidence of reform.  I

18   know Dr. Ginger, very much so, stresses the fact that you

19   can have all of these things on paper, but if there isn't a

20   measurable outcome, then it was all for naught.

21          So I think that the extension is informed by that

22   perspective.  The extension is informed by that challenge

23   that the City administration and the Department is

24   confronted with.  And so we're asking for that six-week

25   extension so that a good compliance plan, which will be the

1    bedrock of reform moving forward, can be presented to the

2    parties on March the 1st as a draft, with comments back from

3    the parties and the monitor -- I'm sorry, the parties and

4    the monitor with that draft on March 1, and comments back on

5    March 7, with filing March 14th.  And Your Honor, you can

6    expect to see a motion requesting that extension filed by

7    January the 29th.

8         So that's the basis for the extension.  That's

9    the changed timeline for the draft, the comments, and the

10   filing.  And that's the City's logic and approach moving

11   forward.  And we hope it's well taken.  We believe it's well

12   taken by the parties and the monitor, and we hope it's well

13   taken by you, Your Honor.

14        THE COURT:  Thank you, Mr. Schmehl.  And I guess

15   I just need to hear, then, consecutively from Mr. Saucedo,

16   Mr. D'Amato, and Dr. Ginger about your interest in and your

17   perceived need for the extension.  You know what?  I'm -- I

18   heard Dr. Ginger say a "sea change."  I wrote it down.  I

19   made a note about that.  And I know that, you know, the team

20   involved on the City's side of things changed dramatically

21   December the 1st.  And obviously, to me, there's going to be

22   some coming to speed.  And it sounds like some of that has

23   already happened.  And I really do appreciate the -- the

24   speed with which you've tried to close that gap and

25   recognize the challenges and the problems.

1          Mr. Saucedo, do you think that the six-week

2    extension is necessary and a positive part of this process?

3          MR. SAUCEDO:  Your Honor, yes, the United States

4    believes the six-week extension is necessary.  The parties

5    spent, with Dr. Ginger, two days back in December looking

6    comprehensively at the reform process.  And it was apparent

7    to everyone that the City had renewed its commitment to

8    developing its own capacity to grow and to learn from each

9    of the monitoring reports and to get to the point where

10   they're learning from their own processes, even before

11   Dr. Ginger prepares his reports.

12          To get there, the City does need to put together

13   a comprehensive, well-thought-out compliance plan.  And as

14   part of that, the City has agreed to present a concrete

15   proposal to revamp the use-of-force process, which is a

16   cornerstone of this agreement.

17          What we saw, in many ways, was that the City, in

18   the past, had just added to the process through policy and

19   through other directives.  And it -- what we ended up with

20   was an unwieldily, convoluted process that really is taking

21   its toll on the people who have to implement this every

22   single day on the street.  We're talking about the

23   rank-and-file officers and the supervisors that were having

24   to implement something that -- well, that went beyond the

25   CASA.

1         So part of the work that needs to take place in
2    the next few weeks is to try and streamline that process,
3    taking into account the current level of resources and where
4    we need to maximize them.  It's for that reason that we'd
5    like to commend the APOA for being a constructive partner
6    here and offering a lot of thoughtful insight into how that
7    process should change.  And so we appreciate their input
8    into the process.  I think, when Dr. Ginger presented his
9    proposal, it really dovetailed with what work needs to take
10   place in the next few weeks.
11        And so what we hope to present to you, Your
12   Honor, is a real -- the big picture of sort of where we're
13   going in the next six months.  And that includes, as
14   Mr. Schmehl has said, a changing of the mindset and the
15   culture within the police department, having a monitoring
16   process that works collaboratively with the City to increase
17   the capacity within the agency to self-learn and improve,
18   and then to pick up with the more traditional monitoring
19   that is taking place for IMR-8.
20        And Your Honor, just to touch on the issue you
21   raised about the outcome assessment, there needs to be a lot
22   of work in revamp- -- in improving the City's data systems.
23   And as you saw, Your Honor, in the first outcome report, it
24   was limited because a lot of the information in that
25   database was not usable or nonexistent.  And so that's one

1    problem that needs to be fixed.

2          The other is that we do want to have enough

3    information, once the City implements its new use-of-force

4    process, where we can capture the outcome of that process.

