1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW MEXICO

3

          UNITED STATES OF AMERICA,
4

5                         Plaintiff,

6          vs.                                14-CV-1025-RB-SMV

7          THE CITY OF ALBUQUERQUE,

8                         Defendant.

9          vs.

10         THE ALBUQUERQUE POLICE
           OFFICERS' ASSOCIATION,
11
                          Intervenor.
12

13

14                       TRANSCRIPT OF PROCEEDINGS
                              STATUS CONFERENCE
15             BEFORE THE HONORABLE ROBERT C. BRACK
                        UNITED STATES DISTRICT JUDGE
16              THURSDAY, MARCH 15, 2018, 1:30 P.M.
                          ALBUQUERQUE, NEW MEXICO
17

18

19           Proceedings recorded by mechanical stenography,

20         transcript produced by computer.

21

22         Reported by:

23             JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
               United States Court Reporter
24             333 Lomas Boulevard, Northwest
               Albuquerque, New Mexico  87102
25             Phone:  (505)348-2209
               Email:  Julie_Goehl@nmcourt.fed.us

```
 1                    A P P E A R A N C E S

 2        FOR THE UNITED STATES:

 3            UNITED STATES ATTORNEY'S OFFICE
              District of New Mexico
 4            201 Third Street, Northwest
              Suite 900
 5            Albuquerque, New Mexico  87102
              BY:   MR. JOHN C. ANDERSON, UNITED STATES ATTORNEY
 6                  MS. ELIZABETH M. MARTINEZ, EXECUTIVE AUSA

 7            --AND--

 8            UNITED STATES DEPARTMENT OF JUSTICE
              Civil Rights Division
 9            950 Pennsylvania Avenue, Northwest
              Washington, D.C.  20005
10            BY:  MR. PAUL KILLEBREW, ESQ.
                   MS. SARAH LOPEZ, ESQ.
11

12

13        FOR THE CITY OF ALBUQUERQUE:

14            CITY ATTORNEY'S OFFICE
              One Civic Plaza, Northwest
15            Fourth Floor
              Albuquerque, New Mexico  87102
16            BY:  MR. ESTEBAN AGUILAR, JR., CITY ATTORNEY
                   MR. JERAMY SCHMEHL, ESQ.
17

18

19        FOR THE INTERVENOR APOA:

20            SANCHEZ, MOWRER & DESIDERIO, P.C.
              Attorneys at Law
21            Post Office Box 1966
              Albuquerque, New Mexico  87103
22            BY:  MR. FREDERICK M. MOWRER, ESQ.

23

24

25
```

```
 1              A P P E A R A N C E S  (Continued)

 2        ALSO PRESENT:

 3            DR. JAMES D. GINGER, INDEPENDENT MONITOR
              MS. LAURIE OWENS, DIRECTOR OF OPERATIONS
 4            MR. DANIEL GIAQUINTO, DEPUTY MONITOR
              MR. LORENZO GARCIA, SPECIAL CONSULTANT
 5            MS. ALYSSA FERDA, USAO OUTREACH COORDINATOR
              MR. MICHAEL J. GEIER, CHIEF, APD
 6            MR. ERIC GARCIA, DEPUTY CHIEF, APD
              MR. HAROLD MEDINA, DEPUTY CHIEF, APD
 7            MS. CORI LOWE, COMPLIANCE BUREAU
              MR. TIM KELLER, MAYOR
 8            MS. SARITA NAIR, CHIEF ADMINISTRATIVE OFFICER
              MR. SEAN WILLOUGHBY, PRESIDENT, APOA
 9            MR. JUSTIN MONTGOMERY, VICE-PRESIDENT, APOA
              MR. JAMES LEWIS, SENIOR ADVISOR FOR PUBLIC SAFETY
10            MR. PETER CUBRA, ESQ.
              MR. ALFRED MATHEWSON, ESQ.
11            MR. ANTONIO MAESTAS, ESQ.
              MR. RALPH ARELLANES
12            MS. MARIA BAUTISTA
              MR. EDWARD HARNESS, CPOA EXECUTIVE DIRECTOR
13            MS. NANCY KOENIGSBERG, ESQ.
              MR. STEVEN ALLEN
14            MR. CHRIS SYLVAN
              MR. ROD KONTNY
15            MS. DOROTHY WOODWARD
              MR. DANNY WHATLEY
16            DR. BILL KASS
              MS. CHELSEA VAN DEVENTER
17

18        TELEPHONIC APPEARANCE:  DIONNA K. FORD, Law Clerk

19

20

21

22

23

24

25
```

STATUS CONFERENCE

(Court in session at 1:30 p.m.)

COURTROOM DEPUTY JESSICA CHAVEZ:  All rise.
United States District Court is now in
session, the Honorable Robert C. Brack presiding.  God
save these United States and this Honorable Court.

THE COURT:  Thanks, everyone.  Good
afternoon.  Take your seats, please.

This is United States of America v. The City
of Albuquerque, and The Albuquerque Police Officers'
Association as intervenor.

We're here this afternoon for a status
conference, and rather than my going around the tables
and trying to figure out who all is here, why don't I
just have you announce your appearances, please.
Perhaps we can begin with the new U.S. Attorney.

MR. JOHN C. ANDERSON:  Thank you, Your Honor.
John Anderson, United States Attorney, on behalf of the
United States.

THE COURT:  Yes, sir.  Thank you.

MS. ELIZABETH MARTINEZ:  Elizabeth Martinez
on behalf of the United States.  And we're joined with
our assistant, Alyssa Ferda.

MR. PAUL KILLEBREW:  Paul Killebrew on behalf
of the United States.  Also sitting at counsel table is

1    Sarah Lopez, an investigator in my office.

2            MR. FREDERICK MOWRER:  May it please the

3    Court.  Frederick Mowrer on behalf of the Albuquerque

4    Police Officers' Association, along with President Sean

5    Willoughby and Vice-President Justin Montgomery.

6            THE COURT:  Thanks very much.

7            MR. ESTEBAN AGUILAR, JR.:  Good afternoon,

8    Your Honor.  Esteban Aguilar, Jr., on behalf of the City

9    of Albuquerque.  With me is co-counsel Jeramy Schmehl.

10   And with the Court's permission, I would like the

11   attendees here on behalf of the City to introduce

12   themselves as well.

13           THE COURT:  Please.

14           MR. ESTEBAN AGUILAR, JR.:  Thank you, Your

15   Honor.

16           MR. JAMES LEWIS:  Your Honor, James Lewis,

17   Monitor, on behalf of APD and the City of Albuquerque.

18           THE COURT:  Thank you.

19           MR. ERIC GARCIA:  Your Honor, Deputy Chief

20   Eric Garcia from APD.

21           MS. CORI LOWE:  Your Honor, Cori Lowe,

22   lieutenant with APD.

23           MS. SARITA NAIR:  Your Honor, Sarita Nair,

24   Chief Administrative Officer.

25           MR. TIM KELLER:  Your Honor, Tim Keller,

1    Mayor of Albuquerque.

2         THE COURT:  Yes, sir.  Thank you.

3         And we've got Judge Garcia, who is here as

4    well.

5         THE HONORABLE LORENZO GARCIA:  Yes, special

6    consultant for the City of Albuquerque, Lorenzo Garcia.

7         THE COURT:  Thank you.

8         MS. LAURIE OWENS:  Your Honor, Laurie Owens

9    with the Monitoring Team.

10        MR. DANIEL GIAQUINTO:  Good afternoon, Your

11   Honor.  Daniel Giaquinto, Deputy Monitor, Independent

12   Monitoring Team.

13        THE COURT:  Thank you.

14        DR. JAMES GINGER:  Good afternoon, Your

15   Honor.  James Ginger with the Monitoring Team.

16        THE COURT:  Thank you very much.  I think

17   that's the last of the introductions.  I know that we

18   have representatives from the amici here, and I think

19   we'll hear from them in turn this afternoon, and look

20   forward to you introducing yourself at that time.

21        The parties have proposed an agenda for

22   today's status conference, and the first item is

23   introduction of the new leadership, the U.S. Attorney.

24        Well, Ms. Martinez, you were going to

25   introduce Mr. Anderson.

1    MS. ELIZABETH MARTINEZ:  Good afternoon, Your

2    Honor.  I would like to take this opportunity to bring

3    the Court and the community up to date on some changes

4    to the Department of Justice team that is representing

5    the United States.

6         First I would like to alert the Court and the

7    community that Luis Saucedo, who has been a member of

8    the DOJ team, is not going to be a part of our team

9    going forward.  As the Court has been aware, Mr. Saucedo

10   has been representing the United States both in this

11   case and in our constitutional policing case in Puerto

12   Rico.  As many in our community are aware, Puerto Rico

13   has been experiencing some pretty challenging

14   conditions, particularly in the aftermath of two

15   catastrophic hurricanes, and Mr. Saucedo is at this

16   point required to dedicate virtually all of his time to

17   the police practices case in Puerto Rico.

18        We do, however, want to reassure the Court and

19   our community that the Department of Justice, both at

20   the Civil Rights Division and here at the U.S.

21   Attorney's Office, remain fully committed to fully and

22   completely following through with the constitutional

23   policing case here in Albuquerque.

24        I would at this time like to introduce to you

25   and to our community our new U.S. Attorney, and I do

1    that with great pleasure.  As you know, Judge, John

2    Anderson is no stranger to this Court or to the U.S.

3    Attorney's Office.  He was an Assistant U.S. Attorney in

4    our office from 2008 to 2013, where he was in our

5    Criminal Division.  He was in our office when our office

6    began investigating the Albuquerque Police Department.

7    And, as this Court is aware, he clerked for Judge Kelly

8    at the Tenth Circuit in Santa Fe.  And, of course, he

9    practiced before you and other judges of this Court

10   while he was an AUSA, and he continued to appear before

11   you and other judges of this Court when he was in

12   private practice after he left our office.

13           Mr. Anderson will speak to you and to our

14   community about his commitment to this important reform

15   process as U.S. Attorney and as the head of our office.

16           THE COURT:  Thank you.  Mr. Anderson, please

17   come forward.  Congratulations on your appointment.

18           We met recently and talked about things just

19   generally.  I'm glad to have you on board.

20           MR. JOHN C. ANDERSON:  Thank you, Your Honor.

21   May it please the Court.

22           It's a privilege to be here for this status

23   conference today and to represent the United States in

24   furtherance of this important reform effort.  I do want

25   to thank the Court.  I know it has put in many hours and

efforts to move this matter forward.  I would also like
to thank the City, the community, stakeholders, and the
amici for being here for this important conference, and
for all of their work in this matter that is crucial to
the health and safety of our community.

I do want to assure the Court and all the
community stakeholders and amici of my commitment to
moving this important effort forward.  I know that all
the parties, including the City, have put in many hours
of work in hopes of achieving this reform that will
undoubtedly make our community a healthier and safer
place to live.  And so I thank you all for being here,
and again I do thank the Court, and I look forward to
working with the Court and all the parties as we make
further progress in this matter, Your Honor.  Thank you.

THE COURT:  Thank you.  And congratulations
once again on your appointment to U.S. Attorney.

MR. JOHN C. ANDERSON:  Thank you, Your Honor.

THE COURT:  Mr. Schmehl, you were going to
make an introduction, as well.

MR. JERAMY SCHMEHL:  Your Honor, may it
please the Court.

Mr. Aguilar is the newly appointed City
Attorney.  He comes from private practice with a
background representing stakeholders in this very

1    system.  He has a background in complex litigation, and

2    he has been practicing for over ten years.

3            I personally am excited to have him in the

4    office two doors down from me.  It has been empty for a

5    little bit longer than I would have liked.  But I'm very

6    excited, as is the City.  I won't belabor the point, and

7    I'll allow him to speak to the Court.

8            And with that, I'll give you the new City

9    Attorney, Mr. Steve Aguilar.

10           THE COURT:  Thank you, Mr. Schmehl.

11           Mr. Aguilar.

12           MR. ESTEBAN AGUILAR, JR.:  Thank you, Your

13   Honor.

14           THE COURT:  And you may not recall, but I

15   have met you.

16           MR. ESTEBAN AGUILAR, JR.:  Absolutely.

17           THE COURT:  And your dad and I went to law

18   school together.

19           MR. ESTEBAN AGUILAR, JR.:  That is absolutely

20   correct, Your Honor, and I do remember.

21           THE COURT:  I'm glad to have you on board

22   with us.

23           MR. ESTEBAN AGUILAR, JR.:  I'm excited to be

24   on board, Your Honor.  May it please the Court.

25   Audience members, stakeholders, members of the

1    community, Your Honor, and of course the DOJ team.

2              Again, my name is Esteban Aguilar, Jr. --

3    Steve, Your Honor, as you know.  I am excited to have

4    the opportunity to become a part of this team and this

5    effort on behalf of the City of Albuquerque to reaffirm

6    our commitment to the reform process, not only to the

7    Court, but to the community, as well.  I know that the

8    Mayor and Ms. Nair are going to speak more to that.

9              But I wanted to assure the Court that the City

10   treats our responsibilities and our obligations under

11   the agreement very seriously, and we are taking all

12   efforts that we can to expedite the reform process and

13   to make sure that it is done correctly, and that it is

14   done efficiently, Your Honor.

15             And so that being said, I know we have a long

16   day and so I don't want to take up more of the Court's

17   time, but I appreciate the opportunity to work and

18   appear before you here today, and I am looking forward

19   to continuing to work with everybody here on behalf of

20   the residents of the City of Albuquerque.

21             THE COURT:  You're welcome.

22             MR. ESTEBAN AGUILAR, JR.:  Thank you, Your

23   Honor.

24             THE COURT:  I'm glad to have you as part of

25   the team, as well.

1          MR. ESTEBAN AGUILAR, JR.:  Thank you.

2          THE COURT:  And say "Hi" to your dad.

3          MR. ESTEBAN AGUILAR, JR.:  Thank you, Your

4     Honor.  Thank you.

5          THE COURT:  Mr. Mayor.

6          MR. TIM KELLER:  Thank you, Your Honor, and

7     members who are here today.  I appreciate the

8     opportunity to share a few words before we get started

9     in earnest, and I believe this is at least the first

10    time in quite some time that the Mayor has been able to

11    be here and present, so I do want to just acknowledge

12    that I'm grateful for that opportunity, and I think

13    it's something, from time to time, that might be

14    important for the City and the stakeholders.

15          Now, firstly, I want to say thank you for

16    having it in this venue.  I've always wanted to come in

17    this courtroom, and I'm glad I've never had to come in

18    here, but I've only seen it on TV where I saw you, which

19    was that KUNM special.  Actually, I was just really

20    thrilled to be able to enjoy this special place, as

21    well.

22          So let me also, I think, just reaffirm, since

23    we haven't gathered in a formal way since our

24    administration took office, that we are committed to not

25    only complying with the CASA, but also to fully

1    institutionalizing constitutional policing in

2    Albuquerque.

3        And I am very grateful to the DOJ, to Dr.

4    Ginger, to the APOA, and the other amici for giving our

5    administration and the new command staff a little bit of

6    extra time to get up to speed and make some urgent

7    changes that we needed to make.  Also, I am thankful to

8    the Court for the associated extensions that have

9    enabled us to do that.

10       Now, as Mayor, I want to share and reiterate

11   that fundamentally, I believe the Mayor is ultimately

12   responsible for at least the City's side of this

13   process, and so I accept that responsibility.  I ran on

14   that responsibility, and I know that I will be in many

15   ways judged by the people on how well or how well I did

16   not do with respect to that responsibility.  And I

17   actually think that's the way it should be, and I think

18   that's what's an important part of democracy in our city

19   and leadership in our community.

20       Now, I want to share just a moment to catch up

21   at least all the stakeholders on some of the changes

22   that we've made, and sort of who's who, and roles and

23   responsibilities, and then I'll just cut it short.

24       Number one, in December when I came in, the

25   first order of business was to reorganize the Police

1    Department along a couple of lines.  One was for

2    effective crime fighting, which is something, obviously,

3    that is sorely needed in our community.  But also,

4    effective compliance and cooperation with the DOJ

5    process.

6            And so we'll leave these with the clerks, but

7    I do have the before and after org charts, and I just

8    want to highlight a couple of things.  We now have a

9    dedicated Compliance Bureau in APD that, of course, is

10   headed by Deputy Chief Garcia, and that is essentially

11   the job of that entire Bureau.  And the fact that we

12   have a Deputy Chief in charge who has been doing this

13   before I think speaks to the seriousness and the level

14   of priority that it needs to be.

15           We also have a new Chief of Police, who I know

16   most folks have met, and he has done an outstanding job

17   in terms of helping craft a structure and individuals

18   for hiring that can actually deliver on this process.

19           Now, there are a couple other components to

20   this.  We just met our new City Attorney, who I think is

21   an excellent fit for this role.  We also have an

22   individual by the name of James Lewis, who is here with

23   us today.  This is essentially the civilian counterpart

24   to Deputy Chief Garcia, so he is basically the civilian

25   charged with monitoring compliance -- lower case

1    "monitoring" -- for myself, for the City of Albuquerque,

2    for the Mayor's Office, for the 11th floor, and for the

3    CAO.  And so we are very grateful to have James on board

4    for that important role.  And I won't go into his

5    extensive bio, but there is a whole host of reasons why

6    I think he's an excellent fit for that role.

7              I think, lastly, let me just talk about

8    something a little bit more deeper in the community, but

9    I think is very relevant.

10             We now have a full-time community policing

11   coordinator, and that's a gentleman by the name of Chris

12   Sylvan, who I think is here.  Maybe he'll wave.  Chris

13   Sylvan in the back.  This, again, is an area where I

14   believe that we need an individual accountability, both

15   in the org chart and in terms of an actual person who

16   can actually facilitate community policing.  And so

17   we've essentially honored that notion with both a person

18   and a full-time position.

19             And so those are some of the larger changes.

20   I won't go into the others as a whole, but just note

21   that to our knowledge, this is the largest restructuring

22   in APD's modern history, and primarily what was cut out

23   was the level of major, and we now have, I think, very

24   clear traditional bureaus and divisions in the

25   departments.  And we also have a situation where we

1    still have some vacancies that we're working on, but a

2    lot of those actually are in the compliance area.

3            And so we continue to put the right people in

4    the right places, and that combination is what I also

5    take personal interest and zeal in, in terms of making

6    sure we've got the boxes right and the people right.

7    And I think so far, we've done a very good job of

8    setting that up.

9            So I think with that, Your Honor, let me just

10   reiterate our commitment to providing the resources that

11   APD needs, as well, to continue these reforms, and that

12   includes sworn officers, civilian personnel, and the

13   technology that is associated with not only this

14   process, which there is a strong technological

15   component, but also with operating a modern, effective,

16   crime-fighting Department.  And fortunately, the Council

17   has made some tough decisions in the last week that is

18   going to enable us to actually do that.

19           So historically, I think there are three areas

20   that we had to bring together as a City.

21           Number one, it takes an administration and a

22   Mayor and a Police Department saying, "We are here to

23   honor both the letter and the spirit of the CASA

24   process."  Number two, it takes people in the right

25   places, in the right structure, to get things done.  And

1    number three, we have to provide the resources that are

2    needed so that we can actually adequately staff our

3    Police Department.

4            That is going to be an ongoing process for us,

5    but I think financially, we're in much better shape, and

6    I appreciate the Council's vote with respect to dealing

7    with that issue.  But we actually have a chance to

8    adequately resource our Police Department for the first

9    time in a long time.  And so we have to work on that

10   over the next few years.  It's not going to be a short

11   process, but I think at least now we have the

12   opportunity to have the kind of Police Department

13   adequately resourced and the kind of reform process

14   adequately resourced, that we haven't had in a long

15   time.

16           And I'll close with this.  I know on the front

17   lines, use of force obviously is fundamental to this

18   entire process.  I was committed to bringing together

19   the notion of building community trust, but also setting

20   up a situation where our officers feel empowered to do

21   the kind of work they need to do in an appropriate way

22   and in that constitutional community policing manner

23   that we're committed to.  And I think we have made some

24   excellent early progress on that, and I hope that's also

25   going to help a lot of the issues that we're seeing on

1    the front line with our officers, as well.

2              So with that, Your Honor, again, I just want

3    to say thank you.  I know we have a long road to go on

4    this, but I know we also want to make as much progress

5    as we can, as fast as we can, and so somewhere in the

6    middle of that I hope will be a successful journey with

7    the DOJ process.

8              Thank you.

9              THE COURT:  Mr. Mayor, of course, thank you

10   for your remarks, and if you'll allow me just a minute

11   to follow up on a couple of points that you made.

12             First of all, I love this courtroom, too.

13   Judge Parker is ever gracious.  He says, "When you have

14   to be in Albuquerque, Bob, call me first."  And it so

15   happens that he's over at Lomas today, doing

16   sentencings, and so the courtroom was available, and I

17   really do appreciate that because it's such a lovely

18   courtroom.  And a lot of people don't know it's here, a

19   lot of people never have had a chance to see it.  So

20   there's that.

21             I don't think it would be out of school to say

22   that when you hadn't been on board very long, you asked

23   to have a tete-a-tete, a meeting, although factions were

24   not represented.  And I came from Las Cruces

25   specifically for that purpose, and we met over at Lomas

1    in the courtroom, and just by way of introduction, for

2    the most part.  And I appreciated the chance to get to

3    know you, had not known you before.

4             And as it came out at the time, I was on the

5    fence about whether I was going to continue to oversee

6    this process.  It doesn't matter to anybody else, but

7    I'm going senior status this summer, and with that gives

8    me some leeway about the cases that I take and don't,

9    and I had thought maybe I'd let somebody else enjoy all

10    this fun.

11             And you said then what you've said very

12    publicly just now.  You ran on this issue.  You're going

13    to be judged on the success of this issue, among many of

14    those other issues during your tenure.  And you said, "I

15    own this."  And I said at that time, with that kind of

16    commitment level from you personally to all of those

17    that are present, I agreed to stay on.  So you either

18    get the credit or, depending on how people view it --

19    you know, I'm still going to be hitched.

20             I attended a Consent Decree conference that

21    was put together by Judge Morgan from New Orleans in the

22    Eastern District of Louisiana.  She has a Consent Decree

23    ongoing there, and she thought a long time ago -- she

24    has been in that process since 2012 -- that we need not

25    reinvent wheels on our own, that we ought to be able

1    to -- and I think there are nine Decrees going on, from
2    as far as Puerto Rico to Seattle.
3            So she has organized this conference.  This is
4    the second year; it's my first year to be able to
5    attend.  But Deputy Chief Garcia and Mr. Schmehl were
6    both there on behalf of the City.  I was pleased to see
7    them.  I was pleased to see that level of interest.  And
8    we can learn a lot from what has gone before us.
9            And we were introduced to the concept of a
10   Compliance Bureau.  Maybe you-all were onboard with all
11   that beforehand.  I hadn't heard about it until that
12   time.  And two young men got up, and they described
13   themselves as geeks.  That wasn't disparaging.  They
14   took that on themselves.  And they talked about the need
15   to be able to measure before you could mark improvement.
16   And they had stood this thing up in New Orleans to a
17   really great result.
18           And there is humor in the process.  They
19   looked like they were 14 years old, to me.  But
20   everybody looks like they're 14 years old, to me.  But
21   someone in the audience said at some point, "I've got a
22   question for Harry Potter," one of the young geeks up
23   there.  And he didn't mean any offense, he said, and the
24   guy said, "I don't take any offense.  I cultivate that
25   image.  You know, we have the haircuts and the glasses

1   and the whole thing."

