IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      vs.                      )   NO: 14-CV-1025 RB-SMV
                               )
THE CITY OF ALBUQUERQUE,       )
                               )
            Defendant.         )


TRANSCRIPT OF PROCEEDINGS
TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE
THURSDAY, APRIL 5, 2018
11:17 A.M.
LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO


(Proceedings recorded by machine shorthand and transcript produced by Computer-Aided Transcription.)

REPORTED BY:     VANESSA I. ALYCE, RPR, NM CCR #259
                 Federal Official Court Reporter
                 100 N. Church Street
                 Las Cruces, NM  88001
                 Phone:  (575) 528-1430
                 Email:  Vanessa_Alyce@nmcourt.fed.us

```
 1    TELEPHONIC APPEARANCES:

 2         FOR THE UNITED STATES:

 3                   UNITED STATES ATTORNEY'S OFFICE
                     District of New Mexico
 4                   201 Third St. NW, Ste. 900
                     Albuquerque, NM  87102
 5                   BY:  ELIZABETH M. MARTINEZ, ESQ.

 6                   and

 7                   U.S. DEPARTMENT OF JUSTICE
                     Civil Division
 8                   601 D. Street NW, Room 5422
                     Washington, D.C. 20004
 9                   BY:  COREY M. SANDERS, ESQ.

10                   and

11                   U.S. DEPARTMENT OF JUSTICE
                     601 D. Street NW, PHB 5418
12                   Washington, D.C. 20004
                     BY:  PAUL KILLEBREW, ESQ.
13

14         FOR THE CITY OF ALBUQUERQUE:

15                   CITY ATTORNEY'S OFFICE
                     P.O. Box 2248
16                   Albuquerque, NM  87103
                     BY:  JERAMY SCHMEHL, ESQ.
17                        ESTEBAN ANGEL AGUILAR, JR., ESQ.
                         MELISSA KOUNTZ, ESQ.
18
           FOR THE INTERVENOR APOA:
19
                     SANCHEZ, MOWRER & DESIDERIO, P.C.
20                   P.O. Box 1966
                     Albuquerque, NM  87103
21                   BY:   FREDERICK MOWRER, ESQ.

22

23

24

25
```

```
 1    TELEPHONIC APPEARANCES continued:

 2         Also Present:

 3                   DR. JAMES D. GINGER
                     Court-appointed Independent Monitor
 4
                     CHIEF MICHAEL GEIER
 5                   COMMANDER JOHN SULLIVAN
                     DEPUTY CHIEF ROGER BAÑEZ
 6                   DEPUTY CHIEF HAROLD MEDINA
                     DEPUTY CHIEF ART GONZALEZ
 7                   LIEUTENANT CORI LOWE
                     SHANIA GALLEGOS
 8                   Albuquerque Police Department

 9                   HONORABLE LORENZO F. GARCIA, RET.

10                   EDWARD HARNESS, Executive Director CPOA

11                   ALYSSA FERDA, Clerk U.S. Attorney's Office

12                   DIONNA K. FORD, Law clerk

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (On the record at 11:17 A.M.)

2          THE COURT:  Good morning, everyone.  This is the

3     April 2018 status conference in *United States of America*

4     *versus City of Albuquerque*.  I'm here.  Jess is here.

5          Dionna, are you on?

6          LAW CLERK:  I am, Your Honor.

7          THE COURT:  Good.  Good.

8          So who do we have, please, on behalf of the City?

9     Let's begin there.

10          MR. AGUILAR:  Your Honor, this is Esteban Aguilar

11     on behalf of the City, along with Jeramy Schmehl and Melissa

12     Kountz.  I'll ask each of the City representatives to

13     introduce themselves.  But we're having a little difficulty

14     hearing you, so I don't know if it's our phone, but we can

15     hear the other parties fairly well, so just to alert the

16     Court.

17          Go ahead.

18          DEPUTY CHIEF MEDINA:  Deputy Chief Harold Medina,

19     Albuquerque Police Department.

20          DEPUTY CHIEF BANEZ:  Deputy Chief Roger Bañez,

21     Albuquerque Police Department.

22          LT. LOWE:  Lt. Cori Lowe, Albuquerque Police

23     Department.

24          FEMALE SPEAKER:  (Inaudible.)

25          MALE SPEAKER:  (Inaudible.)

1              (Reporter interruption for clarification.)

2              THE COURT:  Hang on just a moment, please --

3              DEPUTY CHIEF GONZALEZ:  Art Gonzalez --

4              THE COURT:  -- we didn't hear the last of the

5    folks from the City police department.

6              LT. LOWE:  Cori Lowe, lieutenant, APD.

7              FEMALE SPEAKER:  (Inaudible), APD.

8              DEPUTY CHIEF GONZALEZ:  Art Gonzalez, Deputy

9    Chief APD.

10             MR. LEWIS:  James Lewis, APD.

11             CDR. SULLIVAN:  John Sullivan, Training Director,

12   APD.

13             CHIEF GEIER:  Mike Geier, Chief, APD.

14             JUDGE GARCIA:  If it please the Court, this is

15   Lorenzo F. Garcia.  I am neither a party nor counsel for

16   either, rather I am a nonlegal representative for the City

17   Council.

18             THE COURT:  Folks, sorry.  There was a female

19   that said she was appearing right after Cori Lowe, and we

20   didn't get that name.

21             FEMALE SPEAKER:  (Inaudible.)

22             THE COURT:  And I'm sorry, we still don't have

23   it.  Could you spell the name for us, please?

24             MS. GALLEGOS:  S-H-A-N-I-A.  Gallegos,

25   G-A-L-L-E-G-O-S.

1          THE COURT:  Perfect.  Thank you.

2          MS. GALLEGOS:  Welcome.

3          THE COURT:  And from the Police Officers

4    Association?

5          MR. MOWRER:  May it please the Court, Frederick

6    Mowrer on behalf of the Albuquerque Police Officers

7    Association.

8          THE COURT:  Thank you.

9          Dr. Ginger, are you with us?

10         DR. GINGER:  I am, Your Honor.

11         THE COURT:  And from the U.S. Attorney's Office?

12         MS. MARTINEZ:  Elizabeth Martinez, Your Honor.

13   And with me is our assistant, Alyssa Ferda, F-E-R-D-A.

14         THE COURT:  Thank you.  Mr. Killebrew is not with

15   you?

16         MS. MARTINEZ:  He's on the line, and one of our

17   colleagues is as well.

18         Paul?

19         MR. KILLEBREW:  Yes, I'm on the line, Your Honor.

20   Thank you.

21         THE COURT:  Anyone else that hasn't been

22   identified?

