## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

> **Plaintiff,**

**v.**                                             **No. 1:14-cv-1025 RB/SMV**

**THE CITY OF ALBUQUERQUE,**

> **Defendant,**

**v.**

**THE ALBUQUERQUE POLICE**
**OFFICERS' ASSOCIATION,**

> **Intervenor.**

### FIRST STATUS REPORT ON THE TECHNICAL ASSISTANCE PROVIDED BY THE INDEPENDENT MONITOR TO THE CITY OF ALBUQUERQUE AND THE CITY OF ALBUQUERQUE'S EFFORTS TO IMPLEMENT ITS COMPLIANCE PLAN

This status report will update the Court, the Parties and the community on the technical assistance provided by the independent monitor to the City of Albuquerque (City) and the City's efforts to implement its compliance plan (Doc. 358-1) which was filed with the Court on March 14, 2018.

The first section of the status report has been authored by the independent monitor and it details the efforts of him and his team to provide technical assistance to the City while the second section addresses the City's efforts to implement the compliance plan.  (*see* Doc. 355 at 4).  This is the first of two such reports and the second one will be filed with the court on August 31, 2018.

**SECTION I:  INDEPENDENT MONITOR'S REPORT ON TECHNICAL ASSISTANCE
PROVIDED TO THE CITY OF ALBUQUERQUE**

In response to critical issues created by APD's former executive and management cadres
related to compliance requirements and APD compliance strategies, the Parties (APD, the City of
Albuquerque, the US DOJ, the USAO NM and APOA), with the approval/concurrence of the
monitor, recommended to the Court, via a "Joint Stipulation Suspending Paragraph 308 of the
CASA", that the monitor submit two "Mini Reports" outlining APD's progress toward
compliance for this reporting period.  This Joint Stipulation was filed with the Court on the 10th
of May, and articulated, in effect, a document that suspended the "normal" reporting processes
for independent monitor's reports, replacing the "normal" process with four status reports, (two
prepared by the monitor and two prepared by the City).  The joint stipulation requires the first of
these four reports to be submitted to the Court on or before June 1, 2018 and the second due to
the Court on or before August 31.

This document constitutes the monitor's first filing in response to the Joint Stipulation
Suspending Paragraph 308 of the Settlement Agreement[1], and covers the period beginning in 1
November, 2017 and ending 30 April 2018.  This document outlines briefly the technical
assistance provided to APD by the monitoring team during the above-identified period of time,
as well as any relevant observations made by the monitor.  The provision of technical assistance
by the monitoring team to APD for that period of time, in most cases, was duplicative of that
which was provided between 2015 and 2017.  Based on the agreements among the Parties, the

---

[1] The Court filing by the Parties, responsive to perceived technical assistance processes designed
to aid APD in moving its compliance efforts forward noted:  "the Independent Monitor will
provide the Court and public information about what technical assistance he and his team have
provided up to that point, as well as any observations the Monitor may have regarding the City's
compliance efforts and where it should focus its resources moving forward." Doc. 355 at 5.

monitor's first status report covers the technical assistance provided to APD in seven critical areas of compliance, including:

1. Developing an internal problem-solving process that APD can use in every area of compliance;

2. Revising APD's policy on use-of-force investigations in light of the recent modifications to the CASA (see Doc. 354);

3. Revising APD's use-of-force policy to make it clearer and more understandable;

4. Designing a new training program for personnel assigned to the force investigation function;

5. Designing a new training program for supervisors regarding their obligations under the three-level force classification system;

6. Designing a new training program for line officers regarding the revised use-of-force policy and their obligations when they use Level 1 force; and

7. Strengthening the administration of APD's training academy.

Each of these areas of technical assistance (TA) is discussed in some detail below.

**A.  Developing an Internal Problem Solving Process**

In the first few weeks of the current reporting period, the monitor personally trained (and in some cases re-trained) key management and operational staff in a universally applicable problem solving process.  In a repeated (and somewhat revised) session with lieutenants, commanders, and deputy chiefs, the monitor walked APD command through the widely recognized "GO-MAPPS" problem-solving process.  This process was virtually identical to the training provided to APD in November of 2015, and consisted of presentation of the elements of the GO-MAPPS process:  Goals, Objectives, Measurement, Analytic Methods, Process Identification, Product Development, and Systematization of Change in reporting, command staff assessments, and analysis.  We further provided exemplars and discussed how a GO-

MAPPS strategy could be implemented in APD[2].  We suggested to APD that all personnel who would have a significant role to play in moving APD forward should be included in the training, so that APD would have a common set of processes to use in moving its compliance efforts forward.

At each step of the follow-on processes offered to APD command, we re-emphasized the importance of a formalized change strategy at strategic, administrative, supervisory and operational levels of the organization.  We noted that we see this as critical to sustaining compliance with the CASA.  Our inputs on each of the elements of the formalized change strategy are outlined below.

## B.  Developing Reliable Systems to Identify, Prioritize, Process and Evaluate Solutions to APD's Use of Force Backlog

Senior members of the monitoring team met with representatives of the new command staff of APD and other members of APD focused on Use of Force issues, to discuss the potentially deleterious effects of the use of force backlog, and to emphasize the need for a clear and effective "Way Forward" regarding the pressing and critical problem of dealing with the use of force backlog that currently exists at APD.  We articulated what we believe is clear and convincing reasons why the backlog could not be discounted.  The information contained in the "backlogged" use of force cases includes:

- Critical information needed to identify, counsel, retrain, or reassign officers who have routinely violated existing use of force policy;

- Key indicators informing the need for revisions to current use of force policy given officers' actual actions in the field;

---

[2] The GO-MAPPS strategy was developed by the New Jersey State Police, in consultation with the monitor, and has been maintained by the organization since its inception.  It is an amalgam of the various problem-solving models related to organizational development and planned change.

- Facts and information critical to understanding actual operations in the field in order to develop clear and effective remedial training;

- Information informing the need to synchronize supervisor and command staff training with actual events "in the field;" and

- Information concerning trends and practices that do not conform to policy, essential for APD to understand the magnitude, direction and effect of past errant use of force related practices.

We further discussed in detail with APD command and supervisory personnel the need for a detailed, precise and robust assessment of the need for a workload analysis of the use of force backlog, e.g., how many cases are in the backlog by number and type; how many frequent offenders exist in the system (officers with 3-5; 6-9; or >10 pending cases); variances among Area Commands, etc.  Not surprisingly, given the nature of the recent appointments of new APD command staff, few command staff, at the time of our site visits, possessed an appreciation for the critical need to clearly identify, assess, and develop remedial responses to the backlog.  In the monitor's opinion, the use of force backlog presents clear threats to policy development, training development, supervision, and the need for command oversight.  We clarified these issues for the "new" APD command staff during the course of our on-site discussions with them this reporting period.

We further discussed with APD their tendency to view use of tear gas, flash-bangs, and other force modalities as "non-use of force events."  We strongly suggested the agency resolve this assessment as to what constitutes a use of force and how such events should be evaluated, assessed, and classified.

Overall, we left APD with a clear understanding of our assessment of use of force:  APD needs to develop modalities to clearly define, identify, classify, review, train and supervise use of force events within the agency.  We also discussed various modalities to achieve these goals, at

times in-depth and with painstaking attention to detail and process, e.g., sampling methodologies to determine the nature and extent of various use of force issues; assessment modalities to determine where the most serious use of force issues were centered, e.g., Patrol, Special Operations, CID, other specialized units, Area Commands' shifts, etc.

In our March 2018 interactions with APD staff, we again asked for examples of APD's "plan" to address the backlog. Our repeated advice was you can't solve a problem until you know the magnitude of it.  We again worked APD staff through a series of potential action steps designed to remediate the backlog, including temporary duty assignments, development of assessment "sheets" to identify not only the number of cases in the backlog, but to identify the categories of cases and the volume in each category. We also suggested using performance metrics e.g., how many backlogged cases were being processed and cleared on a weekly basis, by whom, and what was the quality of that clearance process.

