1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW MEXICO

3
      UNITED STATES OF AMERICA,        )
4                                      )
                    Plaintiff,         )
5                                      )
                    vs.                )   NO: 14-CV-1025 RB-SMV
6                                      )
      THE CITY OF ALBUQUERQUE,         )
7                                      )
                    Defendant.         )
8

9

10                      TRANSCRIPT OF PROCEEDINGS
                          STATUS CONFERENCE
11            BEFORE THE HONORABLE ROBERT C. BRACK
                   UNITED STATES DISTRICT JUDGE
12                   MONDAY, JUNE 11, 2018
                          8:30 A.M.
13            ALBUQUERQUE, BERNALILLO COUNTY, NEW MEXICO

14

15

16

17

18

19

20

21        (Proceedings recorded by machine shorthand and
      transcript produced by Computer-Aided Transcription.)
22
      REPORTED BY:    VANESSA I. ALYCE, RPR, NM CCR #259
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmcourt.fed.us

```
 1   APPEARANCES:

 2        FOR THE UNITED STATES:

 3                 UNITED STATES ATTORNEY'S OFFICE
                   District of New Mexico
 4                 201 Third St. NW, Ste. 900
                   Albuquerque, NM  87102
 5                 BY: JOHN ANDERSON, ESQ.
                       ELIZABETH M. MARTINEZ, ESQ.
 6
                   and
 7
                   U.S. DEPARTMENT OF JUSTICE
 8                 601 D. Street NW, PHB 5418
                   Washington, D.C. 20004
 9                 BY:  PAUL KILLEBREW, ESQ.

10                 and
                   U.S. DEPARTMENT OF JUSTICE
11                 905 Pennsylvania Ave. NW
                   Washington, D.C.  20579
12                 BY: STEPHEN RYALS, ESQ.

13        FOR THE CITY OF ALBUQUERQUE:

14                 CITY ATTORNEY'S OFFICE
                   P.O. Box 2248
15                 Albuquerque, NM  87103
                   BY:  JERAMY SCHMEHL, ESQ.
16                     ESTEBAN ANGEL AGUILAR, JR., ESQ.
                       SAMANTHA HULTS, ESQ.
17
          FOR THE INTERVENOR APOA:
18
                   SANCHEZ, MOWRER & DESIDERIO, P.C.
19                 P.O. Box 1966
                   Albuquerque, NM  87103
20                 BY:   FREDERICK MOWRER, ESQ.

21

22

23

24

25
```

```
 1    APPEARANCES continued:

 2         Also Present:

 3                   DR. JAMES D. GINGER
                     Court-appointed Independent Monitor
 4                   LAURIE OWENS, member Monitoring Team

 5
                     CHIEF MICHAEL GEIER
 6                   COMMANDER JOHN SULLIVAN
                     COMMANDER ROBERT MIDDLETON
 7                   DEPUTY CHIEF ERIC GARCIA
                     DEPUTY CHIEF HAROLD MEDINA
 8                   LIEUTENANT CORI LOWE
                     LIEUTENANT JENNIFER PEREZ
 9                   Albuquerque Police Department

10                   JAMES LEWIS
                     SARITA NAIR
11                   Mayor Keller's Office

12                   HONORABLE LORENZO F. GARCIA, RET.

13                   EDWARD HARNESS, Executive Director CPOA

14                   PAUL HAIDLE, ACLU of New Mexico

15                   ALICE LIU MCCOY, ESQ., Disability Rights NM

16                   ANTONIO MAESTAS, ESQ., Community Coalition

17                   RALPH ARELLANES, member Community Coalition

18                   PETER CUBRA, ESQ., McClendon Sub-class

19                   CHRIS SYLVAN, CPC Manager

20                   DOROTHY WOODWARD, member Northeast CPC

21                   DANNY WHATLEY, Co-chairman MHRAC

22                   DENISE GUTIERREZ, USAO Law Enforcement
                     Coordinator
23
                     ALYSSA FERDA, USAO Outreach Coordinator
24

25
```

1                          E X H I B I T S

2     EXHIBITS FOR THE GOVERNMENT:          IDENTIFIED   RECEIVED

3        1 PowerPoint presentation re: CPCs  137          138
         2 EPIC Program materials            137          138
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (In Open Court at 8:31 A.M.)

 2          THE COURT:  This is *United States of America*

 3   *versus City of Albuquerque*.  We're here for a public hearing

 4   today.  I heard someone say just a moment ago that, gosh,

 5   that's kind of an ambitious agenda you have there.  I

 6   thought the same thing when I saw it.  And I'm glad to go

 7   with you-all as far as we can this morning.  I've got a

 8   trial starting right after lunch here, a jury trial, so

 9   we're going to go until noon.  We'll do the best we can and

10   cover as much ground as we can.

11          So I think the first matter is we're going to

12   have opening remarks from the U.S. Attorney, Mr. Anderson.

13          MR. ANDERSON:  Thank you and good morning, Your

14   Honor.

15          THE COURT:  Good morning.

16          MR. ANDERSON:  John Anderson, United States

17   Attorney.  I appreciate the opportunity to present this

18   morning.  And as I mentioned when we were last together in

19   March, the United States Attorney's Office for the District

20   of New Mexico and my colleagues from the Civil Rights

21   Division remain committed to seeing the CASA through and the

22   reform process through to the end.  It's important, as I

23   mentioned in March, for a number of reasons.  First and

24   foremost is that our community deserves effective law

25   enforcement and it deserves constitutional policing.  And we

1    remain committed to working in partnership with the Civil

2    Rights Division and the Albuquerque Police Department to

3    ensure that policing in our community is done both

4    effectively to address the violent crime issue and also to

5    help the Albuquerque Police Department be the best

6    crime-fighting agency that it can be.

7            As the Court is aware, since we re- -- since we

8    convened in March, we've been in somewhat of a reset period.

9    The monitor has been providing technical assistance and APD

10   has been working on implementing a comprehensive Compliance

11   Plan.  And my colleague from Civil Rights Division,

12   Mr. Killebrew, will address both the technical assistance

13   and the Compliance Plan in greater detail during his

14   remarks, but let me speak for a minute about the challenges

15   that we are focusing on now.

16           We are continuing to address the backlog on the

17   use-of-force investigations.  We are working actively with

18   APD and the monitor on that front.  We also recognize that

19   there is much to do in terms of bringing the Academy up to

20   fully staffed levels where it can implement these effective

21   compliance practices.  We know that the APD officers deserve

22   high-quality training and that Academy and those training

23   programs remain critical to obtaining full compliance.  And

24   we look forward to the City dedicating all the resources

25   necessary to providing the type of effective training

1    programs that the community and the officers need and

2    deserve.

3              We also remain encouraged by the active role that

4    the community stakeholders are playing here.  We know that

5    APD continues to meet with stakeholder groups that are

6    represented here today.  Those meetings take place every six

7    weeks.  And we know that the APD has modified its policy

8    development to create opportunities for input from those

9    community stakeholders.  So we remain very much encouraged

10   that the active role they're taking and the input that they

11   are having into this process.

12             Just to close, Your Honor, I think we are in a

13   very good place here.  We have work to do, but we're moving

14   forward together.  We see many positive signs coming from

15   the City and from APD.  And we believe that they are, and

16   all of us together are, in a very good position to move

17   forward to coming into full compliance with the CASA.

18             So I look forward to hearing the input from

19   everybody today and I appreciate the Court's time and the

20   opportunity to address the Court on this important topic.

21             Thank you, Your Honor.

22             THE COURT:  Thank you, Mr. Anderson.  I

23   appreciate your remarks.

24             And we're going to hear from Ms. Nair now on

25   behalf of the City.

```
1              MS. NAIR:  May it please the Court.
2              Good morning.  Thank you for this opportunity --
3              THE COURT:  Good morning.
4              MS. NAIR:  -- to address the Court in the place
5    of Mayor Keller, who sends his regrets because he's
6    traveling for work.
7              We are now six months into our administration.
8    During this time, we've changed top leadership, created the
9    Compliance Bureau, moved Internal Affairs into the
10   Compliance Bureau and divided it into an IA Force and IA
11   Misconduct Division.  We've identified and begun to work
12   through the backlog of use-of-force investigations;
13   negotiated a collective bargaining agreement with APOA;
14   reactivated and staffed up the community policing councils;
15   and passed a budget that provides for more officers, more
16   compliance resources, updated technology, and a wide array
17   of non-enforcement programs, including substance abuse
18   treatment and diversion programs.
19             But most importantly, we have changed the City's
20   and the Department's attitude towards the DOJ and the
21   monitoring team, who were once considered to be our
22   opposition, to treat them as partners in transforming the
23   police department.
24             What I am most positive about are the strides we
25   have made in the world of data collection, understanding and
```

1    delivery.  I remember my own disbelief when I read IMR-6 and

2    last year's outcome assessment report.  At various times,

3    the monitor described APD data as "haphazard, incomplete,

4    incoherent, and inconsistent," and noted that "APD, while it

5    tends to collect a massive amount of data, appears not to be

6    a data-driven organization."  That notion was unacceptable

7    to us.

8         You will hear more about this today, but from my

9    perspective, we're not creating perfect data sets yet, but

10   we've taken the most important step:  We've shifted from

11   compiling data because the monitor is making us to compiling

12   data so that our own leadership can evaluate operations and

13   strategize on the best way to make improvements.  This is a

14   huge shift in both the mindset and the day-to-day work.  We

15   can now identify our own weaknesses, both in data and in

16   performance, and work on doing better instead of waiting for

17   others to call us out.

18        I'm grateful to Chief Geier, Deputy Chief Garcia,

19   Lieutenant Lowe, Dr. Winnograd, and their excellent team,

20   who made this a reality.  I'm also cautiously positive about

21   the change to the Use-of-Force Policy Suites.  The old

22   policies didn't work for anyone, officers in the field,

23   supervisors doing reviews, the DOJ, or the community.  I am

24   not always as patient as I should be, but I believe the time

25   line you will hear about today strikes the right balance

1    between meaningful input from everyone and efficiency.

2              On the other end of the spectrum, what I see as

3    the most arduous piece of this journey is the need for

4    culture change.  By "culture change," I mean taking the

5    positive, proactive shift in mindset and tactics that we've

6    begun to see in the Compliance Bureau and making it

7    persuasive throughout the organization.

8              James Baldwin said, "Not everything that is faced

9    can be changed, but nothing can be changed until it is

10   faced."  In the past six months, we've turned to face the

11   roadblocks that are holding back our progress at APD.

12   Everyone in this room has helped to articulate what needs to

13   be changed.  Now we need to do the work.

14             You can't buy culture change.  There's no

15   culture-change software.  There's no single magical

16   cultural-change training.  That said, when we address this

17   historical underfunding of compliance efforts, the lack of

18   the coordinated data systems, and the lack of meaningful

19   feedback loops for continuance training, we are addressing

20   the symptoms of that old culture.

21             Culture change is slow, iterative, and painful.

22   Culture change hurts feelings.  People retreat into their

23   shells and quit because of culture change, but then again,

24   culture change can be empowering and enduring.  People step

25   up and join in because of culture change.  Culture change

1    supports people trying to do the right thing.  You will hear

2    from many of those people within APD today and there are

3    many more.

4          Dr. Rickman speaks of police transformation.  Our

5    administration believes it is important to talk about what

6    the Department will look like when that transformation is

7    complete.  So in closing, let me share some of that vision.

8          APD will be a Department with officers at every

9    rank who want to be held accountable and want to hold their

10   sisters and brothers accountable because that is how we

11   excel.  Today you will hear about the EPIC program, which is

12   a step in that direction.  APD will honor how critically

13   important it is to support officers as they enforce laws and

14   get collars, and will also honor how sensible and

15   Constitutional use of force increases the likelihood of

16   convictions and positive outcomes from that enforcement

17   action.  APD will tackle crime as a problem to be understood

18   and solved from all angles and with all tools.  The

19   Department will value the powerful tools of knowing the

20   community inside and out, earning their trust, and treating

21   people experiencing mental health and substance abuse

22   challenges with respect and dignity.  APD and City Hall will

23   always have a healthy tension, but both will understand that

24   calling a mistake a "mistake" is a form of support.

25          I'm pleased to report that we are on our way to

1    making the changes we need to institutionalize

2    constitutional community policing in a way that will

3    transform our police department and our City.

4            Thank you for this opportunity to speak to the

5    Court.  And I stand for questions.

6            THE COURT:  I don't have any questions, Ms. Nair,

7    but thank you very much for your remarks.

8            Dr. Ginger, are you next up?  Presentation of the

9    first status report?

10           DR. GINGER:  Okay.  Sorry.  I'm sorry, Your

11   Honor.  I was a bit confused about the order.

12           THE COURT:  You know what?  I don't mean to

13   confuse anyone.  Whoever is up, let's go.

14           DR. GINGER:  It's me.  "It is I," as they say.

15           Thank you, Your Honor.  I intend to be very

16   brief.  What I have to say is a bit behind the curve.  This

17   process has already gone well past what I have to talk

18   about, but my role is to talk about the interim report for

19   IMR-7, which the Court has already received and, I'm sure,

20   read.  It had analyzed steps that would need -- needed to be

21   taken to move forward in this process.  And as the Court

22   knows, this was -- the last site visit was not a typical

23   site visit.  It was designed to do TA.  We provided APD with

24   37 separate pieces of technical assistance in this last six

25   months.  Most of it on site, but some of it by telephone.

 1          We -- just some of those pieces, I'll mention
 2     them, so the Court and those listening can understand.  Some
 3     of those pieces involved developing internal problem-solving
 4     processes.  We find -- we have found that in the past to be
 5     a major weakness with APD.  There seemed to be no ethos to
 6     actually think about the process of solving problems.  It
 7     was more "let's just respond, let's try this, let's try
 8     this."  And in many cases, there wasn't even an assessment
 9     of whether it had worked -- something had worked or not
10     until the monitor came out with a report.  And that was
11     something we worked diligently with this new group at APD to
12     try to make sure they understand the need for a clearly
13     articulated problem analysis and an internal
14     problem-solving.  They shouldn't rely on the monitor to
15     develop those processes.  They need to be internal to the
16     PD.
17          We also provided technical assistance on revising
18     the existing use-of-force process and addressing what is a
19     significant use-of-force investigation backlog.  That was a
20     major piece of what we did when we were on site over the
21     last six months.  And we've been here several times on
22     several sort of mini visits because we needed to craft
23     carefully designed discussions and then training to allow
24     APD to understand where they were, where they needed to be,
25     and what they might best do to move that forward.

1          We gave additional training on revising the

2     Use-of-Force Policy.  And I'm pleased to say that we have a

3     Use-of-Force Policy that the main policy is approvable by

4     the monitor as I stand here right now.  It doesn't require

5     huge amounts of revision and so forth.  If the Court

6     recalls, it took almost a year, I think, for the last

7     Use-of-Force Policy to get ground through and approved.

8     This took about less than six months, so that's a major

9     improvement.

10         We find APD to be highly receptive to our

11    discussions.  If we recommend that they contact folks who

12    have been through this before, which we always do, they take

13    us up.  Usually on that recommendation, there's a follow-up

14    contact.  So that's another huge difference we've seen.

15         We also provided technical assistance on revising

16    the training positive processes for use of force.  As the

17    Court is aware, in our last few reports, we were not very

18    effuse in our praise, I guess, of the process involved in

19    training for use of force.  It was sort of haphazard and

20    didn't quite fit the model that the CASA requires.  We find

21    that this new policy and process that APD is intending to

22    use to train this new policy is markedly improved.  So I

23    think that's another -- another good piece.  We spent a lot

24    of time on that over the last six months.  And we continue

25    to do so, to try to be sure that we get not only a good

 1   Use-of-Force Policy, but we get a training practice that is

 2   modern enough to ensure that the officers understand what

 3   this policy is and they're able to implement it in the

 4   field.

 5           We also provided new training processes for

 6   supervision, supervisory processes, to make sure that those

 7   meet with national standards and expectations.  I'm sure the

 8   Court recalls that almost every one of our previous

 9   monitoring reports has been highly critical of the

10   supervisory process.  In terms of missing obvious issues in

11   use of force or whatever that case might be, the supervisory

12   process has been a significant impediment over the past

13   three years, three and a half years.  The new training that

14   we see, the new policy that we see, the new process that we

15   see with the new -- new APD is much improved.  And I'm

16   pretty sanguine about the processes that will lead to some

17   type of acceptable overall outcome.

18           We also provided technical assistance on recruit

19   training, basically, training for new officers coming into

20   APD, to try to get that a little bit better tuned.  It was

21   not as problematic to us as the old supervisory training,

22   but -- it was better than that, but it still needed some

23   fine tuning, so we provided specifically training in that

24   process.

25           We also provided substantial technical assistance

1    on integrating policy into training for patrol officers

2    during that six-month period.  And that was linked to the

3    training that we provided related to supervision.

4            And then the seventh and final piece was we

5    provided some substantial amount of training on

6    administration process to try to get the folks -- many of

7    whom were new to their jobs at APD, to get them to the point

8    that they understood what was required by the CASA; what was

9    required of APD in order to document that they were, indeed,

10   adhering to the CASA.  And we did some fine tuning of

11   process as well.

12           So those 37 pieces that we provided over that

13   six-month period, I think, have gotten APD to the point that

14   they have a substantial foundation now and they should be

15   able to move forward.  We see no lack of willingness with

16   new command.  They're literally thirsty for suggestions and

17   process that might help them move forward.

18           While we're here this time, we'll be providing

19   some strategic planning training for key command staff.

20   That's probably the one piece that is missing right now, is

21   an overall understanding and development of good strategy

22   designed to move everything forward.  So we'll spend a good

23   chunk of today, Wednesday, this Wednesday, with command

24   staff, key members of command staff, D.C. Garcia and his

25   folks, all of the deputy chiefs, trying to work them through

1    a strategic planning process for APD.  And that should be

2    the icing on the cake that should get us to the point that

3    we're really ready to move this train forward.  And I'm

4    looking forward to writing some reports that look different

5    from what the Court has seen in the past.

6              I'd be happy to respond to any questions that

7    there may be.

8              THE COURT:  No, I don't have any questions,

9    Doctor.  Thank you.

10             I'm looking forward to those reports, too.  I

11   think we all are.

12             Deputy Chief Garcia?

13             D.C. GARCIA:  Good morning, Your Honor.

14             THE COURT:  Good morning.

15             D.C. GARCIA:  Deputy Chief Garcia with the

16   Albuquerque Police Department.  And our report today will

17   focus on our efforts and our progress with the Compliance

18   Plan.

19             Today you will hear from members of our team, who

20   have been doing -- who are leading the efforts in achieving

21   our goals with the Compliance Plan.  I wanted you to meet

22   each member of the team who is responsible for those areas.

23   I know you haven't met them in the past.  I think it's

24   important for the Court to meet with them, to know who is

25   doing that work.

1          I'm proud of the work that they have done.  We do

2     have a lot of work to be done, and we know that, but I

3     believe we are moving forward.  Like Mr. Anderson said, we

4     are meeting with the amici every six weeks.  Our intent is

5     to get input from the community as much as possible on our

6     policies and our processes, not only to show them what we

7     are doing, but to get their input and hopefully improve the

8     way we are doing things.

9          Our first area right now will be use-of-force

10    investigations backlog.  And that will be presented by

11    Commander Robert Middleton.

12               CDR. MIDDLETON:  Good morning, Your Honor.

13               THE COURT:  Good morning, Commander.

14               CDR. MIDDLETON:  I am Rob Middleton, as D.C.

15    said, and I'm the commander of the newly implemented

16    Internal Affairs Force Division.  When I got this assignment

17    and promotion to this position, I was excited to start.  I

18    knew that a lot was ahead of me.  And I was assigned two

19    priorities.  The first was the Use-of-Force Policy Suite.

20    We had to revamp and redo the entire thing for the

21    Albuquerque Police Department.  And like Dr. Ginger said,

22    we're on track.  We've got the input from all the parties

23    and I think we're putting together something that all the

24    officers will understand and be able to use in the field and

25    apply it and understand it as well.

1          The second thing is the -- was the use-of-force

2    investigations backlog.  And that was the biggest thing --

3    our biggest hurdle that we have to get over in APD.

4          I have some notes here, too, that everybody can

5    look at as I speak.

6          The investigative backlog was originally defined,

7    on September 20, 2017, as 110 incidents of use of force and

8    40 incidents of show of force.

9          THE COURT:  Commander, excuse me.  Is there a way

10   that we could turn one of those monitors so that the people

11   in the gallery could see it?

12          (Discussion off the record.)

