**Monitor's Second "298 Report"**

**Prepared in Response to Paragraph 298 of the CASA**

**Outcomes Measures and Analysis of the
Albuquerque Police Department's
Implementation of the CASA**

**Submitted by:**

**James D. Ginger, Ph.D.
Independent Monitor**

**Submitted August 6, 2018**

**Table of Contents**

**1.0 Introduction**      **1**

**2.0 Status of CASA Implementation re Paragraph 298**      **3**

**3.0 Paragraph Compliance Assessments**      **5**

    **3.1 Use of Force Compliance Data and Monitor's Assessments**      **5**

    **3.2: Number of Violations Reported by APD Area Command and Year**      **16**

    **3.3: Number of Use of Force Administrative Investigations Supported by a Preponderance of the Evidence Standard**      **22**

    **3.4: Number of Officers who are Identified in the Early Intervention System**      **23**

    **3.5: Number of Use-of-Force Related Injuries**      **23**

    **3.6 Ratio of Use of Force to Arrests**      **24**

    **3.7 Number of Activations and Deployments of Specialized Tactical Units**      **26**

    **3.8: Crisis Intervention Measures**      **29**

    **3.9: CIT/COAST Operations**      **31**

    **3.10 Training Activities**      **32**

    **3.11 Overall Analysis of Academy Recruitment and Training Operations**      **33**

    **3.12 Officer Assistance and Support Measurements**      **36**

    **3.13 Supervision Measurements**      **37**

    **3.14 Civilian Complaints, Internal Investigations and Discipline**      **37**

**4.0 Summary and Conclusions**      **41**

**1.0 Introduction**

This report constitutes the second monitor's "298 Report," a report specifically required by Paragraph 298 of the CASA.  The operative requirements for "298 Reports" are outlined in Paragraph 298 as follows:

"298. In addition to compliance reviews and audits, the Monitor shall conduct qualitative and quantitative assessments to measure whether implementing this Agreement has resulted in the outcomes expressed in Paragraph 294. These outcome assessments shall include collecting and analyzing the following outcome data trends and patterns:

a) use of force measurements including:

    i.  number of uses of force overall and by force type, area command, type of arrest, and demographic category;

    ii.  number of force complaints overall, disposition of complaints, force type, area command, and demographic category;

    iii.  number of uses of force that violate policy overall and by force type, area command, type of arrest, and demographic category;

    iv.  number of use of force administrative investigations supported by a preponderance of the evidence;

    v.  number of officers who are identified in the Early Intervention System for which use of force is a factor, or have more than one instance of force found to violate policy;

    vi.  number of injuries to officers and members of the public overall and by type, area command, and demographic category; and

    vii.  ratio of use of force compared per arrest, force complaints, calls for service, and other factors that the parties deem appropriate;

b) Specialized Units:

    i.  number of activations and deployments of specialized tactical units; and

    ii.  number of uses of force used overall and by force type, area command, and  demographic category;

c) crisis intervention measures, including the information outlined in Paragraphs 129 and 137;

d) recruitment measurements, including number of highly qualified recruit candidates;

   i. detailed summary of recruitment activities, including development and leveraging community partnerships;

   ii. the number of recruit applicants who failed to advance through the selection process after having been identified as well qualified, grouped by the reason for the failure to advance (this provision does not apply to those who fail to pre-qualify through APD's online recruiting or other pre-screening system);

   iii. the number of well-qualified recruit applicants who were granted any exceptions to the hiring standards, grouped by exceptions granted, and the reasons exceptions were granted;

   iv. the number of well-qualified recruit applicants with fluency in languages other than English, grouped by the specific languages spoken;

   v. the number of well-qualified recruit applicants with previous law enforcement experience, grouped by former agencies and years of service; and

   vi. the number of well-qualified recruit applicants grouped by educational level achieved or years of military service;

e) force investigations indicating a policy, training, or tactical deficiency;

f) training data, including:

   i. number of officers trained pursuant to this Agreement, by the type of training provided; and

   ii. training deficiencies identified through use of force investigations, the Force Review Board, civilian complaints, internal complaints, the disciplinary process, and the Civilian Police Oversight Agency;

g) officer assistance and support measurements, including:

   i. availability and use of officer assistance and support services; and

   ii. officer reports or surveys of adequacy of officer assistance and support;

2

h)     supervision measurements, including initial identification of policy violations and performance problems by supervisors, and effective response by supervisors to identified problems; and

i)     civilian complaints, internal investigations, and discipline, including: the number of misconduct complaints, and whether any increase or decrease appears related to access to the complaint process;

i.     number of sustained, not sustained, exonerated, and unfounded misconduct complaints;

ii.    number of misconduct complaint allegations supported by a preponderance of the evidence;

iii.   number of officers who are subjects of repeated misconduct complaints, or have repeated instances of sustained misconduct complaints; and

iv.    number of criminal prosecutions of officers for on- or off-duty conduct."

## 2.0  Status of Implementation of Paragraph 298

This report, as with all monitor's reports, is designed to be directly responsive to the requirements articulated in the CASA.

Effective on the 14th of November, 2014, the U.S. District Court approved implementation of a Court Approved Settlement Agreement (CASA).  The CASA identified the United States of America, Department of Justice, Civil Rights Division, and the City of Albuquerque, with the Albuquerque Police Officers' Association as Parties.  This agreement established 344 distinct requirements of the Parties (the USDOJ, APD, APOA, and the City of Albuquerque) that were to be attained over the life of the CASA.  Among those 344 requirements was paragraph 298, which required, at pages 92-94, completion of an "outcome assessment" designed to use "quantitative and qualitative assessments to measure whether implementing this Agreement has resulted in the outcomes expressed in Paragraph 294" (CASA p. 88).  In effect, Paragraph 298 requires an overarching assessment of the effectiveness of the CASA in bringing about "reform" within the APD and related entities, as required by the CASA.

This report represents the monitor's second response to the requirements of Paragraph 298.  As with all official monitor's reports, this document is designed to be congruent with the individual requirements (expressed in the numbered paragraphs) of the CASA.  Like the monitor's reports themselves, the "298

report" is a mostly quantitative assessment of APD's performance on the specific requirements, accruing to the City and APD, of the CASA. The pages below depict the Monitor's assessment of APD's compliance efforts for 2014-2017. 2018 is not addressed because only partial-year data were available when this report was drafted.

Development of an integrated report for the second report was an exceptionally easier process than that encountered for our first report. APD submitted data that was responsive, well organized, accessible, and analyzable. APD has taken a wholly new approach to data management since the advent of a new administration in December, 2017, and provided the monitor with professional, well organized and documented data that we found to be accessible, useable, and accurate, based on our analyses and our previous knowledge (garnered from our periodic monitor's reports).

In the monitor's first "298 Report," we noted the issue of "Invisible Use of Force." That issue has been ameliorated somewhat during this reporting period by an APD committed to the collection, analysis, and reporting of uses of force by APD personnel. There is still work to be done in the ancillary processes of effective policy analysis regarding use of force, training related to use of force, supervising uses of force, and remediation of improper uses of force. The data related to use of force by APD officers, however, is dramatically improved at this point. This improvement should make the other remaining issues regarding use of force supervision and management much easier to manage. In cases such as this, we note that better reporting often leads to an increase in reported numbers.

## 3.0  Paragraph Compliance Assessments

The data reported below depict the measureable results of APD's compliance efforts for the years 2014 (pre CASA), 2015 (partial CASA implementation), 2016 (full-year CASA implementation), and 2017. We have not reported data here for the first few months of 2018, as it would create substantial issues of cross-year comparisons. Those data, however, are available in APD's newly developed systems.

## 3.1  Use of Force Compliance Data and Monitor's Assessments

This section of the 298 report reflects data related to Paragraph 298's use of force reporting requirements for APD. APD self-reported data and data collected and analyzed by the monitor are the focus of the data analyses that were part of the first 298 report (covering mostly 2015 and 2016). Data for 2014 serve as the best available "baseline" against which operational data are compared. This second report covers 2014 through December 31, 2017. Partial 2018 data, though available and tracked by APD, were not included, as they would have obfuscated clear analysis of full-year data for 2015-2017. Again, we posit that

4

the increase in reported uses of force may be attributable to more accurate reporting, not an increase in actual uses of force.

### 3.1.1    2014 APD Use of Force Data

In 2018, APD reported use of force data for four years in response to Paragraph 298's data requirements.  Data were provided for 2014, 2015, 2016, 2017, and part of 2018.  The CASA was effective November, 14, 2014, and became operational on June 2, 2015.  Data for 2016 represent the first full year of compliance activity for the agency.

[1] SEP.

Table 3.1.1-1, shown page six below, was constructed using APD supplied information regarding use of force modalities for 2014.  One should note that Table 3.1.1-1, below, is considered "baseline" data.  APD in 2014 set a "baseline" use of force measure of 756 separate incidents. More importantly, the top 23 use of force modalities, from among the 37 reported, were responsible for more than 95 percent of all uses of force, leaving only such force processes as "Spit Socks" (fabric devices place over suspect's head to prevent them from spitting on officers while they are under arrest) and "Headgear" (protective gear to prevent subjects from injuring themselves during transport and processing) and other more questionable tactics (such as "motor vehicle" and "flashlight") to fill in the final five percent of uses of force by APD officers.

