1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3
     UNITED STATES OF AMERICA,       )
4                                    )
                       Plaintiff,    )
5                                    )
                       vs.           )   NO: 14-CV-1025 RB-SMV
6                                    )
     THE CITY OF ALBUQUERQUE,        )
7                                    )
                       Defendant.    )
8

9

10                    TRANSCRIPT OF PROCEEDINGS
                     TELEPHONIC STATUS CONFERENCE
11            BEFORE THE HONORABLE STEPHAN M. VIDMAR
                 UNITED STATES MAGISTRATE JUDGE
12                  THURSDAY, AUGUST 9, 2018
                          1:30 P.M.
13          LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

14

15

16

17

18

19

20

21        (Proceedings recorded by machine shorthand and
      transcript produced by Computer-Aided Transcription.)
22
      REPORTED BY:    VANESSA I. ALYCE, RPR, NM CCR #259
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmcourt.fed.us

```
 1    TELEPHONIC APPEARANCES:

 2         FOR THE UNITED STATES:

 3                   UNITED STATES ATTORNEY'S OFFICE
                     District of New Mexico
 4                   201 Third St. NW, Ste. 900
                     Albuquerque, NM  87102
 5                   BY:  ELIZABETH M. MARTINEZ, ESQ.

 6                   and

 7                   U.S. DEPARTMENT OF JUSTICE
                     601 D. Street NW, PHB 5418
 8                   Washington, D.C. 20004
                     BY:  PAUL KILLEBREW, ESQ.
 9
                     and
10                   U.S. DEPARTMENT OF JUSTICE
                     905 Pennsylvania Ave. NW
11                   Washington, D.C.  20579
                     BY: STEPHEN RYALS, ESQ.
12
           FOR THE CITY OF ALBUQUERQUE:
13
                     CITY ATTORNEY'S OFFICE
14                   P.O. Box 2248
                     Albuquerque, NM  87103
15                   BY:  ESTEBAN ANGEL AGUILAR, JR., ESQ.
                          JERAMY SCHMEHL, ESQ.
16                        LINDSEY VAN METER, ESQ.

17         FOR THE INTERVENOR APOA:

18                   SANCHEZ, MOWRER & DESIDERIO, P.C.
                     P.O. Box 1966
19                   Albuquerque, NM  87103
                     BY:   FREDERICK MOWRER, ESQ.
20

21

22

23

24

25
```

```
 1    TELEPHONIC APPEARANCES continued:

 2        Also Present:

 3                    DR. JAMES D. GINGER
                      Court-appointed Independent Monitor
 4
                      CHIEF MICHAEL GEIER
 5                    COMMANDER MICHELLE CAMPBELL
                      CHIEF OF STAFF JOHN ROSS
 6                    COMMANDER ANGELA BYRD
                      COMMANDER ROBERT MIDDLETON
 7                    DEPUTY CHIEF ERIC GARCIA
                      DEPUTY CHIEF HAROLD MEDINA
 8                    DEPUTY CHIEF ARTURO GONZALEZ
                      DEPUTY CHIEF ROGELIO BAÑEZ
 9                    LIEUTENANT CORI LOWE
                      LIEUTENANT JENNIFER PEREZ
10                    SERGEANT ERIC NELSON
                      SHANIA GALLEGOS
11                    Albuquerque Police Department

12                    JAMES LEWIS
                      Mayor Keller's Office
13
                      HONORABLE LORENZO F. GARCIA, RET.
14
                      DR. PETER WINOGRAD, Consultant
15
                      ALYSSA FERDA, USAO Outreach Coordinator
16                    LAUREN SOHERR, USAO Staff

17                    DIONNA K. FORD, Law clerk

18

19

20

21

22

23

24

25
```

1                    (On the record at 1:30 P.M.)

2               COURT CLERK:  The United States District Court

3    for the District of New Mexico is now in session, the

4    Honorable Stephan M. Vidmar presiding.

5               THE COURT:  Good afternoon.  This is Judge

6    Vidmar.  We are on the record in *United States of America*

7    *versus City of Albuquerque*, 14-CV-1025.  I'd like counsel to

8    enter your appearances.

9               Let's first hear entries of appearance for the

10   attorneys who are here for the United States.

11              MS. MARTINEZ:  On behalf of the United States,

12   Elizabeth Martinez, Senior Litigation Counsel at the United

13   States Attorney's Office for the District of New Mexico.

14   Good afternoon, Your Honor.

15              THE COURT:  Afternoon, Counsel.

16              MR. KILLEBREW:  Afternoon, Your Honor.  This is

17   Paul Killebrew from the Civil Rights Division, Department of

18   Justice.

19              THE COURT:  Afternoon.

20              MR. RYALS:  Afternoon, Your Honor.  This is

21   Stephen Ryals of the Civil Rights Division, Department of

22   Justice.

23              THE COURT:  Afternoon, Counsel.

24              Anyone else here for the United States?

25              All right.  For the City of Albuquerque, Counsel,

1    please enter your appearances.

2              MR. AGUILAR:  Good afternoon, Your Honor.

3    Esteban Aguilar, Jr., City Attorney, on behalf of the City

4    of Albuquerque.

5              MR. SCHMEHL:  Jeramy Schmehl.

6              THE COURT:  Counsel.  And good afternoon.

7              MS. VAN METER:  Lindsay Van Meter, Assistant City

8    Attorney for the City of Albuquerque.

9              THE COURT:  Any other counsel for the City of

10   Albuquerque?

11             JUDGE GARCIA:  This is Lorenzo Garcia.  I'm

12   appearing on behalf of the City Council, but not as legal

13   representative, as the City Council is ably represented by

14   the attorneys from the City Attorney's Office.

15             THE COURT:  Afternoon, Judge.

16             Do we have the monitor here as well?

17             DR. GINGER:  Yes, Your Honor.  It's Jim Ginger

18   for the monitoring team.

19             THE COURT:  Afternoon, Dr. Ginger.

20             All right.  Is there anyone else who needs to

21   enter an appearance?

22             MALE SPEAKER:  Your Honor, on behalf of the City

23   of Albuquerque, we have the Albuquerque Police Department

24   personnel.  And I will go around the room and have them

25   introduce themselves very briefly.

