**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

 **Plaintiff,**

v.           No. 1:14-cv-1025 RB/SMV

THE CITY OF ALBUQUERQUE,

 **Defendant,**

v.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

 **Intervenor.**

### SECOND STATUS REPORT ON THE TECHNICAL ASSISTANCE PROVIDED BY THE INDEPENDENT MONITOR TO THE CITY OF ALBUQUERQUE AND THE CITY OF ALBUQUERQUE'S EFFORTS TO IMPLEMENT ITS COMPLIANCE PLAN

  This status report will update the Court, the Parties and the community on the technical assistance provided by the independent monitor to the City of Albuquerque ("City") and the City's efforts to implement its compliance plan (Doc. 358-1) which was filed with the Court on March 14, 2018.

  The first section of the status report has been authored by the independent monitor and it details the efforts of him and his team to provide technical assistance to the City while the second addresses the City's efforts to implement the compliance plan. (*See* Doc.355 at 4)

## SECTION I: INDEPENDENT MONITOR'S REPORT ON TECHNICAL ASSISTANCE PROVIDED TO THE CITY OF ALBUQUERQUE

This document constitutes the second status report outlining the technical assistance processes provided to the Albuquerque Police Department in response to the requirements of recent modifications to Paragraph 308 of the CASA. As we noted in our first status report, filed with the Court in June, 2018, the "Joint Stipulation was filed with the Court on the 10th of May, and articulated, in effect, a document that suspended the "normal" reporting processes for independent monitor's reports, replacing the "normal" process with four status reports, (two prepared by the monitor and two prepared by the City). The joint stipulation requires the first of these four reports to be submitted to the Court on or before June 1, 2018 and the second due to the Court on or before August 31."

This document is the second filing in response to those requirements. The second filing covers the months June, July and August, 2018. The first monitor's report for the seventh monitoring period covered March-May. Again, based on the agreement of the Parties, the monitor's second status report covers the technical assistance provided to APD in thirteen critical areas of compliance, including:

1.  Developing an internal problem-solving process that APD can use in every area of compliance;

2.  Monitor's review and comment on proposed APD Use of Force policies;

3.  Designing a new training program for personnel assigned to the Force Review Board investigative function;

4.  Designing a new training program for supervisors regarding their obligations under the three-level force classification system;

5.  Development of a mini-seminar for APD senior command outlining recommended strategic planning methods;

6.  Designing a new training program for line officers regarding the revised use-of-force policy and their obligations when they use Level 1 force;

7.   Strengthening the administration of APD's training academy;

8.   Addressing effectively the Use of Force backlog of investigation and resolution of over 345 backlogged use of force cases still pending completion;

9.   Force Review Board Restructuring and Training;

10.  Special Operations Division Use of "Less than Lethal" Force;

11.  Other TA Provided During Seventh Reporting Period;

12.  New Academy Command; and

13.  Global Issue Identification and Recommendations.

Each of these areas of technical assistance (TA) is discussed in some detail below.

## 1. Developing an Internal Problem Solving Process

In the first few weeks of the first reporting period, the monitor personally trained (and in some cases re-trained) key management and operational staff in a universally applicable problem solving process. In a repeated (and somewhat revised) session with lieutenants, commanders, and deputy chiefs, the monitor walked APD command through the widely applicable "GO-MAPPS" (Goals-Objectives-problem-solving process[1]). During the second reporting period covered by this report, we had multiple discussions with APD command and staff focused on their work product and process. We bolstered the problem-solving process training offered early in the 7th reporting period with in-depth discussions with APD command and staff personnel of task-focused processes across multiple work areas, including Blue Team development and implementation processes, electronic control weapons training, supervision, use of force reporting and review,

---

[1] This process, GO-MAPPS (Goals-Objectives-Measures-Analytic Methods, Process and Product) was relied on extensively by the monitor in similar projects with monitoring processes used in Pittsburgh, PA and with the New Jersey state police. It proved to be the key to success in training assessments and developments in both jurisdictions. GO-MAPPS outlines "problem sets" responses by defining **G**oals, **O**bjectives, **M**easures, **A**nalytic Methods, **P**rocess and **P**roduct. This process is still being used on a daily basis at NJSP, more than a decade after that consent decree was terminated.

special operations, "best practices" review and assessment, strategic planning, training curriculum development, assessment and response of the use of force backlog, and other related areas. We also demonstrated a tested and proven "strategic planning" method to APD command personnel.

During the second reporting period, we continued the work begun earlier in the IMR-7 reporting dates. Specifically, we reviewed in-depth with APD training academy staff a seven-step planning and development process, and arranged a session with personnel from the New Jersey State Police training academy, an organization that has had remarkable success in revising training protocols to meet consent decree requirements. GO-MAPPS is still utilized as a planning process at NJSP, nearly ten years after the consent decree process was successfully completed.

### 2. Review and Comment on Proposed APD Use of Force Policies

Given required changes in policy development processes, based on past performance at APD, we reviewed in detail and commented on APD's proposed use of force policy changes (suggesting improvements in policy analysis, problem-solving, and policy revision practices). These review-comment processes were designed to improve the clarity, guidance, and operational impact of APD's use of force policy suite, as well as to enhance the ability of supervisory personnel to respond to changes in use of force policy with targeted, informed, and refreshed understanding of the implications of policy changes in the field, as they applied to electronic control weapons (ECW) usage, use of force other than ECW, and review of uses of force by supervisory and command personnel. This component also included monitoring team comments and guidance on proposed "Special Orders" designed to affect use of force practices, supervisory review, and other issues. The monitoring team also reviewed comments from the POB (Police Oversight Board) and CPOA (Civilian Police Oversight Agency). We view it as highly positive that, for the first time, POB and CPOA have had meaningful access to the policy development process, including the use of force policy, and other related and supporting policies.

### 3. Review and Comment on Force Review Board Training and Practice

Members of the monitoring team also conducted a thorough review of APD's proposed training curriculum for the Force Review Board (FRB), and provided recommendations regarding that training to ensure it was responsive to identified FRB issues that had created oversight lapses in the past. These comments were provided to the Training Academy leadership so that issues could be resolved prior to the process of training the "new" FRB members in order to facilitate a smooth transition from old FRB practices (practices of which we had been highly critical in past monitor's reports) to new, more effective and manageable FRB practices. During the reporting period we identified past failed processes at FRB and suggested methods of restructuring, tightening review timelines, improving membership selection processes, improving member voting practices, and improving FRB outputs so they could be easily folded into departmental problem identification, training, supervision and disciplinary processes.

