**Progress and Status Summary of the USDOJ Settlement Agreement Entered**

**Into by the United States of America and the City of Albuquerque**

**Regarding the Albuquerque Police Department**

**Eighth Report**

**February 1, 2018 – July 31, 2018**

Prepared by the Albuquerque Police Department Compliance Division

**Table of Contents**

I. Introduction……………………………………………………………………….4

   Key Steps Taken by the New Administration………………………………………5

   Compliance Levels and the CASA's Measurable Paragraphs………………..…..........8

   How This Progress Report Is Organized……………………………………....10

II. APD's Progress on the CASA's Measurable Paragraphs………………………….11

   CASA Area 1: Use of Force: Internal Controls and Accountability (¶14-89)……....11

      A) Use of Force Principles (¶ 14-17)…………………………………………...12

      B) Use of Firearms (¶ 18-23)…………………………………………………13

      C) Electronic Control Weapons (¶ 24-38)……………………………………14

      D) Crowd Control and Incident Management (¶ 39-40)………………………..16

      E) Use of Force Reporting (¶ 41-45)…………………………………………17

      F) Force Reviews and Investigations (¶ 46-77)………………………………17

      G) Force Review Board (¶ 78-80)……………………………………………..23

      H) Multi-Agency Task Force (¶ 81-85)………………………………………25

      I) Use of Force Training (¶ 86-89)…………………………………………26

   CASA Area 2: Specialized Units (¶ 90-109)………………………………………...27

      A) Special Operations Division (¶ 90-105)…………………………………...27

      B) Special Investigations Division (¶ 106-109)…………………………………29

   CASA Area 3: Crisis Intervention (¶ 110-137)………………………………………...30

      A) Mental Health Response Advisory Committee (¶ 111-117)…………………31

      B) Behavioral Health Training (¶ 118-122)……………………………………..32

      C) Crisis Intervention Certified Responders and Crisis Intervention Unit (¶ 123-131)..32

      D) Crisis Prevention (¶ 132-137)……………………………………………..34

   CASA Area 4: Policies and Training Generally (¶ 138-161)………………………35

      A) Policy Development, Review and Implementation (¶ 139-148)……………35

      B) Training On Revised Policies, Procedures and Practices (¶ 149-154)………37

      C) Field Training Officers Program (¶ 155-161)………………………………37

CASA Area 5: Misconduct Complaint Intake, Investigations and Adjudication (¶ 162-202)…41

    A) Reporting Misconduct (¶ 163)……………………………………………………41

    B) Public Information on Civilian Complaints (¶ 164-168)………………………41

    C) Complaint Intake, Classification, and Tracking (¶ 169-182)…………………...41

    D) Investigations of Complaints (¶ 183-194)…………………………………………41

    E) Preventing Retaliation (¶ 195-197)……………………………………………41

    F) Staffing and Training Requirements (¶ 198-200)………………………………41

    G) Discipline Process and Transparency (¶ 201-202)……………………………41

CASA Area 6: Staffing, Management and Supervision (¶ 203-231)…………………43

    A) Staffing (¶ 204)……………………………………………………………43

    B) Duties of Supervision (¶ 205-208)…………………………………………...43

    C) Supervisory Training (¶ 209)…………………………………………………...43

    D) Early Intervention System (¶ 212-219)……………………………………………45

    E) On-Body Recording Systems For Documenting Police Activities (¶ 220-231)…………47

CASA Area 7: Recruitment, Selection and Promotion (¶ 232-246)……………………...51

    A) Recruitment Plan (¶ 233–235)…………………………………………………51

    B) Hiring Practices (¶ 236-240)……………………………………………………51

    C) Promotions (¶ 241-243)…………………………………………………………...53

    D) Performance Evaluations (¶ 244-246)…………………………………………54

CASA Area 8: Officers Assistance and Support (¶ 247-253)…………………………55

CASA Area 9: Community Engagement and Oversight (¶ 254-293)…………………56

    A) Community and Problem-Oriented Policing (¶ 255-259)……………………...56

    B) Community Meetings and Public Information (¶ 260-265)……………………59

    C) Community Policing Councils (¶ 266-270)……………………………………59

    D) Civilian Police Oversight Agency (¶ 271-293)………………………………...63

CASA Area 10: Assessing Compliance (¶ 320)…………………………………………63

CASA Outcomes Assessment (¶ 298)…………………………………………………64

III. Conclusion……………………………………………………………………...68

IV. Appendix

1. Compliance Organizational Chart

2. APD Audit Schedule 2018-2019

3. February 1 – July 31, 2018 APD Compliance Plan

4. Personnel Management, Education and Development System Guide

5. Albuquerque Police Department 2017 Annual Report and 2018 Strategic
   Recruitment Plan

## I. Introduction

The Albuquerque Police Department (APD) and the City of Albuquerque continue to work with the Department of Justice (DOJ) and the Independent Monitor (IM) to improve the overall functioning of the Department.  In addition, APD has continued the work toward meeting the requirements of the Court Approved Settlement Agreement (CASA) to include the First Amended and Restated Court-Approved Settlement Agreement filed with the court in March 2018.  Documents related to APD's Settlement Agreement can be located at http://www.cabq.gov/police/documents-related-to-apds-settlement-agreement.

This progress report is slightly different than the previous reports in two ways.  First, the report covers the new administration's key steps taken to strengthen APD's reform effort. Secondly, the report is organized by the ten (10) sections as formatted in the CASA.  The reader should also be aware that the Parties filed a joint stipulation suspending CASA paragraph 308 with the Court on March 5, 2018.  According to the court filing, "the Independent Monitor and the City will file status reports with the Court on June 1, 2018, and August 31, 2018, in place of a seventh, full monitoring report on May 2, 2018." (Doc. 355, pg.1).  APD has continued the reform effort guided by feedback from the IM, the City and the DOJ; filed the second status report on August 31, 2018 (Doc. 398) and has continued to update the Court and Amici groups on a regular basis.  The First Status Report from the City and Independent Monitoring Team can be located at http://www.cabq.gov/police/documents/first-status-report-from-the-city-and-independent-monitor-team-june-2018.pdf.

## Key Steps Taken by the New Administration

In December 2017, APD and the City of Albuquerque had major changes in administration and began directing efforts to address the CASA.  Throughout the reporting period, APD continued to make major changes within the Police Department to include the creation of an Implementation Unit (renamed the Compliance Division) to focus on the CASA and the long-term sustainability for Department-wide improvement, as well as reorganization and movement throughout Command Staff positions.

APD created a Compliance Division to provide oversight, guidance, and accountability while serving as a centralized Division for CASA-related activities.  The Division is responsible for process development, auditing and assessment functions, and will specifically focus on Level 1 Use of Force and Show of Force case reviews.  The Compliance Division organizational chart is attached to this document as Appendix 1.

APD evaluated positions within the former Inspections Division and repurposed these positions to assist with the implementation and audit functions throughout the CASA.  APD created a Compliance Bureau managed by a Deputy Chief of Police and a Compliance Division under that Bureau to oversee the compliance and reform effort.  An assigned Lieutenant manages the Compliance Section, assisting in oversight of CASA-related activities.

Two units have been created within the Compliance Section; the Implementation Unit and the Performance Metrics Unit with a new manager assigned to each unit. The Implementation Unit assists project leads with their assigned CASA paragraphs and emphasizes the identification and design of new processes while also addressing process

related issues to improve upon efficiency and effectiveness within a specified area. The Performance Metrics Unit will perform audit and assessment functions including auditing, evaluation, analysis and reporting on a variety of Departmental operations.

Auditing is an essential function within the reform effort and is required throughout the CASA.  The Compliance Section, Performance Metrics Unit has developed audit plans and tentative scheduling for the remainder of 2018 and into 2019.  The audit schedule is subject to change with the needs of the department.  The audit schedule is included with this report at Appendix  These audit plans are driven by three key factors:

- Court Approved Settlement Agreement (CASA);

- Risk assessment results (Risk assessment results are evaluations on policies for risk on the likelihood and impact on the Department); and

- Internal resources to execute the plan (evaluation of the audit scope based on the Unit resources).

The goal is to prioritize CASA-related policies and test not only compliance but assess potential risk areas.  The Performance Metrics Unit conducts audits in accordance with the Generally Accepted Government Auditing Standards (GAGAS). www.gao.gov/yellowbook

APD also created the Performance Review Section within the Compliance Division with the Performance Review Unit under the Section Lieutenant. The Performance Review Section includes one (1) Lieutenant and three (3) Officers, one of those officers have been officially assigned to the Unit and two (2) are assisting the Field Services Bureau until September 2018.  One Sergeant and four Video Review personnel will be added upon staffing approval and hiring.  This section will serve as an additional assessment function of

Level 1 Use of Force and Show of Force cases to ensure APD is thoroughly reviewing cases and identifying strengths and weaknesses in those reviews.  The Performance Review Section Lieutenant manages the administrative portion of the Force Review Board (FRB) to ensure recommendations stemming from the FRB are routed correctly, addressed, and returned by the assigned deadlines.

Another major step for APD's focus on Use of Force and accountability was to divide the Internal Affairs Division into two separate divisions under the Compliance Bureau.  In March 2018, APD divided the Internal Affairs Division into the Internal Affairs – Force Division and Internal Affairs – Misconduct Division.  This was done to narrow the scope of responsibility of the division Commanders.  APD assigned a Commander to the Internal Affairs – Force Division and retained the existing Internal Affairs Division Commander assigned to the Internal Affairs – Misconduct Division.

APD also strengthened its efforts in CASA-related activities by assigning one person, mostly sworn, to be responsible for each measurable paragraph within the CASA.  This was done for accountability purposes, to have one person leading the effort for each specific paragraph, to increase sworn participation, and to show that sworn personnel are committed to the effort.  Some paragraph project leads were changed to reduce collateral duties for those assigned too many tasks.  This will allow more time and energy towards specific efforts versus overtasking personnel with several unrelated tasks and/or paragraphs.

APD's Compliance Bureau also created a detailed compliance plan to address the issues raised by the IM. This compliance plan outlined specific tasks and deadlines and guided APD's efforts during the reporting period of February 1, 2018, through July 31, 2018.  The document is in the appendix.  The compliance plan encompassed ninety-one (91) tasks for

APD to complete during this reporting period.  Out of the ninety-one (91) tasks, eighty-eight (88) were completed during this timeframe (96.70%).  There are three incomplete tasks from the compliance plan; two of which are duplicate tasks for training Video Review Unit personnel.  These two tasks remain incomplete as APD is awaiting the hiring process to be completed.  Once personnel are hired, they will be trained on their respective duties.  The last incomplete task is training members of the Force Review Board.  The entire Force Review Board program is being reevaluated and developed.  Once the development is complete, Force Review Board members will be trained and board meetings will commence.

In addition to the compliance plan and two-mini reports, the data outcomes and assessments within paragraph 298 were also provided to the IM for review.  APD manually researched and pulled data for each section required in paragraph 298.  The poor quality of the data provided in the past has been the focus of many of the IM's conversations and moving forward, APD chose to take a different approach.  APD began to identify the data source to identify where the data originated, how the queries were developed to capture such data and if the data were accurate and useable.  APD found many areas where the data were accurate, valid and useable.  It is important to mention APD also identified areas that need improvement and further validation.  APD created a 3-phase approach in a continued effort to validate and verify Department data.  Progress on paragraph 298 outcomes and assessments are discussed in detail later in this progress report.

**Compliance Levels and The CASA's Measurable Paragraphs**

There are two hundred seventy-five (275) paragraphs within the CASA with measurable requirements.  Throughout this report, paragraphs within the CASA are written as CASA

paragraphs or simply, paragraphs.  As of the Independent Monitor's Sixth Report from November 2017, APD's overall compliance rates for this reporting period are as follows:

- Primary compliance - 97%;

- Secondary compliance - 71%; and

- Operational compliance - 52%

Below is IMR-1 through IMR-6 with APD's compliance measurements over time (IMR-6, pg. 17).  Because of the parties' joint stipulation, and the modified reporting convention, the IM's compliance assessment has not changed since IMR-6.  The next IM report is to be filed with the Court in early November 2018.



As defined in IMR-1, compliance measurements in the APD monitoring process consists of three parts: primary, secondary, and operational:

9

- *Primary compliance is the "policy" part of compliance. To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA. As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.*

- *Secondary compliance can be attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., Sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the Department for doing so. By definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the agency.*

- *Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their Sergeants, and Sergeants are routinely held accountable for compliance by their Lieutenants and command staff.  In other words, APD 'owns' and enforces its own policies"* (IMR-1, pg. 13).

**How This Progress Report Is Organized**

This report will address progress made during this reporting period and APD's responses to IMT recommendations. The progress will follow the format of the CASA, which is divided into ten (10) areas. Eight of the ten areas also include multiple subsections and this progress report includes information about those subsections and if any changes occurred during this reporting period. The reader should know that several paragraphs overlap, flow into one another and some have the same requirements within them. APD has a better understanding of the expectations within the CASA; therefore, APD has addressed these paragraphs in one section, as needed for easier reading. The ten CASA areas are:

1. Use of Force: Internal Controls and Accountability;
2. Specialized Units;
3. Crisis Intervention;
4. Policies and Training Generally;
5. Misconduct, Complaint Intake and Adjudication;
6. Staffing, Management, and Supervision;
7. Recruitment, Selection, and Promotions;
8. Officers Assistance and Support; and
9. Community Engagement and Oversight
10. Assessing Compliance

## II. APD's Progress On The CASA's Measurable Paragraphs

The remainder of this report provides detailed information about the progress APD has made in measurable paragraphs in the ten CASA areas during the reporting period of February 2018 through July 2018.

**CASA Area 1: Use of Force: Internal Controls and Accountability** (Paragraphs 14-89)

The Use of Force section of the CASA has nine subsections: A) Use of Force Principles; B) Use of Firearms; C) Electronic Control Weapons; D) Crowd Control; E) Use of Force

11

Reporting; F) Force Investigations; G) Force Review Board; H) Multi-Agency Task Force; and I) Use of Force Training.  Each of these subsections will be addressed in order.

A) Use of Force Principles (Paragraphs 14-17)

Use of Force policy and training recommendations from the IMT are considerable and extensive, spanning throughout the related paragraphs within this section.  During this reporting period, APD has taken major steps to focus on Use of Force.  One of the most important steps taken is the revision to APD's Use of Force-related policies.  The revisions have included input and feedback from personnel of the Albuquerque Police Department, the City of Albuquerque, attorneys with the Department of Justice, the Albuquerque Police Officer's Association, Police Oversight Board, Civilian Police Oversight Agency and *Amici* groups.

APD began the revision process and followed the SOP 3-52 policy development process for Use of Force policies on March 23, 2018.  The policy development process can be located at http://www.cabq.gov/police/standard-operating-procedures.

The progress for Use of Force policies are as follows:

- 2-52 Use of Force General Policy – Comments have been received from the community, IM and Parties and a resolution draft will be submitted for monitor approval on September 4, 2018;

- 2-53 Definitions – Sent to POB on August 2, 2018, for 30 day review and comments are due back from the IM and Parties by September 7, 2018;

- 2-54 Intermediate Weapons – Sent to POB on August 10, 2018, for 30 day review and comments are due back from the IM and Parties by September 10, 2018;

12

- 2-55 De-escalation – Sent to POB on August 10, 2018, for 30 day review and comments are due back from the IM and Parties by September 10, 2018;

- 2-56 Reporting Use of Force – first draft submitted to the Parties, IM and POB on August 8, 2018; and

- 2-57 Supervisory Review and Investigation – first draft submitted to the Parties, IM and POB on August 8, 2018.

On June 2, 2018, the City of Albuquerque filed with the Court to extend the deadline to review the Use of Force policies and training as anticipated in paragraph 86 of the CASA, to ensure that they, "*incorporate, and are consistent with, the Constitution and provisions of the CASA. The Court accepted all of the stipulated changes to the CASA and ordered them effective on April 12, 2018. For the foregoing reasons, the City respectfully moves this Court to extend the June 2, 2018 deadline to review Use of Force policies to September 21, 2018 and requests that the deadline to review training on the Use of Force policies be extended to October 1, 2018*" (Doc. 376).

B) Use of Firearms (Paragraphs 18-23)

The IMT made two recommendations relating to paragraphs 18 and 19; both of which concerned APD's need to develop policies and develop review/audit processes. As stated above, APD has created the Performance Metrics Unit in April 2018 that is responsible for audit functions. Audit scheduling was created for the remainder of 2018 and for 2019 and APD is moving forward with audit functions. Prior to the creation of the Performance Metrics Unit, APD's Inspection Unit conducted an audit during APD firearms qualifications and found that APD's current tracking of firearms is not efficient.

In addition, the Training Academy has been utilizing a new database to assist in tracking data for firearms qualifications, along with other training-related activities. The Training Academy has been experiencing and identifying deficiencies in this system, which is the first step for improving data collection efforts in order to meet the requirements of these paragraphs.

One of the recommendations of the IMT states that APD will not train personnel prior to policy approval. APD agreed with that recommendation and stopped the practice of training before policies are approved. APD has taken recommendations seriously and the Training Academy is revising the firearms policy to address firearms qualifications standards and to explain failure to qualify and remediation processes for personnel to meet the requirements of paragraphs 18-21.

For paragraphs 22 and 23, APD has taken steps to address firearms discharges, which are included in policy and the upcoming revision of Use of Force policies. Not only has the IMT made several recommendations but also APD recognized this as a data outcomes issue when the IM requested data for paragraph 298, which is discussed later in this progress report. The IMT mentions the Early Intervention and Recognition Systems policy and the inclusion of firearms discharges. EIRS is also discussed in a separate section within this progress report; however, APD agreed with these recommendations.

C) Electronic Control Weapons (Paragraphs 24-38)

On May 21, 2018, APD conducted a Department-wide April 2018 quarterly upload audit on Electronic Control Weapons (ECW), commonly known as the Taser. The audit determined the following results:

- 93.37% of ECWs were uploaded in the appropriate timeframe; and

- 6.63% failed to upload their ECW within the month of April.

The findings demonstrated that APD missed sworn personnel in On-the-Job Training (OJT) as they transferred through new training assignments and some were newly hired personnel not issued an ECW.  This accounted for 2.20% of ECWs not uploaded; while others failed to upload their ECW, accounting for 4.43%.

As stated earlier, APD took a different approach than in the past when it comes to CASA paragraph oversight.  The new ECW paragraphs project lead was tasked with evaluating the ECW processes to identify deficiencies.  In order to improve processes, steps were taken to assist the Department in completing this task.  The project lead sent out email reminders to Division Heads throughout the upload period.  In addition, the APD Compliance Section, Performance Metrics Unit conducted an informational meeting for Division Heads and their administrative staff to learn how to run reports during the upload timeframe to monitor progress within their Divisions.  To address missed OJT personnel, the Field Training and Evaluation Program Sergeant will be responsible for the oversight of future uploads.

Between May 15-25, 2018, the Compliance Section, Performance Metrics Unit conducted a random ECW audit on the Southeast Area Command.  Ten percent (10%) of Officers assigned to this Area Command were to upload their ECW data during a specified timeframe.  The goal was two-fold:

- To determine if spark tests (conducted to ensure the ECW functionality) were conducted; and

- If reported ECW Uses of Force corresponded with the ECW upload.

APD has known that spark test identifications are difficult on the currently assigned x26 Taser.  The differentiation between a deployment and a spark test is not easily identified.  This issue continues and APD is in the procurement stage of purchasing the x2 Taser which has the capability of differentiating between the two.  APD found that all Uses of Force involving ECW matched the upload.

### D) Crowd Control and Incident Management (Paragraphs 39-40)

The Emergency Response Team (ERT) is the team responsible for "*responding to requests for deployment to nonemergency peaceful gatherings in which citizens appear to be exercising their First Amendment rights in civil assembly.  ERT shall also be deployed to emergency incidents, including civil unrest, civil disturbances, declared states of emergency and natural disasters. The ERT shall respond to all civil gatherings where the potential for violence or other illegal behavior exists. The ERT shall respond to large assemblies which may require deployment of a mobile field force, as well as to other incidents if requested by the APD chain of command or by Field Services supervisors*" (APD SOP 2-29 Emergency Response Team). Policies can be located at http://www.cabq.gov/police/standard-operating-procedures/standard-operating-procedures-manual.

The ERT SOP is currently going through the 3-52 policy development process for review and approval.  The policy was:

- Presented to the Office of Policy Analysis on June 7, 2018;

- Presented to the Policy and Procedure Review Board (PPRB) on August 10, 2018; and

- Sent to POB on August 22, 2018, for 30-day review.

To meet IMT recommendations, a training plan is being developed following the Training Academy's 7-step process upon policy approval.  All ERT supervisors will be trained first and then the entire ERT team.

At the recommendation of the IMT, APD will also train all sworn personnel and Emergency Control Center (also known as Dispatch) on handling an unplanned, First Amendment demonstration prior to ERT arrival.  This training plan will also follow the Training Academy's 7-step process upon policy approval.

ERT members attended annual training with New Mexico State Police and the Bernalillo County Sheriff's Department on June 29, 2018.

For paragraphs 39 and 40, the IMT recommended that the Multi-Agency Review and Assessment Form correspond to the policy and all forms be standardized.  APD has incorporated the form into the policy, which is in the policy development process.  APD ensured that After-Action Reports follow a standard structure and include mechanisms for communication, to include needed revisions to policy and training within the agency.

Another recommendation from the IMT stated, "*any recommendation made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately 'closes the loop' on lessons learned*" (IMR-6, pg. 75).

APD has standardized After Action Reports and have incorporated the AAR into the policy that is pending approval.  The After Action Report is prepared by the call-out incident Commander; any recommendations or issues of concern are immediately documented and brought up to ERT supervisors in order to make a determination if the issue rises to the level of a training need or policy revision.

E) Use of Force Reporting (Paragraphs 41-45); F) Force Investigations (Including
Supervisory Force Reviews & Force Investigations by the Internal Affairs Division)
(Paragraphs 46-77)

During this reporting period, the City filed with the Court on March 5, 2018, an amendment
to the CASA to address changes in Use of Force reporting within paragraphs 41-45.  In
paragraph 41 of the CASA, "*Uses of Force will be divided into three levels for reporting,
investigating, and reviewing purposes*" (Doc. 354-1, pg. 21).  Use of Forces will now be
classified as Levels 1, 2, and 3.  As stated above, APD has been diligently working towards
revising the entire Use of Force policy suite.

"*The goal is to promote greater efficiency and reduce burdens on first-line supervisors,
while optimizing critical investigative resources on higher-risk Uses of Force.  The levels of
force are defined as follow:*

- *Level 1 is force that is likely to cause only transitory pain, disorientation, or discomfort
during its application as a means of gaining compliance.  This includes techniques,
which are not reasonably expected to cause injury, do not result in actual injury, and are
not likely to result in a complaint of injury (i.e., pain compliance techniques and resisted
handcuffing).  Pointing a firearm, beanbag shotgun, or 40 millimeter launcher at a
subject, or using an ECW to "paint" a subject with the laser sight, as a Show of Force
are reportable as Level 1 force.  Level 1 force does not include interaction meant to
guide, assist, or control an individual who is offering minimal resistance.*

- *Level 2 is force that causes injury, could reasonably be expected to cause injury, or
results in a complaint of injury.  Level 2 force includes use of an ECW, including where
an ECW is fired at a subject but misses; use of a beanbag shotgun or 40 millimeter*

*launcher, including where it is fired at a subject but misses; OC Spray application; empty hand techniques (i.e., strikes, kicks, takedowns, distraction techniques, or leg sweeps); and strikes with impact weapons, except strikes to the head, neck, or throat, which would be considered a Level 3 Use of Force.*

- *Level 3 is force that results in, or could reasonably result in, serious physical injury, hospitalization, or death.  Level 3 force includes all lethal force; critical firearms discharges; all head, neck, and throat strikes with an object; neck holds; canine bites; three or more uses of an ECW on an individual during a single interaction regardless of mode or duration or an ECW application for longer than 15 seconds, whether continuous or consecutive; four or more strikes with a baton; and Uses of Force resulting in a loss of consciousness"* (Doc. 354-1, pg. 23-24).

APD is working towards improving Use of Force case reviews at multiple levels.  The newly created IA-Force Division and the Compliance Division- Performance Review Section, will be responsible for the thorough and consistent reviews of Use of Force cases.  The Performance Review Section will be responsible for the reviews of Level 1 cases and the Internal Affairs-Force Division will be responsible for Levels 2 and 3 cases.

The APD IA-Force Division is comprised of:

- One (1) Commander;
- One (1) Lieutenant;
- Three (3) Sergeants;
- Ten (10) Detectives;
- One (1) Program Data Analyst; and

19

- One (1) Administrative Assistant

The ten (10) detectives assigned to the Division have separate and distinct responsibilities. Five (5) are responsible for investigative functions of serious Use of Force cases and five (5) are designated for conducting Use of Force backlog case reviews.

