```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF NEW MEXICO

 3
      UNITED STATES OF AMERICA,      )
 4                                   )
                      Plaintiff,     )
 5                                   )
                      vs.            )   NO: 14-CV-1025 RB-SMV
 6                                   )
      THE CITY OF ALBUQUERQUE,       )
 7                                   )
                      Defendant.     )
 8

 9

10              TRANSCRIPT OF PROCEEDINGS
              TELEPHONIC STATUS CONFERENCE
11          BEFORE THE HONORABLE ROBERT C. BRACK
              UNITED STATES DISTRICT JUDGE
12            MONDAY, SEPTEMBER 10, 2018
                     10:00 A.M.
13        LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

14

15

16

17

18

19

20

21      (Proceedings recorded by machine shorthand and
      transcript produced by Computer-Aided Transcription.)
22
      REPORTED BY:    VANESSA I. ALYCE, RPR, NM CCR #259
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmcourt.fed.us
```

```
 1    TELEPHONIC APPEARANCES **:

 2         FOR THE UNITED STATES:

 3                    UNITED STATES ATTORNEY'S OFFICE
                      District of New Mexico
 4                    201 Third St. NW, Ste. 900
                      Albuquerque, NM  87102
 5                    BY:  ELIZABETH M. MARTINEZ, ESQ.

 6                    and

 7                    U.S. DEPARTMENT OF JUSTICE
                      Civil Division
 8                    601 D. Street NW, Room 5422
                      Washington, D.C. 20004
 9                    BY:  COREY M. SANDERS, ESQ.

10                    and

11                    U.S. DEPARTMENT OF JUSTICE
                      601 D. Street NW, PHB 5418
12                    Washington, D.C. 20004
                      BY:  PAUL KILLEBREW, ESQ.
13
                      and
14                    U.S. DEPARTMENT OF JUSTICE
                      905 Pennsylvania Ave. NW
15                    Washington, D.C.  20579
                      BY: STEPHEN RYALS, ESQ.
16
           FOR THE CITY OF ALBUQUERQUE:
17
                      CITY ATTORNEY'S OFFICE
18                    P.O. Box 2248
                      Albuquerque, NM  87103
19                    BY:  ESTEBAN ANGEL AGUILAR, JR., ESQ.
                           SAMANTHA HULTS, ESQ.
20                         JERAMY SCHMEHL, ESQ.
                           LINDSEY VAN METER, ESQ.
21
           FOR THE INTERVENOR APOA:
22
                      SANCHEZ, MOWRER & DESIDERIO, P.C.
23                    P.O. Box 1966
                      Albuquerque, NM  87103
24                    BY:   FREDERICK MOWRER, ESQ.

25
```

```
1    TELEPHONIC APPEARANCES continued **:

2         Also Present:

3                        DR. JAMES D. GINGER
                         Court-appointed Independent Monitor
4
                         CHIEF MICHAEL GEIER
5                        DEPUTY CHIEF ROGELIO BAÑEZ
                         DEPUTY CHIEF ERIC GARCIA
6                        DEPUTY CHIEF ARTURO GONZALEZ
                         DEPUTY CHIEF HAROLD MEDINA
7                        COMMANDER MICHELLE CAMPBELL
                         COMMANDER ANGELA BYRD
8                        COMMANDER ROBERT MIDDLETON
                         LIEUTENANT JENNIFER PEREZ
9                        SHANIA GALLEGOS
                         Albuquerque Police Department
10
                         HONORABLE LORENZO F. GARCIA, RET.
11                       Non-legal Representative for City Council

12                       DR. PETER WINOGRAD, Consultant

13                       JAMES B. LEWIS
                         Senior Advisor to Mayor Keller
14
                         EDWARD HARNESS, Executive Director CPOA
15
                         JUSTIN MONTGOMERY, Vice President APOA
16
                         ALYSSA FERDA, USAO Outreach Coordinator
17
                         DIONNA K. FORD, Law clerk
18

19    (** Reporter's Note:  The above appearance list is based on
      the written list of attendees submitted to the Court after
20    the hearing.)

21

22

23

24

25
```

1                    (On the record at 10:00 A.M.)

2            THE COURT:  Good morning, everyone.  This is

3    *United States of America versus City of Albuquerque*, our

4    September 2018 status conference.  Would you-all state your

5    appearances for the record, please.

6            MR. AGUILAR:  Esteban Aguilar, Jr., on behalf of

7    the City of Albuquerque.

8            MS. MARTINEZ:  Elizabeth Martinez, U.S.

9    Attorney's Office, for the United States.

10           MR. MOWRER:  Fred Mowrer on behalf of the

11   Albuquerque Police Officers Association.

12           DR. GINGER:  Jim Ginger with the monitoring team.

13           CDR. BYRD:  Commander Byrd, APD Training.

14           CHIEF GEIER:  Mike Geier, APD.

15           MR. SCHMEHL:  Jeramy Schmehl, Assistant City

16   Attorney on behalf of the City of Albuquerque.

17           FEMALE SPEAKER:  (Inaudible.)

18           THE COURT:  I didn't hear that last name.

19           MR. AGUILAR:  That was Lindsey Van Meter, City of

20   Albuquerque.

21           CDR. MIDDLETON:  And Rob Middleton, APD.

22           THE COURT:  I'm sorry.  I didn't hear that name,

23   either.

24           CDR. MIDDLETON:  Rob Middleton, APD.

25           THE COURT:  Yes, sir.  Thank you.

1                    FEMALE SPEAKER:  Michelle (inaudible).

2                    THE COURT:  Sorry.  I'm not able to hear that.

3                    MR. AGUILAR:  Commander Campbell, APD.  Deputy

4        Chief Garcia, APD, is here as well.  Lt. Perez is here, APD.

5        Dr. Winograd, APD.  James Lewis.  Deputy Chief Garcia --

6                    MS. GALLEGOS:  Shania Gallegos, APD.

7                    JUDGE GARCIA:  Lorenzo Garcia on behalf of the

8        City of Albuquerque City Council, but not as counsel of

9        record or legal counsel (inaudible) --

10                   MR. AGUILAR:  And Samantha Hults, City of

11       Albuquerque.

12                   MR. HARNESS:  Edward Harness, Civilian Police

13       Oversight Agency.

14                   MR. KILLEBREW:  Your Honor, this is Paul

15       Killebrew, Corey Sanders, and Stephen Ryals on behalf of the

16       Department of Justice.

17                   MS. MARTINEZ:  Your Honor, this is Elizabeth

18       Martinez.  As we did the last time, at the conclusion of the

19       status conference, we will submit to the Court's clerk a

20       complete list of everyone who is here today so that we have

21       a comprehensive list for the court reporter.

22                   THE COURT:  That would be very helpful.  And were

23       there any other -- any other folks appearing this morning

24       that we haven't heard from yet?

25                   LAW CLERK:  Good morning, Judge.  This is Dionna.

1          THE COURT:  Good morning, Dionna.  Thanks for

2     being here.

3          MR. MONTGOMERY:  I'm sorry.  Justin Montgomery

4     with the Albuquerque Police Officers Association, as well.

5          THE COURT:  Thank you.

6          Anyone else?

7          Great.  Let's -- the parties have submitted, in

8     keeping with prior practice, a proposed agenda.  And we're

9     going to begin this morning with Chief Geier.  You have an

10    introduction to make, Chief?

11         CHIEF GEIER:  Yes, I do, Your Honor.  If you

12    remember, back in April, Deputy Chief Garcia and I went to

13    the Epoch training in New Orleans.  And one of the takeaways

14    we got was, in their academy, they have both a sworn

15    commander and a civilian former dean of a university out

16    there.  And it seems to be that it helps with the -- from

17    the academic standpoint to have that kind of approach.  He

18    had some difficulty with law enforcement commanders at the

19    academy because they really aren't -- they're trained in law

20    enforcement subject matter as experts in that regard, but

21    not in the realm of some of the deficiencies that were being

22    pointed out to us with lesson plans and training protocols.

23         So we went on a search and we were really

24    fortunate that we found somebody local.  Angela Byrd was

25    appointed commander in July of this year with APD.  Her

1    previous experience includes law enforcement certification

2    and command with both the State of Kansas and New Mexico.

