# Monitor's Eighth Report

# Compliance Levels of the Albuquerque Police Department and the City of Albuquerque with Requirements of the Court-Approved Settlement Agreement

## No. CIV 14-1025 RB/KK

November 2, 2018

Prepared by: Public Management Resources, Inc.
James D. Ginger, Ph.D. Independent Monitor

**Table of Contents**

| Topic | Page |
|---|---|
| **1.0 INTRODUCTION** | **1** |
| **2.0 Executive Summary** | **4** |
| **3.0  Synopsis of Findings** | **5** |
| **4.0  Current Status** | **7** |
| **4.1      Overall Status Assessment** | **7** |
| **4.2      Dates of Project Deliverables** | **8** |
| **4.3      Format for Compliance Assessment** | **8** |
| **4.4      Compliance Assessment** | **9** |
| **4.5      Operational Definition of Compliance** | **10** |
| **4.6      Operational Assessment** | **11** |
| **4.7      Assessing Compliance with Individual Tasks** | **11** |
| **5.0      Summary** | **236** |

**1.0 Introduction**

The following pages constitute the monitor's full compliance assessment describing the Albuquerque Police Department's compliance status with the Court Approved Settlement Agreement (CASA) entered into by the City of Albuquerque and the United States Department of Justice.  The CASA became effective on November 14, 2014 when representatives of the United States Department of Justice and the City of Albuquerque executed the final agreement, and the agreement was approved by the Federal District Court.  The CASA became "operational" on June 2, 2015, when full funding was available to the monitoring team.  Prior to the availability of full funding, the monitoring team was on-site and working with APD to move the project forward.  We have continued that effort, continually, since.

This monitor's report follows the same format as all previous reports. That format is organized into five sections:

> 1.0  Introduction;
> 2.0  Summary;
> 3.0  Synopsis of Findings;
> 4.0  Compliance Findings; and
> 5.0  Summary.

The purpose of the monitor's periodic compliance reports is to inform the Court of the monitor's findings related to the progress made by APD in achieving compliance with the individual requirements of the CASA.  This report covers the compliance efforts made by APD during the eighth monitoring period, which covers February through July 2018.

Frequent readers of the monitor's reporting will note that there was no IMR-7 provided to the Court.  That was necessitated by the December 2017 advent of a new administration at APD which assumed full responsibility for compliance, but who were, for the most part, unfamiliar with the CASA process and the status of compliance efforts.  The monitor recommended, and the Parties and the Court agreed, that the seventh IMR reporting period would best be utilized to bring the new administration up to speed on the status of the project, extant goals and obstacles, and the granular compliance processes that needed to be considered, re-considered, or modified based on the past practices (and the results those practices had attained) of the previous administration.  As a result, members of the monitoring team spent the entire seventh monitoring period bringing the new administration up to speed and briefing them on the monitor's perspectives regarding compliance requirements and the then-current status of compliance efforts.  The processes we engaged in with the new command at APD were outlined in two "mini-reports" filed during the seventh reporting period. Those "mini-reports" are summarized below.

Our first mini-report concentrated technical assistance provided by the monitoring team focused on fifteen issues and processes:

1.  The essential need to focus on a reform agenda process of policy development, training, and supervision, particularly as related to use of force and associated issues;

2.  The need for an assessment of all the "moving parts" of a revised use of force reporting and review process;

3.  The need to revise policies and protocols related to the Multi-Agency Task Force in order to ensure clear transfer of knowledge about use of force-related incidents referred to MATF;

4.  The need for the Special Operations Division to standardize all CASA-related training and training documents across all units and collaborate with the Academy on the form and style of these lesson plans;

5.  That SOD consider adapting the seven-step training cycle and integrate that process into their daily training regimen;

6.  That there existed a "clear and present" need for an organization-wide evaluation of how the Risk Assessment Matrix[1] (RAM), first developed by SOD, was being used, as APD currently does not "know" institutionally how the RAM is being applied across the organization;

7.  That the Compliance Bureau should take the lead in ensuring this revision is completed;

8.  That the Academy has adopted the seven-step training cycle as its operational model, and a civilian unit has been designated the "Oversight and Maintenance" unit for training's seven-step process;

9.  That the Academy's ability to begin the general use of force and supervisor use of force training is completely reliant upon the finalization of and approval by the Parties of APD policies related to use of force, since the lag time in getting the new force system laid out and codified in policy has significant training implications;

10.  Noting that use of force training may extend into the early part of 2019, thus Operational compliance would likely extend into the summer months of 2019 and that compliance classifications would reflect these delays;

---

[1] The RAM is used to pre-screen warrant execution so as to identify warrants, persons, or locations that may be suitable for warrant execution by field operations personnel, as opposed to tactical units.

11. Suggesting APD should consider alternative delivery schedules (i.e. AM and PM sessions) in order to get the training out to the organization faster;

12. Encouraging the Academy attempt to connect in-class training, tactical training and reality-based training (RBT) scenarios to ensure that, when looking at an officer's RBT performance they are also assessed for proper application of force as per APD policy;

13. Alerting APD to proper training and lesson plan construction, making them aware of past reviews where instructor ratios were either inappropriate or not adhered to once a class began;

14. Recommending that the academy create systems requiring outside commands routinely and regularly "push" training needs to them, which can be incorporated into organization-wide programs; and

15. Reviewing and approving the Training Academy's seven-step curriculum development process, which was highly consistent with suggestions we made to the Academy early on in the monitoring process.

We focused on systems-building technical assistance in our first mini-report process. For our second mini-report, we focused more heavily on building skill-sets and perspectives to support problem-solving processes at APD. Our technical assistance for the second half of the IMR-7 reporting period focused on forward-looking strategies to foster APD's compliance efforts. These included:

1. Developing an internal problem-solving process that APD can use in every area of compliance;

2. Discussion of the monitor's review and comment on proposed APD Use of Force policies;

3. Assisting APD in designing a new training program for personnel assigned to the Force Review Board's force assessment function;

4. Facilitating the design of a new training program for supervisors regarding their obligations under the three-level force classification system;

5. Development of a mini-seminar for APD senior command outlining recommended strategic planning methods;

6. Designing a new training program for line officers regarding the revised use-of-force policy and their obligations when they use Level 1 force;

7. Strengthening the administration of APD's training academy;

3

8.  Addressing effectively the use of force backlog of investigations and resolution of well over 300 backlogged use of force cases then pending a meaningful APD response;

9.  Force Review Board Restructuring and Training;

10.  Special Operations Division Use of "Less than Lethal" Force;

11.  New Academy Command; and

12.  Global Issue Identification and Recommendations.

We enhanced our "technical assistance" role in the IMR-7 reporting period by executing multiple separate site visits, instead of our normal single site visit. During these visits, members of the monitoring team worked side-by-side, with command personnel and others at APD, in charting a way forward for the agency.  This technical assistance was designed to address two direct and exigent needs:  first, to give the new command at APD an in-depth understanding of the critical tasks left undone by the previous administration; and second, to clearly identify what we perceived as the dozen critical processes that need to be addressed in order to move compliance efforts forward.

## 2.0 Executive Summary

The compliance efforts we have observed during this reporting period differ substantively from those we had observed earlier in the monitoring process.  We have found the current APD executive staff to be fully committed to CASA compliance processes.  Most of the new command and oversight cadres also appear to be fully committed to moving APD forward in its compliance efforts. We have found extremely attentive audiences for our compliance process advice, and in most cases, APD has moved forward adroitly as it implements responses to that advice.  We remind the reader again, that this compliance project is, by design, a long-term project, involving complex, and arduous processes involving hundreds of "moving parts."

Based on our work with the new executive and command personnel at APD, we have noted a new approach by APD to its compliance efforts.  These efforts often involve:

- Methodical approaches to problem-solving;
- Movement toward data-based decision making;
- Strategic approaches; and
- Looking outside the organization for effective models and processes to move compliance forward.

4

The current leadership grasps key issues involved in the compliance process and they are quickly building effective problem-solving mechanisms.  The monitoring team will continue to support those efforts through discussions, clarifications, and recommendations regarding effective processes observed in other agencies undertaking similar projects.

Taking the time to build good foundations is critical to the compliance process. APD leadership cadres are beginning to understand that some processes simply cannot be rushed, but need time to develop, plan, implement, assess and revise. The agency is beginning to adopt this long-term approach to reform that we have recommended from the early stages of this process.  We see this as an important change in approach. The new executive and management cadre at APD has been highly responsive to monitoring team feedback.

**3.0 Synopsis of Findings for the 8th Reporting Period**

**3.1 Outstanding Issues**

The CASA compliance process has several critical outstanding issues that need prompt attention and resolution.  Chief among those is the review and revision of APD's use of force policy suite.  The Parties and the monitor have devoted substantial attention to this critical task over the past months. The main use of force policy was approved by the monitor after the close of this reporting period. A substantial amount of work remains to be done, and is currently in progress, regarding completion of all related use of force policies.  All related Use of Force policies, e.g., definitions, etc. are still pending as of the close of this reporting period.  After the close of the reporting period, the monitor and the chief of police worked through outstanding issues with the pending use of force main policy (2-52) and, as a result, APD was able to develop an acceptable version of that policy.

The resolution of the use of force policies was a critical outstanding issue.  Other significant compliance issues outstanding are:

> 1.  Policies and training regarding CASA-related functions, such as use of force review and assessment, complaint investigations, and the Force Review Board processes;

> 2.  Re-integration of Force Review Board practices into the APD policing oversight process;

> 3. Misconduct complaint intake, investigation, and adjudication;

5

    4.  The Use of Force "backlog" being processed by members of the APD IA-Force Division;

    5.  Training documentation, delivery, gap analysis, and assessment/evaluation issues;

    6.  Community engagement and outreach; and

    7.  Early intervention systems designed to identify officers who frequently engage in behaviors prohibited by policy and training;

Each of these areas is discussed in detail in the body of IMR-8.

## 3.2 Accomplishments

In the past year, APD has made substantive progress in developing a coherent management strategy, identifying and prioritizing the critical issues confronting APD (noted above), and crafting change strategies to remediate identified problems.  A great deal of work lies ahead; however, the current leadership at APD has adopted a receptive and attentive attitude toward the change processes that lie ahead.  They have taken the first steps toward becoming a data-driven organization that uses data and facts to assess issues, identify potential solutions, and effect meaningful change.  In addition, APD has taken the following direct actions to move their compliance processes forward:

- Recruiting from outside the organization a new Academy Commander who possesses direct, successful experience in curriculum development, delivery, and assessment;

- Implementing a well-structured and staffed unit designed to reduce the long-standing backlog of use of force incidents;

- Researched and adapted implementation strategies informed by the experiences in other police agencies working through similar reform processes;

- Enhancement of the Compliance Bureau staffing and organization in a manner that should drastically improve compliance-related performance;

- Completion on initial work for restructuring the documentation of training processes, including improved training plans and revised internal responsibilities and processes;

- Strong movement toward community-based problem-oriented policing practices designed to address community concerns and priorities; and

  ▪ Reorganization and staffing of the Internal Affairs processes designed to
    improve the quality of internal investigations.

## 3.3 Persistent or Evolving Problem Areas

We note four persistent problem areas, most carried over from the previous
administration, but which present clear obstacles to effective compliance.  These
include:

1.  Development of a strong self-auditing function;

2.  Issues relating to identification, assessment and action on events
constituting alleged policy or rule violations by sworn personnel within the
90-day limit established by union contract;

3.  The use of "Additional Concerns Memos" to dispose of policy violation
issues, as opposed to actual findings and corrective action; and

4.  An apparent "uptick" in filed "prohibited practice" complaints by the
police union (six new prohibited practice complaints are still pending
resolution as of the publication of this report).

## 4.0 Current Compliance Assessments

As part of the monitoring team's normal course of business, it established
a base-line assessment of all paragraphs of the CASA for the
Independent Monitor's first report, (IMR-1). This was an attempt to
provide the Parties with a snapshot of existing compliance levels and,
more importantly, to provide the Parties with identification of issues
confronting compliance as the APD continues to work toward full
compliance. As such, the baseline analysis is considered critical to future
performance in the APD's reform effort as it gives a clear depiction of the
issues standing between the APD and full compliance. This report, IMR-
8, provides a similar assessment, and establishes a picture of progress
on APD goals and objectives since the last report.

## 4.1 Overall Status Assessment

Section 4.1 provides a discussion of the overall status of APD as of the
eighth reporting period.  As of the end of the eighth reporting period, APD
continues to make progress overall, having achieved primary compliance
in 99.6 percent of the tasks it agreed to by implementation of the CASA
process with the Department of Justice.  Primary compliance relates
mostly to development and implementation of acceptable policies
(conforming to national practices). APD is in 75.4 percent Secondary
Compliance as of this reporting period, which means that effective follow-
up mechanisms have been taken to ensure that APD personnel

understand the requirements of promulgated policies, e.g., training, supervising, coaching, and disciplinary processes to ensure APD personnel understand the policies as promulgated and are capable of implementing them in the field.  APD is in 59.2 percent Operational compliance with the requirements of the CASA, which means that 95 percent of the time, field personnel either perform tasks as required by the CASA, or that, when they fail, supervisory personnel note and correct in-field behavior that is not compliant with the requirements of the CASA.

Figure 4.1.1, below depicts APD's compliance performance over the last six reporting periods.



## 4.2 Project Deliverables

Project deliverables are defined by the Settlement Agreement governing the parties' response to the CASA, (DOJ, the City, APD, and the Albuquerque Police Officers' Association (APOA).  Each deliverable is discussed in detail below in section 4.7.

## 4.3 Format for Compliance Assessment

The Monitor's Reports are organized to be congruent with the structure of the Agreement, and specifically reports, in each section, on the City's and APD's compliance levels for each of the 276 individual requirements of the CASA.

For example, the monitor's reports will be structured into nine major sections, following the structure of the Agreement:

8

I.   Use of Force;

II.   Specialized Units;

III.   Crisis Intervention;

IV.   Policies and Training;

V.   Misconduct Complaint Intake, Investigation and Adjudication;

VI.   Staffing, Management, and Supervision;

VII.   Recruitment, Selection and Promotions;

VIII.   Officer Assistance and Support; and

IX.   Community Engagement and Oversight;

All future monitor's reports will deal with each of these nine major areas in turn, beginning with APD's response and performance regarding reporting, supervising, and managing its officers' use of force during the performance of their duties, and ending with APD's efforts at community engagement and its ability to facilitate community oversight of its policing efforts.

## 4.4 Structure of the Task Assessment Process

Members of the monitoring team have collected data concerning the APD's compliance levels in a number of ways:  through on-site observation, review, and data retrieval; through off-site review of more complex items, such as policies, procedures, testing results, etc.; through review of documentation provided by APD or the City which constituted documents prepared contemporaneously during the normal daily course of business.  While the monitoring team *did* collect information provided directly by APD in response to the requirements of the Agreement, those data were *never* used as a sole source of determination of compliance but were instead used by the monitoring team as explanation or clarification of process.  All data collected by the monitoring team were one of two types:

- Data that were collected by using a structured random sampling process; or

- Selecting *all* available records of a given source for the "effective date."

Under no circumstances were the data selected by the monitoring team based on provision of records of preference by personnel from the City or

9

APD.  In every instance of selection of random samples, APD personnel were provided lists of specific items, date ranges, and other specific selection rules, or the samples were drawn on-site by the monitor or his staff. The same process will be adhered to for all following reports until the final report is written.

## 4.5 Operational Definition of Compliance

For the purposes of the APD monitoring process, "compliance" consists of three parts:  primary, secondary, and operational.  These compliance levels are described below.

- **Primary Compliance**:  Primary compliance is the "policy" part of compliance.  To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA.  As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.

- **Secondary Compliance**:  Secondary compliance is attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the department for doing so.  By definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the agency.

- **Operational Compliance**:  Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff.  In other words, the APD "owns" and enforces its policies.

As is true, in the monitor's experience, with all of these complex organizational change projects, change is never simple or quick.  A great deal of work lies ahead.  The monitoring team is committed to assisting APD command staff by working closely with the APD in forging new, and revising old policies, articulating clear guidelines and practices for APD's intensive training of the department's supervisors and managers, assisting APD in building assessment tools designed

10

to identify problematic behaviors, and advising on "best practices" that can be adapted by APD as it moves forward in its efforts to meet the individual and global requirements of the CASA.

## 4.6 Operational Assessment

The following sections of the Monitor's Eighth Report articulate processes and findings related to each of the 276[2] active elements of the CASA.

The APD and the City have agreed to comply with each of the articulated elements.  The monitoring team has provided the Parties with copies of the team's monitoring methodology (a 299-page document) asking for comment.  That document was then revised, based on comments by the Parties. This document reflects the monitor's decisions relative to the parties' comments and suggestions on the proposed methodology and is congruent with the final methodology included in Appendix One of the monitor's first report[3].  The first operational paragraph, under this rubric, is paragraph 14, as paragraph 13 is subsumed under paragraph 14's requirements.

### 4.6.1 Methodology

The monitor assessed the City and APD's compliance efforts during the eighth reporting period, using the *Monitor's Manual*, included as Appendix A, in the monitor's first report (see footnote 3).  The manual identifies each task required by the CASA and stipulates the methodology used to assess compliance.

## 4.7 Assessing Compliance with Individual Tasks

APD's compliance with individual tasks for the eighth reporting is described in the sections that follow.

### 4.7.1 – 4.7.3 Assessing Compliance with Paragraph 14, 15 and 16: Principles and Policies

The monitoring team currently is working with APD and the Parties to develop an approvable revision to the Use of Force policy suite under which APD currently works. At this point, APD has crafted a use of force "main policy" that is acceptable to the monitoring team, and the monitor has approved that policy (2-52).  That policy was finalized

---

[2] Tasks accruing to the United States or the Monitor were not included in this methodology, as the monitor sees his role as evaluating APD and the City entities supportive of APD in meeting its responsibilities under the CASA.

[3] Available at: https://www.justice.gov/usao-nm/file/796891/download

and approved after the close of the eighth reporting period. Additional work remains on use of force policy development, as supporting policies are still pending.

We commend the leadership at APD for making the extra effort to develop workable policy guidance dealing with use of force.

Over the course of our engagement with APD, our use of force case reviews have consistently revealed serious deficiencies in the oversight and accountability process, particularly with respect to force reporting, supervisory-level investigations and chain of command reviews.  The use of force and investigations of use of force must comply with the requirements of the CASA and applicable laws, and must comport with best practices. Central to these investigations is an assessment of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  As with other reporting periods, the monitoring team spent an extensive amount of time providing perspective, feedback and technical assistance to APD personnel regarding responsibilities related to reporting and investigating uses of force.

During this monitoring period, the monitoring team noted a significant improvement in planning efforts and attention to detail designed to better oversee the management of force investigations. During this monitoring period, 50% of all supervisory force investigations initiated between February 1 and July 31, 2017 have been completed. More importantly, eighty-one percent of the supervisory force investigations initiated during the *first half* of the monitoring period have been completed and findings were made. These results provide an assurance that the present backlog of force investigations dating back to 2017 is not being compounded by the addition of a large number of contemporary investigations to the backlog list.

When coupled with past training gaps, the CASA's requirement to periodically update the Use of Force suite of policies, which at the end of this monitoring period have yet to be approved, will represent another challenge to the progress made in overseeing force investigations.  In the next monitoring period, the monitoring team will focus on how APD oversees force investigations and how it determines if officers' conduct "complied with APD policy," especially the new policies put into place.

Paragraphs 14, 15 and 16 remain only in Primary Compliance. One of the reasons for this compliance status is the outstanding training gaps which we noted in Paragraphs 87 and 88 of IMR-6.  Similarly, in this monitoring report we note in Paragraphs 86-88 that APD's revisions to the Use of Force suite of policies will extend use of force

training into 2019. Therefore, Secondary Compliance cannot be considered at this time.  When considering the gaps noted in IMR-6 that still need to be addressed through training, and the introduction of the new Use of Force suite of policies, Secondary Compliance for Paragraph 14 cannot be considered until these training priorities are satisfactorily addressed.

APD has introduced and codified the use of a Seven-Step Training Cycle as its training development methodology, which should help the Academy organize its work and manage the training needs of the organization.  We recommend, again, that APD personnel responsible for organizational training review the feedback, technical assistance and recommendations the monitoring team has provided in past IMRs.  Those reports are a valuable source of information to ensure the future success in training.  If ignored, APD will undoubtedly experience more delays in obtaining Secondary Compliance.

Based on past performance APD will retain Secondary Compliance status, but as we note elsewhere, the promulgation of new policies and investigative procedures related to uses and shows of force must be communicated through effective training.  We will look to the IMR-9 reporting period to ensure APD communicates any new policies or policy provision requirements to its personnel.

Parenthetically, we note that APD's latest training outline submitted to the monitoring team regarding training for IA investigative personnel processing the use of force backlog is a remarkable improvement over past practice.  We find it CASA-compliant and have approved it as written.  Once all CASA-relevant training is delivered using similar lesson plans, and effectively evaluated internally (via testing or related procedures), APD will be in secondary compliance on this process.

### 4.7.1 Assessing Compliance with Paragraph 14

Paragraph 14 stipulates:

**"Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:**

a) **Officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;**
b) **Force shall be de-escalated immediately as resistance decreases;**
c) **Officers shall allow individuals time to submit to arrest before force is used whenever possible;**
d) **APD shall explicitly prohibit neck holds, except where lethal force is authorized;**
e) **APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome**

active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject;

f)   APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;

g)   Officers shall not use force to attempt to effect compliance with a command that is unlawful;

h)   Pointing a firearm at a person shall be reported in the same manner as a use of force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and

l)   immediately following a use of force, officers, and, upon arrival, a supervisor, shall inspect and observe subjects of force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care. This may require an officer to provide emergency first aid until professional medical care providers arrive on scene.”

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance.**

## 4.7.2 Assessing Compliance with Paragraph 15:  Use of Force Policy Requirements

Paragraph 15 stipulates:

“APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices. The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal, that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units. The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate. The use of force policy will incorporate the use of force principles and factors articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability.”

## Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.3 Assessing Compliance with Paragraph 16:  Weapons Protocols

Paragraph 16 stipulates:

**In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below. The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy.**

**Results**

> Primary:      **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraphs 14 - 16***

***4.7.1-3a: Develop an approvable revision to the Use of Force policy suite, including the now-approved 2-52.***

***4.7.1-3b: APD should develop and implement a comprehensive training plan to simultaneously address all training gaps that are delaying Secondary Compliance, to include the development of initial training for the new use of force suite of policies that are being developed.***

**4.7.4 – 4.7.6 & 4.7.76 Assessing Compliance with Paragraphs 17-20 and 89: Firearms Modifications and Training**

The 2018 Firearms training cycle has been completed and the Firearms staff have compiled extensive data to document all that is required, and all that they have accomplished in order to meet or exceed the CASA requirements.  We view this as excellent work that easily could and should be emulated by other APD staff as they consider how to respond to monitoring team findings.

96.5% of all APD personnel (873 of 905) completed firearms training.  Personnel who had not yet completed training were on various types of leave—Military, or Family Medical Leave Act, etc.  Upon returning, each officer will be required to attend all missed training, including firearms, before being permitted to work.

APD is required to provide sufficient training courses to allow officers to gain proficiency and meet firearms qualification requirements.  During past site visits, members of the monitoring team attended firearms training.  APD Range Staff have changed range hours to enable officers to practice firearms in a low-light environment and have integrated monitoring team recommendations into its policy and procedures. The firearms staff has added additional days and times to allow more practice.  In reviewing data related to failures to qualify, firearms staff documents the referral to additional training for poorly performing shooters.

Following the 2018 Firearms Qualifications cycle, the monitoring team was provided with data that showed at least 3 officers who failed to qualify and then

failed an immediate requalification attempt were ordered to surrender their firearms and police vehicle and placed in an administrative position until they returned to the range to qualify.  Additionally, documentation was found that officers failing to qualify with rifle or shotgun were required to surrender the firearm until they returned to the range to qualify.  The monitoring team sees this as another positive example of a staff making changes in order to meet the requirements of the CASA.

In response to CASA requirements and numerous recommendations from the monitor, the chief of police commissioned the Audit Division to conduct the 2018 Firearms Audit—the results of which were submitted to the monitoring team. The audits were conducted during eight sessions of day and low light firearms qualifications. The monitoring team taking a 25% random selection of those individuals in attendance.  Data collected to determine CASA compliance were:

- Firearm Assignment (Officer name and Employee ID)
- Weapon Type, Make, Model, Caliber
- Serial number provided by Officer during qualification
- Serial number provided by Property list
- Verbal confirmation by Officer if all firearms they are qualifying with has been modified
- Verbal confirmation by Officer if all firearms they are qualifying with are agency approved firearms

Audit Findings:

- There were twelve occurrences where the Officer indicated their firearms had been modified.
- There were eighteen occurrences where the firearms have serial numbers that do not match with what was provided by Officers' and what was listed in the Property Unit's Inventory List.
- 100% of the total firearms data provided by Officers' are agency approved firearms.
- There were nineteen occurrences where the Inventory List provided by the Property Unit listed additional firearms assigned to the officer(s), however they did not have the firearms during their qualification date.
- There were sixteen occurrences where the Property Unit did not list firearms that the officer(s) were qualifying with during their qualification date.
- There were ten occurrences when the firearm, type, make, model did not match with what was provided by Officers' and what was listed in the Property Unit's Inventory List.
- There were six occurrences where the Officer could not provide the firearms serial number.
- There were five occurrences where the Officers' name was not listed on the Property list, therefore the inventory information was unavailable to verify.

16

During earlier site visits the monitoring team was provided a copy of a normal course of business interoffice memorandum from an APD Fiscal Officer to the APD Planning unit, dated January 8, 2016, that verified that the required tracking system is fully in place.  APD also continued to work with the city Department of Technology to upgrade the current system to enhance security and streamline annual inventory procedures.  The 2018 firearms audit, however, highlighted numerous failures in the tracking system that need to be corrected in order to elevate compliance levels.

In conducting a follow-up to the 2018 firearms audit, APD has found and corrected many of the inconsistencies including problems when running reports or queries with the Enterprise Learning Management System:

- The 12 occurrences of "modified" weapons were related to grips and sights, neither of which is considered a modification by SOP 2-3 (Firearms and Ammunition Authorization).
- Historical data within ELMS was presented as current, thereby showing old firearm serial numbers attributed to an officer that had been returned/replaced. Once reconciled, related data fell within the CASA requirement of 95%.

A database for the Supervisors Monthly Inspection Report has been created and is in use by APD supervisors.  Monthly firearm inspection information is included in this database; however, APD has not created a review/audit/reporting process for this data.  Collecting the inspections into a database is only the first step.  The monitoring team expects APD to utilize the data to identify and correct violations of policy, if any.  This would be required to attain Operational Compliance.

Additionally, during the June 2018 site visit, members of the monitoring team visited all six Area Commands and spoke with supervisors at each location.  Some supervisors were frank in their discussion of monthly inspections, informing the monitoring team that there are both *formal* and *informal* inspections, explaining that they do not in fact physically check every officer's weapons for make, model, serial numbers, modifications or ammunition every month. Unless all supervisors are trained in the CASA and policy requirements and in what is considered a firearm "modification", and this training is exhibited during every inspection, compliance cannot be attained.

The monitor makes note of no formalized audit/review/reporting or process for authorized and modified weapons. Without it, APD has no way of knowing what weapons/ammunition are being carried by its personnel in the field.

Secondary compliance would require APD to be able to point to specific *training* for supervisors related to how they are expected to review these requirements (by roll-call inspection, by "drive-by" in-field inspections, by OBRD review comments, etc.)  The monitoring team is not aware of any APD training, policy or other mechanism currently established to affect such inspections, reviews,

17

and remediation, other than some policy and practice processes that require official inspection of firearms used in officer-involved shootings. After-the-fact inspections are not routinely viewed as acceptable policy.

### 4.7.4 Assessing Compliance with Paragraphs 17

Paragraph 17 stipulates:

**"Officers shall carry only those weapons that have been authorized by the Department. Modifications or additions to weapons shall only be performed by the Department's Armorer as approved by the Chief. APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons."**

**Results**

> Primary:   **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.5 Assessing Compliance with Paragraph 18:  On-duty Weapons

Paragraph 18 stipulates:

**"Officers shall carry or use only agency-approved firearms and ammunition while on duty."**

**Results**

> Primary:   **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.6 Assessing Compliance with Paragraph 19:  On Duty Weapons

Paragraph 19 stipulates:

**"APD issued Special Order 14-32 requiring all officers to carry a Department- issued handgun while on duty. APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns."**

**Results**

> Primary:   **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraphs 17-19:***

18

*4.7.4-6a APD should evaluate modalities for developing formal audit/review/reporting policy for "carry and use" assessments and inspections regarding modified or altered weapons outlined in these paragraphs, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work.*

*4.7.4-6b APD should provide specific training for supervisors in the following areas identifying "weapons modifications"*

*4.7.4-6c Training supervisors in Monthly Inspection requirements (all weapons/ammunition inspections should be a formal Training Academy function).*

*4.7.4-6d APD should complete additional work to coordinate the Firearms data with City IT, Property and the Training Academy.*

### 4.7.7 Assessing Compliance with Paragraph 20:  Weapons Qualifications

Paragraph 20 stipulates:

**"Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year. Officers who fail to qualify on their primary weapon system shall complete immediate remedial training. Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify. Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment**."

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.8 Assessing Compliance with Paragraph 21:  Firearms Training

Paragraph 21 stipulates:

**"APD training shall continue to require and instruct proper techniques for un-holstering, drawing, or exhibiting a firearm."**

APD SOPs related to use of force policies remain under negotiation.  Over the course of our engagement with APD, our use of force case reviews have consistently revealed serious deficiencies in the oversight and accountability process, particularly with respect to force reporting, supervisory-level investigations, and chain-of-command reviews.  The use of force and investigations of force by APD personnel must comply with applicable laws and

comport to best practices. Central to these investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  During this reporting period, as with other reporting periods, the monitoring team, during its January, March and June 2018 site visits spent an extensive amount of time providing perspective, feedback and technical assistance to APD personnel regarding responsibilities related to the reporting and investigation of uses of force.

Since APD has been unable to achieve secondary compliance because of lingering training gaps, and the fact that the revisions pertinent to this paragraph were introduced while APD remained in non-compliance, the new policy provisions had a direct impact on APD's secondary compliance status for past reporting periods.

**Results**

APD has begun the required process to update and adjust the Use of Force suite of policies, which will extend use of force training into 2019. Therefore, secondary compliance cannot be considered at this time.  When considering the training gaps noted in IMR-6 that still need to be addressed through training, and the introduction of the new Use of Force suite of policies, secondary compliance for Paragraph 21 cannot be considered until these training priorities are satisfactorily addressed.  APD has introduced and codified the use of a 7-Step Training Cycle as its training development methodology, which should help the Training Academy organize its work and manage the training needs of the organization.  We strongly recommend that APD personnel responsible for organizational training review the feedback, and technical assistance and recommendations the monitoring team has provided in past IMRs.  Those reports are a valuable source of information to ensure future success in training.  If ignored, APD will undoubtedly experience more delays in obtaining secondary compliance.

We have determined that Primary Compliance is retained for this reporting period, based on a previously approved force policy.  We strongly recommend that APD personnel responsible for this paragraph review past feedback, technical assistance and recommendations the monitoring team has provided.

> Primary:     **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraph 21:*

*4.7.8a: Review past monitor's reports for recommendations related to this paragraph and assess each recommendation to assess its continued validity.*

*4.7.8b:  For those past recommendations APD deems valid, implement them as written.*

*4.7.8c:  For those past recommendations APD deems not valid, develop alternative strategies to reach the necessary milestones for training, supervision, and oversight that will have the desired effect in the field.*

**4.7.9 Assessing Compliance with Paragraph 22:  Firearm Discharges from Moving Vehicles**

Paragraph 22 stipulates:

**"APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person. Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle."**

**Methodology**

The monitor was finally able to approve APD's proffered version of its use of force policy.

The monitor and the chief of police have had substantive and productive discussions about what remains to be done.  At this point, APD and the monitor are in basic agreement regarding what the final version of the revised use of force policy suite should look like. After the close of the monitoring period, the monitor and the parties were able to reach consensus on a workable use of force policy, 2-52.  All supporting policies remain "under development."

We commend the leadership at APD for making this extra effort to develop workable policy that addresses use of force.

**Results**

> Primary:      **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendation for Paragraph 22:*

*Recommendation 4.7.9:  APD should continue its current trajectory regarding development of an acceptable use of force policy suite.*

**4.7.10 Assessing Compliance with Paragraph 23:  Tracking Firearm Discharges**

Paragraph 23 stipulates:

**"APD shall track all critical firearm discharges. APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its use of force annual report."**

## Methodology

Frequent readers of the monitor's reports are aware of the fact that tracking firearms discharges by APD personnel has been problematic in the past.  The new administration at APD has developed meaningful and—based on the monitor's recent evaluations—accurate reporting systems for incidents of firearms discharges.  Those data were used extensively for the latest version of the "298 Report," which reports, among other items uses of force and firearms discharges.  While the data are available, and based on the monitoring team's analysis, are reliable and valid, they have yet to be "ported over" to the Early Intervention System.

APD continues to experience reliability, validity, and functionality problems with its off-the-shelf EIS system.  Based on the monitor's direct conversations with those responsible for implementing the EIS package of related sub-systems, it has proven unreliable, cumbersome, and ineffective.  While accurate data is available to APD from newly engineered data collection and analysis systems used by the Compliance Bureau, the department's Early Intervention System has proven ineffective and of extremely low utility.  As was often the case with APD in the past, the city purchased a potentially highly-sophisticated, elaborate and difficult to implement and use "packaged" system.  That system has proven all but impossible to configure to accomplish the relatively simple tasks required by the CASA.  After-purchase support, according to the APD staff who are tasked with using the system, is virtually non-existent.  Reportedly, even obtaining a copy of the "users manual" has proven problematic.

## Results

Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not in Compliance**

### Recommendations for Paragraph 23:

***4.7.10a. Consider an external review and assessment of existing EIS processes and meld the results into recommendations regarding a "way forward" with existing processes, or development of a new system or adaptations to the existing systems.***

***4.7.10b:  Avoid the temptation to purchase a complex, complicated, difficult to learn and use system (such as the current system) and consider a system that meets current CASA requirements, is expandable and adaptable, allowing APD to grow the system as future needs are identified.***

**4.7.11 – 4.7.25 Assessing Compliance with Paragraphs 24-38: Use of ECWs**

During past reporting periods, the monitoring team conducted in-depth reviews with APD personnel of APD use of force cases that involved the use of ECWs. The results of those case reviews were communicated to APD for consideration as they continued to implement new policy provisions through training and operational oversight.  APD's subsidiary policy on Electronic Control Weapons (ECW) was approved by the monitor and DOJ in January 2016, bringing APD into policy compliance on CASA requirements in Paragraphs 24 through 36. That policy is currently due for review and revision.

The monitoring team reviewed APD training materials for the 2017 Use of Force Training Program-Phase I, (which included ECW recertification) that was completed by APD personnel (98.5%), and found the training incorporated the provisions of the CASA. The 2018 ECW training cycle begins in August 2018.

APD's past performance shows that the department has met operational compliance in each of the ECW cases reviewed by the monitoring team.  In each of the reviewed cases, APD officers were faced with sometimes complex sets of circumstances but were observed to use their ECW in a manner that complied with APD policy, legal standards and conformed with CASA requirements.

The monitoring team note that the attention that officers demonstrated in ensuring follow-up medical treatment was provided for people exposed to an ECW was excellent. APD officers were seen to routinely and immediately seek medical attention in cases involving ECW deployment.

We were provided with APD's 2019 Annual Audit Plan.  A new organizational structure within APD now includes a Compliance Division and the Performance Metrics Unit.  This unit is responsible for drafting the audit plan.

Based on the review of APD's planning, we believe APD has developed a comprehensive matrix and protocol to conduct directed, quarterly audits of ECW data.  Likewise, APD's audit coordinator delivered a comprehensive assessment of audit findings to the chief of police in the form of an internal memo entitled, "Electronic Control Weapon Download Data Audit." The memorandum specifically indicated that the purpose of the audit was to assess compliance with department policies and procedures as they relate to quarterly ECW downloads, spark test protocols, and the comparison of ECW download data to

use of force reports.[4]   The chief of police was provided specific, actionable recommendations based on the outcomes of the assessment.

If replicated and continued, this audit methodology and findings will stand as a strong foundation for APD to demonstrate operational compliance with respect to directed audits conducted at the organizational level. The report presented to the monitoring team included an outline of its methodology, a summary of findings, specific objectives, and comparison data that were used to assess reported use and show of force reports.  The report contained specific findings that led to recommendations to the chief of police concerning potential follow-up actions he could take. The compliance audit mirrors many of the audit processes utilized by the monitoring team, and outcome variables are directly tied to CASA requirements.

During its next site visit, the monitoring team will again meet with personnel responsible for the provisions of these paragraphs to determine what follow-up activities occurred as a result of this audit-- specifically, what APD did in response to the recommendations of the ECW use audit.   The ultimate value of the audit will be found in follow-up activities wherein APD should demonstrate they have "closed the loop" on their assessments.  The follow-up activities will show if APD has the capacity to replicate this process in the future and reveal if the program has a meaningful place in an overarching oversight and accountability process.

Work remains for APD to reach full compliance with paragraphs 37 and 38. While APD has developed the makings of a comprehensive, directed audit program, the steps they took need to be codified in written policy or procedures, and followed up by implementation and routinization of current and suggested policy and practice.  Absent these steps, their positive activities could end up being an *ad hoc* assessment and not a required and routine process.   The monitoring team has not been provided evidence (as of the close of this reporting period) that procedures and policy have been developed for random reviews of ECW data.

During its last two site visits, the monitoring team found APD's auditing team to be engaged and invested in the development of procedures to meet the provisions of Paragraph 37 and 38.  That said, APD still has unresolved issues regarding "random and directed audits."  Processes need to be developed, articulated in written policy, and supported with protocols that guide the audit unit as it compares operational requirements with operational practice, allowing the audit unit to identify and address any discrepancies in audit reports via recommendation of training or retraining, follow-up, or discipline.

During the June 2018 site visit members of the monitoring team observed that APD is collecting the data required to make these critical assessments.   We

_____

believe that the audit unit has the talent and capability to accomplish these tasks.

As noted in previous monitoring reports, Paragraph 38 stipulates that APD conduct several types of analyses to determine critical factors involved in ECW usage.  These include:  the level of ECW use over time; the rate of suspect and officer injuries in relation to the rate of ECW use; and the effect of ECW "painting and arcing" on compliance rates.  The type of analytical capabilities to perform such assessments require specific skill sets and training.  While statistical computations may be possible, the analytic assessment of the data (i.e. determining what the data mean) requires an expertise in data analysis.

