# Monitor's Ninth Report

# Compliance Levels of the Albuquerque Police Department and the City of Albuquerque with Requirements of the Court-Approved Settlement Agreement

## No. CIV 14-1025-JB-SMV

May 2, 2019

Prepared by: Public Management Resources, Inc. James D. Ginger, Ph.D., Independent Monitor

**Table of Contents**

| Topic | | Page |
|---|---|---|
| 1.0 | Introduction | 1 |
| 2.0 | Executive Summary | 2 |
| 3.0 | Synopsis of Findings | 4 |
| 4.0 | Current Status | 6 |
| 4.1 | Overall Status Assessment | 6 |
| 4.2 | Dates of Project Deliverables | 8 |
| 4.3 | Format for Compliance Assessment | 8 |
| 4.4 | Compliance Assessment | 9 |
| 4.5 | Operational Definition of Compliance | 9 |
| 4.6 | Operational Assessment | 10 |
| 4.7 | Assessing Compliance with Individual Tasks | 11 |
| 5.0 | Summary | 282 |

**1.0 Introduction**

This Independent Monitor's Report (IMR) follows the same format as all previous reports. That format is organized into five sections:

> 1.0  Introduction;
> 2.0  Summary;
> 3.0  Synopsis of Findings;
> 4.0  Compliance Findings; and
> 5.0  Summary.

The purpose of the monitor's periodic compliance reports is to inform the Court of the monitor's findings related to the progress made by APD in achieving compliance with the individual requirements of the CASA.  This report covers the compliance efforts made by APD during the ninth monitoring period, which covers August 2018 through January 2019.  As of this reporting period, we have seen a new strategy developed by APD, one which the monitoring team believes will significantly aid efforts to implement the *spirit* of the CASA as well as the specific requirements.  This strategy involves overlaying the specific requirements of the CASA with current, state-of-the art community policing efforts designed to move APD from simply a law enforcement agency to a community *integrated* law enforcement agency.  The Chief and his command staff have identified and replicated several state-of-the art policing strategies that are designed to transition APD to an agency that has true partnerships with the citizens it serves.

These four new initiatives at APD build from successful processes already implemented and tested in other police departments.  They include:

*1.  EPIC* –Ethical Policing is Courageous:  A peer-based program designed to empower individual officers the strategies and tools to step in and intervene in improper police behaviors in order to prevent problems before they occur.  EPIC training officers in how to defuse situations before they become critical issues in how officers interact with and treat the public.  The Chief contends that "If we can prevent some of our own misconduct periodically, and salvage some officers' careers [by preventing] some mistakes we can have a substantial impact.  Just one mistake can ruin a career."  The goal is to have other officers intervene one-on-one to cause an officer about to make a mistake to re-think his process and actions.  EPIC represents a cultural change in policing that equips, encourages and supports officers to do the right thing.

**2.  Law Enforcement Assisted Diversion** (*LEAD*) programs are designed to end the revolving door of arrest-try-incarcerate-repeat generated by most law enforcement programs designed to deal with drug abuse or prostitution.  The program allows law enforcement officers to redirect low-level offenders engaged in drug or prostitution activity to community-based services, thus preventing negative outcomes of being processed by official criminal justice system components for first offenses.

***3.  CIT-ECHO***—An Extension for Community Healthcare Outcomes:  A collaborative model of medical education and care management that empowers clinicians to provide better care to more people.  ECHO dramatically increases access to specialty training and knowledge by front-line law enforcement personnel with the knowledge and support they need to manage difficult interactions.  Engages POs in a continuous learning system and partnering them with specialist mentors at an academic medical center or hub.  The goal is to address inadequate or disparities in care.  ECHO has been recognized as an effective mechanism to move critical care to a broader, closer-to-the-consumer service delivery model, by training special teams of police officers in the crisis intervention model and "workable alternative treatment sources."

CIT-Echo trains APD officers in triage and referral processes and uses a distributed processing model, rather than a centralized "facility" model.

***4.  Problem Response Teams***—Dedicated community-policing trained officers assigned to community outreach and problem-solving modalities that involve working directly with local residents and business owners to identify problems, issues, needs and solutions related to articulated community problems.

5.  **Direct Personal Involvement—**The Chief has, on multiple occasions, directly inserted himself into the change process at APD, sending direct, clear, and personal signals to the agency's membership that change is coming and APD is entering a new era in the way it delivers policing services to the citizens of Albuquerque.  For example, the Chief has personally delivered the introductory segments of training regarding new use of force practices.  In our past experience in these organizational reform processes, this level of personal commitment by the chief executive is critical to implementing the types of changes required by the CASA.  Of all the organizational change processes engaged in by APD over the past year, the direct personal involvement of the Chief may be the most critical.

## 2.0 Executive Summary

Again, for the second reporting period in a row, the compliance efforts we have observed during this reporting period differ substantively from those we had observed earlier in the monitoring process.  We have found that the current APD executive staff continue to be fully committed to CASA compliance processes.  Most of the new command and oversight cadres also appear to be fully committed to moving APD forward in its compliance efforts.  We have found extremely attentive audiences for our compliance process advice, and in most cases, APD has moved forward adroitly as it implements responses to that advice.  We remind the reader again, that this compliance project is, by design, a long-term project, involving complex, and arduous processes with hundreds of "moving parts."

IMR-9 is the second full monitor's report that reflects the progress made at APD since the advent of a new management and executive cadre at APD.  We note at the outset that the new management cadre continues to exhibit a strong grasp of the key issues

2

confronting them as they work toward compliance with the CASA.  As we noted in our report for the 8th reporting period, the new executive and command personnel at APD have implemented a new approach to the agency's compliance efforts.  We noted in IMR 8 that APD's new management cadre has recognized the need for:

- Methodical approaches to problem-solving;
- Movement toward data-based decision making;
- Strategic approaches; and
- Looking outside the organization for effective models and processes to move compliance forward.

More importantly, the current leadership continues to demonstrate a grasp of the key issues involved in the compliance process and they are building effective problem-solving mechanisms designed to effectuate meaningful change at APD.

In IMR-8 we noted that "Taking the time to build good foundations is critical to the compliance process."  APD leadership cadres have begun to understand and embrace the fact that some processes simply cannot be rushed, but need time to develop, plan, implement, assess and revise.  During IMR-9's reporting period, APD has adopted the long-term approach to reform that we have recommended from the early stages of this process.  We see this as a critical change in approach. The new executive and management cadre at APD have been highly responsive to monitoring team feedback.

The leadership and management cadres currently at APD have made palpable progress.  More importantly, they have constructed critical foundations for the change that still remains to be accomplished.  We again caution the reader, however, that the types of planned change and organizational processes required by the CASA take time to plan, design, implement, evaluate and redesign.  The CASA change process is a classic "long-linked" technology, requiring high degrees of sequential dependence, i.e., it has multiple steps, each requiring success in order for the "whole" to be effective.

**Figure 2.1:  Longitudinal Compliance Levels for Reporting Periods 1-9**



## 3.0 Synopsis of Findings for the 9th Reporting Period

In IMR-8 we noted "The CASA compliance process has several critical outstanding issues that need prompt attention and resolution.  Chief among those is the review and revision of APD's use of force policy suite."  Since that comment, APD has completed the use of force policy suite, and those policies were approved by the monitor this reporting period.

The resolution of the use of force policies was a critical outstanding issue.  Other significant compliance issues remain outstanding.  These include:

Policies and training regarding other (non-force) CASA-related functions, such as:

1.  Re-design of Force Review Board processes;

2.  Re-integration of Force Review Board practices into the APD policing oversight process;

3.  Misconduct complaint intake, investigation, and adjudication;

4.  The use of force "backlog" being processed by members of the APD IA-Force Division;

5.  Training documentation, delivery, gap analysis, and assessment/evaluation issues (many of which remain "pending" at this time);

4

6.  Community engagement and outreach; and

7.  Early intervention systems designed to identify officers who frequently engage in behaviors prohibited by policy and training.

APD's performance on each of these areas is discussed in detail in the body of IMR-9.

## 3.1 Accomplishments

During the eighth monitoring period, we noted "APD has made substantive progress in developing a coherent management strategy, identifying and prioritizing the critical issues confronting APD (noted above), and crafting change strategies to remediate identified problems." These developments have continued to blossom at APD during the ninth reporting period. A great deal of work lies ahead; however, the current leadership at APD continues to develop a receptive and attentive attitude toward the change processes that lie ahead. APD continues moving toward becoming a data-driven organization that uses data and facts to assess issues, identify potential solutions, and effect meaningful change. During this reporting period, APD has taken the following direct actions to move their compliance processes forward:

- Building a more rigorous development and assessment practice at the Training Academy related to curriculum development, delivery and assessment;

- Fielding an effective unit designed to reduce the long-standing backlog of use of force incidents;

- Researching and adapting implementation strategies informed by the experiences in other police agencies working through similar reform processes;

- Developing competencies within the Compliance Bureau in a manner that should drastically improve compliance-related performance, including a new "Performance Metrics Unit" that serves as APD's internal audit unit, performing work similar to the monitoring process;

- Continuing work for restructuring the documentation of training processes, including improved training plans and revised internal responsibilities and processes;

- Continuing staffing and development of a well-organized and staffed self-audit function (the Performance Metrics Unit);

- Continuing movement toward community-based, problem-oriented policing practices designed to address community concerns and priorities;

- Provision of training designed to change the culture and climate at APD; and

- Reorganizing and staffing the Internal Affairs processes in a manner designed to improve the quality of internal investigations;

In the ninth reporting period, APD has institutionalized many of these actions, and has continued its self-improvement practices into other critical areas of the agency.

## 3.2 Persistent or Evolving Problem Areas

We note three persistent problem areas, most carried over from the previous administration, but all of which present clear obstacles to effective compliance.  These include:

1. Resolving issues relating to identification, assessment and action on events constituting alleged policy or rule violations by sworn personnel within the 90-day limit established by union contract;

2. The use of "Additional Concerns Memos" to dispose of policy violation issues, as opposed to actual findings and corrective action; and

3. A continuation of what we have labeled the "Counter-CASA Effect" at APD.

## 4.0 Current Compliance Assessments

As part of the monitoring team's normal course of business, it established a base-line assessment of all paragraphs of the CASA for the Independent Monitor's first report, (IMR-1). This was an attempt to provide the Parties with a snapshot of existing compliance levels and, more importantly, to provide the Parties with identification of issues confronting compliance as the APD continues to work toward full compliance. As such, the baseline analysis is considered critical to future performance in the APD's reform effort as it gives a clear depiction of the issues standing between the APD and full compliance. This report, IMR-9, provides a similar assessment, and establishes a picture of progress on APD goals and objectives since the last monitor's report.

## 4.1 Overall Status Assessment

Section 4.1 provides a discussion of the overall compliance status of APD as of the ninth reporting period.  As of the end of the ninth reporting period, APD continues to make progress overall, having achieved primary compliance in 99.6 percent of the tasks it agreed to by implementation of the CASA process with

the Department of Justice.  Primary Compliance relates mostly to development and implementation of acceptable policies (conforming to national practices). APD is in 79 percent Secondary Compliance as of this reporting period, which means that effective follow-up mechanisms have been taken to ensure that APD personnel understand the requirements of promulgated policies, e.g., training, supervising, coaching, and disciplinary processes to ensure APD personnel understand the policies as promulgated and are capable of implementing them in the field.  APD is in 63 percent Operational Compliance with the requirements of the CASA, which means that 63 percent of the time, field personnel either perform tasks as required by the CASA, or that, when they fail, supervisory personnel note and correct in-field behavior that is not compliant with the requirements of the CASA

Figure 4.1.1, below depicts APD's compliance performance over the last seven reporting periods.  We note that there was no "conventional" IMR written for the seventh monitoring period.  Instead, given the fact that a new administration was on-board, we spent the IMR-7 period almost exclusively on technical assistance (TA) as opposed to actual compliance monitoring.  The monitor developed and published two "mini-reports" outlining that TA.  We note that there was no full-scope monitor's report for the IMR-7 reporting period.  Instead, the monitor and the Parties, with the approval of the Court, provided a technical-assistance-intensive process designed to bring the new administration up to speed on the CASA and its implementation requirements.

Figure 4.1.1 contains no data for IMR-7.  At the monitor's recommendation, the Parties agreed that the monitoring team would shift to a second phase of technical assistance, for APD's new command elements, designed to reflect the same TA provided to the initial command staff.  The new command elements were selected by the in-coming chief of police.

Figure 4.1.1:  Long Term Compliance Status



The careful reader will note a slight increase in all compliance levels for this reporting period, compared with the IMR-8 reporting period.

## 4.2 Project Deliverables

Project deliverables are defined by the Settlement Agreement governing the parties' response to the CASA, (DOJ, the City, APD, and the Albuquerque Police Officers' Association (APOA).  Each deliverable is discussed in detail below in section 4.7.

## 4.3 Format for Compliance Assessment

The Monitor's Reports are organized to be congruent with the structure of the CASA, and specifically report, in each section, on the City's and APD's compliance levels as well as with CPOA, for each of the 276 individual requirements of the CASA.

The Monitor's Reports are structured into nine major sections, following the structure of the Agreement:

      I.       Use of Force;

      II.      Specialized Units;

     III.     Crisis Intervention;

     IV.     Policies and Training;

V.        Misconduct Complaint Intake, Investigation and
          Adjudication;

VI.       Staffing, Management, and Supervision;

VII.      Recruitment, Selection and Promotions;

VIII.     Officer Assistance and Support; and

IX.       Community Engagement and Oversight;

All monitor's reports deal with each of these nine major areas in turn, beginning with APD's response and performance regarding reporting, supervising, and managing its officers' use of force during the performance of their duties, and ending with APD's efforts at community engagement and its ability to facilitate community oversight of its policing efforts.

## 4.4 Structure of the Task Assessment Process

Members of the monitoring team have collected data concerning the APD's compliance levels in a number of ways:  through on-site observation, review, and data retrieval; through off-site review of more complex items, such as policies, procedures, testing results, etc.; and through review of documentation provided by APD or the City which constituted documents prepared contemporaneously during the normal daily course of business.  While the monitoring team *did* collect information provided directly by APD in response to the requirements of the CASA, those data were *never* used as a sole source of determination of compliance, but were instead used by the monitoring team as explanation or clarification of process.  All data collected by the monitoring team were one of two types:

• Data that were collected by using a structured random sampling process; or

• Selecting *all* available records of a given source for the "effective date."

Under no circumstances were data selected by the monitoring team based on provision of records of preference by personnel from the City or APD.  In every instance of selection of random samples, APD personnel were provided lists of specific items, date ranges, and other specific selection rules, or the samples were drawn on-site by the monitor or his staff. The same process will be adhered to for all following reports until the final report is written.

## 4.5 Operational Definition of Compliance

For the purposes of the APD monitoring process, "compliance" consists of three parts:  primary, secondary, and operational.  These compliance levels are described below.

- **Primary Compliance**:  Primary compliance is the "policy" part of compliance.  To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA.  As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.

- **Secondary Compliance**:  Secondary compliance is attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the department for doing so.  By definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the department.

- **Operational Compliance**:  Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff.  In other words, the APD "owns" and enforces its policies.

As is true in the monitor's experience, change is never simple or quick.  A great deal of work lies ahead.  The monitoring team is committed to assisting APD command staff by working closely with the APD in forging new, and revising old policies, articulating clear guidelines and practices for APD's intensive training of the department's supervisors and managers, assisting APD in building assessment tools designed to identify problematic behaviors, and advising on "best practices" that can be adapted by APD as it moves forward in its efforts to meet the individual and global requirements of the CASA.

## 4.6    Operational Assessment

The APD and the City (CPOA and POB) have agreed to comply with each of the articulated elements of the CASA.  The monitoring team has provided the Parties with copies of the team's monitoring methodology (a 299-page document) asking for comment.  That document was then revised, based on comments by the Parties. This document reflects the monitor's decisions relative to the Parties' comments and

suggestions on the proposed methodology and is congruent with the final methodology included in Appendix One of the monitor's first report[1].  The first operational paragraph, under this rubric, is paragraph 14, as paragraph 13 is subsumed under paragraph 14's requirements.

### 4.6.1 Methodology

The monitor assessed the City and APD's compliance efforts during the ninth reporting period, using the *Monitor's Manual*, included as Appendix A, in the monitor's first report (see footnote 3).  The manual identifies each task required by the CASA and stipulates the methodology used to assess compliance.

### 4.7 Assessing Compliance with Individual Tasks

APD's compliance with individual tasks for the ninth reporting is described in the sections that follow.

### 4.7.1   Assessing Compliance with Paragraph 14

Paragraph 14 stipulates:

> **"Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:**
> **a)  Officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;**
> **b)  Force shall be de-escalated immediately as resistance decreases;**
> **c) Officers shall allow individuals time to submit to arrest before force is used whenever possible;**
> **d)   APD shall explicitly prohibit neck holds, except where lethal force is authorized;**
> **e)  APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance (or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject);**
> **f)  APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;**

---

[1] Available at: https://www.justice.gov/usao-nm/file/796891/download

**g)  Officers shall not use force to attempt to effect compliance with a command that is unlawful;**
**h)  Pointing a firearm at a person shall be reported in the same manner as a use of force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and**
**l)  immediately following a use of force, officers, and, upon arrival, a supervisor, shall inspect and observe subjects of force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care. This may require an officer to provide emergency first aid until professional medical care providers arrive on scene."**

## Methodology

APD's current SOPs related to use of force were first approved by the monitor in June 2017.  Those policies incorporated use of force reporting and supervisor investigation responsibilities for APD officers.  Throughout 2018, and up to the end of the IMR-9 reporting period, APD reworked those policies to integrate a new, three-tiered reporting system.  Members of the monitoring team have provided extensive and detailed perspective, feedback and technical assistance related to this new three-tiered system.  Over the course of our engagement with APD, our use of force case reviews consistently revealed serious deficiencies in the oversight and accountability process, particularly with respect to use of force, force reporting, supervisory-level investigations and chain of command reviews.  While we are seeing significant progress in these areas, in particular with the Internal Affairs Force Division, that positive movement has not alleviated issues that continue in the field.  The CASA requires that the use and investigations of force shall comply with applicable laws and comport to best practices.  Central to force investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  As with other reporting periods, the monitoring team spent an extensive amount of time providing perspective, feedback and technical assistance to APD personnel related to all of their responsibilities regarding the proper reporting, classification and investigation of uses of force to include our November 2018 site visit.  In addition, the monitor worked closely with the parties to write use of force policies that can be trained and implemented in the field.  The new use of force "suite of policies" were not approved until January 15, 2019, which was near the end of the IMR-9 monitoring period.

## Results

Paragraphs 14 remains in Primary Compliance. One of the key reasons for this compliance status is the outstanding training gaps in Paragraphs 86 - 88 that have lingered for the past several monitoring periods.  We comment more extensively about efforts APD's Academy has made to address the training gaps, and recognize that APD has remediated most of the training gaps through their on-line Learning Management System (LMS) in January 2019.  We spoke with the Academy Commander about two areas that were not addressed in the recent gap training, and she committed to

delivering additional training early in the IMR-10 reporting period.[2]  Similarly, we were told that APD's decision to adjust the use of force "suite of policies" will likely extend training of those policies into the latter part of 2019.  Therefore, Secondary Compliance cannot be considered at this time, since APD never achieved that compliance status with its original use of force policies.[3]  Conducting the use of force gap training was essential to APD's success, because we saw evidence in our review of data this reporting period that demonstrated issues still exist that squarely fall within the requirements of this paragraph.  APD is maturing in its use of their 7-Step Training Cycle, and the use of that training development system will organize its work and help better manage the training needs of the organization.  We recommend that APD Academy personnel review the feedback we provide in Paragraphs 24-36, 41-59 and 60-77 when developing its new use of force training.  We comment extensively on progress APD has made and shortcomings we identified related to officer uses of force, as well as the quality of force investigations and command level oversight of those investigations.  We will not reiterate that information here, but even with the significant strides APD is making, it is also clear there is still ground to be covered toward compliance with this paragraph.

> Primary:      **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.2  Assessing Compliance with Paragraph 15:  Use of Force Policy Requirements

Paragraph 15 stipulates:

> **"APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices. The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal, that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units. The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate. The use of force policy will incorporate the use of force principles and factors articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability**."

---

[2] We note that one open training gap pertains to crowd control that requires APD's ERT to finalize SOP's and develop training that we comment on in Paragraphs 39-40 of this report.
[3] APD's new use of force system adds a new level of force that impacts reporting, classification and investigatory responsibilities.  That significant of a change will require a complete retraining of the organization to achieve Secondary Compliance.

**Methodology**

APD's current SOPs related to use of force were first approved by the monitor in June 2017.  Those policies incorporated use of force reporting and supervisor investigation responsibilities for APD officers.  Throughout 2018, and up to the end of the IMR-9 reporting period, APD reworked those policies to integrate a new, three-tiered reporting system.  Members of the monitoring team have provided extensive perspective, feedback and technical assistance related to this new three-tiered system.  Over the course of our engagement with APD, our use of force case reviews consistently revealed serious deficiencies in the oversight and accountability process, particularly with respect to use of force, force reporting, supervisory-level investigations and chain of command reviews.  While we are seeing progress in these areas, in particular with the Internal Affairs Force Division  that positive movement has not alleviated issues that continue in the field.  The use and investigations of force shall comply with applicable laws and comport to best practices. Central to force investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  As with other reporting periods, the monitoring team spent an extensive amount of time providing perspective, feedback and technical assistance to APD personnel related to all their responsibilities related to the proper reporting, classification and investigation of uses of force, to include our November 2018 site visit.  In addition, the Monitor worked closely with the parties to write use of force policies that can be trained and implemented in the field.  The new use of force "suite of policies" were not approved until January 15, 2019, which was near the end of the IMR-9 monitoring period.

**Results**

Paragraph 15 remains in Primary Compliance. One of the key reasons for lack of progress in compliance efforts for this paragraph is the outstanding training gaps in Paragraphs 86 - 88 that have lingered for the past several monitoring periods.  Below, we comment more extensively about efforts APD's Academy has made to address the training gaps, and recognize APD has remediated most of the training gaps through their on-line Learning Management System.   In January 2019, we spoke with the Academy Commander about two areas that were not addressed in the recent gap training, and she committed to delivering additional training early in the IMR-10 reporting period.[4]  Similarly, we were told that APD's decision to adjust the use of force "suite of policies" will likely extend training of those policies into the latter part of 2019. Therefore, Secondary Compliance can't be considered at this time, since APD never achieved that compliance status with its original use of force policies.[5]

---

[4] We note that one open training gap pertains to crowd control that requires APD's ERT to finalize SOP's and develop training that we comment on in Paragraphs 39-40 of this report.

[5] APD's new use of force system adds a new level of force that impacts reporting, classification and investigatory responsibilities.  That significant of a change will require a complete retraining of the organization to achieve Secondary Compliance.

14

Conducting the use of force gap training was essential to APD's success because we saw evidence in our review of data this reporting period that demonstrated issues still exist that squarely fall within the requirements of this paragraph.  APD is maturing in its use of their 7-Step Training Cycle, and the use of that training development system will organize its work and help better manage the training needs of the organization.  We recommend that APD Academy personnel review the feedback we provide in Paragraphs 24-36, 41-59 and 60-77 when developing its new use of force training.  We comment extensively on progress APD has made and shortcomings we identified related to officer uses of force, as well as the quality of force investigations and command level oversight of those investigations.  We will not reiterate that information here, but even with significant strides APD is making, it is also clear there is still ground to be gained toward compliance with this paragraph.

|          |                    |
|----------|--------------------|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |

### 4.7.3 Assessing Compliance with Paragraph 16:  Weapons Protocols

Paragraph 16 stipulates:

> **"In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below. The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy."**

**Methodology**

APD's current SOPs related to use of force were first approved by the monitor in June 2017.  Those policies incorporated use of force reporting and supervisor investigation responsibilities for APD officers.  APD has previously achieved Secondary Compliance with the provisions of this paragraph, notwithstanding changes that have occurred to use of force policies that directly relate to this paragraph.  Throughout 2018, and up to the end of the IMR-9 reporting period, APD reworked their use of force "suite of policies" to integrate a new, three-tiered reporting system.  Members of the monitoring team have provided extensive perspective, feedback and technical assistance related to this new three-tiered system.  Over the course of our engagement with APD, our use of force case reviews consistently revealed serious deficiencies in the oversight and accountability process, particularly with respect to use of force, force reporting, supervisory-level investigations and chain of command reviews.  While we are seeing significant progress in these areas, in particular with the Internal Affairs Force Division (IAFD), that positive movement has not alleviated issues that continue in the field.  The use and investigations of force must comply with applicable laws and comport to best practices. Central to force investigations is a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy. The Monitor worked closely with the parties to write use of force policies that can be

15

trained and implemented in the field.  The new use of force "suite of policies" were not approved until January 15, 2019, which was near the end of the IMR-9 monitoring period.

**Results**

Paragraph 16 remains in Secondary Compliance.  APD's decision to adjust the use of force "suite of policies" will likely extend training of those policies into the latter part of 2019.  The relationship between the provisions of this paragraph and training the new use of force policies is self-evident.  We recommend that APD Academy personnel review the feedback we provide in Paragraphs 24-36, 41-59 and 60-77 when developing its new use of force training.  We comment extensively on progress APD has made and shortcomings we identified related to officer uses of force, as well as the quality of force investigations and command level oversight of those investigations.  We will not reiterate that information here, but even with the significant strides APD is making, it is also clear there is still significant work to do toward compliance with this paragraph.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

## 4.7.4 Assessing Compliance with Paragraphs 17-20 and 89:  Firearms Modifications and Training

The 2019 annual firearms training cycle was just beginning at the end of this reporting period.  The basis of this review was the completion of the 2018 training cycle.

The 2018 firearms training cycle has been completed and the firearms staff have compiled extensive data to document all requirements outlining what they have accomplished in order to meet or exceed the CASA requirements.  We view this as excellent work that should be emulated by other APD staff as they consider how to respond to monitoring team findings.

98.6% of all APD personnel (901 of 916) completed firearms training.  Personnel who had not yet completed training were on various types of leave—Military, or Family Medical Leave Act, etc.  Upon returning, each officer will be required to attend all missed training, including firearms, before being permitted to work.

APD is required to provide sufficient training courses to allow officers to gain proficiency and meet firearms qualification requirements.  During past site visits, members of the monitoring team attended firearms training.  APD range staff have changed range hours to enable officers to practice firearms in a low-light environment and have integrated monitoring team recommendations into its policy and procedures related to firearms training. The firearms staff has added additional days and times to allow more practice. In reviewing data related to failures to qualify, we found that firearms staff documents all failures, and refers poorly performing officers for additional training.

Following the 2018 firearms qualifications cycle, the monitoring team was provided with data that showed at least 3 officers who failed to qualify and then failed an immediate requalification attempt.  These three officers were ordered to surrender their firearms and police vehicle and placed in an administrative position until they returned to the range to qualify.  Additionally, documentation was found that officers failing to qualify with rifle or shotgun were required to surrender the firearm until they returned to the range to qualify.  The monitoring team sees this as another positive example of a staff making changes in order to meet the requirements of the CASA.

In response to CASA requirements and numerous recommendations from the monitor, the Chief of Police commissioned the Audit Division to conduct the 2018 Firearms Audit—the results of which were submitted to the monitoring team. The audits were conducted during eight sessions of day- and low-light firearms qualifications. The Audit Division took a 25% random selection of those individuals in attendance.  Data collected to determine CASA compliance included:

- Firearm assignment (officer name and employee ID) weapon type, make, model, caliber;
- Serial number provided by officer during qualification;
- Serial number provided by Property list;
- Verbal confirmation by officer if any firearms they are qualifying with have been modified; and
- Verbal confirmation by officer if all firearms they are qualifying with are agency approved firearms.

Audit findings were reported in writing, and noted the following issues:

- There were twelve occurrences in which officer indicated their firearms had been modified.
- There were eighteen occurrences in which the firearms had serial numbers that did not match with what was listed in the Property Unit's Inventory List.
- 100% of the total firearms data provided by officers are agency-approved firearms.
- There were nineteen occurrences where the Inventory List provided by the Property Unit listed additional firearms assigned to the officer(s); however, they did not have the firearms during their qualification date.
- There were sixteen occurrences where the Property Unit did not list firearms that the officer(s) were qualifying with during their qualification date.
- There were ten occurrences when the firearm, type, make, model did not match with what was provided by officers' and what was listed in the Property Unit's Inventory List.
- There were six occurrences where the officer could not provide the firearm's serial number.
- There were five occurrences where the officers' names were not listed on the Property list; therefore, the inventory information was unavailable to verify.

During earlier site visits the monitoring team was provided a copy of a normal course of business interoffice memorandum from an APD Fiscal Officer to the APD Planning Unit, dated January 8, 2016, that verified that the required tracking system is fully in place.  APD also continued to work with the city Department of Technology to upgrade the current system to enhance security and streamline annual inventory procedures.  The 2018 firearms audit, however, highlighted numerous failures in the tracking system that need to be corrected in order to elevate compliance levels.

In conducting a follow-up to the 2018 firearms audit, APD has found and corrected many of the inconsistencies including problems when running reports or queries with the Enterprise Learning Management System (ELMS).  The 12 occurrences of "modified" weapons were related to grips and sights, neither of which is considered a modification by SOP 2-3 (Firearms and Ammunition Authorization).  Historical data within ELMS was presented as current, thereby showing old firearm serial numbers attributed to an officer that had been returned/replaced. Once reconciled, related data fell within the CASA requirement of 95%.

A database for the Supervisor's Monthly Inspection Report has been created and is in use by APD supervisors.  Monthly firearm inspection information is included in this database; however, APD has not created a review/ audit/ reporting process for this data.  Collecting the inspections into a database is only the first step. The monitoring team expects APD to utilize the data to identify and correct violations of policy, if any. This would be required to attain Operational Compliance.

During the June 2018 site visit, members of the monitoring team visited all six Area Commands and spoke with supervisors at each location.  Some supervisors were frank in their discussion of monthly inspections, informing the monitoring team that there are both formal and *informal* inspections, explaining that they do not in fact physically check every officer's weapons for make, model, serial numbers, modifications or ammunition every month. During the November 2018 site visits to all Area Commands—one sergeant was vocally resistant to established policy and training, stating that he *would not* conduct a formal inspection of his officer's weapons and ammunition, believing that his duties as a leader required him to trust that the officers would follow the rules to carry only issued weapons and ammunition.  This conversation was relayed to APD command staff and the sergeant was issued a verbal reprimand.  We will follow up on this supervisory refusal to adhere to the CASA and to normal "best practices" relating to officer equipment and adherence to articulated policy.  This sergeant's resistance to conforming to established policy, while seemingly minor, could have serious civil liability repercussions.  Further, we find it a piece of deliberate refusal to comply with the CASA, another example of the counter-CASA effect that APD should work diligently to identify and correct on an on-going basis.

No formalized audit/review/reporting process is articulated for authorized and modified weapons. Without it, APD has no way of knowing what weapons/ammunition are being carried by its personnel in the field. Unless all supervisors are trained in the CASA and policy requirements and in what is considered a firearm "modification", and this training is effectuated during every inspection, compliance cannot be attained.  We further note that the "counter-CASA" effect demonstrated by the sergeant discussed above should

indicate to APD the need for extensive, intensive, and focused internal audit of the firearms protocols to ensure that what was noted in our review is not more widespread. We are reasonably sure that the one incident discovered during our monitoring process this period, in which a field supervisor refused to audit the types of weapons carried by his patrolmen, is not simply an isolated incident, but is part of a lingering counter-CASA effect left behind by the previous administration.

Secondary Compliance would require APD to be able to point to specific *training* for supervisors related to how they are expected to review these requirements (by roll-call inspection, by "drive-by" in-field inspections, by OBRD review comments, etc.)  The monitoring team is not aware of any APD training, policy or other mechanism currently established to affect such inspections, reviews, and remediation, other than some policy and practice processes that require official inspection of firearms used in officer-involved shootings.  After-the-fact inspections are not routinely viewed as acceptable policy.

### 4.7.4 Assessing Compliance with Paragraphs 17

Paragraph 17 stipulates:

> **"Officers shall carry only those weapons that have been authorized by the Department. Modifications or additions to weapons shall only be performed by the Department's Armorer, as approved by the Chief. APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons."**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.5 Assessing Compliance with Paragraph 18:  On-duty Weapons

Paragraph 18 stipulates:

> **"Officers shall carry or use only agency-approved firearms and ammunition while on duty."**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.5 4.7.6 Assessing Compliance with Paragraph 19:  On Duty Weapons

Paragraph 19 stipulates:

> **"APD issued Special Order 14-32 requiring all officers to carry a Department- issued handgun while on duty. APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendations for Paragraphs 17-19:***

***4.7.4-6a APD should evaluate modalities for developing formal audit/review/reporting policy for "carry and use" assessments and inspections regarding modified or altered weapons outlined in these paragraphs, including known "successful" similar programs in other police agencies, using modalities established for Completed Staff Work.***

***4.7.4-6b APD should provide specific training for supervisors in the expected practice in identifying "weapons modifications"***

***4.7.4-6c Training supervisors in monthly Inspection requirements (all weapons/ammunition inspections training) should be a formal Training Academy function.***

***4.7.4-6d APD should complete additional work to coordinate the firearms data with City IT, Property and the Training Academy.***

***4.7.4-6e Given recent noted intentional failures at the supervisory level related to weapons inspections by field sergeants, conduct an assessment check of all service areas across randomly selected shifts to assess the degree to which visual inspections of officer-carried duty weapons, and report findings in an official PINS (Problems, Issues, Needs, Solutions) document.***

***4.7.4-6f:  If necessary, re-train sergeants, lieutenants, and commanders of squads, units, and area commands that score < .95 on the inspections protocols noted in "e" above.***

### 4.7.7 Assessing Compliance with Paragraph 20:  Weapons Qualifications

20

Paragraph 20 stipulates:

> **"Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year. Officers who fail to qualify on their primary weapon system shall complete immediate remedial training. Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify. Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment**."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.8 Assessing Compliance with Paragraph 21:  Firearms Training

Paragraph 21 stipulates:

> **"APD training shall continue to require and instruct proper techniques for un-holstering, drawing, or exhibiting a firearm."**

## Methodology

As noted in IMR-8, APD SOPs related to use of force remain approved as of June 2017, however, throughout 2018 APD has undertaken a rebuild of their use of force "suite of policies" that will include a new 3-Tier system.  Those new policies were not approved until the very end of the monitoring period; therefore, any necessary training will be assessed in the future.  Past reviews of use of force cases have revealed serious deficiencies in the oversight and accountability process, particularly with respect to force reporting, supervisory-level investigations and chain of command reviews.  We have previously reported on deficiencies related to APD officers and supervisors properly reporting and investigating shows of force, which has directly impacted compliance efforts with this paragraph.  An officer's actions related to a show of force are intrinsic to the responsibilities in reaching compliance with the provisions in this paragraph.  Central to those type of supervisory investigations is a determination of each involved officer's conduct to determine if their conduct was legally justified and compliant with APD policy.

As with other reporting periods, the monitoring team spent time during its November 2018 site visit providing perspective, feedback and technical assistance to APD personnel related to the responsibilities of reporting and investigation of uses of force, and their responsibilities of training to meet the provisions of this paragraph.  As

21

reported in IMR-8, APD has been unable to achieve Secondary Compliance because of lingering training gaps directly related to this paragraph. As noted in Paragraphs 86-88 of this report, the proper display of a firearm and electronic control weapon (ECW) as a show of force has lingered as a training gap for the past two years but was remediated at the end of this reporting period. In January 2019, APD provided training curricula to the monitoring team that was designed to remediate several training gaps, including proper procedures for displaying a firearm, and reporting and investigating shows of force. Within the materials we reviewed were a lesson plan, videos and other supporting documentation that was all designed to be delivered through APD's on-line learning platform. The need to fill this training gap was obvious, since personnel need the requisite guidance to ensure they are properly displaying weapons when a decision is made to do so.

**Results**

APD has made the decision to again adjust the use of force "suite of policies,"[6] and the revision process continued through the IMR-9 reporting period. When we met with personnel responsible for training the policies, we learned that the training will extend into the latter part of 2019. It was important for APD to conduct its "gap training" to ensure proper procedures are being followed in the intervening period of time. In January 2019, the monitoring reviewed and approved use of force training that will address the immediate need to remediate past training issues with show of force, and documentation was provided by APD that demonstrated that 98% of the organization received the training and passed a test to demonstrate there was an acceptable transfer of knowledge. More details concerning the training are located in Paragraphs 86-88. We learned that several officers needed remediation through an additional in-person training program. The decision to conduct the additional training in-person at the Academy was prudent and APD took that step itself, which we see as an appropriate reaction to officers in the field failing the on-line test.

Based on the approved training and attendance records, we have determined that APD has achieved Secondary Compliance for this paragraph. It will be APD's responsibility to assess the new "suite" of use of force policies to determine what additional training is necessary to retain Secondary Compliance in the future. Operational Compliance will be assessed in future monitoring periods based on APD's ability to properly apply the training in the field.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

**4.7.9 Assessing Compliance with Paragraph 22: Firearm Discharges from Moving Vehicles**

---

[6] Effective process, and the CASA requires periodic updates of policies.

Paragraph 22 stipulates:

> **"APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person. Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle."**

## Methodology

As noted in IMR-8, APD SOP's related to use of force remain approved as of June 2017, however, throughout 2018 APD has undertaken a rebuild of their use of force "suite of policies" that will include a new 4-Tier system.  Those policies were not approved until the very end of this monitoring period.  Past reviews of use of force cases have revealed serious deficiencies in the oversight and accountability process, particularly with respect to force reporting, supervisory-level investigations and chain of command reviews.

The use and investigations of force shall comply with applicable laws and comport to best practices. Central to these investigations will be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  As with other reporting periods, during its November 2018 site visit the monitoring team spent time providing perspective, feedback and technical assistance to APD personnel related to responsibilities related to the proper reporting and investigation of uses of force.

## Results

As reported in IMR-8, APD has been unable to achieve Secondary Compliance because of lingering training gaps directly related to this paragraph.  As noted in Paragraphs 86-88 of this report, proper training case law and APD policy provisions pertaining to this paragraph were necessary to achieve compliance with these paragraphs.  The policy requirements have remained a lingering training gap for the past two years.  In January 2019, APD advanced training curricula to the monitoring team that was designed to remediate several training gaps, including a gap related to this paragraph.  Within the materials we reviewed were a lesson plan, videos and other supporting documentation.  The monitoring team reviewed and approved the proffered use of force training, and documentation was subsequently provided by APD that demonstrated that 98% of the organization received the training and passed a test to demonstrate there was an acceptable transfer of knowledge.  More details concerning the training is located in Paragraphs 86-88, but we learned that several officers needed remediation through an additional in-person training program.  The decision to conduct the additional training in-person at the Academy was prudent and APD took that step

23

itself, which we see as an appropriate reaction to officers in the field failing the on-line test.

Based on the approved training and attendance records, we have determined that APD has achieved Secondary Compliance for this paragraph.  It will be APD's responsibility to assess the new "suite" of use of force policies to determine what additional training is necessary to retain Secondary Compliance in the future.  Operational Compliance will be assessed in future monitoring periods based on APD's ability to properly apply the training in the field.

APD has introduced and codified the use of a 7-Step Training Cycle as its training development methodology, which should help the Training Academy organize its work and manage the needs of the organization, especially in light of the extensive training programs they intend to deliver in 2019.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not in Compliance**

### 4.7.10 Assessing Compliance with Paragraph 23:  Tracking Firearm Discharges

Paragraph 23 stipulates:

> **"APD shall track all critical firearm discharges. APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its use of force annual report."**

**Methodology**

After the close of the 9th reporting period, APD produced the annual report for 2017. Until annual reports, including the sections dealing with critical firearms discharges are completed accurately and in a timely manner, APD will remain out of compliance for Paragraph 23.

**Results**

> Primary:      **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraph 23:*

*4.7.10a:*  **Continue the work currently being done to bring annual reports into the required cycle, including the report for 2018.**

### 4.7.11-4.7.18 and 4.7.21-4.7.23 Assessing Compliance with Paragraphs 24-31 and 34-36 (Electronic Control Weapons)

Paragraphs 24-31 and 34-36 address requirements for APD'S use of Electronic Control Weapons (ECWs), as follows:

Paragraph 24: Use of ECWs;
Paragraph 25: ECW Verbal Warnings;
Paragraph 26: ECW Limitations;
Paragraph 27: ECW Cycling;
Paragraph 28: ECW Drive-Stun Mode;
Paragraph 29: ECW Reasonableness Factors;
Paragraph 30: ECW Targeting;
Paragraph 31: ECW Restrictions;
Paragraph 32: ECW Weak-side Holster;
Paragraph 33: ECW Annual Certification;
Paragraph 34: ECW Medical Protocols;
Paragraph 35: ECW Medical Evaluation; and
Paragraph 36: ECW Notifications.

During past reporting periods, the monitoring team conducted in-depth reviews of APD use of force cases involving the use of Electronic Control Weapons (ECWs). The results of those case reviews, along with the implementation of policy provisions through training and operational oversight, resulted in operational compliance for Paragraphs 24 through 36.

During this monitoring period APD case ledgers revealed 34 cases (August 1, 2018 through January 14, 2019) in which an ECW was utilized. In early 2018, the monitoring team reviewed six ECW cases, approximately an 18% sample of all known cases. During a site visit in March 2018, the monitoring team reviewed several of these cases in depth with various members of APD to provide perspective on how to assess ECW cases. This was part of our technical assistance focus with APD during the site visit for IMR-9.  Prior to our November 2018 site visit, the monitoring team reviewed three more ECW cases. The purpose for choosing these three ECW cases is that they were all reviewed by the Backlog Review Team of the Compliance Bureau's Internal Affairs–Force Division, who are principally focused on 2017 uses of force.[7]

In early 2019, the monitoring team randomly selected six ECW cases for review. These are contemporary cases that occurred during the latter half of 2018. The cases reviewed, and a short synopsis of each case is listed below.

---

[7] We provided technical assistance to APD since the IAFD personnel are conducting thorough investigations and have identified numerous policy violations.  Where there is an issue related to the force used in an event, we recommended that IAFD look at all use of force cases in 2017 and 2018 to ensure there are no problematic trends.  We have voiced concern because, despite the good work IAFD is delivering, 2018 and 2019 use of force cases are not ordinarily investigated by them.

**Case #IMR-9-5 (ECW Application)**

APD officers responded to a neighborhood disturbance after being notified that a male suspect was being physically aggressive, verbally abusive and damaging property. APD officers encountered the suspect walking away from the caller's location. The suspect immediately became uncooperative and made several verbal threats toward the officers. The suspect appeared to have been under the influence of a substance, or appeared to have been suffering from a mental disability, which heightened the officers' concern. The suspect jumped over a wall into a residential yard and continued his aggressive demeanor[8], threatening to harm the officers on numerous occasions. Officers crossed over the wall into the same yard where several additional commands were given to the suspect, all of which he failed to follow. The suspect took steps toward the officers, and simultaneously two officers[9] deployed their Tasers, which was successful in subduing the suspect. He was quickly handcuffed and placed into a patrol vehicle. When the suspect was briefly removed from a patrol car for emergency care, he again became aggressive and ultimately had to have a "spit sock" placed over his head.

The officers were faced with an aggressive and obviously disturbed individual who was uncooperative from the onset of the encounter. Once the individual was Tased, officers quickly de-escalated their force toward the suspect. Because a sergeant deployed his ECW, a lieutenant conducted the use of force investigation. The quality of the use of force supervisory investigation was better than those we have seen in the past, and there was strong and accurate written justification for the report's findings. However, the case showed many investigatory shortcomings we've seen in the past. There was boilerplate language in the reports and some lacked sufficient detail. The lieutenant did not properly categorize the participation of all officers that were involved in the event. These issues were not reconciled at higher review levels.

**Case #IMR-9-6 (ECW Application)**

During early morning hours, APD officers were dispatched to a business establishment for a reported burglary in progress. Officers arrived at the front door and as they approached, a suspect began to run away. Several commands were given to the suspect to "stop" but he continued across a street and onto the property of a nearby high school. After a short distance, the suspect scaled a fence and was briefly entangled by his jacket. The officer reported "painting" the suspect with his ECW and documented, "Before (the suspect) started running again I painted him in the center of his back with my Taser and fired it in an attempt to stop him before he began running

---

[8] Lapel videos reviewed by the monitoring team captured instances where the suspect made aggressive movements toward a pile of rocks, which concerned the officers for their safety. These acts were documented in officer reports.
[9] One of the involved officers was a sergeant, so the use of force investigation was conducted by a lieutenant.

again."  It was apparent that the ECW was deployed when there was an intermediate barrier between the suspect and officer, the suspect had already turned and begun to run away, and the area was unpopulated.  Based on our observations, there was a failure to warn the suspect prior to the use of the ECW, thus the use of the ECW was not within APD policy.  The officer deployed the ECW through an opening in the fence but missed the subject, which can be seen on the lapel camera.  The officer said, "Due to the exertion of being in a foot pursuit I was unable to issue a verbal warning prior to firing the ECW", which is not consistent with the video we reviewed.[10]  The suspect ran a short distance before giving up and laying on the ground.  The officer was able to take the suspect into custody without further force being used.  A second officer was not considered a witness to the use of force, which we were unable to reconcile.  This case was not initially reported as a use of force and was identified as such by the commander nearly two months following the incident.  There was no documentation of any remediation of performance deficiencies in this case.

## IMR-9-7 (ECW Application)

During evening hours APD officers were dispatched to an aggressive driver complaint where a witness reported seeing a driver acting erratically and waving a gun out of the window.  An officer hosting a ride-a-long (passenger) located both the victim and suspect vehicles at a traffic light and after following the suspect vehicle into a neighborhood, it was stopped near the driveway of a home. The officer gave a number of commands to "get on the ground" and the driver complied.  The officer used a show of force with his weapon and continued to give commands to "get on the ground", but the passenger would not comply.  The passenger began to walk toward the front door of the home[11] and the officer followed.  Despite reporting elevated concerns for the safety of the officer, and possibly people in the home, when the suspect made the movement toward the front door the officer transitioned down in force options to his ECW.  This factor was never discussed or explained by the supervisor or chain of command.  The suspect was Tased as he began walking up a small set of stairs and ultimately laid down on a porch.  The officer reported having his weapon and Taser out at the same time following the ECW use, which was documented in the reports, but created a significant safety issue.  APD reported that the officer attended training following the event, but not as a referral for training related to use of force.  The remediation of a specific performance deficiency requires a specific training referral to the academy.  Follow up investigation revealed that the suspects did not possess a weapon, so the suspects were charged with crimes related to the initial call for a person brandishing a weapon, not for brandishing a weapon per se.  The supervisor conducting the force

---

[10] The officer was actually heard making radio updates as he ran, and made a command to stop, instead of an ECW warning.  After continuing to run after the suspect and catching him, the officer was still able to make announcements to the suspect and talk to an assisting officer.  These details bring into question the officer's rationalization for not "announcing" the deployment of his Taser, but these inconsistencies were not noted by the APD review of this case.

[11] The officer reported that the passenger walked away and then "…began to half run away from me".  The passenger clearly was not following commands and moved toward the front door, but the lapel camera does not show the passenger "half running".

investigation failed to perform a rigorous investigation and did not interview all available witnesses.

## IMR-9-8 (ECW Application)

APD officers responded to a call about a male walking in traffic and punching at cars. Upon arrival in the area and witnessing the individual's actions in disrupting traffic, two officers attempted to remove him from traffic, but he pulled away from them and crossed the street to a store where he subsequently battered a female store clerk (in addition to previously battering a motorist in a vehicle). Upon engaging the individual, officers attempted to speak with and control the individual's movements, to no avail. The individual was uncooperative, agitated, and continued to be abusive and walked away from officers toward another retail location with members of the public in close proximity. The individual's knuckles were cut and bleeding from allegedly striking vehicles. An APD sergeant gave sufficient warning to the individual that if he did not stop walking away, he would be Tased. After the warning was provided and the individual continued towards the direction of other members of the public and populated places of business, the individual was Tased (one 5-second cycle in standoff-mode), handcuffed, and taken into custody. The individual continued to be uncooperative and had to be put in a restraint system prior to transport. A number of witnesses were located during the neighborhood canvass. One business manager saw the interaction and was in the process of locking his business' doors to protect his employees when the Taser was deployed.  where they found the car parked.  We found no issues with this ECW deployment.

## IMR-9-9 (ECW Application)

APD officers pursued a stolen car they identified during patrol in a residential area. Two officers converging on the scene crashed into each other before exiting their vehicles and eventually drawing firearms and ECWs on two females and a male at a nearby housing complex. A male (Hispanic and in his 60s) was mistaken as the driver of the vehicle (actually an African-American male in his 20's) and was Tased because officers incorrectly interpreted that he was fleeing and had abducted a Hispanic female and was holding her hostage. After the Hispanic male was tased, officers then gave the Taser warning, and during the handcuffing of the male (who was now in a kneeling position), an officer aggressively forced the male to the ground face-first, significantly impacting the concrete. This use of force was not identified by the investigating sergeant (who witnessed the event). When a lieutenant reviewed both the ECW event and the force against the kneeling individual, the matter was directed back to the sergeant for further review. The sergeant found both the ECW and force against the kneeling individual to be within APD policy. The reviewing lieutenant appropriately found both uses of force to be out of policy and referred the matter to the Commander, who made the appropriate internal affairs referral on the officers and what can be assumed to be on the investigating sergeant as well. However, the record is not clear on the referral. This matter also involved an ECW show of force that an officer failed to self-report that was not found by the investigating sergeant.

**IMR-9-10 (ECW Application)**

APD officers responded to a call about a domestic violence incident involving a mother's allegation that her adult son had been at their residence earlier in the evening breaking drinking glasses and threatening her, and had now returned to the residence and was outside attempting to gain entry to the residence she was occupying. Responding officers located the suspect along the side of the house during hours of darkness. They gave appropriate commands to the suspect to stand up, face away from the officers/turn around, and show his hands. The suspect initially stood up and showed his hands, but then disregarded the commands and began walking directly towards the officers in a confined space while placing his hands back in the pockets of his bulky jacket. Officers warned the suspect that if he continued walking toward them and kept his hands in his pockets, he would be Tased. One ECW application was deployed in standoff-mode (one 5-second cycle) without penetration as the suspect neared the officers, but the firing of the taser was effective in inducing the suspect to stop advancing and to remove his hands from his pockets. An officer then handcuffed the compliant suspect while he was standing alongside the house and he was escorted to a police vehicle and seated in the rear seat.  We found no deficiencies with this event.

**Observations and Comments**

The cases the monitoring team reviewed this reporting period revealed a number of deficiencies, from ECW deployment problems by officers, to supervisory review and oversight errors, to instances of an area commander arguing with staff personnel who reviewed and classified an ECW application.  Officer deployment problems include failing to advise a person they will be Tased [*IMR-9-9*] *and* [*IMR-9-6*], failing to self-report ECW shows of force [*IMR-9-9*], failing to initially report an ECW use of force [*IMR-9-6*], discharging an ECW on a person who was incorrectly identified by the officer as a threat to an officer [*IMR-9-6*] and [*IMR-9-9*]. In one case [*IMR-9-12*], a FSB Commander completing a review of a use of force was later alerted by a lieutenant that the case had an unreported show of force.  The Commander wrote a memo back to document his disagreement with the assessment of the officer's actions.  It is unclear how the issue was resolved, but this type of internal exchange causes serious concern for the monitoring team.[12]  It appears to be yet another residual effect of the counter CASA Effect at APD.

Supervisory review and oversight issues of ECW deployments would normally be reported in the section of this monitor's report consistent with Force Investigations and Supervisory Force Investigations (Paragraphs 46-59). However, since APD has yet to achieve Secondary or Operational Compliance with any of those Paragraphs of the CASA, the monitoring team includes commentary on these supervisory review and

---

[12] When an organization level entity makes an assessment of a case, it should carry more weight than a single Area Commander for a host of reasons.  We have expressed strongly to APD that disparity in how events are viewed and assessed across multiple commands can only be resolved at a higher organizational level (i.e., Internal Affairs, IAFD or CIRT).

oversight issues (as they relate to the ECW cases reviewed) in this section for IMR-9. These issues include errors in the review of OBRD audit logs [*IMR-9-9*], not accurately reporting when Taser warnings are provided [*IMR-9-9*], not adequately providing Taser warnings [*IMR-9-6*] and [*IMR-9-7*], not identifying ECW shows of force [*IMR-9-9*], and not properly assessing preponderance of evidence standards when assessing justifications for deployment [*IMR-9-6*] and [*IMR-9-9*]. The monitoring team identified a trend of officers muting their OBRDs audio at the scenes of uses of force, which was not identified or documented by supervisors.  We see this as a significant issue that needs to be addressed by APD, since we have reported extensively over the past few years on the lack of compliance with OBRD use in the field.  In one case [IMR-9-6] an officer's lapel camera briefly captured an officer discussing the use of force at the scene with other officers as he approached the group.  Suddenly the audio goes silent and the conversation is seen but no longer heard.  We were unable to assess the quality of supervisor interviews based on the videos we were provided; therefore, we cannot assess the appropriateness and quality of questions officers were asked during the supervisory review process.  We strongly suggest that APD conduct such an assessment forthwith.

Further, deficiencies in reports are not being properly addressed by many supervisors, to include instances of boilerplate language, lack of sufficient detail, and instances where officers who were involved in an event are not properly categorized by a supervisor in their investigation [IMR-9-5]. We saw instances where legitimate canvassing for witnesses following a use of force did not occur [IMR-9-7].  In the same case an officer, reacting to a report of a suspect with a weapon, confronted the suspect in a driveway.  The suspect failed to follow commands and began moving toward the front door of a residence.  The officer was using a show of force (with a handgun) at the time, and articulated an escalation of concern for his safety as the suspect moved toward the house.  However, as the threat was increasing the officer was de-escalating his force option to an ECW.  The outcome was fortunate, but this discrepancy should have been addressed in the supervisor's investigation, especially since the same officer documented having both his ECW and weapon out of their holsters following the ECW deployment.

In another case a lieutenant correctly identified a performance deficiency and made a referral to the academy [IMR-9-5] for two officers to be trained, but two months later, documentation we were provided indicated that referral had yet to be addressed.[13]  In the same case an officer leapt over the top of a patrol car to apply a "spit sock" on a suspect, and then assisted by pulling the suspect into the patrol car; however, that same officer isn't identified as a witness or assisting officer in officers' reporting of the event.  Another officer listed as "Did not witness" in the supervisory force investigation stated in his own report, "I observed (suspect) headbutt (APD Officer) shortly after I arrived. I then assisted by placing my hands onto his right shoulder while pushing him back towards the vehicle and away from (APD Officer)."  Strangely enough, no APD supervisor noted these violations and discrepancies, even though the case was subject

---

[13] In fact, the paperwork the monitoring team was given provided no evidence that the training referral was ever addressed.

to multiple levels of review.  At this stage of the monitoring process, we find these oversights inexplicable, given the multiple levels of review to which the incident was exposed.  In our experience, these oversight failures indicate a significant level of "disengagement" from the CASA by field supervisors.

One ECW case reviewed by the monitoring team was so problematic that it was forwarded to Internal Affairs by a commander for further action. This case was investigated by a supervisor who was subsequently identified as being involved in a possible show of force with a firearm, and who was also a witness to a problematic use of ECW and an out of policy use of force on a kneeling citizen being handcuffed (who was mistakenly identified as a suspect in a crime before his release with no charges). We also noted supervisors investigating a use of force incident in which they were actively involved in.  This is more than just problematic, since, inherently, it creates a lack of objectivity.  While individuals within the chain of command should be commended for properly identifying many of the problematic areas of this supervisory force investigation associated with the ECW deployment, we note that the Internal Affairs referral was made more than 60 days after the date of the incident. In the opinion of the monitoring team, this is not to be construed as an error on the part of a lieutenant or commander, but more of an exemplar of APD's reluctance to require officers and supervisors to report misconduct, when warranted, directly to Internal Affairs before fully completing a supervisory force investigation.  While extensive commentary is merited on this specific supervisory force investigation, the monitoring team will reserve comment on this matter since it is presently under an Internal Affairs review.

In December 2017, members of the monitoring team alerted APD about the significant backlog of serious use of force, use of force and show of force cases.  At that time, we recommended that APD assemble teams of investigators to address the backlog as well as new use of force cases that occur.  We saw this as the best way to quickly change the path of non-compliance.  The primary issue APD faced was finding staffing for those important tasks.  APD subsequently created the IAFD investigative team who are completing comprehensive reviews of 2017 use of force cases, but more than a year's worth of force cases will apparently not be reviewed by them, which we see as a significant impediment to compliance efforts.

As noted in the preceding paragraph, the lack of objectivity (real or perceived) is critically problematic in supervisory force investigations.  This problem with the lack of objectivity has been previously pointed out to APD in prior Monitor Reports, during in-depth cases reviews (March 2018) and specifically evidenced in IMR-8 (Paragraphs 48-52). That section of IMR-8 chronicled case [IMR-9-11] (show of force / use of force) whereby a supervisor who ordered the use of a Taser actually investigated the show of force stemming from an officer painting somebody with an ECW.

In the companion supervisory use of force investigation [IMR-9-11] for this matter, an officer deployed less-than-lethal force twice, both on orders of the supervisor. The less-lethal force deployed (40mm rubber bullet) on the orders of a supervisor struck the suspect 2-3 seconds after he fell to the ground in a fenced-in area after a foot chase.

This use of force against the fugitive while he was on the ground was initially deemed to be an in-policy use of force at the supervisory level (by the supervisor who gave the use of force commands), but appropriately found to be out-of-policy by the Backlog Review Team. The safety net of the Backlog Review Team is currently available for backlogged cases. IAFD has demonstrated their willingness to call out policy violations and look more deeply into instances of potentially embellished exigency in the interest of conducting a thorough and objective investigation.  However, more contemporary cases of ECW applications (e.g., [IMR-9-6] and [IMR-9-9]) and uses of force do not have this same scrutiny.  This lack of objectivity that we have identified over the past twelve months needs to be addressed in an expeditious manner so as to not further erode significant efforts APD has made to this point to reach operational compliance status for ECW use.  In short, the Backlog Review Team has reached out and embraced their charge.  In-field supervision and leadership, however, has not only failed to do the same, it has been found to inappropriately reach out to argue against Backlog Review Team findings.  We see this as a critical issue, one APD needs to acknowledge, assess, and remediate immediately.

The monitor has, in his past few reports, identified a counter-CASA effect at APD. Based on our reviews of process, again this reporting period, it is clear that incidents of supervisory and command personnel reaching out to attempt to change legitimate process and findings has become more prevalent than ever.  In the monitor's opinion, this is a critical issue, more potentially troublesome than training lapses, supervisory lapses, or mid- and upper level leadership issues.  If APD is to be successful in moving into compliance with the CASA, this proactive and well-entrenched counter-CASA effect needs to be identified, assessed, and addressed head-on, openly, and diligently.  In the monitor's opinion, the counter-CASA effect cannot be tolerated without exposing APD to loss of compliance in critical areas.

### 4.7.11 Assessing Compliance with Paragraph 24

Paragraph 24 stipulates:

> **"ECWs shall not be used solely as a compliance technique or to overcome passive resistance. Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered. Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range."**

**Results**

### ECW Usage As Compliance Techniques

|  | In Compliance |
|---|:---:|
| IMR-9-5 | Y |
| IMR-9-6 | N |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | N |
| IMR-9-10 | Y |
| **Compliance %** | **67%** |

Our analysis indicates that APD field personnel were in compliance with only 67 percent of the incidents we reviewed for this paragraph.  Two of the six ECW applications we reviewed exhibited use of an ECW as a "compliance technique."

Primary:          **In Compliance**
Secondary:      **In Compliance**
Operational:   **Not In Compliance**

### 4.7.12 Assessing Compliance with Paragraph 25:  ECW Verbal Warnings

Paragraph 25 stipulates:

> **"Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to discharging an ECW on the subject. Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning."**

**Results**

Members of the monitoring team reviewed six ECW application events for compliance with this task.  Compliance figures for the six events are depicted below, and show only a 50 percent compliance rate for the requirements articulated in APD policies related to paragraph 25 of the CASA.  Results of our review are reported in the Table below.

**Verbal Commands Prior to
Deployment of Tasers**

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | N |
| IMR-9-7 | N |
| IMR-9-8 | Y |
| IMR-9-9 | N |
| IMR-9-10 | Y |
| Compliance % | **50%** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

### 4.7.13 Assessing Compliance with Paragraph 26:  ECW Limitations

Paragraph 26 stipulates:

> **"ECWs will not be used where such deployment poses
> a substantial risk of serious physical injury or death
> from situational hazards, except where lethal force
> would be permitted. Situational hazards include falling
> from an elevated position, drowning, losing control of a
> moving motor vehicle or bicycle, or the known
> presence of an explosive or flammable material or
> substance."**

**Results**

**Deployment of Tasers in Situations Posing
Risk of Serious Injury or Death**

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | Y |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | **100** |

Primary:        **In Compliance**
Secondary:   **In Compliance**

34

Operational:  **In Compliance**

## 4.7.14 Assessing Compliance with Paragraph 27: ECW Cycling

Paragraph 27 stipulates:

> **"Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power. Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power). After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.   Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Officers shall also weigh the risks of subsequent or continuous cycles against other force options. Officers shall independently justify each cycle or continuous cycle of five seconds against the subject in Use of Force Reports."**

**Results**

Tabular results for compliance with Paragraph are presented below.

### Continuous Cycling of ECWs

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | N |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | **83** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.15 Assessing Compliance with Paragraph 28:  ECW Drive-Stun Mode

Paragraph 28 stipulates:

> **"ECWs shall not be used solely in drive-stun mode as a pain compliance technique. ECWs may be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject, so that officers can consider another force**

35

option."

**Results**

### ECW Use in Drive-Stun Mode

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | Y |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | **100** |

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.16 Assessing Compliance with Paragraph 29:  ECW Reasonableness Factors

Paragraph 29 stipulates:

> **"Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options. ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons. In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others. Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations."**

**Results**

### Use of ECWs Based on All Circumstances of Incident

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | N |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | N |
| IMR-9-10 | Y |
| Compliance % | **67** |

36

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

## 4.7.17 Assessing Compliance with Paragraph 30:  ECW Targeting

Paragraph 30 stipulates:

> **"Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury."**

**Results**

Compliance data for this paragraph are presented below.

### Targeting Subject's Head, Neck, or Genitalia

|              | In Compliance |
|--------------|---------------|
| IMR-9-5      | Y             |
| IMR-9-6      | Y             |
| IMR-9-7      | Y             |
| IMR-9-8      | Y             |
| IMR-9-9      | Y             |
| IMR-9-10     | Y             |
| Compliance % | 100           |

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.18 Assessing Compliance with Paragraph 31:  ECW Restrictions

Paragraph 31 stipulates:

> **"ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective."**

**Results**

### Taser Usage on Handcuffed Individuals

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | Y |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | 100 |

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.19 Assessing Compliance with Paragraph 32:  ECW Holster

Paragraph 32 stipulates:

> **"Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm."**

**Results**

### Taser Holstered on Weak-Side Only

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | Y |
| IMR-9-7 | N |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | **83** |

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

While APD has executed policy and trained the "weak side only" policy, we have found evidence that the training regarding that policy, and the resultant supervisory practices, failed to take note of an incident this reporting period, in which an officer was observed

with both his firearm and his Taser drawn during a use of force incident.  This practice is universally prohibited, given the markedly increased probability of an accidental discharge of the firearm.  This error in tactics was not noted by anyone in the officer's chain of command during their review of this event.  Members of the monitoring team noted the error in their review of the incident and the officer's OBRD video.

## 4.7.20 Assessing Compliance with Paragraph 33:  ECW Certifications

Paragraph 33 stipulates:

> **"Officers shall receive annual ECW certifications, which should consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes' and scenario- and judgment-based training."**

**Results**

### Annual Training for ECWs

|            | In Compliance |
|------------|:-------------:|
| IMR-9-5    | Y             |
| IMR-9-6    | Y             |
| IMR-9-7    | Y             |
| IMR-9-8    | Y             |
| IMR-9-9    | Y             |
| IMR-9-10   | Y             |
| Compliance % | 100         |

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.21 Assessing Compliance with Paragraph 34:  ECW Annual Certification

Paragraph 34 stipulates:

> **"Officers shall be trained in and follow protocols developed by APD, in conjunction with medical professionals, on their responsibilities following ECW use, including:**
>
> **a)  removing ECW probes, including the requirements described in Paragraph 35;**
> **b)  understanding risks of positional asphyxia, and training officers to use restraint techniques that do not impair the subject's respiration following an ECW application;**
> **c)  monitoring all subjects of force who have received an ECW application while in police custody; and**

39

**d) informing medical personnel of all subjects who: have been subjected to ECW applications, including prolonged applications (more than 15 seconds); are under the influence of drugs and/or exhibiting symptoms associated with excited delirium; or were kept in prone restraints after ECW use**."

## Results

### Training re Risks of ECW Usage

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | Y |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | **100** |

Primary:      **In Compliance**
Secondary:  I**n Compliance**
Operational: **In Compliance**

## 4.7.22 Assessing Compliance with Paragraph 35

Paragraph 35 stipulates:

> **"The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel."**

## Results

### Provision of Medical Attention

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | Y |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | **100** |

Primary:      **In Compliance**
Secondary:  **In Compliance**

Operational: **In Compliance**

### 4.7.23 Assessing Compliance with Paragraph 36:  ECW Notifications

Paragraph 36 stipulates:

**"Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges)."**

**Results**

**Notification of Supervisors or ECW Usage**

|  | In Compliance |
|---|---|
| IMR-9-5 | Y |
| IMR-9-6 | Y |
| IMR-9-7 | Y |
| IMR-9-8 | Y |
| IMR-9-9 | Y |
| IMR-9-10 | Y |
| Compliance % | **100** |

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: I**n Compliance**

*Recommendations for Paragraphs 24, 25, 27, 29, 32 and 38*

*4.7.23a:  Given the small sample size in the monitor's evaluation, APD should conduct an internal review of compliance for paragraphs 24, 25, 27, 29, 32, and 38 using a broader sample size.*

*4.7.23b:  Error rates should be reported for each paragraph (24, 25, 27, 29, 32, and 38), listing the number of events sampled and the number of errors identified, by area command, shift, and supervisor.*

*4.7.23c:  For each area command, shift and supervisor identified with multiple errors, develop a remediation command that addresses the officer, the officer's supervisor, and the shift command structure.*

*4.7.23d:  Ensure that the errors identified in the internal review are analyzed and categorized by policy segment, supervisor, lieutenant, and area command.*

*4.7.23e:  Require specific and meaningful "intervention," based on errors attributable to sergeants, lieutenants, and area command.*

***4.7.23f:  After six months, re-visit the respective area commands and sample a second set of OBRD reviews to determine if compliance levels have improved.***

***4.7.23g:  If compliance levels have not improved consider appropriate discipline for the responsible sergeants, lieutenants, and area commander.***

***4.7.23h:  Repeat steps 1-6 until error rates are less than five percent.***

***4.7.23i:  The internal review should focus on areas of non-compliance noted by the monitor***

### 4.7.24 – 4.7.25 Assessing Compliance for Paragraph 37-38

Paragraphs 37–38 of the CASA address auditing and analysis requirements that APD must meet related to ECW use as follows:

> Paragraph 37: ECW Safeguards;
> Paragraph 38: ECW Reporting.

As with past reporting periods the monitoring team spent time providing perspective, feedback and technical assistance to APD personnel responsible for the tasks associated with these paragraphs.  During our November 2018 site visit, we learned that the Audit Assessment Unit (AAU) name had been changed to the Performance Metrics Unit (PMU), but the personnel maintain the same chain of command.  We continue to be impressed with the sophistication of thought and command of information the PMU personnel have shown toward their responsibilities.  We also appreciate the support they are receiving from their command level supervisors.  PMU were well prepared for the meeting and provided a comprehensive presentation of the status of their unit's efforts.  As we noted in the past, the PMU team thinks differently than most organizational units, and routinely engages in activities that use systematic and codified approaches that are anchored to best practices.

The PMU finalized SOP 8-2 "Performance Metrics Unit" that lays out the duties and responsibilities of the unit, procedures to be followed for initiating, conducting and supervising unit projects, and a process map that illustrates the workflow for projects.[14] During our site visit we learned that PMU was staffed with three (3) auditors, including the audit manager, but a request was made to increase the staffing by three (3) additional auditors.[15]  During the last reporting period we were provided with a comprehensive 2019 Annual Audit Plan.  The PMU previously estimated it would take

---

[14] SOP 8-2 codified specific provisions reported on in IMR-8.  Also appended to the SOP is the approved PMU Audit Report template.  For the past three years the monitoring team has been recommending that APD append forms that are specifically referenced in, or relate to, an organizational SOP, so we were relieved to see the concept was adopted by PMU.

[15] The monitoring team followed up with APD and learned that the staffing has increased by one (1) auditor as of the end of the reporting period, leaving the PMU with four (4) personnel.  They are actively attempting to bring on an additional supervising auditor that will be functionally situated between the PMU Manager and the auditing team.

approximately 4500 work hours to complete the tasks in the Audit Plan, which translates to more than 112 work-weeks without considering other tasks that may be assigned to PMU personnel. We view adequate staffing, equipment, and oversight as critical to APD's success in compliance management.  The monitoring team previously noted that if APD properly leverages the work product and capabilities of PMU personnel they will likely see significant progress toward CASA compliance.  After reviewing work product of PMU for this reporting period we have never been more certain of that notion. PMU's work is of high quality.

In IMR-8, the monitoring team documented receiving an Auditing Plan and SOP Risk Assessment Matrix for review, and during this reporting period we have seen strong evidence of it being implemented.  PMU completed an assessment of each organizational SOP for the frequency an SOP provision may be encountered, and the risk associated with that policy provision.  Following that assessment, PMU decided to focus their first internal audit on the Special Operations Division (SOD) and its Standing Operating Procedures.  We were provided copies of the following to review:

1.    Audit Agenda for SOP 6-8 "Specialized Tactical Unit"
2.    Audit Plan and Program for SOP 6-8
3.    Audit Report for SOP 6-8
4.    Audit Report for SOP 6-7 "Explosive Ordinance Disposal Unit (Bomb Squad)"
5.    Audit Report for SOP 6-9 "K9"

PMU's Audit Agenda (Dated July 20, 2018) for SOP 6-8 outlined many of the precursor activities that would set the course for the audit, including assigning an auditor to the project, providing a self-assessment to SOD for initial data gathering and setting timelines for the audit.  While the audit agenda may on its surface appear to be a basic administrative task, these are the type of procedural steps that demonstrate a systematic approach to the work, which is what the monitoring team has been stressing that APD adopt for the past three years.

PMU's audit plan and program for SOP 6-8 was a comprehensive documentation of fieldwork the PMU conducted when gathering data for the audit, objectives were set, methodologies for the approach to assessing each policy provision were articulated and results were provided.  The monitoring team noted several instances where PMU identified and documented administrative, training and operational shortcomings or discrepancies within SOD.[16]  This is exactly the type of organizational oversight APD should strive for across all of its commands.

We learned from PMU that they began a second audit of a SOD Unit when preliminary results for the SOP 6-8 were sent to SOD for review.  Understandably, there was initial concern over draft, preliminary findings PMU reported with SOP 6-8 since several gaps

---

[16] PMU documented compliance rates as low as 29% in some assessment categories.  We comment more on their findings in SOD paragraphs 90-105.

were identified.  PMU reported that there were "two active attempts by SOD to circumvent the audit process", which is categorized as "interference" with PMU work.  These terms of art within the auditing field translate poorly when applied within a law enforcement setting.

We discussed the circumstances surrounding the use of these terms and do not consider SOD's communications as an obstruction of the process.  There appears to have been some initial hesitation by SOD after receiving the initial findings (this was the first audit of its kind at APD), and they appear to have wanted more perspective from PMU.  That is not surprising to the monitoring team, since this type of organizational introspection is new to APD.  In fact, both PMU and SOD reported positively about the audit experience after it was completed.  The PMU Manager told us that the SOD Commander spoke up in support of the audit in later command level meetings, expressing the benefits of the audit PMU conducted from his perspective.  We emphasized the importance of effectively communicating the PMU responsibilities to all APD commands, and ensuring they understand the provisions within, and breadth of, SOP 6-8.  That may help avoid future apprehension by units going through their first PMU audit.

PMU's Audit Report for SOP 6-8 organized the findings of the SOD audit into easily digestible sections.  The "Summary of Results" section provides specific recommendations for SOD to consider, including policy, training and operational perspectives.  The report contained a "Management Response" section for each recommendation.  We reviewed the responses, and for the most part found them to be appropriate.  We have commented in the past that audit reports without a meaningful response to findings are of little value to the organization.  As noted, PMU's business process includes the requirement that an audited unit provide a response to the findings, so for the next reporting period we anticipate that substantial value will be found in the adjustments SOD has made in reaction to their audit.  We will focus attention on collecting "proofs" from PMU that demonstrate that SOD followed through on their documented "Management Response".

We want to comment here on an area of findings in the SOP 6-8 audit that has relevance across all aspects of APD's use of force reporting and supervision system.  PMU included an assessment of Special Order 18-51 that required NFDD (Noise, Flash-bang Distraction Devices) and chemical munition deployments to be reported as uses of force.[17]  At the time of the audit, APD still operated under a two-level classification system for uses of force, though the audit assessed SOD activities against the proposed 3 Tier system.[18]  The following was noted in the Conclusion section of the PMU report:

---

[17] We commented extensively on this topic in IMR-8.  Please refer to that report for more details concerning SOD's past failure to properly report certain types of uses of force.

[18] Parenthetically, the new suite of policies was approved at the end of the reporting period and include a 3 Tier classification system for force.  We discussed the difference with PMU personnel during our site visit.

1.	The audit found that most documentation used to report the deployment of chemical munitions and NFDDs was well-maintained. However, tracking of the deployments was unreliable.

   a.	In the auditor's judgment, the criteria used to classify deployments of chemical munitions and NFDDs lacked meaningful classification and funneled all deployments to Level 1 use of force.[19]

2.	Records reviewed in the course of the audit indicated that exposure to chemical munitions can result in a complaint of Injury.

3.	PMU interviews confirmed that determination of injury can be subjective. For a hypothetical complaint of injuries resulting from the exposure to chemical munitions, the SOD commander and tactical commander were not able to reach a consensus on whether classification of the deployment would be upgraded to a Tier (Level) 2 use of force.

We note these findings here because they are relevant to the overarching assessments that will have to be made by supervisors in the field when applying APD's new use of force suite of policies. If SOD command personnel have difficulty reaching consensus as to whether a particular use of force should be classified as a Tier 1 or Tier 2, we can reasonably predict that similar confusion may exist with field supervisors once the new use of force policies are implemented.

We highlight this now so APD can take reasonable steps when developing and delivering training during its 2019 Use of Force training programs.  We also see this is a positive example of how a unit internal to APD can provide substantive and meaningful data to influence training and operational compliance efforts.[20]

Our review of the audit reports that were prepared for SOPs 6-7 and 6-8 revealed similar positive actions by both PMU and SOD.  We are extremely encouraged by the interaction that was evident between the two units during the course of the audits and observe that PMU's independent assessment unearthed opportunities for administrative corrective actions, and requests for software product enhancements[21].  In fact, during a review of data, PMU discovered an inventory discrepancy with the Bomb Squad.  It was

---

[19] PMU has identified a variable that we have noted in meetings with APD since the promulgation of SO 18-51.

[20] Parenthetically, the monitoring team communicated to APD that they should consider this specific example when developing new use of force training in 2019.

[21] We saw that SOD turned to APD's IA for guidance and help with better capturing and analyzing K9 bite ratio data.  PMU set in motion other internal organizational discussions that we would expect to see from a meaningful audit process.

clear from the management response that this was an important find and the unit subsequently put administrative oversight processes in place to avoid such discrepancies in the future.  These are examples of the way good process is supposed to work in a professional organization that self-corrects.

The monitoring team was also provided the following by PMU:

1.      ECW Quarterly Upload Audit Report (Dated 8/31/18) – This report captured quarterly uploads of ECW data for the second quarter of 2018.  The Audit report found that there was a 95.2% compliance rate for ECW uploads, and specifically listed the officers who had not complied with policy. The report did not provide details as to how APD addressed the failure of several officers to upload their ECW data.  The monitoring team, however, requested that information and were provided an Internal Memorandum that documented that all but two officers have uploaded their ECW data.[22]

2.      ECW Quarterly Upload Audit Report (Dated 11/21/18) – This report captured quarterly uploads of ECW data for the third quarter of 2018.  The Audit report found that there was a 96.8% compliance rate for ECW uploads, and specifically listed the officers who had not complied with policy. The report did not provide details as to how APD addressed the failure of several officers to upload their ECW data.

3.      Random Sergeant ECW Review Audit Report (Dated 12/20/18) – This report captured data that compared ECW downloads against use and show of force reports.  In the "Purpose" section PMU stated, "The purpose of the random review primarily focused on comparing the ECW upload data for Field Services Bureau (FSB) sergeants to use of force (UOF) and show of force (SOF) reports. The Performance Metrics Unit (PMU) assessed whether all documented weapons deployments, if any, have a corresponding use of force report."  The Audit report found the following:

   a. The integrity of the data compiled in an ECW upload report was not reliable. The data do not decipher between spark tests versus an actual discharge of the weapon;
   b. Auditor judgment was used to categorize or differentiate between a likely spark test versus potential weapon discharges, based on department protocols;
   c. While there are discrepancies noted related to spark tests, PMU was able to match 6/6 ECW uploads to use of force reports, and 1/1 ECW uploads to a show of force report; and

_____

[22] The memorandum reviewed was created after the reporting period ended (February 20, 2019) in response to a monitoring team inquiry.  Conversations on "closing the loop" on PMU findings have been discussed with APD.

d. The management response spoke to enhancements that will exist with new Taser purchases (and deployments) that will remediate spark test differentiation and allow for more accurate data.

The monitoring team requested that APD provide documentation that demonstrated provisions of Paragraph 38 had been met. In response, we were provided with an Interoffice Memorandum, dated January 29, 2019, entitled "CASA Paragraph 38 Status". Notwithstanding the fact that this memorandum does not constitute a course of business document, the contents of the report verified that APD has not yet developed ways to meet the provisions of Paragraph 38. It did, however, outline steps that are being taken to address the provisions of Paragraph 38. Compiling comprehensive data to provide the proper analysis to meet Paragraph 38 CASA provisions will require APD to craft their own assessment plan. Finally, we learned that APD is in the final stages of delivering its 2016 and 2017 Annual Reports.[23] We will report our findings with respect to the Annual Reports once they are provided.

The monitoring team notes the progress APD has made with the PMU and feel that the attitudes and ability of the unit will reap benefits organization-wide. We see a great opportunity for APD to build a strong internal capacity to collect and analyze data, and to provide informed recommendations to APD decision makers. As we noted in past reports, given proper staffing and support we believe this unit can reveal itself as the centerpiece of organizational reform. We recommend that APD leadership regularly assess the workload and staffing of PMU, since, as their workload increases, and the products they create provide more and more benefits across APD, there will be a strong propensity to seek out their assistance. That response to their work potentially could overburden their staff and reduce their effectiveness, if not managed properly. APD should remain cognizant of these issues moving forward.

APD's PMU has put into practice an auditing program that is rarely found in a law enforcement organization. As a consequence of the efforts of PMU, and their attention to the responsibilities contained within Paragraph 37, we have determined they have achieved Secondary and Operational Compliance during this reporting period. During the IMR-10 reporting period we will focus on sustaining the momentum they have created and assess follow-up activities (in the form of "proofs") that show evidence of the management responses to their recommendations.[24] Those proofs may not exist in every circumstance, but recommendations should be tracked to their logical conclusion for each audit.

---

[23] We have stressed the need, where use of force and show of force statistics are provided, that the Annual Reports need to call out and properly qualify the validity of relevant statistics in light of the many issues the monitoring team has brought to APD's attention over the past three years.

[24] While most management responses had firm "Implementation Dates", we did note several instances where implementation dates were ambiguous. We highly recommend that all implementation dates be firmly set, even if those dates simply represent a placeholder for PMU follow-up.

Paragraph 38 maintains its Primary Compliance status.  We will look to APD for any course of business documentation that demonstrates they have advanced the responsibilities within this paragraph in the next reporting period.

### 4.7.24 Assessing Compliance with Paragraph 37:  ECW Safeguards

Paragraph 37 stipulates:

> **"APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy. APD agrees to implement a protocol for quarterly downloads and audits of all ECWs. APD agrees to conduct random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's Use of Force Reports. Discrepancies within the audit should be addressed and appropriately investigated."**

**Results**

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.25 Assessing Compliance with Paragraph 38:  ECW Reporting

Paragraph 38 stipulates:

> **"APD agrees to include the number of ECWs in operation and assigned to officers, and the number of ECW uses, as elements of the Early Intervention System. Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force, and whether officer and subject injuries are affected by the rate of ECW use. Probe deployments, except those described in Paragraph 30, shall not be considered injuries. APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis. ECW data analysis shall be included in APD's use of force annual report."**

**Results**

Primary:     **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 38:***

48

*4.7.25a: APD should commission a "working group" from City data processing, APD Internal Affairs, APD Compliance Bureau and other related stakeholders who use, or would use, the EIRS system. This working group should be tasked with identifying: 1.) Current goals and objectives of the EIRS system design; 2.) Current absolute needs from the EIRS system related to "must have" components; 3.) Realistic "future needs" identified by adding to the "must haves" all CASA-required capacities; and 4.) a general description of probable needs over the next 5 years. This may require contracting with a systems- design firm or other outside resource.*

*4.7.25b: Given the results of the process outlined in 4.7.2a, develop or purchase or develop a system that will be capable of meeting specified goals and objectives, and capable of meeting projected 5-year goals and objectives.*

*4.7.25c: "Build" or purchase a system that will meet identified "must have" needs and is expandable to meet identified future "must have" needs.*

*4.7.25d: APD should obtain outside input from Seattle PD, New Orleans PD, and Cleveland PD regarding their actions in response to similar language in their consent decrees;*

*4.7.25e: APD should consult with, and document recommendations from the City's data management division regarding whether the current system is salvageable, and if not, should consider moving to systems in use in other agencies currently undergoing DOJ-related reform processes that offer better chances for success than the current EIRS.*

*4.7.25f:  APD should monitor the staffing levels in PMU and leverage their efforts to benefit all areas of the CASA.*

**4.7.26 – 4.7.27 Assessing Compliance with Paragraph 39-40: Crowd Control Policies and After-Action Reviews.**

Paragraphs 39-40 of the CASA address requirements that APD must meet related to crowd control policies, and the management and supervision of APD responses to events involving mass demonstrations, civil disturbances and other crowd situations. While the policies apply to all APD officers, the tasks associated with Paragraphs 39 and 40 are overseen by members of the APD Emergency Response Team (ERT).

In the past, the monitoring team has spent significant time providing perspective, feedback and technical assistance to APD's Emergency Response Team (ERT) supervisors during its site visits.  During our November 2018 site visit we met with an ERT supervisor responsible for the tasks associated with compliance and, as in the past, the monitoring team found receptiveness and a sincere interest in succeeding. We discussed the ERT policy and training requirements for APD personnel that are

pending relating to ERT protocols.  The following paragraphs represent our findings related to Paragraphs 39-40.

In IMR-8 we commented that during the preceding year there had been two changes in leadership for ERT, which we saw as a significant issue toward gaining Secondary and Operational Compliance in Paragraphs 39-40.  This type of leadership change was not unique to ERT, as we saw a similar pattern across the organization.  With the change in executives at the top of APD at the end of 2017, there was also a significant turnover of commanders throughout the various Divisions and Sections.  Changes APD made did not seem to create a lack of continuity in ERT operationally, but it did slow down certain compliance efforts in areas of policy development and training.

As we noted in IMR-8 (in paragraphs 90-105), certain types of force used by SOD were not being reported that also had relevance to ERT compliance efforts.[25]  During our March, June and November 2018 site visits we discussed this issue with Commanders of ERT.  During the IMR-8 reporting period the monitoring team was provided an interoffice memorandum dated, May 30, 2018, that was prepared by the current SOD Commander.  In it he detailed his research into the use of chemical munitions and NFDDs and concluded that chemical munitions and use of NFDD's by APD should be captured as reportable uses of force.  On June 2, 2018, APD promulgated Special Order (SO) 18-51, "Use of Chemical Munitions Noise Flash Diversionary Devices" that supported the opinion of the monitoring team and the findings of the SOD Commander.  SO 18-51 served as notice to the organization that chemical munitions and NFDDs will be investigated as uses of force; however, it was principally focused on a SOD response to an event.  It was represented to the monitoring team that there were no crowd events during this monitoring period that required ERT to deploy chemical munitions or NFDDs.  However, since SO 18-51 focused on SOD deployments, APD's ERT should follow SOD's lead by ensuring that the its members are clear that the use of chemical munitions and NFDDs constitute a use of force.  This may all be resolved with the promulgation of new use of force policies, but because of the public nature of ERT events (especially if they respond to a disorderly crowd), if APD is explicit with their expectations they will be better prepared when those situations occur.

In the past, ERT weaknesses in the documentation of pre-event preparation and post-event After Action Reports (AAR), coupled with incident command shortfalls, were contributing factors in APD's problematic response to past major protests.  The monitoring team has previously communicated to APD that ERT training should follow good policy development and include authentic, scenario-based incident command exercises that stress advanced planning and preparation, command post operations, and large-scale tactical maneuvering to respond to dynamic aspects of modern-day protests while operating within Constitutional bounds.

We learned that Standing Operating Procedure (SOP) 2-29 "Emergency Response Team" has been under revision throughout this monitoring period, and has not been

---

[25] The unreported uses of force related to chemical munitions and deployments of NFDDs.

approved by the monitor.  That, in turn, has resulted in a lag in delivering crowd control training and leaves the issue of "crowd control" as a lingering training gap for the organization.[26]  We were told by ERT personnel that once there is a formal adoption of the new policy they will advance new training not only to ERT personnel, but the entire organization.[27]  ERT is working with the Academy to advance their training through the 7-step training cycle, and when done they expect it will occur in the following stages:

**Stage 1** – All department personnel will receive training on SOP 2-29 through an on-line training platform, which will also cover aspects of use of force concerning chemical munitions and NFDDs.

**Stage 2** – All ERT supervisors will receive an in-person "train the trainer" course on the new (when approved) ERT SOP, which will incorporate practice in crowd control formations and movements, so they are consistent across the entire ERT. (Note – There are a total of 5 teams of ERT, and approximately 90 personnel)

**Stage 3** – All other ERT personnel will receive in-person training[28] to review use of force practices, including force related to chemical munitions and NFDDs, training on SOP 2-29, and squad formations and movements utilizing ERT supervisors as trainers.

ERT were again encouraged to develop and maintain training plans for ERT and non-ERT members of the Field Services Bureau.  We were told that there are approximately ninety (90) ERT personnel (Approx. 75 officers and 15 supervisors) who will receive eight (8) hours of comprehensive training.

The monitoring team, as a part of the normal data collection process, will review policy changes, any related training records and After-Action Reports regarding any demonstration or crowd control events as a component of the IMR-10 monitoring period. We were provided with an Incident Action Plan and its corresponding After-Action Report pertaining to a Governor's Conference (July 19-21, 2018) that took place in Santa Fe.  Although this event occurred outside the IMR-9 reporting period, we reviewed the documentation in order to provide feedback.  While the APD ERT did report to Santa Fe to assist local authorities with the event as backup, they ultimately were not required to deploy.  Therefore, the After-Action Report we reviewed was brief. We recommend that the current ERT supervisors review past reports and comments we provided concerning the quality of records associated with ERT deployments.  Previous ERT Commanders put forms in place that are required to be used to elicit feedback from other agencies when APD's ERT is activated.  This is not to suggest those forms were necessary in this specific event, but because there are few actual ERT

---

[26] We have written extensively in past reports about certain training gaps that occurred as a result of APDs past use of force training programs.  See. Paragraphs 86-88 for additional details pertaining to crowd control.

[27] APD personnel across the organization will be trained in certain areas, where ERT assigned personnel will receive a more robust training program.

[28] Supervisors that attended the "train the trainer" course will be used as trainers.

deployments it is increasingly important that procedures adopted in past reporting periods be passed on to new Commanders and codified in policy.

ERT is coordinating their efforts with the Training Academy, as recommended in IMR-8, to ensure training is advanced through the current Academy systems.  The monitoring team has some concern over the elongated timeline for policy revisions and the delivery of training related to new ERT policies, especially in light of the fact that a lingering training gap revolves around crowd control procedures.

Based on our review, we have determined Primary Compliance should be continued for Paragraphs 39 through 40.

### 4.7.26 Assessing Compliance with Paragraph 39: Crowd Control Policies

Paragraph 39 stipulates:

> **"APD shall maintain crowd control and incident management policies that comply with applicable law and best practices. At a minimum, the incident management policies shall:**
>
> **a) define APD's mission during mass demonstrations, civil disturbances, or other crowded (sic) situations;**
> **b) encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses;**
> **c) require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and**
> **d) continue to prohibit the use of canines for crowd control."**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 39:***

***4.7.26a:  Execute, evaluate, and if necessary, field test (via mock events) APD's new crowd control policies and training to ensure they meet articulated goals and objectives.***

***4.7.26b:  Develop and deliver a meaningful training program to its ERT and Field Services members that is centered on crowd control policies.  That training should include scenarios, practical exercises, and lessons learned from previous***

*APD responses to events. Training must meet the instructional objectives documented within APD lesson plans.*

### 4.7.27 Assessing Compliance with Paragraph 40

Paragraph 40 stipulates:

**"APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures."**

**Results**

    Primary:    **In Compliance**
    Secondary:  **Not In Compliance**
    Operational: **Not In Compliance**

*Recommendations for Paragraph 40:*

*4.7.27a:   Develop and deliver a meaningful training program to ERT   and Field Services members that is centered on crowd control policies.  That training should include scenarios, practical     exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented   within APD lesson plans.*

*4.7.27b:  Ensure that APD's after-action reports follow a standard structure and include mechanisms for communicating needed   revisions to policy and training within the agency.  We encourage APD's ERT Commanders to review past reports for monitor's comments regarding AARs and to incorporate AAR procedures and forms (previously agreed upon) into SOPs.*

*47.7.27c: Any recommendations made from after-action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned,   e.g., recommendation, implemented practice addressing recommendations, evaluation of results of changes implemented, etc.*

### 4.7.28 – 4.7.46 Assessing Compliance with Paragraph 41-59: Supervisory Review of Use of Force Reporting

The series of related Paragraphs (41 through 59) encompass requirements for reporting, classifying, and investigating uses of force that require a supervisory-level response based upon the type and extent of force used.  The CASA delineates this larger group of paragraphs into three separate sub-groups:  Use of Force Reporting – Paragraphs 41-45; Force Investigations – Paragraphs 46-49; and Supervisory Force Investigations – Paragraphs 50-59.  The following represents our finding relative to these series of paragraphs.

The CASA requirements stipulate that the use and investigation of force shall comply with applicable laws and comport to best practices. Central to these investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  We have commented extensively in the past that APD's reporting and investigation of uses of force have demonstrated serious deficiencies that has hindered compliance efforts.  As with other reporting periods, the monitoring team spent time during the IMR-9 reporting period in processes providing perspective, feedback and technical assistance to APD personnel.  We provided perspective to APD to help the new administration better understand and deal with historical difficulties the agency has had achieving compliance, and provided ideas concerning how they could best be addressed.  We have seen examples of our technical assistance being implemented in certain areas, as well as an improvement with the overall handling of use of force incidents; however, we still are finding evidence of significant force reporting and investigation issues, as well as system and process disconnects that may hinder Operational Compliance moving forward.

While on-site during the IMR-9 reporting period, a meeting was held with members of the monitoring team, APD command staff, the City, the US Attorney and DOJ to discuss two specific issues we see as key illustrations of obstacles to compliance: 1) Additional Concern Memos (ACMs) being improperly used to address policy and misconduct that should be elevated to Internal Affairs, and 2) Incorrect interpretations of when a timeline begins for the completion of an investigation.  Failing to properly remediate performance deficiencies and tepid responses to policy violations will impede seriously reform efforts. We have commented extensively that policy violations that should be reported to Internal Affairs are instead often being handled in area commands or within ACMs. ACMs have been found to contain information that clearly required Internal Affairs referrals, but as important, is the fact that ACMs are a poor mechanism to track aggregated data that can be used for performance plans and as data for the EIRS.  To its credit, APD has acknowledged this practice is creating issues for the agency and committed to ending the use of ACMs entirely.

However, ACMs are simply the mechanism by which IA referrals have historically been avoided.  Regardless of what system is put in place, or what form is used, without requiring officers and supervisors to make immediate referrals to IA when such referrals are mandated, and legitimately holding them accountable when they don't, abolishing the use of ACMs will be meaningless.   As APD encounters memoranda that contain violations that should have been referred to IA, they must have a plan to address past policy violations, and must describe how policy violations will be handled moving forward.  We provided APD with perspective and exemplars of how APD's IA could establish itself as the centerpiece of APD's policy and misconduct oversight system. The more IA leans in to that responsibility, the sooner APD will be successful in its compliance efforts.

After the close of this reporting period, the monitor and the parties collaborated on a way forward to resolve the lingering issue of ACMs.  Several tenuous issues are created

by the past practice of ACMs, many of which we dealt with extensively in IMR-8.  In short, ACMs create a second category of policy violations, which under then-current APD practice, was a category that consisted of probable secondary policy violations (violations not as critical as the main violations encountered in a given incident).  In the past, these related-but-not-central violations were noted as "additional concerns."  They tended to constitute less serious violations of policy that were not as critical as the main policy violations that were fully investigated by APD's IA process.  In the past, these "additional concerns" were poorly documented conclusory statements not supported by careful documentation or analysis.  In short, they were "place holders" for officer actions or inactions, not related to the more serious misconduct found in a given IA investigation.

The backlog of "additional concerns" that exists in IA's current case load is substantial in volume. The ACMs in a given IA investigation often outnumber significantly the "critical issue" policy violations noted by investigators.  While, for the most part, the policy violations involved in these ACMs were not critical, APD seems to have been investigating only the most critical actions in a given event, relegating relatively less critical--but still important--actions to a short-hand, conclusory ACM process.  There appears to have been little, if any, concern given to correcting what was improper execution of policing powers.  Some of these improper executions were significant.

In the monitor's opinion, APD has allowed to develop over the past few years, a "gray area" of numerous incidents of improper behavior, without ensuring notation and remediation of those behaviors, other than a simple "note to the file."  We suggest that it is important that APD note for the record the occurrence of these actions, and further that they scrub existing records for training needs, counseling, or other non-punitive remedial methods. We are open for discussion about how this should occur going forward.

Unfortunately, this worrisome body of "additional concerns" has fallen to the current administration to regularize and scrutinize, as it was not properly managed by the previous administration.

As examples of this process, during this reporting period, we received a number of internal memoranda that documented instances where serious uses of force were not being properly reported or categorized by supervisors, which adversely impacted the investigations.  Examples we saw included: failing to report neck holds (IMR-9-13 and IMR-9-14); arrests where three (3) or more applications of an ECW were not immediately reported as a serious uses of force (IMR-9-15and IMR-9-16); an instance where a suspect was attempting to evade arrest on a bike and a sergeant used his vehicle to block his path, which was handled as an accident instead of a serious use of force (IMR-9-17); a case in which an officer forcefully swung a handcuffed suspect into the side of a patrol vehicle, that was not reported as a serious use of force (IMR-9-18),[29] a case where an officer struck a subject in the head multiple times, that was not initially

---

[29] A lieutenant that identified this failure to report a serious use of force prepared a comprehensive internal memorandum documenting his efforts and opinions.

reported by the officer or caught by a supervisor for a CIRT response to the scene (IMR-9-19), and instances where an ECW struck a person in the face or throat (IMR-9-20 and IMR-9-21).  We were provided ACMs that captured an instance of prisoner escape (IMR-9-22), an officer who struck a vehicle when responding to a location and left the scene (IMR-9-23)[30], an instance when an officer's patrol vehicle was stolen from the Prisoner Transport Center (IMR-9-24)[31], and an unreported use of force (IMR-9-25).

The collection of scenarios and potential policy violations contained in these memoranda illustrate a few important points.  First is the importance of ensuring immediate interaction with IA and the proper interpretation of when the timeline for discipline (as per SOP 3-41) begins.  Second, there is still significant progress to be made in the field with respect to the proper reporting and investigation of uses of force, and third, these types of events should inform training programs APD intends to develop for its new use of force policies.  As we understand the new policies, IAFD will assume the primary investigative role for most uses of force.  However, if improper reporting of force occurs in the field, then APD's compliance efforts will stall dramatically as the monitoring team continues to be the *de facto* investigative authority.  This is simply not acceptable.

During this monitoring period, the monitoring team continues to note an improvement in planning efforts and attention to detail to better oversee the management of force investigations. During this monitoring period, 73% (162) of the 222 supervisory force investigations initiated between August 1 and January 14, 2019 were completed and findings were made prior to the close of the monitoring period. In IMR-8, only 50% of the supervisory force investigations initiated during the respective period were completed by the close of that monitoring period. In IMR-8, 81% of the supervisory force investigations initiated during the first half of the monitoring period had been completed and findings made prior to the close of that period. In this monitoring period (IMR-9), all supervisory force investigations (142) initiated during the first three months of the monitoring period had been completed by the close of the period. These results provide important and continued assurance that the present backlog of force investigations dating back to 2017 is not being compounded by the addition of a large number of contemporary investigations onto the backlog list.  We are encouraged to see this improvement and note that APD has moved forward with an analytic process of reviewing a random sample of 2018 cases to assess the quality of the cases being submitted in the field.  Based on our review of data APD provided, we have issues of concern that fall outside the purview of the IAFD's work.

---

[30] This officer was reportedly responding to a business establishment owned by a relative.  She reported experiencing brake failure when approaching a light and struck a curb, but said she did not realize she also struck another vehicle.  The event was later called in as a hit and run accident.  We were not provided accompanying documentation to assess the underlying investigations, but the issue was not raised to IA and was instead handled with verbal counseling.  It is also unknown if the issue with the patrol vehicle's brakes was ever resolved.

[31] In this case a lieutenant made a BlueTeam entry and requested an IA number "…so I can investigate any wrongdoing by (officer) or if it is an equipment issue/failure…"

In the next monitoring period, the monitoring team will focus on how APD oversees force investigations and determine if subject officers' conduct "complied with APD policy," especially the new policies put into place.

Paragraphs 41–59 are found to be in Primary Compliance only. One of the reasons cited for this poor compliance status was persistent outstanding training gaps that relate to these paragraphs. We report extensively on the current efforts the APD Academy has taken to remediate those gaps in Paragraphs 86--88 of this report. In short, APD took steps to remediate the training gaps and most were addressed during this reporting period, but some remain. Those steps are important because the training gaps have lingered for the past several monitoring periods, and compliance efforts in the field were negatively impacted by the training gaps. We noted one internal memorandum prepared by a field supervisor that specifically noted the gap training as helping him properly categorize a use of force. (IMR-9-14) Based on our conversations with APD, the decision to adjust the use of force suite of policies, as required by the CASA, will likely extend the training of those policies into the latter part of 2019. Therefore, since APD never achieved Secondary Compliance for these paragraphs, that compliance status will not be re-considered until the new use of force policies have been trained.

A number of APD functions conform to various aspects of Paragraphs 48-52. For example, during our November 2018 site visit, the monitoring team met with APD representation from the Multi-Agency Task Force (MATF). A review of the MATF case ledgers and other documents continues to indicate the task force's activation for criminal investigations related to officer-involved shootings, in-custody deaths, felonious force against officers, criminal conduct cases resulting from a use of force by officers, as well as its coordination with APD's Internal Affairs Division).

Other APD functions related to these paragraphs continue to demonstrate the spirit and rigor that will ultimately be required to achieve compliance. Specifically, the Internal Affairs Force Division's use of data, workload analyses, keen attention to detail, and role-specific training is noted to have more clarity in purpose and grasp of the CASA language than the monitoring team has seen since the inception of the CASA. APD has committed significant personnel to the task of investigating the 2017 backlogged use of force cases. It is also important to note that newly promoted field supervisors are now rotated through the IAFD to see first-hand the current methodology employed to investigate and review supervisory use of force cases. This system was devised and implemented entirely at the initiative of APD and the IAFD, which we see as a workable method to positively influence force investigations in the field.

As noted in Paragraphs 60-77, 39.8% (121 cases) of the 304 backlogged use of force cases have been reviewed by the IAFD. Since APD recently neared its staffing goal for the IAFD, we anticipate that the backlogged caseload of use of force cases will be completed or near completion by the end of IMR-10. Coupled with the increasing efficiency in completing the supervisor use of force cases, the monitoring team reasonably anticipates that in IMR-10 it will be able to more particularly focus its

attention on APD's ability to demonstrate its adherence to the 14 points of supervisory use of force investigations pursuant to Paragraph 52.

In early 2019, the monitoring team randomly selected four (4) supervisory force investigation cases for review that were also reviewed by IAFD.  The cases reviewed, and a short synopsis of each case, is listed below:

## IMR-9-26 (Supervisory Use of Force Investigation)

An APD officer was working a detail inside a Walmart when a shoplifter was identified by loss prevention officers. The officer and loss prevention personnel approached the shoplifter as she was exiting the store. The officer identified himself as an APD officer and advised the shoplifter that she was under arrest. The shoplifter then began to actively resist arrest and at a point broke free and ran away from the officer and Walmart's loss prevention officer, who was standing nearby. Both the officer and the shoplifter eventually fell to the ground and the officer's OBRD ceased recording at that point. The officer was finally able to fully handcuff the shoplifter upon the arrival of backup officers. The officer self-identified to the supervisory investigator that he used a show of force with an *oleo capsicum* (OC) canister in order to calm the shoplifter while awaiting backup. Both the officer and the shoplifter sustained superficial abrasions. The original chain of command reviews found the use of force to be in compliance with APD policy. The Backlog Review Team also found the use of force to be in compliance with APD policy. The Review Team also identified several deficiencies in the quality of the investigation. These deficiencies noted that the separation of officers prior to their interview and any neighborhood canvass could not be verified; two civilian witnesses were not encouraged to provide a written statement; during the supervisory force investigation, five use of force interviews were conducted in a 16-minute time span, and leading questions were utilized by the supervisor when interviewing civilian witnesses. However, no mention was made that a group interview was conducted of the civilians. Despite these deficiencies, no material discrepancies were identified during the review of evidence, statements, or interviews. The BlueTeam entry indicated the full incident was captured by OBRD, but all of the reports clearly indicated that not all of the incident was captured due to the OBRD becoming dislodged, falling to the ground and becoming inoperative when the officer was overcoming the shoplifter's active resistance. Additionally, no records were found pertaining to the handcuffing and detainment of an Hispanic male (eventually released) who arrived near the scene well after the arrest of the shoplifter was effectuated.

## IMR-9-27 (Supervisory Use of Force Investigation)

APD received a call about a female being assaulted by a male who subsequently injected heroin and passed out in a stolen vehicle outside of a motel. As officers were responding, the suspect departed in the stolen vehicle and a Bernalillo County Sheriff's helicopter tracked the vehicle to the University of New Mexico Hospital. The suspect abandoned his vehicle and ran into the hospital. APD personnel (one sergeant and one officer) subsequently pursued the suspect into the hospital on foot and were guided by

various citizens and employees in the hallways as to the suspect's direction of flight. The sergeant and officer subsequently came around a corner at the end of a hallway and surprised the suspect hiding against the wall. Officers had their weapons drawn and used a show of force prior to making physical contact with the suspect, who actively resisted by not following instructions, reaching behind his back as to retrieve something, and spinning away from officers and attempting to flee. Officers used various empty-hand techniques (grab, push, restrain, take-down maneuvers) and a single elbow strike to justifiably apprehend and control the individual prior to handcuffing. Neither the suspect (who was subsequently charged with possession of methamphetamine and receiving a stolen vehicle) nor the officers were injured during this arrest. The sergeant who made contact with the suspect claimed to have activated his OBRD prior to giving foot pursuit, but his OBRD did not activate. The other officer's OBRD did capture the foot pursuit and eventual capture of the suspect. A supervisory canvass for witnesses was reportedly done by the sergeant involved in the foot pursuit, although no verification (*via* OBRD) was provided. No witnesses were revealed as a result of the canvass. However, hospital surveillance footage was obtained to show the suspect's flight and eventual capture, as well as the existence of various witnesses. No individuals observed on the hospital surveillance footage were interviewed during the supervisory investigation.

The Backlog Review Team's evaluative narrative of the supervisory use of force investigation detailed an extensive analysis of each use of force applied by the officers, notably more detailed than the original supervisory use of force investigation. The issue of the sergeant not activating his OBRD was noted in the lieutenant's investigation as a "concern," but he did not note any follow-up action taken. Another Lieutenant received the concern about the OBRD violation, but forwarded it to another lieutenant, who did not follow up on the OBRD policy violation. Despite this pervasive lack of follow-up on the OBRD violation, the reviewing commander wrote that any and all concerns were followed up by reviewing supervisors. Notably the violation was not documented on an Additional Concerns Memo (ACM) and never entered onto the sergeant's retention card.  In the final analysis, the chain-of-command had at least three opportunities to respond to noted errors.  It failed to act on any of these opportunities, instead letting the issue die in a bureaucratic *lassez faire* miasma.

APD's response to the events surrounding this use of force failed on multiple levels. Most egregiously, while the investigating lieutenant noted the OBRD lapse, the two reviewing lieutenants failed to take any action.  An analysis of the failure chain shows:

1.)  Failure at the initial sergeant's level—failure to activate the OBRD during a field investigation into a use of force;

2.)  Failure at the initial review of the sergeant's report—Failure to respond to the violation of OBRD protocols at the initial level of review (lieutenant1);

3).  Failure to follow up on the OBRD violation by lieutenant 2, who simply forwarded the issue to a third lieutenant (lieutenant 3);

4.) Failure to follow up on the forwarded issue of the OBRD violation by a third lieutenant (lieutenant3); and

5.) Failure of the Area Commander to note four failures of process by three lieutenants and a sergeant, all failures relating to OBRD policy.

The monitor finds this chain of events extremely troubling.  At the requirement of the CASA and the urging of the monitor, APD has developed a "defense-in-depth" for use of force reporting and review.  At the Area Command in question, this "defense-in-depth" failed five times, with failures at all levels of review.

It is not feasible that this in-depth failure was accidental, and instead, we believe, yet again, that this deliberate indifference is most feasibly attributable to the Counter-CASA effect at APD.

### IMR-9-28 (Supervisory Use of Force Investigation)

Two APD officers were working in one vehicle, en-route to a call when they observed what they believed to be a male breaking into a church. They made contact with the suspect (without notifying him of the purpose of the contact) and when attempting to conduct a pat-down frisk of the suspect, he immediately began to actively resist and use physical force against one of the officers. Together both officers used open-hand techniques to restrain and forcibly handcuff the suspect. Both the officers and the suspect received minor injuries. The original chain of command reviews found the use of force to be in compliance with APD policy. The Backlog Review Team also found the use of force to be in compliance with APD policy. During their contact with the suspect, the suspect remained agitated and uncooperative, refused to be interviewed about his injuries, and had to be put in a restraint system when officers were transporting him for processing.

One of the areas of concern noted in the APD review of this arrest was that the transporting officers did not all activate their OBRDs, nor did they properly notify a supervisor of placing a restraint system on the suspect. The investigating supervisor deemed these to be actionable after contacting Internal Affairs, who advised the supervisor that the officers have no prior history of violating the applicable SOP. The "Backlog Review UOF Investigative Data Plan" indicates 36 OBRDs were uploaded and viewed, but only 33 were listed below this statement. Thirty-two videos were provided for review to the monitoring team. The reviewing lieutenant did a diligent job in his review (particularly requesting additional information) as noted in the BlueTeam report. However, no review by any APD member mentions any video analysis that depicts an officer reaching up towards an OBRD at the same time the recording ceases during the physical contact with the suspect. Obviously, the monitoring team caught this discrepancy during their review of the randomly selected incident.  We see this as a critical omission by APD supervisory personnel.  In summary, this one incident was "processed" by overlooking at least five procedural errors:

60

1.  Only 92 percent of the OBRDs reportedly available for this incident appear to have been reviewed and documented by APD's supervisory personnel;

2.  Only 89 percent of the OBRDs reportedly available were forwarded to the monitoring team for review.

3.  None of the APD reviewers thought that seeing an OBRD deliberately turned off during the incident was worthy of mention or investigation;

4.  None of the 33 supervisory "reviews" managed to notice or report that, during the event, a restraint system was used on the arrestee; and

5.  None of the supervisory reviewers, apparently, found issue with the fact that OBRDs were turned off, or were never activated, during transport of the arrestee for processing.

Again, we see a system-wide failure at the Area Command in question, related to some significant issues.  A sole sergeant assumed the authority to deem policy violations inconsequential.  Four involved officers appeared to not have activated their OBRDs. One OBRD appeared to have been "lost," and the entire chain of command appears not to have noted an officer turning off his OBRD as soon as officers make physical contact with the individual.  These areas of concern apparently were missed by all levels of review at the Area Command, up to and including the Area Commander.  The monitoring team find these errors substantial and critical.

### IMR-9-29 (Supervisory Use of Force Investigation)

APD officers were dispatched to a commercial burglary at an AFD fire station, where it was reported that a suspect stole a pair of shoes from inside the building.  They were provided preliminary information concerning the crime and a description of a suspect. While officers searched the area, APD dispatch notified them that the victim of the burglary saw the suspect at a specific location within the city.   Officers responded to that location and located the suspect.  An APD officer approached the suspect to question him about the reported burglary.  He initially drew his Taser because of the suspect's demeanor, but then felt it would not be necessary.  The suspect became agitated at the initial approach of the first officer, stepped away, took a bladed stance and failed to follow directions.  A second APD officer was able to approach the suspect from behind and take him to the ground using a leg sweep.  The two officers handcuffed the suspect without using additional levels of force.  IAFD conducted a review of the investigation and determined that the levels of force used in the event were objectively reasonable and within departmental policy. The monitoring team agrees with that assessment. Within the documentation IAFD identified performance deficiencies concerning the first officer's approach to the suspect. Specifically, they determined that the officer could have better articulated why the suspect was being detained, which could have influenced the event away for the need to use force.  It was our judgment

that APD completed an objective and thorough review of this use of force and reached appropriate conclusions based on the facts.

As noted in the paragraphs of this report pursuant to ECWs (Paragraphs 24-36), several trends have been identified during supervisory use of force investigations that can undermine APD's recent notable efforts to improve its ability to address CASA compliance. In order to reduce redundancy, those specific trends and observations will not be restated here. However, a number of other areas give rise for concern, since they relate to specific feedback we provided APD in the past that deserve to be reiterated. A growing number of case reviews reveal what appears to be a pattern of officers muting their OBRDs audio at various times when interacting with detained individuals and members of the public. Additionally, the number of cases where OBRDs are not recording, or cease to record, is a matter of concern. Of particular concern is when an officer appears to reach to the area of the OBRD at a critical moment, the recording ceases or is muted, and the investigating supervisor does not address this in a meaningful way. Instances we observed occurred after a use of force where officers were seen together and not separated. In one video, an officer approached a group of officers (one was a supervisor) who can be heard discussing the use of force and suddenly the audio goes silent. (IMR-9-30).

We are deeply concerned about the use of Additional Concerns Memos (ACMs) to address blatant policy and rule violations, rather than referring them to Internal Affairs for investigation and appropriate agency action. This decision is problematic. In one case reviewed during this period, supervisory personnel made numerous recommendations for follow-up on deficiencies. These concerns never made their way into an ACM, thus portraying another problematic aspect of APD's dilemma in dealing with policy violations, and more importantly not appropriately documenting policy violations by officers. ACMs are being used as an alternative to processing policy failures and directly informing officers that their actions were unacceptable. ACMs, as currently used by APD, "hide" an important and sometimes serious array of policy violations. We recommend they be eliminated, and that all IA and supervisory investigations be thorough, complete, and fair.

The verification of a supervisory investigator's neighborhood canvassing efforts has been challenging for APD, to date. APD needs to explore how to provide objective proof that can be audited to provide tangible evidence that a neighborhood canvass was conducted. This is extremely important, especially when surveillance or OBRD recordings reveal persons in the area of a police action and APD investigators note their canvass efforts revealed no witnesses or persons in the area. Over the last two monitoring periods, the monitoring team has noted a number of persons at the scene of police actions that are detained, placed in handcuffs, searched, placed into a police vehicle without any details provided to the detained person, without any basis for a criminal charge (and no charges are filed), and the detainment is not articulated in a report. This is simply an unacceptable process, and it should be the focus of serious effort at APD to regularize an acceptable resolution that is constitutional and conforms to the CASA.

We have seen positive strides by APD with respect to handling uses of force, including instances where the use of force review chain of command has documented performance issues, policy violations and miscategorized uses of force.  It is reasonable to believe that if the monitoring team is encountering problems in the cases we review, the issue is significant enough to warrant a close assessment of use of force cases that do not currently fall under the responsibilities of the IAFD.  For the next reporting period we will focus our attention on APD's approach to assessing use of force cases that do not ordinarily fall to the IAFD to investigate.  The reform effort will be influenced by APD's ability to call out policy violations fairly, immediately make referrals to IA when they are found, and confront issues with legitimate accountability.  Based on our review, we have determined Primary Compliance should be continued for this series of paragraphs.

Given our numerous documented concerns with the OBRD processes described above, we urge APD to institute an internal review of OBRD implementation, most suitably by the Performance Metrics Unit.  We have deep concerns that OBRD policy is being changed at the street and command levels, in contradistinction to established and CASA-required intent and current policy.  This is a critical issue!

### 4.7.28 Assessing Compliance with Paragraph 41:  Use of Force Reporting Policy

Paragraph 41 stipulates:

> **"APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices. The use of force reporting policy will require officers to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force. Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor. This reporting requirement also applies to off-duty officers engaged in enforcement action."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.29 Assessing Compliance with Paragraph 42:  Force Reporting Policy

Paragraph 42 stipulates:

"The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the investigation. The written or recorded narrative will include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject's behavior; (d) the level of resistance encountered; and (e) a description of each type of force used and justification for each use of force. Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force."

**Results**

Primary:       **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.30 Assessing Compliance with Paragraph 43:  Reporting Use of Force Injuries

Paragraph 43 stipulates:

"Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action."

**Results**

Primary:       **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.31 Assessing Compliance with Paragraph 44:  Medical Services and Force Injuries

Paragraph 44 stipulates:

"APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle."

**Results**

Primary:       **In Compliance**

64

Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.32 Assessing Compliance with Paragraph 45:  OBRD Recording Regimens

Paragraph 45 stipulates:

> **"APD shall require officers to activate on-body recording systems and record all use of force encounters.  Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination."**

**Results**

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.33 Assessing Compliance with Paragraph 46:  Force Investigations

**Paragraph 46 stipulates:**

> **"All uses of force by APD shall be subject to supervisory force investigations as set forth below. All force investigations shall comply with applicable law and comport with best practices. All force investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy."**

**Results**

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.34 Assessing Compliance with Paragraph 47:  Quality of Supervisory Force Investigations

Paragraph 47 stipulates:

> **"The quality of supervisory force investigations shall be taken into account in the performance evaluations of the officers performing such reviews and investigations.**"

**Results**

Primary:       **In Compliance**

Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.35 Assessing Compliance with Paragraph 48:  Force Classification Procedures

Paragraph 48 stipulates:

> **"APD agrees to develop and implement force classification procedures that include at least two categories or types of force that will determine the force investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to optimize APD's supervisory and investigative resources on uses of force. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents: (a) officer-involved shootings; (b) serious uses of force as defined by the Memorandum of Understanding; (c) in-custody deaths; and (d) other incidents resulting in death at the discretion of the Chief."**

**Results**

Primary:      **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.36 Assessing Compliance with Paragraph 49

Paragraph 49 stipulates:

> **Under the force classification procedures, serious uses of force shall be investigated by the Internal Affairs Bureau, as described below. When a serious use of force or other incident is under criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Bureau will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Task Force shall periodically share information and coordinate with the Internal Affairs Bureau, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of serious uses of force. Uses of force that do not rise to the level of serious uses of force or that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force.**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.37 Assessing Compliance with Paragraph 50:  Supervisory Response to Use of Force

Paragraph 50 stipulates:

> **"The supervisor of an officer using force shall respond to the scene of the use of force to initiate the force investigation and ensure that the use of force is classified according to APD's force classification procedures.  For serious uses of force, the supervisor shall ensure that the Internal Affairs Bureau is immediately notified and dispatched to the scene of the incident."**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.38 Assessing Compliance with Paragraph 51:  Self-Review of Use of Force

Paragraph 51 stipulates

> **"A supervisor who was involved in a reportable use of force, including by participating in or ordering the force being reviewed, <u>shall not</u> review the incident or Use of Force Reports for approval."**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.39 Assessing Compliance with Paragraph 52:  Supervisory Force Review

Paragraph 52 stipulates:

> **"For all supervisory investigations of uses of force, the supervisor shall:**
>
> **a) Respond to the scene, examine all personnel and subjects**

67

of use of force for injuries, interview the subject(s) for complaints of pain after advising the subject(s) of his or her rights, and ensure that the officers and/or subject(s) receive medical attention, if applicable.

b) Identify and collect all relevant evidence and evaluate that evidence to determine whether the use of force was consistent with APD policy and identifies any policy, training, tactical, or equipment concerns;

c) Ensure that all evidence to establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;

d) Ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses are to be encouraged to provide and sign a written statement in their own words;

e) Ensure that all officers witnessing a use of force incident by another officer provide a use of force narrative of the facts leading to the use of force;

f) Separate all officers involved in a use of force incident until each has been interviewed and never conduct group interviews of these officers;

g) Ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;

h) Conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;

i) Utilize on-body recording systems to record all interviews;

j) Review all use of force narratives and ensure that all Use of Force Reports include the information required by this Agreement and APD policy;

k) Consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;

l) Make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects;

m) Obtain a unique tracking number; and

**n) Where a supervisor determines that there may have been misconduct in the use of force, immediately notify the Area Commander and the Internal Affairs Bureau."**

## Results

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**


## 4.7.40 Assessing Compliance with Paragraph 53:  Force Review Timelines

Paragraph 53 stipulates:

**Each supervisor shall complete and document a supervisory force investigation Force Report within 72 hours of completing the on-scene investigation. Any extension of this 72-hour deadline must be authorized by a Commander. This Report shall include:**

**a)  all written or recorded use of force narratives or statements provided by personnel or others;**

**b)  documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**

**c)  the names of all other APD employees witnessing the use of force;**

**d)  the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options; and**

**e)  documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.**

**Results**

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.41 Assessing Compliance with Paragraph 54:  Command Review of Force

Paragraph stipulates:

> **Upon completion of the Use of Force Report, investigating supervisor shall forward the report through his or her chain of command to the Commander, who shall review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The Commander shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.**

**Results**

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.42 Assessing Compliance with Paragraph 55:  Force Review Evidence Standard

Paragraph 55 stipulates:

> **"Where the findings of the Use of Force Report are not supported by a preponderance of the evidence, the supervisor's chain of command shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation. The supervisor's superior shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. Commanders shall be responsible for the accuracy and completeness of Use of Force Reports prepared by supervisors under their command. "**

**Results**

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.43 Assessing Compliance with Paragraph 56:  Force Review Quality

Paragraph 56 stipulates:

> **"Where a supervisor repeatedly conducts deficient supervisory force investigations, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules. Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force investigation immediately and notify the Internal Affairs Bureau and the Chief. The Internal Affairs Bureau shall immediately take over the administrative."**

**Results**

Primary:          **In Compliance**
Secondary:     **Not In Compliance**
Operational:   **Not In Compliance**

### 4.7.44 Assessing Compliance with Paragraph 57:  Force Review Board

Paragraph 57 stipulates that:

> **"When the Commander finds that the supervisory force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board. The Force Review Board shall review the supervisory force investigation to ensure that it is complete and that the findings are supported by the evidence. The Force Review Board shall ensure that the investigation file is forwarded to the Internal Affairs Bureau for recordkeeping."**

**Results**

Primary:          **In Compliance**
Secondary:     **Not In Compliance**
Operational:   **Not In Compliance**

### *4.7.44.1 Assessments for Paragraphs 41–57:*

A careful review of paragraphs 41-57 reveals systemic failures in force review at APD.

71

We see it as critical that APD analyze our findings for paragraphs 41-57 and identify the problems, issues, needs and solutions associated with these systemic failures.  In the monitoring team's experience, many of the failures discussed in paragraphs 41-57 are more likely than not attributable to past failures in training assessment, training development, and training delivery.  APD has hired a new training director who, unlike previous training directors at the agency, has an understanding of the technical training process, and the complexity of training a viable staff for police service delivery.  Still other issues relating to APD's performance in paragraphs 41-57 quite simply are attributable to poor supervision and a lack of will to call poor performance when it is seen on the part of field managers and command personnel.

Weak "command and control" of use of force is another contributing factor to APD's field commands' failures to call improper use of force or poor tactics leading to use of force when it occurs. The recommendations that follow for shortfalls we have observed in the field relative to paragraphs 41-57 need to be prioritized and processed swiftly.  The issues noted in paragraphs 41-57 are at the heart of the CASA, and it is clear to the monitor that APD's failures in these areas are attributable to the lack of will in the supervisory and field management cadres at APD.  The CASA requires a change in attitude and performance at the supervisory (sergeant), management (lieutenants), and command (commanders) levels of the agency.  Until APD can change the way these field level segments think, process, and assess in-field uses of force, APD will struggle to gain compliance on the most central segments of the CASA.

### *Recommendations for Paragraphs 41 – 57:*

*4.7.28 - 44a: For the Area Command in question, develop documented and evaluated training regarding use of force, use of force reporting policy, supervision, and remediation of poor performance.*

*4.7.28 - 44b: For the Area Command in question ensure that the training developed conforms to the CASA, national standards and the extensive and intensive advice provided to APD (both in writing and in person) by the monitoring team.*

*4.7.28 - 44c: For the Area Command in question, monitor the delivery of the approved training processes intensively.  We have noted, in the past, that some SMEs at APD have a tendency to "leave the script" and support training processes that are not reflective to the intent, spirit, and fabric of the training practices developed by Academy leadership, APD leadership, and the monitoring team.*

*4.7.28 - 44d:  Ensure that testing covers the critical deficiencies noted in in-field performance, especially relating to supervision and management of use-of-force practices in the field.*

*4.7.28 - 44e:  Ensure that this training conforms to monitor-approved training plans.*

72

***4.7.28 - 44f:  Ensure that testing protocols are designed to measure learning on critical points of the training process and are reasonably designed to identify weakness in the training design.***

***4.7.28 - 44g:  Plan for mid-course corrections after each session of use of force training is delivered, using a test-for-learning processes that provide notice to the Academy if training is not as effective as anticipated.***

***4.7.28 - 44h:  Implement mid-course corrections between classes, and if the learning failures are significant and on the critical path for effective use of force practices in the field, remediate via retraining process, such as video segments, written updates, etc.***

***4.7.28 - 44i:  Conduct follow-up assessments concerning the efficacy of the training as supervisors begin implementing training received when they return to the field.***

***4.7.28 - 44j:  Where those follow-up assessments identify supervisors who are not following policy and training, develop immediate intervention practices to document failed supervisory processes, mentor sergeants, lieutenants and commanders who fail to follow practice, and follow-up to ensure intervention has been successful.***

### 4.7.45 Assessing Compliance with Paragraph 58:  Reassignment of Force Review

Paragraph 58 stipulates that:

> **"At the discretion of the Chief, a supervisory force investigation may be assigned or re-assigned to another supervisor, whether within or outside of the Command in which the incident occurred, or may be returned to the original supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing."**

### Results

Primary:        **In Compliance**
Secondary:      **Not In Compliance**
Operational:    **Not In Compliance**

***Recommendations for Paragraph 58:***

***4.7.45a:  Develop an early intervention system that triggers alerts when clusters of poorly investigated use of force incidents arise, and address these issues early with Area Command staff, requiring Commanders affected to develop and implement written "Intervention Plans" designed to identify the causes of failure and remediate those causes systematically.***

***4.7.45b:  Routinely monitor the intervention process for integrity to the proffered plans.***

## 4.7.46 Assessing Compliance with Paragraph 59:  Abuse of Force Discipline

Paragraph 59 stipulates:

> **"Where, after a supervisory force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

**Results**

> Primary:        **In Compliance**
> Secondary:   **Not In Compliance**
> Operational:  **Not In Compliance**

***Recommendation for Paragraph 59:***

***See recommendations 4.7.44.1a-4.7.44j, above.***

## 4.7.47 - 4.7.64 Assessing Compliance with Paragraph 60-77:  Force Investigations by the Internal Affairs Bureau

Paragraphs 60–77 of the CASA address requirements that APD respond to and investigate serious uses of force, as follows:

Paragraph 60: IAB Force Review
Paragraph 61: Criminal and Civil Force Investigations
Paragraph 62: Revision of IAB Manual
Paragraph 63: IAB Staffing
Paragraph 64: Training IAB Personnel
Paragraph 65: Referral of Force Investigations to MATF
Paragraph 66: MATF Assistance to IAB
Paragraph 67: Notice to External Agencies of Criminal Conduct in Use of
          Force
Paragraph 68: Consultation with External Agencies and Compelled
          Statements
Paragraph 69: IAB Responsibilities in Serious Uses of Force
Paragraph 70: Use of Force Data Reports
Paragraph 71: IAB Investigative Timelines

Paragraph 72: IAB Report Review
Paragraph 73: IAB Findings Not Supported by Preponderance of the
      Evidence
Paragraph 74: IAB Quality Control
Paragraph 75: IAB Quality Control (Force Review Board)
Paragraph 76: Force Investigations by MATF or FBI
Paragraph 77: Discipline on Sustained Investigations

As with other reporting periods, the monitoring team spent significant time working with APD's Compliance Bureau and Force Division personnel during its November 2018 site visit.  We met with enlisted and civilian members alike and found a genuine level of receptiveness and a sincere interest in attaining CASA compliance.

During our November 2018 site visit, the monitoring team met with members of Internal Affairs--Force Division and had an opportunity to review the 2018 enhanced training held for primarily newly assigned members to the Force Division. This training, building on the 2017 CIRT training, focused on role-specific training relative to reviewing the extensive backlog of use of force investigations. This role-specific training has had an immediate positive impact on the review of the backlogged use of force cases.

At the end of the monitoring period, forty percent (121 cases) of the 304 backlogged cases have been reviewed by the Force Division. This review to date identified 17 cases involving the out-of-policy uses of force, a 14 percent error rate in the existing system. Three of the cases revealed officer conduct that resulted in APD referring the cases to be reviewed for possible criminal conduct. One of these out-of-policy cases involved an officer (determined to be one of APD's top users of force) who had multiple use of force cases (backlogged and non-backlogged) pending. APD, increasingly recognizing its risks due to the nonconformance to its policies by a disproportionately small number of officers, reviewed this officer's cases in aggregate. Based upon an administrative resolution to adjudicate this officer's cases consistent with SOP 3-41, APD subjected this officer to a multifaceted intervention, inclusive of discipline.[32]

The initial intervention resulted in the removal the officer from uniformed patrol within Field Services, and placement in an administrative position. The officer received a suspension and additional suspension time held in abeyance. Prior to returning to patrol, the officer will receive training on tactics, policy, and practices related to the observed SOP violations. Following the completion of training and an executive review that clears the officer to return to patrol, the officer will be placed on a performance improvement plan for a period of one year (with intermediate and final reviews). A fitness for duty examination will provide additional input before a final decision is made to reassign the officer back on uniformed patrol. Successful completion and outcomes from the enumerated steps of this intervention will also serve to mitigate the suspension

---

[32] The monitoring team discussed this specific case with the Commander of IAFD and will continue to monitor the outcome of discipline that was imposed.  It is our understanding that discipline imposed by the Chief is under appeal.

time held in abeyance for this officer and the potential cumulative disciplinary consequences of the officer's pending cases.

The handling of this matter serves as an exemplar of how APD has evolved recently in the identification of problems and risks and how they take definitive steps to mitigate these risks to protect the public, the police agency, as well as the careers of individual officers. APD's Force Division recognized that officers involved in cases on the backlog list of use of force cases also had more contemporary use of force cases pending. Rather than examine the backlogged cases in isolation from more recent use of force cases, the Force Division took a more holistic approach to examine officer activities in an effort to reduce APD's overall risk environment.  Based on this analysis and ultimately the prioritized investigation of multiple cases involving this officer, any continuation of the noncompliant officer's actions apparently was halted, and appropriate interventions were proposed to mitigate future non-compliant behavior. While this is extremely important for obvious reasons, it should be noted that APD's analysis of backlogged use of force cases revealed various cases of out-of-policy use of force by 16 different officers. A review of all pending use of force cases (inclusive of contemporary use of force cases through the end of IMR-9) revealed these 16 officers were involved in a total of 35 cases. Almost all (91%) of these cases have been reviewed to date. At the end of IMR-9 (January 31, 2019) this analysis was conducted again to include the most recent use of force cases. As a result of the renewed analysis, nine more cases were added to the 35 previously identified cases. This level of review demonstrates APD's recursive, proactive actions to identify and positively impact problems before they occur. This pattern of intuitive learning and action consistent with quality loops, if replicated throughout APD, could significantly reduce risks and their adverse consequences for the organization.

While the need to be detailed in the review of use force cases is self-evident, it is equally apparent that the need to become proficient with the detailed investigations of serious use of force matters is proving to be challenging to APD, with respect to contemporary investigations. Paragraph 71 of the CASA requires APD to "complete administrative investigations within two months after learning of the use of force." During IMR-9 (data current through January 16, 2019), APD recorded 46 cases involving the serious use of force by its members. Only three of these investigations (approximately 7%) were deemed to be completed by mid-January 2019. The average completion time for these three cases was 140 days; more than double the maximum time allowed. When compounded with initial failures by field supervisors to properly categorized uses of force as serious, the concern for timeliness for these cases to be completed is obvious.[33]

We have stated in previous reports that delays in the comprehensive investigation of use of force incidents (backlogged cases as well as the investigation of contemporary

---

[33] We commented in Paragraphs 41-59 on several serious uses of force that were improperly categorized when they initially occurred.  While identified within the chain of command reviews, it is unclear if what the monitoring team was provided constitutes all miscategorized cases.  It also reveals that these cases did not result in a response to the scene by CIRT, thereby influencing the quality of the investigation.

cases) significantly impedes the ability of APD to react to policy violations when force is used. In assessing compliance with Paragraphs 41-59 and other Paragraphs in this report, we have already noted that APD has not convened a Force Review Board since November 2017 to review use of force matters.  As it relates to Paragraph 75 and the requirement to forward completed cases to the Force Review Board, the completed cases are now backlogging at the back end of the force investigation process. This exacerbates the workload for APD's oversight processes to ensure the quality and rigor of these investigations.  It also creates a disciplinary quagmire that severely impedes APD's ability to impose discipline for even the most severe of policy violations.  The implications for Operational Compliance efforts moving forward are self-evident.  It is difficult for us to overstate the dangers of these outcomes to the effectiveness of APD's compliance attempts.

As noted in Paragraphs 41-59 of this report, while on-site, a meeting was held with members of the monitoring team, APD command staff, the City of Albuquerque, USA and DOJ staff to discuss two specific issues we see as key illustrations of obstacles to compliance: 1) Additional Concern Memos (ACMs) being improperly used to address policy and misconduct that should be elevated to Internal Affairs, and 2) incorrect interpretations of when a timeline begins for the imposition of discipline for sustained policy violations.  Failing to properly remediate performance deficiencies and tepid responses to policy violations will impede reform efforts.

This may well be the central critical threat to APD as it attempts to attain full compliance.  We see this threat as exigent and imminent.

We have commented extensively that policy violations that should be reported to Internal Affairs are instead often being handled at Area Commands and are often handled by ACMs.  These ACMs have been found to contain information that clearly required Internal Affairs referrals.  ACM' are a poor mechanism to track aggregated data that can be used for performance plans and an EIRS.  To its credit, APD has acknowledged this practice is creating issues for the agency and has committed to ending the use of ACMs entirely.  However, at this time, ACMs are simply the mechanism by which IA referrals have historically been avoided by the Counter-CASA proponents at APD.  Regardless of what system is put in place, or what form is used, without empowering and requiring officers and supervisors to make immediate referrals to IA when indicated by the facts, and legitimately holding officers accountable when they don't, abolishing the ACM will be meaningless.  As APD encounters memoranda that contain violations that should have been referred to IA, or uncover new policy violations themselves, they must have a plan to address past transgressions and determine how policy violations will be handled moving forward.[34]  We provided APD with perspective and exemplars of how APD's IA could establish itself as the centerpiece of APD's policy and misconduct oversight system.  The more IA leans in to that responsibility, the sooner APD will be successful in its compliance efforts.

---

[34] At times we see a focus on policy violations related to uses of force, but not on reporting, investigatory and proper categorization failures on the part of supervisors or command personnel.  Without true accountability measures throughout the system there will be little incentive to reform practices in the field.

We progressively have had concerns about the "ACM" process and the tendency of some at APD to use this as a "heat sink" where obvious transgressions can go to fade into the background.  Until APD takes steps to end the ACM process, and, when appropriate, to call into question formally previous behavior that violates internal policy and the CASA, we are reasonably certain that the ACM process will continue to be a stumbling block on the path to compliance.

To illustrate issues that are still occurring in the field, we noted in Paragraphs 41-50 a number of internal memoranda in which the APD chain of command documented instances of serious uses of force that were not properly reported or categorized by field supervisors, which adversely impacted the investigation.[35]  Examples we saw included, failing to report a neck hold (IMR-9-13and IMR-9-14), cases where three (3) or more applications of an ECW were not immediately reported as a serious uses of force (IMR-9-15and IMR-9-16), an instance where a suspect was attempting to evade arrest on a bike and a sergeant used his vehicle to block his path which was handled as an accident instead of a serious use of force (IMR-9-17), a case where an officer forcefully swung a handcuffed suspect into the side of a patrol vehicle that was not reported as a serious use of force (IMR-9-18),[36] a case where an officer struck a subject in the head multiple times that was not initially reported by the officer or caught by a supervisor for a CIRT response to the scene (IMR-9-1907), and instances where an ECW struck a person in the face or throat (IMR-9-20 and IMR-9-21).  We were provided ACMs that captured an instance of prisoner escape (IMR-9-22), an officer who struck a vehicle when responding to a location and left the scene (IMR-9-23)[37], an instance when an officer's patrol vehicle was stolen from the Prisoner Transport Center (IMR-9-24)[38], and an unreported use of force (IMR-9-25).

The collection of scenarios and potential policy violations contained in these memoranda illustrate a few important points.  First, the importance of ensuring immediate interaction with IA and the proper interpretation of when the timeline for discipline begins (As per SOP 3-41) is critical.  Second, there is still significant progress to be made in the field with respect to the proper reporting and investigation of uses of force.  Third, these types of events should inform training programs APD intends to

---

[35] The monitoring team did not complete a comprehensive review of these instances to report on final outcomes.

[36] A lieutenant who identified this failure to report a serious use of force prepared a comprehensive internal memorandum documenting his efforts and opinions.

[37] This officer was reportedly responding to a business establishment owned by a relative.  She reported experiencing brake failure when approaching a light and struck a curb but said she did not realize she also struck another vehicle.  The event was later called in as a hit and run accident.  We were not provided accompanying documentation to assess the underlying investigations, but the issue was not raised to IA and was instead handled with verbal counseling.  It is also unknown if the issue with the patrol vehicle's brakes was ever resolved.  We reinforce the common knowledge:  hit and run incidents by on-duty police officers are not appropriately handled by verbal counseling.  Full and complete investigation, and where appropriate, remedial discipline are required.

[38] In this case a lieutenant made a BlueTeam entry and requested an IA number "…so I can investigate any wrongdoing by (officer) of if it is an equipment issue/failure…"  The careful reader here can easily detect the cover-up attempt by the lieutenant, which is a common theme of the counter-CASA effect.

develop for its new use of force policies.  As we understand the new policies, IAFD will assume the primary investigative role for most uses of force.  However, if improper reporting of force occurs in the field then APD's compliance efforts will stall.  We will not reiterate here all that was written in Paragraphs 41-59, but we recommend that IAFD consider that narrative as it contemplates assuming responsibility for initial use of force and serious use of force investigations.  There is important information contained within the data the monitoring team was provided that will help inform future decisions and planning efforts.

To put it bluntly, ACMs have become the favorite tool of those members of APD who are part of the Counter-CASA contingent.  APD should take immediate and definitive steps to purge the use of ACMs from its conduct review systems.   An error needs to be called an error.  A refusal to comply needs to be treated as a refusal to comply.  Only then can remedial process affect the levels of non-compliance at APD.

Pursuant to Paragraphs 65, 66, and 76, certain CASA-defined uses of force can be assigned to the MATF for investigation. Consistent with Paragraphs 81-85 of this report detailing the instances when the MATF will respond to conduct criminal investigations, the monitoring team noted the participation of the MATF in nine APD cases (seven officer involved shootings; two in-custody deaths) during the latter months of 2018 that comprise this monitoring period.

During our November 2018 site visit, the monitoring team met with MATF members and continued examining various issues pertaining to their notification and consultation with the District Attorney's Office, the FBI, and/or the U.S. Attorney's Office when the use of force by officers exhibit indicia of criminal conduct. This was first amplified during the June 2018 site visit for IMR-8 when a member of the U.S. Attorney's Office arranged a meeting with various persons from APD to examine the details of APD's interactions with the District Attorney's Office. While meeting with APD members assigned to the MATF in November 2018, the monitoring team reviewed a flow chart that indicated the Violent Crimes Division (and ultimately the MATF) receives cases from Internal Affairs to review for criminality. Upon investigation by the MATF, if probable cause indicative of criminality is established, the flow chart indicates the MATF (or Violent Crimes Division) sends the case to the District Attorney for review and possible prosecution.

The monitoring team does not follow the logic of Internal Affairs abdicating their authority and continuity of control by authorizing the MATF to submit such a matter to the District Attorney after their review and determination. If this matter is an Internal Affairs case, any finding or determination of probable cause suggesting criminality should be forwarded back to Internal Affairs. At that point, a formal transmittal to the District Attorney should be prepared by Internal Affairs consistent with the authorization of the Chief of Police. This ensures the Chief of Police is appropriately apprised of personnel implicated in possible criminal activity and allows the Chief, as the appropriate authority, to authorize a referral to the District Attorney.

This analysis may seem a bit esoteric; however, in the monitor's opinion, the "old process" was simply an attempt to build yet another "hole" into which potential serious policy violations could fall.  This breach needs to be corrected immediately.

Paragraphs 70-74 deal with the quality of the investigative process of Internal Affairs. Notwithstanding the punctuality of serious use of force cases as highlighted by the backlogged cases, as well as the contemporary investigations, the monitoring team has observed the Force Division's significant efforts to improve the quality of use of force investigations, reviews, and the quality of the personnel assigned to these functions. At the same time, the efforts to resolve investigative inconsistencies and findings not supported by a preponderance of evidence have markedly improved over past monitoring periods. This improvement can be attributed to the clear direction and oversight of the supervision and command of the Compliance Bureau and Force Division of Internal Affairs. Directly attributable to this focused direction and oversight was the design and implementation of the onboarding process and training of newly assigned personnel to the Force Division.

As discussed in IMR-8, these processes and training (inclusive of audio recorded interviews, instruction, case reviews, tests, etc.) continued into IMR-9. Individuals scoring the lowest on the tests for assignment to the Force Division continue not to be selected for assignment. Additionally, based upon the turnover of personnel in Internal Affairs since 2017 and the training of all personnel (incumbent and newly assigned) in the new methodology of conducting force investigations, the quagmire of former Internal Affairs personnel (assigned prior to 2018) who failed tests associated with CASA training programs regarding use of force investigations has been resolved.

To reach Secondary Compliance, APD must demonstrate that it has adequately trained its Internal Affairs personnel on its own policies and protocols. Based on the records we reviewed starting in IMR-8 through this period, APD has demonstrated they have developed and delivered adequate training to effectively remediate testing failures of persons assigned to Internal Affairs back in 2017. Therefore, Secondary Compliance has been achieved for Paragraph 73 and 74.

Compliance Findings

Based on our review, we have determined Secondary Compliance is continued for Paragraphs 60 through 67, 69-72, and 76-77.  Paragraph 68 remains in Primary Compliance until evidence of training can be provided regarding compelled statements. Paragraph 75 is not in compliance, due to lengthy delay in impaneling a Force Review Board (since November 2017).  We expect this critical component to be on-line and functioning before the end of the IMR-10 reporting period.  Parenthetically, we note that APD's decision to temporarily discontinue the FRB, given the unacceptable problems experienced with the initial FRB process, was a good decision, creating time to craft solid policy, process and training.  While some may see this as delaying compliance, the monitoring team sees it as a legitimate and well-taken decision to halt a failed

system and craft a new, effective FRB system.  We laud APD for the courage it took to make this decision, rather than satisficing through an unworkable (exiting) FRB system.

### 4.7.47 Assessing Compliance with Paragraph 60:  IAB Force Review

Paragraph 60 stipulates that:

> **"The Internal Affairs Bureau shall respond to the scene and conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Bureau by the Chief. In cases where the Internal Affairs Bureau initiates a criminal investigation, it shall ensure that such investigation remains separate from and independent of any administrative investigation. In instances where the Multi-Agency Task Force is conducting the criminal investigation of a serious use of force, the Internal Affairs Bureau shall conduct the administrative investigation."**

**Results**

>Primary:      **In Compliance**
>Secondary:  **In Compliance**
>Operational: **Not In Compliance**

*Recommendation for Paragraph 60:*

*4.7.47a:  APD should continue its current planning processes related to re-constituting an effective FRB process.  We have reviewed work completed to date by the department regarding the reconstituted FRB, and find it methodical, based on lessons learned from other agencies working through consent decrees, and focused on past comments by the monitoring team related to FRB processes.*

### 4.7.48 Assessing Compliance with Paragraph 61:  Criminal and Civil Force Investigations

Paragraph 61 stipulates:

> **"The Internal Affairs Bureau will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60. The Internal Affairs Bureau shall include sufficient personnel who are specially trained in both criminal and administrative investigations."**

**Results**

APD IA processes focused on criminal and civil issues appear reasonably staffed given current workload.  Policies are reasonably crafted, and have been approved by the monitor.  What remains is simply a matter of working through the backlog in a persistent, methodical manner, ensuring the process produced effective, industry-standard work.   This will simply take time to resolve.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendation for Paragraph 61:***

***4.7.48a:  Continue to monitor internally the progress of the Internal Affairs in conducting effective intake, assessment, assignment, investigation, and resolution processes for criminal and civil investigations in order to ensure that staffing levels are appropriate and processes are effective in producing acceptable results.***

**4.7.49 Assessing Compliance with Paragraph 62:  Revision of Internal Affairs Manual**

Paragraph 62 stipulates:

> **"Within six months from the Effective Operational Date, APD shall revise the Internal Affairs Bureau manual to include the following:**
>
> **a)  definitions of all relevant terms;**
>
> **b)  procedures on report writing;**
>
> **c)  procedures for collecting and processing evidence;**
>
> **d)  procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;**
>
> **e)  procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;**
>
> **f)  scene management procedures; and**
>
> **g)  management procedures."**

**Results**

Primary:      **In Compliance**

Secondary:   **In Compliance**
Operational:  **Not In Compliance**

***Recommendation for Paragraph 62:***

***4.7.49a:  Continue work on revision and update of the IAB manuals, ensuring they comply with the CASA and best practices in the field.***

### 4.7.50 Assessing Compliance with Paragraph 63:  Staffing IAB

Paragraph 63 stipulates:

> **"Within ten months from the Effective Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Bureau to fulfill the requirements of this Agreement. APD shall ensure that all serious uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary. At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Bureau."**

**Results**

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

***Recommendation for Paragraph 63:***

***4.7.50a:  Identify the department's expected milestone date for staffing at IAB based on data related to incoming cases, average time for case completion, and calculations of the number of staff needed to effectively investigate incoming cases within established expected parameters.***

### 4.7.51 Assessing Compliance with Paragraph 64:  Training Force Division Personnel

Paragraph 64 stipulates:

> **"Before performing force investigations, Internal Affairs Bureau personnel shall receive force investigation training that includes, at a minimum, the following areas: force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene**

> technicians, the Office of the Medical Investigator, District
> Attorney staff, the Multi-Agency Task Force, City Attorney
> staff, and Civilian Police Oversight Agency staff; and
> investigative equipment and techniques. Internal Affairs
> Bureau personnel shall also receive force investigation
> annual in-service training."

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.52 Assessing Compliance with Paragraph 65:  Referral of Force Investigations to MATF

Paragraph 65 stipulates:

> **"Where appropriate to ensure the fact and appearance of
> impartiality and with the authorization of the Chief, APD may
> refer a serious use of force or force indicating apparent
> criminal conduct by an officer to the Multi-Agency Task Force
> for investigation."**

## Results

As we noted in our narrative on pp. 79 and following we have noted some concerns regarding the MATF process.  The monitoring team does not follow the logic of Internal Affairs being required to abdicate their authority and continuity of control by authorizing the MATF to review these cases and submit them to the District Attorney after their review and determination.  In our view, previous administrations have used this referral process to age complaints until they are past the deadline for discipline.  We note this paragraph is "permissive," as it reads "may refer" instead of "shall refer."  We suggest APD use this mechanism only when it is meaningful and necessary to receive an outside opinion on a problematic use of force.  That recommendation notwithstanding, the paragraph is written in a form that makes this requirement discretionary, depending on imprecise terminology, e.g., "where appropriate to ensure the fact and appearance of impartiality."  We have found no instances in which we have noted factual or apparent partiality in the MATF's findings.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.53 Assessing Compliance with Paragraph 66:  MATF Assistance to IAB

Paragraph 66 stipulates:

> "To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Internal Affairs Bureau or the Multi-Agency Task Force in the investigation of any serious use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs."

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.54 Assessing Compliance with Paragraph 67:  MATF Assistance to IAB

Paragraph 67 stipulates:

> "The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation."

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.55 Assessing Compliance with Paragraph 68:  Consultation with External Agencies and Compelled Statements

> "If the Internal Affairs Bureau determines that a case will proceed criminally, or where APD requests a criminal prosecution, the Internal Affairs Bureau will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186. No other part of the investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation."

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**

Operational:  **In Compliance**

### 4.7.56 Assessing Compliance with Paragraph 69:  IAB Responsibilities in Serious Uses of Force

Paragraph 69 stipulates:

> **"In conducting its investigations of serious uses of force, as defined in this Agreement, the Internal Affairs Bureau shall:**
>
> **a) respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;**
>
> **b)  ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;**
>
> **c)  ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses should be encouraged to provide and sign a written statement in their own words;**
>
> **d)  ensure, consistent with applicable law, that all officers witnessing a serious use of force by another officer provide a use of force narrative of the facts leading to the use of force;**
>
> **e)  ensure that all officers involved in a use of force incident remain separated until each has been interviewed and never conduct group interviews of these officers;**
>
> **f)  review all Use of Force Reports to ensure that these statements include the information required by this Agreement and APD policy;**
>
> **g)  ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;**
>
> **h) conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;**
>
> **i)  record all interviews;**
>
> **j) consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;**

**k) make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and**

**l) train all Internal Affairs Bureau force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors."**

## Results

APD has provided the policy and training components of this paragraph to IAB personnel.  What remains to be accomplished is consistent and persistent supervision and review to ensure that IAB findings are consistent with best practices.

Primary:          **In Compliance**
Secondary:        **In Compliance**
Operational:   **Not In Compliance**

*Recommendations for Paragraph 69:*

*4.7.56a:  Conduct detailed failure analyses for all IAB investigations deemed improperly completed.*

*4.7.56b:  Using these failure analyses, routinely modify training, procedures, practice and supervision/oversight until IAB findings are greater than 94 percent complete and adequate on each of the elements addressed in paragraph 69.*

## 4.7.57 Assessing Compliance with Paragraph 70:  Use of Force Data Reports

Paragraph 70 stipulates:

**"The Internal Affairs Bureau shall complete an initial Use of Force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force."**

## Results

Primary:          **In Compliance**
Secondary:   **In Compliance**
Operational:   **Not In Compliance**

*Recommendations for Paragraph 70:*

*4.7.57a:  Conduct a data analysis of Use of Force Data reports to determine why they take longer than 24 hours to process and develop recommendations to relieve the major bottlenecks affecting this process.*

*4.7.57b:  Ensure that any ECW errors noted based on the monitor's recommendations in response to identified issues with ECW usage are used to make changes to use of force data analyses moving forward.*

## 4.7.58 Assessing Compliance with Paragraph 71:  IAB Investigative Timelines

Paragraph 71 stipulates:

> **"The Internal Affairs Bureau shall complete administrative investigations within two months after learning of the use of force. Any request for an extension to this time limit must be approved by the commanding officer of the Internal Affairs Bureau through consultation with the Chief or by the Chief. At the conclusion of each use of force investigation, the Internal Affairs Bureau shall prepare an investigation report. The report shall include:**
>
> **a)  a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Internal Affairs Bureau's independent review of the facts and circumstances of the incident;**
>
> **b)  documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying Use of Force Data Reports. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**
>
> **c)  the names of all other APD officers or employees witnessing the use of force;**
>
> **d)  the Internal Affairs Bureau's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of**

88

force could have been avoided through the use of de-
escalation techniques or lesser force options;

e)  if a weapon was used by an officer, documentation
that the officer's certification and training for the
weapon were current at the time of the incident; and

f)  the complete disciplinary history of the target
officers involved in the use of force."

## Results

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not in Compliance**

*Recommendations for Paragraph 71:*

*4.7.58a:  Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing delay.  The review should:*

*a.  Identify key causes of failure;*
*b.  Identify where in the IAB process related to Paragraph 71 the failure points were;*
*c.  The cause of the failures; and*
*d.  Recommend actions to remedy the top five causes of failure to meet the established timelines.*

*4.7.58b:  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established timelines.*

*4.7.58c:  Determine if these processes need to be revised, expanded, or refocused given our comments re ECW usage failures in the field contained in paragraphs 24-36, 41-59, and 60-77.*

*4.7.58d:  Repeat until 95% of cases completed meet established requirements for quality of IA investigations.*

### 4.7.59 Assessing Compliance with Paragraph 72:  IAB Report Review

Paragraph 72 stipulates:

"**Upon completion of the Internal Affairs Bureau
investigation report, the Internal Affairs Bureau
investigator shall forward the report through his or her
chain of command to the commanding officer of the
Internal Affairs Bureau. The Internal Affairs Bureau**

**commanding officer shall review the report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance of the evidence standard. The Internal Affairs Bureau commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings. "**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 72:*

*4.7.59a:  Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing delay.  The review should:*

*a.  Identify key causes of failure;*
*b.  Identify where in the IAB process related to Paragraph 72 the failure points were;*
*c.  Identify the cause of the failures;*
*d.  Recommend actions to remedy the top five causes of failure to meet the established timelines;*
*e.  Revaluate performance and repeat the process, with a focus on supervisors who routinely fail to meet established timelines; and*
*e.  Repeat as necessary until the failure rate is below five percent.*

## 4.7.60 Compliance with Paragraph 73:  IAB Findings Not Supported by Preponderance of the Evidence

Paragraph 73 stipulates:

**"For administrative investigations, where the findings of the Internal Affairs Bureau investigation are not supported by a preponderance of the evidence, the Internal Affairs Bureau commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report. The commanding officer of the Internal Affairs Bureau shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it. The Internal Affairs Bureau commanding officer shall be**

> responsible for the accuracy and completeness of
> investigation reports prepared by the Internal Affairs Bureau."

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## Recommendations for Paragraph 73:

**4.7.60a:** *Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet established quality requirements regarding preponderance of the evidence by reviewing the key failure points causing insufficient investigations relative to preponderance of the evidence.  The review should:*

> *a.  Identify key causes of failure to meet preponderance of the evidentiary standards for IA investigations;*
> *b.  Recommend actions to remedy the top five causes of failure to meet the established requirements related to preponderance of the evidence.*

**4.7.60b:  Implement recommended actions and conduct continual follow-up assessment to determine what impact, if any, the implemented actions had on the unit's ability to meet established preponderance of evidentiary standards.**

**4.7.60c:  Repeat until 95% of cases completed meet established requirements regarding evidentiary standards.**

## 4.7.61 Assessing Compliance with Paragraph 74:  IAB Quality Control

Paragraph 74 stipulates:

> "Where a member of the Internal Affairs Bureau repeatedly
> conducts deficient force investigations, the member shall
> receive the appropriate corrective and/or disciplinary action,
> including training or removal from the Internal Affairs Bureau
> in accordance with performance evaluation procedures and
> consistent with any existing collective bargaining agreements,
> personnel rules, Labor Management Relations Ordinance, Merit
> System Ordinance, regulations, or administrative rules."

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

**Recommendations for Paragraph 74:**

**4.7.61a:** *Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet quality standards by reviewing the key failure points causing the failure.  The review should:*

> *a.  Identify key causes of failure;*
> *b.  Identify where in the IAB process related to Paragraph 74 the failure points were;*
> *c.  Identify the cause (of the failures); and*
> *d.  Recommend actions to remedy the top five causes of failure to meet the established timelines.*

**4.7.61b:  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established quality standards for IA investigations.**

**4.7.61c:  Repeat until 95% of cases completed meet established evidentiary standards.**

**4.7.62 Assessing Compliance with Paragraph 75:  IAB Quality Control**

Paragraph 75 stipulates:

> **"When the commanding officer of the Internal Affairs Bureau determines that the force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board with copy to the Chief."**

**Results**

> Primary:       **In Compliance**
> Secondary:   **Not In Compliance**
> Operational:  **Not In Compliance**

**Recommendations for Paragraph 75:**

**4.7.62a:** *Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet the requirement to forward the case to the FRB by reviewing the key failure points causing incomplete cases to be forwarded to the FRB.  The review should:*

> *a.  Identify key causes of failure;*
> *b.  Identify where in the IAB process related to Paragraph 75 the failure points were; and*

**d.  Recommend actions to remedy the top five causes of failure to meet the established protocols, e.g., training, supervision, staffing, etc.**

**4.7.62b:  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established evidentiary and quality standards.**

**4.7.62c:  Repeat until 95% of cases completed meet established evidentiary and quality standards.**

### 4.7.63 Assessing Compliance with Paragraph 76:  Force Investigations by MATF or FBI

Paragraph 76 stipulates:

> **"At the discretion of the Chief, a force investigation may be assigned or re- assigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations or may be returned to the Internal Affairs Bureau for further investigation or analysis. This assignment or re-assignment shall be confirmed in writing."**

### Results

We note that this paragraph is "permissive" in nature, not prescriptive:  it uses "may" instead of "shall."  We have noted no instances this reporting period in which a case was inappropriately assigned to the MATF or the FBI.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not Observable**

### 4.7.64 Assessing Compliance with Paragraph 77:  Discipline on Sustained Investigations

Paragraph 77 stipulates:

> **"Where, after an administrative force investigation, or a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Bureau or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate. The Chief need not delay the imposition of discipline until the outcome of the criminal investigation. In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that**

necessary training is delivered and that policy, tactical, or equipment concerns are resolved."

## Results

   Primary:    **In Compliance**
  Secondary:  **In Compliance**
 Operational:  **In Compliance**

## 4.7.65 Assessing Compliance with Paragraph 78:  Force Review Board Responsibilities

Paragraph 78 stipulates that:

> **"APD shall develop and implement a Force Review Board to review all uses of force. The Force Review Board shall be comprised of at least the following members: Assistant Chief of the Professional Accountability Bureau, the Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigations Bureau, a Field Services Major, the Training Director, and the Legal Advisor. The Force Review Board shall conduct timely, comprehensive, and reliable reviews of all use of force investigations. The Force Review Board shall:**

> **a)  review each use of force investigation completed by the Internal Affairs Bureau within 30 days of receiving the investigation report to ensure that it is complete and, for administrative investigations, that the findings are supported by a preponderance of the evidence;**

> **b)  hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident. The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Bureau investigation, shall not be present;**

> **c)  review a sample of supervisory force investigations that have been completed and approved by Commanders every 90 days to ensure that the investigations are complete and timely and that the findings are supported by a preponderance of the evidence;**

> **d)  order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings. For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;**

94

**e)  determine whether the use of force violated APD policy. If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;**

**f)  determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;**

**g)  document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation, or 15 days of the review of sample supervisory force investigation; and**

**h)  review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis."**

## Methodology

The monitor was unable to review or assess FRB findings for this reporting period, as the FRB has been "suspended" pending implementation of a restructuring and re-tasking plan.  Policy exists relating to restructuring.  Training is "pending."

## Results

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

### *Recommendation for Paragraph 78:*

*4.7.65a:  Implement the planned re-constitution of FRB, and, once adequate "product" is produced under pending FRB revisions, implement a process- and outcome-evaluation of the new FRB processes.*

## 4.7.66 – 4.7.67 Assessing Compliance with Paragraphs 79-80:  Annual Use of Force Reporting

### 4.7.66.1 Assessing Compliance with Paragraphs 79:  Annual Use of Force Reporting

Paragraph 79 states:

**At least annually, APD shall publish a Use of Force Annual Report.  At a minimum, the following information should be included in the Annual Use of Force Report:**

**a)  number of calls for service;**

95

b)  number of officer-initiated actions;
c)  number of aggregate uses of force;
d)  number of arrests;
e)  number of custodial arrests that involved use of force;
f)  number of SWAT deployments by type of call out;
g)  number of incidents involving officers shooting at or from
     moving vehicles;
h)  number of individuals armed with weapons;
i)  number of individuals unarmed;
j)  number of individuals injured during arrest, including APD
     and other law enforcement personnel;
k)  number of individuals requiring hospitalization, including APD
     and other law enforcement personnel;
l)  demographic category; and
m)  geographic data, including street, location, or Area Command.

Paragraph 79 of the CASA addresses requirements APD must meet by publishing a Use of Force Annual Report:

The monitoring team spent time providing perspective, feedback and technical assistance to APD during its November 2018 site visit.  As noted in IMR-8, in the past, the monitoring team requested data for show of force cases, as well as supervisory level use of force and serious use of force cases so we could conduct comprehensive reviews of those cases.   The purpose was to assess the nature of uses of force, to assess the quality of use of force reporting, and to ensure that proper supervisory force investigations are conducted.

We obtained valuable information in those reviews that has a direct impact on our assessment of the quality of data reporting at APD.  We have found multiple instances in which APD personnel failed to accurately report or investigate the force they used, which obviously impacts the veracity of statistics APD publishes in their Use of Force Annual Report.  We have noted in previous monitor's reports that, until APD officers completely and accurately report uses and shows of force, and until supervisors review those reports with an eye toward adherence to established policy, APD's use of force data will remain seriously problematic.  In the past year we have seen positive steps in this regard with respect to the Internal Affairs Force Division's (IAFD) investigation of the backlog of use of force investigations.  IAFD are identifying hundreds of policy violations, including unreported uses of force, in their work.  While we are encouraged by the thoroughness of the IAFD's work, we obviously are concerned with the legitimacy of statistics that are contained in aggregated data reports like the Use of Force Annual Report.

We have communicated to APD during this reporting period that APD must establish systems to capture data in these cases and reconcile these misreported events against other use of force statistics.  We were told that APD is in the final stages of publishing use of force annual reports for the years 2016 and 2017, and that the monitoring team would have an opportunity to review them during the next reporting period.

We have determined that APD maintains its Primary Compliance status for Paragraph 79.

**Results**

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 79:***

***4.7.66a:  APD should monitor use of force, serious use of force and show of force reporting discrepancies found as the IA Force Division reviews the backlog of cases.  Reporting errors must be reconciled to ensure that statistics published in the Annual Use of Force Reports are accurate.***

***4.7.66b:  Ensure that data regarding uses of force are accurate, and where trends are identified, solutions to issues are crafted.***


**4.7.67 Assessing Compliance with Paragraph 80**

Paragraph 80 states:

> **APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force investigations carried out by supervisors, the Internal Affairs Bureau, or Multi-Agency Task Force; and all force reviews conducted by the Force Review Board.  APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary.**

**Methodology**

As with past reporting periods, the monitoring team spent time providing perspective, feedback and technical assistance to APD personnel responsible for the tasks associated with these paragraphs.  As with past reporting periods, we found APD personnel to be receptive to our feedback.

**Results**

APD's capacity to build systems and processes that accurately collect, assess and analyze use of force data continue to mature, but more work is necessary.  APD has been unable to build a comprehensive and sustainable EIRS that can be relied upon to provide accurate data to inform decisions by supervisors and command level personnel.  As we have reported in the past, the monitoring team has identified multiple instances in

which serious uses of force, uses of force and shows of force have gone unreported by APD officers.  Likewise, supervisory efforts to address policy violations and performance issues of officers are often disconnected and many times these violations go unnoticed and without being addressed in any meaningful manner.  Most recently, APD acknowledged a failure on the part of SOD to report certain types of force, but they have been actively working toward remediating the issue.  The data analysis capabilities of APD are maturing rapidly through the Performance Metrics Unit (PMU), which is an extension of the Office of the Chief of Police.  We are encouraged with the manner in which PMU is conducting audits of APD units, and we believe that the byproduct of those audits will be better data with which to make CASA compliance determinations in the future.

APD's Internal Affairs Force Division is actively addressing a significant backlog of use of force investigations from 2017, and in the course of their work they are self-identifying significant numbers of unreported uses and shows of force.  APD has not conducted a Force Review Board of any kind since the fall of 2017, so an organization-level oversight of force has been virtually non-existent.  These facts all create considerable compliance issues with this paragraph.  Finally, APD has not submitted a Use of Force Annual Report to the monitoring team in three years. APD produced a Use of Force Annual Reports for 2016 after the close of this reporting period.   Data development for the 2017 report are nearing completion and are expected to be delivered to the Monitor in the IMR-10 reporting period.  APD expects the 2018 Use of Force Annual Report to be completed by the summer of 2019.

We understand that APD has made significant progress hiring a private vendor that provides a robust analytical system that will finally give APD a platform to assemble training, internal affairs, use of force, and performance data in a central repository.  The quality of any system is entirely reliant upon the quality of the data it receives.  The efforts underway at APD have the potential to help ensure the accuracy of data when their new system is finally launched. APD retains its Primary Compliance status with Paragraph 80.

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

***Recommendation for Paragraph 80:***

***4.7.72.1a: APD should monitor use of force, serious use of force and show of force reporting discrepancies found as the IA Force Division reviews the backlog of cases. Reporting errors must be reconciled to ensure that statistics published in APD's Annual Use of Force Reports are accurate.***

**4.7.68 – 4.7.72 Assessing Compliance with Paragraph 81 – 85: Multi-Agency Task Force (MATF) Participation by APD**

Paragraphs 81 – 85 of the CASA address requirements that APD continue to participate in the Multi-Agency Task Force, consult with the participating jurisdictions to establish investigative protocols for the task force, and generally consult and coordinate with the participating agencies regarding investigative briefings and the release of information relevant to MATF investigations.

APD members assigned to the MATF are now assigned from the Violent Crimes Division as opposed to the previous practice of being assigned from Internal Affairs. The MATF now only investigates officer-involved shootings, in-custody deaths, felonious force against officers, and criminal conduct cases resulting from a use of force by officers. This is reflected in a review of the 2018 MATF case log. APD continuously ensures personnel assigned to the MATF are full time detectives or supervisors with member agencies, ensures a representative of each member of the MATF is present during interviews of involved personnel, addresses perceived deficiencies in MATF investigations, and maintains the confidentiality of MATF investigations.

MATF protocols have evolved, and now address CASA requirements (e.g., canvass for and interview of witnesses, ensuring officers involved in a use of force incident remain separated until each has been interviewed and/or complete a report, etc.). This includes updated dispatch protocols for MATF notifications.

Based on our review, we have determined operational compliance should be continued for Paragraphs 81 through 85.

### 4.7.68 Assessing Compliance with Paragraph 81:  MATF Participation by APD

Paragraph 81 of the CASA stipulates:

> **"APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist. APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that govern the Multi-Agency Task Force are current and effective. APD shall ensure that the inter-governmental agreements are consistent with this CASA."**

**Results**

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

### 4.7.69 Assessing Compliance with Paragraph 82:  Investigative Protocols for the MATF

Paragraph 82 stipulates that:

> **"APD agrees to consult with participating jurisdictions to**

> **establish investigative protocols for the Multi-Agency Task Force. The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities."**

## Results

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.70 Assessing Compliance with Paragraph 83:  Coordination with MATF

Paragraph 83 stipulates:

> **"APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel."**

## Results

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.71 Assessing Compliance with Paragraph 84:  Briefing with MATF

Paragraph 84 of the CASA stipulates:

> **"APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force."**

## Results

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.72 Assessing Compliance with Paragraph 85:  Expiration of MOU re MATF

Paragraph 85 stipulates:

> **"If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding. This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in-custody deaths."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.73 – 4.7.75 Assessing Compliance with Paragraph 86-88: Review of Use of Force Policies and Training; Use of Force Training Based on Constitutional Principles; and Annual Supervisory In-Service Training.

Paragraphs 86-88 of the CASA address various training requirements that APD must meet related to use of force and the supervision of use of force by officers.  As with other reporting periods, the monitoring team has continued to provide perspective and technical assistance to APD's Training Academy, in particular during our November 2018 site visit.  During this monitoring period APD intended to apply past "lessons learned" and incorporate the extensive feedback that has been provided to the Academy through various modalities.  APD's past lack of training capacity has contributed significantly to organizational inefficiencies and the stagnant nature of compliance efforts related to training.[39]  However, with new leadership at the Academy, we see signs of progress and improvements in the sophistication of thought that is needed to positively impact APD's training programs throughout 2019.  A significant barrier to APD's ability to advance meaningful use of force training has been its inability to assimilate acceptable training components related to use of force that will affect officers' actions in the field.  Consequently, little has been accomplished toward APD's long-term compliance efforts with Paragraphs 86-88. Some positive advancements have occurred recently, as we note in the following pages.

The academy continues to create systems and build operational units that will benefit APD's training development skills.  However, work still is needed to ensure that there is legitimate academy oversight of CASA related training, and that training advanced by APD meets acceptable standards.  During this monitoring period, the monitoring team

---

[39] We note that we have met many academy instructors who are skilled at conveying information, and we have experienced positive "can-do" attitudes during each visit.  The historical lack of capacity mostly relates to significant administrative shortcomings we have encountered and documented in past reports.

has commented in writing on specific training materials APD advanced for our review[40], and the following paragraphs represent our findings related to Paragraphs 86-88.

During our November 2018 site visit, the monitoring team met with Academy staff responsible for the tasks associated with Paragraphs 86-88. We found the Academy personnel to be engaged in their responsibilities and very receptive to feedback. This was also our first opportunity to meet with APD's new Academy Commander. We commented in IMR-8 that there had been three changes in leadership at the Academy over the prior 12 months, which we saw as a significant issue toward reaching compliance in many force-related paragraphs. That lack of continuity significantly impacted APD training requirements and led to extensive inefficiencies and frustration among the Academy staff, and officers in the field. It has also made APD vulnerable to continued issues related to the proper performance of officers and supervisors in the field.

During the seventh monitoring period APD reached outside the organization and hired a new Academy Commander who brings an experienced background in training and curriculum development. We met with her during our November 2018 site visit and were impressed with her overall understanding of the potentially difficult road ahead regarding needs assessments and change processes needed at the Academy. In IMR-8 we recommended the new Commander reflect heavily on criticism, feedback and technical assistance provided in past monitor reports, as well as the numerous memoranda we have written regarding APD's training processes. We reiterate that recommendation in this (current) report. Until APD views training as a process, not an event, compliance on many key elements of the CASA will remain elusive.

We want to note one perspective the Commander shared that we were encouraged to hear. The monitoring team has commented extensively in past reports that APD will continue to struggle in their compliance efforts until they appropriately respond to situations where policy violations are found. One such area that we have discussed on multiple occasions is the proper use of OBRDs ("Body Cameras"). The Commander noted that the Academy is receiving training requests from the field for officers who fail to activate their OBRD's appropriately, where in her opinion, failures, in most cases, are not training issues. We completely agree. Activation of OBRDs is a binary choice: "on" or "off." In our opinion there are a finite number of these cases where an officer truly needs training to comply with OBRD policies. The failures we have observed are more appropriately categorized as supervisory problems. Accountability through other types of corrective processes, e.g., counseling by field supervisors, incident-based corrective measures, and discipline are more likely to curb non-compliance with OBRD policies, and that will free the Academy to address issues that can be fixed through formal training. We caution APD again, to engage in a more sophisticated problem analysis process and identify the true cause of human-system failures.

---

[40] The monitoring team approved SOD training related to their Risk Assessment Matrix (RAM), as well as "gap training" meant to remediate use of force training gaps that have lingered for the past two years.

In our experience with APD in the past, the problem lies, in most issues, with supervision, not training. This anomaly has permeated APD in the past: blaming policy, training, equipment, staffing: anything but supervision and command, who actually should bear the brunt of failures observed in APD's field service delivery processes.

The monitoring team did sense a degree of frustration by some members of the Academy staff with implementing the 7-Step training cycle, so we spent additional time providing perspective and technical assistance to help them apply this new (to APD) process of training. We understand that, like any new business process, there will be some growing pains, but over time the Academy's use of a systematic approach will help ensure they are routinely meeting the organization's unique training needs. Even with the expected learning curve, APD seems committed to implementing the 7-Step Training Cycle. Parenthetically, we also sensed frustration among non-academy personnel who are attempting to advance their training programs through the 7-Step Cycle. As competency grows within the Academy, so too will the competency in the field --- with regular guidance when training materials are submitted. APD will then see an increase in the quality of their training products and better timeliness of training approvals. It will take a concerted effort by all APD personnel concerned with training requirements to work closely with the Academy to ensure standards that have been set are being met.

The Academy has instituted a new unit, entitled the "Comprehensive Training Unit" (CTU) that will be responsible for managing the 7-Step Training Cycle, which includes the oversight of training "quality control". We emphasized the importance of empowering this specific unit with the Academy Commander. With proper support and staffing, the monitoring team sees this unit as having the potential to coach Academy personnel, as well as external commands, through APD's compliance efforts.[41] We have seen in other agencies how a unit of people who are fully committed to assessing training materials (against CASA requirements) can have a profound impact on compliance efforts. With the new Academy Commander, there has already been an increase in the overall quality of lesson plans; thus, we expect the CTU will be key in managing the higher expectations at the Academy. It will be incumbent upon CTU supervisors to call out and document shortcomings that are found in training curricula before they are advanced to the monitoring team or into a training room.

The monitoring team encountered one example in which the oversight of training initially broke down, but that issue has since been remedied. During our January 2018 site visit the monitoring team reviewed videos that the Academy produced to address certain training gaps related to un-resisted handcuffing and neck holds. The purpose of the Academy showing the videos at the time was because the (then) Academy Commander was interested in getting initial impressions from the monitoring team. We commented then, and numerous times since, that the quality of the videos was far better than we

---

[41] The 7-Step Training Process came about after numerous conversations and technical assistance recommendations by the monitoring team over the past few years. The use of such a system is crucial because APD has not had an identifiable or codified training development process. The Comprehensive Training Unit will be vital to its success, and this system will help to properly organize APD's training.

had seen in the past.  Since that time, the monitoring team has inquired about the status of the videos on numerous occasions, and during a June 2018 site visit we were told that they were put on hold because the use of force suite of polices were being rewritten.  Consequently, the monitoring team has never been provided the videos or accompanying curriculum for official review and approval.

We revisited the status of the videos during our November 2018 site visit, expressing our concern over any continued delay in remediating past training gaps.  We were assured that the training gaps would be addressed ASAP, with the intention of getting that training done prior to the end of the IMR-9 reporting period.  The Academy Commander was referred to past Monitor reports where tables were provided that outline the status of each training gap.

In IMR-8 we commented that APD must reconcile all pending training gaps from IMR-6,[42] to ensure those gaps are not left lingering.  As noted earlier, we followed up on these training gaps during our November 2018 meetings to see what efforts had been made.  It was evident that the training gaps were not being addressed.  We discussed the fact that, in the absence of new use of force policies,[43] APD officers and supervisors continue to operate in the field under the standing use of force policies.  The Academy's plan for the development and delivery of any training for new use of force suite of policies likely would not commence until March 2019, and would not be completed until October 2019.  We commented to APD that such a timeline leaves an extensive period without addressing the training gaps we previously reported.

At the end of December 2018, the monitoring team was advised that materials "approved" by the monitoring team (to address previously identified training gaps) had been released to the organization through its on-line training platform.  We immediately alerted APD that curriculum related to use of force training gaps had not been provided to, or approved by, the monitoring team.  Unfortunately, the training had already been launched to the organization.  The monitoring team asked that the lesson plans and supporting curriculum be provided ASAP, with the intention of resolving this problem with the Academy.[44]  Parenthetically, we learned that once the Academy Commander reviewed the (then) current lesson plan, she concluded that it obviously did not meet the new expectations of quality; therefore, she had it redone prior to submitting it to the monitoring team.  Ultimately, we were provided with acceptable lesson plans, videos

---

[42] Gaps related to previous use of force training have lingered for the past 2+ years.  We have written extensively about those gaps in past Monitor reports, and we told APD that with modest effort those gaps could be remediated easily.

[43] APD has been working for many months to advance new, acceptable use of force policies that can be used for academy training curriculum.

[44] Proper development of training occurs in a specific order that was not followed here.  The monitoring team felt that the best course of action was to work with the academy to solve the problem and not build upon the tasks they are attempting to accomplish.  In the future, APD will be expected to follow typical curriculum development processes and based on our conversation with the Academy Commander we see this as a "one off".

and supporting materials.[45]  The proper application of the 7-Step Training Cycle should have caught this type of issue before the training was released.  We were assured by the Academy Commander that this would be addressed internally so it is not repeated in the future.  The Academy was given an approval for curriculum used to address the following previously reported training gaps, including:

1.    Neck Holds;
2.    Distraction Techniques (Strikes);
3.    SCOTUS cases related to shooting at vehicles (*Plumhoff);*
4.    Show of Force reporting and investigations; and
5.    Un-resisted handcuffing.

The Academy recognized that there was an unacceptable number of failures for this on-line training; therefore, Special Order #19-10 "Use of Force Gap Video Remedial Training" was promulgated.  That SO required personnel, who failed the on-line test associated with the gap training, to report to the Academy for remedial training.[46]  APD's efforts to ensure compliance with testing requirements are commendable and should be the standard moving forward.  This should influence personnel in the field to make better efforts to attain passing scores through the on-line platform.  We further note that this was a dramatic departure from our past experiences with the "old" Academy, where failures were accepted or debated hotly with the monitoring team.

The monitoring team was provided records that demonstrated that APD's testing compliance reached 98% for this training program; therefore, we consider these topics to have been sufficiently remediated.[47]  The following gaps, however, were not addressed in this initial gap training[48]:

1.    *De minimis* force[49]; and

---

[45] One recommendation was made to the Academy Commander concerning test question construction.  The monitoring team noted that every true/false question on the test resulted in the same answer.  This could easily be taken advantage of in the field.  We recommended that the academy staff receive instruction on how to construct valid test questions that truly measure whether there was a transfer of knowledge.  The Commander was very receptive to that recommendation and assured us it would take place in the near future.

[46] APD personnel were given two specific dates, with one-hour time slots, that they could attend.  If a person who failed either (1) failed the test again or (2) failed to respond to the report for the remedial training they would be placed on administrative assignment to the academy until they passed the exam.

[47] The Academy Commander and the monitoring team discussed the failure rates and we provided technical assistance that may help increase the quality of on-line programs, and test results, in the future.

[48] IMR-6 noted five (5) additional gaps only related to attendance at certain training programs.  We are focusing our attention on those gaps that had not been addressed through training in any manner.

[49] The fact that this concept has not yet been remediated through training, or rescinded through a Special Order, is highly problematic and may contribute to the failure to report, or improper reporting of, use of force.  The monitoring team has spoken to the Academy Commander and we

2.      Crowd Control Training[50]

During our site visit, we also discussed the Academy's plans for addressing use of force training when the new suite-of-policies are finalized, approved and forwarded.  The Academy Commander outlined a plan to deliver training in four distinct "tiers" and is impressing upon the staff to use multiple teaching modalities.  The following is a synopsis of three tiers of training the Academy intends to deliver throughout 2019:

Tier 1 will include an introduction by the Chief of Police and the delivery of all new use of force policies through APD's on-line learning system.  This should increase the quality of learning in the classroom (that occurs later), by allowing officers and supervisors to learn the policy provisions prior to arriving for in-class portions of the training.

1.      Tier 1 is a prerequisite for the subsequent training modules and must be completed prior to attending Tiers 2, 3, and 4. A pretest will be taken by all officers before any other training commences.

2.      Each officer will be expected to submit two questions to the Academy staff (through the online training platform) that can be used to develop the in-person training found in Tier 2.  The intent is to elicit information from officers concerning topics they may still be struggling to understand.[51]

Tier 2 is designed to include in-person instruction regarding the use of force policies and incorporating information gleaned from the on-line testing data during Tier 1.  Tier 2 of lecture-based classroom instruction along with video and live scenario reviews[52]. The video and scenario reviews, which involve group assessments, will allow officers to cognitively apply the new use of force policies by observing them being implemented in a controlled setting.   All officers must have successfully completed Tier 1 training prior to attending the Tier 2 training. The academy will assess any areas of difficulty during Tier 1 pre-testing and address them in a more comprehensive manner by hands-on learning and in-class scenarios.  Instructors will act out scenarios where pre-established learning objectives require the class participants to identify and apply key policy provisions.  A post-test will be administered to all attendees.[53]

---

have been assured this will be addressed as soon as practicable during the next reporting period. We will collect data for that training when it is available.

[50] The Academy is reliant upon ERT to develop training that will remediate this gap.  We have spoken with the Academy Commander on this topic as well.

[51] We were told that the Academy is building a SharePoint portal for APD personnel to submit training needs.  We see this as a positive mechanism for receiving information on contemporary training needs.

[52] Our understanding is that in Tier 2 instructors will act out scenarios that will be assessed by class participants.  This tiered training approach will be designed like the "tell, show, do" method of instruction, with the hands-on portion by participants occurring during Tier 3.

[53] The draft plan provided to the monitoring team indicated that attendees will take a post-test remotely and within ten (10) days following the training.  While we appreciate the technological limitations the Academy may have, we recommend that the post-test occur prior to attendees leaving the training session.  We can reasonably predict that doing otherwise will result in

Tier 3 is the supervisory portion of the Use of Force training.

Tier 4 will include Reality Based Training (RBT) for every enlisted member of the organization.  There will be a defensive tactics component of training, and scenarios that require the interwoven use of APD use of force provisions with proper defensive tactics.

Tiers 1 and 2 must be completed successfully prior to attending Tier 4 training.  Officers will be expected to use proper de-escalation techniques before using appropriate levels of force.[54]  Checklists will be used by instructors to collect and analyze data during the training to track areas of successes and failures to ensure that minor, but necessary, modifications can occur to enhance the quality of training.  Members of the Internal Affairs Force Division will provide instruction on the proper documentation of each officer's actions.[55]

Defensive tactics will be addressed during Tier 4 training, and officers will cycle through multiple stations where different scenarios will be utilized.  Officers will receive additional lecture on the practical application of the new use of force policies. That refresher will help prepare the officers to properly apply what they learned during the practical exercises.

The Academy Commander advised that the completion timeline associated with this 'Tiered" approach will likely continue into the fall of 2019.  Considering the extended time required to build consensus among the Parties on the new use of force policies, and the complexity of the training approach, this is a reasonable estimate.  In the past, we recommended that the Academy not sacrifice quality, efficiency and effectiveness, just to "get it done".  This tiered approach will be innovative when completed and accommodates many of our past recommendations.[56]  However, we cautioned the commander that she will likely have to manage organizational expectations, since,

---

[54] The draft plan we were provided stated, "Every officer will also complete two evaluated defensive tactics scenarios which require a de-escalation attempt before escalating to a use of force." (Emphasis added).  We cannot emphasize enough the importance of not inadvertently creating "training scars".  The scenarios should not be designed to all result in a use of force.  A more appropriate approach would to alter the scenarios so that there are outcomes that do not result in a use of force following de-escalation attempts.

additional training gaps and personnel inefficiencies for the Academy to address.  If they occur, it will result in additional delays in gaining training compliance and impact assessments of in-field implementation of the training.

[55] The monitoring team has met separately with the IAFD and believe that they are in the best position to provide instruction in the area of proper articulation and report writing following a use of force event.  The draft plan did not include the report writing component when listing the manner in which officers would be evaluated in Tier 4, but when we met with the Academy staff we were told it would occur during the training.

[56] The monitoring team spoke with the Academy Commander post-visit and provided perspective on areas of the new force policies that will require deep contemplation when training them.  Based on the language proposed for a Tier 1 use of force, APD will have to focus considerable attention to training at the low-end of the force classification assessments.

based on the timeline we were presented, Operational Compliance assessments, more likely than not, will not occur until 2020.  In the opinion of the monitoring team, the sophistication of this approach to training the new policies should be supported by the APD leadership.  If done properly, APD will likely avoid repeating past mistakes of rushing training that resulted in many poor organizational outcomes.

One word of caution is necessary for the Academy to consider as they begin to develop the 2019 use of force training.  Because of the elongated approach to the training, several months will pass between officers completing Tier 1 (where policy training is principally located) and the operational application of the policy provisions following the completion of Tier 4.  We discussed ways to shorten the timeframe, and the different approaches that could be used, but regardless of the approach, an organizational rollout of this significance will invariably have good and bad features.  A strong training-implementation-evaluation plan will be essential to ensure there is a successful deployment of the new policies.

SOD RAM Training

The monitoring team was also provided with curricula that was developed by Special Operations Division and refined by the Academy for submission to the monitoring team. SOD has developed and utilized a Risk Assessment Matrix (RAM) when assessing whether a SOD response is necessary for a search warrant execution.[57]  That RAM is now used by non-SOD units; therefore, SOD has implemented an audit program wherein they periodically review and assess whether the RAM is being properly used by these other APD commands.  SOD developed RAM training that was submitted to the monitoring team and ultimately approved for delivery to the organization.  The intended platform for the training was APD's on-line learning management system (LMS), with some focused in-classroom processes.  The monitoring team reviewed training materials which included a PowerPoint presentation, and video presentation of the materials that were uploaded as an instructional tool into APD's LMS and attendance records.

Data provided by APD indicated that the success rate for the RAM training was 71%. The calculations were based on 675 APD officers passing the on-line test out of 950 officers required to attend the on-line class.  We also noted that 67 officers failed a required exam, which is a 9% failure rate for those who took the class.  It is our understanding that APD has begun remediating the test failures, and we will collect new data for the RAM training in the next monitoring period.  For this type of training, the monitoring team sees an on-line delivery method as appropriate for the wider APD audience.  APD should assess why failures are occurring and determine if there is something in the actual delivery mechanics that may be contributing to those failures.

---

[57] The monitoring team has commented extensively on the Risk Assessment Matrix (RAM) in past Monitor reports.  We previously communicated our concern that the RAM is now utilized by non-SOD units without having been trained in the proper use of the form.  Likewise, the oversight of the use of the RAM was missing.  SOD implemented an audit program that includes the use of a RAM log by non-SOD units.

The monitoring team will continue to work with the Academy in this area as they refine their training programs.

The monitoring team was also provided with course of business documentation related to a newly constituted Training Committee and an Academy Strategic Training Plan. In the past, APD reported having a Training Committee, but the monitoring team has seen no evidence that the Committee provided meaningful guidance for training offered by the organization.  Past mistakes aside, we were provided with a draft Training Committee Manual and policy draft (SOP 3-34) that were developed during this monitoring period. These documents outline the 7-step training cycle, rules and procedures, areas of the organization that will have representatives on the committee, what the responsibilities of the committee are, and reporting mechanisms related to training needs.  The Training Committee will meet quarterly to identify unique needs found throughout the organization, emerging best practices, and most importantly, emerging trends that may need to be remediated across the organization. The manual outlines a number of information pathways that will be used to identify training needs, including the analysis of objective use of force data and anecdotal information provided from the field.

The draft Strategic Training Plan is in its early developmental stages and will be designed to address two years of training requirements.  It will require a deep degree of contemplation, with significant guidance from the Training Committee.  Likewise, implementing the plan will require command-level support and a clear vision of "what success will look like" to the organization in the future.

In the past, APD lesson plans have struggled in terms of the quality of instruction and development of needs-related learning objectives.  Feedback provided by the monitoring team has resulted in a significant increase in quality since the inception of the CASA, but more work remains to be done.  APD, historically, has had little respect for the importance of mapping and connecting training needs through the curriculum development process.  However, in this reporting period we saw a turn toward higher quality lesson plans and supporting materials in the documentation we were provided. We continue to recommend that APD training staff seek out and attend training courses that are focused on training development and measurement of performance outcomes. This type of continuing education will greatly benefit the whole organization, and should not be confined to Academy staff alone.  Any command personnel responsible for curriculum development should receive advanced training in these areas. We believe strongly that training of this nature will accelerate the reform process across the organization.

As we noted in the past, the Academy Commander should have the legitimate authority to influence all organizational training.  That will ensure consistency and ensure that non-Academy commands are adhering to proper standards and policy, but it requires buy-in by command level personnel throughout APD.  As training development and delivery extends outside the Academy, issues directly impacting CASA compliance will emerge.  Since the Academy Commander has the most experience assessing CASA

training requirements, and because the Academy Commander works directly with the monitoring team on those requirements, the Academy Commander is in the best position to offer guidance to APD leadership.

We recommend that APD focus considerable attention on gathering training needs from the field and ensuring training objectives and curriculum are "mapped" properly to affect specific performance issues being encountered in the field, and that implementation of training is assessed and measured quantitatively and qualitatively.  That process will allow curriculum to be responsive to performance deficiencies identified in the field. We are encouraged by the increased quality of documentation we have received of late, but also recognize the Academy staff is continuing its path toward learning how to develop training within the context of a CASA.  Our conversations with the new Academy Commander have been very positive and we appreciate the responsiveness to our feedback.

That said, there is a great deal of work to be accomplished in 2019, which will require a significant outlay of personnel and resources to the Academy.  To be successful, APD leadership will have to embrace that reality as the 2019 use of force training is delivered.  It is highly unlikely that the training plan we were provided can be executed with the current staffing, without the quality of the training being adversely impacted. The draft training plan we were provided, if delivered as intended, will likely be the most meaningful use of force training we have seen at APD since the inception of the CASA.

Based on our review, Primary Compliance is continued for Paragraphs 86 through 88. Secondary and operational will be assessed in IMR-10, after training actually occurs.

### 4.7.73 Assessing Compliance with Paragraph 86:  Review of Use of Force Policies and Training

Paragraph 86 stipulates:

> **"APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and provisions of this Agreement.  APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy."**

**Results**

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.74 Assessing Compliance with Paragraph 87:  Use of Force Training Based on Constitutional Principles

Paragraph 87 stipulates:

> **"APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:**
>
> **a)  search and seizure law, including the Fourth Amendment and related law; b) APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;**
>
> **c)  use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;**
>
> **d)  use of de-escalation strategies;**
>
> **e)  scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;**
>
> **f)  deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;**
>
> **g)  crowd control; and**
>
> **h)   Initiating and disengaging foot pursuits."**

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.74:  Recommendations for Paragraph 87

**4.7.74a:  *Continue with the planned Use of Force training and ensure detailed evaluation of training items that were deemed successful, and items that are identified as needing additional training.***

## 4.7.75 Assessing Compliance with Paragraph 88:  Annual Supervisory In-Service Training

Paragraph 88 stipulates:

> **"Supervisors of all ranks, including those assigned to the Internal Affairs Bureau, as part of their initial and annual in-service supervisory training, shall receive additional training that includes: a)  conducting use of force investigations, including evaluating officer, subject, and witness credibility; b)  strategies for effectively directing officers to minimize**

111

uses of force and to intervene effectively to prevent or stop
unreasonable force; c)  incident management; and
d)  supporting officers who report unreasonable or unreported
force, or who are retaliated against for using only reasonable
force or attempting to prevent unreasonable force. "

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### Recommendations for Paragraphs 86-88

**4.7.75a:  The Strategic Training Plan and draft policies presented to
the monitoring team should be finalized and submitted to the Monitor for review
as soon as practicable.**

**4.7.75b: The Academy staff should be properly augmented to support the
staffing shortages.**

**4.7.75c: All lingering training gaps should be remediated as soon as possible, in
particular de minimis force.**

**4.7.75d:  APD Academy Staff seek out and attend training courses focused on the
proper development of training curriculum and how to connect that curriculum to
the measurement of performance outcomes.  Proper test question construction
should be emphasized.**

**4.7.75e: Recommendation:  APD personnel assigned to non-academy commands
who carry significant training requirements should receive training
commensurate with the Academy staff.  This will ensure continuity in curriculum
development across the organization.**

**4.7.75f: Recommendation: Training Committee meetings should include
recommendations submitted, mapped to, and documented in specific training
programs. Topics they identify should be tracked until they are included in a
particular program.**

### 4.7.76 Assessing Compliance with Paragraph 89:  Annual Firearms Training

Paragraph 89 stipulates:

"**Included in the use of force training set out above, APD shall
deliver firearms training that comports with constitutional
principles and APD policy to all officers within 12 months of
the Operational Date and at least yearly thereafter. APD**

112

**firearms training shall:**

**a)  require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms as necessary, on an annual basis;**

**b)  require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;**

**c) incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program; and**

**d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times."**

## Methodology

The methodology outlined in Paragraphs 17-21, serves as the baseline for compliance determinations for paragraph 89.

The 2018 Firearms training cycle has been completed and the Firearms staff have compiled extensive data to document all that is required, and all that they have accomplished, in order to meet or exceed the CASA requirements.  We view this as excellent work that easily could and should be emulated by other APD staff as they consider how to respond to monitoring team findings.

98.6% of all APD personnel (901 of 916) completed firearms training.  Personnel who had not yet completed training were on various types of leave—Military, or Family Medical Leave Act, etc.  Upon returning, each officer will be required to attend all missed training, including firearms, before being permitted to work.

APD is required to provide sufficient training courses to allow officers to gain proficiency and meet firearms qualification requirements.  During past site visits, members of the monitoring team attended firearms training.  APD Range Staff have changed range hours to enable officers to practice firearms in a low-light environment and have integrated monitoring team recommendations into its policy and procedures. The firearms staff has added additional days and times to allow more practice.  In reviewing data related to failures to qualify, firearms staff documents the referral to additional training for poorly performing shooters.

Following the 2018 Firearms Qualifications cycle, the monitoring team was provided with data that showed at least 3 officers who failed to qualify and then failed an

immediate requalification attempt were ordered to surrender their firearms and police vehicle and placed in an administrative position until they returned to the range to qualify.  Additionally, documentation was found that officers failing to qualify with rifle or shotgun were required to surrender the firearm until they returned to the range to qualify.  The monitoring team sees this as another positive example of a staff making changes in order to meet the requirements of the CASA.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.73 - 4.7.75 Assessing Compliance with Paragraph 90-105: Management of Specialized Units, and accompanying paragraphs focused on the Special Operations Division.**

Paragraphs 90-105 of the CASA address requirements that APD must meet related to management and supervision of functions inside the Special Operations Section (SOD) as follow:

> Paragraph 90: Management of Specialized Units;
> Paragraph 91: Composition of Specialized Tactical Units;
> Paragraph 92: Training of Specialized Tactical Units;
> Paragraph 93: Tactical Unit Missions and Policies;
> Paragraph 94: Tactical Units Policy and Procedure;
> Paragraph 95: Annual Review of Tactical Policies;
> Paragraph 96: Documentation of Tactical Activities;
> Paragraph 97: Tactical Mission Briefings;
> Paragraph 98: Tactical Uniforms;
> Paragraph 99: Force Review Board Assessments;
> Paragraph 100: Eligibility Requirements for Tactical Teams;
> Paragraph 101: Tactical Team Training;
> Paragraph 102: K9 Post Deployment Reviews;
> Paragraph 103: Tracking K9 Deployments;
> Paragraph 104: Tracking K9 Bite Ratios; and
> Paragraph 105: Analyzing Tactical Deployments.

As with other reporting periods, the monitoring team spent time providing perspective, feedback and technical assistance to APD's Special Operations Division (SOD) personnel. We met with SOD personnel responsible for the tasks associated with these paragraphs and, as in the past, the monitoring team found openness, receptiveness and a sincere interest in succeeding.  As we noted in IMR-8, while SOD has historically led the organization in terms of compliance, they spent the latter part of 2018 implementing technical assistance the monitoring team provided that was meant to address CASA

related issues we had identified at SOD.[58]  The monitoring team has commented on specific training materials SOD advanced for our review related to their Risk Assessment Matrix (RAM).  The following paragraphs represent our findings related to Paragraphs 90-105.

In IMR-8 we commented on changes that occurred in leadership and with the civilian support staff at SOD. We found that continuity of information has remained stable during this reporting period.  Strong systems and policies within SOD have ensured that reform efforts and attitudes toward reform were not impacted as a consequence of command level changes.  In fact, we have found the current SOD command personnel to be equally interested in sustaining the changes that have been identified in past monitor reports.  We have stressed the importance of selecting command personnel that respect the reform that has been achieved, and in our opinion, that has occurred. The current Commander has been in place for approximately one year and his interaction with the monitoring team has been extremely positive.

We noted our concern in IMR-8 that SOD was failing to report certain types of uses of force, due to poor guidance that was given to them by the prior police administration. During our January, March, and June 2018 site visits we discussed Use of Force reporting related to barricaded subjects, and the fact that SOD was required to report when chemical munitions and Noise Flash Diversionary Devices (NFDDs) were used as a means of force.  We recommended that APD immediately review case law and best practices in this area, and discuss this specific issue with other organizational commands.  Likewise, we felt it was critical that APD identify the scope of the issue by conducting an assessment of 2016 and 2017 SOD deployments to determine how many of those deployments involved unreported uses of force.  We stressed that SOD should address this issue quickly to ensure they did not lose the Operational Compliance they had worked to achieve.

It was clear that members of SOD were interested in a swift remediation of the issue, though it took until June 2018 for a Special Order to be issued that addressed the problem.  That said, during this reporting period we saw evidence of SOD conducting an assessment of past deployments and then, in response to that review, implementing SO 18-51.  Coupled with internal auditing efforts by APD, we expect, and will monitor for, a meaningful remediation of any past reporting issues.  Likewise, audits conducted of SOD identified other administrative shortcomings that can easily be adjusted. The difficult issue APD faced during this reporting period was to decide how to deal with past cases that were not reported as uses of force, since that failure impacts numerous CASA related paragraphs (i.e., FRB related paragraphs).

Instances of NFDD and chemical munition deployments have been captured in SOD After Action Reports (AAR), but there was a significant concern by APD that the additional information necessary to fully investigate past cases as uses of force would not exist.  We reviewed a report that was prepared by the Commander of the Special

---

[58] See IMR-7 and IMR-8 for comments concerning SOD not properly reporting uses of force related to NFDDs and chemical munitions.

Operations Division entitled, "Report on the Investigative Process to Address Chemical Munitions and Noise Flash Diversionary Devices (NFDD) as Uses of Force" (Dated October 28, 2018).  This comprehensive report outlined the methodology and research the Commander used to gain internal and external perspectives as to how NFDDs and chemical munitions should be viewed in the context of a use of force. He also did an assessment of past cases from the years 2016 and 2017 to determine how many SWAT callouts during those two years required a use of force report, but that report did not occur. In his research he determined that in 2016 there were 12 unreported uses of force involving chemical munitions and one unreported use of force arising out of the use of an NFDD. The Commander determined that in 2017 there were 20 unreported uses of force involving chemical munitions and three unreported uses of force involving an NFDD.  This same Commander promulgated Special Order (SO) 18-51 "Use of Chemical Munitions Noise Flash Diversionary Devices" on June 2, 2018, to address the gap in force reporting, so we view his efforts to address the issue positively.  It is a model instance of APD identifying and self-correcting issues prior to the monitoring team noting them and requiring adjustments.

To date, the SOD Commander has been extremely receptive to monitor feedback and has proactively taken measures to fix a use of force reporting problem that existed long before he took command.  The report cited above, and Special Order 18-51, are positive steps for APD's SOD to retain its compliance status, but as we review of SOD use of force cases it is our opinion more work must be done.  A random sample of cases that fall within the parameters of SO 18-51 were reviewed in order to provide initial feedback to APD.  The results of those reviews are as follow:

## Case Reviews

### Incident # IMR-9-1

Members of APD's SWAT were contacted by a federal law enforcement agency and asked to assist with the execution of a search warrant. The search warrant related to an investigation into identity theft, mail fraud, and bank fraud, and the suspects associated with the search warrant had various criminal histories, some with verified violent backgrounds.  Arrest warrants were not obtained for those suspects (at the time of the incident); however, a search warrant for an apartment they reportedly rented had been authorized. The federal agency was provided APD's Risk Assessment Matrix (RAM) and it was determined that SWAT would assist.  By the time SWAT was fully involved it was believed that the apartment where the search warrant was to be executed may be unoccupied. The suspects were known to move from place to place, so a "knock and talk" was determined to be the best initial approach to the apartment.

SWAT arrived at the location, and shortly thereafter, one of the suspects exited the apartment.  He told SWAT members that a second suspect was still inside.  Over several hours APD made various attempts to convince the second suspect to exit the apartment without success.  Independently, one APD officer reported seeing a second suspect through a window.  After deploying several NFDD's and casting canisters of

116

chemical munitions through different exterior breach points, the second suspect exited the apartment and was taken into custody by SOD without further force being used.

## Monitoring Team Observations

1.  APD must decide what constitutes "barricaded" or "barricading" in the context of a suspect refusing to exit a building and be more descriptive in its reports.  For instance, in this case, the suspect refused to exit the building after being instructed to do so, which is clearly a concern.  In one officer's report he stated, "… I illuminated the floor area with my flashlight and immediately noticed black pants with white stripes walking back and forth. I immediately made the proper announcements and advised there were subjects barricading in the apartment."  Without any other description or context, it is impossible to determine what "barricading" means.   APD must not use the term "barricade" (or any derivative thereof) as boilerplate language, and must be much more descriptive in this area when reporting their SWAT activities and justifications for force. The difference between hiding, refusing to exit, and actively fortifying positions by creating barricades to interfere with the entry of officers into a structure should not be confused.  Each is alarming, but the inferences that are drawn from each may lead to a different tactical response, depending on the situation.  There were instances within the documentation of boilerplate language being used.

2.  Reports documented different facts as to how the front door of the apartment was rendered open.  One stated, "Entry officers were able to confirm that when (Suspect 1) exited the apartment he left the front door open," while a second report stated, "Officers who had keys to the front door also opened the front door (given the search warrant to the apartment) so verbal commands could be better communicated to those persons inside."  There may be an innocuous reason this information is inconsistent, but it should have been clarified during the supervisory review of the reports.

3.  APD reports documented different information that was provided (by a suspect) about a second suspect who was still inside the apartment.  Reports stated the second suspect "…had access to a firearm", while other reports claimed the suspect "…was still inside armed with a pistol and refusing to exit" or "…was armed with a handgun."  Either scenario would raise the concern of SWAT officers at the scene.  However, precision in reporting and reconciling discrepancies of information are important for a host of tactical reasons and could be relevant to justifications provided for uses of force in the same scenario. While the reports discuss authorizations for various NFDD or chemical munitions deployments, it was rarely clear in the reports who the specific person was that gave the authorization.

4.  The supervisor who submitted the Tactical Activation Report stated in his incident summary, "I listed the subject as John Doe due to the fact that tactical units were assisting (federal agency) and I am unable to find the name of the subject in any APD reports."  The problem with this statement within any APD report should be self-evident, let alone a supervisory report documenting a use of force.

The monitoring team noted that when one SWAT team deployed OC canisters, several members were overcome with the fumes themselves.  We did not see documentation of this occurrence or any reference to a tactical or training issue being referred to the SWAT Commander.  Therefore, it's likely this issue would not be considered by the FRB.

**Assessment**

In addition to the command and control issues noted above, the use of force documentation in (IMR-9-1) reviewed indicates non-compliance with the CASA's use of force reporting and supervisory investigation paragraphs.[59]

**Incident # IMR-9-2**

APD officers were called and asked to respond to a domestic violence complaint between a mother and son. The suspect was reportedly intoxicated and started an altercation by threatening the mother with barbecue-style forks.  APD personnel established a perimeter around the apartment and began to issue announcements through a loudspeaker and requested the son to surrender.  Over the course of several hours, it was determined that the suspect had a history of violence and would be charged with aggravated assault for this situation.  APD SWAT was activated to assist in taking the suspect into custody. A search warrant and arrest warrant were approved by a judge. During the event, an NFDD and chemical munition deployment occurred, which constituted a use of force.

**Assessment**

Reports provided to the monitoring team gave different accounts of the activities of the suspect after SOD removed a blanket from on top of him.[60]  One report stated, "I provided lethal coverage as another team member removed the blanket using a tool. (Suspect) quickly sat up and became argumentative with officers. It was decided to enter the room and take (Suspect) into custody. As I stepped in other team members took (Suspect) into custody." A second report stated, "Once the blanket was removed the subject sat up, followed commands and was taken into custody without incident." These differences are relevant and require a more comprehensive assessment by a supervisor.  In the context of a use of force scenario, a suspect being argumentative leaves open the question whether other force was necessary when the subject was being handcuffed.  We do not suggest force was used, only that, at a minimum, this is an inconsistency of information and should have prompted questions during supervisory reviews.

---

[59] Because this is meant to be broad guidance, a paragraph by paragraph comparison of CASA requirements was not conducted for this report.  Generally, the report writing and documentation of NFDD and chemical munitions uses of force need to improve.

[60] APD reports documented observations that were made by SWAT personnel as the events unfolded. SWAT members observed the suspect unresponsive under a blanket after chemical munitions were introduced into his apartment.

118

It is unclear what "lethal coverage" means in this scenario and whether it would constitute a show of force because there is a lack of description within the reports.

The monitoring team encountered boilerplate language in the reports.

The After-Action Report (AAR) contained good detail and rationale for the deployment of different tactics that assisted taking the suspect into custody.  However, at the point where the suspect was taken into custody, the AAR did not detail him being argumentative, which is a substantive difference from one of the officer's reports and needed to be reconciled.  This is indicative of one of the significant failures in supervision at APD.  Lack of congruity in internal reporting is a critical issue.  Wherever it is encountered, APD needs to identify it and take steps to reconcile which of the varied reports is accurate.   To fail to do so exposes APD to significant exposure to risk in civil complaints, and a significant risk to effective prosecution in criminal complaints.

The supervisor who completed the Tactical Activation Report documented that he was unable to complete a proper on-scene investigation and noted, "My involvement was strictly to document this incident by submitting this information into this Blue Team entry."  The supervisor did note, however, that after doing his own "investigation" and reviewing of lapel video footage that the force used in this event was appropriate. The investigation of uses of force must be contemporaneous with the event, thorough, objective and must adhere to APD policy and the CASA.

**Results**

The use of force documentation [IMR-9-2] reviewed does not demonstrate Operational Compliance when assessed against the CASA's use of force reporting or supervisory investigation paragraphs.  The proper reporting and investigation of uses of force require an immediate, thorough, and legitimate investigation by a supervisor. Investigations must follow established APD policies and procedure and be consistent with the CASA.   This was not the case in IMR-9-2.

**Incident # IMR-9-3**

APD SWAT was called to assist in apprehending an armed suspect who was wanted after fleeing police and shooting at officers in the process.  A SWAT activation occurred, and a perimeter was set around an area within a residential neighborhood.  APD received information from witnesses that the suspect was held up in an abandoned house. Simultaneously, efforts were made by APD personnel to obtain arrest and search warrants for the suspect and the residence where he was suspected to be hiding. The efforts to have the suspect surrender carried on for several hours.  NFDDs (flash bangs), chemical munitions and the use of an armored vehicle were authorized and used in the SWAT efforts to have the suspect surrender.  After a lengthy effort by SWAT personnel, the suspect surrendered and was apprehended and handcuffed without additional force being used.

119

**Monitoring Team Observations**

The quality of the After-Action Report (AAR) for this event was much better than other similar reports we reviewed. The timeline was easier to follow, and it was easier to understand who authorized the various degrees of force that were used.

Overall, the monitoring team reviewed this SWAT activation and response as a success.  As with the other two cases we reviewed, the issue is the quality of justifications and reporting throughout the reports that are generated related to uses of force, and whether the specific reporting and investigatory steps for a use of force were followed.

APD's SWAT has been commended in our past reports for the quality of their activations and the After-Action Reports (AAR) that they generate following an activation.  The reporting responsibilities for uses of force have some overlap with AARs, but are not an exact 1:1 comparison when considering CASA compliance.  In the past we learned that SWAT was failing to capture certain types of activities as uses of force.[61]  Moving forward, if SWAT is to maintain Operational Compliance with respect to its use of force reporting requirements, they need to ensure the reports they generate comport with feedback the monitoring team has provided to the greater APD audience in past monitoring reports. Paragraphs 90 and 93 will be assessed closely in the IMR-10 monitoring period, so an immediate and significant increase in quality of force reporting is needed.  Otherwise, the CASA compliance impact will likely extend beyond SOD.  We can reasonably predict that CASA paragraphs focused on proper reporting and supervision of uses of force, as well as paragraphs related to the Force Review Board (FRB), will be impacted by SOD's force reporting efforts.

The need for APD to identify overarching CASA responsibilities and how different paragraphs can impact others cannot be overemphasized.  We encourage SOD to meet with, and discuss advances that have been made by, the Internal Affairs Force Division (IAFD) with respect to use of force documentation. This was the first opportunity that the monitoring team has had to review uses of force reported by SOD related to NFDDs and chemical munitions, under their newly adopted procedures.  Therefore, we expect this feedback to be taken into account for each instance where a use of force is reported and investigated by SOD.

As we noted in Paragraphs 37-38, the Performance Metrics Unit (PMU) conducted an Audit Report for SOD SOP 6-8 and organized their findings into easily digestible sections.  The "Summary of Results" section provided specific recommendations for SOD to consider from policy, training and operational perspectives.  PMU's business process includes the requirement that an audited unit to provide a Management Response to the findings, so for the next reporting period we expect SOD to document

---

[61] This has been written about extensively in IMR–7 and IMR–8.  APD SWAT adopted new procedures for the proper reporting and investigation of uses of force related to NFDD and chemical munitions deployments.  Those procedures have been incorporated into the new UOF site of policies.

the operational, training, and oversight changes made in reaction to their audit.  We reviewed the SOD responses to PMU's work, and for the most part found them to be appropriate.  We will focus attention on collecting "proofs" from PMU that demonstrate that SOD followed through on their documented "Management Response".

We note that these types of systems improvement practices represent the PMU beginning to stand-up its internal (to APD) business practices to replicate the monitor's processes.  This is a critical step that will ensure that practices generated to gain compliance have a long "shelf-life" lasting beyond the monitoring team's departure.

PMU included an assessment of Special Order 18-51.  At the time of the audit, APD still operated under a two-level classification system for uses of force, though the audit assessed SOD activities against the proposed 3-Tier system.[62]  The following was noted in the Conclusion section of PMU's report:

1. The audit found that most documentation used to report the deployment of chemical munitions and NFDDs was well-maintained. However, tracking of the deployments was unreliable.

   a. In the auditor's judgment, the criteria used to classify deployments of chemical munitions and NFDDs lacked meaningful classification and funneled all deployments to a Level 1 use of force.[63]

2. Records reviewed in the course of the audit indicated that exposure to chemical munitions can result in a complaint of injury.

3. PMU interviews confirmed that determination of injury can be subjective. For a hypothetical complaint of injuries resulting from  the exposure to chemical munitions, the SOD Commander and tactical commander were not able to reach a consensus on whether classification of the deployment would be upgraded to a Tier (Level) 2 use of force.

We note these findings here because they are relevant to the overarching assessments that will have to be made by supervisors in the field when applying APD's new use of force suite of policies.  Also, PMU reported that the audit and oversight it provided was embraced by SOD, and ultimately the SOD Commander gave positive feedback to other APD Commanders.[64]

The monitoring team reviewed documentation for the delivery of organization-wide training on the proper use of the SOD Risk Assessment Matrix (RAM).  APD

---

[62] Parenthetically, the new suite of use of force policies was approved after the end of the reporting period and include a 3-Tier classification system for force.  We discussed the difference with PMU personnel during our site visit.

[63] PMU has identified a variable that we have noted in meetings with APD since the promulgation of SO 18-51.

[64] See paragraphs 37-38 for a more comprehensive account of the interactions between PMU and SOD.

promulgated Special Order 18-50 that codified the use of the RAM and the manner in which SOD would conduct audits of its use throughout the organization.  We saw this action as a positive step and a direct reaction to technical assistance the monitoring team has provided SOD.  The auditing program provides an internal oversight mechanism to ensure that the RAM, which originates with SOD, is being properly applied.  SOD has utilized a Risk Assessment Matrix (RAM) for the past few years when assessing whether a SWAT response is necessary for a search warrant execution.[65] The RAM is now used by non-SOD units; therefore, SOD implemented an audit program wherein they periodically review and assess whether the RAM is being properly used by these other APD commands.  We reviewed course of business documentation that was provided by the Special Investigation Division (SID), as well as course of business documentation provided by SOD and determined SOD has been completing audits of RAMs in the field.

RAM training submitted to the monitoring team during this reporting period was approved for delivery to the organization, with the intended training platform being APD's on-line Learning Management System (LMS).  The training materials reviewed by the monitoring team included a PowerPoint presentation, a video presentation of the materials, and attendance records.  Data provided by APD indicated that its passage rate for the RAM training was 71%.  The calculations were based on 675 APD officers passing the on-line test out of 950 officers required to attend the on-line class.  We also noted that 67 officers failed a required exam, which is a 9% failure rate for those who took the class.  It is our understanding that APD began remediating the test failures and we will collect new data for the RAM training in the next monitoring period.  For this type of training we see an on-line delivery method as appropriate for the wider APD audience.  APD should assess why failures are occurring and determine if there is something in the actual delivery mechanics that force (those failures.  We will continue to work with SOD and the Academy as they refine their training programs.[66]

We note these failure rates as an indication that legitimate testing of learning is now taking place at APD.  Readers of past monitor's reports will recall frequent expressions of concern of immediate 95% passing scores for past APD training efforts may have been indicative of inadequate testing of learning.  These new figures indicated to us that legitimate testing of learning is taking place.

The monitoring team reviewed SOD records related to selecting into the unit APD personnel who possess appropriate capabilities and found those records to be sufficient.  Those records included Department Personnel Circulars with job descriptions, Transfer Orders and Unit Handbooks for SWAT, K9 and the Bomb Unit.  As we have noted in the past, SOD maintains strong records that track the selection process from the posting of an opening through the selection of an officer for

---

[65] The monitoring team has commented extensively on the Risk Assessment Matrix (RAM) in past Monitor reports.  We previously communicated our concern that the RAM is now utilized by non-SOD units without having been trained in the proper use of the form.  Likewise, the oversight of the use of the RAM was missing.  SOD implemented an audit program that includes the use of a RAM log by non-SOD units.

[66] The training results are detailed more in pp 86-88.

assignment to SOD.  We did note some formatting differences in the Unit Handbooks. Those differences were relatively innocuous, but we highlight these observations since we strongly believe that uniformity and consistency supports sustainability, especially in light of the fact that these three units all fall under the same command.

We also reviewed internal SOD training records for the SWAT, K9 and Bomb Units, and found them to be sufficient.  In the past we recommended SOD review its lesson plans and update them to reflect new Academy standards, and the SOD Commander was very receptive to our feedback, as he has been in other areas of our engagement. The RAM training is a good example of SOD moving toward Academy standards.  The PMU also commented on the quality of training records SOD had on file and gave specific recommendations on how they can remediate certain gaps that were identified.  The monitoring team sees this interaction between SOD and PMU as a strong indication of APD's intention to oversee its own activities and ensure CASA compliance is achieved or maintained.  A law enforcement agency that self-assesses and self-polices its activities is capable of achieving long-term success. During the next reporting period, we will look for evidence that demonstrates SOD adjusted its administrative procedures and implemented what they documented in their Management Responses.

Based on our review of the existing SOD policy requirements and other related documentation, we determined that SOD remains in Operational Compliance with respect to tactical unit missions and policies and annual reviews of policies (P93–95; 100).  SOPs 6-7, 6-8 and 6-9 are currently under review and moving through the approval process.  However, as detailed in IMR-8, uses of force pertaining to chemical munitions and NFDDs must be addressed in policy and included in SOD handbooks (Manuals) and training.  We note that, at the end of this reporting period, APD received monitor approval for its new use of force "suite of policies" which includes SOD relevant provisions.  This, in turn, requires the adjustment of SOD procedures (i.e. handbooks and policies) to be consistent with agency-wide use of force policies (P93).  As noted in past Monitor reports, SOD instituted unit manuals that are given to newly assigned members of each unit.  The manuals are a collection of SOPs, background and expectations for new SOD members.  The manuals are provided to a new SOD member and reviewed with a supervisor, after which both sign and date the document as a record for future reference in the event a performance issue arises.  We reviewed manuals that were provided to new members during this reporting period and determined that SOD continued the practice of orienting new SOD personnel using the unit manuals.

The monitoring team reviewed operational plans and sixteen (16) AARs which revealed instances where chemical munitions and NFDDs were used by SOD.  The level of detail provided in the AARs was significant, as we have seen in past reporting periods. Completing an After-Action Report and meeting CASA requirements for reporting and investigating uses of force (consistent with Special Order 18-51, relating to the use of NFDDs and chemical munitions) will require additional work on the part of SOD. Reporting force and supervisory force investigations must meet the provisions of the CASA in every incident.  As noted earlier, SOD is attempting to evolve its practices to

come in alignment with use of force reporting relative to NFDD and chemical munitions deployments.  We discussed our initial impressions with the SOD Commander and his reception of the feedback was positive.  Now that the new use of force "suite of policies" have been approved, SOD can better align its force reporting and investigation activities.  We see the adjustment needed as very achievable in the next reporting period.

SOD's post deployment reviews of K9 are detailed and well justified.  Adherence to Special Order 18-51 will require a movement toward the same type of documentation in situations where NFDDs and/or chemical munitions are used.  (P96-97).

We reviewed Monthly Inspection Reports that were completed and determined that SOD continues to capture information regarding uniform cleanliness and completeness, equipment, as well as proper identification markings and whether an officer's OBRD is working properly.  Informal site inspections of SOD personnel occurred during our November 2018 site visit.  The monitoring team is frequently invited to attend SOD training sessions wherein we observe SOD personnel to be in appropriate tactical attire as required by Paragraph 98, as was the case during our last site visit.

APD has not conducted a Force Review Board (FRB) session through 2018 and up to the end of this reporting period.  As we noted in the past, the lack of FRB activity has likely created significant issues that have put at risk compliance for Paragraph 99.  The FRB and the quality of its work has come under considerable scrutiny in past Monitor reports.  We strongly recommend that APD reflect on past technical assistance and look to feedback they have been provided by the monitoring team in the above case reviews before re-engaging the tactical FRB.  SOD, through their Activation Data Report, tracks SOD deployments, which are reviewed by the monitoring team.  PMU, in its Audit Report of SOD identified tracking errors and made specific recommendations to remediate those issues.  We will request information from SOD and focus our attention to see if SOD was responsive to the PMU recommendations during the next reporting period.

We reviewed Annual Assessment Reports for each SOD unit and examples of Performance Work Plans for officers from each unit and found that SOD completed Annual Assessments for its personnel. We also reviewed a lesson plan entitled, "Introduction to Tactical Capabilities", which is a 24-hour course of instruction meant to address the provisions of Paragraph 101.  Specifically, the course is intended to help officers better understand their responsibilities during tactical activations and how they should interact with units supporting tactical operations units to effectively resolve a critical incident.  We learned that the lesson plan was approved by the Academy, but training did not commence until after this reporting period.  Therefore, we will collect training records for IMR-10.

APD continues to track K9 deployments and bite ratios consistent with monitor-approved methodology.  We note that PMU also commented to SOD about the proper

tracking of K9 bite ratios and their inclusion in APD's EIRS.  We know that APD has been unable to establish an effective operational EIRS given then-current support systems, so they proactively began discussions with IAFD to see if the current technology available to SOD could be leveraged to capture K9 bite ratio data.  As of the end of this reporting period that task was still unresolved.  The monitoring team reviewed a K9 Bite Ratio report and tracking ledgers documenting SOD K9 handler and K9 bite ratios for the months of August, September and October 2018.  During that time frame, no K9 handler had a bite ratio that exceeded 20%, but APD continues to track data consistent with the CASA.  We reviewed four (4) post-bite deployment reviews that were prepared by K9 supervisors and determined they contained high quality documentation of facts, and the assessment of the use of force was well done in each instance.  The monitoring team reviewed SOD Tactical Unit Deployment Tracking Sheets for the monitoring period.  APD continues to monitor and analyze the number, type, and characteristics of deployments, and states a clear reason for each tactical deployment, as well as the number of arrestees in each deployment. (Paragraphs 102-105)

SOD continues to demonstrate a positive attitude toward CASA compliance and is building the capacity to properly investigate uses of force related to NFDD's and chemical munitions, which previously went unreported.  Technical shortcomings of current APD systems impact the ability for the proper categorization of these types of force within the Blue Team system, but the SOD Commander has initiated efforts to create options within Blue Team to properly capture data for all uses of force that are relevant to Special Order 18-51 and the new use of force "suite of policies".   The monitoring team will be particularly interested in SOD's efforts to act upon recommendations they received from PMU audits, and evidence they can provide that they are implementing change as a result of those audits.

Based on our meetings with SOD and review of documentation, we have determined Operational Compliance is be continued for Paragraphs 90 through 98 and 100 through 105.

### 4.7.77 Assessing Compliance with Paragraph 90:  Management of Specialized Units

Paragraph 90 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances, provides for effective command-level accountability, and ensures force is used in strict compliance with applicable law, best practices, and this Agreement. To achieve these outcomes, APD shall implement the requirements set out below.**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.78 Assessing Compliance with Paragraph 91:  Composition of Specialized Tactical Units

Paragraph 91 stipulates:

> **"APD's specialized tactical units shall be comprised of law enforcement officers who are selected, trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units. The specialized tactical units shall consist of SWAT, Canine, and Bomb Squad/EOD."**

Special Operations conducts regular, extensive training at numerous levels: Bomb, SWAT, K-9 and Crisis Negotiation Team units. During this reporting period (August 2018 through January 2019) Special Operations continued with extensive training and supplied the monitoring team with data documenting the training received. Unit and Team training was conducted and recorded on monthly reports. The monitoring team reviewed the monthly reports to ensure the requirements of the paragraph were being met. As stated in previous IMRs APD has achieved a program, "that puts a premium on continuous updating, adaptive leadership, shared situational awareness and careful assessments of the type of intervention that is warranted under APD's concept of operation." The monitoring team sees this as a positive example of attention to detail and a model to be emulated throughout the department.

In addition to the training administered, the three (3) members who tested and passed all requirements to be selected into Special Operations as reflected in the previous report, continued to progress with the requirements as reflected in documentation supplied to the monitoring team.  All criteria for the process was documented and reviewed by the monitoring team.

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.79 Assessing Compliance with Paragraph 92:  Training of Specialized Tactical Units

Paragraph 92 stipulates:

> **"APD shall ensure that specialized tactical units are
> sufficiently trained to complete the following basic
> operational functions: Command and Control; Containment;
> and Entry, Apprehension, and Rescue."**

## Methodology

We reviewed the Special Operations training conducted by APD for the ninth reporting
period (August 18 through January 19) and confirmed that the operational functions
included in this paragraph are regularly covered and documented. During the November
2018 site visit the monitoring team was invited to view live tactical training at the SOD
facility. The monitoring team reviewed data that included, but was not limited to, forms
indicating the date, location of training, instructors, synopsis of training and approval
from a supervisor.

APD provided COB data, contemporaneous Excel spreadsheet data (2018 Tactical
Files) that displays training by officer, by unit, and by operational function trained, that
correspond to those listed in paragraph 92 was reviewed by the monitoring team.

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.80 Assessing Compliance with Paragraph 93:  Tactical Unit Missions and Policies

Paragraph 93 stipulates:

> **"Each specialized tactical unit shall have clearly defined
> missions and duties. Each specialized tactical unit shall
> develop and implement policies and standard operating
> procedures that incorporate APD's agency-wide policies on
> use of force, force reporting, and force investigations."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.81 Assessing Compliance with Paragraph 94:  Tactical Units Policy and Procedure

Paragraph 94 stipulates:

**"APD policies and procedures on specialized tactical units shall include the following topics:**

> **a) Team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility;**
> **b) Coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed;**
> **c) Personnel selection and retention criteria and mandated physical and tactical competency of team members, team leaders, and unit commanders;**
> **d) Training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training;**
> **e) Equipment appropriation, maintenance, care, and inventory;**
> **f) Activation and deployment protocols, including when to notify and request additional services;**
> **g) Conducting threat assessments to determine the appropriate responses and necessary resources;**
> **h) Command and control issues, including a clearly defined command structure; and**
> **i) Documented after-action reviews and reports."**

## Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.82 Assessing Compliance with Paragraph 95:  Annual Review of Tactical Policies

Paragraph 95 stipulates:

> **"The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually, and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement."**

## Results

Primary: **In Compliance**

Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.83 Assessing Compliance with Paragraph 96:  Documentation of Tactical Activities

Paragraph 96 stipulates:

> **"In addition to Use of Force Reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations. After-action reports shall address any areas of concern related to policy, training, equipment, or tactics."**

**Methodology**

A review of the Special Operations training conducted by the monitoring team for the period (February, 2018 through July, 2018) confirmed that the operational functions included in this paragraph are regularly covered and documented. During the June 2018 site visit the monitoring team was invited to view live tactical training at the SOD facility. The monitoring team reviewed the Excel spreadsheet (2018 Tactical Files) that displays training by officer, by unit, and by operational function trained that correspond to those listed in paragraph 92.

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.84 Assessing Compliance with Paragraph 97:  Tactical Mission Briefings

Paragraph 97 stipulates:

> **"APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment. APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations. All specialized tactical team members should have an understanding of operational planning."**

**Methodology**

For this report the monitoring team reviewed documentation for the period August 2018 through January 2019, in addition to material reviewed during the November 2018 site visit.  This documentation was assessed for Operational Compliance with the

requirements of this paragraph. As in the previous reporting period, the monitoring team verified compliance by means of personal inspections, review of policies, and discussions with SOD staff during site visits. During the site visit, SOD supplied the monitoring team with a draft copy of revisions to SOP 2-20 Hostage, Suicidal/Barricaded Subject, and Tactical Threat Assessment and SOP 2-70 Execution of Search Warrants. The monitoring team will monitor any training affected by changes in future site visits and review of data from APD.

Based upon case reviews, the monitoring team verified that Tactical Sectional Commanders, Supervisors and Officers have a working knowledge of operational planning, and routinely applied that understanding and skill to actual operations. During the November 2018 site visit, the monitoring team requested documentation from APD that supports that such training was being conducted. Special Operations continues to conduct extensive training at all levels and conforms to best practices nationwide and to the specifics of this paragraph.

**Results**

       Primary:          **In Compliance**
       Secondary:     **In Compliance**
       Operational:   **In Compliance**

## 4.7.85 Assessing Compliance with Paragraph 98:  Tactical Uniforms

Paragraph 98 stipulates:

> **"All specialized tactical units shall wear uniforms that clearly identify them as law enforcement officers."**

**Results**

       Primary:          **In Compliance**
       Secondary:     **In Compliance**
       Operational:   **In Compliance**

## 4.7.86 Assessing Compliance with Paragraph 99:  Force Review Board Assessments

Paragraph 99 stipulates:

> **"All specialized tactical unit deployments shall be reviewed by the Force Review Board in order to analyze and critique specialized response protocols and identify any policy, training, equipment, or tactical concerns raised by the action. The Force Review Board shall identify areas of concern or particular successes and implement the appropriate response, including modifications to policy, training, equipment, or tactics."**

**Results**

Primary:        **Not In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**


### 4.7.87 Assessing Compliance with Paragraph 100: Eligibility Requirements for Tactical Teams

Paragraph 100 stipulates:

> **"APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria."**

**Methodology**

The monitoring requested data from SOD for the IMR-9 time frame August 2018 through January 2019. The monitoring received and reviewed the 2018 APD SWAT Unit Annual Assessments, K9 Unit Annual Assessments, and Bomb Unit Annual Assessments. The annual reports show that members from the tactical units are displaying exemplary work in constitutional policing, integrity, community policing, and critical police functions. Monthly inspection reports were also received and reviewed by the monitoring team for this reporting period. These reports show compliance with eligibility criteria for all team members. The Special Operations Division, which oversees specialized tactical units, has established policies that set selection criteria for team membership and training requirements for all members. These are listed in the Bureau SOPs that cover Bomb Squad (4-03), K-9 Unit and SWAT (4-04). We find that unit policy is in compliance with the requirements of this paragraph and constitutes, in the monitoring team's assessment, a best practice in the management of tactical units and personnel. APD has incorporated the "unit policies" into its formal policies related to these functions, and thus is compliant with the requirements of this paragraph.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**


### 4.7.88 Assessing Compliance with Paragraph 101: Tactical Team Training

Paragraph 101 stipulates:

> **"APD shall train specialized tactical units conducting barricaded gunman operations on competencies and**

131

> **procedures that include: threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders."**

## Methodology:

Data collected and reviewed by the monitoring team for this reporting period confirms that training by the Tactical Section continues to be conducted on a regular basis, in accordance with national standards (National Tactical Officers Association) for high-risk tactical operations. The findings of the monitoring team's review of data for APD tactical teams reveal continual operational success in 2018. The monitoring team's review of the Tactical Section training found that all subjects required in this paragraph are covered in a wide array of training contexts. As reported in previous reports CNT continues to be an essential operational component in tactical activations.

### Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

## 4.7.89 Assessing Compliance with Paragraph 102:  K-9 Post Deployment Reviews

Paragraph 102 stipulates:

> **"APD shall continue to require the Canine Unit to complete thorough post- deployment reviews of all canine deployments."**

### Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

## 4.7.90 Assessing Compliance with Paragraph 103:  Tracking K-9 Deployments

Paragraph 103 stipulates:

> **"APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams."**

**Results**

  Primary:  **In Compliance**
  Secondary:  **In Compliance**
  Operational: **In Compliance**

## 4.7.91 Assessing Compliance with Paragraph 104:  Tracking K-9 Bite Ratios

Paragraph 104 stipulates:

> **"APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold and require interventions as appropriate. Canine data and analysis shall be included in APD Use of Force Annual Report."**

**Results**

  Primary:  **In Compliance**
  Secondary:  **In Compliance**
  Operational: **In Compliance**

## 4.7.92 Assessing Compliance with Paragraph 105: Analyzing Tactical Deployments

Paragraph 105 stipulates:

> **"APD agrees to track and analyze the number of specialized tactical unit deployments. The analysis shall include the reason for each tactical deployment and the result of each deployment, to include: (a) the location; (b) the number of arrests; (c) whether a forcible entry was required; (d) whether a weapon was discharged by a specialized tactical unit member; (e) whether a person or domestic animal was injured or killed; and (f) the type of tactical equipment deployed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

**Methodology**

The monitoring team reviewed the 2018-2019 SWAT Activation Data for the time period of August 1, 2018 through January 31, 2019. APD had twenty-one (21) activations in this reporting period in 2018-2019. The functionality and operation of APD's SWAT Unit has been reviewed in several paragraphs of this agreement with exemplary documentation maintained to meet all requirements of this paragraph.

APD continues to monitor and analyze the number, type, and characteristics of deployments, and states a clear reason for each tactical deployment and outcome, as well as the number of arrestees in each deployment. The statistics reviewed by the monitoring team are evidence of the success, oversight and accountability norms within the APD.

**Results**

     Primary:      **In Compliance**
     Secondary:   **In Compliance**
     Operational:  **In Compliance**

**4.7.93 – 4.7.96 Assessing Compliance with Paragraphs 106-109: Special Unit Policies, and accompanying paragraphs focused on the Special Investigation Division.**

Paragraphs 106 – 109 of the CASA address requirements that APD must meet related to management and supervision of functions inside the Special Investigation Division (SID) as follow:

- Paragraph 106: Specialized Unit Policies;
- Paragraph 107: High Risk Situation Protocols;
- Paragraph 108: Inspection of Specialized Units; and
- Paragraph 109: Tracking Specialized Unit Responses.

During past reporting periods, the monitoring team spent an extensive amount of time providing perspective, feedback and technical assistance to APD's Special Investigation Division (SID) personnel.  We have commented extensively on their receptiveness to feedback, and the overall professionalism we encounter within SID.  During this reporting period we met with the Commander responsible for the tasks associated with SID compliance.  His responsibilities toward the CASA have expanded, and APD now includes him in other organizational matters.  We see this expanded scope of responsibilities to be linked to SID's historical lead in terms of CASA compliance.  The following represent our findings related to Paragraphs 106-109.

We noted in IMR- 8 that over the prior year there had been two changes in leadership at the SID.  However, the current commander came from SOD, which we saw as positive for SID's continuing efforts to maintain compliance in Paragraphs 106-109.  In each conversation we have with the SID Commander he expressed a desire to promote a culture of accountability within SID.  In past reports the monitoring team stressed the importance of establishing strong systems and policies within SID to ensure that reform efforts can survive changes of command personnel.   SID continues to be responsive to the CASA, and, as in the past, is exceptionally receptive to feedback received from the monitoring team.  We were provided documentation to demonstrate that the business processes that helped establish Operational Compliance continue to exist.  Specifically, we reviewed the following documentation and data, taken from this monitoring period:

1.  SID Orientation Training Records;
2.  SID Inspection Forms;
3.  Operational Plans;
4.  SharePoint Records;
5.  Internal Memorandums; and
6.  Risk Assessment Matrix (RAM) forms and Ledgers, and SOD Audit Memoranda.

As noted in past monitor reports, SID developed unit-level handbooks that set forth the unique standards, missions and duties for each of its subordinate units. Those handbooks serve several purposes, including SID incorporating and reinforcing APD's use of force policies, including the provisions of the CASA.  Within the handbooks are "Proficiency Checklists" with criteria for a supervisor to assess each new detective against before they can conduct lone investigations.  Members of the monitoring team worked closely with SID when they initially submitted training records, lesson plans, and other course of business documentation for newly assigned detectives to receive once they begin their work at SID. Those activities originally took place in January 2017. During IMR-8 we reviewed Unit Handbook "sign off" sheets and confidentiality acknowledgment sheets and documented a concern that the (then new) SID Commander was not aware of an independent SID training program that the monitoring team previously approved related to the handbooks.  We discussed this training program during our June 2018 site visit and prior to our departure the Commander indicated that the training program would be held in the near future for the newly assigned detectives.  During this reporting period, we reviewed training records provided by SID and determined that SID followed through with their commitment to provide Orientation Training.  As noted elsewhere, APD has reworked its entire use of force "suite of policies".  This will require a careful review of SID's handbooks to ensure they are properly updated to reflect the new policies once they are promulgated.  During the next monitoring period we will review the handbooks, SID policies and training records to ensure they have updated their materials to reflect new policy provisions.

Based on our review of the existing SID policy requirements, Annual Inspection Forms and the Annual SID Inspection Interoffice Memorandum documentation, we determined that SID remains in Operational Compliance with respect to Inspection of Specialized Units.  SID has shown consistency in completing their inspection requirements, which demonstrates internal business processes that prompt the command to take the appropriate steps related to SID inspections.

The monitoring team reviewed 25 separate SharePoint tracker records related to SID operations.  We noted that the records SID maintains document the use of a Risk Assessment Matrix (RAM) in two instances.  We were also provided memoranda wherein SID supervisors self-identified and corrected discrepancies within the SharePoint records.  We see this oversight of SharePoint accuracy to be a positive example of supervision.  Finally, we were provided with three (3) course-of-business memorandums from a SOD supervisor documenting audits of SID RAM records that

were executed in July, September and October 2018.  SOD communicated to SID that their records demonstrated that the RAM was properly prepared, and that SID documentation supported the scores contained within the reports.  Because these SOD audit reports are now routine, they constitute course of business documentation which will be valuable to compliance determinations in the future.  Based on our review of the SharePoint data, we determined they captured each of the data points required by the CASA. SID maintains its current Operational Compliance status.  However, Operational Plans reviewed by the monitoring team showed areas of improvement are needed during the next reporting period.  Operational Plans and After-Action Reports connect activities and policy provisions for organizational units during operations in the field. They are relevant to RAMs, SharePoint entries and documentation of uses of force that may occur during an operation.

The monitoring team reviewed 19 separate Operational Plans that were prepared during this reporting period.  In the past we commented on the quality of these reports, but we noted a wide variation of quality with the reports we reviewed for this report.  In several instances, relevant information was not included to allow us to make reasonable assessments of compliance.  The monitoring team recognizes the critical importance of operational plans and their correlation to safety of officers and citizens.  Current error rates are not sufficient to withdraw compliance with Paragraph 106.  We caution SID that they must continue to treat Operational Plans as essential tools for compliances. We will spend considerable time in IMR-10 reviewing plans to ensure they are seen as a valuable product.  Likewise, SID supervisors should guard against Operational Plans being seen as a *pro forma* burden to investigators, since they are an essential link to proper conduct in the field.

Based on our review of documentation we determined that Operational Compliance should be maintained by SID for paragraphs 106-109 for this reporting period.

### 4.7.93 Assessing Compliance with Paragraph 106:  Specialized Unit Policies

Paragraph 106 stipulates:

> **"Each specialized investigative unit shall have a clearly defined mission and duties. Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.94 Compliance with Paragraph 107:  High Risk Situation Protocols

Paragraph 107 stipulates:

> **"APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required. APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response. The protocols shall include communicating high-risk situations and threats promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.95 Compliance with Paragraph 108:  Inspection of Specialized Units

Paragraph 108 stipulates:

> **"Within three months of the Effective Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training. APD shall conduct re-inspections on at least an annual basis."**

**Methodology:**

Consistent with the unit's mission and training, a review of the individual inspection forms indicated that there was proper documentation of all weapons and equipment assigned or made accessible to SID. An Interoffice Memorandum was submitted on January 2019 to document SID's yearly inspection. The Memorandum, completed during the normal course of daily business, stated in part that all sworn personnel were involved and no issues of concern were located; additionally, all personnel were rated as satisfactory. Weapons that are not currently assigned to SID personnel were also inspected to ensure serial numbers of equipment corresponds with documentation on inventory lists provided to the monitoring team. The monitoring of these inspections is set to continue on at least an annual basis.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.96 Assessing Compliance with Paragraph 109:  Tracking Specialized Unit Responses

Paragraph 109 stipulates:

> **"APD agrees to track and analyze the number of specialized investigative unit responses. The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include: (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative unit member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.97 Assessing Compliance with Paragraph 110: Individuals in Crisis and Related Issues

Paragraph 110 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below."**

This overarching paragraph refers to the paragraphs 111-137, below. As such, this paragraph will not be noted in compliance until such time that other related required paragraphs are found to be fully in compliance. Members of the monitoring team assessed data from the relevant policies as noted in the table below.

**Results**

During this reporting period, APD worked diligently in collaboration with the monitoring team to improve policies, drafting a new "administrative" policy (SOP 1-37, revising, and re-working SOP 2-19. SOP 2-19 is now a shorter, clearer policy, geared toward operational field processes.)

In spite of the considerable progress of writing and re-writing 1-37 and 2-19, two of the five policies addressing behavioral health issues listed above, APD needs to focus urgently on producing approvable policies for the remainder of this policy suite. Based on the records available to the monitoring team, three of these policy requirements or past due. APD is not in compliance for this "overarching" paragraph. This is another factor creating substantial policy development backlogs at APD. Without policy, training is not feasible, and operational compliance is not attainable. In the monitoring team's experience, mental health practices are in reasonably regular flux, as new practices are developed and old practices are revised, updated, and re-crafted. APD is in primary compliance for this paragraph—it has policies in place. Until these policies are updated, we caution APD to be circumspect about re-training its officers in mental health practice absent these updates. As with the early stages of the CASA-implementation process, delays in policies generate delays in training, which lead to delays in adequate supervisory processes, which are the definition of non-compliance.   See Table 4.7.97. below.

**Table 4.7.97 Policy Renewal Status for Behavioral Health Policies**

| Policy | Policy Name (Relevance to 110) |
| --- | --- |
| SOP 1-11 (previously 1-14) | BEHAVIORAL SCIENCES SECTION – Approved after close of reporting period |
| SOP 1-37 (new) | CRISIS INTERVENTION SECTION AND PROGRAM (pending training) |
| SOP 2-19 (previously 2-13) | RESPONSE TO BEHAVIORAL HEALTH ISSUES – Approved after close of reporting period |
| SOP 2-20 (previously 2-42) | HOSTAGE, SUICIDAL/BARRICADED SUBJECT, AND TACTICAL THREAT ASSESSMENT – Due for review on 10/16/18 (Past Due) |
| SOP    (previously 1-09) | USE OF ON-BODY RECORDING DEVICES / MANAGEMENT OF RECORDINGS (contains reference to "subjects in crisis") Due for review on 6/2/18 (Past Due) |

Primary:     **In Compliance** (based on existing policy)
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 100:*

*4.7.97a: Update clearly articulated policy for APD's mobile crisis teams, consistent with the policies in Table above, and provide training on that policy for APD's Mobile Crisis Teams.*

**4.7.98 – 4.7.115 Assessing Compliance with Paragraphs 111- 128: Mental Health Response Issues.**

Paragraphs 111-128 address mental health response issues treated in detail in the CASA. In determining compliance outcomes for these paragraphs, the monitoring team reviewed normal course-of-business documentation related to mental health response practices by APD during the reporting period for the 9th monitor's report. Our findings are discussed below.

Data available to the monitoring team show regular monthly meetings for the community's Mental Health Response Advisory Committee (MHRAC) that involve at times highly detailed discussions of problems, issues, needs and solutions. MHRAC continues to be one of the success stories in APD's community outreach processes. MHRAC's reports, recommendations, communications, and assessment processes created during this reporting period continue to be a source of valuable insight for APD's mental health/crisis intervention strategies. A broad spectrum of community mental health leaders, APD command staff, APD's Crisis Outreach and Support Team members (COAST) and mental health professionals attend and participate in MHRAC meetings. Our reviews of MHRAC's agendas and meeting minutes indicate broad-based input from community mental health experts, advocates, and providers.

In assessing the APD's compliance with this paragraph, we reviewed APD processes designed to:

- Structure mental health processes in the community;
- Foster close coordination between APD and mental health leaders; and
- Craft meaningful, flexible, and effective mental health services throughout  the communities served by the APD.

We note that APD has met, and in many cases far exceeded, many of the requirements of the CASA related to mental health response planning, crisis intervention, and service delivery. Our review indicates that APD crisis outreach services personnel have worked diligently with the advisory committee to assess, improve, and serve the target communities.

### 4.7.98 Assessing Compliance with Paragraph 111: Mental Health Response Advisory Committee

Paragraph 111 stipulates:

> **"Within six months of the Effective Date, APD and the City shall establish a Mental Health Response Advisory Committee (Advisory Committee) with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness."**

### Methodology

In assessing compliance with this paragraph, the monitoring team reviewed:

- MHRAC's reports, recommendations, communications, and processes created during this reporting period;
- Meeting agendas and minutes for MHRAC meetings;
- Meeting minutes for subcommittee meetings; and
- Various communications regarding policy reviews between APD and MHRAC.

MHRAC meetings occurred monthly during this reporting period, along with some subcommittee meetings. Table 4.7.98 below briefly describes major topics covered during the MHRAC meetings.

### Table 4.7.98 Topics of IMR-9 Reporting Period MHRAC Meetings

| Reporting period month | Meeting date | Issues discussed |
|---|---|---|
| August 2018 | 8/21/18 | Updates from CIU, subcommittees, COAST, draft Crisis Negotiations Team SOP |
| September 2018 | 9/18/18 | New UNMH member, updates from CIU, sub-committees, COAST, Discussion of SOP 1-11, City's plan for homelessness |
| October 2018 | 10/16/18 | Cadet training, updates from CIU, sub-committees, COAST, Transport of subjects experiencing behavioral health crisis |
| November 2018 | 11/20/18 | Presentations: Adult Protective Services, Project ECHO, Mobile Crisis Team, updates from CIU, |

| | | sub-committees, COAST, Transport of subjects experiencing behavioral health crisis |
|---|---|---|
| December 2018 | 12/18/18 | CIU Data, Year-end Reports, lapel camera technology, updates from CIU, sub-committees, COAST |
| January 2019 | 1/15/19 | City Homelessness Initiative, updates from CIU, sub-committees, COAST |

## Results

Primary:          **In Compliance**
Secondary:        **In Compliance**
Operational:      **In Compliance**

## 4.7.99 Assessing Compliance with Paragraph 112

Paragraph 112 stipulates:

> **"The Advisory Committee shall include representation from APD command staff, crisis intervention certified responders, Crisis Intervention Unit (CIU), Crisis Outreach and Support Team (COAST), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups."**

## Methodology

Members of the monitoring team reviewed MHRAC's agendas and meeting minutes for monthly meetings that occurred during this reporting period.

## Results

All specified groups named in this paragraph regularly participated in MHRAC meetings during this reporting period, and minutes reflected discussions of agenda items designed to facilitate the goals of MHRAC.

Primary:          **In Compliance**
Secondary:        **In Compliance**
Operational:      **In Compliance**

## 4.7.100 Assessing Compliance with Paragraph 113

Paragraph 113 stipulates:

> **"The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event."**

## Methodology

Members of the monitoring team reviewed MHRAC's reports, recommendations, communications, and processes, and conducted interviews with specific members of the MHRAC. In addition, we reviewed MHRAC monthly meeting agendas and minutes, and MHRAC subcommittee meeting minutes and memos.

## Results

The MHRAC continued to provide guidance to the City and APD regarding developing and expanding the number of CIT-certified responders, as well as response strategies for interacting effectively with homeless individuals and people with mental illness. During this reporting period, the MHRAC considered and provided feedback on the APD's policies and developing mobile crisis teams.

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

## 4.7.101 Assessing Compliance with Paragraph 114:

Paragraph 114 stipulates:

> **"APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality."**

## Methodology

Members of the monitoring team reviewed a 100% sample of MHRAC's reports, recommendations, communications, and processes during the reporting period, assessing these documents for compliance with Paragraph 114. The monitoring team

also reviewed the signed MOU between APD's CIU and the University of New Mexico Health Sciences Center/UNM Health Systems (signed version dated 10/10/17).

## Results

Negotiations between the City of Albuquerque and the University of New Mexico Health System resulted in the execution of a signed MOU that governs the release and exchange of information. During this reporting period, members of the CIU began adding modules to existing mental health training courses regarding this October 2017 MOU.  The new modules were also shared with the MHRAC for feedback. Training on these modules has begun; however, as of the end of this reporting period, fewer than 95 percent of all certified CIT responders have received the training updates regarding the MOU.

>Primary: **In Compliance**
>Secondary: **Not In Compliance**
>Operational: **Not In Compliance**

### *Recommendation for Paragraph 114:*

### *4.7.101a: Continue to provide training to, at minimum, CIU staff and certified CIT responders on this MOU.*

### 4.7.102 Assessing Compliance with Paragraph 115

Paragraph 115 stipulates:

>**"Within nine months of the Effective Dates, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also, within nine months of the Effective Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario-based training involving typical situations that occur when mental illness is a factor.**

## Methodology

Members of the monitoring team reviewed a 100% sample of data provided to MHRAC by APD relating to provisions of Paragraph 115, including data analysis in the form of PowerPoint slides; and MHRAC and subcommittee meeting agendas and minutes.

## Results

APD continued to work with staff to produce meaningful data analysis of the data elements specified in paragraphs 129 and 137. APD has presented these data regularly

to the MHRAC. APD provides all behavioral health training curricula to the MHRAC for review, but the feedback processes between the MHRAC and APD remain unclear and not routinized.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 115:***

***4.7.102a: Submit required documentation to MHRAC as well as documentation from MHRAC noting review and approval.***

### 4.7.103 Assessing Compliance with Paragraph 116

Paragraph 116 stipulates:

> **"The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services."**

### Methodology

Members of the monitoring team reviewed data provided to MHRAC by APD relating to enhancing coordination within and among MHRAC's service base, including memos, emails, and MHRAC meeting minutes.

### Results

The MHRAC continued their work to enhance coordination of services for chronically homeless individuals and people experiencing mental health crisis. APD and the MHRAC regularly provided updated lists of resources to APD officers for them to provide to people they interact with while on patrol. The monitoring team's review shows a substantial and tangible degree of interaction and cooperation between local behavioral health systems and the APD on this issue, as well as tangible results in systems improvement recommendations.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.104 Assessing Compliance with Paragraph 117

Paragraph 117 stipulates:

> **"Within 12 months of the Effective Date, and annually thereafter, the Advisory Committee will provide a public report**

**to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources."**

## Methodology

Members of the monitoring team reviewed the MHRAC's annual public report from 2018, which included a Co-Chairs Report, an Information Sharing Subcommittee Annual Report, a Resource Subcommittee Annual Report, and a Training Subcommittee Annual Report.

## Results

The MHRAC produced a set of Annual reports for 2018, all of which were posted on the APD website in a timely fashion.

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.105 Assessing Compliance with Paragraph 118 Behavioral Health Training

Paragraph 118 stipulates:

**"APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment."**

No evaluation methodology was developed for paragraph 118, as it is not a "requirement" for APD or City action, but simply states facts.

## 4.7.106 Assessing Compliance with Paragraph 119 Behavioral Health Training for all Cadets

Paragraph 119 stipulates:

**"APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by the end of 2015."**

146

**Methodology**

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training, including pre-tests and post-tests of training participants and certificates of training completion.

APD continues to provide state-mandated basic behavioral health training to cadets in the academy as well as 40 hours of basic CIT to academy graduates upon completion of the field training program.  This training is provided as well to all field officers

**Results**

> Primary:       **In Compliance**
> Secondary:  **In Compliance**
> Operational:  **In Compliance**

**4.7.107 Assessing Compliance with Paragraph 120**

Paragraph 120 stipulates:

> **"The behavioral health and crisis intervention training provided to all officers will continue to address field assessment and identification, suicide intervention, crisis de-escalation, scenario-based exercises, and community mental health resources. APD training shall include interaction with individuals with a mental illness and coordination with advocacy groups that protect the rights of individuals with disabilities or those who are chronically homeless. Additionally, the behavioral health and crisis intervention training will provide clear guidance as to when an officer may detain an individual solely because of his or her crisis and refer them for further services when needed."**

**Methodology**

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training and observed an ECIT training session during this monitoring period. APD continues to appropriately and effectively utilize training curricula that address field assessment, identification, suicide intervention, crisis de-escalation, community mental health participation and scenario-based exercises and role play exercises. All training emphasizes the importance of community partnerships and appropriate referrals to services. APD also continues to update their behavioral health curricula appropriately, for example, recently adding modules addressing the information sharing MOU between the City and UNMH.

**Results**

> Primary:       **In Compliance**
> Secondary:  **In Compliance**

147

Operational:  **In Compliance**

### 4.7.108 Assessing Compliance with Paragraph 121

Paragraph 121 stipulates:

> **"APD shall ensure that new tele-communicators receive 20 hours of behavioral health training. This training shall include: telephonic suicide intervention; crisis management and de-escalation; interactions with individuals with mental illness; descriptive information that should be gathered when tele-communicators suspect that a call involves someone with mental illness; the roles and functions of COAST, crisis intervention certified responders, and CIU; the types of calls that should be directed to particular officers or teams; and recording information in the dispatch database about calls in which mental illness may be a factor."**

**Methodology**

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training for tele-communicators and note that behavior health training for tele-communicators training took place in October 2018.

**Results**

APD's 20 hours of behavioral health training for tele-communicators includes all topics noted in paragraph 121 as well as role-play scenarios drawn from actual 911 calls fielded by APD tele-communicator personnel.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.109 Assessing Compliance with Paragraph 122

Paragraph 122 stipulates:

> **"APD shall provide two hours of in-service training to all existing officers and tele-communicators on behavioral health-related topics biannually."**

**Methodology**

Members of the monitoring team reviewed training records of APD relating to basic behavioral health training for officers and tele-communicators.

**Results**

APD has developed a 2-hour in-service training curriculum that addresses the requirements of New Mexico House Bill 93, entitled "Police Training for Mental Impairments." APD remains in compliance with the requirement of bi-annual training. APD updated this curriculum in September 2018.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.110 Assessing Compliance with Paragraph 123: Crisis Intervention Certified Responders and Crisis Intervention Unit

Paragraph 123 stipulates:

> **"APD shall maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis. APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives housed at the Family Advocacy Center whose primary responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future. APD agrees to expand both the number of crisis intervention certified responders and CIU."**

**Methodology**

Members of the monitoring team reviewed training and assignment records for CIU officers for the reporting period. According to APD records, 184 field officers are ECIT trained, making them "certified responders" per this paragraph.

APD maintains a Crisis Intervention Unit staffed with detectives housed at the Family Advocacy Center. While the number of detectives varied slightly throughout this reporting period (due to promotions mostly), the number of detectives in the CIU held steady at 12, meeting the recommended number of detectives noted in the "Albuquerque Police Department Comprehensive Staffing Assessment and Resources Study" conducted by Alexander Weiss Consulting, LLC (Final Draft Report, December 11, 2015).

We remain unaware of any specific methodology developed by APD to determine the department's definition of the "sufficient number" of crisis-intervention certified responders, but the CIU has made progress toward developing a methodology for determining that requirement. The monitoring team's assessment is that staffing

remains insufficient, based on the requirement that staffing for the advocacy center is below that articulated in the CASA.

**Results**

Primary:         **In Compliance**
Secondary:     **In Compliance**
Operational:   **Not In Compliance**

***Recommendation for Paragraph 123:***

***4.7.110a: Develop and execute a data-driven, methodologically appropriate workload and manpower planning and analysis protocol that ensures that reliable "staffing levels" for ECIT officers are calculated, reported, set as staffing goals, and attained.***

### 4.7.111 Assessing Compliance with Paragraph 124

Paragraph 124 stipulates:

> **"The number of crisis intervention certified responders will be driven by the demand for crisis intervention services, with an initial goal of 40% of Field Services officers who volunteer to take on specialized crisis intervention duties in the field. Within one year of the Effective Date, APD shall reassess the number of crisis intervention certified responders, following the staffing assessment and resource study required by Paragraph 204 of this Agreement."**

**Methodology**

Members of the monitoring team reviewed training records for the ECIT officers, who meet the definition of "field services officers who volunteer to take on specialized crisis intervention duties in the field" along with planning memos from the CIU as they begin their process to determine how they will determine whether 40% is "sufficient" for the needs of Albuquerque (per paragraph 123).

**Results**

The current staffing levels of crisis intervention "certified responders" consistently met the 40% goal during this reporting period, varying from 40.9% to 43.6%. The CIU held six ECIT "certified responders" classes on the following dates during this reporting period: October 15, October 16, November 8, December 3, January 7 and January 10.

Primary:         **In Compliance**
Secondary:     **In Compliance**
Operational:   **In Compliance**

### 4.7.112 Assessing Compliance with Paragraph 125

Paragraph 125 stipulates:

> **"During basic crisis intervention training for field officers provided to new and current officers, training facilitators shall recommend officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals with mental illness to serve as crisis intervention certified responders."**

**Methodology**

Members of the monitoring team reviewed recommendations obtained and assessed by training facilitators, along with recruiting emails to field services officers during this reporting period.

**Results**

The APD CIU instructors routinely identify and recommend field officers well suited for the Enhanced CIT (ECIT) course.  A member of the CIU reaches out to those officers and recommends that they enroll in an upcoming ECIT course.

> Primary:      **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.113 Assessing Compliance with Paragraph 126

Paragraph 126 stipulates:

> **"Within 18 months of the Effective Date, APD shall require crisis intervention certified responders and CIU to undergo at least eight hours of in-service crisis intervention training biannually."**

**Methodology**

Members of the monitoring team reviewed training records for CIU personnel.

**Results**

APD provided 8-hours of "re-certification" refresher training during this reporting period. APD CIU instructors trained a total of 37 ECIT certified responders during two sessions held on October 15 and October 16.

> Primary:      **In Compliance**
> Secondary:    **In Compliance**

Operational:   **In Compliance**

## 4.7.114 Assessing Compliance with Paragraph 127

Paragraph 127 stipulates:

> **"Within 18 months of the Effective Date, APD will ensure that there is sufficient coverage of crisis intervention certified responders to maximize the availability of specialized responses to incidents and calls for service involving individuals in mental health crisis; and warrant service, tactical deployments, and welfare checks involving individuals with known mental illness."**

### Methodology

During this reporting period, APD CIU continued to deliver Enhanced CIT (ECIT) training to address the requirement for "certified responders." The APD CIU accomplished significant work during this reporting period toward determining whether the initial goal of 40% is "sufficient" for Albuquerque, including internal discussions and memos about how to define and measure "sufficient coverage."

### Results

ECIT training recently has been completed, and paragraph 124's requirement of 40% was reached during this reporting period.  The revised ECIT policy has been finalized this quarter. APD has begun the process of assessing operational determinations for this paragraph and the monitoring team will review their determinations in the next reporting period.

Primary:       **In Compliance**
Secondary:     **In Compliance**
Operational:   **In Compliance**

## 4.7.115 Assessing Compliance with Paragraph 128

Paragraph 128 stipulates:

> **"APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so."**

**Methodology**

Members of the monitoring team conducted ride-alongs with field officers on November 5 and November 7 during this monitoring period. The ride-alongs were either with the Mobile Crisis Team or with field officers in the busiest area commands in terms of mental health-related calls (SW, SE and Foothills area commands).

**Results**

We observed that the requirements of this paragraph were routinely met in the field.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

**4.7.116 – 4.7.124 Assessing Compliance with Paragraphs 129-137**

Monitoring team members reviewed (via report review and ride-along processes) the APD's current activities related to provision of policing services to individuals with mental illness and individuals in behavioral crises (paragraphs 129 through 137). Our observations indicate that the behavioral health paragraphs of the CASA have received careful and meaningful attention during the reporting period. APD is in compliance with all nine paragraphs outlining specific APD (and related organization such as the Mental Health Response Advisory Committee, etc.).

As part of the monitoring process, the monitoring team:

1.  Reviewed minutes of MHRAC meetings, and observed multiple training sessions for APD mental health community service personnel;

2.  Reviewed extant and proposed policies guiding APD's service delivery to individuals experiencing mental health crises;

3.  Assessed APD's service delivery mechanisms focused on the homeless populations of Albuquerque;

4.  Assessed APD procedures for connecting the homeless to support services;

5.  Evaluated APD's interagency communications and cooperation practices regarding mental health services;

6. Assessed staffing at the Crisis Intervention Unit;

7. Reviewed the interaction protocols and processes among COAST/CIU with personnel from community mental health resource providers;

8. Assessed APD's mental health data collection and analysis processes; and

9. Reviewed APD training curricula related to community mental health processes.

The data we reviewed indicate that APD's outreach and support efforts to those in the communities served are resilient, effective, and problem-oriented. Data collection, analysis and reporting processes and protocols have been updated with much improved accuracy and reliability, and training remains a strong point of this effort. APD's services in this area are so strong that they have been consistently featured in national conferences such as the International Association of Chiefs of Police (IACP), etc.

### 4.7.116 Assessing Compliance with Paragraph 129

Paragraph 129 stipulates:

> **"APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
> **a) date, shift, and area command of the incident;**
> **b) subject's age, race/ethnicity, and gender;**
> **c) whether the subject was armed and the type of weapon;**
> **d) whether the subject claims to be a U.S. military veteran;**
> **e) name and badge number of crisis intervention certified responder or CIU detective on the scene;**
> **f) whether a supervisor responded to the scene;**
> **g) techniques or equipment used;**
> **h) any injuries to officers, subjects, or others;**
> **i) disposition of the encounter (e.g., arrest, citation, referral); and**
> **j) a brief narrative of the event (if not included in any other document)."**

**Results**

A dedicated data analyst continues to update the "Albuquerque Police Department Crisis Intervention Unit Data Book: A Working Compendium" (the most recent version reviewed by the monitoring team is dated December 18, 2018).   These updates occur on a regular basis and are used to track the data required by this paragraph. APD also continues to refine their ability to track data through existing systems.  For example, in October 2018, changes to the Pre-Booking form and the Pre-Booking report were made to reflect a new yes/no check box for "Psychiatric Services Referral," which will serve as an additional triangulation of data for the Data Analyst and CIU to track and compare to their other data sources.

Primary:       **In Compliance**

154

Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.117 Assessing Compliance with Paragraph 130

Paragraph 130 stipulates:

> **"APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis."**

**Results**

APD's behavioral health-related units continue to use data-driven decision making, and to revise programmatic responses based on solid data analysis.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.118 Assessing Compliance with Paragraph 131

Paragraph 131 stipulates:

> **"Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services."**

**Results**

As of the date of the close of this reporting period, the protocol has not been updated. We recommend APD work with the advisory committee to ensure the protocols are updated and congruent with related policy and protocols.  This should be a high priority over the coming months.

Primary:      **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 131:*

*4.7.118a: Work with advisory committee to ensure the protocols are updated and congruent with related policy and protocols.*

**4.7.119 Assessing Compliance with Paragraph 132 Crisis Prevention**

Paragraph 132 stipulates:

> **"APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers."**

**Results**

Based on our review of program documentation, it is apparent from in-field reports, data analysis and real-time response to identified issues that APD's COAST and CIU routinely follow up with critical elements of the population who would benefit from COAST and CIU services.

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

**4.7.120 Assessing Compliance with Paragraph 133**

Paragraph 133 stipulates:

> **"COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at risk of experiencing a mental health crisis and assist with follow-up calls or visits."**

**Results**

Based on our review of program documentation, it is apparent from in-field reports, data analysis and real-time response to identified issues that APD's COAST and CIU routinely follow up with critical elements of the population who would benefit from COAST and CIU services.

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.121 Assessing Compliance with Paragraph 134

Paragraph 134 stipulates:

> **"APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options."**

**Results**

Based on our review of program documentation, it is apparent from in-field reports, data analysis and real-time response to identified issues that APD's COAST and CIU routinely follow up with critical elements of the population who would benefit from COAST and CIU services.

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.122 Assessing Compliance with Paragraph 135

Paragraph 135 stipulates:

> **"APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement. Within three months of completing the staffing assessment and resource study required by Paragraph 204 of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less."**

**Results**

APD provided the monitoring team with a detailed tracking of all COAST members and detectives within the CIU.  These data were collected throughout this reporting period. While the number of detectives waxed and waned by +1 to -1 throughout this reporting period (due to promotions mostly), the number of detectives in the CIU held steadily at 12. Importantly, during this reporting period, CIU gained a second sergeant, which will enhance operations for the unit.

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.123 Assessing Compliance with Paragraph 136

157

Paragraph 136 stipulates:

> **"COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources**."

## Results

COAST and CIU have developed robust relationships with service providers throughout the city, and network with them regularly to discuss new ideas and solutions. They have recently focused on problem solving in the downtown area, for example, and have been networking on a national level through their presentations at various conferences, allowing them to learn about best practices throughout the nation.

Primary:          **In Compliance**
Secondary:     **In Compliance**
Operational:  **In Compliance**

## 4.7.124 Assessing Compliance with Paragraph 137

Paragraph 137 stipulates:

> **"APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
> **a) number of individuals in the COAST and CIU caseloads;**
> **b) number of individuals receiving crisis prevention services;**
> **c) date, shift, and area command of incidents or follow up encounters;**
> **d) subject's age, race/ethnicity, and gender;**
> **e) whether the subject claims to be a U.S. military veteran;**
> **f) techniques or equipment used;**
> **g) any injuries to officers, subjects, or others;**
> **h) disposition of the encounter (e.g., arrest, citation, referral); and**
> **i) a brief narrative of the event (if not included in any other document)."**

## Results

A dedicated data analyst continues to update the "Albuquerque Police Department Crisis Intervention Unit Data Book: A Working Compendium" on a regular basis to track the data required by this paragraph. APD also continues to refine their ability to track data through existing systems. The most recent version reviewed by the monitoring team is dated 18 NOV 18.  In October 2018 changes to the Pre-Booking form and the

Pre-Booking report were made to reflect a new yes/no check box for "Psychiatric Services Referral," which will serve as an additional triangulation of data for the CIU data analyst and CIU to track and compare to their other data sources.

> Primary:      **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

## 4.7.125 Assessing Compliance with Paragraph 139[67]

Paragraph 139 stipulates that:

> **"APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices. APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically. "**

APD continues to produce effective policy and procedures that are compliant with the CASA.  The monitor continues to be intensively and extensively involved with policy development at APD, and continues to make recommendations for improvement in the process.

> Primary:      **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

## 4.7.126 Assessing Compliance with Paragraph 140

Paragraph 140 stipulates:

> **"APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference. APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format."**

**Results**

No substantial changes to the indexing and numbering systems have been recommended or made by APD, except for the recent revisions necessitated by APD's moving to a more manageable use of force classification, review, assessment, and processing system.  APD remains in compliance with this paragraph based on past and current practices.

---

[67] Paragraph 138 is judged to be prefatory to the following section on training, and as such established goals, but not quantifiable objectives.  These are dealt with in paragraphs 139-148.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.127 Assessing Compliance with Paragraph 141

Paragraph 141 stipulates:

> **"Within three months of the Effective Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures."**

**Methodology**

APD remains in compliance with this paragraph based on past and current practice. Policies are provided to all sworn members of APD via intra-net and are available to the public via the internet.

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.128 Assessing Compliance with Paragraph 142

Paragraph 142 stipulates:

> **"Within three months of the Effective Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities. The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014)."**

**Methodology**

APD's responses to the requirements of this paragraph were implemented early in the compliance process with creation of the PPRB.  Early in this project, the monitoring team, as part of their routine practice, observed PPRB meetings and found them to be comprised as required by the CASA. That composition continues to this day.

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**

160

Operational:   **In Compliance**

## 4.7.129 Assessing Compliance with Paragraph 143

Paragraph 143 stipulates:

> **"Within nine months of the Effective Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement. The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division."**

### Methodology

The monitor, over the past three years, has routinely assessed PPRB practice, and found it consistent with the CASA and established practice.  Past practice at PPRB has been effective and not deleterious to decisions of the command staff at APD, the Parties and the monitor.

### Results

During the IMR-9 reporting period, the Parties and the monitor agreed to provide substantially more technical assistance than normally would have been the case, and provided to APD a draft use of force policy that had been carefully vetted and agreed to by the Parties and the monitor.  PPRB (and APD's SMEs) then reviewed that piece of policy work and substantially revised the Parties' work.  Those revisions significantly changed the Parties' agreed-to draft of the use of force policies.  This process served to highlight a potential defect in the policy development process at APD, one that needs to be remediated by a thorough review of the charge, processes, and location of the of the PPRB in APD's policy development process.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.130 Assessing Compliance with Paragraph 144

Paragraph 144 stipulates:

> **"Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Effective Date. APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility. There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations."**

APD remains in compliance with this task based on past performance.

**Results**

The technical requirements of this paragraph are routinely met by the official requirements of APD policy.

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.131 Assessing Compliance with Paragraph 145

Paragraph 145 stipulates:

> **"The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law. The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews."**

**Methodology**

APD remains in compliance with this task based on past performance.

**Results**

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.132 Assessing Compliance with Paragraph 146

Paragraph 146 stipulates:

> **"APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure."**

**Methodology**

APD remains in compliance; however, over the next few monitor's reports, we will revisit APD's parameters on disciplinary decisions vis a vis uniformity.

162

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

## 4.7.133 Assessing Compliance with Paragraph 147

Paragraph 147 stipulates

> **"APD shall submit all policies, procedures, manuals, and
> other administrative orders or directives related to this
> Agreement to the Monitor and DOJ for review and comment
> before publication and implementation."**

## Methodology

Members of the monitoring team routinely reviewed policies, procedures, administrative orders and special orders for compliance with this paragraph.  APD's practice regarding special orders (temporary instructive mechanisms designed to revise workflow, review, and or decision-making processes at APD) are now routinely routed through the monitoring team for review and comment.

## Results

APD routinely complies with the requirements of this paragraph.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

## 4.7.134 Assessing Compliance with Paragraph 148

Paragraph 148 stipulates:

> **"APD shall have 15 days to resolve any objections to new or
> revised policies, procedures, manuals, or directives
> implementing the specified provisions. If, after this 15-day
> period has run, the DOJ maintains its objection, then the
> Monitor shall have an additional 15 days to resolve the
> objection. If either party disagrees with the Monitor's
> resolution of the objection, either party may ask the Court to
> resolve the matter. The Monitor shall determine whether in
> some instances an additional amount of time is necessary to
> ensure full and proper review of policies. Factors to consider
> in making this determination include: 1) complexity of the
> policy; 2) extent of disagreement regarding the policy; 3)
> number of policies provided simultaneously; and 4)
> extraordinary circumstances delaying review by DOJ or the
> Monitor. In determining whether these factors warrant**

> **additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review. Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion."**

## Methodology

The provisions of this paragraph seldom need to be invoked.  The Parties have tended to be mutually supportive in getting policies moved through the approval process.

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.135 Assessing Compliance with Paragraphs 149

Paragraph 149 stipulates:

> **"Within two months of the Effective Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement."**

Paragraph 149 identifies requirements for action by APD early on in the compliance process. These paragraphs relate to briefings of all officers on the requirements of the CASA, briefings and training of officers relative to their CASA-required actions, and training and retraining of officers.

## Methodology

The monitoring team reviews records for all new APD employees to ensure that they are briefed and presented the terms of the Agreement. The monitoring team reviews PowerDMS entries to ensure all personnel sign off as acknowledging that the material was reviewed and received. The monitoring team was supplied documentation via an Interoffice Memorandum reflecting a CASA update for Cadet Class #120 and Lateral Class #121 indicating that these new members were briefed and presented the terms of the Agreement. PowerDMS entries were also supplied. The City remains in compliance with this paragraph based on earlier performance.

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.136 Assessing Compliance with Paragraph 150

Paragraph 150 stipulates:

> **"Within three months of issuing a policy or procedure pursuant to this Agreement, APD agrees to ensure that all relevant APD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations. APD agrees to document that each relevant APD officer or other employee has received and read the policy. Training beyond roll-call or similar training will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy."**

### Methodology

The City remains in compliance with this paragraph based on earlier performance. The monitoring team will continue to monitor new policies and changes to policy that are pending approval in future reporting periods to ensure that the requirements of this paragraph are maintained.

### Results

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.137 Assessing Compliance with Paragraph 151

Paragraph 151 stipulates:

> **"Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Effective Date, and annually thereafter. Within six months of the Effective Date, APD shall set out a schedule for delivering all training required by this Agreement."**

### Methodology

The City remains in compliance with this paragraph based on earlier performance and maintains a current training schedule fulfilling the requirements of this paragraph. The monitoring team will continue to monitor new policies and changes to policy that are pending approval in future reporting periods to ensure that the requirements of this paragraph are maintained and that appropriate training is delivered and followed.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.138 Assessing Compliance with Paragraph 152

Paragraph 152 stipulates:

> **"APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty."**

**Methodology**

The monitoring team requested from APD copies of COB documentation related to this paragraph. Since early 2018, APD has seen an influx of applications from currently practicing officers from other jurisdictions. Given this new interest from outside APD related to the lateral employment process, we will continue to monitor the selection and assessment practices to ensure compliance with this paragraph. To date, we have noted no policy outliers in this process. All lateral hires are certified, and all are required to process through APD-specific training renewals. APD is working currently to reassess and update its lateral processing, training and supervision processes. The monitoring team has reviewed and approved those updates.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.139 Assessing Compliance with Paragraph 153

Paragraph 153 stipulates:

> **"APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records. APD shall also maintain complete and accurate records of any audit, review, assessment, or evaluation of the sufficiency or effectiveness of its training programs. APD shall make these records available for inspection by the Monitor and DOJ."**

**Methodology**

The monitoring team's requests for, and review of, records responsive to Paragraph153 produce ample evidence that the provisions of the paragraph are being met by APD. The material reviewed for this reporting period (August 2018 through January 2019)

included but was not limited to:

- 2018 Electronic Control Weapons Update and Certification;
- Supervisor Use of Force Supplemental Training;
- Field Training and Evaluation Program (FTO Course);
- 2018 Supervisor RBT; and
- Lateral Training

APD continues to maintain compliance by making records available for inspection by the monitoring team during site visits.

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.140 Assessing Compliance with Paragraph 154

Paragraph 154 stipulates:

> **"APD shall ensure that changes in relevant case law and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and pre-service training."**

No changes to relevant case law and statutes were noted during this reporting period. Based on past performance by the Advanced Training Unit, APD remains in compliance.

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.141 – 4.7.147 Assessing Compliance with Paragraphs 155-161: Field Training and Evaluation Program

During this reporting period (August 2018 through January 2019), the monitoring team reviewed and examined the data required for APD to maintain compliance with these paragraphs in the forms of policy, programs, and results. APD remains in Operational Compliance with the paragraphs in the CASA that relate to the Field Training and Evaluation Program, except for paragraph 161.

Members of the monitoring team met with the APD Academy personnel responsible for maintaining the program development and implementation as per SOP 6-1 "Training Division". The Academy had a new Commander recently assigned as of the November

167

2018 site visit.  The new Commander was present for the visit. For this reporting period, no known applicable changes to case law, core principles, or values, had taken place, but revisions to SOP 1-46 Field Training And Evaluation Program (FTEP) had been submitted. The monitoring team has received a draft copy of submitted revisions to the Field Training and Evaluation Program that are currently under review in the chain of command and are awaiting approval.

The monitoring team reviewed Special Orders for the FTO Class during this reporting period. These Field Services Bureau Special Orders reflect 100% compliance with the program's requirement of sixteen weeks of field training and no early release from the program.

The number of officers serving as FTO's for the FTO program during this monitoring period has fluctuated between 44 and 51 available FTO's. During this period, APD enrolled eleven new members into the program.  The monitoring team reviewed the vetting process for the applications and backgrounds of the eleven individuals. This review indicated that all requirements of the CASA were met. APD submits backgrounds and applications (on an on-going basis) to the monitoring team for review to ensure compliance. In addition to the eleven new members, all current FTO personnel, received and completed the annual FTEP/FTO In-Service Course as required by the CASA.

In order to assess compliance with the CASA, all Special Orders for the FTO program were reviewed. The below listed criteria were attained during this period:

      1) Recruits are trained in multiple Area Commands;
      2) Recruits are trained in different shifts; and
      3) Recruits are exposed to different Field Training Officers.

APD maintains compliance with these requirements.

Members of the monitoring team also requested COB documentation to ensure APD continues to afford recruits with:

1)  A mechanism for confidential feedback regarding quality of field training;
2)  Consistency between instructional processes developed in field training and at the training academy; and
3)  APD's consideration of feedback and what, if any,  changes are made as a result of a given recruit.

As documented in previous monitoring periods, the monitoring team reviewed the anonymous survey utilized by APD to comply with the requirements of the CASA. The 119th Cadet Class, like previous classes, maintained a high degree of participation. The monitoring team paid particular attention to the following areas:

- Use of technology;
- Scenario Training;

168

- Geographic Orientation;
- Radio Communication;
- Driving;
- Report writing;
- Knowledge of criminal and traffic code;
- Court;
- Use of Force policy and practice; and
- Patrol Procedures.

The APD Academy continues to monitor the surveys and submit course-of-business memoranda covering these areas. Where applicable, the Academy made changes to the 120th Cadet Class curriculum.

The monitoring team has discussed with the FTO coordinator a concern with maintaining a full complement of FTO's as APD moves forward. At the June 2018 site visit, APD advised that the current enrollment in the entire FTO Program was 75 members (FTO's, Sergeants and Lieutenants). At the end of this reporting period, (January 31, 2019) the breakdown of the program was four Lieutenants, eleven Sergeants, and forty-four FTO's for a total of fifty-nine members in the program. During this reporting period, particularly January 2019, APD had sixty (60) recent academy graduates to train in the FTO program. The program had only forty-four (44) available FTO's at that time, well under any recommended ratio as it relates to law enforcement best practices. APD issued a Memorandum/Field Services Bureau Special Order (FSB SO 19-05) dated January 14, 2019, putting the 21st Lateral Class (twenty-six [26] officers) in temporary assignments. APD assigned thirty-four (34) FTO's to the remaining thirty-four (34) recent graduates, leaving ten (10) available FTOs in the program. Given the certainty of promotions and retirements, APD must be forward-thinking to avoid a shortage of FTOs in the program. The monitor offered, as a suggestion, that APD reach out to other law enforcement agencies throughout the country to ascertain different measures used to maintain a full complement of FTOs. We have documented that sentiment in previous IMRs. Documentation received for this reporting period contains data suggesting that APD has begun to address this issue.  It is too early to assess the success of that process, and we will continue to monitor the process in the next reporting period. The City of Albuquerque has an understanding with APD to supply the necessary support and resources. Based on information received after the close of this monitoring period, many of our concerns outlined in the FTO paragraphs above have come to fruition.  As recently as April 2019, APD and the APOA have engaged in focused and intense renegotiations of the nature of FTO processes and compensation.  These negotiations resulted in a weekend call by APOA to the monitor, expressing concern over the organization, process, and compensation for current FTOs.  Based on the latest information available, resolution of these issues is still "pending."

## 4.7.141 Assessing Compliance with Paragraph 155

Paragraph 155 stipulates:

> **"APD shall supervise and manage its field-training program to ensure that new officers develop the necessary technical and practical skills required to use force in accordance with APD policy and applicable law. The field-training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community. Field-Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.142 Assessing Compliance with Paragraph 156

Paragraph 156 stipulates:

> **"APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field-training program early."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.143 Assessing Compliance with Paragraph 157

Paragraph 157 stipulates:

> **"APD shall revise the qualifications for Field Training Officers to require four (4) years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism."**

## Results

Members of the monitoring team reviewed documentation associated with paragraph 157's requirements and found that all current FTO meet or exceed the requirements of this paragraph.

Primary:        **In Compliance**

Secondary:        **In Compliance**
Operational:      **In Compliance**

## 4.7.144 Assessing Compliance with Paragraph 158

Paragraph 158 stipulates:

> **"New Field Training Officers and Area Sergeant Coordinators shall receive at least forty (40) hours of initial supervisory-level training and annual in-service training in the following areas: management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques. Field Training Officers and Area Sergeant Coordinators shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de-escalation techniques; and effective problem solving. APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.145 Assessing Compliance with Paragraph 159

Paragraph 159 stipulates:

> **"Recruits in the field-training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.146 Assessing Compliance with Paragraph 160

Paragraph 160 stipulates:

> **"APD shall provide a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and**

> suggestions for changes to academy training based upon
> their experience in the field-training program. APD shall
> consider feedback and document its response, including the
> rationale behind any responsive action taken or decision to
> take no action."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.147 Assessing Compliance with Paragraph 161

Paragraph 161 stipulates:

> "The City shall provide APD with the necessary support and
> resources to designate a sufficient number of Field Training
> Officers to meet the requirements of this Agreement."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

### *Recommendations for Paragraph 161:*

*4.7.147a:  APD should conduct relevant "completed staff work" to clearly and specifically identify the number of FTO needed to support the workload for the new staffing numbers anticipated by APD in the next three years.  That staff work should identify:*

*4.7.147b: Projected "new hires" needed to meet the additional authorized increases in staffing levels anticipated by APD in the next five years;*

*4.7.147c: The resulting number of certified FTOs needed to meet the projected increases in staffing levels;*

*4.7.147d: The anticipated numbers of "losses" in certified FTOs (due to retirements, promotions, transfers, etc.;*

*4.7.147e: The total number of new FTOs needed to meet resulting staffing levels;*

*4.7.147f: The resulting training adjustments that will need to be made to train new FTOs over the coming year.*

### 4.7.148 Assessing Compliance with Paragraph 162

Paragraph 162 requires:

> **"To maintain high-level, quality service; to ensure officer
> safety and accountability; and to promote constitutional,
> effective policing, APD and the Civilian Police Oversight
> Agency shall ensure that all allegations of officer misconduct
> are received and are fully and fairly investigated; that all
> findings in administrative investigations are supported by a
> preponderance of the evidence; and that all officers who
> commit misconduct are held accountable pursuant to a fair
> and consistent disciplinary system.  To achieve these
> outcomes, APD and the Civilian Police Oversight Agency shall
> implement the requirements below.**"

This Paragraph is an introductory paragraph for CPOA-related CASA requirements.  As
such it requires no direct evaluation but is subsumed by the CPOA-related individual
requirements below.

### 4.7.149 Assessing Compliance with Paragraph 163:  Duty to Report Misconduct

Paragraph 163 stipulates:

> **"APD shall require that all officers and employees report
> misconduct by any APD officer or employee, including
> themselves, to a supervisor or directly to the Internal Affairs
> "Bureau for review and investigation.  Where alleged
> misconduct is reported to a supervisor, the supervisor shall
> immediately document and report this information to the
> Internal Affairs Bureau.  Failure to report or document alleged
> misconduct or criminal behavior shall be grounds for
> discipline, up to and including termination of employment."**

### Methodology

Paragraph 163 of the CASA pertains to the duty of all APD officers and employees to
report misconduct by APD officers and employees, and the duty of supervisors to
document information regarding misconduct of subordinates and to report same to IA. It
also requires failure to do to be grounds for discipline.

During the monitoring period and the November 2018 site visit, members of the
monitoring team reviewed 8 investigations completed by IAD [IMR-9-4, IMR-9-31, IMR-
9-32, IMR-9-33, IMR-9-34, IMR-9-35], one case transferred from CPOA – [IMR-9-36],
one case completed by an independent internal affairs investigator based on an internal
complaint – [IMR-9-37]  and 8 completed by CPOA [IMR-9-38, IMR-9-39, IMR-9-40,
IMR-9-41, IMR-9-42, IMR-9-43, IMR-9-44, and IMR-9-45]. The monitoring team also
reviewed APD regulations and met with the IAD Misconduct Commander and staff, and
the CPOA Director and staff.

**Results**

The findings related to Paragraph163 indicate the following CASA-related outcomes.

This monitoring period we found that 5 of the IA cases we reviewed had components of the requirements of Paragraph 163. Given the different ways misconduct comes to the attention of a supervisor, and considering the fact that the reporting of policy violations to IAD Misconduct is often times done in memorandum form, "immediately document and report" is interpreted in context of the case.  In three of the cases noted above, we found the referral to be adequate. [IMR-9-34, IMR-9-4, and IMR-9-35]. However, in two of these cases, the requirements of this paragraph were not met. In [IMR-9-32] the immediate supervisor did not flag a potential use of force violation and refer it to IA in a timely manner, and in [IMR-9-31] co-workers did not report observed violations of social media policy. In both of these cases, the suspected violations were noted by higher-level supervisors. Since these failures to refer by supervisors or co-workers were properly referred for IAD Misconduct investigations, in these cases, the system worked. Likewise, the failures to refer on a timely basis were eventually referred to IAD, and were addressed in the IA investigation.  Again, the system worked as designed.

This is a prime example of the improvement we are seeing recently at APD:  violations of policy and practice are being noted, assessed, and "called" prior to any need for the monitoring team to bring these issues to APD's attention.  This is a marked change to past practices at APD, and is compliant to process required by the CASA and good practice.

The monitor continues to see some issues pertaining to the timeliness of referrals to IAD Misconduct for cases now being completed, that were originally referred to IAD by CIRT.  These timeliness of referral issues in Use of Force cases are linked to the backlog of Use of Force reviews and APD's interpretation of when a referral to IAD should be made during a Use of Force review (when the review is complete or when reasonable indications of misconduct first arise).

The backlog, and interpretive issues arising out of Use of Force reviews, are more fully discussed in regard to paragraphs 60-77 of this IMR. We note that CIRT has been replaced in the IA process with the more carefully constructed and supervised IA-Force Division.  Nonetheless, the out-of-compliance practices engaged in by the old CIRT unit have left a residual of force cases that were remarkably poorly investigated and documented.  We have noted in past reports that CIRT was the epicenter of counter-CASA practices.  While the personnel who created those issues are gone—CIRT was disbanded—the issue of poorly investigated cases remains.  This issue results in non-compliance findings for operational compliance for this reporting period.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

**4.7.150 – 4.7.154 Assessing Compliance with Paragraphs 164-168: Public Information on Civilian Complaints**

Paragraphs 164 through 168 of the CASA pertain to the informational program required of the APD and CPOA, requiring them to make the public aware of the procedures for making civilian complaints against APD personnel. These paragraphs also direct that APD and CPOA provide information, in Spanish and English, to the public in different informational forums that increase the public's accessibility to complaint forms and facilitate the reporting of misconduct.  These paragraphs also require the acceptance of civilian complaints and the officers to identify themselves upon request.

Members of the monitoring team reviewed the APD and CPOA websites, and, in addition to APD headquarters and the CPOA office and City Hall, made ten visits to substations, and to City public buildings, including libraries and community centers. These inspections were conducted to determine whether informational brochures and Complaint and Commendation forms where available. While on-site at the above-mentioned locations, we also had compliance-related meetings with IAD and CPOA personnel.

The findings related to Paragraphs164 through 168 indicate the following outcomes, related to requirements of the CASA:

> 1. In all of its visits to APD, CPOA and City properties, the monitoring team found IA/CPOA informational brochures and Civilian Complaint and Commendation forms to be available.  All were visibly displayed for easy public access. Moreover, the monitoring team continues to find the informational program to be effective. Information on complaint filing is available on the APD and CPOA websites, and in informational materials, brochures, and posters. The information and complaint forms were available online on the APD and CPOA websites.

> 2. The information clearly explains the "mechanisms" for filing complaints, and offers complaint and commendation forms that can be filed electronically or downloaded. Complaint forms are otherwise readily accessible in hard copy at APD, CPOA, City buildings, and also from individual patrol vehicles. The information, both on the website and hard copy, is in Spanish and English. The information does not discourage the filing of complaints and makes clear that complaints can be filed anonymously or by third parties.

Further, based on our review of a stratified random sample of IA and CPOA investigations, we found no instances of evidence or allegations of refusal to provide name and badge numbers when requested.

IA and CPOA are in full compliance with the requirements of Paragraphs 164 through 168.

### 4.7.150 Assessing Compliance with Paragraph 164: Public Information on Civilian Complaints

Paragraph 164 stipulates:

> **"Within six months of the Effective Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints."**

### Results

The process and results of our review of this paragraph are explained in sections 4.7.150-154, above. Compliance for these paragraphs has been attained and maintained, as described below.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.151 Assessing Compliance with Paragraph 165:  Availability of Complaint Forms

Paragraph 165 stipulates:

> **"APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall, public libraries, community centers, and the office of the Civilian Police Oversight Agency.  Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints.  Complaint forms, informational materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person. Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above."**

176

**Results**

Based on our site-visits, observations, and facility reviews noted in paragraphs 4.7.150 – 4.7.154, above, we find APD and CPOA in full compliance with these paragraphs.

     Primary:     **In Compliance**
     Secondary:   **In Compliance**
     Operational: **In Compliance**

## 4.7.152 Assessing Compliance with Paragraph 166:  Public Information on Complaint Process

Paragraph 166 stipulates:

> **"APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites.  The placard shall specify that complaints may be submitted anonymously or on behalf of another person.  APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles.  Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request.  If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint."**

**Results**

     Primary:     **In Compliance**
     Secondary: **In Compliance**
     Operational: **In Compliance**

## 4.7.153 Assessing Compliance with Paragraph 167:  Duty to Accept Citizen Complaints

Paragraph 167 stipulates:

> **"APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints**."

**Results**

     Primary:     **In Compliance**

177

Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.154 Assessing Compliance with Paragraph 168:  Multi-Lingual Complaint Forms

Paragraph 168 stipulates:

> **"Complaint forms and related informational materials shall be made available and posted in English and Spanish."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.155 – 4.7.168 Assessing Compliance with Paragraphs 169-182:  Training on Complaint Intake

Paragraphs 169 through 182 of the CASA pertain to the necessary steps detailing the receipt, acceptance and processing of complaints. These paragraphs require APD and CPOA to receive all complaints, regardless of whether they are made internally or externally, and regardless of whether they are made timely. They require an effective and uniform system that is allegation-based for classifying complaints, and internally referring and appropriately assigning complaints for investigation.

During the monitoring period and the 9th site visit, members of the monitoring team held meetings with the IAD Misconduct Commander and members of his staff; CPOA Executive Director and members of his staff; reviewed complaint log-in and classification records, selected by way of a stratified random sample; and reviewed 8 IA and 8 CPOA investigations completed during the monitoring period. The monitoring team also reviewed the APD and CPOA websites and POB minutes relative to approval of investigations

The findings related to Paragraph169 through 182 indicate the following outcomes, related to requirements of the CASA.

Based on our present and prior reviews, internal and civilian (external) complaints continue to be accepted, reviewed, classified and assigned for investigation according to CASA requirements and approved policy.

Regarding acceptance of complaints, we continue to find no instances of APD or CPOA refusing to accept a citizen complaint. It is well known policy among APD personnel that refusing to accept a complaint, or the discouraging of a complaint are grounds for discipline. Although timely complaints are encouraged, untimely complaints are

accepted, as well as anonymous and third-party complaints. Of the total cases reviewed, we found none during this reporting period that were initiated by an online anonymous complaint. That notwithstanding, given APD's and CPOA's compliance with paragraph 172 in the past, operational compliance is continued for the task of accepting, processing and investigating anonymous complaints.

APD has developed and is using a centralized numbering and tracking systems that continues to assign unique identification numbers to all received complaints. Complaints are received and classified according to allegations and not potential outcomes. We found no instances of complaints being improperly classified. The tracking system is being used correctly, and appears to maintain accurate data, based on our comparisons with "known data." APD's Blue Team management software enables allegations of misconduct by homeless or those who have a mental illness to be tracked. We continue to find that all complaints referred or made to IA, that are within the jurisdiction of the CPOA, are timely referred to CPOA within 3 business days.

Of the total investigations reviewed by the by the monitoring team this reporting period, we found one involving a situation where APD personnel received a complaint from a third party and then informed a supervisor within the appropriate time limitation [IMR-9-4].   We found one involving a citizen request for a supervisor, and the supervisor timely appeared at the scene and provided complaint information. [CPC-153-18].

 We also found only two cases in which supervisors were involved in the incident that was the subject of a complaint. In one, [CPC-128-18], a supervisor was involved in a Use of Force (forcible arrest) incident. He properly recognized that he could not do the review and called in a Lieutenant to conduct the review. In the other, [IMR-9-32], a supervisor was involved in a Use of Force incident in which an officer deployed a taser. Although the supervisor was appropriately the subject of the investigation for conducting a deficient Use of Force review, an issue left unaddressed was whether the supervisor should have conducted the Use of Force review since the sergeant was involved in the incident. APD was in compliance with one of the two cases applicable to the requirements of this paragraph, and not in compliance with the second.  Thus, this is only a 50% compliance rate with paragraph 182 of the CASA, rendering APD out of compliance with this aspect of this section of the CASA.

We do note, for the sake of clarity, that as the number of incidents applicable to a given paragraph of the CASA declines, the probability of an out of compliance finding escalates.  This is central to our long-standing push to have APD train, supervise, and review errors out of their systems.  For example, if a lieutenant or commander had caught and corrected the error in [IMR-9-32], APD would have maintained compliance.

The monitoring team notes that APD has been in compliance with paragraph 182 of the CASA for four consecutive IMRs, and thus this non-compliance appears to be an anomaly. The monitoring team would expect that Use of Force reviews or any supervisory review of officer conduct easily would be recognized as an event not to be investigated by a supervisor who participated in the same incident that is the subject of

the review or complaint.  Again, effective supervisory and management review is the key to APD's success.  Failure to implement and "monitor" such systems is certain to lead to failure.

### 4.7.155 Assessing Compliance with Paragraph 169:  Training on Complaint Intake

Paragraph 169 stipulates:

> **"Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake**."

**Results**

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

### 4.7.156 Assessing Compliance with Paragraph 170:  Complaint Receipt Process

Paragraph 170 stipulates:

> **"APD shall accept complaints regardless of when they are filed.  The City shall encourage civilians to promptly report police misconduct so that full investigations can be made expeditiously, and the full range of disciplinary and corrective action be made available."**

**Results**

We found no instances in which the documentation of complaints reviewed by the monitoring team this reporting period indicated a refusal by APD to accept a citizen's complaint. Further, we are not aware of any information either formally, through our report review processes, or informally, through our contacts with *amici* and other interested persons that suggest this is an issue.

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

### 4.7.157 Assessing Compliance with Paragraph 171:  Prohibition of Refusal to Take Complaint

Paragraph 171 stipulates

> **"The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint shall be grounds for discipline."**

**Results**

    Primary:      **In Compliance**
    Secondary:   **In Compliance**
    Operational:  **In Compliance**

## 4.7.158 Assessing Compliance with Paragraph 172:  Acceptance of Anonymous Complaints

Paragraph 172 stipulates:

> **"APD and the Civilian Police Oversight Agency shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation.  Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail.  Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be provided with a complaint form in Spanish to ensure that the individual is able to make a complaint.  Such complaints will be investigated in accordance with this Agreement."**

**Results**

    Primary:      **In Compliance**
    Secondary:   **In Compliance**
    Operational:  **In Compliance**

## 4.7.159 Assessing Compliance with Paragraph 173:  Inform Supervisors of Citizen Complaints

Paragraph 173 stipulates:

> **"All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint.  All misconduct complaints shall be submitted to the Internal Affairs Bureau by the end of the shift following the shift in which it was received.**"

**Results**

    Primary:      **In Compliance**
    Secondary:   **In Compliance**
    Operational:  **In Compliance**

## 4.7.160 Assessing Compliance with Paragraph 174:  Allegation by Judicial Officers

Paragraph 174 stipulates:

> **"APD and the Civilian Police Oversight Agency shall develop a system to ensure that allegations by a judicial officer of officer misconduct made during a civil or criminal proceeding are identified and assessed for further investigation.  Any decision to decline investigation shall be documented."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.161 Assessing Compliance with Paragraph 175:  Allegations Made by the Homeless or the Mentally Ill

Paragraph 175 stipulates:

> **"APD and the Civilian Police Oversight Agency shall track allegations regarding misconduct involving individuals who are known to be homeless or have a mental illness, even if the complainant does not specifically label the misconduct as such."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.162 Assessing Compliance with Paragraph 176:  Centralized Complaint Numbering System

Paragraph 176 stipulates that:

> **"Within six months of the Operational Date, the Internal Affairs Bureau, in coordination with the Civilian Police Oversight Agency, shall develop and implement a centralized numbering and tracking system for all misconduct complaints.  Upon the receipt of a complaint, the Internal Affairs Bureau shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant."**

### Results

Primary:        **In Compliance**

Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.163 Assessing Compliance with Paragraph 177:  IAB Complaint Data Management

Paragraph 177 stipulates:

> **The Internal Affairs Bureau's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.  This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.**

### Results

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.164 Assessing Compliance with Paragraph 178:  Supervisors to Provide Complaint Information

Paragraph 178 stipulates:

> **"Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Bureau.  All information should be referred to the Internal Affairs Bureau by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances."**

### Results

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.165 Assessing Compliance with Paragraph 179:  Referral of Complaints to CPOA

Paragraph 179 stipulates:

183

> **"Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Bureau shall refer the complaint to the Civilian Police Oversight Agency."**

## Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

## 4.7.166 Assessing Compliance with Paragraph 180:  Handling of Internal Complaints by IAB

Paragraph 180 stipulates:

> **"Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Bureau for review and classification.  The Internal Affairs Bureau shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Bureau for investigation.  In consultation with the Chief, the commanding officer of the Internal Affairs Bureau shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Bureau, the Multi- Agency Task Force, and/or referred to the appropriate federal law enforcement agency.**"

## Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

## 4.7.167 Assessing Compliance with Paragraph 181:  IAB Classification Protocol

Paragraph 181 stipulates:

> **"APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Bureau in determining where an internal complaint should be assigned."**

## Results

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.168 Assessing Compliance with Paragraph 182:  Prohibition from Self-Investigation

Paragraph 182 stipulates:

> **"An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct."**

### Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraph 182:*

*4.7.168a:  Ensure the sergeant who conducted a self-investigation has the error formally documented and is directly counseled regarding the nature of his error and the proper way to respond to such fact situations.*

*4.7.168b:  Ensure counseling occurs and is documented regarding the self-investigation is documented.*

*4.7.168c:  Conduct a thorough review of the offending sergeant's past practice to ensure all similar issues from this sergeant's recent practice (six months) are noted, documented and responded to in an appropriate manner.*

### 4.7.169 – 4.7.180 Assessing Compliance with Paragraphs 183 – 194: Investigation of Complaints

Paragraphs 183 through 194 of the CASA pertain to requirements for best practices in the investigation of misconduct complaints. These paragraphs require that all relevant evidence be considered, that investigations be fair and impartial, and that they reach reliable findings. They also impose time limits for completion of investigations; designate permissible findings with the corresponding standard of proof; and require an assessment regarding whether the facts of an investigation indicate a change in policy, procedure, or training. In addition, requirements are set forth regarding situations in which there may be simultaneous criminal and administrative investigations of the same subject matter.

During the 9th monitoring period we found the following outcomes.

185

In regard to paragraphs 183 through 194, members of the monitoring reviewed a stratified random sampling of 8 investigations completed by IAD and 8 completed by CPOA. The monitoring team also met with the chief and the city attorney, the CPOA director and members of CPOA, the IAD Misconduct Commander and members of CPOA, attended a POB meeting and reviewed CPOA/POB meetings, agenda, minutes and findings on the CPOA website.

The findings related to Paragraphs 183 through 194 address 12 requirements of the CASA.

APD personnel are required by policy and practice to cooperate with the internal affairs system.  This cooperation is required by regulation and practice. We continue to find no instances in which APD personnel refused to cooperate with an investigation.

Investigations conducted by IAD Misconduct and by CPOA generally are of good quality. Absent extraordinary circumstances, statements are taken from complainants and relevant witnesses, and the interviews are recorded, accurately assessed and given appropriate evidentiary weight. Investigations are documented in writing and reflect salient training and policy assessments. Timeliness requirements of investigations, once assigned, are met. The appropriate case dispositions are generally made, and findings are based on the appropriate quantum of proof.

Our review for this reporting period revealed 6 investigations that were administratively closed or had allegations that were partially administratively closed [IMR-9-34, IMR-9-33, IMR-9-31, IMR-9-39, IMR-9-41, IMR-9-40].  Our assessments indicated all were proper closures. In addition to the CASA criteria for administratively closing cases, IAD and CPOA may also use an administrative closure disposition in cases in which a preliminary investigation reveals the allegations cannot be minimally sustained.

Simultaneous criminal and administrative investigations of the same subject matter are kept separate, and proper steps are followed regarding the protection of an officer's constitutional rights in an administrative investigation while a criminal investigation is pending. Coordination and consultation with prosecutorial authorities are properly conducted.

In the cases reviewed by the monitoring team this reporting period, we found two cases that had preliminary indications of criminal conduct [I-MR-9-4 and IMR-9-36].

There was evidence in [IMR-9-4] that proper and timely coordination with the relevant prosecuting authority took place. IAD appropriately held off taking a compelled statement from the subject officer until approval was given by the District Attorney. There was also an indication in a related investigation [IMR-9-37], that the total administrative investigation in [IMR-9-4] was put on hold until the criminal investigation was completed. We note that paragraph 188 in conjunction with paragraph 186 requires the criminal and administrative investigations to proceed simultaneously but allows for a delay in taking statements from the subject and witnesses until completion of the

criminal investigation, or permission is given to take by the statements from the appropriate prosecutorial authority.

We put APD on notice that these paragraphs do not allow for carte blanche delay of an administrative investigation *in toto* during the investigation of a related criminal investigation. In such cases the monitoring team would expect that the administrative investigation would continue in all aspects not involving the taking of statements from witnesses who may incriminate themselves. We would also expect a timely request be made to the prosecutorial authority to take compelled statements from witnesses who IAD believes may incriminate themselves, and a timely statement be taken once permission is granted by the prosecutorial authority. The monitoring team will scrutinize these issues in future cases involving criminal and administrative investigations of the same alleged misconduct.

Unlike [IMR-9-4], in [IMR-9-36] there was no indication that coordination with prosecutorial authorities took place. However, there was not enough proof to rise to the level of probable cause required for notification of the District Attorney's Office; therefore, this case is not deemed to be deficient.

We found no cases in which an officer failed to submit a public safety statement, once requested, by claiming that the statement would be self-incriminating. We did find, however, several cases in which complainants or logical witnesses were not interviewed [IMR-9-38, IMR-9-39, and IMR-9-41]; however, adequate explanations were given for the absence of interviews (e.g. complainant did not respond to repeated requests for interview, etc.).

The advisements to complainants regarding the reopening of administratively closed cases and of appealing CPOA findings, as well the actual practices related to these advisements, are firmly in place, and appear to be followed as a matter of practice.

Notwithstanding the generally good quality of investigations conducted by IAD Misconduct and CPOA this reporting period, the monitoring team has noted some issues with elements related to paragraphs 183 through 194 of the CASA. These findings by the monitoring team indicate two deficient cases of the 8 IAD and 8 CPOA cases we reviewed by way of a stratified random sample, for a collective 88% compliance rate relative to paragraphs 183 and 190 of the CASA, less than the 95% required for operational compliance.  Each of these problematic cases is discussed in some detail below.

In [IMR-9-32], a sustained finding against a supervisor was made for a deficient use of force review. However, the supervisor was involved in the incident and thus, per paragraph 51 of the CASA, should not have conducted a review of the incident. The IA investigation did not focus on this aspect and therefore we find it to be less than thorough.

One case the monitoring team found extremely problematic in terms of reliability and thoroughness was [ IMR-9-37]. This matter was referred to an independent outside investigator, to avoid a conflict or the appearance of a conflict of interest.

The case involved allegations of altering an official document, that is, backdating the completion of an internal affairs investigation to misrepresent that the investigation was completed within the 120-day timeline (90 days plus a 30-day extension) required by the Collective Bargaining Agreement (CBA) and the CASA. An IA Detective brought the allegation to the attention of APOA and the APOA in turn lodged a complaint with IAD Misconduct.

After conducting a thorough review of the investigation in question, the monitor found that there was no question that the investigation was completed by the assigned IA Detective a day before (a Thursday) the expiration of the 120-day period (a Friday), and that the completed and reviewed/approved investigation was not sent to the Chain of Command for review until after four days after the expiration of the 120-day timeline (2 business days - a Tuesday). The issue was whether the review/approval of the investigation by the former IA Commander was completed on, before, or after the 120th day.

The IAPro log showed that the subject commander did not review the investigation in IAPro until one business day after the expiration of the 120-day period (a Monday), and that a printed copy of the investigation was made on the same day. That notwithstanding, there was evidence that the commander had been aware of the investigation and reviewed it incrementally as it progressed, that printed copies of the investigation may have been made before and/or on the 120th day, and that the commander may have reviewed printed copies on the 120th day. The evidence also left open the possibility that the commander reviewed the completed investigation with an IA Lieutenant as he was logged into IAPro on the 120th day. Given the conflicting evidence, credibility and ability to recollect were crucial to this investigation.

We found several areas that call into question the reliability of the investigation. First, a preliminary investigation was conducted in which the detective who brought this matter to light was questioned in what was described as a "two-hour conversation." Although a memorandum was made to reflect that the preliminary investigation indicated a formal investigation was warranted, it was, in the monitor's opinion, overly conclusory and did not contain details of the conversation. The formal investigation revealed that notes of the "two-hour conversation" had been taken, but the notes were never produced or incorporated into the formal investigation. Thus, what the IA Detective said previously in the preliminary investigation could not be compared to his statement given in the formal IA investigation.  We see this as a shortfall in investigative process.

Secondly, the subject of the investigation defended herself in the first part of her statement by essentially stating she completed her review on the 120th day (a Friday) and logged in and reviewed it in IAPro one business day later (a Monday) to check on the existence of a Disciplinary Action Packet (DAP). A DAP is not considered part on an

IA investigation, rather it is an appendage to an investigation, having been developed by IAD Misconduct at the suggestion of the monitor to help the Chain of Command in calculating the correct level of discipline. She was not 100% clear and adamant in her recollection, but was somewhat certain she had completed the review on time. During her statement the main investigator (there were two independent investigators present for the questioning) who was conducting the questioning abruptly went off the record and the statement resumed 14 minutes later. No explanation was given for the break in the statement.  This is a critical error in protocol, and is a direct violation of accepted practice, as there was no indication for the record as to what transpired in those 14 minutes.

After the break the subject officer, who was without representation, in response to continued questioning, started to modify her statement by stating that although she reviewed the case before the expiration of 120 days, she may not have conducted a final review before the expiration of the 120-day period. Her concern in dating her review as completed on the 120th day was due to "DOJ" (meaning CASA time requirements and monitoring). There was another unexplained off-the-record pause in the statement, this one lasting 7 minutes, after which she responded to the investigator's "recapping" of her statement by admitting to backdating her review of the investigation because of oversight concerns, and also due to unreasonable workload and receiving completed cases for review at the "last hour" as reasons leading to the backdating. At the end of the statement the second investigator could be heard stating "you did the right thing", which in the context we interpreted to mean admitting to the backdating.

We have no evidence to cast aspersions regarding the existence or nature of any conversation that may have taken place during the two aforementioned pauses.  That said, the findings in this matter rely very heavily on the subject's statement. Given the nature of the formal statement, the monitoring team believes what may have been said by the subject before her formal statement is important for comparison purposes, and to judge the reliability of her formal statement. During her formal statement she admitted going to the Chief and talking about the incident and apologizing, although she did not recall the exact details of the conversation. Therefore, we consider it important to know exactly what she said to the Chief.  The Chief should have been a witness in this investigation. Instead, no statement was taken from the Chief and we do not know if the description of her conduct with the Chief matches what she finally admitted to in her formal statement.

We note also that several issues were missed or not adequately dealt with. Supervisory reviews can be in-depth; they can be perfunctory; they can be incremental as an investigation progresses, or any combination of these supervisory review processes. Also, at the time the events transpired in the investigation, the supervisory reviews could be conducted in IAPro (with an electronic log), or documented by hard copy documents. What constitutes an adequate review for purposes of putting one's signature on an investigation and approving it as of a certain date, was not addressed or resolved in the investigation. The fact remains the commander *may have had enough*

*incremental awareness of the investigation to be satisfied with it on the date she indicated.*

A sub-issue existed in the investigation regarding whether hard copies contained in a binder were printed on the 120th day or the 123rd day. There was conflicting evidence on this issue. There were also indications that the investigation can be printed by the assigned investigating detective outside of logging into IAPro, and that paper copies existed before the printing of copies for the binder. Indeed, our review confirmed that the IA Commander had reviewed the investigation outside of IAPro and had questions about the investigation as it was progressing. The issue of whether the assigned detective printed hard copies for review before the hard copies were printed for the binder was not addressed in the investigation of this review, nor were findings developed. These are critical omissions.

In addition, the matter was investigated solely from the standpoint of whether the review document was altered (backdated); however, there  was conflicting evidence regarding this issue. What was overlooked is the issue of tolerating a system within one's command, which consisted of a hybrid of review in IAPro and review of printed copies, and of cases being submitted for review only a day before the due date. It was a system that created a climate in which the allegation in this case was capable of being made. This raises issues of appropriate supervision, system design, and command control, and thus the case should have also been considered and analyzed in light of the requirements of SOP 3-14.

Another allegation of backdating against the subject commander was made by a witness to the primary allegation in this case. This secondary allegation was non-sustained, and was actually refuted by a witness. Two witnesses who could have shed additional light on the secondary allegation were former members of the APD.  No effort was made to question them, apparently because they are no longer uniformed members and their statements could not be compelled. However, they could have been requested to give voluntary statements, but it appeared that no effort was made to do so. To our knowledge, both individuals are still residing in New Mexico, and that one is currently a member of a law enforcement agency in New Mexico.  Although the allegation was refuted by a witness, an attempt still should have been made to obtain the statements of the two witnesses who were former members of APD, an either a statement taken from each witness or an explanation given if they refused to give a statement or could not be contacted. The fact that no attempt was made to take these statements gives rise  to concerns of failure to conduct a complete investigation on this secondary allegation.

Other issues that arise in this case constitute a conflict, or at least the appearance of a conflict, of interest.   This causes concern for the monitoring team on several fronts:
.

    1.  The APOA was the complainant in this matter. That notwithstanding, witnesses in this investigation were represented by APOA representatives and its attorneys. If the APOA is the

complainant, it should not be participating in the investigation. This would be akin to allowing a civilian complainant to participate in the investigation of his/her own complaint against an officer.  At the very least if a member of the APOA is the complainant, and the APOA represents witnesses in the investigation, then that member should be appropriately "walled-off" from any participation in representing witnesses in the investigation and having any contact with APOA representatives about the case itself.

2. The Chief was a witness to a conversation/apology by the subject and should have been asked to give a statement in this investigation. Upon being made a witness, he should have been advised to recuse himself from imposing discipline, and to delegate disciplinary authority to a Deputy Chief. Instead he was not made a witness and imposed the discipline in this matter.

3. The supervisor who was tasked with conducting the preliminary investigation, upon finding that a formal investigation should occur, was immediately assigned to replace the subject commander. At a very minimum, this creates the appearance of impropriety. Although there is no indication in the record that the supervisor who conducted the preliminary investigation anticipated being assigned to replace the subject commander, or did not conduct a proper preliminary investigation, this scenario could reasonably give rise to a perception of a significant lack of a sense of fairness and propriety. Quite simply when one conducts a preliminary investigation that leads to a formal investigation and a transfer of the subject, the supervisor conducting the preliminary should not be assigned to replace the transferred subject.

Based on the evidence available to us, we cannot and do not assert that these issues skewed the outcome in this matter, we do note, however, that these issues raise perception issues and concerns that can serve to undermine public confidence in the outcome. The "optics," as they say, are not good.

We also note that the CPOA undertook an independent review and disagreed with the findings of the independent investigator, finding no violations of the part of the subject commander. CPOA also did not find concerns with the integrity of the supervisory review/approval system of IA investigations. We further note that the subject of the investigation, that was allegedly backdated, resigned instead of facing termination, so apparently the 120-day rule was not raised as a defense to discipline, another indication that the issue of exactly when the review was completed was not easily decipherable.

We agree with CPOA on its finding regarding the integrity of the system. In our monitoring reviews we have not come across other indications of potential backdating. The compliance division and current leadership of IAD are aware of the dating of review

issues, and IAD apparently is working on a policy that would prevent the questioning of the date a review is completed.  That policy, however, will not affect the results of the investigation under discussion here.

We cannot say we agree or disagree with either the findings of the independent investigator or of CPOA. Rather we feel that the reliability of investigation and confidence in its outcome cannot be found in the current state of the record. Although IAD did not conduct this investigation, it was the City's responsibility to ensure it was conducted in accordance with the CASA. We find the investigation deficient for purposes of compliance with paragraphs 183 and 190 of the CASA.

In regard to the time requirements contained in Paragraph 191, all of the 8 IAD and 8 CPOA investigations we sampled were timely completed once they were assigned. (The investigation in [IMR-9-4] was completed on time but the issue was whether the supervisory review was completed on the 120th day – we do not find this case to be deficient from a time standpoint, particularly since there was a delay due to a related criminal investigation). That notwithstanding, we note that in three cases, [IMR-9-39, IMR-9-43, and IMR-9-34], assignment was made after seven working days of having received the complaint. In [IMR-9-36] the transfer to IA was made by CPOA after seven working days from the date the complaint was received. The monitor understands that in some instances it may take longer than seven working days for a preliminary investigation or an investigation to reveal the possibility of criminality and therefore the necessity of a referral to IA from CPOA. However, in this case the potential criminality was apparent on the face of the anonymous website complaint. Since this is a matter of first impression, the monitor will not count this as deficient, however CPOA is put on warning that the same seven working day requirement for assignment will in the future be applied to transfers from CPOA to IA where the potential for criminality is apparent on the face of the complaint. Once assigned, all investigations we reviewed this reporting period were completed in timely fashion.

Although investigations with or without extensions generally meet the time requirements of the CASA and the CBA, the failure to assign within seven working days renders the overall compliance rate for paragraph 191 at 81%, well below the 95% necessary for operational compliance. We note there are plans in process to add a case coordinator position to IAD and a case coordinator to CPOA. If those "plans" come to fruition, we would expect the assignment issue to be ameliorated.  We will continue to monitor these timelines in future monitor's reports.

### 4.7.169 Compliance with Paragraph 183: Investigations Reach Reliable Conclusions

Paragraph 183 stipulates:

> **"APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall**

**interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident or involved in any significant event before or after the original incident, shall provide a written statement regarding their observations, even to state that they did not observe anything.**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

### Recommendations for Paragraph 183:

**4.7.169a: Interview all witnesses.  If known witnesses are not interviewed, explain, in writing, why they were not interviewed.**

**4.7.169b:  Immediately terminate the practice of utilizing ACMs, until APD develops a policy regarding their continued use that is reviewed and approved by the monitor.**

**4.7.169c:  The City should appoint a review and approval authority for all APD investigations that are conducted by an independent investigator.**

### 4.7.170 Assessing Compliance with Paragraph 184:  Investigations Documented in Writing

Paragraph 184 stipulates:

> **"APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing.  APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation. Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct."**

## Results

Based on our on-going review of their finished work product, we find CPOA and APD in compliance with this paragraph.

Primary:      **In Compliance**

Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.171 Assessing Compliance with Paragraph 185:  Required Cooperation with IAB/CPOA

Paragraph 185 stipulates:

> **"APD shall require personnel to cooperate with Internal Affairs Bureau and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control. Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances."**

#### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.172 Assessing Compliance with Paragraph 186:  Separate Administrative and Criminal Investigations

Paragraph 186 stipulates:

> **"APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment.  When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement.**"

#### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.173 Assessing Compliance with Paragraph 187:  Advisement of Officer Rights

Paragraph 187 stipulates:

> **"Advisements by the Internal Affairs Bureau or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee**."

## Results

|             |               |
|-------------|---------------|
| Primary:    | **In Compliance** |
| Secondary:  | **In Compliance** |
| Operational:| **In Compliance** |

## 4.7.174 Assessing Compliance with Paragraph 188:  Notification of Criminal Misconduct

Paragraph 188 stipulates:

> **"If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the Internal Affairs Bureau commanding officer. If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Bureau.  The Internal Affairs Bureau commanding officer shall immediately notify the Chief.  The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, the Internal Affairs Bureau shall continue with the administrative investigation of the allegation.  Consistent with Paragraph 186, the Internal Affairs Bureau may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Bureau deems such interviews appropriate**."

## Results

|             |               |
|-------------|---------------|
| Primary:    | **In Compliance** |
| Secondary:  | **In Compliance** |
| Operational:| **In Compliance** |

## 4.7.175 Assessing Compliance with Paragraph 189:  Provision of Public Safety Statements

Paragraph 189 stipulates:

"**Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including Use of Force Reports and incident reports.  APD shall make clear that all statements by personnel in incident reports, arrest reports, Use of Force Reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements.  Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief**."

## Results

No instances of officers refusing to provide a public safety statement were noted during, this reporting or in previous reporting periods.  Given APD's performance related to this requirement over the past three reporting periods, the monitor finds them in compliance for the requirements of Paragraph 189.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.176 Assessing Compliance with Paragraph 190:  Considering All Relevant Evidence

Paragraph 190 stipulates:

"**In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence.  There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to be deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements.**"

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

***Recommendation for Paragraph 190:***

***4.7.176: For case number [IMR-9-37] follow up on any contradicting factors or evidence, and ensure these issues are resolved.***

### 4.7.177 Assessing Compliance with Paragraph 191:  90 Days to Complete Administrative Investigations

Paragraph 191 stipulates:

> **"All administrative investigations conducted by the Internal Affairs Bureau or the Civilian Police Oversight Agency shall be completed within 90 days of the initiation of the complaint investigation.  The 90-day period shall not include time for review.  An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief.  Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation.  To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations of the officer, and extended absences."**

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 191***

***4.7.177a:  APD should refocus its efforts related to this paragraph by conducting a quantitative analysis of the reasons that cause any case to be delayed past 90 days.***

***4.7.177b:  Once causes for these delays are identified, develop recommendations for changes to policy, staffing, procedure or practice that are designed to eliminate such delays.***

### 4.7.178 Assessing Compliance with Paragraph 192:  Case Dispositions

Paragraph 192 stipulates:

**"APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:**

> **a) "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer;**
> **b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;**
> **c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;**
> **d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training;**
> **e) "Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or**
> **f) "Administratively closed," where the policy violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.179 Assessing Compliance with Paragraph 193:  Reopening Administrative Investigations

Paragraph 193 stipulates:

> **"All administratively closed complaints may be re-opened if additional information becomes available.  The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.180 Assessing Compliance with Paragraph 194:  Training and Legal Standards

Paragraph 194 stipulates:

> **"In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether: (a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures.  This information shall be shared with the relevant commander(s)."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

**Monitor's Note:**

As we cited in our last report, we reiterate that the APD practice of issuing Additional Concerns Memoranda (ACMs) jeopardizes APD's ability to achieve full compliance in the critical area of internal affairs. This *ad hoc* practice arises out of supervisory reviews, and is used as a means of documenting what are supposedly minor policy violations, but does not act as a request for, or a trigger of, a formal IA investigation. ACMs that are issued are posted on an officer's retention card, and figure into the prior offense calculation for subsequent offenses where applicable. This practice is problematic for at least two reasons.  The first is that failure to conduct an IA investigation in cases that present evidence of a policy violation "loses the thread" in building justification for progressive discipline.  The second issue is that the documentation of violations on a retention card, without the due process afforded by the normal disciplinary process, are serious "due process" issues. This matter continues to be the focus of discussions among the parties and the monitor. These sorts of *ad hoc* policy derivatives make solid, correct disciplinary decisions difficult, if not impossible.  It is the type of shortcut the previous administration made significant use of; however, it is not something we would encourage the current administration to continue.

The issues of use, documentation, and record-keeping relative to ACMs must be resolved in order for the APD to achieve compliance for use of proper case dispositions. We see this as a critical issue: ACMs create a substantial "dark area" that could potentially obscure important trends from identification, analysis, and resolution.  We do note that this "ACM" process is a hold-over from the past administration.  Nonetheless, it falls to current leadership to analyze, assess and remediate the issues created by this

"off the books" management of improper officer behavior.  In the monitor's opinion, this process should be discontinued immediately.  It is:

- Poorly documented;

- A "backdoor" that allows supervisors or managers to divert serious infractions into a "black hole" where, without serious management oversight and control, things can go to "get lost;"

- A source of obfuscation of what actually occurs on the street relative to some of the more critical CASA elements, e.g., use of force, abuse of authority, etc.; and

- A filter that could, and the monitor argues does, obscure management's visual acuity as to what is actually occurring on the street.

The monitor also notes issues of concern with Paragraph 188's requirement that the IAD Misconduct Commander coordinate with the chief when consulting with the relevant prosecuting agency where a misconduct complaint intake or investigation reveals "there may have been criminal conduct by any APD personnel."

The practical problem with a strict interpretation of this language is that prosecutors are reluctant to discuss cases in which there is less than probable cause, or less than reasonable articulable suspicion that a crime has been committed, whereas the phrase "may have been" alludes to a mere suspicion standard.

The parties have reached a negotiated solution agreeable to the monitor that will allow a preliminary or continued administrative investigation to take place, and a determination of probable cause that a crime was committed to be developed before the coordination with relevant prosecuting agency under paragraph 188. The monitor would expect this process to be agreed to in writing as soon as practicable.  We encourage APD to move forward diligently with its plans to address this issue.  Further, we encourage development of "test data" on the proposed new system to identify precisely the number of incidents involved, categorization into groups (not prosecutable v. prosecutable), and outcome results.

As noted in the Civilian Police Oversight section of this report, CPOA has utilized the Administratively Closed disposition in situations where a preliminary investigation cannot minimally sustain the allegations contained in a complaint. In such cases, based on this initial evidence, the investigation is cut short and administratively closed without necessarily interviewing all relevant witnesses or even the complainant in some instances. The monitor realizes the need to wisely and economically deploy resources and thus does not disapprove of this general practice. However, we again caution that in following this practice, other policy violations that are not contained in the initial complaint could be missed. This practice should only be utilized where the preliminary

investigation has developed conclusive evidence that totally "closes the door" on the alleged policy violation and any reasonably foreseeable related violations.

### 4.7.181 – 4.7.183 Assessing Compliance with Paragraphs 195-197: Preventing Retaliation

Paragraphs 195 through 197 of the CASA pertain to the City's requirement to prevent retaliation against anyone who reports misconduct or cooperates in a misconduct investigation, by any employee of the City, including APD members, and making it a ground for discipline.

Members of the monitoring team have reviewed City and APD policies, as well as a stratified random sample of 16 IA and CPOA cases completed during the review period. We also met with members of IAD and CPOA during the site visit and received updates in the practices of each agency.

Retaliation is clearly prohibited both as a matter of City and APD policy. The Albuquerque Code of Ordinances prohibits retaliation for reporting improper governmental action. APD policy prohibiting retaliation and/or making it grounds for discipline is found in SOP (AO 3-41-4-A; GO 1-1-E-10; GO1-4-3-C-2; and GO 1-5-3-B-4). The monitoring team has also determined that meetings involving CPOA and IAD, in which APD's anti-retaliation policy is reviewed, occur on an annual basis.

In review of the random sample of investigations completed this reporting period, members of the monitoring team found no complaints of, or actions indicating, retaliation.  Although this aspect was non-observable this monitoring period, in light of APD's clear policy prohibiting retaliation, and APD's performance in accepting and investigating past retaliation complaints, APD remains in compliance with paragraphs 195-197.

### 4.7.181 Assessing Compliance with Paragraph 195:  Retaliation Prohibited

Paragraph 195 stipulates:

> **"The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct."**

### Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.182 Assessing Compliance with Paragraph 196:  Review of Anti-Retaliation Statements

Paragraph 196 stipulates:

> **"Within six months of the Effective Date, and annually thereafter, the Internal Affairs Bureau and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation.  This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation.  Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct."**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.183 Assessing Compliance with Paragraph 197:  Retaliation Grounds for Discipline

Paragraph 197 stipulates:

> **Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds for discipline, up to and including termination of employment.**

**Results**

Primary:     **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.184 – 4.7.186 Assessing Compliance with Paragraphs 198 – 200:  Staffing and Training Requirements

Paragraphs 198 through 200 of the CASA require the City to adequately fund and resource internal affairs functions (APD and CPOA/POB), and also require that APD personnel who conduct misconduct investigations and CPOA investigators to receive a baseline amount of initial annual training.

The monitoring team met with IAD Misconduct and CPOA on several occasions including visits to their respective offices and inspection of physical space. The monitoring team discussed staffing needs and training, also reviewed staffing charts

and training records and assessed the timelines of processing complaints and information of potential misconduct in investigations that were randomly selected.

The findings related to Paragraphs 198 through 200 indicate the following outcomes, related to requirements of the CASA.

The CPOA Ordinance requires that CPOA/POB be given staff sufficient to carry out the agency functions contained in the Ordinance. We found no indications of understaffing at CPOA.   By its Ordinance CPOA has a dedicated and independent source of funding equal to, at a minimum, ½% of the APD annual operation budget. This funding is adequate, particularly in light of the increased budget for APD.

Currently, the staffing of IAD Misconduct appears to be sufficient as investigative timelines are generally being met. The CPOA staffing also appears to be adequate as investigative timelines are generally being met, once a complaint is assigned.  No delays or quality control issues were noted that can be traced to staffing levels.

We note that CPOA now contracts with the Institute for Social Research, University of New Mexico. This monitoring team expects that this will improve CPOA's data and trend analysis tasks, as well as its public reporting responsibilities.

Notwithstanding the generally adequate staffing, funding and training of IAD and CPOA personnel, we found deficiencies with the POB staffing and time period for renewal of the term and contract of the CPOA Executive Director. These deficiencies are discussed herein in regard to paragraphs 271 and 272 of this IMR.

As we pointed out in IMR 8, we also found that work processes of those APD units charged with conducting misconduct investigations, exhibited issues with elements related to paragraph 199 of the CASA. The paragraph requires annual training of at least 8 hours not only for IAD personnel, but also for members of the area commands who may be assigned internal affairs investigations to conduct. There is a practice of assigning IA investigations to members of an area command, at the rank of sergeant, to conduct investigations alleging minor misconduct against an APD member of the same command.  APD has yet to develop training that would meet the 8-hour annual requirement for these personnel.  Beginning in the 6th IMR we placed IAD on notice that this issue needed to be resolved. We realize that sergeants from area commands do not conduct the bulk of IA investigations, nor the more serious investigations, however APD must develop an adequate annual training program for those area command sergeants who may be assigned minor misconduct investigations in order to be in full operational compliance with this paragraph.

In discussions with IAD we learned a policy is being developed to meet the IAD annual training requirement for those individuals from the area commands who are assigned minor misconduct investigations to conduct. In this regard we put IAD on warning that a satisfactory training policy must be developed by the next site visit or APD risks a finding of "willful indifference" to this task contained within paragraph 199.

For both IAD personnel as well as the area command personnel who may be assigned minor misconduct investigations, we note that the annual training must generally cover how to conduct misconduct investigations with a focus on two aspects mandated by the CASA in paragraph 199 ("policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."). IAD is put on notice that the content of the annual training for both IAD and Area Command personnel will be scrutinized during the next IMR period.

As we noted in IMR 8 there remains potential issues pertaining to the CPOA training requirements found in paragraph 200. In prior site visits we reviewed the initial training provided by CPOA's legal counsel and found it to be well organized and delivered. It addresses all salient points of the CASA and of internal complaint investigations.  We do note, however, that there were no performance testing measures included in the training.  Likewise, the annual training for the past two years for CPOA investigators involved the annual NACOLE (National Association of Civilian Oversight of Law Enforcement) conference. The agenda for the NACOLE training can be found online. Although we found it generally relevant to the CPOA mission, testing measures and results could not be evaluated.

We learned during this IMR period that CPOA has diversified its annual training. Counsel for the CPOA provided updated training to the POB. In addition, two CPOA Investigators attended the Use of Force Summit conducted by the Daigle Law Group, a law firm that specializes "in management consulting services in support and development of effective and constitutional practices.  One investigator attended the P.E.A.C.E. investigative Interviewing course.

The external training mentioned above, although related and beneficial to the CPOA mission, do not contain evaluation (testing) of the participants after the training is delivered.  CPOA should consider using supporting training materials provided by these external training sources and develop internal testing methods to ensure that learning has occurred on critical points.

The overall CPOA performance indicates that the training has been effective, however, going forward the monitor will expect more exact and immediate indications of effectiveness of training. Although the annual training situation for CPOA has improved and is more tailored to its mission, we are still unable to assess the overall effectiveness of the training received by CPOA investigators.

### 4.7.184 Assessing Compliance with Paragraph 198:  CPOA Staffing

Paragraph 198 stipulates:

> **"The City shall ensure that APD and the Civilian Police**
> **Oversight Agency have a sufficient number of well-trained**
> **staff assigned and available to complete and review thorough**
> **and timely misconduct investigations in accordance with the**

> **requirements of this Agreement. The City shall re-assess the staffing of the Internal Affairs Bureau after the completion of the staffing study to be conducted pursuant to Paragraph 204. The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.185 Assessing Compliance with Paragraph 199:  IA Initial and Annual Training

Paragraph 199 stipulates:

> **"All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Bureau, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

## 4.7.186 Assessing Compliance with Paragraph 200:  CPOA Training

Paragraph 200 stipulates:

> **"Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Effective Date and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraphs 199 and 200:***

***4.7.185-186a: Identify the cadre of area command sergeants who may be assigned misconduct investigation and develop an annual IA training program for them and have them complete same on an annual basis.***

***4.7.185-186b: Do not assign a misconduct investigation to any APD personnel who have not met the annual training requirement.***

***4.7.185-186c: CPOA should develop an assessment mechanism to measure the effectiveness of outside training such as the NACOLE conference. That can easily be done by "testing" by CPOA once the CPOA investigators have completed the external training.***

### 4.7.187 – 4.7.188 Assessing Compliance with Paragraphs 201- 202:  Discipline and Transparency

Paragraphs 201-202 require that discipline imposed for sustained violations be fair and consistent, with consideration of aggravating and mitigating circumstances. These paragraphs also require the use of a disciplinary matrix in imposing discipline and sets forth required elements for the disciplinary matrix.

The monitoring team reviewed a stratified random sample of cases investigated during this review period. The monitoring team also met with the Chief of Police, the City Attorney, the CPOA Director and IA Misconduct Commander and reviewed APD discipline processes.

As we commented in IMR-8, marked improvements have been made in the APD disciplinary system.  These changes provide the supervisory chain and the chief with the information necessary to facilitate the accurate calculation of the appropriate level of discipline. The continued use of the  "Disciplinary Action Packet" (DAP) may well prove to be an enhancement in the imposition of discipline.   We will continue to monitor this process for compliance with the requirements of the CASA. The DAP packet serves as a guideline by giving the subject officer's supervisory chain and the chief of police information regarding each disciplinary matter in which major discipline can be imposed. The following information elements are included in the DAP:

a. Recommendations regarding the class designation of the policy violations under consideration;
b. An accurate "snapshot" of the subject's disciplinary record and prior offenses; and
c. A recommended or preliminary disciplinary calculation, based on the appropriate elements in the disciplinary matrix, setting forth the range (minimum and maximum) of discipline.

In addition, retention cards currently provide the classification of any prior sustained offenses and dates of imposition of discipline.  This greatly facilitates the calculation of applicable prior offenses.

SOP AO 3-46 ("Discipline System") with its Appended Chart of Sanctions (Discipline Matrix) is under review. As written, it requires that any deviation from the presumptive range of discipline (appropriate range as established by the Chart of Sanctions) must be justified in writing (3-46-5B4).

Other past recommendations of the monitor regarding AO 3-46 are under consideration by APD, and continued improvements in the Chart of Sanctions are currently being developed. Since IMR-6, we have noted that a discrepancy exists between paragraphs 5c2 and 5c4 of AO 3-46, that allows for different interpretations of what constitutes a prior offense, based on whether the prior offense is, or is not, in the same class as the present offense. We have also noted that SOP 3-46-5G allows for the imposition of non-disciplinary corrective action in addition to applicable discipline, but it does not contain notice that non-disciplinary corrective action should not be the only disposition if the matrix calls for the imposition of discipline. We strongly suggest (again) that these past recommendations be addressed in the current review and revision of the "Discipline System" policy.

Notwithstanding the recent improvements in the disciplinary process, our review continues to note issues with elements related to the imposition of discipline and use of the discipline SOP and the discipline matrix. Not all of the packets of the cases selected and reviewed by the monitoring team contained the retention cards of the individuals against whom sustained findings were made. Without retention cards, the monitor (and we presume the chief of police) will not be able to gauge, from primary source data, whether there is prior discipline that would render the present offense a second or third offense.  We note that occasionally the prior disciplinary record is summed up in a memorandum by a member of the reviewing chain of command; however, although commendable, this process does not suffice as primary source data.

The monitoring team reviewed a stratified random sample of cases completed during the review period. In that review we identified 7 cases (six of which were investigated by APD) in which discipline was imposed or should have been imposed [IMR-9-44, IMR-9-31, IMR-9-32, IMR-9-33, IMR-9-34, IMR-9-37 and IMR-9-4].

Of those seven cases we found three that were deficient from the standpoint of determining whether discipline was assigned or the level of discipline was appropriate, a compliance rate of only 57% with the requirements of paragraph 201. These three cases are discussed below.

In [IMR-9-32], a sustained finding was made for one officer for a violation of minimum amount of force requirements (classification levels 4-7), and on another officer for deficiency in conducting use of force investigations (classification levels 4-7). Written letters of reprimand were imposed. The packet did not contain the retention cards of the two subjects of the investigation; however, the prior offense records were summarized in the Area Commander's memoranda. Regarding the violation of minimum use of force, there was a prior disciplinary action that would make the then-present offense a second

207

offense. The present offense was deemed to be a level 6 in the letter of reprimand. The presumptive range would therefore have been a suspension of 8 to 32 hours. No explanation was given for the deviation from the presumptive range (8-32 hours suspension) to a letter of reprimand. Likewise, the second subject's presumptive range was also calculated at 8-32 hours suspension, but no explanation was given for the deviation from the presumptive discipline to a letter of reprimand. In neither of these two cases was an explanation given for the selection of a classification level of 6 in a range of 4 to 7.

We have found such discrepancies frequently in our reviews of discipline at APD. The deviation from the suggested 8-32 hours to a written reprimand is significant and meaningful. It appears to violate disciplinary guidelines without notice of the rationale for so doing.

In [IMR-9-44], a sustained finding was made for a "violation not based on original complaint" (failure to prepare a use of force report). There is no evidence in the packet showing that discipline was imposed or that there was a non-concurrence letter from the Chief or his designee.

As we stated in regard to paragraphs 183 and 190 of this IMR, we found the investigation in case number [IMR-9-37] to be problematic to such a degree that we cannot determine whether the discipline imposed was appropriate. To the monitor, this is a significant problem, raising questions of due diligence, care, and compliance, particularly given the nature of the offense and the potential damage to the target officer if the allegations were not fairly and completely investigated.

### 4.7.187 Assessing Compliance with Paragraph 201:  Fact Based Discipline

Paragraph 201 stipulates:

> **"APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently."**

**Results**

Primary:   **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 201:*

*4.7.187a:  Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless written reasons for departure from the matrix recommendations accompany the decision.*

***4.7.187b: Ensure that adequate explanation is given for the selection of a classification level where there is more than one level of classification associated with a regulation for which a sustained finding is made.***

**4.7.188 Assessing Compliance with Paragraph 202: Discipline Matrix**

Paragraph 202 stipulates:

> **"APD shall establish a disciplinary matrix that:**
>
> **a)  establishes a presumptive range of discipline for each type of rule violation;**
> **b)  increases the presumptive discipline based on an officer's prior violations of the same or other rules;**
> **c)  sets out defined mitigating or aggravating factors;**
> **d)  requires that any departure from the presumptive range of discipline must be justified in writing;**
> **e)  provides that APD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and**
> **f)  provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 202:***

***4.7.188a Ensure that all disciplinary decisions either conform to the recommended ranges included in APD's disciplinary matrix or that they are accompanied by written explanations for the departure from the recommendations of the disciplinary matrix.***

***4.7.188b Ensure that all disciplinary decisions related to actions (or inactions) that are reasonably on the "critical path" regarding compliance with the CASA show a keen resolve to foster behaviors required by the CASA.***

***4.7.188c Ensure that all disciplinary packets are complete and self-explanatory, including documentation that all steps in the investigation and disciplinary processes were completed as required by policy.***

***4.7.188d Ensure that deviations from the presumptive range of discipline are addressed, explained and reasonable.***

209

***4.7.188e Ensure that all investigations selected for monitor review, in which discipline is imposed, contain the primary source data, if it was included in the regular course of business data available to command personnel.***

### 4.7.189 Assessing Compliance with Paragraph 203

Paragraph 203 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement the terms of this Agreement. APD shall also deploy a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally. APD shall revise and implement policies for supervision that set out clear requirements for supervision and comport with best practices."**

### Methodology

Members of the monitoring team are aware of past external staffing study work at APD by the Weiss Group that articulated staffing goals. Despite that work, no "magic number" exists to identify the exact number of officers APD needs to meet its workload. Based on the monitor's experience, these numbers tend to change almost annually. During 2018, APD has received an increased number of applications for entry-level patrol positions—along with a substantial increase in applications for lateral-entry positions. The agency has also made a palpable and commendable shift from "traditional" policing methods to community-oriented policing methods.

### Results

Given the apparent new pool of individuals interested in careers at APD, it seems appropriate for APD to develop goals and objectives for its recruiting and hiring processes. Outcome variables are available, such as calls for service per officer, specific response time goals, etc. The static numbers generated three years ago became invalid after as little as a year. Outcome variable-based staffing levels can and should be updated and assessed annually.

APD remains in compliance with this paragraph based on current staffing, efforts to improve outreach, and current numbers of recruits and lateral transfers who have expressed interest. Over the last year APD has moved from a sparse recruiting environment to a reasonably abundant recruiting environment. Whether the change is due to the new leadership at APD, the shift in focus at APD from pure enforcement to service delivery and community-oriented policing, or improvements in APD's salary structure is unclear. What is clear is that interest in APD jobs has elevated recently.

Operational compliance will depend on meeting established recruiting goals, based on the calculated number of officers needed to meet the policing objectives of the City of Albuquerque's neighborhoods.  These new goals should be based on detailed analysis of calls-for-service rates, new community-oriented goals, quantitative workload analyses, and detailed historical "perspective" information.

Primary:      **In Compliance**
Secondary:  **In Compliance (based on Weiss Study)**
Operational: **Not In Compliance**

*Recommendations for Paragraph 203:*

*4.7.189a:  Review the available literature and process on staffing goals.  Where practicable make staffing goals contingent upon desired outcome goals, e.g., average response times; committed hours per officer, by patrol shift; available non-committed time to pursue community-oriented policing goals, etc.*

*4.7.189b:  Consult with other police agencies who have incorporated community-oriented policing into their service delivery functions to determine how they collect, track, calculate and analyze staffing needs viz a viz community policing goals.*

**4.7.190 Assessing Compliance with Paragraph 204:  Comprehensive Staffing Study**

Paragraph 204 requires:

> **"In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission. APD therefore shall conduct a comprehensive staffing assessment and resource study. The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques. The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands. This staffing assessment and resource study shall be completed within one year of the Effective Date. Within six months of the completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement."**

**Methodology**

Alexander Weiss and Associates completed an APD staffing study in 2015, and specific staffing standards were identified.  Since 2015 APD has encountered difficulties meeting those standards.  In IMR-6 we found APD in compliance with the requirements of Paragraph 204.  Staffing standards were articulated by APD.  Historically, APD has had difficulty generating the number of recruits and lateral transfers called for by the results of its staffing studies.  That issue seems to have changed markedly recently, with APD experiencing substantial increases in applicants.  The staffing plan developed by APD during the last year meets the standards articulated by Paragraph 204.  We note in our analysis in Paragraph 203 above that "traditional" staffing analyses often poorly translate into community policing staffing analyses.  Our recommendations for Paragraph 203 also apply to paragraph 204.  We note the staffing analysis for community-oriented policing is a newly identified need, necessitated by APD's recent successes in transitioning to processes supportive of community-oriented policing.  As we have observed in other agencies moving to community-oriented policing, staffing decisions often can only be made after careful study of the time requirements of intensive community-oriented policing efforts.

APD maintains its past status on this paragraph; however, the juxtaposition of APD's old staffing calculation methods are somewhat archaic when confronted by the needs of community-oriented policing.  In order to maintain current compliance levels, APD needs to plan, develop, and move forward (with some alacrity) in developing a working model of calculating staffing needs for its new community oriented style of policing.  The somewhat archaic Weiss calculations will be less and less effective as APD moves from a "call response model" to a community policing model.

**Results**

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.191 – 4.7.194 Assessing Compliance with Paragraphs 205- 208: Supervision and Related Paragraphs

Paragraphs 205 thru 208 of the CASA address supervision requirements for first line supervisors to properly supervise the use-of-force, supervision within the chain of command, span of control and levels of supervision, and lieutenants and commanders maintain close supervision of officers under their command.

The monitoring team met with the staff from APD tasked with these paragraphs during the November 2018 site visit and made data requests for any and all progress from the last reporting period. During the last reporting period, APD embarked in a process to best position their organization to achieve the requirements of the CASA as it relates to these paragraphs, by starting focus groups designed to identify areas of concern,

212

training needs, and technology issues. The commander in charge of these paragraphs has decided to take a methodical approach to reach secondary and operational compliance. As stated in the last report, APD believes it will take twelve (12) to eighteen (18) months to fully implement all changes. During this reporting period the focus was geared to improving monthly activity reports, monthly check-off lists, monthly line-inspection forms, and video inspections. APD Performance Improvement Analysts were utilized to conduct interviews of the FSB supervisors to ascertain their thoughts and experiences with their current requirements for monthly reports.

This is the kind of data-driven, analytic approach to management we have long encouraged APD to take.  Two areas of concern were identified and addressed: the MyPal program did not capture all data and was therefore underreporting activity; and the amount of time spent per supervisor on supervisory checklists appeared burdensome.

APD personnel met with Department of Technology and Innovations (DTI). DTI staff advised the commander that feedback from MyPal from its inception the year prior had not been supplied to them. In December 2018, APD had officers from the Northeast Command manually track their monthly activities to check the accuracy of their reporting as compared to the documentation received from MyPal.

Accuracy is paramount in documenting and addressing supervisory issues, and the necessity of utilizing different programs or processes to complete monthly activities reports will slow APD's ability to address the issues that are delaying secondary and operational compliance. During this reporting period, APD conducted pilot audits in the Foothills and Northeast Commands to ensure data are quickly and accurately pulled into the data warehouse. The monitoring team was supplied with documentation, draft forms, and pilot audits. The documents supplied addressed the issues that APD had identified and assessed for this reporting period.

In the coming months, the monitoring team will need to review larger data samples to determine if APD is meeting their short-term goals set for this reporting period, and are moving in the right direction to meet the requirements of the CASA. Training for the program "MyPAL" that was delivered in the past to all Field Service Bureau personnel and PACT lieutenants and sergeants will continue to be delivered to recently promoted members, until APD implements a platform to adequately house supervision measurements into one process that can provide oversight at the micro and macro levels. APD has been in contact with the New Orleans Police Department as a source of information, due to that department's recent success in data-driven policing. The NOPD is currently in a consent decree and is addressing supervision as part of the requirements of that decree.

The monitoring team visited each of APD's six area commands during the November 2018 site visit. We inspected daily line-ups at each Command to ensure that staffing levels were met, and that a first-line supervisor was assigned to the field officers on patrol. Course-of-business staffing reports and data requested for this reporting period

indicate that the staffing levels reflect operational compliance.  We noted that first-line-supervisors were on duty at all locations at the time of the site visit. The normal day-to-day operations of the APD patrol units are supported and supervised at numeric levels required by the settlement agreement. Adequate supervisory personnel are in place at ratios required by the CASA.  The monitoring will continue to monitor the levels and effects in future site visits.

As in previous IMRs, the area of assessment of use-of-force incidents as required by Section IV of the CASA is of concern to the monitoring team. APD continues to work on a formalized and routinized processes for supervisory monthly reports, but until a working process is complete and fully implemented, APD cannot attain secondary or operational compliance. The monitoring team will review new pilot audits and steps implemented to reduce repetitive oversight errors in the next reporting period.

### 4.7.191 Assessing Compliance with Paragraph 205

Paragraph 205 stipulates:

> **"First-line supervisors shall investigate officers' use-of-force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **Not In Compliance** |

**Recommendation for Paragraph 205:**

***4.7.191:  Conduct both quantitative and qualitative reviews of supervisory effectiveness in the conduct of their reviews of officer performance, and ensure officers are appropriately focused on all applicable goals of the agency related to patrol operations.***

### 4.7.192 Assessing Compliance with Paragraph 206

Paragraph 206 stipulates:

> **"All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command. First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary**

> **command. Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department."**

Policy, procedure, and process are in place for implementing the requirements of this paragraph.  Training, staffing, and oversight, however, currently have serious gaps leading to compliance failures relating to "closely and consistently" supervising officers.  Sergeants, lieutenants, and command officers continue to miss critical deficiencies in the individual policing events reviewed by the monitors. Most of the deficiencies we have noted relate directly to use-of-force issues, e.g., supervisory and command personnel missing critical failing elements of officers' and supervisors' use-of-force reporting and/or practice.  At this point, this is *the* critical area of shortfall for APD's compliance efforts.  The policies and training are where they need to be, but supervisory and mid-management personnel (lieutenants and commanders) are failing to meet many of their oversight responsibilities.

We are convinced that, while some of these shortfalls are related to systems and reporting process, a large percentage of these failures are willful, with a small, but central cadre of supervisors simply not receptive to the requirements of the CASA.  We see ineffective supervision as the primary reason for many of the failures in compliance levels related to field-based policing practices.  The sergeant who simply refused to conduct routine inspections of officers' firearms is a blatant example of this core of supervisory personnel who are among the strongest facilitators of the counter-CASA effect at APD.  While on the surface, this seems a minor event, in actuality it clearly represents the essence of the counter-CASA phenomenon at APD:  the sergeant knew his duty, and understood what was required to execute his duty; however, simply because he disagreed with the operational requirements agreed to by the APD, the City of Albuquerque, the United States Department of Justice, and a federal judge, he blatantly and deliberately failed to execute his duty.  The "penalty" for that deliberate defiance was a verbal reprimand.

To the monitoring team, this hardly seemed reasonably appropriate, given the deliberate and blatant counter-CASA actions of this sergeant, and the gross failure of his chain of command to grasp the serious nature of his defiance of CASA requirements. We have advised APD for years that success in this project is directly dependent on effective supervision at the line-level.  No effective system can focus solely on computers, automated programs, or global focus.  Success will be won or lost at the supervisory level:  well-trained, competent sergeants who are aware of their CASA-related job functions, and who perform those functions properly every day on every shift, are the key components of eventual success.

**Results**

|            |                      |
|------------|----------------------|
| Primary:   | **In Compliance**    |
| Secondary: | **Not In Compliance** |

Operational:      **Not In Compliance**

**Recommendations for Paragraph 206:**

*4.7.192a:  Using existing documentation processes, e.g., routine supervisory reporting of CASA-related process (such as reviews of use of force reports, reviews of OBRD footage of critical incidents such as uses of force, etc.) identify the most resistant contributors to the Counter- CASA effect at APD and remediate their resistance.  The "refusal" of the patrol sergeant mentioned in sections 4.7.4 through 4.7.7, above is a clear example of deliberate resistance.*

*4.7.192b:  Once these Counter-CASA elements are identified, engage in counseling, re-training, and, if necessary, discipline or transfer, to remediate or remove those personnel from supervisory positions in areas critical to the CASA.*

*4.7.192c:  Maintain carefully documented records of the actions engendered by the Counter-CASA effect, the individuals engaging in those actions, the disciplinary processes implemented, and the results of follow-up evaluations to determine if change has occurred.*

*4.7.192d:  Publish quarterly assessments of the nature, scope and significance of the Counter-CASA effect, by Area Command, unit, group or squad, and utilize these data to clarify the scope, nature, and impact of the Counter-CASA effect on APD compliance efforts.*

### 4.7.193 Assessing Compliance with Paragraph 207

Paragraph 207 stipulates:

> **"First-line supervisors shall ordinarily be assigned as a primary supervisor to no more than eight officers. Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary."**

**Results**

During our site visits at Area Commands this reporting period, we found no unit, shift, or operational command that failed to meet this articulated span of control.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.194 Assessing Compliance with Paragraph 208

Paragraph 208 stipulates:

> **"APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command. APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement."**

Our review of use-of-force incidents was designed to assess compliance with this paragraph.  While lieutenants and commanders were found to be "on-duty" when we made our Field Services site visits, these ranks tended to be less effective when the monitoring team reviewed results-oriented outcome variables related to their work product.  For example, sergeants, lieutenants and commanders are still routinely missing out-of-policy actions by their officers when management personnel review officer reports and OBRD video.  We continue to note from our review of use-of-force incidents that the main sources of "findings" concerning improper or deficient supervision is the Compliance Bureau and the monitoring team.  It must be the Command level at APD's Area Commands if APD is to attain operational compliance.  Until sergeants' immediate supervisors are "calling the ball" on these ineffective sergeants, and noting failed supervision in sergeant's records, progress will remain elusive.

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendations for Paragraphs 205, 206 and 208:***

***4.7.194a: APD should codify monitor's comments in paragraphs 205, 206 and 208 over the past three reporting periods and conduct a failure analysis on each supervision issue noted in those reports. These failure points should be analyzed to identify what caused the initial failure and why those initial failures were not "caught and corrected" by lieutenant and commander levels.***

***4.7.194b:  For Paragraphs 205, 206 and 208:  Based on the results of the analysis for 4.7.194a, above, develop counseling, retraining, or disciplinary processes to reduce or eliminate deliberate counter-CASA refusals to perform.  Take careful notice of "repeat offenders" at the sergeant, lieutenant and commander levels of the organization.***

***4.7.194c:  Routinely monitor the supervisory, mid-management, and command level personnel who consistently miss or overlook officer behaviors that violate the requirements of the CASA, and where those supervisory and management errors persist, take necessary remedial***

217

*action, including retraining, counseling, transfer or discipline, as
appropriate.*

**4.7.195 - 4.7.197 Assessing Compliance with Paragraphs 209 -211:
Review of Sergeants' Training**

Paragraphs 209 through 211 address various supervisory training requirements APD
must meet for the CASA. As with other reporting periods and in other paragraphs in the
CASA, the monitoring team has dedicated extensive amounts of time providing
perspective, feedback and technical assistance to APD's Training Academy in its three
2018 site visits.

These paragraphs require that every sergeant receive forty (40) hours of mandatory
supervisory, management, leadership and command accountability training.  Other
topics in the training requirements include, but are not limited to, investigating use-of-
force, de-escalating conflict, monitoring use-of-force to ensure consistency with policies,
and understanding supervisory tools such as the Early Intervention System and on-body
recording systems. As in other monitoring periods, data requested and received by the
monitoring team indicate that these portions of the requirement have been addressed
by APD in the supervisory course delivered during this reporting period.

Training lapses are identified in the monitor's reports in paragraphs 41 through 59 and
86 through 88. We note in paragraphs 86 through 88 that "APD will find that
performance outcomes related to the use and supervision of force in the field are at the
heart of the CASA's operational compliance."

"The emphasis on APD gathering training needs from the field and ensuring that training
objectives and curricula are 'mapped,' are essential to affect specific performance
changes, and to ensure that field implementation can be assessed and measured." In
response to the requirements of paragraphs 205 through 208, a new system currently
under development for supervisory monthly reports that will report any results designed
to measure the impact of the training received under paragraphs 209 through 211. The
seven-step training cycle that was recently implemented by the academy should
enhance the training process. The technical assistance afforded APD during the 2018
site visits should assist APD in an effort to move forward with an effective and
manageable system to capture data concerning the performance of its officers.

During this monitoring period, APD remains in primary compliance with paragraphs 209
through 211, because of changes currently being implemented in response to the
requirements of paragraphs 205 through 211.  However, we note that the impact of
training recently delivered by APD is not measureable during this reporting period, as
there has been too little time since delivery to expect an impact in the field.

Secondary and operational compliance will require revised training protocols and
changes in the way police in-field operations are executed, supervised and reported.
APD eventually must come to the point that "calling" improper actions in the field is

effected at the supervisory level, not the internal quality-control level, e.g., IA, the Training Academy, etc., or at the monitor's level.

### 4.7.195 Assessing Compliance with Paragraph 209

Paragraph 209 stipulates:

> **"Sergeant training is critical to effective first-line supervision. Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities."**

### Results

Compliance has not been attained this reporting period, as the majority of APD sergeants have not yet received the new supervisory training classes.

> Primary:     **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.196 Assessing Compliance with Paragraph 210

Paragraph 210 stipulates:

> **"APD's sergeant training program shall include the following topics:**
>
> **a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;**
> **b) de-escalating conflict;**
> **c) evaluating written reports, including those that contain canned language;**
> **d) investigating officer uses of force;**
> **e) understanding supervisory tools such as the Early Intervention System and on-body recording systems;**
> **f)  responding to and investigating allegations of officer misconduct;**
> **g) evaluating officer performance;**
> **h) consistent disciplinary sanction and non-punitive corrective action;**
> **i)  monitoring use-of-force to ensure consistency with policies;**
> **j)  building community partnerships and guiding officers on this requirement;**
> **k) legal updates."**

**Results**

Secondary compliance has not been attained this reporting period, as the majority of APD sergeants have not yet received the new supervisory training classes.

> Primary:    **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**


### 4.7.198 Assessing Compliance with Paragraph 211

Paragraph 211 stipulates:

> **"All sworn supervisors shall also receive a minimum of 32 hours of in-service management training, which may include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement."**

**Results**

Compliance has not been attained this reporting period, as the majority of APD sergeants have not yet received the new supervisory training classes.

> Primary:    **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraphs 209 – 211:***

***4.7.198a:  Deliver and evaluate the revised supervisory training blocks to all required APD supervisors.***

***4.7.198b:  Develop a response plan for sections of supervisory training that indicate, through poor performance on testing or field implementation, a need for clarification, explanation, or remediation of points "trained" but not understood (as measured by evaluative processes).***

### 4.7.198 – 4.7.205 Assessing Compliance with Paragraphs 212-219
### EIS/EIRS/PMEDS

During the November 2018 site visit, the Performance Evaluation and Management System (PEMS) policy 3-33 was still making its way through the review process. Members of the monitoring team attended demonstrations by vendors interested in providing new system capabilities to the APD.  While the monitoring team was

impressed by the claims of the vendors, APD was again reminded of the technical assistance provided by the monitor relating to systems development, implementation, training, and support for hardware/software purchases.  The monitoring team reviewed a 91-page RFP developed by APD for the acquisition of PEMS and supporting systems integration.  It appears that APD has learned valuable lessons from prior purchases without on-going support, and from the monitoring team's technical assistance to enable crafting a document that should have them safely acquiring the next generation of personnel management tools and moving forward toward compliance.

While APD is currently utilizing the existing system (IAPro) to attempt to identify officers who exceed current thresholds and may require intervention, they have provided the monitoring team with draft versions of policy, SOPs and plans to move forward with a system that has the capability to meet or exceed CASA requirements.  It is proposed to be a data-driven system with thresholds supported by data analysis and research, using standard deviation data to establish thresholds rather than arbitrarily assigned incident numbers (as we have long-recommended).

Training and supervision are the next major objectives that need to be addressed by APD once policy has been approved.  During the May 2019 site visit, the monitoring team will conduct a review of the trial data being captured at two area commands (with respect to the system's ability to identify deficient behavior via standard deviation).

APD visited the New Orleans PD to gain additional insight into systems development. We continue to work with the APD and the City to craft acceptable policies and procedures that conform to national standards for these paragraphs.

APD envisions the entire process as a 24-month project based upon policy approval, system selection, training and implementation.  The monitoring team believes this to be an appropriate estimate, based on prior experience with Early Intervention Systems in Pittsburgh and New Jersey.  While this timeline is problematic with regards to attaining compliance with the requirements of the CASA, the monitoring team believes that APD has finally grasped the importance of an Early Intervention System.  While approved policy guidance exists, it is highly probable that, when new systems are developed, policies will need to change.  Nonetheless, APD is currently in primary compliance, pending new policy development and approval, as existing policies have been promulgated and approved.

### 4.7.198 Assessing Compliance with Paragraph 212

Paragraph 212 stipulates:

> **"Within nine months of the Effective Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers. APD supervisors shall be trained to**

> **proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.199 Assessing Compliance with Paragraph 213

Paragraph 213 stipulates:

> **"APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.200 Assessing Compliance Paragraph 214

Paragraph 214 stipulates:

> **"APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.201 Assessing Compliance Paragraph 215

Paragraph 215 stipulates:

> **"The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to**

222

collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum:
a) uses of force;
b) injuries and deaths to persons in custody;
c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy;
d) all civilian or administrative complaints and their dispositions;
e) all judicial proceedings where an officer is the subject of a protective or restraining order;
f) all vehicle pursuits and traffic collisions involving APD equipment;
g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system;
h) all disciplinary action taken against employees;
 i) all non-punitive corrective action required of employees;
 j) all awards and commendations received by employees, including those received from civilians, as well as special acts performed by employees;
 k) demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;
 l) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and
m) all offense reports in which an officer is a suspect or offender."

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**


## 4.7.202 Assessing Compliance Paragraph 216

Paragraph 216 stipulates:

"**APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it. The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command.**"

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.203 Assessing Compliance Paragraph 217

Paragraph 217 stipulates:

> **"APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law. Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System. On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.204 Assessing Compliance Paragraph 218

Paragraph 218 stipulates:

> **"APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system. APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command. Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.205 Assessing Compliance Paragraph 219

Paragraph 219 stipulates:

> **"Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate. The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement."**

## Results

While the new PEMS policy is currently in draft form and still in the approval process, the monitoring team identified a CASA requirement that was completely omitted. Paragraph 215 (k) relates to capturing demographic data for Use of Force and Search and Seizure incidents.  These required elements should be included in the revised version of PEMS.

Primary:         **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 212 - 219:*

*4.7.205a:  Document the curriculum for OBRD training for supervisors, and ensure that that the new PEMS system addresses all required components of paragraph 219 and the additional requirements of Paragraph 23 (Firearm discharges), Paragraph 38 (ECW data) and Paragraph 105 (Tactical Unit data).*

*4.7.205b:  Document learning assessment processes for the training provided for supervisors.*

*4.7.205c:  Design and document audit protocols for supervisory review and reporting of OBRD processes.*

## 4.7.206 – 4.7.217 Assessing Compliance with Paragraphs 220-231

During this reporting period, APD has completed the OBRD training for the 20th Lateral class, the 120th Cadet class and the 21st Lateral class.  The deployment of new AXON cameras to all of APD was completed during this reporting period, with the officers in uniform (Field Services) receiving two (2) cameras each.  After a successful recruiting

225

and hiring campaign, the necessary additional cameras are in the purchase process. Initial OBRD training was completed by all officers receiving an OBRD.

During the team site visit in November 2018, the OBRD policy 2-8 was pending as "in review" and remains in review as of the writing of this report. Members of the monitoring team visited every Area Command and had supervisors explain their understanding of the policy requirements and asked the supervisors to demonstrate that they in fact had done the required video reviews.  All supervisors contacted were aware of the policy requirements, fluent in their use of the system, and had documented their completed video reviews.  This is a marked improvement over past performance in this area and a direct result of OBRD refresher training conducted during this reporting period, with more than 97% of APD personnel completing the refresher via Power DMS.

APD discovered that when supervisors entered data into the monthly video inspection form, they were permitted to skip certain fields and continue with completing the form. This caused inaccurate data collection if a field had been skipped, so changes were implemented to require all fields to be mandatory, in order to eliminate missing data. The revised form adds an audit function and the Performance Metrics Unit is in the pilot phase of conducting random and directed audits for OBRD.  The Northwest and Foothills Area Commands are the two pilot commands for the months of February and March 2019.  The monitoring team will review the progress/outcome of this pilot during the May 2019 site visit.

Additional personnel have been assigned to OBRD functions to assist in training.  Two civilians were certified in Instructor Training and attended Axon camera systems training. Additionally, the camera program has been transferred to the Evidence Section from the Property Section. This enables an officer having problems with a camera to get a replacement at any time. This unit will also track issues reported with the cameras—failures, battery issues, etc.

In order to attain compliance with the requirement that all cameras are checked daily to ensure they are working, APD has requested documentation from Axon that will explain the cameras built-in protocols that restrict downloads, recharging and uploading camera updates to only cameras known (by the system) to be functioning correctly.  APD provided an email from an Axon software engineer describing this safeguard. The monitoring team reviewed AXON training materials and observed units in the field being charged/ downloaded/ uploaded and agree that a non-functioning camera would be indicated by the system.

APD has begun to develop systems and processes and to outline methods of conducting internal inspections and audits with regards to several requirements of the CASA relating to OBRD.  Spreadsheet data has been presented to the monitoring team regarding sixteen cases of OBRD infractions during this reporting period, involving eighteen officers and one Lieutenant. Nine cases have been sustained with seven cases still in progress.  These spreadsheets, however, do not distinguish how these policy violations were discovered, whether they were referred to Internal Affairs, or the

226

final disposition of the cases.  Members of the monitoring team will work with Internal Affairs and OBRD personnel during the next site visit to address the requirements and explore methods to capture and report the data.

Regarding training, members of the monitoring team have taken the OBRD training and test via Power DMS.  During this process, we found the testing protocols to be reasonably designed to assess learning. We have requested, but never received any curriculum for the training of supervisors regarding their responsibilities with OBRD (other than PowerPoint slides).  We have admonished APD on a number of occasions that PowerPoint slides do not constitute full training documentation.  Well-trained supervisors are the lynchpin to making this entire process function properly.  APD is reminded that all CASA-related training should be based on acceptable lesson planning processes similar to the GO-MAPPS (seven-step training process) outline the monitor has provided the Training Academy on multiple occasions.

APD's response to IMR-8 indicates that OBRD Supervisory Training is in development as one of three blocks of OBRD training—in addition to OBRD Function Training and Policy Review Training.

> Primary:     **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

## 4.7.206 Assessing Compliance Paragraph 220

Paragraph 220 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems. Within six months of the Effective Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require:**
> **a) specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;**
> **b) officers to ensure that their on-body recording systems are working properly during police action;**
> **c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning;**
> **d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible;**
> **e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;**

> **f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits;**
> **g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and**
> **h) APD to retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved."**

## Results

APD has developed compliant policy for OBRD operation, and has trained all appropriate personnel in the operation of OBRD units with respect to those policies.  To date, we have not seen compliant levels of in-field operations of OBRDs at the 95 percent level.  Based on our knowledge and experience, this is attributable to inadequate processes of supervision and review by first-line supervisors.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 219 – 220:*

*4.7.206a: Develop and implement a routinized system of inspections and audit of OBRD field processes which will assess methodically the required elements of OBRD use in the field.*

*4.7.206b: Prepare, quarterly, a written assessment of the results of the inspections and audit outcomes, identifying the top five areas of non-compliance with the requirements of OBRD field processes.*

*4.7.206c:  Based on the quarterly audits, identify the top three reasons for non-compliance with OBRD policies and procedures, and develop specific, targeted responses to address and remediate each of the top three non-compliance areas.*

*4.7.206d:  Repeat steps a-c until field OBRD error rates are below five percent.*

## 4.7.207 Assessing Compliance with Paragraph 221

Paragraph 221 stipulates:

> **"APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and**

228

> **implementation. Upon approval by the Monitor and DOJ, policies shall be implemented within two months."**

## Results

Policies responsive to paragraph 221 have been developed and trained.  As of the end of this reporting period, those policy and training initiatives have not had the desired effect on in-field operations of OBRDs *viz a viz* policy and performance gaps.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

### Recommendations for Paragraph 221:

### 4.7.207a: Develop, implement, and assess supervisory protocols to ensure violations of applicable policy are identified by supervisors and are addressed and remediated.

### 4.7.207b:  Publish quarterly "OBRD Failure" reports identifying the top five reasons for OBRD failure in the field, and identifying the Area Command, shift, and supervisors associated with those failures.

### 4.7.207c:  Retrain, counsel or discipline supervisors with repeated failures in noting, assessing, and correcting officers with repeated OBRD operations failures.

### 4.7.207d:  Repeat until error rates on OBRD operation fall below five percent.

## 4.7.208 Assessing Compliance with Paragraph 222

Paragraph 222 stipulates:

> **"The Parties recognize that training regarding on-body recording systems is necessary and critical. APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff. APD will develop a training curriculum, with input from the Monitor and DOJ that relies on national guidelines, standards, and best practices."**

## Results

Training for OBRD operations in the field has been implemented; however, given the unacceptably high failure rates in the field, this training appears not to have been effective within the supervisory ranks, as failure rates related to OBRD operations in the field are still unacceptably high.  These failure rates, it appears to the monitoring team,

are not related to problems with policy, but are directly related to problems with supervision. The majority of OBRD errors noted by the monitoring team indicate a failure of sergeants to review, assess, and act upon OBRD failures exhibited by line personnel.   In effect, it appears that in most Area Commands, in-field OBRD performance is not viewed as important.  This is a critical issue.  Until supervisors are fully engaged in insisting on proper performance in the field, progress will be elusive.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 222:***

***4.7.208a:  Reinforce the established clear, concise, and reasonable requirements for supervisory review of in-field activations of OBRDs, requiring field supervisors to review OBRD activations and recordings for compliance to established policy.***

***4.7.208b:  Establish a routinized process for command oversight of the OBRD review process, requiring lieutenants to assess, in a methodical way, the OBRD review processes of sergeants under their command, and commanders to assess the OBRD review performance of lieutenants under their command, to ensure compliance with reasonable assessments of actions in the field.***

***4.5.208c:  Establish a routinized administrative review, via Compliance Bureau Personnel, of Area Command OBRD review efficiency, including performance metrics such as overall review rates, error rates, and remediation protocols.  This review process should be on-going and assigned to the Performance Metrics Unit.***

### 4.7.209 Assessing Compliance with Paragraph 223

Paragraph 223 stipulates:

> **"APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order. Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor."**

**Results**

The requirements of this paragraph of the CASA are actualized in policy and training. Supervisory oversight for this paragraph has proven to be poor, at best.  We do note that APD has been creative enough to turn to an equipment solution to testing, having

230

made the decision to upgrade OBRD devices to a model that will not operate unless nominal functioning is detected by the charging systems.  While we respect APD's initiative in finding a workaround to supervisory failures on this point, this simply serves to reinforce our belief that supervisors are routinely refusing to implement OBRD policies in the field.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

## 4.7.210 Assessing Compliance with Paragraph 224

Paragraph 224 stipulates:

> **"Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy."**

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 223 – 224:*

*4.7.210a:  Ensure that supervisors who fail to note errors in OBRD operation are counseled, or for multiple offenders, retrained and/or disciplined for ineffective OBRD review processes.*

*4.7.210b:  If, after counseling or retraining, supervisors continue to miss OBRD activation or usage violations, ensure appropriate discipline is imposed.*

*4.7.210c:  Identify the top 20 sergeants who have substandard performance on OBRD activation review and retrain them in the process.  Place these individuals "on notice" that their performance on this task will be routinely reviewed, and continued failures will result in discipline.*

## 4.7.211 Assessing Compliance with Paragraph 225

Paragraph 225 stipulates:

**"At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed."**

## Results

Data reviewed regarding OBRD review for this reporting period indicated compliance for this paragraph. Monthly assessments are stipulated by the CASA. Again, we note that the new models of OBRD devices will have a "handshake" protocol with the charging systems that will diagnose on-board systems in individual OBRD units. Units found to fail the on-board diagnoses will not charge, and "error messages" will be sent to ensure the units are inspected.

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.212 Assessing Compliance with Paragraph 226
Paragraph 226 stipulates:

**"APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent."**

## Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.213 Assessing Compliance with Paragraph 227

Paragraph 227 stipulates:

**"APD shall ensure that on-body recording system videos are properly categorized and accessible. On-body recording system videos shall be classified according to the kind of incident or event captured in the footage."**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.214 Assessing Compliance with Paragraph 228

Paragraph 228 stipulates:

> **"Officers who wear on-body recording systems shall be required to articulate on camera or provide in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded. Intentional or otherwise unjustified failure to activate an on-body recording system when required by APD policy shall subject the officer to discipline."**

## Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

See paragraph 231 for an explanation of non-compliance for OBRD usage.

***Recommendations for Paragraph 228:***

***See paragraph 231 for recommendations for remediation of problems concerning this paragraph.***

## 4.7.215 Assessing Compliance with Paragraph 229

Paragraph 229 stipulates:

> **"APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties. On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room)."**

## Results

Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

The majority of OBRD errors noted by the monitoring team indicate a failure of sergeants to review, assess, and act upon OBRD failures exhibited by line personnel.

***See monitor's recommendations for paragraph 231.***

## 4.7.216 Assessing Compliance with Paragraph 230

Paragraph 230 stipulates:

> **"APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift. All images and sounds recorded by on-body recording systems are the exclusive property of APD."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.217 Assessing Compliance with Paragraph 231

Paragraph 231 stipulates:

> **"The Parties are committed to the effective use of on-body recording systems and to utilizing best practices. APD currently deploys several different platforms for on-body recording systems that have a range of technological capabilities and cost considerations. The City has engaged outside experts to conduct a study of its on-body recording system program. Given these issues, within one year of the Effective Date, APD shall consult with community stakeholders, officers, the police officer's union, and community residents to gather input on APD's on-body recording system policy and to revise the policy, as necessary, to ensure it complies with applicable law, this Agreement, and best practices."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 220-231:*

*4.7.206-217a:  Document all training provided responsive to above paragraphs and provide that documentation to the monitoring team for review.*

*4.7.206-217b:  Ensure that training provided responsive to these paragraphs is well documented and has clear goals and measureable objectives.*

*4.7.206-217c:  Conduct detailed failure analyses designed to identify the causes of incidents of "failure to record," and identify the true cause of these failures: equipment, training, supervision, or "other."*

*4.7.206-217d:  Rank order the failure rates, and develop action plans to eliminate the causes of failure, beginning with the most frequent and working to least frequent.*

*4.7.206-217e:  Identify a frequency-based list of supervisors who fail to enforce OBRD requirements, and schedule these supervisors for retraining, counseling, or discipline, as appropriate.*

**4.7.218 – 4.7.226 Assessing Compliance with Paragraphs 232-240**

Members of the monitoring team examined and reviewed APD data related to these requirements in the form of policy, programs, and results.  APD has been, and is currently attracting and hiring qualified individuals, and has been and remains in Operational Compliance with each of these CASA paragraph requirements.

Members of the monitoring team met with Training Academy personnel responsible for the development and implementation of a strategic recruitment plan. The APD Training Academy has provided the monitoring team with the "2018 Annual Report & 2019 Strategic Recruitment Plan." APD continues to aggressively promote the agency via web-based applications with expanded emphasis on minority group sites. Additionally, APD continues to provide documentation of attendance at many diverse community group events including military, faith-based, educational, and sports-related events. State and national events were also targeted by the APD recruiters, including the NM State Fair, the Balloon Fiesta and the NRA National Shooting Competition. In addition to making contact with prospective recruits, APD has been able to collect valuable information from its recruiters regarding hiring strategies.  APD has accepted applications from several law enforcement officers contacted at these events.  APD discovered that interested individuals were sometimes unable to connect with APD via the internet and has begun resolving this, and other tech-related issues.  APD is working to make the application process available to applicants who rely on their mobile devices, and has added a "scan code" to its recruiting brochure that will take an applicant directly to the APD online registration website.  The "blind" online application process, wherein applicants can remain completely anonymous until they arrive for testing, is a laudable and effective process.

The University of New Mexico worked with the APD to develop a comprehensive recruiting plan, and the partnership continues.  APD recruiting staff has met with the UNM Athletic recruiters to learn their tactics of attracting highly qualified individuals, and secondly to establish access to athletes who may be interested in an APD career.

The "2019 Strategic Recruitment Plan" lists a review of past strategies and enumerates goals/objectives and activities to attract a diverse pool of applicants for 2019.  APD has expanded its web-based advertising with more emphasis on minority group sites (Native People Recruits, The Cause, and Saludos websites) in addition to the military and university communities. APD continues regular contact with board members of the Southern Christian Leadership Conference. Feedback received from a recruiting summit

was a determining factor in the reduction of the college credit requirements. APD has expanded its efforts with the high school "Career Enhancement Center," to recruit students into the Public Service Aide (PSA) program, and foster processes to facilitate the transition from PSA to police officer.   APD has provided documentation that demonstrates changes to recruiting process based on community feedback.  During 2018, APD Recruiters attended meetings with all six Community Policing Councils. Community Councils recommended that APD post Albuquerque demographic data on its website, and that was completed.  Additionally, the Councils recommended an instructional video to demonstrate the testing and hiring process and that video was completed, posted on APDonline and is emailed to each applicant.  Another Council meeting proposed that videos of current officers discussing their reasons for joining APD would be helpful.  These are currently in the planning stages. Finally, monthly tutoring sessions have been implemented and while they have encountered some staffing issues, APD continues to facilitate these tutoring sessions. APD has added additional testing dates during the week rather than just weekends to enable those working weekend shifts to test.

No recruit class was seated until the final few days of this monitoring period.  The monitoring team will conduct a random audit of the CASA requirements for that recruit class during the May 2019 site visit.

Members of the monitoring team requested COB data related to training for CASA requirements and reviewed a random sample of six lateral hires (a 21% sample of the 29 laterals hired).  All lateral applicants were screened by psychological testing, completed a medical examination, and were subjected to polygraph screening, and drug testing.  Results of APD's screening process for the 20th Lateral class are included in Tables 4.7.218a, b and c below.

In addition to the initial APD test with related skills questions, the background questionnaires for both a candidate's former employers and personal references contain questions related to employment, criminal and credit history, and questions regarding controlled substance use and abilities to work with diverse communities.  A random audit (six of 29 seated—21%) of applicant files found each one to contain the relevant questionnaires with answers to the specific questions related to the requirements of this paragraph. The results of that review are included in Table 4.7.218b below, and indicate 100 percent compliance for this task.

For the requirement of drug testing current officers, APD submitted Course of Business documentation of random drug testing for current APD officers during this monitoring period, August 1, 2018 to January 31, 2019.  The results of that review indicate 100 percent compliance for this task.

APD has met or exceeded all established requirements for Paragraphs 232-240 in the past and the monitoring team expects APD to continue to remain in compliance (See Table 4.7.218a, below).

### Table 4.7.218a
### Screening Points for Recruits and Lateral Hires

| # | New recruits and lateral hires to undergo a psychological examination to determine their fitness | New recruits and lateral hires, to undergo a medical examination to determine their fitness | New recruits and lateral hires, to undergo a polygraph examination to determine their fitness | Reliable and valid pre-service Drug testing for new officers and random testing for existing officers. | Detect the use of banned or illegal substances, including steroids. |
|---|---|---|---|---|---|
| Lateral 1 | 1 | 1 | 1 | 1 | 1 |
| Lateral 2 | 1 | 1 | 1 | 1 | 1 |
| Lateral 3 | 1 | 1 | 1 | 1 | 1 |
| Lateral 4 | 1 | 1 | 1 | 1 | 1 |
| Lateral 5 | 1 | 1 | 1 | 1 | 1 |
| Lateral 6 | 1 | 1 | 1 | 1 | 1 |
| Total | 6 | 6 | 6 | 6 | 6 |
| Number in Compliance Total all Incidents | 6 | 6 | 6 | 6 | 6 |
| % in Compliance Total by Category | 100% | 100% | 100% | 100% | 100% |

### Table 4.7.218b

### Screening Points for Recruits and Lateral Hires

| Case No. | Assessing a candidate's credit history | Assessing a candidate's criminal history | Assessing a candidate's employment history | Assessing a candidate's use of controlled substances | Assessing a candidate's ability to work with diverse communities |
|---|---|---|---|---|---|
| Lateral 1 | 1 | 1 | 1 | 1 | 1 |
| Lateral 2 | 1 | 1 | 1 | 1 | 1 |
| Lateral 3 | 1 | 1 | 1 | 1 | 1 |
| Lateral 4 | 1 | 1 | 1 | 1 | 1 |
| Lateral 5 | 1 | 1 | 1 | 1 | 1 |
| Lateral 6 | 1 | 1 | 1 | 1 | 1 |
| Number in Compliance Total all Incidents | 6 | 6 | 6 | 6 | 6 |
| % in Compliance Total by Category | 100% | 100% | 100% | 100% | 100% |

237

**Table 4.7.218c**

**Additional Screening Points for Lateral Hires**

| Case No. | History of using lethal and less lethal force | Named in a civil or criminal action | Assessing a lateral's use of force training records | Assessing a lateral's complaint history | Providing training in APD policies, procedures and the CASA |
|---|---|---|---|---|---|
| Lateral 1 | 1 | 1 | 1 | 1 | 1 |
| Lateral 2 | 1 | 1 | 1 | 1 | 1 |
| Lateral 3 | 1 | 1 | 1 | 1 | 1 |
| Lateral 4 | 1 | 1 | 1 | 1 | 1 |
| Lateral 5 | 1 | 1 | 1 | 1 | 1 |
| Lateral 6 | 1 | 1 | 1 | 1 | 1 |
| **Number in Compliance Total all Incidents** | **6** | **6** | **6** | **6** | **6** |
| **% in Compliance Total by Category** | **100%** | **100%** | **100%** | **100%** | **100%** |

## 4.7.218 Assessing Compliance with Paragraph 232

Paragraph 232 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts."**

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.219 Assessing Compliance with Paragraph 233

Paragraph 233 stipulates:

> **"APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting**

> **qualified applicants from a broad cross section of the
> community. The recruitment plan shall establish and clearly
> identify the goals of APD's recruitment efforts and the duties
> of officers and staff implementing the plan."**

## Results

APD remains in compliance with this paragraph based on work completed earlier regarding recruitment planning.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.220 Assessing Compliance with Paragraph 234

Paragraph 234 stipulates:

> **"APD's recruitment plan shall include specific strategies for
> attracting a diverse group of applicants who possess
> strategic thinking and problem-solving skills, emotional
> maturity, interpersonal skills, and the ability to collaborate
> with a diverse cross-section of the community."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.221 Assessing Compliance with Paragraph 235

Paragraph 235 stipulates:

> **"APD's recruitment plan will also consult with community
> stakeholders to receive recommended strategies to attract a
> diverse pool of applicants. APD shall create and maintain
> sustained relationships with community stakeholders to
> enhance recruitment efforts."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.222 Assessing Compliance with Paragraph 236

Paragraph 236 stipulates:

> **"APD shall develop and implement an objective system for hiring and selecting recruits. The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.223 Assessing Compliance with Paragraph 237

Paragraph 237 stipulates:

> **"APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and polygraph examination to determine their fitness for employment. APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers. The program shall continue to be designed to detect the use of banned or illegal substances, including steroids."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.224 Assessing Compliance with Paragraph 238

Paragraph 238 stipulates:

> **"APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws. APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities."**

240

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.225 Assessing Compliance with Paragraph 239

Paragraph 239 stipulates:

> **"APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires. APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.226 Assessing Compliance with Paragraph 240

Paragraph 240 stipulates:

> **"APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.227 – 4.7.229 Assessing Compliance with CASA Paragraphs 241-243: Promotions

The monitoring team conducted a random audit of the promotions made by APD on October 26, 2018.  APD promoted fifteen officers to the rank of Sergeant and five

Sergeants to the rank of Lieutenant.  The monitoring team reviewed eight of the fifteen Sergeants (a 53% sample) and three of the five Lieutenants (a 60% sample) and found APD to be in full compliance with the requirements of these paragraphs for all eleven promotions we reviewed. Records were checked in Human Resources, Internal Affairs and the Training Academy.

APD provided members of the monitoring team a new Promotional Practices Policy (dated January 31, 2019). The new policy promulgated by APD was adopted after approval by the Court. Based on the monitoring team's review of promotions recently made by APD, the agency has promoted individuals who meet applicable standards and existing policy.

Additional promotions were made at the end of this reporting period.  During the May 2019 site visit, the monitoring team will conduct another random audit of those promoted and review their records to ensure all were within the policy approved by the Court.

### 4.7.227 Assessing Compliance with Paragraph 241

Paragraph 241 stipulates:

> **"APD shall develop and implement fair and consistent promotion practices that comport with best practices and federal anti-discrimination laws. APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant. APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions. These criteria should account for experience, protection of civil rights, discipline history, and previous performance evaluations."**

**Results**

The Court has approved the extant promotions policy, which was the result of long-term, on-going negotiations between APOA and the City.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.228 Assessing Compliance with Paragraph 242

Paragraph 242 stipulates:

> **"APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that**

**are required to perform supervisory and management duties in core substantive areas."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.229 Assessing Compliance with Paragraph 243

Paragraph 243 stipulates:

**"Within six months of the Effective Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.230 – 4.7.232 Assessing Compliance with CASA Paragraphs 244-246 (Performance Evaluations and Promotional Policies)

APD has completed and promulgated policy regarding performance evaluations.   The policy provides guidance on use of the system, listing criteria to be used to assess achievement of performance goals, and outlining corrective action required if performance goals are not met. During prior site visits, members of the monitoring team attended the Talent Management training and found it to be excellent.  As the system has been in use over the past two years, however, deficiencies in its ability to conform to all CASA requirements has become apparent.

Once again, during the November 2018 site visit, members of the monitoring team visited all six area commands and had supervisors demonstrate the Talent Management System. All supervisors were fluent in their use of the system, were able to show examples of work plans and achievements of subordinates, and had completed the requirements of the policy, the CASA and the system on-time, but with issues.

APD is currently working on revising the existing Performance Evaluation policy to include specific sanctions for missed checkpoints and failure to make notifications regarding incorrect personnel assignments.  Those planned revisions will enhance the performance evaluation system.  Additionally, APD has found that the existing Talent Management system is not fully capable for use as a supervisory evaluation tool,

especially with respect to CASA requirements as outlined in Paragraph 47.  There is currently no method of evaluating a supervisor's use of force investigations within the system. Completed Staff Work (CSW) documentation has been presented to the monitoring team recognizing all the shortcomings of the existing system and providing recommendations for corrections.

The monitoring team was provided with course of business documentation, generated through the automated system, that showed compliance rates below 95% for the immediate supervisors completing the latest two evaluation checkpoints (October 2018 and January 2019). The APD Lead Commander responsible for the Performance Evaluation requirements referred 17 supervisors to Internal Affairs for administrative investigations regarding the failure to complete their checkpoints in a timely manner. Additionally, the monitoring team was provided with data related to upcoming checkpoint reminders, failures to meet the requirements, and the responses to the reasons for those failures. The reasons for failing to meet the checkpoint requirements included administrative errors of failing to assign an officer appropriately, military leave, FMLA and other medical type leaves. Other reasons for failures have been noted by APD as a training issue and plans for additional training are under development. All checkpoint requirements were met prior to the end of the reporting period, but not prior to their required completion date. Should more than five percent of APD's supervisors fail to meet the required checkpoints during the next reporting period, a loss of compliance would be appropriate.  We encourage APD to pay close attention to these issues, and insure that, where necessary, updates, changes, and retraining are made as dictated by performance.

The recommendations of the proposed development plan (if implemented) should provide the necessary means to gain operational compliance with all elements of the CASA requirements.

### 4.7.230 Assessing Compliance with Paragraph 244

Paragraph 244 stipulates:

> **"APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet performance goals. The evaluation system shall provide for appropriate corrective action, if such action is necessary."**

### Results

Current practice at APD meets the requirements of this paragraph for this reporting period.  The monitoring team will continue to review performance assessment practices at APD as the monitoring process continues.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.231 Assessing Compliance with Paragraph 245

Paragraph 245 stipulates:

> **"As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates."**

**Results**

APD has developed a formal and trackable system of annual performance evaluations. This system is new enough to have produced too few evaluation processes to be quantitatively reviewed.  The system appears to be used as envisioned by APD.  We will revisit system outputs during the IMR-10 reporting period, once more data points are available.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.232 Assessing Compliance with Paragraph 246

Paragraph 246 stipulates:

> **"As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.233 – 4.7.239 Assessing Compliance with CASA Paragraphs 247-253: Officer Assistance and Support

The monitoring team reviewed the Behavioral Sciences Section (BSS) Program for the

Albuquerque Police Department to ensure that officers and employees of the department were provided ready access to mental health and support resources as required by the CASA. The program continues to provide Critical Incident Service, Therapy Service, and a Training Component to the APD. The Behavioral Science Section is staffed with highly qualified personnel to maintain high-level, quality service. This program is run by a Medical Director, supported by certified clinicians, a policy analyst, a public information officer, and quality assurance auditors.  The monitoring team was supplied with the most current documentation supporting the program's functions.

During the November 2018 site visit, the monitoring team met with BSS personnel responsible for maintaining the program's development, revisions, and upgrades. BSS supplied the monitoring team with documentation outlining the program's functions. The BSS has developed a handbook that describes the entire program and all of the program requirements as articulated by the CASA. BSS supplied the monitoring team minutes of semi-annual meetings. Revisions to BSS process are ongoing and reviewed at these meetings. BSS continues to look for ways to improve and promote officer wellness.  These areas include but are not limited to:

- Increased collaboration with groups within the City of Albuquerque that touch on officer wellness, either directly or indirectly;
- Increased collaboration with groups outside of the City who can help promote officer wellness;
- Working with a local university on a wellness and resilience grant; and
- Working with the police union on BSS goals.

We reviewed the training component of the program to ensure APD members received training in Officer Support Protocols. The clinicians currently provide training to management and supervisory personnel to ensure accessibility of the program to officers. We also reviewed the Cadet Class Schedule for the 120th Cadet Class.

As stated in previous IMRs, the nature of the documentation is highly confidential and again, as in previous site visits, aggregate data was reviewed where it was deemed practical. In other cases, notes taken by the monitoring team were devoid of any direct or circumstantial information that would allow an individual to be identified.

During the November 2018 site visit, on-site inspections of the BSS facilities were conducted by the monitoring team. The monitoring team met with BSS staff and confirmed that confidential records were secured in locked filing cabinets and that those records were maintained in areas where only BSS staff has access.

Members of the monitoring team also reviewed COB documents for the Peer Support Services for this reporting period. As in the previous site visits, documentation included the following: Peer Support Services Data; New Members Selection and Training; Peer Support Board activities; Team meetings; and Peer Support Survey Results. BSS activities for this reporting period indicate positive use of the program. Material viewed

by the monitoring team, as it relates to this program, are highly confidential and operational compliance assessment is difficult. We found APD's BSS programs to be industry-standard and compliant with the relevant paragraphs of the CASA.

The data reviewed by the monitoring team for BSS paragraphs during this reporting period indicate that there is a mindset that confidentiality of the program is more protected than in the past. BSS has conducted three anonymous surveys of the entire department dating back to 2016. The most recent survey was conducted during this reporting period. The data gleaned from these surveys indicate a positive trend. The quality and availability of the program reflects an increased belief among officers regarding the importance of what is offered. As of the site visit in November 2018, BSS continues to maintain updated Excel spreadsheets of available health professionals and flyers that were reviewed during the site visits at all of APD's Area Commands. BSS implemented a new phone system during this reporting period, and continues to expand marketing and providers in order to move the program forward. Plans to ensure material is documented on their "Daily 49" system in APD briefing rooms are still in the process of being updated.

APD has met the CASA requirements for these paragraphs and is in compliance. The monitoring team will continue to closely monitor this process in future site visits.

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.233 Assessing Compliance with Paragraph 247

Paragraph 247 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources. To achieve this outcome, APD agrees to implement the requirements below."**

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.234 Assessing Compliance with Paragraph 248

Paragraph 248 stipulates:

> **"APD agrees to develop and offer a centralized and**

> **comprehensive range of mental health services that comports with best practices and current professional standards, including: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.235 Assessing Compliance with Paragraph 249

Paragraph 249 stipulates:

> **"APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.236 Assessing Compliance with Paragraph 250

Paragraph 250 stipulates:

> **"APD shall ensure that any mental health counseling services provided APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.237 Assessing Compliance with Paragraph 251

Paragraph 251 stipulates:

> **"APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families."**

248

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.238 Assessing Compliance with Paragraph 252

Paragraph 252 stipulates:

> **"APD shall develop and implement policies that require and
> specify a mental health evaluation before allowing an officer
> back on full duty following a traumatic incident (e.g., officer-
> involved shooting, officer-involved accident involving fatality,
> or all other uses of force resulting in death) or as directed by
> the Chief."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.239 Assessing Compliance with Paragraph 253

Paragraph 253 stipulates:

> **"APD agrees to compile and distribute a list of internal and
> external available mental health services to all officers and
> employees. APD should periodically consult with community
> and other outside service providers to maintain a current and
> accurate list of available providers."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.240 – 4.7.255 Assessing Compliance with Paragraphs 255 -270: Community Policing and Community Engagement

Paragraphs 255-270 address the CASA community engagement requirements that include fully adopting community policing principles, integrating them into APD policy, practices and operations, and the establishment and operations of Community Policing Councils (CPCs).  Updating community oriented policing training for both cadets and current staff, increasing and tracking non-enforcement citizen contracts, and sustaining CPCs are central to achieving these paragraph objectives.

For paragraphs 255-265, members of the monitoring team reviewed relevant Special Orders and policies; interviewed members of APD's compliance team and commanders assigned to coordinate responses; interviewed community members and CPC participants; reviewed the APD website; reviewed APD's course-of-business spreadsheets from their events tracking system; and assessed responses to data and information requests pertaining to each of these paragraphs.

For paragraphs 266-270, the primary source of compliance data was the CPC sections of the APD website, including a review of CPC annual reports, meeting minutes, and agendas; attendance and observation of CPC meetings; interviews with APD outreach staff, community and CPC members, and area commanders; and APD data and information responses pertaining to each of these paragraphs.

For the ninth reporting period, APD demonstrated a continued commitment to fostering "culture change," including revisions of APD's mission and vision statement; enhanced special programming and outreach efforts to previously marginalized groups such as at-risk youth; deployment of more officers in proactive policing roles; and greatly expanding tracking of officer non-enforcement contacts with community members.

APD staff in particular brought guidance and resources to the CPC programs, helping to boost participation and the number and diversity of CPC voting members. CPCs are operational in all six command areas.   Frequency of CPC meetings, CPC generation of recommendations, and overall participation in CPCs far exceeds the requirements articulated in the CASA. The CPCs are quickly becoming a national best practice.

APD still needs to finalize, assess and expand its community- oriented policing training, complete its tracking system for officer non-enforcement contacts, strengthen the weaker CPCs, and develop and implement more command area-based communications and outreach strategies. In the monitor's view, CPCs are vital to success at APD, and the City is bound by the CASA to foster, support, and guide the CPCs in any way it can.  Where issues of CPC recruiting, governance, and "outputs" are concerned, we suggest that while the City cannot direct its CPCs, it certainly can support them with training, access to outside consultants, provision of problem-solving services, etc.

The following paragraphs represent specific monitoring team findings for paragraphs 255-270.

## 4.7.240 Assessing Compliance with Paragraph 255[68]

Paragraph 255 stipulates:

> **"APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-solving policing principles**

**into its management, policies, procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."**

Paragraph 255 requires APD to develop policy guidance and mission statements reflecting its commitment to community and problem-oriented policing and supporting administrative systems.  APD has published Special Order 16-06 dated January 9, 2017, which indicated that APD revised its mission statement, reflecting its commitment to community-oriented policing.

During the previous reporting period, APD established a working group that organized a comprehensive and inclusive process that included commanders, line staff, and community members. The group completed its work during this reporting period, and produced a mission and vision statement reflecting its commitment to community policing principles.  These were provided to the monitoring team on January 14, 2019.The product identified APD's vision as "an Albuquerque where citizens and the police department work together through mutual trust to build a thriving community." The mission statement identified by APD was "to reduce crime, increase safety, and build relationships through community policing."

APD continues to make progress integrating community policing principles into its management practices (policies, procedures, recruitment, training, deployment, tactics, and accountability systems).  During this reporting period, APD continued to revise its training curriculum, made more officers available to achieve community policing goals, and worked to adapt patrol assignments in order to further engage officers with community members.

APD is continuing its work to ensure that community participation, input and access are folded into the mix of policy-making, training development, goal-setting, in-field processes and tactics, supervision, command decision making, and program assessment, as evidenced by updating staffing deployment plans to place greater emphasis on community driven policing.

APD, in conjunction with the USAO, continued its youth community outreach efforts with completion of a second session of the DEFY (Drug Education for Youth) program that brought law enforcement officers together with groups of at-risk youth in a summer camp experience, where life skills were also taught.

APD command staff appears clearly committed to a departmental transformation involving the integration of community policing principles throughout the organization. The transformation requires a "culture change" driven by new and revised policies, training reflecting new policies, and active, consistent and impartial supervision. During this reporting period, APD has continued to engage in intensive planning, re-assignment of numerous personnel, and adjustments in roles and responsibilities, all designed to support this transformation.  APD, in conjunction with the USAO, continued high-level discussions concerning strategies to promote "culture change" and took additional steps to implement "culture change" strategies.

Examples of this change process during this reporting period include:

- APD completed a Community Policing Strategy that includes organizational transformation as one of its key goals.

- APD has also started to deploy more officers to the six command areas to help increase non-enforcement contacts and problem oriented policing practices.

We find APD still to be in the initial stages of implementing verifiable changes in the field-based delivery of processes and services that affect a sea-change in the way APD relates to the communities it serves.  Once these changes become a normal part of the way APD does business, the APD will be in full compliance for this paragraph.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 255:***

***4.7.240a: Conduct a quarterly review of progress made across the department in achieving "culture change" and the integration of community policing principles throughout APD operations, and share findings both internally and with other community stakeholders;***

***4.7.240b: Strengthen ongoing input into police operations from CPCs and other community stakeholders, including further outreach to other community service organizations and advocacy groups;***

***4.7.240c: Work with USAO and other community partners to expand community-based initiatives targeting high risk youth.***

**4.7.241 Assessing Compliance with Paragraph 256:  APD Response to Staffing Plan**

Paragraph 256 stipulates:

> **"As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing."**

Paragraph 256 requires APD to realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing.  APD's PACT (Police and Community Together) plan was approved on December 27, 2016, and staff re-alignment responsive to the plan was continued during the 7th reporting period.  Implementation of the PACT plan was terminated during the last reporting period, and replaced with deployment of Problem Response Teams (PRT) to all of the six command areas. These PRTs provide additional staffing to increase non-enforcement contacts, build community partnerships, and provide for more pro-active policing activities.  We find the new PRT to be a marked improvement to the old PACT process, with strong goals related to problem-solving policing processes, as opposed to PACT's enforcement-based processes.

During this report period APD has started deploying PRT staff with one area command fully staffed with eight officers and with other command areas seeking to fill PRT positions.

APD's switch away from PACT, a staffing allocation plan designed to increase officer staffing at the command levels, represents a paradigm shift in APD's policing strategies and approaches.  The plan currently being implemented goes even further in its support of community policing goals and community engagement.  As with PACT, PRT also calls for shifting staffing resources to command areas, but goes further in re-defining roles and key activities, and actually assigning officers to micro beats or blocks and tasking them to get acquainted with community members through increased non-enforcement contacts.

 During this reporting period, APD developed a plan to assess operational impact and effectiveness of these new deployment strategies.  The plan currently lacks specific measurable goals and objectives to assess effectiveness, and does not yet articulate an ongoing set of metrics to measure ongoing activities and impact.  We strongly recommend inclusion of measureable "outcomes" as part of APD community policing strategies.

While general goals have been outlined for this plan, we still require more specific measures, and analytic methods to determine effectiveness or guide program revision and adaptation.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 256:***

**4.7.241a:  *Continue to make new staffing allocation and deployment plan a priority, and take the necessary steps to gain important input and support from settlement partners and community stakeholders including CPCs;***

**4.7.241b:  *Ensure the staffing plan has clearly articulated and defined goals, objectives and outcome measures.***

**4.7.242 Assessing Compliance with Paragraph 257:  Geographic Familiarity of Officers**

Paragraph 257 stipulates:

> **"APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders, engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality of life issues."**

**Methodology**

The monitoring team's assessment of APD's new compliance strategies for the Community Policing components of the CASA include the following:

- APD reported that all of the six (100 percent) Area Commands provided data regarding signed bid packets. These packets include a list of neighborhood associations, meetings and community contacts.

- For this reporting period, APD documented that more than 95 percent of newly assigned officers were provided familiarity data and returned signed bid packets.

- APD demonstrated significant progress from the prior reporting periods and described and documented the POP projects undertaken in each of the command areas.   Current documentation describes the projects and their goals but fails to always identify participants and identify outcomes.

- APD has proposed the implementation of a range of strategies to encourage ongoing non-enforcement contacts and to stimulate working with other city agencies and community members to engage in more problem-solving activities.

APD continues to make steady progress in ensuring that officers are given the necessary information to enhance familiarity with the geographical areas they serve. Providing their officers this information is a first step, and eventually this should be reflected in more POP projects.  For this reporting period, APD documented POP

projects in each of the six command areas representing significant progress from the previous reporting period. The monitoring team will continue to confirm issuance of bid packets to APD staff and will assess how that information is being utilized to advance APD's community policing goals.   APD is also encouraged to do routine reviews and updates of the information provided to officers in their bid packages and other sources as well.

**Results**

     Primary:     **In Compliance**
     Secondary:  **In Compliance**
     Operational: **Not In Compliance**

***Recommendations for Paragraph 257:***

**4.7.242a:  *Update specific procedures for establishing and maintaining Problem-Oriented Policing (POP) projects in each of the six-command area including a standard reporting template identifying participants and tracking POP activities and outcomes;***

**4.7.242b:  *Update regularly information provided in bid packages to officers.***

**4.7.242c:  *Develop and utilize assessment methods to determine if bid packet information is increasing officer familiarity with neighborhoods served.***

**4.7.243 Assessing Compliance with Paragraph 258: Officer Outreach Training**

Paragraph 258 stipulates:

> **"Within 12 months of the Effective Date, APD agrees to provide 16 hours of initial structured training on community and problem oriented policing methods and skills for all officers, including supervisors, commanders, and executives this training shall include:**
>
> **a)  Methods and strategies to improve public safety and crime prevention through community engagement;**
> **b)  Leadership, ethics, and interpersonal skills;**
> **c) Community engagement, including how to establish formal partner ships, and actively engage   community organizations, including youth, homeless, and mental health communities;**
> **d) Problem-oriented policing tactics, including a review of the principles behind the problem-solving framework developed under the "SARA Model", which promotes a collaborative, systematic process to address issues of the community. Safety, and the quality of life;**
> **e) Conflict resolution and verbal de-escalation of conflict and;**
> **f)  Cultural awareness and sensitivity training.**

255

> **These topics should be included in APD annual in-service training."**

## Methodology

While APD is making some progress in revamping their training to better align with changing policies, directives and other practices that reflect a greater emphasis and adherence to community policing principles, APD has not completed this training overhaul, and still needs to apply the seven-step process to all of its training elements of the 16 hours of required training. The monitoring team was presented with a lesson plan for the community policing stakeholder/resources course, and an updated source materials list, which will serve as the basis for much of this required 16 hours of training.

Responding to recommendations from the previous monitoring report, APD is strengthening its course evaluation methods and provided updated course evaluation forms that capture both perceptions of training and knowledge retained.  During this reporting period, APD has not resolved how it will meet the requirement to provide the sixteen hours COPS training in service as well.

APD's decision to overhaul the required 16 hours of COP training was necessitated by a paradigm shift in the department's policing philosophy, placing a much greater emphasis on community policing and engagement.  The outline provided to the monitoring team reflects this shifting philosophy and is part of a broader effort to effectuate organizational culture change.   By having officers internalize a different way to perceive their relationship with the community members they serve, and to assess alternative ways of interacting with the community, APD brings "change" to the forefront of its community policing processes.  The monitoring team believes that the updating and delivery of the COP training curriculum is key to achieving some of the most important elements of the CASA agreement.

## Results

　　　Primary:　　**In Compliance**
　　　Secondary:　**Not In Compliance**
　　　Operational:　**Not In Compliance**

### *Recommendation for Paragraph 258:*

**4.7.243a:** *Seek external technical assistance in the COPs curriculum development process using subject matter expert as peer reviewers for COP curriculum.*

### 4.7.244 Assessing Compliance with Paragraph 259:  Measuring Officer Outreach

Paragraph 259 stipulates:

> **"Within six months of the Effective Date, APD agrees to develop and implement mechanisms to measure officer**

> **outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross section of stakeholders."**

APD submitted to the monitoring team nearly 100 community event forms capturing officer participation in community events. The completed forms represent at least partial implementation of a tracking system designed to capture officer participation at community events, event outcomes and other relevant information. The information is captured at various decision points and included in an event form.   APD has not provided the monitoring team any activity reports generated by the database comprised of information from the community event forms. The department continues to consider additional updates to this form to improve data query and report generating capabilities and develop the necessary SOPs to fully execute this event capturing system.

APD continues to lag in identifying and documenting partnerships with community entities focused on problem solving. Partnership information provided to the monitor focused on cooperative arrangement with other law enforcement and justice entities instead of the required partnerships with community-based organizations that serve high risk populations such as the homeless and the mentally disabled.  While there are often informal relationships in place, formalizing and documenting these processes are important requirements if APD expects to set expectations and ensure sustainability and evaluability.

**Results**

     Primary:     **In Compliance**
     Secondary:  **Not In Compliance**
     Operational: **Not In Compliance**

***Recommendations for Paragraph 259:***

***4.7.244a:  Complete development of the automated communications event calendaring system and integrate it with the larger TRaCS effort to capture all non-law enforcement contacts and any meaningful outcomes; and***

***4.7.244b Identify community service organizations and advocacy groups that serve and represent high- risk populations, and better document current partnerships and new partnerships.***

**4.7.245 Assessing Compliance with Paragraph 260:  PIO Programs in Area Commands**

Paragraph 260 stipulates:

> **"APD shall develop a Community Outreach and Public Information program in each area command."**

## Methodology

During this reporting period, APD maintained a "command areas" website including CPC-related information for each of the six command areas.  These websites currently capture crime information, agendas for upcoming CPC meetings, schedules of upcoming events, other news items, information on how to report crimes, information regarding how to file complaints, and recommendations for officer commendations.

APD continues to fail to meet the requirement of having a community outreach and public information program in each command area.  There remains a lack of evidence of any coordinated and focused area command-based public information strategy that includes community outreach, messaging, reaching marginalized audiences, and better communication tools, such as using social media, to enhance community engagement.

All six area commands currently have websites and engage in limited outreach efforts. The websites also provide information about upcoming CPC meetings. APD Command area communications with its area residents could be greatly enhanced with a customized Area-based process that would utilize social media tools to reach a broader audience. During the prior reporting period, APD received technical assistance from the Bureau of Justice Assistance to help develop a CPC-based public information strategy which several of the CPCs used as a basis for expanding their own social media outreach.

## Results

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

### *Recommendations for Paragraph 260:*

**4.7.245** *Continue to improve Area Command public information strategies and programing including using technical assistance to update those strategies incorporating significantly more use of various social media tools to reach a broader audience of area command residents.*

### 4.7.246 Assessing Compliance with Paragraph 261:  Community Outreach in Area Commands

Paragraph 261 stipulates:

> **"The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command   that is open to the public.  During the meetings, APD officers from the Area command and the APD**

> **compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings."**

## Methodology

In conjunction with the Mayor's Office and other CASA partners, APD held a city-wide community meeting during this reporting period to present summary of findings from the IMR-8 report to community stakeholders and other interested parties.  The meeting was widely attended by a cross-section of community members.   Additionally, in three of the six command areas, APD staff presented summaries of findings at the area command CPC monthly meetings. CASA updates were also provided at many other CPC meetings. The monitoring team expects briefings to be conducted in all six of the area command CPCs after the completion of the IMR-9 report.

APD has in place six functioning CPCs that meet once a month and provide on-going opportunities for APD to directly interface with residents and brief them on progress in compliance with the settlement agreement.  The CPC also served as a conduit for updates on policy change; new training, policing strategies and tactics; and addressing resident community safety concerns. CASA updates and briefings on policy changes were addressed at some of these meetings during this reporting period.  The monitoring team suggests that APD may want to make greater use of CPC processes to provide a public forum to discuss changes in APD policy, training, and policing strategies.

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.247 Assessing Compliance with Paragraph 262:  Community Outreach Meetings

Paragraph 262 stipulates:

> **"The Community Outreach and Public Information meeting shall, with appropriate safeguards to protect sensitive information, include summaries, of all audits and reports pursuant to this Agreement and any policy changes and other significant action taken as a result of this Agreement. The meetings shall include public information on an individual's right and responsibilities during a police encounter."**

**Methodology**

We note that all CASA-related reports are posted on the APD website. Further, APD has expanded its information on an individual's rights and responsibilities during a police encounter.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.248 Assessing Compliance with Paragraph 263: APD Attendance at Community Meetings

Paragraph 263 stipulates:

> **"For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area command shall attend at least two community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned."**

**Methodology**

We note that APD previously established, through SOP-3-02-1, the requirement and tracking mechanisms to implement this task.  APD, during the prior period, submitted to the monitoring team a detailed flow chart outlining a process for capturing community events information, officer participation, and outcomes.  APD also previously submitted a TraCS worksheet that reported the number of events and reported participation rates by command area, and units within each command area. The reported data indicated only partial compliance with meeting participation requirements for the command areas.

In addition, APD continues to make gradual progress in having officers regularly attend community meetings and tracking that participation.  During this reporting period, APD provided the monitoring team with nearly 100 completed event participation forms.  APD should continue improvements and complete its data capture coupled with developing a capacity to generate reports covering officer participation in community events.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 263:***

**4.7.248a:** ***Seek assistance to complete the tracking data base (TraCS) and develop standard reporting formats for command staff and an ability to query the database for special reports and information requests.***

**4.7.249 Assessing Compliance with Paragraph 264:  Crime Statistics Dissemination**

Paragraph 264 stipulates:

> **"APD shall continue to maintain and publicly disseminate accurate and updated crime statistics on a monthly basis."**

**Methodology**

During this reporting period, APD maintained its contract with a service that provides up-to-date crime mapping services based on "calls for service" that can be accessed on APD's website.  This has proven to be a very useful tool to members of the CPCs. APD posts year-to-date crime numbers and comparisons with the previous year. The reporting meets industry standards in format and timeliness.

**Results**

    Primary:    **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

**4.7.250 Assessing Compliance with Paragraph 265:  Posting Monitor's Reports**

Paragraph 265 stipulates:

> **"APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD website with reasonable exceptions for materials that are legally exempt or protected from disclosure."**

**Methodology**

All requirements stipulated by this paragraph continue to be met by the APD and the City.  Further, APD has developed guidelines for determining any reasonable exceptions to posting audits and reports relating to the CASA. During this reporting period, APD also posted monitoring team reports on the APD website in a timely fashion.

**Results**

    Primary:    **In Compliance**

Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.251 Assessing Compliance with Paragraph 266:  CPCs in Each Area Command

Paragraph 266 stipulates:

> **"The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level. The Community Policing Councils shall meet, at a minimum, every six months."**

**Methodology**

CPCs have been established in each of the six Area Commands since November 2014. During this and prior reporting periods, each of the six Councils tended to meet once a month, far exceeding the once every six-month requirement.  During this reporting period, five of the six CPCs increased or maintained high levels of participation, including the number of voting members and community participants. Several CPCs are still struggling to improve community participation, however.  APD has provided support and assistance to these lagging CPCs to facilitate outreach efforts. During this reporting period, APD continued its timely documentation and posting of CPC meeting agenda, and minutes.

APD has consistently exceeded CASA requirements with CPCs meeting monthly since their inception.  Some CPCs still struggle to increase voting membership diversification but have made strides in those areas and have developed a strategy to make further improvements.  Most CPCS have matured over the last several years, institutionalizing practice, building a following, and generating meaningful recommendations to APD.  In a typical month, there are more than 150 residents and up to 20 police officers meeting across the six CPCs.  These police advisory and collaborative councils provide a means for community members to directly communicate with area commanders and their staff, and together address community safety issues.

CPCs represent a strong success for the CASA, providing what is becoming a national "best practice" for providing opportunity for meaningful community input in police operations, fostering relationships, and building trust among police and community members. The monitoring team expects APD to continue to support the maturation of this program and be prepared to export its practices and concepts to other law enforcement agencies.

**Results**

Primary:      **In Compliance**

Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.252 Assessing Compliance with Paragraph 267:  Selection of Members of the CPCs

Paragraph 267 stipulates:

> **"In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross section of community members and APD officers, including for example representatives of social services providers and diverse neighborhoods, leaders in faith, business, or academic communities, and youth. Members of the Community Policing Councils shall possess qualifications necessary to perform their duties, including successful completion of the Citizen Police Academy."**

## Methodology

Each CPC establishes their own selection criteria within the parameters of CASA, including background check requirements. These requirements have excluding factors limited to current warrants and/or violent felonies in the last three years.  The requirement to complete a 12-week course for the Citizen Police Academy was modified during an earlier reporting period, with APD developing and providing an option for CPC members to complete a two week-end (four day) version of the course. In this reporting period, APD continues to post CPC membership criteria for each of the six area commands on their websites.  APD also provided support to CPCs in helping to recruit a more representative cross section of community members as CPC voting members. Diversification of membership continued to improve during this reporting period.  APD staff also prepared a plan to help guide further diversification efforts.

Several CPCs still struggle with the recruitment of voting members and having diverse voting membership, and may yet require more assistance from APD.   CPCs are beginning to explore greater use of social media tools to help reach young people and other hard-to-reach population groups.  This can potentially lead to an expanded and more diverse CPC voting membership.   APD is also considering the establishment of a youth policing council.

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

263

*Recommendation for Paragraph 267:*

*Recommendation 4.7.252:  Use social media and other available tools and develop a specific outreach strategy for each area command CPC for both voting members and non-voting participants and include specific ways to meet the CASA's diversity requirements.*

### 4.7.253 Assessing Compliance with Paragraph 268:  Resourcing the CPCs

Paragraph 268 stipulates:

> **"The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, APD shall appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure."**

## Methodology

In the prior reporting period, APD's new leadership cadre hired a new outreach director, and an administrative assistant who have primary responsibility for community outreach and support for the CPCs.  APD also facilitated two CPC membership training sessions covering topics ranging from CPC mission, roles, and responsibilities to handling meetings and building consensus. CPC members indicated significant improvements in APD coordination and responsiveness to CPC concerns.

In this reporting period, APD continued its support of monthly meetings for each of the six CPCs including note-taking, minutes, posting of minutes and agendas, and tracking recommendation development and responses. Additionally, APD staff hosted a CPC summit meeting, an awards ceremony at the convention center, and helped develop and participated in, the modified "citizens training academy". APD outreach staff also provided on-going coaching and guidance to new CPC members and leadership. The APD outreach staff also worked to help standardize the CPC annual reports and posts all relevant CPC information in a timely fashion.

CPCs may still need additional APD assistance in some areas, including a new member orientation package and training, and most importantly, outreach and recruitment of additional voting members and expanded participation.   Nonetheless, requirements of this paragraph are currently in compliance.

**Results**

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.254 Assessing Compliance with Paragraph 269:  APD-CPC Relationships

Paragraph 269 stipulates:

> "**APD shall seek the Community Policing Councils assistance, counsel, recommendations, or participation in areas including:**
>
> **a) Reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;**
> **b)  Reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;**
> **c)  Providing information to the community and conveying feedback from the community;**
> **d) Advising the chief on recruiting a diversified work force**
> **e) Advising the Chief on ways to collect and publicly disseminate data and information including information about APDs compliance with this Agreement, in a transparent and public –friendly format to the greatest extent allowable by law."**

## Methodology

The CPCs continued to make progress during this reporting period in addressing the areas for CPC input identified in the CASA.  The agenda items and CPC recommendations at most CPCs often closely align with the issues and topics identified in the CASA. Also, APD leadership, including the Chief, participated in CPC meetings discussing the shifting departmental philosophy to a greater emphasis on community policing, and commitment to APD reforms.

Agenda items often addressed neighborhood community safety concerns and included presentations on crime prevention and CASA updates.  We note that APD still does not consistently bring issues and recommended policy changes to the attention of all of its CPCs in a proactive manner. APD has made significant progress in the tracking, reporting, and feedback on CPC recommendations.

CPCs continued their maturation process during this reporting period with the direct support of APD and city leadership, and the infusion of additional staff resources. There remain several CPCs that, while holding monthly meetings and addressing basic requirements, may still require further assistance from APD to help meet the goals outlined for them in the CASA.

There are still areas of improvement that should to be addressed, including more discussion at CPC meetings of APD policies and policing strategies, and broader and more diverse community participation.  Nonetheless, APD and its CPC are in compliance with the requirements of this paragraph.

**Results**

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.255 Assessing Compliance with Paragraph 270:  CPC Annual Reports

Paragraph 270 stipulates:

> **"The Community Policing Councils shall memorialize their recommendations in annual public report that shall be posted on the City website. The report shall include appropriate safeguards not to disclose information that is legally exempt or protected from disclosure."**

**Methodology**

During the prior reporting period APD posted the 2017 CPC annual reports for all six CPCs. The annual reports were not presented in a standard format, and often did not effectively capture CPC annual activities and achievements. During this reporting period, APD held a training to promote standardization in annual reports among CPCs and hopefully the 2018 annual report iterations will demonstrate more consistency. It is noted that the CPC annual reports are not easily located on the APD website.  Despite the need for some improvements, the CPCs, and thus APD, are in compliance with the requirements of this CASA paragraph.

**Results**

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.256 through 4.7.277 Assessing Compliance with Paragraphs 271-292: Community Police Oversight Agency

Paragraphs 271 through 292 of the CASA pertain to the Civilian Police Oversight Agency (CPOA) including the Police Oversight Board (POB). These paragraphs require an independent, impartial, effective, and transparent civilian oversight process, one that not only investigates civilian complaints but also affects disciplinary and policy recommendations, trend analysis, and community outreach, including the publishing of reports.

During the monitoring period and the November 2018 site visit, members of the monitoring team held meetings with the CPOA Executive Director, and members of his staff, at the CPOA office; attended a POB public monthly meeting; and reviewed CPOA training records.  In addition the monitoring team selected, by way of a stratified random sample, 8 CPOA investigations completed during the monitoring period. The monitoring team also reviewed the CPOA website, including but not limited to, POB agenda and minutes, community activities, public reports, and POB meetings and non-concurrence letters.

The findings related to Paragraphs 271 through 292 indicate the following outcomes, related to requirements of the CASA.

The CPOA/POB is an impartial and productive agency that provides civilian oversight of APD. It is an independent agency whose appointed members are dedicated individuals of diverse backgrounds drawn from a cross-section of the community. They are committed to the goals of the CASA, as are all members of the CPOA. The initial and annual training requirements for POB members continue to be adequately met.

As we noted in IMR-8, the investigations of CPOA, once complaints are assigned, are generally thorough and timely. (We discuss in more detail the quality of investigations in the Investigation of Complaints section of this report). The Executive Director has the authority to recommend disciplinary action in the cases CPOA investigates, as well as the cases that are reviewed by CPOA (Serious Use of Force and Officer-Involved Shootings), and the POB has a mechanism for approving the recommendations of the executive director. The chief or his designee retains the discretion to impose discipline.

Cooperation between CPOA and IAD continues to be satisfactory. In general, both agencies respect each other's role, and realize it is in their best interests and that of the CASA, to cooperate and facilitate their intertwined missions and related areas of responsibility. CPOA has the necessary access to information and facilities reasonably necessary to investigate complaints and review serious use of force and officer-involved shootings.

CPOA and POB have adequate time to weigh in on the policy-making process. Due to changes in the policy review procedures, POB now appears to have enough time to review and debate policies and policy changes as an entire body. This will enhance not only POB's policy role, but the entire APD policy making and policy revision processes as well.

In this monitoring period, we found two cases in which the Chief disagreed with the investigative findings or the disciplinary recommendations of the CPOA/POB. [IMR-9-43, IMR-9-42]. In [IMR-9-43]. the Chief issued a non-concurrence letter that comprehensively articulated the rationale upon which the decision to not impose discipline was based.  In [IMR-9-42], we found the Chief had granted an appeal to a written letter of reprimand on the next to last day of the IMR 9 review period. The

granting of the appeal differs from the recommendation of CPOA. The internal memorandum written by the Chief, articulating his reasons for granting the appeal, was sufficient to allow the reader to clearly understand his decision.

When differing from the CPOA/POB recommendations, the non-concurrence letters are such that the public, CPOA/POB, and the APD are now well aware of the Chief's reasons and thought process in reaching the level of discipline imposed. Although there were no non-concurrence letters this review period regarding disagreement in policy recommendations, we fully expect the same articulation of reasons in these instances in the future.

CPOA has a robust community outreach program, which also utilizes social media among other mediums. The quarterly meetings, bringing together CPOA and City representatives with the CPCs, have continued. They provide the opportunity for the CPCs to coordinate their efforts, with the assistance of the CPOA, particularly with regard to policy recommendations. Although individual CPCs are free to make their own recommendations, where there is commonality of interests, unity in making recommendations carries greater weight and cogency.

Notwithstanding the progress made to date, in the overall oversight process, the monitoring team found the process exhibited issues with elements related to specific paragraphs

There have been indications that POB's role in the oversight process and the reform process of the CASA is not being taken seriously enough by the City. The POB consists of 9 members, all of whom are needed to keep current with its challenging workload and tasks of the Board and its sub-committees. Three POB vacancies occurred in 2018, (March 2018; June 2018; and September 2018). None of these vacancies had been filled by the end of this IMR period (January 31, 2019). The monitoring team has learned that, after the close of this reporting period, three candidates have been selected to fill these vacancies and were to be presented to City Council for approval at its February 2019 meeting. Without reflecting on the qualifications of the candidates or their desire and commitment to serve, we have learned that the selection process was seriously wanting. No formal interview of the candidates took place before selection. There was no input from the POB or CPOA as to the background and qualifications of the three candidates, or for any applicants for that matter. It appears that they were selected solely from the information provided on their November 2017 website applications, pending an appropriate background check. Since these events occurred outside of this reporting period, they do not affect compliance levels for this report.  We do however, encourage the City to pay careful attention to the requirements of the CASA when vetting and selecting new POB members.

On a brighter note, the City did timely re-appoint 2 current POB members whose terms expired during the IMR period, thereby avoiding adding an additional two vacancies to the three vacancies that already existed.

Another related issue was the reappointment of the Executive Director to a second term. His first term expired in October 2018. In anticipation of the end of his contract and in accordance with paragraph 279 of the CASA, the POB voted to renew the Executive Director's contract in May of 2018. Notwithstanding that the CASA gives the authority to select the Executive Director to the POB ("the agency"), City Council twice delayed voting on approval of the reappointment. The Executive Director was finally approved in early December 2018; however at the expiration of this IMR period he was still working without a contract.

Approval of POB decisions regarding appointments or reappointments of the Executive Director position should be made in a timely manner, i.e., before the expiration of a term, leaving no doubt who will lead CPOA in the next director's term. Assuming the candidate meets City hiring requirements such as passing a background check, the monitoring team would expect there to be no future uncertainty or hesitation regarding the formality of approving the POB's selection.

We have seen ramifications of the vacancies in the POB workflow and process. One such case is [IMR-9-42], involving an external complaint about APD's performance in investigating a child abuse case. This was a high-profile matter which drew public attention and response from APD's leadership. A preliminary investigation was conducted by APD which led to a decision to pursue a formal investigation. An external complaint was also filed with CPOA regarding the same matter, leading to a CPOA investigation. It appeared initially that APD and CPOA would conduct a joint investigation, or at least share information and avoid duplicative efforts, but ultimately each office conducted its own investigation.

Once CPOA concluded its investigation, a procedural path was followed that can only be described as "tortuous." The investigation was sent to POB for its review and approval. The minutes of the October 11, 2018 meeting of POB show that the case was referred to the POB Case Review Subcommittee (CRC), The minutes of the CRC on October 27, 2018 show that the "CRC feels investigation incomplete and didn't examine all policies." At the POB meeting of November 8, 2018, the case was listed on the Non-Consent Agenda as "Unfounded/ Sustained" on two separate allegations. A motion was made and approved to refer all the non-consent cases on the agenda back to the CRC. The minutes for November 27, 2018 CRC meeting show that "CRC is satisfied and addressed all concerns within [IMR-9-42] and no further discussion is needed this case." That CRC decision notwithstanding, at the December 13, 2018 POB meeting, the POB voted to send the case back to CPOA for further investigation.

There is also evidence that the complainant acquired investigative documents through IPRA and has publicly criticized the CPOA's handling of the investigation, including the written "Public Comment" dated December 18, 2018. Although not formally an appeal of the CPOA's findings, it appears that these comments had been received, reviewed and contemplated by the POB before an appeal of the findings by the complainant was ripe.

To date the Chief has received the CPOA file with findings not yet approved by POB, as well the IA investigation, and has imposed discipline and has non-concurred in part with both investigations. To date, POB has not approved or disapproved the findings of CPOA, so from the civilian oversight standpoint the matter is still pending completion of re-investigation.

POB-approved findings and recommended discipline have not yet been made.  A review of the investigative file shows that training should be recommended on 4th Amendment issues dealing with the seizure of abandoned property, and with the apparent confusion regarding SOP 2-92-3(B)(3) and the difference between writing an incident report on cases of "confirmed or suspected" child abuse, neglect, abandonment or cruelty, and writing a report to the Children Youth and Families Department (CYFD) based on "reasonable suspicion that a child is abused or neglected." Based on the fact pattern of the investigation, training is needed related to when a preliminary investigation (and then a formal investigation) need to be conducted in cases of suspected child abuse, and when there should be coordination of such investigative efforts internally within APD.  Even though discipline has been imposed, to date, APD did not have the benefit of POB's recommendations regarding findings, discipline, training or policy arising out of this case, prior to imposition of discipline.

Another case with review issues is [IMR-9-43]. That case involved the primary issue of whether an APD officer failed to follow protocol for identifying and/or investigating a mental health crisis. The CPOA investigation did not sustain any charges. POB properly allowed, and heard an appeal of the CPOA investigation in its November 2018 meeting, in which it granted the appeal in part by sustaining two charges against the officer. However, the POB provided no explanation or rationale for its decision, nor any disciplinary recommendations, nor any indication whether there were any training or policy implications. The Chief non-concurred in the POB recommendation, responding with a detailed non-concurrence letter in which his rationale was comprehensively set forth. The Chief's letter also rightfully mentioned that the POB decision provided no rationale or insight into its decision-making for him to consider.

For the foregoing reasons, the monitoring team finds POB not in compliance" for paragraph 271. "Meaningful oversight" by POB means effective oversight, which is difficult if not impossible to achieve when missing a third of its personnel for a protracted period.

This non-compliance finding is a result of the City (and surely some internal processes at POB) failing to assess, process and achieve adequate staffing for POB.

A note of caution is issued to the POB and the CPOA. The Ordinance and the Policies and Procedures clearly set forth a reasonable and concise process for investigations by CPOA and approval of CPOA's findings and recommended discipline by POB, as well as the POB authority to make different findings or to require additional investigation. Allowing the equivalent of an appeal before a case is concluded based on materials obtained in an IPRA request is a worrisome deviation from that process.

The more closely the process is followed, the easier it will be to accomplish the agency's mission. In addition, we note that the revised ordinance pending approval gives broader authority to POB/CPOA than the CASA requires. That is a determination rightfully made by Council; however, the monitoring team will assess whether the exertion of full authority allowed by the ordinance, but not required by the CASA, interferes with POB/CPOA's CASA-mandated mission and duties.  We will continue to review closely the interaction of CASA, ordinance, and workflow at POB/CPOA.

We mentioned in IMR-8 that a new mediation policy, agreed upon by the parties and approved by the monitor and the Court, is now in place. This is a marked improvement that was expected to enable CPOA to make greater use of this effective complaint remedy and disposition tool. It was also expected that this in turn will enable CPOA to further improve on its efforts for timely disposition of complaints. Unfortunately, this monitoring review has shown that complainants have not taken advantage of the mediation program and have opted not to pursue mediation. CPOA is currently assessing the program and other Alternative Dispute Resolution (ADR) mechanisms in New Mexico in an effort to make the mediation program a viable alternative for complainants.

As noted in IMR-8, when reviewing a stratified random sample of investigations regarding the requirement of "expeditiously as possible" process complaints (contained in paragraph 281 of the CASA), and the time requirement for completing investigations contained in paragraph 191, we looked for and determined the following dates: complaint received, complaint assigned for investigation, initiation of investigation after assignment, completion of investigation, and notification of intent to impose discipline (where applicable).

During the 6th site visit, the monitoring team discussed with the parties the issue of delay between the date a complaint is received and the date it is assigned for investigation. Although the CASA does not deal directly with the issue of time to assign, the parties and the monitor agreed that a delay of more than 7 working days for assignment is unreasonable and would affect the "expeditious" requirement of paragraph 281 and time requirement of paragraph 191 starting with future IMRs.

We sampled 8 CPOA investigations completed this monitoring period. All of them had evidence of "as soon as possible" initiation of investigation after assignment. All of them were timely completed once they were assigned. However, we note that in the following cases, [IMR-9-39, IMR-9-43], assignment was made after seven working days of having received the complaint. This is a marked improvement from IMR-8, however a 75 % compliance rate is still out of compliance with the "expeditious" time requirements of the CASA.

To its credit, CPOA has initiated a new internal tracking system of complaints received which appears to be paying dividends. We have also learned that the CPOA is seeking two new staff positions, a complaint coordinator and an administrative assistant. This

new tracking system, together with these new staff positions, should lead to quicker initial review, assessment and assignment of complaints to the appropriate CPOA investigator.

In our review of the public information requirement for CPOA/POB, we also found issues related to paragraph 292 of the CASA requiring the CPOA to file semi-annual reports with the City Council. CPOA attempts to meet this requirement by filing one semi-annual and one annual report per year, and quarterly reports verbally with City Council. Since our last IMR, the 2016 Annual Report has been posted on the CPOA website and the 2017 Annual Report is currently undergoing review by the POB, and then City Council, before final approval and release to the public.  We have also learned that the CPOA intends to meet this CASA mandated reporting requirement in the future by issuing two semi-annual reports.  In order for there to be meaningful communication with the public, the goal should be to release a semi-annual report within 120 days of completion of the reporting period.

The data analysis role is outsourced to the Institute for Social Research at the University of New Mexico, The reports are not published until they have been reviewed and approved by City Council.  We will continue to monitor this process.

### 4.7.256 Compliance with Paragraph 271:  CPOA Implementation

Paragraph 271 stipulates:

> **"The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD.  The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force."**

### Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraph 271:*

*4.7.256a POB vacancies must be promptly filled. The City should consider carefully POB/CPOA input regarding the qualifications of applicants for vacant POB positions.*

### 4.7.257 Assessing Compliance with Paragraph 272:  Independence and Accountability of CPOA

Paragraph 272 stipulates:

> **"The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance."**

## Results

No change in compliance processes are noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.258 Assessing Compliance with Paragraph 273:  Requirements for Service of CPOA Members

Paragraph 273 stipulates:

> **"The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque."**

## Results

No change in compliance processes is noted for this paragraph since the last reporting period.  The agency remains in compliance based on past and current process.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.259 Assessing Compliance with Paragraph 274:  CPOA Pre-Service Training

Paragraph 274 stipulates:

> **"Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:**
>
> **a)  This Agreement and the United States' Findings Letter of April 10, 2014;**
> **b)  The City ordinance under which the agency is created;**

273

**c)  State and local laws regarding public meetings and the conduct of public officials;**
**d)  Civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;**
**e)  All APD policies related to use of force, including policies related to APD's internal review of force incidents; and**
**f)  Training provided to APD officers on use of force."**

## Results

No change in compliance processes is noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.260 Assessing Compliance with Paragraph 275:  CPOA Annual Training

Paragraph 275 stipulates:

> **"The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement."**

## Results

No change in compliance processes is noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.261 Assessing Compliance with Paragraph 276:  CPOA Ride-alongs

Paragraph 276 stipulates:

> **"The City shall require those appointed to the agency to perform at least two ride-alongs with APD officers every six months."**

## Results

No change in compliance processes is noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.262 Assessing Compliance with Paragraph 277:  CPOA Authority and Resources to Make Recommendations

Paragraph 277 stipulates:

> **"The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer-involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force.**"

**Results**

No change in compliance processes is noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.263 Assessing Compliance with Paragraph 278:  CPOA Budget and Authority

Paragraph 278 stipulates:

> **"The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws.  The agency shall have the authority to hire staff and retain independent legal counsel as necessary**"

**Results**

No change in compliance processes is noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.264 Assessing Compliance with Paragraph 279:  Full-Time CPOA Investigative Staff

Paragraph 279 stipulates:

> **"The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review of serious uses of force and officer-involved shootings.  The investigative staff shall be selected by and placed under the supervision of the Executive Director. The Executive Director will be selected by and work under the supervision of the agency.  The City shall provide the agency with adequate funding to ensure that the agency's investigative staff is sufficient to investigate civilian complaints and review serious uses of force and officer-involved shootings in a timely manner."**

## Results

No change in compliance processes is noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.265 Assessing Compliance with Paragraph 280:  Receipt and Review of Complaints by CPOA

Paragraph 280 stipulates:

> **"The Executive Director will receive all APD civilian complaints, reports of serious uses of force, and reports of officer-involved shootings.  The Executive Director will review these materials and assign them for investigation or review to those on the investigative staff.  The Executive Director will oversee, monitor, and review all such investigations or reviews and make findings for each.  All findings will be forwarded to the agency through reports that will be made available to the public on the agency's website."**

## Results

No change in compliance processes is noted for this paragraph since last reporting period.  The agency remains in compliance based on past and current process.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.266 Assessing Compliance with Paragraph 281:  Prompt and Expeditious Investigation of Complaints

Paragraph 281 stipulates:

**"Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible."**

## Results

Two of the eight cases reviewed took longer than seven days to be assigned for investigation, and error rate of 25 percent.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 281:*

*4.7.266a: Develop an internal tacking system or other process that ensures all complaints are either assigned for investigation, referred to mediation, or administratively closed within 7 working days of receipt of complaint.*

*4.7.266b: Ensure that tardy assignments of investigations and tardy investigations are noted and discussed with the involved CPOA personnel.*

*4.7.266c: CPOA should consider hiring a Case Coordinator to further ensure the timely logging of receipt, the review, and the assignment of complaints.*

### 4.7.267 Assessing Compliance with Paragraph 282:  CPOA Access to Files

Paragraph 282 stipulates:

**"The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:**

**a)  all civilian complaints, including those submitted anonymously or by a third party;**
**b)  the identities of officers involved in incidents under review;**
**c)  the complete disciplinary history of the officers involved in incidents under review;**
**d)  if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);**
**e)  all APD policies and training; and**

> **f) if requested, documents, reports, and other materials for incidents that may evince an overall trend in APD's use of force, internal accountability, policies, or training."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.268 Assessing Compliance with Paragraph 283:  Access to Premises by CPOA

Paragraph 283 stipulates:

> **"The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director upon reasonable notice. The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement.**"

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.269 Assessing Compliance with Paragraph 284:  Ensuring Confidentiality of Investigative Files

Paragraph 284 stipulates:

> **"The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.270 Assessing Compliance with Paragraph 285:  Authority to Recommend Discipline

Paragraph 285 stipulates:

> **"The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed."**

## Results

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.271 Assessing Compliance with Paragraph 286:  Documenting Executive Director's Findings

Paragraph 286 stipulates:

> **"Findings of the Executive Director shall be documented by APD's Internal Affairs Bureau for tracking and analysis."**

## Results

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.272 Assessing Compliance with Paragraph 287:  Opportunity to Appeal Findings

Paragraph 287 stipulates:

> **"The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency."**

## Results

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.273 Assessing Compliance with Paragraph 288:  CPOA Recommendations Regarding APD Policies

Paragraph 288 stipulates:

> **"The agency shall make recommendations to the Chief regarding APD policy and training.  APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes."**

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.274 Assessing Compliance with Paragraph 289:  Explanation for not Following CPOA Recommendations

> **"For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded."**

## Results

Our review of policy review interactions between the Chief of Police and the CPOA show no substantive differences between the Chief of Police and CPOA regarding policy.  The working relationship between CPOA and the current chief is much improved compared to the previous chief.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.275 Assessing Compliance with Paragraph 290:  Regular Public Meetings

Paragraph 290 stipulates:

> **"The agency shall conduct regular public meetings in compliance with state and local law.  The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD."**

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**

280

Operational: **In Compliance**

## 4.7.276 Assessing Compliance with Paragraph 291:  Community Outreach for the CPOA

Paragraph 291 stipulates:

> **"The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.277 Assessing Compliance with Paragraph 292:  Semi Annual Reports to Council

Paragraph 292 stipulates:

> **"The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:**
>
> **a)  number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> **b)  demographic category of complainants;**
> **c)  number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> **d)  number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
> **e) policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;**
> **f)  policy changes recommended by the agency, including any dispositions by the Chief;**
> **g)  public outreach efforts undertaken by the agency and/or Executive   Director; and**
> **h)  trends or issues with APD's use of force, policies, or training."**

**Results**

CPOA submits annual and semi-annual reports in response to the requirements of this paragraph.

281

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.278 Assessing Compliance with Paragraph 320: Notice to Monitor of Officer Involved Shootings

Paragraph 320 stipulates:

> "**To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings. APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.**"

### Methodology

An Assistant City attorney has taken responsibility for providing notice to the Monitoring team regarding all APD critical firearm discharges.  Based on the new system's results, the monitor now receives expeditious notification, via e-mail exchanges, of all officer-involved shootings.  The City's 320 notifications now match the "known data" contemporaneously maintained by the monitoring team, which is tallied from news reports, contemporaneous reviews of use of force reports, and spot checks of information reviewed from IA "course of business" data.

### Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 5.0 Summary

As of the close of the ninth reporting period, APD is in a strong position to move forward successfully; however, we see some potential obstacles to finishing compliance efforts in a timely manner.  In the paragraphs below, the monitoring team identifies APD's strengths, weaknesses, opportunities, and threats (SWOT), *vis. a vis.* the remaining tasks facing APD as it moves forward.  These comments provide APD with an industry-standard assessment:  SWOT analyses, which are the industry-wide accepted standard for prefatory strategic planning and management.

282

*Strengths*

APD executive staff, i.e., the chief of police and deputy chiefs of police and most in the command levels of APD are committed, knowledgeable, change-oriented individuals, and are beginning to look "outside" the agency for models, processes, product and solutions to the issues confronting the agency as it moves forward with compliance efforts.

The current city administration has committed to the requisite funding levels that were obvious from the outset of the project in 2015.  Acquisition of additional officers, and funding for needed information and management systems are being met at a level that is necessary for moving forward with many CASA-related processes.

*Weaknesses*

Despite the strengths noted above, APD is confronted with several weaknesses that have, and will continue to retard progress.  These include:

- A lack of vision among some of the command ranks;
- A lack of full commitment to reform at command through sergeant levels;
- A paucity of technical skills in command ranks;
- A lack of integration of compliance efforts;
- Overt resistance from some in command, mid-management, and supervisory levels;
- A paucity of technical skills among key elements of the reform effort, including:

        --  A lack of experience and core knowledge regarding organizational development and planned change;

        -- A lack of familiarity with the application of automated information systems to the specific problem sets confronted by the agency; and

        --A lack of a sophisticated understanding of and experience with quantitative and qualitative program evaluation.

These are the same weaknesses we have noted since the inception of the monitoring project, and are reflective of the lack of an outside focus by APD during the past administration.

*Opportunities*

Fortunately, APD and the City are aware of the potential impacts of outside talent in certain critical positions, and have begun importing talent where needed. In addition to

this change in perspective, we have also observed several related opportunities for APD to move forward effectively.  These include:

- Enhanced funding levels from new administration;
- Enhanced support from new administration;
- Newly earned trust from community;
- The continued Court mandate for "change;"
- Acceptance of "outside hires" at management and technical levels; and
- Existence of "experienced" organizations that have preceded APD in the reform effort (Los Angeles, Seattle, New Orleans, Cleveland etc.).

It is incumbent on APD executive staff to identify, assess, select, and manage these opportunities in the coming months.

### *Threats*

Despite these new-found opportunities, APD is also confronted with some formidable threats to success.  These include:

- The Counter-CASA effects we have discussed in detail over the past five reports;
- Technological, managerial, and supervisory skill deficits; and
- The shelf-life of existing opportunities (discretionary funding for reform efforts) may soon dry up, as the City is required to focus on other, equally important issues.

At times, merely acknowledging and understanding the interplay among the elements of a SWOT analysis is enough to stave off unwarranted events.  At other times, a focused and highly attentive awareness of each of these elements is necessary to move an agency forward.