**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                  No. CIV 14-1025 JB\SMV

CITY OF ALBUQUERQUE,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Intervenor's Notice of Objection to Use of Force Policy (§ 2-57-2, Standing Operating Procedure), filed May 28, 2019 (Doc. 447)("Objection"); and (ii) the Memorandum in Support of Albuquerque Police Officers Association's Party Status, filed December 6, 2019 (Doc. 498)("Second MTI"). The Court held a hearing on August 13, 2019. See Clerk's Minutes at 1, filed August 13, 2019 (Doc. 473). The primary issues are: (i) whether the Court would have permitted the Albuquerque Police Officers Association ("Officers Association") to intervene, had the Court been presiding when the Officers Association filed its Motion to Intervene, filed December 18, 2014 (Doc. 40), and its Memorandum in Support of Intervenor Albuquerque Police Officers' Association Motion to Intervene (FRCP Rule 24), filed December 19, 2014 (Doc. 41)("MTI"); (ii) whether the Court should permit the Officers Association to raise its Objection to the "Use of Force -- Review and Investigation by the Department" Standing Operating Procedure ("SOP") § 2-57, filed June 20, 2019 (Doc. 458-6)("SOP § 2-57"); and (iii) whether the Court should amend SOP § 2-57, because the would-have-known standard in the use-of-force policy violates the Constitution of the United States of America, federal law, or the Second Amended and Restated Court-Approved Settlement

Agreement, filed July 30, 2019 (Doc. 465-1)("Second Amended Settlement Agreement").   The Court concludes that: (i) if the Court had been presiding when the Officers Association filed its MTI, the Court would have granted the Officers Association's request for intervenor status, but it would have limited that status to the Officers Association's interest in its Collective Bargaining Agreement,   https://www.cabq.gov/humanresources/documents/apoa-jul-9-2016.pdf/view   (last visited June 10, 2020)("CBA"); (ii) although the Court will permit the Officers Association to make substantive Objections to the Settlement Agreement to protect its interests under the CBA, the Officers Association's Objection is not timely and thus the Court denies the Officer Association's Objection; and (iii) the Court will not amend SOP § 2-57's would-have-known standard, because it does not have authority to do so, and even if the Court did have the authority to amend the would-have-known standard, Albuquerque has the right to enact a policy more stringent than the constitutional floor that is consistent with the Settlement Agreement and caselaw.

## **FACTUAL BACKGROUND**

In November, 2012, the Plaintiff United States of America opened an investigation into the use of force by Albuquerque Police Department's ("APD") law enforcement officers.   Joint Motion Requesting Approval and Entry of the Settlement Agreement as an Order at 2, filed November 14, 2014 (Doc. 9)("Joint Motion for Settlement").   In April, 2014, the United States issued the results of its investigation, in which it "concluded that it had reasonable cause to believe that the Albuquerque Police Department engages in a pattern or practice of use of excessive force, in violation of the Fourth Amendment and Section 14141" of Title 42 of the United States Code. Joint Motion for Settlement at 3.   Soon after the United States issued its results, the United States entered discussions with Albuquerque, with input from the public and subject-matter experts,

which resulted in an announced agreement on October 31, 2014.  <u>See</u> Joint Motion for Settlement at 2; Memorandum Opinion and Order at 2, filed June 2, 2015 (Doc.134)(Brack, J.)("Original Settlement Agreement MOO").  The Albuquerque City Council, in a unanimous vote, endorsed the agreement.  <u>See</u> Joint Motion for Settlement at 2; Original Settlement Agreement MOO at 2 (Brack, J.).  The Original Settlement Agreement "sets up a comprehensive framework for reform with proposed 'revisions, policies, procedures, and practices to address the allegations in the United States' Complaint," Original Settlement Agreement MOO at 2 (Brack, J.)(quoting Joint Motion for Settlement at 6), and has provisions pertaining "to the use of force, specialized units, crisis intervention, training, misconduct investigations, supervision, recruitment, officer health, and community engagement."  Original Settlement Agreement MOO at 2 (citing Settlement Agreement, filed November 14, 2014 (Doc 9-1)("Original Settlement Agreement")).  The Original Settlement Agreement includes a "management-rights" provision that states

> The Association (APOA) agrees that the employees shall be bound by and obey such directives, r[u]les, and regulations insofar as the same do not conflict with this Agreement, the laws of the United States, the laws of the State of New Mexico and/or the laws of the City of Albuquerque.  Under normal circumstances, the Association will be given written notice of proposed changes to Department directives, rules and regulations that directly affect the wages, hours, and working conditions of bargaining unit member[s] and may submit written input to the Chief within fourteen (14) days.

Original Settlement Agreement ¶ 147, at 51-52.  The Original Settlement Agreement also provided a procedure for objections:

> APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions.  If, after this 15-day period has run, the [United States Department of Justice] maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection.  If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter.  The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies.  Factors to consider in making this determination

include: 1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor.  In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review.  Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion.

Original Settlement Agreement ¶ 148, at 52.

The next month, the United States brought a lawsuit against Albuquerque under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, alleging a "pattern or practice of use of excessive force by APD officers that deprives persons of rights, privileges, or immunities, secured and protected by the Fourth Amendment."  Complaint at 1, filed November 12, 2014 (Doc. 1).  According to the Complaint, APD police officers shot and killed approximately twenty individuals from 2009 to 2012.  See Complaint at 3.  The Complaint alleges that the "majority of these shootings were unconstitutional."  Complaint at 3.  Moreover, the United States alleges in its Complaint, APD police officers used deadly force: (i) "against individuals known or suspected of having mental illness and experiencing mental health crisis"; (ii) "in circumstances where there is no imminent threat of deadly or serious bodily harm"; (iii) "where persons pose only a minimal threat" to officers and others; and (iv) "where [the] officers' own conduct escalates situations and contributes to the need to use force."  Complaint at 3.  The United States further alleges that APD engaged in a pattern or practice of using force that is less than lethal in an unconstitutional manner.  See Complaint at 4.

Two days after the United States filed its Complaint, the United States and Albuquerque submitted a joint motion to the Honorable Robert C. Brack, United States District Judge for the United States District Court for the District of New Mexico, to approve the Original Settlement

Agreement.  <u>See</u> Joint Motion for Settlement at 1.  Although Albuquerque joined the Motion, it clarified that it denied any pattern or practice of unconstitutional use of force by APD or any of its agents.  <u>See</u> Joint Motion for Settlement at 3.  In their Joint Motion, the United States and Albuquerque asked the Court to approve the Original Settlement Agreement, to "retain jurisdiction over the Agreement for the purpose of enforcing its terms until the City has achieved full and effective compliance with the Agreement," and to allow "community members and other stakeholders to express their views as amici curiae to assist the Court in its consideration of the Agreement."  Joint Motion for Settlement at 3.  After provisionally approving the Original Settlement Agreement, Judge Brack set a fairness hearing so interested parties could provide their opinions on the Original Settlement Agreement.  <u>See</u> Order Inviting the Submission of Briefs by Amicus Curiae, filed December 17, 2014 (Doc. 35).  Seven groups spoke at the fairness hearing. <u>See</u> Clerk's Minutes at 1, filed January 21, 2015 (Doc. 90).  After the fairness hearing, Judge Brack approved the Original Settlement Agreement, entering it as a court order.  <u>See</u> Original Settlement Agreement MOO at 1.

The Original Settlement Agreement requires "compliance within two years [of November 14, 2014], and sustained and full effective compliance for four years" by November 14, 2018. Memorandum Opinion and Order, filed September 24, 2015 (Doc. 143)(Brack, J.)(citing Original Settlement Agreement ¶ 342, at 103).  The United States and Albuquerque selected Dr. James Ginger as the independent monitor of the agreement, a former police officer who "function[s] as the eyes and ears of the Court."  Original Settlement Agreement MOO at 3.  Dr. Ginger periodically submits progress reports to the Court in compliance with the Original Settlement Agreement and its later iterations.  <u>See</u>, <u>e.g.</u>, Report, filed August 18, 2017 (Doc. 295); Report, filed November 1, 2019 (Doc. 493).  This continuous monitoring resulted in Judge Brack, at the parties' request,

suspending portions of the First Amended and Restated Court-Approved Settlement Agreement, filed February 19, 2017 (Doc. 247-1)("First Amended Settlement Agreement") and Second Amended Settlement Agreement, with which Albuquerque is in compliance.  See, e.g., Order, filed April 12, 2018 (Doc. 365)(suspending the First Amended Settlement Agreement's ¶ 308, at 93).

The Officers Association has given its input to the United States and Albuquerque throughout the process.  The Albuquerque and the Officers Association also have a CBA.  See Memorandum Opinion and Order, filed November 30, 2016 (Doc. 238)("Promotional Policy MOO"). The relevant portion of the CBA states:

> If the City anticipates the implementation of policies or directives related to its agreement discussions with the DOJ that impacts Officers' terms or conditions of employment, the City will notify the APOA of its anticipated changes and provide the APOA the opportunity to meet and confer with the City in a timely manner on the anticipated changes.

CBA § 2.5, at 6.  Albuquerque and the Officers Association renewed their CBA, which became effective on July 7, 2018, and did not change this language.  See City of Albuquerque and Albuquerque Police Officers Association 2018 Collective Bargaining Agreement, § 2.5, at 6, https://www.cabq.gov/humanresources/documents/apoa-jul-9-2016.pdf/view (last visited June 10, 2020)("2018 CBA").  The 2018 CBA does not include a section on the standard of review for use of force.  See generally 2018 CBA.  The 2018 CBA states: "The employer reserves the right to develop and implement such directives rules and regulations as may be deemed necessary to the employer for the conduct of affairs of the Department." 2018 CBA § 32.1, at 42.

The Original Settlement Agreement required APD to revise its use-of-force SOP in 2017. See Defendant City of Albuquerque's Response to Intervenor's Objections to Use of Force Policy (§ 2-57-2, Standard Operating Procedure) at 3, filed July 15, 2019 (Doc. 462)("Albuerque Objections Response"). Dr. Ginger criticized portions of the revised use-of-force SOP, so APD recrafted the policies through 2018 into January, 2019. See Objections Response at 3. The United States and Albuquerque did not approve of the new policies, so on January 31, 2019, with Dr. Ginger's consent, the United States and Albuquerque adopted Albuquerque's proposed SOP language. See Objections Response at 7-8. That language is the basis for the Officers Association's objections.

## PROCEDURAL BACKGROUND

The Officers Association filed its MTI in 2015. See MTI at 1. Judge Brack granted the MTI as to the remedial phase of litigation. See Memorandum Opinion and Order at 3-4, 13, filed February 19, 2015 (Doc. 102)("MTI MOO")(Brack, J.)("MTI MOO"). Accordingly, the Officers Association has brought Objections since the MTI MOO, including its most recent Objection. See, e.g., APOA's Notice of Objection to APD Promotional Policy and Request for Status Conference at 1, filed August 25, 2016 (Doc. 198); Objection at 1.

### 1. Motion to Intervene.

The Officers Association filed its MTI. See MTI at 1. It argues that under rule 24(a) of the Federal Rules of Civil Procedure, it has a right to intervene in the action. See MTI at 1. The Officers Association begins by providing background information relevant to its argument. See MTI at 1. It clarifies that it represents APD's "sworn, certified" employees. MTI at 1. As these employees' representatives, the Officers Association entered into the CBA, which "governs the terms and conditions of employment for the bargaining unit," with Albuquerque over forty years

ago.  See MTI at 1.  The Officers Association notes that Albuquerque and the Officers Association are required to bargain in good faith under New Mexico Public Employee Bargaining Act, N.M. Stat. Ann. § 10-7E-1 to -26 ("PEBA"),[1] and the City of Albuquerque Labor-Management Relations Ordinance, Albuquerque, N.M. Rev. Ordinances, ch. 3, art. II, § 3-2-1 to -18 ("Labor Ordinance").[2]

---

[1]N.M. Stat. Ann. § 10-7E-17 states, in relevant part:

**A.** Except for retirement programs provided pursuant to the Public Employees Retirement Act [10-11-1 NMSA 1978] or the Educational Retirement Act [22-11-1 NMSA 1978], public employers and exclusive representatives:

> **(1)** shall bargain in good faith on wages, hours and all other terms and conditions of employment and other issues agreed to by the parties. However, neither the public employer nor the exclusive representative shall be required to agree to a proposal or to make a concession; and

> **(2)** shall enter into written collective bargaining agreements covering employment relations.

**B.** The obligation to bargain collectively imposed by the Public Employee Bargaining Act [10-7E-1 NMSA 1978] shall not be construed as authorizing a public employer and an exclusive representative to enter into an agreement that is in conflict with the provisions of any other statute of this state. In the event of conflict between the provisions of any other statute of this state and an agreement entered into by the public employer and the exclusive representative in collective bargaining, the statutes of this state shall prevail.

N.M. Stat. Ann. § 10-7E-17.

[2]Section 3-2-4 of Albuquerque, N.M. Rev. Ordinances states:

(A)   City employees have the right to form, join and otherwise participate in the activities of an employee organization of their own choosing for the purpose of bargaining collectively with the city government, and for other lawful reasons.  City employees also have the right to refuse to join and participate in the activities of employee organizations.  An employee organization which has been certified by the Mayor as the exclusive bargain representative for an appropriate bargaining unit of the city employees may bargain collectively with the city government concerning hours, salary, wages, working conditions, and all terms and conditions of employment.

(B)   Nothing contained in this article shall be construed to limit, impair, or affect the rights of any individual city employee to the expression or

- 8 -

communication of a view, grievance, complaint, or opinion on any matter related to the conditions or compensation of city employment or their betterment aside from the method described herein, so long as the same is not designed to and does not interfere with the full, faithful and proper performance of the duties of his employment.

(C)   No organization, its representative or other individual, shall be allowed to solicit membership for an employee organization or labor union during such employees' duty hours.

Albuquerque, N.M. Rev. Ordinances ch. 3, art. II, § 3-2-4.  Regarding management rights, the city ordinance states:

Subject to existing law, the Mayor and his administrative staff shall have the following rights:

(A)   To direct the work of its employees;

(B)   To hire, promote, evaluate, transfer and assign employees;

(C)   To demote, suspend, discharge or terminate employees for just cause;

(D)   To determine staffing requirements;

(E)   To maintain the efficiency of the city government and ensure the carrying out of normal management functions;

(F)   To take actions as may be necessary to carry out the mission of the city government in emergencies; and

(G)   To manage and to exercise judgment on all matters not specifically prohibited by this article or by a collective bargaining agreement in effect between the city employer and an employee organization.

Albuquerque, N.M. Rev. Ordinances ch. 3, art. II, § 3-2-5.  The ordinance also sets out the following legal obligations surrounding the city's duty to bargain:

The city government and any employee organization recognized as the exclusive representative for a unit, through their designated agents, shall bargain concerning hours, salary, wages, working conditions and other terms and conditions of employment not in violation of law or local ordinance and not in conflict with the provisions of §§ 3-1-1 et seq., the Merit System; Personnel Regulations, establishing classified and unclassified service, methods of service rating of classified employees, methods of initial employment, promotion recognizing efficiency and ability as applicable standards, discharge of employees, and grievance and appeal procedures for classified employees; provided, however, that the provisions of a collective bargaining agreement which has been ratified and

MTI at 1-2.  The Officers Association argues that the Original Settlement Agreement violates the CBA and allows Albuquerque to unilaterally alter the CBA's terms and conditions of employment without bargaining in good faith with the Officers Association.  See MTI at 3.  Thus, the Officers Association contends, because the Original Settlement Agreement affects its CBA rights, the Court should permit the Officers Association to intervene in the case.  See MTI at 3.

The Officers Association next fleshes out why the Court should permit it to intervene as a matter of right under rule 24(a) of the Federal Rules of Civil Procedure.  See MTI at 3.  Before analyzing each factor of the United States Court of Appeals for the Tenth Circuit's test, the Officers Association notes that United States Court of Appeals for the Ninth Circuit has directed district courts to apply rule 24(a) tests "liberally and in favor of any potential intervenors."  MTI at 3 (citing United States v. City of L.A., Cal., 288 F.3d 391, 391 (9th Cir. 2002)("United States v. City of L.A.").  The Officers Association then turns to the first factor -- timeliness -- and asserts that, while a motion to intervene "may be filed at either the merits phase or the remedial phase of litigation," "its motion is timely filed as this litigation is in its earliest stage."  MTI at 4.  Without elaboration, it asserts that its MTI would prejudice neither the United States nor Albuquerque.  See MTI at 4.[3]

The Officers Association turns to the second factor -- whether it had an "interest relating

---

approved by the Mayor shall, where in conflict with any other provision of §§ 3-1-1 et seq. govern.  This duty includes an obligation to confer in good faith with respect to terms and conditions of employment.

Albuquerque, N.M. Rev. Ordinances ch. 3, art. II, § 3-2-7.

[3]The Officers Association relies only on Ninth Circuit cases for its intervention-as-right argument.  See MTI MOO at 4-9 (citing United States v. City of L.A., 288 F.3d at 391; San Jose Mercury News, Inc. v. U.S. Dist. Court N. Dist. (San Jose), 187 F.3d 1096, 1101 (9th Cir. 1999); Nikon Corp. v. ASM Lithograph B.V., 222 F.R.D. 647, 649-50 (N.D. Cal. 2004)(Patel, J.)).

to the property or transaction that is the subject matter of this litigation."  MTI at 4.  It notes that

this interest, known as a significant protectable interest, exists when the Officers Association

"asserts an interest that is protected under some law, and the legal relationship between itself and

the City."  MTI at 4.  It cites the Ninth Circuit's reasoning in United States v. City of L.A. to

illustrate why the Officers Association has a protectable interest in this case.  See MTI at 5-7.  The

Officers Association explains that, in that case, the Ninth Circuit[4] concluded that the Los Angeles

Police Protective League ("Police League") has "a legally protected interest in both the merits and

the remedies of litigation between the United States and an employer when that litigation impacts

state-law collective bargaining obligations."  MTI at 5.  It notes the similarities between United

States v. City of L.A. and this case -- in both cases: (i) the United States alleges that the city

"engaged in a pattern and practice of depriving individuals of constitutional rights through

excessive force"; (ii) the United States and the City entered into a Settlement Agreement before

the United States filed the complaint; and (iii) the United States and the City jointly filed the

Settlement Agreement the same day the United States filed its complaint.  MTI at 5 (citing United

States v. City of L.A., 228 F.3d at 396).  According to the Officers Association, the Police League

moved to intervene, because the settlement agreement was inconsistent with the labor agreement

between the Los Angeles and the Police League.  See MTI at 5.  The Officers Association explains

that the district court denied the motion to intervene both as a matter of right and permissively.

See MTI at 5.  The Officers Association says that the Ninth Circuit reversed the district court's

decision, and the Officers Association states that the Police League

> had a protectable interest in the merits and the remedies of the case because the
> complaint: (1) sought injunctive relief against members of the League; (2) raised

---

[4]Although the Officers Association wrote "Ninth Circuit District Court," it is referring to
the Ninth Circuit's holding, not the district court involved in that case.  See MTI at 5.

factual allegations that the member officers had committed unconstitutional acts in the line of duty; and (3) sought remedies which could affect the terms of the labor agreement.

MTI at 5.  The Officers Association excerpts a paragraph from United States v. City of L.A. to illustrate the protectable interest in the merits phase of that case:

> "The Police League claims a protectable interest because the complaint seeks injunctive relief against its member officers and raises factual allegations that its member officers committed unconstitutional acts in the line of duty.  These allegations alone are sufficient to demonstrate that the Police League had a protectable interest in  the merits phase of the litigation."

MTI at 5 (quoting United States v. City of L.A., 228 F.3d at 399).  It then excerpts another paragraph to illustrate the protectable interest in the remedial phase of that case:

> "The Police League has state law rights to negotiate about the terms and conditions of members' employment as LAPD officers and to rely on the collective bargaining agreement that is a result from those negotiations.  These rights give it an interest in the consent decree at issue.  Thus, the Police League's interest in the consent decree is two-fold.  To the extent it contains or might contain provisions that contradict terms of the officers' [collective bargaining agreement], the Police League has an interest.  Further, to the extent it is disputed whether or not the consent decree conflicts with the [collective bargaining agreement], the Police League has the right to preserve its views on the subject to the district court and have them fully considered in conjunction with the district court's decision to approve the consent decree."

MTI at 5 (quoting United States v. City of L.A., 228 F.3d at 400)(alteration in MTI).  Analogizing to United States v. City of L.A., the Officers Association asserts that it has a protectable interest in the merits phase of litigation, because the United States makes allegations in its Complaint against Albuquerque and its employees, and because Albuquerque alleges that law enforcement officers, who are members of the Officers Association, have violated the Constitution in the line of duty.  See MTI at 6 (providing no cite for the latter proposition).  The Officers Association then asserts that it has a protectable in interest in the remedial phase of the litigation, because, in the Original Settlement Agreement, Albuquerque commits to actions that harm the Officers

- 12 -

Association.  See MTI at 6 (stating that the CBA contains provisions that establish an "equitable peaceful procedure for resolution of differences" and that the Settlement Agreement's new discipline guidelines around the use-of-force conflict with those CBA provisions).  The Officers Association notes that Albuquerque agreed to these actions that would violate CBA terms without engaging in the required good-faith bargaining.  See MTI at 6. If Albuquerque proceeds with the Settlement Agreement, the Officers Association argues, Albuquerque will have violated the Labor Ordinance, which could result in litigation.  See MTI at 8.

Turning to the third factor -- whether denying intervention would hamper the Officer Association's ability to protect its interest -- the Officers Association again cites a Ninth Circuit standard on which it bases its argument.  See MTI at 8 (citing United States v. City of L.A., 228 F.3d at 397).  The Officers Association argues that the Court should analyze this factor under the Ninth Circuit's standard to see, not whether the interest will be impaired, but whether the interest "'may' be impaired 'as a practical matter.'"  MTI at 9 (quoting United States v. City of L.A., 228 F.3d at 397).  The Officers Association argues that, should the Court deny the MTI, the Officers Association's interest likely will be impaired, because Albuquerque will be able to adopt policies and procedures as part of the Settlement Agreement that are incompatible with the CBA.  See MTI at 9.  Moreover, the Officers Association argues, denial of the intervention will harm the Officers Association, because Albuquerque will impermissibly alter terms of employment without bargaining in good faith with the Officers Association.  See MTI at 9.  It then notes that the Ninth Circuit concluded that a settlement agreement overrides state law bargaining rights.  See MTI at 9 (citing United States v. City of L.A., 228 F.3d at 401).

The Officers Association then turns to the fourth prong -- adequacy of representation -- and again cites a Ninth Circuit case for its test.  See MTI at 9-10 (stating the three factors the Ninth

Circuit considers in an adequacy-of-representation analysis in the motion-to-intervene context)(citing United States v. City of L.A., 288 F.3d at 398).  The Officers Association acknowledges that there is a presumption of adequate representation "when a representative is a governmental body or officer charged by law with representing the interest of the absentee," but it argues that the presumption is inapplicable in this case, because it does not apply to Albuquerque when it is an "antagonist[]" in the collective-bargaining process.  MTI at 10 (citing United States v. City of L.A., 228 F.3d at 402). The Officers Association provides several examples of Albuquerque acting as an adversary to the Officers Association during the collective-bargaining process, including Albuquerque unilaterally reducing wages, which resulted in an alleged breach of the CBA and a case pending in state court.  See MTI at 10.  The Officers Association adds several items of evidence that it deems are determinative regarding Albuquerque's adversarial position, including the necessity of the Officers Association's Prohibited Practice Complaint about the Settlement Agreement and the Original Settlement Agreement itself.  See MTI at 10.  The Officers Association concludes its argument by reiterating that Albuquerque and the Officers Association are situated adversely, and thus Albuquerque cannot adequately protect the Officers Association's interests.  See MTI at 10.

The Officers Association turns to its alternative argument -- that the Court should permit the Officers Association to intervene under rule 24 (b)(2)(B) of the Federal Rules of Civil Procedure.  See MTI at 11.  The Officers Association again cites the Ninth Circuit for the standard: "'a court may grant permissive intervention where the application for intervention shows (1) independent grounds for jurisdiction; (2) t[hat] the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common.'" MTI at 11 (quoting United States v. City of L.A., 288 F.3d at 403).  The Officers Association

- 14 -

quickly disposes of the first two factors, stating that the Court has federal-question jurisdiction, because the Complaint alleges a violation of 42 § U.S.C 14141, and that the MTI is timely and intervention will not delay the litigation process.  See MTI at 11 (citing Freedom from Religious Found., Inc. v. Geithner, 644 F.3d 836, 843-44 (9th Cir. 2011)).  The Officers Association moves to the next factor -- whether it raises common questions of law or facts -- and states that it shares common questions of law or facts with the existing parties, because the Officers Association "seeks to defend its member officers against allegations of police misconduct" and "seeks to address the viability of the remedies in the Settlement Agreement."  MTI at 11.  It notes that intervention would not "alter the factual background of these claims."  MTI at 11.  Finally, the Officers Association turns to the fourth factor -- whether the Officers Association's interest is adequately represented by another party.  See MTI at 11.  The Officers Association notes that its interest is "distinct" from Albuquerque's interest, and thus Albuquerque does not adequately represent the Officers Association's interest.  MTI at 11.  It argues that "its participation will contribute to the equitable resolution of this conflict."  MTI at 11 (citing Venegas v. Skaggs, 867 F.2d 527, 530-31 (9th Cir. 1989)).  It concludes by stating that, should the Court grant intervention, the Officers Association would submit an answer to the other parties.  See MTI at 12.

      **2.**      **Albuquerque MTI Response.**

Albuquerque responds.  See Defendant City of Albuquerque's Response in Opposition to APOA's Motion to Intervene, filed January 29, 2015 (Doc. 93)("Albuquerque MTI Response").  Albuquerque begins by noting that it does not dispute "most" of the Officers Association's purported facts.  Albuquerque MTI Response at 1.  Albuquerque argues, however, that the Settlement Agreement "does not contain any specific rules, policies, or procedures" that Albuquerque must implement, because Albuquerque will decide on these policies after the

Settlement Agreement is finalized.  Albuquerque MTI Response at 2.  Thus, Albuquerque argues,

the Officers Association's contention that the Original Settlement Agreement has terms that

"conflict[] with the CBA is mere conjecture."  Albuquerque MTI Response at 2.

Albuquerque notes that the Officers Association's MTI does not include "key" CBA

provisions.  Albuquerque MTI Response at 2.  It excerpts the first omitted provision:

> "The City and the APOA recognize the necessity to collaborate on issues
> that arise as a result of the Department of Justice's ("DOJ") investigation and
> proposals related to the findings of the DOJ regarding the Albuquerque Police
> Department.  If the City anticipates the implementation of policies or directives
> related to its agreement discussions with the DOJ that impacts Officers' terms or
> conditions of employment, the City will notify the APOA of its anticipated changes
> and provide APOA the opportunity to meet and confer with the City in a timely
> manner on the anticipated changes.  The commitment will not prevent the APOA
> from submitting the changes for negotiations when the parties negotiate a successor
> collective bargaining agreement."

Albuquerque MTI Response at 2 (quoting CBA § 2.5).  It excerpts a second "key" provision: "The

employer reserves the right to develop and implement such directives rule and regulations as may

be deemed necessary to the employer for the conduct of affair of the Department."  Albuquerque

MTI Response at 3 (quoting Collective Bargaining Agreement, Section 32.1, filed December 20,

2019 (Doc. 501-1)("CBA § 32.1")).  Finally, Albuquerque excerpts a third "key" provision:

> The Association (APOA) agrees that the employees shall be bound by and obey
> such directives, r[u]les, and regulations insofar as the same do not conflict with this
> Agreement, the laws of the United States, the laws of the State of New Mexico
> and/or the laws of the City of Albuquerque.  Under normal circumstances, the
> Association will be given written notice of proposed changes to Department
> directives, rules and regulations that directly affect the wages, hours, and working
> conditions of bargaining unit member[s] and may submit written input to the Chief
> within fourteen (14) days."

Albuquerque MTI Response at 3 (quoting CBA § 32.2)(alterations added).  Albuquerque argues

that these three provisions are dispositive of the Officers Association's MTI.  See Albuquerque

MTI Response at 3.

Albuquerque begins its argument by stating that the Court should not permit the Officers Association to intervene as a matter of right under rule 24(a).  See Albuquerque MTI Response at 3.  Albuquerque begins with the protectable-interest factor, which it argues is dispositive of intervention in both the merits and the remedial phases of litigation.  See Albuquerque MTI Response at 4.  Regarding the merits phase of litigation, Albuquerque argues that the Officers Association relies "entirely" on a Ninth Circuit case, which is "not binding authority and the proposition for which the [Officers Association] cites it is questionable."  Albuquerque MTI Response at 4 (citing United States v. City of L.A., 288 F.3d at 399).  The proposition in question is that a police union has a right to intervene on behalf of its officer members when there are allegations of officer misconduct -- a proposition that Albuquerque argues could lead to police unions having "unchecked ability to influence city officials' prerogative to control litigation strategy."  Albuquerque MTI Response at 4-5 (citing Floyd v. City of N.Y., 302 F.R.D. 69, 117 (S.D.N.Y. 2014)(Torres, J.)).  Albuquerque points to Floyd v. City of N.Y. as "a more reasoned approach," because the Honorable Analisa Torres, United States District Judge for the United States District Court for the Southern District of New York concluded that, "although the unions need not have an independent cause of action against New York City, they must have a specific legal interest as distinguished from a general interest."  Albuquerque MTI Response at 5 (citing Floyd v. City of N.Y., 302 F.R.D. at 91).  Albuquerque notes that, in Floyd v. City of N.Y., like in this case, the Complaint was against New York and its police department, and not against individual officers.  See Albuquerque MTI Response at 5 (citing Floyd v. City of N.Y., 302 F.R.D. at 94-96).  In contrast, Albuquerque argues, the action in United States v. City of L.A., was against individual officers as well as the city and the police department.  See Albuquerque MTI Response at 5-6 (citing 288 F.3d at 399).  Albuquerque argues, thus, that United States v. City of L.A., has

a "more nuanced" conclusion than Albuquerque suggests, because the Ninth Circuit concluded that "a police union ha[s] a right to intervene in the merits on behalf of its members where members had been accused of misconduct and they could still face liability on that misconduct," which is inapplicable to this case.  Albuquerque MTI Response at 6 (citing Floyd v. City of N.Y., 302 F.R.D. at 123).  Accordingly, Albuquerque concludes, the Officers Association has not presented any authority to show that a police union has a protectable interest in the merits phase of litigation "in which its members were not parties, were not facing liability, and where the relief sought was not against union members."  Albuquerque MTI Response at 6.

Albuquerque then turns to whether the Officers Association has a protectable interest in the remedial phase of litigation.  See Albuquerque MTI Response at 7.  It notes that the remedy in this case -- the Original Settlement Agreement -- is contractual in nature and "even when injunctive relief joins the parties' agreement, the source of the authority requiring the parties to act remains their acquiescence rather than the rules of law."  Albuquerque MTI Response at 7 (citing Local No. 93 Int'l Assoc. of Firefighters v. City of Cleveland, 478 U.S. 501, 519-22 (1986)("Local No. 93 v. Cleveland")).  Albuquerque adds that, if the Original Settlement Agreement imposes duties on the Officers Association or disposes of the Officers Association's claims, then the Officers Association would need to consent to the Original Settlement Agreement.  See Albuquerque MTI Response at 7.  The Original Settlement Agreement does not, however, impose duties on the Officers Association or dispose of its claims, and thus, Albuquerque contends, the Original Settlement Agreement does not require the Officers Association's consent.  See Albuquerque MTI Response at 7 (citing Local No. 93 v. Cleveland, 478 U.S. at 529-30; Johnson v. Lodge No. 93 of the Fraternal Order of the Police, 393 F.3d 1096, 1107(10th Cir. 2004)("Johnson v. Lodge No. 93")).

Albuquerque analogizes to <u>Johnson v. Lodge No. 93</u>, although it acknowledges the issue in that case differs from the issue in this case.  <u>See</u> Albuquerque MTI Response at 7.  Albuquerque says that the union in <u>Johnson v. Lodge No. 93</u> makes the same arguments as the Officers Association -- that the settlement agreement undermines the union's position as the exclusive bargaining agent for its members, conflicts with the CBA, and impairs employment terms and conditions without union consent.  <u>See</u> Albuquerque MTI Response at 7 (citing <u>Johnson v. Lodge No. 93</u>, 393 F.3d at 1101).  Albuquerque notes that in <u>Johnson v. Lodge No. 93</u>, the CBA had a "'management rights provision'" that gave the city the right to manage the police department, which the Tenth Circuit concluded "plainly encompassed the city's right to enter into a remedial settlement agreement during the terms of the" CBA.  Albuquerque MTI Response at 7-8 (citing <u>Johnson v. Lodge No. 93</u>, 393 F.3d at 1101, 1104).  The Tenth Circuit further concluded that allowing the union to veto settlement agreements with any relation to its members' employment terms would "neuter the management rights provision" and "unduly frustrate Congress's preference for achieving compliance with race discrimination laws by voluntary means."  Albuquerque MTI Response at 8 (citing <u>Johnson v. Lodge No. 93</u>, 393 F.3d at 1105).  Moreover, Albuquerque argues, the Tenth Circuit concluded that, because the settlement agreement did not thrust obligations or duties on the union, the settlement agreement did not impair the union's rights.  <u>See</u> Albuquerque MTI Response at 8 (citing <u>Johnson v. Lodge No. 93</u>, 393 F.3d at 1107).  Albuquerque draws a parallel between <u>Johnson v. Lodge No. 93</u> and this case, because both cases involve a CBA with a management-rights provision.  <u>See</u> Albuquerque MTI Response at 8 (citing CBA § 32.1-2, at 41-42)(stating that the CBA's management-rights provision gives Albuquerque the right to implement rules for APD's operation and that the CBA establishes the Officers Association's "express agreement that its members shall be bound by and obey such rules to the

extent the rules do not conflict with the CBA").  Albuquerque further notes that the Original Settlement Agreement contains no concrete rules or procedures, and only "an agreement as to remedial policies in general," and thus any alleged conflict of the rules or procedures with the CBA are "purely speculative" and therefore insufficient "to establish a protectable interest in the litigation."  Albuquerque MTI Response at 8 (citing Johnson v. Lodge No. 93, 393 F.3d at 1105).

Albuquerque acknowledges that, although the Officers Association does not specify any conflicting provisions in its MTI, the Officers Association notes conflicting provisions in its Brief of Amicus Curiae Albuquerque Police Officers' Association, filed January 14, 2015 (Doc. 67)("Amicus Curiae Brief").  See Albuquerque MTI Response at 9.  Albuquerque first turns to CBA §§ 20.1.4, 20.1.6, 20.1.7, which are about administrative investigations resulting from "an official or unofficial complaint."  Albuquerque MTI Response at 9 (citing CBA § 20.1.3, at 28-29.).  In contrast, Albuquerque asserts, the Original Settlement Agreement's provisions are not about investigations resulting from complaints, but about "fact-finding inquiri[es]" that result from use-of-force incidents.  Albuquerque MTI Response at 9.  Albuquerque regardless turns to the first specific alleged conflict, which is that the Original Settlement Agreement's requirement that a supervisor immediately respond to the scene of a use-of-force incident to begin the investigation conflicts with the CBA § 20.1.4's requirement that an officer must be notified about the disciplinary investigation's nature before interrogation.  See Albuquerque MTI Response at 9.  Albuquerque argues that the supervisor can inform the officer about the nature of the investigation before the supervisor begins the on-scene interrogation and that the supervisor's arrival is itself notice to the officer about the investigation.  See Albuquerque MTI Response at 9.  Albuquerque further notes that the CBA's requirement was established to resolve investigations that arise from complaints, while the Original Settlement Agreement's provision is about investigations that arise

from use-of-force incidents.  See Albuquerque MTI Response at 9 (citing CBA § 20.1.3, at 28-29).

Albuquerque turns to the second alleged conflict -- that the Original Settlement Agreement's requirement that a supervisor must interview the involved officer immediately upon arrival at the use-of-force incident's scene conflicts with CBA § 20.1.6, which permits an officer to have a representative present at interrogation.  See Albuquerque MTI Response at 9-10 (citing Amicus Brief[5]).  Albuquerque counters that these provisions are consistent, because the officer can request that a representative come to the scene for the interview.  See Albuquerque MTI Response at 10.  Further, Albuquerque argues, these provisions are consistent, because CBA § 20.1.11 states that, as long as the interrogation is not delayed more than two hours, the involved officer is permitted to consult with a bargaining representative or counsel.  See Albuquerque MTI Response at 10.  Albuquerque then turns to the third alleged conflict -- that CBA § 20.1.8, which states that the Internal Affairs Bureau must not handle any potential criminal investigations, and these investigations thus must be transferred to a criminal investigations unit or a law enforcement agency, conflicts with the Settlement Agreement's creation of a criminal investigation team within the Internal Affairs Bureau.  See Albuquerque MTI Response at 10.  Albuquerque argues that a criminal investigation team situated within the Internal Affairs Bureau can operate independently from the Internal Affairs Bureau, consistent with the requirement in CBA § 20.1.8 that the Internal Affairs Bureau not handle criminal investigations. See Albuquerque MTI Response at 10.

Albuquerque next turns to the Officers Association's general issues.  See Albuquerque

_____

[5]Albuquerque cites "Doc. 66 at 11/16."  Albuquerque MTI Response at 9.  Although Doc. 66 is the Amicus Brief, the Amicus Brief's page 11 does not contain any substantive text, and the Amicus Brief does not have a page 16.

MTI Response at 11.  Albuquerque counters the Officers Association's argument that the Original Settlement Agreement's omission of officers' rights under Garrity v. New Jersey, 385 U.S. 493 (1967), conflicts with the CBA by noting that the Original Settlement Agreement does not contain any language undermining the officers' Garrity v. New Jersey rights.  See Albuquerque MTI Response at 11 (citing Amicus Curiae Brief, at 12, 16).  Albuquerque next counters the Officers Association's assertion that the Original Settlement Agreement provisions allowing for "additional investigatory protocol in use of force incidents" conflict with the CBA.  Albuquerque MTI Response at 11 (citing Amicus Curiae Brief at 12, 16).  Albuquerque argues that these provisions do not conflict with the CBA, because the CBA does not have any provisions relating to use-of-force investigations, and because the CBA does not restrict Albuquerque's rights regarding use-of-force investigations.  See Albuquerque MTI Response at 11 (citing N.M. Stat. Ann. § 10-7E-6(D)).  Similarly, Albuquerque asserts, the CBA does not contain provisions relating to additional officer training and on-body camera systems, so Albuquerque may consent to additional officer training and on-body camera systems procedures.  See Albuquerque MTI Response at 11.  Moreover, Albuquerque argues, any future conflict is speculative, because Albuquerque has not yet established procedures for use-of-force investigation, additional training, or on-body camera systems, and because the CBA may expire before the procedures are implemented.  See Albuquerque MTI Response at 11-12.

Albuquerque next argues that the Court should not permit the Officers Association to object to the Original Settlement Agreement's creation and staffing of the criminal investigations unit, because that unit is "so critical to the success of the negotiated remedies" that, if the Court permitted the Officers Association to bargain regarding the criminal investigations unit, the Original Settlement Agreement would be "frustrate[d.]"  Albuquerque MTI Response at 12.

Moreover, Albuquerque argues, the Supremacy Clause of the Constitution of the United States of America precludes the Officers Association "from overriding the federal constitutional principles" embedded in the Original Settlement Agreement.   Albuquerque MTI Response at 12 (citing Williams v. Eaton, 443 F.2d 422, 429 (10th Cir. 1971)(concluding that the Supremacy Clause bars the state constitution from "overrid[ing] federal constitutional principles")).

Albuquerque notes that CBA § 2.5 anticipates the United States' and Albuquerque's Settlement Agreement and resulting policies affecting Officers Association members' employment conditions and terms, because the provision requires Albuquerque to notify and discuss with the Officers Association "'the implementation of policies or directives related to its agreement discussions with the DOJ that impacts the Officers terms or conditions of employment.'"   Albuquerque MTI Response at 12 (quoting CBA § 2.5, at 5).   Albuquerque further notes that the CBA anticipated that the Settlement Agreement might affect the CBA's terms, because the CBA states that "[t]he commitment [to meet and confer. . . on the anticipated changes] will not prevent the [Officers Association] from submitting the changes for negotiations when the parties negotiate a successor" CBA.   Albuquerque MTI Response at 13 (quoting CBA § 2.5, at 5)(alteration in Albuquerque MTI Response).   Albuquerque argues that this provision does not require Albuquerque and the Officers Association to enter into an agreement before Albuquerque can consent to the Settlement Agreement; rather the provision requires only that Albuquerque meet with the Officers Association for discussion.   See Albuquerque MTI Response at 13 (noting that "the provision contemplates" disagreement between Albuquerque and the Officers Association, which is why it permits the Officers Association to "submit[] any changes to the CBA as a result of the settlement for negotiations when the parties negotiate a successor collective bargaining agreement").   Thus, Albuquerque argues, CBA § 2.5 is consistent with the Officers Association's

disagreement with a finalized Settlement Agreement.  See Albuquerque MTI Response at 13. Albuquerque further notes that it has not breached this provision, as the Officers Association argues, because it has engaged the Officers Association throughout the process.  See Albuquerque MTI Response at 13.  Even if Albuquerque breached this provision, it argues, the Officers Association's remedy is a breach-of-contract action in a separate court proceeding, not intervention in this case.  See Albuquerque MTI Response at 13-14 (citing APOA v. City of Albuquerque, 2013-NMCA-0110, 314 P.2d 677).  Albuquerque then summarizes its arguments, concluding that the Court should deny the Officers Association's MTI, because the Officers Association has no protectable interest in the merits or the remedial phases of litigation.  See Albuquerque MTI Response at 14.

Albuquerque turns to its alternative argument -- that, even if the Court concludes that the Officers Association has a protectable interest in the merits phase or in the remedial phase of the litigation, the Officers Association does not have standing to protect its interest.  See Albuquerque MTI Response at 14.  Albuquerque argues that the Officers Association does not have standing, because the Settlement Agreement does not impose any duties or obligations on it, and that the Officers Association's members do not have standing, because they are non-parties to the case, and because they have not suffered any injury beyond APD's "agreement to implement certain policies."  Albuquerque MTI Response at 14-15 (citing Floyd v. City of New York, 302 F.R.D. at 187; Local No. 93 v. Cleveland, 478 U.S. at 529-30; Johnson v. Lodge No. 93, 393 F.3d at 1107).

Albuquerque again challenges the Officers Association's reliance on United States v. City of L.A., this time for the proposition that a union can intervene as a matter of right if a settlement agreement could harm a union's "ability to protect and enforce its contract provisions." Albuquerque MTI Response at 15.  Albuquerque distinguishes that case as arising out of the Ninth

Circuit, while the Tenth Circuit, in contrast, has rejected a union's argument that a settlement agreement could impair its rights under future CBAs as "speculative." Albuquerque MTI Response at 15 (citing Johnson v. Lodge No. 93, 393 F.3d at 1105). Albuquerque reiterates that any future violation is speculative and that the Officers Association already has a remedy -- a breach-of-contract lawsuit -- available to it should the violations manifest. See Albuquerque MTI Response at 15.

Albuquerque next argues that the Court should not permit the Officers Association to permissively intervene under rule 24(b)(2). See Albuquerque MTI Response at 15. Albuquerque argues that it already has demonstrated that the Officers Association has no protectable interest and that the Officers Association has conceded that it is not bringing a claim. See Albuquerque MTI Response at 16 (citing MTI at 14-15, 18). Thus, Albuquerque asserts, the Officers Association must demonstrate that it has a common defense either with its claim that "it seeks to defend its member officers against allegations of police misconduct [or with its claims that it] seeks to address the viability of the remedies in the settlement agreement." Albuquerque MTI Response at 16. Albuquerque argues that the first claim is not a valid defense, because the United States makes claims against only Albuquerque, and not individual Officers Association members; and that the second claim is not a valid defense, because it is based on a hypothetical violation between the CBA and rules arising out of the Settlement Agreement. See Albuquerque MTI Response at 16.

Moreover, Albuquerque argues, permissive intervention would result in undue delay and prejudice, because the parties already have spent "thousands of person-hours" in the negotiation process, and permitting the Officers Association to intervene would mean that the parties would need to restart negotiations. Albuquerque MTI Response at 16-17. Further, Albuquerque argues,

permissive intervention would provide the Officers Association with the "unchecked ability to influence the City's right to control litigation strategy in this case."  Albuquerque MTI Response at 17 (citing Floyd v. City of N.Y., 302 F.R.D. at 117).  Thus, Albuquerque concludes, the Court should deny permissive intervention.

Albuquerque offers reassurance that it will continue to engage the Officers Association and other community stakeholders during the Settlement Agreement's implementation.  See Albuquerque MTI Response at 17.  Albuquerque notes that it met with the Officers Association for four hours the day before it filed its MTI Response.  See Albuquerque MTI Response at 17.  Thus, Albuquerque concludes, "neither intervention of right or by permission is necessary, appropriate, or permi[ssible]."  Albuquerque MTI Response at 17.

### 3.    The United States MTI Response.

The United States responds.  See United States' Opposition to Motion to Intervene by the Albuquerque Police Officers' Association at 1, filed January 29, 2015 (Doc. 94)("U.S. MTI Response").  The United States asks the Court to deny the Officers Association's request, because the United States engaged with the Officers Association and its members throughout the investigation and settlement processes, and because the Officers Association has not shown that "any provision of the Settlement Agreement tips that balance [between the needs of the officers, the needs of the community, and constitutional, effective policing] so far away from the interests of its members that the remarkable remedy it requests -- the right to renegotiate the Settlement Agreement -- is merited."  U.S. MTI Response at 1.  The United States begins its argument by summarizing the ways in which it has engaged with the Officers Association and its members throughout the investigation and settlement processes.  See MTI at 2.  It notes that the United States met with the Officers Association thirteen times, beginning during the investigation up until

the day before it filed its U.S. MTI Response.  See U.S. MTI Response at 2.  The United States emphasizes that it sent out an open invitation for the Officers Association's members to attend some of these meetings.  See U.S. MTI Response at 2.  The United States contends that it heard from officers not only at these meetings, but also through direct outreach.  See U.S. MTI Response at 3 (stating that it talked to "hundreds" of officers through outreach).  It notes that the "DOJ team held more than 40 meetings with officers that were attended, in total, by more than 500 police officers" and that many of these meetings were held in APD Area Commands.  U.S. MTI Response at 3.  It adds other examples of the United States involving the Officers Association in the process: (i) United States attorneys and investigators participated in ride-alongs with officers; (ii) United States attorneys met with officers at each APD Area Command to answer questions and to receive comments after the United States issued its findings; and (iii) the United States and Albuquerque held seven joint briefings with officers at APD's Training Academy in December, 2014, which approximately seventy-five percent of APD personnel attended.  See U.S. MTI Response at 3.  The United States emphasizes that the Officers Association has another way to voice its concerns: filing an amicus curiae brief.  See U.S. MTI Response at 3.  It notes that the United States and Albuquerque met with the Officers Association after the Officers Association filed its Amicus Curiae Brief to discuss the Officers Association's concerns.  See U.S. MTI Response at 3.

The United States then turns to its next argument -- that the Original Settlement Agreement reflects the Officers Association's participation.  See U.S. MTI Response at 4.  It provides Original Settlement Agreement terms that addressed some of the Officers Association's concerns: (i) a requirement that investigating officers conduct thorough, timely investigations that result in complete findings; (ii) a request that there will be an investigation outcome of officer exoneration, in contrast to an outcome of "inconclusive findings'; and (iii) a provision that establishes a

disciplinary system that "is applied consistently and fairly" using a disciplinary matrix that considers mitigating and aggravating factors.  U.S. MTI Response at 4 (citing Original Settlement Agreement, ¶¶ 183-192, at 60-63; id. ¶ 201, at 65).  Moreover, the United States argues that, after learning that APD officers interpreted the early intervention system as "a disciplinary tool," the United States and Albuquerque made sure that the Original Settlement Agreement reworked the early intervention system to serve "its intended purpose" -- providing early training and support to officers to circumvent future issues.  U.S. MTI Response at 4 (citing Original Settlement Agreement ¶¶ 212-19, at 68-71).

The United States then explains how it addressed other concerns from some of the Officers Association's members.  First, the United States notes, because officers were concerned that promotional policies were unfair, the Original Settlement Agreement now has specific concrete requirements for promotion and evaluations, and it holds supervising officers accountable for evaluations.  See U.S. MTI Response at 5 (citing Original Settlement Agreement ¶¶ 241-46, at 76-77).  Next, the United States explains, because officers were concerned about staffing shortages, the Original Settlement Agreement required a staffing study and staffing plan.  See U.S. MTI Response at 5 (citing Original Settlement Agreement ¶ 204, at 66).

The United States then notes that the CBA between Albuquerque and the Officers Association "provides ongoing opportunities to effect reform of the Albuquerque Police Department."  U.S. MTI Response at 5-6 (citing CBA § 2.5, at 5)(noting that the CBA requires Albuquerque and the Officers Association to collaborate on issues that affect the Officers Association member's employment terms and conditions).  The United States emphasizes that the Officers Association approved the Original Settlement Agreement before the United States and Albuquerque filed it in court.  See U.S. MTI Response at 6 (quoting Stephanie Lopez, the Officers

Association president, as stating that "there's nothing in the agreement that the department can't do")(Meeting of Albuquerque City Council at 41:43-42:35, taken November 6, 2014 (http://cabq.granicus.com/MediaPlayer.php?view_id=2&clip_id=97).   The Original Settlement Agreement, the United States argues, will not impact the current CBA, which is alive from July 16, 2014 to July 16, 2015, because it requires APD Policy and Procedures Board to develop and amend policies by August 14, 2015, and to implement these policies by November 14, 2015.  See U.S. MTI Response at 6-7 (citing First Proposed Settlement Agreement ¶¶ 143-44, at 51). According to the United States, both deadlines fall after the CBA's termination.  See U.S. MTI Response at 7.

The United States then moves to its legal arguments.  It begins by arguing that the Officers Association is not entitled to intervene by right, because the Officers Association has not shown a protectable interest that would be impaired but for its intervention.  See U.S. MTI Response at 7. The United States cites the four factors that the Officers Association must demonstrate to intervene as of right: (i) a timely motion; (ii) "an interest relating to the property or transaction which is the subject of the action"; (iii) an impairment to the interest; and (iv) inadequate representation by the existing parties of the interest.  U.S. MTI Response at 7-8 (quoting SWEPI, PL v. Mora Cty., N.M., No. CIV 14-0035, 2014 WL 6983288 at *23 (D.N.M. Dec. 5, 2014)(Browning, J.), and citing Elliot Indus. LP v. BP Am. Prod. Co., 407 F.3d 1091, 1103 (10th Cir. 2005)).  It concedes the first factor -- timeliness -- and the fourth factor -- adequacy of representation.  See U.S. MTI Response at 8.  It turns instead to whether the Officers Association has a protectable interest in the litigation, noting that determining whether a protectable interest exists "'is a highly fact-specific determination.'"  U.S. MTI Response at 8 (quoting Coal. of Ariz./N.M. Ctys. for Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 841 (10th Cir. 1996)(internal quotation marks and

citations omitted in the U.S. MTI Response)("Coal. of Ariz./N.M. Ctys. v. Dep't of Interior").  It acknowledges that the Tenth Circuit has acknowledge protectable interests other than interests that are "'direct, substantial, and legally protectable,'" U.S. MTI Response at 8 n.1 (quoting Utah Ass'n of Ctys. v. Clinton, 255 F.3d 1246, 1251 (10th Cir. 2001)), and notes that the Tenth Circuit has concluded that the primary concern "'is the practical effect of the litigation on the applicant for intervention,'"  U.S. MTI Response at 8 n.1 (quoting San Juan Cty., Utah v. United States, 503 F.3d 1163, 1193 (10th Cir. 2007)(en banc)("San Juan Cty. v. United States")).  The Officers Association, the United States argues, has not demonstrated a protectable interest in the remedial phase or the liability phase of the case, and it cannot veto the Settlement Agreement.  See U.S. MTI Response at 9.  Thus, the United States argues, Judge Brack should deny the Officers Association's MTI.  See U.S. MTI Response at 9.

The United States argues that the Court should not allow the Officers Association to intervene in the remedial phase of the case, because the Officers Association "has identified no way in which the Settlement Agreement in this case impairs a protectable interest" nor has it identified "any provision of the CBA that conflicts with its Settlement Agreement."  U.S. MTI Response at 9.  The United States notes that the Officers Association heavily relied on United States v. City of L.A., but the United States distinguishes that case from the current case.  See U.S. MTI Response at 9.   The United States notes that, in United States v. City of L.A., the Ninth Circuit concluded that the police union's interest arose from "'provisions [in the consent decree] that conflict[ed]' with the union's collective bargaining agreement."  U.S. MTI Response at 9 (quoting United States v. City of L.A., 288 F.3d at 400)(alterations added in U.S. MTI Response). The United States argues that the Officers Association, in contrast, has not identified any conflicts between the Original Settlement Agreement and the CBA.  See U.S. MTI Response at 9.  The

United States emphasizes that, although the Officers Association notes that the Original Settlement Agreement contains new discipline guidelines, the Officers Associations does not demonstrate how these guidelines conflict with any CBA provisions.  See U.S. MTI Response at 9-10.

The United States acknowledges that the Officers Association highlights six alleged conflicts between the Original Settlement Agreement and the CBA in its Amicus Curiae Brief. See U.S. MTI Response at 10 (citing Amicus Curiae Brief).  It identifies the six alleged conflicts: (i) use-of-force investigations, which the Officers Association argues conflicts with the CBA requirements that officers are permitted a representative present during interrogation and that officers are entitled to know disciplinary investigation's nature before interrogation; (ii) the Internal Affairs Unit's criminal investigations, which the Officers Association argues conflict with the "CBA's prohibition on the Internal Affairs Unit handling criminal investigations"; (iii) the absence of the officers' rights under the Fifth Amendment to the Constitution of the United States of America; (iv) the power given to commanders to order "additional investigation[s] of possible misconduct," which the Officers Association argues conflicts with the CBA's provision requiring investigators to inform an officer of a disciplinary investigation's nature before interrogation; (v) the disciplinary matrix, the early-intervention system, and the Force Review Board, which the Officers Association argues the Original Settlement Agreement forbids without the Officers Association's approval; (vi) on-body recording systems and crisis intervention training, which the Officers Association argues can be implemented only if there are changes in working conditions and bargaining regarding officer compensation.  See U.S. MTI Response at 10-11 (citing Amicus Curiae Brief at 7-9).  The United States then explains how each of the alleged conflicts is not a conflict, because "the Settlement Agreement and the CBA are compatible on all of these points." U.S. MTI Response at 11.  Before turning to the conflicts, the United States notes that some of the

provisions that the Officers Association discusses in the Amicus Curiae Brief implicate Albuquerque's managerial rights regarding its employees, which include police officers.  See U.S. MTI Response at 11.

Turning to the first conflicting provision, the United States argues that the Original Settlement Agreement is consistent with the CBA regarding notice, because the Original Settlement Agreement does not require the "supervisors to interrogate officers before giving notice."  U.S. MTI Response at 12 (citing First Proposed Settlement Agreement ¶¶ 50-59, at 23-27).  Moreover, the United State argues, officers will have notice of the disciplinary investigation's nature before interrogation, because the investigation will begin immediately while the officer is still at the scene.  See U.S. MTI Response at 12.  The United States contradicts the Officers Association's argument that this investigation timeline will prevent officers from having a representative present during interrogation, because "nothing in the Settlement Agreement prevents officers from having a representative present during any interview," and the Original Settlement Agreement does not require the interrogation to begin as soon as the supervisory arrives on-scene.  U.S. MTI Response at 13.  It notes that "use of force investigations under the Settlement Agreement will not usually be 'administrative investigations," as the CBA uses that term, because most uses of force will likely be constitutional and within APD policy."  U.S. MTI Response at 13.  Thus, the United States concludes, any conflict between the Original Settlement Agreement and the CBA is fictional.  See U.S. MTI Response at 13.

The United States next turns to the Officers Association's second alleged conflict -- that the CBA forbids the Internal Affairs Unit from conducting criminal investigations, as set forth in the Original Settlement Agreement.  See U.S. MTI Response at 14.  The United States acknowledges that the Original Settlement Agreement provides for the Internal Affairs Bureau to

conduct criminal investigations, but it notes that the Original Settlement Agreement has terms "that thoroughly protect officers' interest in maintaining separation between the two kinds of investigations." See U.S. MTI Response at 14. It argues that the Original Settlement Agreement terms that help keep the investigations separate advance the CBA's same interest of separation between the investigations. See U.S. MTI Response at 15.

The United States next turns to the Officers Association's assertion that the lack of discussion of the officers' Fifth Amendment rights that Garrity v. New Jersey guarantees conflicts with the CBA. See U.S. MTI Response at 15. Garrity v. New Jersey, the United States asserts, ensures that officers' compelled, incriminating statements given during administrative investigations in which their jobs were threatened cannot be used against them in a criminal trial. See U.S. MTI Response at 15 (citing Garrity v. New Jersey, 385 U.S. at 496-99). The United States argues that there is nothing in the Original Settlement Agreement, nor does the Officers Association point to anything in the Original Settlement Agreement, that harms officers' Garrity v. New Jersey rights. See U.S. MTI Response at 15. Moreover, the United States argues, the Original Settlement Agreement has seven provisions that protect officers regarding compelled statements. See U.S. MTI Response at 15-16 (citing Original Settlement Agreement ¶¶ 186, 187, 189, 199, 200, at 61, 62, 65).

The United States then turns to the Officers Association's fourth stated conflict -- the commanders' power to order "additional investigation[s]" into possible misconduct. U.S. MTI Response at 16. The United States explains that the Original Settlement Agreement permits a commander who has reviewed a supervisor's use-of-force investigation report to order additional investigation if the commander concludes that there may be additional evidence that would assist the investigation. See U.S. MTI Response at 16 (citing Settlement Agreement ¶ 54, at 25). The

Officers Association, according to the United States, contends that this authority conflicts with the officers' right to receive notice regarding the disciplinary investigation's nature before interrogation.  See U.S. MTI Response at 16 (citing Amicus Curiae Brief at 8).  The United States counters the Officers Association's assertion of a conflict by reiterating that "nothing in the Settlement Agreement requires officers to be interrogated without first receiving notice" and that "officers whose force has been investigated by a supervisor will have received ample notice" of the investigation's nature.  U.S. MTI Response at 17.

The United States then turns to the Officers Association's fifth alleged conflict -- the creation of the Force Review Board, the early-intervention system, and the disciplinary matrix, which the Officers Association asserts require its approval before formation.  See U.S. MTI Response at 17.  The United States notes that, although the Officers Association has asserted an interest in all disciplinary matters, it has not shown that this case's outcome will substantially affected this interest.  See U.S. MTI Response at 17 (citing Amicus Curiae Brief at 9; San Juan Cty. v. United States, 503 F.3d at 1195).  The United States notes that the Officers Association has not even alleged the Settlement Agreement's discipline guidelines and procedures conflict with the CBA, and thus there must not be any conflict.  See U.S. MTI Response at 17.

The United States turns to the Officer Association's sixth proposed conflicting provisions -- the on-body recording systems and the crisis-intervention training.  See U.S. MTI Response at 17.  The United States argues that, again, the Officers Association has not contended that there is anything related to the on-body recording systems in the Settlement Agreement that conflicts with the CBA.  See U.S. MTI Response at 17.  As to the crisis-intervention training, the United States contravenes the Officers Association's argument that crisis-intervention training is impermissible violates the Officers Association's bargaining rights regarding new-training

compensation by noting that the Original Settlement Agreement does not say anything precluding the officers from receiving compensation for the training.  See U.S. MTI Response at 18.  Thus, the United States concludes, neither of these asserted issues has any basis in the Original Settlement Agreement.  See U.S. MTI Response at 18.

The United States moves to the Officers Association's argument that it has an interest in the case's merits phase, because, in the Complaint, the United States alleges that Albuquerque allows officers to engage in a pattern or practice of excessive force, makes allegations against Officers Association members, and seeks relief against Albuquerque employees, including Officer Association members.  See U.S. MTI Response at 18 (citing MTI at 7, 11).  The United States counters that the Complaint is against only Albuquerque, that the allegations are not against any individual Officers Association members, and that it is seeking relief against only Albuquerque.  See U.S. MTI Response at 18 (citing Complaint ¶¶ 2, 7-25, 28, at 2-7).  Moreover, the United States argues, the Officers Association's assertion that it seeks to defend members from misconduct allegations is moot, because the Settlement Agreement ensures that the case will not go to trial.  See U.S. MTI Response at 18.  Thus, the United States argues, Judge Brack should not permit the Officers Association to intervene in the merits stage of litigation.  See U.S. MTI Response at 18-19.

The United States turns to whether Judge Brack should permit the Officers Association to intervene permissively, noting as a threshold matter that Judge Brack must have independent jurisdiction to allow permissive intervention and that Judge Brack cannot determine whether he has jurisdiction over the Officers Association's claims, because the Officers Association has not made any claims.  See U.S. MTI Response at 19 n.3 (citing Williams v. W. Laundry Equip. LLC, No. CIV 06-0569, 2006 WL 4061164 at *9 (D.N.M. Nov. 21, 2006)(Browning, J.)(citing Sec. Ins.

Co. v. Schipporeit, 69 F.3d 1377, 1381 (7th Cir. 1995)).  The United States argues that the Officers Association has not complied with the permissive-intervention requirements under rule 24(c) of the Federal Rules of Civil Procedure, because it has not submitted the required "'pleading that sets out the claim or defense for which intervention is sought.'"  See U.S. MTI Response at 19 (quoting Fed. R. Civ. P. 24(c))(citing MTI at 14-15)(stating that the Officers Association "does not seek to bring claims").  The United States acknowledges that Judge Brack could construe the Officers Association's statement that it "'seeks to defend its member officers against allegations of police misconduct'" as a defense, but the United States notes that the Original Settlement Agreement precludes a need for liability findings.  U.S. MTI Response at 20.

The United States argues, in the alternative, that, if Judge Brack concludes that the Officers Association has raised a defense that shares a common question of law or fact, "the Court should deny permissive intervention because granting it would unduly delay and prejudice the Parties in this action."  U.S. MTI Response at 20.  It notes that the United States and Albuquerque have extensively engaged the Officers Association throughout the process and that the Officers Association has filed its Amicus Curiae Brief.  See U.S. MTI Response at 20-21.  The United States emphasizes that, even as an intervenor, the Officers Association would not be able to block the Original Settlement Agreement, and thus, after all its participation in the process and lack of actual conflicts, the Officers Association's suggestion that Judge Brack send it to mediation with the United States and Albuquerque to negotiate a new Settlement Agreement would be an unwarranted delay.  See U.S. MTI Response at 21-22.  Thus, the United States concludes, Judge Brack should deny the Officers Associations request to permissively intervene.  See U.S. MTI Response at 22.

5. __Officer Association's MTI Reply to Albuquerque__.

The Officers Association replies to Albuquerque.  See Reply in Support of Motion to Intervene, filed February 13, 2015 (Doc. 99)("MTI Reply to Albuquerque").  The Officers Association begins by countering Albuquerque's allegedly "too broad" assertion that the Officers Association does not have a protectable interest, because the United States "accus[ing Officers Association] members of constitutional violations" is not a protectable interest, and because the Officers Association's "interest in the remedies does not exist simply because these are mandatory subjects of collective bargaining."  MTI Reply to Albuquerque at 1.  The Officers Association contradicts Albuquerque's argument that United States v. City of L.A. does not support the Officers Association's interest by noting that the Ninth Circuit concluded that the union had a dual interest: (i) based on whether the settlement agreement and CBA did or could conflict; and (ii) based on the union's "right to present its position" on the settlement agreement and have the district court "fully consider" its views.  MTI Reply to Albuquerque at 2 (citing United States v. City of L.A., 288 F.3d at 400).  The Officers Association concludes that, regardless, "the district court must hear and consider the [Officer Association's] views prior to any approval of the [Settlement Agreement.]"  MTI Reply to Albuquerque at 2 (citing United States v. City of L.A., 288 F.3d at 400).  The Officers Association concludes that it has a right to be heard even as a "third-party." MTI Reply to Albuquerque at 2 (citing Local No. 93 v. Cleveland, 478 U.S. at 501).

The Officers Association next argues that it does not have to demonstrate that the Original Settlement Agreement conflicts with the CBA at this point in the litigation and that it only needs to meet rule 24(a)(2) requirements to intervene as a matter of right.  See MTI Reply to Albuquerque at 3. The Officers Association points to Floyd v. City of N.Y., which it alleges Albuquerque misuses to support the proposition that the Original Settlement Agreement does not seek any relief

against individual officers.  See MTI Reply to Albuquerque at 3 (citing Floyd v. City of N.Y., 302

F.R.D. at 117).  It distinguishes Floyd v. City of N.Y. from this case by noting that, unlike Floyd

v. City of N.Y., it has identified state and local laws that give the Officers Association bargaining

rights over some issues in the litigation.  See MTI Reply to Albuquerque at 4.  The Officers

Association further distinguishes Floyd v. City of N.Y. by noting the union in that case did not

raise any "specific," "particular" concerns.  MTI Reply to Albuquerque at  4.  The Officers

Association counters that the Original Settlement Agreement subjects Officers Association

members to liability and damages.  See MTI Reply to Albuquerque at 3-4)(citing Original

Settlement Agreement ¶ 15, at 15 (stating that "the use of unreasonable force will subject officers

to discipline, possible criminal prosecution, and/or civil liability")).

The Officers Association then argues that it has an interest in protecting its rights under the

CBA.  See MTI Reply to Albuquerque at 4.  It notes that courts have concluded that, if a proposed

remedy might harm a contractual right, that contractual right is a protectable interest.  See MTI

Reply to Albuquerque at 4-5 (citing W.R. Grace & Co. v. Local Union, 759, 461 U.S. 767, 771

(1983); B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541, 545 (1st Cir. 2006); Sw.

Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 820 (9th Cir. 2001)).  The Officers Association

argues that Albuquerque has conceded that the Original Settlement Agreement impacts this

interest, because Albuquerque has conceded that Original Settlement Agreement provisions

permitting the Internal Affairs Unit to conduct criminal investigations conflict with CBA

provisions, and because Albuquerque has conceded that it must respect the CBA's provision that

officers must be given sufficient time to get representation before an investigation begins.  See

MTI Reply to Albuquerque at 5.  Yet, the Officers Association argues, Albuquerque has

acknowledged that it will violate the notice and representation provisions, because in its Response,

Albuquerque noted that "it is assumed" that supervisors arriving on scene would notify the involved officer of his or her rights before beginning the investigation and that the officer would have only two hours to get representation.  MTI Reply to Albuquerque at 5.  According to the Officers Association, Albuquerque thus has conceded conflicts between the Original Settlement Agreement and the CBA.  See MTI Reply to Albuquerque at 5.

The Officers Association then argues that the Original Settlement Agreement "impacts exactly the mandatory subjects of collective bargaining raised in the Floyd case."  MTI Reply to Albuquerque at 5-6.  Thus, the Officers Association argues, it should be permitted to negotiate all Settlement Agreement terms and definitions that could result in officer discipline, such as Original Settlement Agreement § III.12.NN, which defines reasonable "use of force" as force that "is objectively reasonable under the circumstances and the minimum amount of force necessary to effect an arrest."  MTI Reply to Albuquerque at 6.   The Officers Association notes its concern about "who or how the minimum amount of force is to be fairly judged."  MTI Reply to Albuquerque at 6.  The Officers Association reiterates that Albuquerque does not have the right to make these unilateral changes to the CBA to settle its dispute with the United States.  See MTI Reply to Albuquerque at 7 (citing United States of City of L.A., 28 F.3d at 399, and citing Local No. 93 v. Cleveland, 478 U.S. at 529).

The Officers Association argues that, because Albuquerque is committing "violations," the Officers Association has the right to intervene.  See MTI Reply to Albuquerque at 7 (citing Local No. 93 v. Cleveland, 478 U.S. at 519-22 (stating that court is required to give a party who shows that a settlement agreement "does or **will have an impact**" on the union's representation of its members a fairness hearing "to determine and litigate the federal court issues [] concerning the matters which impact the contract")(emphasis added in MTI Reply to Albuquerque)).  The Officers

Association counters Albuquerque's assertion that Albuquerque gave the Officers Association many opportunities to participate in the Settlement Agreement process, by stating that only the United States met with Officers Association members and its Executive Board, and that the Officers Association "as a collective body, was never given the opportunity to meet and discuss the Settlement Agreement that was being negotiated." MTI Reply to Albuquerque at 7. The Officers Association further notes that the CBA was in negotiations while the Settlement Agreement was in negotiations, so if the United States and Albuquerque had "acted in good faith," some issues could have been resolved during negotiations. MTI Reply to Albuquerque at 7-8. It further argues that, despite the CBA's procedures establishing how Albuquerque and the Officers Association should meet regarding the Settlement Agreement, that meeting never occurred. See MTI Reply to Albuquerque at 9.

The Officers Association moves to its next argument -- the "remedies of litigation." MTI Reply to Albuquerque at 8. The Officers Association first tackles Albuquerque's argument regarding the CBA's management-rights provisions, by stating that, although Albuquerque has some managerial rights, these rights do not allow it to take action that conflicts with the CBA. See MTI Reply to Albuquerque at 8. It then cites the Labor Ordinance, stating that the statute protects the Officers Association's right to negotiate its members' employment conditions, and then to the Constitutions of the United States and of New Mexico, stating that they forbid Albuquerque from entering into a settlement agreement that violates its existing contracts. See MTI Reply to Albuquerque at 8 (citing Labor Ordinance; Constitution of the State of New Mexico, art. II. § 19; Am. Fed. of State Courts and Mun. Emps., Council 18 AFL-CIO v. State of N.M.,, et al., 2013-NMCA-106, 314 P.3d 674).

The Officers Association undermines Albuquerque's reliance on the Supremacy Clause as

a basis for precluding intervention by stating that the Supremacy Clause is inapplicable in this case, because the Supreme Court in Local No. 93 v. Cleveland was talking about "the rights of a third party to intervene and present evidence reflecting the argument and the contractual rights of the [party] protected under state and local authority" when discussing that a decision cannot be entered over a party's objections if the decision will impact that party's rights.  MTI Reply to Albuquerque at 8-9 (citing Local No. 93 v. Cleveland, 478 U.S. at 1075; United States v. City of Hialeah, 140 F.3d 968 (11th Cir. 1998)(S.J., Kravitch)(dissenting).

The Officers Association turns to Albuquerque's third argument -- that, even if the Officers Association has a protectable interest in the merits phase or in the remedial phase of the Original Settlement Agreement, it does not have standing.  See MTI Reply to Albuquerque at 9.  The Officers Association states that, in making this argument, Albuquerque misapplied the caselaw. See MTI Reply to Albuquerque at 9.  Even the United States District Court for the Southern District of New York in Floyd v. City of N.Y., a case on which Albuquerque heavily relies, agrees that

> a court may not enter a consent decree that imposes obligations on a third party outside the Agreement[;] such as an intervenor has standing to make a showing that the decree affects the subject of collective bargaining, a contract right, or that imposes some duty on the obligations of the intervenor to which it does not consent.

MTI Reply to Albuquerque at 9 (citing Local No. 93 v. Cleveland, 478 U.S. at 529; Bridgeport Firebird's Soc. v. City of Bridgeport, 686 F.3d 53, 53 (D. Conn. 1988); United States v. City of Miami, 664 F.3d 435 (5th Cir. 1981)(en banc)(per curium).  The Officers Association thus contends that, Albuquerque presents no caselaw stating that it cannot intervene, and it therefore has standing to intervene.  See MTI Reply to Albuquerque at 10.

The Officers Association argues, in the alternative, that Judge Brack should let it intervene permissively under rule 24(b)(1)(B).  See MTI Reply to Albuquerque at 10.  The Officers

Association asserts that its intervention meets each of the four factors: (i) it will not delay or prejudice the adjudication of the parties' rights, because Judge Brack should focus on its participation, which will help all the parties come to an agreement, rather than the "speed with which this important matter is addressed"; (ii) it will add value to the process, because, without the Officers Association's buy-in, "the process will not work"; (iii) its interests are not adequately represented, because the United States and Albuquerque are "antagonistic" to the Officers Association; and (iv) the Officers Association does not have an adequate remedy available in another action, because, although it could sue Albuquerque for breach of contract, a breach-of-contract suit "would leave a very interesting question to a court torn between whether the CBA or the Settlement Agreement is controlling" and would not be resolved before "irreparable" "damage" was done to individual officers rights.  MTI Reply to Albuquerque at 10-11.  The Officers Association concludes by reiterating its request for the Court to grant its Motion to Intervene.  See MTI Reply to Albuquerque at 11.

### 6.   The Officer Association's MTI Reply to the United States.

The Officers Association begins its argument by stating that, to intervene as of right, it does not need to demonstrate that the Original Settlement Agreement conflicts with the CBA.  See Reply to the United States Response to APOA's Motion to Intervene, filed February 13, 2015 (Doc. 100)("MTI Reply to United States").  The Officers Association notes that the United States contest only two of the four factors under rule 24(a)(2) -- whether the Officers Association has a protectable interest and whether that protectable interest will be impaired -- and adds its own fifth factor -- the Officers Association may not intervene if it cannot stop the Settlement Agreement by withholding its consent.  See MTI Reply to United States at 2.  It undermines the United States' reliance on Local No. 93 v. Cleveland for this factor, by noting that the Supreme Court's "non-bar

rule" applies to parties, not non-parties seeking intervention.  MTI Reply to United States at 2.

Moreover, the Officers Association argues, the Supreme Court in Local No. 93 v. Cleveland

concluded that a third-party union was entitled to intervene as a matter of right, make objections,

and present relevant evidence to protect its interests, even though it was unable to bar the

settlement agreement.  See MTI Reply to United States at 2-3 (citing Local No. 93 v. Cleveland,

478 U.S. at 530; Bridgeport Firebird Soc. v. City of Bridgeport, 686 F. Supp at 57).  The Officers

Association contends that, like the union in Local No. 93 v. Cleveland, it "has the right to 'air its

objections' as a party to the reasonableness of the Settlement Agreement" without demonstrating

that the Original Settlement Agreement conflicts with the CBA.  MTI Reply to United States at 3

(quoting Local No. 93 v. Cleveland, 478 U.S. at 530).

      The Officers Association moves to its next argument -- that it has a protectable interest in

the lawsuit.  See MTI Reply to United States at 3.  It notes that the Tenth Circuit takes a "'liberal'"

approach to permitting intervention.  MTI Reply to United States at 3 (quoting Utahns for Better

Transp. v. U.S. Dep't of Transp., 295 F.3d 1111, 1115 (10th Cir. 2002), and citing Feller v. Brock,

802 F.2d 722, 729 (4th Cir. 1986)).  It counters the United States' assertion that a breach-of-

contract suit is an appropriate remedy for a the Officers Association's contractual rights under the

CBA by noting that courts have concluded that, if a proposed remedy may impact a movant's

contractual rights, the movant has a protectable interest in the lawsuit.  See MTI Reply to United

States at 3-4 (citing W.R. Grace & Co. v. Local Union, 759, 461 U.S. at 771; B. Fernandez &

Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d at 545; Sw. Ctr. for Biological Diversity v.  Berg, 268

F.3d at 820).  The Officers Association further notes that it has the right  "to negotiate the terms

and conditions of employment of APD officers" and "to protect those interests" under PEBA and

Labor Ordinance, and the right to rely on the CBA.  MTI Reply to United States at 4 (citing United

States v. City of L.A., 288 F.3d at 399-400; United States v. City of Hialeah, 140 F.3d at 983).  It

further argues that Albuquerque does not have the right to unilaterally change the CBA's terms.

See MTI Reply to United States at 4 (citing United States v. City of L.A., 288 F.3d at 400; W.R.

Grace & Co., 461 U.S. at 771).

The Officers Association next notes that the United States omits key context when it

excerpts City of Los Angeles to undermine the Officers Association's reliance on the case:

> "To the extent that it contains or might contain provisions that contradict terms of
> the officers' [Memorandum of Understanding ("MOU")[6]], the Police League has
> an interest.  Further, to the extent that it is disputed whether or not the consent
> decree conflicts with the [MOU], the Police League has the right to present its views
> on the subject to the district court have them fully considered in conjunction with
> the district court's decision to approve the consent decree."

 MTI Reply to United States at 4-5 (quoting City of Los Angeles, 288 F.3d at 400)(alteration .  The

Officers Association concludes that, according to the Ninth Circuit, the Officers Association must

show only that the Settlement Agreement and the CBA may conflict, "[o]r, regardless of any

contradictions, the district court must hear and consider the [Officers Association's] views prior

to any approval of a Settlement Agreement."  MTI Reply to United States at 5 (citing City of Los

Angeles, 288 F.3d at 400.  Thus, according to the Officers Association, the United States' argument

that the Ninth Circuit in City of Los Angeles had concluded that the union's interest arose out of

conflicting provisions in the settlement agreement and CBA is a misleading argument.  See MTI

Reply to the United States at 5.

The Officers Association next argues that the litigation may impair its protectable interest.

See MTI Reply to United States at 5.  It states that the United States proffers too high a standard,

---

[6]The MOU appears to be a collective bargaining agreement.  See United States v. City of
L.A., 288 F.3d at 396 (stating that the MOU "governs the terms and conditions under which
members of the Police League are employed by the City").

because it cites a "substantially-affected" standard while omitting the rest of the sentence, which clarifies that a movant who demonstrates that it would be "'substantially affected'" by the litigation "should, as a general rule, be entitled to intervene."  MTI Reply to United States at 5 (quoting Advisory committee notes to Fed. R. Civ. P. 24 (1966 amendment), and citing U.S. MTI Response at 8).  It argues that it need show under rule 24 only that the litigation "'***may*** as a practical matter impair or impede [third-party's] ability to protect its interest.'"  MTI Reply to United States at 6 (quoting WildEarth Guardians v. Nat'l Park Serv., 604 F.3d 1192, 1199 (10th Cir. 2010)(emphasis and alteration added in MTI Reply to United States).  The Officers Association asserts that litigation meets this standard, because the Settlement Agreement, which could alter the bargained-for employment terms and conditions under the CBA despite the Labor Ordinance's requirement that all terms must be negotiated in good faith, may affect the Officers Association's contractual rights under the CBA.  See MTI Reply to United States at 6.

Turning to the alleged conflicts between the Settlement Agreement and the CBA, the Officers Association notes that its Amicus Curiae Brief lists only a "small non-exclusive" "sample" of the conflicts, which it asserts it said in its Amicus Curiae Brief.  MTI Reply to United States at 6 (citing generally Amicus Curiae Brief).  It first addresses the conflict between the Original Settlement Agreement's use-of-force investigation procedures and the CBA's disciplinary procedures.  See MTI Reply to United States at 6-7.  The Officers Association argues that the Settlement Agreement's procedures conflict with the CBA's notice requirement, and it attempts to undermine the United States' counterargument by noting that the United States omitted some of the CBA § 20.1.4, including the sentences stating: "'Prior to any administrative interrogation being conducted sufficient information shall be disclosed to reasonably apprise the officer of the allegations.  This information will be provided to the target officer[s] in writing via

Certified U.S. mail.'"  MTI Reply to United States at 7 (quoting CBA § 20.1.4, at 29).  The Officers Association notes that the mail requirement provides the officer the "opportunity to fully understand the purpose of the investigation and adequately prepare" and that an immediate on scene interrogation does not fulfill the mail requirement.  MTI Reply to United States at 7.  The Officers Association argues that, by stating that use-of-force investigations usually are not administrative investigations, the United States acknowledges that some use-of-force investigations will be administrative investigations, and thus, those investigations must be conducted according to CBA procedures.  See MTI Reply to United States at 7-8.  The Officers Association adds that, even if the Original Settlement Agreement does not forbid a representative from attending the involved officer's on-scene interview, the Original Settlement Agreement does not provide a procedure for when a representative is unavailable.  See MTI Reply to United States at 8.  The Officers Association concludes that the Original Settlement Agreement's on-scene interviews "cannot be conducted properly under this current CBA" and do not adequately protect officers' rights.  MTI Reply to United States at 8.

The Officers Association turns to another conflict -- the Internal Affairs Unit's jurisdiction over criminal investigations in violation of the mandate of CBA § 20.1.8 that "criminal investigations 'shall not be handled by the Internal Affair's Unit.'"  MTI Reply to United States at 8 (quoting CBA § 20.1.8, at 29-30).  The Officers Association states that "[t]here could not be a clearer contradiction between the CBA and the Settlement Agreement."  MTI Reply to United States at 8-9.  The Officers Association asserts that the United States' argument that these terms are consistent, because the Original Settlement Agreement provides protections to officers, and because the Internal Affairs Unit will keep the criminal and administrative investigations cabined, do not resolve the contradiction.  See MTI Reply to United States at 8-9.  The Officers Association

- 46 -

concludes that the United States may not "impede on the [Officers Association's] contractual rights by merely offering 'protections.'"  MTI Reply to United States at 9.

The Officers Association turns to the next conflict -- the Settlement Agreement's creation of the Force Review Board, the early intervention system, the disciplinary matrix, crisis intervention training, and the on-body recording systems without the Officers Association's consent.  See MTI Reply to United States at 9.  The Officers Association argues that these "disciplinary protocols" "are mandatory subjects of collective bargaining" and that, thus, the Officers Association "has a right to protect its interests in these sorts of program that are going to affect working conditions"  MTI Reply to United States at 9 (citing Labor Ordinance § 3-2-7). The Officers Association concludes that, even though it does not have to prove that the Settlement Agreement and the CBA conflict, "[t]here is, at a very minimum, at least a possibility that the [Officers Association's] interest may be impaired," and so Judge Brack should grant it intervention as a matter of right.  MTI Reply to United States at 9.

The Officers Association switches to a new argument -- that its amicus curiae status is insufficient to protect its interests.  See MTI Reply to United States at 10.  It argues that the United States takes Local No. 93 v. Cleveland out of context to argue that the Officers Association has received due process, because the police union in that case "was given the opportunity to intervene, to present evidence, and to discuss its objections as a party in front of the court."  MTI Reply to United States at 10 (citing Local No. 93 v. Cleveland, 478 U.S. at 529; U.S. MTI Response at 22). In contrast, the Officers Association asserts, it has been given the opportunity to submit only an amicus brief, which is insufficient to protect its interest.  See MTI Reply to United States at 10 (citing Coal. of Ariz./N.M. Ctys. v. Dep't of Interior, 100 F.3d at 844 ("The right to file a brief as amicus curiae is no substitute for the right to intervene.")).  The Officers Association concludes

that intervention is necessary to protect its interests.  See MTI Reply to United States at 10.

The Officers Association makes an alternative argument -- that Judge Brack should allow it to intervene permissively under rule 24(b)(1)(B).  See MTI Reply to United States at 10-11.  It argues that it meets the threshold requirement of having a defense or claim of common questions of law or fact, because it "has an interest in defending its members from allegations of police misconduct."  MTI Reply to United States at 11.  Turning to the first factor, the Officers Association argues that its intervention would not cause undue delay or prejudice, because its intervention "would aid the current parties [with the] APOA member's perspectives."  MTI Reply to United States at 11 (citing Arney v. Finney, 967 F.3d 418, 421-22 (10th Cir. 1992)).  Turning to the third factor,[7] the Officers Association asserts that the existing parties do not adequately represent the Officers Association's interest, because Albuquerque is "antagonistic" to it "in the collective bargaining process," and because Albuquerque has a "substantial[ly] different position[] on the Settlement Agreement" than the Officers Association has.  MTI Reply to United States at 11.  Turning to the fourth factor, the Officers Association argues that there is no other adequate remedy available, because, even if the Officers Association sued for breach of contract, the Original Settlement Agreement would impair its contractual right under the CBA, "and it would leave a very interesting question to a court on whether the CBA or the Settlement Agreement is controlling."  MTI Reply to United States at 11.  The Officers Association concludes that Judge Brack should permit it to intervene.  See MTI Reply to United States at 11.

---

[7]The Officers Association does not address the second factor -- whether its "input adds value to the existing litigation."  MTI Reply to United States at 11 (citing Lower Ark. Valley Water Conservancy Dist. v. United States, 252 F.R.D. 687, 609-91 (D. Colo. 2008)(Nottingham, J.).

7.        **MTI MOO.**

On February 19, 2015, Judge Brack granted MTI as a matter of right in the litigation between the United States and Albuquerque.  See MTI MOO at 13 (Brack, J.).  Judge Brack granted the Officers Association's MTI as to the litigation's "remedial" phase.  MTI MOO at 4 (Brack, J.).  Judge Brack deferred ruling, however, on the litigation's "liability" phase.  MTI MOO at 4 (Brack, J.)(citing San Juan Cty. v. United States, 503 F.3d at 1189).

Judge Brack considered the Officers Association's MTI in the action as a matter of right under rule 24(a).  See MTI MOO at 4 (Brack, J.)(citing MTI).  Judge Brack notes both the United States and Albuquerque agreed that the MTI's timeliness and the existing parties' inadequacy of representing the Officers Association's interest rule 24's first and fourth prongs.  MTI MOO at 4 (Brack, J.)(citing Fed. R. Civ. P. 24(a); Coal. of Ariz./N.M. Ctys. v. Dep't of Interior, 100 F.3d at 840.  Both the United States and Albuquerque contested the second and third prongs, which require that "(2) the intervenor claims an interest relating to the property or transaction at issue in the litigation; [and] (3) the intervenor's interest may as a practical matter be impaired or impeded." MTI MOO at 4 (quoting Coal. of Ariz./N.M. Ctys. v. Dep't of Interior, 100 F.3d at 840).

After stating that the Tenth Circuit conflated those two prongs as the "impaired-interest requirement,"[8] Judge Brack first analyzed the Officers Association's interest under the second prong, see MTI MOO at 5 (Brack, J.)(quoting San Juan Cty. v. United States, 503 F.3d at 1190). In reviewing the Tenth Circuit caselaw on this point, Judge Brack reasoned that the "minimal" burden of showing an interest must be "adversely affected by the litigation" stems from the

---

[8]As discussed supra in its Law Regarding section, the Court concludes that the Tenth Circuit analysis includes both whether there is a protected interest and whether that case's disposition will impair that protected interest.

pragmatic need to "involve[e] as many apparently concerned persons as is compatible with efficiency and due process."  MTI MOO at 5 (Brack, J.)(quoting Utah Ass'n of Ctys v. Clinton, 255 F.3d 1246, 1253 (10th Cir. 2001); San Juan Cty. v. United States, 503 F.3d at 1199; Coal. of Ariz./N.M. Ctys. v. Dep't of Interior, 100 F.3d at 841).

Judge Brack rejected Albuquerque's argument that the Officers Association has no interest in this litigation, criticizing Albuquerque's reliance on Floyd v. New York "for the proposition that the union has no significant protectable interest," because the untimeliness and substantive inadequacy of the union's motions affected the court's decision.  MTI MOO at 5 (Brack, J.)(citing 302 F.R.D. 69 at 84, 100, 104, 109, 112).  Here, Judge Brack concluded that there is a "sufficient interest" on the Officers Association's part, because, even though individual officers are not named in the Complaint, the Complaint effectively seeks an injunction against the "the police officers that the City employs."  MTI MOO at 6 (Brack, J.)(citing Complaint ¶ 28(b)-(c), at 7).  Judge Brack concluded that, because the Officers Association is the long-standing "exclusive bargaining representative" of the police officers, and because an injunction could potentially impair those officers' interests, he should permit the Officers Association to intervene.  MTI MOO at 6 (Brack, J.)(citing MTI at 1; PEBA; Labor Ordinance, Albuquerque, N.M., Amended Code of Ordinances § 3-2-1).  Judge Brack stated that the Officers Association has an interest in protecting its CBA with Albuquerque, and that PEBA and Labor Ordinance statutorily protect the CBA.  See MTI MOO at 6 (Brack, J.)(citing PEBA § 10-7E-15; Labor Ordinance §§ 3-2-4 and -7).

Judge Brack next analyzed rule 24's impairment prong, agreeing with the Officers Association that, in addition to contradicting the CBA's terms, "a proposed decree" could impair the Officers Association's right to negotiate the "terms and conditions of its members' employment."  MTI MOO at 7 (Brack, J.).  Judge Brack reasoned that the United States' and

Albuquerque's attempts to read the Original Settlement Agreement consistently with the CBA -- and to persuade the court there is no conflict between the Original Settlement Agreement and the CBA -- belied their recognition that the Original Settlement Agreement could and does conflict with the CBA.  See MTI MOO at 7 (Brack, J.). Nevertheless, Judge Brack focused on the potential for conflict and not on the existence of an actual conflict.  See MTI MOO at 7 (Brack, J.).  He cited an Original Settlement Agreement provision that allows the parties to "jointly modify" it or "implement alternative provisions at any time," concluding that this "*may as a practical matter impair or impede the [] ability to protect its members' interests.*" MTI MOO at 8 (Brack, J.)(citing Original Settlement Agreement ¶ 338, at 102, and quoting Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1116 (emphasis added)).

Judge Brack next addressed Albuquerque's argument that the Officers Association's CBA interest will not be legally impaired, because any consent decree can be implemented under the CBA's management-rights provision.  See MTI MOO at 8 (citing Albuquerque MTI Response at 7-8).  Judge Brack distinguished the case from the case on which Albuquerque relies -- Johnson v. Lodge No. 93, 393 F.3d at 1100-01 -- because "the applicable law is so different for the two phases of litigation."  MTI MOO at 8 (Brack, J.).  In Johnson v. Lodge No. 93, the United States Court of Appeals for the Tenth Circuit denied the union's attempts to block the consent decree between the two original parties and analyzed the legal conflicts at that stage of the litigation.  393 F.3d at 1100-01.  Because in this case the litigation is at a different stage -- the "motion to intervene stage" -- Judge Brack stated that Johnson v. Lodge No. 93 is unhelpful: "The issue at the motion to intervene stage is the *practical* effect of a judgment . . . not the *legally compelled* effect."  MTI MOO at 8 (Brack, J.)(quoting San Juan Cty. v. United States, 503 F.3d at 1200)(emphases in San Juan Cty. v. United States).  Judge Brack, thus, concluded that he should apply New Mexico law

"when the time comes to examine actual conflict," just as the Tenth Circuit in Johnson v. Lodge No. 93 applied Oklahoma law to determine "whether the decree, the union's CBA rights, the union's statutory rights, and the City's management functions . . . created a conflict."  MTI MOO at 8 (Brack, J.)(citing 393 F.3d at 1102).

Judge Brack rejected the United States and Albuquerque's arguments that he should deny the Officers Association's MTI on the grounds that the CBA is set to expire in 2015, because Albuquerque is not able to "unilaterally impose conditions of employment once a CBA has expired."  MTI MOO at 9 (Brack, J.)(quoting Am. Fed. of State v. City of Albuquerque, 304 P.3d 443).  Given the time taken to negotiate the current CBA, Judge Brack speculated that the current CBA may be in effect "for the entire duration of the consent decree."  MTI MOO at 9 (Brack, J.).  He also rejected Albuquerque's suggestion that the Officers Association seek damages in state court if the settlement agreement violates the CBA; such an approach, Judge Brack concludes, would lead to inefficiency and "conflicting interpretations of the consent decree's meaning."  MTI MOO at 9 (Brack, J.).

Judge Brack concluded that the Officers Association has met rule 24(a)'s requirements and granted its motion to intervene as a matter of right, but stressed that "[g]ranting intervention does not mean the Union has the power to veto the proposed [Settlement] Agreement."  MTI MOO at 9 (Brack, J.).  Judge Brack then addressed Albuquerque's alternative argument that, even if the Officers Association meets the requirement of rule 24(a), it has no Article III standing.  See MTI MOO at 10 (Brack, J.).  Judge Brack stated that, under Tenth Circuit caselaw, an intervenor need not have standing "so long as there was Article III standing for the original party on the same side of the litigation as the intervenor."  MTI MOO at 10 (Brack, J.)(quoting San Juan Cty. v. United States, 503 F.3d at 1171)  Judge Brack stated that, now that the Officers Association can intervene

as a party, he "orders the Union to state its formal objections on the record, as a party to the case"

and urges it to "analyze the issues, and in particular the CBA, under New Mexico law and, when

appropriate, the National Labor Relations Act."  MTI MOO at 10 (Brack, J.)(citing Regents of

Univ. of N.M. v. N.M. Fed'n of Teachers, 962 P.2d 1236, 1243 (N.M. 1998)).

        **8.      The Objection.**

        The Officers Association filed its Objection after learning that APD planned to start use-

of-force training for its force investigators.  Objection at 1.  It objects to one provision in the "Use

of Force -- Review and Investigation by the Department" Standing Operating Procedure ("SOP")

§ 2-57, which states: "'Supervisors and FIS detectives shall consider the facts that a reasonable

officer on the scene would have known at the time the officer used force.'"  Objection at 5 (quoting

Albuquerque Police Department Procedural Orders- Use of Force, filed May 28, 2019 (Doc.

447-1).

        First, the Officers Association takes issue with the provision itself.  See Objection at 5.

The Officers Association argues that the provision promotes a subjective review, in contrast to the

other policies' objective reviews.  See Objection at 5.  The Officers Association describes the

provision as "vague" and "undefined."  Objection at 5.  The Officers Association argues that the

provision ignores the officer's "neuropsychology"[9] in a use-of-force situation.  See Objection at 5.

The Officers Association concludes that the provision's "application would disrupt principles of

_____

        [9]Although the motion uses the word "neuropsychology," neuropsychology refers only to
the study of a specific psychology field, "how the brain and the rest of the nervous system influence
a person's cognition and behaviors."   What is Neuropsychology?, Careers in Psychology,
https://careersinpsychology.org/becoming-a-neuropsychologist/   (last   visited   June   12,
2020)("Neuropsychology Description").   Neuropsychology has a particular emphasis on the
effects of injury and illness on the brain's functioning.  See Neuropsychology Description.  The
Court assumes that the Officers Association uses neuropsychology as a synonym for "state of
mind" and reads the Motion accordingly.

due process, obscure disciplinary standards and devolve use of force training and its application into utter confusion."  Objection at 6.

The Officers Association then elaborates on the provision's application, characterizing the application as problematic.  See Objection at 6.  First, the Officers Association contends, it would be difficult to train personnel to determine "what an officer would have known," and there is a lack of published lesson plans about this topic. Objection at 6 (quoting SOP § 2-57).  Next, the Officers Association argues that, because APD is not a homogenous entity with a single reviewing body, "the majority of reviewing supervisors will consistently have differing needs in correcting perceived deficiencies."  Objection at 6.  Further, the Officers Association argues, that application of this provision will result in more information-gathering at the investigative stage, which will "expose[] investigators to discipline."  Objection at 6.  The Officers Association concludes that, read in context, the provision will cause "personal views [to] arbitrarily infect the established standard of review."  Objection at 7.

The Officers Association also objects that the "would have known" standard "contravenes the stated goals for the First Amended [Settlement Agreement], ignores existing law, and artfully avoids the bedrock constitutional principle of 'objectively reasonable.'"  Objection at 7-8 (italics in original).  The Officers Association contends that it agreed to approve SOPs §§ 2-52 to 2-56, because Albuquerque agreed that SOP 2-57 would conform to the objectively reasonable standard. See Objection at 7.  The Officers Association argues that it does not consent to modify First Amended Settlement Agreement's definition of "reasonable force" nor does it consent to modify the standard used to judge reasonable force.  Objection at 7.  The Officers Association next argues that, because "would have known" is in conditional perfect tense, the language encourages "logical equivalences, which in turn necessarily relies on 'what if' explorations" in contravention of the

Supreme Court's guidance in <u>Graham v. Connor</u>, 490 U.S. 386 (1989), guidance to avoid if-then statements.  Objection at 7.

Without citation, the Officers Association argues that a "*use of force* policy must be constitutional, predictable, teachable and consistent," and that this use-of-force policy does not meet any of those criteria.  Objection at 8 (italics in original).  It argues that the Court should not allow Albuquerque to substitute its own use-of-force standard instead of the <u>Graham v. Connor</u> standard.  <u>See</u> Objection at 8.  The Officers Association notes that the provision does not give any guidance as to the inquiry's scope, nor does it give any examples of what an officer "would have known."  Objection at 8.

Turning to its next argument, the Officers Association says that "even assuming that the [provision] is derived from 'qualified immunity' analysis, the clearly established" benchmark governs that test.  Objection at 9.  To support this argument, the Officers Association cites a Tenth Circuit case that states: "'[A]n officer's violation of the Graham reasonableness test is a violation of **clearly established law** if there are no substantial grounds for a reasonable officer to conclude that there was no legitimate justification for acting as she did.'"  Objection at 9 (quoting <u>Buck v. City of Albuquerque</u>, 549 F.3d 1269, 1291 (10th Cir. 2008)(quoting <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1286)(internal quotations omitted in Objection)(bold in Objection only)).  The Officers Association argues that, in contrast, the would-have-known provision encourages speculation.  <u>See</u> Objection at 9.  The Officers Association then summarizes its arguments, concluding with a statement that the <u>Graham v. Connor</u> standard is "a 'best practice' approach in training, investigating and enforcing use of force standards."  Objection at 10.

9.        **The United States Objection Response**.

The United States responds.   See United States' Response to Intervenor's Notice of Objection to Albuquerque Police Department's Use of Force Policy (Doc. 447), filed July 15, 2019 (Doc. 461)("United States Objection Response").   The United States first rebuts the Officers Association's Objection by stating that SOP 2-57 is consistent with Tenth Circuit caselaw and with the Constitution's standards.   See United States Objection Response at 3.   Countering the Officers Association's assertion that the would-have-known standard is inconsistent with Graham v. Connor, the United States notes that Albuquerque's language is the same as the language that the Tenth Circuit uses when it applies Graham v. Connor to a use-of-force case.   See United States Objection Response at 4 (citing Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2008)).   In Weigel v. Broad, "the Tenth Circuit discussed Graham's admonition that a use of force's reasonableness 'must be judged from the perspective of a reasonable officer on the scene'" and concluded "'that a reasonable officer *would have known* that the pressure placed on Mr. Weigel's upper back as he lay on his stomach create a significant risk of asphyxiation and death.'"   United States Objection Response at 4 (quoting Weigel v. Broad, 544 F.3d at 1152-1153)(emphasis in United States Objection Response)).   APD, thus, includes the "would have known" language, because the Tenth Circuit binds APD.   United States Objection Response at 5.   The United States counters the Officers Association's assertion that the language contravenes Graham v. Connor by emphasizing that Weigel v. Broad applies Graham v. Connor.   See United States Objection Response at 5.

In two footnotes, the United States contextualizes the Officers Association's argument. See United States Objection Response at 4 n.4; id. at 5 n.5.   The United States notes that Officers Association is included on an email among the United States, Albuquerque, the Officers Association, and the Monitor, in which they discussed Tenth Circuit caselaw regarding the Graham

v. Connor standard, including Weigel v. Broad.  See United States Objection Response at 4 n.4

(citing Email from United States to the City of Albuquerque, the Officers Association, and the

Monitor at 1-2 (dated January 31, 2019), filed July 15, 2019(Doc. 461-1)("Jan. 31 Email"))).

Moreover, the United States argues, the Officers Association agreed to the "would have known"

language in the same email chain.  See United States Objection Response at 4 n.4 (citing Jan. 31

Email at 1 ("However, as clarification, the Officers Association accepts the language 'knew or

would have known.'")).   The United States concludes that Officers Association's Objection is

irreconcilable with its earlier acceptance and its knowledge of caselaw.   See United States

Objection Response at 5.

        The United States argues that the Officers Association's proposed modification from

"would have known" to "facts known" changes the inquiry from an objective inquiry to a

subjective inquiry in contravention of Graham v. Connor.   United States Objection Response at 5

(citing Graham v. Connor, 490 U.S. at 397 (describing the reasonableness inquiry as "an objective

one")).   The United States notes that the Officers Association's proposed standard could result in

Constitutional violations, because it would sanction uses of force that violate the Constitution, as

long as the officer, whether reasonably or unreasonably, did not "grasp facts that made the force

unlawful."   United States Objection Response at 5.   The United States then asks the Court to

overrule the Officers Association's Objection.   See United States Objection Response at 5.

        The United States then argues that the Officers Association's Objection is untimely.   See

United States Objection Response at 6.   The United States notes that Judge Brack ordered the

parties to file any Objections by January 31, 2019.   See United States Objection Response at 6

(citing Order Granting City of Albuquerque's Unopposed Motion for Extension of Deadlines Set

Forth in the Court's June 6, 2018 Order, filed November 5, 2018 (Doc. 417)(Brack, J.)("Deadlines

Order")).  The United States argues that, because Officers Association did not file its objection until May 28, 2019 -- 117 days after the deadline -- the Court should overrule the Objection.  See United States Objection Response at 6.  Moreover, the United States argues, the United States, Albuquerque, and Dr. Ginger have invested resources predicated on this policy, and new policy changes would prejudice them, which, the United States contends, are other reasons to overrule the Objection.  See United States Objection Response at 6.

### 10.    Albuquerque Objection Response.

Albuquerque responds.  See Albuquerque Objection Response at 1.   Albuquerque summarizes its three arguments: (i) the Officers Association does not properly raise its Objection; (ii) Albuquerque may enact policies that are more stringent than "the minimal constitutional floor set forth in Graham v Connor"; and (iii) the "would have known" language comports with the law. Albuquerque Objection Response at 1.   Albuquerque begins with its first argument.   See Albuquerque Objection Response at 8.

Albuquerque argues that Officers Association's Objection is improperly raised, because (i) neither the CBA nor any court order authorizes the Officers Association to file an Objection; and (ii) the Officers Association files the Objection in an untimely manner.   See Albuquerque Objection Response at 8-9.  Albuquerque argues that, although Judge Brack granted the Officers Association intervenor status, the Officers Association does not have the right to develop and implement policies. See Albuquerque Objection Response at 9.  The Officers Association consents to the CBA, which gives Albuquerque the right to develop and implement policies, and states that "'employees shall be bound by and obey such directives, rules, and regulations insofar as the same do not conflict with the agreement.'"  Albuquerque Objection Response at 9 (quoting CBA §§ 32.1 and 32.2).  The CBA also incorporates an Albuquerque ordinance that "reserves certain powers to

the Mayor and the Mayor's administrative staff, including the powers to 'direct the work of its employees' and to 'manage and exercise judgement on all matters not specifically prohibited by this article or by a collective bargaining agreement.'"   Albuquerque Objection Response at 9 (quoting Revised Ordinances of Albuquerque, New Mexico § 3-2-5(A), (G); and citing CBA § 2.4)).   Albuquerque concludes that the CBA and Revised Ordinances of Albuquerque, New Mexico § 3-2-5(A), (G) reserve power to enact use-of-force policies and use-of-force investigation policies for APD's administrative staff and for Albuquerque.   See Albuquerque Objection Response at 9.

Albuquerque argues that the First Amended Settlement Agreement does not grant the Officers Association the right to object to a policy -- the First Amended Settlement Agreement grants the right to object to the Dr. Ginger's resolutions of policy disputes only to Albuquerque and to the DOJ.   See Albuquerque Objection Response at 10.   Albuquerque argues that, if the Court construes the First Amended Settlement Agreement as permitting Officers Association to object, the Court would be expanding the Officers Association's rights "beyond that allowed by the CBA, federal, state, and local law, and the Court's *Memorandum Opinion and Order* granting the Officers Association intervenor status."   Albuquerque Objection Response at 10 (citing MTI MOO (Brack, J.); Johnson v. Lodge No. 93, 393 F.3d at 1102 (evaluating a union-intervenor' objections to determine whether the use-of-force consent decree was in conflict with a CBA)).   Moreover, the Officers Association has an alternate route to resolve complaints: Albuquerque's Labor-Management Board.   See Albuquerque Objection Response at 10 (citing Revised Ordinances of Albuquerque, New Mexico § 3-2-15).   Albuquerque continues that Officers Association's failure "to do so with regard to this policy demonstrates that the Officers Association

acknowledges that the CBA does not allow the relief the Officers Association now seeks."
Albuquerque Objection Response at 10.

Albuquerque turns to its timeliness argument. See Albuquerque Objection Response at 11.
Albuquerque argues that, if the Court permits the Officers Association to raise its Objection, the
Court should overrule the Objection, because the Officers Association did not file the Objection
in a timely manner. See Albuquerque Objection Response at 11. Albuquerque notes that, although
the entities were discussing policies through January 31, 2019, which is the Objections deadline,
the Officers Association had a responsibility to motion the Court to extend the deadline. See
Albuquerque Objection Response at 11. Albuquerque argues that, although the First Amended
Settlement Agreement does not provide a time limit for filing Objections, the Officers Association
does not have good cause for filing its Objection nearly four months after the deadline. See
Albuquerque Objection Response at 11. Albuquerque emphasizes that this delay prejudices
Albuquerque, which is adhering to the First Amended Settlement Agreement's requirement to
create training programs on the policies. See Albuquerque Objection Response at 11.
Albuquerque notes that the Officers Association knows that Albuquerque is expending time and
resources developing training programs. See Albuquerque Objection Response at 11-12 (citing
Deadlines Order). Albuquerque argues that, moreover, any delay will result in more months of
monitoring, which will come at a cost to Albuquerque. See Albuquerque Objection Response at
11.

Albuquerque then argues that APD "***Can and Must***" adopt a more limiting standard than
the constitutional floor. Albuquerque Objection Response at 12 (emphasis and capitalization in
original)(citing Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1255 (10th Cir.
2008); Smith v. Freland, 954 F.2d 343 347 (6th Cir. 1992); In the Matter of Jonathan Franco,

PB-17-02, 10-11 (Albuquerque Personnel Board, September 13, 2017), filed July 15, 2019 (Doc. 462-6)).   Albuquerque emphasizes that APD's standard benefits both the officers and Albuquerque, because "the higher standard creates a protective space between permitted officer conduct and officer and municipal liability for constitutional violations."  Albuquerque Objection Response at 13 (citing Police Executive Research Forum, PERFS 30 Guiding Principles on the Use of Force at 35, available at https://www.policeforum.org/assets/30%20guiding%20 principles.pdf (last visited February 5, 2020)("PERFS 30 Guiding Principles")).   Albuquerque notes that the First Amended Settlement Agreement limits the use of force in several ways, all of which are more restrictive than the constitutional floor.  See Albuquerque Objection Response at 13 (citing Errata Settlement Agreement ¶¶ 14(a), 14(c), 15, 22, 27, 28,  at 15-18, filed March 9, 2018 (Doc. 356-1)).  Albuquerque argues that, in contrast to its Objection regarding SOP § 2-57, the Officers Association "does not object to provisions throughout the use of force suite of policies that limits the use of force by officers beyond that allowed by Graham's standard, which is telling." Albuquerque Objection Response at 14.  Moreover, Albuquerque notes, the Officers Association does not object to SOP § 2-57-2, which states that: "[A]ny review or investigation of use of force incidents shall consider that officers must at all times comply with the even stricter standards as set forth in Department Policy."  Albuquerque Objection Response at 13 (quoting SOP § 2-57 at 2, filed June 20, 2019 (Doc. 458-6)(alteration in Albuquerque Objection Response).  Albuquerque argues that the Officers Association does not object to that language, because it is "well accepted" that employers can implement a more stringent standard for its employees than the constitutional floor.  Albuquerque Objection Response at 13-14 (citing Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1255 (10th Cir. 2008)).  Albuquerque concludes that Albuquerque and

APD can adopt higher standards than the Graham v. O'Connor and the constitutional floor.  See Albuquerque Objection Response at 13-14.

Albuquerque then argues that the would-have-known standard is objective and clear. First, Albuquerque details Tenth Circuit cases that evaluate a law enforcement officer's reasonableness under a would-have-known standard.  See Albuquerque Objection Response at 15 (citing Weigel v. Broad, 544 F.3d at 1153; Tenorio v. Pitzer, 802 F.3d 1160, 1166 (10th Cir. 2015)(citing Zuchel v. City & Cty. of Denver, 997 F.2d 730 (10th Cir. 1993)).  These cases demonstrate, Albuquerque argues, that the standard is not vague, that law enforcement officers can be trained in this standard, and that this objective test "can be readily applied to measure officer conduct."  Albuquerque Objection Response at 16.

Albuquerque undermines the Officers Association's test by describing it as "**Undefined and Subjective**."  Albuquerque Objection Response at 16 (emphasis and capitalization in original). Albuquerque counters the Officers Association's assertion that the standard should consider "'the neuropsychology of one who is involved in a use of force,'" because considering the officer's thoughts renders the test subjective.  Albuquerque Objection Response at 16 (quoting Objections to APD SOP § 2-57 at 5-6, filed May 28, 2019 (Doc. 447))(alteration added)).  Moreover, according to Albuquerque, SOP § 2-57-2 already directs investigation detectives to "objectively consider the totality of the circumstances," including circumstances that would affect a reasonable officer's neuropsychology.  Albuquerque next argues that, when the Officers Association states that every one of its "'area command[s] has its own personality,'" and, thus, its own needs, the Officers Association is proposing that "each area command should apply its own undefined standards" instead of "a uniform, objective, officer on-scene standard."  Albuquerque Objection Response at 17 (quoting Objections to APD SOP § 2-57 at 6 (alteration added)).  Albuquerque

concludes that the Officers Association's proposition would result in varying, potentially conflicting, standards.  See Albuquerque Objection Response at 17.

      **11.**      **The Objection Reply.**

The Officers Association replies.  See Intervenor's Reply to the Department of Justice and the City of Albuquerque of Albuquerque Responses to its Objection to Use of Force Policy (§ 2-57-2, Standing Operating Procedure), filed August 2, 2019 (Doc. 470)("Objection Reply"). The Officers Association begins with Albuquerque's argument that, according to Settlement Agreement and the "policy development" process, Officers Association is not permitted "to comment on, or object to, a proposed policy after it progresses from the PPRB to the Monitor and DOJ." Objection Reply at 5 (citing Errata Settlement Agreement at ¶¶ 147-48, at 55). The Officers Association states that this limitation restricts its right to seek remedies in court.  See Objection Reply at 5.  The Officers Association notes that it has never directed or encouraged its members to take any action that conflicts with the CBA.  See Objection Reply at 5.  The Officers Association argues that, despite Albuquerque's contention that the First Amended Settlement Agreement neither requires the Officers Association to approve a policy or procedure nor authorizes the Officers Association to object to a policy or procedure, the First Amended Settlement Agreement does not restrict the Officers Association's ability to seek redress from the Court.  See Objection Reply at 5.  The Officers Association notes that Judge Brack granted the Officers Association intervenor status after the parties filed the Settlement Agreement and that the parties did not give the Officers Association  "a meaningful participation in the pre-filing discussions, negotiations and drafting of the Settlement Agreement."  Objection Reply at 5.

The Officers Association then discusses Judge Brack's MTI MOO.  See Objection Reply at 6.  The Officers Association notes that Judge Brack elected not to qualify the Officers

Association's status in his MOO and granted the Officers Association status as a party intervenor "without reservation." Objection Reply at 6. The Officers Association argues that, because Judge Brack did not restrict its status, it is "entitled to litigate fully any issue on the merits as an intervenor." Objection Reply at 6.

The Officers Association then argues that administrative proceedings and PERFS 30 Guiding Principles are inapplicable to the use-of-force investigations. See Objection Reply at 6. The Officers Association undermines Albuquerque's reliance on an administrative proceeding, In the Matter of Jonathan Franco, by arguing that a use-of-force "**investigation**" was not at issue in the proceeding, and thus, the proceeding does not support Albuquerque's argument. Objection Reply at 6-7 (emphasis in Objection Reply). The Officers Association notes that Albuquerque relies on the administrative matter to demonstrate that it has the authority to adopt more stringent standards than the constitutional floor. See Objection Reply at 7. It argues that, although reasonable force "may still violate a policy requiring the 'minimum amount of force necessary,'" "reasonableness must first be judged under the *Graham* standard." See Objection Reply at 7.

The Officers Association then counters Albuquerque's assertion that amending the policies would delay training programs. See Objection Reply at 7-8. The Officers Association argues that it is asking only for two additional words or one amended sentence, and that such changes "should not cause the entire training module to be modified in any way, as none of the remaining policies are affected." Objection Reply at 8. The Officers Association notes that its proposed changes would not delay Albuquerque from starting the use-of-force training in all other areas. See Objection Reply at 8. The Officers Association argues that the United States and Albuquerque draw the conclusion that the delay will prejudice them on the false premise that the training programs do not use the Graham v. Connor standard. See Objection Reply at 8.

The Officers Association then discusses the Graham v. Connor standard in the context of use-of-force investigations, describing the standard as "significan[t]." Objection Reply at 8. In contrast, the Officers Association argues, APD has adopted an "unclear" and "subjective" standard in use-of-force investigations that "has diluted the significance of the Graham v. Connor standard." Objection Reply at 8. The Officers Association argues that "this Court's § 1983 and Fourth Amendment jurisprudence" has deferred to the officer's safety and to "'split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving.'" Objection Reply at 8 (quoting Graham v. Connor, 490 U.S. 386). The Officers Association argues that the United States and Albuquerque are implementing a standard that does not consider the totality of the circumstances at public safety's expense. See Objection Reply at 8.

The Officers Association argues that, even if the Court permits the would-have-known standard, SOP § 2-57-2 still does not have any "clearly established" language. Objection Reply at 8. The Officers Association asserts that this lack of limiting language encourages use-of-force investigators to conduct a subjective review of the facts. See Objection Reply at 8. The Officers Association notes that, in the context of qualified immunity, the Tenth Circuit reviews both "what a reasonable officer would have known or could have known," and whether what a reasonable officer could have known is clearly established. Objection Reply at 8 (citing Weigel v. Broad, 544 F.3d at 1153). The Officers Association reiterates that an officer's reasonableness "is considered from the officer's standpoint." Objection Reply at 8. In contrast to investigators considering the totality of circumstances from the officer's viewpoint, the Officers Association argues, SOP § 2-57-2 "allows an investigator to impute facts into the officer's mental processes, facts unknown to the officer on-scene at the time force was used." Objection Reply at 9. The Officers Association concludes that this standard will result in inconsistent outcomes and "imprecise" training

programs, and "the 'Monday morning quarterback' approach this Court cautioned against in James v. Chavez."  Objection Reply at 9 (citing James v. Chavez, No. CIV 09-0540, 2011 WL, at * 17 (D.N.M. November 9, 2011)(Browning, J)).

12.    **The August 13, 2019 Hearing.**

The Court held a hearing on August 13, 2019.  See Transcript of Proceedings at 1 (taken August 13, 2019), filed September 4, 2019 (Doc. 481)("Aug. 13 Tr.").  Albuquerque clarified that, for the exhibits, the Court should rely on the Intervenor's Second Errata, filed June 20, 2019 (Doc. 458).  See Aug. 13 Tr. at 6:24-7:3 (Court, D'Amato).  Albuquerque offered its first exhibit -- a January, 21, email from Dr. Ginger, detailing his proposed changes to the Officers Association's draft --which the Court labeled as Albuquerque's Hearing Exhibit A.  See Aug. 13 Tr. at 8:17-25 (Van Meter, Court).  Albuquerque offered its second exhibit -- Hearing Exhibit B -- which is a January 25, e-mail from Ms. Martinez to the parties asking to discuss their input the following week.  See Aug. 13 Tr. at 9:7-12 (Van Meter).  Albuquerque offered its third exhibit -- Hearing Exhibit C -- which is Dr. Ginger's proposed resolution draft, attached to a January 25, email from Ms. Martinez.  See Aug. 13 Tr. at 9:20-24 (Van Meter).  Albuquerque then noted that Officers Association's Exhibit 7 is submitted as the approved Policy and Procedure Review Board ("PPRB") draft, but that Exhibit 7 is not the approved PPRB draft but § 2-52's current draft.  See Aug. 13 Tr. at 10:4-18 (Van Meter, Court).  Albuquerque offered the approved PPRB draft as its Exhibit D.  See Aug. 13 Tr. at 10:3-12 (Van Meter, Court).

The Court asked the Officers Association to address the timeliness of its objection.  See Aug. 13 Tr. at 11:1-4 (Court).  After the Officers Association acknowledged it filed its Objection four months after the resolution draft, the Officers Association explained that there was internal conflict within the Officers Association regarding whether to file an objection and what objection

to file.  See Aug. 13 Tr. at 11:13-16 (D'Amato).  The Officers Association elaborated on the internal conflicts, stating that some Officers Association members initially thought that they should "attack" the "entire suite," but gave up "given the procedural history."  Aug. 13 Tr. at 11:18-21 (D'Amato).  The Officers Association agreed to adopt SOP § 2-52 through § 2-56, predicated on "[t]he City of Albuquerque's representation that they would be loyal to" Graham v. Connor.  Aug. 13 Tr. at 12:2-6 (D'Amato).  The Officers Association explained that it spent October, 2018, and November, 2018, discussing the investigation standard in § 2-57, finally narrowing it in April, 2019, to the "one sentence now before the Court."  Aug. 13 Tr. at 12:7-11 (D'Amato).  The Officers Association concluded that "whether it's a satisfactory explanation why the delay, it is the explanation the Officers Association has."  Aug. 13 Tr. at 12:15-17 (D'Amato).

The United States then argued that the issue of timeliness is "dispositive."  Aug. 13 Tr. at 13:5-6 (Ryals).  It stated that, because Judge Brack ordered the parties to file all Objections by January 31, 2019, that order precludes the Court from hearing the Objection.  See Aug. 13 Tr. at 13:7-13 (Ryals, Court).  The Court construed the Officers Association's argument as an extension for time to file its Objection and inquired whether the United States thinks the Officers Association's argument merits an extension.  See Aug. 13 Tr. at 14:2-6 (Court).  The United States answered that the Officers Association filed its Objection four months after the deadline, and, during that interval, APD relied upon the policies in developing their training programs.  See Aug. 13 Tr. at 14:9-12 (Ryals).  When the Court asked the United States to explain the "practical effect" of the delayed Objection on training, the United States deferred to APD.  Aug. 13 Tr. at 14:16-20 (Court, Ryals).  The United States provided its understanding of the delay's prejudicial effect: the officers will have "to go back and review everything else that [they came] up with based on how the force review will now proceed."  Aug. 13 Tr. at 15:3-5 (Ryals).  When the Court asked if the

Objection's filing itself is "slowing anything down," the United States said that it does not know whether the filing is slowing anything.  Aug. 13 Tr. at 15:7-14 (Court, Ryals).

The Court then asked the United States whether, if the Court construes the Objection as a motion to reconsider, the Court should hear the Objection on the merits.  See Aug. 13 Tr. at 15:21-25 (Court).  When the United States said that it "certainly think[s] we should be heard on the merits," the Court questioned why the United States thinks the merits should be reached if it is raising a timeliness issue.  Aug. 13 Tr. at 16:3-6 (Ryals, Court).  The United States clarified that it would like to be heard on the merits if the Court changes the Objections deadline.  See Aug. 13 Tr. at 16:11-13 (Ryals).

Albuquerque then argued the timeliness issue.  See Aug. 13 Tr. at 16:19-22 (Court, Van Meter).  Albuquerque agreed with the United States that the timeliness issue is dispositive, but it clarified that it would like to argue the merits if the Court rules that the Objection is timely.  See Aug. 13 Tr. at 16:23-25 (Van Meter).  It explained that, should the Court sustain the Objection, "[t]he City of Albuquerque will have to revise the policy" and "retrain the policy."  Aug. 13 Tr. at 17:7-11 (Van Meter).  When Albuquerque stated that the "entire department" would need to be retrained, the Court asked why police officers, who are not investigating use-of-force incidents, would have to be retrained.  Aug. 13 Tr. at 17:14-17 (Court).  Albuquerque explained that all police officers receive training about every use-of-force SOP.  See Aug. 13 Tr. at 17:25-18-1 (Van Meter).  Albuquerque explained that, although the officers will "hopefully" not alter what they do in these situations, they have "almost a due process [right] to understand what standard they're being reviewed upon."  Aug. 13 Tr. at 18:15-19 (Van Meter).  Albuquerque then explained that previous policy changes have required Albuquerque to do "gap training," which is "an incredible extra expense" and "an incredible investment of time."  Aug. 13 Tr. at 19:11-16 (Van Meter).

Albuquerque explained the different tiers of the training and noted that the would-have-known standard is "relevant to them all."   Aug. 13 Tr. at 20:12-13 (Van Meter).   Albuquerque acknowledged that it does not know how significantly the change would impact the training programs but emphasized that it already had begun the training process.   See Aug. 13 Tr. at 20:18-25 (Van Meter).

The Court then returned to the Officers Association and asked whether the Officers Association would object to the Court recasting its Objection as a motion to reconsider.   See Aug. 13 Tr. at 22:4-6 (D'Amato).   The Officers Association agreed to the Court reinterpreting its Objection as a motion to reconsider.   See Aug. 13 Tr. at 22:7 (D'Amato).   The Officers Association then noted that APD has not begun training on SOP § 2-57.   See Aug. 13 Tr. at 22:12-16 (D'Amato).   The Court asked the Officers Association whether it agrees with the statement that the delay is not a "big prejudice," because the training on this issue has not begun.   Aug. 13 Tr. at 22:24-23:1 (Court).   The Officers Association responded that not only is the lack of training not prejudicial, but it is unclear even how "one [would] train an investigator on what an officer would have known without some delineation or clarification or limits."   Aug. 13 Tr. at 23:2-6 (D'Amato). The Court reiterated its confusion how to train law enforcement officers on this standard and expressing its concern with the "second-guessing down the road" that could result from the standard.   Aug. 13 Tr. at 23:7-17 (Court).   The Officers Association repeated its concern that the standard will result in investigators second-guessing officers.   See Aug. 13 Tr. at 23:20-23 (D'Amato).

The Court moved to the merits.   See Aug. 13 Tr. at 24:10-12 (Court).   The Court began by posing a hypothetical: if Albuquerque, attempting to be a "national model for city police departments, adopts a set of standards that far exceeded Graham v. Connor, how could the Court

- 69 -

justify striking down those standards?" Aug. 13 Tr. at 24:16 (Court).  See id. at 24:15-20 (Court).

The Officers Association acknowledged that the Court could not strike those standards.  See Aug.

13 Tr. at 24:21-22 (D'Amato).  The Court asked the Officers Association to identify the Court's

authority to strike a standard that exceeds the constitutional floor.  See Aug. 13 Tr. at 25:1-8; id.

at 25:23-25 (Court).  The Officers Association responded that the caselaw cited by Albuquerque

gives the Court authority, not to strike down a standard exceeding the constitutional floor, but to

strike a standard that is vague and does not give a law enforcement officer notice.  See Aug. 13 Tr.

at 25:9-13; 25:16-18 (D'Amato).  The Officers Association reiterated that it is not arguing that the

Court should strike the standard because of its strictness, but that the standard, without any limiting

language, is too vague to provide notice.  See Aug. 13 Tr. at 26:1-12 (D'Amato).  The Officers

Association explained that, if Albuquerque elects to establish a standard that is stricter than

Graham v. Connor, the standard must have clear language and must give the officer notice.  See

Aug. 13 Tr. at 27-1:5 (D'Amato).  The Officers Association notes that SOP §2-57-2 does not

incorporate the officer's perspective. See Aug. 13 Tr. at 27:10-14 (D'Amato).

The Court voiced its confusion on how to train a law enforcement officer on "what he or

she should or should not have known." Aug. 13 Tr. at 28:8-9 (Court).  The Court acknowledged

that the Tenth Circuit caselaw, however, has established that you can train law enforcement

officers on gathering evidence, because there is limited Tenth Circuit caselaw that discusses "when

we begin to penalize officers for an [in]adequate investigation." Aug. 13 Tr. at 28:16 (Court).  See

id. at 28:9-10 (Court).  The Court then asked the Officers Association what language the Officers

Association thinks should be added to the contested sentence.  See Aug. 13 Tr. at 29:1-5 (Court).

The Officers Association responded that it would rewrite the sentence to read:

> Supervisor and investigators analyzing use of force incidents will do so from the perspective of a reasonable officer on scene, and shall consider only the facts and perceptions known by the officer at the time he used force.  They will take into account that which an officer would have known, which was clearly established at the time of the use of force.

Aug. 13 Tr. at 29:6-13 (D'Amato).  When the Court noted that the Officers Association's rewrite omitted language that the other parties want included, Officers Association countered that it wants only limiting language to be added to "would have known."  Aug. 13 Tr. at 29:16-21 (D'Amato).  The addition of "with which was clearly established," they argue, clarifies what officers would known and comports with the qualified immunity standard.  Aug. 13 Tr. at 29:16-25 (D'Amato).  The Court noted that the Officers Association is conflating two different tests -- constitutional violation and clearly established -- and that a constitutional violation determination does not include a clearly established prong.  See Aug. 13 Tr. at 30:4-10 (Court).  In response to the Officers Association noting that Albuquerque relies on qualified immunity cases, the Court reiterated that the clearly established test is not relevant.  See Aug. 13 Tr. at 30:11-20 (D'Amato, Court).

The Officers Association argued that officers should not be subject to the would-have-known standard, because the standard is "so subjective" and "almost like second-guessing, Monday morning quarterbacking an officer."  Aug. 13 Tr. at 31:6-8 (D'Amato).  See id. at 31:3-8 (D'Amato).  Omitting limiting language, the Officers Association argued, also subjects investigators to unfair discipline.  See Aug. 13 Tr. at 31:13-16 (D'Amato).  The Officers Association offered a hypothetical situation in which a law enforcement officer uses force on a man based on false information from the dispatcher that the man has a knife.  See Aug. 13 Tr. at 32:3-10 (D'Amato).  The Officers Association argued

> If [the officer] could articulate a reasonable use of force based on what he perceived, what he actually knew, and then during the investigatory stage he finds out that, or an investigator finds out, that the dispatch contained incorrect

information, and if he had known the correct information, he may have taken different steps, that opens the door for Monday morning quarterbacking or second-guessing an officer based on what he believed was true. But if he would have known it was false, maybe he wouldn't have taken that action, and therefore, subject him to discipline.

Aug. 13 Tr. at 32:10-21 (D'Amato).

The Court said that it cannot identify the source giving it the authority to tell Albuquerque to make policies clearer. See Aug. 13 Tr. at 33:1-:4 (Court). The Officers Association responded with several reasons it believes the Court has this authority: (i) separation of powers between the executive and judicial branches; (ii) the municipal government's policy is "impos[ing]" on the Court's jurisdiction; (iii) due process concerns; (iv) the Court "should intervene" when Albuquerque "rewrite[s] the intent of Graham." Aug. 13 Tr. at 33:9; 17-18. See id. 33:5-19 (D'Amato). The Court said it recently decided a qualified immunity case with facts similar to the Officers Association's hypothetical. See Aug. 13 Tr. at 33:20-34:2 (Court). It noted that it needed the facts to make its decision, and that an investigation that omitted the facts that the officer does not know would be "a real cramped investigation and review." Aug. 13 Tr. at 34:17 (Court). See id. at 34:3-16. The Officers Association clarified that "[i]n no way do we want to limit the investigator's role in ferreting out facts." Aug. 13 Tr. at 34:20-21 (D'Amato). The Officers Association explained its concern that there is no language limiting the scope of what an officer would have known. See Aug. 13 Tr. at 35:3-5 (D'Amato). The Court responded that this concern is the issue: the officer's testimony could establish "the parameters by which he or she would be judged." Aug. 13 Tr. at 35:12. See id. at 35:7-18 (Court). The Officers Association disagreed with the Court and explained that any violation that is clearly established, such as what "is clear in the SOP," would subject the officer to punishment. Aug. 13 Tr. at 35:19-36:2 (D'Amato).

The Court asked the United States to speak on the merits.  See Aug. 13 Tr. at 37:4 (Court).
The United States first addressed the Court's authority to resolve Officers Association's Objection,
pointing to Settlement Agreement ¶ 148, which permits "either party [to] ask the Court to resolve"
any disagreement with the Monitor's resolution.  Aug. 13 Tr. at 37:22 (Court).  See id. at 37:20-24.
(Court).  The United States noted that the parties did not consider adding the Officers Association
as a party to the Settlement Agreement, because the Officers Association was not yet a party to the
case.  See Aug. 13 Tr. at 38:10-18 (Ryle).  The Court responded that it interprets "either party" to
refer to the United States and Albuquerque, the two parties to the Settlement Agreement, Aug. 13
Tr. at 38:3-8 (Court), and the word "either" to suggest that "parties" excludes intervenors and
amici,  Aug. 13 Tr. at 38:23 (Court).  See id. at 38:21-25 (Court).  Agreeing with the Court, the
United States explained that it had not fleshed out this issue, because it believed that the objection's
timeliness and the United States' other arguments resolve the Objection.  See Aug. 13 Tr. at 39:3-9
(Ryle).  It also noted that, while the Officers Association fully participated in Settlement
Agreement, the Court order may not have given Officers Association standing to object.  See Aug.
13 Tr. at 39:10-18 (Ryle).  Turning to the merits, the United State highlighted Weigel v. Broad as
the "operative case."  Aug. 13 Tr. at 39:22 (Ryle).  See id. at 39:21-23 (Ryle).  The United States
explained that the would-have-known standard in Weigel v. Broad is "anchored to evidence," and
that the  Weigel v. Broad officers' training educated them so that they would have known of their
use of force's increased risk of serious injury or death.  Aug. 13 Tr. at 40:5 (Ryle).  See id. at
40:2-11 (Ryle).  The United States argued that Weigel v. Broad supports the proposition that it is
"totally appropriate [] for the APD to examine and consider the training they provided the officers
and the directives that they have given them.  And it's appropriate to characterize that as the
officers would have known, and take those factors into account when evaluating the officers'

conduct." Aug. 13 Tr. at 40:14-19 (Ryle).  The United States argues that Weigel v. Broad supports its language and that its language meets Settlement Agreement's requirement that the policies follow the law.  See Aug. 13 Tr. at 40:20-41:3 (Ryle).

The Court expressed skepticism with the United States' reliance on the Weigel v. Broad language, noting that parties often take a single sentence from opinions out of context and reference it as a rule of law, even when the Court does not mean for it to be a rule of law.  See Aug. 13 Tr. at 41:9-18 (Court).  The United States countered that, although a single sentence can be taken out of context, the Tenth Circuit in Weigel v. Broad used the "would have known" language twice and discussed the standard "in the context of what a reasonable officer would have known."  Aug. 13 Tr. at 42:13.  See id. at 42:15-21 (Ryle).  The United States emphasized that it "goes without saying" that investigations into an officer's use of force includes what the officer knew, but that Albuquerque also will allow the investigator to consider what the officer should have known based on the officer's training and on Albuquerque's policies and directives.  Aug. 13 Tr. at 44:13 (Ryle). See id. at 44:11-19 (Court).

The Court then turned to Albuquerque and asked whether the Court should consider the Officers Association's Objection.  See Aug. 13 Tr. at 45:4-6 (Court).  Albuquerque responded that the Court should not consider the Officers Association's Objections, because other mechanisms are available to the Officers Association to resolve issues.  See Aug. 13 Tr. at 45:10-12 (Van Meter).  Taking issue with the United States' characterization of Judge Brack's order, Albuquerque explained that Judge Brack ruled on the Officers Association's intervention before he approved Settlement Agreement, and thus, the Officers Association already had an opportunity to ask Judge Brack to modify Settlement Agreement ¶¶ 147 and 148.  See Aug. 13 Tr. at 47:1-12 (Van Meter). Albuquerque noted that Judge Brack ruled on several Officers Association objections, using as his

authority the fact that the Officers Association argued that the Settlement Agreement violates the CBA.  See Aug. 13 Tr. at 47:13-17; id. at 48:1-8 (Court, Van Meter).  The Court acknowledged that it had a similar thought: if a party entered into another agreement that violates the CBA, that issue would be a separate one over which the Court does not have any authority.  See Aug. 13 Tr. at 48:16-20 (Court).  Albuquerque noted that the Officers Association has three opportunities to comment on the policy's language as well as the opportunity to dispute issues with Albuquerque at the bargaining table.  See Aug. 13 Tr. at 49:8-11 (Van Meter).  Albuquerque emphasized that, although it has the final say on all issues besides wages or issues related to the CBA, the Officers Association has "every opportunity to have input in the policy development process."  Aug. 13 Tr. at 49:12-13 (Van Meter).  See id. at 49:11-17 (Van Meter).  Albuquerque further noted that, because Judge Brack approved the Settlement Agreement after he ruled on the Officers Association's intervention, the Settlement Agreement's language "either party" refers only to the City and the United States.  Aug. 13 Tr. at 49:22 (Court).  See id. at 49:20-50:6 (Court, Van Meter).  Albuquerque explained to the Court that the objection process is meant for the United States and Albuquerque only to dispute the Monitor's resolution, and the Court's role in the process is to decide disputes between the United States and Albuquerque about the settlement's implementation.  See Aug. 13 Tr. at 50:12-51:23 (Court, Van Meter).  Albuquerque agreed with the Court that it is concerned that parties will appeal to the Court to "micromanage" the process, which will result in delays.  Aug. 13 Tr. at 52:15 (Court).  See id. at 52:9-19 (Van Meter, Court).

Turning to the merits, Albuquerque noted that the Officers Association has proposed three different solutions to the would-have-known language.  See Aug. 13 Tr. at 52:20-23 (Van Meter).  Albuquerque argued that the newest proposed solution, the "clearly established" solution, "confuses the law and the facts."  Aug. 13 Tr. at 53:3 (Van Meter).  See id. at 53:1-5 (Van Meter).

Albuquerque further argued that another proposed solution, that the investigation look only at what the officer knew, is inconsistent with the law.   See Aug. 13 Tr. at 537-11 (Van Meter). Albuquerque highlighted that problem in an email containing that language discussing SOP 2-57, in which Dr. Ginger never approved that proposed language, but instead asked the Officers Association to forward its proposal to other parties.   See Aug. 13 Tr. at 55:12-25 (Van Meter, Court)(citing Email from James Ginger to Fred Mowrer at 1, filed August 2, 2019 (Doc. 470-4)(stating that Dr. Ginger "approve[s] of the recommended changes" and asks Mr. Mowrer to "forward the changes we discussed to the Parties").   At the Court's request, Albuquerque explained that email circulation process, noting that emails in the proposal stage are circulated only to the United States, Mr. Mowrer, Dr. Ginger, and Dr. Ginger's administrative assistant, Laurie Owens. See Aug. 13 Tr. at 56:22-57:5 (Van Meter).   Albuquerque explained that Dr. Ginger "attempted to resolve the issues by drafting a resolution draft," which is typically what Dr. Ginger does when the United States objects to a City policy.   Aug. 13 Tr. at 58:8-9 (Van Meter).   See id. at 13-18 (Van Meter).

Albuquerque then walked the Court through SOP § 2-57 to demonstrate how the Officers Association's argument is wrong.   See Aug. 13 Tr. at 59:8-10.   It noted that Dr. Ginger's resolution draft attached to the Jan. 31 Email is the first time that SOP § 2-57 contains  the "knew or" language.   Aug. 13 Tr. at 59:1.   See id. at 59:15-25 (Van Meter).   Albuquerque did not agree to this proposed language, so Albuquerque met with the United States, the Officers Association, and Dr. Ginger, and proffered the "would have known" language, to which the United States consented, because it is consistent with Tenth Circuit caselaw.   Aug. 13 Tr. at 60:6-12 (Van Meter).   See id. at 60:7-12 (Van Meter).   Albuquerque noted that the Officers Association did not approve of the language during this timeframe, yet it waited four months before filing the Objection.   See Aug.

13 Tr. at 60:15-18 (Van Meter).  The language, thus, was adopted.  See Aug. 13 Tr. at 61:1-2 (Van Meter).

Albuquerque then turned to SOP § 2-57, noting that it does not want to look at the contested sentence in isolation.  See Aug. 13 Tr. at 61:3-5 (Van Meter).  It began by reviewing the force investigation standards, noting that the policy dictates that investigators conduct one-on-one interviews with the involved officers.  See Aug. 13 Tr. at 61:18-62:5 (Van Meter)(citing SOP § 2-57).  Responding to an earlier hypothetical in which an officer received wrong information, Albuquerque showed the Court how its policies ensure that if an officer receives wrong information about the incident, the investigators consider that "wrong information [] what a reasonable officer on the scene would have known."   Aug. 13 Tr. at 63:4-9 (Van Meter).  Albuquerque emphasized that the would-have-known standard resolves material inconsistencies between officers at the scene.  See Aug. 13 Tr. at 63:12-24 (Van Meter).  Albuquerque argued that using "what a reasonable officer on the scene would have known" standard avoids relying on what the officer who used force is contesting if "what the officer is claiming is not what a reasonable officer on scene would have known."  Aug. 13 Tr. at 63:25-64:11 (Van Meter).

Albuquerque countered the Officers Association's claim that its standard is inconsistent with Graham v. Connor.  See Aug. 13 Tr. at 64:21-65:4 (Van Meter).  Albuquerque further notes that the Officers Association's language "ties the City of Albuquerque to an unclear standard." Aug. 13 Tr. at 64:6-7 (Van Meter).  It concluded by clarifying that its officers have received "Tier 1" training, which includes SOP § 2-57, and thus, any amendment to the policies would require Albuquerque to retrain the officers on any new standard.  Aug. 13 Tr. at 65:9-17 (Van Meter).  See Aug. 13 Tr. at 19:21-22 (Van Meter)(describing Tier 1 training as a "video introduction")

- 77 -

The Court turned to Dr. Ginger, who admitted that this is the first time he has had to opine on a policy to the Court, because the parties were able to resolve issues in the previous three processes with which Dr. Ginger was involved.  See Aug. 13 Tr. at 66:4-11 (Ginger).  Dr. Ginger emphasized that, although he is concerned with officer safety, because he is a former police officer, he approves the would-have-known standard, which is a standard that "has been used for decades." Aug. 13 Tr. at 67:50 (Ginger).  See id. at 66:21-67:11 (Ginger).  Dr. Ginger describes the standard as "anchored on objective articulatable evidence that is required to support an officer's actions." Aug. 13 Tr. at 68:18-19 (Ginger).  In response to the Court asking Dr. Ginger what he thought the Court's role should be, Dr. Ginger stated that, as long as the Officers Association can show how the policy has a "distinct and articulable negative impact on the Officers Association members, the Officers Association should be able to go to the Court when it has exhausted all of its other options."  Aug. 13 Tr. at  69:16 (Ginger).  See id. at 69:11:16 (Ginger).   Dr. Ginger notes that language similar to the language at issue "has been used in every use of force development process" that he has overseen.  Aug. 13 Tr. 69:23-24 (Ginger).  See id. at 69:22-70:1 (Ginger).

The Court allowed the amici to speak, starting with the American Civil Liberties Union. See Aug. 13 Tr. at 70:8-9 (Court).  The American Civil Liberties Union asked the Court to deny the Officers Association's objection, because Graham v. Connor is the minimum, and not the maximum, standard.  See Aug. 13 Tr. at 71:7-12 (Haidle).  The McClendon Subclass Members then spoke,[10] stating that the Court does not have the authority to consider the Officers

---

[10]The McClendon Subclass is an amicus curiae comprised of individuals who are part of the McClendon, et al. v. City of Albuquerque, et al., No. 95-24 JAP/KBM, lawsuit.  See Entry of Appearance at 1, filed January 14, 2015 (Doc. 52).  The members are "people who have mental and/or developmental disabilities who are detained by the Albuquerque police department."

Association's Objection, because none of Albuquerque, the Constitution, any federal statue, or the Settlement Agreement authorize the Court to hear this Objection.  See Aug. 13 Tr. at 72:16-22 (Cubra).  The McClendon Subclass Members noted that the Court had delegated some of its authority to Dr. Ginger to resolve disputes, and that, because Dr. Ginger has made a decision, "[t]hat's the end of the conversation in terms of discretion, except as set forth in the Consent Decree, and, of course, your inherent authority."  Aug. 13 Tr. at 73:25-74:3 (Cubra). See Aug. 13 Tr. at 73:17-74:3 (Cubra).  The McClendon Subclass Members acknowledge that, had the Officers Association brought a constitutional or federal law violation claim, the Court could rule on that claim.  See Aug. 13 Tr. at 74:4-74:7 (Cubra).  The McClendon Subclass Members note, for future reference, that the Court can resolve an objection from the United States or Albuquerque under Settlement Agreement ¶ 148.  See Aug. 13 Tr. at 75:13-24 (Cubra).

The Civilian Police Oversight Agency ("CPOA") spoke next.[11]  See Aug. 13 Tr. at 77:9-12 (Harness).  The CPOA stated that, after reviewing the Officers Association's Objection, they oppose the Objection.  See Aug. 13 Tr. at 77:13-20 (Harness).  The Community Coalition then spoke.  See Aug. 13 Tr. at 78:24-25 (Court).  The Community Coalition voiced its support for Albuquerque's standard, stating that it sends a "message" "to the community about the change that has come about because of this process."  Aug. 13 Tr. at 78:11-13 (Mathewson).  See id. at 74:4-14 (Mathewson).  The Community Coalition emphasized that, although law enforcement officers will be held to a higher standard, they will not need to change "how they go about policing."  Aug. 13 Tr. at 78:17-18 (Mathewson).  See id. at 78:14-20 (Mathewson).

---

[11]The CPOA oversees APD and gives APD policy guidance.  See Civilian Police Oversight Agency, City of Albuquerque, https://www.cabq.gov/cpoa (last visited May 27, 2020).

The Officers Association directed the Court to Dr. Ginger's email chain, noting that Dr. Ginger stated that he accidentally typed SOP § 2-56 instead of SOP § 2-57, and that, therefore, Ginger approved SOP § 2-57 and not SOP § 2-56.  See Aug. 13 Tr. at 78:18-79:4 (D'Amato, Court).  The Officers Association reiterated that Judge Brack granted it full intervenor status and that thus the Officers Association should be treated the same as the other parties.  See Aug. 13 Tr. at 80:25-81:1 (D'Amato)(citing Reply at 6 (citing Wright & Miller, 7C Fed. Prac. & Proc. Civ)). The Officers Association explained that the McClendon Subclass Members "represented, and the Court will see on its second amended Settlement Agreement, that, in fact Officers Association is a signatory to the Settlement Agreement."  Aug. 13 Tr. at 81:8-10 (D'Amato).  Thus, the Officers Association argued, Albuquerque is incorrect that the Officers Association has standing only as to issues involving the CBA.  See Aug. 13 Tr. at 81:10-13 (D'Amato). The Officers Association noted that it has "been quite amenable to resolution through Dr. Ginger's process."  See Aug. 13 Tr. at 81:16-18 (D'Amato).  The Officers Association urged the Court to see the importance of the use-of-force policy for the Officers Association, even if the Court concludes that the Officers Association has no standing to object to anything outside of the CBA.  See Aug. 13 Tr. at 82:1-8 (D'Amato).  The Officers Association concluded by asking the Court to "at least give us standing to argue that which affects our membership."  Aug. 13 Tr. at 82:12-15 (D'Amato).

The Court responded.  See Aug. 13 Tr. at 82:17 (Court).  The Court declined to sustain or overrule the Objection at the hearing, although it noted that it is likely to overrule the Objection. See Aug. 13 Tr. at 82:19-21.   The Court mused that, to reach the merits, it could characterize the Objection as a motion to reconsider SOP § 2-57, see Aug. 13 Tr. at 83:2-3 (Court), but stated that the parties need to respect the deadlines, see Aug. 13 Tr. at 83:4-6 (Court).  The Court stated that its "initial thought is that [it] will not be receptive to entertaining objections from the" Officers

Association and encourages the Officers Association to "use [its] jawboning powers" with the United States, Albuquerque, and Dr. Ginger.  Aug. 13 Tr. at 83:18-21, 23 (Court).  See id. at 83:15-25 (Court).  The Court said that it is inclined to say that only the United States and Albuquerque are parties to the Settlement Agreement and that it is not inclined to exercise its judicial power to order "those two parties to do something they have not agreed to do."  Aug. 13 Tr. at 84:6-7 (Court).  See id. at 84:1-11 (Court).  The Court turned to the merits, explaining that it thinks Albuquerque can impose a standard that exceeds the constitutional floor, and that it does not consider its role to be to rewrite policies and rules.  See Aug. 13 Tr. at 84:12-24 (Court).  The Court concluded by overruling the objection and leaving the policy as is.  See Aug. 13 Tr. at 85:9-10 (Court).

### 13.     The Second MTI.

The Officers Association asks the Court to permit it to intervene as a party to the lawsuit under ¶ 148 of the Second Amended and Restated Court-Approved Settlement Agreement, filed July 30, 2019 (Doc. 465-1)("Second Amended Settlement Agreement")).  See Memorandum in Support of Albuquerque Police Officers Association's Party Status at 1, 9, filed December 6, 2019 (Doc. 498)("Second MTI").  On May 28, 2019, the Officers Association filed Objections to a new use-of-force policy adopted by the Albuquerque Police Department.  See Second MTI at 2.  The Officers Association argues the new use-of-force policy would place its members in danger of disciplinary actions as a result of "hindsight reviews" and violate both established caselaw and Officers Association members' contractual rights.  Second MTI at 2 (citing Graham v. Connor, 490 U.S. 386 (1989)).

The Officers Association says that, at oral argument on August 13, 2019, the Court questioned whether the Officers Association had standing to file an objection under ¶ 148 of the

Settlement Agreement, which states that "either party" may ask the Court to resolve a matter. Second MTI at 2. The Officers Association reports that, at the August 13, 2019, hearing, the United States "admitted to the Court" that the Officers Association was not yet a party to the case when ¶ 148 was written, and thus ¶ 148 does not contemplate the Officers Association as a party. See Second MTI at 2. According to the Officers Association, the United States suggested that, although the Officers Association had participated in the use-of-force policy's development, "this may not have elevated its standing to object under the Court's Order." Second MTI at 2. The Officers Association states that Albuquerque argued that SOP § 2-57 does not violate the CBA, which "was [Judge Brack's] concern when it allowed the [Officers Association] to intervene" and that the Officers Association would have recourse to a Prohibited Practice Complaint if Albuquerque violated the Officers Association's rights. Second MTI at 3. The Officers Association attempts to refute this argument by citing Judge Brack's comments that it would be inefficient for the Officers Association to seek relief in another court. See Second MTI at 3 (citing MTI MOO at 9 (Brack, J.)). The Officers Association reiterates Dr. Ginger's assessment that the Officers Association should have "some outlet to the Court when all the other avenues have been exhausted . . . but that doesn't remove some sort of burden of proof to show where [sic] it is we are trying to do has a distinct and negative impact on the members of the APOA." Second MTI at 3 (quoting Aug. 13, 2019 Tr. at 69:11-13 (Ginger)).

The Officers Association argues that its right to intervene and "to participate in this matter as a full party . . . was granted by the Court without restriction." Second MTI at 4 (citing MTI MOO (Brack, J.); Original Settlement Agreement MOO). The Officers Association reiterates that Judge Brack granted the Officers Association's motion to intervene as a matter of right to allow the final Settlement Agreement to "fully address" the Officers Association's concerns. Second

MTI at 4 (citing MTI MOO (Brack, J.)).  Judge Brack ordered the Officer's Association to "state

its formal objections on the record, 'as a party to the case,'"  Second MTI at 4 (quoting MTI MOO

(Brack, J.)), and repeated this position in its Original Settlement Agreement MOO, see Second

MTI at 4 (citing Original Settlement Agreement MOO at 14(c)).  The Officers Association cites

Judge Brack for the proposition that "the Union has a right to present objections to the proposed

agreement."  Second MTI at 4 (citing MTI MOO (Brack, J.); Local No. 93 v. Cleveland, 478 U.S.

at 519).  It also notes that Judge Brack would "not approve provisions of the agreement that directly

conflict with the Union[']s Collective Bargaining Agreement . . . or State law."  Second MTI at 5

(citing Johnson v. Lodge No. 93, 393 F.3d at 1107-08).

The Officers Association notes that Judge Brack concluded that the Original Settlement

Agreement's ¶ 338, which provides for the parties' ability to make changes to the Original

Settlement Agreement, to be another factor favoring the Officers Association's intervention as a

party.  See Second MTI at 5 (citing MTI MOO (Brack, J.)).  According to the Officers Association,

such status would ensure the Officers Association had "sufficient basis to object" to changes in

the Original Settlement Agreement and would be consistent with the rule that "parties who choose

to resolve litigation through settlement may not dispose of the claims of a third party, and . . . may

not impose duties or obligations on a third party without that party's agreement."  Second MTI at

5 (quoting Local No. 93 v. Cleveland, 478 U.S. 501 at 529).  According to the Officers Association,

Judge Brack concluded that the modification process laid out in ¶ 338 would not impair Officers

Associations interests, because the Officers Association's party status would ensure that the

Officers Association has "notice and an opportunity to respond" and that the Officers Association

would be able to "file its objections, or its intent to file an objection, within 40 days of the proposed

modification."  Second MTI at 5 (quoting Original Settlement Agreement MOO at 28).  The

Officers Association argues that these rulings demonstrate that Judge Brack envisioned the Officers Association's participation as a party in the Original Settlement Agreement and envisioned the Officers Association's use of ¶ 148 to object to the other parties' actions.  See Second MTI at 5-6.

The Officers Association next addresses the Court's inquiry whether the wording of "either party" in ¶ 148 refers only to the United States and Albuquerque and, therefore, precludes the Officers Association's Objections pursuant to ¶ 148.  Second MTI at 6.  The Officers Association states that "the Court has already ruled on this matter" and adds that "provision 338 was one of the reasons to permit the APOA to intervene."  Second MTI at 6 (citing Original Settlement Agreement MOO at 25).  In addition, the Officers Association notes that Albuquerque and the United States drafted the wording of "either party" in ¶ 148 before Judge Brack admitted the Officers Association as a party.

Next, the Officers Association invokes judicial estoppel in support of its assertion of full party status, arguing that "[j]udicial estoppel prevents a party who has successfully assumed a certain position in judicial proceedings from then assuming an inconsistent position, especially if doing so prejudices a party who has acquiesced in the former position."  Second MTI at 6 (citing S.W. Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co., 2006-NMCA-151, ¶ 18, 148 P.3d 806; State v. St. Cloud, 465 N.W.2d 177 (S.D. 1991)).  The Officers Association states that a party "cannot play 'fast and loose' with the Court by changing legal positions in the midst of a suit."  Second MTI at 6-7 (quoting Citizens Bank v. C & H Constr. & Paving Co., 1976-NMCA-063, ¶ 43, 552 P.2d 796, 803).  It points out that neither the United States nor Albuquerque appealed "this Court's ruling that the APOA participate as a party, to include the APOA's participation concerning changes that would be made to the Settlement Agreement pursuant to paragraph 338."

Second MTI at 7.  Furthermore, the Officers Association asserts that it was consulted at least twice on modifications to the First Amended Settlement Agreement in the last year, and neither the United States nor Albuquerque objected to its June 2018 intervention under the First Amended Settlement Agreement ¶ 148 regarding the United States' proposed promotional policy.  See Second MTI at 7.  It notes that Judge Brack allowed the Officers Association to brief fully the matter and issued an order granting partial relief to the Officers Association.  See Second MTI at 7.  The Officers Association argues that the parties' "failure to object to the APOA's use of paragraph 148 to file its objection concerning the promotion policy" provides a telling insight into the parties' interpretation of Judge Brack's order on the Officers Association's status.  Second MTI at 7.

The Officers Association next argues that in the four-and-a-half years of negotiation, the United States, Albuquerque, and Judge Brack have not put the Officers Association on notice that the Original and First Amended Settlement Agreements limit or restrict its participatory status.  See Second MTI at 8.  Any objections to its status should have been raised at the beginning of the proceedings, the Officers Association argues, and the Officers Association has relied on its position as a party throughout this time.  See Second MTI at 8.  Over the United States' and Albuquerque's opposition, Judge Brack granted the Officers Association full party status to "[e]nsure the Court could properly enforce the Order and . . . allow the APOA to protect its CBA and to participate in any modification of the [Settlement Agreement]."  Second MTI at 8.

Finally, the Officers Association raises the law-of-the-case doctrine: it argues that because Judge Brack has already decided the Officers Association's party status, new arguments to limit it "relate to the same issues recurring within the same suit."  Second MTI at 9 (citing Alba v. Hayden, 2010-NMCA-037, 237 P.3d 767; Cordova v. Larsen, 2004-NMCA-87, ¶ 10, 94 P.3d 830; United

States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997)).  Similarly, the Officers Association argues that the law-of-the-case doctrine applies, because Judge Brack, acting for the District of New Mexico, has "already interpreted wording in paragraph 338 that is substantially similar to the wording in paragraph 148" and has permitted the APOA to "use paragraph 148 to challenge a policy issued by the City."   Second MTI at 9.

**14.    United States Second MTI Response.**

The United States responds. The United States' Response to Memorandum of Intervenor Albuquerque Police Officers Association at 1, filed December 19, 2019 (Doc. 500)("United States Second MTI Response").   While the United States acknowledges the Officers Association's participation as an intervenor over the last five years, it considers the Officers Association's intervention "limited to the protection of its members' collective bargaining rights" and agrees with the Court's oral ruling that the Officers Association cannot object to an APD policy, because it is not a party to the First Amended Settlement Agreement.  United States Second MTI Response at 1.  The United States affirms the value of the Officers Association's participation in the process so far, particularly in terms of: (i) its ability to raise issues that affect APD officers' safety and legal and constitutional rights; and (ii) its role in communicating with officers about the Settlement Agreement.  See United States Second MTI Response at 2.  The United States defines the issue not as whether the Officers Association can continue to assist the parties and Ginger with the Second Amended Settlement Agreement's implementation but "whether the Officers Association, as an intervenor, can seek relief from the Court when APD institutes a policy that the Officers Association finds objectionable."  United States Second MTI Response at 2.

The United States notes that this question arose four months after the finalization of SOP § 2-57, when the Officers Association filed a notice objecting to one sentence in the policy.  United

States Second MTI Response at 2 (citing Jan. 31 Email at 1-2; Objection at 2-3).  The United States notes that, after responses from and replies by the United States, Albuquerque, and the Officers Association, the Court held a hearing on the Officers Association's Objection, which it overruled from the bench.  See United States Second MTI Response at 3 (citing Aug. 13 Tr. at 84-85).  The United States notes that the Court's "inclination 'to take a position that only the City and the United States are parties to this agreement'" and the Court's reticence to exercise "raw judicial power" by "telling those two parties to do something that they have not agreed to do" are correct.  United States Second MTI Response at 3 (quoting Tr. at 84:5-7 (Court)).  The United States characterizes the Court's oral ruling on the Officers Association's Objection as "consistent with the terms of the Settlement Agreement, which defines the parties to the agreement as the City of Albuquerque and the United States."  United States Second MTI Response at 3.  The United States contends that the Court's decision "finds ample support in the Federal Rules of Civil Procedure and cases in the Tenth Circuit."  United States Second MTI Response at 3.  The United States makes two primary points in its argument: (i) the Officers Association is not a party to the Second Amended Settlement Agreement; and (ii) the Officers Association's SOP Objections are outside its scope of rights as an intervenor, which are limited to protecting its CBA.  See United States Second MTI Response at 5-6.

First, the United States argues that the Officers Association is not a party to the Second Amended Settlement Agreement by referring to its text, which defines the parties as "the United States of America and the City of Albuquerque."  United States Second MTI Response at 3 (quoting Second Amended Settlement Agreement at 1).  It notes that the Second Settlement Agreement assigns the parties "numerous rights and responsibilities," including the "right to seek relief from the Court regarding disagreements about APD's Settlement Agreement-related

policies" and did not modify these terms when it granted the Officers Association's MTI.  United States Second MTI Response at 4 (citing Second Amended Settlement Agreement ¶ 148; MTI MOO (Brack, J.)).  Rather, the United States contends, Judge Brack granted the Officers Association's MTI only because of the Officers Association's bargaining relationship with Albuquerque, recognizing its interest in "ensuring the integrity" of the CBA, United States Second MTI Response at 4 (citing Original Settlement Agreement MOO at 14; MTI MOO at 6 (Brack, J.)), and by granting the MTI, Brack did not give "the Union . . . the power to veto the proposed Agreement," United States Second MTI Response at 4 (citing MTI MOO at 9 (Brack, J.)).

Second, the United States argues that the Officers Association's policy objections were "outside the scope of its rights as an intervenor."  United States Second MTI Response at 4.  It argues that an "intervention of right . . . may be subject to appropriate conditions or restrictions . . .," and the court may "impose appropriate conditions on an intervenor."  United States Second MTI Response at 4 (quoting advisory committee notes to Fed. R. Civ. P. 24 (1966 Amendment), and citing Swelpi, LP v. Mora Cty., N.M., 14-CV-0035 JB/SCY, 2014 WL 6983288, *46 n. 20 (D.N.M. Dec. 5, 2014)(Browning, J.)).  The United States also cites Tenth Circuit caselaw that permits district courts "broad discretion to set conditions and restrictions on the scope of intervention," and for affirming district court rulings "limiting intervenors' roles in cases involving consent decrees."  United States Second MTI Response at 5 (citing San Juan Cty. v. United States, 503 F.3d at 1189; Johnson v. Lodge No. 93, 393 F.3d at 1108).  The United States "welcomes the Officers Association's continued participation . . . as an intervenor and values its perspectives and insights" but disagrees that this involvement should extend to objecting to an APD policy that is unrelated to its interest in collective bargaining rights.  United States Second MTI Response at 5.

In support of this argument, the United States asserts that Judge Brack did not extend the Officers Association's rights as an intervenor "to issues beyond the CBA" when the Officers Association raised objections to the Original Settlement Agreement based on purported conflicts with the CBA.  United States Second MTI Response at 5-6 (citing Intervenor's Objections to the Proposed Settlement Agreement, filed March 5, 2015 (Doc. 105)("Officers Association's Settlement Agreement Objections"); Settlement Agreement MOO at 15).  According to the United States, Judge Brack reviewed the Officers Association's Objections and determined that the Original Settlement Agreement did not conflict with the CBA or state law before confirming it.  United States Second MTI Response at 6 (citing Original Settlement Agreement MOO at 14-28).

In terms of the Officers Association's objection to SOP § 2-57, the United States notes that the Officers Association has not asserted any conflict between the CBA and SOP § 2-57, but "objected to [only] one sentence in the policy on the ground that it was inconsistent with the law."  United States Second MTI Response at 6 (citing Objections; Objection Reply).  The United States notes that the Officers Association argued for the first time in its December 2019 Second MTI that there is a conflict between SOP § 2-57 and the Officers Association members' "contract rights," but the United States argues that the Officers Association did not identify a specific CBA.  United States Second MTI Response at 6 n.4 (citing Officers Association Memo at 2).  Because the Officers Association does not raise the CBA in its arguments against SOP § 2-57 at the August, 2019, hearing, the United States asserts that the Court "appropriately ruled" that the Officers Association's objection to SOP § 2-57 was beyond the scope of the Officers Association's intervention.  See United States Second MTI Response at 6.

15.    __Albuquerque Second MTI Response__.

Albuquerque responds.    See City of Albuquerque's Response to Intervenor's Memorandum in Support of Albuquerque Police Officers Association's Party Status at 1, filed December 20, 2019 (Doc. 501)("Albuquerque Second MTI Response").   Albuquerque urges the Court to deny Officers Association's Objection to SOP § 2-57.   While the Officers Association objects to the proposed use-of-force standard -- "what a reasonable officer would have known" -- Albuquerque counters that this standard is drawn from controlling Supreme Court and Tenth Circuit caselaw.  Albuquerque Second MTI Response at 2 (citing Graham v. Connor, 490 U.S. at 386; Weigel v. Broad, 544 F.3d at 1152-53).   Albuquerque notes that APD "has now delivered most of the training on the use of force . . . policies," and that they will be operative in January 2020.  Albuquerque Second MTI Response at 2.

Albuquerque argues that caselaw involving a party intervening in a case with a settlement agreement "generally focuses on the party's interests regarding objecting to the consent decree itself," but this intervention "does not mean that it can veto the settlement," so long as "the settlement is reasonable, fair, and consistent with [federal law]."   Albuquerque Second MTI Response at 3 (citing WildEarth Guardians v. U.S. Forest Serv., 778 F. Supp. 2d at 1149). Albuquerque cites the Court's holding in WildEarth Guardians v. United States Forest Service for the rule that a "non-consenting intervenor may object to the approval of a settlement agreement if the decree adversely affects its legal rights or interests."   Albuquerque Second MTI Response at 3 (citing WildEarth Guardians v. U.S. Forest Serv., 778 F. Supp. 2d at 1149).  Albuquerque also refers to Johnson v. Lodge No. 93, where the Tenth Circuit denied the union-intervenor's objections to the Settlement Agreement, because state law did not give the union the "unfettered right" to "insist on particular terms and conditions of employment, and to then arbitrate the City's

failure to acquiesce to those particular terms." Albuquerque Second MTI Response at 3 (quoting Johnson v. Lodge No. 93, 393 F.3d at 1104-07).

Albuquerque urges the Court to decide whether the Labor Ordinance or the CBA provide grounds for the Officers Association's Objection before the Court turns to the Objection's merits. See Albuquerque Second MTI Response at 3-4. Where the intervenor is not a party to the settlement agreement and fails to meet traditional standing requirements, Albuquerque contends that the intervenor cannot object to the agreement. Albuquerque Second MTI Response at 4 (citing N.M. ex rel. State Eng'r v. Carson, 908 F.3d 659, 665-66 (10th Cir. 2018)). Albuquerque argues that, although the Officers Association's objection is to a SOP and not to the Settlement Agreement, state law, the Labor Ordinance and the CBA all grant it the right to "develop and implement such directives[,] rules[,] and regulations as may be deemed necessary to the employer for the conduct of affairs of the Department." Albuquerque Second MTI Response at 4 (quoting CBA § 32.1, at 41)). Albuquerque argues that the Second Amended Settlement Agreement gives the United States and Dr. Ginger -- but not the Officers Association -- the right to bring policy objections to the Court, and in granting the Officers Association's motion to intervene, Judge Brack did not expand the Officers Association's authority. See Albuquerque Second MTI Response at 4-5.

Albuquerque contends that the Officers Association's objection to SOP § 2-57 lacks support of any showing that "the provision violates state law or the CBA," or that it "imposes a new obligation on the Officers' Association." Albuquerque Second MTI Response at 5 (citing Johnson v. Lodge No. 93, 393 F.3d at 1105-06). Further, Albuquerque notes that the Officers Association did not demonstrate: (i) any injury in fact to itself or its members; (ii) a causal connection between the injury and the conduct in question; (iii) that a favorable decision would

redress that injury; or (iv) that the Officers Association suffered any legal prejudice.   See Albuquerque Second MTI Response at 5 (citing N.M. ex rel. State Eng'r v. Carson, 908 F. 3d at 666).  Albuquerque quotes the Tenth Circuit: "'If the applicant is granted intervention because of an interest that may be injured by the litigation, it does not follow that the intervention must extend to matters not affecting that interest.'"  Albuquerque Second MTI Response at 5 (quoting San Juan Cty. v. United States, 503 F.3d at 1189).

Albuquerque next argues that the United States and Dr. Ginger adequately represent any interest the Officers Association may have in ensuring "policies enacted by the APD are consistent with the Settlement Agreement and the law": it contends this interest is the only basis for an objection "pursuant to paragraphs 147 and 148 of the Settlement Agreement."  Albuquerque Second MTI Response at 5.  Albuquerque argues that "[]ithout a nexus to the rights protected by the CBA," the Officers Association cannot demonstrate an interest that justifies bringing an objection before the Court.  Albuquerque Second MTI Response at 5.

With regard to previous court orders on the Officers Association's party status, Albuquerque argues that, while Judge Brack granted the Officers Association the "right to present objections to the proposed Agreement," he overruled those objections, because he did "not find any direct conflicts with the CBA, state, or federal law."  Albuquerque Second MTI Response at 6 (quoting Original Settlement Agreement MOO at 14-15, 29).  Albuquerque points out that the Officers Association did not object to the Second Amended Settlement Agreement's ¶¶ 147 or 148, which refer to the United States and Albuquerque as sole parties to the Agreement: "[I]f either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter."  Albuquerque Second MTI Response at 6 (quoting Second Amended Settlement Agreement ¶ 148); Albuquerque Second MTI Response at 6 n. 4.  Albuquerque notes

that, in addition to the Officers Association's lack of objection to ¶¶ 147 and 148, Judge Brack did not order the Officers Association a party to the Original Settlement Agreement, and therefore the terms "party" and "parties" in the Second Amended Settlement Agreement do not include the Officers Association.   Albuquerque's Response at 6 (quoting Second Amended Settlement Agreement ¶¶ 147-148).

Albuquerque argues that when Judge Brack ruled that "[n]othing in this court-approved Agreement supersedes the CBA," Judge Brack "did not grant the APOA greater rights than it has pursuant to the CBA," or alter its terms.   Albuquerque Second MTI Response at 6 (quoting Original Settlement Agreement MOO at 18).   According to Albuquerque, allowing the Officers Association to use ¶ 148 to object to a policy already approved by the DOJ, Albuquerque, and the Monitor, would frustrate the employer's right under the Labor Ordinance and CBA "to develop such directives[,] rules[,] and regulations as may be deemed necessary to the employer."   Albuquerque Second MTI Response at 6 (quoting CBA § 32.1)(internal quotation marks omitted)(alterations in Second MTI Response).   Albuquerque argues that allowing the Officers Association to read ¶ 148 in this way would contradict Judge Brack's holding that the Original Settlement Agreement does not supersede the CBA.   See Albuquerque Second MTI Response at 7.   Albuquerque emphasizes its rights under the Labor Ordinance and the CBA to "manage and . . . exercise judgment on all matters" and to "develop and implement Department policy" so long as it does so consistently with the CBA and state law.   Albuquerque Second MTI Response at 7 (quoting Original Settlement Agreement MOO at 15, 27 (Brack, J.)(quoting Labor Ordinance § 3-2-5; CBA §§ 2.5, 32.1)).

Addressing the Officers Association's argument that it has "full party" status, Albuquerque responds that this position is "inconsistent with the case law upon which the Court relied in exercising its discretion to allow the APOA to intervene."   Albuquerque Second MTI Response at

7 (citing Second MTI at 4).  For example, in <u>Local No. 93, International Association of Firefighters</u> <u>v. Cleveland</u>, the Supreme Court "declined to consider arguments where the union did not demonstrate that the consent decree impinged on the union's rights . . . under law or the CBA." Albuquerque Second MTI Response at 7 (citing 478 U.S. at 530).  Albuquerque also contends that the Officers Association's assertion of full-party status is inconsistent with Judge Brack's rationale in allowing the Officers Association to intervene only "to protect the interests set forth in the CBA and labor-relations laws."  Albuquerque Second MTI Response at 7 (citing MTI MOO at 6 (Brack, J.)).

Next, Albuquerque rejects the Officers Association's judicial estoppel argument, because "it misconstrues the City's argument."  Albuquerque Second MTI Response at 8.  Albuquerque does not object to challenges from the Officers Association about Second Amended Settlement Agreement provisions that impair the Officers Association's or its members' rights under the CBA or under the law: for example, when the Officers Association argued its objections to Albuquerque's promotional policy before the Court, Albuquerque did not object.  <u>See</u> Albuquerque Second MTI Response at 8 (citing Motion for Court Acceptance of the City's Proposed Promotional Policy, filed May 29, 2018 (Doc. 374)("City of Albuquerque's Proposed Promotional Policy Motion")).  In contrast, Albuquerque argues that the Officers Association's objections to the "would-have-known" standard do not relate to "any provision of the CBA or any term or condition of employment."  Albuquerque Second MTI Response at 8.  Further, Albuquerque argues that, because this Objection is the first time the Officers Association has brought an objection with "no clear relationship to the CBA or labor-relations," it has never before needed to object to Officers Association's use of ¶ 148.  In sum, Albuquerque "merely objects to allowing the Officers Association to exercise rights reserved to [Albuquerque] by law and the

CBA, specifically the right to manage the day-to-day affairs of APD."[12]  Albuquerque Second MTI Response at 8.

Nevertheless, Albuquerque does not object to "inclusion of the Officers' Association in the policy development process," the Officers Association's presence at policy meetings, its ability to provide written comments on policies, or "its vote at the [Policy and Procedures Review Board]." Albuquerque Second MTI Response at 8.  Albuquerque states that it "welcomes the input of officers and the APOA regarding its policies" and has given it "numerous opportunities for comment."  Albuquerque Second MTI Response at 8 (citing Albuquerque Objection Response). For the above reasons, Albuquerque urges the Court to overrule the Officers Association's objection.  See Albuquerque Second MTI Response at 9.

## LAW REGARDING FEDERAL COURT JURISDICTION TO ENFORCE SETTLEMENT AGREEMENTS

"Once a lawsuit is settled and dismissed, the district court does not generally have 'ancillary jurisdiction to enforce the parties' settlement agreement.  A district court can, however, retain jurisdiction over a settlement agreement if the order of dismissal shows an intent to retain jurisdiction or incorporates the settlement agreement.'"  McKay v. United States, 207 F. App'x. 892, 894 (10th Cir. 2006)(unpublished)[13](quoting Morris v. City of Hobart, 39 F.3d 1105, 1110

---

[12]The Court presumes Albuquerque was referring to its own rights -- rather than the Officers Association's rights -- in this sentence: "The City merely objects to allowing the Officers Association to exercise rights reserved to it by law and the CBA, specifically the right to manage the day-to-day affairs of APD."  Albuquerque Second MTI Response at 8.

[13]McKay v. United States is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

(10th Cir. 1994), and citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 380-81)).

Accordingly, a federal court does not, ipso facto, have jurisdiction over a settlement agreement by

virtue of the settlement agreement resolving claims which the federal court previously entertained.

See Marcotte v. Burlington N. Santa Fe Rail Corp., No. CIV 04-0836 JB/RLP, 2007 WL 5685129,

at *12 n.5 (D.N.M. Oct. 11, 2007)(Browning, J.)("The Court has, however, no ancillary

jurisdiction over the settlement agreement of the parties, because the Court did not explicitly retain

such jurisdiction in its order dismissing this case with prejudice pursuant to joint motion.").

Reference to the settlement agreement in the order dismissing a case is necessary for a

court to retain jurisdiction over the agreement after dismissing the parties' claims which the

settlement resolved, unless the Court has an independent basis for jurisdiction over the agreement.

"Unless incorporated into a judgment of the court, a settlement agreement is 'a contract, part of

the consideration for which [i]s dismissal of a[] suit.'"   Beetle Plastics Inc. v. United Ass'n of

Journeymen & Apprentices of Plumbing & Pipefitting Indus., 97 F.3d 1464, at *1 (10th Cir. Sept.

19, 1996)(unpublished table decision)(quoting Kokkonen v. Guardian Life Ins. Co., 511 U.S. at

381).   "Without reservation by the court . . . there must be an independent basis for federal

---

> In this circuit, unpublished orders are not binding precedent, . . . And we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that McKay
v. United States, Beetle Plastics, Inc. v. United Ass'n of Journeymen & Apprentices of Plumbing
and Pipefitting Indus., In re SEC, Ute Distrib. Corp. v. Norton, Wallace v. United States, and Smith
v. U.S. Parcel have persuasive value with respect to a material issue and will assist the Court in its
disposition of this Memorandum Opinion and Order.

jurisdiction." Morris v. City of Hobart, 39 F.3d at 1110-11 (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 382).

If the parties' "obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal -- either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order," the situation is different. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381. "In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381. On the other hand, "[t]he judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381. See Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 547-48 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the Erie[14] doctrine instructs that federal courts must apply state substantive law and federal procedural law." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017). "If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not 'exceed[ ] statutory authorization or Congress's rulemaking power.'" Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162 (quoting Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins., 559 U.S. 393, 398 (2010)("Shady Grove")). "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in [Shady

---

[14]Erie R. Co. v. Tompkins, 304 U.S. 64 (1983).

Grove], as laid out by Justice Stevens in his concurring opinion." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162. "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162 (citations and quotations omitted). There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163 (citations omitted). If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163. If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's rulemaking authority under the Rules Enabling Act, 28 U.S.C. § 2072, that is, it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b). See Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163-64.

Justice Stevens, in his controlling concurrence in Shady Grove, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right. [Shady Grove, 559 U.S. at 418-21 (Stevens, J., concurring) ]; see Gasperini [v. Center for Humanities, Inc.], 518 U.S. [415] at 427 (1996)]. Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural." Shady Grove, 559 U.S. at 419 (Stevens, J., concurring). Rather, a more nuanced approach is required. [Shady Grove, 559 U.S. at 419-20]. Justice Stevens observed that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." [Shady Grove, 559 U.S. at 419-20](citation and internal quotation marks omitted). One example of such a law is a procedural rule that "may . . . define the amount of recovery." [Shady Grove, 559 U.S. at 420]. Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." [Shady Grove, 559 U.S. at 418,]. If so, the federal rule

may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right.

Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164 (citations omitted)(alteration in the original)(quoting Shady Grove, 559 U.S. at 418-20 (Stevens, J., concurring)).  "[W]hen state law creates a cause of action, it also defines the scope of that cause of action," which includes "the applicable burdens, defenses, and limitations."  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164-65.  Consequently, even though burdens of proof, affirmative defenses, and liability limitations are all legal concepts that savor of procedure, "[f]ailing to enforce such attendant attributes of a state law would lead to different measures of the substantive rights enforced in state and federal courts," i.e., would modify substantive rights.  Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1165.  See Walker v. Spina, 359 F. Supp. 3d 1054, 1082-83 (D.N.M. 2019)(Browning, J.).

**LAW REGARDING GOOD CAUSE TO MODIFY SCHEDULING ORDER DEADLINES**

"The District Court has wide discretion in its regulation of pretrial matters."  Si-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990).  Scheduling orders, however, "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Accord Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6.  The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.  Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test.  Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.  The Court has stated in the past: "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6.

> Other courts within the Tenth Circuit have held that
>
> the good cause standard primarily considers the diligence of the party . . . .  The party seeking an extension must show that despite due diligence it could not have reasonably met the scheduled deadlines.  Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.

Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(Rushfelt, M.J.)(alteration in original)(internal quotation marks omitted).  The Honorable Dale A. Kimball, United States District Judge for the United States District Court for the District of Utah, found "good cause" existed to amend the court's scheduling order when the court decided to permit the plaintiff's counsel to withdraw as counsel.  Kee v. Fifth Third Bank, No. CIV 2:06-00602-DAK-PMW, 2008 WL 183384, at *1 (D. Utah Jan. 17, 2008)(Kimball, J.).  Judge Kimball reasoned: "In light of the court's decision to permit [counsel] to withdraw . . . the court has determined that good cause exists for amending the existing scheduling order."  2008 WL 183384, at *1.  Similarly, this Court has found good cause to amend a scheduling order when a party demonstrates their due diligence and the amendment will not cause "undue prejudice or harm" to the opposing party.  Walker v. THI of N.M. at Hobbs Ctr., 262 F.R.D. 599, 604-605 (D.N.M. Oct. 8, 2009)(Browning, J.).

### LAW REGARDING INTERVENTION AS A MATTER OF RIGHT

Federal Rule of Civil Procedure 24(a) provides for intervention as a right:

> (a)  **Intervention of Right**.  On timely motion, the court must permit anyone to intervene who:

> (1)    is given an unconditional right to intervene by a federal statute; or
>
> (2)    claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  The movant bears the burden of establishing its right to intervene.  See United States v. Tex. E. Transmission Corp., 923 F.2d 410, 414 (5th Cir. 1991).  A court generally may not consider concerns of judicial economy and efficiency when ruling on a request to intervene as a right.  See United States v. Union Elec. Co., 64 F.3d 1152, 1158 & n.1 (8th Cir. 1995)("We find that supplanting the standards applicable to intervention as of right under Rule 24(a) with policy considerations led to the erroneous denial of intervention in this case."); In re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991)("The district court, however, incorrectly bolstered its denial of intervention of right by referring to concerns of judicial economy and need for guidance.  Although those issues have a place in motions for permissive intervention, Rule 24(a) affords them no weight.").  To intervene as a matter of right under rule 24(a)(2), the movant must show that: (i) the motion is timely; (ii) the movant asserts an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) existing parties do not adequately represent the movant's interest.  See Elliott Indus. LP v. Am. Prod. Co., 407 F.3d at 1103.

"The timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances."  Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. 236, 245 (D.N.M. 2008)(Browning, J.)(quoting Utah Ass'n of Ctys. v. Clinton, 255 F.3d 1246, 1250 (10th Cir.

2001))(alteration omitted)(internal quotation marks omitted).  "Unusual circumstances" refers to those circumstances that would excuse the untimely filing of a motion to intervene.  In re SEC, 296 F. App'x 637, 640 (10th Cir. 2008)(unpublished).  In measuring timeliness by the length of time that the applicant knew of its interest, the Tenth Circuit looks to the point in time "when the movant was on notice that its interests may not be protected by a party already in the case."  Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d 1223, 1232 (10th Cir. 2010).

"Under rule 24(a)(2), the applicants must claim . . . an interest relating to the property or transaction which is the subject of the action."  Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1250 (internal quotation marks omitted).  "The Tenth Circuit requires that the interest be 'direct, substantial, and legally protectable.'"  Forest Guardians v. U.S. Dep't of Interior, No. CIV 02-1003, 2004 WL 3426413, at *5 (D.N.M. Jan. 12, 2004)(Browning, J.)(quoting Utah Ass'n of Ctys. v. Clinton, 255 F. 3d at 1250).  The Tenth Circuit has also noted that the inquiry is "highly fact-specific," and that "the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."  Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1251-52.  "The threshold for finding the requisite legal protectable interest is not high."  Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *5 (citing Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1115)("Furthermore, the Tenth Circuit has deemed the mere threat of economic injury to be sufficient for granting intervention.").

"To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal."  WildEarth Guardians v. U.S. Forest Serv., 573 F.3d at 995 ("If an absentee would be substantially affected in a practical sense by the determination made in an action, he

- 102 -

should, as a general rule, be entitled to intervene."). "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." San Juan Cty. v. United States, 503 F.3d at 1203. A third party's interest may be impaired "when the resolution of the legal questions in the case effectively foreclose [sic] the rights of the intervenor in later proceedings, whether through res judicata, collateral estoppel, or stare decisis." Ute Distrib. Corp. v. Norton, 43 F. App'x 272, 279 (10th Cir. 2002)(unpublished).

       "Although an applicant for intervention as of right bears the burden of showing inadequate representation, that burden is the 'minimal' one of showing that representation 'may' be inadequate." Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413 at *6. "The most common situation in which courts find representation adequate arise when the objective of the [movant] is identical to that of one of the parties." Bottoms v. Dresser Indus., Inc., 797 F.2d 869, 872-73 (10th Cir. 1986)(emphasis added). The Tenth Circuit has found, however, that the "possibility of divergence of interest need not be great in order to satisfy the burden of the applicants." Coal. of Ariz./N.M. Ctys. v. Dep't of Interior, 100 F.3d at 845. This minimal burden is further reduced when it is the government that is supposed to adequately represent the potential intervenor's interest. See Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1254-1255. "[A] presumption of adequate representation arises when an applicant for intervention and an existing party have the same ultimate objective in the litigation," but the Tenth Circuit has "held this presumption [is] rebutted by the fact that the public interest the government is obligated to represent may differ from the would-be-intervenor's particular interest." Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1255. The Tenth Circuit stated:

> [T]he government's representation of the public interest generally cannot be
> assumed to be identical to the individual parochial interest of a particular member
> of the public merely because both entities occupy the same posture in the litigation.
> In litigating on behalf of the general public, the government is obligated to consider
> a broad spectrum of views, many of which may conflict with the particular interest
> of the would-be intervenor.

Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1255-56. Thus, when a prospective intervenor shows

that the "public interest the government is obligated to represent may differ from the would-be

intervenor's particular interest," the burden of demonstrating inadequate representation is met.

Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1255.

> [T]he Rule's reference to practical consideration in determining whether an
> applicant can intervene implies that those same considerations can justify
> limitations on the scope of intervention.  If the applicant is granted intervention
> because of an interest that may be injured by the litigation, it does not follow that
> the intervention must extend to matters not affecting that interest; and just because
> no party will adequately represent one particular interest of the applicant does not
> mean that the applicant must be allowed to participate in the litigation of other
> matters concerning which its interests *are* adequately represented.

San Juan Cty. v. United States, 503 F.3d at 1189 (emphasis in original).

## LAW REGARDING ARTICLE III STANDING

 "Article III of the Constitution limits the jurisdiction of federal courts to Cases and

Controversies."  San Juan Cty. v. United States, 503 F.3d at 1171.  See U.S. Const. art. III, § 2.

"In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the

outcome of the controversy as to assure that concrete adverseness which sharpens the presentation

of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v.

United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(Ebel, J.)(quoting Massachusetts v. EPA, 549

U.S. 497, 539 (2007))(internal quotation marks omitted). "[A] suit does not present a Case or

Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cty.

v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1)

an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(Hartz, J.)(internal quotation marks omitted). Finally, "[s]tanding is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(Seymour, J.)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).

## LAW REGARDING STANDING AND INTERVENTION

Because "standing implicates a court's jurisdiction, [and] requires a court itself to raise and address standing before reaching the merits of the case before it," the requirements of standing under Article III must be resolved by the court. San Juan Cty. v. United States, 503 F.3d at 1172 (quoting San Juan Cty. v. United States, 420 F.3d 1197, 1205 n.3 (10th Cir. 2005)). The Tenth Circuit held that "parties seeking to intervene under rule 24(a) or (b) need not establish Article III standing 'so long as another party with constitutional standing on the same side as the intervenor remains in the case.'" San Juan Cty. v. United States, 503 F.3d at 1172 (quoting San Juan Cty. v. United States, 420 F.3d at 1206).

Since the Tenth Circuit decided San Juan County v. United States, "the Supreme Court modified our 'piggyback standing' rule, holding that an intervenor as of right must 'meet the requirements of Article III if the intervenor wishes to pursue relief not requested' by an existing party." Kane Cty. v. United States, 928 F.3d 877, 886-87 (10th Cir. 2019)(quoting Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1648 (2017)). In Town of Chester, New York v. Laroe Estates, Inc., "the record was ambiguous whether the intervening plaintiff was seeking a different form of relief from the existing plaintiff: a separate award of money damages

against the same defendant in its own name.  137 S.Ct. at 1651-52.  Because "[a]t least one

[litigant] must have standing to seek each form of relief requested," the Supreme Court of the

United States remanded the case for the United States Court of Appeals for the Second Circuit to

determine whether the intervenor, in fact, sought "additional relief beyond" what the plaintiff

requested.  Kane Cty. v. United States, 928 F.3d at 886-87 (quoting Town of Chester, New York

v. Laroe Estates, Inc., 137 S. Ct. at 1651-52).  With regard to a settlement agreement, the Court

has held that "if the original parties to the case settle all the claims between them and the intervenor

wishes to challenge the settlement, however, the intervenor is then required to establish

independent standing under Article III of the United States Constitution."  WildEarth Guardians

v. United States Forest Serv., 778 F. Supp. 2d 1143, 1151 (D.N.M. 2011)(Browning, J.)(citing

City of Colo. Springs v. Climax Molybdenum Co., 587 F.3d 1071, 1081 (10th Cir.

2009)("Intervenors must show independent standing to continue a suit if the original parties on

whose behalf intervention was sought settle or otherwise do not remain adverse parties in the

litigation.")(quoting Dillard v. Chilton County Comm'n, 495 F.3d 1324, 1330, 1336 (11th Cir.

2007)(internal quotation marks omitted)).

## LAW REGARDING INTERVENORS IN CONSENT DECREES

A "consent decree," which is "'also termed a consent order,'" is "'[a] court decree that all

parties agree to.'"  Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 563 n.29 (D.N.M.

2014)(Browning, J.)(quoting Black's Law Dictionary at 471 (9th ed. 2009)).  Consent decrees are

a way for parties to settle the issues "without having to bear the financial and other costs of

litigating. It has never been supposed that one party -- whether an original party, a party that was

joined later, or an intervenor -- could preclude other parties from settling their own disputes and

thereby withdrawing from litigation."  Local No. 93 v. Cleveland, 478 U.S. at 528-29.  An

intervenor, therefore, is entitled to "present evidence and have its objections heard at the hearings on whether to approve a consent decree," but "it does not have power to block the decree merely by withholding its consent." Local No. 93 v. Cleveland, 478 U.S. at 529. "Allowing [a party] to intervene does not mean that it can veto the settlement . . . The district court can still approve the consent decree if it finds that the settlement is reasonable, fair and consistent with [federal law]." WildEarth Guardians v. United States Forest Serv., 778 F. Supp. 2d at 1149 (quoting United States v. Albert Inv. Co., 585 F.3d 1386, 1398 (10th Cir. 2009)(internal citations omitted)). Nonetheless,

> parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor.

Local No. 93 v. Cleveland, 478 U.S. at 529.

### LAW REGARDING INTERVENORS IN SETTLEMENT AGREEMENTS

A "consent decree," which is " also termed a consent order,'" is "'[a] court decree that all parties agree to.'" Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 563 n. 29 (D.N.M. 2014)(Browning, J.)(quoting Black's Law Dictionary 471 (9th ed. 2009)). Consent decrees are a way for parties to settle the issues "without having to bear the financial and other costs of litigating. It has never been supposed that one party – whether an original party, a party that was joined later, or an intervenor – could preclude other parties from settling their own disputes and thereby withdrawing from litigation." Local No. 93, 478 U.S. at 528-529. An intervenor, therefore, is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree," but "it does not have power to block the decree merely by withholding its consent." Local No. 93 v. Cleveland, 478 U.S. at 529. "Allowing [a party] to intervene does not

mean that it can veto the settlement . . . The district court can still approve the consent decree if it finds that the settlement is reasonable, fair and consistent with [federal law]." <u>WildEarth Guardians v. United States Forest Serv.</u>, 778 F. Supp. 2d at 1149 (quoting <u>United States v. Albert Inv. Co.</u>, 585 F.3d at 1398 (internal citations omitted)).   Nonetheless, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor." <u>Local No. 93 v. Cleveland,</u> 478 U.S. at 529.

## <u>LAW REGARDING LAW OF THE CASE DOCTRINE</u>

"Law of the case is a doctrine that binds the trial court after an appeal." <u>Lane v. Page</u>, 727 F. Supp. 2d, 1214, 1230 (D.N.M. 2010)(Browning, J.)(citing <u>Clark v. State Farm Mut. Auto. Ins.</u>, 590 F.3d 1134, 1140 (10th Cir. 2009)).  In <u>Clark v. State Farm Mutual Automobile Insurance</u>, the Tenth Circuit stated:

> Under the law of the case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.

590 F.3d at 1140.  Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." <u>Dobbs v. Anthem</u>, 600 F.3d 1275, 1279 (10th Cir. 2010).  Only "final judgments may qualify as law of the case." <u>Poche v. Joubran</u>, 389 F. App'x at 774 (quoting <u>Unioil, Inc. v. Elledge</u>, 962 F.2d 988, 993 (10th Cir. 1992).  The doctrine is inapplicable where "a ruling remains subject to reconsideration." <u>Wallace v. United States</u>, 372 F. App'x 826, 828 (10th Cir.

2010)(unpublished)(quoting Unioil, Inc. v. Elledge, 962 F.2d at 993; citing United States v.

Bettenhausen, 499 F.2d 1223, 1230 (10th Cir. 1974), and Langevine v. Dist. of Columbia, 106

F.3d 1018, 1022-23 (D.C. Cir. 1997)).  This rule means that "district courts generally remain free

to reconsider their earlier interlocutory orders." Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing

Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005); United States v. Smith, 389 F.3d 944,

949 (9th Cir. 2004)(explaining that a district court may review its prior rulings so long as it retains

jurisdiction over the case)).  "[O]nce 'a case is appealed and remanded, the decision of the appellate

court establishes the law of the case and ordinarily will be followed by both the trial court on

remand and the appellate court in any subsequent appeal.'" Kane Cty. v. United States, 928 F.3d

877, 902 (10th Cir. 2019)(quoting Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d 1128, 1132

(10th Cir. 2001)).

        The Tenth Circuit has "acknowledged . . . that 'the rule [of law of the case] is a flexible

one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule

is one of efficiency, not restraint of judicial power.'"  Been v. O.K. Indus., Inc., 495 F.3d 1217,

1225 (10th Cir. 2007)(internal citation omitted)(citing Prairie Band Potawatomi Nation v.

Wagnon, 476 F.3d 818, 823 (10th Cir. 2007)).  The Tenth Circuit has stated that this flexibility

means "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"

Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d

1219, 1227 (7th Cir. 1995), and citing Homans v. City of Albuquerque, 366 F.3d 900, 904 (10th

Cir. 2004)("[T]he doctrine is discretionary rather than mandatory.")).  "If the original ruling was

issued by a higher court, a district court should depart from the ruling only in exceptionally narrow

circumstances."  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing McIlravy v. Kerr-McGee Coal

Corp., 204 F.3d 1031, 1035 (10th Cir. 2000)).

Tenth Circuit caselaw recognizes

> three 'exceptionally narrow' grounds supporting a district court's departure from an appellate court's earlier ruling: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice."

Been v. O.K. Indus., 495 F.3d 1217, 1222 n.4 (10th Cir. 2007)(quoting McIlravy v. Kerr-McGee Coal Corp., 204 F.3d at 1035 (quotation omitted)).  The Tenth Circuit, however, "has declined to apply these limitations to rulings revisited prior to entry of a final judgment, concluding that 'district courts generally remain free to reconsider their earlier interlocutory orders.'"  Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1251 (10th Cir. 2011)(quoting Been v. O.K. Indus., 495 F.3d at 1225).  "This principle remains true even when a case is reassigned from one judge to another in the same court: '[T]he [law-of-the-case] doctrine does not bind a judge to following rulings in the same case by another judge of coordinate jurisdiction as long as prejudice does not ensue to the party seeking the benefit of the doctrine.'"  Rimbert v. Eli Lilly & Co., 647 F.3d at 1251 (quoting United States v. Johnson, 12 F.3d 1540, 1544 (10th Cir. 1993)).  "The relevant prejudice is limited to lack of sufficient notice that one judge is revisiting the decision of a prior judge and the opportunity to be heard with respect to the new ruling."  United States v. Johnson, 12 F.3d at 1544.

## LAW REGARDING DUTY TO INVESTIGATE BEFORE MAKING AN ARREST

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero v. Fay, 45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]."  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259

(10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

In Romero v. Fay, the Tenth Circuit confronted the issue of when an officer must conduct further investigation before arresting an individual. In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder. See 45 F.3d at 1474. Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder. See 45 F.3d at 1474. After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi. See 45 F.3d at 1474. The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred. See 45 F.3d at 1474. The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff. 45 F.3d at 1474. The officer never interviewed the alibi witnesses. See 45 F.3d at 1474. The plaintiff was incarcerated for three months before the government dismissed the case and he was released. See 45 F.3d at 1474.

The plaintiff brought a 42 U.S.C. § 1983 action for, among other things, violations of his Fourth Amendment rights. See Romero v. Fay, 45 F.3d at 1474. The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and of Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him. See 45 F.3d at 1476. The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the

Tenth Circuit, and the Honorable Monroe G. McKay, former-United States Circuit Judge for the Tenth Circuit joined.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined:

> Once [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In  Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything.  See 147 F.3d at 1254-55.  The Tenth Circuit, in an opinion that Judge Murphy, authored, and the Honorable Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth Circuit, and the Honorable James Kenneth Logan, former United States Circuit Judge for the Tenth Circuit joined, concluded that qualified immunity did not apply.  See 147 F.3d at 1257-59.  The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape."  147 F.3d at 1257.  The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause."  147 F.3d at 1257.  The Tenth Circuit held

that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations."  147 F.3d at 1257.  The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . .  Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff].  They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.  See 478 F.3d at 1113.  Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that the Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit, authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].  See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the defendant] was arrested without probable cause.

Cortez v. McCauley, 478 F.3d at 1116 (footnotes and citations omitted).  The Tenth Circuit further

held that

> it was established law that "the probable cause standard of the Fourth Amendment
> requires officers to reasonably interview witnesses readily available at the scene,
> investigate basic evidence, or otherwise inquire if a crime has been committed at
> all before invoking the power of warrantless arrest and detention."  Romero[ v.
> Fay], 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co.,
> 147 F.3d . . . [at] 1259 . . . ("[P]olice officers may not ignore easily accessible
> evidence and thereby delegate their duty to investigate and make an independent
> probable cause determination based on that investigation.").  In the present case,
> witnesses were readily available for interviews, physical evidence was available,
> and a medical diagnosis was forthcoming.  Defendants, however, . . . conducted no
> investigation.  Instead, the Defendants relied on the flimsiest of information
> conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted).  The Tenth Circuit concluded,

therefore, that qualified immunity did not apply.  See Cortez v. McCauley, 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective for the City of Rio Rancho, New Mexico -- Monica

Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL

7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim

against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in

violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court concluded

that the officer had probable cause to arrest the plaintiff based on information gleaned from other

officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a

witness at the scene on the night of the incident -- Jennifer Katz.  See 2011 WL 7444745, at *43-

46.  Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on

the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses."

2011 WL 7444745, at *15.  Garcia contended that, moreover, Casuas should have known that

failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him

violated his constitutional rights.  See 2011 WL 7444745, at *15.  Garcia argued that, had Casuas

interviewed him before arresting him, she would have discovered Katz' and Odom's motivations

to lie.  See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the

plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits
> for the general proposition that officers must interview witnesses at the scene,
> Garcia points to no case law which would establish that, after the officers at the
> scene have interviewed witnesses, the Constitution requires the investigating
> detective to interview those witnesses again. . . . Here, the responding police
> officers . . . interviewed every adult alleged to be involved in the incident and
> briefly spoke with K.J. . . .
>
> Garcia also states that, if Casuas had investigated further, she would have
> known that there was no semen on the bedding, and she would have discovered
> Katz' and Odom's motivation if she spoke to him. . . . The Tenth Circuit's
> discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion
> that Casuas was required to do more after [K.J.'s interview] solidified the existence
> of probable cause.  In Romero v. Fay, the Tenth Circuit held:
>
>> Plaintiff contends that regardless of whether the statements by
>> Duran and Guiterrez supplied probable cause for Defendant Fay to
>> arrest Plaintiff, under clearly established law a reasonable police
>> officer would have investigated his alibi witnesses before arresting
>> him, and the exculpatory information possessed by them would have
>> negated the probable cause to arrest.  We disagree.
>
> 45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized
> that "officers are not required to conduct full investigations before making an
> arrest."  147 F.3d at 1257 n.8.
>
> . . . .
>
> These cases establish that Casuas was not required to speak to [Katz'
> neighbors], because they did not appear to be material witnesses.  Garcia has made
> no allegations and presented no facts suggesting that the neighbors were ever
> around K.J.  Garcia has also not presented any facts demonstrating that [the
> neighbors] have shed light on the motivations of Katz or Odom.  Garcia only

- 115 -

speculates that Casuas *might* have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In <u>Romero v. Fay</u>, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . .  Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . .  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . .  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect.  <u>See</u> <u>Cortez v. McCauley</u>, 478 F.3d at 1121 n.18 (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 145-46 (1979)).  The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview.  Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (alterations added).

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard.   See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .").  The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205.  When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."  Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

1.   **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d at 1143, the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case."   Estate of Larsen v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

2.   **Least- or Less-forceful Alternatives in Excessive-Force Cases**.

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to gain custody, so long as the use of force is reasonable under Graham v. Connor.  The Fourth Amendment requires only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless the availability of less intrusive alternatives. Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme

Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated

that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the
> decision as to which among reasonable alternative law enforcement techniques
> should be employed to deal with a serious public danger.  Experts in police science
> might disagree over which of several methods of apprehending drunken drivers is
> preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice
> among such reasonable alternatives remains with government officials who have a
> unique understanding of, and a responsibility for, limited public resources,
> including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of

any particular government activity does not necessarily turn on the existence of alternative 'less

intrusive' means.").

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the Terry[15]

stop of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's contention

that the arresting officers were "obligated to use the least intrusive means available to dispel their

suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme Court held:

"The reasonableness of the officer's decision to stop a suspect does not turn on the availability of

less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to

make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."

United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted).  Similarly, in

United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always
> imagine some alternative means by which the objectives of police might have been
> accomplished.  But "[t]he fact that the protection of the public might, in the abstract,

---

[15]Terry v. Ohio, 392 U.S. 1 (1968).

have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit discussed when a police dog's use is objectively reasonable and whether the defendant Lehocky's actions violated "well established law enforcement standards." It rejected the plaintiff's argument that certain testimony "should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force." 399 F.3d at 1222. In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994). Similarly, "violations of state law and police procedure generally do not give rise to a 1983 claim" for excessive force. Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force). Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [(10th Cir. 2002)]. Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052

> Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez. In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cty. Comm'rs of Cty. Lake, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

- 120 -

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (internal quotations omitted).  See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)(citation omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment . . . .  Officers thus need not avail themselves of the least intrusive means of responding to an exigent situations; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Garner v. Tennessee [sic] and Graham v. Connor.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative."  Jonas v. Bd. of Comm'rs

- 121 -

of Luna Cty., 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.).  See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable).  See also Roy v. Inhabitants Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.).  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."  Illinois v. Lafayette, 462 U.S. at 647-48.  The Court has also rejected the consideration of a less intrusive alternative to end a threat.  See Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Under § 1983, a

plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.  To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.    Procedural Approach to Qualified Immunity.

The Supreme Court has provided the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution and then determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[16] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[16]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81.  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.'" Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-07.  See Kerns v. Bader, 663 F.3d at 1181.[17]  "Courts

---

(2018).  This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

[17]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law

_____

    with the attendant needless (entirely avoidable) risk of reaching an improvident
    decision on these vital questions.

663 F.3d at 1183-84.  See Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)("If
dispositive of the claim, we ordinarily need address only the second element of qualified
immunity, that is, whether the law supporting a constitutional violation was clearly established."
(citing Kerns v. Bader, 663 F.3d at 1180)).  The Tenth Circuit did not analyze whether the officer
violated the plaintiff's constitutional rights and stated that guidance on the particular
constitutional issue would be more appropriate in a case not involving qualified immunity:
"Neither do we doubt that the scope of the Constitution's protection for a patient's hospital
records can be adequately decided in future cases where the qualified immunity overlay isn't in
play (e.g., through motions to suppress wrongly seized records or claims for injunctive or
declaratory relief)." 663 F.3d at 1187 n.5.

       The Tenth Circuit does not always undertake the "clearly established" analysis before the
constitutional violation analysis.  See, e.g., Savage v. Troutt, 774 F. App'x 574, 579 (10th Cir.
2019); Rudnick v. Raemisch, 774 F. App'x 446, 449 (10th Cir. 2019); Serrano v. United States,
766 F. App'x at 565.  Since Kerns v. Bader, the Tenth Circuit has commented:

    Although it is within the court's sound discretion to address which of the two
    elements to address first, Pearson, 555 U.S. at 236 . . . , "the Supreme Court has
    recently instructed that courts should proceed directly to, 'should address only,'
    and should deny relief exclusively based on the second element" in certain
    circumstances, Kerns, 663 F.3d at 1180 (quoting Camreta v. Greene, 563 U.S.
    [at] 707 . . . .)).

Serrano v. United States, 766 F. App'x at 565.  In Serrano v. United States, the Tenth Circuit
stated that the district court addressed only the constitutional violation prong after concluding
that Serrano had not established a constitutional violation and approved the district court's
analysis, because the district court "also had to consider the reasonableness of the team's use of
force for purposes of Serrano's [Federal Tort Claim Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-
02, 2411-12, 2671-60,] claims."  Serrano v. United States, 766 F. App'x at 565.

       The Court believes, as a general rule, that the constitutional violation analysis should
receive more attention.  On remand from Kerns v. Bader, the Court stated:

    While the Court must faithfully follow the Tenth Circuit's decisions and opinions,
    the Court is troubled by [the Tenth Circuit's] statement and the recent trend of the
    Supreme Court's hesitancy in § 1983 actions to address constitutional violations.
    A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil
    remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-
    39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

        Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . .
        and was enacted for the express purpose of "enforc(ing) the
        Provisions of the Fourteenth Amendment."  The predecessor of

---

> § 1983 was thus an important part of the basic alteration in our
> federal system wrought in the Reconstruction era through federal
> legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of
"clearly established" law, but that

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a
> judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was
> unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense
in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for
constitutional violations where they reasonably believed that their conduct was
constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why
Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24
B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the
"clearly established" prong in reference to an officer's good faith and held that a
compensatory award would only be appropriate if an officer "acted with such an
impermissible motivation or with such disregard of the [individual's] clearly
established constitutional rights that his action cannot reasonably be characterized
as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In
Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the
clearly established prong became a part of the qualified immunity test.  See 457
U.S. at 818 ("We therefore hold that government officials performing
discretionary functions generally are shielded from liability for civil damages
insofar as their conduct does not violate clearly established statutory or
constitutional rights.").  It seems ironic that the federal courts would restrict a
congressionally mandated remedy for constitutional violations -- presumably the
rights of innocent people -- and discourage case law development on the civil side
-- and restrict case law development to motions to suppress, which reward only
the guilty and is a judicially created, rather than legislatively created, remedy.
Commentators have noted that, "[o]ver the past three decades, the Supreme Court
has drastically limited the availability of remedies for constitutional violations in"
exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel

---

litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level.");  Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, 3 F. Supp. 3d 1088, 1130-31 n.24 (D.N.M. 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  Since Kerns v. Board of Commissioners, the Court has also observed:

> The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent.
>
> A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided.

A.M. ex rel. Youngers v. N.M. Dep't of Health, 108 F. Supp. 3d 963, 1029 (D.N.M. 2015)(Browning, J.).

questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[18]  See Camreta v. Greene, 563 U.S. at 707.  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182; Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.    Clearly Established Rights.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)[19](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

---

[18]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

[19]Lobozzo v. Colorado Department of Correction, is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.... However, if an unpublished opinion . . . has persuasive value with respect to a

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)(quoting Malley v. Briggs, 475

---

material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin. 426 F.3d 1266, 1274 (10th Cir.2005). The Court concludes that Lobozzo v. Colorado Department of Correction, Serrano v. United States, 776 F. App'x 561 (10th Cir. 2019); Rudnick v. Raemisch, 774 F. App'x 446 (10th Cir. 2019); Savage v. Troutt, 774 F. App'x 574 (10th Cir. 2019);  Choate v. Huff, 773 F. App'x 484, (10th Cir. 2019); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906 (10th Cir. 2017); Sanchez v. Labate, 564 F. App'x 371 (10th Cir. 2014); Wilson v. City of Lafayette, 510 F. App'x 775 (10th Cir. 2013); and Stevenson v. Cordova, 733 F. App'x 939 (10th Cir. 2018), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

U.S. at 341).

"The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. The Supreme Court has stated: "[T]he clearly established right must be defined with specificity." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. "[T]the clearly established law must[, rather,] be 'particularized' to the facts of the case," White v. Pauly, 137 S. Ct. 548, 552 (2017)(quoting Anderson v. Creighton, 483 U.S. at 640); under this view of the clearly established prong, a court should inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances, see City of Escondido v. Emmons, 139 S. Ct. at 503 (directing the Court of Appeals to ask, in excessive force cases, "whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances"). See Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)("[T]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" (quoting Mullenix v. Luna, 136 S. Ct. at 308)); District of Columbia v. Wesby, 138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").

The Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some situations, "clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances." A.N. by & through Ponder v. Syling, 928 F.3d 1191, 1198 (10th Cir. 2019). The Tenth Circuit has commented: "'[G]eneral statements of the law

- 131 -

are not inherently incapable of giving fair and clear warning to officers' that their conduct violates

a constitutional right, and that such statements provide the required notice when 'the unlawfulness'

of their conduct is 'apparent' from the pre-existing law." A.N. by & through Ponder v. Syling,

928 F.3d at 1198 (quoting White v. Pauly, 137 S. Ct. at 552). According to the Tenth Circuit,

"'[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if

they apply with obvious clarity to the specific conduct in question.' And this is so 'even though

the very action in question has not previously been held unlawful.'" A.N. by & through Ponder v.

Syling, 928 F.3d at 1198 (first quoting Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018),

and then quoting Hope v. Pelzer, 536 U.S. 730 (2002)). The Tenth Circuit has cautioned that such

an approach is inappropriate where a case involves "relevant ambiguities." Colbruno v. Kessler,

928 F.3d 1155, 1165 (10th Cir. 2019)(citing Aldaba v. Pickens, 844 F.3d 870, 879 (10th Cir.

2016)("Aldaba II"); Wilson v. City of Lafayette, 510 F. App'x 775, 778 (10th Cir. 2013); Thomson

v. Salt Lake Cty., 584 F.3d at 1315-17).

        Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly

established inquiry, see Casey v. City of Fed. Heights, 509 F.3d at 1284 ("We have therefore

adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have

since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens,

844 F.3d at 876. In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens,

777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after

the Supreme Court vacated its decision in light of Mullenix v. Luna. In concluding that it had

previously erred in Aldaba I, the Tenth Circuit determined:

        We erred . . .  by relying on excessive-force cases markedly different from this one.
        Although we cited Graham v. Connor, 490 U.S. 386 (1989) to lead off our clearly-
        established-law discussion, we did not just repeat its general rule and conclude that

> the officers' conduct had violated it. Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity. We also relied on several cases resolving excessive-force claims. But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876. The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case. See Aldaba II, 844 F.3d at 874 n.1. See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10

(10th Cir. 2017). The Tenth Circuit explained:

> To show clearly established law, the Hope Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741 . . . . This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012). But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the [United States Court of Appeals for the] Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312. We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer* . . . . As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1. Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision. See White v. Pauly, 137 S. Ct. at 551. In

White v. Pauly, the Supreme Court explained: "The panel majority misunderstood the 'clearly

established' analysis: It failed to identify a case where an officer acting under similar

circumstances as Officer White was held to have violated the Fourth Amendment." White v.

Pauly, 137 S. Ct. at 552.[20] The Supreme Court's per curiam reversals appear to have the Tenth

---

[20]The Supreme Court has signaled to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established. Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York

v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's view of the clearly established prong assumes that officers are well-versed in Supreme Court and Tenth Circuit opinions. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. at 1153, yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court, has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. at 342). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct.

Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Choate v. Huff, 773 F. App'x 484, 487-88 (10th Cir. 2019); Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555-56 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017); Aldaba II, 844 F.3d at 874, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (concluding that the publication of information about an arrested and detained juvenile violated clearly established equal protection law prohibiting treating the juvenile differently than similarly situated juveniles); Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there

---

at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)).  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, 69 Stan. L. Rev. Online 163 (2017) -- seems to agree with the Court, see, e.g., Casey v. City of Fed. Heights, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x at 555-56; Brown v. City of Colo. Springs, 709 F. App'x 906, 915-16 (10th Cir. 2017), and willing to reverse district court decisions.

was clearly established law even though the three decisions invoked to satisfy that prong were not

"factually identical to this case," because those cases "nevertheless made it clear that the use of

force on effectively subdued individuals violates the Fourth Amendment").

## LAW REGARDING A POLICE UNION INTERVENING IN A CONSENT DECREE

There are cases in many other districts in which the United States and a City resolve a

police-related lawsuit by entering into a settlement agreement.  The police union sometimes

responds by filing a motion to intervene.  The Court has surveyed caselaw to determine how other

courts have ruled on police unions' motions to intervene.

In State v. City of Chicago, 912 F.3d 979 (2019), the United States Court of Appeals for

the Seventh Circuit affirmed the district court's decision concluding that the police union's motion

to intervene was untimely.  See State v. City of Chi., 912 F.3d at 989.  Two days after the State of

Illinois filed a lawsuit against the City of Chicago that alleged that the Chicago Police Department

had use-of-force policies and practices that violated constitutional and Illinois law, Illinois and

Chicago filed a motion to stay the proceedings while they negotiated a settlement agreement.  See

State v. City of Chi., 912 F.3d at 982.  The Fraternal Order of Police, Lodge No. 7 "[a]lmost

immediately" "publicly indicated its opposition to any consent decree," because of the possibility

of the settlement agreement impairing its rights under its CBA, but did not file its motion to

intervene until more than nine months had passed.  State v. City of Chi., 912 F.3d at 982.  Although

the district court concluded that Lodge No. 7 satisfied three of the four factors for interventions as

of right, the district court denied Lodge No. 7's motion, because it did not meet the fourth factor -

- timeliness.  See State v. City of Chi., 912 F.3d at 982, 984.

Because the district court denied Lodge No. 7's motion solely based on timeliness, the

Seventh Circuit assessed only timeliness in its opinion.  See State v. City of Chi., 912 F.3d at 982,

984.  The Seventh Circuit first assessed Lodge No. 7's knowledge of interest in the suit, noting that the Seventh Circuit measured knowledge of interest from the time when the proposed intervenor "has reason to know its interests *might* be adversely affected, not from when it knows for certain that they will be." State v. City of Chi., 912 F.3d at 985 (citing e.g. Heartwood, Inc. v. U.S. Forest Serv., Inc., 316 F.3d 694, 701 (7th Cir. 2003)(italics in State v. City of Chi.).  Thus, the Seventh Circuit concluded, Lodge No. 97's timeliness was measured from its public opposition to the consent decree immediately after the suit was filed, and not when Lodge No. 97 was shut out of negotiations later.  See State v. City of Chi., 912 F.3d at 984-85 (emphasizing that the inherent relationship between Lodge No. 97 and Chicago makes the knowledge that the two entities do not share interests "hardly remarkable").  The Seventh Circuit then assessed whether the motion's delay would prejudice Illinois and Chicago, noting that the "settlement negotiations were complex and well-publicized." State v. City of Chi., 912 F.3d at 986.  The Seventh Circuit concluded that the delay would prejudice Illinois and Chicago, because "'[o]nce parties have invested time and effort into settling a case it would be prejudicial to allow intervention.'" State v. City of Chi., 912 F.3d at 986-87 (citing Ragsdale v. Turnock, 941 F.2d 501, 504 (7th Cir. 1991)).

The Seventh Circuit next looked at whether denying intervention would prejudice Lodge No. 97, noting that "the inability to appeal the entry of a consent decree does not always mandate intervention." State v. City of Chi., 912 F.3d at 987.  Instead, the Seventh Circuit concluded that Lodge No. 97 would be, at most, only "minimal[ly]" prejudiced, because it "has enjoyed repeated (and continuing) opportunities" to express its concerns to the district court during fairness hearings. State v. City of Chi., 912 F.3d at 987.  It also concludes that Lodge No. 97's rights in its CBA are protected, because the settlement agreement contains "carve-out language" that "makes clear that the parties do not intend for the consent decree to be interpreted as impairing CBA

rights." State v. City of Chi., 912 F.3d at 987.  Further, the Seventh Circuit noted that "the Lodge's

assertion of prejudice is largely speculative.  As things stand now, the consent decree cannot impair

the CBA or state law rights enjoyed by Chicago police officers."   State v. City of Chi., 912 F.3d

at 988.  The Seventh Circuit concluded that the Lodge No. 97's "allegations of prejudice are

presently speculative, and the other factors counsel against intervention," but the Seventh Circuit

noted that the district court can reexamine intervention if Lodge No. 97's speculations are realized.

See State v. City of Chi., 912 F.3d at 988.  Finally, the Seventh Circuit concluded that, although

the district court did not consider unusual circumstances, Lodge No. 97 "never squarely presented

that legal theory to the district court" and "the district court considered the facts underlying the

argument but found them unpersuasive," and thus the district court did "not err in focusing on the

disputed factors."  See State v. City of Chi., 912 F.3d at 989 (citing Illinois v. City of Chi.,  No.

17-6260, 2018 WL 3920816, at *5-6(N.D. Ill. 2018)(Dow, J.)).

In United States v. City of Miami, 278 F.3d 1174 (11th Cir. 2002), the United States Court

of Appeals for the Eleventh Circuit affirmed the district court's denial of the Miami Community

Police Benevolent Association's ("MCPBA") motion to intervene in a settlement agreement

between the United States and the City of Miami, Florida.  See 278 F.3d at 1175-177.  The United

States originally filed a complaint against the City of Miami and the Fraternal Order of Police

("FOP") FOP, alleging employment discrimination under Title VII of the Civil Rights Act of 1964.

See 278 F.3d at 1176.  In 1977, the district court approved the settlement agreement over the FOP's

objections.  See 278 F.3d at 1176.  The FOP then appealed, and the Eleventh Circuit remanded the

case with instructions for the district court to alter the decree so that it did "not affect the promotion

of members of the Police Department."  278 F.3d at 1176 (citing United States v. Miami, 664 F.2d

435 (5th Cir. 1981)).

Twenty-two years later -- after the demographic makeup of the police department had changed considerably -- the United States moved to supersede the 1977 settlement agreement with a settlement agreement that ensured Miami would continue to improve upon its discriminatory hiring procedures.  See 278 F.3d. at 1177.  Two months later, the MCPBA sought to intervene on the basis the FOP did not adequately represent the MCPBA's interests, which the MCPBA argued were "'diabolically [sic] opposed'" to the FOP's interests.  278 F.3d  at 1177 (quoting the MCPBA's Brief)(alteration in United States v. Miami).  The Eleventh Circuit affirmed the lower court's denial of the MCPBA's motion to intervene, because it could "discern no difference between the objectives that the United States seeks to fulfill in this case and those of the MCPBA," and believed that the United States would adequately represent the MCPBA's interests.  278 F.3d. at 1179.

In Johnson v. Lodge No. 93 of the Fraternal Order of Police, although the Tenth Circuit did not rule on a police union's motion to intervene, it opined on the limits of a police-union-intervenor's position.  The Tenth Circuit affirmed the district court's approval of a consent decree between the City of Tulsa and African-American members of the Tulsa Police Department.  393 F.3d at 1098-1099.  The FOP had intervened in the consent decree and appealed the district court's approval of the consent decree, arguing that it violated its CBA and the Oklahoma Fire and Police Arbitration Act.  393 F.3d  at 1098-99 (citing Okla. Stat. tit. 11, § 51-101 et seq. (2001)).

The case originated in 1994 as a class action by African-American police officers against Tulsa, in which the officers alleged that the Tulsa Police Department engaged in "systemic and long-standing racial discrimination . . . in the areas of hiring, promotions, discipline, training, and assignments."  393 F.3d at 1099.  The district court tried to end a three-year "costly litigation battle" with settlement negotiations, but these negotiations stalled after the FOP moved to

intervene, and the City withdrew its support for the proposed consent decree.  393 F.3d at 1099-1100.  The district court granted the FOP's motion to intervene and appointed a settlement judge to facilitate negotiations between the parties and the FOP.  See 393 F.3d at 1100.  The court finally approved the consent decree over the FOP's objections in May 2003.  See 393 F.3d at 1101.  In pertinent part, the FOP argued that the consent decree (i) "violates Oklahoma labor law and the CBA because it prevents the City from bargaining in good faith with FOP regarding issues that fall within FOP's purview as the 'exclusive bargaining agent' for [Tulsa Police Department] members," and (ii) "adversely affects the third-party legal rights of FOP and its members without their consent."  393 F.3d  at 1101 (alteration added and not in original).

The Tenth Circuit identified the issue as "whether the consent decree conflicts with state law or the CBA turns on whether the CBA's management rights or other provisions precluded the City from adopting the employment provisions embodied in the consent decree."  393 F.3d at 1103.  Applying Oklahoma law, the Tenth Circuit disagreed with FOP's contention that the "clear and unmistakable waiver" interpretation standard applied to the interpretation of the CBA's management rights provision, and it instead concluded that the "contract coverage" standard applied.  393 F.3d at 1103.  Under the clear-and-unmistakable standard that the FOP advanced, the "plaintiffs and the City would be required to show specific intent by FOP to waive its right to bargain over each particular subjection of the consent decree."  393 F.3d at 1103.  The Tenth Circuit disagreed with the FOP, and it instead applied the "contract coverage" standard to the CBA's management-rights provision, reasoning that the FOP relied on cases that were outdated or inapposite.  393 F.3d at 1104.  Applying the contract-coverage standard, which is "'when [an] employer and union bargain about a subject and memorialize that bargain in a collective bargaining agreement, . . . there is no continuous duty to bargain during the term of an agreement with respect

to a matter covered by the [CBA],'" the Tenth Circuit concluded that the "CBA did not bar the

City from entering the consent decree without bargaining with FOP, and thus the consent decree

does not violate state labor law or the CBA."  393 F.3d at 1104 (quoting NLRB v. United States

Postal Serv., 8 F.3d 832, 836 (D.C. Cir. 1993)(citations omitted).  When explaining the contract-

coverage standard, the Tenth Circuit cited decisions by the Oklahoma Public Employees Relations

Board ("PERB") relied on by the district court:

> An employer does not violate any duty to bargain when it alters subjects such as
> . . . a change in the system of progressive discipline when the management rights
> clause of the collective bargaining agreement negotiated between the employer and
> the union gives the employer the right to make, issue and enforce such policies or
> practices.

393 F.3d at 1104 (citing Fraternal Order of Police, Lodge No. 151 v. City of El Reno, PERB No.

353 (1998); Lodge No. 103, Fraternal Order of Police v. City of Ponca City, PERB No. 349

(1997)).  The management-rights provision in the FOP's CBA states that Tulsa "'retains' the rights

to 'manage the affairs of the Police Department in all respects,' to 'establish and enforce Police

Department rules, regulations, and orders,' and to 'introduce new, improved, or different methods

and techniques of Police Department operation.'"  393 F.3d at 1104 (quoting the FOP's CBA).

The Tenth Circuit also found that "the CBA's management rights clause specifically retains for

the City the right to . . . discipline employees."  393 F.3d at 1104.  As a result, the Tenth Circuit

disagreed with the FOP's "assertion that these topics are subject to mandatory bargaining under

the CBA." 393 F.3d at 1104.

The Tenth Circuit also rejected the FOP's argument that the consent decree violated its

rights "with respect to future collective bargaining agreements," because it would prohibit the city

from "bargaining in good faith with respect to the terms of future collective bargaining

agreements." 393 F.3d at 1104-05.  The Tenth Circuit reasoned that this argument was speculative,

that "[t]he consent decree itself acknowledges the continuing validity of the CBA," and that the decree should be read "in accordance with language in the CBA."  393 F.3d at 1105.  The Tenth Circuit also commented that the FOP's position would give intervenors in federal employment discrimination cases "plenary power to veto all settlements which touch on terms and conditions of employment," and this power would "neuter[] the CBA's management rights provision" and "frustrate Congress's preference for achieving Title VII compliance by voluntary means."  393 F.3d at 1105.

The Tenth Circuit disagreed with the FOP's assertion that the consent decree "binds" it and "imposes legal obligations without its consent."  393 F.3d at 1106 (citing Local No. 93, 478 U.S. at 529-530).  The Tenth Circuit dismissed those concerns, because the consent decree binds only the parties to the consent decree.  See 393 F.3d at 1107 (citing Local No. 93, 478 U.S. at 529-30).  The Court then addressed the FOP's concerns that the consent-decree-created "Dispute Avoidance and Resolution Committee" changed the FOP's arbitration rights.  393 F.3d at 1107.  The Tenth Circuit stated that the "FOP retains the rights to arbitrate issues arising under the CBA," and thus the Dispute Avoidance and Resolution Committee did not infringe on those rights.  393 F.3d at 1108.  The Tenth Circuit also dismissed the FOP's fears that the court itself would usurp the "traditional role of the labor arbitrator" and become a "gatekeeper" for union grievances.  393 F.3d at 1108.

Turning to the FOP's assertion that it could force a trial on the racial discrimination claims to decide its contract rights under the CBA, the Tenth Circuit distinguished precedents the FOP relied on for that argument.  393 F.3d at 1108.  For instance, in Sanguine, Ltd. v. United States Department of Interior, 798 F.3d 389 (10th Cir. 1986), the Tenth Circuit set aside a consent decree in favor of litigation on the merits, because the intervenors, who were granted intervention status

after the consent decree's entry and thus unable to present their objections, would be prejudiced otherwise.  See 393 F.3d at 1108-09 (citing Sanguine, Ltd. v. U.S. Dep't of Interior, 798 F.2d 389). The Tenth Circuit concluded that a trial on the merits was not needed, because the FOP was included in the consent decree process and its objections were heard, and because "the consent decree [did] not alter the FOP's rights under the CBA."  393 F.3d at 1109.

In United States v. City of New Orleans, 2012 WL 12990388 (E.D. La. Aug. 31, 2012)(Morgan, J.), the FOP and the Police Association of New Orleans moved to intervene in litigation between the United States and the City of New Orleans arising from "an alleged pattern or practice of conduct by the New Orleans Police Department that subjects individuals to excessive force [and] . . . unlawful searches and seizures in violation of the Fourth Amendment" as well as "discriminatory policing practices in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI."  2012 WL 12990388, at *1.  The district court denied the Fraternal Order of Police's and the Police Association of New Orleans' motions to intervene as of right and permissively. 2012 WL 12990388, at *9-12.

Analyzing the two unions' motions together, the Honorable Susie Morgan, Senior United States District Judge for the United States District Court for the Eastern District of Louisiana, reasoned that the unions did not have a "legally protectable interest *in the subject matter of this litigation* required for intervention as of right."  2012 WL 12990388, at *7 (emphasis in original). Judge Morgan distinguished the unions' assertion of protectable property interest in the civil service jobs from the police in Edwards v. City of Houston, 78 F.3d 983 (5th Cir. 1996), which was an employment discrimination case.  2012 WL 12990388, at *7-9.  There, the court granted intervention, because Title VII's preclusive effect "would prohibit the non-party officers -- if they were not allowed to intervene -- from collaterally challenging the consent decree after the district

court approved it." United States v. City of New Orleans, 2012 WL 12990388, at *8 (citing Edwards v. City of Houston, 78 F.3d at999, 1004; 42 U.S.C. § 2000e-2(n)). Judge Morgan found Edwards v. City of Houston inapposite, because the consent decree between the United States and New Orleans "remedied . . . Title VI . . . claims having to do with the NOPD's practices with respect to citizens" and did not remedy Title VII employment discrimination claims. United States v. City of New Orleans 2012 WL 12990388, at *9. Comparing the FOP and the Police Association of New Orleans with the police union in United States v. City of L.A., Judge Morgan found that the unions did not have a CBA or memorandum of understanding with New Orleans, and so the consent decree could not threaten or impair any contractual rights. See United States v. City of New Orleans, 2012 WL 12990388, at *10.

In United States v. City of Hialeah, the Eleventh Circuit concluded that the United States District Court for the Southern District of Florida properly refused to approve part of a consent decree between the United States Department of Justice and the City of Hialeah, Florida, which arose from allegations of employment discrimination in both the police and fire departments. See 140 F.3d at 971. The Dade County Police Benevolent Association and a firefighters' union were joined as defendants shortly after the United States and Hialeah entered a proposed consent decree, but the United States and Hialeah did not invite either union to participate in the consent decree's formulation. See 140 F.3d at 972. At a fairness hearing two months later, the court also allowed a group of approximately 200 individual police officers to intervene. See 140 F.3d at 972.

Although the district court approved a consent decree resulting from negotiations with the unions and intervenors, it did not approve a provision that would have imposed "retroactive competitive seniority" for minority applicants who applied for promotion, because such a provision "would violate contractual seniority rights of the incumbent employees, rights

guaranteed to them in the unions' collective bargaining agreements with the City." 140 F.3d at 971. The district court "therefore refused to enter that part of the proposed consent decree over the objections of those whose legally enforceable seniority rights would be adversely affected." 140 F.3d at 971. The Eleventh Circuit affirmed the district court's decision, stating that, because the police and firefighters were unable to participate in negotiations, "[t]he district court correctly rejected the Department of Justice's request to ram the proposed settlement agreement down the throats of the unions and individual objectors without affording them a fair adjudication of their rights." 140 F.3d at 984.

In United States v. City of L.A., the Los Angeles Police Protective League moved to intervene in consent decree litigation between the United States and the City of Los Angeles, the Los Angeles Police Department, and the Board of Police Commissioners of the City of Los Angeles. See 288 F.3d at 396. The proposed consent decree sought to address the police department's "pattern or practice of depriving individuals of constitutional rights through the use of excessive force, false arrests and improper searches and seizures in violation of 42 U.S.C. § 14141." United States v. City of L.A., 288 F.3d at 396. The Ninth Circuit reversed the district court's denial of the Los Angeles Police Protective League's motion to intervene, reasoning that the Los Angeles Police Protective League had a protectable interest not only in the remedial phase, but in the liability phase of the litigation as well. See United States v. City of L.A., 288 F.3d at 398-399. The Ninth Circuit concluded that the Los Angeles Police Protective League had a protectable interest in the liability phase of the litigation, because the district court had not finally approved the consent decree when it denied the Police League's motion, and the United States had "not unequivocally and completely disclaim[ed] the remedies sought in its complaint against the Police League's member officers." United States v. City of L.A., 288 F.3d at 399. Furthermore,

the decree contained a provision that allowed the United States to "dissolve the decree and proceed

with the suit if the Los Angeles Police Department, and the Board of Police Commissioners and

the Los Angeles Police Protective League were unable to resolve a collective bargaining issue."

United States v. City of L.A., 288 F.3d at 400.

Additionally, the Los Angeles Police Protective League had "a protectable interest in the

remedy," because of "state-law rights to negotiate about the terms and conditions of its members'

employment" and the right to "rely on the collective bargaining agreement that is a result of those

negotiations."  288 F.3d at 400.  The Ninth Circuit added that

> to the extent that [the consent decree] contains or might contain provisions that
> contradict terms of the officers' MOU, the Police League has the right to present
> its views on the subject to the district court and have them fully considered in
> conjunction with the district court's decision to approve the consent decree.

288 F.3d at 400.

In United States v. City of Portland, No. 3:12-cv-02265-SI, 2013 WL 1230978, (D. Or.

Feb. 19, 2013)(Simon, J.), the United States filed a complaint against the City of Portland alleging

a "pattern or practice of conduct by the Portland Police Bureau that subjects individuals with actual

or perceived mental illness to excessive force."  2013 U.S. Dist. LEXIS 188465, at *2.  The parties

filed a joint motion to enter a negotiated settlement agreement, and, the next day, the Portland

Police Association moved to intervene.  2013 U.S. Dist. LEXIS 188465, at *3.  The district court

granted the PPA's motion to intervene "for remedy purposes" and deferred ruling on the PPA's

motion "for liability purposes."  2013 U.S. Dist. LEXIS 188465, at *4.

The Honorable Michael Simon, United States District Judge for the United States District

Court for the District of Oregon, granted the Portland Police Association's motion to intervene,

reasoning that "the broad enforcement provisions in the proposed Settlement Agreement still allow

the United States to seek judicial enforcement in this Court of any provision of the proposed Settlement Agreement (after mediation), without providing any exception for those provisions that implicate the PPA's collective bargaining rights."  2013 U.S. Dist. LEXIS 188465, at *15.  The court concluded that the settlement agreement may impair or impede the Portland Police Association's protectable interest, because the court may resolve implementation of the consent decree's terms through injunctive relief.  See 2013 U.S. Dist. LEXIS 188465, at *15.

In evaluating the adequacy of representation by existing parties, the court held that none of the parties would adequately represent the Portland Police Association, because the "general presumption of adequate representation when the government is acting on behalf of a constituency that it represents" did not apply "when the governmental body acts as an employer, such as the City is to the members of the PPA, or when the parties 'are antagonists in the collective bargaining process.'"  2013 U.S. Dist. LEXIS 188465, at *15-16.

The Court acknowledges that these cases are varied: some cases are employment discrimination claims under Title VII, while other cases are excessive-force claims; some cases involve a detailed collective bargaining agreement, while other cases involve no collective bargaining agreement; and some cases involve the scope of a union that already has intervened, while other cases involve a union seeking to intervene.  Moreover, only one of these cases, Johnson v. Lodge #93 of the Fraternal Order of Police, binds the Court.  Regardless, the Court has presented this survey to give a "lay of the land" and give context to the Officers Association status as an intervenor.

## ANALYSIS

Had the Officers Association presented the Court with the MTI, the Court would have granted the MTI but restricted the Officers Association's intervenor status to protecting its interest in the CBA.  Moreover, the Court will overrule the Objection, because the Objection is not timely.  Further, if the Court ruled on the Objection's merits, it would overrule the Objection, because the use-of-force policy does not violate the Settlement Agreement, Tenth Circuit caselaw, Supreme Court caselaw, or the Constitution.

## I.   THE COURT WOULD HAVE, IF IT HAD BEEN PRESENTED WITH THE ISSUE,   GRANTED THE OFFICERS ASSOCIATION'S MOTION TO INTERVENE.

The parties have not asked the Court to reconsider Judge Brack's decision to permit the Officers Association to intervene, and the Court is not reconsidering Judge Brack's decision.  The Court, however, conducts its own analysis to determine whether it agrees with Judge Brack's decision. In doing so, the Court concludes that, had it been presented with the issue, it would have granted the Officers Association's MTI, but it would have restricted intervention only to issues related to the Original Settlement Agreement.  The Court notes, however, that intervenor status gives the Officers Association only the rights and interests it had before intervention and does not create any new rights.  Thus, the Officers Association's intervenor status gives it only the ability to object when the Settlement Agreement may impair its rights under the CBA, and intervenor status does not give the Officers Association the right to defend its members against allegations in the Complaint.

A.   **IF THE COURT HAD BEEN PRESENTED WITH THE ISSUE, IT WOULD HAVE GRANTED THE OFFICER ASSOCIATION'S MOTION TO INTERVENE.**

To intervene as a matter of right under rule 24(a)(2), the movant must show that: (i) the motion is timely; (ii) the movant asserts an interest relating to the property or transaction which is the subject of the action; (iii) the lawsuit may impair or impede the movant's interest relating to the property; and (iv) the existing parties do not adequately represent the movant's interest. See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d at 1103; Romero v. Bd. of Cty. Comm'rs for the Cty. of Curry, 313 F.R.D. 133, 138 (D.N.M. 2016)(Browning, J.). First, the Court must determine whether the MTI is timely.[21] To determine timeliness, the Tenth Circuit guides district courts to consider "all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." Utah Assoc. of Ctys. v. Clinton, 255 F.3d at 1250 (internal quotation marks omitted). See Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. 236, 245 (D.N.M. 2008)(Browning, J.). The "mere passage of time" is not dispositive --  rather, the important question concerns actual proceedings of substance on the merits." Moore's Federal Practice § 24.21[1], at 884 (3d ed. 2008). See Utah Assoc. of Ctys. v. Clinton, 255 F.3d at 1250-51 (stating that motion to intervene was timely where filed approximately two-and-one-half years after the case began, "in view of the relatively early stage of litigation and the lack of prejudice to plaintiffs flowing from the length of time between the initiation of the proceedings and motion to intervene"). Although the Tenth Circuit directs district courts to assess intervention "in the light of all circumstances," the Tenth Circuit has "recognized three factors as particularly important: '[

---

[21]In conducting this analysis, the Court uses the facts at the time the Officers Association submitted its MTI.

(1) ] the length of time since the [movant] knew of [its] interests in the case; [ (2) ] prejudice to the existing parties; [and (3) ] prejudice to the [movant].'" Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d 1223, 1232 (10th Cir. 2010)(quoting Sanguine, Ltd. v. U.S. Dep't of Interior, 736 F.2d at 1418)(alterations in Okla. ex rel. Edmondson v. Tyson Foods, Inc.).  Courts should also consider "the existence of any unusual circumstances."  Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d at 1232 (alterations in Okla. ex rel. Edmondson v. Tyson Foods, Inc.)

The length of time the Officers Association knew of its interest in the case weighs in the Officers Association's favor.  The Officers Association had notice that a Complaint was coming and knew generally what the Complaint might say because of the public nature of the United States and Albuquerque's discussion regarding the investigation findings and settlement.  See Joint Motion for Settlement at 2.  Presumably, the Officers Association was aware when the findings were released that it would have an interest in the subsequent lawsuit.  See State v. City of Chicago, 912 F.3d at 985 (stating that the police union should have had knowledge from the beginning of the lawsuit, because the police union's "very existence is rooted in the competing interests between its members and the City").  Thus, the Officers Association had a lengthier amount of time to know of its interest in the case than the Complaint's filing date suggests.  The Officers Association, however, should not be expected to write its MTI before the official filing of the Complaint, as there was no guarantee of the filed Complaint's exact contents.  Thus, the Court considers the additional notice but does not penalize the Officers Association, because the Officers Association could not have known the filed Complaint's exact contacts until it was filed.  Even if the Officers Association had a copy of the proposed Complaint before it was filed, there was no guarantee that the United States and Albuquerque would file the exact same document they gave the Officers Association.  Moreover, the Officers Association's knowledge of its interest in the case can begin

only after there is a case.  Thus, although the Officers Association might have anticipated that there would be a lawsuit and that the lawsuit would affect the Officers Association, the Officers Association's interest in the exact details of the suit is measured from when the lawsuit was filed.

Moreover, although the passage of time is not dispositive, it persuades the Court of the filing date's reasonableness, because the time between the Officers Association knowledge of its interest in the case and its filing of its MTI is not sufficient to prejudice the United States and Albuquerque.  See Utah Ass'n. of Ctys. v. Clinton, 255 F.3d at 1250.  The United States filed its Complaint on November 12, 2014.  See Complaint at 1.  The Officers Association filed its MTI five weeks later, on December 18, 2014.  See MTI at 1.   Between the Complaint's filing and the MTI's filing, the United States and Albuquerque entered only two documents that moved the case forward: City of Albuquerque's Answer to the Complaint, filed November 11, 2014 (Doc. 7); and the Joint Motion for Settlement.  See Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1251 (concluding that, although there had already been document discovery, discovery disputes, and motions to dismiss, the motion to intervene was timely, in part, because the "case was far from ready for disposition," as evidenced by lack of scheduling orders, trial dates, or deadlines for motions set). Although those documents are material to the case's posture, the United States and Albuquerque filed those documents the same day as the Complaint, so it would be unreasonable to expect the Officers Association to file its Motion to Intervene before the Answer to the Complaint or the Joint Motion for Settlement.  Notably, the first of over twenty Motions to Intervene in this case was filed only a week before the Officers Association filed its MTI.  See Antone "Tony" Pirard's Motion to Intervene under Rule 14(a)(2)(C)(3)(4); Rule 19 (a)(1)(A)(B)(i)(ii)(b)(1)(A)(B)(C)(3)(4)(c)(1)(2); Rule 24(a)(2)(b)(1)(B)(b)(3), December 9, 2014 (Doc. 14).   Although the Officers Association could have filed its MTI earlier, the delay is not

- 151 -

prejudicial to the United States and Albuquerque, because of the early stage of litigation and because of the lack of significant activity in the case.

The third factor -- the prejudice to the Officers Association if intervention is denied -- cuts against the Officer's Association, because it has other mechanisms to resolve its concerns and fairness hearings in which to express its concerns to the Court.  The first two factors, however, outweigh this third factor.  Thus, the Officer's Association's MTI is timely.

The Officers Association must demonstrate next that it has an interest relating to the property or transaction that is the subject matter of this case.  See Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1251.  Although the "'contours of the interest requirement have not been clearly defined,' in this circuit the interest must be 'direct, substantial, and legally protectable.'"  Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1251 (quoting Coal. of Ariz./N.M. Ctys. v. Dep't of Interior, 100 F.3d at 840 (further internal quotations omitted)).  "Whether . . . applicant[s] ha[ve] an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination." W. Energy All. v. Zinke, 877 F.3d 1157, 1165 (10th Cir. 2017)(quoting Coal. of Ariz./N.M. Ctys. v. Dep't of Interior, 100 F.3d at 841).

The Officers Association argues that it has two protectable interests in this lawsuit: (i) protecting its officers from the allegations that its members have committed unconstitutional acts, because Albuquerque has allowed its officers to engage in a pattern or practice of excessive force resulting in a deprivation of civil rights; and (ii) preserving its CBA from conflicting provisions in the Settlement Agreement.  See MTI at 10.  The Court concludes that the first interest is a not a protectable interest in this lawsuit, although it is legally protectable, because it is not a direct and substantial interest.  See Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1251.  The United States seeks relief in its Complaint against Albuquerque's "officers" and "employees," which

includes Officers Association members.  <u>See</u> Complaint ¶ 28(b), (c), at 7.  The Officers Association represents the Albuquerque police officers, and because the United States is seeking injunctive relief against Albuquerque police officers, the Officers Association could be construed as having legally protectable interest.  <u>See</u> MTI MOO at 7 (Brack, J.).

The Complaint, however, is somewhat of a legal fiction, because the United States filed the Complaint after the United States and Albuquerque concluded negotiations of the First Proposed Settlement Agreement.  <u>See</u> Joint Motion for Settlement at 2; Original Settlement Agreement MOO at 2.  The United States was not, therefore, truly seeking this relief against "officers" and "employees."  Regardless, Judge Brack did not have to approve the First Proposed Settlement Agreement, and thus, the officers consequently could have been subjected to an injunction's effects.  That the parties were already jointly seeking resolution mitigates the Officers Association's interest, because Judge Brack might not have approved the Settlement Agreement.  That the Officers Association's interest is not direct further mitigates the interest.  The suit does not name individual officers; the prayer for relief only vaguely mentions "officers" and "employees."  Although the Court concludes that Albuquerque police officers are Albuquerque's employees and thus implicated, they are named as part of a list of Albuquerque agents, and not as a separate class or as a named parties.  <u>See</u> Complaint ¶ 28 (b), (c), at 7.   Moreover, if the litigation proceeded to trial, the officers would not have been held in the court's contempt had they refused to follow a resulting injunction, and thus, their interest is less direct and substantial than it would have been had the suit named them individually.  <u>See</u> <u>United States v. City of L.A.</u>, 288 F.3d at 399 (concluding that the police union had a protectable interest, in part, because the United States named individuals in the complaint).

The Officers Association's second interest -- preserving its CBA -- is a legally protectable, direct, and substantial interest.  See Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1251. The Officers Association is the exclusive bargaining representative for Albuquerque police officers.  See MTI at 1.  Accordingly, PEBA and the Labor Ordinance both establish the Officers Association's exclusive bargaining rights to represent the officers and its right to bargain in good faith over employment terms and conditions with Albuquerque.  See PEBA; Labor Ordinance.  In accordance with these laws, Albuquerque and the Officers Association negotiated a CBA that went into effect in July 2014.  See Albuquerque MTI Response at 1-2.  Its interest in preserving these bargained-for terms is thus legally protected.  The Complaint seeks relief that includes policy changes, which may implicate employment terms and conditions as the CBA protects.  See Complaint ¶ 28 (b), (c), at 7.  Albuquerque may have to implement policy changes that impermissibly alter bargained-for policies in the CBA.  Thus, the case's resolution directly affects the Officers Association's interest, because Albuquerque may be mandated or may agree to change policies in contravention of the CBA.  The CBA took more than four years to negotiate, and thus the Officers Association's interest in preserving such a long bargained-for agreement is substantial. See MTI at 10.

The Officers Association next must demonstrate that the litigation's disposition will impair the Officers Association's interest in preserving the CBA.  See Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1251.  The Officers Association argues that it has an interest in the litigation "to the extent that the [Settlement Agreement] contains or might contain" terms that conflict with the CBA, and the Officers Association provides a non-exhaustive list of Original Settlement Agreement provisions that conflict with the CBA.  See United States v. City of L.A., 288 F.3d at 400.  The Court concludes that the Officers Association has demonstrated that there is some existing conflict

between the Original Settlement Agreement and the CBA.  For example, the Officers Association cites CBA § 20.1.8, which forbids the Internal Affairs Bureau from conducting criminal investigations of officers to keep administrative and criminal investigations separate.  See Amicus Curiae Brief at 7-8; MTI Reply at 8-9.   It notes that the Original Settlement Agreement contains a directly contradictory provision establishing a criminal investigations team within the Internal Affairs Bureau.  See Amicus Curiae Brief at 7-8; MTI Reply at 8-9.  These terms are plainly contradictory.  The United States and Albuquerque, however, attempt to reconcile the provisions. The United States acknowledges the conflict, but it argues that its Original Settlement Agreement provision still fulfills the purpose of CBA § 20.1.8,  because the Original Settlement Agreement includes protections to keep the criminal investigations separate from the administrative investigations.  See U.S. MTI Response at 14.  Albuquerque argues that the criminal investigations team, despite being part of the Internal Affairs Bureau, can operate separately from the Internal Affairs Bureau.  See Albuquerque MTI Response at 10.  Neither of these arguments is convincing, because both the United States and Albuquerque acknowledge that, despite the mandate of CBA § 20.1.8, the Original Settlement Agreement establishes a team to handle criminal investigations within the Internal Affairs Bureau.  See U.S. MTI Response at 14; Albuquerque MTI Response at 10.   Moreover, the United States' and Albuquerque's attempts to reconcile the terms as "consistent" demonstrates that there is potential for the terms to conflict.  Albuquerque MTI Response at 10.  At this point in the litigation, the Court only needs to see whether there is a potential for conflict to conclude that the disposition may impair the Officers Association's protectable interest.  See Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1116 (stating that, if the proposed intervenor demonstrates that the disposition "may" impair its interest, its interest warrants intervention); San Juan Cty. v. United States, 503 F.3d at 1189 (concluding

that the possibility that the disposition may not impair the intervenor's interest is not dispositive in terms of intervention).  Further, the Original Settlement Agreement has the potential to contain provisions that are the CBA's mandatory subjects, which would give rise to conflict.  Thus, the Court concludes that there is actual and potential conflict, which would impair the Officers Association's protectable interest in preserving its CBA.  See Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1116.

The United States and Albuquerque contend that, even if the Court concludes that the CBA is a protectable interest, the Officers Association does not have a protectable interest in the case, because the CBA will expire in July, 2015.  See Albuquerque MTI Response at 1-2; U.S. MTI Response at 6-7.  The test asks, however, whether the interest will or could be impaired, and not for how long the interest will be impaired.   See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d at 1103 (stating that the third factor for intervention as a matter of right is whether "the applicant's interest may be impaired or impeded").  Moreover, even if the Court concludes that the CBA was certain to expire before Judge Brack approved and entered the Original Settlement Agreement, the case could still impair or impede the Officers Association's interest.  The CBA in this case took between four and five years for the parties to negotiate and finalize.  See MTI at 10; Amicus Curiae Brief at 2.  Thus, it is possible -- and the test requires only a possibility -- that the expired CBA still will govern for several years after July, 2015.  Albuquerque may not unilaterally alter the CBA after its expiration, because the CBA provides that, if neither the Officers Association nor Albuquerque "request the opening of negotiations as provided in the Labor-Management Relations Ordinance 67-1977, as amended, this Agreement and the conditions herein shall continue in effect from year to year." CBA § 35.4, at 44.  See also MTI MOO at 9 (Brack, J.)(concluding that Albuquerque cannot "'unilaterally impose conditions of employment once a

CBA has expired")(quoting Am. Fed. of State v. City of Albuquerque, 2013-NMCA-063, 304 P.3d

443, and citing N.M. Stat. Ann. § 10-7E-26 for the proposition that CBA must remain in effect

until a new agreement is finalized).   Thus, the possibility remains that neither party will open

negotiations, and the CBA will continue, which could impede the Officers Association's interest).

The Tenth Circuit previously has concluded that, when determining whether a settlement

agreement will violate a union's protected interests, the inquiry is whether the settlement

agreement adversely affects any of the union's legal rights and not whether a legally protected

settlement agreement provision is violated.   See Johnson v. Lodge No. 93, 393 F.3d at 1107.

Albuquerque uses this case to bolster its argument that the Original Settlement Agreement will not

impair the Officers Association's rights.   In Johnson v. Lodge No. 93 of the Fraternal Order of

Police, the Tenth Circuit concluded that the union's interest was not impaired, because the

settlement agreement did not adversely affect any of the union's rights.   See 393 F.3d at 1107.  The

Tenth Circuit explained that the union's legal rights were not affected, because similar to

> Local No. 93, the consent decree here does not bind FOP to do or not to do
> anything, nor does it impose any legal obligations on FOP.  Additionally, "only the
> parties to the decree [i.e., plaintiffs and the City] can be held in contempt of court
> for failure to comply with its terms," and the consent decree "does not purport to
> resolve any claims [FOP] might have under the Fourteenth Amendment."

Johnson v. Lodge No. 93, 393 F.3d at 1107 (quoting Local No. 93, 478 U.S. at 530).   Because the

Tenth Circuit concluded the settlement agreement did not impose any legal duties or obligations

on the union, it did not see a need to address the union's argument that the settlement agreement

conflicted with its CBA's legally protected arbitration provision to reach an outcome.   See Johnson

v. Lodge No. 93, 393 at 1107 ("Thus, under the Supreme Court's reasoning in Local No. 93, we

find that the consent decree does not impermissibly affect FOP's legal rights.  We nonetheless

address FOP's argument that the Dispute Avoidance and Resolution Committee created pursuant to the December 2002 Decree alters FOP's arbitration rights under the CBA.").

It addressed, however, the legally protected arbitration provision, and it concluded that the settlement agreement supplemented the arbitration provision and that the union still retained its arbitration rights.  See Johnson v. Lodge No. 93, 393 F.3d at 1107.  Similarly, the Original Settlement Agreement imposes no duties or obligations on the Officers Association, nor does it suggest that it resolves any legal claims the Officers Association may make about the Original Settlement Agreement.  The Court cannot hold the Officers Association members in contempt for refusing to comply with any injunctive relief granted pursuant to the Complaint.  Thus, according to Albuquerque, under Johnson v. Lodge No. 93, the Court need not determine whether the First Proposed Settlement Agreement provision establishing a criminal investigations team within the Internal Affairs Unit violates the CBA and impairs the Officers Association's interest.  The Tenth Circuit in Johnson v. Lodge No. 93 was not determining, however, whether it should permit the police union to intervene, because its interest was impaired -- instead, the Tenth Circuit was determining whether the police union, which already was an intervenor, could raise an objection to the settlement agreement.  See 393 F.3d at 1107.  Thus, this case is distinguishable.

If the Court were writing on a clean slate, however, the analysis would be different.  Rule 24(a) notably states that, for intervention to be appropriate, the litigation must impair the movant's "ability to protect its interest," and not just impair the movant's interest. Fed. R. Civ. P. 24(a) (emphasis added).  Accordingly, courts have concluded that the litigation's outcome would not impair the movant's ability to protect its interest, "for example, when the court finds that the would-be intervenor could protect its interest in a separate action."  Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1908.2 (3d ed.)(citing e.g., St. Bernard Parish v. Lafarge N. America, Inc., 914 F.3d

969 (5th Cir. 2019)(concluding that an attorney would not be prejudiced if the court denied intervention in a case between a barge facility operator and a parish after the attorney withdrew from a related case against the barge facility operator; "although the attorney sought to intervene in order to address a fee dispute between himself, the parish, and its current counsel, [] even if a federal interpleader action was unavailable, a state-law action against the parish or its current counsel to recover for his services was possible").  Further, some Tenth Circuit caselaw has focused the interest-impairment analysis on whether the "resolution of the legal questions in the case effectively forecloses the rights of the proposed intervenor in later proceedings, whether through *res judicata,* collateral estoppel, or *stare decisis*."  Ute Distrib. Corp. v. Norton, 43 F. App'x at 279 (citing Fed. Deposit Ins. Co. v. Jennings, 816 F.2d 1488, 1492 (10th Cir. 1987)).[22] Accordingly, the Court examines whether the litigation outcome will affect the Officers Association's ability to protect its interest in preserving its CBA down the road.

There are two basic possible outcomes: a settlement agreement or a trial.  First, the Court may approve the Original Settlement Agreement or approve a later proposed Settlement Agreement.  Either of these outcomes will result in a finalized Settlement Agreement in which Albuquerque will agree to implement policies to resolve the issues.  Even if Albuquerque agrees to implement any policies that violate the CBA in the finalized Settlement Agreement, the finalized Settlement Agreement will not affect the Officers Association's ability to protect its interest in

---

[22]Wright and Miller note that the 1966 amendment to rule 24(a) was meant to permit intervention by those movants who were "practically disadvantaged by the disposition of the action and to repudiate the view, expressed in authoritative cases under the former rule, that intervention must be limited to those who would be legally bound as a matter of res judicata." Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1908.2 (3d ed.).  Accordingly, stare decisis, for example, "by itself may, in a proper case, supply the practical disadvantage that is required for intervention under Rule 24(a)(2)."  Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1908.2 (3d ed.)

preserving the CBA, because other mechanisms are available for the Officers Association to resolve its grievance. The Officers Association could file a breach-of-contract lawsuit in state court.  Alternatively, the Officers Association could file a grievance under the PEBA, see PEBA § 10-7E-8, or under the Labor Ordinance to obtain an administrative hearing,  see Labor Ordinance § 3-2-10.  In fact, these administrative mechanisms may afford the Officers Association more protections for its interest in preserving its CBA than intervention in the federal case.  Intervention gives the Officers Association merely the right to present its Objections to the Court.  It does not make the Officers Association a party to the Settlement Agreement, nor does it give the Officers Association the ability to override the Settlement Agreement.  Of course, the Court could reject the Original Settlement Agreement based on the Officers Association's Objections.  The federal case offers only a time-intensive, inefficient solution of throwing out the entire Settlement Agreement and starting from scratch each time the Officers Association objects -- while the PEBA and the LRMO give Albuquerque and the Officers Association an administrative hearing with officers who are experienced in resolving these disputes in a setting structured for this purpose. See PEBA § 10-7E-8; Labor Ordinance § 3-2-10.  The best way to resolve a CBA dispute may be to follow the CBA mechanism for disputes and sit at the bargaining table to develop a memorandum of understanding.  Alternatively, the litigation could result in a trial and an injunction.  If injunctive relief were the ultimate outcome, and Albuquerque implemented new procedures to execute the injunction, the Officers Association again has all the aforementioned relief mechanisms to remedy any dispute.  The Court finds it difficult to say that a movant with four preestablished mechanisms for resolving a dispute pertaining to its interest in its CBA faces such a threat of impairment that it must intervene in a suit where the resolution will not determine

any issues related to its CBA and thus will not prevent, through res judicata, collateral estoppel, or stare decisis, the movant from protecting its interest.

The Court acknowledges other, published Tenth Circuit caselaw makes it clear that an alternative forum is not enough: "'[W]here a proposed intervenor's interest will be prejudiced if it does not participate in the main action, the mere availability of alternative forums is not sufficient to justify denial of a motion to intervene.'"  Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1254 (quoting Commodity Futures Trading Comm'n v. Heritage Capital Advisory Serv., 736 F.2d 384, 387 (7th Cir. 1984)).  The Court construes this language to mean that, although the existence of an alternative forum is not enough on its own, the Court can consider the number and quality of available alternative fora to determine whether the interest is impaired.  In this case, that analysis would show that there are four available fora for the Officers Association to protect its interest -- state court, Labor Ordinance, PEBA, and the bargaining table -- and, as discussed supra, these fora would offer at least as much protection as intervention.  The Court notes, however, that the Tenth Circuit's analysis regarding alternative fora is cursory[23] and, when coupled with its caselaw

---

[23]The Tenth Circuit gives a brief analysis:

Plaintiffs also contend the intervenors' interests are not impaired because they would be able to participate in the formulation of a revised land use plan for the area should it lose its monument status. Again we disagree. "[W]here a proposed intervenor's interest will be prejudiced if it does not participate in the main action, the mere availability of alternative forums is not sufficient to justify denial of a motion to intervene." Commodity Futures Trading Comm'n v. Heritage Capital Advisory Serv., 736 F.2d 384, 387 (7th Cir. 1984). Moreover, the possibility of impairment is not eliminated by the intervenors' opportunity to participate in the formulation of a revised land use plan that, at most, would not provide the level of protection to the intervenors' interests that the current plan offers.

Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1254.

emphasizing the minimal burden of impairment, suggests that alternative fora are unlikely to mitigate interest-impairment.

The fourth factor is whether the existing parties adequately represent the Officers Association's interest.  See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d at 1103. Neither the United States nor Albuquerque asserts that they are adequate representatives of the Officers Association's interests in this litigation.  See U.S. MTI Response at 4; MTI MOO at 4-8 (Brack, J.).  A party's own concession that it does not adequately represent the movant's interests or omission that it could adequately represent the movant's interest should not be taken lightly. But the Court examines the parties' ability for adequate representation anyway.  The United States asserts that Albuquerque and the Officers Association "have exactly the same interest when it comes to the United States' allegations that APD officers engaged in unconstitutional conduct: both deny such allegations."   U.S. MTI Response at n.4.   The Court, however, has already concluded that the Officers Association does not have a protected interest in the United States' allegations in the Complaint, and that it has an interest only in the Original Settlement Agreement and how it may conflict with the CBA.  Regardless, the United States does not share an interest with the Officers Association in protecting the CBA, because the United States is not a party to the CBA and has no interest in the CBA.

The Court looks at whether the remaining party, Albuquerque, adequately represents the Officers Association's interest in the CBA.  Albuquerque, as a party to the CBA, similarly shares an interest in protecting the CBA.  Albuquerque and the Officers Association, however, had sufficiently different interests in the CBA that it took them over four years to negotiate the final agreement.  See MTI at 10; Amicus Curiae at 2.  Thus, even though the CBA is a result of the resolution of competing interests, the underlying competing interests render Albuquerque's

interest in the CBA distinct, and perhaps even somewhat contrary for certain provisions, to the Officers Association's interest in the CBA.  That Albuquerque agreed to an Original Settlement Agreement provision that directly contradicted a CBA provision speaks to the different interests. See Albuquerque MTI Response at 10.  Thus, the Court concludes that Albuquerque does not adequately represent the Officers Association's interest in the CBA.

Albuquerque and the Officers Association point to cases from Courts of Appeals other than the Tenth Circuit to demonstrate support for their argument that the Officers Association does not have an interest in the litigation.  Albuquerque relies heavily on Floyd v. City of New York, which denied a police union's motion to intervene, in part, because the union did not have a protectable interest in the litigation.  See Albuquerque MTI Response at 6 (citing Floyd v. City of N.Y., 770 F.3d at 82).  Examining the first alleged interest in defending officers from liability, Albuquerque contends that, in Floyd v. City of N.Y., the lawsuit was against New York City and the Police Department and not against individual officers.  See Albuquerque MTI Response at 5.  In this case, Albuquerque argues, the lawsuit also is against Albuquerque and not against individual officers. Thus, Albuquerque argues, the Court should follow Floyd v. City of N.Y.'s reasoning and deny the MTI.  See Albuquerque Motion Response at 5-6.

In contrast, the Officers Association relies heavily on United States v. City of L.A.  See MTI at 5-8.  Examining the first interest, the Officers Association argues that, similar to the United States in this case, the plaintiff had filed a complaint that "seeks injunctive relief against its member officers and raises factual allegations that its member officers committed unconstitutional acts in the line of duty."  MTI at 9 (quoting United States v. City of L.A., 288 F.3d at 399).  Thus, the Officers Association argues, because the Ninth Circuit in United States v. City of L.A concluded that those facts were sufficient "'alone'" to show that the police union had a protectable

interest, then the Court should follow the Ninth Circuit's reasoning and grant the MTI.  See MTI at 6 (quoting City of L.A., 288 F.3d at 399).

Neither case is on-point, although the United States v. City of L.A is more similar to this case than Floyd v. City of N.Y.  In United States v. City of L.A, the United States filed its complaint the same day that it, along with the defendant, filed a "Joint Application to Enter Consent Decree" and the proposed settlement agreement.  United States v. City of L.A, 288 F.3d at 396.  Thus, the complaint was a legal fiction in that the parties immediately began moving towards settlement, but there was a possibility that settlement would not work and that the United States would continue to seek injunctive relief.  In this case, the United States filed its Complaint the same day that it and Albuquerque filed the Original Settlement Agreement.  See Complaint; Original Settlement Agreement.  Thus, the Complaint is a legal fiction in that the parties immediately started pursuing settlement, although the possibility existed that Judge Brack would not approve Original Settlement Agreement.   Thus, the immediate move towards settlement in both cases mitigates any threat towards the officers' interest.  Moreover, like the United States v. City of L.A complaint, this Complaint "seeks injunctive relief against its member officers and raises factual allegations that its member officers committed unconstitutional acts in the line of duty."[24]   United States v. City of L.A 288 F.3d at 399.  See Complaint at 1.

_____

[24]Albuquerque states that the United States v. City of L.A complaint was "against individual union member officers, against whom the United States sought injunctive relief," Albuquerque MTI Response at 5 (citing United States v. City of L.A, 288 F.3d at 399), in contrast to this Complaint, which Albuquerque argues does not seek relief "punishing individual officer behavior," Albuquerque MTI Response at 6.  This language muddies the actual underlying facts.  The United States did not name any individual officers in its complaint in United States v. City of L.A.  See Intervenor-Appellant's Brief in City of L.A., 2001 WL 34093539 at * 2 ("[The United States[] is suing the City of Los Angeles [], not individual police officers, under 42 U.S.C. § 14141 alleging a pattern and practice by Los Angeles police officers that deprives persons of rights, privileges, and immunities secured or protected by the Constitution or law of the United States.").

However, the Court concludes that the United States v. City of L.A officers had a more direct and substantial interest in the action.[25]   In this case, the officers are accused of excessive force, but the Complaint clarifies that the excessive use of force is part of APD's patterns and practices.  See Complaint ¶ 7, at 3 ("The pattern or practice of use of excessive force stems from systemic deficiencies in the Defendant's policies, training, supervision, recruiting, hiring, internal investigations, and external oversight."); id. ¶ B, at 12 (stating that, although the less-lethal-force claim does not specifically allege system deficiencies, it incorporates everything from the deadly-force claim, including that excessive force in general stems from systemic deficiencies); id. ¶ 17, at 5 ("The use of excessive force by Albuquerque police officers is the result of the Defendant's failure to institute adequate controls and systems of accountability to detect, correct, and prevent officer misconduct.").  The individual officers' actions still compose the Complaint's underlying facts, but the Complaint makes it clear that those actions can be traced back to Albuquerque's patterns or practices.  In contrast, the United States v. City of L.A complaint appears to have alleged generalized wrongdoing by the officers that may have been outside the scope of their employment.  See Intervenor-Appellant's Brief, 2001 WL 34093539, at *2 (stating that the complaint alleged, "among other things, that League members use excessive force against persons, falsely arrest persons, improperly stop, search and seize persons, and engage in other misconduct" and that "in an attempt "to remedy these individual acts committed by League members, the Complaint (in its prayer) seeks an order enjoining League members").  The complaint focused on

_____

[25]The facts in Floyd v. City of N.Y. are very different from the facts in this case, so it is of minimal help in deciding the issue.  In Floyd v. City of N.Y., the police union not only submitted an untimely motion, but it only argued one protectable interest: "conclusory," "speculative," and not legally protected "reputational damage," which was only tenuously related to the excessive-force claims in the complaint.  770 F.3d at 1056.

a division of the Los Angeles Police Department that, "according to the testimony of a former LAPD officer, had engaged in widespread misconduct and corruption." Floyd v. City of N.Y., 302 F.R.D. at 106.  The testimony led to over 150 civil lawsuits and the overturning of dozens of convictions.  See Floyd v. City of N.Y., 302 F.R.D. at n.18.  It also appears that the independent monitor investigated police corruption, which could have led to further charges beyond what was in the complaint.  See United States v. City of L.A., 2002 WL 31288087, at *1 (stating that the independent monitor was "charged with collecting information and investigating alleged police corruption").  Most important, the United States v. City of L.A. officers faced a greater possibility of liability than the Officers Association's members, because the United States v. City of Los Angeles' proposed settlement agreement had a provision permitting "the United States to seek its dissolution in certain circumstances and litigate the action on the merits." Floyd v. City of N.Y., 302 F.R.D. at 107.  In contrast, the Original Settlement Agreement contains a provision for the parties jointly to terminate the finalized Settlement Agreement after four years, a provision for either party to dissolve the agreement after a period of six years, and nothing about the United States litigating the action on the merits after termination.  See Original Settlement Agreement ¶¶ 342-344, at 103-04.  So the protectable interest was more substantial in United States v. City of Los Angeles than in this case, because there was a greater threat of litigation against individual officers.  The Ninth Circuit, however, does not bind the Court.  Even if the United States v. City of Los Angeles police officers' interest is identical to the Officers Association members' interest, the Court is not persuaded that the interest is sufficiently substantial or direct to meet the standard as discussed above.

Albuquerque relies heavily on Johnson v. Lodge No. 93 to undermine the Officers Association's protectable interest in the CBA.  See Albuquerque MTI Response at 7-8.

Albuquerque argues that <u>Johnson v. Lodge No. 93</u> permits it to enter into the Original Settlement Agreement because of the CBA's managerial-rights provision.  <u>See</u> Albuquerque MTI Response at 7.  The managerial-rights provision in that case stated that the police union

> recognizes the prerogative of Employer [the City] to operate and manage its affairs in all respect and in accordance with its responsibilities, and the powers of authority which Employer has not officially abridged, delegated, granted or modified by this Agreement are retained by Employer, and all rights, powers, and authority Employer had prior to the signing of this Agreement are retained by Employer and remain exclusively without limitation within the rights of Employer.

<u>Johnson v. Lodge No. 93</u>, 292 F.3d at 1100 (alteration in <u>Johnson v. Lodge No. 93</u>).  The management-rights provision then listed fourteen topics over which Tulsa did not need to bargain "including matters such as the assignment of working hours, hiring and promotions, the allocation of work assignments, and officer discipline."  <u>Johnson v. Lodge No. 93</u>, 292 F.3d at 1101.  It further noted that Tulsa had "the right to determine [Tulsa Police Department] policy, to manage the affairs of the Police Department in all respects, and to introduce new, improved or different methods and techniques of Police Department operation or change existing methods and techniques."  <u>Johnson v. Lodge No. 93</u>, 292 F.3d at 1101 (alteration added and not in original).  Because the Tenth Circuit concluded in <u>Johnson v. Lodge No. 93</u> that the managerial-rights provision "plainly encompassed the city's right to enter into a remedial settlement agreement during the term of the collective bargaining agreement," Albuquerque MTI Response at 8 (citing <u>Johnson v. Lodge No. 93</u>), Albuquerque argues that the Court should conclude that the CBA's managerial-rights provision also encompasses Albuquerque's right to enter into the Original Settlement Agreement with the United States, <u>see</u> Albuquerque MTI Response at 8.  The CBA's managerial-rights provision, however, does not merit such a conclusion.  Albuquerque acknowledges that the CBA's managerial-rights provision clarifies that only directives, rules, and

regulations that "do not conflict with this [Collective Bargaining] Agreement" will bind the Officers Association.  CBA § 32.2, at 41-42.  <u>See</u> Albuquerque MTI Response at 8.  Further, Albuquerque omits the portion of the managerial-rights provision that states that a Memorandum of Understanding "between the parties must be reached an[d] executed in the case where either party wishes to change or amend a policy which would be in conflict with the provisions of this Agreement."  CBA § 32.2, at 42.  Accordingly, if Albuquerque wants to change a policy as part of the Original Settlement Agreement, it must negotiate a Memorandum of Understanding with the Officers Association.  Thus, Albuquerque does not have the power to implement policies that conflict with the CBA.

That the managerial-rights provision restrains Albuquerque does not mean that the Officers Association can "veto all settlements that touch on the terms and conditions of its members' employment."  Albuquerque MTI Response at 8 (citing <u>Johnson v. Lodge No. 93</u>, 292 F.3d at 1105).  The Court is not concluding that the Officers Association has veto power; an interest does not give a party any right greater than the party had before intervention.  <u>See WildEarth Guardians v. U.S. Forest Serv</u>., 778 F. Supp. 2d at 1149 ("'Allowing [a party] to intervene does not mean that it can veto the settlement . . . .  The district court can still approve the consent decree if it finds that the settlement is reasonable, fair and consistent with [federal law].'")(quoting <u>United States v. Albert Inv. Co.</u>, 585 F.3d at 1398 (alterations in <u>WildEarth Guardians v. U.S. Forest Serv.</u>)(internal citations omitted)).  Although the Officers Association retains the rights that it had before intervention to resolve Albuquerque's breach of the CBA through state court or through administrative mechanisms, intervention does not grant it a new right to veto the Settlement Agreement.  Rule 24 does not establish substantive rights under the Rules Enabling Act; the Federal Rules of Civil Procedure grants only procedural rights.  It is concluding, however, that the

Officers Association has a protectable interest in preserving its CBA and at least trying to keep Albuquerque from making unilateral changes to the CBA in the Settlement Agreement.

Albuquerque argues, in the alternative, that the Officers Association does not have standing to intervene.  See Albuquerque MTI Response at 14.  The Tenth Circuit has noted that rule 24(a)'s "provisions cannot remove the Article III hurdle that anyone faces when voluntarily seeking to enter a federal court," and thus, "Article III's requirements apply to *all* intervenors, whether they intervene to assert a claim or defend an interest."  Safe Streets All. v. Hickenlooper, 859 F.3d 865, 912 (10th Cir. 2017)(emphasis in Safe Streets All. v. Hickenlooper)(citing Wittman v. Personhuballah, -- U.S. --, 136 S. Ct. 1732, 1735-37 (2016); Hollingsworth v. Perry, 570 U.S. 693, 697-711 (2013), abrogating in part San Juan Cty. v. United States, 503 F.3d at 1172 (stating that a movant seeking intervention under rule 24(a) or rule 24(b) did not need to establish Article III standing if another party with constitutional standing on the movant's side was still in the case )).  Two years later, the Tenth Circuit issued an opinion clarifying its statement in Safe Streets Alliance, calling the statement "dicta."  Kane Cty., Utah v. United States, 928 F.3d at 887 n.11.  The Tenth Circuit clarified:

> Safe Streets involved two States (Nebraska and Oklahoma) seeking to intervene as plaintiffs in an action against another State, Colorado.  There, we held that we were without *subject matter* jurisdiction to consider the State's intervention motion, because 28 U.S.C. § 1251(a) gave exclusive subject-matter jurisdiction to the United States Supreme Court to resolve disputes between two states.  Id. at 877, 912.  Furthermore, Safe Streets relied on Hollingsworth v. Perry, 570 U.S. 693, 708, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013), for this dicta about constitutional standing, but Hollingsworth, in fact, applied the piggyback standing rule.  There, the intervenors had to demonstrate their own standing because they were the *sole parties* to seek an appeal.  Id. at 702, 708, 133 S.Ct. 2652.  Here, the United States remains a party.  The dissent also cites United States v. Colorado & Eastern Railroad Company, 882 F.3d 1264 (10th Cir. 2018).  But again, that case is inapposite because there the would-be intervenor seeking to enforce a consent decree that it was not a party to "could not 'piggyback' on the standing of one of the described parties to the Consent Decree because there was no current case or

controversy pending before the court on the part of those parties." Id. at 1268.  In contrast, there exists a live controversy between the United States and the plaintiffs in this case.

Kane Cty., Utah v. United States, 928 F.3d at 887 n.11 (emphases in Kane Cty., Utah v. United States).  Thus, if the Court was deciding the MTI now, the Officers Association, which is seeking relief beyond what Albuquerque is seeking, would have to meet independently the Article III requirements.  See Kane Cty. v. United States, 928 F.3d 877, 886-87 (10th Cir. 2019)(quoting Town v. Chester, N.Y. v. Laroe Estates, Inc., 137 S.Ct. 1645, 1648 (2017)).  At the time of the MTI, however, the Court would need to decide only whether another party with constitutional standing on the same side as the Officers Association had standing, and Albuquerque would provide the Officers Association with that standing.[26]

## B.    THE PARTIES HAVE NOT ASKED THE COURT TO RECONSIDER JUDGE BRACK'S MOTION TO INTERVENE MOO.

The parties have not asked the Court to reconsider Judge Brack's MTI MOO, although MTI MOO does not bind the Court, under the law-of-the-case doctrine.  See generally Objections; Albuquerque Objections Response; United States Objections Response.  As the Tenth Circuit noted in Rimbert v. Eli Lilly & Co., 647 F.3d 1247 (10th Cir. 2011), the law-of-the-case doctrine "does not bind a judge to follow rulings in the same case by another judge of coordinate jurisdiction as long as prejudice does not ensue to the party seeking the benefit of the doctrine."  647 F.3d at

---

[26]The Tenth Circuit approvingly cited other Courts of Appeals that have concluded that a party that satisfies rule 24(a) categorically satisfies Article III standing's requirements, although the Tenth Circuit did not go as far as to adopt explicitly these propositions.  See Kane Cty. v, Utah v. United States, 929 F.3d at 889 n. 14 ("Other courts have recognized that 'any person who satisfies Rule 24(a) will also meet Article III's standing requirement.'")(citing Roeder v. Islamic Republic of Iran, 333 F.3d 228, 233 (D.C. Cir. 2003); Sokaogon Chippewa Cmty. v. Babbit, 214 F.3d 941, 946 (7th Cir. 2000)).  The Officers Association's fulfillment of rule 24(a)'s requirements should be sufficient to establish Article III standing under Tenth Circuit law.

1251 (quoting <u>United States v. Johnson</u>, 12 F.3d at 1544).  "The relevant prejudice is limited to

lack of sufficient notice that one judge is revisiting the decision of a prior judge and the opportunity

to be heard with respect to the new ruling."  <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d at 1251.  Because,

however, no party has asked the Court to reconsider, Judge Brack's decision to permit intervention

stands.

        **C.**      **THE COURT WILL STRICTLY LIMIT THE OFFICERS ASSOCIATION'S STATUS AS AN INTERVENOR TO PROTECT ITS INTEREST IN ITS CBA.**

The Officers Association asked Judge Brack to determine its intervenor status for two

phases of litigation -- the remedial phase and the liability phase -- and Judge Brack split the case

into two these phases when deciding on the Officers Association's intervenor status.  <u>See</u> MTI

MOO at 4 (Brack, J.)(granting the Officers Association intervenor status in the remedial phase of

the litigation and deferring rule on the Officers Association's intervenor status in the liability

phase.).  The Court has searched diligently through Judge Brack's opinions and the record for a

clear definition of the remedial phase and the liability phase of the litigation, but Judge Brack does

not give explicit definitions for liability phase and remedial phase.  The first mention the Court

finds of the remedial and liability phases of litigation is in the Officers Association's MTI.  <u>See</u>

MTI at 4.  The Officers Association, however, does not provide its definitions for the remedial and

liability phases of litigation and only indicates their intended meanings, as discussed supra.  The

Officers Association seems to have lifted these terms from a case it cites out of a different Court

of Appeals -- the Ninth Circuit.  <u>See</u> MTI at 7.  That case is <u>United States v. City of L.A.</u>, in which

the Ninth Circuit affirmed in part and reversed in part the district court's ruling on a police union's

motion to intervene.  288 F.3d at 395.  In <u>United States v. City of L.A.</u>, the district court had

divided the litigation into the two phases -- the merits phase and the remedial phase -- and

determined whether the police union had a right to intervene in each of the phases of litigation.
See 288 F.3d at 399.  The district court determined that: (i) the police union did not have a
protectable interest in the merits phase of the litigation, because the district court assumed that it
would approve and finalize the consent decree, and because the sought injunction applied only to
Los Angeles; and (ii) the police union did have a protectable interest in the remedial phase of
litigation, because state law entitled the police union to negotiate employment terms and to rely on
the CBA that resulted from those negotiations.   See 288 F.3d at 399-400.  Thus, the district court
appears to define the merits phase of litigation as the stage of litigation before settlement or trial,
and the remedial stage of litigation as everything pertaining to the settlement after it is approved
and entered.  Speaking to the merits phase, the Ninth Circuit stated:

> The district court erred as to the merits of the action. Of course, as the
> district court noted, the Police League and the officers it represents have no
> protectable interest in violating other individuals' constitutional rights. No one
> could seriously argue otherwise. However, the Police League claims a protectable
> interest because the complaint seeks injunctive relief against its member officers
> and raises factual allegations that its member officers committed unconstitutional
> acts in the line of duty. These allegations are sufficient to demonstrate that the
> Police League had a protectable interest in the merits phase of the litigation.
>
> The district court found that the Police League did not have a protectable
> interest in the merits because the proposed consent decree's injunctive provisions
> pertained only to the City defendants and because approval of the proposed decree
> would obviate the need to prove liability. However, in reaching these conclusions
> the court impermissibly assumed that it would in fact approve the proposed consent
> decree. No hearing had yet been held on the consent decree and it was unknown
> whether the district court would enter a decree at all or, if so, in the form then
> proposed.

United States v. City of L.A., 288 F.3d at 399.  The Ninth Circuit notes that,

> [w]hen the potential scope of an action is narrowed by amended pleadings or court
> orders, or when an existing party expressly and unequivocally disclaims the right
> to seek certain remedies, the court may consider the case as restructured rather than
> on the original pleadings in ruling on a motion to intervene.

288 F.3d at 399.   The Ninth Circuit clarifies that a court making a motion-to-intervene determination cannot exclude from consideration the party's interests in the liability phase of litigation if the case has not been restructured or if the party's disclaimer in any interests is conditional.   See 288 F.3d at 399 (stating that if the action's restructuring "has not yet been accomplished, or if a party's disclaimer of certain remedies is contingent rather than unequivocal, then the district court is not free to consider the potential for issue reduction when determining whether a putative intervener has a protectable interest in the merits").   The Ninth Circuit, therefore, appears to define the merits phase of the litigation as the time before settlement or trial. If remedies are sought against a party, the Ninth Circuit concludes, that party has a protectable interest in the merits phase of litigation until either the other party disclaims the remedy "unequivocally and completely," or the court enters a settlement agreement in which the other party disclaims the remedy "unequivocally and completely."   United States v. City of L.A., 288 F.3d at 399.   Thus, the Ninth Circuit narrows the Officers Association's definition of the merits phase of litigation by noting that an unequivocal and complete disclaimer of a remedy ends the liability phase for that remedy.

In terms of the litigation's remedial phase, the Ninth Circuit states:

The district court correctly concluded that the Police League had a protectable interest in the remedy sought by the United States.   The Police League has state-law rights to negotiate about the terms and conditions of its members' employment as LAPD officers and to rely on the collective bargaining agreement that is a result of those negotiations.   See Cal Gov't Code §§ 3500-3511.   These rights give it an interest in the consent decree at issue.

. . .

Thus, the Police League's interest in the consent decree is two-fold.   To the extent that it contains or might contain provisions that contradict terms of the officers' [Memorandum of Understanding ("MOU")], the Police League has an interest.   Further, to the extent that it is disputed whether or not the consent decree

conflicts with the MOU, the Police League has the right to present its views on the subject to the district court and have them fully considered in conjunction with the district court's decision to approve the consent decree.

288 F.3d at 400 (citing EEOC v. AT&T, 506 F.2d 735, 741-42 (3d. Cir. 1974)).  The Ninth Circuit, similarly to the Officers Association, limits the remedial phase actions relating to the consent decree's implementation that occur after the court has entered the finalized consent decree.  See United States v. City of L.A., 288 F.3d at 400.  Thus, it could be extrapolated from the Ninth Circuit's decision that the moment before the court enters the Settlement Agreement, the case is in the litigation phase, because the parties are still moving towards a trial or other adjudication of liability; and the moment after the court enters the Settlement Agreement, the case enters the litigation's remedial phase, in which the court no longer is tasked with adjudicating guilt and instead crafts and monitors the appropriate remedies.  The Court agrees with these broad definitions and defines the liability phase as all actions and events before liability is decided or settled -- in this case, when the Settlement Agreement, is entered -- and the remedial phase as all actions and events related to the finalized remedy, which in this case is also the Settlement Agreement.  Thus, all objections to the Proposed Settlement Agreement before its finalization would be part of the litigation's liability phase.

Judge Brack determined intervenor status for only the "remedial" stage of the case, and he left the question of intervenor status for the "liability" stage of the case, although he treats them differently than this Court defines them.  MTI MOO at 4 (Brack, J.).  Judge Brack's rulings on Objections shed light on how he defines  the phases of litigation.  He concluded there are three bases for permitting Objections: (i) a conflict between the Settlement Agreement and the law; (ii) a conflict between the Settlement Agreement and the CBA; and (iii) the mandatory obligations the Settlement Agreement places on the Officers Association.  See Original Settlement Agreement

MOO (Brack, J.).   Consistent with this conclusion, Judge Brack was quick to note that policy concerns are not a sufficient basis for an Objection, although he often overruled these Objections anyway, even after acknowledging that the Objection was beyond the agreement's scope.   See Original Settlement Agreement MOO at 23 (Brack, J.)(declining to rule on use-of-force definitions and training officers, because, he stated, Albuquerque and the Officers Association could negotiate these terms); Original Settlement Agreement MOO at 24 (Brack, J.)(overruling Objections regarding new technology and equipment policies even after stating that these Objections "were beyond the scope of the agreement"); Original Settlement Agreement MOO at 27 (Brack, J.)(appearing to overrule the Officers Association's Objections that they were excluded from the Mental Health Response Advisory Committee, even though he states that the Objection is a "policy question beyond the expertise of this Court").   In contrast, Judge Brack tackles the merits of Objections that the Officers Association argues conflicts with the CBA or the law.   See, e.g., Original Settlement Agreement MOO at 25 (Brack, J.)(deciding the Objections to "perceived changes to the policies for promotions, evaluations, and assignments," which were based on CBA provisions).   Thus, Judge Brack appears to narrow the scope of permitted Objections to limit the Objections only to those Objections that allege that the Settlement Agreement violates the CBA or law, or imposes mandatory obligations on the Officers Association.   The below table reviews the Officers Association's Objections and whether Judge Brack permitted the Objection.

| The Officers Association's Objections Categorized by Judge Brack | The Officers Association's Grounds for its Objections | Judge Brack's Posture Towards the Objection |
| --- | --- | --- |

| 1. *Investigation Procedures* | CBA § 2.3.1.4; Fifth Amendment rights; due process rights. | Judge Brack allowed these Objections and ruled on their substance. |
|---|---|---|
| Force Review Board | CBA § 20.1.6 | Judge Brack allowed these Objections and ruled on their substance. |
| Criminal Investigations by Internal Affairs Bureau | CBA § 20.1.7-8 | Judge Brack allowed these Objections and ruled on their substance. |
| 2. *Civilian Complaints and the Oversight Agency* | CBA § 20.1.3.1-2 | Judge Brack allowed these Objections and ruled on their substance. |
| Albuquerque City Ordinance - created Civilian Police Oversight Agency | CBA § 20.1.19 | Judge Brack did not allow the Objection, because the ordinance's legality is beyond the scope of current litigation. |
| 3. *Officer Privacy* | CBA § 20.2.10 | Judge Brack allowed these Objections and ruled on their substance. |
| Drug Testing and Mental Health Evaluations | CBA § 20.2.10 | Judge Brack allowed these Objections and ruled on their substance. |
| 4. *Discipline Policy* Early Intervention System | CBA § 21.1.1 | Judge Brack allowed these Objections and ruled on their substance. |
| Disciplinary Matrix | Violation of due process[27] | Judge Brack declined to rule on this Objection; the Settlement Agreement does not specify levels and types of discipline, or process. "The Court will not unnecessarily decide which issues require mandatory bargaining. For now, the Agreement as written does not yet create a disciplinary system for the Union to challenge." Original Settlement Agreement MOO at 23. |
| Definitions of force and standards for | Definition and standards of force above constitutional | Judge Brack declined to rule on these Objections regarding clarifying definitions and training officers, and he overruled the |

_____

[27]Judge Brack characterizes the basis for this objection as violating the presumption of innocence.  See Original Settlement Agreement MOO at 23 (Brack, J.).  The First Settlement Agreement Objections offer some clarity, stating that the matrix is a "complete violation of the officer's rights to due process and the law regarding the burden of proof resting [on] the employer. So much for guilty until proven."   First Settlement Agreement Objections at 12.

| | | |
|---|---|---|
| using force; proper training on standards. | maximum; proper training, clarified confusion") | Objection regarding the use-of-force standard.  In terms of clarifying definitions and training officers, Judge Brack stated that "the City and Union can negotiate on their own terms."  Original Settlement Agreement MOO at 23.  In terms of the use-of-force standard, Judge Brack stated that, "[p]olice departments are free to set their own standards and policies.  Changing the definition of excessive force in a police handbook does not alter the constitutional standard and does not increase officers' constitutional liability."  Original Settlement Agreement MOO at 23. |
| 5. *New Policies Regarding Technology and Equipment* | Policy concerns | Judge Brack overruled these Objections, stating that these issues were "beyond the scope of the agreement."  Judge Brack elaborated on his decision, stating that the Settlement Agreement "does not mandate any form or level of discipline. It merely states that the failure to follow APD policy will result in discipline."  Original Settlement Agreement MOO at 24.  Thus, Judge Brack concluded, "[s]hould the City and the Union determine that the technology policies require further clarification, they are free to adopt more detailed policies -- so long as they comport with the baseline requirements in the Agreement .  .  . Presumably, the City and the Union will negotiate the impacts of their policies in their next collective bargaining session."  Original Settlement Agreement MOO at 24-25. |
| Preservation of Camera Footage | Policy concerns, a due process violation, and a conflict with the collective bargaining agreement | Judge Brack allowed these Objections and ruled on their substance. |
| 6. *Promotions, Evaluations, and Assignments.* | CBA § 14.1; 14.1.2; 17.1; 17.3.2 | Judge Brack allowed these Objections and ruled on their substance. |

| Crisis Management Training | Efficiency concerns | Judge Brack allowed these Objections and overruled them. |
| 7. *Department Policymaking* APOA exclusion from Mental Health Response Advisory Committee | Policy concerns[28] | Although it appears as if Judge Brack declines to rule on this Objection, because he states that it is a "policy question beyond the expertise of this Court," he seems to overrule it, because he says it "fails for a similar reason" as another Objection that he explicitly overrules. Original Settlement Agreement MOO at 27. The Court concludes that Judge Brack's reasoning for overruling the objection is that, "[i]n general, the City retains the right to develop and implement Department policy." Original Settlement Agreement MOO at 27 (citing CBA § 32.1). |
| APOA exclusion from Force Review Board | Policy concerns[29] | Judge Brack overruled the Objection, because the review of use-of-force investigations and data collection on use-of-force investigations "are not areas where the Union has traditionally had a voice." Original Settlement Agreement MOO at 27. |
| APOA exclusion from Policy and Procedures Review Board | Policy concerns[30] | Judge Brack allowed this Objection and ruled the Objection, stating that the Objection has no foundation, because the Officers Association was invited to attend |

---

[28]Unusually, Judge Brack notes that the Officers Association has given no legal basis for this Objection. See Original Settlement Agreement MOO at 27.

[29]The Officers Association argues that it should be included on the Force Review Board, because "it is clear from the Settlement Agreement this board will operate outside the time limits imposed in the CBA to conduct administrative investigations." Objections Reply at 14. Judge Brack does not address this argument. The Court presumes that Judge Brack does not address this argument, because the argument does not support the conclusion that the Officers Association should be included on the Force Review Board. The Officers Association's argument supports an Objection to the Force Review Board itself, but the Officers Association does not make that Objection.

[30]Specifically, the Officers' Association stated that its participation in the Policy and Procedures Review Board "has not been readily recognized by the Department," and that it does not know how the Policy and Procedures Review Board will make the necessary changes in accordance with the Settlement Agreement without the Officers Association's participation. See First Settlement Agreement Objections Reply at 8.

| | | |
|---|---|---|
| | | and participate in Policy and Procedures Review Board meetings but did not attend those meetings. |
| Stipulated Modifications under ¶ 338 of Original Settlement Agreement | | Judge Brack allowed this Objection and overruled it, stating that he "is not concerned that this provision will impair the [Officers Association's] interests," because the provisions' existence "was one of the bases the Court cited for permitting the [Officers Association] to intervene into this lawsuit." Original Settlement Agreement MOO at 28. |
| *OVERALL OBJECTIONS* | | Judge Brack concluded with a statement that he overruled all of the Officers Association's objections, because: (i) the Settlement Agreement did not conflict with state law; (ii) the Settlement Agreement did not conflict with the CBA; and (iii) the Settlement Agreement did not "impose any mandatory obligations" on the Officers Association and that the Officers Association "may choose to negotiate many of the specific policies and their implications." Original Settlement Agreement MOO at 28. |

Explaining his decision, Judge Brack writes:

> The Union requests intervention for both the liability and the remedial phases of litigation.  Most of the Union's argument, however, focus[es] on intervention in the remedial phase.  The Court will rule currently on the Union's motion to intervene in the remedial phase and will defer the ruling on the motion to intervene in the liability phase.  See San Juan Cty., 503 F.3d at 1189 (discussing a district court's flexibility in permitting intervention for certain matters).  If the Court oversees a liability phase in this litigation, it will consider the [Officers Association's] motion to intervene as timely.

MTI MOO at 4 (Brack, J.).  The practice of deciding intervention for each stage of the case

individually stems from the advisory committee's note to rule 24(a) of the Federal Rules of Civil

Procedure, which authorizes courts to "subject [an intervention of right under the amended rule]

to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings." Fed. R. Civ. P. 24(a), advisory committee notes. See Forest Conservation Council v. U.S. Forest Serv., 66 F.3d 1489, 1496-97 (9th Cir. 1995)(citing rule 24(a) for the proposition that a district court can limit intervention to issues for which the nonparty has a "'sufficient interest'"), abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011)(quoting United States v. S. Fla. Water Mgmt. Dist., 922 F.3d 704, 707 n. 4 (11th Cir. 1991).   Courts have interpreted the advisory committee notes to mean that they can limit the scope of an intervenor's party status.   See, e.g., United States v. City of Detroit, 712 F.3d 925, 931 (6th Cir. 2013)(stating that "courts are not faced with an all-or-nothing choice between grant or denial: Rule 24 also provides for limited-in-scope intervention"); Thomas v. Bakery, Confectionery & Tobacco Workers Int'l Union, 982 F.2d 1215, 1220 (8th Cir.1992), cert. denied, 508 U.S. 972 (1993).   Although the Tenth Circuit has not addressed limited intervention in the police-union-intervention context, it has approved limited intervention.[31]   See United States v. Curry, No. CV 10-1251 MCA/LFG, 2011 WL 13315500, at *3 (D.N.M. July 20, 2011)(stating

---

[31]Although there is no caselaw in the Tenth Circuit regarding the liability and remedial phases of litigation in the police union settlement agreement context, there is some caselaw in other Courts of Appeals regarding the liability and remedial phases of litigation in the police union settlement agreement context.  In United States v. Portland, 2013 LEXIS 188465, the Honorable Michael H. Simon, United States District Judge for the United States District of Oregon, determined several motions to intervene, including a motion to intervene from the Portland Police Association.  See 2013 LEXIS 188465, at *10.  When analyzing the Portland Police Association's motion to intervene, Judge Simon narrowed his focus to determining only whether the Portland Police Association could intervene in the remedial phase of the litigation.   See 2013 LEXIS 188465, at *9.  To make this determination, Judge Simon looked to see "if the proposed Settlement Agreement contains -- or even might contain -- provisions that contradict the terms of the Labor Agreement."  2013 LEXIS 188465, at *10.  Thus, Judge Simon was concerned only with the Settlement Agreement in making his determination about the Portland Police Association's intervenor status at the remedial phase of the litigation.

that "limited intervention, however, has been approved by our Circuit")(citing <u>San Juan Cty. v.</u> <u>United States</u>, 503 F.3d at 1189).

The relevant excerpt of <u>San Juan Cty.</u> states

If the applicant is granted intervention because of an interest that may be injured by the litigation, it does not follow that the intervention must extend to matters not affecting that interest; and just because no party will adequately represent one particular interest of the applicant does not mean that the applicant must be allowed to participate in the litigation of other matters concerning which its interests are adequately represented. Thus, the Advisory Committee Notes state, "An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."

503 F.3d at 1189.   In this excerpt, the Tenth Circuit clarifies that it interprets the rule 24(a) advisory committee notes as permitting courts to restrict intervention based on the party's interest. Thus, this Court has the authority to restrict the scope of the Officers Association's intervenor status.   If the Court was deciding this status, it would restrict the Officers Association's intervention status not along the phases of litigation, but to the protected interest.   Thus, the Court would allow the Officers Association to intervene only to protect its interest under the CBA.   The Officers Association, therefore, may make Objections regarding the First Proposed Settlement Agreement before the Court finalizes it, and the Officers Association may make Objections regarding the finalized Settlement Agreement after the Court enters it, as long as all of these Objections arise out of conflict with the CBA.   Only the Court may enlarge the Officers Association's intervenor status.

**D.       EVEN IF THE COURT PERMITTED THE OFFICERS ASSOCIATION TO OBJECT, THE OBJECTION WOULD NOT BE TIMELY.**

All parties agree that the deadline for parties to file Objections was January 31, 2019.   <u>See</u> Aug. 13 Tr. at 11:13-16 (D'Amato); <u>id.</u> at 13:7-13 (Ryals, Court); Albuquerque Objection

Response at 8.  See also Deadlines Order at 1-2 ("APD shall enact all use of force policies (SOPs 2-52 through 2-57) by January 31, 2019. . . . If the parties are unable to resolve a disagreement regarding any policy or training within the above deadlines, they will file a motion with the Court to resolve the issue within the above deadlines.").  All parties further agree that the Officers Association filed its objection on May 28, 2019, almost four months after the deadline.  See Aug. 13 Tr. at 11:13-16 (D'Amato); id. at 14:9-12 (Ryals); Albuquerque Objection Response at 8.  The Court, thus, must determine whether the Officers Association has good cause for its four-month delay.

The Court concludes that the Officers Association does not give a satisfactory explanation for its four-month delay.  See Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6. (stating that good cause is met when a party is unable to meet the deadline despite "diligent" efforts).  To justify its delay, the Officers Association cites internal disagreement and difficulty narrowing the issue.  See Aug. 13 Tr. at 11:13-16 (D'Amato).  These reasons are reasons in which a motion to extend the deadline would be appropriate.  On the day of the deadline, the Officers Association was aware that it had not made a decision yet about an Objection.  The Officers Association had an explicit procedure to follow to obtain more time: file an extension for time. See Deadlines Order at 1-2 ("If a motion is filed with the Court to resolve any issues pertaining to the development of a policy or training, the deadlines associated with the policy or training at issue and any interrelated policies and/or trainings will be automatically vacated.").  The Officers Association declined to go through this channel to get more time; the Court, thus, is reluctant permit it to circumvent the deadline.  The Court is a reasonable court, but it cannot permit parties

to set their own deadlines without good cause.[32]   The Court could recast the Objections as a Motion

to reconsider, but it declines to do so, because it would be unwise to change the nature of the

Objections when the Officers Association's right to bring its Objections is at issue.

Albuquerque argues, in the alternative, that the Officers Association does not have standing

to intervene.   See Albuquerque MTI Response at 14.   The Tenth Circuit has noted that rule 24(a)'s

"provisions cannot remove the Article III hurdle that anyone faces when voluntarily seeking to

enter a federal court," and thus, "Article III's requirements apply to *all* intervenors, whether they

intervene to assert a claim or defend an interest."   Safe Streets All. v. Hickenlooper, 859 F.3d 865,

912 (10th Cir. 2017)(emphasis in   Safe Streets All. v. Hickenlooper)(citing   Wittman v.

Personhuballah, -- U.S. --, 136 S. Ct. 1732, 1735-37 (2016); Hollingsworth v. Perry, 570 U.S. 693,

697-711 (2013), abrogating in part San Juan Cty. v. United States, 503 F.3d at 1172 (stating that a

movant seeking intervention under rule 24(a) or rule 24(b) did not need to establish Article III

standing if another party with constitutional standing on the movant's side was still in the case )).

Two years later, the Tenth Circuit issued an opinion clarifying its statement in   Safe Streets

Alliance, calling the statement "dicta."   Kane Cty., Utah v. United States, 928 F.3d at 887 n.11.

The Tenth Circuit clarified:

> Safe Streets involved two States (Nebraska and Oklahoma) seeking to intervene as
> plaintiffs in an action against another State, Colorado.   There, we held that we were
> without *subject matter* jurisdiction to consider the State's intervention motion,
> because 28 U.S.C. § 1251(a) gave exclusive subject-matter jurisdiction to the
> United States Supreme Court to resolve disputes between two states.   Id. at 877,
> 912.   Furthermore, Safe Streets relied on Hollingsworth v. Perry, 570 U.S. 693,
> 708, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013), for this dicta about constitutional

_____

[32]Although the good-cause standard is used generally in the scheduling order context, that context, which also deals with parties collaborating on a deadline that the Court then enforces, is sufficiently analogous to the present case for the Court to extend the standard to this case. See Fed. R. Civ. P. 16(b)(4) (stating that scheduling orders  "may be modified only for good cause and with the judge's consent").

standing, but Hollingsworth, in fact, applied the piggyback standing rule.  There, the intervenors had to demonstrate their own standing because they were the *sole parties* to seek an appeal.  Id. at 702, 708, 133 S.Ct. 2652.  Here, the United States remains a party.  The dissent also cites United States v. Colorado & Eastern Railroad Company, 882 F.3d 1264 (10th Cir. 2018).  But again, that case is inapposite because there the would-be intervenor seeking to enforce a consent decree that it was not a party to "could not 'piggyback' on the standing of one of the described parties to the Consent Decree because there was no current case or controversy pending before the court on the part of those parties."  Id. at 1268.  In contrast, there exists a live controversy between the United States and the plaintiffs in this case.

Kane Cty., Utah v. United States, 928 F.3d at 887 n.11 (emphases in Kane Cty., Utah v. United States).  Thus, if the Court was deciding the MTI now, the Officers Association would not be able to "'piggyback'" on Albuquerque's standing, because Original Settlement Agreement MOO is a final judgment that terminates the "live controversy between" the United States and Albuquerque.

Kane Cty., Utah v. United States, 928 F.3d at 887 n.11 (quoting United States v. Colorado & Eastern Railroad Company, 882 F.3d at 1264.  At the time of the MTI, however, the Court's analysis would have been whether another party with constitutional standing on the same side as the Officers Association had standing, and Albuquerque would provide the Officers Association with that standing.  See San Juan Cty. v. United States, 503 F.3d at 1172 (stating that "as long as there was Article III standing for the original party on the same side of the litigation as the intervenor, the intervenor need not itself establish standing").  Moreover, the Tenth Circuit approvingly cited other Courts of Appeals that have concluded that a party that satisfies rule 24(a) categorically satisfies Article III standing's requirements, although the Tenth Circuit did not go as far as to adopt explicitly these propositions.  See Kane Cty. v, Utah v. United States, 928 F.3d at 889 n. 14 ("Other courts have recognized that 'any person who satisfies Rule 24(a) will also meet Article III's standing requirement.'")(citing Roeder v. Islamic Republic of Iran, 333 F.3d 228, 233 (D.C. Cir. 2003); Sokaogon Chippewa Cmty. v. Babbit, 214 F.3d 941, 946 (7th Cir. 2000)).  The

Officers Association's fulfillment of rule 24(a)'s requirements would be sufficient to establish Article III standing under Tenth Circuit law.

> ### E.   ALTHOUGH THE COURT WILL PERMIT THE OFFICERS ASSOCIATION TO INTERVENE TO PROTECT ITS CBA RIGHTS, THE LAWSUIT IS NOT THE BEST PLACE FOR THE OFFICERS ASSOCIATION TO PROTECT ITS INTERESTS.

There is precedent for district courts within the Tenth Circuit to permit a police union to intervene when the police union argues that the consent decree violates their interests under their CBA. See Johnson v. Lodge No. 93, 393 F.3d at 1100 (noting that the district court concluded that the police union, which previously had asked the district court to reject the consent decree for violating the "FOP's rights as the 'exclusive bargaining agent' for [Tulsa Police Department] officers and contravened the collective bargaining agreement between the FOP and the City," had sufficient interest to intervene)(alteration added and not in original). Other courts have concluded that a police union may intervene to protect its interests under a CBA. See, e.g., Bridgeport Guardians v. Delmonte, 227 F.R.D. 32, 35 (D. Conn. 2005)(permitting a police union's motion for limited intervention to dispute a special master's recommended ruling that the police union, as the exclusive bargaining agent for police officers, alleged would interfere with its CBA); United States v. City of Portland, 2013 U.S. Dist. LEXIS 1884655, at *14 (concluding that the police union should be able to intervene as a matter of right to protects its interest in its labor agreement, even though only a few provisions of the Original Settlement Agreement conflicted with the Labor Agreement, and there was only a possibility that "the proposed Settlement Agreement *may* impair or impede the PPA's protectable interest," because the United States might seek injunctive relief asking the City to implement terms that conflict with the Labor Agreement)(emphasis in United States v. City of Portland); City of L.A., 288 F.3d at 400-01 (permitting intervention, because the

consent decree "might contain provisions that contradict the" police union's protected rights in its MOU, because there was dispute over whether the consent decree conflicted with the MOU, and because the consent decree "by its terms purports to give the district court the power, on the City's request, to override the Police League's bargaining rights under California law and require the City to implement disputed provisions of the consent decree").  The Court, however, is less suited to resolve collective bargaining disputes than the mechanisms established specifically for these disputes.  For instance, the state court is better positioned to handle a breach-of-contract dispute, because the dispute arises under state contract law, and because a breach-of-contract lawsuit would be focused solely on the CBA rather than the CBA being a small part of a massive lawsuit. Moreover, both state and municipal ordinances protect the CBA, and both systems have established detailed procedures to handle these sorts of disputes.  Moreover, the bargaining table is the logical place for Albuquerque and the Officers Association to resolve disputes over the collective bargaining agreement.  Thus, although the Court concludes that limited intervention is appropriate under controlling Tenth Circuit caselaw, if it were not so bound, and if the Court were writing on a clean slate, it would hold that alternate mechanisms specifically tailored towards these disputes are better fora to handle them and deny the Officers Association's MTI, as other courts have done in similar circumstances. See United States v. City of Hialeah 140 F.3d at 983 (stating that, if Hialeah wanted to alter the CBA's terms, "it must do so at a bargaining table").

In State v. City of Chicago, the Seventh Circuit concluded, in part, that because the Lodge had alternative channels to protect its rights, it did not fulfill the rule 24(a)(2) requirements.  The Court agrees with the Seventh Circuit's reasoning that other protective mechanisms minimize the prejudice to the proposed intervenor. See State v. City of Chicago, 912 F.3d at 987 (stating that the Lodge had state law protections and that "when the interested party can adequately convey its

concerns to the district court at the fairness hearing, prejudice is often minimal"). The Tenth

Circuit, however, binds the Court, and the Tenth Circuit has concluded that alternative fora are

insufficient to deny intervention. Utah Ass'n of Ctys. v. Clinton, 255 F.3d at 1254.

**II.     THE COURT WILL NOT INVALIDATE THE WOULD-HAVE-KNOWN STANDARD, BECAUSE THE COURT HAS NO POWER UNDER THE CONSTITUTION, FEDERAL LAW, OR THE SETTLEMENT AGREEMENT TO INVALIDATE ALBUQUERQUE'S USE OF FORCE SOP UNLESS IT VIOLATES THE CONSTITUTION, FEDERAL LAW, OR THE SETTLEMENT AGREEMENT'S TERMS.**

As a threshold matter, the Objections were not timely, and, thus, the Officers Association

lost the opportunity for the Court to rule on its Objections. Even if the Objections were timely,

the Officers Association does not identify any source that authorizes the Court to invalidate the

use-of-force SOP beyond the Second Amended Settlement Agreement, and, thus, the Court can

invalidate the use-of-force SOP only if the use-of-force SOP violates the Constitution, federal law,

or the Second Amended Settlement Agreement. The Court concludes that the use-of-force SOP

does not violate the Constitution, federal law, or the Second Settlement Agreement, and thus the

Court does not have the authority to rule on the Officers Association's Objections to the use-of-

force SOP. Moreover, even if the Court were to rule on the Objections, it would overrule them,

because the would-have-known standard is consistent with Supreme Court caselaw, Tenth Circuit

caselaw, and the Second Amended Settlement Agreement, and because Albuquerque may

implement standards above the constitutional minimum.

**A.     THE COURT HAS THE AUTHORITY TO AMEND THE USE-OF-FORCE POLICY ONLY IF IT VIOLATES THE CONSTITUTION, FEDERAL LAW, OR THE SETTLEMENT AGREEMENT.**

The Court has jurisdiction in this case, because Judge Brack explicitly retained jurisdiction

over the Settlement Agreement in the Settlement Agreement MOO, which is the case's Final

Judgement.  See Original Settlement Agreement MOO at 30 (Brack, J.)(ordering "that the Court

will retain jurisdiction to enforce the provisions of the Agreement, hereinafter referred to as the

Consent Decree").  See also Morris v. City of Hobart, 39 F.3d at 1110 (stating that a judge can

retain jurisdiction over a settlement agreement when dismissing a case if the judge states his or her

intention in the dismissal order or incorporates the settlement agreement into his or her dismissal

order).  The Officers Association identifies the Second Amended Settlement Agreement as the

source of the Court's authority to rule on the Objections.[33]  The Court concludes that the Second

Settlement Agreement authorizes it to rule on Objections only if there is a Constitutional, federal

law, or Settlement Agreement violation.  See United States v. Hardage, 982 F.2d at 1496 (citing

Tiernan v. Devoe, 923 F.2d 1024, 1031 (3rd Cir. 1991); Millner v. Norfolk & W.R. Co., 643 F.2d

1005, 1009 (4th Cir.1981)(recognizing the court's "inherent equitable power summarily to enforce

a settlement agreement when the practical effect is merely to enter a judgment by consent").  Shima

Baradaran-Robison, Kaleidoscopic Consent Decrees: School Desegregation and Prison Reform

Consent Decrees After the Prison Litigation Reform Act and Freeman-Dowell, 2003 B.Y.U. L.

Rev. 1333, 1372 (2003)(stating that a district "court has inherent power to interpret a consent

decree, but this power is limited by the scope of the parties' agreement")(citing United States v.

City of Northlake, 942 F.2d 1164, 1167 (7th Cir. 1991); Waste Mgmt. of Ohio, Inc. v. City of

Dayton, 132 F.3d 1142, 1146 (6th Cir. 1997)(stating that a district court has "a duty to enforce,

interpret, modify, and terminate their consent decree as required by circumstance")).  Moreover,

---

[33]The Officers Association generally references the First Amended Settlement Agreement
and not the Second Amended Settlement Agreement.  The Court speculates that the Officers
Association references the First Amended Settlement Agreement, because it is where the relevant
paragraphs were first introduced.  Because all the relevant First Amended Settlement Agreement
paragraphs are incorporated into the Second Amended Settlement Agreement, the Court references
the Second Amended Settlement Agreement in this section for ease.

in United States v. Hardage, 982 at 1496, the Tenth Circuit cited approvingly a case from the United States Court of Appeals for the Fourth Circuit that states that the court's authority to "enforce a settlement agreement and to enter judgment based on that agreement without plenary hearing" "arises not under Rule 56 of the Federal Rules of Civil Procedure but under the trial court's inherent equitable power summarily to enforce a settlement agreement when the practical effect is merely to enter a judgment by consent." Millner v. Norfolk & W. R. Co., 643 F.2d at 1009. The Second Amended Settlement Agreement authorizes the Court to resolve "any objection to new or revised policies, procedures, manuals, or directives implementing the specified provisions" if "either party disagrees with the Monitor's resolution of the objection." Second Amended Settlement Agreement at ¶ 148. Thus, the Second Amended Settlement Agreement authorizes the Court to rule on the Objection. See Promotional Policy MOO at 4 ("Paragraph 148 of the CASA confers authority on the Court to resolve disagreements between the parties regarding new or revised policies, including the one at issue here")(footnote omitted).

Moreover, the Second Amended Settlement Agreement further limits the scope of these Objections so that the Objection is only to a policy that "'does not incorporate the requirements of this Agreement or is inconsistent with this Agreement or the law.'" Albuquerque's Response to Objections at 4 (quoting Second Amended Settlement Agreement at ¶ 147). Thus, Second Amended Settlement Agreement's language to rule only on Objections arising out of policies that either do not incorporate the Second Amended Settlement Agreement's requirements or are inconsistent with the Second Amended Settlement Agreement or with the law limits the Court. Thus, the Court does not have the authority to amend the SOP based on the Officer Association's objection to the SOP's "vagueness," unless there is a Second Amended Settlement Agreement provision or law that requires a use-of-force standard not to be vague. Objection at 5. The Officers

Association does not provide a Second Amended Settlement Agreement provision or any law that has this requirement, and, thus, the Court does not have the authority to hear the Objection on this basis.

Nonetheless, if the Court were to decide the vagueness Objection, it would overrule the Objection.  Although the Officers Association argues that the use-of-force SOP is "vague," the Court concludes that the use-of-force SOP's generality allows the Court to consider the circumstances at the scene when determining reasonableness in accordance with the objective-reasonableness.  Guidelines of the appropriate force for specific circumstances -- for example, pinning down a person to the ground is not excessive force in x, y, and z circumstances but is unacceptable in a, b, c circumstances -- would limit the Court to a single circumstance instead of allowing the Court to look at the totality of the circumstances when making this evaluation.  See Graham v. Connor, 490 U.S. at 396.  An officer may mistakenly, but reasonably, make a split-second miscalculation and use more force than the situation warrants.  A list of circumstance-specific guidelines would not allow the Court to adjust its calculation for a reasonable mistake, and thus, would not permit the Court to review the totality of the circumstances.  Moreover, bright-line excessive-force rules would remove the officers' professional judgment and even could result in dangerous situations in which an officer substitutes rigid thinking for common sense.  The Supreme Court in Graham v. Connor clarified that it wanted courts to be able to consider "rapidly evolving" circumstances, which necessitates flexibility in thinking instead of a rigid adherence to a bright-line rule.  The Court, thus, concludes that the objectively reasonableness standard's generality is consistent with Graham v. Connor.

**B.**     **THE USE-OF-FORCE SOP DOES NOT VIOLATE THE CONSTITUTION.**

The Court concludes that the use-of-force SOP comports with the Fourth Amendment to the United States Constitution's reasonableness determination in use-of-force contexts. The Supreme Court has directed courts to use an "objective[-]reasonableness" standard, in which courts look at the "perspective of a reasonable officer on the scene" "without regard to their underlying intent or motivation," when determining  excessive-force claims against enforcement officers in the context of an arrest, investigatory stop, or seizure.  Graham v. Connor, 490 U.S. at 386 (stating that the objective-reasonableness standard under the Fourth Amendment applies to these claims). Despite the Officers Association's protests otherwise, the Court concludes that the use-of-force SOP accords with the objective-reasonableness standard.

The Court concludes that the SOP § 2-57-2's definition of reasonable force -- "facts that a reasonable officer on the scene would have known at the time the officer used force" -- is consistent with Tenth Circuit caselaw interpreting the Fourth Amendment.  The Court acknowledges that the would-have-known language is taken directly from a Tenth Circuit case -- Weigel v. Broad.  The United States and Albuquerque encourage the Court to recognize that, because the would-have-known standard's language is identical to language in Weigel v. Broad, the would-have-known standard is necessarily consistent with Tenth Circuit caselaw.  But the Court is disinclined to ascribe this meaning -- that perhaps the Tenth Circuit did not intend -- to the language.  Thus, although the Tenth Circuit uses the language twice in the Weigel v. Broad opinion, the Court assesses whether the substance is the same in that case and in other Tenth Circuit caselaw.

In Weigel v. Broad, the Tenth Circuit begins its use-of-force analysis by citing Graham v. Connor for the principle that the use-of-force analysis is (i) "'an objective one: the question is whether the officer' actions are objectively reasonable in light of the facts and circumstances

confronting them, without regard to underlying intent and motivation,'" Weigel v. Broad, 544 F.3d at 1151 (quoting Graham v. Connor, 490 U.S. at 388); and (ii) "a totality of the circumstances approach," Weigel v. Broad, 544 F.3d at 1151. The Tenth Circuit further notes that the use-of-force inquiry must be "'from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight'" and that the "perspective includes an 'examination of the information possessed by the [officers].'" Weigel v. Broad, 544 F.3d at 1151 (first quoting Graham v. Connor, 490 U.S. at 396; second quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987))(alteration in Weigel v. Broad).

The use-of-force SOP's would-have-known standard comports with all these principles. It is an objective question, because it looks at what a reasonable officer would have done, rather than the officer's underlying intent or motivation. Because the would-have-known standard encompasses everything a reasonable officer would have known at the time of the use of force, the standard looks at the totality of the circumstance. Further, the would-have-known standard uses as its perspective a reasonable officer's perspective, including the relevant information that a reasonable officer on the scene would have known. A reasonable officer on the scene would witness everything the officer being investigated witnessed, and thus, would have at least as much information as the officer being investigated. Accordingly, the would-have-known standard encompasses the information that the officer being investigated possesses. Thus, in terms of principles, the would-have-known standard comports with Weigel v. Broad.

Next, the Tenth Circuit applies the analysis. When making its excessive-force determination, the Tenth Circuit makes its determination based on two key facts: (i) "for three minutes the troopers subjected Mr. Weigel to force that they **knew** was unnecessary to restrain him"; and (ii) "a reasonable officer **would have known** [that force] presented a significant danger

of asphyxiation and death." Weigel v. Broad, 544 F.3d at 1153 (emphases added). The Tenth Circuit infers the first key fact from the "articulable evidence," Sept. 4 Tr. at 67:19  (Ginger), which considers what the officers knew, see Weigel v. Broad, 544 F.3d at 1153. In comparison, SOP 2-57 requires that the investigating officer "listens to what the involved officer has to say," Sept. 4 Tr. at 62:4-5 (Van Meter), and the would-have-known standard does not exclude that information.

Further, the Tenth Circuit infers the second key fact from the police department's training, which a reasonable officer from that police department on the scene would have had. See Weigel v. Broad, 544 F.3d at 1152 ("WLEA training materials made clear that the pressure applied to Mr. Weigel's upper torso would suffice to cause his suffocation."). As discussed, supra, a reasonable officer has average training, so he or she can be expected to have undergone the average amount of training that an officer at that police department has undergone. Accordingly, the Tenth Circuit presumed that a reasonable officer would have familiarity with the police department's training materials. See 544 F.3d at 1152. In comparison, the would-have-known standard also extends beyond what the officer at the scene knew to considering what a reasonable officer, who received at least comparable training to the involved officer,[34] to include "the training [that APD] provided the officers and the directives that they have give them. And it's appropriate to characterize that as [facts that] the officers would have known." Sept. 4 Tr. at 40:15-18 (Van Meter). The Tenth Circuit in Weigel v. Broad notably did not scrutinize the individual officers on the scene's underlying motivations or intent. Whether the police officers intended to asphyxiate the plaintiff

---

[34]The Court notes that all officers have some basic training before they are permitted to respond to crime scenes that a reasonable officer responding to the scene is assumed to have, but the Court recognizes that some officers may have more advanced training that goes beyond the training that a reasonable officer could be expected to have.

was irrelevant to the determination.  Similarly, the would-have-known standard, and SOP § 2-57 in general, do not mention that the investigating officer should look into the involved officers' motivations or intent.  Thus, because the Tenth Circuit's analysis has the same scope as the would-have-known standard, and does not consider any factors outside what would be appropriate to consider under SOP § 2-57, the Court concludes that the would-have-known standard is consistent with Tenth Circuit caselaw.

The Officers Association further argues that, because "would have known" is a conditional perfect verb, it "necessarily relies on 'what if' explorations," which would violate Graham v. Connor.  Officers Association Objections at 8.  The Court interprets this argument to mean that the Officers Association believes that "would have known" indicates that a use-of-force investigator will consider "hypothetical circumstances" when making his or her determination, rather than the totality of the actual circumstances.  Officers Association Objections at 8.  The Court disagrees with this interpretation.  The "would have known" language is linked to a hypothetical reasonable officer: use-of-force investigations should be based on "'facts that a reasonable officer on the scene would have known at the time the officer used force.'"  Officers Association Objections at 8 (quoting SOP § 2-57-2).  Thus, the tense of "would have known" is necessary, because the use-of-force investigators are examining the totality of circumstances from the viewpoint of a hypothetical person and not examining from the viewpoint of hypothetical circumstances.  Altering the tense would render the sentence nonsensical: "facts that a reasonable officer on the scene knew at the time the officer used force."  The "reasonable officer" did not know, however, anything at the time the officer being investigated used force -- the reasonable officer does not exist in reality and exists only as a magnifying glass through which the investigating officers examine the scene.  Thus, the "would have known" language facilitates the

"reasonable officer" legal fiction; it does not encourage investigating officers to conjure up hypothetical circumstances. Thus, the would-have-known standard does not invite hypothetical circumstances in contravention of Graham v. Connor.

Moreover, the "reasonable officer" standard is meant to make the assessment objective rather than subjective. Marsha L. Levick & Elizabeth-Ann Tierney, The United States Supreme Court Adopts a Reasonable Juvenile Standard in J.D.B. v. North Carolina for Purposes of the Miranda Custody Analysis: Can A More Reasoned Justice System for Juveniles Be Far Behind?, 47 Harv. C.R.-C.L. L. Rev. 501, 504 (2012)("Reasonable Juvenile Standard")("[The reasonable-person standard] is an objective standard against which triers of fact measure individuals' conduct or blameworthiness.")(citing People v. Cross, 127 P.3d 71, 78 (Colo. 2006); People v. Goetz, 497 N.E.2d 41, 50-51 (N.Y. 1986); Jankee v. Clark Cty., 612 N.W. 2d 297, 310 (Wis. 2000)). The reasonable person in the criminal law context "'possesses the intelligence, educational background, level of prudence, and temperament of an average person [and] lacks unusual physical handicaps.'" Reasonable Juvenile Standard at 504 (quoting Joshua Dressler, Understanding Criminal Law § 10.04 [B][3][b] (1987), and citing Arthur Ripstein, Equality, Responsibility, and the Law at 192 (Gerald Postema ed., 1999)). Thus, a reasonable officer has the intelligence, educational background, level of prudence, and temperament of an average law enforcement officer. This standard is objective, because it examines what level of force the reasonable officer would use in that situation in the context of the totality of circumstances, instead of examining why the officer being investigated used the level force he or she used. Whether the officer personally believes his or her actions were reasonable would be subjective in contravention of Graham v. Connor. 490 U.S. at 386. Reviewing instead what a reasonable officer would have done in that situation removes any inquiry into underlying intent or motivation, stripping away the

- 195 -

necessity of a Monday morning investigatory officer trying to piece together what the individual officer was thinking.  For example, an individual officer may want to break the arm of a suspect who already had surrendered after initially resisting, but instead the officer is able only to pin the suspect's arm.  An investigating officer looking at the situation from the reasonable officer's viewpoint would focus only on whether pinning the suspect's arm was an excessive use of force. In contrast, an investigating officer looking at the situation subjectively would determine whether the officer was intending to pin the suspect's arm or to break the suspect's arm; the investigating officer would have to look at the individual officer's underlying intent and motivations to make a determination.  See Graham v. Connor, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.")(citing Scott v. United States, 436 U.S. 128, 138 (1978)(further internal citation omitted)). Thus, because looking at the situation from a reasonable officer's perspective focuses only on concrete, tangible facts, basing findings on what a reasonable officer would have known is a more objective inquiry than basing findings on what the on-scene officer knew.

The Officers Association provides a hypothetical:

So if an officer is responding to a call: A man with a knife; reads the communication dispatch on his computer in the car; and he's running lights and sirens to the scene, and uses force on a man who is believed to have a knife in his possession. And then finds out later that the CAD misrepresented the actual fact; that man had the knife in the previous incident.  If he could articulate a reasonable use of force based on what he perceived, what he actually knew, and then during the investigatory stage he finds out that, or an investigator finds out that, that the dispatch contained incorrect information, and if he had known the correct information, he may have taken different steps, that opens the door for Monday morning quarterbacking or second-guessing an officer based on what he believed was true.  But if he would have known it was false, maybe he wouldn't have taken that action, and therefore, subject him to discipline.

Sept. 4 Tr. 32:3-21 (D'Amato).  The Court agrees with the Officers Association that punishing an officer for a fact that he or she could not have known at the time and that became known only after the fact would be a violation of Graham v. Connor's prohibition against second-guessing and hindsight.  The Court concludes, however, that the would-have-known test does not punish an officer in this situation.  A reasonable officer at the scene would not have known information that he or she did not have.  A reasonable officer at the scene would have received the same dispatch that the officer being investigated would have received.  A reasonable officer at the scene would not have known information discovered after the scene; the use-of-force SOP makes sure to cabin the information a reasonable officer would have known to the scene itself by stating that the relevant information considered is the information available "at the time the officer used force." An investigatory officer, therefore, would not be able to include facts learned after the time that the involved officer used force when considering what a reasonable officer on the scene would have known, unless a reasonable officer should have known these facts.  Thus, if the officer being investigated acts on false information that was not corrected until after the use of force, the investigation would focus only on whether the officer used force in accordance with how a reasonable officer acting on the false information would use force.  See Sept. 4 Tr. at 63:4-9 (Van Meter)("[I]n the circumstance . . . [where the] officer is getting the wrong information on the way to the scene, it is actually the view of the City that that wrong information is what a reasonable officer on the scene would have known.").

Further, although the Officers Association correctly notes that the would-have-known standard could result in investigating officers making a determination based on facts that the officer being investigated did not know at the scene, this determination does not violate Graham v. Connor by being speculative.  See Officers Association Objections at 9.  The Court concludes,

however, that this "imput[ation]" of facts is not speculative, insofar as any factual determination can be not speculative.  Objections at 9.  Determining what a reasonable officer in that position on the scene would have known is less difficult, because that determination relies only on the situation's facts.   For instance, if an officer states that he or she did not see a person's hands in the air, the investigating officer using the would-have-known standard can determine based on the relative positions of the alleged victim and of the officer being investigated, the amount of light, and other circumstances whether a reasonable officer would have known that the person's hands were in the air.  Thus, the standard that examines what a reasonable officer would have known is not speculative and is more objective.

Moreover, this standard is consistent with Graham v. Connor's statement that the standard must  account for the split-second decisions officers often must make in the line of duty.  See 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.").  The would-have-known standard asks the investigating officer to look at the facts that a reasonable officer would have known at the time of force, which includes changes in circumstances.  A reasonable officer of reasonable intelligence, education, and training would consider evolving circumstances when making a split-second judgment -- law enforcement officers' job is to assess and respond to a situation.  A reasonable officer may make mistakes in his or her response, but the standard does not demand perfection -- after all, the officer is meant to be reasonable, and not exceptional.  Because a reasonable officer would be aware of changes in circumstances at an active scene, the would-have-known standard accounts for officers making split-second judgments in rapidly changing circumstances.

- 198 -

In the context of training officers, the Officers Association states that, if it is "reasonable to conclude that a reasonable officer 'would have known' what is revealed on his or her 'On Body Recording Device'" or whether a reasonable officer "would have known the offender suffered from mental illness," then the reasonable officer perspective improperly uses hindsight to determine excessive use of force.  The Officers Association, however, poses these questions as if the answer is binary.  To make these determinations, the investigating officer will have to look at the totality of circumstances, and <u>Graham v. Connor</u> requires an examination of the totality of the circumstances.  Thus the answer is not binary, but instead is, as it so frustratingly often is in the legal realm, it depends.  And it depends on the totality of the circumstances. Moreover, in contrast to the Officers Association's contention, hindsight need not play a role in answering these questions.  For instance, the determination whether a reasonable officer would have known that the offender suffered from mental illness is not based on whether it surfaces after the situation that the offender suffered from mental illness.  Instead, the determination is based on whether a reasonable officer at the crime scene would have known from the circumstances that a person suffered mental illness.  Thus, the determination is not based on hindsight, which is using knowledge acquired after the incident, but the reasonable-officer-on-the-scene perspective, which is using knowledge available during the incident.  Further, the would-have-known standard does not ask investigatory officers whether less forceful alternatives were available, which would contravene <u>Graham v. Connor</u>'s directive.  Instead, the would-have-known standard asks them to account for whether the force was reasonable in the circumstances.  Thus, hindsight does not play a role in the would-have-known standard and the would-have known standard does not violate constitutional law.

### C.     THE USE-OF-FORCE SOP DOES NOT VIOLATE FEDERAL LAW.

The Officers Association makes only one federal law argument in its Objections Reply. See Objections Reply at 8-10.  It argues that the federal law requires the factual situation must be "clearly established" in the 42 U.S.C. § 1983 context, and that thus the would-have-known standard must have "clearly established" language.  Objections Reply at 9 ("[T]here remains a lack of 'clearly established' limiting language in SOP 2-57-2.").  As the Officers Association acknowledges, see Objection Reply at 10, the "clearly established" language is part of the qualified-immunity analysis, Scott v. Harris, 550 U.S. 372, 377 (2007).  Thus, although a qualified-immunity analysis includes a clearly established prong, a use-of-force analysis does not include a clearly established prong.  Nonetheless, the Officers Association spends several pages discussing the qualified-immunity analysis, arguing that, because "the discussion of Weigel and other cases cited by the City are *qualified immunity* evaluations" that were "decided on a motion for summary judgment, where the court takes the facts 'in the light most favorable to the party asserting the injury,'" the cases are inapplicable to the use-of-force investigatory standard. Objection Reply at 13 (quoting Scott v. Harris, 550 U.S. at 377)(emphasis in original).  See Objection Reply at 10-13.  The Officers Association misstates the law.  It correctly asserts that a qualified-immunity analysis requires courts to view the facts in the "'light most favorable to the party asserting the injury.'"  Scott v. Harris, 550 U.S. at 377 (quoting Saucier v. Katz, 533 U.S. at 201).  A summary-judgment motion, however, requires courts to construe the facts in the light most favorable to the non-moving party.  See Scott v. Harris, 550 U.S. at 377 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curium); Saucier v.Katz, 533 at 201)).  "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts."  Scott v. Harris, 550 U.S. at 377.  Thus, a summary judgment use-of-force-constitutional-violation analysis uses the same analysis as other motions.  Thus, the United States and Albuquerque were not wrong

to cite caselaw on summary-judgment motions, because that caselaw involves the use-of-force

standard.  See, e.g., Albuquerque Objection Response at 14 (citing Weigel v. Broad, 544 F.3d at

1153).

Further, "clearly established" is limited to the qualified-immunity context, which, as

discussed supra, does not apply to this situation, in which an investigating officer is making a use-

of-force constitutional violation determination.  The qualified-immunity analysis is a two-step

analysis with two independent components: (i) a constitutional-violation prong; and a (ii) clearly

established prong.  See Scott v. Harris, 550 U.S. at 377.  The Supreme Court treats them separately

to the extent that it permits the courts to determine one prong without ever reaching the other.  See

Pearson v. Callahan, 555 U.S. at 236.  Although the clearly established prong is particular to the

qualified immunity-analysis, the constitutional-violation prong is not particular to the qualified-

immunity analysis.  A constitutional violation is a constitutional violation, and constitutional-

violation tests do not morph into different tests in the qualified-immunity context.  See Pearson v.

Callahan, 555 U.S. at 236 (stating that the constitutional-violation prong "is intended to further the

development of constitutional precedent").  Thus, Albuquerque does not need to add any limiting

language to its excessive-force determination, even though a clearly established prong limits a

constitutional violation in the qualified-immunity context, because the use-of-force SOP

determines whether an officer used excessive force, and not whether an officer should receive

qualified immunity.

The Officers Association argues that, because the qualified-immunity constitutional

violation analysis has the same "objective reasonableness" test as an excessive-force constitutional

violation analysis, the "clearly established language" must cabin the excessive-force objective

reasonableness test as it cabins the qualified immunity objective reasonableness.  Objections at 9

(citing Buck v. City of Albuquerque, 549 F.3d at 1269).  As support, the Officers Association

excerpts Buck v. City of Albuquerque: "[A]n officer's violation of the Graham reasonableness test

is a violation of **clearly established law** if there are 'no substantial grounds for a reasonable officer

to conclude that there is legitimate justification for acting as she did.'"  Objections at 9 (quoting

Buck v. City of Albuquerque, 548 F.3d at 1291)(quoting Holland ex rel. Overdorff v. Harrington,

268 F.3d 1179, 1197 (10th Cir. 2001)))(emphasis in Officers Association Objections only).  An

excessive-force constitutional violation that meets the Graham v. Connor factors must then meet

by qualified immunity's clearly established law prong.  The Court, therefore, concludes that the

objectively reasonable would-have-known standard -- in the constitutional violation context –

translates in SOPs without an additional limit from the qualified immunity context.  As the Court

has said, the clearly established prong is a misguided doctrine in the qualified immunity test; the

federal courts should not move it into other areas of law.  Indeed, now-Justice Gorsuch has said

excessive force legal issues should be denied in areas other than § 1983 and Bivens actions.  See

Kerns v. Bader, 663 F.3d 1173, 1186 (10th Cir. 2011).

       Moreover, the clearly established language is about the law.  The clearly established prong

asks whether caselaw has clearly established the violated constitutional right, such that an officer

would have sufficient notice that his action violated.  The Court sees problems with this

incorporating the clearly established prong and test into the SOP language.  First, for facts to be

obviously verified, there would need to be little doubt as to their existence – i.e. the parties,

including the officer being investigated, all would have to agree on the facts, or there would have

to be recordings of the facts.  Second, the clearly established language is lifted from a different

context and would cause confusion for officers when trying to distinguish clearly established in

the legal, qualified immunity sense, from clearly established when determining whether a

constitutional violation occurred at all.  The Court concludes that requiring Albuquerque to add clearly established language would result in a confusing standard with a burden of proof that could hinder investigations.  Thus, Albuquerque has not violated federal law by omitting "clearly established" language.

> **D.     THE USE-OF-FORCE SOP DOES NOT VIOLATE THE SETTLEMENT AGREEMENT, BECAUSE THE UNITED STATES AND ALBUQUERQUE ADOPTED THE SOP IN A MANNER CONSISTENT WITH THE SETTLEMENT AGREEMENT.**

The Officers Association alleges that the use-of-force SOP violates three Second Amended Settlement Agreement provisions: one provision that states that officers must use "'force in accordance with the Constitution and federal laws,'" Objections Reply at 5 (quoting Second Amended Settlement Agreement ¶ 13, at 14), and two provisions that state that the use-of-force SOP must "compl[y] with applicable law and comport[] with best practices," Objections Reply at 5 (quoting Second Amended Settlement Agreement ¶ 15, at 15; id. ¶ 41, at 17).[35]  The full sentence at issue in ¶ 13, at 14 states that the "APD shall revise and implement use of force policies, training, and accountability systems to ensure that force is used in accordance with the Constitution and laws of the United States."  Second Amended Settlement Agreement ¶ 13, at 14.  As discussed above, the would-have-known policy is not in conflict with the Constitution or the laws of the United States.  Thus, Second Amended Settlement Agreement ¶ 13, is not in conflict with the

---

[35]The Court notes that the United States and Albuquerque all but ignore this argument in their Responses, see United States Objections Response and Albuquerque Objections Response, and that the Officers Association does not mention this argument in it Reply.  Nonetheless, the Court will resolve this argument.

would-have-known standard.  Further, the Court concludes that the Officers Association has not demonstrated that the use-of-force SOP is inconsistent with best practices.[36]

The Officers Association next argues that sentences within the Second Amended Settlement Agreement ¶¶ 15 and 41, at 15, 17, require use-of-force investigations to be consistent with the law.  See Objections Reply at 5.  The sentence at issue in ¶ 15, at 15, states that the "APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices."  Second Amended Settlement Agreement ¶ 15, at 15.  The sentence at issue in ¶ 41, at 17 states that "APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices."  Second Amended Settlement Agreement ¶ 41, at 17.  The Officers Association states in its Objections Reply, however, that its "Objection is directed to the investigation of an officer using force, not the actual use of force.  The objection does not affect the policy on the actual use of force by an officer."  Objections Reply at 2 (citing SOP § 2-52).  The Second Amended Settlement Agreement ¶ 15, at 15, however, deals exclusively with the use-of-force policy, which it defines as:

>   All force techniques, technologies, and weapons, both lethal and less lethal, that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units.  The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of force is appropriate.  The use of force policy will incorporate the use of force principles and factors articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability.

---

[36]The Officers Association does not define best practices beyond noting that the Graham v. Connor standard is a best practice.  See Objections at 10.

Second Amended Settlement Agreement ¶ 15, at 15.  It does not mention anything about the use-of-force investigation.  <u>Compare</u> Second Amended Settlement Agreement ¶ 15, at 15 ("APD shall develop and implement an overarching agency-wide <u>use of force policy</u>."), <u>with</u> Second Amended Settlement Agreement ¶ 46, at 17 ("<u>All force reviews and investigations</u> shall comply with applicable law and comport with best practices.")(emphases added).  Further, the excerpted sentence of ¶ 41, at 17, is about the "use of force reporting policy and Use of Form Report Form," and not the use-of-force investigation policy.  <u>See</u> Second Amended Settlement Agreement ¶ 41, at 17.  <u>Compare</u> Second Amended Settlement Agreement ¶ 41, at 17 ("APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices.") <u>with</u> Second Amended Settlement Agreement ¶ 46, at 17 ("All force reviews and investigations shall comply with applicable law and comport with best practices.").  Thus, Second Settlement Agreement ¶¶ 15 and 41, at 15, 17, are not relevant to the Officers Association's Objection.

Nonetheless, the Second Amended Settlement Agreement notes that use-of-force investigations must comply with law and best practices, <u>see</u> Second Amended Settlement Agreement ¶ 46, at 17, and thus the Court uses the Officers Association's arguments to determine whether this provision conflicts with the use-of-force SOP.  The Officers Association argues that the would-have-known standard is incompatible with best practices, because the standard is impossible to teach to law enforcement officers and because there are "no lesson plans available." Objections at 3.  The Court's research indicates that there are systems in which the objective reasonableness test is taught using threat assessment and response training.  <u>See</u>, <u>e.g.</u>, John Klein & Ken Wallentine, <u>A Rational Foundation for Use of Force Policy, Training and Assessment</u> at 10, AELE (2014).  Moreover, the type of training aligned with the Officers Association's argument

is known as "use-of-force continuum training," which uses as its model a continuum that "includes a diagram depicting a scale of force options to be used in response to a subject's actions."  Michael L. Ciminelli, Legal Implication of Use-of-Force Continuums in Police Training, Rochester Police Dep't (2014)("Use-of-Force Continuums Review").  In his review, Michael L. Ciminelli, the Chief of Police of Rochester, New York, acknowledges criticisms that "continuums fail to accurately reflect the correct legal standard regarding police use of force: objective reasonableness under the Fourth Amendment to the Constitution."  Use-of-Force Continuums Review at 2.  Although Ciminelli does not advocate abandoning continuums categorically, he cautions that use-of-force continuums "may not accurately reflect the 'totality of circumstances' that should be examined to apply the objective reasonableness standard."  Use-of-Force Continuums Review at 2.  The Court notes that it is not advocating one type of training over another training, but it is merely noting that, not only is the use-of-force policy permissible, it can be and has been taught to law enforcement officers, and thus the Officers Association has not demonstrated how the policy is inconsistent with best practices.

Further, the Court concludes that the Officers Association has not shown that this standard is more difficult to implement evenly across different offices than the Officers Association's suggestion of a subjective test.  The Officers Association protests that implementing this standard across offices will be difficult for its investigating officers, who have "differing needs in correcting deficiencies."  Objections at 6.  A trained and competent investigating officer should be able to make an excessive-force determination based on the facts of the situation, without knowing the officer or facts about the officer that deviates from the prototypical reasonable officer, such as his or her intelligence, temperament, or motivations behind the use-of-force.  Determining deficiencies in investigatory reports is possible with this model -- because the investigating officer

should make his or her determination from a factual, objective standpoint officers from different branches should be able to make a similar determination with the same set of facts.   An investigating officer's deficient performance should be obvious if he or she consistently made a determination different from the determination of his or her peers for in similar situations.   In contrast, the Officers Association's proposal of a different test for each office would lead to disparities in investigatory outcomes.   Thus, the Officers Association has not shown how an objective standard applied in all offices contravenes best practices.   Therefore, the Court would overrule this Objection.

**IT IS ORDERED** that the Objections in the Intervenor's Notice of Objection to Use of Force Policy (§ 2-57-2, Standing Operating Procedure), filed May 28, 2019 (Doc. 447), are overruled.

_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

John C. Anderson
    United States Attorney
Elizabeth M. Martinez
Michael H. Hoses
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

--and--

Luis E. Saucedo
Paul Killebrew
Corey M. Sanders
United States Department of Justice

    *Attorneys for the United States*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

--and--

Lindsay Fay Van Meter
Robyn Lee Rose
Samantha M. Hults
Esteban Angel Aguilar, Jr.
City of Albuquerque
Albuquerque, New Mexico

    *Attorneys for the City of Albuquerque*

Frederick M. Mowrer
John James D'Amato, Jr.
Albuquerque, New Mexico

    *Attorneys for Albuquerque Police Officers Association*

Maria Martinez Sanchez
Steven Robert Allen
American Civil Liberties Union of New Mexico
Albuquerque, New Mexico

    *Attorneys for Amicus Curiae American Civil Liberties Union*

Peter Cubra
Law Office of Peter Cubra
Albuquerque, New Mexico

    *Attorney for Amicus Curiae McClendon Subclass*

Andres Valdez
Albuquerque, New Mexico

    *Pro se Amicus Curiae*

Thomas Dent
Albuquerque, New Mexico

*Pro se Amicus Curiae*