Progress and Status Summary of the USDOJ Settlement Agreement Entered

into by the United States of America and the City of Albuquerque

Regarding the Albuquerque Police Department

Twelfth Report

February 1, 2020 – July 31, 2020

Prepared by the Albuquerque Police Department Compliance and Oversight Division

## Table of Contents

I. Introduction ............................................................................................................................................................. 4

II. Acronym List ........................................................................................................................................................... 4

III. Executive Summary ............................................................................................................................................... 5

IV. Progress Report Organization .............................................................................................................................. 7

V. Compliance Levels and the CASA's Measurable Paragraphs ................................................................................ 8

VI. Key Steps Taken by the Administration ............................................................................................................... 9

VII. Section Progress on the CASA's measurable paragraphs ................................................................................. 10

    Section 1:  Use of Force:  Internal Controls and Accountability (Paragraphs 14-89) ..................................... 10

        A. Use of Force Principles .......................................................................................................................... 10

        B. Use of Firearms ...................................................................................................................................... 12

        C. Electronic Control Weapons ................................................................................................................... 13

        D. Crowd Control and Incident Management ............................................................................................. 16

        E. Use of Force Reporting ........................................................................................................................... 16

        F. Force Reviews and Investigations ........................................................................................................... 17

        F1. Supervisory Force Reviews .................................................................................................................... 18

        F2.  Force Investigations by the Internal Affairs Division ........................................................................... 21

        G. Force Review Board ................................................................................................................................ 27

        H. Multi-Agency Task Force ......................................................................................................................... 28

        I. Use of Force Training ............................................................................................................................... 29

    Section 2:  Specialized Units (Paragraphs 90 – 109) ....................................................................................... 31

        A.  Specialized Tactical Units (SOD) ............................................................................................................ 31

        B. Specialized Investigative Units (SID) ...................................................................................................... 33

    Section 3:  Crisis Intervention (Paragraphs 110 – 137) ................................................................................... 34

        A.  Mental Health Response Advisory Committee (Paragraphs 110-117) ................................................... 34

        B. Behavioral Health Training (Paragraphs 118-122) .................................................................................. 36

        C. Crisis Intervention Certified Responders and Crisis Intervention Unit (Paragraphs 123-131) ............. 37

        D. Crisis Prevention (Paragraphs 132-137) ................................................................................................ 39

    Section 4:  Policies and Training Generally (Paragraphs 138 – 161) ............................................................... 40

        A. Policy Development, Review, and Implementation ................................................................................ 40

        B. Training on Revised Policies, Procedures, and Practices ........................................................................ 42

        C. Field Training Officer Program ............................................................................................................... 43

    Section 5:  Misconduct Complaint Intake, Investigation, and Adjudication (Paragraphs 162 – 202) ............ 45

        A. Reporting Misconduct ............................................................................................................................ 45

        B. Public Information on Civilian Complaints .............................................................................................. 45

C.  Complaint Intake, Classification, and Tracking ............................................................................................. 46

D.  Investigation of Complaints ........................................................................................................................ 48

E. Preventing Retaliation ................................................................................................................................. 51

F. Staffing and Training Requirements ............................................................................................................ 51

Section 6:  Staffing, Management, and Supervision (Paragraphs 203 – 231) ................................................... 53

A. Staffing ........................................................................................................................................................ 54

B. Duties of Supervisors .................................................................................................................................. 54

C. Supervisor Training ..................................................................................................................................... 56

D. Early Intervention System ........................................................................................................................... 56

E. On-Body Recording Systems for Documenting Police Activities ................................................................. 58

Section 7:  Recruitment, Selection and Promotions (Paragraphs 232 – 246) .................................................. 62

A. Recruitment Plan ........................................................................................................................................ 62

B. Hiring Practices ........................................................................................................................................... 62

C. Promotions .................................................................................................................................................. 63

D. Performance Evaluation .............................................................................................................................. 64

Section 8:  Officers Assistance and Support (Paragraphs 247 – 253) ............................................................... 65

Section 9:  Community Engagement and Oversight (Paragraphs 254 – 293) ................................................... 66

A. Community & Problem-Oriented Policing (Paragraphs 255-259) ............................................................... 66

B. Community Meetings & Public Information (Paragraphs 260-265) ............................................................. 69

C. Community Policing Councils (Paragraphs 266-270) ................................................................................... 70

D. Civilian Police Oversight Agency (CPOA) (Paragraphs 271-292) ................................................................. 71

Section 10:  Assessing Compliance (Paragraph 320) ........................................................................................ 74

A. Access and Confidentiality .......................................................................................................................... 74

VIII.  Conclusion ................................................................................................................................................... 74

IX. Appendix ....................................................................................................................................................... 75

A.    Detailed Scorecards

B.    Enhanced Crisis Intervention Team (ECIT) Workload Study

## I. Introduction

The Albuquerque Police Department (APD) and the City of Albuquerque (City) continue to work with the Department of Justice (DOJ) and the Independent Monitor (IM) to improve the overall functioning of the Department and work toward meeting the requirements of the Court Approved Settlement Agreement (CASA) No. CIV 14-1025-JB-SMV.

APD has received guided feedback from the IM, the City, and the DOJ for the reporting period of February 1 to July 31, 2020.  In accordance with CASA paragraph 319, APD has prepared this progress report to delineate key steps taken, gauge progress, communicate correction plan status, and respond to concerns raised in the Monitor reports to implement the agreement.

## II. Acronym List

| | |
|---|---|
| ACM | Additional Concern Memo |
| AAR | After Action Review |
| BSS | Behavioral Sciences Section |
| CAD | Computer Aided Dispatch |
| CASA | Court Approved Settlement Agreement |
| CIS | Crisis Intervention Section |
| CIU | Crisis Intervention Unit |
| CJCC | Criminal Justice Coordinating Council |
| CNT | Crisis Negotiation Team |
| COA | City of Albuquerque |
| COAST | Crisis Outreach and Support Team |
| COD | Compliance and Oversight Division |
| COP | Community Oriented Policing |
| CPC | Civilian Police Complaint (IAPS and CPOA) |
| CPCs | Community Policing Councils |
| CPOA | Civilian Police Oversight Agency |
| CTU | Comprehensive Training Unit |
| DAP | Discipline Action Packet |
| DOJ | Department of Justice |
| DTI | Department of Technology and Innovation |
| ECIT | Enhanced Crisis Intervention Team |
| ECW | Electronic Control Weapon (taser) |
| EIRS | Early Intervention and Recognition System |
| ELMS | Enterprise Learning Management System |
| ERT | Emergency Response Team |
| FRB | Force Review Board |
| FSB | Field Service Bureau |
| FTAL | Field Training Area Lieutenant |
| FTAS | Field Training Area Sergeant |
| FTEP | Field Training Evaluation Program |
| FTO | Field Training Officer |
| IAFD | Internal Affairs Force Division |
| IAPS | Internal Affairs Professional Standards |
| IAR | Internal Affairs Request |
| IMR | Independent Monitor Report |
| IMT | Independent Monitoring Team |
| MATF | Multi-Agency Task Force |
| MHRAC | Mental Health Response Advisory Committee |
| MOU | Memorandum of Understanding |

| | |
|---|---|
| OBRD | On Body Recording Device |
| OJT | On the Job Training |
| PDH | Pre-Determination Hearing |
| PEMS | Performance Evaluation and Management System |
| PMU | Performance Metrics Unit |
| POP | Problem Oriented Policing |
| PPRB | Policy and Procedure Review Board |
| PRT | Proactive Response Team |
| PRU | Performance Review Unit |
| RAM | Risk Assessment Matrix |
| SID | Special Investigation Division |
| SOD | Special Operations Division |
| SOP | Standard Operating Procedure |
| TraCs | Traffic and Criminal software |

## III.  Executive Summary

The City and APD consider CASA compliance of paramount importance and remain committed to addressing CASA paragraph requirements at all Department levels.  The purpose of this progress report is to track the Eleventh Independent Monitor's Report (IMR), the Independent Monitoring Team's (IMT) recommendations, APD's actions in response to the IMT recommendations, individual paragraph compliance status, and other transformational efforts that occurred from February 1 to July 31, 2020.

There are two hundred seventy-six (276) paragraphs in ten sections within the CASA with measurable requirements.  Compliance is measured by three levels (primary, secondary, and operational).   In this reporting period, key efforts to meet compliance requirements have been addressed by APD throughout all ten sections of the CASA including:  Use of Force; Specialized Units; Crisis Intervention; Policies and Training; Misconduct Complaint Intake; Investigation and Adjudication; Staffing, Management and Supervision; Recruitment Selection and Promotion; Community Engagement and Oversight, and Assessing Compliance.

As of the end of the IMR-11 reporting period, APD's compliance levels were:
>    Primary Compliance 100%;
>    Secondary Compliance 93%;
>    and Operational Compliance 66%.

Compared to IMR – 10, the IMR – 11 percentage change rates are:
>    Primary Compliance:  no Change at 100%;
>    Secondary Compliance:  from 81% in IMR 10 to 93% in IMR 11, a change of 14.8 percent;
>    and Operational Compliance: From 64% in IMR 10 to 66% in IMR 11, a change of 3%.

The new APD use of force policy suite which, went into effect January 11, 2020, is used to guide and assess all aspects of levels 1, 2, and 3 use of force cases.  APD has been working under the new use of force policy suite for six months and has identified policy improvements to guide personnel in reporting and documenting use of force incidents.  Although the current use of force policy suite went through a rigorous review with various stakeholders prior to publication, APD recognizes the importance of sound policies and procedures and has formed a work group to revise the use of force policy suite taking into consideration feedback from both internal and external stakeholders.  While the existing policies are in review, the published policies remain in effect.   APD also revised and published SOP 2-3 Firearms and Ammunition in June 2020.  An important revision to SOP 2-3 was the need to clearly define a weapon modification opposed to an accessory.

APD takes data curation seriously and recognizes the value of data-driven decision making.  In this reporting period, the Internal Affairs Force Division (IAFD) spent a significant amount of time validating use of force data.  Additionally, the City and APD established a data coordination working group, which includes data base architects, analysts, executive staff, and representation from APD Divisions to consider the many aspects of data generation, management, access, preservation, and analysis.

The Performance Evaluation and Management System (PEMS) has been completely redesigned to replace the existing Early Intervention and Recognition System (EIRS).  PEMS is a proactive-management tool that promotes employee and supervisory awareness using an automated notification program and a standardized review process.  The primary purpose of PEMS is to provide timely and reliable data to employees and supervisors in order to make informed decisions, as early as possible, regarding well-being, training, career development, and performance concerns.   PEMS is designed to incorporate the full-range of Use of Force reporting criteria specified by the CASA, to include firearm discharges, Electronic Control Weapon (ECW) data, and Tactical Unit data.  Section 1:  Use of Force begins with paragraph 14 through 89.

APD specialized units include both tactical and investigative units. The Special Operations Division (SOD) Commander is responsible for tactical- related paragraphs and the Special Investigations Division (SID) Commander is responsible for the investigative-related paragraphs.  The SOD paragraphs (90–105) continue to be in operational compliance and there were no IMR 11 recommendations for these paragraphs.  During the current reporting period, SOD proactively worked to enhance forms and administrative processes to ensure continued accountability and clarity.  The SID paragraphs (106- 109) remain in Operational Compliance without IMR 11 recommendations as well.   Because SID unit operations are inherently sensitive, operations are routinely monitored and assessed to ensure that unit-level practices adhere to Department policies, procedures and CASA requirements.

The Crisis Intervention Section (CIS) continues to collaborate with the Mental Health Response Advisory Committee (MHRAC), local healthcare representatives, the University of New Mexico's Psychiatric Emergency Services, and educational working groups from the four largest mental health hospitals in the city to improve APD's ability to assist individuals in crisis.  APD provides ongoing behavioral health and crisis intervention training to both sworn and civilian staff in the form of initial certification and annual renewal courses. The Crisis Intervention Unit (CIU) and the Crisis Outreach and Support Team (COAST) are consistently working to connect individuals in crisis with prevention services and treatment options.  A workload study was conducted to identify all crisis intervention-trained individuals.  The workload study has been distributed to each area commander and every field lieutenant.  The Emergency Communications Center and CIU worked together to add Enhanced Crisis Intervention Team (ECIT) members to the list of trained officers in the dispatch program, which in turn clearly informs other officers and supervisors who is ECIT trained on their shifts.  The Crisis Intervention Section can be found in paragraphs 100 to 137.  See ECIT Workload Study in Appendix B.

Training is a key element to achieving Secondary Compliance with the CASA.  Having effective policies and training are necessary preconditions of Operational Compliance.   All CASA-related policies are reviewed and approved by the IMT and DOJ prior to publication and training by APD.  The Compliance and Oversight Division (COD, formerly AOD) is responsible for the development, revisions, tracking and management of policies.  APD has three types of policies: general, procedural, and administrative order.  The general orders are policies related to the core values and functions of the police department.  The procedural orders are policies related to the procedures used by sworn personnel to accomplish their duties.  The administrative orders are policies that provide personnel with guidance in administrative matters.  The APD Training Academy continues to facilitate training on necessary policies. In IMR – 11, the IMT recognized APD's training team's significant strides toward overall training development and CASA compliance efforts.  Unfortunately, due to COVID-19 social distancing restrictions, the Academy staff was forced to initiate plans to convert scheduled in-person trainings to a virtual environment delaying the Tier 4 use of force training.  The Field Training Evaluation Program (FTEP) has held four testing periods for FTO applicants to include Field Training Area Sergeants (FTAS) and Field Training Area Lieutenants (FTAL).   The FTEP has increased its numbers significantly since the start of this reporting period.  Twenty-nine Field Training Officers and five Field Training Area Sergeants have been added to accommodate on-the-job training for all three shifts in all six Area Commands.  The CASA policies and training (Section 4) includes paragraphs 138 to 161.

Internal Affairs Professional Standards (IAPS) is the central intake, case management oversight, and repository for policy violations and/or misconduct complaints to ensure conformance with policy provisions.  The Civilian Police Oversight Agency (CPOA) is an independent entity that investigates complaints originating externally from non-Department personnel.   To maintain high-level, quality service, to ensure officer safety and accountability; and to promote constitutional, effective policing IAPS works to ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system.  IAPS processes are designed to ensure that investigations of officer misconduct complaints are thorough and attain reliable and complete findings.  Retaliation for reporting misconduct or for cooperating with an investigation is strictly prohibited and grounds for discipline, up to and including termination of employment can be assessed.   IAPS is currently working to complete an updated Disciplinary Action Packet (DAP) template and case review checklist to ensure all

disciplinary decisions are in compliance with the discipline matrix in SOP 3-46 Discipline System.   Additionally, IAPS continues to make improvements to their internal processes for standardization and consistency. The misconduct, complaint intake, investigation and adjudication (Section 5) can be found in paragraphs 162 to 202.

While there is a lot of work ahead, APD has made significant strides in improving supervision during this reporting period.  The process of revising several supervisory-related policies is in process.  One example of overall process improvements are the revised line inspections.  SOP 3-30 Line Inspection Process was published in March 2020.  Each month, supervisors conduct line inspections for each officer under his/her supervision, and determine if officers are carrying the appropriate equipment and if serial numbers match property cards, if their vehicles are in good condition, and if the supervisor conducted a review of two videos per officer.   In addition, APD has improved line inspection forms to capture useful information to measure supervision.  The COD's Performance Metrics Unit (PMU) conducts monthly audits that include supervisory requirements, such as completing line inspections in accordance with policy and the CASA.  A newly hired COD data analyst has started analyzing the data from audit scorecards (see 'Appendix A Detailed Scorecards') to help to drive departmental decisions.  This reporting period marks the first quarterly inspections of the new Taser 7 electronic control weapon.  With enhanced data capturing capabilities of the Taser 7, APD's PMU can now audit and collect detailed data regarding weapon discharges.  Staffing, management and supervision paragraphs 203 to 231 are in Section 6.

APD has developed a comprehensive recruitment and hiring strategic plan to attract and hire qualified individuals to maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing.  Signal Vine, Instagram, Facebook, and Google Ads are utilized since online advertising has proven to be the highest yielding recruitment tool.  APD continues to require all candidates for sworn positions to undergo a psychological, medical and polygraph exam.  APD employs fair and consistent promotion practices that align with best practices and federal anti-discrimination laws.  Recruitment, selection, and promotions can be found in paragraphs 232 to 246 of Section 7 of the CASA.

To maintain high-level, quality service, to ensure officer safety and accountability, and to promote constitutional, effective policing, APD's Peer Support and Behavioral Science Section (BSS) provides officers and employees ready access to mental health and support resources. A centralized and comprehensive range of mental health best practices are offered to include:  readily accessible confidential counseling services, critical incident, peer support, stress management training, and mental health evaluations. BSS also created an online series, titled "Saving Sanity with Stories and Education" which provided an opportunity for employees and their families to share stories of coping, struggling, and resilience, with mental health professionals and peer support members present to offer guidance, education, and support.  Additionally, Peer Support and several divisions throughout the department are developing a comprehensive officer wellness program.  The program is dedicated to promoting physical and mental wellness through exercise, proper nutrition, and mental health treatment and support.  This evolved as a collaboration amongst CABQ Health & Wellness, the APD Academy, Peer Support, Behavioral Sciences Section, Chaplain's Unit, and Performance Evaluation Management System (PEMS). Progress regarding APD's BSS and Peer Support programs can be found in Section 8, paragraphs 247 to 253.

APD is committed to community-oriented policing and to integrate community and problem-oriented policing principles, within our city.  To meet objectives of improving community engagement, APD launched a virtual summer camp for kids in July that received over 2,000 views.  The Community Oriented Policing (COP) Problem Oriented Policing (POP) training (COP/POP) training is currently being delivered to sworn personnel and will provide methods to develop interpersonal skills, partnerships, and increase knowledge regarding cultural diversity and implicit bias.  A community event web application is in the testing phase and will allow for real time reporting of community engagement efforts and will provide transparency and accountability to the public.  Section 9 includes paragraphs 255 to 259 which details community engagement and oversight requirements.

APD remains committed to implementing and sustaining the requirements of the CASA.  The progress made during this reporting period highlights the Department's ability to work collaboratively with stakeholders to implement positive change.  Through guidance and feedback from the IMT and DOJ, APD will continue to work towards full operational compliance in all CASA paragraphs.


## IV.  Progress Report Organization

This progress report aligns with the ten (10) CASA sections in response to recommendations set forth by the Monitor's Eleventh Report (IMR-11). Each Section contains subsections and respective paragraphs. Each paragraph of the CASA is listed and is followed by the corresponding IMR – 11 recommendations (if any), APD's response to the recommendations, and in some cases APD's response to the paragraph in general.

The full CASA, Independent Monitor Reports (IMR's) and other related documents can be located at:
http://www.cabq.gov/police/documents-related-to-apds-settlement-agreement.

## V.  Compliance Levels and the CASA's Measurable Paragraphs

There are two hundred seventy-six (276) paragraphs within the CASA with measurable requirements.  As defined in IMR-1, compliance measurements in APD's monitoring process consists of three parts: primary, secondary, and operational as defined below:

1. **Primary** compliance is the "policy" part of compliance. To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA. As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.
2. **Secondary** compliance can be attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the Department for doing so. By definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the agency).
3. **Operational** compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and Sergeants are routinely held accountable for compliance by their lieutenants and command staff. In other words, APD "owns and enforces its own policies".

As of the release of IMR - 11, APD's overall compliance rates compared to IMR - 10 were as follows:

| Compliance Level | IMR 10 Percentage Compliant | IMR 11 Percentage Compliant | % Change in Compliance Rate from IMR 10 to IMR 11 |
|---|---|---|---|
| Primary (policy) | 100% | 100% | 0% |
| Secondary (training) | 81% | 93% | 14.8% |
| Operational compliance (day to day operations) | 64% | 66% | 3% |

The following table shows paragraph compliance rates, from IMR – 1 through IMR-11 (no IMR – 7)[1].  The red represents the number of paragraphs in Primary Compliance, yellow represents the number in Secondary Compliance, and green represents the number of paragraphs in Operational Compliance.  The next IMR will be filed with the court in November 2020.



## VI.  Key Steps Taken by the Administration

- The new APD use of force policy (2-52 through 2-57) suite, which went into effect January 11, 2020, generated a vast ripple effect of activity throughout the Department regarding efforts to align all Sections of the CASA with the new policy, which includes implementation of training adjustments, administrative process changes for supervisors, data intake modifications, performance management systems, and policy revisions.
- On May 11, 2020 in accordance with APD policy, a six-month review began with a use of force policy work group that consists of the Internal Affairs Force Division (IAFD) Commander, the Compliance and Oversight Division (COD, formerly AOD) Policy Manager, and three IAFD Lieutenants.  The working group will continue to meet until the policies are revised.
- The City and APD established a data coordination working group to consider the many aspects of data generation, management, access, preservation, and analysis.
- SOP 2-3 Firearms and Ammunition was published.  The updated policy defines a weapon modification and accessory and provides rules and expectations for modifications and accessories to approved weapons.
- An SOP for crowd control and management has been revised and submitted to the DOJ and Independent Monitor for final approval.
- SOP 3-30 Line Inspection Process was published in March 2020.  Each month, supervisors conduct line inspections for each officer under his/her supervision, and determine if officers are carrying the appropriate equipment and if serial numbers match property cards, if their vehicles are in good condition, and if the supervisor conducted a review of two videos per officer.
- The DOJ approved the new SOP 3-33 Performance Evaluation and Management System (PEMS), which will be published once training has been delivered.

---

[1] There was no IMR – 7 by agreement between the DOJ, City, and Monitor with the approval of the Court.

- Monthly Line Inspections were implemented for all sworn personnel that now includes a weapon verification process in which weapon serial numbers are visually checked against each officer's property card.
- The newly developed Performance Evaluation Management System (PEMS) is currently being tested at the Valley Area Command and will replace the existing Early Intervention and Recognition System (EIRS).
- Internal Affairs Force Division (IAFD) completed an internal review of Paragraph 38 and drafted the Annual Use of Force Report in July 2020. The report was shared with the City, Monitor, and DOJ.
- IAFD has rewritten the Performance Review Unit process (PRU), which includes all new chain of command level one forms, new PRU forms, a newsletter and instructional video.
- Due to COVID -19 restrictions, Academy staff began plans to convert scheduled trainings to a virtual environment.
- The Crisis Intervention Section (CIS) continued to meet virtually to collaborate with the Mental Health Response Advisory Committee (MHRAC).
- The 2020 ECIT workload study was completed and examined total CIT contacts, rather than just calls with a clear mental health focus.
- APD made enhancements to the intranet platform to provide APD personnel an opportunity to review and provide feedback to any new or revised policy prior to publication.
- The Field Training Evaluation Program (FTEP) held four testing periods for applicants to be Field Training Officers (FTOs), and increased its numbers significantly since the start of this reporting period with the addition of twenty-nine Field Training Officers and five Field Training Area Sergeants whose work schedules span all three shifts in all six Area Commands.
- The practice of utilizing Additional Concern Memos (ACMs) for CASA-related issues was prohibited by Special Order in April of 2019. The ACM process was replaced by a new Internal Affairs Request (IAR), which will account for every policy violation or misconduct.
- Internal Affairs Professional Standards (IAPS) created a case review process for internal investigations where detectives are required to give case updates as to the progression of the investigation.
- APD continues to attract qualified individuals from a variety of new and innovative recruiting events.
- The PMU continues to conduct monthly scorecard audits to assess APD's compliance with CASA requirements and policy. The COD data analyst will begin analyzing scorecard results to share with Executive Staff and drive departmental decisions.

