Monitor's Twelfth Report

Compliance Levels of the Albuquerque Police Department and the City of Albuquerque with Requirements of the Court-Approved Settlement Agreement

No. CIV 14-1025-JB-SMV

November 2, 2020

Prepared by: Public Management Resources, Inc. James D. Ginger, Ph.D., Independent Monitor

**Table of Contents**

| Topic | | Page |
|---|---|---|
| 1.0 | Introduction | 1 |
| 2.0 | Executive Summary | 1 |
| 3.0 | Synopsis of Findings | 3 |
| 4.0 | Current Status | 4 |
| 4.1 | Overall Status Assessment | 4 |
| 4.2 | Dates of Project Deliverables | 5 |
| 4.3 | Format for Compliance Assessment | 5 |
| 4.4 | Compliance Assessment | 6 |
| 4.5 | Operational Definition of Compliance | 7 |
| 4.6 | Operational Assessment | 7 |
| 4.7 | Assessing Compliance with Individual Tasks | 8 |
| 5.0 | Summary | 353 |

## 1.0 Introduction

This Independent Monitor's Report (IMR) follows the same format as all previous reports. That format is organized into five sections:

1.0  Introduction;
2.0  Executive Summary;
3.0  Synopsis of Findings;
4.0  Compliance Findings; and
5.0  Summary.

The purpose of the monitor's periodic compliance reports is to inform the Court of the monitor's findings related to the progress made by APD in achieving compliance with the individual requirements of the CASA.  This report covers the compliance efforts made by APD during the 12th monitoring period, which covers February 2020 through July 2020.

## 2.0 Executive Summary

The 12th monitoring report addresses compliance efforts at APD from February 1, 2020 to July 31, 2020.  As is its usual practice, the monitoring team conducted a full and detailed "site visit" process, including gathering data (on an on-going basis) describing inputs, outcomes, and status conditions of each CASA paragraph.  Our monitoring modalities this reporting period were somewhat different than those for past reports due to travel restrictions related to COVID-19, which substantially restricted our ability to conduct on-site assessments, as has been past practice.  Site visit protocols for this reporting period were effectuated using electronic "meetings" via Zoom, and increased reliance on telephonic discussions, electronic data transfer, and a substantial increase in one-on-one topic-specific discussions with APD personnel.  Our data collection modalities remained virtually the same, since we maintained our usual highly detailed and routinized data acquisition processes.  This consisted of members of the monitoring team providing detailed and comprehensive data requests to APD for "course of business documentation" related to all CASA paragraphs.  Under no circumstances were our determinations based on APD's provision of documents of preference.  During preparation of this report, the monitoring team reviewed current versions of dozens of APD CASA-related policies, official APD offense, arrest, supplemental, and other formal field-based reports, dozens of officer-generated On-Body Recording Device (OBRD) videos, administrative "process" reports, internally generated self-assessment reports, disciplinary reports, process planning reports, and other CASA-related documents.

The monitoring team continued its in-depth assessment of APD's compliance efforts reviewing each paragraph of the CASA and collecting data, written information, and at times engaging in detailed, critical, and comprehensive course-of-business documentation review.  The 12th monitor's report, in short, reflects our assessment of the successes and failures of APD's compliance efforts for the reporting period.  Our

1

detailed assessments of APD's compliance processes for the 12th reporting period are provided in the following paragraphs.

During the IMR-12 monitoring period, APD continued its compliance processes that, in the past, have proven effective.  The Compliance and Oversight Division continues to generate thoughtful, high quality work related to administrative practices.  Policy development and promulgation processes are industry-standard and represent some of the most reliable practices at APD at the current time.  COD's inspection and audit practices serve as an example for other agencies interested in data-centric assessment of field operations.  APD's Special Operations practices continue to exhibit strong field-based activities, as well as industry-standard processes of after-action documentation, review and assessment.  Further, Behavioral Health practices and crisis intervention practices continue their past industry-standard service the officers of APD and the residents of the City of Albuquerque.  Further, APD's recruiting practices are making solid progress in generating outreach and recruiting functions designed to increase the numbers and quality of new recruits for APD.

APD's compliance efforts have exhibited serious shortfalls during the IMR-12 reporting period.  These range from critical shortfalls in management and oversight of the APD Training Academy, significant and deleterious failures relating to oversight and discipline; and executive-level failures regarding oversight, command and control, discipline, supervision, and training.  During this reporting period (February through July 2020) virtually all of these failures can be traced back to leadership failures at the top of the organization.  During the past two reporting periods, the monitor has provided more direct technical assistance, advice, high-level problem identification, mid-level problem-solving processes, and executive-level consultation than was provided in any of the monitor's previous monitoring experiences.  Each of our reports is accompanied by an exhaustive list of recommendations for improvement in any CASA compliance area that was not found in compliance.  Those lists of recommendations detail hundreds of process improvement designs.  The vast majority of these recommendations appear to have been filed away, rather than actualized.

Since the inception of this monitoring process in 2015, we have been as open and honest as possible with APD executive leadership and have never noted a problem at APD without following up with suggestions regarding how APD might best address that problem.  At this stage of the process most of those discussions at the executive level have fallen on deaf ears.  After six years of suggestions, recommendations, and problem-solving meetings, as of the end of the IMR-12 reporting period, much remains to be done.

Specifically, APD must consider the following areas of compliance to be exigent processes that need to be refined; modified; re-engineered; or simply paused, reassessed, redesigned, and reimplemented.

- Training;
- Process design and development;

2

- Supervision;
- Discipline;
- Leadership; and
- Oversight.

To be perfectly clear, based on the monitor's experience with these projects (dating back to the 1990s) APD is on a path that reflects deliberate indifference to the requirements of the CASA. We highly recommend that the City take direct steps to put APD on an alternate trajectory regarding compliance efforts:

- APD's new leadership, which assumed leadership responsibilities after the close of this reporting period, must step up and insist on compliance.

- Management needs to design simple, effective, trackable systems for process improvement.

- Supervision needs to leave behind its dark traits of myopia, passive resistance, and outright support for, and implementation of, counter-CASA processes.

- Most importantly, line officers need to engage in actions as designed by policy, law, and best practice, not past customs.

Until these actions take place, compliance will be exceptionally evasive.

We note that in September 2020, the City announced the retirement of the former Chief of Police and selected a new interim chief (the former First Deputy Chief) and announced its intention to run a full selection process for a new permanent chief. The announcement was necessitated by the retirement of the former chief of police. The reader should note that references to the "Chief of Police" in this report refer to the now-retired former Chief of Police who served as Chief of Police throughout the 12th reporting period. References to the current acting chief of police refer to the now-acting interim Chief of Police[1].

## 3.0 Synopsis of Findings for the 12th Reporting Period

As of the end of the IMR-12 reporting period, APD's compliance levels are as follows:

Primary Compliance          100%;
Secondary Compliance         91%; and
Operational Compliance       64%.

---

[1] The former Chief of Police retired on September 25, 2020. The First Deputy Chief was appointed Acting Chief of Police on September 11, 2020 and named Interim Chief of Police on September 26, 2020.

3

Since the last report, IMR-11, the following changes in compliance levels are noted:

Primary Compliance:          No change at 100%;

Secondary Compliance:    A loss of 2.2 percent; and

Operational Compliance:    A loss of 3.0 percent.

## 4.0 Current Compliance Assessments

As part of the monitoring team's normal course of business, it established a base-line assessment of all paragraphs of the CASA for the Independent Monitor's first report, (IMR-1). This was an attempt to provide the Parties with a snapshot of existing compliance levels and, more importantly, to provide the Parties with identification of issues confronting compliance as APD continues to work toward full compliance. As such, the baseline analysis is considered critical to future performance in APD's reform effort as it gives a clear depiction of the issues standing between the APD and full compliance. This report, IMR-10, provides a similar assessment, and establishes a picture of progress on APD goals and objectives since the last monitor's report.

## 4.1 Overall Status Assessment

Section 4.1 provides a discussion of the overall compliance status of APD as of the 12th  reporting period.  As of the end of the 12th reporting period, APD continues to make progress overall, having achieved primary compliance in 100 percent of the applicable paragraphs of the CASA. Primary Compliance relates mostly to development and implementation of acceptable policies (conforming to national practices). APD is in 91 percent Secondary Compliance as of this reporting period, which means that effective follow-up mechanisms have been taken to ensure that APD personnel understand the requirements of promulgated policies, e.g., training, supervising, coaching, and implementing disciplinary processes to ensure APD personnel understand the policies as promulgated and are capable of implementing them in the field.  APD is in 64 percent Operational Compliance with the requirements of the CASA, which means that  64 percent of the time, field personnel either perform tasks as required by the CASA, or that, when they fail, supervisory personnel note and correct in-field behavior that is not compliant with the requirements of the CASA

Figure 4.1.1 below depicts APD's compliance performance over the last eleven reporting periods and intensive "hands-on" guidance and advice.

4

Figure 4.1.1. Longitudinal Compliance Performance



We note that there was no "conventional" IMR written for the seventh monitoring period.  Instead, given the fact that a new administration was on-board, we spent the IMR-7 period almost exclusively on technical assistance (TA) as opposed to actual compliance monitoring.  The monitor developed and published two "mini-reports" outlining that TA.

## 4.2 Project Deliverables

Project deliverables are defined by the Settlement Agreement governing the parties' response to the CASA, (DOJ, the City, APD, and the Albuquerque Police Officers' Association (APOA).  Each deliverable is discussed in detail below in section 4.7.

## 4.3 Format for Compliance Assessment

The Monitor's Reports are organized to be congruent with the structure of the CASA, and specifically report, in each section, on the City's and APD's compliance levels as well as with CPOA, for each of the 276 individual requirements of the CASA.

The Monitor's Reports are structured into nine major sections, following the structure of the Agreement:

I.      Use of Force;

II.     Specialized Units;

III.    Crisis Intervention;

IV.     Policies and Training;

V.      Misconduct Complaint Intake, Investigation and
        Adjudication;

VI.     Staffing, Management, and Supervision;

VII.    Recruitment, Selection and Promotions;

VIII.   Officer Assistance and Support; and

IX.     Community Engagement and Oversight;

All monitor's reports deal with each of these nine major areas in turn, beginning with APD's response and performance regarding reporting, supervising, and managing its officers' use of force during the performance of their duties, and ending with APD's efforts at community engagement and its ability to facilitate community oversight of its policing efforts.

## 4.4 Structure of the Task Assessment Process

Members of the monitoring team have collected data concerning APD's compliance levels in a number of ways:  through on-site observation, review, and data retrieval; through off-site review of more complex items, such as policies, procedures, testing results, etc.; and through review of documentation provided by APD or the City which constituted documents prepared contemporaneously during the normal daily course of business.  While the monitoring team did collect information provided directly by APD in response to the requirements of the CASA, those data were never used as a sole source of determining compliance, but were instead used by the monitoring team as explanation or clarification of process.  All data collected by the monitoring team were one of two types:

- Data that were collected by using a structured random sampling process; or

- Selecting *all* available records of a given source for the "effective date."

Under no circumstances were data selected by the monitoring team based on provision of records of preference by personnel from the City or APD.  In every instance of selection of random samples, APD personnel were provided lists of specific items, date ranges, and other specific selection rules, or the samples were drawn on-site by the

6

monitor or his staff. The same process will be adhered to for all following reports until the final report is written.

**4.5 Operational Definition of Compliance**

For the purposes of the APD monitoring process, "compliance" consists of three parts:  primary, secondary, and operational.  These compliance levels are described below.

- **Primary Compliance**:  Primary compliance is the "policy" part of compliance.  To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA.  As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.

- **Secondary Compliance**:  Secondary compliance is attained by implementing acceptable training related implementation of supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel, and are held accountable by managerial and executive levels of the department for doing so.  By definition, there should be operational artifacts such as reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the department.

- **Operational Compliance**: Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff.  In other words, the APD "owns" and enforces its policies.

As is true in the monitor's experience, change is never simple or quick.  A great deal of work lies ahead.  The monitoring team remains committed to assisting APD command staff by working closely with the APD in forging new, and revising old, policies; articulating clear guidelines and practices for APD's intensive training of the department's supervisors and managers; assisting APD in building assessment tools designed to identify problematic behaviors; and advising on "best practices" that can be

7

adapted by APD as it moves forward in its efforts to meet the individual and global requirements of the CASA.

## 4.6    Operational Assessment

APD and the City (the CPOA and CPOA Board) have agreed to comply with each of the articulated elements of the CASA.  The monitoring team provided the Parties with copies of the team's monitoring methodology (a 299-page document) asking for comment.  That document was then revised, based on comments by the Parties. This document reflects the monitor's decisions relative to the Parties' comments and suggestions on the proposed methodology and is congruent with the final methodology included in Appendix One of the monitor's first report[2].  The first operational paragraph, under this rubric, is paragraph 14, as paragraph 13 is subsumed under paragraph 14's requirements.

### 4.6.1 Methodology

The monitor assessed the City and APD's compliance efforts during the 12th reporting period, using the *Monitor's Manual*, included as Appendix A, in the monitor's first report (see footnote 2, below, for a link to that methodology).  We do note that the original methodology was revised at times, based on the availability of records (or lack thereof), and related organizational processes. The manual identifies each task required by the CASA and stipulates the methodology used to assess compliance.

### 4.7 Assessing Compliance with Individual Tasks

APD's compliance with individual tasks for the 12th reporting is described in the sections that follow.

### 4.7.1  Assessing Compliance with Paragraph 14

Paragraph 14 stipulates:

> **"Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:**
>
> a)   **Officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;**
> b)   **Force shall be de-escalated immediately as resistance decreases;**
> c)   **Officers shall allow individuals time to submit to arrest before force is used whenever possible;**
> d)   **APD shall explicitly prohibit neck holds, except where lethal force is authorized;**

---

[2] Available at: https://www.justice.gov/usao-nm/file/796891/download

e)   **APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject;**

f)   **APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;**

g)   **Officers shall not use force to attempt to effect compliance with a command that is unlawful;**

h)   **pointing a firearm at a person shall be reported as a Level 1 Use of Force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and**

l)   **immediately following a use of force, officers, and, upon arrival, a supervisor, shall inspect and observe subjects of force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care. This may require an officer to provide emergency first aid until professional medical care providers arrive on scene."**

## Methodology

As we have documented in the past few monitor's reports, APD reworked their use of force policies to integrate a new, three-tiered reporting system that was approved by the Monitor and the Parties.  CASA requirements stipulate that the use and investigation of force shall comply with applicable laws and comport to best practices.  Central to these investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  The monitoring team spent significant time during the IMR-12 reporting period discussing compliance, and strategies to achieve compliance, with APD staff with responsibilities overseeing various CASA paragraphs.  As illustrated throughout this report, there are still issues relating to force reporting and investigation.  In addition, we have observed issues with APD's implementation of an effective Internal Affairs system, and an effective supervisory and command oversight of use of force.

On January 11, 2020, APD's new use of force "suite of policies" were operationalized,[3]  Field supervisors continue to make initial assessments and classifications to determine the appropriate type of response to instances in which officers use force.  The Internal Affairs Force Division's (IAFD's) role is

---

[3] APD's Tier 4 use of force training was intended to be completed during the IMR-12 reporting period. Past delays completing policies and training by APD converged with the national crisis dealing with a Pandemic which impeded APD's ability to conduct Tier 4 training.

codified, and they are responsible for investigatory responsibilities associated with all Levels 2 and 3 uses of force. As we noted in the past, APD must plan for the increased workload that will result to address policy violations that are likely to be identified in this new process. Similarly, when APD consistently and properly reports force, their workload will increase regardless of whether or not policy violations exist. We believe that if APD properly applies the policies they have enacted, Internal Affairs will see a noticeable increase in misconduct allegations.[4] That said, APD's internal affairs apparatus continues to reveal defects that hinder the proper remediation of performance deficiencies and the application of discipline. We discuss these deficiencies later in this report.[5]

During the IMR-11 reporting period the monitoring team reviewed use of force investigations, training records, and records related to the Force Review Board (FRB) and certain specialized units. We previously cautioned APD that we see the assessment of uses of force at the lower levels (Between the new Tiers 1 and 2) as a potential area of concern moving forward. If APD does not account for field supervisors continuing to make improper initial classifications of force, this will be an area of vulnerability to CASA compliance. Not surprisingly, we saw continual evidence in this reporting period of force not being reported, or being misreported, by supervisors in the field. APD's current use of force policies should create a system of complementary and interlocking components that compensate for each other and provide support across the system of force oversight. That said, during the IMR-12 reporting period we encountered system-wide failures related to the oversight of force used by APD officers and supervisory and command review of those uses of force.

The monitoring team has been critical of the FRB, citing its past ineffectiveness and its failing to provide meaningful oversight for APD's use of force system. The consequences are that APD's FRB, and by extension APD itself, endorses questionable, and sometimes unlawful, conduct by its officers. Convening an FRB serves several key purposes, chief among them is to create a forum for executive oversight that pushes department-level expectations down through all levels of supervision. The FRB should serve as an organizational safety mechanism to capture errors, refer cases for additional investigation, make referrals for various types of remediation, request internal affairs investigations for misconduct, and monitor use of force trend data. In preparation of this report, the monitoring team conducted reviews of cases the FRB heard during this reporting period. Of the cases we reviewed that were approved by the FRB, we saw:

---

[4] This condition is not surprising to the monitoring team, as even APD's own IAFD uncovered more than a thousand policy violations when they reviewed cases that were initially investigated by field supervisors. Increased reporting of policy violations would be a natural result of any legitimate oversight by IAPS. APD's latest data show 263 IARs for IMR-10, 404 IARs for IMR-11, and 534 IARs for IMR-12.
[5] See Paragraphs 41 – 77.

1. Instances where obvious uses of force went unreported and investigated; evidence of supervisory failures; and one instance of misconduct in which unjustified force was used on a handcuffed person who was likely suffering from a form of mental disability (IMR-12-01).[6]  Particularly troubling is that this case was investigated by IAFD and, as it progressed, the entire use of force system.  Those investigations failed, including the FRB assessment.  What this means is simple: that after two years of conceptualizing, recasting, and implementing new use of force policies; delivering meaningful training of those policies; training IAFD personnel to properly investigate uses of force; putting a video review unit in place; exhaustive technical assistance from the monitoring team; and reconstituting the FRB under new policies and training; the system is still ineffective in providing oversight of uses of force.  We provide more regarding our assessment of the FRB in Paragraph 78.

While meeting with the Academy Director and staff, we discussed the status of APD's Paragraph 86-88 annual requirements to deliver use of force training. While there is some overlap of topics with the four-Tiers of training the monitor approved during IMR-11, it was clear that as a consequence of the Academy being hyper-focused on completing the Tier 4 training (which is still incomplete), they have not considered their annual training requirements!  Such oversights are extremely troubling.  The monitoring team is cognizant of the issues facing the department as a consequence of the Pandemic, but the Academy did not appear to have even explored options to address this requirement.[7]  It simply went un-met.  Such oversights are inexplicable at this point.  After six years of highly focused TA from the monitoring team, after 10 highly problem-focused monitor's reports (most of which included detailed recommendations for responding to CASA paragraph activities that were not in compliance) the Academy seems to have "forgotten" its mission.   Likewise, APD's Academy had not advanced any concerns about or plans to address these requirements until after it was brought to their attention by the monitoring team![8]  To be clear, APD's efforts to complete the Tier 4 training, which at this point is still incomplete, do not absolve the department from its other training requirements.  For most officers, it's been over a year since they attended Tier 1 and by the end of 2020 it will be over a year since Tiers 2 and 3 were attended by APD officers and supervisors. As noted, some required CASA topics are not addressed in the Tier training sessions and will need their own training sessions.  This will be the third round of "gap training," designed to address training oversights at the Academy.  Such

---

[6] We learned from APD records that the suspect in this case has been involved in at least three separate and recent events where force was used.  **(Force** Cases IMR-12-01, IMR-12-03, and IMR-12-04) Following the close of the reporting period members of the monitoring team attended a virtual FRB where one of the other related cases was heard, and unreasonable force was used in that case as well.  To its credit, the FRB made more meaningful observations and referrals in this instance.

[7] We discussed this issue and provided our perspective on how APD can accomplish the task through different delivery methods.

[8] IMR-11 contained a recommendation that APD devise a Covid-19 training plan.  To date, we have not been provided with an acceptable, achievable, or coherent plan.

under-performance, quite simply, is not acceptable in a truly reform-minded agency.

**Results**

During the IMR-12 reporting period, APD continued to struggle to establish a system of force oversight and the accountability for officer conduct.  These struggles have significant influence on the organization's efforts to achieve Operational Compliance.  Still evident are systemic failures that allow questionable uses of force and misconduct to survive without being addressed in any meaningful way.[9]  While these factors are highly problematic from an accountability perspective, they provide genuine areas to explore when deciding how and where to develop training programs, and deciding what audience is in the greatest need of remediation through training.  We've commented extensively in the past that APD is predisposed to minimize their response to performance issues and misconduct, and defaults to training referrals regardless of the severity of an offense, or, at times repetitive incidents of violation of policy and or training.[10]  APD has, as a matter of routine, pointed to past deficiencies with their policies and training when attempting to explain or excuse problems in the field. Now that APD has developed and implemented new policies and training they believe are capable of steering better outcomes, the response to problems they encounter must now require a close examination of an officer's interest and willingness to apply the training that was provided to them.  We have no doubt that many of the instances of non-compliance we see currently in the field are a matter of 'will not," instead of "cannot"!  The monitoring team expected there would be a period of time during which mistakes were made while applying the new policies and training, but issues we continue to see transcend innocent errors and instead speak to issues of cultural norms yet to be addressed and changed by APD leadership.  The following pages provide a great deal of detail regarding our observations of APD's in-field and oversight process failures.

As an exemplar of our concern that APD's top leadership demonstrate serious deficiencies in establishing the right expectations of the organization, during this reporting period we note that the former Chief of Police coordinated a specific APD officer to address Academy cadets, under a lecture title of "Career Survival" as a condition of discipline following an instance of serious misconduct.[11]  In our opinion, the former chief's decision to facilitate this event represented a serious lack of judgment, especially since the monitor had previously advised the former chief that the officer's actions were extremely serious, constituted direct and

---

[9] We also followed up on an ECW use of force by investigative personnel, which we reported in IMR-11. (IMR-11-9) .   As we document later in this report, we believe the follow up conducted by a member of IAFD was flawed and perfunctory.

[10] APD also tends to lean heavily toward verbal counseling as opposed to higher and sometimes more appropriate disciplinary sanctions, even with officers for whom the "last" verbal counseling proved ineffective.

[11] This officer was also the subject of a Special Report prepared and delivered to the Court by the monitor in September 2016.

intentional violations of policy and the CASA, and possibly warranted termination. We comment in more detail in Paragraphs 60-77 (relating to an in-custody death) and Paragraphs 86-88.

While APD achieved Secondary Compliance for this paragraph in IMR-11, based on our review and attendance of Tier 2 and Tier 3 use of force training, and the representation by APD that Tier 4 would be completed, the organization will be in jeopardy of losing Secondary Compliance should it not complete each of its training requirements before the end of the IMR-13 reporting period.  The Academy has been provided extensive technical assistance and guidance that should have benefited their efforts.  In IMR-11 we recommended that APD develop a plan to address training issues in light of COVID-19, and we reiterate that recommendation here.  With a coordinated and concerted effort across APD commands these are achievable goals even under the current circumstances.

As we noted in IMR-11, Operational Compliance will require renewed focus and point-by-point adherence to applicable CASA paragraph requirements.  It will also depend on APD's assertiveness in identifying and stopping supervisory and mid-level command usurpation of executive authority by overlooking, incorrectly characterizing, or improperly addressing policy violations.  As we document later, APD's system of oversight continues to demonstrate areas of deep concern that impede the ability to achieve Operational Compliance.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

### 4.7.2  Assessing Compliance with Paragraph 15:  Use of Force Policy Requirements

Paragraph 15 stipulates:

> **"APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices. The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal, that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units. The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate. The use of force policy will incorporate the use of force principles and factors articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability**."

**Methodology**

As we have documented in the past few Monitor reports, APD reworked their use of force policies to integrate a new, three-tiered reporting system that was approved by the Monitor and the Parties.  CASA requirements stipulate that the use and investigation of force shall comply with applicable laws and comport to best practices.  Central to these investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  As with other reporting periods, the monitoring team spent significant time during the IMR-12 reporting period providing perspective, feedback and technical assistance to APD personnel regarding force investigations.  We continued to attempt to help the administration better understand and deal with historical difficulties the agency has had achieving compliance, and provided ideas concerning how they could best be addressed moving forward.  During this reporting period we reviewed use of force cases, cases assessed and approved by the FRB, and other documentation and data related to various specialized units relevant to the CASA.  We found substantial evidence of force reporting and investigation issues, as well as system and process disconnects that continue to hinder Operational Compliance.[12]

**Results**

During the IMR-12 reporting period APD continued to struggle establishing a system of force oversight and the accountability of officer conduct.  These struggles have significant impact and influence on the organization's efforts to achieve Operational Compliance across several CASA paragraphs.  Still evident are systemic failures that allow questionable uses of force and misconduct to survive without being addressed in any meaningful way.[13]  Likewise, later we report on cases we reviewed that were heard and approved by APD's Force Review Board that contained significant issues.  At this point, the monitoring team remains the last line of defense for these failures.  That is unsustainable, and until APD "shoulders its burden," and begins to take responsibility for self-identifying violations of policy and training, compliance will be elusive.

Operational Compliance will require renewed focus and point-by-point adherence to applicable CASA paragraph requirements.  It will also depend on APD's assertiveness in identifying and stopping supervisory and mid-level command usurpation of executive authority by overlooking, incorrectly characterizing, or delaying responses to blatant policy violations until responses are "time barred".  For example, we have seen instances in which supervisors and command staff simply fail to "notice" serious violations of APD policy.  We note frequently in this report, allegations of serious misconduct in which delays appear to be engineered so that discipline is "time-barred" due to the requirements of the union contract.  We also note elsewhere in this report serious issues of misconduct that are, in our opinion, deliberately overlooked, poorly

---

[12] We document our findings in detail later in this monitor's report.
[13] We also followed up on an ECW use of force by investigative personnel, which we reported in IMR-11. (IMR-11-9).  As we document later in this report, we believe the follow up conducted by a member of IAFD was simply flawed and perfunctory.

14

investigated, delayed, or otherwise mishandled by APD, resulting in an inability to identify, note, and correct behaviors not compliant with the CASA.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

### 4.7.3 Assessing Compliance with Paragraph 16:  Weapons Protocols

Paragraph 16 stipulates:

> **"In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below. The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy."**

### Methodology

APD previously achieved Secondary Compliance, notwithstanding changes that have occurred to use of force policies that directly relate to this paragraph.  APD integrated a new, three-tiered reporting system in which Level 1 uses of force are investigated by field supervisors and Levels 2 and 3 are investigated by IAFD.  Members of the monitoring team provided extensive perspective, feedback and technical assistance related to this new three-tiered system.  The new use of force "suite of policies" were approved on January 15, 2019 and following the Academy's Tiers 1-3 training programs, those policies finally went live in the field on January 11, 2020.  During the IMR-12 reporting period the monitoring team reviewed use of force cases, cases assessed and approved by the FRB, and other documentation and data related to various specialized units relevant to the CASA.  We found substantial evidence of force reporting and investigation issues, as well as system and process disconnects that, unless corrected, will continue to hinder Operational Compliance moving forward. These errors were despite the pervasive technical assistance provided by the monitoring team outlining acceptable practices.

### Results

Operational Compliance for Paragraph 16 will require renewed focus and point-by-point adherence to applicable CASA paragraph requirements.  It will also depend on APD's assertiveness in identifying and stopping supervisory and mid-level command usurpation of executive authority by overlooking, incorrectly characterizing, or delaying blatant policy violations.  Paragraphs 16 remains in Secondary Compliance.[14]    At this

---

[14] APD's new use of force system adds a new level of force that impacts reporting, classification, and investigatory responsibilities.  Training efforts that may impact Secondary Compliance are covered in great detail in Paragraphs 86-88.

point, this usurpation of executive prerogative is APD's major stumbling block to compliance in the area of internal controls and discipline.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

**Recommendations for Paragraphs 14 – 16:**

**4.7.1-3a:  Identify the best candidates possible for leadership and supervisory positions within IAFD and IAPS, based on exhibited traits of effective leadership and supervision.  These candidates should be demonstrably willing to make the necessary choices and take the necessary actions to establish an effective internal investigative process.**

**4.7.1-3a:  Ensure that the chosen candidates are actually trained to understand the goals, objectives, established best-proactive, evaluation, and change management modalities related to internal process controls, management, oversight, and planned change.[15]**

**4.7.4 – 4.7.10 Assessing Compliance with Paragraphs 17 - 20**

The 2020 Firearms Training cycle has been delayed due to the New Mexico Health restrictions in response to the COVID Pandemic.  This year, APD plans to conduct both Firearms and Taser certification during the same session This training will begin as soon as health restrictions are lifted.

APD Firearms Staff has done a great deal of work to address all the monitor's IMR-10 and IMR-11 recommendations regarding CASA Firearm requirements, issues, problems, and solutions. Policy revisions, training revisions, additional training for range staff and line supervisors have all been documented. The monitoring team will audit the training during the November 2020 site visit.

With the Firearms Training Curriculum submitted to the monitoring team along with Course of Business documentation that the training was completed in 2019, secondary compliance has been reached.

During the June 2020 "virtual" site visit, members of the monitoring team visited all Area Commands and spoke (via Zoom) with supervisors at each location.  All

---

[15] A myriad of accepted training product is available nationally, as noted elsewhere in this report, for commanders, supervisors and team members related to the internal affairs functions.  See for example, the Southern Police Institute (www.spi.louisville); Federal Law Enforcement Training Center (fletc.gov), the FBI (fbileeda.org); the Public Agency Training Council (patc.com); the Federal Law Enforcement Training Institute (fletc.gov).  Although not vetted by the monitoring team, there are even on-line training processes for the IA function available (dlglearningcenter.com) that would assist APD in fielding an effective and meaningful IA function. We note again that the monitoring team has spent numerous hours tutoring (and otherwise guiding) those recently responsible for the IA function at APD.

16

supervisors *stated* that they are conducting monthly inspections, physically checking every officer's weapon for make, model, serial numbers, modifications, accessories or ammunition every month. Policy, Special Orders, database revisions and Firearms training should have provided the tools necessary for field supervisors to complete this task. During the November 2020 site visit, the monitoring team will assess the impact of this policy and training in field operations. Operational compliance will be reached once the monitoring team observes that line supervisors are in fact making formal weapons inspections monthly, documenting any failures identified, and follow up corrections to the failures. We also note that APD's COD has created an implemented a process of inspections and audit activities designed to assess line supervisors' compliance practices related to the requirements of these paragraphs.  The monitor sees these processes as eventually becoming acceptable course-of-business documentation of an enhanced and effective  "inspections and audit" processes.

### 4.7.4 Assessing Compliance with Paragraphs 17

Paragraph 17 stipulates:

> **"Officers shall carry only those weapons that have been authorized by the Department. Modifications or additions to weapons shall only be performed by the Department's Armorer, as approved by the Chief. APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

### 4.7.5 Assessing Compliance with Paragraph 18:  On-duty Weapons

Paragraph 18 stipulates:

> **"Officers shall carry or use only agency-approved firearms and ammunition while on duty."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

### 4.7.5 4.7.6 Assessing Compliance with Paragraph 19:  On Duty Weapons

Paragraph 19 stipulates:

17

> **"APD issued Special Order 14-32 requiring all officers to carry a Department- issued handgun while on duty. APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns."**

## Results

Primary:   **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

### *Recommendations for Paragraphs 17-19:*

*4.7.4-6a:  Involve APD's Audit and Analysis Section personnel in the development of an action plan related to the requirements of paragraphs 17-19, and implement process designed to achieve objectives required in those paragraphs.*

## 4.7.7 Assessing Compliance with Paragraph 20:  Weapons Qualifications

Paragraph 20 stipulates:

> **"Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year. Officers who fail to qualify on their primary weapon system shall complete immediate remedial training. Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify. Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment.**"

## Results

Primary:   **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.8 Assessing Compliance with Paragraph 21:  Firearms Training

Paragraph 21 stipulates:

> **"APD training shall continue to require and instruct proper techniques for un-holstering, drawing, or**

18

**exhibiting a firearm."**

As noted following the past two reporting periods, APD rebuilt their use of force "suite of policies" that now include a 3-Level reporting system.  Shows of force are now explicitly reported and reviewed as a Level 1 use of force, and that review resides with field supervisors and their chains of command, unless that show of force accompanies a higher level of force requiring IAFD to be activated.  APD received extensive feedback on training programs they are delivering to its officers and supervisors relative to their new policies and, as previously reported, APD is delivering training for its new use of force suite of policies through four distinct tiers.  Tier 1 (policy delivered through APD's on-line learning management system) was completed during IMR-9.  Tiers 2 and 3 were delivered to officers and supervisors, respectively, and the monitoring team was able attend the training during our November 2019 site visit.  We provided feedback that we believed was critical to ensure certain points were clear to officers in the field, which APD actualized by incorporating those processes into their training.  They also released post-training videos to help refresh officers' understanding prior to the policies going live on January 11, 2020. All related policies reviewed by the monitoring team met standards established by APD and approved by the monitor and the Parties.  Prior to the close of IMR-11, we reviewed Tier 4 training and provided feedback to assist the quality of the training before it was delivered.  We comment extensively about the status of the training efforts in Paragraphs 86-88; however, it is appropriate to note here that APD will put themselves in jeopardy of losing its compliance efforts if it fails to sustain the momentum it created in the earlier days of the IMR-12 reporting period.  Delays and missteps in training efforts over the past several years resulted in APD taking extensive time to achieve Secondary and Operational Compliance with Paragraph 21.  We highly encourage APD take cognizance of the feedback we provide in Paragraphs 86-88 in terms of training and review our feedback for case reviews we conducted for this reporting period to identify problem areas of performance in the field.

**Results**

APD must continue to be diligent with their training development and delivery for provisions of this paragraph.  As we note elsewhere in this report, oversight of training has degraded significantly this reporting period.  To retain Operational Compliance, APD must demonstrate use of force training programs incorporate needs, issues and concerns that are drawn from the field and are relevant to APD policy and Constitutional policing.  It will also be APD's responsibility to continue to assess the use of force policies to ensure they are current and address issues encountered in the field.  While Operational Compliance has been achieved for Paragraph 21, we believe that any failure to properly maintain Operational Compliance here will likely result in problems in the field and impact CASA compliance efforts elsewhere.  Revisions and updates to training practice are required at this point.  We will revisit these issues in IMR-13.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.9 Assessing Compliance with Paragraph 22:  Firearm Discharges from Moving Vehicles

Paragraph 22 stipulates:

> **"APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person. Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle."**

### Methodology

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.10 Assessing Compliance with Paragraph 23:  Tracking Firearm Discharges

Paragraph 23 stipulates:

> **"APD shall track all critical firearm discharges. APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its use of force annual report."**

### Methodology

At the close of the 12th reporting period, APD has not yet produced the final Annual Use of Force Report.  As noted in IMR-10 and 11, APD published its 2016 and 2017 Annual Reports[16] in March of 2019, having not published an Annual Use of Force Report since 2015.  APD decided to organize use of force data from the years 2016 and 2017 together, which we found to be an appropriate approach under the circumstances. During this reporting period APD provided a draft of a use of force Annual Report combining data from 2016-2019, which we again believe is a good way to display and track data over years.  We will not opine over the accuracy of data, but information required for Paragraph 23 was observed in the draft Annual Report.  We discuss our observations of the draft Annual Report in greater detail in Paragraphs 38 and 79.

---

[16] The report was dated February 2019 and was published on March 14, 2019.

Until annual reports, including the sections dealing with critical firearms discharges are completed accurately and in a timely manner, APD will remain out of compliance for Paragraph 23.

We noted no direct problems with APD's tracking of officer-involved shootings; however, reporting of such incidents continues to lag behind expectations.  APD reports experiencing significant issues with the quality of the data required for these reports and has tracked the problem back to issues with the City's data management systems.

**Results**

> Primary:        **In Compliance**
> ,Secondary:  **Not In Compliance**
> Operational:  **Not In Compliance**

***Recommendations for Paragraph 23:***

***4.7.10a:  Continue the work currently being done to bring annual reports into the required cycle, including the draft report that includes the years 2018 and 2019.***

***4.7.11-4.7.18 and 4.7.21-4.7.25 Assessing Compliance with Paragraphs 24-31 and 34-38 (Electronic Control Weapons)***

Paragraphs 24-31 and 34-36 address requirements for APD'S use of Electronic Control Weapons (ECWs), as follows:

Paragraph 24: Use of ECWs;
Paragraph 25: ECW Verbal Warnings;
Paragraph 26: ECW Limitations;
Paragraph 27: ECW Cycling;
Paragraph 28: ECW Drive-Stun Mode;
Paragraph 29: ECW Reasonableness Factors;
Paragraph 30: ECW Targeting;
Paragraph 31: ECW Restrictions;
Paragraph 32: ECW Weak-side Holster;
Paragraph 33: ECW Annual Certification;
Paragraph 34: ECW Medical Protocols;
Paragraph 35: ECW Medical Evaluation; and
Paragraph 36: ECW Notifications.

During the monitoring period for IMR-12, issues related to the transition to the Taser 7 from the X26 Taser have continued.  In anticipation of the new Taser units, APD conducted the training for the Taser 7, and then due to unforeseen circumstances, the new Tasers were not issued for an extended period. Several unintentional discharges

occurred when officers were attempting to conduct a function test, which no longer requires a pull of the trigger to test the unit.  Additionally, the X26 platform required a quarterly manual upload, using a cable attaching the device to a computer.  The Taser 7 automatically uploads when the ECW rechargeable battery is switched out using the battery docking stations.  Special Order 19-135 requires the supervisors to ensure that the batteries are replaced at least once every 30 days.  This would exceed the CASA requirement of quarterly uploads. Policy also states that supervisors will ensure that following a use of force with the Taser 7, the battery will be removed and replaced with a fully charged battery from the dock.

The Performance Metrics Unit conducted an audit of ECW discharge events for Field Services Area Commands during March 2020.  The analysis identified that employees were not properly conducting function checks. Special Order 20-57 was issued in response, highlighting the procedures for performing an ECW function check and to exchange the ECW battery at least once a month, which ensures an upload of the ECW data. In addition to the order and its publication on Power DMS on July 16, 2020, the Performance Metrics Unit lieutenant contacted the sergeant in the Advanced Training Unit at the APD Police Training Academy to discuss the audit findings.  Taser certification training was to be conducted during the 2020 Firearms training cycle; however, due to the New Mexico Public Health Order restrictions related to COVID, all training was postponed.  The lieutenant and sergeant developed a plan to conduct in person training throughout the Area Commands to ensure that all personnel could properly conduct a function check.  They utilized sign in rosters to document attendance and expected to be completed by the end of the 13th monitoring period.  If firearms training had not yet begun, the Lieutenant and Sergeant had planned to provide the training to APD's specialized units.

During past reporting periods, the monitoring team conducted in-depth reviews of APD use of force cases involving the use of Electronic Control Weapons (ECWs). The results of those case reviews, along with the implementation of policy provisions through training and operational oversight, resulted in operational compliance for Paragraphs 24 through 36. PMU's work, however, continues to indicate a need for further training on the new Taser units' operational processes and accompanying APD policies.  We will revisit this issue in IMR-13.

During past reporting periods, the monitoring team conducted in-depth reviews of APD use of force cases involving the use of Electronic Control Weapons (ECWs). The results of those case reviews, along with the implementation of policy provisions through training and operational oversight, resulted in operational compliance for Paragraphs 24 through 36.

In IMR-9, APD compliance with five Paragraphs was adversely impacted as the result of the monitoring team's review of ECW cases. During a site visit in May 2019 (IMR-10), the monitoring team reviewed several of these cases in depth with various members of

APD in the form of technical assistance to provide perspective[17] on how to assess ECW cases. A review of ECW cases during IMR-10 revealed a number of deficiencies, from ECW deployment problems by officers, to supervisory review and oversight errors. The cases the monitoring team reviewed during IMR-11 represented a markedly better result as compared to the sample of cases reviewed during IMR-9 and IMR-10. During IMR-11, none of the cases reviewed by the monitoring team identified inappropriate deployments of ECWs by officers or supervisors. Supervisory oversight of ECW deployments was much better with many nuances identified and addressed by either first-line supervisors or chain of command reviews.

During this monitoring period, APD case ledgers revealed 99 distinct cases (between January 11, 2020 through July 31, 2020) in which an ECW was utilized (inclusive of 73 ECW Shows of Force). Sixty-four of the 99 ECW cases included only ECW Show of Forces (in which an actual ECW application did not occur). These numbers represent a significant increase in ECW cases over the previous monitoring periods.[18] During this monitoring period, ECW Shows of Force comprise 73% of ECW cases. In the two preceding monitoring periods, ECW Shows of Force represented approximately 40% of the ECW cases.[19]  As of August 6, 2020, APD had completed reviews of only 30 of the ECW cases. In light of these data and the significant upward trend in ECW Shows of Force, a larger, stratified sample of ECW cases was analyzed to examine these Shows of Force more closely. These cases consist of ECW cases selected from a data request made in the early part of the monitoring period, as well as cases available at the close of the monitoring period. This sample size of six cases represents 20% of the completed ECW cases and appears to be representative of a cross-section of 2020 ECW deployments that occurred since the January 11, 2020 implementation of the revised suite of use of force policies. The cases reviewed, and a short synopsis of each case are listed below.

### Case #1 IMR-12-05 (ECW Show of Force)

In February 2020, at approximately 2:30 PM, an officer responded to a restaurant regarding a call that an individual had threatened a worker with a knife. Upon arrival, the officer interviewed the victim and obtained a description of the suspect as well as a description of his knife. Shortly thereafter, officers identified the suspect walking a short distance away from the restaurant. Two uniformed officers began following the suspect on foot, and clearly conveyed their identity as Albuquerque police officers and advised the individual that he was not free to leave and must stop and follow the commands of the officers. While following the suspect on foot, the suspect tripped and officers approached the suspect and covered the individual with both an ECW and a handgun. Upon arcing the ECW, the suspect stayed on the ground, partially submitting himself to

---

[17] We provided technical assistance to APD since the IAFD personnel were conducting thorough reviews and had identified numerous policy violations.  Where there was an issue related to the force used in an event, we recommended that IAFD examine the use of force case, since it is clear that the diligence of IAFD use of force case reviews were not being replicated in the field by front-line supervisors.

[18] IMR-11 had 53 ECW cases inclusive of 21 ECW Shows of Force. IMR-10 had 34 ECW cases inclusive of 14 ECW Shows of Force.

[19] ECW Shows of Force comprised 40% of ECW cases in IMR-11 and 41% in IMR-10.

the officers and rolling to his side (not to his stomach as instructed). The two officers, assisted by a third officer, began to utilize minimal physical force to handcuff the suspect who initially tensed up and did not initially submit to being handcuffed. Two pairs of handcuffs were needed to be utilized because of the bulkiness of the suspect's clothing and the restrictiveness of his backpack. The ECW display in this case was appropriate and its use contributed to a safe, successful outcome in taking the suspect into custody.

The monitoring team has catalogued their concerns with other aspects of this case in Paragraphs 41-59 of this report.

**Case #2 IMR-12-06 (ECW Show of Force and ECW Application)**

Two APD officers were dispatched to a reported commercial burglary in a multi-building office complex.  After meeting with the building owner and learning that no one should be inside the complex, the officers approached an area between two of the buildings. OBRDs of the two officers revealed obvious signs of forced entry in multiple office suites.  An offender had broken out the front glass of a door that provided access to an office from the exterior of the building. The officers continued their search for a potential subject.  At one point, Officer 1 returned to the parking lot to reposition his patrol vehicle.  He heard Officer 2 begin yelling commands to someone, so he quickly returned to the area to assist.

Officer 2 was moving around a building when he encountered a male subject who had just emerged from an office suite through the broken glass of the office doorway.  He properly identified himself and immediately began giving commands for the subject to stop, get down onto the ground, and that if he failed to comply force would be used. The subject turned toward Officer 2 and began to walk with slow, exaggerated, and aggressive mannerisms.   As this was happening, Officer 1 arrived back at the location and unholstered his ECW.  As the subject was being told to comply, he was verbally responding to the officer's commands by saying "Or what?" and "What are you going to do?" He continued to walk at the officers, despite being warned several times that force would be used against him if he didn't comply.  He walked to within 15 feet of the two officers, who were now (both) illuminating the suspect with their ECWs lasers as a show of force.  The subject stopped, with his hands down and slightly in front of him and his feet spread apart in what appeared from our review to be a fighting stance.  When the subject was warned he would be tased if he didn't comply, he stated, "That'll hurt."  The two officers communicated between themselves to be prepared to tase the subject.  The subject turned slightly at which time Officer 1 called out "taser, taser, taser" and deployed his ECW, bringing the subject to the ground.  Officer 2 quickly handcuffed the subject without any additional force having to be used.

Following the use of force, the officers were professional with the suspect and escorted him to a patrol vehicle.  A supervisor was called to the scene and after the incident was properly categorized as Level 1 and Level 2 uses of force, IAFD was contacted and an investigator responded to the scene.  Also, an ambulance was called to the scene to

24

provide medical services to the suspect and a crime scene detective took photographs of the scene, officers, and subject.

## Case #3 MR-12-07 (ECW Show of Force)

In April 2020, four APD officers met with a complainant, who reported suspicious activity by two male subjects in the parking lot of his business.  The caller indicated the two males had been in the area for an extended period of time walking and looking into cars and into the rear beds of trucks.  The caller also indicated they were seen crossing the street and then returning again several times.  The caller did not indicate he confronted the subjects, nor did he report any information to suggest the two subjects were seen stealing anything.  The description of their actions suggested they were only acting suspiciously.  One officer told the caller that if they located the suspect(s) they would at least notify them against trespassing.

A short time later the four officers encountered a male subject, matching the basic description of one of the males, walking in a nearby parking lot.  All four officers, in separate cars, arrived nearly simultaneously as the subject was walking through a cross walk.  He was told to stop and after a few steps he stopped and turned toward two of the officers.  His attitude was excited at first and he appeared alarmed at the manner in which he was approached by the four officers, with two circling behind him.  Almost immediately he began asking the officers what he did wrong.  He was told to keep his hands away from his waist, at which time he lifted his shirt and turned completely around, presumably to show he wasn't armed.  One officer approached him, and the subject stepped backward and said, "stand back bro", and one officer immediately said, "yo bro, you bow up with me and I'm going to tase your ass" while unholstering his ECW.[20]  It appeared the subject was looking around because he was receiving commands from multiple officers, two of whom were standing behind him.

It was only then that the officers told the subject why he was stopped.  The subject acknowledged he was at the business where the caller was located, but that he was asking for change (from people).  He denied that he was looking into vehicles, and the officers told him that he was being detained for investigation.  The subject was asked his name, but he remained silent and sat down on the ground under his own power.  When an officer said "there you go" the subject clapped his hands in a mocking fashion.  When the subject wouldn't tell the officers his name, they approached him to place him into handcuffs.  The subject was passively sitting on the ground, hands together and looking straight forward.  When the officers attempted to pull his arms back, the subject tensed and slightly pulled and told the officers to stop.  With that, the officer with the taser placed one hand on the subject and pointed his taser at him (in close proximity) and said, "I'm going to tase your ass".  At that point the subject complied, and officers were able to place the subject into handcuffs without any force being used.

They stood the subject up and began to walk him toward a patrol car.  The subject can be seen making an awkward, quick up and down motion with his right foot, but never

---

[20] "Bow up" is a term associated with aggressive behavior and taking a defiant posture.

thrusts toward the officer in any attempt to strike him.  He made a similar motion with his left foot and the officer advised him if continued he would be taken to the ground.  The subject, who was not actively resisting in any manner, walked compliantly and was seated in the rear of a patrol car.  After a period of time the officers let the subject out of the patrol car, unhandcuffed him and let him go.  None of the officers documented any follow up with the original caller or any effort to further investigate whether the subject committed any type of theft.  In fact, on an OBRD recording, one officer told the subject that they knew he hadn't stolen anything. The subject was summoned for two counts of assault on a police officer and resisting arrest.  A supervisor was called to the scene to investigate a Level 1 (ECW) Show of Force. The monitoring team's view of this event is the officers' actions contributed to the subject's tone and attitude when they first encountered him.  They poorly interpreted the actions of the suspect, and the documentation of immediate threat and fear seems overstated, given our review of available video.  Also, the investigation of the show of force was deficient throughout the chain of command.  The following are some observations of the event:

1. The reports prepared by the officers were poorly written, did not contain sufficient detail, and contained boilerplate language.
2. In their reports, officers documented that the subject balled up his fists, presumably to articulate a reason for fear.  One officer documented that the subject "…told us he was going to kick our ass".  We did not observe either of these actions on OBRDs.  As for the latter claim, the officer who documented it in his report made no such statement when interviewed by the supervisor at the scene.  Likewise, none of the officers are noted as reacting to that type of overt verbal threat during the encounter.
3. The officer who displayed the ECW and later walked the subject to the patrol vehicle documented that he "…saw that (subject) almost kicked me," and that he told the subject that "…if he was to continue kicking he would be taken to the ground."  Another officer documented that the subject attempted to kick an officer as he was escorting him to the police car.  In his report, the supervisor documented that an officer believed that the subject was preparing to "attack (kick)" officers when the subject was on the ground. The officer in question makes no such assertion in his written Use of Force report, and instead stated, "After he (subject) was handcuffed he attempted to kick me while I tried to secure him into the rear of (officer's) marked vehicle".  The actions viewed on OBRD as the subject is walked to the patrol vehicle do not depict a person trying to kick the officer, even though the subject was in a clear position to kick the officer if that had been his intent.  The supervisor incorrectly attributed the attempted "kick" to the wrong point in the event, and that was approved by the Lieutenant and Commander.
4. The officers used the term "target glancing" in their reports to describe the subject's actions.  Our review did not uncover subject actions that could be noted as target glancing.[21]

---

[21] In IMR-11 the monitoring team noted this term being used with frequency and APD should hone in on its legitimacy when assessing uses of force.

5. Characterizing the subject's actions as "attempting to flee" in officer reports is not supported by OBRD evidence.

6. This event was poorly managed from the first approach of the officers through the supervisor and chain of command reviews.  In our view, the officer's actions and approach to the subject contributed to the subject's initial reaction to their presence, including the drawing of the ECWs.[22]  Approaching the suspect was predicated on him acting suspiciously near cars in a business parking lot, yet no follow up to the initial call for service appeared to have occurred once they located the subject.

7. APD leadership should view the actions of these officers from an organization-wide perspective.  In light of the many APD use of force reviews we have conducted, and the perspective we've gained for how APD officers react and have viewed actions similar to the subject in this case, we see areas of this case worthy of critical review.[23]

8. Perhaps most notable is the failure of anyone in the investigating chain of command to address the inappropriate stance an officer took in writing his written report documenting his involvement in the incident. In the very first portion of the "Incident Information," the report template requires an officer to "state if you were involved in the use of force or a witness to the use of force." That officer answered in this manner:

- Show of Force; "I do not wish to waive any of my Constitutional rights. This statement is being given under coercion. I have no alternative but to give this statement or face discipline or termination. I am giving this information based upon my understanding that this statement, and any information derived from this statement, and any information derived from this statement (sic), cannot be used against me in any criminal proceeding. I hereby reserve my right to remain silent under the United States Constitution and any other rights as prescribed by law. I specifically rely upon the protection afforded to me under the doctrine set forth in Garrity v. New Jersey, 385 U.S. 493 (1967)."

The culture of non-accountability in APD allowed an officer to write this non-response to the question posed. The officer was not exposed to an interview for his unresponsiveness or to any intervention for failing to answer this question. On numerous occasions the monitoring team has addressed the issue of officers believing they can issue themselves prosecutorial immunity under Garrity v. New Jersey (1967) when exposed to an interview. Now, officers seem to believe they can issue themselves immunity from prosecution while writing a report and APD command staff are complicit in this belief.  This counter-CASA belief system needs to be directly and clearly called out when it is observed.  Failure to identify this type of counter-CASA resistance (on the part of supervisors and during command review) should be noted and corrected by

---

[22] From the subject's perspective, he's being surrounded while each of the officers are putting on black gloves.  This would alarm anyone in similar circumstances.
[23] We provide perspective on critical points of review APD should consider below in our assessment of Paragraph 24.

APD.  We note this as a relatively aggressive extension of counter-CASA processes noted of late at APD.

## Case #4 IMR-12-08 (ECW Show of Force)

In April 2020, an APD officer was on routine patrol when she observed a male subject on foot that she has had "numerous contacts" with in the past.  Her familiarity included the suspect's propensity for violence and tendency for running from the police.  The officer checked NCIC for potential warrants and learned that he had an active felony warrant for armed robbery. The officer notified APD dispatch and requested additional patrols respond to assist. When the suspect took note of the officer's presence, he started to run through traffic to get away. The officer waited for backup but learned from a witness that the subject was last seen jumping over a wall heading toward a shopping center. The officer was operating a marked patrol vehicle and engaged her lights and siren, but the subject continued to run toward a large store in the shopping center. The officer lost sight of the subject, but a witness flagged her down and said the subject ran inside a store.  Once inside, several employees alerted the officer to where the subject ran within the store and one person told the officer the suspect "was armed with a gun." Several officers approached the area where the suspect was located and found him lying on the ground in a prone position with a store security guard close by.  Attempts were made to locate a weapon, including reviewing store surveillance.  Ultimately, the officer was able to connect a bag containing a small crowbar that she believed could have been misconstrued as a weapon.

During the event an assisting officer conducted a show of force with his ECW when the subject was being taken into custody.  This was reported and a supervisor responded to the scene to conduct a Level 1 use of force investigation.  The monitoring team reviewed all the available documentation, to include the supervisory investigation and chain of command reviews.  Based on the totality of circumstances we believe the show of force was objectively reasonable.  The supervisor identified a policy violation in that one of the officers at the scene failed to properly activate his OBRD. This violation was entered into BlueTeam to IA with a request that the policy violation be sustained, and the case administratively closed. That request was adopted by IA and documented in a memo back to the officer's command a few weeks after the event.

## Case #5 IMR-12-09 (ECW Show of Force)

In May 2020, at approximately 9:00 PM, two officers responded to a residence regarding a mother and father's dispute with their adult son (who resided with them) who would not return his mother's car keys. While Officer 1 was taking the information from the parents in the living room, Officer 2 was in the hallway knocking on the son's bedroom door to speak with him. The subject answered the door and was confrontative and apparently angry. Officer 2 reported the individual had a small knife in his hand (indistinguishable on the video) and stepped towards him. Officer 1 saw this from down the hallway, approached the end of the hallway, and painted the subject with her ECW. The individual stated he was a disabled veteran and that the officers could shoot him.

28

The individual walked back into his room (apparently putting down the knife) and came out with the keys for the car. He was confrontational again, threw the keys on the floor, told the officers to leave, and walked back into his room and closed the door.

A supervisor arrived on the scene to conduct the use of force review and appropriately deemed it to be a Level I use of force due to the ECW Show of Force. The supervisor provided admonishments to the two officers about speaking of the use of force. The supervisor attempted to engage the subject and interview him about the officers' interactions with him. However, the individual again was confrontational and angry, refused to cooperate, and retreated back to his room not to be seen again on video. The officers and the supervisor all correctly opined that they did not have any criminal charges against the subject.

The following are some observations of the event:

1. The supervisor did not call for photographs to be taken of the officer who had the ECW Show of Force. An IA request was submitted and sustained for this lack of diligence.
2. The supervisor interviewed the parents about the officer's show of force with both officers standing with him. This certainly places prejudicial pressure on any witnesses to implicate problematic behavior on the part of officers (which did not occur in this incident).
3. The supervisor indicated that he was watching the officer's OBRD video on the officer's cell phone Axon app. It was not apparent why the supervisor needed to utilize the officer's cell phone to conduct his review.
4. While beginning to watch the officer's OBRD video, in the presence of the officer, the supervisor stated he was doing it because, "God knows we can't take an officer's word for what happened. We have to watch the video." This conveys a lack of professionalism on the part of the supervisor and portrays a culture of indifference toward CASA compliance.  We have observed no official response from APD regarding this expressed attitude by the supervisor.

### Case #6 IMR-12-10 (ECW Show of Force and ECW Application)

On a midafternoon in March 2020, officers were dispatched to a street location where a male was throwing rocks at people in passing vehicles and partially exposing himself. Officers located the individual, conducted a field interview, and asked the individual to leave the location. Upon departing and walking approximately one block away from the officers, the suspect took something out of the trash and threw it in the street and also picked up a rock and threw it at a moving vehicle. The vehicle's operator stopped and confirmed the strike against his vehicle and officers pursued the suspect on foot for a few blocks before closing the gap on the suspect. When one of the officers got approximately 15 feet behind the suspect, the suspect stopped in the middle of the street, turned back, and balled up his fists and started to move toward the officer swinging his fists. The officer immediately stopped and began backpedaling away from the suspect and appropriately discharged his ECW in standoff mode as the individual

came at him in an aggressive manner. The ECW did not have its intended effect on the individual and the officer attempted to recharge the probes but discharged his ECW a second time in standoff mode. The second cartridge of probes were also ineffective. Another officer displayed an ECW Show of Force but did not discharge the ECW because of the presence of another officer behind the suspect. Unbeknownst to the suspect, that third officer approached the suspect from behind, grabbed onto his shoulders and executed a leg sweep to put the suspect down on the ground in a controlled manner. The suspect responded to verbal commands to roll onto his stomach and two officers quickly handcuffed him with minimal effort. As the officers were handcuffing the suspect, a supervisor arrived on scene and quickly determined the incident was a Level 1 ECW Show of Force and a Level 2 ECW application. Medical personnel responded to the scene, but the suspect refused treatment. IAFD was notified and responded to initiate the investigation. The investigation and various levels of IAFD chain of command reviews correctly identified deficiencies in an officer's report and a supervisor's completion of a review form. A training referral was appropriately prepared and forwarded to the Training Academy to address an officer's proficiency in utilizing the upgraded model of the ECW.

The monitoring team catalogued their concerns with other aspects of this case in Paragraphs 41-59 of this report.

The cases the monitoring team reviewed this reporting period represent consistent results with those observed in IMR-11. Combined, IMR-11 and IMR-12 case reviews reflect markedly better results than the cases reviewed during IMR-10. In IMR-12, none of the cases reviewed by the monitoring team identified inappropriate applications of ECWs by officers or supervisors. Supervisory oversight of ECW deployments was much better with many nuances identified and addressed by either first-line supervisors or chain of command reviews.

Nonetheless, their still exists persistent problems that seem to plague APD. As an example, the monitoring team takes cognizance of the frequency and context in which officers note that a person is *target glancing*. In IMR-11, officers reported that a "very intoxicated" suspect was target glancing while in a very small room. In IMR-12, a suspect was noted to be target glancing while surrounded on all sides by four officers. The monitoring team did not construe, based on our video review, that the suspects in either of these cases were target glancing.

Boilerplate language continues to be found in reports. In this monitoring period, case reviews revealed deficiencies in supervisors' reviews to include text from templates still on the submitted reports when they are submitted after completion[24]. Poor report writing on the part of officers seems to be addressed by various assistance provided by chain of command personnel (especially from IAFD) that the monitoring team notes is in the form of mentoring. This mentoring also includes officers receiving templates and report exemplars to see how quality reports are written.  We see this as a sign of engagement on the part of supervisors with non-punitive responses to "process" problems.

---

[24] Chain of Command reviews caught this instance of templated language.

However, we have noted a number of occasions in which officers who contemplate using force or actually utilize force seem to take liberties with overstating perceived threats against them or others. Officers' perceptions about those that they believe will flee from them also seem to be overstated based on our review of video and report narratives. In Paragraphs 41-59 of this report, the monitoring team noted that persons experiencing a mental health crisis or emotional distress continue to have charges placed against them that appear overstated.  Additionally, these individuals are charged with criminal violations that are not explained to them. Needless to say, the monitoring team does not always objectively corroborate these perceived overstatements. Supervisors however should be attentive to such issues.

In a number of past IMRs, inaccuracies in BlueTeam reporting have been chronicled. These inaccuracies have often centered on officer assessments of persons possibly experiencing mental health crises. The monitoring team is of the opinion that if the officer states multiple times in their police reports that a person was "possibly having a mental health episode" or that a suspect had "a mental health issue," the BlueTeam record for the same incident should reflect this in writing. The absence of such congruency provides skewed data in BlueTeam for developing public reports and actually understates the frequency in which officers deal with those experiencing a myriad of mental health issues.

The problem of APD officers "self-immunizing" themselves against prosecution has reached the point that the monitoring team believe it must be called out, and some form of response by APD internal processes needs to be affected. Two occurrences during this monitoring period best illustrate the critical nature of this matter.

1.  An officer involved in an ECW Show of Force failed to state the nature of his involvement in an incident while using a report template that requires an officer to "state if you were involved in the use of force or a witness to the use of force." Nobody in the reviewing chain of command addressed the inappropriate stance the officer took in not only failing to answer the question about his involvement in the use of force, but also essentially writing a declaration of use immunity generally issued by prosecutors!  We view this as highly a problem process that needs to be addressed by APD.

2.  The monitoring team has also observed officers "self-immunizing" when being interviewed as part of an internal affairs investigation.  This appears to be an accepted standard practice by investigating APD personnel, as the instances we encountered have the characteristics of an orchestration between the investigators of misconduct and APOA representatives attending interviews on behalf of officers.

3.  The monitoring team had the opportunity to review a course largely constructed by IAFD personnel for training their personnel. The lesson plan for the 40-hour training program contained information on Garrity, but not the investigator's role or supervisor's role in addressing it during interviews and statement reviews. The PowerPoint for the training was lacking context about Garrity protections,

31

especially as it pertains to officer's self-immunizing themselves with investigators idly standing down and not commenting about the officer's assertion.

While the deficits of this training content were pointed out to three IAFD supervisors during a conference call in the latter portion of this monitoring period, the failure of APD to address officers self-immunizing themselves has been pointed out by the monitoring team over the past three years to all levels of APD up to and including the former Chief of Police. It is the opinion of the monitoring team that this matter continues to undermine reviews and investigations, and APD has willfully and intentionally failed to address officers and supervisors who do not understand "use immunity" and the provisions of who can issue Garrity protections.  In short, the monitor has identified this as an issue, and has provided clear and convincing evidence to APD that this behavior is problematic.  To date we have seen no interest among APD command or executive staff to address this issue.  Our advice and counsel seem to have fallen on deaf ears.

While the activation of OBRDs has improved over past monitoring periods (especially as it relates to the muting of OBRD's and the toggling of the OBRD on and off during prolonged encounters and operations), when OBRD policy violations do occur, they are handled in a disparate manner. In one ECW case this monitoring period, an officer admits to a supervisor on the scene that he did not activate his OBRD. The supervisor appropriately makes a referral to IAPS but includes only mitigating circumstances to lessen the disciplinary impact on the office. IAPS summarily accepts this "excuse," as it does in most cases reviewed by the monitoring team. In another ECW case, an IAFD detective summarily dismissed an OBRD policy violation as explained away by an officer and never submits it as an IA request so that the policy violation can be classified, investigated, and assessed for disciplinary action! In this particular case, the officer who failed to activate his OBRD had a substantiated OBRD violation eight months earlier. The disparity in treatment of a CASA-centric policy violation pertaining to OBRDs places APD back where it was 18 months ago when it could not get a handle around the disparate treatment of policy violations due to the circumvention of field supervisors who utilized ACMs and SARs to usurp the floundering authority of IAPS. APD has discarded the use of those exculpatory processes, only to allow them to be replaced, functionally, by a third canard.  We view these types of lapses as quintessential examples of the Counter-CASA effect, and remind APD, yet again, that these types of cultural resistance to the requirements of the CASA cannot simply be ignored by supervisory and administrative review (IA) personnel when they occur.

So that the monitoring team can be abundantly clear to APD and the City of Albuquerque, 20 of a CASA-centric policy (in this case the OBRD policy) that is violated intentionally or unintentionally by officers, cannot be excused by:

- The officer who failed to adhere to the policy;
- Any supervisor conducting a use of force review;
- Any IAFD detective;
- Any member of the IAFD chain of command;
- Only offering mitigating factors to minimize the officer's inactions.

32

APD has been highly resistant to change in this area over the years.

Finally, supervisors' statements made when conducting reviews of ECW applications and Shows of Forces have been noted to undermine the spirit of the CASA and model poor leadership qualities. In one case this monitoring period, when a supervisor is advised by an officer at the scene of an ECW Show of Force that he did not activate his OBRD before going hands on with a suspect, the supervisor states, "you're not the first one, so…", and subsequently commented, "we'll get all that administrative stuff" before moving on from the officer. This certainly does not convey the importance of adhering to CASA-centric policies. In another case during this monitoring period, a supervisor displayed poor leadership qualities and was a poor role model when conducting a review of an ECW Show of Force. During this review, while in the presence of a subordinate officer whose actions he was reviewing by watching the officer's OBRD video footage, stated, "God knows we can't take an officer's word for what happened. We have to watch the video." This conveys a lack of professionalism on the part of the supervisor and portrays a persistent and long-lived culture of indifference toward CASA compliance on the part of supervisory personnel at APD.  We have yet to note any awareness from APD's internal systems of this bit of Counter-CASA internal culture. "Administrative stuff" is, at times, critical, as it cuts at the very heart of CASA compliance.

### 4.7.11 Assessing Compliance with Paragraph 24

Paragraph 24 stipulates:

> **"ECWs shall not be used solely as a compliance technique or to overcome passive resistance. Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered. Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range."**

### Results

See table below.

**ECW Usage As Compliance Techniques**

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Our analysis indicates that APD field personnel were in compliance with 100 percent of the incidents we reviewed for Paragraph 24.

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.12 Assessing Compliance with Paragraph 25:  ECW Verbal Warnings

Paragraph 25 stipulates:

> **"Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to discharging an ECW on the subject. Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning."**

**Results**

Members of the monitoring team reviewed eight randomly selected ECW application events for compliance with this task. Compliance figures for the eight events are depicted below, indicating a 100 percent compliance rate for the requirements articulated in APD policies related to Paragraph 25 of the CASA.

**Verbal Commands Prior to
Deployment of Tasers**

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.13 Assessing Compliance with Paragraph 26:  ECW Limitations

Paragraph 26 stipulates:

> **"ECWs will not be used where such deployment poses a substantial risk of serious physical injury or death from situational hazards, except where lethal force would be permitted. Situational hazards include falling from an elevated position, drowning, losing control of a moving motor vehicle or bicycle, or the known presence of an explosive or flammable material or substance."**

**Results**

**Deployment of Tasers in Situations Posing
Risk of Serious Injury or Death**

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.14 Assessing Compliance with Paragraph 27: ECW Cycling

Paragraph 27 stipulates:

> **"Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power. Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power). After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.   Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous**

> cycling) may increase the risk of death or serious injury.
> Officers shall also weigh the risks of subsequent or
> continuous cycles against other force options. Officers
> shall independently justify each cycle or continuous
> cycle of five seconds against the subject in Use of Force
> Reports."

## Results

Tabular results for compliance with Paragraph 27 are presented below.

### Continuous Cycling of ECWs

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| Compliance % | 100% |

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.15 Assessing Compliance with Paragraph 28:  ECW Drive-Stun Mode

Paragraph 28 stipulates:

> "ECWs shall not be used solely in drive-stun mode as a
> pain compliance technique. ECWs may be used in drive-
> stun mode only to supplement the probe mode to
> complete the incapacitation circuit, or as a
> countermeasure to gain separation between officers and
> the subject, so that officers can consider another force
> option."

## Results

See table below.

**ECW Use in Drive-Stun Mode**

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.16 Assessing Compliance with Paragraph 29:  ECW Reasonableness Factors

Paragraph 29 stipulates:

> **"Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options. ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons. In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others. Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations."**

**Results**

**Use of ECWs Based on All Circumstances of Incident**

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:        **In Compliance**

37

Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.17 Assessing Compliance with Paragraph 30:  ECW Targeting

Paragraph 30 stipulates:

> **"Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury."**

**Results**

Compliance data for Paragraph 30 are presented below.

**Targeting Subject's Head, Neck, or Genitalia**

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.18 Assessing Compliance with Paragraph 31:  ECW Restrictions

Paragraph 31 stipulates:

> **"ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective."**

**Results**

See table below.

**Taser Usage on Handcuffed Individuals**

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.19 Assessing Compliance with Paragraph 32:  ECW Holster

Paragraph 32 stipulates:

> **"Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm."**

**Results**

**Taster Holstered on Weak-Side Only**

|  | In Compliance |
|---|---|
| IMR-10-1 | Y |
| IMR-10-2 | Y |
| IMR-10-3 | Y |
| IMR-10-4 | Y |
| IMR-10-5 | Y |
| IMR-10-6 | Y |
| IMR-10-7 | Y |
| IMR-10-8 | Y |
| Compliance % | **100%** |

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.20 Assessing Compliance with Paragraph 33:  ECW Certifications

Paragraph 33 stipulates:

> **"Officers shall receive annual ECW certifications,**

39

> **which should consist of physical competency;**
> **weapon retention; APD policy, including any policy**
> **changes; technology changes' and scenario- and**
> **judgment-based training."**

## Results

Paragraph 33 requires APD officers to receive annual ECW certifications that consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes and scenario- and judgment-based training.  We requested training curriculum, as well as attendance and testing data, for 2018 ECW training for the department.  We cross referenced that data with officers who reported using ECW as a means of force during our case reviews and found that each officer that reported using their ECW in those cases had received the required training and certifications.  We also reviewed an Interoffice Memorandum entitled, "Status update on 2019 Taser 7 Transition" and Excel spreadsheet where APD captured department wide compliance data.  Data we reviewed indicated that APD has a 95% overall attendance rate for the training[25], and 100% of active sworn member have successfully attended the training.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.21 Assessing Compliance with Paragraph 34:  ECW Annual Certification

Paragraph 34 stipulates:

> **"Officers shall be trained in and follow protocols**
> **developed by APD, in conjunction with medical**
> **professionals, on their responsibilities following ECW**
> **use, including:**
> **a)  removing ECW probes, including the requirements**
> **described in Paragraph 35;**
> **b)  understanding risks of positional asphyxia, and**
> **training officers to use restraint techniques that do not**
> **impair the subject's respiration following an ECW**
> **application;**
> **c)  monitoring all subjects of force who have received**
> **an ECW application while in police custody; and**
> **d)  informing medical personnel of all subjects who:**
> **have been subjected to ECW applications, including**
> **prolonged applications (more than 15 seconds); are**
> **under the influence of drugs and/or exhibiting**
> **symptoms associated with excited delirium; or were**
> **kept in prone restraints after ECW use**."

---

[25] APD reported thirty-two sworn members are on various types of authorized leave (i.e., FMLA or military) and had not yet attended the Taser transition training.

**Results**

### Training re Risks of ECW Usage

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:      **In Compliance**
Secondary:  I**n Compliance**
Operational: **In Compliance**

## 4.7.22 Assessing Compliance with Paragraph 35

Paragraph 35 stipulates:

> **"The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel."**

**Results**

### Provision of Medical Attention

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.23 Assessing Compliance with Paragraph 36:  ECW Notifications

Paragraph 36 stipulates:

> **"Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges)."**

**Results**

### Provision of Medical Attention

|  | In Compliance |
|---|---|
| IMR-12-05 | Y |
| IMR-12-06 | Y |
| IMR-12-07 | Y |
| IMR-12-08 | Y |
| IMR-12-09 | Y |
| IMR-12-10 | Y |
| **Compliance %** | **100%** |

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.24 & 4.7.25 Assessing Compliance with Paragraphs 37 & 38

Paragraphs 37 – 38 of the CASA address auditing and analysis requirements that APD must meet related to ECW use as follows:

Paragraph 37: ECW Safeguards;
Paragraph 38: ECW Reporting.

During our June 2020 virtual site visit members of the monitoring team met with personnel responsible for the tasks delineated in Paragraphs 37 and 38.  The momentum and continuity of business continues in APD's Compliance Bureau, and the Performance Metrics Unit (PMU) maintained its forward leaning posture during IMR-12. PMU values objectivity when assessing data, and to date that approach has set them apart from some slower evolving commands.  Senior members' view of the data PMU is collecting and analyzing is creating meaningful dialog across commands, which is evidenced within data we reviewed.  Members of the PMU team came prepared to the meeting and provided relevant updates to processes now routine in the unit, and initiatives that are still in development.  In past reporting periods the monitoring team spent time providing perspective and feedback to APD, and the technical assistance we previously gave has clearly taken hold.  We find no instances where PMU requires persuading to enhance their business process, and instead find them seeking out perspectives on how to make their work product more valuable to the department.  We encountered one such instance this reporting period that is worthy of note and is discussed below related to PRU personnel conducting reviews of Level 1 uses of force.

APD previously achieved Operational Compliance for Paragraph 37, so we centered our attention on their ability to sustain their momentum and maintain operational success. As outlined below, we determined APD has sustained their Operational Compliance standing for IMR-12.

We see the expansion of PMU's scope of influence to be essential to compliance efforts across the organization, since the margin for error for Operational Compliance in the field is narrow.  As we document elsewhere, we continue to see serious deficiencies with use of force reporting and investigations at all levels, which impacts data integrity that is reported by the organization.  We suggest that PMU's view of data presented to them should be with a skeptical eye, since sometimes faulty reasoning at the data input stage will likely result in faulty data analysis on the back end of PMU's processes.  Of particular note are issues we see at the initial, field level categorization of uses of force and investigations related to that force.  As APD began the work of recasting its use of force suite of policies we cautioned the department (often) that although higher order investigations were being shifted to IAFD, the highest risk of error would likely still reside with front line supervisors in the field.  While we've identified issues related to IAFD this reporting period, this perspective remained largely true during this reporting period.

We learned that APD assigned two people to PRU in order to conduct "reviews" of Level 1 uses of force as a measure of oversight to attempt to catch errors that may occur during the first point of force classification.  This may be a response to recommendations the monitoring team has made in the past. We believed that without a meaningful audit of Level 1 uses of force to catch issues early, Operational Compliance will be hindered moving forward.[26]  Paragraph 57 states, "The Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence."  Early in the IMR-12 reporting period we spoke with the Commander who oversees PRU and discussed the nature of their "reviews" of supervisory Level 1 uses of force versus the notion of "audits".   The Commander described that the two people assigned the task were quickly becoming overwhelmed with the volume of work, which is not surprising.  APD should assess whether staffing is sufficient to review all Level 1 uses of force to ensure they are "…complete and that the findings are supported by the evidence" if the intent of that language is to conduct comprehensive reviews of all reports, videos and associated documentation for each case.[27]  That would be a labor-intensive task, and we would expect two people to make regular mistakes and operate with a substantial and sustained backlog of work.

---

[26] The performance of APD supervisors in the field, when classifying and investigating uses of force has shown to be deficient over time.  Therefore, as a risk mitigation measure, we recommended that APD put an auditing function in place to monitor field supervisor performance to head off issues early now that new policies have been enacted.

[27] In our experience, APD's quality of reviews still requires a detailed inspection of all available data to ensure force was used and investigated appropriately.  To date, field supervisors are not accurately classifying such events in all cases.

PMU provided a presentation of the status of their unit's efforts and, as usual, we were impressed with the progress of the team. We have discussed PMU staffing levels in past reports and learned that the number of people assigned to PMU remains steady.

PMU field inspections of Area Commands have become a routine part of the business process, and despite challenges presented by COVID-19, PMU maintained their inspections of data throughout IMR-12.[28]   For this reporting period we reviewed Inspection Summary Reports and Score Cards for each of the six Field Services Bureau Area Commands, and the Motors Unit. These inspections allow PMU to measure compliance with CASA paragraphs principally focused on ECW, OBRD, APD firearms requirements, IA complaint forms and requirements related to 72-hour extension requests during use of force investigations.[29]  They directly correlate data to specific CASA-related policy provisions and provide relevant observations made by analysts during assessments that are helpful to APD supervisors.[30]  The course of business documentation we reviewed demonstrated that APD has maintained Operational Compliance with Paragraph 37.

PMU collect pre-determined sets of data that measure compliance efforts across the six (6) Field Services Bureau (FSB) Area Commands and generated "Scorecards" that are shared back to those commands. The broad areas being assessed receive percentage scores related to compliance for each Area Command. Scores are color coded making the reports quickly digestible, which is an important quality for a field supervisor. We see legitimate exchanges of perspective between Area Commanders and PMU when an Inspection Report notes policy violations. Area Commanders have an opportunity to review and refute PMU findings, and within the data we reviewed we noted many instances where 1) PMU agreed with an Area Commander's perspective and evidence that was presented and changed a report finding; and 2) PMU disagreed with the perspective and evidence provided by an Area Commander and did not change the finding in the Inspection Report. When we discussed these exchanges with PMU we were told that there are instances in which they are provided excuses instead of evidence from an Area Commander, and we saw examples of that during our reviews.[31]  To be clear, we see the interaction

---

[28] We were informed that the only issue encountered was the ability to personally inspect IA complaint forms in the field, since PMU has worked remotely due to the Pandemic.

[29] The current paragraphs noted in PMU's "Inspection Summary" Report included ECW paragraph 37; OBRD paragraphs 224, 230; Firearms paragraphs 18, 20; Supervision Paragraphs 32, 207 and 225; and 72-hour extension paragraph 53.

[30] We have commented that the data being collected by PMU, if shared and analyzed from an IA and training perspective, will be a tremendous resource to APD. PMU isolates the data by Area Command and Unit and focuses even deeper on individual policy provisions that are being adhered to or violated.

[31] We observed one instance in which PMU accepted an excuse, as opposed to evidence, when an officer failed to upload OBRD before leaving work due to a family emergency. We do not question the legitimacy of the officer's emergency; however, this leaves an open question of how these types of instances are managed at the supervisory level and to what extent the supervisor should have intervened at the time, to ensure the OBRD was uploaded. Further, as opposed to finding the policy violation in compliance PMU should consider other ways to capture that encounter when displaying the information.

between to the Area Commanders and PMU to be a bright example of effective internal oversight.  If this manner of oversight is expanded and combined with legitimate remedial actions, the department will be well positioned to self-monitor in the future.  That said, this is a work in process and as PMU matures, their ability to monitor areas of policy centered more on uses of force and internal affairs will be possible.

During our site visit PMU reported these additional points of interest:

1) We learned that the application allowing Area Commanders to download Scorecards, which we reported in IMR-11, is in place but not yet enabled;

2) PMU received requests by SOD and SID to have inspections of their Commands.  This assessment will be assessed by the monitoring team during the next reporting period;

3) Special Oder 19-135, dated December 11, 2019, requires the replacement of an ECW battery (for the newly deployed Taser 7) every 30 days.  We recommended APD consider a monthly battery change requirement, as each month does not have 30 days and they could inadvertently create gaps of interpretation of when battery changes should occur.  This is an issue that should be clarified by APD; and

4) ECW downloads automatically occur when a battery is placed in a charger.  We noted that if a battery is lost or discarded prior to an officer placing it into a charger all data related to that ECW is lost.  This provides an opportunity for APD to consider its handling of ECW data and how and where the battery exchange occurs, and under what manner of supervision.

With respect to Paragraph 38 the monitoring team requested course of business documentation that demonstrated provisions had been met.  For reasons explained below, the documents we were provided for Paragraph 38 will not impact APD's current compliance standings, and they will remain in Primary Compliance.

As noted in IMR-10 and 11, APD published its 2016 and 2017 Annual Reports[32] in March of 2019, having not published an Annual Use of Force Report since 2015.  APD decided to organize use of force data from the years 2016 and 2017 together, which we found to be an appropriate approach under the circumstances.  The "Use of Force Report for the Years 2016/2017" was published in March of 2019.  During this reporting period APD provided a draft of

---

It should be noted that the officer, once realizing the mistake, uploaded the OBRD remotely albeit outside the requirements of policy.

[32] The report was dated February 2019 and was published on March 14, 2019.

a use of force Annual Report combining data from 2016-2019, which we believe is a good way to display and track data over years.

Paragraph 38 contains a provision stating, "Analysis of this (*sic*) data shall include a determination of whether ECW's result in an increase in the use of force, and whether officer and subject injuries are affected by the rate of ECW use."  APD personnel tasked with completing the Annual Use of Force Report expressed concern over the ability to meet the strict language of Paragraph 38 by forming a conclusion of whether ECW access is a causal factor for uses of force and injuries to persons, since there are a host of factors that contribute to the use of an ECW and/or associated injuries in any given case.   Members of the monitoring team discussed perspectives on the interpretation of the aforementioned language and recommended that this concern be brought to the attention of the parties and the Monitor for open discussion.  The issue has yet to be fully discussed and assessed, as of the writing of this report.

Our impressions of the draft Annual Use of Force Report are as follows:

1. Overall, a great deal of work went into this report and the categories of data meet provisions relevant to the CASA.  The style of writing and structure of the report were easy to follow and digest, so we commend the staff who were responsible for preparing this draft report.  Once finalized, we can reassess the report and document our findings in greater detail.

2. On page 6 of the report, APD calls out the specific CASA paragraphs the report is meant to address, and Paragraph 38 is among them.  However, when writing about Paragraph 38 in the report they specifically omit the language they found problematic through the use of ellipses (...) which may or may not be intentional but is certainly important.  All other ECW related data required by Paragraph 38 is captured in this report.

3. We know through case reviews that policy violations, including failures to report and properly investigate uses of force, extended up to and including the IMR-12 reporting period.  For that reason, we advised APD that language calling out issues with data integrity would be necessary for any higher level of compliance to be achieved with this Paragraph. ADP appropriately addressed this concern under the section "Data Fidelity".  They also spent a fair amount of time describing their efforts over the past two years to clean up the data (as best they can).  As we have noted in the past, systemic failures across the organization will contribute to a lack of data fidelity and undermine the value of information presented in the final work product.  The ECW data are no exception. APD as an organization has yet to fully appreciate the value of solid data collection and reporting regarding critical CASA-related processes.

Again, we recommend APD continue to assess the workload and staffing of PMU, since the organization's reliance on PMU's work product should continue to expand.  Becoming a data-driven police department requires commitment, with the expectation that making smarter decisions creates effectiveness that results in significant organizational efficiencies.

We believe PMU is the most positive resource APD has available at this time to foster Operational Compliance efforts across the organization.  We observed that PMU continues to create and modify internal auditing methods that will allow effective business processes to take hold and be sustainable.  As we noted in IMR-11, we believe that all CASA parties should first look to ensure PMU has a prominent seat at the table and has been the central figure in devising each internal assessment plan.  Eventually, they will be a solid resource to replace the monitoring team once compliance efforts are complete.

Paragraph 37 maintains its Operational Compliance status.
Paragraph 38 maintains its Primary Compliance status.

### 4.7.24 Assessing Compliance with Paragraph 37:  ECW Safeguards

Paragraph 37 stipulates:

> **"APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy. APD agrees to implement a protocol for quarterly downloads and audits of all ECWs. APD agrees to conduct random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's Use of Force Reports. Discrepancies within the audit should be addressed and appropriately investigated."**

**Results**

| | |
|---|---|
| **Primary:** | **In Compliance** |
| **Secondary:** | **In Compliance** |
| **Operational:** | **In Compliance** |

### 4.7.25 Assessing Compliance with Paragraph 38:  ECW Reporting

Paragraph 38 stipulates:

> **"APD agrees to include the number of ECWs in operation and assigned to officers, and the number of ECW uses, as elements of the Early Intervention System. Analysis of this data shall include a determination of whether ECWs result in an increase in**

47

the use of force, and whether officer and subject injuries are affected by the rate of ECW use. Probe deployments, except those described in Paragraph 30, shall not be considered injuries. APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis. ECW data analysis shall be included in APD's use of force annual report."

## Results

|              |                    |
|--------------|--------------------|
| **Primary:** | **In Compliance**  |
| **Secondary:** | **Not In Compliance** |
| **Operational:** | **Not In Compliance** |

### Recommendations for Paragraph 38

### 4.7.25a: Complete an analysis of whether ECWs result in an increase in the use of force and whether officer and subject injuries are affected by the rate of ECW use.

### 4.7.26 – 4.7.27 Assessing Compliance with Paragraphs 39-40: Crowd Control Policies and After-Action Reviews.

Paragraphs 39-40 of the CASA address requirements that APD must meet related to crowd control policies, and the management and supervision of APD responses to events involving mass demonstrations, civil disturbances, and other crowd situations. While the policies apply to all APD officers, the tasks associated with Paragraphs 39 and 40 are overseen by members of the APD Emergency Response Team (ERT).

The monitoring team met with ERT members responsible for compliance with Paragraphs 39-40 during our June 2020 virtual site visit and discussed their efforts during this reporting period. We discussed the ERT policy and training requirements that are pending relating to ERT protocols and learned that ERT was updating and recasting their policy with another SOP number --- now SOP 2-35 "Emergency Response Team (ERT)".[33]  The Monitor reviewed and commented on drafts of the updated ERT SOP and at the end of the reporting period the policy was still pending. The following paragraphs represent our findings related to Paragraphs 39-40.

Beginning with IMR-9 we documented ERT's effort to develop training and how it intended to address its requirements through a 3-Stage training process as follows:

**Stage 1** – All department personnel would receive training on SOP 2-29 (being recast now as SOP 2-35) through an on-line training platform, which

---

[33] APD's changing of SOP numbers has carried through the entire CASA project.  While recasting policies is not uncommon, APD's seemingly constant changing of policy numbers can create confusion over time.

will also cover aspects of use of force concerning chemical munitions and NFDDs.[34]

**Stage 2** – All ERT supervisors will receive an in-person "train the trainer" course on the new (when approved) ERT SOP, which will incorporate practice in crowd control formations and movements, so they are consistent across the entire ERT structure.[35]  (Note – There are a total of 5 teams of ERT, and approximately 90 personnel who will need to attend the training)

**Stage 3** – All other ERT personnel will receive in-person training and discuss use of force, including force related to chemical munitions and NFDDs, training on the ERT SOP, and squad formations and movements utilizing ERT supervisors as trainers.[36]

As reported in IMR-10 and IMR-11, ERT worked with the Academy to advance their Stage 1 training through the 7-Step Training Cycle, which was submitted to and approved by the monitoring team at the end July 2019.  APD promulgated Special Order 19-73 "Crowd Control Gap Training" on July 22, 2019.  That special order required that it be completed by July 29, 2019.  We were provided with a July 30, 2019, "Close Out" memorandum that documented the to-date compliance with Special Order 19-73.[37]  1,001 APD personnel were required to attend the training, and the documentation we reviewed demonstrated that APD achieved an overall performance score of 96%.[38]

During our site visit, ERT advised that they are refining their administration of routine training.  ERT ensures that personnel attend training sessions, and if a member misses a training date, there is a process in place to track the officer's compliance until they attend a make-up session.  We were told that if an ERT member misses three training sessions within a year they are dismissed from the team.  When asked, ERT Commanders could not recall an instance where a member of ERT has been dismissed from the team due to failing to attend training.  They schedule five training sessions per

---

[34] This stage of training was completed at the end of the IMR-10 reporting period.  ERT will have to consider retraining at Stage 1 once the new policy is completed.  Likewise, the topic of crowd control is a CASA requirement for the 86-88 series, so proper coordination between commands could reduce redundancy of effort.

[35] Issues with in-person training due to the Pandemic and recent incidents of social unrest will likely impede these efforts.  Any such delays are an illustration the consequences that result from ERT not advancing policy and training in a timely manner.  This is an organizational failure as much as a failure at the ERT level.

[36] Supervisors who attended the "train the trainer" course will be used as trainers.  Since this stage of training has been in development for nearly two years, any training will have to reflect the most up to date use of force policies and current Academy standards.

[37] APD providing the "Close Out" memorandum is encouraging to the monitoring team.  Incorporating this type of document as a routine part of their training process has been called out many times in the past.  When it becomes routine it is considered a course of business document that the monitoring team can then rely upon in future compliance assessments.

[38] Since these stages of training are becoming increasingly elongated, we suggest APD review the status of Stage 1 in order to create continuity between the different monitor's reports.

year, and the fifth is specifically for personnel to make up training they may have missed during the year.  As we have in the past, we encourage ERT Commanders to standardize their routine training documentation and mirror larger programs that they coordinate with the Academy staff.  We reviewed five randomly selected training records for routine ERT training programs that took place during this reporting period.[39]  While this type of routine training may be too cumbersome to run through the 7-Step Training Cycle, the basic tenets of learning objectives, testing outcomes, and post-training reporting are still valuable when tracking performance in the field for individuals or entire units.  The training records we reviewed are inferior to those we see in other areas of the organization, and different teams receive different training topics.  This can create a disparity of competencies across teams, and in light of the number of ERT responses of late, we expect APD would value continuity of capabilities across the different teams.  We highly recommend that ERT meet with the Academy to ensure a more professional format and process for routine training materials.

The monitoring team, as a part of the normal data collection process, requested APD provide documentation for any mass gatherings that occurred during the IMR-12 reporting period.  As we have noted in the past, low frequency, high impact events carry the most risk to an agency, so ensuring that ERT remain aware of their requirements, past commitments, and emerging trends is all the more important.  Over the past several Monitor reports, ERT has had virtually no call outs or After-Action Reports to review, but that changed during this reporting period due to nationwide social unrest following police encounters in other cities.  APD provided the monitoring team with 24 Pre-Operational Plans and 22 After-Action Reports to review.[40]  Overall, the quality of the documents was a marked improvement to those we were provided in the past, with the general flow and content placed in a standard template.  We were encouraged with the increased quality of documentation, and offer the following brief observations to consider that will benefit ERT:

1. There were different terms for the same report.  Team leaders referred to the pre-operational plans as either "Event Action Plans" or "Incident Action Plans".  It is irrelevant to the monitoring team which term ERT chooses, but standardization in all areas across teams is important.

2. The documentation we were provided for a May 28, 2020, event was the most comprehensive and we recommend that ERT look to that paperwork as a model to be emulated.  We began to see variable quality in the paperwork as time passed and more ERT deployments occurred.  ERT would be wise to collect reports prepared for these events (by different team leaders) and assess the presentation of information to further standardize that information within the templated categories.

---

[39] ERT teams are separated and named by different colors (i.e., White Team, Blue Team)
[40] Two of the events occurred immediately following the IMR-12 reporting period and in two instances After-Action Reports have not been submitted, accounting for the difference in numbers between the two types of reports that were provided.

3.  ERT should continue to focus attention on its pre-operational plans, since they lay the foundation of command and control for an event.  If done properly, they will be a prominent exhibit to protect the department's pre-event decision making and the intended courses of action when scrutinized following an ERT deployment.

4.  ERT should familiarize themselves with SOD After-Action Reports and consider adopting some of their qualities.  A healthy conversation between these two organizational entities would likely benefit ERT, in particular in the area of attributing command decisions to specific people during an event.

5.  In each of the pre-operational plans ERT called out the fact IAFD would be present and responsible for the investigation of uses or shows of force.  The quality of ERT After-Action Reports will be important as IAFD collects relevant documentation when investigating force used during these types of events.  Timeliness of ERT After-Action Reports is important as well in order for them to be used as a component of a comprehensive use of force investigation.  Therefore, IAFD should have access to the ERT After-Action Reports at the earliest point possible.  Otherwise, inconsistencies and gaps of information may arise between the two commands when documenting actions for the same event.

6.  As we note in Paragraphs 90-105, a separate issue was identified following protest deployments relating to the proper timelines for reporting and documenting uses of force.  APD handled numerous protests in short periods of time, with IAFD responding to investigate accompanying uses of force.  We learned there was "substantial disagreement" between commands as to the proper timelines to apply for use of force reporting during protests.  The recent protest deployments revealed an important issue to be resolved and we will look for APD to propose a reasonable and workable solution to these contradictions for future events.  Balancing the need for timely use of force investigations with chaotic emerging events will require the commands to tease out the relevant issues, devise a proper response to those issues and advance their proposal to the Monitor for consideration.

7.  Based on our review of the documents, there are very clear lessons learned that ERT can use to inform team training in the future.  Equally importantly is ERT's ability to benefit from department-wide training related to crowd control and decision-making during incidents of social unrest.  This is essential given the current dynamics of protest and response we see throughout the country.

While reviewing SOD After-Action Reports in preparation of Paragraphs 90-105 we learned the following:

1. SOD Commanders outlined lessons learned for future activations, in particular gaps in communication between ERT and SOD at the front end of a protest detail.  That lack of communication "…put resources at a disadvantage…" since tactical officers were off duty and SOD had to catch up to be able to effectively deploy personnel.

2. SOD noted the lack of cross-disciplinary training between SOD and ERT, and the importance that each knows the capabilities and limitations of the other duties during an event.  SOD intends to consult with ERT and schedule routine training with the two units.

3. During a tactical activation for a protest detail, SOD realized that some ERT personnel arrived without gas masks, which limited SOD's ability to deploy chemical munitions to create time and space between officers and a crowd.[41]

Circumstances that caused the recent protests are highly unfortunate, but ERT now has a number of deployment experiences that will benefit them in the future.  Translating those experiences into policy refinement and training programs will require ERT to work closely with other departmental Divisions.  By doing so, APD will create efficiencies that simultaneously benefit multiple commands.  While several of the recent events did not result in an actual ERT deployment, there is still valuable information that can be gleaned from outside law enforcement perspectives.[42]  Finally, we were advised that IAFD investigations into uses of force related to ERT deployments to protests were still pending at the end of the monitoring period.  IAFD is reportedly investigating eight use of force cases that stem from four separate mass demonstrations and involve approximately 214 individuals.  The monitoring team will request a sample of these IAFD investigations during the IMR-13 reporting period.

Based on our review, we have determined Primary Compliance should be continued for Paragraphs 39 and 40.  Secondary Compliance will be achieved once APD has an approved ERT policy and their Stages 2 & 3 training have been completed.  ERT must also consider any policy modifications that may impact the Stage 1 training they have already completed and decide whether that training has to be updated for the entire organization.  The monitoring team will be making such a determination, so it will be important for ERT to be proactive in this regard.  Finally, since crowd control training is a component of the Academy's annual training requirements, we again recommend that ERT develop

---

[41] SOD noted that this issue was addressed following the event but casts a light on ERT's failure to complete its ERT centric training over the past several reporting periods.  These are the type of problems that occur when proper policy and training are not in place, and there are low instances of deployments.
[42] Like SOD, there is a distinction between the terms of "activation" and "deployment".  Activation can best be characterized as being present and available during an event, while in a deployment ERT engages a situation in some manner.  We have been told that after receiving assistance from allied agencies, it is difficult to get those same agencies to provide feedback of their impressions of APD's performance during a deployment.  We encourage APD to continue their efforts to elicit information.

and deliver that training in conjunction with the Academy.  We have commented many times in the past that proper coordination will greatly benefit APD.

### 4.7.26 Assessing Compliance with Paragraph 39: Crowd Control Policies

Paragraph 39 stipulates:

> **"APD shall maintain crowd control and incident management policies that comply with applicable law and best practices. At a minimum, the incident management policies shall:**
>
> **a) define APD's mission during mass demonstrations, civil disturbances, or other crowded (sic) situations;**
> **b) encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses;**
> **c) require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and**
> **d) continue to prohibit the use of canines for crowd control."**

### Results

Primary:         **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.27 Assessing Compliance with Paragraph 40

Paragraph 40 stipulates:

> **"APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures."**

### Results

Primary:         **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### *Recommendations for Paragraphs 39 and 40:*

53

*4.7.26-27a: Recommendation:  APD must develop and deliver a meaningful training program to its ERT and Field Services members that is centered on crowd control policies.  That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans. Training should incorporate lessons learned from recent ERT activations, and contemplate best practices developed by police agencies facing similar social unrest across the country.*

*4.7.26-27b: APD must continue to ensure its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy, training, or operational rubric within the agency.  We encourage APD's ERT Commanders to review past reports and to incorporate AAR procedures and forms (previously agreed upon) into SOPs.*

*4.7.26-27c: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.*

*4.7.26-27d: ERT should coordinate with IAFD to devise workable solutions to ensure reasonable and timely use of force reporting and investigations occur in circumstances where multiple planned and unplanned protests are being addressed.*

*4.7.26-27e: ERT should work with SOD to schedule routine multi-disciplinary training.*

### 4.7.28 – 4.7.46 Assessing Compliance with Paragraph 41-59: Supervisory Review of Use of Force Reporting

This series of related Paragraphs (41 through 59) encompass requirements for reporting, classifying, investigating, and reviewing uses of force that require a supervisory-level response based upon the type and extent of force used.  The CASA delineates this larger group of paragraphs into three separate sub-groups:  Use of Force Reporting – Paragraphs 41-45; Force Reviews and Investigations – Paragraphs 46-49; and Supervisory Force Reviews – Paragraphs 50-59.  The following represents our findings relative to this series of paragraphs.

The CASA requirements stipulate that the use of force and reviews / investigations of force shall comply with applicable laws and comport to best practices. Central to these reviews and investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  We have commented extensively in the past that APD's reporting and investigation of uses of force have demonstrated serious deficiencies that have hindered compliance efforts. As with other reporting periods, the monitoring team spent time during the IMR-12 reporting period in consultative processes providing perspective, feedback, and

technical assistance to APD personnel regarding force investigations. We provided perspective to APD to help the administration better understand and deal with historical difficulties the agency has had in achieving compliance, and provided ideas concerning how these issues could best be addressed moving forward.  We have seen examples of our technical assistance being implemented in certain areas, as well as an improvement with the overall handling of use of force incidents. However, we still find evidence of force reporting and investigation problems, as well as system breakdowns and process disconnects that will continue to hinder Operational Compliance moving forward, unless these issue receive direct, assertive, focused attention from APD leadership.

During IMR-10, APD promulgated Special Order (SO) 19-25, entitled, "Internal Affairs Request Through BlueTeam". Internal Affairs Professional Standards (IAPS) Division became the central intake for "all identified or suspected violations of Department Standard Operating Procedures (SOP)," thus rescinding the problematic use of ACMs and the Supervisory Action Report (SAR)." During IMR-11, the monitoring team observed evidence that SO #19-25 was being adhered to in practice. While its acceptance was diluted in IMR-10 and the early part of the IMR-11 monitoring period by IA personnel reacting slowly to opening IA cases based on reporting from the field and Commanders not wanting to cede authority over policy violations, in the latter part of the monitoring period the monitoring team observed numerous examples of personnel requesting IA investigations on policy violations. A number of cases reviewed during this monitoring period contained requests for the IA review of policy violations. These requests continue to be examined by the monitoring team to the point of their logical conclusions, in order to determine if APD is properly administering its IA oversight functions.  APD's tracking data indicate a steady up-tick in IA policy investigations, with 263 referrals in IMR-10's reporting period, 404 referrals in IMR-11, and 534 referrals in IMR-12.

The monitoring team has given exhaustive technical assistance and feedback to APD concerning the problems associated with their IA processes. This technical assistance included on-site support up to the last day of the IMR-11 monitoring period. This feedback encompassed best practices in internal affairs operations, as well as the lack of timeliness of APD's use of force investigations, and the disparity in discipline that exists by deferring disciplinary decisions (especially on matters originating from use of force incidents) to Area Commands. This concern about criteria and timelines also extends to the Paragraph 53 requirement of completing supervisory force investigations within 72 hours. In past monitoring periods, the monitoring team observed numerous incidents of what seem to be Commanders elongating the amount of time (up to 60 days) that supervisors have to submit supervisory force investigations for Commander review by summarily granting longer extensions than requested by supervisors.[43] In these prior monitoring periods, the time required to review non-serious use of force investigations often extended two months after the actual use of force. Pursuant to SOP 2-57, the deadline is 30 days for Commanders to complete their review.

---

[43] We note that when a first line supervisor requests an initial extension to submit their use of force investigation, that initial request often undermines the opportunity for that case to be completed before the 30-day deadline.

In IMR-12, there were several cases that were completed beyond 60 days. Timeliness continues to plague APD on a number of fronts beyond just the deadline to complete supervisory use of force investigations. Whether the genesis of this problem is merely APD's culturally ingrained *laissez faire* approach to deadlines, or the intentional failure of individuals to act with any sense of urgency (and collaterally undermining the spirit of the CASA), the outcome is the same—the detrimental effect of APD not imposing corrective measures and discipline of officers for policy violations. This fear or inability to impose appropriate corrective measures and discipline adversely impacts APD's ability to reduce its risk for individual officers, for the agency as a whole, for the city government, and for the city's citizens.  This may be the most influential problem facing APD as it moves to comply with the requirements of the CASA.

APD's focus on Level 1 use of force supervisory reviews commenced during this monitoring period (February 1, 2020 through July 31, 2020). APD opened 173 new cases. This represents a substantial decrease (28.2 percent) from the 241 supervisory use of force investigations opened during the IMR-11 reporting period.  Pursuant to SOP 2-57, supervisors must complete and document a supervisory force review of a Level 1 use of force within 72 hours after the supervisor leaves the scene of a use of force (upon a commander's approval, supervisors may receive a seven-day extension). The lieutenant in the involved officer's chain of command has ten calendar days from receiving the supervisor's review to complete a review of a Level 1 use of force. The commander in the involved officer's chain of command has ten calendar days from receiving the lieutenant's review to complete the review of a Level 1 use of force. Thus, the maximum amount of time a Commander has to complete a review of a supervisory review is 30 days (assuming a seven-day extension was granted to the supervisor conducting the initial review). As the table below indicates, at the close of the monitoring period only 68% of the Level 1 supervisory use of force reviews were completed within the allotted 30-day period. During the first three months of the monitoring period, 99 reviews were initiated and 77% of those reviews were completed within 30 days. This analysis provides a snapshot of how APD continues to struggle to complete these investigations in a timely manner.

Table 4.7.28.1  Timely Investigations of Supervisory
Use of Force Investigations

| Monitoring Period | # of Sup. UOF Cases Initiated (Months 1-3) of the Mon. Period | # of Sup. UOF Cases (Months 1-3) Completed within 30 days | Total # of Sup. UOF Cases Initiated during the Mon. Period | Total # of Sup. UOF Cases Completed within 30 days |
|---|---|---|---|---|
| IMR-12 | 99 | 76 (77%) | 173 | 117 (68%) |
| | | | | |

As of January 11, 2020, APD implemented a new suite of use of force policies, as well as a new classification system for investigating uses of force. While this system has

certainly changed the dynamics of how uses of force are categorized and investigated, APD should conduct an analysis of causal factors leading to their failure to achieve a better efficiency in completing the investigations. Information may be gleaned from examining past failures that will positively impact the effectiveness and efficiency of use of force incidents moving forward. More importantly, such an analysis may benefit APD by examining the factors that led them to present to the Court how this new system would facilitate compliance, and then determine what may be impeding their progress to achieve compliance under their new system.

Compliance with Paragraphs 41-59 has been an elusive endeavor for APD, as it started IMR-11 only in Primary Compliance—after six years of effort. One of the reasons cited for this poor compliance status was persistent outstanding training gaps that relate to these paragraphs. However, APD took successful steps to remediate these outstanding training gaps (commencing during IMR-10) and in IMR-11, they successfully implemented a training program to integrate the new suite of use of force policies into practice. This led to APD achieving secondary compliance in IMR-11. Operational compliance for Paragraphs 41-59 will prove more elusive for APD if they do not begin to achieve the efficiencies and effectiveness, they touted for the new suite of use of force policies implemented in January 2020.

As a result of these issues, APD is dangerously close to losing secondary compliance for Paragraphs 41-59.  This is emblematic of a host of training issues newly confronting APD during this reporting period.  These training issues are dealt with extensively in paragraphs below.  Parenthetically, the monitor has held multiple in-depth conversations recently with APD regarding these existential threats to training compliance.

A number of APD functions conform to various aspects of Paragraphs 48-52. For example, during our June 2020 virtual site visit, the monitoring team met with APD representation from the Multi-Agency Task Force (MATF). A review of the MATF case ledgers and other documents continues to indicate the task force's activation as set forth in Paragraphs 81-85.

The monitoring team conducted a review of Level 1 use of force cases drawn from samples taken throughout the monitoring period. The cases reviewed and a synopsis of each case are listed below. For Level 1 use of force cases involving an ECW, those case facts were fully described in Paragraphs 24-36 of this report. Problems, if any, with those cases as they relate to the conduct of supervisory use of force reviews are cited here for clarity purposes.

**Case #1 IMR-12-11 (Level 1 UoF)**

In February 2020, at approximately 11:00 AM, officers responded to a Walmart regarding complaints about a female who was criminally trespassing on the property. The subject was yelling and highly agitated after not being allowed to make a purchase inside the store. The individual then positioned her possessions near the store's

entrance and was disruptive towards patrons. After officers issued a criminal trespass notification form to the individual, she left the immediate area. In an effort to de-escalate the situation, officers observed the subject from a reasonable distance. The individual continued to yell expletives loudly, flailed her arms while walking around, and pedestrians had to move out of her way to avoid her movements. Approximately 15 minutes later, officers arrested the subject for criminal trespass and disorderly conduct. The subject was handcuffed, placed in a vehicle, as she continued to be disruptive by kicking the seats and banging herself against the inside of the vehicle. While transporting the subject to the prisoner transportation center (PTC), the individual stated she would kill herself if she had to go to jail and wanted to go to the hospital. Due to the continued kicking and banging herself against the vehicle, the individual was placed in a passive restraint system to prevent injury; however, she continued to be uncooperative. While at the detention center, the subject continued to be uncooperative and had to be controlled when being handcuffed once again for transport to the hospital. When being handcuffed again, the subject kicked an officer in the leg a few times and an officer appropriately "trapped" the subject's leg to prevent further kicking. It should be noted the subject was subsequently charged with battery on the officer for the kicking incident. Later, when the officers were departing the hospital with the subject after receiving a medical clearance, one of the officer's used minimal force to pull the transporting vehicle's seatbelt tight to help secure the uncooperative subject. This force was also appropriate.

Case Observations:

1. The monitoring team reviewed the officers' OBRDs and reports, as well as the responding use of force investigation and chain of command reviews. Overall the quality of the investigation was good, and the use of force was within policy.
2. The acting field sergeant's efforts to conduct on-scene interviews of officers were appropriate, based upon the minimal amount of force used in this incident. The case was submitted late after an extension was granted. This was noted in the lieutenant's review and the reviewing lieutenant appropriately mentored the acting sergeant on the timeliness of the investigation's submission.

### Case #2 IMR-12-05 (ECW Show of Force)

This case was reviewed in Paragraphs 24-36 of this report. The case involved a February 2020 ECW Show of Force after officers followed a suspect on foot who had just threatened a restaurant worker with a knife. As reported previously, two officers, assisted by a third officer, appropriately used minimal physical force to handcuff the suspect. The ECW display and the minimal physical force used to handcuff the suspect were appropriate and within policy.

Case Observations:

1. The third officer on the scene of this ECW Show of Force did not turn on his OBRD until after the suspect was seated in the vehicle. Audio recordings

documented this officer self-reporting to the investigating sergeant that he did not turn on his OBRD. However, the officer's verbal account of not activating his OBRD to the investigating sergeant on scene differed from what he wrote in his police report and use of force (witness) narrative. This was not reconciled by the investigating supervisor.

2. An IA request for the failure to activate the OBRD was submitted via team BlueTeam to IA and accompanied by a PDF file that contained mitigating circumstances. No aggravating circumstances were offered. The conflict between the officer's on-scene recorded statement about not turning on the OBRD and the officer's version of the OBRD non-activation in his written report was not reconciled, nor was it reported within the request for a Sanction 7 verbal reprimand.  We note this was a critical error, caught only by the monitoring team.

3. The Area Commander supported the Sanction 7 verbal reprimand before having the benefit of reviewing the videos and the completed use of force investigation. In fact, the audit log of the investigating supervisor's OBRD recording provides no evidence that the Area Commander ever reviewed the Use of Force interviews or on-scene actions of the supervisor.  This is a critical error affecting command duties and "due diligence."

4. Additionally, an officer needed to use minimal physical force (accompanied by another officer) when walking the suspect into the PTC and while inside of the facility. This was not noted by either officer in their reports, nor did they report that the suspect needed to be transported to another location due to being disruptive/emotionally uncooperative. If APD did not view all of the of these accompanying officers' videos in their entirety, nobody would know this had occurred.  Thus, several levels and points of incident review were missed.

5. It should be noted that an additional officer arrived at this facility to deal with the suspect and was incredibly patient working with the suspect to gain his cooperation for purposes of prisoner intake.


**Case #3 IMR-12-12 (Show of Force x2)**

In February 2020, an afternoon SWAT activation occurred in response to a request to arrest a suspect regarding an attempted sexual assault. The suspect, who was in his apartment with his two-year old son, was not responsive to officer attempts to contact him in the residence. The suspect was known to have mental health issues, in addition to having made threats against police officers, and was known by the police to possess weapons. After all communication attempts failed, the SWAT team made a forced entry into the suspect's apartment and successfully arrested him, while at the same time safely removing his son who was in the same bed with him.

Case Observations:

1. When a sergeant was conducting an on-scene investigation, two APD members self-reported that they "covered the suspect with the muzzle of their weapons as they advanced towards a room where the two occupants…were located." However, the individual written reports of the officers indicated one officer's "muzzle may have unintentionally covered the suspect," while the other officer reported he needed his "rifle mounted light to observe the male" and that he did not have a sight picture and did not have the intention to cover the male with my muzzle." These discrepancies were not noted in the supervisor's review.

2. Due to the darkness in the room and the legitimate movements of the SWAT members during the entry or arrest, no inappropriate use of force (especially with firearms) was noted on videos reviewed by the monitoring team. Audio on these videos confirmed this determination. Thus, the subsequent investigation's conclusion on the shows of force was appropriate. However, the investigation and subsequent chain of command reviews largely failed to appropriately investigate and classify other force events in this case.

3. The review of videos in this case revealed officers carried the handcuffed suspect from the bedroom, through the apartment, and outside the apartment through the courtyard to an APD vehicle. The suspect refused to walk and had to be carried. The suspect, who is a heavier male, was completely naked and "dead-weight." He was carried facedown by two (and at times by three) officers, who held his arms (behind his back) and ankles. The suspect also appeared to be partially dragged through gravel a very short distance due to the strain of carrying the heavier, uncooperative male. This resulted in the suspect sustaining scraped knees, what appeared to be other smaller abrasions, and an apparent cut to his right forehead.

4. The sergeant's review of the shows of force (reported as shows of force from the onset through the Commander's Review) indicated photos were taken of the individual at the scene. However, the monitoring team was only provided with photos presumed to be that of the victim. Pursuant to BlueTeam reporting, these were the only photos in this use of force investigation. It appears no one at APD noted this apparent "loss" of evidence.

5. The lieutenant's review noted the abrasions on the suspect's knees (attributed to being carried) but failed to identify the injury to the suspect's forehead.

6. The reviews conducted (sergeant, lieutenant, and commander) failed to mention the appropriate force used by the officers to physically control and move the handcuffed suspect that resulted in his visible injuries.

7. From the point of breaching the door through making physical contact with the suspect, at no time did any officer on the entry team announce "POLICE."

The monitoring team determined that the injuries appear to have occurred to the suspect while he was carried and dragged. While this would normally be a Level 2 use of force, in this scenario the suspect was handcuffed when he was carried and dragged (and apparently injured). Thus, according to APD policy, this Level 2 use of force became a Level 3 use of force. For this reason, the monitoring team deems this case to be an unreported and uninvestigated Level 3 use of force.

## Case #4 IMR-12-13 (Compliance Technique)

Officers were called to a motor vehicle accident in a residential neighborhood.  When Officer 1 arrived on the scene, a citizen had the driver, who was reportedly intoxicated, pinned to the ground face down.  The officer approached the two, made quick observations that led him to believe the driver was intoxicated, and took over control for the citizen. The suspect was face down with his arms to the side and extended above his head.  The officer attempted to handcuff the suspect, and initially he was compliant, but suddenly began to stiffen, thrash, and actively resist.  The officer called for backup, held the subject to the ground and made numerous commands to "stop resisting." Officer 2 arrived and approached the scene to assist the first officer, who was still struggling with the suspect.  The two officers were able to handcuff the suspect, who was then walked to a nearby patrol car. They dealt with a combination of lack of compliance along with the effects of the subject's intoxication as they walked and when trying to place the subject into the vehicle.

The case was investigated by a sergeant and a determination was made that there was a Level 1 use of force by officer 1, but not a use of force by officer 2.  That incorrect assessment continued through the chain of command, as well as the Performance Review Unit (PRU).  The use of force in this case was determined to be objectively reasonable, in line with department policy, and the minimum amount necessary by a preponderance of evidence.  We are gravely concerned, however, at the inability of officers, supervisors, and lieutenants to clearly identify uses of force by officers.  Given the numbers apparently involved, systemic retraining may be necessary.  This is a compliance issue that APD needs to assess carefully and should result in process improvement plans that are then fed into a process of clarification or global retraining (via video or similar end-user processes).

Case Observations:

1. Overall, the flow of the Level 1 investigation was easy to follow and documented by each level of supervision.

2. Based on a review of OBRD's the subject demonstrated obvious signs of disorientation, likely due to alcohol.  He was combative with Officer 1 and was incoherent when he spoke.

3. In the accident report Officer 2 documented that he assisted by placing his left knee on his (the subject's) back and right knee on the ground while he "gained

control of his right arm and placed [sic] into a handcuff.  When describing the series of events to the supervisor, Officer 1 stated that Officer 2 took control of the subject's right arm and said to put his hands behind his back "…or this isn't going to end up good for you."  As he went to pull the arm the subject resisted so Officer 2 placed his knee just above the subject's shoulder blade and held onto the subject. That distracted the subject enough that Officer 1 was able to pull the subject's other arm back without (additional) resistance.  Officer 2 was able to get a handcuff of the subject's right arm and "…pulled it around."  Officer 1 told the supervisor that the two officers attempted to walk the subject to the patrol vehicle, but he was "dead weight".  Once at the patrol vehicle, the two officers were able to place the subject inside by Officer 1 holding the legs and Officer 2 pulling him into the vehicle (face down).

4.  OBRDs reviewed by the monitoring team capture the actions reported by Officer 1.  Officer 2's OBRD footage shows him holding the subject's arm as he stood next to him.  As he took control of the subject's wrist, he stated "You need to chill or this is going to hurt, do you understand?" There is tensing by the subject at which time Officer 2 kneels on the subject to brace him with his left knee. Simultaneously, he pulls up and back on the subject's arm and wrist.  These actions are consistent with the description provided by Officer 1. However, the combination of information is a discrepancy in reporting and a use of force by Officer 2.  These factors are not properly addressed by the supervisor, the chain of command, or PRU.  Once again, it is the monitoring team who are noting these issues, and a phalanx of APD internal review processes missed these critical elements.

5.  Immediately following the subject being placed in the patrol car, at least five potential witnesses are seen standing by the scene, but only two witness statements were obtained by the supervisor.

6.  The subject had minor cuts to his face, which could have occurred during the motor vehicle accident, while being restrained by the citizen, or during the struggle with officers.  The supervisor makes a declarative statement that they were "preexisting" to the use of force, but an insufficient explanation is provided to be confident, especially in light of the fact that the struggle with the officers occurred with the subject being face down.  He appears to have relied solely on the description in Officer 1's report narrative.

7.  The supervisor was on scene for 25 minutes before viewing relevant OBRD footage, which could have affected the proper classification of force and the steps necessary to properly investigate the event had that review occurred. Officer 1 actually had to stop the ambulance from leaving the scene with the subject so the supervisor could view his OBRD.  It is unclear if the Supervisor reviewed Officer 2's OBRD at the scene.  During an on-scene interview by the supervisor, he failed to ask meaningful questions of Officer 2 to determine if his actions constituted a use of force.

8. The supervisor's interview of two witnesses failed to capture sufficient detail to reconcile both Officers' actions to properly determine each use of force.

9. Officer 1's report narrative lacked appropriate detail when describing how he and Officer 2 moved the subject to the patrol vehicle. He noted that while moving to the patrol vehicle the subject "…choose [sic] to bend his knees" and "…then again lift his legs causing (Officer 2) and I to get him to the patrol vehicle." The actions taken by the two officers were objectively reasonable and constituted an additional use of force. This was not addressed by the supervisor or the chain of command in any meaningful manner.

10. Officer 2's report contained insufficient detail to assess his actions, and in addition contained boilerplate language (i.e., "…I arrived and assisted with putting the male in handcuffs" and "…I gained control of his right hand and assisted placing the male in handcuffs").

11. The PRU identified policy violations associated with the timeliness of reporting the use of force through Blue Team by the supervisor, which instead of occurring before the end of the shift was entered four days later. PRU assessed that the SOP was deficient and failed to adequately address the timeline for making an initial BlueTeam entry. We agree in part. The requirement to make a BlueTeam entry exists in SOP 2-57; however, the language making it mandatory by the end of the shift is listed in SOP 2-56. The supervisor is responsible for both policies and should be conversant with both. However, we agree that it is appropriate to include the timeline requirements for BlueTeam entries into SOP 2-57. PRU made a recommendation that a BlueTeam entry not be mandatory by the end of a shift. We disagree completely.

12. The monitoring notes that the actions by both Officers 1 and 2 were objectively reasonable: their force was proportional to the resistance experienced, and their minimal amount of force utilized was necessary and consistent with APD policy. Both officers were professional in their interaction with the subject.

**Case #5 IMR-12-14 (Compliance Technique / Distraction Technique)**

Officers responded to a domestic violence call, in which a witness reported hearing arguing between a male a female inside an apartment. Through a window the caller reported seeing the male subject assault the female and choke her, and that she stopped moving. The caller heard the female yelling to "stop hitting me" and the male yelling that they were both bleeding. Finally, the caller believed that he heard a baby crying inside the apartment.

When officers arrived, they approached the apartment where they were met at the door by a female, who opened the door, but left the door chain connected. For approximately 20 minutes the officers calmly talked with the female and explained their

need to confirm her safety and the safety of a baby that was reported to be inside the apartment by a witness.[44]  The female refused their entry and was uncooperative.  She pulled back a blind that allowed officers to see her and inside the apartment, which appeared disheveled.  Also, an officer noted on his OBRD that he saw blood on the floor and an injury on the female.  Though unclear by the documentation provided by APD, it appeared (when we reviewed an OBRD) that an officer at the scene contacted a supervisor to obtain permission to force entry into the apartment.  After talking to the supervisor, four (4) officers forced entry into the apartment.  Immediately prior to the officers forcing the door open, which required them to break through the security chain, the female can be seen on an officer's OBRD quickly pulling a couch in front of the door as a barricade.

The female attempted to hold the door shut and could be seen maintaining a hold on the chain of the door as the officers attempted to open the door with force.[45]  Officers struggled to get the door open because of the resistance offered by the female. Once inside, two of the officers began to physically struggle with the female in an attempt to handcuff her.  An officer said "stop" four times as she struggled, but the woman fought with the officers until they were able to push her against a dog crate that was positioned immediately inside the door.  Two other officers approached the rear of the apartment and after several commands, a male subject exited a bathroom, was taken into custody, and handcuffed.  During the encounter, an officer attempting to secure the male utilized a Level 1 show of force with a 40mm weapon, but APD failed to report obvious uses of force against the female, which were missed through the entire chain of command.

Case Observations:

1. The investigation of this event by the responding supervisor was deficient in numerous areas, failing to properly categorize officer actions as a clear use of force while taking the female subject into custody. This failure continued through the supervisor's chain of command, including the Performance Review Unit's assessment of the case.  Because the investigation was so poorly managed, by failing to properly investigate the origin of injuries of the female and not photographing the officers and the subjects of the uses of force, a Level 2 use of force was likely missed which would have required an IAFD response.

2. The supervisor's questioning of the officers, and other individuals, was perfunctory at best.  The supervisor would ask officers to self-characterize the level of force that was used and did not ask appropriate follow up questions to discern what the correct force categorization(s) actually should be.  A prime example is when the supervisor asked an officer, "Everyone went into cuffs compliantly?", and the officer's response was "Uh, for the most part."  The supervisor never follows up with that response which contributed to a use of force not being reported or investigated.  First of all, this is a leading question.

---

[44] The woman denied there was a child in the house, which proved accurate later in the event.

[45] This likely meant that the woman was on the couch or standing directly beside the couch when officers forced their way into the apartment.

Secondly there was a lack of a necessary follow-up question from the sergeant: "What do you mean 'for the most part?"

3. Discrepancies were not addressed by the investigating supervisor or the chain of command.  Injuries sustained by the female victim were potentially inflicted from multiple sources, including by the suspect who was taken into custody or during the use of force.  The female claimed she was injured by the officer's actions several times, to include when questioned by the supervisor.  She pointed out injuries to her left leg, but an officer noted in his report there were injuries to her right leg prior to her being subjected to the (unreported) force.

4. Injuries observed on the female victim's upper left leg (as viewed on OBRDs) are consistent with the height of the dog crate she was pushed up against by the officers.  This was not adequately investigated by the supervisor or the chain of command.

5. Officers and the supervisor attempted to characterize the female victim's actions as "passive resistance" and their actions as "low level control tactics".  These assertions are entirely incorrect.  For illustrative purposes, officer reports documented the male subject's actions as "active resistance" because he stayed in the bathroom too long and disregarded officer commands to come out.  Conversely, they characterized the female's actions as "passive resistance" when she refused open the door for over 20 minutes (necessitating a forced entry).  She was observed attempting to barricade the door with a couch before their entry, and then struggled with two officers inside the door as they attempted to handcuff her.  This constitutes a forcible handcuffing and should have been reported as such.

6. Reviews of OBRDs illustrate that there was video evidence that the actions associated with the female victim constituted a Level 1 use of force.  The supervisor even contacted the Force Investigation Section (FIS) twice regarding the injuries, and still failed to properly categorize the force used against the female victim.[46]

7. Reports reviewed by the monitoring team contained boilerplate language.

8. During the review process, IA requests were prepared in BlueTeam, focused on the supervisor failing to enter the use of force into BlueTeam within timelines and the lieutenant and commander not identifying the infraction.[47]  It is obvious to the monitoring team that the adjudication of allegations took place at the point of

---

[46] The calls to FIS are not documented in any report provided to the monitoring team.  It is unknown if sufficient information was provided to FIS for them to make an appropriate assessment, since each time the supervisor indicated he was going to call FIS he turned off his OBRD.

[47] We noted in the documentation that the Lieutenant in this chain of command was cited as receiving an enhanced sanction (written reprimand) for repeated deficiencies with use of force investigations.  Notwithstanding our concerns with the manner in which allegations of misconduct are taken in and adjudicated, this recognition of repeated deficiencies by the Lieutenant was a positive sign.

initial intake of a complaint without the benefit of an investigation. This has multiple consequences, including APD failing to self-identify the critical issues noted above, and a potential lack of due process for officers. We have cautioned APD many times about conducting such cursory reviews of allegations and the problems that can arise as a result. This fits a long-standing pattern of APD's: ignoring the advice of the monitoring team when it does not fit APD's concept of police operations.

9. In an officer's report, he referred to the officer who used a Show of Force as an "Acting Sergeant" and, if accurate, would preclude the supervisor who responded to the scene from conducting the investigation. No one at APD took note of this conflict with policy. Again, the monitoring team is the only backstop in this case.

10. The uses of force used were within APD policy, but numerous concerns were noted throughout the event. The female victim of domestic violence remained in handcuffs for nearly an hour and was left sitting, while scantily dressed (t-shirt and underwear), on the cement outside the apartment for most of that time. Likewise, when questioned in relation to the use of force against her, she was Mirandized (while in handcuffs) and laying on her bed. Ultimately, the female was simply released and characterized as the victim of domestic violence in reports. No one in the supervisory chain of command questioned the justification of keeping the female victim handcuffed and treated in this manner, especially in light of the fact that she was never charged with a criminal offense. This is an issue with basic standards of care for people in custody. The monitoring team notes such issues frequently in APD interactions, especially those involving victims or individuals who are experiencing some type of mental or emotional crisis. This phenomenon is a serious concern, and one that APD should investigate further, particularly in light of other problematic APD interactions with those with obvious mental health issues.

**Case #6 IMR-12-15 (Compliance Technique)**

Officers responded to a report of a family dispute in a residential neighborhood. The caller advised that his stepson was found out in front of the house and had been tied up. It was later determined that the subject was tied up by his boyfriend because he was intoxicated and physically assaulted the boyfriend at a different location. The stepfather untied the subject, at which time he became combative with the family, which included his mother and a brother. The stepfather requested assistance and three officers were dispatched to the scene, one of whom was ECIT certified.

While responding to the scene, call details provided to the officers were updated with information obtained from the RTCC to include the male subject was diagnosed with schizophrenia and had assaults against persons in his history. Call detail updates also included that the subject was intoxicated and falling asleep. Officers met with family members and others away from the home, as they exited the home upon the officer's approach. They learned that the subject was sleeping in his bedroom. The family

members were patted down for weapons, but no reasonable suspicion existed to believe they were armed or an immediate threat to the officers.[48]

After entering the home, the officers encountered the suspect, who was laying under covers on a bed in a bedroom.  Several attempts were made to gain the attention of the subject from a distance.  Once he began to move, he was asked several times to show his hands, which were under the covers.  The subject eventually stood up and walked to the door, unarmed, and attempted to close the door on the officers.  One officer was able to keep the door open with his foot and pushed the subject forward against a bed and handcuffed him.  During this part of the event he was told to "stop resisting."  The subject was then escorted to the living room by the three officers.  Once there he was mildly resistant to the officers and one of the officers noted on their OBRD that the subject was trying to scratch him with his fingernails.  The primary officer told the subject he was there to ensure he was not physically harmed or sexually assaulted.[49] Eventually, the officers unhandcuffed the subject and he went back into his bedroom. The officers then alerted the family members of what transpired and recommended they leave the house to allow the subject to sleep off his intoxication.  A supervisor responded to the scene to investigate a Level 1 use of force.

Case Observations:

1. The officers were very professional and polite throughout the entire event and the force used constituted a Level 1 use of force.

2. The officers responded to a domestic dispute, where a male was reportedly intoxicated and physically fighting family members.  Likewise, the officers were made aware of the subject's mental health history.

3. The officers had an opportunity to speak with family members before approaching the house where the subject was located.  They did not attempt to establish whether there was physical violence against the family warranting an arrest of the subject, or whether they wanted to pursue criminal charges.  The officers spent considerable time focused on the possibility that the subject was the victim of a physical or sexual assault.  It was clear that the subject was impaired in some manner and disoriented.

There was no articulated underlying offense against the subject of the force prior to the force being used.  The only charge levied against the subject was a summons for assault (against an officer) for attempting to scratch an officer (after the subject was handcuffed) and only after the officer returned to the Area Command and watched his OBRD.  This was not addressed at any level of supervision.

---

[48] None of the reports reviewed by the monitoring team contained any justification as to the need to pat down the family members, who actually called police and were potentially victims of an assault.

[49] This was reportedly based on the subject being left outside tied up by his boyfriend.

4. There was no articulated reasonable suspicion evident that justified the officers conducting frisks of the family members that were the original 911 callers. This was not addressed at any level of supervision.

5. The responding supervisor investigated the use of force and when determining the appropriateness of the force did not question witnesses about the underlying call for service to determine if a criminal predicate existed necessitating the use of force. His attention was focused on whether they witnessed the force application itself. None of the reports reviewed by the monitoring team contained any justification as to the need to pat down the family members, who actually called police and were potentially victims of an assault.

6. The supervisor did not have photographs taken of the subject, or complete a thorough inspection of the subject for injuries. He documented that it was due to the fact that the subject was uncooperative and pretending to be asleep.

7. The supervisor's report contained deficiencies, but we did note it was structured well to connect actions he took with specific times on his OBRD.

As we detailed case reviews in the earlier paragraphs of this report relative to ECWs (Paragraphs 24-36), several trends have been identified during supervisory use of force investigations that can enhance or undermine APD's recent efforts to improve its ability to address CASA compliance. Some of the areas that will surely improve APD's ability to improve compliance efforts include:

1. Activation of OBRDs has improved over past monitoring periods. Notable is that the muting of OBRD's and the toggling of the OBRD on and off during prolonged encounters and operations has been greatly reduced.

2. The noticeable increase in the recorded admonishments to officers has continued.

3. Evidence suggesting that canvassing of neighborhoods and areas surrounding uses of force continues to improve. The narration of supervisors looking for security cameras continues to be a positive trend.

A number of areas observed by the monitoring team, that give rise for concern for APD include:

1. APD supervisors need to be cognizant of collateral misconduct not directly attributed to the actual use of force incident they are reviewing. Historically this has been an area of weakness for supervisors.

2. Offering only mitigating factors to IAPS when making an IA referral for officer conduct/omissions is not objective and reflects poorly on what should be a balanced review of case facts. As a cautionary note, APD has relied heavily on training referrals when policy violations have been identified in the field, and in the past

68

pointed to ineffective training as a causational factor they considered when deciding how to address misconduct.  The monitoring team will be circumspect in its Operational Compliance determinations moving forward as it assesses whether APD is applying meaningful corrective actions for officer or supervisor misconduct. Commanders need to consider aggravating as well as mitigating circumstances when considering meaningful corrective actions.

3. Extensions to complete supervisory reviews continue to be a problem for timeliness, making compliance goals elusive.

4. Supervisors often fail to reconcile differences in what occurs at an incident, what is said to the supervisor at the scene, and what is written in official reports.

5. Supervisors continue to undermine their objectivity by advocating for officers when they offer mitigating factors to IA and not offering aggravating factors or evidence of other policy violations.

6. Officers continue to utilize minimum physical force on individuals and documentation of this appears nowhere in a written report.

7. Pointing a weapon equipped with a light or a scope at a subject is explained away in reports as not a show of force, but as a need to "illuminate" or "enlarge" the subject. It is problematic to point a rifle or other weapon at somebody solely to enlarge or illuminate the person. It is even more problematic to use this as a justification for a show of force or to represent the pointing of the weapon as unintentional.  These are issues that must be addressed by APD via policy updates; special written performance updates; e.g., notices of trending issues to supervisors and clear notice of deficiencies during supervisory review of problematic incidents.

8. Persons experiencing a mental health crisis or emotional distress continue to have charges placed against them that appear overstated and they are charged with criminal violations that are not explained to them.

9. Officers failing to announce **"POLICE"** upon forcible entry is obviously dangerous and exposes police to claims of "fearing an intruder" by suspects and other individuals.

10. Supervisors not properly assessing injuries makes classifying uses of force difficult.

11. Leaving arrestees and detainees naked or scantily clad (in this case in a t-shirt and underwear), in public view for long periods of time violates standard duty-to-care protocols.

12. Walking arrested persons long distances instead of calling for a vehicle exposes officers and arrestees to increased risks.

13. Boilerplate language is accepted in reports and vague responses are allowed to supervisors' questions (and not challenged by the supervisors).

14. Witnesses are not always accounted for concerning providing statements or obtaining their identifying information.

15. Supervisors fail to ask meaningful questions, especially about critical elements to proving or disproving uses of force or policy violations.

16. Officers offer unjustifiable explanations classifying actual uses of reportable force as "low-level control tactics."

17. Adjudication of IA requests seemingly takes place at the point of intake without the benefit of an investigation or consideration of aggravating factors.

18. The practice of officers problematically frisking witnesses or those that call for help absent reasonable articulable suspicion seems to be increasing. Officers frequently offer little reasonable articulable suspicion, if any, for such frisks.

19. The term "low level control tactics" has been misapplied by officers and accepted by supervisors. APD should take special cognizance of incidents characterized by officers as low-level control tactics to protect against incidents in which reportable levels of force are going unreported.  This will have particular impact on compliance efforts.

20. APD needs to rethink the way they interact with people experiencing mental or emotional crises.

As a means of monitoring APD efforts to demonstrate that the quality of supervisory use of force investigations are being considered when performance evaluations are completed for APD supervisors (relative to Paragraphs 47 and 56), the monitoring team requested data to substantiate such efforts. In response to our data request, APD provided the monitoring team with an Interoffice Memorandum, dated August 11, 2020, entitled "Talent Management Evaluation Process Update." The contents of this response appear to only vaguely address supervisory force investigations.

As we note elsewhere in this report, during this reporting period we observed serious deficiencies in use of force classifications and investigations, and a lack of quality in organizational oversight of force incidents both in Area Commands and at IAFD.   The breakdown of oversight rose to instances where defective force investigations were signed off by the Force Review Board (FRB) and then approved by the former Chief of Police.  This cannot be allowed to stand.  Until APD puts in place acceptable standards to evaluate and track the quality of work (especially work related to use of force reviews) by supervisors, APD will continue to experience difficulty achieving higher levels of compliance across the CASA.  Performance evaluations serve multiple purposes that are all relevant to CASA compliance, so for APD to have made such little progress at

70

this stage of the talent management evaluation project is discouraging.  The ability to properly document expectations, set benchmarks, and assess performance would allow APD to quickly identify deficiencies that can be remediated through counseling or discipline, when necessary.  APD's innate tendency to perpetually list "training" as a recommendation for a response to a policy violation is reflective of its tendency to avoid "real discipline" at virtually any cost.  Training has occurred, has been reviewed and approved by the monitoring team.  Failures to comply at this point are either intentional or a result of individual officers' refusal to accept policy and training.  As a consequence of APD's inability to close the gap in performance expectations, we continue to see glaring mistakes in supervisory oversight of uses of force.  For an agency attempting to affect cultural change, the correlation between effective supervision and constitutional uses of force cannot be overstated.  Based on the data we were provided, the efforts to put an overarching management system into place that is capable of addressing supervisors who repeatedly conduct deficient supervisory reviews is without resolution, and is directly correlated to our observations this monitoring period of the serious deficiencies in supervisory use of force classifications and reviews.

We see the expansion of PMU's scope of influence to be essential to compliance efforts across the organization, since the margin for error for Operational Compliance in the field is narrow.  As we document elsewhere, we continue to see serious deficiencies with use of force reporting and investigations at all levels, which impacts data integrity that is reported by the organization.  PMU's view of data presented to them should be with a skeptical eye, since sometimes faulty reasoning at the data input stage will likely result in faulty data analysis on the back end of PMU's processes.  Of particular note are issues we see at the initial, field level categorization of uses of force and investigations related to that force.  As APD began the work of recasting its use of force suite of policies we cautioned the department (often) that although higher order investigations were being shifted to IAFD, the highest risk of error would likely still reside with front line supervisors in the field.  That is continually verified by our incident reviews.  While we have identified issues related to IAFD this reporting period, most failures we observed during this reporting period were seen at the supervisory and command levels.  Further, to reach operational compliance, errors in use of force, force reporting and related processes, eventually, must be noted and dealt with by supervisors, not administrative staff.  Only then will we begin to observe progress in the CASA's delineated outcome factors.

To address the requirements of Paragraph 57, APD assigned two individuals to PRU in order to conduct "reviews" of Level 1 uses of force as a measure of oversight to attempt to catch errors that may occur during the first point of force classification.  This may be a response to recommendations the monitoring team has made in the past. We believed that without a meaningful audit of Level 1 uses of force to catch issues early, Operational Compliance will be hindered moving forward.[50]  Paragraph 57 states, "The

---

[50] The performance of APD supervisors in the field when classifying and investigating uses of force has proven to be deficient over time.  Therefore, as a risk mitigation measure, we recommended that APD put an auditing function in place to monitor field supervisor performance to deal with issues early now that new policies have been enacted.

Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence." Early in the IMR-12 reporting period we spoke with the Commander who oversees PRU and discussed the nature of their "reviews" of supervisory Level 1 uses of force versus the notion of "audits".  The Commander described that the two people assigned the task were quickly becoming overwhelmed with the volume of work, which is not surprising. APD should assess whether this staffing is adequate to perform the work required in a timely and effective manner, and that the work is "…complete and that the findings are supported by the evidence." If the intent of that language is to conduct comprehensive reviews of all reports, videos, and associated documentation for each case, APD must ensure staffing is adequate.[51] Parenthetically this dilemma is an often-observed anomaly of trying to replace supervisory and mid-level management reviews with administrative review. The appropriate solution is to train, supervise, audit, and intervene until supervisory and mid-level command personnel can meet the requirements necessary. These four essential management tools (train-supervise-audit-intervene) are not strong points among APD command and executive personnel.

We note here our concern with APD's tendency to move work product that should be the purview of field supervisors to administrative units. The work, by its nature, needs to be effectuated directly by a given officer's supervisors if these new policies, training, and oversight issues are ever to be internalized by personnel in field operations.  We understand that the "models" for these processes need to be identified and tested by administrative units, but as the monitor has told APD from the very outset of this project, the three most important elements of effective compliance are the three stripes on a sergeant's uniform. As such, it is imperative that the chief of police make this an omnipresent focus of tactical and strategic decision making to insist on compliant practices from APD's deputy chiefs, who in turn should be equally insistent with their commanders, who will need to monitor their lieutenants' compliance practices, who must in turn insist on such scrutiny from their sergeants. Only then will officers see these goals as important.

While meeting with the Academy Director and staff we discussed the status of APD's Paragraph 86-88 annual requirements to deliver use of force training. While there is some overlap of topics with the four tiers of training the monitor approved during IMR-11, it was clear that as a consequence of the Academy being hyper focused on completing the Tier 4 training, they did not effectively prioritize their annual training requirements. The monitoring team is cognizant of the issues facing the department as a consequence of the Pandemic, but the Academy did not appear to have even explored options to address this requirement.[52] Likewise, APD had not advanced any concern to address these requirements to the monitor until after it was brought to their attention.[53] To be clear, APD's efforts to complete the Tier 4 training (which is *still not*

---

[51] In our experience, APD's quality of reviews still requires a detailed inspection of all available data to ensure force was used and investigated appropriately.

[52] We discussed this issue and provided our perspective on how APD can accomplish the task through different delivery methods.

[53] IMR-11 contained a recommendation that APD devise a COVID-19 training plan.

*completed,* does not absolve the department from its other training requirements.  For most officers, it's been over a year since they attended Tier 1 and by the end of 2020 it will be over a year since Tiers 2 and 3 were attended by APD officers and supervisors. This "oversight" is simply not excusable, as we are virtually certain it will create down-stream compliance issues.

While APD achieved Secondary Compliance in this series of paragraphs in IMR-11 based on our review and attendance of Tier 2 and Tier 3 use of force training, and the representation by APD that Tier 4 would be completed, the organization will be in jeopardy of losing Secondary Compliance should it not complete each of its training requirements before the end of the IMR-13 reporting period.  The Academy has been provided exhaustive technical assistance and guidance that should benefit their efforts. In IMR-11 we recommended that APD develop a plan to address training issues in light of COVID-19, and we reiterate that recommendation here.  With a coordinated and concerted effort across APD commands these are achievable goals even under the current circumstances.

As we have discussed with APD, Operational Compliance will require renewed focus and point-by-point adherence to applicable CASA paragraph requirements. Compliance achievement will also depend on APD's assertiveness in identifying and stopping supervisory and mid-level command attempts to usurp executive authority by overlooking, incorrectly characterizing, or delaying blatant policy violations. One of the fundamental ways APD can wrest control from those who sabotage APD compliance efforts is to objectively evaluate supervisory and management personnel and document their acts and omissions in performance evaluations, thus holding them accountable for failures to supervise effectively.

### 4.7.28 Assessing Compliance with Paragraph 41:  Use of Force Reporting Policy

Paragraph 41 stipulates:

> **"Uses of force will be divided into three levels for reporting, investigating, and reviewing purposes. APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices. The use of force reporting policy will require officers to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force. Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor. This reporting requirement also applies to off-duty officers engaged in enforcement action."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.29 Assessing Compliance with Paragraph 42:  Force Reporting Policy

Paragraph 42 stipulates:

> **"The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the review or the APD officer conducting the investigation. The written or recorded narrative will include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject's behavior; (d) the level of resistance encountered; and (e) a description of each type of force used and justification for each use of force. Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.30 Assessing Compliance with Paragraph 43:  Reporting Use of Force Injuries

Paragraph 43 stipulates:

> **"Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.31 Assessing Compliance with Paragraph 44:  Medical Services and Force Injuries

Paragraph 44 stipulates:

74

> **"APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

### 4.7.32 Assessing Compliance with Paragraph 45:  OBRD Recording Regimens

Paragraph 45 stipulates:

> **"APD shall require officers to activate on-body recording systems and record all use of force encounters.  Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination."**

## Results

A complete discussion of this topic is found in Paragraphs 220 – 231, below.  Generally, we are extremely concerned that of the 91 cases referred for investigation, only 77 were sustained, and only one resulted in anything more than a (often repeated) verbal or written reprimand.  We note that these internally referred cases, in most police departments with which we are familiar, often have very high sustained rates, since it is supervisory or command staff who bring the "complaint."   It is clear that the current APD simply has no appetite for discipline, either reformative (counseling, coaching, retraining, enhanced supervision, transfer, etc.) or actual discipline such as suspensions or terminations.  Until this aversion to discipline is addressed seriously at APD, the remaining CASA paragraphs remaining out of compliance will show little progress.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

### 4.7.33 Assessing Compliance with Paragraph 46:  Force Investigations

Paragraph 46 stipulates:

75

> **"The three levels of use of force will have different kinds of departmental review. All uses of force by APD shall be subject to supervisory review, and Level 2 and Level 3 uses of force are subject to force investigations as set forth below. All force reviews and investigations shall comply with applicable law and comport with best practices. All force reviews and investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy."**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

## 4.7.34 Assessing Compliance with Paragraph 47:  Quality of Supervisory Force Investigations

Paragraph 47 stipulates:

> **"The quality of supervisory force investigations shall be taken into account in the performance evaluations of the officers performing such reviews and investigations**."

## Results

APD has created the PRU Compliance Review for Level 1 Use of Force investigations by supervisors.  This is a 5-page comprehensive review of all aspects of the supervisory requirements into a use of force investigation.  Should the review highlight any inconsistencies in the investigation, the Commander of the supervisor will be notified.  Once this becomes a routine/automated process with appropriate responses—APD should reach Operational Compliance.

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

## 4.7.35 Assessing Compliance with Paragraph 48:  Force Classification Procedures

Paragraph 48 stipulates:

> **"APD agrees to develop and implement force classification procedures that include at least three categories of types of force that will determine the**

76

force review or investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to promote greater efficiency and reduce burdens on first-line supervisors, while optimizing critical investigative resources on higher-risk uses of force. The levels of force are defined as follow:

a. Level 1 is force that is likely to cause only transitory pain, disorientation, or discomfort during its application as a means of gaining compliance. This includes techniques which are not reasonably expected to cause injury, do not result in actual injury, and are not likely to result in a complaint of injury (i.e., pain compliance techniques and resisted handcuffing). Pointing a firearm, beanbag shotgun, or 40-millimeter launcher at a subject, or using an ECW to "paint" a subject with the laser sight, as a show of force are reportable as Level 1 force. Level 1 force does not include interaction meant to guide, assist, or control a subject who is offering minimal resistance.

b. Level 2 is force that causes injury, could reasonably be expected to cause injury, or results in a complaint of injury. Level 2 force includes use of an ECW, including where an ECW is fired at a subject but misses; use of a beanbag shotgun or 40 millimeter launcher, including where it is fired at a subject but misses; OC Spray application; empty hand techniques (i.e., strikes, kicks, takedowns, distraction techniques, or leg sweeps); and strikes with impact weapons, except strikes to the head, neck, or throat, which would be considered a Level 3 use of force.
c. Level 3 is force that results in, or could reasonably result in, serious physical injury, hospitalization, or death. Level 3 force includes all lethal force; critical firearms discharges; all head, neck, and throat strikes with an object; neck holds; canine bites; three or more uses of an ECW on an individual during a single interaction regardless of mode or duration or an ECW application for longer than 15 seconds, whether continuous or consecutive; four or more strikes with a baton; any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject; and uses of force resulting in a loss of consciousness. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents: (a) officer-involved shootings; (b) serious uses of force as defined by the Memorandum of Understanding; (c) in-custody deaths; and (d) other incidents resulting in death at the discretion of the Chief."

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.36 Assessing Compliance with Paragraph 49

Paragraph 49 stipulates:

> **"Under the force classification procedures, officers who use Level 1 force shall report the force to their supervisor as required by Paragraph 42; Level 1 uses of force that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force. Level 2 and 3 uses of force shall be investigated by the Internal Affairs Division, as described below. When a use of force or other incident is under criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Division will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Task Force shall periodically share information and coordinate with the Internal Affairs Division, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of uses of force."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.37 Assessing Compliance with Paragraph 50:  Supervisory Response to Use of Force

Paragraph 50 stipulates:

> **"The supervisor of an officer using force shall respond to the scene of all Level 1, 2, and 3 uses of force to ensure that the use of force is classified according to APD's force classification procedures. For Level 2 and Level 3 uses of force, the supervisor shall ensure that the Force Investigation Section of the Internal Affairs Division is immediately notified and dispatched to the scene of the incident to initiate the force investigation."**

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

## 4.7.38 Assessing Compliance with Paragraph 51:  Self-Review of Use of Force

Paragraph 51 stipulates

> **"A supervisor who was involved in a reportable use of force, including by participating in or ordering the force being reviewed, shall not review the incident or Use of Force Reports for approval."**

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

## 4.7.39 Assessing Compliance with Paragraph 52:  Supervisory Force Review

Paragraph 52 stipulates:

> **"For all supervisory reviews of Level 1 uses of force, the supervisor shall:**
>
> **a) respond to the scene and immediately identify the officer(s) involved in Level 1 use of force;**
>
> **b) review the involved officer's lapel video, determining whether the incident involves a Level 1 use of force;**
>
> **c) review the lapel video of other officers on-scene where uncertainty remains about whether the incident rises to a Level 2 or Level 3 use of force;**
>
> **d) examine personnel and the subject for injuries and request medical attention where appropriate.;**
>
> **e) contact the Internal Affairs Division to conduct a Level 2 or Level 3 use of force investigation if lapel video does not affirm a Level 1 use of force;**
>
> **f) gather any evidence located at the scene of the Level 1 use of force;**

**g) capture photographs of the officer(s) and subject involved in the Level 1 use of force;**

**h) require the submission of a Use of Force Report from the involved officer by the end of shift; and**

**i) conduct any other fact-gathering activities while on-scene, as necessary, to reach reliable conclusions regarding the officer's use of Level 1 force."**

## Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

## 4.7.40 Assessing Compliance with Paragraph 53: Force Review Timelines

Paragraph 53 stipulates:

**Each supervisor shall complete and document a supervisory force review of a Level 1 Use of Force within 72 hours of the use of force. Any extension of this 72-hour deadline must be authorized by a Commander. This Report shall include:**

**a)  all written or recorded use of force narratives or statements provided by personnel or others;**

**b)  documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**

**c)  the names of all other APD employees witnessing the use of force;**

**d)  the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided**

> **through the use of de-escalation techniques or lesser force options; and**
>
> **e)  documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.**

## Results

While APD has in place policies in conformance with this paragraph, actual implementation in the field exhibits a much different picture.  Supervisors continue to fail in their charge to review and report effectively and accurately on officers' use of force, as depicted in our case-by-case analyses in this report.  This is a critical failure that is routinely missed by command review, and even Force Review Board review.  It speaks to an organizational culture that fails to see supervision and oversight as tasks on the critical path to compliance.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.41 Assessing Compliance with Paragraph 54:  Command Review of Force

Paragraph stipulates:

> **Upon completion of the Use of Force Report, investigating supervisor shall forward the report through his or her chain of command to the Commander, who shall review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The Commander shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.42 Assessing Compliance with Paragraph 55:  Force Review Evidence Standard

Paragraph 55 stipulates:

> **"Upon completion of the review, the reviewing supervisor shall forward the review through his or her chain of command to the Commander, who shall review the entry to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The Commander shall order additional review when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. These reviews shall be completed electronically and tracked in an automated database within the Internal Affairs Division. Where the findings of the supervisory review are not supported by a preponderance of the evidence, the supervisor's Commander shall document the reasons for this determination and shall include this documentation as an addendum to the original review. The supervisor's superior shall take appropriate action to address the inadequately supported determination and any deficiencies that led to it. Commanders shall be responsible for the accuracy and completeness of the Level 1 force reviews prepared by supervisors under their command."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**


## 4.7.43 Assessing Compliance with Paragraph 56:  Force Review Quality

Paragraph 56 stipulates:

> **"Where a supervisor repeatedly conducts deficient supervisory force reviews, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules. Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force review immediately and notify the Internal Affairs Division and the Chief. The Force Investigation Section of the Internal Affairs Division shall immediately initiate the administrative and criminal investigation."**

82

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## 4.7.44 Assessing Compliance with Paragraph 57:  Force Review Board

Paragraph 57 stipulates that:

> **"When the Commander finds that the supervisory force review is complete and the findings are supported by the evidence, the file shall be forwarded to the Performance Review Unit of the Compliance Bureau. The Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence. The Performance Review Unit shall ensure that the file is forwarded to the Internal Affairs Division for recordkeeping. Where the Performance Review Unit of the Compliance Bureau determines that a supervisory force review, which has been completed by the supervisor and reviewed by the chain of command, is deficient, the Performance Review Unit shall forward the review to the supervisor for correction. Any performance deficiencies in the investigation or review will be noted in the affected Commander's performance records."**

**Methodology**

This topic is discussed in depth in paragraph 78, below.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 57 and 78:***

***See recommendations for Paragraph 78.***

## 4.7.45 Assessing Compliance with Paragraph 58:  Reassignment of Force Review

Paragraph 58 stipulates that:

> **"At the discretion of the Chief, a supervisory force review may be assigned or re-assigned to another supervisor, whether within or outside of the Command**

> **in which the incident occurred, or may be returned to the original supervisor for further review or analysis. This assignment or re-assignment shall be explained in writing."**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

### Recommendations for Paragraph 41-58:

**4.7.45a:  Develop an early intervention system that triggers alerts when clusters of poorly investigated use of force incidents arise, and address these issues early with Area Command staff, requiring Commanders affected to develop and implement written "Intervention Plans" designed to identify the causes of failure and remediate those causes systematically.**

**4.7.45b:  Routinely monitor the intervention process for compliance with the proffered plans.**

**4.7.5c:  Monitor use of force incident responsibilities at the sergeant's level and ensure that sergeants who will be on leave are not assigned critical use of force incidents.  APD will need to assess staffing and determine how best to handle these issues.  This is another case of "a bit of forethought" avoiding compliance losses.**

### 4.7.46 Assessing Compliance with Paragraph 59:  Abuse of Force Discipline

Paragraph 59 stipulates:

> **"Where, after a supervisory force review, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 59:  APD should revisit its disciplinary practices to ensure integrity with the tenets of effective discipline.*

*4.4.46a:  Clarify operational process requirements of the violated policy in each and every incident of a known violation with the involved employee(s);*

*4.4.46b:  Insist on consistent disciplinary decisions based on employee acts or omissions, including a table of infractions with disciplinary ranges for each potential level of infractions;*

*4.4.46c:  Insist on consistency, and ensure the consistency is calibrated to the level of infractions;*

*4.4.46d:  Establish an available escalation process, from minor to major interventions.*

*4.4.46e:  Require appropriate escalation if given classes of infractions are repeated;*

*4.4.46f:  Document all disciplinary interventions;*

*4.4.46g:  Ensure that all disciplinary findings and comments fit established departmental documentation protocols.*

*4.4.46h:  Include "fact statements" based on the department's investigative findings, ensuring that all infractions are clearly explained;*

*4.4.46i:  Increase the corrective measures as violations are more serious;*

*4.4.46j:  Provide a process in which disciplined employees are given an opportunity to respond to allegations and decisions re discipline; and*

*4.4.46k:  Follow through on consequences, e.g., establish progressive disciplinary standards, and ensure that requirements are enforced and followed up.*

## 4.7.47 - 4.7.64 Assessing Compliance with Paragraph 60-77:  Force Investigations by the Internal Affairs Division

As in the November 2019 site visit and prior visits, the monitoring team spent time working with APD's Compliance and Oversight Division and Internal Affairs Force Division (IAFD) personnel during its June 2020 virtual site visit. A significant portion of this time was addressing the increasing number of shortfalls noted in the investigative tenacity of cases investigated by IAFD. The monitoring team has noted what it has deemed to be efforts of "going through the motions" in completing its investigative tasks as opposed to the investigative grit required when investigating the uses of force and

potential uses of force. Problems with APD's uses of force are the reason APD is under a court-approved monitoring process. As in IMR-11, we have expressed concern during IMR-12 to, amongst others, the IAFD Commander, IAPS Commander, SOD Commander, the City Attorney's staff, and the former Chief of Police and Deputy Chiefs, and discussed with them the interrelationship between use of force investigations and misconduct that is uncovered during those investigations. On January 11, 2020, APD enacted a new stratified system for categorizing use of force incidents. This was an APD-initiated endeavor. Supervisors and investigators received training on this new system that represents some of the best training we have seen to date at APD. This is important because APD's ability to "police" itself is the centerpiece of its organizational reform efforts and is the linchpin for achieving the long-term sustainability of those reforms.

Based upon our observations in IMR-12, APD has failed miserably in its ability to police itself.

Despite exhaustive feedback and technical assistance over the years, APD has yet to enable a trustworthy system that its executive staff (inclusive of the office of the Chief of Police), the city, or the public can rely upon. This monitoring period, there are numerous examples that demonstrate our assertion of APD's failures in policing itself.

One such example is a use of force case that is factually described later in this introduction to paragraphs 60-77. The synopsis of that case[54] contains additional case facts that are not restated in the following assessment. While the following assessment of this use of force gleaned from APD records (and glaring omissions from its records) may seem a bit exhaustive, its level of detail is needed to illuminate how improper conduct at the officer level leads to the failures of multiple levels of detectives, supervisors, commanders, the Force Review Board (FRB) and other accountability systems designed to provide assurances of integrity, and ultimately the Chief of Police.

Earlier this year, uniformed officers responded one evening to two theft complaints that turned out to have the same suspect, who shortly thereafter was located and arrested. The suspect resisted arrest and appropriate physical force had to be utilized to handcuff him. The suspect increasingly revealed himself to be an individual in apparent mental health crisis and was uncooperative. The suspect refused to cooperate and refused to walk, necessitating three officers to carry the individual through narrow passageways to exit the curtilage of a residential property. At one point the officers needed to take the suspect down to put him into leg shackles and then continue carrying him to a patrol vehicle. It took all three officers to get the individual into the patrol vehicle.

Emergency medical services were notified to respond to the scene. At points while the suspect was seated in the right rear of the patrol vehicle, he was permitted to partially hang out of the vehicle while the door was open.[55] During one of these occasions, a

---

[54] The synopsis is for Case (IMR-12-16). This case is contained in the latter part of this introduction for Paragraphs 60-77.

[55], handcuffed,

single officer standing at the right rear door attempted to close door on the suspect's head. Shortly thereafter while the suspect was again hanging with his head partially out of the vehicle, this same officer standing at the door of the vehicle began to push the door closed on the shoulders/upper body of the suspect. At one point towards the end of this episode, the suspect can be heard saying, "Oh yes, press a little harder." Every member of the monitoring team who reviewed these videos noticed these transgressions, but, apparently, either no one at APD reviewed the videos, or if anyone did, they failed to notice and articulate the associated problems.  Put simply, this is an egregious supervisory and command error.

Obviously, neither of these uses of force were necessary or appropriate.  In the monitor's opinion, they bordered on sadistic.  There was no legitimate police purpose to these actions, and they were obviously executed in a surreptitious manner.  The on-scene supervisors failed to note this act.  The OBRD review unit personnel missed the abusive act. Supervisory personnel at the scene missed this act.  The Video Review Unit missed this act.  The FRB failed to take note of this unnecessary use of force.  In fact, only members the monitoring team noticed and "called out" this egregious use of unnecessary force.

This same officer is later observed grabbing the suspect's head and forcefully pushing it down (so that the suspect's chin appears to get pressed into his own chest) when attempting to control the suspect while he was being placed on a stretcher. These three uses of force are not reported on any report completed by the officer, nor are they noted in the investigator's report or mentioned in any reviewing supervisor's report. Furthermore, none of the three officers (inclusive of an acting sergeant) involved in handcuffing/carrying the suspect were interviewed by the IAFD investigator!

For clarity purposes:

1) The three enumerated uses of force were not reported by the initial officer using the force against the handcuffed suspect.

2) The investigating IAFD detective did not note any of these three uses of force in either of his two investigative reports.

3) The IAFD first-line supervisor conducted a review of both of the investigative reports prepared by the IAFD detective and determined no potential misconduct was identified—thus tallying another oversight "miss" in this case.

4) The IAFD lieutenant conducted a force review of the investigative reports and determined the investigation of the uses of force were 100% in compliance with the CASA paragraphs requiring the undertaking of investigative tasks for uses of force. The lieutenant verified that the officers were not interviewed in this case. The lieutenant also opined that the case was originally investigated as a Level 2 use of force but should actually be a Level 3 use of force because the individual sustained an injury from an empty hand technique while in handcuffs.  This

87

shows an apparent lack of knowledge of even a rudimentary understanding of extant use of force policies on the part of the lieutenant.

5) The IAFD Commanding Officer's review indicated he reviewed all the videos (after a civilian employee in the Video Review Unit reportedly already watched all of the OBRD videos) and determined the uses of force were within policy!

It should be noted that the arrestee in this case was visited in the hospital by an IAFD detective and was barely conscious and appeared unable to speak. The detective walked around the incoherent suspect and noted abrasions/bruises on the limited parts of his body that were visible, to include an abrasion on his shoulder. This accounted for this person's "interview" and incredibly, IAFD took credit for this interaction as an interview of the subject of a use of force. On a side note, this is the type of disingenuous reporting that skews APD data that the police department publicly holds up to show their compliance efforts.

The review of this use of force investigation represents the first case the monitoring team reviewed under the new use of force suite of policies put into effect in January 2020. The implementation of these policies represents a tremendous two-year organizational effort borne from APD's own desire and undertaking to change its previous system. This effort included a multi-tiered training program to ensure officer comprehension. This use of force incident and its subsequent poor investigation and reviews, as well as the pervasive lack of material oversight represents a complete system failure that started within the first week of implementation of the new use of force policies and that proceeded through May 2020.

The failures were not based on an officer's lack of comprehension of the policies, but on the unethical conduct of an officer engaging in misconduct and violating the civil rights of an arrestee experiencing an apparent mental health crisis while restrained by handcuffs, shackles around his ankles (connected to the handcuffs), and a seatbelt in a police vehicle. Over the next five months, this failure in ethical responsibility then cascaded uphill throughout a chain of command inclusive of a well-trained IAFD detective, sergeant, lieutenant, and commanding officer. The case was then handed off to a completely redesigned Force Review Board whose sole purpose is to provide a safety net to ensure such misconduct is not missed at any level of subordinate review. This undertaking by the Force Review Board failed in its mission and execution in providing a meaningful review that should have revealed the egregious violations against a handcuffed person experiencing a mental health crisis. The capstone in this case study of a multi-level organizational failure in accountability is that the Chief of Police affixed his signature to the findings of the Force Review Board's lack of due diligence and meaningless findings.

Our review of this matter reveals APD's failed execution and review of the very processes they petitioned the Court to implement two years earlier.

The gross mismanagement and accountability failures in this matter were so egregious that during our June 2020 virtual site visit, the team presented these findings to IAFD personnel, Compliance Bureau personnel, and the Chief of Police.[56] Not a single person offered any meaningful commentary to account for the gross failures in this case. The monitoring team always follows up when glaring failures are brought to the attention of APD. In this particular matter, the follow-up documentation the monitoring team was provided for review revealed yet another cascade of failure, across all levels of the organization, and lack of accountability that quite literally shock the conscience.

This follow-up review revealed an internal affairs case number was requested the next morning to document an initiation of an internal affairs investigation of the "unreported" use of force; not an investigation into an allegedly inappropriate use of force. Likewise, no investigation was requested to be opened on the culpably deficient manner in which the investigation was conducted, supervised, reviewed, or forwarded to the Chief of Police for the affixing of his signature to close out the case with no disciplinary action taken.

As the monitoring team pointed out for the last several monitoring periods, APD lacks a professional internal affairs process with personnel skilled in the best practices utilized throughout the United States to conduct internal affairs investigations. In this matter, where the overt implication is that APD members from the level of detective up through the Chief of Police were derelict in their duties, the investigation of this matter was not investigated by a supervisory investigative member of Internal Affairs Professional Standards (IAPS). The "internal investigation" was assigned to the same detective in IAFD that failed to identify the inappropriate uses of force and failed to identify that the officer failed to report the uses of force. To compound the matter, the same chain of command that also failed to supervise the original use of force investigation and failed to serve as a safety net in their review of the investigation would now serve once again to supervise, review, and report back to the Chief of Police about the findings of this internal affairs investigation.  We assert, based on our knowledge of the case, that the processes used to attempt to ignore an abusive use of force are deliberate, and, as part of the culture that generated the CASA in the first place, should have been noted by the multiple levels of review.  The FRB returned this case for "additional investigation," despite the fact that there were clear and intentional violations.

The results of the internal investigation (or follow-up investigation) reported that the actions of the officer closing the vehicle's door on the suspect's head was not a use of force and that the pushing of the vehicle's door for approximately one minute to compress the upper part of the suspect's body was only a "low-level control tactic."

---

56. During meetings and in recent reports we have cautioned APD not to become complacent when reviewing IAFD products. Generally, past praise has been centered on IAFD's investigations and their identification of more than a thousand policy violations in the "backlog" review they conducted. We believed that identifying and calling out policy violations under circumstances where IAFD knows the department has no intention to discipline officers ("backlog") cases) regardless of the severity of the violation, and making initial determinations of misconduct during current force investigations is entirely different.

So that it is abundantly clear, the monitoring team completely disagree with these findings and opines that the findings completely disregard the written policies of APD and the spirit of the CASA. Compounding these problematic findings, the monitoring team further notes that the forcible grabbing of the suspect's head by the officer when attempting to force him onto the stretcher was not addressed in the follow-up investigation, just as it had not been identified or addressed in the initial use of force investigation.  We find it stunning that these excuses were not called out by lower-, mid-, upper-, or executive-level review.  That task was, once again, left to the monitoring team.

The dissection of this "second" investigation requires an exhaustive review of the case facts and failures on the part of numerous persons to comprehend its poor quality and implications of its multiple system failures. Some of these points are set forth below as a means of providing some insight into the problems with the command and control of APD (from the Chief of Police and below) and how the culture of APD is opportunistic in creating a narrative that is counter to facts and policy, the very definition of a Counter-CASA effect.

- A BlueTeam automated entry indicates the alleged misconduct was received at IAPS on June 10, 2020 and was timestamped June 10, 2020 at 0837 hours. This entry indicates an internal affairs investigation number was assigned to the case with the original detective assigned to the investigation.

- This detective's report indicates he was assigned to the case the day before it was received by IAPS[57]. The significance is that this detective was assigned to the case before the IAPS Commander even received the misconduct allegation. This undercuts the authority and legitimacy of the internal affairs function (IAPS), assigned as a staff function under the Chief of Police.  Sadly, given our past experiences with APD's IA processes, this planned usurpation of command discretion by lower levels of the organization is not surprising to the monitoring team. We see no other explanation for these failures other than one of deliberate to the requirements of the CASA, established policy and training.

- We note that the monitoring team met with the IAPS Commander on an unrelated matter two days after briefing the IAFD Commander about the case. The IAPS Commander was asked if any action had commenced thus far on this case. The IAPS Commander, who was not a part of the case briefing two days earlier, advised members of the monitoring team that he had yet to be briefed about the case from anybody on his staff or from anybody in any other command!

---

[57] This means the detective was assigned to "re-investigate" the case, inclusive of his own deficiencies and those of his chain of command, the same day (June 9, 2020) the monitoring team presented its findings on this case to the IAFD Commander (the detective's commander) and his staff. The BlueTeam automated entry indicates the referral for the alleged misconduct was received at IAPS on June 10, 2020 at 0837 hours. The monitoring team met with the IAPS Commander on June 11, 2020 and he had not yet been briefed on the case. Therefore, the detective was assigned to "re-investigate" the case and the alleged misconduct without the authorization of the IAPS Commander.

- The BlueTeam entry indicates the matter investigated was determined to be a "non-force incident."[58]

  - The BlueTeam entry's *Crisis Details-Nature of Crisis* lists attributes of the suspect as: biologically induced (Schizophrenia / Depression / Anxiety); chemically induced (Crack / Meth /PCP / Heroin). These attributes were not listed in the original BlueTeam entry.

  - The BlueTeam entry's *Crisis Behaviors* lists attributes of the suspect as: Disorientation / Confusion; Belligerent / Uncooperative Behavior; Out of touch with reality; Disorganized speech / communication; Bizarre, unusual behavior. These attributes were not listed in the original BlueTeam entry.

  - The original BlueTeam entry indicated "Unknown" for the officer's assessment of whether the person was experiencing a mental crisis. The June 2020 BlueTeam entry reflects "Yes," indicative of the suspect was experiencing a mental crisis.

  - The BlueTeam entry indicates the suspect did not self-report experiencing a mental crisis. However, it should be noted that multiple times the suspect asked to go to the VA hospital.

  - The BlueTeam entry indicates no injuries were noted as visible on the suspect. However, the original investigation revealed video footage of a detective walking around the suspect while he was lying in a hospital bed and narrating injuries that he could see on his body, inclusive of an injury to his shoulder. It should be noted that the suspect's shoulders are what appeared to be making contact with the doorjamb of the police vehicle and the right rear door of the vehicle while he was being compressed by the officer pushing the door against him.

  - The BlueTeam entry indicates that the parts of the vehicle that made contact with the suspect's head were considered an ***improvised weapon***! The entry further notes that the suspect's head is the part of his body that was contacted by the improvised weapon. This entry does not take into account the upper part of the suspect's torso and shoulders that were compressed by the officer pushing the door closed on him in the rear of the vehicle.

    - It should be noted that SOP 2-53 (Use of Force Definitions) identifies an Improvised Impact Weapon under the definition of a Hard Object. This definition notes that a Hard Object (inclusive of an Improvised Impact Weapon) is something used "to forcefully strike an individual, which has

---

[58] APD addressed these issues since the close of the reporting period, by ensuring the new IAPS commander and the IAFD commander are both advised of all IARs screened by IAFD.

the potential to cause serious physical injury or death through blunt force trauma."

> --It is the overwhelming consensus of the monitoring team that when a police vehicle's door is closed on an individual's head, whether intentionally or unintentionally, it is capable of causing serious physical injury or death through blunt force trauma. Likewise, compressing an individual's upper body, specifically the shoulders and chest area as in this case, also has the potential to cause serious physical injury or death through blunt force trauma. Any determination outside of this consensus, such as the one found in this follow-up investigation, is factually misleading and intellectually dishonest.

- ▪ It is further noted that SOP 2-53 classifies a strike to the head, neck, throat, chest, or groin with an improvised impact weapon is a Level 3 use of force.

- The determination in this follow-up investigation indicated "the unintentional strike to (the) head was not found to be a use of force and (the suspect) did not complain of an injury or allegation of force from the strike, therefore this incident was not a reportable use of force per policy."  Thus, investigative personnel took it upon themselves to functionally re-write policy.

> The SOP does not differentiate between intentional and unintentional strikes. Furthermore, any strike to the head regardless of complaint or injury is automatically considered a Level 3 use of force. The characterization by this detective that this is not a reportable use of force is blatantly contradictory to the SOPs as written. For any reviewing supervisors or commanders to approve this determination is completely improper and indicative of their complicity to perpetuate a false narrative. This false narrative ranges from protecting the officer who used force against an arrestee experiencing an apparent mental health crisis (who was handcuffed, in ankle shackles, and restrained by a seatbelt), all the way up through, and including, the chain of command to the Chief of Police who reviewed and signed off on the original deficient investigation.

- The IAFD Misconduct Addendum form, dated June 25, 2020, indicates the officer unintentionally closed the door on the suspect's head. This is based upon the statements of the officer. More problematic though is that the detective notes that the suspect "intentionally" (emphasis added) dropped his head into the path of the door as it was closing and his head was struck on the left side with the interior of the door." The detective utilizes this assertion despite the facts:

- ▪ The detective never interviewed the suspect;

- Even when interviewed, the officer who closed the door on the suspect's head said nothing about the suspect intentionally placing his head in the path of the door;

- In addition to the detective never interviewing the suspect, the detective never interviewed any other officer or on-scene personnel except for the officer who closed the door on the suspect's head. This is problematic for a number of reasons.

- Maybe the most problematic is that the detective states in his Evaluative Narrative Form that a lieutenant "did witness what occurred" and cited the timeframe on the lieutenant's OBRD recording when he witnessed the suspect's upper body being compressed by the vehicle's door. The monitoring team's review of the lieutenant's timestamped OBRD recording shows the lieutenant on the other side of the street in his vehicle when the suspect was compressed between the door. The lieutenant then walks over towards the suspect after the suspect states, "Oh yes, press a little harder," and the officer subsequently allowed the door to spring back open. Incomprehensibly, the detective elected not to interview the lieutenant who "witnessed" this event.

- The detective's BlueTeam entry indicates that the suspect had some biologically induced mental condition, was under the influence of a narcotic, was disoriented, confused, and out of touch with reality. We are uncertain *how the detective determined that the suspect <u>intentionally</u> placed his head in the path of the door.*   This appears to be another incident of "the system" taking care of officers who violate departmental policies.

The detective made his determinations without any evidence set forth in his reports or findings. This tends to show a bias in assessing the credibility of officers over those who are arrested, those who are suffering a mental crisis, and those persons against whom force is used. More importantly, the intention of the suspect is not even relevant; force still was used against the suspect and needed to be reported and investigated. The matter of intentionality is merely a part of the false narrative perpetuated by the detective and the APD chain of command.

What is not set forth in any report completed by the detective is that the officer at a minimum failed to exercise a standard of care (duty to care) that a reasonable officer should have exhibited with someone who was in mental crisis and less than 90 seconds earlier had been hanging his head and shoulders out of the vehicle. This poor standard of APD's duty to care is evident as the officer began closing the door on the suspect's head. The officer began to say, "watch your," but he doesn't complete the sentence because the door had already made contact with the suspect's head. Individuals in mental crisis needs to be afforded more care.

With respect to the suspect hanging out of the vehicle and being compressed by the door for almost a full minute, APD officers, investigators, supervisors, and executives

are under the false illusion that the suspect uttering, "Oh yes, press a little harder"[59] (maybe sarcastically) is not construed as complaining. This simply is not the objective opinion of the monitoring team.  The officer stated he never asked the suspect if he was injured because the "Albuquerque ambulance was already on the scene and walking to where we were at, so I figured if he had a complaint of injury he would tell them…". Such deflection, making it the arrestee's responsibility to identify injury, not the officer, is more than unacceptable.  It is disingenuous, duplicitous, and wholly unsupported by verifiable facts on OBRD recordings.

Based upon the perceived mental health crisis and substance toxicity officers perceived the suspect to be experiencing, this officer left it up to the compromised suspect to verbalize any injury to medical personnel. Furthermore, this officer chose to not disclose to medical personnel the force he exposed the suspect to just minutes earlier.

It is the consensus of the monitoring team that the officer's version of the force that he used with the door *so the suspect wouldn't fall out* is different than what is seen on the OBRD video. In fact, one can visibly observe the gap between the door and the lower frame of the vehicle narrowing considerably and the shoulders of the suspect contorting to absorb the pressure of the door that is compressing him. The suspect's speaking becomes observably labored when he is being compressed. The suspect had been previously hanging out of the vehicle and there seemed to be no concern then for him falling out of the vehicle. The officer's version of this event and the force he utilized is not compatible with the video evidence. In the follow-up interview in the internal investigation, the interviewing detective failed to ask critical questions to appropriately challenge the officer's assertions, especially when the officer stated the suspect was "laying on the door," or that the officer "made sure he could breathe the entire time…" In fact, the detective's questioning appeared perfunctory in nature and he failed to clearly connect applicable elements of the relevant use of force SOP's and other relevant SOP's with the statements of the officer and the video evidence.  The "investigation" was wholly inaccurate.

Factoring into the evidence that discredits the officer's statement is that he was present when the suspect was handcuffed behind the back, placed in a passive restraint system (PRS) securing his ankles to his handcuffs, and assisted in seat belting him in the rear of the vehicle. In his statement, the officer stated he thought the suspect unbuckled his seatbelt and that this was his rationale for holding the door and that he…" might have slightly closed it (the door)…" on the suspect. Since there were multiple officers on the scene, any one of these officers could have assisted or checked for the seatbelt or assisted in repositioning the suspect in the vehicle. Furthermore, SOP 2-82 (Restraint and Transportation of Prisoners) indicates the only use of restraints to secure prisoners is limited to the following department approved restraining devices: double locking handcuffs; double locking leg shackles; the "Passive Restraint System" when appropriate; and/or department issued flex cuffs. *The doors of police vehicles are not*

---

[59] We are convinced from our review of video in this case, that, in the moment, the prisoner knew force was being used against him.

*authorized objects or equipment under the SOP to restrain prisoners.* We find these assertions to be dishonest, and unbecoming for a police officer.

Our review of this use of force has made numerous references to the culpably inefficient manner in which the interview was conducted. Most problematic in the interview may be the way the union representative attempted to influence the detective. During the interview of the officer, the APOA representative acted as the union's Weingarten representative for the officer. At times during the questioning, the union representative *took control of the interview by narrating the audio portion of a video being played for the officer.* The union representative also suggested what the officer actually meant to say in response to a question, instead of what the officer actually said. As an example, the officer stated, "All I was doing intentionally was keeping the door closed." The union representative then interjected, stating, "yes, so I know he just made the statement that he didn't do it intentional (sic) and he was just keeping the door closed, uh, I think he needed to rephrase that to where he kept the door propped to keep him from falling further out of the door, as I believe was what Officer…meant to say." The officer followed with, "Yeah." The impact of this input by the union representative appears to be reflected in Part 2; Question #2 of the detective's Evaluative Narrative Form. The detective states that the officer was "inadvertently" applying pressure to the suspect's upper body while trying to hold the door in place. In his statement, the officer actually stated, "All I was doing intentionally was keeping the door closed."  Given these interactions, we can see clearly the depth and breadth of the Counter-CASA effect: members of the APOA, literally, can read the target officer's statement into the record!

The myriad of issues raised by the analysis of this use of force investigation obviously dovetails into numerous accountability issues. These issues raise significant questions that expose APD's policy, training, and commitment to compliance (making sure personnel are doing what they are supposed to be doing), and discipline (adverse employment impacts for not performing up to standards). The monitoring team constantly points out to APD how to address these issues. One example is the monitoring team's review of a 40-hour training program completed near the end of this monitoring period.

The review of this training program, primarily developed by IAFD personnel, revealed a largely well-constructed, quality training program. The program is focused on training investigators who investigate uses of force. Despite the overall positive assessment of the program, a number of issues reviewed in the proposed training program revealed problematic belief structures that are difficult to overcome with training alone. For example, in a section of the program's curriculum on the assessment of evidence collected, the lesson points out that the OBRD video/audio footage is "the most objective piece of evidence as it provides a video representation of the force incident," especially since it serves to exclude officer/subject/witness perception issues. However, in the part of the curriculum that deals with investigators conducting interviews, a list is offered which notes "the standardized order" in which to consider evidence. This prioritized list contains 11 items to consider, while the corresponding PowerPoint slides reflect 12 items. On this list, the involved officers' OBRD video is

listed as #3 (#1 and #2 are what an officer writes in a report and states in an interview) and witness officers' OBRD videos are listed at #6. Civilian witness interviews are listed at #8 and suspect interviews are listed at #9. A test question for this part of the instruction focuses on IAFD investigators utilizing this standardized order for reviewing evidence to minimize bias and to improve the validity of the evidence.

Simply stated, this de-prioritization of what civilians and suspects report is largely problematic and actually promotes bias and reduces evidence validity.  It does not comport to best practices in IA investigations.

The monitoring team has consistently reported on APD's investigative findings not always relying upon objective evidence. This is directly linked to the monitoring team's comments earlier in this section of this report about the detective who opined that the suspect intentionally placed his head in the path of the closing door. This type of learning content reinforces APD's culture of prioritizing what a police officer says and writes in direct contradiction to that of civilian witnesses, subjects against whom force is against, people experiencing a mental health crisis, and what is depicted by video evidence.  In short, the training suggests that the officer's account is more reliable than video evidence!  We proffer this example as a pure symptom of the Counter-CASA Effect.

Another glaring example of the collateral issues raised by the analysis of the previously detailed use of force investigation is the failure to implement discipline at APD and the lack of minimally adequate internal affairs function. No legitimate internal affairs investigation was conducted on the deficient handling of the initial use of force investigation. No legitimate internal affairs investigation was conducted into the officer's non-reporting of uses of force nor the actual force utilized. No legitimate internal affairs investigation examined any violations of rules and regulations, codes of conduct, or violations of policy related to how officers restrain prisoners. The same people who failed to view videos and failed to properly oversee the investigation were authorized to preside over the follow-up investigation into the use of force. At no time did the internal affairs (IAPS) commander exert any control or domain over the allegations or the subsequent investigation. This case exhibited a need for IAFD and IAPS to coordinate on assessment of field activity in cases that indicate both force and policy issues.  Once we brought this issue to APD's attention, it was remedied immediately by requiring cross-consultation between IAPS and IAFD when warranted.

Since internal affairs is a recognized staff function with a direct line to the Chief of Police, we fail to understand how the Chief could allow the follow-up investigation to proceed with *no bona fide* internal affairs investigation initiated to determine the culpability of personnel  who failed fulfill the requirements of their positions. This is a critical issue since more than a dozen APD personnel were required to view video evidence in this use of force investigation and either failed to do so in a complete manner or saw the video evidence and chose to ignore it and hope that the case would be closed.

Since IAFD personnel present these cases to the Force Review Board (FRB), they essentially control what the board members see at every FRB meeting. This demonstrates a lack of internal controls, which is especially significant in light of the monitoring team's observations while attending an FRB meeting during our virtual site visit on June 11, 2020. At the very beginning of the meeting, a board member asked a deputy chief if he had read a memo pertaining to a matter before the board. The deputy chief replied that he has been so busy that week that he had not had any time to review anything in preparation for the FRB meeting.

This is how the use of force investigation previewed in this section of this report passed muster by the FRB, which subsequently endorsed the closed case without any exceptions (or deficiencies noted) for the signature of the Chief of Police!  The reader should juxtapose the monitoring team's assessment of the incident with APD's.  This case depicts a process that is deliberately indifferent.  Oversight, or lack thereof, approves using a door pushed by a police officer into the head and shoulders of a handcuffed and restrained arrestee.  This is truly a case that shocks the conscience, yet APD fails to take note of these issues, from seven different levels:  supervisory, mid-management, management, IAD, FRB, and the deputy chief and chief's level.  We know of no other definition for this type of failed oversight than deliberate indifference.

As of the drafting of this report, no discipline has been meted out to any officer, investigator, supervisor, commander, or APD executive. The ramifications of this lack of discipline could reinforce the thought that, at APD, no problems existed with the investigation. Certainly, the officer will think this since the "internal investigation" found no fault with his actions, what he did was acceptable. The officers around that officer will have an even stronger belief that nothing was wrong, since they are further from the facts than the officer, who was merely subjected to a perfunctory interview. This interview was merely a component of a perfunctory investigation with a bias[60] towards finding no fault on the part of the officer, thus minimizing the impact on investigative and supervisory personnel for failing to properly supervise and review the evidence and investigative findings.  We note that APD, to date, has taken no action with the investigator for performing a faulty preliminary investigation.

The monitoring team has collectively recognized the increased number of APD interactions with individuals diagnosed with mental illness or those individuals identified as experiencing some type of mental health or emotional crisis. More than half of the use of force cases reviewed this monitoring period involved someone either in crisis or with a diagnosed mental health illness. This certainly exacerbates APD's problems in dealing with these individuals with special needs. Some of these problems have been underscored in this report, and include:

- APD's bias in assessing the credibility of officers over those who are suffering a mental crisis;

---

[60] Merriam-Webster defines the exoneration of someone by means of a perfunctory investigation utilizing a biased presentation of data as a *whitewash*.

- Persons experiencing a mental health crisis or emotional distress continue to have charges placed against them that appear overstated;

- Persons experiencing a mental health crisis or emotional distress are charged with criminal violations that are not explained to them;

- Officers frequently note in their police reports that a person was "possibly having a mental health episode" or that a suspect had "a mental health issue," but the BlueTeam record for the same incident does not reflect what officers write in their reports (thus skewing data that is utilized for identifying trends and developing policy and procedures for dealing with these citizens with special needs);

- APD's failure to apply the basic standards of duty of care for people who are victims or for individuals who are experiencing some type of mental or emotional crisis;

- APD's refusal to identify and consider video and audio validation of violations of existing policy; and

- APD's abrogation of organizational, administrative, managerial,  supervisory, and line personnel's duties related to the standard of care of in-custody individuals.

For these reasons, APD needs to rethink the way they interact with people experiencing mental or emotional crises. Unfortunately, the monitoring team was extremely disappointed with the recent training APD approved and disseminated for "Interaction with Persons with Mental Illness." The state-developed agenda for this maintenance of effort (MOE) training was designed for a two-hour training program, but APD distilled it down to a *28-minute video distributed on an online delivery platform*. Documents we reviewed revealed the Training Subcommittee of the APD Mental Health Response and Advisory Committee (MHRAC) were provided no advance information about this training, nor any opportunity to review or advise APD on its development or curricular content. Like many mechanisms put into place within APD, the MHRAC was excised from of the decision-making and consultation loop on this matter. Rather than taking the opportunity to provide meaningful training in a much-needed area, APD failed to collaborate with internal and external partners to provide the best training possible to more appropriately service and care for a vulnerable population that disproportionately impacts its "Calls for Service" workload. Consistent with the findings in Paragraph 110 of this report, the monitoring team views this misstep as more evidence of APD's failures to adhere to the basic standards of duty of care that need to be accorded to people who are vulnerable, especially those who are experiencing some type of mental or emotional crisis.

In the monitor's opinion, based on 23 years of experience in the monitoring process of police reform projects, these types of surreptitious, hugger-mugger activities are substantial, intentional, and wholly deliberate artifacts of a strengthening Counter-CASA process at APD.  There appears to be no regularized reciprocal from APD leadership to minimize the Counter-CASA effect.

While examining APD's issues with their duty to care for vulnerable populations, the monitoring team also construes prisoners in APD's custody to be a vulnerable population. One case was already introduced earlier in this section of this report in which a handcuffed prisoner (whose handcuffs were also shackled to his ankles via a chain) had a police vehicle's door closed on his head and then had the police vehicle's door compressed against the handcuffed prisoner's upper body (improperly deemed to be a "low-level control tactic" on the part of the officer). In another incident that was adjudicated during this monitoring period, an officer found his arrestee in a holding cell had hung himself with shackles. An investigation revealed the officer had failed to make two required visual checks[61] on the prisoner and only went into the holding cell when readying to transport the prisoner to the Prisoner Transport Center (PTC). Upon finding the prisoner, the officer took no basic first aid steps to check to see if the prisoner was breathing or had a pulse; the officer merely kicked the prisoner's leg in an attempt to elicit a response. The officer contacted his duty lieutenant and went back to completing reports/forms, and at no time did he call for paramedics or other emergency medical services. The officer did, however, appear to have a lengthy conversation with the police union's president.  When subjected to two interviews, the officer stated that one of the reasons why he did not call for medical assistance was because he was in shock. Despite being in shock, the one call the officer was able to make was to his union president! This call was made before emergency medical services were contacted and arrived on scene.

Twenty-two minutes after the officer found his prisoner in a compromised state, the duty lieutenant learned that the officer had not yet called for emergency medical services (having only called his union president up to this point). The lieutenant then requested medical personnel. The prisoner was examined by medical personnel 32 minutes after the officer found the prisoner on the floor of the holding cell!

The officer in this case was the subject of a Special Report compiled by the monitoring team four years prior to this incident. In that report, the officer's uses of force were examined, inclusive of the officer purposely kneeing a subject in the head who was being held down by other officers, causing significant bleeding from the subject's face.

The facts in these two cases clearly demonstrate the officer's indifference to the safety of individuals in his custody. While the arrestee survived the knee strike to the head years earlier, the arrestee in the holding cell did not survive, nor was he afforded the decency of reasonable emergency intervention. The officer's failure to adhere to a professional standard of duty to care, in addition to making material misstatements (especially about failing to activate his OBRD while transporting the prisoner and before going into the holding cell), was dealt with by APD in a highly questionable manner. As

---

[61] The investigation revealed:
- At 0357 hours, the prisoner placed his head and neck on the chain in the holding cell.
- At 0358 hours, the officer failed to make the required visual check of the prisoner.
- At 0400 hours, the prisoner was observed to exhibit labored breathing.
- At 0401 hours, the prisoner appeared to stop breathing.

noted elsewhere in this report, this officer was assigned by the former chief to speak to academy cadets to share his experience. In that address, the officer showed no remorse and noted his employment problems were attributed to "not (being) liked by some concerned people… politics."  The messages this sends to highly impressionable recruits are extremely concerning to the monitoring team.

Four years earlier, this officer's indifference to human life and to those who were in his care did not result in death. Unfortunately, in 2019 the officer's indifference for human life to those who were entrusted in his care resulted in a more tragic outcome. For the Albuquerque Police Department and the citizens of Albuquerque, the progressive discipline for this indifference to life on a subsequent occasion amounted to a suspension of a handful of 10-hour shifts and four and a half minutes of discomfort for the officer standing before a cadet class, discussing his actions and explaining away his inactions. For the monitoring team, this represents another exemplar of APD failing to establish an effective standard of care for persons in their custody.

During IMR-12 (data current through August 6, 2020), APD recorded 79 Level 3 use of force cases by its members. Between February 1 and April 30, twenty-five cases were opened and 21 of these cases were completed within three months.[62] [63]This equates to a completion rate of 91% pursuant to Paragraph 71, below the required 95 percent. APD opened 232 Level 2 use of force cases during the IMR-12 reporting period. Between February 1 and April 30, 108 cases were opened and 97 of these cases were completed within three months.[64] This equates to a completion rate of 91% pursuant to Paragraph 71. Two of the 11 cases that were not closed within their three-month deadline are in suspended status due to an officer being on leave pursuant to the Family and Medical Leave Act (FMLA) and are excluded from this calculation.

Since APD implemented a new suite of use of force policies on January 11, 2020, the monitoring team did not make any comparative analyses of Level 2 and 3 cases to prior reporting periods due to nuances in classification levels utilized prior to January 11. However, the monitoring team has taken cognizance of the fact that IAFD has significantly improved the completion rate of use of force investigations within the first three months of this monitoring period. While IAFD still has to improve its efficiency rate for completing Level 2 and 3 cases, it should be abundantly apparent from the preceding parts of this synopsis of Paragraphs 60-77 (as well as the case synopses that follow) that IAFD must focus specifically on the effectiveness of its investigations and oversight processes to achieve operational compliance. This focus must be at the granular level to assess the finer details of force utilized by officers and to eliminate its agency-level bias towards narratives not supported by objective analysis.

---

[62].  Level 3 cases that were opened after May 1 had not reached their three-month deadline within the IMR12 reporting period. Therefore, these cases were not included in this calculation.

[63] Investigations of two of these cases were delayed due to officers being on FMLA leave.

[64] Level 2 cases that were opened after May 1 had not reached their three-month deadline within the IMR12 reporting period. Therefore, these cases were not included in this calculation.

The monitoring team conducted a review of Level 2 and Level 3 use of force cases drawn from samples taken throughout the monitoring period. The cases reviewed and a synopsis of each case are listed below. For use of force cases involving an ECW, those case facts may have been fully described in Paragraphs 24-36 of this report. Problems, if any, with those cases as they relate to the conduct of IAFD use of force investigations are cited here for clarity purposes.

**Case #1 IMR-12-16[65]**

In January 2020, at approximately midnight a uniformed officer responded to a complaint of a theft of a garbage can at a convenience store/gas station. Around the same time an officer met with a victim at a nearby motel who had his car burglarized and his dog stolen by a person who fit the description of the garbage can theft suspect. As officers conducted the investigations and began looking for the suspect and dog in a nearby neighborhood, the dog approached the theft victim in the presence of an officer and the suspect's location was revealed in the darkness of a courtyard of a private residence located behind a 6-foot high cinderblock wall. After utilizing verbal commands to no avail in getting the suspect to climb the wall out of the courtyard, two officers climbed the wall and gave verbal commands to the suspect. The suspect resisted and objectively reasonable minimal physical force had to be utilized to handcuff him. The suspect increasingly revealed himself to be an individual in emotional crisis and was uncooperative.  An acting sergeant arrived on the scene and after lengthy attempts to arouse the homeowner, a gate to the property was eventually unlocked for egress purposes. The suspect refused to cooperate and refused to walk, necessitating three officers to carry the individual through narrow passageways to exit the property. At one point the officers needed to put the suspect down to put him into leg shackles and then continue carrying him to a patrol vehicle. It took all three officers to get the individual into the patrol vehicle.

Emergency medical services were notified to respond to the scene. At one point while the suspect was seated in the right rear of the patrol vehicle, he was partially hanging out of the vehicle while the door was opened. Shortly afterwards when the suspect was more fully positioned within the vehicle, he leaned back out of the vehicle when a single officer was standing at the door and subsequently closed the right rear door on the suspect's head. Shortly thereafter while the suspect was still hanging with his head partially out of the vehicle, this same lone officer standing at the door of the vehicle began to push the door closed on the shoulders/upper body of the suspect. At one point towards the end of this episode, the suspect can be heard saying, "Oh yes, press a little harder." Neither of these uses of force were appropriate nor was the nonreporting of these events. This same officer is also observed grabbing the suspect's head when attempting to control the suspect being placed in soft restraints on a gurney. These three uses of force are not reported on any report completed by the officer nor are they noted in the investigator's report or mentioned in any reviewing supervisor's report. None of the three officers (inclusive of an active sergeant) involved in the handcuffing and carrying of the suspect were interviewed by the IAFD investigator. The suspect was

---

[65] [IMR-12-16] is the case discussed in detail in the earlier part of the introduction for Paragraphs 60-77.

"interviewed" by an IAFD detective when the suspect was in a hospital bed and barely conscious due to what appeared to be sedation. The suspect would be clinically assessed as not oriented to person, place, or time.

**Case #2 IMR-12-17**

Two APD officers were riding together in a residential neighborhood when they observed a male subject enter the driver's side of a pickup truck that was parked in the road.  As they passed the truck the male was slouched down and laying toward the passenger's seat, which they perceived was meant to conceal himself.  They backed the patrol car behind the vehicle and as they approached the truck, the male began to walk away.  The officers announced themselves, but the subject ignored their request for him to stop.  One officer returned to the patrol car and drove it to a position ahead of the subject, at which time he began to run away.

One officer pursued him on foot for approximately 15 seconds down alleys and between houses and into a trailer park.  The officer was able to catch the subject, grabbed his shoulders and pulled him to the ground.  Once on the ground, the subject immediately submitted and was handcuffed without further force having to be used.  The second officer operated his vehicle through the streets and eventually came across his partner and the subject.  He was never in a vantage point to view the use of force, but he arrived on the scene in time to help the subject to his feet and walk him to the patrol car.  A supervisor was called and responded to the scene to conduct the initial assessment.  Likewise, an ambulance was called as a precautionary measure, even though the subject did not exhibit nor complain about injuries.  Later it was determined that the officer who used force had a minor cut to his leg, which was later documented.  The supervisor who responded collected initial information and determined that the case involved a Level 2 use of force, so IAFD was contacted and responded to the scene to investigate.  The monitoring team reviewed the case and determined that the use of force was properly categorized by the responding supervisor.  Further, the use of force was objectively reasonable, within APD policy and consistent with the CASA provisions.

**Case #3 IMR-12-06**

Two APD officers were dispatched to a reported commercial burglary in a multi-building office complex.  After meeting with the building owner and learning that no one should be inside the complex they approached an area between two of the buildings.  OBRDs of the two officers revealed obvious signs of forced entry in multiple office suites.  An offender had broken out the front glass of a door that provided access to an office from the exterior of the building, as well as broken windows. The officers continued their search for a potential subject.  At one point, Officer 1 returned to the parking lot to reposition his patrol vehicle.  He heard Officer 2 begin yelling commands to someone, so he quickly returned to the area to assist.

Officer 2 had been moving around a building when he encountered a male subject who had just emerged from an office suite through the broken glass of the office doorway.

He identified himself and immediately began giving commands for the subject to stop, get down onto the ground and that if he failed to comply force would be use.  The subject turned toward Officer 2 and began to walk with slow, exaggerated and aggressive mannerisms.   As this was happening Officer 1 arrived back at the location and unholstered his ECW.  As the subject was being told to comply, he was verbally responding to the officer's commands by saying "Or what?" and "What are you going to do?" He continued to walk at the officers, despite being warned several times that force would be used against him if he didn't comply.  He walked to within 15 feet of the two officers, who were now (both) painting the suspect with their ECWs as a show of force. The subject stopped with his hands down and slightly in front of him and his feet spread apart in what appeared to be a fighting stance.  When the subject was warned he'd be tased if he didn't comply, he stated, "That'll hurt."  The two officers communicated between themselves to be prepared to tase the subject.  The subject turned slightly at which time Officer 1 called out "taser, taser, taser" and deployed his ECW, bringing the subject to the ground.  Officer 2 quickly handcuffed the subject without any additional force having to be used.

Following the use of force, the officers were professional with the suspect and escorted him to a patrol vehicle.  A supervisor was called to the scene and after the incident was properly categorized as Level 1 and Level 2 uses of force.  IAFD was contacted and an investigator responded to the scene, and the IAFD investigation properly determined that the use of force was objectively reasonable and within policy.  An ambulance was called to the scene to provide medical services to the suspect and a crime scene detective took photographs of the scene, officers and subject.

**Case #4 IMR-12-18**

This case was cited in Paragraphs 24-36 of this report. The case involved a March 2020 ECW Show of Force, an ECW application, and a leg sweep takedown of a suspect after a brief foot chase. As reported previously, the three officers appropriately used reasonable force to counter the suspect's flight and threat to officers

Case Observations:

1. The IAFD Evaluative Narrative Form indicated that the use of distance and de-escalation techniques were not utilized in the encounter. However, it is clear from the videos that the officer utilized distance to reduce the need to utilize force. The officer immediately stopped when the subject turned around in an aggressive manner towards him, and as the suspect began aggressively coming towards the officer, the officer immediately began backing up to gain an advantage from distance. It was at this time that the officer was able to draw his ECW and only fired as he was still trying to back up from the suspect and the suspect was still moving towards him. Despite the officer utilizing distance to his advantage to gain separation from the aggressor, force was still necessary.

2.  Various reports identify two individuals as civilian witnesses. However, the two individuals were employees of a business that captured the use of force incident on their surveillance cameras. When an IAFD detective was speaking to them about the video, he asked if they had witnessed the event and one of the witnesses stated, "No, we just all watched it on tape." Based upon this statement, the detective improperly assessed both of them as witnesses (when only one of them may have seen the event via video recording) and had them fill out witness statements for what they viewed on the camera after it had been recorded.

3.  The officer who completed the leg sweep takedown wrote in his police report that the subject was "possibly having a mental health episode" and had "a mental health issue." However, in the BlueTeam entry under "Experiencing Mental Health Crisis (Officer Assessment), it states "Unk" (unknown). This type of misinformation skews data that APD relies upon for its public reports and to conduct various levels of risk analysis.

4.  The officer who utilized a leg sweep and take down of the suspect had not activated his OBRD video prior to engaging in the foot chase and take down. The officer explained that he activated his OBRD as he started running, "but possibly pressed it to (sic) softly." The officer wrote in his Use of Force Narrative that as the suspect was being taken into custody, he "heard his camera beep and looked down and saw that his camera was still flashing green at which time he immediately activated its record function." Video from another officer's OBRD shows that as this officer had completed handcuffing the suspect and was kneeling alongside the suspect, a supervisor parked his vehicle behind the officer and began to approach the scene. At this point the officer glanced over his left shoulder at the approaching supervisor and reached down and activated his OBRD. The IAFD detective stated that the OBRD video starts when the suspect is being handcuffed. This is simply accurate. The video actually begins after the individual is handcuffed and as the supervisor is walking up to the scene. This IAFD detective opined that he found this to be a reasonable explanation and determined the officer not to be in violation of the APD OBRD policy.  We remain confused as to how APD failed to identify the discrepancies

5.  This OBRD violation should have resulted in an IA request forwarded to IAPS via BlueTeam. The monitoring team opines that it is outside the purview of an IAFD detective to classify a potential policy violation, investigate it, and subsequently clear an officer. Most problematic in this case is that the officer who failed to activate his OBRD had a sustained OBRD violation eight months earlier. A review of this officer's retention card reveals that an IA investigation was initiated three weeks after a use of force case commenced in which the officer utilized a solo takedown (as in this present case) while engaged in a foot pursuit (as in this present case). The initiative this detective took, as well as his chain of command, to summarily decide not to forward the policy violation and to IAPS for classification and determination is consistent with APD's past practice of field personnel investigating force incidents and utilizing an ACM (Additional Concerns

Memo) or a SAR (Supervisory Action Report) to keep potential policy violations below the radar of IAPS and off of individual officer's IA records and retention cards. This is a deliberate subversion of the already weak IA mission of APD, creates unreliable data which analysts will rely upon for risk analysis and public reports, and undermines the value of APD's long-awaited Early Intervention System (EIS). APD needs to reexamine the non-disciplinary action taken in this matter.  We view this matter as yet another deliberate Counter-CASA artifact designed to weaken oversight of in-field operations.

## Case #5 IMR-12-19

In January 2020, at approximately 2:00am, APD received a call about two suicidal adults from a family member located within their residence. Two uniformed officers responded and were initially refused entry into the residence before being provided access by other family members who had been called to the scene by another family member from within the residence. A male could be heard screaming inside the residence and continued screaming as officers walked into the residence. The two officers calmly spoke to the heavily intoxicated individual before the individual walked directly into the officers, disobeying their commands to stop, and pushing them into a corner, and telling the officers to kill him. Officers blocked the subject by extending their arms, so the subject did not strike them, before using physical force to restrain the subject and subsequently bringing the subject to the ground to control him. The subject initially began to actively resist handcuffing, but officers were able to utilize minimal force to overcome the resistance and handcuff the subject. The subject had blood on his nose and rescue was called to the scene, but the subject refused treatment. The subject was charged with battery on a peace officer, despite never being told this until he was at the hospital for treatment. The subject's sister, who was also intoxicated and suffering from depression, continuously agitated officers at the scene and attempted to keep some officers from entering the residence, including the investigating sergeant. Two officers had physical contact with the sister, construed as pushing and shoving, and no mention of this was made in their reports or in the accompanying IAFD reports.

The monitoring team reviewed the officers' OBRDs and reports, as well as the responding use of force investigation and chain of command reviews.  Overall the quality of the investigation was good, and the use of force was within policy. A field sergeant's minimal efforts in conducting on-scene interviews of witnesses was noted in the chain of command reviews.

## Case #6 - Follow up to Case #IMR-11-1

In IMR-11 the monitoring team reported on this use of force case and intended to document the follow up activities of APD in IMR-12.[11]   The monitoring team was concerned enough with the case that we felt, at the time, it was appropriate to alert APD that this use of force was poorly reported by officers, poorly investigated by a supervisor, and replete with oversight failures that continued through the entire chain of command, to include Internal Affairs.  We noted

tactical and safety issues, an unreported use of force, poorly written reports that contained boilerplate language, and witnesses that were not interviewed.[66]  The case was referred to IAFD to be addressed and, unfortunately, problems with organizational oversight of this case were badly exacerbated at IAFD.  The basic facts of the case are as follow:

In August 2019, APD Auto Theft detectives were working a multi-agency crime reduction detail when they observed a male subject walking in the area.  One of the detectives recognized the subject and conducted a warrant check, learning that the subject had an active felony warrant for his arrest (Probation Violation/ Receiving Stolen Vehicle).  Detectives devised a plan to arrest him once he cleared an area where other people were congregated.  Once the subject began to walk away, several detectives moved in and ordered him to stop.  A handgun was visible in the subject's waistband area and he failed to stop when ordered.  Based on the totality of circumstances, one detective deployed his taser, and it was on the second cycle that it had the desired effect.  Several officers restrained the subject and forcibly handcuffed him.

As noted above, we found a number of deficiencies with the initial investigation of the force event and requested APD conduct an internal review of the case.  Following our referral, APD's IAFD initiated and conducted an internal affairs investigation into the event.  Based on our review of follow up materials provided, our opinion is that APD conducted a deficient, perfunctory investigation based on a biased presentation of information.  The following represents our perspective on some parts of APD's follow up:

1. In our view, the IA investigator and APOA representatives clearly orchestrated the reading of language meant to invoke an officer's *Garrity* rights at the beginning of each taped statement.  We have brought this inappropriate process to APD's attention on numerous occasions, yet APD still allows it to transpire.  This caps years-long recommendations to APD to alter non-congruent CASA practices.  During case reviews for IMR-12, the monitoring team encountered, for the first time, an officer including a self-declared *Garrity* invocation in their use of force Witness Statement form.  Our concerns about this extend to the officers themselves, who may not understand the proper channels to receive legitimate *Garrity* protections.  As well, we have concerns as to their purpose and limitations, giving them a false sense of security when they read a canned statement before an internal affairs interview.

2. The IAFD Lieutenant assigned the case was unprepared for the interviews of officers.  Relevant policy provisions were not identified and/or

---

[66] We recommended that IAFD review this case.  Based on our past experience with IAFD we expected they would uncover many of the same issues as the monitoring team.  IAFD did identify many of the same issues, but the follow up investigation is flawed in many ways and the adjudication of the misconduct identified in the case was <u>significantly insufficient</u>.

addressed during interviews with officers and there was a failure to connect their actions/inactions to those policy provisions.

3. When an officer was asked an open-ended question, the investigator seemed to accept the answer as fact and failed to ask reasonable follow up or probing questions to challenge the response and ensure there was an objective assessment of the credibility of the information provided by an officer.

4. At times, the IAFD Lieutenant allowed the APOA to overstep its role during interviews. Based on the tone and manner in which interviews were conducted, it appeared the Lieutenant was uncomfortable or intimidated by the presence of the APOA representative!

5. The IAFD Lieutenant's investigation report routinely inserted gratuitous, mitigating, and often irrelevant information to effectively justify policy violations. For instance, the misconduct in the case is not mitigated by past policy deficiencies and use of force "backlogs" as noted by the investigator. Likewise, there were references to how the policies had changed (again to mitigate responsibility), but when the monitoring team asked APD to provide examples of the policy changes being referred to in order to determine their relevance APD was unable to provide a meaningful response. Again, this reflects a pervasive and almost determined Counter-CASA process.

6. There are inconsistencies and disparity in the manner in which allegations and findings are adjudicated between APD personnel who were the subject of the internal investigation.

7. There is a flawed interpretation of an officer's responsibilities to report a use of force.

8. As an illustration of the poor quality of the IAFD investigation, the acting lieutenant who conducted the initial defective use of force investigation was interviewed. The IAFD Lieutenant identified nine (9) separate failures with the initial use of force investigation including: failure to properly identify, investigate and report use of force; not properly identifying officers who failed to prepare reports; failures by officers to retain OBRDs; failure to document all suspect injuries; failure to properly identify policy violations by officers and report those violations to IA and significant other investigative deficiencies. Despite the breadth of these failures, the entire interview of the acting lieutenant, inclusive of an introduction, during the internal affairs investigation was merely 5 minutes in length. This represents an abject failure to effectively implement meaningful internal affairs practices at APD.

9.  Despite those nine (9) critical failures with the initial force investigation, APD issued the acting lieutenant a verbal reprimand for not making sure OBRDs are properly tagged.  To put this into some context, an officer involved in the same event failed to seatbelt the subject in her patrol vehicle and received the same sanction (a verbal warning) as the acting lieutenant.   In the opinion of the monitoring team, this is the type of flawed adjudication of misconduct and performance deficiencies that are elongating the reform process.

10. An officer failing to report an obvious use of force was a prevalent issue with the case and was not identified anywhere in the force investigation's chain of command.  Despite that fact, the IAFD lieutenant didn't ask a single question to the acting lieutenant about the detective who failed to report force or the steps he went through to determine the types of force used in the event.  The detective said in his statement that he discussed his actions with the acting lieutenant, but the IAFD Lieutenant didn't ask what the detective told him (the acting lieutenant) about force being used during his internal affairs interview.

11. The IAFD lieutenant documented that the detective who used force "…did write a report identifying that he went 'hands on,'" but that term is not used in the officer's report.

12. APD exonerated the officer who failed to report a use of force under the flawed premise of a policy deficiency, suggesting that an officer is only responsible for completing a report when force is used.  We believe this is ostensibly meant to suggest that as long as an APD officer submits a report following a use of force, regardless of the content, then that officer has met the policy provision.

13. The IAFD Lieutenant indicated in his report that members of an assisting agency "did not provide" reports for their involvement in the event.  As written, it's impossible to determine if the agency was even requested to provide the reports.  Also, the detectives from allied agencies were not interviewed during the internal affairs investigation. This is a disturbing pattern in IA cases.

14. The IAFD Lieutenant conducted "coaching sessions" with the lieutenant and commander who approved the deficient use of force investigation. They weren't interviewed because apparently "No interview was necessary." It is unclear how these "coaching sessions" were conducted, and how they were approved outside of a typical internal affairs adjudication processes.

We liken the sequence of events surrounding the initial deficient use of force investigation, and perfunctory follow up internal affairs investigation by IAFD, to

108

the type of performance we grew to expect from APD when the CASA began.  It is highly concerning that, at this stage of the project, after the extensive and intensive technical assistance the monitoring has provided, APD would view this internal affairs investigation as a reasonable response to misconduct surrounding failures to report force and failures related to properly investigating uses of force. We believe that the poor response from the internal affairs function of the agency only serves to re-enforce bad performance.

**Compliance Findings**

Based on our review, we have determined at least Secondary Compliance is continued for Paragraphs 60 through 77.  Until substantial revisions are made to the internal functioning of IAFD, operational compliance will remain elusive.  We note elsewhere in this report that multiple external training programs offer formalized external IA management courses, including the Southern Police Institute at the University of Louisville, the Federal Law Enforcement Training Center, and multiple other highly respected agencies and organizations.  It is essential that APD train its IA personnel in the correct way to meet its functional responsibilities.  To do less is deliberately non-compliant.

**4.7.47 Assessing Compliance with Paragraph 60:  IAD Force Review**

Paragraph 60 stipulates that:

> **"The Force Investigation Section of the Internal Affairs Division shall respond to the scene and conduct investigations of Level 2 and Level 3 uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Division by the Chief. In cases where an investigator in the Force Investigation Section initiates a Level 2 or Level 3 use of force investigation and identifies indications of apparent criminal conduct, the Section shall refer the use of force to an investigator in the Section, with no involvement in the initial administrative investigation into the Level 2 or 3 use of force, to conduct a criminal investigation. The criminal investigation shall remain separate from and independent of any administrative investigation. In instances where the Multi-Agency Task Force is conducting the criminal investigation of a use of force, the Internal Affairs Division shall conduct the administrative investigation."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

*4.7.47a:  Conduct a complete review of recent IA case investigations and identify all similar or related violations of the CASA.  Where appropriate, re-open and re-investigate those cases;*

*4.7.47b:  Organize from that review, a list of behaviors that are counter-CASA and ensure that those behaviors are restricted by a revised IA policy, detailed re-training, supervision and discipline.*

**4.7.48 Assessing Compliance with Paragraph 61**

Paragraph 61 stipulates:

> **"The Force Investigation Section of the Internal Affairs Division will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60. The Force Investigation Section of the Internal Affairs Division shall include sufficient personnel who are specially trained in both criminal and administrative investigations."**

**Results**

> Primary:       **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

*Recommendation for Paragraph 61:*

*4.7.48a:  Continue to monitor internally the progress of Internal Affairs in conducting effective intake, assessment, assignment, investigation, and resolution processes for criminal and civil investigations in order to ensure that staffing levels are appropriate, and processes are effective in producing acceptable and timely results.*

**4.7.49 Assessing Compliance with Paragraph 62:  Revision of Internal Affairs Manual**

Paragraph 62 stipulates:

> **"Within six months from the Operational Date, APD shall revise the Internal Affairs Division manual to include the following:**
> **a)    definitions of all relevant terms;**
> **b)    procedures on report writing;**
> **c)    procedures for collecting and processing evidence;**
> **d)    procedures to ensure appropriate separation of criminal and administrative investigations in the event**

of compelled subject officer statements;

e)   procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;

f)   scene management procedures; and

g)   management procedures."

## Results

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 62:*

*4.7.49a:  Continue work on revision and update of the IAB manuals, ensuring they comply with the updated CASA, the new use of force policies that became operational on January 11, 2020 as well as the new investigation procedures for Level 1, 2, and 3 uses of force, and known best practices in the field.*

### 4.7.50 Assessing Compliance with Paragraph 63:  Staffing IAD

Paragraph 63 stipulates:

> "Within 39 months from the Operational Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Division and Force Investigation Section to fulfill the requirements of this Agreement. APD shall ensure that all Level 2 and Level 3 uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary. At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Division or Force Investigation Section."

## Results

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 63:*

*4.7.50a:  Identify the department's expected milestone date for staffing at IAD based on data related to incoming cases, average time for case completion, and calculations of the number of staff needed to effectively investigate incoming cases within established parameters.*

**4.7.51 Assessing Compliance with Paragraph 64:  Training Force Division Personnel**

Paragraph 64 stipulates:

> **"Before performing force investigations, Force Investigation Section personnel shall receive force investigation training that includes, at a minimum, the following areas:  force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques. Force Investigation Section personnel shall also receive force investigation annual in-service training."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

*Recommendation for Paragraph 64:*

*4.7.51a:  Modify the 40-hour training program for IAFD investigators and supervisors that was reviewed during this monitoring period and make the appropriate revisions, based upon the written and oral feedback on the program provided by the monitoring team.*

*4.7.51b:  Modify the 40-hour training program for IAFD investigators and supervisors based upon the monitor's critical assessment of IAFD investigations and supervisory reviews provided in this report.*

**4.7.52 Assessing Compliance with Paragraph 65:  Referral of Force Investigations to MATF**

Paragraph 65 stipulates:

> **"Where appropriate to ensure the fact and appearance of impartiality and with the authorization of the Chief, APD may refer a serious use of force indicating apparent criminal**

112

> **conduct by an officer to the Multi-Agency Task Force for criminal investigation."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.53 Assessing Compliance with Paragraph 66:  MATF Assistance to IAD

Paragraph 66 stipulates:

> **"To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Force Investigation Section of the Internal Affairs Division or the Multi-Agency Task Force in the investigation of any Level 2 or Level 3 use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.54 Assessing Compliance with Paragraph 67:  MATF Assistance to IAD

Paragraph 67 stipulates:

> **"The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.55 Assessing Compliance with Paragraph 68:  Consultation with External Agencies and Compelled Statements

> **"If APD initiates a criminal investigation, or where APD requests a criminal prosecution, the Force Investigation Section will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186. No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

### *Recommendation for Paragraph 68:*

### *4.7.55:  APD should move forward with process design, policy development and training related to investigations regarding potential criminal prosecutions and compelled interviews of officers.*

### 4.7.56 Assessing Compliance with Paragraph 69:  IAD Responsibilities in Serious Uses of Force

Paragraph 69 stipulates:

> **"In conducting its investigations of Level 2 or Level 3 uses of force, as defined in this Agreement, the Force Investigation Section shall:**
>
> **a)** **respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that the use of force has been classified according to APD's classification procedures, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;**
>
> **b)** **ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;**
>
> **c)** **ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses should be encouraged to provide and sign a written statement in their own words;**
>
> **d)** **ensure, consistent with applicable law, that all officers**

witnessing a Level 2 or Level 3 use of force by another officer provide a use of force narrative of the facts leading to the use of force;

e)  provide a written admonishment to involved and witness officer(s) to the use of force that they are not to speak about the force incident with anyone until they are interviewed by the investigator of the Force Investigation Section;

f)  conduct only one-on-one interviews with involved and witness officers;

g)  review all Use of Force Reports to ensure that these statements include the information required by this Agreement and APD policy;

h)  ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;

i)  conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;

j)  record all interviews;

k)  consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;

l)  make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and

m)  train all Internal Affairs Division force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors.

## Results

APD has provided the policy and training components of this paragraph to IAD personnel.  What remains to be accomplished is consistent and persistent supervision and review to ensure that IAD findings are consistent with CASA requirements.  We consider this issue to be on the "critical path" to compliance, and until APD can effectuate significant change in its IAD processes—meeting accepted practice in the field and the requirements of the CASA—operational compliance will remain elusive.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraphs 68 and 69:*

*4.7.56a:  Conduct detailed failure analyses for all IAD investigations deemed improperly completed or delayed.  This report provides a workable starting point for that analysis.*

*4.7.56b:  Using these failure analyses, routinely modify training, procedures, practice, and supervision/oversight until IAD findings are greater than 94 percent complete and adequate on each of the elements addressed in paragraph 69.*

*4.7.56c: Resolve IA administrative (use of force) and misconduct investigative timelines to ensure they are practical and allow corrective and disciplinary actions to routinely occur within those timelines.*

**4.7.57 Assessing Compliance with Paragraph 70:  Use of Force Data Reports**

Paragraph 70 stipulates:

> **"The Force Investigation Section shall complete an initial Use of Force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 70:*

*4.7.57a:  Conduct a data analysis of Use of Force Data reports to determine why they take longer than 24 hours to process and develop recommendations to relieve the major bottlenecks affecting this process.*

**4.7.58 Assessing Compliance with Paragraph 71:  IAS Investigative Timelines**

Paragraph 71 stipulates:

> **"The Force Investigation Section shall complete Level 2 or Level 3 administrative investigations within three months after learning of the use of force. Any request for an extension to this time limit must be approved by the commanding officer of the Force Investigation Section through consultation with the Chief or by the**

116

**Chief. At the conclusion of each use of force investigation, the Force Investigation Section shall prepare an investigation report. The report shall include:**

**a)** **a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Force Investigation Section's independent review of the facts and circumstances of the incident;**

**b)** **documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying Use of Force Data Reports. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**

**c)** **the names of all other APD officers or employees witnessing the use of force;**

**d)** **the Force Investigation Section's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options;**

**e)** **if a weapon was used by an officer, documentation that the officer's certification and training for the weapon were current at the time of the incident; and**

**f)** **the complete disciplinary history of the target officers involved in the use of force.**

## Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not in Compliance**

### *Recommendations for Paragraph 71:*

### *4.7.58a:  Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing delay.  The review should:*

    *a.  Identify key causes of failure;*

117

*b. Identify where the failure points were in the IAD process related to*
   *Paragraph 71;*
*c. Identify the cause of the failures;*
*d. Identify who is responsible for the cause of the delays; and*
*e. Recommend actions to remedy the top five causes of*
   *failure to meet the established timelines.*
*f. Repeat this process until failures re Paragraph 71 are less than 95*
*percent.*

*4.7.58b:  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established timelines.*

*4.7.58c:  Determine if these processes need to be revised, expanded, or refocused given our comments regarding supervisory reviews and IAFD failures contained in paragraphs 24-36, 41-59, and 60-77.*

*4.7.58d:  Repeat until 95% of cases completed meet established requirements for quality of IA investigations.*

*4.7.59e:  APD should carefully review the changes its use of force policy viz a viz this paragraph to ensure that in-field systems related to this paragraph are in compliance with all aspects of the new use of force policy suite and the new IA investigations rubric.*

## 4.7.59 Assessing Compliance with Paragraph 72:  IAS Report Review

Paragraph 72 stipulates:

> **"Upon completion of the Force Investigation Section investigation report, the Force Investigation Section investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Division. The Internal Affairs Division commanding officer shall review the report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance of the evidence standard. The Internal Affairs Division commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

118

*Recommendation for Paragraph 72:*

*4.7.59a:  Conduct a review of a sample of cases completed by IAD (in the past 3-6 months) that failed to meet established timelines by reviewing the key failure points causing delay.  The review should:*

> a. *Identify key causes of failure;*
> b. *Identify where in the IAD process related to Paragraph 72 the failure points were;*
> c. *Identify the cause of the failures;*
> d. *Recommend and implement actions to remedy the top five causes of failure to meet the established timelines;*
> e. *Revaluate performance and repeat the process, with a focus on supervisors who routinely fail to meet established timelines; and*
> e. *Repeat as necessary until the failure rate is below five percent.*

## 4.7.60 Compliance with Paragraph 73:  IAS Findings Not Supported by Preponderance of the Evidence

Paragraph 73 stipulates:

> **"For administrative investigations, where the findings of the Force Investigation Section investigation are not supported by a preponderance of the evidence, the Internal Affairs Division commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report. The commanding officer of the Internal Affairs Division shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it. The Internal Affairs Division commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Division."**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

## Recommendations for Paragraph 73:

119

**4.7.60a: *Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet established quality requirements regarding preponderance of the evidence and review the key failure points causing insufficient investigations relative to preponderance of the evidence.  The review should:***

> ***a.  Identify key causes of failure to meet preponderance of the evidentiary standards for IA investigations;***
> ***b.  Recommend actions to remedy the top five causes of failure to meet the established requirements related to preponderance of the evidence.***

**4.7.60b:  *Implement recommended actions and conduct continual follow-up assessment to determine what impact, if any, the implemented actions had on the unit's ability to meet established preponderance of evidentiary standards.***

**4.7.60c:  *Repeat until 95% of cases completed meet established requirements regarding evidentiary standards.***

**4.7.61 Assessing Compliance with Paragraph 74:  IAS Quality Control**

Paragraph 74 stipulates:

> **"Where a member of the Force Investigation Section repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal from the Force Investigation Section in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules."**

**Results**

    Primary:      **In Compliance**
    Secondary:   **In Compliance**
    Operational:  **Not In Compliance**

**Recommendations for Paragraph 74:**

**4.7.61a: *Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet quality standards by reviewing the key failure points causing the failure.  The review should:***

> ***a.  Identify key causes of failure;***

b. *Identify where in the IAD process related to Paragraph 74 the failure points were located;*

c. *Identify the cause (of the failures); and*

d. *Recommend actions to remedy the top five causes of failure to meet the established timelines.*

*4.7.61b:  Implement recommended actions and conduct a follow-up assessments to determine what impact, if any, the implemented actions had on failures to meet established quality standards for IA investigations.*

*4.7.61c:  Repeat until 95% of cases completed meet established evidentiary standards.*

### 4.7.62 Assessing Compliance with Paragraph 75:  IAD Quality Control

Paragraph 75 stipulates:

> **"When the commanding officer of the Internal Affairs Division determines that the force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board with copy to the Chief."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

**Recommendations for Paragraph 75:**

*4.7.62a:  Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet the requirement to forward the case to the FRB by reviewing the key failure points causing incomplete cases to be forwarded to the FRB.  The review should:*

a. *Identify key causes of failure;*

b. *Identify where in the IAD process related to Paragraph 75 the failure points were; and*

d. *Recommend actions to remedy the top five causes of failure to meet the established protocols, e.g., training, supervision, staffing, etc.*

*4.7.62b:  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established evidentiary and quality standards.*

121

*4.7.62c:  Repeat until 95% of cases completed meet established evidentiary and quality standards.*

## 4.7.63 Assessing Compliance with Paragraph 76:  Force Investigations by MATF or FBI

Paragraph 76 stipulates:

> **"At the discretion of the Chief, a force investigation may be assigned or re- assigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations or may be returned to the Force Investigations Section for further investigation or analysis. This assignment or re-assignment shall be confirmed in writing."**

**Results**

We note that this paragraph is "permissive" in nature, not prescriptive:  it uses "may" instead of "shall."  We have noted no instances in past reporting period in which a case was inappropriately assigned to the MATF or the FBI.

Primary:          **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.64 Assessing Compliance with Paragraph 77:  Discipline on Sustained Investigations

Paragraph 77 stipulates:

> **"Where, after an administrative force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Division or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate. The Chief need not delay the imposition of discipline until the outcome of the criminal investigation. In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

**Results**

We have noted a disheartening laxity in discipline over the course of this reporting period.  The former chief had adapted a disingenuous process of announcing formal discipline of a given number of days or hours, then holding the majority of those days or hours "in abeyance."  The end result was that the discipline actually implemented was substantially lower than the disciplinary matrix would require.  The loss of compliance with the requirements of this paragraph is directly attributable to the former chief's failure to establish a meaningful disciplinary practice at APD.

      Primary:      **In Compliance**
      Secondary:  **In Compliance**
      Operational: **Not In Compliance**

Monitor's Note:

During our June 2020 virtual site visit members of the monitoring team revisited APD's interpretation of when an internal affairs investigative timeline begins when misconduct is identified.  We also asked that regardless of APD's current application of the timeline, whether there is any alternate interpretation of that perspective.  In response to our request we received an email (Dated June 11, 2020) from the current IAPS Commander which stated, 'The timeline for an administrative investigation, including the imposition of discipline, begins when the misconduct/policy violation is identified', and that the only alternate perspective emanates from the union, who believes that the timeline begins when a use of force occurs.  While we appreciate and agree with the IAPS Commander's position regarding the start of the timeline, readers of past Monitor reports will note that we have documented APD previously acquiescing to the union's position, which has exacerbated the department's ability to apply legitimate consequences when misconduct occurred. The inability of APD to establish an accurate and consistent interpretation of this simple concept, at this point of the reform process, is problematic on many fronts.

### 4.7.65 Assessing Compliance with Paragraph 78:  Force Review Board Responsibilities

Paragraph 78 stipulates that:

> **"APD shall develop and implement a Force Review Board to review Level 2 and Level 3 uses of force. The Force Review Board shall be comprised of at least the following members: Deputy Chief of the Administrative Support Bureau, Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigative Bureau, a Field Services Commander, the Academy Division Commander, and the Legal Advisor. The Force Review Board shall conduct timely, comprehensive, and reliable reviews of Level 2 and Level 3 use of force investigations. The Force Review Board shall:**

a) review each use of force investigation completed by the Force Investigation Section within 30 days of receiving the investigation report to ensure that it is complete and, for administrative investigations, that the findings are supported by a preponderance of the evidence;

b) hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident. The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Division investigation, shall not be present;

c) order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings. For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;

d) determine whether the use of force violated APD policy. If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;

e) determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;

f) document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation; and

g) review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis."

As with other reporting periods, the monitoring team spent time providing perspective, feedback and technical assistance to APD personnel responsible for the tasks associated with the Force Review Board (FRB).  During our June 2020 virtual site visit the monitoring team attended an FRB meeting that heard one (1) tactical response case.  We also reviewed files of cases heard by the FRB, ledgers, and other documents related to the FRB.   In the past, the monitoring team has been overt in its criticism of the FRB, citing its ineffectiveness and its failing to provide meaningful oversight for APD's use of force systems.  The consequence could be that APD endorses

questionable, and sometimes unlawful, conduct by its officers.  Convening an FRB serves several key purposes. Chief among them is to create a forum for executive oversight that pushes department level expectations down through all levels of supervision and command.  On September 16, 2016, the monitoring team delivered a Special Report to the Court[67] meant to document our impressions of APD's performance and noted the following:

> "Because constant slippage occurs in any system, executives must remain vigilant at every turn. That is simply the nature of systems and human performance.  Policy and training are critical components but provide only the illusion of oversight and accountability. They are not self-executing and require a well-conceived and structured oversight and accountability process, two cornerstones of which are engaged field supervisors and an effective chain of command."[68]

The following paragraphs represent our findings related to Paragraph 78:

Our initial impression of the newly constituted FRB was positive, as we observed the meetings being more organized from an administrative perspective and the FRB Chair attempting to keep meetings on point.  That said, our observations during this reporting period demonstrated APD has substantial work ahead to resolve organization-wide failures and ensure that members of the FRB are engaged, prepared to exercise their responsibilities, and actually perform as expected.  For the most part, that was not the case during the IMR-12 reporting period.

The FRB serves as an organizational safety mechanism to capture errors, refer cases for additional investigation, make referrals for various types of remediation, request internal affairs investigations for misconduct, and to monitor use of force trend data.  In the past, FRB meetings simply went through the motions, which clearly influenced the view APD, as a whole, had toward use of force oversight and accountability.  FRB members came unprepared for meetings, failed to offer any meaningful input or engage case presentations with questions to challenge organizational norms.  Unfortunately, personal observations and feedback from the parties lead us to believe those characteristics have creeped back into the current process of FRB meetings.[69]  For instance, while attending the FRB meeting during our June 2020 site visit, one of the Board members started the meeting by advising they had been busy that week and had not had enough time to review the cases.  If true, that entirely undermines the legitimacy

---

[67] We recommend all APD executives read and reflect on the Special Report, as many of our observations then remained true during the IMR-12 reporting period.

[68] Special Report of the Independent Monitor, Use of Force Police, Supervision and Management at the Albuquerque Police Department, September 16, 2016, Pg. 7.

[69] Immediately following the 12th reporting period DOJ and the DOJ requested a meeting with APD to provide feedback concerning the FRB.  The monitoring team was asked to attend.  We learned that feedback critical of the FRB has been provided to APD on more than one occasion since the new FRB was constituted.  Concerns ranged from poor quality in reviews and a tepid commitment to ensuring FRB's were thoughtful and critical.

of the Board making any determinations related to use of force cases.  In that same meeting other members seemed disengaged, while the conversation was dominated by one or two members.[70]  The following represents perspective and feedback APD must contemplate if the FRB is ever to assume its proper place in APD's oversight and accountability system:

1. Based on the current pace of FRB meetings being scheduled, the number of cases heard at meetings, and the propensity to not complete all cases on an agenda, we expect APD will struggle to meet timelines for reviewing cases on any consistent bases.  Likewise, most people attending meetings are at the executive level, so we do not believe APD will be able to sustain attendance levels long-term if the FRB does not complete cases placed on an agenda and move through cases in a meaningful, yet concise, manner.  That can only be accomplished if each member of the Board has reviewed materials and is fully versed on the facts of the cases under review.  Based on our observations this reporting period, that simply is not the case.

2. The FRB is making legitimate efforts to make and track referrals that come from case reviews.  When a referral is made, there is great care during the meetings to isolate the question being asked of a command or the task that command is being asked to accomplish.  We have noted that the carefulness sometimes takes an exorbitant amount of time away from the meeting. That said, based on cases we reviewed during this reporting period, we know the most significant issues are not being identified and referred in some instances.

3. Board members frequently seemed unprepared or disinterested during discussions of cases under review.  Much of the discussion seems superficial and fails to hone on to the critical aspects of a case under review and FRB members seem unable or unwilling to identify clear policy violations.

4. With uses of force and misconduct still being missed, our collective belief is that Board members are either not reviewing entire files of material prior to a meeting or are unqualified to critically review the materials they have been provided.  Either is a critical compliance issue.

5. The Chairperson of the FRB should ensure at the start of the meeting that each Board member was provided case materials and have each member overtly state they thoughtfully have reviewed the materials.  We will consider this when making compliance determinations in the future.

---

[70] We sense frustration in the FRB members by personnel responsible for administering the meetings. The same people are working hard to make FRB meetings meaningful, but like other areas of the organization we have encountered, if critical personnel responsible for CASA tasks do not feel a sense of accomplishment, they will quickly be discouraged with the process.

Members should not be allowed to take part in FRB voting when they have not reviewed all case materials.[71]

6.  The FRB is vulnerable to missing critical aspects of a case if they rely only on the materials IAFD or SOD provide during meeting presentations.[72] Likewise, FRB members should ask probing questions and not be reluctant to challenge the findings of either division when deciding on a case.[73]  Further, relying on Video Review Unit (VRU) bookmarks of OBRD footage will likely result in the FRB regularly missing critical issues with cases.  We consider this as serious issue relative to the quality of FRB oversight.

7.  Since meetings are currently held virtually, we saw Board members sitting outside the view of the camera or not turning their cameras on during the meeting.  We saw voting taking place by members displaying "thumbs up" emojis as opposed to voicing their opinions.  We recommend Board members be required to keep cameras on during meetings and in view of the picture frame to ensure they are present, actively listening, not multitasking, and are taking part in the discussion.

8.  As we noted in IMR-11, since the initial classification of force in the field still falls to field supervisors who have historically struggled with that responsibility, we believe the FRB should take a thoughtful approach to overseeing Level 1 uses of force as an additional proactive measure.  We uncovered examples during this reporting period of clear uses of force being missed or misclassified by Area Command supervisor.  The reader should note that the monitoring team have learned that the Deputy Commander of IAFD is deciding which cases are referred to the various area commands for investigation.  We are concerned about this potential diversion of FRB purview.  If the monitoring team identifies a misclassified case that should have been included in the FRB review schedule but was not because it was misclassified in the field, that missed case will impact FRB compliance efforts in the future.  We strongly suggest that APD review the "decision chain" in this process and consider building preventative loops into case selection and review processes for FRB.

---

[71] We provided this particular feedback to the FRB Chair and note that in a meeting we attended following the IMR-12 reporting period he asked that each Board member confirm they reviewed the materials they were provided.
[72] In IMR-11 we commented, "As APD's FRB continues its effort we share a word of caution to not allow reviews to become *pro forma* once they begin hearing cases investigated by IAFD.  We have been very complimentary of IAFD's investigative efforts; however, the workload placed on that unit could impact the quality of investigations and the supervision of cases."  We noted also that, "…moving forward it (APD) would be wise to monitor cases closely to protect Operational Compliance efforts."
[73] Parenthetically, a case presented to the FRB after the IMR-12 reporting period (IMR-12-23) included unreported uses of force, and we noted that the PowerPoint presented to the FRB by IAFD did not include OBRD footage that would have made obvious the fact that the investigating IAFD detective missed critical elements during their investigation.  We will report more extensively on this case in IMR-13.

Further, the decision point regarding which cases go to IAFD and which go to the area commands for review should be recognized as a critical element needing oversight and assessment.

By the start of IMR-11, APD had not convened an FRB meeting since November 2017 (nearly two years) and that lapse clearly enabled policy violations by officers and supervisors to continue unchecked in any meaningful way.  As we note in this report, we still find instances where use of force reporting and investigations are problematic, and where systemic failures with APD's IA oversight go un-noticed and un-remedied.

**Case Reviews**

In preparation of this report, the monitoring team conducted reviews of cases the FRB heard during this reporting period.   We reviewed cases that occurred after the new use of force suite of policies were trained and operationalized in January 2020, so we found them to be particularly relevant to our assessment of the FRB's performance.   Of the cases we reviewed that were approved by the FRB, we saw instances where obvious uses of force went unreported and un-investigated, supervisory failures, and one instance of misconduct in which unjustified force was used on a handcuffed person who was obviously suffering from a level of emotional distress (IMR-12-01).[74]  Particularly troubling is that the case was investigated by IAFD and as it progressed, the entire use of force system APD constructed over the past two years failed, including the FRB. Such systemic failures are clarion calls indicating broken or deliberately ineffective processes. To date, we have seen no response from APD regarding these issues, even though we brought these issues to their attention on more than one occasion during the reporting period.

During our exit interview with the former Chief of Police (during our June 2020 virtual site visit), we provided our perspective of IMR-12-01, to include a video showing the obvious problematic behavior by an APD officer.[75]  What this means is simple: after two years of conceptualizing, recasting and implementing new use of force policies, delivering meaningful training of those policies, training IAFD personnel to properly investigate uses of force, putting video review units in place, provision of exhaustive technical assistance from the monitoring team and reconstituting the FRB under new policies and training, systemic issues still exist that impede the organization's ability to effectively provide oversight of uses of force.  This case does not represent a one-off event, and instead demonstrates APD's continued cultural issues related to failures to identify misconduct and hold officers accountable.[76]  In each Monitor's Report and our

---

[74] We learned from APD records that the suspect in this case has been involved in at least three separate and recent events where force was used.  (Force Cases IMR-12-02, IMR-12-03, and IMR-12-04) Following the close of the reporting period, members of the monitoring team attended a virtual FRB during which one of the other related cases was heard.

[75] Representatives from APD Command Staff, IAFD, the City Attorney's Office, and DOJ also attended the chief's meeting.  Little was offered by any member of APD to provide perspective, explain what they were presented, or their perspective.

[76] The case we reference was brought to the attention of APD's former Chief of Police and Command Staff, and members of the City Attorney's Office during our June 2020 virtual site visit.  Likewise, it was

2016 Special Report, we have called out failings in areas of APD's internal affairs system, reported on instances where APD demonstrated its reluctance to address misconduct, and other instances of command failures related to officer accountability.[77] At this point, given the immense levels of technical assistance we have provided APD over the past years, and given the detailed exit interviews we've had with the former Chief of Police and his staff, we judge these "oversights" to be intentional. At this point blame for missed opportunities to properly remediate problematic behavior clearly rests with executive leadership level of APD.

In the monitor's opinion, these failures to attend to the business of reviewing, classifying, assessing, and responding to aberrant uses of force by APD personnel are not attributable to problems with systems.  They are attributable to a lack of will among virtually all levels of APD to call out uses of excessive and improper uses of force.

APD reported that during the IMR-12 reporting period they conducted 19 separate FRB meetings, hearing 28 tactical operation cases, 21 serious uses of force (previous policy term) or Level 3 uses of force, and 11 cases drawn from a 10% random sample of completed supervisory level use of force investigations.  Our sample of FRB cases was chosen randomly from lists of available cases and others were included because we encountered them while in the normal course of reviewing cases and learned those same cases had been presented to the FRB.[78]    Several FRB meetings were canceled for various reasons during the reporting period.  It has become obvious that a combination of the slow pace of meeting dates, the implementation of the new use of force policies, and the unresolved pre-2019 cases compound into a serious problem for APD compliance efforts moving forward.  The following represent our observations of eight cases we reviewed for IMR-12.

**Case IMR-12-22**
**Date of Incident: 1/15/20**
**Date Approved by Commander: 3/17/20**
**FRB Presentation: 5/21/20**

This case was identified during normal reviews of use of force cases and we learned that the case had also been reviewed by the FRB during this reporting period.

---

obvious during our exit interview with the Mayor of Albuquerque that he had been briefed, in some measure, about this case.  This case and our complete analysis of it are documented earlier in this report.

[77] These instances have been wide ranging in nature.  APD is slow in addressing systemic issues when the issues are pointed out to them;  supervisors and commanders fail to call out obvious policy violations during their initial case investigations; and there are substantial instances of APD failing to identify collateral policy violations and demonstrated incompetence throughout the chain of command that allows disciplinary timelines to expire.

[78] We intended to review two additional cases, for a total of ten, for this reporting period and requested cases IMR-12-20 and IMR-12-21 from APD.  However, based on our findings of the FRB cases we document in this report, the monitoring team felt it was unnecessary to review these two additional cases as they would have no influence on the final compliance determination.

In January 2020, at approximately midnight, a uniformed officer responded to a theft of a garbage can at a convenience store/gas station. Around the same time an officer met with a victim at a nearby motel who had his car burglarized and his dog stolen by a person who fit the description of the garbage can theft suspect. As officers conducted the investigations and began looking for the suspect and dog in a nearby neighborhood, the dog approached the theft victim in the presence of an officer and the suspect's location was revealed in the darkness of a courtyard of a private residence located behind a 6-foot high cinderblock wall.  After utilizing verbal commands to no avail in getting the suspect to climb the wall out of the courtyard, two officers climbed the wall and gave verbal commands to the suspect. The suspect resisted and physical force had to be used to handcuff him. The suspect increasingly revealed himself to be an individual in emotional crisis and was uncooperative.  An acting sergeant arrived on the scene and after lengthy attempts to arouse the homeowner, a gate to the property was eventually unlocked for egress purposes. The suspect refused to cooperate and refused to walk, necessitating three officers to carry the individual through narrow passageways to exit the property.  At one point the officers needed to put the suspect down to put him into leg shackles and then continue carrying him to a patrol vehicle. It took all three officers to get the individual into the patrol vehicle.

Emergency medical services were notified to respond to the scene. At one point the suspect is seen on OBRD footage in the right rear of the patrol vehicle, lying face down with his shoulders and head partially hanging out of the vehicle while the door was opened.  As he continued to make nonsensical comments to an officer standing at the door, he reared up his body as he spoke.  At this time the officer flung the door toward the "closed" position, while at the same time the suspect was lowering his body, which caused the door to strike the suspect's head.  After striking the suspect's head with the door, the officer did not reposition or better secure the suspect, or exercise any other basic standard of care, to ensure injuries to the suspect did not occur while in his custody.   Shortly thereafter, while the suspect was still hanging with his head partially out of the vehicle, this same lone officer standing at the door of the vehicle began to apply pressure to push/pinch the door on the shoulders/upper body of the suspect.  At one point toward the end of this episode, the suspect can be heard saying, "Oh yes, press a little harder."  Neither of these uses of force were appropriate.  Later, this same officer is observed grabbing the suspect's head when attempting to control him as he was being placed in soft restraints on a gurney.

For clarity purposes, none of these three enumerated uses of force were reported by the officer using the force, and the investigating IAFD detective failed to note any of these three uses of force in either of his two investigative reports. The IAFD first-line supervisor conducted a review of the investigative reports prepared by the IAFD detective and determined no potential misconduct was identified!  The IAFD lieutenant conducted a force review of the investigative reports and determined the investigation of the uses of force were 100% in compliance with the CASA and verified that officers were not interviewed in this case.  The lieutenant also opined that the case was originally investigated as a Level 2 use of force but should actually be a Level 3 use of force because the individual sustained an injury from an empty hand technique while in

handcuffs. The IAFD Commanding Officer's review indicated he reviewed all the videos (after a civilian employee in the Video Review Unit (VRU) watched all of the OBRD videos) and determined the uses of force were within policy.

We also noted that the arrestee in this case was visited in the hospital by the IAFD detective while the arrestee was barely conscious and appeared unable to speak. This "walkaround" was reported as the arrested person's interview related to the use of force! Again, only the monitoring team noted this discrepancy.  It strains credulity to believe that all of these errors were just that: simple "mistakes."  The only rational finding is that APD simply (and intentionally) failed to diligently review, investigate, classify, and "call out" aberrant police behavior.

The review of this use of force investigation represented the first case reviewed by the monitoring team under the new use of force suite of policies put into effect in January 2020.  This complete system failure occurred within the first week of implementation of the new use of force policies, and after APD had completed use of force training.[79]   In our opinion, the failure was not based on an officer's lack of comprehension of the policies, but on the unconstitutional conduct of an officer engaging in misconduct and violating the civil rights of an arrestee experiencing an apparent mental health crisis while handcuffed in a vehicle. This failure in ethical responsibility then cascaded uphill throughout a chain of command failures, inclusive of a well-trained IAFD detective, sergeant, lieutenant, and commanding officer. The case was then handed off to a completely redesigned FRB whose sole purpose is to oversee the system, compensate for mistakes and provide a safety net to ensure such misconduct is not missed at any level of subordinate review.  This undertaking by the FRB failed.  It failed in its mission and execution in providing a meaningful review that should have revealed the actions of the officer against a handcuffed person experiencing a mental health crisis.  The capstone in this case study of a multi-level organizational failure in accountability is the former Chief of Police affixing his signature to the findings of the FRB's lack of due diligence and meaningful findings.  After six years of "reform" at APD, after six years of acute and intensive technical assistance and assessment from the monitoring team, after six years of exhaustive (and critical) reports from the monitor; after six years of "effort," this knowable and egregious case floated through seven levels of review at APD (on-scene officers; on-scene supervisory personnel; "upstream" area command supervisory and management personnel; video review unit personnel; IAFD; and FRB) and all eight of those levels managed to "not see" a clear and convincingly incident of deliberate excessive use of force against an individual obviously suffering a crisis.

Despite these oversights at APD, the monitoring team noted these violations, and immediately brought them to the attention of APD, the former Chief of Police, and other levels of oversight at the City.  Once we brought this lapse in supervision, oversight,

---

[79] We confirmed that the officer involved in this inappropriate conduct attended Tier 2 use of force training on December 4, 2019, and on December 12, 2019 he completed the accompanying test through APD's learning management system to confirm his understanding of the new use of force policies.  His final score for the exam demonstrating the transfer of knowledge was 92%.

command and control to the APD's attention, APD's response was to send the case back to IAFD, absent any known direction, requested points of contention, or guidance.

Even more problematic was APD's decision, after the monitoring team provided clear synopses of its failures, to return the case to the exact same IAFD investigator and chain of command to conduct an internal affairs investigation.  To be clear, this case does not represent an instance in which minor follow up or further clarity of investigation findings is necessary, but instead represent issues reflecting poorly on the capabilities of the system: supervisors, initial investigators, and IAFD chain of command.  These same subordinate APD representatives should be subject to counseling, re-training, or discipline as a consequence of the case failures.

Returning the case in this manner demonstrated a lack of basic risk management competencies, and tangentially, ensured that no discipline of the officer could occur due to union contract timeline constraints.[80]  The monitoring team learned that the suspect against whom force was used in this case has had at least three fairly recent encounters with APD where force was used against him.  One case occurred only days before the event documented here and was identified by the monitoring team following the close of IMR-12 (IMR-12-23).  That case involved entirely different officers; was highly problematic as well, from force reporting to IAFD's investigation; contained inappropriate and unreported uses of force, an illegal search, and several other significant issues with officer attitudes while dealing with a person in obvious emotional distress.  We attended an FRB meeting on August 20, 2020 and provided feedback to the Chairperson of the FRB on August 21, 2020.  We will report our findings for that case in IMR-13.  It is inconceivable that the FRB, former Chief of Police and Command Staff would not, on their own, recognize the inappropriateness of sending this case back to the original investigator for an internal affairs investigation.[81]  The monitoring team's review of this matter revealed APD's failed design, execution, and review of the very processes they petitioned the Court to implement two years earlier.  We believe this case perfectly illustrates concerns we have pointed out to APD on numerous occasions: that the FRB cannot have confidence that subordinate entities within their use of force system are yet capable of presenting consistently competent use of force investigations.  To feel the need to make this comment after five years of "reform" is a chilling fact.

We view this case as a clarion call pointing to APD's systemic and inherent refusal to notice, investigate, evaluate, decide, act on even the most abusive of officer misconduct.

---

[80] The monitoring team learned that the suspect on whom force was used in this case has had at least three encounters with APD where force was used against him.  One case occurred only days before the event documented here and was identified by the monitoring team following the close of IMR-12 (IMR-12-23).  That case involved entirely different officers, was highly problematic as well, from force reporting to IAFD's investigation, contained inappropriate and unreported uses of force, an illegal search, and several other significant issues with officer attitudes while dealing with a person in obvious emotional distress.  We attended an FRB meeting on August 20, 2020 and provided feedback to the Chairperson of the FRB on August 21, 2020.  We will report our findings for that case in IMR-13.

[81] We document earlier in this report the failures of the resultant internal affairs investigation.

**Case IMR-12-24**
**Date of Incident: 5/3/19**
**Date Approved by Commander: 10/6/19**
**FRB Presentation: 3/5/20**

In May 2019 two uniformed APD officers were called to a reported domestic violence incident in the parking area of a hotel.  It was reported that a female subject was armed with a knife and had injured her brother-in-law during a confrontation.  When officers arrived, they met with a witness and ultimately found the female hiding behind a dumpster in a small enclosure behind the hotel.  The female was non-compliant and belligerent and had a large hunting knife in her possession.  The officers attempted to coax the female from behind the dumpster, but she continued an excited demeanor and appeared to be experiencing some manner of mental distress.  After several attempts to coax the woman out, Officer 1 took control of the suspect's wrist and applied a handcuff, and ultimately used force to pull the female out.  The female was handcuffed by the two officers after being pushed and braced against the rear of the dumpster.  Officer 2 then pulled a patrol vehicle close to the dumpster and opened the rear door.

Officer 1 walked the suspect to the open, rear door and told the suspect to get inside.  The suspect continued to be uncooperative and boisterous and would not follow instructions.  Her actions are best characterized as passively resistant at the time, and Officer 1 asked her to get into the patrol vehicle seven separate times.  Less than a minute after the patrol vehicle pulled up the suspect is heard saying, "Don't push me" to Officer 1, and he responds, "I'm not trying to push you." Within 3 seconds the OBRD shows Officer 1 pushed the handcuffed suspect toward the door opening and into an uncontrolled fall into the back seat and said "get into the car" as he pushed her legs inside and closed the door.  Based on the OBRDs and reports reviewed, it appears the suspect struck the rear of her head on the door frame as her body entered the back seat.  She later tells a crime scene detective she has a bump on her head.

We find nothing in the FRB records that the actions of Officer 1 were called into question or that any referrals were made.  The monitoring team assessed the applications of force, reports prepared, and the documentation provided by the FRB.  Based on our review there are concerns with the manner the officer applied force when pushing the handcuffed suspect into an uncontrolled fall into the rear of the patrol vehicle.   In addition, there were deficiencies with the force investigation.  This case took five months to be signed off by the IAFD Commander and ten months to reach the FRB.  While this case occurred under previous use of force policies, the FRB convened to hear the case during this reporting period and while a new FRB policy was in place.  This case calls into question proper reporting of force, investigative thoroughness and proper standards of care by an officer while dealing with a handcuffed person experiencing a mental health crisis.

**Case IMR-12-25**
**Date of Incident: 8/2/19**
**Date Approved by Commander: 10/11/19**

133

**FRB Presentation: 2/13/20**

In August 2019, four uniformed APD officers were performing a routine detail in an Albuquerque park, enforcing City ordinances due to previous violent crimes and to prevent people from erecting temporary structures.  APD officers encountered a male subject who had erected a tent on the premises and approached him to remedy the issue in accordance with the ordinance.  During the interaction, officers learned the subject had a confirmed felony warrant from out of state.  The subject was asked to approach an officer, with the intent of taking him into custody for the warrant.  The subject took a couple of steps toward the officer, suddenly turned and then began running away.  An officer was able to close the distance and suddenly the subject turned and threw several punches at the officer.  During the course of these events, several commands were given by the officers for the subject to stop.  The primary officer yelled, "taser, taser, taser" and deployed his ECW but the subject appeared to fight through the effects and ran another short distance before falling to the ground. The subject continued to flail and fight the effects of the ECW requiring a second officer to go hands on with the subject.  When that occurred, the officer documented that he came into contact with the ECW wires and received a shock, causing him to fall to the ground.[82]  This brief action by the officer could be characterized as an (unreported) Level 1 use of force, but the shock of the ECW occurred quickly after he took hold of the suspect.  In all, three separate ECW deployments occurred.  Due to the brevity of information captured during an FRB, we cannot determine if the FRB contemplated the officer's actions as a separate use of force.  The records presented to the monitoring team revealed that the FRB found the case to be properly reported, investigated, and that the force used was objectively reasonable under the circumstances.  We have little confidence in that finding.

**Case IMR-12-26**
**Date of Incident: 8/5/19**
**Date Approved by Commander: 10/28/19**
**FRB Presentation: 3/5/20**

This event occurred on August 5, 2019, was submitted by the investigator on August 26, 2019, and finalized by the Area Commander on October 28, 2019.  The case was presented to the FRB on March 5, 2020, more than six months after the event and 4 months after the case cleared the Area Commander.

In August 2019, three APD officers (one still serving as a field training officer) were detailed to investigate a domestic violence event.  They located the female victim and children, who had driven from the scene, and interviewed her on the side of the highway.  She was emotional and described being assaulted and held down by her boyfriend in their home and stated that the argument had related to him being intoxicated.  The victim reported that her boyfriend becomes violent when he is

---

[82] During our review of OBRDs that officer can be seen grabbing the subject and then suddenly falling to the ground, presumably in reaction to making contact with the ECW wires as he reported.

intoxicated.  During this encounter, she asserts that the suspect repeatedly punched her in her left arm and after overpowering her, attempted to choke her with her own arm.

All three officers proceeded to the residence to locate the boyfriend, believing they had established probable cause to make an arrest for domestic violence.  After the officers knocked on the door to the residence, the suspect opened the door to the residence and the officers identified themselves.  The suspect attempted to shut the door on the officers, but one officer put his foot into the doorway to prevent it from being closed.  He was then able to push the door open, all while giving orders to the suspect to stop his actions.  Force was used to take the subject to the ground, as he was actively resisting and being belligerent, while the three officers attempted to handcuff him.  An officer was able to apply one handcuff, but the suspect pulled his arm away and under his body.  All three officers were struggling with the suspect, holding him down and giving commands for him to stop resisting.  Likewise, the OBRDs show the struggle and the fact that all three officers were attempting, through appropriate physical force, to stop the suspect from resisting arrest.  Eventually, the officers overcame the resistance and applied handcuffs.  The suspect was then placed in a personal restraint system, walked to a patrol vehicle, and transported to the station for processing without further force being necessary.  A use of force investigation was initiated by a supervisor into the force used by the three officers.

The supervisor's investigation was well written but failed to appropriately characterize the actions of all three officers as force, instead referring to the actions of two of the officers as "low level control tactics".  We noted inconsistencies when characterizing the officers' actions, since at the beginning of his report he lists all three officers as using force, but later refers to two officers as using low-level control tactics.  Officers used boilerplate language in their reports when describing their actions when engaged with the suspect, which was not addressed at any point through the chain of command.  We believe that the levels of force used during the encounter were appropriate by each officer, but as described by the officers' own reports, and by policy definition at the time, each officer's actions constituted a use of force. These inconsistencies continued through the chain of command and were not reconciled when the case was reviewed by the FRB.  This amounts to a failure of the FRB to fulfill one of its primary functions, taking notice of trends and issues indicating a need for change in related departmental processes, e.g., report writing, factual assessments training, supervision, command oversight, and executive oversight by the FRB.

**Case IMR-12-27**
**Date of Incident: 2/22/20**
**Date Approved by Commander: 3/17/20**
**FRB Presentation: 6/25/20**

This case was identified during normal reviews of Level 1 use of force cases.  During our review we learned that the case had also been reviewed by the FRB during this reporting period.[83]

In February 2020, an afternoon SWAT activation occurred in response to a request to arrest a suspect in an attempted sexual assault. The suspect, who was in his apartment with his two-year old son, was not responsive to officer attempts to contact him in the residence. The suspect was known to have mental health issues, in addition to making threats against police officers, and known to possess weapons. After all communication attempts failed, the SWAT team made a forced entry into the suspect's apartment, successfully arrested him, while at the same time safely removing his son.  When a sergeant was conducting an on-scene investigation, two APD members self-reported that they "covered the suspect with the muzzle of their weapons as they advanced towards a room where the two occupants…were located."  However, the individual written reports of the officers indicated one officer's "muzzle may have unintentionally covered the suspect," while the other officer reported he needed his "rifle- mounted light to observe the male" and that he did not have a sight picture and did not have the intention to cover the male with my muzzle." These discrepancies were not noted in the supervisor's review.

Due to the darkness in the room and the legitimate movements of the SWAT members during the entry or arrest, no inappropriate use of force (especially with firearms) was noted on videos reviewed by the monitoring team. Audio on these videos confirmed this determination. Thus, the subsequent investigation's conclusion on the shows of force appears appropriate. However, the investigation and subsequent chain of command reviews largely failed to appropriately investigate and classify other force events in this case.

The review of videos in this case revealed that, because the suspect refused to walk, officers carried the handcuffed suspect from the bedroom, through the apartment, and outside the apartment through the courtyard to an APD vehicle. The suspect, who is a heavier male, was completely naked and "dead-weight." He was carried facedown by two (and at times by three) officers, who held his arms (behind his back) and ankles. The suspect also appeared to be partially dragged through gravel a very short distance due to the strain of carrying the heavier, uncooperative male. This resulted in the suspect sustaining scraped knees, what appeared to be other smaller abrasions, and a cut to his right forehead.

The sergeant's review of the shows of force (reported as shows of force from the onset through the Commander's Review) indicated photos were taken of the individual at the scene. However, the monitoring team was provided only with photos presumed to be

---

[83] Following the close of the reporting period the monitoring team provided feedback on observations we were making concerning the current efficacy of the FRB.  This case was discussed and during that discussion pictures were shown to the Board of the suspect that demonstrate obvious injuries.  The FRB members who attended that feedback meeting provided no explanation or context that would explain why the injuries to the suspect were not addressed.

that of the victim.  Pursuant to BlueTeam reporting, these were the only photos in this use of force investigation.

The lieutenant's review noted the abrasions on the suspect's knees (attributed to being carried), but nothing about the injury to the suspect's forehead. The reviews conducted (sergeant, lieutenant, and Commander) did not mention the appropriate force used by the officers to physically control and move the handcuffed suspect that nonetheless resulted in his visible injuries. The monitoring team determined that since the injuries appear to have occurred to the suspect while he was carried and dragged, this would be a Level 2 use of force.  However, since this Level 2 use of force was used against a handcuffed individual, pursuant to APD policy (SOP 2-53) this was actually an unreported and uninvestigated Level 3 use of force.

The monitoring team reviewed FRB data generated as a result of the case being heard by the FRB on June 25, 2020.  Some observations of the data presented are as follow:

1. Concerning the quality control question "Did the Board review the case within 30 days of receiving the case information?" APD took credit for this being heard within 30 days, despite the case being completed by the IAFD Commander more than 3 months earlier!  Such shortfalls are terminal to effective discipline.
2. Under "Injuries sustained" the FRB documented "No" despite obvious injuries being depicted in the photographs we were provided.
3. No issues with supervision were identified despite serious investigative and chain of command shortcomings.
4. No referrals for follow up or additional investigation occurred as a result of the FRB's review of this case.

In short, the FRB "review" of this incident bordered on malfeasance, yet the self-critique indicated success.  We can envision no scenario in which these errors were mistakes; instead we assess the process of FRB review of this case to be malfeasance.  Whether these failures are due to deliberate design or to incompetence is not knowable; however, given the sheer volume of monitoring team "technical assistance" to APD related to the topic of FRB operations, we strongly suspect the former.

**Case IMR-12-28**
**Date of Incident: 09/30/19**
**Date of After-Action Report: 09/30/19**
**FRB Presentation: 02/06/20**

In September 2019, a tactical activation response occurred in which SID members attempted to serve an outstanding felony warrant for armed robbery on an individual who subsequently barricaded himself in a residence. When communications via loudspeaker failed and telephone calls to the suspect's cell phone went unanswered, officers deployed two noise flash diversionary devices (NFDD) outside the residence to stimulate a response from the suspect. When no response was received, two rounds of 40 mm direct impact sponge rounds were deployed through a window of the residence

to facilitate better communications. After the deployment of the sponge rounds, the suspect exited the residence and surrendered without incident. No physical force was utilized, and no injuries were reported.  We note here that we have long questioned the use of 40 mm rounds to "establish better communications," given the availability to APD of electronic hailers, etc.  Nonetheless, we continue to see this technique used under questionable circumstances. We have yet to receive an adequate "exigency" explanation for the use of pyrotechnics to "stimulate a response."  In short, the use of various "excuses" for the deployment of 40 mm rounds during tactical operations—for tangential reasons—continues unabated.  Despite several discussions concerning this process, APD has yet to produce any documentation that this type of use of 40mm rounds is supported by other agencies' training, policy or practice.  We consider this an issue of deliberate non-compliance at this point.  Again, the FRB process failed to highlight the "communications portal" as an issue, despite our multiple warnings.  At this point we consider this issue a deliberate process of non-compliance at FRB.

**Case IMR-12-29**
**Date of Incident: 10/28/19**
**Date of After-Action Report: 10/28/19**
**FRB Presentation: 03/05/20**

In October 2019, a tactical activation response occurred in which investigative personnel requested K-9 assistance to establish a perimeter after they initiated a surveillance of a residence occupied by an individual with an outstanding felony warrant for homicide.  Upon the arrival of a tactical supervisor, communications via loudspeaker were initiated, but failed to elicit a response from the suspect. A full tactical activation was subsequently initiated. After telephone communications were established with the suspect and family members, the suspect exited the residence and surrendered without incident. No physical force was utilized, and no injuries were reported.  In this instance, the monitoring team and APD's FRB were in agreement of the review and assessment outcomes.

**Case IMR-12-30 (Tactical Activation – UOF – K-9 Bite)**
**Date of Incident: 08/16/19**
**FRB Presentation: 02/20/20**

In August 2019, a tactical activation response occurred when an individual with an active felony warrant for battery on a police officer refused to vacate his residence as a result of a restraining order.  After the subject was visually identified by officers conducting surveillance and failing to exit the residence and surrender to officers' multiple requests, a SWAT activation was authorized. After multiple nonlethal projectiles were employed (NFDDs, 40mm OC/CS Ferret rounds, CS Tri-Chambers, etc.), the suspect eventually exited the residence, but did not comply with officer commands.  A police service dog (PSD) was deployed and subsequently initiated a "bite and hold" on the suspect. Officers responded and removed the PSD and overcame active resistance on the part of the suspect with physical force.  The resultant use of force investigation revealed an officer did not upload their OBRD until 3-4 days after that incident.

The investigation also revealed three officers did not do supplemental reports even though they placed individuals into handcuffs (despite not arresting them) and used low-level tactics (pushing) on a subject while maintaining an outer perimeter.  A policy deficiency was identified by IAFD, noting that APD policy does not make it mandatory for an officer to do a report whenever placing somebody in handcuffs.  Despite this being cited in the IAFD lieutenant's review, the voting sheet for the FRB indicated "No" under policy concerns or deficiencies. Reports from officers indicated they aimed rifles just to the side of the suspect for "illumination purposes" and to use a magnifier on a rifle, specifically indicating they did not have their sights on the suspect.  These are potential shows of force. The videos for these officers were not provided and raise a genuine concern that the FRB has not addressed: pointing high-powered weapons at suspects or subjects for purposes of illumination or enlargement.  This is yet another failure at FRB.

These types of issues are the reason for the existence of the FRB.  These are critical oversight issues depicting what could be problematic trends when considering the potential for accidental discharges when only aiming rifles (or any firearm) for illumination or magnification purposes.  Instead of the "rubber stamp" employed by FRB in these incidents, a detailed discussion of the potential liability and assessments of remedial measures *should have been affected at FRB.*

**Results**

When first constituted as an organizational unit, APD's IAFD focused the majority of its attention on reviews of a "backlog" of use of force cases and reported finding hundreds of policy violations that were missed, went unreported, and/or were not addressed by supervisors in the field. Since IAFD only assumed primary responsibility of investigating Level 2 and Level 3 uses of force on January 11, 2020, it was reasonable to expect similar violations would be found up to and through 2019 cases.[84]  We cautioned APD on IAFD's continued performance level and to be circumspect when presented with Level 2 and 3 use of force cases moving forward.  This is especially true for the FRB, since the FRB serves as the first level of review outside the IAFD chain of command. We specifically identified for APD leaders the difference in IAFD assessing use of force cases completed by supervisors in the field where they identify (past) misconduct[85], versus now being the initial investigator and having the responsibility to report misconduct or criminal behavior when it is first encountered.  In the context of APD's historical culture of non-accountability we expressed concern that IAFD may find the latter task difficult.

---

[84] We discuss the implementation of APD's new use of force suite of policies elsewhere.  IAFD now investigates all Level 2 and Level 3 uses of force, however, initial classifications and Level 1 use of force investigations still fall on field supervisors.  IAFD has been investigating serious uses of force but that is a smaller population of cases overall.

[85] IAFD were aware that the department had no intention of disciplining officers, regardless of the seriousness, for misconduct that was identified within the backlogged cases.  That knowledge would relieve IAFD of the emotional burden associated with appropriately calling out misconduct by officers.

As we noted in IMR-10 and 11, APD had two distinct populations of use of force cases to address: those that occurred under their standing policies (November 2017 to January 10, 2020); and those that occur after their new use of force policies were launched on January 11, 2020.  We learned that APD's FRB began hearing SOD tactical cases from January 1, 2019 forward, leaving unresolved the issue of use of force cases and tactical deployments from November 2017 through December 2018.  That created a third sub-group to be addressed by the FRB.[86]  We were told APD intended to provide a plan to the monitor that would propose a methodology for handling pre-2019 cases, and on May 20, 2020 we received a PINS (Problems Issues Needs Solutions) memo outlining APD's proposed approach.[87]  In the opinion of the monitoring team, APD's proposed approach is more contemplative than past proposals and we were encouraged with the PINS memo that was provided.  As of the close of the monitoring period we are not aware that APD has begun operationalizing their methodology.[88]   This may well lead to creation of another "backlog."

APD has expressed frustration and feel that DOJ and the monitoring team view the role of the FRB differently, and that the DOJ has repeated that the FRB is not intended to be punitive.  We agree and do not believe that the FRB is or should be punitive.  The FRB does not investigate misconduct, make findings concerning alleged misconduct, make disciplinary decisions, or carry out discipline in any manner.  That said, the FRB makes determinations that may lead to referrals for policy violations to be investigated, not unlike the expectations of any APD commander.  Conceptually, the FRB should rarely be encountering situations where serious misconduct is missed or uses of force are badly investigated.  To date, that is simply not the case, but the quality of performance by the subordinate units that feed use of force cases preclude cursory reviews of those same cases by the FRB.  This is an issue with the competency of the system, not the intended purpose of the FRB.  APD could choose to conduct less thorough reviews of

---

[86] APD will now have two groups of cases that occurred under the old use of force policies, those that occurred before 2019 and those that occurred through 2019 and up to January 11, 2020.

[87] It is unclear why APD would reconstitute the FRB and begin hearing cases without first reconciling their responsibilities for the older cases, but we have grown accustomed to this type of flawed approach to problem solving.  We reiterate, partial solutions are, in effect, no solutions.  We know from our personal assessment of APD use of force-related cases that the agency's process and outcome systems were terribly flawed and missed a myriad of opportunities for "lessons learned."  More importantly they have missed noting trends in problematic behaviors by individuals, squads and shifts.

[88] The proposal presented a methodology to select a portion of backlogged cases.  Pending are tactical activations, serious use of force, and 10% supervisory use of force from November 2017 to December 2019.  APD's memo indicated their approach will reduce the number of cases to review from 470 to a more manageable number of 86, or 18.3%.  There are cases in four subgroups, 1) tactical, 2) serious use of force, 3) 10% sample supervisory use of force, and 4) excessive use of force lawsuits against the City.  APD reported they will use a stratified random sample to select a proportional sampling across the groups.  APD reported 470 total cases that fall within the timeframe of the backlog as follows: 84 tactical activations, 158 serious uses of force, 20 officers involved in shootings, 7 cases in litigation, and 201 cases in the 10% supervisory use of force category.  The 27 OIS and litigation cases will be reviewed as their own category and the FRB will review 100% of those cases. (Source APD's May 2020 PINS memo to the monitor).  The procedures outlined mirrored those of the monitoring team as it writes its periodic reports.

cases presented to the FRB, but they will increase their risk of signing off on defective use of force investigations. An effectively operating system would identify these types of issues prior to a case ever reaching the FRB. In that scenario, the FRB would be presented with cases where misconduct was appropriately handled at lower levels and problems with cases were already competently remediated.

When APD reaches that point, the FRB will mainly concentrate on strategic issues related to uses of force, as well as policy and trend analysis, and problematic cases reaching the FRB should be one-off occurrences.[89] Based on our observations, APD is not even remotely near that place in its evolution.

We believe the FRB is a key organizational feature for influencing organizational reform. As we noted in the past, if APD is ever to achieve Operational Compliance in its use of force requirements, having a fully functional, engaged and well documented FRB will be essential. During the IMR-13 reporting period we will continue to assess if APD is meeting its time requirements, is conducting quality reviews of use of force cases it hears, and whether they operationalize their approach for handling pre-2019 cases. Frankly, we are well past the point at which APD should have internalized its use of force oversight and assessment processes. At this point we have expended literally hundreds of hours of technical assistance to APD on this topic over the past six years. At this time, we believe this is an issue of will not, not cannot.

Based on our review, we have determined Secondary Compliance is continued for Paragraph 78.

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraph 78:*

*4.7.44c: Report regularly on progress on the established goals and objectives related to the FRB process.*

*FRB should focus attention for Level 1 uses of force to ensure field supervisors are properly classifying cases.*

*Closely monitor referrals that are made from the FRB to ensure that each referral is clear and is followed through on by the impacted command.*

---

[89] For instance, the monitoring team has identified issues related to appropriate standards of care by officers when dealing with people in emotional crisis, and the manner in which officers move/carry persons who are handcuffed. A properly functioning FRB would self-identify these issues and devise strategies to isolate problems and implement effective solutions. Such is simply not the case at the present time.

*APD should organize its pre and post FRB meeting documentation in a manner that clearly demonstrates how it meets each of the relevant provisions of the CASA.*

## 4.7.66 – 4.7.67 Assessing Compliance with Paragraphs 79-80:  Annual Use of Force Reporting

### 4.7.66 Assessing Compliance with Paragraph 79:  Annual Use of Force Reporting

Paragraph 79 states:

> **"At least annually, APD shall publish a Use of Force Annual Report. At a minimum, the following information should be included in the Annual Use of Force Report:**
>
> **a) number of calls for service;**
>
> **b) number of officer-initiated actions;**
>
> **c) number of aggregate uses of force, and uses of force by Level;**
>
> **d) number of arrests;**
>
> **e) number of custodial arrests that involved use of force;**
>
> **f) number of SWAT deployments by type of call out;**
>
> **g) number of incidents involving officers shooting at or from moving vehicles;**
>
> **h) number of individuals armed with weapons;**
>
> **i) number of individuals unarmed;**
>
> **j) number of individuals injured during arrest, including APD and other law enforcement personnel;**
>
> **k) number of individuals requiring hospitalization, including APD and other law enforcement personnel;**
>
> **l) demographic category; and**
>
> **m) geographic data, including street, location, or Area Command."**

## Methodology

Paragraph 79 of the CASA addresses requirements APD must meet by publishing a Use of Force Annual Report:

The monitoring team has previously spent time providing perspective, feedback and technical assistance to APD regarding Paragraph 79 during past site visits.  We continued that practice during the IMR-12 reporting period and as in the past APD was

142

receptive to our perspectives and were prepared to discuss the provisions of this paragraph. The tasks required to meet compliance with this Paragraph reside within APD's IAFD, and in preparation of this report we requested APD's final Annual Use of Force Report that would include data for the years 2018 and 2019. We were provided with a draft version to review that encapsulated data from the years 2016-2019.

There have been many instances where APD personnel failed to properly report or investigate uses of force, which obviously impacts data integrity in the Use of Force Annual Reports. As in the past, we again saw evidence during this reporting period of serious deficiencies in use of force classification, accuracy of reports, defective force investigations and instances in which these problem cases were approved by IAFD, the Force Review Board and former Chief of Police. While we have previously expressed appreciation for the thoroughness of the IAFD's work, they now are conducting initial investigations as opposed to critiquing the work of others. We previously cautioned APD that conducting reviews of use of force backlogged cases[90], where APD had no intention of disciplining officers for misconduct found (regardless of the severity), and conducting initial investigations where there is an expectation to address misconduct found, are entirely different. Therefore, careful attention would have to occur by senior APD leadership to ensure IAFD's work is properly supervised and that the unit is staffed with sufficient personnel to allow them to be effective.

Based on our case reviews during this reporting period, we are still concerned with the integrity of data that will be contained in reports like the Use of Force Annual Report. In prior conversations we made clear the need to qualify information contained in APD's Use of Force Annual Reports, since the accuracy of past reporting was significantly compromised for a host of reasons. For the report to be meaningful to consumers today and in the future, it is important to understand the context in which the data are being collected and analyzed year over year.

Reporting errors have been historically prevalent in the Field Services Bureau, but during the IMR-11 reporting period we reviewed an ECW use of force event involving APD investigative personnel that had unreported force and supervisory issues. The perfunctory internal affairs investigation performed by APD's IAFD after the case was brought to their attention is a perfect illustration of APD leadership's aversion to holding people accountable. It is highly concerning that the aversion to discipline now extends into IAFD, which has received such detailed and focused feedback over the last several reporting periods. We strongly recommend a swift and detailed "reset" of this process. IAFD is a critical link in reform. It must steadfastly adopt a uniform, fair, and thorough ethos as it moves forward. For APD at this point, learning from past mistakes is crucial.

---

[90] IAFD was at the center of reviewing a backlog of more than 300 use of force cases and in their reviews IAFD identified more than 1,000 policy violations of varying severity. APD took the position that regardless of the severity of the policy violation they would not discipline officers for their conduct because they believed the collective bargaining agreement precluded that action. The monitoring team expressed our vehement disagreement with APD's assessment. Nonetheless, the APD's assertion was operationalized and implemented, leading to a leadership and oversight vacuum at the agency, just as we had warned.

Preventing future mistakes will require clarity, thoroughness, and steadfast adherence to policy, training, and process approved by the monitoring team and the chief of police.

We believe (and have articulated on several occasions) that as APD transitioned to a new three-tiered reporting structure, the agency would be vulnerable to mistakes at the lower reporting levels by field supervisors.  Without close scrutiny and legitimate consequences to faulty reporting or investigatory failures, there is little confidence that APD will reach Operational Compliance with critical CASA paragraphs in the near future, and data integrity will continue to be compromised.  This is a clear and present danger moving forward.  APD, at this point, has no appetite for application of needed discipline (remedial or punitive).  Suspensions for activities found out of compliance are rare indeed, and those that are made, as of late are eviscerated by issuing suspensions of a given number of hours and routinely holding 50 percent or more of those hours "in abeyance."  Ineffective discipline at APD, at this time, is a major roadblock to reform.  Major and serious field-based actions involving use of force, due diligence and care, and other issues continue to plague APD's field operations processes.

As noted in IMR-10 and 11, APD published its 2016 and 2017 Annual Reports[91] in March of 2019, having not published an Annual Use of Force Report since 2015! APD decided to organize use of force data from the years 2016 and 2017 together, which we found to be an appropriate approach under the circumstances.  The "Use of Force Report for the Years 2016/2017" was published in March of 2019.  During the 12th reporting period APD provided a draft of a use of force Annual Report combining data from 2016-2019, which we believe is a good way to display and track data over time. Our overall impression of the draft report is that a great deal of work went into this product and the categories of data meet provisions relevant to the CASA.  The style of writing and structure was easy to follow and digest, so we commend the staff who were responsible for preparing this draft report.  While we cannot attest to the integrity of data, the categories of data included in the report provide the required information for Paragraph 79.  Once APD's reporting processes are finalized, we can reassess the report and document our findings in greater detail.

We know through case reviews that policy violations, including failures to report and properly investigate uses of force extended up to and including the 12th reporting period.  For that reason, during our June 2020 virtual site visit we advised APD that language calling out issues with data integrity would be necessary for any higher level of compliance to be achieved with this Paragraph.  ADP appropriately responded by addressing this concern under the section "Data Fidelity."  They also expended a fair amount of time describing their efforts over the past two years to clean up the data (as best they can).  As we have noted in the past, systemic failures across the organization will contribute to a lack of data fidelity within the Annual Report and undermine the value of information presented in the final work product.  With any data there will be a margin for error  but closing that margin of error at APD can be a relatively straight forward process.

---

[91] The report was dated February 2019 and was published on March 14, 2019.

We have determined that APD maintains its Primary Compliance status for Paragraph 79.  We will revisit the compliance standing once we are provided the final draft of the 2016-2019 Annual Use of Force Report.  We will report our findings at that time.

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 79:***

***4.7.66a:  APD should monitor use of force, serious use of force and show of force reporting discrepancies.  Reporting errors must be reconciled to ensure that statistics published in its Annual Use of Force Reports are accurate.***

***4.7.66b: Now that APD has transitioned to a three-tiered use of force reporting system, the agency should create an auditing process for tier-one uses of force to ensure proper categorization is taking place.  Data collected from these audits should feed the Annual Use of Force reports, and when appropriate, issues should be referred to IA and the Academy.***

***4.7.66c: APD should devise ways to scrutinize data presented by agency units, and coordinate with PMU to ensure that there are common methods to handle and present data.***

**4.7.67 Assessing Compliance with Paragraph 80**

Paragraph 80 states:

> **"APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by the Force Investigation Section, Internal Affairs Division, or Multi-Agency Task Force; and all force reviews conducted by the Performance Review Unit of the Compliance Bureau and the Force Review Board. APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary."**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 80:*

*4.7.67a Develop, using the 7-step training process articulated by the monitor, specific training with learning objectives reflective of the requirements of this paragraph, and deliver and evaluate that training.*

**4.7.68 – 4.7.72 Assessing Compliance with Paragraph 81-85: Multi-Agency Task Force (MATF) Participation by APD**

Paragraphs 81- 85 of the CASA address requirements that APD continue to participate in a MATF, consult with the participating jurisdictions to establish investigative protocols for the task force, and generally consult and coordinate with the participating agencies regarding investigative briefings and the release of information relevant to MATF investigations.

APD members from the Violent Crimes Division are assigned to the MATF to investigate officer-involved shootings, in-custody deaths (now inclusive of deaths at the Bernalillo County Jail), felonious force against officers, and criminal conduct cases resulting from a use of force by officers. This is reflected in a review of documentation provided to members of the monitoring team. APD continuously ensures personnel assigned to the MATF are full-time detectives or supervisors with member agencies, ensures a representative of each member of the MATF is present during interviews of involved personnel, addresses perceived deficiencies in a MATF investigation, and maintains the confidentiality of MATF investigations.

A review of sign-in sheets confirms a robust response to MATF callouts, especially officer-involved shootings that often have multiple crime scenes necessitating numerous investigative resources. A March 10, 2020 meeting addressed the training that MATF members need to canvass areas adjacent to crimes scenes, collect witness statements, and perform other investigative needs, many of which are addressed within the CASA (and thus impacting APD members).

On June 11, 2020 the APD's former chief of police signed an updated MATF Memorandum of Agreement (MOA) that reflects the current MATF membership. Most notably, the Rio Rancho Police Department is no longer a member of the MATF. The revised MOA is currently being disseminated amongst the other partner agencies for review and signature. A review of this draft MOA reveals that the desired protocols are accurately reflected in the document and are consistent with the letter and spirit of the CASA.

146

Based on our review, we have determined operational compliance is continued for Paragraphs 81 through 85.

### 4.7.68 Assessing Compliance with Paragraph 81:  MATF Participation by APD

Paragraph 81 of the CASA stipulates:

> **"APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist. APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that govern the Multi-Agency Task Force are current and effective. APD shall ensure that the inter-governmental agreements are consistent with this CASA."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.69 Assessing Compliance with Paragraph 82:  Investigative Protocols for the MATF

Paragraph 82 stipulates that:

> **"APD agrees to consult with participating jurisdictions to establish investigative protocols for the Multi-Agency Task Force. The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.70 Assessing Compliance with Paragraph 83:  Coordination with MATF

Paragraph 83 stipulates:

> **"APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel."**

147

**Results**

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.71 Assessing Compliance with Paragraph 84:  Briefing with MATF

Paragraph 84 of the CASA stipulates:

> **"APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force."**

**Results**

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.72 Assessing Compliance with Paragraph 85:  Expiration of MOU re MATF

Paragraph 85 stipulates:

> **"If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding. This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in-custody deaths."**

**Results**

> Primary: **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.73 – 4.7.75 Assessing Compliance with Paragraph 86-88: Review of Use of Force Policies and Training; Use of Force Training Based on Constitutional Principles; and Annual Supervisory In-Service Training.

During the IMR-12 reporting period, APD continued to struggle establishing a system of force oversight and the accountability for officer conduct.  These struggles have

significant impact and influence on the Academy's efforts to achieve Operational Compliance.  Still evident are systemic failures throughout the organization that allow questionable uses of force and misconduct to survive without being addressed in any meaningful way.  While these factors are highly problematic, they provide genuine areas to explore when deciding how and where to develop training programs, and what audience is in the greatest need of remediation through training.  We have commented extensively in the past that APD is predisposed to minimize their response to performance issues and misconduct, and defaults to training referrals regardless of the severity of an offense.[92]  APD has, as a matter of routine, pointed to past deficiencies with their policies and training when attempting to explain away problems in the field.  Now that APD has developed and implemented new policies and training they believe are capable of steering better outcomes, the response to problems they encounter will likely require a close examination of an officer's interest and willingness to apply what was provided to them when issues arise, as well as supervisors' willingness to identify and respond to improper behavior.

The monitoring team expected there would be a period of time when mistakes are made while applying the new policies following training, but issues we continue to see transcend innocent errors and instead speak to issues of cultural norms yet to be changed or adapted.  When discussing these concepts with the APD Academy Director and staff, it has become evident to them that training is not always a fitting remedy for violations of policy in the field, and at times they receive referrals that are not appropriate for the circumstances.[93]  During a Force Review Board (FRB) in June 2020, the monitoring team observed a Deputy Chief recommending a training referral for a simple matter that another FRB member vocalized could be simply corrected by adding one sentence to a policy about evidence procedures. We repeat here, that an interlocking system of policies, training, supervisory oversight, and organizational accountability can only be successful when top executives embrace the notion of legitimate consequences to misconduct and set the right expectations of conduct through training.  We are uncertain that that notion has taken hold at APD at this time.

As an exemplar of our concern that APD's top leadership demonstrate serious deficiencies in establishing the right expectations of the organization, during this reporting period we were alerted to the former Chief of Police coordinating a specific APD officer to address Academy cadets, under a lecture title of "Career Survival" as a condition of discipline following an instance of serious misconduct.  In our opinion, his decision to facilitate this event represented a serious lack of judgment.

---

[92] This trend continued during IMR-12.  Likewise, APD also tends to lean heavily toward verbal counseling as opposed to higher and more appropriate disciplinary sanctions.  Such processes eviscerate the concept of progressive discipline.

[93] After the close of the reporting period the monitoring team audited an FRB meeting during which the Academy Director was vocal that misconduct of an officer in a case under review was not a training issue and was instead an officer issue.  In that case, several members of the Board agreed.

The former Chief conducted this "training" with full knowledge of opinions of the monitor and the monitoring team.[94], [95] We note that the former Chief of Police and the monitor had engaged in a detailed discussion of the officer's behavior, and that at the end of those discussions the monitor opined that the former Chief "really had no choice, given the officer's history and his blatant disregard for the safety of his prisoner, but to terminate the officer." Academy cadets and new officers represent an essential part of a law enforcement agency affecting cultural change. Setting the right tone and standards for academy cadets through training cannot be overstated, so particular care should be taken to protect the environment in which they are trained. To best frame our concern it is important to provide the correct context for our opinion and we will refer here to the officer as Officer 1.

In September 2016, members of the monitoring team delivered to the Court a document entitled, "Special Report of the Independent Monitor – The Concept of Systemic Failure and APD's Existing Use of Force Oversight and Accountability System". The report emanated from a series of concerning uses of force and an instance of serious misconduct by Officer 1 and was meant to provide instructive guidance for the department to address systemic and cultural deficiencies at APD.[95] Even then, APD struggled to comprehend the feedback we were providing regarding their culture of non-accountability and deficiencies in their systems. In hindsight, their objection to our writing that Special Report, and their assertion that our opinion was incorrect, seems absurd.[96] APD finally opened an internal affairs investigation looking into the actions of Officer 1 during one particular use of force. In that case Officer 1, during an arrest, delivered a knee strike to the head of a defenseless suspect who was being controlled by other officers. The following quote was taken from that internal affairs investigation and was included at the opening of the Special Report:

> "Officer AO-1 (Officer 1) maintains that he did not strike the subject in the head and would not entertain the possibility that he did so inadvertently. In his report and his interviews, he continued to minimize the event. He has yet to accept any responsibility for his actions."

The former Chief of Police and Officer 1 addressed the cadet class on April 23, 2020. Officer 1 was being disciplined (again) for actions and inactions regarding an in-custody

---

[94] While in discussions with Academy staff during our June 2020 virtual site visit, they were asked how many times the officer addressed the Academy cadet class. We did not elicit verbal opinions about the officer's cadet training, but it was obvious that the Academy staff were uncomfortable with the former chief's decision to allow the officer access to the cadet class. We are of the same opinion.

[95.] The monitor previously had a conversation about this officer, and his latest incident, in which the monitor stated, in direct response to the former Chief's query about "what to do," with the comment: "Chief, in my opinion, you have no choice but to terminate him."

[95] While the Special Report highlighted several problematic uses of force, the purpose was to use the cases to amplify wider deficiencies with APD's culture and accountability processes at that time.

[96] A casual follower of APD's CASA efforts will recall that IAFD identified well over a thousand policy violations when reviewing use of force backlog cases. At the time of the Special Report, which predated IAFD's efforts, APD argued that the opinions within the report did not reflect the progress that had been made and changes in the culture in the field. A key underlying point made in the Special Report was that APD failed to properly address clear issues with Officer 1, and even after APD initiated an internal affairs investigation, Officer 1 refused to accept any responsibility for his actions.

death that occurred at the latter part of 2019, and as a condition of a more favorable disciplinary disposition, Officer 1 was required to address cadet classes.  The purpose of this lecture may have been an attempt to use what Officer 1 endured as a consequence of his misconduct, so cadets will want to avoid those issues themselves in the future.[97]  Paragraphs 86-88 include provisions that require training of officers in the proper application of force and reporting of that force, for supervisors to make credibility determinations of officers during their investigations of force and to support officers against retaliation when reporting unreasonable force.  The former Chief of Police's intentions were likely pure, but we question the wisdom of such a lecture to Academy cadets and are concerned about the impact it could have on their perspective as they assume patrol in Albuquerque.

The monitoring team requested that the lecture be videotaped and were ultimately provided a copy to review.  Our concerns were realized as we observed that the former Chief personally moderated the lecture, which lasted approximately 25-30 minutes.[98] A non-exhaustive list of points from the lecture include:

1. The cadets were not provided with sufficient context for the misconduct of Officer 1 (for either case discussed) for a clear and proper message.  In fact, the most critical elements associated with the misconduct were not discussed.
2. When addressing Officer 1's previous use of force incident approximately five years earlier the former Chief noted what was accepted five or ten years earlier (or even further back than this timeframe) is no longer accepted.  Yet in other correspondence to the monitor regarding Officer 1's use of force five years ago, the former chief described it as "an unlawful use of force." Thus, what was unlawful five years ago (and remains unlawful today) was also unlawful many years prior to the incident.
3. To provide a perspective to the cadets, the former chief remarked that if somebody was to spit in the face of an officer, an officer would want to "tune a guy up as we all would be (sic) in our first reaction." Unfortunately, modern-day professional law enforcement agencies should not be recruiting individuals whose first reaction would be to "tune a guy up." Likewise, the suggestion of such a reaction is inconsistent with the messaging a cadet should receive from the top law enforcement executive in the department.
4. The former chief spoke in terms of officer "oversights", "mistakes" and "accidents" and things that are "unintentional", which undermine the fact that Officer 1's actions had been deemed intentional serious misconduct.

---

[97] In our view, Officer 1's overall tone did not come across as bitter, and he made references of his having to change and adapt to times.  He also recommended cadets listen to the instructors and follow their guidance.

[98] The former chief presents himself professionally and he has a paternal manner of speaking that makes him easy to listen to in most settings we have encountered.

5. The former chief noted that Officer 1 previously worked for him in an Area Command and that he was a great officer and was recently Officer of the Month. This was despite Officer 1 earlier having to take leave of his administrative position seemingly because he was not temperamentally suited for the position.

6. Officer 1 minimized his actions and the circumstances that existed at the time of his excessive use of force, even insinuating he was the victim of politics at the time.

7. Officer 1 noted that "DOJ" was changing policies, and the clear insinuation was those changes were related to his discipline. These are false representations, and left cadets to believe that policies were changing, and Officer 1 likely did something that was acceptable under the "old" policies. What he did was not acceptable, but the recruits were never given the necessary details to understand his misconduct and subsequent discipline. This a craven message to send to cadets, particularly when it is supported so closely by the former chief of police.

8. Officer 1's recommendations to the cadets included, "Surround yourself with people you trust the most and the ones you know will help you." Officer 1 told cadets he's worked with the same two officers his whole career and "unfortunately" one was off that night (during the in-custody death) and one of the officers is the one that "corrects me" and "fixes" things (for Officer 1).

9. As an illustration of the tone of the lecture, only one question was asked of Officer 1, when a cadet asked if Officer 1 was apprehensive when he went back on patrol after the 2015 discipline, geared toward his personal safety rather than "lessons learned".

10. We have encountered two separate instances when the former chief, when accounting for conduct of police officers, has drawn a distinction between types of officer deception. The former chief drew a distinction between "white lies" and "big lies" during the cadet lecture, missing a great opportunity to speak clearly that there is no distinction as a police officer: lies are lies. In light of issues we have seen in the past, this is a particularly important message for officers as they enter their careers.[99] The notion of a law enforcement executive drawing such distinctions between failures of truth or candor by police officers is incomprehensible and has no place in 21st century professional policing. Such comments seriously bring into question his leadership and willingness to effect change. As of September, there is a new acting chief of police.

---

[99] The former Chief of Police drew a similar distinction in a January 3, 2020, Non-concurrence memo over the discipline of an APD officer. He stated, "There is no doubt many of (the officer's) other statements are misleading and evasive. However, I can only rely on my past experiences with issues of "untruthfulness" and I have found many different examples of what might be considered to meet the criteria. These range from a small "white lie" to a comprehensive and deliberate falsification of statements or documents to cover up misconduct or even criminal activity."

Distinguishing between opportunities to train officers to correct performance deficiencies, and legitimate misconduct that should be addressed through the disciplinary process is still poorly managed by the top echelon of the department.  As a consequence, the Academy's workload continues to grow, and CASA training requirements are not being addressed.  As described below, only a modicum of training related to Paragraphs 86-88 occurred during the IMR-12 reporting period.  While issues related to the Pandemic certainly contributed to the lack of training, we identified significant gaps that should receive serious consideration in order to avoid causing a reversal to the progress APD has achieved relevant to sustaining Secondary Compliance for training practices.

As we noted in IMR-11, APD's training team made significant strides toward overall compliance throughout 2019 by developing a four-tiered program of training designed to educate APD officers and supervisors on the agency's new use of force suite of policies.  The monitoring team, with other parties to the CASA, provided extensive perspective and technical assistance over many months, as APD developed that training program.  We continue to see training staff committed to their work, and elements of APD maturing in its training capabilities, but there is significant room to grow to establish sustainable business processes that will outlive the CASA.  We have seen variable adherence to APD's 7-Step Training Cycle which, when properly implemented, is specifically designed to provide a framework so the department will be capable of maintaining acceptable levels of professional training long into the future. We see evidence of information being shared with the Academy from outside commands, but the Academy still struggles to collect and collate the information, and then translate identified needs into specific training objectives.[100]  Over the course of this project we have commented extensively on this point.  When developing training, APD must begin with the end in mind, and with an eye on the specific behaviors or performance deficiencies they are attempting to influence.  As illustrated earlier in this report, there is a trove of performance gaps still occurring in the field that the academy can analyze.  To date, that level of analysis is lacking at the Academy.

APD's Performance Metrics Unit has built data streams to help identify issues within field commands, and if combined with lessons learned from other areas of the organization, the Academy will be able to target the more relevant performance outcomes and turn the department toward Operational Compliance.  APD collects a great deal of information related to the use and investigation of force, so a broad training curriculum is no longer the best approach to reach Operational Compliance. There will be instances in which state or county mandated training is handed to APD to deliver, and training topics will be developed as a result of command level requests, but APD will be unable to establish and sustain any degree of Operational Compliance without quickly identifying contemporary issues from the field and translating those

---

[100] For years, the monitoring team has provided continual and exhaustive guidance on curriculum development.  Basic issues with tenets of training lesson plan development should no longer exist, yet we continue to see issues.  We've commented in the past that properly constructed lesson plans and testing instruments are not simply administrative exercises and instead provide the framework to build officer competencies.

needs into high-level training programs. The fact that training that impinges upon CASA related topics originates from outside APD does not absolve the Academy from its responsibility to scrutinize that training for proper structure, content, and appropriateness for an APD audience.  In fact, by now APD's Academy should be in a state of hypervigilance when receiving such training.  As noted herein, the Academy continually advances improperly documented and drafted training programs originating outside APD that were intended to address CASA related topics.  As a consequence, the topics will have to be redelivered properly.  This is precisely the type of ineffectiveness we reported in previous Monitor Reports.  Based on our reviews of uses of force, force investigations and failures by the Force Review Board during this reporting period, we have never been more convinced of this perspective.  This reflects a serious and meaningful retrograde at the Academy.  After hundreds of hours of technical assistance and one-on-one tutoring and advise, the Academy continues to produce sub-standard work.

As noted earlier, APD has been quick to point to deficient policies and training as sources of issues that are seen in the field.  We agree in part, but most issues we've seen transcend policy and training and instead have been linked to misconduct and a command level aversion to holding people accountable.  That continued through the IMR-12 reporting period.  As discussed elsewhere in this report, despite two years developing new policies and three tiers of professional Academy training being delivered, significant issues still exist throughout the department.  We have always seen the Academy as a lynchpin of organizational change, but until APD embraces legitimate accountability across the department, the Academy will be overcome with work.  At this point there is no other place to point to in order to explain the critical failures of accountability: the top echelon of the organization has failed in its most basic responsibilities.

We view failures that continue to be encountered at more localized commands, like the Academy, as symptoms of a larger problem.  In IMR-11 we noted, "Now that APD have provided their officers and supervisors with good training, we will focus more attention on how APD responds to instances when that training is not being implemented in the field."

As the IMR-11 reporting period closed, we were encouraged with the process of APD's four (4) tiers of use of force training.  We previously reported our attendance in Tiers 2 and 3 during our November 2019 site visit, so we will not repeat here all our observations.  We noted some areas to enhance the training and clarify policy provisions, but overall, we were impressed with the quality of the in-person training by the instructors.  The following is a synopsis of the four (4) Tiers of training the Academy has created and delivered, to date, related to APD's use of force suite of policies:

**Tier 1** included an introduction by the former chief of police and the delivery of all new use of force policies through APD's on-line learning system.  That delivery method was meant to front load the policies and reduce the amount of time in the classroom that is typically dedicated to introducing each policy provision.  APD's intent was to enhance

learning in the classroom (for Tiers 2 and 3), by introducing policy provisions prior to officers arriving for the in-class portions of the training.  That would allow later tiers to focus more on applying the policies to scenarios through exercises and group discussions.

**Tier 2** included in-person instruction of the use of force policies and incorporating information gleaned from the on-line testing data and student surveys during Tier 1.  Tier 2 consisted of lecture-based classroom instruction and a heavy reliance on scenarios and adult-based learning methods.[101]  The video and scenario reviews, along with group exercises, were designed to allow officers to cognitively apply the new use of force policies by observing them being implemented in a controlled setting.

**Tier 3** was provided to all supervisors and acting supervisors in a lecture-based, classroom training program.  The instruction included video scenarios and adult-based learning methods to ensure the class understood their responsibilities related to SOP 2-57.  APD implemented their monitor-approved use of force policies following the successful completion of Tier 3.[102]

**Tier 4** is proposed to include Reality Based Training (RBT) for every enlisted member of the organization.  There will be a defensive tactics component of the training, and scenarios that require the interwoven use of APD use of force provisions with proper defensive tactics, as well as report writing.[103]  Feedback on issues encountered in the field would be solicited from officers prior to the delivery of Tier 4, since officers and supervisors now have insight following the implementation of the new use of force policies and training.

At the close of the IMR-11 reporting period, the only training remaining to be delivered related to the new use of force policies was the Tier 4, Reality-Based Training (RBT).  The monitoring team was given an opportunity to review updated training materials and provided feedback to APD, which was incorporated into the final product.  While each tier of training is important, Tier 4 is critical since APD has an opportunity to collect data from the field to determine if and how training from Tiers 1-3 are being applied.  That collection of information is key to the 7 Step Training Cycle and APD's ability to quickly remediate issues that are being encountered.  Likewise, officers and supervisors can seek clarity on proper application of policies and in some cases make recommendations for policy revisions.  APD's Tier 4 curriculum was reasonably organized and thoughtful and should provide a degree of confidence that, once delivered, officers would be better positioned to succeed in the field.

---

[101] DOJ strongly recommended APD academy personnel attend an LAPD Advanced Instructor Certification Course, which was attended by APD Academy staff toward the end of the IMR-10 reporting period.
[102] The implementation date for the new use of force suite of policies was January 11, 2020.
[103] Training materials reviewed indicated that members of IAFD would be on hand to assess reports that are submitted during the training and will provide direct feedback to officers on areas of improvement.

The Tier 4 training, if properly executed, will require substantial commitment of resources from several organizational commands, as it is heavy in practical scenarios. We sense there is tension between commands in this regard, since staffing Tier 4 will require an allocation of officers from outside the Academy to meet proper instructor/student ratios.  We highly encourage APD to support the Academy's efforts with Tier 4 or Secondary Compliance will be adversely impacted.  Since it was APD that devised and presented the training's methodology, structure, and content for monitor approval, any deviation puts APD's training efforts at risk.  This is a critical factor relating to compliance.

Throughout the development process, and in particular at the end of IMR-11, APD was cautioned regarding the delivery of Tier 4.  The Academy received provisional Secondary Compliance based on the Tier 4 materials we were provided and the expectation that this final phase would be completed during the IMR-12 reporting period.  As discussed below, the volatility of their compliance standing is exacerbated by a failure to contemplate annual use of force training requirements.  APD's training academy compliance standing impacts many other CASA paragraphs and, unfortunately, has been complicated due to the global Pandemic that has adversely impacted states across the country.[104]

During our June 2020 virtual site visit we met with the Academy staff responsible for the tasks associated with Paragraphs 86-88.  As in the past we found the them to be professional, interested in success, and receptive to feedback.  We learned that small groups have attended new sessions of Tiers 1-3, all of which helped APD retain a 95%+ compliance standing.  A lateral class of officers attended Tiers 1 and 2, which was made up of a combination of new commanders, rehired APD officers, and officers from outside police agencies.  The academy combined facilitated training, exercises and videos, and testing was conducted remotely following the training.[105]  At the time of the site visit the Academy was still optimistic that Tier 4 could be started and delivered to the department before the end of the IMR-12 reporting period.  The evolving Pandemic has since affected APD's ability to deliver Tier 4, which at the close of IMR-12 had not started.

While meeting with the Academy Director and staff we discussed the status of APD's Paragraph 86-88 annual requirements to deliver use of force training.  While there is some overlap of topics with the Tiered training, it was clear that APD has been hyper focused on completing the Tier 4 training and did not contemplate their annual training requirements.  The monitoring team is cognizant of the issues facing the department as a consequence of the Pandemic, but the Academy did not appear to have even

---

[104] APD is reacting to a national crisis and they are being impacted by an inability to bring officers to the Academy for in-person training.  We note that APD's current circumstances are the result of extended delays to develop their new use of force policies and the training programs for those policies.  The delays date back as far back as 2018.

[105] APD would be wise to track training attendees from make-up or new sessions of the Tiered training to determine if there is any discernable difference in their testing results or adherence to policy in the field.

explored options to address this requirement.[106]  Likewise, APD had not advanced any concern to address these requirements to the monitor until after it was brought to their attention by the monitoring team.[107]  APD's efforts to complete the Tier 4 training does not absolve the department from its other training requirements.  For most officers, it's been over a year since they attended Tier 1 and by the end of 2020 it will be over a year since Tiers 2 and 3 were attended by APD officers and supervisors. As noted, some topics are not addressed in the tiered training sessions and would require their own training sessions.

When the current Academy Commander took over approximately two years ago, she was faced with numerous gaps that resulted from poorly conceived, constructed and delivered use of force training programs.  We discussed these past problems and provided our perspective as to how APD could avoid repeating past failures and avoid establishing new training gaps.  We recommended that APD create a table of training topics, by CASA paragraph, and determine what topics have not been addressed for 2020.[108]  This would allow APD to organize their responsibilities and serve as a quick reference to make tracking those responsibilities over time easier.  The Academy staff prepared the training table in response to a data request at the end of the reporting period.  The table included; 1) Training Topics by Paragraph; 2) Courses in which the topic would be delivered; 3) Current status of the delivery of the topic; 4) Hours of training; and 5) Delivery dates.  Virtually all the topics deferred the training topic to the fall of 2020 or into 2021.  We noted two specific training programs designed to address Paragraphs 87a and 87c that were delivered during the IMR-12 reporting period and requested the training materials to review for compliance.

Interestingly, the two topics addressed in these training programs revealed themselves as significant field-based issues during this reporting period.  As such, the proper development of training around these topics, with effective training delivery, would have been beneficial to the organization.  We made the following observations and determinations:

1. Paragraph 87a requires training to address "search and seizure law, including the Fourth Amendment and related law."  The proffered training was aimed at the topic of "Terry Frisks" and was delivered through APD's learning management system.  The training consisted of a video moderated by a member of the County District Attorney's Office.  The written content displayed at the beginning of the video is not in question; however, we found several deficiencies with the training.  1) APD did not develop the training through its 7 Step Training Cycle, and the training did not address specific issues and performance deficiencies that exist in the field; 2) APD did not complete a lesson plan for the training; and 3) There

---

[106] We discussed this issue and provided our perspective on how APD can accomplish the task through different delivery methods.

[107] IMR-11 contained a recommendation that APD devise a Covid-19 training plan.

[108] The monitoring team made this same recommendation numerous times in the past to the previous administration, which was not accomplished properly.

was no testing mechanism to determine if there was a transfer of learning (APD only captured whether an officer attended the training, which is entirely inappropriate at this stage of the CASA); and most importantly 4) The presentation and use of OBRD videos in the training failed to provide proper context around the frisks/searches being displayed and, as shown, serves only to reinforce improper behavior in the field!  This training is determined to be deficient as delivered and does not meet the requirements of Paragraph 87c.

2.  We note that we advised City Legal of our concerns about the departure from normal practice related to training development, and received in return, an expressed sentiment that it was not our worry.  City Legal refused our request for documentation.  After a detailed discussion, we averred to City Legal's confidence in the product.  As a result, we are faced with a piece of training that failed seriously to address established requirements and process required by the CASA.  This is an issue that will have serious and (more likely than not) long-lasting implications and is one that could have been avoided if City Legal had simply responded to our request and submitted the training for pre-screening.  We will continue to report on the cascade effects this refusal will have in coming monitoring reports.     As a result of this ineffectual, poorly documented, and virtually "secret" training, the APD has suffered a significant setback[109].

3.  Paragraph 87c requires training to address "use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disabilities." This state mandated and constructed training was delivered to APD through their on-line learning platform with a 28-minute video, while the lesson plan associated with this training contained two hours of training material.[110]   There were four learning objectives, but APD addressed only three.  Also, there is material in the lesson plan that is not addressed in the training video.[111]   Presumably the state felt the material in the lesson plan was all relevant to an officer, and it is unknown how APD decided to focus the materials and how APD connected the needs of the department to the specific material it drew from the state's lesson plan. These issues directly contradict proper application of APD's own 7-Step Training Cycle, adapted with guidance from the monitor.  We determine

---

[109] The City notes that an "early draft" was sent to the monitor in mid-May of this year, and notes that the "City is revising 'upcoming" Search and Seizure lesson plans.  This does not address the issue that the City Attorney's office refused the monitor's direct request for final-product CASA-related training materials.

[110] We note that the amount of material presented would likely benefit from more than two hours of training; however, we only note the 2 hours as it was listed as the time allotment in the lesson plan.

[111] Delivering training in this manner puts both officers and the organization at risk if behaviors in the field are called into question.  One purpose of a lesson plan is to document what an officer is taught in case their actions are called into question in a criminal or civil proceeding.  We do not call into question the content of the lesson plan, but instead suspect the topic has not been properly delivered.

this training is e deficient as delivered and does not meet the requirements of Paragraph 87c.

When training curriculum originates outside APD, or is developed in coordination with people outside APD, the Academy is not absolved from its requirement to advance training consistent with its policies and the CASA.  Unfortunately, APD missed great opportunities to address what we deem as clear deficiencies in the field related to Paragraph 87a and 87c.  It is more likely than not that, if the City had honored our request for training documentation to review, this serious lapse in compliance could have been avoided.  Nonetheless, APD has suffered serious and wide-reaching failures in its training processes this reporting period.  Such was not the case, however.

We have recommended on numerous occasions that APD seek out and attend training courses focused on training development and the measurement of performance outcomes, and we reiterate it again here.  This type of continuing education will greatly benefit the whole organization and should not be confined to Academy staff alone.  Any command personnel responsible for curriculum development should receive advanced training in these areas.[112]  Training curricula developed by outside sources are particularly susceptible to these issues, as we warned the City earlier this year, to no avail.

While APD achieved Secondary Compliance based on our review and attendance of Tier 2 and Tier 3 use of force training, and the representation by APD that Tier 4 would be completed, the organization will be in jeopardy of losing Secondary Compliance should it not complete each of its training requirements before the end of the IMR-13 reporting period.  The Academy has been provided exhaustive technical assistance and guidance that should benefit their efforts.  In IMR-11 we recommended that APD develop a plan to address training issues in light of COVID-19 but have yet to receive a comprehensive plan.  With a coordinated and concerted effort across APD commands these are achievable goals even under the current circumstances.  Without concerted effort, a thorough review of points of under-performance at the Academy, and a common-sense approach to remediate areas of under-performance, APD risks a serious and difficult to remedy loss of compliance in the training requirements identified in the CASA.

### 4.7.73 Assessing Compliance with Paragraph 86:  Review of Use of Force Policies and Training

Paragraph 86 stipulates:

> **"Within 36 months of the Operational Date, APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the**

---

[112] DOJ strongly recommended APD academy personnel attend an LAPD Advanced Instructor Certification Course, which was followed by APD toward the end of the IMR-10 reporting period.  This recommendation was beneficial to the Academy receiving Secondary Compliance.

> **Constitution and provisions of this Agreement. APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy."**

## Results

Primary:          **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not in Compliance**

## 4.7.74 Assessing Compliance with Paragraph 87:  Use of Force Training Based on Constitutional Principles

Paragraph 87 stipulates:

> **"APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:**
>
> **a) search and seizure law, including the Fourth Amendment and related law;**
>
> **b) APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;**
>
> **c) use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;**
>
> **d)  use of de-escalation strategies;**
>
> **e)  scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;**
>
> **f)  deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;**
>
> **g)  crowd control; and**
>
> **h)   Initiating and disengaging foot pursuits."**

## Results

Primary:          **In Compliance**

Secondary:   **In Compliance**
Operational: **Not In Compliance**

## 4.7.75 Assessing Compliance with Paragraph 88:  Annual Supervisory In-Service Training

Paragraph 88 stipulates:

> **"Supervisors of all ranks, including those assigned to the Internal Affairs Division, as part of their initial and annual in-service supervisory training, shall receive additional training that includes: a)  conducting use of force investigations, including evaluating officer, subject, and witness credibility; b)  strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force; c)  incident management; and d)  supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force. "**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

### *Recommendations for Paragraphs 86-88*

*4.7.73-75a: The Academy staff should be properly augmented to ensure the quality of training curriculum and training systems are not negatively impacted due to staffing shortages.*

*4.7.73-75b: APD Academy Staff should seek out and attend training courses focused on the proper development of training curriculum and how to connect that curriculum to the measurement of performance outcomes.  Likewise, proper test question construction should be emphasized in Academy personnel's future training plans.*

*4.7.73-75c:  APD personnel assigned to non-academy commands who carry significant training requirements should receive training commensurate with the Academy staff.  This will ensure continuity in curriculum development across the organization.*

*4.7.73-75c  Ensure that the Academy is the central point for review and approval of all training development and delivery processes for APD.*

161

*4.7.73-75d:  APD should produce a draft training-related COVID-19 response document, identifying salient training-related problems-issues-needs-solutions (PINS) related to COVID-19, viz a viz training-related issues.*

*4.7.73-75e: APD must properly supervise the delivery of training that is developed from outside sources before it is delivered to the department, regardless of its origin.  Training programs should be developed based on best practices, APD policy and must adhere to the requirements of the CASA.*

*4.7.73-75f: APD must protect the training environment from lectures that may be perceived as inappropriate or are contrary to APD policy or the CASA.*

### 4.7.76 Assessing Compliance with Paragraph 89:  Annual Firearms Training

Paragraph 89 stipulates:

> **"Included in the use of force training set out above, APD shall deliver firearms training that comports with constitutional principles and APD policy to all officers within 12 months of the Operational Date and at least yearly thereafter. APD firearms training shall:**
>
> **a)  require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms as necessary, on an annual basis;**
>
> **b)  require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;**
>
> **c) incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program; and**
>
> **d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times."**

## Methodology

The methodology outlined in Paragraphs 17-20, serves as the baseline for compliance determinations for paragraph 89.

The 2020 Firearms Training cycle has been delayed due to the New Mexico Health restrictions in response to the COVID Pandemic.  This year, APD plans to conduct both Firearms and Taser certification during the same session.  As health restrictions are lifted, the training will begin.

APD is required to provide sufficient training courses to allow officers to gain proficiency and meet firearms qualification requirements.  During past site visits, members of the monitoring team attended firearms training.  APD Range Staff have changed range hours to enable officers to practice firearms in a low-light environment. The firearms staff have added additional days and times to allow more practice.  In reviewing data related to failures to qualify, firearms staff documents the referral to additional training for poorly performing shooters.

APD completed the required Firearms training cycle for 2019.  They should be commended for overcoming the delays and obstructions to completing the task to ensure that compliance is met. The monitoring team is convinced that APD will again overcome delays to ensure that the 2020 training cycle will be completed.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.73 - 4.7.75 Assessing Compliance with Paragraph 90-105: Management of Specialized Units, and accompanying paragraphs focused on the Special Operations Division.**

Paragraphs 90-105 of the CASA address requirements that APD must meet related to management and supervision of functions inside the Special Operations Section (SOD) as follows:

> Paragraph 90: Management of Specialized Units;
> Paragraph 91: Composition of Specialized Tactical Units;
> Paragraph 92: Training of Specialized Tactical Units;
> Paragraph 93: Tactical Unit Missions and Policies;
> Paragraph 94: Tactical Units Policy and Procedure;
> Paragraph 95: Annual Review of Tactical Policies;
> Paragraph 96: Documentation of Tactical Activities;
> Paragraph 97: Tactical Mission Briefings;
> Paragraph 98: Tactical Uniforms;
> Paragraph 99: Force Review Board Assessments;
> Paragraph 100: Eligibility Requirements for Tactical Teams;
> Paragraph 101: Tactical Team Training;
> Paragraph 102: K9 Post Deployment Reviews;
> Paragraph 103: Tracking K9 Deployments;
> Paragraph 104: Tracking K9 Bite Ratios; and

Paragraph 105: Analyzing Tactical Deployments.

As with other reporting periods, the monitoring team spent time providing perspective and feedback to APD's Special Operations Division (SOD) personnel and met with personnel responsible for the tasks associated with these paragraphs during our June 2020 virtual site visit. As in the past, we found them to be professional and sincerely interested in reform efforts that increase their capabilities.

The following paragraphs represent our findings related to Paragraphs 90-105.

As we previously reported, SOD enlisted staff and civilian staff established administrative business processes that help them sustain Operational Compliance and we found that continuity of information in the Division has remained stable during this reporting period.  In the past we have commented on the need for strong systems and policies across APD, since they help ensure that reform efforts are not impacted as a consequence of Command level changes. We strongly encourage to continue selecting Commanders for SOD who have, throughout their careers, demonstrated higher-order thinking, strong organizational maturity, and those who have sincerely embraced APD's reform efforts. Some regularized form of external monitoring of SOD, such as routine review and assessment of randomly selected deployments, is essential as a matter of proper oversight and awareness. While this external monitoring of SOD operations should fall to the Force Review Board, our observations of that board's performance this reporting period has caused consternation and concern with the Board's intent and effectiveness.

In past Monitor reports APD's SWAT has been commended for the quality of their activations and the After-Action Reports (AAR) they generate.  SOD reports have always shown significant detail and readers can easily follow and understand the sequence of their movements and decisions during events.  For this reporting period the monitoring team reviewed fifty-two (52) AARs resulting from tactical activations. Included in that population of reports were seventeen (17) that had accompanying Pre-Operational Plans, mostly associated with protests that occurred around the city over the past few months.  The good quality of AARs continued during the IMR-12 reporting period and SOD continues to document (in great detail) the thought processes a supervisor goes through when decisions are made.  We also noted that AAR's now include specific sections for the types of force used, names of the officers who used force and the supervisor who was responsible for investigating the use of force.[113]  We note observations and provide the following feedback for the AARs and Pre-Operational Plans we reviewed:

1.  With IAFD taking a greater responsibility to investigate uses of force associated with tactical activations, SOD should ensure that IAFD receives final versions of AARs as a part of their investigation.  We saw instances where AARs received final approvals 2-3 months following an

---

[113] They also overtly state if the SOD deployment did not result in a use of force.

164

event.  Because AARs are typically prepared by SOD lieutenants and commanders, the volume and length of call outs and the length and detail in an AAR, we are not surprised with the delay.  We mention the timeliness because the AAR is an important component of a comprehensive use of force investigation and IAFD should have access to the AAR at the earliest point possible.  Otherwise, inconsistencies and gaps of information may arise between two commands when documenting actions for the same event.

2. A separate issue was identified following a series of SOD protest deployments.  The issue related to the proper timelines for reporting and documenting uses of force.  The police department handled numerous protests in short periods of time, with IAFD responding to investigate accompanying uses of force.  SOD called out "substantial disagreement" between commands as to the proper timelines to apply.  The recent protest deployments revealed an important issue to be resolved and we will expect a reasonable and workable solution for future events.  Balancing the need for timely use of force investigations with chaotic emerging events will require the commands to tease out the relevant issues, devise a proper response to those issues, and advance their proposal to the monitor for consideration.

3. We continue to find instances where SOD Commanders outlined lessons learned for future activations.  We saw two such instances in which the SOD A/Lieutenant called out gaps in communication between ERT and SOD at the front end of a protest detail.  That lack of communication "…put resources at a disadvantage…" since tactical officers were off duty and the SOD had to catch up to be able to effectively deploy his personnel.  The SOD A/Lieutenant also called out the lack of cross-disciplinary training between SOD and ERT, and the importance that each knows the capabilities, limitations, and proper implementation of duties during an event.  A recommendation was made by SOD to consult with ERT and schedule routine training with the two units.

4. SOD identified data discrepancies where the terms SOD "activation" and "deployment" were being misapplied.

5. During a tactical activation for a protest detail, SOD realized that some ERT personnel arrived without gas masks, which limited SOD's ability to deploy chemical munitions to create time and space between officers and a crowd.  This was addressed during a debriefing but casts a light on ERT's failure to complete its ERT centric training over the past several

reporting periods.  These are the type of problems that occur when proper policy and training are not in place.

To the extent necessary, we will continue to review AARs to ensure the trend we have seen continues in a positive direction.  We also note that during the IMR-12 reporting period, APD promulgated Special Order (SO) 20-16 on February 24, 2020, which was amended on June 1, 2020, entitled "Incidents requiring an After-Action Review by Field Services Bureau Personnel".[114]  The SO requires FSB incident commanders to prepare After Action reports for the following events:

1. Tactical activations;
2. Response to individuals in crisis and are threatening to jump from an elevated position such as a bridge or a building;
3. Response to an active shooter; and
4. Any other significant event at the request of the area commander or responding specialized unit's division commander.

The listed purpose of this After-Action Report is to provide feedback to FSB supervisors and specialized units regarding trends and potential areas of improvement.  We see this as a meaningful measure to put into place and noted that APD created a specific form and guidance to ensure the After-Action Reports have a standardized format.  We only caution that, since this process is new, comparing these reports against other routine reports from the same event could result in discrepancies or conflicting information.  We only call this out as a point of technical assistance, but by having SOD review AARs prepared by FSB we expect there will be an increase in the quality of documentation in the field.

The monitoring team previously reviewed documentation for the delivery of organization-wide training on the proper use of the SOD Risk Assessment Matrix (RAM), and approved it being delivered to the department.  SID consults with SOD for specific types of search warrants and is required to fill out a Risk Assessment Matrix (RAM)[115] to determine if they are required to call out SOD.  During the IMR-10 reporting period, we noted that APD unearthed an important issue that required a resolution, when the SID Commander disagreed with SOD's opinion of the score of a particular RAM.  SOD and SID worked together and developed protocols to reconcile this type of event should it occur in the future.  SOD established a "RAM Audit Remediation Process" that was approved by the agency.  Now, if there is a discrepancy found during a RAM audit, and the effected unit Commander disagrees with the finding, that Commander will document their position and forward it through the chain of command.  SOD will make the final decision on the scene.

---

[114] The reader should note that this SO was promulgated in direct response to a Force Review Board referral.

[115] There are pre-set and scored categories APD units must consider when filling out a RAM, and a score of 25 or more requires a SOD call out.  Units are also required to append proofs that they made inquiries for specific risk categories, i.e., an assessment as to whether the suspect has a violent history requires criminal histories to be attached).

We saw this process in practice during IMR-12 when a SOD audit of SID RAM reports in July 2020 uncovered a discrepancy in documentation.  The SID Commander prepared a rebuttal to SOD and once the evidence was presented that there was not a discrepancy, SOD amended its opinion.  While the final decision on compliance rests with the SOD Commander, the process is collaborative with meaningful interaction between the commands.  The establishment of these protocols is a good example how these two units work together and continue to meet their CASA related responsibilities.  Finally, SOD has developed a draft training course designed to teach basic tactics to APD detectives (including SID). The intent is to provide tactical guidance for situations where a search warrant does not meet the scoring threshold on the RAM requiring a tactical response.  By the close of the reporting period the monitoring team had provided feedback on the course and it was still pending.[116]

The monitoring team reviewed SOD audits of SID RAM records for four separate and distinct cases, and SOD memorandums for those cases.  SOD RAM audit reports continue to be a routine business practice, and we were able to review the audits against the records SID provided for the IMR-12 reporting period.  It is clear that APD implementing these audits is valuable for long term sustainability and helps ensure that problems can be quickly self-identified.  This type of internal oversight and response between SID and SOD is indicative of a system that has taken hold and can be relied upon in the future.  SOD RAM Audits summarizes an event and includes the documentation that was reviewed by the auditor, provides audit findings, and also notes areas for improvement.

We identified one case with potentially contradictory information (IMR-12-31).  In the Pre-Operational Plan under the section "Other Considerations" the detective noted "Consider all subjects to be armed" and "High drug trafficking area", but when cross referenced against the RAM we observed that under "Location Facts" the detective scored the search warrant as a "0" for the question "Verified firearms at location" and "0" for "Drug Manufacturing location/large scale narcotics distribution".  Likewise, under the heading "Target Subjects" the detective scored the search warrant a "0" for "Subject of warrant is known and verified to carry firearms".  If the score associated with any one of these criteria was applied, it would have required an SOD activation to execute the search warrant.  A comprehensive assessment was conducted of the case during a SOD RAM (Risk Assessment Matrix) Audit. The case was determined to be properly scored, but these seemingly contradictory statements were not discussed in the RAM Audit Memo, dated March 9, 2020.  In the future, we recommend APD reconcile these types of statements.  As we saw during this operation there was an accidental discharge of a weapon by a detective after the event was complete, and the detective returned to the police vehicle.

---

[116] In the past we have commented on investigative personnel executing search warrants, calling out the inherent risk since there are instances where a situation may not score above the RAM threshold yet the totality of circumstances points toward a SOD response.  Also, a RAM could be incorrectly scored and only caught after the search warrant has been executed.

The monitoring team reviewed SOD records related to the selection of APD personnel into the unit and found those records to be sufficient.  We learned that SOD is in the process of expanding the use of handbooks and are in the process of creating a handbook for administrative personnel, to help with transitions between civilian staff, since they typically coordinate information tracking for the Division.  Records we reviewed for IMR-12 included Department Personnel Circulars with job descriptions, Transfer Orders, and Unit Handbooks for SWAT, K9, and the Bomb Unit.   SOD continues to maintain strong records that track the selection process from the posting of an opening through the selection of an officer for assignment to SOD.  We reviewed internal SOD training records for the SWAT, K9, and Bomb Units, and found them to be sufficient.  In the past we recommended SOD review its lesson plans and enhance them to reflect new Academy standards.[117]  In IMR-11 we noted that the routine training SOD conducts at the Division level now includes a standardized form that included goals, objectives, and measure for training they provide.  SOD worked with the Academy and expanded the form during the IMR-12 reporting period to include "Operational Function" with notations for CASA requirements, methods for "transfer of knowledge" to students, training revisions needed based on observations in the class, and remedial actions necessary for student deficiencies.  These components closely mirror elements of the Academy's 7-step Training Cycle yet are nimble enough to be applied for day-to-day training SOD seeks to deliver.  We were also presented with lesson plan drafts for the following courses, which are in development and moving through the APD approval process: 1) Less Lethal, Chemical Munitions; 2) Less Lethal Distraction Device; 3) Less Lethal Impact Munitions; and 4) Tactics & Techniques for Search Warrants.  While we have not reviewed the training plans in detail, from a cursory review, we noted that SOD's coordination with the Academy and the quality of lesson plan structure and content continues to improve.  (P91-92; 101).

Based on our review of the existing SOD policy requirements and other related documentation, we determined that SOD remains in Operational Compliance with respect to tactical unit missions and policies and annual reviews of policies (P93–95; 100).  During the IMR-12 reporting period SOD revised SOP 1-92 "Specialized Tactical Units" (Formerly 6-8), effective July 9, 2020.  The work prepared by the SOD Commander took nearly all recommendations made by the monitoring team.  The only pending concern to the policy related to the ambiguous wording related to the type and length of training supervisors and commanders within SOD must attend.  As presented, supervisors and commanders are able to attend programs of different lengths, topics, and quality, which in turn could result in disparity that we hope to guide APD away from.  In response to our recommendation that the training contain more specific criteria and be linked to a national organization, like the NTOA, APD inserted language that SOD supervisors and commanders would have to attend a "nationally recognized" training course.  We feel that is still too ambiguous and will likely create issues for SOD in the future.  We will continue to work with SOD on refining this language, as they are

---

[117] During IMR-11 we were provided lesson plans for NFDDs and chemical munitions training that was reviewed by the Academy's Comprehensive Training Unit.

typically receptive to technical assistance.  The monitoring team also reviewed SOD handbooks prepared during IMR-12 which demonstrated that SOD is continuing the routine "onboarding" practice established by previous Commanders.

We reviewed Monthly Inspection Reports that were completed for the months of February 2020 through July 2020 and determined that SOD continues to capture information regarding uniform cleanliness and completeness, equipment, as well as proper identification markings and whether an officer's Taser video recorder is working properly.  (P98)

As we noted in IMR-11, APD resumed conducting Force Review Board (FRB) sessions related to SOD Tactical Deployments during IMR-11, and regular hearings of SOD cases have occurred throughout the IMR-12 reporting period.  Historically, SOD tracked their activations closely and ensured the cases were presented to the FRB.  During our June 2020 virtual site visit the SOD Commander made us aware that only one case, involving an officer involved shooting, was pending from 2019, and that the FRB was regularly hearing 2020 tactical activation cases.  In the past, we commented that the scope of review by the FRB of SOD tactical activations is too narrow when cases have an accompanying use of force, and a full analysis of protocols and policy, training, equipment or tactical concerns may not be possible without a comprehensive review that includes the use of force at the same time.[118]  The presentations provided by SOD of tactical activations are comprehensive, but the conversation is stunted in cases of use of force.  Generally, the presentation is a retelling of the circumstances that led to the activation, when certain events occurred during an event, and the thought process behind Commander decisions on the scene at the time.  During the June 2020 virtual site visit, members of the monitoring team attended an FRB where two SOD cases were heard.  One of the cases had several complex factors, so the presentation was lengthy.  One of the FRB members commented on the extended period of time it took to complete the presentation, and it was interesting to listen as the SOD commander pushed back and defended the need to provide a comprehensive explanation of the case so a meaningful assessment of the case could be made.  The case presentation was, in fact, lengthy but we agreed with the SOD Commander's perspective.

Following the close of the IMR-12 reporting period, members of the monitoring team sat in on a virtual session of the FRB and the presentation of a SOD tactical activation with an accompanying use of force.  It appeared that the FRB finally recognized the gap in information and a robust conversation centered on the FRB hearing all elements of these cases, including uses of force, in the future.  The FRB concluded the presentation with a referral to examine this approach to cases moving forward.  We provide more perspective on our observations and concerns of the performance of the FRB during this reporting period in Paragraphs 57 and 78.   That said, based on our concerns, we reiterate the importance of SOD remaining vigilant with its self-assessments.  Further,

---

[118] Historically, SOD uses of force were not discussed in any detail during the tactical presentations.  If there was an accompanying use of force with a case, that element of the activation would only be presented and scrutinized by the FRB if that specific case was picked during a 10% random sample or if it included a serious use of force that would be presented by CIRT, or IAFD.

SOD should and ensure it collaborates closely with IAFD moving forward in terms of use of force reporting.  This would improve the probability of SOD not being the source of non-compliance determinations for other CASA paragraphs in the future.

For IMR-12 the monitoring team reviewed several SOD related use of force cases that either occurred during the reporting period or were heard by the FRB during this reporting period.  We note our findings elsewhere in this report, but because of the importance of feedback to SOD we repeat our findings below.

**IMR-12-32**

In February 2020, an afternoon SWAT activation occurred in response to a request to arrest a suspect who had attempted a sexual assault. The suspect, who was in his apartment with his two-year old son, was not responsive to officer attempts to contact him in the residence. The suspect was known to have mental health issues, in addition to making threats against police officers (suicide by cop) and known to possess weapons. After all communication attempts failed, the SWAT team made a forced entry into the suspect's apartment, successfully arrested him, while at the same time safely removing his son who was in the same bed with him. When a sergeant was conducting an on-scene investigation, two APD members self-reported that they "covered the suspect with the muzzle of their weapons as they advanced towards a room where the two occupants…were located."  However, the individual written reports of the officers indicated one officer's "muzzle may have unintentionally covered the suspect," while the other officer reported he needed his "rifle mounted light to observe the male" and that he did not have a sight picture and did not have the intention to cover the male with my muzzle." These discrepancies were not noted in the supervisor's review.

Due to the darkness in the room and the legitimate movements of the SWAT members during the entry or arrest, no inappropriate use of force (especially with firearms) was noted on videos reviewed by the monitoring team. Audio on these videos confirmed this determination. Thus, the subsequent investigation's conclusion on the shows of force was appropriate. However, the investigation and subsequent chain of command reviews largely failed to appropriately investigate and classify other force events in this case.

For example, the review of videos in this case revealed officers carried the handcuffed suspect from the bedroom, through the apartment, and outside the apartment through the courtyard to an APD vehicle. The suspect refused to walk and had to be carried. The suspect, who is a heavier male, was completely naked and "dead-weight."  He was carried facedown by two (and at times by three) officers, who held his arms (behind his back) and ankles. The suspect also appeared to be partially dragged through gravel a very short distance, due to the officers being required to carry the heavier, uncooperative male. This resulted in the suspect sustaining scraped knees, what appeared to be other smaller abrasions, and a cut to his right forehead.

The sergeant's review of the shows of force (reported as shows of force from the onset) through the Commander's Review indicated photos were taken of the individual at the scene. However, the monitoring team was only provided with photos presumed to be

that of the victim.  Based on APD's BlueTeam reporting, these were the only photos in this use of force investigation.

The lieutenant's review noted the abrasions on the suspect's knees (attributed to being carried), but nothing about the injury to the suspect's forehead. The reviews conducted (sergeant, lieutenant, and Commander) did not mention the appropriate force used by the officers to physically control and move the handcuffed suspect that nonetheless resulted in his visible injuries. The monitoring team determined that since the injuries appear to have occurred to the suspect while he was carried and dragged, this should have been classified as a Level 2 use of force. However, since this Level 2 use of force was used against a handcuffed individual, pursuant to APD policy (SOP 2-53) this was actually an unreported and uninvestigated Level 3 use of force.  This case is a good representation of how SOD can influence wider use of force compliance levels.

**IMR-12-28**
**Date of Incident: 09/30/19**
**FRB Presentation: 02/06/20**

In September 2019, a tactical activation response occurred when SID members attempted to serve an outstanding felony warrant for armed robbery on an individual who subsequently barricaded himself in a residence. When communications via loudspeaker failed and telephone calls to the suspect's cell phone went unanswered, officers deployed two noise flash diversionary devices (NFDD) outside the residence to stimulate a response from the suspect. When no response was received, two rounds of 40 mm direct impact sponge rounds were deployed through a window of the residence "to facilitate better communications." After the deployment of the sponge rounds, the suspect exited the residence and surrendered without incident. No physical force was utilized, and no injuries were reported.

**IMR-12-29**
**Date of Incident: 10/28/19**
**FRB Presentation: 03/05/20**

In October 2019, a tactical activation response occurred when investigative personnel requested K-9 assistance to establish a perimeter after they initiated a surveillance of a residence occupied by an individual with an outstanding felony warrant for homicide. Upon the arrival of a tactical supervisor, communications via loudspeaker were initiated, but failed to elicit a response from the suspect. A full tactical activation was subsequently initiated. After telephone communications were established with the suspect and family members, the suspect exited the residence and surrendered without incident. No physical force was utilized, and no injuries were reported.

**IMR-12-30**
**Date of Incident: 08/16/19**
**FRB Presentation: 02/20/20**

In August 2019, a tactical activation response occurred when an individual with an active felony warrant for battery on a police officer refused to vacate his residence as a result of a restraining order. After the subject was visually identified by officers conducting surveillance and failing to exit the residence and surrender to officers' multiple requests, a SWAT activation was authorized. After multiple nonlethal projectiles were employed (NFDDs, 40mm OC/CS Ferret rounds, CS Tri-Chambers, etc.), the suspect eventually exited the residence, but did not comply with officer commands. A police service dog (PSD) was deployed and subsequently initiated a "bite and hold" on the suspect.  Officers responded and removed the PSD and overcame active resistance on the part of the suspect with physical force. The resultant use of force investigation revealed an officer did not upload their OBRD until 3-4 days after that incident.

The investigation also revealed three officers did not do supplemental reports, even though they placed individuals into handcuffs (despite not arresting them) and used low-level tactics (pushing) on a subject while maintaining an outer perimeter.  A policy deficiency was identified by IAFD, noting that no APD policy was identified that makes it mandatory that an officer do a report whenever placing somebody in handcuffs. Reports from officers indicated they aimed rifles just to the side of the suspect for illumination purposes and to use a magnifier on a rifle, specifically indicating they did not have their sights on the suspect.  These are potential shows of force.  The videos for these officers were not provided.  This raises a genuine concern that the FRB has not addressed: pointing high-powered weapons at suspects or subjects for purposes of illumination or enlargement. Issues such as this are the precise reasons that strong FRB processes are required by the CASA.  These are critical oversight issues of what could be problematic trends when considering the potential for accidental discharges when aiming rifles (or any firearm) only for illumination or magnification purposes.

SOD tracks deployments through their Activation Data Reports, which were reviewed by the monitoring team.  PMU previously identified tracking errors and made specific recommendations to remediate those issues.  When we met with SOD during this reporting period, and they provided proofs for modifications to their tracking methods showing they were responsive to the PMU report, as required by paragraph 99 of the CASA.

For IMR-12 we reviewed Annual Assessment Reports that were completed for each SOD unit, as well as examples of Performance Work Plans for officers for whom SOD completed Annual Assessments for its personnel.  Criteria set by policy and SOD handbooks are not explicitly called out in a uniform manner within the Annual Assessments, but they continue to be conducted in a routine manner.  We encourage APD to look deeper at Division and Unit level policy provisions to ensure their personnel are being assessed by correlating predetermined criteria, as per the requirements of Paragraph 100 of the CASA.

APD continues to track K9 deployments and bite ratios consistent with monitor-approved methodology.  The monitoring team reviewed the latest K9 Bite Ratio report and tracking ledgers documenting SOD K9 handlers and K9 bite ratios for this reporting

period.  During that time frame, one K9 handler was reported as having a bite ratio that exceeded 20% in each month of the IMR-12 reporting period.119  We first documented the activities with SOD and this K-9 team in IMR-11. The monitoring team reviewed supervisory Interoffice memoranda that document the reviews of the data and interviews with the K-9 Handler.  In each instance the SOD Commander reviewed relevant information and provided appropriate justification and context before concluding that the bite ratio was not problematic and that the officers' K-9 use was within APD policy.  The most pressing factor contributing to this K-9 team's bite ratios is that SOD has not had qualified K-9 staffing levels for tactical activations, so there has been an overreliance on one K-9 Team.  Following the IMR-12 reporting period the SOD Commander conducted an assessment of the situation.  In order to reduce the burden on the K-9 team that was consistently exceeding 20%, the Commander was forced to refrain from placing a particular sergeant into an acting lieutenant position within the Division, since that sergeant was a part of the only other K-9 team qualified for tactical activations.   There are several other teams currently being trained which eventually should be qualified to deploy for tactical events.  Based on our review of documentation and our conversations with the SOD Commander, we believe that he is closely monitoring the situation and attempting to remediate the problem.  As this time, reviews conducted of the K-9 Handler's activities, and associated documentation, have not revealed any specific issues.  That said, the APD should continue to monitor this carefully to not place the organization or the K-9 team into a precarious situation.

The monitoring team reviewed SOD Tactical Unit Deployment Tracking Sheets for the monitoring period.  APD continues to monitor and analyze the number, type, and characteristics of deployments, and states a clear reason for each tactical deployment, as well as the number of arrestees in each deployment. (P102 - P105)

SOD continues to demonstrate a positive attitude toward CASA compliance and to demonstrate the commitment to sustain CASA compliance.  In the opinion of the monitoring team that commitment was sustained for IMR-12. Based on our meetings with SOD and review of documentation, we have determined Operational Compliance should be continued for Paragraphs 90 through 105.

### 4.7.77 Assessing Compliance with Paragraph 90:  Management of Specialized Units

Paragraph 90 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances,**

---

[119] The bite ratio average, month to month, ranged from 21-26%, with the highest monthly average being 31%.  August 19 & 20, 2020, SOD memos were reviewed that documented the issues with staffing and the steps SOD is taking to remediate the issues.

> **provides for effective command-level accountability,
> and ensures force is used in strict compliance with
> applicable law, best practices, and this Agreement. To
> achieve these outcomes, APD shall implement the
> requirements set out below."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.78 Assessing Compliance with Paragraph 91:  Composition of Specialized Tactical Units

Paragraph 91 stipulates:

> **"APD's specialized tactical units shall be comprised of
> law enforcement officers who are selected, trained,
> and equipped to respond as a coordinated team to
> resolve critical incidents that exceed the capabilities
> of first responders or investigative units. The
> specialized tactical units shall consist of SWAT,
> Canine, and Bomb Squad/EOD."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.79 Assessing Compliance with Paragraph 92:  Training of Specialized Tactical Units

Paragraph 92 stipulates:

> **"APD shall ensure that specialized tactical units are
> sufficiently trained to complete the following basic
> operational functions: Command and Control;
> Containment; and Entry, Apprehension, and Rescue."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

174

### 4.7.80 Assessing Compliance with Paragraph 93:  Tactical Unit Missions and Policies

Paragraph 93 stipulates:

> **"Each specialized tactical unit shall have clearly defined missions and duties. Each specialized tactical unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

**Results**

Primary:         **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.81 Assessing Compliance with Paragraph 94:  Tactical Units Policy and Procedure

Paragraph 94 stipulates:

**"APD policies and procedures on specialized tactical units shall include the following topics:**

> **a) Team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility;**
> **b) Coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed;**
> **c) Personnel selection and retention criteria and mandated physical and tactical competency of team members, team leaders, and unit commanders;**
> **d) Training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training;**
> **e) Equipment appropriation, maintenance, care, and inventory;**
> **f) Activation and deployment protocols, including when to notify and request additional services;**
> **g) Conducting threat assessments to determine the appropriate responses and necessary resources;**
> **h) Command and control issues, including a clearly defined command structure; and**

**i) Documented after-action reviews and reports.”**

## Results

Primary:　　　**In Compliance**
Secondary:　　**In Compliance**
Operational:　**In Compliance**

## 4.7.82 Assessing Compliance with Paragraph 95:  Annual Review of Tactical Policies

> **“The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually, and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement.”**

## Results

Primary:　　　**In Compliance**
Secondary:　　**In Compliance**
Operational:　**In Compliance**

## 4.7.83 Assessing Compliance with Paragraph 96:  Documentation of Tactical Activities

Paragraph 96 stipulates:

> **“In addition to Use of Force Reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations. After-action reports shall address any areas of concern related to policy, training, equipment, or tactics.”**

## Results

Primary:　　　**In Compliance**
Secondary:　　**In Compliance**
Operational:　**In Compliance**

## 4.7.84 Assessing Compliance with Paragraph 97:  Tactical Mission Briefings

Paragraph 97 stipulates:

> **"APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment. APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations. All specialized tactical team members should have an understanding of operational planning."**

## Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

## 4.7.85 Assessing Compliance with Paragraph 98:  Tactical Uniforms

Paragraph 98 stipulates:

> **"All specialized tactical units shall wear uniforms that clearly identify them as law enforcement officers."**

## Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **In Compliance**

## 4.7.86 Assessing Compliance with Paragraph 99:  Force Review Board Assessments

Paragraph 99 stipulates:

> **"All specialized tactical unit deployments shall be reviewed by the Force Review Board in order to analyze and critique specialized response protocols and identify any policy, training, equipment, or tactical concerns raised by the action. The Force Review Board shall identify areas of concern or particular successes and implement the appropriate response, including modifications to policy, training, equipment, or tactics."**

## Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:    **Not In Compliance** (see recommendations for Paragraph 78, above)

## 4.7.87 Assessing Compliance with Paragraph 100: Eligibility Requirements for

177

**Tactical Teams**

Paragraph 100 stipulates:

> **"APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.88 Assessing Compliance with Paragraph 101: Tactical Team Training

Paragraph 101 stipulates:

> **"APD shall train specialized tactical units conducting barricaded gunman operations on competencies and procedures that include: threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

## 4.7.89 Assessing Compliance with Paragraph 102:  K-9 Post Deployment Reviews

Paragraph 102 stipulates:

> **"APD shall continue to require the Canine Unit to complete thorough post- deployment reviews of all canine deployments."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

178

### 4.7.90 Assessing Compliance with Paragraph 103:  Tracking K-9 Deployments

Paragraph 103 stipulates:

> **"APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.91 Assessing Compliance with Paragraph 104:  Tracking K-9 Bite Ratios

Paragraph 104 stipulates:

> **"APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold and require interventions as appropriate. Canine data and analysis shall be included in APD Use of Force Annual Report."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.92 Assessing Compliance with Paragraph 105: Analyzing Tactical Deployments

Paragraph 105 stipulates:

> **"APD agrees to track and analyze the number of specialized tactical unit deployments. The analysis shall include the reason for each tactical deployment and the result of each deployment, to include: (a) the location; (b) the number of arrests; (c) whether a forcible entry was required; (d) whether a weapon was discharged by a specialized tactical unit member; (e) whether a person or domestic animal was injured or**

179

killed; and (f) the type of tactical equipment deployed.
This data analysis shall be entered into the Early
Intervention System and included in APD's annual
reports."

**Results**

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

**4.7.93 – 4.7.96 Assessing Compliance with Paragraphs 106-109:
Special Unit Policies, and accompanying paragraphs focused on the
Special Investigation Division.**

Paragraphs 106 – 109 of the CASA address requirements that APD must meet
related to management and supervision of functions inside the Special
Investigation Division (SID) as follow:

Paragraph 106: Specialized Unit Policies;
Paragraph 107: High Risk Situation Protocols;
Paragraph 108: Inspection of Specialized Units; and
Paragraph 109: Tracking Specialized Unit Responses.

Generally, CASA paragraphs centered on SID are designed to help the agency create
an administrative foundation that ensures investigative activities are organized and
documented in a manner that supports wider changes in the department.  While we
continue to see areas for improvement, the administrative underpinnings were
sustained throughout the IMR-12 reporting period.  APD would be wise to examine all
investigative divisions to ensure they too are properly conditioned to support wider
reform efforts, and not become complacent with SID's compliance standing.  With
operational compliance determinations related to force reporting and investigations,
every corner of the organization will play a role in creating a successful outcome.  As
investigative roles have evolved, and policies have been cast and recast over the past
several years, APD should examine its entire investigative apparatus to protect against
activities that may negatively influence CASA compliance elsewhere.

During our June 2020 virtual site visit we met with the SID Commander responsible for
the tasks associated with CASA compliance.  Like past visits, the Commander came
prepared to discuss SID compliance and was respectful of the processes the CASA has
influenced APD to adopt.  Following the meeting we requested and were provided with
data to review that would demonstrate APD's compliance status with Paragraphs 106-
109.

During the IMR-11 reporting period, while conducting an ECW case review, we noted a
troublesome instance in which APD investigative personnel used and then self-
investigated a use of force during a multi-jurisdictional crime suppression detail.  The

incident had at least one unreported use of force and had tactical and safety issues we felt were important enough to immediately bring to APD's attention.  The ECW use was found to be in compliance but reporting and investigation failures were obvious.[120] Following our notification of the case, APD opened an internal affairs investigation that was conducted by IAFD.  While we documented our assessment of IAFD's investigation earlier in this report, it is worth repeating that we saw the investigation as perfunctory and deficient on many levels.[121]  Despite the deficiencies, IAFD still identified nine (9) failures of a supervising detective that was on the scene of the use of force.  As we called out in IMR-11, that event is an important exemplar for APD to study as it implicated the CASA across several commands.  We discussed the case with the SID Commander who indicated that when that internal affairs investigation was being resolved he was only responsible for assessing the appropriate discipline for SID personnel that were on scene.  Notwithstanding the potential disparity that can occur by multiple commanders assessing discipline for the same internal affairs case, we reiterate that the SID Commander must be diligent in the oversight of use of force reporting and investigations, since that will be critical to organization-wide success.

We have noted on several occasions this reporting period that IAFD's investigations of current cases have not met their long-established standards.  This is a critical issue, and one that must be addressed immediately by APD.  We hypothesize that past performance was affected by the fact that all cases previously investigated were well beyond the timeline allowing the effectuation of discipline.  Now that IAFD's workload consists mainly of cases not time-restricted regarding discipline, quality seems to have begun to suffer significantly.   This is a clear and present danger to compliance statuses across the use-of-force investigative process.

The following represents our findings related to Paragraphs 106-109.

The monitoring team was provided documentation to demonstrate that the business processes that helped establish Operational Compliance continue to exist.  Specifically, we reviewed the following documentation taken from this monitoring period:

1.  SID SharePoint Records;
2.  SID Unit Handbooks;
3.  SID Training Records;
4.  SID Inspection Forms;
5.  Operational Plans / After Action Reports;
6.  Internal Memorandums and Department Circulars for Transfers, and Transfer In and Out Forms; and
7.  Risk Assessment Matrix (RAM) forms and Ledgers, and SOD Audit Memorandums

---

[120] The monitoring team noted its concerns within our ECW case reviews for Paragraphs 24-31 during IMR-11 and in this report.

[121] On June 9th, 2020, during our virtual site visit, members of the monitoring team provided extensive feedback to the commanders of IAFD and IAPS, outlining many deficiencies with the investigation and disciplinary analysis.

SID consults with SOD for specific types of search warrants and is required to fill out a Risk Assessment Matrix (RAM)[122] to determine if they are required to call out SOD. During the IMR-10 reporting period, in its normal course of business SOD audited the RAM records for SID and found they assembled the correct documentation for one particular case, but mis-scored the event.  We noted that APD unearthed an important issue that required a resolution, since the SID Commander disagreed with SOD's opinion of the score.  The monitoring team recognized this interaction as healthy but were unclear how the issue is resolved when two commands disagree over the finding of a RAM audit.  SOD and SID worked together and developed protocols to reconcile this type of event should it occur in the future and established a "RAM Audit Remediation Process".  The establishment of this protocol was a good example of how these two units worked together to meet their CASA-related responsibilities.  In our review of documentation for IMR-12 we did not encounter an instance where the two commands were required to use their new process to remediate disagreements with RAM Audit results.

SID previously developed and implemented unit-level handbooks that set forth the unique standards, missions, and duties for each of its subordinate units which have been updated and standardized in format across all SID units.  The handbooks from each unit serve several purposes, including SID incorporating and reinforcing APD's use of force policies, and including the provisions of the CASA.  The monitoring team was provided course of business documentation that allowed us to track an initial Department Circular announcing an opening in SID, through to an officer's assignment and initial training.  We specifically looked at records of five officers that were transferred into SID, and three officers that transferred out of SID during this reporting period.  SID created a "SID Transfer In and Transfer Out" form, which was in direct response to issues they self-identified related to CASA compliance.  SID was encountering difficulty tracking the retrieval of property from personnel that transferred out of SID, and their new report was designed to alleviate the problem.  Like the IMR-11 reporting period, we reviewed "Transfer In and Out Forms" that were completed and were able to cross reference those forms against the same SID personnel who were transferred into or out of the Division during this reporting period.

SID previously implemented a procedure in which they self-audit SharePoint records to ensure that proper information is being captured.  As we noted in IMR-11, we reviewed an October 29, 2019 "SharePoint Audit" memorandum prepared by the SID Commander that we felt created good internal oversight.  For IMR-12 we were not provided with a similar internal audit of the SharePoint Records, and recommend SID continue the practice they established in the last reporting period.  The monitoring team reviewed thirty-one SharePoint records between February 1, 2019, and July 31, 2019, and found they contained the required information.

---

[122] There are pre-set and scored categories APD units must consider when filling out a RAM, and a score of 25 or more requires a SOD call out.  Units are also required to append proofs that they made inquiries for specific risk categories (i.e., an assessment as to whether the suspect has a violent history requires criminal histories to be attached).

The monitoring team reviewed SID RAM records for four separate and distinct cases that occurred during this reporting period, and SOD memorandums for RAM audits they conducted of those cases.  SOD RAM audit reports continue to be routine, and we were able to review those audits against the records SID provided.  It is clear that APD implementing these audits is valuable for long term sustainability and helps ensure that problems can be quickly self-identified.  This type of internal oversight and response between SID and SOD is indicative of a system that has taken hold and can be relied upon in the future.  SOD RAM Audits summarizes an event and includes the documentation that was reviewed by the auditor, provides audit findings, and also notes areas for improvement.

We identified one case with contradictory information (IMR-12-31).  In the Pre-Operational Plan under the section "Other Considerations" the detective noted "Consider all subjects to be armed" and "High drug trafficking area", but when cross referenced against the RAM we observed that under "Location Facts" the detective scored the search warrant as a "0" for the question "Verified firearms at location" and "0" for "Drug Manufacturing location/large scale narcotics distribution".  Likewise, under the heading "Target Subjects" the detective scored the search warrant a "0" for "Subject of warrant is known and verified to carry firearms".  If the score associated with any one of these criteria was applied, it would have required an SOD activation to execute the search warrant.  A comprehensive assessment was conducted of the case during a SOD RAM Audit and the case was determined to be properly scored, but these seemingly contradictory statements were not discussed in the RAM Audit Memo, dated March 9, 2020.  In the future, we recommend APD reconcile these types of statements, as we saw during the operation there was an accidental discharge of a weapon by a detective during the entry for the execution of a search warrant.  IAFD responded but we saw no evidence of a meaningful review of the event at the SID level for lessons learned.   We note this was "only" one case; however, given the critical nature of these high-risk events, APD should ensure the conflicts observed here are trained out of their SOD/SID processes.  Further, we remind APD that these critical-task events need heightened oversight and review.

During the past several reporting periods we commented that SID Operational Plans and After-Action Reports need improvement.  When we discussed this with the SID Commander, he acknowledged the Division can improve in its documentation in these areas, but also noted there are instances, due the nature of an emerging investigative opportunity, where lengthy Pre-Operational Plans may not be feasible.  For instance, a detective may be assigned a "surveillance" role for an operation, and to be more prescriptive before the operation may not be possible because detective roles routinely change because of constantly evolving and uncontrollable factors on the street.

For IMR-12 we reviewed forty-six Operational Plans and After-Action Reports.  The documentation we were provided was better than past reporting periods; however, records we reviewed still contained scarce information, in particular with the After-Action

Reports, which are a brief check list and narrative section.[123]  In Pre-Operation plans, under the section "Additional Information" we commonly saw "To be discussed during briefing" and "TBD" which could leave open the possibility for gaps of information or disagreements of expectations following an investigation.[124]  We continue to see this as an area of improvement and again encourage SID to treat Operational Plans and After-Action Reviews as essential tools for compliance and safety.  We strongly suggest SID revise process and product to address the shortfalls noticed above.  During the IMR-13 reporting period we will revisit these issues.

SID has shown consistency through several reporting periods regarding their ability to adhere to their CASA requirements with Paragraphs 106-109.  As noted earlier, with Operational Compliance determinations related to uses of force beginning to occur, APD should not lose sight of the relevance SID and other investigative Divisions have toward those efforts.  Therefore, as APD conducts their own internal reviews and audits of cases, all investigative units should be considered since their supervisors may have less repetitions and experience classifying and investigating uses of force.  We suggest this to enable APD to intercede and correct areas of the organization that may not have had routine interaction with the monitoring process.  While these shortcomings are not reason for non-compliance findings, they should be issues of concern for APD, and assessment and remediation processes are in order.  We will continue to closely monitor these issues.

Based on our review of documentation we determined that Operational Compliance should be maintained by SID for paragraphs 106-109 for this reporting period.

### 4.7.93 Assessing Compliance with Paragraph 106:  Specialized Unit Policies

Paragraph 106 stipulates:

> **"Each specialized investigative unit shall have a clearly defined mission and duties. Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

---

[123] While the narrative section could be used to document a wide range of important information, records we reviewed were commonly as brief as a few words or a couple of brief hand-written sentences. Presumably, more information is contained in investigative reports, but this leaves open the possibility that gaps in information can occur.

[124] In fairness, the questions relate to "Bust Signal", "Danger Signal" and "Debriefing Location" which are likely left ambiguous for the safety of future operations in the event this documentation is presented in a discovery request.  If SID personnel react to a situation in which the safety of an officer is in question, and there is a related use of force, we call this out to ensure the information can be provided elsewhere, when necessary, to assess the actions and reactions of detectives during an operation.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.94 Compliance with Paragraph 107:  High Risk Situation Protocols

Paragraph 107 stipulates:

> **"APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required. APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response. The protocols shall include communicating high-risk situations and threats promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.95 Compliance with Paragraph 108:  Inspection of Specialized Units

Paragraph 108 stipulates:

> **"Within three months of the Operational Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training. APD shall conduct re-inspections on at least an annual basis."**

**Methodology:**

The monitoring team reviewed and examined the data related to paragraph 108 for this reporting period (February 1, 2020 thru July 31, 2020). The monitoring team conducted the site visit via a virtual platform from June 8th thru June 12th, 2020, due to the circumstances created by the COVID-19 Pandemic.

The monitoring team requested and received SID Inspection Forms for this reporting period. The forms clearly document all equipment to include weapons and vehicle

assigned to SID personnel and whether the condition of the equipment inspected is in satisfactory condition or in unsatisfactory condition. The monitoring team's review of all personnel assigned to SID revealed all equipment to be in satisfactory condition. Unlike in other reporting periods, SID conducted monthly inspections, and records their findings on monthly reports.  As requested, SID submitted these reports to the monitoring team. An Interoffice Memorandum completed during normal course of business for this reporting period (SID's Yearly Inspection) was also submitted to the monitoring team for review. It stated, in part, that no personnel were involved in issues of concern. The Memorandum, completed during the normal course of daily business, stated in part that all sworn personnel were in compliance with the requirements of this agreement.  These self-assessments are critical and will enable APD to continue high-performance in these areas once the monitoring team ends it process.

During this reporting period, due to the fact that it was conducted via a virtual platform, the monitoring team was supplied with weapon inventory photos of each individual weapon for inspection of all weapons stored in the SID facility to ensure the documentation supplied to the monitoring team corresponded with the items kept in their storage safe. All items were properly labeled and accounted for.

The monitoring of these inspections is set to continue on at least an annual basis and as previously stated in this report on a monthly basis as well.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.96 Assessing Compliance with Paragraph 109:  Tracking Specialized Unit Responses

Paragraph 109 stipulates:

> **"APD agrees to track and analyze the number of specialized investigative unit responses. The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include: (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative unit member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

**Results**

      Primary:      **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

Monitor's Note:  While SID operations are in compliance this reporting period, we make the following suggestions designed to address pending issues that may result in compliance problems:

4.7.96a:  SID should continue to monitor the adoption of use of force policies and ensure that they properly operationalize those policies when a member of their Division uses any type of force.

4.7.96b: APD should conduct independent audits of arrests and Level 1 uses of force reported by members of SID to ensure they are properly classified.

4.7.96c: SID should review the quality of Operational Plans and After-Action Reports to ensure they are completed properly and are used as a tool for safety and compliance.

4.7.96d: SID and SOD should continue to work together to ensure that RAM records are accurate, and that SID properly uses SOD for search warrants.

### 4.7.97 Assessing Compliance with Paragraph 110: Individuals in Crisis and Related Issues

Paragraph 110 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below."**

This overarching paragraph encompasses the entire Crisis Intervention section of the CASA. As such, this paragraph will not be in compliance until such time that other related required paragraphs are found to be fully in compliance, including those addressing APD's use of force.

The monitoring team notes some troubling trends with regard to APD's use of force against people in crisis and people with mental illness during this reporting period; we are concerned about APD's progress toward the requirements of this paragraph, among others. In the Use of Force section of this report, we note our concerns more specifically; we are disheartened by what we have seen in this reporting period and believe APD has far to go in coming into compliance with Paragraph 110.

The monitoring team also notes the complexities that may arise from the City of Albuquerque's intention to create a separate, non-sworn department to respond to some of the calls for service that are currently addressed by APD, which was announced during this reporting period.[125] The new Albuquerque Community Safety Department (ACS) is in the early stages of its development.  The monitoring team will continue to assess closely its development and will assess how it may affect APD's levels of compliance throughout this section of the CASA, including our reviews of related policies.

The monitoring team assessed data from the relevant policies, which guide the requirements of the Crisis Intervention section of the CASA, as noted in the table below.

**Results**

While many reviews and revisions are underway, most of the policies in this suite are past-due for review and revision. One policy in this suite (addressing hostage situations, barricaded individuals, and tactical threat assessments) was not due for review during this reporting period. Without appropriately updated policies, training is not feasible, and operational compliance is not attainable. In the monitoring team's experience, mental health practices are in reasonably regular flux, as new practices are developed and old practices are revised, updated, and re-crafted – a notion that holds particularly true as the City plans for reform in this area. APD is in primary compliance for this paragraph—it has policies in place. Until these policies are updated regularly, we caution APD to be circumspect about re-training its officers regarding mental health practices, absent these updates. We do note, however, that the policy review processes as they are currently implemented allow for comment periods for stakeholders within APD as well as robust discussion with members of the MHRAC. The monitoring team notes that delays in policies generate delays in training, which lead to delays in adequate supervisory processes, which are the definition of non-compliance. See Table 4.7.97.

---

[125] 6/15/20, "Mayor Keller announces new Albuquerque Community Safety Department," KQRE may be accessed <u>here</u>.

**Table 4.7.97 Policy Renewal Status for
Behavioral Health Policies**

| Policy | Policy Name (Relevance to 110) |
|---|---|
| SOP 1-20 | BEHAVIORAL SCIENCES SECTION – Effective August 31, 2018; was due for Review August 31, 2019; we note that the version of this policy on the City's website is outdated. This policy underwent review during this reporting period, but reviews are revisions were still underway as of the close of this reporting period. |
| SOP 1-37 | CRISIS INTERVENTION SECTION AND PROGRAM--Effective April 4, 2019; due for Review April 4, 2020. This policy underwent review during this reporting period, with a draft prepared for the PPRB dated July 8, 2020, but reviews and revisions were still underway as of the close of this reporting period. |
| SOP 2-19 | RESPONSE TO BEHAVIORAL HEALTH ISSUES--Effective April 4, 2019; due for Review April 4, 2020.  This policy underwent review during this reporting period, with a draft prepared for the PPRB dated 7/8/20, but reviews and revisions were still underway as of the close of this reporting period. |

189

| | | |
|---|---|---|
| SOP 2-20 | | HOSTAGE SITUATIONS, BARRICADED INDIVIDUALS, AND TACTICAL THREAT ASSESSMENTS--Effective August 5, 2019; due for Review August 5, 2020. This policy was not due for review during this reporting period. |
| SOP 2-8 | | USE OF ON-BODY RECORDING DEVICES (contains reference to "subjects in crisis"): Effective June 2, 2017; due for Review June 2, 2018 and review is in process. We also note the version of this policy on the City's website is outdated. Since the passage of New Mexico Senate Bill 8126 APD has revised policy aligns with the language of the new law.  This occurred after the close of this reporting period. |

**Results**

Primary:    **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**[127]

**4.7.98 – 4.7.115 Assessing Compliance with Paragraphs 111- 128: Mental Health Response Issues.**

Paragraphs 111-128 address how APD is required to respond to calls involving mental health. In determining compliance outcomes for these paragraphs, the monitoring team reviewed normal course-of-business documentation related to mental health response practices by APD. We discuss our findings below.

---

[126] https://www.santafenewmexican.com/news/legislature/lujan-grisham-signs-bill-requiring-law-enforcement-to-wear-body-cameras/article_50625102-c142-11ea-bc99-8332b6be391e.html.

[127] We note that we observed some clearly disturbing interactions between APD officers and individuals obviously suffering from mental disabilities.  Those issues are dealt with in detail in prior sections of this report and will not be repeated here.

Data available to the monitoring team show regular monthly meetings of the community's Mental Health Response Advisory Committee (MHRAC), involving at times highly detailed discussions of problems, issues, needs, and solutions. MHRAC continues to be one of the success stories in APD's community engagement processes. MHRAC's reports, recommendations, communications, and assessment processes during this reporting period continue to be a source of valuable insight for APD's mental health, crisis intervention, and homelessness operational strategies. A broad spectrum of community mental health leaders, APD command staff, APD Crisis Intervention Unit members, APD's Crisis Outreach and Support Team members (COAST), and mental health professionals attend and participate in MHRAC meetings. Our reviews of MHRAC's agendas and meeting minutes indicate broad-based input from community mental health experts, advocates, individuals with lived experience, and providers.

In assessing APD's compliance with this paragraph, we reviewed APD processes designed to:

- Structure and improve mental health processes in the community;
- Foster close coordination between APD and mental health leaders; and
- Create meaningful, flexible, and effective mental health services throughout the communities served by the APD.

We note that APD has met, and in many cases far exceeded, the requirements of the CASA related to mental health response planning, crisis intervention, and service delivery. Our review indicates that APD crisis outreach services personnel have worked diligently with the advisory committee to assess, improve, and serve the target communities. We also note, however, that while APD's crisis intervention system has produced work that consistently demonstrates creativity and community responsiveness, the same is not true of the Field Services Bureau, based on our review of incidents during this reporting period. The monitoring team will continue to explore those disconnects in future reports.

### 4.7.98 Assessing Compliance with Paragraph 111: Mental Health Response Advisory Committee

Paragraph 111 stipulates:

> **"Within six months of the Operational Date, APD and the City shall establish a Mental Health Response Advisory Committee (Advisory Committee) with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods**

**regarding police contact with individuals with mental illness."**

## Methodology

In assessing compliance with this paragraph, the monitoring team reviewed the following documentation:

- MHRAC's reports, recommendations, communications, and processes during this reporting period;
- Meeting agendas and minutes for MHRAC meetings;
- Meeting minutes for subcommittee meetings;
- Various communications regarding policy reviews between APD and MHRAC.

The monitor remains encouraged by the robust membership of MHRAC and substantial number of new participants in MHRAC meetings during this reporting period. Since the meetings are now taking place online via Zoom (due to the COVID Pandemic), participation has increased. The monitoring team observed the online MHRAC meetings in May, June, and July of 2020. We believe the MHRAC is on the right path to being sustainable, stable, and able to withstand changes in leadership, should they occur. The MHRAC continues to address emerging issues within sub-committees, which include the Training Subcommittee and the Information Sharing/Resources Subcommittee.

MHRAC meetings occurred regularly during this reporting period, but not monthly; due to COVID-19, the March and April in-person meetings were cancelled. Starting in May the MHRAC meetings have been held online via Zoom. The two MHRAC subcommittees met regularly during this reporting period, but a few were cancelled due to COVID-19 as well. Table 4.7.98a on the following page, briefly describes major topics covered during the MHRAC meetings and subcommittee meetings. In addition to the topics discussed during MHRAC meetings, a review of emails and other communications demonstrate that MHRAC members also addressed a variety of other issues during this reporting period, including reviews of policies 1-10 Peer Support Program and 1-81 Proactive Response Team.

## Table 4.7.98a Dates and Topics of IMR-12 Reporting Period MHRAC Meetings

| Reporting period month | Meeting date | Issues discussed |
|---|---|---|
| February 2020 | 2/18/20; in person | New shelter updates; APD updates on COAST and CIU; Mental Health Court discussion. |
| March 2020 | n/a | Meeting cancelled due to COVID-19. |
| April 2020 | n/a | Meeting cancelled due to COVID-19. |
| May  2020 | 5/19/20 Online via Zoom | New shelter update; Hospital updates; Extreme Risk Firearm Protection Orders; Criminal Justice Coordinating Council; APD updates on COAST and CIU. *IMT attended this meeting.* |
| June 2020 | 6/16/20 Online via Zoom | New shelter update; 2019 CIU annual report; APD updates on COAST and CIU. *IMT attended this meeting.* |
| July 2020 | 7/21/20 Online via Zoom | Albuquerque Community Safety Department Update; New shelter update; Intro to APD Policy Unit; Welfare Check program; APD updates on COAST and CIU. *IMT attended this meeting.* |

## Table 4.7.98b: MHRAC Subcommittee Meeting Dates and Topics

| Subcommittee | Issues discussed |
|---|---|
| ***Information Sharing & Resources:*** 3/10/20**;** 7/14/20 (via Zoom); 8/11/20 (via Zoom); 9/8/20 (via Zoom) | Review of MHRAC bylaws; Introduction to APD Policy and Procedures Section; Updates on 1-37 and 2-19; Proactive Response Team policy discussion; LEAD discussion; MOUs and the way forward discussion. |
| ***Training:*** 2/24/20; 4/27/20 (via Zoom); | CNT Training Collaboration and Coordination; LEAD; ECHO; CIU training; Updates to CIU Handbook. |

## Results

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational:  **In Compliance**

## 4.7.99 Assessing Compliance with Paragraph 112

Paragraph 112 stipulates:

> **"The Advisory Committee shall include representation from APD command staff, crisis intervention certified responders, Crisis Intervention Unit (CIU), Crisis Outreach and Support Team (COAST), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico**

**Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups."**

## Methodology

The monitoring team reviewed MHRAC's membership rosters, agendas, and meeting minutes (which include attendee names and affiliations) for monthly meetings that occurred during this reporting period. Members of the monitoring team attended the May, June, and July MHRAC meetings online via Zoom.

### Results

All specified groups named in this paragraph regularly participated in MHRAC meetings during this reporting period, and minutes reflected discussions of agenda items designed to facilitate the goals of MHRAC.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.100 Assessing Compliance with Paragraph 113

Paragraph 113 stipulates:

**"The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event."**

## Methodology

The monitoring team reviewed MHRAC's reports, recommendations, communications, and processes, and conducted interviews with specific members of the MHRAC. In addition, we reviewed MHRAC monthly meeting agendas and minutes, and MHRAC subcommittee meeting minutes, various email communications, and memos. Members of the monitoring team also attended three MHRAC meetings during this reporting period via Zoom.

**Results**

The MHRAC continued to provide guidance to the City and APD regarding developing and expanding the number of CIT-certified responders, as well as response strategies for interacting effectively with homeless individuals and people with mental illness. In particular, during this reporting period, members of the MHRAC introduced an important topic for discussion with APD and the City: responses to people with mental illness or people experiencing homelessness who have animals, which sometimes may not meet the legal requirements of a service animal, but may be considered to meet standards for emotional support animals. Acknowledging that this is a complex issue, the monitoring team looks forward to continued conversation and collaboration led by MHRAC.

During this reporting period, the MHRAC considered and provided feedback on APD's policies, responses to homelessness, and trends reflected in CIU data and analysis. During this reporting period, the MHRAC continued to engage in robust discussions with APD and other City entities regarding the creation of a new homeless shelter, encampments in Coronado Park, and the new Albuquerque Community Safety Department. The conversations around these issues were thoughtful and anchored in principles of collaboration and problem solving.

> Primary:       **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

**4.7.101 Assessing Compliance with Paragraph 114:**

Paragraph 114 stipulates:

> **"APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality."**

**Methodology**

The monitoring team reviewed all of MHRAC's reports, recommendations, communications, and processes during the reporting period, assessing these documents for compliance with Paragraph 114. The MOU between APD's CIU and the University of New Mexico Health Sciences Center/UNM Health Systems remains in place and has not been updated since the monitoring team's previous reviews (signed and dated 10/6/17). There has been new discussion, however, about information sharing with the Bernalillo County Criminal Justice Coordinating Council's Diversion and Re-entry Subcommittee. A draft MOU has been circulated and has been discussed by members of MHRAC during this reporting period. The monitoring team compliments this new level of coordination among City and County leaders. We will continue to observe the development of this partnership.

195

**Results**

APD's existing mental health training courses contain content regarding the MOU between APD and the University of New Mexico. The MHRAC and APD continue to have important discussions around protected health information and HIPAA concerns, and we note that as Albuquerque's new Department of Community Safety (ACS) continues to take shape. The monitoring team will monitor whether and how that necessitates changes to the MOU(s) or protocols with regard to sharing information collaboratively across stakeholders.

We also note a recurring issue during this reporting period regarding wait times for admissions at local hospitals. APD officers articulated concerns and complaints about wait times at local hospitals when they brought patients to emergency rooms as resolutions to calls for service, or during other interactions with people in crisis, or people with mental illness. We note that APD's CIU engaged in several meetings by phone or Zoom with hospitals in May and June to resolve these issues.  The monitoring team will assess the impact of continued conversations among stakeholders will achieve resolution and improve these important collaborations.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

**4.7.102 Assessing Compliance with Paragraph 115**

Paragraph 115 stipulates:

> **"Within nine months of the Operational Date, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also, within nine months of the Operational Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario-based training involving typical situations that occur when mental illness is a factor.**

**Methodology**

The monitoring team reviewed data provided to MHRAC by APD relating to provisions of Paragraph 115, including data assessments in the form of PowerPoint slides. We also reviewed MHRAC and subcommittee meeting agendas and minutes.

**Results**

APD continues to work with staff to produce meaningful data analyses of the data elements specified in paragraphs 129 and 137 and to think analytically about what those data reveal about operational decisions (i.e., deployment, staffing, etc.). APD presented these data to the MHRAC during the meeting on June 16, 2020. APD is still finalizing a partnership with UNM's Institute for Social Research to advance their data analysis efforts.

APD continues to provide all behavioral health training curricula (including updates and changes) to the MHRAC for review, and the feedback processes between the MHRAC and APD have been improving, particularly since the introduction of the MHRAC feedback map. The map assists in the flow of communication and timing of information, feedback, and reviews. For example, during this reporting period, the MHRAC was provided and considered the 40-hour APD Crisis Negotiation Team course, which included "Crisis Incident Communication" materials and "Stress and Stress Management" materials.

We note here that MHRAC voiced concerns about a course entitled "Interaction with Persons with Mental Illness" that had been reduced from 2 hours to 30 minutes (see Paragraph 119 for further details), which, while a concern for APD, also demonstrates that the review system is working in that MHRAC noted the change in curriculum and noted its concern.  We will follow up with APD on this issue during the next monitoring period.

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.103 Assessing Compliance with Paragraph 116

Paragraph 116 stipulates:

> **"The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services."**

**Methodology**

The monitoring team reviewed data provided to MHRAC by APD relating to enhancing coordination within and among MHRAC's service base.  This review included memos, emails, and MHRAC meeting minutes.

**Results**

The MHRAC continued its work to enhance coordination of services for chronically homeless individuals and individuals experiencing mental health crises, which has been challenging during the COVID Pandemic. APD and MHRAC regularly provided updated cards listing community resources to APD officers for them to provide to people with whom they interact while on patrol. CIU detectives, COAST members, and MCT members also regularly distribute the resource cards. The monitoring team's review shows a substantial and tangible degree of interaction and cooperation between local behavioral health systems and the APD on these issues, as well as tangible results in systems improvement recommendations. Further, during this reporting period, and because of the ease of accessibility of MHRAC meetings online via Zoom, many new community members began attending MHRAC meetings.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.104 Assessing Compliance with Paragraph 117

Paragraph 117 stipulates:

> **"Within 12 months of the Operational Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources."**

**Methodology**

The MHRAC produced its annual report during the last monitoring period and it has been available on the City's website since its posting on January 24, 2020. The report includes information about the topics MHRAC addressed during 2019. We expect the MHRAC to produce its 2020 annual report during the next monitoring period and the monitoring team will review it then.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.105 Assessing Compliance with Paragraph 118 Behavioral Health Training

Paragraph 118 stipulates:

> **"APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment."**

No evaluation methodology was developed for paragraph 118, as it is not a "requirement" for APD or City action, but simply states facts.

### 4.7.106 Assessing Compliance with Paragraph 119 Behavioral Health Training for all Cadets

Paragraph 119 stipulates:

> **"APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by July 15, 2016."**

**Methodology**

The monitoring team reviewed training records maintained by APD relating to basic behavioral health training, including pre-tests and post-tests of training participants and other documentation related to training activities.

APD continues to provide state-mandated basic behavioral health training to cadets in the academy, but during this reporting period we note that a previously 2-hour training session (typically offered during APD's Maintenance of Effort (MOE) training) had been reduced to a 30-minute training video distributed via PowerDMS. We echo the concerns raised by the MHRAC when they reviewed the training, entitled "Interaction with Persons with Mental Illness." We note here that this curriculum did not go through proper *MHRAC* review processes until *after* it was developed and distributed to officers via PowerDMS, nor did the Academy staff collaborate or consult with the Crisis Intervention Section on the creation of this curriculum.  Further, while not required, APD has long been able to submit proposed training to members of the monitoring team for commend and review before execution.  No such procedure was followed in the case of the MOE training offered by APD.

The 28-minute video, which features one Academy staff member and a few graphics, does not follow the state-developed agenda, which clearly requires the training to be 2 hours in length. While we understand that COVID-19 necessitates some training to move online, we do not understand why a 2-hour training session on a critical topic has been reduced to 30 minutes. This is another self-inflicted training gap by APD.  While we are unable to identify the source of this externally developed training, it is eerily

similar to other Counter-CASA training we have seen at APD in the past.  Where this training came from is uncertain, even among some "in-the-loop" personnel at APD. Whatever the source, it has resulted in a non-compliance finding for one of the best attributes of APD's CASA implementation processes and calls into direct question the ability of the Training Commander to execute the tasks required of that position.

We are inclined to be of the opinion that this is yet another Counter-CASA artifact, and until APD conducts internal inquiries to determine the source of this aberrant development, we consider it to be just that.  In any event, this development has removed this long-compliant paragraph from secondary and operational compliance. This creates compliance issues at both CIT and the training academy.  It behooves APD to answer the questions related to specifically who developed this training, who signed off on it at the training academy, and identify the rationale for these Counter-CASA actions.  At a minimum, this stealth assault on CIT should have been noted and corrected by the Academy commander.

APD continues to provide the 40-hour basic CIT training to all field officers as well, though the course delivery scheduled for May 2020 was cancelled due to COVID-19. The monitoring team has confirmed, through review of curricula, that the quality of 40-hour CIT training remains strong. CIT training uses hands-on, scenario- based learning and its use of talented actors, specifically trained to lead scenarios, continues to enhance the learning experience for participating officers, and to improve in-field performance.

**Results**

    Primary:      **In Compliance**
    Secondary:   **Not In Compliance**
    Operational: **Not In Compliance**

**Recommendation 4.7.106a:  APD should implement a complete inquiry into the rationale and modality changes resulting in this training gap.  Responsibilities and rationalities for the change need to be identified, as well as who was in the approval loops, that allowed a CASA-specific training program to be manipulated into non-compliance.**

**4.7.107 Assessing Compliance with Paragraph 120**

Paragraph 120 stipulates:

> **"The behavioral health and crisis intervention training provided to all officers will continue to address field assessment and identification, suicide intervention, crisis de-escalation, scenario-based exercises, and community mental health resources. APD training shall include interaction with individuals with a mental illness and coordination with advocacy groups that protect the rights of individuals with disabilities or**

> **those who are chronically homeless. Additionally, the behavioral health and crisis intervention training will provide clear guidance as to when an officer may detain an individual solely because of his or her crisis and refer them for further services when needed."**

## Methodology

The monitoring team reviewed APD's training curricula relating to behavioral health. Despite the monitoring team's significant concern raised in Paragraph 119 immediately above, APD continues to provide acceptable training that addresses field assessment and identification, suicide intervention, crisis de-escalation, community mental health participation, scenario-based exercises, and role-play exercises. All training, except for that noted in Paragraph 119 emphasizes the importance of community partnerships and appropriate referrals to services. APD also continues to update their behavioral health curricula appropriately, for example, by updating scenarios in which professional actors interact with training participants.

### Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.108 Assessing Compliance with Paragraph 121

Paragraph 121 stipulates:

> **"APD shall ensure that new tele-communicators receive 20 hours of behavioral health training. This training shall include: telephonic suicide intervention; crisis management and de-escalation; interactions with individuals with mental illness; descriptive information that should be gathered when tele-communicators suspect that a call involves someone with mental illness; the roles and functions of COAST, crisis intervention certified responders, and CIU; the types of calls that should be directed to particular officers or teams; and recording information in the dispatch database about calls in which mental illness may be a factor."**

## Methodology

The monitoring team reviewed APD's training records relating to basic behavioral health training for tele-communicators and noted that behavioral health training for tele-communicators took place on February 5-7 and June 24-26. During this training, 20 APD tele-communicators participated, with all 20 completing the training. During the

February training, a few public safety professionals from other agencies participated as well, allowing for robust class discussions.

**Results**

APD's 20 hours of behavioral health training for tele-communicators includes all topics noted in paragraph 121, as well as role-play scenarios drawn from actual 911 calls fielded by APD tele-communicator personnel.

> Primary:      **In Compliance**
> Secondary: **In Compliance**
> Operational: **In Compliance**

### 4.7.109 Assessing Compliance with Paragraph 122

Paragraph 122 stipulates:

> **"APD shall provide two hours of in-service training to all existing officers and tele-communicators on behavioral health-related topics biannually."**

The monitoring team reviewed APD's training records relating to basic behavioral health training for officers and tele-communicators and noted our concerns with a state-mandated 2-hour training session that was reduced to 30 minutes (see Paragraph 119).

**Results**

APD has lost compliance with the requirement of bi-annual training according to training records.  Until APD can validate how many officers received only the 30-minute training session, and we can calculate a compliance factor for this training, APD has lost compliance in this area. We are not aware of who approved the reduction.  There are a host of issues surrounding these issues. During this reporting period, APD's CIU conducted several training courses that meet these requirements, including ECIT refresher courses, which are 8 hours in length.

> Primary:      **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

**Recommendation 4.7.109a:  APD must review its training records to identify specifically who attended the truncated training sessions noted in section 4.7.108, above.  Those officers will need to be re-trained, using a CASA-compliant training processes.**

**Recommendation 4.7.109b:  Conduct a thorough internal investigation to identify who changes this training, why it was changed, and exactly what changes were made.**

**4.7.110 Assessing Compliance with Paragraph 123: Crisis Intervention Certified Responders and Crisis Intervention Unit**

Paragraph 123 stipulates:

> **"APD shall maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis. APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives housed at the Family Advocacy Center whose primary responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future. APD agrees to expand both the number of crisis intervention certified responders and CIU."**

**Methodology**

The monitoring team reviewed training and assignment records for CIU officers for the reporting period. According to APD records, 203 field officers are ECIT trained, making them "certified responders" per this paragraph. With very few exceptions, APD officers who become ECIT trained maintain their certification status by enrolling in recertification courses at appropriate times.

APD maintains a Crisis Intervention Unit staffed with detectives housed at the Family Advocacy Center. The number of detectives in the CIU is currently 13 (up from 12 in the first 3 months of this reporting period), meeting the recommended number of detectives noted in the "Albuquerque Police Department Comprehensive Staffing Assessment and Resources Study" conducted in 2015 by Alexander Weiss Consulting, which was 12. We note here, as we have elsewhere in this report, that staffing studies such as that conducted by Weiss Consulting have relatively short "half- lives," thus the reliability of those numbers tends to decrease as time passes.

During the last reporting period, APD continued its strides in work toward compliance with the requirements of this paragraph with regard to determining what "sufficient number" means to APD. APD's CIU has worked diligently on its ECIT workload analysis, and members of APD created an ECIT workload analysis and staffing model "to ensure a sufficient number of Enhanced Crisis Intervention Team (ECIT) officers city-wide." The model considers: number of behavioral health calls for service by shift and area command; the number of Field Services officers by shift and area command; the average length of a behavioral health call for service; the yearly shift bid; and the APD requirement for 70% minimum staffing (which considers vacation time, sick time, other circumstances that may affect staffing on any given day). APD data indicate that on average, ECIT trained officers respond to 75% of calls for service involving

behavioral health elements. The percentage of ECIT responses to these calls for service varies across shifts and area commands (ranging roughly between 66% and 84%).

While the model is certainly a work in progress and will likely be refined over time, as the CIU continues to revisit and recalculate it monthly, we are encouraged by this work. The CIU notes consistent improvement in response rates of ECIT officers responding to mental health-related calls for service. At this time, the monitoring team has no tangible information to indicate that the ECIT workload analysis and staffing model has been embraced by APD leadership and is actively being used to guide staffing decisions. We are concerned that a failure to be attentive to actual staffing needs may attenuate CIU's effectiveness in an area critical to the CASA.

**Results**

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not In Compliance**

***Recommendation for Paragraph 123:***

***4.7.110a: Implement the data-driven, methodologically appropriate workload, staffing planning and analysis protocol developed by CIU that ensures that reliable "staffing levels" for ECIT officers are regularly calculated, reported, set as staffing goals, and attained.***

**4.7.111 Assessing Compliance with Paragraph 124**

Paragraph 124 stipulates:

> **"The number of crisis intervention certified responders will be driven by the demand for crisis intervention services, with an initial goal of 40% of Field Services officers who volunteer to take on specialized crisis intervention duties in the field. Within one year of the Operational Date, APD shall reassess the number of crisis intervention certified responders, following the staffing assessment and resource study required by Paragraph 204 of this Agreement."**

**Methodology**

The monitoring team reviewed training records for the ECIT officers, who meet the definition of "field services officers who volunteer to take on specialized crisis intervention duties in the field," along with the ECIT workload analysis and staffing model (see paragraph 123). The APD's analysis indicates that currently 45 percent of Field Services officers who are ECIT trained respond to 75 percent of calls for service that have a behavioral health component.

**Results**

The current staffing levels of crisis intervention "certified responders" consistently met the 40 percent goal during this reporting period, varying from 49.6 to 52.1 percent. Table 4.7.111 below notes the percentages by month. Please see above comments related to paragraph 123 for further information about APD CIU's reassessment of the number of ECIT certified responders and their assessment of compliance with the 40 percent requirement.

See Table 4.7.111, below. The CIU held both Enhanced CIT courses as well as ECIT Refresher courses during this reporting period.

**Table 4.7.111 Staffing Level of Enhanced CIT- Certified Responders**

| Percentage of APD Officers who are Enhanced CIT Certified Responders | |
|---|---|
| February 2020 | 52.1% |
| March 2020 | 49.6% |
| April 2020 | 50.6% |
| May 2020 | 51.7% |
| June 2020 | 51.7% |
| July 2020 | 50.4% |

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.112 Assessing Compliance with Paragraph 125**

Paragraph 125 stipulates:

> **"During basic crisis intervention training for field officers provided to new and current officers, training facilitators shall recommend officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals with mental illness to serve as crisis intervention certified responders."**

The monitoring team reviewed recommendations obtained and assessed by training facilitators, along with recruiting emails to field services officers during this reporting period.

**Results**

The APD CIU instructors routinely identify and recommend field officers well suited for the Enhanced CIT (ECIT) course. Members of the CIU reach out to those officers via email and recommend that they enroll in an upcoming ECIT course.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

### 4.7.113 Assessing Compliance with Paragraph 126

Paragraph 126 stipulates:

> **"Within 18 months of the Operational Date, APD shall require crisis intervention certified responders and CIU to undergo at least eight hours of in-service crisis intervention training biannually."**

**Methodology**

The monitoring team reviewed training records for CIU and field services personnel as well as updates to the training curriculum.

**Results**

APD provided 8-hours of "re-certification" training to its certified responders via ECIT refresher training during this reporting period.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

### 4.7.114 Assessing Compliance with Paragraph 127

Paragraph 127 stipulates:

> **"Within 18 months of the Operational Date, APD will ensure that there is sufficient coverage of crisis intervention certified responders to maximize the availability of specialized responses to incidents and calls for service involving individuals in mental health crisis; and warrant service, tactical deployments, and welfare checks involving individuals with known mental illness."**

206

**Methodology**

During this reporting period, the APD CIU continued to analyze data designed to determine whether the initial goal of 40 percent is "sufficient coverage" for Albuquerque. Our related discussion in paragraphs 123 above, and our recommendation that APD "implement the data-driven, methodologically appropriate workload, staffing planning and analysis protocol developed by CIU that ensures that reliable 'staffing levels' for ECIT officers are regularly calculated, reported, set as staffing goals, and attained" have been well received by APD, and it is moving toward implementing these refinements.

**Results**

As noted above, APD's CIU has determined that 40% is a proportion they are comfortable with when they calculated their ECIT response rates to behavioral health calls for service. During this reporting period, the proportion of APD officers maintaining ECIT training certification was consistently above 40%, and in most months exceeded 50%.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.115 Assessing Compliance with Paragraph 128**

Paragraph 128 stipulates:

> **"APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so."**

**Methodology**

The monitoring team reviewed documentation, including email traffic among APD members, that indicates some confusion among Field Services Bureau (patrol) officers about the roles and responsibilities of various responders for crisis calls (i.e., when they should be called to the scene) – including CIT-trained officers (all APD officers), MCTs, ECIT-trained officers, and CIU detectives. An amended departmental Special Order was issued during this reporting period (SO 19-74 Amended, issued April 8, 2020) that clarified that MCTs "may respond at any point during a behavioral health call as a first responder or at the request of officers or a supervisor already on scene," but prior to that clarification, there was additional confusion about the role of the MCTs, one of APDs primary response mechanisms for calls for service involving people in crisis or people with mental illness.

**Results**

The monitoring team has some substantial concerns regarding whether or not the requirements of this paragraph are routinely met in the field, based on several outcomes during calls for service during this reporting period (see our comments regarding Use of Force during mental health crises section for further information). We suggest that APD assess current protocols and oversight process related to CIT and MCT responses viz a viz uses of force and surreptitious, unreported uses of force during responses to individuals in crisis. See for example paragraph 123, above. In addition to the problematic responses to individuals in crisis, we are also gravely concerned by the fact that the monitoring team was the only entity who noted these problematic behaviors. At least one of these incidents went completely through the APD review systems, including the Force Review Board un-noticed, and was only noted by the monitoring team. This is a critical oversight and APD should conduct a detailed failure analysis with accompanying recommendations for change to protocols, training, supervision and oversight. We consider this an urgent need and will request and review the results of this failure analysis during the next monitoring period IMR 13). Lamentably, we attribute many of these issues to the Counter-CASA effect we have identified long-ago within APD.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not In Compliance**

**Recommendation 4.7.115a:  Conduct a complete assessment of all CIT/CIU responses involving the officer identified in the events outlined above.**

**Recommendation 4.7.115b:  Conduct a random sample of all CIT/CIU responses to ensure that the issues identified above have not been replicated in other CIT/CIU responses by other officers.**

**Recommendation 4.7.115c:  Provide the monitor the results of the inquiry outlined above for inclusion in IMR-13.**

**4.7.116 – 4.7.124 Assessing Compliance with Paragraphs 129-137**

Monitoring team members reviewed (via reports) the APD's current activities related to provision of policing services to individuals with mental illness and individuals in behavioral crises (paragraphs 129 through 137). Our observations indicate that, overall, the behavioral health paragraphs of the CASA have received careful and meaningful attention during the reporting period.

As part of the monitoring process, the monitoring team:

> 1.  Reviewed minutes of MHRAC meetings, subcommittee meetings and observed the MHRAC meeting in November;

208

2.  Reviewed extant and proposed policies guiding APD's service delivery to individuals experiencing mental health crises;

3.  Assessed APD's service delivery mechanisms focused on the homeless populations of Albuquerque;

4.  Assessed APD procedures for connecting to support services people who are homeless and people with mental illnesses;

5.  Evaluated APD's interagency communications and cooperation practices regarding mental health services;

6. Assessed staffing at the Crisis Intervention Section;

7. Reviewed the interaction protocols and processes among COAST/CIU with individuals from community mental health resource providers;

8. Assessed APD's mental health data collection and analysis processes; and

9. Reviewed APD training curricula related to community mental health processes.

The data and processes we reviewed indicate that APD's outreach and support efforts to those in the communities served by CIT processes are resilient, effective, and problem-oriented. Data collection, analysis and reporting processes and protocols have been updated with improved accuracy and reliability, and training remains a strong point of this effort.

As we indicate in Paragraph 128, however, there are some substantial issues with some of APD's crisis response tactics.  While these instances are relatively rare, they are serious, and deeply non-compliant with the requirements of the CASA.  See paragraph 129, above, for more detail.  The reader should note that our random sample of COAST/CIU responses was just that, a sample.  As such, the lessons learned from that sample are more likely than not applicable to crisis response tactics as a whole.

We are reasonably sure, given our assessment methodologies, that we have not uncovered all of the problematic incidents related to CIT responses.  A thorough internal review at APD of recent CIT/CIU responses is essential.  Further, we have already identified officers who have been involved in these unwarranted events.  Those officers should be subjected to a 100 percent review of CIT/CIU responses in which they were involved in any way.  Salient information was provided to APD and city leadership shortly after it was uncovered by the monitoring team.  The CASA violations we noted

were not "errors."  They were deliberate (and surreptitious) violations of CASA requirements, policy and training.  More importantly we note, again, that it was the monitoring team who noticed and sounded the warning on these actions, not the APD.  Immediate, direct, and effective assessments are required by APD to determine the scope and nature of these deliberate counter-CASA actions.  Linked failures of supervisory, command, and executive oversight (including FRB failures) should be identified, catalogued, assessed, and ameliorated.

### 4.7.116 Assessing Compliance with Paragraph 129

Paragraph 129 stipulates:

> **"APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
> **a) date, shift, and area command of the incident;**
> **b) subject's age, race/ethnicity, and gender;**
> **c) whether the subject was armed and the type of weapon;**
> **d) whether the subject claims to be a U.S. military veteran;**
> **e) name and badge number of crisis intervention certified responder or CIU detective on the scene;**
> **f) whether a supervisor responded to the scene;**
> **g) techniques or equipment used;**
> **h) any injuries to officers, subjects, or others;**
> **i) disposition of the encounter (e.g., arrest, citation, referral); and**
> **j) a brief narrative of the event (if not included in any other document)."**

**Results**

APD continues to update its "CIU Data Book" entitled *Police Response to Behavioral Health Incidents in Albuquerque,* regularly, but it did not update it with 2020 data during this reporting period. The most recent version of the data analysis appears in the 2019 APD Crisis Intervention Annual Report, which is available on the City's website and reflects all of the elements required by this paragraph.
APD is still finalizing a partnership with UNM's Institute for Social Research to advance their data analysis efforts; after that relationship is finalized the monitoring team expects more frequently updated data analyses.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

### 4.7.117 Assessing Compliance with Paragraph 130

Paragraph 130 stipulates:

> **"APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis."**

**Results**

APD's behavioral health units continue to innovate and address the requirements of this paragraph, including utilizing actual encounters to inform training. APD has analyzed the most recent data available during this reporting period. This analysis is critically important to the agency's decision making. It is used to "develop new response strategies for repeat calls for service" and to "identify systemic issues that impede APD's ability to provide an appropriate response." In fact, the monitoring team had a number of conversations with CIU members after a recent APD officer-involved shooting that took the life of a person in mental health crisis.  We crafted a discussion to assess how training might improve. In March of 2020, members of the MCT crafted some training scenarios involving the clinicians on scene, which is helpful for officers who have not yet had much experience interacting with MCTs during calls for service.

    Primary:      **In Compliance**
    Secondary:   **In Compliance**
    Operational: **In Compliance**

### 4.7.118 Assessing Compliance with Paragraph 131

Paragraph 131 stipulates:

> **"Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services."**

**Results**

APD updated this policy (SOP 2-20) in August 2019 and issued the new version of this policy (Effective August 5, 2019; due for review August 5, 2020, after this reporting period ended). APD's efforts to identify and implement a collaborative approach to policy, training, and implementation around this important issue continue to evolve. During this reporting period, the monitoring team saw positive signs of increased collaboration across the department, including numerous emails between CIU and CNT illustrating collaborative approaches, including sharing information about specific interactions and outcomes as well as sharing CIT Worksheets.

In addition, the Special Operations Division, Tactical Section and the Compliance Bureau and the Crisis Intervention Section collaborated on a training curriculum addressing APD's "Barricaded Suicidal Individual Protocol," which details the instructional goal and learning objectives; the curriculum consists of a 15-20 minute video to be distributed via PowerDMS followed by a written exam that requires officers to articulate in writing the difference between disengagement and non-engagement, among other important concepts.   We do note however, that response protocols are not regularly updated, which means APD loses the ability to "learn" from others in the field, to adapt to and adopt new "best practices," and to peer-test current APD response modalities.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not In Compliance**

***Recommendation for Paragraph 131:***

***4.7.118a: Work with advisory committees to ensure the protocols are updated and that related policy and protocols are reflective of "best practices." Develop appropriate training strategies, deliver training, implement the policy, and evaluate results.***

***4.7.118b: APD command should require cooperative approaches between CIU, CNT and SOD, establishing timelines for assessments as to why inter-unit cooperation on the issue of barricaded suicidal individuals has lagged, and follow-up on findings and recommendations at regular intervals.***

***4.7.118c: APD executive leadership should pay particular attention to the results of the implementation of cooperative approaches between CIU, CNT and SOD. This project should be goal-driven, should include production of specifically articulated tangible objectives and measurable timelines to ensure progress is made.***

### 4.7.119 Assessing Compliance with Paragraph 132 Crisis Prevention

Paragraph 132 stipulates:

> **"APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers."**

### Results

Based on our review of program documentation, it is apparent from in-field reports, data analysis, and real-time response to identified issues that APD's COAST, and CIU routinely follow up with members of the community who would benefit from COAST and CIU services. During this reporting period, COAST members continued to use creativity and solid problem-solving approaches to address persistent issues, though during the height of the COVID Pandemic, COAST members were temporarily reassigned to the City's Department of Family and Community Services on March 23, 2020 to assist with COVID-19 placements. Under this new arrangement they continue to interact with people in need of services. As of the writing of this report, COAST members had not yet been formally returned to their duties at APD. During this reporting period, CIU, MCT, and COAST conducted numerous home visits and worked together to assist a resident in getting accepted to a treatment facility in Houston, TX that specializes in neurological disorders.  They also assisted a person in need to visit Joy Junction, a local homeless shelter, for rest, warmth, and food. COAST connected many individuals to community resources. Beyond that, COAST and CIU function as a referral and assistance mechanism for those in the community confronted by persistent mental health issues.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.120 Assessing Compliance with Paragraph 133

Paragraph 133 stipulates:

> **"COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at risk of experiencing a mental health crisis and assist with follow-up calls or visits."**

**Results**

Based on our review of program documentation, including weekly and monthly summaries of CIU activities, it is apparent from in-field reports, data analysis and real-time response to identified issues that APD's COAST and CIU routinely follow up with critical elements of the population who would benefit from COAST and CIU services. Some of the work done this reporting period by COAST and the MCTs is, quite simply, excellent. The number of MCTs available citywide was reduced during this reporting period, though, due to clinician staffing. The programs are becoming a further bulwark for those members of the Albuquerque community living with mental illness; however we caution APD to be cognizant of issues with staffing, as even the best of systems will eventually fail in the face of continual under-staffing.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.121 Assessing Compliance with Paragraph 134

Paragraph 134 stipulates:

> **"APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options."**

**Results**

Based on our review of program documentation, including in-field reports, data analysis and real-time response to identified issues, it is clear that APD's COAST and CIU routinely follow up with critical elements of the population who would benefit from COAST and CIU services. The weekly and monthly reports of COAST and CIU members indicate a wide variety of referrals, connections, and coordination with services and treatment options.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.122 Assessing Compliance with Paragraph 135

Paragraph 135 stipulates:

> **"APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement. Within three months of**

214

> **completing the staffing assessment and resource study required by Paragraph 204 of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less."**

## Results

APD provided the monitoring team with a detailed tracking report for all COAST members and detectives within the CIU. The number of COAST clinicians declined during this reporting period due to one retirement and one permanent reassignment. As of the end of this reporting period, there were only three clinicians. The Crisis Intervention Section have no plans to replace the two COAST members who left during this reporting period, due to the new and evolving Albuquerque Department of Community Safety (ACS).  The City envisions that ACS will become the agency responsible for non-sworn responses to community members in crisis or living with mental illness.

As of July 31, 2020, the number of CIU detectives was 13 (not including two sergeants and one lieutenant). The monitoring team also notes that having two sergeants in this unit continues to be working nicely in terms of supervision, division of labor, and morale.

We note parenthetically that the use of a data-driven, methodologically appropriate workload and staffing planning and analysis to ensure expansion (or contraction) of CIU staffing based on workload and other factors could positively affect the COAST and the MCTs. This would ensure reliable staffing levels for mental health professionals in COAST and in the MCTs are attained. At this point, the data exist to support this analysis, and such an analysis is something that APD should consider carefully.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.123 Assessing Compliance with Paragraph 136

Paragraph 136 stipulates:

> **"COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources**."

## Results

COAST and CIU have developed and continue to develop robust relationships with service providers throughout the city and interact with them regularly to discuss new

ideas and solutions. In fact, APD CIU members have been active in recruiting new members of MHRAC and encouraging new partners to attend MHRAC meetings, which serve as exercises in problem solving, brainstorming, and coordinating local services.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.124 Assessing Compliance with Paragraph 137

Paragraph 137 stipulates:

> **"APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
> **a) number of individuals in the COAST and CIU caseloads;**
> **b) number of individuals receiving crisis prevention services;**
> **c) date, shift, and area command of incidents or follow up encounters;**
> **d) subject's age, race/ethnicity, and gender;**
> **e) whether the subject claims to be a U.S. military veteran;**
> **f) techniques or equipment used;**
> **g) any injuries to officers, subjects, or others;**
> **h) disposition of the encounter (e.g., arrest, citation, referral); and**
> **i) a brief narrative of the event (if not included in any other document)."**

### Results

APD continues to update its "CIU Data Book" entitled *Police Response to Behavioral Health Incidents in Albuquerque* regularly, but it did not update it with 2020 data during this reporting period. The most recent version "Fall 2019" of the data analysis appears in the 2019 APD Crisis Intervention Annual Report, which is available on the City's website.  This document reflects all of the elements required by this paragraph. APD is finalizing a partnership with UNM's Institute for Social Research to advance their data analysis efforts.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.125 Assessing Compliance with Paragraph 139[128]

Paragraph 139 stipulates that:

> **"APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices. APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically."**

APD continues to produce effective policy and procedures that are compliant with the CASA.  The monitoring team continue to be intensively and extensively involved with policy development and review at APD and continue to make recommendations for improvement in the process and product.  All CASA-related policies are reviewed and approved by the monitor prior to publication and training by APD.  These policy reviews and assessments are extremely time consuming; however, they result in more consistent, CASA-congruent policy work from APD and the City.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.126 Assessing Compliance with Paragraph 140

Paragraph 140 stipulates:

> **"APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference. APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format."**

**Results**

APD is in the process of updating and revising the indexing and numbering systems for its policy product.  These changes should facilitate APD's move to a more manageable use of force classification, review, assessment, and processing system.  APD remains in compliance with this paragraph based on past and current practices.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

---

[128] Paragraph 138 is judged to be prefatory to the following section on training, and as such established goals, but not quantifiable objectives.  These are dealt with in paragraphs 139-148.

217

### 4.7.127 Assessing Compliance with Paragraph 141

Paragraph 141 stipulates:

> **"Within three months of the Operational Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures."**

**Methodology**

APD remains in compliance with this paragraph based on internal practice.  Policies are provided to all sworn members of APD via departmental intra-net and are available to the public via the internet.  Critical policies are specifically trained at the Academy, and officers are tested for comprehension of those policies.

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.128 Assessing Compliance with Paragraph 142

Paragraph 142 stipulates:

> **"Within three months of the Operational Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities. The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014)."**

**Methodology**

APD's responses to the requirements of this paragraph were implemented early in the compliance process with creation of the PPRB.  Early in this project, the monitoring team, as part of their routine practice, observed PPRB meetings and found them to be comprised as required by the CASA. That composition continues to this day.

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

218

### 4.7.129 Assessing Compliance with Paragraph 143

Paragraph 143 stipulates:

> **"Within nine months of the Operational Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement. The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division."**

### Methodology

The monitor, over the past three years, has routinely assessed PPRB practice, and found it consistent with the CASA and established practices in the field.  Past practice at PPRB has been, for the most part, effective and not deleterious to decisions of the command staff at APD, the Parties and the monitor.

### Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.130 Assessing Compliance with Paragraph 144

Paragraph 144 stipulates:

> **"Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Operational Date. APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility. There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations."**

APD remains in compliance with this task based on past performance.

### Results

The technical requirements of this paragraph are routinely met by the official requirements of APD policy and are executed in practice.

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.131 Assessing Compliance with Paragraph 145

Paragraph 145 stipulates:

> **"The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law. The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews."**

**Methodology**

APD remains in compliance with this task based on past performance.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.132 Assessing Compliance with Paragraph 146

Paragraph 146 stipulates:

> **"APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure."**

**Methodology**

Over the last six years, members of the monitoring team have continually assessed the processes designed to implement this paragraph.  Three issues have proven consistently problematic with APD's execution of practices responsive to this paragraph.  First, we have noted consistently over the years, APD's apparent reluctance to execute appropriate discipline in the face of improper conduct in the field.  Secondly, we have noted high degrees of variance in corrective actions initiated by the organization when out of policy behavior occurs.  Similar unwarranted behaviors in the field have been addressed differently, with no clear explanations for the rationale behind these different approaches.

Finally, as we have noted frequently in past reports, many policy infractions have been addressed by methods outside "normal" policy channels.  The past use of "additional concerns memos" and the ubiquitous abuse of investigative timelines have crafted internal disciplinary systems that have proven virtually ineffective over the years.

220

Recently, APD has heeded long-term advice from the monitor, and taken steps to control the extra-policy effects of these processes.  APD has initiated a formal review of ACMs and has re-focused its attention on established disciplinary timelines. The monitoring team continues to devote a substantial amount of time advising APD during this process, and the end result is a department-wide internal assessment of those two practices by the Compliance and Oversight Division (COD).

The monitoring team has been in near-constant communication with COD concerning this assessment.  COD has continued a case-by-case review of past ACMs in a systematic and methodical way.  The monitoring team continues to work closely with COD to ensure a methodologically sound "review" of existing ACMs, and we anticipate that the work product produced by this review will produce a summary of the content of ACM files and detailed recommendations for a way forward that will ensure that relevant information is generated. This has allowed APD to work with the Parties to resolve any issues remaining with the now-discontinued ACM process. The final report on APD's work on this issue was issued in June of 2020.  As usual, COD's processes showed a clear understanding of the questions to be answered and assessment of the data that would allow those answers to be data-based and reliable. Their protocols resemble closely the monitor's protocols for data selection.

**Results**

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

**4.7.133 Assessing Compliance with Paragraph 147**

Paragraph 147 stipulates

> **"APD shall submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ for review and comment before publication and implementation. If the Monitor or DOJ objects to the proposed new or revised policy, procedure, manual, or other administrative order or directive, because it does not incorporate the requirements of this Agreement or is inconsistent with this Agreement or the law, the Monitor or DOJ shall note this objection in writing to all parties within 15 business days of the receipt of the policy, procedure, manual, or directive from APD. If neither the Monitor nor DOJ objects to the new or revised policy, procedure, manual, or directive, APD agrees to implement it within one month of it being provided to DOJ and the Monitor."**

**Methodology**

Members of the monitoring team routinely reviewed policies, procedures, administrative orders, and special orders for compliance with this paragraph.  APD's practice regarding special orders (temporary instructive mechanisms designed to revise workflow, review, and or decision-making processes at APD) are now routinely routed through the monitoring team for review and comment.

**Results**

APD routinely complies with the requirements of this paragraph.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

**4.7.134 Assessing Compliance with Paragraph 148**

Paragraph 148 stipulates:

> **"APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions. If, after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection. If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter. The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies. Factors to consider in making this determination include: 1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor. In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review. Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion."**

**Methodology**

The provisions of this paragraph seldom need to be invoked.  The Parties and the APOA have tended to be mutually supportive in getting policies moved through the approval process.  This speaks well for the City and APD, and their joint determination to do the right thing.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.135 Assessing Compliance with Paragraphs 149

Paragraph 149 stipulates:

> **"Within two months of the Operational Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement."**

Paragraph 149 identifies requirements for action by APD early on in the compliance process. This paragraph references the briefing of all officers on the requirements of the CASA, as well as the briefing and training of officers relating to their compliance methodology.

As in previous reporting periods, the monitoring team requested and received records for all new APD employees to ensure that they are briefed and presented with the terms of the CASA. The monitoring team reviewed records from the department's PowerDMS system to ensure all personnel signed off in acknowledgment that the material was reviewed and received. APD also included an Interoffice Memorandum dated August 2020 that indicated both cadet classes' acknowledgement of having received the CASA documentation. Included in these reports was Cadet Class #122 and Lateral Class #23. Records reviewed by the monitoring team show that the cadets and laterals were briefed and presented the terms of the Agreement, and all but three cadets of this group had completed the review/signature for this reporting period. The remainder of the trainees  met the criteria to ascertain compliance with the CASA requirements. The cadets who had not signed off at the time of this report will not affect the ninety-five (95)% threshold for compliance with this paragraph.

The City remains in compliance with this paragraph based on earlier performance.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.136 Assessing Compliance with Paragraph 150

Paragraph 150 stipulates:

> **"Within three months of issuing a policy or procedure
> pursuant to this Agreement, APD agrees to ensure that
> all relevant APD personnel have received and read their
> responsibilities pursuant to the policy or procedure,
> including the requirement that each officer or employee
> report violations of policy; that supervisors of all ranks
> shall be held accountable for identifying and
> responding to policy or procedure violations by
> personnel under their command; and that personnel
> will be held accountable for policy and procedure
> violations. APD agrees to document that each relevant
> APD officer or other employee has received and read
> the policy. Training beyond roll-call or similar training
> will be necessary for many new policies to ensure
> officers understand and can perform their duties
> pursuant to the policy."**

## Methodology

APD remains in compliance with this paragraph based on earlier performance. As stipulated in the requirements of this paragraph ("Training beyond roll-call or similar training…"), APD trained its personnel on Use of Force Tiers 2 and 3 and documented its results for this process in the last reporting period.  We have noted no departure from past compliance practice during our reviews of this process during this reporting period.

APD submitted documentation by means of PowerDMS-generated reports to the monitoring team.  This documentation indicated that all personnel signed off in acknowledgement of the training received during this reporting period. The monitoring team will continue to monitor new policies and changes to policy that are pending approval to ensure that the requirements of this paragraph are maintained.

### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.137 Assessing Compliance with Paragraph 151

Paragraph 151 stipulates:

> **"Unless otherwise noted, the training required under
> this Agreement shall be delivered within 18 months of
> the Operational Date, and annually thereafter. Within
> six months of the Operational Date, APD shall set out a
> schedule for delivering all training required by this
> Agreement."**

## Methodology

The City remains in compliance with this paragraph based on earlier performance and

224

maintains a current training schedule fulfilling the requirements of this paragraph. APD supplied the monitoring team with an updated 2020 Working Training Calendar. For this reporting period, numerous changes to the schedule have taken place and will continue to take place into the next reporting period due to the COVID Pandemic. In future reporting periods, the monitoring team will continue to monitor new policies, and changes to policy that are pending approval, to ensure that the requirements of this paragraph are maintained, and that appropriate training is delivered and followed. The academy supplied the monitoring team with documentation of the following training that was conducted during this reporting period,  and training that is scheduled for the continue into the next reporting period. Compliance for the below listed courses will be determined once all members have attended courses schedule for the next reporting period:

- Day and Night Low Light Firearms Qualification;
- COP/POP two-day training;
- Child Abuse Training Video (PDMS);
- Domestic Violence Training Video (PDMS);
- Ensuring Child Safety Training Video (PDMS);
- Interaction with Persons with Mental Illness (PDMS);
- Terry Pat Down Briefing Video (PDMS);
- Tourniquet and Trauma Kit Training (PDMS); and
- Weapons Modification Briefing (PDMS).

**Results**

     Primary:      **In Compliance**
     Secondary:  **In Compliance**
     Operational: **In Compliance**

## 4.7.138 Assessing Compliance with Paragraph 152

Paragraph 152 stipulates:

> **"APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty."**

## Methodology

The monitoring team requested from APD copies of COB documentation related to this paragraph. The monitoring team reviewed the Training History Reports for all the lateral hires to ensure they are certified law enforcement officers.   We also reviewed the class academy schedule to ensure all training required by the CASA was received prior to entry to duty. The monitoring team will continue to monitor the lateral hire program in future site visits.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.139 Assessing Compliance with Paragraph 153

Paragraph 153 stipulates:

> **"APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records. APD shall also maintain complete and accurate records of any audit, review, assessment, or evaluation of the sufficiency or effectiveness of its training programs. APD shall make these records available for inspection by the Monitor and DOJ."**

### Methodology

During this reporting period (February 1, 2020 thru July 31, 2020) the monitoring team's requests for, and subsequent review of, records responsive to Paragraph153 produce ample evidence that the requirements of the paragraph are being met by APD. The material reviewed for this reporting period included, but was not limited to:

- First Line Supervision Training;
- Behavioral Science training for supervisors;
- Behavioral Science training for Cadet Class;
- Use of Force Tier II; and
- Use of Force Tier III.

Based on our experience, APD continues to maintain compliance by making records available for inspection by the monitoring team during site visits.

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.140 Assessing Compliance with Paragraph 154

Paragraph 154 stipulates:

> **"APD shall ensure that changes in relevant case law**

**and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and pre- service training."**

## Methodology

No changes to relevant case law and statutes were noted during this reporting period (February 1, 2020 thru July 31, 2020.) Based on past performance by the Advanced Training Unit, APD remains in compliance.

## Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.141 – 4.7.147 Assessing Compliance with Paragraphs 155-161: Field Training and Evaluation Program

The monitoring team reviewed and examined the data required for APD to maintain compliance with paragraphs 155 through 161 for this reporting period (February 1, 2020 thru July 31, 2020), in the forms of policy, programs, and results. For this monitoring period (IMR-12), the monitoring team conducted the site visit via a virtual platform from June 8th thru June 12th, 2020, due to the circumstances created by the COVID Pandemic. APD remains in Operational Compliance with the paragraphs in the CASA that relate to the Field Training and Evaluation Program.

During the June 2020 virtual platform site visit, the monitoring team spoke with the APD Academy personnel responsible for maintaining the program development and implementation as per SOP 6-1 "Training Division." As in the previous reporting period, no known applicable changes to case law, core principles, or values had taken place, but, as in the previous reporting period, revisions to SOP 1-46 Field Training and Evaluation Program (FTEP) had been submitted and are still pending approval. The monitoring team has received a draft copy of submitted revisions to the Field Training and Evaluation Program. Those revisions remain under review in the chain of command and will be assessed for compliance by the monitoring team once they are finalized.

During this reporting period APD members from the FTEP attended a course hosted by the Institute of Police Technology and Management (IPTM) in Jacksonville Florida. IPTM teaches Law Enforcement Agencies around the country in various law enforcement areas. The course attended was "Managing the Patrol FTO program," and from that training, as well as their review of best practices around the country, APD determined that in the last two weeks of the FTEP the FTOs would wear a modified yet approved uniform with all mandatory equipment to distinguish themselves from the recruit. The theory behind the different uniform is that the general public tends to gravitate towards the senior officer, thus not allowing the junior officer (recruit) to be the

227

lead. The FTO would still be present continuing with his/her duties as an FTO and be available to address any issues as mandated by current approved policy. The APD will monitor the effectiveness of this change and submit documentation to the monitoring team in the next reporting period.

The FTEP requires that academy graduates receive sixteen (16) weeks of field training and that recruits not be released from the program without completing the sixteen-week program. During this period one academy graduate was not medically cleared to participate in the FTO program and is scheduled to complete the training during the next reporting period.

The monitoring team reviewed Special Orders for the FTO Classes to ensure compliance for this reporting period. They are as follows:

Field Service Bureau Special Orders

- 23st Lateral Class SO 20-39 Phase I, SO 20-44 Phase II;
- 121st Cadet Class SO 20-12, Phase I, SO 20-20,22 Phase II, SO 20-26, 27 Phase III, SO 20-33, 36, 38, 43 Final Phase; and
- 122nd Cadet Class SO 20-45 Phase I

These Field Services Bureau Special Orders maintain APD's 100% compliance with the program's requirement of sixteen weeks of field training and no early release from the program.

During this monitoring period, the FTO program has expanded significantly, largely due to the efforts the supervisor of the program has taken to reach compliance with the requirements of the CASA. The supervisor and the FTEP have maintained a close relationship with recent graduates from the program and have seen a high level of interest in these members becoming FTO's. This method and others recently implemented to encourage APD officers to become FTOs is evident by the number of FTO's currently in the program when compared to the numbers from previous IMRs.

The number of officers serving as FTOs for the FTO program during this monitoring period is 79 available FTOs, up from 50 during the last reporting period.

The monitoring team reviewed the vetting process for the applications and backgrounds of the twenty-nine new individuals for this reporting period. The monitoring team review of the documentation indicated that all requirements of the CASA were met. APD submits background checks and applications (on an on-going basis) to the monitoring team for review to ensure compliance.

During this reporting period the FTEP continued to maintain compliance in the following areas:

1) Recruits are trained in multiple Area Commands;
2) Recruits are trained in different shifts; and

228

      3) Recruits are introduced to different Field Training Officers.

As reflected in the supporting documentation (Special Orders), APD maintains compliance with these requirements.

Members of the monitoring team also requested COB documentation to ensure APD continues to afford recruits with:

- A mechanism for confidential feedback regarding quality of field training;
- Consistency between instructional processes developed in field training and at the training academy; and
- APD's consideration of feedback and what, if any, changes are made as a result of a given recruit.

Anonymous surveys conducted by the FTEP during this reporting period were reviewed by the monitoring team, as in previous reporting periods, to ensure compliance with the requirements of the CASA. The 121st Cadet Class and the 22nd Lateral Class continued to maintain a high degree of participation.

The APD Academy continues to monitor the surveys and submit course-of-business memoranda covering these areas. These surveys are reviewed by the monitoring team to ensure compliance with the CASA requirements. The surveys indicate that the academy training is consistent with the instruction received while enrolled in the FTEP. Any and all recommendations are carefully scrutinized by the FTEP and the academy staff to address any areas of concern outlined in surveys.

During this reporting period the hard work and dedication by the FTEP was recognized by a member of the DOJ working on this CASA. The DOJ member used APD's FTO program examples for another case the DOJ is working on. The monitoring team recognizes this hard work in the documentation received and reviewed and will continue to monitor the program in future visits.

### 4.7.141 Assessing Compliance with Paragraph 155

Paragraph 155 stipulates:

> **"APD shall supervise and manage its field-training program to ensure that new officers develop the necessary technical and practical skills required to use force in accordance with APD policy and applicable law. The field-training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community. Field-Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.142 Assessing Compliance with Paragraph 156

Paragraph 156 stipulates:

> **"APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field-training program early."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.143 Assessing Compliance with Paragraph 157

Paragraph 157 stipulates:

> **"APD shall revise the qualifications for Field Training Officers to require three (3) years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.144 Assessing Compliance with Paragraph 158

Paragraph 158 stipulates:

> **"New Field Training Officers and Area Sergeant Coordinators shall receive at least forty (40) hours of initial supervisory-level training and annual in-service training in the following areas: management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques. Field Training Officers and Area Sergeant Coordinators shall be required to**

230

> **maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de- escalation techniques; and effective problem solving. APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators."**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.145 Assessing Compliance with Paragraph 159

Paragraph 159 stipulates:

> **"Recruits in the field-training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers."**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.146 Assessing Compliance with Paragraph 160

Paragraph 160 stipulates:

> **"APD shall provide a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the field-training program. APD shall consider feedback and document its response, including the rationale behind any responsive action taken or decision to take no action."**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.147 Assessing Compliance with Paragraph 161

231

Paragraph 161 stipulates:

> **"The City shall provide APD with the necessary support and resources to designate a sufficient number of Field Training Officers to meet the requirements of this Agreement."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.148 Assessing Compliance with Paragraph 162

Paragraph 162 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system.  To achieve these outcomes, APD and the Civilian Police Oversight Agency shall implement the requirements below."**

This Paragraph is an introductory paragraph for IAPS (formerly IAPS -Misconduct Division) and CPOA-related CASA requirements.  As such it requires no direct evaluation but is subsumed by the IAPS and CPOA-related individual requirements below.

## 4.7.149 Assessing Compliance with Paragraph 163:  Duty to Report Misconduct

Paragraph 163 stipulates:

> **"APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs Division for review and investigation. Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Division. Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment.**

**Methodology**

Paragraph 163 of the CASA pertains to the duty of all APD officers and employees to report misconduct by APD officers and employees, and the duty of supervisors to document information regarding misconduct of subordinates and to report same to IA. It also requires failure to comply to be grounds for discipline.

During the monitoring period and the 12th site visit, members of the monitoring reviewed twelve (12) investigations completed by IAPS and eight (8) investigations completed by CPOA. The twelve  IAPS investigations are [IMR-12-33, IMR-12-34, IMR-12-35,  IMR-12-41, IMR-12-37, IMR-12-38, IMR-12-39, IMR-12-40, IMR-12-42, IMR-12-36, IMR-12-43, and IMR-12-44]. The eight CPOA investigations are [IMR-12-45, IMR-12-46, IMR-12-47, IMR-12-48, IMR-12-49, IMR-12-50, IMR-12-51, and IMR-12-52]. It should be noted that [IMR-12-54] was also selected for review, and it was found that the investigation had been transferred to IAPS and assigned [IMR-12-33], and thus was reviewed by the monitoring team as an IAPS case. We note that the investigation in [IMR-12-36] was completed during the IMR-11 period, and since the discipline in that case was directly related to [IMR-12-42], [IMR-12-36] was also reviewed in the IMR-12 period.

A non-concurrence letter was issued during this monitoring period [IMR-12-53]. The actual investigation in this matter was reviewed in IMR-11, and the resulting non-concurrence letter was reviewed during this reporting period to determine if a reasonable and understandable basis was articulated for differing with the investigative findings and recommendations of CPOA.

The monitoring team also reviewed APD regulations and had meetings with IAPS Commander and staff and the CPOA Director and staff.

**Results**

The findings related to Paragraph163 indicate the following CASA-related outcomes.

This monitoring period we found that 10 of the 12 IAPS Misconduct cases [IMR-12-34, IMR-12-35, IMR-12-41, IMR-12-36, IMR-12-38, IMR-12-39, IMR-12-40, IMR-12-42, IMR-12-37, and IMR-12-44] implicated the tasks of paragraph 163.  Given the different ways misconduct comes to the attention of a supervisor and considering the fact that reporting cases to IAPS is often times done in memorandum form, "immediately document and report" is interpreted in context of the case.  In all of the cases noted above we found the referral time to IAPS to be satisfactory, except [IMR-12-36] which we found to be inadequate within the context of the facts of the case that literally required "immediate action." This case is addressed in more detail in the Discipline and Transparency section of this report (paragraphs 201 and 202). Because we find that the supervisor in [IMR-12-36] took his role seriously regarding reviewing an internal complaint made by one officer against another, properly documented the matter and

233

referred it to IA (albeit in a lengthier timeline than the context required), and that the delay did not result in the imposition of discipline being time-barred.  APD maintains Operational Compliance with this paragraph.

The final IAPS investigations [IMR-12-33 and IMR-12-43] were referred to IAPS by CPOA and therefore did not implicate paragraph 163.

The monitor continues to see issues pertaining to the timeliness of referrals to IAPS regarding cases now being completed, that were originally referred to IAPS by CIRT. These timeliness of referral issues are linked to the Use of Force backlog reduction initiative, and an ongoing interpretation issue of when a referral to IAPS should be made during a Use of Force review (when the review is complete or when reasonable indications of misconduct first arise).

The backlog and interpretive issues arising out of Use of Force reviews are more fully discussed in paragraphs 60-77 of this IMR. We again note that CIRT has been replaced in the IA process by the Internal Affairs Force Division (IAFD). The above backlog issues arising out of the Use of Force reviews notwithstanding, based on our review of the random sample set forth above, we find operational compliance with paragraph 163. It is important that APD continues to emphasize and monitor closely the duty of supervisors to identify and timely report to IAPS instances of misconduct.

### Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.150 – 4.7.154 Assessing Compliance with Paragraphs 164-168: Public Information on Civilian Complaints

Paragraphs 164 through 168 of the CASA pertain to the informational program required of APD and CPOA to make the public aware of the procedures for making civilian complaints against APD personnel. These paragraphs also direct that APD and CPOA provide information, in Spanish and English, and in different informational forums, that increases the public's accessibility to complaint forms and facilitates the reporting of misconduct.  These paragraphs also require the acceptance of civilian complaints and require that officers identify themselves upon request.

In addition to meetings with IAPS and CPOA during the 12th site visit, members of the monitoring team continued to review the APD and CPOA websites for information regarding procedures to make civilian complaints.  Due to the "virtual" nature of the 12th site visit, the monitoring team was unable to make unscheduled visits to APD substations, and to City libraries and community centers for the purpose of determining whether informational brochures and Complaint and Commendation forms were available. In its past visits to APD, CPOA and City properties, the monitoring team

consistently found the informational brochures and Civilian and Commendation forms to be available, as well as visibly displayed for easy public access. Even though this aspect was non-observable in this site visit, due to the prior superlative performance with these public information requirements, full operational compliance has been maintained by APD, CPOA, and the City with Paragraphs 164 through 168 of the CASA.

The monitoring team continues to find the informational program to be effective. Information on complaint filing is available on the APD and CPOA websites, and in informational materials, brochures, and posters. This information and the actual complaint forms were available online (in English and Spanish) on both the APD and CPOA websites.  CPOA has implemented the use of a new brochure, which provides a tear-off of a postage pre-paid complaint and commendation form, thereby making it easier for the public to engage the agency. The information clearly explains the "mechanisms" for filing complaints and includes complaint and commendation forms that can be filed electronically or downloaded. Complaint forms are readily accessible in hard copy at APD, CPOA, City buildings, as well as from individual patrol vehicles. Like the website, information on the hard copy forms are in Spanish and English. The information does not discourage the filing of complaints and makes clear that complaints can be filed anonymously or by third parties.

Further, based on our review of a stratified random sample of IAPS and CPOA investigations, we found no instances of allegations of refusal to provide name and badge numbers when requested.

### 4.7.150 Assessing Compliance with Paragraph 164: Public Information on Civilian Complaints

Paragraph 164 stipulates:

> **"Within six months of the Operational Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints."**

**Results**

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.151 Assessing Compliance with Paragraph 165:  Availability of Complaint Forms

Paragraph 165 stipulates:

235

**"APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall, public libraries, community centers, and the office of the Civilian Police Oversight Agency. Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints.  Complaint forms, informational materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person.  Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.152 Assessing Compliance with Paragraph 166:  Public Information on Complaint Process

Paragraph 166 stipulates:

**"APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites.  The placard shall specify that complaints may be submitted anonymously or on behalf of another person.  APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles.  Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request.  If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint."**

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.153 Assessing Compliance with Paragraph 167:  Duty to Accept Citizen Complaints

Paragraph 167 stipulates:

> **"APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints**."

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.154 Assessing Compliance with Paragraph 168:  Multi-Lingual Complaint Forms

Paragraph 168 stipulates:

> **"Complaint forms and related informational materials shall be made available and posted in English and Spanish."**

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.155 – 4.7.168 Assessing Compliance with Paragraphs 169-182:  Training Regarding Complaint Intake

Paragraphs 169 through 182 of the CASA pertain to the steps necessary in the receipt, acceptance, and processing of complaints. These paragraphs require APD and CPOA to receive all complaints, regardless of whether they are made internally or externally, and regardless of whether they are made in a timely manner. They require an effective and uniform system that is allegation-based for classifying complaints, and internally referring and appropriately assigning complaints for investigation.

During the monitoring period and the 12th site visit, members of the monitoring team utilized the same methodology as prior periods, meeting  electronically with the IAPS Commander and members of his staff, and the CPOA Executive Director and members of his staff.  We reviewed complaint log-in and classification records, selected (by way of a stratified random sample) and reviewed 12 IAPS and 8 CPOA investigations completed during the monitoring period. The monitoring team also reviewed the APD and CPOA websites and CPOA Board minutes relative to approval of investigations.

The monitoring team continues to find full compliance in regard to paragraphs 169 through 182. Accordingly, the findings related to Paragraph 169 through 182 indicate the following outcomes, related to requirements of the CASA.

Based on our present reviews, and consistent with prior IMR findings, internal and civilian (external) complaints continue to be accepted, reviewed, classified and assigned for investigation according to CASA requirements and approved policy.

Regarding acceptance of complaints, in our review of the stratified random sample of investigations as well as IAPS and CPOA processes, we found no instances of a refusal or even a hesitation by APD or CPOA to accept a citizen's complaint. Further, we are not aware of any information received formally through our report review processes, or informally, through our contacts with *amici* and other interested persons, that suggest this is an issue. Indeed, in our stratified random sample we have noticed commendable officer action in which complaint information is actually volunteered to the individual who questioned the officer's action [IMR-12-45], and in which a civilian's request to speak to a supervisor is immediately honored, a complaint form is offered, and considerable time is taken to explain the reasons for police actions to the individual against whom police action is taken. [IMR-12-51].

It has been and continues to be a long-standing policy among APD personnel that refusing to accept a complaint, or the discouraging of a complaint, are grounds for discipline. Although timely complaints are encouraged, untimely complaints are accepted, as well as anonymous and third-party complaints. The monitoring team has also seen annual written requests from APD to relevant judicial officials requesting that APD be made aware of all allegations of officer misconduct made by judicial officials.

APD has developed, and continues to use, a centralized numbering and tracking system that assigns unique identification numbers to all received complaints. Complaints are received and classified according to allegations and not potential outcomes.

We found no instances of complaints being improperly classified. The tracking system is being used correctly, and appears to maintain accurate data, based on our comparisons with "known data." APD's Blue Team management software enables the tracking of allegations of misconduct by homeless or those who have a mental illness. Our reviews of the relevant log and investigations continue to show that complaints referred or made

to APD and IAPS, that are within the jurisdiction of the CPOA, are referred to CPOA within 3 business days.

In regard to the requirements to accept anonymous and third-party complaints per paragraph 172,  of the total investigations reviewed by the monitoring team this monitoring period, we found four in which APD personnel received a complaint from a third-party [IMR-12-33, IMR-12-42, IMR-12-48, and IMR-12-51].

[IMR-12-33] involved a complaint received from the Metropolitan Detention Center on behalf of a female inmate who complained that she had been improperly touched by an officer who had transported her to the Prisoner Transport Center. [IMR-12-42] involved notification from the Rio Rancho police of an arrest of an APD officer for domestic violence, [IMR-12-48] and [IMR-12-51] both involved a complaint from the spouse of an individual against whom police action was taken. APD and CPOA continue to demonstrate that they will accept all complaints, regardless of origin.

Of the total cases reviewed, similar to IMR-11, we found none during this IMR period that were initiated by an online anonymous complaint. Although this aspect was non-observable this monitoring period, based on past operational compliance, APD and CPOA continue to be in full compliance with paragraph 172.

Moreover, we continue to find no cases in which APD received a civilian complaint of misconduct and failed to timely inform supervisors or failed to timely refer a complaint to IAPS. Thus, we continue to find operational compliance with paragraphs 173 and 178.

Our stratified random found no instances in which a supervisor conducted an investigation of an incident in which the supervisor was involved as a participant or as a witness. Therefore, operational compliance has been reestablished by APD for paragraph 182.

We note that APD is in the process of revising SOP AO 3-41, Complaints Involving Department Policy or Personnel, which addresses the procedures for accepting, processing, and investigating allegations of employee misconduct. Notwithstanding the compliance of IAPS and CPOA relative to paragraphs 169-182, a properly revised AO 3-41 will enhance and facilitate the complaint intake and categorization process. The monitoring team would expect that the revised AO 3-41 be implemented no later than the expiration of IMR-13 review period. The monitoring team also signals that during the next IMR review period it will focus on the number and the criteria for selection of minor allegations that are referred to Area Commands for investigations.

### 4.7.155 Assessing Compliance with Paragraph 169:  Training on Complaint Intake

Paragraph 169 stipulates:

> **"Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake**."

**Results**

Primary:         **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.156 Assessing Compliance with Paragraph 170:  Complaint Receipt Process

Paragraph 170 stipulates:

> **"APD shall accept complaints regardless of when they
> are filed.  The City shall encourage civilians to promptly
> report police misconduct so that full investigations can
> be made expeditiously, and the full range of
> disciplinary and corrective action be made available."**

**Results**

Primary:         **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.157 Assessing Compliance with Paragraph 171:  Prohibition of Refusal to Take Complaints

Paragraph 171 stipulates

> **"The refusal to accept a misconduct complaint,
> discouraging the filing of a misconduct complaint, or
> providing false or misleading information about filing a
> misconduct complaint shall be grounds for discipline."**

**Results**

Primary:         **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.158 Assessing Compliance with Paragraph 172:  Acceptance of Anonymous Complaints

Paragraph 172 stipulates:

> **"APD and the Civilian Police Oversight Agency shall
> accept all misconduct complaints, including
> anonymous and third-party complaints, for review and
> investigation.  Complaints may be made in writing or
> verbally, in person or by mail, telephone (or TDD),**

240

**facsimile, or electronic mail.  Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be provided with a complaint form in Spanish to ensure that the individual is able to make a complaint.  Such complaints will be investigated in accordance with this Agreement."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.159 Assessing Compliance with Paragraph 173:  Inform Supervisors of Citizen Complaints

Paragraph 173 stipulates:

**"All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint.  All misconduct complaints shall be submitted to the Internal Affairs Division by the end of the shift following the shift in which it was received.**"

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.160 Assessing Compliance with Paragraph 174:  Allegation by Judicial Officers

Paragraph 174 stipulates:

**"APD and the Civilian Police Oversight Agency shall develop a system to ensure that allegations by a judicial officer of officer misconduct made during a civil or criminal proceeding are identified and assessed for further investigation.  Any decision to decline investigation shall be documented."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.161 Assessing Compliance with Paragraph 175:  Allegations Made by the Homeless or the Mentally Ill

Paragraph 175 stipulates:

> **"APD and the Civilian Police Oversight Agency shall track allegations regarding misconduct involving individuals who are known to be homeless or have a mental illness, even if the complainant does not specifically label the misconduct as such."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.162 Assessing Compliance with Paragraph 176:  Centralized Complaint Numbering System

Paragraph 176 stipulates that:

> **"Within six months of the Operational Date, the Internal Affairs Division, in coordination with the Civilian Police Oversight Agency, shall develop and implement a centralized numbering and tracking system for all misconduct complaints.  Upon the receipt of a complaint, the Internal Affairs Division shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.163 Assessing Compliance with Paragraph 177:  IAD Complaint Data Management

Paragraph 177 stipulates:

> The Internal Affairs Division's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to

242

> **the complainant of the interim status and final disposition of the investigation.  This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.164 Assessing Compliance with Paragraph 178:  Supervisors to Provide Complaint Information

Paragraph 178 stipulates:

> **"Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Division.  All information should be referred to the Internal Affairs Division by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.165 Assessing Compliance with Paragraph 179:  Referral of Complaints to CPOA

Paragraph 179 stipulates:

> **"Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Division shall refer the complaint to the Civilian Police Oversight Agency."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.166 Assessing Compliance with Paragraph 180:  Handling of Internal Complaints by IAD

Paragraph 180 stipulates:

> **"Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Division for review and classification.  The Internal Affairs Division shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Division for investigation.  In consultation with the Chief, the commanding officer of the Internal Affairs Division shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Division, the Multi- Agency Task Force, and/or referred to the appropriate federal law enforcement agency**."

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.167 Assessing Compliance with Paragraph 181:  IAD Classification Protocol

Paragraph 181 stipulates:

> **"APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Division in determining where an internal complaint should be assigned."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.168 Assessing Compliance with Paragraph 182:  Prohibition from Self-Investigation

Paragraph 182 stipulates:

> **"An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a**

**person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct."**

**Results**

Primary:   **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.169--4.7.180 Assessing Compliance with Paragraphs 183-194: Investigation of Complaints

Paragraphs 183 through 194 of the CASA pertain to requirements for thoroughness, timeliness, reliability of findings, and overall quality in regard to the investigation of misconduct complaints. For example, they require that all relevant evidence be considered and that investigations be fair and impartial and reach reliable findings. They also require time limits for completion of investigations, designated permissible findings with the corresponding standard of proof, and an assessment regarding whether the facts of an investigation indicate a need for change in policy, procedure, or training. In addition, requirements are set forth regarding the situations where there may be simultaneous criminal and administrative investigations of the same subject matter.

In regard to paragraphs 183 through 194, during the 12th monitoring period members of the monitoring team reviewed a stratified random sampling of 12 investigations completed by IAPS and 8 completed by CPOA. The monitoring team also met with the former chief and the City Attorney, the CPOA Director and CPOA Legal Counsel, the IAPS Commander, attended a meeting with CPOA Board members and reviewed CPOA Board meetings, agenda, minutes, and findings on the CPOA website.

First, we take this opportunity to point out and highlight several changes in IA processing procedures that are starting to show dividends and should result in considerable processing improvements. The Commander of IAPS now requires supervisory reviews of investigations at marks of 10, 20, and 40 days after assignment. Also, investigations are required to be complete within 70 days of assignment and any extension must be approved by the Commander of IAPS. Requests for the chief's approval for an extension beyond 90 days must likewise be approved by the Commander of IAPS. The Commander also performs a weekly "timeline check" on every open IAPS investigation, and investigations surpassing 60 days are automatically flagged for the Commander's review. Approval of completed investigations are electronically signed by the Commander, leaving no room for challenge of when the investigation was actually completed. The timeline for review of a completed investigation by the chain of command through the chief is also tracked.

Organizational changes have also been implemented that will improve the quality of investigations as well as timeliness. The first crucial steps in the IA process – proper

intake/preliminary assessment/assignment are now a separate area of focus led by a Deputy Commander. This individual also decides which allegations to forward to the Area Command for investigations and is available for guidance and quality control for those minor investigations assigned out to the Area Commands. Once investigations are assigned to IAPS investigators, the quality of those investigations are the area of supervisory focus of a separate Investigations Manager[129]. There is also an improved communications process among the parties and monitoring team regarding intake and discipline as discussed in the Discipline and Transparency section (paragraphs 201-202) of this IMR

The findings related to Paragraphs 183 through 194 address the following requirements of the CASA.

Regarding the availability of an effective mediation program and compliance with paragraph 184, it should be noted that a new Mediation Protocol, in the form of a Memorandum of Understanding between the City, APD, APOA, and CPOA, was filed with the Court along with a *"SECOND JOINT STIPULATION SUSPENDING, IN PART, PARAGRAPH 184 OF THE COURT-APPROVED SETTLEMENT AGREEMENT AND JOINT BRIEF EXPLAINING THE BASIS FOR PARTIAL SUSPENSION,"* on the final day of the IMR-12 review period. The purpose of this was to make it possible for allegations of less serious or minor misconduct to be the subject of mediation and to test the efficacy of this expanded mediation program. An Order was signed and filed by the Court on August 6, 2020, approving the Second Joint Stipulation.

The monitoring team recognizes that City and CPOA have expended good faith efforts to carry out the mediation of complaints under paragraph 184. It is hoped that a viable mediation program will emerge that will prove to be an effective case resolution tool. This will tend to enhance public confidence in APD and reduce the number of external complaint-engendered investigations and improving the timeliness and quality of remaining investigations.

APD personnel are required by policy and practice to cooperate with the internal affairs system.  This cooperation is required by regulation and practice. As in past IMRs we continue to find one instance in which APD personnel refused to cooperate with an investigation [IMR-12-42]. In that matter, the subject officer had been arrested and detained on a serious domestic violence incident and refused to be interviewed administratively due to the corresponding criminal matter. The administrative investigation proceeded without the statement, resulting in sustained violations and proposed discipline of termination. The officer resigned before discipline could be imposed.  As such, the refusal to be interviewed administratively was properly handled.

Based on past reviews, we have found that investigations conducted by IAPS, +and by CPOA generally have been of good quality. However again this monitoring period, our

---

[129] This is the civilian equivalent of a deputy commander.

stratified random sample revealed investigations that we deem to be deficient, as more fully detailed below.

First our review revealed five investigations that were administratively closed or had allegations that were partially administratively closed [IMR-12-46, IMR-12-47, IMR-12-48, IMR-12-45, and IMR-12-49].  Of these five, we find two, specifically [IMR-12-45 and IMR-12-49], were not proper administrative closures.

[IMR-12-45] involved deficiencies of investigation by CPOA and of findings by both CPOA and the CPOA Board. This case involved a complainant's vehicle that pursued and conducted a "pace" of a police vehicle that was apparently speeding. The complaint was administratively closed as being unable to minimally substantiate the allegation. Neither the officer nor the complainant was interviewed. The CPOA letter administratively closing the case indicated that the lapel video from the officer was not available and apparently was not considered before the administrative closure decision. However, the video was provided to the monitoring team in response to its data request for investigative materials.

The record on which CPOA based its administrative closure decision was insufficient to indicate that the alleged misconduct did not occur (by clear and convincing evidence) or that it could not be minimally substantiated. Therefore, both the officer and complainant should have been interviewed. If the complainant had been interviewed, it is probable that the cell phone video later produced by the complainant on appeal would have been produced during the investigation, leading to insightful questioning and analysis. Also, the officer's video lapel was missed by CPOA before the administrative closure. As such this investigation was deficient.

The complainant appealed the CPOA findings to the Board and produced the cell phone video for consideration by the Board. Also, the officer's video lapel was found and considered by the Board. There were indications from the video produced by the complainant that the officer was speeding, but law enforcement may digress from traffic laws in the performance of duties. The officer's incident report indicates that he was on duty going to a briefing. The officer's lapel video shows the stop of the complainant's vehicle and interaction to be proper: the officer was professional and polite, merely gave the complainant a warning about not following police officers too closely, and also volunteered and produced a complaint form for the driver. The officer could have cited the driver for unsafe driving for filming the officer from a cell phone while driving on a highway, but did not do so, giving only a warning.

The officer was not interviewed and therefore he was not asked whether he was speeding, nor questioned as to the exact speed and degree of unsafety in driving his vehicle, and whether he was in the official performance of duties and his reasons for the vehicle speed.

The complainant requested an appeal on April 22, 2020 and the appeal was not heard until the Board meeting on July 9, 2020. The Board overruled the administrative closure

finding of CPOA and entered a finding of sustained on 1-1-4(F)(2), failing to operate a vehicle in a prudent matter.  Although the Board's overruling of the administrative closure was proper, the Board's finding of sustained, based on the record before it, was improper. Rather than enter such a finding, the matter should have been returned to CPOA for further investigation, including an interview of the officer and an interview of the complainant. Instead the Board entered a finding against the officer without giving the officer the benefit of the doubt of an interview, presumably based on the video produced from the complainant. However, the video and total evidence, does not show a proper "pacing of a vehicle" to prove an approximate speed. The complainant claims speed in excess of 100 miles per hour were reached, yet the complainant's video shows a speedometer reading of approximately 86-88 miles per hour. There is nothing in the record of this case to indicate a calibration of the complainant's speedometer or reliable testimony as to the proper functioning of the complainant's speedometer, evidence normally required in attempting to prove speeding by a "pace", among other elements of a "pace" speeding case.

It should also be noted that prior to July 9, 2020 meeting of the Board, the materials provided to the monitoring team show the complainant notified the Board that he had taken efforts to notify the Chief of Staff and the Mayor's office about his discontent with the complaint process and the performance of CPOA. The Board then spent a considerable amount of time discussing this matter in its July 2020 meeting, including time in executive session, where it could have, and should have, simply returned the matter to CPOA for further investigation. In summary, the Board spent an inordinate amount of time on an allegation of minor misconduct, reaching a resolution in favor of the complainant.   Additional investigation was warranted.

In [IMR-12-49], a complaint was made against a Public Service Aid for improper demeanor and negligence. There was a traffic accident in which the complainant was a driver of a vehicle that was the subject of a rear end collision, and which had an infant child in a car seat. There were no injuries. The complainant was satisfied with the officers who responded to the accident but filed a complaint against the PSA who authored the accident report, for leaving out of the report that the infant child was an occupant of the vehicle. When the complainant tried to get the accident report corrected, he had a conversation with the PSA in which the complainant alleges the PSA was "cold, snarky, and disrespectful" over the phone. The PSA did ultimately file a supplemental report to the accident report in which the infant child was identified as an occupant.

The CPOA investigation was administratively closed based on the fact that a supplemental report was filed and that there was no recorded evidence of the telephone conversation between the PSA and the complainant. The memo back to the complainant and the administratively closing of this matter stated that without independent evidence this matter becomes much of a case of conflicting statements.

The part of the complaint regarding negligence in leaving out the child was properly resolved. Mistakes are made occasionally with reports and a supplemental report was

248

filed in which the child was properly identified as an occupant of the vehicle. Therefore, the investigation properly concluded that this was not a sustained violation. However, the complaint about inappropriate demeanor was not fully brought to resolution. First, this is the type of complaint that is appropriate for mediation and hopefully with the new mediation program, such an allegation will be successfully resolved in mediation. However, absent an appropriate referral to mediation, issues of credibility must be resolved in investigations even if there is no independent evidence that may or may not corroborate an allegation. It is not enough to say that this is a case of conflicting statements. Both the complainant and the officer could have been interviewed and based on those interviews a credibility assessment, leading to a finding other than administrative closure, should have been made.

For the reasons stated, we find that the use of administrative closures in [IMR-12-49 and IMR-12-45] rendered these investigations deficient.

Our review has indicated a third investigation [IMR-12-35] which was not thorough enough to ensure the reliability of the investigation. That case involved a complaint of retaliation, code of conduct violations, and violation of an SOP for recording a statement. The posture of the case reveals the subject of the IA reportedly telling a union representative about the subject's Commander asking for the subject's work phone and alluded to recording work conversations with the Commander. The subject also reportedly said the Commander instructed her to do audits on a fellow employee (complainant) who was suspected of having deleted records for money. The union representative relayed this to a civilian employee (complainant) who claimed that the subject was talking about her and was retaliating against her for a prior investigation.

There were findings of unfounded on the retaliation and code of conduct allegations and sustained on the recordings violation because the subject could not establish that participants of the meeting that had been recorded were advised or otherwise knew they were being recorded.

The fact record in this matter supports the findings. However, there were deficiencies in the investigation that affect the reliability of the investigation and possibly the findings. The union representative, who was a link in the communication chain and hence a potential witness, attended the IAPS interview of the subject officer as the subject officer's representative. In addition, the union representative participated in the subject's interview fairly extensively, and the interview in effect became a group interview. These constitute failures to follow fundamental tenets of "best practices" for misconduct investigations.

The complainant was not interviewed, nor was the union representative.  First, the union representative should have been interviewed as to what exactly the officer told her and what exactly she then relayed to the complainant. Next the complainant should have been interviewed as to what the union representative told her and why she felt it was retaliation. If this information had been obtained, then a more prepared interview of the subject officer could have been conducted. Basically, the questioning of the subject

officer focused on the recordings, but not the issue of what the subject officer told the union representative and whether that was, or was not, retaliation. In the monitor's opinion, we are well past the point in this compliance process at which such basic protocol mistakes should be surfacing at IAPS.  We are aware that IAPS is under relatively command.  Nonetheless, these types of procedural errors must be self-identified and self-regulated if APD is to reach full compliance for its internal affairs processes.  The monitor made recommendations—early on in the new IAPS commander's tenure, that he be offered advanced training in the IA function, either at the FBI's "Managing and Conducting Internal Affairs Investigation" training or other nationally recognized sources.  We are far too deep into this compliance project to continually see these failures to perform.

The findings by the monitoring team therefore indicate 3 deficient investigations of the total 20 investigations (12 IAPS and 8 CPOA) cases we reviewed by way of a stratified random sample. This yields a collective compliance rate of 85% relative to the "quality requirements" set forth in paragraphs 183 and 190 of the CASA, a noticeable improvement from the 69% exhibited in IMR-11 but still far short the 95% required for operational compliance. At this stage of the reform process, for IAPS to be so far from exhibiting effective compliance processes constitutes a serious and meaningful failure.

We found four other matters where investigative processes or findings shortcomings must be pointed out, but since we do not feel they adversely affected the overall reliability or disposition of the investigation, we do not calculate then as deficient for compliance (reliability of investigation) purposes**.** [IMR-12-44, IMR-12-39, IMR-12-36, and IMR-12-34].  We strongly suggest that APD conduct a thorough quality review of these cases to determine how these shortfalls made it through supervisory and command review at IAPS.

We found the sustained findings [IMR-12-44] to be supported by the evidentiary record. The case involved three officers who made an arrest of an individual for an assault/domestic violence against a family member. The IA investigation focused on an allegation of an improper arrest of a second individual (a witness to the domestic violence arrest). The allegation against one of the officers for failing to report a use of force hinged on whether the officer actually observed the use of force employed by a fellow officer in the second arrest. The complaint was unfounded. Upon our review of the investigation and video, we cannot disagree with the decision to not sustain this allegation. However, the determination of a violation is not clear and convincing, and in no way meets the "clear and convincing" standard required of an unfounded finding. The correct finding should have been "not sustained". In addition, the record indicates that the individual in the second arrest pleaded guilty to disorderly conduct, which may contradict the finding in the IA investigation that the second arrest was improper (without a sufficient basis). Although the videos speak for themselves, and we agree with the finding that the arrest lacked probable cause, a fuller investigation would have included an attempt to determine the factual basis of the guilty plea to determine if there was something that was missed in the video reviews.  We note that defendants often

plead guilty to charges, regardless of the legitimacy of the processes used in effecting an arrest.

[IMR-12-39] involved a second matter in which the reported actions of the District Attorney contradicted sustained findings of the IA investigation, and the prosecutorial analysis was not considered. Allegations were sustained against three officers regarding a warrantless entry into a residence and warrantless arrest for DWI not based on probable cause. There was information possessed by the officers that a female driver was operating a vehicle while under the influence approximately a quarter of an hour before the officers arrived and that she was now in a specific apartment made known to the officers. The constitutional analysis should have been fairly straightforward: was there probable cause to believe that an occupant of the apartment meeting the given description had committed the offense of DWI.  Further, was there were sufficient exigent circumstances (dissipation of evidence -- blood alcohol content -- and ability to leave the apartment and drive while under the influence) to justify a warrantless opening of the front door that led to observations consistent with being under the influence.

The investigation found that there was no probable cause. We do not believe it was as clear cut as the investigative report indicates. Based on information received by the officers, the issue of probable cause before the apartment entry was made was a close call and based on observations made after the door to the apartment was opened, there was confirmation of probable cause. The issue was more related to whether there were sufficient exigent circumstances to justify the police actions. There is no indication that the District Attorney's Office was contacted to determine the status of the DWI charge and whether there had been a determination of probable cause and sufficient exigent circumstances to justify moving forward with the DWI prosecution. In the PDH, it was asserted that the DWI charge had been dismissed due to a discovery violation; however, it appears from other documentation, that the DA's office had been willing to proceed with the charge based on its determination that there was a constitutional basis for the arrest.

We cannot say that the administrative finding of an improper arrest in this case was inappropriate, and we find that the other findings relating to the collateral issues were supported by the record. We do not mean to suggest that IAPS and the disciplinary process are bound by determinations of constitutionality made by the DA's office. However, when investigating and then adjudicating an administrative allegation based on the constitutionality of a police action, it would behoove APD to reach out and attempt to obtain the DA's view of the constitutionality of the action.  Once that step had been taken, APD could then consider taking a case decision. Alternatively, advice from an attorney designated as an IAPS legal advisor would also help in areas of challenging constitutional determinations.  APD should be cognizant that issues of such officer determinations, made on-the-scene in fluid situations, that do not involve areas of well-established law, can benefit from attorney input before deciding they are administratively actionable.

[IMR-12-36] involved unsolicited and unwanted inappropriate texts, including graphic nude photos, from one officer to another officer. The conduct was investigated and sustained as two code of conduct allegations. These findings were appropriate. However, an allegation of sexual harassment was not included. The investigator's notes point out that sexual harassment was not an allegation because this was a one-time incident not of a repetitive nature. We find that the sexual harassment regulation was misinterpreted or deliberately misrepresented. Although the number of instances and whether conduct was repetitive in nature are to be considered when determining whether conduct constitutes sexual harassment, repetition is not a prerequisite for such a finding, and an isolated incident can still be deemed to be sexual harassment. In this case, there was more than one text, and even if it was one incident in which the texts occurred, the subject officer's actions were the epitome of sexual harassment and should have been identified as such.  These shortcomings should have been identified during APD's supervisory oversight and review.  This case exhibited multiple areas of failure, which should be analyzed by APD to determine if they are simply case specific, investigator specific, or accrue to the department IAPS unit as a whole.  This constitutes the fourth poorly investigated and documented case in our sample of five cases.

The final case we reviewed for this section, [IMR-12-34], was an investigation involving deficient Use of Force reviews. The central issue was whether a sergeant conducting a use of force of review on actions of an acting sergeant, who was receiving on-the-job training and not yet considered a duty sergeant, violated the rule prohibiting use of force review of someone of the same rank. We agree with APD's well-researched determination that this rule was not violated. The overall reliability of the IA investigation resulting in no sustained findings was appropriate.  However, we found the questioning of one witness utilized a leading question that suggested an exculpatory or mitigating response ("was it your understanding that the sergeant could not conduct this investigation because she was conducting an investigation of acting sergeant that was not of the same rank" or words to that effect). We do not mean to suggest that leading questions are never appropriate in an IA investigation, but their use in IA investigations is justified in limited circumstances, and never in a circumstance where the question may be suggestive of an excuse or "way out" or other mitigated response.  This is yet another example of the perniciousness of the Counter-CASA effect, in which "investigators" suggest "excuses" for actions that violate policy. We will continue to call out such substantive issues, as we have in the past.

Given these four questionable results from APD's IA processes this reporting period, we find that IAPS is non-compliant for this paragraph.  Again, we suggest the new commander of IAPS be offered task-specific training for his new responsibilities.  It has been a common mistake at APD to assign individuals to task-specific assignments without prior training to build the requisite knowledge, skills, and abilities (KSAs) required in that assignment.  While not specifically recommended by the monitor, we note that such training is available on-line by DLG Learning Center, as well as the standard in-person training programs offered by the Federal Law Enforcement Training Center (www.fletc.gov).  Other opportunities exist at the Public Agency Training Council (www.patc.com), and the Southern Police Institute of the University of Louisville

(louisville.edu/SPI).  Until APD can mount a competent, well-trained, and well-staffed IA unit, led by well-trained command, and supervised by competent personnel, compliance in this area will remain elusive.  Suggesting competent training for APD personnel assigned to technical areas is merely suggesting that APD do what hundreds of other agencies do:  train their personnel to perform specific critical tasks.

The advisements to complainants regarding the reopening of administratively closed cases and of appealing CPOA findings, as well the actual practices related to these advisements, are firmly in place. Although appeals of the findings and recommendations of the Executive Director are not commonly granted, they do occur, as evidenced by the minutes of the CPOA Board meetings. As already discussed in this section regarding [IMR-12-45], and also referenced in the section pertaining to the Civilian Police Oversight Agency, (paragraphs 271-292), the Board in [IMR-12-45] appropriately granted the appeal but then erroneously entered a finding of sustained without sending the matter back for additional investigation. The Board's erroneous finding notwithstanding, this case illustrates that the reopening of administratively closed cases based on new evidence, and/or the right to appeal, as required by the CASA, are honored by the CPOA Board.

In addition to the CASA criteria for administratively closing cases, the monitoring team in past IMRs agreed that IAPS and CPOA may also use an administrative closure disposition in cases in which a preliminary investigation reveals the allegations cannot be minimally sustained. As set forth more fully herein in the Monitor's Note in this section, the monitoring team approved the use of a finding of "unfounded" in lieu of administrative closure in such situations. As with the prior use of administrative closures based on a preliminary investigation, we again caution CPOA and IAPS not to utilize this disposition for the sake of expediency to counter the effect of an increased workload and present staffing levels.

In the cases reviewed by the monitoring team this reporting period, we found three cases that had preliminary indications of criminal conduct. [IMR-12-33, IMR-12-42, and IMR-12-44]. In [IMR-12-33], the criminal investigation actually was completed before the IA investigation, so coordination with prosecutorial authorities to proceed with an administrative investigation was not warranted. The other two cases both showed evidence of proceeding with an administrative investigation without obstructing or negatively impacting a potential corresponding criminal investigation.

We again point out in this IMR that paragraphs 186 through 188 of the CASA do not allow for *carte blanche* delays of administrative investigations *in toto* during the investigation of a related criminal investigation. In such cases, all aspects of the administrative investigation are to continue, except the taking of statements from witnesses who may incriminate themselves. When that situation occurs, a timely request to the relevant prosecutorial authority must be made before the taking of statements from witnesses who IAPS believes may incriminate themselves.  We have found no cases where this principle was violated.

We likewise found no cases in which an officer failed to submit a public safety statement by claiming that the statement would be self-incriminating. We did note, however, a case in which a Public Service Aid refused to give a statement.  Given APD's performance related to this requirement over the past four reporting periods, the monitor continues to find APD in compliance for the requirements of Paragraph 189.

In regard to the time requirements contained in Paragraph 191, the past performance of IAPS and CPOA generally have been consistent in terms of timely completion of investigations once they are assigned. However, in our current stratified random sample we have identified five investigations [IMR-12-45, IMR-12-48,IMR-12-50, IMR-12-51, and IMR-12-52], that did not proceed as expeditiously as possible or are otherwise out of compliance with time requirements expressed in paragraphs 191 and 281 of the CASA.  These timeline deficiencies are more fully discussed in the section pertaining to the Civilian Police Oversight Agency, (paragraphs 271-292) of this report.

Another example of complaint processing untimeliness is found in [IMR-12-43]. This case involved a website complaint to CPOA dated in September 2019. CPOA transferred the investigation to IAPS, based on the potential for criminal conduct, in February 2020, almost 5 months after receipt of complaint. Six of the eight cases we reviewed from CPOA this reporting period were not completed on a timely basis, a failure rate of 75 percent. We note this failure rate to be the same compliance rate as IMR-11.

Although not part of the stratified random sample discussed above, in regard to the time requirements of paragraph 191, we pointed out in IMR-11 that the monitoring team learned of 28 untimely investigations discovered at IAPS that had missed their time deadline for the imposition of discipline, and of the discovery of 50 unprocessed files at CPOA that are likewise out of time with CASA and CBA time requirements. Seventy-five percent of the CPOA cases reviewed this reporting period were untimely completed. Although not part of the compliance calculation set forth herein, it bears repeating that blunders of this sort cannot be repeated if operational compliance is to be achieved with the time requirements of paragraph 191 and 281, and the disciplinary requirements of paragraph 202. Internal self-audit of cases received, and investigative timelines should become a routine part of IA and CPOA operations.  Monthly and quarterly reports are warranted.  Improved "interim oversight" is warranted (weekly checkpoints, status meetings, timeline management practices, training, and perhaps staffing need to be initiated and processed via discussions at the weekly Chief's meetings.

The ability, capacity, and demonstrated performance to investigate, in a timely manner, allegations of misconduct, and to review completed investigations in a timely and effective manner to determine whether discipline is warranted, are crucial to the success of compliance efforts. Exact timelines are not only required under paragraphs 191 and 281 of the CASA but are also required by virtue of the application of the Collective Bargaining Agreement (CBA). These timeline deficiencies directly impact APD's obligation to provide consistent, fair, and progressive discipline on sustained charges, as required by paragraphs 201 and 202 of the CASA.

APD and CPOA performances, from taking a complaint of alleged misconduct, to the imposition of discipline (when warranted), in a timeframe that is not barred by the CBA, will continue to be an area of scrutiny by the monitoring team in future IMRs.  During this reporting period, 75 percent of the completed CPOA cases were untimely. Normally, such failures are attributable to staffing and/or management deficiencies. At times, however, they may be attributable to poor management and oversight.  APD and CPOA need to redouble their efforts to meet CASA requirements, and full, data-based assessments of staffing requirements for both units are required.

### 4.7.169 Compliance with Paragraph 183: Investigations Reach Reliable Conclusions

Paragraph 183 stipulates:

> **"APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident or involved in any significant event before or after the original incident, shall provide a written statement regarding their observations, even to state that they did not observe anything.**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **Not In Compliance** |

*Recommendations for Paragraph 183:*

*4.7.169a:  The practice of utilizing ACMs for CASA-related issues was prohibited by Special Order in April of 2019; however, this prohibition must be supported by assiduously careful internal processes to ensure that the prohibition is followed by supervisors and command personnel, and that those who do not adhere to these requirements are noted, and corrective action is taken.*

*4.7.169b:  The City should appoint a review and approval authority for all external APD IA investigations that are conducted by an independent investigator. The appropriateness of selection of this external authority should be documented in writing.*

***4.7.169c: In investigations where the complainant or logical witnesses are not interviewed, or in matters that are administratively closed, the investigation should include a clear explanation of why the interviews were not conducted and or why further investigation steps were not warranted.***

### 4.7.170 Assessing Compliance with Paragraph 184:  Investigations Documented in Writing

Paragraph 184 stipulates:

> **"APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing.  APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation. Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.171 Assessing Compliance with Paragraph 185:  Required Cooperation with IAD/CPOA

Paragraph 185 stipulates:

> **"APD shall require personnel to cooperate with Internal Affairs Division and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control.  Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**

Operational:  **In Compliance**

### 4.7.172 Assessing Compliance with Paragraph 186:  Separate Administrative and Criminal Investigations

Paragraph 186 stipulates:

> **"APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment.  When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement**."

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.173 Assessing Compliance with Paragraph 187:  Advisement of Officer Rights

Paragraph 187 stipulates:

> **"Advisements by the Internal Affairs Division or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee**."

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.174 Assessing Compliance with Paragraph 188:  Notification of Criminal Misconduct

Paragraph 188 stipulates:

> **"If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the**

257

**Internal Affairs Division commanding officer. If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Division.  The Internal Affairs Division commanding officer shall immediately notify the Chief.  The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, the Internal Affairs Division shall continue with the administrative investigation of the allegation.  Consistent with Paragraph 186, the Internal Affairs Division may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Division deems such interviews appropriate**."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.175 Assessing Compliance with Paragraph 189:  Provision of Public Safety Statements

Paragraph 189 stipulates:

**"Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including Use of Force Reports and incident reports. APD shall make clear that all statements by personnel in incident reports, arrest reports, Use of Force Reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements.  Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief**."

## Results

No instances of officers refusing to provide a public safety statement were noted during, this reporting or in previous reporting periods.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.176 Assessing Compliance with Paragraph 190:  Considering All Relevant Evidence

Paragraph 190 stipulates:

> **"In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to be deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 190:*

*4.7.176a: For investigations found to be deficient follow up on any deficiencies noted by this IMR, and analyze, discuss, and use teaching points and policies to further refine investigative quality.*

### 4.7.177 Assessing Compliance with Paragraph 191:  90 Days to Complete Administrative Investigations

Paragraph 191 stipulates:

> **"All administrative investigations conducted by the Internal Affairs Division or the Civilian Police Oversight Agency shall be completed within 90 days of the**

259

initiation of the complaint investigation.  The 90-day period shall not include time for review.  An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief.  Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation.  To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations of the officer, and extended absences."

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

### Recommendations for Paragraph 191:

*4.7.177a: APD and CPOA should refocus their efforts related to this paragraph by conducting a quantitative analysis of the reasons that cause any case to be delayed past 90 days.*

*4.7.177b: Once causes for these delays are identified, develop recommendations for changes to policy, staffing, procedure or practice that are designed to eliminate such delays.*

*4.7.177c: All investigations should include a clear timeline that delineates date of incident, date of receipt of complaint, date of assignment, date of extension if applicable, date investigation is completed, dates review period begins and ends, and date of notice of intent to discipline if applicable.*

*4.7.177d: In regard to matters initiated by internal complaints, investigations should include a clear timeline that delineates when the APD employee who made the referral to IAPS first became aware of the alleged misconduct, and when all employees in the chain of referral became aware of the misconduct, so that the time or receipt of information of potential misconduct to referral to IAPS can be accurately gauged.*

### 4.7.178 Assessing Compliance with Paragraph 192:  Case Dispositions

Paragraph 192 stipulates:

**"APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:**

a) "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer;
b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;
c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;
d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training;
e) "Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or
f) "Administratively closed," where the policy violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint."

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

### Recommendation for Paragraph 192 :

**4.7.178:  *Although the monitoring team has approved the closing of an investigation and the use of an "unfounded' finding in lieu of "administrative closure' where a preliminary investigation shows by clear and convincing evidence that the conduct which is the subject of the complaint did not occur, and shows no indication of any other violation (misconduct not based on original complaint), we caution APD and CPOA not to utilize this disposition for expediency sake where the complaint, in conjunction with the underlying facts, calls for a fuller investigation with findings that resolve the issue of whether the allegations were sustained or not sustained.***

### 4.7.179 Assessing Compliance with Paragraph 193:  Reopening Administrative Investigations

Paragraph 193 stipulates:

"All administratively closed complaints may be re-opened if additional information becomes available.

> **The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened."**

## Results

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.180 Assessing Compliance with Paragraph 194:  Training and Legal Standards

Paragraph 194 stipulates:

> **"In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether: (a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures.  This information shall be shared with the relevant commander(s)."**

## Results

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## Monitor's Note:

The parties and the monitor have discussed potential issues related to the requirement in paragraph 188 of the CASA that the IAPS Commander coordinate with the chief when consulting with the relevant prosecuting agency in instances where a misconduct complaint intake or investigation reveals "there may have been criminal conduct by any APD personnel."

The practical problem with a strict interpretation of this language is that prosecutors are reluctant to discuss cases where there is less than probable cause or less than at least reasonable suspicion that a crime has been committed, whereas the phrase "may have been" alludes to a mere suspicion standard.  This is a tension that needs to be addressed. Accordingly, the parties have reached a negotiated solution agreeable to the monitor that will allow a preliminary or continued administrative investigation to take place and a determination of probable cause that a crime was committed to be

developed before the coordination with relevant prosecuting agency is required under paragraph 188. Despite our urging since IMR-9, this refinement of process has still not been agreed to in writing.

As also noted in the Civilian Police Oversight section of this report, CPOA has utilized the Administratively Closed disposition in situations in which a preliminary investigation cannot minimally sustain the allegations contained in a complaint. In such cases, based on this initial evidence, the investigation is cut short and administratively closed without necessarily interviewing all relevant witnesses or even the complainant in some instances. The monitor realizes the need to wisely and economically deploy resources and thus has not disapproved of this practice in theory. Based on a request from CPOA, during the IMR-12 review period, the monitor approved the closing of an investigation and the use of an "unfounded' finding in lieu of "administrative closure' where a preliminary investigation shows by clear and convincing evidence that the conduct which is the subject of the complaint did not occur, and shows no indication of any other violation.  However, we reiterate that in following this practice, care must be taken not to miss other policy violations that are not contained in the initial complaint. Therefore, we put CPOA and APD on notice that this practice should only be utilized where the preliminary investigation shows by clear and convincing evidence that the allegations of misconduct did not occur, and also shows no indication of misconduct not related to the original complaint that would require further investigation, and should not be used for expediency sake in tackling investigative burdens.

As stated earlier in this IMR with regard to staffing of IAFD, and later in paragraphs 271-292 regarding CPOA, full staffing of IAPS must be commensurate with APD's view of when the investigative timeline begins for complaint investigations, and resulting deadlines, workload analyses, and data projections. This is crucial to the ability of APD and its civilian oversight to conduct effective, thorough, and efficient investigations that result in fair and progressive discipline and corrective actions when allegations are sustained. Particular attention must be paid to CASA related violations, which for consistency and importance to the CASA compliance process should be investigated by IAPS and not by members of area or division commands, nor should they be resolved by way of administrative closure.  The "shedding" of allegations of violations CASA paragraphs to the area and division commands should be avoided under all circumstances.

### 4.7.181 – 4.7.183 Assessing Compliance with Paragraphs 195-197: Preventing Retaliation

Paragraphs 195 through 197 of the CASA pertain to the City's requirement to prevent retaliation against anyone who reports misconduct or cooperates in a misconduct investigation, by any employee of the City, including of course APD members, and making it a ground for discipline**.**

Members of the monitoring team have reviewed both City and APD policies regarding the prohibition of retaliation, and they remain unchanged. The monitoring team also

selected and reviewed a stratified random sample of IA and CPOA cases completed during the 12th IMR review period. They also met with members of IAPS and CPOA during the site visit and received updates in the practices of each agency.

Retaliation is clearly prohibited both as a matter of City and APD policy. The Albuquerque Code of Ordinances prohibits retaliation for reporting improper governmental action and APD policy prohibiting retaliation and/or making it grounds for discipline is found in SOP (AO 3-41-4-A, GO 1-1-4-E-10 and 11, GO1-4-3-C-2, and GO 1-5-4-B-4).

The monitoring team has received documentation showing that the annual meeting requirement between CPOA and IAPS, in which APD's anti-retaliation policy is reviewed, occurred shortly after the expiration of the IMR 12 period. During that meeting the Commander of IAPS and the Executive Director of CPOA concurred that the anti-retaliation policy in its present form met the needs of the APD and CPOA.

The monitoring team found one investigation in its review of the random sample that involved an allegation of retaliation, in addition to allegations regarding code of conduct and violation of SOP for recording a statement. [IMR-12-35]. This investigation was found to be deficient and was discussed fully in the Investigations of Complaints section (paragraphs 183 to 194) of this IMR. The retaliation and code of conduct investigations were unfounded; however, the SOP violation for an unauthorized recording was sustained.  The employee resigned in lieu of discipline.  Notwithstanding the deficiencies we found in the investigation, in light of the investigation of the allegation of retaliation and outcome in the case (resignation), along with the City's and APD's clear policy against retaliation and IAPS investigative performance with past retaliation complaints, APD remains in compliance with paragraphs 195-197.

All data reviewed by, and observations made by, the monitoring team for this reporting period continues to demonstrate compliance for the tasks in paragraphs 195-197.

### 4.7.181 Assessing Compliance with Paragraph 195:  Retaliation Prohibited

Paragraph 195 stipulates:

> **"The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct."**

### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.182 Assessing Compliance with Paragraph 196:  Review of Anti-Retaliation Statements

Paragraph 196 stipulates:

> **"Within six months of the Operational Date, and annually thereafter, the Internal Affairs Division and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation.  This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation.  Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.183 Assessing Compliance with Paragraph 197:  Retaliation Grounds for Discipline

Paragraph 197 stipulates:

> **Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds for discipline, up to and including termination of employment.**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.184 – 4.7.186 Assessing Compliance with Paragraphs 198–200:  Staffing and Training Requirements

Paragraphs 198 through 200 of the CASA require the City to adequately fund and resource internal affairs functions (IAPS and CPOA and the CPOA Board), and also require that APD personnel who conduct misconduct investigations and CPOA investigators to receive a baseline amount of initial and annual training.

Consistent with past site visits the monitoring team met with IAPS and CPOA separately. Their respective offices and physical spaces have remained the same. The monitoring team discussed staffing needs and training, also reviewed staffing charts and training records, and assessed the timelines of processing complaints and information of potential misconduct in investigations that were randomly selected, as well as assessed the quality of the investigations. The findings related to Paragraphs 198 through 200 indicate the following outcomes, related to requirements of the CASA.

Despite the fact that IAPS, as discussed in the Investigations of Complaints section (paragraphs 183-194) of this IMR, has made great strides in improving its investigative timelines, it bears repeating that additional staff may still be required to complete thorough investigations in a timely manner under the time constraints of the CASA and Collective Bargaining Agreement (CBA). The CASA and the CBA utilize the same timeline (90 days or 120 days with an extension approved by the former chief). The CASA specifies the investigative timeline begins with "the initiation of the complaint investigation" (paragraph 191), whereas the CBA is silent on when the timeline begins. Compliance with the CBA time constraints obviously impacts the APD's ability to impose discipline on sustained charges (compliance with CASA paragraphs 201 and 202).

Both IAPS and CPOA must be staffed sufficiently to meet their timeline responsibilities so that discipline for sustained charges is not "time-barred." Compliance with the CBA in cases where discipline is time-barred by the CBA (finding of "failure to impose discipline on sustained charges due to time considerations"), does not absolve the City of its failure to comply with the progressive discipline requirements of CASA.

The CPOA Ordinance and the CASA require that CPOA and the CPOA Board be given staff sufficient to carry out the agency functions contained in the Ordinance.  CPOA has a dedicated and independent source of funding equal to, at a minimum, ½ of 1% of the APD annual operational budget. This funding was adequate in the past; however, the ½ of 1% has since been removed. Although we cannot determine that the present CPOA budget was less than adequate during the IMR-12 period (as set forth more fully in this IMR in our discussion regarding paragraphs 278 and 279), we continue to observe indications of understaffing at CPOA. Examples are the discovery last reporting period of 50 unprocessed files that are now out of time with CASA and CBA time requirements, and the number of untimely cases revealed by our stratified random sample are discussed more fully in conjunction with paragraphs 191 and 281 of this IMR. The CPOA budget and staffing, and the correlation with CPOA's ability to comply with its CASA requirements, will continue to be a focus of the monitoring team in future review periods.

We note that CPOA has been contracting with the Institute for Social Research, University of New Mexico, for data and trend analysis tasks in order to meet its public reporting responsibilities. We indicated in IMRs 10 and 11 that CPOA had been given approval to hire a data analyst, and that the hiring had been effectuated. The data and trend analyses are now conducted internally and should eventually improve CPOA's timeline in meeting its public information responsibilities.

As we have pointed out since IMR-8, in regard to paragraph 199 of the CASA, we are satisfied that the training requirement is met for those members of IAPS who are doing the investigations involving serious allegations of other than minor misconduct.  Both the 24-hour preliminary and the 8-hour in-service training address the requirements of this paragraph. However, the paragraph requires annual training of at least 8 hours, not only for IAPS personnel, but also for members of the area commands who may be assigned internal affairs investigations to conduct. There is a practice of assigning IA investigations to members of an area command, at the rank of sergeant, to conduct investigations alleging minor misconduct against an APD member of the same command. In IMR-9, we put IAPS on notice that a satisfactory training policy must be developed, or APD risks a finding of "willful indifference" to this task contained within paragraph 199.

APD has made progress, and toward the end of this IMR review period submitted an annual training plan that, once approved, would meet the 8-hour annual requirement for these personnel. This policy was preliminarily reviewed by the monitoring team and returned for restructuring of content.  Although a final draft of that policy has not yet been approved, the monitoring team is satisfied that enough progress has been made that a finding of "willful indifference" to this task is not warranted. This training plan is slated to be finalized and approved before the end of the next monitoring period (January 31, 2021).

Also, in regard to CPOA training requirements, since IMR-8 we have noted that the initial training provided by CPOA's legal counsel was well organized and delivered.  It addresses all salient points of the CASA and of internal complaint investigations.  The annual training for the past years for CPOA investigators involved the annual NACOLE (National Association of Civilian Oversight of Law Enforcement) conference.  The agenda for the NACOLE training can be found online.  CPOA members are currently enrolled in the 2020 Annual NACOLE Conference which is being conducted virtually in more than 30 webinars.

In response to our observations in IMR-8 and 9, CPOA has diversified its annual training beyond the annual NACOLE conference.  CPOA Board members, as well as CPOA staff, have attended Use of Force training that included a pre and post-test to gauge whether training objectives have been met.  Counsel for the CPOA also provided training to the CPOA Board regarding the Police Oversight Ordinance updates and revisions.

Our prior criticisms of CPOA external training has focused on the lack of testing measures. The monitor has approved the utilization of a written exercise on the subject of the NACOLE training, and how it relates to the mission and job of CPOA members as an appropriate measure of comprehension this training.  CPOA still needs to establish scoring factors and processes for this assessment of learning.  We suggest that high-risk, critical CPOA tasks be methodically tested.

We further discuss the CPOA training requirements in the Civilian Police Oversight Agency section (paragraphs 271-292) in this IMR. As set forth therein, with the use of appropriate comprehension measures of external training, we find CPOA members – both investigative members of the agency and members of the Board - to be in compliance with the training requirements set forth in paragraphs 200, 275 and 276 of the CASA.

### 4.7.184 Assessing Compliance with Paragraph 198:  CPOA Staffing

Paragraph 198 stipulates:

> **"The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement. The City shall re-assess the staffing of the Internal Affairs Division after the completion of the staffing study to be conducted pursuant to Paragraph 204.  The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations."**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.185 Assessing Compliance with Paragraph 199:  IA Initial and Annual Training

Paragraph 199 stipulates:

> **"All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Division, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

**4.7.186 Assessing Compliance with Paragraph 200:  CPOA Training**

Paragraph 200 stipulates:

> **"Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Operational Date and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

**Results**

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

***Recommendations for Paragraphs 199 and 200:***

***4.7.185-186a: Identify the cadre of area command sergeants who may be assigned misconduct investigations and develop an annual IA training program for them and have them complete same on an annual basis.***

***4.7.185-186b: Do not assign a misconduct investigation to any APD personnel who have not met the annual training requirement.***

***4.7.185-186c: CPOA should develop an assessment mechanism to measure the effectiveness of outside training such as the NACOLE conference. That can easily be done through "testing" by CPOA once the CPOA investigators have completed the NACOLE training.***

***4.7.185-186d: Investigations involving allegations that are CASA related should remain with IAPS and not be transferred to Area Command personnel.***

**4.7.187 – 4.7.188 Assessing Compliance with Paragraphs 201- 202:  Discipline and Transparency**

Paragraphs 201-202 require discipline fact-based, be imposed for sustained violations that exhibits adequate consideration of aggravating and mitigating circumstances. These paragraphs also require the use of a disciplinary matrix in imposing discipline and sets forth required elements for the disciplinary matrix. Read together, these paragraphs require progressive discipline that is fair, consistent and commensurate with a balancing of the aggravating and mitigating factors.

The monitoring team reviewed a stratified random sample of cases investigated during this review period. We also met with the former Chief of Police, the City Attorney, the CPOA Director, and IAPS Commander and reviewed APD discipline processes.

As we commented in IMR-8 through IMR-11, marked improvements have been made in the APD disciplinary system.

During the IMR-12 period increased and ongoing communication regarding the status of disciplinary matters, between APD, DOJ, and the monitoring team, has been put firmly in place. First, there is a bi-monthly IAPS update telephone conference between the parties. Secondly, IAPS shares with DOJ and the monitoring team weekly reports that track complaint intake and processing, as well as disciplinary recommendations including proposed discipline, and discipline imposed after the PDH and appeal stages. Most recently just after the close of the review period, at the request of the monitoring team, APD will also share a weekly report regarding officers who have been relieved of duty or put on special assignment pending the investigation of misconduct allegations.

Several other procedural changes, which should have positive impact on the quality of disciplinary decisions, have been implemented during the IMR-12 period. On several occasions the monitoring team has made recommendations that APD should adopt the practice of having a representative of IAPS attend PDHs and represent the findings and recommendations set forth in the investigation. In accordance therewith, we note that PDHs are now attended by the Commander of IAPS. To have a representative of the investigation on hand during a PDH, in addition to the written investigation, should prove to be a marked improvement for the clarity and quality of the disciplinary decisions.

Another significant change that occurred during the 12th reporting period is that the Chief delegated his authority to a Deputy Chief to conduct PDHs and impose discipline.[130] The monitoring team anticipated that this change – the delegation of the disciplinary function from the Chief to Deputy Chiefs – would eliminate the problematic process that was occurring when the Chief mitigated discipline by imposing discipline and then cutting the discipline by half or more by holding substantial portions of the discipline imposed in abeyance.  Instead, in several cases reviewed by the monitoring team in the IMR-12 reporting period, officers appealed the disciplinary decisions of the Deputy Chiefs to the Chief, who granted the appeals by mitigating the discipline through a process of holding significant portions of the discipline in abeyance.[131]

---

[130] During the IMR-12 reporting period (on July 1, 2020) and into the IMR-13 reporting period (on August 1, 2020 and September 1, 2020), the former Chief signed 30-day Special Orders delegating the responsibility of conducting PDHs and imposing discipline – traditional responsibilities of the Chief – to Deputy Chiefs.  The Interim Chief resumed these responsibilities when he became Acting Chief on September 12, 2020 and retained these responsibilities when he became Interim Chief on September 26, 2020.

[131] For example, [IMR-12-55] in an IAPS case in which the Chain of Command recommended a 40-hour suspension for an officer where the investigation resulted in findings of sustained violations of "laws, rules and regulations", and the Deputy Chief imposed a 16-hour suspension after the PDH. On appeal, the former Chief reduced the  officer's discipline to a written reprimand.

As pointed out in past IMRs the continued use of the "Disciplinary Action Packet" (DAP) is an enhancement in the disciplinary process.  The DAP serves as a guideline by giving the subject officer's supervisory chain and the chief information regarding each disciplinary matter in which discipline can be imposed. The following information elements are included in the DAP:

> a. Recommendations regarding the class designation of the policy violations under consideration;

> b. An accurate "snapshot" of the subject's disciplinary record and prior offenses; and

> c. A recommended or preliminary disciplinary calculation, based on the appropriate elements in the disciplinary matrix, setting forth the range (minimum and maximum) of discipline.

In addition, retention cards are being updated to provide the classification of any prior sustained offenses and dates of imposition of discipline. Classification levels for SOP violations continue to be reviewed and updated. This greatly facilitates the calculation of the appropriate offense level, the identification of applicable prior offenses, and selection of the appropriate range within the disciplinary matrix.

Although the DAP is a definite improvement, it is being utilized only in cases that are investigated by IAPS. A similar format is not yet utilized by CPOA. This results in the chief receiving sustained charges in two different formats, not an ideal situation. Consistent with our recommendation in IMR-11, we strongly urge a uniform system, and recommend that CPOA adopt the practice of utilizing the DAP on investigations with sustained charges.

SOP AO 3-46 ("Discipline System") with its Appended Chart of Sanctions (Discipline Matrix) is still under review and a draft has not yet been distributed to the parties for comment. We highly recommend that the contemplated revisions to AO 3-46 address our concerns set forth in prior IMRs. Although AO 3-46  correctly requires that any deviation from the presumptive range of discipline (appropriate range as established by the Chart of Sanctions) be justified in writing (3-46-5B4), as currently written it is confusing in that it does not allow for a clear and uniform way of calculating progressive discipline. Since IMR-6, we have noted that a discrepancy exists between paragraphs 5c2 and 5c4, which allows for different interpretations of what constitutes a prior offense, based on whether the prior offense is, or is not, in the same class as the present offense. We have also noted that SOP 3-46-5G allows for the imposition of non-disciplinary corrective action in addition to applicable discipline, but it does not contain notice that non-disciplinary corrective action should not be the only resolution if the matrix calls for the imposition of discipline. We have learned that these past recommendations are scheduled to be addressed in the current review and revision of the "Discipline System" policy. We will review carefully the proposed changes to ensure

that they are indeed improvements to the disciplinary system, not dead drops allowing the requirement for discipline to be circumvented.

We add the following to our list of recommendations for AO 3-46: it should contain criteria for and guidance on holding discipline in abeyance (which in reality is a departure from the disciplinary matrix), and for allowing of a resignation in lieu of imposing discipline.  Both of these factors, used frequently by the former Chief, served to eviscerate the articulated discipline-related practices of APD.-

As emphasized in IMR-11, we reiterate that it is crucial to the disciplinary process, and thus to CASA compliance, that a new AO 3-46 be approved and implemented. APD has had more than ample time to improve and enhance AO 3-46 and a revised AO 3-46 must be a priority for the IMR-13 period.  We see no valid reason for the extended delay in accomplishing this task.

Although not as directly related to the imposition of discipline as SOP AO 3-46, it bears repeating that the contemplated revisions to AO 3-41 should also be completed in the IMR-13 period. These revisions should contain specific criteria and guidance related to allegations that are referred to Area Commands for investigation.

We urge APD to continue its efforts in upgrading retention cards to reflect all prior sustained violations and the corresponding levels of classification. We continue to applaud the efforts to upgrade the classification of violations. Changes are intended to designate the proper classification level for each violation, and to articulate range of levels selected to offer guidance on what level within the range is appropriate. These efforts will enhance the disciplinary system by decreasing subjectivity in calculating the appropriate discipline, while allowing the chief or his designee to retain justifiable discretion in imposing discipline within the parameters of A0 3-46.

Notwithstanding the recent discussions for improvements in the disciplinary process, our review continues to note issues with elements related to the imposition of discipline. The monitoring team reviewed a stratified random sample of cases completed during the review period. In that review we identified eleven cases in which discipline was imposed or should have been imposed [IMR-12-35, IMR-12-41, IMR-12-37, IMR-12-38, IMR-12-39, IMR-12-40, IMR-12-42, IMR-12-36, IMR-12-43, IMR-12-44, and IMR-12-45].

Of those eleven cases we identified four [ IMR-12-38, I-155-19, IMR-12-37, and IMR-12-43] in which discipline was deficient, either because discipline was not imposed, the tenets of the discipline regulation (AO 3-46) or the Chart of Sanctions (Disciplinary Matrix) were not followed, relief of duty was not pursued, or the level of discipline was otherwise inappropriate. This equals a compliance rate of 64% with the requirements of paragraphs 201and 202, an improvement from the 50% compliance rate set forth in IMR-11, but still short of the 95% required for operational compliance.  Further, we are extremely concerned by the former Chief's tendency to hold discipline "in abeyance" absent extant policy or procedure empowering the chief to do so.  This "abeyance"

process routinely reduced actual discipline by half or more.  Justifications for such radical abuse of the disciplinary process were seldom explained or justified.

These cases are discussed below.

[IMR-12-38] involved an IA investigation of an officer who failed his range qualification and then contrary to the order of the range supervisor, failed to notify his sergeant that he had failed at the range, occurring in December, 2019. A code of conduct violation for insubordination / willful failure to obey an order (Classification Range 3-7) was sustained. The subject officer had a past history of one Class 7 violation and two Class 6 violations within the applicable timeframe for progressive discipline. Two other investigations involving the same officer with sustained findings were pending imposition of discipline at the time, [IMR-12-56 and IMR-12-57], separate incidents both of which occurred in September 2019. The Chain of Command recommended termination, but the former chief disagreed, indicating his findings would be a code of conduct violation of a lessor range (failure to perform duties to standards, a Class Range of 6-7), and intended to impose a 40-hour suspension.  At the initiation of the PDH, the former chief signaled he would consolidate the matter with [IMR-12-56 and IMR-12-57] and would make one disposition. The Officer accepted responsibility during the PDH and conducted himself well. Ultimately the former chief did not consolidate in one disposition, imposing a 40 hour suspension with 20 hours held in abeyance on [IMR-12-56], 50 hours suspension with 20 held in abeyance on [IMR-12-57], and a 10 hour suspension on this matter [IMR-12-38], for a total of 60 hour active suspension and 40 hours held in abeyance. The retention card shows for [IMR-12-38] that the more serious violation of willful insubordination was administratively closed and the lessor code of conduct violation (designated as a Class 6) was sustained with a 10-hour suspension imposed.   Thus, the former chief of police executed a suspension of ten hours for an infraction for which the chain of command had recommended termination.

We find the discipline to be deficient. The allegations in [IMR-12-38] were not code of conduct allegations that were duplicative, where the greater offense subsumes the lessor. The use of administrative closure on the more serious violation was inappropriate. Based on the investigative record the allegation should have been sustained, or unfounded, exonerated or non-sustained, but not administratively closed. Analyzing the violation sustained by the former chief, the retention card shows it was found to be a Class 6 violation. The prior offenses easily render this to be a third offense, and the discipline listed for a Class 6, Third offense in the disciplinary matrix is a suspension of 40-80 hours. The suspension of 10 hours was a significant departure for which there was no written, cogent articulation of reasons.

From the PDH it was apparent that the former chief sincerely and in good faith believed the young officer could improve his performance, should be given additional chances, and that dismissal was not appropriate. We do not mean to suggest that the chief or his designee cannot utilize discretion to depart from the matrix, even as gross a departure as occurred here (considering all three cases and the prior record), but in order to depart  to such a degree, there must be a written, articulated justification that is

reasonable and cogent. Other than what one may discern from the colloquy in the PDH in [IMR-12-38], there was nothing written that would explain the justification for such favored treatment.

[IMR-12-36] was reviewed as a companion case to [IMR-12-42], which involved allegations of domestic violence and physical assault that resulted in noticeable and serious injuries. The subject officer was the same in both cases. In the latter case the officer was arrested and while detained, and after the investigation was complete and was pending chain of command review, resigned in lieu of discipline that was pending a PDH in [IMR-12-58]. This earlier case involved allegations of inappropriate texts and texting of lewd photographs made from the subject officer (male) to a colleague (female officer). These communications had a negative impact on the victim, who reported them almost immediately to her chain of command. The texts were unsolicited and inappropriately personal in nature. The photographs were graphic and lewd; one photograph was of the subject officer shirtless wearing shorts pulled low, and there were two photographs of a full-frontal view of a nude male with face obscured. Two code of conduct violations were sustained (a sexual harassment allegation was not considered – we discuss this in the Investigations of Complaints section of this report). An 80-hour suspension had been recommended and a PDH was pending when the officer's resignation occurred (after his arrest that led to [IMR-12-42]).

The Commanders Recommendations section in the investigation [IMR-12-58] alludes to a prior incident that was alcohol related and involved inappropriate interactions with female officers. Although the subject officer's command properly referred this matter to IAPS, it took five days to do so and we find fault with the fact that immediate relief of duty was not imposed upon the preliminary investigation revealing the texts and photographs. So blatantly direct was the harassment, and so graphically inappropriate were the photographs, that immediate relief of duty with referral for professional assistance was called for. Although the Investigator's Notes section reveals that the subject officer said he had an appointment for substance abuse counseling, perhaps imposition of relief of duty with requirements of immediate professional help could have prevented the serious domestic violence incident that followed in [IMR-12-42].  The handling of this case was wholly deficient.  It speaks to a culture of abuse where sexual harassment is accepted as a matter-of-fact event.

Another case of deficient discipline involved the investigation of an officer for failing to contact a supervisor during a criminal investigation of alleged child abuse once the subject officer realized that the focus of the child abuse investigation was an Albuquerque police officer, [IMR-12-37]. The allegations were a code of conduct violation (failing to perform efficiently and direct best efforts) and a procedural violation for failing to notify the supervisor that an APD officer was the subject of a criminal investigation. A PDH was conducted by an Acting Area Commander very professionally, and the subject officer presented himself well during the PDH and took responsibility for his actions and omissions. Pursuant to the PDH, the code of conduct violation was non-sustained but the procedural violation (Class 5, First Offense) was sustained. An 8-hour suspension was imposed, to be held in abeyance, and a training issue was

appropriately identified and flagged.  Thus, the officer, who failed to take appropriate action on a child abuse allegation (a class five offense) concerning a fellow officer, was resolved with what in effect was no action!

The subject officer's retention card showed two sustained Class 7 violations in a prior investigation within one year of the present offense. These prior Class 7 violations both involved "Verbal Reprimand Not Imposed due to timelines." They involved use of force investigation procedure and medical attention following a use of force, appearing to be part of the Use of Force backlog cases arising out of the prior use of ACMs. These findings, even though discipline was not imposed, should have enhanced a present offense that is counted as a prior offense. In this case they were not identified in the Disciplinary Action Packet, nor considered as prior offenses in the imposition of discipline.  The Acting Commander noted that the DAP did not identify any previous violations and the discipline imposed reflected the absence of same.

The disciplinary matrix Chart of Sanctions shows the range for a Class 5, First Offense to be a suspension of 8-32 hours. A Class 5, Second Offense is a suspension of 40-80 hours. Here we do not find fault with the minimum of the range for a Class 5, First Offense (8 hours) being imposed. The deficiency in this case is that prior offenses were not identified in the DAP and not relied upon by the Acting Commander in imposing discipline; that is, the starting point of the aggravating/mitigating circumstances analysis should have been a Class 5, Second Offense (40-80 hours) and then proceeded accordingly.  Given our experience with APD over the past six years, the monitor concludes that these deficiencies were deliberate, and designed to allow a lesser disciplinary decision.

The final case of deficient discipline involved a matter that held a 10-hour suspension in abeyance for a 3rd OBRD violation within a year. [IMR-12-59]. The complaint was for an unlawful traffic stop outside the jurisdictional boundary of Albuquerque. The driver questioned the officer's actions and jurisdiction at the scene, and it was apparent that a complaint would likely result from the encounter. The investigation of the complaint sustained violations for failing to upload the OBRD video and failing to call the stop into dispatch (both not based on original complaint). The subject officer's retention card showed two prior investigations involving sustained violations for failure to manage OBRD recordings, one resulting in a verbal reprimand and one resulting in verbal reprimand and 10-hour suspension to be held in abeyance for 6 months. It also showed, within one year, a separate violation of a missed court date for which a verbal reprimand was received. The discipline in this matter was the exact same discipline that had been imposed in the previous investigation, 10 hour suspension to be held in abeyance for 6 months on the OBRD violation and a and a verbal reprimand on failure to call the stop in.  The disciplinary matrix for a third offense, level 7 shows a suspension of 8-32 hours. This case failed to follow the tenets of progressive discipline by imposing the same discipline as the prior OBRD violation and failing to set forth a reasonable and convincing explanation for holding a suspension in abeyance for a second time. The activation of the OBRD and the proper management of OBRD recordings are crucial to the success of CASA reforms, and discipline in regard to OBRD failures must be

commensurate with the organizational needs to deter and correct such misconduct as well as the prior offenses of the individual officer. In this case it falls short of that mark. We find the discipline actually executed in this case to be problematic, and symbolic of an unwillingness to correct effectively violations of CASA-related behaviors.  More shockingly, this Counter-CASA process emanated from the office of the  former Chief of Police.

The monitor again notes that in regard to paragraphs 198 through 200 of this report, compliance with the CBA in not imposing discipline that is "time-barred" does not excuse APD's failure to meet the requirements of paragraphs 201 and 202 of the CASA to impose appropriate discipline on sustained charges. The CASA indirectly requires APD and CPOA to be staffed sufficiently to meet their investigative responsibilities in a timely manner, to operate efficiently, and to bring sustained charges to the command review process in time for the review process to run its normal course. The monitor also expects that the command review will take place in an efficient manner such that when discipline is appropriate, the Notice of Intent to Discipline letter will be issued within the requisite time period. Investigations ending with "failure to impose discipline on sustained charges due to time considerations" will be marked as deficient for purposes of paragraph 201 and 202 compliance, absent careful articulation and explanation by APD.

### 4.7.187 Assessing Compliance with Paragraph 201:  Fact Based Discipline

Paragraph 201 stipulates:

> **"APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

**Recommendations for Paragraph 201:**

*4.7.187a:  Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless written reasons for departure from the matrix recommendations accompany the decision.*

*4.7.187b: Ensure that adequate explanation is given for the selection of a classification level where there is more than one level of classification associated with a regulation for which a sustained finding is made.*

*4.7.187c: APD should designate the Commander of IAPS or a Deputy Chief as the only person in the organization who has the authority to determine that discipline cannot be imposed due to time violations, and that designation should not be made without the approval of the City Attorney.*

*4.7.187d: All investigations involving sustained charges where discipline cannot be imposed due to violations of time constraints should be reported quarterly to the Chief, the City Attorney, DOJ, and the monitor.*

*4.7.187e: APD should adopt the practice of having a representative of IAPS or an administrative prosecutor attend PDHs and represent the findings and recommendations set forth in the investigation.*

*4.7.187f: Ensure uniformity in the amount and format of summarizing information presented to the Chief with investigations, and thus CPOA should follow the IAPS practice and adopt the use of Disciplinary Action Packets to accompany its investigations in which charges are sustained.*

*4.7.187g: Ensure that all PDHs are recorded and preserved as part of the investigative file.*

### 4.7.188 Assessing Compliance with Paragraph 202: Discipline Matrix

Paragraph 202 stipulates:

> "APD shall establish a disciplinary matrix that:
>
> a)  establishes a presumptive range of discipline for each type of rule violation;
> b)  increases the presumptive discipline based on an officer's prior violations of the same or other rules;
> c)  sets out defined mitigating or aggravating factors;
> d)  requires that any departure from the presumptive range of discipline must be justified in writing;
> e)  provides that APD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and
> f)  provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed."

### Results

Primary:  **In Compliance**
Secondary:  **In Compliance**
Operational:  **Not In Compliance**

277

**Recommendations for Paragraph 202:**

**4.7.188a:  Ensure that all disciplinary decisions either conform to the recommended ranges included in APD's disciplinary matrix or that they are accompanied by written explanations for the departure from the recommendations of the disciplinary matrix.**

**4.7.188b: Ensure that all disciplinary decisions related to actions (or inactions) that are reasonably on the "critical path" regarding compliance with the CASA reflect a resolve to foster behaviors required by the CASA.**

**4.7.188c: Ensure that all disciplinary packets are complete and self-explanatory, including documentation that all steps in the investigation and disciplinary processes were completed as required by policy.**

**4.7.188d: Ensure a more exact calculation of prior offenses for purposes of calculating the presumptive range of the disciplinary matrix.**

**4.7188e: Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless cogent, written reasons for departure from the matrix recommendations accompany the decision.**

**4.7188f:  A revised AO 3-46 must be adopted on a priority basis and must reflect the tenets of the CASA and principles of fair and consistent discipline, and clearly set forth the information necessary to calculate a prior offense and the appropriate range of the disciplinary matrix in accordance with the principles of progressive discipline.**

**4.7188g:  Ensure that a revised AO 3-46 addresses when a suspension can be held in abeyance and the criteria for doing so, and that a cogent explanation consistent with the tenets of progressive discipline be given whenever a suspension is held in abeyance.**

**4.7188h: Insert an additional column in the disciplinary decision matrix that identifies whether the range of discipline is enhanced by prior offenses.**

**4.7189i: Revise SOP and develop guidance for when relief of duty is appropriate and warranted.**

MONITOR's NOTE: Holding a suspension in abeyance is in effect a departure from the appropriate range of the disciplinary range, requiring a reasonable and articulable justification for doing so, as set forth in Recommendation 4.7188e above.

We also underscore that the activation of the OBRD and the proper management of OBRD recordings are crucial to the success of CASA reforms, and that discipline must

always consider and reflect aggravating and mitigating circumstances, and be commensurate with the organizational needs to deter and correct misconduct as well as with the record of the subject officer, and particularly so where violations have a direct nexus to the CASA, as reflected in Recommendation 4.7.188b, above.

### 4.7.189 Assessing Compliance with Paragraph 203

Paragraph 203 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement the terms of this Agreement. APD shall also deploy a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally. APD shall revise and implement policies for supervision that set out clear requirements for supervision and comport with best practices."**

### Methodology

During this reporting period, the City received a proposal from Alexander Weiss Consulting, LLC (AWC) to conduct a "staffing study" of APD.  That proposal was dated 29 June 2020.  The monitoring team has briefly reviewed the AWC proposal "summary," and finds that there is not enough detail to determine the actual scope, process and product stipulated in the proposal summary.  We will continue to assess this process as more information becomes available.  Until APD (or the City) develop a quantifiable, data-based, reliable assessment of staffing needs, operational compliance with this paragraph will be elusive.

### Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

### 4.7.190 Assessing Compliance with Paragraph 204:  Comprehensive Staffing Study

Paragraph 204 requires:

> **"In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its**

**mission. APD therefore shall conduct a comprehensive staffing assessment and resource study. The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques. The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands. This staffing assessment and resource study shall be completed within one year of the Operational Date. Within six months of the completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement."**

## Methodology

During this reporting period, APD received a proposal from Alexander Weiss Consulting, LLC (AWC)to conduct a "staffing study" of APD.  That proposal was dated 29 June 2020.  The monitoring team has briefly reviewed the AWC proposal "summary," and finds that there is not enough detail to determine the actual scope, process and product stipulated in the proposal summary.  We are unable to determine if the proposal submitted was directly crafted to the CASA-identified requirements; however, based on the monitor's familiarity with staffing processes, we are concerned that the Weiss proposal may not identify crucial staffing process analysis for APD's "community-oriented" policing principles, goals and objectives.  We note that the Weiss proposal makes only a passing "bulleted" mention of "community-outreach" practices and does not specifically address such processes as problem identification, issue analysis, community outreach staffing, or problem-solving process staffing.  We would consider a treatment of these labor factors to be critical if APD is to move forward with its current intentions to grow its community-oriented policing practice.  We will continue to assess this process as more information becomes available.

## Results

    Primary:       **In Compliance**
    Secondary:   **In Compliance**
    Operational:  **In Compliance**

### *Recommendations for Paragraph 203:*

**4.7.189-4.7.190a:  Generate reliable factor-based processes for identifying the workloads created by APD community policing practices, and base future manpower analyses and staffing requests on these data elements.**

**4.7.191 – 4.7.194 Assessing Compliance with Paragraphs 205- 208: Supervision and Related Paragraphs**

The monitoring team reviewed and examined the data required for APD to achieve compliance with paragraphs 205 thru 208 for this reporting period (February 1, 2020 thru July 31, 2020), in the forms of policy, programs, and results. For this monitoring period (IMR-12), the monitoring team conducted the site visit via a virtual platform from June 8th thru June 12th, 2020, due to the circumstances created by the COVID Pandemic. The aforementioned paragraphs correspond to the Supervision and Related paragraphs as delineated in the CASA. These paragraphs address the supervisory requirements for First Line Supervisors, the required span of control and corresponding levels of supervision, and the expectation of close supervision by the lieutenants and commanders.

APD's Performance Metrics Unit (PMU) continues to conduct quantitative evaluations and audits on areas of the CASA as they relate to the supervisory aspects of the related paragraphs. The data supplied to the monitoring team show improvement in the following areas: monthly activity reports, monthly check-off lists, monthly line inspections, monthly video inspections and firearms. Revisions were made to SOP 3-30 (Line Inspection Process), SOP 2-80 (Arrests, Arrest Warrants, and Booking), SOP 4-13 (Daily Staffing and Briefings), SOP 3-14 (Supervisory Leadership) and SOP 2-8 (On Body Recording Devices). During this period, a pilot program for the community engagement and outreach application was implemented. The program is designed to improve community engagement and to create a process that accurately reports any relationship-building activities that take place between APD and the community.

These improvements are facilitating APD capture of useful information to better measure the supervisory requirements. As stated by the monitoring team in previous reporting periods, Information Technology issues have been a major obstacle in implementing this new system. As a result of these concerns, APD has been working with the City of Albuquerque's Department of Technology and Innovation (DTI) to create the appropriate workspace for certain applications. The Accountability and Oversight Division (AOD) is in the process of testing the program. They have advised the monitoring team that they are working on making it available department-wide with a target date to go live during the next reporting period.  We note that this somewhat innocuous statement speaks volumes about just how much APD's compliance processes have developed matured of late.  Gone are the days where programs were announced and implemented without solid planning and assessment.  This is a sign of commitment on the part of APD to strong CASA-implementation planning and execution.

Due to the fact that the site visit for IMR-12 was conducted on a virtual platform, any in-person assessments will be conducted during the next possible on-site visit. The monitoring team relied on the above-mentioned reports to verify compliance with staffing levels, that first-line supervisors were on duty at all commands, and that normal day-to-day operations of APD patrols units are supported and supervised at the levels

required by the CASA.  The strength and professionalism of APD's internal processes regarding data for paragraph 204 speaks volumes for the systems improvement processes available at APD during this reporting period.

As in previous IMRs, the assessment of use of force by APD supervisors as mandated by Section IV of the CASA is of concern to the monitoring team. The progress made by APD in these areas is a positive sign that the department is moving in the right direction. Nonetheless, until the process is complete and fully implemented throughout the entire department, secondary or operational compliance cannot be attained. The monitoring team will continue to review audits and actions taken to reduce repetitive oversight errors during future reporting periods.  We note that the ability of APD to field fully functioning self-monitoring is critical to the success of APD's organizational reform practices.  To date, self-monitoring of supervisory processes has not been fully developed.

### 4.7.191 Assessing Compliance with Paragraph 205

Paragraph 205 stipulates:

> **"First-line supervisors shall investigate officers' use-of-force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy."**

#### Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.192 Assessing Compliance with Paragraph 206

Paragraph 206 stipulates:

> **"All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command. First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary command. Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department."**

**Results**

Primary:          **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.193 Assessing Compliance with Paragraph 207

Paragraph 207 stipulates:

> **"First-line supervisors shall ordinarily be assigned as a primary supervisor to no more than eight officers. Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary."**

**Results**

During Zoom site visits at Area Commands this reporting period, we found no unit, shift, or operational command that failed to meet this articulated span of control.

Primary:          **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.194 Assessing Compliance with Paragraph 208

Paragraph 208 stipulates:

> **"APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command. APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement."**

**Results**

Primary:          **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraphs 205, 206, 208:*

*4.7.191-4.7.194a: Now that training has been completed, APD must move its focus to the next (and much more difficult task) of ensuring applicable policies and training are actually implemented in the field. Based on our past experience with APD's supervisory cadre, this will be a complex task requiring focused daily oversight, assessment, follow-up, and correction.*

*4.7.191-4.7.194b: Unless rigorous field-wide inspections and audit processes are implemented, we foresee a potentially significant amount of "slippage" at command levels regarding adherence to existing policy and training. APD should anticipate this potential as well and should plan and implement meaningful assessment and internal monitoring practices related to the business practices outlined in these paragraphs.*

*4.7.191-4.7.194c:  We note this is the second consecutive report in which we have articulated these recommendations, and we have yet to see any attempt to implement the recommendations (or alternate procedures) designed to work toward compliance for these three paragraphs.*

**4.7.195 - 4.7.197 Assessing Compliance with Paragraphs 209 - 211:
Review of Sergeants' Training**

Paragraphs 209 and 210 address various supervisory training requirements APD must meet for the CASA. "Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities." Data requested and received by the monitoring team for this reporting period:

- April 2020 eighty (80) hour course;
- Evaluation for eighty (80) hour course;
- Critiques for eighty (80) hour course;
- Rosters for eighty (80) hour course;

As in other monitoring periods, data requested and received by the monitoring team indicate that these portions of the requirement have been addressed by APD in the supervisory course delivered during this reporting period.

APD continues to improve on the new system for supervisory monthly reports that will report any results designed to measure the impact of the training received under paragraphs 209 and 210 for the 11th reporting period.

The use of force training as mentioned in IMR-11 will extend until the next reporting period well into the end of 2020.  APD has completed Tier 3 training for supervisors during this reporting period and the results of that training should bear results for the

next monitoring period. Tier 4 training is tentatively scheduled for the first quarter of 2021 according to the Academy staff.

The impact of training recently delivered by APD and what remains to be delivered is not measurable during this reporting period, the monitoring team will closely monitor the impact of the training in future reporting periods.

### 4.7.195 Assessing Compliance with Paragraph 209

Paragraph 209 stipulates:

> **"Sergeant training is critical to effective first-line supervision. Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities."**

### Results

Compliance has not been attained this reporting period, possibly due in part to the impact of COVID-19 on APD operations.  We do note that we are deeply concerned about current work product being developed at the Academy.  It seems training oversight and management practices have been seriously attenuated during 12th monitoring period.

Primary: **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.196 Assessing Compliance with Paragraph 210

Paragraph 210 stipulates:

> **"APD's sergeant training program shall include the following topics:**
>
> **a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;**
> **b) de-escalating conflict;**
> **c) evaluating written reports, including those that contain canned language;**
> **d) investigating officer uses of force;**
> **e) understanding supervisory tools such as the Early Intervention System and on-body recording systems;**
> **f)  responding to and investigating allegations of officer misconduct;**
> **g) evaluating officer performance;**
> **h) consistent disciplinary sanction and non-punitive**

**corrective action;**
**i)  monitoring use-of-force to ensure consistency with**
**policies;**
**j)  building community partnerships and guiding**
**officers on this requirement;**
**k) legal updates."**

## Results

Compliance has not been attained this reporting period.

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.197 Assessing Compliance with Paragraph 211

Paragraph 211 stipulates:

**"All sworn supervisors shall also receive a minimum of**
**32 hours of in-service management training, which may**
**include updates and lessons learned related to the**
**topics covered in the sergeant training and other areas**
**covered by this Agreement."**

## Results

The monitoring team conducted the site visit via a virtual platform from June 8th thru June 12th, 2020, due to the circumstances created by the COVID Pandemic. The in-service management training was not delivered for this reporting period. The below listed courses are scheduled to be delivered within the 13th reporting period. The delivery of these courses would bring APD into compliance with the requirements of the paragraph. The monitoring team will continue to monitor progress in this paragraph in future site visits.

- Completing and Administrative Investigation;
- IA – Request and Notification;
- Proposed UOF investigation video;
- UOF Video/review practical – Sample scenario for review;
- Critical Incident Management videos – prepared by Academy;
- Proposed ethics video; and
- Video series to address common supervisory deficiencies

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

**Recommendations for Paragraphs 209 – 211**

**4.7.195-4.7.197a:  Ensure provision of adequate, focused, and CASA-congruent training related to the requirements of paragraphs 209-211.**

**4.7.198 – 4.7.205 Assessing Compliance with Paragraphs 212-219 EIS/EIRS/PMEDS**

During this monitoring period the Performance Evaluation and Management System (PEMS) policy 3-33 was approved by the Monitor. APD has come a long way toward understanding the value of an "early intervention system."

At the end of the monitoring period for IMR-12, the PEMS Supervisor Lesson Plan was submitted to the Training Academy for review and development for supervisor training. While this is a complicated plan, the CTU and PEMS development team meet weekly to improve the lesson plan and Power Point presentation.

Phase 2 testing had just begun late in the monitoring period, so no completed audit data was yet available.  Supervisors at the testing location are requested (and are responding) to providing feedback. In reviewing the feedback, many supervisors are struggling with the difference between discipline and performance assessments.  Partly to blame is the opportunity for a supervisor solely to determine if behavior is "problematic" or "commendable." Many have provided feedback that the behavior reviewed did not fall into either category.  As such, it is obvious that system development must continue with this valuable feedback in mind.

As noted in IMR-11, the draft versions of policy, curriculum, and plans to move forward with a system that has the capability to meet or exceed CASA requirements have been established. PEMS is proposed to be a data-driven system with thresholds supported by data analysis and research, using a statistical process based on an 80/20 percentage principle to establish thresholds rather than arbitrarily assigned incident numbers (as we have long-recommended).

APD envisions the entire process as a significant project based upon policy approval, system selection, training, and implementation.  This is a major project which will require time, focus, input, and assessment from multiple levels of the organization.  The monitoring team believes this to be, of necessity, a long-term process, based on prior experience with Early Intervention Systems in Pittsburgh and New Jersey.  While this timeline is problematic with regards to attaining compliance with the requirements of the CASA, the monitoring team believes that APD has finally grasped the importance of an Early Intervention System.  While approved policy guidance exists, it is highly probable that, when new systems are developed, policies will need to change.  Nonetheless, APD is currently in primary compliance, as existing policies have been promulgated and approved.

287

### 4.7.198 Assessing Compliance with Paragraph 212

Paragraph 212 stipulates:

> **"Within nine months of the Operational Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers. APD supervisors shall be trained to proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being."**

### Results

Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.199 Assessing Compliance with Paragraph 213

Paragraph 213 stipulates:

> **"APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties."**

### Results
Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.200 Assessing Compliance Paragraph 214

Paragraph 214 stipulates:

> **"APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review."**

### Results

Primary:       **In Compliance**

Secondary:  **Not In Compliance**
Operational: **Not In Compliance**


### 4.7.201 Assessing Compliance Paragraph 215

Paragraph 215 stipulates:

> **"The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum:**
> **a) uses of force;**
> **b) injuries and deaths to persons in custody;**
> **c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy;**
> **d) all civilian or administrative complaints and their dispositions;**
> **e) all judicial proceedings where an officer is the subject of a protective or restraining order;**
> **f) all vehicle pursuits and traffic collisions involving APD equipment;**
> **g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system;**
> **h) all disciplinary action taken against employees;**
> **i) all non-punitive corrective action required of employees;**
> **j) all awards and commendations received by employees, including those received from civilians, as well as special acts performed by employees;**
> **k) demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;**
> **l) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and**
> **m) all offense reports in which an officer is a suspect or offender."**


### Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.202 Assessing Compliance Paragraph 216

Paragraph 216 stipulates:

> **"APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it. The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.203 Assessing Compliance Paragraph 217

Paragraph 217 stipulates:

> **"APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law. Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System. On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.204 Assessing Compliance Paragraph 218

Paragraph 218 stipulates:

> **"APD shall provide in-service training to all employees, including officers, supervisors, and commanders,**

**regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system. APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command. Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.205 Assessing Compliance Paragraph 219

Paragraph 219 stipulates:

> **"Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate. The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 212 - 219:*

*4.7.198-205a:  Complete and submit for approval the curriculum for PEMS training for supervisors and ensure that the new PEMS system addresses all required components of paragraph 215 and the additional requirements of Paragraph 23 (Firearm discharges), Paragraph 38 (ECW data) and Paragraph 105 (Tactical Unit data).*

***4.7.198-205b: Document and demonstrate that the proposed "Pareto Principle" or 80/20 principle as a statistical tool that works effectively and can be used to demonstrate both acceptable and unacceptable behavior from officers as required by the CASA.***

***4.7.198-205c: Document learning assessment processes for the training provided for supervisors.***

***4.7.198-205d: Design and document audit protocols for supervisory review and reporting of PEMS processes.***

### 4.7.206 – 4.7.217 Assessing Compliance with Paragraphs 220-231

During this monitoring period for IMR-12 (February 1, 2020-July 31, 2020), APD's PMU has continued to actively engage in auditing Area Commands for OBRD-related activities. The findings so far yielded enough information to conclude that great strides have been made with respect to APD's execution and training related to their OBRD requirements. The internal audit processes this period showed a compliance rate of 95% or higher in all six Area Commands with respect to OBRD requirements. The actual take-away from these processes are positive.  APD has matured in management oversight of critical processes and has begun addressing known problems without first querying the monitoring team for assistance.  This is the type of indicator of self-reliance that will lead, eventually, to full compliance.  The final step in this process, internalizing lessons learned while the monitoring team is engaged almost daily with APD, will begin in earnest with the release of the internal audit of OBRD activity, and APD's response to the release of that internal audit.  This will be an important test of APD's ability to self-manage.

The areas of concern continue to be accountability and the response to violations of the OBRD policy requirements.  During this monitoring period, ninety-one Internal Affair Requests were initiated for allegations specific to SOP 2-8 On-Body Recording Devices. The findings are as follows:

Sustained:  77
Unfounded:  9
Exonerated: 4
Not Sustained: 1

Sustained Findings/Actions/Discipline:

Administratively Closed-Non-Disciplinary Corrective Action: 32
Verbal Reprimand: 33
Letter of Reprimand: 11
Suspension: 1
Resignation: 1

292

Four officers were found to have two or more OBRD violations during this period.  Three of the four officers had their first case Administratively Closed NDCA and received a verbal reprimand for the second violation.  One officer received a verbal reprimand and then a 10-hour suspension, but the suspension was held in abeyance.  We are baffled as to just how APD can "administratively close" a sustained case.  Overall, we note that OBRD policy requirements are critical elements of CASA compliance, yet we found that only one officer received any actual re-training or discipline.  The message this sends to officers is questionable at best.  OBRD usage is a critical tool for assessing officer actions in the field, and such irresponsible and lenient responses by oversight mechanisms to such blatant disregard for established policy are serious indictors of failed leadership.

Members of the monitoring team visited all six Area Commands (virtually), and asked supervisors explain their understanding of the existing policy requirements, and to demonstrate that they in fact had completed the required video reviews.  All supervisors contacted were aware of the policy requirements, fluent in their use of the system, and had documented their completed video reviews. Several supervisors had discovered broken equipment during monthly line inspections and had the equipment replaced immediately.  Several violations were discovered during video reviews and referred to Internal Affairs via Blue Team.  This is a marked improvement over past performance in this area, and reflects the internal audits showing compliance rates at or in excess of 95%.  APD's internal audits and the monitoring team's assessments are in synch, an indication of reliability and validity of APD's internal audit functions.

During the IMR-11 reporting period, APD submitted an OBRD Curriculum to the monitoring team.  The curriculum and its accompanying PowerPoint presentation were reviewed by the monitoring team, returned with comments, revised, and finally approved by the monitor.  The final product was an excellent training curriculum.  A 4-hour class was presented to all new acting sergeants and newly promoted first-line supervisors during an 80-hour Supervisory Training block.  The monitoring team views well-trained supervisors as the lynchpin to making this entire process function properly. Due to the COVID Pandemic, no OBRD training took place during this reporting period.

### 4.7.206 Assessing Compliance Paragraph 220

Paragraph 220 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems. Within six months of the Operational Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require:**
> **a) specific and clear guidance when on-body recording systems are used, including who will be assigned to**

293

wear the cameras and where on the body the cameras are authorized to be placed;
b) officers to ensure that their on-body recording systems are working properly during police action;
c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning;
d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible;
e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;
f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits;
g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and
h) APD to retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved."

**Results**

APD has developed compliant policy for OBRD operation and has trained all appropriate personnel in the operation of OBRD units with respect to those policies. During prior reporting periods we have noted that the pilot audits at the Area Commands illustrated compliance levels of in-field operations of OBRDs below the 95 percent level. During the 12th reporting period, APD has shown great improvement in supervision and review by first-line supervisors and command cohorts. The important information, however, is that these audits were conducted internally by APD, not externally by the Monitor. Operational compliance will require demonstrable and effective internal responses to the issues noted by these internal (to APD) findings. We note, parenthetically, that we have operationalized several "oversight" conversations with APD's Oversight Division relative to their internal audit processes, providing insight, feedback, and coaching. Based on our review of their work this reporting period, the vast majority of our advice has been operationalized in COD's work related to internal auditing and reporting.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

294

*Recommendations for Paragraph 220:*

*4.7.206a: Prepare, quarterly, a written assessment of the results of the inspections and audit outcomes, identifying the top five areas of non-compliance with the requirements of OBRD field processes.*

*4.7.206b: Based on the quarterly audits, identify the top three reasons for non-compliance with OBRD policies and procedures, and develop specific, targeted responses to address and remediate each of the top three non-compliance areas.*

*4.7.206c: Repeat steps a and b until field OBRD error rates are below five percent.*

### 4.7.207 Assessing Compliance with Paragraph 221

Paragraph 221 stipulates:

> **"APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and implementation. Upon approval by the Monitor and DOJ, policies shall be implemented within two months."**

### Results

Policies responsive to paragraph 221 have been developed and trained.  Supervisors have begun to document OBRD equipment failures, failures to upload required recordings and failures to record.  These failures are beginning to be referred to Internal Affairs, however the monitoring team is concerned that the final outcomes of policy violations are not commensurate with the violation. Only one of 91 violations resulted in a suspension, and that suspension was held in abeyance!

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 221:*

*4.7.207a: Develop, implement, and assess supervisory protocols to ensure violations of applicable policy are identified by supervisors and are addressed and remediated, many of which have already been recommended to APD by the monitoring team.*

*4.7.207b: Publish quarterly "OBRD Failure" reports identifying the top five reasons for OBRD failure in the field, and identifying the Area Command, shift, and supervisors associated with those failures.*

***4.7.207c: Discipline supervisors with repeated failures in noting, assessing, and correcting officers with repeated OBRD operations failures.***

***4.7.207d: Repeat until error rates on OBRD operation fall below five percent.***

### 4.7.208 Assessing Compliance with Paragraph 222

Paragraph 222 stipulates:

> **"The Parties recognize that training regarding on-body recording systems is necessary and critical. APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff. APD will develop a training curriculum, with input from the Monitor and DOJ that relies on national guidelines, standards, and best practices."**

**Results**

Monitor-approved supervisory training for OBRD operations in the field was implemented during the monitoring period for IMR-11. Problems with supervision in past reports have not presented themselves this period. Internal Affairs received ninety-one referrals related to OBRD policy violations. The monitoring team, due to the COVID Pandemic conducted this visit "virtually". During the next site visit, conditions permitting, members of the monitoring team will spend significant time reviewing Internal Affairs files to determine if the actions taken as a result of OBRD policy violations were appropriate.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 222:***

***4.7.208a: Reinforce the established clear, concise, and reasonable requirements for supervisory review of in-field activations of OBRDs, requiring field supervisors to review OBRD activations and recordings for compliance to established policy.***

***4.7.208b:  Ensure global retraining of supervisory and command personnel regarding these requirements.***

***4.7.208b:  Increase internal oversight related to OBRD usage and supervision and ensure that OBRD supervisory oversight is of sufficient scale and scrutiny to identify problematic issues related to OBRD usage.***

*4.7.208b: Establish a routinized process for command oversight of the OBRD review process, requiring lieutenants to assess, in a methodical way, the OBRD review processes of sergeants under their command, and commanders to assess the OBRD review performance of lieutenants under their command, to ensure compliance with reasonable assessments of actions in the field.*

*4.7.208c: Establish a routine administrative review, via Compliance Bureau Personnel, of Area Command OBRD review efficiency, including performance metrics such as overall review rates, error rates, and remediation protocols.  This review process should be on-going and assigned to the Performance Metrics Unit.*

### 4.7.209 Assessing Compliance with Paragraph 223

Paragraph 223 stipulates:

> **"APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order. Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor."**

### Results

The monitoring team has reviewed the latest supervisors monthly line inspection forms submitted online and assessed the OBRD related queries. During interviews with the monitoring team, supervisors reported several equipment failures and had replacements made immediately. APD is working with Axon to obtain comprehensive data to reach compliance with this requirement.  APD supervisors are beginning to properly document equipment checks at an acceptable level.  Effective supervision, documentation of behaviors, and application of appropriate discipline to sustained policy violations are key to elevation of compliance rates.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

### 4.7.210 Assessing Compliance with Paragraph 224

Paragraph 224 stipulates:

> **"Supervisors shall be responsible for ensuring that officers under their command use on-body recording**

> **systems as required by APD policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

### *Recommendations for Paragraphs 223 – 224:*

*4.7.209-210a: Ensure that supervisors who fail to note errors in OBRD operation are counseled, or for multiple offenders, retrained and/or disciplined for ineffective OBRD review processes. If, after counseling or retraining, supervisors continue to miss OBRD activation or usage violations, ensure appropriate discipline is imposed.*

*4.7.209-210b: Identify the top 20 supervisors who have substandard performance on OBRD activation review and assess the reasons for failure to enforce established process.  Place these supervisors "on notice" that their performance on this task will be routinely reviewed, and continued failures will result in discipline.*

*4.7.209-210c:  Follow up on these counseling sessions with discipline if necessary.*

### 4.7.211 Assessing Compliance with Paragraph 225

Paragraph 225 stipulates:

> **"At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed."**

## Results

During site visits to the various Area Commands, including virtual the (virtual) site visit in the 12th monitoring period, APD supervisors have been able to demonstrate that they understand the policy with regards to video reviews and have documented that they have in fact conducted these reviews.  Those reviews demonstrate whether or not the officer is acting within policy and that the equipment was in working order.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.212 Assessing Compliance with Paragraph 226

Paragraph 226 stipulates:

> **"APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.213 Assessing Compliance with Paragraph 227

Paragraph 227 stipulates:

> **"APD shall ensure that on-body recording system videos are properly categorized and accessible. On-body recording system videos shall be classified according to the kind of incident or event captured in the footage."**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.214 Assessing Compliance with Paragraph 228

Paragraph 228 stipulates:

> **"Officers who wear on-body recording systems shall be required to articulate on camera or provide in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded. Intentional or otherwise unjustified failure to activate an on-body recording system when required by APD policy shall subject the officer to discipline."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**

Operational: **Not In Compliance**

### 4.7.215 Assessing Compliance with Paragraph 229

Paragraph 229 stipulates:

> **"APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties. On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room)."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

Monitor's Note: The majority of past OBRD errors noted by the monitoring team (and APD's Force Backlog Review) indicated a failure of supervisors to assess and act upon OBRD failures exhibited by line personnel.  Again, these were not policy or training errors, but errors in implementation of approved policy.  The errors were those of supervisory and management personnel failing to insist on compliance with the CASA. During this period, supervisors were in fact discovering and referring policy violations to Internal Affairs for investigation.  The final step in the process will be appropriate measures being taken for the violations. Of the 91 cases referred for investigation with 77 being sustained, only one resulted in a suspension, which was then held in abeyance.  Thus, APD has solidly signaled to its field personnel that adherence to OBRD policy is not important and will not be enforced.  This is a sure bulwark against compliance with the CASA, and it comes from the highest levels of the organization.

### 4.7.216 Assessing Compliance with Paragraph 230

Paragraph 230 stipulates:

> **"APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift. All images and sounds recorded by on-body recording systems are the exclusive property of APD."**

**Results**

Primary:      **In Compliance**

Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.217 Assessing Compliance with Paragraph 231

Paragraph 231 stipulates:

> **"The Parties are committed to the effective use of on-body recording systems and to utilizing best practices. APD currently deploys several different platforms for on-body recording systems that have a range of technological capabilities and cost considerations. The City has engaged outside experts to conduct a study of its on-body recording system program. Given these issues, within one year of the Operational Date, APD shall consult with community stakeholders, officers, the police officer's union, and community residents to gather input on APD's on-body recording system policy and to revise the policy, as necessary, to ensure it complies with applicable law, this Agreement, and best practices."**

**Results**

Primary:     **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 228, 229, and 231:*

*4.7.217a: Conduct detailed failure analyses designed to identify the causes of incidents of "failure to record," and identify the true cause of these failures: equipment, training, supervision, or "other."*

*4.7.217b: Rank order the failure rates and develop action plans to eliminate the causes of failure, beginning with the most frequent and working to least frequent.*

*4.7.217c: Identify a frequency-based list of supervisors who fail to enforce OBRD requirements, and schedule these supervisors for retraining, counseling, or discipline, as appropriate.*

## 4.7.218 – 4.7.226 Assessing Compliance with Paragraphs 232-240 (Recruiting)

Members of the monitoring team reviewed APD data related to these requirements in the form of policy, programs, Course of Business documents, and results.  APD continues attracting and hiring qualified individuals, and therefore remains in Operational Compliance with each of these CASA paragraph requirements. APD Recruitment staff continue to provide an impressive array of strategies and concepts for

recruiting police officers during the COVID Pandemic and at a time in history in which interest in the profession is down significantly nationwide.

In response to COVID, the recruiting unit had to cancel many community events and gatherings.  However, they have become extremely innovative in their ability to carry on their mission.  While having created a social media footprint for recruiting, it has been enhanced with the addition of Facebook and Instagram accounts, including "live" events with the ability for live questions & answers. Zoom meetings were conducted with current cadets both in and out of state.  APD has continued to produce videos including the Academy Campus video which provided an Academy tour, Physical Training demonstrations, and how to complete Step 1 in the application process.   Both TV and radio has been utilized with the "Stand Alone" videos broadcast by all the local stations and "live" radio segments with call ins for Questions & Answers.  During the reporting period, and prior to the COVID restrictions, the recruiting unit attended career fairs at UNM, CNM, El Paso Community College, Kirtland AFB, Ft. Bliss, and numerous others. Virtual events have continued through the restrictions.

The monitoring team applauds other recruiting unit innovative solutions to COVID restrictions. Recruiting flyers have been included in ABQ water bills.  Recruiting flyers and posters have been delivered to the unemployment offices. The unit has done "in-person" recruiting at locations with displaced workers and utilizes an SUV as a mobile recruiting "billboard."

The results of these efforts can be seen in the significant increase in phone queries, submission of interest cards and new applicants.  All areas have shown substantial increases over the prior years' numbers.

A recruit class was seated, along with laterals during this monitoring period, and graduated in June 2020.  The monitoring team has always conducted a random audit of the CASA requirements for all classes and laterals.  Due to the COVID response and a virtual site visit for IMR-12, this audit was not conducted.  However, during all past audits, the monitoring team has not once found any of the requirements to be missing. APD has been in 100% compliance with these requirements for more than three years. The audits will be conducted again during the next site visit.

With the easing of restrictions, the Recruiting Unit is planning to once again interact with community leaders and stakeholders to ensure their involvement with the Albuquerque Police Department's selection process.


For the requirement of random drug-testing of current officers (Paragraph 237), APD submitted course of business documentation of testing current APD officers during this monitoring period at an acceptable level.  The monitoring team noted in a prior report that only seven officers were tested one month and none during another month due to a change in vendors.

APD has met or exceeded all established requirements for Paragraphs 232-240.

### 4.7.218 Assessing Compliance with Paragraph 232

Paragraph 232 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.219 Assessing Compliance with Paragraph 233

Paragraph 233 stipulates:

> **"APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross section of the community. The recruitment plan shall establish and clearly identify the goals of APD's recruitment efforts and the duties of officers and staff implementing the plan."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.220 Assessing Compliance with Paragraph 234

Paragraph 234 stipulates:

> **"APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community."**

**Results**

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.221 Assessing Compliance with Paragraph 235

Paragraph 235 stipulates:

> **"APD's recruitment plan will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. APD shall create and maintain sustained relationships with community stakeholders to enhance recruitment efforts."**

**Results**

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.222 Assessing Compliance with Paragraph 236

Paragraph 236 stipulates:

> **"APD shall develop and implement an objective system for hiring and selecting recruits. The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws."**

**Results**

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.223 Assessing Compliance with Paragraph 237

Paragraph 237 stipulates:

> **"APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and**

> **polygraph examination to determine their fitness for employment. APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers. The program shall continue to be designed to detect the use of banned or illegal substances, including steroids."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.224 Assessing Compliance with Paragraph 238

Paragraph 238 stipulates:

> **"APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws. APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.225 Assessing Compliance with Paragraph 239

Paragraph 239 stipulates:

> **"APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires. APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.226 Assessing Compliance with Paragraph 240

Paragraph 240 stipulates:

> **"APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.227 – 4.7.229 Assessing Compliance with CASA Paragraphs 241-243: Promotions

There have been no promotions made by APD during this reporting period.  When promotions are made records are checked in Human Resources, Internal Affairs, and the Training Academy.

APD provided members of the monitoring team the Human Resources Department's Police Department Promotional Procedures Policy (dated January 31, 2019).  This policy was adopted after approval by the monitor.  Based on the monitoring team's review of past promotions made by APD, the department has promoted individuals who meet applicable standards and existing policy.  APD retains its compliance findings based on past performance.

### 4.7.227 Assessing Compliance with Paragraph 241

Paragraph 241 stipulates:

> **"APD shall develop and implement fair and consistent promotion practices that comport with best practices and federal anti-discrimination laws. APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant. APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions. These criteria should account for experience, protection of civil**

**rights, discipline history, and previous performance evaluations."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.228 Assessing Compliance with Paragraph 242

Paragraph 242 stipulates:

> **"APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties in core substantive areas."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.229 Assessing Compliance with Paragraph 243

Paragraph 243 stipulates:

> **"Within six months of the Operational Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.230 – 4.7.232 Assessing Compliance with CASA Paragraphs 244-246 (Performance Evaluations and Promotional Policies)

 APD completed the review and approval process for policy 3-32 Employees Work Plan/Performance Evaluations during the reporting period for IMR-11.  The policy provides guidance on use of the system, lists criteria to be used to assess achievement of performance goals, and outlines corrective action required if performance goals are

not met.  Additionally, it outlines actions for the supervisor should the software issues that have plagued the current system continue.

During past site visits, members of the monitoring team visited Area Commands and several other duty locations including Investigations Divisions.  Supervisors demonstrated the Talent Management System to the monitoring team.  All supervisors were fluent in their use of the system and were able to show examples of work plans and achievements of subordinates.  Supervisors had completed the requirements of the policy, the CASA, and the system functions.

APD plans to implement the replacement of the current Talent Management System. APD has accepted a proposal from Benchmark Analytics to provide a comprehensive Data Management System.  This new system includes software to enhance the performance evaluation process.  The new system will consider use of force incidents as well as a supervisory review of a use of force.  Completed Staff Work documentation has been presented to the monitoring team identifying the shortcomings of the existing system and providing recommendations for corrections.  It is especially noteworthy that APD is discovering its own weaknesses/errors and developing solutions rather than waiting for the monitoring team to find weaknesses in APD systems.  This is a positive outcome for APD as it works toward compliance.

APD has created a new notification system to alert supervisors when the performance evaluations are due.  It is set to automatically send out notifications 5, 10 and 30 days prior to the due date of the checkpoint. The 30-day notification enables supervisors to query any missing or additional personnel incorrectly assigned to them.

The monitoring team was provided with course of business documentation indicating that the APD Lead Commander responsible for the Performance Evaluation requirements continues to refer supervisors to Internal Affairs for administrative investigations regarding the failure to complete their checkpoints in a timely manner. The March 2020 checkpoint showed a success rate of 97.5% completed evaluations, with an investigation to resolve the 21 missing evaluations.

### 4.7.230 Assessing Compliance with Paragraph 244

Paragraph 244 stipulates:

> **"APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet performance goals. The evaluation system shall provide for appropriate corrective action, if such action is necessary."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.231 Assessing Compliance with Paragraph 245

Paragraph 245 stipulates:

> **"As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.232 Assessing Compliance with Paragraph 246

Paragraph 246 stipulates:

> **"As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.233 – 4.7.239 Assessing Compliance with CASA Paragraphs 247-253: Officer Assistance and Support

Paragraphs 247 through 253 of the CASA pertain to the City's requirements to offer an Officer Assistance and Support Program to all employees and their family members.

For this monitoring period, the monitoring team conducted the site visit via Zoom from

309

June 8th thru June 12th, 2020, due to the circumstances created by the COVID Pandemic. The monitoring period for this report was February 1, 2020 through July 31, 2020. The Director and the staff of the BSS Program supplied documentation for this period during the Zoom conferences for review by the monitoring team. The material for the month of June and July was additionally submitted to the monitoring team for review in August of 2020. The program continues to provide Critical Incident Service, Therapy Service, and a Training Component to APD personnel. The BSS program continues to provide APD personnel complete access to mental health and support resources as required by the CASA. During this monitoring period, BSS continued to offer an Officer Assistance and Support Program to all APD employees and family via the HIPPA compliant *doxy.me*, Facetime, Zoom and or by phone. Unfortunately, the COVID Pandemic has affected APD, as it has affected all police departments across the country, but as a result of this Pandemic, BSS was able to purchase Electronic Medical Record (EMR) software. This enables the BSS program to securely share electronic information with patients and other clinicians, help reduce medical errors, and provide safer and more convenient health care.

The BSS program posted an addendum to consent for treatment (Informed Consent for Telehealth Services) so that patients understand the use of electronic communications to enable mental health professionals to connect with individuals via interactive video and audio communication. Revisions to the BSS process are ongoing and reviewed at scheduled meetings to maintain the most current best practices in the industry. The monitoring team was supplied with the topics discussed at said meetings, as well as the personnel in attendance. As documented in previous IMRs, BSS continues to explore and work on areas to improve the program.

These areas include but are not limited to:

- Curricula for Crisis Negotiation Training;
- UNM's Project ECHO First Responder Program (the BSS Director has helped lead discussions about first responders and their ability to cope with stress related to the COVID Pandemic)
- Promoting Wellness and Reduce Substance Abuse;
- Collaboration between APD, UNM, and Pacific University (Portland) to promote mindfulness and stress reduction research continues;
- Expansion of the Self-Care interactive Online Network (SCION) website to include a "Saving Sanity Series" to help with resilience and mental wellness;
- Behavioral Health Services Handbook;
- Review data from workers comp with goal of reducing city expenses through increased wellness;
- BSS coordinated with expert in mindfulness to offer classes to APD in three shifts to allow all APD officers and APD employees access to the class;
- Expansion of unit and hiring of an additional provider;

- Academic research on various interventions to support law enforcement; and
- Revisions in progress to SOP.

On-site inspections of the BSS facilities are normally conducted by the monitoring team to ensure security and confidentiality in the program, and to ensure that only BSS staff have access to all records maintained within the program. During the most recent, virtual site-visit, APD facilitated a virtual tour of the premises. As a result of the electronic inspection, and to the best of the monitoring team's ability to conduct the inspection, APD continues to meet all requirements with CASA.

The 122nd Cadet Class Schedule was reviewed by the monitoring team to ensure compliance with the CASA, as it relates to training requirements delivered by the BSS program. There was no training delivered by BSS program during this reporting period for management and supervisors for compliance with the CASA requirements.

Peer Support Services COB documents were reviewed by the monitoring team for this reporting period, February 1, 2020 thru July 31, 2020. Documentation for this period included the following:

- Peer Support Reports, which include dates of activities, method of contact, initiating party, personnel from peer support group;
  Peer Support Survey Results;

The Peer Support Program activities for this reporting period indicate continual positive growth and willingness to be forward-thinking. During this reporting period, the program has revised SOP 1-10 and the SOP is in the process of review through the chain of command. As documented in previous IMRs the Program continues to explore and work on areas to improve the program.

Material viewed by the monitoring team, as it relates to this program, is highly confidential and operational compliance assessment is difficult. APD's BSS programs continue to be industry-standard and compliant with the relevant paragraphs of the CASA.

During this reporting period, BSS continued to maintain updated Excel spreadsheets of available health professionals and flyers that were reviewed during the site visits at all of APD's Area Commands. Material for the BSS programs is documented on their "Daily 49" system in APD briefing rooms throughout the department, with the most current information for the program.

The monitoring team maintains, as in previous IMRs, that the nature of the documentation is highly confidential and again, as in previous site visits, although this site visit was conducted via a virtual platform, aggregate data was reviewed where it was deemed practical. In other cases, notes taken by the monitoring team were devoid of any direct or circumstantial information that would allow an individual to be identified.

As a result of the hard work, time, and dedication that has been entrusted into this program, APD maintains full compliance with the requirements of the CASA regarding these paragraphs. The monitoring team will continue to monitor closely this process in future site visits and through reviews of COB documentation.

### 4.7.233 Assessing Compliance with Paragraph 247

Paragraph 247 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources. To achieve this outcome, APD agrees to implement the requirements below."**

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.234 Assessing Compliance with Paragraph 248

Paragraph 248 stipulates:

> **"APD agrees to develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, including: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations."**

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.235 Assessing Compliance with Paragraph 249

Paragraph 249 stipulates:

> **"APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma."**

**Results**

Primary:          **In Compliance**
Secondary:     **In Compliance**
Operational:  **In Compliance**

### 4.7.236 Assessing Compliance with Paragraph 250

Paragraph 250 stipulates:

> **"APD shall ensure that any mental health counseling services provided APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care."**

**Results**

Primary:          **In Compliance**
Secondary:     **In Compliance**
Operational:  **In Compliance**

### 4.7.237 Assessing Compliance with Paragraph 251

Paragraph 251 stipulates:

> **"APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families."**

**Results**

Primary:          **In Compliance**
Secondary:     **In Compliance**
Operational:  **In Compliance**

### 4.7.238 Assessing Compliance with Paragraph 252

Paragraph 252 stipulates:

> **"APD shall develop and implement policies that require and specify a mental health evaluation before allowing an officer back on full duty following a traumatic incident (e.g., officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death) or as directed by the Chief."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.239 Assessing Compliance with Paragraph 253

Paragraph 253 stipulates:

> **"APD agrees to compile and distribute a list of internal and external available mental health services to all officers and employees. APD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.240 – 4.7.255 Assessing Compliance with Paragraphs 255 -270: Community Policing and Community Engagement

Paragraph 255 requires APD to develop policy guidance and mission statements reflecting its commitment to community and problem-oriented policing and supporting administrative systems.  APD has revised its mission statement, reflecting its commitment to community-oriented policing.

In October 2018 in conjunction with community members, APD developed the following mission statement, "The mission of the Albuquerque Police Department is to preserve the peace and protect our community through community- oriented policing, with fairness, integrity, pride, and respect."  The APD vision statement includes the following language which also appears on their website. "Help provide a safe and secure community where the rights, history, and culture of all are respected!" The mission statement could not be easily located on the APD website.

During previous reporting periods, APD made progress integrating community policing principles into its management practices (policies, procedures, recruitment, training, deployment, tactics, and accountability systems).  Most notable is the increased connectivity to community partners and resources in APD enforcement activity as evidenced by the City's violent crime reduction strategy which includes community partners, resources, and an emphasis on social service intervention to help deter future violence.  Progress in this reporting period was clearly impacted by COVID-19 with the cancelling of summer youth camps that had been held for the past two years with the support of the USAO, AFR, DEA, and the National Guard.  These camps were growing

in participation and programming prior to their cancellation. APD did replace the youth summer camps with a virtual version launched July 2020 that included 31 videos. Other planned programming affected by COVID-19 included implementation of "Connecting Youth with Law Enforcement designed for high school students.

Other programming underway to advance community engagement include:

- IMPRINT, a program designed to engage police officers with all first-grade classes of Title I schools.  Currently there are 22 schools participating, and the schools are preparing to engage up to 1000 youth, on a monthly basis. IMPRINT is expected to continue in either face to face or virtual platform in the coming months; and

- A Rapid Accountability Diversion Program (RAD) is also under development including the hiring of a restorative justice specialist to help develop alternatives to court for first time misdemeanor offenders with a goal of reducing recidivism and strengthening community relationships.

During this reporting period, APD reported two sets of findings from its culture survey. The first was completed in July 2019, and the second in February 2020, prior to the COVID-19 impact and before protests associated with calls to action regarding perceived police violence.  The six-month comparison showed little change on the items reported. Most troubling was the finding that nearly 25 percent of officers surveyed indicated that "APD's work is not positively impacting citizens in the community."  This perception, by a significant number of officers, suggests a lack of belief in current APD policing practices to positively impact the communities they serve. This belief, or lack of confidence, in delivering on the APD's mission of securing communities through community policing principles, as currently practiced by APD, raises questions about the efficacy of current approaches, buy in of officers, or both. This perhaps indicates a need to further re-think overall policing strategies.  APD has indicated a forthcoming remediation plan to address these and other culture survey issues in the coming months.

The monitoring was advised that APD expects to continue its expansion of youth outreach efforts, especially as we move into a post COVID-19 PERIOD next year. The Youth Summer programing, the addition of program IMPRINT for elementary school students and the "Connecting Communities with Law Enforcement" program for high school students are important steps in integrating community policing principles into APD activities and investing in strengthening police/community relations. The monitoring team acknowledges CPD efforts in enhancing the School Resource Officer program and expects APD to continue with its plans to work with National Association of School Resource Officers in the post COVID-19 environment.

The COVD-19 impact, recent civil unrest and subsequent protests, and other longstanding factors have transformed policing environments across the nation, including in Albuquerque.  Elected officials and residents are actively considering the

establishment of a Department of Community Safety to re-align some current policing services and to re-shape policing priorities. The monitoring team is pleased to note that the City is currently involving residents in these discussions, through presentations of the concept to the Community Policing Councils. The monitoring team encourages these discussions to further garner input about the range of APD policing strategies and activities, to make them both more effective and community responsive.

The internalization of the core principles of community policing through the training process by APD officers will, in time, provide a foundation for cultural transformation and shift in attitudes.  In the interim, culture survey findings and continued trust issues demonstrate a need for more immediate action by APD to build support and confidence in community policing within its ranks and with the general public.

We find that APD was impacted by COVID19 in efforts implement changes in the field-based delivery of processes and services that affect the way APD relates to the communities it serves. The monitoring team expects APD to begin moving forward to regain momentum in its outreach efforts, step up its community consultations and to take this opportunity to "re-think" the delivery of community safety services to the residents of Albuquerque.

## 4.7.240 Assessing Compliance with Paragraph 255

Paragraph 255 stipulates:

> **"APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-solving policing principles into its management, policies, procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 255:*

*4.7.240a: Develop a remediation plan in response to the semi-annual review including culture change survey findings and implement without delay. Share current plans and remediation strategies both internally and with community stakeholders.*

*4.7.240b: Provide training that meets national standards for School Resource Officer Unit.*

316

***4.7.240c: Continue to work with USAO and other community partners to expand and reach significantly higher numbers high risk youth through various engagement programming.***

**4.7.241 Assessing Compliance with Paragraph 256:  APD Response to Staffing Plan**

Paragraph 256 stipulates:

> **"As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing."**

**Methodology**

Paragraph 256 requires APD to realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing.  APD's PACT (Police and Community Together) plan was approved on December 27, 2016, and staff re-alignment responsive to the plan was continued during the 7th reporting period.  Implementation of the PACT plan was terminated during the 8th reporting period and replaced with deployment of Problem Response Teams (PRT) to all the six command areas.  While the PRTs represented a marked improvement to the old PACT process with strong goals related to problem-solving policing processes, as opposed to PACT's enforcement-based processes, progress in implementation and meeting the requirements of this paragraph have now taken more than 5 years. APD needs to bring this re-deployment to completion.  As also required by this paragraph, APD needs to ensure that its recruitment and hiring goals align with community and problem-oriented policing.

During this reporting period APD pledged and assigned two PRT officers and one supervisor to each of the Six Area Commands.  Additional resources will be assigned to the Area Commands as they become available. The policy framework for the PRT teams is still being finalized with drafts presented to the MHRAC Board and the PPRB for consideration, and still requiring additional senior level reviews. PRT training is also under development and currently at the very beginning of the process. APD also proposes to illicit feedback from the community on PRT performance using a "Quality Control Committee" of Command area residents to capture this feedback.

The monitoring team recognizes the challenges posed by the public health emergency and the recent demonstrations that interfere with APD's ability to move forward on some of these requirements.  We are also aware of the challenges of capturing any feedback and impact of these deployments during the last six months.  However, given the extended period of time APD has worked on these staffing reallocations, the monitoring team believes that APD should expedite its efforts to finalize the policy, develop and deliver the requisite training, and complete the resourcing of the Area Commands

required to implement a community policing strategy. APD also needs to complete its development of more specific measures to determine effectiveness and guide program revision and adaption.

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 256:*

*4.7.241a:  Continue to make new staffing allocation and deployment plan a priority, and take the necessary steps to gain important input and support from settlement partners and community stakeholders including CPCs;*

*4.7.241b:  Ensure the staffing plan has clearly articulated and defined goals, objectives and outcome measures, and consider a partnership with a local university criminal justice department to assist in developing more specific performance metrics.*

*4.7.241b:  Ensure that PRT activity is expanded as needed, fielding adequate numbers of specifically trained PRT officers who are guided by specific, tangible, and quantitative goals and objectives.*

**4.7.242 Assessing Compliance with Paragraph 257:  Geographic Familiarity of Officers**

Paragraph 257 stipulates:

> **"APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders, engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality of life issues."**

**Methodology**

In the previous reporting period, the monitoring team reviewed documentation from APD outlining newly implemented "digitized" bid packet processes (information about areas assigned to police officers). This process helped to create better utility, tracking, and accountability within the department.  For this reporting period, the digitized process completed its test phases and as a result of identified issues, APD took corrective actions. The re-working of aspects of this digitized process has delayed full implementation into the next reporting period.  APD is now working to archive all bid packets on August 27, 2020 and initiate a clean start beginning on August 29, 2020.

318

This reporting period APD specifically started working on updating beat maps and further identifying and sorting out Area Command community leaders. APD is also working to develop some level of supervision outside the bid process to ensure that officers are effectively using the information provided. Once this new process is fully operationalized, it will house important information about the area assigned to an officer. When complete, it will create a beat discussion forum providing officers assigned to an area the opportunity to share information with one another about trends or emerging problems.  Officers will also be able to download information about the communities they serve including community leaders, neighborhood associations, etc. Officers will also be tested on their knowledge of bid packet information, which will eventually be updated quarterly.

APD developed and provided instructional videos for all officers receiving and updating bid packets so that they will fully understand the new process. APD plans to have additional instructional videos covering the gathering and reporting of beat information to be shared among officers working in the same geographical areas.

APD is taking a huge leap forward with the investment and initiation of this digital structure for its bid packets.  Full implementation will create easy access to up-to-date information for officers, and track emerging trends, and problem-solving efforts as well. However, the monitoring team is frustrated with the pace of work in addressing this CASA requirement.  The monitoring team believes that APD needs to demonstrate a greater sense of urgency and have a fully operationalized system including the requisite training, supervisory, and evaluative functions in place.  We note that APD has been working on these processes since the first year of the CASA.

The monitoring team will continue to confirm issuance of bid packets to APD staff and will assess how that information is being utilized to advance APD's community policing goals.  Once fully implemented, the monitoring team will conduct a comprehensive review of the completed, digitized, bid process in the following reporting period. The monitoring team will also be looking for evidence of the application of information generated through this bid process to enhance community engagement. Operational compliance requires full implementation of these digitized processes and evidence of application in community policing practices.

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

*Recommendations for Paragraph 257:*

*4.7.242a:  Conduct a thorough review of the above-outlined efforts, in consultation with the project leads.*

*4.7.242b:  Utilize PERT or other related project management tools to establish realistic due dates for each major sub task required for implementation.*

*4.7.242c:  Establish clearly defined and articulated, reasonable milestones for major project tasks and clearly identify who is responsible for these tasks.*

*4.7.242d:  Submit these documents to COD for review and revision.*

*4.7.242e:  Hold personnel accountable for meeting timelines and quality-of-work requirements;*

*4.7.242f:  Submit management/oversight reports on a quarterly basis until all elements of the project are completed;*

*4.7.242g:  Conduct long-term evaluations of program impacts.*

### 4.7.243 Assessing Compliance with Paragraph 258: Officer Outreach Training

Paragraph 258 stipulates:

> **"Within 12 months of the Operational Date, APD agrees to provide 16 hours of initial structured training on community and problem oriented policing methods and skills for all officers, including supervisors, commanders, and executives   this training shall include:**
>
> **a)  Methods and strategies to improve public safety and crime prevention through community engagement;**
> **b)  Leadership, ethics, and interpersonal skills;**
> **c) Community engagement, including how to establish formal partnerships, and actively engage   community organizations, including youth, homeless, and mental health communities;**
> **d) Problem-oriented policing tactics, including a review of the principles behind the problem-solving framework developed under the "SARA Model", which promotes a collaborative, systematic process to address issues of the community. Safety, and the quality of life;**
> **e) Conflict resolution and verbal de-escalation of conflict and;**
> **f)  Cultural awareness and sensitivity training.**
>
> **These topics should be included in APD annual in-service training."**

**Methodology**

During the 11th reporting period, APD completed restructuring of its required 16 hours of Community Oriented Policing (COP) training that better reflects the department's 21st century community policing philosophy, incorporates into training new and changing departmental policies and orders, and better aligns with COP training requirements. APD submitted its reconstructed training to the monitoring team for review.  The monitoring team noted several deficiencies, which were addressed by APD training staff. The monitoring team subsequently approved the COP training allowing for its first delivery this calendar year. The COP training was developed using a documented seven-step process and covered the required elements outlined in paragraph 258. The monitoring team will assess how APD delivers this training, not only to cadets, but as part of their in-service training program.  The monitoring team is also aware of the dynamic nature of current community policing practices and consequently, the need to routinely update COP curriculum.

In this reporting period, APD reported the following attendance numbers for its 2020 approved COP POP training course:

> Total number scheduled for training through July 31, 2020:  150
> Total attended that were scheduled through July 31, 2020: 149
> Total who received training during an academy session through July 31, 2020: 86
> Total trained through July 31, 2020:  235
> Total remained to be trained as of July 31, 2020: 758

 APD's decision in the 11th reporting period to overhaul the required sixteen hours of COP training was initially necessitated by a paradigm shift in the department's policing philosophy, placing a much greater emphasis on community policing and engagement. The approved curriculum and its eventual delivery in some form to all APD officers represented a major milestone for APD in their transformation journey. The training will help officers internalize a different way to perceive their relationship with the community members they serve, and to assess alternative ways of interacting with the community. This allows APD to bring "change" to the forefront of its community policing processes. The monitoring team believes that the delivery of the COP training curriculum is key to achieving some of the most important elements of the CASA, and that these further investments in improving the quality and relevance of this training will be instrumental in driving culture change throughout APD.

The monitoring team is concerned about the pace at which this training is being delivered to APD officers. As APD reports, at the end of the monitoring period, about 75 percent of their officers had not received this training. The monitoring team believes that is imperative for APD to find ways to expedite the delivery of this training to the remaining three quarters of its officers. We also expect APD to assess and develop ways to identify the impact of this training on field performance.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 258:***

**4.7.243a:  *Ensure that supervisors are oriented with the COP training and new COP goals and objectives.***

**4.7.244 Assessing Compliance with Paragraph 259:  Measuring Officer Outreach**

Paragraph 259 stipulates:

> **"Within six months of the Operational Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross section of stakeholders."**

**Methodology**

During the 11th reporting period, APD made some progress developing its capability to track officer community engagement and outreach activity goals.  Previously, APD standardized and simplified the collection of non-enforcement contact data by revising the non-enforcement contact form in the TRaCS system (which tracks officer activity) and created standardized tracking spread sheets for all Area Commands. The new forms also required documentation of APD follow-up on community concerns that surface during these contacts. During this reporting report, APD indicates that the revised TRaCS form is complete and in full use. They also acknowledge that increased supervision and possibly additional training will be required to ensure correct use by officers.  APD, during this reporting period, also initiated the development of an 'app' that will further assist in tracking community events and officer response.  APD continues to acknowledge a need to further refine and improve its tracking processes, report generating capabilities, and its abilities to develop performance metrics and reporting protocols.

APD recognizes that the current method of tracking partnerships requires a more robust data tacking method that better captures information about the more significant and formal partnerships. While the monitoring team understands that circumstances over the last six months may have slowed progress, nevertheless it is now urgent that APD finalize its tracking and reporting of its work with community partners and develop standing reporting protocols for its community contacts and outcomes.  APD must also,

without delay, provide any additional training and supervisory controls to ensure adherence to policy and effective implementation.

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 259:***

***4.7.244a:  Develop standard reporting protocols of TRaCS  and partnership data ; and;***

***4.7.244b Identify community service organizations and advocacy groups that serve and represent high risk populations, and better document those partnerships including background, referral arrangements, if any, resource sharing if any, decision-making, roles and responsibilities of parties.***

**Assessing Compliance with Paragraph 260:  PIO Programs in Area Commands**

Paragraph 260 stipulates:

> **"APD shall develop a Community Outreach and Public Information program in each area command."**

**Methodology**

During the prior reporting period, APD reported developing a process that allows each area command to post relevant and timely information about their command area. Crime prevention specialists from each area command develop a monthly events calendar with information about the event and photos. This information is shared with the Senior Crime Prevention Specialist who then screens and forwards to the APD Social Media Director.  Information submitted is then posted on an area command specific group page.   Each command area also maintains its own website, which typically captures crime information, agendas for upcoming CPC meetings, schedules of upcoming events, other news items, information on how to report crimes, and information regarding how to file complaints.  A review of the area command web pages during this reporting period revealed limited messaging about police activity the area commands and no listing of a monthly events calendar for several of the area commands.  In some instances, most of the information about police activity, crime prevention tips, and other matters of community interests are found only in the minutes of the area command's CPCs.

During the 12th reporting period, APD reported that a "sample memorandum" was created and distributed to all area commanders to standardize information needed to improve public information strategies. APD also indicates that little if any progress was

made in having public information plans for each area command. Although APD may have in place a process to capture and share positive stories and valuable information that is command area specific, it demonstrates little effort to convey that and other information of relevance and interest to area command residents—and officers-- in any systematic and coherent manner. The CASA requires that APD have a community outreach and public information program that is customized for each area command. APD has simply failed to make any recent progress beyond templates to standardize information needs.

The monitoring team suggests that APD seek immediate assistance to fully develop a program description that has program goals, processes, key activities, resource requirements, and ways to assess effectiveness.  The area command-based public information plans and programs should specifically address community outreach, messaging, reaching marginalized audiences, and using social media to enhance community engagement.  The monitoring team also suggests that APD consult with the area command CPCs when developing these public information and outreach plans.

**Results**

>Primary:      **In Compliance**
>Secondary:  **In Compliance**
>Operational: **Not In Compliance**

***Recommendations for Paragraph 260***

***4.7.245a: Contact other departments using CPC-like processes and assess their work to develop action plans responsive to CPC public outreach and development plans.  If necessary, coordinate with the City for guidance in plan development, including articulation of goals, objectives, timelines, measures, etc.***

***4.7.245b: Further develop and document Area Command public information strategies and programing by developing planning template and aiding command areas in formulating customized approaches for each command area.***

**4.7.246 Assessing Compliance with Paragraph 261:  Community Outreach in Area Commands**

Paragraph 261 stipulates:

>**"The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command   that is open to the public. During the meetings, APD officers from the Area command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and**

> **address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings."**

## Methodology

In prior reporting periods, APD used CPCs as a platform to share information about implementation of CASA requirements.  CPC meetings were interrupted due to COVID-19. There were five presentations covering CASA topics or providing updates with at least one in each of the six area commands with the exception the Southeast Area Command in the prior reporting period. For much of this reporting period, due to COVID-19, public meetings were greatly limited or even prohibited.  In July 2020, using virtual platforms CPCs resumed their monthly meetings.  APD has had little if any opportunity to meet this requirement during this reporting period.

APD has in place six functioning CPCs that provide a community platform for APD to convey relevant and timely information to community stakeholders and members.   The CPCs are now being utilized as a conduit for updates on policy changes, new training, policing strategies, and tactics, and addressing residents' community safety concerns.  CPC meetings.   APD provided the CPOA Executive Director an update on IMR-11 compliance processes.  In May of 2020, APD provided to the CPOA Executive Director an IMR-11 update on CASA compliance.  The Executive Director provided update to the CPC chairs. APD states they will be attending via zoom and requesting to be on the agenda for future IMR updates.

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not in Compliance**

## 4.7.247 Assessing Compliance with Paragraph 262:  Community Outreach Meetings

Paragraph 262 stipulates:

> **"The Community Outreach and Public Information meeting shall, with appropriate safeguards to protect sensitive information, include summaries, of all audits and reports pursuant to this Agreement and any policy changes and other significant action taken as a result of this Agreement. The meetings shall include public information on an individual's right and responsibilities during a police encounter."**

325

**Methodology**

We note that all CASA-related reports are posted on the APD website. Further, APD has information on an individual's rights and responsibilities during a police encounter.

**Results**

Primary:    **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

**4.7.248 Assessing Compliance with Paragraph 263: APD Attendance at Community Meetings**

Paragraph 263 stipulates:

> **"For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area command shall attend at least two community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned."**

**Methodology**

For the 12th reporting period, APD fully operationalized TraCS, it's automated management system for community-identified response systems.  APD has recognized this system's limitations and the need to ensure adequate supervisory controls and additional training.  APD previously reported that commanders are submitting all non-enforcement contact information in a standardized format on a spreadsheet to command staff for tracking purposes. We note that APD previously established, through SOP-3-02-1, the requirement and tracking mechanisms to implement this task.  APD reports that the form used has the officer document any issues raised at meetings, and actions for the officer to in consider in response.  APD continues to explore ways to enhance this process.

APD should finalize its work on this non-enforcement tracking system by continuing its enhanced data management structuring and tracking capabilities.  These data should be used to better inform managers and guide targeted adjustments in operations. The monitoring team suggests APD should put in place standard data reporting protocols on a monthly basis and share findings with commanders and managers.  The monitoring team also recommends these reports on non-enforcement contacts to be used to target engagement efforts and promote community policing practices. The monitoring team urges APD to move to put in place the necessary supervisory controls and provided any additional training as required to ensure full implementation.   While we acknowledge APD is currently in full compliance with the requirements of this paragraph, these

recommendations are designed to foreclose foreseeable threats to continued compliance efforts.

**Results**

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

### Assessing Compliance with Paragraph 264:  Crime Statistics Dissemination

Paragraph 264 stipulates:

> **"APD shall continue to maintain and publicly
> disseminate accurate and updated crime statistics on a
> monthly basis."**

**Methodology**

During the 12th reporting period, APD maintained its contract with a service that provides up-to-date crime mapping services based on "calls for service" that can be accessed on APD's website.  This has proven to be a very useful tool to members of the CPCs. However, APD continues to not post updated crime statistics on its website. Current postings only display 2018 and 2019 aggregate crime trends.  The CASA specifically requires APD to "publicly disseminate accurate updated monthly crime statistics". This is of special concern, since APD had previously followed this requirement. The failure to post timely crime trend information by area command as specified in the CASA is especially disconcerting when considering the increasing community concerns about crime.  The monitoring team understands the "preliminary status" of initially reported numbers are subject to change after further review and validation. The monitoring team would expect APD to report these numbers with that caveat. We will monitor APD's response to this recommendation during the IMR-13 reporting period.

**Results**

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

***Recommendation for Paragraph 264:***

***4.7.249a:  Analyze the reasons for failing to process and reports in a manner that is sufficiently informative of current crime data and trends, as stipulated by the requirements of Paragraph 264, and ensure these numbers are easily accessible to the public, using personal computers and other methods commonly used by the public for such tasks, such as cell phones, etc.***

327

### 4.7.250 Assessing Compliance with Paragraph 265:  Posting Monitor's Reports

Paragraph 265 stipulates:

> **"APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD website with reasonable exceptions for materials that are legally exempt or protected from disclosure."**

## Methodology

All requirements stipulated by this paragraph continue to be met by the APD and the City.  Further, APD has developed guidelines for determining any reasonable exceptions to posting audits and reports relating to the CASA. During the 12th reporting period, APD also posted monitoring team reports on the APD website in a timely fashion.

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.251 Assessing Compliance with Paragraph 266:  CPCs in Each Area Command

Paragraph 266 stipulates:

> **"The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level. The Community Policing Councils shall meet, at a minimum, every six months."**

## Methodology

CPCs have been established in each of the six Area Commands since November 2014. During this and prior reporting periods, each of the six Councils tended to meet once a month, far exceeding the once every six-month requirement.  Since their establishment nearly six years ago, there has been a remarkable consistency and adaptability displayed over time.  At times, many CPCs struggled with attendance, maintaining records, functioning in a transparent and inclusive manner, and having a diverse membership. They struggled often with inadequate support and guidance from APD. Nevertheless, CPCs, often through the commitment of CPC leaders, forged ahead, and have achieved a long-held objective of permanently establishing the CPCs as part of

the City's governance framework.  The City, by enacting an ordinance that statutorily provides for their ongoing operations, has been a key part of achieving this goal.  During this reporting period, the COVID-19 public health emergency prevented in-person Council meetings from February to June for most CPCs. During this lull in meetings, CPC Chairs and others continued work re-tooling CPC operating guidance, including technical assistance sessions, working through voting member selection processes, and related issues.   In July of 2020, CPCs reconvened using virtual platforms and as a consequence were able to expand participation in meetings. New leadership and several reconstituted Councils are creating new energy and generating momentum for this tool of community engagement moving APD closer to the collaborative/community policing model envisioned in the Settlement Agreement. We note that during this reporting period, facilitation processes for the CPCs was transferred from APD to CPOA.

At the onset of this reporting period, CPCs were still experiencing a lack of support and very little guidance or leadership from APD. Long-standing membership selection issues were not being addressed, and CPCs were not provided the basic support needed to continue their operations. Towards the end of the reporting period an MOU was established moving the facilitation and oversight of the CPCs from APD to CPOA.  The transfer of program authority immediately yielded results with resources being made available, initiation of problem-solving sessions with parties in addressing specific Council membership issues. Continuing work with Council Chairs, the City's legal office, and others finalized the proposed ordinance for City Council consideration and passage.  The monitoring team is supportive of these developments and believes these steps represent significant reform progress.

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

**4.7.252 Assessing Compliance with Paragraph 267:  Selection of Members of the CPCs**

Paragraph 267 stipulates:

> **"In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross section of community members and APD officers, including for example representatives of social services providers and diverse neighborhoods, leaders in faith, business, or academic communities, and youth.  Members of the Community Policing Councils shall possess qualifications necessary to perform their duties,**

**including successful completion of the Citizen Police Academy."**

## Methodology

CPC membership criteria and selection processes came under criticism and scrutiny during the 11th reporting period. This criticism continued at the onset of this reporting period. APD-initiated arbitrary and unexplained changes and requirements regarding CPCs. APD also introduced the use of exclusionary criteria related to criminal backgrounds, and created confusion concerning the ride along and completion of the Citizens Police Academy requirement for CPCs. The monitor personally characterized these unilateral changes to formerly accepted process as a deliberate attempt by APD personnel to eviscerate the effectiveness of the CPCs. These changes were implemented in an arbitrary and capricious manner by APD, without consultation with the monitor or the Department of Justice. The monitor views these problems as generated by rogue elements of APD, without notice to, or the knowledge of the chief of police. This is yet another incident of the counter-CASA effect at work among some leadership elements at APD.

The Council of Chairs, comprised of the Chairs of each of the six CPCs, took a leadership role in re-visiting the guidance for CPC membership selection. Working closely with the COPA director and the DOJ, they began this work by requesting technical assistance from the monitoring team in helping to re-engineer the recruitment, the selection criteria, the selection process, the removal of members, and other considerations. The revised and updated guidance was approved in July 2020 by the City's newly designated administrator of this program, the COPA director, and included the following:

1.  Citizen's Police Academy: moving forward, the CPA 12-week course will not be required but recommended. (This requires an amendment to the Court Appointed Settlement Agreement which has the support of the City, , the Civil Rights Division of DOJ, and the monitoring team);
2.  Ride along processes are no longer required, but are recommended;
3.  Background checks are no longer required; however, if a member chooses to do a ride along then background check is conducted using APD stipulated criteria; and
4.  Criminal history- a criminal history will not exclude a person from serving on a CPC. However, current active felony warrants or criminal charges will disqualify a person from membership.

Pending approval of the CASA amendment, the Parties, with the concurrence of the monitor, agree to continue to suspend the CPA and ride along requirement. The July 2020 revisions to the CPC guidance were posted on the APD website as of July 31, 2020.

The rationale for these changes offered by the CPC Council of Chairs and the CASA Parties included removing barriers to membership for many prospective members who

330

simply do not have time to complete requirements for completing the CPA training. Removing the criminal history portion that could be limiting others who now could make significant contributions, after having already answered for any past criminal conduct. They noted that adhering presently to the CPC membership code of conduct held more relevance than any past behavior.

Efforts at the onset of the reporting period to expand and diversify membership were stymied by the COVID-19 public health emergency which shut down CPC activity for several months and a vacuum in leadership caused by personnel changes at APD. With the transfer of program authority from APD to CPOA, and the corresponding work with the DOJ and the CPC leadership, extensive progress was made in both expanding membership and in greater diversification of that membership. These improvements were apparent in meetings attended virtually by the monitoring team in July 2020.

The monitoring team remains encouraged that under the leadership of CPOA and an increasingly active Council of Chairs, the CPC expansion and diversification will continue. In spite of the limitations posed by COVID-19, CPC virtual meetings in July demonstrated substantial participation with as many as 70 people in virtual attendance. The CPC program is beginning to realize its potential and becoming a vital element to APD community engagement and movement toward implementation of a collaborative policing model.  The monitoring team credits the transfer of CPC operations away from APD to the CPOA, which occurred during this reporting period.  It appears that the CPCs have found a new, and a much more collaborative and supportive, home at CPOA.

**Results**

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

**4.7.253 Assessing Compliance with Paragraph 268:  Resourcing the CPCs**

Paragraph 268 stipulates:

> **"The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, APD shall appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure."**

**Methodology**

In this reporting period, the City transferred the authority of the CPC from APD to CPOA.  During the transition, APD continued to provide some CPC support, with other support provided by the COPA.   At the onset of the reporting period, APD leadership of the CPC program continued to face challenges.  Changes in staffing, leadership, and insufficient communication with CPC members led to issues and conflicts within the CPCs and complaints of lack of support. The DOJ and CPOA stepped up and filled a leadership vacuum and helped to facilitate an orderly transfer of authority.  For the past several months, CPOA leadership has already made a significant difference in both coordinating support for CPCs and providing guidance and leadership in working through CPC membership issues.  CPCs resumed their Council meetings in July 2020, demonstrating the efficacy of virtual platforms in conducting public meetings.  The technical support, guidance, and the working through of issues leading to an expanded and more diverse set of members was a direct result of this new leadership. The monitoring team also takes notice that in spite of all of the recent challenges posed by the public health emergency and the program's transfer, CPCs all have posted annual reports, and have updated meeting agendas and minutes of meetings as well.

The most important resources to CPCs are the members themselves. A core group of volunteers have, over the course of several years, devoted their time and effort into building the foundation for the successful operations of CPCs.  They have attended training, dozens of monthly meetings, and more recently, with many participating in Council leadership meetings, began to help work through membership and other related issues, to develop guidance for CPC operations and engage in CPC advocacy.  Their tireless volunteerism on behalf of the residents of Albuquerque has now led to enactment of a city ordinance permanently establishing the CPCs as part of the CPOA. We expect that CPCs will soon hire a program liaison and other staff support.  In addition, other funds will be available for supplies and to meet other operational needs of the CPCs.  The monitoring team expects CPCs to continue a maturing process and become a permanent fixture in engaging community members with the police officers who serve them and advancing collaborative policing throughout Albuquerque and establishing a national model.

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

**4.7.254 Assessing Compliance with Paragraph 269:  APD-CPC Relationships**

Paragraph 269 stipulates:

**"APD shall seek the Community Policing Councils assistance, counsel, recommendations, or participation in areas including:**

**a) Reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;**
**b)  Reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;**
**c)  Providing information to the community and conveying feedback from the community;**
**d) Advising the chief on recruiting a diversified work force**
**e) Advising the Chief on ways to collect and publicly disseminate data and information including information about APDs compliance with this Agreement, in a transparent and public –friendly format to the greatest extent allowable by law."**

## Methodology

The CPCs, as a result of the public health emergency, were unable to host meetings during much of this reporting period.  CPCs, during this reporting period, continued to offer a wide range of agenda items, often including special presentations from APD covering various aspects of their operations. In January of this year, there were presentations at CPC meetings covering the APD body-worn camera program, the APD gang unit, and an update on APD compliance with the settlement agreement. These meetings spend considerable time discussing immediate community safety issues, and CPD's proposed response.  CPCs were being regularly used as platforms for APD briefings on CASA implementation efforts and monitoring outcomes. The agenda items and CPC recommendations at most CPCs often are aligned closely with the issues and topics identified in the CASA.

In July of this reporting period, all six CPCs returned to hosting public meetings, the first since January for most of them. These meetings successfully used virtual platforms and were well attended. One session drew over 70 participants. One topic covered at several meetings included a discussion of the City's proposed Community Safety Department.

There remain ongoing challenges with sustaining and enhancing CPC activities, including holding regularly scheduled meetings, addressing basic requirements of information sharing, and engaging in community safety and problem-solving activities. Under CPOA oversight, the monitoring team expects continued assistance to ensure the permanence and ongoing viability of this critical community input vehicle for APD operations.

## Results

Primary:       **In Compliance**

333

Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.255 Assessing Compliance with Paragraph 270:  CPC Annual Reports

Paragraph 270 stipulates:

> **"The Community Policing Councils shall memorialize
> their recommendations in annual public report that shall
> be posted on the City website. The report shall include
> appropriate safeguards not to disclose information that
> is legally exempt or protected from disclosure."**

### Methodology

During this reporting period, APD posted all of its 2019 CPC annual reports.  In the previous reporting period, all six CPCs produced 2018 annual reports presented in a standard format, and often captured CPC annual activities and achievements.  APD held training during a prior reporting period, which helped to promote standardization in annual reports among CPCs. The monitoring team expects CPCs, with support from CPOA, to continue to complete and post annual reports a timely fashion.

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.256 through 4.7.277 Assessing Compliance with Paragraphs 271-292: Community Police Oversight Agency

Paragraphs 271 through 292 of the CASA pertain to the Civilian Police Oversight Agency (CPOA), including its Board, the Civilian Police Oversight Board.   These paragraphs require an independent, impartial, effective, and transparent civilian oversight process, one that not only investigates civilian complaints but also renders disciplinary and policy recommendations, trend analysis, and conducts community outreach including the publishing of reports.

During the monitoring period and the June 2020 virtual site visit, members of the monitoring team held Zoom meetings with the CPOA Executive Director and members of his staff, with the CPOA Attorney, with members of the CPOA Board, and reviewed CPOA training records, and selected  (by way of a stratified random sample) and reviewed, eight  CPOA investigations completed during the monitoring period. We also identified and reviewed one non-concurrence letter in the former chief's response to disciplinary recommendations made by CPOA. [IMR-12-53].

The findings related to Paragraphs 271 through 292 indicate the following outcomes, related to requirements of the CASA.

The CPOA Board has demonstrated itself to be impartial and productive body that provides effective civilian oversight of APD. It is an independent agency whose appointed members (the Board) are dedicated individuals of diverse backgrounds drawn from a cross-section of the community. They are committed to the goals of the CASA, as are non-appointed members of the CPOA. Based on our meetings with the CPOA Executive Director, members of the CPOA Board, and our review of CPOA Board meetings, agenda and minutes, we are satisfied that the current Board and the agency recognize the need to be fair, objective and impartial and to be perceived by the public as such.

Moreover, at its July 9, 2020 meeting, the CPOA Board approved substantial revisions to the CPOA Policies and Procedures. These revisions deal primarily with the ethics, code of conduct, and impartiality incumbent upon Board members, as well as discipline of Board members. These revisions or additions to the Policies and Procedures are currently undergoing review by the monitoring team. They are a further illustration of the CPOA Board's proactive commitment to its mission and responsibilities, which will prove to be enhanced guidance for its members.

The initial and annual training requirements for the Board members continue to be met. Regarding annual training requirements under paragraphs 275 and 276 of the CASA, Agency and Board members have attended the annual National Association for Civilian Oversight of Law Enforcement (NACOLE) conferences, and are currently attending the 2020 Annual NACOLE Conference, being conducted virtually in a series of over 30 webinars, commencing before the expiration of the IMR-12 review period and extending into September, 2020. The monitor and Parties have agreed to accept a written exercise on the subject of the NACOLE training, and how it relates to the mission and job of CPOA members, to suffice as an appropriate measure of comprehension of this external training.

Board members have also received Use of Force training and had changes to the CPOA Ordinance addressed by legal counsel to the CPOA. Annual ride-a-long requirements are not all current due to the Pandemic, but it is expected that will be rectified promptly once Pandemic health concerns have abated. Based on past performance CPOA maintains operational compliance with this task. A CPOA Board Post Training Examination for Board members was developed and continues to be administered by the Executive Director. This testing has been approved by the monitor as an adequate measure of comprehension of Board members with the Use of Force Training. Operational compliance with paragraphs 275 and 276 has been maintained by CPOA in IMR-12.

As we noted in the past several IMRs, the investigations produced by CPOA, once complaints are assigned, are generally thorough.  (We discuss this in more detail the quality of investigations in the Investigation of Complaints section, paragraphs 183-194,

335

of this report). The Executive Director has the authority to recommend disciplinary action in the cases CPOA investigates, as well as the cases that are reviewed by CPOA (Serious Use of Force and Officer-Involved Shootings), and the Board has a mechanism for approving the recommendations of the Executive Director. The chief or his designee retains the discretion to impose discipline.

As noted since IMR-10, the Board's Complaint Review Committee (CRC) has been restored. A review of their meeting agenda and minutes shows that they are active and productive. The Board has adopted the recommendation of the CRC made in its meeting of January 2020 for the CRC to meet quarterly and to develop more of an auditing function of completed investigations, as opposed to reviewing every single investigation to approve or disapprove CPOA's findings and recommendations. It remains to be seen whether this new review function will prove to be an effective review by the Board of the CPOA investigations and recommendations. This will be an area of focus in IMR-13.

Satisfactory cooperation between CPOA and IAPS has been long-standing in nature. In general, both agencies continue to respect each other's role, and realize it is in their best interests, and that of the CASA, to cooperate and facilitate their intertwined missions and related areas of responsibility. CPOA has the necessary access to information and facilities reasonably necessary to investigate complaints and review serious use of force and officer-involved shootings.

CPOA and the Board continue to debate policies and policy changes as an entire body and have adequate time to provide input on the policy-making process. A Policy Analyst position for CPOA has been requested by CPOA for 2021 budgetary process. If approved and filled this position should significantly enhance the Board's ability to conduct trend analysis and bring meaningful insight to the policy-making process.

We reviewed the one letter issued in the IMR-12 review period in which the former chief disagreed with the disciplinary recommendations of the CPOA and the Board. [IMR-12-53]. Although that investigation was reviewed in IMR-11, and the actual investigation and discipline imposed in the case were found to be deficient therein, we find that the non-concurrence letter thoroughly explains the former chief's reasoning for the discipline that was imposed and clearly meets his responsibility under paragraph 285 of "articulating the reasons" the CPOA  disciplinary recommendations were not followed. The non-concurrence letters continue to be such that the public, CPOA, the CPOA Board, and the APD are well aware of the chief's reasons and thought processes in reaching his decisions regarding the level of discipline imposed.  While we disagree with the chief's reasoning, he is within his CASA-documented purview to establish disciplinary recommendations.

CPOA continues to have an active community outreach program, which also utilizes social media, in addition to other media. In past IMRs we have pointed out the agency's internal efforts, such as  addressing the APD Cadet class as well as the APD Lateral Hire class, and external efforts, such as addressing the National Federation of Press

Women - New Mexico Chapter and the Executive Director serving as a panelist at the annual conference of the National Association of Civilian Oversight of Law Enforcement (NACOLE). This general outreach has continued in the IMR-12 period.  In June 2020, the Executive Director attended and presented at several community meetings, held at Indivisible Nob Hill, Interfaith Community, and La Mesa Presbyterian Church, to address community concerns following the incidents of racial injustice and abuse of force. The Executive Director presented at special meetings with the Human Rights Board of Albuquerque. The Human Rights Board then attended the June 2020 meeting of the CPOA Board to become more familiar with the CPOA Board's mission and function and to explore collaboration between the roles of both Board's.

The Executive Director and representatives of CPOA have continued to have quarterly meetings with City Council, and they also attend the quarterly meetings of the collective CPCs. In addition, they continue to attend the majority of individual CPC meetings.  In order to more closely identifying the needs and goals of the different communities that make up Albuquerque, the CPOA engagement with the CPCs allows for coordination of efforts, particularly with regard to policy recommendations. As more fully addressed in the discussion pertaining to paragraphs 266 through 270 of this report, shortly after the expiration of the IMR-12 review period, the Public Safety Committee of City Council reviewed and considered an Ordinance revision to institutionalize the CPCs and to integrate them with, and under, CPOA organizationally. The Committee approved the revised Ordinance, and the Ordinance was forwarded to City Council for consideration at its September 2020 meeting. It was approved and realigned the CPC function under CPOA should prove to be a significant enhancement to the CPC mission as well as the community outreach function of the CPOA. Critical to its success will be whether CPOA will be provided the necessary resources to effectively administer the CPCs. The monitoring team finds the CPOA to have robust community outreach efforts and therefore operational compliance is maintained for paragraph 291 of the CASA.

As we have noted since IMR 9, the CPOA Board needs to be at full strength to meet its many responsibilities.  We note that with the addition of new members this monitoring period, the Board would have had eight of nine positions actively filled. However, toward the end of the IMR-12 period an experienced and dedicated member of the Board resigned from the Board. This left the Board at seven members at the expiration of the IMR-12 period.

Although we had no meetings this IMR site visit with City Councilors or the Council Director as in IMR-11 site visit, all indications are that they remain committed to the police oversight process, and realize the importance of having a fully resourced and supported CPOA Board. In meetings with City Council staff members, the CPOA has been reassured that an active vetting process is currently being pursued to identify appropriate candidates to fill the two vacant Board positions. Based on past meetings with Council members, the Council Director, and current CPOA representations, we are satisfied that Council is taking diligent steps to vet potential candidates and to fill the vacancies of the CPOA Board as they occur. We urge that the Board be brought up to full capacity during the IMR-13 period.

We reported in IMR-11 on the positive development regarding the use of a facilitator to conduct meetings between the CPOA (agency personnel) and members of the CPOA Board, for the purpose of enhancing understanding and respect for the different roles of the agency and the Board, as well as to strengthen the relationship between them and to improve the working environment. The professional working relationship between the Board and agency improved in the IMR-12 period, and we have been informed that it is the intent of both to reengage the facilitator during the IMR-13 reporting period to further strengthen the professional bonds.

In regard to the task of permitting a meaningful opportunity to appeal CPOA findings to the Board, we examined an appeal this review period along with the underlying investigation [IMR-12-45]. As discussed in the Investigation of Complaints section of this IMR (paragraphs 183-194), we determined that the findings of the Board, made in favor of the complainant on appeal, to be deficient. However, the Board once again demonstrated its willingness to entertain appeals and to give complainants a meaningful opportunity to be heard, thus it maintains operational compliance with this CASA requirement (paragraph 287).

For the foregoing reasons, the monitoring team continues to find that the CPOA Board to be in compliance with paragraphs 271 and 273 of the CASA. "Meaningful oversight" by the Board means effective oversight, and the Board has demonstrably committed itself to conducting its mission impartially.

Not only does the Board need to be at full strength, under paragraphs 278 and 279 of the CASA, the CPOA must have adequate budget and staff (non-appointed members of the agency) to perform its roles. As we noted in IMR-10, the CPOA budget was required by Ordinance to be ½ of 1% of the APD budget.  This requirement has since been removed, and the ordinance now states:

> "The CPOA shall recommend and propose its budget to the Mayor and City Council during the city's budget process to carry out the powers and duties under §§ 9-4-1-1 through 9-4-1-14, including itemized listings for the funding for staff and all necessary operating expenses." Revised Ordinances of Albuquerque, New Mexico, 1994, Section 9-4-1-4(A)(2)."

Although we cannot definitively state that the present CPOA budget is insufficient for purposes of CASA compliance, there are now stronger indications in our review of the CPOA work performance that more staffing is required. First, CPOA lost the services of its lead investigator, who resigned in the IMR-12 period in order to take a position with IAPS. Although the commitment and experience of this individual has not been lost to the IA process, CPOA is now short a lead investigator as well as an investigator.  It is expected that these positions will be filled shortly into the IMR-13 period and CPOA will be back to a full its full complement of 4 investigative personnel (1 lead investigator and 3 investigators). CPOA has requested an additional 2 investigative positions and a

policy analyst position in its 2021 budget request, and indications are that these requests are currently receiving thoughtful consideration in the 2021 budget process.

We reiterate again in this IMR that we believe CPOA is operating efficiently within the confines of its present staffing and number of complaints it receives, but as set forth in this and past IMRs regarding timeliness of completion of investigations, the CPOA ability to meet CASA requirements is at the straining point. It is evident to the monitoring team that the CPOA must increase its investigative capacity to keep abreast of its workload within the requirements of the CASA and the investigative time requirements of the CBA. This will continue to be a focus of the monitoring team.

As we pointed out in previous IMRs, a new mediation policy was developed that was an apparent improvement and that was expected to enable CPOA to make greater use of this effective complaint remedy and disposition tool. However, this revised policy did not prove to be successful. As we noted in IMR-10, unfortunately complainants did not take advantage of the mediation program and have, for the most part, opted not to pursue mediation.

As discussed in reference to paragraph 184 herein, during the 12th IMR monitoring period, a second revised version of the mediation program was completed, and on the final day of the review period the new Mediation Protocol, in the form of a Memorandum of Understanding between the City, APD, APOA, and CPOA, was filed with the Court along with a *"SECOND JOINT STIPULATION SUSPENDING, IN PART, PARAGRAPH 184 OF THE COURT-APPROVED SETTLEMENT AGREEMENT AND JOINT BRIEF EXPLAINING THE BASIS FOR PARTIAL SUSPENSION."* The purpose of this motion was to make it possible for allegations of less serious or minor misconduct to be the subject of mediation and to test the efficacy of this expanded mediation program.  The Court entered an Order approving same on August 6, 2020.

The monitoring team recognizes that the City and CPOA have expended considerable good faith efforts to carry out the mediation of complaints under paragraph 184. We expect that the Joint Stipulation, allowing for an expansion of complaints that are eligible for mediation, will prove to be the catalyst for an effective mediation program. The monitoring team continues to emphasize that a viable mediation policy, and effective use thereof, are important in the overall disciplinary process and could prove to be instrumental in alleviating CPOA's investigative burden. The mediation policy and its implementation and impact on case resolution will be a focus of the monitoring team in the next IMR.

As the monitoring team has noted since IMR-8, when reviewing a stratified random sample of investigations, regarding the requirement of "expeditiously as possible" processing of complaints contained in  paragraph 281 of the CASA, and the time requirement for completing investigations contained in paragraph 191, we look for and determine the following dates: complaint received, complaint assigned for investigation, initiation of investigation after assignment, completion of investigation, and chain of command review and notification of intent to impose discipline (where applicable).

During the 6th site visit, the monitoring team discussed with the parties the issue of delay between the date a complaint is received and the date it is assigned for investigation. Although the CASA does not deal directly with the issue of time to assign, the parties and the monitor agreed that a delay of more than seven working days for assignment is unreasonable and would affect the "expeditious" requirement of Paragraph 281 and the time requirement of Paragraph 191.  We agreed this timeline requirement would be assessed in IMR-8 and in all following IMRs.

We sampled eight CPOA investigations completed this monitoring period. Five of the eight contained evidence of delays in assignment for investigation. Despite the positive development of CPOA's use of a new internal tracking system of complaints, we note that in five cases [IMR-12-45, IMR-12-48, IMR-12-50, IMR-12-51, and IMR-12-52] assignments were made after seven working days of having received the complaint, we noted that the investigation was otherwise untimely.

[IMR-12-45] involved an allegation of unsafe driving and speeding made against an officer while driving a police vehicle. The matter was not assigned for investigation until more than three months after receipt of the complaint. In addition, when contacted by the CPOA investigator, the complainant refused to cooperate and was angry because of the passage of time.

[IMR-12-48] involved an allegation of an insufficient basis for a traffic stop. It is difficult to determine when the investigation was assigned and completed, but the findings letter back to the complainant administratively closing the matter was dated almost five months after receipt of complaint.

[IMR-12-50] involved a long complaint about ineffective police response, only a small part of which pertained to APD. Even with an allowance for unusual circumstances due to complexity of complaint, most of which did not apply to APD, the findings letter back to the complainant with a finding of exoneration was almost eight months after receipt of complaint.

[IMR-12-51] involved a demeanor and improper detention complaint in regard to a reported incident of domestic violence. The investigation concluded over seven months after receipt of complaint, and the findings letter back to the complainant was eight months after receipt of complaint.

[IMR-12-52] involved code of conduct allegations regarding a detention made pursuant to a reported burglary. Assignment was made almost three months after receipt of complaint and the findings letter back to complainant was more than eight months from receipt of complaint.

Since none of these investigations resulted in sustained findings, the non-sustained findings did not result in an inability to impose due to time constraints. However, operational compliance for timely investigations decreased from 45% compliance rate in

IMR-11 to 38% for this IMR.  Given a 95 % requirement for compliance, these failure rates are extremely concerning.  We suspect strongly that these delays may be due to under-staffing.  A staffing and time-management study may be in order for CPOA.

Another example of CPOA untimeliness is found in a matter investigated by IAPS. [IMR-12-43]. That case involved a website complaint to CPOA dated September 11, 2020. CPOA transferred the investigation to IAPS, based on the potential for criminal conduct, on February 24, 2020, almost 5 months after receipt of complaint.

In addition, in IMR-11 we pointed out that, during the 11th IMR reporting period, the Executive Director discovered approximately 50 investigative files, based on complaints made in 2017.   These files were given to a former CPOA administrative for processing but were never actually processed and placed into the administrative system. Thus, these complaints remained unassigned for investigation. Once this matter was discovered, it was revealed by the Executive Directive in a timely and forthright manner. CPOA is now in the process of classifying, assigning, and investigating these complaints, but any sustained charges will not result in discipline due to time constraints.

CPOA continues to be out of operational compliance with the requirements of paragraph 281 related to timeliness. We are satisfied that the Executive Director now has a mechanism in place for review and assignment of all complaints.  Once we observe implementation and management of this mechanism, we can re-visit our compliance findings.

In our review of the public information requirement for CPOA and the Board, we found that issues we have had in the past with the timeliness of release of public reports are being addressed. In regard to paragraph 292 of the CASA requiring the CPOA to file semi-annual reports with the City Council, CPOA previously attempted to meet this requirement by filing one semi-annual and one annual report per year, and quarterly reports verbally with City Council. They have now implemented a process of filing two semi-annual written reports per year.

We reported in IMR-10 that both CPOA Semi-Annual Reports for 2018 had been completed and were going through the approval process. With the hiring of the Data Analyst, it was discovered that improvements in reporting and analysis of statistics contained in the 2018 semi-annual reports could be made. To its credit, CPOA decided to sacrifice timeliness for quality, and the Data Analyst was assigned the responsibility of revising the reports. These rewrites have been completed, approved by the CPOA Board, and were approved by the Public Safety Committee shortly after the expiration of the IMR-12 period at its August meeting. The reports were approved by Council at its September meeting. We would expect that the 2019 semi-annual reports will be ready for Council review during the IMR-13 period, and in 2021 CPOA will be in a position to meet  a goal of releasing the 2020 semi-annual reports within a reasonable and meaningful time period of the expiration of the semi-annual period (120 days).

Based on our observations and interaction with CPOA staff, we believe that the CPOA is operating efficiently within the confines of its present workload and staffing.  However, the ability of the CPOA to meet its investigative responsibilities is impacted by the availability of necessary staff. At the same time, we are cognizant of the fact that funding is always a central issue.  Nonetheless, as demonstrated by our analysis of CPOA's ability to meet its timeliness of investigation requirements, either investigative staff needs to be increased, or new efficiencies need to be found in the CPOA process.  Otherwise CPOA will continue to be severely challenged in meeting the requirements of the CASA pertaining to the timeliness and quality of investigations.

### 4.7.256 Compliance with Paragraph 271:  CPOA Implementation

Paragraph 271 stipulates:

> **"The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD. The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

Monitor's Note:

CPOA Board vacancies need to be promptly filled.  The City should continue its diligent and ongoing screening process that considers CPOA and Board input regarding the qualifications of applicants for vacant Board positions.

### 4.7.257 Assessing Compliance with Paragraph 272:  Independence and Accountability of CPOA

Paragraph 272 stipulates:

> **"The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance."**

**Results**

Primary:      **In Compliance**

342

Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.258 Assessing Compliance with Paragraph 273:  Requirements for Service of CPOA Members

Paragraph 273 stipulates:

> **"The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

Monitor's Note:

The CPOA Board must continue to reinforce the need for its members to commit to sections § 9-4-1-5 (B) (4) and (5) of the Albuquerque Police Oversight Ordinance and paragraph 273 of the CASA requiring its members to demonstrate an ability to engage in mature, impartial decision-making; a commitment to transparency and impartial decision making; and the impartial, transparent and objective adjudication of civilian complaints, as well as the importance of public perception of impartiality by CPOA Board members.

City Council should ensure that appointments and reappointments of CPOA Board members meet the qualification requirements set forth in § 9-4-1-5 (B) of the Albuquerque Police Oversight Ordinance and paragraph 273 of the CASA, and take appropriate action if Council determines that sitting members have not met those standards.

## 4.7.259 Assessing Compliance with Paragraph 274:  CPOA Pre-Service Training

Paragraph 274 stipulates:

> **"Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:**
>
> **a)  This Agreement and the United States' Findings Letter of April 10, 2014;**

343

**b)  The City ordinance under which the agency is created;**
**c)  State and local laws regarding public meetings and the conduct of public officials;**
**d)  Civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;**
**e)  All APD policies related to use of force, including policies related to APD's internal review of force incidents; and**
**f)  Training provided to APD officers on use of force."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.260 Assessing Compliance with Paragraph 275:  CPOA Annual Training

Paragraph 275 stipulates:

> **"The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.261 Assessing Compliance with Paragraph 276:  CPOA Ride-alongs

Paragraph 276 stipulates:

> **"The City shall require those appointed to the agency to perform at least two ride-alongs with APD officers every six months."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.262 Assessing Compliance with Paragraph 277:  CPOA Authority and Resources to Make Recommendations

Paragraph 277 stipulates:

> **"The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer-involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force.**"

**Results**

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.263 Assessing Compliance with Paragraph 278:  CPOA Budget and Authority

Paragraph 278 stipulates:

> **"The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws.  The agency shall have the authority to hire staff and retain independent legal counsel as necessary.**"

**Results**

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

Monitor's Note:

CPOA should be provided increased investigative staff to meet its CASA requirements pertaining to timeliness and thoroughness of investigations, and adequate resources to effectively meet its new responsibilities pertaining to the integration with, and administration of CPCs.

### 4.7.264 Assessing Compliance with Paragraph 279:  Full-Time CPOA Investigative Staff

Paragraph 279 stipulates:

> **"The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review**

> of serious uses of force and officer-involved shootings.
> The investigative staff shall be selected by and placed
> under the supervision of the Executive Director. The
> Executive Director will be selected by and work under
> the supervision of the agency.  The City shall provide
> the agency with adequate funding to ensure that the
> agency's investigative staff is sufficient to investigate
> civilian complaints and review serious uses of force
> and officer-involved shootings in a timely manner."

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.265 Assessing Compliance with Paragraph 280:  Receipt and Review of Complaints by CPOA

Paragraph 280 stipulates:

> "The Executive Director will receive all APD civilian
> complaints, reports of serious uses of force, and
> reports of officer-involved shootings.  The Executive
> Director will review these materials and assign them for
> investigation or review to those on the investigative
> staff.  The Executive Director will oversee, monitor, and
> review all such investigations or reviews and make
> findings for each.  All findings will be forwarded to the
> agency through reports that will be made available to
> the public on the agency's website."

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

Monitor's Note:

CPOA and IAD should avoid conducting independent investigations on the same alleged misconduct. Jurisdiction should lie with one office or the other. In the rare instance where an external complaint and an internal complaint address the same subject matter, an agreement should be made regarding which office will conduct the investigation or a joint investigation with one set of findings should be conducted.

## 4.7.266 Assessing Compliance with Paragraph 281:  Prompt and Expeditious Investigation of Complaints

Paragraph 281 stipulates:

> **"Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible."**

**Results**

    Primary:    **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

*Recommendations for Paragraph 281:*

*4.7.266a: Continue to develop and refine an internal tacking system or other process that ensures all complaints are either assigned for investigation, referred to mediation, or administratively closed within seven working days of receipt of complaint, and once assigned for investigation proceed according to the timelines set forth in the CASA and CBA.*

*4.7.266b: Ensure that tardy assignments of investigations and tardy investigations are noted and discussed with the involved CPOA personnel.*

**4.7.267 Assessing Compliance with Paragraph 282:  CPOA Access to Files**

Paragraph 282 stipulates:

> **"The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:**
>
> **a)  all civilian complaints, including those submitted anonymously or by a third party;**
> **b)  the identities of officers involved in incidents under review;**
> **c)  the complete disciplinary history of the officers involved in incidents under review;**
> **d)  if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);**
> **e)  all APD policies and training; and**
> **f)  if requested, documents, reports, and other materials for incidents that may evince an overall trend in APD's use of force, internal accountability, policies, or training."**

347

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.268 Assessing Compliance with Paragraph 283:  Access to Premises by CPOA

Paragraph 283 stipulates:

> **"The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director upon reasonable notice. The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.269 Assessing Compliance with Paragraph 284:  Ensuring Confidentiality of Investigative Files

Paragraph 284 stipulates:

> **"The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.270 Assessing Compliance with Paragraph 285:  Authority to Recommend Discipline

Paragraph 285 stipulates:

348

> **"The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.271 Assessing Compliance with Paragraph 286:  Documenting Executive Director's Findings

Paragraph 286 stipulates:

> **"Findings of the Executive Director shall be documented by APD's Internal Affairs Division for tracking and analysis."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.272 Assessing Compliance with Paragraph 287:  Opportunity to Appeal Findings

Paragraph 287 stipulates:

> **"The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

Monitor's Note:

The CPOA Board must respect and follow the appeals process set forth in its Ordinance and apply it equally to all members of the public. The functional equivalent of allowing an appeal before the end of an investigation should be avoided at all costs.

When the CPOA Board grants an appeal, before sustaining any violations that were not determined by CPOA or otherwise altering CPOA findings, its first threshold question should be whether the investigation needs to be returned to the CPOA investigative staff for additional investigation. If the CPOA Board makes findings that were not noted by CPOA or otherwise alters CPOA findings, it should do so only if the record of investigation sufficiently supports its findings and additional investigation is not warranted.

When the CPOA Board grants an appeal and sustains violations that were not found by CPOA or otherwise alters CPOA findings, disciplinary recommendations should be made, and training/policy issues addressed, to better enable the chief to reach an appropriate decision.

### 4.7.273 Assessing Compliance with Paragraph 288:  CPOA Recommendations Regarding APD Policies

Paragraph 288 stipulates:

> **"The agency shall make recommendations to the Chief regarding APD policy and training.  APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.274 Assessing Compliance with Paragraph 289:  Explanation for not Following CPOA Recommendations

> **"For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded."**

**Results**

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

## 4.7.275 Assessing Compliance with Paragraph 290:  Regular Public Meetings

Paragraph 290 stipulates:

> **"The agency shall conduct regular public meetings in compliance with state and local law.  The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD."**

**Results**

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

## 4.7.276 Assessing Compliance with Paragraph 291:  Community Outreach for the CPOA

Paragraph 291 stipulates:

> **"The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status."**

**Results**

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

## 4.7.277 Assessing Compliance with Paragraph 292:  Semi Annual Reports to Council

Paragraph 292 stipulates:

> **"The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:**

a)  **number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
b)  **demographic category of complainants;**
c)  **number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
d)  **number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
e) **policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;**
f)  **policy changes recommended by the agency, including any dispositions by the Chief;**
g)  **public outreach efforts undertaken by the agency and/or Executive   Director; and**
h)  **trends or issues with APD's use of force, policies, or training."**

## Results

Primary:    **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 292:*

*4.7.277a: CPOA should specifically identify the pressure points causing non-compliance with this paragraph and work with APD and the monitoring team to decide upon processes that will move it back into compliance.*

### 4.7.278 Assessing Compliance with Paragraph 320: Notice to Monitor of Officer Involved Shootings

Paragraph 320 stipulates:

> "**To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings. APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer."**

352

**Methodology**

APD continues to meet the requirements of this paragraph.  The City Attorney's Office routinely notifies the monitor, on a timely basis, of officer-involved shootings.

**Results**

> Primary:       **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 5.0 Summary

During this reporting period, we have noted that APD's compliance-related practices have continued along pre-established patterns.  Functional units that were in compliance in past reports, for the most part, have remained in compliance.  Units that have exhibited compliance related issues in the past, for the most part, remain out of compliance.  The Compliance and Oversight Division is fast-becoming a group that will be well-placed to pick up the monitor's responsibilities when this process is over, and their management structure, leadership, and internal processes remain strong, issue-focused, and of high quality.  Special Operations continue their strong compliance efforts.  Conversely, we have identified strong under currents of Counter-CASA effects in some critical units on APD's critical path related to CASA compliance.  These include supervision at the field level; mid-level command in both operational and administrative functions (patrol operations, internal affairs practices, disciplinary practices, training, and force review).

Supervision (sergeants and lieutenants) and mid-level command (commanders) remain one of the most critical weak links in APD's compliance efforts.  During this reporting period, the monitoring team often found in its reviews of management and oversight practices, a near myopathy at APD when it comes to assessing actions in the field against the requirements of APD policy and the CASA.  Supervisors and command-level personnel have a deleterious tendency to ignore the requirements of policy and training, and at times to even support processes to hide or circumvent internal systems designed to ensure compliance to established policy.  Even more importantly, Tier 4 training and required annual training processes are at or near atrophy at APD.

When a major police organization can "forget" to plan for annual training processes—and no one notices except the monitoring team, there are serious, meaningful, and near terminal problems with leadership at the training command level, and at the executive oversight and control level.

When a major, and CASA-critical command such as Internal Affairs can allow union representatives to hijack internal investigations and can allow officers to respond to salient (and reasonable) fact-finding questions by simply reading a Garrity statement

353

into the record, as opposed to answering questions posed, there are serious and near-terminal problems with process, policy enforcement, and outcome factors When internal fact-finding processes such as Internal Affairs can routinely permit officers and union representatives to hijack internal fact-finding, and no one notices except the monitoring team, there are serious, meaningful, and near terminal problems with leadership at internal investigative commands.

When critical oversight elements such as the Force Review Board can miss critical violations regarding use of force and visible evidence of open, overt, and reprehensible mistreatment of arrestees by APD field personnel, there are serious, meaningful and near terminal problems with executive review processes specifically designed to note these types of problems and posit solutions to ensure they do not re-occur, there are serious, meaningful, and near-terminal problems with departmental command and leadership at the highest levels.

When, in effect, the monitoring team stands as the quality-control mechanism for supervision, command, and leadership levels of the police department, we are facing serious, existential threats to effective management and service delivery functions at APD.  In the monitor's opinion, based on our detailed analyses presented in this report, APD stands at a critical crossroad.  A change in the trajectory at APD is essential. Leaders need to step up and lead.  Managers need to step up and manage. Supervisors need to step up and supervise.  Most importantly, field officers need to conform to established policy and training and effect CASA-congruent policing practices.

The change required is certainly possible.  The Pittsburgh Bureau of Police has proven the possibility by successfully meeting the change requirements during their consent decree and did so in record time.  The New Jersey State Police, a larger, more diverse, and more decentralized agency than APD, successfully met the change requirements of their consent decree, and in doing so, became a model for other agencies facing reform issues.

At this point, we assert that the issue is leadership.  The next chief at APD needs to step up, speak out, set and meet reform goals, and ensure that the management team supporting him, or her, are pulling together to ensure reform.  Until that happens, change will be difficult to make.  Reform will be difficult to implement.  Effective, constitutional policing will remain elusive.