**Progress and Status Summary of the United States Department of Justice Settlement Agreement**

**Entered into by the United States of America and the City of Albuquerque**

**Regarding the Albuquerque Police Department**

**Thirteenth Report**

**August 1, 2020 – January 31, 2021**

**Prepared by the Albuquerque Police Department Compliance and Oversight Division**

## Table of Contents

I. Introduction .............................................................................................................................................. 4

II. Acronym List ............................................................................................................................................ 4

III. Executive Summary ................................................................................................................................. 5

IV. Progress Report Organization ................................................................................................................. 6

V. Compliance Levels and the CASA's Measurable Paragraphs ................................................................... 6

VI. Key Steps Taken by APD and City Administration ................................................................................... 8

VII. Section Progress on the CASA's measurable paragraphs ..................................................................... 12

    Section 1: Use of Force: Internal Controls and Accountability (Paragraphs 14-89) ................................. 12

        A. Use of Force Principles ............................................................................................................... 12

        B. Use of Firearms ........................................................................................................................... 13

        C. Electronic Control Weapons ....................................................................................................... 14

        D. Crowd Control and Incident Management .................................................................................. 17

        E. Use of Force Reporting ................................................................................................................ 18

        F. Force Reviews and Investigations ............................................................................................... 18

        F1. Supervisory Force Reviews ....................................................................................................... 20

        F2. Force Investigations by the Internal Affairs Division ............................................................... 22

        G. Force Review Board ..................................................................................................................... 28

        H. Multi-Agency Task Force ............................................................................................................. 31

        I. Use of Force Training ................................................................................................................... 31

    Section 2: Specialized Units (Paragraphs 90 – 109) ................................................................................. 33

        A. Specialized Tactical Units (SOD) ................................................................................................. 33

        B. Specialized Investigative Units (SID) ........................................................................................... 35

    Section 3: Crisis Intervention (Paragraphs 110 – 137) ............................................................................ 36

        A. Mental Health Advisory Committee (Paragraphs 110-117) ........................................................ 36

        B. Behavioral Health Training (Paragraphs 118-122) ...................................................................... 38

        C. Crisis Intervention Certified Responders and Crisis Intervention Unit (Paragraphs 123-131) ....................................................... 39

        D. Crisis Prevention (Paragraphs 132-137) ..................................................................................... 41

    Section 4: Policies and Training Generally (Paragraphs 138 – 161) ......................................................... 42

        A. Policy Development, Review, and Implementation ..................................................................... 42

        B. Training on Revised Policies, Procedures, and Practices ............................................................ 44

        C. Field Training Officer Program .................................................................................................... 45

    Section 5: Misconduct Complaint Intake, Investigation, and Adjudication (Paragraphs 162 – 202) .......................................... 47

        A. Reporting Misconduct ................................................................................................................. 47

        B. Public Information on Civilian Complaints ................................................................................... 47

        C. Complaint Intake, Classification, and Tracking ........................................................................... 48

D. Investigation of Complaints ........................................................................................................................ 50

E. Preventing Retaliation ................................................................................................................................ 53

F. Staffing and Training Requirements............................................................................................................ 53

Section 6:  Staffing, Management, and Supervision (Paragraphs 203 –208)................................................... 55

A. Staffing ....................................................................................................................................................... 55

B. Duties of Supervisors.................................................................................................................................. 55

C. Supervisor Training..................................................................................................................................... 57

D. Early Intervention System.......................................................................................................................... 58

E. On-Body Recording Systems for Documenting Police Activities ................................................................ 60

Section 7:  Recruitment, Selection and Promotions (Paragraphs 232 – 246) ............................................... 63

A. Recruitment Plan........................................................................................................................................ 63

B. Hiring Practices........................................................................................................................................... 64

C. Promotions.................................................................................................................................................. 65

Section 8:  Officers Assistance and Support (Paragraphs 247 – 253) ............................................................ 66

Section 9:  Community Engagement and Oversight (Paragraphs 254 – 293) ................................................ 67

A. Community & Problem-Oriented Policing (Paragraphs 255-259) ............................................................... 67

B. Community Meetings & Public Information (Paragraphs 260-265)............................................................. 69

C. Community Meetings & Public Information (Paragraphs 266-270)............................................................. 70

D. Civilian Police Oversight Agency (CPOA) (Paragraphs 271-292)................................................................. 71

Section 10:  Assessing Compliance (Paragraph 320) ..................................................................................... 74

A. Access and Confidentiality ......................................................................................................................... 74

VIII.  Conclusion ............................................................................................................................................. 74

IX. Appendix ................................................................................................................................................... 74

# I. Introduction

The Albuquerque Police Department (APD) and the City of Albuquerque (City) continue to work with the Department of Justice (DOJ) and the Independent Monitor (IM) to improve the overall functioning of the Department and work toward meeting the requirements of the Court Approved Settlement Agreement (CASA) No. CIV 14-1025-JB-SMV.

APD has received guided feedback from the IM, the City, and the DOJ for the reporting period of August 1, 2020 to January 31, 2021.  This report documents the key steps APD has taken to meet compliance with the CASA, gauge progress, communicate correction plan status, and respond to concerns raised in the IMT.  This report was prepared pursuant to paragraph 319 of the CASA.

# II. Acronym List

| | | | |
|---|---|---|---|
| AAR | After Action Report | HIPAA | Health Insurance Portability and Accountability Act |
| ACS | Albuquerque Community Safety | IADLEST | International Association of Directors of Law Enforcement Standards and Training |
| BSS | Behavioral Sciences Section | | |
| BNMM | Black New Mexico Movement | IAFD | Internal Affairs Force Division |
| CAC | Crimes Against Children | IAPS | Internal Affairs Professional Standards |
| CAD | Computer Aided Dispatch | IAR | Internal Affairs Request |
| CARE | Child Abuse Response Evaluators | IM | Independent Monitor |
| CASA | Court Approved Settlement Agreement | IMR | Independent Monitor's Report |
| CIS | Crisis Intervention Section | IMT | Independent Monitoring Team |
| CIU | Crisis Intervention Unit | MATF | Multi-Agency Task Force |
| CJCC | Criminal Justice Coordinating Council | MHRAC | Mental Health Response Advisory Committee |
| CNT | Crisis Negotiation Team | MOE | Maintenance of Effort |
| COA | City of Albuquerque | MOU | Memorandum of Understanding |
| COAST | Crisis Outreach and Support Team | NASRO | National Association of School Resource Officers |
| COD | Compliance and Oversight Division | NCP | National Certification Program |
| CEU | Community Engagement Unit | NNSC | National Network for Safe Communities |
| COP | Community Oriented Policing | OBRD | On-Body Recording Device |
| CPC | Civilian Police Complaint (IAPS and CPOA) | OJT | On the Job Training |
| CPCs | Community Policing Councils | OPA | Office of Policy Analysis |
| CPOA | Civilian Police Oversight Agency | PDH | Pre-Determination Hearing |
| CTU | Comprehensive Training Unit | PEMS | Performance Evaluation and Management System |
| DAP | Discipline Action Packet | PIA | Process Improvement Analyst |
| DOJ | Department of Justice | PMU | Performance Metrics Unit |
| DTI | Department of Technology and Innovation | POP | Problem Oriented Policing |
| ECC | Emergency Communication Center | PPRB | Policy and Procedure Review Board |
| ECIT | Enhanced Crisis Intervention Team | PRT | Proactive Response Team |
| ECW | Electronic Control Weapon (taser) | PRU | Performance Review Unit |
| EIRS | Early Intervention and Recognition System | RAD | Rapid Accountability Diversion |
| ELMS | Enterprise Learning Management System | RAM | Risk Assessment Matrix |
| ERP | Enterprise Resource Planning | SID | Special Investigation Division |
| ERT | Emergency Response Team | SOD | Special Operations Division |
| FRB | Force Review Board | SOP | Standard Operating Procedure |
| FSB | Field Service Bureau | SRO | School Resource Officer |
| FTAL | Field Training Area Lieutenant | TDY | Temporary Duty |
| FTAS | Field Training Area Sergeant | TraCs | Traffic and Criminal software |
| FTEP | Field Training Evaluation Program | TRU | Telephone Reporting Unit |
| FTO | Field Training Officer | USDOJ | United States Department of Justice |
| GVRU | Gun Violence Reduction Unit | VIP | Violence Intervention Program |

## III.  Executive Summary

The City and APD consider CASA compliance of paramount importance and remain committed to addressing CASA paragraph requirements at all Department levels. The purpose of this progress report is to document the Twelfth Independent Monitor's Report, the Independent Monitoring Team's recommendations, APD's actions in response to the IMT recommendations, individual paragraph compliance status, and other transformational efforts that occurred from August 1, 2020 to January 31, 2021.

There are two hundred seventy-six (276) paragraphs in ten sections within the CASA with measurable requirements. Compliance is measured by three levels (primary, secondary, and operational).  In this reporting period, key efforts to meet compliance requirements have been addressed by APD throughout all ten sections of the CASA including: Use of Force; Specialized Units; Crisis Intervention; Policies and Training; Misconduct Complaint Intake; Investigation and Adjudication; Staffing, Management and Supervision; Recruitment Selection and Promotion; Community Engagement and Oversight, and Assessing Compliance.

As of the end of the IMR-12 reporting period, APD's compliance levels were:
Primary Compliance 100%;
Secondary Compliance 91%; and
Operational Compliance 64%.

In late 2020, at the suggestion of the IMT, APD began evaluating whether to restructure Internal Affairs Professional Standards Division and Internal Affairs Force Division into one division.  During conversations between the Parties, the IMT recommended that APD make necessary improvements to intake/adjudication and investigative processes first, then structure the division(s) around the processes.  To address intake/adjudication and investigative processes, APD requested technical assistance from the IMT in two areas: internal affairs intake/adjudication and force investigations processes.  This technical assistance will affect numerous CASA paragraphs in one way or another, such as paragraphs 46-78, 162, 163, 170-194, and 205.  Further, in January 2021, the Chief approved twenty-five (25) detectives total for the division to investigate levels 2 and 3 use of force cases.

All the Special Operations Division (SOD) paragraphs (90 -109) remain in Operational Compliance.  A change in SOD command began on December 21, 2020.  Standard operating procedures regarding SOD activities continue to be reviewed annually.  SOD continues to utilize Risk Assessment Matrices for pre-planned warrants, and After-Action Reports (AAR) are now After-Action case files containing more comprehensive information applicable to the tactical activation, and are used for review and documentation purposes.

APD continues to develop, implement and support integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. APD has continued to meet remotely during the pandemic with the Mental Health Response Advisory Committee (MHRAC).  Meetings were held every month during this monitoring period.  Regular topics included the continued planning of the new Albuquerque Community Safety (ACS) Department and the gateway shelters.  Other topics included Albuquerque Fire and Rescue's Wellness Check program, ongoing concerns with New Mexico's on body camera law for law enforcement, the release of recorded footage, the impact of COVID on services, changes to the mobile crisis team program and a presentation of collected APD data on mental health interactions.  MHRAC currently also has two subcommittees, one focusing on information sharing and emerging resources for those living with behavioral health issues and a training subcommittee that evaluates and provides feedback on all APD behavioral health training.  Topics covered by the information sharing/resource subcommittee included building a COVID specific version of the APD resource card, an introduction to the Policy and Procedures Section of APD, and discussion of a standalone Certificates for Evaluation policy.   The Training subcommittee covered updates to the Crisis Negotiation Team training being developed by the SOD, Handbook updates for the Behavioral Sciences Section (BSS), changes to the Enhanced Crisis Intervention Team training and Law Enforcement Assisted Diversion training delivered to all APD officers.

In September 2020, APD transitioned to temporary acting leadership at the Training Academy.  In the past, the DOJ and IMT have been critical of APD's curriculum standards and proposed bringing in an experienced educator to oversee curriculum development to work with both civilian and sworn personnel.   In December 2020, the City advertised for a Curriculum Development Manager position to focus on training curriculum development.  First and second round interviews were conducted in January.  APD intends to make the final hiring decision after a third and final round of interviews with City leadership.  Additionally, APD has reassigned an Assistant City Attorney with both an education and legal background, and a Compliance and Oversight Division (COD) Process Improvement Analyst (PIA) with

specialized training development and training management experience to work with the Academy. APD also hopes to name a permanent Commander to the Training Academy this Spring.

IAPS continues to improve the quality and timeliness of investigations involving department personnel through increased oversight and accountability. During this reporting period, IAPS established a more cohesive relationship with DOJ and meets biweekly to provide status updates on internal affairs investigations. The increased communication with DOJ demonstrates APD's willingness to be transparent and accept feedback to strengthen the internal affairs process.

In an effort to improve department-wide inspections and audit processes, APD's COD worked with the City's Department of Technology and Innovation (DTI), Enterprise Resource Planning (ERP) team to implement a more user-friendly and automated line inspection process. The new line inspection form will auto populate data from source systems, reducing data entry error from manual entries and increasing efficiency in completing the inspection process. APD's PMU continues to audit both the monthly line inspection forms and criminal complaint and juvenile statements of probable cause to ensure close and effective supervision of officers. Beginning January 1, 2021, a pilot phase for the Lieutenant Weapon Inspection process was initiated in the Valley Area Command and the SOD. The Lieutenant Weapon Inspection serves as a second level review verifying the randomly selected officer's department issued weapons match his/her property card and the officer is carrying department authorized ammunition. The new community engagement application, currently in a test phase with PRT, is intended to increase oversight and accountability of officers' efforts to address community concerns. Supervisors will be able to view reports relating to officers' participation in community events and activities and ensure concerns are resolved.

In Fall 2020, APD initiated a new marketing campaign for recruiting officers. In the past, APD recruiting advertisements focused on specialized units such as SWAT or K-9 Units to draw in applicants; however, APD sees the value in including the community's idea of the ideal officer and the attributes one must possess. Those attributes include but are not limited to, have patience, be respectful, recognize self-bias, as well as possess both a human side and a protective side and know the difference when to use each.

The Behavioral Sciences Section (BSS) provided training to all supervisors and acting supervisors in November and December 2020. The training focused on BSS's role in providing mental health services to include minimizing the stigma, addressing confidentiality, common stressors, warning signs of officer distress, self-referral vs. mandated referrals and evaluations after critical incidents/officer involved shootings. BSS strives to promote the importance of mental health wellness and self-care to sustain viability both professionally and personally.

APD continues to reach out to diverse community groups throughout the City in an effort to bridge the gap, build partnerships, facilitate better communication, and understanding with the police department. As a result, many community engagement endeavors took place during this reporting period. APD developed and tested a new community engagement software application, expanded a School Resource Officer (SRO) and youth project called IMPRINT, hired clergymen who will work with members of the community to determine how APD can improve efforts to increase public trust and include the community in transformation efforts, and created a community ambassador program. APD continues to be an active participant in the development of the ACS Department, and actively pursues partnerships with amici and other groups such as the Black New Mexico Movement (BNMM), Burque Against Racism, and Commission of the Deaf and Hard of Hearing.

## IV. Progress Report Organization

This progress report follows the organization of the CASA and the Monitor's Twelfth Report (IMR-12), setting forth responses to the recommendations in IMR-12. Each Section contains subsections and respective paragraphs. Each paragraph of the CASA is listed and is followed by the corresponding IMR-12 recommendations (if any), APD's response to the recommendations, and in some cases APD's response to the paragraph in general.
The full CASA, Independent Monitor Reports and other related documents can be located at:
http://www.cabq.gov/police/documents-related-to-apds-settlement-agreement.

## V. Compliance Levels and the CASA's Measurable Paragraphs

There are two hundred seventy-six (276) paragraphs within the CASA with measurable requirements. As defined in IMR-1, compliance measurements in APD's monitoring process consists of three parts: primary, secondary, and operational as defined below:

1. **Primary** compliance is the "policy" part of compliance. To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA. As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.
2. **Secondary** compliance can be attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the Department for doing so. By definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the agency).
3. **Operational** compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and Sergeants are routinely held accountable for compliance by their lieutenants and command staff. In other words, APD "owns and enforces its own policies".

As of the release of IMR – 12, APD's overall compliance rates compared to IMR - 11 were as follows:

| Compliance Level | IMR 11 Percentage Compliant | IMR 12 Percentage Compliant | % Change in Compliance Rate from IMR 11 to IMR 12 |
|---|---|---|---|
| Primary (policy) | 100% | 100% | 0% |
| Secondary (training) | 93% | 91% | -2% |
| Operational compliance (day to day operations) | 66% | 64% | -2% |

The following table shows paragraph compliance rates, from IMR-1 through IMR-12 (no IMR-7)[1]. The red represents the number of paragraphs in Primary Compliance, yellow represents the number in Secondary Compliance, and green represents the number of paragraphs in Operational Compliance. The next IMR will be filed with the court in May 2021.

---

[1] There was no IMR-7 by agreement between the DOJ, City, and Monitor with the approval of the Court.



## VI. Key Steps Taken by APD and City Administration

The thirteenth reporting period began August 1, 2020 and ended on January 31, 2021.  In September, 2020, APD transitioned to a new Chief of Police as well as new leadership at the Training Academy.  Many initiatives are currently in the inception stages due to these leadership changes two months into the reporting period; however, APD continues to make significant progress towards overall departmental improvements; many of which are directly related to the CASA.

In March 2020, APD began feeling the impacts of COVID-19.  The Training Academy began delaying training across the department, to include Tier 4 use of force training.  While initial delay was understandable given the unchartered pandemic territory, after months of postponement and without approving or moving forward with alternative plans to deliver the trainings, APD fell further and further behind in conducting mandated training.  Paragraphs 86 and 87 require twenty-four (24) hours annual use of force training, scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies.  APD delayed training due to the uncertainty about how long COVID restrictions would last, but by the end of 2020, these delays resulted in noncompliance with Paragraphs 86 and 87.  Since the leadership change, the APD Training Academy has refocused priority to conducting Tier 4 use of force training, which is scheduled to begin March 2021.  Due to the small number of participants for each class, APD anticipates completion in November of 2021.

In the past, the Department of Justice and Independent Monitoring Team have been critical of APD's ability to produce curricula and proposed that bringing in an experienced educator into an oversight position to work with both sworn and civilian personnel is the best option to move forward with quality training.  The following are steps taken to remedy curriculum deficiencies.

- In December 2020, the City advertised for a Curriculum Development Manager position to focus on training curriculum development.  APD conducted the first and second rounds of interviews in January 2021, and the third and final round will be conducted by City leadership.
- In January 2021, APD reassigned an Assistant City Attorney with both an education and legal background, to work with the Academy to provide feedback and guidance from both the educational and liability standpoints in the development of training curriculum.
- APD has included in the training development process, a COD PIA that came to APD from the University of New Mexico with extensive program evaluation, training development and training management experience.
- APD reestablished a partnership with Central New Mexico (CNM) Community College, which is essential to increasing the overall training

capacity allowing more availability for the existing Training Academy staff to focus and accomplish required training.

- In November 2020, APD experienced an increase in positive COVID-19 cases amongst personnel. APD took steps in line with national models to limit exposure while maintaining service levels. For example, the Emergency Communications Center (ECC) dispatches officers to calls for service that only require a report to be completed. Officers use their phones to speak with the individuals in order to collect the information and complete a report. Also, officers who were symptomatic or on work-from-home status pending test results were placed with the Telephone Report Unit (TRU), increasing TRU's capacity to complete timely reports. These steps required the COVID group working together with ECC, TRU, Field Services Bureau (FSB) to create a successful plan to limit exposure and maintain 100% functionality.

- In December 2020, APD announced that the department was developing a Detective Academy, which current and future detectives will be required to attend. The course will include trainings such as Interview and Interrogation, Crime Scene Management, Courtroom Preparation and Procedures, Search and Arrest Warrants, Constitutional Policing, Felony Investigation and Case Preparation, Crimes Against Children Unit (CACU), Child Abuse Response Evaluators (CARE), and Electronic Devices, with a tentative training to be conducted in Summer 2021.

- In early 2020, APD began creating a new community engagement software application, headed by the then Deputy Chief of the FSB (now Interim Chief), in order to see community engagement efforts at the click of a button, resulting in easier reporting of officer community engagement activities. This is not only good for APD, but also for transparent reporting to the community, IMT and DOJ. In August 2020, APD began the test phase with the Proactive Response Teams (PRT) and the Community Engagement Unit (CEU). In November 2020, the Training Academy's Comprehensive Training Unit (CTU) received the Needs Assessment for the training plan and training curriculum continues to be developed. The plan to go-live with the new community engagement application is July 2021. This application will collect and track data necessary to meet the requirements outlined in paragraphs 255, 257, 258, and 259. In the meantime, APD will continue to track and report this data as usual; however, this application will make those efforts more efficient.

- In November 2020, the SRO Unit transitioned to the CEU. CEU is transitioning from an enforcement approach to one that engages with the youth. The unit participates in projects such as IMPRINT, which is a partnership with APD, schools, and community sponsors providing positive police interactions through educational participation efforts with fifth graders at Title I schools. In addition to CEU's participation, APD developed an officer collateral program, resulting in twenty (20) volunteer officers assisting with IMPRINT. This program will assist in meeting the requirements in paragraphs 254 and 258.

- The City hired a long-time community activist and member of the clergy in January 2021, to continue working with members of the community to establish methods to increase public trust and include the community in transformation efforts. This effort will assist with CASA compliance as a whole; specifically, paragraphs 205, 255, 257, and 259. Since starting, the new clergy member is attending community meetings, getting to know members of the community, and will provide to APD additional information about community concerns, recommendations, and requests. This avenue is intended to provide alternative methods to ensure APD hears the community's concerns and close the gap between the community and the department.

- In November 2020, along with the City of Albuquerque's Office of Equity and Inclusion, APD began developing the Community Ambassador Program. This program is comprised of APD officers who serve as ambassadors or liaisons, connecting diverse communities and the police department. APD wants to reach our diverse community groups throughout the City in an effort to bridge the gap and help build partnerships, better communication, and understanding amid these communities and the police department. This effort relates directly to CASA paragraphs 257, 258, and 259. It is through such efforts that APD can enhance our community policing philosophy. Twelve (12) ambassador applicant officers along with six (6) additional volunteer officers attended the City's cultural sensitivity training in mid-January 2021 with additional anti-racism training scheduled for the end of January 2021.

- APD continues to be an active participant in the development of the ACS Department. The APD Crisis Intervention Section (CIS) Lieutenant and the Emergency Communication Manager have active roles and provide valuable input into the ACS development process. The ACS is being designed to assist those in the community living with mental illness and limit the number of police enforcement contacts; and therefore to provide them with the proper resources and reducing the uses of force with those individuals.

- In September 2020, APD began a Public Service Announcements program to educate and communicate with the community including topics such as domestic violence awareness, suicide prevention, accidental shootings in the community, and holiday safety. These announcements assist in the requirements outlined in paragraph 258.

- In September 2020, APD increased partnership initiatives to create positive and transparent relationships and to provide open communication between the community and APD, working together to problem solve. While the CASA includes groups such as the amici and Community Policing Councils (CPCs). APD sees value in developing additional partnerships, including but not limited to, the BNMM, Burque Against Racism, and Commission of the Deaf and Hard of Hearing. These continued partnerships will help meet the requirements outlined in paragraph 259.

- Starting in October 2020, members of APD and the Black New Mexico Movement to begin meeting once per month to create a better relationship between police and the black community. Recently, the group meetings have focused on the Ambassador Program outlined above.
- Beginning in December 2020, APD monthly meetings commenced with members of Burque Against Racism, focusing on fairness for minority groups and working with leadership within the black youth community. APD, the Black New Mexico Movement, and Burque Against Racism have decided to work together by combining the individual meetings into one. The goals are to establish relationships and understandings through increased exposure between officers and the community through Town Hall discussion panels, lunches with cadets, and determining the best recruiting efforts to further diversify APD. This will not only address paragraph 259, but also recruiting requirements outlined in paragraphs 234 and 235.
- In January 2021, monthly meetings began between APD and the Commission of the Deaf and Hard of Hearing, drafting a memo of understanding to ensure APD personnel provide adequate services to those who are deaf or hard of hearing.
- In January 2021, APD provided to the IMT a request for technical assistance in two areas: internal affairs intake/adjudication and force investigations processes. This technical assistance will affect numerous CASA paragraphs in one way or another, such as paragraphs 46-78, 162, 163, 170-194, and 205.
- IAFD has battled with maintaining personnel in the division.  While this issue continues, in January 2021, the Chief approved twenty-five (25) detectives total for the division to investigate levels 2 and 3 use of force cases.  The difficult part is not only recruiting personnel into the division, but also maintaining personnel.  In order to address this issue, APD is considering incentives for personnel in Internal Affairs.
- In December 2020, the City and the DOJ began working on correcting force investigations through a stipulated order which was approved by the Court on February 26, 2021.  APD and the DOJ met with the amici and the APOA to solicit feedback regarding the proposed Stipulated Order.  The goal of the Stipulated Order is to define steps to bring APD into compliance with paragraphs 46-78.
- In December 2020, the City hired a retired judge to provide legal advice and feedback for Force Review Board (FRB) use of force cases.  This added effort has helped APD work towards operational compliance as required in paragraph 78.
- In January 2021, the Chief assigned a Deputy Chief of Police as the full-time FRB Chair.  This effort ensures that all Deputy Chiefs of Police are involved in one way or another with the FRB.
- The Performance Metrics Unit (PMU) began providing scorecards in 2018 and have since included:  all six (6) area commands; Criminal Enforcement Division' s Auto Theft Unit and three (3) Impact Units; Investigation Services Division's Gang Unit and Investigative Support Unit; and Metro Traffic Division, which includes the DWI Unit and two (2) Motors Units.  Scorecards assist with compliance requirements outlined in paragraphs 18, 20, 32, 37, 53, 165, 207, 224, 225, and 230.  See Detailed Scorecards in Appendix A.
- In December 2020, PMU began working with the SOD to create scorecards for the division.  The scorecard process will result in increased oversight and ease of reading data reports by the chain of command, to move APD toward being a data-driven department.  Audit testing began in January 2021 and a 2-month pilot will begin in February 2021.
- Beginning in October 2020, the executive staff are provided monthly updates for specific CASA paragraphs not in operational compliance.  The project lead and the COD PIA present the steps taken to increase compliance levels for those specific CASA requirements, including the recommendations provided in IMRs. The paragraphs included in this reporting period's updates are:
  - o   Paragraphs 17 - 19 (Firearms);
  - o   Paragraphs 50, 58, 60, 62, and 70 (Use of Force); and
  - o   Paragraphs 255, 258, and 260 (Community Engagement).
- In November 2020, the IAPS Commander began providing to the Chief of Police discipline data to include discipline determined by division heads.  Usually only cases with discipline above 40-hours suspension reach the Chief of Police's desk; however, this report provides discipline, the class sanction for the sustained findings, and the final discipline imposed department-wide. While not a direct CASA requirement, this oversight by the Chief relates to paragraphs 162, 201, and 202.
- There are other project updates related to oversight that do not have a direct CASA requirement; however, affect departmental operations and are intended to increase trust with the community through transparency efforts. One example is the evaluation of overtime, resulting in changes in policy through a special order (20-85 Amendment to SOP 3-20), which included clear language and higher sanctions in order to hold personnel accountable.  APD published the special order in October 2020 and continues to revise the policy, SOP 3-20 Overtime, Compensatory Time and Work Shift Designations.
- Since September 2020, APD personnel more readily accept advice from the DOJ, IMT and City Legal, including but not limited to recommendations regarding policy, training, use of force, FRB operations and referrals and discipline.
  - o   There are many examples but one that includes all the above is the SOP 2-12 Pursuit Intervention Technique, SOP 2-45 Pursuit by Motor Vehicle and Use of Force Policy Suite (SOPs 2-52 through 2-57) deficiencies, which stemmed from IMT evaluated use of force cases, DOJ feedback, and the FRB. These policies are under revision in accordance with the policy development process to address those concerns.

- o Late 2020, many of the executive staff began having conversations with the IMT, which has allowed for up-to-date communication at the highest level of the department directly with members of the IMT.  The executive staff appreciates these conversations and have benefitted from the discussions.
- o IMR-12 outlined a case involving an APD officer interacting with an individual in crisis resulting in an IMT recommendation for paragraph 128 suggesting APD review this officer's calls for service history.  A Crisis Intervention Section (CIS) lieutenant conducted a review and reported his findings in January 2021.  The lieutenant developed a methodology to identify trends, and make recommendations that could benefit the department not just one officer. The recommendations include but are not limited to:
  - ▪ Additional pat down training (which was already in development by the Training Academy based on an FRB referral).  Additional training on CIT worksheet requirements, which would result in increased referrals for CIS follow-up with individuals living with a mental illness;
  - ▪ Include in the new Computer-Aided Dispatch (CAD) system a mechanism to easily collect and report on calls that include mental health, alcohol, or substance abuse;
  - ▪ Standardize language added into the CAD by the Real-Time Crime Center (RTCC).  There are multiple ways information is entered into the CAD by the RTCC at this time, such as, NEG MENTAL HEALTH, NEG BEHAVIORAL HEALTH or NEG CIT.  This would draw the eye of the officers to important information while reviewing the CAD upon dispatch; and
  - ▪ During CIT training, instructors continue to encourage officers to use their CIT skills in all interactions, not only with individuals clearly living with mental illness.
- • In Fall 2020, APD initiated a marketing campaign for recruiting new officers via increased marketing through Boomtime, social media campaigns and outreach in other states.  This marketing campaign will assist in attracting and hiring qualified individuals as required in paragraph 232.
- • In Summer 2020, the City began a campaign for One Albuquerque.  The goal is to include the continuity to solve the City's challenges from the pandemic to public engagement and recruiting.  APD's recruiting efforts were included towards the end of 2020.  In the past, APD recruiting advertisements focused on specialized units such as SWAT or K-9 Units to draw in applicants; however, APD sees the value in including the community' s idea of the ideal officer and the attributes one must possess. Those attributes include but are not limited to, have patience, be respectful, recognize self-bias, as well as possess both a human side and a protective side and know the difference when to use each.
- • In October 2020, the Interim Chief began monthly meetings with officers and sergeants through a random sample selection of personnel conducted by the COD. This ensures that the Chief is giving personnel an opportunity to speak about their concerns, provide rumor control, and updates down to the officer and sergeant level through smaller groups and individually.  Open communication from leadership is vital to driving organizational change, improving morale and engaging employees.
- • In December 2020, the COD completed work with the City's ERP team streamlining and automating the supervisory line inspection process.  APD had been working with an outdated, user-unfriendly database for line inspections, which made it nearly impossible to accurately report results.  The new line inspection platform scheduled go-live is February 2021.  While this may seem like a simple solution, the development process is lengthy to ensure the data reported met the requirements of paragraphs 205, 206, and 208.  This work will also assist in the transition from several software programs into Benchmark Analytics, which continues in the development process.
- • In November 2020, APD-TV began running the Chief's Corner during the Daily49, which is a video that goes out to the entire department and provides updates such as Covid-19 impacts on the department, CASA-related court hearings and progress, and crime reduction initiatives.
- • APD continues with the pilot phase in two area commands for the 80/20 Pareto Principle for the updated Performance Evaluation and Management System (PEMS).  During the November 2020 site visit, the members of the IMT requested that APD conduct a side-by-side comparison between the 80/20 Pareto Principle and Standard Deviation approaches.  The PEMS Unit completed this 2-month comparison in January 2021 and drafted a report with their findings, working towards compliance in paragraphs 23, 38, 80, 104, 105, 109, and 212-219.  The IMT approved the Pareto Principle approach on February 11, 2021.  This will allow APD to, proactively and reactively, identify officers whose performance needs improvement and requires supervisory intervention for corrective action and management.

APD expects the steps described above to show improvement in CASA compliance over the next few monitoring periods, but APD also acknowledges the need for further work.  There is the need for culture change and APD understands that need and will not only depend on the strong men and women we have working towards this effort, but also continue to request and accept feedback from both the DOJ and the IMT.  APD realized the benefit from more frequent feedback received from the DOJ and the IMT this last reporting period.  There are issues that seem obvious from the outside looking in, which APD missed. Once brought to the department's attention during these more

frequent communications, APD has worked to make those changes as quickly as possible.  The best example is FRB.  APD has received immediate feedback from both the DOJ and IMT after some FRB meetings ranging from ideas for process improvement, how to approach controversial topics, and probing questions to ask to get to the root of the problem and more importantly, the solution.  APD remains committed to working with the DOJ and IMT to improve.

## VII.  Section Progress on the CASA's measurable paragraphs

The sections of this report provide detailed information about the progress APD has made with the measurable CASA paragraphs during the reporting period from August 1, 2020 to January 31, 2021, and includes progress made, plans to correct any problems, APD responses to IMR recommendations, and general updates.  All recommendations listed throughout this progress report are from IMR-12 and each recommendation has a corresponding recommendation number.  IMR-12 may be located at:
https://documents.cabq.gov/police/reports/department-of-justice/independent-monitors-twelfth-report-nov-2020.pdf

## Section 1:  Use of Force:  Internal Controls and Accountability (Paragraphs 14-89)

**A. Use of Force Principles**

**14.**  Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:
   a)  officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;
   b)  force shall be de-escalated immediately as resistance decreases;
   c)  officers shall allow individuals time to submit to arrest before force is used whenever possible;
   d)  APD shall explicitly prohibit neck holds, except where lethal force is authorized;
   e)  APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject;
   f)  APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;
   g)  officers shall not use force to attempt to effect compliance with a command that is unlawful;
   h)  pointing a firearm at a person shall be reported as a Level 1 use of force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and
   i)  immediately following a use of force, officers, and, upon arrival, a supervisor, shall inspect and observe subjects of force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care.  This may require an officer to provide emergency first aid until professional medical care providers arrive on scene.
**Paragraph 14 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See below at Paragraph 16.

**15.**  APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices.  The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units.  The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate.  The use of force policy will incorporate the use of force principles and factors Case articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability.
**Paragraph 15 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See below at Paragraph 16.

**16.**  In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below.  The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy.
**Paragraph 16 is in Secondary Compliance.**

**IMR – 12 Recommendations for paragraphs 14-16:**

**4.7.1-3a**:  Identify the best candidates possible for leadership and supervisory positions within IAFD and IAPS, based on exhibited traits of effective leadership and supervision.  These candidates should be demonstrably willing to make the necessary choices and take the necessary actions to establish an effective internal investigative process.

**4.7.1-3b**:  Ensure that the chosen candidates are actually trained to understand the goals, objectives, established best-proactive, evaluation, and change management modalities related to internal process controls, management, oversight, and planned change.

**APD Response to Recommendations for Paragraphs 14-16:**  The long-time Commander of Internal Affairs Force Division (IAFD) retired in September 2020.  From October 2020 to January 2021, two different individuals served as acting commander for IAFD.  Effective January 30, 2021, the Commander from APD COD was reassigned temporary duty (TDY) to IAFD.  The Commander began identifying several areas where IAFD could improve in quality, complete and timely investigations.  One of the first steps to make this happen was to recruiting personnel into the division who were willing to work in command level positions.  Two lieutenants accepted TDY reassignment and upgrade to acting deputy commander to assist in improving investigations, to include but not limited to interviewing, as well as both personnel supervision and case management.  Further recruiting efforts continue to properly staff IAFD with qualified individuals who understand the roles and responsibilities of the IAFD.