5    And there needs to be some time for the monitoring team to

6    analyze that new data.  And so the January 2019 date, we

7    believe, is reasonable in light of the work that needs to be

8    done to improve the data-collection system and to give the

9    monitor -- the City time to implement its new processes, so

10   that we can pick up that outcome data, and to give the

11   monitoring team time to assess it.

12          DR. GINGER:  And Your Honor, this is Jim Ginger.

13   If I could add just one point.  I'm sure the Court remembers

14   the difficulty we had and described in the first outcomes

15   assessment report in even obtaining data to work with that

16   were valid and reliable.  We made very specific

17   recommendations in that report for changes that needed to be

18   made to the database that collected this data and the way in

19   which the data were provided to the monitoring team.  Quite

20   frankly, I have no doubt -- I have no tangible proof, but I

21   have no doubt that those recommendations were not acted on

22   until or before the new administration took effect.  So that

23   leaves that workload, which is substantial.  It's not --

24   it's not minor by any nature.  It was just ignored by the

25   previous administration.  It will probably take me a week or

1   so to bring the new administration up to speed on what is

2   meant by the recommendations I left in that initial outcome

3   assessments report.

4           So that -- and that's not unusual.  That tends to

5   be the case with these processes.  The development of

6   effective data collection and data maintenance is always a

7   problem.  It's even more so with APD.  And the new databases

8   that need to be developed have been discussed with the

9   City's data manager.  He remains a holdover from the old

10  administration, and I think that's a good thing because,

11  (a), there's some continuity there and, (b), it was clear to

12  me, from my standpoint as monitor, that this individual had

13  been giving the City good advice; it was just simply being

14  ignored.  He's a very competent fellow.  He knows his stuff.

15  He's easy to work with.  But there's going to be a pretty

16  intensive period of time where he and I just need to sit

17  down and talk about what I meant in those specific

18  recommendations and how APD might best respond to those

19  recommendations.

20          And so I support this request for an extension,

21  mainly because the databases that need to drive the next

22  outcomes assessment report are, at this point, not capable

23  of doing it.  So we're going to need to fix the databases

24  before we can develop a new report -- collect the data,

25  analyze it, and develop a new report.

1          THE COURT:  And Mr. D'Amato, the rank-and-file,

2     how do they feel about delaying the compliance plan,

3     delaying the -- the mini reports, I mean, and the outcome

4     assessments?  What do they think?

5          MR. D'AMATO:  So with the present administration

6     and the command staff, what's not being said, but underlying

7     the entire change, is a matter of trust.  Prior continuances

8     by the previous administration with respect to the

9     compliance plan may have been a disingenuous request to the

10    parties.  The membership here believes that this request for

11    an extension is made in good faith.  And that belief is

12    based upon the actions of the administration and the new

13    command staff.  So because the trust is so important and the

14    ability to actually see action that bespeaks the trust,

15    we're in favor of the extension.

16          Let me first tie that into the no IMR-7.

17    Everyone, right now, is in a very cooperative and a very

18    communicative mood to get things done.  I believe that we're

19    not all on the same page, but at least we're all on the same

20    chapter of the same book.  I think it's in the best interest

21    of the City not to have an IMR-7 because that would reflect

22    a past administration that is no longer -- or a past

23    philosophy that is no longer relevant.  And I think the two

24    mini reports, whether you label them as, you know, "IMR-7,

25    the first half," and "IMR-7, the second half," March and May

1   respectively, that would more accurately capture the present

2   mood and activities of the parties and the City.

3          Something that should be advised to you, Your

4   Honor, is the effect on the community.  If they perceive no

5   IMR-7 as a deceptive maneuver or the same old stuff of delay

6   with no activity, that's not good for this new

7   administration.  But if they see two mini reports that

8   accurately reflect the reality of what's going on, that

9   would serve to enhance the trust and belief in the new

10  administration.

11         I say that because, one night this week,

12  Dr. Ginger and his team, along with Director Harness and the

13  City attorneys, APOA membership officers met with the

14  Civilian Police Council, directors and some members.  And it

15  was almost like if you could make a painting to show the new

16  spirit of mission-oriented compliance from all quarters; it

17  was a very positive thing to see.  So I think no IMR-7, as

18  Jeramy said, is not that fatal, as long as the mini reports

19  address the current activity.