2          I'm really glad.  I came home, talked to my

3   clerks about the Compliance Bureau sort of approach, and

4   said, "I'm looking forward to talking to the City about

5   that."  And within just a few days of that, I learned

6   that you-all were of the same mind.  I'm pleased about

7   that.

8          So thank you for your comments and your

9   commitment, and unless there's something else -- Ms.

10  Nair, were you --

11         MS. SARITA NAIR:  No, Your Honor, unless you

12  have questions for me.

13         THE COURT:  No, thank you.

14         Thanks, Mr. Mayor.

15         MR. TIM KELLER:  Thank you, Your Honor.

16         THE COURT:  And you're always welcome at

17  these.  Please feel free.

18         MR. TIM KELLER:  Thank you.  I appreciate you

19  sticking it out, too.

20         THE COURT:  So, Mr. Killebrew, are you up

21  next, Item 3 on the agenda, the joint stipulation

22  suspending CASA Paragraph 308?  I know what that means,

23  but there are those here that may not.

24         And the fact is, Mr. Killebrew was there, too.

25         MR. PAUL KILLEBREW:  Yes, Your Honor.

1          THE COURT:  In Ft. Worth, at the conference.

2     I'm glad to hear you now, please.

3          MR. PAUL KILLEBREW:  Thank you so much, Your

4     Honor.  Thank you, as well, for indulging the parties,

5     the amici, this community by coming to Albuquerque

6     today for a public hearing that everyone could be

7     present at.

8          The last time we were all together in November

9     felt very different, and I think at that time we knew

10    that we were on the precipice of big changes.  I think

11    what we're here today to say is that those changes are

12    coming, and the filings I'm going to talk about today

13    are the first stage of that.  So there's going to be --

14    also, because the Mayor brought it up, I wanted to just

15    acknowledge that the staffing decisions that the

16    Albuquerque Police Department and the City have made

17    have been very positive.  In November, I said that they

18    were agents of change within the Albuquerque Police

19    Department, and those agents of change are still there,

20    and now they are the leaders of change within the

21    Albuquerque Police Department.

22         So Deputy Chief Garcia is now in charge of

23    that Compliance Bureau.  He is the one who is managing

24    the entire change process within the agency.  We view

25    that as a very positive decision by the City.

1          There's also a commander, John Sullivan.  He

2    was previously the commander over the Special Operations

3    Division which encompasses the SWAT Team.  As you may

4    remember, the SWAT Team has been in compliance for quite

5    some time.  Now Commander Sullivan has been put in

6    charge of the Academy.  The Academy has been a focus of

7    Monitor reports.  It was an area of deliberate

8    non-compliance in IMR 6, and so now they've got somebody

9    over there to whip it into shape, and we're very pleased

10   with those moves.

11          The three filings that we're going to talk

12   about today are the one you just mentioned about

13   Paragraph 308; there's another filing about use-of-force

14   modifications; and then the City's filing yesterday of

15   its Compliance Plan.  We're going to talk about those

16   separately during the hearing, but I want to say at the

17   outset, they all hang together.  These are deliberate

18   moves to make some changes that will move the reform

19   process forward more efficiently, and they all depend

20   upon one another.

21          So the first one, as you mentioned before, is

22   the suspension of Paragraph 308.  Paragraph 308 has to

23   do with the timing of the Independent Monitor's reports.

24   So those reports come out every six months, and the next

25   report would be coming out in May.  Instead, there's not

1    going to be a full Monitor's report in May.  The next

2    full monitoring report will be in November.  And in the

3    meantime, we're going to be changing a little bit about

4    what the Monitor does.

5           To contextualize this, I would refer to what

6    Sean Willoughby, the President of the Albuquerque Police

7    Officers' Association, said back in November.  He said,

8    "We need a reset button."  And so after he said that, we

9    all thought about it.  The Monitor really took it to

10   heart, and he made a proposal to the parties about what

11   that reset button could look like.

12          So Document 355, which is the stipulation

13   about Paragraph 308, is the culmination of the Monitor's

14   proposal.  The idea of not having a Monitor's report in

15   May is to provide an opportunity to shift resources from

16   monitoring to technical assistance.  Technical

17   assistance is a jargon-ny term, so I'm going to define

18   it.  This is a definition I got from the United Nations

19   that I thought was very accurate:

20          Technical assistance is non-financial

21   assistance provided by specialists.  It can take the

22   form of sharing information and expertise, instruction,

23   skills training, transmission of working knowledge, and

24   consulting services and may also involve the transfer of

25   technical data.  The aim of technical assistance is to

1    maximize the quality of project implementation and

2    impact by supporting administration, management, policy

3    development, capacity building, and so on.

4            That's exactly what we're going to be doing

5    for the next several months.  The reason we had to make

6    a change in the monitoring methodology was that the

7    Monitor can't both monitor compliance and provide the

8    amount of technical assistance that's really needed.

9    There simply isn't enough of him to go around or enough

10   of his team to go around.

11           So to keep within the existing budget, we are

12   shifting the resources from monitoring to technical

13   assistance.

14           On Page 5 of Document 355 there is a bullet

15   list of subjects of technical assistance, and those are

16   -- again, as I mentioned before, this is all very much

17   tied up with the other filings that have been made.  The

18   technical assistance will go into what the use-of-force

19   investigation process will look like; the revisions to

20   APD's use-of-force policy suite; the training programs

21   that are going to be designed to bring personnel up to

22   speed on the new use-of-force investigation process.

23           This is the kind of technical assistance that

24   APD has long needed, and we are so grateful that APD is

25   receptive to it now.

1    Now, I want to be very clear, moving from

2    monitoring compliance to technical assistance is a

3    trade-off.  There are things that we lose and things

4    that we gain.  One of the things that DOJ is conscious

5    of in this context is that a Monitor has to remain

6    independent and has to assess the agency's efforts in

7    reaching compliance.  When they provide technical

8    assistance, that's a slightly different role.  They're

9    assisting an agency.

10    And so we get concerned about possibly

11    undermining the independence of the Monitor because

12    they're providing assistance that will lead to

13    compliance efforts that may or may not bear fruit.  So

14    we have talked that over with Dr. Ginger, and we feel

15    satisfied that he understands the risks and will

16    maintain, as he always has, his independence and will

17    always be calling balls and strikes based on the

18    evidence.  So we don't have concerns about that.

19    The much bigger trade-off is that we won't

20    have a full comprehensive Monitor's report in May, and

21    so there will be a period from the seventh monitoring

22    period, which runs from August to January of 2018 --

23    2017 -- no, I'm sorry, 2018, where there will not be a

24    Monitor's report that will cover that period.  And so

25    that's a period of compliance that we just won't have

1    information about, going forward.

2            We had talked about some strategies to deal

3    with that.  One is that in the next Monitor's report

4    coming in November, the Monitor could look at 12-month

5    samples of information so that we would get some

6    compliance information for this six-month period that

7    would have been covered by the May report.  We probably

8    won't do that across the board.  We'll select particular

9    areas where it makes sense to do that.  But that's --

10   that helps.

11           The other thing that gives us some comfort

12   about losing this May report is the status reports that

13   the City and the Monitor will be filing, and this is how

14   this particular filing marries to the City's Compliance

15   Plan.  The City's Compliance Plan lays out in great

16   detail all of the specific steps that they will be

17   taking over the next several months to reach compliance,

18   and they're going to be reporting on their progress in

19   executing those steps.

20           So it's not that we'll be without information

21   about what the City is doing.  We will have a lot of

22   information about what the City is doing, more

23   information from the City than they've given us in the

24   past.  And so that gives us some comfort that we're not

25   flying blind during these next few months.

1          And fundamentally, we accept these trade-offs

2     because they're worth it.  Right now, the City needs

3     this type of technical assistance in order to move

4     forward, and this is the most efficient way to get them

5     into compliance.

6          I also wanted to mention that the technical

7     assistance has already begun.  The Monitor provided

8     technical assistance during the week of January 15th.

9     He has been providing it all this week.  Members of his

10    team will be out in two weeks to provide additional

11    technical assistance.  And our expectation, and I

12    believe the City's expectation and the Monitor's

13    expectation, is that after two weeks from now, we'll

14    continue scheduling technical assistance sessions as

15    needed, based on the different projects that are

16    ongoing.

17         So that's what I have to say about the

18    Paragraph 308 suspension.  I'm happy to answer any

19    questions.

20         THE COURT:  I know that you alluded to it,

21    but the people of Albuquerque have been watching this

22    process for a while, and when you say we have to hit a

23    reset button, which we all said -- I think that phrase

24    was used a lot in November -- the people of Albuquerque

25    have to understand and believe that this is necessary,

that the dollars that were spent up to this point have

not been wasted, and that we're not losing ground by

not having the Monitor's report for this period of

time.

If you don't mind, just address yourself to

the citizens of Albuquerque about why -- I mean, I

understand what you said.

MR. PAUL KILLEBREW:  Yes.

THE COURT:  But maybe in a broader sense, why

this is necessary, why this is worth the time and

effort, and the trade-offs, as you said.

MR. PAUL KILLEBREW:  Certainly.  Certainly.

I think if we just had the Monitor right now

assessing compliance, he would find some progress for

that six-month period, I hope.  But I think most of that

period occurred under the previous administration, and I

think we knew what their attitude towards this process

was, and as that culminated in the hearing last

November.

So right now, I think the thing that is most

valuable to the people of Albuquerque is improvement in

their Police Department, and changes in the systems in

the Department.  Those changes, they are undertaking

tremendous effort and going to great expense to make,

but they need help.  They need the help of nationally

1   recognized policing experts who have solved these

2   problems before.

3           That's what the Monitoring Team is.  The

4   Monitoring Team is made up of people who are recognized

5   across the country as being experts in policing, and on

6   the exact issues that the Albuquerque Police Department

7   is facing.  You can't spend money any better than by

8   getting those folks to give advice and guidance on how

9   to build all the systems that are going to be necessary

10  to foster constitutional policing.

11          After we filed this joint stipulation, we sent

12  the filing out to our stakeholder and amici community

13  and had three different meetings with folks to get their

14  views on this.  And on this particular filing, I'm very

15  pleased to say, everyone recognized that this was a

16  worthwhile investment and this was a reasonable

17  trade-off.  We had, I would say -- I'm racking my brain

18  to remember if anyone objected to what we were doing.  I

19  don't recall anyone having a problem with it.  I think

20  everyone saw that right now what the City needs is the

21  counsel, advice, and guidance of the Monitor Team.

22          THE COURT:  I appreciate the extra comments.

23  Thank you.

24          Mr. Schmehl, do you have the ball for the City

25  at this point?

1          MR. PAUL KILLEBREW:  Thank you, Your Honor.

2          THE COURT:  Yes, sir.  Thank you, Mr.

3   Killebrew.

4          MR. JERAMY SCHMEHL:  Your Honor, thank you

5   for this opportunity to address this filing.

6          I think the best way I can begin the framing

7   of it is to go back to -- I believe it was either the

8   19th or 20th of December, and Mr. Ginger, or Dr. Ginger,

9   rather, presented his proposal, and there was a brief

10  pause, with the question being asked, "What do you

11  think?  Does this sound good?"  And the City's response

12  was, "Yes."

13         So the City stands fully supportive of this

14  approach, moving forward.  As Mr. Killebrew spelled out,

15  it's going to afford an opportunity to get some

16  assistance, needed technical assistance from the experts

17  in the Monitoring Team, and I think that he has done a

18  good job of capturing that and explaining that to the

19  Court and everyone here today.

20         What I want to focus on, as well, is the

21  City's obligation.  And the City's obligation under this

22  is not to disappear; it's not to rest on its laurels;

23  it's to provide reports.  And it's spelled out, the

24  first one coming out June the 1st, and the second one

25  coming out August 31st.

1          And those reports are going to talk about

2   what's happening, you know, giving real reports to the

3   community for the first time, from the City's

4   perspective, about what's working, what's not working,

5   as the Compliance Plan spells out who's responsible for

6   making it work.  And those types of things are first.

7          And Your Honor very clearly ordered, the last

8   time we were in court, in November, that that needed to

9   happen.  And that filing was made yesterday, on the eve

10  of this hearing today.

11         And so in that vein, to get that conversation

12  started, as Mr. Killebrew explained, we had meetings

13  with the amici.  We explained the stipulations.  And

14  that's the beginning of those conversations.  What's

15  going to happen moving forward?  There's a commitment

16  from the City and the Department, approximately every

17  six weeks or whatever interval makes sense to those

18  amici, we're going to sit down and talk to them.  We're

19  not going to wait until the eve of the hearing, whether

20  it's the one in November, the one in November the prior

21  year, to learn about problems.  We're going to have very

22  real conversations and engage in a dialogue, rather than

23  a monologue that just simply hasn't been working.  And

24  the City is committed to that, and the Department is

25  committed to that.

1          And I also think the Compliance Plan really

2     overlays on top of this whole restart, refresh,

3     recharge, way forward, whatever anyone wants to call it.

4     And I think it's a perfect overlay because it brings

5     structure to those communications.  You're talking about

6     those areas of deliberate non-compliance that were very

7     clearly spelled out in the Compliance Plan, and the

8     first five areas, you know, many of them center around

9     resources, use of force, the Implementation Unit.  And

10    then those concerns were raised by the amici, dating

11    back to the action plan that was filed with the Court, I

12    believe Documents 315 and 319.

13         So this joint stipulation certainly represents

14    an opportunity to step back and assess and figure out a

15    way forward.  But what the City is taking this as is an

16    opportunity to do that, but also speak to the community,

17    talk to them about the challenges and problems, and

18    actually get their input and ideas and concerns so that

19    this reform effort reflects what it should be, that it's

20    a collaborative effort to bring constitutional policing

21    to the City of Albuquerque.

22         That's it, Judge, unless you have some

23    questions for me.  I'm happy to answer them.

24         THE COURT:  I don't think so at this point,

25    Mr. Schmehl, but I want to just the alert amici --

1    they're going to address the Court at some point in the

2    afternoon.  We're hearing some representations about

3    your involvement in this reset and in signing off or

4    not.  I want to hear from you about your thoughts on

5    the reset, on this way forward, as it's been described

6    by the Doctor.  So thank you.

7                    And I think we'll hear from Mr. Mowrer.

8                    MR. JERAMY SCHMEHL:  Thank you, Your Honor.

9                    THE COURT:  Yes, sir.

10                   MR. FREDERICK MOWRER:  Good afternoon, Your

11   Honor.  Thank you for the pleasure of being able to

12   address the Court.

13                   Your Honor, the APOA believes -- since we're

14   using the term, I'll continue to use it -- a reset

15   probably was appropriate at the time that button was

16   pushed.  As the Court knows, many, many years ago, it

17   seems like a long time ago, the APOA took the position

18   that this process was moving too fast and that we were

19   missing things that needed to be addressed.  I think

20   that reset has now been hit.  I think that the

21   monitoring program as dictated in 355 probably does need

22   to be changed to allow the Monitor to switch focus, so

23   instead of providing another report where he documents

24   the things that aren't working, that he can provide

25   technical assistance not only to the City, but to the

1    employees of the Albuquerque Police Department, to show

2    them changes that would probably be helpful for all

3    concerned.  And the APOA adopts that.

4            The APOA believes that the reset is necessary.

5    In light of the other changes that are also being

6    proposed to the Court, it only makes sense to save

7    resources, because they are finite in nature, to save

8    those resources, apply them in a different way, use the

9    technical assistance that the Monitor and his team can

10   provide to not only the City, but also to the members of

11   the Association, and teach us a way forward that makes

12   better sense.  Because the way we were going did not

13   appear to me, I think, and to the Union at many times,

14   to be moving forward at a pace that made any sense.

15           So we wholeheartedly adopt this proposed

16   change to Document 355 or Paragraph 308 of the CASA.

17           THE COURT:  Mr. Mowrer, thank you.  It occurs

18   to me, though -- and if it was addressed, I missed it.

19   We've talked about the meeting that we went to in

20   Ft. Worth.  Have other Monitors around the country, in

21   the other eight Consent Decree programs, ever been

22   called upon to provide the technical assistance to make

23   this sort of transitional step?

24           MR. FREDERICK MOWRER:  Your Honor, I'm not

25   aware that they have been, but I'm speaking from just

1    my vague impression of how these Consent Decrees have

2    gone.  But I think this may be the first one where the

3    parties have sat down and agreed to change focus in the

4    middle of the process, to try and effectuate change.

5              THE COURT:  And I understood your exposure to

6    it might be different.  But Mr. Killebrew or Mr.

7    Schmehl, can you address my question?

8              Thank you, Mr. Mowrer.

9              MR. FREDERICK MOWRER:  Thank you, Your Honor.

10             MR. PAUL KILLEBREW:  Certainly, Your Honor.

11   Thank you.

12             We -- I believe Paragraph 305 of the CASA

13   explicitly provides that the Monitor can provide

14   technical assistance.  That's in there because it's our

15   experience in these policing and Consent Decree cases

16   that technical assistance is often necessary.  The scale

17   of it can be very, very small; or, as here, very large.

18   And so we remain open to the idea that the Monitor may

19   be able to provide technical assistance.

20             There has actually already been some technical

21   assistance provided in Albuquerque.  Stephen Rickman,

22   who is on the Monitoring Team, has provided technical

23   assistance to the City to help get the Community

24   Policing Councils established, and he provided training

25   to the members of the Community Policing Councils that

 1    was incredibly effective.  So it is fairly common in

 2    these cases to have the experts and the Monitoring Team

 3    provide this technical assistance.

 4           In terms of the shift that we're making,

 5    though, of substituting technical assistance for

 6    monitoring for a brief period, I'm not aware that we've

 7    done that before.  The closest parallel that I can think

 8    of is what we've done in Puerto Rico, where the

 9    beginning of that process is not monitoring compliance;

10    it's capacity building.

11           There is a, I believe, four- or five-year

12    capacity building period where the entire focus is just

13    on establishing the basic infrastructure, both in terms

14    of policy and technology and all the basics within the

15    Police Department there, before we even start measuring

16    compliance.  And the Monitoring Team is very much a part

17    of establishing those systems.

18           And so it's just a recognition that there are

19    conditions sometimes where the way everyone needs to be

20    spending their resources is on developing the agency's

21    capacity, and I think that's largely where we are with

22    APD right now.  The DOJ, the Monitoring Team, the Union,

23    the City, we're all engaged in a collaborative effort to

24    build capacity within APD and build the systems that

25    will lead to compliance.

1            THE COURT:  Thank you.  And I think I really

2    do appreciate the insight, and I bet those here do, as

3    well.  But this isn't starting from scratch with

4    something.  And the fact is, Consent Decrees, I've

5    learned recently, look a lot alike from one

6    jurisdiction to another.  They all come from the

7    Department of Justice at some point.  And so this

8    built-in allowance for technical assistance finds

9    itself in most of them, I guess.

10            MR. PAUL KILLEBREW:  Yes, that's right.

11    There are provisions of the Consent Decrees that look

12    very similar to one another, and those are typically

13    the process-related ones, the ones that have to do with

14    the monitoring process.  And that's because we have now

15    about 25 years of experience doing this work and

16    working with Monitors, and we've learned some things.

17    And one of the things we've learned is about sometimes

18    you've got this team of experts that is sitting right

19    there.  Why can't we use them as a resource?  It's an

20    obvious thing that we want to do.

21            THE COURT:  Good.  Well, thank you for the

22    insight.

23            MR. PAUL KILLEBREW:  Thank you, Your Honor.

24            THE COURT:  Dr. Ginger, do you want to be

25    heard on this topic?

1          DR. JAMES GINGER:  Yes, sir, if you don't

2     mind.

3          THE COURT:  Of course not.

4          DR. JAMES GINGER:  As the Court knows, I've

5     been involved in these monitoring projects since the

6     early 2000s.  I've been a student of and participating

7     in projects since that point in time.  There have been

8     numerous occasions where there has been a change to the

9     administration in a location where there's a monitoring

10    project underway.  But to my knowledge, we've never had

11    the confluence of events, the change of administration

12    and an earlier administration that was so resistant to

13    change, as we've had here.

14          So as a result, we provided what will in

15    effect be virtually the same amount of technical

16    assistance to the APD in the first two years of this

17    project.  We budgeted for it.  We provided it.  It

18    wasn't accepted, I guess.  It wasn't used.  So what

19    happened, then, with the change of administration, we

20    have a long-lived Settlement Agreement and a new

21    administration that has not had the benefit of that

22    previous technical assistance.

23          So that's why I developed the Way Forward

24    Plan, because I recognized that this Police Department,

25    this new Police Department as configured today, had not

1    had the benefit of the earlier technical assistance, but

2    they still had the same problems that confronted the APD

3    the first day we walked on the job.

4              So historically, that had never happened

5    before, so we needed to design something relatively new,

6    relatively efficient, and very effective.  And

7    hopefully, that's what we've done.  And it will allow us

8    to continue our responsibilities without asking for more

9    money, and it will allow the City to continue to grow

10   its responses without paying for additional technical

11   assistance to the Monitoring Team So we've tried to hold

12   the budget at the same level; and yet, give APD what it

13   needs in terms of our insight into what's happening and

14   what needs to happen.

15             THE COURT:  Thank you, Doctor.

16             On the notion of the Compliance Bureau that

17   the City is in the process of standing up, a couple of

18   questions.  One, have you been involved with this work

19   in any jurisdiction where the administration, the City

20   administration and the Police Department actually had a

21   Compliance Bureau or stood one up?

22             DR. JAMES GINGER:  100 percent of the ones

23   I've been involved in had it.  Usually on my first

24   visit, the Chief Executive Officer of the Police

25   Department and I sat down and had a long conversation

1    about how this process is going to work.  We present

2    them with our relatively detailed methodology of how

3    we're going to do our job.  And we, the Monitoring

4    Team, make a recommendation to that Chief Executive

5    that they consider the development of the

6    Implementation Division or Bureau or whatever it turns

7    out to be labeled.  And it always comes to a different

8    name because people like to change that up.  They don't

9    like to follow in lock-step with other Police

10   Departments.

11          So I have been involved with -- I was the

12   Monitor in Pittsburgh, I was involved in the LAPD

13   process, and I was the Monitor for New Jersey State

14   Police, and all three of those organizations, as a first

15   step, developed the equivalent of a Compliance Bureau.

16          APD chose not to do that, against our advice.

17   But the choice was made.  And we were still required to

18   monitor progress, which as you well know we did for

19   quite some time.  But now we find the Police Department,

20   through no fault of its own, through no fault of its

21   current leadership, who has been lacking a Compliance

22   Bureau for almost three and a half years now, and that's

23   a serious delay in the usual process.

24          So what I tried to do with this Way Forward

25   Plan was to compensate for that, so that you could stay

1    reasonably on schedule; and yet, not deprive APD of the

2    knowledge and technical assistance they needed.

3         THE COURT:  So did your provision of

4    technical assistance extend to the standing up of the

5    Compliance Bureau?  And as I understood the whole point

6    of a Compliance Bureau, it's ultimately the Police

7    Department can measure its own progress and can

8    continue to measure its progress against norms that we

9    all agree ought to be in place long after you're gone

10   or long after I'm gone.

11         And that's the deal, right?

12         DR. JAMES GINGER:  Correct.

13         THE COURT:  So I know earlier on, you had a

14   hard time getting data that you could use in developing

15   your reports.  The Compliance Bureau will be giving you

16   that data, right?

17         DR. JAMES GINGER:  Correct.

18         THE COURT:  So are you providing them

19   technical assistance?  Is that part of this reset?