23         MR. SANDERS:  Yes, Your Honor.  Corey Sanders

24   from the Department of Justice.

25         MR. HARNESS:  Edward Harness from the Civilian

1    Police Oversight Agency.

2              THE COURT:  Thank you, Mr. Harness.

3              Anyone else?

4              If not, folks, we've got a -- and I'd call it an

5    ambitious agenda proposed this morning, so let's get right

6    to it.

7              The first matter is a report on technical

8    assistance provided by or provided to APD.

9              Dr. Ginger?

10             DR. GINGER:  Thank you, Your Honor.

11             As the Court is probably aware, we've spent the

12   first four months of the new tenure of the new

13   administration sort of working out a way forward in response

14   to that plan that I had devised back in November, I guess,

15   of last year.  We actually initialized that last month with

16   a site visit to Albuquerque by, over a period of time, all

17   of our team members.  We weren't all able to get there at

18   once.  And it's probably better that way because we were

19   able to focus basically on a topic at a time with APD

20   instead of having them torn between seven or eight different

21   topics and seven or eight different people at one time.  So

22   I think that turned out to be a fairly decent kickoff to

23   this new phase.

24             We have provided some very specific technical

25   assistance and will be continuing that for the next -- for

1　this month, as well.  We have more team members that will be

2　up there.  And all of us are providing specific actionable

3　technical assistance to APD on a way forward, trying to

4　build skills that they may need, trying to assess what their

5　needs are under this new process, and make sure that they

6　have a clear understanding of what our expectations are.

7　　　　　We've done some fairly basic stuff that we had

8　tried to do before with APD.  We reintroduced the concept of

9　a sequential planning process and gave APD some examples of

10　different planning modalities that we think they might be --

11　might be useful to them in the future.  We debriefed each

12　member of the senior staff on the way forward plan; not only

13　did we tell them what we had in mind, but we got input back

14　from them about what they might need under that process.

15　　　　　We identified several critical path issues for

16　APD and talked about past failures and what we might be able

17　to do to make sure that those failures don't reoccur.  And I

18　think everybody has a good understanding of what the new way

19　forward is and what the critical path is on that new way

20　forward.

21　　　　　We provided some very specific problem-solving

22　modalities for the use-of-force backlogs for APD to

23　consider.  And I think that was well received.  Everybody

24　seems to be on the same page and we're all trying to move

25　the boat in the same direction, which as the Court knows, is

1    new for us.  And I want to express my thanks to folks at APD

2    and the City for this new attitude and this new receptivity

3    that we've seen in the past few weeks and months.

4              THE COURT:  Thank you, Dr. Ginger.

5              Chief Geier, how is this technical assistance

6    going?  How do you see it benefiting the City?  There's a

7    tradeoff, we all understand that, to the extent that the

8    monitor is providing that assistance, there -- the team is

9    not doing the classic monitoring role, so how do you see

10   this playing out?  Is it something that's -- you see as

11   beneficial?

12             CHEIF GEIER:  Yes.  Obviously, we're in the early

13   stages.  And I mean, it's starting off, it's kind of broad,

14   you know, assistance in that regard, but we see some

15   specific areas that they've pointed out and offered that

16   assistance to us from the onset in the last visit.  I think

17   it's a good starting point for us right now because it gives

18   us that more specific guidance of which direction we need to

19   go.

20             I think sometimes, when you start with a very

21   wide framework, it leads to confusion and people kind of

22   take that on their own initiative to interpret what it is on

23   their level when, in reality, now we're getting again, that

24   specific guidance that will put us in that direction.  And I

25   think that will expedite the entire process as a result.  So

1    we're grateful for at least starting the implementation at

2    this stage.  And we're looking forward to hopefully

3    continuing and building from that.

4              THE COURT:  Thank you.  Does anyone else want to

5    be heard on the technical assistance being provided?

6              Let's look to Item 2, then, on the agenda, Update

7    on the implementation on the City's compliance plan.

8              Mr. Schmehl?

9              MR. SCHMEHL:  Yes, Your Honor.  Thank you.  I'll

10   pretty quickly pass the mic to Lt. Cori Lowe, who will

11   provide the Court with an update on the progress in

12   implementing the compliance plan.  Thank you, Your Honor.

13             LT. LOWE:  Good morning, Your Honor.  Lt. Lowe

14   with APD.  I just wanted to give a real quick update on the

15   current compliance plan.  As we're working through it, we

16   have started to learn that this is a very helpful tool in

17   trying to get us in the right direction that we're trying to

18   go, as well as get deadlines to abide by, but we're also

19   learning.  A couple of things that you will see in the next

20   few sections kind of describe that.

21             Area 1 is use of force.  That remains to be the

22   priority for APD.  And those deadlines should be met with

23   what they're doing on a daily basis, if we don't get that

24   done quite a bit earlier than the deadlines that we

25   previously set.

1          For Area Number 2, the deadlines have been met,

2     for the most part.  And there has been a file-saving

3     mechanism put in place, so we can show proof of task

4     completion.  And just for a second, I'm going to give it

5     back to Assistant City Attorney Jeramy Schmehl, so he can

6     explain the policy development process.

7          MR. SCHMEHL:  Yes, Your Honor.  And I think we

8     actually may be knocking out two birds with one stone here

9     because this is going to be mentioned as Agenda Item

10    Number 7; specifically, SOP 352, which discusses the policy

11    development process.

12         As Your Honor may remember, we had a series of

13    meetings.  We had, actually, a discussion at the full Police

14    Oversight Board meeting where it was presented as a process

15    flow, and we actually -- and again, we met with the policy

16    review subcommittee for the Police Oversight Board.  And all

17    that discussion culminated in a meeting with the amici, and

18    that included the Police Oversight Board.

19         Internally, we had discussions -- and when I say

20    "internally," I refer to the parties and the monitor --

21    about how to go forward with getting that 352 finally, you

22    know, approved and reviewed by everyone.  We anticipated

23    that that would be the way to do it, to get that

24    conversation going with the POB and the amici.  And then

25    there would be a draft provided to the parties and the

1  monitor, and then there would be approval.  However, having

2  taken a step back, it's been determined that it should go to

3  the full Police Oversight Board on the 12th of this month

4  for them to talk about it in public formally.  We're

5  anticipating comments back from the monitor and parties on

6  April the 9th.  So there may be -- and as it relates to

7  the compliance plan, there may be a slight delay in that

8  one.  That was anticipated to be completed by the April the

9  14th; however, we wanted to make sure that it was -- you

10  know, it was thoroughly discussed and that no one was cut

11  out, specifically the Police Oversight Board was not cut out

12  from that end process because that's the goal moving forward

13  to make sure that they have a role in that conversation at

14  the end of the formal adoptation [sic] of a policy.