Also in March we worked with APD to design an assessment and triage system for the backlog, to enable them to identify specific numbers of the backlogged cases by type and age. The process we discussed also focused on identifying the amount of investigative and processing time it takes for each type of case and applying systems analysis processes to the issue of resolving the existing backlog.  In all our work with APD, we focused on the criticality of the backlog of use of force cases as a major impediment to compliance.

We also identified alternative strategies for identifying the staffing needs for the newly formed "Compliance Bureau," and strongly suggested APD develop a clear way forward on the use of force backlog.  Further, we specifically advised that APD should provide the monitoring team, in writing, their assessment of the staffing and resources that will be needed and will be committed to use of force investigations moving forward.  We suggested that this staffing level

be revisited periodically to ensure that it is adequate to achieve the desired end result: A reduction in use of force backlog (to only those cases that are new enough to fall into the "incomplete" category based on APD goals and objectives, as opposed to "overdue").

During our site visit in January, 2018, we discussed with APD use of force reporting related to barricaded subjects and advised APD that it needed to take specific steps (internally) to ensure that use of flash bangs and OC canisters were adequately reported and investigated as uses of force. We advised that failure to resolve this "classification and investigation" process conflict could result in loss of compliance, and that, even though the existing process was attributable to the previous administration's apathy toward leadership and force investigation and control, the loss of compliance for SOD in this area would be imminent if these issues were not addressed. APD should note that we in no way suggested that the use of these munitions (OC and flash bangs) required a full IA investigation, but suggested that the review could be internal to SOD, given the high-quality nature of their reviews and self-assessments in the past.

Again, in March 2018 we discussed this issue (OC and flash bangs) with SOD, noting that resolution did not require exhaustive or comprehensive staff work, but simply required an acceptance on the part of APD that these devices constituted a use of force, and thus needed formal investigation. We strongly suggested this issue be brought to the attention of the Chief of Police (directly) and that remediation of reporting and classification should be expedited.[3]

Further, we learned during our early 2018 site visits that APD had not hosted a Force Review Board meeting since before December 1, 2017. We specifically and directly advised that APD needed to formulate a specific, cogent, and implementable "plan" to address FRB backlogs.

---

[3] The reader should note that effective 22 MAY 18, the City proposed a Special Order addressing this issue. That Special Order is being reviewed by the parties at this time.

We suggested this issue needed to be fully documented, assessed, classified and reported to the Chief.

In addition to these strategic issues identified and "worked through" with APD, we provided various types of general, broad-scale TA to APD during our December-March "TA visits."  We advised APD :

1. That it was critical to focus on policy development, training, and supervision related to "Level I Use of Force" in their new force classification system.

2. That it would potentially be more effective to roll out a new use of force reporting system as a "pilot", so the system can be exercised and evaluated against a set of pre-established criteria. This will allow APD to assess effectiveness of their new system and clean up any questions or issues surrounding the new reporting structure.  We see this advice as applicable to most of the program development work facing APD at this time.

3. That APD should consider revising protocols related to the Multi-Agency Task Force (MATF) to require submissions to the MATF to be "covered" via memoranda that itemize all reports and evidence submitted related to an APD use of force case MATF investigation.

4. That Special Operations Division should consider standardizing training documents across all units and collaborate with the Academy on the form and style of these lesson plans.

5. That SOD consider adapting the seven-step training cycle and integrate that process into their daily training regimen.

6. That SOD routinize the process of pushing training needs they identify to the Academy, so those areas can be assessed for organization-wide relevance.

7. There existed a "clear and present" need for an organization-wide evaluation of how the Risk Assessment Matrix (RAM), first developed by SOD, was being used.  APD currently does not "know," institutionally, how the RAM is being applied across the organization.  We recommended that the Compliance Bureau take the lead in ensuring this is completed.

## C.  Training Academy Review and TA

In addition, we developed specific assessment-recommendation chains for issues confronting the Training Academy.  Specifically we noted:

8

1. The Academy has adopted the seven-step training cycle as its operational model, and a civilian unit has been designated the "Oversight and Maintenance" unit for training's seven-step process. We see this as a major step forward.

2. The Academy's ability to begin the general use of force and supervisor use of force training is completely reliant upon the finalization of, and approval by the Parties, of APD policies related to use of force. The lag in time getting the new force system laid out and codified in policy has significant training implications. While APD has made significant strides in upgrading the staffing and focus of the Academy's staff, and in codifying appropriate process for developing, vetting, delivering, and assessing the impact of training processes (and in upgrading existing staff) there remains a "heavy lift" to implement the planned process in an orderly and effective manner, given the persistent training deficiencies noted earlier in the monitoring process.

3. We were advised that use of force training may extend into the early part of 2019. Operational compliance would likely extend into the summer months of 2019. We advised APD accordingly that compliance classifications would reflect these delays.

4. We recommended APD consider alternative delivery schedules (i.e. AM and PM sessions) in order to get the training out to the organization faster. This was not recommended to impact the quality of the training, but instead to deliver training in a shorter overall timeframe.

5. We recommended the Academy attempt to connect in-class training, tactical training and Reality-Based Training (RBT) scenarios to ensure that when looking at an officer's RBT performance they are also assessed for proper application of force as per APD policy. Weaknesses in other factors, other than just use of force, could also be implicated.

6. We again alerted APD to proper training and lesson plan construction. For instance, we made them aware of past monitoring assessments where instructor ratios were either inappropriate or not adhered to once a class began.

7. We recommended that the academy create systems where outside commands routinely and regularly "push" training needs to them, which can be incorporated into organization-wide programs. This can also be accomplished through a robust Training Committee.

8. We reviewed and approved the Training Academy's seven-step curriculum development process, which was highly consistent with suggestions we made to the Academy early on in the monitoring process.

## D. ERT Review and TA

We also provided direct and specific technical assistance to APD relating to operation of its Emergency Response Team (ERT). Our recommendations were as follows:

1. We discussed past shortcomings with APD policy and training related to ERT responses. We were told that APD is assessing the proper training development and training delivery platforms for ERT related policies.

2. We recommended APD consider the delay that typically occurs from the   time a Field Services Bureau officer encounters a potential issue with a crowd, and the proper steps that officer should take prior to ERT taking control.  That assessment should inform the proper training that non-ERT officers should receive.  We were told that the training of non-ERT members may be best suited for an on-line platform, which we noted may not be effective considering the typical delay that occurs when attempting to get ERT members to a scene.

3. We specifically discussed the need for ERT leadership to engage the Use of Force reporting issue we discussed with SOD related to OC deployments.  We cautioned the delay that has existed with APD addressing this issue generally, but ERT specifically, and how the failure to deal with the issue can affect (directly and collaterally) CASA issues.

## E.  Other TA Provided

Also during the course of our TA site visits for the seventh reporting period, we developed specific recommendations and insights regarding other areas of APD operations.  We discussed the continuation of key business processes that resulted in SID achieving Operational Compliance.  These included:

1. The new SID commander arrived after overseeing SOD, so we expect continued due diligence in their approach to CASA compliance.

2. While on site we were provided with documentation APD felt demonstrated Operational compliance.  We are currently evaluating that documentation for the potential effectiveness of the planned process, and will comment further in the second monitor's status report.

3. We met with the new commander of IA who appears engaged with the task.  He briefed us on the new structure of IA, and the suspension of APD's policy of conducting automatic criminal investigations when serious uses of force occur.

4. We further advised APD that it was clear that the new bifurcated approach to criminal and use of force investigations within IA, and any associated misconduct allegations that may arise, still needs to be thought through carefully and worked out in APD policies and procedures.