13          MS. MARTINEZ:  Your Honor, if I may, immediately

14   after this proceeding, we do have DVDs with all of these

15   exhibits on them that we will make available to individuals

16   here in the courtroom.  And we also will be sending out an

17   e-mail to individuals on what we call our APD list.  And I

18   believe almost everyone here is on that list.  And if they

19   are not, Ms. Ferda can collect their e-mail addresses so

20   that they can get this information.

21          THE COURT:  Perfect.  That's going to be helpful

22   to have it later, but to be able to follow along, I think it

23   will add something to the Commander's presentation, but I

24   appreciate that, Ms. Martinez.

25          And so if -- I hope everyone heard.  Ms. Martinez

1    said that this information will be made available to all of

2    you in electronic form after the hearing, so -- and

3    otherwise, kind of scootch together to look at the monitors.

4              All right.  Commander, go ahead.

5              CDR. MIDDLETON:  Thank you, sir.

6              Just to reiterate, on September 20, 2017, the

7    use-of-force backlog list comprised of 110 incidents of use

8    of force and 40 incidents of show of force.  When I got my

9    group together and we looked at what the numbers were and we

10   dove into the actual case numbers of use-of-force backlog,

11   we reorganized that and defined it as any use of force case

12   that was in the queue over 120 days.

13             We had that submitted by May 7th and we

14   identified 284 incidents of use of force that met that

15   criteria.  Those 110 incidents of use of force and 40

16   incidents of show of force are included in that 284.

17             We went back in 120-day increments from there.

18   And on December 9th, we checked what was over the 120

19   days, and we found that there were 46 incidents of use of

20   force, but those 46 were included in the 284.

21             We went up to April 17th and we checked and

22   found that there were 36 incidents of use of force.  And 6

23   of those were included in the 284.  So we added the 30 plus

24   the 230 incidents to come up with our defined use-of-force

25   backlog cases of 314.  This is a complicated process.  And

1    with the assistance of City Attorney Jeramy Schmehl, we

2    verified these numbers again and again.  We have the case

3    numbers for each one of these 314.

4              In addition to that 314 use-of-force and

5    show-of-force cases, we found that there were 89 incidents

6    of serious use-of-force.  And those were cases that had not

7    yet been completed investigation or reviewed and are waiting

8    to go to FRB.

9              Of those 89 incidents, 63 of those are either

10   completed through the investigation or they're being

11   investigated under the new scrutiny of the Internal Affairs

12   Force Division.

13             26 of those 89 are completed and have -- and were

14   completed prior to my arrival.  So we're going to consider

15   those the serious use-of-force backlog that we will review

16   as part of that process, prior to going to the FRB, the

17   Force Review Board.

18             There are several reasons why a backlog was

19   created, in the first place.  One is that there weren't

20   defined time limits for the chain of command and Field

21   Services Bureau to get their cases, the incidents,

22   investigated, reviewed, and submitted to go to the Internal

23   Affairs warehouse, which is called IAPro.

24             With the help of D.C. Medina -- he issued Special

25   Order 18-58 on May 18, 2018.  And in that special order, he

1    directed all field chain of command to get their case --

2    their use-of-force incidents investigated and submitted to

3    IAPro to our side and the Internal Affairs Force Division

4    within 60 days.  And D.C. Medina is going to come up right

5    after me --

6              THE COURT:  Excuse me, Commander.  So as of

7    May 18th, a couple weeks ago of this year, an order was

8    issued that all of the serious uses of force be cleared?

9              CDR. MIDDLETON:  All use of force and show of

10   force.

11             THE COURT:  All of them, huh?  This is 300-plus?

12             CDR. MIDDLETON:  No, sir, no.  I'm going to go

13   into that a little bit later.  So these were incoming cases.

14   So that was to prevent any more numbers being added to that

15   314.  So there are use-of-force incidents happening probably

16   as we speak.  We want those done and completed within 60

17   days, so they don't go over that 120-day time limit and add

18   to the cases that we have to review.

19             THE COURT:  All right.  So for incoming uses of

20   force?

21             CDR. MIDDLETON:  Yes, sir.

22             THE COURT:  Sixty days is the limit --

23             CDR. MIDDLETON:  Yes, sir.

24             THE COURT:  -- within which they are to be

25   investigated?

1                    CDR. MIDDLETON:  Yes.

2                    THE COURT:  And you're going to tell me in a

3       minute, I'm sure, how we're going to address the backlog --

4                    CDR. MIDDLETON:  Yes.  Yeah, that's coming up --

5                    THE COURT:  -- going forward?

6                    CDR. MIDDLETON:  -- in just a bit.

7                    THE COURT:  Thank you.

8                    CDR. MIDDLETON:  All right.  There is an

9       additional reason why there are so many cases backlogged.

10      One of them, like I said, is on the administrative process

11      of this in the Internal Affairs Force Division.  We have one

12      administrative assistant who checks the incoming, the

13      completed investigations, use-of-force investigations, for

14      any clerical or administrative errors that might have

15      happened in the field with the chain of command, so with the

16      officers, themselves, the sergeant, lieutenant, commander,

17      prior to the arrival at the Internal Affairs Force.  That's

18      our one person assigned to make sure that those errors

19      aren't happening.

20                    And there was an additional problem when -- and

21      I'm going to give you an example here:  If a use-of-force

22      incident occurred in the field involving multiple officers,

23      and we'll say five officers were involved, those five

24      officers would open up what's called "Blue Team" and they

25      would make an individual entry into Blue Team for that one

1    use-of-force incident.  So when that goes -- openings went

2    through the chain of command, it got to our administrative

3    assistant, who had to check for clerical errors, that all

4    five matched the information prior to submitting that into

5    the warehouse of IAPro.  So that created a backlog on the

6    administrative side.  And this is different from the 314.

7              So on April 13, 2018, we found that there were

8    327 cases awaiting entry into IAPro.  We came up with two

9    solutions for this:  One was to add one administrative

10   assistant, and her name is Andrea.  She's doing a great job

11   for us, and she is assisting our permanent administrative

12   assistant.

13             The next was we issued Special Order 18-60 on May

14   21st.  And in that special order, it directed all

15   first-line supervisors that when they were in charge of a

16   use-of-force incident, they would be responsible for opening

17   the Blue Team entry for that incident, not the officers.  So

18   for the same example, if there are five officers involved in

19   that use-of-force incident, the one sergeant would open up

20   the Blue Team, and we would take care of any clerical errors

21   up front in the field prior to arriving in IAFD.

22             So on June 1st, when we checked the

23   administrative delay, we saw that the cases went from 327

24   awaiting entry into IAPro down to 160 cases.  And we foresee

25   a workable number now that we have that plan in place that

1    will be between zero and ten cases at any given time

2    awaiting entry into IAPro once we get rid of that

3    administrative delay.

4              THE COURT:  So you went from 327 to 160 in six

5    weeks?

6              CDR. MIDDLETON:  Yes, sir.

7              THE COURT:  So can we think, on that same

8    timetable, six weeks from now, we'd have everything entered

9    into IAPro?

10             CDR. MIDDLETON:  Yes, sir.  And it will be a

11   workable number because, as we speak, cases are being

12   generated.  So on any given week, we might have two to three

13   additional use-of-force incidents coming in that need to be

14   entered, some weeks we might have more, you know, 10 to 15,

15   so it could be a workable number between, we're predicting,

16   zero to ten cases as a workable number.

17             THE COURT:  And the special order in May said you

18   have 60 days to get these things investigated?

19             CDR. MIDDLETON:  No.  That was a different

20   special order.  This special order directs all supervisors

21   that they are responsible for entering the use-of-force

22   incident into Blue Team.

23             THE COURT:  Okay.  The May 18th order said 60

24   days?

25             CDR. MIDDLETON:  Yes.  The May -- yeah, that was

1    the May 18th order, yes.

2              THE COURT:  And what happens if it doesn't?  Is

3    there a downside?

4              CDR. MIDDLETON:  There are consequences.  And

5    Deputy Chief Medina has taken on the responsibility to hold

6    the chain of command and Field Services Bureau accountable

7    for that special order.

8              THE COURT:  All right.  Thank you.

9              CDR. MIDDLETON:  Yes, sir.

10             There was just some key words on here and I'll

11   explain what all this means.  We have put together a

12   use-of-force backlog investigative team.  And I was just

13   speaking to Dr. Ginger this morning that that team, their

14   official order starts today, this morning.  And their

15   directive is to review the 314 use-of-force incidents and

16   shows of force and the 26 serious use-of-force incidents.

17   What we're looking for are any policy, training, or tactical

18   deficiencies in those cases.  The backlog investigators will

19   be looking for problems with the chain of command -- with

20   the officer, themselves, and the chain of command, and how

21   they identified, reported, investigated, and reviewed those

22   use-of-force cases.

23             After going through these 314 and 26 cases, this

24   team will be well prepared and will be able to move forward

25   in the future with this new Use-of-Force Policy Suite to

1    thoroughly, consistently, and objectively investigate and

2    review a use-of-force.  That's our goal.  That's our plan.

3    And that's our methodology that we've put in place.

4           As the Backlog Review Team goes through these

5    cases, they will be -- one of their objectives is to

6    identify officers who routinely violate a use-of-force

7    policy.  We'll be making referrals for them to get

8    counseling, retraining, or possibly reassignment as we go

9    through that backlog.  The backlog investigators will be

10   assessing findings in the review process and they'll be

11   looking for policy violations, potential criminal conduct,

12   deficiencies in identifying reporting and investigating the

13   use of force.  And after going through the cases -- or well,

14   it's going to be simultaneously, we're going to be making

15   referrals to the Assistant Direct Attorney for possible

16   prosecution or declination letters on these cases as well as

17   to the Academy.  And Cdr. John Sullivan knows and it's part

18   of the plan to train these officers.  And if it's on a macro

19   level where we're identifying something that has happened

20   again and again, we know we have a Department-wide

21   deficiency where we can train the entire Department on what

22   we've noticed prior to going forward.  One of the other

23   referrals we'll be making is for the chain of command for

24   counseling and possible progressive discipline.

25           Back in March, we put together a Compliance Plan,

1   and this is the last slide.  And we had ten -- we came up

2   with ten objectives to meet with the deadlines that you see

3   in the column there.  The first three objectives that we

4   came up with we met by May 7th and that was specifically

5   defined in the backlog.  We wanted to define the scope of

6   the use-of-force investigative backlog, which we did.  And

7   we wanted to compile a list of the investigations to be

8   completed, which we did.

9           Next, we wanted to prioritize them.  We came up

10  with a priority list of how we would deal with the backlog.

11  And the very first priority, and the recommendations from

12  the monitors, Dr. Ginger, and accepted through the chain of

13  command to be was that we would look at the top nine users

14  of force and start with them, just in case the possibility

15  existed that they were still operating under the same

16  practice they did in a use-of-force incident that might be

17  happening now.  So that's why reassignment was one of the

18  objectives there.  We would have to stop that action or

19  possible retraining, counseling, or progressive discipline.

20          Next, we wanted to identify -- or we came up with

21  a plan to identify video that corresponded to each

22  use-of-force incident, but we found that this would happen

23  naturally anyway.  As the investigators go through each

24  incident, their plan was to -- their objective is to look at

25  the video, the on-body recording device of the officers, so

1    we didn't have to set this up ahead of time.  So for

2    efficiency reasons, it's part of the backlog investigation,

3    case by case.  So I wrote a memo to the chain of command

4    explaining that.

5              So the next, we wanted to develop a training plan

6    with APD Training Academy to conduct reviews of backlog

7    use-of-force investigations.  We wrote a seven-step

8    comprehensive training process that's been accepted through

9    the Academy and viewed by the monitors.  And our first round

10   of training has been conducted.  We have revised -- part of

11   the seven-step process is the revision, so we did a revised

12   needs assessment and lesson plan PowerPoint, and we're going

13   to be delivering that next round of training at the end of

14   the month to the Backlog Review Team.

15             Next, we wanted to identify the personnel, and

16   that is on a temporary duty assignment or collateral duty,

17   but we needed to get people in there to help develop this

18   process up to this point.  We did get people in there.  And

19   I wrote a staffing plan and, like I said earlier, the

20   staffing plan was approved and our first seven officers were

21   transferred today, three sergeants and two lieutenants, and

22   they're working on it, as we speak.

23             The next one just falls right in line with that,

24   the delivering of the training.  We completed the training.

25             Next, we wanted to do weekly meetings where we

1    collected minutes in the meetings.  We've done three

2    meetings with our Backlog Review Team.  And we've revised

3    the weekly meetings all three times, so we think we have a

4    good work-in-process right now to collect the minutes.  And

5    this will be -- the minutes will be able to identify the

6    trends in the backlog that we're seeing, and we're going to

7    be able to create Excel spreadsheets to identify those

8    trends and make those transparent to everybody.

9            The next two were about the video process,

10   itself.  The video process -- the video investigative

11   training was done in the initial round for the Backlog

12   Review Team.  The second one, I completed a -- I did a

13   staffing plan for a video review unit.  Everyone in my unit

14   has read IMR-6.  And then one of the directives in IMR-6 was

15   that we create an efficient, effective, and trained unit to

16   watch on-body recording device videos from beginning to end.

17   So that staffing plan has been submitted and I'm waiting on

18   the budget to approve the hiring of six non-sworn personnel

19   to go through that -- the videos.

20           Your Honor, there's some great detail that we've

21   done here.  I told Dr. Ginger this morning that we've

22   created hundreds of documents already.  We're ready to go

23   and we're going to revise this process through the 314.

24   It's a learning process as well.  So with the Use-of-Force

25   Suite and doing our homework with the backlog review, we

1    will be ready for incoming cases with the new policy.

2              And do you have any questions for me?  It looks

3    like you have quite a few.

4              THE COURT:  Do I have that look on my face?

5              CDR. MIDDLETON:  Yeah.

6              THE COURT:  This is a -- you've described a

7    really daunting task.

8              CDR. MIDDLETON:  Yes, sir.

9              THE COURT:  Those are big numbers.  And those

10   numbers are of a concern to everyone in the community.  Do

11   you have any -- and if you said it, I missed it.  Do you

12   have any target date to have worked through the backlog?

13             CDR. MIDDLETON:  We have only projected dates

14   right now.  Today is -- we have gone through some

15   use-of-force cases in the backlog, but based on

16   recommendation, as well as by the monitors and Dr. Ginger,

17   we're putting together a performance metrics.  And we're

18   going to go through the next 30 days to see how many cases

19   these seven officers can go through in the next 30 days.

20   We're going to be put a formula together to show what we

21   expect the deadline will be with those seven.  And I expect

22   it won't be a number that anybody will want.  They will want

23   it earlier than that, so I'm going to be asking for

24   additional personnel to add to my Backlog Review Team to get

25   that number down to within a few months.  And I can't tell

1    you right now what that deadline will be until we do the

2    metrics for it, but it will be in 2018.

3              THE COURT:  So you've got seven people on the

4    team and you may add others --

5              CDR. MIDDLETON:  Yes, sir.

6              THE COURT:  -- to the team.  But if I remember,

7    macro sense, you guys are -- ought to be at 1,000 officers

8    and you're at 800 or something?  Remind me what those

9    numbers are.

10              CDR. MIDDLETON:  I don't have those numbers right

11    now.  Chief might have that numbers, but I don't have that

12    data available now.

13              THE COURT:  My point being --

14              CDR. MIDDLETON:  Yeah.

15              THE COURT:  -- this:  If you are at a point where

16    you don't have enough officers, as it is, and you're taking

17    lots of officers, several officers, off the street to do

18    this sort of review, how do you cover the waterfront?  Tell

19    me how that works.

20              CDR. MIDDLETON:  That's going to be a recruiting

21    and retention plan that has been put in place.  And I know

22    that the recruiting with Commander Sullivan has gone up

23    quite a bit.  They just seated a class of 45 right now.  And

24    I believe this might be a question for Ms. Nair that

25    officers probably will not be retiring, based on than

1   retention plan.  That's on a Department-wide level that I

2   somewhat understand.  And I understand that the backlog is

3   also a priority, and we're doing our best with this Backlog

4   Review Team and Internal Affairs Force Division to, I guess,

5   spread the impact that it has on the Department.

6           So when we first started recruiting officers for

7   this unit, I told the six area commanders that I'm not going

8   to hit your area of command and take all seven from you.  So

9   we did spread it out where we took some from an

10  Investigative Unit.  And I know Cdr. Arturo Gonzalez is in

11  the back.  We took two of his investigators, and then we

12  took one officer from five area commands in addition to

13  that.  So just to spread the impact.  That's -- we're

14  consciously trying do it without hurting any area commands

15  too hard.

16          THE COURT:  Is Ms. Nair still over there?

17          MR. AGUILAR:  No, Your Honor.  She stepped out.

18  She had to leave the hearing.

19          THE COURT:  Okay.  Who can give me those macro

20  numbers?  Deputy Chief Garcia?

21          D.C. GARCIA:  Your Honor, Deputy Chief Medina

22  will be handling that and can speak to those.  And he can

23  speak to how the area commands are still going to be

24  operating out in the field and he can also assist with those

25  numbers.

1          THE COURT:  That's great.  And when I hear from

2    Chief Medina, I want you to talk about the retention plan

3    and if are we seeing benefits from that already.  Are fewer

4    people retiring?  I hope you can address those things for me

5    because, ultimately, it's numbers, it's always

6    numbers-driven.

7          So those were the questions I had.  And good

8    luck, God bless you.  You've got a daunting task.  But you

9    know what?  Everybody's watching.  You know that.

10          CDR. MIDDLETON:  Yeah, we understand that.

11          THE COURT:  So not to, you know, put any more

12    pressure on you.  Thank you, Commander.

13          CDR. MIDDLETON:  I understand that, Your Honor.

14    And I hear the people laughing in the back, and they are

15    ones who are helping me, as well.  We're not taking this on

16    by ourselves.  Elizabeth Martinez has been a great help with

17    the Use-of-Force Policy Suite.  And we are taking the

18    recommendations from the monitors and Dr. Ginger.  One thing

19    we were told is don't throw 20 people at this and hope it

20    works.  Put the plan in place, first.  We have a process for

21    our plan and we started off with seven officers.  So that's

22    our plan in place prior to submitting the performance

23    metrics.

24          THE COURT:  Great.  Thank you.

25          CDR. MIDDLETON:  Thank you, sir.

1          THE COURT:  Thanks for your report.

2          So we're going to hear from Deputy Chief Medina

3     right now.

4          D.C. MEDINA:  Good morning, Your Honor.  And good

5     morning to everybody in the court.

6          THE COURT:  Good morning, sir.

7          D.C. MEDINA:  My name is Harold Medina, I'm

8     Deputy Chief of Police of the Field Services Bureau.

9     Basically it's all the uniformed officers along with -- I'm

10    helping with oversight of the Academy and also with the

11    tactical section.  That's probably the reason why I was

12    asked to help address the inching backlog of use-of-force

13    cases because most -- the vast majority of those cases do

14    generate in the Field Services Bureau.

15         A couple things about me that I've heard this

16    morning that are enlightening is I'm a numbers-driven

17    person.  If you tell me there's change, I want to see the

18    change in the numbers.  If not, I don't believe the change

19    has occurred.  The other thing is I believe in cultural

20    change.  I believe what the CEO said.  If we're going to

21    effect change that is longterm, that makes the Department

22    better, that makes the Department more in tune with the

23    community, we need to change the culture in the Department.

24    And when United States Attorney Anderson was speaking

25    earlier, he made a couple points that I took note of:  He

1    said we need to become a Department that understands and

2    practices constitutional policing.  And he said we need to

3    reduce crime rates, and the community deserves a police

4    department that is efficient and gets things done within the

5    community.

6            When I arrived in December, I think it's

7    important to note that what the state of the Department was

8    that I came back to.  I looked and I saw that it was

9    struggling in implementing the requirements of the CASA,

10   that -- but that wasn't the only struggle.  I saw the

11   highest crime rates the city had seen in 20 years.

12   Recruiting efforts were six, seven officers sometimes per

13   Academy class.  Community policing was more about checking a

14   box than truly getting to the spirit of community policing.

15   The officers were afraid to do their job and there was low

16   morale.