The reader should note that the data reported in Table 3.1.1a were "self-reported" data based on records maintained prior to the advent of the CASA. The data in APD's old databases, as a result, are somewhat different in format and scope than the data that were eventually reported in direct response to the requirements of the CASA. The reader will note specific changes within the data tables presented for paragraph 298a-i over the years 2014 (pre CASA), 2015 (the first year of CASA implementation), 2016 and 2017 (the latest full-year reporting periods).  Use of force methods for 2014 are reported in full in the following pages, beginning with Table 3.1.1a.

Readers of the first 298 report will note that APD's *ad hoc* listing of "Self-Reported Use of Force Methods" for 2014, reported specifically by APD for the purposes of this reporting process, failed to include any reported firearms discharges at suspects for 2014.  We considered the previous 2014 data provided by APD on firearms discharges unreliable, as noted in our first 298 report.

In contradistinction, the current administration at APD included firearms discharges in its force reporting modalities.  This new reporting regimen included 15 firearms discharges by APD personnel in 2014, including nine specific firearms discharges at "OIS-subjects" and one discharge at or from a vehicle.

5

APD's current use of force data for 2014 show multiple reported modalities of APD's use of force continuum, ranging from the more severe (use of firearms, and use of vehicles to strike subjects) to relatively minor applications of "force," e.g., Taser sparking or application of handcuffs.  See Table 3.1.1a, on the following page.  The new administration at APD has shrunk force reporting components to a more manageable number, and clearly identifies OIS events at suspects, "from vehicles," and accidental discharges.  The current database is much more comprehensive and, in the monitor's opinion, reliable.  The new database also goes back through 2014, thus capturing more information regarding such critical incidents, allowing long-term comparisons.  The new data provided by APD (shown in blue) show a total of 385 uses of force by APD personnel in 2014, as opposed to the data previously provided by APD (under the old administration), which showed significantly fewer incidents of use of force.

Table 3.1.1a, below, depicts APD-provided data for 2014 as provided by APD in 2017.  Data depicted in blue are numbers provided by APD in 2018 for the same categories.  The original numbers originally provided were often wildly incorrect, in some cases under reporting by as much as 800 percent (Taser Drive-Stun use).

Readers of the first 298 report will recall numerous incidences in that report in which we questioned the veracity of APD's proffered data.  The analysis above, in Table 3.1.1a indicates that prior to 2018, APD routinely under-reported its use of force numbers, in some cases by a rate of 800 percent[1], based on the more accurate data provided by the new APD administration.

---

[1] See comparative data related to OC spray applications in the City's 2014 v. 2015 data related to OC Spray use.

## Table 3.1.1a:  Self-Reported Use of Force Methods, 2014

| Rank | Force Modality | No. of Uses<br><br>"Old" APD Data | No. of Uses<br><br>"New" APD Data | % Difference<br><br>"Old" v. "New" |
|---|---|---|---|---|
| 1 | Forcible Handcuffing | 184 | | |
| 2 | Empty Hand Tech | 72 | 85 | +18.1% |
| 3 | Other Restraints | 69 | | |
| 4 | Orders and/or Words | 54 | | |
| 5 | Takedowns | 40 | 125 | +212.5% |
| 6 | Arm/Leg | 38 | | |
| 7 | Taser (Projectile) | 35 | 54 | +54.3% |
| 8 | Taser-Air (Sparking) | 35 | | |
| 9 | Solo Takedown | 35 | | |
| 10 | Overcoming Resistance | 28 | | |
| 11 | Team Takedown | 28 | | |
| 12 | Hands or Feet Impact | 20 | 21 | +5.0% |
| 13 | Pursuit | 14 | | |
| 14 | K-9 Apprehension | 14 | | |
| 15 | Takedown | 9 | | |
| 16 | Impact Weapon | 7 | | |
| 17 | Taser (Drive-Stun) | 7 | | |
| 18 | OC Spray | 7 | | |
| 19 | Press Technique | 7 | | |
| 20 | 12 Gauge Bean Bag | 6 | | |
| 21 | PRS | 6 | | |
| 22 | Bean Bag | 5 | | |
| 23 | Impact Method | 5 | | |
| 24 | "Spit-Sock" | 4 | | |
| 25 | Chemical Agent | 3 | | |
| 26 | Head Gear | 3 | | |
| 27 | K-9 Warning | 2 | | |
| 28 | Leg Restraints | 2 | | |
| 44 | OC Spray | 1 | 9 | +800.0% |
| 29 | Display of a Weapon | 1 | | |
| 30 | Flashlight | 1 | | |
| 31 | Motor Vehicle | 1 | | |
| 32 | Directed Subject Against Wall | 1 | | |
| 33 | Non-Lethal | 1 | | |
| 34 | Verbal Commands | 1 | | |
| 35 | PT 7/7 | 1 | | |
| 36 | Arm Bar | 1 | | |
| 37 | Other | 8 | | |

### 3.1.2  2015 APD Use of Force Data

For 2015, APD's Use of Force data became much more clear and easier to understand and track. The reduction in total reported uses of force from 2014 to 2015 was 63.7 percent, a more than notable number[2]. A review of APD use of force data for 2015 shows a pattern in use of force tactics, with fully 20.5 percent of uses of force being "takedowns" of one form or another, and the next highest category being Taser use (at 17.5 percent). Those two categories, takedowns and empty hand control techniques, account for 33 percent of all uses of force reported by APD in 2015.

The highest single category reported for 2015 is "Takedowns." The top eight use of force categories comprise 93.1 per cent of all uses of force for 2015.  Data for these use of force modalities are reported in Table , page below. We note that APD went for the better part of 2015 without an approved (by the monitor and Parties) use of force policy.  Table 3.1.2a, on page 10, below depicts the results of our analysis of this CASA requirement.

**Table 3.1.2a:  APD Self-Reported Use of Force Methods, 2015**

| Rank | Force Modality | No. of Uses | % |
|---|---|---|---|
| 1 | Takedown | 118 | 27.1 |
| 2 | Empty Hand | 89 | 20.5% |
| 3 | Taser/ECW | 76 | 17.5% |
| 4 | Display Handgun/Rifle | 52 | 12.0% |
| 5 | Hands/Feet Impact | 19 | 4.4% |
| 6 | K-9 Apprehension | 18 | 4.1% |
| 7 | Canine | 18 | 4.1% |
| 8 | Impact Bean Bag | 15 | 3.4% |
| 9 | Firearm (OIS) | 14 | 3.2% |
| 10 | OC Spray | 9 | 2.1% |
| 11 | Other | 7 | 1.6% |
| | **Total** | **435** | 100% |

In 2015, the four top categories of use of force were non-impact modalities, e.g., takedowns, empty hand control techniques, Taser usage, and display of a weapon, and accounted for more than 70 percent of all uses of force.

---

[2] The reader is reminded that, in 2015, APD revised its reporting modalities regarding use of force, dropping many of the more rare force event types and consolidating its reporting tables, moving from as many as 45 force types to the more manageable 13 force types, reflecting CASA requirements.  We consider these categories effective in tracking CASA-related requirements.

### 3.1.3 2016 APD Use of Force Data

APD's reported data for 2016 show similar category results, with empty hand techniques, Takedowns and "Taser" lead the list substantially  (See Table 3.1.3a, below).  Also, for 2016, use of force overall appears to be significantly higher than in 2014 or 2015, with a total of 867 recorded incidents reported for 2016. While to some this might seem alarming, in the monitor's opinion it is simply the CASA at work.  In the monitor's opinion, by 2016 all APD officers and supervisors had been trained in use of force reporting, and reporting became more "accurate" in terms what constitutes use of force and what has to be reported as such. Overall numbers of uses of force jumped to 867 for 2016, up from 435 in 2015. These numbers continue the pattern seen for 2014 and 2015, with Empty Hand Control Techniques and Takedowns constituting the most frequent use of force actions reported by APD (591 of 867 force events, a total of 68.2 percent0.

#### Table 3.1.3a:  APD 2016 Use of Force Methods

| Rank | Force Modality | No. of Uses | % of Total |
|:---:|:---|:---:|:---:|
| 1 | Empty Hand Techniques | 340 | 39.2 |
| 2 | Takedowns (Team/Solo) | 251 | 15.1 |
| 3 | Other | 125 | 14.4 |
| 4 | ECW | 61 | 7.0 |
| 5 | Hand-Foot Impact | 42 | 4.8 |
| 6 | K-9 Apprehension w/ Bite | 10 | 1.2 |
| 7 | OC Spray | 9 | 1.0 |
| 8 | Firearm (OIS) | 8[3] | <1 |
| 9 | 40 mm Impact | 6 | <1 |
| 10 | ECW Painting | 5 | <1 |
| 11 | Bean Bag Impact | 4 | <1 |
| Total | | 867 | 100% |

We do not view the obvious jump in numbers as alarming; the increased numbers may well be due to the fact that APD is moving into implementation processes required by the CASA related to officer-reporting of use of force. Based on our experience, this appears to have substantially increased the *percentage* of *reported* uses of force, while the underlying numbers, we hypothesize, have remained relatively constant. The numbers reported, more likely than not, reflect APD's reporting of more (if not most) of the actual uses of force that APD experienced in 2016.  Force modalities 1 through 6, "Empty Hand Techniques" through "Canine Apprehension with Bite" account for more than 81 per cent of APD's uses of force for 2016.  Also in 2016, APD implemented a new force investigation instrumentality, with the creation of the "Critical Incident

---

[3] Again, we are unsure of the validity of this number, as the monitoring team cannot account for all eight reported OIS events articulated here.