1                    THE COURT:  Okay.

2                    CHIEF GEIER:  Mike Geier, Chief of Police.

3                    CDR. MIDDLETON:  Rob Middleton, Commander of

4      Internal Affairs Force.

5                    D.C. GARCIA:  Eric Garcia, Deputy Chief of

6      Compliance Bureau.

7                    CDR. CAMPBELL:  Michelle Campbell from the

8      Compliance Bureau.

9                    LT. LOWE:  Cori Lowe, Lieutenant with the APD.

10                   MS. GALLEGOS:  Shania Gallegos.

11                   LT. PEREZ:  Jen Perez with the APD.

12                   THE COURT:  I didn't hear the last person

13     there -- the last two, please.

14                   MR. AGUILAR:  Shania Gallegos and Jen Perez, both

15     from APD.

16                   THE COURT:  Thank you.

17                   MR. AGUILAR:  Yes, Your Honor.

18                   MALE SPEAKER:  Sgt. Eric Nelson, APD.

19                   D.C. GONZALEZ:  Art Gonzales --

20                   THE COURT:  I'm sorry.  You're going to have to

21     speak a little clearer.

22                   D.C. GONZALEZ:  Art Gonzalez, Deputy Chief APD

23     Investigations.

24                   THE COURT:  Sir.

25                   D.C. MEDINA:  Harold Medina, Deputy Chief APD.

1             C.O.S. ROSS:  John Ross, APD.

2             MR. LEWIS:  James Lewis, Mayor's Office, APD.

3             CDR. BYRD:  Angela Byrd, APD

4    Commander-in-Training APD.

5             MR. AGUILAR:  And that's all of us, Your Honor.

6             MR. MOWRER:  May it please the Court, Your Honor,

7    this is Frederick Mowrer on behalf of the Union, APOA.

8             THE COURT:  Afternoon, Counsel.

9             All right.  Have we covered everyone who is here

10   this afternoon?

11            LAW CLERK:  Good afternoon, Your Honor.  This is

12   Dionna Ford.

13            THE COURT:  Oh, hi, Dionna.  How are you doing.

14            MS. MARTINEZ:  Your Honor, this is Elizabeth

15   Martinez.  We've been joined by a couple more members of the

16   APD staff.  One of the things I would like to suggest for

17   the Court is that immediately after this status conference,

18   we submit to the Court's clerk a comprehensive list of

19   everyone who has come into this conference room, so that the

20   Court's court reporter can have a complete list of everyone,

21   including their names, full spellings, and title.

22            THE COURT:  All right.  Well, I would sure

23   appreciate that.  That's a great idea.

24            MS. MARTINEZ:  And the two individuals who just

25   walked in were Deputy Chief Arthur Bañez and Dr. Peter

1    Winograd.

2              THE COURT:  All right.  Thank you, Counsel.  Are

3    we ready to proceed to the first thing on the agenda?

4              MR. AGUILAR:  We are, Your Honor.

5              THE COURT:  All right.  My understanding is, is

6    the first thing we want to address is CASA paragraph 298

7    Outcomes Assessment Report.  And that is Dr. Ginger's

8    report, which was filed on August 6, 2018.

9              And Dr. Ginger, will you be addressing this?

10             DR. GINGER:  I will, Your Honor.  Thank you.

11             THE COURT:  All right.

12             DR. GINGER:  What we found for the second 298

13   report was a drastically improved database provided by APD

14   regarding each of the elements of that report.  Readers of

15   the first report understand that we were less than pleased

16   with the response of APD to the requirements of that

17   paragraph for the first report that we wrote.  What we found

18   here is a remarkable improvement.  And kudos to APD for

19   putting together what they did.  I know it took a great deal

20   of time and effort and a great deal of attentiveness to get

21   those records correct.

22             Regarding the new database, we found the data

23   that was provided to be both internally reliable -- in other

24   words, table to table, if it reported a use of deadly force

25   in one table, the same number was present for that same

1    factor in other tables, so it was internally reliable -- and

2    we found it to be externally valid.  In other words, it

3    included events that the monitoring team knew about through

4    its own research and its own documentation.  So we had sort

5    of a double assessment of how reliable and useable that

6    database was, and it scored exceptionally high on both of

7    those.

8            What -- with this new report, we now have a

9    baseline.  The first report was, in our opinion, was not

10   accurate enough to establish a baseline.  In the second

11   report, we now have one.  And each new report, as the years

12   go by, will add a column for the current year and be able to

13   track those numbers reliably over time, which is exactly

14   what that report is designed for.

15           We still found some gaps in the data, in the

16   second report, for 2014 and 2015.  That was despite APD's

17   current attempt to go back and find as much data as they

18   could and get -- and ensure that they were included in the

19   second set of data tables.  Those were not to the point that

20   they created serious weaknesses, and they're simply

21   reflective of the old record-keeping versus new

22   record-keeping.  And that is not -- it's not something that

23   we don't routinely experience in other long-term databases.

24           In short, APD has done a stellar job with this

25   current set of data reports.  We were able to use them

1    fairly fluidly.  And I hope the draft of the report made

2    good sense and it should serve as a really good foundation

3    for the next report due next year.

4              THE COURT:  Excellent.  That's good news.  Have

5    you covered everything you wanted to cover?

6              DR. GINGER:  Yes, sir, thank you, Your Honor.

7              THE COURT:  All right.  Would anyone from the DOJ

8    like to -- or let's go to the City of Albuquerque first.

9    Anyone from the City of Albuquerque like to comment on the

10   report that Dr. Ginger just discussed?

11             MR. AGUILAR:  Thank you, Your Honor.  This is

12   Mr. Aguilar on behalf of the City.  I'll speak first and

13   then I think the Chief may have a few comments.

14             Again, echoing what Dr. Ginger has said, the

15   report shows that under the current administration at the

16   City of Albuquerque, as well as any leadership under the

17   Albuquerque Police Department, the City has made substantial

18   improvements and strides in this effort to collect and to

19   provide the monitor with useful and accurate data.  The City

20   has made drastic improvements in reporting uses of force,

21   largely ameliorating the residual use-of-force problems that

22   existed under the prior administration.