### 4. Reviewing APD's Revised Training Program for APD Supervisors

Members of the monitoring team reviewed carefully APD's proposed new training for officers and supervisors related to the revised use of force policies, revised reporting processes for uses of force, and supervisory review of use of force under a new, streamlined use of force practice developed by APD with input from the police union, the monitoring team, and DOJ. We reviewed the proposed curriculum for appropriate goals, objectives, measures of effectiveness, etc., and provided feedback for areas and methods of improvement to the planned training. As we have in the past, we caution APD about detailed planning for training events until all related policies have been approved by the monitor and the Parties.

### 5. Mini Seminar for Senior Command on Strategic Planning Methods

Members of the monitoring team provided a detailed and problem-specific seminar for senior APD command staff related to strategic planning methods, including problem identification, threat assessment (as related to CASA implementation), problem prioritization, and potential outcome assessments. During that session, we identified the most critical problems and issues confronting APD as they move toward compliance, assessed those problems and issues in terms of long-term impact, and discussed methods of transition from "planning" to "action." This training focused on actual command- and executive-level issues affecting compliance, and was designed to leave key APD command elements with an enhanced understanding of problem identification processes, "threat analysis" methods, and problem "ranking" methods.

**6. Designing Training Programs for Line Officers Regarding the Revised Use-of-Force Policy and Related Issues**

The monitoring team spent a significant amount of time during the second half of the seventh reporting period reviewing training curricula proposed by the Training Academy related to specific changes in policy, practice, supervision, and assessment of use of force-related policies and issues generated by the changes made by the APD and the Parties to the APD's use of force policies and practices. These included, again, detailed review and comment on proposed training protocols and processes, including delivery, review, and assessment processes. This included detailed discussions of course syllabi, instructional modalities, evaluation, and documentation of training provided and results attained. We note again APD's tendency to plan training prior to the approved policy being finalized. As of the date of this report, the Parties are still involved in reviewing portions of the use of force policy suite. We caution APD's academy, as we have in the past, against planning and delivering training on policy issues, such as use of force, that have not been fully vetted and approved by the Parties and the monitor.

**7. Strengthening the Administration of APD's Training Academy.**

6

Members of the monitoring team worked closely with the administrative staff of the Academy to identify past weaknesses, related causes and problems created by those weaknesses, and steps to improve planning, process management, delivery and evaluation of the training function. We discussed with training command specific items that had proven problematic in the past, including critical elements of training command such as:

- Needs assessment processes;
- Program development;
- Program documentation;
- Program evaluation; and
- Program revision and "institutionalization."

We found some relatively serious skill deficiencies among training staff related to these five areas, and worked, within the time available, to lead them to in-field examples of agencies who had done well with these training processes.

### 8. Addressing the Use of Force Backlog

During the 7th Reporting Period, members of the monitoring team provided substantial amounts of review, commentary, and guidance to APD on how to process the substantial use of force investigative backlog left behind by the previous administration. We identified the use of force backlog as a "serious threat to compliance" moving forward, and provided APD with discussions regarding multiple potential models to assess, plan, organize and implement effective measures to reduce the use of force investigative backlog, while ensuring that more cases were not added to the backlog. The elements of TA provided included:

- Methods to clearly identify (by count and type of case) the number of cases considered to be "backlogged;"

- Methods to calculate a workable "average" for the length of time to complete various types of investigations constituting the use of force backlog;

- Methods for calculating the number of staff that would need to be dedicated to the clearance of backlogged cases if APD wanted to minimize the impact of "backlogged use of force cases" on compliance findings; and

- Methods for organizing, assigning, tracking, and evaluating the quality of investigations of "backlogged" cases.

We note that APD's Internal Affairs unit has taken those processes to heart, and is now producing weekly "recaps" of the number of cases remaining in the backlog, the number of cases moved through the investigative and decision-making process, and the number of cases still remaining in the backlog. Such performance metrics are important, and reflect steady progress in staffing, training, supervision and assessment of investigative personnel assigned to the "backlog" investigative process.

### 9. Special Operations Division Use of "Less than Lethal" Force

During the second half of the reporting period, members of the monitoring team worked closely with APD's Special Operations Division in crafting a coherent and integrated approach to developing policy and operational oversight regarding use of tactics considered to be "Less than Lethal Force," i.e., flash-bangs, stun devices, etc. This entailed detailed and multiple interactions between SOD leadership and the monitoring team, and even some illustrative literature reviews by the monitoring team (assessed, summarized, and "interpreted" for SOD leadership by the monitoring team) so as to ensure that APD's SOD policies, training, and supervision were congruent with the CASA, constitutional law, and "best practices" in the field.

### 10. Community Outreach and Community Policing

During the June-August time period, members of the monitoring team also focused on community outreach practices, including the provision of specific outreach-related training, facilitation of SME contacts with APD community policing staff, and weekly telephone

consultations with the City of Albuquerque's community outreach director. These activities included, but were not limited to:

Continued outreach and inclusion processes focused primarily on CPC operations, on-site and telephonic meetings with APD's community outreach team relative to "best practices" in public messaging, strategies to increase non-enforcement contacts, measuring non-enforcement contacts, outreach strategies for CPCs, and improving CPC diversity. Members of the monitoring team also met with Academy leadership to discuss approaches to revising the Citizens' Police Academy training processes, including developing more current curriculum for the Citizens' Police Academy, and referrals to other citizen police academy processes in other departments.

The monitor's staff also facilitated two meetings with city leadership and APD leadership regarding promoting cultural change within APD, as well as structuring and facilitating a training session with city and APD leadership regarding Citizens' Policing Councils operations, outreach, and generation of recommendations for a "way forward."

Further, the monitoring team's police-community relations specialist coordinated and arranged for crisis communications training to be provided by a nationally recognized expert in crisis management and media relations. The three-hour training was followed by a briefing of key executive staff and city leaders. Additional training was provided by monitoring team members regarding media relations and an orientation process for CPC members.

In late August, the monitoring team's police-community relations specialist coordinated a five-hour training program for CPC members that included social media training by a nationally recognized media relations expert. The CPOA Executive, who has been a significant source of support for the CPCs since they were organized, participated in the training.

**11. Other TA Provided During the Seventh Reporting Period**

As part of the monitoring team's on-going systems improvement processes for APD, we provided during the course of the seventh reporting period routine "TA" services, relating to six additional specific areas. These are discussed in sections 10.1 through 10.6, below.