APD is in the process of conducting reviews, per IMT recommendations, on previously completed Serious Use of Force, Use of Force and Show of Force cases to ensure that the Department is properly investigating cases, identifying deficiencies in Use of Force investigations and developing action plans to address those deficiencies.  The following goals guide the work of these reviewers:

- To assess the original supervisor or investigator's finding concerning whether the Use of Force or Show of Force was in or out of policy;

- To identify policy violations, unrelated to the application of force by the officers which were not captured in the original investigation;

- To identify potential criminal conduct in either the force used by the Officers or other actions taken; and

- To identify deficiencies in training, policy, tactics, and equipment as well as supervisory deficiencies in the reporting, investigating, and reviewing Use of Force incidents so that these trends can be captured and applied for training and work performance purposes.

The review of supervisor Use of Force investigations will consider investigations completed by the Field Services Bureau (FSB) chain of command. The review of a serious Use

of Force investigation will involve investigations, which have been completed by the IA-Force chain of command that are pending presentation to the Force Review Board (FRB).

On a weekly basis a status report is sent to command level personnel updating them on the status of supervisor Use of Force investigations pending in various chains of command.  As of July 27, 2018, the following represents the number of Use of Force and Show of Force cases pending based upon the amount of time that has passed since the investigation was initiated:

1.      Fifty-two (52) Use of Force cases pending sixty days or less;

2.      Twelve (12) Show of Force cases pending sixty days or less;

3.      Nine (9) Use of Force cases pending more than sixty days; and

4.      No Show of Force cases pending more than sixty days.

Since the issuance of the Special Order 18-58 on May 18, 2018, which required timelines for field chain of command investigations, the cases in chain have gone from over 200 to 84 on July 27, 2018.  APD does not anticipate any cases going past the 120-day limit again.

The total number of backlog Use of Force and Show of Force investigations that need to be reviewed is three hundred and fifteen (315) incidents.  Within the three hundred and fifteen incidents, there are seventy-five (75) Show of Force incidents to be reviewed.  There are also twenty-six (26) serious Use of Force investigations.

In addition to the investigative response to a Use of Force, APD includes a distinct administrative data entry and analysis function that enhances the Department's understanding of the data generated by these incidents. This function enables the Department to produce the data it needs for the paragraph 298 outcomes assessment and to publish the annual Use of Force report

anticipated by paragraph 79 of the CASA.  (Doc. 354-1, pg. 38) (See, Doc. 356, Adopting Certain Modifications to the First Amended and Restated CASA).  These data include the number of custodial arrests that involved Use of Force, number of individuals armed with weapons, geographic data, demographic data and number of individuals injured.

In addition to these data, APD has incorporated additional checkpoints in the review process to capture other critical information including:

- All attachments listed in reports and mandated by policy are in the entry;

- Data concerning the use or failure to activate on-body recording devices;

- Criminal charges;

- Proper case and incident number;

- Type of resistance from a subject of force; and

- Types of force.

The investigating supervisor rather than the involved officer(s) now initiate the administrative entry of a force incident.  This is because there may be multiple officers involved in a Use of Force incident and it is inefficient have multiple administrative entries for multiple officers.  This Blue Team entry primarily consists of the Use of Force report, Use of Force data report and Use of Force narrative report by the involved officers.  Once the supervisor completes an investigation, the case is forwarded to the Lieutenant and then the Commander for review and approval.  The investigating supervisor is responsible for making a finding about whether the Use of Force (or Show of Force) is in policy or out of policy and the chain of command must either concur or disagree with that finding.

The Blue Team entry can be sent back and forth in the chain of command for a variety of reasons, such as deficiency in the Officer's reporting, or the review of force by an investigating supervisor is found insufficient by a Lieutenant or Commander, or required documentation has not been attached to the entry.  The supervisor force investigation is completed by the field chain of command and the Blue Team entry is forwarded to an administrative assistant in the Internal Affairs - Force Division.

The administrative assistant is responsible for reviewing the Blue Team entry and supporting documents to ensure that all the required data and documentation is included.  The administrative assistant does not edit or revise the review by the chain of command, or the respective findings and all of the required data and documents must be included before the entry can be warehoused in the database.  Historically there have been issues gathering data and documents from personnel in the chain of command and only one administrative assistant has been tasked with this work.

During the reporting period, a staffing plan was generated which called for additional personnel to assist the one dedicated administrative assistant in clearing the backlog administrative entries.  The needs of the staffing plan were initially met, the backlog was remediated; however, personnel were reassigned away from the Division, which led to the backlog increasing back to one hundred and ninety four (194) entries.

G) Force Review Board (Paragraphs 78-80)

In November 2017, the majority of the previous administration retired and the restructuring of the Department began.  This included changes in position titles among Executive Staff (i.e. the rank of Major was no longer in existence).  During this interim period, activities of the FRB

ceased until the new administration was in place and properly trained.  The last FRB meetings were as follows:

- Tactical FRB: November 1, 2017;

- Critical Incident Review Team (CIRT) FRB: November 15, 2017; and

- Supervisory FRB: November 29, 2017

There were several issues and statements by the IMT surrounding FRB and its efforts in the past.  The IMT replied to a case reviewed by the FRB, stating, "*APD has presented a case that involved both the Use of Force and serious Use of Force.  That case was mishandled from the initial event up to and including the FRB review of the case.  The case represents a serious indictment of the effectiveness of APD's entire Use of Force oversight and accountability system*" (IMR-6. pg. 178).

In addition to the change in administration, several recommendations from the Independent Monitor Reports suggested the need to revamp the FRB process, stating APD's oversight "*has reached a point of critical failure*" and implement formal training for all FRB members (IMR-6, pg. 179).  This would also include revising the FRB policy. A training curriculum for FRB was developed and submitted for IMT approval in May 2018.  This training plan did not meet the approval of the IMT.

During the June 2018 site visit, the IMT suggested the curriculum be revised to include not only the provided technical assistance and recommendations from the IMT, but also best practices from outside law enforcement agencies.  The newly formed Compliance Bureau decided a change in project leads would be necessary to devote the amount of time needed to focus on FRB moving forward.  In June 2018, APD switched the FRB project leads with a new

focus on FRB processes, including defining clear roles and responsibilities of voting and non-voting board members.

The project lead created a focus group, including personnel from the Special Operations Division and Internal Affairs- Force Division, to address the concerns surrounding the FRB.  The group has focused on cases pending review by the FRB, policy revision, and developing training plans for FRB members.  The FRB group has been working with the Training Academy's Comprehensive Training Unit on the 7-step process, beginning with a Needs Assessment, to effectively train FRB members.

APD did not anticipate reevaluating the Force Review Board as a whole; however, the identification of the need to do so is important to notice.  The project lead and the focus group have been reworking the project from policy and training to becoming operational.  Training of FRB members will not be conducted until a training plan has been submitted and approved by the IMT as stated above with the new direction.

APD will create an FRB board schedule to review current cases awaiting FRB presentation:

- Tactical activations: 46 cases

- CIRT cases: 33 cases

- Supervisory cases: 62 cases

APD understands the necessity of FRB; however, further understands the need for a thorough and proper program development.

H) Multi-Agency Task Force (Paragraphs 81-85)

25

The Multi-Agency Task Force (MATF) is in operational compliance for all paragraphs. The MATF is comprised of personnel from the Albuquerque Police Department, the New Mexico State Police, the Bernalillo County Sheriff's Department and Rio Rancho Police Department. During the reporting period, the Multi-Agency Task Force drafted with the proposed revisions, the Memorandum of Agreement (MOA) that meets the needs of all included agencies. The MOA is awaiting multi-agency approval.   APD MATF personnel will continue to meet on a regular basis with other MATF jurisdictions.

In order to maintain direct oversight of the MATF, APD is creating a collateral duty position, MATF Sergeant Coordinator.  The MATF Sergeant Coordinator will be responsible for case documentation, assignment and status.  APD identified the need for more thorough call out documentation, such as identifying the type of call out incident and case distribution both internal to and external of APD.

I) Use of Force Training (Paragraphs 86-89)

One of the biggest issues and criticisms of APD in the past was APD training personnel on unapproved policies.  APD no longer trains personnel on any policy until approved by the IMT.  APD goes a step further with guidance from the IMT, to follow a standardized 7-step training process in the development of any training.  The revised Use of Force policy suite will follow this process.

APD created a Comprehensive Training Unit (CTU) within the Training Academy in response to IMT recommendation and adopted the 7-step training process.

As stated earlier in the Use of Force section of this progress report, APD has been revising all Use of Force related policies.  After those policies are approved, APD will develop

26

training following the Training Academy's 7-step process based on those policy revisions. APD will not train on any changes to Use of Force without policy approval. APD does continue to train newly hired personnel on the current Use of Force policy.

APD continues to train on firearms and personnel have to, "*satisfactorily pass firearms training and qualify for regulation and other service firearms, as necessary, on an annual basis*" (Amended CASA, pg. 41).

**CASA Area 2. Specialized Units** (Paragraphs 90-109)

Specialized Units include both specialized tactical and specialized investigative units. For the following paragraphs, the Special Operations Division Commander is responsible for tactical-related paragraphs and the Special Investigations Division Commander is responsible for the investigative-related paragraphs described below.

A) Special Operations Division (Paragraphs 90-105)

During this reporting period, APD promoted a Lieutenant to Commander and assigned that Commander over Special Operations Division (SOD) on February 17, 2018. SOD has taken steps to adhere to IMT recommendations from IMR-6 and the June 2018 site visit. SOD completed the Division's annual review in April 2018. SOD assigned an Administrative Lieutenant to the Division in June 2018 to develop, maintain and implement improvements throughout the Division.

SOD continues to track, document and conduct K-9 deployment reviews on all K-9 bites and all tactical deployments. Bite ratios and 20% thresholds are tracked by SOD monthly and SOD provides a memorandum to the Internal Affairs-Misconduct Division for the Early Intervention and Recognition System (EIRS). At this time, APD's current EIRS system does

not have the capability to include bite ratios into EIRS; however, this will be discussed in detail in the EIRS section of this progress report.

SOD is improving the development and Department-wide use of the Risk Assessment Matrix (RAM) to ensure SOD responds to critical situations where a tactical unit is required. In May 2018, a Special Order 18-50 was published with guidelines for units to abide by when using the matrix.  The SOD Administrative Lieutenant developed a training plan for the RAM.  The plan is going through the APD Training Academy's 7-step process with input from the IMT and is in the review process.  Training will be conducted upon review and approval.  The IMT recommended that SOD conduct audits of the Risk Assessment Matrix (RAM).  In May 2018, SOD began conducting audits to verify proper use of the matrix Department-wide, which requires managerial responses to findings, if needed.

The IMT recommended that APD, specifically SOD and the Emergency Response Team (ERT), classify chemical munitions and Noise Flash Diversionary Device (NFDD) as reportable Uses of Force.  APD has taken that recommendation and as of June 2018, APD has classified them as such.

When SOD transfers new personnel into the Division, each unit has unit-specific handbooks for each new transfer to complete.  SOD SWAT currently has three (3) SWAT Officers who are in the process of completing their unit specific handbook.  This handbook includes specific areas that must be completed and passed during the one-year observation period.

SOD reviewed all policies affecting the Division and made revisions to policies as needed.  The policies were submitted through and are going through the approval process.

28

SOD is standardizing training documents and is collaborating with the APD Training Academy on the form and style of current and future training plans. SOD has adapted the Training Academy's 7-step training process, has started integrating that process into SOD's training plans which includes housing the training plans at the Training Academy. Some examples of training plans submitted through the 7-step process are the Risk Assessment Matrix, Supervisor training on Tactical Activations, 40-hour Tactical Emergency Medical Support (TEMS) and Crisis Negotiation Team Training.

The Compliance Section, Performance Review Unit started an audit of SOD in August 2018. The unit has established an audit that will test the Standard Operating Procedures (SOP) outlined in policies. The scope of the audit will entail the current SOP in place, any related special orders and any IMT recommendations.

B) Special Investigations Division (Paragraphs 106-109)

All Special Investigations Division (SID) paragraphs are in operational compliance. As new personnel transfer into the Division, each one will attend a new detective orientation and receive a unit specific handbook. The orientation provides new detectives with the overarching mission and duties of the Special Investigation Division. Each transfer is evaluated against specific and predetermined performance criteria.

During this reporting period, the Organized Crime Unit (OCU) became part of SID and each detective attended SID's orientation. Since June 2018 when OCU joined SID, the SID Commander approved the newly developed unit handbook.

SID utilizes a program to capture divisional investigative work product, tracking and analyzing each unit's investigative response.  SID completes Operational Plans and the Risk Assessment Matrix to identify instances where a specialized tactical unit is required.

The Compliance Section, Performance Review Unit will start an audit of SID in September 2018.  The unit has established an audit that will test the Standard Operating Procedures (SOP) outlined in policies.  The scope of the audit will entail the current SOP in place, any related special orders and any IMT recommendations.

**CASA Area 3: Crisis Intervention** (Paragraphs 111-137)

The Crisis Intervention Unit (CIU) has made a number of important improvements overall and in response to specific recommendations by the IMT. Overall CIU has:

- Worked with the new Assistant City Attorney with revising policies affecting behavioral health.  The recently revised policies also included feedback and collaboration with the McClendon Sub-class attorneys;

- Improved the collection of critical data about calls for service with a behavioral health component. CIU has been working with the administrator of the CIT worksheets tracking platform to ensure that all CIT referrals and reports are completed as required by APD's policy; and

- Completed the CIU handbook on June 12, 2018.  CIU has added benefits for their handbook.  As one added benefit, CIU provides the unit handbook to stakeholders that have strong ties with APD's Behavioral Health, such as the Mental Health Response Advisory Committee (MHRAC), to have in-depth information about the unit and assist in board member succession.  Current detectives, as well as potential,

future detectives receive this handbook to read, learn, and understand the functions of CIU.

A) Mental Health Response Advisory Committee (Paragraphs 110-117)

One recommendation for paragraph 110 was for APD to conform to the goals within paragraphs 110-137.  One of those goals stated within the CASA, "*APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals*" (Doc. 354-1, First Amended and Restated Court-Approved Settlement Agreement, pg. 46).  CIU has established the Mobile Crisis Team (MCT), which are teams comprised of mental health professionals and eCIT Officers who are responsible for responding to priority behavioral health crisis calls and intervention.  MCTs are trained to complement the eCIT and CIU.

A recommendation for paragraph 113 was to "*assess MHRAC-APD information interfaces to identify ways of increasing lead times presented to MHRAC from APD related to issue review and consideration and development of recommendations*" (IMR-6, pg. 257).  APD has responded to this recommendation by CIU immediately sending MHRAC the created and/or revised training plan for review, consideration and development of recommendations.  Once APD receives feedback from MHRAC, CIU will brief and revise all recommendations deemed appropriate.  CIU and MHRAC will continue an already strong working relationship.

For paragraph 115, the IMT recommended that APD, "*submit required documentation to MHRAC as well as documentation from MHRAC noting review and approval.  Ensure that*

*documentation is responsive to relationship building and scenario-based training*" (IMR-6, pg. 259). APD has CIU-based Reality Based Training (RBT) scheduled for August 23, 2018. CIU will be sending MHRAC scenarios by the end of August 2018 for their review.

In response to the recommendation for paragraph 117, "*ensure MHRAC reports are posted on relevant City of Albuquerque websites*" (IMR-6, pg. 260), the 2017 annual report is posted and available on the City's website;  https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents/mental-health-response-advisory-committee-documents.

For paragraphs 123 and 124, the IMT made the recommendation for "*APD to develop and execute a data-based, methodologically appropriate workload and manpower planning analysis that ensures that reliable staffing levels for eCIT Officers are calculated, reported, set as staffing goals, and attained*" (IMR-6, pg. 265). At the time of this report and required by the CASA, CIU has twelve (12) detectives. The administrative assistant is currently updating a database and one full-time CIU detective is the designee for the eCIT training block. APD is currently at the required 40% level, with 46.5%.

<u>B) Behavioral Health Training (Paragraphs 118-122) and C) Crisis Intervention Certified Responders and Crisis Intervention Unit (Paragraphs 123-131)</u>

During this reporting period, Crisis Intervention Unit (CIU) personnel conducted two (2) enhanced Crisis Intervention Training (eCIT) classes: June 14, 2018, and July 12, 2018. At the time of this report, 46.5% of Field Services Bureau officers are certified eCIT and CIU continues to track the percentage of Field Services Bureau officers eCIT trained. In order for APD to continue assessment and improvement efforts, CIU created a new 8-hour training plan for eCIT

refresher training, revised the 40-hour training plan for the Crisis Intervention Team (CIT) training, and revised the training plan for cadets.  Much like the APD Training Academy, CIU has implemented pre-tests to establish baseline knowledge and post-tests to measure the transfer of knowledge.  For eCIT training only, students are required to take an additional exam. Students have to take an entrance exam to ensure the officer's knowledge is sufficient to participate in the enhanced-level course.  The unit also, at the request of the IMT, tracks all training requests received, both internal and external.  This has proven to be invaluable tracking as these requests illustrate trust of APD by outside agencies.

CIU has identified the need to have a process in place for civilian personnel who fail the pre-test, post-test or both.  CIU experienced this scenario in July 2018 without a formal plan in place. CIU is developing a plan to address this issue and to ensure the plan is consistent for participants who may find themselves in this position.

For paragraph 125, the IMT recommended APD "*submit training documentation for CIT and other related behavioral health training, e.g., routinely kept class rosters, exam score, etc*" (IMR-6, pg. 266).  CIU assesses and evaluates officers, looking for the skills for prospect eCIT officers.  At the completion of the training, coordinators meet with the prospective officers and discuss eCIT.  If agreed upon by CIU staff and the officers, the officers are scheduled for eCIT training.  In addition to this response, eCIT certification is valid for two years and the next eCIT refresher is scheduled for October 2018.

For paragraph 127, the IMT has recommended that, "*APD complete eCIT training as designed and evaluate performance via a reasonable testing procedure*" (IMR-6, pg. 267).  CIU has conducted an internal analysis to include the mandatory 40% eCIT trained, staffing levels of

CIU needed to maintain such requirement, implemented viable testing protocols and CIU will continue to offer eCIT training opportunities to maintain that level.

For paragraph 128, the recommendation stated that, "*APD establish a clear, meaningful protocol for CIU response; train that protocol; and supervise implementation*" (IMR-6, pg. 268). CIU will be conducting mandatory training for APD personnel starting in October 2018 and the recommendation response is incorporated in that training.

Paragraph 131 discusses collaboration with MHRAC concerning protocols that "*addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services*" (Doc. 354-1, First Amended and Restated Court-Approved Settlement Agreement, pg. 51). APD has acknowledged that the previous policy was in need of revision and the revised policy was presented to the Office of Policy Analysis (OPA) on August 9, 2018, and will continue through the policy development process. APD will revise training and training evaluation protocols to reflect the revisions. To better reflect the APD personnel responsible to meet the requirements within paragraph 131, APD changed project leads for paragraph 131 to the Special Operations Division Commander.

### D) Crisis Prevention (Paragraphs 132-137)

There were two recommendations for paragraph 136. The first recommendation reads that, "*APD should ensure that COAST and CIU personnel track incident report involving their personnel for indications of recurring issues and problems that may be addressed by referral of clients to community health resources*" (IMR-6, pg. 274). The second recommendations reads,

"*once these opportunities are identified, train COAST and CIU personnel to implement, where appropriate referrals to outreach, service delivery, crisis prevention, and referrals to community health resources*" (IMR-6, pg. 274).   APD has responded with COAST personnel conducting and documenting various outreach endeavors on a weekly basis.  COAST personnel also work in conjunction with Road Runner Food Bank for food baskets and attend outreach where they obtain information about additional resources.

Lastly, the IMT recommends for paragraph 137, "*Collect, analyze, interpret and memorialize the data elements above on a routine basis, and produce reports circulated to CIU and COAST personnel, through the chain of command, and eventually to the public via APD's web-site*" (IMR-6, pg. 275).  APD has taken the recommendation, has been analyzing data, and has been circulating that data analysis through CIU, COAST and chain of command personnel.  In addition, those data are presented to MHRAC and the community in the quarterly CIU Data Book.  The CIU Data Book released in June 2018 can be located at http://www.cabq.gov/mental-health-response-advisory-committee/documents/albuquerque-police-Department-crisis-intervention-unit-data-book-june-15-2018.pdf.

August 15-17, 2018, CIU attended the CIT International Conference and hosted four (4) workshops during the conference.  In addition, four (4) CIU detectives attended the CIT International Conference, CIT Coordinator course.  The four detectives are now certified CIT Coordinators and considered instrumental in the development of effective CIT programs.

**CASA Area 4: Policies and Training Generally** (Paragraphs 138-161)

A) Policy Development, Review and Implementation (Paragraphs 138-148)

As mentioned in APD's previous progress report, Standard Operating Procedure (SOP) 3-52,

Policy Development Process, had been the "*subject of considerable discussion*" (Sixth APD

Progress Report, pg. 8).  The previous progress report can be located at

http://www.cabq.gov/police/documents/sixth-apd-progress-report-with-appendices.pdf.  The

concern was the inclusion and level of inclusion of the Police Oversight Board (POB) in the

process.  In January 2018, APD recognized the need for continued policy development process

improvement.  APD worked closely with the Independent Monitor (IM), Department of Justice

(DOJ), members of the POB and CPOA and Amici groups to revise the policy.  The SOP 3-52

policy has been operational since April 24, 2018.

The Office of Policy Analysis (OPA) reconvened on May 10, 2018, with both new and

existing members.  At the end of this reporting period, July 31, 2018, twenty-one (21) policies

have started the process and two (2) have completed the entire policy development process, to

include IMT approval when needed, and have been published.  APD has followed SOP 3-52 and

ensured notice and an opportunity to be heard by the Police Oversight Board (POB) Policy

Subcommittee, the public, and stakeholders.

In an effort to engage external stakeholders with an emphasis on policy development

participation and commentary, APD has conducted several outreach presentations on the policy

development process.  A few examples of APD outreach are:

- Northeast Community Policing Council on June 12, 2018;

- POB meeting on June 14, 2018;

- APD personnel forums on June 20, 21, and 27, 2018;

- Valley Community Policing Council on June 28, 2018; and

- Mental Health Response Advisory Committee (MHRAC) on June 19, 2018.

As of July 31, 2018, the Albuquerque Police Department had one hundred ninety-four (194) Standard Operating Procedure (SOP) manuals ranging from General, Procedural and Administrative Orders as well as individual Division, Section and Unit SOPs.  Policy numbers will change as APD continues to review policies, develop new policies, and consolidate others. The Implementation Unit has one full-time employee dedicated to policy and two additional Temporary Duty employees to assist with the policy effort.

During this reporting period, four of the six Use of Force policies were presented to the Office of Policy Analysis and are progressing through the policy development process as outlined in SOP 3-52.  The Office of Policy Analysis (OPA) is working diligently to review policies.  This effort is ongoing and faces its own challenges. Due to the large volume of SOPs requiring review, OPA meets weekly and will continue to do so until the majority of policies are reviewed and approved pursuant to SOP 3-52 Policy Development Process.

Independent Monitor Reports 5 and 6 referenced several Special Orders posted on PowerDMS addressing critical CASA-related processes, directly affecting critical elements of the CASA.  In IMR-6, the Monitor requested to be copied on all proposed CASA-related Special Orders.  As a result, APD established a new process to review and approve Special Orders. APD's Compliance Section created a Special Order coversheet requiring review and approval by the Compliance Section Lieutenant, City Legal, the Chief of Police and the IM prior to posting on PowerDMS.  The new Special Order approval process is available to personnel on APD's intranet.

The creation of a Compliance Bureau has allowed for a standardized and structured approach when working with the IMT.  APD is in the process of conducting a Department-wide check of Special Orders.  The Special Order process is one example of the improved oversight of

CASA related directives.

B. Training on Revised Policies, Procedures and Practices (Paragraphs 149-154); C. Field
Training Officers Program (Paragraphs 155-161)

The APD Training Academy has developed and implemented the 7-step Training Process
for all training within APD.  The 7-steps include: (1) Needs Assessment, (2) Curriculum
Development, (3) Oversight/Approval, (4) Delivery, (5) Operational Application, (6) Evaluation,
and (7) Revision.  The goals of this approach are to have standardized training plans Department-
wide and to house all training plans with the APD Training Academy.  Documentation of
training requires that all steps of the training process generate sufficient records to ensure that the
Department is able to reproduce its process in planning, developing, delivering, and evaluating
training.

During this reporting period, many APD Divisions, working closely with the APD
Training Academy's Comprehensive Training Unit (CTU), are in the process of transferring their
division, section, or unit-specific training plans into the standardized 7-step process.  The 7-step
process can be lengthy as the Department transitions into this type of training plan development.

The APD Training Academy is transitioning to a learning management system that will
assist in activities surrounding the Academy's mission and goals.  There have been numerous
setbacks with the current system; however, the Training Academy is committed to implementing
a tracking system with the capacity to schedule training; store Department-wide training plans to
better collect and analyze data; and monitor implementation and evaluate outcomes.  For the
time being, the Training Academy developed a training schedule to assist in planning, timeline
development and effective utilization of personnel.