3    She was a deputy sheriff in Wichita, Kansas, for six years

4    and was Chief of Police for the Bosque Farms, New Mexico,

5    Police Department.  She was appointed the director of the

6    Southeastern New Mexico Law Enforcement Training Academy in

7    2008, and where she held that position for eight years.

8    During that tenure, she was initially responsible for the

9    basic law enforcement academy and subsequently also

10   implemented programs that included advanced law enforcement

11   training, public safety telecommunications academy, and

12   certification by waiver academy.  She also recognized the

13   need for police relations and implemented community-service

14   protocols for the basic academy.

15           Cdr. Byrd has earned her New Mexico Advanced

16   Certification in Leadership to include First Line

17   Supervisor, Intermediate, Advanced, Command, and Executive

18   Levels.  She's a Master Instructor in Use-of-force Response

19   to Resistance, Defensive Tactics, and Instructor

20   Development.  She is also instructor certified in law

21   enforcement disciplines including Reality-Based Training,

22   Firearms Training Systems, and General Police Instruction.

23           Cdr. Byrd holds a bachelor's degree in sociology

24   from Newman University in Wichita, Kansas.  She also earned

25   a master's degree in criminal justice from Wichita State

1   University and has begun her doctorial studies.

2            She has taught criminal justice classes at the

3   university level, and has coached women's soccer for the

4   University of the Southwest in Hobbs, New Mexico.

5            So I'd like to introduce Cdr. Byrd.  I believe

6   she's on line and may have a few opening statements just

7   regarding her philosophy.

8            Cdr. Byrd?

9            CDR. BYRD:  Thank you, Chief.

10           Good morning, Judge.  How are you this morning?

11           THE COURT:  I'm very well.  Thank you.  And

12   that's a pretty impressive resumé you bring to the Academy.

13   I'd love to hear anything you might have to say.

14           CDR. BYRD:  Well, as you well know, training is

15   where it all starts.  And the mindset of the community

16   service begins at the cadet, at the basic level.  The

17   Academy, which includes many facets of training, has made

18   significant strides just in the short time I've been here

19   with APD.  And we have really tried to move forward in a

20   service-oriented direction.  We have included many

21   community-based projects within the basic Academy now.  And

22   trying to foster a foundation which will, hopefully,

23   progress through the career, through the officers' career at

24   APD.

25           We currently have about 29 laterals, which the

1    APD Academy staff is emphasizing the importance of community

2    involvement in that Academy, as well.  All the staff at the

3    Academy want APD to succeed in this endeavor and will remain

4    steadfast, as we meet all the objectives and goals of the

5    CASA reform.  As we make this transition, with the

6    seven-step process that I've found that is -- also with

7    Dr. Ginger -- how important it is to have that seven-step

8    process in place, I'm trying to lead from the front.  And

9    the expectations of my staff will remain unwavering.  After

10   meeting all the best practices and standards of training, we

11   are committed to maintaining the highest level of

12   professionalism, as APD moves forward.

13          It's a pleasure for me to be a part of this

14   transformation.  I really appreciate the opportunity and

15   hope that I can bring as much as I can to the table to help

16   us get through all this.

17          Thank you.

18          THE COURT:  Thank you, Commander.  Welcome.  And

19   God speed.  I wish you well at the Academy and look forward

20   to hearing good reports from the Academy going forward.

21          CDR. BYRD:  Thank you, Judge.

22          THE COURT:  Let's see, Deputy Chief Garcia, are

23   you there?

24          MALE SPEAKER:  He's stepping up to the

25   microphone, Your Honor.

1          THE COURT:  Who's got this second item?  I

2   couldn't tell whether it was Dr. Ginger or Deputy Chief.

3          DR. GINGER:  Your Honor, this is Jim Ginger.  I

4   think I have the first section of Item Number 2, and I think

5   then the chief will cover the second section.

6          THE COURT:  That would be great.  I'll hear you.

7          DR. GINGER:  Just a very quick recap because I

8   know the Court has gotten the reports on this, but just to

9   sort of refocus us and review what we've provided to APD in

10  terms of technical assistance during the second half of the

11  last monitoring period:  We worked very closely with APD on

12  13 separate and distinct areas during the second half of the

13  seventh reporting period.  And I'll go through those very

14  briefly, with one exception.  There's one issue we have that

15  has the monitoring team, as a whole, concerned.  And we

16  mentioned it in the technical assistance report and we

17  mentioned it in-depth to APD when we were on site.  And that

18  is what I have come to call the "counter-CASA effect" within

19  APD.  It's a small group, but it's a widespread collection

20  of sworn personnel at sergeant's and lieutenant's levels

21  with civil service protection that appear to be, based on my

22  knowledge and experience, not completely committed to this

23  process.

24          I had a conversation with the Chief in depth

25  about that issue.  He's cognizant of it.  And I know he's

 1    trying, as best he can, to work through it.  But it's

 2    difficult because those folks are in ranks and positions

 3    that are protected by civil service, and the bid through the

 4    Union contract tends to keep them there.  So it's something

 5    we're all aware of and we will be working through.

 6            We provided 12 other pieces of technical

 7    assistance during that period mostly related to internal

 8    problem-solving processes, for example, policy development,

 9    you know, how to work through the policy development

10    process; a training program for the Force Review Board,

11    which is a major sticking point on compliance at this point,

12    or has been at least, and designing new programs, new

13    training programs, for supervisors regarding the new

14    three-level force classification system.

15            We provided what I would call a mini seminar for

16    APD senior command staff on a strategic planning method that

17    should be beneficial to them as they're trying to move

18    forward.  We worked with APD on designing a new training

19    program on use of force -- on the newly revised Use-of-Force

20    Policy.  We provided some discussion and technical

21    assistance on strengthening the administration of APD

22    Training Academy.

23            Just parenthetically, I welcome Cdr. Byrd as

24    well.  I just reviewed her first work product and it was --

25    it truly was the first training design piece that I've

1    reviewed from APD that complies to professional standards

2    and professional process.  And kudos to her and her people

3    for pulling that together.  It was really quite well done.

4    So I think that's going to make a major difference in terms

5    of where we move, moving forward.

6          We provided quite a bit of discussion and

7    consultation on addressing the use-of-force backlog.  That

8    is still an ongoing process.  We provided some -- the same

9    sort of conversation and structuring on the Force Review

10   Board and training processes.  We also provided to the

11   Special Operations Division some fairly intensive and

12   wide-reaching consultation on less-than-legal-force options;

13   how those are defined and how they're trained and, actually,

14   even how they're delivered.  And then we spent quite a bit

15   of time during that last part of the last reporting period

16   working with APD on global issue identification -- you know,

17   what are the burning issues, we basically walked through

18   those 12 already -- and then our recommendations for how

19   they might move forward.

20         So it was a pretty intensive and extensive

21   process.  We received good receptions on virtually all of

22   the discussions that we had.  APD continues to be in the

23   harness and pulling hard to move forward.

24         THE COURT:  Dr. Ginger, you indicated one item of

25   concern, what you've described as the "counter-CASA effect."

1    And you said that this particular group you've identified

2    are not committed to the process.  I think that was what you

3    said just a moment ago, but I'm concerned that -- is it

4    they're just ambivalent to the process or are they

5    undermining the process?

6              DR. GINGER:  Well, they are certainly ambivalent.

7    Based on my experience in these projects, that ambivalence,

8    alone, because they're -- the ones I'm speaking of are in

9    critical areas, and that ambivalence, alone, will give rise

10   to exactly the sort of issues that we've seen in the past at

11   the training Academy.  So while it's not overt, you know,

12   there's nobody sabotaging computer files or that sort of

13   thing, it's a sort of a low-level processing, but

14   nonetheless, it has an effect.  It has, I think, a direct

15   and substantive effect.  It's the critical issue I see with

16   APD at this point.

17             THE COURT:  And you've talked with command staff

18   about this.  I think if this came up at the prior status

19   conference, I wasn't here, as you recall, but I'm just

20   curious to know how this comes to your attention and what

21   sort of reaction you get when you have brought it to the

22   attention of command staff.