As we noted in prior reports, we believe there are APD personnel capable of doing the required analysis with appropriate direction, training, and expert support.  However, because of the type of assessments being conducted, the mere use of statistics, without a deeper review of the individual circumstances behind the use of an ECW during an event, will not be likely to reveal meaningful information that the organization can act upon.  We strongly recommend these data be subjected to meaningful statistical analysis and interpretation.

During past reporting periods, the monitoring team conducted in-depth reviews of APD use of force cases involving the use of Electronic Control Weapons (ECWs). The results of those case reviews, along with the implementation of policy provisions through training and operational oversight, resulted in operational compliance for Paragraphs 24 through 36.

During this monitoring period (February 1 through July 31, 2018) APD case ledgers revealed 55 cases in which an ECW was utilized. In March 2018, the monitoring team reviewed six ECW cases, slightly over a 10 percent random sample. During a site visit in March 2018, the monitoring team discussed many of these cases in depth with various members of APD. The monitoring team has since reviewed three more ECW cases. The purpose for choosing these three ECW cases is that they were all reviewed by the Backlog Review Team of the Compliance Bureau's Internal Affairs – Force Division, and thus provide some insight into the effectiveness of that unit. The cases reviewed, and a short synopsis of each case is listed below:

### [IMR-8-1] (Show of Force Investigation)

Police assembled a team of six officers to respond to a call for a fugitive with an outstanding warrant for aggravated assault with a deadly weapon. The officers proceeded to the fugitive's residence with a tactical plan inclusive of a force array with tactical weapons. Upon arrival at the residence, the fugitive fled the location on foot. A foot chase ensued, and when the fugitive stopped running after stumbling to the ground behind a fence, "less-than-lethal" force was used in addition to an officer using a show of force with an ECW. The officer in this

case appropriately transitioned from a firearm to an ECW. The officer announced he was utilizing an ECW and *painted* the fugitive with the ECW laser to ensure the fugitive did not flee again as officers were attempting to reach the fugitive in a fenced-in area not immediately accessible to on-scene officers. An on-scene supervisor conducted the Show of Force investigation on the ECW display and deemed it to be an in-policy Show of Force. This was affirmed by the Backlog Review Team. A different supervisor conducted a Supervisory Use of Force investigation on the use of less-than-lethal force by another officer at the scene of the apprehension.

## [IMR-8-2] (Supervisory Use of Force Investigation)

Police were dispatched to a local business for a reported shoplifting.  The suspect was known to employees of the business from past incidents, a fact that was reported to the officers.  The suspect left the establishment and when confronted began to run from the officers.  The suspect then got onto a bicycle and was chased by officers for the next several minutes.  At one point, there was an attempt by an officer (non-APD) to use an ECW on the suspect while he was still riding the bicycle, but it was not effective.  An APD officer encountered a male in the general vicinity who partially matched the description of the suspect who was being sought.  Ultimately, the person approached proved to not be the shoplifting suspect.  He was detained and during his interaction with the officer he also ran, with the officer in a foot pursuit.  While the second individual was still running, he was Tased from behind and fell to the ground. He was taken into custody with no other force being used.

The original chain of command reviews found the use of force on the second individual to be in compliance with APD policy.  The APD Backlog Review Team reviewed the case and noted numerous policy violations, including an out of policy use of force (the use of the ECW on a fleeing person).  We note here, as we do frequently in this report, and have done often in past reports, that a substantial number of supervisory force investigations fail to carefully assess, analyze, and "call" out-of-policy uses of force.  We do note, however, that the backlog review team established by APD identified these issues independently of the monitoring team.

Nevertheless, this is a critical shortfall in field supervisory practice that must be addressed before APD can come into compliance with the CASA.  On-scene supervisors must eventually be trained, supervised, and counseled, and where necessary, disciplined for failures in their assessments of their officers' uses of force.

## [IMR-8-3] Supervisory Use of Force Investigation

Police were dispatched to a report that an individual was throwing rocks at a security guard after being asked to leave a property. An officer saw a person who fit the description of this person walking on the sidewalk. The officer stopped and

26

exited his patrol vehicle and began to immediately yell to the person to stop. The person continued walking, then ran, with the officer in pursuit on foot and yelling for the individual to stop running. After crossing an intersection, the individual stopped, dropped his bags, and the officer pointed his handgun at the individual and continued telling yelling at him to get on the ground. The individual had no weapons in his hands and did not threaten the officer. No other persons were visible in the area. The individual picked up his bags off the sidewalk and began to walk away from the officer. The officer transitioned to his Taser, advised the person he would Tase him if he did not get down on the ground, then deployed his Taser seconds later, striking the individual in the back. This was deemed to be an in-policy use of force with the ECW by the investigating supervisor, but upon review of the Lieutenant, the ECW use was deemed out of policy. The lieutenant and commander requested a letter of reprimand for the officer and additional ECW training. The Backlog Review Team affirmed the out of policy use of the ECW in this case.

Based on our review, we have determined APD has continued operational compliance for Paragraphs 24 through 36. During future discussions, and during our next site visit, the monitoring team will use these case reviews as an opportunity to inform further discussions with the IA Force Investigation Division. Our intention will be to give technical assistance to APD as they continue to refine their use of force case assessments.  There are still opportunities to increase APD's capability in this area; however, we see significant progress in the quality of assessments by the IA Force Division.  We will be particularly interested in the remedy APD applies to cases in which lower level reviews were deficient, or failed to follow policy, and when officers violate policies that are focused on the requirement to use reasonable force.

### 4.7.11 Assessing Compliance with Paragraph 24

Paragraph 24 stipulates:

**"ECWs shall not be used solely as a compliance technique or to overcome passive resistance. Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered. Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range."**

### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.12 Assessing Compliance with Paragraph 25:  ECW Verbal Warnings

Paragraph 25 stipulates:

**"Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to discharging an ECW on the subject. Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning."**

#### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.13 Assessing Compliance with Paragraph 26:  ECW Limitations

Paragraph 26 stipulates:

**"ECWs will not be used where such deployment poses a substantial risk of serious physical injury or death from situational hazards, except where lethal force would be permitted. Situational hazards include falling from an elevated position, drowning, losing control of a moving motor vehicle or bicycle, or the known presence of an explosive or flammable material or substance."**

#### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.14 Assessing Compliance with Paragraph 27: ECW Cycling

Paragraph 27 stipulates:

**"Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power. Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power). After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.  Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Officers shall also weigh the risks of subsequent or continuous cycles against other force options. Officers shall independently justify each cycle or continuous cycle of five seconds against the subject in Use of Force Reports."**

**Results**

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.15 Assessing Compliance with Paragraph 28:  ECW Drive-Stun Mode

Paragraph 28 stipulates:

**"ECWs shall not be used solely in drive-stun mode as a pain compliance technique. ECWs may be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject, so that officers can consider another force option."**

**Results**

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.16 Assessing Compliance with Paragraph 29:  ECW Reasonableness Factors

Paragraph 29 stipulates:

**"Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options. ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons. In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others. Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations."**

**Results**

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.17 Assessing Compliance with Paragraph 30:  ECW Targeting

Paragraph 30 stipulates:

**"Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has**

29

reasonable cause to believe there is an imminent risk of serious physical injury."

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.18 Assessing Compliance with Paragraph 31:  ECW Restrictions

Paragraph 31 stipulates:

**"ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective."**

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.19 Assessing Compliance with Paragraph 32:  ECW Holster

Paragraph 32 stipulates:

**"Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm."**

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.20 Assessing Compliance with Paragraph 33:  ECW Certifications

Paragraph 33 stipulates:

**"Officers shall receive annual ECW certifications, which should consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes' and scenario- and judgment-based training."**

### Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.21 Assessing Compliance with Paragraph 34:  ECW Annual Certification

Paragraph 34 stipulates:

**"Officers shall be trained in and follow protocols developed by APD, in conjunction with medical professionals, on their responsibilities following ECW use, including:**

**a)** **removing ECW probes, including the requirements described in Paragraph 35;**
**b)** **understanding risks of positional asphyxia, and training officers to use restraint techniques that do not impair the subject's respiration following an ECW application;**
**c)** **monitoring all subjects of force who have received an ECW application while in police custody; and**
**d)** **informing medical personnel of all subjects who: have been subjected to ECW applications, including prolonged applications (more than 15 seconds); are under the influence of drugs and/or exhibiting symptoms associated with excited delirium; or were kept in prone restraints after ECW use.**"

### Results

Primary:       **In Compliance**
Secondary:  I**n Compliance**
Operational: **In Compliance**

## 4.7.22 Assessing Compliance with Paragraph 35

Paragraph 35 stipulates:

**"The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel."**

### Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.23 Assessing Compliance with Paragraph 36:  ECW Notifications

Paragraph 36 stipulates:

**"Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges)."**

**Results**

> Primary:  **In Compliance**
> Secondary: **In Compliance**
> Operational: I**n Compliance**

### 4.7.24 – 4.7.25 Assessing Compliance for Paragraph 37-38

Paragraphs 37-38 of the CASA address auditing and analysis requirements that APD must meet related to ECW:

- Paragraph 37: ECW Safeguards
- Paragraph 38: ECW Reporting

The monitoring team has spent an extensive amount of time providing perspective, feedback and technical assistance to APD's Audit and Assessment Unit (AAU) personnel during its January, March and June 2018 site visits.  We met with members responsible for the tasks associated with compliance with Paragraphs 37 and 38, and, as in the past, the monitoring team found the team APD has assembled within AAU to be among the most progressive in the organization.  As we would expect, the team simply thinks differently than most APD organizational units, and routinely engages in activities that help define the scope of issues APD faces by using systematic approaches to case review, data collection, and data analysis.

AAU spent the majority of this monitoring period writing a draft policy and audit plan and assembling data sets with the ultimate goal of better informing organizational decision makers.  The monitoring team has long believed that if APD properly staffed, supported and leveraged the work product and capabilities of AAU personnel, they would see significant progress toward CASA compliance.  AAU has been compiling and structuring data so that organizational leaders can visualize project "chokepoints" that could be hindering APD's progress.  These data sets will allow APD to draw inferences that can help them properly allocate resources and reduce long-standing inefficiencies.  The work product provided to the monitoring team by AAU, while still being fully developed, is the most comprehensive and professionally developed staff work we have reviewed to date.

In the past, the monitoring team has commented repeatedly on the need for APD to develop comprehensive matrices and protocols to conduct directed, quarterly audits of ECW data.  Likewise, approximately two years ago APD's (then) Audit

Coordinator delivered a comprehensive assessment of audit findings to the chief of police in the form of an internal memo entitled, "Electronic Control Weapon Download Data Audit." The memorandum specifically indicated that the purpose of the audit was to assess compliance with requirements of the CASA.  The report provided specific, actionable recommendations, but we were unable to identify any data to suggest that the report had any meaning to the former leadership to the organization.   At the time we wrote, "The ultimate value of the audit will be found in follow-up activities wherein APD should demonstrate they have 'closed the loop' on their assessment.  The follow-up activities will show if APD has the capacity to replicate this process in the future and reveal if the program has a meaningful place in an overarching oversight and accountability process."  We are aware of no meaningful internal response to our recommendations by the previous APD leadership.

In stark contrast to this past failure, the new AAU has provided draft SOP 8-2 "Audit and Assessment Unit" for our review. That document has several key provisions:

1. AAU coordinates and conducts audits in accordance with Generally Accepted Government Auditing Standards (GAGAS) and assessments.
2. Auditors who encounter internal or external "Threats to Independence," or efforts to interfere with or limit the scope of an audit will immediately notify their supervisor within the unit.
3. AAU shall have full and unrestricted access to all departmental functions, data, records (manual or electronic), physical property and personnel who may be relevant to an audit or assessment, unless specifically prohibited in writing by the chief of police for matters of homeland security requiring a security clearance.
4. If an audit report includes recommendations, a formal response with an action is required from the affected commander(s), including target dates for implementation for the recommendation to AAU within 14 calendar days.

In addition to reviewing draft SOP 8-2, the monitoring team was provided a preliminary 2019 Annual Audit Plan and a comprehensive Standard Operating Procedure Risk Assessment matrix for review.  We have always believed there were APD personnel capable of doing the necessary analyses required of the CASA if they were given appropriate direction, training, and support.  Having reviewed these preliminary documents, we conclude that members of APD's AAU are demonstrating the proper enthusiasm, ability and acumen to conduct auditing functions needed for CASA compliance.  In fact, AAU is not confining its role, and instead is looking across the entire CASA with a strategic approach to its auditing role.

AAU has completed an assessment of each organizational SOP for the frequency an SOP provision may be encountered, and the risk associated with that policy provision.  That type of critical thinking is not commonly found in law

enforcement agencies and is highlighted here to amplify our belief that AAU could have a profound impact on APD compliance if implemented properly and provided the staffing and tools necessary to meet its articulated responsibilities.

In the past, we recommended that APD consider developing a comprehensive "auditing plan" to ensure all the relevant CASA requirements are covered and redundancies of effort are eliminated.  AAU presented the monitoring team with a "Preliminary 2019 Annual Audit Plan" that identifies thirty (30) separate APD policies related to CASA compliance and provides tentative timelines and the time allocation (hours of work) that will be necessary to complete an audit of each SOP.  The plan also provides the aggregate total hours for the entire group of policies to be completed.  This information will be helpful to APD leadership when they are determining the proper staffing that will be needed to accomplish the tasks associated with the audit plan.  The information we were provided indicated it will require approximately 4,500 work hours to complete the tasks in the 2019 Annual Audit Plan.  That is more than 112 work-weeks, not including the many other tasks that are assigned to AAU personnel.

The work envisioned by the AAU is very similar to that currently engaged in by the monitoring team.  Once the audit processes are fully implemented, and the AAU fully staffed and organized, APD will be in a position to identify and address problems before the monitoring team identifies issues in its reporting processes. APD will then have a clear roadmap regarding how to address obstacles to full compliance.  If APD will address the issues prior to notice by the monitoring team, this is the very definition of operational compliance.  Adequate staffing will be critical for this unit, as will be appropriate authority and access to critical data, reports, and information.

In the IMR-9 reporting period, the monitoring team will focus on the final approval of SOP 8-2, the advancement of training of that SOP, and development of protocols to meet the specific provisions of these CASA paragraphs.  APD should focus attention on the provisions in Paragraph 38: i.e.,  "Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force, and whether officer and subject injuries are affected by the rate of ECW use" and "APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis."  All the provisions of Paragraph 38 must be met, but we highlight these two to ensure they are given proper attention as AAU continues to develop its plans.  Compiling comprehensive data to support the proper analysis to meet these two CASA provisions may require their own assessment plan.

The monitoring team is optimistic about the progress APD has made with the AAU and feel that the attitudes and abilities of the unit will reap benefits organization-wide.  We see a great opportunity for APD to build a strong internal capacity to collect and analyze data and provide informed recommendations to APD decision makers.  Given proper staffing and support, this unit could reveal itself as a centerpiece of organizational reform.  We recommend that APD

34

leadership regularly assess the workload and staffing of AAU. As their workload increases, and the products they create provide more and more benefits across APD, there will be a strong propensity from operational units to seek out their assistance.  If not managed properly, that response to their work could overburden their staff and reduce their effectiveness .

APD maintains its Primary Compliance status for these two paragraphs for this reporting period; however, the monitoring team believes that with internal support, AAU is certainly capable of achieving Secondary and Operational Compliance in the near future.  We are very encouraged that past recommendations that were given by the monitoring team related to complying with these paragraphs are being acted upon by AAU and APD command. This process alone could serve as a meaningful guide to other key management personnel at APD.

Issues with APD's chosen "early warning system," formerly captioned EIRS, have been widely reported in past monitor's reports.  At times data have been deliberately mis-reported or not reported at all.  This is an issue that has yet to be resolved, due in part to problems with the chosen automated information system. We have discussed these issues with APD, and while they are aware of the problems and issues, there is little consensus as to how to move forward.  Based on our knowledge of the current system, the lack of "technical support" from the vendor, and, incredibly, the reported lack of system documentation (users' manuals, etc.) available for the present system, APD may be well-suited to consider moving to a less-sophisticated but CASA-congruent database.

The current system was purchased as a state-of-the-art management system, but has proven unmanageable.  We have discussed several options with program managers for the current EIRS, but to date have noted very little progress in decision-making regarding alternative methods to reach compliance with Paragraph 37.  This needs to be a high priority for APD as it moves from the current system to one that is functional, or is able to divine "fixes" to the current system.  The choice to be made is dichotomous:  Fix the current system or scrap it in favor of a different (preferably field-proven) system.

It is clear to members of the monitoring team that the paradox regarding the current EIRS is beyond the scope of the abilities of current staff, none of whom are deeply schooled in program analysis, design, coding, assessment, and integration.  This issue, of necessity, needs to be elevated to City data services for resolution.  In the interim, we highly recommend that APD visit with Seattle, New Orleans, and Cleveland to assess if those jurisdictions have workable systems that can be adopted.  Compliance for paragraphs 37 and 38 are listed below.

### 4.7.24 Assessing Compliance with Paragraph 37:  ECW Safeguards

Paragraph 37 stipulates:

**"APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy. APD agrees to implement a protocol for quarterly downloads and audits of all ECWs. APD agrees to conduct random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's Use of Force Reports. Discrepancies within the audit should be addressed and appropriately investigated."**

**Results**

>Primary:      **In Compliance**
>Secondary:  **Not In Compliance**
>Operational: **Not In Compliance**

### 4.7.25 Assessing Compliance with Paragraph 38:  ECW Reporting

Paragraph 38 stipulates:

**"APD agrees to include the number of ECWs in operation and assigned to officers, and the number of ECW uses, as elements of the Early Intervention System. Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force, and whether officer and subject injuries are affected by the rate of ECW use. Probe deployments, except those described in Paragraph 30, shall not be considered injuries. APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis. ECW data analysis shall be included in APD's use of force annual report."**

**Results**

>Primary:      **In Compliance**
>Secondary:  **Not In Compliance**
>Operational: **Not In Compliance**

***Recommendations for Paragraphs 37 and 38:***

***4.7.24-25a:  APD should commission a "working group" from City data processing, APD Internal Affairs, APD Compliance Bureau and other related stakeholders who use, or would use, the EIRS system.  This working group should be tasked with identifying:  1.)  Current goals and objectives of the EIRS system design; 2.) Current absolute needs from the EIRS system related to "must have" components; 3.)  Realistic "future needs" identified by adding to the "must haves" all CASA-required capacities; and 4.) a general description of probable needs over the next 5 years.  This may require contracting with a systems-design firm or other outside resource.***

36

*4.7.24-25b:  Given the results of the process outlined in 4.7.2a, develop or purchase or develop a system that will be capable of meeting specified goals and objectives, and capable of meeting projected 5-year goals and objectives.*

*4.7.24-25c: "Build" or purchase a system that will meet identified "must have" needs and is expandable to meet identified future "must have" needs.*

*4.7.24-25d:  APD should obtain outside input from Seattle PD, New Orleans PD, and Cleveland PD regarding their actions in response to similar language in their consent decrees;*

*4.7.24-25e:  APD should consult with, and document recommendations from the City's data management division regarding whether the current system is salvageable, and if not, should consider moving to systems in use in other agencies currently undergoing DOJ-related reform processes that offer better chances for success than the current EIRS.*

**4.7.26 – 4.7.27 Assessing Compliance with Paragraph 39-40: Crowd Control Policies and After-Action Reviews.**

Paragraphs 39-40 of the CASA address requirements that APD must meet related to crowd control policies, and the management and supervision of APD responses to events involving mass demonstrations, civil disturbances and other crowd situations.  While the policies apply to all APD officers, the tasks associated with Paragraphs 39 and 40 are overseen by members of the APD Emergency Response Team (ERT).

As with other reporting periods, the monitoring team has spent time during this reporting period providing perspective, feedback and technical assistance to APD's Emergency Response Team (ERT) supervisors during its January, March and June 2018 site visits.  We met with supervisors responsible for the tasks associated with compliance and, as in the past, the monitoring team found receptiveness and a sincere interest in succeeding.  In the past, the monitoring team has commented extensively on ERT operations, to include the quality of After Action Reports related to major crowd events and training associated with their policies.  The quality of those types of documents and materials has increased over time.  ERT has pending training requirements related to training APD personnel in ERT policies and protocols.  The following paragraphs represent our findings related to Paragraphs 39-40.

Over the past year there have been two changes in leadership at ERT, which we see as a significant issue relating to Secondary and Operational Compliance with Paragraphs 39-40.  Changes APD have made have created a lack of continuity

to past technical assistance that has been given, and the rationale that past APD Commanders had when implementing specific CASA-related reform processes. This is not to impugn the necessity of the changes and is meant only to point out that APD compliance efforts can be delayed with repetitive changes of command. This is one reason the monitoring team stresses the importance of establishing strong policies and systems related to these paragraphs.

As we note in Paragraphs 90-105, certain types of uses of force by SOD were not being reported. This issue also has relevance to ERT compliance efforts. During our January 2018 site visit, we discussed use of force reporting related to barricaded subjects, and whether SOD reported when chemical munitions were used as a means of force in those instances. Up to that point, the monitoring team was unaware that an issue existed with respect to proper use of force reporting in those instances, by SOD. We were told that the previous APD leadership instructed SOD not to capture uses of chemical munitions against barricaded suspects as uses of force. We discussed this issue of chemical munitions deployments with more than one APD commander while on site, including academy SMEs.

We quickly recognized the relevance this issue had toward the use of chemical munitions in situations involving events and crowds of people, so we discussed the topic with the Commander of ERT. Through our many conversations, it became clear to the monitoring team that current members of the organization believed that a chemical munition used as a means of crowd control by ERT would in fact be a reportable use of force.

During our March 2018 site visit, the monitoring team again discussed this issue with members of SOD and ERT. It was clear during our visit that movement had not been made regarding this issue. We advised APD leadership that this was not an issue requiring a comprehensive report, and simply required addressing the current business process through a policy statement to all members of the organization. In short, this significant issue could be addressed nearly instantaneously if APD agreed that the use of chemical munitions against a barricaded suspect, or its use against protestors during crowd control, is a use of force.

We also recommended that APD establish a forward-leaning position on the use of Noise-Flash Diversionary Devices (NFDD) or "flash bangs", since under certain circumstances they are also reportable uses of force. It is important to note that APD had not reported an instance where ERT used chemical munitions or NFDD's as a means of crowd control, but the monitoring team saw the resolution of this issue as critical for ERT, in the event they were faced with a situation in which these methods may be deployed. To guide APD in its decision-making processes, we provided them with an up-to-date literature review regarding NFDD's as uses of force. The reader should note that we emphasized that nearly all independent research on the topic considers NFDDs as potentially lethal force.

The monitoring team was ultimately provided an Interoffice Memorandum dated, May 30, 2018, that was prepared by the current SOD Commander. In it, he detailed his research into the use of chemical munitions and NFDDs and concluded that chemical munitions and use of NFDD's by APD should be captured as reportable uses of force. The monitoring team reiterated on more than one occasion that the research was actually for APD's benefit only, and that the use of chemical munitions and/or NFDDs (under certain circumstances) against barricaded persons should have always been reported as uses of force.

On June 2, 2018, APD promulgated Special Order (SO) 18-51, "Use of Chemical Munitions Noise Flash Diversionary Devices" that supported the opinion of the monitoring team and the findings of the SOD Commander. SO 18-51 served as notice to the organization that chemical munitions and NFDDs will be investigated as uses of force. APD represented to the monitoring team that there were no crowd events during this monitoring period that required ERT to deploy chemical munitions or NFDD's. We have found no instances of such uses in our review of SOD records.

At the heart of past issues APD's ERT encountered was the fact that an effective policy was not in place, nor had the agency provided meaningful training to its ERT unit, the unit that could be expected to respond to a significant demonstration event. Weaknesses in pre-event preparation and incident command shortfalls, in the monitoring team's judgment, were major contributing factors in APD's problematic responses to past major protests in Albuquerque. As in past monitoring reports, the monitoring team has communicated to APD that ERT training should follow good policy development and include authentic, scenario-based incident command exercises that stress advanced planning and preparation, command post operations, and large-scale tactical maneuvering to respond to dynamic aspects of modern-day protests while operating within Constitutional bounds.

An issue that the monitoring team previously identified for ERT commanders was the inherent lag in time that existed between APD Field Services Bureau officers first arriving at the scene (of an unplanned crowd demonstration/protest) and trained ERT personnel arriving on scene to take control. In past conversations, we advised that the lag in time was often 2 hours, which introduced important policy and training implications that needed to be addressed for non-ERT personnel. This issue highlighted a further need to review call-out and response protocols for ERT supervisors. The monitoring team met with ERT commanders during our June 2018 site visit and learned that these protocols have been addressed to ensure that upon the first call for service an on-duty ERT supervisor will immediately respond to the scene. We encouraged ERT to capture response times for future responses to events and to assess data they collect for possible modifications to policy or training.

The Standing Operating Procedures 2-29 "Emergency Response Team" and 4-21 "Response to First Amendment Assemblies" have been under revision throughout this monitoring period.  During our site visits, the monitoring team has provided technical assistance to ERT, who were enthusiastic about advancing new training related to the policies.  We were told that once there is a formal adoption of new policies, ERT will then advance new training.  The monitoring team encouraged ERT command to develop and maintain training plans for ERT and non-ERT members of the Field Services Bureau.

We were informed that there are approximately ninety (90) ERT personnel (Approx. 75 officers and 15 supervisors) who will eventually receive eight (8) hours of comprehensive training.   ERT supervisors will receive the training first, and since many ERT supervisors are certified instructors they will provide training to the remaining ERT officers.  Components of SOPs 2-29 and all of SOP 4-21 will then follow for the remainder of the department.  The monitoring team, as a part of its normal data collection process, will review policy changes, any related training records and after-action reports to any demonstration or crowd control events as a component of the IMR-9 reporting process.  Before developing and delivering training, we encourage ERT to coordinate their efforts with the Training Academy and to reflect heavily on past technical assistance and feedback the monitoring team has provided.  Past IMRs provide significant guidance and recommendations for avoiding past shortcomings of training related to crowd control policies and procedures.

Based on our review, we have continued Primary compliance for Paragraphs 39 and 40.  Secondary and Operational compliance will be re-assessed in the next monitor's report; however, substantial policy work and training will be necessary to move forward the processes covered by this paragraph.

Members of the monitoring team have engaged in in-depth discussions with SOD leadership regarding methods to develop, train, and supervise SOD activities related to this paragraph.  While policies have been promulgated and approved by the monitoring team, training on those policies and supervisory/managerial processes designed to assure compliance with policies are still under development, and are not currently reflected in SOD operations.

In addition, members of the monitoring team have engaged in in-depth discussions with SOD leadership regarding methods to develop, train, and supervise SOD activities related to this paragraph.  While policies have been promulgated, training on those policies and supervisory/ managerial processes designed to assure compliance with policies are still under development.

### 4.7.26 Assessing Compliance with Paragraph 39: Crowd Control Policies

Paragraph 39 stipulates:

**"APD shall maintain crowd control and incident management policies that comply with applicable law and best practices. At a minimum, the incident management policies shall:**

  **a) define APD's mission during mass demonstrations, civil disturbances, or other crowded (sic) situations;**
  **b) encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses;**
  **c) require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and**
  **d) continue to prohibit the use of canines for crowd control."**

## Results

> Primary:      **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.27 Assessing Compliance with Paragraph 40

Paragraph 40 stipulates:

**"APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures."**

## Results

> Primary:  **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraphs 39 and 40:*

*4.7.26-27a:  Review past IMRs for relevant recommendations related to ERT practices related to public demonstrations and disturbances;*

*4.7.26-27b:  Review current policies from other agencies currently working through CASA-like reform processes in Seattle, WA; Cleveland, OH; and New Orleans, LA.*

*4.7.26-27c:  Adapt, adopt, or revise current and planned ERT policies, training and practice to conform to the requirements of current policy guidance and "lessons learned" in other cities involved in consent decree processes.*

***4.7.26-27d:   APD must develop and deliver a meaningful training program to its ERT and Field Services members.  That training should be centered on crowd control policies.  That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans.***

***4.7.26-27e:  APD must ensure that its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy and training within the agency.***

***4.7.26-27f: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.***

***4.7.26-27g:  Update and revise existing policy regarding NFDDs and chemical munitions to conform with the monitoring team's advice regarding same.***

**4.7.28 – 4.7.46 Assessing Compliance with Paragraph 41-59: Supervisory Review of Use of Force Reporting**

The series of related Paragraphs 41 through 59 encompasses requirements for reporting, classifying, and investigating uses of force that require a supervisory-level response based upon the type and extent of force used.  The CASA delineates this larger group of paragraphs into three separate sub-groups:  Use of Force Reporting – Paragraphs 41-45; Force Investigations – Paragraphs 46-49; and Supervisory Force Investigations – Paragraphs 50-59.

APD's use and investigations of force must comply with applicable laws and comport to best practices. Central to these investigations is a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  As with other reporting periods, the monitoring team spent an extensive amount of time providing perspective, feedback and technical assistance to APD personnel related to responsibilities for the reporting and investigation of uses of force during its January, March and June 2018 site visits.

During the March 2018 site visit members of the monitoring team hosted a meeting among a diverse cross section of APD personnel who have responsibilities related to use of force and serious use of force investigations. The purpose of the meeting was to provide insight and clarification as to how members of the monitoring team go about the business of reviewing use of force investigations, and to demonstrate a model process to APD.  The intention was

to increase APD staff's capability to review cases through a technical assistance demonstration.  This was accomplished by members of the monitoring team conducting a review of two use of force cases prior to the visit and then discussing our findings with the group.

We facilitated the meeting by discussing specific aspects of the force reports and underlying investigation, and showing videos associated with the cases for illustrative purposes.  Each case brought unique issues related to force reporting and investigation, missed opportunities for training, discipline and counseling, and other failures within the force oversight system.  The meeting was meant to be educational, and the feedback we received from those who attended was very positive.  This exercise was important for APD to experience, and should, we suggest, inform a better internal capacity to oversee uses of force.

During this monitoring period, the monitoring team noted a significant improvement in APD's planning efforts and its attention to detail, leading to better management of force investigations. During this monitoring period, 50 percent of the supervisory force investigations initiated between February 1 and July 31 have been completed. More importantly, eighty-one percent of the supervisory force investigations initiated during the first half (February-April) of the monitoring period have been completed and findings were developed. These results provide an assurance that the present backlog of force investigations dating back to 2017 is not being compounded by the addition of a large number of contemporary investigations to the backlog list.

APD's required revisions of the Use of Force suite of policies, which at the end of this monitoring period had yet to be approved, will represent another challenge to the progress made in overseeing force investigations. In the next monitoring period, the monitoring team will focus on how APD oversees force investigations and determines if subject officers' conduct "complied with APD policy," especially the new policies put into place.  We do note that, after the close of this reporting period, the chief of police and the monitor were able to reach agreement on a workable version of SOP 2-52 the main policy guiding the use of force.

In IMR-6, Paragraphs 41- 59 were in judged to be in primary compliance only. One of the reasons cited for this compliance status was the outstanding training gaps in paragraphs 87 and 88. Similarly, in this monitoring report we note in paragraphs 86 - 88 that APD's work to adjust the Use of Force suite of policies, as required by the CASA, will extend use of force training into 2019. When considering the gaps noted in IMR-6 that still need to be addressed through training and the introduction of the new use of force suite of policies, secondary compliance for paragraphs 41-59 cannot be considered until these policy and training priorities are satisfactorily addressed.

The training issues notwithstanding, various APD functions conform to various aspects of paragraphs 41-59. For example, during our

June 2018 site visit, the monitoring team met with APD representation from the Multi-Agency Task Force (MATF). A review of the MATF case ledgers and other documents continues to indicate the task force's activation for criminal investigations for officer-involved shootings, serious use of forces, and in-custody deaths, as well as its coordination with APD's Internal Affairs Bureau. Other APD functions related to these paragraphs are beginning to demonstrate the spirit and rigor that will ultimately be required to achieve full compliance. Specifically, the IA Force Division's use of data, workload analyses, keen attention to detail, and role-specific training appears to have more clarity in purpose and grasp of the CASA language than the monitoring team has seen since the inception of the settlement agreement.

After months of relative inertia with respect to reviewing backlogged supervisory and serious use of force investigations, APD has mounted what appears to be a well-assembled and data-driven team within the IA Force Division.  APD has finally commenced work in earnest on reviewing these cases. At the close of the monitoring period on July 31, 2018, approximately 6% of the backlogged cases had been reviewed and completed. In IMR-9, the monitoring team will assess the effectiveness of the various plans APD has implemented to address this backlog of use of force investigations. We note that the most recent workload analysis and proposed staffing plan (dated August 13, 2018) offers staffing options that project the completion of these backlogged investigations to occur anywhere between January 1, 2019 and August 10, 2019. In addition to assessing the effectiveness of these various plans, the monitoring team will also assess the rigor and the timeliness of these delinquent use of force investigations.

In IMR-9 the monitoring team will focus its attention on APD's ability to demonstrate its adherence to the 14 points of supervisory use of force investigations pursuant to Paragraph 52. The monitoring team is concerned about the quality of these investigations for several reasons. First and foremost is that these investigations are not subjected to the review of the data-driven IA Force Division that is currently reviewing the backlog of use of force investigations. Examples of our concerns with supervisory use of force investigations can be illustrated with the monitoring team's review of the three ECW cases noted in Paragraphs 24-36 of this report. For clarity, we revisit our concerns here.

In **[IMR-8-04]** (Show of Force / Use of Force), a supervisor who ordered the use of a Taser actually investigated the show of force stemming from an officer painting somebody with an ECW.  In the companion supervisory Use of Force investigation, an officer

deployed less-than-lethal force twice. The first time (40mm sponge round) was based on a supervisor's instruction to destroy an outdoor camera believed to be installed by the fugitive they were pursuing. The second time the officer deployed less-than-lethal force (40mm rubber bullet), again on the orders of a supervisor, was when he struck the fugitive with the rubber bullet 2-3 seconds after he fell to the ground, following a foot chase. This use of force against the fugitive while he was on the ground was initially deemed to be an in-policy use of force at the supervisory level, but appropriately found to be out-of-policy by the Backlog Review Team.

In this same supervisory investigation, the process lacked investigative rigor; no witnesses were canvassed, based on the explanation that no witnesses were in the area. However, a review of all of the officers' lapel videos revealed an officer directing people near the scene on two occasions to "get back inside." Most egregiously, of the six officers at or near the scene of the deployment of the 40mm round of ammunition on the fugitive, the supervisor chose to interview only the officer who fired the 40mm round.

Audit records revealed the supervisor did not even view the majority of OBRD's of the other officers until after he interviewed the officer who fired the 40mm weapon at the individual lying face down on the ground.

In another case, *[IMR-8-5],* a Supervisory Use of Force investigation discussed in Paragraphs 24-31 and 34-36 of this report, a show of force was not appropriately cited by the field investigation and review, but was found in the review of the videos by the monitoring team as well as by the Backlog Review Team.  In this particular case, the officer reported he drew his duty weapon out to the *low ready* position, but the OBRD clearly shows the firearm was aimed at the upper body of the individual stopped by the officer. This particular discrepancy has been pointed out to APD numerous times by the monitoring team during past monitoring periods and video review sessions.

APD's Compliance efforts for Paragraph 41-59: Supervisory Review of Use of Force Reporting have fallen short in multiple areas.

Compounding our concerns about the quality of these supervisory investigations is the fact that the Force Review Board has not been operational since November 2017. Therefore, the agency oversight of the rigor of these investigations is diminished. We consider the cessation of FRB meetings a critical issue.

Finally, the monitoring team expresses a sincere concern about the problematic past pattern of APD to allow the use of "Additional Concerns Memos" (ACM's) to address blatant policy and rule violations rather than referring them to Internal Affairs for investigation and appropriate agency action. Supervisors conducting deficient supervisory investigations also seem to be predominantly cited on ACM's.  We will focus attention to determine if supervisors who have had repeated discrepancies in their use of force investigations have had notations in their performance evaluations, have been referred to training, or have been subjected to internal discipline.

The scope and impact of the ACM process will receive our detailed attention in the next reporting period.  Based on our review, we have determined Primary Compliance should be continued for Paragraph 41-59.  We strongly recommend that APD sergeants, lieutenants and commanders review the feedback and recommendations that were provided for paragraphs 41-59 in IMR-6.  There is significant feedback that could benefit APD as they continue to build their capabilities in the investigation and oversight of uses and serious uses of force.

### 4.7.28 Assessing Compliance with Paragraph 41:  Use of Force Reporting Policy

Paragraph 41 stipulates:

**"APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices. The use of force reporting policy will require officers to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force. Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor. This reporting requirement also applies to off-duty officers engaged in enforcement action."**

### Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.29 Assessing Compliance with Paragraph 42:  Force Reporting Policy

Paragraph 42 stipulates:

**"The use of force reporting policy shall require all officers to provide a**

46

written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the investigation. The written or recorded narrative will include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject's behavior; (d) the level of resistance encountered; and (e) a description of each type of force used and justification for each use of force. Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force."

### Results

Primary: **In Compliance**
Secondary:**Not In Compliance**
Operational: **Not In Compliance**

## 4.7.30 Assessing Compliance with Paragraph 43:  Reporting Use of Force Injuries

Paragraph 43 stipulates:

"Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action."

### Results

Primary:     **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.31 Assessing Compliance with Paragraph 44:  Medical Services and Force Injuries

Paragraph 44 stipulates:

"APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle."

### Results

Primary:     **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.32 Assessing Compliance with Paragraph 45:  OBRD Recording Regimens

Paragraph 45 stipulates:

**"APD shall require officers to activate on-body recording systems and record all use of force encounters.  Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination."**

### Results

> Primary:        **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.33 Assessing Compliance with Paragraph 46:  Force Investigations

### Paragraph 46 stipulates:

**"All uses of force by APD shall be subject to supervisory force investigations as set forth below. All force investigations shall comply with applicable law and comport with best practices. All force investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy."**

### Results

> Primary:        **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.34 Assessing Compliance with Paragraph 47:  Quality of Supervisory Force Investigations

Paragraph 47 stipulates:

**The quality of supervisory force investigations shall be taken into account in the performance evaluations of the officers performing such reviews and investigations**.