## VII. Section Progress on the CASA's measurable paragraphs

The Section portions of this report provide detailed information about the progress APD has made with the measurable CASA paragraphs during the reporting period from February 1, 2020 to July 31, 2020, and includes progress made, plans to correct any problems, APD responses to IMR recommendations and general updates. The reader should be aware all recommendations listed throughout this progress report are from IMR-11 and each recommendation has a corresponding recommendation number. IMR-11 may be located at:
http://documents.cabq.gov/police/reports/department-of-justice/eleventh-independent-monitors-report.pdf

## Section 1: Use of Force: Internal Controls and Accountability (Paragraphs 14-89)

### A. Use of Force Principles

**14.** Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:
   a) officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;
   b) force shall be de-escalated immediately as resistance decreases;
   c) officers shall allow individuals time to submit to arrest before force is used whenever possible;
   d) APD shall explicitly prohibit neck holds, except where lethal force is authorized;
   e) APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject;

f) APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;

g) officers shall not use force to attempt to effect compliance with a command that is unlawful;

h) pointing a firearm at a person shall be reported as a Level 1 use of force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and

i) immediately following a use of force, officers, and, upon arrival, a supervisor, shall inspect and observe subjects of force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care.  This may require an officer to provide emergency first aid until professional medical care providers arrive on scene.

**Paragraph 14 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 14.

**APD Response:**  See below at Paragraph 15.

**15.** APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices.  The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units.  The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate.  The use of force policy will incorporate the use of force principles and factors Case articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability.   There were no IMR

**Paragraph 15 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 15.

**APD Response for Paragraphs 14 and 15:**   In IMR – 11, the monitoring team commended APD for significant progress in the area of force investigations by APD's Internal Affairs Force Division (IAFD) and also observed significant strides made in the Academy's training development and delivery through the use of force training efforts.  The new APD use of force policy (2-52 through 2-57) suite, which went into effect January 11, 2020, is used to guide and assess levels 1, 2, and 3 use of force cases.

From January 11, 2020 through July 26, 2020, IAFD has investigated and closed 192 level 2 and 3 use of force cases, all within their timelines.  All of the elements in paragraph 14 are evaluated in these cases.

Out of the 192 cases investigated, there were three cases out of policy, with 98.5% of the cases in policy.  When cases are found to be out of policy, an IAR is opened for a Force Internal Investigation (FII) which is conducted to investigate the potential misconduct.  On May 11, 2020 in accordance with APD policy, a six-month review began with a use of force policy work group that consists of the IAFD Commander, the Compliance and Oversight Division (COD) Policy Manager, and three IAFD Lieutenants.  The working group will meet until the policies are revised.

**16.** In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below.  The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy.

**Paragraph 16 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 recommendations for paragraph 16.

**APD Response:**   This paragraph is in secondary compliance due to the use of force policy suite being newly implemented. The Academy will continue to train new employees and supervisors on the use of force policy suite. Operational compliance will be gained when IAFD is able to provide information that the training is being applied in the field.

**17.** Officers shall carry only those weapons that have been authorized by the Department.  Modifications or additions to weapons shall only be performed by the Department's Armorer as approved by the Chief.  APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons.

**Paragraph 17 is in Secondary Compliance.**

**IMR – 11 Recommendations and APD Response:**  See below at Paragraph 19.

## B. Use of Firearms

**18.** Officers shall carry or use only agency-approved firearms and ammunition while on duty.
**Paragraph 18 is in Secondary Compliance.**
**IMR – 11 Recommendations and APD Response:**  See below at Paragraph 19.

**19.** APD issued Special Order 14-32 requiring all officers to carry a Department issued handgun while on duty.  APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns.
**Paragraph 19 is in Secondary Compliance.**
**IMR – 11 Recommendations for Paragraphs 17-19:**
**4.7.4-6a**:  Develop an action plan, complete with tasks, responsibilities, and due dates for addressing the concerns outlined in paragraphs 17-19 and implement the plan as warranted.
**4.7.4-6b**:  Involve APD's inspections and audit personnel in the development of the action plan.

**APD Response to IMR – 11 Recommendations for Paragraphs 17-19:**  APD SOP 2-3 Firearms and Ammunition was published on June 17, 2020.  The updated policy defines a weapon modification and accessory and provides rules and expectations for modifications and accessories to Department-authorized weapons.  A PowerDMS training video was published to provide additional guidance to differentiate between a weapon modification and an accessory.  Monthly Line Inspections are completed by supervisors and includes a weapon verification process in which weapon serial numbers are checked against each officer's property card.  The Monthly Line Inspection is an audit resource to ensure weapons and ammunition are being checked by APD supervisors.  As an additional self-assessment measure, COD PMU performs a random sample monthly audit of all FSB Area Commands which includes verification of Supervisory inspection of weapons, serial numbers, and ammunition to determine that offices are adhering to department order.  The department has maintained 95% compliance with monthly audit process during this reporting period.  See attachment A for an example of the monthly audit scorecard.

**20.** Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year.  Officers who fail to qualify on their primary weapon system shall complete immediate remedial training.  Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify.  Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment.
**Paragraph 20 is in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 20.
**APD Response:**  The Academy continues to require annual firearms qualifications, and to improve process to ensure information is clear for reporting and transparency.  However, during this reporting period, there were fewer officers trained due to COVID-19 restrictions and social distancing regulations.

**21.** APD training shall continue to require and instruct proper techniques for unholstering, drawing, or exhibiting a firearm.
**Paragraph 21 is in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 21.
**APD Response:**  The basic firearms block of instruction continues to cover proper techniques for unholstering, drawing, or exhibiting a firearm, which are reinforced in all other firearms training that is conducted.

**22.** APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person.  Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle.
**Paragraph 22 is in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 22.

**23.** APD shall track all critical firearm discharges.  APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its Use of Force Annual Report.
**Paragraph 23 is in Operational Compliance.**
**IMR – 11 Recommendations:**
**4.7.10a**:  Continue the work currently being done to bring annual reports into the required cycle, including the report for 2018.
**APD Response:**   IAFD compiled the 2016 - 2019 Annual Use of Force Report in July 2020.  The report was shared with the City, Monitor, and DOJ.  Once the arrest numbers can be validated, the Annual Use of Force Report will be published.
**4.7.10b:**  Continue the work currently underway to develop a replacement process for the old "EIS" system.
**APD Response:**   The newly developed Performance Evaluation Management System (PEMS) is currently being tested at the Valley Area Command and will replace the existing EIRS.  The Performance Evaluation and Management System (PEMS) is a proactive-management tool that promotes employee and supervisory awareness using an automated notification program and a standardized review process.  The primary purpose of PEMS is to provide timely and reliable data to employees and supervisors in order to make informed decisions, as early as possible, regarding the well-being, training, career development, and performance concerns.  Continuing progress should make the system available for other area commands in the next reporting period.

## C. Electronic Control Weapons

**24.** ECWs shall not be used solely as a compliance technique or to overcome passive resistance.  Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered.  Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range.
**Paragraph 24 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 24.
**APD Response:**  See below at Paragraph 37.

**25.** Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to discharging an ECW on the subject.  Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning.
**Paragraph 25 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 25.
**APD Response:**  See below at Paragraph 37.

**26.** ECWs will not be used where such deployment poses a substantial risk of serious physical injury or death from situational hazards, except where lethal force would be permitted.  Situational hazards include falling from an elevated position, drowning, losing control of a moving motor vehicle or bicycle, or the known presence of an explosive or flammable material or substance.
**Paragraph 26 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 26.
**APD Response:**  See below at Paragraph 37.

**27.** Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power.  Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power).  After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.  Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury.  Officers shall also weigh the risks of subsequent or continuous cycles against other force options.   Officers shall independently justify each cycle or continuous cycle of five seconds against the subject in use of force reports.
**Paragraph 27 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 27.

**28.** ECWs shall not be used solely in drive-stun mode as a pain compliance technique.  ECWs may be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject, so that officers can consider another force option.
**Paragraph 28 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no IMR – 11 Recommendations for Paragraph 28.

**29.** Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options.  ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons.  In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others.  Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations.
**Paragraph 29 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no IMR – 11 Recommendations for Paragraph 29.

**30.** Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury.
**Paragraph 30 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no IMR – 11 Recommendations for Paragraph 30.

**31.** ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective.
**Paragraph 31 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no recommendations for Paragraph 31.

**32.** Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm.
**Paragraph 32 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no recommendations for Paragraph 32.

**33.** Officers shall receive annual ECW certifications, which should consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes; and scenario- and judgment-based training.
**Paragraph 33 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no IMR- 11 Recommendations for Paragraph 33.
**APD Response:**   Annual ECW certification is occurring at this time.

**34.** Officers shall be trained in and follow protocols developed by APD, in conjunction with medical professionals, on their responsibilities following ECW use, including:
  a) removing ECW probes, including the requirements described in Paragraph 35;
  b) understanding risks of positional asphyxia, and training officers to use restraint techniques that do not impair the subject's respiration following an ECW application;
  c) monitoring all subjects of force who have received an ECW application while in police custody; and
  d) informing medical personnel of all subjects who:  have been subjected to ECW applications, including prolonged applications (more than 15 seconds); are under the influence of drugs and/or exhibiting symptoms associated with excited delirium; or were kept in prone restraints after ECW use.
**Paragraph 34 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no recommendations for Paragraph 34.
**APD Response:**   All above mentioned criteria are included in the training for ECW recertification.

**35.** The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility.  Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel.
**Paragraph 35 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no IMR – 11 Recommendations for Paragraph 35.

APD Response:  See below at Paragraph 37.

**36.** Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges).
**Paragraph 36 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 36.
**APD Response:**  See below at Paragraph 37

**37.** APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy.  APD agrees to implement a protocol for quarterly downloads and audits of all ECWs.  APD agrees to conduct random and directed audits of ECW deployment data.  The audits should compare the downloaded data to the officer's use of force reports.  Discrepancies within the audit should be addressed and appropriately investigated.
**Paragraph 37 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 37.

**APD Response to Paragraphs 25 - 37:**  APD transitioned to a newer version of the ECW in late 2019 into early 2020.  The COD PMU conducted a random quarterly audit of ECWs for Field Services Area Commands for the date range of March 1- March 31, 2020, and identified a concern regarding employees not properly conducting function checks of the ECW.  Function checks were included in the annual firearms qualification training; however, the training was postponed due to COVID-19 restrictions.  In the interim, members of COD and the Training Academy conducted function check retraining to over 110 officers.  The 2020 firearms qualification training has resumed and all officers assigned an ECW will be retrained on the ECW function checks.

**38.** APD agrees to include the number of ECWs in operation and assigned to officers, and the number of ECW uses, as elements of the Early Intervention System.  Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force and whether officer and subject injuries are affected by the rate of ECW use.  Probe deployments, except those described in Paragraph 30, shall not be considered injuries.  APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis.  ECW data analysis shall be included in APD's Use of Force Annual Report.
**Paragraph 38 is in Primary Compliance.**
**IMR – 11 Recommendations:**
**4.7.23a:** APD should conduct an internal review of compliance for paragraph 38 and ensure that its review is responsive to the elements of paragraph 38.
**APD Response:**  A review of Paragraph 38 was conducted and APD determined that it is not possible to control or account for all factors in a force event that may or may not lead to the use of an ECW or other force types.  Too many variables impact force events to determine what causes outcome variables such as injuries and compliance.  However, the Use of Force Annual Report does include and specifically address whether officers are using ECWs appropriately, the number of ECWs issued, and the number of ECW applications.  A finding of "in policy" is based on a thorough investigation by trained detectives with multiple layers of review, and considers the force application in the context of whether it was necessary, proportional, and reasonable.  This analysis also includes whether the ECW was the minimum amount of force needed to accomplish a lawful objective.  All ECW data from 2019 was analyzed and it was found that 95% of the cases involving ECWs were "in policy".
**4.7.23b:** APD should produce 2018 and 2019 Use of Force Annual Reports as soon as practicable.
**APD Response:**  IAFD compiled the 2016 - 2019 Annual Use of Force Report in July 2020.  The report was shared with the City, Monitor, and DOJ.  Once the arrest numbers can be validated, the Annual Use of Report will be published.
**4.7.23c:** Require specific and meaningful "intervention," based on errors attributable to sergeants, lieutenants, and area commands.  Multiple failures should not be addressed through verbal reprimands, but should be addressed by re-training, documented counseling, or other tangible methods consistent with APD disciplinary policy.
**4.7.23d:** Six months after remedial steps, re-visit the respective area commands and sample a second set of ECW reviews to determine if compliance levels have improved.
**APD Response:**  ECW data collection is now achieved exclusively as part of the Use of Force Annual Reports.  Once PEMS goes live, if an employee or supervisor exceeds an assessment threshold a monitoring plan will be initiated.  The monitoring plan is in addition to any type of discipline that would occur for violating policy.  The monitoring plan is designed to address the underlining element(s) which caused the assessment threshold to be exceeded.

**4.7.24f**: If compliance levels have not improved, consider appropriate remediation or discipline for the responsible sergeants, lieutenants, and area commanders.

**APD Response:** The PEMS is a vital component to addressing and remediating repeated policy violations by employees and supervisors. APD has worked rigorously to create a strong PEMS policy and is now focusing on a comprehensive training plan to provide management with the tools necessary for improving employee performance and compliance with policies.

**4.7.24-25g**: Repeat steps 1-6 until error rates are less than five percent.

**4.7.24-25h**: The internal review should focus on areas of non-compliance noted by the monitor and internal processes at APD.

**APD Response:** Any misconduct/policy violations identified during the use of force investigation is submitted through an IAR to be investigated by IAFD. Action is taken for misconduct and policy violations are handled in accordance with SOP 3-46 Discipline System. IAFD is tracking the misuse of an ECW, and conducting internal investigations regarding misconduct policy violations.

## D. Crowd Control and Incident Management

**39.** APD shall maintain crowd control and incident management policies that comply with applicable law and best practices. At a minimum, the incident management policies shall: a) define APD's mission during mass demonstrations, civil disturbances, or other crowded situations; b) encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses; c) require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and d) continue to prohibit the use of canines for crowd control.

**Paragraph 39 is in Primary Compliance.**

**IMR – 11 Recommendations:** See below for IMR – 11 Recommendations and APD Responses at Paragraph 40.

**40.** APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures.

**Paragraph 40 is in Primary Compliance.**

**IMR – 11 Recommendations:** The following recommendations were offered by the IMT for Paragraphs 39 and 40.

**4.7.26-27a**: APD must develop and deliver a meaningful training program to its Emergency Response Team (ERT) and Field Services members that is centered on crowd control policies. That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans.

**4.7.26-27b**: APD must ensure that its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy, training, or operational rubric within the agency. We encourage APD's ERT Commanders to review past reports and to incorporate After Action Report (AAR) procedures and forms (previously agreed upon) into SOPs.

**4.7.26-27c**: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.

**APD Response to IMR – 11 Recommendations for Paragraphs 39 and 40:** The work on crowd control and incident management completed during this monitoring period has been focused on developing and revising the ERT policy. Upon approved policy, APD will complete the ERT Training for ERT supervisors and team members. The Academy and ERT will complete the training curriculum once all parties approve the policy. ERT has experienced an unprecedented operational tempo and APD will continue to work toward developing meaningful training for ERT and its supervisors while maintaining a high operational tempo.

## E. Use of Force Reporting

**41.** Uses of force will be divided into three levels for reporting, investigating, and reviewing purposes. APD shall develop and implement a use of force reporting policy and use of force report form that comply with applicable law and comport with best practices. The use of force reporting policy will require officers to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force. Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor. This reporting requirement also applies to off-duty officers engaged in enforcement action.

**Paragraph 41 is in Secondary Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 41.

**42.** The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the review or the APD officer conducting the investigation.  The written or recorded narrative will include:

   a) a detailed account of the incident from the officer's perspective;

   b) the reason for the initial police presence;

   c) a specific description of the acts that led to the use of force including the subject's behavior;

   d) the level of resistance encountered; and

   e) a description of each type of force used and justification for each use of force.  Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force.

**Paragraph 42 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 42.

**43.** Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action.

**Paragraph 43 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 43.

**44.** APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force.  The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility.  The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.

**Paragraph 44 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 44.

**45.** APD shall require officers to activate on-body recording systems and record all use of force encounters.  Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination.

**Paragraph 45 is in Primary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 45.

**APD Response:**  The new APD use of force policy suite (2-52 – 2-57), which went into effect January 11, 2020, is used to guide and assess levels 1, 2, and 3 use of force cases.  Internal investigations are conducted when officers fail to record a use of force encounter.

## F. Force Reviews and Investigations

**46.**  The three levels of use of force will have different kinds of departmental review.  All uses of force by APD shall be subject to supervisory review, and Level 2 and Level 3 uses of force are subject to force investigations as set forth below.  All force reviews and investigations shall comply with applicable law and comport with best practices.  All force reviews and investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy.

**Paragraph 46 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 46.

**47.** The quality of supervisory force reviews shall be taken into account in the performance evaluations of the officers performing such reviews.

**Paragraph 47 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 47.

**APD Response:**   APD incorporated a use of force section in the 2019-2020 performance evaluation system.  Supervisors are now required to evaluate their employees' adherence to the use of force policies to include the on-scene review by supervisors and the documentation review.  APD has contracted with Benchmark Analytics to develop a comprehensive data management system.  Benchmark is a comprehensive top-to-bottom software platform – featuring seven analytics-driven integrated management modules designed to capture all of the day-to-day operational data points in one location.  The new supervisory review will include a self-review report (self-assessment), manager review (subordinate assessment), and a manager evaluation (360 primary report-supervisor).  A team is meeting regularly with Benchmark to identify fields in the customized system.

**48.** APD agrees to develop and implement force classification procedures that include at least three categories of types of force that will determine the force review or investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to promote greater efficiency and reduce burdens on first-line supervisors, while optimizing critical investigative resources on higher-risk uses of force. The levels of force are defined as follow:

a) Level 1 is force that is likely to cause only transitory pain, disorientation, or discomfort during its application as a means of gaining compliance. This includes techniques which are not reasonably expected to cause injury, do not result in actual injury, and are not likely to result in a complaint of injury (i.e., pain compliance techniques and resisted handcuffing). Pointing a firearm, beanbag shotgun, or 40 millimeter launcher at a subject, or using an ECW to "paint" a subject with the laser sight, as a show of force are reportable as Level 1 force. Level 1 force does not include interaction meant to guide, assist, or control a subject who is offering minimal resistance.

b) Level 2 is force that causes injury, could reasonably be expected to cause injury, or results in a complaint of injury. Level 2 force includes use of an ECW, including where an ECW is fired at a subject but misses; use of a beanbag shotgun or 40 millimeter launcher, including where it is fired at a subject but misses; OC Spray application; empty hand techniques (i.e., strikes, kicks, takedowns, distraction techniques, or leg sweeps); and strikes with impact weapons, except strikes to the head, neck, or throat, which would be considered a Level 3 use of force.

c) Level 3 is force that results in, or could reasonably result in, serious physical injury, hospitalization, or death. Level 3 force includes all lethal force; critical firearms discharges; all head, neck, and throat strikes with an object; neck holds; canine bites; three or more uses of an ECW on an individual during a single interaction regardless of mode or duration or an ECW application for longer than 15 seconds, whether continuous or consecutive; four or more strikes with a baton; any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject; and uses of force resulting in a loss of consciousness. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents:

    i.    Officer-involved shootings;

    ii.    Serious uses of force as defined by the Memorandum of Understanding;

    iii.    In-custody deaths; and

    iv.    other incidents resulting in death at the discretion of the Chief.

**Paragraph 48 is in Secondary Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 48.

**APD Response:** The new use of force policies were approved January 15, 2019 and implemented January 11, 2020. To date, all officers have been trained on Tiers 1, 2, and 3. Tier 4 training has been delayed due to COVID-19.


**49.** Under the force classification procedures, officers who use Level 1 force shall report the force to their supervisor as required by Paragraph 42; Level 1 uses of force that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force. Level 2 and 3 uses of force shall be investigated by the Internal Affairs Division, as described below. When a use of force or other incident is under criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Division will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Case Task Force shall periodically share information and coordinate with the Internal Affairs Division, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of uses of force.

**Paragraph 49 is in Secondary Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 49.

**APD Response:** APD's use of force policy 2-56 Use of Force Reporting by Department Personnel is in place to describe the responsibilities of all Albuquerque Police Department personnel to report use of force, whether an officer is witness to a use of force or involved in a use of force, so that reviewers and investigators can determine whether such force was reasonable, necessary under the circumstances, and proportional to the threat or resistance of the individual.


## F1. Supervisory Force Reviews

**50.** The supervisor of an officer using force shall respond to the scene of all Level 1, 2, and 3 uses of force to ensure that the use of force is classified according to APD's force classification procedures. For Level 2 and Level 3 uses of force, the supervisor shall ensure that the Force Investigation Section of the Internal Affairs Division is immediately notified and dispatched to the scene of the incident to initiate the force investigation.

**Paragraph 50 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 50.

**51.** A supervisor who was involved in a reportable use of force including by participating in or ordering the force being reviewed, shall not review the incident or use of force reports for approval.
**Paragraph 51 is in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 51.

**52.** For all supervisory reviews of Level 1 uses of force, the supervisor shall:
    a) respond to the scene and immediately identify the officer(s) involved in Level 1 use of force;
    b) review the involved officer's lapel video, determining whether the incident involves a Level 1 use of force;
    c) review the lapel video of other officers on-scene where uncertainty remains about whether the incident rises to a Level 2 or Level 3 use of force;
    d) examine personnel and the subject for injuries and request medical attention where appropriate;
    e) contact the Internal Affairs Division to conduct a Level 2 or Level 3 use of force investigation if lapel video does not affirm a Level 1 use of force;
    f) gather any evidence located at the scene of the Level 1 use of force;
    g) capture photographs of the officer(s) and subject involved in the Level 1 use of force;
    h) require the submission of a use of force report from the involved officer by the end of shift; and
    i) conduct any other fact-gathering activities while on-scene, as necessary, to reach reliable conclusions regarding the officer's use of Level 1 force.
**Paragraph 52 is in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 52.

**53.** Each supervisor shall complete and document a supervisory force review of a Level 1 use of force within 72 hours of the use of force.  Any extension of this 72-hour deadline must be authorized by a Commander.  This review shall include:
    a) all written or recorded use of force narratives or statements provided by personnel or others;
    b) documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why.  The report should also include all available identifying information for anyone who refuses to provide a statement;
    c) the names of all other APD employees witnessing the use of force;
    d) the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques and
    e) documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.
**Paragraph 53 remains in Operational Compliance.**
**IMR – 11 Recommendations:**   There were no IMR – 11 Recommendations for Paragraph 53.
**APD Response:**  The PMU audits 100% level one use of force to determine if supervisors are meeting the requirement of this paragraph.

**54.** Upon completion of the review, the reviewing supervisor shall forward the review through his or her chain of command to the Commander, who shall review the entry to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard.  The Commander shall order additional review when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  These reviews shall be completed electronically and tracked in an automated database within the Internal Affairs Division.
**Paragraph 54 is in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 54.