In order to ensure that the chosen candidates are trained to understand the goals, objectives, established best practices, evaluation, and change management modalities related to internal process controls, management, and oversight, APD is in the process of updating the IAFD training.  All new and existing detectives will be required to attend the training that is being developed.  In order for training to be delivered timely, the training has been broken into phases.  APD will be submitting for approval the first phase of IAFD training, which includes CASA requirements and interview training, in March 2021.

Additionally, in January 2021, APD provided to the IMT a request for technical assistance in two areas: internal affairs intake/adjudication and force investigations processes in order to fully understand where and how current processes and training needs to change for APD to become fully compliant with the CASA.  The IAFD Commander works closely with the DOJ and the IMT members to improve overall force investigations, which was criticized in IMR-12.  These improvements will be approved by the DOJ and the IMT and reflected in the IAFD training with defined goals, objectives, ensuring IAFD personnel are knowledgeable in internal affairs processes.

**17.** Officers shall carry only those weapons that have been authorized by the Department.  Modifications or additions to weapons shall only be performed by the Department's Armorer as approved by the Chief.  APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons.
**Paragraph 17 is in Secondary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 19.

## B. Use of Firearms

**18.** Officers shall carry or use only agency-approved firearms and ammunition while on duty.
**Paragraph 18 is in Secondary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 19.

**19.** APD issued Special Order 14-32 requiring all officers to carry a Department issued handgun while on duty.  APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns.
**Paragraph 19 is in Secondary Compliance.**
**IMR – 12 Recommendations for Paragraphs 17-19:**
**4.7.4-6a**:  Involve APD's Audit and Analysis Section personnel in the development of an action plan related to the requirements of paragraphs 17-19, and implement process designed to achieve objectives required in those paragraphs.

**APD Response to Recommendations for paragraphs 17-19:**  As recommended by the Independent Monitoring Team, APD created an action plan to address the requirements of paragraphs 17-19.  The action plan was provided to the IMT as part of the data submission for IMR-13.  One area of the action plan focused on developing a process for lieutenants to verify sergeants are visually inspecting firearms and ammunition during the

monthly line inspection.  A pilot process began in January 2021 in the Valley Area Command and the SOD.  The pilot is scheduled to run through March 31, 2021.   Lieutenants from the test sites are required to visually inspect firearms and ammunition for two officers per month for each sergeant assigned to their Watch/Section.  The COD Lieutenant will review the results of the monthly inspections and submit an Internal Affairs Request for any policy violations.  The lieutenant inspection of weapons and ammunition is a second level review to ensure officers are carrying agency approved firearms and ammunition.  Once the pilot is complete and the process is incorporated into APD SOP 3-30 Line Inspections, the Lieutenant Weapon Inspection will be implemented department-wide.

APD completed the 2020 Annual Firearms qualifications for all active sworn personnel in September 2020.  Additionally, APD finalized the new Line Inspection Form in PeopleSoft.  The new Line Inspection Form populates assigned weapons and qualification data for each officer, which reduces data entry errors and increases efficiency in completing the form.

**20.** Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year. Officers who fail to qualify on their primary weapon system shall complete immediate remedial training.  Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify.  Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment.
**Paragraph 20 is in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 20.
**APD Response:**  The Academy continues to require annual firearms qualifications and to improve process to ensure information is clear for reporting and transparency.  In 2020, all active sworn APD officers were qualified on their primary weapon system.

**21.** APD training shall continue to require and instruct proper techniques for unholstering, drawing, or exhibiting a firearm.
**Paragraph 21 is in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 21.
**APD Response:**  The basic firearms block of instruction continues to cover proper techniques for unholstering, drawing, or exhibiting a firearm, which are reinforced in all other firearms training that is conducted.

**22.**  APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person.  Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle.
**Paragraph 22 is in Operational Compliance.**  There were no Recommendations for Paragraph 22.
**APD Response:**  APD SOP 2-52 Use of Force General policy prohibits the discharging of a firearm from a moving vehicle or at a moving vehicle.

**23.**  APD shall track all critical firearm discharges.  APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its Use of Force Annual Report.
**Paragraph 23 is in Primary Compliance.**
**IMR – 12 Recommendations**:
**4.7.10a**:  Continue the work currently being done to bring annual reports into the required cycle, including the draft report that includes the years 2018 and 2019.
**APD Response:**  APD continues to work on bringing annual reports into the required cycle, the Annual Use of Force report was published in 2020 to include the years 2018 and 2019.

## C.  Electronic Control Weapons

**24.** ECWs shall not be used solely as a compliance technique or to overcome passive resistance.  Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered.  Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range.
**Paragraph 24 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 24.

**APD Response:**  See below at Paragraph 38.

**25.** Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to discharging an ECW on the subject.  Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning.
**Paragraph 25 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 25.
**APD Response:**  See below at Paragraph 38.

**26.** ECWs will not be used where such deployment poses a substantial risk of serious physical injury or death from situational hazards, except where lethal force would be permitted.  Situational hazards include falling from an elevated position, drowning, losing control of a moving motor vehicle or bicycle, or the known presence of an explosive or flammable material or substance.
**Paragraph 26 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 26.
**APD Response:**  See below at Paragraph 38.

**27.** Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power.  Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power).  After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.  Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury.  Officers shall also weigh the risks of subsequent or continuous cycles against other force options.    Officers shall independently justify each cycle or continuous cycle of five seconds against the subject in use of force reports.
**Paragraph 27 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 27.
**APD Response:**  See below at Paragraph 38.

**28.** ECWs shall not be used solely in drive-stun mode as a pain compliance technique.  ECWs may be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject, so that officers can consider another force option.
**Paragraph 28 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 28.
**APD Response:**  See below at Paragraph 38.

**29.** Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options.  ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons.  In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others.  Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations.
**Paragraph 29 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 29.
**APD Response:**  See below at Paragraph 38.

**30.** Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury.
**Paragraph 30 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 30.
**APD Response:**  See below at Paragraph 38.

**31.** ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective.
**Paragraph 31 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 31.
**APD Response:**  See below at Paragraph 38.

**32.** Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm.
**Paragraph 32 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 32.
**APD Response:** See below at Paragraph 38.


**33.** Officers shall receive annual ECW certifications, which should consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes; and scenario- and judgment-based training.
**Paragraph 33 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 33.
**APD Response:** See below at Paragraph 38.


**34.** Officers shall be trained in and follow protocols developed by APD, in conjunction with medical professionals, on their responsibilities following ECW use, including:
   a) removing ECW probes, including the requirements described in Paragraph 35;
   b) understanding risks of positional asphyxia, and training officers to use restraint techniques that do not impair the subject's respiration following an ECW application;
   c) monitoring all subjects of force who have received an ECW application while in police custody; and
   d) informing medical personnel of all subjects who: have been subjected to ECW applications, including prolonged applications (more than 15 seconds); are under the influence of drugs and/or exhibiting symptoms associated with excited delirium; or were kept in prone restraints after ECW use.

**Paragraph 34 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 34.
**APD Response:** See below at Paragraph 38.


**35.** The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel.
**Paragraph 35 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 35.
**APD Response:** See below at Paragraph 38.


**36.** Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges).
**Paragraph 36 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 36.
**APD Response:** See below after Paragraph 38.


**37.** APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy. APD agrees to implement a protocol for quarterly downloads and audits of all ECWs. APD agrees to conduct random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's use of force reports. Discrepancies within the audit should be addressed and appropriately investigated.
**Paragraph 37 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 37.
**APD Response:** See below after Paragraph 38.


**38.** APD agrees to include the number of ECWs in operation and assigned to officers, and the number of ECW uses, as elements of the Early Intervention System. Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force, and whether officer and subject injuries are affected by the rate of ECW use. Probe deployments, except those described in Paragraph 30, shall not be considered injuries. APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis. ECW data analysis shall be included in APD's use of force annual report.
**Paragraph 38 remains in Primary Compliance.**

**IMR – 12 Recommendation:**
**4.7.25a:** Complete an analysis of whether ECWs result in an increase in the use of force and whether officer and subject injuries are affected by the rate of ECW use.
**APD Response:**  APD does meet a majority of the requirements in paragraph 38; however, will work with the DOJ and the IMT during the next reporting period to determine the best way to conduct a meaningful analysis for ECWs.  With each ECW deployment, there needs to be a complete and thorough investigation to determine if the use of force was within policy, if the tool was effective, and the minimum amount of force to accomplish a lawful objective.

**APD Response to Paragraphs 24 - 38:**  All active sworn personnel completed the 2020 Taser 7 recertification during this reporting period.  The recertification was conducted as part of the 2020 annual firearms qualifications.  During the Taser 7 recertification training, special emphasis was given on the use of warnings and announcements prior to deploying the taser.  This was a referral made by the FRB.  The use of warnings and announcements is another attempt to gain compliance from an individual to avoid deploying the taser.  Supervisors continue to document compliance with paragraph 32 as part of the monthly line inspection process to ensure ECWs are kept in the weak-side holster.  The PMU continues to conduct quarterly audits of ECWs and matches the firings with a use of force report as required by paragraph 37.  Through these efforts, APD expects to maintain operational compliance for paragraphs 24-37.

## D. Crowd Control and Incident Management

**39.** APD shall maintain crowd control and incident management policies that comply with applicable law and best practices.  At a minimum, the incident management policies shall:  a) define APD's mission during mass demonstrations, civil disturbances, or other crowded situations;  b) encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses; c) require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and d) continue to prohibit the use of canines for crowd control.
**Paragraph 39 is in Primary Compliance**.
**IMR-12 Recommendations:**  See recommendations and APD response after Paragraph 40.

**40.** APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures.
**Paragraph 40 is in Primary Compliance.**
**IMR – 12 Recommendations for Paragraph 39 and 40:**
**4.7.26-27a:** APD must develop and deliver a meaningful training program to its ERT and Field Services members that is centered on crowd control policies. That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans.  Training should incorporate lessons learned from recent ERT activations, and contemplate best practices developed by police agencies facing similar social unrest across the country.
**4.7.26-27b:** APD must continue to ensure its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy, training, or operational rubric within the agency. We encourage APD's ERT Commanders to review past reports and to incorporate AAR procedures and forms (previously agreed upon) into SOPs.
**4.7.26-27c:** Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.
**4.7.26-27d:** ERT should coordinate with IAFD to devise workable solutions to ensure reasonable and timely use of force reporting and investigations occur in circumstances where multiple planned and unplanned protests are being addressed.
**4.7.26-27e:** ERT should work with SOD to schedule routine multi- disciplinary training.
**APD Response to Recommendations for Paragraph 39 and 40:**
Updated ERT trainings are in development and include crowd control training for all department personnel, and ERT Supervisor Training.  ERT has worked with the Training Academy's Comprehensive Training Unit (CTU) and both courses are currently in the final stages of the required seven step process.  The need to improve combined crowd control training and continuity of deployment processes between ERT and the SOD was identified in September 2020.  Several meetings have taken place between ERT, SOD and IAFD to ensure understanding of responsibilities during an ERT deployment.  A memorandum detailing responsibilities was drafted and approved of by the chain of command of each group.  The procedures within the memo are intended to be adopted into standard operating procedures for ERT, SOD, and IAFD once fully approved.  An ERT/SOD combined training lesson plan is in Step-1 (Needs Assessment) of the seven-step process.  The SOD and ERT chain of command will be working in unison to complete the lesson plan.  At the end of each training stage, a close out memorandum will be provided.  Furthermore, all

training completed will be documented in Smartsheet.  Currently all FEMA Certifications for ERT officers are uploaded as well.  The Smartsheet also tracks the Quarterly ERT Training which takes place throughout the year.

The importance of implementing a standardized structure for AARs for ERT deployments to include mechanisms for communicating needed revisions to policy, training or operational rubric has been identified.  All complete ERT Event/Incident Action Plans along with corresponding After Action Reports (AARs) were scanned and attached to a Smartsheet Callout Ledger.  The After Action Reports were reviewed and compared to specific examples from May 28, 2020, for both ERT and SOD.  The review revealed what information is required to capture, what is needed for proper analysis, and to establish consistency through a Policy Procedure Review Board (PPRB) compliance approved template specifically for ERT AARs.  A process was documented to ensure loop closure on lessons learned.  To further the immediate dissemination of lessons learned, an ERT Newsletter will be developed and published each month. The first newsletter will be completed in March and distributed at the end of the month to ERT officers only.  The newsletter will include an on-call schedule, pertinent upcoming events, training dates, ERT updates, contact information for chain of command and nationwide trends.

## E.  Use of Force Reporting

**41.** Uses of force will be divided into three levels for reporting, investigating, and reviewing purposes.  APD shall develop and implement a use of force reporting policy and use of force report form that comply with applicable law and comport with best practices.  The use of force reporting policy will require officers to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force.  Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor.  This reporting requirement also applies to off-duty officers engaged in enforcement action.
**Paragraph 41 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and APD Response after Paragraph 59**.**

**42.** The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the review or the APD officer conducting the investigation.  The written or recorded narrative will include:
   a) a detailed account of the incident from the officer's perspective;
   b) the reason for the initial police presence;
   c) a specific description of the acts that led to the use of force including the subject's behavior;
   d) the level of resistance encountered; and
   e) a description of each type of force used and justification for each use of force.  Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force.
**Paragraph 42 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**43.** Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action.
**Paragraph 43 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**44.** APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force.  The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility.  The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.
**Paragraph 44 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**45.** APD shall require officers to activate on-body recording systems and record all use of force encounters.  Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination.
**Paragraph 45 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

## F. Force Reviews and Investigations

**46.** The three levels of use of force will have different kinds of departmental review. All uses of force by APD shall be subject to supervisory review, and Level 2 and Level 3 uses of force are subject to force investigations as set forth below. All force reviews and investigations shall comply with applicable law and comport with best practices. All force reviews and investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy.

**Paragraph 46 is in Secondary Compliance.**

**IMR-12 Recommendations:** See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**47.** The quality of supervisory force reviews shall be taken into account in the performance evaluations of the officers performing such reviews.

**Paragraph 47 is in Secondary Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 47.

**APD Response:** To make sure that use of force reviews are consistently factored into supervisor's performance evaluations, an audit process is being developed. Significant progress has been made during this reporting period. Based on available data, the process will ensure that commanders check employee performance documents and ensure that any violations related to SOP 2-57 Use of Force-Review and Investigation by Department Personnel are documented in the evaluation. The audit process will include determining whether the policy violation was documented in the evaluation, and if not, that an internal affairs request was submitted and that the supervisor stipulated how the policy violation was addressed. A pre-determined percentage of documents will be audited each month and the parameters for repeat violations and progressive discipline will be included in the overall process.

**48.** APD agrees to develop and implement force classification procedures that include at least three categories of types of force that will determine the force review or investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to promote greater efficiency and reduce burdens on first-line supervisors, while optimizing critical investigative resources on higher-risk uses of force. The levels of force are defined as follow:

a) Level 1 is force that is likely to cause only transitory pain, disorientation, or discomfort during its application as a means of gaining compliance. This includes techniques which are not reasonably expected to cause injury, do not result in actual injury, and are not likely to result in a complaint of injury (i.e., pain compliance techniques and resisted handcuffing). Pointing a firearm, beanbag shotgun, or 40 millimeter launcher at a subject, or using an ECW to "paint" a subject with the laser sight, as a show of force are reportable as Level 1 force. Level 1 force does not include interaction meant to guide, assist, or control a subject who is offering minimal resistance.

b) Level 2 is force that causes injury, could reasonably be expected to cause injury, or results in a complaint of injury. Level 2 force includes use of an ECW, including where an ECW is fired at a subject but misses; use of a beanbag shotgun or 40 millimeter launcher, including where it is fired at a subject but misses; OC Spray application; empty hand techniques (i.e., strikes, kicks, takedowns, distraction techniques, or leg sweeps); and strikes with impact weapons, except strikes to the head, neck, or throat, which would be considered a Level 3 use of force.

c) Level 3 is force that results in, or could reasonably result in, serious physical injury, hospitalization, or death. Level 3 force includes all lethal force; critical firearms discharges; all head, neck, and throat strikes with an object; neck holds; canine bites; three or more uses of an ECW on an individual during a single interaction regardless of mode or duration or an ECW application for longer than 15 seconds, whether continuous or consecutive; four or more strikes with a baton; any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject; and uses of force resulting in a loss of consciousness. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents:

     i. Officer-involved shootings;

     ii. Serious uses of force as defined by the Memorandum of Understanding;

     iii. In-custody deaths; and

     iv. other incidents resulting in death at the discretion of the Chief.

**Paragraph 48 is in Secondary Compliance.**

**IMR-12 Recommendations:** See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**49.** Under the force classification procedures, officers who use Level 1 force shall report the force to their supervisor as required by Paragraph 42; Level 1 uses of force that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force. Level 2 and 3 uses of force shall be investigated by the Internal Affairs Division, as described below. When a use of force or other incident is under criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Division will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Case Task Force shall periodically share information and coordinate with the Internal Affairs Division, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of uses of force.

**Paragraph 49 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

### F1. Supervisory Force Reviews

**50.** The supervisor of an officer using force shall respond to the scene of all Level 1, 2, and 3 uses of force to ensure that the use of force is classified according to APD's force classification procedures.  For Level 2 and Level 3 uses of force, the supervisor shall ensure that the Force Investigation Section of the Internal Affairs Division is immediately notified and dispatched to the scene of the incident to initiate the force investigation.
**Paragraph 50 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**51.** A supervisor who was involved in a reportable use of force including by participating in or ordering the force being reviewed, shall not review the incident or use of force reports for approval.
**Paragraph 51 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**52.** For all supervisory reviews of Level 1 uses of force, the supervisor shall:
   a) respond to the scene and immediately identify the officer(s) involved in Level 1 use of force;
   b) review the involved officer's lapel video, determining whether the incident involves a Level 1 use of force;
   c) review the lapel video of other officers on-scene where uncertainty remains about whether the incident rises to a Level 2 or Level 3 use of force;
   d) examine personnel and the subject for injuries and request medical attention where appropriate;
   e) contact the Internal Affairs Division to conduct a Level 2 or Level 3 use of force investigation if lapel video does not affirm a Level 1 use of force;
   f) gather any evidence located at the scene of the Level 1 use of force;
   g) capture photographs of the officer(s) and subject involved in the Level 1 use of force;
   h) require the submission of a use of force report from the involved officer by the end of shift; and
   i) conduct any other fact-gathering activities while on-scene, as necessary, to reach reliable conclusions regarding the officer's use of Level 1 force.
**Paragraph 52 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**53.** Each supervisor shall complete and document a supervisory force review of a Level 1 use of force within 72 hours of the use of force.  Any extension of this 72-hour deadline must be authorized by a Commander.  This review shall include:
   a) all written or recorded use of force narratives or statements provided by personnel or others;
   b) documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report shall specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why.  The report should also include all available identifying information for anyone who refuses to provide a statement;
   c) the names of all other APD employees witnessing the use of force;
   d) the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques and
   e) documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.
**Paragraph 53 is in Secondary Compliance.**
**IMR-12 Recommendations:**  See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**54.** Upon completion of the review, the reviewing supervisor shall forward the review through his or her chain of command to the Commander, who shall review the entry to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard.

The Commander shall order additional review when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. These reviews shall be completed electronically and tracked in an automated database within the Internal Affairs Division.

**Paragraph 54 is in Secondary Compliance.**

**IMR-12 Recommendations:** See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**55.** Where the findings of the supervisory review are not supported by a preponderance of the evidence, the supervisor's Commander shall document the reasons for this determination and shall include this documentation as an addendum to the original review. The supervisor's superior shall take appropriate action to address the inadequately supported determination and any deficiencies that led to it. Commanders shall be responsible for the accuracy and completeness of the Level 1 force reviews prepared by supervisors under their command.

**Paragraph 55 is in Secondary Compliance.**

**IMR-12 Recommendations:** See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**56.** Where a supervisor repeatedly conducts deficient supervisory force reviews, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules. Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force review immediately and notify the Internal Affairs Division and the Chief. The Force Investigation Section of the Internal Affairs Division shall immediately initiate the administrative and criminal investigation.

**Paragraph 56 is in Secondary Compliance.**

**IMR-12 Recommendations:** See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**57.** When the Commander finds that the supervisory force review is complete and the findings are supported by the evidence, the file shall be forwarded to the Performance Review Unit of the Compliance Bureau. The Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence. The Performance Review Unit shall ensure that the file is forwarded to the Internal Affairs Division for recordkeeping. Where the Performance Review Unit of the Compliance Bureau determines that a supervisory force review, which has been completed by the supervisor and reviewed by the chain of command, is deficient, the Performance Review Unit shall forward the review to the supervisor for correction. Any performance deficiencies in the investigation or review will be noted in the affected Commander's performance records.

**Paragraph 57 is in Secondary Compliance.**

**IMR-12 Recommendations:** See Recommendations after Paragraph 58 and 59 and APD Response after Paragraph 59**.**

**58.** At the discretion of the Chief, a supervisory force review may be assigned or reassigned to another supervisor, whether within or outside of the Command in which the incident occurred, or may be returned to the original supervisor for further review or analysis. This assignment or re-assignment shall be explained in writing.

**Paragraph 58 is in Secondary Compliance.**

**APD Response:** The Chief has the discretion to assign and reassign cases and there were not any cases in this reporting period for this requirement.

**IMR12 Recommendations for Paragraphs 41 – 58:**

**4.7.45a:** Develop an early intervention system that triggers alerts when clusters of poorly investigated use of force incidents arise, and address these issues early with Area Command staff, requiring Commanders affected to develop and implement written "Intervention Plans" designed to identify the causes of failure and remediate those causes systematically.

**4.7.45b:** Routinely monitor the intervention process for compliance with the proffered plans.

**4.7.5c:** Monitor use of force incident responsibilities at the sergeant's level and ensure that sergeants who will be on leave are not assigned critical use of force incidents. APD will need to assess staffing and determine how best to handle these issues. This is another case of "a bit of forethought" avoiding compliance losses.

**APD Response to 4.7.5c:** The new early intervention system assigns the lieutenant when there is either no sergeant or the sergeant is TDY.

**59.** Where, after a supervisory force review, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

**Paragraph 59 is in Secondary Compliance.**

**IMR – 12 Recommendations:**  APD should revisit its disciplinary practices to ensure integrity with the tenets of effective discipline.

**4.4.46a:**  Clarify operational process requirements of the violated policy in each and every incident of a known violation with the involved employee(s);

**4.4.46b:**  Insist on consistent disciplinary decisions based on employee acts or omissions, including a table of infractions with disciplinary ranges for each potential level of infractions;

**4.4.46c:**  Insist on consistency, and ensure the consistency is calibrated to the level of infractions;

**4.4.46d:**  Establish an available escalation process, from minor to major interventions.

**4.4.46e:**  Require appropriate escalation if given classes of infractions are repeated;

**4.4.46f:**  Document all disciplinary interventions;

**4.4.46g:**  Ensure that all disciplinary findings and comments fit established departmental documentation protocols.

**4.4.46h:**  Include "fact statements" based on the department's investigative findings, ensuring that all infractions are clearly explained;

**4.4.46i:**  Increase the corrective measures as violations are more serious;

**4.4.46j:**  Provide a process in which disciplined employees are given an opportunity to respond to allegations and decisions re discipline; and

**4.4.46k:**  Follow through on consequences, e.g., establish progressive disciplinary standards, and ensure that requirements are enforced and followed up.

**APD Response to Recommendations for Paragraphs 41 to 59:**  The APD use of force policy suite (SOP 2-52 through SOP 2-57) went into effect January 11, 2020.  The completed forms are uploaded to a documentation supervisory oversight and accountability system called BlueTeam/IAPro for case storage, verification, misconduct investigation and tracking purposes.  APD is required to submit for policy violations an internal affairs request (IAR) to initiate an investigation.  IAFD had been investigating policy violations within the cases; therefore, making data collection and reporting of policy violations for IAFD almost impossible.  As of October 2020, IAFD is reporting all policy violations in an IAR which results in improved reporting of violations, investigations, and disciplinary action, when applicable.  APD is currently following Special Order 21-15 Internal Affairs Request through BlueTeam which will be reflected in the revised Standard Operating Procedures SOP 3-41 Internal Complaints Involving Department Policy or Personnel.  There are processes and policies in place allowing disciplined employees to respond to allegations and disciplinary decisions.

APD is also revising SOP 3-46 Discipline System, and with the training for the Performance Evaluations and Management Systems (PEMS) tentatively scheduled for summer 2021, APD will improve overall intervention plans for both performance and discipline.

In January 2021, IAFD began receiving technical assistance by the IMT to review APD's cross-functional process maps to improve and streamline the on-scene and in-house IAFD investigative processes.  These processes improvements will include investigative formats to reduce redundancy and streamline the responsibilities through the chain of command, from detective through the commanding officer.  APD is transitioning from a form-based investigation to investigations formatting similar to that of other specialized units, to include the IAPS.

APD uses IAPro to provide data for the above recommendations, which does capture the policy violation(s) investigated, the findings, and the discipline, if applicable.  With that said, APD is moving forward with Benchmark Analytics that will include two modules specific to those recommendations, use of force and internal affairs.  Both modules will assist in easier reporting of data for use of force investigations as well as investigations into policy violations and misconduct.

## F2.  Force Investigations by the Internal Affairs Division

**60.** The Force Investigation Section of the Internal Affairs Division shall respond to the scene and conduct investigations of Level 2 and Level 3 uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Division by the Chief.  In cases where an investigator in the Force Investigation Section initiates a Level 2 or Level 3 use of force investigation and identifies indications of apparent criminal conduct, the Section shall refer the use of force to an investigator in the Section, with no involvement in the initial administrative investigation into the Level 2 or 3 use of force, to conduct a criminal investigation.  The criminal investigation shall remain separate from and independent of any administrative investigation.  In instances where the Multi-Agency Task Force is conducting the criminal investigation of a use of force, the Internal Affairs Division shall conduct the administrative investigation.

**Paragraph 60 is in Secondary Compliance.**

**IMR – 12 Recommendations:**
**4.7.47a:**  Conduct a complete review of recent IA case investigations and identify all similar or related violations of the CASA.  Where appropriate, re-open and re-investigate those cases.
**4.7.47a:**  Organize from that review, a list of behaviors that are counter-CASA and ensure that those behaviors are restricted by a revised IA policy, detailed re-training, supervision and discipline.
**APD Response:**  IAFD is pulling and reassessing cases previously closed that have been selected for review by the FRB.  IAFD is reassessing cases to identify missed policy violations, and upon any identification, opening up internal affairs investigations.  If there are any criminal investigations initiated, those investigations are kept separate from administrative investigations.  The IAFD data analysts will report and analyze similar or related violations.  The best course of action will be based on the information provided, whether that remedy be re-training, discipline, or other action.

**61.**  The Force Investigation Section of the Internal Affairs Division will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60.  The Force Investigation Section of the Internal Affairs Division shall include sufficient personnel who are specially trained in both criminal and administrative investigations.
**Paragraph 61 is in Secondary Compliance**
**IMR – 12 Recommendations:**
**4.7.48a:**  Continue to monitor internally the process of Internal Affairs in conducting effective intake, assessment, assignment, investigation, and resolution process for criminal and civil investigations in order to ensure that staffing levels are appropriate and processes are effective in producing acceptable and timely results.
**APD Response:**  See below at Paragraph 67.

**62.**  Within six months from the Operational Date, APD shall revise the Internal Affairs Division manual to include the following:
   a) definitions of all relevant terms;
   b) procedures on report writing;
   c) procedures for collecting and processing evidence;
   d) procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;
   e) procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;
   f) scene management procedures; and
   g) management procedures.
**Paragraph 62 is in Primary Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 62.
**APD Response:**  See below at Paragraph 67.

**63.**  Within 39 months from the Operational Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Division and Force Investigation Section to fulfill the requirements of this Agreement.  APD shall ensure that all Level 2 and Level 3 uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary.  At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Division or Force Investigation Section.
**Paragraph 63 is in Secondary Compliance.**
**IMR – 12 Recommendations:**
**4.7.50a:**  Identify the department's expected milestone date for staffing at IAB based on data related to incoming cases, average time for case completion, and calculations of the number of staff needed to effectively investigate incoming cases within established parameters.
**APD Response:**  The newly assigned TDY IAFD Commander is determining the staffing levels required to complete timely and thorough investigations based on data.  One immediate need was commanding officer positions in the division.  At the time, there was one (1) acting deputy commander for the entire division.  The Commander identified APD personnel external to IAFD who were interested in deputy commander positions and helping improve the division.  Since the close of the reporting period, two lieutenants have been TDY to IAFD and upgraded to acting deputy commander positions.  Both have extensive criminal investigations experience, which should transition into administrative investigations, to include but not limited to, assisting with interview techniques, revising current investigation formats into organized investigative ones while

meeting the requirements of the CASA, and improving investigative process leading to improved timelines.  IAFD also opened nine (9) detective positions to assist in investigations.  The new commander continues to work with the IAFD data analysts to determine proper staffing given the current circumstances.

**64.** Before performing force investigations, Force Investigation Section personnel shall receive force investigation training that includes, at a minimum, the following areas:  force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques.  Force Investigation Section personnel shall also receive force investigation annual in-service training.
**Paragraph 64 remains in Operational Compliance.**
**IMR – 12 Recommendations:**
**4.7.51a:** Modify the 40-hour training program for IAFD investigators and supervisors that was reviewed during this monitoring period and make the appropriate revisions, based upon the written and oral feedback on the program provided by the monitoring team.
**4.7.51a:** Modify the 40-hour training program for IAFD investigators and supervisors based upon the monitor's critical assessment of IAFD investigations and supervisory reviews provided in this report.
**APD Response:** See below at Paragraph 67.

**65.** Where appropriate to ensure the fact and appearance of impartiality and with the authorization of the Chief, APD may refer a use of force indicating apparent criminal conduct by an officer to the Multi-Agency Task Force for criminal investigation.
**Paragraph 65 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 65.
**APD Response:** See below at Paragraph 67.

**66.** To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Force Investigation Section of the Internal Affairs Division or the Multi-Agency Task Force in the investigation of any Level 2 or Level 3 use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs.
**Paragraph 66 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 66.
**APD Response:** See below at Paragraph 67.

**67.** The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation.
**Paragraph 67 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 67.

**APD Response to Paragraphs 63 - 67:** In the past, IAFD personnel coming into the division were being trained in cases from the IAFD backlog. Those cases were older, in accordance with the old use of force policy suite.  IAFD is revising training to focus on the current use of force policies and developing a formalized training and on-boarding program for new detectives.  IAFD is developing use of force training blocks based on paragraphs 60 - 67. The training is intended to provide incoming investigators/participants with specific instruction in all standard operating procedures applicable to use of force guidelines; defined responsibilities for IAFD; and ensuring the findings are supported by the evidence.

The training is currently being modified to make the appropriate revisions, based upon the written and oral feedback provided by the IMT.  The IAFD training will be required for all current and new personnel assigned to the division in order for all personnel to be investigating cases in the same manner.  The IAFD Commander recognized that while all IAFD personnel had been trained in the department use of force tier training, they lacked proper training of investigating use of force.  The last interview training the division received was in July 2019, which with detective level turnover, there are numerous detectives who have never received this type of training.  New detectives would "shadow" an existing detective conducting investigations.  While this on-the-job training is beneficial, formal training is also necessary.  There were several areas lacking to conduct complete and thorough investigations.  One of those was interviewing the involved officer and witnesses.  IAFD had not been consistently conducting interviews in cases, resulting in complete investigations.  Due to the immediate need for investigative training, the IAFD training will be separated into phases of training, beginning with the highest priority which is interview techniques, which includes scenario-based exercises. APD will continue to work through this training with the IMT and the DOJ through each phase of training.

While the division handbook is being revised, IAFD will ensure that any new training material is reflected in that handbook.  Handbooks assist in developing detectives and include the requirements outlined in paragraph 62.

**68.** If APD initiates a criminal investigation, or where APD requests a criminal prosecution, the Force Investigation Section will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186.  No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation.

**Paragraph 68 is in Secondary Compliance.**

**IMR – 12 Recommendation:**

**4.7.55** APD should move forward with process design, policy development and training related to investigations regarding potential criminal prosecutions and compelled interviews of officers.

**APD Response:**  According to APD Policy 2-57-4 Use of Force Review and Investigation by Departmental Personnel, where a Level 2 or Level 3 use of force investigation indicates apparent criminal conduct by an officer in the use of force, IAFD shall refer the incident to an investigator from the Criminal Investigations Division (CID) for investigation. The criminal investigator shall have no involvement in the administrative investigation into the use of force.

**69.** In conducting its investigations of Level 2 or Level 3 uses of force, as defined in this Agreement, the Force Investigation Section shall:

a) respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that the use of force has been classified according to APD's classification procedures, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;

b) ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;

c) ensure that a canvass for, and interview of, witnesses is conducted.  In addition, witnesses should be encouraged to provide and sign a written statement in their own words;

d) ensure, consistent with applicable law, that all officers witnessing a Level 2 or Level 3 use of force by another officer provide a use of force narrative of the facts leading to the use of force;

e) provide a written admonishment to involved and witness officer(s) to the use of force that they are not to speak about the force incident with anyone until they are interviewed by the investigator of the Force Investigation Section;

f) conduct only one-on-one interviews with involved and witness officers;

g) review all use of force reports to ensure that these statements include the information required by this Agreement and APD policy;

h) ensure that all use of force reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;

i) conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;

j) record all interviews;

k) consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;

l) make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and

m) train all Internal Affairs Division force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors.

**Paragraph 69 is in Secondary Compliance.**

**IMR12 Recommendations for Paragraphs 68 and 69:**

**4.7.56a:**  Conduct detailed failure analyses for all IAD investigations deemed improperly completed or delayed. This report provides a workable starting point for that analysis.

**4.7.56b:** Using these failure analyses, routinely modify training, procedures, practice, and supervision/oversight until IAD findings are greater than 94 percent complete and adequate on each of the elements addressed in paragraph 69.

**4.7.56c:**  Resolve IA administrative (use of force) and misconduct investigative timelines to ensure they are practical and allow corrective and disciplinary actions to routinely occur within those timelines.

**APD Response:**  See below at Paragraph 71.

**70.** The Force Investigation Section shall complete an initial use of force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force.

**Paragraph 70 is in Secondary Compliance.**

**IMR – 12 Recommendations:**

**4.7.57a:** Conduct a data analysis of Use of Force Data reports to determine why they take longer than 24 hours to process and develop recommendations to relieve the major bottlenecks affecting this process.

**APD Response:** IAFD uses the BlueTeam data base system to satisfy the 24-hour notification to the Chief of Police. BlueTeam is a software platform that supports frontline documentation, supervisory oversight and organizational accountability. The Force Investigation Section on-call detectives are responsible for documenting that 24-hour notification once they leave the use of force scene. During this reporting period all initial use of force was reported to the Chief within the required 24-hours after IAFD learned of the use of force.