20         So we're all in favor, the APOA is all in favor

21  of the extension.

22              THE COURT:  Well --

23              MR. D'AMATO:  Thank you.

24              THE COURT:  -- yes, sir, thank you.

25              You know, Mr. D'Amato, your remarks just then

1    were encouraging to me.  And I assume reflective of

2    everyone's position at this point that, as we're moving

3    forward with a new cast of characters and, you know, the --

4    all of the different metaphors that we've used -- "reset

5    buttons" -- that trust is merited until it's abused.  And

6    we -- I think, as we begin, we have to assume good faith on

7    the part of the new administration, the new command staff.

8    And gosh, I'm hoping for -- I'm hoping that this isn't just

9    a honeymoon period, but rather the beginning of a very

10   positive step by way of winding down this process.

11          What we didn't talk about on Number 3 when we

12   discussed the potential of the mini reports in March and

13   May, I think the calendar -- and Dionna, you're there, I

14   think, aren't you?

15          LAW CLERK:  I am, Judge.

16          THE COURT:  I'm looking for the calendar coming

17   up for dates ahead.  Didn't we have a public hearing

18   scheduled in May --

19          LAW CLERK:  We do.

20          THE COURT:  -- right?  So obviously, we need to

21   think in terms of that.  If IMR-7 is going to be -- not

22   "eliminated," but just reduced to the two mini reports, we

23   need to think about to the extent which we have a public

24   hearing and when, because, Mr. D'Amato, picking up on a

25   point you just made, the last thing we want is for the

1    public to view the extensions we perceive as necessary,

2    given, you know, the learning curve for the new

3    administration, as being just the same old thing; you know,

4    we're just kicking the can down the road.  We can't have

5    that.  We have to avoid that perception, it seems.  So I

6    think, given what I've heard, I will favorably consider the

7    request that's going to be made in soon-to-be-filed motion

8    practice on the compliance plan.

9           And let me hear from acting City Attorney

10   Ms. Hults about the City Council's current resolution, or

11   the Resolution 17-252.

12          MS. HULTS:  Samantha Hults on behalf of the City

13   of Albuquerque.  I'm actually going to defer the

14   introduction and kind of report over to Jerry Walz, who is

15   acting in a limited capacity as the City Council's attorney

16   for this matter.

17          THE COURT:  Thank you.

18          Mr. Walz?

19          MR. WALZ:  Thank you very much, Your Honor.  I'll

20   be glad to address that issue regarding the City's limited

21   resolution.

22          First of all, let me tell you what the resolution

23   is not.  And the city councilors I met with warned me to

24   make this very clear to the Court, that this was not an

25   attempt to circumvent, in any manner, the process that is

1    ongoing, to circumvent the Court's authority, or to

2    undermine Dr. Ginger in any manner.  Rather, the action was

3    taken independently of the City Attorney's Office; hence,

4    that's why I'm representing the City Council on this as an

5    accountability measure to the taxpayers of the City of

6    Albuquerque and the non-taxpayers, alike, so that they -- as

7    the Court was indicating, there needs to be confidence in

8    the system and the system is working.

9            On top of that, we know from Doc. 114, which is

10   the Court Order that sets forth the parties' stipulation

11   regarding terms and conditions of the independent monitor's

12   payment, that the budget is to be developed.  And it also

13   provides documents that can be obtained and reviewed by the

14   City to be sure that the appropriate payments are being

15   made.  Importantly, Your Honor, we have a new fiscal year

16   coming up in terms of -- it's hard to believe that we're

17   going to be going into 2000 -- having to start thinking

18   about this next year, 2019.  And we need to start working on

19   budgetary issues to be sure that, (a), the proper assessment

20   can be made by the City Council as to what type of

21   appropriations need to be made; that the appropriate

22   resolutions or ordin- -- or resolutions, I'm sorry, be

23   advanced, and that the appropriate budgets be passed by the

24   City Council and approved by the mayor.  So there's a lot of

25   work to be done here.