20         DR. JAMES GINGER:  Yes, Your Honor, it

21   absolutely is.  I've been here all week, and I've spent

22   the vast majority of my time with personnel from the

23   Compliance Bureau, and the team has spent a great deal

24   of time with folks from the Training Academy, which

25   were the two major weaknesses we identified, other than

1    supervision, in our monitoring, earlier monitoring

2    reports.

3           So we've been laser focused on making sure

4    that Chief Garcia has the knowledge and understanding

5    and even the personnel support, the people to do the job

6    that that Compliance Bureau is charged with.

7           THE COURT:  Do they have any Harry Potters

8    over there?

9           DR. JAMES GINGER:  They do, Your Honor,

10   although I have to say that this would be a Harriette

11   Potter.

12          THE COURT:  Fair enough.  Fair enough.

13   Anything else, Doctor?

14          DR. JAMES GINGER:  No, sir.

15          THE COURT:  At this point?

16          DR. JAMES GINGER:  No.

17          THE COURT:  Thank you.  Thanks very much.

18          Well, Mr. Killebrew, you're back up.  Have you

19   got a spring in your chair?  We'll be talking about the

20   stipulation modifying CASA use-of-force provisions, and

21   this is Document 354.  I'll hear you.

22          MR. PAUL KILLEBREW:  Thank you.  Thank you

23   very much, Your Honor.

24          Yes, while Document 354, which is the joint --

25   the brief that explains the modifications as to use of

1   force -- and I apologize that we made some mistakes in

2   the attachment to that document, which is the red line

3   that shows the changes to the CASA, and we filed an

4   errata, which is Document 356-1, that shows the correct

5   changes.  And I apologize for that oversight and take

6   responsibility for them.  But 356-1 we have checked

7   quite thoroughly, and it is the correct document.

8           So what this is about is the central issue of

9   this case.  The most intractable problem in this reform

10  effort is getting APD to the point where it can identify

11  and appropriately address unconstitutional uses of

12  force.  That's why DOJ opened an investigation of the

13  Police Department.  That's why we have a Consent Decree.

14  That's why we've had six Monitor reports, a special

15  report, and an outcome assessment report, all critical

16  of the APD's ability when it comes to recognizing our

17  policy and unconstitutional uses of force.

18          This is the problem we are here to solve, and

19  we don't leave until we solve it.

20          So what we have seen across all of the reports

21  is that the systems that APD had set up simply were not

22  working.  And there are a number of causes for those

23  failures, but it brought to light that we needed to

24  rethink how we were tackling the problem in light of

25  what we were seeing from the process failures of APD.

1    So around July of 2017, we started having

2    discussions among the parties and the Monitor about

3    different approaches, and we thought about:  Are there

4    things that we could do, that would stay within the

5    confines of the CASA, that might get us there faster?

6    Or do we need to start putting on the table changing the

7    CASA in order to get better systems set up?

8    Along those discussions, one of the things we

9    recognized was that supervisors at APD were simply

10   having an incredibly difficult time appropriately

11   investigating uses of force.  And the CASA, as

12   originally set out, gave supervisors, the first-line

13   supervisors, the sergeants, extensive responsibilities

14   when it came to uses of force.

15   For most uses of force, the supervisor is

16   supposed to show up at the scene and conduct a full

17   investigation of the entire incident, write up a full

18   investigation report, and send it up through their chain

19   of command.  And, as the monitoring reports detail,

20   those investigations -- there was a great variability in

21   the quality of those investigations.  And as a system,

22   we had to recognize that relying on supervisors for this

23   function was not going to solve our use-of-force

24   problem.  They simply did not have this ability to get

25   these investigations done right.

1          The other thing we saw was that APD had

2     created a Centralized Unit to investigate the most

3     serious uses of force, and that unit was

4     professionalizing, and its investigations were gaining

5     in quality and consistency.

6          So as we discussed how to handle the use-of-

7     force problem, and really the use-of-force investigation

8     problem, we thought maybe it makes sense to diminish the

9     role of supervisors and expand the role of the

10    Centralized Unit.  So that is essentially where we

11    landed.

12         I should say also, the supervisors -- it's not

13    fair to just say they didn't, you know, they didn't know

14    how to do good investigations.  They were not given a

15    policy that was a model of clarity.  They were not given

16    training that really explained to them what they needed

17    to do.  And we simply didn't understand the workload and

18    the strain that was going to put on them, to have to

19    conduct all of these investigations.  So essentially, we

20    just didn't set them up for success.

21         But going forward, we realized that having a

22    Centralized Unit with responsibility for more force

23    investigations would make it easier to assess when

24    there's a problem with those investigations and correct

25    them.  Because it's one unit, and you can have much

tighter command and control over this one Centralized

Unit than you can over an entire agency of supervisors.

So the system we set up was moved into what

we're calling Level 1, Level 2, and Level 3 uses of

force.

Level 1 uses of force are non-injury force.

There is no actual injury.  There is no complaint of

injury.  These are the very, very minor uses of force.

A good example would be when someone is being handcuffed

and they tense or move their arms to resist being

handcuffed, and the officer has to use physical effort

to bring their hands together and handcuff the person.

That officer is using physical force to overcome

resistance, and so it qualifies within the meanings,

within the definitions of the CASA and the Fourth

Amendment, as a seizure as force.

But that is a very low level kind of that's

not -- there hasn't been an injury.  It just needs to be

addressed and made sure it was appropriate, but it's not

as serious, obviously, as something like an officer-

involved shooting or a taser.

So for that very low-level use of force, the

officer who uses force would still call their supervisor

out to the scene.  The supervisor will show up, talk to

the officer, talk to the subject if they're willing, any

other witnesses who may be there, and they have the
capability to immediately play back the body-worn camera
footage of the incident on their cellphones, right there
on the spot.

And so the supervisor can make an assessment
about:  Was this actually a Level 1 use of force, or was
it more serious?

If it was just a Level 1 use of force, then
the responsibility is on the officer to document the
force they used and the circumstances that led to it, to
put that into a use-of-force report, and they have to do
that by the end of the shift.  The supervisor will then
review that report, make sure that the force used was
appropriate.  If it wasn't appropriate, then the
supervisor needs to address that.  Assuming it was, the
supervisor will then send that report up his chain of
command or her chain of command within the district that
they work in.

After it's been approved all the way through
the chain of command, up through the commander, it will
go to a Central Unit called the Performance Review Unit
that is going to be looking at every single Level 1 use
of force across the Department.  And their function is
essentially quality assurance.  They're going to be
looking at the package and making sure that it meets APD

1   standards of quality, and also making sure that the use

2   of force was appropriate.  So it's another layer of

3   review.

4          That unit can also be collecting data on

5   Level 1 uses of force so that they can identify trends.

6   And so if they see a spike in one form of force, they

7   can identify if there's something going on that we need

8   to address through a policy change or through training.

9          So that's how Level 1 uses of force would be

10  handled.  Again, it's force that does not lead to an

11  injury or complaint of injury, so it's at the very, very

12  low end.

13         Anything that results in an injury --

14         THE COURT:  Mr. Killebrew, before you go on

15  to Number 2 --

16         MR. PAUL KILLEBREW:  Yes.

17         THE COURT:  I'm sure it's here somewhere, but

18  I can't find the PRU on the APD or the OC.  There's an

19  acronym for everything here.  But where is the PRU on

20  the organizational chart?  I'm trying to track.  The

21  supervisor in the field makes the report, and it goes

22  to PRU.

23         Mr. Schmehl.

24         MR. JERAMY SCHMEHL:  Yes, Your Honor.  That

25  will be housed in the Compliance Bureau, so that

1    Performance Review Unit would be -- and I don't know

2    that the organizational chart is going down to that

3    level, that breakout level.  So it's not spelled out on

4    that, but we certainly can get one that breaks it down

5    into divisions and sections and whatnot so it's more

6    clear.  But that will be housed within the Compliance

7    Bureau.

8            THE COURT:  Okay.  So under Compliance

9    Bureau, or associated with it, Compliance Division,

10    Behavioral Health and Crisis Intervention.  But is it

11    under the Compliance Division?  Is that where I find

12    it?

13            MR. JERAMY SCHMEHL:  Yes, Your Honor.

14            THE COURT:  Everybody is shaking their head.

15    Okay.

16            MR. JERAMY SCHMEHL:  Yes.  And like I said,

17    Your Honor, we can provide a breakout of that with more

18    detail, because I think that's a very good question,

19    and it's just an oversight on those organizational

20    charts.  It's just sort of a higher level org chart.

21            THE COURT:  Well, great.  I appreciate the

22    insight.

23            MR. JERAMY SCHMEHL:  Thank you.

24            THE COURT:  I didn't mean to interrupt you.

25    Go ahead.

1          MR. PAUL KILLEBREW:  Oh, no.  Thank you, Your

2     Honor.  All right.  So Level 2 uses of force is force

3     where there is an injury.  And Level 3 force obviously

4     results in injury.  But Level 2 is essentially an

5     intermediate level of force, and this would include

6     like a tasing or the use of an impact weapon.

7          And Level 2 uses of force, as soon as it

8     happens, the officer calls their supervisor.  The

9     supervisor comes out to the scene, again, to make sure

10    that it's correctly categorized.  And then they call a

11    Centralized Unit, which will be called a Force

12    Investigation Section.  And the Force Investigation

13    Section, perhaps we should go ahead and clarify where it

14    will be housed.

15          THE COURT:  I found it on Administrative

16    Support Bureau.  Is that right?  Force Investigation

17    Team.

18          MR. JERAMY SCHMEHL:  That's correct, Your

19    Honor.  Well, actually, that would be Force

20    Investigation Section, and then within that section you

21    have those investigations.  So then you'd have, of

22    course, the division above the section, but it would be

23    in that administrative chart.

24          THE COURT:  Okay.  I think I've got that one

25    located.

1          MR. PAUL KILLEBREW:  Okay.  So the Force

2     Investigation Section handles the investigation from

3     all Level 2 and Level 3 uses of force.  There is an

4     equivalent division right now that looks at what has

5     been called serious uses of force, and serious uses of

6     force is equivalent to a Level 3 under this new system,

7     Level 3 use of force.

8               So they'll be looking at more kinds of force,

9     as I said before.  Level 2 is where we're taking uses of

10     force that supervisors used to investigate and giving

11     them to the Force Investigation Section.  The Force

12     Investigation Section will be conducting the thorough

13     kinds of investigations that we've seen already for

14     serious uses of force and the kinds of investigations

15     that we had expected supervisors to be carrying out, but

16     that we weren't seeing by and large.

17               So Level 2 and Level 3 will be the same thing.

18     Level 3 is, again, equivalent to serious uses of force.

19     When it happens, the officer calls the supervisor, who

20     comes to the scene, makes sure it was correctly

21     categorized.  And then the supervisor calls the Force

22     Investigation Section, and they will come and take over

23     the investigation.

24               So the advantages to us under this system are

25     that if there is an issue in how the Force Investigation

1    Section is conducting its work, it's much easier to

2    correct.

3            And the parallel I would draw here would be to

4    the SWAT Team.  Part of the reason the SWAT Team came

5    into compliance so quickly was that you had very direct

6    command and control.  It's a unit that has to be

7    responsive directly to their chain of command.  It's a

8    relatively small unit, and when that commander orders

9    policy changes or orders training, he knows very quickly

10   whether or not that has happened, and he can hold the

11   members of that unit accountable if they're falling down

12   on the job, and he can do it quickly.

13           And that's what we're looking for under the

14   Force Investigation Section, for that sort of very

15   direct, very clear management.

16           So it's our hope that this will -- it is our

17   expectation that this will improve force investigations.

18   Again, there are trade-offs to this change.  There are

19   things we give up and things that we gain.

20           And the trade-off here is what's happening

21   with Level 1 uses of force.  Those, before, would have

22   been subjected to a full supervisory investigation.  And

23   now, we're relying on the officer to document their use

24   of force correctly, to explain in writing why they used

25   force; and we're relying on supervisors to review that

1    information and make sure it's all correct and meets the

2    standards of quality in the agency.  This gives me some

3    trepidation.  I'll be honest.

4         When we were investigating APD and reviewing

5    use-of-force reports, we found that officers often

6    failed to adequately describe the force that they used.

7    The language they used, you couldn't tell what they had

8    done.  And they failed to adequately describe why they

9    used force.  They didn't explain what the threat they

10   perceived was.  They didn't explain if there were

11   circumstances there that led to the use of force.  And

12   so there were some reports that we simply just couldn't

13   use in the investigation because there wasn't enough

14   detail or information there for us to make an

15   assessment.

16        So under this new system, here's the scenario

17   I'm worried about.  An officer uses force, documents it

18   poorly.  A supervisor signs off on it anyway, and it

19   goes up through the chain of command, and then

20   eventually it lands with DOJ and the Monitor.  And we

21   look at this thing and we say, "How could this possibly

22   have gotten through APD's systems?  You just can't even

23   tell what happened in this incident."

24        So that is my concern, that that's what's

25   going to happen.  I've alerted the City and APD to that

1    concern.  What we expect to happen is that they will

2    provide better training to line officers and to

3    supervisors about what these use-of-force reports need

4    to contain; and the level of detail that officers need

5    to be using when they describe the force that they're

6    using; and that this review unit is going to truly audit

7    each of those reports and make sure that they get sent

8    back for correction when something isn't going right.

9         And that send-back from that Centralized Unit

10   is looking at all the Level 1s, and that doesn't just go

11   to the line officer who didn't write up the force report

12   correctly.  It has to go back down through that chain

13   of command.  Because if the Force Review Unit is

14   catching it, that means that the commander didn't catch

15   it, the lieutenant didn't catch it, the sergeant didn't

16   catch it.  All those folks have to get into the practice

17   of making sure that these reports are of adequate

18   quality.

19        I think this trade-off and this risk is worth

20   it, primarily because of what's happening to Level 2

21   uses of force.  These will now be going to the

22   Centralized Unit instead of being investigated by

23   supervisors.  I expect there to be an immediate increase

24   in the quality of those kinds of investigations, which

25   is what we need to see.

1          So we expect higher quality investigations.

2     We expect to see accurate findings.  We expect to see

3     APD holding its officers accountable.  And we expect to

4     see an elimination of the pattern of unconstitutional

5     uses of force.  That's what we're here to do, and we're

6     not going to leave until that has happened.

7          And, Your Honor, with that, I'll take any

8     questions that you may have.

9          THE COURT:  Well, an obvious question and

10    concern is, you're relying on the officer that has just

11    used force to self-report.

12         MR. PAUL KILLEBREW:  Yes.

13         THE COURT:  And I see a potential concern

14    there.

15         MR. PAUL KILLEBREW:  Yes.

16         THE COURT:  If he's responsible for

17    initiating the process, maybe the process doesn't get

18    initiated at all.  And I'm interested in hearing from

19    Mr. Mowrer on behalf of the Police Union and the City

20    in terms of why this isn't the concern that it seems to

21    me.  So they either don't report, or they under-report,

22    and the supervisor can check this on the basis of the

23    body cam.

24         MR. PAUL KILLEBREW:  Yes.

25         THE COURT:  If that's been appropriately used

1   and preserved.

2           MR. PAUL KILLEBREW:  Yes.

3           THE COURT:  But there's a couple of problem

4   areas there we've already experienced, getting to this

5   point.

6           MR. PAUL KILLEBREW:  Yes.

7           THE COURT:  So I understand.  You've

8   expressed the concern.  I share it.  We'll see how that

9   goes forward.

10          MR. PAUL KILLEBREW:  Yes.  I will say, in

11  just responding to this concern about unreported force,

12  I thought about that in preparing my remarks today, and

13  I didn't add it, mainly because that's an existing

14  risk.  This new system doesn't change that risk.

15          And the way that we've decided to address that

16  risk, which we all recognize and have actually seen

17  played out, is that we have the whole host of systems

18  that are set up to identify when this is happening, at

19  least some of the time.  The supervisors are doing

20  random reviews of body camera footage on a regular basis

21  for each of their subordinates, and if they see

22  unreported force through that, they can then look into

23  it.

24          Not reporting force is misconduct, and an

25  officer would be -- the expectation is that an officer

1       would be held accountable for failing to report force.

2       The individual who is the subject of the force could

3       file a civilian complaint, and the Civilian Police

4       Oversight Agency could then conduct an investigation.

5              And I believe that APD is also looking into

6       enhancing its video review so that there's more video

7       review that's being conducted within the agency.  They

8       don't want to put all the weight on the supervisors to

9       do it, but they're looking into the possibility of

10      having a unit looking at video more regularly.

11             So those are a number of things that we do to

12      address unreported force, but it is a problem and it's

13      something that we all take really seriously.  And to

14      catch it, we'll be addressing it.

15             THE COURT:  Thank you.

16             MR. PAUL KILLEBREW:  Thank you, Your Honor.

17             THE COURT:  Mr. Schmehl, as a part of your

18      remarks, you might alert everyone to kind of a new

19      policy about body cam footage, and the new

20      administration is more open about sharing that, and you

21      might talk about that some.

22             MR. JERAMY SCHMEHL:  Certainly, Your Honor,

23      and thank you.

24             I want to first address the confusion that was

25      my fault about the organizational chart.  These changes

1    are so new.  They are proposed changes, as they are set

2    out in the document there, the amended Settlement

3    Agreement.  So when we're talking about the Performance

4    Review Unit and the Force Investigation Section, the

5    investigators, those are bureaucracies that are being

6    staffed up and considered, and then those will be

7    brought to an organizational chart that more clearly and

8    definitively spells out what that will look like.  So I

9    just want to let you know that that was the case.  This

10   is a situation of us improving and growing, and that's

11   why there was that confusion.

12           I want to talk about -- because I think

13   Mr. Killebrew did a really good job of going over the

14   levels of force; the investigative response to Level 2

15   or Level 3 force; and then the review that would happen

16   after a Level 1 force incident took place.

17           I want to focus in on what I perceive -- what

18   the City perceives to be the issues, you know,

19   developing the policy and the training, those types of

20   things.  But actually, before I do that, I want to take

21   just a step back and say that this was brought to the

22   table.  Certainly there were a lot of conversations in

23   the Department, all the way down to the point where last

24   night at the CPC summit, I was having a conversation

25   with an attendee, and he was aware of all of the

1    problems with the former -- well, hope to be former --

2    force reporting and investigation system, particularly

3    the burdens placed on supervisors.

4         The Union, particularly Mr. Willoughby, played

5    a very central role in bringing this to the table, a

6    draft proposal of the system, and what now is the

7    language in the amendments to the Settlement Agreement

8    were presented.  And that was really what got the ball

9    formally rolling because these conversations have been

10   happening, as I said, all the way down to community

11   members, certainly in the Department, and now the City

12   is very happy to see them as part of this new change

13   process.

14        So the challenges.  The challenges are going

15   to be, as Mr. Killebrew said, one challenge, and what he

16   said was:  Well, what about the unreported force?  Where

17   are you going to find it?  It is an expected risk, where

18   something happens in a system, where people are expected

19   to report force.

20        With this new approach, there's an ability to

21   centralize the thought around looking for that.  There's

22   an ability to say:  Well, let's pull reports where

23   there's resisting arrest.  Let's pull reports where

24   there's assault on a police officer, or battery on a

25   police officer, and let's start looking for it.

1        In the old system, in the sort of scattered

2 approach, there wasn't a centralized way to start to

3 look at those issues and to start to think about that

4 data and the reports, to address the problem and find

5 the report or even when it hasn't been reported.  So I

6 think that's important, to think about it.

7        And the centralization of force reporting

8 investigations also brings to it a standardization to

9 the investigation, and I think that is very, very

10 critical.  If you picked up any of the Monitor's

11 reports, you'll see that as a consistent, persistent,

12 and accurate critique of what is happening in force

13 reporting and investigations -- and now, particularly,

14 like I said, the investigations.

15        What does right look like?  You know, when you

16 look at certain paragraphs -- for instance, the

17 obligation on an officer who uses the force, you know,

18 to describe the contact, the force, all those types of

19 things.  Well, what is a sufficient depiction of those

20 things from an eye that is lending scrutiny to that

21 investigation?  Then when you move to considerations of

22 that investigation, all the way down to what is an

23 adequate canvass for witnesses, making sure from just

24 the lowest level that you're writing down the names and

25 addresses of witnesses.

1          So this new system will allow for a very

2    focused consideration when you're talking about the

3    Level 2 or 3 use of force, on making sure that the

4    product is going to meet the requirements and, really,

5    the standards set by the Settlement Agreement, and

6    lending something to the conversation of what should

7    that be, to the development of forms that are more

8    efficient.

9          There is a blank sheet approach right now --

10   Dr. Ginger has talked about that -- which is, you know,

11   it's just really difficult for you to go in and look at

12   that investigation and say, "This meets scrutiny," or

13   "This fails to meet scrutiny."  So there is an emphasis,

14   I believe, moving forward, on being able to address

15   those concerns in a very central, focused way.

16         The other thing is the training.  You're going

17   to be able to provide the training in that same way.

18   You're going to have a smaller span of control.  Right

19   now, these use-of-force investigations are under

20   supervisor level, so what would be akin to a Level 2 are

21   being done across six area commands.

22         So given the vast confusion around, really,

23   the policy, the inadequacies in the training, and then

24   the product coming out of it, it is across the board to

25   the point where there are conversations across different

1   area commands, saying:  Well, no, I think it should be

2   this way, or this way, or this way.

3          So that's going to be addressed by the new

4   force reporting investigation approach considered by

5   this stipulation and the attached document.

6          And I almost think that's another risk.  What

7   do you do if something -- the way I would phrase it is,

8   something that wasn't supposed to make it through, it

9   makes it through.  I think that's a system of

10  accountability that you have to create.

11         So we're talking about a 95 percent

12  expectation of compliance.  Certainly everyone would

13  like for it to be 100 percent, but we're dealing with

14  human factors.  That whole system, when it starts with

15  the Force Investigation Section investigator, or when

16  it's a Level 1, where it's a review in the field, they

17  have to be held accountable.

18         And that's the reason why the review of this

19  work is being done within the Compliance Bureau, to lend

20  more of an eye to an audit or a review that's outside of

21  what created it.  And I think that's crucial to take

22  into consideration, because as it stands, that doesn't

23  exist.  And I believe that if it did exist, it should be

24  in that way.  It shouldn't be something that's part of

25  the system creating it, to scrutinize it and say it is

1    sufficient or not.

2          This approach also does away with, in my

3    opinion, for the most part -- certainly serious use of

4    force is still a consideration, but it treats force,

5    whether it's a Level 2 or a Level 3, the more -- the

6    higher level force that's likely to lead to either

7    injury or serious injury, the same.  And that was

8    already the reality of these provisions in the

9    Settlement Agreement.

10         There was an immense amount of confusion that

11   when I'm involved in a field use of force where it's

12   something that causes a low level of injury or a lower

13   level of injury, it's somehow different than a serious

14   use of force.  Force is force.  What's important about

15   it is how it's reported; how it's investigated; and how

16   officers, whether it's in that review, the chain of

17   command, or whether it's in the Force Investigation

18   Section, and those investigators, through that chain of

19   command, are held accountable for the product, and then

20   an officer is held accountable to the standard of

21   constitutional policing.

22         And, Your Honor, you asked a question at the

23   beginning, and I'd like to answer that and any other

24   questions you have.  Otherwise, I think I've summarized

25   the City's position on these considerations.