15         And now, Your Honor, Cdr. John Sullivan will

16  speak to training issues that are implicated by the

17  compliance plan.

18         THE COURT:  Thank you.  Cdr. Sullivan?

19         CDR. SULLIVAN:  Good morning, Your Honor.

20  Cdr. Sullivan with APD.  Two items on training on the

21  compliance plan that have not yet been met.  One of them was

22  the submission of our comprehensive seven-step program.

23  That actually was submitted to the parties and Dr. Ginger

24  this morning.  So I apologize to the Court.  It's a couple

25  days late, but I was waiting to get a completed staff book

1   that I had created reference to the testing process

2   included.  So that's done.  I anticipate that approval

3   process to take a few days, and we should be up and running

4   with that.

5            The second item pending before the Court, as far

6   as the compliance plan and training, is an analysis of a

7   survey of the modified Citizens Police Academy.  We had been

8   waiting on that in hopes to get all of these surveys back

9   from the attendees of the modified Citizens Police Academy.

10  We have not received all of those surveys; however, we're

11  just going to go forward and do an analysis on what we have

12  received thus far.  I feel like we've had enough time out

13  there in hopes of getting the surveys back.  At this point,

14  we probably won't receive any further surveys.  So we should

15  have that analysis completed and submitted to the parties by

16  the beginning of next week.

17           MS. MARTINEZ:  Your Honor, Elizabeth Martinez.

18  If I may be heard on that?

19           I do want to also let the Court know that, on

20  March 16th, Cdr. Sullivan had a meeting with members of

21  the POB to elicit their feedback on the condensed Citizen

22  Police Academy.  So in addition to the survey, he also did

23  meet with Mr. Harness and members of the POB.  And I am

24  aware that, on Saturday, when the CPC members are having a

25  training session, he is also planning to meet with members

1    of the CPCs to elicit their feedback and get their input on

2    the new condensed Citizens Police Academy.  So he is going

3    beyond simply just the survey and actually meeting with both

4    POB and CPC members to get one-on-one input and feedback.

5    And I wanted the Court to be aware of that additional step

6    that he is taking.

7              THE COURT:  Well, thank you, Ms. Martinez.

8              And thank you, Cdr. Sullivan, for your commitment

9    to involving the -- well, the policing councils of the

10   oversight board in this compliance plan process.  That's

11   critical in terms of public trust.  And that's been the

12   source of some -- some angst, as you know, in the past,

13   so -- a failure to abide or a failure to include those

14   public voices.

15             Anyone else on the compliance plan?

16             LT. LOWE:  Your Honor, just to finish up, this is

17   Lt. Lowe for Areas 4, 5, and 6.  We are meeting our

18   deadlines with one exception, which is for the force review

19   board, but again, that's just waiting for the policy

20   development process.  Once that's in place, we will be able

21   to meet all our deadline from here on out.

22             And that would be it for Lt. Lowe on the

23   compliance plan, if there's not any other questions.

24             THE COURT:  Thank you.

25             I like hearing deadlines are being met and we're

1   moving -- moving forward.

2        So Number 3, the parties were inquiring about

3   potential court action on the joint stipulation modifying

4   the CASA use-of-force provision and the joint stipulation

5   suspending CASA Paragraph 308.

6        Mr. Killebrew?

7        MR. KILLEBREW:  Thank you, Your Honor.

8   Paragraph 308 or 338 is the one that governs stipulations

9   and modifications.  And as I'm sure the Court remembers, the

10  paragraph says that modifications, that the parties are to

11  inform the Court and that they go into effect 45 days after

12  submission to the Court, unless the Court orders otherwise.

13       And so the parties have submitted the

14  modification suspension on March 5th.  And in the past,

15  the Court has, at times, issued orders when the parties have

16  submitted a stipulation modifying some aspect of the CASA,

17  so we weren't sure if the Court had intended to issue orders

18  with regard to this modification.

19       The other -- the other filing that we made was a

20  suspension of the CASA -- of a CASA requirement relating to

21  the timing of monitoring reports.  There's nothing in

22  Paragraph 338 that talks about submitting those to the Court

23  or the Court needing to rule on them, but we thought it

24  best, in light of how the Court has handled modifications in

25  the past, to go ahead and provide a filing for the Court and

1 follow the same format as the modification pleadings.

2 So essentially, I guess what we're asking is

3 should we expect orders from the Court on those pleadings

4 or -- or not?

5 THE COURT: Well, I had this conversation with my

6 clerk yesterday. I think it best or better practice to have

7 orders following up those stipulations. And if the parties

8 can agree about a form of order, please submit it to me. I

9 just -- I like that process better. So submit forms of

10 order to me and I'll get them filed.

11 MR. KILLEBREW: Thank you, Your Honor. We will

12 do that right away.

13 THE COURT: Thank you.

14 Ready to go to Number 4, then? Factors to be

15 considered in determining filing date for the next CASA,

16 paragraph 298, outcome assessment report.

17 Ms. Martinez?

18 MS. MARTINEZ: Yes, Your Honor. Before the

19 March 15th status conference, the Court's clerk contacted

20 the parties and the monitor and asked us to articulate the

21 impact that the joint stipulation suspending the regular

22 reporting would have on the 298 outcomes assessment report.

23 And specifically, she asked us to let us know how that would

24 impact the filing date for the next outcomes assessment

25 report.

1          Ms. Ford let us know that based on the Court's

2    calendaring, the Court anticipated that the next outcomes

3    assessment report would be due for filing on May 14th,

4    2018.  At the time, we requested that the Court let the

5    parties and monitor report at this conference because we

6    needed time to review matters and confer on this issue.  And

7    we appreciate that the Court did give us that latitude.  And

8    we don't have a recommendation for this Court at this time,

9    but we would like to discuss with the Court factors that we

10   would like the Court to consider.

11         First, we would like the Court to consider that

12   the monitor's first outcomes assessment report was not filed

13   until August 1st, 2017.  And that's Document 292.  And

14   that report was filed, as the Court knows, late because the

15   problems that the monitor encountered with making sure that

16   he had appropriate data to work with and the difficulties

17   that the monitor encountered in being able to validate the

18   data.

19         Second, the CASA contemplates that the 298

20   outcomes assessment be filed annually.  So the parties and

21   the monitor believe that the next report would be filed no

22   earlier than August 1st, 2018.  Even if we had not filed

23   Document 355, which of course, has now suspended the regular

24   reporting structure.