In addition to these micro-level interactions and discussions of technical assistance, the monitoring team provided multiple TA events for APD command staff addressing more macro-level issues.  For example, we met with the Chief of Police and other executive-level members of the City's team (including representation of the City Council) to review specifically past failures along the critical path of compliance.  During that session, which lasted several hours, we noted specific past failures in training of police personnel at all levels, supervision of police personnel at the patrol level, and planning, analysis and development of CASA-related programs.

We engaged City personnel (from the mayor's office, city legal, and APD) in a full-throated discussion of the reasons for those failures, and spent a significant amount of time discussing possible remedies and fixes to issues we had observed, documented and commented on (fully in our monitor's reports) with earlier APD efforts in training for field officers, supervision of field officers, and APD's internal planning processes.  Each of the areas reviewed by the monitor is discussed in detail below.

## 1. Training

We dealt substantively during the session with the following critical issues relating to macro-level compliance measures in the APD's former training practices:

- Failure (of the previous APD administration) to conduct and document training needs assessments that considered the myriad of issues (related to training) discussed in painstaking detail in previous monitor's reports;

- Failure (of the previous APD administration) to review, assess, prioritize, and implement recommendations related to training made in previous monitor's reports;

- Failure (of the previous APD administration) to conduct thorough needs assessments and policy integration into the training development protocols in effect at the Academy at the time;

- Failure (of the previous APD administration) to follow the assess-revise-deliver-assess protocol for training development;

- Insistence on training before or immediately after approval of salient policies, leading to training that often failed to adequately address recently approved policy related to use of force, reporting processes, review processes, etc.;

We included thorough discussions of how to break the cycle of non-compliance at the Academy by thoroughly documenting the training needs associated with specific training (based on in-field practices and outcomes); ensuring that training identified specific practices recommended in earlier monitor's reports; testing learning in a meaningful way; identifying officers needing retraining (by testing and by their later performance in the field) and ensuring that retraining, when needed, was used to close the training loop.

Members of the monitoring team reached out to the training academy staff at the New Jersey State Police and arranged a working session between APD training command and NJSP training command staffers relating to the transfer of technical and process information related to the seven-step training process. This process was envisioned as a bridge for APD's Training Academy as it works to create its own version of practices related to training development.

## 2. Supervision

We reviewed with the Chief of Police and other City officials, our assessments of the overall failure of supervision at APD, which we treated thoroughly in our earlier monitor's reports. We noted that supervision ranked second (behind training) on the list of issues we have noted with APD's implementation of the CASA over the past three years. Again, we re-emphasized the critical importance of first-line supervision in carefully reviewing police practice in the field, noting behavior that is outside established policy or protocol, and immediately and effectively correcting that aberrant behavior. We addressed the fact with new command staff,

that faulty supervision was the number one reason for APD's past failures in the area of use of force, and noted that those failures in supervision were rarely noted by mid-level (lieutenant) and higher (commander and deputy chief) levels of the organization. We noted again with "new command" that supervision is one of the most important factors for success in controlling use of force, and that there were three secrets to improving supervision: Train; train some more; and hold line supervisors directly responsible for reviewing (and dealing with) improper uses of force by line personnel. We discussed this issue in depth, suggesting APD consider, assess, and implement modalities for improving force-review processes among mid- and upper level command (lieutenants and commanders) who, we noted, were just as likely as line sergeants to overlook egregious abuses of departmental use of force policies by some line officers. We suggested APD consider the New Jersey State Police "Staff Sergeant" model as a way forward.

### 3. Planning

We also noted that poor planning was the third leg of the non-compliance stool for past APD compliance efforts. We suggested that, like most modern American police departments, APD should run on accurate data. These data should be used to aid in the planning cycle, which we described as a five-step process:

1. Problem identification (based on accurate and timely data analysis);

2. Program development, outlining the GO-MAPPS process we had trained APD on earlier in the reporting period (for the second time);

3. Funding decisions based on detailed threat-benefit analyses;

4. Implementation planning and execution; and

5. Outcomes assessments.

Finally, we suggested strongly that APD view every decision in light of CASA goals, objectives, process and outcomes.

### 4. Compliance Bureau Team Building Processes

The monitoring team implemented a series of mini-training events with personnel from the Compliance Bureau concerning foundational auditing concepts, foundational auditing v. compliance auditing, vision development and implementation, developmental processes for the Compliance Bureau, and building skill-sets within the Compliance Bureau particularly as they relate to "sound principles" of auditing. The monitoring team provided review and insights related to skill-sets needed within the new Compliance Bureau. In addition, members of the monitoring team worked with APD training academy staff to arrange an APD conference call and consultation with the New Jersey State Police training academy related to training and compliance efforts. That initial session was scheduled for April, but was postponed by APD. We continue to work with NJSP's Academy staff to facilitate that call, which reportedly will be rescheduled.

### 5. Community Outreach and Community Policing TA

The monitoring team also provided intensive updates to APD command staff members regarding four specific areas of import to the CASA, related to community outreach and community policing. These included:

1. A review of specific areas of the CASA in which APD has reached full compliance, and a discussion of the need for a specific level of awareness to ensure that those areas do not fall out of compliance as APD focuses on other pressing areas such as use of force, training, supervision, and internal compliance audits;

2. The need for an assessment of "change" in community policing areas since the submission of IMR-6 by the monitoring team;

3. Provision of specific examples by members of the monitoring team of the "status of the field" which centered on examples provided by members of the monitoring team illustrating "success stories" from agencies like the Camden County (NJ) Police Department, and the San Antonio (TX) Police Department's community engagement model with their Explorer, Expanded Explorer, and Police Athletic League programs.

4.  We provided specific suggestions of modalities for expanding community outreach via peer-to-peer exchanges between APD staff and other departments that have been successful in enhanced community outreach.  Members of the monitoring team assisted APD in conceptualizing such processes.

5.  Delivery of "refresher training" for CPCs was provided by the monitoring team's community relations specialist.  We also offered refresher training in social media applications to affect positive change in internal and external outreach by the CPCs.

6.  In addition, we delivered specific CPC-related training to about 35 participants, all members of APD's CPCs, and to select attendees from the DOJ and the City.  This training was offered as part of our normal "TA" duties, and resulted in no additional costs to the City.

**Summary**

The "formal" technical assistance processes outlined above are only a part of the TA provided to APD by the monitoring team.  They do not cover the direct provision of TA by the monitor during routine interactions with APD personnel through the weekly "chief's meetings," during monthly Parties meetings, and through problem-centered *ad hoc* conversations by phone (and in person) and via e-mail that members of the monitoring team have with APD on a weekly basis.

In effect, there has been no shortage of guidance, and in our opinion, the new management cadre at APD has been eager to receive, and appreciative of, that guidance. Effective September 1, we will revert to our "normal" monitoring processes, which in and of themselves contain substantive amounts of "consulting" and advice to APD. Regardless of the phase of the project, however, the monitoring team will continue to effectuate a steady, un-interrupted stream of TA and monitoring practices over the coming years.

It is incumbent on APD to view those processes as what they are:  insights, proffered protocols, and processes used by the monitoring team to identify potential problems to compliance, and to recommend alternative strategies to ensure that potential problems do not

turn into issues of non-compliance.  To do that, however, will require an expressed *and implemented* commitment on the part of APD to read carefully each monitor's report, identify actions steps articulated in those reports, consider carefully how best to implement needed actions, and evaluate the effectiveness of those program modalities in achieving the goals of the CASA.

The newly formed Compliance Bureau will need to play a central and command-centric role in the way forward recommended by the monitoring team.  APD will have won the compliance battle when the Compliance Bureau detects problems and issues before the monitoring team does and implements organizational wide change to solve those problems in an independent and effective way.

Readers of past monitor's reports have a clear understanding that the current administration of APD has inherited a long-standing set of problems with APD's compliance efforts.  The previous administration at APD, based on the monitor's experience, knowledge, and training, countered the monitoring process with a series of compliance processes and strategies that were found, in some instances, to be deliberately non-compliant and problematic.  One needs only to look to past monitor's reports to find a litany of noted issues with APD's past compliance efforts, and to find an exhaustive list of recommendations for improvement in those efforts.