17           In dealing with the use-of-force back -- delay

18   that these cases were taking, I took all those things into

19   consideration as we developed a plan.  The first thing I did

20   is I sat down and I discovered that we couldn't even

21   generate a number.  The first weeks I was here, I got

22   numbers from 130 cases to 400 cases and the number

23   consistently changed.  We knew there was a problem with the

24   data and what questions we were asking and what kind of

25   response we were going to develop.

```
1              The first thing I did is I asked that my
2    Operations Review Section find where the cases were not
3    getting completed at.  And we quickly found that most of the
4    cases were stuck at the lieutenants' level and were not
5    getting past the lieutenants.  We identified some
6    lieutenants who had as many as 20 cases pending in their
7    queue that had not been investigated.
8              We also found that one of biggest problems was,
9    when they implemented this policy, they didn't create a
10   deadline.  There was a 72-hour deadline for the officers to
11   get it done.  Guess what?  There's no officers on the list.
12   All these cases were being held up at the sergeant level,
13   which had no deadlines; the lieutenant level, which had no
14   deadlines; the commander level, which had no deadlines.
15             We also found that there was no tracking system.
16   Sometimes people will do their job if you just give them a
17   little reminder.  There was no system that really told us
18   when cases got to a certain point and when people were
19   falling behind.
20             And the last thing is I realized that we needed
21   to look some of the best practices around the nation to see
22   what they were doing.
23             So at this point in time, we began to address
24   this problem, but we also began to address what the Chief
25   had determined were the priorities for the Department,
```

1   making sure that we followed and implemented all the aspects

2   of the CASA, making sure that we were working on reducing

3   crime, making sure that we were working on recruiting police

4   officers, and making sure that we're developing a good

5   strong community policing program and increasing the morale

6   of our officers.

7           So the first thing we did related to developing a

8   tracking system is we made a very simple system.  The system

9   works where I get -- every -- twice a week, I get a list

10  that says how many days since the crime occurred -- I mean,

11  since a use of force occurred and how many days has it been

12  sitting with the individual responsible for that case.  And

13  I go through this personally twice a week and the commanders

14  are probably tired of me sending them an e-mail that says,

15  "These ones need to be done and make sure your lieutenant is

16  doing this."

17          One of the other first things we did is we also

18  made difficult phone calls to commanders and we advised them

19  that their lieutenants who were behind on their use-of-force

20  cases could come to work in plain clothes and that you would

21  find an upgrade for them for their field duties and their

22  responsibility would be to clear these use-of-force cases or

23  they will not return to the field.  It was pretty motivating

24  because most of the lieutenants had their queues cleared

25  within two weeks.  And when I first started, we had a number

1    of almost 300 and -- 160 cases in the queue that needed to
2    be cleared out and that were being delayed in the use of
3    force above 60 days that we knew we were going to establish
4    as a deadline.

5            So one of the charts we created for -- to help me
6    track a little bit easier is anything under 60 days I know
7    is still without delay and they still have time.  Anything
8    61 to 120 days, we know we have a priority on.  Anything 120
9    to 180 is a separate priority.  And anything above 240 days
10   is the utmost of priorities.  Right now, I could tell you
11   that the current numbers I got, as of Friday, the
12   60-to-120-day cases were at 35.  The 120-to-180-day cases
13   were at 9.  And there was only one case that was 180 to 240
14   days old.  I tried to get an update this morning because I
15   know several commanders worked through the weekend to try to
16   reduce that number.  And hopefully, I'll have an updated
17   number sometime later today on that.

18           So those are the results.  As you can see, we
19   clearly are reducing the delay by creating a 60-day time
20   frame in which they have to get it done.  Several
21   lieutenants have already been disciplined as a result of the
22   reviews by their commanders, which tells us the commanders
23   are reviewing the cases.  They're holding their lieutenants
24   accountable.  There's possibly more discipline that will
25   come about later because of the fact that some of those

1    cases with some of those lieutenants were greatly held up

2    and not being done in a timely fashion.  But we're also

3    waiting for the review of these cases through

4    Cdr. Middleton's process because I want to make sure that

5    there isn't something wrong in our training or how we

6    implemented this back when it was implemented.  That may

7    lead us to the reason why some of these lieutenants were

8    holding onto cases.  I want to make sure we're fair with the

9    officers because that goes hand in hand with morale, but not

10   only do we see that our use-of-force cases that are being

11   delayed, the delay has shortened and we're almost clear from

12   those cases.  And I anticipate, in the next four weeks,

13   we'll have zero cases past the 60-day deadline.  And then my

14   next step will be making sure that sergeants get them done

15   within the deadlines established for them and that

16   lieutenants get them done.  And then we know that everything

17   is already done when commanders should have them done.

18            But some of the other things that we've seen is

19   crime reduction.  I know that was mentioned earlier.  It's

20   important to our community.  We have about a 33 percent

21   reduction in auto burglary.  We have a 12 percent reduction

22   in auto theft.  We have a 12 percent reduction in commercial

23   burglaries.  We have a 50 percent increase in traffic stops.

24   So I think that everything is showing us the officer morale

25   is higher.  Our crime is being reduced.  Our use-of-force

1    investigations are getting cleared quicker and more

2    efficiently.

3            The Academy had 43 cadets start today as part of

4    our recruiting effort.  Not only do we have 43 cadets

5    starting today, we also had 15 laterals test this past

6    Saturday that got through the initial testing process.  We

7    have 5 laterals already seated.  And we're anticipating that

8    our lateral process, based off our work with the Union on

9    collective bargaining, the process is going to enable us to

10   hopefully get a lateral class of at least 40.  Our current

11   numbers are 850, approximately.  If you add 43 that are in

12   the Academy now plus the 17 on OJT, we're right about 910.

13   Unfortunately, it will take some time to get them as

14   functioning officers out in the field.  If we seat another

15   class in the spring of 40 and we seat a class of 40

16   laterals, we're about 880.  And I think that's a good

17   direction for us -- I mean, 980.  That's a good direction

18   for us to be going.  And it shows that we are increasing

19   recruiting efforts.

20           We are getting more people to stay with the

21   compensation package that was offered to the officers.  It

22   takes into account the number of years of service.  So our

23   most senior officers, who are ready to retire, benefit the

24   most from the package.  They get an increased hourly rate

25   over those that are just starting of almost $3.50.  They get

1    a longevity pay for this first year of $500.  So it was a

2    good cooperative effort between the City of Albuquerque and

3    the Union to come up with a plan that we thought would work.

4    Myself and Union President Shaun Willoughby talked about it

5    last week, and we're hopeful that the early signs that we're

6    seeing is that it is going to work and it is going to

7    develop the number of officers that we need.

8           So I want to close in saying that we're

9    addressing the problems with the Albuquerque Police

10   Department as a whole.  We're not just looking at the court

11   settlement, we're looking at all aspects because it's

12   important that, as a Department, we're trusted by the

13   community, the community feels they're safe, and that the

14   community feels they have an effective police department and

15   that this court settlement agreement is not a crutch on the

16   police department.  I think that when you take all those

17   factors into play, I think it shows that we have a good

18   trend and we're moving in the right directions in a lot of

19   ways.

20          I'll stand for any questions, Your Honor.

21          THE COURT:  Chief Medina, you gave me some

22   numbers a moment ago.  Of all the numbers we've heard so far

23   this morning, those are the numbers, I think, that people --

24   that really tickle our ears.  Those are the ones we want to

25   hear and that is reductions in crime rates.  You said some

1    numbers, 33 percent, I didn't write them down.  Tell me

2    where those numbers come from and over what period of time

3    they're measured.

4            D.C. MEDINA:  Those numbers came from our records

5    management system.  What we're trying to do is compare

6    apples to apples.  And one of the biggest things that I've

7    asked for from my analysts is to give me comparable data.

8    We don't have UCR data available yet for the year, so it

9    wouldn't be right for us to compare data from other record

10   systems with UCR because they're not --

11           THE COURT:  "UCR" means what?

12           D.C. MEDINA:  -- comparable.  Uniform Crime

13   Report.  That's basically the data that's reported to the

14   FBI.  But we have historical data systems that we can track

15   information through.  And I have a history in property

16   crimes.  2010 and '11, I was the property crimes lieutenant.

17   I ran numbers every day.  So one of the things that I asked

18   them to do is I know that we will get an accurate reflection

19   of our numbers if we track the same systems.  So we've

20   chosen to track our records management system.  And for auto

21   thefts, for example, I wanted to do a double-check that

22   those numbers were close.  So I asked them to hand-count the

23   entries of stolen vehicles into NCIC to make sure that we

24   were close to what our records management system was saying.

25           Those numbers, like I said, Your Honor, are

1    coming from our records management system.  It's an accurate

2    reflection of the same systems giving numbers.  We're

3    tracking the first five months of 2017 to the first five

4    months of 2018 to see if we're making a difference from '17,

5    which were the highest numbers, to 2018.  Because of the

6    fact that the numbers are so skewed and they had risen so

7    sharply in 2017, it's really hard for us to use the best

8    practice of tracking three years' worth of numbers because

9    there is going to be no progress in the data because the

10   numbers are so skewed because of the sharp increases that

11   occurred in 2017.  So we're using 2017 as a gauge to compare

12   2018 for the numbers.

13           THE COURT:  So the first five months of '17

14   versus the first five months of '18.  Give me those numbers

15   again.  You had a percentage number and you broke them down

16   by particular crime.

17           D.C. MEDINA:  Yes.  For auto theft, we're right

18   about 12 percent.

19           THE COURT:  And these are decreases?

20           D.C. MEDINA:  Decreases.  For robbery,

21   42 percent.  Commercial burglary, 12 percent.  Residential

22   burglary, 7 percent.  Traffic stops have increased

23   53 percent.  Which is good proactive way to measure the

24   morale of our officers.

25           THE COURT:  Let me just make sure I wrote them

1    down correctly and heard you.  A 12 percent decrease in auto

2    theft.

3              D.C. MEDINA:  Yes, sir.

4              THE COURT:  A 42 percent in robbery.

5              D.C. MEDINA:  Robbery.

6              THE COURT:  12 percent decrease in commercial

7    burglary, 7 percent decrease in residential burglary.  And

8    traffic stops are up 53 percent.

9              D.C. MEDINA:  Yes, sir.  And a 33 percent

10   decrease in auto burglaries.

11             I wasn't joking when I said I was a numbers guy.

12             THE COURT:  Those numbers are -- last year's

13   numbers were high, so the fact that they're off that's a

14   good thing, but it's -- you know, over a three-year period

15   it may not be as significant a number.  But I can tell you,

16   for my purposes and for purposes of the people that are here

17   today and what you're going to see in the paper tonight,

18   those are the numbers that people care about.  They want to

19   see that we're actually -- you're having an impact in the

20   community in terms of actual crime, right?

21             So this is good stuff.  And I appreciate that.

22   And to the extent that those numbers are subject to

23   challenge, I'm sure I'll hear from somebody later today

24   about that.  But I really do appreciate it.

25             D.C. MEDINA:  No, Your Honor.  And that -- I'm

1    glad that you're happy with the numbers.  And I think that's

2    why, when I gave my presentation this morning, I wanted to

3    cover that.

4              Our response to the problems that the Albuquerque

5    Police Department is facing, when me and Chief spoke when we

6    returned in December, we wanted to make sure that we had a

7    balanced approach and that we realized that we couldn't just

8    focus on one area, that we had to focus on all the areas:

9    Recruiting, crime, community policing, and implementing the

10   court settlement agreement to its fullest within the

11   Department to coming into compliance.  And we knew if we

12   didn't move forward in all these areas that we were denying

13   the citizens of Albuquerque the services that they should be

14   getting from a police department.

15             And although I think that we could have just

16   focused on the use of force and maybe had them cleared by

17   this point in time, I'll take the fact that we have about 43

18   cases, 44 cases that are beyond the 60 days, along with all

19   the other good things that are coming out of the police

20   department.

21             THE COURT:  Thank you.  Thanks very much, Chief.

22             D.C. MEDINA:  Thank you, Your Honor.

23             Lt. Lowe?  Yes, ma'am.

24             LT. LOWE:  Good morning, Judge.

25             THE COURT:  Good morning.

1          LT. LOWE:  Good morning, Court.

2          My name is Cori Lowe.  I'm a lieutenant with the

3     Compliance Bureau.  And I'll be presenting, to the Court,

4     Area 2, the Implementation Unit.

5          I know we have the slides, but I'm going to go

6     into a little bit more detail on a couple of things.  I'm

7     going to discuss the tasks APD has identified in the

8     Compliance Plan for the development of the Compliance

9     Bureau.  I'm going to give an update and the status of each

10    issue.

11         Like Deputy Chief Medina mentioned, when they

12    came on in 2007 -- December of 2017, the administration from

13    both the City and APD agreed with Dr. Ginger's suggestion

14    and created the Compliance Bureau.  This bureau is

15    specifically focused on CASA-related activities and

16    progress.  We originally had an Inspections Unit, which was

17    trying to do a lot of the Compliance Bureau -- Compliance

18    Plan initiatives; however, those positions were re-purposed

19    within the Compliance Bureau to better utilize our manning

20    and our experience.

21         We have three areas that we want to focus on as a

22    Compliance Bureau, which is oversight, guidance, and

23    accountability.  The Compliance Bureau will also be a

24    centralized division for activities surrounding the

25    CASA-related activities.  And we want to clear lines of

1    information and communication to assist in the

2    organizational reform, a reform shift across the Department.

3    We want to make sure from the Patrolman, Second Class, who

4    is our probationary officers, all the way up to the Chief of

5    Police fully understand the situation that we're in and why

6    the improvements are being completed.

7         The Compliance Bureau will be responsible for

8    three different areas.  I'll go into a little bit more

9    detail here in a second, but one is process development.

10   The second is auditing and assessment functions.  And the

11   third one is specifically focusing on Level 1 use-of-force

12   and show-of-force case reviews.

13        And one of the things I wanted the Court to

14   understand is a little bit of how APD is -- the rank is

15   broken down.  So within the Compliance Bureau, we have,

16   obviously, a deputy chief of police.  And for the Compliance

17   Bureau, it's Deputy Chief of Police Eric Garcia.  Underneath

18   the bureau is a division.  And for us, it's the Compliance

19   Division, which does have a temporary duty commander

20   assigned, who is Michelle Campbell, who while she is new to

21   this position, she is not new to the CASA, as she has been a

22   project lead on several paragraphs, so she has experience.

23        Within the division, it is broken up into two

24   sections:  The Compliance Section and the Performance Review

25   Section, with the lieutenant over each.  I am the lieutenant

1    who manages the Compliance Section and has overall oversight
2    of the compliance activities, including this Compliance
3    Plan.  Then we have a second lieutenant, who manages the
4    Performance Review Section, who up until officially this
5    last Saturday, was on temporary duty, but now she's
6    permanently assigned.  And she is responsible for the
7    oversight of Level 1 use-of-force and show-of-force reviews.
8            Under my section, the Compliance Section, there
9    are two units that have been created.  There is the
10   Implementation Unit, with a civilian manager, Jolene Luna,
11   who has over 25 years' experience with the City.  And the
12   Performance Metrics Unit, also a civilian manager, Cara
13   Garcia.  Cara comes from outside; however, she used to work
14   with APD.  She was one of the ones that was identified by
15   Dr. Ginger and his team as doing an effective audit
16   assessment on our TASERs a couple of years ago.  So we were
17   lucky enough to bring her back.
18           The Implementation Unit assists with our project
19   leads.  Our project leads are sworn personnel that are
20   assigned specific paragraphs within the CASA and are
21   responsible and accountable for getting them into
22   compliance.  In the past, APD has lacked formal documented
23   processes, and this team is here now to assist in developing
24   in those processes to work through, identify weaknesses and
25   deficiencies, and then provide feedback to improve the

1    process along the way.

2            Then after that process is developed, then we

3    have the Performance Metrics Unit, who performs audits and

4    assessments.  As stated earlier, we -- there's a little bit

5    of a difference between an assessment and an audit.  An

6    assessment is more of a reporting.  And with that said, we

7    have to do downloads quarterly for our TASERs.  We need to

8    make sure that -- and with that, we just pull a report.  The

9    next month, we pull a full report.  It will let us know who

10   conducted the download, what date they conducted the

11   download.  And then we they have deadlines, so if they miss

12   that deadline, we'll know.  That's where that assessment

13   comes through.

14           And the audits are more of a comprehensive and

15   detailed approach of looking at TASER as a whole.  We're

16   looking if our policies are being done correctly -- or being

17   followed correctly, if our policies are within best

18   practices, and if there's any improvement that we need to

19   make.  And if there are any deficiencies identified within

20   that audit process, the Implementation Unit comes back in to

21   assist again.  This is creating a cyclical response to the

22   public -- the problem-solving process, to include

23   problem-solving methods that Dr. Ginger brought up earlier,

24   which is goal maps, which is talking about goals,

25   objectives, measurements, analysis, process identification,

1    and product development.  So it's really helping us make

2    sure that we're collecting everything that we need from

3    Point A to Point Z with problem-solving.

4            Again, then we have the Performance Review

5    Section.  And under that is the Performance Review Unit, led

6    by Lt. Perez, who will serve as an additional assessment

7    function for Level 1 use-of-force and show-of-force cases.

8    Lt. Perez will also be responsible for managing the Force

9    Review Board and its functions.  Force Review Board can also

10   be called or addressed as "FRB."  And they will also

11   continue and assure that there's recommendations stemming

12   from FRB and from her Level 1 use-of-force and show-of-force

13   reviews to make sure they're correctly routed, addressed

14   accordingly, and assigned those deadlines to make sure that

15   we close that loop.

16           Her team will also identify strengths and

17   weaknesses in the reviews to ensure agency-wide retraining.

18   This is one of the areas I think we're improving upon,

19   training.  And we want to make sure that the information

20   that we see, that we identify as deficiencies, and how we

21   correct them are provided to the officers and supervisors

22   actually doing the job.

23           Lt. Perez will speak more on FRB and Area

24   Number 4.  I just wanted to give you a little bit of

25   background on the actual Compliance Division.  In the

1    Compliance Plan, there were six tasks for this reporting

2    period.  APD completed all 100 percent of those tasks on or

3    before their deadlines.

4             The next section that was brought up was our

5    policies development process or Special Operating Procedure,

6    SOP, 3-52.  The policy development process took a little bit

7    longer than we anticipated and we missed the original

8    deadline.  However, with that said, APD did not just want to

9    push a policy through.  We wanted to receive internal and

10   external feedback to thoroughly improve upon the original

11   policy.

12            As part of our policy development process, we

13   have what is called the Office of Policy Analysis, or OPA.

14   OPA serves as a central hub for policy presentation and

15   provides administrative support to policy development

16   processing.  We have a civilian SOP liaison who is assigned

17   specifically for policy.  And that comes from Point A to

18   publish -- from when it gets revised or developed into where

19   it's being published and revised -- or published and, if it

20   has to have revision, it will come back at a later date.

21   But that's his sole job, because policy is so important to

22   what we expect our officers to do on a daily basis.

23   Although we did meet the deadline -- or missed the deadline

24   we were able to publish it on April 24th of 2018.

25            So there were seven tasks in this specific area

1    because it was so detailed.  We did -- as of today, we have

2    completed all seven, so we're 100 percent.  However, three

3    out of the seven were completed after the original due date,

4    due to the reasons I stated earlier.

5            Next was to develop and implement a Compliance

6    Division Policy.  Being a new division, we have to create a

7    policy from scratch.  And APD has researched best practices

8    to identify roles and responsibilities that other law

9    enforcement agencies already have with similar depart --

10   similar divisions.  Some of the ones that we looked at were

11   New Orleans, Cleveland, and Seattle PD, all of which are

12   either under a similar settlement agreement or actual

13   consent decree.  New Orleans and Seattle have been under

14   theirs for quite a while.  And Cleveland and APD are

15   somewhat similar to each other, as far as time.  Our goal is

16   not to reinvent the wheel, but to learn from one another.

17   And we've done a lot of information-sharing.  For instance,

18   myself and Cdr. Campbell just met with the Cleveland -- a

19   division of Cleveland police this last week to kind of see

20   if we were able to learn anything from their structure.

21   While I do believe our structure is actually very strong,

22   there's always ways to improve it.

23           Another area that we looked at, just so we can

24   make sure that we have best practices, is the International

25   Association of Chiefs of Police, or IACP, website.  That

1    website provides for recent articles, other policies that

2    other departments have put up there to publish for open

3    viewing, so we don't have to reach out to the departments

4    individually if it's already there.  So based off that

5    research and our organization needs, APD drafted job

6    descriptions for each of the areas that we need to --

7    positions we needed to fill.  We came up with roles and

8    responsibilities and then we also came up with an

9    organizational chart.

10           As a division continues to grow, the creation of

11   process flows does as well.  So with that said, I created

12   tasks to -- it should have been two separate tasks.  It

13   should have been the job descriptions, roles,

14   responsibilities, and organizational charts as one.  And

15   then the process flows as their other separate task.  So

16   that is something I definitely learned from this Compliance

17   Plan.  With that said, I do not consider Task 2 to be

18   complete.  We still have lot of process flows to develop,

19   and we're just simply not as far as along as I originally

20   hoped to be.