Review Team (CIRT).  Frequent readers of the monitor's reports will note that we have been highly critical of the CIRT processes and outcomes over the last thirty months.  We continue to see the quality, timeliness, and outcomes of CIRT investigations as strongly problematic.  We have no doubt that CIRT actually has disrupted any reasonable hope of clearly understanding the trajectory of force-related findings and process analyses.

We understand that the CIRT unit has been disbanded, and see that as a positive step.  Readers of the monitor's periodic reports are familiar with the myriad of problems and issues created by CIRT over the past two years, but we review them here for the sake of clarity and problem identification.  Issues noted by the monitoring team over the past two years relating to CIRT investigations, as of the date of this report, include:

> 1.  Lack of specific "findings" as a result of CIRT investigations (CIRT classifies the investigation as "closed," rather than noting an outcome such  as "unfounded" or a violation of a specific policy or order;

> 2.  The use of outcome findings such as "active" or "closed" going back to 2016;

> 3.  Lack of case tracking and oversight (with some cases "aging" well past the 30-month mark without disposition;

> 4.  Apparent lack of specific guidelines regarding when and why a specific cases are referred to CIRT;

> 5.  CIRT's tendency to track and reports dispositions only for "reasonable" use of force—all other dispositions are "closed," which blinds the user to outcome dispositions for unreasonable uses of force;

> 6.  CIRT's then-current caseload contained "active" case investigation statuses from as early as January, 2016—nearly 30 months old and still pending;

> 7.  Apparent lack of specific policy guidance regarding what constitutes a CIRT case, and what is not a CIRT case, i.e., CIRT seems to investigate a wide range of force events, and these case types appear to have been inconsistent over the years;

> 8.  Reporting of only "favorable" dispositions, such as "UOF Reasonable," or "In Policy," with non-favorable dispositions apparently covered by the palliative "Closed;" and

> 9.  CIRT processes are, we believe, directly responsible for the drop in total case counts for case initiations reported by APD in its IA processes in

2016 and 2017, leading to a false perception that uses of force have declined (see Fig. 2, p. 13).

Given the paucity of detail in CIRT's written product, we were unable to clearly identify the number of cases they have handled or specific categories of "outcomes" for CIRT-investigated incidents. Based on the monitor's training, knowledge and experience, the CIRT process, as implemented in 2015 through 2017 was designed (intentionally or inadvertently) to confuse, complicate, delay, and yield ineffective APD's response to some serious applications of force that were "out of policy." Further, CIRT processes, and cases assigned to CIRT appear to have been directly responsible for fewer force cases being "counted" in APD's IA data tables. Given past experiences with CIRT, we note that it is incumbent on APD to install adequate process, flow, and quality control functions to monitor, assess, and report on the new Internal Affairs Force and Misconduct units to ensure that another bottleneck, similar to those the CIRT unit created, is avoided.

### 3.1.4 APD Use of Force Data for 2017

For the year 2017, we again note a significant reduction in general use of force data totals. These data are depicted in "Table 4, below. Total "general" uses of force in 2017 show a marked decline, from 867 uses of force identified by APD in 2016, to "only" 631 in 2017. As we note above, it is clear that these reductions are not "real" reductions but are the result of implementation by the former administration of APD of a CIRT process that siphoned off critical uses of force from the "normal" use-of-force investigation processes, and moved the "counts" of uses of force from IA to CIRT. Nonetheless, the numbers for APD uses of force are reported below.

Again, using these numbers, it is clear that the majority of uses of force by APD are mostly "hands on" procedures, i.e., empty hand techniques, physical takedowns, etc. We are also concerned that nearly 15 percent of use of force cases are categorized as "tools," the third largest category. We do note, however, that APD's new use of force reporting modalities, recently implemented, are more specific, and expect more clarity in the agency's data in the coming months.

Other data specified by the CASA for paragraph 298 included uses of force by area command.

**Table 3.1.4a:  Reported APD Uses of Force, 2017**

| Rank | Force Modality | No. of Uses | % of Total |
|------|----------------|-------------|------------|
| 1 | Empty Hand Techniques | 175 | 27.7 |
| 2 | Takedowns (Team/Solo) | 140 | 22.2 |
| 3 | Other | 124 | 19.7 |
| 4 | ECW Painting | 50 | 7.9 |
| 5 | Display Firearm | 48 | 7.6 |
| 6 | ECW | 39 | 6.2 |
| 7 | Hands/Feet Impact | 31 | 4.9 |
| 8 | Firearm (OIS) | 7 | 1.1 |
| 9 | Canine | 6 | 1.0 |
| 10 | 40 mm Impact/Bean Bag | 6 | 1.0 |
| 11 | OC Spray | 5 | 0.8 |
| Total | | 631 | 100.0 |

**Table 3.1.4b:  Use of force by Area Command (2014-2017)**

| Area Cmnd | 2014 | 2015 | 2016 | 2017 |
|-----------|------|------|------|------|
| Foothills | 69 | 66 | 111 | 42 |
| NE | 78 | 91 | 243 | 145 |
| NW | 32 | 41 | 109 | 61 |
| SE | 103 | 139 | 428 | 216 |
| SW | 34 | 50 | 108 | 42 |
| Valley | 58 | 74 | 219 | 128 |
| Total | 374 | 461 | 1,218 | 634 |
| % +/- Yr to Yr | | 23.3% | 164.2% | -47.9% |

12

### 3.1.5  Use of Force Incidents Reported by APD 2014-2017

Based on the data provided by APD, use of force statistics show an expected progression over the last four years, 2014-2017.  The numbers of recorded uses of force spiked in 2016, year two of the reform project, as APD improved its record keeping and reporting processes.  The data depicted in Table 3.1.4b, above, show a significant jump in use of force events in the third year of the reform project, once APD improved its data collection and reporting processes.  Based on our knowledge and experience in police reform cases, this is normal, as new reporting protocols and quality control processes begin to affect reporting rates.  The 23 percent increase from 2014 to 2015 was intuitively expected, as new policy, training, supervisory, and management processes began to take effect.  The 164 percent increase in year three was also expected intuitively (as new systems were routinized and supervised more closely.  The 47 percent decrease shows the effects of the new policy, training, supervisory and managerial changes taking place at APD.

The next measureable requirement of APD's and the City's compliance efforts is 298a-ii, which requires reporting of "number of force complaints overall, disposition of complaints, force type, area command, and demographic category."  We noted in our first "298 Report" that APD's reporting modalities for paragraph 298a-ii report the data required; however, there are no summative tables designed to report totals as required by 298a-ii.  For example, we noted in our first monitoring report: "while APD's 298a-ii data identify which area command and specific unit was responsible for each use of force violation, there is no ranked, "command-specific" summative information that informs the reader of the rank order of Commands' responsibilities for uses of force."  This deficiency made interpretation of the data much more difficult, and turns it into a user-task, not a reporting task completed by the APD's information system's reporting formats.

The new data provided by APD regarding this 298 requirement were also unable to identify "outcome" statuses for many use of force complaints filed by citizens in 2017.  Outcome variables were often simply noted "null," as the Compliance Bureau personnel who compiled the data for this requirement, pursuant to the monitor's request, were unable to penetrate the previous system's data management processes in a manner sufficient to divine the true nature of use of force review processes and outcomes for 2017 data.  We note our discussion of CIRT process failures (see pp. 11-12 above).  The current Compliance Bureau staff expended considerable effort to report meaningful data for this paragraph, but was unable to penetrate the old APD's (CIRT's) arcane and recondite record keeping and data reporting processes.

As the reader is aware, a new administration came "on-board" at APD in December, 2017.  This new administration has already begun improving APD's force-management information systems and processes.  While in the past, users

13

of APD's "force management" system documents (supposedly APD command and executive staff) were faced with the task of identifying the salient facts relating to uses of force by Area Command, shift, and other important variables. More importantly, however, APD's reporting modalities for 2014, 2015, and 2016 appear to change from year to year, making consistent comparisons virtually impossible. The current administration has revised those problematic processes, and created a data management system for use of force reporting that allows trend identification and trend tracking.