23             What's interesting is that, when APD officers are

24   using force, they're utilizing lower levels of force, such

25   as takedowns and hand-to-hand techniques, which is -- which

1   is always a positive.  There has been a notable impact on

2   policy and training on the reporting of force by APD

3   officers, as well.  It can be seen by the fact of -- with

4   the reported spike in reports in 2016 after the delivery of

5   training and as APD improved our record-keeping and

6   reporting processes.  There's notable decline, indicating --

7   in 2017, indicating the impact of the new policy training,

8   supervisory and managerial training that's been taking place

9   at APD.

10          There are more general critical aspects of the

11   report concerning reporting and data collection, but the

12   City has -- is reviewing all of the recommendations from the

13   monitor, and we are taking -- we're analyzing all of the

14   tables and all of the other information so we can improve --

15   continue to improve on those numbers and on the

16   recommendations made by the monitoring team.

17          And I will turn the line over to Chief Geier.

18          CHEIF GEIER:  Good afternoon.  First of all, I'd

19   like to acknowledge our appreciation for the remarks of

20   Dr. Ginger.  We've known, through his assistance and his

21   way-forward process, that we would be able to get through

22   some of those problems and the concerns and some of the

23   roadblocks that we faced when we first came on board.

24          I want to also acknowledge the team, obviously,

25   led by Deputy Chief Garcia and Dr. Winograd, who

1    tremendously helped with this particular paragraph, and the

2    whole team that contributed to that effort.  The combined

3    team effort there is what got us through those obstacles to

4    where we are now.  We realize that there's still a long way

5    ahead.  And due to these investigative foundations for

6    achieving total compliance, I think we're on track.  And

7    again, we appreciate all the efforts of the monitoring team

8    and the DOJ, so thank you all.

9              THE COURT:  Chief.

10             Anybody else for the City of Albuquerque?

11             MR. AGUILAR:  No, Your Honor.

12             THE COURT:  Appreciate your comments.

13             How about for the United States?

14             MR. KILLEBREW:  Your Honor, this is Paul

15    Killebrew for the United States.  Thank you very much.  I

16    want to take a step back to talk for a second about the

17    purpose of this 298 Outcomes Assessment report.  The 298

18    Assessment report does not look only at whether APD is doing

19    what the Consent Decree requires in terms of passing policy

20    or instituting training, but whether those efforts are

21    having an impact on policing in the street.

22             And so what we could design there are a series of

23    methods that we can look at and say, is this -- is what --

24    are all of the efforts we have undertaken having the impact

25    that we would expect, and does that impact show that the

 1   pattern of practice of constitutional violations has been

 2   eliminated?  So looking at the second Outcomes Assessment

 3   Report, I think we can answer that question that, no, we are

 4   not there yet, but we have some promising signs of progress.

 5           So a couple of things that I would highlight:

 6   The report shows that force, reported force, increased after

 7   implementation of the CASA.  And that's exactly -- as

 8   Dr. Ginger points out in the report, that is exactly what we

 9   would expect because now officers are reporting the force

10   that they use.  So while the numbers show that officers --

11   an increase in the amount of hands-on force, I think that

12   that probably represents an increase in the reporting of

13   hands-on force, not that more of it is actually being used.

14   And that's good because now we have a more reliable

15   indication of how much force is actually being used out

16   there.  And Mr. Aguilar is absolutely correct, you're seeing

17   officers using the more serious kinds of force less

18   frequently and they're utilizing the less invasive forms of

19   force more frequently, which I think is an indication that

20   they're being careful in the decision to use force and what

21   kind of force to use, which is in line with the goals of the

22   CASA.

23           There is another number that Dr. Ginger pointed

24   out as something we all need to look into more, which is

25   that, in 2017, S.W.A.T. activations nearly doubled from the

1    previous year.  And that's without a change, that I'm aware

2    of, in S.W.A.T. policy on when it goes out to a scene.  So

3    we will be curious to see the City look into that issue and

4    try to understand why the S.W.A.T. team was used so much

5    more frequently in 2017 versus 2016.  I will say that one

6    comfort about that number is that the S.W.A.T. activations

7    have typically not resulted in injury to individuals.  Many

8    of those encounters with S.W.A.T. typically end with an

9    arrest and no force used against the individual.

10            Another issue that we see in this report is that

11    the accountability for out-of-policy uses of force continues

12    to be a problem.  I think we see that officers who use force

13    outside the policy have historically not been held

14    accountable for it.  Later in this status conference, we're

15    going to talk about APD's efforts to resolve its

16    use-of-force backlog, investigations that are older.  And

17    that process has given me some comfort, going forward, that

18    APD is holding officers accountable when the policy is not

19    consistent -- I mean, the use of force is not consistent

20    with the policy.

21            I think, in the future, what we'll be looking for

22    from APD and the City is to continue improving the data

23    systems.  There were some numbers in the report that we

24    weren't sure how APD has collected the data and reported the

25    data to Dr. Ginger.  And so we had reached out to the City

```
1    to start to understand those issues a little bit better.
2    But in general, I think the report shows that we are on the
3    right path, though we still have some progress to make.
4              Thank you, Your Honor.
5              THE COURT:  All right.  Thank you, Mr. Killebrew.
6              Mr. Mowrer?
7              MR. MOWRER:  Your Honor, all I would say is I
8    think the report shows the hard work of the officers of the
9    Albuquerque Police Department are doing in the field and
10   that this progress is continuing to go forward and that the
11   Department and its employees should be proud of the goals
12   that they have met.  Thank you.
13             THE COURT:  All right.  Very good.
14             Would anyone else like to comment on Agenda Item
15   Number 1?
16             MS. MARTINEZ:  Your Honor, Elizabeth Martinez.
17   If I may?
18             THE COURT:  Okay.
19             MS. MARTINEZ:  One of the things that with every
20   status conference is that the United States orders the
21   transcript and we make it available very broadly to the
22   community.  And so one thing I'd like to make sure is very
23   clear is that this report reports on activities through the
24   end of 2017.  And so I'd like to make sure that everyone is
25   clear that this does not reflect performance and conduct by
```

1    APD officers in 2018.  So I'd just like to make sure that

2    the record reflects that.

3                    Thank you, Your Honor.

4                    THE COURT:  Very good.  Thank you.

5                    Would anyone else like to comment on Agenda Item

6    Number 1?

7                    MALE SPEAKER:  No, Your Honor.

8                    THE COURT:  All right.  Let's move to Agenda Item

9    Number 2, update from APD Internal Affairs regarding

10   use-of-force investigation backlog.  I understand that

11   Cdr. Middleton will address this?

12                    CDR. MIDDLETON:  Yes, sir.  Let me move closer to

13   the mic.