**11.1 Identify and Neutralize the "Counter CASA Effect**

We took deliberate steps to discuss with senior APD command what we had come to see as a deliberate "counter CASA" effect that had made itself evident in the routine process of our interactions with the APD under the former administration. Careful readers of the monitor's reports are aware of those "counter CASA" effects which included: a unilateral "shut down" of the Early Intervention System by APD supervisory personnel; poor and seemingly deliberate leadership and process management deficiencies by members of the Force Review Board; deliberate provision of inaccurate and misleading data on key CASA components; deliberate and misleading statements to the monitoring team by key executive leadership personnel of the previous administration, and "publication" of an errant, poorly researched and documented "Underuse of Force Report" by the CIRT unit leadership. We advised APD executive staff that we have noted that some of the personnel involved in those past "obfuscations" are still employed by APD, some in CASA-sensitive positions. While we understand issues of seniority and the APD "bid" process may exacerbate this issue, we will continue to monitor APD's responses to this concern.

**11.2    Move to Problem-Oriented Quality Improvement in Supervision, Mid- and Upper-Level Management Levels at APD**

Since the advent of the monitoring process, we have urged APD to transition to a problem-oriented process for quality improvement in supervision, mid- and upper-level management ranks. We see it as critical that, to the extent possible, those who are working diligently to implement CASA-required processes be recognized for that work, and where feasible, transfers and

promotions are reflective of that work. We continued to emphasize that assessment with the "new" APD command and executive staff. We have advised APD that we see a move to problem-oriented improvements in supervisory, command, and executive staff as critical to APD's success in complying with the CASA.

### 11.3 Rely on Previous IMR Recommendations and Process Suggestions

As we had with the previous administration at APD, we again emphasized with the new administration the need to comb the monitor's previous reports to identify the recommendations made to resolve most of the issues noted in section eleven of this report. Over the last four years, well over 400 recommendations have been made regarding how to resolve problems identified in the monitor's previous reports.

### 11.4 Develop a Problem-Oriented Approach to Supervision, Management and Executive Functions at APD

As we discussed at length with command levels at APD in past years, there is little likelihood, if any, that success in CASA compliance would come until it took a careful look at the reasons for failure in its management and oversight systems. We have advised the new administration of the same, and over that last few months have suggested that they take a deep and critical look at internal management functions and processes at APD. The tried and proven problem-oriented process, first outlined by the Police Executive Research Forum in the 1980s, is a good approach for the current leadership at APD to take in assessing the strengths, weaknesses, opportunities and threats to effective management of CASA-related process. Where there are failures analyze the reasons for them, develop solutions, respond by implementing the solutions, and assess the effectiveness of those solutions (SARA). We see the beginnings of such a process with the new management cadre at APD, and stand ready to assist them where possible in "working" failure out of APD's CASA related processes.

11

### 11.5  New Academy Command

During our site visits with APD over the last reporting period, APD executive leadership informed us of the intent to bring new focus to the APD Training Academy by infusing new leadership from the outside.  That decision was taken, formally, after the end of the reporting period for this report.  Based on our continual problems with the quality of work of senior staff at the training academy over the last four years, we see this as an effective move to bring APD's training command up to speed on established, effective practices in planning, organizing, delivering, and evaluating the outcomes of its training processes. We stand ready to assist the new training commander as plans are developed, implemented, and assessed relating to finally bringing training into compliance with the requirements of the CASA.  As we noted early on in the monitoring process, training is a touchstone for CASA compliance.  We will continue our practice of providing open access to the monitoring team for Academy executive staff.  Shortly after the end of the reporting period for this report, APD recruited and hired a new Training Commander from outside the agency.  Given our continuous comments about the efficacy of the training process, we see this as a good thing.

### 11.6  Internal Audit Functions

We have long-exhorted APD to implement a meaningful internal audit function designed to translate key components of the CASA, e.g., policy, training, supervision and discipline, into actionable "audit schedules."  Such a unit was articulated by APD in 2016; however, it was never adequately staffed, trained, supervised, or charged with completion of meaningful performance audits. It was, in effect, a "paper unit."  We have discussed this issue with the current APD leadership cadre since early in the transition process, and are pleased to see the billeting of a new audit unit within the Compliance Bureau.  We have advised current APD leadership that we stand ready to work with new audit unit in any way we can to ensure its effectiveness.  As APD is aware,

12

the same admonitions apply: staffing, training, oversight, good direction and empowerment are critical to the success of any audit unit. It appears APD has taken the right step to ensure that the first area of focus of this newly fielded audit unit will be related to internal audit of CASA-related requirements. We will continue to assess the workflow and focus of the new unit.

### 12. Global Issue Identification and Recommendations

Based on our overall assessment of the transition process we have observed at APD over the last reporting period, we also made several global recommendations designed to assist APD in their issue identification and response protocols related to compliance with the CASA. These included our perceived need for APD to:

    a. Be wary of a residual "Counter-CASA Effect," and to assess the goodness of fit of current assignments of personnel who, in the past have erected roadblocks to compliance.

    b. Move to a problem-oriented quality improvement focus to ensure that supervisory, mid- and upper-management personnel are meaningfully committed to the CASA and the requisite implementation protocols;

    c. Identify, train for, and implement continuous improvement processes and practices;

    d. Identify, assess, and manage the current organizational culture at APD so as to empower those who work effectively to implement the CASA and to minimize the effect of those in the supervisory and management cadres who do not support effective CASA implementation; and

    e. Strengthen the supervisory ranks through a coherent, clearly stated process of remediation of those who do not support CASA compliant strategies, policy and process

    f. Comb previous monitor's reports for recommendations and suggestions, and prioritize implementation of those that address items 1-13 above; and

    g. Develop a problem-oriented approach to supervision, management and executive functions related to (or supportive of) adequate CASA requirements actualization.

### 13. Summary

In the monitor's experience with planned change activities in other police agencies, the higher-level needs often get lost in the day-to-day response to exigencies and emergent events. APD will need all of its current management and leadership acumen to ensure the issues outlined above are kept at the fore of their executive and managerial "to do" lists.

Our work with APD over the past reporting period has been both diagnostic and prescriptive. We have identified specific issues we see as standing between APD and effective compliance with the CASA, and have spelled out specific steps that need to be taken to address and overcome those issues. We note a near-universal willingness at APD command levels to seek out and carefully consider the monitoring team's guidance. This constitutes a significant and important "sea-change" in the APD-monitoring team's relationship. Currently, we receive almost daily requests for assessment, input, and suggestions relative to APD's planned activities designed to facilitate compliance with the CASA. We caution the reader to realize that, while APD is currently committed to compliance, the problems identified and treated in the CASA are problems that came into existence after years of denial that true change was needed. What remains ahead is a set of complex, inter-related, and critical process development activities that are designed to achieve compliance. As always, the monitoring team stands ready to assist APD as it works its way through the issues standing between it and full compliance with the CASA. Today, that willingness to assist APD in its compliance efforts is being met by APD with willingness to listen to the monitoring team's guidance, and, where feasible, to implement those recommendations with an intent to move the APD into true, measureable compliance with the requirements of the CASA.