APD has been working closely with the Central New Mexico (CNM) Community

College to establish a partnership for training specific courses such as mandatory annual training and supervisor training.  This collaboration has led to a satellite affiliation for the APD Basic Training Academy, currently awaiting the New Mexico Law Enforcement Academy Board approval.  Another collaborative idea is to assist with online training for APD personnel, which could result in a reduction of overtime expenditures.  In order to learn, improve and excel at the instructional levels, CNM professors will monitor APD instructors and provide valuable feedback.

Personnel from the Training Academy have been active participants in the Use of Force policy suite revisions to ensure training aspects have been considered during the redrafting.  This is a major improvement from the past when the Training Academy was left out of the policy development process.

During this reporting period, APD conducted one modified Citizen's Police Academy (CPA) specifically for the Civilian Police Oversight Agency (CPOA), Police Oversight Board (POB) and Community Policing Council (CPC) members.  A standardized CPA begins on August 28, 2018.

During this reporting period, the Training Academy restructured and reestablished the Training Committee.  The Training Committee is responsible for evaluating, coordinating and overseeing all in-service and advanced training programs components for the needs assessment, the assessment and the review stages.  Training Committee provides guidance to the Training Academy based on statistical analysis, trends and training recommendations in order to ensure that the Academy can effectively meet the training needs of the Department. The Committee will collect information from sources both within the Department and from outside stakeholders. While the Academy directly addresses training of personnel that is required by the State or

supervisory personnel, the Committee will identify immediate training needs as well as monitor long-term trends in order to address emerging and existing patterns that are contrary to best practices or the law. All preliminary Committee proposals have been developed in conjunction with monitor feedback.

In February 2018, fifteen (15) officers attended the 40-hour Basic Field Training Officer (FTO) class. In March, 2018, APD held a FTO selection process and five (5) of the seven (7) applicants were accepted into the Field Training and Evaluation Program (FTEP). In March 2018, an APD lateral academy class started On-The-Job (OJT) training with three (3) OJT recruits and in May 2018, all three lateral recruit officers completed OJT. Between April and June 2018, all forty-one (41) recruit officers on OJT from the 118th cadet class successfully complete OJT. In May 2018, APD held a FTEP recertification class with seven (7) in attendance and recertified. APD held another 40-hour Basic FTO class in May 2018 with six (6) officers and one (1) Crime Scene Specialist. In June 2018, eighteen (18) academy graduates from the 119th cadet class started OJT and continue at the time of this report.

As of April 2018, the FTEP had the largest number of FTOs in the program's history with seventy-six (76). However, as a result of training fatigue (with 44 on OJT at one time) and openings with other units within the department, there are currently fifty-two (52) Field Training Officers. In order to sustain a sufficient number of FTOs per paragraph 161, APD submitted a request to amend paragraph 157 of the CASA and have proposed a new incentive package for FTOs:

- February 7: Amendment request to the CASA was submitted; and

- July 12: A memo requesting improved incentive package was submitted and awaiting results.

**CASA Area 5: Misconduct Complaint Intake, Investigation and Adjudication** (Paragraphs 162-202)

A) Reporting Misconduct (¶ 163); B) Public Information on Civilian Complaints (¶ 164-168); C) Complaint Intake, Classification, and Tracking (¶ 169-182); D) Investigations of Complaints (¶ 183-194); E) Preventing Retaliation (¶ 195-197); F) Staffing and Training Requirements (¶ 198-200); G) Discipline Process and Transparency (¶ 201-202)

As stated earlier in this progress report, the Internal Affairs Division was divided into two separate divisions; the Internal Affairs - Misconduct Division and Internal Affairs - Force Division. This section will focus on progress made within the Internal Affairs - Misconduct Division since the information related to Internal Affairs - Force Division was covered earlier in this report. The two Divisions work closely with each other. During this reporting period, IA-Misconduct personnel conducted misconduct investigations training for members of the new IA - Force Division.

IA - Misconduct Division does not currently have a Program Data Analyst to conduct necessary data and trend analysis. During this reporting period, APD prioritized staffing in order to hire a Program Data Analyst to assist in these efforts. The analyst position has been opened, advertised and is pending hire.

The Internal Affairs (IA) - Misconduct Division is responsible for the misconduct intake process, investigation and adjudication for cases not referred to the Citizen's Police Oversight Agency (CPOA). Many of the paragraphs throughout this section include the operations of APD's IA – Misconduct Division and the separate operations of the CPOA. CPOA operates as an independent and separate entity from APD. For this report, APD chose to discuss all CPOA-

41

related paragraphs in one section for easier reading and understanding.  CPOA progress and requirements will be covered in the section on Community Engagement and Oversight.

During this reporting period, IA - Misconduct Division personnel have started creating an Internal Affairs training plan with guidance from the Training Academy.  IA Misconduct will follow the Training Academy's 7-step process.  The IMT will vet and approve the training plan prior to conducting training, meeting CASA requirements.

IA – Misconduct Division, in response to IMT recommendations throughout this section's paragraphs, are reevaluating policies.  For paragraphs 183 and 184, the IMT recommends that APD, "*Revise appropriate policies to reflect the use of ACMs* [Additional Concern Memoranda] *within the IA 'outcomes' definitions and train personnel accordingly*" (IMR-6, pg. 310).  ACMs are the current APD documentation and practice that, "*arises out of supervisory reviews…where there is no other corresponding policy violation.*" (IMR-6, pg. 310).  The IMT has raised concerns surrounding ACMs, from data collection and tracking of violations within the ACMs to the usability of the memorandums.  APD agreed with these concerns.  With the assistance and guidance of the IMT, APD is reevaluating the overall process.  Once policies are revised, training plans will be developed following the Training Academy's 7-step process.  Once the policies are approved, training will be conducted.

For paragraph 191, the Monitor provided three recommendations surrounding case assignment and investigative timelines.  The recommendations explain the need for timelines and if investigations are delayed due to unusual circumstances and extensions are necessary, "*it should be clearly set forth in an investigative timeline for supervisory review*" (IMR-6, pg. 317).  The timelines also include the assignment process.  Case assignments will not exceed 7 working

days from the time the case is submitted.  APD responded to these recommendations and the IA – Misconduct Commander is not aware of any overdue case assignments or investigations.

The Monitor provided seven (7) recommendations for paragraphs 201 and 202.  The Monitor stated, "*We found APD to be out of compliance on three of eight cases relative to consistent and fair discipline, for an 87 percent compliance rate.  Relative to consistent application of mitigating and aggravating factors, APD was out of compliance on two of their eight cases. This constitutes a 75 percent compliance rate*" (IMR-6, pg. 324).  With the new administration, APD is committed to fair and consistent discipline applied to sustained allegations.

During this reporting period and in response to Monitor concerns, APD implemented the Disciplinary Action Packet which is now included in each case.  It identifies previous violations of each sanction level, the timeline of those violations, and the specific violation of the investigated case with a proposed sanction.  The chain of command has to justify, in writing, any deviation from the recommended discipline.

One area that needs to be completed is creating a definitions page in the disciplinary matrix that provides specific guidance on the appropriate sanction level when a sanction range is listed within a policy.

**CASA Area 6: Staffing, Management, and Supervision** (Paragraphs 203-231)

A) Staffing (Paragraph 204): B) Duties of Supervisors (Paragraphs 205-208), C) Supervisory Training (Paragraph 209)

During this reporting period, APD has continued to "*assess the appropriate number of personnel to perform the different Department functions to fulfill its mission*" (Doc. 354-1, First Amended and Restated Court-Approved Settlement Agreement, pg. 70).  Several divisions,

including but not limited to the Training Academy, the Compliance Division, and the Internal Affairs- Force Division have completed staffing assessments and are working towards improving staffing levels to meet the needs within the divisions.

APD continues to meet requirements for first line supervision and the 8:1 supervisory ratio (eight Officers to one Sergeant or other first line supervisor).  APD maintains documentation of personnel assigned under any one Sergeant or other first line supervisor, especially for the Field Services Bureau.  As a Department, APD maintains the 8:1 ratio with the exception for areas where the 8:1 ratio does not apply.  There are exception units, such as the Crisis Intervention Unit, that go beyond that ratio.  However, APD measures task complexity and determines span of control to identify those areas, which are few within the Department.

APD shifted project leads for these paragraphs in order to dedicate more time and effort towards supervision.  During this reporting period, much of the time spent was focused on paragraphs 205 and 208.  Previous IMR's identified each paragraph as a deficiency within APD, specifically surrounding Use of Force investigations and management oversight.  According to IMR-6, APD is in primary compliance for paragraph 205, and in secondary compliance for paragraph 208.

One of the recommendations from the Monitor was for APD to measure the impact on conducted training.  However, Use of Force policies are currently being revised and thus training cannot be conducted until those policies are approved and training plans have been developed and approved by the Monitor.  Use of Force is major part of supervision and proper training on the new policies will provide guidance and clarity for Sergeants and supervision as a whole. APD does track and collect Use of Force data; however, the Department does not analyze or use that data to effectively supervise and manage.

During this reporting period, APD has been researching national best practices.  APD has been identifying supervisory deficiencies through past IMR's, by conducting interviews of supervisors at every level for a clear understanding of their concerns, by requesting supervisory expectations from different divisions within the Department, and by conducting focus group meetings for open discussion, in order to plan a way forward for supervision.

APD has drafted a problem-solving document, P.I.N.S. (Problems, Issues, Needs and Solutions) in order to address major issues affecting the success of these paragraphs.  One issue identified is the need for APD to require monthly Sergeant and first-line supervisor reporting in order for Lieutenants and Commanders to track and evaluate supervisory Use of Force investigations and other requirements.  The current reporting process misses important aspects to effective supervision from the Sergeant level to the Commander level.  Several goals and timelines have been and are being developed to improve the current process while creating a long-term plan that is cost-effect, beneficial and user-friendly.

During the reporting period of first line supervision training as required in paragraph 209, thirty-nine (39) Officers attended the Acting Sergeant class, March 19-23, 2018.  Although the paragraph states Sergeants, APD wants to ensure that Officers put into an Acting Sergeant position; therefore, a first line supervisor, receives training in order to perform the duties and responsibilities of a Sergeant.  APD is undergoing a promotional process for the rank of Sergeant and will conduct training when the process is finalized with those personnel selected.

D) Early Intervention System (Paragraphs 212-219)

During this reporting period, APD took a major step towards improving the Early Intervention System, also called the Early Intervention and Recognition System (EIRS).  APD

assigned a full-time EIRS Lieutenant to the Internal Affairs – Misconduct Division, which is responsible for EIRS. The EIRS Lieutenant has made a lot of progress in this area, which required a complete program reevaluation and reorganization.

The EIRS program is changing to a data-driven system with thresholds supported by data analysis and research. The EIRS is intended to become a system that promotes early identification of potential problems, recognition of superior performance and standardized documentation of actions taken. This program needs to identify the positive and negative trends in equipment, training, policy and/or personnel. The new system will incorporate levels of assessment and use standard deviation to determine thresholds. There will be seven (7) broad data points to track:

- Use of Force;

- Complaints against an Officers;

- Vehicle crashes;

- Vehicle pursuits;

- Training/Certifications;

- Court-related Issues; and

- Personnel Management

During the reporting period, the EIRS Lieutenant developed a process for improving the program. One of the changes was simply to the name, from the Early Intervention System to the Personnel Management, Education and Development System (PMED). A presentation was made to the Compliance Bureau Deputy Chief and staff, updating the division on the new plan moving forward. Once approval was granted from the Deputy Chief, a presentation was made to

the Chief and his staff on August 7, 2018.  The program was approved to move forward.  The Personnel Management, Education and Development System pamphlet is in the appendix.

One of the recommendations for EIRS, is for APD to develop, incorporate and train personnel on an effective policy.  The EIRS, now PMED, revised policy has been drafted and is waiting to be scheduled for the Office of Policy Analysis and will continue through the SOP 3-52 policy development process.  The PMED Lieutenant has identified the need to have standardized formats with issues such as Performance Improvement Plans and will be attending training for Performance Improvement Plan training on August 23, 2018.  A training plan will be developed following the Training Academy's 7-step process.  In addition, APD will develop a training plan on the revised policy, also using the Training Academy's 7-step process.

The PMED Lieutenant has worked in collaboration with a local business, Resilient Solutions 21, to develop concepts for data-driven analytics.  The goal is to identify trends and patterns to alert supervision and management, who will address the issue(s) with the hope of mitigating risk of excessive Use of Force, excessive auto crashes, or other negative outcomes in the future.

E) On-Body Recording Systems for Documenting Police Activities (Paragraphs 220-231)

In December 2017, APD completed the deployment of the newly purchased Axon on-body camera system or the On-Body Recording Device (OBRD).  APD initially trained 930 sworn and civilian personnel on the OBRD.

In March 2018, APD changed project the lead for On-Body Recording Device (OBRD) related paragraphs from a Detective to a Lieutenant.  The project lead added personnel to assist with the OBRD program; helping with policy, equipment and training responsibilities.  The new OBRD team members received Basic Instruction Training certification through the New Mexico

Department of Public Safety.  This certification allows them to instruct OBRD related material.
In June 2018, those OBRD team members received Axon certification in camera operations and
troubleshooting.

APD researched best practices policies from police Departments in similar compliance
agreements including Seattle Police Department, Cleveland Division of Police, New Orleans
Police Department; as well as from Denver Police Department and Houston Police Department,
which are not in such agreements.  During the June 2018 site visit, the Monitor recommended
that APD continue to revise policy, accurately reflecting the expectations of the CASA.   APD
has addressed those recommendations in the revised, draft policy for OBRD.  The policy is in the
policy development process.

APD has developed a camera shortage.  On June 8, 2018, APD received a quote for the
purchase of 255 additional camera systems.  In the meantime, APD made adjustments for this
shortage to include taking back additional cameras from non-essential, sworn personnel and
reassigning the cameras to essential, sworn personnel in the Field Services Bureau.

Paragraph 220 states that APD will review OBRD recordings regularly and paragraph 224
states that supervisors will ensure camera usage per policy.  APD is developing a process to
identify types of videos to watch to ensure camera usage per policy from paragraph 224.
Additionally, APD's current policy states that APD supervisors will, "*review at least two videos
per month of each Officers under their direct supervision. Sergeants should spend approximately
7-10 minutes reviewing each video*" (APD Procedural Use of On-Body Recording Devices SOP
2-8(F)(2)(e)).  The Monitor recommended that if APD supervision is going to review a video, the
video should be watched in its entirety.  APD agrees with this recommendation and this change
is being added into the revised policy during the policy's annual review.

There was one recommendation stemming from IMR-6 surrounded APD disseminating a Special Order, without Monitor approval, changing the requirements of supervisory video reviews, from two videos per month, per Officer to two videos per month, per squad. This Special Order was rescinded and APD reverted to the original policy requirements. It should be noted that Special Orders affecting the CASA must be reviewed and approved by the Monitor to ensure that changes reflect the CASA.

For paragraph 223, a recommendation stated, "*APD should conduct an immediate, thorough and complete audit protocol relative to proper testing and functioning of OBRD equipment*" (IMR-6, pg. 348). APD has worked closely with Axon that advised cameras are checked every time it is plugged into the docking station to ensure the firmware is up to date and working properly. This firmware download and update cannot occur if the camera is not functioning properly according to Axon. There is a multistep process for the Axon camera to properly function. If one of these steps is missed, the camera will not work. APD has attached a sticker on each docking station that tells which lights correspond to different functions of the camera.

Upon policy approval, the three (3) OBRD and Basic Instructor trained personnel will meet the Monitor recommendation for paragraph 225 and train all supervisors on the new policy. With three available trainers versus one, APD will be able to provide more training opportunities for supervisors.

Paragraph 227 discusses the need to ensure that videos are properly classified and accessible, according to the type of incident in the footage. The Monitor made three (3) recommendations for this paragraph:

- "*Identifying training elements specific to this paragraph's requirements and assess whether the training was delivered in a clear manner;*

- *Design remedial training, counseling, or discipline if required to directly affect the observed in-field supervisory under performance; and*

- *Once the remedial training, counseling, or discipline is implemented, close the loop by re-evaluating performance in the field. Repeat until under-performance is eliminated*" (IMR-6, pg. 352).

APD understood these recommendations and made improvements based off them. Supervisors are responsible for completing the monthly video inspection form.  When evaluating this process, APD discovered that when supervisors entered the data in the monthly video inspection form, they were allowed to skip certain fields and continue with completing the form. This resulted in inaccurate data collection and reporting.  Since identifying this issue, APD corrected those fields, which are now mandatory fields to complete before continuing.

The Monitor recommended APD put into place auditing protocols responsive to paragraphs 228, 229 and 230.  The goal for these types of audits are to identify issues, including but not limited to, intentional or unjustified failures to activate OBRD required by policy.  As stated earlier in this progress report, the APD Compliance Division has an audit unit called the Performance Metrics Unit.  This unit is responsible for audit and assessment functions Department-wide.  The unit audits programs in accordance with and based upon policy.  OBRD is one of the CASA-related sections scheduled for auditing.

Additionally, supervisors are responsible for identifying any policy violations or discrepancies when completing the monthly video inspection form for each officer.  APD is also currently issuing two cameras per Field Services Bureau and Tactical assigned officers, so one

can be placed in a docking station to download and recharge while the other one is being used for field use.  Additional cameras are in the purchasing process (255) to ensure that all Officers have two.

Previously, APD utilized several different camera platforms, which were difficult to manage, control and oversee.  Currently, per APD policy, personnel are only authorized to wear Department-issued OBRD.  There is currently only one platform, Axon, being used Department-wide, meeting national best practices.

**CASA Area 7: Recruitment, Selection and Promotions** (Paragraphs 232-246)

<u>A) Recruitment Plan (Paragraphs 233-235): and B) Hiring Practices (Paragraphs 236-240)</u>

During this reporting period, the University of New Mexico (UNM) worked in collaboration with APD to develop a comprehensive recruiting plan, named the Albuquerque Police Department 2017 Annual Report and 2018 Strategic Recruitment Plan.  This document is in the appendix.  This report details the results of the 2017 recruiting plan, listing a review of past strategies, goals/objectives and plans to attract a diverse pool of applicants, and explains the 2018 strategic recruitment plan.

The APD Training Academy has continued to promote APD via web-based applications with expanded emphasis on minority group sites, such as http://www.thecauseinteractive.com/lawenforcecareer.html.   In addition, APD continues to recruit in Military and University communities. APD has regular contact with the Southern Christian Leadership Council board members.  APD has expanded its efforts with the High School "Career Enhancement Center" in an effort to recruit students into the Public Service Aide

(PSA) program, and furthered efforts to develop processes to transition from PSA into Police Officers.

In addition to the initial APD test focusing on related skills questions, the background questionnaires for both a candidate's former employers and personal references contain questions related to the required skills and abilities.

The APD Recruiting Unit has increased staffing to include one Recruiting Sergeant and five (5) civilian personnel to assist in the recruiting efforts.

APD continues to assess progress status in recruiting and selection processes in a variety of ways.  APD has continuously documented attendance of many diverse community group events including military, faith-based, educational, and sports-related.

In addition, APD utilizes unidentified online application process wherein an applicant can remain completely anonymous until they arrive for testing.  This process removes any possible bias and simply forwards the answers to the questions to the background officer for review.

APD will continue to foster relationships with community stakeholders like the UNM Athletic Recruiting personnel to discuss their recruiting plan and actions in the event APD can utilize the same tactics to recruit highly qualified individuals.  Through this discussion with UNM Athletics, the Department hopes to foster a relationship where UNM recruiters will recommend their athletes and students to APD.  Furthermore, APD personnel have met with a KRQE Integrated Digital Specialist to discuss social media recruiting tools and are awaiting a written proposal.

In an effort to strengthen the process of screening applicants, APD created an automated system for generating chief selection reports, which will transcribe information available via the

applicant's interest card automatically to a chief report from the apdonline administrative site. This will alleviate the need of recreating information already available and provide a uniform report amongst all background personnel. The system has rules in place requiring information be provided to ensure all avenues of a background are encompassed in the report.

The APD Background Unit will continue to complete thorough and objective backgrounds of applicants and continue to look for ways to streamline the process without compromising the integrity of the background.  APD has recently begun testing applicants on weekdays, separate of weekend testing dates to accommodate applicant schedules. Additionally, APD has added two (2) civilian Background Unit personnel to assist in processing of applicants.

C) Promotions (Paragraphs 241-243)

During this reporting period, APD completed a Lieutenant promotional process.  Eighteen (18) Sergeants passed the Lieutenant promotional process.  To date, eleven (11) of the eighteen (18) have been promoted to the rank of Lieutenant.  On July 20, 2018, APD announced a Sergeant promotional process.  The written exam was held on August 29, 2018.  The written exam is the first portion of the promotional process.

To meet the requirements within paragraph 246, the performance evaluations policy is in the process of being revised to ensure that the all supervisors are completing the performance management evaluations, completed quarterly and annually, in an accurate and timely fashion. The revised policy is scheduled to be heard at the Office of Policy Analysis on September 6, 2018.  The revision covers the following:

- Sanctions for failing to complete evaluations in a timely manner;

- Responsibility for performance documents if personnel are transferred, on light duty, etc.; and

- Procedures to ensure the personnel assigned to each supervisor is accurate.

D) Performance Evaluations (Paragraphs 244-246)

APD uses a performance management tool to conduct personnel work performance evaluations.  The third quarter evaluations, also called checkpoints, were due in March 2018. There were 27 missed deadlines during this checkpoint with an overall compliance rate of 96% for sworn personnel.

In addition, APD supervision had to complete annual evaluations by June 30, 2018.  The project lead sent weekly emails during the month prior to the due date in an effort to remind supervisors to complete the evaluations.  The emails included job aides and helpful tips.  In addition to the reminders, excel spreadsheets were provided listing personnel who had not yet completed their checkpoint.

Forty-three (43) of the eight hundred and forty-two (842) sworn supervisors did not complete the evaluation by the June 30, 2018, deadline.  Twelve (12) of the forty-three (43) documents were submitted for approval by the direct supervisor; however, they were not approved by the next line supervisor. The compliance rate for sworn personnel was 94.89% for the annual complete manager evaluation.

Although the current program is currently in full compliance, in an effort to achieve operational excellence, and to maximize the potential of the personnel, the department is expanding the current program.  APD is reviewing the circumstances as to why evaluations were not completed on time and analyzing the information to prevent the same issues from

reoccurring.  APD has identified a supervisory training need and will develop training to ensure that supervisors are properly trained on the quarterly and the much lengthier, annual process. The training plan will follow the Training Academy's 7-step process.

**CASA Area 8: Officers Assistance and Support** (Paragraphs 247-253)

During the reporting period, the Behavioral Sciences Section (BSS), with guidance from the Monitor, conducted electronic surveys and provided post-training written evaluations.  An overview showed that trends are moving in the right direction, with more belief in the confidentiality of the BSS Officers support program that assists in the requirements for paragraph 250. These trends will be continuously reviewed by the Director, the Unit, and during the next, and all, semi-annual meetings to meet with requirements within paragraph 247.

During this reporting period, APD's Peer Support (paragraph 248) members attended the following trainings:

- Spiritual & Psychological First Aid from the International Critical Incident Stress Foundation, on May 1 – 2, 2018; and
- Grief Following Trauma from the International Critical Incident Stress Foundation, on May 3 – 4, 2018.

During the January 2018 site visit, the Monitor recommended APD consider conducting a survey to receive feedback on the knowledge and trust of the program.  APD agreed with that recommendation, creating a survey for both sworn and civilian personnel and sent out the survey in April 2018.  Three-hundred eighty-one (381) people responded to the survey.  Personnel responded with positive feedback about the program.  APD also learned about areas to improve upon such educating and communicating the program's accessibility and functions.

APD has thirty (30) Peer Support members in the program and advertised for more membership in July 2018.  APD expanded Peer Support membership on July 12, 2018, by selecting twenty-five (25) new members.  New personnel will be attending training on September 6-7, 2018, Assisting Individuals in Crisis from the International Critical Incident Stress Foundation prior to becoming active members.

On May 24, 2018, the Peer Support handbook became a useable guide to Peer Support.  APD Peer Support board membership, the Mental Health Response Advisory Committee (MHRAC) and the Monitor vetted and approved the handbook.

To meet with requirements within paragraphs 249, 251 and 253, BSS will continue to conduct in-services trainings. During the reporting period, BSS personnel conducted a series of in-person trainings at various hours and in various Area Commands to assure that as many people in supervisory roles within the chain of command were trained as possible. An additional mandatory, online training was presented on APD's online platform.  Resource referral information continues to be available to personnel for officer and employee assistance.

**CASA Area 9: Community Engagement and Oversight** (Paragraphs 254-293)

A) Community and Problem-Oriented Policing (Paragraphs 255-259)

During the June 2018 site visit, the Monitor met with the paragraph project leads and other members of the APD to discuss progress on Community and Problem-Oriented Policing (COP/POP).  From the meeting and IMT recommendation for paragraph 255, personnel responsible for COP/POP have created a working group to strengthen the APD mission and vision statement to incorporate community input to match the goals of the Department.  This group is comprised of APD executive staff, sworn rank and file, civilian staff, and community

stakeholders.  The goal is to draft a mission statement that highlights community-oriented policing in addition to community expectation of their police Department.