23             DR. GINGER:  It came to my attention through

24   protracted issues over the past year, I guess, maybe a

25   little bit less than a year.  You know, the same sort of

1    issues we had before Chief Geier and his crew came in, we

2    found again after Chief Geier and his crew came in.  And it

3    was directly -- those issues were directly associated with

4    the same people that we had had problems with before.  I had

5    a conversation with the Chief.  I don't think that was any

6    news to him, but you know, given the fact that these folks

7    have civil service protection, his choices are limited at

8    this point.

9            THE COURT:  Well, that's got me scratching my

10   chin.  We've got a group you've identified as people that

11   are at least ambivalent and obviously not a positive part of

12   moving the process forward, even if they aren't actively

13   undermining it, but there isn't anything to be done about

14   that ambivalence.  There isn't anything -- because of their

15   protection, we're just left to -- how do you deal with that

16   in systemic reform?  You've bound to have run into something

17   like this before.

18           DR. GINGER:  Sure.

19           MR. MOWRER:  Your Honor, I hate to interrupt.

20   Just very briefly, this is Fred Mowrer, APOA.  This the

21   first I'm hearing of this issue concerning what has been

22   listed as a critical issue -- "counter-CASA group"? --

23   obviously involving employees of the Department.  And I'm a

24   little troubled that this is the first I'm hearing about

25   this.  And would like to be part of some conversation as;

1    soon as possible, I guess, with the City, Dr. Ginger, City

2    Attorney, the Chief with regard to what this is all about,

3    this group and what is being done to address this.

4           THE COURT:  And I think that's fair comment,

5    Mr. Mowrer.  And I expect that you and the Chief and

6    Dr. Ginger and anyone else necessary to the conversation

7    will have that conversation when we're through here this

8    morning.  It's the first I've heard of it.  And if it's the

9    first you've heard of it, that's even more concerning.

10          So Dr. Ginger, with that directive, I'll ask that

11   you-all meet immediately afterward and discuss this, but

12   just in more general sense, how do you deal with

13   recalcitrance in the ranks when you've got civil service

14   protection?

15          DR. GINGER:  It's fairly straightforward, Your

16   Honor.  Just to correct the record, we did mention this in

17   our second mini report that went out to the parties.  It was

18   included in there as one of the major issues that we saw APD

19   confronting, so it should -- it should be -- it should be a

20   term that is familiar with folks.

21          The process of addressing that is the old tried

22   and true method of oversight and supervision.  And we have

23   two or three people who, while they may not be directly

24   disobeying orders, are somewhat slow to move along, and

25   that's just a matter of supervision, consultation,

 1    notification, continued review of their work product.   And

 2    then, if it continues to not meet standards, then something

 3    needs to be done through a disciplinary process.

 4           So it is addressable.   They addressed it at New

 5    Jersey State Police.   They addressed it at Pittsburgh.

 6    Eventually, they addressed it at Los Angeles.   This is not

 7    an irreconcilable issue, but it is an important issue.   But

 8    it was in our second mini report that we produced to the

 9    Court.   It received specific notations in that report.   I've

10    had conversations with the Chief about it prior -- prior to

11    this.   And I think he's familiar with what we're talking

12    about.   So I've been working with PD on this for quite some

13    time and it's been reported.

14           THE COURT:   And is APOA and Mr. Mowrer, are they

15    on the circulation list for that -- the mini report?

16           DR. GINGER:   Yes, sir.

17           THE COURT:   All right.   I'm still going to ask

18    that you-all meet and talk about this just so that everybody

19    is up to speed when we conclude here.

20           DR. GINGER:   Yes, sir.

21           THE COURT:   Thank you.

22           MALE SPEAKER:   Your Honor, Chief Geier has a

23    brief comment, as well.

24           CHIEF GEIER:   Your Honor, again, after

25    discussions with Dr. Ginger, even before that, we noticed

1    some of that -- again, some of those problems that were

2    being identified basically were at the higher level.  And

3    they weren't just in the membership of the APOA, but some of

4    the unprotected positions at commander and whatnot that we

5    identified problems and, again, some of that resistance that

6    carried over from a previous administration, I believe.

7               We have made changes.  Some of those people have

8    been removed from those positions, as well as being replaced

9    by other people who have picked up the slack.  Because I

10   think the word got down to the lower levels, the sergeants

11   and lieutenants, it was a matter of loyalties to previous

12   commanders or a matter of miscommunication in terms of the

13   where the direction the Department was going, trying to go

14   forward with the CASA, and there was still some old-school

15   resistance.  So we are on top of it at the higher levels.  I

16   think we've made some significant changes, Cdr. Byrd being

17   one of those people that stepped up and addressed some of

18   deficiencies, even with her own people that had

19   miscommunications from previous command staff.  So it isn't

20   something we're not aware of, as you have implied, yourself.

21   It is something that is deep-seated and is a little harder

22   to find a quick fix or solution to it, but I think, in the

23   long term, by having this foundation with new leadership and

24   a new direction from the top down, we should be able to get

25   through this and survive it.

1          Thank you.

2          MS. MARTINEZ:  Your Honor, Elizabeth Martinez.

3     DOJ would like to participate in this dialogue.  Thank you.

4          MR. KILLEBREW:  Yes, Your Honor.  This is Paul

5     Killebrew, just very briefly, for purposes of the record,

6     this thing that Dr. Ginger has been speaking of, he

7     discusses it in Document 398 on the court's docket at

8     page 10.  And a draft of this document, which is

9     Dr. Ginger's mini report, was provided to the comments --

10    provided to the parties, in advance of being filed, for

11    review and comments.  And we all had an opportunity to read

12    it and comment on it prior to it being filed.

13         Thank you, Your Honor.

14         THE COURT:  Yes, sir.  Thank you.

15         And Chief, I appreciate the positive comment.

16    I -- and I guess this is not anything that should surprise

17    us or take us -- catch us off guard, but it's...it's on

18    everyone's radar now, and I'll expect to hear an update in

19    subsequent status conferences.

20         Chief Garcia, Lt. Lowe?  How about we hear about

21    the Compliance Plan?

22         D.C. GARCIA:  Good morning Your, Honor.  This is

23    Deputy Chief Garcia.  The Compliance Plan, as you know, ran

24    from February 1st through July 31st of this year.  Of

25    the 91 tasks that we had on our Compliance Plan, 88 of them

1    were completed.  Three weren't completed and they will be

2    carried over to our next Compliance Plan that we are

3    composing currently.  The three areas that we need to carry

4    over, two of them are related to the Video Review Unit and

5    it's basically hiring and training that personnel.  And the

6    third one is from the Force Review Unit.  We have

7    Lt. Jennifer Perez currently working on the Force Review

8    Board process.  And we're needing to revamp that, thanks to

9    a lot of comments and -- from Dr. Ginger and his team --

10   it's helping us to revamp that process completely, so we can

11   make it more productive, Your Honor.

12             THE COURT:  Thank you.

13             And anything from Lt. Lowe?

14             D.C. GARCIA:  No, Your Honor.  She is currently

15   on vacation.

16             MALE SPEAKER:  Oh, man.

17             THE COURT:  Well, good for her.

18             D.C. GARCIA:  Well-deserved vacation.

19             THE COURT:  All right.  Anything else on this

20   Item 2?

21             I obviously read the numbers.  88 of 91, that's a

22   great percentage completion rate.  I understand the comment

23   about the three uncompleted tasks rolling over, so I see

24   that as significant progress and appreciate it.  I think the

25   Compliance Bureau is going to be one of the real positive

1   upgrades to our system that's going to serve us well going

2   forward.

3             Number 3, Cdr. Campbell, you're going to give us

4   a report on the -- well, Item 3?

5             CDR. CAMPBELL:  Good morning, Your Honor.

6   Michelle Campbell, and I wanted to update you on our eighth

7   progress report that was filed through the courts on

8   September 1st; one of which I wanted to just make sure the

9   Court was aware that we did change up the way we did the

10  progress report just a little bit.  At the beginning, we

11  make sure to let the reader know that we took -- that APD

12  and our new administration took key steps to strengthen APD

13  reform efforts; one of those being actually starting the

14  Compliance Bureau and bringing in the resources needed in

15  order to reach all the demands of the CASA recommendations

16  from the IMRs and everything else that goes along with

17  making sure that we're doing a very good job.