### Results

> Primary:        **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.35 Assessing Compliance with Paragraph 48:  Force Classification Procedures

Paragraph 48 stipulates:

**APD agrees to develop and implement force classification procedures that include at least two categories or types of force that will determine the force investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to optimize APD's supervisory and investigative resources on uses of force. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents: (a) officer-involved shootings; (b) serious uses of force as defined by the Memorandum of Understanding; (c) in-custody deaths; and (d) other incidents resulting in death at the discretion of the Chief.**

### Results

Primary:     **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.36 Assessing Compliance with Paragraph 49

Paragraph 49 stipulates:

**Under the force classification procedures, serious uses of force shall be investigated by the Internal Affairs Bureau, as described below. When a serious use of force or other incident is under criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Bureau will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Task Force shall periodically share information and coordinate with the Internal Affairs Bureau, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of serious uses of force. Uses of force that do not rise to the level of serious uses of force or that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force.**

### Results

Primary:     **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.37 Assessing Compliance with Paragraph 50:  Supervisory Response to Use of Force

Paragraph 50 stipulates:

**"The supervisor of an officer using force shall respond to the scene of the use of force to initiate the force investigation and ensure that the use of force is classified according to APD's force classification procedures.  For serious uses of force, the supervisor shall ensure that the Internal Affairs Bureau is immediately notified and dispatched to the scene of the incident."**

## Results

Problems with Supervisory Use of Force investigations (SUoF) are described in detail in pp. 22-24.  Members of the monitoring team reviewed an eleven percent sample (6 of the 54) SUoF cases for this reporting period.  Fully half of the cases sampled exhibited difficulties in the supervisory use of force investigation.

> Primary:      **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.38 Assessing Compliance with Paragraph 51:  Self-Review of Use of Force

Paragraph 51 stipulates

**"A supervisor who was involved in a reportable use of force, including by participating in or ordering the force being reviewed, <u>shall not</u> review the incident or Use of Force Reports for approval."**

## Results

> Primary:      **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.39 Assessing Compliance with Paragraph 52:  Supervisory Force Review

Paragraph 52 stipulates:

**"For all supervisory investigations of uses of force, the supervisor shall:**

**a) Respond to the scene, examine all personnel and subjects of use of force for injuries, interview the subject(s) for complaints of pain after advising the subject(s) of his or her rights, and ensure that the officers and/or subject(s) receive medical attention, if applicable**

**b) Identify and collect all relevant evidence and evaluate that evidence to determine whether the use of force was consistent with APD policy and identifies any policy, training, tactical, or equipment concerns;**

**c) Ensure that all evidence to establish material facts related to the use of**

50

force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;

d) Ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses are to be encouraged to provide and sign a written statement in their own words;

e) Ensure that all officers witnessing a use of force incident by another officer provide a use of force narrative of the facts leading to the use of force;

f) Separate all officers involved in a use of force incident until each has been interviewed and never conduct group interviews of these officers;

g) Ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;

h) Conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;

i) Utilize on-body recording systems to record all interviews;

j) Review all use of force narratives and ensure that all Use of Force Reports include the information required by this Agreement and APD policy;

k) Consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;

l) Make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects;

m) Obtain a unique tracking number; and

n) Where a supervisor determines that there may have been misconduct in the use of force, immediately notify the Area Commander and the Internal Affairs Bureau."

## Results

Compliance review processes for this reporting period found one instance in which a supervisor, in effect, reviewed his own use of force incident.  This involved a supervisor who ordered an ECW deployment, which was effected by an officer in response to his order.  The supervisor then reviewed his own actions and orders as the investigating officer.  Unfortunately, this policy violation was not noted by the sergeant's command reviewers:  lieutenants, commanders, or deputy chiefs.  Specific policy guidance prohibiting

such reviews needs to be enforced by chain of command.  The failure of administrative and command level personnel to note such a violation indicates a further failure at those levels of the organization as well.  We see this as a critical error in APD's oversight processes. We will follow-up during the next reporting period to determine what corrective actions have been taken by APD on matters similar to the one reported here.

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.40 Assessing Compliance with Paragraph 53:  Force Review Timelines

Paragraph 53 stipulates:

**Each supervisor shall complete and document a supervisory force investigation Force Report within 72 hours of completing the on-scene investigation. Any extension of this 72-hour deadline must be authorized by a Commander. This Report shall include:**

**a)   all written or recorded use of force narratives or statements provided by personnel or others;**

**b)   documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**

**c)   the names of all other APD employees witnessing the use of force;**

**d)   the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options; and**

**e)   documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.**

This paragraph has been problematic for APD in the past due data received containing irrelevant material, data not requested, data not in the format requested and material not submitted in a timely fashion. The monitoring team met with members from APD assigned to this paragraph during our March 2018 and June 2018 site visits to discuss the issues and to determine what corrective action was being implemented to ensure compliance with this portion of the paragraph. APD has made remarkable progress with this paragraph as it relates to the 72-hour requirement. APD submitted 60 Use of Force files for review by the monitoring team for the time period February 2018 through July 2018. Three reports failed to meet the criteria as set forth in the CASA:

- Case number **IMR-8-6** (The extension request was 6 days after the date of the incident)
- Case number **IMR-8-7** (No extension request and approved supervisory report entry into Blue Team 18 days after date of incident)
- Case number **IMR8-8** (No extension request and approved supervisory report entry into Blue Team 18 days after date of incident)

Areas of concern for the monitor include:

- APD has met the 95% threshold for the 72-hour requirement of this paragraph but a high number of the initial supervisory reports required an extension.

- The extensions were reviewed by Commanders and extensions were granted with stipulated timeframes depending on the circumstances for completion. We note that the other requirements of the paragraph will become harder to track because they will bleed into future reporting periods.

Nonetheless, APD is in compliance with the requirements of this paragraph at this time.

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

**4.7.41 Assessing Compliance with Paragraph 54:  Command Review of Force**

Paragraph stipulates:

**Upon completion of the Use of Force Report, investigating supervisor shall forward the report through his or her chain of command to the Commander, who shall review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The Commander shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.**

### Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.42 Assessing Compliance with Paragraph 55:  Force Review Evidence Standard

Paragraph 55 stipulates:

**"Where the findings of the Use of Force Report are not supported by a preponderance of the evidence, the supervisor's chain of command shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation. The supervisor's superior shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. Commanders shall be responsible for the accuracy and completeness of Use of Force Reports prepared by supervisors under their command. "**

### Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.43 Assessing Compliance with Paragraph 56:  Force Review Quality

Paragraph 56 stipulates:

**"Where a supervisor repeatedly conducts deficient supervisory force investigations, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules. Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force**

**investigation immediately and notify the Internal Affairs Bureau and the Chief. The Internal Affairs Bureau shall immediately take over the administrative."**

**Results**

> Primary:      **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.44 Assessing Compliance with Paragraph 57:  Force Review Board

Paragraph 57 stipulates that:

**"When the Commander finds that the supervisory force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board. The Force Review Board shall review the supervisory force investigation to ensure that it is complete and that the findings are supported by the evidence. The Force Review Board shall ensure that the investigation file is forwarded to the Internal Affairs Bureau for recordkeeping."**

During the March 2018 site visit members of the monitoring team met with a diverse cross section of APD personnel who have responsibilities for overseeing use of force and serious use of force investigations.  The purpose of the meeting was to provide insight as to how members of the monitoring team go about the business of reviewing use of force investigations.  The intention was to increase APD's capability to review use of force cases through a technical assistance demonstration.  This was accomplished by members of the monitoring team conducting a review of two use of force cases prior to the visit and then discussing our findings with the group.  We facilitated the meeting by discussing specific aspects of the force reports and underlying investigation, and showing videos associated with the cases for illustrative purposes.

Each case brought unique issues related to force reporting and investigation, missed opportunities for training, discipline and counseling, and other failures within the force oversight system.  The meeting was meant to be educational, and the feedback we received was very positive from those who attended.  This exercise was important for APD to experience, since the FRB should assume some aspects of an internal monitoring role.

The monitoring team has long believed the FRB, as it was constituted and managed, had been a significant contributing factor to past APD failures in its use of force oversight system.  Despite exhaustive

technical assistance, in the past, APD significantly struggled to establish a legitimate oversight entity in its FRB.  At the beginning of the IMR-8 monitoring period we were concerned this trend may continue with respect to the FRB.

APD was certainly aware there had been no FRB meetings since November 2017, and that lapse created a clear sense of urgency to get training developed and delivered as quickly as possible, so FRB meetings could resume.  However, those efforts were not well coordinated and were occurring while a complete overhaul of the use of force suite of policies was also underway.  We surmised that not enough consideration was being given to past feedback and technical assistance the monitoring team had provided, both in person and in monitor reports.  The monitoring team has written extensively in each of the past monitor reports about the poor performance of the FRB, and we strongly recommended that APD reflect on our past constructive criticisms, feedback and technical assistance.  We have cautioned APD to be very strategic and contemplative in its approach to the FRB as they moved forward.  During our June 2018 site visit, we discussed additional information we believed was important for APD to consider which was previously reflected in IMR-6.

It is clear that our feedback has resonated with APD, and functions related to these paragraphs are beginning to demonstrate the conscientiousness and effort that will be required to achieve compliance.  On July 27, 2018, APD produced a Completed Staff Work document regarding the Force Review Board.  This document was prepared by a member of the Compliance Bureau.  The efforts documented in that Staff Work document represent the most thoughtful and comprehensive assessment of the FRB to date.

Challenges will need to be addressed and overcome as APD rolls out its newly constituted FRB; however, the preliminary assessment that was presented to the monitoring team is a very promising start.  We believe APD now has people in place who understand the issues, and if supported properly, they should begin to formulate and implement a cogent plan to address FRB related issues.  The monitoring team will dedicate the time necessary to APD's efforts with the FRB during the IMR-9 reporting period to see how they have progressed.  We will continue our consult-advise-assess process as improvement in FRB systems are planned, assessed, and implemented.

Beginning in December 2017, and continuing throughout the eighth monitoring period, the monitoring team has continued to communicate its concern over an expansive use of force supervisory

56

investigation "backlog," which APD determined to be 304 supervisory and 89 serious use of force investigations.  We saw the "backlog" as the single greatest threat to advancing the organization toward CASA compliance and encouraged APD to develop a comprehensive plan that addressed how the "backlog" would be addressed.  As new APD leadership was attempting to assess the complexity of the CASA and its requirements, the problem continued to grow and become more unmanageable.   We reiterated our concerns over the "backlog" on several occasions and over three separate site visits during this reporting period.  At the same time, FRB oversight of these use of force cases was becoming a significant "backlog" of its own, since APD had not held a force review meeting of any significant type since November of 2017.  A central component to its responsibilities as outlined in Paragraph 78 states, "The Force Review Board shall conduct timely, comprehensive, and reliable reviews of all use of force investigations."  This provision is a key feature to influencing organizational reform, and the fact that the FRB has not conducted business since November 2017 is more than concerning to the monitoring team.

After months of relative inertia with respect to reviewing backlogged use of force investigations, what appears to be a well-assembled and data-driven team within the Force Division of Internal Affairs has finally commenced work in earnest on reviewing these cases. This work was supported by a model PINS (Problems-Issues-Needs-Solutions) document penned within the Compliance Bureau.  At the close of the monitoring period on July 31, 2018, approximately 6% of the backlogged cases had been reviewed and completed. In IMR-9, the monitoring team will assess the effectiveness of the various plans APD has presented and implemented to address this backlog of use of force investigations.  We will also revisit the manner in which the "new" FRB is approaching its responsibilities as the cases are completed.

During the eighth monitoring period, the monitoring team also noted a significant improvement in the quality of planning efforts and attention to detail designed to enhance to the oversight of the management of force investigations occurring outside the "backlog".  During the eighth monitoring period, 50% of the supervisory force investigations initiated between February 1 and July 31 have been completed. More importantly, eighty-one percent of the supervisory force investigations initiated during the first half of the monitoring period has been completed and findings have been reported. However, as of now these cases are not exposed to the IA Force Division's review.  Based on past performance, APD should expect issues in force reporting and investigations in this group of cases.  Exemplars of issues are illustrated with the monitoring teams review of three

57

ECW cases noted in Paragraphs 24-31 and 34-36 of this report.  It is crucial to APD's future success that these cases be exposed to an additional layer of review by the Force Review Board, and that the Force Review Board be properly poised to address issues as they are uncovered during their meetings.

Based on our review of completed work, we have determined Primary Compliance should be continued for Paragraphs 57 and 78: despite the lag in FRB meetings, policy support for a robust FRB is in place.

APD's work to revise the Use of Force suite of policies, which at the end of this monitoring period have yet to be approved, will represent another challenge to the progress toward the FRB overseeing force investigations. In the next monitoring period, the monitoring team will focus attention on APD's efforts to institute an effective FRB that is capable of addressing its past and future oversight responsibilities, especially as new policies are put into place.  We consider the FRB process to be on the critical path for overall compliance with force-related paragraphs in the CASA.

**Results**

> Primary:    **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 57:***

***4.7.44a: Formalize current plans for FRB development, establishing revised policies where necessary, and creating written "process" requirements reflective of those policies (how the policies will be implemented by FRB);***

***4.7.44b:  Establish written goals and measurable (quantifiable) objectives for FRB reform and upgrade processes;***

***4.7.44c: Report regularly on progress on the established goals and objectives related to the FRB process.***

**4.7.45 Assessing Compliance with Paragraph 58:  Reassignment of Force Review**

Paragraph 58 stipulates that:

**"At the discretion of the Chief, a supervisory force investigation may be assigned or re-assigned to another supervisor, whether within or outside of**

58

the Command in which the incident occurred, or may be returned to the original supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing."

## Results

Primary: **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.46 Assessing Compliance with Paragraph 59:  Abuse of Force Discipline

Paragraph 59 stipulates:

"Where, after a supervisory force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."

## Results

Primary: **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 41 - 59:*

*4.7.28-46a:  Finish on-going assessment and planning processes to bring the FRB back on-line with a clear set of goals, objectives, processes, and procedures designed to effectively review uses of force, using methodologies similar to those employed by the monitoring team over the past four years.*

*4.7.28-46b:  Establish systematic methods to take articulated goals, objectives and procedures and reduce them to specifically articulated, measureable outcome objectives related to the requirements of the operative components of Paragraphs 41-47.*

*4.7.28-46c:  Identify individual areas of concern noted in this paragraph and implement a set of systematic processes designed to address each area of concern expressed by the monitoring team regarding Paragraphs 41-47.*

***4.7.28-46d:  Develop carefully considered "checkpoints" for force-related processes employed by APD and audit these checkpoints assiduously for compliance, performance, and assessments of effectiveness and efficiency.***

***4.7.28-46e:  Routinely report on the status of the performance metrics established for the checkpoints stipulated in (b) above.***

***4.7.28-46f:  Craft assessment and evaluation processes for use of force-related policies, including carefully considered milestones and timelines for re-integration of the FRB into APD's force management systems processes.***

***4.7.28-46g:  Implement quarterly assessments of use of force-related "control points," e.g., training, supervisory reviews, FRB deliberations, inspections and audits***

***4.7.28-46h:  Ensure that all policy violations generated by line level personnel are noted by supervisory review and forwarded through the chain of command for review.***

***4.7.28-46i:  Ensure that all policy violations over-looked by first-line supervisors are identified by the chain-of-command reviews, and that appropriate corrective is taken by each level of review.***

***4.7.28-46j:  Ensure that all policy violations noted by chain-of-command reviews cover not just the officers, but also identify any potential failure points at the sergeant, lieutenant and commander levels.***

### 4.7.47 - 4.7.64 Assessing Compliance with Paragraph 60-77: Force Investigations by the Internal Affairs Bureau

The series of related Paragraphs 60 through 77 encompass requirements for Internal Affairs. These requirements direct members of Internal Affairs to respond to the scene and conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, and uses of force reassigned to Internal Affairs by the chief.

APD's structure for investigating serious uses of force cases previously consisted of the Internal Affairs Division (IAD), which had three units: The Internal Affairs Section, Critical Incident Review Team (CIRT), and the Force Investigation Team (FIT). These entities were overseen by the Professional Accountability Bureau (PAB). The reorganization of the internal affairs function with a Force Division

60

under the newly formed Compliance Bureau has provided more focus on the CASA requirements under Paragraphs 60-77. Prior to the monitoring team's June 2018 site visit, APD approved a plan to increase the staffing of the Force Division to review the backlog of use of force and serious use of force investigations.

The backlog of 89 cases identified as serious use of force investigations were assessed by APD and found to be in various stages of investigation and review. Roughly one-third of these cases were still being investigated by APD investigators; another one-third of these cases were in various stages of "in-chain" reviews; and the final one-third of investigations needed a comprehensive review prior to being deemed ready for forwarding to the Force Review Board (FRB). The Force Division's assessment of the state of the backlog revealed the majority of backlogged cases were not completed with the newer forms that were developed to help assure the completeness and thoroughness of the investigations, as well as to ensure appropriate referrals were made in the cases. Plans were developed during this monitoring period to build significant quality control loops into the review process for serious use of force investigations, a process recommended to APD by the monitoring team years ago.

Just prior to the end of this monitoring period, Force Division investigators commenced the review of serious use of force investigations that were deemed ready for the Force Review Board. The Force Division Commander recognizes that applying the new quality loops to these cases is a valuable learning tool (as well as a data-gathering tool for purposes of needs assessment) that can be leveraged across all of the backlogged investigations.

As with other reporting periods, the monitoring team has spent an extensive amount of time providing perspective, feedback and technical assistance to APD's Compliance Bureau and Force Division personnel during its January, March and June 2018 site visits.  We met with enlisted and civilian members alike, and found a genuine level of receptiveness and a sincere interest in attaining CASA compliance.

During our June 2018 site visit, the monitoring team met with members of Internal Affairs' Misconduct Division and Force Division. As previously mentioned, the reconfigured Force Division has the Internal Affairs responsibility to respond to the scene and conduct investigations of serious uses of force, as well as other uses of force as noted in the CASA. Discussions at that time were indicative of APD's efforts to ensure administrative investigations remain separate from other Internal Affairs criminal investigative efforts.

Consistent with the CIRT manual, commented on extensively in IMR-6, the Force Division personnel are trained in both criminal and administrative investigations. In fact, enhanced training consistent with Paragraph 60-64, and 69 (as well as other related Paragraphs) that took place during this monitoring period reinforced what was covered in the CIRT manual as well the 2017 CIRT training.  The 2018 enhanced training program was held primarily for newly assigned members to the Force Division. This program focused on role-specific training relative to reviewing the extensive backlog of use of force investigations.

Pursuant to Paragraphs 65, 66, and 76, certain CASA-defined uses of force can be assigned to the Multi-Agency Task Force (MATF) for investigation. Consistent with Paragraphs 81-85 of this report, whereby the monitoring team noted the participation of the MATF in three APD cases (initially classified as in-custody deaths) during this monitoring period, it is apparent that the Internal Affairs-Force Division receives support from other APD units inclusive of the MATF.

During our June 2018 site visit, the monitoring team met with a number of APD personnel from various entities within Internal Affairs and the MATF and discussed various issues pertaining to their notification and consultation with the District Attorney's Office, the FBI, and/or the U.S. Attorney's Office when use of force cases exhibit any indicia of criminal conduct. During our latest site visit (June 14, 2018), a member of the U.S. Attorney's Office arranged a meeting with various persons from APD to examine the details of APD's interactions with the District Attorney's Office. Members of the monitoring team attended this meeting. In addition to this meeting, the monitoring team reviewed various documents presented to us by APD (e.g., District Attorney Case Review List Form, Backlog Review Update – Project Status Reports, etc.) that are indicative of APD's compliance efforts with respect to Paragraphs 67, 68, and 77 regarding force cases exhibiting indicators of criminal conduct.

When assessing compliance with Paragraphs 48-52 in this report, the monitoring team has already discussed the fact that the Force Review Board has not been operational since November 2017, thus critically jeopardizing APD's oversight capabilities to ensure the quality and rigor of these investigations. Further discussion about this matter here as it relates to Paragraph 75 would only be redundant. Some delay is understandable, given the state and quality of these investigations in the past; however, APD must soon move forward on salient issues confronting FRB operations.

Paragraphs 70-74 deal with the quality of the investigative process of Internal Affairs. Notwithstanding the lack of punctuality of completion of serious use of force cases as highlighted by the backlog of these investigations, the monitoring team has observed the Force Division's efforts focused on improving the quality of the use of force investigations it is reviewing. In IMR-9, the monitoring team will assess the quality of investigation reports, and will review how the appropriate commanding officers review these reports, particularly with respect to resolving investigative inconsistencies and findings not supported by a preponderance of evidence. With respect to Paragraph 74, the monitoring team has reviewed numerous documents that are indicative of the level of effort and oversight the Compliance Bureau and IA Force Division are exerting over the performance of investigators assigned to reviewing and investigating serious uses of force or backlogged supervisory force investigations. This effort and oversight are appropriately focused on the on-going processes to assess the qualities needed to be successful in the position of a Force Division investigator or supervisor.  The review effort also included tests of requisite skills and audio recorded interviews of these prospective Force Division members. Appropriately, the individuals scoring the lowest on these tests were not selected for assignment to the Force Division.  We commend APD's Compliance Bureau for its rigor in this winnowing process.

Based on our review, we have determined Secondary Compliance should be continued for Paragraphs 60 through 67, 69 – 72, and 76 – 77.  Paragraph 68 remains in Primary Compliance until evidence of adequate problem-centered training can be provided regarding compelled statements.

Paragraph 73 and 74 remain in Primary Compliance until evidence is presented illustrating the IA Commander took appropriate action to remediate testing failures of persons assigned to Internal Affairs.

### 4.7.47 Assessing Compliance with Paragraph 60:  IAB Force Review

Paragraph 60 stipulates that:

**"The Internal Affairs Bureau shall respond to the scene and conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Bureau by the Chief. In cases where the Internal Affairs Bureau initiates a criminal investigation, it shall ensure that such investigation remains separate from and independent of any administrative investigation. In instances where the Multi-Agency Task Force is conducting the criminal**

investigation of a serious use of force, the Internal Affairs Bureau shall conduct the administrative investigation."

### Results

    Primary:   **In Compliance**
    Secondary: **In Compliance**
    Operational: **Not In Compliance**

## 4.7.48 Assessing Compliance with Paragraph 61:  Criminal and Civil Force Investigations

Paragraph 61 stipulates:

**"The Internal Affairs Bureau will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60. The Internal Affairs Bureau shall include sufficient personnel who are specially trained in both criminal and administrative investigations."**

### Results

    Primary:   **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

## 4.7.49 Assessing Compliance with Paragraph 62:  Revision of IAB Manual

Paragraph 62 stipulates:

**"Within six months from the Effective Operational Date, APD shall revise the Internal Affairs Bureau manual to include the following:**

**a)   definitions of all relevant terms;**

**b)   procedures on report writing;**

**c)   procedures for collecting and processing evidence;**

**d)   procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;**

**e)  procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;**

**f)   scene management procedures; and**

**g)   management procedures."**

64

**Results**

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

## 4.7.50 Assessing Compliance with Paragraph 63:  Staffing IAB

Paragraph 63 stipulates:

**"Within ten months from the Effective Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Bureau to fulfill the requirements of this Agreement. APD shall ensure that all serious uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary. At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Bureau."**

**Results**

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

## 4.7.51 Assessing Compliance with Paragraph 64:  Training IAB Personnel

Paragraph 64 stipulates:

**"Before performing force investigations, Internal Affairs Bureau personnel shall receive force investigation training that includes, at a minimum, the following areas: force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques. Internal Affairs Bureau personnel shall also receive force investigation annual in-service training."**

**Results**

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

### 4.7.52 Assessing Compliance with Paragraph 65:  Referral of Force Investigations to MATF

Paragraph 65 stipulates:

**"Where appropriate to ensure the fact and appearance of impartiality and with the authorization of the Chief, APD may refer a serious use of force or force indicating apparent criminal conduct by an officer to the Multi-Agency Task Force for investigation."**

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

### 4.7.53 Assessing Compliance with Paragraph 66:  MATF Assistance to IAB

Paragraph 66 stipulates:

**"To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Internal Affairs Bureau or the Multi-Agency Task Force in the investigation of any serious use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs."**

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

### 4.7.54 Assessing Compliance with Paragraph 67:  Notice to External Agencies of Criminal Conduct in Use of Force

Paragraph 67 stipulates:

**"The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation."**

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**

Operational: **Not In Compliance**

## 4.7.55 Assessing Compliance with Paragraph 68:  Consultation with External Agencies and Compelled Statements

**"If the Internal Affairs Bureau determines that a case will proceed criminally, or where APD requests a criminal prosecution, the Internal Affairs Bureau will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186. No other part of the investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation."**

**Results**

Primary:    **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.56 Assessing Compliance with Paragraph 69:  IAB Responsibilities in Serious Uses of Force

Paragraph 69 stipulates:

**"In conducting its investigations of serious uses of force, as defined in this Agreement, the Internal Affairs Bureau shall:**

**a) respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;**

**b) ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;**

**c) ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses should be encouraged to provide and sign a written statement in their own words;**

**d) ensure, consistent with applicable law, that all officers witnessing a serious use of force by another officer provide a use of force narrative of the facts leading to the use of force;**

**e) ensure that all officers involved in a use of force incident remain separated until each has been interviewed and never conduct group interviews of these officers;**

**f) review all Use of Force Reports to ensure that these statements include the information required by this Agreement and APD policy;**

**g)  ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;**

**h) conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;**

**i)  record all interviews;**

**j) consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;**

**k) make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and**

**l) train all Internal Affairs Bureau force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors."**

## Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

## 4.7.57 Assessing Compliance with Paragraph 70:  Use of Force Data Reports

Paragraph 70 stipulates:

**"The Internal Affairs Bureau shall complete an initial Use of Force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force."**

## Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

## 4.7.58 Assessing Compliance with Paragraph 71:  IAB Investigative Timelines

Paragraph 71 stipulates:

**"The Internal Affairs Bureau shall complete administrative investigations**

within two months after learning of the use of force. Any request for an extension to this time limit must be approved by the commanding officer of the Internal Affairs Bureau through consultation with the Chief or by the Chief. At the conclusion of each use of force investigation, the Internal Affairs Bureau shall prepare an investigation report. The report shall include:

a)  a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Internal Affairs Bureau's independent review of the facts and circumstances of the incident; 

b)  documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying Use of Force Data Reports. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement; 

c)  the names of all other APD officers or employees witnessing the use of force; 

d)  the Internal Affairs Bureau's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options; 

e)  if a weapon was used by an officer, documentation that the officer's certification and training for the weapon were current at the time of the incident; and 

f)  the complete disciplinary history of the target officers involved in the use of force."

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

## 4.7.59 Assessing Compliance with Paragraph 72:  IAB Report Review

Paragraph 72 stipulates:

"Upon completion of the Internal Affairs Bureau investigation report, the Internal Affairs Bureau investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Bureau. The Internal Affairs Bureau commanding officer shall review the

**report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance of the evidence standard. The Internal Affairs Bureau commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings. "**

## Results

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

## 4.7.60 Compliance with Paragraph 73:  IAB Findings Not Supported by Preponderance of the Evidence

Paragraph 73 stipulates:

**"For administrative investigations, where the findings of the Internal Affairs Bureau investigation are not supported by a preponderance of the evidence, the Internal Affairs Bureau commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report. The commanding officer of the Internal Affairs Bureau shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it. The Internal Affairs Bureau commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Bureau."**

## Results

> Primary:      **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.61 Assessing Compliance with Paragraph 74:  IAB Quality Control

Paragraph 74 stipulates:

**"Where a member of the Internal Affairs Bureau repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal from the Internal Affairs Bureau in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules."**

## Results

> Primary:      **In Compliance**

Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.62 Assessing Compliance with Paragraph 75:  IAB Quality Control

Paragraph 75 stipulates:

**"When the commanding officer of the Internal Affairs Bureau determines that the force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board with copy to the Chief."**

**Results**

      Primary:     **In Compliance**
      Secondary: **In Compliance**
      Operational: **Not In Compliance**

## 4.7.63 Assessing Compliance with Paragraph 76:  Force Investigations by MATF or FBI

Paragraph 76 stipulates:

**"At the discretion of the Chief, a force investigation may be assigned or re-assigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations or may be returned to the Internal Affairs Bureau for further investigation or analysis. This assignment or re-assignment shall be confirmed in writing**."

**Results**

      Primary:     **In Compliance**
      Secondary: **In Compliance**
      Operational: **Not In Compliance**

## 4.7.64 Assessing Compliance with Paragraph 77:  Discipline on Sustained Investigations

Paragraph 77 stipulates:

**"Where, after an administrative force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Bureau or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate. The Chief need not delay the imposition of**

discipline until the outcome of the criminal investigation. In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."

**Results**

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraphs 60-77:***

***4.7. 47-64a:  Conduct a thorough needs assessment related to training needs within the Compliance Bureau's Force Division;***

***4.7. 47-64b:  Document the actions of IA/Force Division Commander in response to testing failures of persons assigned to Internal Affairs.***

***4.7. 47-64c:  Ensure that all of those who failed the testing process or retrained and re-tested or are transferred out of Internal Affairs.***

***4.7. 47-64d:  Plan, establish time-lined goals and objectives to arrange adequate resources for IA/Force Division work processes and to ensure strong oversight and internal quality control processes for IA-Force Division work product, recommendations, and decision-making on force-related investigations.***

### 4.7.65 Assessing Compliance with Paragraph 78:  Force Review Board Responsibilities

Paragraph 78 stipulates that:

> "APD shall develop and implement a Force Review Board to review all uses of force. The Force Review Board shall be comprised of at least the following members: Assistant Chief of the Professional Accountability Bureau, the Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigations Bureau, a Field Services Major, the Training Director, and the Legal Advisor. The Force Review Board shall conduct timely, comprehensive, and reliable reviews of all use of force investigations. The Force Review Board shall:
>
> a)  review each use of force investigation completed by the Internal Affairs Bureau within 30 days of receiving the investigation report to ensure that it is complete and, for administrative investigations, that the findings are supported by a preponderance of the evidence;

**b)** hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident. The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Bureau investigation, shall not be present;

**c)** review a sample of supervisory force investigations that have been completed and approved by Commanders every 90 days to ensure that the investigations are complete and timely and that the findings are supported by a preponderance of the evidence;

**d)** order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings. For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;

**e)** determine whether the use of force violated APD policy. If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;

**f)** determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;

**g)** document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation, or 15 days of the review of sample supervisory force investigation; and

**h)** review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis."

## Methodology

The monitoring team has written extensively in each of the past monitor's reports about the poor performance of the FRB and we strongly recommended that APD reflect on our past criticisms, feedback, recommendations and technical assistance. We have cautioned APD to be very strategic and contemplative in its approach to the FRB as they moved forward, and during our June 2018 site visit we reiterated the fact that important information to consider (problem sets, causes, impacts, needed change) is dealt with extensively within IMR-6. APD is, again, referred to IMR-6 as a starting point for FRB issue resolutions.

It is clear that our feedback has resonated with current leadership at APD, and functions related to these paragraphs are beginning to demonstrate the conscientiousness and effort that will be required to

achieve compliance.  On July 27, 2018, a Completed Staff Work document on the Force Review Board was prepared by a member of the Compliance Bureau.  The efforts documented in the staff work represent APD's most thoughtful and comprehensive assessment of the FRB to date.

Further, that PINS document serves as a model for assessing most other issues facing the APD reform effort.  Challenges will continue to be faced as APD rolls out its newly constituted FRB, but the preliminary assessment that was presented to the monitoring team is a very promising start.  We believe APD now has people in place that understand the issues, and if supported properly, they can begin to formulate and implement a plan to address FRB related issues.  The monitoring team will dedicate time to APD's efforts with the FRB during the IMR-9 reporting period to determine how they have progressed and to provide "mid-course corrections" that may facilitate stronger development.   Work product generated by the Compliance Bureau continues to be exemplary.

During the March 2018 site visit members of the monitoring team hosted a meeting among a diverse cross section of APD personnel who have responsibilities overseeing use of force and serious use of force investigations.  The purpose of the meeting was to provide insight as to how members of the monitoring team go about the business of reviewing use of force investigations.  The intention was to increase their capability to review cases through a technical assistance demonstration.  This was accomplished by members of the monitoring team conducting a review of two use of force cases prior to the visit and then discussing our findings with the group.  We facilitated the meeting by discussing specific aspects of the force reports and underlying investigation, and showing videos associated with the cases for illustrative purposes.  Each case brought unique issues related to force reporting and investigation, missed opportunities for training, discipline and counseling, and other failures within the force oversight system.  The meeting was meant to be educational, and the feedback we received was very positive from those who attended.  In effect, the monitoring team "modeled" the expected role of the FRB for the benefit of demonstrating FRB responsibilities and monitor-recommended process.

The monitoring team has long believed the FRB, as it was previously constituted and managed, had been a significant contributing factor to past APD failures in its use of force oversight system.  Despite exhaustive technical assistance, in the past, APD struggled to establish a legitimate oversight entity in its FRB.  At the beginning of the IMR-8 monitoring period we were concerned this trend may continue with respect to the FRB.  APD was certainly aware there

had been no FRB meetings since November 2017, and that lapse created a clear sense of urgency to get training developed and delivered as quickly as possible, so FRB meetings could resume. However, those efforts were not well coordinated and occurred while a complete overhaul of the use of force suite of policies was in process.  We note that process is still underway, and like the process of developing APD's first set of approvable policies, is proceeding in a disjointed and laborious manner.

It also appears there was inadequate consideration of past feedback and technical assistance the monitoring team has provided to APD, both in person and in our monitoring reports. We have expended inordinate amounts of time over the last year trying to aid APD in conceptualizing new data-driven planning processes.

We laud the agency for its commitment and "can do" attitude; however, we must emphasize again the planning sequence:  Identify the *Problem*; identify the *Issues* causing the problem; identify what APD *Needs* to "have" to address the problem effectively; and identify step-wise *Solutions* designed to improve organizational performance related to the problem.

Beginning in December 2017, and continuing throughout the latest monitoring period, the monitoring team communicated its concern over an expansive use of force supervisory investigation "backlog", which APD determined to be 304 "Supervisory" and 89 "Serious Use of Force" investigations.  We see the "backlog" as the single greatest threat to advancing the organization toward CASA compliance and have encouraged APD to develop a comprehensive plan that identifies how the "backlog" would be addressed.

As new APD leadership was attempting to assess the complexity of the CASA and its requirements, the problem of the IA backlog continued to grow and become more unmanageable.   We reiterated our concerns over the backlog of IA force cases on several occasions and over three separate site visits.  At the same time, FRB oversight of use of force cases was becoming a significant "backlog" of its own, since APD had not held an FRB of any type since November of 2017. A central component to FRB responsibilities as outlined in Paragraph 78 states, "The Force Review Board shall conduct timely, comprehensive, and reliable reviews of all use of force investigations."  This provision is a key feature to influencing organizational reform, and the fact that the FRB has not conducted recent business is of substantial concern to the monitoring team.

After months of relative inertia with respect to reviewing backlogged use of force investigations, what appears to be a well-assembled and

data-driven team within the Force Division of Internal Affairs has finally commenced work in earnest on reviewing these cases. At the close of the monitoring period on July 31, 2018, approximately 6% of the backlogged cases have been reviewed and completed. In IMR-9, the monitoring team will assess the effectiveness of the various plans APD has presented and implemented to address this backlog of use of force investigations, and how the FRB is approaching its responsibilities as the cases are completed. Steady progress has been made since that date; however, much remains to be done.

During this monitoring period, the monitoring team also noted a significant improvement in planning efforts and attention to detail related to the management of force investigations occurring outside the "backlog".  During this monitoring period, 50% of the supervisory force investigations initiated between February 1 and July 31 have been completed.  This is a marked improvement.  More importantly, 81percent of the supervisory force investigations initiated during the first half of this monitoring period have been completed and findings were made.

However, as of now, these cases have not been exposed to the IA Force Division's review, so based on the monitoring team's assessment of past performance, APD should expect compliance issues in force reporting and investigations in this group of cases. Exemplars of such issues are illustrated with the monitoring teams review of three ECW cases noted in Paragraphs 24- 31 and 34- 36 of this report.  It will be crucial to APD's future success that these cases be exposed to an additional layer of review and that the FRB be properly charged, trained and supervised to address issues as they are uncovered during their meetings.

Based on our review, we have determined Primary Compliance is continued for Paragraph 78. Secondary compliance is dependent upon APD's ability to review, assess, and update use of force-related policies, and convert those policies into effective training for supervisors.  Operational compliance will require demonstrable evidence that APD is capable of, and willing to, implement and enforce those policies.

**Results**

APD's performance with Paragraph 78 is effectively in disarray at this time.  This is a direct result of failure to initiate meaningful FRB oversight over the past four years, a trend begun by the old administration, and not yet resolved by the new administration. The chief of police and his Compliance Bureau personnel are actively engaged in work to rectify these issues and to develop a workable

"way forward" (with assistance from the monitoring team) on this critical issue. During the previous administration, FRB simply ceased to meet. The monitoring team have consulted extensively on this topic with current personnel in Internal Affairs and responsible parties involved in the FRB process.  Nonetheless, work remains to be done on these CASA requirements related to internal affairs and FRB processes.

Primary:     **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### Recommendations for Paragraph 78:

*4.7.65a:  Consider contracting with outside consultants in process management and process engineering to identify the component parts of the issues confronted by APD in FRB and related processes.  The levels of work are extensive and intensive, and a process engineering approach may well be the best way forward for affected paragraphs.*

*4.7.65b:  Continue the work already underway to re-boot FRB processes at APD, with clear outcome goals, quality control, and executive level oversight by the Compliance Bureau, pending assessment by the monitoring team.*

*4.7.65c:  Thoroughly review IMR-8's related recommendations regarding FRB processes, and identify a clear "way forward" with goals, objectives, measureable milestones, and efficient quality control processes.*

*4.7.65d:  Isolate and analyze each critical component of the IA-Force and FRB review processes by developing process flow charts, GANNT and PERT charts.  Identify critical failure points and causes in previous systems, and analyze best-fit "fixes" to the existing system.*

**Monitor's Comments**

**IAB and FRB:**  APD needs to work assiduously to "re-boot" mutually supportive IAB and FRB processes.  In some cases, new policy work is required to ensure appropriate reach and impact of internal investigations relative to use of force and related processes.  In other cases, structural changes are necessary to allow work to flow in a fluid manner, to ensure proper oversight, and to bolster effective outcomes.

The CASA paragraphs that in the past have been addressed by FRB process are in limbo until conceptual, flow, process, and outcome variables relating to FRB are reviewed, clarified, and changed to bring APD into conformance with CASA requirements. The monitoring team have expended hundreds of hours working through this process and conveying to APD needs and outcome states associated with a functional FRB process. Recently, that advice seems to have been taken to heart; however, given the state of disarray within the initial FRB's oversight and decision-making functions, a significant amount of work remains to be done.

So serious is the problem that we cannot clearly assess compliance levels with the 19 paragraphs associated with the FRB and its quality control processes related to uses of force. Never, in the monitor's four decades of police service, have we seen one administration turn over such a broken process to its successors.