**55.** Where the findings of the supervisory review are not supported by a preponderance of the evidence, the supervisor's Commander shall document the reasons for this determination and shall include this documentation as an addendum to the original review.  The supervisor's superior shall take appropriate action to address the inadequately supported determination and any deficiencies that led to it.  Commanders shall be responsible for the accuracy and completeness of the Level 1 force reviews prepared by supervisors under their command.
**Paragraph 55 is in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 55.

**56.** Where a supervisor repeatedly conducts deficient supervisory force reviews, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules.  Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force review immediately and notify the Internal Affairs Division and the Chief.  The Force Investigation Section of the Internal Affairs Division shall immediately initiate the administrative and criminal investigation.
**Paragraph 56 is in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 56.

**APD Response for paragraphs 55 and 56:**  Since going live with the new use of force policy suite on January 11, 2020, IAFD has responded to over 367 use of force callouts.  IAFD created a 40-hour use of force training block based on these paragraphs.  It was submitted to the IMT and DOJ for approval.  APD received the first round of comments in July 2020 and anticipate the training to begin in the last quarter 2020.

**57.** When the Commander finds that the supervisory force review is complete and the findings are supported by the evidence, the file shall be forwarded to the Performance Review Unit of the Compliance Bureau.  The Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence.  The Performance Review Unit shall ensure that the file is forwarded to the Internal Affairs Division for recordkeeping.  Where the Performance Review Unit of the Compliance Bureau determines that a supervisory force review, which has been completed by the supervisor and reviewed by the chain of command, is deficient, the Performance Review Unit shall forward the review to the supervisor for correction.  Any performance deficiencies in the investigation or review will be noted in the affected Commander's performance records.
**Paragraph 57 is in Secondary Compliance.**
**IMR – 11 Recommendations and APD Response:**  See paragraph 78

**58.** At the discretion of the Chief, a supervisory force review may be assigned or reassigned to another supervisor, whether within or outside of the Command in which the incident occurred, or may be returned to the original supervisor for further review or analysis.  This assignment or re-assignment shall be explained in writing.
**Paragraph 58 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.45a:**  Develop an early intervention system that triggers alerts when clusters of poorly investigated use of force incidents arise, and address these issues early with Area Command staff, requiring Commanders affected to develop and implement written "Intervention Plans" designed to identify the causes of failure and remediate those causes systematically.
**4.7.45b:**  Routinely monitor the intervention process for integrity to the proffered plans.
**APD Response:**  APD is in the process of developing a new program called PEMS, an early intervention system that triggers alerts when clusters of poorly investigated use of force incidents arise in two categories:
   a)  If a supervisor has a "deficient investigation", this would trigger a policy mandated assessment. In this case, one deficient investigation would require an assessment and corrective action by the chain of command.
   b)  If a supervisor has multiple SOP violations for inadequate investigations, then PEMS will trigger when the supervisor exceeded a Complaints Against Officer assessment threshold.  A monitoring plan will be developed to address the underlying causes of failures for exceeding the threshold.  The remediation can be in the form of consequences from an internal affairs misconduct investigation, to include but not limited to training, verbal or written reprimand, suspension, and/or demotion.  The remediation can also come in the form of Mandatory Training Referral made by the Chain of Command.

**59.** Where, after a supervisory force review, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action.  Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.
**Paragraph 59 is in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 59

## F2.  Force Investigations by the Internal Affairs Division

**60.** The Force Investigation Section of the Internal Affairs Division shall respond to the scene and conduct investigations of Level 2 and Level 3 uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Division by the Chief.  In cases where an investigator in the Force Investigation Section initiates a Level 2 or Level 3 use of force investigation and identifies indications of apparent criminal conduct, the Section shall refer the use of force to an investigator in the Section, with no involvement in the initial administrative investigation into the Level 2 or 3 use of force, to conduct a criminal investigation.  The criminal investigation shall remain separate from and independent of any administrative investigation.  In instances where the Multi-Agency Task Force is conducting the criminal investigation of a use of force, the Internal Affairs Division shall conduct the administrative investigation.
**Paragraph 60 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.47a:**  APD should continue its current planning processes related to reconstituting an effective FRB process.  We have reviewed work completed to date by the department regarding the reconstituted FRB, and find it methodical, based on lessons learned from other agencies working through consent decrees, and focused on past comments by the monitoring team related to FRB processes.
**APD Response:**  See Paragraph 67 below.

**61.** The Force Investigation Section of the Internal Affairs Division will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60.  The Force Investigation Section of the Internal Affairs Division shall include sufficient personnel who are specially trained in both criminal and administrative investigations.
**Paragraph 61 is in Secondary Compliance**
**IMR – 11 Recommendations:**
**4.7.48a:**  Continue to monitor internally the progress of Internal Affairs in conducting effective intake, assessment, assignment, investigation, and resolution processes for criminal and civil investigations in order to ensure that staffing levels are appropriate, and processes are effective in producing acceptable and timely results.
**APD Response:**  See Paragraph 67 below.

**62.** Within six months from the Operational Date, APD shall revise the Internal Affairs Division manual to include the following:
   a) definitions of all relevant terms;
   b) procedures on report writing;
   c) procedures for collecting and processing evidence;
   d) procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;
   e) procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;
   f) scene management procedures; and
   g) management procedures.
**Paragraph 62 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.49a:**  Continue work on revision and update of the IAB manuals, ensuring they comply with the updated CASA, the new use of force policies that became operational on January 11, 2020 as well as the new investigation procedures for Level 1, 2, and 3 uses of force, and known best practices in the field.
**APD Response:**  See Paragraph 67 below.

**63.** Within 39 months from the Operational Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Division and Force Investigation Section to fulfill the requirements of this Agreement.  APD shall ensure that all Level 2 and

Level 3 uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary. At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Division or Force Investigation Section.

**Paragraph 63 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.50a:** Identify the department's expected milestone date for staffing at IAB based on data related to incoming cases, average time for case completion, and calculations of the number of staff needed to effectively investigate incoming cases within established parameters.

**APD Response:** See Paragraph 67 below.

**64.** Before performing force investigations, Force Investigation Section personnel shall receive force investigation training that includes, at a minimum, the following areas: force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques. Force Investigation Section personnel shall also receive force investigation annual in-service training.

**Paragraph 64 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 64.

**APD Response:** See Paragraph 67 below.

**65.** Where appropriate to ensure the fact and appearance of impartiality and with the authorization of the Chief, APD may refer a use of force indicating apparent criminal conduct by an officer to the Multi-Agency Task Force for criminal investigation.

**Paragraph 65 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 65.

**APD Response:** See Paragraph 67 below.

**66.** To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Force Investigation Section of the Internal Affairs Division or the Multi-Agency Task Force in the investigation of any Level 2 or Level 3 use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs.

**Paragraph 66 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 66.

**APD Response:** See Paragraph 67 below.

**67.** The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation.

**Paragraph 67 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 67.

**APD Response to Paragraphs 63 - 67:** IAFD created a 40-hour use of force training block based on paragraphs 60 - 67. The training is intended to provide incoming investigators/participants with specific instruction in all standard operating procedures applicable to use of force guidelines; defined responsibilities for IAFD; as well as delineate how the CASA relates to use of force. The curriculum was submitted to the IMT and DOJ for approval. APD received preliminary comments in July 2020 and anticipate that the training will be fully approved to begin during the last quarter of 2020.

**68.** If APD initiates a criminal investigation, or where APD requests a criminal prosecution, the Force Investigation Section will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186. No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation.

**Paragraph 68 is in Secondary Compliance.**

**IMR – 11 Recommendation:**

**4.7.55:** APD should move forward with process design, policy development and training regarding investigations regarding potential criminal prosecutions and compelled interviews of officers.

**APD Response:**  According to APD Policy 2-57-4 Use of Force Review and Investigation by Departmental Personnel**,** where a Level 2 or Level 3 use of force investigation indicates apparent criminal conduct by an officer in the use of force, IAFD shall refer the incident to an investigator from the Criminal Investigations Division (CID) for investigation. The criminal investigator shall have no involvement in the administrative investigation into the use of force.  Notice of such a referral shall be provided to the affected officer.

**69.** In conducting its investigations of Level 2 or Level 3 uses of force, as defined in this Agreement, the Force Investigation Section shall:

a) respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that the use of force has been classified according to APD's classification procedures, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;

b) ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;

c) ensure that a canvass for, and interview of, witnesses is conducted.  In addition, witnesses should be encouraged to provide and sign a written statement in their own words;

d) ensure, consistent with applicable law, that all officers witnessing a Level 2 or Level 3 use of force by another officer provide a use of force narrative of the facts leading to the use of force;

e) provide a written admonishment to involved and witness officer(s) to the use of force that they are not to speak about the force incident with anyone until they are interviewed by the investigator of the Force Investigation Section;

f) conduct only one-on-one interviews with involved and witness officers;

g) review all use of force reports to ensure that these statements include the information required by this Agreement and APD policy;

h) ensure that all use of force reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;

i) conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;

j) record all interviews;

k) consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;

l) make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and

m) train all Internal Affairs Division force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors.

**Paragraph 69 is in Secondary Compliance.**

**IMR - 11 Recommendations for Paragraphs 68 and 69:**

**4.7.56a:**  Conduct detailed failure analyses for all IAB investigations deemed improperly completed or delayed.

**4.7.56b:** Using these failure analyses, routinely modify training, procedures, practice, and supervision/oversight until IAB findings are greater than 94 percent complete and adequate on each of the elements addressed in paragraph 69.

**4.7.56c:**  Resolve IA administrative use of force and misconduct investigative timelines to ensure they are practical and allow corrective and disciplinary actions to routinely occur within those timelines.

**APD Response:**  As of July 31, IAFD closed 199 use of force cases since going live on January 11, 2020, each of which was closed within timelines.  The reviewing chain of command completes a Compliance Worksheet for each case, which demonstrates APD IAFD's ability to meet the requirements 95% of the time or better.  IAFD process and staffing is evaluated each month.  A report is generated and provided to the Deputy Chief of the Professional Standards and Accountability Bureau (previously titled the Compliance Bureau).  During the course of the 199 use of force investigations, IAFD discovered 213 policy violations which were closed within timelines.

**70.** The Force Investigation Section shall complete an initial use of force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force.

**Paragraph 70 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.57a:**  Conduct a data analysis of use of force data reports to determine why they take longer than 24 hours to process and develop recommendations to relieve the major bottlenecks affecting this process.

**4.7.57b:**  Ensure that any ECW errors noted based on the monitor's recommendations in response to identified issues with ECW usage are used to make changes to use of force data analyses moving forward.

**APD Response:**  IAFD uses the BlueTeam data base system to satisfy the 24-hour notification to the Chief of Police.  BlueTeam is a computer platform that supports frontline documentation, supervisory oversight and organizational accountability.  The Force Investigation Section (FIS) detectives are responsible for documenting that 24-hour notification once they leave the use of force scene.


**71.** The Force Investigation Section shall complete Level 2 or Level 3 administrative investigations within three months after learning of the use of force.  Any request for an extension to this time limit must be approved by the commanding officer of the Force Investigation Section through consultation with the Chief or by the Chief.  At the conclusion of each use of force investigation, the Force Investigation Section shall prepare an investigation report.  The report shall include:

   a) a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Force Investigation Section's independent review of the facts and circumstances of the incident;

   b) documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying use of force Data Reports.  In situations in which there are no known witnesses, the report shall specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why.  The report should also include all available identifying information for anyone who refuses to provide a statement;

   c) the names of all other APD officers or employees witnessing the use of force;

   d) the Force Investigation Section's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options;

   e) if a weapon was used by an officer, documentation that the officer's certification and training for the weapon were current at the time of the incident; and

   f) the complete disciplinary history of the target officers involved in the use of force.

**Paragraph 71 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.58a:**  Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing delay.  The review should:

   a. Identify key causes of failure;

   b. Identify where the failure points were in the IAB process related to Paragraph 71;

   c. Identify the cause of the failures;

   d. Identify who is responsible for the cause of the delays; and

   e. Recommend actions to remedy the top five causes of failure to meet the established timelines.

   f.  Repeat this process until failures re Paragraph 71 are less than 95 percent.

**4.7.58b:**  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established timelines.

**4.7.58c:**  Determine if these processes need to be revised, expanded, or refocused given our comments re ECW usage failures in the field, contained in paragraphs 24-36, 41-59, and 60-77.

**4.7.58d:**  Repeat until 95% of cases completed meet established requirements for quality of IA investigations.

**4.7.59e:**  APD should carefully review the changes its use of force policy viz a viz this paragraph to ensure that in-field systems related to this paragraph are in compliance with all aspects of the new use of force policy suite and the new IA investigations rubric.

**APD Response:**  All IAFD use of force investigations have met timelines; however, IAFD will conduct a failure analysis if a case exceeds the timeline.  IAFD has found the ECW usage process does not require revisions at this time, due to the fact that officers using the ECW are being held accountable to a timely use of force investigation and any misconduct investigation in the field when applicable.

IAFD determined that the in-field systems related to this paragraph need to be revised for Level 1 uses of force and are in the process of making those revisions.

**72.** Upon completion of the Force Investigation Section investigation report, the Force Investigation Section investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Division. The Internal Affairs Division commanding officer shall review the report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance of the evidence standard. The Internal Affairs Division commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.

**Paragraph 72 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.59a:** Conduct a review of a sample of cases completed by IAB (in the past 3-6 months) that failed to meet established timelines by reviewing the key failure points causing delay. The review should:

    a. Identify key causes of failure:
    b. Identify where in the IAB process related to Paragraph 72 the failure points were;
    c. Identify the cause of the failures;
    d. Recommend and implement actions to remedy the top five causes of failure to meet the established timelines;
    e. Revaluate performance and repeat the process, with a focus on supervisors who routinely fail to meet established timelines; and
    e. Repeat as necessary until the failure rate is below five percent.

**APD Response:** As stated above in the APD response to Paragraph 71, no force investigations failed to meet established timelines in the past 3 – 6 months or within this reporting period.

**73.** For administrative investigations, where the findings of the Force Investigation Section investigation are not supported by a preponderance of the evidence, the Internal Affairs Division commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report. The commanding officer of the Internal Affairs Division shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it. The Internal Affairs Division commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Division.

**Paragraph 73 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.60a:** Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet established quality requirements regarding preponderance of the evidence and review the key failure points causing insufficient investigations relative to preponderance of the evidence. The review should:

    a. Identify key causes of failure to meet preponderance of the evidentiary standards for IA investigations;
    b. Recommend actions to remedy the top five causes of failure to meet the established requirements related to preponderance of the evidence.

**4.7.60b:** Implement recommended actions and conduct continual follow-up assessment to determine what impact, if any, the implemented actions had on the unit's ability to meet established preponderance of evidentiary standards.
**4.7.60c:** Repeat until 95% of cases completed meet established requirements regarding evidentiary standards.

**APD Response:** IAFD has a layered system of review. A use of force case begins when the detective responds to the callout. That case will be assigned to the same detective since they have on-scene recollection of the case. As the detective investigates the case, their immediate supervisor is there to help with challenges. Once the case is complete and the findings are supported by the preponderance of the evidence, it is moved through the chain of command to the commanding officer. If the investigation needs more work once it reaches the commanding officer, the chain of command will have roundtable discussions to resolve issues and make a determination based on the preponderance of the evidence. Each level 3 case that IAFD completes will be presented to the FRB, and 10% of the level 2 cases will be presented. The commanding officers attend FRB and use the feedback to make continual improvements on the investigations.

**74.** Where a member of the Force Investigation Section repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal from the Force Investigation Section in accordance

with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules.

**Paragraph 74 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.61a:**  Conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet quality standards by reviewing the key failure points causing the failure.  The review should:

    a.  Identify key causes of failure;

    b.  Identify where in the IAB process related to Paragraph 74 the failure points were located;

    c.  Identify the cause (of the failures); and

    d.  Recommend actions to remedy the top five causes of failure to meet the established timelines.

**4.7.61b:**  Implement recommended actions and conduct follow-up assessments to determine what impact, if any, the implemented actions had on failures to meet established quality standards for IA investigations.

**4.7.61c:**  Repeat until 95% of cases completed meet established evidentiary standards.

**APD Response:**  Currently IAFD holds its own personnel accountable for thorough and objective investigations.  To date, very few cases were not properly investigated resulting in an internal investigation of IAFD personnel for failing to meet an investigatory requirement.


**75.** When the commanding officer of the Internal Affairs Division determines that the force investigation is complete and the findings are supported by the evidence, the investigation report file shall be forwarded to the Force Review Board with a copy to the Chief.

**Paragraph 75 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.62a:** Once FRB is returned to action, conduct a review of a sample of cases completed by IAB in the past 3-6 months that failed to meet the requirement to forward the case to the FRB by reviewing the key failure points causing incomplete cases to be forwarded to the FRB.  The review should:

    a.  Identify key causes of failure;

    b.  Identify where in the IAB process related to Paragraph 75 the failure points were; and

    d.  Recommend actions to remedy the top five causes of failure to meet the established protocols, e.g., training, supervision, staffing, etc.

**4.7.62b:** Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established evidentiary and quality standards.

**4.7.62c:**  Repeat until 95% of cases completed meet established evidentiary and quality standards.

**APD Response:**  Every Level 3 case closed by IAFD has been sent to a pool of level 3 cases awaiting presentation to the FRB.  Every level 2 case follows the same protocol.  10% of level 2 cases will be selected for presentation.  A commanding officer from IAFD is present in FRB for each presentation.

IAFD receives feedback for each FRB presentation.  That feedback is incorporated into the current investigations as appropriate.


**76.** At the discretion of the Chief, a force investigation may be assigned or reassigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations, or may be returned to the Force Investigation Section for further investigation or analysis.  This assignment or re-assignment shall be confirmed in writing.

**Paragraph 76 is in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 76.


**77.** Where, after an administrative force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action.  Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Division or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate.  The Chief need not delay the imposition of discipline until the outcome of the criminal investigation.  In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

**Paragraph 77 is in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no recommendations for Paragraph 77.

## G. Force Review Board

**78.** APD shall develop and implement a Force Review Board to review Level 2 and Level 3 uses of force.  The Force Review Board shall be comprised of at least the following members:   Deputy Chief of the Administrative Support Bureau, Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigative Bureau, a Field Services Commander, the Academy Division Commander, and the Legal Advisor.  The Force Review Board shall conduct timely, comprehensive, and reliable reviews of Level 2 and Level 3 use of force investigations.  The Force Review Board shall:

a) review each use of force investigation completed by the Force Investigation Section within 30 days of receiving the investigation report to ensure that it is complete and, for administrative investigations, that the findings are supported by a preponderance of the evidence;

b) hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident.  The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Division investigation, shall not be present;

c) order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings.  For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;

d) determine whether the use of force violated APD policy.  If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;

e) determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;

f) document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation; and g) review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis.

**Paragraph 78 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.44a:** Report regularly on progress on the established goals and objectives related to the FRB process.

**4.7.44b:** FRB should focus attention for Level 1 uses of force to ensure field supervisors are properly classifying cases.

**4.7.44c:** Closely monitor referrals that are made from the FRB to ensure that each referral is clear and is followed through on by the impacted command.

**4.7.44d:** APD should organize its pre and post FRB meeting documentation in a manner that clearly demonstrates how it meets each of the relevant provisions of the CASA.

**APD Response:**  Each quarter, the data analysts from IAFD report to the FRB on use of force trend data for the previous quarter.  The reported data includes, but is not limited to, the number of uses of force by area command, levels of force, types of force used, and On-Body Recording Device (OBRD) requirements.  Additionally, the data analysts also report on quarterly FRB process metrics which include, but are not limited to, the number of cases FRB heard, the number of referrals generated, and types of referrals.  Potential referral subjects are policy, training, tactics, equipment, supervision, or successes.  The objectives of the FRB are to evaluate presented use of force cases, and identify concerns and deficiencies regarding policy, training, tactics, equipment, and/or supervision.

APD specifically created the Performance Review Unit to review level one use of force cases as required by CASA paragraph 57.  The PRU is tasked with reviewing a level one use of force case after the initial chain of command completed the case.  One aspect of the PRU review is to determine if the field supervisors properly classified use of force cases.  APD does see the value of including a sample of level one use of force cases into FRB.  However, with FRB attempting to catch up with older cases during FRB's revamp time in 2018-2019 and keep up with current cases, APD will re-evaluate the feasibility of this recommendation in the next reporting period.  APD now organizes pre and post FRB meeting documentation to clearly demonstrate how each meeting addresses the relevant provisions of the CASA.  For example, CASA paragraph 78a requires the FRB to review a case within 30 days of receiving the case information.  The FRB minutes now reflect compliance with 78a to clearly demonstrate how the requirement was met.

**79.** At least annually, APD shall publish a Use of Force Annual Report.  At a minimum, the following information should be included in the Annual Use of Force Report:

a) number of calls for service;

b) number of officer-initiated actions;
c) number of aggregate uses of force, and uses of force by Level;
d) number of arrests;
e) number of custodial arrests that involved use of force;
f) number of SWAT deployments by type of call out;
g) number of incidents involving officers shooting at or from moving vehicles;
h) number of individuals armed with weapons;
i) number of individuals unarmed;
j) number of individuals injured during arrest, including APD and other law enforcement personnel;
k) number of individuals requiring hospitalization, including APD and other law enforcement personnel;
l) demographic category; and
m) geographic data, including street, location, or Area Command.

**Paragraph 79 is in Primary Compliance.**
**IMR – 11 Recommendations:**
**4.7.66a:** APD should monitor use of force, serious use of force and show of force reporting discrepancies that are found.  Reporting errors must be reconciled to ensure that statistics published in APD's Annual Use of Force Reports are accurate.
**APD Response:** IAFD has closed nearly 200 cases in this reporting period.  IAFD chain of command through the commanding officer thoroughly and objectively reviewed each case and reconciled and unreported uses and shows of force through misconduct investigations to ensure better reporting for the Annual Use of Force Report.
**4.7.66b:** As APD transitions to a three-tiered use of force reporting system, they should create an auditing process for tier-one uses of force to ensure proper categorization is taking place.  Data collected from these audits should feed the Annual Use of Force Reports, and when appropriate referred to IA and the Academy.
**APD Response:** The PRU structure was placed under the purview of IAFD on July 4th, 2020, but it has not yet been staffed.  When appropriate staffing is in place, the process is written to ensure this happens.

**80.** APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by the Force Investigation Section, Internal Affairs Division, or Multi-Agency Task Force; and all force reviews conducted by the Performance Review Unit of the Compliance Bureau and the Force Review Board.  APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary.
**Paragraph 80 is in Primary Compliance.**
**IMR – 11 Recommendations:**
4**.7.67a:** Conduct a detailed failure analysis for this paragraph and identify where, when, and what types of "causes" are responsible for the failures in this system.
**APD Response:** IAFD currently uses BlueTeam and IAPRO to track all uses of force, which are complementary computer platforms that support supervisor documentation, supervisory oversight and organizational accountability.  The data collected is stored in the City of Albuquerque's Data Warehouse.  The City of Albuquerque data architects validate this data for the Annual Use of Force Report.  The one category of data that remains to be validated is arrest numbers.

## H. Multi-Agency Task Force

**81.** APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist.  APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that govern the Multi-Agency Task Force are current and effective.  APD shall ensure that the inter-governmental agreements are consistent with this Agreement.
**Paragraph 81 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no Recommendations for Paragraph 81.
**APD Response:**  See below at Paragraph 85.

**82.** APD agrees to consult with participating jurisdictions to establish investigative protocols for the Multi-Agency Task Force.  The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating

agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities.