**71.** The Force Investigation Section shall complete Level 2 or Level 3 administrative investigations within three months after learning of the use of force. Any request for an extension to this time limit must be approved by the commanding officer of the Force Investigation Section through consultation with the Chief or by the Chief. At the conclusion of each use of force investigation, the Force Investigation Section shall prepare an investigation report. The report shall include:

   a) a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Force Investigation Section's independent review of the facts and circumstances of the incident;

   b) documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying use of force Data Reports. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;

   c) the names of all other APD officers or employees witnessing the use of force;

   d) the Force Investigation Section's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options;

   e) if a weapon was used by an officer, documentation that the officer's certification and training for the weapon were current at the time of the incident; and

   f) the complete disciplinary history of the target officers involved in the use of force.

**Paragraph 71 is in Secondary Compliance.**

**MR – 12 Recommendations:**

**4.7.58a:** Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing the delay. The review should:

   a. Identify key cause of failure

   b. Identify where the failure points are in the IAD process related to paragraph 71.

   c. Identify the causes of the failures.

   d. Identify who is responsible for the cause of delays; and

   e. Recommend actions to remedy the top 5 causes of failure to meet the established timelines.

   f. Repeat this process until failures re. P71 are less than 95%.

   4.7.58b: Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established timelines.

**APD Response to Paragraphs 68 - 71:** As stated earlier, APD is receiving technical assistance by the IMT. One of those areas are to document an investigative process that will assist APD in tracking and overseeing case progress, to include timelines. There is a lot of work to be done to complete this task. This will be a heavy lift for APD as it will include revising the format of investigations. APD continues to work closely with the IMT to reach this objective.

**72.** Upon completion of the Force Investigation Section investigation report, the Force Investigation Section investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Division. The Internal Affairs Division commanding officer shall review the report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance

of the evidence standard.  The Internal Affairs Division commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.

**Paragraph 72 is in Secondary Compliance.**

**IMR – 12 Recommendations:**

**4.7.59 a:**  Conduct a review of a sample of cases completed by IAD (in the past 3-6 months) that failed to meet established timelines by reviewing the key failure points causing delay.  The review should:

a. Identify key causes of failure;

b. Identify where in the IAD process related to Paragraph 72 the failure points were;

c. Identify the cause of the failures;

d. Recommend and implement actions to remedy the top five causes of failure to meet the established timelines;

e. Revaluate performance and repeat the process, with a focus on supervisors who routinely fail to meet established timelines; and

e. Repeat as necessary until the failure rate is below five percent.

**APD Response:**  See below at Paragraph 75.

**73.** For administrative investigations, where the findings of the Force Investigation Section investigation are not supported by a preponderance of the evidence, the Internal Affairs Division commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report.  The commanding officer of the Internal Affairs Division shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it.  The Internal Affairs Division commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Division.

**Paragraph 73 is in Secondary Compliance.**

**IMR – 12 Recommendations:**

**4.7.60a:**  Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing the delay.  The review should:

a. Identify key causes of failure to meet preponderance of the evidentiary standards for IA investigations.

b.  Recommend actions to remedy the top five causes of failure to meet the established requirements related to preponderance of evidence.

**4.7.60b:**  Implement recommended actions and conduct continual follow-up assessment to determine what impact, if any, the implemented actions had on the unit's ability to meet established preponderance of evidentiary standards.

**4.7.60c:**  Repeat until 95% of cases completed meet established requirements regarding evidentiary standards.

**APD Response:**  See below at Paragraph 75.

**74.** Where a member of the Force Investigation Section repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal from the Force Investigation Section in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules.

**Paragraph 74 is in Secondary Compliance.**

**IMR – 12 Recommendations:**

**4.7.61a:**  Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet quality standards by reviewing the key failure points causing the failure.  The review should:

a. Identify key causes of failure;

b. Identify where in the IAD process related to Paragraph 74 the failure points were located;

c. Identify the cause (of the failures); and

d. Recommend actions to remedy the top five causes of failure to meet the established timelines.

**4.7.61b:**  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established quality standards for IA investigations.

**4.7.61c:**  Repeat until 95% of cases completed meet established evidentiary standards.

**APD Response:**  See below at Paragraph 75.

**75.** When the commanding officer of the Internal Affairs Division determines that the force investigation is complete and the findings are supported by the evidence, the investigation report file shall be forwarded to the Force Review Board with a copy to the Chief.

**Paragraph 75 is in Secondary Compliance.**

**IMR – 12 Recommendations:**

**4.7.62a: Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet the requirement to forward the case to the FRB by reviewing the key failure points causing incomplete cases to be forwarded to the FRB. The review should:**
a. Identify key causes of failure;
b. Identify where in the IAD process related to Paragraph 75 the failure points were; and
d. Recommend actions to remedy the top five causes of failure to meet the established protocols, e.g., training, supervision, staffing, etc.
**4.7.62b:** Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established evidentiary and quality standards.
**4.7.62c:** Repeat until 95% of cases completed meet established evidentiary and quality standards.

**APD response to Paragraphs 71 – 75:** IAFD is responsible for responding to level 2 and level 3 use of force incidents and are required to conduct an investigation for each use of force.   IAFD is in the process of revising several investigative processes, to include the format for easier review, and completing the investigative case in sequential order while ensuring the findings are supported by the evidence.   The IAFD chain of command reviews the investigations and a commanding officer is responsible for the accuracy and completeness of investigation reports prepared by the IAFD.   Each level 3 case that IAFD completes will be presented to the FRB, and 10% of the level 2 cases will be presented.   A commanding officer attends FRB to answer board questions and use the feedback to make continual improvements on the investigations.

The new commander is including performance evaluations standards for use of force investigations.  This will be done to document and manage performance in a timely manner.  Each quarter, APD is required to complete checkpoints with personnel to evaluate performance.  If supervisors track their subordinate's work consistently, this will make the quarterly checkpoints easier and allow supervisors to review past performance for their evaluations.

**76.** At the discretion of the Chief, a force investigation may be assigned or reassigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations, or may be returned to the Force Investigation Section for further investigation or analysis.  This assignment or re-assignment shall be confirmed in writing.
**Paragraph 76 is in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 76.

**77.** Where, after an administrative force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action.  Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Division or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate.  The Chief need not delay the imposition of discipline until the outcome of the criminal investigation.  In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.
**Paragraph 77 is in Secondary Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 77.

**APD response for Paragraphs 76-77:**  APD continues to comply with the requirements of the paragraphs.  When necessary, the Chief of Police assigns or reassigns cases appropriately.

## G. Force Review Board

**78.** APD shall develop and implement a Force Review Board to review Level 2 and Level 3 uses of force.  The Force Review Board shall be comprised of at least the following members:   Deputy Chief of the Administrative Support Bureau, Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigative Bureau, a Field Services Commander, the Academy Division Commander, and the Legal Advisor.  The Force Review Board shall conduct timely, comprehensive, and reliable reviews of Level 2 and Level 3 use of force investigations.  The Force Review Board shall:
   a) review each use of force investigation completed by the Force Investigation Section within 30 days of receiving the investigation report to ensure that it is complete and, for administrative investigations, that the findings are supported by a preponderance of the evidence;
   b) hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident.  The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Division investigation, shall not be present;

c) order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings.  For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;

d) determine whether the use of force violated APD policy.  If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;

e) determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;

f) document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation; and g) review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis.

**Paragraph 78 is in Secondary Compliance.**

**IMR – 12 Recommendations:**

**4.7.44c** Report regularly on progress on the established goals and objectives related to the FRB process.

**APD Response:**

In September 2020, APD initiated internal investigations on three (3) board members who did not identify or follow through with policy violations during the September 17, 2020, FRB meeting.  This particular FRB meeting illustrated the changes in mindset and understanding of the overall FRB goals, which is ultimately to improve the department and to make the hard decisions that are necessary for that improvement.  Since September 2020, the FRB has increased referrals submitted to improve the department's operations, including tactics, training, supervision, and equipment as required in paragraphs 78 and 99.  In addition, if the Board identifies a violation of policy, a board member initiates an internal investigation meeting the requirement outlined in paragraph 163.

The chart below represents the improvements in overall referrals from August 1 through September 15, 2020 in comparison to September 16, 2020 through January 21, 2021 upon change in leadership.  Note: policy concern, policy concern/deficiency and policy deficiency are the same. The reporting was due to a change in process language and going forward will be consistent.



In October 2020, the City hired retired Judge Roderick "Rod" Kennedy to provide legal advice and feedback for FRB use of force cases. This added effort has helped APD work towards operational compliance as required in paragraph 78.  In November 2020, the Interim Chief of Police initiated a monthly update by the FRB project lead and COD Commander to provide a high-level overview and updates on FRB progress.  Lastly, in January 2021, the Interim Chief of Police assigned a Deputy Chief as the full-time FRB Chair.  This assignment demonstrates APD's commitment to improving the FRB process and ensuring critical oversight by all Deputy Chiefs.

**4.7.44c:** FRB should focus attention for Level 1 uses of force to ensure field supervisors are properly classifying cases.

**APD Response:** APD is evaluating how it can incorporate Level 1 use of force cases into the FRB process.

**4.7.44c:** Closely monitor referrals that are made from the FRB to ensure that each referral is clear and is followed through on by the impacted command.

**APD Response:** Every referral generated by the FRB is documented within the post meeting documentation to include the meeting minutes, the Chief's Report and the voting sheets. The FRB administrative personnel maintains a referral tracking log to monitor the progress of each referral until the Board determines the responsible party has met the requirements intended by the Board.

Since September 2020, FRB began highlighting systemic concerns, which through further examination appear many are department-wide issues. Examples of these issues include, but are not limited to:
- Special Operations Division operations specific to SWAT and K-9 Units. While this is primarily a division issue, units that request SOD are also impacted;
- The quality of force investigations. While FRB cases are level 2 and level 3, this also impacts level one use of force investigations;
- Training with a focus on communication and de-escalation prior to using force;
- Training on arrest warrants and arrests; and
- Requiring policy revisions, to include incorporating clearer language, definitions and expectations. The use of force policy suite is a good example of policies undergoing revision based on the referrals by the FRB.

**4.7.44c:** APD should organize its pre and post FRB meeting documentation in a manner that clearly demonstrates how it meets each of the relevant provisions of the CASA.
**APD Response:** As of August 13, 2020, paragraph markers have been added to the meeting minutes as well as the voting sheets to confirm the pre and post FRB meeting documentation meets each relevant provision of the CASA.

**79.** At least annually, APD shall publish a Use of Force Annual Report. At a minimum, the following information should be included in the Annual Use of Force Report:
   a) number of calls for service;
   b) number of officer-initiated actions;
   c) number of aggregate uses of force, and uses of force by Level;
   d) number of arrests;
   e) number of custodial arrests that involved use of force;
   f) number of SWAT deployments by type of call out;
   g) number of incidents involving officers shooting at or from moving vehicles;
   h) number of individuals armed with weapons;
   i) number of individuals unarmed;
   j) number of individuals injured during arrest, including APD and other law enforcement personnel;
   k) number of individuals requiring hospitalization, including APD and other law enforcement personnel;
   l) demographic category; and
   m) geographic data, including street, location, or Area Command.
**Paragraph 79 is in Primary Compliance.**
**IMR – 12 Recommendations:**
**4.7.66a:** APD should monitor use of force, serious use of force and show of force reporting discrepancies. Reporting errors must be reconciled to ensure that statistics published in its Annual Use of Force Reports are accurate.
**4.7.66b:** Now that APD has transitioned to a three-tiered use of force reporting system, the agency should create an auditing process for tier-one uses of force to ensure proper categorization is taking place. Data collected from these audits should feed the Annual Use of Force reports, and when appropriate, issues should be referred to IA and the Academy.
**4.7.66c:** APD should devise ways to scrutinize data presented by agency units, and coordinate with PMU to ensure that there are common methods to handle and present data.
**APD Response:** Currently IAFD has a backlog of cases and is also working to increase IAFD staffing to complete the backlog of cases and create processes and oversights to prevent further case backlogs.

**80.** APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by the Force Investigation Section, Internal Affairs Division, or Multi-Agency Task Force; and all force reviews conducted by the Performance Review Unit of the Compliance Bureau and the Force Review Board. APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary.
**Paragraph 80 is in Primary Compliance.**

**IMR – 12 Recommendations:**
**4.7.67a:** Develop, using the 7-step training process articulated by the monitor, specific training with learning objectives reflective of the requirements of this paragraph, and deliver and evaluate that training.
**APD Response:** APD currently uses BlueTeam and IAPro to track reported uses of force, and upon completion is stored in the City of Albuquerque's Data Warehouse. Recommendation 4.7.67a above is not relevant to this paragraph, and it appears that it was inadvertently assigned.

## H. Multi-Agency Task Force

**81.** APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist. APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that govern the Multi-Agency Task Force are current and effective. APD shall ensure that the inter-governmental agreements are consistent with this Agreement.
**Paragraph 81 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 81.
**APD Response:** See below at Paragraph 85.

**82.** APD agrees to consult with participating jurisdictions to establish investigative protocols for the Multi-Agency Task Force. The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities.
**Paragraph 82 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 82.
**APD Response:** See below at Paragraph 85.

**83.** APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel.
**Paragraph 82 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 83.
**APD Response:** See below at Paragraph 85.

**84.** APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force.
**Paragraph 84 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 84.
**APD Response:** See below at Paragraph 85.

**85.** If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding. This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in-custody deaths.
**Paragraph 85 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 85.

**APD Response to Paragraphs 81-85:** The Multi-Agency Task Force (MATF) continues to operate under a Memorandum of Agreement with the Bernalillo County Sheriff's Office and New Mexico State Police. Members of APD's Multi-Agency Task Force are now mentoring the Homicide Unit for peer review and assisting with caseload and case management. MATF detectives are also helping on homicide call outs. Collaboration between the Homicide Unit detectives and MATF detectives has helped to strengthen the quality of investigations as well as further enhance the skillset of detectives. During this reporting period, MATF attended an eight (8) hour workshop with the Homicide Unit hosted by Deputy District Attorneys from the Second Judicial District Attorney's Office. The workshop focused on interviews and interrogations as well as search warrants. The workshop provided the Violent Crimes Division an opportunity to introduce new Homicide Unit detectives as well as deliver refresher training to MATF detectives. Collaboration between the two units improves standardization of casework submitted to the DA's Office.

## I. Use of Force Training

**86.** Within 36 months of the Operational Date, APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and provisions of this Agreement.  APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy.

**Paragraph 86 remains in Secondary Compliance.**

**IMR-12 Recommendations:**  See recommendations and APD response after Paragraph 88.

**87.** APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:

- a) search and seizure law, including the Fourth Amendment and related law;
- b) APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;
- c) Use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;
- d) use of de-escalation strategies;
- e) scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;
- f) deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;
- g) crowd control; and
- h) initiating and disengaging foot pursuits.

**Paragraph 87 is in Secondary Compliance.**

**IMR-12 Recommendations:**  See recommendations and APD response after Paragraph 88.

**88.** Supervisors of all ranks, including those assigned to the Internal Affairs Division, as part of their initial and annual in-service supervisory training, shall receive additional training that includes:

- a) conducting use of force reviews or investigations, including evaluating officer, subject, and witness credibility;
- b) strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force;
- c) incident management; and
- d) supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force.

**Paragraph 88 is in Secondary Compliance.**

**IMR – 12 Recommendations for Paragraphs 86 - 88:**

**4.7.73.75a**: The Academy staff should be properly augmented to ensure the quality of training curriculum and training systems are not negatively impacted due to staffing shortages.

**4.7.73.75b:** APD Academy Staff should seek out and attend training courses focused on the proper development of training curriculum and how to connect that curriculum to the measurement of performance outcomes. Likewise, proper test question construction should be emphasized in Academy personnel's future training plans.

**4.7.73.75c:** APD personnel assigned to non-academy commands who carry significant training requirements should receive training commensurate with the Academy staff. This will ensure continuity in curriculum development across the organization.

**4.7.73.75d**: APD should produce a draft training-related COVID-19 response document, identifying salient training-related problems-issues-needs-solutions (PINS) related to COVID-19, viz a viz training-related issues.

**4.7.73.75e:** APD must properly supervise the delivery of training that is developed from outside sources before it is delivered to the department, regardless of its origin. Training programs should be developed based on best practices, APD policy and must adhere to the requirements of the CASA.

**4.7.73.75f:** APD must protect the training environment from lectures that may be perceived as inappropriate or are contrary to APD policy or the CASA.

**APD Response to Recommendations for Paragraphs 86 - 88:**  The Training Academy continues to evaluate staffing requirements based on current and projected workload.  COVID restrictions effected the Training Academy's ability to function at the level hoped for in 2020.   A response document, identifying salient training-related problems-issues-needs-solutions (PINS) related to COVID-19 was drafted late November 2020. The document was intended to re-evaluate and modify training delivery models that can be implemented either without human contact or in small social-distanced groups that comply with public health orders while meeting the needs of State-mandated, CASA, and Departmental educational requirements.  The Training Academy met with the IMT, and the decision was made to deliver as many courses as possible via Zoom; develop PowerDMS refresher/simulator videos for Use of Force Tiers 1-3 training; as well as deliver the Tier 4 Use of Force Training in person with enhanced

safety measures such as reduced class size, social distancing, mandatory masks, temperature checks and COVID-19 questionnaire beginning March, 2021.

As the Department continues to identify areas for improvement throughout the organization the workload at the Training Academy continues to increase.  Training Academy leadership identified that current staffing levels are insufficient and are in the process of making staffing requests with the City to better meet the needs of the APD.  Outside curriculum development courses have been identified that will help developers improve, but have been put on hold due to COVID.  A curriculum development course was attended by Academy and IAFD staff in 2019 but cannot be delivered at this time due to COVID restrictions.  The facilitator for this course is based in California and cannot travel to New Mexico, and APD staff cannot travel to California.   Preliminary development of an internal Curriculum Developer course has begun at the Training Academy.  Additionally, the Training Academy is working toward oversight of other non-Training Academy sources.   This requires policy improvements to address officers attending outside training opportunities.  The Training Academy is also working with the Bernalillo County District Attorney's Office and the State of New Mexico to ensure we are meeting their requirements, while adhering to policy and CASA requirements.  The Training Academy continues to update vetting processes and code of conduct requirements for outside lecturers.

**89.** Included in the use of force training set out above, APD shall deliver firearms training that comports with constitutional principles and APD policy to all officers within 12 months of the Operational Date and at least yearly thereafter.  APD firearms training shall:
   a) require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms, as necessary, on an annual basis;
   b) require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;
   c) incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision making training, including continuous threat assessment techniques, in the annual in-service training program; and
   d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times.

**Paragraph 89 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 89.
**APD Response:**   Firearm training was completed within the 12-month period, and continues to be completed during the annual qualifications and the reality-based training scenarios.

## Section 2:  Specialized Units (Paragraphs 90 – 109)

### A. Specialized Tactical Units (SOD)

**90.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances, provides for effective command-level accountability, and ensures force is used in strict compliance with applicable law, best practices, and this Agreement.  To achieve these outcomes, APD shall implement the requirements set out below.
**Paragraph 90 remains in Operational Compliance.**
**IMR-12 Recommendations**:  There were no Recommendations for Paragraph 90.

**91.**  APD's specialized tactical units shall be comprised of law enforcement officers who are selected, trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units.  The specialized tactical units shall consist of SWAT, Canine, and Bomb Squad/EOD.
**Paragraph 91 remains in Operational Compliance.**
**IMR-12 Recommendations**:  There were no Recommendations for Paragraph 91.

**92.**  APD shall ensure that specialized tactical units are sufficiently trained to complete the following basic operational functions:  Command and Control; Containment; and Entry, Apprehension, and Rescue.
**Paragraph 92 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraph 92.

**93.** Each specialized tactical unit shall have clearly defined missions and duties.  Each specialized tactical unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force reporting, and force investigations.
**Paragraph 93 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 93.

**94.** APD policies and procedures on specialized tactical units shall include the following topics: a) team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility; b) coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed; c) personnel selection and retention criteria and mandated physical and tactical competency of team members, team leaders, and unit commanders; d) training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training; e) equipment appropriation, maintenance, care, and inventory; f) activation and deployment protocols, including when to notify and request additional services;  g) conducting threat assessments to determine the appropriate responses and necessary resources; h) command and control issues, including a clearly defined command structure; and i) documented after-action reviews and reports.
**Paragraph 94 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 94.

**95.** The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement.
**Paragraph 95 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 95.

**96.** In addition to use of force reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations.  After-action reports shall address any areas of concern related to policy, training, equipment, or tactics.
**Paragraph 96 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 96.

**97.** APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment.  APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations.  All specialized tactical team members should have an understanding of operational planning.
**Paragraph 97 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 97.

**98.** All specialized tactical units shall wear uniforms that clearly identify them as law enforcement officers.
**Paragraph 98 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 98.

**100.** APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria.
**Paragraph 100 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 100.

**101.** APD shall train specialized tactical units conducting barricaded gunman operations on competencies and procedures that include:  threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders.
**Paragraph 101 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 101.

**102.** APD shall continue to require the Canine Unit to complete thorough post deployment reviews of all canine deployments.
**Paragraph 102 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 102.

**103.** APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams.
**Paragraph 103 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 103.

**104.** APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold, and require interventions as appropriate. Canine data and analysis shall be included in APD Use of Force Annual Report.
**Paragraph 104 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 104

**105.** APD agrees to track and analyze the number of specialized tactical unit deployments. The analysis shall include the reason for each tactical deployment and the result of each deployment, to include: (a) the location; (b) the number of arrests; (c) whether a forcible entry was required; (d) whether a weapon was discharged by a specialized tactical unit member; (e) whether a person or domestic animal was injured or killed; and (f) the type of tactical equipment deployed. This data analysis shall be entered into the Early Intervention System and included in APD's Annual Reports.
**Paragraph 105 remains in Operational Compliance**.
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 105.

**APD Response to Paragraphs 90 to 105:** A change in Special Operations Division command began on December 21, 2020. Standard operating procedures regarding SOD activities continue to be reviewed annually. SOP 1-92 Specialized Tactical Units was completed and published in July 2020 to detail the tactical duties and processes that are used in response to crisis negotiation team activities, hostage situations, barricaded and armed individuals, high-risk arrests, execution of search and arrest warrants with exigent or dangerous circumstances, major jail disturbances, civil disturbances, and specialized patrol functions. Other special operations policies are in the various stages of the revision process. The most current revision of SOP 2-70 Execution of Search Warrants, SOP 2-23 Use of Canine Unit, are at the mid-way stage of annual revision, SOP 1-42 Explosive Ordnance Disposal Unit, Bomb Squad, SOP 1-64 Canine Unit and SOP 2-20 Hostage and Barricaded Individual, and Tactical Threat Assessment are at the first stages of annual revision, and SOP 1-92 Specialized Tactical Units was published in July 2020.

**A**PD will continue to utilize Risk Assessment Matrices (RAM) for pre-planned warrants. AARs are now After Action case files containing more comprehensive information applicable to the tactical activation and are used for review and documentation purposes.

Inspection logs continue to be completed and include uniform as well as assigned tactical equipment checks. The annual assessment includes physical assessment, equipment inventory, Employee Work Plans (EWP's), qualifications, behavioral science interviews and training. SOD Training Ledgers are maintained and completed on an ongoing basis.

## B. Specialized Investigative Units (SID)

**106.** Each specialized investigative unit shall have a clearly defined mission and duties. Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force reporting, and force investigations.
**Paragraph 106 remains in Operational Compliance**.
**IMR-12 Recommendations**: There were no Recommendations for Paragraph 106.
**APD Response:** During the course of 2020, four significant standard operating procedures were drafted or partially revised by ISD personnel, and are still in development in accordance with SOP 3-52 Policy Development Process. These four policies are SOP 1-50 The Gun Violence Reduction Unit, SOP 2-69 Informants, SOP 2-71 Search and Seizure Without a Warrant, SOP 5-1 The Investigative Services Division.

**107.** APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required. APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response. The protocols shall include communicating high-risk situations and threats promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident.
**Paragraph 107 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraph 107.

**108.** Within three months of the Operational Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training. APD shall conduct re-inspections on at least an annual basis.
**Paragraph 108 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraph 108.

**APD Response:** In 2020, Investigative Services Division (ISD) conducted scheduled inspections of personnel and their issued equipment. ISD adopted the monthly inspection which is conducted by the field. The data points inspected are captured under the supervision tab on the "APD Protopage". In order to remain in operational compliance with Paragraph 108 of the CASA, ISD Command Staff conducted a random inspection of Investigative Services Division (ISD) personnel. This was completed on December 10, 2020. Serial numbers were verified on division issued long rifles and backup weapons which are listed on their division property sheets. Issued weapons were verified according to the individual's property card maintained by the APD Property Unit.

**109.** APD agrees to track and analyze the number of specialized investigative unit responses. The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include: (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative unit member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the Early Intervention System and included in APD's Annual Reports.
**Paragraph 109 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraph 109.

**APD Response:** ISD command staff is fully committed to maintaining operational compliance for this CASA paragraph. On December 9, 2020, an audit was conducted of the ISD's investigative responses. ISD command staff looked at the entries made this calendar year from January 1, 2020 through December 5, 2020. The investigative responses were entered into a shared drive by the division's supervisors. There were forty-two (42) entries made into the SharePoint system. ISD personnel were requested to respond by varying agencies, internal specialized units, and at the request of the Field Services Bureau. Out of the forty-two (42) entries, only one (1) resulted in a SWAT activation and none of the incidents resulted in a use of force. Each entry documented debriefs which were conducted following the investigative response.

## Section 3:  Crisis Intervention (Paragraphs 110 – 137)

### A.  Mental Health Advisory Committee (Paragraphs 110-117)

**110.** To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below.
**Paragraph 110 remains in Secondary Compliance**.

**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 110.

**111.** Within six months of the Operational Date, APD and the City shall establish a Mental Health Response Advisory Committee (Advisory Committee) with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness.

**Paragraph 111 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 111.

**112.** The Advisory Committee shall include representation form APD command staff, crisis intervention certified responders, Crisis Intervention Unit (CIU), Crisis Outreach and Support Team (COAST), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups.
**Paragraph 112 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 112.

**113.** The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from mental illness, identifying training needs, and providing guidance on effective responses to behavioral crisis event.
**Paragraph 113 remains in Operational Compliance.**
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 113.

**114.** APD, with guidance form the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality.
**Paragraph 114 remains in Secondary Compliance.**
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 114.

**115.** Within nine months of the Operational Date, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also, within nine months of the Operational Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario-based training involving typical situations that occur when mental illness is a factor.
**Paragraph 115 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 115.

**116.** The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services.
**Paragraph 116 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 116.

**117.** Within 12 months of the Operational Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources."
**Paragraph 117 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 117.

**APD Response for Paragraphs 110-117:**  APD continues to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals.  MHRAC has continued to meet remotely during the pandemic, and meetings were held every month during this monitoring period.  Regular topics of the full meeting included the continued planning of the new Albuquerque Community Safety Department and the gateway shelters.  Other topics included Albuquerque Fire and Rescue's Wellness Check program, ongoing concerns with New Mexico's on body camera law for law enforcement, the release of recorded footage, the impact of COVID on services, changes to the mobile crisis team program and a presentation of collected APD data on mental health interactions.  MHRAC currently has two subcommittees, one focusing on information sharing and emerging resources for those living with behavioral health issues and a training subcommittee that evaluates and provides feedback on all APD behavioral health training.  Topics covered by the information sharing/resource subcommittee

included building a COVID specific version of the APD resource card, an introduction APD's Policy and Procedures Section, and discussion of a standalone Certificates for Evaluation policy.  The training subcommittee covered updates to the Crisis Negotiation Team training being developed by the Special Operations Division, Handbook updates for the Behavioral Sciences Section, changes to the Enhanced Crisis Intervention Team training and Law Enforcement Assisted Diversion training delivered to all APD officers.      Additionally, the MHRAC co-chair and the two MHRAC subcommittees released their annual reports for 2020 which are available at:

https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents/mental-health-response-advisory-committee-documents

## B.  Behavioral Health Training (Paragraphs 118-122)

**118.** APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment.
**Paragraph 118 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 118.

**119.** "APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by July 15, 2016.
**Paragraph 119 remains in Primary Compliance**.
**IMR-12 Recommendations:**
**4.7.106a:** APD should implement a complete inquiry into the rationale and modality changes resulting in this training gap.  Responsibilities and rationalities for the change need to be identified, as well as who was in the approval loops, that allowed a CASA-specific training program to be manipulated into non-compliance.
**APD Response:**  During this monitoring period APD CIU instructed two basic cadet academies, one at Central New Mexico Community College and one at APD's Training Academy.  A total of 47 cadets were trained this monitoring period.

APD's Training Academy has worked with CIU to ensure the appropriate requirements for lesson plan development and training are in compliance with CASA requirements.

**120.** To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement, and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below.
**Paragraph 120 remains in Operational Compliance.**
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 120.
**APD Response:**  During this monitoring period APD CIU held one CIT 40-hour class.  Fourteen (14) people were trained this monitoring period including an officer from Sandia Police Department and an employee of the new Violence Intervention Project.  This class is particularly difficult to run during a pandemic due to the fact in person scenarios are so vital to the instruction.  The class was re-evaluated this monitoring period to allow an easier transfer into a zoom only or hybrid block of instruction.  Additionally, training was provided to all APD officers on how to refer individuals to the Law Enforcement Assisted Diversion program.  The program is for individuals who commit low level non-violent offenses to support a substance use disorder or as a result of a behavioral health issue.

**121.** Within six months of the Operational Date, APD and the City shall establish a MHRAC "support committee" with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis.  The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness.
**Paragraph 121 remains in Operational Compliance.**
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 121.

**APD Response:**  APD CIU provided one telecommunicator class this monitoring period in which eight new Emergency Communications Center employees became certified.

**122.** The Advisory Committee shall include representation from APD command staff, crisis intervention certified responders, Crisis Intervention Unit ("CIU"), Crisis Outreach and Support Team ("COAST"), and City-contracted mental health professionals.  APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups.

**Paragraph 122 remains in Primary Compliance.**

**IMR – 12 Recommendations:**

**4.7.109a:** APD must review its training records to identify specifically who attended the truncated training sessions noted in section 4.7.108, above. Those officers will need to be re-trained, using a CASA-compliant training processes.

**4.7.109b:** Conduct a thorough internal investigation to identify who changes this training, why it was changed, and exactly what changes were made.

**APD Response:**  In the previous monitoring period, a training video on mental health was released that did not meet the standards of CIU and MHRAC.  In Spring 2021 as part of the annual MOE training, all sworn personnel will receive new instruction on interactions with people living with mental illness.  The training will be two hours in length and delivered by CIU detectives.  The training curriculum was developed by CIU in conjunction with MHRAC.  The two full hours of instruction during MOE will cover multiple topics including: interactions with the most common mental illnesses APD officers encounter, disengagement, and APD's most utilized area resources.

APD's Training Academy has worked with CIU to ensure the appropriate requirements for lesson plan development and training are in compliance with CASA requirements.

## C.  Crisis Intervention Certified Responders and Crisis Intervention Unit (Paragraphs 123-131)

**123.** The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST.  The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event.

**Paragraph 123 remains in Secondary Compliance.**

**IMR – 12 Recommendations:**

**4.7.110a:** Implement the data-driven, methodologically appropriate workload, staffing planning and analysis protocol developed by CIU that ensures that reliable "staffing levels" for ECIT officers are regularly calculated, reported, set as staffing goals, and attained.

**APD Response:** See below at Paragraph 127.

**124.** APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality.

**Paragraph 124 remains in Operational Compliance.**

**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 124.

**APD Response:** See below at Paragraph 127.

**125.** Within nine months of the Operational Date, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance.  Also within nine months of the Operational Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario based training involving typical situations that occur when mental illness is a factor.

**Paragraph 125 remains in Operational Compliance.**

**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 125.

**APD Response:** See below at Paragraph 127.

**126.** The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services.

**Paragraph 126 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 126.

**APD Response**: See below at Paragraph 127.

**127.** Within 12 months of the Operational Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources.

**Paragraph 127 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 127.


**APD Response to Paragraphs 123-127:** During this monitoring period, at least 44% of field services officers were trained as Enhanced Crisis Intervention Team members. CIU also worked on improving ways to report how often ECIT officers are utilized during clear mental health calls. This percentage will be reported monthly to area commanders beginning in March. During this monitoring period, 33 officers received the ECIT base training and seven officers were re-certified as ECIT responders by taking the update class.

**128.** APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so.

**Paragraph 128 remains in Secondary Compliance.**

**IMR – 12 Recommendations**:

**4.7.115a:** Conduct a complete assessment of all CIT/CIU responses involving the officer identified in the events outlined above.

**4.7.115b:** Conduct a random sample of all CIT/CIU responses to ensure that the issues identified above have not been replicated in other CIT/CIU responses by other officers.

**4.7.115c:** Provide the monitor the results of the inquiry outlined above for inclusion in IMR-13.

**APD Response:** In response to recommendations from the previous monitor's report, CIU has developed a methodology for reviewing calls where individuals exhibit mental health concerns. Using a search string which checks APD records at both call creation and call close, CIU has been able to locate interactions regardless how the call was originally coded in the CAD system. Approximately 40 calls have been evaluated in a test location during this monitoring period. Next monitoring period a random sample of mental health interactions across APD will be evaluated.

**129.** APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:

   a) date, shift, and area command of the incident;
   b) subject's age, race/ethnicity, and gender;
   c) whether the subject was armed and the type of weapon;
   d) whether the subject claims to be a U.S. military veteran;
   e) name and badge number of crisis intervention certified responder or CIU detective on the scene;
   f) whether a supervisor responded to the scene;
   g) techniques or equipment used;
   h) any injuries to officers, subjects, or others;
   i) disposition of the encounter (e.g., arrest, citation, referral); and
   j) a brief narrative of the event (if not included in any other document).

**Paragraph 129 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 129.

**APD Response:** APD continues to update the CIU data book, the most recent being Fall 2020's release. The Fall 2020 data book was completed in partnership with the New Mexico Sentencing Commission. This data book was presented to MHRAC in January and is available for download at: https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents

**130.** APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat

calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis.

**Paragraph 130 remains in Operational Compliance.**

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 130.

**APD Response:**   Scenarios for the ECIT certification class have been updated to reflect encounters APD has recently had with individuals experiencing behavioral health crisis.  Specifically, how to interact with family members of those in crisis and how to evaluate the value of either separating the family member or bringing them in to assist in de-escalation has been added to the training.

**131.** Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services.

**Paragraph 131 is in Secondary Compliance.**

**IMR – 12 Recommendations**:

**4.7.118a:** Work with advisory committees to ensure the protocols are updated and that related policy and protocols are reflective of "best practices." Develop appropriate training strategies, deliver training, implement the policy, and evaluate results.

**4.7.118b:** APD command should require cooperative approaches between CIU, CNT and SOD, establishing timelines for assessments as to why inter- unit cooperation on the issue of barricaded suicidal individuals has lagged, and follow-up on findings and recommendations at regular intervals.

**4.7.118 c:** APD executive leadership should pay particular attention to the results of the implementation of cooperative approaches between CIU, CNT and SOD. This project should be goal-driven, should include production of specifically articulated tangible objectives and measurable timelines to ensure progress is made.