1          Now, I'm glad to state that, yesterday, we had a

2   very productive meeting.  Ms. Hults was also a participant

3   in that meeting with Luis Saucedo and with Elizabeth

4   Martinez to discuss some of the mechanics of these issues on

5   how to do this.  And we do not have a formula carved out,

6   but Ms. Martinez was hopeful that in early February that we

7   could work out some type of approach as to how to perform

8   some of these auditing measures.  We certainly do not want

9   to run afoul, and we will not run afoul, of anything that is

10  being done by DOJ or by the Court, but the City does need to

11  have measures in place, as with any governmental entity, to

12  be able to perform their own auditing measures.

13         So Your Honor, that was the whole purpose of

14  that.  I know the Court was also concerned about the timing

15  that occurred regarding this resolution.  The City Council

16  also wanted to make it very clear that the City Council had

17  no idea about any movement or releases from the City

18  Attorney's Office relating to any of that tape-recorded

19  business that the Court heard about in November.  This was

20  not done in conjunction with any other activity to try to

21  discredit the monitor or the process.

22         So the City Council has been and continues and

23  will continue to work in good faith.  We'll meet with

24  Ms. Martinez, Mr. Saucedo, and the DOJ team to work in an

25  orderly fashion and try to get something to the Court's

1    attention by early February.  And with the Court's

2    permission, I'd like Ms. Martinez to maybe add further

3    comment to my remarks.

4                THE COURT:  Yes, sir.  Thank you.

5                Ms. Martinez?

6                MS. MARTINEZ:  Yes, Your Honor.  Your Honor, I

7    believe that part of the problem that we have had with

8    respect to the City Council's need for information here is

9    that, from the beginning, it is unfortunate that the City

10   Council has never had a clear understanding about what its

11   role in this process is.  I believe that the prior

12   administration never adequately and appropriately informed

13   the Council about its role or about Dr. Ginger's role in

14   this process.  And I appreciate the fact that the current

15   administration is making efforts to ensure that they have

16   adequate information and are appropriately advised.

17                I am sure that the Court will recall, and I have

18   let Mr. Walz and Ms. Hults know, that we will pull this

19   information together for them.  But early on in this

20   process, this was an issue that came before Court.  The City

21   Council did want Dr. Ginger to come before them and respond

22   to them, answer their questions, appear before them in

23   council.  And as the Court is aware, the Department of

24   Justice was concerned about this.  Dr. Ginger is the Court's

25   monitor.  He answers to the Court.  He speaks primarily

1    through his reports.  We believe it's very, very important

2    that everybody respect the fact that he answers to the Court

3    and that his position not become politicized.

4              As the Court will recall, this became an issue

5    that was discussed at several status conferences.  And we

6    worked with the City and the monitor and we brought before

7    the Court several avenues by which the monitor could provide

8    information to the Council on an ongoing basis.  And those

9    avenues were made available to the Council.  There are --

10   there were a couple of councilors, actually, one in

11   particular, who regularly availed herself of those avenues.

12   And we will work with Mr. Walz and the acting City Attorney

13   to make sure that those avenues and perhaps others are

14   available.

15             We recognize that, as Year Four, the current

16   order will come to an end at the end of this year, and that

17   the City and Dr. Ginger will discuss a payment arrangement

18   for next year and the Court will enter a new order for his

19   remuneration, but it will be necessary for the City and the

20   Council to obtain information that it will be important for

21   the Council to -- and the City to receive information from

22   Dr. Ginger.  And we will make sure that there is the ability

23   for the Council to receive that information in an

24   appropriate way.

25             We will work, in the next couple of weeks, to

1    come up with a proposal that works for the City and the

2    Council and Dr. Ginger.  And we will endeavor to have the

3    proposal to the Court during the February 8th status

4    conference, and have the Court consider it and let us know

5    whether it meets with the Court's approval.

6              Thank you, Judge.

7              THE COURT:  Yes, ma'am.  Thank you.

8              Dr. Ginger, do you want to be heard on this

9    issue?

10             DR. GINGER:  Your Honor, I wouldn't have much to

11   add to that, except to say that I have been exceptionally

12   careful to manage the funds that are available to us as a

13   monitoring team on this process to the point that I realize

14   the -- well, in some cases, deliberate lack of compliance

15   that I was getting from the City was going to lead to

16   extended costs downline.  In other words, things that we

17   should have already had done and should already be in

18   compliance haven't been done and were not in compliance, so

19   that moves costs downstream.

20             I was able to manage that internally by reducing

21   the amount of compensation for myself and some key staff.