1          THE COURT:  Thank you.

2          MR. JERAMY SCHMEHL:  Thank you, Your Honor.

3          THE COURT:  Mr. Mowrer?

4          MR. FREDERICK MOWRER:  Thank you, Your Honor.

5          I would like to first of all thank the City

6   Attorney for giving credit to APOA President Willoughby

7   and Vice-President Montgomery for helping lead this

8   change.  We realized early on that the force reporting

9   system that was being used was not working.

10          Probably the biggest problem that we noticed

11  and wanted the changes that we pushed for, and I think

12  is now implemented, is that supervisors in the field

13  need to be supervisors in the field, and what we had

14  lost was the supervisors in the field.  They were

15  spending their entire day or days investigating use-of-

16  force complaints, and not managing the people under

17  their command, staff in the field.  And that's what

18  their job is.

19          So we helped implement -- and I'd like to

20  thank President Willoughby and Vice-President Montgomery

21  for the leadership in this.  We helped implement this

22  drive to try and simplify these levels so that we could

23  get sergeants back in the field, supervising their

24  individual members of their squads, and help improve the

25  services that this Department provides the public.

1         So we believe that the critical changes to
2    this use-of-force provision, these three steps, the
3    steps that will be taken to investigate the use of
4    force, will be successful and will help implement the
5    changes that have been advocated by the Monitor and by
6    the DOJ.
7         And to answer your question specifically, my
8    sense of this is, not the lack of reporting of the use
9    of force.  That happens because people are human beings,
10   people make mistakes, and sometimes there will be a lack
11   of reporting because an individual decides to try and
12   avoid it.  But I think the vast majority of any
13   encounter with the general public in the City of
14   Albuquerque is reported, it's reported timely, and it's
15   reported accurately.
16        What we noted and what we thought the failure
17   was or what was not working appropriately was the
18   quality of the review of the use of force that was being
19   reported to the supervisors.  What we hope that this
20   three-step process will do now is free up supervisors to
21   deal with Level 1, which I think Mr. Killebrew pretty
22   much accurately described.  Level 2 and Level 3 will be
23   identified by supervisors who report and will have
24   access to the individual officer and witnesses and to
25   the video camera, and call out a separate team that will

investigate these separate levels.  You'll get a better
quality of investigation, freeing up the supervisors to
work in the field, and giving it to people who have been
trained to do this level of investigation for the use of
force that has been reported.

So what the APOA believes is that while we
recognize there's a risk, there's always a risk with
human beings involved in any process, Your Honor.  But
we don't think the reporting of use of force is the
problem here.  We think it's the quality of the reports
that are generated, the quality of the reporting that's
done, and the quality of the reviewing that was being
done was the problem.  And we think this system will
clarify that, simplify that, and send a better product
up for review by what's now called the Compliance
Bureau.

THE COURT:  Thank you.

Dr. Ginger.

DR. JAMES GINGER:  Thank you, Your Honor.

It was relatively easy for the Monitoring Team
to support this change because, as the Court knows, I'm
a process guy.  I look at flow charts and those sorts of
things to determine what a process is going to look
like.

The change proffered by the parties in this

1    case literally increases the review rate of the minor

2    uses of force -- for example, an over-tight handcuff or

3    something like that -- by 33 percent.  Under the old

4    system, it was the regular APD supervisory command tier

5    at the area station and the Monitoring Team.  Under the

6    new system, it's still those two, but it also will

7    involve DC Garcia's Compliance Unit, who will conduct

8    similar types of reviews.  So basically, we didn't

9    reduce the level of reviews.  We increased it.  So we

10   support the proposed change.

11           Because the other output of that is, we have a

12   more manageable system.  And I advised the parties,

13   almost from Day One, that truly the only way out of this

14   Consent Decree involved three stripes on sergeants'

15   uniforms.  If they didn't get their sergeants involved

16   -- and every agency I've been involved with, they had to

17   markedly increase the number of supervisors in place, so

18   to speak, in order to come into compliance.  This system

19   actually increases supervision of the types of use of

20   force that could easily, normally, slip through the

21   cracks.

22           So the Monitoring Team supports it.

23           THE COURT:  Good.  Thank you, Doctor.

24           It occurs to me that I haven't heard from the

25   new Chief, and you certainly are welcome to address any

1    of this, or all of this, as you would like.  But I

2    didn't mention that the new Chief was at that meeting

3    that I talked about earlier.  And if I recall correctly,

4    he came out of retirement to do this.  Is that right,

5    Chief?

6          MR. MICHAEL GEIER:  That's correct.

7          THE COURT:  I said at the time, "Goodness, it

8    would have been easy for you to sit this one out."

9          But you came in with your eyes wide open, and

10    that was part of the commitment on behalf of the City

11    and the Police Department that got me to stick around.

12    So thank you for that.  I had meant to say that earlier.

13          The Compliance Plan is next.  Deputy Chief

14    Garcia.

15          MR. ERIC GARCIA:  Good afternoon, Your Honor.

16    Deputy Chief Eric Garcia with the Albuquerque Police

17    Department Compliance Bureau, and I'll be going over an

18    overview of the Compliance Plan that we filed with the

19    Court yesterday.

20          First of all, I'd say the first five areas of

21    the Compliance Plan specifically address the findings of

22    deliberate non-compliance and deliberate indifference by

23    the City.  The sixth area will address the concerns of

24    the amici that were brought to the Court's attention on

25    November 16th of 2017.

1          After conferring with IMT, the Independent

2     Monitoring Team, Your Honor, the parties, and the amici,

3     the first version of our Compliance Plan, we realized we

4     had kind of aggressive deadlines and it was an

5     unrealistic approach.  So after speaking to the amici,

6     the DOJ, and the Monitoring Team, we needed to set

7     realistic expectations because we didn't want to be in

8     the same place the previous administration was, where we

9     could not meet deadlines.  We needed to set expectations

10    about what we could realistically accomplish between

11    February and July of this year.

12          This Compliance Plan is a living and working

13    document, but it continues to be building upon it.  Also

14    included in the Compliance Plan, at the suggestion of

15    the amici, is a legend that defines certain terms and

16    acronyms that we have in the plan.  I think that was

17    important.  That was something that I think we needed to

18    realize, because it's not just the Police Department

19    looking at this stuff.  We need to be understandable to

20    the Court and to the public.

21          Also, we included a list of reference

22    materials in the document because we want our personnel

23    to know where they can look for additional information

24    for certain things like job-task analysis, completed

25    staff work, things of that nature.

1          The Compliance Plan itself, Your Honor, is,

2     like I said, divided into six areas.

3          The first area was the use-of-force

4     investigations backlog.  We believe that's a critical

5     area at this time.  Specific compliance issues that need

6     to be addressed with that issue, that area of concern,

7     are review, remediate, and decrease the backlog of field

8     use-of-force investigations.  Due to the process and the

9     complicated process we have in place right now, there's

10    a backlog, and we need to address that backlog.

11         We have created a commander position for the

12    Internal Affairs force which will be in charge of the

13    Force Investigation Section -- that commander is

14    Commander Robert Middleton -- which I think is going to

15    greatly assist us in achieving compliance and

16    understanding the process that we need to do to meet

17    these issues of deliberate non-compliance.

18         We have specific deadlines on each of these,

19    as well.  And initially, like I said, the deadlines,

20    we're pretty close.  We expanded upon those because we

21    want to be sure we can meet those deadlines.  We don't

22    want to rush, and we also don't want to lay back and not

23    be addressing these issues.  They need to be addressed,

24    but we need to be realistic, to be sure we can meet

25    those deadlines and expectations of the Court.

1    Also attached to each of the areas are

2    specific actions; basically, tasks that we need to

3    achieve to meet each of these areas, where we are

4    meeting these areas of non-compliance and deliberate

5    indifference.

6    We also have an area of use-of-force

7    investigations backlog that is going to deal with the

8    backlog of serious use-of-force investigations, because

9    we also have a backlog there, as well, that our Critical

10   Incident Review Team is handling now.  A new system that

11   we are proposing to put in place should address this, as

12   well.

13   Our second area of our Compliance Plan is the

14   APD Implementation Unit.  We quickly realized that there

15   wasn't much, if any, dedicated resources to the

16   Implementation Unit.  That's why we created the

17   Compliance Bureau.  And especially after being in the

18   conference in Ft. Worth, we realized agencies who are

19   farther ahead than we are, like New Orleans, Seattle,

20   they have a whole dedicated Bureau dedicated to

21   compliance, and that's what we are settling right now.

22   We've got to create that implementation needed

23   within the Compliance Bureau.  And with that

24   Implementation Unit, we are creating two civilian

25   managers who will be answering to a lieutenant.  It's

1    Lieutenant Cori Lowe.  She has been helping me quite a

2    bit with the forming of the Compliance Bureau.  Those

3    two managers will be civilian managers.  We're going to

4    have one that's going to be in charge of the

5    Implementation Unit, itself, and another one in charge

6    of the Performance Metrics Unit.  Because basically we

7    have to implement everything, but we have to have some

8    type of measurement to show that we are meeting our

9    goals and our objectives.

10           Again, under the APD Implementation Unit, we

11   have created a Compliance Division.  We have a series of

12   tasks that are specific to the needs of creating this

13   Bureau and Implementation Unit.

14           Lieutenant Cori Lowe from the Compliance

15   Division will be the responsible person for those.  And,

16   again, we have deadlines in place.  And we also freeze

17   these areas.

18           We also have an area where you put for proof

19   of compliance and data sources, course of business

20   documents that show that we are completing these tasks

21   and show the Court that we are meeting these, and show

22   the public that we are meeting all of those tasks.

23           Under the Implementation Unit we also have a

24   manual published, SOP, our policy development process.

25   We have worked with the amici and the public on

1    developing this process.  We understood that the

2    original process was very difficult to understand, had

3    too many steps.  It was complicated.  I don't think the

4    public understood it, and I think a lot of personnel

5    from our Department did not understand that policy, as

6    well.  So that is one area we're working on right now.

7    We met with the amici on this.  We're getting their

8    input.

9            And I would like to emphasize that my plan is

10   to meet with the amici and the public at least every six

11   weeks to get their input.  I want to know how we're

12   doing.  I want to show them our progress with the

13   Compliance Plan, and the Compliance Bureau, and I want

14   to get their input.  Because Compliance has given us

15   quite a bit of good ideas, and I think that we can

16   implement it in the Implementation Unit and the

17   Compliance Bureau.  Again, Lieutenant Cori Lowe from the

18   Compliance Division will be in charge of this area.

19           Our next section is develop and implement a

20   Compliance Division policy.  Lieutenant Cori Lowe will

21   be in charge of that, as well.  We are not trying to

22   reinvent the wheel here.  We also are going to talk to

23   agencies, like I said, like New Orleans and Seattle to

24   see what has worked for them; see if we can utilize it

25   here; draft our policy to mirror some of the things that

1    were working in those areas, as well.  Again, deadlines;

2    a specific person in charge; and proof of compliance how

3    we are meeting this plan.

4              Also in the Implementation Unit, we also have

5    created a section within the Compliance Division devoted

6    to use of force case oversight, and that's where we're

7    talking about that Review Unit that's going to be

8    reviewing all Level 1 uses of force.  I think it's

9    important, because we need to have an internal type of

10    team, because Dr. Ginger has expressed that we have --

11    because we have a process in place, and we catch our

12    errors and we fix those and correct those.  That's

13    exactly what we need to be doing.  It's not a "check the

14    box."  It's a process in place so that when I'm gone,

15    when Lieutenant Lowe is gone, when Chief Geier is gone,

16    these systems are here basically forever.  It makes a

17    better Police Department, changing this as a course of

18    business.

19              THE COURT:  Deputy Chief, we've been at it an

20    hour and a half plus.  I think you're going to be a

21    while yet in your presentation.

22              MR. ERIC GARCIA:  Yes.

23              THE COURT:  Why don't we take a short break,

24    let everybody stretch their legs a little bit.  Let's

25    be ten minutes, and we will reconvene at 3:15.  And

1    thanks very much.

2              MR. ERIC GARCIA:  Thank you, Your Honor.

3              (Recess from 3:05 p.m. until 3:31 p.m.)

4              COURTROOM DEPUTY JESSICA CHAVEZ:  All rise.

5              THE COURT:  Thank you, everyone.  Take your

6    seats, please.

7              Deputy Chief was at the stand, at the podium.

8    We're in the midst of your presentation, please.

9              MR. ERIC GARCIA:  Thank you, Your Honor.

10             I want to go into the next area, talking about

11   the operations of the Academy.  The first specific

12   compliance issue that needs to be addressed on Number 3

13   was address the staffing deficiencies within the

14   Training Academy.  Dr. Ginger has noted in previous

15   reports that the Academy was severely understaffed, and

16   he recognized that and addressed the Court as well.

17             One of the big changes that was made, as was

18   stated earlier, was Commander Sullivan was moved to the

19   Academy, which I think is a very positive step.  He has

20   shown himself to be able to reorganize and implement a

21   lot of these areas of the CASA, so we are expanding it

22   to a greater scale at the Academy.

23             Commander Sullivan requested an increase of

24   personnel at the Academy, and the Chief and the City

25   have agreed to several of the items that he has

1    requested.  A lot of it is administrative staff.  A lot

2    of it is based on his seven-step training process that

3    he has spoken to two members of the Independent

4    Monitoring Team, Phil Coyne and Billy Toms.  They

5    suggested that that had worked in New Jersey, the New

6    Jersey State Police.

7             Commander Sullivan has implemented that; he is

8    implementing that at the Academy.  To do the seven-step

9    process, he needs additional personnel, and that is

10   currently being reviewed.  And I was really happy to

11   hear this week that an increase in personnel at the

12   Academy is going to happen, because training is

13   obviously a huge issue with the whole entire CASA.

14            THE COURT:  Chief, let me interrupt you

15   again.

16            MR. ERIC GARCIA:  Yes.

17            THE COURT:  Excuse me.  But just for

18   everyone's benefit, the Compliance Plan you're talking

19   about was filed last night.  It's Document 358.  It's a

20   far-ranging plan, progressive I think.

21            MR. ERIC GARCIA:  Yes.

22            THE COURT:  It was something that I had asked

23   for when we were together in November, I guess, to

24   address specific concerns.  And it's an attachment, I

25   think, to that Document 358 that you're going through

1  with us now.

2      MR. ERIC GARCIA:  Yes, Your Honor.

3      THE COURT:  So this is all available to the

4  public, and you ought to study it, or you certainly can

5  study it in more detail.

6      MR. ERIC GARCIA:  Yes, Your Honor.  And on

7  that note, we welcome input from the public.  I don't

8  want any surprises.  I'd like to work with the

9  community to get the Compliance Plan in shape and to

10  improve it, instead of, like in the past, the only time

11  we hear from the Department or see anything put out

12  would be at a status hearing.  I think that's the wrong

13  approach.  I think we need to be open, transparent.

14  And I think we need to work with the community and

15  listen to them and implement their recommendations in

16  this plan, and we have already started to do that.

17      So like I said, every six weeks, at a minimum,

18  we want to meet with the public to get their input, and

19  also to give them kind of a progress report on where we

20  sit.  Because I know not everything is going to be good.

21  We are going to have good and bad.  Sometimes we may not

22  make a deadline.  If we don't, I want to explain why,

23  and I want to explain what we are going to do to correct

24  that.  So it's an ongoing process, Your Honor.

25      Like I said, Commander John Sullivan at the

 1    Training Academy is in charge of the operations, is the

 2    single person responsible for that.  Specific deadlines

 3    are there.  He has got things off to a good start at the

 4    Academy, with that training process.  I doubt we're

 5    giving him the personnel to be able to do his job

 6    efficiently.

 7            Included in the Academy is, like I said, a

 8    seven-step training process, Your Honor.  He has also

 9    developed a process to determine the transfer of

10    knowledge, because we have to make sure that our

11    personnel, from our line officers to our supervisors,

12    understand the policies and understand the training, and

13    we've got to be able to measure that they understand

14    that.  Commander Sullivan is developing a process to

15    determine that transfer of knowledge.

16            He's also working with -- he developed a

17    modified Civilian Police Academy, CPA for Police

18    Oversight Board, the Citizens Police Oversight Agency,

19    and the CPC members, Community Policing Councils.  And

20    there have been a few issues, obviously, with the CPA

21    that have been brought to our attention.  Commander

22    Sullivan is addressing them.  As a matter of fact, we

23    have reached out to set up a meeting -- hopefully

24    tomorrow, if possible; if not, early next week -- to

25    address their specific concerns because I don't believe

1     their concerns were addressed with them in the past.  Or
2     weren't addressed adequately.  I'll put it that way,
3     Your Honor.
4           Number 4.  The fourth area of our Compliance
5     Plan is supervisor use-of-force investigation,
6     identifying process failures.  One of the big items
7     there is improve the Force Review Board process.  We're
8     having to revamp the Force Review Board.  We have a new
9     commander by the name of Chris George, who was the
10    administrative lieutenant for the Force Review Board,
11    who has now been tasked as the responsible person to
12    identify uses of force to the Force Review Board,
13    revamping the Force Review Board for the new process.
14    He's also going to be creating a handbook for each
15    member of the Force Review Board.  Because, as we've
16    seen in the past reports, the Force Review Board has
17    been deficient.
18          Number 5, Your Honor, is the use-of-force
19    training, which is a huge task.  That's going to be
20    undertaken by the APD Advanced Training, the Training
21    Plan, between Advanced Training and the Internal Affairs
22    Force Division, a new division we've created.  So
23    creating that, working alongside each other, will be
24    Commander John Sullivan and Commander Rob Middleton, to
25    ensure that we have a training plan for the use-of-force

1    training.

2            And Number 6, our amici concerns, several

3    concerns that were brought to our attention last year,

4    back in November, such as the McClendon subclass

5    concerns, the CPOA and the POB members, issues with

6    evidence.com.  We're working on that.  We have spoken to

7    Director Harness from the CPOA, and we're going to be

8    addressing his issues of concern, especially dealing

9    with his access and his administrative rights with

10   evidence.com.

11           And one thing that was brought to our

12   attention, as well, was the Community Policing Councils.

13   Mr. Sylvan has been doing a lot of the work himself on

14   those.  We realized quickly -- I think it was last year,

15   actually -- that they needed a dedicated administrative

16   support personnel.  Currently, that administrative

17   personnel that is hired shares the duties between the

18   MHRAC, the Mental Health Response Advisory Committee,

19   and the CPC Councils.  We're going to change that.

20   We'll have a dedicated administrator for MHRAC, and

21   another one specifically dedicated to assist Mr. Sylvan

22   in his duties with the Community Policing Councils.

23           Like I said before, Your Honor, the Compliance

24   Plan is a living, working document.  I want to continue

25   to meet with the public, the parties, and the amici.  I

1    want to update everyone on our progress.  I want to

2    continue to gather their input.

3         In addition to the meeting that we're going to

4    be having on the Citizens Police Academy, we'll also

5    reach out to the Community Coalition to address some

6    additional concerns that they have with use of force.

7    That meeting is scheduled for tomorrow morning, Your

8    Honor, and that's going to be a standard type of process

9    with us.  If the community has a question or a concern,

10   I want to hear from them.  My staff and I are going to

11   meet with them.  We'll bring in the necessary subject

12   matter experts in that area to speak to them, to give

13   them an explanation.  If they have input in policy,

14   anything of that sort, we want to be sure and get their

15   input.

16        Also, I would like to thank Dr. Ginger.  He

17   has provided a lot of support for me and our whole

18   Bureau effort in performing.  We collaborated with Dr.

19   Ginger on meeting our goals, objectives, and measures.

20   As a matter of fact, he provided technical assistance to

21   all of our project leads on Tuesday morning, I believe,

22   at the main police station, on developmental process, so

23   that our new stakeholders understand and our new project

24   leads understand that we do have to develop processes.

25   It's not a "check the box."  It's a process that needs

1    to be put in place to address all the issues in the CASA

2    so that these reforms stay forever, to make us a better

3    Police Department, obviously, and work better with our

4    community.

5            I think, Your Honor, we believe that so far

6    our efforts and the efforts of the new administration

7    and the new Mayor and the new CAO, they demonstrate our

8    commitment to reform; and we believe, at least, it's a

9    significant change from the past.  And moving forward, I

10   think this is the way we need to work.  We need to work

11   together with the Independent Monitoring Team, the

12   Department of Justice, and the community, to be sure so

13   we can meet all of our goals and, like I said, make us a

14   better Police Department.

15           And that concludes my presentation, and I'm

16   open for questions, Your Honor.

17           THE COURT:  I don't have any, Deputy Chief.

18   Thank you very much.

19           Mr. Killebrew.

20           MR. PAUL KILLEBREW:  Thank you, Your Honor.

21           I said a lot today about the trade-offs, and

22   I'm very happy to say that when it comes to this

23   Compliance Plan, there are no trade-offs.  This is all

24   positive.  I am just delighted.  Well, there is one

25   trade-off, which is that Lieutenant Cori Lowe now dreams

1    in spreadsheet because she lives this thing.

2          But this document, you know, when the Court

3    proposed this and ordered the parties to develop one,

4    ordered APD to develop one, I think what we all hoped

5    was that this would help us all see what APD is really

6    doing day-to-day and hold them accountable for that.

7          What it has become, though, is something much

8    better, much broader, and much more important to APD.

9    It's becoming a true planning document.  They're really

10   thinking through carefully what are the steps that we're

11   going to take in order to come into compliance; what

12   order do these steps need to come in; and when are we

13   going to get these things done.  And that is the kind of

14   thought process that we simply weren't seeing in the

15   same way before.  So I just commend them for taking the

16   Court's order and really seeing the potential there and

17   grabbing that potential and making something with it.

18         So, as the Deputy Chief said, this is a living

19   document.  This is a document that I think this entire

20   week, when I've gone to APD for meetings, I walk into a

21   room, and it's up on a big screen, and Lieutenant Lowe

22   is sitting there at the typewriter, and everyone is

23   sitting there talking about:  Okay, what do we need to

24   tweak here?  What do we need to move there?

25         Because this is what planning looks like.

1  Planning is about projecting into the future, and then

2  making adjustments as you learn more.  And that's

3  exactly what they're doing.

4          And so what we expect of this Compliance Plan

5  is, yes, there was one version filed yesterday as

6  Document 258-1, but that document is already different

7  today, I would expect.  They're going to continually be

8  refreshing it as they make changes, as they learn more,

9  and then updating the parties and the Court about the

10  progress that they're making.

11          I wanted to clarify a couple of things about

12  how we got to where we got on the documents filed.  A

13  couple of weeks ago, consistent with the Court's order,

14  the City provided a draft of the Compliance Plan to DOJ

15  and the Monitor and all the amici and stakeholders, so

16  everyone had a chance to look at it and to give some

17  feedback.  And these three meetings that we had with

18  stakeholders were about this Compliance Plan, as well.

19          There was one consistent theme from everyone

20  in terms of feedback, which was that APD had set far too

21  much for itself to do in the original draft.  The

22  original draft had not only all the areas of deliberate

23  non-compliance; it also had every amici concern and all

24  the Monitor recommendations.  The original draft didn't

25  have a deadline in there.  There weren't many deadlines

1    that went past April, and so they were setting --

2    proposing to do the entire case in the next couple of

3    months.  And that, we all just recognized, was going to

4    be -- you know, we appreciate the ambition.  But at this

5    point, what we think APD really needs is to be realistic

6    about what it can accomplish and how much time it's

7    going to take to do these things.

8            So everyone's recommendation was:  Hey, let's

9    cut down how much we're trying to take on; and with

10   what's left, let's extend that through the next six

11   months, all the way through the end of July.