25         There are considerations that we believe will

1    require -- or we will be recommending that the report be

2    filed later than August 1st, 2018.  One of those concerns

3    is that the compliance bureau and Dr. Ginger are still

4    working to ensure that the 298 outcomes assessment data

5    warehouse is being populated with the correct data and that

6    the data is able to be validated.  APD has secured the

7    services of Dr. Peter Winograd to validate the data.

8            And I believe that the Court is familiar with

9    Dr. Winograd.  He is a professor who is under contract with

10   APD.  He has been working with the Crisis Intervention Unit,

11   and the Court knows how well that division has been doing.

12   And we understand that is working very well with the IT

13   staff at APD in reviewing materials.  And I believe that

14   Dr. Ginger will be able to speak to the work that is going

15   on with the data warehouse, because he met by phone with

16   Lt. Lowe and Dr. Winograd earlier this week.

17           So the work, in terms of making sure that the

18   appropriate data is being collected, is ongoing.  And the

19   work with making sure that the data is being able to be

20   validated is ongoing.

21           Second, we need to make sure that all of the data

22   that meets the CASA's needs is being collected.  Several

23   paragraphs of the data -- of the CASA, rather, require that

24   APD collect demographic data.  And the demographic data that

25   needs to be collected is defined in the definition section

1   at paragraph 12-2 of the CASA.  As this Court has heard at

2   the community coalition at least twice, first in November

3   and then in March, members of the community want to make

4   sure that the 298 outcomes assessment report includes

5   reporting on the demographic data that the CASA requires

6   collection of.  And the parties and the monitor believe it's

7   important that when the next report, the next outcomes

8   assessment report, comes out that it includes that

9   information.  So we do want to make sure that that

10  information is in there.  We want to make sure that this

11  particular group of amici's interests are responded to.

12          Another factor that we believe is important is

13  that we believe that the next monitoring report, IMR-8,

14  should be released before the next outcomes assessment

15  report.  IMR-8 is due for filing in November of 2018.  As

16  the Court knows, a regular monitoring report provides a

17  tremendous amount of context.  And an outcomes assessment

18  report is really just data-driven.  And the parties and the

19  monitor believe it's really important that the community

20  have that context before they get a report that is really

21  just a statistical report.

22          So we're going to ask that Court consider those

23  factors in determining when the next outcomes assessment

24  report should be filed.  We are not in a position at this

25  point to recommend a date for the filing of the next

1  outcomes assessment report.  We'd like to ask the Court to

2  let us update the Court at the next status conference when

3  we have more information on the status of the 298 outcomes

4  assessment data warehouse.

5          And with that, Judge, unless you have questions

6  for me, I'd like to have Dr. Ginger update the Court on his

7  discussions with Lt. Lowe and Dr. Winograd.

8          THE COURT:  Dr. Ginger?

9          DR. GINGER:  Thank you, Your Honor.  I'm sure the

10 Court's aware that the first 298 reports that we issued had,

11 I guess, to put it mildly, ample and specific

12 recommendations for improving the 298 reporting process.  As

13 the Court recalls, we found instance after instance after

14 instance of inaccurate, incomplete, and/or unreliable data.

15 And we made specific recommendations to APD to correct those

16 issues.

17         Unfortunately, the previous administration,

18 previous to the current chief of the police and his team,

19 apparently did absolutely nothing with those

20 recommendations.  They sat from the time of the report came

21 out in August until December, I guess, when a new

22 administration came in without -- to my knowledge, without

23 any tangible changes to the data collection and reporting

24 processes.  So it leaves the current administration at APD

25 in a real bind.  They have a report that is due this August,

1   but they have this -- they have basically the same reporting

2   systems that gave rise to all of the issues that we

3   articulated in the first 298 report.  So that puts Chief

4   Geier and his folks in an almost untenable position of

5   trying to produce data that had no underlying systems to

6   produce it.  That's the problem.

7            The good news is they recognize what the problem

8   is and they have taken specific measurable and articulable

9   steps to repair those problems.  And Ms. Martinez mentioned

10  a contract with Dr. Winograd.  I had a very long and very

11  productive conversation with him earlier this week.  He

12  understands the goals of that paragraph.  He understands

13  what the 298 reporting systems should be doing.  He's

14  already identified, as the monitoring team had, some very

15  specific and tangible issues with the current process.  But

16  unfortunately, even though we alerted APD to that in August,

17  you know, we're just now starting to get to the point where

18  we can address those issues.

19           So if we were to do another 298 report when it's

20  due, we would simply report basically the same things that

21  we reported in the last one:  That the data collection, the

22  data integrity and the data analysis systems are poor, to

23  say the best.  And that, I think, will be with

24  Dr. Winograd's guidance and with Lt. Lowe's diligent work

25  that will improve markedly over the coming months.  I think

1   they understand this is a burning issue and it's not

2   something that we can let linger too long.  So they're

3   motivated to get data collection and analysis changes

4   implemented and executed.

5           I think that's the good news.

6           THE COURT:  Mr. Schmehl, did you want to be heard

7   on this issue?

8           MR. SCHMEHL:  Your Honor, I would just briefly

9   add because I think Dr. Ginger and Ms. Martinez have done a

10  good job of capturing most, if not all the issues, the City

11  supports the movement of the 298 outcomes assessment report

12  because it will allow -- allow consideration of the issues

13  that Dr. Ginger has raised while also taking into the

14  consideration the fact that, you know, the joint stipulation

15  has changed the reporting out in this reform effort.  It

16  makes sense for the 298 outcomes assessment report to take

17  that into consideration as well.

18          The City certainly wants a report that leads to

19  credibility and also reflects work being done under this new

20  time frame.

21          THE COURT:  Thank you.

22          Mr. Mowrer?

23          MR. MOWRER:  Mowrer:  No, sir, I don't need to be

24  heard.  I agree with the proposal to extend the deadline.

25          THE COURT:  Okay.  So folks, I understand the

1    request.  I've heard what you've said, but I have an

2    overarching concern:  We all talked about a new approach, a

3    new attitude from the City with the change of

4    administrations, and there was a great spirit of cooperation

5    and just a completely positive change in terms of direction

6    as of March.  But that honeymoon is not going to last very

7    long.  And we're already hearing from the public that the

8    process isn't going anywhere and we're -- a lot of money has

9    been spent and nothing's been accomplished.  And you've

10   heard those things as well.