With every new administration, however, the way forward is seldom to look to the past, but to look forward, identifying existing issues and obstacles to compliance; prioritizing those obstacles by assessing their frequency, location, effects, and causes; and to systematically respond to those issues.  We cannot overestimate the complexity of the issues confronting APD

16

at this point.  They relate directly to policy, training, supervision, discipline, oversight, management, administration and leadership.

Neither should we expect immediately changed outcomes.  The way through the issues confronting the APD today, which stand in the way of long-term compliance, are not simple, but they are "known."  We have emphasized the "way forward" with APD over the past several months, and have provided highly detailed and extensive suggestions regarding the way forward. Those suggestions related to:

- Problem and issue identification;

- Assessment of the cause, nature, and impact of obstacles to compliance;

- Development of integrated strategies to ensure change that will bolster APD's chances at success for their compliance efforts;

- Building systems to monitor internally any changes in compliance outcomes; and

- Re-focus the command staff's implementation of a data-based oversight, assessment, problem-identification and response processes that, over time, winnow the CASA-related problems out of APD training, command, oversight, supervision, and remediation processes.

We emphasize again, here, as well as in our day-to-day interactions with APD, the need to rely on a proven problem-solving model (Problems-Issues-Needs-Solutions) as well as the need to structure an internal "intelligence system" that subjects all CASA-related problems and issues, to an integrated "Early Warning System" approach that is data-based, methodical, pervasive, relentless, and demanding.  "Action" is not necessarily progress.  Action thoughtfully planned, implemented, and assessed for effectiveness will, inevitably, lead to progress, and we encourage APD to apply the PINS model, which inherently subjects process changes to a meaningful "effectiveness" test, for all internal processes related to the CASA.

**SECTION II:  CITY OF ALBUQUERQUE'S EFFORTS TO IMPLEMENT ITS COMPLIANCE PLAN**

This first status report by the City comes at the halfway point in the effort to implement the compliance plan and will emphasize the work done to this point to accomplish the deliverables in the following areas:  use of force investigation backlog (Area 1), APD Implementation Unit (Area 2), operations of the Academy (Area 3), supervisor use of force investigations—process failures (Area 4), use of force training (Area 5) and *Amici* concerns (Area 6).

The status report is structured to update the Court and the community in certain areas of concern as they inform, which include:

(1)     "Actions the City has taken;

(2)     Impediments to progress in meeting the deliverables set out in the compliance plan;

(3)     Unanticipated problems experienced;

(4)     Any missed deadline;

(5)     An explanation for why the City missed those deadlines and what the new Deadlines will be;  and

(6)     Any other relevant issues or concerns that arose."  (Doc. 331 at 2).

Because this status report closely mirrors the City's compliance plan, it will benefit the reader to consider the two documents side by side. (*see*, Exhibit A, "City of Albuquerque's Compliance Plan", Doc. 358-1.)

**Area 1: Use of Force Investigations Backlog**

This area of the compliance plan was developed in response to the need for the Department to review certain delayed, but completed, use of force and serious use of force investigations, with the following goals in mind for the reviewers:

1. To assess the original supervisor or investigator's finding concerning the appropriateness of the force used by an officer and either concur or dissent;

2. To identify policy violations, unrelated to the application of force by the officer which were not captured in the original investigation;

3. To identify potential criminal conduct in either the force used by the officer or other actions taken;  and

4. To recognize deficiencies in the reporting of force by officers and investigation of force by supervisors and investigators so that these trends can be captured and applied for training and work performance purposes;

The review of supervisor use of force investigations will consider investigations completed by the Field Services Bureau (FSB) chain of command.  The review of a serious use of force investigation will involve investigations which have been completed by the IA-Force chain of command that are pending presentation to the Force Review Board (FRB).

The review of these investigations is central because they will undoubtedly involve a variety of issues identified during the reform effort which have been exemplified by problems in the reporting, investigation and supervision of officers involved in force incidents.  Problems that are identified through this review process will be addressed through the appropriate remediation of officers or supervisors in the chain of command.  The review of these investigations will also inform the effort to retool the force reporting and investigation policy, training and process.

An administrative investigation must be completed within one hundred and twenty (120) days from the discovery of a potentially out of policy application of force which emphasizes the need for use of force investigations to be completed in a timely manner.  Where an investigation is delayed an officer is left to continue behavior that may not be in line with Department policy and training and a critical learning opportunity is lost.

The completed force investigations to be reviewed will undoubtedly contain lost opportunities to address policy violations arising out of the application of force and other

19

concerning conduct which have crippled APD's ability to develop an accountable force reporting and investigation system.  The key will be to effectively address these concerns despite the passage of time.

A total of three hundred and fourteen (314) supervisor use of force and show of force investigations will be reviewed through the work anticipated in this area of the compliance plan. In addition to these investigations there are twenty six (26) serious use of force investigations that will be reviewed.  It is important to note that there are seventy two (72) serious use of force investigations that have not been completed by the IA-Force chain of command which will not be subject to the review process.  This is the approach because reviewers are not part of the chain of command and should not be interjected into that process to investigate and review serious use of force incidents.  The plan to review these investigations will involve training, personnel and resource allocation.  A full discussion is set out below.

The Department has taken steps to clear investigations that have been delayed from the Field Services Bureau chain of command and has also implemented rules around the timely completion of supervisor use of force investigations by promulgating Special Order 18-58, which became effective May 23, 2018 (*See*, Exhibit B).  The key emphasis of this Special Order is to assure that the chain of command has a very clear understanding of deadlines as it comes to the completion of supervisor use of force investigations.  Further details concerning Special Order 18-58 are set out below.

APD has also developed a tracking mechanism around supervisor use of force investigations which is provided to the Deputy Chief (DC) of the Field Services Bureau and captures indicators such as the amount of time that an investigation has been pending in a particular chain of command;  the individual in the chain of command presently working on the

investigation;  and the number of investigations held by a supervisor in the chain of command.
The DC is provided this information on a daily basis and he directly contacts any supervisor in
the chain of command if the indicators mentioned above alert him to the fact that an investigation
or supervisor may be delayed or causing delay.

In support of the manpower to complete supervisor use of force and serious use of force
investigations is an administrative system that takes a use of force incident and initiates a
corresponding administrative entry.   These entries are important to APD because they capture
data points which are disseminated into the Use of Force Annual Report anticipated by CASA
paragraph 79. (Doc. 354-1 at 38.) (*See*, Doc. 356, Adopting Certain Modifications to the First
Amended and Restated CASA.)  This data includes information such as number of custodial
arrests that involved use of force, number of individuals armed with weapons, geographic data,
demographic data and number of individuals injured. (*Id*.)  In addition to this data APD has
incorporated additional checks in the review process, to include; ensuring all attachments listed
in reports and mandated by policy are in the entry, data concerning the use or failure to use on-
body recording devices, criminal charges, proper case and incident number, type of resistance
from a subject of force, and types of force.

The administrative entry of a force incident is initiated by the involved officer through
the creation of what is called a "BlueTeam entry" which is completed by an officer and then
forwarded to the investigating supervisor.  The BlueTeam entry primarily includes the use of
force report, use of force data report and use of force narrative report by the involved officer.
Once the BlueTeam entry detailing a use of force investigation by an investigating supervisor it
is forwarded on to the lieutenant and commander for review.  The investigating supervisor is
responsible for making a finding about whether the use of force (or show of force) is "in policy"

or "out of policy" and the chain of command must either concur or disagree with that finding. The BlueTeam entry can be sent back and forth in the chain of command for a variety of reasons, such as a deficiency in the officer's reporting, or the review of force by an investigating supervisor is found insufficient by a lieutenant or commander, or required documentation has not been attached to the entry.