21           However, with that said, we have created several,

22   including just policy development and revision, just how to

23   get a policy through our process.  In itself, now, we have a

24   process flow, data requests and submissions to and from the

25   monitoring team, and how we're going to work with special

1    orders.  As you heard, Cdr. Middleton named three right off
2    the bat.  So special orders are an integral part of our
3    operations and we want to make sure our officers know how to
4    go about and how they get approved.
5              Therefore, there was two tasks during this
6    reporting period.  We completed one, so we're 50 percent.
7    And I gave Task 2 a new deadline of July 13th of 2018 so we
8    can get as many process flows up and running before I
9    consider it a completed task.
10             I stated this previously when we discussed the
11   development of a Compliance Bureau; however, we did have a
12   task that stated to create a section devoted to use-of-force
13   oversight.  This is the Performance Review Unit introduced
14   earlier.  And they have oversight and they will also review
15   and identify deficiencies in Level 1 use-of-force cases.
16   They will develop a process to conduct a detailed
17   use-of-force investigation failure analysis to determine the
18   cause of the failure, with the goal of determining
19   corrective actions.  This is to ensure that we're covering
20   our -- making sure that not only do we identify it, but we
21   find a way to correct that deficiency.  And if it goes
22   agency-wide, we need to go through that entire training
23   process.  We do need to identify if it's just one particular
24   officer, supervisor that is having an issue or if it's
25   something that we can see pattern and trends that take over

 1    Department-wide.  If is it Department-wide, that's where

 2    this training comes in.  And we want to make sure everyone

 3    gets a fair share of that.

 4            They will also develop and provide

 5    recommendations for policy, training, supervision, tactics,

 6    and equipment.  This is very similar to the Force Review

 7    Board.  And there is really no reason to make it different

 8    because the idea behind the review should be the same.  And

 9    that also includes remediation, responses, and disciplinary

10    actions, if each failure is identified and not addressed.

11            Again, the section lieutenant for the Performance

12    Review Unit is Lt. Perez.  And she will also manage the

13    Force Review Board and work with the Internal Affairs Force

14    Division, Cdr. Middleton and his team, on developing a

15    training plan for her personnel before they get going.  And

16    that's strictly because Cdr. Middleton's team is a little

17    bit ahead of her development.  And once we get that

18    developed, we can use -- again, not reinventing the wheel.

19    If they've already created something, we go ahead and use

20    the same platform.

21            So for this reporting period, there were two

22    tasks that needed to be completed.  We are zero percent for

23    this task completion.  However, with that said, for the

24    entire Compliance Plan, that's actually four tasks listed

25    under there.  We moved out the deadlines for all of them to

1    make sure that we thoroughly and effectively developed this

2    section the best way that we can.  But just keep in mind

3    that not any of the deadlines that we propose go beyond

4    July 31st of 2018.

5              The last section for the Compliance Bureau was to

6    develop a process to measure progress for the Compliance

7    Plan.  APD did extensive research on project and task

8    management tools that I wanted to make sure are

9    user-friendly and that will assist with compliance

10   oversight.  And what I mean by that is I wanted -- I wanted

11   our project leads to be able to enter something, a task,

12   give themselves -- if we've given them a deadline, they have

13   it already, but they can also develop their own deadlines if

14   they create subtasks within the original task given.  So

15   they can monitor their own progress.

16             And then there's my -- my level, which is

17   mid-manager level, where we're able to see exactly where

18   they are with the compliance, but we're a little bit more

19   specific.  But then I also want the admin -- the command

20   staff, the City administration, the monitoring team, to be

21   able to have a compliance oversight like an umbrella, so

22   they can really take a look and see where we are on any

23   given day.  We really believe in transparency for this

24   Department.  There's really no reason to keep anything not

25   known.  And I want that to be very open and to make sure

1    that we have a good oversight plan in place, so in case we

2    miss anything, we have a way to address it.

3            We have identified one platform that meets our

4    needs at multiple levels.  And we're just simply in the

5    procurement stage, so we're just waiting for that to be

6    purchased.  However, just, I want to make sure that the

7    Court knows that, in the meantime, we have been measuring

8    progress, just not the most efficient way.  We have been

9    manually been using Gantt Charts, Tableau, calendars, and

10   spreadsheets to measure our performance.

11           During this reporting period, there were seven

12   tasks that we needed to complete.  We completed six of those

13   tasks, so we're at 86 percent for this section.  The one

14   task we missed was the one above, which is where we're

15   actually purchasing the project management tool; however,

16   we're just pending the purchasing process.

17           And that is it for my first, initial one, Judge.

18   Do you have any questions for me?

19           THE COURT:  I don't think so, Lieutenant.  I'm --

20   I just think it's worthy of stepping back and noting that

21   we've been at this a long time, but nobody ever even

22   suggested a Compliance Bureau until six months ago.  I mean,

23   and you-all have stood this thing up and have made some

24   progress, obviously, as you've described.  And that's

25   important, because this is something that other cities with

1    consent decrees have used and have found helpful to add to

2    transparency, to add to that sense that community policing

3    is being achieved.

4           So I think it's commendable that the new

5    administration jumped in with both feet and stood this up.

6    I'm proud of that and the progress you've made.  Thank you.

7                LT. LOWE:  Thank you, sir.

8                THE COURT:  We've got Commander Sullivan on the

9    Academy.

10               CDR. SULLIVAN:  Good morning, Your Honor.

11               THE COURT:  Good morning, Commander.

12               CDR. SULLIVAN:  My name is John Sullivan.  I'm

13   the Director of Training for the Albuquerque Police

14   Department.  I am here this morning to discuss with you Area

15   3 of the Compliance Plan, Operations of the Academy.  As you

16   can see, we've also provided the slides to address this.

17          The first thing was to address the staffing

18   deficiencies within the Academy and create a comprehensive

19   training unit devoted to the seven-step process.  This was

20   outlined prior to my arrival at the Academy in several of

21   the IMRs and special reports from the monitoring team.

22               (Discussion off the record.)

23          When I took over the Academy, I completed a

24   staffing study on February 18th and submitted that through

25   the chain of command on the 25th.  And I'm happy to say,

1    in May, we began receiving some of that staffing.  I was

2    given a Comprehensive Training Unit Manager and a

3    Specialist, both civilian positions.  An additional

4    specialist position is in the queue, I'm being told, with

5    the City.  I should have that person hired sometime this

6    week or next week.  And on June 1st, they actually created

7    an opening for a sworn lieutenant, who will oversee all of

8    my compliance efforts at the Academy, to include the

9    seven-step process and advanced training.

10           So this is a big move.  This is a huge step

11   forward in the Academy.  It's happened relatively quickly,

12   so I'm very pleased to say we are making significant

13   progress as it comes to staffing the Academy.  There's more

14   to be done, and I do have assurance from the leadership with

15   APD and the City that I'm going to receive those staff, so I

16   have no doubt that that's going to happen at this point.

17           The next one was to develop a process to

18   determine the transfer of knowledge.  Again, upon taking

19   over the Academy, I realized that after reading some of the

20   IMRs and some of the special reports from Dr. Ginger's team

21   that they were less than impressed when they looked at the

22   testing of officers coming in to do advanced training on not

23   just CASA-related projects, but all of our testing.  They

24   found it interesting that everybody received a 95 percent or

25   higher.  And when I looked at that, I found it kind of

1    interesting, too.

2            And being a police officer now for almost 20

3    years with the Albuquerque Police Department, I knew in my

4    mind exactly why it was happening; however, I chose to

5    create a completed staff work to address that issue.  I did

6    some research, looked at some of the best practices

7    nation-wide and found out what I think we all knew already,

8    but the Academy wasn't doing testing correctly.  We weren't

9    doing it the way it needed to be done to show the accurate

10   and adequate transfer of knowledge.  We were doing the

11   good-ol'-boy testing.  The instructor would say, "This could

12   be something you might see later," and everybody was allowed

13   to kind of sit there and do the testing with each other and

14   a group test environment took place.

15           After completing my complete staff work, I'm

16   happy to say, with the support of the Chief and this Police

17   Department, that doesn't happen at this Academy anymore.

18   I've implemented several changes.  The first one being, it's

19   always been 70 percent and you're considered passing.  If

20   you took a course at the Academy and you took a test, if you

21   got 70 percent, you were considered passing and you had

22   shown that you had sufficiently understood that information.

23   I changed that to 80 percent; specifically, as it pertains

24   to CASA-related and compliance issues.  I think it's

25   important, especially moving forward with the community and

1    with this Department, that these officers don't just show a

2    70 percent knowledge.  I think they should be able to show

3    at least an 80 percent knowledge of the material.

4            I've seen -- like I said, I've been here from the

5    old administration.  I know that a lot of officers on the

6    street didn't understand the use of force, they didn't

7    understand the training.  They didn't understand the CASA or

8    the process.  So it's important, it's my job to make sure

9    that they understand that.  And they're not going to leave

10   any training session with the Academy without at least

11   getting an 80 percent on my tests.

12           And my tests are going to be a little different,

13   too.  From now on, after you take a training at the Academy,

14   you'll be required to leave the facility to take the test

15   electronically.  The test questions will come from a mixed

16   bag of test questions, selected randomly.  So for example,

17   if you take the training and you log onto your computer, the

18   next day, to take the test, you'll get a different set of

19   questions from your partner who may have taken the exact,

20   same training with you.

21           All my questions will be vetted to make sure

22   they're applicable and they -- they apply the knowledge

23   transfer of the subject matter, but this person may not get

24   the exact, same questions the next person gets.  So nobody

25   can say, "The answer to Number 1 is 'C'," or if they do,

1    they might get the answer wrong.

2              And then, finally, one of the things we added is

3    not just written testing.  I think it's very important,

4    especially when I was completing my staff work and doing the

5    research around the country, the scenario -- graded

6    scenarios is another really good way of knowledge transfer.

7    I can't just -- not everything is paper, classroom,

8    especially when it comes to law enforcement.  So these

9    officers, with this new Use-of-Force Policy and the Suite

10   that we're all working on right now, when they go to be

11   tested and trained on that, they'll also have to show

12   physical proficiency in it, with reality-based scenario

13   training.  So it won't just be go through the training, you

14   made some mistakes, but go along your way.  Even if you make

15   mistakes, you're going to be -- you're going to be

16   considered a fail and you're going to have to do some

17   remedial-type training.  If you fail any of the tests more

18   than once -- more than twice, I'm sorry, you'll have to go

19   back to Academy and you'll have to get some remedial

20   training on that.

21             So as a part of my seven-step process, which I'll

22   talk about next, the knowledge transfer, the testing

23   element, is crucial.  And we can no longer go through the

24   motions of just saying, "Well, they got the training, they

25   must know it."  It's my job, and our job as the Academy, to

1    determine that we have some process to ensure that they do
2    know it and that they're applying it, which is a different
3    story; I won't waste your time with that.  But I -- they're
4    going to have that knowledge transfer.  If they don't, we're
5    going to bring them back and we're going to make sure they
6    understand it.
7              The next task that I was asked to do with the
8    Compliance Plan was develop a modified Citizens Police
9    Academy, specifically for the members of the Police
10   Oversight, the CPOA, the Citizens Police Oversight, and the
11   community -- Citizen Police Councils.  We did that.  And the
12   last weekend of February and the first weekend of March,
13   several of the members in the court right now were in the
14   class.  I am -- will be very honest, and I'm sure other
15   people will talk to you about it, a lot of concerns were
16   brought up during the class.  And they were brought to my
17   attention throughout the two weekends.  The concerns were so
18   important and pressing, in my opinion, that we actually,
19   with the help of Deputy Chief Garcia, called a meeting the
20   week after the modified Citizen Police Academy.  And I
21   invited the heads of the Police Oversight Board, the CPOA.
22   The U.S. Attorney's Office was there.  Several folks were
23   there who were in the class, and I wanted hear firsthand
24   because I wasn't in the training, myself, obviously, what
25   was wrong and what they didn't like about the training.  And

```
 1    we sat in that for about an hour, and they went over -- it
 2    all centered, basically, around the same issue, on one
 3    particular trainer didn't deliver an appropriate
 4    presentation on many levels and the content of the
 5    presentation he delivered was inappropriate on many levels.
 6              And that was expressed to me and I was very
 7    pleased that they gave me that feedback because I
 8    immediately went back to work and went to fixing it.  I met
 9    with my staff, to include the supervisor of that trainer and
10    that trainer, discussed the issues.  I reviewed the actual
11    content of the course, made several significant changes
12    because I concurred with what I'd heard from the community
13    when they told me about it.  Upon reviewing it, they were
14    right that we missed the mark on it.  And that's -- that's
15    not okay, but it's okay for us to go fix it.  And that was
16    my number one goal.
17              So I spent a few weeks working on the modified
18    plan, on that training.  And that trainer still works for
19    me.  He's been moved out of the use-of-force training and
20    he's moved into a different area.  It's tough.  We're all
21    fighting with resources, and I -- you know, he's a good
22    trainer.  He's been around for a long time.  I think he
23    missed the mark on that day.  And he may miss the mark for
24    what we are trying to accomplish in this room, so I'm
25    transitioning to somebody who may hit that understanding a
```

1    little bit better; however, I didn't want to throw out the

2    baby with the bath water, so to speak, so I've watched that

3    trainer teach another class a few weeks later to make sure

4    that he actually understands what I've told him and taught

5    him about how to present, and I'm proud to say he did.  He's

6    been on longer than I have.  He's been an officer -- so you

7    can teach an old dog new tricks, apparently.

8             He did great, but I'm not going to just sit on

9    that.  That's not enough.  I'm still going forward with a

10   different trainer and a whole different curriculum.  So I

11   addressed both of those issues and I actually went in person

12   to the Police Oversight Board and explained to them what had

13   been done and the progress we've made, and I invited any of

14   them to come to the next training.  And I think a few of

15   them will take me up on that.  So I think we've had a good

16   collaboration since then.

17            We did do a survey to -- part of the seven-step

18   process is a revision.  So I need to get surveys on the

19   training and I need to revise it, which is -- basically

20   encompasses what I've been talking to you about for the last

21   couple of minutes.  So we did complete a survey of this

22   modified CPA.  And I did write up an analysis of that, which

23   is basically a summary of what I told you just now this

24   morning.  How we're going to change the lesson plan, we're

25   going to change instructors, and we're going to change the

1    course content a little bit for the next one.  And we're

2    hoping to do another modified CPA in the beginning of 2019.

3              Finally, I was tasked with developing our

4    comprehensive training plan, which is basically the

5    seven-step model.  I got the process from the New Jersey

6    folks.  There's no secret that Dr. Ginger's team has got a

7    lot of New Jersey folks on it.  And that's great because

8    they've been through this process before.  The technical

9    assistance that the doctor talked about is, for us and for

10   me in the Academy environment, significantly more than he

11   even explained.  He doesn't give his team enough credit for

12   the work that they've done with us.  I can pick up a phone

13   and call anybody from the monitoring team any time of day,

14   realizing they're two hours ahead of me, and they still pick

15   up the phone.  The DOJ Ryals has been working with me a lot.

16   We've had a significant amount of help in developing this.

17             We have developed a seven-step process.  We have

18   developed a training plan that is been reviewed and approved

19   by the monitoring team.  It is in place.  So when the policy

20   suite comes up with the use of force or any of the other

21   CASA-related trainings, it will follow the comprehensive

22   seven-step training plan and will be implemented as such.

23   It's a big move for the Academy.  I know they've been

24   working on it for quite a while.  And I'm happy to say it's

25   done and actually been approved and we will be going forward

1    with it.

2            So that's what I have to talk to you about as it

3    pertains to the Compliance Plan.  I understand you may have

4    more questions, since I'm the director of training, so I

5    stand for any questions based on that or anything else you

6    have.

7            THE COURT:  I don't have any additional

8    questions, thank you.

9            Folks, I think we're going to take a break.

10   We've been at it about an hour and a half.  We'll be ten

11   minutes and we'll be back.   Ten minutes.

12                    (A recess was taken.)

13           We're going to hear from Lt. Perez.

14           LT. PEREZ:  Good morning, Your Honor, and to

15   Dr. Ginger and to all of the parties present.

16           I am Lt. Jen Perez.  And as Lt. Lowe stated, I am

17   the lieutenant of the newly created Performance Review

18   Section.  One of my responsibilities is to serve as the

19   administrative lieutenant for the Force Review Board, also

20   known as the FRB.  And today I will provide a brief review

21   of where we are now with the Force Review Board.

22           The format of the new FRB will further define

23   roles, responsibilities, and guidelines for FRB members.

24   The FRB will continue to review use-of-force investigations,

25   tactical activations, and statistics regarding use-of-force

1   trends.  The format of the FRB will promote efficiency and

2   ensure officers' use of force are in compliance with

3   Department policy and constitutional policing.

4           A curriculum to train FRB members was submitted

5   on May 3rd of 2018.  It was resubmitted May 25th of 2018

6   and is pending approval.  Special Order 18-59 was published

7   May 21st 2018.  This special order explains the new format

8   for both voting board members and non-voting members and the

9   procedure for conducting FRB meetings once FRB resumes.

10          Because tactical reviews, prior to January 1st,

11  2018, that involved the deployment of chemical munitions

12  and/or a noise flash diversionary device, also known as

13  NFDDs, were not considered a use of force, they will be

14  reviewed under the old construct; however, a munitions

15  deployment review sheet will be completed as a course of

16  business documentation and attached to each review.  This

17  document will indicate that we acknowledge that it is

18  considered best practice to document and investigate

19  chemical munition deployments, NFDDs, as a use of force.

20  Moving way forward, future deployments will be held to this

21  standard.

22          The FRB Standard Operating Procedure was

23  submitted to the Office of Policy Analysis on May 14th,

24  2018, and is awaiting approval and comments from the

25  stakeholders.

1               And I'm happy to respond to any questions, sir.

2               THE COURT:  Well, you said you'd be brief and...

3               LT. PEREZ:  To the point, sir.

4               THE COURT:  You were.  And I appreciate that.  I

5       don't have any questions.  I'm sure we'll hear otherwise

6       about how this is being perceived --

7               LT. PEREZ:  Yes, sir.

8               THE COURT:  -- in the public, but thank you.

9               LT. PEREZ:  Thank you, sir.

10              THE COURT:  Thank you very much.

11              And Lt. Lowe, we're going to hear from you again.

12              LT. LOWE:  Yes, Your Honor.  Good morning again,

13      Your Honor.  Just so everyone -- in case there's anyone new

14      in the courtroom, I'm Lt. Cori Lowe of the Compliance Bureau

15      and I'll be presenting on Area 5, to develop a training plan

16      for the Internal Affairs Force personnel.  APD delivered

17      their first round of use-of-force backlog training that

18      Cdr. Middleton was talking about earlier in his presentation

19      to their personnel on April 30, to May 3, 2018.  During that

20      time -- or after that time, APD learned from that training

21      the identified areas of improvement and are revising the

22      comprehensive training plan for their second revision.  That

23      second revision will be delivered June 26th through

24      27th of 2018.  There will also be a development of

25      criminal and administration investigations training upon

1    approval of the Use-of-Force Policy Suite.  Just keep in
2    mind that there are already three fully explained criminal
3    investigators that we've already had from our previous Force
4    Investigation Team.

5             Three people, to include one lieutenant from
6    Internal Affairs, were sent the week of June 4th through
7    the 8th, 2018, to the Institute of Policy Technology and
8    Management, or IPTM, for training.  What this will do, they
9    will -- this will allow us to develop misconduct training
10   based on what the -- the information they brought back.  For
11   this area, for this one area there was one task for this
12   reporting period.  It is 100 percent complete, as they did
13   provide their initial first round use-of-force backlog
14   training.

15            There was only one task and I just wanted to make
16   sure that we brought it up, Judge, if there is any
17   questions.

18            THE COURT:  Okay.  The slide that's up is
19   training development, but there's a second slide I'm looking
20   at.  There you go.

21            LT. LOWE:  Yes.  Okay.  There it is.  There's
22   actually an error at the very bottom.  They did complete --
23   there was only one task.  For some reason, it says that
24   there was two of four components there.  There is not.
25   There is just one task for that section.

1          And again, they're just working on developing

2     misconduct training from the training that they got -- that

3     they received from IPTM.

4               THE COURT:  All right.  So thank you.

5               LT. LOWE:  You're welcome.

6               THE COURT:  Let's talk about the amici concerns.

7               LT. LOWE:  The next section is amici concerns.

8     The first section was to evaluate the McClendon subclass

9     concerns.  The City and the McClendon subclass worked

10    together to revise policies related to the lawsuit, all of

11    which have been published, with the exception of one, due to

12    a pending monitor approval, but it will be published soon.

13    The rest of those policies were published on April 26, 2018.

14          The second task of that area was APD was to

15    provide ECIT recruitment and a training plan to the

16    McClendon subclass attorneys.  And they did so on May 1st,

17    2018.  And as stated earlier by Deputy Chief Garcia, APD and

18    the amici have been -- have started their update meetings

19    every six weeks.  For that section, that is -- I wanted to

20    do a follow-up update on the training plan development for

21    the McClendon subclass policies that were published.