**Table 3.1.5a:  Sustained Violations of Use of Force Policies by Year**

| Year | Sustained Violations |
|------|----------------------|
| 2014 | 30  |
| 2015 | 19  |
| 2016 | 219 |
| 2017 | 162 |

**Figure 3.1.5a:  Incidents of Use of Force Policy Violations Noted by APD (2014-2017)**



Data for this Paragraph of the CASA illustrate the difference a committed command presence can have.  For 2014, a pre-CASA year, APD reported only 30 force-related policy violations.  That number actually dropped in 2015, to 19 force-related policy violations.  The CASA became effective in June of 2015, and the following year, APD reported 220 force-related policy violations (after new

force policy and training programs were implemented).  It is clear from these data that the CASA has had an effect:  substantially more uses of force are being reported, catalogued, and investigated after the CASA and related policy changes than before.  We note that in 2014 and 2015 APD seemed to use fairly contorted language not to "sustain" some cases.  For example in 2014 (pre-CASA) and 2015 (Year one of the CASA), APD used clear language about only one sustained case, actually declaring it "sustained."  For 2014, APD wrote 30 "additional concerns" memoranda (ACM), without actually sustaining the original or collateral allegations.  For 2015 the first partial year of implementation of the CASA, that number dropped to 19.  For 2016, the first full year of CASA implementation, 219 allegations were completed with an ACM, while only one was "sustained."  In 2017, 32 policy violations were either "ACM-closed," or "closed," while 130 were sustained.

We seriously doubt the ability of the previous (pre December 2016) use of force reporting mechanisms (the extant automated database) to serve as a learning and management tool unless:

1.  Serious effort is devoted to train supervisory personnel regarding modalities of  ensuring significant information is properly entered into the system;

2.  Supervisory, management, and executive personnel are properly trained to use the system on a daily basis;

3.  APD develops an internal "tracking" oversight system to ensure that all critical incidents, as defined by the agency and required by the CASA, are properly noted, catalogued, and assessed, and appropriate individual, unit,  and/or department-wide "lessons learned" are used to "manage" errors out of APD's operational systems.  We do note that the "new" APD has eliminated the Critical Incident Review Team, and consider that a strong step forward.  We are concerned however that substantial elements of the leadership of the old CIRT team continue to have a management role in the newly organized IA process; and

4.  Strong and effective internal audit processes are established to ensure that IA cases related to CASA requirements are moved effectively through the new system.  These audit processes should carefully review case management processes to ensure that established case quality elements are met and that established timelines are adhered to.

APD's "new approach" to the use of force database is now suitable for making long-term assessments of compliance with the CASA.  What remains to be done is to ensure that trends, patterns, and problem areas are continually analyzed, identified and noted issues are resolved.

### 3.2. Violations Reported by APD by Command and Year (2014-2017)

A review of data tables for this 298 requirement indicates another problem with APD's databases.  As we note elsewhere, reporting raw data without considering such external factors as number of calls for service per individual "work unit," e.g., Patrol area commands, Special Services, Investigations, and "unknown," make it difficult for APD to recognize and identify "outliers."  For example, an analysis of the raw data indicates that APD's SE Area Command is responsible for fully 50 percent of reported uses of force in some years, exceeding other individual area commands by at least 600 percent.  Without foundational information presented in the form of ratios, for example: uses of force per 1,000 calls for service, these numbers quickly become misleading.  Southeast Area Command's use of force events constitute a total of half of all reported uses of force included in 298a-iii's reporting requirements for 2016 and 2017.  We noted in our first 298 report: "Without analyses reported by workload factors, e.g. calls for service per work unit, arrests per work unit, etc., APD is "flying blind" when it comes to assessing and controlling uses of force.  A portion of this difference among area commands is obviously explicable by the number and nature of calls for service, violent crime rates, and other issues.  Without reporting these geographic differences, APD risks overlooking important trends and issues."  Again, we recommend that APD build database systems supporting data that allow "outcomes" to be reported at a minimum as ratios, e.g., uses of force per 100 arrests, etc.

Given the issues articulated above, we are unable to present clear statistical data to assess departmental responses to violations of policy.  APD is currently planning changes to these reporting databases to allow more meaningful data reporting and review.

Raw data seldom tell the whole story, in the monitor's experience, and it is critical that these data be meaningful when they are published. Tables and figures for these data are exceptionally difficult to construct, given the reporting modalities of APD over the years involved (2014-2016).  Reporting processes have been revised in late 2017, and appear to be more suited to clear data reporting.

Further, even after the Compliance Bureau "cleaned" APD's old records and put them into a readable and understandable format (with accuracy and completeness decidedly better than the old system), the new databases continued to be fraught with data "outliers" that cannot reasonably be brought into any real utility through use of affordable and executable *ad hoc* processes.  For example, cases processed during 2014-2017 continue to have multiple "null" values, even after APD's work in 2018 to bring the data into some semblance of order.

A tally of the number of "null" values reported in the data for this 298 report indicate that the database relating to internal investigations of improper procedure, behavior, or process at APD show a total of 992 "null" values, which mean that even after APD's 2018 "cleaning" of data, substantial numbers of data points are simply "not available" through reasonable efforts to produce them.  For example, even after APD's 2018 work to produce a meaningful set of data on internal disciplinary processes, APD found 992 data entries that were labeled "NULL", meaning that good data for the process in question were not retrievable from the old system for the year 2014 alone.

The entire database for that analysis contained only 12,168 data points, an error rate of 8.2 percent.  Moreover, the majority of "NULL" findings were returned in the most critical elements of the database, e.g., "Finding," "Action," "Finding 2," "Finding 3," and Finding 4."  Thus, the "null returns" were located in the most important segments of the database covering 3,744 data elements.  The null data points were reported most frequently for "Action [Taken]."  Given the state of the (older) APD data there is no way meaningful tables or figures that can be developed for the information contained in the databases that are inclusive of the first year of the project.

In the monitor's opinion, APD has reached the point of diminishing returns in further efforts to "find" data that, more likely than not, had not been correctly collected in the first place.  We strongly suggest that APD focus on clean data going forward, rather than devoting substantial resources to a process that, in the monitor's opinion, would result in negligible return.

To illustrate the futility of attempting meaningful data-analytic processes using older APD data, we have constructed the figure below, which depicts data showing policy violations noted by CPOA and APD systems.  Further, the types of errors or missing data tended, in the past, to be some of the most critical information, including but not limited to:

- Findings
- Action taken;
- Allegation;
- Nature of the complaint; and
- Responsible Officers Names.
-

**Figure 3.2.1a:  Comparison of Data Accuracy of APD's "Old" v. "New" Systems[4]**

**(Use of Force Reporting)**



Further, even the 2014 cases, which at the time the data were collected for this report, still showed an unusually high number of "open" statuses, indicating a lack of action or a failure to update the database as cases were cleared.  The reader is reminded that this appears true even though APD recently spent several months working with a highly skilled outside contractor to bolster the accuracy and reliability of their internal processes databases.

We remind the reader that, some database failures are simply not remediable, despite the talent and time spent by a very competent outside contractor. It is critical, however, that the weaknesses, inconsistencies, and missing data issues be rectified moving forward, or the "298 reporting process" on this section will become moot.

### 3.2.1.1  Use of Force by Area Command (2014-2016)

Figure 3.2.1a, below, depicts uses of force by area command, using data from newly developed systems at APD.    These data show what is more likely than not an increase in *reporting* of use of force events from 2014 through 2016, followed by a decrease in reported uses of force in 2017.  Again, we view these data as intuitively correct, i.e., we see major increases in reported uses of force in 2015 and 2016, reflective of improved data reporting by APD.  These are followed by a substantial decrease in 2017 (compared to 2016) as new training, policy, supervision and command oversight processes took hold at APD.

---

[4] Reliable data were not attainable from 2014, and not all data were available for 2017.

**Table 3.2.1.1a  Use of Force by Area Command (2014-2017)**

| UoF by AC | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Foothills | 69 | 66 | 111 | 42 |
| NE | 78 | 91 | 243 | 145 |
| NW | 32 | 41 | 109 | 61 |
| SE | 103 | 139 | 428 | 216 |
| SW | 34 | 50 | 108 | 42 |
| Valley | 58 | 74 | 219 | 128 |
|  | 374 | 461 | 1,218 | 634 |
| % +/- Yr to Yr |  | +23.3% | +164.2% | -48.0% |

### 3.2.2:  Uses of Force Violating APD Policy (2014-2017)

The next measureable requirement of APD and the City's compliance efforts in 298a-iii, requires reporting of the numbers of uses of force that violate APD policy, by type of force, area command, type of arrest, and demographic category.  APD reporting protocols report these data for the years 2014, 2015, and 2016, and 2017.  Data reported were included in APD's "Paragraph 293A3-A5 UOF Report" for 2014, 2015, 2016 and 2017.  Paragraph 298a.iii requires reporting (and an implied analysis) of "number of uses of force that violate policy overall and by force type, area command, type of arrest and demographic category (CASA p. 88-89, 298 a-iii).  In its "report" for 2014, APD identifies one incident that indicated a "Policy Violation."  Again, 2014 was prior to implementation of the CASA, and in some ways serves as a baseline. Classification and reporting differences, however, often make direct year-to-year comparisons difficult if not impossible. That event involved a use of five separate force mechanisms, including use of: empty hand control technique, handcuffs, hand or foot impact, orders/words, and "overcame resistance."  *No Area Command information was included for the 2014 event.*  APD's report for 2014 identified the number of policy violations (1), the number of types of force used (5), gender of officer and citizen, type of arrest, and demographic status of the subject and the officer, as well as other data not required by paragraph 298a.