14                    THE COURT:  Very good.

15                    CDR. MIDDLETON:  This is Cdr. Middleton.  And I

16   have a brief project status report and an update on the

17   backlog.

18                    We have 314 -- 315 backlog use-of-force cases,

19   that includes show of force as well.  And there are 26

20   serious use-of-force cases in the backlog, for a total of

21   341.  Of those cases, 20 of them are at the detective level

22   right now being reviewed.  14 are at the sergeant level.

23   That means the detective has already completed their review

24   of the investigation and the sergeant is reviewing it for

25   accuracy.  Fourteen cases were closed and they were found to

1  be in policy.  Five cases were closed and found to be out of

2  policy.  And of the original findings for all of those

3  cases, only one was closed out of policy originally.  That

4  means we changed the finding on four of those cases.

5          In total right now, we've closed six out of

6  policy.  And I can give you an example of one and what we're

7  finding in how long it takes to review one of these cases.

8          THE COURT:  Okay.

9          CDR. MIDDLETON:  A case file that happened

10  April 17, 2017.  And I'm not going to go into great detail.

11  I'm going to give you a synopsis of it.  It's a petty

12  shoplifting at a Walmart.  When the officer arrived, he

13  identified the offender, so he had probable cause to make a

14  detention and conduct an investigation.  The offender chose

15  to run from the officer, and the officer tased him in the

16  back as he ran.  We found this, through a review, that it

17  was out of policy, and we found some other issues with this

18  as well.  And what the backlog officers are doing when they

19  review these cases is they're looking at everything, not

20  just use of force.  So for this example, they found that the

21  officer failed to assess the situation, carefully

22  communicate with others.  He failed to identify additional

23  resources to help him in the situation, and he decided to

24  close distance rather than deescalate.  He didn't take

25  charge of the scene, and the supervisor responding to the

1    call failed to conduct a thorough, rigorous investigation.

2              So these are a few of the findings in one case

3    out of 341.  And the mean time for review of one case that

4    we've found so far is about 17.2 hours.

5              THE COURT:  Wow.

6              CDR. MIDDLETON:  So about 17 hours for every

7    single case.  And this is to get through 341.

8              So what's interesting, too, is we've had two

9    officer-involved shooting cases from the backlog and in the

10   review process from the beginning.  Those are going to take

11   more time to investigate because there's a great deal of

12   evidence to consider while reviewing these cases.

13             THE COURT:  How do you prioritize them for

14   review?  Is it -- or is it just chronologically, you go to

15   the oldest one first and go forward, or is there some method

16   of triaging, if you will?

17             CDR. MIDDLETON:  We do have a method.  We found

18   that the top -- we've prioritized it by investigating the

19   top nine users of force first.  We found that the top nine

20   users of force accounted for over 100 use-of-force

21   incidents, so we wanted to address that first and make some

22   sort of proactive changes while we're still getting incoming

23   use-of-force cases.  So if there's something that we could

24   effect in the meantime, that's the goal, that we'll track

25   these first top nine users of force.

1          We also are putting -- we are finding the first

2     three officer-involved shooting cases are in the backlog

3     being investigated first for the serious uses of force.  And

4     another interesting fact that I can bring up is we're

5     putting a mean time on everything, how long it takes for

6     each step of this process to take.  And one thing I didn't

7     bring up two days ago was it takes about 6.7 hours to view

8     the videos for every single case.  If you multiply that by

9     341, it's going to take 2,284 hours just to watch the videos

10    for these cases.  With those cases closed, we're at

11    7.3 percent of all these cases closed up to this point.

12          THE COURT:  Okay.  Thank you.

13          Let me ask first, Dr. Ginger, would you like to

14    comment on anything that Cdr. Middleton said?

15          DR. GINGER:  Yes, I would, Your Honor.  Thank

16    you.  What APD has gone through with this use-of-force

17    backlog process is almost exactly what we've been after APD

18    to do since Day 1, which is a true systems-analysis approach

19    to problems and issues, find out -- find out, in a given

20    problem chain, where the measure piece is and start

21    addressing those pieces, not only retroactively, but

22    proactively.

23          So this is an excellent start.  Their

24    systems-analytic process is top-notch.  I mean, they've

25    really done a good job.  This will turn into a model process

1    for other police agencies.  So I think they can be proud of

2    what they've conceptualized and what they've done.  And to

3    date, the execution has been -- we haven't found any errors

4    or issues with that execution.  The only major issue we see

5    is a measure of manpower and time.  And given the backlog

6    that APD was confronted with this year, it's simply going to

7    take some time to get this resolved.

8         THE COURT:  Okay.  All right.  Well, good.

9    That's good to hear.  I'm sure Judge Brack will be glad to

10   hear it.

11        Would anyone from the City, anyone else from the

12   City of Albuquerque, like to comment on Agenda Item

13   Number 2?

14        How about for the United States?

15        MR. KILLEBREW:  Your Honor, this is Paul

16   Killebrew for the United States.  All we would like to say

17   is we are pleased that APD has undertaken a systematic

18   review of these cases and are conducting that review in a

19   highly transparent manner and keeping both the parties and

20   the Court updated regularly on their progress.  We are

21   interested to see the outcome of this process, to ensure

22   that APD has lessons learned and that they can take what's

23   happening in these cases and make them valuable learning

24   tools at their training academy and in other parts of the

25   Department.

1          THE COURT:  Thank you, Mr. Killebrew.

2          Mr. Mowrer, would you like to comment?

3          MR. MOWRER:  No, sir.  Thank you.

4          THE COURT:  Would anyone else like to comment on

5    Agenda Item Number 2?

6          Let's move to Agenda Item Number 3, update on

7    implementation of Compliance Plan under joint stipulation

8    suspending CASA paragraph 38, which is Document Number 355.

9          Is this -- Mr. Schmehl, are you going to address

10   this first?

11         MR. SCHMEHL:  Your Honor, I'm going to quickly

12   pass it over, actually, to Lt. Cori Lowe from the Compliance

13   Bureau, who will speak directly to that agenda item.

14         THE COURT:  All right.

15         Lt. Lowe?

16         LT. LOWE:  Good afternoon, Your Honor.  Lt. Lowe

17   with APD.