## SECTION II: CITY OF ALBUQUERQUE'S IMPLEMENTATION OF THE COMPLIANCE PLAN

**Introduction**

In November of 2017, the parties, with the approval of the Monitor, agreed to implement

14

a new strategy to achieve compliance with the CASA: the City of Albuquerque agreed to develop a compliance plan. [Doc. 331] "The purpose of the compliance plan is to set forth specific actions that the City will take to achieve compliance with the CASA, the individuals responsible for those actions, and deadlines for taking action." [Doc. 331, p. 2] The City created the compliance plan with the assistance and approval of the United States and the Monitor, and on March 14, 2018, the City filed the Compliance Plan with the Court. [Doc. 358-1] The Compliance Plan focused on six areas identified by the parties and Monitor as of significant concern: 1) the Use of Force Investigation Backlog; 2) The APD Implementation Unit (which focused on the creation of the compliance bureau); 3) operations of the academy; 4) Supervisor Use of Force Investigations (Process Failures); 5) use of force training; and 6) amici concerns. Furthermore, the Compliance Plan identified specific actions, or tasks, the City needed to take, identified the individual responsible for taking the action, stated a deadline for the completion of the action, and required APD to identify the document which would prove that the action was completed. In all, ninety-one (91) tasks were identified in the Compliance Plan.

The Compliance Plan was developed with the intent that all actions be completed within six months of the filing of the Compliance Plan. [Doc. 331, p. 2] Further, the parties and the Monitor agreed that the City would provide a first status report as to the implementation of the Compliance Plan half-way through the six-month period. The City did so on June 1, 2018. [Doc. 375] As of that date, eighty-two (82) tasks were due to be completed, and the City completed seventy-six (76) of the eighty-two tasks by May 31, 2018. Since May 31, 2018, the City completed all but three of the remaining tasks (88 out of 91 tasks).

As agreed to by the parties and the Monitor, in this Status Report the City will identify: "actions that it has taken; impediments to progress; unanticipated problems; any missed deadlines, including an explanation for why the City missed those deadlines and what the new deadlines will

be; and any other relevant issues or concerns that arose during the previous period" [Doc. 331, pp. 4-5] between the period beginning May 2, 2018 and ending July 31, 2018.

## Area 1: Use of Force Investigations Backlog

The work done by the Department to eliminate the backlog of use of force and serious use of force investigations continued during the period covered by this second Status Report. The first Status Report from the City set out the four primary goals [2] to be achieved through the review of use of force, show of force and serious use of force investigations (Doc. 375, p. 19) and recognized that the failure to review these incidents in a timely fashion represented lost opportunities to correct officer behavior. (*Id.*).

In addition to the backlog of use of force and serious use of force investigations being reviewed there are use of force incidents occurring in the field that must be investigated in a timely fashion. To address field use of force investigations with a clear timeline the Deputy Chief of the Field Services Bureau drafted and published Special Order 18-58. This Special Order has proven to be an effective remedy to the issue of field use of force investigations being completed well within the administrative timeline to address potential misconduct.

On a weekly basis a status report is sent to command level personnel updating them on the status of supervisor use of force investigations pending in various chains of command. As of July 27, 2018[3] the following represents the number of use of force and show of force cases pending

---

[2] "1. To assess the original supervisor or investigator's finding concerning the appropriateness of the force used by an officer; 2. To identify policy violations, unrelated to the application of the force by the officer which were not captured in the original investigation; 3. To identify potential criminal conduct in either the force used by the officer or other actions taken; and 4. To recognize deficiencies in the reporting of force by officers and investigators of force by supervisors and investigators so that these trends can be captured and applied to training and work performance purposes."

[3] Since the issuance of Special Order 18-58 on May 18, 2018, the cases pending in various chains of command have gone from over two hundred (200) to eighty four (84). The Department anticipates that no field use of force investigations will ever pass the one hundred and twenty (120) day mark.

based upon the amount of time that has passed since the investigation was initiated:

1. Fifty-two (52) use of force cases pending sixty days or less;

2. Twelve (12) show of force cases pending sixty days or less;

3. Nine (9) use of force cases pending more than sixty days; and

4. No show of force cases pending more than sixty days.

As it concerns the backlog of use of force and show of force investigations the total to be reviewed is three hundred and fifteen (315) incidents.   Within the three hundred and fifteen incidents there are seventy-five (75) show of force incidents to be reviewed.   There are also twenty six (26) serious use of force investigations.

In addition to the investigative response to a use of force there is an administrative data entry function that feeds the Department's understanding of the data generated by these incidents. Administrative entries depict use of force incidents and capture the data needed for the Department to publish the annual use of force report anticipated by paragraph 79 of the CASA. (Doc. 354-1 at 38) (*See*, Doc. 356, Adopting Certain Modifications to the First Amended and Restated CASA). This data includes information such as number of custodial arrests that involved use of force, number of individuals armed with weapons, geographic data, demographic data and number of individuals injured. (*Id.*).   In addition to this data APD has incorporated additional check points in the review process, to include; ensuring all attachments listed in reports and mandated by policy are in the entry, data concerning the use or failure to activate on-body recording devices, criminal charges, proper case and incident number, type of resistance from a subject of force, and types of force.

The administrative entry of a force incident is now initiated by the investigating supervisor rather than an involved officer.   This is the case because there may be multiple officers involved in a use of force incident and it becomes inefficient for there to be multiple administrative entries

17

for multiple officers involved in one incident. This "Blue Team entry" primarily consists of the use of force report, use of force data report and use of force narrative report by the involved officer. Once an investigation is completed by the supervisor it is forwarded to the lieutenant and then the commander for review and approval. The investigating supervisor is responsible for making a finding about whether the use of force (or show of force) is "in policy" or "out of policy" and the chain of command must either concur or disagree with that finding.

The Blue Team entry can be sent back and forth in the chain of command for a variety of reasons, such as a deficiency in the officer's reporting, or the review of force by an investigating supervisor is found insufficient by a lieutenant or commander, or required documentation has not been attached to the entry. The supervisor force investigation is completed by the field chain of command, and the Blue Team entry is then forwarded to an administrative assistant in the Internal Affairs Force Division.

The administrative assistant is responsible for reviewing the Blue Team entry and supporting documents to assure that all of the required data and documentation is included. The administrative assistant does not edit or revise the review by the chain of command, and the respective findings and all of the required data and documents must be included before the entry can be warehoused in the database. Historically there have been issues gathering data and documents from personnel in the chain of command, and only one administrative assistant has been tasked with this work.