The Policing and Community Together (PACT) team is being renamed to the Problem Response Team (PRT).  This change is in draft form at this point and APD will continue to work in the proposed approach.  Through this new approach, APD is working towards strengthening its approach to community policing and community outreach.

One of the other points of IMT and APD discussion was proper documentation for the attendance of community meetings by APD personnel.  In IMR-6, the IMT recommends, "*APD should continuously focus on mechanisms to take issues identified through its community-based systems such as the CPCs and move those issues through internal processes to ensure that community opinions, needs, and critical issues are reflected in patrol plans, organizational priorities, and programmatic planning*" (IMR-6, pg. 372).  APD completes a standardized, electronic form after every attended community meeting.  Officers also log with a specific code to identify a community meeting (10-75-1).  This will allow for improved data collection, data analysis and verification of attendance, helping to meet the requirements within paragraphs 255 and 259.

APD held two (2) summer youth group camps called Camp Fearless.  The informational pamphlet on Camp Fearless can be found at https://www.cabq.gov/police/programs/summer-camp-fearless.

- Camp Fearless Westside was held June 12-15, 2018.  Camp Fearless Westside was hosted at Valley High School.  There were 40 kids in attendance and on June 15, 2018, APD held a graduation with certificates signed by APD Chief Geier.

- Camp Fearless Eastside was held July 10-13, 2018.  Camp Fearless Eastside was hosted at the Boys and Girls Club in the Northeast Area Command.  There were 38 kids (Two registered kids did not show up) in attendance and on July 13, 2018, APD held a graduation with certificates signed by APD Chief Geier.

Paragraph 256 states "*APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing*" (Doc. 354-1, First Amended and Restated Court-Approved Settlement Agreement, pg. 83).  The Policing and Community Together (PACT) team is being renamed to Problem Response Team (PRT).   This change is in draft form at this point and APD will continue to work in the proposed approach to meet the requirements within this paragraph. The proposed approach will be guided not only by the CASA, but the IMT recommendations.

APD does track and provide to the IMT bid packets to meet the requirements of paragraph 257.  Bid packets are provided to officers when they start a new Field Services Bureau field officer assignment.  Packets are provided to, "*ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city Departments to address quality-of-life issues*" (Doc. 354-1, First Amended and Restated Court-Approved Settlement Agreement, pg. 374).  Bid packets include, a signature page, a beat and boundary map of the Area Command, a list of community leaders and neighborhood association contacts, City Councilor names and district boundaries, and the Bernalillo County commission districts.  The bid packet also includes, Area Command POP projects, tactical operation form, Officers information form,

monthly vehicle inspection form, line inspection form, emergency notification contact, and identified Area Command Community Policing Council (CPC).

APD received recommendations for paragraph 257 from the Monitor, identify, document, and describe other City Departments actively involved the community policing partnerships with the Albuquerque Police Department.

APD wants to improve upon the current community policing training curriculum, including the 16-hour CASA-mandated training.  The training plan is being revised for all levels of personnel who receive the training, following the Training Academy's 7-step process.  This includes cadet basic training and in-service training to embrace and integrate the community policing principles in everyday interactions with community members, stakeholders, community partners, and other law enforcement entities.

B) Community Meetings and Public Information (Paragraphs 260-265); and C) Community Policing Councils (Paragraphs 266-270)

During the reporting period, APD hired a new Community Outreach Manager and a Community Policing Council (CPC) Administrative Assistant to work with each of the six (6) CPC groups, one for every Area Command throughout the city.  APD has continued to maintain the website and host events like "Coffee with a Cop" and "Fast and the Fuzz".  APD held the following events:

- Coffee with a Cop on March 8, 2018 at Starbucks located 4301 San Mateo Blvd NE, in the Northeast Area Command;

- Coffee with a Cop  on March 13, 2018 at the Church of Scientology located at 1509 San Pedro NE, in the Southeast Area Command;

- Coffee with a Cop on March 23, 2018 at La Cueva High School located at 7801 Wilshire Ave NE, in the Northeast Area Command;

- "Beeping Easter Egg Hunt" by the APD Bomb Squad on March 31, 2018 at the Korean War Veteran's Park located at 1700 Yale SE, in the Southeast Area Command;

- Pop with a Cop on April 10, 2018 at Sonic located at 6320 Central Ave SE, in the Southeast Area Command;

- Coffee with a Cop on April 25, 2018 at McDonalds located at 13301 Central SE, in the Foothills Area Command;

- Coffee with a Cop on April 25, 2018 at APD Southwest Area Command Substation located at 6404 Los Volcanes NW, in the Southwest Area Command;

- Coffee with a Cop on April 25, 2018 at Starbucks located at 4407 Lomas Blvd NE, in the Valley Area Command;

- Coffee with a Cop on May 24, 2018 at McDonalds located at 5900 Menaul Blvd NE, in the Northeast Area Command;

- Fast and the Fuzz on May 26, 2018 at APD Valley Area Command Substation located at 5408 2nd St NW, in the Valley Area Command;

- Coffee with a Cop on June 9,2018 at Donut Mart located at 3301 Coors NW, in the Northwest Area Command

Each Area Command has a website to offer information sharing, community outreach and updates on Area Command activities and hosts Officers Appreciate Day in their respective Area Commands.

The six (6) CPCs continue to exceed the requirements within paragraph 261. The requirement states that CPCs will meet on a semi-annual basis; however, each CPC meets monthly.

In response to paragraph 263, APD requires officers and supervisors assigned to Area Commands to attend at least two (2) community meetings per year in their assigned geographic area. Officers log with a specific code to identify a community meeting (10-75-1) and complete a standardized, electronic form with information on the meeting, any needs identified and what was done to address that need. The code and the electronic form allow for improved data collection, data analysis and verification of attendance.

APD posts the crime statistics by Area Command using a one-year comparison from January 1, 2017, through August 6, 2017, with the same timeframe for 2018. This information can be found at, http://www.cabq.gov/police/area-commands.

APD received a recommendation pertaining to paragraph 266; "*APD should continue work to broaden membership and participation by determining what factors are keeping 'relevant stakeholders' from expressing their views at CPC meetings, and documenting attempts to address those factors*" (IMR-6, pg. 384). In response to that recommendation and for paragraph 267, APD has improved outreach through social media, electronic billboard advertising, attended church services, met with APD Forward members, attended neighborhood association meetings and neighborhood coalition meetings. The Office of Neighborhood Coordination (ONC) has helped APD advertise the CPC meetings. The ONC, "helps create vibrant and thriving neighborhoods in the City of Albuquerque" (https://www.cabq.gov/office-of-neighborhood-coordination). APD posted the selection process for CPC membership on the webpage,

http://www.cabq.gov/police/community-policing-council/requirements-to-serve-as-a-voting-member.

In response to paragraph 268 and along with IMT recommendation, APD has taken the lead to ensure a comprehensive community policing approach is identified for each area command, based on CPC interaction, participation, and comment.  APD now provides note-taking assistance and recently hired a full-time Administrative Assistant to help with posting items (minutes, agendas, etc.) to and updating the webpage.  With the Administrative Assistant available, APD can assist with the recommendation for paragraph 270, "*assign staff to develop a more standard format for the CPC annual report and provide assistance to each CPC in producing the annual report*" (IMR-6, pg. 389).  To date, all 2017 CPC annual reports have been posted to the website.  The annual reports can be found at

http://www.cabq.gov/police/community-policing-council/community-policing-councils-annual-reports.

During this reporting period, APD developed a process map to help streamline recommendations submitted by the voting members.  This allows for improved tracking from the time of the recommendation to the result of the recommendation.

### D) Civilian Police Oversight Agency (Paragraphs 271-293), CPOA portion of Misconduct Complaint Intake, Investigation and Adjudication (Paragraphs 162-202)

This portion of the progress report addresses the paragraphs in CASA Area 5: Misconduct, Complaint Intake, Investigation and Adjudication, which are related to the Civilian Police Oversight Agency (CPOA).  Again, the CPOA is a separate and independent entity from APD with a specific focus on civilian complaints on police personnel, reports of serious Uses of Force

and officer-involved shootings.  Based on IMR-6 reporting, paragraphs 271-280 remain in operational compliance.

During the reporting period, the CPOA developed a case intake, assignment process to ensure cases are assigned for review and investigation within seven (7) working days to meet the IMT recommendation for paragraph 281.  In addition, the CPOA Executive Director ensures that investigations conducted by his personnel are completed in a timely manner, will note any delays and evaluate the reasons to the delay.

The IMT provided recommendations for paragraphs 285 and 289.  The recommendations relate to the Chief of Police responding to the CPOA's recommendations; from investigations findings to policy recommendations from the CPOA to the APD Chief of Police.  Since the IMR-6 recommendation, APD has sworn in a new Chief of Police.  The current Chief of Police and the CPOA Executive Director have remedied this concern.

**CASA Area 10. Assessing Compliance (Paragraph 320)**

Paragraph 320 stipulates that the Monitor may conduct on-site visits and assessments without prior notice to the City and that the Monitor shall have access to all necessary individuals, facilities, and documents needed to assess compliance with the CASA. Furthermore, this paragraph this states that APD will notify the Monitor of any critical firearms discharge, in-custody death, or arrest of any Officers.  The Monitor have judged this paragraph to be in full primary, secondary, and operational compliance.

**CASA Outcome Assessments (Paragraph 298)**

Paragraph 298 is very different from the other measurable paragraphs in the CASA.  This paragraph focuses on all of the key outcomes of the CASA.  Paragraph 298 is addressed in an

annual report by itself rather than being rated in terms of compliance levels. During the reporting period, APD made a number of efforts to strengthen its capacity to gather, report, and use the outcome data identified in CASA paragraph 298. Paragraph 298 identifies the specific categories of data that need to be gathered on nine (9) overarching outcomes including:

- Use of Force measurements;

- Specialized Units;

- Crisis intervention measures;

- Recruitment measurements, including number of highly qualified recruit candidates;

- Force investigations indicating a policy, training, or tactical deficiency;

- Training data;

- Officers assistance and support measurements;

- Supervision measurements, including initial identification of policy violations and;

- Civilian complaints, internal investigations, and discipline.

In August of 2017, the Independent Monitor released the First 298 Report on the Outcome Measures and Analysis of the Albuquerque Police Department's Implementation of the CASA. That report concluded that serious work needed to be completed on APD's outcome data system before that data system could be used to assess APD's compliance processes.

The First 298 Report on Outcome Measures also included thirteen (13) specific recommendations for improving APD's data system:

- "*Remove all vestiges of obscured data from routine reporting processes;*

- *Identify critical process data points and report them in the same manner and process over time;*

- *Carefully review and identify by means of a "serial number" all Uses of Force reported by APD personnel, including development of ad hoc "lessons learned" documents that can be used in future training for supervisors, Lieutenants and command-level Officers;*

- *Ensure that data included in APD reports pursuant to Paragraph 298 are reviewed for accuracy, completeness, and timeliness;*

- *Where the monitor has noted discrepancies or concerns, see for example the noted incongruity between known and reported firearms discharges in 2014, ensure that data collection, analysis and reporting are, in every instance accurate, clear and understandable.*

- *Explain reporting process in any instance in which it is not clear, i.e., APD should include a "methodology" section in each of the nine individual "298" topics and for each of the subsections of those nine topics.*

- *Generate quarterly Paragraph 298 progress reports in a data-rich format similar to the monitor's reports that identify systems brought on line to comply with 298 requirements, e.g., policy, training, supervision, and oversight functions;*

- *Track results of those (item 7 above) systems' impacts over time.*

- *Ensure that these quarterly reports are data-based, identify specific measurable goals and objectives, and report on progress toward meeting those goals and objectives.*

- *Implement an internal APD "Red Team" process to vet and assess the APD's Paragraph 298 process reports to ensure accuracy, timeliness, and veracity before the reports are provided to senior level staff and the monitor;*

- *Subject every 298 process report to a "lessons learned" analysis, and link that analysis to policy, training, supervision and remediation processes;*

- *Consider the purpose and function of APD's 298 data reporting function, and choose a format and process that matches purpose and function, e.g., a "lessons learned" component with recommendations for improvement in the reporting, review, and analysis of Use of Force designed to report more effectively, analyze more carefully, and build internal systems that learn and adapt;*

- *As with most data reporting from APD, there is very little analysis by the agency when it reports its data.  Data simply are reported without noting trends, issues, problems or solutions.  APD should consider developing summative, data-driven responses to issues noted in their aggregate data.  We view this as a critical deficiency for all aspects of 298-reporting.  Findings, assumptions, and recommendations should replace reporting of raw data in the APD's data-driven reports.  The most critical issue to answer is "why," and APD has proven to be neither curious about, nor to collect data that will address that issue*" (Doc. 295, pg. 39-40).

In April of 2018, APD's Compliance Bureau developed a three-phrase work plan to respond to the Monitor's concerns and recommendations to strengthen the Department's capacity to gather, analyze and use outcome data.  Phase 1 consisted of convening a Department-wide paragraph 298 work group and identifying specific individuals who were responsible for outcome data in each of the nine areas listed above.   These paragraph project leads began by reviewing all IMR recommendations related to their outcome area.  Next, these project leads worked with the Compliance Bureau to develop carefully documented excel spreadsheets that were submitted to the IMT by June 1, 2018.

The Independent Monitor's Second 298 Report on the Outcome Measures and Analysis of the Albuquerque Police Department's Implementation of the CASA was released on

August 1, 2018.  This second report was much more positive about the accuracy and completeness of APD's outcome data.   The Monitor stated that "*APD submitted data that was responsive, well organized, accessible, and analyzable. APD has taken a wholly new approach to data management since the advent of the new administration in December, 2017 and provided the monitor with professional, well organized and documented data that we found to be accessible, useable and accurate, based on our analyses and our previous knowledge (garnered from our periodic monitor's reports)*" (Doc. 295, pg. 4). To be clear, APD recognizes that its outcome data system still has a long way to go.

Based on the Independent Monitor's positive response, APD has moved ahead with Phases 2 and 3 of the three-phase work plan.   During Phase 2, the Compliance Bureau is working with each of the paragraph project leads to ensure that Paragraph 298 outcome data is accurate, complete and easily accessible as regular course of business documents.  Phase 2 began in June 1, 2018 and is scheduled to be completed by November 2018.    Phase 3 consisted of implementing regularly scheduled data meeting with the APD Chief of Police and other command staff to ensure that data are used to become a data-driven police agency. During Phase 3, the Chief of Police, Deputy Chiefs of Police and other command staff will meet regularly to review the outcome data, make changes in practice and policy, and then use future data to evaluate the impact of those changes.  It is important to note that Phase 2 and Phase 3 are iterative and overlapping processes.

III. **Conclusion**

The information presented in this progress report emphasizes APD's and the City of Albuquerque's commitment to meeting the requirements of the CASA and to create a police department that is transparent and provides effective, high quality police services.  APD

created a Compliance Division and charged it with the responsibilities of overseeing the compliance and reform efforts.  The Compliance Division is being developed to help the Department become a self-monitoring agency after the CASA requirements are met and the DOJ and the IMT leave.

The Monitor's Sixth Report from November 2017 found that APD was in primary compliance with 97%; secondary compliance with 71%; and operational compliance with 52% of the measurable CASA paragraphs.  This progress report summarizes the efforts made during the reporting period from February 2018 through July 2018.

In summary, APD and the City of Albuquerque are committed to meeting all of the requirements of the CASA.  APD has a tremendous amount of work to be done and understands the importance of creating sustainable operations that will continue after the IMT and the DOJ are gone.

## IV. Appendix

1.      Compliance Organizational Chart
2.      APD Audit Schedule 2018-2019
3.      February 1 – July 31, 2018 APD Compliance Plan
4.      Personnel Management, Education and Development System Guide
5.      Albuquerque Police Department 2017 Annual Report and 2018 Strategic Recruitment Plan

# APPENDIX 1:

# COMPLIANCE ORGANIZATIONAL CHART



# APPENDIX 2:

# APD AUDIT SCHEDULE 2018-2019

Schedule 1: 2018 Annual Audit Plan

Albuquerque Police Department

| | AUDIT SOP/TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **USE OF FORCE: INTERNAL CONTROLS AND ACCOUNTABILITY** | | | | | | | | | | | | | | | |
| 1 | 2-52 Use of Force | To evaluate compliance with procedures in the policy related to use of force. Sampling may be used. | | | | | | | | | | | | | |
| 2 | 2-53 ECW | To evaluate compliance with procedures in the policy related to ECW, including CASA mandates. Sampling may be used. | | | | | | | | | | | | | |
| 3 | 2-54 Use of Force Reporting | To evaluate compliance with procedures in the policy related to use of force reporting, including CASA mandates. Sampling may be used. | | | | | | | | | | | | | |
| 4 | 7-3 FIT | To evaluate compliance with procedures in the policy related to the FIT. Sampling may be used. | | | | | | | | | | | | | |
| 5 | 7-2 CIRT (Force Division) | To evaluate compliance with procedures in the policy related to the CIRT. Sampling may be used. | | | | | | | | | | | | | |
| 6 | 2-29 ERT | To evaluate compliance with procedures in the policy, including CASA mandates regarding crowd control. A 100% sample of all ERT cases for the previous year will be the sample. | | | | | | | | | | | | | |
| 7 | 4-21 First Amend Assemblies | In conjunction with the 2-29 ERT audit, evaluate compliance with procedures in the policy. | | | | | | | | | | | | | |
| 8 | 2-56 Force Review Board | To evaluate compliance with procedures in the policy, including safeguards that close the feedback loop. Sampling may be used. | | | | | | | | | | | | | |
| 9 | 2-3 Firearms & Ammunition | To evaluate compliance with procedures in the policy, include annual firearms trainings and CASA mandates. | | | | | | | | | | | | | |
| 10 | 2-8 OBRD | To evaluate compliance with procedures in the policy related to the OBRD. Sampling may be used. | | | | | | | | | | | | | |
| **SPECIALIZED UNITS** | | | | | | | | | | | | | | | |
| 11 | 6-8 Tactical Unit | The tactical related policies: Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |

Performance Metrics Unit
As of June 2018

Albuquerque Police Department

| | AUDIT SOP/TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 6-9 K-9 Unit | The tactical related policies: Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |
| 13 | 6-7 Explosive Disposal Unit | The tactical related policies: Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |
| 14 | 5-1 Special Investigations | To evaluate compliance with policy and CASA mandates with relations to Special Investigations. | | | | | | | | | | | | | 150 |
| **CRISIS INTERVENTION** | | | | | | | | | | | | | | | |
| 15 | 2-19 Response to Behavioral Health Issues | To evaluate compliance with procedures in the policy related to the response to behavioral health issues. Sampling may be used. | | | | | | | | | | | | | 150 |
| 16 | 2-20 Hostage, Suicidal/Barricaded Subject | The tactical related policies: Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |
| **MISCONDUCT, COMPLAINTS, AND DISCIPLINE** | | | | | | | | | | | | | | | |
| 17 | 6-1 Training Division | To evaluate compliance with procedures in the policy related to the Training Division. Sampling may be used. | | | | | | | | | | | | | |
| **TRAINING** | | | | | | | | | | | | | | | |
| 18 | 7-1 Internal Affairs | To evaluate compliance with procedures in the policy related to Internal Affairs. Sampling may be used. | | | | | | | | | | | | | |
| 19 | 3-13 Officer's Duties and Conduct | To evaluate compliance with procedures in the policy related to officer's duties and conduct. Sampling may be used. | | | | | | | | | | | | | |
| 20 | 3-46 Discipline | To evaluate compliance with procedures in the policy related to discipline. Sampling may be used. | | | | | | | | | | | | | |
| 21 | 3-41 Complaints on Policy or Personnel | To evaluate compliance with procedures in the policy related to complaints on policy or personnel. Sampling may be used. | | | | | | | | | | | | | 150 |

| AUDIT | SOP/TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STAFFING, MANAGEMENT AND SUPERVISION** | | | | | | | | | | | | | | | |
| 22 | 3-11 Command Staff Responsibilities | To evaluate compliance with procedures in the policy related to Command Staff responsibilities. Sampling may be used. | | | | | | | | | | | | | |
| 23 | 3-14 Supervisory Leadership | To evaluate compliance with procedures in the policy related to supervisory leadership. Sampling may be used. | | | | | | | | | | | | | |
| 24 | 3-33 Early Intervention & Recognition | To evaluate compliance with procedures in the policy related to early intervention and recognition. Sampling may be used. | | | | | | | | | | | | | |
| 25 | 3-44 Review of Completed Administrative Investigation Cases | To evaluate compliance with procedures in the policy related to review of completed administrative investigation cases. Sampling may be used. | | | | | | | | | | | | | |
| **RECRUITMENT, SELECTION, AND PROMOTIONS** | | | | | | | | | | | | | | | |
| 26 | 6-2 Recruiting Unit | Evaluate compliance with procedures in policy, including provisions for lateral hires and consistent vetting processes across a sample of applicants. Sampling may be used. | | | | | | | | | | | | | |
| 27 | 3-32 EWP/Performance | To evaluate compliance with procedures in the policy related to EWP/Performance. Sampling may be used. | | | | | | | | | | | | | |
| **OFFICER ASSISTANCE AND COMMUNITY OUTREACH** | | | | | | | | | | | | | | | |
| 28 | 1-10 Peer Support | In conjunction with SOP 1-11 Behavioral Sciences Section audit, evaluate the program with an emphasis on program evaluation for sustainability. | | | | | | | | | | | | | 80 |
| 29 | 1-11 Behavioral Sciences | To evaluate compliance with procedures in the policy, including confidentiality and access to support services. | | | | | | | | | | | | | 80 |
| 30 | 4-35 Problem Oriented Policing | To evaluate compliance with policy and CASA mandates with relations to community outreach initiatives. | | | | | | | | | | | | | |

| Total Hours | 1,210 |
|---|---|

Albuquerque Police Department

| | AUDIT TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | SID Cash | To evaluate compliance with federal mandates with regards to money handling. The department will assess semi-annually prior and after their annual federal audit. | | | | | | | | | | | | | 32 |
| 2 | Quarterly ECW Upload | To evaluate compliance with procedures in policy with regards to quarterly uploads. The assessment will occur the month after each month the upload is due, per policy. | | | | | | | | | | | | | 64 |
| 3 | Civilian Complaint Postings | To assess compliance through direct inspections of all police stations, community centers, and libraries to ensure they have posters, brochures, and civilian complaint forms for CPOA. | | | | | | | | | | | | | 24 |
| 4 | Evidence | Upon request, assess evidence prior to destruction, including weapons and narcotics. | TBD | | | | | | | | | | | | TBD |
| 5 | Random ECW | To evaluate the ECW uploads compared to use of force and show of force reports. The schedule is to be determined and will be conducted at random. | TBD | | | | | | | | | | | | 20 |

Total Hours | 140

Schedule 2: 2019 Annual Audit Plan

Albuquerque Police Department

| | AUDIT SOP/TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **USE OF FORCE: INTERNAL CONTROLS AND ACCOUNTABILITY** | | | | | | | | | | | | | | | |
| 1 | 2-52 Use of Force | To evaluate compliance with procedures in the policy related to use of force. Sampling may be used. | | | | | | | | | | | | | 280 |
| 2 | 2-53 ECW | To evaluate compliance with procedures in the policy related to ECW, including CASA mandates. Sampling may be used. | | | | | | | | | | | | | 280 |
| 3 | 2-54 Use of Force Reporting | To evaluate compliance with procedures in the policy related to use of force reporting, including CASA mandates. Sampling may be used. | | | | | | | | | | | | | 150 |
| 4 | 7-3 FIT | To evaluate compliance with procedures in the policy related to the FIT. Sampling may be used. | | | | | | | | | | | | | 150 |
| 5 | 7-2 CIRT (Force Division) | To evaluate compliance with procedures in the policy related to the CIRT. Sampling may be used. | | | | | | | | | | | | | 150 |
| 6 | 2-29 ERT | To evaluate compliance with procedures in the policy, including CASA mandates regarding crowd control. A 100% sample of all ERT cases for the previous year will be the sample. | | | | | | | | | | | | | 80 |
| 7 | 4-21 First Amend Assemblies | In conjunction with the 2-29 ERT audit, evaluate compliance with procedures in the policy. | | | | | | | | | | | | | 80 |
| 8 | 2-56 Force Review Board | To evaluate compliance with procedures in the policy, including safeguards that close the feedback loop. Sampling may be used. | | | | | | | | | | | | | 150 |
| 9 | 2-3 Firearms & Ammunition | To evaluate compliance with procedures in the policy, include annual firearms trainings and CASA mandates. | | | | | | | | | | | | | 150 |
| 10 | 2-8 OBRD | To evaluate compliance with procedures in the policy related to the OBRD. Sampling may be used. | | | | | | | | | | | | | 150 |
| **SPECIALIZED UNITS** | | | | | | | | | | | | | | | |
| 11 | 6-8 Tactical Unit | The tactial related policies; Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |

Albuquerque Police Department

| | AUDIT SOP/TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 6-9 K-9 Unit | The tactical related policies: Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |
| 13 | 6-7 Explosive Disposal Unit | The tactical related policies: Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |
| 14 | 5-1 Special Investigations | In conjunction with 5-3 Criminal Investigations, evaluate compliance with policy and CASA mandates. | | | | | | | | | | | | | 150 |
| **CRISIS INTERVENTION** | | | | | | | | | | | | | | | |
| 15 | 2-19 Response to Behavioral Health Issues | To evaluate compliance with procedures in the policy related to the response to behavioral health issues. Sampling may be used. | | | | | | | | | | | | | 150 |
| 16 | 2-20 Hostage, Suicidal/Barricaded Subject | The tactical related policies: Tactical, K-9, Explosive Disposal, and Hostage/Barricaded Subjects will be evaluated for compliance with policy, including CASA mandates. | | | | | | | | | | | | | 150 |
| **TRAINING** | | | | | | | | | | | | | | | |
| 17 | 6-1 Training Division | To evaluate compliance with procedures in the policy related to the Training Division. Sampling may be used. | | | | | | | | | | | | | 150 |
| **MISCONDUCT, COMPLAINTS, AND DISCIPLINE** | | | | | | | | | | | | | | | |
| 18 | 7-1 Internal Affairs | To evaluate compliance with procedures in the policy related to Internal Affairs. Sampling may be used. | | | | | | | | | | | | | 150 |
| 19 | 3-13 Officer's Duties and Conduct | To evaluate compliance with procedures in the policy related to officer's duties and conduct. Sampling may be used. | | | | | | | | | | | | | 150 |
| 20 | 3-46 Discipline | To evaluate compliance with procedures in the policy related to discipline. Sampling may be used. | | | | | | | | | | | | | 150 |
| 21 | 3-41 Complaints on Policy or Personnel | To evaluate compliance with procedures in the policy related to complaints on policy or personnel. Sampling may be used. | | | | | | | | | | | | | 150 |

Performance Metrics Unit
As of June 2018

Albuquerque Police Department

| | AUDIT SOP/TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STAFFING, MANAGEMENT AND SUPERVISION** | | | | | | | | | | | | | | | |
| 22 | 3-11 Command Staff Responsibilities | To evaluate compliance with procedures in the policy related to Command Staff responsibilities. Sampling may be used. | | | | | | | | | | | | | 150 |
| 23 | 3-14 Supervisory Leadership | To evaluate compliance with procedures in the policy related to supervisory leadership. Sampling may be used. | | | | | | | | | | | | | 150 |
| 24 | 3-33 Early Intervention & Recognition | To evaluate compliance with procedures in the policy related to early intervention and recognition. Sampling may be used. | | | | | | | | | | | | | 160 |
| 25 | 3-44 Review of Completed Administrative Investigation Cases | To evaluate compliance with procedures in the policy related to review of completed administrative investigation cases. Sampling may be used. | | | | | | | | | | | | | 150 |
| **RECRUITMENT, SELECTION, AND PROMOTIONS** | | | | | | | | | | | | | | | |
| 26 | 6-2 Recruiting Unit | Evaluate compliance with procedures in policy, including provisions for lateral hires and consistent vetting processes across a sample of applicants. Sampling may be used. | | | | | | | | | | | | | 150 |
| 27 | 3-32 EWP/Performance | To evaluate compliance with procedures in the policy related to EWP/Performance. Sampling may be used. | | | | | | | | | | | | | 150 |
| **OFFICER ASSISTANCE AND COMMUNITY OUTREACH** | | | | | | | | | | | | | | | |
| 28 | 1-10 Peer Support | In conjunction with SOP 1-11 Behavioral Sciences Section audit, evaluate the program with an emphasis on program evaluation for sustainability. | | | | | | | | | | | | | 80 |
| 29 | 1-11 Behavioral Sciences | To evaluate compliance with procedures in the policy, including confidentiality and access to support services. | | | | | | | | | | | | | 80 |
| 30 | 4-35 Problem Oriented Policing | To evaluate compliance with policy and CASA mandates with relations to community outreach initiatives. | | | | | | | | | | | | | 150 |
| | | Total # of audits per month | 2 | 3 | 3 | 3 | 3 | 3 | 2 | 4 | 2 | 1 | 2 | 2 | |

Total Hours | 4,490

Albuquerque Police Department

| | AUDIT TITLE | PURPOSE | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | SID Cash | To evaluate compliance with federal mandates with regards to money handling. The department will assess semi-annually prior and after their annual federal audit. | | | | | | | | | | | | | 32 |
| 2 | Quarterly ECW Upload | To evaluate compliance with procedures in policy with regards to quarterly uploads. The assessment will occur the month after each month the upload is due, per policy. | | | | | | | | | | | | | 64 |
| 3 | Civilian Complaint Postings | To assess compliance through direct inspections of all police stations, community centers, and libraries to ensure they have posters, brochures, and civilian complaint forms for CPOA. | | | | | | | | | | | | | 24 |
| 4 | Multi-Agency Task Force | To evaluate compliance with CASA mandates with regard to the Memorandum of Agreement (MOA). | | | | | | | | | | | | | |
| 5 | Evidence | Upon request, assess evidence prior to destruction, including weapons and narcotics. | TBD | | | | | | | | | | | | TBD |
| 6 | Random ECW | To evaluate the ECW uploads compared to use of force and show of force reports. The schedule is to be determined and will be conducted at random. | TBD | | | | | | | | | | | | 20 |

Total Hours | 140

Performance Metrics Unit
As of June 2018

Performance Metrics Unit
2019 Annual Audit Plan
As of 6-22-2018

## Introduction

*"Internal auditing is an independent, objective assurance activity designed to add value and improve an organization's operations...by bringing a systematic, disciplined approach to evaluate and improve the effectiveness of risk management, control, and governance processes."*

   *- Government Auditing Standards, Government Accountability Office (GAO)*

Introduction

The Annual Audit Plan for the Albuquerque Police Department is drafted upon completion of a new organizational structure which includes a Compliance Division and a new unit, Performance Metrics. The Performance Metrics Unit under the division is responsible for drafting the audit plan. The 2018/2019 Annual Audit Plan is driven by three key factors: (1) Court Approved Settlement Agreement (CASA) mandates, (2) risk assessment results and (3) internal resources to execute the plan. The goal is to address CASA-related policies and test not only compliance, but assess potential risk areas given the resources available to the Performance Metrics Unit. The annual audit plan is subject to change. Any changes to the scheduled audit plan are discussed with the Compliance Division management which includes the Division Lieutenant, Commander, and Deputy Chief of Police of the Compliance Bureau.

Standards of Practice

The Performance Metrics Unit conducts audits in accordance with the Generally Accepted Government Auditing Standards (GAGAS). (www.gao.gov/yellowbook)

ALBUQUERQUE POLICE DEPARTMENT

# APPENDIX 3:

# FEBRUARY 1 – JULY 31. 2018
# APD COMPLIANCE PLAN

| Area | Specific compliance issues to be addressed | Specific actions to address compliance issues | Responsible (1 person) | Deadline | Proof of Compliance/ Data Sources | Completed? 1=Yes 0=No |
|---|---|---|---|---|---|---|
| **1. Use of Force Investigation Backlog** | **Review, Remediate and Decrease the Backlog of Field Use of Force Investigations** | **Internal Affairs (IA)-Force, Training Academy and other identified APD personnel will:** | | | | |
| | | Define the scope of backlogged Use of Force (UoF) investigations and develop a remediation plan to decrease this backlog | | 5/7/2018 | Remediation Plan | 1 |
| | | Compile a list of backlogged UoF investigations to be addressed in the remediation plan | | 5/7/2018 | Remediation Plan | 1 |
| | | Prioritize backlogged UoF investigations to be reviewed using the remediation plan | | 5/7/2018 | Remediation Plan | 1 |
| | | Identify corresponding video with each UoF and its investigation, to include identifying cases without video | | 5/7/2018 | Memo | 1 |
| | | Develop a training plan, along with APD Training Academy personnel, to conduct reviews of backlogged UoF investigations | | 5/11/2018 | Training Plan | 1 |
| | | Identify and assign personnel to the backlog review team, in temporary duty or collateral duty status, comprised of sworn personnel with investigative backgrounds | **Commander Robert Middleton (IA-Force)** | 5/14/2018 | Training Documents | 1 |
| | | Deliver training to the backlog review team members and their supervision | | 5/14/2018 | Memo | 1 |
| | | Conduct weekly review meetings with the backlog review team, Administrative Support Bureau Deputy Chief of Police, IA-Force Division Commander, IA-Force Division Lieutenant, the Compliance Bureau Deputy Chief of Police and the Compliance Division Lieutenant for case review and progress | | On going | Meeting Minutes | 1 |
| | | Develop a training plan, along with Training Academy personnel, for the backlog review team members and their responsibility to review UoF related videos | | 5/11/2018 | Training Plan | 1 |
| | | Deliver video review function training to the backlog review team members and their supervision | | 5/14/2018 | Training Documents | 0 |
| | **Review, Remediate and Decrease the Backlog of Serious Use of Force Investigations** | **Internal Affairs (IA), Training Academy and other identified APD personnel will:** | | | | |
| | | Define the scope of backlogged Use of Force (UoF) investigations and develop a remediation plan to decrease this backlog | | 5/7/2018 | Remediation Plan | 1 |
| | | Compile a list of backlogged UoF investigations to be addressed in the remediation plan | | 5/7/2018 | Remediation Plan | 1 |
| | | Prioritize backlogged UoF investigations to be reviewed using the remediation plan | | 5/7/2018 | Remediation Plan | 1 |
| | | Identify corresponding video with each UoF and its investigation, to include identifying cases without video | | 5/7/2018 | Memo | 1 |
| | | Develop a training plan, along with APD Training Academy personnel, to conduct reviews of backlogged UoF investigations | | 5/11/2018 | Training Plan | 1 |
| | | Identify and assign personnel to the backlog review team, in temporary duty or collateral duty status, comprised of sworn personnel with investigative backgrounds | **Commander Robert Middleton (IA-Force)** | 5/14/2018 | Training Documents | 1 |
| | | Deliver training to the backlog review team members and their supervision | | 5/14/2018 | Memo | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Conduct weekly review meetings with the backlog review team, IA-Force Division Commander, IA-Force Division Lieutenant, the Compliance Bureau Deputy Chief of Police and the Compliance Division Lieutenant for case review and progress | | On going | Meeting Minutes | 1 |
| | | Develop a training plan, along with Training Academy personnel, for the backlog review team members and their responsibility to review UoF related videos | | 5/11/2018 | Training Plan | 1 |
| | | Deliver video review function training to the backlog review team members and their supervision | | 5/14/2018 | Training Documents | 0 |
| 2. APD Implementation  Unit | Create a Compliance Division (Implementation Unit) within the APD Compliance Bureau | Compliance Division personnel will: | | | | |
| | | Identify unnecessary positions working in the recently dissolved Inspections Division and draft a problem solving document (CSW) for repurposing those positions within the Compliance Division | | 1/2/2018 | CSW document to DCOP Garcia | 1 |
| | | Obtain current employee roles and responsibilities from remaining personnel within the recently dissolved Inspections Division (now Compliance Division) | | 1/3/2018 | Copies of city job descriptions and individual comment | 1 |
| | | Develop a tentative organization chart for the new Compliance Division under the Compliance Bureau | | 2/23/2018 | Organization chart sheet | 1 |
| | | Draft job descriptions for the newly identified Implementation Unit Manager and Performance Metrics Unit Manager positions | | 2/14/2018 | Job descriptions template | 1 |
| | | Submit job descriptions for the above management positions to the City for approval (already approved by CAO Nair) | | 3/2/2018 | Job description form mandated by the City | 1 |
| | | Draft job descriptions for the newly identified Force Review Unit that will be responsible for conducting an additional supervisory review of all completed level 1 and a sample of levels 2 and 3 UoF investigations | **Lieutenant Cori Lowe (Compliance Division)** | 5/5/2018 | Job descriptions draft | 1 |
| | | Complete a Job Task Analysis and Needs Assessment to identify sufficient staffing for the Implementation Unit, the Performance Metrics Unit and the Force Review Unit to provide quality compliance assistance to the APD | | 5/20/2018 | Completed JTA and NA | 1 |
| | | Draft a staffing request memo to the Chief of Police for sworn personnel based off the findings of the completed Job Task Analysis and Needs Assessment | | 6/10/2018 | Staffing memo request | 1 |
| | | Based on the results of the approved budget (effective July 1), draft a staffing request memo to the Chief of Police for civilian personnel based off the findings of the completed Job Task Analysis and Needs Assessment, specifically data analyst positions | | 7/20/2018 | Staffing memo request | 1 |
| | | Develop and submit a Compliance Division organization chart to the CAO and Chief of Police for review and approval | **Deputy Chief Garcia** | 7/20/2018 | Approval/feedback response | 1 |
| | | Submit the final organization chart to IMT and Parties for review and approval | **Lieutenant Cori Lowe (Compliance Division)** | 7/31/2018 | Approval/feedback response | 1 |
| | Amend and Publish SOP 3-52 (Policy Development Process) | Compliance Division personnel will: | | | | |
| | | Prepare a draft of SOP 3-52 (Policy Development Process) for future policies to follow | | 2/26/2018 | Draft SOP | 1 |
| | | Schedule external stakeholder forums for input, feedback and commentary | | 2/26/2018 | Minutes from POB,  correspondence | 1 |

| | | | | | |
|---|---|---|---|---|---|
| | Take the feedback from the forums and make the necessary revisions to SOP 3-52 | **Jeramy Schmehl (City Attorney)** | 3/1/2018 | Written or correspondence | 1 |
| | Present the amended SOP 3-52 to the IMT and Parties for feedback and commentary | | 3/12/2018 | Draft SOP | 1 |
| | Revise the draft of SOP 3-52 with feedback from IMT and Parties | | 4/4/2018 | Revised draft of SOP | 1 |
| | Present the draft of SOP 3-52 for approval by IMT and Parties | | 4/4/2018 | Approval/feedback response | 1 |
| | Publish SOP 3-52 internally and on the City website | **Adam Paul Garcia (SOP Liaison)** | 4/14/2018 | PowerDMS, city website | 1 |
| **Develop and Implement Compliance Division Policy** | **Compliance Division personnel will:** | | | | |
| | Identify best practices for Compliance Division related SOPs from other law enforcement agencies (i.e. Cleveland PD, Seattle PD and New Orleans PD) | **Lieutenant Cori Lowe (Compliance Division)** | 3/12/2018 | Copies of correspondence and/or online data | 1 |
| | Develop processes and process flows for each identified section within the Compliance Division | | 7/13/2018 | Process flows for each identified section | 1 |
| | Draft a new SOP for the Compliance Division to address goals and objectives, personnel roles and responsibilities, training, UoF review and paragraph/division compliance, data analysis procedures, auditing processes, project management, etc. (Dependent upon budget and staffing approval) | | 7/13/2018 | SOP Draft | 1 |
| | Submit to OPA and follow SOP 3-52 (Policy Development) process for policy approval | | 7/13/2018 | SOP Draft and correspondence | 1 |
| **Create a Section within the Compliance Division devoted to UoF case oversight** | **Compliance Division personnel will:** | | | | |
| | Develop a UoF performance review unit to have oversight, review and identify "policy outliers" in UoF cases not previously addressed in all level 1 and samples of levels 2 and 3 UoF cases | **Lieutenant Cori Lowe (Compliance Division)** | 7/6/2018 | Organization chart, job description(s), roles and responsibilities | 1 |
| | Develop a process for conducting random and directed reviews of all level 1 and samples of levels 2 and 3 UoF cases | | 7/13/2018 | Process work flow and schedule | 1 |
| | Develop a process to conduct a detailed UoF investigation failure analysis to determine the cause of the failure with the goal of determining corrective actions that need to be taken | | 7/27/2018 | Failure analysis process work flow | 1 |
| | Develop a process to provide recommendations for policy, training, supervision, tactics, equipment (similar to the FRB function), disciplinary and/or remediation responses for each failure identified | | 7/31/2018 | Process work flow and recommendation sheet | 1 |
| **Develop a process to measure progress of the Compliance Plan** | **Compliance Division personnel will:** | | | | |
| | Schedule a technical assistance meeting with Dr. Ginger and Project Leads to develop open lines of communication between APD and the IMT | **Lieutenant Cori Lowe (Compliance Division)** | 3/13/2018 | Minutes and sign in | 1 |
| | Provide the formal, court approved compliance plan to the Project Leads via group email | | 4/10/2018 | Email correspondence | 1 |
| | Identify best practices for performance measurements from other law enforcement agencies to measure progress of tasks/actions | | 4/10/2018 | Correspondence, notes and online findings (New Orleans PD) | 1 |
| | Develop a performance measurement plan to easily see compliance progress, to include progress failures | | 4/20/2018 | Correspondence, measurement plan | 1 |

| | | | | | |
|---|---|---|---|---|---|
| | | Identify a process and a platform to communicate, illustrate progress and commit to transparency within APD, the City of Albuquerque and the citizens of Albuquerque | | 4/20/2018 | Correspondence, chosen platform documentation, process work flow | 1 |
| | | Submit progress measurement process to IMT and parties for review/approval | | 4/20/2018 | Process work flow and measurement illustration example, approval/feedback | 1 |
| | | Implement approved progress measurement plan | | 7/13/2018 | Approved measurement plan | 1 |
| **3. Operations of Academy** | **Address staffing deficiencies within the Training Academy** | **The APD Training Academy personnel will:** | | | | |
| | | Develop Job Task Analysis (JTA) template to identify Academy personnel staffing deficiencies | | 1/12/2018 | JTA template | 1 |
| | | Conduct JTA for all current Training Academy staff positions | | 1/26/2018 | JTA forms completed by all staff | 1 |
| | | Research national best practices to identify staffing of other law enforcement agencies training sections | | 1/26/2018 | Emails from departments contacted | 1 |
| | | Compile the completed JTA submissions for review and verification by the Training Academy Lieutenant | **Commander John Sullivan (Training Academy)** | 1/26/2018 | Compilation of the JTA forms and JTA verification memo | 1 |
| | | Draft a COB document with the verified results of the JTAs to the Training Academy chain of command | | 2/18/2018 | Memo addressed to the chain of command | 1 |
| | | Present JTA findings memo including a staffing request and a proposed organization chart for approval | | 2/23/2018 | Memo addressed to the chain of command | 1 |
| | | Receive approval/disapproval for staffing request from the chain of command | | 3/14/2018 | Email correspondence | 1 |
| | **Create a Comprehensive Training Unit devoted to the 7-step Training Process** | **The APD Training Academy personnel will:** | | | | |
| | | Develop a Comprehensive Training Unit to incorporate the 7-step training process to meet IMT recommendations | **Commander John Sullivan (Training Academy)** | 3/16/2018 | Organization chart, job description(s), required City forms | 1 |
| | **Develop a process to determine transfer of knowledge** | **The APD Training Academy personnel will:** | | | | |
| | | Complete a CSW on effective transfer of knowledge (post-training testing methods) | **Commander John Sullivan (Training Academy)** | 2/23/2018 | CSW | 1 |
| | | Submit the CSW through the Compliance Division to the Chief of Police | | 2/23/2018 | CSW, email correspondence | 1 |
| | **Develop a Modified Civilian Police Academy (CPA) for POB/CPOA/CPC members** | **The APD Advanced Training will:** | | | | |
| | | Hire Full-time employee that will be responsible for the development of the modified CPA Program | | 1/20/2018 | CSA A. Erickson | 1 |
| | | Develop a modified CPA program for POB/CPOA/CPC members | | 2/1/2018 | Schedule | 1 |
| | | Deliver a modified CPA for POB/CPOA/CPC members over a two weekend period | **Commander John Sullivan (Training Academy)** | 3/4/2018 | Attendance rosters for 02/24-25/2018 and 03/03-04/2018 | 1 |
| | | Develop an Instructor Code of Conduct form and include in lesson plans | | 2/1/2018 | Code of Conduct form | 1 |
| | | Develop a survey component that will be utilized to assess efficacy of the CPA, identifying strengths of the training and areas of improvement | | 2/24/2018 | Surveys with feedback | 1 |
| | | Evaluate the survey findings for the revision of a Needs Assessment (part of the 7-step process) for the next modified CPA | | 3/30/2018 | Memo | 1 |

| | Develop a Comprehensive Training Plan(s) (TP) to provide effective and efficient training | APD Training Academy will: | | | | |
|---|---|---|---|---|---|---|
| | | Develop Comprehensive Training Plans (TP) using the 7-step process to have a systematic and detailed plan that provides consistency for all training conducted for APD **See Appendix for 7-step process | Commander John Sullivan (Training Academy) | 11/30/2017 | Draft TP | 1 |
| | | Submit the TP to IMT for correction/approval | | 12/17/2017 | Draft TP | 1 |
| | | Draft a secondary TP addressing the IMR-6 recommendations to improve the training process | | 4/1/2018 | Revised draft of the TP | 1 |
| | | Resubmit the revised TP to the IMT for correction/approval | | 4/1/2018 | Revised draft of the TP | 1 |
| 4. Supervisor UoF Investigations - Process Failures | Improve the Force Review Board (FRB) process | The Project Lead along with IA, Training Academy, FSB and other identified APD personnel will: | | | | |
| | | Identify deficiencies in the current FRB SOP (2-56) | Lieutenant Jennifer Perez (Performance Review Section) | 12/1/2017 | COB identifying the deficiencies | 1 |
| | | Draft standardized form(s) for FRB to use going forward | | 12/1/2017 | Draft Form(s) | 1 |
| | | Identify national practices of other law enforcement agencies that have and use a Force Review Board process | | 1/15/2018 | Electronic correspondence and IACPnet | 1 |
| | | Revise the FRB SOP 2-56 to address the identified deficiencies | | 1/30/2018 | Draft revision of SOP 2-56 | 1 |
| | | Draft a Special Order to continue tactical FRB to keep from creating a large backlog of cases awaiting review | | 2/3/2018 | Draft of Special Order | 1 |
| | | Submit the Special Order to the IMT for approval | | 2/28/2018 | Draft Special Order | 1 |
| | | Submit a draft of the SOP and forms to the IMT and parties for approval/feedback | | 3/1/2018 | IMT approval/corrections correspondence | 1 |
| | | Develop an FRB handbook draft to assist current and future FRB members in the FRB process | | 3/30/2018 | Handbook draft | 1 |
| | | Submit SOP 2-56 to the SOP Liaison to begin the policy development process (see SOP 3-52) | | 4/1/2018 | SOP draft | 1 |
| | | Develop a training plan, along with Training Academy personnel, to train FRB members on the FRB process and UoF policies and investigations | | 4/20/2018 | Training Plan that includes UoF and FRB related SOPs (update upon UoF SOP suite approval) | 1 |
| | | Submit an APD FRB training plan to the IMT and parties for review/approval | | 4/20/2018 | Training Plan that includes UoF and FRB related SOPs (update upon UoF SOP suite approval) | 1 |
| | | Train new FRB voting members on policies, expectations and procedures for conducting a thorough review | | 4/20/2018 | Sign in roster, Training Plan that includes UoF and FRB related SOPs (update upon UoF SOP suite approval) | 0 |
| 5. UoF (UoF) Training | Develop a Training Plan for IAD-Force personnel | APD Advanced Training/Force Investigations (IAD-Force) will: | | | | |
| | | Develop a training plan (TP) for IAD-Force personnel to perform UoF, criminal and misconduct investigations. The training will be developed using the previously approved 7-step training process. **See 7-Step Process in Appendix | Commander Robert Middleton (IA-Force) | 6/4/2018 | Training Plan | 1 |
| 6. Amici Concerns | Evaluate McClendon Sub-class concerns | Behavioral Health Section/Compliance Division personnel will: | | | | |
| | | Schedule a meeting with the McClendon Sub-class attorneys pertaining to, "APD officers continue to jail people who need psychiatric hospitalization in violation of APD's new policy" to clarify issues surrounding this concern | Lieutenant Cori Lowe (Compliance | 3/19/2018 | Scheduling calendar | 1 |

| | | | | | |
|---|---|---|---|---|---|
| | | Provide eCIT recruitment and training plan to the McClendon Sub-class attorneys | **Division)** | 5/1/2018 | APD eCIT recruitment and training plan | 1 |
| **Provide CPOA/POB members Evidence.com access for case investigation** | Scientific Evidence Division personnel will: | | | | |
| | Develop documented parameters to allow video access for CPOA/POB members into Evidence.com for the completion of case reviews and investigations | **Commander Chris George (Scientific Evidence Division)** | 4/13/2018 | Written correspondence | 1 |
| **Provide dedicated administrative support personnel to the Community Policing Council (CPC)** | The CPC Manager and identified APD personnel will: | | | | |
| | Draft a CPC administrative assistant job description to provide assistance for CPC minutes and agendas, recommendation(s) documentation, and to provide technological assistance to update CPC websites. | **Chris Sylvan (CPC Manager)** | 4/12/2018 | Job description | 1 |
| | Submit the job description for approval | | 4/12/2018 | Job description, correspondence | 1 |

Total Tasks    91

**As of 07/31/2018 with amended deadlines**

**Completed (88/91)**           **96.70%**

**\*\*Due but Not Completed  (3/91)**           **3.30%**

# APPENDIX 4:

# PERSONNEL MANAGEMENT, EDUCATION and DEVELOPMENT SYSTEM GUIDE

## PMED Unit

- CDR Mike Miller
- Lt Bret White
- Sgt (TBD)
- Data Analyst: (TBD)
- Office Assistant: (TBD)

## Contact Us

If you have any questions, comments or need assistance please contact

APD-Internal Affairs
Attn: PMED Unit
c/0 400 Roma Blvd NW
Albuquerque, NM 87102

Phone: [Telephone]
Email: [Email address]
Web: [Web address]

# Performance Management, Evaluation and Development Guide - <span style="color:red">DRAFT</span>





**Albuquerque Police Department**
APD-Internal Affairs
Attn: PMED Unit
c/0 400 Roma Blvd NW
Albuquerque, NM 87102

# ALBUQUERQUE POLICE DEPARTMENT

**Internal Affairs – PMED Unit**

# Table of Contents

PMED System ....................................................................**1**

Levels of Assessment .......................................................**2**

PMED Process ...................................................................**3**

Employee Duties ...............................................................**4**

Action Plans ......................................................................**5**

# Action Plans

## Positive Trends

Look at Award Recommendations, TDY assignments for career development.