18            The report was also organized in ten sections as

19  formatted with the CASA because we wanted to make sure the

20  reader could follow exactly what we were doing when we were

21  laying out the progress report.

22            The other thing that we did with this progress

23  report is we added multiple links for the documentation.

24  That way, our readers could be more aware of the links that

25  APD has where all our information is stored.  And we do our

1    best to make sure that everything is updated and is current

2    on those links.  Also to kind of save the Court from having

3    a whole bunch of different reports added to the progress

4    report.

5              The Compliance Division also -- oh, we also

6    included five appendices to the report, which you'll find at

7    the end, which is the Compliance Division Work Chart.  And

8    D.C. Garcia also just gave you an update of where we were

9    with the Compliance Plan.

10             The APD audit schedule -- and as you'll see, it

11   is subject to change.  If APD sees a bigger concern, we'll

12   go ahead and change the audit schedule to reflect that.

13   That was one of the major things that APD did bring during

14   this progress time period is we started the Performance

15   Matrix Unit, which is doing the audits of the CASA-related

16   paragraphs to see where we are -- see where we're at and to

17   keep us going in the right direction.

18             The other thing that you will see, Your Honor, is

19   that reference to the IRS systems.  APD was able to put a

20   lieutenant in charge of revamping that section and really

21   taking care of the paragraphs and all of the recommendations

22   with the IMRs.  And they have changed the name to "Personal

23   [sic] Management Education and Development System."  And

24   there's a draft in there for you to see.  Again, it's going

25   through all of the approval processes.  And they are

1   updating the policy and having that go through the 3-52

2   pros- -- progress, as well -- process, as well.

3          Do you have any questions or was there anything

4   that you saw in the progress report that you'd like me to

5   answer, sir?

6          THE COURT:  No, thank you, Commander.

7          Dr. Ginger, you've looked at the status report

8   from the City.  Any comment?

9          DR. GINGER:  I think it shows steady progress,

10  Your Honor.  And I would much rather that steady progress

11  than, you know, stellar progress here, stellar progress

12  there, and then other areas leaving a lot to be desired.  So

13  I concur with your opinion that the Compliance Bureau is

14  going to be a major piece of this project moving forward.

15  The quality of their work has been absolutely spectacular

16  over the last six months.  Everything we get from them

17  survives both assessments of both internal and external

18  validity.  It's easy to read.  There are no hidden -- hidden

19  corners that you have to seek out.  It's a very well run and

20  integral part of this compliance process.

21          THE COURT:  Well, Dr. Ginger, I think that may be

22  a new high in terms of praise.  I don't think "absolutely

23  spectacular" has been -- that particular phrase has been

24  used before.  So congratulations to the City and those

25  involved at the Compliance Bureau, particularly Chief

1    Garcia.

2              Anyone else on the City's progress report?

3              CDR. CAMPBELL:  Thank you, sir.

4              THE COURT:  Yes, ma'am.  Thank you.

5              Number 4 is an update on the Use-of-Force

6    investigation backlog.  Commander Middleton, I'm glad to

7    hear from you.

8              CDR. MIDDLETON:  Yes, sir.  I think, in front of

9    you, you have the project status report.  That's what we're

10   updating once a week right now.  It shows we have 24 cases

11   closed in policy.  18 cases are at the detective level and

12   14 cases are at the sergeant level.  That means that the

13   detective has completed the case and that the sergeant is

14   checking it for accuracy.  We have 24 cases closed in

15   policy.  But what's changed from this status report from the

16   last one is that, prior to this, we had 5 cases closed out

17   of policy.  But what we did is we put it through an -- and

18   considered it still under investigation.  And what you'll

19   see down towards the bottom of the page, it says "Cases

20   initially found to have force out of policy."  There's five

21   case numbers listed there.  We are changing what we're doing

22   in the process now and some perhaps haven't had a chance to

23   review this, but we've put together PINS and identified the

24   problems, issues, needs, and solutions of how the we're

25   going to deal with those out-of-policy cases and how we can

1    hold officers and commanders accountable.

2         What we're going to do is target the officer to

3    come in for an interview while still protecting them under

4    their collective-bargaining agreement and conducting the

5    interview and forwarding the case to Chief Geier.  That way,

6    every officer will be -- officer, sergeant, lieutenant, and

7    commander will be brought in to discuss what happened in the

8    out-of-policy event, to bring them up to speed, correct

9    behavior, prevent future errant behavior, and change the

10   officers' conduct one at a time.

11        Additionally, for the officers and chain of

12   command who aren't found in the backlog process, we're

13   collecting all of the trend data through this backlog

14   process and we'll be forwarding that off to Cdr. Byrd for a

15   needs assessment to train future use-of-force training in

16   that process.

17        I know that you'll see the numbers on there.  We

18   have 24 use-of-force cases, in policy, closed.  You'll see

19   three cases, show-of-force, that are closed.  And one

20   serious use-of-force case.  The total on the second page

21   still shows 24.  And the reason for that is the overlap.  On

22   the use-of-force cases, they included three shows of force.

23   So they're separated out so you can see it, but it's still

24   one case number.  The serious use-of-force case is included

25   in that as well, because there is some overlap to

1    show-of-force.

2         Two of our cases that we looked at so far could

3    have been considered criminal conduct by the officers.  And

4    we did forward that through our criminal investigators to

5    have the discussion with the District Attorney's Office.

6    And we have received declination letters back on those two

7    cases so far.

8         And I know Dr. Ginger, the DOJ, and the APOA has

9    had a chance to look at this.  They provided me feedback and

10   I made the changes to the project.  So we're going to go

11   over that and then submit it once again for approval before

12   we start targeting officers in for interviews.

13        And I stand for any questions that you have.

14        THE COURT:  Yes, sir.  Commander, first of all,

15   it's a problem that -- you know, it's a big problem, has to

16   be addressed.  I appreciate that you're doing it in a

17   methodical, professional way.  But do you have all of the

18   resources you need to accomplish this working through the

19   backlog?

20        CDR. MIDDLETON:  We have the resources we need.

21   And like you said, it's a complicated process.  So we do

22   foresee us completing this.  You know, it's not going to be

23   done tomorrow or by the end of 2018, but we do have the

24   resources to do this.  We have separated out the work where

25   our investigators will be sending out the target letters and

1    they'll be doing the interviews of the officers.  And to

2    task out the work, I just got assigned a Force Investigative

3    Section lieutenant.  And he will be doing the interviews of

4    the sergeants and lieutenants.  I'll be calling the

5    commanders in and having a discussion with them.  And all of

6    this will be funneled into the Chief of Police where he'll

7    have the final decision.

8              THE COURT:  And I have -- in reviewing for this

9    morning's status conference, I saw a reference to 17 hours

10   per, average 17 hours per investigation to clear something.

11   And then I saw another reference to 20-hour average.  Can

12   you help me with that?

13             CDR. MIDDLETON:  Yes, sir.  There's -- we did

14   a -- basically, a metrics on how long it takes to review the

15   case and all of the evidence, the time spent on reviewing

16   video.  We have a data form and a narrative form and then

17   the entire investigation.  A lot of the times are skewed, so

18   we're throwing out highs and lows.  That's where you're

19   seeing a few different numbers there.  On a serious

20   use-of-force case, we've had one out on a detective level

21   for approximately a month, but we also have those

22   shows-of-force that take probably less than a day to review.

23   So we'll throw out those highs and lows, but the average

24   that we're looking at right now is on the bottom of the face

25   sheet where it shows 22.6 hours per case.  And to date, we

1    have 40 -- of 49 cases reviewed, we have the time logs

2    turned in.  And it's taken 1,107 hours to look at those 49

3    cases.  And that doesn't mean those 49 are closed.  They're

4    still -- some of those are still at the sergeant level.

5              THE COURT:  All right.  That's --

6              CDR. MIDDLETON:  I don't know if that answers

7    your question or not.  I know that was just a lot of hours

8    that I threw at you.

9              THE COURT:  Thank you, Commander.  That's

10   helpful.

11             Any -- Dr. Ginger, any questions for the

12   commander?