Considerable work needs to be done before APD can re-institute a meaningful high-level assessment process for in-field uses of force. APD is taking the prefatory steps to begin this process; however, progress will most likely be measured in months, not weeks.

### 4.7.66 – 4.7.67 Assessing Compliance with Paragraphs 79-80: Annual Use of Force Reporting

Paragraphs 79-80 relate to publication of an Annual Use of Force Report and related processes and building tracking and reporting systems for use of force by APD officers.

Compliance results for Paragraphs 79-80 of the CASA addresses requirements APD must meet via publication of a Use of Force Annual Report and developing a tracking system for officer use of force incidents.

The monitoring team has spent an extensive amount of time providing perspective, feedback and technical assistance to APD during its January, March and June 2018 site visits. In past reports the monitoring team has requested data sets for supervisory level use of force cases and serious uses of force cases and has conducted comprehensive reviews of a sample of those cases. While the purpose is to assess the quality of force reporting and supervisory force investigations in the field, we also obtain valuable information that has a direct impact on the quality of data reporting. Until APD officers completely and accurately report their use and show of force data, and until supervisors review those reports with an eye toward adherence to established policy, APD's use of force data will remain problematic.

APD's IA Force Division is currently addressing a significant use of force and serious use of force investigation "backlog".  In conversations between the monitoring team and Force Division personnel we have learned that detectives are uncovering instances where uses of force are not reported or not fully reported, as well as instances of shows of force are not properly reported.  These cases all represent significant issues to the publishing of a Use of Force Annual Report.  These are indicators of how grossly ineffective the previous administration had been in its CASA compliance efforts.  This ineffectiveness was painstakingly documented in IMRs 2-6, and hundreds of recommendations were made to the previous administration. We suggest that APD establish systems to capture reliable statistics in these cases and reconcile these misreported events against other use of force statistics.  We have noted some exceptional work of late by APD in data conversion processes for the CASA's "Paragraph 298 reporting systems.  This is a good starting point for retooling APD force reporting processes.  To date, the monitoring team has not been presented with a 2017 Use of Force Annual Report.

We have determined that APD maintains its Primary Compliance status for Paragraphs 79 and 80:  they have committed to "new" more reliable data and are collecting and analyzing those data, thus the policy for data reporting exists.  That policy needs to be operationalized, and normal course of business data reporting needs to be effectuated.

### 4.7.66 Assessing Compliance with Paragraphs 79:  Annual Use of Force Reporting

Paragraph 79 states:

> **At least annually, APD shall publish a Use of Force Annual Report.  At a minimum, the following information should be included in the Annual Use of Force Report:**

a) **number of calls for service;**

b) **number of officer-initiated actions;**

c) **number of aggregate uses of force;**

d) **number of arrests;**

e) **number of custodial arrests that involved use of force;**

f) **number of SWAT deployments by type of call out;**

g)  **number of incidents involving officers shooting at or from moving vehicles;**

h)  **number of individuals armed with weapons;**

i)  **number of individuals unarmed;**

j)  **number of individuals injured during arrest, including APD and other law enforcement personnel;**

k)  **number of individuals requiring hospitalization, including APD and other law enforcement personnel;**

l)  **demographic category; and**

m)  **geographic data, including street, location, or Area Command.**

## Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.67 Assessing Compliance with Paragraph 80

Paragraph 80 states:

**APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force investigations carried out by supervisors, the Internal Affairs Bureau, or Multi-Agency Task Force; and all force reviews conducted by the Force Review Board.  APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary.**

## Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 79 and 80:*

*4.7.66-67a:  APD should monitor use of force, serious use of force and show of force reporting discrepancies found as the IA Force Division reviews the backlog of cases.  Reporting errors must be reconciled to ensure that statistics published in APD's 2017 Annual Use of Force Report are accurate.*

***4.7.66-67b:  Moving forward, APD should ensure that data collection, classification, analysis and reporting for paragraph 80 requirements are subjected to the same rigor, care, and quality assurance processes as were provided for APD's "new" Paragraph 298 data reporting processes.***

### 4.7.68 – 4.7.72 Assessing Compliance with Paragraph 81 – 85: Multi-Agency Task Force (MATF) Participation by APD

Paragraphs 81 – 85 of the CASA address requirements that APD continue to participate in a MATF, consult with the participating jurisdictions to establish investigative protocols for the task force, and generally consult and coordinate with the participating agencies regarding investigative briefings and the release of information relevant to MATF investigations.

No changes in the MATF requirements or agreement have been made since the last reporting period. However, APD is currently working with other member agencies on a revised Memorandum of Agreement (MOA). As of June 15, 2018, the major proposed changes in language to the MOA pertain to ensuring the personnel assigned to the MATF are full time detectives or supervisors with member agencies, addressing the importance that a representative of each member of the MATF be present during interviews of involved personnel, addressing perceived deficiencies in a MATF investigation, and maintaining the confidentiality of MATF investigations.

Additionally, APD has developed a draft Investigative Bureau Order (SOP 5-8) to address MATF investigative protocols. The draft Order addresses CASA requirements (e.g., canvass for and interview of witnesses, ensuring officers involved in a use of force incident remain separated until each has been interviewed and/or complete a report, etc.).

APD continues to participate with all MATF partners on MATF investigative matters. Documents provided indicate APD members regularly attend briefings and meetings on MATF matters. A review of the MATF case ledger reveals the three APD cases investigated during this monitoring period are still pending completion.

Based on our review, we have determined operational compliance should be continued for Paragraphs 81 through 85.

### 4.7.68 Assessing Compliance with Paragraph 81:  MATF Participation by APD

Paragraph 81 of the CASA stipulates:

**"APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist. APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that govern the Multi-Agency Task Force are current and effective. APD shall ensure that the inter-governmental agreements are consistent with this CASA."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational:  **In Compliance**

### 4.7.69 Assessing Compliance with Paragraph 82:  Investigative Protocols for the MATF

Paragraph 82 stipulates that:

**"APD agrees to consult with participating jurisdictions to establish investigative protocols for the Multi-Agency Task Force. The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational:  **In Compliance**

### 4.7.70 Assessing Compliance with Paragraph 83:  Coordination with MATF

Paragraph 83 stipulates:

**"APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational:  **In Compliance**

### 4.7.71 Assessing Compliance with Paragraph 84:  Briefing with MATF

Paragraph 84 of the CASA stipulates:

**"APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational:  **In Compliance**

### 4.7.72 Assessing Compliance with Paragraph 85:  Expiration of MOU re MATF

Paragraph 85 stipulates:

**"If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding. This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in- custody deaths."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational:  **In Compliance**

### 4.7.73 – 4.7.75 Assessing Compliance with Paragraph 86-88:  Review of Use of Force Policies and Training; Use of Force Training Based on Constitutional Principles; and Annual Supervisory In-Service Training.

Paragraphs 86-88 address various training requirements that APD must meet related to use of force and supervision of use of force.  As with other reporting periods, the monitoring team has spent an extensive amount of time providing perspective, feedback and technical assistance to APD's Training Academy during its January, March and June 2018 site visits.  This monitoring period has been focused heavily toward technical assistance, as the new APD leadership builds its capacity to address CASA-related issues.  Also, during this monitoring period, the monitoring team has commented

on specific training materials APD advanced for our review.  The following paragraphs represent our findings related to Paragraphs 86-88.

Over the past year there have been three changes in leadership at the Training Academy, which we see as a significant issue related to reaching compliance in all force-related paragraphs.  Changes APD have made create a lack of continuity to past technical assistance provided by the monitoring team.   In the past, APD has struggled significantly in its training requirements, making APD more vulnerable to shortcomings than most other professional law enforcement organizations.  It has been obvious to the monitoring team that people chosen for the assignment in the past (while perhaps competent in other areas of the organization) were met by a steep learning curve in their efforts to move APD's training requirements forward in a meaningful way.  During our January, March and June site visits we met with the (then) Academy Commander, who demonstrated a sincere interest in advancing many of the recommendations found in past reports. Chief among those recommendations was the implementation of the 7 Step Training Cycle, academy oversight of organization-wide training and increasing staffing to meet CASA training requirements.

In terms of training progress, however, little has been accomplished to advance APD's compliance with Paragraphs 86-88.  Parenthetically, APD recently made a change at the Academy Commander position by bringing in outside talent.  The new Academy Commander possesses a more experienced background in training and curriculum development.  We encourage the new Commander to reflect heavily on our past critiques, feedback and technical assistance the monitoring team has provided in our past monitoring reports and in the numerous memorandums we have written.

As we have noted in the past, in our opinion, the Training Academy Commander must have the legitimate authority to influence all organizational training, to ensure non-academy commands are also adhering to proper training standards and policy.  As training development and delivery extends outside the Training Academy, issues directly impacting CASA compliance emerge.  Since the Academy Commander will have the most experience assessing CASA training requirements and working directly with the monitoring team on those requirements, she will be in the best possible position to offer guidance to APD leadership in other areas of the department.

We want to amplify one specific point that has been brought to the attention of APD multiple times in the past relating to training:

acceptable training found in other police agencies not under CASA-like processes is probably insufficient to meet the requirements of the CASA, because police agencies rarely focus on performance outcomes in training.  APD will find that performance outcomes related to the use and supervision of force in the field are at the heart of CASA operational compliance.  In the experience of the monitoring team, this type of training sophistication is not commonly found in a typical law enforcement agency.  Therefore, we encourage the newly appointed Academy commander to focus considerable attention on gathering training needs from the field (by familiarizing herself with training practices in Seattle, New Orleans, Cleveland, the New Jersey State Police, and the Los Angeles Police Department, all agencies currently undergoing, or having successfully completed CASA-like projects).  The Academy should ensure training objectives and curricula are "mapped" properly to affect specific performance changes, and that field implementation of training can be assessed and measured.  These processes will allow training curricula to be properly adjusted to respond to field performance.

Over the past several months, APD has adopted and implemented a 7-Step Training Cycle to enhance its training processes.  This came about after numerous conversations and technical assistance recommendations by the monitoring team over the past few years.  We saw the use of such a system as crucial because APD did not have an identifiable or documented training development process.  The implementation of this type of process was a critical step forward, but we cautioned APD that supporting the process with proper staffing was essential to success. Like other organizational commands, we have sensed frustration on the part of academy personnel in obtaining the necessary staffing to meet CASA training requirements, but some progress has been made.

While the monitoring team has seen the quality of training materials increase significantly from when we first met with APD officials, a lack of coordination and standardization of training across the organization remains.  Consequently, APD will likely continue to experience varying qualities of training curriculum organization-wide.  We have discussed on numerous occasions the critical importance of oversight by the Training Academy over all CASA-related training, and proper staffing of the academy to meet that challenge.  APD has created a new unit whose principle responsibilities will be centered on managing the 7-Step Training Cycle and monitoring curriculum quality.  If staffed, managed and supported properly, that unit should positively influence all APD training requirements.

The new training Commander has already had an impact.  The Academy has submitted its first "new" training project plan to the

monitoring team for review and comment.  We found it to be remarkably improved over past submissions, and judge it to be squarely in the "best practices" target we have long implored APD to facilitate at the Academy.  APD now has a model for acceptable lesson plans.  Every training endeavor subject to CASA compliance issues should reflect the same "standard of care."  This is a refreshing change at the Academy, where we have been militating for such change since June of 2015.

In the past, APD has been profoundly ineffective in collecting its CASA related training needs and developing meaningful and timely training for its officers and supervisors.  Past monitoring reports reflect deep inefficiencies in developing comprehensive plans to take full advantage of the training time APD commits their officers.  During this monitoring period, progress was not made toward Secondary Compliance in Paragraphs 86 - 88, principally because APD has again run up against the annual requirement to adjust the Use of Force suite of policies.  During our June 2018 site visit the then-Academy Commander projected training of the updated use of force policies extending well into 2019.  We still believe that timeline to be an aggressive schedule, but given the skill-set of the new Academy Commander, it is perhaps attainable.  We caution APD again, however, to be focused on quality of the training product, and to insist on a quality-first set of performance measures.

We also note that there exists a long-term (since IMR-4) set of pending training gaps noted again in IMR-6.  APD's training academy must ensure that when training of any new force related policies commence, those gaps are not left lingering.  In the past, APD has left a long line of unaddressed training gaps within its training processes that made the monitoring process extremely difficult to track.  This was despite our repeated warnings of the performance issues such gaps would create in the field.  We believe the past inefficiencies have frustrated line officers and supervisors, and have seriously affected compliance levels.  We suggest strongly that the "new academy" conduct an omnibus review of those identified gaps in IMRs 4-6 and ensure that new training eradicates them.

Based on our review, we have determined Primary compliance should be continued for Paragraphs 86 through 88.

### 4.7.73 Assessing Compliance with Paragraph 86:  Review of Use of Force Policies and Training

Paragraph 86 stipulates:

**"APD will review all use of force policies and training to ensure they**

86

incorporate, and are consistent with, the Constitution and provisions of this Agreement.  APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy."

### Results

Primary:   **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.74 Assessing Compliance with Paragraph 87:  Use of Force Training Based on Constitutional Principles

Paragraph 87 stipulates:

**"APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:**

a)   **search and seizure law, including the Fourth Amendment and related law;**

b)   **APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;**

c)   **use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;**

d)   **use of de-escalation strategies;**

e)   **scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;**

f)   **deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;**

g)   **crowd control; and**

h)   **Initiating and disengaging foot pursuits."**

### Results

Primary:   **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.75 Assessing Compliance with Paragraph 88:  Annual Supervisory In-Service Training

Paragraph 88 stipulates:

**"Supervisors of all ranks, including those assigned to the Internal Affairs Bureau, as part of their initial and annual in-service supervisory training, shall receive additional training that includes:**

a) **conducting use of force investigations, including evaluating officer, subject, and witness credibility;**

b) **strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force;**

c) **incident management; and**

d) **supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force. "**

## Results

Primary:     **In Compliance**
Secondary: **Not in Compliance**
Operational: **Not in Compliance**

*Recommendations for Paragraphs 86-88:*

*4.7.73-75a:  As we have suggested multiple times in the past, APD should develop a comprehensive training plan, based in part on information contained within the monitoring reports, and draw direct lines between policy, the CASA, training gaps identified by the monitoring team and the specific areas within their training curriculum where these issues are addressed.  The plan should include a table to ensure that the right topics are delivered to the right audience of people.*

*4.7.73-75b: APD should ensure that any training based on the new Use of Force suite of policies include the remediation of training gaps that were identified in IMR-6.*

*4.7.73-75c:  APD Academy Staff should seek out and attend training courses focused on the proper development of training curriculum and how to connect that curriculum to the measurement of performance outcomes.  Alternatively, the new Academy commander, who has a firm grasp on this practicum, should train a new set of "planning development and documentation" skills.*

**4.7.76 Assessing Compliance with Paragraph 89:  Annual Firearms Training**

Paragraph 89 stipulates:

**"Included in the use of force training set out above, APD shall deliver firearms training that comports with constitutional principles and APD policy to all officers within 12 months of the Operational Date and at least yearly thereafter. APD firearms training shall:**

**a)  require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms, as necessary, on an annual basis;**

**b)  require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;**

**c) incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program; and**

**d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times."**

## Methodology

The methodology outlined in Paragraphs 17-21, above, served as the baseline for compliance determinations for paragraph 89.

Introduction

The 2018 Firearms training cycle has been completed and the Firearms staff has compiled extensive data to document all that is required by APD policy and all they have accomplished in order to meet/exceed the CASA requirements.  We view this as excellent work that easily could, and should, be emulated by other APD staff as they consider how to respond to monitoring team findings.

96.46% of all APD personnel (873 of 905) completed firearms training.  Personnel who had not yet completed training were on various types of leave—Military, ILD or FMLA, etc.  Upon returning, each will be required to attend all missed training, including firearms, before being permitted to work.

APD is required to provide sufficient training courses to allow officers to gain proficiency and meet qualification requirements.  During past site visits, members of the monitoring team personally observed firearms training practices.  APD range staff have changed range hours to enable officers to practice firearms in a low-light

environment and has integrated monitoring team recommendations into its policy and procedures. The firearms staff have added additional days and times to allow more practice.  In reviewing data related to failures to qualify, firearms staff now documents the referral to additional training for poor-performing shooters.

Following the 2018 Firearms Qualifications cycle, the monitoring team was provided data that showed at least three officers who failed to qualify and then failed an immediate requalification attempt.  All three were ordered to surrender their firearms and police vehicle and placed in an administrative position until they returned to the range to qualify, as per approved policy.  Additionally, documentation was found that officers failing to qualify with rifle or shotgun were required to surrender those firearms until they returned to the range to qualify. The monitoring team sees this as another positive example of staff making changes in order to meet the requirements of the CASA.

**Results**

> Primary:    **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

**4.7.77 – 4.7.92 Assessing Compliance with Paragraph 90-105: Management of Specialized Units, and accompanying paragraphs focused on the Special Operations Division.**

Paragraphs 90 – 105 of the CASA address requirements that APD must meet related to management and supervision of functions inside the Special Operations Division (SOD) as follow:

Paragraph 90: Management of Specialized Units
Paragraph 91: Composition of Specialized Tactical Units
Paragraph 92: Training of Specialized Tactical Units
Paragraph 93: Tactical Unit Missions and Policies
Paragraph 94: Tactical Units Policy and Procedure
Paragraph 95: Annual Review of Tactical Policies
Paragraph 96: Documentation of Tactical Activities
Paragraph 97: Tactical Mission Briefings
Paragraph 98: Tactical Uniforms
Paragraph 99: Force Review Board Assessments
Paragraph 100: Eligibility Requirements for Tactical Teams
Paragraph 101: Tactical Team Training
Paragraph 102: K9 Post Deployment Reviews
Paragraph 103: Tracking K9 Deployments
Paragraph 104: Tracking K9 Bite Ratios
Paragraph 105: Analyzing Tactical Deployments

As with other reporting periods, the monitoring team spent an extensive amount of time providing perspective, feedback and technical assistance to APD's Special Operations Division (SOD) personnel during its January, March and June 2018 site visits. We met with enlisted and civilian members responsible for the tasks associated with SOD compliance and, as in the past, the monitoring team found SOD to be receptive and to possess sincere interest in succeeding. While SOD has historically led the organization in terms of compliance, this monitoring period we have focused heavily toward technical assistance as the new APD leadership builds its capacity to address CASA related issues. Also, during this monitoring period, the monitoring team has commented on specific training materials SOD advanced for our review, but more importantly we addressed use of force reporting deficiencies associated with SOD. The following paragraphs represent our findings related to Paragraphs 90-105.

Over the past year there have been two changes in leadership at the SOD, which we see as a significant issue regarding maintaining compliance in Paragraphs 90-105. Changes APD has made in leadership have created a lack of continuity to past technical assistance that has been given, and more importantly, these (necessary changes) have broken the link with the rationale and process that past APD Commanders had when implementing specific CASA related reform processes.

Likewise, civilian support staff that established administrative business processes to help SOD reach and sustain Operational Compliance have also changed. In past reports, the monitoring team has stressed the importance of establishing strong systems and policies within SOD to ensure that reform efforts can survive changes of command personnel. We have also stressed the importance of selecting command personnel who understand and respect the reform that has occurred within SOD. APD and SOD will certainly be tested, in the coming monitoring periods, by exigent events that will inform whether or not SOD has truly instituted business processes that can avoid "slippage" from past organizational reform practices and maintain a successful path through to sustained compliance.

We have noted for the last reporting period that SOD does not report certain types of use of force by SOD. During our January 2018 site visit we discussed Use of Force reporting related to barricaded subjects, and whether SOD reported when chemical munitions were used as a means of force in those instances. We were told that the previous APD leadership instructed SOD not to capture uses of chemical munitions against barricaded suspects as uses of force.

We considered this a serious departure from best practices, and recommended that APD immediately review case law and best practices in this area.  We strongly advised APD to discuss this specific issue with other organizational commands as well as the leadership of the organization.

We also provided SOD with a recent in-depth literature review conducted by the monitor relating to the issue of chemical munitions and "distraction devices." This literature review indicated that these devices are considered uses of force.  We stressed (at that time) that if a true reset of APD's CASA compliance efforts is to be considered valid, SOD must address this issue immediately in order to not lose the Operational Compliance they worked so diligently to achieve.  We discussed this exact issue of chemical munitions deployments with more than one APD commander while on site, including academy SME's.

It was clear that members of the organization believed that a chemical munition, whether breaching buildings or used as a means of crowd control by ERT, was in fact a reportable use of force.  We do not believe that any professional law enforcement agency would see the use of such chemical munitions as anything other than a reportable use of force.  The fact that the use of these devices was not being reported and reviewed properly is a clear reflection, and further verification, of the apathy the previous APD leadership had toward true organizational reform.  As soon as we noted these issues, we put SOD command on notice that swift remediation of the issue was essential.

During our March 2018 site visit, the monitoring team again discussed this issue with members of SOD.  Also present in the meeting were members from the Mayor's office and DOJ. It was clear during the meeting that movement had not been made regarding this issue, despite our written advice that change was needed.  We advised APD that this was not an issue requiring a comprehensive report, but one that simply required addressing the current business process through an edict to all members of the organization via policy, special order, or other direct means, followed by training and supervision.

In short, this significant issue could be addressed quickly if APD agreed that the use of chemical munitions against a barricaded suspect, or its use against protestors during crowd control, is a reportable use of force.  The failure of APD to address the issue meant that since January 2018, at a minimum, they could have had additional unreported uses of force.  We strongly recommended that this issue be brought to the attention of the chief directly and

immediately so that proper remediation of the issue could occur. We also recommended that APD establish a forward leaning position on the use of Noise Flash Diversionary Devices (NFDD) or "flash bangs", since under certain circumstances they are also reportable uses of force. We alerted APD that moving forward, this could be a critical area that could potentially move SOD out of Operational Compliance in certain CASA paragraphs if not immediately and reasonably remediated.

The monitoring team was ultimately provided an Interoffice Memorandum dated, May 30, 2018, that was prepared by the then-current SOD Commander. In it he detailed his research and conclusion that chemical munitions and use of NFDD's should be captured as reportable uses of force. On June 2, 2018, APD promulgated Special Order 18-51, "Use of Chemical Munitions Noise Flash Diversionary Devices" that supported the opinion of the monitoring team and the findings of the SOD Commander. SO 18-51 served as notice that chemical munitions and NFDDs will be investigated as uses of force. While this is a positive step, and demonstrates a professional response to the issue, the SO was not promulgated until nearly 6 months after we first identified the problem to APD. To our knowledge, the SO has not been incorporated into formal policy (no draft policy doing so has been forwarded to the monitoring team as of the date of our draft monitoring report for IMR-8). These processes are reminiscent of the manner in which the previous administration at APD handled issues identified by the monitoring team. These issues require serious follow-up, and adherence to nationally accepted practice.

The more difficult issue APD now faces is how to deal with past cases that were not reported as uses of force, since that failure impacts numerous CASA related paragraphs. While instances of NFDD and chemical munition deployments are historically captured in SOD After Action Reports (AARs), there was a significant concern on the part of APD that information that would be necessary to fully investigate past cases as uses of force, at this point, may not exist and would take an extensive amount of time to assemble. We pointed out the need to reconcile this issue because there will certainly be issues with the validity of annual use of force and early warning system data sets. Rather than assuming that information needed to rectify this problem is not available, it is incumbent on APD to investigate the availability of that data and develop an articulated response to this issue.

More importantly, as APD moves through an extensive use of force investigation "backlog", SOD cases will begin to pass to the Force Review Board (FRB). We pointed out that clear guidance and a

93

reasonable methodology for handling these cases at the FRB had to be established, and if there are data missing, that issue needs to be identified in terms of scope, the nature of the data needed, and alternative modalities to obtain those data points.

CASA compliance issues could arise from using incomplete data. The monitoring team further notes that any methodology limiting the scope of cases that would be properly captured would have to be approved by the monitor in consultation with the parties. To date we have not received a formal proposal from APD relating to these issues. Again, we consider this an urgent issue.

While discussing this issue with the current SOD Commander, we found him to be fully accepting of our perspective and feedback. In fact, we were impressed in his ability to influence the issuance of SO 18-51, and the response by APD leadership, since in the past these types of progressive actions proved to be exceptionally difficult to engender. We suggest that the SO (18-51) be codified in SOD and APD policy during the current "use of force" policy development process.

Based on our review, APD maintains Operational compliance for Paragraphs 90 through 105. We strongly recommend that APD should ensure that our guidance concerning NFDDs and field use of chemical gas is transitioned into operational policy at SOD and other units that have these tools in their field practice procedures. Failing to do so could potentially impact compliance status on these issues.

Detailed review of staffing, unit training practices, policies, and field practices indicate continued compliance with CASA requirements by APD's specialized tactical units.

### 4.7.77 Assessing Compliance with Paragraph 90: Management of Specialized Units

Paragraph 90 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances, provides for effective command-level accountability, and ensures force is used in strict compliance with applicable law, best practices, and this Agreement. To achieve these outcomes, APD shall implement the requirements set out below.**

### Results

94

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.78 Assessing Compliance with Paragraph 91:  Composition of Specialized Tactical Units

Paragraph 91 stipulates:

**"APD's specialized tactical units shall be comprised of law enforcement officers who are selected, trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units. The specialized tactical units shall consist of SWAT, Canine, and Bomb Squad/EOD."**

During this reporting period (February 2018 through July 2018) Special Operations continued with extensive training for the Bomb, SWAT, K-9 and CNT units. Individual, Unit and Team training was conducted and recorded on monthly reports. The monitoring team reviewed the monthly reports to ensure the requirements of the paragraph were being met. In addition to the training administered, three members tested and passed all requirements to be selected into Special Operations. The monitoring team received and reviewed data for the selection process of these three officers. All criteria for the process was documented and reviewed by the monitoring team.

Special Operations has developed and implemented certain policies (Bomb SOP 4-03, SWAT SOP 4-04, K-9 SOP 4-12, and CNT SOP 2-43) that have been reviewed and approved and address the requirements set forth in paragraph 91.

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.79 Assessing Compliance with Paragraph 92:  Training of Specialized Tactical Units

Paragraph 92 stipulates:

**"APD shall ensure that specialized tactical units are sufficiently trained to complete the following basic operational functions: Command and Control; Containment; and Entry, Apprehension, and Rescue."**

## Methodology

A review of the Special Operations training conducted by the monitoring team for the period (February 18 through July 18) confirmed that the operational functions included in this paragraph are regularly covered and documented. During the June 2018 site visit the monitoring team was invited to view live tactical training at the SOD facility. The monitoring team reviewed the Excel spreadsheet (2018 Tactical Files) that displays training by officer, by unit, and by operational function trained that correspond to those listed in paragraph 92.

**Results**

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

## 4.7.80 Assessing Compliance with Paragraph 93:  Tactical Unit Missions and Policies

Paragraph 93 stipulates:

**"Each specialized tactical unit shall have clearly defined missions and duties. Each specialized tactical unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

**Results**

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

## 4.7.81 Assessing Compliance with Paragraph 94:  Tactical Units Policy and Procedure

Paragraph 94 stipulates:

**"APD policies and procedures on specialized tactical units shall include the following topics:**

**a)    Team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility;**
**b)    Coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed;**
**c)    Personnel selection and retention criteria and mandated physical and tactical competency of team members, team leaders, and unit**

commanders;

**d)   Training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training;**

**e)   Equipment appropriation, maintenance, care, and inventory;**

**f)   Activation and deployment protocols, including when to notify and request additional services;**

**g)   Conducting threat assessments to determine the appropriate responses and necessary resources;**

**h)   Command and control issues, including a clearly defined command structure; and**

**i)   Documented after-action reviews and reports."**

## Results

Primary:   **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.82 Assessing Compliance with Paragraph 95:  Annual Review of Tactical Policies

Paragraph 95 stipulates:

**"The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually, and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement."**

## Results

Primary:   **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.83 Assessing Compliance with Paragraph 96: Documentation of Tactical Activities

Paragraph 96 stipulates:

**"In addition to Use of Force Reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations. After-action reports shall address any areas of concern related to policy, training, equipment, or tactics."**

## Methodology

A review of the Special Operations training conducted by the monitoring team for the period (February, 201818 through July, 2018)

97

confirmed that the operational functions included in this paragraph are regularly covered and documented. During the June 2018 site visit the monitoring team was invited to view live tactical training at the SOD facility. The monitoring team reviewed the Excel spreadsheet (2018 Tactical Files) that displays training by officer, by unit, and by operational function trained that correspond to those listed in paragraph 92.

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.84 Assessing Compliance with Paragraph 97:  Tactical Mission Briefings

Paragraph 97 stipulates:

**"APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment. APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations. All specialized tactical team members should have an understanding of operational planning."**

**Methodology**

For this report the monitoring team reviewed documentation during two site visits (March 18 and June18) for Operational Compliance with the requirements of this paragraph. As in the previous reporting period the monitoring team verified compliance by means of personal inspections, review of policies and discussions with SOD staff during site visits.

**Results**

The monitoring team, based upon case reviews, acknowledged that Tactical Sectional Commanders, Supervisors and Officers have a working knowledge of operational planning and apply that understanding and skill to actual operations. During the March 2018 and June 2018 site visits, the monitoring team requested documentation from APD that supports if such training was being conducted. During these visits the monitoring team witnessed personnel from SOD implement operational and tactical plans before and during tactical operations.  Special Operations continues to conduct extensive training at all levels and conforms to best practices nationwide and to the specifics of this paragraph.

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.85 Assessing Compliance with Paragraph 98:  Tactical Uniforms

Paragraph 98 stipulates:

**"All specialized tactical units shall wear uniforms that clearly identify them as law enforcement officers."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.86 Assessing Compliance with Paragraph 99:  Force Review Board Assessments

Paragraph 99 stipulates:

**"All specialized tactical unit deployments shall be reviewed by the Force Review Board in order to analyze and critique specialized response protocols and identify any policy, training, equipment, or tactical concerns raised by the action. The Force Review Board shall identify areas of concern or particular successes and implement the appropriate response, including modifications to policy, training, equipment, or tactics."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.87 Assessing Compliance with Paragraph 100:  Eligibility Requirements for Tactical Teams

Paragraph 100 stipulates:

**"APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria."**

**Results**

During the June 2018 site visit, the monitoring reviewed random APD Sworn Annual reviews for members assigned to tactical units. The annual reports show that members from the tactical units are displaying exemplary work in constitutional policing, integrity, community policing, and critical police functions.  The Special Operations Division, which oversees specialized tactical units, has established policies that set selection criteria for team membership and training requirements for all members. These are listed in the Bureau SOPs that cover Bomb Squad (4-03), K-9 Unit and SWAT (4-04). This unit policy is in compliance with the requirements of paragraph 100 and constitutes a best practice in the management of tactical units and personnel.  APD has incorporated the "unit policies" into its formal policies related to these functions, making it compliant with this paragraph.

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational:  **In Compliance**

### 4.7.88 Assessing Compliance with Paragraph 101:  Tactical Team Training

Paragraph 101 stipulates:

**"APD shall train specialized tactical units conducting barricaded gunman operations on competencies and procedures that include: threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders."**

### Methodology:

The monitoring team has reviewed the Tactical Section training and found that all subjects required in Paragraph 101 are covered in a wide array of training contexts, including but not limited to scenario-based training. CNT continues to be an essential operational component in tactical activations.

Training for the Tactical Section continues to be conducted on a regular basis in accord with national standards (NTOA) for high-risk tactical operations. APD tactical teams continued to demonstrate operational success in 2018.

### Results

100

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational:  **In Compliance**

### 4.7.89 Assessing Compliance with Paragraph 102:  K-9 Post Deployment Reviews

Paragraph 102 stipulates:

**"APD shall continue to require the Canine Unit to complete thorough post-deployment reviews of all canine deployments."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.90 Assessing Compliance with Paragraph 103:  Tracking K-9 Deployments

Paragraph 103 stipulates:

**"APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.91 Assessing Compliance with Paragraph 104:  Tracking K-9 Bite Ratios

Paragraph 104 stipulates:

**"APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold, and require interventions as appropriate. Canine data and analysis shall be included in APD Use of Force Annual Report."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**

Operational: **In Compliance**

**4.7.92 Assessing Compliance with Paragraph 105:  Analyzing Tactical Deployments**

Paragraph 105 stipulates:

**"APD agrees to track and analyze the number of specialized tactical unit deployments. The analysis shall include the reason for each tactical deployment and the result of each deployment, to include: (a) the location; (b) the number of arrests; (c) whether a forcible entry was required; (d) whether a weapon was discharged by a specialized tactical unit member; (e) whether a person or domestic animal was injured or killed; and (f) the type of tactical equipment deployed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

**Methodology**

The monitoring team reviewed the Division's Tactical Unit Deployment Tracking Sheet for the time period of February 1, 2018 through May 31, 2018.  APD had 24 activations in this reporting period in 2018.  The functionality and operation of APD's SWAT Unit has been reviewed in several paragraphs of this agreement.  APD continues to monitor and analyze the number, type, and characteristics of deployments, and states a clear reason for each tactical deployment, as well as the number of arrestees in each deployment.

**Results**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

***Recommendations for Paragraphs 90 – 105:***

***4.7.77-92a:  SOD should complete an assessment of 2017 After Action Reports to determine instances where chemical munitions and/or NFDDs were deployed and not reported as uses of force.  That data should be presented to the Chief of Police for his review and recommendations to the monitor.  The data should be included in APD's Annual Report as a sub-category with explanation.***

***4.7.77-92b: Because training occupies a significant role for SOD personnel, SOD personnel should attend advanced training (similar to Training Academy personnel) geared toward proper***

*lesson plan development and establishing field implementation measures.*

*4.7.77-92c:  Assess each recommendation outlined by the monitoring team in this paragraph, and move expeditiously to implement appropriate policy guidance, training and supervision.*

**4.7.93 – 4.7.96 Assessing Compliance with Paragraph 106 – 109: Special Unit Policies, and accompanying paragraphs focused on the Special Investigation Division.**

Paragraphs 106-109 of the CASA address requirements that APD must meet related to management and supervision of functions inside the Special Investigation Division (SID) as follow:

Paragraph 106: Specialized Unit Policies
Paragraph 107: High Risk Situation Protocols
Paragraph 108: Inspection of Specialized Units
Paragraph 109: Tracking Specialized Unit Responses

As with other reporting periods, the monitoring team has spent an extensive amount of time providing perspective, feedback and technical assistance to APD's Special Investigation Division (SID) personnel during its January, March and June 2018 site visits.  We met with members responsible for the tasks associated with SID compliance and, as in the past, the monitoring team found receptiveness and a sincere interest in meeting the provisions of the CASA.  SID has historically been one of the units that led the organization in terms of CASA compliance assessments, and during this monitoring period there was an emphasis on technical assistance as the new APD leadership builds its capacity to address CASA related issues.  The following paragraphs represent our findings related to Paragraphs 106-109.

Over the past year there have been two changes in leadership at the SID.  However, the most recent command change saw the movement of the SOD commander to SID, which we see as positive for SID's efforts to maintain compliance in Paragraphs 106-109.  Changes at APD can create a lack of continuity to past technical assistance; however, this change in command may result in positive business processes (that have been successful in two units) becoming synthesized under a single organizational command.  In fact, when members of the monitoring team met with the current SID commander, he indicated that he hoped to have such an effect on SID.  In past reports the monitoring team has stressed the importance of establishing strong systems and policies within SID to

ensure that reform efforts can survive changes of command personnel.  SID has always been an advocate for positive reform, and in fact were among the first organizational units to speak in terms of "sustainability", which is a professional and sophisticated concept we hope all APD commanders adopt.  We noted one potential gap in training new personnel assigned to SID (discussed below), but the new SID Commander immediately investigated the issue and committed to resolving it as soon as possible.

SID continues to make legitimate attempts to be responsive to the CASA and continues to be exceptionally receptive to the feedback they receive from the monitoring team.  The monitoring team met with members of SID who are responsible for addressing the terms of these paragraphs and were provided documentation to demonstrate that the business processes that helped establish operational compliance continue to exist.

Members of the monitoring team reviewed documentation that SID provided concerning newly assigned detectives to the Division.  As documented in past monitor reports, SID developed unit-level handbooks that set forth the unique standards, missions and duties for each of its subordinate units.  Those handbooks serve several purposes, including SID incorporating and reinforcing APD's use of force policies, including the provisions of the CASA.  Within the handbooks are "Proficiency Checklists" with criteria for a supervisor to assess each new detective against before they can conduct lone investigations.

Previously, members of the monitoring team worked closely with SID when they submitted training records, lesson plans and other course of business documentation for newly assigned detectives to receive once they begin their work at SID. We reviewed Unit Handbook "sign off" sheets and confidentiality acknowledgment sheets for fourteen (14) enlisted members of SID who were transferred to the Division during this monitoring period.  One point of concern was when we met with the new SID Commander during a site visit he was not aware of an independent SID training program that the monitoring team previously approved related to the handbooks.  However, before the monitoring team left APD, he met with us a second time and indicated that the training program would be held in the near future for the newly assigned detectives.  While important to document, we expect the new SID Commander's response to be swift to reconcile the training gap.  The monitoring team will collect training records from SID during its IMR-9 data review to verify the training program was delivered to the newly assigned detectives.  Finally, with the creation of new use of force policies, SID must

ensure that unit level handbooks are properly updated to reflect the new policies once they are promulgated.

Based on our review of the existing SID policy requirements, Annual Inspection Forms and the Annual SID Inspection Interoffice Memorandum documentation, we determined that SID remains in Operational Compliance with respect to Inspection of Specialized Units.  This is the third consecutive year that SID has completed their annual inspection, which demonstrates consistency of an internal business processes that prompts the command to take the appropriate steps related to SID Inspections.

The monitoring team also reviewed a draft Special Investigations Division Annual Review, SID Operational Plans and information they maintain in their SharePoint tracker system and determined that it captures each of the data points required by the CASA to maintain its current Operational Compliance status.  The documentation records that were reviewed revealed that SID collects and tracks all required data points for its deployments.

### 4.7.93 Assessing Compliance with Paragraph 106:  Specialized Unit Policies

Paragraph 106 stipulates:

**"Each specialized investigative unit shall have a clearly defined mission and duties. Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

**Results**

>Primary:    **In Compliance**
>Secondary: **In Compliance**
>Operational: **In Compliance**

### 4.7.94 Compliance with Paragraph 107:  High Risk Situation Protocols

Paragraph 107 stipulates:

**"APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required. APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response. The protocols shall include communicating high-risk situations and threats promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident."**

105

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.95 Compliance with Paragraph 108:  Inspection of Specialized Units

Paragraph 108 stipulates:

**"Within three months of the Effective Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training. APD shall conduct re-inspections on at least an annual basis."**

**Methodology:**

The monitoring team reviewed the Special Investigation Division's annual inspection forms that were completed in January of 2018. During the monitoring team site visit in June 2018, the monitoring team reviewed:

- SID Primary Weapons Systems Long Rifle Inventory List
- SID Defense Technology 40MM Gas Guns Inventory List
- SID Fleet Inventory List

Consistent with the unit's mission and training, a review of the individual inspection forms indicated that there was proper documentation of all weapons and equipment assigned or made accessible to SID.  An Interoffice Memorandum was submitted on January 2018 to document SID's yearly inspection.  The Memorandum, completed during the normal course of daily business, stated in part that all sworn personnel were involved and no issues of concern were located; additionally, all personnel were rated as satisfactory.  Weapons that are not currently assigned to SID personnel were also inspected to ensure serial numbers of equipment corresponds with documentation on inventory lists provided to the monitoring team.  The monitoring of these inspections is set to continue on at least an annual basis.