**Paragraph 82 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no Recommendations for Paragraph 82.

**APD Response:**  See below at Paragraph 85.

**83.** APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel.

**Paragraph 82 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no Recommendations for Paragraph 83.

**APD Response:**  See below at Paragraph 85.

**84.** APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force.

**Paragraph 84 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no Recommendations for Paragraph 84.

**85.** If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding.  This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in-custody deaths.

**Paragraph 85 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no Recommendations for Paragraph 85.

**APD response to Paragraphs 81 – 84:**  During this reporting period, an updated Memorandum of Agreement (MOA) was drafted and is being routed for signatures by the participating agencies:  Bernalillo County Sheriff's Office and the New Mexico State Police.  The updated MOA contains the requirements outlined in the CASA and serves as a guiding document for the participating agencies as they investigate Officer Involved Shootings, in-custody deaths and criminal allegations related to use of force.

In September 2019, a Department Memorandum was sent out soliciting interest for the Multi-Agency Task Force (MATF) collateral duty program.  The program provides an opportunity for officers to gain experience investigating officer involved shootings, in–custody deaths and other incidents resulting in death.  The collateral duty program has proven to be effective and has provided valuable relief to the four MATF detectives who are on call 24 hours a day, 7 days a week.   The collateral officers also provide additional assistance for the on-scene investigations, making the call out time more efficient.  Four collateral officers attended *Five Stages of Interview and Interrogation Techniques* training by Daniel E. Sosnowski in March 2020.

## I. Use of Force Training

**86.** Within 36 months of the Operational Date, APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and provisions of this Agreement.  APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy.

**Paragraph 86 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**  Recommendations and APD's Response for Paragraph 86 are below at Paragraph 88.

**87.** APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:

  a) search and seizure law, including the Fourth Amendment and related law;

  b) APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;

  c) Use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;

d) use of de-escalation strategies;

e) scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;

f) deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;

g) crowd control; and

h) initiating and disengaging foot pursuits.

**Paragraph 87 is in Secondary Compliance.**

**IMR – 11 Recommendations:**  Recommendations and APD's Response for Paragraph 87 are below at Paragraph 88.

**88.** Supervisors of all ranks, including those assigned to the Internal Affairs Division, as part of their initial and annual in-service supervisory training, shall receive additional training that includes:

a) conducting use of force reviews or investigations, including evaluating officer, subject, and witness credibility;

b) strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force;

c) incident management; and

d) supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force.

**Paragraph 88 remains in Secondary Compliance.**

**IMR – 11 Recommendations for Paragraphs 86 – 88:**

**4.7.73-75a:**  The Academy staff should be properly augmented to ensure the quality of training curriculum and training systems are not negatively impacted due to staffing shortages.

**4.7.73-75b:** APD Academy Staff should seek out and attend training courses focused on the proper development of training curriculum and how to connect that curriculum to the measurement of performance outcomes. Likewise, proper test question construction should be emphasized in Academy personnel's future training plans.

**4.7.73-75c:**  APD personnel assigned to non-academy commands who carry significant training requirements should receive training commensurate with the Academy staff. This will ensure continuity in curriculum development across the organization.

**4.7.73-75c:**  Ensure that the Academy is the central point for review and approval of all training development and delivery processes for APD.

**4.7.73-75a-c:** APD should produce a draft training-related covid-19 response document, identifying salient training-related problems-issues-needs-solutions (PINS) related to covid-19, viz a viz training-related issues.

**APD Response to Paragraphs 86 – 88:**  In this reporting period, the Academy encountered a massive unforeseen challenge due to the COVID-19 pandemic resulting in a temporary halt to all face-to-face continuing education and required trainings.  Once it became apparent that operations would not be able to return to normal in the near future, Academy staff began plans to convert scheduled trainings to a virtual environment, except cadet training.  The Advanced Training Section is working diligently to transfer the key objectives of the Tier 4 use of force curriculum into a virtual class that will be delivered upon completion and approval.   Academy leadership believes it important to move forward with reinforcing the material taught in tiers 1-3.

Two new instructors were added and one Comprehensive Training Unit (CTU) vacancy was filled.   Academy staff did not attend any training during this reporting period as well.   CTU personnel have begun developing a "curriculum developer" curriculum based on the Academy's 7-step process; information gained from experience and gleaned from IMT and the DOJ; as well as material obtained from outside agencies. The Academy continues its work in centralizing all training and training development within APD and is making strides with the enormous task.

**89.** Included in the use of force training set out above, APD shall deliver firearms training that comports with constitutional principles and APD policy to all officers within 12 months of the Operational Date and at least yearly thereafter.  APD firearms training shall:

a) require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms, as necessary, on an annual basis;

b) require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;

c) incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision making training, including continuous threat assessment techniques, in the annual in-service training program; and

d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times.

**Paragraph 89 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no recommendations for Paragraph 89.

**APD Response:**   Firearm training was completed within the 12-month period, and continues to be completed during the annual qualifications and the reality-based training scenarios.

# Section 2:  Specialized Units (Paragraphs 90 – 109)

## A.  Specialized Tactical Units (SOD)

**90.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances, provides for effective command-level accountability, and ensures force is used in strict compliance with applicable law, best practices, and this Agreement. To achieve these outcomes, APD shall implement the requirements set out below.

**Paragraph 90 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 90.

**91.**  APD's specialized tactical units shall be comprised of law enforcement officers who are selected, trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units.  The specialized tactical units shall consist of SWAT, Canine, and Bomb Squad/EOD.

**Paragraph 91 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 91.

**APD Response:**  All Special Operations Division Paragraphs continue to be in operational compliance.  During the reporting period of February 1 – July 31, 2020, APD worked further to enhance forms and administrative processes.  Training documents were amended and implemented for SWAT, K9, Explosive Ordnance Detail (EOD) and Crisis Negotiation Team (CNT) to ensure accountability and clarity.   Some examples include; adding signature and date blocks to document individual review and verification, citing the appropriate CASA Paragraph(s) on all forms, and a release form requiring date and signatures was added to the on-the-job (OJT) training handbook to ensure training completion is documented.  Additionally, SOD has been working with a Process Improvement Analyst from the Compliance and Oversight Division to create process maps and handbooks to assist in administrative onboarding.

**92.**  APD shall ensure that specialized tactical units are sufficiently trained to complete the following basic operational functions: Command and Control; Containment; and Entry, Apprehension, and Rescue.

**Paragraph 92 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 92.

**93.**  Each specialized tactical unit shall have clearly defined missions and duties.  Each specialized tactical unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force reporting, and force investigations.

**Paragraph 93 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 93.

**94.**  APD policies and procedures on specialized tactical units shall include the following topics: a) team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility; b) coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed; c) personnel selection and retention criteria and mandated physical and tactical

competency of team members, team leaders, and unit commanders; d) training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training; e) equipment appropriation, maintenance, care, and inventory; f) activation and deployment protocols, including when to notify and request additional services;  g) conducting threat assessments to determine the appropriate responses and necessary resources; h) command and control issues, including a clearly defined command structure; and i) documented after-action reviews and reports.
**Paragraph 94 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 94.

**95.**  The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement.
**Paragraph 95 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 95.

**APD Response:**  SOD is revising SOP 2-70 Execution of Search Warrants, which added a Risk Assessment Matrix (RAM), Risk Assessment Matrix Log sheets, and outlines scoring continuity across the department.  The policy is currently being revised and will be presented to the Policy and Procedure Review Board (PPRB) on 9/30/2020.

**96.**  In addition to use of force reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations.  After-action reports shall address any areas of concern related to policy, training, equipment, or tactics.
**Paragraph 96 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 96.

**97.**  APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment.  APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations.  All specialized tactical team members should have an understanding of operational planning.
**Paragraph 97 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 97.

**APD Response:**  Changes were made to the After Action Review (AAR) form to include charges from the warrant and specify use of force Tier Level (1, 2, 3).

A field was added to the use of force form to indicate which SOD supervisor identified the level of force.  This is a specific example of the type of mechanism recommended by the IMT that ensures trained practices are rigorously adhered to by its supervisory cadres.

**98.**  All specialized tactical units shall wear uniforms that clearly identify them as law enforcement officers.
**Paragraph 98 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 98.

**99.**  All specialized tactical unit deployments shall be reviewed by the Force Review Board in order to analyze and critique specialized response protocols and identify any policy, training, equipment, or tactical concerns raised by the action.  The Force Review Board shall identify areas of concern or particular successes and implement the appropriate response, including modifications to policy, training, equipment, or tactics.
**Paragraph 99 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 99.

**APD Response:**  A worksheet was created that captures data on staffing issues, requested resources, and communication efforts, and can also identify other tactical questions from the field.

**100.**  APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria.
**Paragraph 100 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 100.

**101.**  APD shall train specialized tactical units conducting barricaded gunman operations on competencies and procedures that include:  threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders.

**Paragraph 101 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 101.

**102.**  APD shall continue to require the Canine Unit to complete thorough post deployment reviews of all canine deployments.

**Paragraph 102 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 102.

**103.**  APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams.

**Paragraph 103 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 103.

**104.**  APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold, and require interventions as appropriate.  Canine data and analysis shall be included in APD Use of Force Annual Report.

**Paragraph 104 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 104.

**105.**  APD agrees to track and analyze the number of specialized tactical unit deployments.  The analysis shall include the reason for each tactical deployment and the result of each deployment, to include: (a) the location; (b) the number of arrests; (c) whether a forcible entry was required; (d) whether a weapon was discharged by a specialized tactical unit member; (e) whether a person or domestic animal was injured or killed; and (f) the type of tactical equipment deployed.  This data analysis shall be entered into the Early Intervention System and included in APD's Annual Reports.

**Paragraph 105 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 105.

**APD Response:**  A RAM Audit determined that there were no deficiencies in the overall data resulting in a completion rate 98.47%.

## B. Specialized Investigative Units (SID)

**106.**  Each specialized investigative unit shall have a clearly defined mission and duties.  Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force reporting, and force investigations.

**Paragraph 106 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 106.

**APD Response:**  SID operations are inherently sensitive; therefore, require excellent judgement, commitment to a team concept, and sound tactics.  These factors are monitored and assessed regularly by the division supervisory personnel to ensure that unit-level practices adhere to department policies and procedures, provide equipment, technology, and train department personnel to enhance and support investigations.  Each unit assigned to SID is responsible for creating, implementing and revising a unit handbook which serves as a standard template.  The purpose of the handbook is to provide new detectives in a specific unit with a guide covering the fundamentals of the unit and the training required to become a functioning member of the unit.  The handbook provides detectives with a field operations manual and serves as a step-by-step guide to assist new detectives in performing essential job duties.  Many circumstances and facts vary from case to case; therefore, operations conducted by specific unit detectives are defined in the handbook, but the handbook does not serve as an all-encompassing directive.   Unit handbooks are reviewed and revised as necessary during the months of January and July on a yearly basis.  Between February and July, 2020, SID received six new detectives.  Each newly-assigned detective signed a confidentiality agreement statement, was issued required equipment, completed a training/proficiency checklist and received a unit handbook specific to their unit assignment.

**107.** APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required.  APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response.  The protocols shall include communicating high-risk situations and threats promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident.

**Paragraph 107 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 107.

**APD Response:**  The APD Standard Operating Procedure for SID clearly states the following: (1) Prior to executing search warrants, SID detectives will complete the APD Tactical Search/Arrest Warrant Service RAM to determine the need for a specialized tactical unit response and (2) Unit supervisors are responsible for assessing each incident to determine if it requires a tactical response.  Unit supervisors are responsible for communicating with tactical supervisors before conducting operations, as well as when operations are in progress.  Between February and July 2020 SID units initiated and completed 45 operational plans, 12 training logs, and submitted five RAM documents.

**108.**  Within three months of the Operational Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training.  APD shall conduct re-inspections on at least an annual basis.

**Paragraph 108 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 108.

**APD Response:**  SID is required per CASA Paragraph 108 to conduct annual inspections of each units' weapons and equipment assigned or accessible to them and determine the consistency of the weapons with the unit's mission and training.  Until December 2019, the re-inspections were conducted biannually.  Effective January 2020, the re-inspections are conducted on a monthly basis and align with scheduled inspections conducted by the Field Services Bureau personnel.

**109.**  APD agrees to track and analyze the number of specialized investigative unit responses.  The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include:  (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative unit member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed.  This data analysis shall be entered into the Early Intervention System and included in APD's Annual Reports.

**Paragraph 109 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 109.

**APD Response:**  SID unit supervisors adhere to SOP 5-1 Special Investigations Division and track investigative responses to incidents within their operational area.  Data collected is entered into the EIRS and is included in the Division's annual review.  The data is collected and analyzed quarterly by the designated SID lieutenant.  Based on this data, the lieutenant will make recommendations as needed to the SID commander.  Between February and July 2020, there have been 31 investigative responses entered into the department SharePoint data platform.

## Section 3:  Crisis Intervention (Paragraphs 110 – 137)

### A.  Mental Health Response Advisory Committee (Paragraphs 110-117)

**110.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals.  APD agrees to develop, implement, and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals.  To achieve these outcomes, APD agrees to implement the requirements below.

**Paragraph 110 remains in Primary Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 110.
**APD Response:** See below at Paragraph 117.

**111.** Within six months of the Operational Date, APD and the City shall establish a MHRAC "support committee" with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness.
**Paragraph 111 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 111.
**APD Response:** See below at Paragraph 117.

**112.** The Advisory Committee shall include representation from APD command staff, crisis intervention certified responders, Crisis Intervention Unit ("CIU"), Crisis Outreach and Support Team ("COAST"), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups.
**Paragraph 112 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 112.
**APD Response:** See below at Paragraph 117.

**113.** The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event.
**Paragraph 113 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 113.
**APD Response:** See below at Paragraph 117.

**114.** APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality.
**Paragraph 114 remains in Secondary Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 114.
**APD Response:** See below at Paragraph 117.

**115.** Within nine months of the Operational Date, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also within nine months of the Operational Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario based training involving typical situations that occur when mental illness is a factor.
**Paragraph 115 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 115.
**APD Response:** See below at Paragraph 117.

**116.** The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services.
**Paragraph 116 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 116.
**APD Response:** See below at Paragraph 117.

**117.** Within 12 months of the Operational Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources.

**Paragraph 117 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 117.

**APD Response to Paragraphs 110 – 117:** The Crisis Intervention Section (CIS) continues to collaborate with MHRAC to improve APD's ability to assist individuals in crisis. During COVID-19, MHRAC and its two subcommittees have continued to meet via Zoom. The meeting information has been posted on the City website and attendance has been much higher than usual.

APD has continued to collaborate with the Criminal Justice Coordinating Council (CJCC) on developing a Memorandum of Understanding (MOU) that will cover nearly every local provider for behavioral health. MHRAC information sharing has also been vital in the development of this MOU. This all-encompassing MOU is a long term goal for APD, the CJCC and MHRAC.

Every week, Crisis Intervention Clinicians provide the list of individuals with active cases to the University of New Mexico's Psychiatric Emergency Services executive staff for coordination of care between our two groups.

This monitoring period a new area hospital/APD working group was established and met for the first time on July 20th. The working group consists of CIU supervisors, the APD psychiatrist and representatives from the four largest mental health hospitals in the city. Information sharing was discussed and a copy of the current MOU with UNMH was sent out for evaluation, and perhaps expansion, to other healthcare systems.

## B. Behavioral Health Training (Paragraphs 118-122)

**118.** APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment.

**Paragraph 118 is not a measurable paragraph.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 118.

**APD Response:** See below at Paragraph 122.

**119.** APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by July 15, 2016.

**Paragraph 119 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 119.

**APD Response:** See below at Paragraph 122.

**120.** The behavioral health and crisis intervention training provided to all officers will continue to address field assessment and identification, suicide intervention, crisis de-escalation, scenario-based exercises, and community mental health resources. APD training shall include interaction with individuals with a mental illness and coordination with advocacy groups that protect the rights of individuals with disabilities or those who are chronically homeless. Additionally, the behavioral health and crisis intervention training will provide clear guidance as to when an officer may detain an individual solely because of his or her crisis and refer them for further services when needed.

**Paragraph 120 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 120.

**APD Response:** See below at Paragraph 122.

**121.** APD shall ensure that new telecommunicators receive 20 hours of behavioral health training. This training shall include: telephonic suicide intervention; crisis management and de-escalation; interactions with individuals with mental illness; descriptive information that should be gathered when telecommunicators suspect that a call involves someone with mental illness; the roles and functions of COAST, crisis intervention certified responders, and CIU; the types of calls that should be directed to particular officers or teams; and recording information in the dispatch database about calls in which mental illness may be a factor.

**Paragraph 121 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 121.

**APD Response:** See below at Paragraph 122.

**122.** APD shall provide two hours of in-service training to all existing officers and telecommunicators on behavioral health-related topics biannually.

**Paragraph 122 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 122.

**APD Response to Paragraphs 118 – 122:** APD provides ongoing behavioral health and crisis intervention training to both sworn and civilian staff.  The behavioral health training paragraphs remain in operational compliance.

## C. Crisis Intervention Certified Responders and Crisis Intervention Unit (Paragraphs 123-131)

**123.** APD shall maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis. APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives housed at the Family Advocacy Center whose primary responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future. APD agrees to expand both the number of crisis intervention certified responders and CIU.

**Paragraph 123 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.110a:** Implement the data-driven, methodologically appropriate workload, staffing planning and analysis protocol developed by CIU that ensures that reliable "staffing levels" for ECIT officers are regularly calculated, reported, set as staffing goals, and attained.

**APD Response:**  The 2020 ECIT workload study has been completed and distributed to each area command.  This year the workload study examined total CIT contacts, rather than just calls with a clear mental health focus.  This change allowed the study to capture a greater range of APD's mental health contacts, regardless of the original dispatched call type.  The workload study has been distributed to each area commander and every field lieutenant.

The Emergency Communications Center (ECC) and CIU worked together to add ECIT to the names of trained officers in the dispatch program.  This clearly tells other officers and supervisors who is ECIT trained on their shifts.  Every time an officer logs on to the system, has their status checked or is dispatched to a call their ECIT flag is visible to both dispatchers and officers in the field.  CIU will provide ECC with monthly lists of certifications and expirations of certifications going forward to ensure that this listing remains accurate.

**124.** The number of crisis intervention certified responders will be driven by the demand for crisis intervention services, with an initial goal of 40% of Field Services officers who volunteer to take on specialized crisis intervention duties in the field.  Within one year of the Operational Date, APD shall reassess the number of crisis intervention certified responders, following the staffing assessment and resource study required by Paragraph 204 of this Agreement.

**Paragraph 124 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 124.

**125.** During basic crisis intervention training for field officers provided to new and current officers, training facilitators shall recommend officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals with mental illness to serve as crisis intervention certified responders.

**Paragraph 125 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 125.

**126.** Within 18 months of the Operational Date, APD shall require crisis intervention certified responders and CIU to undergo at least eight hours of in-service crisis intervention training biannually.

**Paragraph 126 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 126.

**127.** Within 18 months of the Operational Date, APD will ensure that there is sufficient coverage of crisis intervention certified responders to maximize the availability of specialized responses to incidents and calls for service involving individuals in mental health crisis; and warrant service, tactical deployments, and welfare checks involving individuals with known mental illness.

**Paragraph 127 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 127.

**128.** APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so.
**Paragraph 128 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 128.

**129.** APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:
   a) date, shift, and area command of the incident;
   b) subject's age, race/ethnicity, and gender;
   c) whether the subject was armed and the type of weapon;
   d) whether the subject claims to be a U.S. military veteran;
   e) name and badge number of crisis intervention certified responder or CIU detective on the scene;
   f) whether a supervisor responded to the scene;
   g) techniques or equipment used;
   h) any injuries to officers, subjects, or others;
   i) disposition of the encounter (e.g., arrest, citation, referral); and
   j) a brief narrative of the event (if not included in any other document).
**Paragraph 129 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 129.

**130.** APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis.
**Paragraph 130 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 130.

**131.** Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services.
**Paragraph 131 is in Primary Compliance.**
**IMR – 11 Recommendations:**
**4.7.118a**: Work with advisory committees to ensure the protocols are updated and that related policy and protocols are reflective of "best practices." Develop appropriate training strategies, deliver training, implement the policy, and evaluate results.
**4.7.118b**: APD command should require cooperative approaches between CIU, CNT and SOD, establishing timelines for assessments as to why inter-unit cooperation on the issue of barricaded suicidal individuals has lagged and follow-up on findings and recommendations at regular intervals.
**4.7.118c**: APD executive leadership should pay particular attention to the results of the implementation of cooperative approaches between CIU, CNT and SOD.  This project should be goal-driven, should include production of specifically articulated tangible objectives and measurable timelines to ensure progress is made.
**APD Response:**  Training for crisis intervention certified responders is ongoing and essential to stay abreast of trends and techniques to assist individuals in crisis.  The bi-annual course review for both the ECIT basic and refresher course have begun.  A needs assessment will be the first step in determining areas where additional training is needed.  A part of that assessment includes a survey sent out to current ECIT officers to help CIU determine the topics in which ECIT officers feel they need additional training.  The following new courses were developed:

a) 40 hour CNT Certification Course, updated with courses that have gone through CTU Specialist, CIT has provided 3.5 hours of trainings- continuation of collaboration.

b) GAP Training 2-20 Barricaded Suicidal Individual Protocol Needs Assessment has been completed with feedback from the IMT. This course is being developed in conjunction with the Crisis Intervention Unit.

## D. Crisis Prevention (Paragraphs 132-137)

**132.** APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers.

**Paragraph 132 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 132.

**133.** COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at risk of experiencing a mental health crisis and assist with follow-up calls or visits.

**Paragraph 133 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 133.

**134.** APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options.

**Paragraph 134 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 134.

**135.** APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement. Within three months of completing the staffing assessment and resource study required by Paragraph 204 of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less.

**Paragraph 135 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 135.

**136.** COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources.

**Paragraph 136 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 136.

**137.** APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:

a) number of individuals in the COAST and CIU caseloads;
b) number of individuals receiving crisis prevention services;
c) date, shift, and area command of incidents or follow up encounters;
d) subject's age, race/ethnicity, and gender;
e) whether the subject claims to be a U.S. military veteran;
f) techniques or equipment used;
g) any injuries to officers, subjects, or others;
h) disposition of the encounter (e.g., arrest, citation, referral); and
i) a brief narrative of the event (if not included in any other document).

**Paragraph 137 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 137.

**APD Response:**  APD works diligently to provide quality services to individuals in crisis. CIU and COAST are consistently working to connect individuals in crisis with prevention services and treatment options.  During the pandemic, COAST has been temporarily assigned to assist individuals experiencing homelessness with emergency housing while awaiting COVID test results.  Additionally, CIU has contracted with the New Mexico Sentencing Commission to evaluate outcomes and data generated by the APD's mental health interactions.  This contract was finalized late in the monitoring period.  The crisis prevention paragraphs remain in operational compliance.