**APD Response:**   APD SOP 2-20 Hostage and Barricaded Individual and Tactical Threat Assessment is in the policy development process.  SOP 2-20 will be sent to MHRAC for review prior to approval by PPRB.  Once the policy is approved, a PowerDMS video will be published for the FSB.  CIU will be teaching MOE 2021 and will cover disengagement/non engagement training.  Continued collaborative information is shared between CIU and CNT in reference to persons living with behavioral issues that become involved in tactical activations.   The CNT will continue to co-facilitate courses with CIU representatives further enhancing inter-unit cooperation.   SOD personnel attend both the monthly full MHRAC meetings and the MHRAC training subcommittee meetings to remain engaged with community stakeholders supporting mental health responses.

## D. Crisis Prevention (Paragraphs 132-137)

**132.** APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers.

**Paragraph 132 remains in Operational Compliance.**

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 132.

**APD Response:**  See below at paragraph 136.

**133.** COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at risk of experiencing a mental health crisis and assist with follow-up calls or visits.

**Paragraph 133 remains in Operational Compliance.**

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 133.

**APD Response:**  See below at paragraph 136.

**134.** APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options.

**Paragraph 134 remains in Operational Compliance.**

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 134.

**APD Response:**  See below at paragraph 136.

**135.** APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement.  Within three months of completing the staffing assessment and resource study required by Paragraph 204

of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less.

**Paragraph 135 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 135.

**APD Response:** The Crisis Intervention Section added a second lieutenant to assist with administration and supervision of the department's mental health response and follow up activities. The section currently has two lieutenants, two sergeants, thirteen detectives and two mobile crisis team officers. Two additional mobile crisis team officers will be added in the next monitoring period. Currently, CIS has three COAST specialists; two on staff mental health clinicians and one psychiatrist on staff.

**136.** COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources.

**Paragraph 136 remains in Operational Compliance.**

**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 136.

**APD Response to Paragraph 132-134 and 136:** In addition to meeting with administrators of the main mental health hospitals in Albuquerque at least quarterly, CIU was approached to begin working directly with metropolitan and district court through their Behavioral Health Court. This was an excellent opportunity for collaboration as many of the individuals on the Behavioral Health Court docket are also on CIU's caseload. CIU Detectives are now staffing cases with the involved parties at both courts weekly.

**137.** APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:

   a)   number of individuals in the COAST and CIU caseloads;
   b)   number of individuals receiving crisis prevention services;
   c)   date, shift, and area command of incidents or follow up encounters;
   d)   subject's age, race/ethnicity, and gender;
   e)   whether the subject claims to be a U.S. military veteran;
   f)   techniques or equipment used;
   g)   any injuries to officers, subjects, or others;
   h)   disposition of the encounter (e.g., arrest, citation, referral); and
   i)   a brief narrative of the event (if not included in any other document).

**Paragraph 137 remains in Operational Compliance.** There were no IMR – 12 Recommendations for Paragraph 137.

**APD Response:** APD continues to update the CIU data book, the most recent being Fall 2020's release. The Fall 2020 data book was completed in partnership with the New Mexico Sentencing Commission. This data book was presented to MHRAC in January and is available for download at: https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents

## Section 4:  Policies and Training Generally (Paragraphs 138 – 161)

**138.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD's policies and procedures shall reflect and express the Department's core values and priorities and shall provide clear direction to ensure that officers and civilian employees deliver effective and constitutional policing services.  APD shall ensure that officers and civilian employees are trained to understand and carry out consistently and competently the duties and responsibilities specified in APD policies and procedures.  To achieve these outcomes, APD agrees to implement the requirements below.

**Paragraph 138 is not a measurable paragraph.**

### A. Policy Development, Review, and Implementation

**139.**  APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices.  APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically. 140. APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system

for ease of reference.  APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format.
**Paragraph 139 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 139.
**APD Response:**  See below at Paragraph 148.

**140.**  APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference.  APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format.
**Paragraph 140 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 140.
**APD Response:**  See below at Paragraph 148.

**141.** Within three months of the Operational Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures.
**Paragraph 141 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 141.
**APD Response:**  See below at Paragraph 148.

**142.** Within three months of the Operational Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities.  The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014).
**Paragraph 142 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 142.
**APD Response:**  See below at Paragraph 148.

**143.** Within nine months of the Operational Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement.  The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division.
**Paragraph 143 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 143.
**APD Response:**  See below at Paragraph 148.

**144.** Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Operational Date.  APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility.  There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations.
**Paragraph 144 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 144.
**APD Response:**  See below at Paragraph 148.

**145.** The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law.  The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews.
**Paragraph 145 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 145.
**APD Response:**  See below at Paragraph 148.

**146.**  APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure.
**Paragraph 146 remains in Operational Compliance**.
**IMR-12 Recommendations:**  There were no Recommendations for Paragraph 146.

**APD Response:** To hold officers accountable, APD continues to apply policies uniformly, standardize current processes and create job aides and check lists to ensure proper steps are followed.

**147.** APD shall submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ for review and comment before publication and implementation. If the Monitor or DOJ objects to the proposed new or revised policy, procedure, manual, or other administrative order or directive, because it does not incorporate the requirements of this Agreement or is inconsistent with this Agreement or the law, the Monitor or DOJ shall note this objection in writing to all parties within 15 business days of the receipt of the policy, procedure, manual, or directive from APD. If neither the Monitor nor DOJ objects to the new or revised policy, procedure, manual, or directive, APD agrees to implement it within one month of it being provided to DOJ and the Monitor.

**Paragraph 147 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 147.

**APD Response:** See below at Paragraph 148.

**148.** APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions. If, after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection. If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter. The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies. Factors to consider in making this determination include: 1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor. In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review. Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion.

**Paragraph 148 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 148.

**APD Response for Paragraphs 138 - 148:** The APD Policy and Procedure Unit is making strides in improving the policy development process and increasing stakeholder input. During this reporting period, a PowerDMS video was published to remind Department personnel of the process to make a policy recommendation. The video was published as a direct result of feedback received from a culture survey. The Policy and Procedure Unit implemented a quality assurance checklist to increase standardization within the policy document. During this reporting period, the Policy and Procedure Unit conducted community outreach and attended the Southeast Area Command Community Policing Council meeting, participated in the Citizen Police Oversight Agency Subcommittee meeting and attended a Mental Health Response Advisory Committee meeting. Input from both internal and external stakeholders is vital to APD's reform effort to include the policy development process.

## B. Training on Revised Policies, Procedures, and Practices

**149.** Within two months of the Operational Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement.

**Paragraph 149 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 149.

**APD Response:** APD continues to present the CASA to all new cadet classes.

**150.** Within three months of issuing a policy or procedure pursuant to this Agreement, APD agrees to ensure that all relevant APD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations. APD agrees to document that each relevant APD officer or other employee has received and read the policy. Training beyond roll-call or similar training will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy.

**Paragraph 150 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 150.

**APD Response:** APD continues to publish policy updates to PowerDMS and officers must acknowledge receipt of the information via an electronic signature. The Training Academy continues to facilitate training on necessary policies. Data collected through PowerDMS is easily tracked and audited.

151. Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Operational Date, and annually thereafter.  Within six months of the Operational Date, APD shall set out a schedule for delivering all training required by this Agreement.
**Paragraph 151 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 151.
**APD Response:**  The Training Academy will continue to deliver the training as required under this agreement.

152. APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty.
**Paragraph 152 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 152.
**APD Response**:  APD verifies lateral hires are sworn law enforcement officers and trains lateral hires prior to entry on duty.  All training is uploaded to ELM as with other Department training such as firearm qualifications.

153. APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records.  APD shall also maintain complete and accurate records of any audit, review, assessment, or evaluation of the sufficiency or effectiveness of its training programs.  APD shall make these records available for inspection by the Monitor and DOJ.
**Paragraph 153 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 153.

154. APD shall ensure that changes in relevant case law and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and preservice training.
**Paragraph 154 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 154.
**APD Response:**  The Training Academy continues to track changes in relevant case law and statutes and adds the information to ELM.

## C. Field Training Officer Program

155. APD shall supervise and manage its field training program to ensure that new officers develop the necessary technical and practical skills required to use force in accordance with APD policy and applicable law.  The field training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community.  Field Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics.
**Paragraph 155 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 155.
**APD Response:**
- The Field Training Evaluation Program (FTEP) continues to work on completing the updates to SOP 1-46 Field Training and Evaluation Program.  SOP 1-46 was reviewed by the Civilian Police Oversight Agency Board.  SOP 1-46 was put on hold while the FTEP Operations Manual is updated to reflect the current structure and to match SOP 1-46.  The Operations Manual is being updated with assistance from City Legal.
- The FTEP has not issued any first strike memos during this time to any Field Training Officer (FTO) in order to address FTEP supervisory issues needed to improve the quality of training given to recruit officers.  However, the FTEP has been made aware of an issue with an FTO who was previously issued a first strike and is working with City Legal and City HR to ensure our strike system currently established is in compliance with the Albuquerque Police Officer's Association (APOA) contract.  Once that process is approved the second strike will be drafted and presented to the FTEP Board for review and approval as defined in the Operations Manual.

156. APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field training program early.
**Paragraph 156 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 156.
**APD Response:**  FTEP provided Special Orders to show that no recruit or lateral officers were released from on-the-job training (OJT) without completing the entire OJT program and its corresponding time requirements.  There is still one officer, from the 121st cadet class who remains on

ILD (Injured Light Duty) and has not started OJT.  The officer is currently assigned to the FTEP while recovering from his injury.  The recruit officer is scheduled to start his OJT on February 6, 2021 after being cleared by Employee Health.

**157.** APD shall revise the qualifications for Field Training Officers to require three years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism.
**Paragraph 157 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 157.
**APD Response:**  The FTEP conducted one FTO testing process in December 2020.  Seven applicants (five officers and two sergeants) applied for the test and they were all vetted through the backgrounds process as currently established by the FTEP.  All seven were found to be qualified candidates meeting or exceeding the minimum standards for the position.  The applicants tested and passed the process and were activated in December of 2020.

**158.**  New Field Training Officers and Area Sergeant Coordinators shall receive at least 40 hours of initial supervisory-level training and annual in-service training in the following areas:  management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques.  Field Training Officers and Area Sergeant Coordinators shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de-escalation techniques; and effective problem solving.  APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators.
**Paragraph 158 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 158.
**APD Response:**
- The FTEP conducted the 2020 FTO Recertification during this reporting period by utilizing a combination of in person and zoom to conduct the recertification due to COVID-19.  The dates for the recertification were November 13, 2020, November 20, 2020, December 10, 2020, December 18, 2020, with additional make up days on December 28, 2020 and January 22, 2021.  The two additional make up days were required due to COVID-19.  Currently all but one active personnel have completed their 2020 recertification and the one outstanding is currently scheduling his makeup session.
- The FTEP conducted three FTO Basic Courses during this reporting period.  The November 2 – November 2, 2020 FTO Basic Course had seven (7) officers, three (3) sergeants, one (1) PTU officer and one (1) PTU sergeant in attendance.  The November 30 – December 4, 2020 class had two (2) officers in attendance as two additional officers had to withdraw due to COVID-19 exposures.  The January 25 – January 29, 2021 FTO Basic Course had 5 officers attend and there is an FTO Basic Course scheduled February 22 – 26, 2021 that has 11 officers currently scheduled.  This course is still open and taking student enrollments.  A FTO/FTAS testing process will be posted at the conclusion of the class in February 2021.

**159.**  Recruits in the field training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers.
**Paragraph 159 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 159.
**APD Response:**  The FTEP provided documents showing that all recruit officers completed their OJT with different FTOs, working different shifts and in different area commands, if possible.  Due to COVID-19 considerations the FTEP has taken the following steps to help reduce and mitigate the spread of COVID -19.  The FTEP coordinates voluntary testing for all FTOs and recruit officers prior to transferring at the end of each phase.  If an FTO or recruit officer is put on leave pending the results of a COVID-19 test, then both officers are put on leave and training continues upon return of negative tests.  The amount of time in training is paused and continues upon return to duty.  This has extended the amount of time some recruit officers have spent on OJT but it ensures that each recruit and lateral officer completes the required minimum of 16 weeks (640 hours) for recruits and 12 weeks (480 hours) for lateral training and no training time was "lost" due to COVID-19.  Also for launch of the 123rd Cadet Class the FTO will be returning to the prior practice of rotating all area commands, shifts and FTOs since the COVID-19 Vaccine has been made available to APD, and is being distributed department wide.

**160.** APD shall provide a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the field training program.  APD shall consider feedback and document its response, including the rationale behind any responsive action taken or decision to take no action.
**Paragraph 160 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 160.

**APD Response:**   FTEP completed the FTO Critiques Response Memo, the OJT Survey Critique, and the FTEP Response to FTAS Critique Memo. There were nine sergeant trainees who completed OJT during this period and the FTEP also collected and responded to the FTAS by Sergeant Trainee Critiques. The FTEP did note an increase in the FTEP Response to FTAS Critiques that were collected. It appears the efforts undertaken by the FTEP did show some positive results and we will continue those efforts and develop ways to further expand the collection of data.

**161.** The City shall provide APD with the necessary support and resources to designate a sufficient number of Field Training Officers to meet the requirements of this Agreement.
**Paragraph 161 remains in Secondary Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 160.
**APD Response:**  On November 6, 2020 a new officer was transferred to the FTEP as a full time addition to the FTEP. He was assigned as the FTEP administrative officer and his addition has been of huge benefit to the program and recruiting efforts. The FTEP administrative officer and operations officer conducted three recruiting events at three different squad field briefings in order to further recruitment efforts for the FTEP. The FTEP is producing a short recruitment video to be launched in the PowerDMS system in mid-February, also to bolster FTO recruiting efforts.

## Section 5:  Misconduct Complaint Intake, Investigation, and Adjudication (Paragraphs 162 – 202)

**162.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system. To achieve these outcomes, APD and the Civilian Police Oversight Agency shall implement the requirements below.
**Paragraph 162 is not a measurable paragraph.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 162.
**APD Response:**  This Paragraph serves as an introductory paragraph for IAPS-Misconduct Division and CPOA related CASA requirements. As such it requires no direct evaluation.

### A.  Reporting Misconduct

**163.**  APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs Division for review and investigation. Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Division. Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment.
**Paragraph 163 remains in Operational Compliance.**  There were no Recommendations for Paragraph 163.
**APD Response:**  APD SOP 3-41 Complaints Involving Department Policy and Personnel requires that all policy violations are reported to IAPS within 24 hours of discovering the violation. Employees are being held accountable when violations are not identified.

### B.  Public Information on Civilian Complaints

**164.**  Within six months of the Operational Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints. The requirements below shall be incorporated into this program.
**Paragraph 164 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraph 164.

**165.**  APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall, public libraries, community centers, and the office of the Civilian Police Oversight Agency. Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints. Complaint forms, informational materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person. Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above.
**Paragraph 165 remains in Operational Compliance.**

**IMR-12 Recommendations:** There were no Recommendations for Paragraph 165.

**166.** APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites. The placard shall specify that complaints may be submitted anonymously or on behalf of another person. APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles. Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request. If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint.
**Paragraph 166 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 166.

**167.** APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints.
**Paragraph 167 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 167.

**168.** Complaint forms and related informational materials shall be made available and posted in English and Spanish.
**Paragraph 168 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 168.

## C.  Complaint Intake, Classification, and Tracking

**169.** Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake.
**Paragraph 169 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 169.

**170.** APD shall accept complaints regardless of when they are filed. The City shall encourage civilians to promptly report police misconduct so that full investigations can be made expeditiously and the full range of disciplinary and corrective action be made available.
**Paragraph 170 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 170.

**171.** The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint shall be grounds for discipline.
**Paragraph 171 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 171.

**172.** APD and the Civilian Police Oversight Agency shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail. Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be provided with a complaint form in Spanish to ensure that the individual is able to make a complaint. Such complaints will be investigated in accordance with this Agreement.
**Paragraph 172 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 172.

**173.** All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint. All misconduct complaints shall be submitted to the Internal Affairs Division by the end of the shift following the shift in which it was received.
**Paragraph 173 remains in Operational Compliance.**
**IMR-12 Recommendations:** There were no Recommendations for Paragraph 173.

**174.** APD and the Civilian Police Oversight Agency shall develop a system to ensure that allegations by a judicial officer of officer misconduct made during a civil or criminal proceeding are identified and assessed for further investigation. Any decision to decline investigation shall be documented.

**Paragraph 174 remains in Operational Compliance.**

**IMR-12 Recommendations:** There were no Recommendations for Paragraph 174.

**175.** APD and the Civilian Police Oversight Agency shall track allegations regarding misconduct involving individuals who are known to be homeless or have a mental illness, even if the complainant does not specifically label the misconduct as such.

**Paragraph 175 remains in Operational Compliance.**

**IMR-12 Recommendations:** There were no Recommendations for Paragraph 175.

**176.** Within six months of the Operational Date, the Internal Affairs Division, in coordination with the Civilian Police Oversight Agency, shall develop and implement a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, the Internal Affairs Division shall promptly assign a unique identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant.

**Paragraph 176 remains in Operational Compliance.**

**IMR-12 Recommendations:** There were no Recommendations for Paragraph 176.

**177.** The Internal Affairs Division's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.

**Paragraph 177 remains in Operational Compliance.**

**IMR-12 Recommendations:** There were no Recommendations for Paragraph 177.

**178.** Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Division. All information should be referred to the Internal Affairs Division by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances.

**Paragraph 178 remains in Operational Compliance.**

**IMR-12 Recommendations:** There were no Recommendations for Paragraph 178.

**179.** Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Division shall refer the complaint to the Civilian Police Oversight Agency.

**Paragraph 179 remains in Operational Compliance.**

**IMR-12 Recommendations:** There were no Recommendations for Paragraph 179.

**APD Response to Paragraphs 164 -179:** All City locations have civilian complaint forms and instructions in both Spanish and English. APD officers are also required to have available complaint forms and APD SOP 3-41 Complaints Involving Department Policy or Personnel dictates that a supervisor will be notified of any complaints. Additionally, anonymous, out of date, and third party complaints are all accepted by CPOA and APD and are forwarded to Internal Affairs Professional Standards Division within 24 hours of receiving a violation. Employees are being held accountable when violations are not identified. Civilian complaints are referred to the Civilian Police Oversight Agency for investigation. The CPOA tracks demographics of the individual submitting the complaint. All cases are assigned a unique identifying number from the initial complaint to the investigation file. The City website has detailed information on how to file a complaint. Further information can be found here: https://www.cabq.gov/@@csesearch?q=file+a+report.

**180.** Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Division for review and classification. The Internal Affairs Division shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Division for investigation. In consultation with the Chief, the commanding officer of the Internal Affairs Division shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Division, the Multi-Agency Task Force, and/or referred to the appropriate federal law enforcement agency.

**Paragraph 180 remains in Operational Compliance.**

**IMR-12 Recommendations:**  There were no Recommendations for Paragraph 180.

**181.**  APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Division in determining where an internal complaint should be assigned.
**Paragraph 181 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraph 181.

**182.**  An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct.
**Paragraph 182 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraph 182.

## D. Investigation of Complaints

**183.**  APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident, or involved in any significant event before or after the original incident, shall provide a written statement regarding their observations, even to state that they did not observe anything.
**Paragraph 183 remains in Secondary Compliance.**
**IMR – 12 Recommendations**:
**4.7.169a:**  The practice of utilizing ACMs for CASA-related issues was prohibited by Special Order in April of 2019; however, this prohibition must be supported by assiduously careful internal processes to ensure that the prohibition is followed by supervisors and command personnel, and that those who do not adhere to these requirements are noted, and corrective action is taken.
**4.7.169b:**  The City should appoint a review and approval authority for all external APD IA investigations that are conducted by an independent investigator. The appropriateness of selection of this external authority should be documented in writing.
**4.7.169c:**  In investigations where the complainant or logical witnesses are not interviewed, or in matters that are administratively closed, the investigation should include a clear explanation of why the interviews were not conducted and or why further investigation steps were not warranted.
**APD Response**:  See below at Paragraph 194.

**184.**  APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing.  APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation.  Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct.
**Paragraph 184 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 184.

**185.**  APD shall require personnel to cooperate with Internal Affairs Division and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control.  Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances.
**Paragraph 185 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 185.

**186.**  APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment.  When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement.
**Paragraph 186 remains in Operational Compliance.**

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 186.

**187.**   Advisements by the Internal Affairs Division or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee.
**Paragraph 187 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 187.

**188.**   If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the Internal Affairs Division commanding officer.  If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Division.  The Internal Affairs Division commanding officer shall immediately notify the Chief.  The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation.  Where an allegation is investigated criminally, the Internal Affairs Division shall continue with the administrative investigation of the allegation.  Consistent with Paragraph 186, the Internal Affairs Division may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Division deems such interviews appropriate.
**Paragraph 188 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 188.

**189.**   Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including use of force reports and incident reports.  APD shall make clear that all statements by personnel in incident reports, arrest reports, use of force reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements. Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief.
**Paragraph 189 remains in Operational Compliance.**
**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 189.

**190.**  In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence.  There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into account any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation. APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements.
**Paragraph 190 remains in Secondary Compliance.**
**IMR- 12 Recommendations**:
**4.7.176 a:** For investigations found to be deficient follow up on any deficiencies noted by this IMR, and analyze, discuss, and use teaching points and policies to further refine investigative quality.
**APD Response**:  Findings are based on all evidence and interviews.  No preference is given to one interview over another.

**191.**  All administrative investigations conducted by the Internal Affairs Division or the Civilian Police Oversight Agency shall be completed within 90 days of the initiation of the complaint investigation.  The 90-day period shall not include time for review.  An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief.  Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation.  To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations of the officer, and extended absences.
**Paragraph 191 remains in Secondary Compliance.**
**IMR- 12 Recommendations**:
**4.7.177a:** APD and CPOA should refocus their efforts related to this paragraph by conducting a quantitative analysis of the reasons that cause any case to be delayed past 90 days.

**4.7.177b**:  Once causes for these delays are identified, develop recommendations for changes to policy, staffing, procedure or practice that are designed to eliminate such delays.

**4.7.177c**:  All investigations should include a clear timeline that delineates date of incident, date of receipt of complaint, date of assignment, date of extension if applicable, date investigation is completed, dates review period begins and ends, and date of notice of intent to discipline if applicable.

**4.7.177d**:  In regard to matters initiated by internal complaints, investigations should include a clear timeline that delineates when the APD employee who made the referral to IAPS first became aware of the alleged misconduct, and when all employees in the chain of referral became aware of the misconduct, so that the time or receipt of information of potential misconduct to referral to IAPS can be accurately gauged.

**APD Response**:  See below at Paragraph 194.

**192.**  The APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation: a) "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer; b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;  c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training; e) "Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or f) "Administratively closed," where the policy violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint.

**Paragraph 192 remains in Secondary Compliance.**

**IMR- 12 Recommendations**:

**4.7.178**:  Although the monitoring team has approved the closing of an investigation and the use of an "unfounded' finding in lieu of "administrative closure' where a preliminary investigation shows by clear and convincing evidence that the conduct which is the subject of the complaint did not occur, and shows no indication of any other violation (misconduct not based on the original complaint), we caution APD and CPOA not to utilize this disposition for expediency sake where the complaint, in conjunction with the underlying facts, calls for a fuller investigation with findings that resolve the issue of whether the allegations were sustained or not sustained.

**APD Response**:  See below at Paragraph 194.

**193.**  Administratively closed complaints may be re-opened if additional information becomes available.  The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened.

**Paragraph 193 remains in Operational Compliance.**

**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 193.

**194.**  In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether: (a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures.  This information shall be shared with the relevant commander(s).

**Paragraph 194 remains in Operational Compliance.**

**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 194.

**APD response to Paragraphs 180-194**:  The Department ensures that all complaints concerning employee misconduct, policies, procedures, and tactics are thoroughly investigated, and will accept and fairly, impartially, and openly investigate all complaints of employee conduct to determine the validity of allegations and to impose any disciplinary actions that may be justified in a timely and consistent manner.  All internal complaints are screened and assigned by IAPS for investigation determined by a screening and intake process.  Current screening process assigns cases based on the potential discipline based on the allegation.  IAPS actively tracks all internal affairs investigations to ensure cases are completed within established timelines.  Specific metrics regarding the investigation process are documented to promptly alert APD command staff of impending deadlines.  IAPS provides a weekly update on active internal affairs investigation timelines to executive staff, DOJ and the IMT.

Per APD SOP 2-56 Use of Force—Reporting by Department Personnel does not allow for a supervisor that used force or ordered force to complete the investigation.  IAPS interviews all complainants and witnesses.  If there is not an interview conducted, a reason as to why is documented.  All evidence is documented, including physical and testimonial evidence.  Target letters are set to the affected employee and their chain of command

notifying them of the allegation and subsequent investigation. Failure for an employee to cooperate can and will lead to discipline.  Administrative and criminal investigations are conducted separate but concurrent.  Fifth amendment rights are only given when there are known criminal charges. Current policy transfers any complaint that may have criminal charges from CPOA to IAPS.  Use of force investigations are not considered compelled statements, and reports are required by all officers.  All case findings are based on all of the evidence and interviews.  Case timelines are checked weekly and a report is generated, which is submitted within IAPS as well as the DOJ/IMT for their review.  The use of administratively closed cases is currently under review in policy and would be more restrictive than what the CASA allows.

IAPS continues to improve the quality and timeliness of investigations involving department personnel through increased oversight and accountability.  During this reporting period, IAPS established a more cohesive relationship with DOJ and meets biweekly to provide status updates on internal affairs investigations.  The increased communication with DOJ demonstrates APD's willingness to be transparent and accept feedback to strengthen the internal affairs process.

## E. Preventing Retaliation

**195.**  The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.
**Paragraph 195 remains in Operational Compliance.**
**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 195.

**196.**  Within six months of the Operational Date, and annually thereafter, the Internal Affairs Division and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation.  This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation.  Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct.
**Paragraph 196 remains in Operational Compliance.**
**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 196.

**197.**  Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds for discipline, up to and including termination of employment.
**Paragraph 197 remains in Operational Compliance.**
**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 197.

**APD response to Paragraphs 195-197:**  As per SOP 3-41 Complaints Involving Department Policy or Personnel, APD will ensure that all complaints concerning employee misconduct, policies, procedures, and tactics are thoroughly investigated.  The Department will accept and fairly, impartially, and openly investigate all complaints of employee conduct to determine the validity of allegations and to impose any disciplinary actions that may be justified in a timely and consistent manner.  Discipline can include termination.

## F. Staffing and Training Requirements

**198.**  The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement.  The City shall re-assess the staffing of the Internal Affairs Division after the completion of the staffing study to be conducted pursuant to Paragraph 204.  The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations.
**Paragraph 198 remains in Operational Compliance.**
**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 198.

**199.**  All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Division, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations.
**Paragraph 199 remains in Secondary Compliance.**
**IMR-12 Recommendations**: See below at Paragraph 200.

**200.** Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year. The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations. G. Discipline Process and Transparency.

**Paragraph 200 is in Secondary Compliance.**

**IMR-12 Recommendations for Paragraph 199 and 200**:

**4.7.185-186a**: Identify the cadre of area command sergeants who may be assigned misconduct investigations and develop an annual IA training program for them and have them complete same on an annual basis.

**4.7.185-186b**: Do not assign a misconduct investigation to any APD personnel who have not met the annual training requirement.

**4.7.185-186c**: CPOA should develop an assessment mechanism to measure the effectiveness of outside training such as the NACOLE conference. That can easily be done through "testing" by CPOA once the CPOA investigators have completed the NACOLE training.

**4.7.185-186d**: Investigations involving allegations that are CASA related should remain with IAPS and not be transferred to Area Command personnel.

**APD and CPOA Response to Paragraphs 199-200:**  An 8-hour annual training curriculum has been developed and is with the Training Academy's Comprehensive Training Unit (CTU) for review and approval.  All APD supervisors will receive the 8-hour annual IA training anticipated to be delivered in 2021.

The CPOA and CPOA Board members that attended the National Association for Civilian Oversight of Law Enforcement (NACOLE) Annual Conference via webinar were given a written assignment to complete to meet the testing requirement. Those completed assignments were forwarded to the Monitor.

**201.** APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently.

**Paragraph 201 remains in Secondary Compliance.**

**IMR – 12 Recommendations**:

**4.7.187a:** Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless written reasons for departure from the matrix recommendations accompany the decision.

**4.7.187b:** Ensure that adequate explanation is given for the selection of a classification level where there is more than one level of classification associated with a regulation for which a sustained finding is made.

**4.7.187c:** APD should designate the Commander of IAPS or a Deputy Chief as the only person in the organization who has the authority to determine that discipline cannot be imposed due to time violations, and that designation should not be made without the approval of the City Attorney.

**4.7.187d:** All investigations involving sustained charges where discipline cannot be imposed due to violations of time constraints should be reported quarterly to the Chief, the City Attorney, DOJ, and the monitor.

**4.7.187e:** APD should adopt the practice of having a representative of IAPS or an administrative prosecutor attend PDHs and represent the findings and recommendations set forth in the investigation.

**4.7.187f:** Ensure uniformity in the amount and format of summarizing information presented to the Chief with investigations, and thus CPOA should follow the IAPS practice and adopt the use of Disciplinary Action Packets to accompany its investigations in which charges are sustained.

**4.7.187g:** Ensure that all PDHs are recorded and preserved as part of the investigative file.

**APD Response:**  APD regularly applies the presumptive range of discipline and utilizes the current discipline matrix for all recommendations from IAPS consistent with the range classification of sanctions.  The IAPS Commander is the representative in PDH's along with the Chief of Police to ensure correct evidence is presented.  IAPS uses the Disciplinary Action Packet consistently to promote fair and consistent application of discipline.

**202.** APD shall establish a disciplinary matrix that: a) establishes a presumptive range of discipline for each type of rule violation; b) increases the presumptive discipline based on an officer's prior violations of the same or other rules; c) sets out defined mitigating or aggravating factors; d) requires that any departure from the presumptive range of discipline must be justified in writing; e) provides that APD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and f) provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.

**Paragraph 202 remains in Secondary Compliance.**

IMR 12 – Recommendations:

**4.7.188a**: Ensure that all disciplinary decisions either conform to the recommended ranges included in APD's disciplinary matrix or that they are accompanied by written explanations for the departure from the recommendations of the disciplinary matrix.

**4.7.188b**: Ensure that all disciplinary decisions related to actions (or inactions) that are reasonably on the "critical path" regarding compliance with the CASA reflect a resolve to foster behaviors required by the CASA.

**4.7.188c**: Ensure that all disciplinary packets are complete and self-explanatory, including documentation that all steps in the investigation and disciplinary processes were completed as required by policy.

**4.7188d**: Ensure a more exact calculation of prior offenses for purposes of calculating the presumptive range of the disciplinary matrix.

**4.7188e**: Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix, unless cogent, written reasons for departure from the matrix recommendations accompany the decision.

**4.7188f**: A revised AO 3-46 must be adopted on a priority basis and must reflect the tenets of the CASA and principles of fair and consistent discipline, and clearly set forth the information necessary to calculate a prior offense and the appropriate range of the disciplinary matrix in accordance with the principles of progressive discipline.

**4.7188g**: Ensure that a revised AO 3-46 addresses when a suspension can be held in abeyance and the criteria for doing so, and that a cogent explanation consistent with the tenets of progressive discipline be given whenever a suspension is held in abeyance.

**4.7188h**: Insert an additional column in the disciplinary decision matrix that identifies whether the range of discipline is enhanced by prior offenses.

**APD Response:**  APD intends to simplify the progressive discipline system while reflecting the tenets of the CASA and principles of fair and consistent discipline.  A new matrix and use of progressive discipline has been proposed in SOP 3-46 Discipline System which is in the policy development process.  APD received technical assistance from the IMT to improve the discipline process.

## Section 6:  Staffing, Management, and Supervision (Paragraphs 203 –208)

**203.** To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement the terms of this Agreement.  APD shall also deploy a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally.  APD shall revise and implement policies for supervision that set out clear requirements for supervision and comport with best practices.

**Paragraph 203 remains in Secondary Compliance.**

**IMR – 12 Recommendation for Paragraph 203:**

**4.7.189-4.7.190a:** Generate reliable factor-based processes for identifying the workloads created by APD community policing practices, and base future manpower analyses and staffing requests on these data elements.

**APD Response to Recommendation for Paragraph 203:**  APD remains focused on resource allocation throughout the department.  Prior to each annual bid cycle, APD assesses staffing for each area command considering calls for service volume and current staffing levels.

### A. Staffing

**204.**  In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission.  APD therefore shall conduct a comprehensive staffing assessment and resource study.  The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques.  The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands.  This staffing assessment and resource study shall be completed within one year of the Operational Date.  Within six months of the completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement.

**Paragraph 204 remains in Operational Compliance.**

**IMR-12 Recommendations**:  There were no Recommendations for Paragraph 204.

### B. Duties of Supervisors

**205.** First-line supervisors shall investigate officers' use of force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy.

**Paragraph 205 moved into Primary Compliance.**

**IMR – 12 Recommendations:**  See below at Paragraph 208.

**206.**  All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command.  First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary command.  Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department.
**Paragraph 206 moved into Primary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 208.

**207.**  First-line supervisors shall ordinarily be assigned as primary supervisor to no more than eight officers.  Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary.
**Paragraph 207 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraphs 207.
**APD Response:**  The Performance Metrics Unit has conducted span of control audits since September 2019. The monthly audits are conducted in real-time and the auditors randomly select a day and time to audit. The CAD system is utilized to determine how many primary supervisors are overseeing a team of officers taking calls for service at any given time. For investigative and specialized units who run operations during various times, auditors may audit historical CAD data to determine span of control during a special operation. During this reporting period, PMU conducted 107 audits related to Paragraph 207 and evaluated 525 officers to determine the primary supervisor and ensure they did not have more than eight officers under their supervision. There were no instances of a primary supervisor with more than 8 officers.

**208.**  APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command.  APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement.
**Paragraph 208 moved into Primary Compliance.**
**IMR – 12 Recommendations for Paragraph 205, 206 and 208:**
**4.7.191-4.7.194a:** Now that training has been completed, APD must move its focus to the next (and much more difficult task) of ensuring applicable policies and training are actually implemented in the field. Based on our past experience with APD's supervisory cadre, this will be a complex task requiring focused daily oversight, assessment, follow-up, and correction.
**4.7.191-194b:** Unless rigorous field-wide inspections and audit processes are implemented, we foresee a potentially significant amount of slippage at command levels regarding adherence to existing policy and training. APD should anticipate this potential as well and should plan and implement meaningful assessment and internal monitoring practices related to the business practices outlined in these paragraphs.
**4.7.191-4.7.194c:** We note this is the second consecutive report in which we have articulated these recommendations, and we have yet to see any attempt to implement the recommendations (or alternate procedures) designed to work toward compliance for these three paragraphs.