22   And that, I think, has built up enough of a cushion for us

23   to make it through this new transition, to make it through

24   to the time that we'll have to spend spinning up new staff,

25   new command staff, and new APD staff.  So as things stand

1    right now, if we move to this -- this process outlined in

2    the way-forward documentation that we're working on, we're

3    able to get to Year Four in budget.  And then that means

4    that, Year Five, which is not covered by this current

5    agreement, will have to be renegotiated, compensation will

6    have to be renegotiated.  And that Year Five will depend, to

7    a great extent, on the level of cooperation we receive from

8    the City in terms of -- you know, when we request data, we

9    get it and it's in a usable format that we can access it and

10   manipulate it.  In other words, it's not provided by Xerox

11   copies that we have to then reenter into another database.

12          So if we -- by getting those issues -- first of

13   all, by anticipating those issues, given the level of

14   cooperation we were receiving early on, we've managed to put

15   a little bit of a nest egg away that's going to get us

16   through this rough spot for the next year.  And if the level

17   of cooperation we have from the City right now continues,

18   then that will reliably inform any kind of budget

19   consideration that we have to make for Year Five.  So we

20   should be able to negotiate that with the City clearly and

21   above board, so that everybody understands, (a), the level

22   of cooperation doesn't change and, (b), our scope of duties

23   don't change.  And I think we're going to be able to make

24   the transition fairly effectively because of that.

25          THE COURT:  Well, thank you.

1          The agenda suggests that Mr. D'Amato might have

2     something to add here as well?

3          MR. D'AMATO:  I think, at this point, the APOA

4     will defer to the Court on any ultimate action it takes with

5     respect to the City's motion and the City Council's actions.

6     At this time, I think it should play out the way the parties

7     and City Council have desired it to play out.  I think it

8     will resolve itself, ultimately, so we're not going to take

9     a position on it, Your Honor.

10          THE COURT:  Thank you.  I'll look forward to

11     further updates on the City Council's resolution.  And the

12     City Council needs to understand that, going forward, I'm

13     not holding any misgivings about their action or their -- or

14     the timing of it.  In November, it suffered from the

15     unfortunate coincidence, you know, with the other matters

16     that caught my attention.  But there's got to be

17     accountability, transparency.  We all understand that.

18     Dr. Ginger certainly does.  So I'll just appreciate you-all

19     keeping me posted on that.

20          Number 5, Dr. Ginger, are you going to take the

21     lead on reports relating to the CPCs?

22          MR. WALZ:  Your Honor, this is Jerry Walz.

23     Before we move on, may I be excused at this point?  I was

24     brought in only for the limited purpose of this report and

25     to hear what the Court had to say on this City Council

1    budgetary issue.  I'm not involved in the others.  And as a

2    cost-saving measure, if I could be excused at this point,

3    I'd be -- it would be appreciated.

4              THE COURT:  Without objection, I'm glad to let

5    you go.  And thank you for your appearance, Mr. Walz.

6              MR. WALZ:  Thank you very much, Judge Brack.

7    Thank you to all the parties as well.

8              THE COURT:  Dr. Ginger, about the meeting with --

9    there was some reference to this a moment ago, but tell me

10   about your meeting with the CPCs.

11             DR. GINGER:  Well, we had the CPC meeting last

12   night.  And first of all, I have to say that virtually the

13   entire command staff was present at that meeting.  And

14   that's the first time in my tenure here that I've seen a

15   strong representation at a CPC meeting by APD command staff.

16   The chief was there.  Most of the deputy chiefs were there.

17   All but one, I'm informed.  And that marked a sea change.

18   And you know, some small things add up to really, really big

19   things in the grand scheme of things.  And the fact that

20   Chief Geier brought his command staff to that meeting and

21   made himself and them available to the CPC members was

22   important.  It was incredibly important.  In the past three

23   years, I can only recall one time when the former chief

24   showed up at one of those meetings.  So to me, that was a

25   major indication of a sea change and really exhibiting an

1    understanding of how modern policing works and integrating

2    the policing process with its community.

3         So I took that as a watershed event.  Every,

4    every indication I get from this new administration -- and

5    I've spoken with the mayor on down -- is that they are

6    absolutely committed to community outreach, community

7    involvement, and listening to what the community has to say.