12           And so the next draft that we saw, the one

13   that was filed yesterday, it actually removed whole

14   subject areas.  So you have to look at the Compliance

15   Plan that was filed as 358-1 along with the cover

16   pleading that was 358, because the cover pleading

17   identifies specific areas that were taken out of the

18   Compliance Plan.  And it's not that APD is never going

19   to do that stuff; they just can't do it now.  And that's

20   entirely reasonable.  So they're going to put those

21   topics off for a future Compliance Plan.

22           Those are the things that they will start to

23   do once they can get to them.  They needed to triage and

24   figure out the most important issues first, and they

25   made decisions about how to triage that I think were

1    entirely reasonable; addressing the backlog, for

2    example.  We can't move forward without clearing out all

3    of the pending use-of-force investigations, and they

4    have a plan for getting that done.

5         There's other things that APD has been working

6    on in response to feedback that are really important.

7    The Monitor noted when he got the draft that APD has a

8    lot of information on this plan, but there's some big-

9    picture pieces that it doesn't have, goals and

10   objectives; the goals being, we want to clear the

11   backlog within 12 months; the objectives being, we're

12   going to make this amount of progress each month, and

13   breaking it down into specific objectives.

14        And so APD has begun creating another document

15   that includes these goals and these objectives.  The

16   draft that I saw earlier this week was very high

17   quality.  It reflected a lot of thinking on how to break

18   down all that remains going forward into specific goals

19   that link up to specific objectives.  And what's really

20   cool is that then you can link up the objectives to the

21   tasks on the Compliance Plan, and you can say, "Wait a

22   second.  You don't have a task to meet this objective,

23   which means you won't meet your goal."

24        And so then they will know that they need to

25   go back in and figure out what tasks are going to be

1    necessary to meet those objectives.

2              So that goals and objectives document is still

3    a work in progress, but we've encouraged the City,

4    because once it's camera ready they should file that, as

5    well, for the Court and the public to see so that we

6    can, again, get a very clear picture of what they're

7    doing.

8              And the other thing they have is an internal

9    document.  It's something that links all of the tasks

10   that are in the Compliance Plan to specific requirements

11   of the CASA.  Now, that seems sort of obvious, but

12   what's great about it is that in effect, they will be

13   able to project their own levels of compliance into the

14   future.  They will know in six months this is where it

15   should be, because we're going to be doing these tasks

16   that link up to these CASA requirements.

17             And so then, if they can make an intelligent

18   projection about what compliance level they should be

19   at, they can do an assessment if they don't hit that

20   objective, and figure out what's going wrong in their

21   systems and what needs to be improved so that those

22   projections are correct in the future.

23             So I am really excited about where they're

24   going with the Compliance Plan.  I am really excited

25   that they're going to be reporting on the Compliance

1    Plan to the Court.  The document suspending Paragraph

2    308 talks about two interim status reports that the City

3    and the Monitor will file, and in those status reports

4    the City will report on its progress in implementing a

5    Compliance Plan, and they're going to tell us, and I

6    encourage them to do so with great candor, the deadlines

7    they're hitting and the deadlines they're missing and

8    why they're missing deadlines, so that we can identify

9    problems early and address them.

10          I'm excited to see those reports, and I do

11    hope that the City is honest with everyone about

12    problems that they're having.  And we don't expect

13    everything to go perfectly.  As I've heard it said

14    before, we don't expect them to be angels and be

15    perfect; but we do expect them to be saints and be

16    honest.  That's what we're looking for from them.

17          I'm just going to check my notes and make sure

18    there's nothing else.  I think that's all I have on the

19    compliance, but I'm happy to answer any questions, Your

20    Honor.

21          THE COURT:  I don't think so.  Thank you,

22    Mr. Killebrew.  I appreciate that.

23          Mr. Mowrer, and then we will hear from Dr.

24    Ginger.

25          MR. FREDERICK MOWRER:  Thank you, Your Honor.

1            Very briefly.  I saw you leaf through the

2     latest version of this.  To say it's ambitious is to say

3     the least, and we stand with the Department to try to

4     accomplish the goals laid out in this Compliance Plan

5     because we believe that if we are successful in reaching

6     those goals, whether we reach them at the target date or

7     we reach them later on, it will benefit not only the

8     citizens of this city, but it's going to benefit the

9     employees in the Department.

10            Thank you.

11            THE COURT:  Absolutely.

12            Dr. Ginger.

13            DR. JAMES GINGER:  Thank you, Your Honor.

14            I echo the DOJ's comments on current process

15     on planning, organizing, and moving work product at APD.

16     The goals, objectives, and timelines process that we've

17     talked about today were actually provided to the old APD

18     early in its process, but this is where the rubber has

19     started to meet the road.  And what DC Garcia has laid

20     out here today is the foundation of modern planning

21     processes at APD, which is one of the things that in the

22     past, in past reports, we've noted as being somewhat

23     problematic.

24            So we laud APD's progress on this point, and

25     at this point.  The Planning Unit that Chief Garcia

```
1    leads has done a whole bunch of work in a very short
2    period of time to get to the point that they now have a
3    picture, so to speak, of what lies in front of them;
4    some indication of which things need to be done first
5    and which things need to be done later; and, more
6    importantly, an ability to visually see, all right,
7    we've got six tasks assigned to this analyst and two
8    tasks assigned to this analyst and 14 tasks assigned to
9    this analyst.  And so now we'll be able to start to
10   equalize workload.  We'll be able to manage timelines.
11             And I commend them for this work.  I think
12   it's foundational for moving forward on the CASA.
13             THE COURT:  Thank you, Dr. Ginger.
14             That concludes through Item Number 5 on the
15   agenda, and we go from there to comments from the amici.
16             We're going to hear first from Mr. Cubra.
17   There he is.
18             MR. PETER CUBRA:  Thank you, Judge.
19             THE COURT:  Yes, sir.  Of course.
20             MR. PETER CUBRA:  Let's start with this.
21   There are 15,000 people who I represent each year who
22   have mental disabilities, that go to our jails, in the
23   McClendon lawsuit.  And on behalf of all of them, thank
24   you for sticking with this case.  I get how hard that
25   is for you.  And honestly, I want to say the same thing
```

1    to Dr. Ginger.  Thank you for sticking with this case,

2    because it now has a chance of being successful.

3            And so it's a great pleasure to be here today,

4    talking about what these new people are doing and the

5    new things they are doing.

6            On the McClendon front, I just will do the

7    perpetual bit of, the Settlement Agreement between us

8    and the City has moved forward very well under the new

9    administration.  The last administration, about 37 hours

10   before they went out of office, adopted certain standard

11   operating procedures, based on our Settlement Agreement,

12   in a way that rejected much of our input.

13           This new administration agreed to ask Judge

14   Parker to give them an extension of time, and the

15   Interim Police Chief, Mike Geier, and Deputy Chief

16   Garcia and the lawyers all sat with us, and just in the

17   last couple of days they have sent us revised standard

18   operating procedures that have addressed many, many of

19   our concerns.

20           It's like dealing with different people.  It's

21   like dealing with another entity.  They are reasonable,

22   thoughtful, paying attention to the community's input as

23   we've tried to express it.  And so it is night and day,

24   the experience we are having with these people at this

25   time.

1          The Chief Administrative Officer set a meeting

2     with me days after I saw you the last time.  Even

3     before, she had it done on her own time.  She did that.

4     And then when I walked in here today, the Mayor and

5     Mr. Lewis both walked up to me to say, "Can we have a

6     meeting with you?"

7          Now, these are public servants, and they're

8     doing it right, and it makes all the difference.  And so

9     at the highest level, Judge, I've been at this since

10     1984, working on system reform lawsuits.  And the ones

11     that worked all have these things in common.  There is a

12     defendant or a set of defendants who actually believe in

13     the outcome, who are actually trying to achieve the

14     outcome.  And honestly, Judge, the other thing that

15     makes them work is a judge who pays careful attention to

16     the case and works very hard.

17          So we are situated for this case to be a

18     success, and I just want to thank everybody involved for

19     what they're doing.

20          There are some specific things I wanted to say

21     about the process.  It feels to me like the person in

22     charge of this operation has a master's in business

23     administration from the Harvard Business School.  They

24     are going about -- and which Tim Keller has.  They are

25     going about this in a methodical, careful, planful,

1  written way which allows them to be accountable to

2  themselves and allows you to hold them accountable, and

3  it's really great news.

4         Now, we talked last time about the technology

5  of doing these cases and how a Compliance Bureau or a

6  division or office is essential, and a Compliance Plan

7  is vital, and they have undertaken both.  In all

8  honesty, this is happening in such a rush, I think it's

9  premature to declare the way that they're doing some of

10 the detail is precisely right.

11        Honestly, the Compliance Plan that I got this

12 morning, and I didn't get to cross-reference with the

13 draft that I got the other day, I'm not sure that I

14 agree that it's a good idea to set aside certain

15 important parts and say, "We don't have a plan at this

16 time to address them," but to make a list of them and

17 say, "We will make some kind of plan about these in the

18 future."

19        It's what Mr. Killebrew talked about in the

20 method.  I get why you don't want a plan that has too

21 much to do between now and July.  But in a lawyerly

22 nuance, the document that covered this Compliance Plan,

23 Document 358, what it actually says at Page 3 is, "Where

24 the compliance plan proves to be an effective modality

25 for planning and executing on the requisites of reform

1    the following recommendations may be set out in the next

2    compliance plan."

3              And so, you know, lawyers are suspicious, and

4    so I didn't read that as a promise that there will be a

5    future Compliance Plan, nor that these things would be

6    set out; but rather, that they may.  And so, you know,

7    it's my role to keep an eye on both of these parties and

8    to make sure that what happens is what they say will

9    happen.

10             So for the time being, I want to say this

11   Compliance Plan is a good start.  I think it needs to be

12   enhanced so that we do project out six months, twelve

13   months, and two years.  Reasonable professionals can

14   disagree about whether that's the preferred methodology,

15   as Mr. Killebrew has stated.  And I respect very much

16   the work he's doing here.  He thinks it's best to do it

17   in six-month chunks, but that's not the way I've done

18   it, and it's not the way Judge Parker does it in his

19   class actions.

20             And so I question whether we ought to at some

21   point soon lay out in a more accountable way the

22   outlying obligations, even if we don't get into detail

23   yet, and just put in placeholders that say that here's a

24   list of nine things that we will address in July or

25   August, and make it a commitment instead of a less than

1    ironclad commitment.

2            So that's my thought about the Compliance

3    Plan.

4            And the Compliance Bureau, they picked the

5    right person to lead it; Lieutenant Lowe is quite

6    impressive in the way she's doing what she's doing.  But

7    it remains to be seen whether this Bureau will become

8    effective, because they're just not there yet.  They

9    will need bodies.  They will need enough hours of person

10   power.  They will need a little bit of technology in

11   order to have these plans that they are setting out turn

12   into a quality management system.

13           Because right now, we've got a bunch of good

14   ideas and some goals and some objectives.  But really,

15   the key part of these bureaus and offices and divisions

16   is, once you think you've accomplished something, you

17   have a system to go back and look and see how you're

18   doing, and then look again and look again.  Because

19   things fall apart really easily in big bureaucracies.

20           And so they're off to a great start.  I'm not

21   criticizing anything they are doing, but I'm just saying

22   it's way early to know if it's going to work.  And

23   adequate resources will be essential, and I don't quite

24   know what their resources are.  I don't think they know

25   what their resources are.

1          And so it's wonderful where we're at, but it

2     could still not work if it's not adequately resourced by

3     people who actually have some experience doing this.  So

4     don't hear that as anything negative, but it's a

5     precautionary note that a good first step does not mean

6     that we're going to have a good trip.

7          At some point they need to reduce to writing

8     some ideas about how they're going to do it, and then

9     disseminate it to us stakeholders, and we'll give them

10     some feedback, and then they should have written detail.

11     The Compliance Plan, as I understand it, does talk about

12     that, that there's going to be a standard operating

13     procedure.

14          So it could very well turn out perfectly, but

15     we don't know yet.

16          The technical assistance part, I honestly was

17     surprised by one thing that Dr. Ginger said, and that is

18     that he thinks that he can do two tasks simultaneously,

19     with sufficient intensity to get the job done, with the

20     existing budget.  That didn't make sense to me, because

21     the TA that is needed and that I understand to be

22     underway over these next six months is so substantial

23     that they can't do their regular job.  But the thought,

24     apparently, is six months out, they will be able to

25     continue the intense TA that's essential and do their

1    regular job.  And so there's just an illogic, in my

2    mind, about that.

3         I had thought, coming into this event today,

4    that you would hear from Dr. Ginger that in order to do

5    this kind of intense TA over time and to do his regular

6    mission of monitoring and reporting, that he couldn't do

7    it within his budget.  And we all know that this City

8    has a big budget problem, and we all know that Dr.

9    Ginger appreciates so much that people who are really

10   trying hard and are smart are now in charge.

11        But I just want to offer you my own

12   observation.  It seems like they'll be stretched very,

13   very thinly, and perhaps beyond their ability to do both

14   well, if they don't have any additional resources in six

15   months.  So my enormous respect for Dr. Ginger makes me

16   loathe to say anything different than what he says, but

17   I just have to call that ball and strike the way I see

18   it, and I wonder.  So there's that.

19        So I would like to know and I think many of us

20   in the community would like to know more information

21   about which members of the Monitoring Team are doing

22   what with whom during this hiatus of the regular

23   reporting.  Because I have only the vaguest idea of

24   who's doing what, and I know many of us would appreciate

25   having a better understanding of what are the topics and

1   what are the tasks and who's doing it.

2          There's a big Monitoring Team and there are a

3   lot of people on the defendant's side, and I don't have

4   a feel for this elephant of what the TA looks like, and

5   I don't think anybody among the stakeholders, who are

6   not parties, has a good understanding of it.  And we

7   would just get comfort from having a better

8   understanding of what we're getting during this

9   six-month hiatus on reporting, for what that's worth for

10  you and Dr. Ginger to consider.

11         So the last thing that I want to say is that

12  you raised some questions about whether doing the

13  technical assistance simultaneous to doing the reporting

14  is typical, and you asked whether or not in these other

15  police cases that's been typical, and I understood

16  people's answers to be:  It's not.

17         But I think I want to try and give you these

18  words of reassurance, that in most of the class action

19  and system reform projects I've worked on, it's very

20  common.

21         Now, this is the courtroom where Judge Parker

22  held the Jackson trial in 1988, 1989, and 1990.  And

23  here we are, still trying to reform that system.  So I'm

24  hoping things go better here than that.

25         But I do want to say it this way.  We have

1    incrementally had more and more activities by Court

2    agents.  And so he uses a person who he calls the

3    Compliance Administrator, which is more than Monitor and

4    less than Receiver, and that person does both, gives TA

5    on a regular basis, outside the presence of this party,

6    with the defendants, and then sits down and gives them a

7    report card later.

8          And I think it can be done, but we all have

9    to, with an open mind and an open set of eyes, recognize

10   there's the intrinsic tendency for people to be kinder

11   to the people they've been nurturing than they would be

12   if they're not nurturing them.  And so I think that Dr.

13   Ginger gets that, and I think that it's going to work

14   out fine.

15         And in the prison conditions case that Judge

16   Burciaga and Judge Conway did, the Duran Consent Decree

17   case, the same thing.  The Special Master and his

18   consultants, they did TA and reporting.  And I think

19   it's fine, and I don't think it's going to turn into a

20   problem.

21         And so that's my little presentation.  Oh, I

22   guess I did want to say this.  The policy development

23   process that has been talked about, this new SOP, I

24   think it is probably less confusing and entangled than

25   the last one, and I think it's highly confusing and

1    entangled.  And so I did suggest in a letter that

2    Dr. Ginger ought to help them think of the way to roll

3    out policies that balances out efficiency and inclusion

4    in a better way, because I think this is still too many

5    cooks, and we'd like the broth to be good.

6            THE COURT:  We would, indeed.

7            MR. PETER CUBRA:  I appreciate you very much,

8    and thank you for the time.

9            THE COURT:  Thank you, Mr. Cubra.  I

10   appreciate your help too.

11           When I got here a while ago, Judge Parker

12   wasn't here.  I was looking for him, my good friend and

13   mentor.  I don't get a chance to see him much.  He had

14   walked over to the jail to take a tour and meet a new

15   administrator or something, as a part of his ongoing

16   work in your matter.

17           MR. PETER CUBRA:  You two have a lot in

18   common.

19           THE COURT:  So, Dr. Ginger, there were some

20   questions posed by Mr. Cubra.  When we conclude or when

21   we get through with these presentations, I'll let you

22   kind of address individual concerns as they come up.

23   You're making notes.  Good job.  Thank you.

24           Next is Dean Mathewson and Mr. Maestas and

25   Mr. Arellanes.  And Ms. Bautista is here, as well.

1    I'm sorry.  Would you let Julie, the court

2    reporter, know who you are.

3    MR. ALFRED MATHEWSON:  Yes.  I'm Alfred

4    Mathewson.

5    MR. ANTONIO MAESTAS:  Thank you, Your Honor.

6    I'm Antonio Maestas.

7    THE COURT:  And you're Mr. Arellanes?

8    MR. RALPH ARELLANES:  Yes.

9    MR. ALFRED MATHEWSON:  Good afternoon.

10   So the reset, I would say that we are pleased

11   to see the reset, if for no other reason than the change

12   in tone, the transparency that we are receiving, and the

13   sense that we're being listened to.  We are concerned,

14   though, three and a half years into the process, and the

15   community had significant trust concerns when we

16   started, and our concern is that by starting over again,

17   if it gets thrown out, the trust concerns will grow

18   rather than be reduced.

19   One of the things that we raised back in May,

20   that I'm not going to address, just mention, the

21   standard operating procedure does open its process up to

22   allow community organizations and individuals who are

23   not represented by lawyers participate, and that's

24   something that we were pleased to see.  We still would

25   like to see the court process be opened up, as well, and

1    we will have conversations with the parties between May

2    and November to see what we come back with.

3            But one of the things, the reason that we are

4    sharing our time with representatives from our

5    organization, as lawyers, we get to speak, but we think

6    that the Court should hear from members of the community

7    to express their concerns and you can see the depth of

8    the trust concerns.

9            In terms of the reset, one of the things, that

10   is happening very fast, and there are lots of documents

11   and lots of filings recently, and we are still

12   reassessing, trying to understand them.  So we'd like

13   the reset, but we are still trying to evaluate and

14   assess it, and part of that is in the documents.

15           So one of the concerns that we have on use of

16   force dealt with the use of tasers, and we are trying to

17   still understand this one.  We can present, tell you

18   what we do understand.  And it's also true, as Chief

19   Garcia said, we are going to meet with the parties

20   regarding this so that we have a better understanding

21   and see if the issues can be addressed.

22           But specifically in terms of the tasers, and

23   this came up in the discussion in the meeting on March

24   8th dealing with the different levels of abuse in terms

25   of the three levels now of force, the review.  And the

1    use of tasers was a second-level review, and it took

2    three uses, three shots of the taser to trigger a

3    third-level review.  Well, the tasers are weapons.

4    Someone has been shot.  And our sense was, if you have

5    these different levels, to say that one shot is a second

6    level and three is a third level, the messaging about

7    how serious the use of a taser is.

8           The bigger issue that came up was the taser

9    manual and whether the officers were being trained to

10   use tasers consistent with the taser manual.  And

11   Mr. Arellanes is going to address this on a personal

12   side, but it had to do with whether or not, as we

13   understood it, the officers were being trained to shoot

14   at the upper chest area.  And Mr. Arellanes recalls

15   reading a taser manual that said you shouldn't do that;

16   you should aim the taser at a lower portion of the body.

17          And so we did have the manual available, and

18   it wasn't clear that the manual had been read by those

19   who were training the officers.  And so for us,

20   certainly Taser International has a manual for how it

21   should be used.  The training ought to be consistent

22   with it.

23          I did, over the weekend, Google it and review

24   two or three manuals over the weekend, and it does

25   depend on the model.  And I don't remember what model

APD is using, but there are instructions, and there was
at least one manual which did contain one similar to
what Mr. Arellanes will raise. So that's a concern.
But also, the City and the parties have agreed to sit
down and talk with us about this so that we can get a
better understanding, to see exactly what has happened
with that, and to make sure that we're on the same page.

THE COURT: Dean, when is that meeting
scheduled?

MR. ALFRED MATHEWSON: We're trying to
schedule it tomorrow. It was initially set for 9:00 in
the morning, but I have a constitutional duty tomorrow
so I can't be there, and so we're trying to reschedule
it for the afternoon.

THE COURT: Well, I expect that whenever that
meeting occurs, tomorrow, early or late, or early in
the next week, these questions will be answered in
terms of what the Academy has taught historically; what
the Academy is going to teach now, if it differs; and
what their manual is and what model it is.

You're going to have all of those questions
answered for you at that meeting, no doubt.

MR. ALFRED MATHEWSON: So what I want to do
is have Mr. Arellanes speak, again, in terms of how the
community is being addressed, because this goes to the

1    trust issue.  This is the concern.  This is how it's

2    viewed by them, and not just how it's viewed by the

3    lawyers.  Thank you.

4              MR. RALPH ARELLANES:  Thank you.  Good

5    afternoon, Your Honor, and thank you for all your

6    dedication to this process, and your time.

7              As you know, my name is Ralph Arellanes, and

8    I'm the Executive Director for New Mexico LULAC, and I

9    am the Chairman of the Hispano Round Table of New

10   Mexico.

11             During our meeting on March the 8th, last

12   week, members of the amici met with the Mayor's Office,

13   his staff, the U.S. Department of Justice, APD brass,

14   City Attorneys, APD Union leadership, and many other

15   City officials.  We were discussing the use of

16   electronic control devices, which are better known as

17   taser weapons.

18             THE COURT:  Mr. Arellanes, forgive me.  I

19   know Ms. Goehl, the court reporter, is thinking, "I

20   can't type this fast."

21             You know, when you read something, you tend to

22   speak more quickly than when you just are not reading.

23             MR. RALPH ARELLANES:  Okay.

24             THE COURT:  So if you'll slow it down just a

25   bit, it will help her.

1          MR. RALPH ARELLANES:  With all due respect, I

2     will slow down, but I was given two minutes.  So I'll

3     slow down.

4          THE COURT:  Oh, and so that's a built-in

5     dilemma.  You know, you give him two minutes, and

6     you've got a lot to say.  I get it.  You've got to talk

7     fast.

8          MR. RALPH ARELLANES:  You gave me two minutes.

9          THE COURT:  All right.  I'll give you three

10    minutes.

11         MR. RALPH ARELLANES:  Thank you, Your Honor.

12         THE COURT:  Yes, sir.

13         MR. RALPH ARELLANES:  I'll probably have to

14    buy one more.

15         So we were discussing the use of electronic

16    control devices, or better known as taser weapons.  As

17    we were discussing use of force, I asked the question,

18    "What part of the body do you fire your taser guns?"

19         Their collective response was, "We shoot for

20    the upper torso or upper body mass."

21         I immediately responded -- because I have a

22    lot of experience with it and a family issue with it.  I

23    immediately responded, "What?"  I said, "You cannot tase

24    a person above the waistline, especially with the X26

25    tasers, which is what APD uses."