11          I -- I think we don't want to take advantage of

12   this honeymoon period and continue to push things out.  If I

13   just leave it as Ms. Martinez requested, that the outcome

14   assessment report comes out after the IMR-8 in November,

15   then -- or you don't tell me until next month when we're

16   going to have it, I just worry about the perception that

17   we're taking advantage of the honeymoon and we're not moving

18   things forward.

19          So I'm not going to be -- I'm going to be

20   understanding, I hope, about the issues, but Doctor, rather

21   than pushing the report out because we don't have what we

22   need to report, maybe rather than just another delay, we

23   have it come out in August as it's scheduled, and we say

24   what we can say and acknowledge that we don't have enough

25   new data, enough data under our -- the new regime to make a

1    complete report.  But to leave it open-ended at this point

2    until sometime after November, I hesitate to sign off on

3    that.

4              So let me hear from you about my concerns.

5    Dr. Ginger?

6              DR. GINGER:  Well, Your Honor, we'll get the

7    report ready when the Court decides it needs to be ready,

8    and we can reflect current status in that report.  So if the

9    Court decides it needs to come out in August, it will be out

10   in August.  We will report what data we can find and APD can

11   provide to us that appears to be reliable, and then we'll

12   report again the current shortfalls in that existing system

13   and update the Court on what progress has been made in the

14   interim.  I mean, that is certainly doable.  It's not

15   something that is a heavy lift by any stretch of the

16   imagination.

17             THE COURT:  So what about, rather than just

18   pushing the date out to some date uncertain, we have a

19   report in August that does just exactly what you've said

20   just now, with an agreement that rather than those reports

21   coming annually, that we -- six months after the August

22   report, we have a supplement to it that incorporates all of

23   the new data systems and information that those make

24   available to us?

25             DR. GINGER:  I only have -- I only have one

1    concern about that, Your Honor, and it's not, as they would

2    say, a terminal concern.  It's not going to affect the life

3    of the process.  We can report clearly about the data

4    weaknesses and what needs to be done, but we cannot, in that

5    reporting process, based on the current system, give anyone

6    more than just a very general idea of what's going on in the

7    areas affected by paragraph 298.  With that caveat, you

8    know, we can certainly produce that report.  It would just

9    simply be a written articulation of what we've already

10   worked through with Lt. Lowe and Dr. Winograd about

11   weaknesses and processes for improvement.  But that's

12   certainly -- that's certainly doable.

13          THE COURT:  Well, give me a big picture,

14   Dr. Ginger.  If -- so August is -- today's -- it's April.

15   That's four months from now.  And you're already suggesting

16   that a report that comes out in August is still going to

17   suffer from the inadequacies of the prior regime.  And if I

18   just understood what you said, six months after that, there

19   are still going to be those problems apparent and we're not

20   going to be able to give people good information.  Did I

21   understand you to say that just now?

22          DR. GINGER:  Well, it's not probable, I don't

23   think, Your Honor.  I think it's possible.  And I may not

24   have been clear in that assessment.  I think -- there are

25   some easy fixes in the 298 conundrum.  And I think Lt. Lowe

1    and Dr. Winograd are moving along the process to identify

2    what those are and then identify areas where we really just

3    have to admit, based on the record-keeping and that sort of

4    process -- those sort of processes, that we don't know what

5    the status is.  So it will be a report that identifies

6    things that we know need to be fixed, some things that we're

7    not sure, you know, where the data systems stand or that

8    we've done a preliminary assessment and think that these

9    data assessment systems stand at point "X," but with no

10   reasonable or particular certainty, as they say.  But it

11   would give the public a good idea of what the problem is,

12   where it came from, and what we're doing to fix it.

13           THE COURT:  Well, I'm discouraged, if I'm hearing

14   you correctly in response to my concern that it's -- I have

15   you report in August and, six months later, which is ten

16   months from now, obviously, and better than a year after the

17   new regime is in place, that we didn't don't have good

18   information and we still don't have the systems in place to

19   provide that information.

20           At some point, I'm telling you, this honeymoon

21   thing is over and people are going to start, and rightfully

22   so, requiring that we have systems in place, that we have

23   information-gathering according to your norms.

24           Boy, I don't like what I think I'm hearing.

25           MR. KILLEBREW:  Your Honor, this is Paul

1    Killebrew from the Department of Justice.  May I be heard

2    briefly on this?

3              THE COURT:  Yes, sir.

4              MR. KILLEBREW:  Thank you, Your Honor.  I wanted

5    to take a step back about the purpose of the outcome

6    assessment reports.  The idea of the outcome assessments is,

7    if you look back at DOJ consent decree initially for the

8    first 10 or 15 years of our practice, we didn't have these

9    things called "outcome assessments."  They were a new

10   innovation, a more recent innovation.

11             And the purpose of the outcomes assessments is

12   that, previously, the way we looked at compliance was, you

13   know, we had a number of things we had to change in policy

14   training and so on, and we looked at compliance and had they

15   done, had they instituted the policy, had they changed the

16   training program, et cetera.  So that introduced a question

17   because, just because you've done all those things, does

18   that mean that the pattern of practice of constitutional

19   violation has been eliminated.  The outcomes assessments

20   were designed to look at that question in a different way.

21   Not just have you changed policies and training, but what is

22   actually happening with policing.  And so we looked at a

23   number of different factors that could be examined in terms

24   of numbers and statistics and proportions and said let's

25   look at all of those because that's another way of looking

1   at whether there is compliance with the overall goals of the

2   consent decree.

3           So the purpose of them is to give that sort of

4   context about what compliance looks like.  And if you look

5   at the CASA, paragraph 300(c), it says that the first

6   outcome assessment is to occur 24 months after the effective

7   date.  So that turns out to be the time at which the parties

8   originally planned or hoped that APD would have reached full

9   compliance and be moving into the sustainment period.  So

10  the idea was that if APD had met that goal, we would be

11  looking not only at a track record of compliance with the

12  obligations under the CASA, but we could also look at the

13  outcome assessments and see if making those reforms had led

14  to the changes we all expected in terms of policing on the

15  street.

16          So here we are now and it's not where we thought

17  we would be.  We're several years into this, and APD and the

18  City have not reached full compliance.  And the outcome

19  assessments are clearly important to understanding what's

20  going on in the City of Albuquerque, but even with IMR-8, I

21  don't think we expect APD to be in full compliance with the

22  CASA.  And so an outcome assessment that comes out right

23  now, again, will provide useful information, but it's -- we

24  wouldn't expect it to show full compliance with the overall

25  goals of the CASA at this point.