The supervisor force investigation is completed by field chain of command and the BlueTeam entry is forwarded to an administrative assistant in IA-Force. The administrative assistant is responsible for reviewing the BlueTeam entry and supporting documents to assure that all of the required data and documentation is included. The administrative assistant does not edit or revise the review by the chain of command, or the respective investigative findings and all of the required data and documents must be included before the entry can be warehoused in the database. Historically there have been issues gathering data and documents from personnel in the chain of command and only one administrative assistant has been tasked with this work. Because of these problems the administrative entry of supervisor use of force investigations has been delayed and there are one hundred and fifty six (156) administrative entries pending transfer into the database. The plan to address these administrative entries is set out below.

A.      Specific issue: Review, remediate and decrease the backlog of field use of force investigations

          *Actions the City has taken:*

          Developed Plan to Review the Backlog of Field Use of Force Investigations:

          The central goal of the review of completed use of force investigations is identify any investigative, evaluative, administrative or supervisory deficiencies in order to address them through referral to the appropriate chain of command or IA-Misconduct. The primary emphasis of the reviews centers on determining if the initial investigative finding concerning the use of

force is supported by a preponderance of the evidence.  Where a reviewer disagrees with the initial finding they will determine if this deficiency can be resolved by seeking out additional evidence from either an additional interview with an officer or other investigate step.  The reviews will also consider potential misconduct unrelated to the force incident, potential criminal conduct, deficiencies in supervisory oversight of personnel using force and process deficiencies in the completion of the initial use of force investigations.

The plan to execute the work of reviewing field use of force investigations has been developed by IA-Force and it will involve the following steps:

1. Identification of the scope and order of review for the investigations;

2. Identification and assignment of personnel to review investigations;

3. Training personnel in the review of investigations;

4. Performance of the the reviews of investigations;

5. Conduct weekly discussions with reviewers to go over case assignments and to gather feedback on cases and other concerns;

6. Capture data about the deficiencies in the performance of investigations by the original investigator and chain of command, identify potential out of policy conduct and identify potential criminal conduct rising out of the incident;  and

7. Refer noted deficiencies/potential criminal conduct to the appropriate entity (IA, Field Services Bureau or the Bernalillo County District Attorney's Office) to be addressed.

The scope of investigations subject to review by IA-FD emphasizes the one hundred and twenty (120) day deadline for the completion of an administrative investigation into a use of force or show of force incident.  A review of these investigations entered into the database was conducted going back to September 2017 and the total number of use of force and show of force investigations that were one hundred and twenty days or older is three hundred and fourteen

(314).  This is the number of supervisor use of force and show of force investigations that IA-FD personnel will review.

IA-Force has staffed seven officer positions to assist in the work to review field use of force investigations.  In advance of these postings, several officers and supervisors were temporarily assigned to IA-Force and they received initial training in conducting force reviews in early May 2018.  The training introduced students to the scope of work to be conducted through the review of these investigations and provided instruction in the following areas:

1. The deficiencies anticipated to be found in completed supervisor use of force investigations;

2. Templates for the reviewers to use when reviewing completed supervisor use of force investigations;

3. An approach to analyzing the evidence found in supervisor use of force investigations;  and

4. Introduction to classroom principles through a pre-test and assessment of learning through a post-test.

In addition to the classroom instruction provided to these officers and supervisors there have been one-on-one coaching sessions and tabletop meetings with reviewers that have centered on how the students approach the evidence, utilize the templates and apply Department policy to the facts of a case to draw a finding.

Plan to Address the Administrative Review Backlog:

The plan to address the administrative review backlog has involved the assignment and training of additional personnel to assist in completing the administrative entry of use of force and show of force incidents.  In the beginning of April an additional assistant was brought in to IA-Force to begin the work of completing the administrative entries and she was also provided

on the job training over the course of a few days.  The administrative backlog was four hundred and ninety three (493) entries on March 29, 2018 and it is now one hundred and fifty six (156).

Once the administrative backlog of use of force and show of force investigations is completed the administrative assistant will have seventy two (72) hours from the time the case is submitted for the administrative review to warehouse the entry in the database.  Additional personnel will also be assigned to assist the administrative assistant in completing these entries moving forward.

Addressing the Supervisor Use of Force Investigations Pending in the Field Chain of Command:

The DC over the Field Services Bureau has taken lead responsibility in assuring that supervisor use of force investigations pending in the chain of command are not delayed moving forward.  Upon review of field use of force and show of force cases, APD discovered no set deadlines, with the exception of seventy two (72) hours for a sergeant to complete an investigation once clearing the scene of an incident.  APD has implemented Special Order 18-58 which clearly outlines and instructs supervisors, lieutenants and commanders on their respective deadlines.  Special Order 18-58 includes the following provisions:

- First line supervisors, typically a Sergeant, will adhere to the original CASA requirement of completing an investigation within seventy-two (72) hours from leaving the scene;

  o Where the first line supervisor is unable to complete the investigation within seventy-two (72) hours, and needs to request an extension, they must provide a detailed explanation in writing to their lieutenant and commander explaining why they were unable to get the investigation completed within the initial timeframe;  and

  o If the extension is approved, the first line supervisor will be provided twelve (12) calendar days in order complete the investigation(s). Therefore, the first line supervisor would have a total of fifteen (15) calendar days to complete their investigation and forward to the appropriate Lieutenant.  (Days 0-15)

25

- Once received by the lieutenant, the lieutenant will have twenty-nine (29) calendar days to complete their review of the first line supervisor's investigation in order to send it to the commander.  (Days 16-45)

- The Commander will have fourteen (14) calendar days to complete their review (Days 46-60).

If a first line supervisor is unable to complete their investigation within the required time period, one (1) additional extension will be authorized by the respective Deputy Chief of Police (One single, five (5) calendar day extension can be granted for the entire investigative process). If the investigation cannot be completed within sixty five (65) calendar days, approval must be gained by the Chief of Police.

During the review of outstanding force investigations it was determined that a majority of cases were pending at the lieutenant's level.  The lieutenant is obligated to review all lapel video involved in a case which has been very time consuming.  In order to address the workload of lieutenants they were given deadlines to complete their reviews by the DC in charge of the Field Services Bureau. In one circumstance, an additional lieutenant was temporarily assigned to assist where an extensive list of reviews were held by a particular lieutenant.  In addition, command staff authorized temporary upgrades of personnel (e.g., upgrading a Sergeant to temporarily assume the duties of a Lieutenant) to ensure adequate coverage of supervisory duties, allowing lieutenants to devote their time to complete their reviews.

The natural consequence of lieutenants completing a significant number of force reviews meant that the workload of commanders would increase.  Therefore, many of the cases were distributed to other commanders, with little to no caseload; resulting in a more manageable workload across commanders.

In order for APD to track the progress in supervisory reviews, a status report is provided to the Chief of Police, Deputy Chiefs of Police and the Chief of Staff every Tuesday and Friday. The Deputy Chief of Police for the Field Services Bureau decides the course of action which may include assigning specific deadlines for the completion of a supervisor use of force investigation.

APD did not previously have an adequate and effective way to track use of force case investigations or chain of command and administrative reviews.  APD wants to review and close cases in a timely fashion and special order will provide supervisors with structure, consistency and order moving forward.

As of June 1, 2018 the following represents the number of use of force and show of force cases pending based upon the amount of time that has passed since the investigation was initiated:

1.  One hundred and eleven (111) use of force cases pending sixty days or less;

2.  Sixteen (16) show of force cases pending sixty day or less;

3.  Thirty five (35) use of force cases pending more than sixty days; and

4.  Two (2) show of force cases pending more than sixty days.

Re-assignment of Internal Affairs Division Command Responsibilities:

APD moved the Internal Affairs Division under the Compliance Bureau and divided Internal Affairs (IA) into two divisions; IA-Misconduct and IA-Force, with a Commander assigned to each division.  This was done to provide a narrower span of control and responsibility for each Commander.