22          For Part 1, 2-80 and training materials, that was

23    submitted on May 22nd, 2018.  They received commentary on

24    May 31st.  They resubmitted the revisions on May 31st,

25    as well.  And they're awaiting additional commentary and

1    final approval of the lesson plan and training materials.

2    The Academy has done partial filming of the training video

3    that was done this last week.

4              Lesson Plan Part 2 is SOP 1-40 and 2-71 and their

5    training materials, which were submitted on June 6, 2018,

6    and waiting to receive commentary.

7              Lesson -- I'm sorry, Part 3 is Lesson Plan SOP

8    4-25.  And the lesson plan is still in development.

9              And Part 4 is 2-19, which is awaiting approval

10   for final SOP revisions.

11             That's a pretty quick update for the amici

12   concerns for the -- as far as the McClendon, and the next

13   section will be for CPOA and POB members.

14             THE COURT:  Yes, ma'am.

15             LT. LOWE:  The task was to provide CPOA and POB

16   members evidence.com, which is a database where we keep a

17   lot of our evidence, such the name, access for case

18   investigations.  And APD did develop documented parameters

19   to allow video access for CPOA and POB members into

20   evidence.com for the completion of their case reviews and

21   their investigations.

22             The last task in there for the amici is to

23   provide a dedicated administrative support personnel to the

24   Community Policing Council, or the CPC.  Chris Sylvan did

25   provide a job description, which was submitted for approval

1    for a full-time administrative assistant responsible for CPC

2    minutes, agendas, recommendations, documentations, and

3    updating the CPC websites.  So there were two tasks out of

4    that specific area, both of which were completed within

5    their original deadline date.

6           And the very last thing I wanted to cover is just

7    the Compliance Plan as a whole.  I wanted to update everyone

8    with the update.  So there was 91 tasks throughout the

9    Compliance Plan.  82 deadlines have passed as of May 31,

10   2018.  79.27 percent, or 65 out of 82, tasks were completed

11   on or before the original deadline.  13.41 percent, or 11

12   out of 82, passed the original deadline, but have since been

13   completed.  And 7.32, or 6 out of 82, were not complete.

14   These tasks have been addressed above and the new deadlines

15   provided.

16          I just wanted to thank you for your time, Judge.

17   And we look forward to continuing with APD transformation.

18   If you have any more questions for me, I'd be more than

19   happy to answer.

20          THE COURT:  Thank you, Lieutenant.  I don't have

21   any further questions.

22          LT. LOWE:  Thank you, sir.

23          THE COURT:  Mr. Killebrew, I'll hear from DOJ

24   senior counsel, and then, Mr. Mowrer, on your view of the

25   status reports.

1          MR. KILLEBREW:  Thank you, Your Honor.  Paul

2     Killebrew on behalf of the United States.

3          We're halfway through the reset period that we

4     talked about beginning back in November.  And it's a good

5     time to start thinking about what we've been able to

6     accomplish, which we've heard a lot of details about

7     already.  And we need to think about what lies ahead for the

8     remainder of this reset period.

9          You've heard a lot about the technical assistance

10    provided and the City's progress on implementing the

11    Compliance Plan.  So I just wanted to take a few minutes to

12    talk about where I think we need to go over the next few

13    months and where I think the most critical needs are.  So

14    I'm going to address two questions.

15         The first question is where could the City stand

16    to gain the most from the monitor's technical assistance for

17    the rest of this reset period.  And if I -- the second

18    question is, if I were the City, what would be keeping me up

19    at night, as we get to the end of this reset period.

20         So in terms technical assistance, I think one of

21    most effective areas where we've seen technical assistance

22    has been on the development of training.  The monitor has

23    helped the APD Academy establish the scaffolding that it

24    needs to create training programs that are effective, that

25    meet officers' needs, and that comply with the

1    court-approved settlement agreement.  So we're very pleased

2    with the progress that's been made at the Academy on those

3    things, but the next big training piece that has to be

4    delivered is use-of-force training, which is the most

5    critical training that's required under the CASA.

6         So we're delighted that APD has a solid training

7    development process for creating use-of-force training, but

8    we would commend them to seek the technical assistance of

9    the monitor on the content of that training.  We anticipate

10   working closely with APD on that training, but we -- in my

11   opinion -- in our opinion, this is an area where the

12   monitor's technical assistance can really leverage big

13   improvements on how APD complies with the CASA.

14        So that's point Number 1.  Point Number 2, what

15   would keep me up at night, if I were the City:  First and

16   foremost on that list has to be the backlog.  We've heard a

17   lot about the use-of-force investigation backlog today and

18   the progress that's made in setting up systems to address

19   it, but I just want to take a step back and talk about why

20   this is the headline issue.

21        When the United States investigated APD, we found

22   a couple of things about use of force:  Number 1, we found

23   trends of unconstitutional uses of force.  The numbers from

24   our findings were that about one in two times that officers

25   used deadly force and someone died that the force was

1    unconstitutional; and that, when officers used other kinds

2    of force, one in three times, it was unconstitutional.  And

3    it wasn't just that officers were out there using force

4    unconstitutionally, it was that when those issues were

5    reviewed by the chain of command, the chain of command

6    didn't catch it.

7            The impact that it has when someone uses force

8    that doesn't comply with policy or the Constitution and then

9    the agency signs off on it, that effectively changes the

10   standard for force within the agency.  So the troubling

11   thing to us about the backlog is that you have a bunch of

12   incidents that have already happened and they have gone past

13   the deadline for which APD can impose discipline.  After it

14   goes to 120 days, they're no longer able to impose

15   discipline under the collective bargaining agreement and

16   their own policy.  So you have the potential, then, for

17   unconstitutional uses of force that are going unaddressed by

18   the agency.  This is, in our opinion, why clearing the

19   backlog has to be a top priority.

20           I will be honest with you, Your Honor, the

21   numbers that we have seen on numbers of cases in the backlog

22   have varied over time.  Today's presentation gave me the

23   most concrete sense of the size of the backlog and the pace

24   of closing it.  And we'll be working with the City to

25   continue getting updated numbers.  To me, the most important

1    numbers are, first of all, how many cases are currently

2    after the 120-day deadline.  And then I want to know, in the

3    last week or in the last two weeks, how many cases have been

4    added to that number and how many cases have been subtracted

5    from that number.  What you would hope to see is that the

6    overall number would go down over time, that the number of

7    cases entering the backlog is going down, and that the

8    number of cases leaving it is going up.  So that's

9    information that we're going to be looking for from APD, so

10   that we're getting regular updates on the pace of closing

11   the backlog.

12          We first knew about the backlog last fall.  And

13   I'll be honest again, Your Honor, we would have liked to

14   have seen faster progress in resolving the backlog.  I think

15   the reason we haven't seen faster progress is that APD has

16   gone back to first principles in a number of areas, and one

17   of them is in designing processes like those for closing the

18   backlog.  So the process that they've spelled out today and

19   in their status report is a good process and it reflects a

20   lot of thought, and I'm hopeful that it will close the

21   backlog expeditiously.  And that's what we will be looking

22   for.

23          The next thing that would keep me up at night, if

24   I were APD, is fully standing up the implementation unit,

25   the Compliance Division.  They have made a lot of progress

1    in creating a unit that is truly tracking progress within

2    APD.  And as it stands, I'm not sure that they have all the

3    personnel that they need.  So we'll be looking for them to

4    continue hiring up for all the positions that need to be

5    filled within that unit.  I think what we're looking for is

6    that we don't want the Compliance Unit to be like the Maytag

7    repairman that just sits there and waits for the call.  You

8    really want them out there, looking for issues within the

9    Department.  You want them designing audits that will find

10   things that they're not seeing.  And right now, that is the

11   mentality that they have, but I don't know that they have

12   all of the personnel required to be doing that kind of work.

13           The other thing we want to work with APD on is

14   how do we make the Compliance Plan process and progress more

15   transparent to the community.  We've got a lot of

16   information today about progress and implementing the

17   Compliance Plan and there was information in the City status

18   report, but I think this is an area that is of significant

19   interest to the public.  And the overall goal for the

20   Compliance Unit is that it becomes the unit within APD that

21   is monitoring the agency; that the agency is then doing

22   self-monitoring.  That monitoring won't really work unless

23   there's some accountability for when they don't meet goals.

24   And this kind of accountability starts with the public.  The

25   public is going to be the one that's really watching to see

1   whether APD is doing what it sets out to do.  So we'd like

2   to work with the City on how we can make the City's progress

3   in implementing the Compliance Plan a little easier for the

4   public to understand and maybe even providing more frequent

5   information to the public about the City's progress.

6           And then the third area for the City that, I

7   think, deserves some focus going forward is at the training

8   Academy.  Like I said earlier, the use-of-force training is

9   the next big piece that's coming along.  And we'll be

10  looking closely to see how the Academy is developing that

11  training and what their products look like.

12          They also have to deliver that training.

13  Commander Sullivan spoke about a trainer who has been

14  providing use-of-force training for the City for a number of

15  years, who is not going to be involved in that in the

16  future.  We are going to be very interested to see who will

17  be delivering use-of-force training.  We believe that we

18  need to have a trainer who has fully bought into the goals

19  that we all share here.  So we will be looking for good,

20  quality training that really gets to the root of the

21  problem.

22          Mr. Ryals is going to speak in a little bit about

23  the Use-of-Force Policies development process.  And as I

24  mentioned earlier, this is another area where APD has gone

25  back to first principles and thought what is not a policy

1    that complies with the CASA, but what's a policy that really

2    expresses the values of this police department.  And we

3    expect to see the same sort of thinking when APD develops

4    its use-of-force training.

5          So those are where I would focus.  I want to

6    thank the Court for coming to Albuquerque and allowing us to

7    have a public hearing at this stage.  We don't have a

8    monitoring report for this period, as we all agreed we

9    wouldn't.  So in some sense, we have less information than

10   we normally would, which I think makes it all the more

11   important to have proceedings like today's where we can

12   present for the community, for the parties, for the Court,

13   the snapshot of where things stand.

14         And with that, Your Honor, I'm happy to answer

15   any questions.

16         THE COURT:  Mr. Killebrew, thank you.  I think

17   you did a nice job of focusing where we are.  We did take a

18   step back.  We decided to spend a considerable period of

19   time doing technical assistance, and we've heard a lot about

20   that this morning.  You know, there's not a lot sexy about

21   technical assistance, as it turns out.  And we've heard a

22   lot about numbers and -- but the big picture is -- I just

23   asked my law clerk a moment ago if he knew the movie *Jerry*

24   *Maguire*.  And he didn't, you know.  And that's a whole

25   'nother issue, you know.  He doesn't get any of my

1    allusions, but -- so he said, "Well, what was it about?"

2                I said, "Well, it was a sports agent, Tom

3    Cruise," for those of you that are as young as my law clerk,

4    "and Cuba Gooding, Jr., who was the super athlete that he

5    represented.  And Maguire would call and say, you know, a

6    lot of stuff, and Cuba would just stop him finally and

7    say --" does everybody remember what he'd say?

8                MR. KILLEBREW:  "Show me the money."

9                THE COURT:  "Show me the money."  And that's,

10   ultimately, what we have to be able do to the community.

11   And I know you know that, but I appreciated your refocusing

12   us on that for a moment.  We did -- we don't have a report,

13   we don't have -- you know, and we all agreed that that's

14   what we needed to do was step back, reset, do this technical

15   assistance, but -- but the clock's ticking, and that backlog

16   is still there.  And the community has the right to know

17   what we're doing.  And so I appreciate the reset and the

18   refocus and let's -- let's go to Mr. Mowrer.

19               MR. KILLEBREW:  Thank you, Your Honor.

20               THE COURT:  Yes, sir.  Thank you.

21               MR. MOWRER:  Good morning, Your Honor.  Good

22   morning, City.

23               THE COURT:  Mr. Mowrer, good morning to you.

24               MR. MOWRER:  Good morning to everyone present.

25   My name is Fred Mowrer.  I'm here on behalf of the

```
 1    Albuquerque Police Officers Association.  I'll keep it very
 2    brief, Your Honor.
 3            As I commented when this process started several
 4    years ago, the speed with which we were moving forward, as I
 5    called it, a "train," was, at that time, mind boggling.
 6    Your Honor, I don't think from what you've heard described
 7    today with the changes that are being proposed -- and I,
 8    specifically, want to thank the City of Albuquerque and the
 9    staff of the Albuquerque Police Department for the amount of
10    effort and work that has gone into a number of subject
11    matter that have been discussed today.  I won't go through
12    them.  The Court was paying attention.  The effort that has
13    been put forward, the number of hours that have been
14    expended is mind-boggling.  The pace with which this is
15    moving forward, as the Court has heard, is still a
16    fast-moving train.  From the perspective of the people in
17    the street, it is hard to keep track of.  It's hard to stay
18    aware of all of the changes that are ongoing.  But I do want
19    to applaud the City for stepping forward and making it
20    possible through the last contract negotiation to help
21    change some of the environment with recruiting.  The
22    numbers, as the Court was interested in, are low.  We need
23    to grow this Department to be successful.  And I think that
24    as we move forward, the APOA is recognizing the pace with
25    which we are moving and hoping that all parties are being
```

1    patient.

2              As mentioned by the Department of Justice, a

3    number of issues exist.  Remember a lot of the issues being

4    discussed are from several years ago that these -- as an

5    example, the backlog problem is being addressed, obviously,

6    and that there is a process in place where numbers are now

7    being looked at.  Keeping in mind some of this backlog was

8    because the people who centered in the backlog, supervisors,

9    were busy in the field taking care of their troops.  And in

10   some instances, didn't put the direction into reviewing some

11   of this use of force.  It wasn't because it was deliberately

12   being ignored.  It was just a matter of practicality.  When

13   you don't have enough people, it's hard to do all that's

14   being required.

15             That is changing, as you heard the numbers today.

16   Part of that's being addressed by the City and the new

17   contract and the new money being infused.  So it is the

18   APOA's hope that with respect to this restructuring and all

19   these new divisions, the Compliance Division, the

20   Use-of-Force sections within Internal Affairs, that the

21   Court will see these changes.  And I just urge everyone

22   present here to be patient.  It takes time to get all this

23   done so it's done appropriately.

24             Thank you, Your Honor.

25             THE COURT:  Mr. Mowrer, thank you.

1           And I've never been accused of being a patient

2     man.  I pray for patience every once in a while.  Well, I

3     stopped praying for patience because God will try your

4     patience if you ask for it.  So I'm -- I'm not a patient

5     man, but we all need to look favorably upon, I think, the

6     effort of the City and all of the -- I said a moment ago,

7     standing up a whole new bureau within six months' time and

8     we're here today to talk about it functioning and it

9     accomplishing things, that's crazy in terms of a time line.

10          MR. MOWRER:  It's mind boggling.

11          THE COURT:  It is.  And so all of that counsels

12    patience, but you know the big picture, we've been at it a

13    while and there have been some setbacks, so I'm hoping that

14    the message is progress with patience.  You know, maybe

15    that's where we need to be today.

16          MR. MOWRER:  That's what I urge, Your Honor,

17    because as I've said, the speed which we are moving in some

18    instances, especially with regards to this Compliance

19    Division and all the tasks and employees that have been --

20    are being hired or in process is almost, in light of the six

21    months of which this has been done, I don't know how they've

22    done it.  Once again, I applaud the staff for all the hard

23    work that they've done because it is -- it's pretty much, as

24    I indicated, mind boggling.

25          Thank you, Your Honor.

1          THE COURT:  And there's -- the officer in the

2    street -- we developed a Use-of-Force Policy and we trained

3    on that policy and now we're...

4          MR. MOWRER:  Doing it again.

5          THE COURT:  ...doing it again.  And you talk

6    about minds being boggled, that's being whipsawed --

7          MR. MOWRER:  Right.

8          THE COURT:  -- so we have to have that in mind as

9    well, I think.  So thank you.

10          MR. MOWRER:  Thank you, Your Honor.

11          THE COURT:  We're going to hear from the amici

12    now.

13          APD Forward, Mr. -- is it *hay-del*?

14          MR. HAIDLE:  *High-del*.

15          THE COURT:  Haidle, excuse me.  And Ms. Liu?

16          MS. LIU:  Yes, Your Honor.  Thank you.

17          Good morning, Your Honor, my name is Alice Liu

18    McCoy from Disability Rights New Mexico.  I'm speaking on

19    APD Forward this morning with Mr. Paul Haidle from the ACLU

20    of New Mexico.  We would like to begin on a positive note

21    and recognize the City and APD's promising new direction and

22    willingness to consider critical feedback.

23          On May 22nd, the Compliance Bureau, led by

24    Deputy Chief Eric Garcia, and the Department of Justice met

25    with APD Forward to discuss APD's progress.  The members of

1    APD Forward who attended the meeting were encouraged by the

2    cooperative tenor of the meeting, particularly in contrast

3    with similar meetings under the previous administration.

4    Mr. Haidle will discuss some of the APD Forward's specific

5    concerns in more detail, but I want to note that, in

6    general, D.C. Garcia and the members of the Compliance

7    Bureau appeared to be receptive to the concerns we raised

8    during the meeting.  We were especially pleased to hear

9    D.C. Garcia report that he is receiving the staff and

10   resources he has requested, if not now, in the near future,

11   to accomplish the Compliance Bureau's tasks and goals.

12   Investing in the success of the Compliance Bureau shows the

13   commitment of this administration's leaders to this reform

14   process.

15           D.C. Garcia has expressed a desire to meet every

16   six weeks to discuss APD's progress with APD Forward and

17   other community stakeholders.  He has also requested that as

18   we identify issues, we also propose possible solutions,

19   suggesting APD is willing to make meaningful change.  We

20   hope the City and APD not only provide regular opportunities

21   for us to share constructive feedback about the Compliance

22   Plan and its reform process, but are also willing to adjust

23   their plans and actions when needed.

24           We've also been closely watching the City's

25   search for the next police chief.  On May 19th, at the

1   urgent request of the City and on short notice, APD Forward

2   hosted a listening session to provide the public an

3   opportunity to address the police chief selection committee.

4   During the section, APD Forward steering committee's Nancy

5   Koenigsberg of Disability Rights New Mexico and Robby

6   Heckman presented our police chief search criteria and

7   moderated questions from the public to the search committee.

8          APD Forward is concerned that the police chief

9   search committee is not representative of the residents of

10  Albuquerque and appears to be comprised of insiders who have

11  held public office or worked in government.  We are

12  especially concerned by the recent news that the contractor

13  leading the search is on the search committee.  APD was also

14  concerned when we heard -- APD Forward was also concerned

15  when we heard that the City wanted to complete the search

16  before the City Council adjourned for summer break, because

17  we believed the aggressive time line for the search is far

18  too rushed, making it impossible for the City to conduct

19  thorough, in-depth national search needed to recruit the

20  most highly qualified candidates.

21         We are happy to report that the City responded in

22  part to our concerns and extended the police chief search

23  beyond the City Council summer break.  We are also pleased

24  to hear that while the interim chief has applied, the City

25  has reaffirmed its commitment to conduct a national search.

1    Additionally, we believe the City should incorporate our

2    police chief search criteria, conduct targeted recruiting

3    efforts to identify the best candidates across the country

4    and create additional avenues for the community to provide

5    meaningful input throughout the search process.

6            APD Forward welcomes all opportunities to become

7    more involved in the search process and provide feedback

8    about potential candidates.  The Chief of the Albuquerque

9    Police Department is crucial to the success of this reform

10   process.  The City has an obligation to invest an

11   appropriate amount of time and resources to ensure it

12   recruits the best possible candidate.

13           THE COURT:  Thank you.

14           MR. HAIDLE:  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MR. HAIDLE:  My name is Paul Haidle with ACLU of

17   the New Mexico.  And on behalf of the APD Forward coalition,

18   thank you for the opportunity to present this morning.

19           Your Honor, I'd like to speak just very briefly

20   about the recently filed progress report from the monitor

21   and from the City, as well as the use-of-force development

22   that's underway at this time.  We at APD Forward completely

23   agree with the sentiment of the hitting reset, that that's

24   the right way to move this process forward, but we're also

25   happy that we are talking about some of the uncomfortable

1    truths that we've heard here this morning, things regarding

2    the training Academy, with the use-of-force backlog that

3    there was no deadlines for supervisors and so that led to a

4    lack of accountability.  These are some of the hard truths,

5    I think, that are now known.  They're out on the table.  And

6    it's important to move ahead from that starting place.

7    We're very encouraged that the City is completely committed

8    to this and we look forward to seeing that expressed

9    commitment move into internalized commitment to the actual

10   moving forward with the implementation.  We do want to,

11   though, echo the monitor's statement that the use-of-force

12   backlog does present a clear threat to this entire process.