For 2015, the same data are reported in APD's "Uses of Force in Violation of APD Policy" report.  For 2017, the same data types are reported as were reported in 2014 through 2016.  We note, not surprisingly, that 2016 showed a substantial increase in uses of force reported, from 2 in 2015 to 13 in 2016 and five in 2017 (see 3.2.2a., below).  For clarity, we have reproduced the appropriate table on the following page.  This fits with the monitor's experience in other agencies that introduce improved policies and training regarding use of

force.  In the monitor's experience this represents not so much an increase in uses of force, *but an increase in review, assessment and reporting rates*. Parenthetically, the report contains virtually no information that would allow APD to identify the nature of policy violations.  This would seem to be critical for training, supervision, command review, and general oversight functions.  We recommend a change to the reporting modes to capture these data.

Data reported in

### Table 3.2.2a:  APD Self-Reported Use of Force Methods, 2015-2017

| Rank | Force Modality | No. of Uses | % |
|------|----------------|-------------|-----|
| 1 | Empty Hand | 689 | 31.1 % |
| 2 | Takedown | 634 | 28.6 % |
| 3 | Other | 256 | 11.6% |
| 4 | Taser/ECW | 230 | 10.4% |
| 5 | Hands/Feet Impact | 113 | 5.1% |
| 6 | Display Firearm | 100 | 4.5% |
| 7 | Firearm (OIS) | 77 | 3.5% |
| 8 | Canine | 52 | 2.3% |
| 9 | OC Spray | 32 | 1.4% |
| 10 | 40 mm Impact | 31 | 1.4% |
|  | **Total** | 2,214 | 100% |
|  |  |  |  |

### Table 3.2.2b:  Use of Force by Demographic Category 2014-2017

| Year | Hispanic | White | Black | Native-Amer |
|------|----------|-------|-------|-------------|
| 2014 | 176 | 285 | 24 | 52 |
| 2015 | 233 | 381 | 55 | 25 |
| 2016 | 639 | 899 | 124 | 164 |
| 2017 | 553 | 757 | 97 | 123 |

Figure 3.2.2a  Arrest Demographics, 2014-2017



### 3.3:  Number of Use of Force Administrative Investigations Supported by a Preponderance of the Evidence Standard

This CASA paragraph requires reporting regarding the "number of use of force administrative investigations supported by a preponderance of the evidence" (CASA Paragraph 298(a)(iv)). The data provided identify the number of cases sustained by APD for 2014, 2015, and 2016.  While the data provided are technically appropriate, we note that, to date, APD has not met this requirement in terms of the quality of its internal investigations (see Section 3.2.1, above). For example, we noted in IMR-6, the most recent monitor's report available, that APD's internal investigations often fail to meet a preponderance of the evidence standard, with only 12 of 16 investigations reviewed by the monitoring team adhering to the "preponderance of the evidence standard." This constitutes 75 percent compliance rate, far short of the required 95 percent for compliance.  At this stage of the reform process, the fact that APD classifies a given IA investigation as "sustained" is not a sign that the preponderance of the evidence standard was used.  APD "sustained" eleven cases in 2014, three in 2015, and five in 2016.

### 3.3.1  Reporting related to Number of Force Investigations Indicating a Need for Policy, Training or Tactical Deficiencies

Data were provided by APD from its automated tracking systems addressing Force Review Board (FRB) cases resolved for 2016.  No data were reported by APD for 2014 or 2015, as FRB was not functional in those years (prior to, and immediately after implementation of the CASA).  Readers of current monitor's reports (through IMR-6) will note highly critical issues with the FRB, the majority

of which related to clearly calling out-of-policy actions on the part of APD officers and recommending organizational responses to these out-of-policy actions, e.g., retraining, transfer, additional supervision, or disciplinary actions. In effect, the FRB, as it was configured in the past, has ceased to function as an effective control point for noting and recommending fixes to problematic issues with policy, training, supervision, equipment and tactics. We note that FRB has made specific recommendations in the past, but follow-up has been severely lacking. Given the manifold issues with FRB, the current administration has suspended its operation until a thorough analysis and reconfiguration is effected.

We noted these same deficiencies in the first 298 report, and, for the most part they remained unresolved, as of late 2017. As a result of these deficiencies, and the "cascade" effect they create, APD suspended the FRB processes in 2017. No new system of strategic-level oversight of the APD's uses of force has been implemented as of development of this report. We see this as a critical issue that must be addressed by the new administration.

### 3.4:  Number of Officers who are Identified in the Early Intervention System

This paragraph requires APD to identify the number of officers identified by the Early Intervention System (EIS) for incidents in which use of force is a factor, or have more than one instance of force found to violate policy. APD's EIS is still under development, and no valid data were produced from that system for the monitor's use in this report.

### 3.5:  Number of Use-of-Force Related Injuries to Officers and Members of the Public

APD reported data responsive to this subsection of Paragraph 298 in their standard Force Reporting system. In 2014, the baseline year, APD's systems reported 28 incidents in which citizens were injured. The most frequent 2014 injury class was "abrasion," accounting for 69 percent of all citizen arrestees. The most frequent 2015 injury class was also "abrasion," with 93 of 202 injuries, or 46 percent. For 2016 "abrasion" was again the top reported injury, at 38 percent. "Gunshot" was reported twice as an injury class in 2015, and five times in 2016. Citizen injuries were reported most frequently in the Southeast Area Command, with 54 reported injuries in 2015, followed in 2016 with the Southeast Area Command reporting 77 citizen injuries. The Southeast Area Command again ranked first in citizen injuries in 2015, with 34 percent of APD's citizen injuries reported in that command. In 2016 Southeast Area Command also ranked first in citizen injuries, with 30 percent of APD's citizen injuries for the year.

Table 3.5.1a, below, reports these data in tabular form for 2014 through 2016, inclusive. Data for 2017 were not available to the monitoring team at the time of publication of this report.

These data indicate a substantial increase in the number of reported incidents with citizen injuries from 2014 through 2016 (from 28 in 2014 to 255 in 2016, an increase of 187 injuries.  We do not know if this is an artifact of better reporting of citizen injuries or an artifact of different types of uses of force from 2014 to 2016. We do note that it *may be* an issue of more careful reporting on officers' part, based on upgraded APD training on use of force.  We suggest this is an item APD may want to visit independently of paragraph 298 data. Regardless, the monitoring team considers this the first valid assessment of use of force rates available to the team since the inception of the monitoring process.

**Table 3.5.1a:  Use of Force Related Injuries to Citizens**

| Year | No. of Incidents w/ Citizen Injuries | No. of Officers Involved |
|------|------|------|
| 2014 | 28 | 46 |
| 2015 | 157 | 217 |
| 2016 | 255 | 385 |
| 2017 | 1,257 | NA[5] |

### 3.6:  Ratio of Use of Force to Arrests

Subsection 298a-vii requires APD to report ratios of uses of force by arrest, force complaints, calls for service, and other factors deemed appropriate.  APD's routine reports depict uses of force by arrest, by number of police "dispatches," and by "all" APD Computer Assisted Dispatch records.  Obviously, some of these numbers are more meaningful than others. The monitoring team deems uses of force per arrest to be the most meaningful, as CAD-based analyses would count the number of uses of force per burglary report, theft report, etc.  Here we report only the "per arrest" and "per dispatches with BOLOs" (Be On the Look Out).

In 2014, on average, based on APD self-reporting, APD used force 1.2 times per arrest.  Assuming that all arrestees are handcuffed, a valid assumption based on our observations, that constitutes 0.2 times per arrest that a modality of force other than handcuffing is used.  We do note that there is a palpable difference between "handcuffing" and "forcible handcuffing[6]."  This may be the cause of the

---

[5] APD's most recent analysis of injury data has identified "potentially misleading" characteristics of data on officer injuries.  The Compliance Bureau is working to develop more reliable measures of officer injuries related to use of force.

[6] The reader is reminded that there are two different kinds of "handcuffing:" normal handcuffing and "forcible" handcuffing.  We report here only the latter, as the former is not considered a use of force by the monitoring team.

variance in numbers.  We will verify (and correct) these baseline numbers in time for inclusion in the third 298 report in August of 2019.  In the interim, we will work closely with APD to ensure accuracy and clarity in this reporting requirement. Also for 2014 citizens' complaints filed with APD related to use of force (those actually captured by the system) were low, with only seven complaints in a reported (by APD) 162 arrests made in which APD used force other than "handcuffing".

However, in 2015, the first year of the CASA, the data show APD reporting only 1.32 uses of force per arrest (.32 times per arrest, after "handcuffing" is removed from the equation).  APD reports four citizens' complaints from 143 arrestees. Use of force rates for 2015 were reported at 1.32 uses of force per arrestee, slightly higher than the 2014 rates.