18         THE COURT:  Afternoon.

19         LT. LOWE:  Just to follow up, this is the second

20   half of the Compliance Plan.  And just to -- for everyone's

21   knowledge, there were 91 tasks that were passed out from

22   January -- I'm sorry, from February 1st to July 31st of

23   2018.  We have finished -- this Compliance Plan was ended on

24   July 31st.  And out of the 91 tasks, APD has completed 88

25   of those.  That's a rate of 96.70 percent.  However, 3 out

1    of the 91 tasks that were -- have not been completed to

2    date.  And I'll just explain those in a little bit of detail

3    just so the Court knows:  There are two tasks that are

4    duplicates.  They're just in two separate areas within the

5    Compliance Plan.  And that is to deliver basic review

6    function training to the backlog review team members and

7    their supervision.  This one was extended because of the

8    hiring process.  And we're in the -- we're still in the

9    process of hiring the personnel for APD to assist with

10    the -- the backlog review.  We did add another deadline for

11    this.  Again, it's dependent on the City's hiring process,

12    and we are shifting towards the back end of that so we can

13    hire new people and we can get those guys trained up.

14              The third one that was not complete was part of

15    the Force Review Board.  And that is also a training

16    component.  And that is to train new Force Review Board

17    members on policies, expectations, and procedures for

18    conducting a thorough review.  There were 11 tasks plotted

19    out in this one particular area.  We did complete all of

20    them, except for this one.  But as we started doing a full

21    review of the Force Review Board, we took -- we changed --

22    we -- to Lt. Jennifer Perez.  And she has started that team

23    up to improve our current efforts and processes to include

24    the goals and matters and streamline that process all the

25    way through.  She's in the process of creating a training

1    plan, which we're going to go with the seven-step training

2    process used at the training academy in order to get that

3    training conducted.

4              So those are the three tasks that we did not

5    complete that we did include in our future Compliance Plan

6    as we move on to the second full Compliance Plan to the

7    Court.

8              Were there any other questions or concerns for

9    the Compliance Plan?

10             THE COURT:  No, not from the Court.

11             Would anyone else from the City like to address

12   Agenda Item Number 3?

13             How about Dr. Ginger?  Would you like to address

14   anything that Lt. Lowe discussed?

15             DR. GINGER:  Just a very brief point, Your Honor.

16   Again, this is another example of APD initiating a

17   systems-analytic approach to the problems they're

18   confronting.  They have -- over the last six months, I

19   suppose, they have been much more data-oriented than they

20   were before, and it's a major step forward.  We now have

21   goals, objectives, and data to track those objectives over

22   time, which is what will bring this process to completion.

23   So this new -- this new process that you're hearing about is

24   incredibly important, long-term.

25             THE COURT:  Very good.

1          How about for the United States?  Mr. --

2          MR. KILLEBREW:  Your Honor --

3          THE COURT:  -- Killebrew?

4          MR. KILLEBREW:  -- very briefly.  This is Paul

5    Killebrew.  We commend the City for having made the progress

6    in the first Compliance Plan and look forward to working on

7    the next one with them.

8          THE COURT:  Mr. Mowrer, would you like to

9    comment?

10          MR. MOWRER:  No, sir.  Thank you.

11          THE COURT:  Would anyone else like to comment on

12   Agenda Item Number 3?

13          All right.  Moving to agenda Item Number 4.  This

14   is the update on Use-of-Force Suite SOPs review and

15   development process.

16          And who will address this first for the City?

17          MR. SCHMEHL:  Your Honor, this is Assistant City

18   Attorney Jeramy Schmehl.  I will take the lead on Agenda

19   Item Number 4 for the City.

20          Your Honor, this agenda item speaks to the

21   Use-of-Force Suite of Policies and also the process in the

22   background to get those policies revised.  Document 355

23   speaks to technical assistance by Dr. Ginger in these

24   policies.  So the monitor and the parties have had a series

25   of meetings about each one of those policies; and those

1   being 2-52, which is the Use-of-Force general policy; 2-53,

2   which is definitions; 2-54, which is intermediate weapons;

3   and then also 2-55.

4          And to give Your Honor a little bit of history of

5   what happened in each of one of these circumstances with

6   each one of these policies, a draft was circulated to the

7   monitor and parties.  There was a period of time to comment

8   on each one of those and then there were meetings to discuss

9   the comments.  In the background of that process,

10  Cdr. Middleton is working to reconcile those comments.  And

11  there also is a -- there's the Department policy development

12  process sort laying on the top of all of that.

13         So as it stands right now, it has -- and there

14  are many other places it has to run along.  And I neglected

15  to mention that the chief has a series of meetings on 2-52.

16  There were a good many comments on that one.  Those comments

17  were captured, taken into consideration, and then

18  incorporated into the policy.  And that is the first time

19  ever in the history of this process where the Chief of

20  Police got out in front of personnel, discussed the general

21  Use-of-Force Policy, which is the touchstone of the reform

22  effort, as it relates to use of force.  So I think that

23  was -- the City believed that was very, very significant.

24         With the rest of them, they were -- the other

25  piece of this policy-development process has been the public

1   presentation of policies to -- with the oversight board.   So

2   2-52 has been presented.   2-54, which, again, is the

3   intermediate weapons, and 2-55, which is deescalation, which

4   is a brand-new policy, and it's a stand-alone policy, which

5   previously was two paragraphs in the general Use-of-Force

6   Policy, will be presented by Cdr. Middleton and capture of

7   comments from the public.   And that's another piece of this

8   policy-development process that's been a huge improvement.

9   Now, that leads to the -- and we are on track with those

10  policies to get them within the September 21 deadline, which

11  is mentioned -- which actually has been ordered by the

12  Court, to get all of those through the policy-development

13  process.

14          The last two to draft, 2-56 -- will be

15  Number 2-56 and 2-57.   2-56 speaks to officers'

16  responsibilities in reporting uses of force.   And 2-57 will

17  speak to the review and investigation processes involved

18  when a use-of-force by an officer takes place.   Those two

19  policies -- we will be getting a draft of those two policies

20  to the monitor tomorrow.   They will have time to review and

21  comment on those policies.   And then we will be having a

22  meeting to discuss them.   And then the City and the

23  Department will work to reconcile or incorporate those

24  comments.