During the period covered by this Status Report a staffing plan was generated which called for additional personnel to assist the one dedicated administrative assistant in clearing the backlog administrative entries. The needs of the staffing plan were initially met, the backlog was remediated and personnel were reassigned which led to the backlog increasing back to one hundred and ninety four (194) entries.

A.     Specific Issue: Review, remediate and decrease the backlog of use of force investigations

*Actions the City has taken:*

As mentioned in the first Status Report to the Court and community the central goal of the review of these completed use of force investigations is to identify any investigative, evaluative and supervisory deficiencies so that they may be appropriately addressed through referral to the appropriate chain of command or Internal Affairs Misconduct. In order to conduct these reviews there must be a determination about the sufficiency of the first investigation to satisfy a preponderance of the evidence that a use of force was in or out of policy. The emphasis during the period covered by this Status Report has been on the allocation of personnel, development of a second round of training, building proficiency in conducting comprehensive reviews of these investigations and the development of training for the video review component to reviewing the backlog.

The following actions have been taken by the Department to continue addressing the backlog of use of force investigations:

- IAFD received the first transfers of personnel on June 9, 2018. The personnel included one (1) lieutenant to address the current processes of the Critical Incident Review Team; three (3) sergeants were assigned to supervise detectives reviewing the backlog of supervisor use of force investigations; and eight (8) detectives were assigned to review the backlog of supervisor use of force investigations.

- A revision to the first delivery of backlog review training has been created and it will build upon the first iteration of training. The second training emphasizes critical analysis of the evidence presented in a use of force investigation so that detectives can draw reliable conclusions based upon the applicable use of force policies so that reliable

conclusions can be drawn about whether a particular use of force was in or out of policy. The anticipated audience for the second delivery will be the current backlog detectives, officers interested in transferring to the unit in the future, Performance Review Unit personnel, and temporary transfers. While this training is pending delivery the sergeants overseeing the work of detectives continue to coach and counsel detectives so that they are reviewing cases with an appropriate level of objectivity and scrutiny.

- IAFD has developed a Backlog Review Project Status (attached hereto as Exhibit 1 is the Report for August 6, 2018) which is provided weekly to the monitor and parties as a means to set out important metrics, such as the total number of use of force investigations reviewed by detectives over the course of the project; the amount of time spent by detectives reviewing a use of force investigation; the time spent by detectives reviewing video involved in a use of force incident; and the use of force incidents that have been found to be out of policy by a detective. This has served to be an important tool to track the progress of the exercise to review and remediate these investigations.

- The first Backlog Review Project Status update was provided on June 29, 2018 with four (4) cases indicated as being closed. As of July 30, 2018 fifteen (15) cases have been closed and there are an additional twelve (12) cases that have been completed by detectives which are pending review by a sergeant. Through the work to review the investigations data is being collected so that trends can be identified concerning equipment, policy, tactics, training and supervisory issues presented in a review. This data is captured in a corresponding synopsis coversheet that accompanies each review. Of the fifteen cases there have been five cases identified as out of policy with only one

20

of those cases being initially found out of policy by the investigating supervisor.

- As mentioned briefly above there was an identified problem with having only one administrative assistant assigned to working on the entry of data concerning incoming field use of force investigations. In response to this issue IAFD requested and received an additional administrative assistant in April. At the time of this assignment the number of cases pending entry into IAPRO[4] was five hundred (500) cases and by the end of June that number was ninety four (94). However, the administrative assistant was re-assigned, and the cases pending entry has increased to one hundred and ninety one (191) cases as of July 27, 2018.

Importantly, a staffing proposal was submitted on April 9, 2018 requesting this administrative assistant as a permanent transfer and it is anticipated that an employment posting has been made with an expectation to fill this position on or about September 10, 2018.

*Impediments to the process/Unanticipated problems*

IAFD were unsure how long it would take a detective to review a use of force case when the plan to review the backlog was created. The plan to review the backlog places the frequent users of force as the first priority for review. As such, the experience has been that these cases are more difficult and time consuming and the expectation is that the first one hundred (100) cases will take the most amount of time to complete. As the detective becomes more experienced, and the supervisors become more thorough in their scrutiny and coaching, the time to complete cases will be decreased.

Based upon the metrics captured through the work done to this point in time it takes a

---

[4] IAPRO is the data entry warehouse where use of force case information is found. The initial Blue Team entry acts as the data transmission vehicle to the IAPRO warehouse where reports can be generated to depict important data points concerning use of force incidents.

detective approximately twenty (20) hours to complete a case. This sum breaks down into approximately six (6) hours watching all videos from involved and witness officers' on-body recording devices. IAFD has developed a staffing plan to hire six (6) non-sworn personnel for a Video Review Unit that will alleviate the work load on detectives and considerably reduce the time spent on a particular case.

The IAFD personnel assigned to review the backlog of supervisor use of force investigations have taken time to become a cohesive unit because considerable time has been spent developing a work-space. It is anticipated that the work-space will be complete by some time in August.

The staffing for the Video Review Unit is pending and the training has been developed and is being reviewed by the Academy. The dedicated internet access for these personnel has been requested and installation is pending. The final impediment to progress reviewing the backlog of field use of force investigations has been increased detective staffing. IAFD has submitted a project completion date based upon increased staffing at the detective level and is awaiting approval of more personnel to be assigned.

*Any missed deadline*

IAFD has met all but one deadline—delivery of training to video review personnel by May 14, 2018. As mentioned above, this training is pending review by the Academy and approval of the monitor before delivery.

*Explain why the City missed those deadlines and what the new deadlines will be*

*Any other relevant issues or concerns that arose*

The City missed the deadline to deliver training as the training took longer to develop than anticipated. It is relevant to mention that the time it is taking to conduct the reviews has been more time consuming than initially anticipated; however, IAFD is committed to thoroughness which

22

will create a foundation for efficiency in these reviews.

## Area 2: APD Implementation Unit

A.   Specific issue: Create a Compliance Division (Implementation Unit) within the APD Compliance Bureau

APD created a Compliance Division to provide oversight, guidance, and accountability while acting as a centralized Division for CASA-related activities. This Division is responsible for process development, auditing and assessment functions, and specifically focuses on level-one use-of-force case reviews.[5]  APD continues to grow this Division.  Because APD was creating an entirely new unit, the tasks identified in the Compliance Plan were related to creating a new unit and ensuring it is operational.