Can this behavior/performance be incorporated into training or policy?

## Negative Trends

Can this trend be corrected? Look at Training, counselling, mentoring

What factors contributed to this trend, lack of training, supervision, etc.

Is a Performance Improvement Plan required?

## Performance Improvement Plan

Used when there is an identified

- Failure to meet specific goals
- To improve behavior-related concerns
- Significant Training Deficiency.

# Employee Duties

## Officer/Employee

Check your PMED status daily to ensure accuracy and compare your indicators to others performing the same or similar duties.

## Immediate Supervisor

Check the PMED status of the employees under your direct supervision on a DAILY basis.

Look for positive trends for encouragement and reward

Look for negative trends to intercept and correct.

Complete Level 2 Assessment and forward for review within 7 days of receipt.

## 2nd Level Supervisor

Review and approve/modify Level 2 Assessment within 5 days of receipt

Complete Level 3 assessment and forward for review within 14 days of receipt.

Implement and monitor Action plans as required.

# PMED System

## Policy (Administrative Orders 3-33)

It is the policy of the Albuquerque Police Department to monitor performance, analyze data and support employees to ensure a professional work environment that promotes constitutional policing, community trust and career development.

*The primary function of PMEDS is ensuring that personnel have the necessary support and guidance from management to carry out the mission of the Albuquerque Police Department in an effective and efficient manner.*

## Indicator Categories

There are seven (7) main categories tracked by APD to assist with Personnel Management and Development

- Use of Force
- Complaints Against Officers
- Vehicle Crashes
- Vehicle Pursuits
- Court Related Issues
- Training/Certifications
- Personnel Management

# Levels of Assessment

## Level 1 Assessment

This is the normal daily supervision of the officer/employee.

Supervisors will review this data on a daily basis to ensure the employee is on track for their performance/behavior standards, training and career development.

## Level 2 Assessment

This occurs when an employee has a performance/behavior indicator that is 1.5 to less than 2.0 standard deviations from the mean.

Immediate Supervisors will review this to determine any positive/negative trends that may be occurring.

Supervisors will document this review with the PMED Assessment form and upload the assessment to BlueTeam as an attachment to the alert.

## Level 3 Assessment

This occurs when an employee has a performance/behavior indicator that is 2.0 or more standard deviations from the mean.

2nd Level Supervisors will review this to determine any positive/negative trends that may be occurring.

Supervisors will document this review with the PMED Assessment form and upload the assessment to BlueTeam as an attachment to the alert.

An Action Plan is required at this level of assessment.

# PMED Process

## Thresholds Determination

Baseline Thresholds will be determined using the APD Warehouse.

The Mean/Median and Standard deviations will be determined using 3 years of data.

## Thresholds Breakdown

Thresholds will be calculated for the following

- Department Wide
- Bureau
- Team
- Officer/Employee

The employee thresholds will be determined based on a rolling 12 month calendar.

## PMED Alerts

Alerts are generated based on threshold analysis for each employee based on bureau standards.

Supervisors will analyze the alerts to determine positive or negative trends and the appropriate action in response to the alert.

# APPENDIX 5:

# ALBUQUERQUE POLICE DEPARTMENT 2017 ANNUAL REPORT AND 2018 STRATEGIC RECRUITMENT PLAN



# City of Albuquerque



# ALBUQUERQUE POLICE DEPARTMENT

# 2017 Annual Report

# &

# 2018 Strategic Recruitment Plan

***Statement of Objectives***

- The Albuquerque Police Department (APD) Recruiting Unit remains steadfast in its efforts to seek out and recruit only the most qualified individuals who wish to serve our community as law enforcement officers, and Police Service Aides (PSAs). The recruiting process is without regard to race, color, national origin, disability, age, gender, sexual orientation, or medical condition.
- Applicants must be willing and able to be trained to provide a safe, secure community where the rights, history, and culture of all citizens is valued, respected, and protected.
- The 2018 Strategic Recruitment Plan was implemented to support the APD's goal of a department workforce that accurately reflects the ethnic and racial composition of our community.

### 2017 Cadet Class Demographics

| Group | 118 Cadet Class | 119 Cadet Class |
|---|---|---|
| FEMALE | 10 | 7 |
| MALE | 39 | 16 |
| CAUCASIAN | 22 | 9 |
| HISPANIC | 21 | 12 |
| AFRICAN AMERICAN | 1 | 0 |
| OTHER | 5 | 2 |

### 2017 Recruiting Events

In 2017 the Recruiting Unit participated in 78 recruiting events. It has continued its collaboration with neighborhood and community leaders. The unit has participated in career fairs sponsored by Senator Michael Padilla (District 14), and Bernalillo County Commissioner Michael Quezada (District 2). It has met separately with all six Community Policing Councils to provide information about the recruiting process, to answer questions, and to ask for suggestions to help increase the number of officers in Albuquerque. Recruiting officers have attended several events and meetings sponsored by the NAACP and the SCLC (Southern Christian Leadership Conference), and have been involved in two round table discussions on racism, diversity and policing.

Recruiting has also continued to work with educators in the state to provide information regarding the application process specifically, and community policing in general. Recruiting officers have attended numerous events in elementary- , middle- and high schools, and have attended career fairs sponsored by colleges and universities. Additionally, the Recruiting Unit has presented to Criminal Justice classes at UNM, CNM, and NM Highlands University. Since we started focusing on schools at any level five years ago, we've seen an increase number of students and former students applying (our partnership with APS has directly yielded at least a dozen officers and Police Service Aides).

Our strong relationship with the military continues to give us a quality pool of applicants. Recruiting officers participate monthly in Kirtland's Transition Assistance Program (TAP), attend career fairs targeted solely at veterans, Guard-, and Reserve members.

In October, APD Recruiting was invited to present to the International Chiefs of Police Conference in Philadelphia.

| January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Martin Luther King Jr. Parade | CEC | Hiring Heroes | UNM Criminal Justice Class | CPC | Rotary Club | Senator Michael Padilla Job Fair | National Night Out Event | NM State Fair | Balloon Fiesta | St. Therese Public Safety Day | Brookline College |
| TAP | CNM | TAP | CNM Career Day | National Day of Prayer | TAP | CNM Criminal Justice Class | United Way, Mission | Chamber of Commerce | IACP | New Mexico Highlands Career Fair | Atrisco Heritage Career Fair |
| Martin Luther King Jr. Luncheon | Grant Middle School | Shamrock Fest | Jackson Middle School | TAP KAFB | Univ. of Phoenix Job Fair | NM Workforce Solutions | Undoing Racism | Comm. Michael Quezada Job Fair | Heroes Game Day | UNM Heroes Day | TAP |
| Brookline College Career Fair | NMSU | Cleveland Middle School | UNM Triathlon | Daniel Webster Park | NW CPC | NE Area Command Officer Appreciation | Undoing Racism | Job Connection | CNM Criminal Justice | UNM Criminal Justice Class | ESGR Career Fair |
| APS College & Career | Kirtland | Emerson Elementary | UNM Job and Internship Fair | Round Table: Policing and Race Issues | National Guard Job Fair | 43rd SW Catholic Conf. | NM Work force | NAACP Diversity Conference | Chiefs of Police Conference | Camino Rael Academy | |
| SCLC Board Member | UNM Career Expo | Cesar Chavez Charter School | CNM Criminal Justice Class | ESGR | X | X | Kirtland AFB Summer Bash | Team Kirtland Career Fair | | Community Police Council Foothills | X |
| SCLC Board | X | NM Workforce Connections | CNM Criminal Justice Class | Veteran Day Park | X | X | SCLU | South Valley Career Fair | | Community Police Council Southeast | X |
| X | X | NM College and Career Readiness Bureau Summit | Team Kirtland Career Fair | X | X | X | Homeland Security | South Valley Academy | | CNM Criminal Justice Class | X |
| X | X | | Public Academy for Performing Arts College and Career Day | X | X | X | X | | | TAP | X |

| *2018 Goals and Plan of Action* |
| --- |

**1. Actively participate in events minority sponsored events and discussion groups**

- **2017 Review:**
  APD Recruiting has taken part in numerous events intended to increase awareness of minority and gender issues in relation to law enforcement (Democracy Today round-table discussion, two-day discussion "Undoing Racism," SCLC sponsored "Justice for Girls" discussion, and the annual SCLC Membership Meeting). Additionally, we were invited for the fourth year to the Annual Martin Luther King Jr. Luncheon. This year marks the first time an APD Chief and top command staff attended. The Recruiting Unit has also participated in several career fairs specifically targeted to attract minority applicants.

- **2018 Plan:**
  The Recruiting Unit will work as an active participant in support of minority goals. Such involvement in the past has fostered minority interest in the APD Police Academy, but we have still have work to do. Reverend Charles Becknell, President of the SCLC, has whole-heartedly endorsed the current APD leadership. It is hoped this new relationship will lead to further gains in the recruitment of African-American applicants. We will continue to support efforts to attract all minorities to law enforcement through career fairs sponsored by county and state representatives.

**2. Establish internet recruiting accounts**

- **2017 Review:** Augmenting the actual physical presence of the unit at both recruiting and non-recruiting events is the use of web-based technologies to showcase career opportunities within the Albuquerque Police Department. To increase recruitment in 2017, APD utilized the following:
    1. Indeed
    2. Military Strategic
    3. Edit House
    4. Saludos
    5. Law Officer
    6. The Cause Interactive
    7. CNM
    8. The Blue Line

9.   UNM Digital Display at Johnson Center
10.  Native Peoples Recruit

The Recruiting Unit launched **apdonline.com** over two years ago to ensure easy, secure access to the department's application process. Since then, experience gained has led to site modifications resulting in an even more streamlined application process.

- **2018 Plan:** The Recruiting Unit will continue to utilize web based advertising, and will regularly assess the effectiveness of specific sites. Additionally, the unit will review and assess advertising websites which have not heretofore been utilized.

### 3. Military and university applicant pool

- **2017 Review:**

  Winning the coveted Freedom Award in 2016 has served to energize the Recruiting Unit in its efforts to attract qualified military personnel. We continue to take part in numerous events aimed at specifically attracting veterans and members National Guard and Reserve. Recruiting officers attend the monthly Transition Assistance Program (TAP) held at Kirtland Air Force Base, and participate in the bi-annual Kirtland Job Fair. We've established a "direct line" with the Brad Lakin, Career Readiness Counselor for the NM National Guard & Armed Forces. Interested applicants phone me directly from his office and are provided information on the selection process. The Recruiting Unit also participates in veteran job fairs sponsored by NM Workforce Solutions, a Department of Labor entity.

  Limited resources have compelled the Recruiting Unit to shift some of its focus away from elementary and middle school events in order to concentrate on high school and college/university students who have an active and timely interest in law enforcement. Our ties with the University of New Mexico have strengthened, mainly through the efforts of Anna Ericksen. She directs APD's Internship Program. Through her contacts, we've been invited numerous times to discuss the selection process with students enrolled in Criminal Justice (CJ) classes. Our relationship with CNM continues to grow, as well. We have not only presented to CJ students there, but we've also take part in a college day in which high school students from around the state get a chance to visit with prospective future employers.

  The Police Service Aide program continues to grow in popularity, providing the department with an immediate applicant pool from which to recruit individuals into the Cadet Academy. Currently there are forty-six PSAs working for the

department, the most in recent history. Most of these will continue their law enforcement career as APD officers.

- **2018 Plan:**
  We would like to see APD's Internship program expanded. Currently, staffing levels prohibit many APD units from accepting more than one intern, thus severely limiting access into a program that serves to introduce students to law enforcement career possibilities.
- Until staffing levels permit us to, we'll focus less on elementary and middle school events, but we'll sustain our commitment to regularly providing high school and college students with information regarding opportunities within the Albuquerque Police Department.

**4. Schedule biweekly testing cycles indefinitely**

- **2017 Review:** The implementation of biweekly testing cycles has had a positive impact on applicants who need flexibility in order to attend testing/background appointments, and on the Recruiting/Background Unit which must administer the entire selection process. With smaller and more frequent testing cycles, background detectives who were once overwhelmed with a large influx of files all at once now receive them in smaller, more manageable numbers. This practice will continue through 2018.
- **2018 Plan:** In addition to continued biweekly testing cycles, the Recruiting Unit will also, schedule permitting, test applicants who are not legitimately able to attend weekend testing.

**5. Increase recruiting staff**

- **2017 Review:** The Recruiting Unit has utilized three "overtime" officers to assist in conducting background investigations on Cadet, Lateral, Police Service Aide and Civilian hires.
- **2018 Plan:** It has been proposed to separate Recruiting and Backgrounds into two units and increase staff with 1 Sergeant, 2 officers, and 2 civilians. This will eliminate the need for overtime officers and increase the ability to proactively recruit and contact potential applicants.

**6. City Entrance Revision**

- **2017 Review:** In collaboration with City Human Resources the unit worked to create a separate City Entrance Exam targeted for Police Service Aide applicants.

**7. Electronic City Entrance Study Guide:**

- **2017 Review:** With the implementation of the electronic study guide in 2016 the Unit had a goal of offering free tutoring sessions once a month to all applicants however fell short of this objective.
- **2018 Plan:** With the anticipation of increasing staff in 2018 the goal remains to offer free tutoring sessions monthly in 2018.

**8. Needed skills**

- **3292** total applications were received in 2017. This includes Cadet, Police Service Aide, Lateral, and Military Certification by Waiver.  **801** applicants indicated that they speak another language.

**9. Challenges**

- **2018 Plan:**
  The Recruiting Unit is not currently a separate entity; it is combined with the Background Unit. Both are supervised by one sergeant. We propose separating those units, each with its own supervisor, thus allowing the Recruiting Unit to be focused solely on recruiting qualified individuals. Further, we recommend the hiring of at least one more recruiter to gather data apropos qualified applicants who do not show up for testing, and to participate with recruiting events. Often, multiple recruiting and community events are scheduled on the same day; the one Recruiting Officer has to choose which of those events to attend. Further, as a matter of safety, it makes sense to send at least two recruiters to events (law enforcement agencies have sent at least two recruiters to every career fair I've attended).
  The Recruiting Unit has presented to all six Community Police Councils (CPCs). We value their recommendations, and have implemented some of them (updating our recruiting website, for example). We'll continue to meet with CPS members to provide them statistical updates, and to explore and possibly implement their suggestions.

| Cadet Class Outcomes | | |
|---|---|---|
| **PHASE** | **118th Cadet Class** | **119th Cadet Class** |
| *Interest Cards Received* | 1,481 | 1,181 |
| *Attended City Entrance* | 230 | 170 |
| *Failed City Entrance* | 45 | 39 |
| *Failed PT* | 27 | 34 |
| *Failed Nelson Denny* | 6 | 5 |
| *Failed Poly* | 15 | 16 |
| *Failed Psych* | 15 | 8 |
| *Failed Backgrounds* | 60 | 39 |
| *Withdrew from process* | 5 | 4 |
| *Made it to Chiefs* | 57 | 25 |
| *Failed Chiefs* | 6 | 1 |
| *Passed Chiefs* | 51 | 24 |
| *Failed Medical* | 2 | 1 |
| *Seated* | 49 | 23 |
| *Male* | 39 | 16 |
| *Female* | 10 | 7 |
| *Military Experience* | 17 | 3 |
| *>32 College Credits* | 34 | 19 |
| *Academy Start Date* | 06/12/2017 | 11/13/2017 |
| *Graduation Date* | 12/21/2017 | 5/24/2018 |
| *Cadets Graduated* | 41 | In Progress |

**Additional 2018 Objectives and Recommendations**

**Seat 100 applicants**
- **2017 Review:** We had a goal of hiring 100 applicants and exceeded with 110 hires. The break down  is a follows:
  - Cadet: 72
  - Lateral: 4
  - PSA:    34
- **Action Plan:** With two established cadet and Police Service Aide classes and an aggressive recruiting campaign our goal is to seat 100 applicants in 2018. We have met our PSA capacity (50) and will now have a surplus of applicants to select the best qualified moving forward.

**Electronic Personal Integrity Questionnaire**

- **Action Plan**: Update the Personal Integrity Questionnaire (PIQ) and require applicants to submit it electronically utilizing the recruiting website.

**Personnel Responsibilities**

**Sergeant**
- Supervisor of the Unit. Responsible to the Lieutenant of the Selection and Training Section.
  - Monitors the entire recruiting and selection process and supervises all assigned support staff.
  - Responsible for orientation and training of unit recruiters and detectives.
  - The Unit Sergeant will complete monthly statistics by the last day of each month.
  - The Sergeant may delegate the task of maintaining statistics to a support staff member who will be responsible for:
    a. Maintaining Recruiting and Selection statistics.
    b. A report by cadet class will be due 30 days after the start of the academy training.
  - The Sergeant will be responsible for coordinating and all applicant medical examinations through Employee Health.
  - The Sergeant will ensure that all State DPS forms are completed on each candidate and that each packet is prepared and delivered to DPS two weeks prior to the start of the academy.

**Recruiter**
- Responsible for recruitment and handles all walk-in police applicants.
-  Attend, as assigned, any career fair, social gathering, or class for the purpose of recruiting police applicants.
- Will also serve as a background investigator. (See Unit S.O.P. Section for Background Investigator).
- Is required to be knowledgeable in personnel matters, especially Equal Opportunity and Affirmative Action and the American Disabilities Act (ADA) as it affects recruiting and selection and the management and operation of the Department.
- Is responsible for administering and scoring the beginning stages of the selection process.
-  Is responsible for maintaining all display equipment, brochures, study packets, and other recruiting material and equipment.
- Is responsible for ensuring that there are sufficient and complete materials for all tests.
- Ensures that all elements of the selection process are administered, scored, evaluated, and interpreted in a uniform manner.


**Background Investigator**
- Background investigators conduct extensive background investigations of a candidate's character, qualifications, and ability to perform as a police officer.
- Background investigators should be representative of the community and thoroughly trained in the content and use of the selection process.
- All background investigators will undergo training in background investigation through classroom and/or on-the-job training.
- Background investigators are charged with conducting all preliminary and follow up interviews of applicants/candidates, and review all Personal History Statements returned, ensuring they are complete and accurate.
- Will assist in the administering, scoring, and evaluating of the beginning stages of the selection process.
- Are responsible for the scheduling and completing of the selection process for candidates from the background investigation stage through the final selection for the Academy.
- Are responsible for ensuring that the final selection of candidates for academy classes has a clear understanding of the expectations during the academy of the physical and mental requirements.
- They should ensure that their candidate has picked up an orientation packet prior to the orientation.

- Coordinate with the Physical Wellness Unit for an applicant physical orientation after Chief's Selection.
- May also serve as a recruiter.

**Administrative Aide II Background**
- Performs all the duties of the Background Coordinator.
- Organizes and creates background folders, including background records checks.
- Sends out all prior residence letters, employment letters, and reference letters needed for background investigations.
- Sends out termination letters, congratulation letters and orientation packets.
- Conducts Triple I checks, I.D. checks, NCIC checks and Records checks.
- Maintains files of current and previous classes.
- Updates and verifies results in the recruiting and background computer tracking system (PRCR).
- Assists the Unit Sergeant in the preparation of the appropriate New Mexico Law Enforcement Academy documentation packets for each cadet once the Academy class has been selected. This includes birth certificates, DD-214's, driver's licenses, high school diplomas, medical forms, etc. as outlined in the application for certification.
- Compiles class information to track each class and class statistics, from the interest card stage through OJT.
- Organizes and disseminates internal selection board study packets.
- Responds to Background information requests from other police departments.
- Enters all of the testing scores and maintains the applicant database. (PRCR)
- Performs other duties as assigned by the Recruiting supervisor or commander.

**Administrative Aide Recruiting (Vacant)**
- Answers telephones. Takes messages when necessary and/or refers callers to the appropriate recruiter, background investigator, or supervisor. If not related to recruiting, refers the caller to the appropriate agency or unit.

- Provides only basic information to potential applicants. All calls or walk-ins, where an applicant is interested in filling out an interest

card or needs specific information, will be referred to a detective or
CSA, when one is available.

- Mails out information packets, study guides, and other various documents.
- Enters and files interest applications.
- Updates and verifies results in the recruiting and background computer tracking system.
- Orders supplies for the Section once a month.
- Makes copies of necessary documents.
- Creates new forms or documents and update old forms or documents when necessary.
- Logs all incoming and outgoing mail.
- Prepares and maintains testing applicant list.
- Prepares materials for recruiting trips and job fairs.
- Performs other duties as assigned by the Unit supervisor or commander.
- Puts together civilian background folders.



# City of Albuquerque



# ALBUQUERQUE POLICE DEPARTMENT

# 2018 Strategic Recruitment and Retention Plan

**Prepared by**

**Chief Michael Geier**

**Deputy Chief Roger Banez**

**Commander James Collins**

There are nearly one million law enforcement officers in the United States serving a population of 320 million adults and children. Law enforcement agencies constantly need to replace officers due to retirement and other causes of attrition. It is a common dilemma that police departments across the nation are facing and many agencies find themselves competing with other police departments for qualified candidates.

The Albuquerque Police Department (APD) currently has approximately 880 sworn police officers serving a city of approximately 560,000 residents. It is the 34th largest municipal police agency in the United States. APD once reached an authorized strength of almost 1100 officers but that number has decreased significantly over the last 10 years to its present critical manpower levels.   During this time crime has increased to dangerous levels, with property and violent crime reaching record numbers. Calls for service have also increased while proactive enforcement efforts have decreased. Essential staffing positions throughout the organization have been reduced or even eliminated. This report takes an in-depth look at the recruitment and retention challenges police agencies currently face, and will propose potential solutions to the problem in APD today.

Like many, if not most law enforcement agencies, APD uses a recruitment and hiring policy to guide the selection process of new personnel. This policy can be found within the agency Standard Operating Policy (SOP) manual. It may also be part of a larger human resources policy for the city that oversees hiring for the organization. The actual policy itself is often procedural in nature, outlining the requirements for consideration of employment, and the necessary and exact steps taken through the hiring process to

ensure the most qualified applicants receive consideration. There is a statement of non-discrimination advocating diversity within the hiring process.

These are all great policies to have and follow, but in an era of greater transparency, many organizations are including a "*statement of principles*" within their recruitment policy. This statement of principles outlines the philosophy and values within which the recruitment and selection process operates, as well as the hiring process expectations for both the agency and the potential candidates.

Some items in the statement of principles might seem obvious, while others may also be included in the police department's core values statement. However, the inclusion of expressed and transparent principles in the recruitment and selection process can be vitally important to the process itself, sending an important message to potential candidates considering your organization among their employment options.

Here are five principles to include in APD's recruitment and selection process policy:

**1. RESPECT FOR DIVERSITY**

Even with the presence of similar statements or clauses within the hiring procedures themselves, a clarified statement on the value of diversity in organizational personnel takes it beyond a mere policy statement to a philosophical statement of inclusion. This principle should clearly state that the organization not only respects diversity, it actively pursues a diverse police workforce through the recruitment and selection process.

**2. SERVICE**

This principle outlines the organization's philosophy regarding community service. Regardless of the policing philosophy the organization employs, service to the community remains the foremost goal. To perpetuate that philosophy, an agency's recruitment principles must emphasize service to the community, and actively seek police candidates who place community service as a priority in their personal approach to policing.

**3. INTEGRITY**

This principle requires the agency instill integrity and honesty as the twin pillars of credibility in the recruitment and selection process. This applies to both the police agency and the candidate. If an honest mistake is made in the process, the agency may resolve the issue on the side of the candidate. However, an agency should be clear that dishonesty or a lapse in moral integrity results in the immediate and permanent disqualification of the candidate. The social contract we hold with our communities demands we expect nothing less from current and future employees.

**4. MERIT-BASED SELECTION**

The recruitment and hiring process of police officers can be extensive and lengthy, or it can be streamlined with an eye toward on-boarding at the earliest opportunity. Regardless of the process, the principle of merit-based selection in law enforcement requires the most qualified applicant receive the highest consideration. A merit-based selection process utilizes multiple evaluations of a candidate's qualifications with each evaluation being objective and independent from the others.