13             DR. GINGER:  No, sir.  We've found his work of

14   late to be certainly acceptable and to meet any standard

15   we've even just discussed with him, let alone given him

16   written notice on.  So I think that's another high point in

17   the process.  I will echo his concerns about the volume of

18   the work and the number of people assigned to deal with it,

19   but you know, these folks keep plugging along.  We keep

20   seeing new cases come through as cleared.  We have no

21   problems with quality of their work at this point.  So at

22   this point, I think APD is doing about the best job it could

23   do in trying to work through this backlog.

24             It's a complicated issue, I guess, is the best

25   way to put it, because a backlog case has tentacles that

1    reach well beyond was the force acceptable or not and get

2    into issues like the Union contract and discipline and so

3    forth.  But the unit is -- it is producing and it's

4    producing quality work.

5           THE COURT:  And just to keep me clear, Commander,

6    this is just the backlog, and the -- we're reducing the

7    backlog steadily.  We're keeping up with current cases

8    involving the three separate categories.  Is that right?

9           CDR. MIDDLETON:  We don't have the categories of

10   force yet in the three levels, as are noted in the joint

11   stipulation.  We still have serious use-of-force cases

12   coming into our Cert. Unit, and then everything else is

13   reviewed within the chain of command.  But we are keeping up

14   with that.  We did make a change since I've been there.

15   Previously, in the Cert. Unit, we had all sergeants staffing

16   that unit.  And since I've been there, they all went back

17   out in the field to do Uniformed Field Services Bureau work,

18   and I brought in officers to do that level work in the Cert.

19   Unit.

20          THE COURT:  Thank you.

21          Anyone else with questions or comments about the

22   use-of-force backlog?

23          MR. MOWRER:  Yes, sir.  This is Fred Mowrer on

24   behalf of the APOA.  The Department has submitted, within

25   the last week, a package of information concerning how

1    they're looking at the backlog of use-of-force cases.  The

2    issue, as Dr. Ginger just referred to, that may impact this

3    issue with regard to the APOA's position and where this goes

4    will be how these cases are dealt with in a concept of

5    discipline, and the APOA has -- because of the contract

6    limitations on being able to impose discipline, has

7    responded to the City with regard to our concerns with their

8    proposals.  And we are, hopefully, working with the City on

9    trying to resolve our concerns.

10              THE COURT:  Thank you.  Thanks, Mr. Mowrer.

11              Anything else?

12              MR. KILLEBREW:  Your Honor, this is Paul

13    Killebrew for the United States.  Just very briefly,

14    Cdr. Middleton didn't mention one thing that his unit is

15    doing, I think, worth the Court knowing about, which is

16    that, as they're reviewing these use-of-force cases, if

17    they're identifying issues that represent a problem for

18    policy or training or tactics, they're noting all of that

19    and making sure that they're, you know, carrying forward

20    those concerns into the appropriate units, whether it is the

21    Academy or the policy board.

22              You know, when we've spoken about the backlog

23    with the Court before, we've always pointed out that our

24    concern about the backlog is that it will make it difficult

25    for APD to eliminate the pattern or practice of

1    unconstitutional uses of force because these represent cases

2    in which they're not going to be able to impose discipline

3    if the use of force violated policy.  So we are encouraged

4    that they're doing basically everything else that they can

5    to learn from these cases and use them to improve the

6    agency.

7              THE COURT:  Thank you, Mr. Killebrew.  And yeah,

8    it's plain that this problem -- well, a systemic problem

9    that the lingering effects -- and we've got to work through

10   them -- but with Cdr. Byrd raising up a whole new group of

11   cadets, proper training, at some point, we hope the backlog

12   goes away and we've got a police force in compliance.

13             I'm encouraged that we're making progress.  I

14   appreciate the City's having designated an appropriate level

15   of resources to deal with the issue.  And I look forward to

16   lots of reports going forward, Cdr. Middleton, that work

17   toward the elimination of the backlog.

18             The fifth item on the agenda, the use-of-force

19   review and development process.  Mr. Schmehl?

20             MR. SCHMEHL:  Yes, Your Honor.  Good morning.

21   I'll be providing an update on the status of the

22   Use-of-Force Policies as they've worked their way through

23   the anticipated process set out in Document 376, which was

24   filed with the court on June the 2nd.

25             SOP 2-52 is a general use-of-force policy that

1    was subject to the meetings with the parties and the monitor

2    in the beginning.  It was then presented publicly at the

3    Office of Policy Analysis.  There was a second presentation

4    to sworn personnel of that in an open meeting as well.  And

5    where we stand, Your Honor, after, again -- the last actual

6    checkpoint in that process was an August 24 special meeting

7    called by the Police Oversight Board.  At that point in the

8    policy development process, the Policy Procedures Review

9    Board had taken place, so there was something of a final

10   draft that had been submitted.  And the parties and monitor

11   had also commented on it.  So the City was in a position to

12   prepare a resolution draft for the monitor.  And the

13   comments from the community at the Police Oversight Board

14   were taken into consideration.  And a draft was presented to

15   Dr. Ginger for 2-52, the general Use-of-Force Policy on

16   September the 4th.  We're anticipating comments back -- or a

17   resolution, rather, back from Dr. Ginger on the 19th of

18   September.

19          The City does have now 2-53, which is the Use-of-

20   Force Definitions section.  And a draft considering the

21   comments from the monitor and parties will be sent out to

22   Dr. Ginger for him to resolve.

23          2-54, which is intermediate weapons and then

24   2-55, which is the new deescalation policy, are to be

25   commented back to the City by the monitor and parties on

1   September the 14th, 2018.

2                Your Honor, you will recall that the purpose of

3   this effort to discuss not only with the parties and the

4   monitor, but also with the community, all of these policies

5   to make sure -- and actually, Your Honor, may I take a step

6   back.  I left out 56 and 57, which 56 is the use of force

7   reporting policy and then 57 is the review and investigation

8   policy as it concerns use of force.  Last week, there was a

9   meeting to discuss those two matters that was held between

10   the monitor and the parties.  As I was saying, Your Honor,

11   the purpose at the beginning of this effort which started

12   the beginning of June was to make sure that the community

13   was brought along.  This is the first time in this process

14   where there have been public presentations of any policies,

15   let alone the Use-of-Force Policies.  So all of those

16   policies that I've mentioned have been presented publicly

17   save for 2-53, which the Police Oversight Board felt was a

18   bit too technical for a public discussion.

19                Now, last week at the meeting with the monitor

20   and parties, 56 and 57 were discussed, as I mentioned.

21   During that meeting, the fact that 52, the general

22   Use-of-Force Policy, had not been resolved was discussed and

23   noted as a concern.

24                So those policies, Your Honor, are moving through

25   the process anticipated by Document 376, which, then, brings

1    us to, of course, the training.  In that filing and in the

2    order that followed, in 377, the deadline to review the

3    Use-of-Force Policy was September the 21st.  However, the

4    deadline to obtain -- for the City to obtain approval of the

5    training was October the 1st.  The City anticipates filing a

6    motion to extend that deadline.  It's unworkable.  At the

7    time that that filing was made, the Academy was working with

8    different leadership.  And of course, that filing was

9    informed by that leadership, but now, we have Cdr. Byrd, the

10   Department has Cdr. Byrd.  She has been working diligently

11   to start -- in the background, of course, because training

12   cannot be delivered until a final approved policy is on her

13   desk -- to pull together training for every one of these

14   policies.  And then also there's, in the background of those

15   trainings, the RBT and other types of use-of-force concerns

16   for Department personnel.

17           So that is my update, Your Honor.  Of course, the

18   most notable concern is the fact that the October 1 deadline

19   for the approval of the training by the independent monitor

20   will be missed; however, there have been discussions with

21   the monitor and parties about those concerns.  We feel like

22   we do have a meeting of the minds, that this is not to be

23   rushed, as it was in the first iteration of the training,

24   which has been highly criticized by Dr. Ginger and his team.