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.96 Assessing Compliance with Paragraph 109:  Tracking Specialized Unit Responses

Paragraph 109 stipulates:

**"APD agrees to track and analyze the number of specialized investigative unit responses. The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include: (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative unit member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

**Results**

> Primary:   **In Compliance**
> Secondary: **In Compliance**
> Operational:  **In Compliance**

**Monitor's Comments:**

SID should continue to monitor the adoption of new use of force policies that will impact the content of their unit level handbooks.  As needed, the handbooks will have to be updated before being presented to newly assigned members of the Division.

Because training is important for SID personnel to be successful, SID should follow up on its training of newly assigned detectives to ensure consistency in its intake of new detectives across the Division.

### 4.7.97 Assessing Compliance with Paragraph 110: Individuals in Crisis and Related Issues

Paragraph 110 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and**

**coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below."**

This overarching paragraph refers to the paragraphs 111-137, below. As such, this paragraph will not be noted in compliance until such time that other related required paragraphs are found to be fully in compliance.

Members of the monitoring team assessed data from the relevant policies as noted in the table below.

**Table 4.7.97 Policy Renewal Status for Behavioral Health Policies**

| Policy | Policy Name (Relevance to 110) |
|---|---|
| SOP 1-11 (previously 1-14) | BEHAVIORAL SCIENCES SECTION – *Due for review on 8/31/18 (Past Due)* |
| SOP 2-19 (previously 2-13) | RESPONSE TO BEHAVIORAL HEALTH ISSUES – *Due for review on 11/29/18* |
| SOP 2-20 (previously 2-42) | HOSTAGE, SUICIDAL/BARRICADED SUBJECT, AND TACTICAL THREAT ASSESSMENT – *Due for review on 10/16/18* |
| SOP 2-8 (previously 1-09) | USE OF ON-BODY RECORDING DEVICES / MANAGEMENT OF RECORDINGS (contains reference to "subjects in crisis") *Due for review on 6/2/18 (Past Due)* |
| SOP 5-3 (previously 3-06) | CRIMINAL INVESTIGATIONS DIVISION (contains referral to Crisis Intervention Unit) – *Due for review on 10/17/18 (Past Due)* |

**Results**

Two of the five policies addressing behavioral health issues listed above, are due to have been updated as of the date of preparation of this report. Based on the records available to the monitoring team, neither of these policy requirements have been assessed, and where necessary, updated. APD is not in compliance for this "overarching" paragraph. This is another factor creating substantial policy development backlogs at APD. Without policy, training is not feasible, and operational compliance is not attainable. In the monitoring team's experience, mental health practices are in reasonably regular flux, as new practices are developed and old practices are revised, updated, and re-crafted. This constitutes

108

another area of policy development, along with use of force policies that is falling behind the curve.  APD is in primary compliance for this paragraph—it has policies in place.  At least two policies, it appears, have not been updated according to schedule. Until these policies are updated, we caution APD to be circumspect about re-training its officers in mental health practice absent these updates.  As with the early stages of the CASA-implementation process, delays in policies generate delays in training, which lead to delays in adequate supervisory processes, which are the definition of non-compliance.

The monitor notes that this is a recurring theme, of late, reminiscent of the serious issues confronted by the Parties early in the CASA implementation process, of an inability of the APD to expeditiously develop, articulate, and promulgate policy work in critical areas of the CASA.  Currently we note issues similar to the ones encountered in the early stages of the CASA process:  extreme difficulty moving the use of force policy process through the necessary steps to produce clear, demonstrable, trainable, and superviseable policy.

> Primary:      **In Compliance** (based on existing policy)
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.97:  Update clearly articulated policy for APD's mobile crisis teams, consistent with the policies in Table above, and provide training on that policy for APD's Mobile Crisis Teams.***

**4.7.98 – 4.7.115 Assessing Compliance with Paragraphs 111-128: Mental Health Response Issues.**

Sections 111-128 deal with mental health response issues addressed in detail in the CASA.  In determining compliance outcomes for these paragraphs, the monitoring team reviewed normal course-of-business documentation related to mental health response practices by APD during the reporting period for the eighth monitor's report.  Our findings are discussed below.

Data available to the monitoring team show regular monthly meetings for the community's Mental Health Resources Advisory Committee (MHRAC) that involved at times highly detailed discussions of problems, issues, needs and solutions.  MHRAC continues to be one of the success stories in APD community outreach processes.  MHRAC's reports, recommendations, communications, and assessment processes created during this reporting period continue to be a source of valuable insight for APD's mental health/crisis intervention strategies.  A broad spectrum of community mental

health leaders, APD command staff, APD's Crisis Outreach and Support Team members (COAST) and mental health professionals attend and participate in MHRAC meetings.  Our reviews of MHRAC's agendas and meeting minutes indicates broad-based input from community mental health experts, advocates, and providers.

Based on our extensive reviews of this reporting period's mental health processes designed to guide and support APD's commitment to work closely with community mental health leaders to craft meaningful, flexible, and effective services throughout the communities served by APD, APD has met, and in many cases exceeded, many of the requirements of the CASA related to mental health response planning, crisis intervention, and service delivery. Our review indicates that APD crisis outreach services worked with the advisory committee to assess, improve, and serve the target audience.

### 4.7.98 Assessing Compliance with Paragraph 111: Mental Health Response Advisory Committee

Paragraph 111 stipulates:

**"Within six months of the Effective Date, APD and the City shall establish a Mental Health Response Advisory Committee (Advisory Committee) with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness."**

### Methodology

The monitoring team reviewed MHRAC's reports, recommendations, communications, and processes created during this reporting period, as well as other data sources considered for this reporting period (which included: meeting agendas and minutes for MHRAC meetings; meeting minutes for subcommittee meetings, including the Information Sharing subcommittee (April 10, 2018; May 9, 2018); and various communications regarding policy reviews between APD and MHRAC written during the reporting period).

MHRAC meetings occurred monthly (except for July 2018) during this reporting period, along with some subcommittee meetings. Table 4.7.98 below briefly describes major topics covered during the MHRAC meetings.

**Results**

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

**Table 4.7.98:  MHRAC Subcommittee Meeting Topics**

| Reporting period month | Meeting date | Issues discussed |
|---|---|---|
| February 2018 | 2/20/18 | • COAST update<br>• Mobile Crisis Teams and MOU<br>• Policy Review |
| March 2018 | 3/20/18 | • COAST update<br>• Mobile Crisis Teams update<br>• Community Corrections |
| April 2017 | 4/17/18 | • COAST update<br>• CIU SharePoint<br>• MHRAC Membership |
| May 2018 | 5/15/18 | • Training and Resources sub-committees<br>• COAST update |
| June 2018 | 6/19/18 | • CIU data<br>• APD's Policy Development Process |

| | | • MHRAC's future |
|---|---|---|

## 4.7.99 Assessing Compliance with Paragraph 112

Paragraph 112 stipulates:

**"The Advisory Committee shall include representation from APD command staff, crisis intervention certified responders, Crisis Intervention Unit (CIU), Crisis Outreach and Support Team (COAST), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups."**

**Methodology:** We reviewed MHRAC's agendas and meeting minutes for monthly meetings that occurred during this reporting period.

**Results:** All specified groups named in this paragraph regularly participated in MHRAC meetings during this reporting period, and minutes reflected discussions of agenda items designed to facilitate the goals of MHRAC.

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

## 4.7.100 Assessing Compliance with Paragraph 113

Paragraph 113 stipulates:

**"The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event."**

## Methodology

Members of the monitoring team reviewed MHRAC's reports, recommendations, communications, and processes, and conducted interviews with specific members of the MHRAC. In addition, we

reviewed MHRAC monthly meeting agendas and minutes, and MHRAC subcommittee meeting minutes and memos.

**Results**

The MHRAC continued to provide guidance to the City and APD regarding developing and expanding the number of CIT-certified responders as well as response strategies for interacting effectively with homeless individuals and people with mental illness. During this reporting period, the MHRAC considered and provided feedback on the APD's policies and developing mobile crisis teams.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.101 Assessing Compliance with Paragraph 114:**

Paragraph 114 stipulates:

> **"APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality."**

**Methodology**

Members of the monitoring team reviewed a 100% sample of MHRAC's reports, recommendations, communications, and processes during the reporting period, assessing these documents for compliance with Paragraph 114.  The monitoring team also reviewed the signed MOU between APD's CIU and the University of New Mexico Health Sciences Center/UNM Health Systems (signed version dated 10/10/17).

**Results**

Negotiations between the City of Albuquerque and the University of New Mexico Health System resulted in the execution of a signed MOU that governs the release and exchange of information.  Based on the record available to the monitoring team at this time, no training has been provided to APD personnel regarding this October 2017 MOU.

> Primary:      **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

113

***Recommendation 4.7.101:  Provide training to, at minimum, CIU staff and certified CIT responders on this MOU.***

## 4.7.102 Assessing Compliance with Paragraph 115

Paragraph 115 stipulates:

**"Within nine months of the Effective Dates, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also, within nine months of the Effective Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario-based training involving typical situations that occur when mental illness is a factor.**

### Methodology

Members of the monitoring team reviewed a 100% sample of data provided to MHRAC by APD relating to provisions of Paragraph 115, including data analysis in the form of PowerPoint slides; and MHRAC and subcommittee meeting agendas and minutes.

### Results

APD continued to work with staff to produce meaningful data analysis of the data elements specified in paragraphs 129 and 137. APD has presented this data regularly to the MHRAC (including during the 6/19/18 MHRAC meeting during this reporting period). APD provides most behavioral health to the MHRAC for review, but it is unclear whether the provision of updated or new curricula and reviews are consistent.

> Primary:  **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not in Compliance**

***Recommendation 4.7.102:  Submit required documentation to MHRAC as well as documentation from MHRAC noting review and approval.  Ensure that documentation is responsive to relationship building and scenario-based training.***

## 4.7.103 Assessing Compliance with Paragraph 116

Paragraph 116 stipulates:

**"The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services."**

## Methodology

Members of the monitoring team reviewed data provided to MHRAC by APD relating to enhancing coordination within and among MHRAC's service base, including memos, emails, and MHRAC meeting minutes.

## Results

The MHRAC continued their work to enhance coordination of services for chronically homeless individuals and people experiencing mental health crisis. APD and the MHRAC regularly provided updated lists of resources to APD officers for them to provide to people they interact with while on patrol. The monitoring team's review shows a substantial and tangible degree of interaction and cooperation between local behavioral health systems and the APD on this issue, as well as tangible results in systems improvement recommendations.

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.104 Assessing Compliance with Paragraph 117

Paragraph 117 stipulates:

**"Within 12 months of the Effective Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources."**

## Methodology

Members of the monitoring team reviewed the Advisory Committee's public report from 2017; the 2018 MHRAC annual report was not due during this reporting period.

## Results

The MHRAC produced an Annual Report in 2017, and it is available on the website; it includes a report from the Co-Chairs of MHRAC but

does not include any subcommittee reports.  There is lag time from year to year and the production of and posting of this report has been inconsistent.

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.104:  Ensure MHRAC annual reports and subcommittee reports are posted on relevant CABQ websites within the first quarter following the year under review.***

### 4.7.105 Assessing Compliance with Paragraph 118 Behavioral Health Training

Paragraph 118 stipulates:

**"APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment."**

No evaluation methodology was developed for paragraph 118, as it is not a "requirement" for APD or City action, but simply states facts.

### 4.7.106 Assessing Compliance with Paragraph 119 Behavioral Health Training for all Cadets

Paragraph 119 stipulates:

**"APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by the end of 2015."**

### Methodology

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training.

APD continues to provide state-mandated basic behavioral health training to cadets in the academy as well as 40 hours of basic CIT to academy graduates upon completion of the field training program and to all field officers.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.107 Assessing Compliance with Paragraph 120

Paragraph 120 stipulates:

**"The behavioral health and crisis intervention training provided to all officers will continue to address field assessment and identification, suicide intervention, crisis de-escalation, scenario-based exercises, and community mental health resources. APD training shall include interaction with individuals with a mental illness and coordination with advocacy groups that protect the rights of individuals with disabilities or those who are chronically homeless. Additionally, the behavioral health and crisis intervention training will provide clear guidance as to when an officer may detain an individual solely because of his or her crisis and refer them for further services when needed."**

### Methodology

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training and observed several training sessions during this monitoring period, including the eCIT course on April 12, 2018. APD continues to utilize a training curriculum that addresses field assessment, identification, suicide intervention, crisis de-escalation, community mental health participation and scenario-based exercises and role play exercises appropriately and effectively. All training emphasizes the importance of community partnerships and appropriate referrals to services.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.108 Assessing Compliance with Paragraph 121

Paragraph 121 stipulates:

**"APD shall ensure that new tele-communicators receive 20 hours of behavioral health training. This training shall include: telephonic suicide intervention; crisis management and de-escalation; interactions with individuals with mental illness; descriptive information that should be gathered when tele-communicators suspect that a call involves someone with mental illness; the roles and functions of COAST, crisis intervention certified responders, and CIU; the types of calls that should be directed to particular officers or teams; and recording information in the dispatch database about calls in which mental illness may be a factor."**

117

**Methodology**

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training for tele-communicators and observed tele-communicator training on three different sessions in April and May 2018 (20 hours total).

**Results**

APD's 20 hours of behavioral health training for tele-communicators includes all topics noted in paragraph 121 as well as role-play scenarios drawn from actual 911 calls fielded by APD tele-communicator personnel. We observed this training and noted robust discussion and problem solving during the debriefs of the scenario exercises.

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

**4.7.109 Assessing Compliance with Paragraph 122**

Paragraph 122 stipulates:

**APD shall provide two hours of in-service training to all existing officers and tele-communicators on behavioral health-related topics biannually.**

**Methodology**

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training for officers and tele-communicators.

**Results**

APD has developed a 2-hour in-service training curriculum that addresses the requirements of New Mexico House Bill 93, entitled "Police Training for Mental Impairments." APD remains in compliance with the requirement of bi-annual training.

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

**4.7.110 Assessing Compliance with Paragraph 123: Crisis Intervention Certified Responders and Crisis Intervention Unit**

Paragraph 123 stipulates:

**"APD shall maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis. APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives housed at the Family Advocacy Center whose primary responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future. APD agrees to expand both the number of crisis intervention certified responders and CIU."**

### Methodology

Members of the monitoring team reviewed training and assignment records for CIU officers for the reporting period.  According to APD records a total of 187 field officers and 23 field sergeants are e-CIT trained, making them "certified responders" per this paragraph.

The APD maintains a Crisis Intervention Unit staffed with detectives housed at the Family Advocacy Center, with a total of 12 sworn officers in the CIU during this reporting period, which meets the 12 recommended in the "Albuquerque Police Department Comprehensive Staffing Assessment and Resources Study" conducted by Alexander Weiss Consulting, LLC (Final Draft Report, December 11, 2015).

We remain unaware of any specific methodology developed by APD to determine the department's definition of the "sufficient number" of crisis-intervention certified responders. The monitoring team's assessment is that staffing remains insufficient, based on the requirement that staffing for the advocacy center is below that articulated in the CASA.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.110:  Develop and execute a data-based, methodologically appropriate workload and manpower planning analysis that ensures that reliable "staffing levels" for eCIT officers are calculated, reported, set as staffing goals, and attained.***

119

### 4.7.111 Assessing Compliance with Paragraph 124

Paragraph 124 stipulates:

**The number of crisis intervention certified responders will be driven by the demand for crisis intervention services, with an initial goal of 40% of Field Services officers who volunteer to take on specialized crisis intervention duties in the field. Within one year of the Effective Date, APD shall reassess the number of crisis intervention certified responders, following the staffing assessment and resource study required by Paragraph 204 of this Agreement.**

### Methodology

Members of the monitoring team reviewed training records for the eCIT officers, who meet the definition of "field services officers who volunteer to take on specialized crisis intervention duties in the field."

### Results

The current staffing levels of crisis intervention "certified responders" (a total of 187 field officers and 23 field sergeants as of May 2018) falls short of the goal of 40% of field services officers. The CIU held eCIT classes on the following dates: April 12, 2018; May 10, 2018; June 14, 2018; and July 12, 2018.  The monitor has asked for updated numbers on staffing, and as of the date of publication of this report, we have not received an update.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **Not in Compliance**

***Recommendation 4.7.111:  Develop a recruitment, training and deployment plan for "Certified responders" that will meet the articulated goal of 40 percent of field services officers.***

### 4.7.112 Assessing Compliance with Paragraph 125

Paragraph 125 stipulates:

**"During basic crisis intervention training for field officers provided to new and current officers, training facilitators shall recommend officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals with mental illness to serve as crisis intervention certified responders."**

### Methodology

Members of the monitoring team reviewed recommendations obtained and assessed by training facilitators, along with recruiting emails to field services officers during this reporting period.

**Results**

The APD CIU instructors identify and recommend field officers well suited for the Enhanced CIT (eCIT) course; a member of the CIU reaches out to those officers and recommends that they enroll in an upcoming e CIT course.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.113 Assessing Compliance with Paragraph 126

Paragraph 126 stipulates:

**"Within 18 months of the Effective Date, APD shall require crisis intervention certified responders and CIU to undergo at least eight hours of in-service crisis intervention training biannually."**

**Methodology**

Members of the monitoring team reviewed training records for CIU personnel.

**Results**

The CIU did not provide 8-hour in-service "refresher" training during this reporting period. The CIU noted, however, that since current eCIT certifications will begin expiring in October 2018, "refresher" training will begin in September 2018.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

### 4.7.114 Assessing Compliance with Paragraph 127

Paragraph 127 stipulates:

**"Within 18 months of the Effective Date, APD will ensure that there is sufficient coverage of crisis intervention certified responders to maximize the availability of specialized responses to incidents and calls for service involving individuals in mental health crisis; and warrant service, tactical**

**deployments, and welfare checks involving individuals with known mental illness."**

## Methodology

During this reporting period, APD CIU continued to deliver Enhanced CIT (eCIT) training to address the requirement for "certified responders." Response times to crisis calls will be calculated after training of all "certified responders" is completed and APD has reached their 40% threshold.

## Results

Since eCIT training has not yet been completed (paragraph 124's requirement of 40% has not yet been reached), the operational elements of the policy are not in compliance. Review of critical CIU calls for process will begin after training of "certified responders" is completed.

     Primary:     **In Compliance**
     Secondary:  **In Compliance**
     Operational: **Not In Compliance**

***Recommendation 4.7.114:  Complete eCIT staffing and training as designed in order to reach 40% of all field personnel as required by Paragraph 124.***

### 4.7.115 Assessing Compliance with Paragraph 128

Paragraph 128 stipulates:

**APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so.**

## Methodology

Members of the monitoring team conducted ride-alongs with field officers several times during this monitoring period: April 10, April 12, June 12 and June 13. The ride- alongs were either with the Mobile Crisis Team or with field officers in the busiest area commands in terms of mental health-related calls (SW and SE).

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.116 – 4.7.124 Assessing Compliance with Paragraphs 129-137

Monitoring team members reviewed the APD's current activities related to provision of policing services to individuals in behavioral crises (paragraphs 129 through 137). Our observations indicate that the behavioral health paragraphs of the CASA have received careful and meaningful attention during the reporting period. APD is in substantive compliance with all nine paragraphs outlining specific APD (and related organization such as the Mental Health Resources Advisory Committee, etc.). We do note staffing issues that need to be addressed, however.

As part of the monitoring process, we:

1. Reviewed minutes of MHRAC meetings, observed multiple training sessions for APD mental health community service personnel;

2. Reviewed extant and proposed policies guiding APD's service delivery to individuals experiencing mental health crises;

3. Assessed APD's service delivery mechanisms focused on the homeless population of Albuquerque;

4. Assessed APD procedures for connecting the homeless to support services;

5. Evaluated APD's interagency communications and cooperation practices regarding mental health services.

6. Assessed staffing at the Crisis Intervention Unit;

7. Reviewed the interaction protocols and processes among COAST/CIU units with personnel from community mental health resource providers;

8. Assessed APD's mental health data collection and analysis processes; and

9. Reviewed multiple training sessions related to community mental health processes.

The data we reviewed indicate that APD's outreach and support efforts to those in the communities served are resilient, effective, and problem-oriented.  Data collection processes and protocols have been updated with much improved accuracy and reliability, and training remains a strong point of this effort.  APD's services in this area are so strong that the processes received the 2018 "Phil Keith Project of the Year Award" from the International Association of Law Enforcement Planners for its work in provision of CIT services in Albuquerque.  The award was presented to APD for developing "a unique, beneficial, and valued project, program, or initiative to the law enforcement profession."

### 4.7.116 Assessing Compliance with Paragraph 129

Paragraph 129 stipulates:

**"APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
**a) date, shift, and area command of the incident;**
**b) subject's age, race/ethnicity, and gender;**
**c) whether the subject was armed and the type of weapon;**
**d) whether the subject claims to be a U.S. military veteran;**
**e) name and badge number of crisis intervention certified responder or CIU detective on the scene;**
**f) whether a supervisor responded to the scene;**
**g) techniques or equipment used;**
**h) any injuries to officers, subjects, or others;**
**i) disposition of the encounter (e.g., arrest, citation, referral); and**
**j) a brief narrative of the event (if not included in any other document)."**

### Results

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.117 Assessing Compliance with Paragraph 130

Paragraph 130 stipulates:

**"APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis."**

124

**Results**

    Primary:    **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

## 4.7.118 Assessing Compliance with Paragraph 131

Paragraph 131 stipulates:

**Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services.**
**Results**

As of the date of the close of this reporting period, the protocol has not been updated.  We recommend APD work with the advisory committee to ensure the protocols are updated and congruent with related policy and protocols.

    Primary:    **Not In Compliance**
    Secondary:  **Not In Compliance**
    Operational: **Not In Compliance**

## 4.7.119 Assessing Compliance with Paragraph 132 Crisis Prevention

Paragraph 132 stipulates:

**APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers.**

**Results**

    Primary:    **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.120 Assessing Compliance with Paragraph 133

Paragraph 133 stipulates:

**COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at risk of experiencing a mental health crisis and assist with follow-up calls or visits.**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.121 Assessing Compliance with Paragraph 134

Paragraph 134 stipulates:

**APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options.**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.122 Assessing Compliance with Paragraph 135

Paragraph 135 stipulates:

**"APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement. Within three months of completing the staffing assessment and resource study required by Paragraph 204 of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.123 Assessing Compliance with Paragraph 136

Paragraph 136 stipulates:

**"COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources.**"

126

**Results**

>  Primary:      **In Compliance**
>  Secondary:   **In Compliance**
>  Operational: **In Compliance**

## 4.7.124 Assessing Compliance with Paragraph 137

Paragraph 137 stipulates:

**"APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
**a) number of individuals in the COAST and CIU caseloads;**
**b) number of individuals receiving crisis prevention services;**
**c) date, shift, and area command of incidents or follow up encounters;**
**d) subject's age, race/ethnicity, and gender;**
**e) whether the subject claims to be a U.S. military veteran;**
**f) techniques or equipment used;**
**g) any injuries to officers, subjects, or others;**
**h) disposition of the encounter (e.g., arrest, citation, referral); and**
**i) a brief narrative of the event (if not included in any other document)."**

**Results**

>  Primary:      **In Compliance**
>  Secondary:   **In Compliance**
>  Operational: **In Compliance**

## 4.7.125 Assessing Compliance with Paragraph 139[5]

Paragraph 139 stipulates that:

**"APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices. APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically. "**

APD policies are currently moving through a "Phase 2" process of annual reassessment and re-promulgation.  Unfortunately, the policy development difficulties we experienced early-on in the APD monitoring process are re-appearing as the Parties, the APOA, and the monitor move into the anticipated re-assessment and re-promulgation process for policies guiding the APD's implementation

---

[5] Paragraph 138 is judged to be prefatory to the following section on training, and as such established goals, but not quantifiable objectives.  These are dealt with in paragraphs 139-148.

of the CASA.  Since APD'S Use of Force policy suite is judged to be among the most critical elements of the reform process, they were the first to be completed in the early stages of the reform process, and they are the first to be slated for "review and re-promulgation."

Unfortunately, the same difficulties encountered early on in this process, and described fully in the monitor's early reports, have re-emerged recently as the Parties and the monitor worked to assess and recalibrate APD's main use of force policy, APD policy 2-52.

The monitor and the chief of police have engaged in numerous conversations in an attempt to move forward with the development of a workable use of force policy.  At this point a new main use of force policy (2-52) has been approved by the monitor.

**Results**

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **Not In Compliance**

**Recommendation 139a:  Continue to move forward with policy development focused on Use of Force and related issues, ensuring congruence with the CASA as policies are developed.**

### 4.7.126 Assessing Compliance with Paragraph 140

Paragraph 140 stipulates:

**"APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference. APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format."**

**Results**

No substantial changes to the indexing and numbering systems have been recommended or made by APD, except for the recent revisions necessitated by APD's moving to a more manageable use of force classification, review, assessment, and processing system.  APD remains in compliance with this paragraph based on past and current practices.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.127 Assessing Compliance with Paragraph 141

Paragraph 141 stipulates:

**"Within three months of the Effective Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures."**

### Methodology

APD remains in compliance with this paragraph based on past practice. Policies are provided to all sworn members of APD via intra-net and are available to the public via the internet.

### Results

      Primary:    **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.128 Assessing Compliance with Paragraph 142

Paragraph 142 stipulates:

**"Within three months of the Effective Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities. The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014)."**

### Methodology

APD's responses to the requirements of this paragraph were implemented early in the compliance process with creation of the PPRB (Policy and Procedure Review Board). Early in this project, the monitoring team, as part of their routine practice, observed PPRB meetings and found them to be comprised as required by the CASA. That composition continues to this day.

### Results

      Primary:    **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.129 Assessing Compliance with Paragraph 143

Paragraph 143 stipulates:

**Within nine months of the Effective Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement. The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division.**

## Methodology

The monitor over the past three years has routinely assessed PPRB practice, and found it consistent with the CASA and established practice. Past practice at PPRB has been effective and not deleterious to decisions of the Parties and the monitor based on specific requirements of the CASA. During this reporting period, the PPRB process changed, and PPRB significantly revised the use of force policy approved by the monitor and the Parties. Previous practice, as observed directly by the monitor was for PPRB to ensure that a given policy fit with other internal policy requirements and did not adversely affect other policy as articulated. For the then-current draft of the use of force policy (2-52), PPRB dramatically rewrote policy approved by the APD, USDOJ, and the monitor without consultation. Past practice at PPRB had been more technical in nature, ensuring no internal policy or process conflicts. With the use of force policy it became highly substantive, and in the monitor's opinion, produced a product that was unusable for implementation of CASA requirements. Current practice at PPRB has created a serious disconnect in APD's ability to produce monitor-approvable policies related to use of force.

As a result, the chief of police and the monitor engaged in an extensive consultation, rewrite and revision process for APD's use of force policy. This process took several weeks, but eventually resulted in a policy that was congruent with the CASA. APD is currently moving forward with the development of training consistent with the revised use of force main policy, 2-52.

## Results

    Primary:    **In Compliance**
    Secondary: **Not In Compliance**
    Operational: **Not in Compliance**

***Recommendation 4.7.129:  Move forward with training on the approved use of force policy, as feasible.***

## 4.7.130 Assessing Compliance with Paragraph 144

Paragraph 144 stipulates:

**"Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Effective Date. APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility. There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations."**

APD remains in compliance with this task based on past performance.  The reader is referred to our concerns noted in our treatment of Paragraph 143, above, relative to the PPRB.

### Results

    Primary:    **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.131 Assessing Compliance with Paragraph 145

Paragraph 145 stipulates:

**"The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law. The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews."**

### Methodology

APD remains in compliance with this task based on past performance.  The reader is referred to our concerns noted in our treatment of Paragraph 143, above, relative to the PPRB.

### Results

    Primary:    **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

## 4.7.132 Assessing Compliance with Paragraph 146

Paragraph 146 stipulates:

**"APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure."**

### Methodology

Members of the monitoring team have noted serious and long-standing issues with application of key CASA-related functions that related to Paragraph 146.  We are concerned, and will continue to assess the uniformity of policy and procedure violation responses by APD.  At this stage, APD remains in compliance; however, over the next few monitor's reports, we will revisit APD's parameters on disciplinary decisions viz a viz uniformity.

**Results**

    Primary:    **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

### 4.7.133 Assessing Compliance with Paragraph 147

Paragraph 147 stipulates

**"APD shall submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ for review and comment before publication and implementation."**

**Methodology**

Members of the monitoring team routinely reviewed policies, procedures, administrative orders and special orders for compliance with this paragraph.  APD's practice regarding special orders (temporary instructive mechanisms designed to revise workflow, review, and or decision-making processes at APD) are now routinely routed through the monitoring team for review and comment.

**Results**

    Primary:    **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

### 4.7.134 Assessing Compliance with Paragraph 148

Paragraph 148 stipulates:

**"APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions. If, after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection. If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter. The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full**

**and proper review of policies. Factors to consider in making this determination include: 1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor. In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review. Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion."**

## Methodology

The provisions of this paragraph seldom need to be invoked.  We do note the potential for its use regarding issues with the new use of force policy currently under revision by the Parties and the APOA. See paragraphs 143, above.

## Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.135 Assessing Compliance with Paragraphs 149

Paragraph 149 stipulates:

**"Within two months of the Effective Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement."**

Paragraph 149 identifies requirements for action by APD early-on in the compliance process.  These paragraphs relate to briefings of all officers on the requirements of the CASA, briefings and training of officers relative to their CASA-required actions, and training and retraining of officers.

## Methodology

The monitoring team reviews records for all new APD employees to ensure that they are briefed and presented the terms of the Agreement. The monitoring team reviews PowerDMS entries to ensure all personnel sign off as acknowledging that the material was reviewed and received. The City remains in compliance with this paragraph based on earlier performance.

## Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.136 Assessing Compliance with Paragraph 150

Paragraph 150 stipulates:

**"Within three months of issuing a policy or procedure pursuant to this Agreement, APD agrees to ensure that all relevant APD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations. APD agrees to document that each relevant APD officer or other employee has received and read the policy. Training beyond roll-call or similar training will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy."**

### Methodology

The City remains in compliance with this paragraph based on earlier performance. The monitoring team will continue to monitor new policies and changes to policy that are pending approval in future reporting periods to ensure that the requirements of this paragraph are maintained.

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.137 Assessing Compliance with Paragraph 151

Paragraph 151 stipulates:

**Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Effective Date, and annually thereafter. Within six months of the Effective Date, APD shall set out a schedule for delivering all training required by this Agreement.**

### Methodology

The City remains in compliance with this paragraph based on earlier performance and maintains a current training requirement schedule fulfilling the requirements of this paragraph. The monitoring team will continue to monitor new policies and changes to policy that are

134

pending approval in future reporting periods to ensure that the requirements of this paragraph are maintained and that appropriate training is delivered and followed.

**Results**

    Primary:    **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

### 4.7.138 Assessing Compliance with Paragraph 152

Paragraph 152 stipulates:

**"APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty."**

**Methodology**

The monitoring team requested from APD copies of COB documentation related to this paragraph. Since early 2018, APD has seen an influx of applications from currently practicing officers from other jurisdictions. Given this new interest from outside APD related to the lateral employment process, we will continue to monitor the selection and assessment practices to ensure compliance with this paragraph.  To date, we have noted no policy outliers in this process. All lateral hires are certified, and all are required to process through APD-specific training renewals.  APD is working currently to re-assess and update its lateral processing, training and supervision processes.  The monitoring team has reviewed and approved those updates.

**Results**

    Primary:    **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

### 4.7.139 -4.7.140 Assessing Compliance with Paragraphs 153-154

The monitoring team requests for and review of records responsive to Paragraphs 153 -154 produce ample evidence that the provisions of these paragraphs are being met by APD.  The material reviewed for this reporting period (February 2018 through July 2018) included but was not limited to:

- Supervisory Training (Tactical Activation Request-SWAT/IED Awareness/K-9 Unit Requests and Search Procedures/Traffic Incident Management);
- Firearm Remedial Training; and
- Field Training and Evaluation Program (In-Service Course/FTO Course).

APD continues to maintain compliance by making records available for inspection by the monitoring team.  No changes to relevant case law and statutes were noted during this reporting period. Based on past performance by the Advanced Training Unit, APD remains in compliance.

### 4.7.139 Assessing Compliance with Paragraph 153

Paragraph 153 stipulates:

**"APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records. APD shall also maintain complete and accurate records of any audit, review, assessment, or evaluation of the sufficiency or effectiveness of its training programs. APD shall make these records available for inspection by the Monitor and DOJ."**

 **Results**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.140 Assessing Compliance with Paragraph 154

Paragraph 154 stipulates:

**"APD shall ensure that changes in relevant case law and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and pre- service training."**

**Results**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.141 – 4.7.147 Assessing Compliance with Paragraphs 155-161: Field Training and Evaluation Program

During this reporting period (February 2018 through July 2018), the monitoring team reviewed and examined the data required for APD to maintain compliance with these paragraphs in the forms of policy, programs, and results. APD remains in Operational Compliance with the paragraphs in the CASA that relate to the Field Training and Evaluation Program.

Members of the monitoring team met with the APD Academy personnel responsible for maintaining the program development and implementation as per S.O.P. 6-1 "Training Division". For this reporting period, no known changes to case law, core principles, values, or expectations were initiated. The monitoring team has received a draft copy of submitted revisions to the Field Training and Evaluation Program that are currently under review in the chain of command and are awaiting approval.

During the site visits for this reporting period, the monitoring team reviewed Special Orders for the FTO Class. These Orders reflect 100 percent compliance with the program's requirement of 16 weeks of field training and no early release from the program.

The FTO program enrolled five new members into the program in March 2018. The monitoring team reviewed the vetting process for the applications and backgrounds of the five individuals in the previous reporting period. This ensured that all requirements of the CASA were met. APD submits backgrounds and applications on an ongoing basis to the monitoring team for review to ensure compliance. In addition to the five new members, all current FTO personnel received and completed the annual FTEP/FTO In-Service Course as required by the CASA.

The monitoring team reviewed Special Orders for the FTO program to ensure:

1) Recruits are trained in multiple Area Commands;
2) Recruits are trained in different shifts; and
3) Recruits are exposed to different Field Training Officers.

APD maintains compliance with these requirements.

Members of the monitoring team also requested COB documentation to ensure APD continues to afford recruits with:

- A mechanism for confidential feedback regarding quality of field training;
- Consistency between field training and the training academy; and

- APD's consideration of feedback and what, if any, changes are made.

The monitoring team reviewed the anonymous survey utilized by APD to comply with the CASA. The 118th Cadet Class, like previous classes, maintained a high degree of participation. The monitoring team paid particular attention to the following areas:

- Use of technology,
- Scenario Training,
- Geographic Orientation,
- Radio Communication,
- Driving,
- Report writing,
- Knowledge of criminal and traffic code,
- Court,
- Use of Force policy and practice, and
- Patrol Procedures.

The APD Academy continues to monitor the surveys and submitted a course-of-business memorandum covering these areas. Where applicable, the Academy made changes to the 119th Cadet Class curriculum. Until the 119th class completes its FTO program and submits its survey, the monitoring team cannot measure the results.

The monitoring team has discussed with the FTO coordinator a concern with maintaining a full complement of FTO's as APD moves forward. At the June 2018 site visit, APD advised that the current enrollment in the FTO Program was 75 members (FTO's, Sergeants and Lieutenants). With promotions and retirements, APD must be forward-thinking to avoid a shortage of members in the program. The monitor offered as a suggestion that APD reach out to other law enforcement agencies throughout the country to ascertain different measures used to maintain a full complement of FTOs. The City of Albuquerque has an understanding with APD to supply the necessary support and resources.

Current proposals by APD for changes in lateral transfer process and procedures are being reviewed and considered by the Parties.  We will report on those fully once resolution of critical issues is reached.

### 4.7.141 Assessing Compliance with Paragraph 155

Paragraph 155 stipulates:

**"APD shall supervise and manage its field-training program to ensure that new officers develop the necessary technical and practical skills required to**

138

**use force in accordance with APD policy and applicable law. The field-training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community. Field Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics."**

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.142 Assessing Compliance with Paragraph 156

Paragraph 156 stipulates:

**"APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field-training program early."**

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.143 Assessing Compliance with Paragraph 157

Paragraph 157 stipulates:

**"APD shall revise the qualifications for Field Training Officers to require four years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism."**

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.144 Assessing Compliance with Paragraph 158

Paragraph 158 stipulates:

**"New Field Training Officers and Area Sergeant Coordinators shall receive at least 40 hours of initial supervisory-level training and annual in-service training in the following areas: management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques. Field Training Officers and Area Sergeant Coordinators shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de-escalation techniques; and effective problem solving. APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

### 4.7.145 Assessing Compliance with Paragraph 159

Paragraph 159 stipulates:

**"Recruits in the field-training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

### 4.7.146 Assessing Compliance with Paragraph 160

Paragraph 160 stipulates:

**"APD shall provide a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the field-training program.  APD shall consider feedback and document its response, including the rationale behind any responsive action taken or decision to take no action."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

### 4.7.147 Assessing Compliance with Paragraph 161

Paragraph 161 stipulates:

**"The City shall provide APD with the necessary support and resources to designate a sufficient number of Field Training Officers to meet the requirements of this Agreement."**

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.148 Assessing Compliance with Paragraph 162

Paragraph 162 requires:

**To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system.  To achieve these outcomes, APD and the Civilian Police Oversight Agency shall implement the requirements below.**

This Paragraph is an introductory paragraph for CPOA-related CASA requirements.  As such it requires no direct evaluation, but is subsumed by the CPOA-related individual requirements below.

### 4.7.149 Assessing Compliance with Paragraph 163:  Duty to Report Misconduct

Paragraph 163 stipulates:

**APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs "Bureau for review and investigation.  Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Bureau.  Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment."**

### Methodology

Paragraph 163 of the CASA pertains to the duty of all APD officers and employees to report misconduct by APD officers and employees, and the duty of supervisors to document information regarding

141

misconduct of subordinates and to report same to IA. It also requires failure to do to be grounds for discipline.