## Section 4:  Policies and Training Generally (Paragraphs 138 – 161)

**138.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD's policies and procedures shall reflect and express the Department's core values and priorities and shall provide clear direction to ensure that officers and civilian employees deliver effective and constitutional policing services.  APD shall ensure that officers and civilian employees are trained to understand and carry out consistently and competently the duties and responsibilities specified in APD policies and procedures.  To achieve these outcomes, APD agrees to implement the requirements below.
**Paragraph 138 is not a measurable paragraph.**


### A. Policy Development, Review, and Implementation

**139.**  APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices.  APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically. 140. APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference.  APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format.
**Paragraph 139 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 139.
**APD Response:**  All CASA-related policies are reviewed and approved by the IMT and the DOJ prior to publication and training by APD.  The Compliance and Oversight Division's (COD and formerly known as Accountability and Oversight Division) Policy and Procedure (P&P) Section is responsible for the development or revisions, tracking and management of policies.  APD remains in operational compliance and all CASA-related policies continue to be reviewed and approved by the IMT and the DOJ.


**140.**  APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference.  APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format.
**Paragraph 140 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 140.
**APD Response:**  APD maintains an organized and indexed policy numbering system.  APD has three types of policies: general, procedural, and administrative order.  The general orders are policies related to the core values and functions of the police department.  The procedural orders are policies related to the procedures used by sworn personnel to accomplish their duties. The administrative orders are policies that provide personnel with guidance in administrative matters.


**141.** Within three months of the Operational Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures.
**Paragraph 128 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 128.


**142.** Within three months of the Operational Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities.  The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014).
**Paragraph 142 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 142.

**143.** Within nine months of the Operational Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement. The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division.
**Paragraph 143 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 143.

**144.** Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Operational Date. APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility. There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations.
**Paragraph 144 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 144.

**145.** The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law. The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews.
**Paragraph 145 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 145.

**APD Response to Paragraphs 141 – 145:** APD continues to use an intranet platform to provide APD personnel an opportunity to review and provide feedback to any new or revised policy prior to publication. Personnel also have the opportunity to make policy recommendations, attend and participate in the Office of Policy Analysis (OPA) when new or revised policies are initially reviewed, and join in the policy development process. Once published, policies are placed onto the intranet for review and electronic signature which is required for all APD personnel. The Policy and Procedure Review Board (PPRB) continues to be fully functional, at least once per month, and meets to review and submit policy recommendations.

**146.** APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure.
**Paragraph 146 remains in Primary Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 146.
**APD Response:** Additional Concern Memos (ACM) are no longer used, as of April 2019. This process has been discontinued and replaced by a new IAR. A screener reads the details of the entry and assigns it appropriately for investigation. The use of "administratively closed" investigations are being addressed through a change in policy SOP 3-41 Complaints Involving Department Policy or Personnel. This will require findings and discipline to be imposed by supervisors. As the findings return from the Commanders, the screener is assessing that disciplinary guidelines are followed.

**147.** APD shall submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ for review and comment before publication and implementation. If the Monitor or DOJ objects to the proposed new or revised policy, procedure, manual, or other administrative order or directive, because it does not incorporate the requirements of this Agreement or is inconsistent with this Agreement or the law, the Monitor or DOJ shall note this objection in writing to all parties within 15 business days of the receipt of the policy, procedure, manual, or directive from APD. If neither the Monitor nor DOJ objects to the new or revised policy, procedure, manual, or directive, APD agrees to implement it within one month of it being provided to DOJ and the Monitor.
**Paragraph 147 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 147.
**APD Response:** APD routinely complies with the requirements of this paragraph and sends the IMT and DOJ policies, procedures, administrative orders, and special orders for review and approval.

**148.** APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions. If, after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional

15 days to resolve the objection.  If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter.  The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies.  Factors to consider in making this determination include:  1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor.  In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review.  Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion.

**Paragraph 148 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 148.

**APD Response:**   According to the monitoring team in IMR – 11, "The provisions of this paragraph seldom need to be invoked.  The Parties have tended to be mutually supportive in getting policies moved through the approval process.  This speaks well for the City and APD, and their joint determination to do the right thing. "

## B. Training on Revised Policies, Procedures, and Practices

**149.** Within two months of the Operational Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement.

**Paragraph 149 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 149.

**APD Response:**  APD continues to present the CASA to all new cadet classes.

**150.** Within three months of issuing a policy or procedure pursuant to this Agreement, APD agrees to ensure that all relevant APD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations.  APD agrees to document that each relevant APD officer or other employee has received and read the policy.  Training beyond roll-call or similar training will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy.

**Paragraph 150 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 150.

**APD Response:**   APD continues to publish policy updates to PowerDMS and officers must acknowledge receipt of the information via an electronic signature. The Academy continues to facilitate training on necessary policies. Data collected through PowerDMS is easily tracked and audited.

**151.** Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Operational Date, and annually thereafter.  Within six months of the Operational Date, APD shall set out a schedule for delivering all training required by this Agreement.

**Paragraph 151 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 151.

**APD Response:**  The Academy will continue to deliver the training as required under this agreement.

**152.** APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty.

**Paragraph 152 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 152.

**APD Response:**   This is tracked by Academy staff and is currently being uploaded into Enterprise Learning Management system (ELMS).  ELMS is used to track other elements such as training and firearm qualification scores.

**153.** APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records.  APD shall also maintain complete and accurate records of any audit, review, assessment, or

evaluation of the sufficiency or effectiveness of its training programs.  APD shall make these records available for inspection by the Monitor and DOJ.

**Paragraph 153 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 153.

**APD Response:**   This is tracked by Academy staff and is currently being uploaded into the ELMS.

**154.** APD shall ensure that changes in relevant case law and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and preservice training.

**Paragraph 154 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 154.

**APD Response:**   During the two-year Maintenance of Effort training, the Training Academy provides legal updates.  Occasionally, legal updates may also be provided as a block of instruction in PowerDMS, APD's policy and training management program.

## C. Field Training Officer Program

**155.** APD shall supervise and manage its field training program to ensure that new officers develop the necessary technical and practical skills required to use force in accordance with APD policy and applicable law.  The field training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community. Field Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics.

**Paragraph 155 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 155.

**APD Response:**  The Field Training Evaluation Program (FTEP) continues to review and evaluate Recruit Officer critiques to determine whether FTOs are demonstrating the highest levels of competence, professionalism, impartiality, and ethics.  SOP 1-46 Field Training and Evaluation Program has been revised and will be published upon approval by the IMT and the DOJ.

**156.** APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field training program early.

**Paragraph 156 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 156.

**APD Response:**   Due to COVID 19 restrictions and the high number of protests, there have been delays in the FTEP, requiring adjustments to on-the-job (OJT) training schedules. There were three classes that graduated and began OJT during this reporting period, Cadet Classes 121 and 122, and Lateral Class 22.  The APD FTO OJT program exceeds the CASA requirements for on-the-job training for Academy graduates, providing five weeks in Phase 1, four weeks in Phase 2, four weeks in Phase 3, and four weeks in the Final Phase (17 weeks total).

**157.** APD shall revise the qualifications for Field Training Officers to require three years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism.

**Paragraph 157 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 157.

**APD Response:**  FTEP held four testing periods for applicants to be FTOs, Field Training Area Sergents (FTAS) and Field Training Area Lieutenants (FTAL).  Each applicant has gone through the testing process and background review in accordance with the FTEP Operations Manual, which in compliance with the CASA requires a commitment to constitutional policing, ethics and professionalism. Additionally, any officer who tests for the position of FTO but has yet to reach the required time in service requirement is informed they will be held in an inactive status and cannot train a recruit officer until that requirement is met.  The FTEP continuously monitors and coordinates the assigning of personnel and coverage issues for all recruit officers to ensure there are no violations of the time requirement.  The FTEP has met with the Performance Metrics Unit in reference to the new Area Command Scorecards for officer and supervisor performance.  The FTEP will be incorporating a data request and evaluation of these scorecards for the yearly review of supervisors and prior to the start of any Sergeant OJT process to ensure the FTEP Field Training Sergeants are adequately performing their own individual duties.

**158.**  New Field Training Officers and Area Sergeant Coordinators shall receive at least 40 hours of initial supervisory-level training and annual in-service training in the following areas:  management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques.  Field Training Officers and Area Sergeant Coordinators shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de-escalation techniques; and effective problem solving.  APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators.

**Paragraph 158 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 158.

**APD Response:**  During this period the FTEP has held three Basic FTO Certification Courses in which thirty officers, five Sergeants and three civilian staff attended the 40-hour course.  The course instruction is for the required 40 hours and addresses areas to include Management and Supervision, Constitutional and Community Oriented Policing, De-escalation Techniques, and Effective Problem Solving.  The 2020 FTEP Recertification Course is currently in development.  It is scheduled for a one-day training course and will occur in late 2020.

**159.**  Recruits in the field training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers.

**Paragraph 159 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 159.

**APD Response:**  The FTEP has increased its numbers significantly since the start of this reporting period.  By adding twenty-nine Field Training Officers and five Field Training Area Sergeants whose work schedules span all three shifts and they are assigned to all six Area Commands.  Currently, as demonstrated by Department Special Order, Recruit Officers are trained in multiple area commands working on different shifts and assigned to four different FTOs.  The FTEP had identified a deficiency in Field Training Officers assigned to graveyard shifts and officers assigned to the Downtown/Problem Response Teams and Foothills Area Command.   After the changeover for the 2020-2021 Field Service Bid, the FTEP Operations Officer will focus his efforts on recruiting officers assigned to those shifts and Area Commands to help the FTEP with more options to assign recruit officers during training.

**160.** APD shall provide a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the field training program.  APD shall consider feedback and document its response, including the rationale behind any responsive action taken or decision to take no action.

**Paragraph 160 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 160.

**APD Response:**  The FTEP has increased the number of confidential critiques that the program conducts.  Previously, only FTOs and on-the-job training experience were critiqued by the Recruit Officer.  During the last reporting cycle, the FTEP implemented several new critiques to include a FTO critique of the Field Training Area Sergeants and the Sergeant Trainee critique of the Field Training Area Sergeants.  These critiques have been used for one training cycle and have resulted in good overall completion of the critiques and validation of the personnel who have been selected as suitable trainers and exhibiting the desired departmental Core Values (Pride, Respect, Integrity, and Fairness).  Also of benefit, the FTEP was able to see that the workload of the Field Training Area Sergeants was too high based upon comments indicated by the FTOs.  The FTEP Coordinator received permission to increase the number of Field Training Area Sergeants and two additional positions were added.  Further evaluations are ongoing and more openings will be posted as the number of FTOs continue to grow.

The FTEP recently conducted a pilot program change for the Final Phase of Recruit Officer Training.  The change was in regard to the dress of the FTO and allowed them to "dress down" in an effort to force the Recruit Officer in the public's eye as the main point of contact.  A survey critique has been sent to both FTOs and Recruit Officers to measure the success of these efforts and upon completion, the FTEP board will evaluate the responses and recommendations to determine whether to continue this approach.

**161.** The City shall provide APD with the necessary support and resources to designate a sufficient number of Field Training Officers to meet the requirements of this Agreement.

**Paragraph 161 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.147a**: APD should conduct independent research to identify the optimum level of FTOs for projected hiring levels moving forward.

**APD Response:**  In July 2019, FTEP contacted seven regional Departments to ascertain their ratio of Field Training Officers to Recruit Officers (FTO:RO).  Of the seven departments information from three was received and reported in the APD January 2020 Completed Staff Work Study (CSW).  In the CSW the ratio of 2:1 was identified by the Mesa Arizona Police Department, the Tucson Arizona Police Department has a 3:1 ratio and the El Paso Police Department utilizes a 4:1 ratio.  In the CSW the ratio of a minimum of 2:1 with the goal of 3:1 (as the ideal goal) was identified and approved by the Department's Executive Leadership.  This ratio aligns with the agreement in the August 2019 Joint Stipulation Agreement to the CASA.  Additionally, in March 0f 2020, the APD FTEP Operations Sergeant and FTEP Operations Officer attended the Institute of Police Technology and Management's (IPTM) "Managing the Patrol FTO Program" apprenticeship training in Jacksonville Florida.  The course is based on the nationally acclaimed "San Jose Model" of Field Training and Evaluation Program and promotes a ratio of 4:1 as the national "best practice" scenario.  The APD FTEP has worked to reach a 2:1 ratio and is now working diligently to raise that ratio to 3:1, which will be a sliding ratio depending on upcoming class sizes.  The FTEP and Albuquerque Police Department feel that a best practice FTO:RO ratio has been identified and the Department is now recruiting, training and developing the FTO's to meet regional and national best practices.  As previously mentioned, the FTEP is running a FTO Basic Certification Course and FTO Testing period, averaging one per month.  The APD FTEP has seen a growth of twenty-nine FTO's and five FTAS since March 2020.  These efforts are directly related to the Memo of Understanding (MOU) signed in February 2020 which set a clearly defined incentive package and the recruitment efforts of the FTEP Operations Officer in conjunction with "word of mouth" efforts by the FTO's themselves.  Prior to the COVID-19 restrictions, the FTEP was also facilitating advanced training opportunities but put on hold until it is safe to proceed with training.  The FTEP is currently and continuously recruiting and conducting FTO Basic/ FTO Testing periods.  A FTO Basic course was held July 20-24, 2020 and a FTO Testing period is scheduled for August 2020.

## Section 5:  Misconduct Complaint Intake, Investigation, and Adjudication (Paragraphs 162 – 202)

**162.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system.  To achieve these outcomes, APD and the Civilian Police Oversight Agency shall implement the requirements below.
**Paragraph 162 is not a measurable paragraph.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 162.
**APD Response:**  This Paragraph serves as an introductory paragraph for IAPS-Misconduct Division and CPOA related CASA requirements.  As such it requires no direct evaluation.

### A.  Reporting Misconduct

**163.**  APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs Division for review and investigation.  Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Division.  Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment.
**Paragraph 163 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 163.

### B.  Public Information on Civilian Complaints

**164.**  Within six months of the Operational Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints.  The requirements below shall be incorporated into this program.
**Paragraph 164 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 164.

**165.** APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall,

public libraries, community centers, and the office of the Civilian Police Oversight Agency. Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints. Complaint forms, informational materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person. Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above.

**Paragraph 165 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 165.

**166.**  APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites. The placard shall specify that complaints may be submitted anonymously or on behalf of another person. APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles. Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request. If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint.

**Paragraph 166 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 166.

**167.**  APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints.

**Paragraph 167 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 167.

**168.**  Complaint forms and related informational materials shall be made available and posted in English and Spanish.

**Paragraph 168 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 168.

## C. Complaint Intake, Classification, and Tracking

**169.**  Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake.

**Paragraph 169 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 169.

**170.**  APD shall accept complaints regardless of when they are filed. The City shall encourage civilians to promptly report police misconduct so that full investigations can be made expeditiously and the full range of disciplinary and corrective action be made available.

**Paragraph 170 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 170.

**171.**  The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint shall be grounds for discipline.

**Paragraph 171 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 171.

**172.**  APD and the Civilian Police Oversight Agency shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail. Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be provided with a complaint form in Spanish to ensure that the individual is able to make a complaint. Such complaints will be investigated in accordance with this Agreement.

**Paragraph 172 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 172.

**173.**   All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint.  All misconduct complaints shall be submitted to the Internal Affairs Division by the end of the shift following the shift in which it was received.
 **Paragraph 173 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 173.

**174.**   APD and the Civilian Police Oversight Agency shall develop a system to ensure that allegations by a judicial officer of officer misconduct made during a civil or criminal proceeding are identified and assessed for further investigation.  Any decision to decline investigation shall be documented.
**Paragraph 174 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 174.

**175.**   APD and the Civilian Police Oversight Agency shall track allegations regarding misconduct involving individuals who are known to be homeless or have a mental illness, even if the complainant does not specifically label the misconduct as such.
**Paragraph 175 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 175.

**176.**   Within six months of the Operational Date, the Internal Affairs Division, in coordination with the Civilian Police Oversight Agency, shall develop and implement a centralized numbering and tracking system for all misconduct complaints.  Upon the receipt of a complaint, the Internal Affairs Division shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant.
**Paragraph 176 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 176.

**177.**   The Internal Affairs Division's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.  This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.
**Paragraph 177 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 177.

**178.**   Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Division.  All information should be referred to the Internal Affairs Division by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances.
**Paragraph 178 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 178.

**179.**   Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Division shall refer the complaint to the Civilian Police Oversight Agency.
**Paragraph 179 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 179.

**180.**   Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Division for review and classification.  The Internal Affairs Division shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Division for investigation.  In consultation with the Chief, the commanding officer of the Internal Affairs Division shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Division, the Multi-Agency Task Force, and/or referred to the appropriate federal law enforcement agency.
**Paragraph 180 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 180.

**181.**   APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Division in determining where an internal complaint should be assigned.
 **Paragraph 181 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 181.

**182.**   An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct.
**Paragraph 182 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**
[From 4.7.155 – 4.7.168 Assessing Compliance with Paragraphs 169-182:  Training Regarding Complaint Intake: "Our stratified random sample found one instance in which a supervisor investigated an incident in which the supervisor could have been deemed a 'participant' in the incident under review… In this case the sample size is small enough that one error (of eight cases reviewed) constitutes and error rate of 12.5 percent, well above the allowable five percent. Due to this finding, APD remains out of operational compliance for paragraph 182.]
**4.7.168a**: APD should ensure notice of violation and explanation to the supervisor noted in paragraph 168, above.  Determine if this was an isolated incident or something that was missed in training, etc.
**APD Response:**  This appears to be an isolated incident.  The new use of force policy suite (2-52 thru 2-57) places level 2 and level 3 investigations under IAFD.  Level 1 investigations will be going through a review by Performance Review Unit.
**4.7.168b**:  If the error noted in paragraph 168 is due to policy, poor training, or other internal issues, ensure the error is corrected by special order, retraining via PowerDMS, or other corrective actions.
**APD Response:**  Current policy does not allow a supervisor to review a use of force which they were a participant.

## D.  Investigation of Complaints

**183.**   APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident, or involved in any significant event before or after the original incident, shall provide a written statement regarding their observations, even to state that they did not observe anything.
**Paragraph 183 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.169a**: The practice of utilizing ACMs for CASA-related issues was prohibited by Special Order in April of 2019; however, this prohibition must be supported by assiduously careful internal processes to ensure that the prohibition is followed by supervisors and command personnel, and that those who do not adhere to these requirements are noted, and corrective action is taken.
**APD Response:**  IAPS continues to make improvements to the BlueTeam entry process. There is a new Job Aid and Special order that is being worked on to improve the IAR entry process.
**4.7.169b**: The City should appoint a review and approval authority for all external APD IA investigations that are conducted by an independent investigator. The appropriateness of determining the need for external investigation should be documented in writing.
**APD Response:**  City Legal and City Human Resources have begun to look into this process to find a contract investigator to conduct these investigations.
**4.7.169c**: In investigations in which the complainant(s) or logical witnesses are not interviewed, or in matters that are administratively closed, the investigation should include a clear written explanation of why the interviews were not conducted and/or why further investigation steps were not warranted to reach the resolutions/findings in the investigation.
**APD Response:**  APD is working to finalize changes to SOP 3-41 Complaints Involving Department Policy or Personnel showing the limited use of Administrative Closure to only allow in very specific instances. Complainants or logical witnesses will be interviewed unless documentation exists with a reason why.  For example, uncooperative, unresponsive, etc.

**184.** APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing. APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation. Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct.
**Paragraph 184 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 recommendations for Paragraphs 184.

**185.** APD shall require personnel to cooperate with Internal Affairs Division and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control. Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances.
**Paragraph 185 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 recommendations for Paragraphs 185.

**186.** APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment. When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement.
**Paragraph 186 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 recommendations for Paragraphs 186.

**187.** Advisements by the Internal Affairs Division or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee.
**Paragraph 187 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 recommendations for Paragraphs 187.

**188.** If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the Internal Affairs Division commanding officer. If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Division. The Internal Affairs Division commanding officer shall immediately notify the Chief. The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, the Internal Affairs Division shall continue with the administrative investigation of the allegation. Consistent with Paragraph 186, the Internal Affairs Division may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Division deems such interviews appropriate.
**Paragraph 188 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 recommendations for Paragraphs 188.

**189.** Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including use of force reports and incident reports. APD shall make clear that all statements by personnel in incident reports, arrest reports, use of force reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements. Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief.
**Paragraph 189 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 recommendations for Paragraphs 189.

**190.** In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence.  There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into account any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements.

**Paragraph 190 remains in Secondary Compliance.**

**IMR- 11 Recommendations:**

**4.7.176a:** For investigations found to be deficient, follow up on any deficiencies noted by this IMR, and analyze, discuss, and use critical failures as illustrations and learning points guiding needed changes.

**APD Response:**  There is a new case review process to include a new Investigations Manager reviewing cases.  The Investigations Manager is responsible for reviewing cases, identifying deficiencies or additional follow-up investigations needs, and to correct any critical failures in investigations.

**4.7.176b:** Enforce policies, timelines, and review protocols to further refine investigative quality.

**APD Response:**  IAPS created case review process for internal investigations where detectives are required to give case updates as to the progression of the investigation. This will improve the quality of investigations earlier in the investigative process versus after the investigation is completed.

**191.**  All administrative investigations conducted by the Internal Affairs Division or the Civilian Police Oversight Agency shall be completed within 90 days of the initiation of the complaint investigation.  The 90-day period shall not include time for review.  An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief.  Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation.  To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations of the officer, and extended absences.

**Paragraph 191 remains in Secondary Compliance.**

**IMR- 11 Recommendations:**

**4.7.177a**: APD and CPOA should refocus their efforts related to this paragraph by conducting a quantitative analysis of the reasons that cause any case to be delayed past 90 days.

**APD Response:**  IAPS now obtains bi-weekly reports from the data analyst researching late investigation and document trends for process improvement.

**4.7.177b**: Once causes for these delays are identified, develop recommendations for changes to policy, staffing, procedure, or practice that are designed to eliminate such delays.

**4.7.177c**:  All investigations should include a clear timeline that delineates date of receipt of complaint, date of assignment, date of extension if applicable, date investigation is completed, dates review period begins and ends, and date of notice of intent to discipline if applicable.

**APD Response:**  IAPS will create a data log to identify deficiencies in 90-day timelines and determine solutions to eliminate delays.  IAPS provides weekly status update of cases times lines to DOJ and the IMT. Additionally, IAPS and COD created job aids to assist personnel with IAPro usage.

**192.**  The APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation: a) "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer; b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;  c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training; e) "Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or f) "Administratively closed," where the policy

violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint.

**Paragraph 192 remains in Secondary Compliance.**

**IMR- 11 Recommendations:**

**4.7.178a:**  Although the monitoring team agrees with the use of dispensing of a full investigation in cases in which a preliminary investigation reveals the allegations cannot be minimally sustained and show no other potential areas of misconduct (not based on the original complaint), we caution APD and CPOA not to utilize this method of preliminary investigations /less than full investigation for expediency sake in instances in which the complaint, in conjunction with the underlying facts, calls for a complete investigation.

**APD Response:**  APD will conduct a full investigation when appropriate and the underlying facts call for one.

**193.**  Administratively closed complaints may be re-opened if additional information becomes available.  The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened.

**Paragraph 193 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 recommendations for Paragraphs 193.

**194.** In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether: (a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures.  This information shall be shared with the relevant commander(s).

**Paragraph 194 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR recommendations for Paragraphs 194.

## E. Preventing Retaliation

**195.**  The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

**Paragraph 195 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 recommendations for Paragraphs 195.

**196.**  Within six months of the Operational Date, and annually thereafter, the Internal Affairs Division and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation.  This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation.  Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct.