**APD Response to Paragraph 205, 206 and 208:**
In an effort to improve field-wide inspections and audit processes, APD's COD worked with the City's Department of Technology and Innovation, Enterprise Resource Planning (ERP) team to implement a more user-friendly and automated line inspection process.  APD historically used the SharePoint site for monthly line inspections.  The SharePoint site requires manual entry of all fields which can be time-consuming and increases the likelihood of data entry errors.  The new line inspection form will auto populate data from source systems such as PeopleSoft HR for name, employee ID, and job title, Enterprise Learning Management for weapon qualification data, City Operator Permit and intoxilyzer certification data, Company Property for assigned weapons and Fleet Focus for assigned vehicle information.  While this may seem like a simple solution, the development process was lengthy to ensure the data reported met the requirements of paragraphs 205, 206, and 208.  APD piloted the PeopleSoft Line Inspection Form from November 1, 2020 through January 31, 2021, in the Foothills Area Command, Traffic Division and Auto Theft Unit.  Feedback was provided and ERP assisted with updates to the form.  The line inspection platform in PeopleSoft is scheduled to go-live Department-wide on February 1, 2021.

In June 2020, APD published Special Order 20-49 Approval of Adult Criminal Complaints/Juvenile Statements of Probable Cause requiring all criminal complaints and juvenile statement of probable cause to be approved in the TraCS program.  TraCS is a software program used statewide to collect public safety data.  The purpose of the updated procedure is to provide an electronic approval of criminal complaints to improve supervisor oversight and accountability.  During this reporting period, the COD Lieutenant developed an audit process to ensure compliance with Special Order 20-49 which will be incorporated in to SOP 2-80 Arrests, Arrest Warrants and Booking Procedures.  The audit process was tested over a two-month period and modified to ensure reliability of the data.  See Appendix B for a graphical representation of the

identification of unapproved criminal complaints during the reporting period and the reduction in potential violations over time as a result of education of field supervisors.

APD's COD Lieutenant audits criminal complaint and juvenile statements of probable cause and submits Internal Affairs Requests on supervisors failing to follow policy requirements.  The monthly audits serve as the oversight process to ensure close and effective supervision of officers.   The Area Commanders have maintained communication with the Compliance and Oversight Division to improve their understanding of the monthly inspections. This demonstrates the effort made by commanders and watch commanders to contribute to the overall success of this process by taking a more hands on approach to supervision to yield a better result.

To ensure use of force reviews are consistently factored into supervisor's performance evaluations, an audit process has been initiated.  Significant progress has been made during the reporting period.  Based on available data, the process will verify employee performance documents are reviewed by commanders to confirm any violations related to SOP 2-57 Use of Force – Review and Investigation by Department Personnel, are documented within the evaluation.  The audit process will include a determination as to whether a policy violation was documented within the evaluation, and if not, that an internal affairs request was submitted and that the supervisor identified how the policy violation was addressed. A pre-determined percentage of documents will be audited each month and the parameters for repeat violations and progressive discipline will be included in the overall process.

The new community engagement application, currently in a test phase with PRT, is intended to increase oversight and accountability of officers' efforts to address community concerns.  Supervisors will be able to view reports relating to officers' participation in community events and activities and ensure concerns are resolved.  The application will also serve as a communication tool to demonstrate APD's commitment to increasing public trust and safety through community engagement initiatives.

The mandatory 20-hour Supervision training included the new line inspections as well as the CASA requirement for first-line supervisors to be responsible for closely and consistently supervising all officers under their primary command. The process for the review of two OBRD videos per officer, per month is included in this training.  All supervisors and acting sergeants were required to attend the training.

Beginning January 1, 2021, a pilot phase for the Lieutenant Weapon Inspection process was initiated in the Valley Area Command and the Special Operations Division.  The Lieutenant Weapon Inspection serves as a second level review verifying the randomly selected officer's department issued weapons match his/her property card and the officer is carrying department authorized ammunition.   The pilot phase will continue through March 31, 2021 with an anticipated go live date of April 1, 2021 for all lieutenants.  The first level review of weapons and ammunition will continue to be conducted by a sergeant in accordance with Standard Operating Procedure 3-30 Line Inspection Process.

The results for the month of January 2021 are as follows:

> Valley Area Command
> Four lieutenants inspected a total of 8 officers = 100% compliance of both weapons inspected and authorized ammunition.

> Special Operations Division
> One lieutenant verified a total of two officers = 100% compliant of both weapons inspected and authorized ammunition.

## C. Supervisor Training

**209.** Sergeant training is critical to effective first-line supervision.  Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities.
**Paragraph 209 remains in Secondary Compliance.**
**IMR-12 Recommendations:**  See below at Paragraph 211.

**210.** APD's sergeant training program shall include the following topics: a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices; b) de-escalating conflict; c) evaluating written reports, including those that contain canned language; d) categorizing and reviewing officer uses of force; e) understanding supervisory tools such as the Early Intervention System and onbody recording systems; f) responding to and investigating allegations of officer misconduct;  g) evaluating officer performance; h) consistent disciplinary sanction

and non-punitive corrective action; i) monitoring use of force to ensure consistency with policies; j) building community partnerships and guiding officers on this requirement; and k) legal updates.

**Paragraph 210 remains in Secondary Compliance.**

**IMR-12 Recommendation for Paragraph 209 – 211:**

**4.7.195-4.7.197a**:  Ensure provision of adequate, focused, and CASA-congruent training related to the requirements of paragraphs 209-211.

**211.** All sworn supervisors shall also receive a minimum of 32 hours of in-service management training, which may include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement.

**Paragraph 211 remains in Primary Compliance.**

**IMR – 12 Recommendation:**

**4.7.197a:** Ensure that training and supervisory processes are, at a minimum, compliant with the basic requirements of the CASA by using internal checkpoints reflective of CASA requirements that must be used by those at APD's Training Academy responsible for training development and assessment.

**APD Response:** The Training Academy is in the process of converting the 2020 supervisor training to a digital format. The training meets the requirements of the CASA and addresses areas on which current supervisors have asked to receive additional training.

**APD Response to Recommendations for Paragraphs 209 - 211:**  The Training Academy updated the 80-hour new supervisor training in 2019, and planned to deliver the most critical updates to all supervisors in early 2020, but were unable due to COVID restrictions.  Adjustments were made to adapt to the restrictions throughout the year, as a result, the Training Academy was able to deliver over twenty hours of the training to all supervisors at the end of 2020.  The Training Academy staff has identified ways to improve course material to allow for multiple delivery methods, in the event that courses are negatively impacted by pandemics or other unforeseen emergencies.

**212.**  Within nine months of the Operational Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers. APD supervisors shall be trained to proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being.

**Paragraph 212 remains in Primary Compliance.**

**IMR – 12 Recommendations:**  See below at Paragraph 219.

**D. Early Intervention System**

**213.**  APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties.

**Paragraph 213 remains in Primary Compliance.**

**IMR – 12 Recommendations:**  See below at Paragraph 219

**214.** APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review.

**Paragraph 214 remains in Primary Compliance.**

**IMR – 12 Recommendations:**  See below at Paragraph 219.

**215.**  The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum: a) uses of force; b) injuries and deaths to persons in custody; c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy; d) all civilian or administrative complaints and their dispositions; e) all judicial proceedings where an officer is the subject of a protective or restraining order; f) all vehicle pursuits and traffic collisions involving APD equipment; g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system; h) all disciplinary action taken against employees; i) all non-punitive corrective action required of employees; j) all awards and commendations received by employees, including those received from civilians, as well as special acts performed by employees; k) demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;  l) all criminal proceedings initiated

against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and m) all offense reports in which an officer is a suspect or offender.
**Paragraph 215 remains in Primary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 219.

**216.**  APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it.  The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information.  The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command.
**Paragraph 216 remains in Primary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 219.

**217.**  APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law.  Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System.  On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner.
**Paragraph 217 remains in Primary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 219.

**218.**  APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system.  APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command.  Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior.
**Paragraph 218 remains in Primary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 219.

**219.** Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate.  The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement.
**Paragraph 219 remains in Primary Compliance.**
**IMR – 12 Recommendations for Paragraphs 212-219:**
**4.7.198-205a:**  Complete and submit for approval the curriculum for PEMS training for supervisors and ensure that the new PEMS system addresses all required components of paragraph 215 and the additional requirements of Paragraph 23 (Firearm discharges), Paragraph 38 (ECW data) and Paragraph 105 (Tactical Unit data).
**4.7.198-205b:** Document and demonstrate that the proposed "Pareto Principle" or 80/20 principle as a statistical tool that works effectively and can be used to demonstrate both acceptable and unacceptable behavior from officers as required by the CASA.
**4.7.198-205c:**  Document learning assessment processes for the training provided for supervisors.
**4.7.198-205d:** Design and document audit protocols for supervisory review and reporting of PEMS processes.

**APD Response for Paragraphs 212-219:**
The name of APD's new early intervention system is Performance Evaluation and Management System.  The Pareto Principle was approved by the IMT on February 11, 2021 as the statistical application that will be used to measure both acceptable and unacceptable behaviors from officers as defined in the CASA.  With that approval, a lesson plan for supervisors will be written by the subject matter experts and submitted for review by the Training Academy's Curriculum Training Unit by the end of March 2021.  The learning assessment documentation will be a part of that lesson plan.  Supervisors will complete a group scenario (PASS/FAIL exam) and a written test through a cloud based on-line software that stores and distributes content online (PowerDMS) upon completion of the course.  APD will conduct this training once the training curriculum has been submitted and approved by the Parties.  Once the training plan is approved, audit protocols will be developed in coordination with the Performance Management Unit staff.  APD is working with the auditing team to develop a scorecard for the PEMS unit to audit the documenting of this process.

A PEMS review board SOP is in development.  The review board will be executive level staff that will evaluate the assessments and monitoring plans to ensure consistency throughout the department.

## E. On-Body Recording Systems for Documenting Police Activities

**220.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems.  Within six months of the Operational Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require: a) specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;  b) officers to ensure that their on-body recording systems are working properly during police action; c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning;  d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible; e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;  f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits; g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and h) APD to retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved.
**Paragraph 220 remains in Secondary Compliance.**
**IMR – 12 Recommendations:**
**4.7.206a:**  Prepare, quarterly, a written assessment of the results of the inspections and audit outcomes, identifying the top five areas of non-compliance with the requirements of OBRD field processes.
**4.7.206b:**  Based on the quarterly audits, identify the top three reasons for non-compliance with OBRD policies and procedures, and develop specific, targeted responses to address and remediate each of the top three non-compliance areas.
**4.7.206c:**  Repeat steps a and b until field OBRD error rates are below five percent.
**APD Response:**  See below at Paragraph 231.

**221.**  APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and implementation.  Upon approval by the Monitor and DOJ, policies shall be implemented within two months.
**Paragraph 221 remains in Secondary Compliance.**
**IMR – 12 Recommendations:**
**4.7.207a:** Develop, implement, and assess supervisory protocols to ensure violations of applicable policy are identified by supervisors and are addressed and remediated, many of which have already been recommended to APD by the monitoring team.
**4.7.207b:** Publish quarterly "OBRD Failure" reports identifying the top five reasons for OBRD failure in the field, and identifying the Area Command, shift, and supervisors associated with those failures.
**4.7.207c:**  Discipline supervisors with repeated failures in noting, assessing, and correcting officers with repeated OBRD operations failures.
**4.7.207d:**  Repeat until error rates on OBRD operation fall below five percent.
**APD Response:**  See below at Paragraph 231.

**222.** The Parties recognize that training regarding on-body recording systems is necessary and critical.  APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff.  APD will develop a training curriculum, with input from the Monitor and DOJ, that relies on national guidelines, standards, and best practices.
**Paragraph 222 remains in Secondary Compliance.**
**IMR – 12 Recommendations:**
**4.7.208a:**  Reinforce the established clear, concise, and reasonable requirements for supervisory review of in-field activations of OBRDs, requiring field supervisors to review OBRD activations and recordings for compliance to established policy.
**4.7.208b:**  Ensure global retraining of supervisory and command personnel regarding these requirements.
**4.7.208b:** Increase internal oversight related to OBRD usage and supervision and ensure that OBRD supervisory oversight is of sufficient scale and scrutiny to identify problematic issues related to OBRD usage.
**4.7.208b:**  Establish a routinized process for command oversight of the OBRD review process, requiring lieutenants to assess, in a methodical way, the OBRD review processes of sergeants under their command, and commanders to assess the OBRD review performance of lieutenants under their command, to ensure compliance with reasonable assessments of actions in the field.

**4.7.208c**: Establish a routine administrative review, via Compliance Bureau Personnel, of Area Command OBRD review efficiency, including performance metrics such as overall review rates, error rates, and remediation protocols.  This review process should be on-going and assigned to the Performance Metrics Unit.
**APD Response:**  See below at Paragraph 231.

**223.**  APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order. Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor.
**Paragraph 223 remains in Secondary Compliance.**
**IMR – 12 Recommendations:**  See below at Paragraph 224.
**APD Response:**  See below at Paragraph 231.

**224.** Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed.  Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy.
**Paragraph 224 remains in Secondary Compliance.**
**IMR – 12 Recommendations for Paragraph 223 and 224:**
**4.7.209-210a:**  Ensure that supervisors who fail to note errors in OBRD operation are counseled, or for multiple offenders, retrained and/or disciplined for ineffective OBRD review processes. If, after counseling or retraining, supervisors continue to miss OBRD activation or usage violations, ensure appropriate discipline is imposed.
**4.7.209-210b:**  Identify the top 20 supervisors who have substandard performance on OBRD activation review and assess the reasons for failure to enforce established process. Place these supervisors "on notice" that their performance on this task will be routinely reviewed, and continued failures will result in discipline.
**4.7.209-210c:**  Follow up on these counseling sessions with discipline if necessary.
**APD Response:**  See below at Paragraph 231.

**225.**  At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed.
**Paragraph 225 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 225.
**APD Response:** The COD PMU scorecards reflect that supervisors are adhering to this policy and requirement.

**226.**  APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent.
**Paragraph 226 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 226.
**APD Response:**  APD continues to ensure that all policies comply with existing laws and regulations as per SOP 3-52 Policy Development Process. APD SOP 2-8 Use of On-Body Recording Devices was revised and published in September 2020 to reflect requirements of Senate Bill 8 which requires mandatory recordings for any law enforcement activity which involves contact with the public, and for any investigative encounters involving personnel and members of the public.  APD SOP 2-8 was also updated requiring all sworn personnel to wear department issued OBRDs while on duty.    A PowerDMS video was delivered in September 2020 to all sworn personnel providing an update to SOP 2-8 and a review of Senate Bill 8.

**227**.  APD shall ensure that on-body recording system videos are properly categorized and accessible.  On-body recording system videos shall be classified according to the kind of incident or event captured in the footage.
**Paragraph 227 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no Recommendations for Paragraph 227.
**APD Response:**  If a case number is assigned to a call, the OBRD recording is automatically categorized through Axon and Computer Aided Dispatch integration. Officers are ultimately responsible for proper categorization and required to verify that the recording was classified correctly.

**228.** Officers who wear on-body recording systems shall be required to articulate on camera or in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded.  Intentional or otherwise unjustified failure to activate an on-body recording system when required by APD policy shall subject the officer to discipline.
**Paragraph 228 remains in Secondary Compliance.**
**IMR – 12 Recommendations and APD Response:**  See below at Paragraph 231.


**229.** APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties.  On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room).
**Paragraph 229 remains in Secondary Compliance.**
**IMR – 12 Recommendations and APD Response:**  See below at Paragraph 231.


**230.** APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift.  All images and sounds recorded by on-body recording systems are the exclusive property of APD.
**Paragraph 230 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 230.
**APD Response:**  COD scorecards continue to assess compliance with OBRD's properly stored by the end of each officer's subsequent shift.


**231.** The Parties are committed to the effective use of on-body recording systems and to utilizing best practices.  APD currently deploys several different platforms for on-body recording systems that have a range of technological capabilities and cost considerations.  The City has engaged outside experts to conduct a study of its on-body recording system program.  Given these issues, within one year of the Operational Date, APD shall consult with community stakeholders, officers, the police officer's union, and community residents to gather input on APD's on-body recording system policy and to revise the policy, as necessary, to ensure it complies with applicable law, this Agreement, and best practices.
**Paragraph 231 remains in Primary Compliance.**
**IMR -12 Recommendations for Paragraph 228, 229 and 231:**
**4.7.217a**:  Conduct detailed failure analyses designed to identify the causes of incidents of "failure to record," and identify the true cause of these failures: equipment, training, supervision, or "other."
**4.7.217b:** Rank order the failure rates and develop action plans to eliminate the causes of failure, beginning with the most frequent and working to least frequent
**4.7.217c:** Identify a frequency-based list of supervisors who fail to enforce OBRD requirements, and schedule these supervisors for retraining, counseling, or discipline, as appropriate.


**APD Response for Paragraphs 220, 221, 222, 223, 224, 228, 229 and 231:**
The Performance Metrics Unit (PMU) continues to conduct audits in several CASA paragraphs, to include OBRD and supervision of OBRD.  Every new unit undergoes a pilot stage and during October and November 2020, the Gang Unit and Investigative Support Unit (ISU) were in their pilot stages for scorecards; therefore, learning the process and getting the units acclimated to scorecards.  The scorecards measure video uploads by the end of next shift, mandatory recording events, and supervisory responsibilities.  All Divisions audited during this reporting period include the six Area Commands, Metro Traffic, Criminal Enforcement, and Investigative Services. For each policy violation, an IAR is submitted to the IAPS Division.  APD added the FSB quarterly OBRD scorecards to see the data in quarters as recommended in IMR-12.  APD does not have five top areas of non-compliance.  There is one area where APD is not consistently over 95%, which is video uploaded prior to subsequent shift.  However, for uploading video audits for fifteen (15) divisions during this reporting period, APD is at or above 95% (see below).  For FSB, video uploads by the end of the next shift resulted in above 95% each month for the reporting period.


The APD Training Academy conducted training for supervisors and acting supervisors between October 21 and December 2, 2020.  During this training, supervisors received instruction on their responsibilities for supervision of the OBRD policy.   A job aide was published to assist with the completion of the new line inspection form which includes the review of two OBRD videos per month.  The existing improvements made to the line inspection form and the existing scorecards and IAR process provide increased oversight of OBRD usage.  A quarterly report of all internal administrative investigations is completed by IAPS.  While this may not be a product specific to OBRD violations, the data provided may be conducive to future analysis.

Since October 2019, PMU distributes draft inspection reports before finalizing the results. Area Commanders can refute a finding and provide a reason for the OBRD failure. Auditors review the rebuttal and determine if the supervisor provided enough evidence to overturn an inspection finding. PMU can pull this report at any time (monthly, quarterly, semi-annually) for management to review potential reasons for OBRD failures for specific area commands, teams, and officers. PMU provides a written response to each rebuttal documented on the Amended Inspections Report. This report lists which rebuttals were accepted and which rebuttals were denied and the reason for denial. There are varied reasons for non-compliance, but failure to upload by subsequent shift is still the most common violation. APD's monthly scorecards are a routine audit process and will continue indefinitely. OBRD compliance rates will continue to be assessed and corrective action will be taken as needed for failure to follow policy requirements.

During this reporting period, COD worked extensively with the City of Albuquerque's Department of Technology and Innovation, and the Enterprise Resource Planning team to develop a comprehensive line inspection form which integrates data from various source systems. This new form allows supervisors to review data which is auto-populated from the source of truth, thereby reducing data entry time, improving standardization and accuracy. The end result is a more thorough and complete monthly inspection with limited possibility for entry error. This of course includes the inspection of each officer's OBRD as well as two videos per officer, per month.

## Section 7: Recruitment, Selection and Promotions (Paragraphs 232 – 246)

**232.** To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts.
**Paragraph 232 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 232.
**APD Response:** The Training Academy will continue to attract qualified individuals from a variety of new and inventive recruiting events. The department has contracted "Boom Time" marketing, to create a widespread marketing strategy. Signal Vine, Instagram, Facebook, and Google Ads are continuing to be used to generate interest across those platforms. Online advertising continues to be the highest yielding recruiting tool for APD aside from APD officers making referrals. Current efforts to boost our online presence will serve to enhance these results. In addition, the Recruiting Unit attended officer briefings, and published "APD TV, Daily 49" videos to give updates to field officers so they have the most up to date information to relay to potential applicants. The Recruiting SOP is currently being reviewed and will go through the respective approval process for any suggested changes.

### A. Recruitment Plan

**233.** APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross section of the community. The recruitment plan shall establish and clearly identify the goals of APD's recruitment efforts and the duties of officers and staff implementing the plan. 234. APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.
**Paragraph 233 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 233.
**APD Response:** The 2021 Strategic Recruitment Plan and 2020 Annual Report were submitted in February 2021.

**234.** APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.
**Paragraph 234 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 234.
**APD Response:** The 2021 Strategic Recruitment Plan and 2020 Annual report were submitted to the monitoring team in February 2020. APD continues to use the recruitment measures laid out in the strategic plan and will analyze the results at year end.

**235.** APD's recruitment plan will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. APD shall create and maintain sustained relationships with community stakeholders to enhance recruitment efforts.
**Paragraph 235 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 235.

**APD Response:** The Recruiting Unit's commitment to support community involvement in the hiring process has continued in 2020 and into 2021. The unit attended 11 Community Policing Council Meetings. These councils consist of community stakeholders who offer suggestions on how to recruit in their communities. In general, community stakeholders are curious about current recruiting numbers. The Recruiting Unit provides updated information as requested and solicits feedback for recruitment efforts. One example, is during the August 20, 2020 CPC a community member expressed concern over recruiting from the military due to concerns of military members needing to be "de-militarized". The member was informed of our background and psychological screening process which can identify patterns of dangerous behavior. In addition to CPC's, the Recruiting Unit attended a "Downtown Public Safety" ECHO meeting where they presented to a diverse group of community stakeholders about recruiting.

## B. Hiring Practices

**236.** APD shall develop and implement an objective system for hiring and selecting recruits. The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws.

**Paragraph 236 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 236.

**APD Response:** APD will continue using the online automated application system. This is an automated system that qualifies based off minimum State of New Mexico Department of Public Safety and APD hiring standards.

**237.** APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and polygraph examination to determine their fitness for employment. APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers. The program shall continue to be designed to detect the use of banned or illegal substances, including steroids.

**Paragraph 237 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 237.

**APD Response:** APD will continue to require all candidates for sworn positions to undergo a psychological, medical and polygraph exam. This process has been followed for all classes seated this year.

**238.** APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws. APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities.

**Paragraph 238 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 238.

**APD Response:** In an ongoing effort to strengthen the process of screening applicants, APD has created an automated system for generating Chief's Selection reports which will transcribe all information available via the applicant's interest card automatically to a consolidated report on the apdonline administrative site. This will alleviate the need of recreating information already available as well as provide a uniform report amongst all background investigators. The system will have rules in place that require information be provided to ensure all avenues of a background are encompassed in the report. APD also automated the process for removal of applicants that do not meet the department's entrance standards. This will ensure all documents are archived electronically and provide for easier accessibility.

**239.** APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires. APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement

**Paragraph 239 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 239.

**APD Response:** APD will continue to complete thorough and objective backgrounds to include assessing laterals above mentioned categories. Additionally, APD continues to look for ways to streamline the process without compromising the integrity of the background.

**240.** APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants.

**Paragraph 240 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 240.

**APD Response**: APD completed the 2021 Strategic Recruitment Plan and 2020 Annual Report in January 2021. See Appendix C for the 2020 Annual Report and 2021 Strategic Recruitment Plan. Upon years end the 2021 Recruitment Plan will be evaluated, and APD will begin work on the 2022 Recruitment Plan based upon the analysis of that report.

## C. Promotions

**241.** APD shall develop and implement fair and consistent promotion practices that comport with best practices and federal anti-discrimination laws. APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant. APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions. These criteria should account for experience, protection of civil rights, discipline history, and previous performance evaluations.
**Paragraph 241 remains in Operational Compliance**.
**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 241.

**242.** APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties in core substantive areas.
**Paragraph 242 remains in Operational Compliance**.
**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 242.

**243.** Within six months of the Operational Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours
**Paragraph 243 remains in Operational Compliance**.
**IMR-12 Recommendations**: There were no Recommendations for Paragraphs 243.

**APD Response for Paragraphs 241-243:** APD continues to implement fair and consistent promotion practices, using multiple methods of evaluations for promotions based on objective criteria along with knowledge, skills, and abilities. APD continues to follow the promotion policy dated January 31, 2019. During this reporting period, three (3) lieutenants who passed the last lieutenant test were promoted. In addition, there is a sergeant test in process and will be completed during the next reporting period.

**244.** APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet performance goals. The evaluation system shall provide for appropriate corrective action, if such action is necessary.
**Paragraph 244 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were Recommendations for Paragraph 244.
**APD Response:** See below at Paragraph 246.

**245.** As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates.
**Paragraph 245 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for Paragraph 245.
**APD Response:** See below at Paragraph 246.

**246.** As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period.
**Paragraph 246 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no recommendations for Paragraph 246.

**APD Response for Paragraphs 244-246:**

Between August 1, 2020 and January 31, 2021, APD completed two evaluation cycle checkpoints. The annual review was due in mid-September. The total number of sworn personnel required to complete the checkpoint was 855 officers. From this number, 762 officers or 89.1% were documented as completing the checkpoint on time. All but one of the outstanding documents were completed to bring the compliance percentage to 99.88%. It is likely that the final performance evaluation checkpoint, which occurred after the bid, affected the compliance percentage. This is due to performance documents automatically assigned to the new supervisor at the bid preventing the prior supervisor from accessing the performance document to complete the final evaluation. In the future, APD staff will monitor the final performance evaluation due date and ensure the performance documents are properly assigned.

The next evaluation checkpoint was due January 2, 2021. For this checkpoint, there were 867 documents of which 858 were completed on time. The completion percentage for this checkpoint was 98.96%. After a thorough analysis on why outstanding evaluations were not completed, the appropriate corrective action for documents which were not completed were submitted for administrative investigation by internal affairs personnel. Additionally, APD is developing an audit process to ensure that use of force reviews are consistently factored into the supervisor's performance evaluations.

## Section 8:  Officers Assistance and Support (Paragraphs 247 – 253)

**247**.  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources. To achieve this outcome, APD agrees to implement the requirements below.
**Paragraph 247 remains in Operational Compliance**.
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 247.

**248.**  APD agrees to develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, including:  readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations.
**Paragraph 248 remains in Operational Compliance**.
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 248.

**249.**  APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma.
**Paragraph 249 remains in Operational Compliance**.
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 249.

**250.**  APD shall ensure that any mental health counseling services provided to APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care.
**Paragraph 250 remains in Operational Compliance**.
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 250.

**251.**  APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.
**Paragraph 251 remains in Operational Compliance**.
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 251.

**252.**  APD shall develop and implement policies that require and specify a mental health evaluation before allowing an officer back on full duty following a traumatic incident (e.g., officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death) or as directed by the Chief.
**Paragraph 252 remains in Operational Compliance**.
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 252.

**253.**  APD agrees to compile and distribute a list of internal and external available mental health services to all officers and employees. APD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers.
**Paragraph 253 remains in Operational Compliance**.

**IMR – 12 Recommendations:** There were no recommendations for Paragraph 253.

**APD Response for Paragraphs 247-253:** Officer assistance and support programs include online therapy and training, the SCION program, as well as programs for coordinated wellness, and mindfulness.  APD SOP 1-20 Behavioral Sciences Section was revised and published in November 2020. BSS is looking at updating how data is collected and have moved to an electronic records system. This system is HIPAA compliant.  Throughout the reporting period, members of the peer support team had the pleasure of addressing the newest cadet class, incoming telecommunicators, and acting supervisor classes.  Team members spoke to the recruits and new employees regarding peer support, stress management, and personal experiences at APD.  APD SOP 1-10 Peer Support was revised and published on December 17, 2020.  APD continues to work on a comprehensive officer wellness program.   The program is dedicated to promoting physical and mental wellness through exercise, proper nutrition, and mental health treatment and support.  This evolved as a collaboration between CABQ Health & Wellness, the Training Academy, Peer Support, Behavioral Sciences Section, Chaplain's Unit, and PEMS.  The Wellness Unit is drafting SOP 1-36 Officer Wellness Program.

## Section 9:  Community Engagement and Oversight (Paragraphs 254 – 293)

**254**. To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall promote the sustainability of reforms by supporting strong community participation and creating formal and informal mechanisms that facilitate ongoing and constructive communication between APD and the many communities that make up Albuquerque. APD shall take an active role in generating broad community support and mutual respect with the diverse communities it serves by adopting greater transparency, forming problem-solving and goal-oriented partnerships, and sharing responsibility for positive outcomes and continuous improvement through meaningful civilian oversight. To achieve these objectives, APD shall implement the provisions below.

### A.  Community & Problem-Oriented Policing (Paragraphs 255-259)

**255.** APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.
Paragraph 255 remains in Secondary Compliance.  IMR – 12 Recommendations:
**4.7.240a:** Develop a remediation plan in response to the semi-annual review including culture change survey findings and implement without delay. Share current plans and remediation strategies both internally and with community stakeholders.
**4.7.240b:** Provide training that meets national standards for School Resource Officer Unit.
**4.7.240 c:** Continue to work with USAO and other community partners to expand and reach significantly higher numbers high risk youth through various engagement programming.
**APD Response to Recommendations for Paragraph 255:**  APD published a culture survey in January 2021 to serve as a semi-annual review of culture change progress towards community oriented policing principles in various department operations such as management, policies, recruitment, training and personnel evaluations.  This culture survey had been developed for sworn personnel to initially address this paragraph. This survey has been distributed over three reporting periods and during the previous reporting period, the survey and results were assessed. It was determined the intent of paragraph 255 was to ensure APD integrates community and problem-solving policing into the listed components of the Department, which are currently being met. Rather, the survey specifically evaluates the officer's opinion on these components. While Department personnel's opinions are valuable, these are implemented in other areas of Department business processes.

The culture survey also varies from the number of personnel who answer each time the survey is submitted, how many questions they choose to answer, which personnel choose to take the survey each time and the reason for answering either yes or no, leaving this to interpretation. Given this, it was determined the culture survey data is not accurate, therefore not reliable and will no longer be used.  After breaking down each objective, it was determined the Department is integrating community and problem-solving policing principals.

APD sent five School Resource Officers (SRO) to the National Association for School Resource Officers (NASRO) training in January 2021.  The NASRO training meets the highest industry standards according to the International Association of Directors of Law Enforcement Standards and Training (IADLEST) National Certification Program (NCP).   The remaining SROs will attend NASRO training in the next reporting period depending on course availability.

APD continues to further its work with community partners to reach higher numbers of high-risk youth.   The Department has implemented a Rapid Accountability Diversion (RAD) Program with a goal of investing in individuals age 20 and under to reduce recidivism and promote positive

behavior change.  Special Order 20-78 outlining the RAD referral process for officers' was published in PowerDMS on December 28, 2020.  To date, nine individuals have completed the RAD program.

The Violence Intervention Program (VIP) implemented a Custom Notification (CN) Program to work with individuals involved in gun related crime and help with resources to reduce gun violence.  The VIP is currently sending CN to youth who are involved in criminal activity to explain the risks and penalties of gun related crimes.  On December 9, 2020, APD lieutenants, commanders, Gun Violence Reduction Unit and VIP manager completed a virtual training on CN by the National Network for Safe Communities (NNSC).

**256.** As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing.
**Paragraph 256 remains in Secondary Compliance.**
**IMR – 12 Recommendations:**
**4.7.241a:** Continue to make new staffing allocation and deployment plan a priority, and take the necessary steps to gain important input and support from settlement partners and community stakeholders including CPCs;
**4.7.241b:** Ensure the staffing plan has clearly articulated and defined goals, objectives and outcome measures, and consider a partnership with a local university criminal justice department to assist in developing more specific performance metrics.
**4.7.241 b:** Ensure that PRT activity is expanded as needed, fielding adequate numbers of specifically trained PRT officers who are guided by specific, tangible, and quantitative goals and objectives.
**APD Response:**   APD was unable to complete a staffing plan during this reporting period.  SOP 1-81 Proactive Response Team is in the policy development process.  Once the policy requirements, roles and responsibilities are finalized, a staffing analysis will be conducted to adequately align resources.

A new ten code (10-75-4) was created to track non-enforcement contacts with community members.  APD has developed a web-based application to track community engagement and outreach efforts.  The test phase of the application began in November 2020, with the Proactive Response Team, and reviews have determined the data collected is accurate.

**257.** APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality-of-life issues.
**Paragraph 257 remains in Secondary Compliance**.
**IMR – 12 Recommendations**:
**4.7.242a:** Conduct a thorough review of the above-outlined efforts, in consultation with the project leads.
**4.7.242b:** Utilize PERT or other related project management tools to establish realistic due dates for each major sub task required for implementation.
**4.7.242c:** Establish clearly defined and articulated, reasonable milestones for major project tasks and clearly identify who is responsible for these tasks.
**4.7.242d:**  Submit these documents to COD for review and revision.
**4.7.242e:** Hold personnel accountable for meeting timelines and quality-of-work requirements;
**4.7.242f:** Submit management/oversight reports on a quarterly basis until all elements of the project are completed;
**4.7.242g:**  Conduct long-term evaluations of program impacts.
**APD Response:**  The Department's field services bid process is not digitized, however, process maps were completed to ensure consistency with future processes.  To ensure officers are familiar with the geographic areas they service, digitized bid packets are completed.  Officers are required to complete a beat familiarity quiz to demonstrate their understanding of the area served and community policing practices.  Sworn personnel completed COP/POP training and a new POP process has been drafted and submitted to PPRB for approval.  An action plan was created to track the implementation of community engagement activities.  See  Community Engagement Action Plan in Appendix D.

**258.** Within 12 months of the Operational Date, APD agrees to provide 16 hours of initial structured training on community and problem-oriented policing methods and skills for all officers, including supervisors, commanders, and executives.  This training shall include:
   a)  methods and strategies to improve public safety and crime prevention through community engagement;
   b)  leadership, ethics, and interpersonal skills;
   c)  community engagement, including how to establish formal partnerships and actively engage community organizations, including youth, homeless, and mental health communities;

   d) problem-oriented policing tactics, including a review of the principles behind the problem solving framework developed under the "SARA Model" (Scanning, Analysis, Response, Assessment), which promotes a collaborative, systematic process to address issues of the community, safety, and quality of life;
   e) conflict resolution and verbal de-escalation of conflict; and
   f) f) cultural awareness and sensitivity training.   These topics shall also be included in APD's annual in-service training.

**Paragraph 258 remains in Secondary Compliance**.
**IMR – 12 Recommendations**:
**4.7.243a:** Ensure that supervisors are oriented with the COP training and new COP goals and objectives.
**APD Response:**  As of January 31, 2021, 98.83% of active sworn have completed the COP/POP training. The POP form has been updated and is scheduled to be presented to the PPRB for approval on February 17, 2021.   The updated POP form demonstrates the needs for the POP project based on issues specific to each area command.  The form applies the SARA model concept and tracks community resources and partnerships. Beginning March, 2021, all area commands will begin the new POP process**.**

**259.** Within six months of the Operational Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross-section of stakeholders.
**Paragraph 259 remains in Secondary Compliance**.
**IMR – 12 Recommendations**:
**4.7.244a:** Develop standard reporting protocols of TRaCS and partnership data and;
**4.7.244b:** Identify community service organizations and advocacy groups that serve and represent high risk populations, and better document those partnerships including background, referral arrangements, if any, resource sharing if any, decision-making, roles and responsibilities of parties.
**APD Response:** APD has developed a web-based application to track community engagement and outreach efforts.  The test phase began in November of 2020, with the PRT's, and reviews have determined the data collected is accurate.  The needs assessment, lesson plan and PowerPoint for this application were submitted to the CTU on February 1, 2021.  APD is also working with CIU to ensure outreach and partnerships that are already in place with individuals living with mental illness and developmental disabilities are being documented.