8    So we'll continue to monitor that.  One event doesn't a

9    trend make, but I thought it was remarkably telling.  And I

10   could tell from the mood in the room, so to speak, that I

11   wasn't the only one that had made that connection, about

12   that amount of attendance from key command staff members at

13   a CPC council.  So I thought that was -- it went very well

14   last night, and I think Chief Geier got off to a great

15   start.

16        THE COURT:  Well, that's more good news.

17        Ms. Martinez, did you want to be heard on that

18   issue?

19        MS. MARTINEZ:  Your Honor, this was a meeting as

20   opposed to a summit.  As the Court has previously heard from

21   us, the head -- the executive director of the Civilian

22   Police Oversight Agency has instituted a practice of

23   convening quarterly CPC summits, which have been a terrific

24   forum for the CPCs to work together, to feed off of each

25   other, and to just -- actually, I think, up until now,

1    really to commiserate with the problems that they have been

2    experiencing in terms of the lack of support and the lack of

3    cooperation that they have been receiving from the City and

4    the Department.

5          And the CPOA, I think, as a police oversight

6    board, have -- had been providing an anchor for the CPCs.

7    And so what we have had up until now is Ed Harness really

8    providing an anchor for them.  And he and the Associate

9    Monitor for Community Engagement, Steve Rickman, who

10   often -- well, would call into the summits.  And when the

11   monitoring team is in town, they serve as the moderators for

12   the summits.

13         We did not have a summit last night, because the

14   mayor asked us not to do that.  Mayor Keller said that --

15   because he was out of town, he requested that we not have a

16   summit because he has asked that he be present for summits.

17   Going forward, he wants to be able, personally, to

18   participate in summits.  And so instead of having a summit,

19   we convened a meeting that was hosted by our acting U.S.

20   Attorney, Jim Tierney.  So I believe that the mayor's

21   personal interest in wanting to participate in the summit

22   also demonstrates the -- this significant change in the new

23   administration's response to this reform process.

24         Yes, we had the new police chief and his command

25   staff here.  I believe that the reason we did not have the

1    Chief Administrative Officer and the acting City Attorney

2    here for that meeting was because both of them were at the

3    City Council meeting last night.  That is why they did not

4    attend.  But otherwise, we did have Mr. Schmehl here and we

5    did have, as I said, Mr. Harness here.  We had the

6    chairwoman of the POB and two members of the POB who

7    participated also.  Most, but not quite all, of the members

8    of the six CPCs were here.  It was a really terrific

9    gathering.  And while they did explain the issues that they

10   had had in the past over the last three years, the optimism

11   that was expressed and the changes that they already have

12   seen in just a month and a half were discussed.  They were

13   introduced to the new Community Policing Council manager,

14   who just came on board a month and a half ago.  We are very

15   excited to have him on board.  He is someone who is familiar

16   with the Albuquerque community.  He is the former policy

17   analyst for Councilor Diane Gibson, who is someone who has

18   been very interested and involved in our reform process from

19   the beginning.

20            So we feel like this was a very positive meeting.

21   And just so the Court is aware, while we did not

22   specifically discuss it as -- in the form of the

23   communication that the Court has been receiving from

24   community members, we discussed the general subject matter

25   of those communications.  And generally, the communications

1    that the Court has been receiving from community members

2    relate to the lack of support that the CPCs have been

3    getting from the City, the lack of administrative support.

4    And we believe that, over time, they will be receiving that

5    support.

6              Often it's, "Why aren't your minutes posted?  Why

7    don't we know who your members are?  Why don't we know what

8    the terms of office are?  Why don't you have your bylaws

9    posted?"  And the fact of the matter is that the CPC members

10   are volunteers.  They do not have access to the City's

11   website.  They cannot do these things themselves.  They do

12   not have administrative support to do that.  Those are

13   matters that are being corrected.

14             We see the wherewithal, we see the interest, and

15   we see the dedication all there.  There is a lot that has to

16   be done.  It just can't happen overnight, and it's just

17   going to take time, Judge.  And a lot of our community

18   members expect the changes to happen now.  I know that our

19   CPC members know that it will take time.  And we're very,

20   very fortunate that they're going to hang in there.

21             THE COURT:  Ms. Martinez, thank you for the

22   positive report.