1      I told them, "According to Taser
2  International's training manuals and standard operating
3  procedures, you cannot tase a person above the waist,
4  nor in the groin area. This is a lethal weapon that has
5  killed thousands of people."
6      Then I asked all of them in the meeting, "Have
7  any of you even read the training manuals on the proper
8  use of taser guns from Taser International?  The company
9  spends millions every single year that you purchase your
10  taser guns."
11      Their collective response was "No," they had
12  not read the manuals.  Not a single person in the room
13  had read the standard operating procedures published by
14  Taser International on the proper use of taser guns,
15  even though we're sending them millions of dollars per
16  year.
17      I cannot believe nor comprehend that we have
18  been fighting this issue for over 11 years now, Your
19  Honor; in my family, since 2007.  And after millions and
20  millions of dollars the City pays for taser weapons and
21  lawsuits, and none of them have read the proper use-of-
22  force procedures to apply taser weapons, mandated by
23  Taser International, the very company they purchased
24  their tasers from.  They haven't even read them.
25      We are basically starting from ground zero,

1    Your Honor, and Mayor Keller has a very long way to go

2    in order to fix these problems.  Right now, every

3    citizen in New Mexico is in great danger because of

4    their incompetence and lack of training in proper use of

5    taser guns, a weapon of human torture.

6          LULAC and the Hispano Round Table of New

7    Mexico have long advocated that the use of taser weapons

8    should cease immediately.  The United Nations has

9    classified these weapons as a weapon of human torture.

10   At a minimum, Your Honor, the use of tasers should stop

11   until officers are properly trained.

12         Lastly, Your Honor, I have written to you

13   before about the fact that the Albuquerque Police

14   Department is following me and several members of my

15   family around town.  This harassment continues.  Last

16   night, they passed by my home at least a dozen times.

17   That's intimidation.  The evening of our March 8th

18   meeting, they were shining their spotlights into my

19   home.  This is the exact same thing they did while we

20   were going through our lawsuit against the City back in

21   2007 to 2010.

22         If they are under-manned, why do they have the

23   time to harass citizens?  They are profiling me and my

24   family for the work we are doing through this process.

25   I have to believe that those present at our meeting last

1    week are very much aware of this conduct.  We ask you

2    for your support, Your Honor.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.

5              Deputy Chief, I'll want a response to that

6    particular allegation later this afternoon, and

7    certainly I'll have you address it with them at the

8    meeting tomorrow, your official Department response.

9              MR. ERIC GARCIA:  Yes, Your Honor.

10             THE COURT:  Thank you.

11             MR. ANTONIO MAESTAS:  Thank you.  I'm Antonio

12   Maestas.  Thank you very much, Judge.

13             The amici are overjoyed with the new

14   leadership team, the City, and the DOJ.  But if I may, I

15   want to read from the findings letter, if I may be so

16   bold, Judge.  In fact, I know we all know it, but I'll

17   read the relevant part:

18             External oversight is broken and has allowed

19   the Department to remain unaccountable to the

20   communities it serves.  Based on our investigation, we

21   find that the Department engages in a pattern or

22   practice of using excessive force during the course of

23   arrests and other detentions, in violation of the Fourth

24   Amendment of the United States.

25             And the seizures that were unconstitutional

1    ceased the life of people.  People were killed.

2            And the findings letter goes on to say:

3            We reviewed all fatal shootings by officers

4    between 2009 and 2012 and found that officers were not

5    justified under federal law in using deadly force in the

6    majority of those incidents.

7            And so we look back on 2010, 2011, 2012, where

8    this city was, and everyone was in denial, you know.

9            And so the findings letter talks about:

10            Although a significant amount of the force we

11    reviewed was used against persons with mental illness

12    and in crisis, the use of excessive force by APD

13    officers is not isolated or sporadic, and that chief

14    among these deficiencies are the Department's failure to

15    implement an objective and rigorous internal

16    accountability system.  Other deficiencies include

17    incoherent implementation of community policing

18    principles.

19            And so even though this stuff has definitely

20    improved, it's our clients' opinion that these processes

21    are not in place.  And so as you recall, Judge, we

22    represent various organizations that are involved in

23    immigration work, community work, work with youth, work

24    with various folks, environmental justice, and they have

25    years and years of organizational experience and

1    relationships here in Albuquerque.

2         So what we'd ask the Court and the bodies is

3    to -- and our paragraphs basically are 215 and 298.

4    215, the early intervention system, acknowledges and

5    keeps demographic data for each officer.  For each

6    individual officer, it keeps demographic categories, for

7    each civilian that these incidents occur with.

8         But when you look at 298 -- or rather, Judge,

9    just for the record, in Paragraph 292, Subparagraph (b),

10   it says "demographic category of complainants."  I don't

11   think "demographic category" is defined.  I'm sure

12   there's understandings amongst the parties.  But when

13   you talk about 298, use-of-force measurements,

14   specialized units, recruitment measures, it talks about

15   "demographic category."  It just uses that word

16   "demographic category" about five times.

17        What we would ask is that since we're changing

18   the language, we use that opportunity to clarify

19   "demographic category" and add it to the demographics of

20   the officer, which is very easy to attain.  It's not

21   additional work that a lot of these paragraphs make the

22   officers do.  And so, for example, in the recruitment,

23   they keep data on whether that recruit speaks Spanish;

24   whether they have a degree; whether they came from

25   another agency.

 1           I think it's important for us, to truly have
 2     the best constitutional use of force in the country,
 3     that the police force have similar demographics to the
 4     communities that it serves; in particular, folks who
 5     either were born here or grew up here.  And so as APD
 6     evolves, we think that keeping these steps shouldn't be
 7     a problem.
 8           Assessment, Your Honor.  The word "assess" is
 9     a Latin word that literally says "to sit beside the
10     learner."  And so what we need is innovative assessments
11     of these things, and we've got to keep the data to have
12     these assessments.  And so even though the diligence of
13     APD is heightened, our scrutiny and our vigorousness
14     cannot wane, given the distrust and things of that
15     nature.
16           But in closing, we're very appreciative of the
17     new Mayor, the new Police Chief, and the folks who came
18     out of retirement.  The Deputy Chiefs are fantastic.
19     The City Attorney, who is committed to his client, but
20     he's also committed to the rule of law and what you
21     order his client to do.  And we're also happy that 16
22     months from the new administration's election until the
23     placement of the new U.S. Attorney for this district is
24     finally in place.
25           So we think that things are going in the right

1    direction.  We're also going to -- I don't know what

2    word to use -- recalibrate or regroup with regard to our

3    amici because we send out notices, and they come or they

4    don't come.  We're going to reach out individually to

5    each of them.  A lot of them are fantastic community

6    reorganizers, so we'll see if they want to organize

7    meetings and chair meetings; and then, to the extent the

8    City can, invite the City to those very meetings to

9    complement the work that the City is doing with regards

10   to their Community Councils.

11           So we'd like to hear for a couple of minutes

12   from Maria Bautista, who has concerns she wishes to

13   address the Court.

14           We want to thank the Court tremendously for

15   allowing citizens to be involved in a civil case, which

16   may be unprecedented, but it's because of your

17   creativity and your leadership, and we want to thank

18   you.

19           THE COURT:  Ms. Bautista.

20           MS. MARIA BAUTISTA:  Thank you.  Good

21   afternoon, Your Honor.

22           THE COURT:  Good afternoon.

23           MS. MARIA BAUTISTA:  My name is Maria

24   Bautista.  I want to acknowledge first the aggrieved

25   families who are responsible initially for these

1    proceedings.

2              I am concerned, Your Honor, about the lack of

3    previous oversight and sanctions by the Court and the

4    Department of Justice regarding the Independent Monitor

5    Reports 1 through 6.  Dr. Ginger indicated on more

6    than one occasion that there was deliberate

7    non-compliance.

8              No matter how hard rank and file worked, the

9    officers themselves were undercut by upper brass, and

10   their retention bonuses were taken.  APD was

11   understaffed because the money available for new

12   officers was used to balance the City budget.  There

13   were no reprimands or sanctions.  In fact, there were

14   rewards and acknowledgments, totally disregarding the

15   Monitor's concerns of deliberate non-compliance.

16             On May 4th, Your Honor, 2016, Dr. Ginger

17   informed the Court that APD was engaging in a policy of

18   do little, delay, and deflect.

19             As an advocate and a stakeholder, I must trust

20   the Court and DOJ.  You are the only recourse that we

21   have.  In this instance, Your Honor, justice failed and

22   crime escalated.

23             The co-conspirators included Mayor Berry, Rob

24   Perry, Jennifer Hernandez, Chief Eden, Deputy Chief

25   Huntsman, and others who participated willfully in the

1    deliberate obstruction of justice, and they were free,

2    Your Honor, to play their game and win.

3          We are here now in this delayed process

4    called, quote, "a reset."  This delay, after three years

5    of hard work by all parties, is the direct result of the

6    past administration.  And they were looking for money.

7    They conspired with one another to undermine and to

8    obstruct the terms of the CASA agreement by covertly

9    taping and recording the Monitor's comments during

10   meetings with APD, and they refused to comply, Your

11   Honor, with the Court order or even with their own SOPs

12   or their own rules of professional conduct.  Those were

13   criminal acts, and they violated the terms of the Court-

14   Approved Settlement Agreement, and there should have

15   been consequences.

16         And that's why the amici has a hard time

17   trusting.  Our commitment is firm, and our amici support

18   a continued process.  And we do look forward to working

19   with the new administration, and we do support Dr.

20   Ginger for that civility.  And I hope that this Court is

21   able to recoup some of the money that we lost over the

22   last three years and be able to assist the process going

23   forward.

24         Thank you.

25         THE COURT:  Thank you, Ms. Bautista.  Thank

1    you all.

2              MR. RALPH ARELLANES:  Thank you, Your Honor.

3              THE COURT:  Ms. Bautista just approached and

4    handed to us -- it looks to be just her remarks written

5    out.  I'm glad for you all to see it.  I didn't know

6    what it was.  You've got it now?  You all have seen

7    it?

8              MR. ESTEBAN AGUILAR, JR.:  Yes, Your Honor.

9              THE COURT:  Did you want to make this part of

10   the record, Ms. Bautista?

11             MS. MARIA BAUTISTA:  Yes, Your Honor.

12             THE COURT:  Any objection?

13             MR. ESTEBAN AGUILAR, JR.:  No objection.

14             THE COURT:  We'll call it Exhibit A to

15   today's proceedings.

16             (Exhibit A admitted.)

17             THE COURT:  Let me address Ms. Bautista's

18   concerns when we conclude today.

19             Now let's go to the Police Oversight Board,

20   POB, and CPOA.  Ms. Chelsea Van Deventer.  I'm sorry.

21   Is that a male?

22             MR. EDWARD HARNESS:  Actually, Your Honor,

23   it's just going to be the CPOA for both.

24             THE COURT:  All right.  Mr. Harness.

25             MR. EDWARD HARNESS:  Good afternoon, Your

1    Honor.  I'm here on behalf of the Police Oversight

2    Board and the Civilian Police Oversight Agency.  I

3    would like to acknowledge that we do have Ms.

4    Van Deventer and Dr. Bill Kass here from the Oversight

5    Board.

6            Dr. Martin Luther King, Jr., once said, "We

7    are not makers of history; we are made by history."  And

8    it is with that in mind that we move forward in this

9    process.  We support this stipulation presented to the

10   Court today because it's the only way forward that makes

11   sense to us.

12           There is a different climate at the

13   Department.  The ivory tower has collapsed, and we are

14   finally being heard.  The Board is thankful for the

15   efforts of APD to file the Compliance Plan, and we are

16   especially thankful for their streamlining and providing

17   a Citizens Police Academy for the members of the

18   community, of whom it is a requirement for them to do

19   their voluntary work.  The Board is glad to finally have

20   reached a point where the Department acknowledges that

21   it must submit CASA-related policies to the body for

22   consideration.

23           However, before I portray this as all

24   seashells and sunshine, we do have some concerns.  We're

25   concerned about the use-of-force changes from the

1    two-level evaluation to a three-level evaluation, and

2    the undefined review process for the agency and the

3    Board.  It was in May of 2016 that we came to you,

4    presenting a solution to review serious use-of-force

5    cases and use-of-force cases, with an agreement that all

6    cases that went to the Force Review Board would then be

7    reviewed by the Police Oversight Board.

8            The current changes only contemplate a Level 3

9    use of force coming before the Force Review Board

10   because they have pigeonholed serious use of force under

11   Level 3.  Yet, in the process which they are describing,

12   Level 2 and Level 3 will go to the Force Review Board.

13   I believe that the citizens of Albuquerque, when there

14   is an injury to a civilian by the use of force by an

15   officer, and it's worthy of going to the Force Review

16   Board, I would believe that the community would want

17   that to go to the oversight body, as well.  And that is

18   yet to be defined.

19           We have concerns about the use-of-force

20   instruction.  Myself and four Police Oversight Board

21   members attended the newly abbreviated Citizens Police

22   Academy.  We spent an entire day on use of force.  It

23   was a Sunday.  That training caused us concern, not only

24   in its content, but in the delivery.

25           We also have concerns that we've been unable

1    to reach an agreement to allow the CPOA to outsource our

2    data analysis.  We've been assured that these concerns

3    will be addressed.

4            So in conclusion, we will bear in mind that we

5    are not makers of history, but we are made by history.

6            Thank you.  Questions?

7            THE COURT:  Mr. Harness, you have indicated

8    that your concerns have been addressed to the new

9    administration and they've been responsive.  You talked

10   about to what extent you were going to get to review

11   the uses of force, just Level 3, and you felt that that

12   was problematic; that all injuries, you said, ought to

13   be reviewed by your agency.

14           And as I understood the definition laid out

15   earlier, Level 1 didn't involve injury.  So your concern

16   is only about Level 2?  Am I reading that correctly?

17           MR. EDWARD HARNESS:  That's correct, Your

18   Honor.  In the amendment to the Settlement Agreement

19   and in the stipulations, at one point serious use of

20   force was stricken, but then it was reinstituted.  But

21   it was reinstituted within the three-level,

22   three-tiered system of evaluation, but it was still in

23   the context of a two-tiered system of evaluation, which

24   is what was in place previously.

25           So there is this void that needs to be flushed

1   out, as to whether or not Level 2 uses of force will be

2   reviewed by the oversight body or whether it's going to

3   be simply Level 3.

4           THE COURT:  Someone -- maybe it was Mr. Cubra

5   -- said earlier, "I've only seen the Compliance Plan

6   for the last couple of hours."  Because it was filed

7   last night.  In fact, after I left my office, it was

8   filed, so I know what time it was filed.  There has

9   been what I am willing to call a really aggressive,

10  ambitious attempt to implement a whole new strategy, a

11  whole new approach to this process by the new

12  administration.  And at some point I'll get tired of

13  using the "reset" metaphor.

14          But it's coming at us pretty fast, and even

15  this afternoon I'm drinking through a firehose.  I'm

16  hearing a lot of stuff.  I have not had a chance to

17  matriculate it all and assimilate it all.  I think we're

18  all in that same boat.  So many of the amici have said,

19  "Yes, we're excited about the new administration, but we

20  have concerns."

21          Well, we all have those concerns.  I think we

22  all share those concerns, because we wouldn't be here

23  otherwise.  A new administration and a new attitude is a

24  great place to start, but the rubber still has to meet

25  the road.  We still have to see results, and we still

1   have to have constitutional policing and a safer city

2   for our citizens.

3          So I echo what's been said.  I'm excited about

4   a change in tone.  Gosh, you know, it may seem like a

5   long time ago to some of you.  It seems like a few days

6   ago, to me, that we were here in November over at the

7   Domenici courthouse and, gosh, that was a whole

8   different day.

9          So it's a legitimate question you raise.  I

10  think, given what I've heard, your concerns are going to

11  be addressed.  And if you still have those concerns

12  after you've had a chance to work through this and

13  really dive into the detail, I want to know about it,

14  and certainly you need to keep those concerns before me.

15  That's all.

16         I'm just suggesting that we're 90 days into

17  this administration, or whatever it is, so I think we're

18  all pleased with the new tone, the new tenor, but we

19  still have to see results, right?

20         MR. EDWARD HARNESS:  Yes.

21         THE COURT:  And as to the Compliance Plan, I

22  haven't read it all.  You know, I was driving up here

23  today when I got it, so there's some detail to still be

24  worked through.

25         MR. EDWARD HARNESS:  Absolutely, Your Honor.

 1          And I'm much more confident working with this

 2     administration and the people that are here today than

 3     who was here in November.  It's just certainly these are

 4     some of the concerns that the Board has, and I'm just

 5     bringing them to your attention, and we hopefully will

 6     have them resolved the next time that we address you.

 7          THE COURT:  Gosh, I hope so.  And I took it

 8     as nothing more than what you said.  We have ongoing

 9     concerns, and those don't go away.

10          MR. EDWARD HARNESS:  All right.

11          THE COURT:  Thank you so much.

12          MR. EDWARD HARNESS:  All right.  Thank you.

13          THE COURT:  Mr. Allen and Ms. Koenigsberg.

14          One thing I learned while I was in New

15     Orleans, that the folks from the City who were there can

16     bear it out, there are periodic status conferences in

17     the other venues, the other Consent Decree cases.

18          But Judge Morgan said, "You let them do what?

19     You hear from the public in these hearings?"  And I

20     said, "Yeah."

21          So apparently that doesn't happen everywhere.

22          MS. NANCY KOENIGSBERG:  Good afternoon, Your

23     Honor.  And especially at this late hour, we do

24     appreciate that the Court gives the amici and the

25     public an opportunity to talk, and I think it proves

1    helpful, in contours, for you to hear that.  So thank

2    you.

3              THE COURT:  It certainly does.

4              MS. NANCY KOENIGSBERG:  Recognizing the

5    lateness of the hour, I'll make my brief comments even

6    briefer because many of them you've heard, about the

7    overall shift in tone.

8              The things that APD Forward is particularly

9    appreciative of, and Mr. Allen will address some points

10   -- we're splitting this in half on behalf of APD

11   Forward.  The ability to talk at an open process and

12   bring concerns directly to the administration is huge.

13   Very early on, like immediately after the first of the

14   year, we had an opportunity to meet with Chief Geier and

15   others in the administration.  We very much appreciate

16   Deputy Chief Garcia's interest in meeting with people

17   every six weeks, and APD Forward is looking forward to

18   taking him up on that as we collect information and can

19   identify issues and pass that along.

20             We do also share the concerns about, even with

21   these time frames perhaps being ambition as well, we

22   very much want this to be the opportunity where things

23   are done right, so that we don't have to, as a community

24   and the police force, have to yet redo one more time.

25             So as the Compliance Plan rolls out, I'm

1    hoping that part of the assessment is whether or not the

2    time frames are in fact realistic.

3            We've got these dual concerns of, we're years

4    behind with getting an infrastructure in place that

5    works and works well.  So that will be the balance, I

6    think, that APD Forward is going to be watching and

7    discussing with the police.  And actually, I think Mr.

8    Mowrer had said that, as well, about if the time frame

9    even in this Compliance Plan, which I've only glanced

10   at, so I'm only a little step ahead of you, we're

11   concerned about.

12           The suspension of Paragraph 308, again, is the

13   same tensions, and we share the same concerns in terms

14   of the trade-off.  At this point, we're going to trust

15   the judgment of the Department of Justice, who has

16   weighed those trade-offs.  We really agree and do want

17   to see how this is going to work out.  Since we're not

18   going to have an IMR 7, my colleagues were in the room

19   discussing about this 12-month look-back, that for the

20   public to really understand and for the stakeholders to

21   understand, that when we come to Independent Monitor

22   Review Report 8, that we'll have a chance to see what

23   the steps were in getting to what the conclusions were

24   that the Monitor makes at the eighth report.

25           And we're going to need to look -- we will

1   look really closely at the status reports that are going

2   to be turned in.  Because, again, that's going to be

3   self-reporting, and we will want some more detail, I

4   think, in those interim reports that are given to the

5   Court in the status reviews.

6           Again, we really appreciate the opportunity

7   for real conversation and input and do have a belief

8   that we are being listened to, and look forward to

9   seeing continued incorporation of the public's input

10  into the Compliance Plan and the activities.  And I'll

11  stop there.  Mr. Allen will be next.

12          Thank you.

13          THE COURT:  Yes, ma'am.

14          MR. STEVEN ALLEN:  Good afternoon, Your

15  Honor.

16          THE COURT:  Good afternoon.

17          MR. STEVEN ALLEN:  I just have a couple quick

18  points to add to the ones that Ms. Koenigsberg already

19  made on behalf of APD Forward.  The first is with

20  regard to the revisions that are being proposed to the

21  CASA.  The APD Forward completely supports the

22  motivation behind those changes.  I think we can all

23  agree that first-line supervisors should not be wasting

24  their time on useless bureaucratic tasks, and so

25  anything that we can do to make their jobs simpler so

1    that they can spend their time to actually supervise

2    and provide guidance to the officers under their

3    command makes perfect sense to us.

4            At the same time, we need to make sure that

5    those systems of accountability from the Department that

6    we're still striving to create don't suffer from any

7    changes that are made.  So some of the concerns that

8    Mr.  Killebrew mentioned, we certainly share.

9            Mr. Harness mentioned one of the big -- you

10   know, we're making these changes somewhat quickly.  I

11   agree with your sentiment that it feels like drinking

12   with a firehose.  The change that Mr. Harness brought up

13   around leaving the definition of serious use of force in

14   the CASA, how it doesn't exactly line up with these

15   three levels of forces, is an important one.

16           Another one that I was just reminded of, in

17   hearing the taser discussion earlier, is that my

18   understanding is that a Level 2 use of force involving a

19   taser means you deploy a taser, but that it misses.  A

20   Level 3 use of force is deploying a taser, and it hits,

21   and using it three or more times in the same interaction

22   over a period of 15 seconds or longer than 15 seconds.

23   You know, if you deploy the taser twice or if you deploy

24   it for ten seconds, it's not clear that it fits into

25   either of those levels.

1   So some of those details, we agree, still need

2   to be worked on, as far as we could assess.

3   The other point I wanted to bring up was

4   around policy development.  We're very excited to see an

5   effort to bring the Police Oversight Board more into

6   this process.  That's a fundamental part of the POB's

7   mission, so we think that's important.  That, again, is

8   a work in progress.  We agree with Mr. Peter Cubra's

9   comments that anything that we can do to simplify that

10  and clarify that for the public -- I have a hard time

11  explaining in my own mind how all these different pieces

12  fit together.

13  I think if we want members of the public to

14  engage in that process, if they sort of care about how

15  their Police Department operates, it's going to be hard

16  to figure out, to explain to them how to plug into that

17  system.  And for that reason, you know, there is still

18  some work to be done there.  But it is exciting to see.

19  Ms. Koenigsberg, right before this meeting,

20  pointed out that we are going to need a new Mobile

21  Crisis Team policy that's developed over the next year

22  or so, and to see that work through these different

23  pieces I think is -- it's going to be an exciting way to

24  test the process and see how it's working.

25  To close, we echo what everyone said.  Happy

1      to see this incredible new tone.  It does seem like

2      night and day to us.  After three years of obstruction

3      and playing games, it finally feels like the adults are

4      in the room.  We are very happy, Your Honor, to hear

5      that you'll stay on the case and that Dr. Ginger will

6      stay on the case.  We do believe this is a recipe for

7      success.

8              We are very optimistic about the future of

9      this reform process, and APD Forward is eager to

10     collaborate and play a constructive role in that

11     process.  And we just thank you that we have the

12     opportunity to do that, because we do understand that

13     that's not always the case with these other Consent

14     Decree processes that are occurring in these other

15     communities.