1          And one other thing about outcome assessments,

2     the way that the CASA is set up is that APD can show

3     compliance by meeting all of the obligations or by showing

4     improvement in the outcome assessments.  And the idea there

5     was that we'd set up requirements for reform that we thought

6     would lead to constitutional policing, but we knew that APD

7     may reap constitution policing through other means, so we

8     wanted to reflect that if they showed improvements in the

9     outcome assessments, this would also be a way of proving

10    their compliance with the goals of the CASA.

11         So all of that context said, the DOJ certainly

12    wants to see these data systems get up and running so that

13    we can start seeing what policing looks like on the street.

14    We do feel more flexibility about the timing of the outcome

15    assessment report, given that we're not in a situation where

16    APD has come into full compliance.  And that's where outcome

17    assessments are most critical from our perspective.

18         Thank you, Your Honor.

19         THE COURT:  Thank you, Mr. Killebrew.  And I

20    appreciate the context.  And certainly you've got a lot of

21    background that I don't have and I'm -- so you've just given

22    me detail that's down in the weeds.  And I'm talking about a

23    view from 10,000 feet.  I'm talking about the view from, you

24    know, the public that's watching this.  And all they know is

25    this process has been in place, we've got requirements under

1     the CASA, the CASA has not been complied with, it's been --

2     now, we're pushing back deadlines, and we can only ride this

3     "past-regime" horse so far.  We've got to have progress.

4          And I don't know how it's measured so much.  I

5     don't know whether the outcome assessment is the place where

6     you have to make a public showing that we are making

7     progress.  I mean that's what those words sound like,

8     "outcome assessment," you know, are we meeting these

9     outcomes?  But I just worry that we've only gotten

10    through -- we're not through yet the fourth item on a

11    ten-item agenda today and I haven't heard -- I've heard a

12    lot about, you know, good attitudes and we're moving

13    forward, but I think at some point, we've got to give the

14    public something concrete in terms of the policing in

15    Albuquerque being turned around, attitudes being turned

16    around, and constitutional policing being a reality as

17    opposed to just a goal.

18         So that's my view from 10,000 feet.  And I'm glad

19    to have you-all talk about how things look down there on the

20    ground, but as we all know, we're being watched.  And we

21    need to be accountable and transparent.  So that's my

22    concern about pushing back deadlines yet again.  I

23    remember -- and I'm sure it had to do with a process that

24    wasn't healthy -- but we pushed out the outcome assessment

25    the first go 'round time after time.

1          So that's -- I'll...

2          MS. MARTINEZ:  Your Honor?

3          THE COURT:  Yes?

4          MS. MARTINEZ:  May I be heard, please?

5          THE COURT:  Yes.

6          MS. MARTINEZ:  It's Elizabeth Martinez.  I would

7   like to ask the Court to please consider that on

8   August 31st, the monitor and the City will be filing a

9   report, one of the interim reports, so the community will be

10  getting a report right at that point.  So it will not be as

11  if the community will not be getting any kind of information

12  between that period.  I mean, I do know that, on June 1st,

13  the community will be getting a report on the technical

14  assistance, but they will be getting a more substantive

15  report on August 31st.  And perhaps that would be

16  something that would address some of the concerns that the

17  Court is raising now.  And a consideration may be that if

18  the monitor is working on an outcomes assessment report,

19  that may also impact the work on the report that is due on

20  August 31st.  So I ask that the Court consider that also.

21  Thank you.

22          THE COURT:  Yes, ma'am.  And I will consider that

23  and I appreciate the additional information.

24          Here's how we're going to leave this:

25  Ms. Martinez earlier asked that at the next status

1   conference in May that you would have a date in mind for the

2   next outcome assessment report.  I will allow that.  I'll

3   wait for an update.  You-all have heard me.  You've heard my

4   concerns and my thoughts about how we might go forward.  I'm

5   not prepared at this point to say that it won't come out

6   until after IMR-8 in November.  And you've heard me, so

7   you-all figure out where we go from here and let me know in

8   May.

9           And I don't -- do we have a date in May?  Because

10  I know I'm gone the first Thursday in May, which is when we

11  usually have these, first Thursday of the month.

12          Dionna, do we have a date for our next hearing?

13          LAW CLERK:  Judge, we do not.  I think Jessica

14  had talked about asking the parties whether May 17th would

15  be available.

16          THE COURT:  Everybody have their calendars with

17  you?  You can look to see whether May 17th will work for

18  our next status conference.

19          MR. MOWRER:  Fred Mowrer on behalf of the APOA.

20  That works for me.

21          MR. KILLEBREW:  That date works for the United

22  States, Your Honor.

23          DR. GINGER:  And for the monitor, Your Honor.

24              (Discussion off the record.)

25          MR. SCHMEHL:  Your Honor, we're polling the room.

1    If you will just give us a brief moment.

2                    (Discussion off the record.)

3              That works for the City as well, Your Honor.

4              THE COURT:  Let's do it on May 17th.  And I

5    need to start a little earlier in the morning.  Let's start

6    at about 10:30, will that work?

7              MS. MARTINEZ:  Yes, Your Honor.

8              THE COURT:  If that's a problem for anyone, let

9    me know and we'll do what we can to accommodate the concern.

10             Let's go to the next item on the agenda, update

11   on the promotional policy.

12             Mr. Sanders.

13             MR. SANDERS:  Yes, Your Honor.  How you doing?

14             Judge, I've been playing a mediating role in this

15   part of the case in the City and APOA in reaching an accord

16   on trying to finalize a policy.  So Judge, I'd let Attorney

17   Kountz give the Court a greater update on where we are with

18   this policy, and I'll let Mr. Mowrer follow up with that.

19   And if you have any followup questions, Your Honor, I'll be

20   more than happy to answer.

21             THE COURT:  Thank you.

22             Ms. Kountz?

23             MS. KOUNTZ:  Good morning, Your Honor.

24             Mr. Sanders was kind enough to provide us with

25   proposed language.  I reviewed it with my client and I'm

1    currently in the process of making some minor revisions to

2    it.  I'll be meeting with the Department again next Tuesday

3    and hope to have something to Mr. Sanders and the APOA at

4    the latter part of next week.

5              THE COURT:  Thank you.

6              Mr. Mowrer, are you satisfied with how things are

7    moving forward?

8              MR. MOWRER:  Well, Your Honor, it's like this

9    entire process.  It's a little slow at times and can be

10   aggravating, but I am looking forward to seeing what

11   Mr. Sanders and Ms. Kountz are able to do after our last

12   telephone conference with regard to our concerns on certain

13   portions of this policy.  And we'll await a new draft so

14   that the APOA can timely respond and hopefully work forward.