*Impediments to the process/Unanticipated problems:*  One impediment at the beginning of this process was having one commander over Internal Affairs with responsibility for

misconduct areas of reform and the newly emerging concerns around the backlog of force

investigations and the revamping of the use of force reporting and investigation system.

APD identified several impediments to the timely and effective completion of use of

force and show of force investigations.  The impediments to addressing these investigations were

identified as the following:  (1) no deadlines for supervisory reviews, leading to a lack of

accountability;  (2) no clear understanding of delayed investigations, to include administratively

delayed investigations;  and  (3) no reporting mechanism to identify the quantity of cases in the

review process, the actual number of existing delayed cases so that there could be an

understanding of case status and problems and trends leading to these delays.

> *Missed deadlines:* None up to 05/11/2018
>
> *If so, explanation:* N/A
>
> *New deadlines:* N/A
>
> *Any other relevant issues or concerns that arose:*
>
> *Tasks update:* APD completed 100% of the tasks during this reporting period (9 of 9).

B.     Specific issue: Review, remediate and decrease the backlog of serious use of force

> *Actions the City has taken:*

The same restructuring of IA, mentioned above, implicated the work to review the

serious use of force investigations that have been pending FRB or consideration by the lieutenant

or commander.  IA-Force completed a staffing study and identified shortages and a plan has been

created to address these staffing concerns.  The plan to review the twenty six (26) delayed

serious use of force investigations will involve the same training and approach as mentioned

above in the section concerning the review of the backlog of field use of force investigations.

Two lieutenant positions were advertised with one filled within IA-Force to address and manage the new level 2 and level 3 use of force investigations anticipated to be completed through the process set out in the recently amended CASA.  On May 10, 2018, APD advertised three sergeant positions to supervise the detectives responsible for conducting the initial investigations.

*Impediments to the process/Unanticipated problems:*  One impediment at the beginning of this process was having one commander over Internal Affairs who was responsible for a large number of paragraphs throughout the CASA.

*Missed deadlines*: None up to 05/11/2018

*New deadlines:* N/A

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 100% of the tasks during this reporting period (9 of 9).

## Area 2: APD Implementation Unit

A.   <u>Specific issue: Create a Compliance Division (Implementation Unit) within the APD Compliance Bureau</u>

APD created a Compliance Division to provide oversight, guidance, and accountability and be a centralized Division for CASA-related activities.  This Division will assist in an organizational shift to improve the department as a whole.  This Division is responsible for process development, auditing and assessment functions, and will specifically focus on Level one use of force and show of force case reviews.

*Actions the City has taken:*

APD evaluated positions in the Inspections Division and repurposed these positions to assist with the implementation and audit functions throughout the CASA. APD created a Compliance Bureau managed by a Deputy Chief of Police and a Compliance Division within that

Bureau to oversee the compliance effort.  An assigned lieutenant manages the Compliance Section, oversight of the CASA and the compliance plan. Two units have been created within the Compliance Section; the Implementation Unit and the Performance Metrics Unit with a new manager assigned to each unit.  The Implementation Unit assists project leads with their assigned paragraphs with an emphasis on identifying and designing new processes and/or addressing process related issues to improve efficiency and effectiveness within a specified area.  The Performance Metrics Unit will perform audit and assessment functions including auditing, evaluation, analysis and reporting on a variety of Departmental operations.

The Force Review Unit has been renamed to the Performance Review Unit.  The unit title was not finalized at the time of the compliance plan filing.  The Performance Review Unit, will be comprised of one Lieutenant, four Sergeants and four Video Review personnel; serving as an additional assessment function of Level one use of force and show of force cases to ensure APD is thoroughly reviewing cases and identifying strengths and weaknesses in those reviews.  Job descriptions have been completed and the Lieutenant position was advertised on May 10, 2018. The section Lieutenant will manage the administrative portion of the Force Review Board (FRB) to ensure recommendations stemming from FRB are correctly routed, addressed accordingly and returned by the assigned deadlines.

*Impediments to the process/Unanticipated problems:*  N/A

*Missed deadlines:* No missed deadlines in this section

*New deadlines:* N/A

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 100% of the tasks during this reporting period (6 of 6).

B.     Specific issue: Amend and Publish SOP 3-52 (Policy development process)

*Actions the City has taken:*

The policy development process standard operating procedure (SOP 3-52) was under review by the independent monitor, parties and the Police Oversight Board (POB) for a considerable period of time.  The discussions about this policy historically centered on the need to consider the role of POB as it must review all CASA related policies after going through the policy development process and before they are reviewed by the independent monitor, parties and the Chief of Police.  With this requirement in mind, APD revised the policy development process to afford POB an opportunity, once a draft is ready to be provided to the parties and monitor, to propose language or amendments to a particular policy.

The revised policy development process also takes into consideration the need to inform the community about policies under review by the Department.  The Office of Policy Analysis (OPA) will serve as the central hub for notice to APD personnel and the community about policy presentations and provide administrative support to the policy development process.  As SOP 3-52 was being revised, the City and Department held several meetings with POB board members and *Amici* to explain the new policy development process and receive input; these meetings provided meaningful insight into what needs to be done to assure that the community has an opportunity to be involved in the policy development process.  SOP 3-52 was published on April 24, 2018.

*Impediments to the process/Unanticipated problems:*  The original deadline did not take into account the amount of time to fully engage stakeholders and thoroughly review and address their concerns.  The stakeholder forums brought out more concerns than originally believed to exist and APD wanted to ensure the task was not only complete, but completed correctly.

*Missed deadlines:* Yes

*If so, explanation:*

- Revise the draft of SOP 3-52 with feedback from IMT and Parties – APD received feedback through April 11, 2018 and revised the policy based on the feedback.

  Task due: 04/04/2018; Completion date: 04/12/2018

- Present the draft SOP 3-52 for approval by IMT and Parties – APD revised the draft policy and submitted.

  o Task due: 04/04/0218; Completion date: 04/13/2018

- Publish SOP 3-52 internally and on the City website – APD received approval on 04/24/2018 and published on the same day

  o Task due: 04/14/2018; Completion date: 04/24/2018

  *New deadlines:*  N/A
  *Any other relevant issues or concerns that arose:*  N/A.

*Tasks update:* APD completed 100% of tasks during this reporting period (7 of 7); 3 of 7 completed after original due date (listed above).

C.     Specific issue: Develop and Implement Compliance Division Policy

*Actions the City has taken:*

In order to develop and implement a Compliance Division, APD researched best practices to identify roles and responsibilities in other law enforcement agencies with similar divisions.  From this research, APD has drafted job descriptions, roles and responsibilities, and an organizational chart as the division continues to develop and grow.  The Compliance Division has also developed several process flows; however, there is a continuous effort to identify further areas in need of documented processes.   A few examples of the process flows are data submissions to and from the IMT, training curriculum submissions to the IMT and audit planning.  APD continues to develop a division policy.

As the Department has considered the appropriate structuring of the Compliance Division, the Division was divided into two Sections: the Compliance Section and the Performance Review Section; narrowing the scope of managerial responsibility. The Compliance Sections consists of the Implementation Unit and the Performance Metrics Units. The Implementation Unit assists project leads with their assigned paragraphs with an emphasis on identifying and designing new processes and/or addressing process related issues to improve efficiency and effectiveness within a specified area. The Performance Metrics Unit will perform audit and assessment functions including auditing, evaluation, analysis and reporting on a variety of Departmental operations.

APD also created and advertised a Lieutenant position for the Performance Review Section. The Performance Review Section will be responsible for additional reviews of level one use of force and show of force cases. The main goals of this section are to consider if supervisors are accurately classifying the level of force, missing shows of force, missing additional uses of force and working with the Training Academy and IA-Force to improve overall use of force processes and investigations. By adding this additional layer of audit and assessment in the review of level one use of force and show of force cases the Department will develop the capability to capture issues for remediation/recommendation of identified issues to other areas of the Department.