13   The monitor called out a threat to policy development,

14   training development, supervision, and the need for command

15   oversight.  These threats to this process demand a very

16   clear -- a very clear plan to address the force backlog and

17   the Policy Suite.

18            So to that end, Your Honor, the City does

19   acknowledge that there are missed opportunities.  We heard

20   about the cases that are beyond 120 days and the challenges

21   that that will present for the City in dealing with

22   potential improper use of force.  As of the writing of the

23   report, we heard that there are 314 supervisor use-of-force

24   investigations more than 120 days old.  This is a problem.

25   One question, as we sat here this morning, that came to our

1    minds was the difference in some of the numbers that we've

2    heard this morning.  I know that it was difficult for me to

3    track when we heard from Deputy Chief Medina about being at

4    186 cases versus we had also heard the number of 314.  And

5    one question I would raise is what is the difference in

6    those numbers?  Is it due to incoming cases versus older

7    cases that are more than 120 days?  What, exactly, is the

8    disparity between those cases?

9              Your Honor, another --

10             THE COURT:  We're going to hear -- we're going to

11   hear, by way of response, from the City Council.  And I hope

12   they're taking notes because I want you-all to address these

13   concerns.

14             MR. HAIDLE:  Thank you, Your Honor.

15             In the status report, the City does mention, on

16   page 20, as well, 72 serious use-of-force investigations

17   that have been removed from the review process.  I don't

18   believe that we've heard about those 72 cases yet this

19   morning either.  And that raised a red flag in our minds

20   that we would like to hear how it was determined that those

21   cases would be removed from the review process and what the

22   criteria was and how that decision was made.

23             Your Honor, as far as the development of the

24   Use-of-Force Policy, and then I'll wrap up, we're very

25   encouraged by the Use-of-Force Policy that's currently under

```
 1    development.  We think it's a very strong policy and an
 2    incredible improvement over the existing policy, requiring
 3    officers to use a minimum amount of force that is necessary
 4    and proportional.  That's exactly the right way we need to
 5    go with the Use-of-Force Policy.  Our understanding is that
 6    the SOP 2-52, the Use-of-Force Policy Suite, will eventually
 7    go through this new policy-development process, and that is
 8    our hope with this.  APD Forward is currently drafting
 9    written comments on the policy and we will be submitting
10    that to the parties.  And we hope that they will give them
11    serious consideration and respond in writing, when
12    appropriate, to those written suggestions as well.
13             Your Honor, as always, we are very grateful for
14    the opportunity to address you.  And we'd be happy to stand
15    for any questions.
16             THE COURT:  I don't have any questions for you,
17    but I appreciate your involvement; have from the start.  And
18    we'll have some response for you shortly, I hope.  Hope we
19    have time for that.
20             MR. HAIDLE:  Thank you.
21             THE COURT:  Thank you.
22             Mr. Maestas and Mr. Arellanes.
23             MR. MAESTAS:  Thank you, Your Honor.  Antonio
24    Maestas on behalf of the Community Coalition and I'll be
25    speaking on behalf of the Coalition.  Alfred Matthews could
```

 1    not be here this morning.  We really appreciate the level of

 2    cooperation between the City of Albuquerque, the APOA, the

 3    Department of Justice, and the monitor's team in moving this

 4    process forward.  It's tremendously refreshing, what we've

 5    been seeing the past couple, three, six months.

 6              With regards to the TASER concerns we brought up

 7    in April, those issues have been addressed.  I want to thank

 8    Chief Deputy Garcia in -- and DOJ in meeting with the amici.

 9    We had a wonderful, frank conversation.  There was very

10    little defensiveness, whatsoever, and we expressed our

11    concerns.  The amici also learned a lot about police

12    procedures and safety precautions and things of that nature.

13    And I think that all of APD will be much more trained with

14    the actual manuals with regards to the use of those devices,

15    as well as the use of those device, so we thank you for

16    that.

17              Our number one concern, Judge, is that we urge

18    the monitor and the City of Albuquerque to meet the current

19    deadlines with regards to paragraph 298.  I believe, in the

20    previous teleconference, August 1st was talked about as an

21    initial deadline and then, obviously, in November.  If there

22    is documents produced by August 1st, we'd ask that they be

23    made available to us.  And we understand, if they don't want

24    them to be made public at that time because I don't think

25    they'll be complete, but as you recall, Judge, paragraph 298

1   is with the outcomes assessments that we need to collect and

2   analyze the data regarding any trends and patterns that we

3   see with regards to use of force, use-of-force complaints,

4   and of course, violations of the policies.  We have to

5   measure whether implementation is resulting in the outcomes

6   expressed in paragraph 294.

7              There's, you know, the common belief or argument

8   is that, well, if we would just weed out the bad apples, the

9   rest of the barrel will be intact.  And that makes perfect

10  sense to a lot of people, but if we got rid of 8, 10, 12

11  officers today, there's still 900 officers in that same

12  institution.  And so we have to look at the culture of that

13  institution.  And sometimes it's difficult for those of us

14  who kind of -- whose brains prioritize individual

15  responsibility and things of that nature, but I'd ask the

16  Court to consider, you know, a sports team or a congregation

17  or a company, in this place, a government agency, and take a

18  step back and consider group dynamics, the science, the

19  sociological and political science of group dynamics.  And

20  as you know, Judge, the behaviors, attitudes, opinions, and

21  experiences of each individual are collectively influenced

22  by the other group members.  For example, when -- at the

23  City Council meetings, when family members of the

24  descendents would come with their grievances and have their

25  minute to speak publicly, you would see 20, 30, sometimes

1   more APD officers, commanders in the audience.  Many of the

2   officers were not sitting in the audience, but were standing

3   up in the City Council chambers.  Many of them were on the

4   benches outside.  This doesn't need to be a collective,

5   organized effort, but that's how it happened.  And it was

6   incredibly chilling, incredibly intimidating, not just to

7   the family members, but to the politicians and everybody

8   involved.  Now, there's like four or five officers there.

9   The purpose is to answer any questions that the Council may

10  have throughout the meeting.  But it's changed tremendously.

11          For example, the then Chief of the Union had a

12  T-shirt with the quote on the back -- you mentioned a

13  movie -- the Jack Nicholson character in *A Few Good Men*,

14  where he spewed off something to the effect of "you sleep

15  under the blanket of safety with which we provide and yet

16  question the means in which we provide it."  That was the

17  quote on the back of the gentleman's shirt at the meeting.

18  That was not just the opinion of that one person, that was

19  the probably the majority or consensus opinion of the entire

20  Albuquerque Police Department at that time.  And so we're

21  just grateful to the new leadership because any group

22  dynamic starts at the top, mayor, chief, deputy chiefs,

23  commanders, but once we get down to the sergeants and the

24  rank-and-file, when those sergeants and patrol officers

25  share -- share the belief that they take personal

1    responsibility in community policing and constitutional

2    policing, that they criticize their officers whether back in

3    the -- back at the substation for lunch or in a formal

4    proceeding, only then will we truly have an entire cultural

5    shift within the Department that is consistent with the

6    settlement agreement and the needs of this community.

7              Lastly, Judge, the update on Mr. Arellanes'

8    harassment claims.  We want to thank you so much for taking

9    that seriously.  That was a little bit of like -- a little

10   bit of negative chatter on social media with regards to how

11   can the judge call for an investigation with such thin

12   proof.  Well, an allegation brought forth in this setting is

13   proof enough to move forward.  A gentleman named Paul

14   Skotchdopole of APOA is investigating.  He met personally

15   with Mr. Arellanes and on May 30th, and we look forward to

16   his findings.

17             One of the specific complaints was Mr. Arellanes

18   lives about seven houses from the nearest street corner in

19   which there is a church catty-corner to his house.  And

20   officers, literally every night, two or three officers would

21   be in their cars, at least one of them facing directly the

22   front of his house.  We know that, as officers do paperwork

23   and things of this nature now, they're encouraged to go to

24   public places and be kind of seen.  Since this -- the last

25   court hearing, none of them have used that church parking

```
 1    lot to do their paperwork and whatnot.  And the
 2    investigator -- as you know, Judge, when an officer goes to
 3    a particular location, they kind of punch in their location
 4    in a computer-automated system.  And it's public record to
 5    obtain these CADs, or Computer Automated Dispatch logs.  So
 6    I'm sure that a lot of this stuff is coincidental, but
 7    nonetheless, it is very intimidating to a person,
 8    particularly the most outspoken member of our community
 9    calling for DOJ investigations prior to the arrival of the
10    settlement agreement and the monitor.  So we look forward to
11    that and we thank you.
12            Also just the appreciation that the Court has
13    taken in providing amici the opportunity to address the
14    Court.  In speaking with other advocacy groups in Seattle
15    and other cities, it's unique if not the only one in the
16    country, the only court in the country, that's allowing this
17    opportunity, so we want to thank you very, very much for
18    that.  I think it's very, very important and really wraps up
19    the whole need for the community to be involved in this
20    process, the Court process, not just the entire process, so
21    thank you very much.  Because a true democracy in the City,
22    which we believe we're on the cusp of, involves criticizing
23    the government without -- without being in fear of
24    intimidation of that very government with which you're
25    criticizing.  I know we think of that in other historical
```

1    contexts or third-world countries, but it happened in our

2    fair city just a short time ago.  And we're coming out of

3    that now and we want to thank you.  So we look forward to

4    participating throughout fall and summer and visiting you

5    again in November.

6                    THE COURT:  Thank you, Mr. Maestas.

7                    MR. MAESTAS:  Thank you.

8                    THE COURT:  Yes, sir.  Thank you.

9            Mr. Cubra?

10                   MR. CUBRA:  Thank you, Judge.

11                   THE COURT:  Yes, sir.

12                   MR. CUBRA:  As always, I have a deep appreciation

13   that you're allowing me to speak on behalf of the subclass

14   members of McClendon.  Thank you.  And I want to echo what

15   Representative Maestas said.  I think your choice to do it

16   this way and have the community involved the way that we are

17   is one of the most positive things that's happening because,

18   whatever happens, at some point this lawsuit will end, and

19   then it's on the community to keep whatever gains we've made

20   intact.  And so thank you very much.

21                   I'm going to just run quickly through my list.

22   The McClendon settlement agreement has been mentioned here

23   by others.  I will say it this way:  We deserve to be the

24   little sister to this lawsuit with respect to the police

25   department, but the McClendon settlement agreement is

1    problematic in this way:  You've been told correctly that,

2    back in April, there have been changed Standard Operating

3    Procedures put in place.  We're waiting for the Court's

4    monitor to approve one last one.  But the City, because

5    they're so busy with other training, has said that they

6    won't get around to actually putting the training before the

7    officers in a classroom until February or March.  And so

8    it's nice to change the writings, and they are going to send

9    out a video telling officers about these changes, but there

10   is so much going on that even though they do take McClendon

11   seriously, they're not going to be able to slot that

12   training in until next February and March.  So the McClendon

13   case will continue to be involved with the Police Department

14   for at least that long until the training happens.  The

15   court order that Judge Parker signed requires them to

16   implement these Standard Operating Procedures before the

17   McClendon case will no longer be addressing the Police

18   Department.

19            There is one other piece of that settlement

20   agreement to remind you about, and it requires the City to

21   work with the County to both establish and to be involved in

22   the allocation of resources for jail diversion mental health

23   services.  Because many of the worst episodes that we've

24   seen in this lawsuit have to do with people having serious

25   psychiatric problems and police officers interacting with

1   them.  And it's the paucity of behavioral health services in

2   our community, which is also true in yours, in Las Cruces,

3   which oftentimes has led to these episodes of violence.  And

4   so the City has still got obligations under the McClendon

5   settlement agreement to help get some jail diversion mental

6   health care into our community to reduce the frequency of

7   these intense encounters.

8          I want to speak to the status report and praise

9   the City for it, because it is the first time that the City

10  provided a status report in this lawsuit, in a court filing,

11  where I thought they were being honest.  That's a big

12  statement.  And so whatever nitpicking I might have about

13  whether all of those words were exactly how I would have

14  said it, that is an honest assessment of where things are

15  at.  And Mr. Sullivan said he's now doing the training.

16  That report actually made an explicit acknowledgment that

17  the APD instructor's demeanor and dismissive attitude in

18  training community people about use-of-force issues was

19  problematic.  And he said they've acted.  And somebody who

20  has been doing that training for a decade, they'll find

21  something else for him to do and not do that anymore.  And

22  so hallelujah that someone who is not embedded in the past

23  is going to be doing use-of-force training.  It's a really

24  good thing.  And it's a good report.

25          The Compliance Plan, there's a lot to celebrate

1    there.  I think they said over 90 percent of the things set

2    out in that document, they have done.  And as best I can

3    tell, that's accurate.  But the point I made last time I

4    want to reiterate:  That Compliance Plan was not ambitious

5    enough and not long-term enough.  The first draft of that

6    plan, which they gave to us for comment, contained many

7    other things and they took out a lot of the content in order

8    to put high energy into the things they thought were, one,

9    most important, two, could do quickest, but with 90 percent

10   of them now accomplished, it's time to carry on.  That

11   Compliance Plan should be a living document, it should be

12   much longer-term than it has been, and it should be

13   reiterated with additional things added.

14          And just for everyone's reference, Document 358,

15   which was given to you before our March hearing, filed in

16   court, has, at pages 3 and 4, a list of eight other things

17   which were in the first iteration of the Compliance Plan.

18   And those things and probably some other things ought to be

19   embedded into the next generation.  And the Compliance Plan

20   should go on and on.  It should be the step-by-step

21   mechanism for guiding this process.  And it is noteworthy

22   that none of us have seen any updating of the Compliance

23   Plan, any changes to it, any comments within it.  And so it

24   really is time for the City to take it another step and

25   start making their Compliance Plan a public document that is

1    longer-term, more comprehensive, and routinely provided to

2    the public.

3          The Compliance Division is the essential piece.

4    We've talked about it over time.  And the people who have

5    been showing up and the work that they're doing is

6    exemplary.  No criticism there.  They will need to take

7    these next steps.  They still need to fully staff up.  And

8    then they need to reduce to writing for all of us to see, of

9    course, the Court and the parties and then the public, to

10   see like what is it that they're doing and what are their

11   rules and how are their procedures.  They have been so busy

12   doing things, they haven't had time to write down what they

13   should be doing, but Government must do that in order to be

14   accountable.  And so that remains a piece that, hopefully,

15   they will have time to do sometime soon because it's

16   essential to an enduring process and to a remedy that will

17   continue after the lawsuit is over for this Compliance

18   Acquisition to be formalized beyond the way it has been thus

19   far.

20         I want to also praise that it's my understanding

21   that ethical policing is courageous or epic.  It is

22   something that they're borrowing from New Orleans and it

23   makes lot of sense.  Because the culture change piece is

24   only at the beginning.  God bless you for having us here now

25   for four years, but we're nowhere close to where we should

```
 1    have been.  And it's because some other people used to be in
 2    this room who weren't committed to this change.  And now
 3    that we have people who are, we're going to do the best that
 4    we can, but these processes take a very long time.  And to
 5    change the culture -- I'll just quote one person and then
 6    I'll be done:  Just at the end of May someone who I respect
 7    a lot said these words:  "There are still lots and lots of
 8    issues at APD.  The deep-seated bunker-mentality culture
 9    goes right down to every unit and shows up in a different
10    way.  It's just a realization that reforming APD in reality
11    is going to be a unit-by-unit exercise and that is going to
12    take years."
13            That was the mayor who said that.  And he's
14    right.  This project is at a very early stage, sad to
15    report, and we're going to be at it for years.  And I just
16    want to thank you on behalf of my 15,000 clients who get
17    jailed annually and say to you that we're going to be at
18    this for a while and I hope that you'll stick with us.
19            Thanks very much.
20            THE COURT:  Thank you, Mr. Cubra.
21            Mr. Sylvan.  And Ms. Woodward.
22            MR. SYLVAN:  Good morning, Your Honor.
23            THE COURT:  Good morning.
24            MR. SYLVAN:  Chris Sylvan --
25            THE COURT:  Yes, sir.
```

1          MR. SYLVAN:  -- Community Policing Council

2     manager and Ms. Woodward with the Northeast Community

3     Policing Council.

4          THE COURT:  Good morning.

5          MR. SYLVAN:  Just wanted to give you a quick

6     update, and these are just bullets on what's happened since

7     the last time we spoke.  The CPCs are still exceeding the

8     CASA requirement of meeting twice a year.  They're meeting

9     monthly still.  I think that's a great positive direction

10    that they've been going.  It's become the national model so

11    far.  Membership is up for voting members.  Applications are

12    up.  In the first three months, I measured from the first

13    three months of '17 versus the first three months of '18,

14    and during '17, we had double digits, I want to say, like,

15    15 applications, but the past three months of this year,

16    we've had like 30.  So that's double.  Because of this, one

17    of our councils has now over ten members.  They were so

18    happy with the applicants that applied to be voting members

19    of the council that they just changed their bylaws to expand

20    membership.

21          We've also filmed a video on YouTube showing the

22    Community Policing Councils.  That was done with the Office

23    of Neighborhood Coordination.  The reason for this is to

24    inform the public and others what the Community Policing

25    Councils do.  And I know technical assistance has been

1    brought up a lot of times in this court this morning.  And

2    the CPCs have received technical assistance from Dr. Rickman

3    from the monitoring team.  They will receive technical

4    assistance tomorrow and Wednesday from Dr. Leal, who is also

5    with the monitoring team.  And later in the summer, there

6    will be social media training technical assistance for the

7    CPCs and APD staff as well.

8         Moving forward, I think we're going in a right --

9    a good direction.  We still have some kinks in the road that

10   we need to work out.  Diversity both in the membership of

11   the CPCs, voting members, and audience members of the CPCs

12   could be better.  We've been doing much outreach in that

13   direction.  Ms. Woodward has been helpful and so has

14   Mr. James Lewis over there.  So we're getting there.  And

15   with that, Your Honor, I stand for questions.

16        THE COURT:  Gosh, what a positive report that

17   was.  National model?  You know what?  We've all been

18   talking about that for a long time.  We want this process

19   overall to be a national model.  And yes, it's going to take

20   awhile and we've been at it awhile, but applications are up

21   to be on your councils.  People are invested to the point

22   that they're not just meeting twice a year, as originally

23   thought, but monthly.  That just says so much about the

24   willingness of a community to be involved.  I really

25   appreciate a positive report whenever I get one, so thank

1    you for that.

2              MR. SYLVAN:  I was going to tell you, in fact,

3    Your Honor, a gentleman from Webster Groves, which is where

4    Ferguson is located, he reached out to me and they want to

5    start their own policing councils and they are looking at

6    the Albuquerque model.

7              THE COURT:  You know, I talked to somebody from

8    Ferguson when we were in Ft. Worth in February.  And they

9    were looking at Albuquerque, you know, to see about things

10   we were doing.  I don't know if it was the same person, but

11   Ms. Woodward, please.

12             MS. WOODWARD:  Dorothy Woodward, D-O-R-O-T-H-Y,

13   W-O-O-D-W-A-R-D.  I'm a member of the Northeast Community

14   Council.  I've been listening to everyone and, believe me,

15   ladies and gentlemen, I am grateful that you have spoken

16   about cultural change and change of attitude, which will

17   lend to behavioral change.

18             Your Honor, since January 2015, Community

19   Policing Councils and the public have been verbally promised

20   stainability of CPCs long after CASA comes into compliance

21   and the monitor's team exits.  Our community requires more

22   than this, especially as Mayor Keller and APD have committed

23   to constitutional and community policing.  As such, the

24   Northeast CPC has initiated two proposals for consideration.

25             In speaking for my council and during meetings

1    and in correspondence with my city councilor, APD, DOJ,

2    Dr. Lewis, and the City, and then forwarded e-mails to the

3    City Council attorney and director, I introduced the

4    following:

5            In the first proposal, we are asking that the

6    City Council soon codify and memorialize CPCs to function,

7    operate, and serve in perpetuity.  We also proposed the

8    position of CPC manager be moved from appointed to

9    classified status rather than at the will of future mayoral

10   administrations.  I must note here that during two meetings

11   of which I was present and spoke of these, others suggested

12   that a full-time classified position of assistant be added

13   to the office of CPC manager.  Our Northeast CPC requests

14   that the City Council collaborate with us to bring forth

15   these proposals as ordinances.

16           On another subject, the Northeast CPC has

17   established four committees of which we engage attendees for

18   feedback.  Presently, committees are reviewing APD policies

19   and previously submitted recommendations.  We are also

20   examining ways to expand community outreach and involvement.