In 2016, APD reported an average use of force rate of 1.16 uses of force per arrest, only 0.16 uses per arrest after "non-forcible handcuffing" is excluded. Strangely enough, however, the number of complaints went up markedly, from four in 2015 to 26 in 2016.  This may have been attributable to increased media coverage related to the CASA and APD reporting modalities, or to better record keeping by APD.  The number of forcibly arrested citizens rose markedly in 2016, as well, with the number of arrests, jumping from 143 in 2015 to 469 in 2016. These numbers tended to remain relatively steady through the end of 2017. Based on our knowledge and experience, we suggest that this was simply an improvement in reporting rates, which we consider a meaningful improvement, and a positive outcome.

In 2017, APD reported 631 uses of force, ranging from minimally intrusive (empty hand control techniques, to the use of deadly force.  These represent a drop from 2016, when a record-high (for the 2014-2017 timeframe) 867 uses of force were reported.  These numbers make intuitive sense, as 2014 the 756 uses of force were reported prior to implementation of the CASA and reflected actions under the "old APD" systems and processes.  Numbers of 2015 uses of force (435 uses of force) were reported during the first year of implementation of the CASA (before oversight systems were functional).  2016 data (867)reflected the first year of operations by APD under the new force-reporting requirements (before training and supervisory systems required by the CASA had taken full effect), and numbers for 2017 (631) reflect the first full year of "effective" change in compliance with the CASA.

### 3.7:  Number of Activations and Deployments of Specialized Tactical Units

298b-i requires APD to report the number of deployments of specialized tactical units.  Data were available for 2015 through 2017 only, as the CASA was not signed and implemented until after the close of the 2014 reporting year.  Data for specialized tactical unit deployments for 2015 through 2017 are reported below

APD self-reported data regarding Special Operations unit deployments (Canine,

Bomb, and SWAT deployments) show an average of 3.7 canine events per month, with figures peaking in June and slowing markedly in December of 2015. Data from APD for 2015-2017 deployments are depicted in the table below.  By June of 2015, the monitoring team was on-site and reviewing deployment and tactical data for canine deployments.  We noted that canine usage appeared to be well supervised, and had some of the best supervisory processes we observed within APD's operational ranks.  That performance continued throughout the year, based on our observations.  The monitor did note, however, specific issues of analyzing bite ratios for APD canine deployments.  Those issues were brought to APD's attention, and have since been resolved.  Canine deployments are depicted graphically, below.  No data were available for 2014.



2014-2017 Bomb Deployments

For calendar year 2014-2017, APD self-reported data regarding specialized unit deployments (Canine, Bomb, and SWAT deployments).   Data for Bomb Squad deployments are presented below, and show an average of 5.5 Bomb Squad deployments per month, with figures peaking in 2014.  Data from APD for 2014-2017 deployments are depicted in the table on the following page.  By June of 2015, the monitoring team was on-site and reviewing deployment and tactical data for Bomb deployments.  We note that Bomb deployments appeared to be well supervised, and also had some of the best supervisory processes we observed within APD's operational ranks. That performance continued throughout the year, based on our observations. Data for 2014-2017 Bomb Squad deployments are depicted Table 3.7b and Figure 3.7b, below.

**Table 3.7b:  Bomb Squad Deployments 2014-2017**

| <u>Type</u> | <u>Year</u> | <u>Number</u> | No. per Month |
|---|---|---|---|
| **Bomb** | **2014** | **87** | **7.25** |
| **Bomb** | **2015** | **63** | **5.25** |
| **Bomb** | **2016** | **53** | **4.42** |
| **Bomb** | **2017** | **60** | **5** |
| | | | **Avg.=5.5** |

These data are depicted graphically in Figure 3.7b, below.



2014-2017 SWAT Deployments

For calendar years 2014-2017, APD self-reported data regarding SWAT deployments show an average of 3.5 deployments per month, for an average deployment rate of 42 deployments per year for 2014-2016.  2017 deployments increased significantly, nearly doubling for the year.  SWAT deployments peaked in March of that year.  Data from APD for 2014-2017 deployments are depicted in the table below.  During 2015, the monitoring team was on-site and reviewing deployment and tactical data for SWAT deployments.  The monitoring team noted that SWAT practices appeared to be well supervised, and again had some of the best supervisory processes we observed within APD's operational ranks. That performance continued throughout the study period, based on our observations.  Table 3.7c, below, and Figure 3.7c on the following page depict APD SWAT deployments for 2014-2017.

**Table 3.7c:  SWAT Deployments per Year**

| Year | Deployments |
|------|-------------|
| 2014 | 45 |
| 2015 | 47 |
| 2016 | 43 |
| 2017 | 78 |



We note the significant deployment increase for SWAT in 2017, and are unaware of any policy, training, reporting or other issues that may explain it.  We will continue to monitor trends for these deployments to determine if this is an "outlier," or the potential beginning of a trend.  Further, we recommend APD review 2017 deployments to determine if there is an identifiable cause for the 81 percent increase in SWAT deployments in 2017 over 2016. The reader should note that all SWAT deployments reported for 2014 through 2017 resulted in some form of use of force.

### 3.8:  Crisis Intervention Measures

Paragraph 298c requires APD to report accurately crisis intervention measures responsive to CASA paragraphs 129 and 137.  Paragraph 129 requires:

APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall

collect the following data:

. a)  date, shift, and area command of the incident;

. b)  subject's age, race/ethnicity, and gender;

. c)  whether the subject was armed and the type of weapon;

. d)  whether the subject claims to be a U.S. military veteran;

. e)  name and badge number of crisis intervention certified responder or CIU detective on the scene;

. f)  whether a supervisor responded to the scene;

. g)  techniques or equipment used;

. h)  any injuries to officers, subjects, or others;

. i)  disposition of the encounter (e.g., arrest, citation, referral); and

. j)  a brief narrative of the event (if not included in any other document).

### 3.8.1  2014 Data Assessment

APD provided no comprehensive data for CIT responses for 2014, as the process was not fully fielded at that time.

### 3.8.2:  2015-2017 Data Assessment

Data collected by APD's reporting system for Paragraph 298c for this iteration of 298 reporting are immeasurably better than those submitted for last year's 298 report.  We commend APD for taking a fresh look at their data needs, data collection systems, data reporting, and data analysis on this critical CASA requirement.  Unfortunately, data processes were so poor in the previous administration that not all years' data were retrievable in a useful format.  Data for 2015, provided by the APD for this report show a robust, effective, and active cadre of behavioral health focused APD officers, who deliver a very active and engaged set of services to those in need in the City of Albuquerque.  Descriptive statistics kept by APD and provided to the monitor indicate:

- APD's delivery of mental health crisis services was effected on a regular basis over the last three years, 2015-2017;
- CIT responses show a natural progression of service calls, indicating an increase in calls almost every year (with the exception of 2016, during which calls fell marginally);
- The NE Area Command proved the busiest for crisis services in every year (for which data were available) except the first year of services, 2015;

and

- Each Area Command showed progressive growth in provision of crisis services over the 2015-2017 time period.

As currently delivered and used by APD, the CIT reporting "system" is now useable to identify successes, failures, liability exposures, and other meaningful management detail.  Data collected are internally reliable, and appear to describe usage rates of CIT services correctly and meaningfully.

### 3.9: CIT/COAST Operations

The data required under Paragraph 137 in paragraph 298c related to Crisis Intervention Team (CIT)and Crisis Outreach and Support Team (COAST) deployments and usage, specifically requiring delineation of:

a)  number of individuals in the COAST and CIU case loads; 

b)  number of individuals receiving crisis prevention services; 

c)  date, shift, and area command of incidents or follow up encounters; 

d)  subject's age, race/ethnicity, and gender; 

e)  whether the subject claims to be a U.S. military veteran; 

f)  techniques or equipment used; 

g)  any injuries to officers, subjects, or others; 

h)  disposition of the encounter (e.g., arrest, citation, referral); and 

i)  a brief narrative of the event (if not included in any other document). 

### 3.9.1  CIT/COAST Operations 2014-2017

APD actually had a functioning Crisis Intervention Team (CIT) in the field and functioning for most of 2014.  The team was actually trained, fielded and supervised prior to the advent of the CASA, which became effective in November, 2014.  Data for CIT processes indicate that CIT personnel provided more in-field services every year from 2014 through 2017.  Table 8, below, depicts the services provided for CIT units between those years.

In the five years that CIT has been active (2014-2018), CIT has fielded more than 21,000 responses to individuals in crisis, based on data kept by APD on a routine "course of business" basis.  This indicates an exceptionally strong commitment to individuals in crisis due to behavioral health issues.  We recommend APD think seriously about tying "output" data with "outcome" data to allow periodic assessments of the effectiveness of CIT operational processes.  For example, an

analysis of "frequent users" of CIT responses may be beneficial in indicating individuals who may benefit from more intense after-response services.  While some of the assessment work may be more "academic" than operational, given the level of resources committed to CIT, it may help APD chart a way forward that will make the CIT response process even more productive.