25          The significant piece about these last two is

1    that we are going to work -- the City is going to work with

2    POB to make sure that the September 21st deadline for

3    these policies to be discussed, reviewed, commented upon,

4    and finally resolved, come within that deadline, which has

5    been established by the Court, which, again, is

6    September 21st.

7              And that is what I have, Your Honor.  And I stand

8    for any questions that you may have.

9              THE COURT:  All right.  Thank you, Counsel.

10             Would anyone else from the City like to speak on

11   this item?

12             MR. AGUILAR:  No, Your Honor, not from us.  Thank

13   you.

14             MALE SPEAKER:  And I would like the record to

15   reflect that Mr. Schmehl is sitting for questions.

16             THE COURT:  All right.

17             Dr. Ginger, would you like to comment on Agenda

18   Item Number 4?

19             DR. GINGER:  Yes, Your Honor.  Again, just very

20   briefly, sort of overview and oversight.  What we're seeing

21   from APD on this policy development cycle is considerably

22   more effective than what we saw in the last policy

23   development cycle in 2015.  We find their responses to

24   suggest changes, additions, et cetera, to be much more open

25   and reasonable and collaborative.  So I'd like to commend

 1    the City and the City staff at PD and City Attorney's Office

 2    for their approach to this second cycle of policy.

 3                THE COURT:  All right.  Thank you, Dr. Ginger.

 4                Mr. Killebrew, would you like to comment?

 5                MR. KILLEBREW:  Yes, Your Honor.  Thank you.  You

 6    know, I am involved in police reform cases across the

 7    country.  And there is a consistent theme on policy review,

 8    which is a little bit of sticker shock just how long it

 9    takes to get a policy through the entire process.  And it

10    can be hard to understand why it would take so long to get

11    these policies done until you see what all is involved in

12    it.  And it has to do with time it takes to look at all the

13    best practices out there and craft a draft that reflects

14    those practices in clear and concise language.  And then it

15    concerns getting all the stakeholders engaged and getting

16    their review.  And that's the stakeholders within the police

17    department and in the broader community.  And then, after

18    you've done all of that, you have to make sure that it's

19    going to be approvable in the litigation with the United

20    States and the Union and the monitor and, ultimately, the

21    Court.

22                So I understand that the process is coming right

23    up against the Court's deadline of September 21st, but to

24    me, it's not particularly surprising and -- as the defendant

25    is taking as much time, but I think they're putting out

1    policies that are a clear improvement over previous drafts.

2    Thank you, Your Honor.

3              THE COURT:  All right.  Thank you, Counsel.

4              Mr. Mowrer, would you like to comment on Agenda

5    Item Number 4?

6              MR. MOWRER:  The only thing I would say is -- on

7    behalf of the Albuquerque Police Officers Association, Your

8    Honor, is the parties have been working very hard to try and

9    come up with policies that comport with what we believe the

10   mission of this Department is, and that we're appreciative

11   of the understanding of the other parties in working with

12   the Union in trying to keep this as simple as possible.

13             THE COURT:  Thank you, Counsel.

14             Would anyone else like to comment on Agenda Item

15   Number 4?

16             All right.  Then, moving to Agenda Item Number 5.

17   It is the update on filing of the August 31, 2018, interim

18   report under joint stipulation suspending CASA

19   paragraph 308, which is Document Number 355.

20             Dr. Ginger, are you going to address this first?

21             DR. GINGER:  Yes, sir, Your Honor.  Thank you.

22             We'll have our second so-called mini report to

23   the Court, as scheduled, on 31 August.  It will reflect

24   actions taken and completed during the monitor's technical

25   assistance phase of this current -- or the then current

1    reporting period.  And that technical assistance is designed

2    collaboratively with DOJ, APD, and the monitoring team in

3    order to help us give APD the information that is important

4    for them to bring new command staff up to speed on the key

5    issues confronting APD and to get an integrated approach to

6    the problems and issues that we've identified as in need of

7    resolution over the next few months.

8              So again, this is another component that's moving

9    along fairly collaboratively and it's certainly a nice

10   change and we appreciate APD's cooperation and

11   considerations.

12             THE COURT:  Thank you, Dr. Ginger.

13             Mr. Schmehl, would you like to address Agenda

14   Item Number 5?

15             MR. SCHMEHL:  Yes, Your Honor, just briefly.  We

16   will -- we'll be circulating -- the City will be circulating

17   its draft of that report, that particular report, directing

18   the efforts to implement -- implement the Compliance Plan on

19   the 17th of the August.  We expect comments back on the

20   draft from the parties and the monitor on the 24th of

21   August.  And then an updated draft will be circulated

22   August 29th to reconcile any sort of issues that there may

23   be on August the 30th.  And of course, the City will take

24   the lead in filing that joint report, which is due to the

25   Court on Friday, August 31st.

1          THE COURT:  All right.  Thank you, Counsel.

2          Would anyone else from the City like to address

3    Agenda Item Number 5?

4          MR. SCHMEHL:  No, Your Honor.

5          THE COURT:  For the United States, Mr. Killebrew.

6          MR. KILLEBREW:  No comments at this time, Your

7    Honor.  Thank you.

8          THE COURT:  Mr. Mowrer?

9          MR. MOWRER:  No, thank you, Your Honor.

10          THE COURT:  Anyone else?

11          Okay.  Item Number 6 on the agenda is community

12    engagement.

13          And Mr. Lewis, are you going to address this item

14    first?

15          MR. LEWIS:  Your Honor, James Lewis, if I may.

16          Basically, we had a meeting yesterday to talk

17    about community engagement.  We had Deputy Chief Garcia.  We

18    had Cdr. Middleton.  We had Cdr. Campbell.  Shania Gallegos

19    was there with us.  And we talked about the methodology that

20    we want to utilize to have community outreach.  And I've

21    been in constant communications with Ms. Martinez because

22    she has the history.

23          And so one of the things that we had talked about

24    doing is trying to get the mayor -- we need to make sure

25    they have the CAO.  We need to have the U.S. Attorneys there

1    because I think one of the things that will help when we

2    talk about community engagement and giving an update in

3    reference to the CASA, a lot of the community may not be

4    aware of exactly what the CASA is.  So we thought it would

5    be nice for the U.S. Attorney's Office to give them a brief

6    overview of what the CASA is all about.