*Actions the City has taken:*

- Drafted a staffing request memo to the Chief of Police for sworn personnel based off the findings of the completed Job Task Analysis and Needs Assessment;

- Based on the results of the approved budget (effective July 1, 2018), drafted a staffing request memo to the Chief of Police for civilian personnel based off the findings of the completed Job Task Analysis and Needs Assessment, specifically data analyst positions;

- Developed and submitted a Compliance Division organization chart to the CAO and Chief of Police for review and approval; and

- Submitted the final organization chart to IMT and Parties for review and approval.

During this reporting period, APD increased the Division's staffing levels for both sworn and civilian positions.  During the Independent Monitor Team (IMT) site visit in June 2018, there was

---

[5] The *First Amended and Restated Court-Approved Settlement Agreement* defines a "Level 1" use of force as a use of "force that is likely to cause only transitory pain, disorientation, or discomfort during its application as a means of gaining compliance."  [Doc. 354-1, ¶ 48(a)]

a meeting with IMT members, a representative for the Department of Justice and APD personnel to discuss the importance of auditing functions. One of the major takeaways from this meeting was the importance of building a strong audit team and that auditing is a critical function of APD's success. With that in mind, APD identified this as a priority and focused its efforts towards building a stronger auditing team. On July 2, 2018, City Budget and APD personnel met to evaluate and prioritize positions needed within the Compliance Division based on the approved budget for Fiscal Year 2019.

As stated in the last status report, the APD Compliance Section was able to bring back a previous APD employee, hiring her as the Performance Metrics Manager within the Compliance Section. The Performance Metrics Unit is responsible for auditing and assessments functions throughout the police department. In 2016, the IMT recognized an audit conducted by this employee on the Electronic Control Weapon (ECW), commonly known as a Taser, as being an accurate audit report and the type of audit APD needs to perform department-wide.

At the time of the previous Status Report, the audit team consisted of two full-time auditors (one of which had recently transitioned from a part-time position to a full-time one) and one part-time auditor. Since the start of the fiscal year, the Performance Metrics Unit's staffing will increase by one additional full time Auditor with the remaining part-time Auditor being reclassified to a full-time position. Going forward, the Department is working to hire additional auditors and an additional Program Data Analyst for the Performance Metrics Unit.

Also within the Compliance Section, APD also created the Implementation Unit. This team assists in identifying, developing and/or improving processes throughout the Department. With the approved budget, the Implementation Unit will increase by one full-time Process Improvement Analyst (PIA) and one Program Data Analyst with additional staff requested if further staffing studies and/or needs assessments identify a need. The Implementation Unit works

in conjunction with the Performance Metrics Unit as audit findings reveal process deficiencies. Those process deficiencies can be used as opportunities for process improvement initiatives.

The Performance Review Section is responsible for thorough reviews of Level One cases. Since the last Status Report a lieutenant was permanently transferred to manage this Section. Since that time, APD has had one (1) Temporary Duty Sergeant assisting in the development of the unit and has advertised, tested and is awaiting permanent transfer of (3) officer level positions. The training plan for these reviews is in the development stage in preparation for full staffing. In addition, (4) civilian Video Review Unit positions are being filled to assist in the review process and the hiring process has been initiated.

The APD Chief of Police, Chief Administrative Officer and the IMT approved the Compliance Division organizational chart. This Division is analyzing and prioritizing positions to ensure staffing is utilized as effectively and efficiently as possible.

*Impediments to the process/Unanticipated problems*:

While awaiting hiring was an anticipated problem, this has delayed the staffing, training, and operations of the Performance Review Section. Thus, to date, the Performance Review Section is not operational.

*Missed deadlines*: No.

*New deadlines*: None.

*Any other relevant issues or concerns that arose*: None.

*Tasks update*: APD completed 100% of the tasks during this reporting period (4 of 4).

B.   Specific issue: Amend and Publish SOP 3-52 (Policy development process)

*Actions the City has taken:*

All tasks necessary to amend and publish SOP 3-52 were completed during the prior reporting period. APD's policy 3-52, Policy Development Process, has been operational since

April 24, 2018. The Office of Policy Analysis (OPA) reconvened on May 10, 2018, with new and existing members.  Since that date, twenty-one (21) policies have started the process, eight (8) have been CASA-related and two (2) have been published after completing the policy development process.  APD has ensured that policies have been sent to the Police Oversight Board (POB) as required and has had consistent participation from the POB Policy Subcommittee.

In an effort to engage external stakeholders, with an emphasis on policy development participation and commentary, APD has conducted several outreach presentations on the policy development process.  A few examples of APD outreach have been:

- Northeast Community Policing Council (CPC) on June 12, 2018;

- POB meetings on June 14, 2018 and August 9, 2018; and

- Mental Health Response Advisory Committee (MHRAC) on June 19, 2018.

*Impediments to the process/Unanticipated problems:* No impediments interfered with the completion of the tasks.

*Missed deadlines:* None.

*New deadlines:*  None.

*Any other relevant issues or concerns that arose:* None.

*Tasks update:* There were no tasks outlined in the compliance plan during this reporting period.  APD completed all tasks in the previous reporting period.

C.   Specific issue: Develop and Implement Compliance Division Policy

*Actions the City has taken:*

- Developed processes and process flows for each identified section within the Compliance Division;

- Drafted a new SOP for the Compliance Division to address goals and objectives,

personnel roles and responsibilities, training, UoF review and paragraph/division compliance, data analysis procedures, auditing processes, project management; and

- Submitted to OPA and follow SOP 3-52 (Policy Development) process for policy approval.

APD researched best practices to identify roles and responsibilities in other law enforcement agencies with similar divisions. From this research, APD has drafted job descriptions, roles and responsibilities, and an organizational chart for the Division. APD completed its Compliance Division policy introducing both sections within the Division: the Compliance Section and Performance Review Section. The Division submitted the policy to the Office of Policy Analysis (OPA) on July 13, 2018, presented to OPA on June 19, 2018, and working through the policy development process.

Process flows development was a task listed in the last Status Report as incomplete. APD wanted to incorporate processes throughout the Compliance Division and numerous process flows have been developed to meet that requirement. APD continues to develop process flows for divisional and department-wide use. Some examples of developed process flows are audit planning, special orders, data submissions to and from the IMT, the 7-step training process (how that process moves internally as well as full submission for IMT review), policy development, community policing training, and Level One case reviews.

APD successfully completed this task on July 6, 2018. APD will continue to build upon as new and updated process flows are developed and/or revised.

*Impediments to the process/Unanticipated problems:* See above.

*Missed deadlines:* None.

*If so, explanation:*

*Any other relevant issues or concerns that arose:* None.

*Tasks update:* APD completed 100% of tasks during this reporting period (3 of 3).