There will always be some form of subjective evaluation, but the goal of the merit-based system is to reduce subjectivity to the highest extent possible to assure candidates that their qualifications and performance are the primary considerations for advancement.

**5. RECRUIT FOR VACANCIES AND HIRE FOR THE FUTURE**

The philosophy behind this principle recognizes that the recruitment and selection process is the first and most important step an organization takes in acquiring and retaining career employees. While the immediate goal of the hiring process might be to fill current or imminent vacancies, the department is looking toward the sustainment of a stable and professional workforce. As such, consider those intangible traits and values that lend themselves to a long-standing employment relationship.

Too many agencies find themselves repeating their recruitment process because the first process failed to result in enough qualified candidates, or the candidates chosen failed to successfully transition to permanent employment status. Implementing a set of organizational principles into your recruitment and selection process helps market your agency to the type of candidates who are most likely to be successful in your hiring process, thereby increasing the chances that your next hire will be a member of your organization for decades to come.


The overall mission for resolving APD's recruitment and retention dilemma is to address the attrition issues and provide adequate staffing to proactively fight crime and deliver quality service to the community. This paper will propose a number of priority goals and objectives for the Department. These can be used to develop a long term strategic plan to achieve this mission and its related goals and objectives. The 5 main goals, or pillars of this strategic plan are as follows:

1. Taking a proactive and innovative approach to recruitment and retentions efforts
2. Developing a marketing plan and a "brand" for APD using a police recruitment consultant
3. Build a  culturally diverse police force

4.  Create new "messaging" efforts to attract millennial candidates during the recruitment process
5.  Implement a long term career development program and other best practices that can serve both in the hiring and retention of good officers

***GOAL 1:***

**TAKING A PROACTIVE AND INNOVATIVE APPROACH TO RECRUITMENT AND RETENTIONS EFFORTS**

Like many law enforcement agencies, the Albuquerque Police Department has been fighting an uphill recruiting and retention battle. Over the last few 3 years, the department set out to hire more police officers.  However APD was only able to increase staffing by 71 officers, or approximately 24 officers per year, due to the numbers of police officers who retired or transferred to other agencies and the private sector. Some of the cadet also failed to complete the police academy.  The following chart demonstrates how this has played out over the last three years for APD

| YEAR | Number of Police Cadets Hired | Number of Police Cadets Graduating Academy | Number of Police Officer Retirements | Net Gain/Loss (+/-) |
|------|------|------|------|------|
| 2015 | 46 | 33 | 57 | -24 |
| 2016 | 111 | 93 | 38 | +55 |
| 2017 | 83 | 65 | 29 | +36 |
| **Totals** | 240 | 191 | 120 | +71 |

With recruitment struggling to keep up with attrition, the City of Albuquerque and the Albuquerque Police Department are aware they have to think outside of the box and, to that end, should continue to use any proven proactive approach with proven success or implement new, innovative recruitment and retention strategies. Key objectives and programs will now be reviewed and critical evaluation measures should be developed to assess and determine the most successful strategies.

**1.   OFFER A HIRING OR REFERAL BONUS**

The department has implemented a $5000 hiring bonus, the first recipients of which are currently in the hiring process. This has possibly helped with recruiting efforts in the face of competing agencies frontloading their pay scales. The Department may want to continue with this incentive but direct it more toward reimbursing travel and relocation expenses for applicants.

Prior to the change to on-line recruiting, the primary methods were job fairs; some billboards placed around the city, and currently employed officers.  There are many factors that lead to the success or failure of a police department's recruiting program, but experience dictates, next to the on-line recruiting, the current officers are the best way to recruit potential candidates.  The current employees are best at describing what it is like to work for a particular organization and can even help provide some guidance or "mentorship" through the application process. Currently, we offer APD employees a $500 referral bonus for an applicant which is paid out after the candidate completes the on the job training component.  Some officers do take advantage of this referral bonus, but many do not.

It is recommended that we replace the $5,000 Hiring Bonus with a $5,000 Referral Bonus to ALL City Employees with no cap.  By doing this, it would provide us approximately 6,000 recruiters for the police department.  In order for an employee to be given a referral bonus, the applicant must claim the referrer during the initial application process, graduate the police academy and successfully complete OJT.  Based on our experience, applicants rarely inquire about the hiring bonus and, in our opinion this incentive do not attract applicants any more than the other benefits already offered by the position.  Currently every seated cadet receives this bonus so there is a 100% payout on this incentive.  If we change it to the referral, not every cadet will have an employee referral which would actually reduce the cost of this incentive.

## 2. CREATE A PRE-HIRE POLICE RECRUIT POSITION

The department created a police pre-hire recruit position, which allows APD to hire applicants before the next police academy starts. This approach has helped prevent applicants from accepting jobs at other agencies while waiting for the police academy to begin. These police recruits perform administrative tasks and ride-alongs, obtaining a better understanding of daily operations.

## 3. FOCUS ON LATERAL TRANSFER CANDIDATES

We recognize that the lives and situations of police officers change. Accordingly, the department should a lateral transfer program that focuses on getting certified officers up to speed and on the street. Upon approval of the chief and the APOA, a Career Development Program should be developed to allow certified law enforcement officers to be hired and placed at salary levels commensurate with their training and experience. This program would provide a "career path and advancement ladder" for all APD sworn officers based on tenure, experience, training requirements, skill sets and performance evaluations.

Salary increases would follow with upward advancements in grade earned by an officer. It would allow officers to advance through their chosen career path with the flexibility to move laterally to other paths over their careers. Such options could include field services, investigations, traffic and supervisory/management. The lateral transfer program would consist of options ranging from in-state certifications by waiver to a lateral training academy and a field training phase.  Such an approach would encourage both in-state and out-of-state lateral candidates to join APD without the loss of income or other benefits. The only exceptions would be seniority and retirement accrual for out-of-state applicants.

Recruiters could reach out to recently retired APD or other New Mexico officers with an incentive plan to return to the department. These officers could be attracted by the higher pay associated with their previous tenure and hiring bonuses.  Under State law they would be required to suspend their current NM PERA pensions and be hired as a lateral officer. However, the benefits would include working at a higher pay than when they retired, which in turn would accrue future retirement pensions; along with the ability to increase the percentage of such retirement benefits up to 90% of their new "top three" of service.

For an officer who was under a Tier 1 PERA classification, their retirement at 20 years of service was 70% of their highest paid three years on the job. If that officer were to get hired as a returning lateral, he would be able to increase the value of the pension based on an expected higher "top 3" and by staying with the department for a little over 5 more years, could retire at 90% of their re-calculated pension rate. With PERA only providing a 2% annual COLA raise to those officers who retired prior to July 1, 2017, this new incentive to return to APD could be highly beneficial especially when "fringe" benefits such as medical insurance is considered.

## 4. ATTEND CAREER FAIRS AT COLLEGES AND MILITARY INSTALLATIONS

APD has joined the rest of law enforcement that attends career fairs and sets up recruiting booths at colleges and local military installations. The department has extended these recruiting booths to community events as well. APD has also worked with colleges and military installations to give recruiting presentations to groups of students and service members. These presentations afford us the opportunity to more efficiently reach and present our department information to larger groups of people.

In 2018, the department should consider participating in such innovative strategies as advertising employment opportunities on military publications or a "virtual" job fair, consisting of a live video conference with military personnel stationed overseas. While at career fairs on military installations, APD's recruiting team should network with the military's Transition Assistance Program (TAP) personnel to help with recruiting efforts. These relationships could prove fruitful in reaching potential applicants who are transitioning out of the military.

**5. PRODUCE RECRUITMENT VIDEOS AND POSTERS**

APD should consider creating recruiting and promotional videos. A short recruitment video could be played during movie theater showings and on local television stations during an active recruitment cycle. This video could also be uploaded to Facebook and YouTube.  It can also be added to the Department's web site. Inspirational posters and billboards can also be used as an effective recruitment tool.

**6.  USE INTERNET & WEB BASED RECRUITMENT STRATEGIES**

In early 2014, the Albuquerque Police Department changed the way it handled the recruiting process by using an internet media driven recruiting campaign.  With the vast majority of households having computers, internet, and cell phones, this is fastest way to reach a large audience in a short and overall economical way.  At that time and even now, this is considered an innovative approach to project the Albuquerque Police Department as a wonderful career choice. The use of a teleconference approach can be a valuable means to reach out with a live "video recruitment brochure."  This can focus on reaching audiences in criminal justice programs or on military bases and can provide interactive "Q & A" opportunities for potential candidates. A logical follow-up process to this will be described in the following section.

**7. CONDUCT TRAVELING AND OFF-SITE TESTING**

Historically, the department only administered the initial required segments of the testing and selection process locally. These "traveling tests" can be administered throughout the State and different locations across the nation, including colleges and military installations. Any success of trial efforts can pave the way for a consistent traveling testing schedule in the future.

Through the relationships we can foster with TAP personnel, we can contact military installations along with the staff at community colleges and universities with criminal justice programs and develop a continuous test process annually.  A pilot program could be used for assessment purposes and the preliminary tests such as the Written Examination, Physical Fitness Test Battery, Personal Inventory Questionnaire (PIQ) and the written portions of the Psychological Tests could be administered over a two day period, such as a weekend or in the evening. Following a background investigation, candidates with passing scores would then only have to return to Albuquerque after a conditional offer of employment for the remaining Polygraph, Psychological and Medical segments of the test process, culminating with the final Chief's Selection Interview.

8. **HOST AN EXPLORER PROGRAM AND OTHER OUTREACH PROGRAMS FOR YOUTHS AND YOUNG ADULTS**

Our department formerly hosted a Law Enforcement Explorer Post. This mentorship program brings in youth aged 14 to 18 to educate and train them in law enforcement experiences. Weekly, they get a unique look at what law enforcement does and why they do it. This type of program could help recruit and encourage young people to prepare for a career in law enforcement. It could also be a great tool for recruiting Police Service Aides, a position that can be a precursor to being hired by a local police agency. The former coordinator for the APD Explorer Program is still a member of the Department and could be used to develop and implement a new program.

Other innovative strategies could be to encourage partnerships and mentorship programs in both the high school and college programs where students can do such activities as internships and ride-a-longs with police officers. This not only is a great community policing initiative but also serves to build trust and legitimacy for our agency with today's youth in order to inspire future commitments to public service.

Other options include continuing the Kids Police Academy and developing programs for Police-Youth interactions at local Community Centers, Athletic programs and clubs such as the Boys and Girls Clubs of America or Police Athletic Leagues. These are all great opportunities to promote positive relations between police officers and young people with the hopes of recruiting the future ranks and file in the Albuquerque Police Department.

APD has also enjoyed a heavy recruiting effort for the Police Service Aide Program.  Our partnership with the Albuquerque Public Schools has resulted in us reaching the maximum allocation of PSA hires for the department.  PSA's are an extremely valuable resource to APD, as well as providing us a strong candidate pool to draw from for police officers.  APD should consider increasing the number of PSA positions.  The PSA program was so successful that in the latter part of 2017, we were told to not hire anymore PSA's because we had hit the limit.  Without the steady flow of PSA's into the program, it hinders our ability to add these employees to our cadet classes.  Holding off on the continual hiring, in essence, creates a void for a period of time which could affect the overall numbers of police cadets starting an upcoming class.  We had to stop hiring and recruiting PSA's, which will eventually come around and create a possible void in our staffing efforts.  This program is an investment that guarantees a steady flow of police applicants.

9.  **RETHINK EDUCATIONAL REQUIRMENTS AND INCORPORATE THESE INTO A CAREER DEVELOPMENT PROGRAM**

When all of this is put together, an applicant for APD still must meet basic entry requirements.  Some of these requirements are mandated by NMDPS, some by the CASA, and some by APD.  Obviously, we cannot ignore the mandates of NMDPS and the CASA, but we can alter APD entry requirements to fit our needs.  APD currently mandates a college requirement and in the absence of that there is an exceptional candidate waiver.  NMSP is the only other agency in our area that has a college requirement to enter their department.  APD also works closely with the College of Central New Mexico (CNM), a two-year community college offering a law enforcement curriculum.  In addition, CNM grants up to 25 hours of college credit for successful completion of the APD Police Academy. The City of Albuquerque offers an educational incentive as well that helps officers finance their college classes.

It is generally agreed that the college requirement is important, but opportunities should be provided for recruit officers to be allowed to temporarily defer and meet this requirement within reasonable time frames following graduation from the police academy. We see a lot of applicants who are not able or interested in attending a traditional university.  Of those we also see several who cannot apply under the exceptional candidate waiver either.  At any rate, both of these requirements are APD driven and in many cases exclude those who may end up being solid police officers. Unfortunately, we will never know because if they do not meet one of these two requirements, they never get to backgrounds.  Obviously, this negatively affects our overall numbers. With a career development program, higher education becomes an important prerequisite as an officer advances through a career ladder. It would unreasonable to impose these requirements at a later stage and expect the officer to achieve a Bachelors or Masters level degree in a compressed time frame in light of family, work and other personal obligations. By incorporating this mindset and expectation early in one's career, the ability to reach these educational goals is more readily obtainable. The Department can also work with colleges and universities that offer on-line degree programs to also help facilitate these opportunities for our personnel.

The Department may wish to take a look at some other requirements and considering making changes to allow for a bigger candidate pool. The chart below shows a comparison of hiring requirements of metro Albuquerque law enforcement agencies.

*The applicant may be required to submit to a polygraph examination as part of the hiring

| Agency | College Requirement | Misdemeanor Drug | Felony Drug | DWI Conviction | Multiple DWI Convictions | Polygraph | City Entrance Exam | NPOST |
|---|---|---|---|---|---|---|---|---|
| Albuquerque Police | YES | 3 YEAR | 5 YEAR | 5 YEAR | 10 YEAR | YES | YES | |
| Bernalillo County Sheriffs | | 3 YEAR | 5 YEAR | 3 YEAR | | YES | | YES |
| Rio Rancho | | PATTERN OF ILLEGAL DRUG USE | PATTERN OF ILLEGAL DRUG USE | 7 YEAR | | * | | |
| NM State Police | YES | PATTERN OF ILLEGAL DRUG USE | PATTERN OF ILLEGAL DRUG USE | 3 YEAR | | YES | | |

process.

## 10. ADOPT A FLEXIBLE SHIFT SCHEDULE

Depending on available research, the national average for law enforcement attrition rates is about 15 percent. It is believed that over the last 3 years APD may have been at a much higher rate. As such, we need to improve morale and working conditions.

One of the biggest steps our department took to improve retention was adopting a flexible shift schedule for officers assigned to the Field Services Division.  Due to lower staffing levels, the Department went to a 12 hour shift schedule but this caused many additional problems in regards to lack of overlapping coverage, related fatigue, health concerns and training scheduling. The Department was able to change to a more user-friendly approach, by offering a new bid schedule that included 8, 10 and 12 hour shift options. This helped somewhat to provide more police officers on the street during peak times, and gave officers some flexibility to choose an option that corresponded to family and other obligations in their personal lives. Research will have to be conducted to show the impact this will have on our agency.

## 11. PROVIDE DIVERSIFIED TRAINING OFFERINGS

Another area our agency can consider to retain police officers is training. The department recently leased a facility from the New Mexico National Guard. While the National Guard was consolidating personnel at another facility, our department was outgrowing the space at our APD Training Academy. Some of the Academy and other training staff were moved offsite to this newly acquired facility called the Reality Based Training Center.

Access to the facility is controlled and the training grounds are secure. This new training facility puts the Albuquerque Police Department on par with top-tier agencies. The training at this location is a major component of the settlement agreement APD is currently operating under due to the focus on de-escalation and constitutional principles regarding the use of force.

The Police Academy itself is a state of the art facility with a gymnasium and running track that includes a state certified obstacle course.  The Department operates its own firearms training and qualifications at two off-site range locations offering a wide range of options in this critical aspect of training. The Police Academy also houses a FATS firearm simulator system that trains in judgmental and decisional shooting and other less than lethal force options.

APD currently offers these diversified training offerings that smaller agencies cannot provide. In addition, APD offers a wide range of in-service and advanced training opportunities that coincide with an officer's interests and assignments. All of these can be emphasized as benefits for an applicant to join our department.

## 12.  INCREASE STAFFING & REORGANIZE RECRUITING & BACKGROUND UNITS

The Albuquerque Police Department Recruiting and Background Unit are housed at the APD Academy and falls under the command of the director of training and academy lieutenant.  Once, many years ago, the units were split into two separate entities with its own sergeant and personnel to handle the day-to-day operations.  In recent times, the unit has been combined due to personnel shortages and both operations are managed by one sergeant.  While it may be easy to see the connection between the units, the responsibilities of each unit are very different.  As anyone could imagine, the workload for a single sergeant to manage two different processes is enormous and may lend to an efficiency problem in providing the department with enough qualified applicants to fill cadet classes.  The workload created a need to re-evaluate the way the department recruited.

As indicated, we do have a recruiting unit and that unit does an outstanding job. However, the entire unit is comprised of one sworn officer and the sergeant who manages both processes, recruiting and backgrounds.  The recruiter spends most of his

day trying to keep up with phone calls, answering emails, and setting up testing dates. It leaves very little time for him to have that personal interaction with applicants that is so needed to close the gap between those who apply and those who actually show up for testing.  In between all of that, the recruiter attends certain community events and will even take part in some job fairs.  To put a fine point on it, he needs help.

Our on-line recruiting generates approximately 10,000 visitors a month, which then yields about 350 applicants per month.  This is quite a lot for one person to manage. The numbers indicate there is a great deal of interest in APD and obviously our on-line campaign is very good.

The background side of the unit is responsible for all police applicants, PSA's, and laterals.  They also conduct backgrounds for communication operators, prisoner transport employees, records technicians, forensic technicians, and crime scene technicians.  This is all done with two full time sworn investigators, a part time CSA, and a civilian investigator.  In order to keep up with the demand, we have been forced to use additional investigators, not assigned to the academy, on over-time to keep up.  Clearly, they could use additional support as well.

While technology is a valuable recruiting tool, we still need adequate staffing and structure to develop an effective and efficient process. The recommendation would be to Split Recruiting and Backgrounds into two separate units and staff with at least two sworn recruiters and 4 sworn or civilian background investigators.  Retired officers hired on a contractual or part time basis could be a viable option to help make our process more robust. Each unit will have its own sergeant/supervisor who answers to the academy lieutenant on the organization chart.

Another suggestion is to create a position of Applicant Outreach Coordinator (AOC). This would be a civilian position who would contact all qualified applicants who are scheduled to attend upcoming testing weekends, to pick up and drop off out-of-state applicants who are here for weekend testing and who are in need of transportation, and to provide resources for all seated cadets.  A further recommendation would be to start this position with a Rivenrock contract employee until all of the "bugs" are worked out. To this end the Department should design and purchase a recruitment and transportation vehicle to the academy for use by the AOC and Recruiting Staff to not only transport applicants to and from testing but also serve as a "mobile" billboard for APD.

**CONCLUSION**

As many of these initiatives are so new, we do not have any data to share on our success to date. We are eagerly waiting for the time when our efforts can be better quantified to determine what are the "best practices we can use to ensure the success of future recruitment and retention efforts.

*GOAL 2*

**DEVELOPING A MARKETING PLAN AND A "BRAND" FOR APD USING A POLICE RECRUITMENT CONSULTANT**

As police departments struggle to recruit and retain officers, some agencies are hiring recruitment consultants to help. For law enforcement agencies considering outside assistance with recruitment campaigns, one pressing question is how to find the right consultant. Calvin Dark and Rasheedah Thomas are the principals of CD Global Strategies Group, a Washington, DC-based strategic communications firm. (*www.cdglobalstrategies.com*.) The company has worked with law enforcement agencies from across the country on crisis communications, marketing and branding. Helping police departments increase their ranks has been incredibly rewarding for their company.

According to this group, before hiring a recruitment consultant, a police department should consider the following questions:

**1. WHAT TYPE OF RECRUITMENT CONSULTANT SHOULD A POLICE DEPARTMENT LOOK FOR?**

"Marketing," "communications" or "public relations" are labels police departments use in solicitations for recruitment consultants – but they have different meanings for police departments and the consultants who want to work with them. The best way to bridge this divide is to be specific about your needs. Detailed descriptions and scopes of work help potential consultants decide if the services they provide are the right fit for your department. Finding a firm with experience working with law enforcement is a big plus. A company that does not have that experience will have a steep learning curve at the beginning of your work together – a learning curve you may have to pay for.

**2. WHAT CAN A RECRUITMENT CONSULTANT DO TO HELP POLICE DEPARTMENTS?**

Hire a consultant who will work with you to create a strategic plan with detailed deliverables. Beware of firms who promise a lot of flash with little substance! A thorough audit of everything you are currently doing to recruit, along with robust messaging development, must be the foundation of your outreach.

### 3. HOW MUCH WILL A RECRUITMENT CONSULTANT COST?

Keep in mind that whatever your budget, a recruitment campaign is a long-term investment in the effectiveness of your department and you get what you pay for. If you can be transparent with candidates, a consultant will work with you to tailor a set of deliverables to your budget.

Unlike other categories of consultants your department or municipality may hire – such as outside legal counsel, construction or facilities repair – setting up an hourly arrangement with a recruitment consultant adds an unnecessary layer of work for the consultant to track progress (time better spent on the campaign itself) and bureaucratic burdens for your staff to review and approve timesheets.

The best method is to work with your consultant from the beginning to agree on a clear set of deliverables along a specific timeline. This allows for mutual clarity on what's expected, when it should be completed and, ultimately, what you're getting for your money.

### 4. HOW LONG SHOULD A CONTRACT WITH A RECRUITMENT CONSULTANT LAST?

While each successful recruitment campaign is specific to your department and its challenges, there are generally four phases to campaigns:

**Phase 1 -** Review and audit of your existing outreach, what you're doing that's working and what's not, as well as identifying the target audiences you want to reach.

**Phase 2 -** Messaging development, production of outreach materials and creating a calendar of activities.

**Phase 3 -** Implementation of the recruitment campaign and carrying out the activities.

**Phase 4 -** Evaluation of results and planning for long-term engagement and activities.

Whatever your budget or timeline, make sure it includes all four phases. For long-term success, give consultants the opportunity to fully complete the phases, especially three and four.

A common mistake departments make is spending the time and money for an outside consultant to create a great set of tools, but not allowing the consultants to help the agency use them effectively. This doesn't mean you have to use consultants indefinitely, but you should allow them to help you use those tools while simultaneously developing a training program for your internal staff so that they can take over in the long-term.

**5. WHERE SHOULD A RECRUITMENT CONSULTANT BE LOCATED?**

There are advantages to hiring a local firm. Local consultants know the area, can meet regularly in person, and usually have ties to the community so they have a stake in helping make the police departments that serve them more effective. However, if our department's goal is to increase the pool of qualified applicants and reach out to minorities and women, outside firms often have contacts and networks that can be beneficial to our campaign that a local firm may not have considered.

Outside consultants can also provide a fresh perspective on what your current outreach looks like and how it can be improved. They won't be deterred from proposing out-of-the-box solutions that would make a local firm say, "It's never been done like that before" (the seven last words of a failed recruitment campaign). If your firm isn't helping us think differently, we have wasted your investment.

Technology allows us to communicate and work with each other whether you're down the street or across the country, and there's no obstacle that a short and well-planned site visit can't help overcome. Whatever we decide is best for your APD, we should make that clear in our RFP so we don't get responses we have to spend time unnecessarily reviewing.

**6. DOES EVERYONE IN THE DEPARTMENT NEED TO KNOW WE ARE DOING THIS?**

Involve members of your department as you plan your recruitment campaign. Current police officers can provide interesting and helpful perspectives on what skillsets and backgrounds can enhance their team.  Our current officers should be able to effectively communicate the messaging, philosophy and objectives of our recruitment campaign. Whether speaking with high school students or representing your department at career fairs, they are the most effective ambassadors for your department.

This is especially important if the goal of an APD recruitment campaign is to bring more diversity to our department. There are common misperceptions about promoting diversity – notably that this promotion is in exchange for quality of applicants. Being able to effectively communicate the importance of diversity will help your existing force better understand and partner with the communities they serve.

**7. HOW DO WE MEASURE THE SUCCESS OF OUR POLICE RECRUITMENT CAMPAIGN?**

Measuring success is more than counting the number of qualified applicants you receive after the campaign, although that is an important measure! Work with department leadership, municipal stakeholders and your consultant to define what success means for you, including broadening your definition of what success looks like. Maybe it's not more applicants, but more qualified women applicants, or that your entire force understands the importance of diversity and can articulate it to improve the way your communities view your department and its goals.

It is extremely important to have this discussion with stakeholders whose buy-in you need to support (and often fund) your outreach. Prepare for the inevitable question from stakeholders: "Was the money we spent worth it?" Essentially the answer to this question is an evaluation of the specific goals and deliverables you established from the beginning.

Experts also encourage our law enforcement clients to ask themselves once the recruitment campaign begins, "Are we doing things the same way we did before?" (The answer should be NO.) If you're talking to the same people, using the same words and going to the same places, you'll just get the same applicants and responses.