25           THE COURT:  Thank you, Mr. Schmehl.

1           Mr. Killebrew?

2           MR. KILLEBREW:  Thank you, Your Honor.  I don't

3    have much to add to what Mr. Schmehl said.  I just wanted to

4    emphasize that I believe, as Mr. Schmehl does, that we're

5    going to have to extend those deadlines that we set for

6    getting policy and training done, but I think that they're

7    for good reason.  And Your Honor may remember that the

8    initial Use-of-Force Policy we did in this case took quite

9    some time, like 12 to 18 months, as I remember, to get

10   completed.  And the reason it took so long was that the City

11   essentially wanted to renegotiate the terms of the CASA and

12   the draft of the policy, and it just took a long time to

13   work through that.  And in this instance, that's not what

14   we're looking at.  We're not seeing the City trying to pull

15   back on its commitment that way.  What we're seeing is a

16   much more open, transparent, and democratic process for

17   developing the policy where a lot more stakeholder input is

18   being invited and solicited and considered.  I can just tell

19   the Court that the Police Oversight Board has had two public

20   meetings just on Policy 2-52, the core Use-of-Force Policy.

21   And I attended the first one and watched the video of the

22   other one.  And it was -- in my mind, it was a sign of a

23   great success in this case because you had, across the

24   meetings, dozens of members of the Albuquerque community

25   speaking to their civilian oversight board with substantive,

1    meaningful comments about the Use-of-Force Policy and then

2    you had board members who had spent a lot of time studying

3    the policy giving their perspective on what APD should or

4    should not do.

5          You know, when we established these institutions

6    at the beginning of this case, I think we all hoped that

7    they would work.  And to me, this was a sign that they are

8    working, that the public does have a real place to speak.

9    And I think people are incentivized to show up to these

10   meetings and speak because they know that APD and the City

11   will be listening to them and considering what they say.

12         So if things are going to take a little longer to

13   make that happen, I think it's well worth the investment of

14   time.  And it's setting the tone and the course for policy

15   development at APD going forward.

16         THE COURT:  Thank you, Mr. Killebrew.

17         And I, just so you-all are -- you know, for those

18   of you that are keeping score, I complimented Dr. Ginger a

19   minute ago when he described something as being "absolutely

20   spectacular."  And Mr. Killebrew has just said that one of

21   the police oversight meetings had been a "great success."  I

22   like hearing those things.  And I understand there's still a

23   lot of activity down in the weeds, but I certainly liked the

24   positive comment.

25         Mr. Mowrer, you're next relating to the

1    use-of-force review process.

2              MR. MOWRER:  Yes, sir.  And I'd just add very

3    briefly, on behalf of the APOA, we are working with the

4    parties there trying to finalize these policies, as

5    described by Mr. Schmehl, and are waiting -- I think the one

6    policy we're waiting on is 2-52 from Dr. Ginger and his

7    comments.  And agree that, with the time that it's taken,

8    probably that the October 1st, 2018, deadline may not be

9    doable, especially when you have a new director at the

10   Academy.  But we'll wait and see how this all turns out.

11             THE COURT:  There's been reference to that

12   October 1st deadline and the likelihood that it's not

13   going to be met.  Can we -- with we reasonably come up with

14   a different deadline, a later deadline, that makes sense for

15   everyone and we can work toward it?

16             MR. SCHMEHL:  Yes, Your Honor.  That's exactly

17   what's happening, Your Honor.  As we've -- as we, the

18   parties and monitor, have come to the recognition this first

19   deadline was not reasonable, we started discussions.  And

20   that was last Thursday, really, the first discussion of that

21   sort took place.  So while I cannot provide you one during

22   this call, we will be working to get you one as soon as

23   possible.

24             THE COURT:  Dr. Ginger?

25             DR. GINGER:  Yes, sir, Your Honor.  I hate to be

1    the one to rain on the parade, but I just simply have to

2    report the facts.  I received the latest use-of-force

3    document, 2-52, from the parties last week.  I found it

4    lacking in multiple key aspects.  It was missing key

5    components.  Issues that needed to be dealt with in a

6    Use-of-Force Policy were not dealt with.  I had questions

7    about enforceability.  So I'm working on writing the

8    resolution document.  I got the final comments pulled

9    together and started on that Thursday, I guess; worked all

10   day Thursday, all day Friday, and through the weekend.  I

11   have the resolution document in draft form.  I'm going

12   through it now, correcting misspellings and editing and that

13   sort of thing.  I found it necessary to basically rewrite

14   the policy.  There were, at last count, 50-plus changes that

15   I saw as needing to be made.  So it's been a fairly complex

16   process.  Those have been made.  They're in draft form.  As

17   soon as I finish proofing that draft, it will go out to the

18   parties immediately.  So I would expect something probably

19   by no later than Wednesday on that resolution draft.

20          THE COURT:  And given your knowledge of the

21   process, what is a reasonable, workable new deadline if

22   October 1st doesn't work?

23          DR. GINGER:  Well, it depends on what the process

24   is for dealing with that resolution draft.  And I really --

25   I really have no idea at this point how it's going to be

1    received by the parties.  It was -- it was executed to

2    correct those 50 changes that we noted that needed to be

3    made.  It was executed to be congruent with the policy -- or

4    with the CASA, I'm sorry.  And it depends -- quite frankly,

5    it depends on the reaction of the Department of Justice, the

6    City, and the Union as to how long that's going to take.  I

7    would not be surprised if this is -- you know, depending on

8    what the rule is for what happens to a resolution draft, if

9    we're going to go through the same process as we went

10   through before, it could be weeks.  If it is, indeed, a

11   resolution draft, you know, according to the CASA, if the

12   parties are unhappy with it, they need to advise the Court

13   and get a ruling.  When it goes out of here, I'll be

14   comfortable with it as reflecting best practices in the

15   field and reflecting the type of policy that APD needs to be

16   working with on use of force right now.  But obviously, that

17   has to go through the parties, and my guess is it might be

18   revisited by the Court.

19            THE COURT:  All right.  I don't like slippage.  I

20   don't like deadlines being missed, as you all know by now,

21   well know, I expect.  I -- just so as to keep the pressure

22   on, I'm going to suggest a generous extension to

23   October 31st.  And if it's not done by then, I want to

24   know why and I'll expect motions practice.  Clear enough?

25            MR. MOWRER:  I'm sorry, Your Honor.  This is Fred

1   Mowrer.  What was that date?

2              THE COURT:  October 31st.  Any other comment

3   about the Use-of-Force Suite of Policies?

4              All right.  Number 6, status report of mediation

5   of complaints under the pilot program.

6              Mr. Harness and Mr. Ryals?

7              MR. HARNESS:  Good morning, Your Honor.  Edward

8   Harness from the Civilian Police Oversight Agency.

9              Upon the Court's signing of the order in May, I

10  met with City of Albuquerque's Alternative Dispute

11  Resolution Section, which facilitates the community

12  mediation program.  I met with Tyson Hummell, director, and

13  Shannon Tripplett, the administrator, and we set up

14  protocols and procedures for contacting the parties,

15  facilitating the mediation sessions, and then distributing

16  the exit surveys for the process.

17             We've had four cases referred out to mediation.

18  All of those cases were closed due to a lack of cooperation

19  on behalf of the complainant.

20             THE COURT:  I'm sorry, Mr. Harness.  I didn't

21  understand.  They're closed for what reason?

22             MR. HARNESS:  The complaining civilian declined

23  to participate in the process and requested an informal

24  counseling with -- through the command for the officer's

25  behavior.  So we referred it to the command for an informal

1    dispute resolution.

2              We had two cases where the officers were deemed

3    to not be eligible for mediation based upon the criteria set

4    out in the Memorandum of Understanding.  And because of this

5    lack of cooperation on behalf of the complainants, in this

6    next series of referrals, which I have seven, I have reached

7    out to them by sending them a mediation brochure and letting

8    them know to expect contact from City ADR to see if that

9    will help facilitate better cooperation on behalf of the

10   complainants.

11             Other than that, I would stand for questions if

12   the Court or any other parties have any questions.

13             THE COURT:  Thank you, Mr. Harness.

14             Mr. Ryals?

15             MR. RYALS:  Yes, Your Honor.  We don't have any

16   further comments.  Thank you.

17             THE COURT:  Mr. Harness, if I can circle back to

18   you, so am I hearing that there's a high percentage of those

19   complaints that are made that people are not interested or

20   sufficiently motivated to pursue mediation when it's

21   offered?  Is that what I'm hearing?