During the monitoring period and the 8th site visit, members of the monitoring reviewed 8 investigations completed by IAD (**[IMR-8-09, IMR-8-10, IMR-8-11, IMR-8-12, IMR-8-13, IMR-8-14, IMR-8-15, and IMR-8-16]** and 11 completed by CPOA **[IMR-8-17, IMR-08-18, IMR-8-19, IMR-8-20, IMR-8-21, IMR-8-22, IMR-8-23, IMR-8-24, IMR-8-25, and IMR-8-26]** during the review period. The monitoring team also reviewed APD regulations and had meetings with IAD Misconduct Commander and Staff and the CPOA Director and Staff.

**Results**

The findings related to Paragraph163 indicate the following CASA-related outcomes.

This monitoring period we found that all of the 8 IA cases we reviewed had components of the requirements of Paragraph 163. Given the different ways misconduct comes to the attention of a supervisor and considering the fact that the reporting to IAD Misconduct is often times done in memorandum form, "immediately document and report" is interpreted in context of the case.  In five of these eight cases noted above, we found the referral to be adequate. However, in three of these cases **[IMR-8-09, IMR-8-14 and IMR-8-15]** the requirements of this paragraph were not met: the immediate supervisor did not flag a potential misconduct issue and refer it to IA in a timely manner. Two of these cases involved supervisors who missed issues in Use of Force reviews that were later caught in IA-Force reviews, and one case involved a supervisor who took corrective action only and did not refer the matter to IAD.  This was later caught in a follow-up complaint to a subsequent supervisor.

Since these failures to refer by supervisors were properly referred to IAD Misconduct investigations, in these cases, the system worked. Supervisory personnel failed in their CASA-related performance requirements, and were referred to IAD for those failures This is a prime example of the differences we are beginning to see at APD: violations of policy and practice are being noted, assessed, and "called" prior to any need for the monitoring team to bring these issues to APD's attention.  This is a marked change to past practices at APD.

The monitor has noticed an issue pertaining to the timeliness of referrals to IAD Misconduct from CIRT that is further discussed in

regard to paragraph 191 in the Investigations of Complaints section of this report. Here it suffices to say that in the future the monitor will be scrutinizing the timeliness of referrals to IAD.  These CIRT cases were current before the latest revisions to the IAD organizational chart that eliminated CIRT and replaced it in the IA process with the more carefully constructed and supervised IA-Force Division.

    Primary:   **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

## 4.7.150 – 4.7.154 Assessing Compliance with Paragraphs 164-168: Public Information on Civilian Complaints

Paragraphs 164 through 168 of the CASA pertain to the informational program required of the APD and CPOA to make the public aware of the procedures for making civilian complaints against APD personnel. These paragraphs also direct that APD and CPOA provide information, in Spanish and English, to the public in different informational forums that increase the public's accessibility to complaint forms and facilitate the reporting of misconduct.  These paragraphs also require the acceptance of civilian complaints and the officers to identify themselves upon request.

Members of the monitoring team reviewed the APD and CPOA websites, made visits to the APD headquarters and substations, the CPOA office, and to City public buildings, including libraries and community centers. They also had meetings with IAD and CPOA personnel.

The findings related to Paragraphs164 through 168 indicate the following outcomes, related to requirements of the CASA:

1.  The monitoring team finds the informational program to be effective. Information on complaint filing is available on the APD and CPOA website, and in informational materials, brochures, and posters. The information and complaint forms were available online on the APD and CPOA websites, and all APD and City buildings visited by members of the monitoring team this reporting period, as well as the CPOA office. One Community Center (Barelas Community Center) did not have the information displayed, although it was presented upon request.

2.  The information clearly explains the "mechanisms" for filing complaints, and complaint and commendation forms that can be filed electronically or downloaded. Complaint forms are otherwise readily accessible in hard copy at APD, CPOA, City buildings, and also from

individual patrol vehicles. The information, both on the website and hard copy, is in Spanish and English. The information does not discourage the filing of complaints and makes clear that complaints can be filed anonymously or by third parties.

Further, based on our review of a stratified random sample of IA and CPOA investigations, we found no instances of allegations of refusal to provide name and badge numbers when requested.

IA and CPOA are in full compliance with the requirements of Paragraphs 164 though 168.

### 4.7.150 Assessing Compliance with Paragraph 164: Public Information on Civilian Complaints

Paragraph 164 stipulates:

**"Within six months of the Effective Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints."**

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.151 Assessing Compliance with Paragraph 165:  Availability of Complaint Forms

Paragraph 165 stipulates:

**"APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall, public libraries, community centers, and the office of the Civilian Police Oversight Agency.  Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints.  Complaint forms, informational materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person.  Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above."**

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.152 Assessing Compliance with Paragraph 166:  Public Information on Complaint Process

Paragraph 166 stipulates:

**"APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites.  The placard shall specify that complaints may be submitted anonymously or on behalf of another person.  APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles.  Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request.  If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint."**

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.153 Assessing Compliance with Paragraph 167:  Duty to Accept Citizen Complaints

Paragraph 167 stipulates:

**"APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints**."

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.154 Assessing Compliance with Paragraph 168:  Multi-Lingual Complaint Forms

Paragraph 168 stipulates:

**"Complaint forms and related informational materials shall be made available and posted in English and Spanish."**

**Results**

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

**4.7.155 – 4.7.168 Assessing Compliance with Paragraphs 169-182:  Training on Complaint Intake**

Paragraphs 169 through 182 of the CASA pertain to the necessary steps in the receipt, acceptance and processing of complaints. These paragraphs require APD and CPOA to receive all complaints, regardless of whether they are made internally or externally, and regardless of whether they are made timely. They require an effective and uniform system that is allegation-based for classifying complaints, internally referring and then appropriately assigning complaints for investigation.

During the monitoring period and the 8th site visit, members of the monitoring team held meetings with the IAB Misconduct Commander and members of his staff, CPOA Executive Director and members of his staff, reviewed complaint log-in and classification records, selected by way of a stratified random sample and reviewed 8 IA and 11 CPOA investigations completed during the monitoring period. The monitoring team also reviewed the APD and CPOA websites and POB minutes relative to approval of investigations

The findings related to Paragraph169 through 182 indicate the following outcomes, related to requirements of the CASA.

Based on our present and prior reviews, internal and civilian (external) complaints are accepted, reviewed, classified and assigned for investigation according to CASA requirements and approved policy.

Regarding acceptance of complaints, we continue to find no instances of APD or CPOA refusing to accept a citizen complaint. It is well known policy among APD personnel that refusing to accept a complaint or the discouraging of a complaint are grounds for discipline. Although timely complaints are encouraged, untimely complaints are accepted, as well as anonymous and third-party complaints. Of the total cases reviewed, we found one **[IMR-8-26]**

146

that was initiated by an online anonymous complaint. This complaint was accepted and processed appropriately.

APD has developed and is using a centralized numbering and tracking systems that continues to assign unique identification numbers to all received complaints. Complaints are received and classified according to allegations and not potential outcomes. We found no instances of complaints being improperly classified. The tracking system is being used correctly, and appears to maintain accurate data, based on our comparisons with "known data." APD's Blue Team management software enables allegations of misconduct by homeless or those who have a mental illness to be tracked.

Of the total investigations reviewed by the by the monitoring team this reporting period, none involved situations where APD personnel received a complaint from a third party and then informed or failed to inform a supervisor within the appropriate time limitation.  We found one instance **[IMR-8-15]** in which there was potential criminal conduct and in which the appropriate coordination required by this paragraph occurred. We found none in which an investigation was conducted by a supervisor who was the subject of the investigation, or who was directly involved in the incident as a participant or supervisor or otherwise was conflicted from performing the investigation. Thus, based on our current review we find APD to be either in compliance or that operational compliance could not be assessed this review period as indicated below.

### 4.7.155 Assessing Compliance with Paragraph 169:  Training on Complaint Intake

Paragraph 169 stipulates:

**"Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake**."

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.156 Assessing Compliance with Paragraph 170:  Complaint Receipt Process

Paragraph 170 stipulates:

**"APD shall accept complaints regardless of when they are filed. The City shall encourage civilians to promptly report police misconduct so that full investigations can be made expeditiously, and the full range of disciplinary and corrective action be made available."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.157 Assessing Compliance with Paragraph 171:  Prohibition of Refusal to Take Complaint

Paragraph 171 stipulates

**"The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint shall be grounds for discipline."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.158 Assessing Compliance with Paragraph 172:  Acceptance of Anonymous Complaints

Paragraph 172 stipulates:

**"APD and the Civilian Police Oversight Agency shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation.  Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail.  Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be provided with a complaint form in Spanish to ensure that the individual is able to make a complaint.  Such complaints will be investigated in accordance with this Agreement."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.159 Assessing Compliance with Paragraph 173:  Inform Supervisors of Citizen Complaints

Paragraph 173 stipulates:

**"All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint.  All misconduct complaints shall be submitted to the Internal Affairs Bureau by the end of the shift following the shift in which it was received**."

### Results

  Primary: **In Compliance**
  Secondary: **In Compliance**
  Operational: **Not Observable this monitoring period**

### 4.7.160 Assessing Compliance with Paragraph 174:  Allegation by Judicial Officers

Paragraph 174 stipulates:

**"APD and the Civilian Police Oversight Agency shall develop a system to ensure that allegations by a judicial officer of officer misconduct made during a civil or criminal proceeding are identified and assessed for further investigation.  Any decision to decline investigation shall be documented."**

### Results

  Primary: **In Compliance**
  Secondary: **In Compliance**
  Operational: **In Compliance**

### 4.7.161 Assessing Compliance with Paragraph 175:  Allegations Made by the Homeless or the Mentally Ill

Paragraph 175 stipulates:

**"APD and the Civilian Police Oversight Agency shall track allegations regarding misconduct involving individuals who are known to be homeless or have a mental illness, even if the complainant does not specifically label the misconduct as such."**

### Results

  Primary: **In Compliance**
  Secondary: **In Compliance**
  Operational: **In Compliance**

### 4.7.162 Assessing Compliance with Paragraph 176:  Centralized Complaint Numbering System

149

Paragraph 176 stipulates that:

**"Within six months of the Operational Date, the Internal Affairs Bureau, in coordination with the Civilian Police Oversight Agency, shall develop and implement a centralized numbering and tracking system for all misconduct complaints.  Upon the receipt of a complaint, the Internal Affairs Bureau shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.163 Assessing Compliance with Paragraph 177:  IAB Complaint Data Management

Paragraph 177 stipulates:

**The Internal Affairs Bureau's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.  This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.164 Assessing Compliance with Paragraph 178:  Supervisors to Provide Complaint Information

Paragraph 178 stipulates:

**"Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Bureau.  All information should be referred to the Internal Affairs Bureau by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances."**

**Results**

     Primary:    **In Compliance**
     Secondary: **In Compliance**
     Operational: **Not Observable in this monitoring period**

### 4.7.165 Assessing Compliance with Paragraph 179:  Referral of Complaints to CPOA

Paragraph 179 stipulates:

**"Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Bureau shall refer the complaint to the Civilian Police Oversight Agency."**

**Results**

     Primary:    **In Compliance**
     Secondary: **In Compliance**
     Operational: **In Compliance**

### 4.7.166 Assessing Compliance with Paragraph 180:  Handling of Internal Complaints by IAB

Paragraph 180 stipulates:

**"Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Bureau for review and classification.  The Internal Affairs Bureau shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Bureau for investigation.  In consultation with the Chief, the commanding officer of the Internal Affairs Bureau shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Bureau, the Multi- Agency Task Force, and/or referred to the appropriate federal law enforcement agency.**"

**Results**

     Primary:    **In Compliance**
     Secondary: **In Compliance**
     Operational: **In Compliance**

### 4.7.167 Assessing Compliance with Paragraph 181:  IAB Classification Protocol

Paragraph 181 stipulates:

**"APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Bureau in determining where an internal complaint should be assigned."**

## Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.168 Assessing Compliance with Paragraph 182:  Prohibition from Self-Investigation

Paragraph 182 stipulates:

**"An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct."**

## Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.169 – 4.7.180 Assessing Compliance with Paragraphs 183 – 194: Investigation of Complaints

Paragraphs 183 through 194 of the CASA pertain to requirements for best practices in the investigation of misconduct complaints. They require that all relevant evidence be considered and that investigations be fair and impartial and reach reliable findings. They also require time limits for completion of investigations, designated permissible findings with the corresponding standard of proof, and an assessment regarding whether the facts of an investigation indicate a change in policy, procedure, or training. In addition, requirements are set forth regarding the situations where there may be simultaneous criminal and administrative investigations of the same subject matter.

During the monitoring period and the 8th site visit, members of the monitoring reviewed a stratified random sampling of 8 investigations completed by IAD and 11 completed by CPOA during the 8th review period. The monitoring team also met with the chief and the city attorney, the CPOA director and members of CPOA, IAD Misconduct

Commander and members of CPOA, attended a POB meeting and reviewed CPOA/POB findings on the CPOA website.

The findings related to Paragraphs 183 through 194 address 12 requirements of the CASA.

APD personnel are required by policy and practice to cooperate with the internal affairs system.  This cooperation is required of by regulation and practice. We found no instances in which APD personnel refused to cooperate with an investigation.  Investigations conducted by IAD Misconduct and by CPOA proved to be of good quality. Once assigned, investigations are generally timely and thorough, consider all relevant evidence, reach reliable findings and are well-grounded in the evidence. Absent extraordinary circumstances, statements are taken from complainants and relevant witnesses, and the interviews are recorded, accurately assessed and given appropriate evidentiary weight. Investigations are documented in writing, and reflect salient training and policy assessments.

The appropriate case dispositions are made, based on the proper standard of proof. This review period we reviewed 4 investigations that were administratively closed **[IMR-8-17, IMR-8-18, IMR-8-25, and IMR-8-24].**  All were proper closures. The CPOA uses an administrative closure disposition in cases in which a preliminary investigation reveals the allegations cannot be minimally sustained. We also note that a new court-approved mediation policy now provides more guidance to CPOA regarding which cases are appropriate for mediation. This will increase the use of this valuable complaint resolution/disposition tool as well the appropriateness of the case selection for mediation.

Simultaneous criminal and administrative investigations of the same subject matter are kept separate, and proper steps are followed regarding the protection of an officer's constitutional rights in an administrative investigation while a criminal investigation is pending. Coordination and consultation with prosecutorial authorities are properly conducted.  In the data sampled by the monitoring team this reporting period, we found one case that may have involved criminal conduct. **[IMR-8-15]**. The coordination with the relevant prosecuting authority was timely and proper. We also found one case in which the officer failed to submit a public safety statement (Police Pursuit Post-Incident Review Form) **[IMR-8-14];** however, this omission was caught in a CIRT review and referred to the appropriate division for investigation. Since the omission was noted and corrected in APD's review process, the monitor does not count it as a deficiency.

The advisements to complainants regarding the reopening of administratively closed cases and of appealing CPOA findings, as well the actual practices related to these advisements, are firmly in place.  With the exception of the issues noted below, investigative practices comply with the requirements of the CASA, which reflect best internal affairs practices.

Notwithstanding the generally good quality of investigations conducted by IAD Misconduct and CPOA, the monitoring team has noted some issues with elements related to paragraphs 183 through 194 of the CASA.  These are noted below.

We reviewed a stratified random sample of 8 IAD and 11 CPOA investigations completed during the monitoring period. This review revealed one investigation **[IMR-8-15]** in which we found that a relevant witness, regarding an asserted justification for lack of referral to IA, was not questioned, and an improper disposition may have been reached due to the failure to question the witness. In another case, **[IMR-8-20]** although we found the investigative finding to be reliable and supported by the evidence, the contradiction by payroll records of a mitigating factor (previously asserted by the subject officer in an IA interview) should have engendered a follow up interview of the subject.  That action, if taken, was not documented in the final investigative report.

These findings by the monitoring team indicate a collective 89% compliance rate relative to paragraphs 183 and 190 of the CASA, less than the 95% required for operational compliance.

### 4.7.169 Compliance with Paragraph 183: Investigations Reach Reliable Conclusions

Paragraph 183 stipulates:

**"APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident or involved in any significant event before or after the original incident, shall provide a written statement regarding their observations, even to state that they did not observe anything."**

### Results

Primary:   **In Compliance**

154

Secondary: **In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.169: Question all witnesses.  If known witnesses are not interviewed, explain, in writing, why they were not available for an interview.***

**4.7.170 Assessing Compliance with Paragraph 184: Investigations Documented in Writing**

Paragraph 184 stipulates:

**"APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing.  APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation. Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct."**

**Results**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

***Recommendation 4.7.170a:  Ensure that all decision points in completed investigations are explained clearly in writing***

**4.7.171 Assessing Compliance with Paragraph 185:  Required Cooperation with IAB/CPOA**

Paragraph 185 stipulates:

**"APD shall require personnel to cooperate with Internal Affairs Bureau and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control.  Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances."**

**Results**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational:  **Not In Compliance**

***Recommendation 4.7.171a:  Build quality control loops to ensure that all relative CASA requirements are addressed in final investigative reports.***

### 4.7.172 Assessing Compliance with Paragraph 186:  Separate Administrative and Criminal Investigations

Paragraph 186 stipulates:

**"APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment.  When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement**."

**Results**

> Primary:    **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.173 Assessing Compliance with Paragraph 187:  Advisement of Officer Rights

Paragraph 187 stipulates:

**"Advisements by the Internal Affairs Bureau or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee**."

**Results**

> Primary:    **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.174 Assessing Compliance with Paragraph 188:  Notification of Criminal Misconduct

Paragraph 188 stipulates:

**"If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the Internal Affairs**

**Bureau commanding officer. If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Bureau.  The Internal Affairs Bureau commanding officer shall immediately notify the Chief.  The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, the Internal Affairs Bureau shall continue with the administrative investigation of the allegation. Consistent with Paragraph 186, the Internal Affairs Bureau may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Bureau deems such interviews appropriate.**"

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.175 Assessing Compliance with Paragraph 189:  Provision of Public Safety Statements

Paragraph 189 stipulates:

**"Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including Use of Force Reports and incident reports. APD shall make clear that all statements by personnel in incident reports, arrest reports, Use of Force Reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements.  Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief.**"

### Results

No instances of officers refusing to provide a public safety statement were noted during, this reporting or in previous reporting periods.

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational:  **Not Observable**

## 4.7.176 Assessing Compliance with Paragraph 190:  Considering All Relevant Evidence

Paragraph 190 stipulates:

**"In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history. During their investigation, APD and the Civilian Police Oversight Agency shall take into any convictions for crimes of dishonesty of the complainant or any witness. APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to be deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation. APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational:  **Not In Compliance**

***Recommendation 4.7.176: Follow up on any contradicting factors or evidence, and ensure these issues are resolved.***

### 4.7.177 Assessing Compliance with Paragraph 191:  90 Days to Complete Administrative Investigations

Paragraph 191 stipulates:

**"All administrative investigations conducted by the Internal Affairs Bureau or the Civilian Police Oversight Agency shall be completed within 90 days of the initiation of the complaint investigation. The 90-day period shall not include time for review. An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief. Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation. To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations, of the officer, and extended absences."**

### Results

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

### 4.7.178 Assessing Compliance with Paragraph 192:  Case Dispositions

Paragraph 192 stipulates:

**"APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:**

    a) **"Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer;**

    b) **"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;**

    c) **"Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;**

    d) **"Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training;**

    e) **"Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or**

    f) **"Administratively closed," where the policy violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint."**

## Results

    Primary:   **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

## 4.7.179 Assessing Compliance with Paragraph 193:  Reopening Administrative Investigations

Paragraph 193 stipulates:

**"All administratively closed complaints may be re-opened if additional information becomes available.  The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened."**

## Results

    Primary:   **In Compliance**
    Secondary: **In Compliance**
    Operational: **In Compliance**

## 4.7.180 Assessing Compliance with Paragraph 194:  Training and Legal Standards

Paragraph 194 stipulates:

**"In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether: TABLE(a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures.  This information shall be shared with the relevant commander(s)."**

**Results**
      Primary:   **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

**Monitor's Note:**
We also note the APD practice of issuing Additional Concerns Memoranda (ACMs). This *ad hoc* practice arises out of supervisory reviews and is used as a means of documenting what supposedly are minor policy violations, but does not act as a request for, or a trigger of, a formal IA investigation. ACMs that are issued are posted on an officer's retention card, and figure into the prior offense calculation for subsequent offenses where applicable. This practice is problematic for at least two reasons.  The first is that failure to conduct an IA investigation in cases that present evidence of a policy violation "loses the thread" in building justification for progressive discipline.  The second issue is that the documentation of violations on a retention card without the due process afforded by the normal disciplinary process are serious "due process" issues. This matter was the focus of discussions during our recent site visits, and continues to be the focus of discussions among the parties and the monitor. These sorts of *ad hoc* policy derivatives make solid disciplinary decisions difficult, if not impossible.

The issues of use, documentation and record-keeping relative to ACMs must be resolved in order for the APD to achieve compliance for use of proper case dispositions. We see this as a critical issue, as ACMs create a substantial "dark area" that could potentially obscure important trends from analysis, identification, and resolution.

The parties and the monitor have also discussed potential issues related to the requirement in paragraph 188 of the CASA that the IAD Misconduct Commander coordinate with the chief when consulting with the relevant prosecuting agency where a misconduct complaint intake or investigation reveals "there may have been criminal conduct

by any APD personnel." The practical problem with a strict interpretation of this language is that prosecutors are reluctant to discuss cases where there is less than probable cause or less than at least reasonable suspicion that a crime has been committed, whereas the phrase "may have been" alludes to a mere suspicion standard.

It appears that the parties will propose a negotiated solution to the monitor that will allow a preliminary or continued administrative investigation to take place and a determination of probable cause that a crime was committed to be developed before the coordination with relevant prosecuting agency is required under paragraph 188. The monitor would expect this process to be finalized before the next site visit.

As noted in the Civilian Police Oversight section of this report, CPOA has utilized the Administratively Closed disposition in situations where a preliminary investigation cannot minimally sustain the allegations contained in a complaint. In such cases, based on this initial evidence, the investigation is cut short and administratively closed without necessarily interviewing all relevant witnesses or even the complainant in some instances. The monitor realizes the need to wisely and economically deploy resources and thus does not disapprove of this practice. However, we caution that in following this practice, other policy violations that are not contained in the initial complaint could be missed. Therefore, we put the parties on notice that this practice should only be utilized where the preliminary investigation's developed evidence totally "closes the door" on the alleged policy violation and any reasonably foreseeable-related violations. In instances where this does occur, whether the disposition should be "Administratively closed" or other disposition indicating a non-sustainment, will be subject of discussion between the parties and the monitor during the 9th review period.

### 4.7.181 – 4.7.183 Assessing Compliance with Paragraphs 195-197: Preventing Retaliation

Paragraphs 195 through 197 of the CASA pertain to the City's requirement to prevent retaliation against anyone who reports misconduct or cooperates in a misconduct investigation, by any employee of the City, including of course APD members, and making it a ground for discipline.

Members of the monitoring team have reviewed both City and APD policies, and a stratified random sample of IA and CPOA cases completed during the review period. They also met with members of

IAD and CPOA during the site visit and received updates in the practices of each agency.

Retaliation is clearly prohibited both as a matter of City and APD policy. The Albuquerque Code of Ordinances prohibits retaliation for reporting improper governmental action and APD policy prohibiting retaliation and/or making it grounds for discipline is found in SOP (AO 3-41-4 and GO 1-4-3). The monitoring team has also determined that meetings involving CPOA and IAD, in which APD's anti-retaliation policy is reviewed, occur on an annual basis

In review of the random sample of investigations members of the monitoring team found one complaint of retaliation, **[IMR-8-20].**   The complaint was received, assigned, and appropriately investigated

Based on clear policy and mindful of IAD performance in this retaliation investigation and with past retaliation complaints, CPOA remains in compliance with paragraphs 195-197.  Data reviewed by the monitoring team for this reporting period indicate compliance for the tasks in paragraphs 195-197.

### 4.7.181 Assessing Compliance with Paragraph 195:  Retaliation Prohibited

Paragraph 195 stipulates:

**"The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct."**

>Primary:   **In Compliance**
>Secondary: **In Compliance**
>Operational: **In Compliance**

### 4.7.182 Assessing Compliance with Paragraph 196:  Review of Anti-Retaliation Statements

Paragraph 196 stipulates:

**"Within six months of the Effective Date, and annually thereafter, the Internal Affairs Bureau and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation.  This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation.  Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct."**

162

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.183 Assessing Compliance with Paragraph 197:  Retaliation Grounds for Discipline

Paragraph 197 stipulates:

**Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds for discipline, up to and including termination of employment.**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.184 – 4.7.186 Assessing Compliance with Paragraphs 198 – 200: Staffing and Training Requirements

Paragraphs 198 through 200 of the CASA require the City to adequately fund and resource internal affairs functions (APD and CPOA/POB), and also require that APD personnel who conduct misconduct investigations and CPOA investigators to receive a baseline amount of initial annual training.

The monitoring team met with IAD Misconduct and CPOA on several occasions including visits to their respective offices and inspection of physical space. The monitoring team also reviewed staffing charts and training records and assessed the timelines of processing complaints and information of potential misconduct in investigations that were randomly selected.

The findings related to Paragraphs 198 through 200 indicate the following outcomes, related to requirements of the CASA.

The CPOA Ordinance requires that CPOA/POB be given staff sufficient to carry out the agency functions contained in the Ordinance. We found no indications of understaffing at CPOA/POB. Currently, the staffing of IAD Misconduct appears to be adequate as investigative timelines are generally being met. The CPOA staffing also appears to be adequate as investigative timelines are generally being met, once a complaint is assigned.  No delays or quality control issues were noted that can be traced to staffing levels, except it appears that the delay in getting City approval for the data analyst

163

contract was a factor contributing to the delay in completing the required semi-annual reports on timely basis.

Notwithstanding the generally adequate staffing, funding and training of IAD and CPOA personnel, we found the work processes of those units exhibited issues with elements related to paragraph 199 of the CASA. The paragraph requires annual training of at least 8 hours, not only for IAD personnel, but also for members of the area commands who may be assigned internal affairs investigations to conduct. There is a practice of assigning IA investigations to members of an area command, at the rank of sergeant, to conduct investigations alleging minor misconduct against an APD member of the same command. Although the initial IA training requirement for these individuals is met in supervisory training, APD has yet to develop training that would meet the 8-hour annual requirement for these personnel.  We previously placed IAD on notice in IMR 6 that this issue needed to be resolved.

We are satisfied that the training requirement is met for those members of IAD who are doing the bulk of the investigations and the investigations involving serious misconduct.  Both the 24-hour preliminary and the 8-hour in-service training address the requirements of this paragraph. The challenge remains with the training of those in the area commands who may be assigned investigations but who are not members of IAD.

We realize this issue is a carry-over from IMR-6.  Nonetheless, APD must develop an adequate annual training program for those area command sergeants who may be assigned minor misconduct investigations in order to be in full operational compliance with this paragraph.

We have also noted potential issues pertaining to the CPOA training requirements found in paragraph 200. In prior site visits we reviewed the initial training provided by CPOA's legal counsel and found it to be well organized and delivered. It addresses all salient points of the CASA and of internal complaint investigations.  We do note, however, that there were no performance testing measures included in the training.  Likewise, the annual training for the past years for CPOA investigators involved the annual NACOLE (National Association of Civilian Oversight of Law Enforcement) conference. The agenda for the NACOLE training can be found online, and is relevant to the CPOA mission.  Testing measures and results could not be evaluated. NACOLE training is not evaluated (tested) after the training is delivered.  CPOA should consider using supporting training materials provided by NACOLE and developing internal testing methods to ensure that learning has occurred on critical points.

The overall CPOA performance indicates that the training has been effective, however, going forward the monitor will expect more exact and immediate indications of effectiveness of training. We are thus unable to assess the overall effectiveness of the training received by CPOA investigators.

### 4.7.184 Assessing Compliance with Paragraph 198:  CPOA Staffing

Paragraph 198 stipulates:

**"The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement. The City shall re-assess the staffing of the Internal Affairs Bureau after the completion of the staffing study to be conducted pursuant to Paragraph 204.  The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations."**

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.185 Assessing Compliance with Paragraph 199:  IA Initial Training

Paragraph 199 stipulates:

**"All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Bureau, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

### 4.7.186 Assessing Compliance with Paragraph 200:  CPOA Training

Paragraph 200 stipulates:

165

**"Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Effective Date and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 199 and 200:*

*4.7.185-186a: Identify the cadre of area command sergeants who may be assigned misconduct investigation and develop an annual IA training program for them and have them complete same on an annual basis.*

*4.7.185-186b: Do not assign a misconduct investigation to any APD personnel who have not met the annual training requirement.*

*4.7.185-186c: CPOA should develop an assessment mechanism to measure the effectiveness of outside training such as the NACOLE conference. That can easily be done by "testing" by CPOA once the CPOA investigators have completed the NACOLE training.*

**4.7.187 – 4.7.188 Assessing Compliance with Paragraphs 201 – 202:  Discipline and Transparency**

Paragraphs 201-202 require that discipline imposed for sustained violations be fair and consistent, with consideration of aggravating and mitigating circumstances. These paragraphs also require the use of a disciplinary matrix in imposing discipline and sets forth required elements for the disciplinary matrix.

The monitoring team reviewed a stratified random sample of eight current cases completed during the review period for compliance with this requirement. The monitoring team also met with the Chief of Police, City Attorney, the CPOA Director and IA Misconduct Commander and discussed the use of the disciplinary matrix.

In response to past recommendations by the monitor, marked improvements have been made in the APD disciplinary system that provide the supervisory chain and the chief with the information

necessary to facilitate the accurate calculation of the appropriate level of discipline.

APD has developed and now utilizes a "Disciplinary Action Packet". This packet serves as a guideline by giving the subject officer's supervisory chain and the chief--in each disciplinary matter in which major discipline can be imposed--recommendations regarding the class designation of the policy violations under consideration. It also provides an accurate "snapshot" of the subject's disciplinary record and prior offenses, by virtue of their class designation and timeline (date of imposition of prior offense compared to current offense), which may enhance the current offense. The packet also contains a recommended or preliminary disciplinary calculation, based on the appropriate box in the disciplinary matrix, setting forth the range (minimum and maximum) of discipline.  Also, retention cards now provide the classification of any prior sustained offenses and date of imposition of discipline, facilitating the calculation of applicable prior offenses.

We also note that another prior recommendation has been followed. SOP AO 3-46 with Appended Chart of Sanctions (Discipline Matrix) sets forth that any deviation from the presumptive range of discipline (appropriate range as established by the Chart of Sanctions) must be justified in writing (3-46-5B4).

Notwithstanding the improvements in the disciplinary process, our review continues to note issues with elements related to the imposition of discipline and use of the discipline SOP and discipline matrix.

The monitoring team reviewed a stratified random sample of cases completed during the review period. In that review we identified 8 cases in which discipline was imposed or should have been imposed **[IMR-8-9, IMR-8-11, IMR-8-10, IMR-8-12, IMR-8-15, IMR-8-60-17; IMR-8-21, and IMR-8-23]**.   Of those cases we found three in which discipline was inappropriate or in which the tenets of the discipline regulation (AO 3-46) with the Chart of Sanctions (Disciplinary Matrix) were not followed. In one, findings were sustained, but discipline was not imposed due to time limitations **[IMR-8-09]**.

A second case involved the use of prior corrective action in lieu of discipline in a misconduct matter with a classification range of 1-7 without an articulation for a departure from the discipline matrix **[IMR-8-15].** A third case involved improper weight given to an unverified excuse that was contradicted by attendance records.  This resulted in a disciplinary decision that was departure from what should have been appropriate discipline **[IMR-8-21].**  No rationale for the

departure from the disciplinary matrix was provided.  These findings show a compliance rate of only 63% with the requirements of paragraph 201.

As we have done since the 6th IMR, the monitoring team notes a discrepancy between paragraphs 5c2 and 5c4 of AO 3-46, that allows for different interpretations of what constitutes a prior offense, based on whether the prior offense is or is not in the same class of the present offense. The method for determining discipline for a prior offense and its effect on a present offense when using the disciplinary matrix calculation is not explained in an easily understandable and coherent fashion.

In addition, although SOP 3-46-5G allows for the imposition of non-disciplinary corrective action in addition to applicable discipline, it does not contain a warning that non-disciplinary corrective action should not be the only disposition where the matrix calls for the imposition of discipline. We do note, however, that we have found no instances where non-disciplinary corrective conduct has been used in lieu of discipline, leading to the anomaly of operationally following the principle contained in the CASA even though the discipline matrix does not contain the required warning.


### 4.7.187 Assessing Compliance with Paragraph 201:  Fact Based Discipline

Paragraph 201 stipulates:

**"APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently."**

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.187:  Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless written reasons for departure from the matrix recommendations accompany the decision.***

### 4.7.188 Assessing Compliance with Paragraph 202: Discipline Matrix

168

Paragraph 202 stipulates:

**"APD shall establish a disciplinary matrix that:**

a) **establishes a presumptive range of discipline for each type of rule violation;**
b) **increases the presumptive discipline based on an officer's prior violations of the same or other rules;**
c) **sets out defined mitigating or aggravating factors;**
d) **requires that any departure from the presumptive range of discipline must be justified in writing;**
e) **provides that APD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and**
f) **provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed."**

## Results

Primary:   **In Compliance**
Secondary: **In Compliance**
Operational: **Not in Compliance**

*Recommendation 4.7.188:  Ensure that all disciplinary decisions either conform to the recommended ranges included in APD's disciplinary matrix or that they are accompanied by written explanations for the departure from the recommendations of the disciplinary matrix.*

## 4.7.189 Assessing Compliance with Paragraph 203

Paragraph 203 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement the terms of this Agreement. APD shall also deploy a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally. APD shall revise and implement policies for supervision that set out clear requirements for supervision and comport with best practices.**"

## Methodology

Members of the monitoring team are aware of past external staffing study work at APD by the Weiss Group that articulated staffing goals. Despite that work, no "magic number" exists to identify the exact number of officers APD needs to meet its workload.  Based on the monitor's experience, these numbers tend to change almost

169

annually.  During 2018, APD has received an increased number of applications for entry-level patrol positions—along with a substantial increase in applications for lateral-entry positions.

**Results**

Given the apparent new pool of individuals interested in careers at APD, it seems appropriate for APD to develop goals and objectives for its recruiting and hiring processes.  Outcome variables are available, such as calls for service per officer, specific response time goals, etc.  The static numbers generated three years ago become invalid after as little as a year.  Outcome variable-based staffing levels can be updated and assessed annually.

APD remains in compliance with this paragraph based on current staffing, efforts to improve outreach, and current numbers of recruits and lateral transfers who have expressed interest.  APD, over the last year has moved from a sparse recruiting environment to a reasonably abundant recruiting environment.  Whether the change is due to the new leadership at APD, the shift in focus at APD from pure enforcement to service delivery, or improvements in APD's salary structure is unclear.  What is clear is that interest in APD jobs has elevated recently.

Operational compliance will depend on meeting established recruiting goals based on the calculated number of officers needed to meet the policing needs of the City of Albuquerque's neighborhoods.

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.190 Assessing Compliance with Paragraph 204: Comprehensive Staffing Study

Paragraph 204 requires:

**"In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission. APD therefore shall conduct a comprehensive staffing assessment and resource study. The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques. The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands. This staffing assessment and resource study shall be completed within one year of the Effective Date. Within six months of the**

**completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement."**

## Methodology

Alexander Weiss and Associates completed an APD staffing study in 2015, and specific staffing standards were identified.  Since 2015 APD has encountered difficulties meeting those standards.  In IMR-6 we found APD in compliance with the requirements of Paragraph 204.  Staffing standards were articulated.  Historically, APD has had difficulty generating the number of recruits and lateral transfers called for by the results of its staffing studies.  That issue seems to have changed markedly recently, with APD experiencing substantial increases in applicants.  The staffing plan developed by APD during the last year meets the standards articulated by Paragraph 204

## Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.191 – 4.7.194 Assessing Compliance with Paragraphs 205-208: Supervision and Related Paragraphs

Paragraphs 205 thru 208 of the CASA address supervision requirements for first line supervisors to properly supervise the use of force, supervision within the chain of command, span of control and levels of supervision, and lieutenants and commanders maintain close supervision of officers under their command.

The monitoring team met with members of the APD responsible for Paragraphs 205 thru 208 during the March 2018 and June 2018 site visit. In IMR-6, the monitoring team identified areas of concern particularly in the area of assessment of use-of-force incidents as required by Section IV of the CASA. As reported then, there were no formalized and routinized processes for supervisory monthly reports, APD implemented the use of a program "MyPAL" for monthly reporting to replace the handwritten monthly reports. Training for the program "MyPAL" was delivered in May of 2017 to all Field Service Bureau and PACT lieutenants and sergeants.

Since that training, there has twice been a change in the personnel responsible for these paragraphs. During this reporting period (February 2018 thru July 2018) APD assigned a new commander to oversee the requirements of these paragraphs.  The commander,

during meetings with the monitoring team, addressed areas that he felt were deficient and not capturing the necessary documentation to meet the requirements of the paragraphs for this section. During the June 2018 meeting, the commander reported that the entire reporting system would be revamped to ensure the requirements of the CASA were fully implemented and reported on fully and properly. The commander stressed that MyPAL, once updated to help bring APD into compliance, will be utilized throughout the department not just FSB. The commander has scheduled a review of the current system utilized to meet the obligations of these paragraphs and has scheduled meetings with APD staff to begin the revision process.

APD focused on problems with the current program, including:

- MyPAL is not the sole program for CASA compliance/successful measurements related to supervision and related processes;
- How to capture when officers are on Light Duty, Family Medical Leave, etc., to ensure accuracy in data entered into program;
- Oversight and management of the program; and
- Use of Force tracking

To address these issues APD developed a focus group designed to identify areas of concern, training needs, and technology issues related to Paragraphs 205- 208:

- Areas of concern include inaccuracies with MyPAL reporting documentation;
- Training for the use of the MyPAL  (previous training only one hour with no updates in training); and
- Technology issues.

During the June 2018 site visit, the commander in charge of paragraphs 205-208 projected that the revisions to the reporting program would take 12 to 18 months to implement. This will have an obvious impact on APD reaching compliance. Secondary and Operational Compliance is not attainable until the program utilized to support the paragraphs is fully developed, trained on and delivered. Also, as documented in other paragraphs in this report, the projected training of the updated use of force policies being extended until 2019 will further delay APD in attaining Operational Compliance in some of the paragraphs. APD will find that performance outcomes related to the use and supervision of force in the field are at the heart of CASA operational compliance.