**Paragraph 196 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 recommendations for Paragraphs 196.

**197.**  Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds for discipline, up to and including termination of employment.

**Paragraph 197 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 recommendations for Paragraphs 197.

**APD response:**  APD continues to take seriously and prohibits all forms of retaliation.  APD policies continue to reflect retaliation prohibitions.

## F. Staffing and Training Requirements

**198.**  The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement.  The City shall re-assess the staffing of the Internal Affairs Division after the completion of the staffing study to be

conducted pursuant to Paragraph 204. The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations.

**Paragraph 198 remains in Operational Compliance.**

**IMR – 11 Recommendations:** There were no IMR – 11 recommendations for Paragraphs 198.

**199.** All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Division, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year. The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations.

**Paragraph 199 remains in Secondary Compliance.**

**IMR – 11 Recommendations:** See below at Paragraph 200.

**200.** Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year. The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations. G. Discipline Process and Transparency.

**Paragraph 200 is in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.185-186a:** Identify the cadre of Area Command sergeants who may be assigned misconduct investigation and develop an annual IA training program for them and have them complete same on an annual basis.

**4.7.185-186b:** Do not assign a misconduct investigation to any APD personnel who have not met the annual training requirement.

**APD Response to Recommendations 4.7.185-186a and 4.7.185-186b:** The Training Academy, along with IAPS, are developing training for supervisors who may be assigned misconduct investigations.

**4.7.185-186c:** CPOA should develop an assessment mechanism to measure the effectiveness of outside training such as the NACOLE conference. That can easily be done by "testing" by CPOA once the CPOA investigators have completed the NACOLE training.

**4.7.185-186d** Investigations involving allegations that are CASA related should remain with IAPS and not be transferred to Area Command personnel.

**APD Response:** As APD revises SOP 3-41 Complaints Involving Department Policy or Personnel, guidelines for assigning internal investigations will be updated to ensure the requirements of the CASA are met.

**201.** APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently.

**Paragraph 201 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.187a:** Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless written reasons for departure from the matrix recommendations accompany the decision.

**APD Response:** IAPS is revising the DAP template and case review checklist to ensure all disciplinary decisions are in compliance with discipline matrix in SOP 3-46 Discipline System.

**4.7.187b:** Ensure that adequate explanation is given for the selection of a classification level where there is more than one level of classification associated with a regulation for which a sustained finding is made.

**APD Response:** IAPS includes DAP in every case with sustained findings. The DAP includes each potential policy violation, each investigation finding, previous discipline, and the preliminary discipline calculation, all in accordance with SOP 3-46 Discipline System to assist the reviewing employee. This DAP is being improved and will be implemented upon completion.

**4.7.187c:** APD should designate the Commander of IAPS or a Deputy Chief as the only person in the organization who has the authority to determine that discipline cannot be imposed due to time violations, and that designation should not be made without the approval of the City Attorney, based on persuasive and factual evidence.

**4.7.187d:** All investigations involving sustained charges where discipline cannot be imposed due to violations of time constraints should be reported quarterly to the Chief, the City Attorney, DOJ, and the Monitor.

**APD Response:** IAPS will work to incorporate this recommendation into the revision of SOP 3-46 Discipline System.

**4.7.187e:** APD should adopt the practice of having a representative of IAPS or an administrative prosecutor attend Pre-Disciplinary Hearings (PDHs) and represent the findings and recommendations set forth in the investigation.

**APD Response:** APD is in discussion for adopting this practice and will follow-up once a final decision has been made.

**4.7.187f:** Ensure uniformity in the amount and format of summarizing information presented to the Chief with investigations. CPOA should follow the IAPS practice and adopt the use of Disciplinary Action Packets to accompany its investigations in which charges are sustained.

**APD Response:** IAPS will share the revised DAP worksheet with the CPOA once finalized.

**202.** APD shall establish a disciplinary matrix that: a) establishes a presumptive range of discipline for each type of rule violation; b) increases the presumptive discipline based on an officer's prior violations of the same or other rules; c) sets out defined mitigating or aggravating factors; d) requires that any departure from the presumptive range of discipline must be justified in writing; e) provides that APD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and f) provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.

**Paragraph 202 remains in Secondary Compliance.**

**IMR 11 – Recommendations:**

**4.7.188a**: Ensure that all disciplinary decisions either conform to the recommended ranges included in APD's disciplinary matrix or that they are accompanied by written detailed explanations for the departure from the recommendations of the disciplinary matrix.

**4.7.188b**: Ensure that all disciplinary decisions related to actions (or inactions) that are reasonably on the "critical path" regarding compliance with the CASA reflect a steadfast resolve to foster behaviors required by the CASA.

**4.7.188c**: Ensure that all disciplinary packets are complete and self-explanatory, including documentation that all steps in the investigation and disciplinary processes were completed as required by policy.

**4.7.188d**: Ensure a more exact calculation of prior offenses for purposes of calculating the presumptive range of the disciplinary matrix.

**4.7188e**: Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless cogent, written reasons for departure from the matrix recommendations accompany the decision.

**4.7188f**: Adopt a revised AO 3-46 on a priority basis and ensure it reflects the tenets of the CASA and principles of fair and consistent discipline, and clearly set forth the information necessary to meet recommendation 4.7188d, that is, what offenses count as a prior offense and how to calculate the appropriate range of the disciplinary matrix in accordance with the principles of progressive discipline.

**4.7188g**: Ensure that a revised AO 3-46 addresses when a suspension can be held in abeyance and the criteria for doing so, and that a cogent explanation consistent with the tenets of progressive discipline be given whenever a suspension is held in abeyance.

**4.7188h**: Insert an additional column in the disciplinary decision matrix that identifies whether or not the range of discipline is enhanced by prior offenses.

**APD Overall Response for 4.7.188a - h:**

The purpose of progressive discipline is to apply incremental discipline as a means to correct misconduct/policy violations in the early stages. APD is working to implement a DAP that will consider progressive discipline and mitigating and aggravating circumstances when recommending final discipline for misconduct/policy violations. Furthermore, the DAP will not allow for a non-disciplinary corrective action (NDCA) where NDCA has been applied on a previous policy violation. APD IAPS is also developing new summary forms that will require an explanation when the recommended discipline is outside the acceptable range. The DAP is in the testing and evaluating process to ensure the recommendations provided by the IMT have been addressed and the requirements of the CASA are met. As APD revises its policies, the IAPS Commander will review and update the assigned sanctions to reflect a single sanction rather than allowing for a sanction range. The reason for this change is to ensure the sanctions align with other similar policies to create fairness and consistency when imposing discipline. Finally, APD is in the process of revising SOP 3-46 Discipline Matrix and will incorporate language as to when a suspension can be held in abeyance and the criteria for doing so to include an explanation whenever a suspension is held in abeyance. The revised SOP 3-46 will clearly define what counts as a prior offense and will provide guidance to complete the DAP. APD IAPS has worked diligently during this monitoring period to address the recommendations from the IMT and make sound policy and process decisions to foster behavior required by the CASA. Although many of the processes are still in progress, APD IAPS is focused on creating a discipline matrix and policy that is fair and consistent.

## Section 6:  Staffing, Management, and Supervision (Paragraphs 203 – 231)

**203.** To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement the terms of this Agreement. APD shall also deploy

a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally. APD shall revise and implement policies for supervision that set out clear requirements for supervision and comport with best practices.

**Paragraph 203 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.189a:** Review the available literature and process on staffing goals. Where practicable make staffing goals contingent upon desired outcome goals, e.g., average response times; committed hours per officer, by patrol shift; available non-committed time to pursue community-oriented policing goals, etc.

**4.7.189b:** Consult with other police agencies who have incorporated community oriented policing into their service delivery functions to determine how they collect, track, calculate and analyze staffing needs and community policing goals.

**APD Response:** APD tracks community engagement-related events and follow-up, and receive digitized bid packets specific to community-oriented policing. Bid packets provide officers' information on beat assignments, businesses, neighborhood association, etc. in the area the officer is assigned. Officers use that information to build trust, relationships, and partnerships with the community.

APD has remained focused on resource allocation throughout the department. For example, APD has been revising its staffing efforts specific to the Field Services Bureau (FSB). The FSB are uniformed officers who respond to calls for service in the City's six area commands. Staffing has been assessed for each area command, considering call for service volume and current staffing levels.

During the last quarter of 2019 and into 2020, APD collaborated with University of Norte Dame graduate students on a gun violence reduction project. During the course of the project, staffing allocation was one point of consideration. APD plans to continue the project when it resumes with the intention of considering project key takeaways for potential solutions.

## A. Staffing

**204.** In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission. APD therefore shall conduct a comprehensive staffing assessment and resource study. The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques. The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands. This staffing assessment and resource study shall be completed within one year of the Operational Date. Within six months of the completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement.

**Paragraph 204 remains in Operational Compliance.**

**APD Response:** There is not a status update for this paragraph. It is a one-time requirement and continues to be fully operational.

## B. Duties of Supervisors

**205.** First-line supervisors shall investigate officers' use of force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy.

**Paragraph 205 remains in Secondary Compliance.**

**IMR – 11 Recommendations:** See below at Paragraph 208.

**206.** All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command. First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary command. Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department.

**Paragraph 206 remains in Secondary Compliance.**

**IMR – 11 Recommendations:** See below at Paragraph 208.

**207.** First-line supervisors shall ordinarily be assigned as primary supervisor to no more than eight officers.  Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary.
**Paragraph 207 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 recommendations for Paragraphs 207.
**APD Response:**  APD continues to be compliant with the 8:1 supervisor to officer ratio.  COD, with the assistance of area commands, developed a standardized line-up.  A line-up includes information such as commanders, lieutenants, sergeants, officers in each area command, watch and squad.


**208.**  APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command.  APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement.
**Paragraph 208 remains in Secondary Compliance.**


**IMR – 11 Recommendations for Paragraphs 205, 206, and 208**:
**4.7.191-4.7.194a**:  Now that training has been completed, APD must move its focus to the next (and much more difficult task) of ensuring applicable policies and training are actually implemented in the field.  Based on our past experience with APD's supervisory cadre, this will be a complex task requiring daily oversight, assessment, follow-up, and correction.
**4.7.191-4.7.194b**:  Unless rigorous field-wide inspections and audit processes are implemented, we foresee a potentially significant amount of "slippage" at command levels regarding adherence to existing policy and training.  APD should anticipate this potential as well and should plan and implement meaningful assessment and internal monitoring practices related to the business practices outlined in these paragraphs.
**APD Response:**  While there is a lot work ahead, APD has made significant strides in improving supervision during this reporting period.  APD has revised or is in the process of revising several supervisory-related policies such as SOP 3-30 Line Inspection Process, 2-80 Arrests, Arrest Warrants and Booking Procedure, 4-13 Daily Staffing and Briefings, 3-14 Supervisory Leadership and 2-8 On-Body Recording Device.
One example for overall process improvements from policy to day-to-day operations, is line inspections.  SOP 3-30 Line Inspection Process was published in March 2020.  Each month, supervisors conduct line inspections for each officer under his/her supervision, and determine if officers are carrying the appropriate equipment and if serial numbers match property cards, if their vehicles are in good condition, and if the supervisor conducted a review of two videos per officer, etc.  There was one major improvement to the line inspection form based on a finding by the IMT during the ninth reporting period.
In IMR 9, the monitoring team wrote, "*During the June 2018 site visit, members of the monitoring team visited all six Area Commands and spoke with supervisors at each location.  Some supervisors were frank in their discussion of monthly inspections, informing the monitoring team that there are both formal and informal inspections, explaining that they do not in fact physically check every officer's weapons for make, model, serial numbers, modifications or ammunition every month. During the November 2018 site visits to all Area Commands—one sergeant was vocally resistant to established policy and training, stating that he would not conduct a formal inspection of his officer's weapons and ammunition, believing that his duties as a leader required him to trust that the officers would follow the rules to carry only issued weapons and ammunition.  This conversation was relayed to APD command staff and the sergeant was issued a verbal reprimand.  We will follow up on this supervisory refusal to adhere to the CASA and to normal "best practices" relating to officer equipment and adherence to articulated policy.  This sergeant's resistance to conforming to established policy, while seemingly minor, could have serious civil liability repercussions.  Further, we find it a piece of deliberate refusal to comply with the CASA, another example of the counter-CASA effect that APD should work diligently to identify and correct on an on-going basis.*"  To address this concern department-wide, APD added, "Did you visually inspect your officer and of his/her equipment, to include his/her person and vehicle?"  This language as an additional accountability measurement which will also assist in future policy violations leading to internal investigations.
In addition, APD has improved line inspection forms to capture useful information to measure supervision.  The previous line inspection did not account for officers not assigned certain property and at first look, appeared the officer was out of compliance.  This updated inspection form also combines line inspection and OBRD video reviews, both conducted monthly.  APD has been working with the City of Albuquerque's Department of Technology and Innovation (DTI) to create an appropriate workspace for line inspections, moving away from SharePoint, which has several downsides to the system for this particular use.  Once APD is using that workspace, mid- and upper-management will have easier access to review the line inspections.
To continue the process, COD's Performance Metrics Unit (PMU) conducts monthly audits that include supervisory requirements, such as completing line inspections in accordance with policy and the CASA. PMU then provides audits results in monthly scorecards

to the divisions audited, and provides monthly updates to the executive staff.  For any failure point in the audit process, an internal affairs investigation is requested for those policy violations.  After working through the first phases of meaningful assessments and internal monitoring practices, APD is finally getting to the last phases of data analysis with follow-up and follow-through.  The newly hired COD data analyst has started analyzing the data from audit scorecards to help to drive departmental decisions.

During this reporting period, the PMU expanded their inspections to the Motor Units within the Support Services Bureau and plans to continue to expand to other units within the department. This reporting period marks the first quarterly inspections of the new Taser 7 electronic control weapon. With enhanced data capturing capabilities of the Taser 7, PMU can now audit and collect detailed data regarding weapon discharges.   In addition, PMU developed a real-time view for divisions to see audits being conducted at any time during the audit period.  This allows them to see where they stand on any given day.

As stated above, APD has a lot of work ahead to continue to improve supervision; however, significant progress has occurred during this reporting period.

## C. Supervisor Training

**209.**  Sergeant training is critical to effective first-line supervision.  Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities.
**Paragraph 209 remains in Secondary Compliance.**
**IMR – 11 Recommendations and APD Response:**  See below at Paragraph 210.

**210.**  APD's sergeant training program shall include the following topics: a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices; b) de-escalating conflict; c) evaluating written reports, including those that contain canned language; d) categorizing and reviewing officer uses of force; e) understanding supervisory tools such as the Early Intervention System and onbody recording systems; f) responding to and investigating allegations of officer misconduct;  g) evaluating officer performance; h) consistent disciplinary sanction and non-punitive corrective action; i) monitoring use of force to ensure consistency with policies; j) building community partnerships and guiding officers on this requirement; and k) legal updates.
**Paragraph 210 remains in Secondary Compliance.**

**IMR – 11 Recommendation for 209 and 210:**
4.7.195-6a:  APD should carefully consider mechanisms to ensure that trained practices are rigorously adhered to by its supervisory cadres and personnel assigned to oversee those cadres.  This may prove to be the most difficult of all remaining tasks yet to reach full compliance.
**APD Response:**  The Academy continues to deliver 80 hours of training to new supervisors, and is currently going through an annual review of the sergeant training curriculum to ensure the material is current and relevant.   Departments such as Internal Affairs (IAPS and IAFD), and SOD are working to amend APD data collection sources to include identification of the supervisor who reports uses of force that can be compared to use of force case counts to determine compliance percentages, which will serve as a method to prove that trained practices are adhered to in the field.

**211.**  All sworn supervisors shall also receive a minimum of 32 hours of in-service management training, which may include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement.
**Paragraph 211 remains in Primary Compliance.**
**IMR – 11 Recommendation:**
**4.7.197a:**  Ensure that training and supervisory processes are, at a minimum, compliant with the basic requirements of the CASA by using internal checkpoints reflective of CASA requirements that must be used by those at APD's Training Academy responsible for training development and assessment.
**APD Response:**  The Academy is in the process of converting the 2020 supervisor training to a digital format.  The training meets the requirements of the CASA and addresses areas on which current supervisors have asked to receive additional training.

## D. Early Intervention System

**212.**   Within nine months of the Operational Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers.  APD supervisors shall be trained to proficiency in the interpretation

of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being.

**Paragraph 212 remains in Primary Compliance.**

**IMR – 11 Recommendations:**  See IMR – 11 Recommendations and APD's Response below at Paragraph 219.


**213.**  APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties.

**Paragraph 213 remains in Primary Compliance.**

**IMR – 11 Recommendations:**  See below at Paragraph 219.


**214.**  APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review.

**Paragraph 214 remains in Primary Compliance.**

**IMR – 11 Recommendations:**  See below at Paragraph 219.


**215.**  The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum: a) uses of force; b) injuries and deaths to persons in custody; c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy; d) all civilian or administrative complaints and their dispositions; e) all judicial proceedings where an officer is the subject of a protective or restraining order; f) all vehicle pursuits and traffic collisions involving APD equipment; g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system; h) all disciplinary action taken against employees; i) all non-punitive corrective action required of employees; j) all awards and commendations received by employees, including those received from civilians, as well as special acts performed by employees; k) demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;  l) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and m) all offense reports in which an officer is a suspect or offender.

**Paragraph 215 remains in Primary Compliance.**

**IMR – 11 Recommendations:**  See below at Paragraph 219.


**216.**  APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it.  The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information.  The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command.

**Paragraph 216 remains in Primary Compliance.**

**IMR – 11 Recommendations:**  See below at Paragraph 219.


**217.**  APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law.  Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System.  On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner.

**Paragraph 217 remains in Primary Compliance.**

**IMR – 11 Recommendations:**  See below at Paragraph 219.


**218.**  APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system.  APD supervisors shall be trained to use the Early Intervention System as designed and to help

improve the performance of officers under their command.  Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior.

**Paragraph 218 remains in Primary Compliance.**

**IMR – 11 Recommendations and APD Response:**  See below at Paragraph 219.

**219.** Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate.  The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement.

**Paragraph 219 remains in Primary Compliance.**

**IMR – 11 Recommendations for Paragraphs 212 – 219:**

**4.7.198-205a**:  Complete and submit for approval the curriculum for PEMS training for supervisors and ensure that the new PEMS system addresses all required components of paragraph 219 and the additional requirements of Paragraph 23 (Firearm discharges), Paragraph 38 (ECW data) and Paragraph 105 (Tactical Unit data).

**4.7.198-205b**: Document and demonstrate that the proposed "Pareto Principle" or 80/20 principle as a statistical tool that works effectively and can be used to demonstrate both acceptable and unacceptable behavior from officers as required by the CASA.

**4.7.198-205c**: Document learning assessment processes for the training provided for supervisors.

**4.7.198-205d**: Design and document audit protocols for supervisory review and reporting of PEMS processes.

**APD Response to Paragraphs 212 – 219:**

a) The lesson plan for the PEMS supervisor class is currently under review by the CTU at the APD Academy.  APD is on step 2 of the seven-step process for developing an approved lesson plan. The goal is to have this lesson plan ready for approval by the Parties in late 2020.

b) The IMT and approving Parties, ratified the new PEMS policy SOP 3-33.  The Chief of Police signed the policy on May 12, 2020.  The policy covers all required elements of the CASA and related paragraphs noted.  SOP 3-33 will not be published until the training to guide supervisors on the policy requirements has been delivered.

c) Phase 2 testing of the Pareto Principle commenced in June, 2020 and will run through September, 2020.  This is the first test of a standardized process for completing an assessment.  The results of this test will provide the information required for this section.

d) The supervisor lesson plan is under development. Supervisors will complete a group scenario (PASS/FAIL exam) and a written test through an online cloud-based software that stores and distributes content online (PowerDMS) upon completion of the course.   APD will conduct this training once the training curriculum has been submitted and approved by the Parties.

e) APD is working with the auditing team to develop a scorecard for the PEMS Unit to document the auditing of this process.  A PEMS Review Board SOP is in development. The review board will be executive level staff that will evaluate the assessments and monitoring plans to ensure consistency throughout the department.  This is similar to the Force Review Board for use of force incidents.

## E. On-Body Recording Systems for Documenting Police Activities

**220.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems.  Within six months of the Operational Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require: a) specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;  b) officers to ensure that their on-body recording systems are working properly during police action; c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning; d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible; e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;  f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits; g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and h) APD to

retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved.

**Paragraph 220 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.206a**: Prepare, quarterly, a written assessment of the results of the inspections and audit outcomes, identifying the top five areas of non-compliance with the requirements of OBRD field processes.

**APD Response:** The PMU provides monthly scorecard audits to each Area Command. There are 4 measures audited specific to OBRD:

    a. Two videos reviewed for each officer by supervisors each month;

    b. Video uploaded by the end of subsequent shift;

    c. Mandatory recordings per policy; and

    d. OBRD monthly equipment inspection.

Failure to upload prior to the end of the subsequent shift was the most common area of non-compliance. Audits conducted between May – July 2020 show that there are no current trends related to OBRD for all six-area commands as they have remained at or above 95% compliance.

**4.7.206b**: Based on the quarterly audits, identify the top three reasons for noncompliance with OBRD policies and procedures, and develop specific, targeted responses to address and remediate each of the top three non-compliance areas.

**APD Response:** The revision of Standard Operating Procedure 2-8 Use of On-Body Recording Devices clarifies expectations specific to OBRD upload and mandatory recordings. The policy was scheduled to take effect June of 2020; however, it is currently being revised to comply with Senate Bill 8, dated June 21, 2020. Policies must reflect compliance with the bill no later than September 2020. Action plans are currently in place to improve data processes. Once the COD's PMU monthly scorecards are sent to the Area Commanders, there is an opportunity to provide rebuttals. If the rebuttal is not accepted or there is no rebuttal to submit, IARs are initiated by the COD via Blue Team for investigation. The scorecards are also reviewed at Duke City Stat which is a monthly meeting with the executive staff. Commanders report on the scorecards for their area command to the executive staff. This reinforces accountability at the command level. The most recent audits show that there are no current trends related to OBRD for all six-area commands as they have remained at or above 95% compliance. The COD is starting to implement the audits in the other bureaus.

**4.7.206c**: Repeat steps a) and b) until field OBRD error rates are below five percent.

**APD Response:** Current trends related to OBRD for all six-area commands have remained at or above 95% compliance.

**221.** APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and implementation. Upon approval by the Monitor and DOJ, policies shall be implemented within two months.

**Paragraph 220 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.207a**: Develop, implement, and assess supervisory protocols to ensure violations of applicable policy are identified by supervisors and are addressed and remediated, many of which have already been recommended to APD by the monitoring team.

**APD Response:** Special Order 19-25 Internal Affairs Request through BlueTeam requires supervisors to initiate an IAR for any potential policy violations within 24 hours of identification. SOP 2-8 On-Body Recording Devices was approved by Chief Geier on May 28, 2020. A video with a full review of the new policy was recorded and scheduled to be released on PowerDMS, however, the process was put on hold to amend the policy to reflect Senate Bill 8 and will be approved and in effect prior to September 20, 2020.

**4.7.207b**: Publish quarterly "OBRD Failure" reports identifying the top five reasons for OBRD failure in the field, and identifying the Area Command, shift, and supervisors associated with those failures.