## B. Community Meetings & Public Information (Paragraphs 260-265)

**260.** APD shall develop a Community Outreach and Public Information program in each Area Command.
**Paragraph 260 remains in Secondary Compliance**.
**IMR – 12 Recommendations**:
**4.7.245a:**  Contact other departments using CPC-like processes and assess their work to develop action plans responsive to CPC public outreach and development plans. If necessary, coordinate with the City for guidance in plan development, including articulation of goals, objectives, timelines, measures, etc.
**4.7.245b:**  Further develop and document Area Command public information strategies and programing by developing planning template and aiding command areas in formulating customized approaches for each command area.
**APD Response:**  APD has revamped the area command websites during this reporting period.   The Community Policing Council meetings are posted on the Area Command Websites.  A representative from the Compliance Bureau attends one meeting per area command after the publication of each IMR, provides updates and answers questions from the community.  APD provided updates virtually to the CPC's due to public health restrictions for both IMR 11 and IMR 12.

**261.** The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command that is open to the public.  During the meetings, APD officers from the Area Command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings.
**Paragraph 261 remains in Secondary Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 261.

**262.** The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement.  The meetings shall also include public education on an individual's rights and responsibilities during a police encounter.

**Paragraph 262 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 262.
**APD Response:**  Meetings have continued virtually during the last reporting period.

**263.** For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area Command shall attend at least two community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned.
**Paragraph 263 remains in Operational Compliance**.
**IMR-12 Recommendations:**  There were no Recommendations for Paragraphs 263.
**APD Response:**  APD continues to ensure sworn personnel assigned to an Area Command attend two community meetings per year.  Personnel are assigned block captains and engage with them at a minimum of once per quarter.

**264.** APD shall continue to maintain and publicly disseminate accurate and updated crime statistics on a monthly basis.
**Paragraph 264 remains in Secondary Compliance**.
**IMR – 12 Recommendations**:
**4.7.249a**: Analyze the reasons for failing to process and reports in a manner that is sufficiently informative of current crime data and trends, as stipulated by the requirements of Paragraph 264, and ensure these numbers are easily accessible to the public, using personal computers and other methods commonly used by the public for such tasks, such as cell phones, etc.
**APD Response:**  The crime stats have been posted on the Area Command websites.  APD is working to make the websites more user friendly for the community, specifically as it relates to the crime statistics.

**265.** APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD's website, with reasonable exceptions for materials that are legally exempt or protected from disclosure.
**Paragraph 265 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 265.
**APD Response:**  APD continues to post audits and reports on the City website in accordance with the requirements of Paragraph 265.

## C.  Community Meetings & Public Information (Paragraphs 266-270)

**266**. The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level. The Community Policing Councils shall meet, at a minimum, every six months.
**Paragraph 266 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no recommendations for Paragraph 266.

**267**. In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross-section of community members and APD officers, including, for example, representatives of social services providers and diverse neighborhoods; leaders in faith, business, or academic communities; and youth. Members of the Community Policing Councils shall possess qualifications necessary to perform their duties, including successful completion of the Citizens Police Academy.
**Paragraph 267 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no recommendations for Paragraph 267.

**268**. The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, APD shall share appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure.
**Paragraph 268 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no recommendations for Paragraph 268.

**269**. APD shall seek the Community Policing Councils' assistance, counsel, recommendations, or participation in areas including:

a)  reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;

b)  reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;

c)  providing information to the community and conveying feedback from the community to APD;

d)  advising the Chief on recruiting a qualified, diverse workforce; and

e)  advising the Chief on ways to collect and publicly disseminate data and information, including information about APD's compliance with this Agreement, in a transparent and public-friendly format to the greatest extent allowable by law.

**Paragraph 269 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no recommendations for Paragraph 269.

**270.** The Community Policing Councils shall memorialize their recommendations in an annual public report that shall be posted on the City's website. The report shall include appropriate safeguards not to disclose information that is legally exempt or protected from disclosure.
**Paragraph 270 remains in Operational Compliance**.
**IMR-12 Recommendations**:  There were no recommendations for Paragraph 270.

### D.  Civilian Police Oversight Agency (CPOA) (Paragraphs 271-292)

**271.** The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD. The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force.
**Paragraph 271 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 271.

**272.** The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance.
**Paragraph 272 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 272.

**273.** The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque.
**Paragraph 273 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 273.

**274.** Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:

a)  this Agreement and the United States' Findings Letter of April 10, 2014;

b)  the City ordinance under which the agency is created;

c)  state and local laws regarding public meetings and the conduct of public officials;

d)  civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable

e)  uses of force;

f)  all APD policies related to use of force, including policies related to APD's internal review of force incidents; and f) training provided to APD officers on use of force.

**Paragraph 274 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 274.

**275.** The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement.
**Paragraph 275 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 275.

**276.** The City shall require those appointed to the agency to perform at least two ridealongs with APD officers every six months.
**Paragraph 276 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 276.


**277.** The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force.
**Paragraph 277 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 277.


**278.** The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws. The agency shall have the authority to hire staff and retain independent legal counsel as necessary.
**Paragraph 278 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 278.


**279.** The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review of serious uses of force and officer-involved shootings. The investigative staff shall be selected by and placed under the supervision of the Executive Director. The Executive Director will be selected by and work under the supervision of the agency. The City shall provide the agency with adequate funding to ensure that the agency's investigative staff is sufficient to investigate civilian complaints and review serious uses of force and officer-involved shootings in a timely manner.
**Paragraph 279 remains in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 279.


**280.** The Executive Director will receive all APD civilian complaints, reports of serious uses of force, and reports of officer-involved shootings. The Executive Director will review these materials and assign them for investigation or review to those on the investigative staff. The Executive Director will oversee, monitor, and review all such investigations or reviews and make findings for each.  All findings will be forwarded to the agency through reports that will be made available to the public on the agency's website.
**Paragraph 280 is in Operational Compliance.**
**IMR – 12 Recommendations:** There were no Recommendations for paragraph 280.


**281.** Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible.
**Paragraph 281 is in Secondary Compliance.**
**IMR-12 Recommendations:**
**4.7.266a**: Continue to develop and refine an internal tacking system or other process that ensures all complaints are either assigned for investigation, referred to mediation, or administratively closed within seven working days of receipt of complaint, and once assigned for investigation proceed according to the timelines set forth in the CASA and CBA.
**4.7.266b**: Ensure that tardy assignments of investigations and tardy investigations are noted and discussed with the involved CPOA personnel.
**CPOA Response**:  The CPOA has reassigned the intake duties to the Lead Investigator at the Agency.


**282.** The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:
   a) all civilian complaints, including those submitted anonymously or by a third party;
   b) the identities of officers involved in incidents under review;
   c) the complete disciplinary history of the officers involved in incidents under review;
   d) if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);
   e) all APD policies and training; and

    f)   if requested, documents, reports, and other materials for incidents that may evince an overall trend in APD's use of force, internal accountability, policies, or training.

**Paragraph 282 remains in Operational Compliance**.

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 282.

**283.** The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director upon reasonable notice.  The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement.

**Paragraph 283 remains in Operational Compliance**.

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 283.

**284.** The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times.

**Paragraph 284 remains in Operational Compliance**.

**IMR-12 Recommendations**:  There were no Recommendations for Paragraphs 284.

**285.** The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews. The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed. If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed.

**Paragraph 285 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for paragraph 285.

**286.** The findings of the Executive Director shall be documented by APD's Internal Affairs Division for tracking and analysis.

**Paragraph 286 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for paragraph 286.

**287.** The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency.

**Paragraph 287 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for paragraph 287.

**288.** The agency shall make recommendations to the Chief regarding APD policy and training. APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes.

**Paragraph 288 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for paragraph 288.

**289.** For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded.

**Paragraph 289 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for paragraph 289.

**290.** The agency shall conduct regular public meetings in compliance with state and local law. The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD.

**Paragraph 290 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for paragraph 290.

**291.** The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status.

**Paragraph 291 remains in Operational Compliance.**

**IMR – 12 Recommendations:** There were no Recommendations for paragraph 291.

**292.** The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:

a)  number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and
b)  the Chief;
c)  demographic category of complainants;
d)  number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the
e)  agency, and the Chief;
f)  number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency,
g)  and the Chief;
h)  policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;
i)  policy changes recommended by the agency, including any dispositions by the Executive Director, the agency, and the Chief;
j)  public outreach efforts undertaken by the agency and/or Executive Director; and
k)  trends or issues with APD's use of force, policies, or training.

**Paragraph 292 is in Secondary Compliance.**
**IMR – 12 Recommendations:**
**4.7.277a:** CPOA should specifically identify the points causing noncompliance with this paragraph and work with APD and the monitoring team to decide upon processes that will move work processes into compliance.

## Section 10:  Assessing Compliance (Paragraph 320)

### A. Access and Confidentiality

**320.** To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City.  The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings.  APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.
**Paragraph 320 remains in Operational Compliance.**
**IMR – 12 Recommendations:**  There were no recommendations for Paragraph 320.
**APD Response:**  The City has a process for and continues to notify the monitor in a timely manner, of any critical firearms discharge, in-custody death, or arrest of any officer.

## VIII.  Conclusion

APD remains committed to implementing and sustaining the requirements of the CASA.  The progress made during this reporting period highlights the Department's ability to work collaboratively with stakeholders to implement positive change.  Through guidance and feedback from the IMT and DOJ, APD will continue to work towards full operational compliance in all CASA paragraphs.

## IX. Appendix

A.  Detailed Scorecards:  August 1, 2020 - January 31, 2021
B.  Criminal Complaint Approval Process (Supervision)
C.  2020 Recruiting Annual Report and 2021 Recruitment Plan
D.  Community Engagement Action Plan

Appendix A

# Detailed Scorecard



Review Month: January 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% |
| OBRD | | | | | | | | 85-94% |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 98% | 100% | 100% | 100% | 100% | ≤ 84% |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6 | 4.0 | 6.0 | 4.5 | 4.5 | 3.5 | 4.8 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 96% | 97% | 100% | 100% | 100% | 96% | 98% | |
| 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | | 100% | 100% | 100% | 100% | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | | 100% | 100% | 100% | 100% | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | | 100% | 100% | 100% | 100% | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| ECW (Next Inspection: January 2021) | | | | | | | | |
| (P37) Quarterly ECW upload | 100% | 100% | 100% | 99% | 100% | 100% | 100% | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| Firearms (Tentative February 2021 for 2020 Firearm Quals) | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | |
| Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | |
| | | | | | | | | |
| Month/Year | 1 | 2021 | | | | | | |

# Detailed Scorecard



Review Month: December 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 98% | 99% | 98% | 99% | 100% | 100% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 93% | 97% | 100% | 100% | 100% | 96% | 98% | | |
| (P18) Inspection of carrying agency approved ammunition | 96% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6 | 4.0 | 8.0 | 7.0 | 6 | 4 | 5.8 | | |
| (P32) ECW is carried on weak-side holster | 96% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| (P225) Equipment inspection | 96% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| (P225) Two video reviews per officer completed by the sergeant | 93% | 100% | 100% | 97% | 100% | 100% | 98% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: January 2021) | | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (February 2021 for 2020 Firearm Quals) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | | |
| **Month/Year** | **12** | **2020** | | | | | | | |

# Detailed Scorecard



Review Month: November 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 98% | 100% | 98% | 98% | 100% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 96% | 94% | 100% | 100% | 100% | 88% | 96% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 88% | 98% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 8 | 4.5 | 5.0 | 5.0 | 7 | 5 | 5.8 | | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 88% | 98% | | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 88% | 98% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 100% | 96% | 88% | 97% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | 100% | 100% | 100% | 100% | | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | | 100% | 100% | 100% | 100% | | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | 100% | 100% | 100% | 100% | | 100% | | |
| ⊟ **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: January 2021) | | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | | |
| ⊟ **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (February 2021 for 2020 Firearm Quals) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | | |
| **Month/Year** | 11 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: October 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 99% | 100% | 98% | 100% | 95% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 86% | 98% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 89% | 91% | 100% | 100% | 96% | 85% | 94% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 97% | 100% | 100% | 89% | 98% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6 | 4.0 | 7.5 | 6.0 | 5 | 4.5 | 5.5 | | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 89% | 98% | | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 89% | 98% | | |
| (P225) Two video reviews per officer completed by the sergeant | 96% | 100% | 97% | 100% | 100% | 89% | 97% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | 100% | | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | | 100% | | 100% | 100% | 100% | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | 100% | | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: Oct 2020) | | | | | | | | | |
| (P37) Quarterly ECW upload | 99% | 99% | 99% | 100% | 99% | 100% | 99% | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (February 2021 for 2020 Firearm Quals) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | | |
| **MonthYear** | 10 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: September 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 100% | 99% | 100% | 97% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 96% | 97% | 100% | 100% | 85% | 100% | 96% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 89% | 100% | 98% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6 | 6.0 | 5.0 | 5.0 | 5 | 7 | 5.7 | | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 89% | 100% | 98% | | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 89% | 100% | 98% | | |
| (P225) Two video reviews per officer completed by the sergeant | 96% | 100% | 100% | 100% | 89% | 100% | 98% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: Oct 2020) | | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (DWI/Impact/Auto Theft: Sept/Oct 2020) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | | |
| **Month/Year** | 9 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: August 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 95-100% | |
| MONTHLY INSPECTIONS | | | | | | | | 85-94% | |
| ⊞ ECW (In pilot October - December 2019) | | | | | | | | ≤ 84% | |
| ⊟ OBRD | | | | | | | | | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 99% | 99% | 100% | 95% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 83% | 100% | 100% | 100% | 100% | 100% | 97% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 96% | 100% | 100% | 100% | 100% | 96% | 99% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 96% | 99% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 4 | 4.0 | 6.0 | 4.5 | 5.25 | 6 | 5.0 | | |
| (P32) ECW is carried on weak-side holster | 96% | 100% | 100% | 100% | 100% | 96% | 99% | | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 96% | 99% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 97% | 100% | 100% | 100% | 100% | 99% | | |
| ⊞ 72 Hour Extension | | | | | | | | | |
| QUARTERLY INSPECTIONS | | | | | | | | | |
| SEMI-ANNUALLY INSPECTIONS | | | | | | | | | |
| | | | | | | | | | |
| Month/Year | 8 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: January 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS | DWI | AUTO THEFT | IMPACT | GANGS | ISU | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% |
| OBRD | | | | | | | | 85-94% |
| (P230) Video Uploaded by the end of subsequent shift | 88% | 92% | 92% | 100% | 100% | 100% | 95% | ≤ 84% |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | | 100% | 100% | |
| Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 3.5 | 5 | 6 | 5.66667 | 1 | 1 | 3.7 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) OBRD Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | | | | | | | |
| (P53) Documentation present of a Commander approving an extension request | | | | | | | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | | | | | | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| ECW (Next Inspection: January 2021) | | | | | | | | |
| (P37) Quarterly ECW upload | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| Firearms (Next Inspection: February 2021 for 2020 Firearms Quals) | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | |
| Month/Year | 1 | 2021 | | | | | | |



# Detailed Scorecard

Review Month: December 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS | DWI | AUTO THEFT | IMPACT | GANGS | ISU | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 100% | 92% | 100% | 100% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 89% | 100% | 100% | 98% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6 | 4 | 2 | 4.66667 | 1 | 2 | 3.3 | | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P225) OBRD Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | | | | | | | | |
| (P53) Documentation present of a Commander approving an extension request | | | | | | | | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | | | | | | | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: January 2021) | | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (Next Inspection: February 2021 for 2020 Firearms Quals) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | | |
| **MonthYear** | 12 | 2020 | | | | | | | |

# Detailed Scorecard



Review Month: November 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS | DWI | AUTO THEFT | IMPACT | GANGS | ISU | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| MONTHLY INSPECTIONS | | | | | | | | 95-100% |
| ⊞ ECW | | | | | | | | 85-94% |
| ⊟ OBRD | | | | | | | | ≤ 84% |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 100% | 94% | 92% | 100% | 98% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P18) Inspection of carrying agency approved ammunition | 83% | 100% | 100% | 100% | 100% | 100% | 97% | |
| ⊟ Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 6 | | 4 | 5.33333 | 1 | 3 | 3.9 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) OBRD Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 89% | 100% | 100% | 98% | |
| ⊟ 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | | 100% | 100% | 100% | | 100% | |
| (P53) Documentation present of a Commander approving an extension request | | | 100% | 100% | 100% | | 100% | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | | 100% | 100% | 100% | | 100% | |
| QUARTERLY INSPECTIONS | | | | | | | | |
| ⊟ ECW (Next Inspection: January 2021) | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | |
| ⊟ SEMI-ANNUALLY INSPECTIONS | | | | | | | | |
| ⊟ Firearms (Next Inspection: February 2021 for 2020 Firearms Quals) | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | 100% | 100% | 100% | |
| (P20) Successfully qualify on other authorized firearm | | | | | 100% | 100% | 100% | |
| | | | | | | | | |
| Month/Year | 11 | 2020 | | | | | | |

# Detailed Scorecard



Review Month: October 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS | DWI | AUTO THEFT | IMPACT | GANGS | ISU | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% |
| ⊞ ECW | | | | | | | | 85-94% |
| ⊟ OBRD | | | | | | | | ≤ 84% |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 83% | 100% | 55% | 83% | 87% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 71% | 80% | 100% | 92% | |
| ⊟ Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 100% | 100% | 0% | 83% | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | 0% | 83% | |
| ⊟ Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 1 | 6 | 3 | 5.75 | 5 | 2 | 3.8 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 0% | 83% | |
| (P225) OBRD Equipment inspection | 100% | 100% | 100% | 100% | 100% | 0% | 83% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 100% | 100% | 0% | 83% | |
| ⊟ 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | | | | | | | |
| (P53) Documentation present of a Commander approving an extension request | | | | | | | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | | | | | | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| ⊟ ECW (Next Inspection: October 2020) | | | | | | | | |
| (P37) Quarterly ECW upload | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| ⊟ Firearms (Next Inspection: February 2021 for 2020 Firearms Quals) | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P20) Successfully qualify on other authorized firearm | | 100% | 100% | 100% | 100% | 100% | 100% | |
| Month/Year | 10 | 2020 | | | | | | |

# Detailed Scorecard



Review Month: September 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS T1/T2 | DWI | AUTO THEFT | IMPACT | Total | Legend | |
|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | **95-100%** | |
| ⊞ ECW | | | | | | **85-94%** | |
| ⊟ OBRD | | | | | | **≤ 84%** | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 100% | 82% | 96% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 100% | 100% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Supervision | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 5 | 7 | 2 | 6 | 5.0 | | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ 72 Hour Extension | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | | | | | | |
| (P53) Documentation present of a Commander approving an extension request | | | | | | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | | | | | | |
| **QUARTERLY INSPECTIONS** | | | | | | | |
| ⊟ ECW (Next Inspection: October 2020) | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | |
| ⊟ Firearms (DWI/Impact/Auto Theft: Sept/Oct 2020) | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | 100% | 100% | 100% | 100% | | |
| (P20) Successfully qualify on other authorized firearm | | 100% | 100% | 100% | 100% | | |
| Month/Year | 9 | 2020 | | | | | |

# Detailed Scorecard



Review Month: August 2020
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained
Team Scorecards

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | MOTORS T1/T2 | Total | Legend |
|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | **95-100%** |
| ⊞ **ECW (In pilot)** | | | **85-94%** |
| ⊟ **OBRD** | | | **≤ 84%** |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | |
| **Firearms** | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | |
| ⊟ **Supervision** | | | |
| (P207) Supervision 8:1 Ratio for a day | 5 | 5.0 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | |
| (P225) Equipment inspection | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | |
| ⊞ **72 Hour Extension** | | | |
| **QUARTERLY INSPECTIONS** | | | |
| ⊟ ECW (Next Inspection: Oct 2020) | | | |
| (P37) Quarterly ECW upload | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | |

Appendix B

# TraCS Process



**February 11, 2021**

P. 205, Methodology regarding data for Criminal Complaints

Professional Standards and Accountability Bureau
Albuquerque Police Department



# Criminal Complaints vs Criminal Summons

- Criminal complaint form is used for both in TraCS

  – Criminal complaint is used as the charging/booking document to arrest an individual

  – Criminal summons is used when filing charges on an individual for a criminal offense without an arrest

# Special Order 20-49

- Published on June 29, 2020

- Requirements

  – All criminal complaints/juvenile statements of probable cause were required to be approved in TraCS

    ◦ Prior to subject being booked into a detention facility

    ◦ Criminal Summons must be approved within five working days upon receipt

# Initial Process



- TraCS = State-funded system that standardizes specific reports

- TraCS has the capability to run reports

  – Initial plan was to use TraCS to retrieve the data
  – Later determined that TraCS did not have the ability to save the reports or archive the data

  – Option two was to use the data warehouse to retrieve the data
    ◦ This process would take time to put into place
    ◦ Assistance from Data Analysis Unit and Tech Services

# Data Retrieval



- Once the data was pulled from the data warehouse the data needed verification

- Manually using the TraCS system each criminal complaint evaluated to ensure the data was accurate

- Labor-intensive process (8 to 16 hours per week – see slide 12 for specifics)
  - The data retrieved contained duplicate entries for each criminal charge listed on the criminal complaints
  - Data warehouse and TraCS final numbers had to match



# TraCS Data Run Process for Lt. Crawford

## Main Steps

- Report is run on/around the 8th and 23rd of each month

- Report is run for the full year

- Data comes from the CoA Data Warehouse, filtered for the particular time period

- Data is sorted from 1-15 (8th) and 16-30 (or 28/29/31 – 23rd)

- Consolidated report uses the updated OPS Lineup

- Sorted/filtered report is sent to Compliance Lieutenant for comments, he sends a final version back to us

- Added improvements are added, as needed (e.g.: comments section, final status, etc.)

# Sample View of the Process – Part 1

## Raw Data from Data Warehouse

| Id | SourceSystemID | SourceSystemKey | CaseNumber | CrimeDate | Statute | NMSAText | Agency |
|---|---|---|---|---|---|---|---|
| 1000 | 39 | FormNMCRICOMP_00001000011602015110052338501Tracs | | 01/16/2015 00:00 | 30-22-1(A) | NMSA 1978. | DEFAULT LOCATION |
| 1001 | 39 | FormNMCRICOMP_00001000012402015092601241301MOTOR | | 01/24/2015 00:00 | 30-15-1 | NMSA 1978. | DEFAULT LOCATION |
| 1002 | 39 | FormNMCRICOMP_00001000012402015093207510811MOTOR | | 01/24/2015 00:00 | 66-08-102(B)  D1 | NMSA 1978. | DEFAULT LOCATION |
| 1003 | 39 | FormNMCRICOMP_00001000012602015083008241311RACS | | 01/26/2015 00:00 | 30-15-1 | NMSA 1978. | DEFAULT LOCATION |
| 1004 | 39 | FormNMCRICOMP_000010000202020150208512413APD-W | 346534 | 02/02/2015 00:00 | 30-16-1(B) | NMSA 1978. | DEFAULT LOCATION |
| 1005 | 39 | FormNMCRICOMP_0000100000204020150302302413MXL21 | | 02/04/2015 00:00 | | | DEFAULT LOCATION |
| 1006 | 39 | FormNMCRICOMP_0000100000204020150522102413MXL21 | | 02/04/2015 00:00 | | | DEFAULT LOCATION |
| 1007 | 39 | FormNMCRICOMP_0000100000204020150525212413MXL21 | | 02/04/2015 00:00 | | | DEFAULT LOCATION |
| 1008 | 39 | FormNMCRICOMP_000010000022802015092050863721APD-W | | 02/28/2015 00:00 | 30-16-20 | | DEFAULT LOCATION |
| 1009 | 39 | FormNMCRICOMP_000010000022802015092914559193APD-W | | 02/28/2015 00:00 | 8-5-1-21 | NMSA 1978. | DEFAULT LOCATION |
| 1010 | 39 | FormNMCRICOMP_000010000310020150159452413APD-W | | 03/10/2015 00:00 | | | DEFAULT LOCATION |
| 1011 | 39 | FormNMCRICOMP_0000100003160201501483083711MXL21 | | 03/16/2015 00:00 | 12-5-1 | | DEFAULT LOCATION |
| 1012 | 39 | FormNMCRICOMP_00001000031602015020541729001MOTOR | | 03/16/2015 00:00 | 12-5-1 | | DEFAULT LOCATION |
| 1013 | 39 | FormNMCRICOMP_00001000031602015020541729001MOTOR | | 03/16/2015 00:00 | 12-5-1 | | DEFAULT LOCATION |
| 1014 | 39 | FormNMCRICOMP_00001000031702015104205909481MOTOR | | 03/17/2015 00:00 | 12-5-1 | | DEFAULT LOCATION |
| 1015 | 39 | FormNMCRICOMP_00001000031702015104503863721MOTOR | | 03/17/2015 00:00 | 12-5-8 | | DEFAULT LOCATION |
| 1016 | 39 | FormNMCRICOMP_000010000317020151248837909481APD-W | | 03/17/2015 00:00 | 12-5-1 | | DEFAULT LOCATION |
| 1017 | 39 | FormNMCRICOMP_00001000042102015101109463041SN9IK | | 04/21/2015 00:00 | 30-16-1(C) | NMSA 1978. | DEFAULT LOCATION |
| 1018 | 39 | FormNMCRICOMP_00001000042102015101109463041SN9IK | | 04/21/2015 00:00 | 30-16-3 | NMSA 1978. | DEFAULT LOCATION |
| 1019 | 39 | FormNMCRICOMP_000010000729020140932125919351N7GK | | 07/29/2014 00:00 | 66-8-102 | NMSA 1978. | DEFAULT LOCATION |
| 1020 | 39 | FormNMCRICOMP_000010000729020140934067290051N7GK | | 07/29/2014 00:00 | 66-8-102 | NMSA 1978. | DEFAULT LOCATION |
| 1021 | 39 | FormNMCRICOMP_0000100008200201502105986372MXL2128 | | 08/20/2015 00:00 | 30-8-4 | | DEFAULT LOCATION |
| 1022 | 39 | FormNMCRICOMP_0000100008200201502105986372MXL2128 | | 08/20/2015 00:00 | 30-20-1 | NMSA 1978. | DEFAULT LOCATION |
| 1023 | 39 | FormNMCRICOMP_0000100001229020140254159670MXL21 | | 12/29/2014 00:00 | 12-5-2 | | DEFAULT LOCATION |
| 1024 | 39 | FormNMCRICOMP_00001000123002014114433510811MXL21 | | 12/30/2014 00:00 | 30-10-1 | | DEFAULT LOCATION |
| 1025 | 39 | FormNMCRICOMP_000012000824020171146303712keith29 | | 08/24/2017 00:00 | 66-5-39.1(A) | NMSA 1978. | ALBUQUERQUE POLICE DEPT |
| 1026 | 39 | FormNMCRICOMP_0000120009250201704052489201TraCS20 | | 09/25/2017 00:00 | 31-01-07 | NMSA 1978. | ALBUQUERQUE POLICE DEPT |
| 1027 | 39 | FormNMCRICOMP_000220001130201606100840949SN3FT21 | 160003993 | 01/13/2016 00:00 | 12-2-7(A) | NMSA 1978. | ALBUQUERQUE POLICE DEPT |
| 1028 | 39 | FormNMCRICOMP_000220001130201606100840949SN3FT21 | 160003993 | 01/13/2016 00:00 | 12-2-3 | | ALBUQUERQUE POLICE DEPT |
| 1029 | 39 | FormNMCRICOMP_0002200012002015094507241335N3FT | 150006152 | 01/20/2015 00:00 | 40-13-6 | NMSA 1978. | ALBUQUERQUE POLICE DEPT |
| 1030 | 39 | FormNMCRICOMP_0002200012302017125421729005N5IK25 | 170007716 | 01/23/2017 00:00 | 12-3-2(A) | | ALBUQUERQUE POLICE DEPT |
| 1031 | 39 | FormNMCRICOMP_0002200012302017125421729005N5IK25 | 170007716 | 01/23/2017 00:00 | 12-2-3 | | ALBUQUERQUE POLICE DEPT |
| 1032 | 39 | FormNMCRICOMP_00022000127020151009193510251N3FT | 150008327 | 01/27/2015 00:00 | | | ALBUQUERQUE POLICE DEPT |
| 1033 | 39 | FormNMCRICOMP_0002200012802015031248381495N3FT | 140071652 | 08/06/2014 00:00 | 12-3-1(A) | CRIMINAL DAMAGE | ALBUQUERQUE POLICE DEPT |

# Sample View of the Process – Part 2

## Consolidated Report

| Case Number | Officer Name | Supervisor | Supervisor Location | Officer Location | Status | Comments | inal Status |
|---|---|---|---|---|---|---|---|
| 20999999999 | Officer 1 | Supervisor 1 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | N/A | | |
| 21000000000 | Officer 2 | Supervisor 2 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | | |
| 21000000001 | Officer 3 | Supervisor 3 | NORTHWEST AREA COMMAND | NORTHWEST AREA COMMAND | N/A | | |
| 21000000002 | Officer 4 | Supervisor 4 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | | |
| 21000000003 | Officer 5 | Supervisor 5 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | Validated | | |
| 21000000004 | Officer 6 | Supervisor 6 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | | |
| 21000000005 | Officer 7 | Supervisor 7 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | | |
| 21000000006 | Officer 8 | Supervisor 8 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | | |
| 21000000007 | Officer 9 | Supervisor 9 | VALLEY AREA COMMAND | VALLEY AREA COMMAND | N/A | | |
| 21000000008 | Officer 10 | Supervisor 10 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | | |
| 21000000009 | Officer 11 | Supervisor 11 | NORTHEAST AREA COMMAND | NORTHEAST AREA COMMAND | N/A | | |
| 21000000010 | Officer 12 | Supervisor 12 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | Validated | | |
| 21000000011 | Officer 13 | Supervisor 13 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | Validated | | |
| 21000000012 | Officer 14 | Supervisor 14 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | N/A | | |
| 21000000013 | Officer 15 | Supervisor 15 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | | |
| 21000000014 | Officer 16 | Supervisor 16 | NORTHEAST AREA COMMAND | NORTHEAST AREA COMMAND | Validated | | |
| 21000000015 | Officer 17 | Supervisor 17 | VALLEY AREA COMMAND | VALLEY AREA COMMAND | N/A | | |
| 21000000016 | Officer 18 | Supervisor 18 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | N/A | | |
| 21000000017 | Officer 19 | Supervisor 19 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | | |
| 21000000018 | Officer 20 | Supervisor 20 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | | |
| 21000000019 | Officer 21 | Supervisor 21 | VALLEY AREA COMMAND | VALLEY AREA COMMAND | Validated | | |
| 21000000020 | Officer 22 | Supervisor 22 | VALLEY AREA COMMAND | VALLEY AREA COMMAND | N/A | | |
| 21000000021 | Officer 23 | Supervisor 23 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | | |
| 21000000022 | Officer 24 | Supervisor 24 | NORTHEAST AREA COMMAND | NORTHEAST AREA COMMAND | N/A | | |

# Sample View of the Process – Part 3

## Report from Lt. Crawford

| Case Number | Officer Name | Supervisor | Supervisor Location | Officer Location | Status | Comments | Final Status |
|---|---|---|---|---|---|---|---|
| 20999999999 | Officer 1 | Supervisor 1 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | N/A | VOIDED FORM | VOIDED |
| 21000000000 | Officer 2 | Supervisor 2 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | OPEN FORM | OPEN |
| 21000000001 | Officer 3 | Supervisor 3 | NORTHWEST AREA COMMAND | NORTHWEST AREA COMMAND | N/A | IN VIOLATION SUBMIT AN IA REQUEST | IN VIOLATION |
| 21000000002 | Officer 4 | Supervisor 4 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | APPROVED STATUS | APPROVED |
| 21000000003 | Officer 5 | Supervisor 5 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | Validated | APPROVED STATUS | APPROVED |
| 21000000004 | Officer 6 | Supervisor 6 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | open form | open |
| 21000000005 | Officer 7 | Supervisor 7 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | form was open until 12/09/2020 not a violation yet | OPEN |
| 21000000006 | Officer 8 | Supervisor 8 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | no data | no data |
| 21000000007 | Officer 9 | Supervisor 9 | VALLEY AREA COMMAND | VALLEY AREA COMMAND | N/A | APPROVED STATUS | APPROVED |
| 21000000008 | Officer 10 | Supervisor 10 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | IN VIOLATION SUBMIT AN IA REQUEST | IN VIOLATION |
| 21000000009 | Officer 11 | Supervisor 11 | NORTHEAST AREA COMMAND | NORTHEAST AREA COMMAND | N/A | IN VIOLATION SUBMIT AN IA REQUEST | IN VIOLATION |
| 21000000010 | Officer 12 | Supervisor 12 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | Validated | OPEN FORM | OPEN |
| 21000000011 | Officer 13 | Supervisor 13 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | Validated | no data | no data |
| 21000000012 | Officer 14 | Supervisor 14 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | N/A | APPROVED STATUS | APPROVED |
| 21000000013 | Officer 15 | Supervisor 15 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | OPEN FORM | OPEN |
| 21000000014 | Officer 16 | Supervisor 16 | NORTHEAST AREA COMMAND | NORTHEAST AREA COMMAND | Validated | no data | no data |
| 21000000015 | Officer 17 | Supervisor 17 | VALLEY AREA COMMAND | VALLEY AREA COMMAND | N/A | no data | no data |
| 21000000016 | Officer 18 | Supervisor 18 | SOUTHWEST AREA COMMAND | SOUTHWEST AREA COMMAND | N/A | getting kick back for corrections on 12/12/2020 | open |
| 21000000017 | Officer 19 | Supervisor 19 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | N/A | APPROVED STATUS | APPROVED |
| 21000000018 | Officer 20 | Supervisor 20 | SOUTHEAST AREA COMMAND | SOUTHEAST AREA COMMAND | Validated | DWI UNIT awaiting blood results | OPEN |

# Information Campaign



- Outlining the expectations

- Extensive review of SO: 20-49

  – Contacting all area commands
    ◦ Complete most of the criminal complaints and criminal summons
    ◦ Explaining the process (add to their knowledge base)

  – Contact Specialized units
    ◦ Explaining the process (add to their knowledge base)



# Lt. Crawford TraCS Time – Sample View

9/14/2020-9/18/2020

## TraCS Record Tracking

| 09/14/2020 Total Work Week Hours | 09/18/2020 Total Hours Worked | Regular Hours | Overtime Hours | |
|---|---|---|---|---|
| 40.00 | 40.00 | 40.00 | 0.00 | |
| Date(s) | Time In | Time Out | Hours Worked | Note(s) on Task(s) |
| 09/14/2020 | 8:00 AM | 4:00 PM | 8.00 | Met ref criminal complaint with Southwest and Southeast area commands |
| 09/15/2020 | 8:00 AM | 4:00 PM | 8.00 | Met ref criminal complaints with Northeast area command Zoom meeting |
| 09/16/2020 | 8:00 AM | 4:00 PM | 8.00 | Met ref criminal complaints with Valley area command, also met with admin assistant concerning electronic line-ups |
| 09/17/2020 | 8:00 AM | 4:00 PM | 8.00 | contacted specialized units ref criminal complaints, via phone and emails |
| 09/18/2020 | 8:00 AM | 4:00 PM | 8.00 | Met ref criminal complaints Foothills area command, discussed all topics related to compliance. Electronic line-ups |