23             How about Mr. Schmehl?

24             MR. SCHMEHL:  Yes, Your Honor.  Thank you.

25   Ms. Martinez covered a lot of my bases there, but I will

1    just reiterate that the administration is committed to this

2    type of community dialogue.  It's absolutely necessary.  You

3    can't police through silence.  I think there has to be that

4    dialogue.  And Mr. Sylvan, Chris Sylvan, who was appointed

5    by the administration in that manager position because it

6    was known that he was able to bridge those gaps and he had a

7    productive relationship with community through his work with

8    Councilor Gibson.

9              THE COURT:  Very good.

10             Mr. D'Amato?

11             MR. D'AMATO:  Thank you, Your Honor.  I can't add

12   anything other than what others have indicated to you about

13   last night's meeting.  It's a -- it's -- it's a large step

14   forward, again, going to the point of trust and

15   communication with the community is essential for this thing

16   to work.  And I think we made a big step last night.  I

17   thank Director Harness and the City appointing Chris Sylvan.

18             THE COURT:  Well, I'd like to add my thanks to

19   Chief Geier.  Is he on the phone today?

20             MR. SCHMEHL:  No, Your Honor.

21             THE COURT:  Well, please make it a point to pass

22   along my thanks to him and his command staff for being

23   conscientious and proactive and understanding the need for

24   the public outreach, the public buy-in that we need so

25   desperately to make this work.  It's a great start, and I

1    really appreciate his involvement.

2            Number 6, the City's anticipated disclosures of

3    recordings.  Ms. Hults?

4            MS. HULTS:  Good morning, Your Honor.  I get the

5    fun one at the end.

6            I just wanted to be able to appear before the

7    Court and to notify the Court of some IPRA requests that we

8    received for the additional recordings.  I know that we

9    filed a notice to the Court about those additional

10   recordings.  There was a release made this week to two

11   separate requesters regarding those audio recordings, and we

12   have received another one this morning.

13           So we are complying with the State IPRA Act, but

14   we want to keep you, Your Honor, and the parties aware as we

15   get these requests, so that way, you are informed and know

16   that the information has been released, or is being

17   released.

18           THE COURT:  Ms. Martinez, did you want to be

19   heard on this?

20           MS. MARTINEZ:  Your Honor, the United States only

21   wants to let the Court know that we were relieved to learn

22   that the new administration took prompt steps to stop the

23   practice of this surreptitious recording when they learned

24   about it.  We were relieved to learn that they notified the

25   parties and the monitor when they learned about the

1    recordings.  And we were reassured by the measures that they

2    took to prevent this practice from reoccurring in the

3    future.  And we are committed to working with the new

4    administration on the course corrections that have had to

5    take place to make sure that the police department is able

6    to address the detrimental impact that this has had on the

7    reform process.  And on the Department.

8              THE COURT:  I'm going to have something to say

9    about all of this in just a moment, but Mr. D'Amato?

10             MR. D'AMATO:  I'm reminded of a scene out of

11   *Casablanca*.  It's like feigned shock, but again, I am really

12   big on not bringing over the negative aspects of the

13   previous administration that may act as a damper on the

14   positive aspects of the new administration.  So I'm happy

15   with what the City is doing.  We'll have to suffer through

16   the public perception and reassure them in every way that we

17   can that this is not the way we do business today.

18             THE COURT:  And thank you, Mr. D'Amato.

19             I've had very recent -- very recent occasion to

20   recall the inspector and the shock he expressed in

21   *Casablanca*.

22             Dr. Ginger?

23             THE DEFENDANT:  I would have nothing to add

24   beyond Mr. D'Amato's comments, Your Honor.  I think this is

25   best left where it was.  And we're continuing to focus on

1     the future, as you can tell from the way-forward document.

2     It's a nonentity with the monitoring team at this point.

3              THE COURT:  Well, thank you for that.

4              Ms. Hults, I, too, was relieved to read about the

5     new administration's approach and rejection of such things.

6     And I -- I understand that they -- the recordings will be

7     made public.  And that's consistent with, I think, what IPRA

8     requires, and my earlier decision.