16             Thank you.

17             THE COURT:  Thank you, Mr. Allen.

18             And to all of the amici, you're telling me

19     today that you've got access, maybe that you haven't had

20     before, and you feel like your voices are being heard

21     like they haven't been before.  I expect that you will

22     continue to closely oversee this process and give the

23     feedback that's critically important to DOJ, to the

24     City, to APD.  And if you at some point feel like that

25     access is being touted and not actually given, then I

1    want to hear about that, too.

2             Let's see where we are.  Mr. Sylvan on behalf

3    of the Community Policing Councils.

4             MR. CHRIS SYLVAN:  Good afternoon, Your

5    Honor.

6             THE COURT:  Good afternoon.

7             MR. CHRIS SYLVAN:  My name is Chris Sylvan.

8    I'm the Community Policing Councils Manager.  I also

9    wear another hat.  I'm the Community Outreach Manager

10   for APD.  So I have dual roles now for APD.

11            And before I forget, I'd like to say that

12   there are two CPC members who are here.  One is going to

13   speak.  Her name is Dorothy Woodward.  She is with the

14   Northeast CPC.  Rod Kontny -- I'm not going to pronounce

15   his name right -- is also here.  He's the Chair of the

16   Foothills CPC.  Rowan Wymark is the Chair of the Valley

17   CPC.

18            So anyway, today I'm supposed to talk about

19   what my role is with the CPCs.  I am the Manager of the

20   CPCs, and what I do is give them administrative support.

21   One of the things I needed to do was address the

22   confusion about what APD's role is with the CPCs, and we

23   want to engage in a meaningful way while respecting the

24   individual entities of the CPCs.  So basically, the CPCs

25   are individual entities; but at the same time, you know,

1    they need some help administratively, and that's why

2    Mayor Keller appointed me to this position.

3           We want the CPC members to know that we want

4    to hear from them and their recommendations are

5    important.  And because of this, I've set up a weekly

6    meeting with the Chief, and we're going to go over those

7    recommendations on a weekly basis.

8           One of the things I've done since I've joined

9    -- excuse me -- since I've been appointed to this

10   position is, I've streamlined the recommendation

11   process.  I've looked at it.  It was very clunky.  And

12   this process will now have a flow.  I even showed Dr.

13   Ginger what the process looks like.  I mapped it out.

14   He enjoyed it because mapping out a process --

15           THE COURT:  Because he likes maps.

16           MR. CHRIS SYLVAN:  Yes.  And I found that

17   out.

18           So I guess the other thing I'm supposed to

19   talk about is ways the administration is re-engaging the

20   CPCs, and I will fold in not only the CPCs, but I also

21   will fold in the Community Outreach.  We are undergoing

22   an aggressive social media campaign.  We're getting

23   ready to hire a social media manager to do better

24   outreach.  Right now, our outreach is not as good as it

25   could be, but it's going to get better just because

 1   we'll have somebody dedicated to that.

 2          We're also reaching out to under-represented

 3   communities.  I personally have been to meetings with

 4   the Chief and the Deputy Chief, Deputy Chief Medina, to

 5   different organizations that they haven't attended to in

 6   the past.  We have an electronic billboard campaign,

 7   apparently, underway.  I don't know if you can see that

 8   here, but this is what went up on the billboard.  It

 9   says, "Help Protect ABQ's Youth.  Join A #CPC Today."

10   So that's one of the ways that we're trying to increase

11   membership and also attendance.

12          THE COURT:  And how does that contrast with

13   previous outreach, if there was?

14          MR. CHRIS SYLVAN:  Since I'm new to the

15   position, I'm not sure how to answer that question,

16   Your Honor, but I'm hoping that with new eyes and with

17   the aggressive campaign that I'm doing -- previously, I

18   was working for Councilor Gibson, and I know you've

19   seen her in these courtrooms before.  She's the

20   Councilor for District 7.

21          And I know that you really have to be

22   aggressive with outreach.  So moving forward, we will

23   also be advertising on Spanish-language radio stations

24   soon.  I'm going to be doing an interview on GOV TV.

25   That's our cable access channel.  And that will give us

1   something to go on the road to talk about what CPCs are

2   and different things in APD.

3          Because of these things that are in place and

4   going to be in place, applications are up since I've

5   taken the job in January, mid January.  One of these

6   days, I'd like one of my CPC Chairs to come up to me,

7   back to the Spanish-language radio station

8   advertisement, come up to me and say, "Hey, we need a

9   Spanish-language interpreter."

10         I want to have a good problem like that.  I

11  also want to have a good problem where we need a signer

12  or any other interpreter.

13         As far as recommendations go, recently the

14  Foothills put out a recommendation.  They were concerned

15  about auto theft.  We worked with the Albuquerque

16  Journal to have the auto theft prevention tips published

17  in last Sunday's Journal.  This was a recommendation

18  that came out of the CPCs -- excuse me -- the Foothills

19  CPC, I think in February, and it's already implemented.

20         We're also creating a comprehensive public

21  information campaign to go along with efforts to target

22  auto theft throughout the city.  That's another part

23  that came out of the Foothills recommendation.

24         One of the other highlights that's come out of

25  the CPCs is the Northeast CPC's request for a shortened

1    Citizens Police Academy, and that has actually been in

2    place.  In fact, several of our members went through it

3    a couple of weeks ago.  That recommendation came on

4    board before -- that recommendation was put in before I

5    started.

6              Other recommendations have been --

7              THE COURT:  Excuse me.  What's the length of

8    the Academy now?

9              MR. CHRIS SYLVAN:  It's two weekends.  And I

10   believe it was -- six weeks?

11             UNIDENTIFIED SPEAKER:  Twelve weeks.

12             MR. CHRIS SYLVAN:  Thank you.  Twelve weeks.

13             THE COURT:  And it's how many hours over two

14   weekends?

15             UNIDENTIFIED SPEAKER:  Two days a week, three

16   hours per night, is what we were doing before.  I'm

17   sorry.  I'm sorry, Your Honor.

18             THE COURT:  And I'm interested to know now.

19   It's two weekends, you say?

20             MR. CHRIS SYLVAN:  Right.

21             THE COURT:  How many hours?  Can anybody tell

22   me that, how many hours that is over two weekends?

23             MR. ERIC GARCIA:  Your Honor, I believe it's

24   32 hours, eight hours each day.

25             THE COURT:  Okay.  Thank you.

1          MR. CHRIS SYLVAN:  And the POB members also

2     were at that shortened Academy.

3          Another highlight that I want to point out

4     that the Valley CPC implemented, and this was before I

5     took this position, they implemented -- they requested

6     bike patrols, and bike patrols have been put in place.

7          The Southeast also mentored -- the Southeast

8     put in a proposal for a mentor program for APD recruits,

9     and that was put into place.

10          And the Southwest put a response to verify the

11     injury accidents.

12          That was another thing that the CPCs have done

13     in the past.  Because I know that you have heard about

14     the CPCs, but I'm not sure if you've heard what the

15     recommendations and what the processes have been and how

16     the recommendations have been implemented.

17          So NYPD leaders visited Albuquerque a few

18     weeks ago, and they left a strong message, in my mind,

19     and I think this applies to CPCs.  Officers shouldn't

20     strive to police the community.  The goal should be to

21     reduce crime, hand-in-hand with the community.  And I

22     hope that that's what we can achieve with the CPCs.

23          THE COURT:  Thank you, and thank you for --

24     well, congratulations on your promotion or whatever it

25     was.

1          MR. CHRIS SYLVAN:  It was a promotion.

2          THE COURT:  Thanks.  Thanks very much and

3    congratulations.  I appreciate your service.

4          Was there someone else that was going to

5    speak, one of the CPCs?

6          MS. DOROTHY WOODWARD:  Good afternoon, Your

7    Honor.

8          THE COURT:  Good afternoon.

9          MS. DOROTHY WOODWARD:  And thank you for the

10   comments about this building.  Forty-nine years ago, I

11   stood here and raised my right hand to protect the

12   Constitution and joined the military.  This is my home

13   town, and I knew this building very, very well for a

14   long time.  It is remarkable.  Thank you for your

15   comments.

16         THE COURT:  I love it.  And I brought my CRD

17   and my law clerk.  They'd never seen it before.  We got

18   here early so we could tour the building, and it really

19   is a treasure.

20         MS. DOROTHY WOODWARD:  It is.  Soak it up.

21         I'm here today because our chairperson, Eric

22   Olivas, cannot be with us, and he has asked me to impart

23   these words on behalf of our Council.

24         Eric says:  I believe I speak for many when we

25   say that the new administration offers CPCs and our

1    community at large a breath of fresh air.  While Mayor

2    Keller and Chief Geier have been on the job only a few

3    months, we have closely observed their priority to place

4    community policing for support groups like CPCs which

5    aim to further community involvement.  We have seen an

6    uptick in that engagement and increased interest in

7    police policy and reform.  For example, in January at

8    our meeting, Chief Geier was our guest speaker, and

9    Deputy Chief Garcia.

10              I like them.

11              THE COURT:  There you go.

12              MS. DOROTHY WOODWARD:  We had 80 members of

13   the community participate.  The dialogue was positive

14   and productive.  The future of Community Policing

15   Councils appears bright in this city, especially now

16   that we have new APD leadership, and we look forward to

17   further grow a productive relationship.

18              That said, it is our hope that the new

19   administration will continue with this support, while at

20   the same time engaging CPCs in meaningful ways.  For the

21   spirit of the Settlement Agreement to outlive this

22   document, groups like CPCs and POBs must be empowered

23   and interwoven into the fabric of policy and

24   decision-making at APD.  We look forward to a healthy

25   relationship with APD, knowing there exists other

1  challenges before us, some of which we have stated here
2  in your Court, Your Honor.
3           Thank you.
4           THE COURT:  Yes, ma'am.  Thank you.
5           MS. DOROTHY WOODWARD:  Do you have any
6  questions?
7           THE COURT:  No, ma'am.
8           MS. DOROTHY WOODWARD:  Okay.  Again, I'm not
9  shy.  Some of the gentlemen at these tables will tell
10  you, I've already let them know where I'm coming from.
11  I'm watching.  Elizabeth knows, too.
12           THE COURT:  I believe you are.
13           MS. DOROTHY WOODWARD:  And Ed Harness.
14           MR. ROD KONTNY:  Again, I'm Rod Kontny.  I am
15  chair of the Foothills CPC.  I will tell you that
16  spending 30 years in the Air Force logistics did not
17  prepare me for this job, because it is unique, and I'm
18  starting to enjoy it.
19           I did go through that Civilian Police Academy,
20  the short view.  It was four days, eight hours each day.
21  The eight hours on use of force was pretty grueling.  I
22  will tell you that.
23           So at any rate, I just want to say a few
24  things about that the CPCs are very important because it
25  allows the citizens to ask, or sometimes confront the

1  police officers who are there, and the police officers

2  then give them their opinions or their actions or the

3  regulations and so forth.  And that's very helpful, very

4  frankly.

5  And the other thing is, of course, the

6  recommendations.  And we put that one in about how to

7  protect your vehicle, and Chief Geier acted on it right

8  away, got me up there.  I've never gotten an e-mail from

9  a Chief before, so that was kind of interesting.  And so

10  we had a meeting in his office, and we concluded, and

11  some good things came out of it, and they're working on

12  other things.

13  I want to say, shortly, one other thing, and

14  that is, I go on ride-alongs.  Last year, I went on one

15  and I had the opportunity to talk to some police

16  officers, guys that are in the squad cars, and the

17  sergeants and the commanders.  I never got above that.

18  But it was very interesting, talking to these young

19  officers, and that they did in fact embrace the CASA.

20  They thought the CASA was a good thing.  They didn't

21  like some of the things that APD was implementing to

22  make them do certain things, and they were very upset

23  about that.  But recently, I've been talking to some of

24  them, and they have a different attitude now, and I

25  think it all comes from the new administration.

1          So at the very level that some of you don't

2     get to, where you talk to police officers on the street,

3     or the sergeants, or maybe the lieutenant, and I can do

4     that, and I find it very encouraging, as everybody does

5     within the administration.

6          So that's all I have.

7          THE COURT:  Thanks very much.  Thank you.

8     You know, you're volunteers and nobody pays you to do

9     this.  You don't do it for the glory, I suppose.  So

10    you do it because you love your community and you want

11    to make it a better place, and I appreciate that.  I

12    think we all do.  And I am glad that we've got some

13    folks that aren't shy in those positions.

14          Thank you very much.

15          MR. ROD KONTNY:  Okay.  Thank you.

16          THE COURT:  And Mr. Whatley is following you.

17          MR. DANNY WHATLEY:  Thank you, Your Honor.

18          THE COURT:  Yes, sir.

19          MR. DANNY WHATLEY:  I'll make this very

20    short.

21          First, Your Honor, I want to thank you for the

22    opportunity to speak, but also that the MHRAC has been

23    provided copies of the stipulations and the Compliance

24    Plan, and we're in total agreement with that and the

25    motivation for that.  We certainly see it is something

1       that will move the CASA along.

2              As you're aware, the MHRAC responsibilities as

3       spelled out in the CASA have us dealing with those

4       interacting with law enforcement that are in mental

5       health crisis, and are also maybe experiencing

6       homelessness.

7              And with that, again, with the CASA outlining

8       those things, we created three subcommittees --

9       training, resource sharing or information sharing, and

10      resources, and those three subcommittees continue to

11      work with APD.  And when the Mayor was speaking, he

12      talked about the Department looking at the CASA, at the

13      letter and the spirit.

14             And I'm here to assure you that the CIU and

15      the folks that we've dealt with have always had the

16      spirit of the CASA.  They've always looked at it as

17      being a change in attitude, a change in direction for

18      law enforcement in our city.  And I think that was from

19      their leadership.  Chief Garcia was primarily

20      responsible for that.

21             But one of the successes that we have had has

22      been in the area of training.  I was in law enforcement

23      for 33 years, and during that time we sort of ran away

24      from civilian interference or relationships with

25      civilian instructors in our Academy.  APD has now turned

 1      and gone in the opposite direction.

 2               And we just had a CIT training, a Crisis

 3      Intervention Training session, the first of March, and

 4      18 hours of that 40-hour training was conducted by MHRAC

 5      membership, so they're bringing in the MHRAC expertise

 6      that's within that committee.  And 17 hours of that

 7      40-hour class was provided by non-law enforcement

 8      professionals in our community.  And, again, that is --

 9      I think Chief Garcia is certainly responsible for that,

10      to see that change.

11               But the CIU has been one of those that has

12      become the professionals in dealing with those and

13      dealing with mental health crisis.  As I think Dr.

14      Ginger will tell you and the Department of Justice will

15      tell you, they've become very impressive, in fact,

16      traveling all over the United States, teaching that

17      model that they're using here.

18               In the old days, we used to look at the

19      Memphis model, and I truly believe that in the future it

20      will be the Albuquerque model because of the guys and

21      the folks that are involved in this training.

22               And the APD officers and the civilians within

23      that division, within CIU, have made that a very

24      professional way to deal with folks.  They're working in

25      the homeless community.  We're seeing more and more

1  homeless that are experiencing and involved in mental

2  health crisis, and we are seeing the change in officers

3  as they interact with those experiencing that crisis and

4  how they deal with the people that are doing that.  But

5  they're not only dealing with the individuals in crisis,

6  but they're dealing with their families and they're

7  dealing with the community in general.

8        When we started the MHRAC years ago now, we

9  had two goals in mind.  One was to provide law

10  enforcement with the training and the policies and

11  everything that they needed to safely do their job,

12  safely for everybody involved.  But the second part of

13  that was so that we might could instill in our community

14  the trust and faith in our officers here in Albuquerque.

15  And I think even though we've got a long way to go,

16  we're going in the right direction.  And we look forward

17  to working with the new administration and the new

18  command staff at APD.

19        Thanks, Judge.

20        THE COURT:  Thank you, Mr. Whatley.  Thank

21  you for what you do.  I think that concludes the

22  comments from the amici.

23        The final item on the agenda is an update on

24  CASA-related community engagement.

25        Ms. Martinez.

1          MS. ELIZABETH MARTINEZ:  Thank you, Your

2     Honor.

3          As you know, Judge, Mayor Keller took office

4     on December 1st of last year, and his first order of

5     business was to appoint Chief Geier to lead APD.  Today

6     is March 15th, and so Mayor Keller and Chief Geier have

7     been on the job for 104 days.  That's only 75 weekdays,

8     so they've actually been on the job only 15 weeks.

9     They've accomplished a great deal in a very short period

10     of time.

11          Today, they've talked about three very

12     significant documents here.  They've talked about two

13     documents that are setting the path for the way forward,

14     and Deputy Chief Garcia has talked about a pretty

15     comprehensive Compliance Plan.  And together, these

16     three documents are setting the infrastructure to put

17     APD back on track to come to full and complete

18     compliance with the CASA.

19          And this has been a real heavy lift for the

20     entire Department, but particularly Chief Geier, Deputy

21     Chief Garcia, Lieutenant Lowe, the folks that are

22     working with them, and folks like Commander Sullivan,

23     certainly Assistant City Attorney Jeramy Schmehl.  These

24     folks have been working tirelessly, virtually around the

25     clock, and they deserve tremendous credit for a

1    tremendous amount of work, and I am -- we are all just

2    amazed at how much work has gone on.

3         And one of the things that is remarkable in

4    all of this is that while all of this has been going on,

5    the community engagement also has been moving forward.

6    It hasn't been ignored.  As you've learned, Deputy Chief

7    Garcia has made sure that they have been reaching out to

8    the amici and to the key stakeholders throughout this

9    process to make sure that they're getting regular input,

10   to make sure that they're being as transparent as they

11   possibly can.  And they've made commitment to the

12   community to continue to have that transparency and that

13   collaboration out there.

14        We applaud that, because that's how the City

15   and APD is going to establish that relationship of trust

16   that is critical to have APD be successful.  Because

17   unless we have APD re-establish that relationship of

18   trust, even if they meet every single element of the

19   CASA, without trust we're just not going to be

20   successful.  So we applaud all of these efforts that APD

21   and the City is making to reach out to the community, to

22   work with the community, to re-establish that critical

23   trust with our community.

24        I want to also commend the City and APD for

25   the work that they have been doing with the CPCs.

1    You've heard about the work that the Academy did in

2    terms of revamping the CPAs so that they could

3    accommodate the CPCs and the Police Oversight Board, the

4    condensed CPAs.  I actually participated in that

5    condensed Academy also.  And, as Mr. Harness commented,

6    there were some concerns voiced by participants on the

7    use-of-force instruction, and that critique was raised

8    with the City and with APD, and the response immediately

9    was, "Bring it to the table.  Let's discuss it.  We will

10   address those concerns."  And, in fact, we expect to

11   have those meetings as early as tomorrow.

12           So that is the response we're getting these

13   days from the City and from APD.  It is an immediate

14   reaction.  It's very much the same kind of response that

15   the Community Coalition and Mr. Arellanes got when they

16   raised a concern about the taser and the manual.  And

17   that is the reaction we're getting from the new

18   administration, and it's all very positive, and it's a

19   very lovely change.

20           In terms of the community engagement, you've

21   heard from Mr. Sylvan and you heard from some members of

22   the CPC earlier today.  One of the things that they

23   didn't mention is that last night, Mr. Harness and the

24   CPOA hosted the sixth CPC summit.  The Mayor was at the

25   summit last night, and this was, as I said, the sixth

 1    CPC summit.  It is the first time that the Mayor, a

 2    Mayor, has attended a CPC summit.  And the Mayor

 3    addressed the summit, he engaged with all of the CPC

 4    Chairmen.  And I'm also delighted to report that it is

 5    the first time that the Chief of Police also

 6    participated in a summit.  And I think that speaks to

 7    the value that our Mayor and our Police Chief place in

 8    the role that the community has in this process.

 9            One of the things that members of the

10    community have raised with us and have raised in some of

11    the meetings we had last week and this week is the fact

12    that they have not had the community meetings that they

13    got used to having since 2012, when DOJ began its

14    investigation into APD.  You may recall that when we

15    initiated our investigation, DOJ started having

16    community meetings to keep the community informed about

17    the investigation.  When we announced our findings, we

18    also had community meetings to inform the community.  We

19    continued having those meetings when Dr. Ginger released

20    his reports.

21            And we ceased having those meetings when the

22    former City Attorney indicated that she believed that

23    the City should take that responsibility.  We agreed

24    with that view because we did think that that was a

25    responsibility that the City should assume.  But the

1    City did not step forward.  So in 2017, those meetings

2    did not occur.

3         We have a new member of the City

4    administration who has a very rich history of working

5    with the community and dealing with community

6    engagement, Mr. James Lewis.  He and I have had some

7    discussion about this, and I know that he is going to be

8    working in this area.  We anticipate that the City will

9    be reengaging with the community in this area and will

10   go back to engaging with the community at large.

11        I believe that we have discussed in these

12   proceedings with this Court, with our community, that

13   Albuquerque has been unique amongst communities that

14   have Consent Decrees.  Our community has demanded to be

15   kept informed.  Our community has insisted that they

16   know what is going on with our process and has insisted

17   that the Department of Justice, that the City of

18   Albuquerque, that APD, and that this Court keep them

19   informed of what is going on.

20        And all of us greatly appreciate that you have

21   included the community, the amici, the stakeholders in

22   this process, and we are very appreciative of the fact

23   that the Mayor has brought Mr. Lewis on into this unique

24   role and that he will be part of keeping the community

25   engaged in this process.

1  Thank you, Judge.  Unless you have any

2  questions, I will relinquish the floor to, I think,

3  Deputy Chief Medina.

4  MR. HAROLD MEDINA:  Good afternoon, Your

5  Honor.  My name is Deputy Chief Harold Medina, with the

6  Albuquerque Police Department.  I retired in 2014, and

7  I returned back to the Police Department recently with

8  the new administration.

9  My focus is community policing.  I think that

10  we need to understand community policing, and we need to

11  make sure that we move forward with the three principles

12  of community policing, not established by me, but

13  established by the COPS Office, and that is community

14  partnerships, problem solving, and transparency in the

15  Department.

16  And as you stated earlier, the proof is where

17  the rubber meets the road.  And I will be brief on some

18  of the projects that we've already started, but I think

19  that the cornerstone of the Albuquerque Police

20  Department gaining legitimacy within the community again

21  is the rebuilding of trust within the community.  And

22  the rebuilding of trust within the community goes beyond

23  community engagement with meetings about the CASA.  It

24  goes into the principles of developing relationships

25  with the community.

1          And historically, the Albuquerque Police

2     Department had relationships with the community at the

3     Neighborhood Association level, and you had a commander

4     and lieutenant who attended all of these meetings, and

5     they had great relationships, and everybody in the

6     community knew who the commander and lieutenant were.

7          But there is one thing I promise you that was

8     a fault in that system, is when that person's car got

9     broken into at 6:00 in the morning, the commander and

10    the lieutenant are not the ones that are taking the

11    police report.

12         So what we're trying to do is, we're trying to

13    shift the focus from the relationship being built with

14    the upper command staff, to the relationship with the

15    community being built with the officers, and that we

16    spread out from the concept of just meeting and

17    community engagement with Neighborhood Associations.

18    We've already met.  We've established a series of Coffee

19    with a Cop that were pushed forward by neighborhood

20    organizations.  I think we have a total of 26 that are

21    going to be occurring in the next month or so in the

22    various area commands.  I think 12 are already

23    scheduled, to my knowledge.