15             THE COURT:  Thank you.  And it's my hope that for

16   our next status conference that we either have an agreement

17   or our positions are well defined and we know where we need

18   to go from there.

19             The next matter is the joint stipulation

20   reference mediation.  Mr. Killebrew?

21             MR. KILLEBREW:  Thank you, Your --

22             MS. KOUNTZ:  Your Honor?

23             MR. KILLEBREW:  Oh.

24             MS. KOUNTZ:  This is Melissa Kountz real quick.

25   May I be excused?

1          THE COURT:  Yes, ma'am.  Thank you for your --

2          MS. KOUNTZ:  Thank you.

3          THE COURT:  -- participation.

4          MR. KILLEBREW:  Your Honor, this is Paul

5    Killebrew for the United States.  You may recall we brought

6    up to the Court in the past that the Civilian Police

7    Oversight Agency proposed to the parties that it be

8    permitted to begin a program for referring minor misconduct

9    complaints to mediation, which is like other forms of

10   alternative dispute resolution.  It's a way to have a

11   resolution for a civilian complaint that would not go

12   through the normal formal process, but that, nonetheless,

13   another jurisdiction has proven to be both very effective

14   and led to higher customer satisfaction both for civilians

15   and officers.

16          And so basic -- the Civilian Police Oversight

17   Agency did some research on mediation and proposed a program

18   to begin it.  The legal in terms of the CASA is that

19   paragraph 184 says that mediation can only be available

20   where the complaint doesn't allege misconduct.  As the Court

21   could imagine, I'm sure, very few complaints have -- contain

22   no allegation of misconduct.  Most complaints, civilian

23   complaints, allege some form of misconduct.  So instituting

24   this mediation program would require a modification of the

25   CASA.  The provision in the CASA is there because the

1  parties wanted to have all civilian complaints handled with

2  consistency and formality so that there -- you could be sure

3  that they would all be handled appropriately and could check

4  whether they had been.

5          At this stage, civilian oversight is -- the

6  Civilian Police Oversight Agency has been up and running for

7  several years and has really taken root in Albuquerque in a

8  way that the parties and the public, it seems, have

9  confidence in.  So we feel comfortable permitting mediation

10  for minor civilian misconduct complaints.  And the parties

11  have been working on a joint stipulation to modify

12  Paragraph 184.

13          I believe what we intend to do is to suspend

14  paragraph 184 for a six-month period so that we can assess

15  how mediation is going.  And if it goes well, then we would,

16  at the end of that six-month period, permanently modify the

17  paragraph.

18          We wanted to put this on the agenda today because

19  we hope and intend that the pleading will be filed with the

20  Court before the next status conference.  And so while we

21  had a chance to just let you know that it's coming, we

22  wanted to do so.

23          THE COURT:  Thank you.

24          Mr. Harness?

25          MR. HARNESS:  Yes, Your Honor, as Attorney

1    Killebrew stated, I believe that we have reached an

2    agreement between ourselves, the APOA, APD, and DOJ to make

3    these changes to allow for the agency to operate in

4    compliance with the City ordinance for mediation to be used

5    in order to take care of the minor complaints.  And I'm glad

6    to hear that it's going to be submitted prior to the next

7    status conference.

8            THE COURT:  Well, Mr. Killebrew -- does anyone

9    else want to be heard on this issue?  If not --

10           DR. GINGER:  Nothing from the monitor, Your

11   Honor.

12           THE COURT:  If not, then Mr. Killebrew, I'll

13   consider signing off on a stipulation that suspends the

14   operation of the critical paragraph for six months, pending

15   your experience with a mediation program.

16           MR. KILLEBREW:  Thank you, Your Honor.  In light

17   of our discussion earlier, we will submit a proposed order

18   when we file that pleading.

19           THE COURT:  Thank you.

20           Number 7, update on status of draft SOP 352,

21   policy development process.

22           Mr. Schmehl?

23           MS. HERNANDEZ:  Yes, Your Honor, thank you.

24   Unless Your Honor has questions, I think it was covered in

25   discussion of Agenda Item Number 2.

1          THE COURT:  Yes, sir.  Any other discussion about

2     Item 7?

3          Thank you.

4          DR. GINGER:  Nothing from the monitor, Your

5     Honor.

6          THE COURT:  All right.  Let's go on to Number 8,

7     then.

8          So Cdr. Sullivan, we -- at the public hearing in

9     March, Mr. Arellanes, we heard from Mr. Arellanes and, in

10    the meantime, he has sent a letter to the Court.  Did

11    everybody get a copy of that letter?

12         MALE SPEAKER:  No, sir.

13         MS. MARTINEZ:  We did not, Your Honor.

14         THE COURT:  Well, Dionna, let's see that

15    everybody gets it --

16         LAW CLERK:  I will, Judge.

17         THE COURT:  -- gets a copy of that, please.

18         So he had concerns not only about the use of

19    force and use of Tasers, but -- and this is kind of an

20    amalgam of the other issue, but he also had some concerns

21    about ongoing harassment.  And I asked Deputy Chief Garcia

22    to look into that.

23         Can you address those for me, Cdr. Sullivan?

24         CDR. SULLIVAN:  Again, Your Honor, Cdr. Sullivan

25    here.  I can address, certainly, the training aspect of it.

1    I was in court when you heard from Mr. Arellanes, so I was

2    aware of the issue.  And on March 28th, we actually had a

3    meeting with Mr. Arellanes and his attorneys.  I brought in

4    the training regimen that we do deliver to both the cadets

5    and the officers ongoing.  I showed them all of the -- all

6    of the paperwork and the documentation that shows that the

7    Albuquerque Police Department and the Albuquerque Police

8    Academy are training in accordance with the Taser manual.

9    And we are specifically following their exact

10   recommendations.

11         Unfortunately, I think that Mr. Arellanes got

12   some bad information from one particular officer.  And it's

13   my responsibility, as the academy director, to determine if

14   that's an individual issue or a systematic issue.  I assured

15   him and his attorneys that we would be doing that.

16         As you know, Your Honor, we're going to be

17   conducting an entire use-of-force retraining in 2018 of the

18   entire Department.  So it's certainly something that will be

19   addressed, but I did want to make sure that he and his

20   counsel are well aware that this is not something the police

21   department trains.  We are certainly well aware of where the

22   Taser target zones are and what the Taser manual represents.

23   And this is absolutely something that we do train and it's

24   what the officers are taught.