*Impediments to the process./Unanticipated problems:* The Implementation Unit and the Performance Metrics Unit managers began in their positions April 14, 2018, and April 28, 2018, respectively. Creation of new positions is a lengthier process, delaying the hiring date for the two managers. On May 10, 2018, APD advertised the opening for a Performance Review Section Lieutenant.

*Missed deadlines:* Yes

*If so, explanation:*

- Develop processes and process flows for each identified section within the Compliance Division (see unanticipated problems above).

Task due: 04/30/2018

*New deadline:* 07/13/2018, in line with Division SOP development tasks

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 50% of tasks during this reporting period (1 of 2)

D.  <u>Specific issue: Create a Section within a Compliance division devoted to Use of Force case oversight</u>

*Actions the City has taken:*

On May 10, 2018, APD advertised a second Lieutenant position within the Compliance Division, the Performance Review Section.  This Lieutenant will manage FRB administration and be responsible for the reviews of Level 1 use of force and show of force cases upon the approval and implementation of the revised use of force policy suite.  A temporarily assigned Lieutenant is working with IA-Force on the development of a training plan for personnel who will reviewing these types of cases.

*Impediments to the process/Unanticipated problems:*  The tasks within this section are complex and require more personnel and time than previously thought.  The current deadlines do not provide the new Lieutenant the adequate time to develop the Performance Review Section.  APD is adjusting the deadlines for this particular task section from now until the end of the reporting period for the compliance plan, July 31, 2018.

*Missed/Adjusted/New deadlines:* Yes

*If so, explanation:*

- Develop a use of force performance review unit to have oversight, review and identify "policy outliers" in use of force cases not previously addressed in all level 1 and samples of levels 2 and 3 use of force cases

  Task due: 04/20/2018; New deadline: 07/06/2018

  - Develop a process for conducting random and directed reviews of all level 1 and samples of levels 2 and 3 use of force cases

    Task due: 05/11/2018; New deadline: 07/13/2018

  - Develop a process to conduct a detailed use of force investigation failure analysis to determine the cause of the failure with the goal of determining corrective actions that need to be taken

  Task due: 06/08/2018; New deadline: 07/27/2018

  - Develop a process to provide recommendations for policy, training, supervision, tactics, equipment (similar to the FRB function), disciplinary and/or remediation responses for each failure identified

  Task due: 06/30/2018; New deadline: 07/31/2018

*Any other relevant issues or concerns that arose:*

*Tasks update:* APD completed 0% of tasks during this reporting period (0 of 2). All tasks under these specific issues have been assigned new deadlines in order for APD to thoughtfully and thoroughly develop this section.

E.   Specific issue: Develop a process to measure progress of the Compliance Plan

*Actions the City has taken:*

APD scheduled a training session with Dr. Ginger and the projects leads responsible for

paragraphs of the CASA. On March 13, 2018, project leads were able to meet Dr. Ginger, attend

a PowerPoint presentation on a planning process called GOMAPPS and were able to ask questions of the monitoring team.

APD has researched project management and task management tools that are user friendly and will assist with compliance oversight.  APD has researched other departments using management plans and many are not realistic for APD due to high costs.  APD has identified one platform that meets the needs at multiple levels.  This platform can track progress for the compliance plan, for CASA and non-CASA related projects.  On May 10, 2018, APD spoke with Dr. Ginger during a conference call and told him about the platform, informing him he would have access to view APD's progress at the IMT level as well.  Dr. Ginger agreed that this platform appeared viable and APD is working on procurement.  APD does currently track progress; however, not in the most efficient way.   APD does use the Compliance Plan, GANTT charts, Tableau, calendars and spreadsheets to measure performance; therefore, the task is complete but APD acknowledges the need for improvement and efficiency.

*Impediments to the process/Unanticipated problems:*  As stated above, the Implementation Unit manager started her position April 14, 2018, and has been researching and presenting potential programs since she started.

*Missed/Adjusted/New deadlines:* Yes

*If so, explanation:*

- Develop a performance measurement plan to easily see compliance progress, to include progress failures – APD does track; however, a platform has been identified with approval from command staff

   Task due: 04/20/2018; Completion date: 05/09/2018

- Identify a process and a platform to communicate, illustrate progress and commit to transparency within APD, the City of Albuquerque and the citizens of Albuquerque - APD does track; however, a platform has been identified with approval from command staff

  Task due: 04/20/2018; Completion date: 05/09/2018

- Submit progress measurement process to IMT and parties for review/approval - APD does track; however, a platform has been identified with approval from command staff and received IMT approval

  Task due: 04/20/2018; Completion deadline: 05/10/2018

- Implement approved progress measurement plan – We foresee the purchasing process to take time and want to ensure we provide enough time to complete this task

  Task due: 05/25/2018; *New deadline*: 07/13/2018

  *Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 86% of tasks during this reporting period (6 of 7).  All tasks under this section have been assigned new deadlines.

### Area 3:  Operations of the Academy

A.  <u>Specific issue: Address staffing deficiencies within the Training Academy and Create a Comprehensive Training Unit devoted to the 7-step training process</u>

*Actions the City has taken:*

APD conducted a staffing study at the Training Academy and identified personnel deficiencies.  There is a temporary duty Advanced Training Lieutenant responsible for all CASA-related paragraphs pertaining to the Training Academy.  APD has created the Comprehensive Training Unit, which is dedicated to curriculum development.  APD created and

filled one Comprehensive Training Unit (CTU) Manager position, created and advertised one Comprehensive Training Unit employee and one Field Training and Evaluation Program (FTEP) employee.

The CTU will incorporate a comprehensive training plan utilizing a seven-step process for training which has been approved by the independent monitor. The seven-step process provides employees with the most effective and efficient training program focused on integrating policy, procedure, and tactics into daily operations through classroom presentations and application of trained skills. The seven steps include: (1) Needs assessment, (2) Curriculum Development, (3) Oversight/Approval, (4) Delivery, (5) Implementation, (6) Evaluation and (7) Revision.

> *Impediments to the process/Unanticipated problems:* N/A
>
> *Missed deadlines:* No
>
> *If so, explanation:*
>
>> *New deadlines:* N/A
>
> *Any other relevant issues or concerns that arose:* N/A
>
> *Tasks update:* APD completed 100% of tasks during this reporting period (8 of 8).

B.   <u>Specific issue: Develop a process to determine transfer of knowledge</u>

*Actions the City has taken:*

APD has drafted a plan to address deficiencies in the testing process at the Training Academy. The independent monitor has voiced concern about overly easy testing which has at times led to an average test score of ninety five percent (95%). The Training Academy changed from a 70% passing score to a minimum of 80% to pass on all CASA-related training. Setting a

higher standard could allow the students to show a level of mastery of the topic(s), while also showing the public our commitment to these standards and the reform process.

APD will also deliver a pre-test and post-test. This process is a proven way to analyze and demonstrate a transfer of knowledge. For each post-test, questions must be independently verified by the Advanced Training Sergeant. This is to ensure questions both address the course objectives and are appropriate to demonstrate transfer of knowledge. In addition, post-test questions can be pulled from a computer-generated pool of potential questions and random for each student.  Students will be given two opportunities to pass (80% or higher). Upon a second failing score, students will automatically be added to a list for remedial training on that topic.

APD will also begin to utilize practical scenario-based testing.  Having the students demonstrate a hands-on knowledge of the course objectives eliminates the usual problems associated with traditional written test taking formats. It also provides for a more stimulating and exciting way to show the transfer of knowledge for both student and instructor.

*Impediments to the process/Unanticipated problems:*  N/A

*Missed deadlines:* No

*If so, explanation:*

*New deadlines:*  N/A

*Any other relevant issues or concerns that arose:*  N/A

*Tasks update:* APD completed 100% of tasks during this reporting period (2 of 2).