21           Any questions, Your Honor?

22           THE COURT:  No, no, ma'am.  I'm interested to

23   hear how the City is responding.  I know that the City has

24   responded in a positive way to an extent.  I'm interested to

25   see what their response is to this new proposed ordinance.

1           MS. WOODWARD:  From my city councilor, it's been
2    positive.  So thank you.
3           THE COURT:  Great.  Great.  Good news and thank
4    you again for all of your effort.
5           MS. WOODWARD:  You're welcome, Your Honor.
6           And one moment, please.  I'd like to say
7    something.
8           And now I'd like to say to all parties, let us
9    conduct ourselves with integrity and respect as we work for
10   the common good of this community we call home.
11          Thank you, Your Honor.
12          THE COURT:  Yes, ma'am.  Thank you.  Wise words.
13   I hope, well heeded.
14          Thank you.
15          Mr. Whatley?  My old friend, Mr. Whatley, you
16   know, it's great.
17          MR. WHATLEY:  Hello, Your Honor.
18          THE COURT:  I come to Albuquerque and I don't
19   know everyone, but I like to see a familiar face.
20          MR. WHATLEY:  I have a familiar face, that's for
21   sure, Your Honor.
22          THE COURT:  It's familiar to me.
23          Please.
24          MR. WHATLEY:  Your Honor, I'm Danny Whatley, of
25   course, and I'm co-chair of the Mental Health Response and

1    Advisory Committee with Rick Miera.  I've been involved in
2    that committee since the very beginning.  The committee is
3    made up, of course, as outlined by the court-appointed
4    settlement agreement, of service providers and professionals
5    in law enforcement within our community and, in that
6    committee, responsible for assisting and working with the
7    City on policies, training, information sharing, and
8    resources.
9            We work really, really closely with the Crisis
10   Intervention Unit and have done so from the very beginning.
11   I know we hear a lot of negative things about the last
12   administration, but our involvement with the City of
13   Albuquerque has always been a stellar arrangement, has been
14   one that has just been one that has helped us get things
15   done.  And I'm here today to let you know about some of the
16   accomplishments of our Crisis Intervention Unit, starting
17   with an article that you should have before you.  It was an
18   article that was presented to and appeared in the *American*
19   *Journal of Psychiatry*, and that publication is the premiere
20   peer-reviewed psychiatric journal in the world.  And the
21   article is entitled "Collaboration to Reduce Tragedy and
22   Improve Outcomes:  Law Enforcement, Psychiatry and People
23   Living with Mental Illness."  And the article was co-written
24   by Dr. Nils Rosenbaum, who is the only psychiatrist employed
25   full-time in a police department, Det. Matthew "Matt" Tinney

1    and Dr. Mauricio Tohen.  Dr. Rosenbaum, as you know, is a

2    Director of Behavioral Health within the Police Department

3    and was the Director of the Crisis Intervention Unit.

4    Det. Matt Tinney is a member of APD and has been

5    instrumental in recognizing, implementing and equipping the

6    standard of conduct and training that is necessary for

7    modern law enforcement as it relates to dealing with those

8    experiencing mental health crises and their interaction with

9    law enforcement.  Dr. Tohen is the Chair of the Department

10   of Psychiatry at the University of New Mexico.  The article,

11   itself, outlines three areas that actually deals with how

12   APD has set up their Crisis Intervention Unit.  And it deals

13   with inclusive collaboration, training and, third,

14   coordinated responses.

15         And that's what we're seeing within the

16   Department, is they are, for the first time, and as a

17   long-time law enforcement officer, this is a first for me to

18   see law enforcement actually not only inviting professionals

19   within the community in, but encouraging those to be

20   involved in the process.  As I advised the Court the last --

21   at the last staff -- the conference, the training that

22   the -- that CIT puts together is one of those that's made up

23   primarily and the majority of those trainers are from the

24   community, professionals and service providers from the

25   community.  So it is one of those that inclusive

1    collaboration, the training, of course, is going on.  And

2    coordinated responses, that is one that I'll talk about a

3    little bit later as I go forward.  And it's one of those

4    things where all of those first responders and all of those

5    involved in a crisis situation needs to be on the same page,

6    and the Crisis Intervention Unit is certainly accomplishing

7    that.

8         The article encourages as well as gives examples

9    on guidance on how to improve mental health/police

10   collaborations.  Your Honor, you should also know that Matt

11   Tinney is the first detective ever published in that

12   prestigious journal, so we should certainly be proud of

13   that, as I said.  You have a copy of that and we'd like to

14   make it a part of record, if there's no objections.

15        THE COURT:  Yes, sir.

16        MR. WHATLEY:  Presentations is the next part.

17   Our CIU has been recognized and considered a leader in the

18   area of crisis intervention and has often been asked to do

19   presentations throughout the nation.  They were given the

20   opportunity this last May to present in New York City.  You

21   should have in front of you, Your Honor, a three-page

22   document that is the guide for the 2018 annual meeting of

23   American Psychiatric Association where the Crisis

24   Intervention Unit gave two presentations to the group.  The

25   first was entitled "Why don't the police just shoot them in

1    the leg:  Law Enforcement, Psychiatry, and People Living
2    with Mental Illness."  And the second presentation was
3    entitled, "How to Bring Psychiatric Training to Law
4    Enforcement in your Community, an Innovative Approach."
5    Again, it shows the level of expertise and the respect that
6    our Crisis Intervention Unit within APD is receiving.
7              And Your Honor, the third thing I'd like to tell
8    you about is an honor.  In 2017, our Crisis Intervention
9    Unit received Team of the Year by the City of Albuquerque
10   and the Albuquerque Police Department.  And I'll read
11   directly from the documents recognizing them and give you
12   what they were recognized for.  (Reading) "The Crisis
13   Intervention Unit has recently received national recognition
14   for their innovation, leadership, knowledge, and effort.
15   The team was featured in a recent publication of *American*
16   *Journal of Psychiatry*, which discusses how the program works
17   with the mental health community.  In addition, the team was
18   invited to present twice at the prestigious International
19   Association of Police Chiefs Conference and the Crisis
20   Intervention Team International Conference in Florida.  They
21   also hosted the Crisis Intervention Team Knowledge Network,
22   ECHO, Extensions of Community Healthcare Outcomes Project,
23   which brings physicians and officers together to staff cases
24   and raise the standards in law enforcement interactions with
25   people living with mental illness.  This project also brings

1    experts in mental health and crisis intervention to officers

2    by video telecommunication platform, giving them access to

3    continuing education.  The Crisis Intervention Team has

4    coached collaboration and education of police officers, jail

5    staff, and mental health professionals.  The team has

6    trained 120 APD officers in enhanced crisis intervention and

7    is a part of policy development and outreach programs, such

8    as the Crisis Outreach and Support Teams, or COAST, which

9    coordinates resources with different agencies."

10          To update you on some of the numbers, Your Honor,

11   that was given in that award letter, the training has also

12   been -- actually, to give that update, the CIU and APD has

13   now trained 196 officers in the Enhanced Crisis Intervention

14   training, with some additional training scheduled in July.

15   This training has also been taught to 9 crime-scene

16   specialists, 20 police-service aides, 90 3-1-1 operators,

17   and 120 dispatchers.  They have also trained personnel from

18   the mayor's office, local attorneys' offices, their

19   respective staff, personnel from local hospitals, public

20   libraries, and medical students.  They have increased their

21   number, with all of this training, by three new detectives

22   and one new COAST person.  One of their longtime members of

23   the Crisis Intervention Unit, Det. Bonnie Briones, won the

24   Advocacy in Mental Health award from the Psychosocial

25   Rehabilitation Association of New Mexico.

1          Finally, Your Honor, you talked -- we've talked a

2     lot about mental crisis, mobile crisis teams, joint effort

3     between the County and the City, and all of those units that

4     are -- that have been stood up so far have all been through

5     the CIU training and the enhanced CIU training.

6          And the last thing I've got, Your Honor, is to

7     talk about communication.  One of the things that the MHRAC

8     has discovered is first responders and those involved in

9     mental health crisis and those involved responding to

10    homeless issues are sometimes not on the same page.  The

11    Albuquerque Fire Department is not a part of the CASA

12    agreement, except as they are a part of the City and

13    employees of the City, but the Fire Department has taken it

14    upon themselves to attend our meetings and communicate now

15    directly from the command level down.  One of the issues we

16    had with the old administration was that there was a wall

17    between AFD and APD and there was really little or no

18    communication on the command level.  We're now seeing a

19    change in that area, as the Albuquerque Fire Department is

20    opening communications, as is APD, so that the first

21    responders not only can be on the same page, but training

22    together and seeing some of that accomplished.

23          Finally, Your Honor, I attended the first

24    meetings of that fledgling group that was created through

25    the CASA that is now known as the MHRAC or the Mental Health

1    Response and Advisory Committee.  I had my doubts about its

2    effectiveness and to the ability of it to come together and

3    work together.  And we've seen some of that today, how slow

4    sometimes these things go.  But as I began to work closely

5    with the Crisis Intervention Unit and saw their heart and

6    saw their drive in this group of dedicated law enforcement

7    officers and civilians from the top down, I changed my mind.

8    I have told anyone who would listen, and I tell you today,

9    Your Honor, that the Albuquerque Police Department and

10   Crisis Intervention Unit will become the standard in how to

11   deal with those experiencing crisis and those interacting as

12   first responders.  In some areas of our country, this is

13   already an accepted fact and soon, very soon, Albuquerque's

14   Police Department and the Crisis Intervention Unit will be

15   that agency that everyone else in law enforcement looks to

16   for leadership and guidance in that area.

17            And Your Honor, that's all I have, unless you

18   have any questions for me.

19            THE COURT:  Mr. Whatley, I don't think I have any

20   questions, just my thanks to you for all of the work you've

21   done with MHRAC and crisis intervention.  And I hope

22   somebody was writing all that down and I hope that gets

23   reported because that is an outstanding report.

24            And you've been here from the beginning.  You

25   know progress is slow, but goodness, to talk in terms of one

1    of our units being a national standard is exciting to me and

2    I really do appreciate it, and it ought to be exciting to

3    our community.

4              MR. WHATLEY:  Thank you, Your Honor.

5              THE COURT:  Yes, sir.  Thank you.

6              Mr. Aguilar?

7              MR. AGUILAR:  May it please the Court, Your

8    Honor.

9              THE COURT:  Yes, sir.

10             MR. AGUILAR:  I will address a couple of the

11   concerns that I can, and then defer and ask for some

12   guidance from those who have more involvement.

13             First, relating to the concerns by Mr. Haidle and

14   APD Forward coalition, as he addressed, the City has been

15   working very closely with our partners in the community to

16   implement and to note -- to implement the changes

17   recommended by the CASA, but also to try to keep the

18   community as updated as possible and to hear a portion of

19   those concerns.  We've been working with Mr. Haidle, not

20   just on CASA-related issues, but other areas of concerns

21   within the police department.  The question that, I think,

22   that he had raised was he would like clarification on the

23   difference between the several use-of-force numbers, and so

24   I'll defer to Mr. Schmehl, the Assistant Albuquerque City

25   Attorney to -- and Deputy Chief Medina on that.

1                THE COURT:  Come forward, gentleman.

2                Mr. Schmehl, good morning.

3                MR. SCHMEHL:  May it please the Court and good

4     morning, Your Honor.

5                THE COURT:  Of course.

6                MR. SCHMEHL:  So with regard to the backlog

7     conversation, I think words are extremely important.  The

8     word "backlog" in this context relates to the discovery in

9     the fall of 2017 of significantly delayed cases that

10    basically cripple the use-of-force reporting and

11    investigation system to the point that Dr. Ginger and the

12    sixth report didn't look at more cases.  I think we're all

13    aware of that history.

14               Now, to further define that and define it

15    actually, more importantly, moving forward, the City and

16    Department looked at that list and then moved forward.

17    Because what that list represented was a static snapshot.

18    Now, every day a case is coming into the system, whether

19    it's a use-of-force or a serious use-of-force investigation

20    is started, at that point of the snapshot, you could have

21    had a case that was 90 days old, 80 days old or what have

22    you, but not 120 days old.  So what the Department and City

23    did is it moved forward from that point in time and swept

24    those cases into the backlog as they aged to the point of

25    being considered worthy -- not necessarily worthy of review,

1    but rising to that level of urgency where you're considering

2    the administrative time line to impose discipline.

3           So from September 20th, 2017, with regards to

4    supervisor use-of-force investigations that move forward and

5    sweep is what took place.  And that's how we arrived, or the

6    City and Department arrived, at the 314.  The PowerPoint

7    slides explain that.  And what is going to happen now, Your

8    Honor, is that the City is going to file a more explanatory

9    brief to the community, to the Court to explain it in better

10   terms because, this morning, as I was listening and

11   obviously picked up on the fact that there is some confusion

12   about what that means.

13          Now, with regard to Deputy Chief Medina's work,

14   he's dealing with active cases coming into the system.  And

15   those are all field use-of-force cases.  And what he's done,

16   his initiative, is to make sure that another backlog is not

17   created.  So he has the website that they've -- they have.

18   I think it's actually just a -- it's a Blue Team entry

19   report.  And Blue Team, of course, being the initial entry

20   that starts a use-of-force an administration perspective.

21   He is taking a real-time approach to making sure that those

22   cases do not age, so that nothing could be missed from that

23   look forward from September 20th, 2017, and the definition

24   of a, quote-unquote, backlog.

25          Now, with regard to the serious use-of-force

1    cases, what that represented, those numbers, 26 of those

2    have been completed by the chain of command and are ready

3    for presentation to the Force Review Board.  The approach to

4    those is the same as the review of the supervisor

5    use-of-force investigations that have been created by the

6    chain of command.  And the reasoning there is not to

7    interject an investigator or reviewer into the chain of

8    command and to let it finish, and that's the reason why you

9    have the other -- the other serious use-of-force

10   investigations that will be completed and reviewed to the

11   same level of scrutiny as those 26.

12            So there's -- there are quite a few moving

13   pieces, Your Honor.  I apologize for any confusion it causes

14   to the Court or the community, but moving forward, we're

15   going to continue that information being pushed out.  We'll

16   make ourselves -- the City and Department will make

17   ourselves available to the amici where they have questions.

18   I encourage APD Forward to reach out to the City.  We want

19   to very transparently address the problem, very effectively

20   address the problem, and make sure that -- you know, it

21   stands at the heart of reform, so it's taken very seriously.

22            THE COURT:  And Mr. Schmehl, when do you think

23   you'll have that, the written explanation, filed?  I really

24   do think that would be helpful because I've been sitting

25   here listening, too, and I'm not clear.  So when do you

1    think you might have that?

2              MR. SCHMEHL:  Your Honor, I can get that to the

3    Court next Wednesday.  Unless you tell me to get it to you

4    sooner.

5              THE COURT:  Next Wednesday, day after tomorrow?

6              MR. SCHMEHL:  The following Wednesday after the

7    first Wednesday.

8              THE COURT:  See how they are?  I'll look forward

9    to it a week from Wednesday.  All right.

10             MR. SCHMEHL:  Thank you, Your Honor.

11             THE COURT:  Mr. Medina -- or I'm sorry, I've

12   forgotten your rank.

13             D.C. MEDINA:  Deputy Chief, sir.

14             THE COURT:  Yes, sir.

15             D.C. MEDINA:  One of the things like we talked

16   about earlier, it's very confusing.  And that was some of

17   the confusion we walked into as an administration because we

18   had to gain an understanding that what are all these

19   backlogs?  Which one means what?  And the best way to

20   explain is a two-tier process.  There's the cases -- the use

21   of force happens.  The officer enters it.  The sergeant does

22   an initial review.  Then after the sergeant does the initial

23   review, the lieutenant reviews it.  The commander reviews

24   it.  And after the commander reviews it, it gets put into

25   IAPro.

1          Once it's put into IAPro, that's where the second

2     backlog kind of was occurring, where these cases need to be

3     put into the system, they need to be evaluated.  And a

4     review process happens, which Cdr. Middleton was talking

5     about where they will review them, they will look for

6     patterns, training deficiencies, and they'll take a sample.

7     Was something missed in the initial review by the one of our

8     command-level officers that needs to be addressed?

9          So I think that's the best way to look at it is,

10    is it's kind of a two-tier process.  The first process is

11    where I'm responsible to make sure that these cases are done

12    with the new established time frame of 60 days.  That's our

13    goal.  And the 186 was an early number of cases that were

14    stuck in that first tier.  Now, what I can tell you is those

15    numbers change daily.  It all depends on if a case is

16    cleared by the commander and what cases are coming in as new

17    use-of-force, and now also which cases are going beyond the

18    60 days.  So as I finished, I got an updated number from our

19    section that runs these numbers for us.  And as of 9:58 this

20    morning, we have 44 cases which have gone beyond the 60-day

21    mark, which we're trying to eliminate.  That is the

22    first-tier backlog that we're trying to get everything under

23    60 days, stop that delay past 60 days.  Of those 44 cases,

24    35 of them are from 60 to 120 days in age and 9 are from 121

25    to 180 days in age.  There is a grand total of 133 cases in

1    the system.  89 of those cases are use of force and 15 are

2    show of force.  And those ones would be from 0 to 59 days --

3    or 60 days when we want them completed.  So we have 133

4    cases that we're going to have to ensure that we get done in

5    a timely fashion, and that is our goal, but we're still

6    dealing with the now reduced cases that were not completed

7    within those 60 days, which is the 44 cases beyond 60 days.

8            Does that make sense?  It's very --

9            THE COURT:  You know, I said earlier I'm not a

10   patient guy and I'm darn sure not a numbers guy.  So I --

11   somebody suggested, you know, being an accountant?  It -- I

12   didn't go because of -- I just don't do numbers, but you

13   know what?  I am going to look forward to that written

14   explanation that I can study a little bit, and I'll bet the

15   community is, too.

16           I just know, from a judge's perspective, I have

17   cases submitted to me.  And my goal, once they're fully

18   submitted, fully briefed, is to have a decision within 60

19   days.  And those that I don't, I know, and they're always

20   bothering me, so that's my backlog.  So I'm trying to put

21   your two-tier system into my little, you know, nimble head,

22   and we'll -- I'm looking forward to the report.  But thanks

23   for your attempt.

24           D.C. MEDINA:  Your Honor, also just one last

25   thing:  If it helps, I know you were talking about numbers

```
 1    earlier.  I actually e-mailed and said, "Can I have the
 2    freshest, current numbers, as of today?"  And if you'd like,
 3    I can give you the current crime reduction numbers, as
 4    through today, itself, for those crime categories we spoke
 5    about earlier.
 6                 THE COURT:  And those numbers would be comparing
 7    the first five months of --
 8                 D.C. MEDINA:  It would be comparing through
 9    June 11th of '17 through June 11th of '18.
10                 THE COURT:  Give us the numbers.
11                 D.C. MEDINA:  Auto theft is at negative
12    14 percent, which was -- has gone down a little bit more.
13    Auto burglary is at negative 31 percent.  Residential
14    burglary has gone up to a negative 11 percent.  Commercial
15    burglaries are up to a negative 12 percent.  Robberies are
16    down a little bit, but they're still up a negative
17    39 percent.  And traffic stops are up 51 percent.  Thank
18    you, Your Honor.
19                 THE COURT:  Thanks for the current numbers.
20    Appreciate that.
21                 MR. AGUILAR:  May I proceed, Your Honor?
22                 THE COURT:  Yes, sir.
23                 MR. AGUILAR:  I know we have a lot to cover in a
24    short amount of time, so from the -- Mr. Cubra, we
25    appreciate working with Mr. Cubra and the kind words.  We do
```

1   have more work to do in our efforts on the -- both the

2   mental health and the homelessness front.  The jail -- as

3   far as the jail diversion and mental health services, the

4   City, several entities within the City and departments, are

5   currently working on finalizing the agreement with members

6   of the County on our single-site housing initiatives.  Those

7   all are tied together with mental health and homelessness in

8   our communities.  And as was pointed out, the Crisis

9   Intervention Team is doing tremendous work, but I also have

10  to commend Chief Dow and the Albuquerque Fire and Rescue for

11  the job that they have been doing.  Again, this is a unified

12  effort in our communities.  And it's going to take all of us

13  working together.  It will take time to implement those

14  changes, but it's in the works, Your Honor.

15          Finally, the Community Police Councils, with

16  Director Silva and Ms. Woodward, we are happy to continue to

17  work closely with them, as well as the U.S. Attorney's

18  Office on all recommendations that we can consider.  And

19  we'll work with the Council, as well as any other members of

20  the community who are interested.

21          I stand for questions, Your Honor.

22          THE COURT:  Gosh.

23          MR. AGUILAR:  Did I miss...

24          THE COURT:  You got it covered pretty quickly.  I

25  appreciate that.

 1            MR. AGUILAR:  I know we have like 20, 25 minutes

 2    left, and there are several major topics on the agenda.