**Table 3.9.1a:  CIT/COAST Operations (2014-2017)**

| Area Command | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Foothills | 885 | 1,056 | 1,071 | 1,126 |
| NE | 296 | 1,160 | 1,318 | 1,318 |
| NW | 684 | 696 | 204 | 1,334 |
| SE | 1,271 | 1,056 | 1,389 | 575 |
| SW | 540 | 577 | 651 | 688 |
| VA | 895 | 886 | 946 | 1,112 |
| **Totals** | **4,571** | **5,431** | **5,579** | **6,153** |

In summary, we note that APD's CIU/COAST operations were recently named by the International Association of Police Planners as the 2018 recipient of the organization's "Project of the Year" award.  IAPP noted that APD CIT/COAST processes were "very comprehensive and address a key need in the police profession." Our on-the-ground assessments of these programs at APD yield similar findings.

**3.10 Recruitment  and Training Activities**

Data for recruitment activities were provided by APD using the newly structured data reporting processes, which, we have noted, have yielded much more reliable information than past practices at APD.  We have noted earlier that APD's compliance bureau, through an outside contractor, have done an excellent job of combing through data required for the Paragraph 298 report, ensuring data reliability and validity, and reporting the revised data in understandable and useable formats.  As we also noted earlier, not all data maintained by APD in the early years of the reform process, were reclaimable; however, for data that were reclaimable, APD has presented them in a clear, cogent, and useable format. Recruitment activities for 2014, 2016, and 2017 were identified, organized and reported clearly by APD.   Data for 2015 were not reproducible.

**3.10.1 2014**

Recruitment activities for 2014 (pre-CASA) consisted of 13 modalities (newspaper ads, recruiting poster versions, billboards, TV commercials, etc.) for which 14 APD recruiters were assigned to events at high schools, middle

schools, veterans' organizations, and job fairs, etc. These 14 modalities yielded 1,309 "interest cards" from individuals who followed up with inquiries, etc. Outreach was also generated via an APD recruiting web-site, which reportedly yielded 749 of the total "interest cards" for 2014 (57% of all interest cards).  A total of 1,309 interest cards were generated by APD recruiting efforts in 2014, which, for this analysis serves as the "benchmark" year.  The most fruitful recruiting methods (in raw numbers of interest cards generated) were (in rank order) the department's recruiting website, "other" methods, and recruiting referrals from members of APD.  We note that these efforts were in 2014, and were "pre-CASA."  APD recruiting efforts were on-going for seven months in 2014.

### 3.10.2  2015

In 2015, APD increased its total interest cards to 3,641, using basically same 13 recruiting modalities used in 2014.  This constitutes a 57 % increase over 2014.  For 2015, the first year of implementation of the CASA, APD recruiters reached out to potential "new hires" at 65 events and through 753 media outlets, yielding a total of 3,641 interest cards.  This constitutes a 57 % increase over the 2014, baseline year.  For 2015 the three most productive recruiting processes continued to be the departmental recruiting website, "other" recruiting methods, and referral from APD employees.  APD recruiting efforts were on-going for twelve months in 2015.

### 3.10.3  2016

In 2016, the third year of implementation of the CASA, APD recruiters reached out to potential "new hires" using 556 media outlets, yielding a total of 3,641 interest cards.  This constitutes a 57 % increase over 2016, baseline year.  For 2015 the three most productive recruiting processes continued to be the departmental recruiting website, "other" recruiting methods, and referral from APD employees.  APD recruiting efforts were on-going for twelve months in 2016.

### 3.10.4  2017

For 2017, recruiting activities continued apace, showing generation of 2,088 "interest cards" generated by the same same three top "producers" of recruits seen in 2015 and 2016:  APD's website, referrals from current APD employees, and "other" mechanisms.  APD recruiting efforts were on-going for twelve months in 2017.  We note that "interest cards" fell from 2016 to 2017, showing a reduction of 1,553 cards, or a 43% reduction.

### 3.10.5  Training Activities

Training data for APD Training Activities varies markedly from many of the processes reported earlier in this document.  The documentation supplied was less detailed and more narrowly focused than one might expect.  It consisted of

two "files" of data, one identifying training completed as part of the supervisory process, and one reflecting CIT training.  While the data provided in these files shows the scope of training related to these two processes, it covers a very small piece of the overall training mission.  We are cognizant of the plethora of issues demanding the new APD command ranks' attention, and we are aware that their first order of business should be assessing past training to identify weaknesses and gaps in the training that need to be overcome in order to move forward and to assess the training currently provided by APD.  Our past monitoring reports have been highly critical of the training process, and we agree with APD's current response to the training "issues" confronting them: identifying the issues with training outlined in previous monitoring reports and developing action plans to address them.

Readers of the monitor's previous reports are well aware that we have found serious and pervasive problems with the way past academy training was planned, organized and delivered.  Further, past monitor's reports have been highly critical of Force Review Board processes and outputs.  During this reporting period, we reviewed further documentation of academy and FRB processes, and found the data generated by those processes to be difficult to absorb, analyze and report.  In the past, we have worked directly with the academy commanders to facilitate improved data collection and analysis related to the training process, but have been unsuccessful in reaching a point where reliable and meaningful data are submitted.  We will work diligently with the Compliance Bureau and the newly appointed Academy Director to foster new planning, development, evaluative and reporting mechanisms for the training academy moving forward.

The first steps should be problem analysis and needs assessments.  Based on our past reporting, a completely revised training curriculum is desperately needed at the sergeant's level.  The data provided by APD, in its current form, is basically a place holder, pending the training academy's detailed needs assessment, issue identification processes, planning, and development of a comprehensive training plan for the APD.  We have already provided extensive technical assistance to APD concerning training needs, and will continue to do so, as "teachable moments" occur over the coming years.

### 3.10.6 Curriculum Development and Delivery

No meaningful data were reported for 2014's or 2015's training activities.  Obviously, given the lack of data for 2015 training activities, we were not surprised by the lack of analyses, assessments, critical evaluations, or "ways to improve" discussions.  This is one of many critical elements currently on APD's "To Do" list, given the scant attention paid to training development by the past administration at APD.  It highlights one of the critical deficits left by the previous administration.  We have consulted with APD (both during the previous administration and the current administration of APD) concerning the criticalities in this area, and have sketched out some critical initial changes that need to be

made in the areas of needs assessment, program development, training delivery, and evaluation of training.  Our past monitor's reports list literally dozens of recommendations for positive change in the APD's training processes.  We suggest that as a starting point.

### 3.10.7  Reporting re:  Recruitment Activities for 2014-2017

Data reported by APD for the purposes of this report indicate a continued focus on recruitment in 2014 through 2017, with APD reporting attendance at 75 "job fairs" and related events for that year.  Between 2014 and 2017, APD received more than 21,000 "hits" from referral systems such as its recruiting website, referrals from current APD employees, radio and television stations, billboards, recruiting events, etc.

### 3.10.8 Overall Analysis of Academy Recruitment and Training Operations

No conclusions can be drawn from the provided data except to say that recruiting, as reflected in the record available to the monitor, is not routinized, and appears not to be guided by goals, objectives, and operational milestones, e.g., there seems to be no strategic or operational plans (inputs, methods, processes, outcome measures) to guide recruiting, based on the information provided to the monitoring team at this time.  We do note that based on APD records, interest in APD has seen a recent up-tick, and APD reports a "full" recruit class seated for later this year.

### 3.10.9  Analysis of Recruitment Failure Rates and Causes

Data responsive to Paragraph dii of APD's 298-related processes provide a "failure analysis," designed to identify critical failure points in the training process.  The highest failure rate component was failure of the background investigation.  The second highest failure rate was "physical abilities," accounting for 26 failures among the two recruit classes covered by APD's data for past reports.  Polygraph failure was the third highest ranking failure point.  Based on the monitor's experience and knowledge, the three most frequently noted failure reasons identify issues APD has in common with most modern police agencies.

The number one reason for failing the candidate selection process continued to be failing APD's background investigation.  This is the most common reason for failure industry wide, and is not unique to APD.  Based on the monitor's knowledge and experience, APD experiences the same failure point frequencies as most modern police agencies:  background investigations, polygraph, psychological assessment, and drug screening.

### 3.10.10  Training Summary

In our last 298 report, we noted

"Overall, we found Academy documentation related to Paragraph 298 to be highly routinized and uncritical.  Based on the record available to us (provided by APD) the academy functions in a highly reactive manner, and is not supported or guided by assertive data management and analysis practices that function in an organized, analytical way.  Though they may exist, we have seen no indicators of a goal-driven organization: e.g., no strategic planning modalities; no outcome and/or unit goals, or defined, measureable objectives; no failure analyses; nor any "lessons learned" or assessments of past practice and results.  We have no doubt that the academy is understaffed (based on our experience with other agencies involved in CASA-like projects).  This lack of a clear focus on future-oriented goals, objectives, measures, and analytical assessment of results is, in our experience, highly reflective of the nature of the (under) staffing levels at the Academy.  We are cognizant of the fact that the current administration is aware of these issues and is working to develop direct and effective responses to recruiting and training issues noted above.  We will continue to monitor this critical element of developing an effective workforce for APD."