7              We also wanted to look at time parameters in

8    between maybe 6:00 and 8:30.  People will sign in and then

9    question-and-answer at the end.  And we're looking at

10   possibly three different locations:  East side, west side,

11   and potentially at the convention center.

12             One of the things that I had to do is I have to

13   make sure that the mayor is available.  So we also looked at

14   what is going on in September.  We have the State Fair and a

15   lot of activity, a lot of traffic, people coming from around

16   the State, so our concern is to make sure that wherever we

17   have it -- and we've talked about locations like some of the

18   churches, God's House up on 84, east side of town, that

19   could possibly host that and then have them invite a lot of

20   the members there.

21             So we are still working at -- we're working

22   through that.  We looked at the list of some of these

23   invitees.  We've talked about the amici, the stakeholders,

24   the base community, the CPCs, officers of the neighborhood

25   coordination, Native American Chamber, Hispano Chamber,

1    Greater Albuquerque Chamber, the Indian Opportunity Office,

2    and we talked about the FOP.  And so we're working with

3    Ms. Martinez, at this point, again, to make sure we have

4    what they've incorporated in the past.  I was not here when

5    they had these town halls, per se, before, so I'm trying to

6    make sure we don't overlook anybody.  So this may not be a

7    total list, but we'll find out if there are some other folks

8    that we should be inviting to the table.  And again, giving

9    you an update of what's going on with the CASA and trying to

10   get people in and out.  And one of things that we talked

11   about is not having it on a Wednesday night because a lot of

12   the folks have prayer service on those nights and they're

13   not going to come out.  So we've been trying to make sure

14   that if we're going to do it, we need to do it right.

15          Just a footnote, too, that, again, we're going

16   down two different tracks and working with Deputy Chief

17   Bañez and Deputy Chief Medina because we're trying to

18   incorporate and going out to all the faith communities and

19   talk about community-oriented policing as well as the CPCs.

20   We're also looking at recruitment along those areas.  So

21   we're working with Pastor Alarid, and he has access to about

22   anywhere from 70 to 72 different churches, faith communities

23   we're looking at.  We've talked about Pastor Benford and

24   also we've visited with Bishop Cooper.  They're head of the

25   Ministers Alliance and they are very engaged and want to get

1    involved.

2              And one of the things that we wanted to tie this

3    into is a lot of them have various ministries, they have

4    youth ministries, and we're asking them to partner with us

5    in having a safe community and a helping community, because,

6    when you look at substance abuse, a lot of them have those

7    types of programs, so we're trying get them to partner with

8    us in those areas there.

9              So that's pretty much a brief overview of where

10   we are.  Again, Ms. Martinez, is there anything else we need

11   to add at this point, because we need to get your list of

12   the folks we invited before?

13             MS. MARTINEZ:  Your Honor, Mr. Lewis and I

14   started discussing the need to have these community meetings

15   because APD has, since the new administration came in and

16   since the Chief Geier took over leadership of APD, started

17   having regular briefing sessions with the amici and the CASA

18   stakeholders.  As you are aware, Judge Brack has included

19   the amici and the stakeholders as regular participants in

20   the public hearings in this case.  Even though he denied

21   intervention for those amici who made motions to intervene,

22   he did make it clear that he would continue to hear from

23   them.  And he has -- and he's done that throughout the

24   pendency of this matter.

25             Under Chief Geier's leadership and with the

1   Compliance Bureau, under the leadership of Deputy Chief
2   Garcia, every six weeks or so, the Compliance Bureau has
3   been holding meetings with the amici and stakeholders and
4   giving them a pretty comprehensive overview of what is going
5   on with the reform effort.  And what we learned is that as
6   the deputy chiefs and Chief Geier have been going out to the
7   community, they have been hearing from other members of the
8   community that if they, too, want to hear what's going on
9   with reform efforts.

10          And during the last status conference, the United
11   States asked Judge Brack whether he would entertain the
12   prospect of a public hearing after the monitor and APD file
13   their August 31st report and Judge Brack indicated that he
14   would consider that request.  At this point, the United
15   States will be formally withdrawing its request.  When we
16   made that request, we did not take into consideration the
17   fact that the monitoring team is in the process of drafting
18   the report that will be filed on November 2nd.  And so it
19   would be disruptive for Dr. Ginger to travel out here for a
20   public hearing in September.  And that led us to consider
21   instead hosting -- having the City host a community meeting
22   and the APOA and DOJ will work with them and support them in
23   doing so.  And we're actively now working with them in
24   setting those up.  And what we anticipate doing is having
25   the Compliance Bureau and the other units within APD provide

 1   the kind of presentation that they have in the past provided

 2   to the Court during the public hearing so that the community

 3   as a whole has an opportunity to hear from APD and know that

 4   they are being seen and making these reforms that are set

 5   forth in the CASA.  So that is an explanation of why it is

 6   that Mr. Lewis is working on putting these community

 7   meetings together.

 8          I also would like to just give the Court a little

 9   background on what is going on in terms of the Community

10   Policing Councils.  I have been working with the associate

11   monitor for community engagement that's been providing

12   technical assistance to the CPC managers and to the CPCs.

13   He has been working with them with a social media consultant

14   and, right now, are working together on presenting two days

15   of training to the Community Policing Councils.  They are

16   currently planning for that training to take place on August

17   24th and August 25th.  And the plan is for social media --

18   it will permit the future -- community about what CPCs do in

19   the community and for the Albuquerque Police Department.

20   And also --

21          THE COURT:  Ms. Martinez, I'm sorry you're

22   cutting out.  Could you back up a little bit?

23          (Reporter interruption for clarification.)

24          When you started talking about the dates.

25          MS. MARTINEZ:  The dates?

1          THE COURT:  Yes.

2          MS. MARTINEZ:  Okay.  The training is scheduled

3     for August 24th and 25th.

4          THE COURT:  Okay.

5          MS. MARTINEZ:  And the training will include

6     social media training for the Community Policing Councils.

7     The purpose of that training will be to enable the CPCs to

8     educate the community about what the CPCs do, both for the

9     community and for APD.  And it will also provide a way for

10    them to recruit new members.