D. Specific issue: Create a Section within the Compliance division devoted to Use of Force case oversight

*Actions the City has taken:*

- Developed a Use of Force (UoF) Performance Review Unit to have oversight, review and identify "policy outliers" in UoF cases not previously addressed in all level 1 and samples of levels 2 and 3 UoF cases;

- Developed a process for conducting random and directed reviews of all level 1 and samples of levels 2 and 3 UoF cases;

- Developed a process to conduct a detailed UoF investigation failure analysis to determine the cause of the failure with the goal of determining corrective actions that need to be taken;

- Developed a process to provide recommendations for policy, training, supervision, tactics, equipment (similar to the FRB function), disciplinary and/or remediation responses for each failure identified.

APD did not meet all of the deadlines during the last reporting period for this issue; therefore, created new deadlines for each of the four tasks above relevant to this issue.

APD began developing a Performance Review Unit to have oversight, review and identify areas of deficiency and/or improvement for Level One cases. The Performance Review Unit began developing a process for cases the unit will be responsible for reviewing as well as a process for failure analysis to determine the cause of the failure. Along with the identification of the cause of failure, the unit will assist in determining corrective actions and develop recommendations for policy, training, supervision, tactics, equipment, disciplinary and/or remediation responses.

*Impediments to the process/Unanticipated problems:* None

*Missed/Adjusted/New deadlines:* No

*If so, explanation:*

*Any other relevant issues or concerns that arose:*  This unit requires staff and the final details of the review process are being addressed in order to ensure that the Performance Review Unit will review cases in compliance with the mandates of the CASA.

*Tasks update:* APD completed 100% of tasks during this reporting period (4 of 4).

E.   Specific issue: Develop a process to measure progress of the Compliance Plan

*Actions the City has taken:*

- Implemented approved progress measurement plan.

APD has manually tracked progress to this point, which is not the most effective and efficient way to monitor progress or easily identify lack of progress.  A program was identified and purchased to assist in this measurement effort.  At the time of this report, APD was in the initial phase of setting up parameters to use the collaboration tool to effectively manage directives in the CASA and track progress.  APD recently started using this program but feel this will be a useful tool for future progress and task management.


*Impediments to the process/Unanticipated problems:* The procurement process took longer than expected; however, this task was completed within its updated deadline.

*Missed/Adjusted/New deadlines:* No

*If so, explanation:*

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 100% of tasks during this reporting period (1 of 1).

**Area 3: Operations of the Academy**

The Compliance Plan included twenty (20) tasks for the Training Academy.  All twenty

29

tasks were due and completed prior to the last Status Report. APD completed 100% of the tasks outlined in the compliance plan. (Doc. 375). The Training Academy has continued to implement the changes necessary to come into compliance with the CASA, and those changes are discussed below.

      A.    Specific issue: Address staffing deficiencies within the Training Academy

*Actions the City has taken:*

The Compliance Plan required the Training Academy to complete tasks necessary to increase the staff at the Academy. During the prior reporting period, the Training Academy researched best practices, developed job task analyses, documented the findings of the job task analyses, and made requests for additional staff.

*Tasks update:*

During this reporting period, the number of staff at the Training Academy was increased. APD opened, advertised, and filled the Advanced Training Lieutenant position, and staffed the Comprehensive Training Unit (CTU) with a Comprehensive Training Manager, two (2) CTU Specialists and one (1) Temporary Duty employee. One (1) permanent CTU Specialist position is awaiting position vacancy notification. The Specialists are responsible for curriculum development, documentation, and analysis of post-training evaluation metrics. The Specialists assist the subject matter experts in developing curriculum to ensure they meet the seven-step training standards, keep records, send tests and surveys to evaluate the effectiveness of training and transfer of knowledge.

In July 2018, APD announced a new Commander over the Training Academy, Angela Byrd. She joins APD after serving as the Chief of Police in Bosque Farms, New Mexico. Commander Byrd is a certified master instructor (through the New Mexico Department of Public Safety) in instructor development, use of force, and defensive tactics. She has proficiency in

training instructors, creating lesson plans, delivering instruction, and strategic planning.

B.  Create a Comprehensive Training Unit devoted to the 7-step training process

*Actions the City has taken:*

Prior to the last status report, APD created the Comprehensive Training Unit to build the necessary staff and resources for the Training Academy to succeed in implementing the 7-step Training Process. The CTU's primary focus is to analyze data, create needs assessments, develop curricula, monitor implementation, evaluate outcomes, and revise processes in conjunction with the aforementioned 7-Step Training Process.

Since the CTU's creation, the CTU has assisted with the development and implementation of the 7-Step Process for twenty-five (25) training courses; sixteen (16) of those are CASA mandated training. One training plan, 2018 Electronic Control Weapon (ECW) recertification, has successfully completed the process from development through IMT review and approval. This training will be delivered to personnel starting in August 2018.

The CTU operates under a comprehensive training plan that utilizes a seven-step process for training which was proposed and approved by the IMT. The 7-step process provides employees with an effective and efficient training program that focuses on integrating policy, procedure, and tactics into daily operations through classroom presentations and application of trained skills. The seven steps include: (1) Needs assessment, (2) Curriculum Development, (3) Oversight/Approval, (4) Delivery, (5) Implementation, (6) Evaluation and (7) Revision. On July 9, 2018, the Training Academy delivered a briefing to members of all APD's units who would be involved in curriculum development and training to introduce and explain the seven-step training process.

Between the development of the seven-step process for training and the hiring of the new Commander of the Training Academy, the Training Academy has taken significant steps toward addressing failures identified by the Independent Monitor through IMR 6. (Doc. 313, p. 9). APD

has taken the necessary preliminary steps to be able to develop training products, which meet nationally accepted practice and the monitor-communicated standards. APD acknowledges that it must continue to consistently and independently produce training, which meets those standards to be in operational compliance with the CASA.

   C.   Specific issue: Develop a process to determine transfer of knowledge

*Actions the City has taken:*

There were no new tasks outlined within the compliance plan for this reporting period. APD completed 100% of the tasks under this issue during the prior reporting period.

*Tasks update:*

During the last reporting period the Department took action to address post-training testing methods. During this reporting period, for consistency, APD revised its SOP (which is currently in the policy development process) to set the passing score for all testing at 80% (changed from 70%) unless expressly authorized by the Director of Training in writing, due to a specific need. The standard method of testing has moved to a randomized, electronic format.

Moving forward, APD will utilize a new electronic testing environment (currently in pilot use), once the new environment proves reliable. A few, select tests are required to be administered in person and are proctored through strict oversight that maintain the integrity of the testing environment.