**OTHER CONSIDERATIONS**

Take full advantage of the expertise consultants can provide such as crisis management and general public relations services. Once you develop a relationship during the creation and implementation of your recruitment campaign, a good consultant will feel vested in the success of your department.

If our budget doesn't allow for having a consultant on a long-term retainer, include as part of your deliverables that they create a crisis communications plan APD can implement in the event of high-profile arrests, lawsuits and other controversies. Why is that relevant? Because those events will definitely hinder your recruitment campaigns if not properly dealt with.

*GOAL 3*

**BUILD A CULTURALLY DIVERSE POLICE FORCE**

The corporate world is asking, "How do we recruit, engage and retain a diverse workforce?" Diversity is not just a good idea today. It is a business imperative if companies want to stay competitive and innovative. What could law enforcement learn

from the business world to increase diversity among its ranks?  The first step is to identify common mistakes in diversity recruitment, perceived obstacles and best practices by organizations.

**COMMON MISTAKES IN DIVERSITY RECRUITMENT**

Organizations make two mistakes when it comes to diversity recruitment. The organization only considers the visible dimensions of diversity: primarily race and gender. The recruitment brochure looks good, but everyone thinks the same. Differences that include sexual orientation, geographic background, thinking and communication style, work function, ability and disability, religion and work style are not valued and are even discouraged. This is a very narrow definition of diversity and offers little or no value to the organization in terms of new ideas, creativity and innovation.

Again, diversity is defined by what you can see. Demographics reflect the outside community, but it is only at the lower or entry levels. There is little or no diversity as you move up into management. When questioned about diversity in their organization, leaders point to all the numbers. Every year they have good numbers, but the people are constantly changing. Employees leave and get jobs where there is a value of diversity at all levels and they are encouraged to move up in the ranks.

**ADDRESSING DIVERSITY CHALLENGES**

To be a successful organization in today's culture, you need to create an environment of inclusion where people feel valued and integrated into a company's mission, vision and strategy at all levels. When employees' skills and knowledge are recognized, appreciated and utilized, they are more engaged in contributing to an organization's success. They are more willing to go the extra mile and share ideas and innovation. The visible and invisible dimensions of diversity that they bring are used as resources for success and growth. In order to create an inclusive work environment, you need a diverse workforce.

Assess your need. Clarify your definition of diversity. Include the visible as well as the invisible dimensions. Conduct a culture assessment of your organization, department or function using focus groups, interviews or surveys. Determine whether one or all of these methods would be most appropriate. Get feedback from the community and identify the needs of any potential end users.

Develop a strategy and implementation plan for a diversity/culture change initiative. Any culture change must be driven by senior management, and include the whole organization. Address all systems and processes including recruitment, employee engagement, retention, promotion and performance evaluation.

**BARRIERS TO SUCCESS**

There are three reasons why organizations drop the ball and don't move forward.

**1. Analysis and data nullification**

When the assessment is completed and data analyzed, leadership is in denial about the results. Employees lose any trust or hope developed as a result of participating in the assessment. Leadership places blame on employees for having a hidden agenda.

**2. Short-cut solution**

Leadership listens to the report and decides that hiring a member of one of the underrepresented groups is the answer. They conduct an executive search for the best and brightest and declare a solution found. There is no need and no time for any long-term strategy.

**3. Diversity holding pattern**

Executive leadership holds a strategy meeting, which results in good ideas or long-term vision, but there is no process of accountability or steps to implement specific actions. Other than discussing the need for more diversity in the organization, there is no plan to change employee recruiting and retention methods.

**RECRUITMENT STRATEGIES WITH DIVERSITY IN MIND**

Organizations can deploy several strategies to improve diversity recruitment:

**1. Create a diverse pool of candidates**

If you are serious about implementing a diversity/culture change initiative, you must create a diverse pool of candidates. If you always recruit from the same places, with the same methods, you will always get the same people. In today's competitive market, you need to be creative. You have to go where the candidates are and have a long enough lead-time to get a good selection of candidates.

APD should consider the following:

- Research and develop a list of schools that historically have large numbers of people from different cultural, ethnic and racial backgrounds. Send recruiting teams to those schools.
- Attend career days at middle and high schools and come prepared to discuss the benefits of working as an officer in our Department.

- Contact student groups on mainstream campuses and ask them to suggest the best candidates or include notices about your organization in their newsletters or other vehicles for communication. Develop relationships with diversity-related organizations (e.g., Black Student Union, Native American Students Organization, Asian-American Student Union, LGBT organizations, etc.) and sponsor events.
- Send a diverse team to meet with people at schools and other recruiting sites and build relationships so your organization will be the agency of choice to apply to work.
- Develop relationships with diverse community organizations and let them know about the opportunities in your organization.
- Identify new ways of reaching target markets. Consider running promotions in movie theaters before films like "Spiderman" and "Star Wars" in order reach a young market who might not have thought about policing as a career.

**2. Clearly communicate the recruitment process**

Our criteria for interviewing and hiring should be based on qualifications and not just because we are more comfortable with someone who went to the same school, practices the same religion or shares your gender or sexual orientation. Have a diverse panel conduct interviews so you can get other perspectives. Include diversity as part of our mission statement and display it on your website and marketing material. One of the first things a potential recruit will do in researching your organization will be to look at your website. If it does not state and show a high value for diversity, there is a good chance that recruit will look elsewhere. We need to market our diversity initiative throughout the organization so the word gets out that your environment is a great place for everyone to work. Identify any changes our organization has made regarding diversity and how diversity goals are being met.

**3. Change perceptions about your profession**

Identify stereotypes of people who work in law enforcement and develop strategies for changing perceptions:

- Use more inclusive language and visuals in rule books, training and recruiting materials. Make sure all pronouns are not male in law enforcement
- Be aware of our own biases and stereotypes and their impact on the environment. Participate in high-level diversity training.
- Create processes to make people who are different from you feel welcome and included in our organization, and then use the media to alert potential employees that you are a welcoming, inclusive employer.
- Market the diversity of their employees as strength.  This helps promote APD as an employer of choice.

- Mentor people who are a different gender or from different cultural or ethnic backgrounds. It will help you become more comfortable with other people and will help your staff grow in their careers.
- Incorporate ideas from other cultures to solve problems and be more innovative.

**4. Implement policies that support diversity recruitment**

Use resources that are already in place and research what other organizations have done to be successful. Implementing the following policies will support your diversity recruitment:

- Develop relationships with employee affinity groups and keep them apprised of any openings.
- Provide cross-cultural communication training to help staff work well together and serve the client population more effectively.
- Survey and interview staff across demographics to determine their needs in order to create a strategic plan for retention and increased recruitment under represented populations.
- Rethink your beliefs that a candidate should always fit a specific profile. Outside of physical requirements for being able to do the job, don't let our biases exclude excellent candidates.

- Examine our definition of leadership qualities to include ways in which people with different thought processes and communication styles can lead. Police departments have been hierarchical in the past,  so we should start learning that people with consensus styles can also be effective leaders and do not exclude them from the recruiting process.
- Conduct exit interviews and identify patterns and themes if they exist. Be willing to change to accommodate and use new ideas and creativity.
- Use a recruiting team trained in diversity and inclusion awareness

*GOAL 4*

**CREATE NEW "MESSAGING" EFFORTS TO ATTRACT MILLENNIAL CANDIDATES DURING THE RECRUITMENT PROCESS**

Generally considered as those born between the early 1980s and the mid-1990s, they are technologically savvy, highly social, socially tolerant, generally well educated and civically engaged. They upend social and business conventions, challenging old ways of thinking across academic, marketplace and political landscapes, and driving change and innovation at a lightning fast pace.

They also take a lot of fire. Criticized as coddled, entitled and immature, they are seen to embody all the characteristics of the *insulter du jour*, the overly sensitive and much-maligned "snowflake."

**HOW MILLENNIAL COPS DIFFER FROM PREVIOUS GENERATIONS**

Millennials entering law enforcement today are more likely than earlier generations of cops to boast college degrees (and to seek even higher education), to come from widely diverse backgrounds, and to express openness to and acceptance of ideas that would strike many older officers as unconventional (or even "liberal").

Many come pre-committed to maintaining a work/life balance in comparison to older colleagues, who wear years of working impossibly long hours and personal self-sacrifice (not to mention relentless pursuit of the almighty O.T. dollar!) like a badge of honor. They are less likely to center their social life around police culture, opting instead to compartmentalize their work and non-work lives.

While these traits are concerning to veteran officers and administrators, to others they reflect a wider sociological shift. In recent years, we have been advocating for police officers to develop a healthier work/life balance to address the stresses of the job, so we hope this generation's approach will become normalized over time.

With that said, millennials – and especially younger millennials – do exhibit one trait that is already affecting police agencies currently hiring and employing them. A generational wariness toward long-term employment commitments has created issues of *employee retention* for a profession that has traditionally expected and relied on workforce longevity to ensure stability and experience.

**MILLENNIAL RECRUITMENT AND RETENTION CONCERNS**

Known as "job hoppers," millennials move from one employer to another, trying on different hats, and ready to jump ship for greener (or more interesting) pastures.

A 2012 poll of millennial workers found that as many as 91 percent expect to stay in any one job less than three years. To think law enforcement is drawing entirely from the 9 percent with expectations of greater stability is foolish. Further, "54 percent of millennials either want to start a business or already have started one. And 72 percent of Generation Z (the post-millennial generation) want to start their own business."

Virtually all new police hires today are coming from the younger end of the millennial pool, with the Gen Z population soon to follow as they come of recruitment age. Gallup research found 60 percent of employed millennials are open to new opportunities, and they are the generation most likely to switch jobs and least engaged in the workplace.

These numbers are raising concern in the private sector where companies are not only competing to recruit and hire the best young talent, but to retain staff and promote engagement. Losing employees impacts productivity and profits, increases employee-training costs and often damages the ability of a company to attract replacement workers. The stakes for law enforcement may even be higher.

Unlike the private sector that can generally expect its employee pool to remain in the game for up to 20 years longer than the typical police officer (who retires younger), they can draw from potential candidates across a wider range of age and experience. Law enforcement typically hires from a much younger pool, often due to statutory restrictions, with older candidates and experienced lateral transfers possible, but still representing relatively few hires.

And as most police officers would probably attest, it can take three to five years for a young officer to become truly proficient at the job. The cost of training a young officer runs into the tens of thousands of dollars in the first few months of employment alone, with hiring expenses, salary and benefits, training, uniforms, gear and field training officer costs. Some departments wash out from 10 percent-50 percent of new hires before they clear probation, and still others quickly decide, "I was wrong, this isn't for me!" and leave on their own.

By the time an officer is solo, fully competent and invested for the long haul, a department has spent a small fortune. Send them to a few schools or invest in training for specialty positions or ancillary assignments and the cost increases. These are good investments if officers stick around long enough to produce benefits. Experienced, highly functioning, highly invested officers benefit their communities, departments and fellow officers. High turnover undermines good service, professionalism and morale.

Police agencies are not only competing for a smaller pool of potential applicants relative to the millennials – which is still the largest living demographic – but can expect more of the same when they start recruiting Gen Z, the smallest demographic and the one most idealizing entrepreneurship over working for someone else. Recruitment and retention may only become harder in the future, so focusing on officer retention strategies now is a top priority for law enforcement agencies.

## PRINCIPLES OF RETAINING MILLENNIAL POLICE OFFICERS

The key principle on which to focus and work toward is *engagement*. Employee engagement is a critical factor in job satisfaction for almost all employees regardless of age, but the millennial cohort is the one most likely to leave in its absence. To foster engagement, police agencies must emphasize certain attitudes and practices from the top down.

**1. Respect an employee's desire for a work/life balance**

The days of cops routinely sacrificing home and personal life for the job are over. Thanks to increased familial closeness and definitions of family expanded to include longtime friendship circles, the ubiquity of social media and tightened bonds it creates, and increased opportunities for socialization and lived "experiences," millennial police officers are simply different than those of older generations.

Embrace the differences. If possible, invite younger officers to bring their family and friends around to show off the department, go on ride-alongs, meet bosses and coworkers, and experience the job. Involving those people most important to your young officers in their work world increases the likelihood of the officer bonding with the agency. Working to enhance valued work/life balance demonstrates good faith, empathy and valuing what is important to them.

**2. Foster a sense of purpose**

Millennials demand purpose. They need to feel invested in something bigger than themselves, that their work has meaning and value, and that putting on the uniform each day is important. Police work can sometimes become a grind, where officers feel they are tasked busy work or simply spinning their wheels with little effect. It takes leadership and guidance, usually from a purpose-driven supervisor or fellow officer, for most employees to discern meaning from the mundane. There are countless "competent" managers in policing, but precious few leaders. Be that leader, regardless of rank.

In "Millennials: The Job Hopping Generation," Gallup writer Amy Adkins posits:

*It's possible that many millennials actually don't want to switch jobs, but their companies aren't giving them compelling reasons to stay. When millennials see what appears to be a better opportunity, they have every incentive to take it. While millennials can come across as wanting more and more, the reality is that they just want a job that feels worthwhile -- and they will keep looking until they find it.*

What could be more worthwhile than law enforcement? For the opportunity to make immediate, lasting impact, policing *should* offer countless opportunities.

**2.  Provide varied and impactful opportunities**

In many law enforcement agencies, specialty assignments are doled out infrequently or given only to certain "golden children." Opportunities for training, to take part on specialty teams or expand professional horizons are few. Even for high performers, this can create a sense of "I'll never move up, or get a chance to do anything besides chase the radio," leading to disillusionment and bitterness.

Even if specialty assignments are highly competitive and difficult to come by, we can still provide opportunities to learn and practice complex skill sets. Providing opportunities for temporary assignments with specialized divisions allows an officer to practice and demonstrate what they are capable of, stay engaged and have a little fun, while letting permanently assigned officers get to know younger officers' work ethic and potential. The agency should develop a **Career Progression or Career Development** program that allows sworn officers different career paths such as patrol, investigations, traffic , criminalistics, supervision/management and leadership. Within these paths are a number of different levels that allow advancement opportunities within one's chosen path. These levels would come with pay increases based on required time in grade, performance evaluations, training requirements, formal education and other benchmarks of quality work and involvement.  Officers can also have the flexibility to move laterally among different career paths without loss of grade, rank or salary.

Encourage patrol officers to work complex investigations, develop community-policing projects, and formulate and carry out traffic enforcement strategies. Supervisors can foster officer development by arranging mentorship and training opportunities to develop needed skills.

### 4. Provide recognition as a matter of course

Millennials are often criticized as the "participation trophy" generation, even by themselves, and there is certainly some validity to that. However, occasional recognition is valuable.

Leaders who care know that praising past and current behavior is the best way to predict future behavior. Praising those who have performed well virtually ensures they will continue whatever activity got them the praise. Recognition does not need to be formal or complex – a roll call "Atta boy!" goes a long way – but departmental awards are very powerful. Unfortunately, many departments see giving praise as a sign of weakness and finding fault or being highly critical is the norm.  APD has a number of formal means of internal recognition but needs to use these examples of exemplary work need to be used to continually promote the positive actions of its personnel.

### 5. Create an environment of advocacy and trust

This one is huge, so do not underestimate it. Millennials are especially untrusting of institutions and organizations. In "Millennials Don't Trust Anyone: That's a big deal," political analyst Chris Cillaza writes, "Of 10 major societal institutions, just two – the military and scientists – garnered majority support from millennials on the question of whom they trust to do the right thing most of the time." The one bright light in an otherwise depressingly cynical article is that the police came in third. So we are doing okay, it seems, among young adults!

If you are a supervisor or senior officer, create an environment of advocacy and trust. Have your subordinates' backs, be willing to take heat for them when it is due, and create an environment of advocacy and trust where appropriate.

**CONCLUSION**

The millennial generation is the future of law enforcement. It is up to current police officers and law enforcement leaders to prepare and support them for the challenges they face. We are all responsible for the retention of solid, well-trained, highly engaged police officers, so let's make sure we do right by them and the communities we serve.

### *GOAL 5*

**IMPLEMENT A LONG TERM CAREER DEVELOPMENT PROGRAM AND OTHER BEST PRACTICES THAT CAN SERVE BOTH IN THE HIRING AND RETENTION OF GOOD OFFICERS**

## 1. HIRING PROCESS

In order to understand why potential candidates might consider other professions, let's look at how law enforcement compares with the rest of the working world. While agency administrators recognize police hiring processes as one of the best human resources tools available to the department, the process is costly, tedious, lengthy and invasive compared to other fields. A multi-page application, physical agility test, extended background check and polygraph are exhaustive compared to hiring practices of other jobs offering comparable compensation. The law enforcement hiring process can take months, whereas in the civilian world, an application, interview, criminal history and drug test can be completed in just days.

In addition, many police applicants struggle to meet minimum police hiring standards. Credit history, physical fitness, prior drug use and other criminal activities limit the talent pool, causing some police departments to lower hiring standards – though this practice has historically provided mixed results and requires careful implementation. By comparison, other fields do not usually have such stringent requirements.

**2. COMPENSATION**

According to the Bureau of Labor Statistics, the average salary of a police officer in the United States is $62,760, but that does not account for geography. This Bureau of Labor Statistics map reveals annual mean wages for police – approximately a quarter of which fall between $17,280 and $43,670. By comparison, multiple studies average the income of a graduate with a bachelor's degree at around $50,000 per year.

Requiring college degrees for police is an excellent practice with history grounded in research. In 1967, a taskforce commissioned by President Lyndon B. Johnson endorsed a four-year degree for police. The National Advisory Commission on Criminal Justice Standards and Goals and the Police Executive Research Forum echoed that endorsement. Multiple studies show educated officers generate fewer complaints and have less use of force issues. However, this may drive up the bar in addition to standard requirements when compared to civilian job opportunities.

While APD compares well in compensation and other benefits among other police and sheriff's departments in New Mexico, it is lacking in comparison to agencies in the surrounding region, such as Colorado, Texas and Arizona. It is difficult to make these comparisons unless other indicators such as cost of living and such are considered.


**3. RISK MANAGEMENT..**

Since events in Ferguson, there has been a growing distrust of law enforcement among some segments of society. When an officer is involved in a shooting, some community members assume the officer is in the wrong. These elements are often vocal and, unfortunately, there have been a few instances where their doubts and fears were borne out by the actions of some officers. This has a polarizing effect on potential applicants. Some may see the disorder and want to join the ranks to become part of the solution. Others prefer a path of less resistance. Either way, there can be little doubt that a law enforcement career is less likely to be obscure.

There is obviously risk associated with working in law enforcement. The National Law Enforcement Memorial Fund lists the current total of officers lost so far this year at 99. The risks are not just physical. Peace officers can be taken to task by their agency, charged with crimes and prosecuted, and sued civilly. This scenario has played out on a number of occasions for APD. This is yet another consideration for those weighing out the balance of a law enforcement career.

**4. GENERATIONAL CHALLENGES**

With thousands of peace officers across the nation heading toward retirement, we must pass the baton on to the next generation. According to a study by the Law Enforcement Management and Administrative Statistics (LEMAS) survey in 2003 and the Census of State and Local Law Enforcement Agencies (CSLLEA) in 2008, the national attrition rate for officers is approximately 10.8 percent

Studies have shown millennials are often even more interested in self-advocacy than Generation X. Another part of this puzzle is the rapidity in which they seek return on their investment. Shortly after being hired they already want to be in SWAT or working as a detective, with little concept of the time it takes to prepare for those positions. Then after attaining these roles, they are ready to move on to the next goal. This presents enormous challenges for a field with firmly established beliefs about working your way up a progressive career ladder.

For some people who may have contemplated pursuing a law enforcement career, their minds may have changed due to the anti-police sentiment we've seen over the last several years. For cops already employed, they may wonder whether to remain in their current department or the field itself.

Though police departments may differ in size, they all face similar challenges. Here's how police leaders from Austin, Texas, Montgomery County, Maryland, and the District of Columbia tackle the challenge of recruiting good candidates and retaining them when they are on the job.

**METROPOLITAN POLICE DEPARTMENT, WASHINGTON, D. C.**

Assistant Chief Robert Contee says his department is looking for officers with integrity and judgment, who can engage with the community. He acknowledges that law enforcement agencies everywhere are still trying to figure out how to retain good officers: "It is critical for us to identify ways to keep them," said Contee, with the one- to five-year mark being a critical time for retention.

To attract millennials, the department advertises positions on social media, in movie theaters, on the back of buses and on local radio stations, along with participating in traditional job fairs. Contee has four tips for retaining good cops:

1. **Flexibility for advancement.** There needs to be flexibility in, as well as opportunities for, educational advancement in order to recruit and retain police officers.
2. **Opportunities for advancement.** Agencies must offer opportunities for advancement. If officers cannot advance, they will go elsewhere, leaving the department from which they were initially hired.

3. **Open communication**. The department must provide an atmosphere where officers can voice their opinions and engage command officials in dialogue.
4. **Change to demonstrate value**. Agencies must provide officers opportunities to demonstrate their value to the organization. Certain skill sets they possess may be beneficial to the department and may maintain their interest in that arena.

**MONTGOMERY COUNTY POLICE, MONTGOMERY COUNTY, MD**

Montgomery County is a suburb of the nation's capital, rich in diversity. The county frequently works with neighboring jurisdictions in Virginia and the District of Columbia. A diversified work force is essential and, as Assistant Chief Luther Reynolds said, "Work ethic is huge." Reynolds reveals that an impeccable reputation and the ability to get along well with others goes a long way in policing and, particularly, in diverse communities.

Reynolds points out that people want to be part of a professional organization that cares about their well-being. In his county, he notes, there is a high level of support for officers from the community, as well as the judiciary and even local politicians.  Reynolds offers six tips for personnel hiring and management:

1. **Value ethics and integrity.** Integrity is essential in hiring good cops. "Integrity has to be impeccable. You can't teach someone to be honest," Reynolds said. Interpersonal communication skills are also vital in choosing the right candidates, and they must possess empathy and be effective in dealing with people.
2. **Offer a comprehensive compensation package.** Pay and benefit packages are important in attracting officers. Benefits like take-home cars, pay increases, comprehensive healthcare coverage and retirement packages influence an individual's initial decision to join a department and then stay with that department once they get some experience under their belt.
3. **Provide training opportunities.** Emphasis Training is a key tool for retaining cops. Departments need a cadre of faculty and a curriculum of excellence that touches on the core values of the organization in order to produce a culture of excellence.
4. **Embrace technology.** Agencies must embrace new technological tools and speak the language of Facebook and Twitter.
5. **Practice compassionate leadership.** People are hungry for leadership. Good leaders treat people with dignity, value and respect and are models of compassion.
6. **Engage the community.** Finally, an agency that values the community tends to retain officers because there is a lot of community engagement.

"A large majority of people in Montgomery County care about police," Reynolds said. When all these elements combine, people feel appreciated and valued.  Officers need to

know there is support for their safety and recognition that what they do is important. They want to be heard. "It's an ongoing evolution," Reynolds said.

**AUSTIN POLICE DEPARTMENT, TEXAS**

Chief Brian Manley leads a department of 1,908 sworn officers and 725 civilians. His jurisdiction is in the top three of the highest paid agencies in the state. Manley believes that retention of good officers starts with recruiting. It is important to recruit the right candidates and emphasize the importance of community and community policing. He considers what candidates have done to give back to the community and how compassionate they are towards the community. His five tips for retention include effective leadership from first-line supervisors to the executive team:

1. The organization must practice effective leadership.
2. Departments must offer an attractive and competitive pay package.
3. Law enforcement agencies need rigorous wellness programs that provide adequate opportunities for police officers to get help when they need it. This includes a strong peer support system and adequate equipment to maintain officer fitness.
4. There must be growth opportunities within the organization that allow officers to expand their knowledge and experience.
5. Offering cutting-edge training allows officers to perform at their best. These insights gleaned from law enforcement leaders in Washington, D. C., Montgomery County and Austin demonstrate the commonalities shared in the recruitment and retention of excellent and productive law enforcement officers. Taking a strategic approach to hiring officers increases the likelihood you will retain those good cops in your ranks.

**SUMMARY**

Whether the difficulties of hiring processes, pay, risks or generational issues confront agencies across America, one thing is clear – law enforcement must adapt and evolve. Police leaders need to navigate new territory with both an eye toward the future and one to the past – stubbornly holding to values and hard-learned lessons, while simultaneously keeping open minds about how to proceed.

Administrators must be mindful of these challenges and develop their recruiting strategies accordingly. This may require increased funding for recruitment and citing these challenges as justification for that funding. In addition, reasonable adaptation to the current candidate pool will help to hire and retain millennials. Shoring up retention numbers is also a good way to hold numbers on the back end, particularly for our most

seasoned officers. If we are to maintain a society of laws, we must fill the gaps in the thin blue line with qualified people, whatever the challenges we face finding candidates.

This document addresses an array of current and proposed option and strategies to improve the recruitment and retention dilemma the Albuquerque Police Department has been faced with over the last few years. It contains an overview of all of these that can be developed into an evaluation and assessment matrix to determine the most effective and cost efficient means of increasing the size of APD in the near future. This study can also be used to develop an overall strategic plan using the mission, goal & objectives, underlying purpose, people responsible, performance benchmarks and timelines to direct this project to success.