22             MR. HARNESS:  Yes, Your Honor, that's been the

23   reaction so far.  And where sort of the rub is, is that our

24   oversight ordinance for the City of Albuquerque requires

25   mediation first, so for those types of calls -- complaints

1    that come in that are deemed to be suitable for mediation,

2    the ordinance would require those -- along with the MOU, for

3    those to go to mediation first and explore that remedy.  And

4    so far, we're having a lack of cooperation on behalf of the

5    citizens.

6           THE COURT:  Dr. Ginger, do you have any

7    experience with this mediation process and is this a result

8    to be expected?  These are -- these are not major

9    complaints.  These are not use-of-force complaints, right?

10   Those wouldn't qualify for the process?

11          DR. GINGER:  That's correct, sir.

12          THE COURT:  So did you have --

13          DR. GINGER:  I'm sorry.  Go ahead.

14          THE COURT:  I was just going to ask if this is

15   something you would expect, given your experience, in terms

16   of lower-level complaints, people just -- when they're

17   offered mediation or required to attend mediation, do they

18   simply give up at that point or...

19          DR. GINGER:  I don't have direct experience, Your

20   Honor, but I am familiar with the literature.  And that is a

21   common theme in the literature, that particularly when these

22   processes are new and particularly, as in this case, the

23   original complaint was a substantial period of time has

24   elapsed since the original complaint was filed, that is not

25   unusual.  It usually takes these things months, if not

1    years, to get to become part of a routine process.  And

2    that's usually accomplished only when you have enough folks

3    who are willing to go through the process and go through the

4    process and are reasonably satisfied with it and feel like

5    their issue has been resolved that, you know, the numbers of

6    people willing to go through the process go up and

7    efficiency improves, but it does take -- it does take time,

8    a couple of years, in most cases, before it's a meaningful,

9    workable, relied-upon process.

10            THE COURT:  Mr. Harness, is there any sort of

11   public reporting of the availability of mediation, and

12   perhaps leaving parties' names out of it, allowing for

13   anonymity, but letting people know that the process exists

14   and the process is responsive and good things happen?  I

15   mean, is there any sort of educational component for the

16   community to understand its availability and the likelihood

17   of a positive result?

18            MR. HARNESS:  Yes, Your Honor, we are continually

19   promoting the program in public outreach.  We also have

20   developed a brochure explaining the process for those that

21   are involved.  We have a brochure that goes to the

22   complainant, and we also have a mediation guide that goes to

23   the officers.  We have had 100 percent cooperation from the

24   officers' side.  We have not had the cooperation from the

25   civilian side.  The only point I would make is that we

1   are -- we are -- we are making this outreach to these

2   complainants within about seven business days from the time

3   that we get the complaint, so they are rather fresh.  And we

4   are making this available.  So we'll continue to do the

5   outreach and we'll try to tailor the program to garner as

6   much public participation as we can.

7             THE COURT:  Thank you.

8             And yeah, please do that and keep me posted.

9             Number 7 is the update on the promotional policy.

10            Ms. Hults?

11            MS. HULTS:  Good morning, Your Honor.

12            THE COURT:  Good morning.

13            MS. HULTS:  The City wants to thank you and the

14   court for making such a very quick ruling on our various

15   motions on this policy.

16            Right now, Mr. Mowrer and I have been discussing

17   the rulings, particularly page 5, which talks about Section

18   11(a) and amends that provision to make that section

19   discretionary.  The City has sent a proposal to the APOA on

20   that provision.  There may be some miscommunication, I

21   think, and Mr. Mowrer and I probably need to sit down and

22   talk about that, but basically the City is proposing that as

23   the Court suggests that section is -- would not be

24   discretionary for a period of time.  And if you look at some

25   of the disciplinary issues that the APOA may be concerned

1    about, including some issues put -- or disciplinary issues

2    that may have been something that was a result of Chief

3    Eden.  Chief Eden actually retired in November of 2018

4    [sic].  Section 11(a) requires that --

5                THE COURT:  Ms. Hults, you said "November of

6    '18."  It's obviously '17.

7                MS. HULTS:  Sorry.  '17.  Sorry.  And that

8    basically Section 11(a) requires that you look back 12

9    months from the date of the written exam.  And so actually,

10   where the 2018 date was coming is most of the disciplinary

11   issues of, you know, Chief Eden that would affect that

12   section would come to an end in 2018, in November.  And so

13   we were proposing that Chief Geier have discretion and look

14   at those 40-hour suspensions whenever there is a promotional

15   process up until that point or even beyond that point, if

16   the Union felt that that was necessary, and come up with a

17   sunset provision date for that.

18               We would like to get this agreed upon and moved

19   as quickly as possible because, after we have that agreed

20   upon, this is one of those policies that requires

21   rule-making through the City of Albuquerque because it's a

22   human resources policy.  And the City is ready to move

23   forward with that.

24               I believe the City has recently learned, anyways,

25   that the Union does plan to file a motion to reconsider.

1    And I'll let Mr. Mowrer kind of talk a little bit about

2    that.

3              THE COURT:  Mr. Mowrer?

4              MR. MOWRER:  Sir, with regard to Ms. Hults'

5    explanation of the sunset provision that you provided, we do

6    need to meet about that.  I did send her communication

7    concerning that.  We've not been able to sit and talk.  This

8    week would be best if we do because I'm still a little --

9    even with this most recent explanation, I'm still a little

10   confused as to how she's proposing it applies.

11             And with regard to another issue we've been

12   attempting to negotiate, we've been unable to reach a

13   resolution of that, unfortunately, and we'll file a motion

14   on that this week.

15             THE COURT:  We'll, I'll see that when I do, I

16   guess.

17             Mr. Sanders?

18             MR. SANDERS:  Yes, Your Honor.  DOJ, we've worked

19   closely with the City and APOA on this issue, Your Honor,

20   and we've just been waiting on implementation so we can

21   effectively monitor it.  And that's all the United States

22   has.

23             THE COURT:  Well, of course.  All right.

24             Well, keep me posted, Mr. Mowrer --

25             MR. MOWRER:  Yes, sir.

1                    THE COURT:  -- and Ms. Hults.

2                    MS. HULTS:  Thank you.

3                    THE COURT:  Yes, ma'am.

4                    Number 8, third round of amici and stakeholder

5    meetings set to begin, I guess, today, through the 12th.

6                    Chief Garcia?

7                    D.C. GARCIA:  Yes, Your Honor.  They will be

8    starting this afternoon at 2 P.M. and running to 5 P.M.

9    today, our time.  We have another meeting tomorrow, I

10   believe, and another meeting on Wednesday.  So all the amici

11   meetings will be done this week.  We plan on discussing the

12   progress of the Compliance Plan, our Compliance Plan

13   Number 2, coming up, and also the progress report that was

14   filed with the Court.

15                   THE COURT:  Thank you.

16                   Lt. Lowe, anything to add?

17                   D.C. GARCIA:  Your Honor, she's still on

18   vacation.

19                   THE COURT:  How long she going to be on vacation?

20   I don't mind, you know, a little vacation, but...

21                   "She's still on vacation."  Yeah, my court

22   reporter caught that before I did.  All right.  My bad.

23                   Community meeting on November the 10th.

24                   Mr. Lewis and Ms. Martinez?

25                   MR. LEWIS:  Your Honor, if I may?  James Lewis.

1   I just want to give a little outline of some of the things

2   we're working on for this community meeting, but first of

3   all, I want to just thank Ms. Martinez, who has been working

4   with us side by side.  I also want to thank the Compliance

5   Bureau.  I want to echo the sentiments that Dr. Ginger gave

6   a few minutes ago, that this group has been working from

7   sunup to sundown.  And the lead person that's going to be

8   working with us on that is Cdr. Campbell from the Compliance

9   Bureau, so I want to thank her.

10          We've actually had a date of the 17th, but the

11  Mayor has looked at and agreed to do it on the 10th.  I want

12  to make sure that the monitors, when they're here, get a

13  chance to participate.  We have set this up where the Mayor,

14  the Chief, and also the U.S. Attorney are going to be some

15  of the keynotes that we have.  We have two hours on the 10th

16  from two to four.

17          We also want to make sure that we start

18  announcing and promoting this.  So Chris Sullivan with the

19  CPCs -- we have a CPC tonight and we have two others this

20  week, so he will be announcing that.  So we want all the

21  amicis [sic], all the stakeholders involved.