The monitoring team visited each area command during the site visits in March 2018 and June 2018 to ensure that staffing levels as required by the CASA were met and to ensure a first-line supervisor was assigned to the field officers on patrol. Members of the monitoring team reviewed course-of-business staffing reports and daily rosters from APD. This information coupled with data received from APD during the reporting period indicates that the staffing levels reflect operational compliance and first-line-supervisors were on duty at the time of the site visit. The normal day- to- day operations of APD patrol units are supported and supervised at levels required by the CASA.

We evaluated "paper" requirements of these paragraphs and "actual" requirements (via on-site assessments) and found that the original system, as planned by APD in 2016 needed substantial improvement (as we have noted in past monitoring reports).  Record-keeping processes are still pending; however, in-field practice shows that adequate supervisory personnel are in place in ratios anticipated by the CASA.

### 4.7.191 Assessing Compliance with Paragraph 205

Paragraph 205 stipulates:

**"First-line supervisors shall investigate officers' use of force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy."**

### Results

     Primary:    **In Compliance**
     Secondary: **Not In Compliance**
     Operational: **Not In Compliance**

### 4.7.192 Assessing Compliance with Paragraph 206

Paragraph 206 stipulates:

**"All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command. First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary command. Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department."**

### Results

Policy, procedure, and process are in place for implementing the requirements of this paragraph.  Training, staffing, and oversight, however, currently have serious gaps leading to compliance failures relating to "closely and consistently" supervising officers.  Sergeants, lieutenants, and command officers continue to miss critical deficiencies in the individual policing events reviewed by the monitors. Most of the deficiencies we have noted relate directly to use of force issues, e.g., supervisory and command personnel missing critical failing elements of officers' use of force reporting and or practice.

> Primary:     **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.193 Assessing Compliance with Paragraph 207

Paragraph 207 stipulates:

**"First-line supervisors shall ordinarily be assigned as a primary supervisor to no more than eight officers. Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary."**

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

## 4.7.194 Assessing Compliance with Paragraph 208

Paragraph 208 stipulates:

**"APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command. APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement."**

**Results**

Our review of use of force incidents was used to assess compliance with this paragraph.  While lieutenants and commanders were found to be "on-duty" when we made our Field Services site visits, these ranks tend to be less effective when the monitoring team reviewed results-oriented outcome variables.  For example, sergeants, lieutenants and commanders are still routinely missing out-of-policy

174

actions by their officers when supervisors and management personnel review officer reports and OBRD video. We continue to note from our review of use of force incidents that the main sources of "findings" concerning improper or deficient supervision is the Compliance Bureau and the monitoring team. It should be the Command level at APD's Area Commands.

>Primary:　**In Compliance**
>Secondary: **Not In Compliance**
>Operational: **Not In Compliance**

*Recommendations for Paragraphs 205, 206 and 208:*

*4.7.191-194a:  APD should consider more effective methods to ensure that supervisory and management personnel understand efforts to operationalize CASA requirements regarding field practices. These methods could include counseling, retraining, enhanced oversight, and, where necessary, discipline.*

*4.7.191-194b:  Use current and past monitor's reports to identify the Area Commands responsible for the failure points noted in supervisory and command oversight, and ensure that deputy chiefs have detailed, forthright discussions with area commanders whose oversight systems are failing.*

*4.7.191-194c:  Build internal systems (audits, etc.) to identify area commanders who routinely miss failure points in CASA compliance and ensure that appropriate remedial steps are implemented to rectify common repetitive oversight errors at the command and supervisory levels.*

**4.7.195 - 4.7.197 Assessing Compliance with Paragraphs 209 - 211: Review of Sergeants' Training**

Paragraphs 209 thru 211 address various supervisory training requirements APD must meet for the CASA. As with other reporting periods and in other paragraphs in the CASA, the monitoring team has dedicated extensive amounts of time providing perspective, feedback and technical assistance to APD's Training Academy in its three 2018 site visits.

As described in other paragraphs throughout this reporting period, changes in leadership continue to create issues relative to operational compliance, and paragraphs 209 thru 211 are no exceptions to this issue. These changes create a lack of continuity to technical assistance rendered by the monitoring team.

These paragraphs require every sergeant receive 40 hours of mandatory supervisory, management, leadership and command accountability training.  Other topics in the training requirements include, but are not limited to, investigating use of force, de-escalating conflict, monitoring use of force to ensure consistency with policies and understanding supervisory tools such as Early Intervention System and on-body recording systems. Data from previous IMR's indicate that these portions of the requirement have been addressed by APD and continue to be addressed. However, results show that training was not effective in remediating errant supervisory practices, particularly as it pertains to use of force.

These training lapses are provided in reports reviewed in Section IV. We note in paragraph 86-88 that "APD will find that performance outcomes related to the use and supervision of force in the field are at the heart of the CASA operational compliance." This will put the emphasis on APD gathering training needs from the field and ensure training objectives and curriculum are "mapped" to properly effect specific performance changes, and that field implementation can be assessed and measured." The seven-step training cycle that was recently implemented by the academy should enhance its training process.

During this monitoring period APD remains in primary compliance with paragraphs 209-211 because of pending changes to the use of force policy and the impact these changes will have on the training requirements.  Until issues surrounding the use of force policy are resolved[6], secondary and operational compliance are unattainable. Secondary and Operational compliance will require revised training protocols and changes in the way police in-field operations are executed and supervised.

We note that a new Commander has been recruited from outside APD, and began her tenure at the Academy.  We have reviewed her first "work product" submission, a specific, tangible, and objectives-based training outline, and found it to be a major improvement over past submissions from the Academy.  Creation of training documentation and training of Academy staff about an overarching policy related to training development and documentation processes that is reflective of the new commander's views on planning, designing, documenting, implementing and evaluating training will be a necessary step forward in moving the Academy to full compliance with the CASA.

---

[6] After the close of this reporting period, the Chief of Police and the monitor were able to resolve the main issues related to 2-52, Use of Force.  Remaining policies in the Use of Force suite are still pending resolution.

### 4.7.195 Assessing Compliance with Paragraph 209

Paragraph 209 stipulates:

**"Sergeant training is critical to effective first-line supervision. Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities."**

### Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 209:*

*4.7.195a:  Expedite, to the extent consistent with quality, development of APD's supervisory training for sergeants, ensuring that the training is consistent with guidance provided by the monitor regarding training plans, course evaluations, and focus on supervisory training needs outlined in monitoring reports.*

### 4.7.196 Assessing Compliance with Paragraph 210

Paragraph 210 stipulates:

**"APD's sergeant training program shall include the following topics:**

**a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;**

**b) de-escalating conflict;**

**c) evaluating written reports, including those that contain canned language;**

**d) investigating officer uses of force;**

**e) understanding supervisory tools such as the Early Intervention System and on-body recording systems;**

**f) responding to and investigating allegations of officer misconduct;**

**g) evaluating officer performance;**

**h) consistent disciplinary sanction and non-punitive corrective action;**

**i) monitoring use of force to ensure consistency with policies;**

**j) building community partnerships and guiding officers on this requirement;**

**k) legal updates."**

## Results

APD has been through multiple permutations regarding training requirements for supervisors and managers.   Beginning with the early stages of the process, the old administration of APD argued with the monitor about the need to "document training." Fortunately, that phase of the project seems to be at an end.  APD has hired, from outside of the agency, an individual whose career has centered around training development, documentation, delivery and assessment.  The first work product the monitor has received from the new training commander was a significant improvement over all previous "training plans" submitted by APD.  It was well thought through, well organized and well documented.  It contained a meaningful outline of knowledge, skills, and abilities to be trained, and outlined a strong evaluation plan.  If future training development follows suit, APD will soon be moving most, if not all, training issues into compliance.

> Primary:      **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.198 Assessing Compliance with Paragraph 211

Paragraph 211 stipulates:

**"All sworn supervisors shall also receive a minimum of 32 hours of in-service management training, which may include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement."**

## Results

APD has been through multiple permutations regarding training requirements for supervisors and managers.   Beginning with the early stages of the process, the old administration of APD argued with the monitor about the need to "document training." Fortunately, that phase of the project seems to be at an end.  APD has hired, from the outside of the agency, an individual whose career has centered around training development, documentation, delivery and assessment.  The first work product the monitor has received from the new training commander was a significant improvement over all previous "training plans" submitted by APD.  It was well thought through, well organized and well documented.  It contained a meaningful outline of knowledge, skills, and abilities to be trained,

and outlined a strong evaluation plan.  If future training development follows suit, APD will soon be moving most, if not all, training issues into compliance.

> Primary:   **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraphs 209-211:*

*4.7.195-197a: Delay work on training plans related to use of force processes until there is an approved Use of Force policy (and supportive policies are revised accordingly).*

*4.7.195-197b:  Focus new supervisory training on the top five critical error points identified in reviews of supervisory personnel's performance related to use of force.*

*4.7.195-197c:  Assess the quality of training based on reductions in noted errors of supervisory performance related to use of force incidents and practices.*

*4.7.195-197d:  APD's training academy should "institutionalize" the current training planning, documentation and delivery processes implemented by the new Academy commander.*

*4.7.195-197e:  APD's training academy should develop, internalize, and institutionalize quality control measures to ensure that the lesson plans developed under the process developed by the new Academy commander are delivered as outlined by the new training guide process recently implemented.*

*4.7.195-197f:  Continue the current process of training development and documentation for all future CASA-related training products.*

**4.7.198 – 4.7.205 Assessing Compliance with Paragraphs 212-219 EIS/EIRS/PMEDS**

During the past two years, members of the monitoring team have reviewed multiple updated policy drafts of the proposed Early Intervention and Recording System (EIRS).  Undoubtedly, the new system currently under development will require new policy guidance; however, until that new guidance is crafted, APD currently has monitor approval for the policy guiding the current system.  Training and supervision are the next major objectives that need to be

addressed by APD.  During the June 2018 site visit, the monitoring team provided APD with technical assistance in an effort to move forward with an effective and manageable system, capable of indicating the performance of its officers.  We continue to work with the City to craft acceptable policies and procedures that conform to national standards for these paragraphs.

As a result of that assistance, APD has come to agree:

- The current system is inefficient and unmanageable
- The thresholds are arbitrary and not supported by data
- The existing policy is poorly written
- Supervisors are without proper training and guidelines
- The perception of the system to be that it is a disciplinary process

While APD is currently still utilizing the existing system to help to identify officers who exceed current thresholds and may require intervention, they have provided the monitoring team with draft versions of policy, SOPs and plans to move forward with a system that will meet and exceed CASA requirements.  It is proposed to be a data-driven system with thresholds supported by data analysis and research, using standard deviation to establish thresholds rather than arbitrary numbers.

APD has increased the staff at Internal Affairs devoted entirely to the Personnel Management, Evaluation and Development System (PMEDS) to include a lieutenant to manage the project with a sergeant tentatively approved along with a PMED Data Analyst position currently advertised. IA has met with the City Technology Manager and APD Technical Services Data Analyst to assist in determining the best sources for the required data.  Additionally, a tech vendor under contract with the City of Albuquerque has been utilized and may be enlisted to further the PMEDS project.

APD envisions the entire process as a 24-month project based upon policy approval, system selection, training and implementation.  The monitoring team believes this to be an appropriate estimate based on prior experience with Early Intervention Systems in Pittsburg and New Jersey.  While this timeline is problematic with regards to attaining compliance with the requirements of the CASA, the monitoring team believes that APD has finally grasped the concept and importance of an Early Intervention System.  While approved policy guidance exists, it is highly probable that, when new systems are developed, policies will need to change.  Nonetheless, APD is in

primary compliance, pending new policy development, as existing policies have been promulgated.

### 4.7.198 Assessing Compliance with Paragraph 212

Paragraph 212 stipulates:

**"Within nine months of the Effective Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers. APD supervisors shall be trained to proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being."**

### Results

> Primary:     **In Compliance**
> Secondary: **Not in Compliance**
> Operational: **Not in Compliance**

### 4.7.199 Assessing Compliance with Paragraph 213

Paragraph 213 stipulates:

**"APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties."**

### Results

> Primary:     **In Compliance**
> Secondary: **Not in Compliance**
> Operational: **Not in Compliance**

### 4.7.200 Assessing Compliance Paragraph 214

Paragraph 214 stipulates:

**"APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review."**

### Results

> Primary:     **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.201 Assessing Compliance Paragraph 215

Paragraph 215 stipulates:

**"The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum:**
**a) uses of force;**
**b) injuries and deaths to persons in custody;**
**c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy;**
**d) all civilian or administrative complaints and their dispositions;**
**e) all judicial proceedings where an officer is the subject of a protective or restraining order;**
**f) all vehicle pursuits and traffic collisions involving APD equipment;**
**g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system;**
**h) all disciplinary action taken against employees;**
**i) all non-punitive corrective action required of employees;**
**j) all awards and commendations received by employees, including those received from civilians, as well as special acts performed by employees;**
**k) demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;**
**l) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and**
**m) all offense reports in which an officer is a suspect or offender."**

### Results

> Primary:   **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.202 Assessing Compliance Paragraph 216

Paragraph 216 stipulates:

**"APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it. The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command."**

**Results**

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.203 Assessing Compliance Paragraph 217

Paragraph 217 stipulates:

**"APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law. Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System. On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner."**

**Results**

Primary:      **In Compliance**
Secondary: **Not In Compliance**
 Operational: **Not In Compliance**

## 4.7.204 Assessing Compliance Paragraph 218

Paragraph 218 stipulates:

**"APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system. APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command. Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior."**

**Results**

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### *Recommendations for Paragraphs 212 – 218:*

*4.7.198-204a:  Re-visit the current EIS policy and revise it to be congruent with the requirements of the CASA and the needs of the APD.*

*4.7.198-204b:  Conduct a field-based assessment to determine the state of the art of EIS processes by identifying the goals, objectives, processes, policies and training provided by other police agencies working under similar requirements of CASA-like processes.*

## 4.7.205 Assessing Compliance Paragraph 219

Paragraph 219 stipulates:

**"Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate. The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement."**

## Results

While the new PMEDS policy is currently in draft form and only beginning the approval process, the monitoring team identified a CASA requirement that was completely omitted.  Paragraph 215 (k) relates to capturing demographic data for Use of Force and Search and Seizure incidents.  These required elements should be included in the revised version of PMEDS.

Primary:    **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 219:*

*4.7.205a:  Carefully review similar systems implemented in Seattle, WA; New Orleans, LA; Los Angeles, CA and other police agencies that have worked through similar requirements.*

*4.7.205b:  Work with supervisory personnel who have shown the ability to comply with the requirements of Paragraph 219 to identify system needs and capabilities that will support an effective oversight process.*

***4.7.205c:  Ensure that the new PMEDS system is capable of addressing all required components of paragraph 219.***

### 4.7.206 – 4.7.217 Assessing Compliance with Paragraphs 220-231

APD has completed the deployment of new cameras to all of APD, with the officers in uniform (Field Services) receiving two (2) cameras each.  Initial camera training was completed by all officers receiving a camera.

During the team site visit in June 2018, the OBRD policy 2-8 had just entered the review process and remains in review as of the writing of this report.  APD provided documentation that policy refresher training had begun during March 2018 to further clarify the CASA requirements of supervisory review of officer recordings. As of the end of the last reporting period, only 86.1% of active sworn officers have completed the refresher.  Members of the monitoring team visited every Area Command and had supervisors explain their understanding of requirements and to demonstrate that they in fact had done the reviews.  All supervisors contacted were aware of the policy requirements, fluent in their use of the system and had documented their completed video reviews.  This is a marked improvement over past performance in this area.

APD discovered that when supervisors entered data into the monthly video inspection form, they were permitted to skip certain fields and continue with completing the form.  This caused inaccurate data collection if a field had been skipped, so changes were implemented to require all fields be mandatory in order to eliminate missing data.

Additional personnel have been assigned to OBRD functions to assist in training.  Two civilians were certified in Instructor Training and attended Axon camera systems training. Additionally, the camera program has been transferred to the Evidence Section from the property section. This enables an officer having problems with a camera to get a replacement at any time. This unit will also track issues reported with the cameras—failures, battery issues, etc.

In order to meet compliance with the requirement that all cameras are checked daily to ensure they are working, APD is obtaining documentation from Axon that have built-in protocols that restrict downloads, recharging and uploading camera updates to only cameras known (by the system) to be functioning correctly.  APD provided an email from an Axon software engineer describing this

safeguard. The monitor has requested "official" Axon material that describes this function.

APD needs to develop systems and processes, outline methods of conducting internal inspections and audits with regards to several requirements of the CASA relating to OBRD.  Data presented to the monitoring team regarding OBRD infractions do not distinguish how it was discovered, whether it was referred to Internal Affairs and the final outcomes. APD should establish formal audit and reporting procedures. Members of the monitoring team will work with Internal Affairs and the OBRD personnel during the next site visit to address the requirements and explore methods to capture the data.

Regarding training, members of the monitoring team have taken the OBRD training and test via Power DMS.  We have requested, but never received any curriculum for the training of supervisors regarding their responsibilities with OBRD (other than power point slides).  Well-trained supervisors are the lynchpin to making this entire process function properly.  APD is reminded that all CASA-related training should be based on acceptable lesson planning processes similar to the GO-MAPPS outline the monitor has provided the Training Academy on multiple occasions.

### 4.7.206 Assessing Compliance Paragraph 220

Paragraph 220 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems. Within six months of the Effective Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require:**
**a) specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;**
**b) officers to ensure that their on-body recording systems are working properly during police action;**
**c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning;**
**d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible;**
**e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;**
**f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits;**
**g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and**

**h) APD to retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved."**

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

## 4.7.207 Assessing Compliance with Paragraph 221

Paragraph 221 stipulates:

**"APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and implementation. Upon approval by the Monitor and DOJ, policies shall be implemented within two months."**

### Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

## 4.7.208 Assessing Compliance with Paragraph 222

Paragraph 222 stipulates:

**"The Parties recognize that training regarding on-body recording systems is necessary and critical. APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff. APD will develop a training curriculum, with input from the Monitor and DOJ that relies on national guidelines, standards, and best practices."**

### Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not in Compliance**

## 4.7.209 Assessing Compliance with Paragraph 223

Paragraph 223 stipulates:

**"APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order. Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift**

**according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor."**

## Results

Primary:　　　**In Compliance**
Secondary:　　**In Compliance**
Operational:　　**Not in Compliance**

## 4.7.210 Assessing Compliance with Paragraph 224

Paragraph 224 stipulates:

**"Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy."**

## Results

Primary:　　　**In Compliance**
Secondary:　　**Not In Compliance**
Operational:　　**Not In Compliance**

## 4.7.211 Assessing Compliance with Paragraph 225

Paragraph 225 stipulates:

**"At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed."**

## Results

Primary:　　　**In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

## 4.7.212 Assessing Compliance with Paragraph 226
Paragraph 226 stipulates:

**"APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent."**

## Results

188

Primary:      **In Compliance**
Secondary:  **Not in Compliance**
Operational: **Not in Compliance**

## 4.7.213 Assessing Compliance with Paragraph 227

Paragraph 227 stipulates:

**"APD shall ensure that on-body recording system videos are properly categorized and accessible. On-body recording system videos shall be classified according to the kind of incident or event captured in the footage."**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.214 Assessing Compliance with Paragraph 228

Paragraph 228 stipulates:

**"Officers who wear on-body recording systems shall be required to articulate on camera or in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded. Intentional or otherwise unjustified failure to activate an on-body recording system when required by APD policy shall subject the officer to discipline."**

### Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.215 Assessing Compliance with Paragraph 229

Paragraph 229 stipulates:

**"APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties. On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room)."**

### Results

Primary:      **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.216 Assessing Compliance with Paragraph 230

Paragraph 230 stipulates:

**"APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift. All images and sounds recorded by on-body recording systems are the exclusive property of APD."**

**Results**

> Primary:   **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

### 4.7.217 Assessing Compliance with Paragraph 231

Paragraph 231 stipulates:

**"The Parties are committed to the effective use of on-body recording systems and to utilizing best practices. APD currently deploys several different platforms for on-body recording systems that have a range of technological capabilities and cost considerations. The City has engaged outside experts to conduct a study of its on-body recording system program. Given these issues, within one year of the Effective Date, APD shall consult with community stakeholders, officers, the police officer's union, and community residents to gather input on APD's on-body recording system policy and to revise the policy, as necessary, to ensure it complies with applicable law, this Agreement, and best practices."**

**Results**

> Primary:   **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraphs 220 – 231:*

*4.7.206-217a:  Document all training provided responsive to above paragraphs and provide that documentation to the monitoring team for review.*

*4.7.206-217b:  Ensure that training provided responsive to these paragraphs are well documented and have clear goals and measureable objectives.*

### 4.7.218 – 4.7.226 Assessing Compliance with Paragraphs 232-240

Members of the monitoring team examined and reviewed APD data related to these requirements in the form of policy, programs, and results.  APD has been, and is currently attracting and hiring qualified individuals, and has been and remains in Operational Compliance with each of these CASA paragraph requirements.

In addition, members of the monitoring team met with Training Academy personnel responsible for the development and implementation of a strategic recruitment plan. The APD Training Academy has provided the monitoring team with the "2017 Annual Report & 2018 Strategic Recruitment Plan" and continues to aggressively promote APD via web-based applications with expanded emphasis on minority group sites. Additionally, APD has provided documentation of attendance at many diverse community group events including Military, Faith-Based, Educational, and Sports related events.  The "blind" online application process, wherein applicants can remain completely anonymous until they arrive for testing, is a laudable and effective process.

The University of New Mexico worked with the APD to develop a comprehensive recruiting plan and the partnership continues with college recruitment and internships.

The "2018 Strategic Recruitment Plan" lists a review of past strategies and enumerates goals/objectives and plans to attract a diverse pool of applicants for 2019.  APD has expanded its web-based advertising with more emphasis on minority group sites (Native People Recruits, The Cause and Saludos websites) in addition to the Military and the University communities. APD continues regular contact with board members of the Southern Christian Leadership Council. Feedback received from a recruiting summit was a determining factor in the reduction of the college credit requirements. APD has expanded its efforts with the High School "Career Enhancement Center," in an effort to recruit students into the Public Service Aide (PSA) program and foster processes to facilitate the transition from PSA to police officer.   APD has provided documentation that demonstrates changes to recruiting process based on community feedback.  During 2018, APD Recruiters attended meetings with all six Community Policing Councils. Community Councils recommended that APD post Albuquerque demographic data on its website, and that was effected.  Additionally, the Councils recommended an instructional video to demonstrate the testing and hiring process.  This is currently in production. Monthly tutoring sessions have been implemented and have encountered some staffing issues. APD continues to facilitate these tutoring sessions.

APD has continued use of a "blind" automated, on-line system that allows an applicant to remain completely anonymous until they arrive for testing. Recruiting and Hiring policies have been revised and approved. Non-automated Recruiting and Hiring policies meet CASA requirements.

Members of the monitoring team requested COB data related to training CASA requirements and reviewed a random sample of nine cadets (a 20 percent sample of the 44 cadets seated). For the requirement of testing existing officers, APD submitted Course of Business documentation of random drug testing for existing APD officers during this monitoring period, February to July 2018.  The results of that review indicate 100 percent compliance for this task. All new applicants were screened by psychological testing, completed a medical examination, were subjected to polygraph screening, and drug testing.  Results of APD's screening process for the latest recruit class are included in Table 4.7.218a, below.

In addition to the initial APD test with related skills questions—the background questionnaires for both a candidate's former employers and personal references—contain questions related to employment, criminal and credit history in addition to questions regarding controlled substance use and abilities to work with diverse communities.  A random audit (nine of 44 seated—20%) of applicant files found each one to contain the relevant questionnaires with answers to the specific questions related to the requirements of this paragraph.

The results of that review included in Table **4.7.218b** below indicate 100 percent compliance for this task.

The monitoring team determined that there were lateral applicants who were in the background investigation stage, but there were no lateral hires during this reporting period.  APD met or exceeded all established requirements for these Paragraphs in the past and the monitoring team expects APD to continue to remain in compliance.

**Table 4.7.218a**
**Screening Points for Recruits and Lateral Hires**

| Case No. | New recruits and lateral hires, to undergo a psychological examination to determine their fitness | New recruits and lateral hires, to undergo a medical examination to determine their fitness | New recruits and lateral hires, to undergo a polygraph examination to determine their fitness | Reliable and valid pre-service Drug testing for new officers and random testing for existing officers. | Detect the use of banned or illegal substances, including steroids. |
|---|---|---|---|---|---|

192

| | | | | | |
|---|---|---|---|---|---|
| Recruit 1 | 1 | 1 | 1 | 1 | 1 |
| Recruit 2 | 1 | 1 | 1 | 1 | 1 |
| Recruit 3 | 1 | 1 | 1 | 1 | 1 |
| Recruit 4 | 1 | 1 | 1 | 1 | 1 |
| Recruit 5 | 1 | 1 | 1 | 1 | 1 |
| Recruit 6 | 1 | 1 | 1 | 1 | 1 |
| Recruit 7 | 1 | 1 | 1 | 1 | 1 |
| Recruit 8 | 1 | 1 | 1 | 1 | 1 |
| Recruit 9 | 1 | 1 | 1 | 1 | 1 |
| Total | **9** | **9** | **9** | **9** | **9** |
| **Number in Compliance Total all Incidents** | **9** | **9** | **9** | **9** | **9** |
| **% in Compliance Total by Category** | **100%** | **100%** | **100%** | **100%** | **100%** |

## Table 4.7.218b Screening Points for Recruits

| Case No. | Assessing a candidate's credit history | Assessing a candidate's criminal history | Assessing a candidate's employment history | Assessing a candidate's use of controlled substances | Assessing a candidate's ability to work with diverse communities |
|---|---|---|---|---|---|
| Recruit 1 | 1 | 1 | 1 | 1 | 1 |
| Recruit 2 | 1 | 1 | 1 | 1 | 1 |
| Recruit 3 | 1 | 1 | 1 | 1 | 1 |
| Recruit 4 | 1 | 1 | 1 | 1 | 1 |
| Recruit 5 | 1 | 1 | 1 | 1 | 1 |
| Recruit 6 | 1 | 1 | 1 | 1 | 1 |
| Recruit 7 | 1 | 1 | 1 | 1 | 1 |
| Recruit 8 | 1 | 1 | 1 | 1 | 1 |
| Recruit 9 | 1 | 1 | 1 | 1 | 1 |
| Total | 9 | 9 | 9 | 9 | 9 |
| | | | | | |
| **Number in Compliance Total all Incidents** | 9 | 9 | 9 | 9 | 9 |
| **% in Compliance** | **100** | **100** | **100** | **100** | **100** |

193

| Total by Category | | | | | |
|---|---|---|---|---|---|
| | | | | | |

## 4.7.218 Assessing Compliance with Paragraph 232

Paragraph 232 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.219 Assessing Compliance with Paragraph 233

Paragraph 233 stipulates:

**"APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross section of the community. The recruitment plan shall establish and clearly identify the goals of APD's recruitment efforts and the duties of officers and staff implementing the plan."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.220 Assessing Compliance with Paragraph 234

Paragraph 234 stipulates:

**"APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community."**

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.221 Assessing Compliance with Paragraph 235

Paragraph 235 stipulates:

**"APD's recruitment plan will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. APD shall create and maintain sustained relationships with community stakeholders to enhance recruitment efforts."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.222 Assessing Compliance with Paragraph 236

Paragraph 236 stipulates:

**"APD shall develop and implement an objective system for hiring and selecting recruits. The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.223 Assessing Compliance with Paragraph 237

Paragraph 237 stipulates:

**"APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and polygraph examination to determine their fitness for employment. APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers. The program shall continue to be designed to detect the use of banned or illegal substances, including steroids."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.224 Assessing Compliance with Paragraph 238

Paragraph 238 stipulates:

**"APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws. APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.225 Assessing Compliance with Paragraph 239

Paragraph 239 stipulates:

**"APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires. APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.226 Assessing Compliance with Paragraph 240

Paragraph 240 stipulates:

**"APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants."**

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.227 – 4.7.229 Assessing Compliance with CASA Paragraphs 241-243: Promotions

APD promoted twelve members to the rank of Sergeant during the reporting period.  The monitoring team reviewed a random sample of six of those promotions and found APD to be in full compliance with the requirements of these paragraphs for all six promotions we reviewed. Records were checked in Human Resources, Internal Affairs and the Training Academy.

APD developed and approved a new Promotional Practices Policy (July 19, 2016). The monitoring team had provided APD with templates for acceptable needs assessment and training outline processes, which we would expect to be followed as this process continues.

The Promotional Practices Policy resolution has been delayed by APOA's request (and the City's objection) for another resolution of outstanding issues.  The revised policy, based on the court's decision, has not yet been submitted to the Monitor.

Until the new policy is approved, APD is operating under the old promotional practices policy, thus compliance is maintained.  Based on the monitoring team's review of promotions recently made by APD the agency has promoted individuals who meet applicable standards and existing policy.

### 4.7.227 Assessing Compliance with Paragraph 241

Paragraph 241 stipulates:

**"APD shall develop and implement fair and consistent promotion practices that comport with best practices and federal anti-discrimination laws. APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant. APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions. These criteria should account for experience, protection of civil rights, discipline history, and previous performance evaluations."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.228 Assessing Compliance with Paragraph 242

Paragraph 242 stipulates:

**"APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties in core substantive areas."**

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.229 Assessing Compliance with Paragraph 243

Paragraph 243 stipulates:

**"Within six months of the Effective Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours."**

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.230 – 4.7.232 Assessing Compliance with CASA Paragraphs 244-246 (Performance Evaluations and Promotional Policies)

APD has completed and promulgated policy regarding performance evaluations.   The policy provides guidance on use of the system, listing criteria to be used to assess achievement of performance goals, and outlining corrective action required if performance goals are not met. During prior site visits, members of the monitoring team attended the training and found it to be excellent.

During the latest site visit, members of the monitoring team visited all six area commands and had supervisors demonstrate the Talent Management System. All supervisors were fluent in their use of the system, were able to show examples of work plans and

198

achievements of subordinates, and had completed the requirements of the policy, the CASA and the system on time.

The monitoring team was provided with documentation, generated through the automated system, that showed a compliance rate of 96.3% for the immediate supervisors completing the latest "Complete Manager Evaluation". Additionally, the monitoring team was provided with data related to upcoming checkpoint reminders, failures to meet the requirements and the responses to the reasons for those failures. The reasons for failing to meet the checkpoint requirements included administrative errors of failing to assign an officer appropriately, military leave, FMLA and other medical type leaves. Other reasons for failures have been noted by APD as a training issue and plans for additional training are under development.

APD is currently working on revising the existing Performance Evaluation policy to include specific sanctions for missed checkpoints.  Those planned revisions will enhance the performance evaluation system.  In the interim, however, APD is in compliance for this paragraph.

### 4.7.230 Assessing Compliance with Paragraph 244

Paragraph 244 stipulates:

**"APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet performance goals. The evaluation system shall provide for appropriate corrective action, if such action is necessary."**

### Results

      Primary:   **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

### 4.7.231 Assessing Compliance with Paragraph 245

Paragraph 245 stipulates:

**"As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates."**

**Results**

          Primary:    **In Compliance**
          Secondary: **In Compliance**
          Operational: **In Compliance**

### 4.7.232 Assessing Compliance with Paragraph 246

Paragraph 246 stipulates:

**"As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period."**

**Results**

          Primary:    **In Compliance**
          Secondary:  **In Compliance**
          Operational: **In Compliance**

### 4.7.233 – 4.7.239 Assessing Compliance with CASA Paragraphs 247-253: Officer Assistance and Support

For this report, the monitoring team reviewed the Behavioral Sciences Section Program for the Albuquerque Police Department for the time period (February 2018 thru July 2018) to ensure that officers and employees of the department were provided ready access to mental health and support resources. Under this program, the services provided to APD include Critical Incident Service, Therapy Service, and a Training Component. The Behavioral Science Section is staffed with highly qualified personnel to maintain high-level quality service. This program is run by a Medical Director, supported by certified clinicians, a policy analyst, a public information officer, and quality assurance auditors.

Members of the monitoring team met twice with the BSS personnel responsible for maintaining the program's development, revisions, and upgrades during these visits. BSS supplied the monitoring team with a 2018 Documentation Notebook outlining the program's functions. The BSS developed a Handbook that encompasses a breakdown of the entire program and all the requirements of the CASA. Revisions are ongoing and reviewed at semi-annual meetings. The Director of the program continues to reach out to outside organizations to stay up to date with the best practices in the field. This is reflected in the program's success.  Programmatic

revisions and innovations based on the "lessons learned" from this process are being revealed and reflected in the data reviewed.

The monitoring team reviewed the training component of the program to ensure APD members received training in Officer Support Protocols. The clinicians are providing training to management and supervisory personnel to ensure accessibility of the program to the department. The monitoring team reviewed the Cadet Class Schedule. The BSS has interwoven training throughout the Cadet program that covers mental health stressors related to law enforcement as required by the CASA. BSS also ensures that family members of the department have mental health services made available to them.

The monitoring team reviewed the Critical Incident Services and the Therapy Services data provided by APD. The nature of the documentation is highly confidential and again, as in previous site visits, aggregate data was reviewed where it was deemed practical. In other cases, notes taken by the monitoring team were devoid of any direct or circumstantial information that would allow an individual to be identified.

The monitoring team reviewed the Behavioral Sciences Section "Privacy and Confidentiality Policy" reviewed by the monitoring team for compliance. We also conducted an on-site review of the BSS facilities. We confirmed that confidential records were secured in locked filing cabinets and that those records were maintained in areas where only BSS staff has access.

Members of the monitoring team also reviewed COB documents for the Peer Support Services for this reporting period. As in the previous visits, documentation included but was not limited to the following: Peer Support Training Curriculum, Peer Support Board activities, meetings, Program Expansion/Outreach and data collection records indicating use of the program. The number and types of BSS activities for this reporting period were supplied and indicate positive use of the program. Again, this material is highly confidential and operational compliance assessment is difficult. The monitoring team is confident that APD's BSS are industry-standard and compliant with the relevant paragraphs of the CASA.

The data reviewed by the monitoring team for BSS paragraphs during this reporting period indicate that there is a mindset that confidentiality of the program is more protected than in the past.  The quality and availability of the program, as assessed from the available data, also reflects an increased belief in the efficacy of what is being offered. BSS continues to maintain updated Excel

spreadsheets of available health professionals and flyers that were reviewed during the site visits to the Area Commands. BSS plans to implement a new phone system, and to expand marketing and providers in order to move the program forward. They are working on plans to ensure material on their Daily 49 system will be posted in APD briefing rooms throughout the department, to increase visibility of the program.

APD has met the CASA requirements for these paragraphs and is in compliance. The monitoring team will continue to closely monitor this process in future site visits.

### 4.7.233 Assessing Compliance with Paragraph 247

Paragraph 247 stipulates:

**"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources.  To achieve this outcome, APD agrees to implement the requirements below."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.234 Assessing Compliance with Paragraph 248

Paragraph 248 stipulates:

**"APD agrees to develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, including: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations."**

### Results

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.235 Assessing Compliance with Paragraph 249

Paragraph 249 stipulates:

"APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma."

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.236 Assessing Compliance with Paragraph 250

Paragraph 250 stipulates:

"APD shall ensure that any mental health counseling services provided APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care."

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.237 Assessing Compliance with Paragraph 251

Paragraph 251 stipulates:

"APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families."

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.238 Assessing Compliance with Paragraph 252

Paragraph 252 stipulates:

"APD shall develop and implement policies that require and specify a mental health evaluation before allowing an officer back on full duty following a traumatic incident (e.g., officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death) or as directed by the Chief."

**Results**

> Primary:   **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.239 Assessing Compliance with Paragraph 253

Paragraph 253 stipulates:

**"APD agrees to compile and distribute a list of internal and external available mental health services to all officers and employees.  APD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers."**

**Results**

> Primary:   **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.240 – 4.7.255 Assessing Compliance with Paragraphs 255 - 270: Community Policing and Community Engagement

These paragraphs address CASA community engagement requirements that include fully adopting community policing principles and integrating them into APD policy, practices and operations, and the establishment and operations of Community Policing Councils. Updating community oriented policing training for both cadets and current staff, increasing and tracking non-enforcement citizen contracts, and sustaining CPCs are central to achieving these paragraph objectives.

For paragraphs 255-265, members of the monitoring team reviewed relevant Special Orders and policies; interviewed members of APD's compliance team and commanders assigned to coordinate responses; reviewed the APD website and APD's course-of-business spreadsheets from their events tracking system; and assessed responses to data and information requests pertaining to each of these paragraphs.

For paragraphs 266- 270, the primary source of compliance data was the CPC sections of the APD website including a review CPC annual reports, meeting minutes, and agenda; attending and observing CPC meetings; interviews with APD outreach staff, area commanders; and APD data and information responses pertaining to each of these paragraphs.

The following paragraphs represent monitoring team findings for paragraphs 255-265.

### 4.7.240 Assessing Compliance with Paragraph 255[7]

Paragraph 255 stipulates:

**"APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-solving policing principles into its management, policies, procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."**

Paragraph 255 requires APD develop policy guidance and mission statements reflecting its commitment to community and problem-oriented policing and supporting administrative systems.  APD has published Special Order 16-06 dated January 9, 2017, which indicated that APD revised its mission statement, reflecting its commitment to community-oriented policing.  We note that "Special Orders" should be translated to policy within a reasonable period of time.  SO 16-06 has been effective for 21 months, well beyond the acceptable lifespan for a special order.  APD should move to memorialize this process into formal policy.

During this reporting period APD reports the establishment of a working group that is considering further revisions designed to enact policy that better reflects practice.   An APD working group has been effectuated. APD reports that its purpose is to revise vision and mission statement to place even greater emphasis on community policing and pubic expectations of police performance. There was no timeline provided for completion of these revisions.

APD continues to make progress integrating community policing principles into its management practices (policies, procedures, recruitment, training, deployment, tactics, and accountability systems).  During this reporting period, APD is re-assessing its training curriculum, making plans to make more officers available to achieve community policing goals, and working to adapt patrol assignments in order to further engage officers with community members.

APD is now actively working to ensure that community participation, input and access are folded into the mix of policy-making, training development, goal-setting, in-field processes and tactics, supervision, command decision making, and program assessment as evidenced

---

[7] Paragraph 254 is not evaluated as it is subsumed in 255 and following.

by updating staffing deployment plans to place greater emphasis on community driven policing. This marks a significant departure from previous APD efforts, and is a bold step forward for the APD.

APD, in conjunction with the USAO initiated significant youth community outreach efforts including the re-establishment of the DEFY (Drug Education for Youth) program that brought law enforcement officers together with groups of at-risk youth in a summer camp experience, where life skills were also taught.