**APD Response:** The APD data analysts continue to work on extracting the data specific to this recommendation. At this time, the only way to pull the information is manually.

**4.7.207c**: Retrain, counsel or discipline supervisors with repeated failures in noting, assessing, and correcting officers with repeated OBRD operations failures.

**APD Response:** A data analyst was hired whose primary focus is in supervision. IAPS is in the process of ensuring this data is available for future reports. When a policy violation or potential policy violation is identified, an IAR must be initiated per Special Order 19-25.

**4.7.207d**: Repeat until error rates on OBRD operation fall below five percent.

**APD Response:** Current trends related to OBRD for all six-area commands have remained at or above 95% compliance.

**222.** The Parties recognize that training regarding on-body recording systems is necessary and critical.  APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff.  APD will develop a training curriculum, with input from the Monitor and DOJ, that relies on national guidelines, standards, and best practices.
**Paragraph 222 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.208a**: Reinforce the established clear, concise, and reasonable requirements for supervisory review of in-field activations of OBRDs, requiring field supervisors to review OBRD activations and recordings for compliance to established policy.
**APD Response:**  SOP 2-8 Use of On-Body Recording Devices currently requires these reviews.  Supervisors are required to complete a monthly inspection form for each officer assigned to them. The inspection requires supervisors to review two recordings for each officer every month.  These requirements are reviewed and addressed during training provided to officers attending the Acting Sergeant Course and for all officers promoting to Sergeant.  A "Monthly Video Cheat Sheet" is located on the APD Protopage under the supervision tab for supervisors to reference when completing monthly inspections.
**4.7.208b**: Establish a routinized process for command oversight of the OBRD review process, requiring lieutenants to assess, in a methodical way, the OBRD review processes of sergeants under their command, and commanders to assess the OBRD review performance of lieutenants under their command, to ensure compliance with reasonable assessments of actions in the field.
**APD Response:**  PMU's monthly scorecards are provided to Lieutenants and Commanders to improve operations within their divisions.  APD is evaluating the next steps to improve on Lieutenant and Commander assessments related to OBRD.  Lieutenants are currently required to review the OBRD of all Level 1 uses of force in their entirety.

**223.**  APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order.  Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor.
**Paragraph 223 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**  See below at Paragraph 224.

**224.** Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy.  Supervisors shall report equipment problems and seek to have equipment repaired as needed.  Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy.
**Paragraph 224 remains in Secondary Compliance.**

**IMR – 11 Recommendations for Paragraphs 223 and 224:**
**4.7.209-210a**: Ensure that supervisors who fail to note errors in OBRD operation are counseled, or for multiple offenders, retrained and/or disciplined for ineffective OBRD review processes. If, after counseling or retraining, supervisors continue to miss OBRD activation or usage violations, ensure appropriate discipline is imposed.
**APD Response:**  This is completed through an existing IAPS process.  The Academy staff is working to provide data specific to supervisor training related to OBRD.
**4.7.209-210b**: Identify the top 20 supervisors who have substandard performance on OBRD activation review and retrain them in the process. Place these individuals "on notice" that their performance on this task will be routinely reviewed, and continued failures will result in discipline.
**APD Response:**  APD data analysts are proactively working on the ability to extract this data.

**225.**  At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed.
**Paragraph 225 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 225.
**APD Response:**  The COD PMU scorecards reflect that supervisors are adhering to this policy and requirement.

**226.**  APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent.

**Paragraph 226 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 226.
**APD Response:**  The policy is being reviewed to ensure it is compliant with the newly approved Legislative Bill.

**227**.  APD shall ensure that on-body recording system videos are properly categorized and accessible.  On-body recording system videos shall be classified according to the kind of incident or event captured in the footage.
**Paragraph 227 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 227.
**APD Response:**  There are no updates for this paragraph.  If a case number is assigned to a call, the OBRD recording is automatically categorized through Axon and Computer Aided Dispatch (CAD) integration.  Officers are ultimately responsible for proper categorization and required to verify that the recording was classified correctly.

**228.**  Officers who wear on-body recording systems shall be required to articulate on camera or in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded.  Intentional or otherwise unjustified failure to activate an on-body recording system when required by APD policy shall subject the officer to discipline.
**Paragraph 228 remains in Secondary Compliance.**
**IMR – 11 Recommendations and APD Response:**  See below at Paragraph 231.

**229.**  APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties.  On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room).
**Paragraph 229 remains in Secondary Compliance.**
**IMR – 11 Recommendations and APD Response:**  See below at Paragraph 231.

**230.**  APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift.  All images and sounds recorded by on-body recording systems are the exclusive property of APD.
**Paragraph 230 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no Recommendations for Paragraph 230.
**APD Response:**  There are no updates for Paragraph 230.  Current policy requires officers to upload their OBRD prior to the end of the subsequent shift. COD scorecards show that APD remains compliant with this recommendation.

**231.**  The Parties are committed to the effective use of on-body recording systems and to utilizing best practices.  APD currently deploys several different platforms for on-body recording systems that have a range of technological capabilities and cost considerations.  The City has engaged outside experts to conduct a study of its on-body recording system program.  Given these issues, within one year of the Operational Date, APD shall consult with community stakeholders, officers, the police officer's union, and community residents to gather input on APD's on-body recording system policy and to revise the policy, as necessary, to ensure it complies with applicable law, this Agreement, and best practices.
**Paragraph 231 remains in Primary Compliance.**
**IMR – 11 Recommendations for Paragraphs 228, 229, and 231:**
**4.7.217a**: Conduct detailed failure analyses designed to identify the causes of incidents of "failure to record," and identify the true cause of these failures: equipment, training, supervision, or "other."
**4.7.217b**: Rank order the failure rates and develop action plans to eliminate the causes of failure, beginning with the most frequent and working to least frequent.
**APD Response to 4.7.21.7 and 4.7.217.b:**  APD data analysts are proactively working on extracting this data.   "Failure to record" IARs can now be compared to the document provided by Axon when OBRDs are returned.
**4.7.217c**: Identify a frequency-based list of supervisors who fail to enforce OBRD requirements, and schedule these supervisors for retraining, counseling, or discipline, as appropriate.
**APD Response:**  IAPS has made the proper requests to allow for this data to be available. The list of supervisors who fail to enforce OBRD requirements will be completed when the data is available.

## Section 7:  Recruitment, Selection and Promotions (Paragraphs 232 – 246)

**232.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts.
**Paragraph 232 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 232.
**APD Response:**  APD continues to attract qualified individuals from a variety of new and innovative recruiting events.  The department is in contact with "Boom Time" marketing in hopes of establishing an all-encompassing marketing strategy.  Signal Vine, Instagram, Facebook, and Google Ads are continuing to be used.  Online advertising continues to be the highest yielding recruiting tool for APD.  Current efforts to boost online presence will serve to enhance these results.   SOP 1-85 Recruiting is currently being reviewed and will go through the respective approval process for any suggested changes.

### A.  Recruitment Plan

**233.**  APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross section of the community.  The recruitment plan shall establish and clearly identify the goals of APD's recruitment efforts and the duties of officers and staff implementing the plan.  234. APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.
**Paragraph 233 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 233.

**234.**  APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.
**Paragraph 234 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 234.
**APD Response:**  APD continues to use the recruitment measures laid out in the annual strategic plan and will analyze the results at year end.

**235.**  APD's recruitment plan will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants.  APD shall create and maintain sustained relationships with community stakeholders to enhance recruitment efforts.
**Paragraph 235 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 235.
**APD Response:**  The Recruiting Unit's commitment to support community involvement in the hiring process has continued in this reporting period.  The unit attended the annual Women in the Military event honoring those women who serve, and who have served, in the US armed forces.  The unit continues to attend Community Policing Councils in all six area commands.  These Councils consist of community stakeholders who offer suggestions on how to recruit in their communities.  With the easing of COVID – 19 restrictions, the Recruiting Unit is looking forward to once again interacting with community leaders and stakeholders to ensure their involvement with the Albuquerque Police Department's selection process.

### B.  Hiring Practices

**236.**  APD shall develop and implement an objective system for hiring and selecting recruits.  The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws.
**Paragraph 236 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 236.

**APD Response:**   APD will continue using the online automated application system, which is programed to qualify based on minimum State and APD hiring standards.

**237.**  APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and polygraph examination to determine their fitness for employment.  APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers.  The program shall continue to be designed to detect the use of banned or illegal substances, including steroids.
**Paragraph 237 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 237.
**APD Response:**   APD will continue to require all candidates for sworn positions to undergo a psychological, medical and polygraph exam.  This process has been followed for all classes seated this year.

**238.**  APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws.  APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities.
**Paragraph 238 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 238.
**APD Response:**   In an ongoing effort to strengthen the process of screening applicants APD has created an automated system for generating chief's selection reports which will transcribe all information available via the applicant's interest card automatically to a chief report on the apdonline administrative site.  This will alleviate the need of recreating information already available as well as provide a uniform chief report amongst all backgrounders.  The system will have rules in place that require information be provided to ensure all avenues of a background are encompassed in the report.

**239.**  APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires.  APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement
**Paragraph 239 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 239.
**APD Response:**   APD will continue to complete thorough and objective backgrounds to include assessing lateral hires with respect to criteria listed in paragraph 239.  APD continues to look for ways to streamline the process without compromising the integrity of the background.

**240.**  APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants.
**Paragraph 240 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 240.
**APD Response:**   At year end, APD will evaluate 2020 and begin work on the 2021 recruitment plan based upon the analysis of that report.

## C.  Promotions

**241.**  APD shall develop and implement fair and consistent promotion practices that comport with best practices and federal anti-discrimination laws.  APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant.  APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions.  These criteria should account for experience, protection of civil rights, discipline history, and previous performance evaluations.
**Paragraph 241 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 241.
**APD Response:** See below at Paragraph 242.

**242.** APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties in core substantive areas.
**Paragraph 242 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 242.

**APD Response to Paragraph 241s and 242:** APD has not had a promotional process during this reporting period; however, both a sergeant and lieutenant promotional process are expected in the summer and fall of 2020.

**243.** Within six months of the Operational Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours
**Paragraph 243 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 243.
**APD Response:** APD continues to follow the requirements of the City Rules and Regulations for promotions, which does include a removal from consideration of the process.

## D. Performance Evaluation

**244.** APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet performance goals. The evaluation system shall provide for appropriate corrective action, if such action is necessary.
**Paragraph 244 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 244.
**APD Response:** See below at Paragraph 246.

**245.** As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates.
**Paragraph 245 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 245.
**APD Response:** See below at Paragraph 246.

**246.** As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period.
**Paragraph 246 remains in Operational Compliance.**
**IMR – 11 Recommendations:** There were no IMR – 11 Recommendations for Paragraph 246.

**APD Response to Paragraphs 244 – 246:** APD continues to monitor the current Performance Evaluation System in place and ensure that the performance documents are completed in order to maintain operational compliance status. SOP3-32, Employee Work Plan/Performance Evaluations has also been updated to align with the most recent changes and was officially approved in January 2020.
Between February 1, 2020 and July 31, 2020, APD completed two evaluation cycles checkpoints. Checkpoint 2 was due in mid-March. The total number of sworn personnel required to complete the checkpoint was 846 officers. Of this number, 825 officers, or 97.5%, completed the checkpoint. Checkpoint 3 was due in mid-June. The total number of sworn personnel required to complete the checkpoint was 847 officers. Of this number, 834 officers, or 98.5%, completed the checkpoint. After a thorough analysis on why outstanding evaluations were not completed, the appropriate corrective action for documents which were not completed were submitted for administrative investigation by internal affairs personnel.
APD continues to mandate training newly promoted supervisors on the proper procedure for completing the performance evaluation documents and reviewing the documents with their subordinates.

## Section 8:  Officers Assistance and Support (Paragraphs 247 – 253)

**247**.  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources.  To achieve this outcome, APD agrees to implement the requirements below.
**Paragraph 247 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 247.

**248.**  APD agrees to develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, including:  readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations.
**Paragraph 248 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 248.
**APD Response:**  Throughout the reporting period, members of the peer support team had the pleasure of addressing the newest Cadet Class, incoming Telecommunicators, and incoming PSA & PSA II classes.  Team members spoke to the recruits and new employees regarding peer support, stress management, and personal experiences at APD.  Peer support is available to all APD personnel, including those in on-the-job training (OJT).  This was an important opportunity for each employee and recruit to put faces to names prior to entering their new positions at APD.  They also received a quick reference handout with relevant behavioral health services available to our APD personnel.  In response to COVID-19 restrictions, Peer Support and the Behavioral Science Section (BSS) created an online series, titled 'Saving Sanity with Stories and Education.'  The eight online sessions provided an opportunity for CABQ employees and their families to share stories of coping, struggling, and resilience.  Mental health professionals and peer support members offered guidance, education, and support.  Additionally, the peer support team hosted two online programs featuring Jose Maresma, an exercise physiologist & health coach.  This series was offered in collaboration with the CABQ Health & Wellness division.  The video modules were presented online each week and any member of APD was welcome to attend.  Working together, Peer Support and several divisions throughout the department are developing a comprehensive officer wellness program at APD.  The program is dedicated to promoting physical and mental wellness through exercise, proper nutrition, and mental health treatment and support.  This evolved as a collaboration between CABQ Health & Wellness, the APD Academy, Peer Support, Behavioral Sciences Section, Chaplain's Unit, and PEMS.
The Peer Support Program also completed their biennial survey of APD personnel regarding their attitudes toward the Peer Support Program and available wellness resources at APD.  The survey findings show increased knowledge of program functions, increased confidence in their ability to contact a team member as needed, and increased levels of trust in team members.

**249.**  APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma.
**Paragraph 249 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 249.
**APD Response:**  See below at Paragraph 253.

**250.**  APD shall ensure that any mental health counseling services provided to APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care.
**Paragraph 250 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 250.
**APD Response:**  See below at Paragraph 253.

**251.**  APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.
**Paragraph 251 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 251.
**APD Response:**  See below at Paragraph 253.

**252.** APD shall develop and implement policies that require and specify a mental health evaluation before allowing an officer back on full duty following a traumatic incident (e.g., officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death) or as directed by the Chief.

**Paragraph 252 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 252.

**APD Response:**  See below at Paragraph 253.

**253.** APD agrees to compile and distribute a list of internal and external available mental health services to all officers and employees. APD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers.

**Paragraph 253 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for Paragraph 253.

**APD Response to Paragraphs 247 – 253:**

The Self Care Interactive Online Network (SCION) was founded by APD detectives and mental health professionals.  The program launched in August 2019 and is going strong.  The first six meetings were held during this reporting period.  Monthly online sessions include brief mental health self-care didactics, question and answer sessions, as well as opportunities for first responders to share stories of mental health challenges and resilience.  SCION set up a website with information about the program and access to past lectures and stories:  https://www.goscion.org/.

Dr. Nils Rosenbaum, Director of the Behavioral Health Division, BSS worked to promote laws that will help APD and the community, including Firearm Restraining Orders and the beginning of a proposal to improve access to workers comp for police officers exposed to trauma.

The BSS promoted mindfulness and stress reduction research at the University of New Mexico and has recruited enough participants in Albuquerque to start the intervention phase of the research locally.


## Section 9:  Community Engagement and Oversight (Paragraphs 254 – 293)


### A.  Community & Problem-Oriented Policing (Paragraphs 255-259)

**255.** APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.

**Paragraph 255 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.240a:** Conduct a semi-annual review including culture change survey of progress made across the department in achieving "culture change" and the integration of community policing principles throughout APD operations, and move more expeditiously to address deficiencies highlighted in the report;

**4.7.240b:** Provide training that meets national standards for School Resource Officer Units;

**4.7.240c:** Continue to work with other law enforcement and community partners to expand and reach significantly higher numbers high-risk youth through various levels of engagement programming.

**APD Response:**  The first semi-annual cultural change survey, comprising ten questions, was sent to all sworn officers via Power DMS in July 2019.  The second survey was scheduled to be administered in January 2020, but was ultimately sent to all sworn officers in February 2020.  Results from the July 2019 cultural survey were provided with the second survey to allow for comparison by participants.  The cultural change survey determined that officers did not adequately understand the requirements for community engagement, performance reviews, and policy issues.  To address questions about community impact, COP/POP training addresses the community impact aspect of law enforcement.    To address deficiencies with performance reviews, the Department is implementing a new performance review system, with the addition of a 360-degree review process. Finally, all policies are available for review on Power DMS, all officers are given the opportunity to comment on pending policies and a policy change form is available on the Power DMS home page.

The National Association of School Resource Officers (NASRO) has been contacted and a packet to request training was obtained in January 2020.  Due to COVID-19, large gathering restrictions were set in place resulting in cancellation of all trainings and travel restrictions.  The request for NASRO training will not be made until the ability to train large groups is authorized again.  The goal is to have NASRO come to Albuquerque to train the 9 APD School Resource Officers and those officers on APD interested in becoming School Resource Officers (SRO). To accommodate neighboring jurisdictions an invitation will be sent to for a limited amount of seats. APD is seeking other nationally recognized SRO training alternatives.  The research to those alternatives is currently being conducted. No further information has been obtained regarding alternatives to SRO training.  This will be a prioritized action item to be completed by October 2020.

Community outreach and partnerships have continued despite many events that may have been cancelled. Planning for future events is also being conducted.

The School Resource Officer (SRO) Program has been assessed and a plan to further re-structure is in process. An SRO standard operating procedure is in development and nearly ready to be proposed as a policy recommendation.  In an attempt to reach more youth throughout Albuquerque with the limited amount of SROs, APD is proposing to adopt a roving SRO model.  SROs are working with Albuquerque Public Schools (APS) to follow up with at-risk youth. APD SROs will be conducting welfare checks with the youth unable to be contacted until school begins.  This direction is a measure of how the SRO Unit is adapting to the COVID pandemic.

The first training group for Imprint was held and 20 officers attended. The program is designed to engage with all 1st grade classes of a Title 1 School.  At this time, 22 schools are involved and APS is prepared to engage with over 1000 youth on a monthly basis.  The youth will engage consistently with the same officer month to month in order to strengthen relationships. Many local businesses have supported the program through sponsorships. Imprint is expected to continue in a face-to-face or virtual platform. Communications have opened with the School Superintendent and the program is welcomed.

The Rapid Accountability Diversion (RAD) Program and policy is being developed.  A program manager with a restorative justice background has been hired to help develop and manage the program.  RAD is designed to offer 1st time misdemeanor offenders an opportunity to complete a diversion pre-adjudication program rather than be introduced to the court.  The goal is to reduce recidivism and strengthen relationships in the community. The program will be for juveniles as well as young adults.

The summer camps that have been held for the past 2 years with the USAO, AFR, DEA and National Guard were cancelled due to COVID-19, and virtual camps were held in their place.  Not only is this an opportunity to continue the youth camps, but by going virtual the expectation is to reach out to more children than have participated in the past. Continuing relationship with the Children Youth and Family Department (CYFD) State Director will assist in having many at risk youths participate in the virtual camp.  The Virtual Camp "Fearless" was launched on July 8, 2020.  The 31 videos that comprise the Virtual Camp have had over 2,500 views. Many participation packets have been coming in and a total number will not be known until August 5, 2020, which is the deadline. An analysis of the Virtual Camp project will be completed in order to refine the program and make it the best product APD can offer the community.

**256.** As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing.
**Paragraph 256 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.241a:** Continue to make new staffing allocation and deployment a priority, and take the necessary steps to gain important input and support from settlement agreement partners and community stakeholders including Community Policing Councils CPCs;
**4.7.241b:** Adjust the staffing plan as required based on initial experience and consider a partnership with a local university criminal justice department to assist in developing more specific performance metrics and how to use as those metrics as effective management tools.
**4.7.241c:** Ensure that Proactive Response Team (PRT) activity is expanded as needed, fielding adequate numbers of specifically trained PRT officers who are guided by specific, tangible, and quantitative goals and objectives.
**APD Response:**  The new action plan for staffing PRT is in phases.  The first phase is to have every area command at minimum be staffed with one sergeant and two permanently assigned officers. The first phase of the action plan will be implemented no later than the end of 2020.  The final phase staffing action plan is to be completed when resources allow.  The final phase includes: Northwest, Southwest and Foothills Area Commands with one sergeant and five officers; the Southeast and Northeast Area Commands will have two sergeants and ten officers. The Valley Area Command, will have two sergeants and ten officers in addition to the current staffing for the downtown teams.  Once the two vacant sergeant positions are filled, the phase one staffing action plan will be 100% completed.

**257.** APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality-of-life issues.

**Paragraph 257 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.242a**:  Continue with existing planning processes, while eventually adding detailed statements of program related goals and quantifiable objectives for the proposed processes.

**APD Response:**  A tab has been created on APD's Protopage specifically for Field Services Bureau that went live in August 2020.  It contains a link to bid packets, beat maps and a section for supervisors that includes emergency contact phone numbers for officers.  Discussion boards are still in development that will allow officers to discuss issues within their beats and the area commands.

**4.7.242b**:  Include quantifiable, measurable objectives for each program element, and evaluate success rates at least quarterly.

**APD Response:**  The Field Services Protopage includes bid packet assessments that test beat familiarity and area command knowledge that can be graded and tracked.

**258.** Within 12 months of the Operational Date, APD agrees to provide 16 hours of initial structured training on community and problem-oriented policing methods and skills for all officers, including supervisors, commanders, and executives.  This training shall include:

   a) methods and strategies to improve public safety and crime prevention through community engagement;

   b) leadership, ethics, and interpersonal skills;

   c) community engagement, including how to establish formal partnerships and actively engage community organizations, including youth, homeless, and mental health communities;

   d) problem-oriented policing tactics, including a review of the principles behind the problem solving framework developed under the "SARA Model" (Scanning, Analysis, Response, Assessment), which promotes a collaborative, systematic process to address issues of the community, safety, and quality of life;

   e) conflict resolution and verbal de-escalation of conflict; and

   f) cultural awareness and sensitivity training.    These topics shall also be included in APD's annual in-service training.

**Paragraph 258 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.243a**:  Ensure that supervisory processes are oriented with the COP training and new COP goals and objectives.

**APD Response:**  The newly revised POP/COP training program was to be delivered to the Department early this year.   With the COVID-19 restrictions, the training was suspended.  The training began in July 2020 and will continue until all personnel attend.

**259.** Within six months of the Operational Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross-section of stakeholders.

**Paragraph 259 remains in Secondary Compliance.**

**IMR – 11 Recommendations:**

**4.7.244a**:  Develop additional standard reporting protocols of TRaCS and partnership data and partnership data.

**APD Response:**  The Traffic and Criminal software (TraCs) form is complete and in use, however, the need to ensure it is being used correctly by field officers is the next step that must be taken.  Further training regarding the use and purpose of the form will be conducted during the COP/POP Class from paragraph 258.  APD is actively working on integrating an electronic application that will assist not only with tracking community events, but also how officers are responding to the issues identified by the community.  A presentation on the application and process was given to all area commanders, crime prevention specialists and some of the executive staff.  The new application is being tested by PRT officers and soon crime prevention specialists will be given the introduction and will learn how use this application.

**4.7.244b:** Identify community service organizations and advocacy groups that serve and represent high risk populations, and better document those partnerships including background, referral arrangements, if any, resource sharing if any, decision-making, roles, and responsibilities of parties.