# Concerns Identified

- Multiple entries for the same case number
  - One for every criminal charge on the form

- Original report contained all form in all statuses
  - Accepted (approved report)
  - Processed (approved report)
  - Validated (awaiting approval from supervisor)
  - Open (possibly not completed or awaiting blood results)
  - Rejected (form rejected by supervisor)
  - N/A (open or rejected reports)



# Original Status

As of September 23, 2020, from the TraCS report from September 1-15, 2020, there were a total of 1,091 Case Number Files

Status of TraCS case files, 9/23/2020 (for 9/1-9/15)



- ■ Accepted
- ■ Proccesed
- ■ Validated
- ■ N/A



# Revised Status

As of September 29, 2020, from the TraCS report from September 1-15, 2020, indicates only cases file status of N/A and Validated for a total of 30

Status of TraCS case files, 9/29/2020 (for 9/1-9/15)



14

16

- N/A

- Validated



# Detailed N/A and Validated Status – Sample View

## As of September 29, 2020

| Officer | Open Cases | Status | Comments |
|---|---|---|---|
| Officer 1 | 3 | N/A | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 2 | 3 | Validated | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 3 | 2 | Validated | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 4 | 2 | Validated | no data for incident |
| Officer 5 | 2 | N/A | no data for incident |
| Officer 6 | 3 | N/A | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 7 | 1 | N/A | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 8 | 1 | N/A | not in tracs system |
| Officer 9 | 2 | Validated | blank form no data entered |
| Officer 10 | 3 | N/A | no data for incident |
| Officer 11 | 1 | N/A | no data for incident |
| Officer 12 | 3 | Validated | not in tracs system |
| Officer 13 | 2 | N/A | no data for incident |
| Officer 14 | 3 | Validated | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 15 | 2 | N/A | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 16 | 1 | Validated | no data for incident |
| Officer 17 | 1 | N/A | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 18 | 2 | N/A | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 19 | 2 | N/A | no data for incident |
| Officer 20 | 1 | Validated | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |
| Officer 21 | 1 | N/A | IA request same as above |
| Officer 22 | 2 | Validated | SHOWS IN VALADATED STATUS BUT HAS SIGNATURE ON FORM |



# Final Status Update Improvement Snapshot – Bi-Weekly

## Updated Through February 8, 2021

Last nine TraCS Reporting Periods: October 8, 2020, October 23, 2020, November 8, 2020, November 23, 2020, December 8, 2020, December 23, 2020, January 8, 2021, January 25, 2021 and February 8, 2021



# Final Status Update Improvement Snapshot – Monthly

## Updated Through January 25, 2021



Four Month TraCS Reporting Periods: October, November, December 2020 and January 2021





# Final Status: October 8, 2020

**2%** of the 645 total cases were in violation of SO: 20-49
IAR were submitted for 10 potential policy violations

Final Status of TraCS case files, 10/8/2020 (for 9/16-9/30): 68





# Final Status: October 23, 2020

1% of the 1,128 total cases were in violation of SO: 20-49
IAR were submitted for 6 potential policy violations

Final Status of TraCS case files, 10/23/2020 (for 10/1-10/15): 52





# Final Status Update Improvement Snapshot – Monthly

## Case Breakdown, Two Bi-Weekly Time Periods for October 8 and 23, 2020

One Month TraCS Reporting Periods: October 8 and 23, 2020





# Final Status: November 8, 2020

<1% of the 996 total cases were in violation of SO: 20-49
IAR were submitted for 3 of potential policy violations

Final Status of TraCS case files, 11/8/2020 (for 10/16-10/31): 42



Legend:
- No Data
- Approved
- Open
- Validated
- Processed
- Voided



# Final Status: November 23, 2020

1% of the 1,034 total cases were in violation of SO: 20-49
IAR were submitted for 7 of potential policy violations

Final Status of TraCS case files, 11/23/2020 (for 11/1-11/15): 53





# Final Status Update Improvement Snapshot – Monthly

## Case Breakdown, Two Bi-Weekly Time Periods for November 8 and 23, 2020

One Month TraCS Reporting Periods: November 8 and 23, 2020





# Final Status: December 8, 2020

<1% of the 977 total cases were in violation of SO: 20-49
IAR were submitted for 1 of potential policy violations

Final Status of TraCS case files, 12/8/2020 (for 11/16-11/30): 33





# Final Status: December 23, 2020

<1% of the 1,028 total cases were in violation of SO: 20-49
IAR were submitted for 2 of potential policy violations

Final Status of TraCS case files, 12/23/2020 (for 12/1-12/15): 31



Legend:
- No Data
- Accepted
- Open
- Validated
- Rejected
- Processed



# Final Status Update Improvement Snapshot – Monthly

## Case Breakdown, Two Bi-Weekly Time Periods for December 8 and 23, 2020

One Month TraCS Reporting Periods: December 8 and 23, 2020





# Final Status: January 8, 2021

<1% of the 998 total cases were in violation of SO: 20-49
There were no IAR submitted for potential policy violations

Final Status of TraCS case files, 1/8/2021 (for 12/16-12/31): 37



| | |
|---|---|
| ■ | Approved |
| ■ | Training |
| ■ | No Data |
| ■ | Open |
| ■ | Processed |



# Final Status: January 25, 2021

<1% of the 869 total cases were in violation of SO: 20-49
There were no IAR submitted for potential policy violations

Final Status of TraCS case files, 1/25/2021 (for 1/1-1/15): 17





# Final Status Update Improvement Snapshot – Monthly

## Case Breakdown, Two Bi-Weekly Time Periods for January 8 and 25, 2021

One Month TraCS Reporting Periods: January 8 and 25, 2021





# Final Status: February 8, 2021

<1% of the 1,098 total cases were in violation of SO: 20-49. There were 3 IAR submitted for potential policy violations. This period had **47 instances for Training**

Final Status of TraCS case files, 2/8/2021 (for 1/16-1/31): 77



Albuquerque Police Recruiting Annual Report



# 2020

# Annual Report & Strategic Recruitment Plan for 2021



Silva, Peter P.

Albuquerque Police Department

Recruiting Unit

2/5/2020

# ALBUQUERQUE POLICE DEPARTMENT

# 2020 Annual Report

## *Statement of Objectives*

- The Albuquerque Police Department (APD) Recruiting Unit remains steadfast in its efforts to seek out and recruit only the most qualified individuals who wish to serve our community as law enforcement officers, and Police Service Aides (PSAs). The recruiting process is without regard to race, color, national origin, disability, age, gender, sexual orientation, or medical condition.

- Applicants must be willing and able to be trained to provide a safe, secure community where the rights, history, and culture of all citizens is valued, respected, and protected.

- The 2020 Strategic Recruitment Plan was implemented to support the APD's goal of a department workforce that accurately reflects the ethnic and racial composition of our community.

**2020 Recruiting Results**

**The Following is an overview of the applications the Recruiting Unit acquired:**

| Applications received from 1-1-2020 through 12-31-2020 |
|---|
| Total : 1910 |

**Out of the Interest Cards:**

| 1765 were qualified |
|---|
| 117 were disqualified |
| 28 were withdrawn |

*The 2020 Genders include:*

**Gender Results:**

| FEMALE | 414 |
|---|---|
| MALE | 1492 |
| Other/Non-Binary | 4 |

**2020 Demographic Results:**

| White | 549 |
|---|---|
| HISPANIC | 956 |
| AFRICAN AMERICAN | 129 |
| NATIVE AMERICAN | 116 |
| ASIAN | 42 |
| NATIVE HAWAIIAN | 9 |
| OTHER/PREFER NOT TO DISCLOSE | 109 |

### *2020 Events Breakdown*

| Event Type | Number of Events/activities |
|---|---|
| Hiring Event – Virtual | 43 |
| Hiring Event  - In Person | 36 |
| Community Meetings | 3 |
| Community Police Council (CPC) | 11 |
| Community Engagement | 12 |
| Content Development | 50 |
| Applicant Engagement | 181 |
| Social Media Posts | 145 |
| Recruiting Vehicle Staged | 9 |
| Media Interviews | 20 |

(*detailed spreadsheet at the end of report*)

### *2020 Reviewed*

## Diverse recruiting Strategies

The Recruiting Unit has been reaching out to "satellite" academies and community colleges across the country as part of our efforts to bring new recruits from a variety of areas. The recruiting unit is also utilizing minorities and women in our advertising to highlight APD's diverse workforce.

APD has seen an increase in minority applicants from the previous year and has seen a spike in 129 African American applicants as opposed to 76 from the previous year.

## Applicant Re-capture Strategy

The Recruiting Unit identified that a large portion of applicants remain interested in APD after either failing, missing, or withdrawing from testing.  To contact these applicants, which number in the hundreds, the unit has been sending out mass email blasts to initiate re-contact with applicants.  We have found this strategy successful in re-igniting interest in joining APD and many have re-applied as a result.

Additionally, the Recruiting Unit has been reviewing applications for disqualifiers that are able to be easily remedied such as not possessing a driver's license *(this should not be associated with not having a license due to administrated MVD removal i.e. DWI, revoked, etc..).*  We also review applications for Police Service Aides whom would qualify as a police officer and encourage them to apply as a cadet.  These strategies have little to no cost for APD and these applicants represent a pool of persons whom are already highly interested in becoming a police officer and therefore little effort is necessary to have them apply.

3

# Technology

Due to the COVID-19 pandemic the Recruiting Unit has been utilizing Zoom, Google Meets, and other electronic platforms to connect with potential applicants.  Facebook and Instagram have been largely instrumental in our advertising strategy.  We have also been able to host a large number of meetings with applicants from around the country.  The success of this is evident in statistics showing our applicant pool nationwide has expanded to **43** states in 2020 as opposed to **29** states in 2019.

The COVID pandemic has been a learning experience and forced the unit to "think outside of the box" and we have developed a wealth of knowledge in online communication.

# Command Structure

The Recruiting Unit has gone through several changes in command structure.  Sergeant Peter Silva was brought on after Director David Romo Retired in June of 2020.  Sergeant Silva reports directly to Commander Elizabeth Armijo who now oversees the recruiting unit and Special Operations Bureau.

## Advertising

Beginning in October of 2020, the unit has hired "BoomTime" to assist with marketing campaigns.  BoomTime is a "word of mouth" company with a proven history of successfully adding to recruiting campaigns.  Boomtime possesses technical knowledge on tracking online marketing to show effectiveness and can target specific campaigns which show to be more successful than others.

# Challenges

The largest challenge to this unit, as well as most of the country was the COVID-19 pandemic.  This pandemic challenged the unit by restricting our ability to interface with applicants in person and to host testing at the scale we would have liked to.  However, although the pandemic was challenging, we have gained new insight into additional recruiting methods which were largely successful.

A secondary challenge has been the state of affairs in the nation with a diminished regard for police work being expressed on media outlets.  Often questions arose during recruiting events about the "climate" and treatment of officers in Albuquerque.  I believe the unit fielded these challenges admirably and always held the department in the highest regard as well as the administration.

4

## 2021 Plan

The recruiting unit plans to develop new strategies as well as expand on what has been successful in 2020.  An example would be the "re-capture" program which has been expanded to include any applicant whom has shown interest through the various job seeking websites such as LinkedIn and Indeed.com.   There are roughly 40,000 individuals who have at some point expressed interest on these outlets going back to around 2017.  This list was discovered after a recruiter inquired with "Indeed" and found that there had been a posting for jobs through their website which had been forgotten for several years.

Recruiting has initiated a "signal vine" text messaging campaign which is already showing to be more successful than emails.   These texts are being sent to individuals who have applied in the past but had withdrawn, failed, or missed testing.  Many of these individuals have already been emailed, however the response to text messages is far greater than emails.  It is apparent that text messaging is going to be a valuable tool for correspondence with recruits.  The Recruiting Unit plans to expand the use of text messaging in 2021.

The Recruiting Unit has initiated email campaigns with the assistance of "Boomtime" marketing.  In addition, Boomtime has created a series of online advertisements which extend across the following electronic outlets; Linkdin, Facebook, Instagram, and Google ads.  Additionally, Boomtime has added an "opt-in" email feature to APDonline.com and send out weekly articles to create and drive interest in police work.  Finally, Boomtime has developed graphics for roadside billboards.  Funding sources are being finalized for additional campaigns.

In order to increase diverse hiring the Recruiting Unit is focusing on highlighting diversity in our social media posts.  This includes recognizing diverse holidays such as Martin Luther King Day, Black History Month, Chinese New Year, Woman's History Month, and many others in order to recognize and celebrate diversity.  Each post is created in such a way that it highlights a holiday and creates a call to action for viewers to apply to APD.

Finally, in order to stay organized as well as track and utilize data in a more comprehensive way, the Recruiting Unit is transitioning to Smart-Sheets as our primary format for task assignments and data collection.  This includes a dashboard which updates in real time as the unit completes tasks.  Beginning January 1, 2021 the unit has begun to populate Smart-Sheets with our daily activities.

## Boomtime Emails (example)



## Recruiting Social Media

## Recruiting Smart Sheets



**Recruiting Dashboard** (updates real-time)

**Weekly Progress Charts**

**Task Management**

## Detailed Event Breakdown

| Event | Content Type | Start Time |
|---|---|---|
| Colorado Law Enforcement Hiring Expo (virtual) | Hiring - Virtual | 12/15/20 |
| zoom meeting San Antonio lea | Hiring - Virtual | 11/14/20 |
| Facebook Instagram CACU | Social Media Post | 11/13/20 |
| Facetime meeting with Ben Levy (New York Applicant) | Applicant Engagement | 11/13/20 |
| Tour of Academy | Applicant Engagement | 11/13/20 |
| filming of testing reminder video | Content Development - Filming/Pictures/Interviews | 11/13/20 |
| Downtown Public Safety ECHO | Event - Community Meeting | 11/12/20 |
| facebook/instagram RTCC | Social Media Post | 11/12/20 |
| filming of exercise (sit ups pushups) | Content Development - Filming/Pictures/Interviews | 11/12/20 |
| filming of cadets in gym | Content Development - Filming/Pictures/Interviews | 11/12/20 |
| Veterans Day instagram/facebook | Social Media Post | 11/11/20 |
| army pays meeting | Process Improvement | 11/11/20 |
| filming of trail for i will survive video | Content Development - Filming/Pictures/Interviews | 11/11/20 |
| filiming of 34 Rob Simmons | Content Development - Filming/Pictures/Interviews | 11/11/20 |
| Fimed multiple cadet videos at academy | Content Development - Filming/Pictures/Interviews | 11/10/20 |
| Foothills CPC | Event - CPC Meeting | 11/09/20 |
| Facebook/Instagram SW Post | Social Media Post | 11/09/20 |
| Facebook/Instagram Missing Person's Unit | Social Media Post | 11/05/20 |
| Facebook/Instagram Bike Post | Social Media Post | 11/04/20 |
| Facebook/Instagram As an officer | Social Media Post | 11/03/20 |
| Cadets Classroom Facebook/Instagram | Social Media Post | 11/02/20 |
| Seminole State Academy LEA | Hiring - Virtual | 11/16/20 |
| Zoom Meeting / South Florida State LEA | Hiring - Virtual | 11/02/20 |
| National Guard Recruiting Presentation | Event - In person Hiring | 11/01/20 |
| Cottonwood Mall Community Event | Event - Community Engagement | 10/31/20 |
| FB/Insta post- 34 Todd Romin Video | Social Media Post | 10/30/20 |
| filiming of PRT downtown - former fire now apd 34 video and pic | Content Development - Filming/Pictures/Interviews | 10/29/20 |
| filiming of 34 bernadette sanchez at se sub station | Content Development - Filming/Pictures/Interviews | 10/29/20 |

| | | |
|---|---|---|
| fliming of 34 blaylock | Content Development - Filming/Pictures/Interviews | 10/29/20 |
| pics of 34s helping disabled motorist | Content Development - Filming/Pictures/Interviews | 10/29/20 |
| FB/Insta post- 34 Wolf &Rahimi | Social Media Post | 10/29/20 |
| Spoke with Lateral Class 24 | Process Improvement | 10/28/20 |
| Real Time Solution Training for Wordpress | Process Improvement | 10/28/20 |
| FB/Insta post- SGT Defrates video | Social Media Post | 10/28/20 |
| Pink SUV Drive | Event - Community Engagement | 10/26/20 |
| Facebook/Instagram Pink SUV/ Dog Post | Content Development - Filming/Pictures/Interviews | 10/26/20 |
| FB/Insta post- testing friday pic/ 61 applicants | Content Development - Filming/Pictures/Interviews | 10/23/20 |
| CAPS- Tutoring with David Sutherland | Applicant Engagement | 10/22/20 |
| FB/Insta post- female runner on tracm with hot air ballooms | Social Media Post | 10/22/20 |
| CPC Northwest | Event - CPC Meeting | 10/21/20 |
| Canon Poster Printer Training | Process Improvement | 10/21/20 |
| CAPS with Justin Perner | Applicant Engagement | 10/21/20 |
| tutoring with alexia? | Applicant Engagement | 10/21/20 |
| FB/Insta post- 34 Chermaine Carter 5 questions | Social Media Post | 10/21/20 |
| Northeast Grave Ida's | Process Improvement | 10/20/20 |
| Campus Tour | Applicant Engagement | 10/20/20 |
| filiming of RBT-Sgt Defrates video | Content Development - Filming/Pictures/Interviews | 10/20/20 |
| Middle Rio Grande Law Enforcement Academy | Hiring - Virtual | 10/20/20 |
| FB/Insta post- 34 Kameron Anderson | Social Media Post | 10/20/20 |
| Northeast Briefing 1st Recruiting Updates | Process Improvement | 10/19/20 |
| Facebook/Instagram Old Town / Pink Expolorer | Social Media Post | 10/19/20 |
| no score pt Alicia Marquez / Kyle Smith | Applicant Engagement | 10/19/20 |
| king briefing  - aaron beck - | Process Improvement | 10/17/20 |
| Northeast Briefing Swing Recruiting Updates | Process Improvement | 10/17/20 |
| no score pt test on Juan Lopez, Christina Jeffreis,Samantha Castillo, Chris Hines, Theresa MArquez | Applicant Engagement | 10/17/20 |
| Filiming of Officer Linda Smith and Todd Romin | Content Development - Filming/Pictures/Interviews | 10/17/20 |

| Workforce Connection Live Hiring Event | Hiring - Virtual | 10/17/20 |
|---|---|---|
| KOB Interview | Media Interview (TV/Radio) | 10/16/20 |
| FB/Insta post- Join us for hiring event post | Social Media Post | 10/16/20 |
| filming of Erik meeks of gangs | Content Development - Filming/Pictures/Interviews | 10/15/20 |
| Signal Vine Meeting | Process Improvement | 10/15/20 |
| filming of Larry Middleton- PRT | Content Development - Filming/Pictures/Interviews | 10/15/20 |
| FB/Insta post- limited seating 2 day weekday testing post | Social Media Post | 10/15/20 |
| Virtual Training | Process Improvement | 10/14/20 |
| no score pt Jeremy Agular | Applicant Engagement | 10/14/20 |
| tutoring with alexia? | Applicant Engagement | 10/14/20 |
| FB/Insta post- Greg Webber 5 questions | Social Media Post | 10/14/20 |
| Northeast PRT Recruiting Briefing | Process Improvement | 10/13/20 |
| Swing Briefing / Edwards | Process Improvement | 10/13/20 |
| filming of Adam Perea for Robbery | Content Development - Filming/Pictures/Interviews | 10/13/20 |
| Northeast Dayshift 2nd | Process Improvement | 10/13/20 |
| filming of Sarah Alvarez for homicide- | Content Development - Filming/Pictures/Interviews | 10/13/20 |
| filming of josh thoma for FAAST | Content Development - Filming/Pictures/Interviews | 10/13/20 |
| Pink Explorer / Breast Cancer | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 10/13/20 |
| filming of whitney burton-IA | Content Development - Filming/Pictures/Interviews | 10/13/20 |
| Swing Briefing /Frank and George Squad | Process Improvement | 10/12/20 |
| Cottonwood Mall Pink SUV | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 10/12/20 |
| FB/Insta post- Join us for hiring event post | Social Media Post | 10/12/20 |
| SE briefing for king squad | Process Improvement | 10/10/20 |
| no score pt test on Juan Lopez, Christina Jeffreis, April Salguero | Applicant Engagement | 10/10/20 |
| SE briefing for id and john squad | Process Improvement | 10/09/20 |
| Northeast Day Shift Briefing | Process Improvement | 10/09/20 |
| Northeast Swing(1st) Briefing Recruiting Updates | Process Improvement | 10/09/20 |

| | | |
|---|---|---|
| Northeast Swing (2nd) Recruiting Updates | Process Improvement | 10/09/20 |
| SE briefing for Baker squad | Process Improvement | 10/09/20 |
| Pink Exporer / Breast cancer | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 10/09/20 |
| FB/Insta post- back of pink suv infront of academy post | Social Media Post | 10/09/20 |
| filming of 34 Tom Griego | Content Development - Filming/Pictures/Interviews | 10/08/20 |
| Pink Exporer / Breast cancer | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 10/08/20 |
| FB/Insta post- you choose poster | Social Media Post | 10/08/20 |
| no score pt Jeremy Agular | Applicant Engagement | 10/08/20 |
| Handshake Webinar | Hiring - Virtual | 10/07/20 |
| FB/Insta post- blonde female 34 in front of docking station 5 questions | Social Media Post | 10/07/20 |
| Recruiting Unit Staged | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 10/07/20 |
| Valley Dayshift briefing..Adams / Bakers | Process Improvement | 10/07/20 |
| SE David squad briefing | Process Improvement | 10/07/20 |
| Recruiting meeting with Haley | Process Improvement | 10/06/20 |
| FB/Insta post- 34 in front of plane | Social Media Post | 10/06/20 |
| Recruiting unit staged | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 10/06/20 |
| SE Charlie squad briefing | Process Improvement | 10/06/20 |
| Academy Staff Officer Treadway Facebook/Instagram | Social Media Post | 10/05/20 |
| Recruiting Unit Staged | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 10/05/20 |
| Valley Area Command Recruiting Briefing | Process Improvement | 10/05/20 |
| SE Henry Squad | Process Improvement | 10/03/20 |
| SE George Briefing | Process Improvement | 10/03/20 |
| no score pt test on shawn brock, Katilyn Abeyta, April salguero , Juan Lopez, Christina Jefferies | Applicant Engagement | 10/03/20 |

| | | |
|---|---|---|
| Instagram/Facebook of DWI - one of 50 units | Social Media Post | 10/02/20 |
| SE Edward, Frank briefing | Process Improvement | 10/02/20 |
| Cavalry Church Police Day | Event - Community Engagement | 10/02/20 |
| Airboat Instagram/Facebook | Social Media Post | 10/01/20 |
| video filming of air support | Content Development - Filming/Pictures/Interviews | 10/01/20 |
| Taser Picture Instagram/Facebook | Social Media Post | 09/30/20 |
| Weekly Recruiting Meeting | Process Improvement | 09/30/20 |
| no score pt | Applicant Engagement | 09/30/20 |
| Workforce Connection Hiring Event | Hiring - Virtual | 09/29/20 |
| Reminder of Hiring Event Facebook/Instagram | Social Media Post | 09/28/20 |
| instagram/facebook posting of James at Kindergarten | Social Media Post | 09/25/20 |
| tutoring with alexia? (rich's applicant) | Applicant Engagement | 09/25/20 |
| instagram/facebook posting of Ryan Holets | Social Media Post | 09/24/20 |
| Downtown Public Safety ECHO | Event - Community Meeting | 09/24/20 |
| No Score PT  Edward Hobbs, Bianca Carrier | Applicant Engagement | 09/24/20 |
| instagram/facebook posting of Alex and tim at recruiting table. 5 questions | Social Media Post | 09/23/20 |
| Workforce Connection rehearsal | Hiring - Virtual | 09/23/20 |
| no score pt Estephany Rosales / Julie Jaramillo /Breanna Frazier | Applicant Engagement | 09/23/20 |
| FB/Insta post- Join us for hiring event post reminder | Social Media Post | 09/22/20 |
| Facebook/Instagram 300 meter demonstration | Social Media Post | 09/21/20 |
| No score PT Sidiki Mudada | Applicant Engagement | 09/21/20 |
| instagram/facebook posting of Crime Scene | Social Media Post | 09/18/20 |
| Zoom meeting Golden West LEA | Hiring - Virtual | 09/18/20 |
| filming of SRO - Gerald Sheldon | Content Development - Filming/Pictures/Interviews | 09/18/20 |
| UTEP Vitual Career Fair | Hiring - Virtual | 09/18/20 |
| instagram/facebook posting of RO Werley and FTO | Social Media Post | 09/17/20 |
| Community Helper Presentsation | Event - Community Engagement | 09/17/20 |
| filiming of 1.5mile run and 300 meter sprint | Content Development - Filming/Pictures/Interviews | 09/17/20 |
| Northwest CPC Zoom Meeting | Event - CPC Meeting | 09/16/20 |

| | | |
|---|---|---|
| Academy Tour with Legacy Academy | Event - Community Engagement | 09/16/20 |
| Zoom Meeting San Antonio College LEA | Hiring - Virtual | 09/15/20 |
| instgram/facebook posting of tim's bio video | Social Media Post | 09/15/20 |
| Zoom Meeting / San Antonio College LEA | Hiring - Virtual | 09/15/20 |
| filming of hiring steps video | Content Development - Filming/Pictures/Interviews | 09/15/20 |
| Cadet Class 123 Interviews Facebook/Instagram | Social Media Post | 09/14/20 |
| Testing Weekend | Applicant Engagement | 09/11/20 |
| september 11th memorial service (honor Guard) | Content Development - Filming/Pictures/Interviews | 09/11/20 |
| Instagram/Facebook posting | Social Media Post | 09/11/20 |
| Academy Staff Facebook/Instagram | Social Media Post | 09/10/20 |
| filming of Ryan holets (auto theft) | Content Development - Filming/Pictures/Interviews | 09/10/20 |
| filming - Tutoring with a recruiter | Content Development - Filming/Pictures/Interviews | 09/10/20 |
| filimng of Andrew Hsu (major crime scene) | Content Development - Filming/Pictures/Interviews | 09/10/20 |
| Zoom Meeting / Siskiyous LEA | Hiring - Virtual | 09/10/20 |
| No Score PT Aurelia Padilla, Estefany Rosales | Applicant Engagement | 09/10/20 |
| instagram/facebook of Recruiter Rahimi/Bio | Social Media Post | 09/09/20 |
| no score pt Kieth Stewart | Applicant Engagement | 09/09/20 |
| Cadet Class 123 Instagram/Facebook | Social Media Post | 09/08/20 |
| Meeting with Boomtime | Process Improvement | 09/08/20 |
| Western NM Law Enforcement Academy | Hiring - Virtual | 09/08/20 |
| fliming of lisa neil running with cadets | Content Development - Filming/Pictures/Interviews | 09/08/20 |
| No score PT Destiny Romero / Deedra Cadman | Applicant Engagement | 09/05/20 |
| No score PT Jennifer Robertson | Applicant Engagement | 09/04/20 |
| Recruiting Unit SUV Instagram Facebook | Social Media Post | 09/03/20 |
| Zoom Signal Vine | Process Improvement | 09/03/20 |
| Zoom Meeting / Western Colorado P.O.A. | Hiring - Virtual | 09/03/20 |
| Filming of Field training officer | Content Development - Filming/Pictures/Interviews | 09/03/20 |
| Zoom CEC JD Maes | Event - Community Engagement | 09/03/20 |
| No Score PT / Alexia Reyna | Applicant Engagement | 09/03/20 |

13

| CPC Southwest | Event - CPC Meeting | 09/02/20 |
|---|---|---|
| Mobile Crime Lab Facebook/Instagram | Social Media Post | 09/02/20 |
| CNM Meeting with Ray Fritts | Process Improvement | 09/02/20 |
| Bomb Robot Picture Facebook/Instagram | Social Media Post | 09/01/20 |
| Team Building Day / class 123 | Applicant Engagement | 09/01/20 |
| Air 1 Post Facebook/Instagram | Social Media Post | 08/31/20 |
| no score pt Brian Szabo and Frank Mohr | Applicant Engagement | 08/29/20 |
| Testing Weekend | Applicant Engagement | 08/28/20 |
| go get pics of bike patrol 34s for social media | Content Development - Filming/Pictures/Interviews | 08/28/20 |
| Bike Patrol Facebook/Instagram | Social Media Post | 08/28/20 |
| filming of tutoring with Recruiter | Content Development - Filming/Pictures/Interviews | 08/27/20 |
| Zoom meeting with Pike Peak  Law Enforcement Academy | Hiring - Virtual | 08/27/20 |
| Blue Ford Explorer Facebook/Instagram | Social Media Post | 08/27/20 |
| Zoom Handshake training event | Process Improvement | 08/27/20 |
| CAPS w/Angel Montoya | Applicant Engagement | 08/26/20 |
| Horse Mounted Facebook/Instagram | Social Media Post | 08/26/20 |
| Motors Academy Picture Facebook/Instagram | Social Media Post | 08/25/20 |
| filming of open space | Content Development - Filming/Pictures/Interviews | 08/25/20 |
| Open Space Facebook/Instagram | Social Media Post | 08/24/20 |
| No Score PT Adrian Castillo- Guzman | Applicant Engagement | 08/22/20 |
| CAPS meeting with Brian Szabo | Applicant Engagement | 08/21/20 |
| CAPS w/Angel Montoya | Applicant Engagement | 08/21/20 |
| No Score PT with Jennifer | Applicant Engagement | 08/21/20 |
| SE CPC | Event - CPC Meeting | 08/20/20 |
| filming of Lisa Neil for Basic | Content Development - Filming/Pictures/Interviews | 08/20/20 |
| WorkForce Connection hiring seminar | Hiring - Virtual | 08/20/20 |
| DCP Community Meeting | Event - Community Meeting | 08/20/20 |
| Northwest CPC | Event - CPC Meeting | 08/19/20 |
| meeting with Haley for Dry run on virtual hiring seminar today | Process Improvement | 08/19/20 |
| Meeting with Real Time Solutions and Recruiting Unit | Process Improvement | 08/19/20 |
| Zoom Meeting Pueblo LEA | Hiring - Virtual | 08/19/20 |
| fliming with open space | Content Development - Filming/Pictures/Interviews | 08/18/20 |
| posting of James Demsich | Social Media Post | 08/18/20 |

| filming of Mike Sciarillo for CIT | Content Development - Filming/Pictures/Interviews | 08/18/20 |
|---|---|---|
| Work force Connection / Meeting | Hiring - Virtual | 08/17/20 |
| Virtual Reminder Facebook/Instagram | Social Media Post | 08/17/20 |
| no score pt Robert Harris (no show) | Applicant Engagement | 08/15/20 |
| Testing Weekend | Applicant Engagement | 08/14/20 |
| zoom Technical School of the Rockies | Hiring - Virtual | 08/14/20 |
| pics of CIT RBT training - for social and b roll for mike sciarrillo | Content Development - Filming/Pictures/Interviews | 08/13/20 |
| pictures of Recruit Officer Duran and ECHO Meeting | Content Development - Filming/Pictures/Interviews | 08/13/20 |
| meeting with May Chavez and Andrea | Process Improvement | 08/13/20 |
| No Score PT Bo Coleman | Applicant Engagement | 08/13/20 |
| applicant pt | Applicant Engagement | 08/13/20 |
| Colton RTS Google Analytics | Process Improvement | 08/12/20 |
| Meeting with Real Time Solutions and Recruiting Unit | Process Improvement | 08/12/20 |
| Testing Reminder Facebook/Instagram | Social Media Post | 08/11/20 |
| applicant pt | Applicant Engagement | 08/11/20 |
| Student Loan Forgiveness Facebook/Instagram | Social Media Post | 08/10/20 |
| no score pt Julie Jaramillo(cancelled) / Otilia Spilca | Applicant Engagement | 08/08/20 |
| No Score PT | Applicant Engagement | 08/08/20 |
| no score pt kate smith (no show) / Zaxary Thomas | Applicant Engagement | 08/08/20 |
| no score pt Amber Edmonds /  Robert Harris (no show) | Applicant Engagement | 08/08/20 |
| Sergeant Silva Facebook/Instagram | Social Media Post | 08/06/20 |
| No score pt Steven Fuller/Nelson Sexson/Brian Eichel/Joshua Hedberg/Chayton Martinez/ Nicholas Steward | Applicant Engagement | 08/06/20 |
| applicant pt | Applicant Engagement | 08/06/20 |
| CPC Southwest | Event - CPC Meeting | 08/05/20 |
| Cadet Class CNM Facebook/Instagram | Social Media Post | 08/05/20 |
| no score pt Otilia Spilca/Devin Werner/Katherine Lindenmuth | Applicant Engagement | 08/05/20 |
| City Orientation Facebook/Instagram | Social Media Post | 08/04/20 |
| applicant pt | Applicant Engagement | 08/04/20 |
| Air Support Facebook/Instagram | Social Media Post | 08/03/20 |
| no score pt Joshua Dolan/ Joshua Deleon/Gerald Olguin/Chance Gore/Zachary Yaegle, Mark Morlang | Applicant Engagement | 08/01/20 |

| | | |
|---|---|---|
| no score pt Kevin Fulton | Applicant Engagement | 08/01/20 |
| Testing Weekend | Applicant Engagement | 07/31/20 |
| Testing Weekend Facebook/Instagram | Social Media Post | 07/31/20 |
| applicant pt | Applicant Engagement | 07/31/20 |
| Signal Vine Meeting | Process Improvement | 07/30/20 |
| Open Space Facebook/Instagram | Social Media Post | 07/30/20 |
| no score pt Damian Dudnow/Tessa Plako | Applicant Engagement | 07/30/20 |
| no score pt Renee Saavedra, Jorge Villalobos, Alex Couch, Jessica Gonzales, Lonetta Gallegos | Applicant Engagement | 07/30/20 |
| Hiring Lateral Officer Facebook/Instagram | Social Media Post | 07/29/20 |
| J. Demsich Video Facebook/Instagram | Social Media Post | 07/28/20 |
| no score pt test for Jacqueline Schlessinger | Applicant Engagement | 07/28/20 |
| applicant pt | Applicant Engagement | 07/28/20 |
| Open Space Facebook/Instagram Post | Social Media Post | 07/27/20 |
| Bernalillo County Government Virtual Career Fair | Hiring - Virtual | 07/27/20 |
| MDC Tutorial Telephone Call | Process Improvement | 07/24/20 |
| no score PT test for Todd Steele, Anna Ponce and Xavier Safley | Applicant Engagement | 07/24/20 |
| no score pt test for Kyle Salberg | Applicant Engagement | 07/24/20 |
| Applicant pt | Applicant Engagement | 07/24/20 |
| no score pt test for Antonio Archuleta and Anna Ponce | Applicant Engagement | 07/23/20 |
| Met with Dorothy Onikute | Applicant Engagement | 07/23/20 |
| applicant pt | Applicant Engagement | 07/23/20 |
| Apdonline.com Mtg | Process Improvement | 07/22/20 |
| Patch Post Facebook/Instagram | Social Media Post | 07/22/20 |
| Signal Vine Meeting | Process Improvement | 07/22/20 |
| no score pt test for Jorge Villalobos, Arthur Acosta, Jarno Hol and Miriam Michel-Munoz | Applicant Engagement | 07/22/20 |
| Bomb Picture Facebook/Instagram | Social Media Post | 07/21/20 |
| applicant pt | Applicant Engagement | 07/21/20 |
| PSA Social Media Post Facebook/Instagram | Social Media Post | 07/20/20 |
| no score pt test for Christian Langley, Kelly Whitehouse, Kelsie Saul, Ryan Betty, and Cody Powell | Applicant Engagement | 07/17/20 |
| Recruiting Unit no score pt with cadet class 123 | Applicant Engagement | 07/16/20 |