9              I received a call yesterday from someone in the

10    news media.  And I've forgotten now his name -- was it Chris

11    McKee?  Is that right, Dionna?

12             LAW CLERK:  That sounds right.  I'm getting on my

13    e-mail right now to check.  Yes, sir, Chris McKee from KRQE

14    News 13.

15             THE COURT:  Right.  He sent an e-mail directly to

16    my office.  And the gist of it was, "Are these things going

17    to be released?"  And you've all answered that this morning.

18    But then he asked whether I had any intention of pursuing

19    sanctions against prior officials in the administration or

20    whether I thought sanctions, you know, were appropriate

21    against the new administration as the successor

22    administration.  And I've not responded to him and don't

23    intend to, other than by way of this:

24             I'm letting you-all know I have no interest in

25    looking back.  My shoulder's to the wheel and my hand is on

1   the plow.  I am looking forward with all of you and I have

2   no intention of pursuing sanctions against the prior

3   administration, and I certainly don't think the successor

4   administration has any accountability on that score.  So

5   this is a -- this is a public hearing, I know.  I'm glad for

6   that information to be out.  But that's my response to his

7   question.

8           So I'm sorry that we started late this morning.

9   My morning docket went much longer than I had expected.  And

10  that's no one's fault but my own, but I do appreciate

11  everyone's participation this morning.  But more than that,

12  I really appreciate everyone, everyone's willingness to take

13  a fresh look into and to "reset," as we keep overusing that

14  metaphor.  I appreciate the pronouncements that I've seen

15  from Mayor Keller and the evidence of good faith and a

16  really willingness to make this process work for the

17  betterment of the City and the people of Albuquerque, as

18  evidenced by the chief's appearance at the meeting of the

19  Community Policing Council last night.  Those are all

20  just -- we're off to a great start.

21          And Dr. Ginger, he's a math guy, he's a -- you

22  know, a metrics guy.  He was quick to acknowledge a moment

23  ago that, you know, "one event doesn't a trend make," but I

24  like what I see and I appreciate everyone's involvement.

25  And we'll look forward to some motions practice, I guess, in

1    just the next few days.

2            Is there anything else I can help you-all with

3    this -- well, this afternoon?

4            LAW CLERK:  Judge, this is Dionna.

5            THE COURT:  Yes.

6            LAW CLERK:  Our March date, did you see the note

7    that you were scheduled to be out of town?

8            THE COURT:  I did.  Right.  I think our status

9    conference for March is set for the 7th or 8th --

10           LAW CLERK:  8th, sir.

11           THE COURT:  I'm going to be out of town on those

12   dates.  And I would propose to move it to the next week.

13   I'd be glad to hear you-all about whether your schedules

14   will allow that move.

15           Did everybody go to lunch?

16           MS. MARTINEZ:  Yes, Your Honor, it works for the

17   United States.

18           THE COURT:  Great.  Thank you, Ms. Martinez.

19           DR. GINGER:  That's acceptable to the monitor,

20   Your Honor.

21           MR. SCHMEHL:  And that works for the City, Your

22   Honor.

23           MR. D'AMATO:  As well as the APOA.

24           THE COURT:  Perfect.  Jessica will get a notice

25   out about that.  We are still on for February at our -- what

1    date is that, Dionna?

2              COURT CLERK:  The 8th.

3              THE COURT:  The 8th.  So February 8th, same

4    time, same station.

5              Thank you-all again.  And I just wish you and the

6    process well as we move forward.  Thanks a lot.  Have a

7    great afternoon.

8              (The proceedings concluded at 12:19 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES OF AMERICA

2                    DISTRICT OF NEW MEXICO

3

4              CERTIFICATE OF OFFICIAL REPORTER

5          I, Vanessa I. Alyce, RPR, NM CCR, and Federal Official

6    Court Reporter in and for the United States District Court

7    for the District of New Mexico, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code, that

9    I did report in stenographic shorthand to the best of my

10   skill and ability the foregoing pages 1-42 of the

11   proceedings set forth herein, that the foregoing is a true

12   and correct transcript of the stenographically recorded

13   proceedings held in the above-entitled matter and that the

14   transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16

17   Dated this 18th day of January 2018.

18

19   S/Electronically Filed
     Vanessa I. Alyce, RPR, NM CCR #259
20   Federal Official Court Reporter
     100 N. Church Street
21   Las Cruces, NM 88001
     Phone: (575) 528-1430
22   Email:  Vanessa_Alyce@nmcourt.fed.us

23

24

25