24         We are also reaching out for youth engagement.

25    We will have our first Youth Coffee with a Cop at

1    La Cueva High School on the 22nd.

2          And I think that all of these are just ways

3    for us to engage the community.  We have already begun

4    planning Junior Police Academies, no longer at the

5    Police Academy at APD, but we're taking them to the

6    Community Centers at each area command, and our goal is

7    to have that first positive experience with youth and

8    police officers so that it's in a positive way, not in a

9    negative way.

10          I think that as we move forward, it's

11   important to recognize that we have been in office 15

12   weeks, we've been here, and we've already made a lot of

13   commitments and we've already taken a lot of steps to

14   develop a lot of this community engagement.  But the

15   last piece of community policing, I think, is what we

16   all have to remember takes time, and that's

17   transformation of a Police Department.

18          And this reform process has to be beyond

19   checking a box that we're engaged with the community.

20   It also includes changing the perception of our officers

21   and how they view the public and how they interact with

22   the public and ensuring that they recognize that they're

23   public servants and that's what they're here for.

24          And in a way, Commander Sullivan has a large

25   task there of assuring that every police officer who

comes out of the Police Department from this day forward recognizes that they're public servants, and that we install that belief in them as a core value in the Police Academy.

And like I stated earlier, I'll be brief. It's about where the rubber meets the road, and those are just small samples of a lot of the programs that we're already planning and implementing to interact and to help rebuild that bond of trust with the community.

Thank you.

THE COURT: Yes, sir. Thank you. And I'm sorry. Your rank?

MR. HAROLD MEDINA: Deputy Chief.

THE COURT: Deputy Chief, forgive me. Your name is Harold Medina?

MR. HAROLD MEDINA: Yes.

THE COURT: Do you know that you have a tocayo, a famous judge named Harold Medina?

MR. HAROLD MEDINA: Yes, I know that. Somebody once told me that, and I think he was out of New York.

THE COURT: He was, and he was a great man, and a good study for you to see what your heritage is in terms of your name.

MR. HAROLD MEDINA: Thank you.

           THE COURT:  Yes, sir.  Thank you.

           Oh, I just always try and, you know, add a
little something.

           Mr. Mowrer.

           MR. FREDERICK MOWRER:  Your Honor, in the
lateness of the hour, APOA has no comment on this
subject.

           THE COURT:  It occurs to me, we might start
these meetings at 5:00, and maybe they would be wrapped
up more quickly.

           Mr. Schmehl, you're on the agenda for this
issue, or Mr. Aguilar.

           MR. JERAMY SCHMEHL:  Deputy Chief Medina took
care of it.

           THE COURT:  Okay.  Great.

           And Dr. Ginger.

           DR. JAMES GINGER:  Yes, sir.  Thank you, Your
Honor.  I'm keenly aware that protocol requires me to
face the Court when I'm addressing you, speaking, so
I'll apologize in advance for turning my back on the
amici who have been up here before.  But I only get in
trouble with the Judge, so --

           THE COURT:  You know what?  If you'd rather
face that way, that's fine with me, except Ms. Goehl --
well, we've got a mic here.

1              DR. JAMES GINGER:  We could do this.  Let's

2    see if this works.

3              CRD JESSICA CHAVEZ:  Here's a microphone.

4              DR. JAMES GINGER:  Okay.  That will work.  I

5    was just trying to avoid contempt, Your Honor.

6              THE COURT:  As you should.

7              DR. JAMES GINGER:  Always a wise choice.

8              THE COURT:  Good call.

9              DR. JAMES GINGER:  As the amici were

10   speaking, I was taking copious notes, none of which

11   I'll be able to read, but I'll try to get through them.

12             Mr. Cubra had some issues and questions about

13   the reset period and where's the report that reflects

14   progress or not, in lieu of doing the direct technical

15   assistance.  We have done technical assistance since Day

16   One.  We've done nothing but technical assistance since

17   Monday here, right now.  It comes in many forms.  Most

18   of us think of it as consulting trips.

19             And we've spent a great deal of time with DC

20   Garcia and his folks and Jeramy Schmehl and other folks

21   with APD this week, talking about the reset and where we

22   plan to go.  Other members of the Monitoring Team will

23   follow in on that.  Their purposes is twofold.  One is

24   to collect data that continues to inform me of APD's

25   progress on this project; and the second is to provide

needed technical assistance.

I don't think anyone familiar with the last two and a half or three years would argue the fact that -- and I do this a lot lately; I talk about the old APD and the new APD. I don't think anyone who is familiar with the old APD would suggest they didn't require technical assistance. And I don't think anyone familiar with the new APD doesn't understand that they will go out of their way to ask for, listen to, and respond to technical assistance. And if I've gotten anything this week, I've gotten that message.

More directly to Mr. Cubra's point, a couple of things. We're reducing the reporting workload this time, so our reports will be much more succinct and much more summary related than being the monstrosities they usually are, 400 to 500 pages.

That serves a couple of purposes. First, it gives the new APD a chance to catch its breath, get its feet on the ground, huddle together, and make its plans for moving forward. And that's intentional. I designed that intentionally because I wanted to avoid them showing up for work on Monday morning and being faced with a list of staccato demands by a Monitoring Team for "what have we done recently about," which is our usual process.

1    So I think with this process, we'll be able to

2    avoid the one thing I hate most of all in managing a

3    project, which is asking for more money.  I really hate

4    to do that, and I've done everything I can do not to

5    foist that off on the citizens of Albuquerque.

6        And secondly, with the intense interactions

7    that we're having with APD personnel, Chief Garcia and

8    Lieutenant Lowe are going to be sick of me by the time I

9    leave Friday.  But that's okay.  I hope we've given them

10   enough technical assistance to get to a running start on

11   jump-starting their Compliance Bureau.  When I leave,

12   we're available by phone seven days a week.  Often,

13   sometimes, maybe, we work on Saturdays.  And if need be,

14   we will.

15       DC Garcia has known all along, from Day One,

16   that that has always been the case.  And one of the

17   reasons he got his units in compliance faster than

18   anybody else was, he took advantage of it.  He didn't

19   mind asking us questions while we were here on-site, and

20   he didn't mind making phone calls to my subject matter

21   experts to ask questions and get clarifications.  And

22   that's why his units were among the very first to roll

23   into compliance.

24       So we've got a twofold approach on this site

25   visit that is different from the other site visits.

1  We're collecting less data.  We're asking more pointed

2  questions to determine whether or not processes are in

3  place, that should be in place, as opposed to asking for

4  50 reams of paper or five electronic disks for data that

5  we can go through and say, "Okay, this one is dated

6  February, this one is dated March, this one is dated

7  April," which is what we do.  And that's, as you can

8  imagine, very painstaking and labor intensive.

9        So the proposal I made to the parties was to

10 throttle back a little on data collection and analysis

11 this reporting period, throttle up on technical

12 assistance, and still give the Court and the Albuquerque

13 citizens an understanding of our assessment of APD's

14 compliance status for this period of time.  And that's

15 what those two interim reports are for.

16        So you'll get a little bit of both.  It will

17 give my team and I time to give whatever technical

18 assistance APD needs, requests within reason -- within

19 reason -- and get them restarted, and get them to where

20 we think they should have been, hopefully by the end of

21 the next reporting period.  They're not going to start

22 from zero to 110, either.  I hope.  You know, the

23 process would militate against it.

24        I didn't tell you these notes were legible, so

25 bear with me for a second.

1    For the LULAC group, Mr. Arellanes and Dean

2    Mathewson, I had already encountered the issue that Mr.

3    Arellanes raised in the parties' meeting -- was it last

4    week?  I'm losing track of time.  I immediately, when

5    that issue came up, sent out to the parties and to APD

6    operational personnel the current taser operating

7    manuals.  And obviously, they already had in their

8    possession the current policies here.

9    We're in the process of going through the two

10   of those things, and I can tell you right now from my

11   initial review -- we haven't completed it -- but from my

12   initial review, APD policy and training is compliant

13   with taser documentation.  Now, that's not finished.  We

14   have a few more stones to turn over to make sure whether

15   or not that's the case.  But we were on that process the

16   day Mr. Arellanes raised the issue, and I hope -- in

17   fact, I know -- that some folks at APD will use that

18   same model in community relations and questions from the

19   community.

20   But we're not finished yet.  We've got to get

21   APD's responses, and we've already gotten some from the

22   Union, and we'll put a final packet together.  But

23   everyone who is on the mailing list for that meeting got

24   a copy of those policies for tasers.  And those are the

25   latest we could find; we couldn't find any after that.

1    So you have the very latest that I know Taser has put

2    out, and we're working on that process.

3          The UNM folks who asked about demographic

4    data.  We've been familiar with that issue for quite

5    some time.  In fact, the last site visit, I spent some

6    time with Dean Mathewson discussing that.  My guess,

7    Dean, is that you'll find the new APD a little more

8    receptive to those issues and the needs of the

9    community.  If you don't, sir, please let me know, and

10   I'll try to work through with Chief Geier and some of

11   his people a reasonable response to your reasonable

12   requests.

13         I think I spent the better part of an hour and

14   a half in your office the last time we met with the Dean

15   and other folks from UNM, talking about this issue and

16   potential solutions to it.  And I think if we reboot

17   that question, we might find some different answers

18   right now.  So if we can try that, I'd be happy to try

19   to facilitate it if you'd like.  I know you're not shy,

20   but if you'd like me to participate, I will.

21         There's a note here that I just simply can't

22   read, so I apologize.

23         For Director Harness with CPOA, Ed and I are

24   both former police officers, so we tend to be on the

25   same wavelength a lot of the time.  He has some

1    legitimate concerns about recommendations from CPOA that

2    go to the Chief for actualization or decision-making.

3    And, again, those reservations were well-founded.

4    Again, I think you'll find a different audience with the

5    new APD in town, so to speak. I think Ed is still here.

6    Yes, there he is. There's a glare; I can't see you.

7    Sorry. I think you will find a different reception. If

8    you don't, then let's sit down and talk about it, and

9    we'll see where we can go from there.

10          I only took 16 pages of notes. Be patient.

11          Regarding the Force Review Board issues, those

12    issues raised were cogent, well presented, and correct.

13    We have the same issues. The Monitoring Team has the

14    same issues. So we'll be working with Chief Garcia,

15    Chief Geier, and his folks, to ensure that the new Force

16    Review Board is, I would hope, a model for the industry;

17    and if not a model for the industry, then certainly

18    congruent and compliant with the current best practices.

19          That's an issue we have on our radar, probably

20    not the site visit. We're still trying to get the car

21    started again, and that sometimes requires a lot of

22    attention. But it's on the agenda, and we look forward

23    to working with APD to get that moved forward. I don't

24    think any of you who read our reports think that we

25    think the FRB process is a good one. I spent a lot of

1    ink and a lot of paper talking about the FRB process.

2          So I forget who this comment came from, but

3    you and I are in agreement.  We need to reconfigure it.

4    We're in the process now of thinking about that among my

5    team and myself, and the next site visit, after this

6    one, we'll be in the process of assisting, as much as we

7    can, getting APD up and running on revisions to that

8    process.

9          One thing I wanted to do -- I think everybody

10   understands it; but if not, I'm going to say it again.

11   There will be no routine, normal IMR 7.  We'll be using

12   the money that we usually spend writing that 500-page

13   document in providing technical assistance and training

14   to APD to jump start their new processes.  So you'll get

15   two mini reports instead.  We have to keep the Court

16   informed what it is we're doing; and how we're doing it;

17   and what kind of reception we're getting at APD; and

18   mistakes that we've made; and that sort of thing.  So

19   those two reports will be used for those purposes.

20   There will not be a normal IMR 7, and that's where the

21   money comes from to do this reboot, the technical

22   assistance reboot.

23          I've failed the Court again.  I took a note

24   and I can read it, but I don't understand what it meant.

25   I apologize.  APD Forward.  Where are you guys?  You and

1    I need to talk, because this is your note.  So I don't

2    know -- I know what the words say, but I don't know what

3    they mean, so I'd like to revisit your concerns.

4          And I believe this is for APD Forward, as

5    well, but I think you guys know that the Monitoring Team

6    is not an easy Monitoring Team.  We're aware of your

7    issues and your concerns.  We get them addressed by APD

8    when we can, which some time ago wasn't all that

9    successful.  But I think, again, with the new APD, I'm

10   finding the door is open, the lights are on, people are

11   engaged, and they are deathly aware of the timelines

12   that come in on their work.  So if that doesn't change,

13   I'll note for you, if it doesn't, then we need to sit

14   down again like we've done before and develop some

15   strategies.  But I think you'll be pleasantly relieved

16   at what you get out of this new group.

17          The issues of Level 1, Level 2, and Level 3

18   uses of force, I think we're all painfully aware that

19   that's a soft spot in this reboot.  I flow-charted it,

20   turned it upside down and in 14 different directions,

21   trying to find fatal flaws with it.  I found some flaws,

22   but I don't think I found any fatal ones.  I think this

23   will work.  And the thing I like about it is, it does

24   what I told APD from Day One.  It puts more sergeants'

25   time on the street.  And that's the only way out of this

1     Settlement Agreement, is effective supervision.

2           So we'll be monitoring for that.  There will

3     be things that come up that the Chief and I need to

4     discuss in terms of what kind of monitoring processes

5     they might want to set to work.  My goal with that is

6     that this becomes the internal Monitoring Team, we're

7     the external Monitoring Team, and that we become

8     simpatico about what our definitions are, what our

9     concerns are, what our processes are, so that when we

10     leave, you still have your Monitor; just a different set

11     of folks.

12           For the CPC folks, Ms. Woodward and Mr.

13     Kontny -- did I get that right?

14           MR. ROD KONTNY:  Yes, sir.

15           DR. JAMES GINGER:  Good.  I don't know how

16     you guys feel, but I know for a fact that this new APD

17     group wants you vibrant and active, and they want your

18     input.  I've already seen evidence of that, and I think

19     probably you have, too.

20           MS. DOROTHY WOODWARD:  Yes.

21           DR. JAMES GINGER:  So I wholeheartedly agree

22     with your assessment of the way things used to be, and

23     I wholeheartedly agree with your disagreement about

24     those things.  But this is a new bunch.  I think you

25     guys are going to be pretty happy.

 1          But look at the meeting -- was it last night?

 2     Look at the meeting last night, compared to meetings a

 3     month or a year ago, and you see a huge difference.  The

 4     Mayor was there.  You know, that should tell us

 5     something.  The Mayor.  To my knowledge, the Mayor had

 6     never been to a CPC meeting under the old

 7     administration.  So hang on.  Change-is-a-coming, as

 8     they say.

 9          Danny Whatley and his crew, Nancy, are you

10     still here?  Yes, there you are.  Okay.  You guys had

11     the same concerns that we had.  With the new leadership,

12     I think you'll see a difference.  If not, the same

13     applies.  If you don't see it, let us know, and we'll

14     start working the drums again.  I know the folks who are

15     in charge of that process, and I know the new expertise

16     that comes from Chief Geier and the new focus that comes

17     from Chief Geier, and I would expect in the very near

18     future that you guys are going to be probably getting

19     asked more questions and asked for more input than

20     you're able to provide.

21          But I've done a lot of future projection here

22     tonight, so I hope everyone's aware of that.  The proof

23     is in the pudding, as the old saying goes, and the

24     Monitoring Team here will be here as of IMR 8 in the

25     same way, reporting what's good, what's bad, and what's

1    indifferent.  And we won't go anywhere until DOJ says

2    we're done.  That's right.  Until DOJ encourages the

3    Judge and influences the Judge to believe that --

4              THE COURT:  We're not done until I say we're

5    done.

6              DR. JAMES GINGER:  We're not done until the

7    Judge says we're done, folks.  Sorry, Your Honor.

8              As you can tell, the process, sometimes I

9    forget about the last step.

10              I know it's late, but if there are any

11    questions, I'll be happy to try to address them.

12              Thank you, Your Honor.

13              THE COURT:  Dr. Ginger, thank you.

14              The hour, it's getting late, and I've got a

15    bit of a drive still, so I won't take but a moment.  One

16    discrete issue, Deputy Chief, Mr. Arellanes talked about

17    a couple of things, but one was personal harassment

18    ongoing at his home and 12 cruise-bys, I would like you

19    to look into that for me.  You can address it now if

20    you'd like, or get your facts together, however you want

21    to handle it.

22              MR. ERIC GARCIA:  Your Honor, I agree.  Those

23    are serious allegations, and I'm going to be requesting

24    an investigation into that.  That kind of behavior will

25    not be tolerated.  So, yes, I'll be requesting an

1   investigation into that, and I will be getting back to
2   Mr. Arellanes, as well.
3           THE COURT:  Please do.  And keep me posted,
4   maybe on a monthly basis, a 30-day basis or something.
5   I'd like to know what the result of your investigation
6   is, and we'll go there from.  All right?
7           MR. ERIC GARCIA:  Yes, sir.
8           THE COURT:  Thank you.  Thank you for your
9   commitment.
10          Another discrete issue.  Ms. Bautista is
11   concerned, as I'm sure we all are, and certainly the
12   taxpayers of the city of Albuquerque are, about a
13   perceived spinning of wheels over the last couple of
14   years and not making the progress that we all coveted.
15   You talked in terms of looking back and recriminations
16   against prior administrations.  And frankly, that's not
17   my job.
18          And if I wasn't attentive enough to that
19   process and I didn't require of the City and the
20   Department what I should have, as the overseer of this
21   process, that's on me, and I'm sorry.  I tried to
22   address things as I was aware of them, and sometimes
23   pretty publicly.
24          But whether any action is taken relative to
25   them, that's not my job.  That's somebody else.  You

1    talked about criminal conduct.  I'm not addressing that,

2    I'm not going to comment on that, and that's the

3    prosecutors' job, and if the prosecutors want to do

4    something, that's their business.  And probably that's

5    going to be the last I'm going to say about that,

6    because it's a new day and we have limited resources,

7    and I don't want resources, limited as they are,

8    directed backward-looking when we've got a lot of work

9    to do yet going forward.

10            And I began today by telling you about my

11   meeting with the Mayor and the Chief and the Deputy

12   Chief, and the DOJ.  I came away from that meeting as

13   upbeat and even excited about this process as I have

14   been throughout.  And if you remember, we had a barbecue

15   in this room because we had a good report in the midst

16   of several bad ones, and I thought we ought to

17   celebrate.  I mean, it doesn't take much to get me

18   excited in this process.

19            So I genuinely am hopeful.  And you know what?

20   We all know that verbalizing an intention is a nice

21   thing, but it's only that.  You know, you have to have

22   commitment associated with that.  And whatever the math

23   was, 104 days, we've already seen some commitment in

24   terms of resources being expended, new hires, a new

25   Compliance Bureau being stood up.

1     When I was in Ft. Worth, hearing about that,

2 about what New Orleans had in place and anticipate

3 leaving in place after the Judge says they're done, I

4 thought:  Gosh, that's bound to be an expensive

5 proposition.

6     And I know Albuquerque is struggling with

7 their budget.  Everybody is.  But that has been very

8 public in the last few months.  I thought:  Can I order

9 that?  Can I require that of someone, you know, of the

10 City?

11     I get the Compliance Plan, and there's a

12 Bureau stood up, and I didn't have to say a word.  And

13 that's commitment that backs up the Mayor's suggestion

14 that he owns this result.  So I'm pleased about that,

15 and I am hopeful.  And do we have a long road to travel

16 yet?  Absolutely, we do.

17     I've heard "rubber hitting the road" and "the

18 proof is in the pudding" and, you know, I can throw

19 another one in there, "a 10,000 mile journey starts with

20 a single step."

21     And damn, you know, we should have been

22 further along after three years.  I get it.  I know that

23 to be true.  But we are where we are, and we're not

24 standing still anymore.  We're moving.  So I'm pleased

25 for the commitment that I've heard from the City.

1        The DOJ is not going anywhere, and they're

2    going to continue to monitor the process, as is our

3    Independent Monitor.

4        And one of the things I took away from the

5    thing in Ft. Worth:  How do you make reform stick?  That

6    was one of the questions that was asked:  How do you

7    make it stick?

8        And one of the great answers, intuitive as it

9    is:  Make reforms that nobody wants to reverse; that the

10   next administration wouldn't dare reverse; a Compliance

11   Bureau that is doing the ongoing work of a Monitor for

12   years to come; and making sure that they're policing the

13   police themselves; and it works; and trust is restored.

14       And these are good things, and who's going to

15   tear that apart?  Who's going to stand that down?  You

16   know, the folks wouldn't stand for it.  You create a

17   system that is going to resist change.  It sounds like

18   that's what they have in mind.

19       So it's late.  I really do appreciate

20   everyone's participation, and I look forward to -- well,

21   I don't think the schedule anticipates that I'll be back

22   in this sort of forum until November.  That's right,

23   isn't it?  I'm not getting any love here.  Gosh, you

24   know, I've forgotten that.  But I'm watching every day,

25   and I am in contact with these folks on a regular basis,

1    and we're not going anywhere until we've got this right,

2    and we've made a good step in that direction.

3              So thank you very much for your presentations.

4              Mr. Aguilar.

5              MR. ESTEBAN AGUILAR, JR.:  Your Honor, before

6    we adjourn, may I approach?

7              THE COURT:  Yes.

8              MR. ESTEBAN AGUILAR, JR.:  I would like to

9    provide the Court with a copy of the org charts that

10   Mayor Keller had asked me for.  The first one, for the

11   record, is the organizational chart as it existed on --

12   as it currently exists, but this was updated on

13   February 23, 2018.  The ladder on the back page is the

14   2017 organizational chart, updated November 1, 2107.

15             Thank you, Your Honor.

16             THE COURT:  And without objection, I presume?

17   I'm glad to make this a part of the record, as well.

18             (Organizational charts admitted.)

19             THE COURT:  Anybody else?  Ms. Martinez.

20             MS. ELIZABETH MARTINEZ:  Yes, Your Honor.

21             I just want to make sure that the community

22   knows that the United States is ordering the transcript

23   of this proceedings on an expedited basis so that we can

24   make sure that the community has the transcript as soon

25   as we can get it to them.  We try to make sure that we

1    keep everyone informed on the proceedings in this case.

2              Thank you so much.

3              THE COURT:  Yes, ma'am.  And I made the point

4    earlier, perhaps not well, but the three documents that

5    we talked a lot about today, they are public record.

6    They've all been filed and are all available on PACER

7    and, I suppose, maybe on the City's website; I don't

8    know.  But they certainly are available to the public.

9              And unless there's anything else, thanks very

10   much.  We're adjourned.

11             (Proceedings concluded at 5:50 p.m.)

```
1    UNITED STATES OF AMERICA

2    DISTRICT OF NEW MEXICO

3

4              CERTIFICATE OF OFFICIAL REPORTER

5                   I, Julie Goehl, RDR, CRR, RPR, RMR,

6    New Mexico CCR #95, Federal Official Realtime Court

7    Reporter, in and for the United States District Court

8    for the District of New Mexico, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code,

10   that the foregoing is a true and correct transcript of

11   the stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the

14   Judicial Conference of the United States.

15                   Dated this 20th day of March, 2018.

16

17              _____
                JULIE GOEHL
18              FEDERAL OFFICIAL COURT REPORTER
                Registered Diplomate Reporter
19              Registered Professional Reporter
                Registered Merit Reporter
20              Certified Realtime Reporter
                NM Certified Court Reporter #95
21              333 Lomas Boulevard, Northwest
                Albuquerque, New Mexico  87102
22              Phone:  (505)348-2209
                Email:  Julie_Goehl@nmcourt.fed.us
23

24

25
```