25         THE COURT:  Commander, thank you for taking the

1  time to meet with Mr. Arellanes and his representative and

2  address his concerns about Taser training and deployment.

3         Just because we're talking about Mr. Arellanes,

4  is Deputy Chief Garcia with us this morning?

5         MR. SCHMEHL:  Your Honor, this is Assistant City

6  Attorney Jeramy Schmehl.  He is not, Your Honor.  He is

7  traveling with some training required by the Department.

8         THE COURT:  When we -- would you -- when you talk

9  to him, please -- I had directed him at the public hearing

10 to address Mr. Arellanes' concern about the harassment issue

11 and to keep me updated on a monthly basis.  I -- I don't

12 remember what date that was, but I expect that a report

13 ought to be due pretty soon.  So I'll look forward to that.

14         Back to the agenda.

15         MR. SCHMEHL:  Yes, Your Honor.  If I could just

16 real briefly -- if it please the Court.  There was a

17 referral made and the next agenda item will speak to the

18 efforts by Deputy Chief Garcia to address and report back to

19 the Court on the allegations.

20         There was a referral for an investigation to be

21 initiated by Mr. Harness into the complaint, and I think he

22 would be speaking to that directly.

23         THE COURT:  I'm sorry.  I hadn't looked down at

24 the next item, so obviously, let's go to that.

25         Mr. Harness?

1    MR. HARNESS:  Yes.  Good afternoon again, Your

2    Honor.  We did receive -- I was in the court when

3    Mr. Arellanes made his allegations against the Department,

4    and I spoke with him briefly after the hearing.  And then in

5    consultation with Deputy Chief Garcia and Cdr. Miller from

6    Internal Affairs, they did draft a complaint on behalf of

7    Mr. Arellanes.  And they forwarded it to our agency in

8    accordance with APD policy and the Albuquerque City

9    ordinance or oversight, because this is a complaint that is

10   originating from a civilian.

11         So we have taken the issue and we have assigned

12   it to an investigator.  The investigator has been out to

13   interview people in Mr. Arellanes' neighborhood.  He is

14   attempting to solicit surveillance videos from the area,

15   attempting to identify APD personnel that may be involved.

16   He's gotten reports on incidents within that particular beat

17   area, CADS reports, and he is in the midst of his

18   investigation.  He has interviewed some neighbors and has

19   not yet interviewed Mr. Arellanes, but that will be a part

20   of the investigation, obviously, as well.

21         THE COURT:  Well, Mr. Harness, thank you for the

22   update, and forgive me for not seeing that next item as it

23   related to Mr. Arellanes.  You-all are addressing the

24   concern in a responsible way, and I look forward to the

25   result of that investigation.  Thank you.

1    MR. HARNESS:  You're welcome.

2    THE COURT:  So Item 10 is just upcoming events

3  and a request for a public status conference in June.

4    The request was for the week of June 11th

5  through the 16th, and my schedule won't allow for that and

6  I'm wondering if we could -- and this will seem inconsistent

7  with my earlier initiative to press forward on at every

8  point, but I -- I'd like to have that public conference --

9  I'll come to Albuquerque again, but I'd like to do that on

10  perhaps July 18th.  What does that look like for

11  everyone's schedule?

12    MR. MOWRER:  I'm sorry, Your Honor.  July what?

13    THE COURT:  Eighteenth.

14    MR. MOWRER:  Thank you.

15    THE COURT:  Wednesday the 18th.

16    DR. GINGER:  Your Honor, I have a conflict.  I'll

17  see if I can change that and advise the Court by tomorrow.

18    MR. MOWRER:  This is Fred Mowrer on behalf of the

19  APOA.  July 18th works for me, Your Honor.

20    THE COURT:  Thank you.

21    MS. MARTINEZ:  The United States is available.

22    THE COURT:  Thank you.

23    JUDGE GARCIA:  Judge Brack, this is Lorenzo

24  Garcia.  I am available on the 18th as well.

25    MR. SCHMEHL:  As is the City, Your Honor.

1          THE COURT:  Good.  Thank you.

2          Dr. Ginger, let us know if that conflict can be

3   revolved.  If not, we'll look at another date.  That just

4   would work best for my schedule, but I'm glad to accommodate

5   everyone else's, if need be.

6          So other than that, June 1st the City and

7   independent monitor file a status report.  June 4th

8   through the 8th, community meetings to discuss the status

9   report, the status of the reform effort.  June 11 through

10  16, the monitoring team is going to be doing a site visit.

11  And what else did we -- is on the agenda this morning,

12  folks?  Anything?

13         MS. MARTINEZ:  Your Honor?

14         THE COURT:  Yes, ma'am.

15         MS. MARTINEZ:  If the Court is not able to do a

16  status conference the week of the site visit, would the

17  Court have its regular status conference the first week of

18  June and then have the July status conference on

19  July 18th?

20         THE COURT:  Yes, ma'am, I think that would be a

21  good way to accommodate the change I need to make.  If it

22  works for everyone else.

23         MS. MARTINEZ:  Thank you so much.

24         THE COURT:  Yes, ma'am.

25         Anything else I can help you folks with today?

1          MR. MOWRER:  Not from the APOA, Your Honor.

2     Thank you.

3          DR. GINGER:  Not from the monitor, Your Honor.

4          THE COURT:  Well, thank you-all very much.  I

5     appreciate everyone's efforts.  I really do.  And look

6     forward to hearing from you, Dr. Ginger, about the change to

7     July 18th and, otherwise, we'll be back together

8     May 17th at 10:30 in the morning.

9          Thanks very much.  Y'all have a great day.

10          (The proceedings concluded at 12:24 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    UNITED STATES OF AMERICA

 2                    DISTRICT OF NEW MEXICO

 3

 4              CERTIFICATE OF OFFICIAL REPORTER

 5        I, Vanessa I. Alyce, RPR, NM CCR, and Federal Official

 6   Court Reporter in and for the United States District Court

 7   for the District of New Mexico, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code, that

 9   I did report in stenographic shorthand to the best of my

10   skill and ability the foregoing pages 1-44 of the

11   proceedings set forth herein, that the foregoing is a true

12   and correct transcript of the stenographically recorded

13   proceedings held in the above-entitled matter and that the

14   transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16

17   Dated this 17th day of April 2018.

18

19   S/Electronically Filed
     Vanessa I. Alyce, RPR, NM CCR #259
20   Federal Official Court Reporter
     100 N. Church Street
21   Las Cruces, NM 88001
     Phone: (575) 528-1430
22   Email:  Vanessa_Alyce@nmcourt.fed.us

23

24

25
```