C.      Specific issue: Develop a modified Civilian Police Academy (CPA) for POB/CPOA/CPC member

*Actions the City has taken:*

APD created a position responsible for the development of this modified CPA.  APD held a two-weekend modified CPA for Police Oversight Board, Citizen Police Oversight Agency and

Community Policing Council members February 24-25, 2018, and March 3-4, 2018.  This training also included a survey component to solicit feedback from the attendees.

*Impediments to the process/Unanticipated problems:*  During the first modified CPA, participants brought up concerns to APD command staff surrounding the Use of Force portion of the training, voicing concerns about APD instructor demeanor and dismissive attitude. Participants were invited to a face-to-face meeting with APD and DOJ to address their concerns. APD is transitioning to a new lead Use of Force instructor.

*Missed deadlines:* Yes

*If so, explanation:*

- Evaluate the survey findings for the revision of a Needs Assessment (part of the 7-step process) for the next modified CPA – The Training Academy was waiting for a 100% survey return; however, not all surveys were returned.  APD conducted an evaluation on the surveys that were turned in.

Task due: 03/30/2018; Completion date: 05/03/2018

*New deadlines:*  N/A

*Any other relevant issues or concerns that arose:*  N/A

*Tasks update:* APD completed 100% of tasks during this reporting period (6 of 6); 1 of 6 completed after original due date.

D.    Specific issue: Develop a Comprehensive Training Plan(s) (TP) to provide effective and efficient training

*Actions the City has taken:*

APD developed a comprehensive training plan using the seven-step process to have a systematic and detailed plan that provides consistency for training conducted by APD.  This plan

was developed to improve training within APD and in response to IMT concerns from the

Independent Monitor's Sixth Report raising issues with APD's training process.

*Impediments to the process/Unanticipated problems:*  APD developed numerous drafts of

the comprehensive training plan and identified areas of concern that personnel wanted to correct

before sending the plan out for approval.

> *Missed deadlines:* Yes

> *If so, explanation:*

- Draft a secondary TP addressing the IMR-6 recommendations to improve the

  training process – APD made several improvements to the training plan.

  Task due: 04/01/2018; Completion date: 04/10/2018

- Resubmit the revised TP to the IMT for correction/approval – APD made several

  improvement to the training plan.

  Task due: 04/01/2018; Completion date: 04/10/2018

> *New deadlines:*  N/A

> *Any other relevant issues or concerns that arose:*  N/A

> *Tasks update:* APD completed 100% of tasks during this reporting period (4 of 4);
> 2 of 4 completed after original due date.

### Area 4:  Supervisor Use of Force Investigations – Process Failures

A.    Specific issue: Improve the Force Review Board (FRB) process

> *Actions the City has taken:*

APD identified a number of deficiencies in the FRB process which include, but are not

limited to; no set roles and responsibilities for members or case presenters, no training for board

members, no formal recommendation/referral process, and anyone could be a designee for

another member with no prior knowledge, training or experience with FRB.  APD suspended the

FRB until processes have been developed, formal training has been developed and conducted, and the policy has been revised to accurately depict the roles and responsibilities of voting members and those presenting cases in front of the FRB.

During this time of suspension, the number of cases waiting to be reviewed by FRB is increasing.  In February 2018, APD decided to move forward with Tactical FRB.  FRB has to review all SWAT activations whether or not there is a use of force.  These activations rarely result in problematic case reviews and is a good place to start with reinstating FRB.  APD drafted a special order identifying new voting members of FRB.   Training for FRB members is pending.

*Impediments to the process/Unanticipated problems:*  APD failed to provide a completed comprehensive training plan to the IMT.  The identified board members have not been trained on FRB; therefore, Tactical FRB has not reconvened.  The FRB project lead, Performance Review Section, along with the Training Academy worked together and completed the training curriculum on May 22, 2018, and IMT review is pending.

> *Missed deadlines:* Yes
>
> *If so, explanation:*
>
> - Submit an APD FRB training plan to the IMT and parties for review/approval – submitted; however, incomplete and resubmission is pending
>
>   Task due: 04/20/2018;
>
>   *New deadline*: 05/23/2018
>
> - Train new FRB voting members on policies, expectations and procedures for conducting a thorough review – APD provided the IMT with an incomplete training plan requiring APD to complete that training plan and resubmit.  APD is

developing a process from start to finish for training plans and submissions to the

IMT. This process flow was completed on May 18, 2108.

Task due: 04/30/2018

*New deadline:* 06/30/2018

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 92% of tasks during this reporting period (11 of 12); one completed after original due date, one with new deadline.

### Area 5: Develop a Training Plan for IAD-Force personnel
**This specific issue has one task with the deadline in June 2018 – IA-Force continues to develop training curriculum for personnel.

### Area 6: Amici Concerns

A.    Specific issue: Evaluate McClendon Sub-class concerns

*Actions the City has taken:*

APD worked with the McClendon sub-class attorneys and the Assist City Attorney to approve and published policies related to the McClendon sub-class with the exception of one policy that is awaiting IMT approval. Those policies were published on April 26, 2018.

APD provided eCIT recruitment and training plan to the McClendon sub-class attorneys on 05/01/2018.

*Impediments to the process/Unanticipated problems:* N/A

*Missed deadlines:* No

*If so, explanation:*

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 100% of tasks during this reporting period (2 of 2).

B.    Specific issue: Provide CPOA/POB members Evidence.com access for case investigation

*Actions the City has taken:*

APD develop documented parameters to allow video access for CPOA/POB members

into Evidence.com for the completion of case reviews and investigations.

*Impediments to the process/Unanticipated problems:*  N/A

*Missed deadlines:* No

*If so, explanation:*

*Any other relevant issues or concerns that arose:*  N/A

*Tasks update:* APD completed 100% of tasks during this reporting period (1 of 1).

C.      Specific issue: Provide dedicated administrative support personnel to the Community
        Policing Council (CPC)

*Actions the City has taken:*

APD has drafted and submitted for approval a job description for an administrative

assistant responsible for CPC minutes and agendas, recommendation(s) documentation, and

updating CPC websites.

*Impediments to the process/Unanticipated problems:*  N/A

*Missed deadlines:* No

*If so, explanation:*

*Any other relevant issues or concerns that arose:*  N/A

*Tasks update:* APD completed 100% of tasks during this reporting period (2 of 2).

Conclusion

The Compliance Plan filed on March 5, 2108, was comprised of ninety-one (91) tasks to

be completed no later than July 31, 2018.  These tasked were assigned to a variety of

sections/divisions across the Albuquerque Police Department.  There have been a few delays and

unanticipated issues; however, APD has identified those issues and developed solutions along

with new deadlines, on or before July 31, 2018, to move forward with achieving the deliverables

set out in Compliance Plan.  As of May 31, 2018, eighty-two (82) deadlines of the ninety-one

(91) tasks have passed.    The following depicts the progress toward accomplishing the tasks set

out in the Compliance Plan to date:

- 7.32% (6/82) are not complete.  These tasks have been addressed above and new

  deadlines provided;

- 79.27% (65/82) were completed on or before the original deadline;  and

- 13.41% (11/82) passed the original deadline but have since been completed.


                              Respectfully submitted,

                              **CITY OF ALBUQUERQUE**
                              **Esteban A. Aguilar, Jr., City Attorney**

                              Electronically Filed

                              */s/Jeramy  Schmehl*                            
                              William W. Zarr
                              Jeramy I. Schmehl
                              P.O. Box 2248
                              Albuquerque, NM 87103
                              (505) 768-4500
                              wzarr@cabq.gov
                              jschmehl@cabq.gov

                              *Attorneys for Defendant City of Albuquerque*

### CERTIFICATE OF SERVICE

        I HEREBY CERTIFY that on the _1st__ day of __June____, 2018, I filed the *foregoing*
*pleading* electronically through the CM/ECF system, which caused the parties, counsel of record
and independent monitor on the service list to be served by electronic means.

                              */s/Jeramy Schmehl*