 3            THE COURT:  I know.  So let's look, then, at

 4    status of ongoing review and revision of Use-of-Force

 5    Policies.  Is that where we are?

 6            MR. AGUILAR:  I believe so, Your Honor.  Thank

 7    you.

 8            MR. SCHMEHL:  May it please the Court?

 9            THE COURT:  Yes, sir.

10            MR. SCHMEHL:  Your Honor, the City filed a motion

11    to extend the deadline in paragraph 86 which related to the

12    Use-of-Force Policies and training and their review.  And

13    Your Honor entered an order last week granting that

14    extension.

15            In that motion, a calendar was set out for the

16    review of the Use-of-Force Policies, the one on -- the

17    general Use-of-Force Policy definitions.  There's a new

18    deescalation policy, and there's going to be a Use-of-Force

19    Reporting and Investigation Policy as well.  We've had

20    pretty good success, I would say.  You know, I don't want to

21    jinx ourselves, but we've had good luck with the general

22    Use-of-Force Policy, as Dr. Ginger stated earlier, based on

23    his assessment, it's approvable by him.  So that's very good

24    to hear.

25            The Police Oversight Board and the CPOA sat in on

1    those meetings, will continue to sit in on those meetings

2    and have the ability to make recommendations directly to the

3    group.  They also are acting as a conduit for community

4    recommendations, as these policies are going through the

5    process.  And this is -- to be clear, Your Honor, this is

6    the technical assistance process, or opportunity that the

7    City is availing itself of before the policy development

8    process, which is anticipated by 352, which is the

9    Department Standard Operating Procedure.

10           So this Thursday, at the Police Oversight Board,

11   for the first time, there will be a public discussion of a

12   Standard Operating Procedure related to the Department.  And

13   I think it is at the heart of reform, the general

14   Use-of-Force Policy.  It speaks to a lot of different

15   things.  And so the City is very happy about it.  The

16   Department is looking forward to it.  So there will be that

17   public discussion and everyone in the courtroom is invited.

18   They have an e-mail blast, it's on the website and those

19   types of things, so we look for that to be well attended.

20           THE COURT:  And where is that?

21           MR. SCHMEHL:  So Your Honor, it will be

22   5:00 P.M., June the 14th, in council chambers.  So there

23   will be that opportunity.  And then, moving forward, Your

24   Honor, we have, as set out in the motion, a very specific

25   time line for the rest of the Use-of-Force Policies to be

1    discussed and considered.

2              And that is it, Your Honor.  I know that we're on

3    a tight time line and I want to be considerate of other

4    speakers, unless you have other questions?

5              THE COURT:  No, sir.  Thank you.

6              Ms. Hults is going to talk about the update on

7    the promotional policy.  And I'm not prepared to rule,

8    certainly.  I've only seen the response within the -- well,

9    as I came in this morning.  So I just -- I'm glad to have an

10   update, but --

11             MR. KILLEBREW:  Your Honor, I apologize for the

12   walking around.  I was doing a little stage managing to

13   figure out how we can best use the next 20 minutes that we

14   have of your time.  I think we have a little bit more,

15   actually, on the Use-of-Force Policies.  And then our --

16   everyone has agreed that we can move straight on there to

17   Mr. Harness' presentation.  And that will probably take us

18   to the end of the day.

19             THE COURT:  That's great.  Your time to manage.

20             MR. KILLEBREW:  Thank you, Your Honor.

21             MR. RYALS:  Good morning, Your Honor.  Steve

22   Ryals on behalf of the United States.  May it please the

23   Court?

24             THE COURT:  Yes, sir.

25             MR. RYALS:  I thought I would address, briefly,

1      the changes that the parties have agreed to, that is, the

2      United States and Albuquerque have agreed to, with regard to

3      3-52.  There's been a lot of -- the Use-of-Force Policy.

4      There's been a lot of discussion about culture change, and

5      it might be good for the Court to understand a little bit

6      about the focus and the precise changes that have been made

7      to 3-52.

8              As you know, APD revised the policy and presented

9      that to the United States.  The United States proposed

10     substantial edits that were designed to make the policy

11     clear, concise, direct, and directive.  We had seen in the

12     monitor's reports and we had heard from officers that the

13     previous iteration of 2-52 was not clear and confusing to

14     the officers.  And we sought to remedy that in concert with

15     the work of APD.

16             The problems, as we perceived them in the

17     previous iteration were the confusion between the Graham

18     standard and what the CASA requires.  As the Court is well

19     aware --

20             THE COURT:  I'm sorry.  Go ahead.

21             MR. RYALS:  The Graham standard simply measures

22     whether an officer can use force in a given circumstance.

23     And the Court's order, the CASA, asks the questions should

24     the officer use force.  It requires that the officers use

25     the minimum amount of force necessary, use deescalation,

1    that the force be reasonable and necessary and proportional.

2    None of those things are required by Graham.  And our effort

3    was to try to make the policy clear that there is a single

4    standard.

5              I will probably not do the account justice, but

6    Commander Sullivan shared with me a bit of training he has

7    in mind on the current draft of the policy, the new policy,

8    to illustrate the difference between what the minimalist

9    Graham standard would require and what APD policy requires.

10   So he'll forgive me if I mess this up, but he talked about a

11   scenario training where the training would come into a

12   scenario where, under Graham, they would be justified in

13   using force, but the correct response of the officer is to

14   not jump in and use force; that is, if they jump in and use

15   force, even though Graham would permit it, they failed the

16   exercise because the APD policy requires more.  And I

17   thought that was a poignant, a very exciting bit of

18   training.

19             Culture shift that we've talked about here today

20   begins with good policies.  It then proceeds to good

21   training.  And it ultimately manifests itself on the street

22   as good supervision and good accountability.  And we have an

23   ideal opportunity here with the changes to 2-52 to work --

24   begin the work of changing the culture with regard to the

25   Use-of-Force and APD.  In fact, it may be a

1    once-in-a-lifetime opportunity.  And we're very excited both

2    about the changes that the United States and Albuquerque

3    have agreed to.  We're also very excited about the robust

4    community input that we will get.  We appreciate the APD

5    Forward comments and we're looking forward to getting their

6    written submissions as well.

7              Ultimately, we believe that the newest version of

8    2-52 provides clear guidance, concise guidance, direct

9    guidance and is very directive.  Importantly, it is a

10   trainable policy.  It will reflect community input.  And we

11   have every expectation that it will reflect best practices

12   in policing, promote adherence to the United States

13   Constitution and, perhaps most importantly, conforms to the

14   Court's orders.

15             I'll answer any questions the Court has.

16             THE COURT:  I'm good, Mr. Ryals.  Thank you.

17             MR. RYALS:  Thank you.

18             THE COURT:  Yes, sir.

19             Mr. Mowrer?

20             MR. MOWRER:  Your Honor, very briefly, 2-52, the

21   use parties, are working together to and have approved a

22   policy that's being considered.  I just want to make it very

23   clear for Court that "parties" does not, the way it's

24   currently drafted and being discussed, include the APOA.

25   There are some issues with some of the language being

1    deleted out of 2-52 that the APOA has brought to the

2    attention of the parties and is currently working with the

3    parties to address.  So I just wanted the Court to know

4    that.

5                THE COURT:  Well, and I'm sure you'll keep me

6    advised.

7                MR. MOWRER:  Yes, I will, sir.

8                THE COURT:  Yes, sir.  Thank you.

9                Time manager, what's next?

10               MR. KILLEBREW:  Your Honor, I believe Mr. Harness

11   was going to report on the investigation that the CPOA has

12   conducted about the allegations that Ralph Arellanes made in

13   court last time.

14               THE COURT:  Thank you.

15               MR. HARNESS:  If it please the Court, good

16   morning, Your Honor.  Edward Harness from the CPOA.  I'm the

17   executive director.  Given the time, I believe all the

18   parties do now have Exhibit 5, which is our ten-page

19   investigative report regarding the allegations of

20   Mr. Arellanes.  We examined the behavior of the Department

21   in relation to its retaliation policy, which is 1-14(E)(10)

22   and (11), which states (reading), "Retaliation by any member

23   of this Department is expressly prohibited.  'Retaliation'

24   includes intentional adverse conduct towards any individual

25   or group not otherwise authorized by law or policy in

1    response to the individual or group taking these actions,

2    exercising their legal right, making or supporting a

3    complaint, making or supporting a claim, making a charge,

4    testifying, assisting, or participating in any manner with

5    an investigation, proceeding, or hearing, exercising their

6    lawful duties.  'Retaliation' includes, but is not limited

7    to threats, intimidation, coercion or other adverse actions

8    against any person in the workplace or community."

9           As the Court is aware, Mr. Arellanes made

10   allegations in his presentation to the Court in March of

11   2018.  Based upon the settlement agreement and the City

12   Ordinance, that Complaint filtered its way through from

13   Deputy Chief Garcia to the Civilian Police Oversight Agency

14   for us to conduct the investigation because the

15   investigation involved a citizen.

16          I'm just going to go through some of the

17   highlights.  I think it's important to put into context the

18   fact that Mr. Arellanes has utilized the previous iteration

19   of the CPOA, the IRO office, back in 2007 with a

20   use-of-force issue, which led to the termination of two

21   officers that were involved.  He also then made similar

22   allegations as to harassment and intimidation from members

23   of APD.  Amongst his allegations for this Complaint, besides

24   what was presented to the Court, the investigation also

25   revealed an incident from October 26th of 2016, an

1    incident in mid-November, and then there's also allegations

2    of abuse of by the arrest of Mr. Arellanes' son, which

3    happened in December of 2017.

4                Our investigator interviewed members of the

5    Albuquerque Police Department which attended the March 8th

6    meeting, which Mr. Arellanes believed was pivotal to part of

7    the harassment.  We also canvased his neighborhood, spoke

8    with neighbors.  We looked for video evidence to

9    substantiate the allegations of spotlighting his house

10   intentionally numerous times, on any occasion.  And what we

11   learned was that Officer V, who lives in the neighborhood

12   and who knows Mr. Arellanes, is also assigned to that area.

13   That's Squad Area 422.  Mr. Arellanes knows Officer V and

14   they have actually exchanged cell phone information and they

15   see each other almost on a daily basis.

16                As it relates to --

17                THE COURT:  Mr. Harness, I'm sorry.  They see

18   each other in what context?

19                MR. HARNESS:  On a daily basis as neighbors.

20                THE COURT:  Just as neighbors?

21                MR. HARNESS:  As neighbors, correct.  Correct.

22                So I'm sort of going backward, but so, yes,

23   Mr. Arellanes has a neighborly relationship with Officer V,

24   who lives seven doors down from Mr. Arellanes, and he's also

25   assigned to the area where he lives.

1          There have been recent burglaries in the

2     neighborhood.  There was a home that was burglarized, an

3     unoccupied home.  There was also a 24-hour daycare center in

4     that same area, which has requested more patrols.  And

5     Officer V says that, yes, he has on occasion, when

6     responding to burglary calls or when patrolling the

7     neighborhood, because he lives there and has been a victim

8     of an auto burglary, he will drive through the alleys and he

9     will use his alley lights and spotlights to drive through

10    the alleys on occasion when he's not on a call.

11         They have also responded to calls, the burglary

12    calls, within the neighborhood.  We've looked at all of the

13    Computer Aided Dispatch.  We detailed a number of calls

14    within the squad area and then Officer V's partner, Officer

15    R, who is Squad Area 423.  Those are the two squads that sit

16    in the church parking lot and do reports.  They do that

17    because they live in the neighborhood, they want to be seen

18    in the neighborhood, and they feel it's a safe place for

19    them to sit and do reports in between calls.

20         As it relates to the WiFi or the surveillance

21    04APD screenshot which Mr. Arellanes provided, we were able

22    to determine that that WiFi is a neighbor a block away.

23    That neighbor related to us that when they first moved in,

24    people would sit in front of their house and use their WiFi.

25    And as they told themselves -- or as they called themselves

1    "Apple Geeks," they decided to change the name of the WiFi

2    so that it would be less susceptible to people sitting in

3    front and using it.  So they have three WiFi networks at

4    their house, Surveillance 4 -- I'm sorry, Surveillance APD

5    4, Surveillance APD 5, and Searching....  That's the

6    explanation for the "surveillance."

7              As it relates to the arrest of Mr. Arellanes'

8    son, there were two occasions when the police have been to

9    his home since November of 2017.  The first was to take a

10   burglary report, where Mr. Arellanes' son reported that

11   people were in his home.  On the second occasion,

12   Mr. Arellanes' son called to say that he had shot somebody,

13   that there was a burglar in his home, an intruder, and that

14   of the two intruders, he had shot one of them in the foot

15   and that he was still in the house, moaning.  And so the

16   officers went to the home.  They responded within two

17   minutes of the call.  There was a search of the residence

18   and no one was found.  There was no blood evidence found.

19   However, there was evidence of discharge of a firearm from

20   within the home, one round, going outside the home toward a

21   neighbor's home.  In that search, they also found a stolen

22   APD shotgun, which, through a miscommunication in the NCIC

23   system, did not show up as stolen, but later was discovered

24   to be stolen.  So there was probable cause to arrest his son

25   at that point.

1          Throughout the transactions and the interactions

2     that Mr. Arellanes has reported, he has been unable to

3     provide any information with -- relating to descriptions of

4     officers, descriptions of vehicles, vehicle numbers, license

5     plate numbers, none of those things.  None of that

6     information throughout these years is noted by Mr. Arellanes

7     at any point in time.  So it is our finding that, at this

8     point, those allegations are unfounded.

9          So I stand for questions.

10          THE COURT:  Well, thank you for the report for

11     the investigation.  And does -- I don't want to open it up,

12     but any comment?

13          And your investigative report, it's dated today,

14     so when was this first disseminated and has Mr. Arellanes

15     seen this?

16          MR. HARNESS:  Mr. Arellanes has not seen it.  It

17     was just disseminated this morning.

18          THE COURT:  Okay.  Because, certainly, I was --

19     this is the first time I'd seen it.  Thank you.

20          Ms. Martinez?

21          MS. MARTINEZ:  Your Honor, I know it is coming up

22     on noon and that is the end of this hearing.  I'd like to

23     make a request, please.  There are a couple of other items

24     on the agenda that we simply will not be able to get to, and

25     one of them was an item on changing cultures within police

1   departments.  And I will ask if maybe we can have that item

2   on a future hearing because it is something that has been

3   discussed in passing several times during this hearing, and

4   it is something that I know that Chief Geier and Mr. Lewis

5   and the City Attorney and I were prepared to discuss this

6   morning.  We know that it's something that is very important

7   to this Court and to this community, and we know that it is

8   not something that can be covered in 30 seconds.

9          The other thing is, Judge, that there are two

10  exhibits that are in the Court's exhibit book that we ask

11  you accept as exhibits so that we can go ahead and have the

12  Court review it and also make them available to the

13  community.  Both of them have been mentioned during this

14  hearing.  One is a PowerPoint presentation that relates to

15  the Community Policing Program that Chief Geier already has

16  been implementing in the Albuquerque Police Department.

17  That has been mentioned today during the program.  And the

18  other one is a training program.  It's a peer-intervention

19  program called EPIC that Chief Geier has started introducing

20  at the Albuquerque Police Department.  And that is Ethical

21  Policing is Courageous.  And that was designed by the New

22  Orleans Police Department and it encourages and authorizes

23  police officers to actively intervene when other officers

24  are engaged in conduct that is unethical, illegal, or

25  against policy, regardless of rank.  And as I mentioned,

1    that is something that Chief Geier and Deputy Chief Garcia

2    participated in, a few months ago, in New Orleans.  And they

3    brought that program back here to Albuquerque and they've

4    already started introducing that program here in Albuquerque

5    for all Albuquerque police officers.  And I know that that's

6    something that Chief Geier -- actually, might he have a

7    couple of minutes to tell you a little bit about that

8    program?

9              THE COURT:  Yes, ma'am.  And without objection,

10    your exhibits can be made a part of the record.

11    (Government's Exhibits 1 and 2 were admitted into evidence.)

12              And with regard to the cultural-shift

13    presentation, I wonder if I might just ask that you reduce

14    that to writing.  I expect that you had significant notes

15    anyway.  Reduce that to writing and file it as -- under that

16    heading, Presentation.  I'll review it and so the public

17    will have an opportunity as well.  And if you still want to

18    have that revisited on subsequent hearing, we'll take it up

19    at that time.

20              Chief, very briefly, please.

21              CHEIF GEIER:  Good morning, Your Honor.  Thank

22    you very much for a few seconds here.  Basically, APD has

23    listened to the suggestions of the monitoring team, and

24    we're continuing to reach outside the Department to try to

25    change a variety of programs that are going to beneficial to

1    the transformation of the Department.  We know that the

2    dynamics, the culture, has been embedded in APD for decades.

3    And as Mr. Maestas has mentioned, it's difficult to change

4    and get to the roots of it.

5              So one of the first things we did is we attended

6    some training in New Orleans, Deputy Chief Garcia and

7    myself, on the EPIC program.  It was a conference held by

8    their department over two days.  We were trained in the

9    basic precepts of the program, and what we decided is that

10   it was -- the positive impact it had in New Orleans

11   Department affected that Department in a great way.  They've

12   made great progress in terms of it building community trust,

13   change in the culture of their officers, and reducing

14   citizen complaints.

15             So we brought this back to APD.  We made

16   arrangements with New Orleans PD to come out.  And they

17   brought two of their trainers.  They came in late May and

18   they met with our Academy staff.  They also met with a group

19   of selected officers, trained specially [sic] officers that

20   are going to train our personnel in this program.  And they

21   helped prepare them for that with a trainer trainer program

22   for the first day.

23             They then conducted an introductions seminar for

24   our management training on May 25th.  And this was

25   attended by 145 members of our supervisors, managers, and

1    command staff, both sworn and civilian.  This program goes

2    from top to bottom.  It was -- this also was featured on one

3    of local news stations.

4         So what we're going to be doing with this EPIC

5    program is we're going to be conducting this in-service

6    training for our personnel.  Rather than at the Academy,

7    we're going to do it offsite at the area commands, where the

8    officers work with each other, and at other sites throughout

9    the city throughout -- for the next several months.  We

10   believe this peer performance intervention program will

11   attain similar positive outcomes as achieved by the New

12   Orleans Police Department.

13        So this is a good example of our initial efforts

14   to change the culture of APD.  Thank you.

15        THE COURT:  Chief, thanks for attending that.

16   Judge Morgan, a friend of mine who is running the consent

17   decree in New Orleans, invited me as well, and I couldn't

18   go.  And I'm glad someone was there and I -- obviously, you

19   took it to heart.  You brought the program here and we're

20   already benefiting from it.

21        And that is about as big a cultural shift as you

22   can ask that, you know, officers report on each other,

23   counsel with each other in the field.  And I just wish you

24   good luck with the adoption of the program.  And it is

25   further evidence of your and the administration's interest

1    in being positive, hands-on, moving the process forward.  So

2    thank you for that.

3              CHEIF GEIER:  Thank you.

4              THE COURT:  And if we go any longer, my staff

5    will have my head because we have to start again in just a

6    few minutes.

7              Thank you-all for being here this morning.  We

8    tried to cobble this into an already full day, and so I'm

9    sorry for having to move everyone along.  Although, I'm

10   thinking, as a model, it might not be bad for the future,

11   because I can't tell you how many times -- well, you-all

12   heard, you know, "I'll just be brief, Judge," so people

13   actually listen when I say something.

14             So thank you-all.  Let's keep up the good work.

15   And next time, we're going to be talking about substance

16   again, Dr. Ginger.  And I'm encouraged.  I really am.  Thank

17   you-all for your time.

18             (The proceedings concluded at 12:04 P.M.)

19

20

21

22

23

24

25

```
 1                    UNITED STATES OF AMERICA

 2                    DISTRICT OF NEW MEXICO

 3

 4              CERTIFICATE OF OFFICIAL REPORTER

 5       I, Vanessa I. Alyce, RPR, NM CCR, and Federal Official

 6   Court Reporter in and for the United States District Court

 7   for the District of New Mexico, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code, that

 9   I did report in stenographic shorthand to the best of my

10   skill and ability the foregoing pages 1-141 of the

11   proceedings set forth herein, that the foregoing is a true

12   and correct transcript of the stenographically recorded

13   proceedings held in the above-entitled matter and that the

14   transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16

17   Dated this 20th day of June 2018.

18

19   S/Electronically Filed
     Vanessa I. Alyce, RPR, NM CCR #259
20   Federal Official Court Reporter
     100 N. Church Street
21   Las Cruces, NM 88001
     Phone: (575) 528-1430
22   Email:  Vanessa_Alyce@nmcourt.fed.us

23

24

25
```