We noted no significant change in Academy operations until the advent of the current administration at APD.  Since that time (December, 2017) APD has taken specific actions to assess Academy needs, and a new cadre of command has been installed at the Academy.  It is too early to expect tangible and documentable change at the Academy; however, we are aware of a new attitude and outlook at the Academy.  Academy leadership have reached out to the monitoring team, and appear responsive to our guidance.  We note that APD has recruited and hired a new Training commander, and that the new commander has a strong background in training development, delivery, and assessment.

We emphasize the criticality of Academy command's need to carefully review previous monitor's reports and to assess and prioritize recommendations made by the monitoring team for improvements to process, structure, supervision, command, and assessment systems at the Academy.

### 3.11: Officer Assistance and Support

Paragraph 298g requires APD to track and report officer assistance measures, such as therapy services, responses to critical incidents involving subjects in crisis, and training of APD personnel.  No data were reported by APD for 2014 or 2015.  Data for 2016 are discussed  below.

Beginning in August of 2016, APD's Behavioral Services Unit began implementing applicable sections of the CASA's officer and community support that included therapy services, training services, and response to critical incidents that may have required technical advise from a mental health professional.  In August through December of that year, BSD provided 119 separate service units, including mandated and non-mandated training to APD

34

personnel, mandated and non-mandated therapy, and response to critical incidents.  For patient confidentiality reasons, the data provided for this segment of paragraph 298 were provided in a format that did not allow sorts, counts, or other tallies, but indicate that service was provided for both sworn and non-sworn personnel, and for families, as requested by involved personnel or mandated by APD.  Sessions provided by BSD personnel ranged from one hour to four hours, depending on need.

BSD provide, according to its records, technical support for eleven critical incident deployments, 94 individual sessions of therapy services and fourteen separate training events, for a total of 119 individual service units.  The unit was implemented and functional beginning in August, 2016.  Internal "outcome" analyses tend to indicated a strong degree of satisfaction and acceptance of BSD's services among sworn personnel.

### 3.12:  Supervision Measurements

The supervision management system at APD came "on-line" in June of 2017.  Given the fact that only six months of data are available from the system, analysis of its effectiveness is problematic.  We will re-visit this issue in the next 298 report.

### 3.13: Civilian Complaints, Internal Investigations, and Discipline

APD provided data regarding civilian complaints, investigations and discipline for 2015, 2016, and 2017.  APD internal investigation files for 2014 were not susceptible to reliable "porting" to Excel spreadsheets, and, based on the monitor's experience, are unreliable at best.

Figure 3.13, below, depicts received civilian complaints for 2015 through 2017.  Given the short timeline included in the Figure, few conclusions can be drawn, and the data simply stand for themselves:  67 citizen complaints from all sources (APD IA, CPOA, and "other" such as vehicle crash investigations, "Additional Concerns Memos, Informal Command Reports, and routine supervisory actions).  Figure 3.1.4, below, depicts civilian complaints received by APD (from all sources) for 2015, 2016, and 2017.  With only three data points (annual data) it is difficult to draw conclusions regarding civilian complaints and complaints received from "all sources."  It is, however, informative to note that data for 2014 were so poorly classified, organized and reported as to render the data useless.



Other than a marked increase in citizen complaints from 2015 to 2016 (more than double) no other notable data characteristics are reportable.  2015 was the first full year of the CASA.

The second database available to the monitor reflecting disciplinary processes within APD reflects issuance of "Additional Concerns Memo" (ACM) by APD supervisory or management personnel for a noted infraction by a member of the APD.  The final classification categories for these "ACMs" is almost universally "sustained" (with the exception of those for which there are no known dispositions reported) or the ambiguous "Closed".

A third database identifies "Repeat Individuals (officers)," and the number of repeat cases.  There are no descriptive data available with this third database to identify the time period within which these "repeat" incidents were reported.  This database identifies officers with "multiple incidents," which appears to be defined as "more than one."   A total of 24 officers had between 1 and 10 "multiple incidents".  There are no indications of what action was taken in these cases.

A fourth database appears to identify officers who have had multiple civilian complaints.  This database also tracks findings and "actions taken."  These databases are difficult to use, difficult to understand, and appear to result, for the most part, in an "additional concerns" memorandum to the officer's file.  One characteristic does stand our however:  the final disposition category for externally generated investigations, i.e., "civilian police complaint" appear to be overwhelmingly "Exonerated," or "Administratively Closed."  Internal disciplinary issues result in sustained findings more frequently.  We note that these impressions are difficult to validate numerically, given the cumbersome nature of these databases.

**4.0  Summary and Conclusions**

While some marked progress has been made, as APD's "Paragraph 298" data responses stand at the present time, work remains to be done to move the existing system forward to the point that the data can be reliably used to assess "outcomes" of APD's compliance processes.  Needed process revisions include:

1. Continue the processes initiated by the Compliance Bureau to ensure that all policy-related misconduct investigations are identified, assessed for efficacy given the extant fact situations, reported accurately and tracked through to completion, including a review of "actions taken;"

2. Identify critical process flow points and report them in the same manner and process over time;

3. Carefully review and identify by means of a "serial number" all uses of force reported by APD personnel, including development of *ad hoc* "lessons learned" documents that can be used in future training for supervisors, lieutenants and command-level officers;

4. Ensure that data included in APD reports pursuant to Paragraph 298 are reviewed for accuracy, completeness, timeliness and functionality;

5. Where the monitor has noted discrepancies or concerns, ensure that data collection, analysis and reporting are, in every instance accurate, clear and understandable;

6. Explain reporting processes in any instance in which they are not clear, i.e., APD should include a "methodology" section in each of the nine individual "298" topics and for each of the subsections of those nine topics (these elements are explained in the data document, but must be translated to command and supervisory personnel in a clear and tangible manner);

7. Generate semi-annual Paragraph 298 progress reports in a data-rich format similar to the monitor's reports that identify systems brought on line to comply with 298 requirements, e.g., policy, training, supervision, and oversight functions;

8. Track results of those (item 7 above) systems' impacts over time;

9. Ensure that these quarterly reports are data-based, identify specific measureable goals and objectives, and report on progress toward meeting goals and objectives identified in previous systems reports;

10. Implement an internal APD "Red Team" process to vet and assess the APD's Paragraph 298 process reports to ensure accuracy, timeliness, and

veracity before the reports are provided to senior level staff and the
monitor;

11.  Subject every 298 process report to a "lessons learned" analysis, and
link that analysis to policy, training, supervision and remediation
processes;

12.  Consider the purpose and function of APD's 298 data reporting function,
and choose a format and process that matches purpose and function, e.g.,
a "lessons learned" component with recommendations for improvement in
the reporting, review, and analysis of uses of force designed to report
more effectively, analyze more carefully, and build internal systems that
learn and adapt;

13.  As with most data reporting from APD, there is very little analysis of the
data by the agency.  Data simply are reported without noting trends,
issues, problems or solutions.  APD should consider developing
summative, data-driven responses to issues noted in their aggregate data.
We view this as a critical deficiency for all aspects of 298-reporting.
Findings, assumptions, and recommendations should replace reporting of
raw data in the APD's data-driven reports.  The most critical issue to
answer is "why," and APD has proven, to this point, not to be interested in
the "why" questions that should be associated with data analysis and
reporting  It has, in the past, had a tendency not to collect data that will
address the issue at hand:  "Why?".

14.  We note that APD has retained the services of an outside data systems
design consultant who is highly skilled and knowledgeable.  We suggest
APD ensure that this individual be included in the task group assigned to
deal with item 13 above.

The reader will note that these recommendations are very similar to those
produced in the monitor's last 298 report.  Unfortunately, that report seems to
have been discounted by the previous administration at APD.  Fortunately, we
find the current administration to be much more attuned to the monitor's
recommendations.

In our last "298 Report," we noted:

"Eventually, the monitor will no longer be engaged to provide an
oversight function for APD.  That role will need to be provided by
supervisory, command and executive personnel.  APD should give
careful and methodical thought to what should be included in the
oversight function, how data should be collected, organized and
reported to assist that function, and how the executive level can
ensure effectiveness of that function.  At the current time, such

oversight is sorely absent, except from the monitoring team.  APD needs to revisit its reporting modalities thoroughly.  We recommend reporting data in a manner gives rise to the power or the ratio: e.g., number of effective force investigations per number of uses of force reviewed; number of injuries per 100 arrests, etc.  Those ratios should be tracked over time and become a daily metric for assessing organizational, supervisory, and management effectiveness.  Raw data are seldom meaningful from a managerial standpoint."

We note that the current administration at APD has taken steps toward the goal of becoming a data-driven police agency.  The data provided by APD for this 298 report are a substantial and meaningful improvement over those received for the first report.  We consider this a first step in a long-term project that will, more likely than not. take years, not months.  In the meantime, however, the new administration at APD has signaled an understanding of the importance of data-driven policing.  The monitoring team stands ready to assist APD as it migrates toward becoming a data-based "learning organization.