11         In addition to that training, they will be

12    providing orientation for the new CPC members.  Part of the

13    plan is also to recognize the community members who have

14    volunteered during the past three years and provided service

15    to the community and to the police department.  They've

16    worked very hard and actually made a number of

17    recommendations that APD has accepted and incorporated into

18    their program.

19         And that is a report on the CPC front.  Thank

20    you, Your Honor.

21         THE COURT:  All right.  Thank you, Counsel.

22         Lt. Lowe, did you wish to address Agenda Item

23    Number 6?

24         MALE SPEAKER:  No, Your Honor.

25         THE COURT:  Okay.  Dr. Ginger, would you like to

1    address Item Number 6?

2            DR. GINGER:  Yes, just very briefly, Your Honor.

3    I will note that we've seen a new spirit of involvement in

4    APD.  And they're looking at the requirements related to

5    community engagement, really, for the first time in this

6    project as a benefit as opposed to simply a requirement.

7    And it's tangible.  You can see in the way they think about

8    things and the way they build systems to comply with these

9    requirements.

10            THE COURT:  Okay.  All right.  Thank you.

11            Mr. Mowrer, would you like to comment?

12            MR. MOWRER:  No, thank you, Your Honor.

13            THE COURT:  Would anyone else like to comment on

14    Agenda Item Number 6?

15            MR. LEWIS:  Your Honor, James Lewis.  One of the

16    things that we're going to be doing as we try to roll out

17    the community engagement, we also have the academy very

18    engaged.  They were very engaged this past week in the

19    police sign out, so I want to thank them for what they've

20    been doing.  And also for a map warrior actually working

21    with all of the different entities on community engagement.

22    Community policing is -- we've got to define it and simplify

23    it where people understand it.  And we have a wonderful

24    program and we just need to make sure we educate people on

25    what it means.

1          THE COURT:  All right.  Thank you, Mr. Lewis.

2          Would anyone else like to comment on Agenda Item

3    Number 6?

4          So let me just -- Ms. Martinez, have we covered

5    everything on the agenda?

6          MS. MARTINEZ:  Yes, Your Honor.

7          THE COURT:  All right.  Before we move on -- I

8    want to briefly address the upcoming deadlines and hearings,

9    but before we move on, would anyone from the City of

10   Albuquerque like to say anything else?

11         MR. AGUILAR:  Your Honor, this is Esteban

12   Aguilar, the City Attorney.  I just want to close by

13   thanking first the monitoring team for all of their hard

14   work and the continued technical assistance they've been

15   providing.  The U.S. Attorneys have been a tremendous help

16   and an invaluable resource working with them and I'd like to

17   thank them and my staff as well.  But also to the

18   Department.  The Department has made tremendous strides in

19   the short amount of time that I have been here.  Across the

20   board, from leadership to compliance, they've worked very

21   hard.  And there's not enough time to thank everyone

22   individually, but they should be commended for their work,

23   their efforts, that we have done to this point.

24         THE COURT:  All right.  Thank you, Counsel.

25         Would anyone from the -- representing the United

1    States like to say anything else?

2           Dr. Ginger, would you like to mention anything

3    else?

4           DR. GINGER:  No, Your Honor, I have nothing

5    further.

6           THE COURT:  Mr. Mowrer?

7           MR. MOWRER:  Nothing further, Your Honor.

8           THE COURT:  Anyone else?

9           All right.  In terms of upcoming deadlines and

10   hearings, it looks to me like the next thing that would be

11   coming up is a second mini report due on August 31, 2018.

12           Ms. Martinez, is that correct?

13           MS. MARTINEZ:  Yes, it is, Your Honor.

14           THE COURT:  Okay.  Anything we need to discuss at

15   this time about that?  Is there going to -- does anyone

16   anticipate any problems meeting that deadline?

17           MS. MARTINEZ:  No, Your Honor.

18           THE COURT:  Okay.  Then the next thing that would

19   be due on September 2nd is the City Status Report 8.

20           And let me just ask you, Mr. Schmehl, first of

21   all, is that deadline correct and, second, do you anticipate

22   any problems meeting that deadline?

23           MR. SCHMEHL:  It is, Your Honor, and no problems

24   in meeting that deadline.

25           THE COURT:  All right.  Thank you.

1          And then it looks like there is a tentative

2    status conference set for September 7.  And I assume Judge

3    Brack will decide whether that's going to work for that date

4    or not.  Are the parties still good with tentative status

5    conference on September 7 or anyone -- let me put it this

6    way:  Is anyone not okay with that?

7          Okay.

8          All right.  Very good.  Counsel, Dr. Ginger,

9    everyone else, appreciate all your input.  I think we have

10   covered everything.  I guess I should just remark that there

11   seems to be a demonstrable change in vibes since the last

12   status conference I attended, and it's very encouraging and

13   gratifying.  And I'm sure Judge Brack will be very pleased

14   to read the transcript and see how well everyone is

15   cooperating and moving forward.

16          So I commend you all on your efforts.  It's an

17   amazingly complex, difficult, and time-consuming job.  And I

18   know I appreciate it, and I'm sure Judge Brack appreciates

19   all the work everyone's putting into it.

20          So that being said, if there's nothing further.

21   Thank you very much for your time and the court will be in

22   recess.

23          (The proceedings concluded at 2:32 P.M.)

24

25

```
 1                  UNITED STATES OF AMERICA

 2                  DISTRICT OF NEW MEXICO

 3

 4            CERTIFICATE OF OFFICIAL REPORTER

 5       I, Vanessa I. Alyce, RPR, NM CCR, and Federal Official

 6  Court Reporter in and for the United States District Court

 7  for the District of New Mexico, do hereby certify that

 8  pursuant to Section 753, Title 28, United States Code, that

 9  I did report in stenographic shorthand to the best of my

10  skill and ability the foregoing pages 1-41 of the

11  proceedings set forth herein, that the foregoing is a true

12  and correct transcript of the stenographically recorded

13  proceedings held in the above-entitled matter and that the

14  transcript page format is in conformance with the

15  regulations of the Judicial Conference of the United States.

16

17  Dated this 14th day of August 2018.

18

19  S/Electronically Filed
    Vanessa I. Alyce, RPR, NM CCR #259
20  Federal Official Court Reporter
    100 N. Church Street
21  Las Cruces, NM 88001
    Phone: (575) 528-1430
22  Email:  Vanessa_Alyce@nmcourt.fed.us

23

24

25
```