   D.   Specific issue: Develop a modified Civilian Police Academy (CPA) for
        POB/CPOA/CPC member

APD held a two-weekend modified CPA for Police Oversight Board, Citizen Police Oversight Agency and Community Policing Council members February 24-25, 2018, and March 3-4, 2018. During the first modified CPA, participants brought up concerns to APD command staff surrounding the Use of Force portion of the training, voicing concerns about APD instructor

demeanor and dismissive attitude. Participants were invited to a face-to-face meeting with APD and DOJ to address their concerns.

*Actions the City has taken*:

There were no new tasks outlined within the compliance plan for this reporting period. APD completed 100% of the tasks under this issue during the prior reporting period.

> E. Specific issue: Develop a Comprehensive Training Plan(s) (TP) to provide effective and efficient training

There were no new tasks outlined within the compliance plan for this reporting period. APD completed 100% of the tasks under this issue during the prior reporting period.

*Tasks Update:*

APD developed a comprehensive training plan using the seven-step process to have a systematic and detailed plan that provides consistency for training conducted by APD. On July 9, 2018, the CTU briefed project leads and department trainers on the 7-step process and the role of the CTU. The Academy is in the process of revisiting all current training and ensuring that all newly created training following the comprehensive training plan.

The Training Academy are in the process of reestablishing the Training Committee. The Training Academy has drafted a proposed SOP revision, which has started the 3-52 policy development process.

> *Impediments to the process/Unanticipated problems:* None

### Area 4: Supervisor Use of Force Investigations – Process Failures

> A. Specific issue: Improve the Force Review Board (FRB) process

*Actions the City has taken:*

While APD completed eleven of the twelve tasks listed out in the Compliance Plan, APD has identified areas for improvement and reevaluated the approach towards the Force Review

Board (FRB).  In June 2018, APD switched FRB project leads with a new focus on FRB processes, including defining clear roles and responsibilities of voting and non-voting board members.

The group has focused on cases pending review by the FRB, policy revision, and developing training plans for FRB members.  The FRB group has begun working with the Training Academy CTU on the 7-step process, beginning with a needs assessment.

*Impediments to the process/Unanticipated problems:*

APD did not anticipate reevaluating the Force Review Board as a whole; however, the project lead and the focus group have been reworking the project from policy and training to becoming operational.

*Missed deadlines:* Yes

*If so, explanation:* Training of FRB members will not be conducted until a training plan has been submitted and approved by the IMT as stated above with the new direction.

*New deadline*: APD will develop an entirely new tasks list with deadlines for FRB.  This tasks list will be included in the second compliance plan due to the amount of work needed for this project.

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* Please see above.  APD will continue to work on developing the FRB.

### Area 5: Develop a Training Plan for IAD-Force personnel

A.        Specific issue: Develop a Training Plan for IAD-Force personnel

*Actions the City has taken:*

The newly created IA-Force Division developed a 7-step training plan for Division personnel to perform Use of Force administrative, criminal and misconduct investigations.

*Impediments to the process/Unanticipated problems:* No

*Missed deadlines:* No

34

*If so, explanation:* N/A

*New deadline:* N/A

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed 100% of tasks during this reporting period (1 of 1).

### Area 6: Amici Concerns

A.      <u>Specific issue: Evaluate McClendon Sub-class concerns</u>

*Actions the City has taken:*

APD continues to work with the McClendon sub-class attorneys and the Assistant City Attorney to approve and publish policies related to the McClendon sub-class. Those policies were published on April 26, 2018, except 2-19 (Response to Behavioral Health Issues), which is obtaining approval from the IMT. APD created video updates all the above policies, which included an electronic post-test component.

APD continues to meet with Amici groups every six weeks to improve communication, transparency and collaboration efforts. APD, Amici groups, the City of Albuquerque, the Department of Justice and the Albuquerque Police Officer's Association met in May and July 2018 and already are planning the next series of meetings, which are scheduled for September 2018. The Compliance Bureau is available to meet upon request if matters arise between the regularly scheduled meetings.

*Impediments to the process/Unanticipated problems:* N/A

*Missed deadlines:* No

*If so, explanation:* N/A

*New deadline:* N/A

*Any other relevant issues or concerns that arose:* N/A

*Tasks update:* APD completed all tasks in this section during the last reporting period.

APD continues to work closely with Amici groups and reaching out to the public to increase information sharing.

## **CONCLUSION**

The Compliance Plan filed on March 5, 2018, was comprised of ninety-one (91) tasks to be completed no later than July 31, 2018. These tasks were assigned to a variety of sections/divisions across the Albuquerque Police Department. There have been a few delays and unanticipated issues; however, APD has identified those issues and developed solutions along with new deadlines, on or before July 31, 2018, to move forward with achieving the deliverables set out in Compliance Plan. Since the last status report filed to the Court on June 1, 2018, APD had thirteen (13) new tasks to complete from June 1, 2018, through July 31, 2018. All thirteen tasks outlined in this reporting period were completed on or before the deadline date.

Out of the ninety-one (91) total tasks within the Compliance Plan, eighty-eight (88) tasks have been completed for an overall 96.70% completion rate:

- 96.70% (88/91) were completed during this reporting period; and

- 3.30% (3/91) were not completed.

Three tasks remain outstanding and incomplete. These three tasks have been discussed in their respective sections above; however, a short explanation is described here. Two of those are the same tasks in two separate sections within the Compliance Plan. Those tasks are to train video review functions; however, these tasks cannot be completed until the personnel who will be assisting in video reviews are hired. APD remains in the hiring stage of the process and training will be conducted when those positions are filled. While waiting for the positions to be filled, APD is developing a training plan using the APD Training Academy's 7-step process. APD will get that training plan reviewed and approved by the Independent Monitor prior to conducting the training. Once the personnel are hired, they will be properly trained prior to assisting in the video

36

review process. The final incomplete task is to train new Force Review Board (FRB) members. As stated in Area 4, APD is taking a new direction and will be creating new tasks and deadlines to improve FRB.

Respectfully submitted,

**CITY OF ALBUQUERQUE**
**Esteban A. Aguilar, Jr., City Attorney**

Electronically filed

*/s/ Jeramy Schmehl*
Jeramy I. Schmehl
Lindsay F. Van Meter
P.O. Box 2248
Albuquerque, NM 87103
(505) 768-4500
jschmehl@cabq.gov
lvanmeter@cabq.gov

Attorney for Defendant City of Albuquerque

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 31st day of August, 2018, I filed the foregoing pleading electronically through the CM/ECF system, which caused the parties, counsel of record, and independent monitor on the service list to be served by electronic means.

*/s/ Jeramy Schmehl*