22          We're expanding that because there's been a

23  tremendous discussion on what do we mean by "community"?  So

24  we want to broaden this to get the community as a whole

25  involved.  So we're engaging the faith community.  I spoke

1  with Terry Cole this morning from the Greater Albuquerque

2  Chamber of Commerce.  She wanted to know how many people do

3  we need to get there from the business community.  So

4  they're excited about it and they're also excited about

5  coming to court when we actually have the next hearing.

6        So along with that, I want to thank the Mayor.

7  The Mayor has a list, the U.S. Attorney's office have a list

8  of potential invitees.  I also spoke with the minister of

9  fellowship, Pastor Alarid, also with another minister's

10 group.  He has about 72 different ministers that he's

11 working with.  We're going to engage and invite each and

12 every one of them to participate.

13       So the -- just one other last thing:  It's going

14 to be held at the convention center and we're still working

15 on locations.  Chris is also -- with the CPC -- is helping

16 us with the Office of Neighborhood Coordination, the

17 neighborhood coalition.  And what we're doing, we want to

18 make sure that the amicis [sic] and the stakeholders, they

19 have representatives come, but some of them are representing

20 somewhere in the neighborhood of anywhere from 18 to 23

21 different organizations and we want to make sure that they

22 get sent an invitation to all of their membership.

23       So Your Honor, that's pretty much my overview at

24 this point of some of the things that we're working on.  I

25 stand for any questions at this point.

1          THE COURT:  Thank you, Mr. Lewis.

2          And Ms. Martinez, did you have anything to add?

3          MS. MARTINEZ:  Yes, Your Honor.  Briefly.  I

4    would like to invite Your Honor to consider joining us for

5    this meeting, whether as a formal part of the program or as

6    a member of the audience.  We have learned that, throughout

7    the country, judges do participate in community meetings,

8    both formally and informally.  Sometimes unannounced.  And I

9    understand that Your Honor will be here in Albuquerque that

10   week for a trial that you anticipate will go for two weeks.

11   So if it works for the Court's schedule, the parties and

12   monitor would be honored to have you as part of the program.

13         The Mayor has asked that we use this as an

14   opportunity to educate the community about this process in

15   an overview way.  And so we will be preparing some general

16   fliers that give sort of a nutshell view of what this

17   process is about, in addition to having the Compliance

18   Bureau provide an update on where APD is in terms of

19   complying with the CASA.

20         I think that what we can expect is that there

21   will be some presentations on the -- you know, just on the

22   explaining the IMR-8 because that will have been filed on

23   November 2nd.  But I do know that the Mayor has asked that

24   we give an explanation to the community, generally, about

25   what these constitutional policing efforts are about.  And

1   so we will be working with my colleagues at the Department

2   of Justice to pull that together and provide that kind of a

3   presentation.

4            THE COURT:  Thank you, Ms. Martinez.

5            MS. MARTINEZ:  Does the Court have any questions

6   for us?

7            THE COURT:  Well, just thank you for that.  Thank

8   you for the invitation.  I do have a trial that's scheduled

9   to begin the 6th and go through the 16th, with the Monday,

10  the 12th, being a holiday, I think.  And I'm not at all

11  clear at this point that I will still be in Albuquerque on

12  Saturday the 10th.  Given the holiday, I may be back home

13  for a couple of days.

14           But I am planning to be in Albuquerque on the

15  5th, Monday, the 5th, and -- for purposes of maybe doing

16  a ride-along or whatever else you-all might have in mind for

17  me.  So I am thinking about that and trying to otherwise

18  look at the schedule to see what it will allow.

19           But I'm pleased that you're having the meeting

20  and pleased, too, for the Mayor's leadership in wanting to

21  be transparent about the processing and educating the public

22  about it.

23           Anything else on the community meeting?

24           MS. MARTINEZ:  No, Your Honor.

25           THE COURT:  All right.  So Number 9 on the

1    agenda, Dr. Ginger, you're still on track to have the

2    IMR-8 filed on November the 2nd?

3              DR. GINGER:  Yes, Your Honor, that's correct.

4              THE COURT:  Draft to the parties by October the

5    2nd and comments thereto on the 17th.

6              Because of scheduling difficulties and for the

7    need to have -- allow the amici to have time to respond to

8    IMR-8, I think we are looking at December 7th, is that

9    right, for the public hearing?

10             MS. MARTINEZ:  Yes, Your Honor.  I understand

11   from Your Honor's law clerk that you have scheduled us for

12   December 7th, at 11 A.M.?

13             THE COURT:  Yes, ma'am.  I have a trial in Las

14   Cruces the 4th, 5th and 6th.  Assuming that trial

15   concludes, I'll come up there on Friday morning and we'll

16   begin at 11:00 and have the rest of the day for the hearing.

17             Yeah, that's that.

18             I guess the monitoring team is going to be in

19   Albuquerque the 5th through the 9th of November?  And any

20   other discussion about upcoming dates?

21             MR. AGUILAR:  May it please the Court, Your

22   Honor, this is Mr. Aguilar.  The site visit, again, is

23   through the -- the 5th through the 9th, 2018.  Depending on

24   your schedule, we would love for you to be able to step in

25   or to sit down with the team as they go through their

52

 1    duties, to sit down with Cdr. Middleton.  I know we had had

 2    some discussions about that, but I understand your time is

 3    valuable, but wanted to extend the invitation to make sure

 4    that you're aware, so that you can see firsthand some of the

 5    tremendous work that the Department is doing, as well as get

 6    an understanding of the level of complexity of some of the

 7    projects, the various divisions within the Compliance Bureau

 8    are working on.  But I also understand you'll be in trial.

 9    And so, anyways, I'll turn the phone over to Ms. Martinez.

10         MS. MARTINEZ:  Yes, Your Honor.  One of the

11    recommendations that the parties and the monitor had was for

12    November 5th, which we understand you are -- is currently

13    open on the Court's schedule, is perhaps brief status

14    conference with the parties and the monitor and time with

15    Cdr. Middleton's team on the use-of-force backlog and

16    perhaps a ride-along with the Crisis Intervention Unit and

17    the Associate Monitor Laura Kunard, who is the expert on the

18    mental health matters.

19         THE COURT:  And I am open to any or all of that

20    on the 5th.  I appreciate the invitation relating to the

21    rest of the week's activities.  That trial is not going to

22    allow for any of that, assuming it goes.  And relative to

23    the comment about other judges and other cities have more

24    involvement, you know, that's...if you-all decide somebody

25    else ought to be doing this, somebody that lives in

1    Albuquerque, who has more access to you-all, I'll

2    understand.

3            And I can tell you that this senior judge stuff

4    doesn't seem so senior when you look at my schedule over the

5    next couple of months.  But anything else this morning?

6                MR. AGUILAR:  Nothing from the City, Your Honor.

7                MR. MOWRER:  Not from the APOA, Your Honor.

8                MS. MARTINEZ:  Not for the United States, Your

9    Honor.

10               DR. GINGER:  Not from the monitor, Your Honor.

11               THE COURT:  Well, thanks, everyone, for your time

12   this morning, for all of your great effort.  And I'll be

13   seeing you-all soon and look forward to it.

14           You-all have a great day, in the meantime, and

15   keep me up to date.  Thank you.

16           (The proceedings concluded at 11:22 A.M.)

17

18

19

20

21

22

23

24

25

1                    UNITED STATES OF AMERICA

2                    DISTRICT OF NEW MEXICO

3

4              CERTIFICATE OF OFFICIAL REPORTER

5        I, Vanessa I. Alyce, RPR, NM CCR, and Federal Official

6    Court Reporter in and for the United States District Court

7    for the District of New Mexico, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code, that

9    I did report in stenographic shorthand to the best of my

10   skill and ability the foregoing pages 1-53 of the

11   proceedings set forth herein, that the foregoing is a true

12   and correct transcript of the stenographically recorded

13   proceedings held in the above-entitled matter and that the

14   transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16

17   Dated this 14th day of September 2018.

18

19   S/Electronically Filed
     Vanessa I. Alyce, RPR, NM CCR #259
20   Federal Official Court Reporter
     100 N. Church Street
21   Las Cruces, NM 88001
     Phone: (575) 528-1430
22   Email:  Vanessa_Alyce@nmcourt.fed.us

23

24

25