**Results**

APD command staff appears clearly committed to a departmental transformation involving the integration of community policing principles throughout the organization. The transformation requires a "culture change" driven by new and revised policies, training reflecting new policies, and active, consistent and impartial supervision. During this reporting period, APD has been engaged in intensive planning, re- assignment of numerous personnel, and adjustments in roles and responsibilities, all designed to support this transformation.  APD, in conjunction with the USAO, also began a set of high-level discussions concerning strategies to promote "culture change" and foster a better environment for further compliance with CASA requirements.

Another important step taken during this reporting period was the establishment of significant youth outreach initiatives enhancing non-enforcement contacts between APD officers and youth, an important element in integrating community policing principles into APD operations. This program was launched with the strong support of USAO and other community partners.  The initial success of the DEFY program has prompted planning for its expansion moving forward.   We find APD to be in the early stages of implementing verifiable changes in the field-based delivery of processes and services that affect a sea-change in the way APD relates to the communities it serves.  Once these changes become a normal part of the way APD does business, the APD will be in full compliance for this paragraph.

> Primary:    **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

***Recommendation 4.7.240: Conduct a quarterly review of progress made across the department in achieving "culture change" and the integration of community policing principles***

206

*throughout APD operations, and share findings both internally and with other community stakeholders;*

- *Strengthen ongoing input into police operations from CPCs and other community stakeholders including further outreach to other community service organizations and advocacy groups.*

- *Work with USAO and other community partners to expand community-based initiatives targeting high risk youth.*

**4.7.241 Assessing Compliance with Paragraph 256:  APD Response to Staffing Plan**

Paragraph 256 stipulates:

**"As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing."**

Paragraph 256 requires APD to realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing. APD's PACT (Police and Community Together) plan was approved on December 27, 2016, and staff re-alignment responsive to the plan was continued during the 6th reporting period.  In addition, APD circulated COB documentation requesting applications for PACT positions during this reporting period. We note a substantial delay in moving to operationalization of the PACT plan.  The monitoring team, during this reporting period, documented limited progress in implementing the PACT plan.

During this report period APD has terminated implementation of the PACT staff allocation plan and is developing a new staffing and allocation plan designed to further support community policing goals and community engagement. This plan, called "Problem Response Teams" (PRT) is under development and calls for moving additional staffing to the area commands, greatly increasing problem-oriented policing projects, and assigning officers to specific neighborhoods and blocks and requiring them to document non-enforcement (community outreach) contacts.

**Results**

APD's switch away from PACT, a staffing allocation plan designed to increase officer staffing at the <u>command levels</u>, represents a

paradigm shift in APD's policing strategies and approaches.  The plan under development goes even further in its support of community policing goals and community engagement.   As with PACT, PRT also calls for shifting staffing resources to command areas, but goes further in re-defining roles and key activities, and actually assigning officers to micro beats or blocks and tasking them to get acquainted with community members through increased non-enforcement contacts. The plan has not been finalized or vetted by settlement agreement partners.

We remind APD that the CASA implementation process evaluation requires goals, measurable objectives, and documented assessment processes.  The department should take care at this early stage to build those elements into its planning efforts.  To date we have seen no documentation outlining those processes.

While general goals have been outlined for this process, we have yet to see policy guidance regarding critical issues such as staffing, goals, objectives, measures, and analytic methods to determine effectiveness or guide program revision and adaptation.

> Primary:   **In Compliance (based on previous policy)**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 256:***

**4.7.241a:  *Make finalizing this new staffing allocation and deployment plan a priority, and take the necessary steps to gain important input and support from settlement partners and community stakeholders including CPCs;***

***4.7.241b:  Ensure the staffing plan has clearly articulated and defined goals, objectives and outcome measures;***

***4.7.241c:  Once the staffing plan is launched, have in place tools to assess its operational impact and effectiveness in achieving community policing objectives.***

**4.7.242 Assessing Compliance with Paragraph 257:  Geographic Familiarity of Officers**

Paragraph 257 stipulates:

**"APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders, engage in problem identification and solving activities with the community members**

**around the community's priorities; and work proactively with other city departments to address quality of life issues."**

Results of the monitoring team's review of APD's new compliance strategies for the Community Policing components of the CASA include the following:

- APD reported in the 6th reporting period that all of the six (100 percent) Area Commands provided data regarding signed bid packets. These packets include a list of neighborhood associations, meetings and community contacts. However, bid packets did not always include a listing and description of ongoing POP projects in their area command.

- For this reporting period, APD documented that nearly all newly assigned officers were provided familiarity data and returned signed bid packets.

- APD was unable to document in any detail all of the POP projects undertaken in each of the command areas in this reporting period.  Normally that documentations would include participation information goals, objectives and outcomes.

- APD is considering assigning officers to micro-beats and requiring more ongoing non-enforcement contacts and working with other city agencies and community members to engage in more problem-solving activities.

APD has made steady progress in ensuring that officers are given information to enhance familiarity with the geographical areas they serve.  Providing their officers this information is a first step, and eventually this should be reflected in more POP projects, increased community/police interactions in non-enforcement activities, and improved community relations. The monitoring team will continue to confirm issuance of bid packets to APD staff, and will assess how that information is being utilized to advance APD's community policing goals.   APD is also encouraged to do routine reviews and updates of the information provided to officers in their bid packages and other sources as well.

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 257:*

**4.7.242a:** *Develop specific procedures for establishing and maintaining Problem-Oriented Policing (POP) projects in each of the six-command area including a standard reporting template describing and tracking POP activities and outcomes.*

**4.7.242b:** *Update regularly information provided in bid packages to officers.*

**4.7.242c:** *Develop and utilize assessment methods to determine if bid packet information is increasing officer familiarity with neighborhoods served.*

### 4.7.243 Assessing Compliance with Paragraph 258: Officer Outreach Training

Paragraph 258 stipulates:

**"Within 12 months of the Effective Date, APD agrees to provide 16 hours of initial structured training on community and problem oriented policing methods and skills for all officers, including supervisors, commanders, and executives   this training shall include:**

**a)  Methods and strategies to improve public safety and crime prevention through community engagement;**
**b)  Leadership, ethics, and interpersonal skills;**
**c) Community engagement, including how to establish formal partner ships, and actively engage   community organizations, including youth, homeless, and mental health communities;**
**d) Problem-oriented policing tactics, including a review of the principles behind the problem solving framework developed under the "SARA Model", which promotes a collaborative, systematic process to address issues of the community. Safety, and the quality of life;**
**e) Conflict resolution and verbal de-escalation of conflict and;**
**f)  Cultural awareness and sensitivity training.**

**These topics should be included in APD annual in-service training. "**

In our last report**,** the monitoring team raised a concern about the post training assessment methodology and recommended that APD conduct review of these assessment methods to ensure alignment with industry standards and report findings to executive staff and the monitoring team.  During this report period, that review was initiated as part of a broader review on the COP curriculum and Academy training practices, and issues were reported with their post training assessments. APD indicated taking steps to address these issues. These issues and related steps included a shift in policing

approaches and strategies, and placing much greater emphasis on community policing and engagement.

APD also initiated, during this reporting period, an overhaul of their community policing training curriculum.  These significant changes will cover cadet basic training and in-service training and align with newly adopted policies and approaches.  The curriculum changes were not completed prior to the end of the reporting period, and thus were not reviewed by monitoring team members during this reporting period.

APD's decision to overhaul the 16 required hours of COP training was necessitated by a paradigm shift in the department's policing philosophy, placing a much greater emphasis on community policing and engagement.  The outline provided to the monitoring team reflects this shifting philosophy and is part of a broader effort to effectuate organizational culture change by having officers internalize a different way to perceive their relationship with the community members they serve, and lead to alternative ways of interacting with them.

APD may benefit from incorporating outside expertise into their COP curriculum development, and in the most effective training methods to deliver it.  This is a significant but most important undertaking and also will encompass in service training as well. The monitoring team believes that the updating and delivery of the COP training curriculum is key to achieving some of the most important elements of the CASA agreement.

**Results**

        Primary:    **In Compliance**
        Secondary: **Not In Compliance**
        Operational: **Not In Compliance**

***Recommendations for Paragraph 258:***

**4.7.243a:** *Seek external technical assistance in the COPs curriculum development process using subject matter experts and expertise from other law enforcement training academies;*

**4.7.243b:** *Develop more effective ways of employing industry standards to assess officer comprehension and retention of training materials and their in-field application and effectiveness.*

### 4.7.244 Assessing Compliance with Paragraph 259:  Measuring Officer Outreach

Paragraph 259 stipulates:

**"Within six months of the Effective Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem solving partnerships, and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross section of stakeholders."**

APD submitted to the monitoring team a detailed flow chart outlining a tracking system designed to capture community event, officer attendance, event outcomes and other relevant information. The information will be captured at various decision points and included in an event form.  This data will be submitted and maintained in a data base that generates activity reports for executive staff and the monitoring team.   The department is currently updating the community event form, data query and report generating capabilities, and the necessary SOPs to fully execute this event capturing system. APD is pushing forward with establishing more problem-solving partnerships, but the documentation of past and current partnerships remains incomplete.

APD is demonstrating progress in achieving compliance with the measurement of community outreach with the development of a detailed tracking process for community event calendars and capturing attendance at these events. There are additional steps required to fully implement this tracking system including software to generate reports on event outcomes, adjustments to the community event form, and SOPs to cover events reporting and attendance. APD continues to lag in identifying and documenting partnerships with community entities focused on problem solving.  These partnerships are more strategic in nature, building a capacity to address a range of issues, and while there are often informal relationships in place, formalizing and documenting these processes are important requirements if APD expects to set expectations and ensure sustainability.

**Results**

> Primary:     **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 259:***

***4.7.244a:  Complete development of the automated communications event calendaring system and integrate it with the larger TRaCS effort to capture all non-law enforcement contacts and any meaningful outcomes; and***

***4.7.244b Identify community service organizations and advocacy groups that serve and represent high- risk populations, and better document current partnerships and new partnerships.***

### 4.7.245 Assessing Compliance with Paragraph 260:  PIO Programs in Area Commands

Paragraph 260 stipulates:

**"APD shall develop a Community Outreach and Public Information program in each area command."**

During this reporting period, APD maintained a command areas website including CPC-related information for each of the six command areas.  These websites currently capture crime information, agendas for upcoming CPC meetings, schedules of upcoming events, other news items, information on how to report crimes, information regarding how to file complaints, and recommendations for officer commendations.

There is lack of evidence of any coordinated and focused area command -based public information strategy that includes community outreach, messaging, reaching marginalized audiences, and better communication tools, such as using social media, to enhance community engagement.

All six area commands currently have websites and engage in various outreach efforts.  The websites also provide information about upcoming CPC meetings. APD Command area communications with its area residents could be greatly enhanced with a customized Area-based process that would utilize social media tools to reach a broader audience. During this reporting period, APD requested technical assistance from the Bureau of Justice Assistance to help them develop command area and CPC-based public information officer programs, with an emphasis on the use of social media tools to communicate with a broader audience.

### Results

  Primary:  **In Compliance**
  Secondary: **In Compliance**

213

Operational: **Not In Compliance**

*Recommendations for Paragraph 260:*

**4.7.245** *Continue to improve Area Command public information strategies and programing including using technical assistance to update those strategies incorporating significantly more use of various social media tools to reach a broader audience of area command residents.*

**4.7.246 Assessing Compliance with Paragraph 261:  Community Outreach in Area Commands**

Paragraph 261 stipulates:

**"The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command  that is open to the public.  During the meetings, APD officers from the Area command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings."**

Monitoring team members, in the previous reporting period, observed two of these required semi-annual meetings devoted to providing community members summarized information from IMR 6, highlighting both accomplishments and continuing challenges.   For this reporting period there were no monitoring report findings to share with community members, but team members did provide updates on monitoring team activities, and briefings on proposed policy changes relating to CASA requirements.  Policy updates were provided by APD and DOJ staff at area command CPC meetings.

APD has in place six functioning CPCs that meet once a month and provide opportunities for APD to directly interface with residents and brief them on progress in compliance with the settlement agreement, updates on policy changes, new training, policing strategies and tactics, and addressing resident community safety concerns. Settlement Agreement updates and briefings on policy changes were addressed at some of these meetings during this reporting period. We expect that more complete briefings at these CPCs will be planned after completion of the IMR 8 report. The monitoring team suggests that APD make greater use of CPC processes to provide a public forum to discuss changes in APD policy, training, and policing strategies.

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.247 Assessing Compliance with Paragraph 262:  Community Outreach Meetings

Paragraph 262 stipulates:

**"The Community Outreach and Public Information meeting shall, with appropriate safeguards to protect sensitive information, include summaries, of all audits and reports pursuant to this Agreement and any policy changes and other significant action taken as a result of this Agreement. The meetings shall include public information on an individual's right and responsibilities during a police encounter."**

We note the following paragraph related findings:

- All CASA-related reports are posted on the APD website.

- APD has previously created a handout outlining individual rights and responsibilities for police encounters and made it available at the semi-annual meetings in each command area during the previous reporting period. It was not distributed at CPC meetings during this report and is not readily available on the APD website.

APD makes available monitoring team reports on their website, and in the past has provided briefings on findings at each of the CPCs. APD plans to arrange for IMR-8 briefings for each CPC once the IMR-8 report is completed and filed with the Court.

### Results

APD remains in compliance based on past results.

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.248 Assessing Compliance with Paragraph 263: APD Attendance at Community Meetings

Paragraph 263 stipulates:

**"For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area command shall attend at least two**

215

**community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned."**

We note that:

- APD previously established, through SOP-3-02-1, the requirement and tracking mechanisms to implement this task.

- APD, during this reporting period, submitted to the monitoring team a detailed flow chart outlining a process for capturing community events information, officer participation, and outcomes.

- APD also submitted a TraCS worksheet that reported the number of events and reported participation rates by command area, and units within each command area. The reported data indicated only partial compliance with meeting participation requirements for the command areas.

APD is making gradual progress in having officers regularly attend community meetings and tracking that participation.  During this reporting period, APD provided for the first time, a detailed plan for capturing scheduled community events, officer participation, and outcomes. APD also provided participation data for the six-month reporting period. APD's proposed improvements in data capture for officer participation should improve future reporting. APD should to seek ways to promote more wide-spread participation in community meetings and expand non-enforcement contacts for all of its officers to ensure compliance.

**Results**

    Primary:    **In Compliance**
    Secondary: **In Compliance**
    Operational: **Not In Compliance**

***Recommendation for Paragraph 263:***

***Recommendation 4.7.248:*** *Seek assistance from other law enforcement agencies regarding their tracking of law enforcement activities and incorporate lessons learned and best practices into APD's tracking methodologies.*

**4.7.249 Assessing Compliance with Paragraph 264:  Crime Statistics Dissemination**

Paragraph 264 stipulates:

**"APD shall continue to maintain and publicly disseminate accurate and updated crime statistics on a monthly basis."**

During this reporting period, APD maintained its contract with a service that provides up-to-date crime mapping services based on "calls for service" that can be accessed on APD's website.  This has proven to be a very useful tool to members of the CPCs.  APD made substantial progress during this reporting period in its posting updated crime statistics for each of the six area commands. The reporting meets industry standards in format and timeliness. The monitoring team notes the practice of including of traffic stops in the crime statistics reporting. Since traffic stops are considered a police action and not a reported crime, APD may want to separate the reporting on these two elements. Clarifying the differences or displaying these items separately may be beneficial.

During this reporting period, APD made substantial progress in the posting of crime statistics on the area command websites.  APD now offers crime mapping services and comparative crime statistics on an updated basis. APD should consider expanding the number of reported crime categories and make access to the data more user friendly.

**Results**

> Primary:    **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

## 4.7.250 Assessing Compliance with Paragraph 265:  Posting Monitor's Reports

Paragraph 265 stipulates:

**"APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD website with reasonable exceptions for materials that are legally exempt or protected from disclosure."**

All requirements stipulated by this paragraph continued to be met by the APD and the City, with the exception of publication of the monitor's Special Reports.  Further, APD has developed guidelines for determining any reasonable exceptions to posting audits and reports relating to the CASA. During this reporting period, APD posted all monitoring team reports on the APD website in a timely

fashion.  We expect that APD will also post monitor special reports as well as the monitoring report covering this reporting period.

**Results**

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.251 Assessing Compliance with Paragraph 266:  CPCs in Each Area Command

Paragraph 266 stipulates:

**"The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level. The Community Policing Councils shall meet, at a minimum, every six months."**

CPCs have been established in each of the six Area Commands since November 2014.  During this and prior reporting periods, each of the six Councils met nearly once a month far exceeding the once every six-month requirement.  Most CPCs during this reporting period increased participation, including the number of voting members and community participants. Several CPCs are still struggling to improve community participation.  During this reporting period, APD made significant progress in the timely documentation and posting of CPC meeting agenda, and minutes.

APD has consistently exceeded CASA requirements with CPCs meeting monthly since their inception.  They still struggle to increase voting membership diversification but are greatly improved in their documentation of meetings for this reporting period. Minutes for each CPC monthly meeting during this reporting period are posted on the APD website.  APD staff also made significant strides in bolstering the participation at CPC meetings and the recruitment of new members.   However, several CPCs still struggle in sustaining voting membership and expanding participation.

**Results**

> Primary:     **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 266:***

*Recommendation* **4.7.251***:  Provide targeted assistance to the several CPCs still needing help in broadening their membership and participation.*

### 4.7.252 Assessing Compliance with Paragraph 267:  Selection of Members of the CPCs

Paragraph 267 stipulates:

**"In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross section of community members and APD officers, including for example representatives of social services providers and diverse neighborhoods, leaders in faith, business, or academic communities, and youth.  Members of the Community Policing Councils shall possess qualifications necessary to perform their duties, including successful completion of the Citizen Police Academy."**

Each CPC establishes their own selection criteria within the parameters of CASA, including background check requirements. These requirements have excluding factors limited to current warrants and/or violent felonies in the last three years.  The requirement to complete a 12-week course for the Citizen Police Academy was modified during this reporting period, with APD developing and providing an option for CPC members to complete a two week-end version of the course.

In this reporting period APD has posted CPC membership criteria for each of the six area commands on their websites.  CPCs continue a need to recruit a more representative cross section of community members as CPC voting members.  Diversification of membership has substantially improved during this reporting period but still fall short in membership who reflect the various demographics and backgrounds referenced in the CASA.

CPCs in general made significant progress in both broadening voting membership and in the diversification of that membership. Several CPCs still struggle with the recruitment of voting members and having diverse voting membership. APD is now helping CPCs more actively through technical assistance and other guidance to help with membership recruitment.  CPC leadership believe that a greater use of social media tools to help reach young people and other hard-to-reach population groups can potentially lead to an expanded and more diverse CPC voting membership.

**Results**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

***Recommendation for Paragraph 267:***

***Recommendation 4.7.252:  Use social media and other available tools and develop a specific outreach strategy for each area command CPC for both voting members and non-voting participants and include specific ways to meet the CASA's diversity requirements.***

**4.7.253 Assessing Compliance with Paragraph 268:  Resourcing the CPCs**

Paragraph 268 stipulates:

**"The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, APD shall appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure."**

APD's new leadership cadre hired a new outreach director, and an administrative assistant that have primary responsibility for community outreach and support for the CPCs.  APD also facilitated two CPC membership training sessions covering topics ranging from CPC mission, roles, and responsibilities to handling meetings and building consensus. CPC members indicated significant improvements in APD coordination and responsiveness to CPC concerns.  Further, CPCs still need additional APD assistance in many areas including a new member orientation package and training, annual reports, the processing and tracking of CPC recommendations and APD responses, and most importantly, outreach and recruitment of additional voting members and expanded participation including a more effective use of social media tools and other communications ion strategies.

After appointing a new chief of police in December of 2017, a community outreach coordinator and an administrative assistant were hired to provide further support for outreach efforts.  The community outreach coordinator and the administrative assistant have as their primary responsibilities community outreach and managing and

220

supporting the CPCs.  APD's new staffing and other types of assistance contributed to an increase in CPC resourcing this report period.  CPCs still need assistance in outreach and using social medial tools and other strategies to expand both voting membership and overall participation.  APD should also assist the CPCs in developing and producing their annual reports, which are quite limited in their current format.  These reports should track CPC recommendations and APD responses.  Further assistance regarding website development would be beneficial.

**Results**

> Primary:    **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 268:***

**4.7.253a:  *Working through area commanders, aid CPCs in implementing the CASA-required outreach plan, including social media tool applications, to expand voting membership and CPC participation;***

**4.7.253b: *Develop a standard annual report format for each CPC and aid them in formulating the CASA required annual report.***

**4.7.254 Assessing Compliance with Paragraph 269:  APD-CPC Relationships**

Paragraph 269 stipulates:

**"APD shall seek the Community Policing Councils assistance, counsel, recommendations, or participation in areas including:**

**a) Reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;**
**b)  Reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;**
**c)  Providing information to the community and conveying feedback from the community;**
**d) Advising the chief on recruiting a diversified work force**
**e) Advising the Chief on ways to collect and publicly disseminate data and information including information about APDs compliance with this Agreement, in a transparent and public –friendly format to the greatest extent allowable by law."**

The CPCs continued to make progress during this reporting period in addressing the areas for CPC input identified in the CASA.  The agenda items and CPC recommendations at several CPCs often closely align with the issues and topics identified in the CASA. For example, during this reporting period, there were discussions at CPCs regarding proposed changes to the APD Use of Force policy. We note that APD is not consistently bringing issues and recommended policy changes to the attention of all of its CPCs in a proactive manner. Further, APD still needs to improve the tracking, reporting, and feedback on CPC recommendations.

CPCs continued their maturation process during this reporting period with the direct support of APD and city leadership, and the infusion of additional staff resources. The performance of CPCs in terms of community and voting member participation, alignment of agenda with CASA requirements, and the generation of recommendations has varied greatly across CPCs. Several CPCs, while holding monthly meetings and addressing basic requirements, may require further assistance from APD to help meet the goals outlined for them outlined in the CASA. The CPC model, as evidenced by the clear successes of several of these CPCs, eventually may provide national guidance regarding formulating and supporting successful community-based police advisory bodies.

There are still areas of improvement that need to be addressed, including more discussion at CPC meetings of APD policies and policing strategies, broader and more diverse community participation, improved tracking and reporting of CPC recommendations, and consistency in performance across all CPCs.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 269:***

**4.7.254a:** *Working with CPC leaders, formulate agenda items and speakers to participate in CPC presentations on issues of interest, APD policy or recommended policy changes, and shifts in policing strategies including furtherance of community policing practices;*

**4.7.254b:** *Use technical assistance employing social media and other communication tools helping CPCs to enhance communication and outreach to a broader community audience;*

***4.7.254c:  Review and improve on the recommendation formulation and tracking process to ensure timely reporting including APD response and posting of recommendations, and any additional actions required or taken on the APD/CPC website.***

## 4.7.255 Assessing Compliance with Paragraph 270:  CPC Annual Reports

Paragraph 270 stipulates:

**"The Community Policing Councils shall memorialize their recommendations in annual public report that shall be posted on the City website. The report shall include appropriate safeguards not to disclose information that is legally exempt or protected from disclosure."**

During this reporting period APD has posted the 2017 CPC annual reports for all six CPCs.  The annual reports are not presented in a standard format, and often do not effectively capture CPC annual activities and achievements. During this reporting period, APD updated and posted 2017 annual reports for all the CPCs. This was the first year in which all CPCs were able to produce and post these reports.  The annual reports provided were inconsistent in their formatting and had some important information gaps.  These shortcomings should be addressed for next year's set of annual reports.

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendation for Paragraph 270:***

***Recommendation 4.7.255: Develop a proposed standard annual reporting format and further assist CPCs in gathering information for these reports.***

## 4.7.256 through 4.7.277 Assessing Compliance with Paragraphs 271 – 292:  Community Police Oversight Agency

Paragraphs 271 through 292 of the CASA pertain to the Civilian Police Oversight Agency (CPOA) including the Police Oversight Board (POB). These paragraphs require an independent, impartial,

effective, and transparent civilian oversight process, one that not only investigates civilian complaints but also involves disciplinary and policy recommendations, trend analysis, community outreach and the publishing of reports.

During the monitoring period and the 8th site visit, members of the monitoring team held meetings with the CPOA Executive Director and members of his staff at the CPOA office, attended a POB public monthly meeting, reviewed CPOA training records, and selected by way of a stratified random sample and reviewed 11 CPOA investigations completed during the monitoring period. The monitoring team also reviewed the CPOA website, including but limited to POB agenda and minutes, community activities, public reports, and non-concurrence letters.

The findings related to Paragraphs 271 through 292 indicate the following outcomes, related to requirements of the CASA.

The CPOA/POB is an impartial and productive agency that provides efficacious civilian oversight of APD. It is an independent agency whose appointed members are dedicated individuals of diverse backgrounds drawn from a cross-section of the community. They are committed to the goals of the CASA, as are all members of the CPOA. The initial and annual training requirements for CPOA and POB members continue to be adequately met.

The investigations of CPOA, once complaints are assigned, are generally thorough and timely. (We discuss in more detail the quality of investigations in the Investigation of Complaints section of this report). The Executive Director has the authority to recommend disciplinary action in the cases CPOA investigates, as well as the cases that are reviewed by CPOA (Serious Use of Force and Officer-Involved Shootings), and the POB has a mechanism for approving the recommendations of the executive director. The chief or his designee retains the discretion to impose discipline

This site visit has revealed certain marked improvements. First, cooperation between CPOA and IA has improved and is currently satisfactory. In general, both agencies respect each other's role, and realize it is in their best interests and that of the CASA to cooperate and facilitate their intertwined missions and related areas of responsibility. CPOA has the necessary access to information and facilities reasonably necessary to investigate complaints and review serious use of force and officer-involved shootings.

CPOA and POB now have more time to weigh into the policy-making process. Due to changes in the policy review procedures, POB now

has adequate time to view and debate policies and policy changes as an entire body. This will enhance not POB's policy role, but the entire APD policy making and policy revision processes as well.

In those instances where the chief disagrees with the investigative findings or the disciplinary recommendations of the CPOA/POB, the chief's non-concurrence letters have improved. There now exists enough articulation in the non-concurrence letters to explain satisfactorily the chief's rationale in the utilization of his discretion when differing from the CPOA/POB recommendations. It is an improvement such that the public, CPOA/POB, and the APD are now aware of the chief's reasons and thought process in reaching the level of discipline imposed. Although there were no non-concurrence letters this review period regarding disagreement in policy recommendations, we would expect the same articulation of reasons in these instances.

A new mediation policy, agreed upon by the parties and approved by the monitor and the Court, is now in place. This is a marked improvement that will enable CPOA to make greater use of this effective complaint remedy and disposition tool. It is also expected that this in turn will enable CPOA to further improve on its efforts for timely disposition of complaints.

CPOA has a robust community outreach program, which also utilizes social media among other mediums. A noteworthy CPOA initiative witnessed by the monitoring team last March was a Community Policing Councils (CPC) Summit. These types of meetings bring together CPOA and City representatives with the CPCs, and now occur on a quarterly basis. They provide the advantage for the CPCs to coordinate their efforts, with the assistance of the CPOA, particularly with regard to policy recommendations. Although individual CPCs are free to make their own recommendations, where there is commonality of interests, unity in making recommendations carries greater weight and cogency. As an example, the coordinated CPC efforts were a factor in the resumption of bike patrols.

Notwithstanding the continued improvements in the oversight process, the monitoring team found the process exhibited issues with elements related to paragraphs 281 of the CASA and to 191 as noted in the Investigation of Complaints section of this report. When reviewing a  stratified random sample of investigations, regarding the requirement of "expeditiously as possible" processing contained in paragraph 281 of the CASA, and the time requirement for completing investigations contained in paragraph 191, we look for and determine the following dates: complaint received, complaint assigned for investigation, initiation of investigation after assignment, completion

of investigation, and notification of intent to impose discipline (where applicable).

During the 6th site visit, the monitoring team discussed with the parties the issue of delay between the date a complaint is received and the date it is assigned for investigation. Although the CASA does not deal directly with the issue of time to assign, the parties and the monitor agreed that a delay of more than 7 working days for assignment is unreasonable and would affect the "expeditious" requirement of paragraph 281 and time requirement of paragraph 191 starting with future IMRs.

We sampled 11 CPOA investigations completed this monitoring period. All of them had evidence of "as soon as possible" initiation of investigation after assignment. All of them were timely completed once they were assigned. However, we note that in six of the eleven cases reviewed, assignment was made after seven working days of having received the complaint, and this in turn put the overall investigative time beyond 120 days if one starts the count at the eighth working day after receipt of complaint. Therefore we do not find the CPOA to be in compliance with the time requirements of the CASA.

To its credit, CPOA has already initiated a new internal tracking system of complaints received. This is the first IMR in which the monitoring team is citing errors where assignments take more than seven days. This new tracking system, together with the new mediation plan, may lead to increased usage of mediation as a case resolution/disposition tool. We expect to be able to report in the next monitoring reports any impacts observed as a result of the new internal tracking system.

Although we found the CPOA to have adequate staffing, budget and resources to perform its mission, should these new efforts not produce improvement in the timely processing of complaints from the date of receipt, the monitoring team in future reports will reassess whether staffing and resources are adequate.

In our review of the public information requirement for CPOA/POB, we also found issues related to paragraph 292 of the CASA requiring the CPOA to file semi-annual reports with the City Council. CPOA attempts to meet this requirement by filing one semi-annual and one annual report per year, and quarterly reports verbally with City Council. We note that the CPOA 2016 and 2017 Annual Reports, as well as the 2017 semi-annual report, are not contained on the CPOA website as of September 1, 2018.

The monitoring team expects this situation to improve now that the contract for data analysis was approved in June 2018. The data analysis role is outsourced to the Institute for Social Research at the University of New Mexico, The delay in approving the data analyst contract, occasioned by the drafting of an MOU regarding data access and data availability involving the City Attorney's Office, was a factor contributing to the delay in the reports. The reports are not published until they have been reviewed and approved by City Council.

### 4.7.256 Compliance with Paragraph 271:  CPOA Implementation

Paragraph 271 stipulates:

**"The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD.  The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force."**

**Results**

      Primary:     **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

### 4.7.257 Assessing Compliance with Paragraph 272: Independence and Accountability of CPOA

Paragraph 272 stipulates:

**"The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance."**

**Results**

      Primary:     **In Compliance**
      Secondary: **In Compliance**
      Operational: **In Compliance**

### 4.7.258 Assessing Compliance with Paragraph 273: Requirements for Service of CPOA Members

Paragraph 273 stipulates:

"The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque."

**Results**

Primary:   **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.259 Assessing Compliance with Paragraph 274:  CPOA Pre-Service Training

Paragraph 274 stipulates:

"Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:

a)  This Agreement and the United States' Findings Letter of April 10, 2014;
b)  The City ordinance under which the agency is created;
c)  State and local laws regarding public meetings and the conduct of public officials;
d)  Civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;
e)  All APD policies related to use of force, including policies related to APD's internal review of force incidents; and
f)  Training provided to APD officers on use of force."

**Results**

Primary:   **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.260 Assessing Compliance with Paragraph 275:  CPOA Annual Training

Paragraph 275 stipulates:

"The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement."

**Results**

Primary:   **In Compliance**

Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.261 Assessing Compliance with Paragraph 276:  CPOA Ride-alongs

Paragraph 276 stipulates:

**"The City shall require those appointed to the agency to perform at least two ride-alongs with APD officers every six months."**

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.262 Assessing Compliance with Paragraph 277:  CPOA Authority and Resources to Make Recommendations

Paragraph 277 stipulates:

**"The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer- involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force**."

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational:   **In Compliance**

### 4.7.263 Assessing Compliance with Paragraph 278:  CPOA Budget and Authority

Paragraph 278 stipulates:

**"The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws. The agency shall have the authority to hire staff and retain independent legal counsel as necessary**."

### Results

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.264 Assessing Compliance with Paragraph 279:  Full-Time CPOA Investigative Staff

Paragraph 279 stipulates:

**"The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review of serious uses of force and officer-involved shootings.  The investigative staff shall be selected by and placed under the supervision of the Executive Director. The Executive Director will be selected by and work under the supervision of the agency.  The City shall provide the agency with adequate funding to ensure that the agency's investigative staff is sufficient to investigate civilian complaints and review serious uses of force and officer-involved shootings in a timely manner."**

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.265 Assessing Compliance with Paragraph 280:  Receipt and Review of Complaints by CPOA

Paragraph 280 stipulates:

**"The Executive Director will receive all APD civilian complaints, reports of serious uses of force, and reports of officer-involved shootings.  The Executive Director will review these materials and assign them for investigation or review to those on the investigative staff.  The Executive Director will oversee, monitor, and review all such investigations or reviews and make findings for each.  All findings will be forwarded to the agency through reports that will be made available to the public on the agency's website."**

**Results**

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.266 Assessing Compliance with Paragraph 281:  Prompt and Expeditious Investigation of Complaints

Paragraph 281 stipulates:

**"Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible."**

230

**Results**

      Primary:    **In Compliance**
      Secondary: **In Compliance**
      Operational: **Not In Compliance**

*Recommendations for Paragraph 281:*

*4.7.266a: Develop an internal tacking system or other process that ensures all complaints are either assigned for investigation, referred to mediation, or administratively closed within 7 working days of receipt of complaint.*

*4.7.266b: Ensure that tardy assignments of investigations and tardy investigations are noted and discussed with the involved CPOA personnel.*

**4.7.267 Assessing Compliance with Paragraph 282:  CPOA Access to Files**

Paragraph 282 stipulates:

**"The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:**

**a) all civilian complaints, including those submitted anonymously or by a third party;**
**b) the identities of officers involved in incidents under review;**
**c) the complete disciplinary history of the officers involved in incidents under review;**
**d) if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);**
**e) all APD policies and training; and**
**f) if requested, documents, reports, and other materials for incidents that may evince an overall trend in APD's use of force, internal accountability, policies, or training."**

**Results**

      Primary:    **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.268 Assessing Compliance with Paragraph 283:  Access to Premises by CPOA

Paragraph 283 stipulates:

**"The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director upon reasonable notice. The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement**."

### Results

       Primary:    **In Compliance**
       Secondary: **In Compliance**
       Operational: **In Compliance**

### 4.7.269 Assessing Compliance with Paragraph 284:  Ensuring Confidentiality of Investigative Files

Paragraph 284 stipulates:

**"The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times."**

### Results

       Primary:    **In Compliance**
       Secondary:  **In Compliance**
       Operational: **In Compliance**

### 4.7.270 Assessing Compliance with Paragraph 285:  Authority to Recommend Discipline

Paragraph 285 stipulates:

**"The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed."**

### Results

       Primary:    **In Compliance**

Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.271 Assessing Compliance with Paragraph 286: Documenting Executive Director's Findings

Paragraph 286 stipulates:

**"Findings of the Executive Director shall be documented by APD's Internal Affairs Bureau for tracking and analysis."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.272 Assessing Compliance with Paragraph 287:  Opportunity to Appeal Findings

Paragraph 287 stipulates:

**"The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.273 Assessing Compliance with Paragraph 288:  CPOA Recommendations Regarding APD Policies

Paragraph 288 stipulates:

**"The agency shall make recommendations to the Chief regarding APD policy and training.  APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.274 Assessing Compliance with Paragraph 289:  Explanation for not Following CPOA Recommendations

**"For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **Not Observable this Period**


### 4.7.275 Assessing Compliance with Paragraph 290:  Regular Public Meetings

Paragraph 290 stipulates:

**"The agency shall conduct regular public meetings in compliance with state and local law.  The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD."**

**Results**

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.276 Assessing Compliance with Paragraph 291:  Community Outreach for the CPOA

Paragraph 291 stipulates:

**"The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status."**

**Results**

Primary:        **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.277 Assessing Compliance with Paragraph 292:  Semi Annual Reports to Council

Paragraph 292 stipulates:

> **"The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:**
>
> a) **number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> b) **demographic category of complainants;**
> c) **number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> d) **number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> e) **policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;**
> f) **policy changes recommended by the agency, including any dispositions by the Chief;**
> g) **public outreach efforts undertaken by the agency and/or Executive Director; and**
> h) **trends or issues with APD's use of force, policies, or training."**

### Results

CPOA submits annual and semi-annual reports in response to the requirements of this paragraph.

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.278 Assessing Compliance with Paragraph 320: Notice to Monitor of Officer Involved Shootings

Paragraph 320 stipulates:

> "**To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings. APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.**"

235

**Methodology**

A City attorney has taken responsibility for providing notice to the Monitoring team regarding all APD critical firearm discharges. Based on the new system's results, the monitor now receives expeditious notification, via e-mail exchanges. The City's 320 notifications now match the "known data" contemporaneously maintained by the monitoring team, which is tallied from new reports, contemporaneous reviews of use of force reports, and spot checks of information reviewed from IA "course of business" data.

**Results**

> Primary:    **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

**5.0 Summary**

Current compliance efforts at APD show the agency to be in 99.6% compliance, with the exception of 1 primary tasks, e.g., policies exist requiring full implementation of the requirements of the CASA. APD is in secondary compliance with 75.4 percent of the CASA requirements related to training and other training-related tasks required by the CASA. Finally, APD is in operational compliance with 59.2% percent of the tasks required by the CASA. Compliance performance has increased during the eighth reporting period for primary, secondary, and operational functions. Primary (policy) compliance rates are up by 5% over the last monitor's report. Secondary (training) compliance rates are up by 9.3%. Operational compliance rates are up by 11.9%. Given the scope and nature of issues confronted by APD at this time last year, these results are exceptional.

The APD has, over the past year, worked closely with the monitoring team to assess the team's findings, carefully considered response modalities for the information contained in the team's findings and discussions, thoughtfully considered implementation strategies to improve performance, and held managers and supervisors accountable for implementing change strategies to respond to the monitoring team's intensive technical assistance regarding a "way forward" toward compliance.

The result of the APD's focus and commitment goes beyond the simple increase of "in-compliance" findings for this report. The

results have been generated by a careful and thoughtful analysis of problem-solving methodologies designed to address carefully the findings conveyed to APD by the monitoring team.  Instead of simply applying random strategies to identified problems, the APD has taken a holistic, thoughtful, and, in many cases, a data driven process, that carefully considers what's been done elsewhere in American policing that has been successful in solving problems and issues similar to those confronting the APD.  We are cognizant that all elements of the management and leadership cadres at APD have been under a great deal of organizational stress over the past year. Nonetheless, the agency has applied well-thought out strategies—many gleaned from other successful police agencies in the United States.  The members of the monitoring team stand ready to work with APD, as we have in the past, as it moves to integrate its new strategies in a manner which will address the outstanding issues remaining to be resolved.