**APD Response:**  As of April 2020, a new area command monthly tracking sheet was introduced that includes partnerships.  An email was sent to each commander on what is expected in order to track the difference between community events and partnerships.  This is a work in progress as further emphasis on the nature of the partnerships indicated the need for more detail.  The current method

of tracking such partnerships should be considered temporary until a more permanent data tracking method can be integrated. Discussion of whether or not a database should be put into effect to capture the more formal partnerships such as MOUs will be conducted.  This not only will allow APD leadership the ease of access to view such partnerships, but will allow the sustainability of dissemination of such important information.  The database will allow for a better view of the partnerships being created and clarity as to the depth of those partnerships.  Discussions with APD leadership is planned in the coming weeks.

## B. Community Meetings & Public Information (Paragraphs 260-265)

**260.** APD shall develop a Community Outreach and Public Information program in each Area Command.
**Paragraph 260 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.245a:** Seek outside assistance to develop and document Area Command public information strategies and programing by developing planning templates and aiding Area Commands in formulating customized approaches for each Area Command.
**APD Response:**  A memorandum was generated and distributed to all the area commanders in order to standardize the information needed to improve public information strategies.  The COVID-19 pandemic has not had as much of an effect on this process as we can continue to create a better process through virtual meetings with area commanders.  The area that does make it challenging is creating a better system of providing the public with information.  APD is discussing options for better management of area command websites, exploring the option of having a twitter account that will be monitored by Department social media personnel.  This will provide increased information sharing for the community and not another discussion platform, but an informational one.

**261.** The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command that is open to the public.  During the meetings, APD officers from the Area Command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings.
**Paragraph 261 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 261.
**APD Response:**  CPC meetings were affected by the pandemic because they had to be suspended as a result of the COVID-19 restrictions. Meetings were conducted in January and February 2020 for several area commands, including the Valley, Southeast, and Northwest. In March 2020, just before the restrictions were implemented, the Foothills, Northeast, and Southwest Area Command CPC meetings were conducted. The CPC meetings reconvened in early July of this year and several area commands have hosted those meetings virtually.

**262.** The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement.  The meetings shall also include public education on an individual's rights and responsibilities during a police encounter.
**Paragraph 262 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 262.

**263.** For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area Command shall attend at least two community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned.
**Paragraph 263 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 263.

**264.** APD shall continue to maintain and publicly disseminate accurate and updated crime statistics on a monthly basis.
**Paragraph 264 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.249a:**  Post 2019 crime statistics on APD's website as soon as practicable.
**APD Response:**  APD is working with the City Department of Technology and Innovation to create a new calls for service preliminary data link for the website.

**265.** APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD's website, with reasonable exceptions for materials that are legally exempt or protected from disclosure.
**Paragraph 265 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 265.

C.  Community Policing Councils (Paragraphs 266-270)

**266.** The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level.  The Community Policing Councils shall meet, at a minimum, every six months.
**Paragraph 266 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 266.

**267.** In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross-section of community members and APD officers, including, for example, representatives of social services providers and diverse neighborhoods; leaders in faith, business, or academic communities; and youth.  Members of the Community Policing Councils shall possess qualifications necessary to perform their duties, including successful completion of the Citizens Police Academy.
**Paragraph 267 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 267.

**268.** The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement.  APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues.  In order to foster this collaboration, APD shall share appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure.
**Paragraph 268 remains in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 258.

**269.** APD shall seek the Community Policing Councils' assistance, counsel, recommendations, or participation in areas including:
  a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;
  b) reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;
  c) providing information to the community and conveying feedback from the community to APD;
  d) advising the Chief on recruiting a qualified, diverse workforce; and
  e) advising the Chief on ways to collect and publicly disseminate data and information, including information about APD's compliance with this Agreement, in a transparent and public-friendly format to the greatest extent allowable by law.
**Paragraph 269 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 269.

**270.** The Community Policing Councils shall memorialize their recommendations in an annual public report that shall be posted on the City's website.  The report shall include appropriate safeguards not to disclose information that is legally exempt or protected from disclosure.
**Paragraph 270 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.255a:**  Develop and deliver required annual reports.

**APD Response to Paragraphs 266 – 270:**  During this reporting period, with the exception of March through June 2020, during COVID-19 restrictions, CPC meetings continued, exceeding CASA requirements of one meeting every six months.  During this time, APD continued to provide the CPCs with crime data and crime fighting initiatives.  After the publication of IMR-11 in May 2020, APD provided each CPC with an update on CASA transformation efforts and compliance levels via email.  In July 2020, CPC meetings

resumed using Zoom Video Communications.  These successful and productive meetings included community members, sworn officers and CPC voting members.   The City continued working on drafting an ordinance, providing the CPC's mission, roles and responsibilities, and governance requirements.  The CPCs are transitioning from APD to Civilian Police Oversight Agency (CPOA) administrative facilitation and oversight.  During the COVID-19 restriction downtime, CPC chairs, the CPOA executive director, the City, the Independent Monitoring Team, and the Department of Justice worked together remotely to reevaluate CPC member criteria to increase membership representative of a cross-section of community members and recruit members who will bring valuable insight into the CPC process.   Reevaluation changes include:

   a) Moving forward, CPC member attendance at the Citizen's Police Academy (CPA), will not be required but recommended. This necessitates an amendment to the CASA, and until that is finalized an agreement to suspend the requirement will remain in place.
   b) Ride-alongs are no longer required for CPC members, but recommended.
   c) Background checks for CPC members are not required unless one chooses to attend a ride-along, then a background check will be conducted.
   d) A criminal history will not exclude a person from serving on a CPC, however, current active felony warrants or criminal charges will disqualify a person from membership.

The City continues to provide resources necessary for the CPCs to fulfil their mission and the requirements of the CASA.  During the transition to CPOA administrative facilitation and oversight, the APD employee who has worked with CPCs in the past will continue to do so and train any new personnel taking on those responsibilities to ensure there is not a lapse in resources or assistance.


## D.  Civilian Police Oversight Agency (CPOA) (Paragraphs 271-292)

**271.** The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD.  The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force.
**Paragraph 271 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 271.


**272.** The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance.
**Paragraph 272 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 272.


**273.** The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque.
**Paragraph 273 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 273.


**274.** Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:
   a) this Agreement and the United States' Findings Letter of April 10, 2014;
   b) the City ordinance under which the agency is created;
   c) state and local laws regarding public meetings and the conduct of public officials;
   d) civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;
   e) all APD policies related to use of force, including policies related to APD's internal review of force incidents; and f) training provided to APD officers on use of force.
**Paragraph 274 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 274.

**275.** The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement.
**Paragraph 275 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 275.

**276.** The City shall require those appointed to the agency to perform at least two ridealongs with APD officers every six months. There were no IMR – 11 recommendations for Paragraph 276, which remains in Operational Compliance.
**Paragraph 276 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 276.

**277.** The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force.
**Paragraph 277 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 277.

**278.** The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws.  The agency shall have the authority to hire staff and retain independent legal counsel as necessary.
**Paragraph 278 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 278.

**279.** The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review of serious uses of force and officer-involved shootings.  The investigative staff shall be selected by and placed under the supervision of the Executive Director.  The Executive Director will be selected by and work under the supervision of the agency.  The City shall provide the agency with adequate funding to ensure that the agency's investigative staff is sufficient to investigate civilian complaints and review serious uses of force and officer-involved shootings in a timely manner.
**Paragraph 279 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 279.

**280.** The Executive Director will receive all APD civilian complaints, reports of serious uses of force, and reports of officer-involved shootings.  The Executive Director will review these materials and assign them for investigation or review to those on the investigative staff.  The Executive Director will oversee, monitor, and review all such investigations or reviews and make findings for each.  All findings will be forwarded to the agency through reports that will be made available to the public on the agency's website.
**Paragraph 280 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.265a:**  CPOA and IAPS should avoid conducting independent investigations of the same alleged misconduct. Jurisdiction should lie with one office or the other.
**4.7.265b:**  In the rare instance in which an external complaint and an internal complaint address the same subject matter, an agreement should be made regarding which office will conduct the investigation or a joint investigation with one set of findings should be conducted.
**APD Response:**  APD and the CPOA continue to communicate and improve processes to avoid conducting independent investigations of the same alleged misconduct.

**281.** Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible.
**Paragraph 281 remains in Operational Compliance.**
There were no IMR – 11 recommendations for Paragraph 281.

**282.** The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:

a) all civilian complaints, including those submitted anonymously or by a third party;

b) the identities of officers involved in incidents under review;

c) the complete disciplinary history of the officers involved in incidents under review;

d) if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);

e) all APD policies and training; and

f) if requested, documents, reports, and other materials for incidents that may evince an overall trend in APD's use of force, internal accountability, policies, or training.

**Paragraph 282 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 282.

**APD Response:**  The CPOA continues to have access to all files and reports housed by APD.  Disciplinary history and ongoing investigations have been provided when requested.


**283.** The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director upon reasonable notice.  The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement.

**Paragraph 283 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 283.


**284.** The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times.

**Paragraph 284 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 284.

**APD Updates for Paragraphs 283 and 284:**  The CPOA and its investigators have access to the APD Main and substations. They retrieve materials from IAPS when requested and IAPS houses all completed CPOA cases in order to ensure confidentiality and safety.


**285.** The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed.

**Paragraph 285 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 285.


**286.** The findings of the Executive Director shall be documented by APD's Internal Affairs Division for tracking and analysis.

**Paragraph 286 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 286.


**287.** The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency.

**Paragraph 287 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 287.


**288.** The agency shall make recommendations to the Chief regarding APD policy and training.  APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes.

**Paragraph 288 remains in Operational Compliance.**

**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 288.


**289.** For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded.

**Paragraph 289 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 289.

**290.** The agency shall conduct regular public meetings in compliance with state and local law.  The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD.
**Paragraph 290 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 290.

**291.** The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status
**Paragraph 291 remains in Operational Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 291.

**292.** The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:
   a) number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Chief;
   b) demographic category of complainants;
   c) number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Chief;
   d) number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief;
   e) policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;
   f) policy changes recommended by the agency, including any dispositions by the Chief;
   g) public outreach efforts undertaken by the agency and/or Executive Director; and
   h) trends or issues with APD's use of force, policies, or training.
**Paragraph 292 is in Secondary Compliance.**
**IMR – 11 Recommendations:**
**4.7.277a:** CPOA should specifically identify the points causing noncompliance with this paragraph and work with APD and the monitoring team to decide upon processes that will move work processes into compliance.

# Section 10:  Assessing Compliance (Paragraph 320)

## A.  Access and Confidentiality

**320.** To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City.  The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings.  APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.
**Paragraph 320 is in Secondary Compliance.**
**IMR – 11 Recommendations:**  There were no IMR – 11 Recommendations for paragraph 320.
**APD Response:**  The City has a process for and continues to notify the monitor in a timely manner, of any critical firearms discharge, in-custody death, or arrest of any officer.

# VIII.  Conclusion

APD remains committed to implementing and sustaining the requirements of the CASA.  The progress made during this reporting period highlights the Department's ability to work collaboratively with stakeholders to implement positive change.  Through guidance and feedback from the IMT and DOJ, APD will continue to work towards full operational compliance in all CASA paragraphs.

## IX. Appendix

    A.   Detailed Scorecards

    B.   Enhanced Crisis Intervention Team (ECIT) Workload Study

# Detailed Scorecard



Review Month: February 2020 for January data
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW (In pilot October - December 2019) | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 95% | 98% | 100% | 98% | 97% | 100% | 98% | | |
| (P224) Mandatory recording incidents under APD policy | 88% | 100% | 100% | 100% | 100% | 100% | 98% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Shall carry only agency approved firearms | 100% | 91% | 100% | 100% | 100% | 100% | 98% | | |
| (P18) Shall carry only agency approved ammunition | 100% | 91% | 97% | 100% | 100% | 100% | 98% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 4 | 4 | 5 | 5 | 5 | 4 | 4.5 | | |
| (P32) ECW is carried on weak-side holster | 100% | 91% | 100% | 100% | 100% | 100% | 98% | | |
| (P225) Equipment inspection | 100% | 91% | 100% | 100% | 100% | 100% | 98% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 91% | 100% | 100% | 100% | 100% | 98% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P225) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| | | | | | | | | | |
| MonthYear | 2 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: March 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 95-100% | |
| **MONTHLY INSPECTIONS** | | | | | | | | 85-94% | |
| ⊞ ECW (In pilot October - December 2019) | | | | | | | | ≤ 84% | |
| ⊟ OBRD | | | | | | | | | |
| (P230) Video Uploaded by the end of subsequent shift | 99% | 100% | 98% | 100% | 99% | 100% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Shall carry only agency approved firearms | 93% | 100% | 76% | 100% | 100% | 100% | 95% | | |
| (P18) Shall carry only agency approved ammunition | 100% | 100% | 79% | 100% | 100% | 100% | 96% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 5 | 5.5 | 5.5 | 5 | 7 | 3 | 5.2 | | |
| (P32) ECW is carried on weak-side holster | 100% | 97% | 82% | 100% | 100% | 100% | 96% | | |
| (P225) Equipment inspection | 100% | 100% | 82% | 100% | 100% | 100% | 97% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 82% | 100% | 100% | 100% | 97% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 0% | 50% | 100% | 100% | 100% | 100% | 75% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (SW/SE only. Next Inspection for all: March 2020) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | 100% | 100% | 100% | 100% | 96% | 100% | 99% | | |
| (P20) Successfully qualify on other authorized firearm | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊞ Citizen Complaint Forms (Next Inspection: July 2020) | | | | | | | | | |
| ⊞ Community Policing Council (Next Inspection: July 2020) | | | | | | | | | |
| | | | | | | | | | |
| **Month/Year** | 3 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: April 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 95-100% |
| **MONTHLY INSPECTIONS** | | | | | | | | 85-94% |
| ⊞ ECW (In pilot October - December 2019) | | | | | | | | ≤ 84% |
| ⊟ OBRD | | | | | | | | |
| (P230) Video Uploaded by the end of subsequent shift | 96% | 100% | 99% | 100% | 100% | 100% | 99% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Firearms | | | | | | | | |
| (P18) Shall carry only agency approved firearms | 100% | 97% | 100% | 97% | 100% | 96% | 98% | |
| (P18) Shall carry only agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6 | 7 | 5.5 | 5 | 8 | 7 | 6.4 | |
| (P32) ECW is carried on weak-side holster | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | | 100% | 100% | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | | 67% | 93% | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | | 100% | 100% | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| ⊟ ECW (Next Inspection: - ) | | | | | | | | |
| (P37) Quarterly ECW upload | 100% | 99% | 100% | 100% | 98% | 100% | 100% | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| ⊟ Firearms (SW/SE only. Next Inspection for all: March 2020) | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P20) Successfully qualify on other authorized firearm | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | |
| ⊞ Community Policing Council | | | | | | | | |
| **Month/Year** | 4 | 2020 | | | | | | |

# Detailed Scorecard



Review Month: May 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% |
| ⊞ ECW (In pilot October - December 2019) | | | | | | | | 85-94% |
| ⊟ OBRD | | | | | | | | ≤ 84% |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 98% | 98% | 100% | 100% | 100% | 99% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Firearms | | | | | | | | |
| (P18) Shall carry only agency approved firearms | 93% | 94% | 100% | 100% | 100% | 96% | 97% | |
| (P18) Shall carry only agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6.5 | 4.5 | 7.5 | 5.25 | 4.5 | 4.25 | 5.4 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 92% | 99% | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 96% | 100% | 97% | 100% | 100% | 100% | 99% | |
| ⊟ 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P53) Documentation present of a Commander approving an extension request | 80% | 100% | 100% | 100% | 100% | 100% | 97% | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊞ **QUARTERLY INSPECTIONS** | | | | | | | | |
| ⊞ **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| | | | | | | | | |
| Month\Year | 5 | 2020 | | | | | | |

# Detailed Scorecard



Review Month: May 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS T1/T2 | Total | Legend |
|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | **95-100%** |
| ⊞ **ECW (In pilot)** | | | **85-94%** |
| ⊟ **OBRD** | | | **≤ 84%** |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | |
| (P224) Mandatory recording incidents under APD policy | 90% | 90% | |
| ⊟ Firearms | | | |
| (P18) Shall carry only agency approved firearms | 83% | 83% | |
| (P18) Shall carry only agency approved ammunition | 100% | 100% | |
| ⊟ Supervision | | | |
| (P207) Supervision 8:1 Ratio for a day | 7.5 | 7.5 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | |
| (P225) Equipment inspection | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | |
| ⊞ 72 Hour Extension | | | |
| **QUARTERLY INSPECTIONS** | | | |
| ⊟ ECW (Next Inspection: July 2020) | | | |
| (P37) Quarterly ECW upload | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | |



# Detailed Scorecard

Review Month: June 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW (In pilot October - December 2019) | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 100% | 100% | 99% | 99% | 100% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 7 | 8 | 6.3 | 4.0 | 5 | 7 | 6.2 | | |
| (P32) ECW is carried on weak-side holster | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| (P225) Equipment inspection | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊞ **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊞ **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| | | | | | | | | | |
| MonthYear | 6 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: June 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS T1/T2 | Total | Legend |
|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | **95-100%** |
| ⊞ **ECW (In pilot)** | | | **85-94%** |
| ⊟ **OBRD** | | | **≤ 84%** |
| (P230) Video Uploaded by the end of subsequent shift | 92% | 92% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | |
| ⊟ Firearms | | | |
| (P18) Inspection of carrying agency approved firearms | 50% | 50% | |
| (P18) Inspection of carrying agency approved ammunition | 50% | 50% | |
| ⊟ Supervision | | | |
| (P207) Supervision 8:1 Ratio for a day | 7 | 7.0 | |
| (P32) ECW is carried on weak-side holster | 50% | 50% | |
| (P225) Equipment inspection | 50% | 50% | |
| (P225) Two video reviews per officer completed by the sergeant | 50% | 50% | |
| ⊞ **72 Hour Extension** | | | |
| **QUARTERLY INSPECTIONS** | | | |
| ⊟ ECW (Next Inspection: July 2020) | | | |
| (P37) Quarterly ECW upload | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | |



# Detailed Scorecard

Review Month: July 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% |
| ⊞ ECW (In pilot October – December 2019) | | | | | | | | 85-94% |
| ⊟ OBRD | | | | | | | | ≤ 84% |
| (P230) Video Uploaded by the end of subsequent shift | 99% | 100% | 100% | 99% | 100% | 99% | 100% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 96% | 100% | 97% | 100% | 100% | 100% | 99% | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 4 | 4.3 | 5.3 | 5.5 | 4.5 | 2.5 | 4.4 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 89% | 100% | 100% | 100% | 100% | 100% | 98% | |
| ⊞ 72 Hour Extension | | | | | | | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| ⊟ ECW (Next Inspection: - ) | | | | | | | | |
| (P37) Quarterly ECW upload | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| | | | | | | | | |
| **MonthYear** | 7 | 2020 | | | | | | |

# Detailed Scorecard



Review Month: July 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS T1/T2 | Total | Legend |
|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | **95-100%** |
| ⊞ ECW (In pilot) | | | **85-94%** |
| ⊟ OBRD | | | **≤ 84%** |
| (P230) Video Uploaded by the end of subsequent shift | 96% | 96% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | |
| ⊟ Firearms | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | |
| ⊟ Supervision | | | |
| (P207) Supervision 8:1 Ratio for a day | 4 | 4.0 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | |
| (P225) Equipment inspection | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | |
| ⊞ 72 Hour Extension | | | |
| **QUARTERLY INSPECTIONS** | | | |
| ⊟ ECW (Next Inspection: July 2020) | | | |
| (P37) Quarterly ECW upload | 100% | 100% | |
| **SEMI-ANNUALLY INSPECTIONS** | | | |

| Scorecard | MOTORS T1/T2 | Total | Legend |
|---|---|---|---|
| ⊟ **Firearms (Next Inspection: June 2020)** | | | |
| (P20) Successfully qualify on primary duty weapon | 100% | 100% | |
| (P20) Successfully qualify on other authorized firearm | 100% | 100% | |
| | | | |
| **Month/Year** | **5** | | |



# ECIT 2020 Workload Study

**2020 Update Prepared by**

Matt Dietzel, Lieutenant, Crisis Intervention Section

**Workload Spreadsheet originally developed by**

Dr. Peter Winograd

# Required minimum coverage for ECIT officers by shift



- Each shift needs at least the listed number of ECIT officers in order to ensure coverage for mental health calls.
- Mobile Crisis Team can reinforce shifts/areas where coverage is low, if required.
  - Please assist CIU in recruiting ECIT officers in that shift if this occurs.

|     | Grave | Days | Swing |
| --- | --- | --- | --- |
| **SE** | 3 | 5 | 4 |
| **NE** | 3 | 5 | 4 |
| **VA** | 3 | 4 | 3 |
| **SW** | 3 | 3 | 3 |
| **FH** | 3 | 3 | 3 |
| **NW** | 3 | 3 | 3 |

2

# Top CIT Contact Beats



- Please assign ECIT officers to the top 5 CIT Contact Beats in each Area Command, especially during high call volume shifts (days and swing)

## Southwest:

### Total Contacts

| Day | Swing | Grave |
|---|---|---|
| 238 | 289 | 169 |

### Top 5 Beats

| Beat | Contacts |
|---|---|
| 124 | 116 |
| 116 | 74 |
| 134 | 61 |
| 111 | 52 |
| 114 | 47 |

## Valley:

### Total Contacts

| Days | Swing | Grave |
|---|---|---|
| 410 | 423 | 192 |

### Top 5 Beats

| Beat | Contacts |
|---|---|
| 224 | 148 |
| 225 | 108 |
| 226 | 106 |
| 234 | 97 |
| 236 | 72 |

**CIT Contact Sheets June 30, 2019 to June 30, 2020**

# Top CIT Contact Beats



- Please assign ECIT officers to the top 5 CIT Contact Beats in each Area Command, especially during high call volume shifts (days and swing)

## Southeast:

### Total Contacts

| Days | Swing | Grave |
|------|-------|-------|
| 606  | 558   | 247   |

### Top 5 Beats

| Beat | Contacts |
|------|----------|
| 334  | 272      |
| 333  | 165      |
| 336  | 142      |
| 325  | 124      |
| 322  | 122      |

## Northeast:

### Total Contacts

| Days | Swing | Grave |
|------|-------|-------|
| 513  | 529   | 301   |

### Top 5 Beats

| Beat | Contacts |
|------|----------|
| 413  | 232      |
| 423  | 225      |
| 422  | 188      |
| 431  | 143      |
| 434  | 131      |

**CIT Contact Sheets June 30, 2019 to June 30, 2020**

4

# Top CIT Contact Beats



- Please assign ECIT officers to the top 5 CIT Contact Beats in each Area Command, especially during high call volume shifts (days and swing)

## Foothills:

### Total Contacts

| Day | Swing | Grave |
|-----|-------|-------|
| 393 | 408 | 257 |

### Top 5 Beats

| Beats | Contacts |
|-------|----------|
| 523 | 227 |
| 531 | 197 |
| 532 | 167 |
| 524 | 143 |
| 521 | 109 |

## Northwest:

### Total Contacts

| Days | Swing | Grave |
|------|-------|-------|
| 238 | 360 | 188 |

### Top 5 Beats

| Beat | Counts |
|------|--------|
| 616 | 74 |
| 613 | 65 |
| 634 | 54 |
| 614 | 50 |
| 624 | 49 |

**CIT Contact Sheets June 30, 2019 to June 30, 2020**

5