| | | |
|---|---|---|
| Handshake Webinar | Hiring - Virtual | 07/16/20 |
| no score PT test for Matthew Griego and Jesus Salazar | Applicant Engagement | 07/16/20 |
| Northwest CPC Meeting | Event - CPC Meeting | 07/15/20 |
| Workforce Connection Virtual Hiring Event/ Live Q&A | Hiring - Virtual | 07/15/20 |
| no score pt test for Alex Couch and Alex Cabaday | Applicant Engagement | 07/15/20 |
| Workforce Connection Social Media Post Facebook/Instagram | Social Media Post | 07/14/20 |
| no score PT test for Andrew Saylor, Ricky Copeland, Nathan Kamps, Nathaniel Myers | Applicant Engagement | 07/14/20 |
| no score pt test for Marissa Calvillo and Paulina De Andrade | Applicant Engagement | 07/14/20 |
| Monday Post feat. James Demsich Facebook/Instagram | Social Media Post | 07/13/20 |
| Zoom confrence with Norther NM College | Hiring - Virtual | 07/10/20 |
| No score Pt test with Lonetta Gallegos and Jacob Osborne | Applicant Engagement | 07/10/20 |
| Additional Workforce Advertisment Instagram | Social Media Post | 07/09/20 |
| Phone meeting with San Juan College | Hiring - Virtual | 07/09/20 |
| Meeting with Army National Guard Recruiting Office | Process Improvement | 07/09/20 |
| Filming of Precorder hiring seminar for colleges | Content Development - Filming/Pictures/Interviews | 07/09/20 |
| Recording of JAmes Demish - for social media post | Social Media Post | 07/09/20 |
| Workforce Instagram/Facebook | Social Media Post | 07/08/20 |
| Workforce Advertisment Instagram | Social Media Post | 07/08/20 |
| Instagram and Facebook posting | Social Media Post | 07/07/20 |
| Meeting with Haley McGuire | Process Improvement | 07/07/20 |
| Instagram posting for Motivation Monday | Social Media Post | 07/06/20 |
| KRQE Brian Johnson | Media Interview (TV/Radio) | 07/03/20 |
| Class 122 Final Inspection | Media Interview (TV/Radio) | 07/03/20 |
| Brian Johnson Video | Social Media Post | 07/02/20 |
| social media Training by Haley | Process Improvement | 07/02/20 |
| Meeting with Deshawn Lucero | Applicant Engagement | 07/02/20 |
| NM Workforce Annoucment for Virtual Recruitment Event | Hiring - Virtual | 07/01/20 |
| Class 122 Pinning (Oates Sibling Picture) | Social Media Post | 06/30/20 |
| Phone meeting with SSgt. G. Martinez | Process Improvement | 06/30/20 |

| Facebook and Instgram post w/picture day-Raquel Ware-Terraza | Social Media Post | 06/29/20 |
|---|---|---|
| Kirtland AFB Hiring event | Hiring - In person Hiring | 06/26/20 |
| Facebook and Instgram post | Social Media Post | 06/26/20 |
| Facebook and Instgram post | Social Media Post | 06/25/20 |
| Holloman AFB Facebook post | Social Media Post | 06/24/20 |
| Meeting with Melissa Cruz | Applicant Engagement | 06/24/20 |
| Call Recruiting Unit to help prepare for Physical Abilities Test | Social Media Post | 06/24/20 |
| meeting with Lonetta Gallegos | Applicant Engagement | 06/24/20 |
| Recruiting Unit helps with CNM Testing | Applicant Engagement | 06/23/20 |
| Facebook/Instagram CNM Physical Ability Test | Social Media Post | 06/23/20 |
| Facebook/Instagram "Jessica and DC Armijo" | Social Media Post | 06/23/20 |
| Partnership with49 FSS AFRC | Process Improvement | 06/23/20 |
| Facebook/Instagram "Looking for that new and exciting career?" | Social Media Post | 06/22/20 |
| Retest of Bianca Carrier on City Entrance | Applicant Engagement | 06/20/20 |
| set up Sekayi Son on a ridealong with 34 Ashalyn Eylicio | Applicant Engagement | 06/19/20 |
| Testing for Applicants | Applicant Engagement | 06/19/20 |
| Testing for 27 applicants - Nelson Denny and City Entrance | Applicant Engagement | 06/19/20 |
| Campus tour with Applicant Sekayi Son | Applicant Engagement | 06/18/20 |
| Met with Dr. Bailey reference Diversity recruiting efforts | Process Improvement | 06/18/20 |
| WorkForce Connection | Hiring - In person Hiring | 06/18/20 |
| Kirtland AFB Hiring event | Hiring - In person Hiring | 06/12/20 |
| Isotopes Public Safety Day | Hiring - In person Hiring | 06/07/20 |
| Testing for Applicants | Applicant Engagement | 06/05/20 |
| Social Media Post Annoucment Testing | Social Media Post | 06/01/20 |
| FTO Thursday J. Rogillo R/O P. Renna | Social Media Post | 05/28/20 |
| KRQE APD Seeing Increase in recruits during COVID | Media Interview (TV/Radio) | 05/28/20 |
| ABQ Journal APD applications more than quadrupled in April | Media Interview (TV/Radio) | 05/28/20 |
| Continue Revision on 1-85 Recruiting SOP | Process Improvement | 05/28/20 |
| ABQ Journal Phone Interview | Media Interview (TV/Radio) | 05/27/20 |
| All Department Marketing Meeting | Process Improvement | 05/27/20 |
| Phone meeting with SFC Gualterio Quintana | Process Improvement | 05/27/20 |

| | | |
|---|---|---|
| Mayor Keller to Hold Media Briefing on Public Safety, Support for Local Restaurants During COVID-1 | Process Improvement | 05/27/20 |
| Swat Wednesday | Social Media Post | 05/27/20 |
| Army National Guard Partnership Post | Process Improvement | 05/26/20 |
| Social Media Memorail Day Post | Social Media Post | 05/25/20 |
| Social Media for NM Special Olympic Athletes | Social Media Post | 05/22/20 |
| FTO Thursday L. Moore and R/O M. Holmen | Social Media Post | 05/21/20 |
| WorkForce Connection | Hiring - Virtual | 05/21/20 |
| Question Wednesday | Social Media Post | 05/20/20 |
| Google Analytics Training | Process Improvement | 05/20/20 |
| KOAT News with Brittany Hope | Media Interview (TV/Radio) | 05/19/20 |
| Cadet Day Tuesday | Content Development - Filming/Pictures/Interviews | 05/19/20 |
| Moberly Area Community College LEA | Hiring - Virtual | 05/19/20 |
| Monday Facebook/Instagram Post | Social Media Post | 05/18/20 |
| Eastern Missouri Police Academy  // Ring Central Meeting | Hiring - Virtual | 05/18/20 |
| Kirtland AFB Hiring event | Hiring - In person Hiring | 05/15/20 |
| Bridgerland Technical College (WEB X) | Hiring - Virtual | 05/14/20 |
| Recruiting Unit Blood Drive | Social Media Post | 05/14/20 |
| Question Wednesday | Social Media Post | 05/13/20 |
| Tuesday Challenge | Social Media Post | 05/12/20 |
| Monday Motivation Picture | Content Development - Filming/Pictures/Interviews | 05/11/20 |
| Metro Public Safety Day | Event - Community Engagement | 05/09/20 |
| Zoom Presentation to Utah State University Law Enforcement Academy | Hiring - Virtual | 05/08/20 |
| Facebook Instagram Jose Nunez | Social Media Post | 05/08/20 |
| Recruiting Meetinsg with CAO Sarita Nair and Chief Geier and Chief Ross | Process Improvement | 05/08/20 |
| Live Video of Jose | Social Media Post | 05/07/20 |
| 5 Question Wednesday Alex | Social Media Post | 05/06/20 |
| Zoom Presentation to Dixie State Police Academy | Hiring - Virtual | 05/06/20 |
| Zoom Recruiting meeting / Middle Rio Grande L.E.A. | Hiring - Virtual | 05/05/20 |
| Social Media Post Motor Unit | Social Media Post | 05/05/20 |
| CEC Virtual MTG PSA Class | Event - Community Engagement | 05/05/20 |
| Tres De Mayo Car show. | Hiring - In person Hiring | 05/03/20 |

19

| | | |
|---|---|---|
| Kirtland AFB Hiring event | Hiring - In person Hiring | 05/01/20 |
| FTO Thursday Sharon Saavedra and R/O | Social Media Post | 04/30/20 |
| 5 Question Wednesday Tim | Social Media Post | 04/29/20 |
| Tim Military Facebook/Instagram Post | Social Media Post | 04/27/20 |
| San Antonio College L.E.A.  / Zoom Meeting | Hiring - Virtual | 04/27/20 |
| Monday Motivation Picture | Social Media Post | 04/27/20 |
| San Antonio College L.E.A.  Zoom Meeting | Hiring - Virtual | 04/27/20 |
| Testing for 34 Marvin Barnes | Applicant Engagement | 04/25/20 |
| Facebook Officer Luis Hernandez | Social Media Post | 04/24/20 |
| COA Recruiting Meeting | Process Improvement | 04/24/20 |
| Recruiting Update W/ CAO Sarita Nair | Process Improvement | 04/24/20 |
| Zoom Recruting Meeting San Antonio College L.E.A. | Hiring - Virtual | 04/24/20 |
| WorkForce Connection Web live Hiring event | Hiring - Virtual | 04/23/20 |
| Chiefs Staff Meeting | Process Improvement | 04/23/20 |
| Hiring and Recruiting Webinar under the Pamdemic Status | Process Improvement | 04/23/20 |
| RBT Training | Applicant Engagement | 04/22/20 |
| Operation Hiring Heroes / Post 13 | Hiring - In person Hiring | 04/22/20 |
| Colorado Mountain College | Hiring - Virtual | 04/21/20 |
| Recrruiting Meeting with Deputy Chief of Staff Armijo | Process Improvement | 04/21/20 |
| MTG Packman/Cumulus | Process Improvement | 04/21/20 |
| Additional Walk through with Workforce Solutions | Process Improvement | 04/21/20 |
| RBT Training | Applicant Engagement | 04/21/20 |
| Social media post at BernCo Business COVID-19 Recovery | Social Media Post | 04/20/20 |
| Monday Motivation Rahimi Sandia Runs | Social Media Post | 04/20/20 |
| Meeting -Alex and Michelle | Process Improvement | 04/18/20 |
| Friday's Hear it from the field Facebook/Instagram | Social Media Post | 04/17/20 |
| Workforce Walk Through | Process Improvement | 04/17/20 |
| FTO Picture Paula Mauser with Recruit Officer | Social Media Post | 04/16/20 |
| 5 Question Wednesday | Social Media Post | 04/15/20 |
| Tuesday Challenge Michelle Facebook/Instagram | Social Media Post | 04/14/20 |
| Creation of 5 Billboards for Advertisment | Content Development - Filming/Pictures/Interviews | 04/14/20 |

| | | |
|---|---|---|
| ABQ Needs You Social Media Post Instagram/Facebook | Social Media Post | 04/13/20 |
| Michelle Running Snow Video | Social Media Post | 04/13/20 |
| NM Workforce Connection MTG Virtual Hiring Event | Hiring - Virtual | 04/13/20 |
| social media Filiming | Content Development - Filming/Pictures/Interviews | 04/11/20 |
| Recruiting from SUV at Walmart, Smiths Grocery and Costco | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 04/11/20 |
| Hand Stand Challenge | Content Development - Filming/Pictures/Interviews | 04/10/20 |
| Social Media Plan for Recruiting Unit | Process Improvement | 04/10/20 |
| Simon video of chalk on unit with message | Content Development - Filming/Pictures/Interviews | 04/08/20 |
| SUV Recruiting | Recruiting Unit(s) Staged (Community Event if you engaged with community members) | 04/07/20 |
| Job Post on BernCo Business COVID-19 Recovery | Hiring - Virtual | 04/07/20 |
| Delivered Donation of Disinfection wipes from Lowe's | Event - Community Engagement | 04/03/20 |
| JTD show 100.3 The Peak | Media Interview (TV/Radio) | 04/03/20 |
| 93.3 KISS FM | Media Interview (TV/Radio) | 04/03/20 |
| 94 Rock show KZRR | Media Interview (TV/Radio) | 04/02/20 |
| KOB Channel 4 Recruiting Segment DC Armijo | Media Interview (TV/Radio) | 04/01/20 |
| Darren White show 770 KKOB | Media Interview (TV/Radio) | 04/01/20 |
| Social Media Plan for Chief/Mayor | Process Improvement | 03/31/20 |
| 770 KKOB Radio Simon | Media Interview (TV/Radio) | 03/31/20 |
| KOAT 7 DC Armijo | Media Interview (TV/Radio) | 03/31/20 |
| Apdonline.com Mtg | Process Improvement | 03/31/20 |
| 97.7 Radio | Media Interview (TV/Radio) | 03/30/20 |
| KRQE NEWS Featuring English | Media Interview (TV/Radio) | 03/30/20 |
| Brett Johnson Sharepoint Discussion | Process Improvement | 03/30/20 |
| 4 video conferences with Michelle | Event | 03/28/20 |
| Chief Video Released Instagram/Facebook | Social Media Post | 03/27/20 |
| Mtg With Sarita | Process Improvement | 03/27/20 |
| Chief 101.7 " Make a difference" | Media Interview (TV/Radio) | 03/27/20 |
| Responding to a Recruiting Crisis: Using Innovative Tactics to Transform Your Recruiting Practices | Process Improvement | 03/26/20 |

| | | |
|---|---|---|
| REcruiting meeting video conference | Process Improvement | 03/26/20 |
| United Soccer | Hiring - In person Hiring | 03/25/20 |
| Contacted 38 Applicants | Applicant Engagement | 03/25/20 |
| Contacted 12 Laterals | Applicant Engagement | 03/25/20 |
| Alan Packman Mtg | Process Improvement | 03/25/20 |
| Open Space Pictures from Rich (Facebook/Instagram) | Content Development - Filming/Pictures/Interviews | 03/22/20 |
| Graduation Video (Facebook/Instagram) | Social Media Post | 03/20/20 |
| Shared Main Facebook Graduation Post | Social Media Post | 03/19/20 |
| Highlight Video Facebook/Instagram | Social Media Post | 03/20/20 |
| Teleconference with Jose Carrasco | Process Improvement | 03/18/20 |
| Corona Virus -all working from home | Event | 03/16/20 |
| no score pt test Joshua Moreno | Applicant Engagement | 03/15/20 |
| special testing for 3 laterals | Applicant Engagement | 03/14/20 |
| weekend testing | Applicant Engagement | 03/14/20 |
| Neogov Issue Fixed | Process Improvement | 03/13/20 |
| No Score PT.. Justin L. DE Guzman | Applicant Engagement | 03/13/20 |
| Chief's Run Facebook/Instagram | Social Media Post | 03/12/20 |
| CAPs with Shaquille Robinson | Applicant Engagement | 03/12/20 |
| WorkForce Connection cancelled but they came to academy | Hiring - In person Hiring | 03/12/20 |
| Air Support Video | Social Media Post | 03/11/20 |
| appointment w/ Patricia Minjarez | Applicant Engagement | 03/11/20 |
| CAPS with Todd Cravens | Applicant Engagement | 03/11/20 |
| ESPN Radio Recording | Media Interview (TV/Radio) | 03/11/20 |
| Walk In Applicant Cung | Applicant Engagement | 03/11/20 |
| N Basketball state championships at PIT | Hiring - In person Hiring | 03/10/20 |
| Social Media Mtg W/Haley | Process Improvement | 03/10/20 |
| Steve Stucker Visits Recruiting Unit Facebook/Instagram | Media Interview (TV/Radio) | 03/10/20 |
| 2020 State Basketball Tournament | Hiring - In person Hiring | 03/10/20 |
| met with Tanya Rameriz after hours | Applicant Engagement | 03/09/20 |
| Rich did recruiting video on Helicopter | Content Development - Filming/Pictures/Interviews | 03/09/20 |
| Meeting with Christian Jaquez- applied/approved | Applicant Engagement | 03/09/20 |
| No score Pt test with Alex Campbell | Applicant Engagement | 03/07/20 |
| Campus tour - Soledad Zavala / pt with Alex Campbell | Applicant Engagement | 03/07/20 |
| met with Stephen Lambros | Applicant Engagement | 03/06/20 |
| Meeting With Aubrey discussing current contracts (Indeed, ipads, signal vine, etc) | Process Improvement | 03/06/20 |
| meeting with Dustin Baxley | Applicant Engagement | 03/06/20 |

| | | |
|---|---|---|
| No score Pt test with Cynthia Smith | Applicant Engagement | 03/06/20 |
| Tribute to Women in the Military | Hiring - In person Hiring | 03/06/20 |
| Meeting with Chief Ross and DC ARmijo | Process Improvement | 03/05/20 |
| Meeting with Stephen Tressler (lateral)applicant | Applicant Engagement | 03/05/20 |
| meeting with Joshua Moreno | Applicant Engagement | 03/05/20 |
| Meeting with Elijah Carter | Applicant Engagement | 03/04/20 |
| SW CPC meeting | Event - CPC Meeting | 03/04/20 |
| Workforce Hiring Event Facebook/Instagram | Social Media Post | 03/04/20 |
| Facebook began | Social Media Post | 03/04/20 |
| spoke to the UC class that had multiple agencies in it regarding laterals | Process Improvement | 03/04/20 |
| No score PT.. Destiny Romero | Applicant Engagement | 03/04/20 |
| Meeting with Denneca Montoya | Applicant Engagement | 03/03/20 |
| Meeting with Joshua Moreno | Applicant Engagement | 03/03/20 |
| Meeting with Xavier Martinez | Applicant Engagement | 03/03/20 |
| campus tour with Kaitlyn Abeyta | Applicant Engagement | 03/03/20 |
| conference call with April in HR about Black hole | Process Improvement | 03/03/20 |
| Metro Public Safety Day MEETING | Event - Community Engagement | 03/03/20 |
| CNM Filming Paula and Brian | Content Development - Filming/Pictures/Interviews | 03/02/20 |
| English assist with RBT scenarios | Applicant Engagement | 03/02/20 |
| met with 2 NELS. Shane and Steven Thomas | Applicant Engagement | 03/01/20 |
| weekend testing | Applicant Engagement | 02/29/20 |
| Kirtland AFB Hiring event | Hiring - In person Hiring | 02/28/20 |
| No score PT with Nanci Najera | Applicant Engagement | 02/28/20 |
| No score PT test with Alex Cambell | Applicant Engagement | 02/28/20 |
| Testing (regular weekend) | Applicant Engagement | 02/28/20 |
| Citizen Police Academy | Event - Community Engagement | 02/27/20 |
| Alan Packman Mtg | Process Improvement | 02/26/20 |
| KRQE Post Facebook | Social Media Post | 02/26/20 |
| Starbucks Military Dedication event | Event - Community Engagement | 02/26/20 |
| Tour with CNM students regarding video | Process Improvement | 02/26/20 |
| CAPS with Tammy Jones | Applicant Engagement | 02/25/20 |
| tour with Jacob Osborne | Applicant Engagement | 02/25/20 |
| Silver City NEL trip | Hiring - In person Hiring | |
| English assist with RBT scenarios | Applicant Engagement | 02/24/20 |

| | | |
|---|---|---|
| CAPS with Danny Garcia | Applicant Engagement | 02/22/20 |
| No score PT test with Ashley Jimenez & aLex cAmpbell | Applicant Engagement | 02/22/20 |
| CNM " Job Connection" | Hiring - In person Hiring | 02/21/20 |
| family night for 122nd Cadets | Applicant Engagement | 02/20/20 |
| Workforce Connection | Hiring - In person Hiring | 02/20/20 |
| CNM Kick Off | Content Development - Filming/Pictures/Interviews | 02/19/20 |
| University of Houston Downtown | Hiring - In person Hiring | 02/19/20 |
| University of Houston Downtown | Hiring - In person Hiring | 02/18/20 |
| Moya Challenge Coin Holder | Social Media Post | 02/18/20 |
| Reliant hiring Career Fair | Hiring - Virtual | 02/18/20 |
| Houston Texas Facebook Post | Social Media Post | 02/17/20 |
| Met with Houston Recruiters | Process Improvement | 02/17/20 |
| English Recruiting event | Hiring - In person Hiring | 02/16/20 |
| Call back telethon | Process Improvement | 02/15/20 |
| Mtg With Sarita | Process Improvement | 02/14/20 |
| Meeting with Sam Rhodes | Applicant Engagement | 02/14/20 |
| UNM Facebook Post | Social Media Post | 02/13/20 |
| meeting with Steve Safir | Applicant Engagement | 02/13/20 |
| meeting with Makela Mattier | Applicant Engagement | 02/13/20 |
| UNM Career Fair | Hiring - In person Hiring | 02/13/20 |
| KAFB Recruiting Event | Hiring - In person Hiring | 02/12/20 |
| Ross Meeting | Process Improvement | 02/10/20 |
| Finalized DOJ documentation | Process Improvement | 02/09/20 |
| UTEP President Facebook | Social Media Post | 02/08/20 |
| No score PT test with Zaxary Thomas | Applicant Engagement | 02/08/20 |
| UTEP Facebook | Social Media Post | 02/07/20 |
| Deanne Video Facebook | Social Media Post | 02/07/20 |
| NEL/Lateral Job Posting | Social Media Post | 02/06/20 |
| UTEP Career Fair | Hiring - In person Hiring | 02/06/20 |
| meeting with Alan Ramirez-Reynard | Applicant Engagement | 02/05/20 |
| Fort Bliss Post Facebook | Social Media Post | 02/05/20 |
| Testing for PSA applicant Cinthya Smith | Applicant Engagement | 02/05/20 |
| El Paso PD Meeting | Hiring - Virtual | 02/05/20 |
| No score PT test with Annika warder | Applicant Engagement | 02/04/20 |
| Fort Bliss Presentation | Hiring - In person Hiring | 02/04/20 |
| meeting with Annika Warder | Applicant Engagement | 02/03/20 |
| One ABQ Job Fair Facebook | Hiring - In person Hiring | 02/01/20 |
| 2020 Youth Job and Volunteer Fair | Hiring - In person Hiring | 02/01/20 |
| English assist with Testing | Applicant Engagement | 02/01/20 |
| meeting with Tristen Gallegos | Applicant Engagement | 01/31/20 |

| Appointment w/Ethan Holmes | Applicant Engagement | 01/31/20 |
|---|---|---|
| Campus tour Deanne Delgado | Applicant Engagement | 01/31/20 |
| meeting with Patrick Baca | Applicant Engagement | 01/31/20 |
| Meeting with eric shaffman | Applicant Engagement | 01/31/20 |
| No score PT with Dominique Vasquez | Applicant Engagement | 01/31/20 |
| meeting with Alan Ramirez | Applicant Engagement | 01/30/20 |
| meeting with Mayors officer | Process Improvement | 01/30/20 |
| walk in by A. Gutierrez (applied and approved) | Applicant Engagement | 01/30/20 |
| Fabricio Ugarte No score PT test | Applicant Engagement | 01/30/20 |
| Kevin Smith appointment / campus tour | Applicant Engagement | 01/30/20 |
| Testing Prep Session | Applicant Engagement | 01/29/20 |
| walkin by Sklyer Whitney | Applicant Engagement | 01/29/20 |
| walk in by Phillip Apodoca (applied and approved) | Applicant Engagement | 01/29/20 |
| Meeting with Workforce solutions | Process Improvement | 01/29/20 |
| No Score PT Jason Cummings | Applicant Engagement | 01/29/20 |
| Campus tour - Earnest Huewitt | Applicant Engagement | 01/28/20 |
| No score PT with Mayra Amaya | Applicant Engagement | 01/28/20 |
| No score PT with Nicole Thorn | Applicant Engagement | 01/28/20 |
| Walk in by Renard Rameriz | Applicant Engagement | 01/27/20 |
| Upward Bound Academy Facebook | Social Media Post | 01/26/20 |
| No Score PT  Andrew Chavez | Applicant Engagement | 01/25/20 |
| Upward Bound / Valley HS | Hiring - In person Hiring | 01/25/20 |
| Call backlog | Process Improvement | 01/25/20 |
| Supernationals Facebook Post | Social Media Post | 01/24/20 |
| Campus tour Veronica Sanchez | Applicant Engagement | 01/24/20 |
| Campus tour Kayla Casey | Applicant Engagement | 01/24/20 |
| Kirtland AFB Hiring event | Hiring - In person Hiring | 01/24/20 |
| Albuquerque Super Nationals Car Show | Hiring - In person Hiring | 01/24/20 |
| Class 122 Facebook | Social Media Post | 01/23/20 |
| Cadet Team Building Day | Applicant Engagement | 01/23/20 |
| Cadet Class 122 Welcome Faceook | Social Media Post | 01/22/20 |
| RBT scenarios for cadet class. | Applicant Engagement | 01/22/20 |
| Memorial Facebook | Social Media Post | 01/21/20 |
| Radio announcement recording at studio | Media Interview (TV/Radio) | 01/21/20 |
| Walkin - Oddo, Monte Ray walkin and applied | Applicant Engagement | 01/21/20 |
| LAPD Facebook | Social Media Post | 01/19/20 |
| Monster Truck Show | Hiring - In person Hiring | 01/18/20 |

| Met with Sarasota County Sheriffs Dept Recruiting Unit | Process Improvement | 01/18/20 |
|---|---|---|
| Toughest Monster Truck Tour | Hiring - In person Hiring | 01/17/20 |
| Enroute LA Facebook | Social Media Post | 01/17/20 |
| No-score Jesus Arreola | Applicant Engagement | 01/17/20 |
| Meeting with Sarasota PD Recruiting | Process Improvement | 01/17/20 |
| LAPD Hiring Seminar | Hiring - In person Hiring | 01/17/20 |
| CAPS WITH R. WARE | Applicant Engagement | 01/16/20 |
| No score PT test with A. Vancourt | Applicant Engagement | 01/16/20 |
| No score PT test with Genieve Padilla | Applicant Engagement | 01/16/20 |
| Workforce Connection | Hiring - In person Hiring | 01/16/20 |
| meeting with Audrey Crespin and her husband | Applicant Engagement | 01/16/20 |
| Citizen Police Comm.  (CPC) | Event - CPC Meeting | 01/15/20 |
| Campus tour with Tiffany Sanchez | Applicant Engagement | 01/15/20 |
| Kirtland AFB Transition Assistance Program for Military | Process Improvement | 01/15/20 |
| Campus Tour / No score PT | Applicant Engagement | 01/15/20 |
| CPC Meeting at NE | Event - CPC Meeting | 01/14/20 |
| Meeting with A. Fitzgerald - applied and approved | Applicant Engagement | 01/14/20 |
| NO score pt  with Edna Hernandez | Applicant Engagement | 01/14/20 |
| Campus tour with A. Vancourt - APplied and approved | Applicant Engagement | 01/14/20 |
| MDC Hiring event | Hiring - In person Hiring | 01/14/20 |
| CAP with R. Ware | Applicant Engagement | 01/14/20 |
| Officer Appreciation Facebook | Social Media Post | 01/13/20 |
| Meeting with Lateral Applicant R. Hatfield | Applicant Engagement | 01/13/20 |
| meeting with Applicant A.Hermosillo and J.OLIVAS | Applicant Engagement | 01/13/20 |
| CAP with D.Bashaw | Applicant Engagement | 01/12/20 |
| Recruiting Lawrence with Tactical | Social Media Post | 01/11/20 |
| Wonderful team Facebook | Social Media Post | 01/11/20 |
| New Year Post Facebook | Social Media Post | 01/11/20 |
| Mayors Address Facebook Haley and Dave | Social Media Post | 01/11/20 |
| Testing (regular weekend) | Applicant Engagement | 01/11/20 |
| CAP w/ David Bashaw | Applicant Engagement | 01/11/20 |
| Campus Tour with JAmes Reynolds | Applicant Engagement | 01/11/20 |
| State of the City | Hiring - In person Hiring | 01/11/20 |
| Radio Facebook | Social Media Post | 01/10/20 |
| testing - regular weekend | Applicant Engagement | 01/10/20 |

| | | |
|---|---|---|
| Walkin-Tim DeVILBliss-Applied and approved | Applicant Engagement | 01/10/20 |
| Law Enforcement Appreciation Facebook | Social Media Post | 01/09/20 |
| PT testing for cadet Orientation | Applicant Engagement | 01/09/20 |
| Campus Tour w/ A. Salguero | Applicant Engagement | 01/08/20 |
| No Score PT  Collin Sandoval | Applicant Engagement | 01/08/20 |
| CAPS with Henry, Mike and David | Applicant Engagement | 01/07/20 |
| Child Care Facebook | Social Media Post | 01/07/20 |
| One ABQ lunch Presser | Process Improvement | 01/07/20 |
| Meeting with Daniel Ocasio. Approved to test | Applicant Engagement | 01/06/20 |
| Meeting with Belding - not qualified | Applicant Engagement | 01/06/20 |
| meeting with Adalia Mofley | Applicant Engagement | 01/06/20 |
| Collateral Recruiting Training afternoon | Process Improvement | 01/06/20 |
| Collateral Recruiting Training morning | Process Improvement | 01/06/20 |
| fort bliss/ El Paso Trip | Hiring - In person Hiring | 01/05/20 |
| "If I can YOU can" Facebook launch | Social Media Post | 01/05/20 |
| CAP with  Henry, Mike and Brandy | Applicant Engagement | 01/03/20 |
| CAPS R. Ware | Applicant Engagement | 01/02/20 |
| CAPS | Applicant Engagement | 01/01/20 |
| Special testing for lateral-Sonya Leyba | Applicant Engagement | 01/01/20 |

# Community Engagement Last Updated 2/5/2021

Appendix D

**Community Engagement Paragraphs**

Project Lead: Commander Art Sanchez

Process Improvement Analyst: Rebecca Weatherford



**CASA Paragraphs 255, 258, 260**

🔗 https://app.smartsheet.co...

**IMR Recommendations**

🔗 https://app.smartsheet.co...

**🔲 CASA Dashboard Paragraphs CE**

| Paragraph # | Visible Progress IMR 12 |
|---|---|
| 255 | ● |
| 258 | ● |
| 260 | ● |

**CE Project Status**

Start Date: **07/29/19**
End Date: **09/30/21**
Percent Complete: **67%**
Duration: **795d**

**CE Task Status**



- 🟢 Status - Complete
- 🟡 Status - In Progress
- 🔴 Status - Not Started

11    6    8

**Key Updates December 18, 2020 - February 5, 2021**

- Daily 49 Process complete
- 75% of SRO's completed NASRO training
- New POP form to be used February 1, 2021
- Area command specific outreach plans in progress
- Met with AC Commanders to inform about AC specific outreach strategies
- PRT lesson plan and training delayed pending SOP approval
- 75-1 app, needs assessment and lesson plan sent to CTU.

## Community Engagement Action Plan

| ¶ # | Action Plan | Status | Responsible Person Or Team | Start Date | End Date | Percent Complete |
|---|---|---|---|---|---|---|
| 258 | Objective 1: Implement meaningful changes to management practices, policy procedures and accountability systems in response to the June 2020 semi-annual culture survey. | | | 01/06/21 | 07/31/21 | 51% |
| 255 | Provide training to supervisors to improve skills on employee respect and leadership. (management) | Not Started | Commander Arturo Sanchez, Lt. Mike Meisinger | 04/01/21 | 07/31/21 | 0% |
| 255 | Deliver training video to department personnel on how to submit a policy recommendation. (policies and procedures) | Complete | Commander Arturo Sanchez | 01/22/21 | 01/29/21 | 100% |
| 255, 258, 259 | Utilize POP project initiatives to ensure and document community policing principles are positively impacting the community. (community outreach) | In Progress | Commander Arturo Sanchez, Lt. Jennifer Garcia | 02/01/21 | 07/31/21 | 75% |
| 255 | Develop process for Daily 49 Community Engagement updates (community outreach) | Complete | Lt. Jennifer Garcia, Rebecca Weatherford | 01/06/21 | 01/07/21 | 100% |
| 255 | Gain approval from Chiefs office for Daily 49 process | Complete | Lt. Jennifer Garcia | 01/19/21 | 02/15/21 | 100% |
| 255 | Deliver community engagement updates through the Chiefs Corner on the Daily 49. | In Progress | Lt. Jennifer Garcia | 02/26/21 | 02/26/21 | 90% |
| 255 | Objective 2: Establish partnerships with a broad cross section of community stakeholders. | | | 01/25/21 | 07/31/21 | 57% |

3/2/2021

| | | | | | | |
|---|---|---|---|---|---|---|
| 255, 259 | Attend SRO training to improve communication and engage with at risk youth. | In Progress | Commander Arturo Sanchez, Lt. Jennifer Garcia | 01/25/21 | 03/31/21 | 75% |
| 260 | Objective 4: Develop and document area command public information strategies to relay information of relevance and interest to community | | | 01/22/21 | 02/28/21 | 53% |
| 260 | Work with area commands and PIO office on customized information for community dissemination | In Progress | Commander Arturo Sanchez | 01/22/21 | 02/28/21 | 50% |
| 260, 261 | Deliver updates to area commands on websites for public outreach. | Complete | Lt. Jennifer Garcia | 01/28/21 | 01/28/21 | 100% |
| 256, 258, 259 | Objective 5: Finalize training plans and Implementation to ensure standardization of accountability mechanisms | | | 07/29/19 | 09/30/21 | 68% |
| 258 | Complete POP/COP training thru Academy. | Complete | Lt. Mike Meisinger | 07/31/20 | 12/31/20 | 100% |
| 258 | Receive close out memo when complete | Complete | Commander Arturo Sanchez | 07/31/20 | 02/05/21 | 100% |
| 255, 259 | Conduct training on 75-1 app | | | 12/21/20 | 04/30/21 | 39% |
| 255 | Complete needs assessment and lesson plan | Complete | Lt. Jennifer Garcia | 12/21/20 | 01/27/21 | 100% |
| 255 | Implement training to crime prevention specialist | Not Started | Sarah Masek | 04/01/21 | 04/30/21 | 0% |
| 255 | Implement training to department | Not Started | Sarah Masek | 04/01/21 | 04/30/21 | 0% |