# Monitor's Thirteenth Report

# Compliance Levels of the Albuquerque Police Department and the City of Albuquerque with Requirements of the Court-Approved Settlement Agreement

## No. CIV 14-1025-JB-SMV

May 3, 2021

Prepared by: Public Management Resources, Inc. James D. Ginger, Ph.D., Independent Monitor

**Table of Contents**

| Topic | | Page |
|---|---|---|
| 1.0 | Introduction | 1 |
| 2.0 | Executive Summary | 1 |
| 3.0 | Synopsis of Findings | 5 |
| 4.0 | Current Status | 6 |
| 4.1 | Overall Status Assessment | 6 |
| 4.2 | Dates of Project Deliverables | 8 |
| 4.3 | Format for Compliance Assessment | 8 |
| 4.4 | Compliance Assessment | 9 |
| 4.5 | Operational Definition of Compliance | 9 |
| 4.6 | Operational Assessment | 10 |
| 4.6.1 | Methodology | 11 |
| 4.7 | Assessing Compliance with Individual Tasks | 11 |
| 5.0 | Summary | 347 |

## 1.0 Introduction

This Independent Monitor's Report (IMR) follows the same format as all previous reports. That format is organized into five sections:

    1.0  Introduction;
    2.0  Executive Summary;
    3.0  Synopsis of Findings;
    4.0  Compliance Findings; and
    5.0  Summary.

The purpose of the monitor's periodic compliance reports is to inform the Court of the monitor's findings related to the progress made by APD in achieving compliance with the individual requirements of the CASA.  This report covers the compliance efforts made by APD during the 13th reporting period, which covers August 2020 through January 2021.

## 2.0 Executive Summary

This monitoring period, the monitoring team has noted multiple successes at FRB.  The FRB is transistioning to a more self-actualizing stance, with some members increasingly willing to question the department's "pattern and practice" issues.  An example of this new way of thinking at FRB resulted in FRB noting issues with SOD's "layered response" protocols which had officers delivering simultaneous force mechanisms in a continuous, near instantaneous process.  For example SOD had mutated its "layered response" into a contracted process that would apply multiple kinds of force, one following the last almost immediately, with no required assessment to ascertain if the previous use of force had an effect before the second, third and fouth use of force application was applied.  FRB's notice and "call out" of the issues with this force modality saved the organization from a non-compliance finding by the monitoring team.

At the present time, APD's most critical tasks are two-fold.  The department needs to take steps to ensure that it has effectively responded to the requirements of the CASA. First, it needs to control the uses of force effectuated by its personnel, ensuring that each use of force is carefully assessed for compliance to approved policy and that each use of force was the minimum necessary to accomplish a legitimate policing objective. Secondly, APD needs to actually enforce the mandates of its established disciplinary system and ensure that improper uses of force in the field are addressed through fairly applied remedial measures, e.g., counseling, retraining, enhanced supervision, and discipline.

Controlling Use of Force

Every police department uses force.  APD, however, based on the monitor's knowledge and experience, over-uses force and at times uses excessive and improper force.  This finding is not new.  It was the outcome of the United States Department of Justice's

1

careful review of APD's use of force, and excessive use of force, that brought the CASA to life.  Over the years, the monitoring team has made hundreds of recommendations designed to assist APD in its efforts to reform its use-of-force practices, and, in truth, APD has implemented numerous reform processes.  Despite that, however, we continue to see out-of-policy uses of force at APD.  More importantly, it continues to be apparent that APD has not had and currently does not have an appetite for taking serious approaches to control excessive or unwarranted uses of force during its police operations in the field.  Command and control practices regarding the use of force continue to be weak.  APD continues to lack the ability to consistently "call the ball" on questionable uses of force, and at times is unable to "see" obvious violations of policy or procedure related to its officers' use of force.  We have consistently noted these issues in our highly detailed bi-annual monitoring reports, and each paragraph found not in compliance contains specific recommendations that APD could implement to reduce unwarranted uses of force.  Unfortunately, we find the need to continually make the same recommendations, often times over and over, as APD seems either unwilling or unable to effectively assess, identify, and remediate officers who over-use force.  Again, this reporting period, we have made dozens of recommendations, many of them made multiple times in the past.  After six years, while progress has been made, i.e., new policies and new training have been implemented, and the Force Review Board is demonstrating that is willing to stand for heightened scrutiny of cases of officer-use of force, there remains much to do.

Disciplinary System

At this point, the disciplinary system at APD routinely fails to follow its own written policy (guiding disciplinary matrices) and virtually decimates its disciplinary requirements in favor of refusals to recognize substantial policy violations, and instead, often sustaining minor related violations and ignoring more serious violations.  In other cases, APD simply defies its own written guidance regarding discipline, for example implementing "discipline" well below that required by its own disciplinary matrix.  Examples of these Counter-CASA processes include:

- Replacing a matrix-required 8–32-hour suspension with a written reprimand;

- Refusal to recognize repeat offenses (which by policy require enhanced penalties);

- Failure to consider "aggravating circumstances" in determining appropriate discipline, but nearly always considering "mitigating circumstances";

- A virtual shutdown of investigations in IAFD, possibly delaying disciplinary action for use of force violations until discipline is "time-barred" by the union contract; and

2

- Charging lessor included policy violations, instead of the (often more fitting) more serious of the policy violations (see, for example, p. 243, sanctions imposed for [IMR-13-16]).

In short, APD is willing to go through almost any machination to avoid disciplining officers who violate policy or supervisors who fail to note policy violations or fail to act on them in a timely manner. We do note, however, that during the 13th reporting period, APD IAPS had no cases in which discipline was not implemented due to the delayed investigation resulting from a near congenital inability to complete investigations in a timely manner. This, in and of itself, is a major accomplishment. However, *no* Level 2 cases initiated after September 8, 2020, were completed by the end of this reporting period. We also note that no Level 3 cases initiated after August 14, 2020, were completed by the end of this reporting period. We cannot project the impact untimely case completions will have on discipline moving forward. We do note, however, that in IMR-12 we made twelve recommendations for improvements to the IA functions at APD. Those twelve recommendations remain in IMR-13. This is a recurring problem with APD. The monitor includes dozens of recommendations in each monitor report. Unfortunately, in some areas of compliance, we are required to make the same recommendations over and over because APD simply fails to address these recommendations in any way and refuses to implement processes of their own designed to achieve a reduction in unwarranted use of force. For example, the ten recommendations we made regarding "fact-based discipline" in IMR-12 are repeated again in this monitor's report. The same holds true for multiple paragraphs of our CASA analysis. We recommend, APD demurs, and we continue recommending change, without reciprocal effort by APD.

Interestingly, we note this aversion to discipline does not seem to apply to civilian personnel, who are often subjected to maximum penalties for relatively minor violations.

To the monitor, this constitutes clear evidence of deliberate indifference to the requirements of the CASA. Again, during this reporting period, we provided APD with highly detailed step-by-step recommendations regarding the use of force investigations and supervision at all levels of the department, among other critical issues. Despite this advice, APD has actually lost ground in its compliance efforts as it relates to training related to and operational implementation of the requirements of the CASA.

The same holds true for the requirements in Paragraph 202 relating to the development of and adherence to a written disciplinary matrix. We have, again this reporting period, listed the same recommendations for failure to adhere to a meaningful disciplinary matrix. Our recommendations on many of the CASA's requirements are repeated time after time in subsequent monitor's reports, and APD effectively continues to ignore the monitor's recommendations or to develop and implement disciplinary processes of their own to meet the requirements of the CASA. The fact that the APD need not implement the monitor's recommendations is indisputably true; however, should they fail to do so, it is incumbent on APD to implement some type of reliable and effective mechanism to respond to findings of non-compliance. Again, during this reporting period, we have

3

made dozens of recommendations.  At some point, APD will need to determine whether they will work to implement those recommendations or will develop their own recommendations for change, and most importantly, implement change-oriented processes.  To fail to do so will simply extend the need for external monitoring.  While it is true that the "average" timeline to completely comply with a series of court-mandated reforms to a police department is in excess of eight years, that time is rapidly approaching, and APD has significant work to do to reach compliance with the Court Approved Settlement Agreement.  It is well past time for APD to quit "nibbling around the edges" and make a true commitment to reform.

As an example of how the monitoring team's recommendations can be used effectively, we note that the Paragraphs related to recruiting have all been met by APD this reporting period.  All recommendations previously made by the monitoring team have been assessed, considered, and either implemented into APD's recruiting processes, or have resulted in development of alternate methods related to recruiting.  The eight paragraphs relating to recruiting are all in compliance as a result.

The same holds true for the paragraphs related to officer assistance and support.  APD is in full compliance with these requirements this reporting period, and no doubt fields a "healthier" cadre of street officers as a result.  These paragraphs are also in full compliance.

Further, IAPS has made significant strides this reporting period, getting control of multiple input, process, and output issues that have hindered compliance in the past, including the most important issue of adhering to required investigative timelines.

After the close of this reporting period, APD announced and implemented bifurcated oversight and command responsibilities.  This new process will charge the Chief of Police with day-to-day and strategic operations of the APD and will remove the bulk of disciplinary functions and overall reform processes from the Chief of Police's portfolio, theoretically leaving the Chief of Police in charge of police operations and the new "Superintendent of Police Reform" to manage APD's reform and internal investigations processes.

Regardless of these changes to organizational structure, the monitoring team will continue its work along past lines:  working to identify serious policy violations and process impediments; recommending changes designed to engender full and meaningful compliance with the requirements of the CASA; and notifying the Court every six months of the progress being made, or the lack thereof.

This monitor's report can be synopsized in a single sentence.  Due to a catastrophic failure in training oversight this reporting period and similar failures at the supervisory and command levels of APD, the agency suffered a 9.9 percentage point loss in compliance elements related to the training and supervisory functions at APD and a 7.8 percentage loss in overall compliance (see Figure 2.1, below).  Overall, there is an

argument to be made that operational compliance rates have held relatively steady, at slightly less than 60 percent, since IMR-8, two and one-half years ago.

The most critical issues confronted by APD in its compliance efforts this reporting period are in training, supervision, and command oversight.  As frequent readers of the monitor's reports will note, supervision and oversight are two of the most important keys to full compliance.



### 3.0 Synopsis of Findings for the 13th Reporting Period

As of the end of the IMR-13 reporting period, APD's compliance levels are as follows:

Primary Compliance                100%;
Secondary Compliance            82%; and
Operational Compliance          59%.

Since the last report, IMR-12, the following changes in compliance levels are noted:

Primary Compliance:        No change at 100 percent;

Secondary Compliance:    A loss of 9.9 percent; and

5

Operational Compliance:    A loss of 7.8 percent.

## 4.0 Current Compliance Assessments

As part of the monitoring team's normal course of business, it established a baseline assessment of all paragraphs of the CASA for the Independent Monitor's first report (IMR-1). This was an attempt to provide the Parties with a snapshot of existing compliance levels and, more importantly, to provide the Parties with identification of issues confronting compliance as APD continues to work toward full compliance. As such, the baseline analysis is considered critical to future performance in APD's reform effort as it gives a clear depiction of the issues standing between the APD and full compliance. This report, IMR-13, provides a similar assessment and establishes a picture of progress on APD goals and objectives since the last monitor's report.

## 4.1 Overall Status Assessment

Section 4.1 provides a discussion of the overall compliance status of APD as of the 13th  reporting period.  As of the end of the 13th reporting period, APD  has experienced a drop in compliance levels in both secondary (training) and operational (actions in the field) compliance.  APD achieved primary compliance in 100 percent of the applicable paragraphs of the CASA.  Primary compliance relates mostly to development and implementation of acceptable policies (conforming to national best practices). APD is in 82 percent Secondary Compliance as of this reporting period, which means that effective follow-up mechanisms have been taken to ensure that APD personnel understand the requirements of promulgated policies, e.g., training, supervising, coaching, and implementing disciplinary processes to ensure APD personnel understand the policies as promulgated and are implementing them in the field.  This Secondary Compliance figure represents a 9.9 percent reduction in Secondary Compliance from IMR-12 to IMR-13.  Operational Compliance with the requirements of the CASA for the 13th reporting period has also fallen from 64 percent in IMR-12 to 59 percent in IMR-13. This means that 59 percent of the time, field personnel either perform tasks as required by the CASA or that when they fail, supervisory personnel note and correct in-field behavior that is not compliant with the requirements of the CASA.

These declines in compliance levels come despite intensive and extensive and intensive "hands-on" guidance and advice from the monitoring team. The bottom line is somewhat shocking.  Operational compliance levels for the 13th reporting period are lower than the compliance figures for the 9th reporting period. Obviously, operational compliance is the most important of the three compliance levels.

The monitoring team views these drops in compliance to be serious and concerning, as they reflect substantial and serious lapses in APD's command and oversight practices designed to ensure implementation of the CASA.  These data indicate that, for the second time since the inception of the CASA implementation process, APD has dropped in period-over-period compliance. The first reporting period in which APD dropped in period-over-period compliance was from IMR-11 to IMR-12.  The second time APD dropped in period-over-period compliance was in IMR-12 to IMR-13.  This represents a serious decline in APD's compliance success and equals an 11.8 percent decline from IMR-11's secondary compliance rate, and an overall decline of 10.6 percent in operational compliance in 12 months.  It is clear to the monitor that as of IMR-13, APD is in serious trouble with its ability to generate compliance with the CASA.   This should sound alarms at all levels of the Albuquerque City government.  It bears repeating that operational compliance rates are lower today than in the IMR-9 reporting period, two years ago.

See figure 4.1 below.

## 4.1:  Longitudinal Compliance Levels, IMR-1 through IMR-13



We note that there was no "conventional" IMR written for the seventh reporting period.  Instead, given the fact that a new administration was on board, we spent the IMR-7 period almost exclusively on technical assistance (TA) as opposed to actual compliance monitoring.  The monitor developed and published two "mini-reports" outlining that TA.  Figure 4.1. depicts a significant shutdown of CASA-related training for the 13th reporting period.  The monitor's data also note a significant drop in operational compliance. Such dramatic failures, in the monitor's experience, are seldom accidental but are instead indicative of deliberate indifference or changes due to exogenous variables such as budget constraints or new case law.   This is particularly true when the variable is completely under the agency's control, i.e., training, as opposed to factors less under the agency's control, such as crime rates or officer injuries. To understand the full impact of these data, APD's operational compliance scores this reporting period were lower than in IMR-9, two years ago.  This is the first monitoring project the monitor has overseen that has made such dramatic regressions in compliance levels. At this point, there is a reasonable argument to be made that operational compliance levels have been relatively stable since the IMR-8 reporting period, with operational compliance levels holding at between 59 percent and 66 percent.

## 4.2 Project Deliverables

Project deliverables are defined by the Court-Approved Settlement Agreement governing the parties' response to the CASA, DOJ, the City, and APD. Each deliverable is discussed in detail in section 4.7 on the following page.

## 4.3 Format for Compliance Assessment

The Monitor's Reports are organized to be congruent with the structure of the CASA, and specifically report, in each section, on the City's and APD's compliance levels as well as with CPOA, for each of the 276 individual requirements of the CASA.

The Monitor's Reports are structured into nine major sections, following the structure of the Agreement:

       I.        Use of Force;

      II.        Specialized Units;

     III.        Crisis Intervention;

     IV.        Policies and Training;

      V.        Misconduct Complaint Intake, Investigation, and Adjudication;

VI.    Staffing, Management, and Supervision;

VII.    Recruitment, Selection, and Promotions;

VIII.    Officer Assistance and Support; and

IX.    Community Engagement and Oversight;

All monitor's reports deal with each of these nine major areas, in turn, beginning with APD's response and performance regarding reporting, supervising, and managing its officers' use of force during the performance of their duties, and ending with APD's efforts at community engagement and its ability to facilitate community oversight of its policing efforts.

## 4.4 Structure of the Task Assessment Process

Members of the monitoring team have collected data concerning APD's compliance levels in a number of ways:  through on-site observation, review, and data retrieval; through off-site review of more complex items, such as policies, procedures, testing results, etc.; and through review of documentation provided by APD or the City which constituted documents prepared contemporaneously during the normal daily course of business.  While the monitoring team did collect information provided directly by APD in response to the requirements of the CASA, those data were never used as a sole source of determining compliance but were instead used by the monitoring team as explanation or clarification of process.  All data collected by the monitoring team were one of two types:

- Data that were collected by using a structured random sampling process; or

- Selecting *all* available records of a given source for the "effective dates."

Under no circumstances were data selected by the monitoring team based on provision of records of preference by personnel from the City or APD.  In every instance of selection of random samples, APD personnel were provided lists of specific items, date ranges, and other specific selection rules, or the samples were drawn on-site by the monitor or his staff. The same process will be adhered to for all following reports until the final report is written.

## 4.5 Operational Definition of Compliance

For the purposes of the APD monitoring process, "compliance" consists of three parts:  primary, secondary, and operational.  These compliance levels are described below.

- **Primary Compliance**:  Primary compliance is the "policy" part of compliance.  To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers,

9

supervisors, and managers in the performance of the tasks outlined in the CASA.  As a matter of course, the policies must be reflective of the requirements of the CASA, must comply with national standards for effective policing policy, and must demonstrate trainable and evaluable policy components.

- **Secondary Compliance**:  Secondary compliance is attained by implementing acceptable training related implementation of supervisory, managerial, and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the department for doing so.  By definition, there should be operational artifacts such as reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the department.

- **Operational Compliance**: Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency, e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff.  In other words, the APD "owns" and enforces its policies.

As is true in the monitor's experience, change is never simple or quick.  A great deal of work lies ahead.  The monitoring team remains committed to assisting APD command staff by working closely with the APD in forging new and revising old, policies; articulating clear guidelines and practices for APD's training of the department's supervisors and managers; assisting APD in building assessment tools designed to identify problematic behaviors; and advising on "best practices" that can be adapted by APD as it moves forward in its efforts to meet the individual and global requirements of the CASA.

## 4.6    Operational Assessment

APD and the City (the CPOA and CPOA Board) have agreed to comply with each of the articulated elements of the CASA.  The monitoring team provided the Parties with copies of the team's monitoring methodology (a 299-page document), asking for comment.  That document was then revised based on comments by the Parties. This document reflects the monitor's decisions relative to the Parties' comments and suggestions on the proposed methodology and is congruent with the final methodology

included in Appendix One of the monitor's first report[1].  The first operational paragraph, under this rubric, is paragraph 14, as paragraph 13 is subsumed under paragraph 14's requirements.

## 4.6.1 Methodology

The monitor assessed the City and APD's compliance efforts during the 13th reporting period, using the *Monitor's Manual*, included as Appendix A, in the monitor's first report (see footnote 2, below, for a link to that methodology).  We do note that the original methodology was revised at times based on the availability of records (or lack thereof) and related organizational processes. The manual identifies each task required by the CASA and stipulates the methodology used to assess compliance.

## 4.7 Assessing Compliance with Individual Tasks

APD's compliance with individual tasks for the 13th reporting is described in the sections that follow.

### 4.7.1   Assessing Compliance with Paragraph 14

Paragraph 14 stipulates:

> **"Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:**
>
> a)   **Officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;**
> b)   **Force shall be de-escalated immediately as resistance decreases;**
> c)   **Officers shall allow individuals time to submit to arrest before force is used whenever possible;**
> d)   **APD shall explicitly prohibit neck holds, except where lethal force is authorized;**
> e)   **APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject;**
> f)   **APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;**

---

[1] Available at: https://www.justice.gov/usao-nm/file/796891/download

g)   **Officers shall not use force to attempt to effect
     compliance with a command that is unlawful;**

h)   **pointing a firearm at a person shall be reported as a
     Level 1 Use of Force, and shall be done only as
     objectively reasonable to accomplish a lawful police
     objective; and**

l)   **immediately following a use of force, officers, and,
     upon arrival, a supervisor, shall inspect and observe
     subjects of force for injury or complaints of pain
     resulting from the use of force and immediately obtain
     any necessary medical care. This may require an
     officer to provide emergency first aid until professional
     medical care providers arrive on scene."**

## Methodology

As we have documented in the past few Monitor reports, APD reworked their
use of force policies to integrate a new, three-tiered reporting system that was
approved by the Monitor and the Parties and implemented on January 11, 2020.
CASA requirements stipulate that the use and investigation of force shall comply
with applicable laws and comport to best practices.  Central to these
investigations shall be a determination of each involved officer's conduct to
determine if the conduct was legally justified and compliant with APD policy.
The monitoring team spent time during the IMR-13 reporting period discussing
compliance and strategies to achieve compliance with APD staff with
responsibilities overseeing various CASA paragraphs.  As illustrated throughout
this report, there is still evidence of force reporting and investigation issues, as
well as issues with APD implementing an effective Internal Affairs system.
However, an equal and more impending crisis to compliance is a backlog of use
of force cases that has become exponentially worse in IMR-13, both at the field
level and within IAFD.  Based on our review of data provided by APD, the
department has experienced a remarkable decrease of use of force cases being
opened and completed during IMR-13 that represents a very real and likely
long-lasting threat to APD's compliance efforts.  When combined with the
Academy failing to provide use of force training in 2020, the lack of executive
oversight of these basic managerial responsibilities will likely reverberate for
some time, based on the monitor's experience in two previous monitoring
projects.  As experience has shown, the collateral effects of these failures may
include out-of-policy uses of force, APD not addressing concerns with officers by
applying performance plans or discipline in a timely manner, and the resultant
additional delays in affecting true organizational reform.

An alarming concern the monitoring team hoped APD would avoid was
unfortunately realized at the close of the reporting period.  During the IMR-13
reporting period, APD continued to struggle implementing a system of training
capable of sustaining itself, and as a consequence, failed to sustain its
Secondary Compliance with Paragraphs 86-88.  That failure had a cascading
effect on numerous other CASA paragraphs, including Paragraph 14.
Throughout the year 2020, the monitoring team attempted to prompt APD into

action by discussing the situation on several occasions, with additional cautionary language in both IMR-11 and IMR-12.  In short, APD failed to perform its training responsibilities in any reasonable and meaningful way despite warnings from the monitor.[2]  There is no subtle way to express the significance of APD's failure other than to document here that they have again self-inflicted a loss of compliance because of their lack of attention to basic organizational training needs.  Given the issues APD has experienced with using, reporting, supervising, and investigating of uses of force since the inception of the CASA, and in particular IMR-12, and the positive narrative they received as recently as IMR-11 relating to its training efforts, it is incomprehensible that the leadership of APD would allow such a lapse of momentum.[3]  We discuss our findings related to use of force training in more detail in Paragraphs 86-88.

As noted above, in January 2020, APD's new use of force "suite of policies" became operationalized.  Field supervisors continue to make initial assessments and classifications to determine the appropriate type of response to instances where officers use force; the Internal Affairs Force Division's (IAFD's) role is codified, and they respond for investigatory responsibilities associated with all Levels 2 and 3 uses of force.  We noted several times in the past that APD needed to provision for the increased workload that would result in addressing policy violations that are likely to be identified in this new process.  Similarly, we cautioned that when APD properly and consistently reports force, their workload will increase, regardless of if policy violations exist.  We have believed if APD properly applies policies they have enacted, there is little doubt that Internal Affairs units will see a noticeable increase in misconduct allegations.[4]  That said, APD's internal affairs apparatus continues to reveal defects that hinder the proper remediation of performance deficiencies and the application of discipline.  We discuss these deficiencies later in this report.[5]  In preparation for IMR-13, the monitoring team analyzed force reporting data, reviewed a sample of Level 1-3 use of force cases, attended Force Review Board meetings, and held several (virtual) meetings with APD personnel to assess APD's progress during this reporting period.

---

[2] To be clear, it is uncertain what influence APD could have had on this outcome if they explored alternate approaches to their training requirements.  The Monitor and monitoring team were not presented with a cogent, lucid plan to address any dilemma they were facing.  As with many other situations of regression APD has experienced, they need look nowhere other than at themselves for blame.

[3] In IMR-12 we stated, "Without concerted effort, a thorough review of points of under-performance at the Academy, and a common-sense approach to remediate areas of under-performance, APD risks a serious and difficult to remedy loss of compliance in the training requirements identified in the CASA." (Page 166)

[4] This condition will not be surprising to the monitoring team, as even APD's own IAFD uncovered more than a thousand policy violations when they reviewed cases that were initially investigated by field supervisors.  9 uptick in IA's being initiated.

[5] See Paragraphs 41 – 77.

**Results**

Timeliness continues to plague APD on a number of fronts beyond just the deadline to complete use of force investigations.  Whether the genesis of this problem is merely APD's culturally ingrained *laissez-faire* approach to deadlines, or the intentional failure of individuals to act with any sense of urgency (and collaterally undermining the spirit of the CASA), the outcome is the same—the detrimental effect of APD not imposing corrective measures and discipline on officers for policy violations.  The fear of, or inability to, impose appropriate corrective measures and discipline adversely impacts APD's ability to reduce its risk for individual officers, for the agency as a whole, for the City government, and for the City's disparate communities.  This may be the most influential problem facing APD as it moves to comply with the requirements of the CASA.  Likewise, examples of good performance or performance deficiencies that come from timely use of force investigations can't be leveraged to deliver training programs that reinforce APD's expectation of proper behaviors by officers and supervisors.

When APD enacted its new stratified system for categorizing and investigating use of force incidents,[6] supervisors and investigators had already received training on this new system that represented some of the best training the monitoring team had seen to date at APD.  Unfortunately, APD has not been able to fully operationalize this training to have a meaningful influence in the field.  This observation does not directly reflect the actions we observe of uniformed members in the field but, maybe more importantly, how investigators and supervisors identify, investigate, and implement appropriate disciplinary and non-disciplinary interventions when use of force and related policy violations occur.  This is important because the need for APD to develop its ability to "police" itself is the centerpiece of its organizational reform efforts and is the linchpin for achieving the long-term sustainability of those reforms.  The failure of APD to exert proper command and control during IMR-13 continued to plague its operations in IMR-13.  During IMR-13, the only obvious bright spot may be progress made by the Force Review Board (FRB).  For IMR-13, instead of providing exhaustive feedback and the minute details of use of force cases, the overall use of force data compiled by APD, and provided to the monitoring team, speaks to the Department's lack of command and control in the domain of use of force cases.

As an exemplar of APD's breakdown in its oversight of force during IMR-13 (data current through early February 2021) consider the following: APD recorded a combined 298 Level 2 and Level 3 use of force cases (compared to 311 cases during IMR-12). Of these 298 cases, APD recorded 244 Level 2 cases and 54 Level 3 cases (compared to 232 Level 2 cases and 79 Level 3 cases during IMR-

---

[6] The new stratified system for categorizing and investigating use of force incidents was an APD-initiated endeavor.

12).  One of the CASA requirements to reach Operational Compliance consideration is that 95% of the use of force cases must be completed within 90 days. For IMR-13, IAFD completed three (3) Level 2 cases within 90 days. This means that IAFD investigators completed 1% of the Level 2 cases within 90 days. While these numbers are disturbing, what is more disturbing is that no case initiated after September 8, 2020, was completed within 90 days. Setting aside the 90-day completion requirement, no case initiated after September 8 was even completed by early February 2021.

When examining the Level 3 use of force cases, the data revealed that two of the 54 cases were completed within 90 days.  This 4% completion rate is eerily similar to the 90-day completion rate of Level 2 use of force cases. Similar to the Level 2 cases, no Level 3 case initiated after August 11, 2020, was completed within 90 days. Setting aside the 90-day completion requirement, APD completed no cases initiated after August 14, 2020, by early February 2021. To put these numbers into perspective, consider that during the first three months of IMR-12, APD opened 108 Level 2 cases, and 97 of these cases were completed within three months.  This yielded a 90% completion rate of cases closed within the 90-day threshold.  Most of the errors we noted were quality control issues.

During IMR-13, the monitoring team received no explicit communications from APD or the City of Albuquerque that contemporary IAFD cases were no longer being completed in a timely manner, let alone not being completed at all.  APD communications included messaging that the IAFD Commander retired, IAFD management was "looking to get out," and that investigators "wanted out of IAFD."  During meetings attended by the monitoring team during which the City of Albuquerque and the DOJ were negotiating various iterations of the draft Stipulated Order regarding the proposed "External Force Review Team (EFIT)," at no time did anyone from the City or APD inform the monitoring team about 1) the size of the growing backlog of cases already past the 90-day mark, 2) the *de facto* work stoppage on contemporary cases not yet at 90 days old, and maybe most importantly 3) that investigators were all working on only one investigation at a time.[7]  Certainly, no one informed the monitoring team that cases opened beyond the first six weeks of the reporting period were not being handled by IAFD investigators.  Nonetheless, the monitoring uncovered these issues and begain TA designed to address them.

---

[7] Anyone conversant with law enforcement practices related to conducting investigations would consider the notion of detectives conducting one investigation at a time inexplicable.  Approaching cases in this manner creates enormous inefficiencies. APD executives not uncovering this approach to investigations earlier is inexcusable. Also, during the reporting period a meeting was convened virtually and attended by members of the monitoring team, APD executives, DOJ and City Legal.  A representative from City Legal suggested that IAFD detectives were not properly trained in how to apply Graham factors (*Graham v. Connor [1989]*) in spite of IAFD's own internal training efforts and the department-wide use of force Tier training.  Everyone on the call, including members of DOJ who approved the use of force Tier training, and the APD executives, disagreed with that assessment given by City Legal.

During this time, the monitoring team was advised, and also observed themselves, that the supervision and command elements of IAFD were significantly hampered by poor leadership. This poor leadership extended beyond just IAFD. The culpability for this poor leadership extends through the chain of command of APD.  Early in the summer months of 2020, the former APD Chief advised the monitoring team that the IAFD Commander was retiring on October 1.  IAFD had no successor selected or seated in this command position as of October 1. Instead, APD leadership utilized three different lieutenants to handle the commander and deputy commander roles within IAFD.  To show the fractured leadership and lack of prioritization this critical function receives from APD, none of these three lieutenants were still in IAFD 120 days after October 1. In fact, even the commander seated in the IAFD position at the close of IMR-13 was there as a temporary duty assignment.  However, this individual holds a Commander's rank and has held integral CASA-centric roles leading up to this assignment.

Within days of this Commander taking temporary responsibilities over IAFD (just after the close of the 13th reporting period), the monitoring team was advised:

- Approximately 60 percent of the cases (381) opened since January 11, 2020, were still not completed as of nine days after the close of the 13th reporting period.

- Of the 381 open cases as of February 9, 2021, approximately 260 cases were still "open" beyond 90 days, and 211 cases were still open beyond 120 days. This obviously undermines APD's ability to discipline officers who may have committed policy violations.[8]

- Approximately 86 misconduct cases being handled by IAFD were, for the most part, not being handled appropriately. Specifically, five cases had been suspended or held in abeyance for one reason or another; 14 cases had yet to be assigned to an investigator; 26 cases were assigned to investigators (and had not yet exceeded their respective 90 or 120-day timelines); 31 cases had already exceeded their 90-day timelines; and 10 cases had already exceeded their 120-day timelines.

  - The monitoring team has used the term "approximately" when describing both the IAFD cases and misconduct cases because 1) we have yet to be provided with the evidence-based information necessary, and 2) we have been advised that the system employed by IAFD is haphazard, as case management efforts to date have been fractured at best, and the accounting of cases is maintained in multiple forms and systems.

---

[8] While the monitor rarely reports data outside a given reporting period, these numbers are particularly disturbing, and they indicate precursors to a potential second wave of backlog case investigations, a problem already addressed, at great cost, by APD earlier in this reform project.

We need to be perfectly clear here.  We see it as particularly recalcitrant that APD would allow another backlog to accrue, given the exorbitant effort expended to work through the last backlog.  The monitor sees this as simply another ploy to avoid the need to discipline officers for behavior violating APD policy, something for which APD has had exceptional difficulties accumulating the supervisory, managerial, and executive will to do.

On a more positive note, on many occasions in the past, the monitoring team has been critical of the Force Review Board (FRB), citing its ineffectiveness, failure to establish organization-wide expectations, and not overseeing APD's use of force processes in a meaningful way.  We can report that during the IMR-13 reporting period, the monitoring team saw a significant increase in the quality of oversight by certain executive-level members of the FRB when assessing uses of force during their weekly meetings.  The FRB is discussed more thoroughly in Paragraph 78, where we highlight that progress, continued areas for growth, and serious concerns that could have a long-term impact on APD's Operational Compliance efforts.  Notwithstanding concerns documented later in this report, we want to make clear that we were highly encouraged with the performance of several high-ranking executives during FRB meetings we attended, and for the first time, believe there is hope the FRB can finally assume its rightful position in the system of oversight by setting an example for lower-level managers to follow.  However, a word of caution --- We have made such statements in the past regarding various areas of the CASA, so it is now incumbent upon the Chief of Police to recognize the significance of this progress and fully enable these members of his executive staff to effect change at APD.  It will take time to trickle down to Area Command levels in a meaningful way, so harnessing the energy we see at the FRB will require more than just words, and instead requires affirmative recognition, actions that motivate continued progress, and purposeful follow-up to ensure the things we are seeing are not reliant upon specific a person and are instead a new norm with the FRB.

APD achieved Secondary Compliance in this paragraph in IMR-11 based on our review and attendance of Tier 2 and Tier 3 use of force training and the representation by APD that Tier 4 would be completed. Due to the organization's training failures regarding Tier 4 and its annual use of force training requirements throughout 2020, Paragraph 14 has reverted to Primary Compliance during IMR-13. This is discussed in greater detail in Paragraphs 86-88.

The monitoring team remains committed to continuing its technical assistance to help guide APD toward success, but that guidance is without meaning if APD does not own the responsibilities themselves.  With a coordinated and concerted effort across APD commands and the leadership and support by APD executives, regaining Secondary Compliance is an achievable goal in 2021.

    Primary:      **In Compliance**
    Secondary:  **Not In Compliance**

Operational:  **Not In Compliance**

## 4.7.2  Assessing Compliance with Paragraph 15:  Use of Force Policy Requirements

Paragraph 15 stipulates:

> **"APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices. The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal, that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units. The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate. The use of force policy will incorporate the use of force principles and factors articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability.**"

### Methodology

As we have documented in the past few Monitor reports, APD reworked their use of force policies to integrate a new, three-tiered reporting system that was approved by the Monitor.  CASA requirements stipulate that the use and investigation of force shall comply with applicable laws and comport to best practices.  Central to these investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy.  As with other reporting periods, the monitoring team spent time during the IMR-13 reporting period providing perspective, feedback, and technical assistance to APD personnel regarding force investigations.  We continued to attempt to help APD better understand and deal with historical difficulties the agency has had achieving compliance and provided ideas concerning how they could best be addressed moving forward.  During this reporting period, we reviewed use of force data; cases were assessed, and meetings were held with APD personnel with CASA oversight responsibilities.  We still find evidence of force reporting and investigation issues, as well as system and process disconnects that will continue to hinder APD moving forward.[9]

### Results

APD achieved Secondary Compliance in this paragraph in IMR-11 based on our review and attendance of Tier 2 and Tier 3 use of force training and the

---

[9] We document our findings in detail later in this Monitor report.

representation by APD that Tier 4 would be completed.   Due to the organization's training failures regarding Tier 4 and its annual use of force training requirements throughout 2020, Paragraph 15 has reverted to Primary Compliance during IMR-13.  This is discussed in greater detail in Paragraphs 86-88 below.

The monitoring team remains committed to continuing its technical assistance to help guide APD toward success, but that guidance is without meaning if APD does not own the responsibilities themselves.  With a coordinated and concerted effort across APD commands and the leadership and support by APD executives, regaining Secondary Compliance is an achievable goal in 2021.

Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.3 Assessing Compliance with Paragraph 16:  Weapons Protocols

Paragraph 16 stipulates:

> **"In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below. The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy."**

**Methodology**

APD previously achieved Secondary Compliance, notwithstanding changes that have occurred to use of force policies that directly relate to this paragraph.  APD integrated a new, three-tiered reporting system in which Level 1 uses of force will be investigated by a field supervisor, and Levels 2 and 3 will be investigated by IAFD.  Members of the monitoring team provided extensive perspective, feedback, and technical assistance related to this new three-tiered system.  The new use of force "suite of policies" were approved on January 15, 2019, and, following the Academy's Tiers 1-3 training programs, those policies finally went live in the field on January 11, 2020.  During the IMR-13 reporting period, the monitoring team reviewed use of force data, assessed cases, and met with APD personnel with CASA oversight responsibilities.  We continue to find evidence of force reporting and investigation issues, as well as system and process disconnects that will continue to hinder compliance efforts moving forward.

**Results**

APD achieved Secondary Compliance in this paragraph in IMR-11 based on our review and attendance of Tier 2 and Tier 3 use of force training and the representation by APD that Tier 4 would be completed.   Due to the

organization's training failures regarding Tier 4 and its annual use of force training requirements throughout 2020, Paragraph 16 has reverted to Primary Compliance during IMR-13.  This is discussed in greater detail in Paragraphs 86-88 below.

The monitoring team remains committed to continuing its technical assistance to help guide APD toward success, but that guidance is without meaning if APD does not own the responsibilities themselves.  With a coordinated and concerted effort across APD commands and the leadership and support by APD executives, regaining Secondary Compliance is an achievable goal in 2021.

Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraphs 14 – 16:***

***4.7.1-3a:  Complete a full assessment of training requirements identified as out of compliance in IMR-13, and devise a clear, concise plan of action, including goals and milestones, designed to remediate lapses in training, and submit that plan to the monitor for comment.***

***4.7.3b:  Appoint an executive oversight authority at the deputy chief level to oversee implementation and evaluation of the plan of action by assessing and reporting achievement of process milestones and deliverables.***

***4.7.3c:  Ensure executive oversight of this process at the deputy chief and chief of police levels, and monitor milestone dates and product quality.***

**4.7.4 – 4.7.10 Assessing Compliance with Paragraphs 17 - 20**

The 2020 Firearms Training cycle has been completed during this reporting period amid severe New Mexico Health restrictions in response to the COVID Pandemic.  APD provided COB documentation that indicated 99.46% of active personnel completed firearms qualification.  As officers on various types of leave return, they are first assigned to the Training Academy for firearms qualification and any other training updates as required.

APD Firearms staff have done a great deal of work to address all the monitor's prior recommendations regarding CASA Firearm requirements, issues, problems, and solutions. Policy revisions, training revisions, additional training, and certifications for range staff and line supervisors have all been documented. The monitoring team will audit the training during future site visits.

The APD Training Academy has modified the ELM (Enterprise Learning Management) system to capture data regarding remedial firearm qualifications.  They will be able to

analyze and summarize data to make policy and training decisions based on data captured.  APD plans to establish a process to document practice sessions, track employees and their improvement plans.  Beginning in 2021, if an officer fails a rifle qualification two years in a row, the rifle will be taken from them and returned to Property until they attend another entire rifle school.  Enhanced rules will also apply to handguns and other weapons.

Secondary compliance was reached with the Firearms Training Curriculum submitted to the monitoring team, along with Course of Business documentation that the training was completed in 2019.

During the June and November 2020 "virtual" site visits, members of the monitoring team visited all Area Commands and spoke (via Zoom) with supervisors at each location.  All supervisors *stated* that they are conducting monthly inspections, physically checking every officer's weapon for make, model, serial numbers, modifications, accessories, or ammunition every month. Policy, Special Orders, database revisions, and firearms training should have provided the tools necessary for field supervisors to complete this task. In response to a recommendation from the monitoring team, APD has made numerous updates to the monthly line inspection process. An audit process has been established, and documentation is presented to the monitoring team.  Errors or omissions have been discovered, corrected, and resulted in revisions to the process. This is another example of APD self- correcting problems rather than the monitoring team making the discovery.

APD has initiated a process where the Area Command Lieutenants will conduct random monthly inspections of personnel, serving as a second-level review verifying an officer's weapons and ammunition are authorized department issue.  During this reporting period, a pilot phase began in the Valley Area Command and continued through the end of March 2021.  The anticipated date of lieutenants conducting these additional inspections is expected to begin in April 2021.

Operational compliance will be reached once the monitoring team observes that line supervisors are making formal weapons inspections monthly, documenting any failures identified, and implementing follow-up corrections to any noted failures. With the processes initiated and plans for full implementation to assess line supervisors' compliance practices related to the requirements of these paragraphs, the monitor sees this as eventually becoming acceptable course-of-business documentation of an enhanced and effective "inspections and audit" process.

### 4.7.4 Assessing Compliance with Paragraphs 17

Paragraph 17 stipulates:

> **"Officers shall carry only those weapons that have been authorized by the Department. Modifications or additions to weapons shall only be performed by the Department's Armorer, as approved by the Chief. APD use of force policies shall include training and**

**certification requirements that each officer must meet before being permitted to carry and use authorized weapons."**

## Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:  **Not In Compliance**

## 4.7.5 Assessing Compliance with Paragraph 18:  On-duty Weapons

Paragraph 18 stipulates:

**"Officers shall carry or use only agency-approved firearms and ammunition while on duty."**

## Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:  **Not In Compliance**

## 4.7.5--4.7.6 Assessing Compliance with Paragraph 19:  On Duty Weapons

Paragraph 19 stipulates:

**"APD issued Special Order 14-32 requiring all officers to carry a Department- issued handgun while on duty. APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns."**

## Results

Primary:        **In Compliance**
Secondary:      **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraphs 17-19:*

*4.7.4-6a:  Move forward with established plans regarding execution and reporting of inspections results and documentation and evaluation of remedial measures implemented.*

### 4.7.7 Assessing Compliance with Paragraph 20:  Weapons Qualifications

Paragraph 20 stipulates:

> **"Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year. Officers who fail to qualify on their primary weapon system shall complete immediate remedial training. Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify. Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment**."

**Results**

Primary:         **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.8 Assessing Compliance with Paragraph 21:  Firearms Training

Paragraph 21 stipulates:

> **"APD training shall continue to require and instruct proper techniques for un-holstering, drawing, or exhibiting a firearm."**

**Methodology**

APD restructured their use of force "suite of policies" that now include a 3-Level reporting system.  Shows of force are specifically reported and reviewed as a Level 1 use of force, and that review resides with field supervisors and their chain of command, unless that event accompanies a higher level of force requiring IAFD to be activated.  APD received extensive feedback on training programs they intended to deliver to officers and supervisors relative to their new policies, and, as previously reported, APD began the process of delivering its new use of force suite of policies through four distinct tiers.  The training approach was devised by APD, and Tier 1 (policy delivered through APD's online learning management system) was completed during IMR – 9.  Tiers 2 and 3 were delivered to officers and supervisors, respectively, during IMR-11 (the monitoring team was able to attend the training during our November 2019 site visit).  We provided additional feedback that we believed was critical to ensure certain points were clear to officers in the field, which APD accepted and incorporated into their training.  Prior to the close of IMR-11, we reviewed Tier 4 training and provided feedback to assist the quality of the training before it was

23

delivered.  We commented in IMR-12 that APD would put itself in jeopardy of affecting its compliance outcomes if it failed to sustain the momentum it created entering the IMR-12 reporting period with respect to training.  Delays and missteps in training efforts over the past several years resulted in APD taking extensive time to achieve Secondary and Operational Compliance with Paragraph 21.

The significance of Paragraph 21 has been revealed on many occasions in the past, as reviews of use of force cases related to the techniques used with a firearm have revealed deficiencies in the oversight and accountability process, particularly with respect to force reporting, supervisory-level investigations, and chain of command reviews.

In IMR-10, we wrote, "In IMR-9, APD achieved Secondary Compliance for this paragraph (Paragraph 21). It will be APD's responsibility to assess the new use of force suite of policies to determine what additional training is necessary to retain Secondary Compliance. Operational Compliance will be assessed following APD's successful delivery of the overarching use of force-tiered training.[10]"

In IMR-11 and IMR-12, we wrote:

> "APD must continue to be diligent with their training development and delivery for provisions of this paragraph. To retain Operational Compliance, APD must demonstrate use of force training programs incorporate needs, issues, and concerns that are drawn from the field and are relevant to APD policy and Constitutional policing. It will also be APD's responsibility to continue to assess the use of force policies to ensure they are current and address issues encountered in the field. While Operational Compliance has been achieved for Paragraph 21, we believe that any failure to properly maintain Operational Compliance here will likely result in problems in the field and impact CASA compliance efforts elsewhere."

**Results**

During the IMR-13 reporting period, APD continued to struggle implementing a system of training capable of sustaining itself and, as a consequence, has failed to sustain its Secondary Compliance with Paragraphs 86-88.  That failure has a cascading effect on numerous other CASA paragraphs centered on the use, reporting, supervision, and investigation of force events, including the requirements of Paragraph 21.  Throughout the year 2020, the monitoring team has attempted to prompt APD into action by

---

[10] Operational Compliance was given in IMR-11 after Tier 4 materials were reviewed and approved at the very close of the reporting period.  We were told at the time Tier 4 would be completed by the close of IMR-12 reporting period.

discussing the situation on several occasions, with additional cautionary language in both IMR-11 and IMR-12.  Despite these warnings, APD has failed to perform its training responsibilities in any reasonable and meaningful way.[11]  During this reporting period, APD failed to deliver Tier 4 training, as well as its 2020 Annual Use of Force training requirements.  As a consequence, APD has moved back to Primary Compliance with this paragraph.  As Paragraph 221 is a training-centric paragraph, once APD completes the delivery of Tier 4 training and its 2021 Annual Use of Force training to the organization, both of which incorporate contemporary organizational needs in the field. Secondary and Operational Compliance will be reassessed.[12]  Re-establishing previous levels of compliance with this paragraph should not be difficult to achieve, assuming a sense of urgency and focus placed on training requirements and focus on the quality of training that is delivered to officers and supervisors.

Primary:        **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.9 Assessing Compliance with Paragraph 22:  Firearm Discharges from Moving Vehicles

Paragraph 22 stipulates:

> **"APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person. Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle."**

**Methodology**

APD undertook the task of rebuilding their use of force "suite of policies" and received approval for their new policies during the latter part of the IMR-9 reporting period.  Throughout the IMR-10 and IMR-11 reporting periods, they received extensive feedback from the monitoring team relating to training programs they intended to deliver to APD's officers and supervisors.  That feedback was then incorporated when the training was

---

[11] To be clear, its uncertain what influence APD could have had on this outcome if they explored alternate approaches to their training requirements.  The Monitor and monitoring team were not presented with a cogent, lucid plan or assessment to address any dilemmas they were facing.  As with many other situations of regression APD has experienced, they need look nowhere other than at themselves for blame.  This lapse represents a failure of oversight and assessment of training practices during the reporting period.

[12] Additional details related to APD's training performance are located in Paragraphs 86-88.

25

delivered throughout the Fall of 2019.  We were provided Tier 4 training materials at the end of this reporting period and provided feedback.  That training content was organized well and APD intended to be delivered Tier 4 to all active members during the IMR-12 reporting period.

In IMR-9, APD achieved Secondary Compliance for this paragraph.  We wrote in IMR-10, "It will be APD's responsibility to assess the new use of force suite of policies to determine what additional training is necessary to retain Secondary Compliance."  We continued Secondary Compliance in IMRs 11 and 12 while continuing to provide technical assistance to the Academy regarding their "Tier" training programs.

**Results**

During the IMR-13 reporting period, APD continued to struggle implementing a system of training capable of sustaining itself, and as a consequence, has failed to sustain its Secondary Compliance with Paragraphs 86-88.  That failure has a cascading effect on numerous other CASA paragraphs centered on the use, reporting, supervision, and investigation of force events, including the requirements of Paragraph 22.  Throughout the year 2020, the monitoring team had attempted to prompt APD into action by discussing the situation on several occasions, with additional cautionary language in both IMR-11 and IMR-12.  In short, APD has failed to perform its training responsibilities in a reasonable and meaningful way.[13]  APD failed to deliver both Tier 4 as well as its 2020 Annual Use of Force training requirements.  As a consequence, APD has moved back to Primary Compliance with this paragraph.  Although use of force incidents related to Paragraph 22 are rare, we highly encourage APD to regularly assess its policies and training to ensure they keep up to date with legal standards and best practices.  This is a common practice in policing, and there is no reason APD should not conform to this practice.

We noted in IMR-11 and 12 since the type of use of force events that are implicated by this paragraph are infrequent, our ability to measure Operational Compliance through case reviews will be sporadic in the future.  Likewise, quantifying the provision that states, "Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle" is difficult to prove in the negative since a goal is that these type of actions are trained out of the department's culture --- except under extraordinary circumstances.  Once APD delivers its Tier 4 and 2021 Annual Use of Force training, both of which incorporate contemporary organizational needs in the field, Secondary and Operational Compliance will be reassessed.[14]  Reestablishing previous levels of compliance with this paragraph should not be difficult to achieve if APD can generate and sustain a sense of urgency related to training requirements without compromising the quality of training delivered to officers and supervisors.

---

[13] To be clear, its uncertain what influence APD could have had on this outcome if they explored alternate approaches to their training requirements.

[14] Additional details related to APD's training performance are located in Paragraphs 86-88.

We have determined that Paragraph 22 is in Primary Compliance for this reporting period.

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

***Recommendation for Paragraph 21 and 22:***

***4.7.8-9a: Complete required Tier 4 and annual Use of Force training.***

**4.7.10 Assessing Compliance with Paragraph 23:  Tracking Firearm Discharges**

Paragraph 23 stipulates:

> **"APD shall track all critical firearm discharges. APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its use of force annual report."**

**Methodology**

During IMR-13, APD published its final Annual Use of Force Report inclusive of the years 2016-2019.  As we noted previously, APD decided to organize use of force data from multiple years, believing the aggregation of data gave the department better context to the information they were assembling.  This also provides readers of the report more information upon which to make judgments of APD's progress, so the monitoring team found this approach to be appropriate under the circumstances.  We encourage APD to keep pace with the Annual Use of Force Report in 2021 by pulling forward the 2020 data in a timely manner.  Lack of diligence in the past three years left APD with a great deal of updating to do, and since the Annual Report is a requirement in other CASA paragraphs, APD would risk the loss of compliance standing if these data are not tallied, analyzed, and reported in a timely manner.

With the publication of their Annual Use of Force Report during the IMR-13 reporting period, APD has achieved Secondary Compliance with Paragraph 23.  When APD implements its Early Intervention System and continues with timely Annual Use of Force Reports, the monitor will assess whether Operational Compliance has been achieved.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

27

***Recommendation for Paragraph 23:***

***4.7.10a:  Cycle forward 2020 data related to Paragraph 23 to ensure the Annual Use of Force Report remains up to date.***

**4.7.11-4.7.18 and 4.7.21-4.7.25 Assessing Compliance with Paragraphs 24-31 and 34-38 (Electronic Control Weapons)**

Paragraphs 24-31 and 34-36 address requirements for APD'S use of Electronic Control Weapons (ECWs), as follows:

Paragraph 24: Use of ECWs;
Paragraph 25: ECW Verbal Warnings;
Paragraph 26: ECW Limitations;
Paragraph 27: ECW Cycling;
Paragraph 28: ECW Drive-Stun Mode;
Paragraph 29: ECW Reasonableness Factors;
Paragraph 30: ECW Targeting;
Paragraph 31: ECW Restrictions;
Paragraph 32: ECW Weak-side Holster;
Paragraph 33: ECW Annual Certification;
Paragraph 34: ECW Medical Protocols;
Paragraph 35: ECW Medical Evaluation; and
Paragraph 36: ECW Notifications.

During past reporting periods, the monitoring team conducted in-depth reviews of APD use of force cases involving the use of Electronic Control Weapons (ECWs). The results of those case reviews, along with the implementation of policy provisions through training and operational oversight, resulted in operational compliance for Paragraphs 24 through 36.

In IMR-9, APD compliance with five Paragraphs was adversely impacted as the result of the monitoring team's review of ECW cases. During a site visit in May 2019 (IMR-10), the monitoring team reviewed several of these cases in-depth with various members of APD in the form of technical assistance to provide perspective[15] on how to assess ECW cases. A review of ECW cases during IMR-10 revealed a number of deficiencies, from ECW deployment problems by officers to supervisory review and oversight errors. The cases the monitoring team reviewed during IMR-11 represented a markedly better result as compared to the sample of cases reviewed during IMR-9 and IMR-10. During IMR-11, none of the cases reviewed by the monitoring team identified inappropriate deployments of ECWs by officers or supervisors. Supervisory oversight of ECW deployments was much better, with many nuances identified and addressed by either

---

[15] We provided technical assistance to APD since the IAFD personnel were conducting thorough reviews and had identified numerous policy violations.  Where there was an issue related to the force used in an event, we recommended that IAFD examine the use of force case, since it is clear that the diligence of IAFD use of force case reviews was not being replicated in the field by front-line supervisors.

first-line supervisors or chain of command reviews. This was also largely the case for our review of ECWs during IMR-12.

During this reporting period, APD case ledgers revealed 67 distinct cases in which an ECW was utilized (inclusive of 44 ECW Shows of Force). Twenty-nine of the 67 ECW cases (43%) included only ECW Shows of Force (cases in which an actual ECW application did not occur).[16] These numbers represent a significant decrease in ECW cases over the previous reporting period.[17] However, this reporting period's ECW cases still remain higher than that of IMR-11 and IMR-10. During this reporting period, ECW Shows of Force comprise 66% of ECW cases. In IMR-12, ECW Shows of Force comprised 73% of ECW cases. In IMR-11 and 10, ECW Shows of Force represented approximately 40% of the periods' ECW cases.[18]  As of February 7, 2021, APD had completed reviews of only 3 ECW cases of the 67 cases opened during this reporting period as opposed to the 30 cases completed during IMR-12 and the 33 cases completed during IMR-11. These data are set forth below in Table 4.7.11a, on the following page.

Table 4.7.11a

| Reporting period (RP) | ECW Cases Opened during the RP | ECW Cases Opened during the RP AND Completed During the Same RP | % of ECW Cases Opened and Completed During the Same RP |
|---|---|---|---|
| IMR-11 | 53 | 33 | 62% |
| IMR-12 | 99 | 30 | 30% |
| IMR-13 | 67 | 3 | 4% |

The data presented in this table represents a significant failure of the APD hierarchy to self-monitor its workload and deploy human resources accordingly.  We have noted similar failures in other use of force requirements, as articulated below.

Due to the scarcity of ECW case reporting completed in the IMR-13 reporting period, the ECW cases reviewed for this monitoring report are comprised of completed cases that originated during IMR-12.

The cases reviewed and a short synopsis of each case are listed below. It is important to note that any problems with the supervisory review or IAFD investigation of ECW deployments will not be discussed in this section of the report but within the relevant forthcoming paragraphs of this report (Paragraphs 41-59 for Supervisory Review of Use of Force Reporting and Paragraphs 60-77 that address Force Investigations by the Internal Affairs Division [IAFD]).

---

[16] In IMR-12, 64 of the 99 ECW cases (65%) included only ECW Show of Forces (cases in which an actual ECW application did not occur). In IMR-11, 10 of the 53 ECW cases (19%) included only ECW Show of Forces (cases in which an actual ECW application did not occur).

[17] IMR-12 had 99 ECW cases inclusive of 73 ECW Shows of Force. IMR-11 had 53 ECW cases inclusive of 21 ECW Shows of Force. IMR-10 had 34 ECW cases inclusive of 14 ECW Shows of Force.

[18] ECW Shows of Force comprised 40% of ECW cases in IMR-11 and 41% in IMR-10.

**Case #1 IMR-13-01 (ECW Application)**

One afternoon, APD officers responded to a motel after the manager reported an individual threatened him. The suspect had departed by the time officers arrived, and officers reported that the suspect had subsequently been involved in a physical altercation with another individual after leaving the motel. The two officers eventually located the suspect at a store a short distance from the motel. The officers approached the suspect inside the store for purposes of identifying him. After returning to their vehicle and determining the suspect had active warrants for narcotics and stolen property, they waited for him to exit the store, approached him, and advised him that he was under arrest due to active warrants. Eight seconds after telling the suspect that he was under arrest, the officer drew his ECW. Shortly afterward, the second officer made what appeared to be an attempt to grab the suspect's hand or arm and missed the suspect (despite the officer writing in his report that the suspect "pulled his wrist out of my hand and began to walk away from me"). No further attempt was made to grab the suspect. The suspect did not comply with the officers' commands to drop his backpack. After being told he was under arrest for warrants and that force would be used against him if he did not comply, the suspect then only offered passive resistance by pacing in very short steps between the officers (the suspect's back was against a wall). While the suspect moved about in front of the officers, he was talking with the officers and calling out to others around him for help. While the suspect was standing in front of the officers pointing to himself, an officer deployed his ECW. The probes were ineffective, and the officer deployed his ECW a second time, and the suspect was incapacitated, falling to the ground. Once on the ground, the suspect had to be physically moved to his stomach because he failed to comply with the officers' instructions to do so. Once on the ground, the two officers were able to handcuff the suspect with minimal physical force.

Based upon the case facts and a review of all the evidence, inclusive of the officers' reports, the evidence revealed the suspect was not an immediate threat to himself, others, or the officers. The preponderance of evidence suggests the suspect was passively resistant at the time the officer chose to utilize the ECW. Thus, the monitoring team holds that this application of an ECW was an out of policy use of force.

This is in contradistinction to the findings related to this event by APD supervisory personnel, who found no problems with the incident. The monitoring team has cataloged their concerns with other aspects of this case in Paragraphs 60-77 of this report.

**Case #2 IMR-13-02 (ECW Application)**

This case involved two APD officers who responded to a call one morning about an individual possibly sleeping in a vehicle.  APD detectives identified the individual as being wanted on a warrant. The officers arrived at the parked vehicle (approximately one hour after the detectives' initial call was received by dispatch) and verified the existence of a warrant for the registered vehicle's owner for failing to appear in court on

30

a misdemeanor shoplifting charge. Upon approaching the vehicle, officers identified the only person in the vehicle as the person listed on the warrant and conversed with that individual who had been sleeping in the vehicle.  After speaking with the individual to try and coax him out of his vehicle, they finally told him that there was an outstanding warrant for him, that he was under arrest, and ordered him from the vehicle. The individual eventually started his vehicle and drove away.  The two officers did not immediately pursue the individual.

Several minutes later, an APD lieutenant transmitted over the radio that the suspect was located. The lieutenant told the suspect once again he was under arrest and to stop, but the suspect fled on foot with a knife on his waistband. Officers converged on the scene, and one of the original officers who had previously approached the individual's vehicle observed the suspect fleeing between residences. That officer pursued the suspect on foot, announced himself as a police officer, and began approaching the suspect in an alley with his firearm pointed at the suspect while giving him commands to get on the ground.  The suspect did not comply with the officer's instructions and continued walking towards the officer as the officer was backing up, trying to maintain a safe distance from the suspect.  At a point when the officer saw the individual had no weapon in his hand, the officer properly transitioned from his firearm to his ECW and gave additional commands to stop and get on the ground. The suspect cleared the corner of a residence and, immediately upon doing so, took off running again with the APD officer in close foot pursuit behind him. After the suspect and officer each hurdled a low wall, the brief foot chase continued, and as the suspect began to go over another wall, the officer discharged his ECW in standoff mode and delivered a five-second cycle from the ECW.  The suspect fell to the ground and still did not comply with the officer's directions to stay on the ground. The individual subsequently got up and approached the wall towards the officer.  Another officer arrived on the scene, jumped over the wall, and placed the suspect in handcuffs.  No further force was used by APD officers.

Throughout the foot pursuit, the APD officer appropriately de-escalated from his firearm to his ECW, continued to maintain a safe distance from the individual, all while giving appropriate verbal commands to the suspect that went unheeded.  The suspect eventually took advantage of this distant separation from the officer and fled again, necessitating the use of the ECW.  Prior to discharging his ECW, the officer announced that he would use the Taser and subsequently discharged it immediately upon making the announcement.  No material deficiencies were noted in either the actual use of force by the officer, the reporting of the force (although the officer's written report did not accurately represent the suspect's positioning when the officer deployed the ECW), or the subsequent response to the ECW deployment.

The monitoring team has cataloged their concerns with other aspects of this case in Paragraphs 60-77 of this report.

**Case #3 IMR-13-03 (Multiple ECW Shows of Force and ECW Applications)**

This case began one afternoon when APD received numerous calls regarding a male, possibly armed with a knife, beating a female with an object. Officers, as well as EMS, responded to the scene. The female was transported to the hospital for treatment of head and facial injuries. Officers approached the suspect, and he refused to comply with their commands.  A safety perimeter was established, and two Spanish-speaking officers attempted to communicate with the subject, who still refused to comply with officers' commands.  The suspect told this officer that he had used methamphetamine earlier that same day.  The suspect was advised he was not free to leave, but he responded he was not going to be arrested.  Numerous attempts were made to de-escalate the incident, and the suspect was given adequate space so as to not feel threatened by officers.  In fact, at one point, while talking to the suspect, and he continued to encroach upon the officers' space, the translating officer organized the backward movement of the officers to provide additional distance.  Throughout the encounter, the suspect was warned more than once that force would be used if he continued to approach them.

The supervisors and officers on the scene were able to devise a plan as to who would use force and the type of force if it was necessitated by the suspect's actions. The suspect continually moved around within the perimeter.  After approximately 25 minutes, the suspect disregarded warnings of being tased if he approached officers, and he closed the distance on other officers, at which time he was tased.  The subject fell to the ground but immediately jumped back up and appeared to pull out the ECW probes from his body.  Other officers deployed ECWs and 40mm less lethal rounds, mostly with little effect.  Eventually, the tasing was effective, and the suspect stayed on the ground, at which time he was subsequently handcuffed, received immediate medical attention by EMS personnel, and was transported to the hospital.

All of the uses of force (inclusive of eight ECW applications, three ECW shows of force, two 40MM deployments, and two resisted handcuffings) were deployed in a short period of time and appear to have been reasonable, necessary, and proportionate.  Officers de-escalated the use of force once the subject was secured. The on-scene supervisor and officers immediately attempted to identify witnesses and secured the scene for the IAFD investigation.

The monitoring team has cataloged their concerns with other aspects of this case in Paragraphs 60-77 of this report.

### Case #4 IMR-13-04 (ECW Application)

Two APD officers were called to a residential neighborhood in the evening hours to a report of a domestic dispute between a father and son.  The son's stepmother called 911 and provided call details, and CAD reports reviewed indicated that the suspect was not armed with a weapon.  The father was reportedly attempting to stop the son from entering the house when the physical altercation started, and at times, the son was apparently outside the house yelling and in a verbal altercation as well (near the house). The son was reported to have a bloody lip and the father a swollen eye from the conflict.

32

Officers approached the house, and OBRDs were activated, which captured the ensuing events in sufficient detail to make an assessment of their actions.  Before the ECW encounter, the officers had not interviewed a witness, identified who the parties to the incident were, or determined the underlying facts that may result in criminal charges.

As the two officers approached the house from the street, a loud yell could be heard. A white male was seen walking across the front yard in their direction at a quick pace. One officer had stepped onto the sidewalk in the area immediately in the front yard of the home when the subject was seen walking at a quick pace in their direction.   The officers immediately identified themselves and told the subject to put his hands down, which at the time were extended out to his sides.  In this specific set of circumstances, based on the totality of circumstances, it was reasonable for the officers to believe that the subject approaching them was involved in the altercation they were about to investigate.  The subject was told that he would be tased if he didn't stop approaching them.  He said, "tase me then," and continued toward them, but in a slow and somewhat staggering walk.  One officer painted the subject with his ECW and deployed his taser, and the subject immediately stopped walking (still with his hands out to his sides).  The first cartridge of the ECW apparently malfunctioned, and the second officer asked what happened?  The subject said, "he missed."  It became immediately apparent that the subject's voice was slurred and slow, and that his movements were indicative of someone who was under the influence of alcohol or drugs, or both.  The subject stopped his movement toward the officers, and they told him to get on the ground, but he refused.  He said, "I'm not trying to hurt you or nothing like that" to the officers as he staggered in a circle in front of the officers.  He engaged in a verbal exchange with one of the officers but wasn't following directions.  However, his actions at this point constituted passive resistance.  The subject took a few small, staggering steps in the direction of one officer with his hands and arms extended out to the side, indicating he was not calming down and to "tase me then."  The first officer deployed the second cartridge of his ECW, which stuck and immobilized the subject and took him to the ground.  The subject was able to stand back up, but the officers were quickly able to take control and apply handcuffs and then place him in the back of the patrol vehicle.

Based upon the case facts and a review of all the evidence, inclusive of the officers' reports, IAFD investigation, and the available OBRD evidence, the preponderance of evidence suggests the suspect was passively resistant at the time the officer chose to utilize the ECW for the second time.[19] Thus, the monitoring team holds that this application of an ECW was an out of policy use of force.  The force used was against a subject who was physically impaired, not proportionate to the threat, nor necessary at the time it was deployed, and was not the minimum amount of force necessary.[20]

---

[19] The monitoring team believed that concerning the first ECW deployment, the manner in which the officers were first approached would have elevated their concern of an immediate threat.  However, once the subject stopped and the dialogue continued, they had an opportunity to reassess the threat and consider lower force options to effect the arrest.

[20] In making the minimum amount of force necessary determination, the monitoring team considered other force options that were available.  There was a disparity of force in favor of the officers, there was no report that the subject was armed with a weapon and the subject was clearly under the influence of alcohol and/or drugs.  In the IAFD investigation there was a statement that the subject was aggressively

**Case #5 IMR-13-05 (ECW Show of Force)**

APD received a call from a city bus driver one morning, reporting a man with a knife on the city bus and that the man threatened the bus driver.  Four officers were dispatched to the scene and found the reported subject sitting in the rear of the bus.  The officers asked the one other remaining unknown passenger to disembark for safety reasons. Two officers engaged the subject, who was observed to be holding an opened, folding-type knife in his right hand.  The subject was yelling that he was upset because he felt the buses kept passing him by for the past several hours.  The officers instructed him to put the knife down so they could talk.  Very quickly after their initial verbal contact with the subject, he stood up and took a step toward them.  Both officers had their issued ECWs un-holstered, and one officer painted the subject with the laser while instructing him to stop and to drop the knife.  The subject stopped and sat down, still loudly expressing his issues.  The subject folded the blade into the knife soon after sitting. The primary officer utilized good communication skills to connect with the subject, convincing him to put the knife on the floor, walking toward them with his hands up, and ending with him putting his arms behind his back to be handcuffed.  The officers remained calm and professional throughout, and the potentially dangerous situation ended without any injuries to the subject or the officers.

The on-scene supervisor immediately initiated his responsibilities to investigate, properly categorized the event as a Level 1 show of force, gave proper instructions, and collected all pertinent witness and involved officer interviews.

No material deficiencies were noted in either the actual use of force by the officer, the reporting of the force, or the subsequent investigation of the use of force.  The actions of the officers were deemed to be objectively reasonable, within policy, and compliant with relevant CASA paragraphs.

**Observations and Comments**

Supervisory oversight of ECW deployments continues to improve. However, the use of boilerplate language continues to be found in reports.  Poor report writing on the part of officers seems to be addressed by various assistance provided by chain of command personnel (especially from IAFD) that the monitoring team notes is in the form of mentoring. This mentoring also includes officers receiving templates and report exemplars to see how quality reports are written.  We continue to see this as a sign of engagement on the part of supervisors with non-punitive responses to "process" problems. This is commendable.

---

walking toward the officer at the time of the second ECW deployment.  That is not evidenced by the clear OBRD evidence reviewed.  Even if force had been objectively reasonable at the time of the second deployment, officers could have considered additional de-escalation methods, attempted to take the subject into custody using their disparity advantage or used another option within the same range of force as the ECW, such as OC spray.

However, we continue to note a number of occasions in which officers who contemplate using force or actually utilize force, seem to take liberties with overstating perceived threats against themselves or others. Supervisors need to be explicitly attentive to such issues.

The activation of OBRDs continues to show improvement. However, this period has revealed more APD personnel failing to upload their OBRD videos rather than officers actually failing to activate their OBRDs (as cited over past reporting periods). During our virtual site visit in November and December of 2020, the monitoring team identified the APD policy that requires personnel to not upload their OBRDs until after the subsequent shift after a force event as being potentially problematic. It is not clear why personnel are not required to upload their OBRDs after the shift in which a force event occurs. APD personnel generally agreed with the concern of the monitoring team on this matter and offered no specific historical perspective as to how or why this genuinely problematic policy came into fruition (as opposed to uploading OBRDs after the shift in which the force was actually used). The monitoring team makes no assertion or causal determination linking this reporting period's failures to upload OBRDs at the end of the shift in which force was used with the APD policy allowing personnel to upload their OBRDs after their subsequent shift. it is clear; however, we posit that the longer any person waits to complete a task, efficiency rates for task completion generally decline over time. For this reason, the monitoring team is again suggesting to APD to review their existing policy and consider amending it to ensure critical OBRD data is uploaded at the end of any shift in which a force incident occurs.

Many law enforcement personnel throughout the country seem to be grappling with the challenges associated with an increasing emphasis on de-escalation in potentially volatile situations.  APD seems to actually be better positioned in this area of law enforcement practice than many other agencies due to its required training cycles and contemporary policies.  In the past, IAFD generally has done a very good job analyzing each application of force utilized by each officer during a force event. This is often a complex task. One pattern the monitoring team has observed, however, especially during ECW applications, is that of officer justification for ECW applications being out of sequence for when the force is actually used. As an example, if a suspect is actively resisting arrest at the onset of an encounter and justification exists at that instant for an ECW application, but the suspect then becomes passive and is not threatening or fleeing, the justification that existed in the previous instant may no longer be applicable. The monitoring team has observed this issue on more than one occasion. A number of times an officer's justification notes that they deferred employing an ECW application while the individual is fleeing to when the person has stopped moving so that they have a better target to aim at with the ECW.  The problem is often that when the target stops actively fleeing, the justification for that ECW application also ceases (or is no longer valid). Supervisors and IAFD investigators need to ensure they are vigilant of this issue. The training academy also needs to ensure its curriculum is explicit in this area, not just for ECW applications but for the deployment of any force. We note elsewhere in this report the degradation of IAFD's investigations process.

### 4.7.11 Assessing Compliance with Paragraph 24

Paragraph 24 stipulates:

> **"ECWs shall not be used solely as a compliance technique or to overcome passive resistance. Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered. Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range."**

**Results**

See table below.

**ECW Usage As Compliance Techniques for IMR-13**

|  | In Compliance |
|---|---|
| IMR-13-01 | N |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | N |
| IMR-13-05 | N/A |
| **Compliance %** | **50%** |

Our analysis indicates that APD field personnel were in compliance with 50 percent of the incidents we reviewed for Paragraph 24, well below the required 95 percent.

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraph 24:*

*4.7.11a:  APD should assess the data related to out-of-policy ECW applications by implementing a detailed review of a broader sample of ECW applications and identifying the top five reasons/fact patterns leading to out-of-policy applications. Once those reasons are identified, determine if individual or broad-scale interventions are necessary.*

*4.7.11b:  Once the determination of intervention type is made, plan, organize, deliver and assess if the intervention has been effective.*

*4.7.11c:  Continue this process until out-of-policy ECW applications are less than five percent of all ECW applications.*

**4.7.12 Assessing Compliance with Paragraph 25:  ECW Verbal Warnings**

Paragraph 25 stipulates:

> **"Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to discharging an ECW on the subject. Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning."**

**Results**

Members of the monitoring team reviewed five randomly selected ECW application events for compliance with this task. Again, as noted earlier, there was a paucity of cases opened and completed during the IMR-13 reporting period.  Compliance figures for the five events are depicted below, indicating a 100 percent compliance rate for the requirements articulated in APD policies related to Paragraph 25 of the CASA.

**Verbal Commands Prior to
Deployment of Tasers**

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | Y |
| **Compliance %** | **100%** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.13 Assessing Compliance with Paragraph 26:  ECW Limitations**

Paragraph 26 stipulates:

> **"ECWs will not be used where such deployment poses a substantial risk of serious physical injury or death from situational hazards, except where lethal force would be permitted. Situational hazards include falling from an elevated position, drowning, losing control of a**

**moving motor vehicle or bicycle, or the known presence of an explosive or flammable material or substance."**

## Results

### Deployment of Tasers in Situations Posing Risk of Serious Injury or Death

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | N/A |
| **Compliance %** | **100%** |

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.14 Assessing Compliance with Paragraph 27: ECW Cycling

Paragraph 27 stipulates:

> **"Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power. Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power). After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.   Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Officers shall also weigh the risks of subsequent or continuous cycles against other force options. Officers shall independently justify each cycle or continuous cycle of five seconds against the subject in Use of Force Reports."**

**Results**

**Continuous Cycling of ECWs**

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | N/A |
| **Compliance %** | **100%** |

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.15 Assessing Compliance with Paragraph 28:  ECW Drive-Stun Mode

Paragraph 28 stipulates:

> **"ECWs shall not be used solely in drive-stun mode as a pain compliance technique. ECWs may be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject, so that officers can consider another force option."**

**Results**

**ECW Use in Drive-Stun Mode**

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | N/A |
| **Compliance %** | **100%** |

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.16 Assessing Compliance with Paragraph 29:  ECW Reasonableness Factors

Paragraph 29 stipulates:

> **"Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options. ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons. In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others. Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations."**

**Results**

**Use of ECWs Based on All Circumstances of Incident**

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | N |
| IMR-13-05 | Y |
| **Compliance %** | **80%** |

Primary:　　　**In Compliance**
Secondary:　**In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 29:***

***4.7.16a:  Review a broader sample of ECW usages to determine the effective rate of failure and the causes of those failures, e.g., policy, training, supervision, etc.***

***4.7.16b:  Address the top five reasons for failure by appropriate means (individual counseling and retraining, roll-call training).***

### 4.7.17 Assessing Compliance with Paragraph 30:  ECW Targeting

Paragraph 30 stipulates:

> **"Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to**

40

**believe there is an imminent risk of serious physical injury."**

## Results

### Targeting Subject's Head, Neck, or Genitalia

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | Y |
| **Compliance %** | **100%** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.18 Assessing Compliance with Paragraph 31:  ECW Restrictions

Paragraph 31 stipulates:

> **"ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective."**

## Results

### Taser Usage on Handcuffed Individuals

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | N/A |
| **Compliance %** | **100%** |

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.19 Assessing Compliance with Paragraph 32:  ECW Holster

Paragraph 32 stipulates:

> **"Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.20 Assessing Compliance with Paragraph 33:  ECW Certifications

Paragraph 33 stipulates:

> **"Officers shall receive annual ECW certifications, which should consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes and scenario- and judgment-based training."**

## Results

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.21 Assessing Compliance with Paragraph 34:  ECW Annual Certification

Paragraph 34 stipulates:

> **"Officers shall be trained in and follow protocols developed by APD, in conjunction with medical professionals, on their responsibilities following ECW use, including:
> a)  removing ECW probes, including the requirements described in Paragraph 35;
> b)  understanding risks of positional asphyxia, and training officers to use restraint techniques that do not impair the subject's respiration following an ECW application;
> c)  monitoring all subjects of force who have received an ECW application while in police custody; and
> d)  informing medical personnel of all subjects who: have been subjected to ECW applications, including prolonged applications (more than 15 seconds); are under the influence of drugs and/or exhibiting symptoms associated with excited delirium; or were kept in prone restraints after ECW use**."

**Results**

Primary:      **In Compliance**
Secondary:  I**n Compliance**
Operational: **In Compliance**

## 4.7.22 Assessing Compliance with Paragraph 35

Paragraph 35 stipulates:

> **"The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel."**

**Results**

### Provision of Medical Attention

| | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | N/A |
| **Compliance %** | **100%** |

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.23 Assessing Compliance with Paragraph 36:  ECW Notifications

Paragraph 36 stipulates:

> **"Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges)."**

**Results**

### Immediate Notification of Application of Taser

|  | In Compliance |
|---|---|
| IMR-13-01 | Y |
| IMR-13-02 | Y |
| IMR-13-03 | Y |
| IMR-13-04 | Y |
| IMR-13-05 | N/A |
| **Compliance %** | **100%** |

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.24 & 4.7.25 Assessing Compliance with Paragraphs 37 & 38

Paragraphs 37 – 38 of the CASA address auditing and analysis requirements that APD must meet related to ECW use as follows:

    Paragraph 37: ECW Safeguards;
    Paragraph 38: ECW Reporting.

During our December 2020 virtual site visit, members of the monitoring team met with personnel responsible for the tasks delineated in Paragraphs 37 and 38.  The Performance Metrics Unit (PMU) has maintained momentum and the continuity of business continued in APD's Compliance Bureau throughout the IMR-13 reporting period.[21]  In light of our observations during the reporting period, APD has maintained its Operational Compliance with Paragraph 37, and with its publishing of the 2016-2019 Annual Use of Force Report has elevated its standing to Secondary Compliance with Paragraph 38.

As in the past, in preparation of this report, the monitoring team requested course of business documentation regarding ECW reporting.  That information demonstrated APD is continuing to organize its methods and effort to sustain their adherence to the requirements of Paragraph 37.  As part of our review, we requested the following information for this reporting period:

A. Any course of business documentation that demonstrates: 1) APD conducted quarterly downloads and audits of all ECWs; 2) APD conducted random audits of ECW deployments; 3) APD conducted directed audits of ECW deployments.

---

[21] The impact of Covid-19 was specifically discussed, and we were told that PMU was able to work remotely without disruption to their work.

B. Any Area Command Inspection Reports and scorecards prepared by PMU and rebuttals submitted by Area Commanders.

We have been particularly impressed with the objectivity PMU demonstrates when assessing data, which traditionally set them apart from other areas of the organization. That objectivity creates an atmosphere where there are opportunities for the monitoring team to provide feedback that fine tunes PMU activities, not establish baseline capabilities.  The clarity of thought that accompanies objectivity allows an organizational unit like PMU to advance information that can meaningfully influence operations.  That said, it is incumbent upon senior leaders to not only accept, but to seek out opportunities to leverage the capabilities of PMU, and to leverage information they provide to better the organization.  We believe the dialog being created between Area Commands and PMU, following PMU's analysis of data, is a positive step, but more can be done from an executive level.

Members of the PMU team again came prepared to the meeting and provided relevant updates to their operation and initiatives that are still in development.  PMU reported losing an auditor for other employment, but they hired a replacement in September 2020.  We have discussed PMU staffing levels in past reports and were encouraged to learn that the number of people assigned to PMU remains steady.  PMU provided a presentation of the status of their unit's efforts and, as usual, we were impressed with the progress of the team.  In October 2020, PMU expanded the scope of its compliance audits to additional operational commands.  That expansion reportedly included APD investigative units, and the monitoring team saw evidence of those audits in the information we reviewed.

We again discussed with PMU that deficiencies with use of force reporting and investigations will impact data integrity that is reported by the organization.  Historically, issues we see are at the initial, field level categorization of uses of force and investigations related to that force.  As APD began the work of recasting its use of force suite of policies, we cautioned the department (often) that although higher order investigations were being shifted to IAFD, the highest risk of error would likely still reside with front line supervisors in the field.  While we have concentrated great energy during our conversations on use of force events that were actually reported, and issues within those events, we provided suggestions for PMU to be proactive in their oversight of areas of potential risk.  In keeping with past technical assistance surrounding lower level uses of force, we recommended PMU explore whether data exist of arrests for assault on police officers, resisting arrest, or other such offenses, where there is not an accompanying use of force report.[22]  This is the type of proactive query PMU can conduct to self-identify problems and protect the organization from criticism.

_____

[22] We recognize circumstances can exist in which an accompanying use of force may not be warranted; however, when these types of charges are brought against a person it is reasonable to believe that a use of force, in some measure, could exist.  It is in these areas APD could be impacted during Operational Compliance determinations in the future, so we brought this idea for them to consider in order to avoid issues later.

Alternatively, finding no issues would be reassuring to the executive staff and give the parties a layer confidence in use of force data.

PMU field inspections of Area Commands expanded into pilot programs for the months of September and October 2020, when investigatory units of the department[23] were audited.  Inspections went live with those groups in December 2020.  Based on our review of data, the PMU audits continue to be a routine part of the business process and despite challenges presented by Covid-19, PMU was able to maintain their inspections of data throughout the IMR-13 reporting period.  For this reporting period we reviewed Inspection Summary Reports, Score Cards, and rebuttals for the months of August 2020 through January 2021.   These inspections allow PMU to measure compliance with CASA paragraphs principally focused on ECW, OBRD, APD Firearms Requirements, Supervision, IA complaint forms, and requirements related to 72-hour extension requests during use of force investigations.[24]  PMU directly correlates data to specific CASA related policy provisions and provide the relevant observations analysts make during assessments that will be helpful to APD supervisors.[25]  The course of business documentation we reviewed demonstrated APD maintained Operational Compliance with Paragraph 37.

PMU collects pre-determined sets of data that measure compliance efforts across the different commands and generates "Scorecards" that are shared back to those commands.  The broad areas being assessed receive percentage scores of "compliances", that are then color coded.  That makes the reports quickly digestible, which is an important quality for a field supervisor.  We continue to see legitimate exchanges of perspective between Commanders and PMU when an Inspection Report notes gaps in information or potential policy violations.  Area Commanders have an opportunity to review and refute PMU findings and, as in the past, we saw instances where: 1) PMU agreed with a Commander's perspective and evidence that was presented, and then changed a report's finding; and 2) PMU disagreed with the perspective and evidence provided by a Commander and did not change the finding in the Inspection Report.  We confirmed that in instances where PMU does not change its finding that a policy violation occurred, that the violation is referred to Internal Affairs for intake and investigation, if appropriate.

This reporting period revealed another positive benefit of PMU's audits, when their reviews of ECW downloads resulted in a number of instances in which officers' videos had not been properly downloaded per policy.  Following a series of exchanges of information, and meaningful dialog with the Commander of the relevant area station,

---

[23] PMU expanded to the DWI, Auto Theft and Impact teams, the Investigative Support Unit (ISU) and Gangs Unit.

[24] The current paragraphs noted in PMU's "Inspection Summary" Report included ECW paragraph 37; OBRD paragraphs 224, 230; Firearms paragraphs 18, 20; Supervision Paragraphs 32, 207 and 225; and 72-hour extension paragraph 53.

[25] We have commented that the data being collected by PMU, if shared and analyzed from an IA and training perspective will be a tremendous resource.  PMU isolates the data by Area Command and Unit and focuses even deeper on individual policy provisions that are being adhered to or violated.

they collectively identified ECW dock stations that were malfunctioning.[26]  They identified a second "anomaly" by inspecting Audit Trails and Taser Device Logs, indicating a taser was in circulation between three separate officers that had a status of "Relinquished" and the system failed to update the Audit Trail when the ECW battery was docked.  These exchanges of information, and investigation into issues we are seeing with PMU, support implementation of the intent of Paragraph 37.

With respect to Paragraph 38 the monitoring team requested course of business documentation that demonstrated provisions had been met.  As noted in IMRs 10 and 11, APD published its 2016 and 2017 Annual Reports[27] in March of 2019, having not published an Annual Use of Force Report since 2015.  The "Use of Force Report for the Years 2016/2017" was finally published in March of 2019.   During the IMR-13 reporting period, APD published its final Annual Use of Force Report inclusive of the years 2016-2019.  APD again decided to organize use of force data from multiple years believing the aggregation of year-over-year data gave the department better context to the information they were assembling.  This also provides readers of the report more information upon which to make judgments of APD's progress, so the monitoring team found this approach to be appropriate under the circumstances.  We encourage APD to keep pace with the Annual Use of Force Report for 2021 by pulling forward the 2020 data in a timely manner.  Lack of diligence in past years left APD with a great deal of delayed submissions, and since the Annual Report is a requirement in other CASA paragraphs, APD could risk the loss of multiple compliance findings if annual reports are not submitted and analyzed for multiple quarters.  We have repeatedly advised APD that publishing the reports is not the only objective, but that analyzing and drawing critical conclusions from those reports is essential.

APD published their Annual Use of Force Report during the IMR-13 reporting period, and they have achieved Secondary Compliance with Paragraph 38.  When APD implements its Early Intervention System—a process that has been "in the works" for at least four years, and continues with timely Annual Use of Force Reports, the monitor will assess whether Operational Compliance has been achieved.

### 4.7.24 Assessing Compliance with Paragraph 37:  ECW Safeguards

Paragraph 37 stipulates:

> **"APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy. APD agrees to implement a protocol for quarterly downloads and audits of all ECWs. APD agrees to conduct random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's Use of**

---

[26] PMU called out that "A malfunctioning dock remains inconclusive evidence that a non-compliance officer did in fact comply with Paragraph 37."

[27] The report was dated February 2019 and was published on March 14, 2019.

**Force Reports. Discrepancies within the audit
should be addressed and appropriately
investigated."**

## Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.25 Assessing Compliance with Paragraph 38:  ECW Reporting

Paragraph 38 stipulates:

> **"APD agrees to include the number of ECWs in
> operation and assigned to officers, and the number of
> ECW uses, as elements of the Early Intervention
> System. Analysis of this data shall include a
> determination of whether ECWs result in an increase in
> the use of force, and whether officer and subject
> injuries are affected by the rate of ECW use. Probe
> deployments, except those described in Paragraph 30,
> shall not be considered injuries. APD shall track all
> ECW laser painting and arcing and their effects on
> compliance rates as part of its data collection and
> analysis. ECW data analysis shall be included in APD's
> use of force annual report."**

## Results

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **Not In Compliance** |

### *Recommendations for Paragraph 38*

*4.7.25a1: We highly recommend that APD continue to involve the monitoring team
in its ECW-reporting, planning and implementation processes.  APD advises that
it has been incapable, in the past, of finding an external vendor capable of
meeting its EIS requirements and has decided to craft its own system.  At this
time, this continues to be a work in progress.  This process has trundled onward
for six years without substantial success.*

*4.7.25a2:  APD must identify reasonable timelines for the process, defining step-
by-step processes and dates of expected completion of those processes;
identifying key milestones and task responsibilities due dates; define operational
systems to be developed, with key milestones for each involved systems; and
clearly articulate who is responsible for each pending action.  Bi-annual reports
should be published that identify the status for each key milestone.  When*

*milestones are missed, complete documentation of why, who was responsible, and anticipated length of the delay caused by missing the milestone deadlines should be reported.*

*4.7.25a3:  Quarterly reports should be provided to the Chief of Police and the monitor updating project progress, i.e., objectives due for the quarter; objectives accomplished for the quarter; problems, issues, needs and solutions designed to move forward on a specific timeline.*

The EIS development project has dragged on for six years and is a critical threat to the viability of APD's compliance efforts.  APD has contracted with outside vendors, who agree to specific timelines, objectives, and functionalities, and are held accountable by APD and the City for meeting those timelines.  As of IMR-13, this is a work in progress.

**4.7.26 – 4.7.27 Assessing Compliance with Paragraphs 39-40: Crowd Control Policies and After-Action Reviews.**

Paragraphs 39-40 of the CASA address requirements that APD must meet related to crowd control policies, and the management and supervision of APD responses to events involving mass demonstrations, civil disturbances, and other crowd situations. The relevance of these requirements became obvious over several months of 2020 when APD's Emergency Response Team (ERT) was called into action to address mass gatherings and violence stemming from protests following controversial events in cities across the country.  While the ERT policies apply to all APD officers, the tasks associated with Paragraphs 39 and 40 are overseen by members of the ERT, which resides within the Field Services Bureau.  During the IMR-13 reporting period APD made little progress toward advancing its compliance standing with Paragraphs 39-40. Positive strides for ERT are no more complicated than writing the ERT policy and training the policy.  In five years APD has been unable to accomplish this simple, combined task.  There is little more that can be said regarding the lack of progress, other than to again point to the top echelon of the organization for failing to ensure that the requirements of these paragraphs were completed.  Frankly, these two paragraphs are easy opportunities to demonstrate progress in light of other organizational shortcomings.  It is the monitor's opinion that failure to do so, at this point constitutes deliberate indifference to the requirements of the CASA

In preparation of this report, the monitoring team requested data for demonstrations and events during which ERT was called to assist, training records and other documentation relevant to making compliance determinations.  During our December 2020 virtual site visit, we had the opportunity to discuss the status of Paragraphs 39-40 with ERT.  We discussed the new ERT policy --- now SOP 2-35 "Emergency Response Team (ERT) --- that was updated and recast on August 18, 2020.  The following represents our findings related to Paragraphs 39-40.

Since the beginning of IMR-9,[28] we have documented ERT's effort to develop training and how it intended to address its requirements through a 3-Stage training process as follows:

> **Stage 1** – All department personnel would receive training on SOP 2-29 (recast now as SOP 2-35) through an online training platform.[29]

> **Stage 2** – All ERT supervisors will receive an in-person "train the trainer" course on the new ERT SOP, which will incorporate practice in crowd control formations and movements so they are consistent across the entire ERT.[30] (Note – There are a total of 5 teams of ERT and approximately 90 personnel who will need to attend the training.)

> **Stage 3** – All other ERT personnel will receive in-person training and discuss use of force, including force related to chemical munitions and NFDDs, training on the ERT SOP, and squad formations and movements utilizing ERT supervisors as trainers.[31]  This training is still working its way through the 7-Step Training Cycle.

As reported in IMRs-10 and 11, ERT worked with the Academy to advance their Stage 1 training through the 7-Step Training Cycle, which was submitted to and approved by the monitoring team at the end of July 2019.  APD promulgated Special Order 19-73 "Crowd Control Gap Training" on July 22, 2019 that required that it be completed by July 29, 2019.  We were provided with a July 30, 2019, "Close Out" memorandum that documented the to-date compliance with Special Order 19-73.  APD personnel attended the training to an overall performance score of 96%.

During our virtual site visit, ERT again advised that they are refining their administration of routine training.  We continue to encourage ERT Commanders to standardize their routine training documentation and mirror larger programs that they coordinate with the Academy staff.  We reviewed training documentation for routine ERT training programs that was provided in response to a data request for this report.  We have commented that routine training may be too cumbersome to run through the 7-Step Training Cycle,

---

[28] The tasks associated with these paragraphs have never achieved a compliance standing above Primary because of failures to train existing policy.  As a consequence of those failures, the policy changes hinder progress because elements of the new policy will have to be retrained.

[29] We commented in IMR-12 that at this point ERT will have to consider Stage 1 of training and whether it needed to be retrained once the new policy is completed.  A memo provided by ERT after the close of IMR-13, dated February 12, 2021, indicated that Stage 1 training requires revisions and will have to be retrained.

[30] The ERT memo indicated that Stage 2 is still working its way through the 7-Step Training Cycle at the Academy.  ERT's expectation is to complete the training by July 31, 2021.

[31] Supervisors who attended the "train the trainer" course will be used as trainers.  Since this stage of training has been in development for more than two years, any training will have to be updated to reflect the most up-to-date use of force policies and current Academy standards.  Likewise, lessons learned from protests and violence during mass gatherings should inform the training content.  That approach is the basis of APD's 7-Step Training Cycle.

since units like ERT need more nimble environments to get training to its members. That said, the basic tenets of learning objectives, testing outcomes, and post-training reporting are still valuable when tracking performance in the field for individuals or entire units.  The monitoring team had an opportunity to review two routine training documentation that addressed a number of different topics and want to acknowledge that the quality has increased since the last materials we were presented.[32]  In fact, a cover memo called out specific language from IMR-12 that demonstrates ERT is making attempts to follow technical assistance provided to them.  ERT would benefit from continuing to meet with the Academy to further improve their routine and organization-wide training materials.  The monitoring team will spend time during the IMR-14 reporting period to discuss curriculum development in further detail.  Our intention will be to provide technical assistance and explain the nuances of creating measurable objectives and how to capture learning outcomes that will enable the ERT commanders to impact performance in the field.

The monitoring team, as a part of the normal data collection process, requested APD provide documentation for any mass gatherings that occurred during the IMR-13 reporting period.  APD provided the monitoring team with eight (8) Pre-Event Plans and After-Action Reports to review.  The documents are adjusted for each event but contain standard language regarding Operational Orders and Rules of Engagement.  We offer the following brief observations to consider that we believe will benefit ERT:

1. In the introduction of the After-Action Reports, the standard language includes, "The report is not meant to second guess the actions of officers and supervisors made during the event."  For an After-Action Report to be valuable to the department, any learning law enforcement agency would expect a critique of actions and decisions that were made.  Those decisions and actions could be either positive or negative, so in our view, including this language seems like a hyper-sensitivity to criticism and accountability.  We suggest the language be removed.

2. Stock language under the heading "Rules of Engagement" in the ERT Event Plans includes a provision that states, "If gas is used on a civil disturbance or riot, it will be covered after the deployment with 40mm munitions.  If subjects attempt to pick up or kick the canister, then less lethal 40mm munitions are authorized to be deployed."  While there is an earlier provision calling out the fact that ERT will make decisions "…in accordance with Use of Force SOP", APD commanders and executives should revisit this language.  The manner and context that this provision is communicated to ERT officers and supervisors during an event is unclear.  Further, we have no indication whether it is consistently provided by all supervisors at all events.  Such an open-ended authorization could result

---

[32] The records we reviewed also contained a tentative training calendar for quarterly ERT training throughout 2021.

in a 40mm munition being applied inappropriately, leaving the department with this open-ended language to rely on when attempting to hold someone accountable for inappropriate use of force.  We provide this specific feedback to help APD avoid adverse Operational Compliance determinations in the future.

In IMR-13, we call out the fact that a separate issue was identified following protest deployments relating to the proper timelines for reporting and documenting uses of force.  The police department handled numerous protests in short periods of time, with IAFD responding to investigate accompanying uses of force.  We learned there was "substantial disagreement" between commands as to the proper timelines to apply for use of force reporting during protests.  We noted that balancing the need for timely use of force investigations with chaotic emerging events will require the department to consider the relevant issues, devise a proper response to those issues and advance their proposal to the Monitor for consideration.[33]  In a January 10, 2021 memorandum entitled, "Emergency Response Team – ERT/SOD/IAFD Coordination," APD documented its acknowledgment of the issue and the intention to advance recommendations for SOP revisions.  We appreciate that APD is attempting to address this important issue and encourage them not to allow the effort to carry too far into the future before advancing a proposed policy change to the Monitor for consideration.

The January 10, 2021 memo we reviewed addressed other topics of concern the monitoring team called out in IMR-12 regarding the coordination of effort between SOD and ERT during events.  APD has documented the start of a communication plan and is in the early stages of the 7-Step Training Cycle while attempting to create cross-training between the two units.  We noted these items to help APD avoid issues in the future, and the memo we reviewed demonstrates ERT is taking cognizance of our feedback.  We will follow up on these items during IMR-14 to determine if ERT is continuing to remediate the issues.  We note that these issues were initially called out internally by SOD and not the monitoring team, so we would expect an even greater sense of urgency to get them resolved.

Based on our review, we have determined Primary Compliance should be continued for Paragraphs 39 through 40.  Secondary Compliance will be achieved once APD has addressed Stages 1-3 of training, which has carried on far too long to be considered reasonable.  We again recommend that ERT develop and deliver that training in conjunction with the Academy, since the coordination of the ERT training will benefit Academy-centric responsibilities in Paragraphs 86-88 as well.

---

[33] For instance, APD should be considering how IAFD will follow up investigations where an officer uses a type of force, but the person(s) on which the force was used run(s) from the scene or are dispersed through other types of force.  The monitoring team has not been provided with a proposal regarding how that circumstance should be handled, or proposed policy revisions outlining the expectations of IAFD under those circumstances.  Having this linger may create burdens on IAFD that may be otherwise resolved among the parties.

## 4.7.26 Assessing Compliance with Paragraph 39: Crowd Control Policies

Paragraph 39 stipulates:

> **"APD shall maintain crowd control and incident management policies that comply with applicable law and best practices. At a minimum, the incident management policies shall:**
>
> **a) define APD's mission during mass demonstrations, civil disturbances, or other crowded (sic) situations;**
> **b) encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses;**
> **c) require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and**
> **d) continue to prohibit the use of canines for crowd control."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |


## 4.7.27 Assessing Compliance with Paragraph 40

Paragraph 40 stipulates:

> **"APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **Not In Compliance** |
| Operational: | **Not In Compliance** |


***Recommendations for Paragraphs 39 and 40:***


***4.7.26-27a: Recommendation:  APD must develop and deliver a meaningful training program to its ERT and Field Services members that is centered on crowd control policies.  That training should include scenarios, practical***

53

*exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans. Training should incorporate lessons learned from recent ERT activations and contemplate best practices developed by police agencies facing similar social unrest across the country.*

*4.7.26-27b: APD must continue to ensure its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy, training, or operational rubric within the agency.  We encourage APD's ERT Commanders to review past reports and to incorporate AAR procedures and forms (previously agreed upon) into SOPs.*

*4.7.26-27c: Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.*

*4.7.26-27d: APD should continue its effort to coordinate with IAFD to devise workable solutions to ensure reasonable and timely use of force reporting and investigations occur in circumstances where multiple planned and unplanned protests are being addressed.  Solutions should be advanced to the monitoring team in the form of Special Orders and/or SOP revisions related to the proper investigation of uses of force during mass gatherings.*

*4.7.26-27e: ERT should continue to work with SOD to create a schedule for routine multi-disciplinary training.  The training should be coordinated with the Academy and their include standards of curriculum development.*

*4.7.26-27f: ERT should address standard language contained within Event Plans regarding when the use of 40mm munitions is authorized to provide the proper context and ensure erroneous uses of 40mm munitions do not occur.*

**4.7.28 – 4.7.46 Assessing Compliance with Paragraph 41-59: Supervisory Review of Use of Force Reporting**

This series of related Paragraphs (41 through 59) encompass requirements for reporting, classifying, investigating, and reviewing uses of force that require a supervisory-level response based upon the type and extent of force used.  The CASA delineates this larger group of paragraphs into three separate sub-groups:  Use of Force Reporting – Paragraphs 41-45; Force Reviews and Investigations – Paragraphs 46-49; and Supervisory Force Reviews – Paragraphs 50-59.  The following represents our findings relative to this series of paragraphs.

The CASA requirements stipulate that the use of force and reviews/investigations of force shall comply with applicable laws and comport to best practices. Central to these reviews and investigations shall be a determination of each involved officer's conduct to

determine if the conduct was legally justified and compliant with APD policy.  We have commented extensively in the past that APD's reporting and investigation of uses of force have demonstrated serious deficiencies that have hindered compliance efforts. As with other reporting periods, the monitoring team spent time during the IMR-13 reporting period in consultative processes providing perspective, feedback, and technical assistance to APD personnel regarding force investigations. We provided perspective to APD to help the administration better understand and deal with historical difficulties the agency has had in achieving compliance and provided ideas concerning how these issues could best be addressed moving forward.  We have seen examples of our technical assistance being implemented in certain areas, and we have noted some improvement with the overall handling of use of force incidents. However, we still find evidence of force reporting and investigation problems, as well as what can be described as systemic breakdowns that skew data reporting efforts.

Since eliminating Additional Concern Memos (ACM) and Supervisory Action Reports (SAR), the monitoring team observed numerous examples of personnel requesting IA investigations on policy violations. These requests are referred to as an Internal Affairs Request (IAR). A number of use of force cases (Levels 1, 2, and 3) reviewed during this reporting period contained requests for IARs for alleged policy violations. These IARs continue to be examined by the monitoring team to the point of their logical conclusions in order to determine if APD is properly administering its IA oversight functions.  During IMR-13, APD's tracking data indicates 424 requests for IA review of alleged policy violations associated with use of force reviews and investigations. During IMR-10, there were 263 IA referrals, 404 IA referrals during IMR-11, and 534 IA referrals during IMR-12. These data are set forth below in Table 4.7.28a.

Table 4.7.28a
Comparison of Uses of Force with Internal Affairs Requests (IARs)

| Reporting period (RP) | Level 1 UoF | Level 2 UoF | Level 3 UoF | Total UoF | Internal Affairs Requests (IARs) |
|---|---|---|---|---|---|
| IMR-10 | 241* | ** | 54** | 295 | 263 |
| IMR-11 | 241* | ** | 40** | 281 | 404 |
| IMR-12 | 173 | 232 | 79 | 484 | 534 |
| IMR-13 | 111 | 244 | 54 | 409 | 424 |

\*    Level 1 use of force cases were referred to as Supervisory Use of Force Investigations prior to IMR-12.

\*\*   After January 10, 2020, Serious Use of Force Investigations were split into Level 2 and Level 3 Use of Force Investigations. Since Level 2 and Level 3 data are not available for IMR-10 and IMR-11, use of force incidents that were classified as Serious Uses of Force back in IMR-10 and IMR-11 are represented in the "Level 3 UoF" column in this table. Thus, the "Level 2 UoF" column has no data in it for IMR-10 and IMR-11.

Since all potential policy violations observed during use of force incidents are reported now to IAPS via IARs, this aggregate data provides a rich resource for APD to analyze to determine misconduct trends. Any training conducted by the Academy or other entity within APD should, as contextually appropriate for the course being designed, should examine as part of its needs assessment phase of curriculum development.[34]

During this reporting period for IMR-13, APD opened 111 Level 1 use of force cases for supervisory review.  In contrast, APD opened 173 new cases during IMR-12 and 241 supervisory use of force reviews during IMR-12. The 111 Level 1 cases opened in IMR-13 represents a decline of 36% from the Level 1 cases opened during the period of February 1 – July 31, 2020 (IMR-12) and a 54% decrease from the supervisory use of force investigations opened during the period of August 1, 2019 – January 31, 2020 (IMR-11).

The monitoring team has given exhaustive technical assistance and feedback to APD concerning the problems associated with their IA processes. This technical assistance, continuously provided since the onset of monitoring, increased in January 2020, and the level of technical assistance has continued to increase throughout IMR-12, IMR-13, and through the writing of this report.  This feedback encompassed briefings on best practices in internal affairs operations, as well as providing recommendations for improving existing internal processes to improve the timeliness of APD's use of force investigations and the disparity in discipline that exists by deferring disciplinary decisions to Area Commands.  In this reporting period, better Internal Affairs Professional Standards (IAPS) oversight and parameters appear to address some of the disparity of discipline emanating from use of force incidents.  However, APD continues to struggle with completing supervisory force investigations within 72 hours. Additionally, APD supervisory and command personnel still struggle to complete their reviews of Level 1 use of force investigations within the allotted 30-day time period.[35]

In IMR-12, there were several cases that were completed beyond 60 days. This continues for IMR-13. Timeliness continues to plague APD on a number of fronts beyond just the deadline to complete supervisory use of force investigations. Whether the genesis of this problem is merely APD's culturally ingrained *laissez-faire* approach to deadlines, or the intentional failure of individuals to act with any sense of urgency

---

[34] The monitoring team has stressed the importance of building information pathways for this type of data to reach the Academy.  To date, despite exhaustive effort to provide technical assistance over the past five years, APD's ability to take available data and translate that data into specific performance gaps in the field, which then results in quality training to remediate field practices is far behind where they should be at this point.

[35] Pursuant to SOP 2-57, supervisors must complete and document a supervisory use of force review of a Level 1 use of force within 72 hours after the supervisor leaves the scene of the use of force incident (and upon a commander's approval, supervisors may receive a seven-day extension). The lieutenant in the involved officer's chain of command has ten calendar days from receiving the supervisor's review to complete a review of a Level 1 use of force. The commander in the involved officer's chain of command has ten calendar days from receiving the lieutenant's review to complete the review of the Level 1 use of force. Thus, the maximum amount of time a Command has to complete a supervisory review is 30 days (assuming a seven-day extension was granted to the supervisor conducting the initial review).

(and collaterally undermining the spirit of the CASA), the outcome is the same—the detrimental effect of APD not imposing corrective measures and discipline of officers for policy violations due to the simple fact that the investigations were completed after deadlines and expired. This fear or inability to impose appropriate corrective measures and discipline adversely impacts APD's ability to reduce its risk for individual officers, for the agency as a whole, for the City government, and community members. This may be the most influential problem facing APD as it moves to comply with the requirements of the CASA.  There appears to be no intent to effectively execute a meaningful IA process at APD.  We exclude the present commands at APD IAPS and IAFD, as they are newly assigned personnel.  These individuals, we believe, are acutely aware of the problems within these two units and are focused on making improvements.  The monitoring team has assigned additional monitoring staff to the team to focus solely on IAPS systems improvements, thus reducing the workloads of monitoring personnel assigned to IAFD process.  This should effectively improve performance in both units.

In IMR-12, the monitoring team recommended that APD should conduct an analysis of causal factors leading to their failure to achieve better efficiency in completing the investigations. The intent of this recommendation was twofold:

1) Such analysis would be beneficial to APD's examination of the factors that led them to present to the Court how this new use of force system would facilitate compliance, and then determine what may be impeding their progress to achieve compliance under their new system; and

2) Based upon the theory, research, and practice of utilizing continuous improvement cycles, information gleaned from the analysis of past failures should be utilized to positively impact the effectiveness and efficiency of use of force incidents moving forward.

Unfortunately, only 60% of Level 1 cases opened during the reporting period were completed within the allotted 30-day period, compared to the 68 % of Level 1 supervisory use of force reviews that were completed within the allotted 30-day period during IMR-12. To put this into perspective, APD is now one year past the time in which it implemented the "new" APD-initiated stratified system for categorizing and investigating use of force incidents.  Any nuances within this system should have been long-rectified before the close of IMR-13.  Additionally, APD's handling of 36% fewer cases than the previous reporting period significantly reduced the supervisory workload in handling these reviews.  However, during IMR-13, supervisors and their chains of command saw an 8% decrease in their overall efficiency in handling these reviews. APD is often quick to cite the need for more training any time it does not meet the thresholds required in the CASA.  However, poor training or a lack of training generally presents itself immediately upon implementing a new process or initiative.  In this instance, APD's supervisors are now one year past the implementation of their newly designed system, yet they are handling 36% fewer Level 1 reviews than when the new process was implemented in January 2020.  APD's efficiency in handling these cases is presently declining.  This is not consistent with a training deficiency.  Furthermore, one

of the rationales (as presented to the monitoring team) for revising the system for categorizing and investigating use of force incidents was to take the workload off of the front-line supervisors and to shift the more significant force cases to IAFD.  One year after this reengineering of the use of force processes, the supervisor's workload of Level 1 cases has declined by 36% (in what the monitoring team perceives as a significant reduction), yet the case completion rate has declined 8%.  These numbers "do not compute."

Despite a constant influx of technical assistance from the monitoring team, feedback from DOJ, and APD-generated staffing studies and workload analyses that all outline the same needs, the command and control ranks of APD have yet again failed to adequately train and oversee a core CASA function and thus have undermined a significant number of high-liability functions of the department.  In the past, we believed this was due to a lack of focus, oversight, command, and control by APD commanders who led these divisions.  We note these drops in productivity occurred contemporaneously with the practice of many assigned IAFD investigators beginning to investigate only one case at a time.  We know of no other police agency similar in size to APD in which IA investigations of uses of force are conducted one at a time.  In the professional IA divisions elsewhere in the country, this is simply unheard of.  It represents a massive surrender of professionalism among those who then commanded IAFD.

We have high degrees of trust for the individuals currently assigned to lead IAFD and IAPS.  They have proven themselves to be alert, conscientious, reliable managers in the past.  We will continue to monitor intake, analysis, output, and decision-making processes of IAFD and IAPS to ensure internal affairs cases move with some degree of alacrity and are completed with high degrees of professionalism.

As the table on the following page indicates, during the first three months (August/September/October) of the reporting period, 52 supervisory reviews were initiated, and 79% of them (41 cases) were completed within 30 days. This represents only a slight increase (though a bright spot) from the 77% (76 cases) completed within 30 days during the first three months of IMR-12. However, during November 2020, APD initiated 19 supervisory reviews, and only five of the reviews were completed within 30 days. Thus, only 26% of the cases were completed within 30 days. In December 2020, APD initiated 27 Level 1 cases and completed 41% of them within 30 days. This is woefully short of the 95% level needed to be considered for Operational Compliance. This analysis provides a snapshot of how APD continues to struggle to complete these investigations in a timely manner, even when they have significantly fewer cases to handle.  The benefactors of APD's apparent inability to manage IA cases are the very officers who are abusing use-of-force policies by their on-street performance.

The data provided in the immediately preceding paragraphs of this section of the report reflect Level 1 cases opened during IMR-13. During IMR-13, APD completed supervisory reviews of Level 1 cases that were opened in IMR-13 as well as cases that were opened in IMR-12. When accounting for all Level 1 cases completed in IMR-13

(regardless of when they were opened), APD completed 103 cases. Seventy-two of these cases were completed within 30 days, equating to 70% of the cases being completed within the 30-day time limit.

Table 4.7.28b Timely Investigations of Supervisory
Use of Force Investigations

| Reporting period | # of Sup. UOF Cases Initiated (Months 1-3) of the Mon. Period | # of Sup. UOF Cases (Months 1-3) Completed within 30 days | Total # of Sup. UOF Cases Initiated during the Mon. Period | Total # of Sup. UOF Cases Completed within 30 days |
|---|---|---|---|---|
| IMR-13 | 52 | 41 (79%) | 111 | 67 (60%) |
| IMR-12 | 99 | 76 (77%) | 173 | 117 (68%) |

APD achieved Secondary Compliance with Paragraphs 41-59 in IMR-11—after years of effort. Based on the trending data presented in IMR-13, gaining Operational Compliance for Paragraphs 41-59 will continue to be elusive for APD if supervisory and managerial controls are not implemented and appropriate interventions are not carried out for non-adherence to the controls.  Shortly after achieving secondary compliance for Paragraphs 41-59, the agency lost secondary compliance on its use of force  "Tier 4 training".

A number of APD functions conform to various aspects of Paragraphs 48-52. For example, during our November-December 2020 virtual site visit, the monitoring team met with APD representatives from the Multi-Agency Task Force (MATF). A review of the MATF case ledgers and other documents continues to indicate the task force's activation as set forth in Paragraphs 81-85.

The monitoring team conducted a review of Level 1 use of forces drawn from samples taken throughout the reporting period. Level 1 uses of force often occur in companion with Level 2 and Level 3 uses of force. Therefore, some Level 1 uses of force are also discussed in the next section of this report that focuses on Level 2 and Level 3 uses of force.  For Level 1 use of force cases involving an ECW, those case facts are fully described in Paragraphs 24-36 of this report.

**IMR-13-06 (Level 2 UoF)**

APD received a call one morning about a subject lying across a sidewalk in the area of Barelas Road. Officers were dispatched and located a male lying motionless across the sidewalk with his right leg extending over the curb into the roadway.  As they approached, they alerted the person to their presence, and he immediately jumped to his feet.  The subject appeared to exhibit signs of experiencing mental health and emotional crisis.  Officers communicated in Spanish with the subject, who refused to provide his full name, and he became more agitated.  After a few minutes, he walked away from the officers and refused to stop or speak with them further.  The officers discussed amongst themselves that the person's only offense was a city ordinance

violation, and, at their discretion, it was not in anybody's best interest to enforce the violation at that time.

As the subject departed the area, an older man and woman approached the officers and advised that the subject was their son and that the officers needed to arrest him because he had an outstanding probation warrant for thefts. The officers immediately attempted to locate the subject, and soon additional officers arrived in the area in an attempt to locate him.  A short time later, two officers observed the subject, who subsequently fled on foot. The officers pursued the subject, yelling for him to stop, identifying that they were APD and that he was being detained. The subject ran through some yards and jumped a chain-link fence, and the two officers immediately jumped the same fence.  Upon scaling the fence, the first officer observed the subject to be on his hands and knees on the ground, so the officer grabbed the subject and pushed him to the ground while attempting to handcuff him. The second officer immediately assisted in pulling the subject's hands from under his torso and handcuffed him. The subject was yelling that he couldn't breathe and wanted to go to the hospital.  The officers attempted to get him to sit up, but he kept lying on his stomach. One officer attempted to pick him up by his arm and shirt, but the subject began to roll, so the officers immediately put him down. The officers positioned the subject in a rescue position to make it easier for him to breathe.  EMS responded to the scene, and the subject was ultimately transported to the hospital. At the hospital, the subject reportedly became disorderly, spitting in the face of an officer, who eventually assisted the hospital staff in restraining the subject.

The on-scene supervisor initially classified the force as a Level 1 use of force, so an IAFD detective was not called to the scene. Weeks later, a lieutenant conducting a delinquent review of the Level 1 use of force determined the force incident constituted a Level 2 use of force. IAFD was subsequently notified of the misclassified use of force from the field and assumed the investigation.

No material deficiencies were noted in either the actual use of force by the officer, the reporting of the force, or in the IAFD investigation of the use of force.

The IAFD detectives completed "Evaluative Narrative Form" was dated September 30, 2020 (less than 30 days after IAFD was notified of the case). No IAFD supervisory or chain-of-command reviews of the completed IAFD investigation were provided to the monitoring team.  It should be noted that aggregate data the monitoring team received from APD in February 2021 indicated this case was a Level 3 use of force with seven separate uses of force. The case was actually investigated as a Level 2 use of force (with additional Level 1 uses of force). A different set of aggregate data the monitoring team received in February 2021 indicated the case was closed approximately four months after the incident took place (despite the case being closed by the detective on September 30) and that only two uses of force occurred during the incident. The "Conclusion: Force Application" section of the IAFD "Evaluative Narrative Form" completed by the IAFD detective provided conclusions for two Level 2 uses of force, three Level 1 uses of force, and one Low-Level Control Tactic (not considered to be a use of force).

From force incidents being misclassified in the field to supervisors and commanders being delinquent in their reviews, the handling of this case presents an exemplar of a number of concerns the monitoring team expresses in our reports and briefings to APD about Level 1 uses of force.  This case is also an exemplar of why the monitoring team has expressed concerns about the integrity of data APD relies upon in its reporting to the monitoring team, DOJ, and to the public.  In this particular instance, the field supervisor misconstrued the level of force, and the force is reported on a series of spreadsheets (not a report from a database) and IAFD reports indicating:

- Seven uses of forces (IMR-13 spreadsheet of Level 2 and 3 uses of force)
- Five uses of force (IAFD "Evaluative Narrative Form")
- Two uses of force (IMR-13 spreadsheet of completed Level 3 uses of force)
- IAFD reports indicating the highest level of force was a Level 2 use of force)

This disparity in reporting undermines the credibility of APD's reporting across the board.  This is not a question of numbers.  It is a question of policy, training, supervision, and command oversight.  As a result, APD's management oversight systems are running blind if the inadequacies we've noted here are apparent elsewhere in APD's oversight systems.

## IMR-13-05 (ECW Show of Force)

The APD received a call from a city bus driver on an August 2020 morning, reporting a man with a knife on the city bus and that the man threatened the bus driver.  Four officers were dispatched to the scene and found the reported subject sitting in the rear of the bus.  The officers asked the one other remaining unknown passenger to disembark for safety reasons.  Two officers engaged the subject, who was observed to be holding an opened, folding-type knife in his right hand.  The subject was yelling that he was upset because he felt the buses kept passing him by for the past several hours.  The officers instructed him to put the knife down so they could talk.  Very quickly after their initial verbal contact with the subject, he stood up and took a step toward them.  Both officers had their issued ECWs un-holstered, and one officer painted the subject with the laser while instructing him to stop and to drop the knife.  The subject stopped and sat down, still loudly expressing his issues.  The subject folded the blade into the knife soon after sitting.  The primary officer utilized good communication skills to connect with the subject, convincing him to put the knife on the floor, walking toward them with his hands up, and ending with him putting his arms behind his back to be handcuffed.  The officers remained calm and professional throughout, and the potentially dangerous situation ended without any injuries to the subject or the officers.

The on-scene supervisor immediately initiated his responsibilities to investigate, properly categorized the event as a Level 1 show of force, gave proper instructions, and collected all pertinent witness and involved officer interviews.

No material deficiencies were noted in either the actual use of force by the officer, the reporting of the force, or the subsequent investigation of the use of force.  The actions of the officers were deemed to be objectively reasonable, within policy, and compliant with relevant CASA paragraphs.

**IMR-13-07 (Reported Show of Force with PIT (Pursuit Intervention Technique) Maneuver Unreported as a Use of Force)[36]**

In August 2020, APD officers were making attempts to locate a wanted suspect when an unrelated vehicle (large pickup truck) was seen exiting a motel and failing to exhibit registration plates.  An officer attempted to execute a motor vehicle stop for the violation, but the driver of the vehicle began to make efforts to elude the officer.  The officer alerted dispatch, and a helicopter patrol engaged the pursuit and for a significant portion of the pursuit, was able to videotape the actions of the suspect's vehicle up to and including the conclusion of the chase.  The pursuit traveled through multiple area commands, and numerous APD officers from those commands began to engage the pursuit from distances and different directions.  The suspect's vehicle could be seen driving erratically and at times was operating at apparently high speeds through the city.  In one example of recklessness, the suspect's vehicle was seen traveling through a red light and struck the rear of a tanker truck.  This damaged but did not disable the suspect vehicle.

After an extended time, the suspect began to enter a major highway (in the correct direction) but suddenly crossed a center median and began to travel the wrong way down a highway offramp toward oncoming traffic.  An APD lieutenant taking part in the pursuit was immediately behind the suspect and made the decision to continue his pursuit and drive the wrong way down the ramp.  He also alerted dispatch he was continuing the pursuit and was going to execute a Pursuit Intervention Technique (PIT) maneuver (effectively authorizing his own pursuit and PIT).  The patrol helicopter video shows the suspect's vehicle arriving at the base of the highway ramp, facing oncoming traffic, and making a hard-right turn to travel in the correct direction of travel.  At the same time, the APD lieutenant executed a PIT as oncoming traffic quickly attempted to avoid both the suspect and APD vehicles.  Patrol helicopter video revealed that at least six additional APD vehicles followed down the ramp in the wrong direction.  Also, at least one additional APD vehicle traveled in the wrong direction down the interior shoulder of the fast lane of travel on the opposite side of the highway.  (The monitoring team could not determine how that officer got into this dangerous position or the justification for it).

As the PIT was still being executed on the suspect's vehicle (which was still moving), the driver opened and exited the driver's side door and ran across all the live lanes of traffic.  A second APD vehicle is seen lightly striking the front of the suspect's vehicle as

---

[36] This case was also presented to APD by the monitoring team in the form of constructive feedback and technical assistance during our December 2020 virtual site visit.  It will be followed up during IMR-14 to determine what, if anything, APD did once they were made aware of the issues with the case.

a precautionary measure so the vehicle would not continue to move.  Numerous APD officers can be seen exiting their patrol vehicles and running across numerous live lanes of traffic.  The suspect is seen on a different video running up a highway ramp, ultimately falling to the ground, and being placed into custody.

The monitoring team became aware of this case only because the lieutenant who executed the PIT reported only a Level 1 show of force on a passenger who remained with the suspect's vehicle following the PIT.  Later, the suspect's vehicle was determined to be stolen, and the driver had outstanding warrants for his arrest.

While this case demonstrated many bad decisions and a loss of operational discipline and oversight by several APD officers and supervisors, we recognize the difficult and split-second decision the lieutenant was forced to make when deciding whether to follow the suspect vehicle the wrong way down the interstate ramp.  We do, however, feel there are numerous areas of concern related to officer and safety and CASA compliance.  The following are some of the observed issues with the case:

1. The Level 1 show of force by a lieutenant was investigated by a sergeant in the field as opposed to IAFD as dictated by policy.  This failure resided with both the sergeant and the lieutenant who reported the show of force, as both should have been aware that the case had to be reported to IAFD due to the lieutenant's rank.  This mistake was caught by an FSB lieutenant approximately a week later.  The consequence of these failures is that necessary investigative steps were compromised at the onset of the case.  When the monitoring team inquired about this event three months later, the case was still pending investigation in IAFD.

2. The PIT was not reported as a use of force in any manner, although such reporting is required by policy.

3. The suspect who drove the vehicle jumped from the moving vehicle during the PIT and began running across several live lanes of travel with numerous officers following on foot.  This self-imposed threat to officer safety was not addressed in any manner, at any level, despite the fact that several officers were on the opposite side of the highway and clearly in a position to take the suspect into custody.

4. A probable second show of force by the second officer who assisted at the end of the PIT went unreported and un-investigated.

5. At least six additional APD officers followed the pursuit of the suspect the wrong way down the interstate exit ramp.  This was not addressed in any manner to determine if these actions were justified and within APD policy, based on the known offense(s) of the fleeing driver.

6. An additional APD officer drove his vehicle the wrong way down the inner fast lane shoulder of the highway against traffic.  This was on the opposite side of the highway from where the PIT occurred.  Ultimately, this same officer parked facing the wrong way, exited his patrol vehicle, and began running across live lanes of traffic after the suspect.  This action is neither reported nor investigated for justification or policy/officer safety issues.

7. The sergeant who improperly investigated the reported show of force failed to interview the subject of the show of force since she was released from the scene.

8. The suspect sustained injuries at some point and was transported to the hospital following his arrest.  On the day of the event, these injuries were not investigated to determine if they occurred during the PIT or as he was arrested, which would further require the investigation of the case by IAFD.

9. The officer who actually took the suspect into custody failed to activate his OBRD, which impacts the ability to assess his actions and those of the suspect at the time of the arrest.  We were told that an internal affairs investigation was initiated for this OBRD violation.

10. On September 27, 2020, an Area Command lieutenant, who APD chose to assign as an Acting Commander of IAFD, conducted a Vehicle Pursuit Review of this event and indicated that he had no other concerns with this case.

The monitoring team reviewed this case to the extent it included uses of force and to assess APD's oversight of policy violations related to that force.  At best, there are numerous training and counseling needs associated with this case, but more likely, legitimate questions of policy violations by officers that needlessly put themselves and others in danger.   Likewise, APD failed to consider the manner of supervision of the pursuit and how and when the authorizations were given to continue the pursuit and conduct the PIT while traveling the wrong way on the highway.  From an organizational risk perspective, this event could provide a trove of lessons to learn to reduce the chance of injury to officers and the public.  Finally, when the event occurred, APD failed to recognize, report, and investigate the PIT maneuver as a use of force, in any manner, despite their own PIT SOP calling out the following:

1. "The use of the PIT in an attempt by officers to stop a fleeing motor vehicle *is considered a seizure under the 4th Amendment,* and its use must be objectively reasonable based on the totality of circumstances." (SOP 2-12; Pursuit Intervention Technique (PITP); Page 1, emphasis added)

2. "The PIT will not be executed at speeds above 35 miles per hour unless the use of deadly force is justified." (SOP 2-12; Pursuit Intervention Technique (PITP); Page 2)

3. This policy should not be viewed as limiting the use of the PIT or *any other use of force* to protect the lives of officers, citizens, or suspects should they be in imminent danger of serious injury or death." (SOP 2-12; Pursuit Intervention Technique (PITP); Page 2, emphasis added)[37]

The monitoring team views this case as another major failure, not only at the local Area Command level but also of top leaders of the department.  This dangerous event carried through multiple area commands for at least 20 minutes with no less than 15 officers taking part, including the deployment of a patrol helicopter and a dangerous PIT while

64

traveling the wrong way down a major city highway. Without question, the actions of the lieutenant while conducting the PIT had the potential of causing injuries and potentially serious injuries under these circumstances.  Considering the magnitude of the event and the risk associated with it --- it appears that no one at the executive level of APD even inquired about this case.  Furthermore, it appears that no one at the top of the organization requested a detailed debrief of the case to ensure it was handled properly.

During our December 2020 virtual site visit, we discussed this case with a few key executives in the department, and once we walked them through their own policies, they agreed that the PIT is a use of force (not only if it is conducted above 35 miles per hour).[38]  The monitoring team will follow up to determine what, if anything, APD did to address the concerns that were raised with this event.  Our findings will be reported in IMR-14.

**IMR-13-08 (Show of Force)**

In August 2020, APD officers discovered a vehicle that had been involved in an accident on a highway.  Witnesses at the scene provided a description of the driver and told officers that he had left the scene on foot.  Later, a second vehicle (that had not initially stopped) returned to the scene, and the driver reported being sideswiped by the first vehicle.  The officers were alerted by radio that a subject matching the description of the driver of the first vehicle was seen walking off the highway a short distance away.

Two officers drove to the location of the subject, who is seen on OBRD walking toward an intersection (carrying a backpack) and away from the officer's location.  Officers immediately exited their patrol vehicle and began yelling orders at the subject to stop and get on his knees.  The subject's response was "why, why, why," and he turned and kept walking away.[39]  One officer immediately moved his firearm to low-ready, and the other officer returned to his patrol vehicle to retrieve a beanbag shotgun.  Both officers then began to jog up a highway ramp toward an intersection that the subject was entering.  One officer yelled, "get on the ground now," and identified themselves as police.  One officer yelled, "you're gonna get 'bean bagged'" as the subject (facing away) is seen removing the backpack from his shoulder and moving it in front of his body.  The officers reported they believed the subject was reaching inside the bag and yelled to the subject not to reach into the bag.  The officer with the beanbag shotgun can be heard chambering a round from a distance of approximately 50-60 feet; almost simultaneously, he brings the shotgun up on the subject while yelling, "Stay out of that bag."  The second officer also brings his issued firearm up on target as the subject turned and faced the officers.  The subject dropped his bag, went to his knees, and was taken into custody by other officers who arrived at the intersection.  The officer with the bean bag shotgun told another officer that the subject was reaching into his pocket, and if the subject moved, he'd be shot with the weapon.  Later the object in the subject's

---

[38] APD has submitted a draft update to SOP 2-12 where PIT maneuvers being reported as a use of force is more obvious.  Depending on the circumstances the PIT is now either a Level 2 or Level 3 use of force.
[39] In a report one of the officers reported the subject said "Fuck you" when told to stop, but that could not be heard on the OBRD.

pocket was determined to be a cell phone.  The subject was compliant when handcuffed.  The following are some observations of the shows of force and ensuing supervisory and chain of command reviews:

1. Photos taken following the arrest show blood coming from the subject's ear. That was not reconciled by the supervisor or chain of command review.  While we saw nothing in the actions of the officers that would have contributed to an injury, this obvious issue was not addressed by supervisors or command.

2. When describing the shows of force, officers referred to the fact that they "acquired a sight picture."  We have seen this language in other reported shows of force encounters and note that acquiring a sight picture is not a prerequisite to a show of force.  We call this out as a precaution since this language was in previous versions of APD's use of force policy and was purposely omitted when those policies were revised.  We highly recommend that APD reinforce this to the department through training and briefings to ensure that shows of force do not go unreported.

3. The supervisor took credit for interviewing the subject, but that interview was deficient.  The subject was willing to answer questions by the supervisor, but the interview was less than two minutes in length, with the first minute being occupied by reading Miranda.  At no point does the supervisor ask foundational questions about the subject's actions prior to the show of force, reasons why force may have been used against him, or adequate descriptions of the actions of the officers.

4. While witnesses were present and provided information concerning the subject's description, those witnesses were not interviewed to establish any foundation for the subsequent show of force.

5. We saw no compelling reason for officers to immediately escalate their tone and retrieval of intermediate weapons at the onset of the event.[40]

6. While the subject was later found to have had felony and misdemeanor warrants, those facts were not known at the time of the show of force.  Essentially, the initial encounter the officers had was with a person that walked away from an accident scene.

7. The supervisor and chain of command failed to identify an OBRD violation by an officer, which was caught by the PRU Compliance Review two months later.  The

---

[40] One officer took credit for de-escalation as follows, "Yes, verbal commands, verbal persuasion and the sound of the shotgun being chambered with a bean bag round were all used in an effort to avoid the use of force."  The supervisor noted, "Officers attempted de-escalation by following the subject who was walking away from them, knowing he was followed by police officers and being observed by Air Support which was overhead.  The subject told officers 'fuck you' while flipping off Air Support.  Officers exhausted all possible resources and, at the time of the show of force, it was imperative that the subjects (sic) actions be stopped, and he be detained for an investigation."

report indicated that an internal affairs investigation was initiated and then returned to the Area Command to be addressed.

8. The PRU Compliance Review called out poor officer reports, failures to interview witnesses at the scene, in addition to an OBRD violation.  We agree.  That said, it is unclear if any feedback or remedial steps were taken to address the supervisor or area commander or if these factors are being captured in any performance evaluations for those personnel for CASA compliance determinations concerning the quality of use of force investigations.

A number of areas observed by the monitoring team during IMR-13 give rise for concern for APD including:

1. APD supervisors need to be cognizant of collateral misconduct not directly attributed to the actual use of force incident they are reviewing. Historically this has been an area of weakness for supervisors at APD. During this reporting period, we have noted an increase in Internal Affairs Requests (IAR) for collateral misconduct. This awareness of policy violations in uses of force, as well as collateral misconduct associated with use of force incidents, may have contributed to this increase in IARs.

2. Extensions to complete supervisory reviews continue to be a problem for timeliness, making compliance goals elusive. This may account for the decline in case completion efficiency.  We note that delayed timelines are not new at APD.  In fact, it is, based on our knowledge and experience, a favorite tactic of the Counter-CASA operatives to diminish discipline.

3. Supervisors fail to reconcile differences in what occurs at an incident (especially as represented on OBRD recordings), what is said or explained to the supervisor at the scene, and what is written in official reports.

4. The overstating charges and risk factors as a basis for justifying tactics and force continues to be a concern and occur in our random samples of police action all too frequently.

5. Walking arrested persons long distances instead of calling for a vehicle exposes officers and arrestees to increased risks.

6. Boilerplate language was present in the reports of many officers during our review of documentation of police activity during the reporting period.

7. Witnesses are not always accounted for regarding providing statements or obtaining their identifying information.

8. APD supervisors and command personnel need to continually reassess the way officers interact with people experiencing mental or emotional crises.

We continue to see the expansion of PMU's scope of influence to be essential to compliance efforts across the organization since the margin for error for Operational Compliance in the field is narrow.  As we document in this report, we continue to see deficiencies with use of force reporting and investigations at all levels. This impacts data integrity as reported by the organization.

Last reporting period, APD assigned two individuals to PRU in order to conduct "reviews" of Level 1 uses of force as a measure of oversight to attempt to catch errors that may occur during the first point of force classification.  We believe that without a meaningful audit of Level 1 uses of force to catch issues early, Operational Compliance will continue to be hindered moving forward.[41]  Paragraph 57 states, "The Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence."  Early in the IMR-12 reporting period, we spoke with the Commander who oversees PRU and discussed the nature of their "reviews" of supervisory Level 1 uses of force versus the notion of "audits."  The Commander described that the two people assigned the task (at the time) were quickly becoming overwhelmed with the volume of work, which is not surprising.  Case backlogs across the use of force levels will continue to put strains on staffing, and that strain will get exponentially worse as time carries forward without required reforms being implemented.  APD needs to continually assess whether staffing levels are adequate to perform the work required in a timely and effective manner and that the work is "…complete and that the findings are supported by the evidence."

The appropriate solution to train, supervise, audit, and intervene until supervisory and mid-level command personnel can meet the requirements necessary still holds true for APD. These four essential management tools (train-supervise-audit-intervene) are not strong points among APD command and executive personnel. However, the monitoring team has observed some evidence of these actions during this reporting period.  This includes Mid-level supervisors catching force classification errors in the field, FRB diligence in their review of cases, and a focus on fixing and retooling broken or inefficient processes are examples of such observable actions.

During the IMR-13 reporting period, APD continued to struggle to implement a system of training capable of sustaining itself, and as a consequence, has failed to sustain its Secondary Compliance with Paragraphs 86-88.  That failure had a cascading effect on numerous other CASA paragraphs including Paragraphs 41-59, which are centered on the use, reporting, supervision, and investigation of force events.  Throughout 2020, the monitoring team attempted to prompt APD into action by discussing the situation on several occasions, with additional cautionary language in both IMR-11 and IMR-12.  In short, APD has failed to

---

[41] The performance of APD supervisors in the field when classifying and investigating uses of force has proven to be deficient over time.  Therefore, as a risk mitigation measure, we recommended that APD put an auditing function in place to monitor field supervisor performance to deal with issues early now that new policies have been enacted.

perform its training responsibilities in any reasonable and meaningful way,[42] despite multiple attempts from the monitoring team to focus APD's attention on these matters.

There is no subtle way to express the significance of APD's failure, other than to document here they have again self-inflicted a loss of time and compliance because of their lack of attention to basic organizational training needs.  Given the issues APD has experienced with its use, reporting, supervision, and investigation of uses of force since the inception of the CASA, and the positive narrative they received as recently as IMR-11 relating to training efforts, it is incomprehensible that the leadership of APD would allow such a reduction of momentum.[43]

We simply find APD mostly "uncurious" when it comes to Area Command, mid-level command, and supervisory personnel thinking through the problems we note in one IMR after another.  In general, this indicates a lack of effective command and control functions at the upper reaches of the agency.

APD's compliance standing for Paragraphs 41-59 has reverted to Primary Compliance until such time as the department adequately delivers an up-to-date Tier 4 training and its 2021 annual use of force requirements for officers and supervisors.  The monitoring team remains committed to continuing its technical assistance to help guide APD toward success, but that guidance is without meaning if APD does not own the responsibilities themselves.  With a coordinated and concerted effort across APD commands and the leadership and support by APD executives, regaining Secondary Compliance is an achievable goal in 2021, assuming diligent effort and a re-focusing on CASA requirements.

### 4.7.28 Assessing Compliance with Paragraph 41:  Use of Force Reporting Policy

Paragraph 41 stipulates:

> **"Uses of force will be divided into three levels for reporting, investigating, and reviewing purposes. APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices. The use of force reporting policy will require officers to immediately notify their immediate, on-duty supervisor**

---

[42] To be clear, its uncertain what influence APD could have had on this outcome if they explored alternate approaches to their training requirements.  The Monitor and monitoring team were not presented with a cogent, lucid plan to address any dilemma they were facing.  As with many other situations of regression APD has experienced, they need look nowhere other than at themselves for blame

[43] In IMR-12 we stated, "Without concerted effort, a thorough review of points of under-performance at the Academy, and a common-sense approach to remediate areas of under-performance, APD risks a serious and difficult to remedy loss of compliance in the training requirements identified in the CASA." (Page 166)

69

**within their chain of command following any use of force, prisoner injury, or allegation of any use of force. Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor. This reporting requirement also applies to off-duty officers engaged in enforcement action."**

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.29 Assessing Compliance with Paragraph 42:  Force Reporting Policy

Paragraph 42 stipulates:

**"The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the review or the APD officer conducting the investigation. The written or recorded narrative will include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject's behavior; (d) the level of resistance encountered; and (e) a description of each type of force used and justification for each use of force. Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force."**

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.30 Assessing Compliance with Paragraph 43:  Reporting Use of Force Injuries

Paragraph 43 stipulates:

**"Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action."**

## Results

Primary:        **In Compliance**

Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.31 Assessing Compliance with Paragraph 44:  Medical Services and Force Injuries

Paragraph 44 stipulates:

> **"APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle."**

**Results**

Primary:      **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.32 Assessing Compliance with Paragraph 45:  OBRD Recording Regimens

Paragraph 45 stipulates:

> **"APD shall require officers to activate on-body recording systems and record all use of force encounters.  Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination."**

**Results**

A complete discussion of this topic is found in Paragraphs 220 – 231 below.  Generally, we are extremely concerned that of the 91 cases referred for investigation, only 77 were sustained, and only one resulted in anything more than an (often repeated) verbal or written reprimand.  We note that these internally referred cases, in most police departments with which we are familiar, often have very high sustained rates, since it is supervisory or command staff who bring the "complaint."   It is clear that the current APD simply has no appetite for discipline, either reformative (counseling, coaching, retraining, enhanced supervision, transfer, etc.) or actual discipline such as suspensions or terminations.  Until this aversion to discipline is addressed seriously at APD, the remaining CASA paragraphs remaining out of compliance will show little progress.

Primary:      **In Compliance**

71

Secondary:   **In Compliance**
Operational:  **Not In Compliance**

### 4.7.33 Assessing Compliance with Paragraph 46:  Force Investigations

Paragraph 46 stipulates:

> **"The three levels of use of force will have different kinds of departmental review. All uses of force by APD shall be subject to supervisory review, and Level 2 and Level 3 uses of force are subject to force investigations as set forth below. All force reviews and investigations shall comply with applicable law and comport with best practices. All force reviews and investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy."**

**Results**

Primary:     **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### 4.7.34 Assessing Compliance with Paragraph 47:  Quality of Supervisory Force Investigations

Paragraph 47 stipulates:

> **"The quality of supervisory force investigations shall be taken into account in the performance evaluations of the officers performing such reviews and investigations.**"

**Results**

APD has created the PRU Compliance Review for Level 1 Use of Force investigations by supervisors. This is a 5-page comprehensive review of all aspects of the supervisory requirements relating to a use of force investigation.  Should the review highlight any inconsistencies in the investigation, the Commander of the supervisor will be notified.

The Acting Lieutenant responsible for compliance with these requirements has been working diligently on revising SOP 3-32 Employee Work Plan/Performance Evaluations, consulting with the Performance Metrics Unit, and has implemented a pilot program regarding the requirement to hold supervisors accountable for their performance evaluations for Use of Force Investigations. Plans include supervisory training to ensure all requirements are met. The supervisory review for Use of Force investigations was one element missing from the current Talent Management System and is required by the CASA. Once this plan is properly trained and becomes a routine/automated process with appropriate responses, Operational Compliance will be reassessed.

Primary:    **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.35 Assessing Compliance with Paragraph 48:  Force Classification Procedures

Paragraph 48 stipulates:

> **"APD agrees to develop and implement force classification procedures that include at least three categories of types of force that will determine the force review or investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to promote greater efficiency and reduce burdens on first-line supervisors, while optimizing critical investigative resources on higher-risk uses of force. The levels of force are defined as follow:**
>
> **a. Level 1 is force that is likely to cause only transitory pain, disorientation, or discomfort during its application as a means of gaining compliance. This includes techniques which are not reasonably expected to cause injury, do not result in actual injury, and are not likely to result in a complaint of injury (i.e., pain compliance techniques and resisted handcuffing). Pointing a firearm, beanbag shotgun, or 40-millimeter launcher at a subject, or using an ECW to "paint" a subject with the laser sight, as a show of force are reportable as Level 1 force. Level 1 force does not include interaction meant to guide, assist, or control a subject who is offering minimal resistance.**
>
> **b. Level 2 is force that causes injury, could reasonably be expected to cause injury, or results in a complaint of injury. Level 2 force includes use of an ECW, including where an ECW is fired at a subject but misses; use of a beanbag shotgun or 40-millimeter launcher, including where it is fired at a subject but misses; OC Spray application; empty hand techniques (i.e., strikes, kicks, takedowns, distraction techniques, or leg sweeps); and strikes with impact weapons, except strikes to the head, neck, or throat, which would be considered a Level 3 use of force.**
>
> **c. Level 3 is force that results in, or could reasonably result in, serious physical injury, hospitalization, or death. Level 3 force includes all lethal force; critical firearms discharges; all head, neck, and throat strikes with an object; neck holds; canine bites; three or more uses of an ECW on an individual during a single**

**interaction regardless of mode or duration or an ECW application for longer than 15 seconds, whether continuous or consecutive; four or more strikes with a baton; any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject; and uses of force resulting in a loss of consciousness. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents: (a) officer-involved shootings; (b) serious uses of force as defined by the Memorandum of Understanding; (c) in-custody deaths; and (d) other incidents resulting in death at the discretion of the Chief."**

## Results

Primary:         **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.36 Assessing Compliance with Paragraph 49

Paragraph 49 stipulates:

**"Under the force classification procedures, officers who use Level 1 force shall report the force to their supervisor as required by Paragraph 42; Level 1 uses of force that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force. Level 2 and 3 uses of force shall be investigated by the Internal Affairs Division, as described below. When a use of force or other incident is under criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Division will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Task Force shall periodically share information and coordinate with the Internal Affairs Division, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of uses of force."**

## Results

Primary:         **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.37 Assessing Compliance with Paragraph 50:  Supervisory Response to Use of Force

Paragraph 50 stipulates:

> **"The supervisor of an officer using force shall respond to the scene of all Level 1, 2, and 3 uses of force to ensure that the use of force is classified according to APD's force classification procedures. For Level 2 and Level 3 uses of force, the supervisor shall ensure that the Force Investigation Section of the Internal Affairs Division is immediately notified and dispatched to the scene of the incident to initiate the force investigation."**

**Results**

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.38 Assessing Compliance with Paragraph 51:  Self-Review of Use of Force

Paragraph 51 stipulates

> **"A supervisor who was involved in a reportable use of force, including by participating in or ordering the force being reviewed, shall not review the incident or Use of Force Reports for approval."**

**Results**

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.39 Assessing Compliance with Paragraph 52:  Supervisory Force Review

Paragraph 52 stipulates:

> **"For all supervisory reviews of Level 1 uses of force, the supervisor shall:**
>
> **a) respond to the scene and immediately identify the officer(s) involved in Level 1 use of force;**

75

b) review the involved officer's lapel video, determining whether the incident involves a Level 1 use of force;

c) review the lapel video of other officers on-scene where uncertainty remains about whether the incident rises to a Level 2 or Level 3 use of force;

d) examine personnel and the subject for injuries and request medical attention where appropriate.;

e) contact the Internal Affairs Division to conduct a Level 2 or Level 3 use of force investigation if lapel video does not affirm a Level 1 use of force;

f) gather any evidence located at the scene of the Level 1 use of force;

g) capture photographs of the officer(s) and subject involved in the Level 1 use of force;

h) require the submission of a Use of Force Report from the involved officer by the end of shift; and

i) conduct any other fact-gathering activities while on-scene, as necessary, to reach reliable conclusions regarding the officer's use of Level 1 force."

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.40 Assessing Compliance with Paragraph 53:  Force Review Timelines

Paragraph 53 stipulates:

Each supervisor shall complete and document a supervisory force review of a Level 1 Use of Force within 72 hours of the use of force. Any extension of this 72-hour deadline must be authorized by a Commander. This Report shall include:

a)  all written or recorded use of force narratives or statements provided by personnel or others;

b)  documentation of all evidence that was gathered,

76

**including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;**

**c)  the names of all other APD employees witnessing the use of force;**

**d)  the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options; and**

**e)  documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.**

## Methodology

APD submitted 50 Use of Force files for review by the monitoring team for the time period August 1, 2020, through January 31, 2021, as it pertains to the first portion (72-hour requirement) of this paragraph.

APD has met the 95% threshold for the 72-hour requirement of this paragraph. A high number of the initial supervisory reports continue to require an extension, as was the case in the previous reporting period. Commanders continue to grant extensions with stipulated timeframes depending on the circumstances for completion. During this reporting period, the monitors' review of extension requests revealed detailed explanations for the requests. The monitoring team continues to note that the other requirements of the paragraph will become harder to track because they will run over into future reporting periods.

It is the Monitor's opinion that over-use of the ability to request extensions for supervisory and command review of uses of force is resulting in an inability to meet investigative timelines required by the APOA's contractual obligations related to investigative timelines, and that such inabilities yield moot any ability to implement progressive discipline designed to better control inappropriate uses of force in the field. This is a practice that must be eliminated, as it appears that this practice is yet another

way that APD supervisory personnel avoid meaningful attempts to implement revised policy and practice.

**Results**

While APD has in place policies in conformance with this paragraph, actual implementation in the field at times exhibits a different picture.  Supervisors continue to fail in their charge to review and report effectively and accurately on officers' use of force, as depicted in our case-by-case analyses. To a small degree, the monitor has seen evidence that these failures are starting to be observed by lieutenants in their oversight reviews as well as in Force Review Board reviews. This is a positive development; however, it is the exception instead of the rule when one looks at the department's overall footprint vis a vis fact finding and discipline.  We expected difficulties with this paragraph's requirements, given the APD's failure to train during this reporting period (see paragraphs 86 - 88).  While APD continues to go through the motions of reporting uses of force and evaluating those uses of force via command and FRB processes, we see a lack of adherence to established policy, a lack of meaningful oversight of force (at, for example, FRB, individual area commands, and at IAFD).

> Primary:    **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.41 Assessing Compliance with Paragraph 54:  Command Review of Force

Paragraph stipulates:

> **Upon completion of the Use of Force Report, investigating supervisor shall forward the report through his or her chain of command to the Commander, who shall review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The Commander shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.**

**Results**

> Primary:    **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

### 4.7.42 Assessing Compliance with Paragraph 55:  Force Review Evidence Standard

Paragraph 55 stipulates:

> **"Upon completion of the review, the reviewing supervisor shall forward the review through his or her chain of command to the Commander, who shall review the entry to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. The Commander shall order additional review when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. These reviews shall be completed electronically and tracked in an automated database within the Internal Affairs Division. Where the findings of the supervisory review are not supported by a preponderance of the evidence, the supervisor's Commander shall document the reasons for this determination and shall include this documentation as an addendum to the original review. The supervisor's superior shall take appropriate action to address the inadequately supported determination and any deficiencies that led to it. Commanders shall be responsible for the accuracy and completeness of the Level 1 force reviews prepared by supervisors under their command."**

## Results

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.43 Assessing Compliance with Paragraph 56:  Force Review Quality

Paragraph 56 stipulates:

> **"Where a supervisor repeatedly conducts deficient supervisory force reviews, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules. Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force review immediately and notify the Internal Affairs Division and the Chief. The Force Investigation Section of the Internal Affairs Division shall immediately initiate the administrative and criminal investigation."**

79

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.44 Assessing Compliance with Paragraph 57

Paragraph 57 stipulates that:

> **"When the Commander finds that the supervisory force review is complete and the findings are supported by the evidence, the file shall be forwarded to the Performance Review Unit of the Compliance Bureau. The Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence. The Performance Review Unit shall ensure that the file is forwarded to the Internal Affairs Division for recordkeeping. Where the Performance Review Unit of the Compliance Bureau determines that a supervisory force review, which has been completed by the supervisor and reviewed by the chain of command, is deficient, the Performance Review Unit shall forward the review to the supervisor for correction. Any performance deficiencies in the investigation or review will be noted in the affected Commander's performance records.**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.45 Assessing Compliance with Paragraph 58:  Reassignment of Force Review

Paragraph 58 stipulates that:

> **"At the discretion of the Chief, a supervisory force review may be assigned or re-assigned to another supervisor, whether within or outside of the Command in which the incident occurred, or may be returned to the original supervisor for further review or analysis. This assignment or re-assignment shall be explained in writing."**

**Results**

Primary:        **In Compliance**
Secondary:   **Not In Compliance**

80

Operational:  **Not In Compliance**

***Recommendations for Paragraph 41-58:***

***4.7.45a:  APD should conduct a comprehensive review of extant processes designed to meet the requirements of the CASA regarding paragraphs 41-58 and ensure that operations personnel are processing force-review functions in a meaningful and forthright manner.***

***4.7.45b:  Timelines must be established for effective investigations that will meet the requirements for efficient discipline viz a viz the APOA contract.***

***47.45c: Develop an early intervention system that triggers alerts when clusters of poorly investigated use of force incidents arise, and address these issues early with Area Command staff, requiring Commanders affected to develop and implement written "Intervention Plans" designed to identify the causes of failure and remediate those causes systematically.***

***4.7.45d:  Routinely monitor the intervention process for compliance with the proffered plans.***

***4.7.5e:  Monitor use of force incident responsibilities at the sergeant's level and ensure that sergeants who will be on leave are not assigned critical use of force incidents.  APD will need to assess staffing and determine how best to handle these issues.  This is another case of "a bit of forethought" helping to avoid compliance losses, as occurred during this reporting period.***

**4.7.46 Assessing Compliance with Paragraph 59:  Abuse of Force Discipline**

Paragraph 59 stipulates:

> **"Where, after a supervisory force review, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

**Results**

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 59:*

*4.4.46a: APD should revisit its disciplinary practices to ensure integrity with the tenets of effective progressive discipline.*

*4.4.46b: Clarify operational process requirements of the violated policy in each and every incident of a known violation with the involved employee(s);*

*4.4.46c: Insist on consistent disciplinary decisions based on employee acts or omissions, including a table of infractions with disciplinary ranges for each potential level of infractions;*

*4.4.46d: Insist on consistency, and ensure the consistency is calibrated to the level of infractions;*

*4.4.46e: Establish an available escalation process, from minor to major interventions.*

*4.4.46f: Require appropriate escalation if given classes of infractions are repeated;*

*4.4.46g: Document all disciplinary interventions;*

*4.4.46h: Ensure that all disciplinary findings and comments fit established departmental documentation protocols.*

*4.4.46i: Include "fact statements" based on the department's investigative findings, ensuring that all infractions are clearly explained;*

*4.4.46j: Increase the corrective measures as violations are more serious;*

*4.4.46k: Provide a process in which disciplined employees are given an opportunity to respond to allegations and decisions re: discipline; and*

*4.4.46l: Follow through on consequences, e.g., establish progressive disciplinary standards, and ensure that requirements are enforced and followed up; and*

*4.4.46m: As we have advised two consecutive chiefs of police, APD should put a full-stop on holding discipline in "abeyance."  Such practices hold no value except to potentially give the "appearance" of effective discipline and are in fact, in most cases, departures from the discipline matrix.*

**4.7.47 - 4.7.64 Assessing Compliance with Paragraph 60-77:  Force Investigations by the Internal Affairs Division**

Generally, this section begins with a summary of findings from the previous period's monitoring report. Based upon the systemic failures observed and robustly reported on in IMR-12, this report will not attempt to restate what has already been written and accepted by the Court.

Since January 11, 2020, when APD enacted a new stratified system for categorizing and investigating use of force incidents,[44] supervisors and investigators received training on this new system that represented some of the best training the monitoring team has seen to date at APD.  Unfortunately, APD has not been able to fully operationalize this training to the point that it has had a meaningful impact on its operations.  This observation does not directly reflect the actions we observe of uniformed members in the field, but maybe more importantly, does not reflect how investigators and supervisors identify, investigate, and implement appropriate disciplinary and non-disciplinary interventions when use of force and related policy violations occur.  This is important because the need for APD to develop its ability to "police" itself is the centerpiece of its organizational reform efforts, and it is the linchpin for achieving the long-term sustainability of those reforms.  This linchpin might be best described as the general function of APD's command and control, especially as it relates to *I*dentifying, *I*nvestigating, and applying appropriate *I*nterventions (3-I) for use of force incidents. The failure of APD to exert its command and control over its 3-I domain during IMR-12 continues to plague its operations in IMR-13. During IMR-13, the only obvious 3-I bright spot may be the progress made by the Force Review Board (FRB). The work of the FRB will be discussed in later paragraphs.

Instead of providing exhaustive feedback and the minute details of use of force cases in this section of the report, the overall use of force data compiled by APD speaks to the Department's lack of command and control in the 3-I domain of use of force cases examined for this report.

During IMR-13 (data current through early February 2021), APD recorded a combined 298 Level 2 and Level 3 use of force cases (compared to 311 cases during IMR-12). Of these 298 cases, APD recorded 244 Level 2 cases and 54 level 3 cases (compared to 232 Level 2 cases and 79 Level 3 cases during IMR-12). One of the CASA implementation requirements to reach an Operational Compliance consideration is that 95% of the use of force cases must be completed within 90 days. This reporting period, IAFD completed three Level 2 cases within 90 days. This means that IAFD investigators completed 1% of the Level 2 cases within 90 days. While these numbers are disturbing, what is more disturbing is that no case initiated after September 8, 2020, was completed within 90 days. Setting aside the 90-day completion requirement, no case initiated after September 8 was even completed by early February 2021**.** When examining the Level 3 use of force cases, the data reveals that only two of the 54 cases

---

[44] The new stratified system for categorizing and investigating use of force incidents was an APD-initiated endeavor.

were completed within 90 days. This 4% completion rate is eerily similar to the 90-day completion rate of Level 2 use of force cases. Similar to the Level 2 cases, no Level 3 case initiated after August 11, 2020, was completed within 90 days. Setting aside the 90-day completion requirement, no case initiated after August 14 was even completed by early February 2021. To put these numbers into perspective, consider that during the first three months of IMR-12, APD opened 108 Level 2 cases, and 97 of these cases were completed within three months. This yielded a 90% completion rate of cases closed within the 90-day threshold. During the first three months of IMR-12, APD opened 25 Level 3 cases, and 21 of these cases were completed within three months, yielding an 84% completion rate of cases closed within the 90-day threshold. These data are presented in the two tables below.  Notwithstanding the completion rates, as we note elsewhere in this report, the overall quality of IAFD investigations remains poor.

Table 4.7.47a Timely Investigations of
Level 2 Use of Force Investigations: IMR-12 & IMR-13

| Reporting period | # of Level 2 UOF Cases Initiated (Months 1-3) of the Mon. Period | # of Level 2 UOF Cases (Months 1-3) Completed within 90 days | Total # of Level 2 UOF Cases Initiated during the Mon. Period | Total # of Level 2 UOF Cases Completed within 90 days |
|---|---|---|---|---|
| IMR-13 | 126 | 3 (2%) | 244 | 3 (1%) |
| IMR-12 | 108 | 97 (90%) | 232 | 106 (46%) |
|  |  |  |  |  |

Table 4.7.47b Timely Investigations of
Level 3 Use of Force Investigations: IMR-12 & IMR-13

| Reporting period | # of Level 3 UOF Cases Initiated (Months 1-3) of the Mon. Period | # of Level 3 UOF Cases (Months 1-3) Completed within 90 days | Total # of Level 3 UOF Cases Initiated during the Mon. Period | Total # of Level 3 UOF Cases Completed within 90 days |
|---|---|---|---|---|
| IMR-13 | 37 | 2 (5%) | 54 | 2 (4%) |
| IMR-12 | 25 | 21 (84%) | 79 | 24 (30%) |

Consider the data in the two tables above within this context:

- On January 11, 2020, when APD operationalized its new stratified system for categorizing and investigating use of force incidents, IAFD had no case backlog. Thus, in the first three months of IMR-12 (February, March, and April of 2020), IAFD detectives completed 90% of Level 2 use of force incidents.[45] Although the

---

[45] Level 2 use of force cases were chosen for this analysis because they present the largest data set to analyze, and they constitute the bulk of the cases investigated by IAFD detectives.

cases were fraught with problems, the monitoring team estimates that optimal case outcomes could have been achieved with little deviations from the amount of time expended to achieve that 90% completion rate.

- At the end of IMR-12 (July 31, 2020), the completion rate for Level 2 use of force incidents fell to 46%.
- After the first three months of IMR-13 (September 30, 2020), the completion rates for cases opened during the first three months of IMR-13 (August, September, and October of 2020) sunk to 2.3%.
- At the end of IMR-13 (January 31, 2021), the Level 2 completion rate was 1%.

These data, to put it simply, indicate a virtually complete shutdown of IAFD processes for the reporting period. During IMR-12, the average number of detectives assigned to IAFD was 19.[46] During IMR-13, the number of detectives assigned to IAFD was 22.[47] The monitoring team considers this level of staffing to be relatively stable for comparative purposes.

The takeaway for these numbers is that a 23 percent increase in IAFD staffing yielded a 97.7 percent decrease in the case completion rate. These numbers defy logic, and in the monitor's opinion, depict a deliberate shutdown of IAFD investigative processes. To its credit, APD has installed, on a temporary basis, new leadership at IAFD. It is our understanding that this new leadership is temporary until a new cadre of leaders and investigators can be selected, trained, and transferred into IAFD.

During the IMR-13 reporting period, the monitoring team received no explicit communications from APD or the City of Albuquerque that contemporary IAFD cases were no longer being completed in a timely manner, let alone not being completed at all. APD communications included messaging that the IAFD Commander retired, IAFD management was "looking to get out," and that investigators "wanted out of IAFD." During meetings attended by the monitoring team, during which the City of Albuquerque and the DOJ were negotiating various iterations of the draft Stipulated Order regarding the proposed "External Force Investigation Team (EFIT)," at no time did anybody from the City or APD notify the monitoring team about 1) the size of the growing backlog of cases already past the 90-day mark, 2) the *de facto* work stoppage on contemporary cases not yet at 90 days old, and perhaps most importantly 3) that investigators were all working on only one investigation at a time.[48] Certainly, no one informed the monitoring

---

[46] According to APD's IAFD "2020 Q4 Staffing Analysis," the detectives assigned to IAFD stood at 18 in February; 20 in March; 17 in April; 19 in May; 18 in June; and 20 in July. This number of detectives does not take into account detectives assigned to IAFD that were not directly assigned to investigate use of force cases.

[47] This number of detectives does not take into account the job / task assignment of the detectives assigned to IAFD.

[48] Anyone conversant with law enforcement practices related to conducting investigations would consider the notion of detectives conducting one investigation at a time inexplicable. This approach to investigations not being identified earlier by APD executives is inexcusable. Also, during the reporting period a meeting was convened virtually and attended by members of the monitoring team, APD executives, DOJ, and City Legal. A representative from City Legal suggested that IAFD detectives were not properly trained in how to apply *Graham* factors (*Graham v. Connor* [1989]) in spite of IAFD's own

team that cases opened beyond the first six weeks of the reporting period were not being handled by IAFD investigators. The cryptic messaging that the monitoring team received included:

- "I am having a list of lost timelines by force and *misconduct* cases created to transparently show this problem."
- "IAFD is experiencing massive needs for extensions based upon timelines and caseload being more than the capacity of our personnel to complete."
- "The administrative coordinator is making a spreadsheet to track all cases to include if the case is open and has an extension or not."[49]

During this time, the monitoring team was advised, and also observed themselves, that the supervision and command of IAFD was significantly hampered by poor leadership. This poor leadership extended beyond just IAFD, and the culpability for this poor planning extends upward through the chain of command of APD. Early in the summer months of 2020, the former APD Chief advised the monitoring team that the IAFD Commander was retiring on October 1.  IAFD had no successor selected and seated in this commander position as of October 1. Instead, APD leadership utilized three different lieutenants to handle the commander and deputy commander roles within IAFD. To show the fractured leadership and lack of prioritization this critical function received from APD, none of these three lieutenants were still in IAPD 120 days after October 1. In fact, even the commander seated in the IAFD position at the close of IMR-13 was there as a temporary duty assignment. However, this individual holds a commander's rank and has held integral CASA-centric roles leading up to this assignment.

Within days of the newly assigned commander taking command of IAFD (just after the close of the 13th reporting period), the monitoring team was advised:

- Approximately 60 percent of the 381 cases opened since January 11, 2020, were still not completed as of nine days after the close of the 13th reporting period.
- Of the 381 open cases as of February 9, 2021, approximately 260 cases were beyond 90 days, and 211 cases were beyond 120 days. This obviously undermines APD's ability to discipline officers who may have committed policy violations.

- Approximately 86 misconduct cases being handled by IAFD were, for the most part, not being handled appropriately. Specifically, five cases had been suspended or held in abeyance for one reason or another, 14 cases had yet to be assigned to an investigator, 26 cases were assigned to investigators (and had

---

internal training efforts and the department-wide use of force Tier training.  Everyone on the call, including members of DOJ who approved the use of force Tier training and the APD executives disagreed with that assessment given by City Legal.

[49] This quoted material is from a document entitled, "IAFD Failure Analysis," dated November 4, 2020. This was presented to members of the monitoring team on the eve (November 29, 2020) of the final virtual site visit for 2020.

not exceeded their respective 90 or 120-day timelines), 31 cases had already exceeded their 90-day timelines, and 10 cases had already exceeded their 120-day timelines.  We note the continued use of "held in abeyance" case outcomes, despite the monitor's direct warning to the then-chief of police that holding discipline "in abeyance" was a critical issue undermining effective discipline.

The monitoring team has used the term "approximately" when describing both the IAFD cases and misconduct cases because 1) we not been provided with the evidence-based information to date, and 2) we have been advised that the system employed by IAFD is haphazard, as case management efforts to date have been fractured at best, and the accounting of cases is maintained in multiple forms and systems.

Despite these bleak numbers reflecting poor case management and oversight of contemporary cases (use of force incidents occurring during the reporting period), IAFD investigators' work on older cases (cases initiated before the start of IMR-13) continued during the reporting period. To present a more accurate picture of the total cases completed by IAFD investigators during IMR-13 (regardless of when the cases were initiated and regardless of if the cases were completed within 90 days), an analysis of case data reveals IAFD investigators completed a total of 83 Level 2 cases and 28 Level 3 cases during the reporting period. This case data is juxtaposed against the number of detectives assigned to IAFD and the number of overtime hours IAFD detectives were paid exclusively for working on investigations. The breakdown of completed cases is depicted below.

The 64% decline in productivity (a comparison of Level 2 and Level 3 cases combined from the third quarter of 2020 with Level 2 and Level 3 cases from the fourth quarter of 2020) is obviously discernible in the table above. During this same period, data provided by APD indicates IAFD detectives' overtime (exclusively for conducting force investigations) declined only 14%.

An analysis of IAFD tables of organization during IMR-13 reveals that the nadir of case completion for IAFD was during two of the three months in which IAFD had the highest level of staffing for detectives. Table 4.7.47c, below, represents the IAFD staffing levels during IMR-13.

To give the reader an understanding of the issues APD has with the "backlog" of IAFD cases, in the span of 90 days, 22 APD IAFD investigators, supervised by approximately ten supervisory and command-level personnel, managed to complete five cases.

See Table 4.7.47c on the following page.

Table 4.7.47c
IAFD Case Completion and Overtime Compensation (2020 Q3 & Q4)

| 2020 Quarter | Month | Level 2 UOF Cases Completed (Regardless of Date of Incident or Completion Date) | Level 3 UOF Cases Completed (Regardless of Date of Incident or Completion Date) | Total Level 2 & Level 3 Cases Completed | # of Dets. In IAFD | Detectives' Overtime (for Investigations Only) During 2020 Q3 and Q4 |
|---|---|---|---|---|---|---|
| 3rd Quarter (Q3) | Jul 2020 | 35 | 8 | 43 | 20 | |
| | Aug 2020 | 26 | 17 | 43 | 22 | 1,298 hours |
| | Sep 2020 | 20 | 6 | 26 | 20 | |
| **Subtotal** | **3 months** | **81** | **31** | **112** | **Avg. 21** | |
| 4th Quarter (Q4) | Oct 2020 | 20 | 2 | 22 | 21 | |
| | Nov 2020 | 6 | 2 | 8 | 23 | 1,115 hours |
| | Dec 2020 | 9 | 1 | 10 | 23 | |
| **Subtotal** | **3 months** | **35** | **5** | **40** | **Avg. 23** | |
| **Total** | **6 months** | **116** | **36** | **152** | **Avg. 22** | **2,413 hours** |

NOTE: During January 2021 (the last month of IMR-13), two Level 2 cases were completed, and zero Level 3 cases were completed. In January 2021, twenty-two detectives were assigned to IAFD. Since the data on the number of detectives assigned to IAFD reflects the counting of persons, fractions are rounded to the next whole number (person).

Table 4.7.47d
IAFD Staffing Levels during IMR-13

| Time Period | IAFD Detectives* | IAFD Supervisory & Command Staff ** |
|---|---|---|
| Aug 2020 | 22 | 8 |
| Sep 2020 | 20 | 8 |
| Oct 2020 | 21 | 8 |
| Nov 2020 | 23 | 8 |
| Dec 2020 | 23 | 8 |
| Jan 2021 | 22 | 6*** |
| **Average****** | **22** | **10** |

\*     Total # of detectives assigned to IAFD irrespective of the job / task assignment.
\*\*    Total # of sergeants, lieutenants, deputy commanders, and commanders.
\*\*\*   Denotes that this reduction reflects the loss of two deputy commanders.
\*\*\*\*   Since the data reflects the counting of persons, fractions are rounded to the next whole number (person).

It is a mystery to the monitoring team how performance degraded so badly that 22 IAFD detectives completed only 83 Level 2 cases in six months.   This means each detective completed less than four investigations in the 180 days during the reporting period. The monitoring team understands that three detectives have duties other than completing investigations. Nonetheless, these detectives are under the command of a commander tasked with investigating cases within agreed-upon timelines. When considering 19 detectives completing 83 cases, this means each detective completed just over four cases in 180 days. Focusing now on Level 3 cases, the data indicate that an average of 22 IAFD detectives completed 28 Level 3 cases for the six-month reporting period. This means each detective completed just over one per 180 days. When considering 19 detectives completing 28 cases, each detective still only completed just over one case per 180 days. This analysis does not support any assumption that staffing directly resulted in this significant decline in productivity.[50]  In the monitor's opinion, the poor performance by IAFD detectives is a deliberate ploy to avoid completing any case within the required timelines for discipline.  This is yet another Counter-CASA effect.

Allowing the completion of use of force cases to dwindle to this level of completion illustrates how APD's command and control over the entire investigative function have either been undermined from within, or the command and control of the investigative function was either tremendously poor or it was completely abandoned, especially in the latter months of the reporting period.  When command- and intermediate-level personnel can allow such obvious weakening of quality control and work product, it amounts to malfeasance.  In the monitor's opinion, this malfeasance has occurred due to APD's practice of command personnel being members of the bargaining unit and thus having splintered allegiances.

This lack of command and control is obviated by staffing studies completed during the past 2-3 years by APD personnel.  One staffing study presented to the monitoring team, developed in May 2020, clearly indicated that the number of use of force cases would become significantly backlogged if staffing levels stayed static.  Presentations from this staffing study indicated that if IAFD was staffed with between 18 and 22 detectives, the backlog of use of force cases would range between 206 and 283 cases.  This projection, while not perfect, does accurately represent the trend that has occurred, with little to any successful intervention by the APD hierarchy, despite the internal notice.  As previously noted in this section addressing Paragraphs 61-77, by early February 2021, estimates revealed that approximately 60 percent of the 381 cases opened since January 11, 2020, still remained open (and many not even started) nine days after the close of the 13th reporting period.  Of the 381 open cases as of February 9, 2021, approximately 260 cases (68%) were beyond 90 days, and more than half of the 211 cases (55%) were beyond 211 days.  This illustrates how APD's historical and contemporary lack of command, control, and accountability measures manifests itself. A comparison of the last two months of case completion data (March and April 2020) that APD compiled and analyzed in its May 2020 IAFD staffing analysis with the case

---

[50] Numbers of cases completed and indicated in this paragraph are an average and not meant to suggest that case completions were evenly distributed among all detectives.

completion data from the last two months of IMR-13 (December 2020 and January 2021) paints a highly dysfunctional picture. The data is set forth below in Table 4.7.47e and represents a nearly complete shutdown of IAFD functions over the course of nearly a year.

Table 4.7.47e
Case Completion Continuum (Level 2 & Level 3 Combined)

|  | Mar 2020 | Apr 2020 | Dec 2020 | Jan 2021 |
|---|---|---|---|---|
| Cases Completed by IAFD | 31 | 48 | 10 | 2 |

The impact of this negligence of duty on the part of APD's command and control personnel is not limited to IAFD: the impacts are projected forward, creating an insurmountable path of achieving compliance any time in the near future, unless IAFD practices, supervision, and oversight are changed drastically. Beyond the mere ineffectual investigation of these cases, any potential discipline from backlogged cases becomes difficult to implement. Based upon the various observations the monitoring team has made over the years and called to the attention of commanders, chiefs, and City officials, this lack of command and control equates to a deliberate indifference to holding personnel accountable for their actions and inactions, which is a serious detriment to CASA compliance. Just like APD's use of Additional Concern Memos (ACMs), Supervisory Action Reports (SARs), and other mechanisms designed to ensure policy violations would never be properly investigated and dispositions would not appropriately be recorded on individuals' disciplinary records, the same result is achieved by not properly staffing investigative and command personnel assigned to these investigative and supervisory functions. This lack of command and control, attributed to the IAFD staffing and efficiency issues, then creates of backlog of cases for the Force Review Board (FRB) that acts as an oversight function for not only the quality of cases completed by IAFD but also for analyzing important trends that impact the safety of officers in the field and for Albuquerque's citizenry. The FRB is currently reviewing cases that happened so long ago that its oversight value is minimal at best. This results in the subversion of APD's historically weak IAPS and IAFD missions (which have shown signs of improvement during the IMR-13 reporting period), creates unreliable data which analysts will rely upon for risk analysis and public reports and undermines the value of APD's long-delayed "Early Intervention System," a system that has languished "under development" for the better part of five years.  When the totality of these circumstances is considered with what the monitoring team has observed and reported in past reports, it amounts to deliberately incompetent actions and inactions that cripple the administrative oversight of in field operations.

In IMR-12, the monitoring team noted that IAFD had significantly improved the completion rate of use of force investigations within the first three months of that reporting period (February / March / April 2020). From the preceding section of this

report, it should be abundantly clear to the reader that the completion rates in the last two to three months of IMR-13 declined precipitously.  In fact, in the monitor's nearly three decades of experience, we have never encountered such a precipitous drop in a key indicator of effectiveness.

For IMR-13, the monitoring team conducted a review of Level 2 and Level 3 use of force cases drawn from samples taken throughout the reporting period. The cases reviewed and a synopsis of each case are listed below. It is important to consider that most of these cases also contained Level 1 uses of force that were investigated by IAFD instead of field supervisors. In the cases reviewed for this section of the report, the field supervisors correctly identified the level of force utilized and appropriately contacted IAFD.  For use of force cases involving an ECW, those case facts have been fully described in Paragraphs 24-36 of this report.  Problems, if any, with those cases as they relate to the investigative practices of IAFD's use of force investigations are cited here for clarity purposes.

**IMR-13-09 (Level 2 Use of Force)**

Just before midnight one evening, an APD officer was detailed to assist the BCSO on a SWAT call. The suspect had previously fled from BCSO deputies on foot with firearms and had threatened officers with the weapons. Once on the scene, the APD officer deployed a robot with a tri-chamber chemical munition in an apartment believed to house the barricaded suspect.  Unbeknownst to the APD officer and other on-scene officers, the suspect had previously burrowed through a wall of the apartment into another apartment (where he was later apprehended) prior to the tri-chamber chemical munition being deployed. Thus, the munition had no effect on the suspect. The utilization of force, in this case, was reasonable.

It was reported by the APD officer that throughout the operation, the APD on-scene supervisor was standing next to him, including authorizing him to deploy the munition. The APD officer wrote in his report that this supervisor "was standing next to me the whole time." IAFD reports indicated this supervisor did not authorize the munition, further indicating the supervisor received a direct order from the incident commander to deploy the munition and that he merely relayed that message to the APD officer operating the robot. However, in his recorded interview, this supervisor said he was acting as the APD tactical lieutenant and authorized the munition deployment based upon the BCSO request to do so. The IAFD investigator misconstrued what the supervisor said about him (the APD supervisor) authorizing the munition deployment. In violation of SOP, this same on-scene supervisor then conducted the on-scene supervisory investigation and improperly opined that based on his preliminary on-scene investigation, the munition deployment was done in accordance with SOP 2-52. Additionally, no OBRD recording was made by the APD officer deploying the munition. Various rationales were offered by multiple APD investigators and supervisors in their reports as to why no recording was made. These rationales included:

- "I did not view the [officer's] video due to the deployment being via the EOD robot."
- No OBRD was necessary "… Because he did not have direct contact with [the suspect] and he was the operator of the EOD robot and did not have a direct line of sight to [the suspect] or other individuals."
- No OBRD was necessary because the "Officer…operated the robot from the command post a block away from the incident."
- "There was no OBRD of the actual use of force because [the officer] was operating the EOD robot from the staging area and did not have personal contact with the offender."

Needless to say, these rationales for not activating the OBRD are not supported by SOP.  Again, we have an incident of use of force for which only the members of the monitoring team appear to be cognizant of policy and practice regarding use of force.

## IMR-13-01 (Level 2 Use of Force)

The case facts for this case were more fully described in Paragraphs 24-36 of this report. This case involved two officers who confronted an individual outside a store to arrest him on active warrants for narcotics and stolen property. The monitoring team determined this case included an out-of-policy use of an ECW. IAFD conducted the use of force investigation and accompanying misconduct investigation. The monitoring team opined that the IAFD force investigation was comprehensive, inclusive of the interview of the officer. The review of the evidence, reports, and officer interviews highlighted numerous discrepancies, inclusive of the officer's misrepresentations of the suspect's actions. These misrepresentations contributed to the suspect being charged with Assault on a Peace Officer. The investigation determined the suspect was not an immediate threat to himself, others, or the officers and was exhibiting only passive resistance at the time the officer deployed his ECW.  Despite this, the investigator opined that the officer's use of force "was objectively reasonable and within APD policy." However, the supervisor who conducted the chain of command review for the Force Division wrote that the suspect "Did not make any overt threats or act in a manner indicative of impending violence." Additionally, the supervisor wrote, "… at the time the ECW was deployed, and the suspect was standing still with both feet planted on the ground while pointing at himself and arguing [about his identity]. The preponderance of evidence suggests the suspect was passively resistant at the time the officer chose to utilize the ECW."  Despite these findings, the Force Division investigator, who also conducted the misconduct investigation, ultimately opined that the officer used his ECW on a passively resistant individual but exonerated him.[51]  An Area Commander

---

[51] During the monitoring team's December 3, 2020 virtual site visit, the monitoring team reviewed this problematic investigative conclusion exonerating the officer. IAFD investigative report excerpts were read aloud to both the IAFD supervisor and the acting IAFD commander (in addition to other members of APD, City Legal, and DOJ). No APD member had an answer as to why allegations were not sustained or why the officer who used the force was exonerated when all the declarative statements of the investigator and reviewer indicated the preponderance of evidence was that the force was not justified. The only comment made was, "We messed up."

concurred with the finding, as did the Deputy Chief of Field Services.  The monitoring team was provided with no evidence that the Internal Affairs Commander who oversees misconduct investigations ever reviewed the findings or authorized the finding of "Exonerated."

Finally, the supervisor who conducted the chain of command review for the Force Division wrote that "…the officers failed to articulate within their supplemental reports the probable cause necessary to justify the 'Assault on a Police Officer' charge.  There is no description within the original police report or supplemental report of any action taken by the suspect that would cause a reasonable officer to believe they were in danger of receiving an immediate battery."  It should be noted that the monitoring team did not see any evidence in reviews of OBRD videos of any indicia of an imminent or immediate battery.  The supervisor further stated that "this is indicative of a growing trend in which officers utilize the *Assault on a Peace Officer* charge to bolster the justification for the use of force."  This lack of evidence in charging the suspect was not addressed in the misconduct investigation.

This investigation also underscores the dysfunctional practice of a misconduct case being conducted by an IAFD investigator with absolutely no oversight from the IAPS (Internal Affairs Professional Standards).  When the misconduct investigation was completed, instead of it being routed from IAFD to IAPS (who are charged with the oversight of all internal misconduct cases), the case was routed to an Area Commander and the Deputy Chief of Field Services. These two individuals had no oversight of the investigation nor any insight into the scope of the investigation.  Yet, they both signed off on the investigation.  Audit records revealed one of the APD executives never even signed in to view the officer's OBRD video footage.

The lack of Internal Affairs Professional Standards section oversight of misconduct investigations has been largely problematic for APD, and the monitoring team has consistently called this out. This is presently being addressed by APD, and the monitoring team had seen some positive developments on this issue by the end of the reporting period.  For the past year, though, the monitoring team has pointed out to the past Chief of Police, the current Chief of Police, representatives of City Legal, and IAFD and IAPS Commanders that the practice of sending misconduct cases to Area Commanders and Deputy Chiefs not aligned within the Internal Affairs chain-of-command is problematic and needs to be addressed.  Every person we discussed this issue with has agreed with our assessment. This was raised again in no uncertain terms during an early February 2021 meeting.  We advised City Legal we would be addressing this failure in this IMR.  By the end of that same day, the monitoring team was advised by an APD commander that City Legal wanted a message passed to the monitoring team that the practice of sending misconduct cases to Areas Commanders and Deputy Chiefs outside of the Internal Affairs chain-of-command would end on that day[52]. More than one month later, no change has occurred to rectify this unethical

---

[52] The monitoring team was told on previous occasions as well on this day that a Special Order was to be issued ending the practice of sending use of force determinations and misconduct matters to Area

practice.  Again, we consider these actions and inactions to be deliberate indifference to the requirements of the CASA.

## IMR-13-02 (Level 2 Use of Force)

The case facts for this case were more fully described in Paragraphs 24-36 of this report.  In brief, this case involved two officers confronted by an individual outside a residence after the officers were dispatched to a domestic altercation between a father and (intoxicated) son/subject.  An initial ECW deployment against the subject was ineffective due to a malfunction of the weapon, but a second ECW deployment, the monitoring team deemed out of policy took the subject to the ground where he was taken into custody.  A field supervisor responded to the scene and properly categorized the use of force as a Level 2, requiring an IAFD response to the scene.  During the ensuing IAFD investigation, it was learned that the subject suffered from mental illness and was prescribed medical marijuana as a treatment.  The monitoring team determined this case included an out-of-policy use of an ECW.

Observations of the IAFD Investigation:

- The field reports prepared by officers provided insufficient detail and contained boilerplate language.  This was not called out in the IAFD investigation.
- When attempting to take a statement from the suspect (who was seated in the rear of a patrol car), the suspect seemed disoriented but continued speaking with the detective.  On more than one occasion, the detective made comments such as "you don't want to talk to me," when the subject had not said he would not provide a statement.  While it may be ineffective interviewing skills, this gave the appearance of the detective not wanting to obtain a statement.
- The IAFD detective obtained good statements of the relevant witnesses on the evening of the event.
- A taped statement of the officer who deployed his ECW was taken by the IAFD detective.  The quality of questioning was extremely poor and failed to obtain relevant information to allow an objective determination if the force was justified and within policy.  Also, the IAFD detective failed to control the statement from outside influences.  As we have commented in other cases, at the onset of the statement, the detective relinquished control of the interview to an APOA representative, who asked questions of the officer and allowed the reading of Garrity into the record without any organizational response.  The entire interview was approximately 8:30 minutes long and was largely dominated by conversation from people who did not deploy an ECW in the case under review.

---

Commanders and Deputy Chiefs outside of the Internal Affairs chain-of-command.  Compounding this issue is the fact that these Area Commanders and Deputy Chiefs weigh in on these use of force determinations and misconduct matters, then are seated on the Force Review Board at which time they review these cases that they have already opined on without fully reviewing the evidence relied upon in the cases. This inherent conflict of interest could be avoided by not routing such cases to these individuals.

- The investigation failed to address injuries sustained by the suspect and clearly failed to distinguish whether the injuries were attributed to either the domestic altercation or the use of force.
- The IAFD detective and chain of command improperly assessed the second ECW deployment, finding it to be within policy.
- The event occurred on June 1, 2020, but was not approved by the IAFD Acting Commander until October 6, 2020 (126 days later).  In his review, the Acting Commander called out the fact that the case exceeded 120 days and documented that a contributing factor was IAFD staffing. He indicated that the current staffing was 18 detectives, and to properly address the current case load, IAFD would have to be staffed with 33 detectives.

## IMR-13-04 <u>(Level 2 Use of Force)</u>

The facts for this case were more fully described in Paragraphs 24-36 of this report. This case involved two APD officers who responded to a call one morning about an individual possibly sleeping in a vehicle, which APD detectives identified as being wanted on a misdemeanor warrant. The person fled from officers in the car and later that morning fled on foot from officers on two other separate occasions. A review of OBRD footage of uniformed officers conducting neighborhood canvasses revealed an officer obtaining written statements from two witnesses. Only one of those statements was cited by the IAFD detective, and only one of the statements was uploaded with the case file. The officer who utilized the force stated, "I waited to deploy my Taser until the suspect had cleared the wall and planted himself on his feet." Despite this statement, the OBRD evidence revealed the officer deployed his Taser when the suspect was going over the wall, causing the suspect to fall from the top of the wall. It was a very low wall, but this was not identified as a discrepancy in the officer's report, although the IAFD detective articulated the same observation the monitoring team made about the discharging of the ECW while the suspect was still going over the wall. Additionally, the IAFD investigation relied upon a CAD record and subsequently listed the wrong vehicle information in their report. More importantly, the IAFD investigation indicated the warrant for the suspect was a felony warrant as opposed to a misdemeanor warrant. This can have important implications for evaluating any potential use of force.

## IMR-13-03 <u>(Level 3 Use of Force)</u>

The case facts for this case were more fully described in Paragraphs 24-36 of this report. This case involved an APD response to numerous calls regarding a male, possibly armed with a knife, beating a female with an object. The subsequent IAFD investigation indicated a member of the Albuquerque Fire and Rescue was a witness to the force, but that person was not interviewed. The investigation also indicated an officer was interviewed, but no statement was found in the data provided to the monitoring team. The investigation also revealed that two officers failed to upload their OBRD recordings from the event until several days later. An IAFD investigator was also assigned to investigate those violations. That investigation revealed that audit records verified the OBRD recordings were not uploaded in a timely manner pursuant to policy,

but no other data was analyzed (e.g., schedules, CAD records, etc.) to verify officer explanations for not uploading their OBRDs. No evidence of recorded interviews or administrative advisements for those subject officers were included in the record provided to the monitoring team.  This is indicative of a misconduct investigation conducted in a substandard manner.

## IMR-13-10 (Level 2 Use of Force)

APD received several calls one-morning reporting several vehicle and residential burglaries and that a suspect was caught on surveillance recordings entering two of the vehicles and a residence.  The victims set out to attempt to locate the perpetrator in the area and located him getting on a bus.  The victims stopped the bus from departing and attempted to hold him until the police arrived.  The subject escaped from the victims and ran through a neighborhood with some of the victims in foot pursuit.  At one point, the suspect entered a residence via an unlocked front door and was confronted by the homeowner.  The subject reportedly jumped through a glass window to escape that residence but was injured by the broken glass. He was subdued by the homeowner and held until APD arrived.  Upon APD's arrival, OBRD recordings captured the suspect's injuries. When approached by officers, the suspect fell backward off of a transformer he was lying against (without any contact from anybody). The suspect was not secured immediately, and when the officer turned his back, the suspect fled on foot.  A short foot pursuit ensued, and the suspect was caught and subdued by the officer, which was captured on the officer's OBRD.  The subject attempted to pull away from the officer, who was advising him to stop. The officer subsequently executed an arm-bar takedown, and the suspect was quickly handcuffed and secured, with no further uses of force.

The on-scene supervisor correctly determined the force utilized was a Level 2 use of force and requested IAFD to investigate the force incident. The IAFD detective identified a tactical training issue and an administrative violation for an officer not using a seat belt on the defendant during the subsequent transport.  No material deficiencies were noted in either the actual use of force by the officer, the reporting of the force, or the subsequent IAFD investigation of the use of force.

The Monitor's Twelfth Report (IMR-12) noted, "…the monitoring team has taken cognizance of the fact that IAFD has significantly improved the completion rate of use of force investigations within the first three months of this monitoring period." Unfortunately, that completion rate has plummeted during IMR-13's reporting period, as documented at p. 90 of this report.

The monitoring team is not aware of any significant changes to staffing, policy, or work product that would explain this degraded completion rate.  Identification of the causes is a question for APD command-level personnel at the higher levels of the organization.

**Compliance Findings**

Based on our review, we have determined at least Primary Compliance is continued for Paragraphs 60 through 77—approved policies are in place.  Until substantial revisions are made to the internal functioning of IAFD, and those changes are trained, secondary and operational compliance will remain elusive.  We have noted in the past that multiple external training programs offer formalized external IA management courses, including the Southern Police Institute at the University of Louisville, the Federal Law Enforcement Training Center, and multiple other highly respected agencies and organizations.  It is essential that APD train its IAFD and IAPS personnel in the correct way to meet their functional responsibilities.  To do less is deliberately non-compliant. We do note that, after the close of this reporting period, APD arranged for on-site IA training through the University of Louisville's Southern Police Institute.

### 4.7.47 Assessing Compliance with Paragraph 60:  IAD Force Review

Paragraph 60 stipulates that:

> **"The Force Investigation Section of the Internal Affairs Division shall respond to the scene and conduct investigations of Level 2 and Level 3 uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Division by the Chief. In cases where an investigator in the Force Investigation Section initiates a Level 2 or Level 3 use of force investigation and identifies indications of apparent criminal conduct, the Section shall refer the use of force to an investigator in the Section, with no involvement in the initial administrative investigation into the Level 2 or 3 use of force, to conduct a criminal investigation. The criminal investigation shall remain separate from and independent of any administrative investigation. In instances where the Multi-Agency Task Force is conducting the criminal investigation of a use of force, the Internal Affairs Division shall conduct the administrative investigation."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 60:***

***4.7.47a:  Conduct a complete review of recent IA case investigations and identify all similar or related violations of the CASA.  Where appropriate, re-open and re-investigate those cases;***

***4.7.47b:  Organize from that review, a list of behaviors that are counter-CASA and ensure that those behaviors are restricted by a revised IA policy, detailed re-training, supervision and discipline.***

## 4.7.48 Assessing Compliance with Paragraph 61

Paragraph 61 stipulates:

> **"The Force Investigation Section of the Internal Affairs Division will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60. The Force Investigation Section of the Internal Affairs Division shall include sufficient personnel who are specially trained in both criminal and administrative investigations."**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendation for Paragraph 61:***

***4.7.48a:  Continue to self-monitor the progress of Internal Affairs in conducting effective intake, assessment, assignment, investigation, and resolution processes for criminal and civil investigations in order to ensure that staffing levels are appropriate and processes are effective in producing acceptable and timely results.***

## 4.7.49 Assessing Compliance with Paragraph 62:  Revision of Internal Affairs Manual

Paragraph 62 stipulates:

> **"Within six months from the Operational Date, APD shall revise the Internal Affairs Division manual to include the following:**
> a)   **definitions of all relevant terms;**
> b)   **procedures on report writing;**
> c)   **procedures for collecting and processing evidence;**
> d)   **procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;**
> e)   **procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;**
> f)   **scene management procedures; and**
> g)   **management procedures."**

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 62:*

*4.7.49a:  Continue work on revision and update of the IAB manuals, ensuring they comply with the updated CASA, the new use of force policies that became operational on January 11, 2020, as well as the new investigation procedures for Level 1, 2, and 3 uses of force, and known best practices in the field.*

**4.7.50 Assessing Compliance with Paragraph 63:  Staffing IAD**

Paragraph 63 stipulates:

> **"Within 39 months from the Operational Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Division and Force Investigation Section to fulfill the requirements of this Agreement. APD shall ensure that all Level 2 and Level 3 uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary. At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Division or Force Investigation Section."**

**Results**

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 63:*

*4.7.50a:  Identify the department's expected milestone date for staffing at IAD based on data related to incoming cases, average time for case completion, and calculations of the number of staff needed to effectively investigate incoming cases within established parameters.*

## 4.7.51 Assessing Compliance with Paragraph 64:  Training Force Division Personnel

Paragraph 64 stipulates:

> **"Before performing force investigations, Force Investigation Section personnel shall receive force investigation training that includes, at a minimum, the following areas:  force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques. Force Investigation Section personnel shall also receive force investigation annual in-service training."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 64:*

*4.7.51a:  Modify the 40-hour training program for IAFD investigators and supervisors that was reviewed during this reporting period and make the appropriate revisions based upon the written and oral feedback on the program provided by the monitoring team.*

*4.7.51b:  Modify the 40-hour training program for IAFD investigators and supervisors based upon the monitor's critical assessment of IAFD investigations and supervisory reviews provided in this report.*

## 4.7.52 Assessing Compliance with Paragraph 65:  Referral of Force Investigations to MATF

Paragraph 65 stipulates:

> **"Where appropriate to ensure the fact and appearance of impartiality and with the authorization of the Chief, APD may refer a serious use of force indicating apparent criminal conduct by an officer to the Multi-Agency Task Force for criminal investigation."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**

100

Operational: **In Compliance**

### 4.7.53 Assessing Compliance with Paragraph 66:  MATF Assistance to IAD

Paragraph 66 stipulates:

> **"To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Force Investigation Section of the Internal Affairs Division or the Multi-Agency Task Force in the investigation of any Level 2 or Level 3 use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.54 Assessing Compliance with Paragraph 67:  MATF Assistance to IAD

Paragraph 67 stipulates:

> **"The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.55 Assessing Compliance with Paragraph 68:  Consultation with External Agencies and Compelled Statements

> **"If APD initiates a criminal investigation, or where APD requests a criminal prosecution, the Force Investigation Section will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186. No other part of the**

101

> **administrative investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

### Recommendation for Paragraph 68:

*4.7.55a:  APD should move forward with process design, policy development, and training related to investigations regarding potential criminal prosecutions and compelled interviews of officers.*

### 4.7.56 Assessing Compliance with Paragraph 69:  IAD Responsibilities in Serious Uses of Force

Paragraph 69 stipulates:

> **"In conducting its investigations of Level 2 or Level 3 uses of force, as defined in this Agreement, the Force Investigation Section shall:**
>
> **a)**    **respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that the use of force has been classified according to APD's classification procedures, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;**
>
> **b)**    **ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;**
>
> **c)**    **ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses should be encouraged to provide and sign a written statement in their own words;**
>
> **d)**    **ensure, consistent with applicable law, that all officers witnessing a Level 2 or Level 3 use of force by another officer provide a use of force narrative of the facts leading to the use of force;**
>
> **e)**    **provide a written admonishment to involved and witness officer(s) to the use of force that they are not to speak about the force incident with anyone until they are interviewed by the investigator of the Force**

        **Investigation Section;**

**f)**     **conduct only one-on-one interviews with involved and witness officers;**

**g)**     **review all Use of Force Reports to ensure that these statements include the information required by this Agreement and APD policy;**

**h)**     **ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;**

**i)**     **conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;**

**j)**     **record all interviews;**

**k)**     **consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;**

**l)**     **make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and**

**m)**     **train all Internal Affairs Division force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors.**

## Results

APD has provided the policy and training components of this paragraph to IAFD personnel.  What remains to be accomplished is consistent and persistent supervision and review to ensure that IAFD findings are consistent with CASA requirements.  We consider this issue to be on the "critical path" to compliance, and until APD can effectuate significant change in its IAFD processes—meeting accepted practice in the field, and the requirements of the CASA—operational compliance will remain elusive.

     Primary:     **In Compliance**
     Secondary:     **In Compliance**
     Operational:  **Not In Compliance**

***Recommendations for Paragraphs 68 and 69:***

***4.7.56a:  Conduct detailed failure analyses for all IAFD investigations deemed improperly completed or delayed.  This report provides a workable starting point for that analysis.***

***4.7.56b:  Using these failure analyses, routinely modify training, procedures, practice, and supervision/oversight until IAFD findings***

*are greater than 94 percent complete and adequate on each of the elements addressed in paragraph 69.*

*4.7.56c: Resolve IA administrative (use of force) and misconduct investigative timelines to ensure they are practicable and allow corrective and disciplinary actions to routinely occur within those timelines.*

### 4.7.57 Assessing Compliance with Paragraph 70:  Use of Force Data Reports

Paragraph 70 stipulates:

> **"The Force Investigation Section shall complete an initial Use of Force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force."**

**Results**

Primary:          **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraph 70:*

*4.7.57a:  Conduct data analysis of Use of Force Data reports to determine why they take longer than 24 hours to process and develop recommendations to relieve the major bottlenecks affecting this process.*

### 4.7.58 Assessing Compliance with Paragraph 71:  IAS Investigative Timelines

Paragraph 71 stipulates:

> **"The Force Investigation Section shall complete Level 2 or Level 3 administrative investigations within three months after learning of the use of force. Any request for an extension to this time limit must be approved by the commanding officer of the Force Investigation Section through consultation with the Chief or by the Chief. At the conclusion of each use of force investigation, the Force Investigation Section shall prepare an investigation report. The report shall include:**
>
> **a)        a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based**

104

on the Force Investigation Section's independent review of the facts and circumstances of the incident;

**b)** documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying Use of Force Data Reports. In situations in which there are no known witnesses, the report shall specifically state this fact. In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why. The report should also include all available identifying information for anyone who refuses to provide a statement;

**c)** the names of all other APD officers or employees witnessing the use of force;

**d)** the Force Investigation Section's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options;

**e)** if a weapon was used by an officer, documentation that the officer's certification and training for the weapon were current at the time of the incident; and

**f)** the complete disciplinary history of the target officers involved in the use of force.

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

## *Recommendations for Paragraph 71:*

*4.7.58a: Conduct a review of a sample of cases completed by IAFD in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing the delay. The review should:*

a. *Identify key causes of failure;*
b. *Identify where the failure points were in the IAFD process related to Paragraph 71;*
c. *Identify the cause of the failures;*
d. *Identify who is responsible for the cause of the delays;*
e. *Recommend actions to remedy the top five causes of failure to meet the established timelines; and*

105

*f.  Repeat this process until failures re Paragraph 71 are less than 95 percent.*

*4.7.58b:  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established timelines.*

*4.7.58c:  Determine if these processes need to be revised, expanded, or refocused given our comments regarding supervisory reviews and IAFD failures contained in paragraphs 24-36, 41-59, and 60-77.*

*4.7.58d:  Repeat until >94% of cases completed meet established requirements for quality of IA investigations.*

*4.7.59e:  APD should carefully review the changes in its use of force policy viz a viz this paragraph to ensure that in-field systems related to this paragraph are in compliance with all aspects of the new use of force policy suite and the new IA investigations rubric.*

### 4.7.59 Assessing Compliance with Paragraph 72:  IAFS Report Review

Paragraph 72 stipulates:

> **"Upon completion of the Force Investigation Section investigation report, the Force Investigation Section investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Division. The Internal Affairs Division commanding officer shall review the report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance of the evidence standard. The Internal Affairs Division commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 72:*

*4.7.59a:  Conduct a review of a sample of cases completed by IAFD and IAPS (in the past 3-6 months) that failed to meet established timelines by reviewing the key failure points causing the delay.  The review should:*

106

a. *Identify key causes of failure;*
b. *Identify where in the IAD process related to Paragraph 72 the failure points were;*
c. *Identify the cause of the failures;*
d. *Recommend and implement actions to remedy the top five causes of failure to meet the established timelines;*
e. *Revaluate performance and repeat the process, with a focus on supervisors who routinely fail to meet established timelines; and*
f. *Repeat as necessary until the failure rate is below five percent.*

## 4.7.60 Compliance with Paragraph 73:  IAFD and IAPS Findings Not Supported by Preponderance of the Evidence

Paragraph 73 stipulates:

> **"For administrative investigations, where the findings of the Force Investigation Section investigation are not supported by a preponderance of the evidence, the Internal Affairs Division commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report. The commanding officer of the Internal Affairs Division shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it. The Internal Affairs Division commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Division."**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

## Recommendations for Paragraph 73:

**4.7.60a:** *Conduct a review of a sample of cases completed by IAFD and IAPS in the past 3-6 months that failed to meet established quality requirements regarding the preponderance of the evidence and review the key failure points causing insufficient investigations relative to the preponderance of the evidence. The review should:*

107

*a.  Identify key causes of failure to meet the preponderance of the evidentiary standards for IA investigations;*
*b.  Recommend actions to remedy the top five causes of failure to meet the established requirements related to preponderance of the evidence.*

***4.7.60b:  Implement recommended actions and conduct continual follow-up assessment to determine what impact, if any, the implemented actions had on the unit's ability to meet the established preponderance of evidentiary standards.***

***4.7.60c:  Repeat until 95% of cases completed meet established requirements regarding evidentiary standards.***

### 4.7.61 Assessing Compliance with Paragraph 74:  IAS Quality Control

Paragraph 74 stipulates:

> **"Where a member of the Force Investigation Section repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal from the Force Investigation Section in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules."**

**Results**

  Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 74:***

***4.7.61a: Conduct a review of a sample of cases completed by IAFD and IAPS in the past 3-6 months that failed to meet quality standards by reviewing the key failure points causing the failure.  The review should:***

*a.  Identify key causes of failure;*
*b.  Identify where in the IA process related to Paragraph 74 the failure points were located;*
*c.  Identify the cause (of the failures); and*
*d.  Recommend actions to remedy the top five causes of failure to meet the established timelines.*

***4.7.61b:  Implement recommended actions and conduct follow-up assessments to determine what impact, if any, the implemented actions had on failures to meet established quality standards for IAD investigations.***

***4.7.61c:  Repeat until 95% of cases completed meet established evidentiary and policy standards.***

### 4.7.62 Assessing Compliance with Paragraph 75:  IAD Quality Control

Paragraph 75 stipulates:

> **"When the commanding officer of the Internal Affairs Division determines that the force investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Force Review Board with copy to the Chief."**

**Results**

  Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 75:***

***4.7.62a: Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet the requirement to forward the case to the FRB by reviewing the key failure points causing incomplete cases to be forwarded to the FRB.  The review should:***

> ***a.  Identify key causes of failure;***
> ***b.  Identify where in the IAD process related to Paragraph 75 the failure points were; and***
> ***d.  Recommend actions to remedy the top five causes of failure to meet the established protocols, e.g., training, supervision, staffing, etc.***

***4.7.62b:  Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established evidentiary and quality standards.***

***4.7.62c:  Repeat until 95% of cases completed meet established evidentiary and quality standards.***

### 4.7.63 Assessing Compliance with Paragraph 76:  Force Investigations by MATF or FBI

Paragraph 76 stipulates:

> **"At the discretion of the Chief, a force investigation may be assigned or re- assigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations or may be returned to the Force Investigations Section for further investigation or analysis. This assignment or re-assignment shall be confirmed in writing."**

### Results

We note that this paragraph is "permissive" in nature, not prescriptive:  it uses "may" instead of "shall."  We have noted no instances in past reporting periods in which a case was inappropriately assigned to the MATF or the FBI.

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.64 Assessing Compliance with Paragraph 77:  Discipline on Sustained Investigations

Paragraph 77 stipulates:

> **"Where, after an administrative force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Division or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate. The Chief need not delay the imposition of discipline until the outcome of the criminal investigation. In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

### Results

We have noted a disheartening laxity in discipline over the course of this reporting period.  The former chief had adapted a disingenuous process of announcing formal discipline of a given number of days or hours, then holding the majority of those days or hours "in abeyance."  The end result was that the discipline actually implemented was

substantially lower than the disciplinary matrix would require.  The monitor has had several conversations with the newly appointed chief of police about this issue. Nonetheless, the process continued unabated during this reporting period.  We fail to see any upside to this practice, and it is just as it appears:  a fraudulent practice to make discipline appear to be more stringent than it actually is.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **Not In Compliance**

Monitor's Note:

During the June 2020 virtual site visit, members of the monitoring team revisited APD's interpretation of when an internal affairs investigative timeline begins when misconduct is identified.  We also asked that regardless of APD's current application of the timeline, whether there is any alternate interpretation of that perspective.  In response to our request, we received an email (Dated June 11, 2020) from the current IAPS Commander which stated, 'The timeline for an administrative investigation, including the imposition of discipline, begins when the misconduct/policy violation is identified,' and that the only alternate perspective emanates from the union, who believes that the timeline begins when a use of force or other misconduct occurs.  While we appreciate and agree with the IAPS Commander's position regarding the start of the timeline, readers of past Monitor reports will note that we have documented APD previously acquiescing to the union's position, which has exacerbated the department's ability to apply legitimate consequences when the misconduct occurred. The inability of APD to establish an accurate and consistent interpretation of this simple concept at this point of the reform process is problematic on many fronts.  We have had multiple conversations with the current chief of police about this issue; however, we note again this reporting period that disciplinary findings continue to be "held in abeyance" for no apparent reason.  We are perplexed with the continuation of this *obscuratis* notion of effective discipline and attribute it as being partially responsible for many of the intractable problems with APD's inability to control improper uses of force and other policy violations.

### *Recommendation for Paragraph 77*

### *4.7.64a:  Make declarative, finite, and transparent decisions on discipline and discontinue the questionable and ineffective practice of holding large proportions of assigned discipline "in abeyance."*

### 4.7.65 Assessing Compliance with Paragraph 78:  Force Review Board Responsibilities

Paragraph 78 stipulates that:

> **"APD shall develop and implement a Force Review**
> **Board to review Level 2 and Level 3 uses of force. The**

Force Review Board shall be comprised of at least the following members: Deputy Chief of the Administrative Support Bureau, Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigative Bureau, a Field Services Commander, the Academy Division Commander, and the Legal Advisor. The Force Review Board shall conduct timely, comprehensive, and reliable reviews of Level 2 and Level 3 use of force investigations. The Force Review Board shall:

a) review each use of force investigation completed by the Force Investigation Section within 30 days of receiving the investigation report to ensure that it is complete and, for administrative investigations, that the findings are supported by a preponderance of the evidence;

b) hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident. The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Division investigation, shall not be present;

c) order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings. For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;

d) determine whether the use of force violated APD policy. If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;

e) determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;

f) document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation; and

g) review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis."

112

On many occasions, the monitoring team has been critical of the Force Review Board (FRB), citing its ineffectiveness, failure to establish organization-wide expectations, and not overseeing APD's use of force system in a meaningful way.  We can report that during the IMR-13 reporting period, we saw a significant increase in the quality of oversight by executive-level members of the FRB when assessing uses of force.  The following analysis of the FRB will highlight the progress we observed, continued areas for growth, and serious concerns that could have a long-term impact on APD's Operational Compliance efforts.

The monitoring team wants to make clear that we were highly encouraged with the performance of several high-ranking executives during FRB meetings we attended, and for the first time, believe there is hope the FRB can assume its rightful position in the system of oversight by setting an example of performance for lower-level managers to follow related to uses of force.  The key observation we made pertained to APD executives demonstrating a willingness to challenge the justifications of uses of force and the underlying investigations into that force.  In the past, FRB meetings simply went through the motions, which clearly influenced the view APD, as a whole, had toward use of force oversight and accountability.  In IMR-13, we saw FRB members challenge case presenters from both SOD and IAFD, often questioning legal and policy determinations.  The value of this approach cannot be overstated, but the downstream benefits of their actions will take time to take hold.  For the first time, we are seeing APD executives using the weight of their office to probe officer and supervisory conduct in the field, something virtually unheard of in the past.  In the meantime, APD has to immediately provision for the easily predictable swell of cases they will be required to hear because of investigative backlogs in IAFD.  To mitigate the problem, we believe APD should immediately increase the number of meetings and the number of cases that are heard in each meeting so they do not create an obstacle to compliance that will undermine the positive observations that occurred during IMR-13.

If sustained, the FRB will influence the organization in a way we have encouraged from the beginning of the CASA compliance effort.  The monitoring team has made positive statements in the past regarding various areas of the CASA. Now it is incumbent upon the Chief of Police to recognize the significance of this progress and fully enable these command staff members to affect change at APD.  It will take time to trickle down to Area Command levels, so harnessing this energy now will require more than words and instead will require affirmative actions and purposeful follow-up by the Chief for it to take hold.

Without a fully functioning and effective FRB, APD has lagged in its effort to establish agency-wide expectations of supervision and accountability.  The consequence has been that APD effectively endorsed questionable and sometimes unlawful conduct by its officers.[53]  The monitoring team began to amplify its concerns over the FRB as early

---

[53] The monitoring team saw one such incident during a September 17, 2020, FRB meeting.  Following that meeting an internal affairs misconduct investigation was initiated against three voting members of the Board for their failure to carry out their duties and not referring misconduct to IAPS.  The monitoring team is concerned with the manner in which the misconduct investigation was conducted, including the lack of

as the Monitor's Third Report and called out the need for the FRB to create a forum for executive oversight that pushed department-level expectations down through all levels of supervision.  Excerpts from that report included:

> "APD must be cognizant of workplace influences that pressure officers at all levels to ignore, rationalize, or even conceal performance deficiencies and policy violations. To be effective*, accountability must begin at the highest levels of the organization and cascade down to lower supervisory levels through critical and probing assessments of events*." (Monitor's Third Report, Pg. 132, July 1, 2016, Emphasis Added)

> "Notwithstanding the critical role front line supervisors serve in the oversight and investigation of force used by APD officers, in the opinion of the monitoring team*, the FRB is at the center of accountability* along with the Internal Affairs Bureau. The monitoring team has reviewed use of force cases with clear and obvious issues of concern that have been either missed or ignored at multiple levels of review." (Monitor's Third Report, Pg. 13, July 1, 2016, Emphasis Added)

The following paragraphs represent additional findings related to Paragraph 78:

The increase in quality of reviews by the FRB during the IMR-13 reporting period was exemplified when it revealed a force deployment technique used by the Special Operations Section (SOD) called a "layered response."  In short, a "layered response" is a pre-planned, coordinated, and simultaneous deployment of multiple force options without the independent assessment of the effectiveness of each use of force. Notwithstanding rare instances where such a technique may be objectively reasonable, and within APD policy and the CASA, as implemented by SOD, the FRB determined they were violating APD policy.  In several instances, the FRB made recommendations for Internal Affairs investigations and began to examine the genesis of the technique within SOD.  The fact that the FRB was first to identify this issue is an important moment in time for the FRB.  Typically, the monitoring team or DOJ has been first to identify such issues. Now having a member(s) of APD command staff self-identify, address, and remediate such an important issue is exactly the type of activity the CASA is attempting to entice.

The "layered response" emerged as an issue in several SOD deployment cases that were reviewed by the FRB during IMR-13, where we observed the simultaneous uses of a 40mm less-lethal shotgun and the release of a K9 on suspects, which constitute actions not supported by policy.[54]   The FRB noted instances in which insufficient cause

---

specificity in questioning commanders, and the fact that the perspective of the commanders involved has not apparently changed.  Allegations were sustained and instead of accepting responsibility the commanders are appealing their discipline.  Yet they were allowed to continue sitting as members of the FRB, even while the internal affairs investigation was being conducted, and still supervise critical areas of the organization.

[54] In each instance an internal affairs case was initiated against the officers involved, and discipline is now pending.  The K9 officer involved, and Commander of SOD, have both been moved from SOD.  We

existed to use a "layered response" and that people were not being given the opportunity to respond to the 40mm, because, within seconds, the K9 was upon them since it was released simultaneously with the 40mm.  In fact, we are now hearing FRB executives comment openly and affirmatively state they do not believe probable cause existed for an arrest or that justification for force did not exist in a particular case.  This type of critical analysis has not been observed in the past but was evident recently, in particular in the second half of the IMR-13 reporting period.

The monitoring team was provided a comprehensive and well thought through report entitled "Special Operations Tactical Threat Assessment and Force Deployment Analysis."  Likewise, the Deputy Chief and Commander, who are now responsible for SOD, assembled training records in an attempt to cast a light on where this "layered response" technique originated within SOD (and provided those to the monitoring team as well).[55]  We have also had several conversations on this issue with the Deputy Chief and Commander and are confident they are personally overseeing the remediation of the issue and organizing SOD efforts to establish guidelines for when a "layered response" may be appropriate.[56]  Building upon observations made in past Monitor reports, SOD will now require an "overt action" on the part of a subject before force is used, in particular regarding "target glancing."  Among several other steps of remediation, in their Plan of Action SOD has instituted the following:

> "The Tactical Section shall not use force for the sole purpose of preventing an individual's predicted action as the result of "target glancing." An overt action following the physical cue of "target glancing" will be required to justify APD's Standard Operating Procedures (SOP) concerning the deployment of force against someone who is an immediate threat or actively resisting."[57] (Page 6)

---

recognize that, as implemented, this technique was flawed but essentially endorsed by the Commander of SOD at the time.  Had there been proper oversight and had use of force investigations been completed and presented to the FRB in a timely manner this issue may have been remediated sooner, and the officers' actions would have been adjusted before multiple disciplinary matters were initiated.  This does not absolve officers from adhering to APD policies that are in place but demonstrates how the convergence of officer and organizational problems can result in bad outcomes for everyone.

[55] The training materials we reviewed failed to demonstrate a clear connection to the "layered response" as implemented by SOD.  The materials were provided by APD as a representation of where they best believed the concept originated.

[56] SOD was assigned a new Commander in the midst of the FRB revealing these issues with "layered responses."  The Deputy Chief and Commander who now oversee SOD have sought out opportunities to share their efforts and seek advice from the monitoring team on several occasions.

[57] We have expressed concern with the use of "target glancing" as a justification for force in other areas of the organization.  We will discuss with APD if this type of guidance will be provided to the Academy for training all APD officers, and whether an adjustment will be made to wider use of force policies.

"Multiple simultaneous force deployments are permitted only under exceptional circumstances…"[58] (Page 8)

During the IMR-14 reporting period, the monitoring team will assess how these findings are inculcated into policy and then developed into training that supports the intent of the SOD report.

As with other reporting periods, the monitoring team spent time providing perspective, feedback, and technical assistance to APD personnel responsible for the tasks associated with the FRB.  During our December 2020 virtual site visit and throughout the reporting period, monitoring team members attended FRB meetings to assess the quality of case reviews.  We also reviewed files of cases heard by the FRB, ledgers, and other documents related to the FRB.

As we noted in previous Monitor reports, the FRB serves as an organizational safety mechanism to capture errors, refer cases for additional investigation, make referrals for various types of remediation, request internal affairs investigations for misconduct, and monitor use of force trend data.  Paragraph 78 states, "The Force Review Board shall conduct timely, comprehensive and reliable reviews of Level 2 and Level 3 use of force investigations."[59]  Timely feedback is key to remediating performance and misconduct issues in the field.  Historically, system failures across many areas of the department have disallowed the FRB to meet its requirement for a "timely" review.  Based on our review of data and conversations with APD officials during IMR-13, the ability for APD to meet that criterion is growing exponentially worse.

During the IMR-13 reporting period, the FRB held 22 separate and distinct weekly meetings.  The meetings generally last 2-3 hours, during which 1-4 cases are heard.  The meetings are very well attended by top executives of the department, representatives of City Legal, the CPOA, DOJ, as well as relevant subject matter experts and case presenters from different areas of the organization.  The FRB is required to review all tactical deployments, a 10% sample of available (completed) Level 2 uses of force, and all Level 3 uses of force.[60]  It is our belief that the frequency of meetings and number of cases heard during each meeting is insufficient to avoid a significant (and new) backlog of cases in the coming months and year(s).  During IMR-13, the FRB heard 12 Level 2 cases, 16 Level 3 cases and conducted 21 tactical

---

[58] "Layered response" is distinguished from other types of events where multiple force options are deployed.  Instances can occur where officers from multiple positions or vantage points react to a subject's actions that are not preplanned.  Likewise, an emerging need to use force commonly occurs when officers are hands on with a subject and have to resort to other types of force and do not constitute a "layered response."  "Layered response" is also distinguished from a force array, the latter of which is meant to provide different force options that are on stand-by in volatile situations.
[59] The FRB also reviews all tactical specialized unit deployments as per Paragraph 99.
[60] The FRB encountered several tactical activations that had accompanying uses of force.  The FRB would hear a tactical activation presentation, but not necessarily the use of force at the same time.  In the past, we attempted to convince APD that it made little sense to hear one element of the case without the other.  Based on their own observations this reporting period, the FRB has now agreed that the cases should be heard together.

activation reviews.  As we noted earlier in Paragraphs 41-77, APD's use of force investigations are building into a new, and even worse, backlog than APD has encountered in the past.  The ramifications will be significant as those cases are finally completed and become available for review by the FRB.  The average number of days it took for each Level 2 and Level 3 case to reach the FRB during IMR-13, from the date of the incident, was 223 days.[61]  The lack of timeliness in the FRB receiving cases to review negatively impacts multiple levels of organizational oversight and hinders APD's ability to assess trend data and quickly address potentially problematic behaviors in the field.

To illustrate the point further, during IMR-13, APD had 244 Level 2 uses of force.  A 10% sample of those cases would be 24, which is double the number of cases the FRB heard in the same time frame.  APD had 54 Level 3 uses of force during IMR-13, but during that same time frame, the FRB only heard 16 cases.  For SOD tactical activations, during IMR-13, there were 34 reported but only 21 were heard by the FRB. Eventually, these cases will all come up for review and have the potential to overwhelm the FRB.

To be of value to the organization, case reviews should be occurring much more contemporaneous to the event than we see currently with the FRB. We provided these numbers for context to demonstrate the reasonably apparent issues APD will experience in the next 1-2 years.  We have made these types of predictions in the past, and APD has not demonstrated the ability to adequately adjust to avoid a problem and instead ends up reacting to the problem.  What we are calling out now is highly alarming to the monitoring team and does not contemplate the increasing rate that cases are not being completed by IAFD, cases that were opened and predate IMR-13, and a backlog of pre-2020 FRB cases[62] that still have to be heard.  The pressure the FRB is experiencing is likely the convergence of a number of factors the monitoring team has been calling out for the past several years.  Deficient investigations in the field and by IAFD and oversight failures by supervisors and commanders have placed an undue burden on the FRB that requires members of the Board to spend an exorbitant amount of time preparing for meetings and reviewing cases.

As we previously commented, conceptually, the FRB should rarely be encountering situations where serious misconduct is missed or uses of force are inadequately investigated. Still, subordinate units' quality of performance has historically been deficient and precluded streamlined reviews of those same cases.  That is an issue created within the system APD operates, not the intended purpose of the FRB.  We reiterate here, the FRB could choose to conduct less thorough reviews of cases

---

[61] We did not include OIS cases in the calculation expecting that some delay may occur due to reviews by the District Attorney.

[62] In May 2020 APD provided the monitoring team with a plan to address pre-2020 cases that the FRB would hear.  We found the plan to be reasonably organized and have inquired about it being implemented on several occasions since it was first presented to us.  Documentation we were provided by APD following the close of IMR-13 suggested that only 36 cases, or 42% of the cases indicated in the May 2020 plan have been completed.

presented to them, but at the current stage of organizational reform, they will increase their risk of signing off on defective use of force investigations.  Right now, we believe that a few key members of the FRB are finally seeing the same issues with uses of force the monitoring team have been calling out for years and would likely not be comfortable conducting less thorough reviews (despite the time it requires).

**Issues of Serious Concern with FRB**

The success of the FRB is ultimately reliant on a number of factors. Chief among them is the integrity of the voting members of the Board, the skills and knowledge they bring regarding APD policies, practices, and procedures, and their willingness to act appropriately when faced with instances of officer misconduct.  During a September 17, 2020, FRB meeting, each of these factors was tested by three voting members of the FRB who would not refer a case to Internal Affairs in spite of them voting that the case involved an out of policy use of force involving multiple ECW deployments, and an illegal entry into a home.  The result was an Internal Affairs investigation being generated by a Deputy Chief against those three APD commanders for failing to refer apparent officer misconduct for out-of-policy uses of force and an additional referral against the officers involved in the incident under review by the FRB.[63]  The monitoring team is concerned about this case on multiple levels, including:

- Even after the Deputy Chief generated the internal affairs investigation concerning the three commanders' failures, they continued their role on the FRB and overseeing cases.  This could have potentially compromised the integrity of the FRB and the cases it reviewed.
- During the course of the internal affairs investigation and while being interviewed, none of the three commanders acknowledged wrongdoing.
- We have been told the commanders are appealing the discipline they received, thus signaling to the Chief of Police that they have learned nothing from the experience.
- From an organizational risk perspective, these commanders are assigned to Field Services Bureau Area Commands where the bulk of younger officers are assigned, and the Basic Training Section at the Academy, where performance expectations for officers are first established.  Therefore, they have significant influence over officer conduct and the attitudes they carry with respect to conduct and reform.

We see these factors as creating a potential long-term risk exposure that the organization should closely monitor and assess.  It is incumbent on APD to monitor this risk, to increase the level of oversight for these three Area Commanders, and, if necessary, to take remedial action if similar events occur involving these three commanders.

---

[63] It's important to note that the concerns raised during the meeting (with the case under review) and the ensuing concerns over the conduct of certain members of the FRB were entirely self-initiated by APD Deputy Chiefs.

**Synopsis of the Case Under Review:**

APD officers responded to a call for service at a residence where a family member was reportedly acting aggressively, was intoxicated, and potentially in possession of a knife. The incident in question occurred over two separate events on the same day.  During the first response, the subject left before the officer's arrival, but family members reported he damaged property at the house.  The family decided to leave the house and stay at a hotel, and officers recommended they seek a restraining order because there was no criminal charge that could be levied since the subject was a lifetime resident of the home.  Officers contacted probation/parole to inquire about the subject's status with those agencies.  They learned that the subject was on probation, and they intended to issue a warrant on the subject.  At the time the events involved in the case took place, no warrant had been issued for the subject before officers responded back to the house (later the same day) and engaged in a confrontation with him.  That confrontation included what constituted an illegal entry into the subject's house and eleven (11) separate ECW deployments, which included several out-of-policy drive stun applications.  On February 12 and 16, 2021, Internal Memorandums to the Chief of Police (Regarding Aggravating Factors for Discipline) a Deputy Chief wrote the following:

> "The core facts of the case before the Force Review Board were that force had been used against an individual because the officers felt there was a warrant for his arrest, and he resisted that arrest. There was NOT a warrant for his arrest, so there was no lawful basis for their actions, and therefore, all the force used was out of policy.  There were also no new additional charges warranting an arrest.  All the machinations and considerations of various parts of this incident and what officers did all comes down to the fact that the person arrested didn't have a warrant for his arrest, and he resisted an unlawful arrest.  I will never fully grasp how this foundational component seems to have been lost in this matter."

A review of the IAFD investigation revealed it to be deficient in its content, investigative rigor, and the findings related to uses of force.  When the officers engaged the subject, they had established no underlying crime and had not verified if a warrant existed.[64] Despite obvious discrepancies in officer reports and numerous apparent policy violations during the event, IAFD determined all the applications of force were justified and failed to call out a single related policy violation.  A presentation of the case occurred at a virtual FRB meeting on September 17, 2020, with approximately 25 people in attendance from APD, City Legal, CPOA, USDOJ, and the monitoring team. The five voting members of the FRB included two Deputy Chiefs, two Area

---

[64] The monitoring team has called out several similar examples over the past several years where officers find themselves using force on a person before they conduct any investigation and know if there is actually a purpose for an arrest.  In this case, the subject was not charged with any underlying crimes that occurred at the house.  He was arrested for a probation warrant that was issued after the event and also charged with assault on officers and resisting arrest.

Commanders (One serving as an Acting Deputy Chief), and a lieutenant from the Academy as a proxy for the Academy Director.

IAFD presented the case to the FRB, which was followed by an opportunity for discussion.  A Deputy Chief opened the conversation with a series of very insightful and direct questions regarding the potential illegality of the arrest of the subject, illegality of the entry into the subject's house, and out-of-policy uses of force by the officers.  The IAFD detective attempted to defend the findings, but it was clear the Deputy Chief was well versed on the investigation and underlying issues that IAFD had not identified before the questioning began.  He was explicit with his belief that there was no valid warrant, there were legal issues with the force used, and entry into the subject's home was not justified. Another Deputy Chief, a voting member, also questioned the appropriateness of officers' actions during the event.  There came the point where a request was made to excuse non-voting members from the meeting and allow the FRB voting members to discuss with City Legal issues concerning the legality of the officers' entry into the subject's home.  The meeting was paused for approximately one hour while that discussion occurred, after which participants of the meeting were invited back (including the monitoring team).

When the meeting reconvened, votes were held concerning different elements of the force case under review, including whether the case should be referred to internal affairs due to the issues the voting members had discussed while in the closed meeting. The motion was made by a Deputy Chief.  What happened next can best be described as a clash between APD Area Commanders clinging to a culture of non-accountability and Deputy Chiefs attempting to exercise legitimate oversight of officer conduct.   While non-voting members were not a party to the closed side-meeting, elements of the conversation spilled over into the open meeting.  It was easily discernable based on this continuing conversation that the voting members were told that the officers' entry into the suspect's home was legally problematic.[65]

A vote was held to determine if the use of force was within policy, and all five voting members agreed that the officers' use of force was out of policy.  However, when a vote was held whether to refer the case to IAPS to investigate misconduct, two Area Commanders and an Academy Lieutenant voted "no," so the referral did not pass.  The Deputy Chief that made the motion to refer the case to IAPS seemed shocked at the "no" votes and was noticeably disturbed that the vote did not carry in the meeting and appeared to be completely distracted as the conversation continued.  One Area Commander asked for a referral to the Academy for them to develop training on the "good faith exception" under New Mexico law.[66]  The two Area Commanders also

---

[65] This was also evident in a statement of one of the Area Commanders during their internal affairs interview.
[66] An APD commander discussed this referral with the monitoring team after the meeting and expressed frustration with that referral and told the monitoring team that no such exception exists.  We later made a request for training records that may illuminate "good faith exception" and how it may apply to the case, but what we were provided simply contradicted the Area Commander's premise that a "good faith exception" justified the officers' entry into the home.  The monitoring team saw the training referral as

wanted to focus on tactical issues with the case as opposed to the legality of the officers' actions and their failure to apply force within policy, even though they ultimately voted that force used was not within policy.

As the conversation continued, a second Deputy Chief readdressed the motion to refer the case to IAPS for investigation of misconduct. He, too, seemed unsettled by the "no" votes. Eventually, they realized that the Deputy Chief could make an independent referral to IAPS in spite of the FRB vote. By this time, the Deputy Chiefs were obviously frustrated, and one requested City Legal provide a written document that captured what they had been told earlier (in the closed meeting). They were told that a written opinion would be provided.[67] We subsequently were told that an IAPS investigation was initiated against the officers in the case under review, the IAFD investigators, and their chain of command, and finally, an IAPS investigation was opened against the two Area Commanders and Academy lieutenant for failing to refer misconduct while sitting as members of the FRB.[68]

As we noted above, the IAPS case against the FRB voting members was deficient on several levels. For instance, even though there were 25 people in attendance for that FRB meeting, the only people interviewed were the three targets of the complaint and one of the two Deputy Chiefs. In fact, the Deputy Chief who actually called a vote for the IAPS referral was never interviewed, and the interviews that were conducted were disjointed and lacked specificity. We noted that the Internal Affairs detective questioned no one about the conversation the voting members had among themselves during the closed portion of the meeting, which would have been particularly important to establish what they knew regarding the legality of the actions of the officers before voting. In a later conversation with the IAPS Commander, we were told that IAPS was never told that a closed meeting occurred during the September 17 FRB in an effort to explain why no questions were asked related to that part of the meeting.[69]

Despite issues, we found with the IAPS investigation, the FRB sustained charges against the three members of the FRB who voted against referring misconduct from the September 17, 2020 meeting. A Deputy Chief provided memos regarding aggravating factors the Chief of Police should consider when imposing discipline against the three FRB members.[70] Considering the rank and position of the Commanders involved, the aggravating factors memo provided by the Deputy Chief, recent (other) disciplinary

---

[67] In conversations with IAPS we learned that the legal opinion was used when sustaining allegations of misconduct against in the officers in the case that was under review.

[68] The meeting was so troubling to APD, that shortly after the FRB meeting ended the Chief of Police contacted the monitoring team to make them aware an internal affairs investigation was going to be opened against the two Area Commanders and the Academy lieutenant who sat on the FRB that day.

[69] We find this failure to notify IAPS to be highly suspect.

[70] Aggravating factors are considered by law enforcement executives when deciding upon enhanced penalties, outside an established Chart of Sanctions, and imposing discipline. We routinely see APD consider mitigating factors when deciding to impose sanctions below that which is recommended in their Chart of Sanctions.

actions taken against each Commander, and information provided in the case file, it would be reasonable to expect the discipline would have been influenced toward a more significant sanction. However, the following was approved by the Chief of Police:

- Commander 1 – Had an additional sustained Class 6 Sanction in the previous year and yet received an 8-hour suspension for failing to report misconduct.
- Commander 2 – Had two (2) additional sustained Class 6 Sanctions in the previous year and yet received an 8-hour suspension for failing to report misconduct.
- Academy Lt. – Had one additional sustained Class 5 Sanction in the previous year and yet received an 8-hour suspension for failing to report misconduct.

APD notes that the Academy Commander did not attend any further FRB meetings. We have commented extensively in the past that Area Commanders, historically, are predisposed to defer policy violations to training instead of IAPS for misconduct investigations. In his internal affairs interview, the Academy Lieutenant felt that training was the appropriate manner of handling the misconduct because he believed for policy violations to be misconduct that they had to be intentionally committed. No such standard exists in APD policy, which calls into question his suitability to serve on the FRB or have influence on other APD officers.[71]

Not surprisingly, we were told that each of the FRB members who had sustained allegations of misconduct are appealing that discipline. The Chief of Police is responsible for overseeing a disciplinary process to deter misconduct and apply consequences that can meaningfully and appropriately hold people accountable. We will continue to assess the discipline that comes from these actions.

**Additional Observations of the FRB:**

1. We commented in past IMRs that FRB members came unprepared for meetings and failed to offer any meaningful input or engage case presenters with questions that matter. During this reporting period, it was obvious that FRB members were conversant with cases under review and prepared for meetings. The quality of questioning and insight we observed by FRB members could only occur if the members reviewed cases thoroughly. Past discussions during meetings were superficial and failed to hone on to the critical aspects of a case under review, and FRB members seem unable to identify clear policy violations. During IMR-13, we saw several instances in which FRB members stepped away from past practices and challenged justifications for force.

---

[71] In his aggravating factors memorandum to the Chief of Police, a Deputy Chief calls out the fact that establishing intent when sustaining misconduct was not in APD policy and would only serve to undermine the disciplinary system.

2.  We learned that the FRB voting members are gathering to discuss cases prior to the actual FRB meeting.[72]  These pre-meetings were not previously discussed with the monitoring team, so we will explore the purpose of these meetings, who attends, and what documentation is prepared following these meetings during the IMR-14 reporting period. We want to ensure that the spirit of Paragraph 78 is not being undermined and will request to attend the meetings to ensure the monitoring team is being provided the proper access to assess FRB relevant discussions and guard against any perception of impropriety.

3.  During IMR-13, we initially saw the most meaningful FRB discussions being dominated by one or two Deputy Chiefs, but as the reporting period carried on, others began to settle into their role as well.  While these Deputy Chiefs demonstrate a personal proclivity to ask meaningful questions, there are two issues APD should be cognizant of moving forward: 1) We see a drop off in the quality of participation by members of the Field Services Bureau.  This may be in part due to them not wanting to talk over Deputy Chiefs during meetings or that others are addressing their concerns, but there may also be a reluctance to question officer conduct from other Area Commands; 2) The future success of the FRB cannot be reliant upon the wisdom and courage (to challenge cases) of the Deputy Chiefs currently attending FRB meetings; therefore, mentoring and succession planning would be a wise venture.

4.  Most people attending FRB meetings are at the executive level, so we are concerned APD will not be able to sustain attendance levels long-term, especially if the FRB does not complete cases placed on an agenda and move through cases in a meaningful yet concise manner.

5.  We saw several instances where FRB voting members sought out advice from their subject matter expert (an APD CIT Lieutenant) related to persons in mental crisis.  In each instance, we found the lieutenant to be well measured and very informative.  He demonstrated confidence and was not hesitant to call out areas where officer(s') actions were wrong or could have been better to resolve an issue without the use of force.  APD would be wise to harness the information and exchanges of ideas that are taking place at the FRB regarding the handling of persons in mental crisis. Translating the lessons learned into training would be a prime example of how the FRB can directly influence officer conduct in the field.

6.  The FRB is continuing to make legitimate efforts to make and track referrals that come from case reviews.

---

[72] While reviewing IAPS internal affairs investigation IMR-13-11 these meetings came to light.

7. In the past, we commented that the Chairperson of the FRB should ensure that each Board member was provided case materials and have each member overtly state they have reviewed the materials.  We believe in direct response to our comments; the FRB moderator now opens meetings by having each voting member of the FRB affirmatively state they have received and reviewed the files for the cases under review.

8. Since meetings are currently held virtually, in the past, we saw Board members sitting outside the view of the camera or not turning their cameras on during the meeting.  Again, in what we believe is direct response to past criticism, we no longer see these types of issues.

9. The FRB should review their reporting documents to ensure they provide the appropriate level of specificity needed for making determinations.  For instance, when the Board votes on whether a use of force is within policy, the only options are "yes" and "no," which is not flexible or expandable enough to address multiple uses of force (perhaps by multiple officers) within a single case.  We have also seen instances in which a particular case's logical correlation of answers to actions in the case is not apparent.  This is likely a product of poor construction of the FRB reporting instruments, which we recommend APD revisit.

**Results**

We continue to believe the FRB is a key organizational feature for influencing reform.  Our observations during IMR-13 are favorable overall, based on the quality of interaction we are now seeing when use of force cases are being reviewed.  We are reticent to call the September 17, 2020 FRB meeting a "watershed moment" for the FRB, but it is likely, not coincidental, that the most noticeable change in quality in the FRB occurred after that meeting.  As we noted in the past, if APD is ever to achieve Operational Compliance in its use of force requirements beyond only Paragraph 78, having a fully functional, engaged, and well-documented FRB will be essential.

Based on our review, we have determined Secondary Compliance is continued for Paragraph 78.  The FRB has begun to show signs that it can achieve Operational Compliance with Paragraph 78 in terms of comprehensive and reliable reviews of Level 2 and Level 3 uses of force investigations.  Worthy of repeating was the FRB self-identifying issues with SOD's "layered response" during IMR-13.  We saw this as legitimate evidence that the FRB is heading in the correct direction.  Sustaining the momentum we saw will be the responsibility of the top echelon of the organization, and APD must now demonstrate it is capable of completing cases and having those cases reviewed by the FRB in a timely manner.

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational:  **Not In Compliance**

*Recommendations for Paragraph 78:*

*4.7.44a: Report regularly on progress on the established goals and objectives related to the FRB process.*

*4.7.44b: FRB should focus attention on Level 1 uses of force to ensure field supervisors are properly classifying cases.*

*4.7.44c: Closely monitor referrals made from the FRB to ensure that each referral is clear and followed through by the impacted command.*

*4.7.44d: APD should organize its pre and post FRB meeting documentation in a manner that clearly demonstrates how it meets each of the relevant provisions of the CASA.*

*4.7.44e: Work to ensure that use of force cases is completed in the field and then received and reviewed by the FRB in a timely manner.*

*4.7.44f: Review FRB documents to ensure they are capable of capturing data related to each use of force by each officer in a particular case. The current "yes" "no" structure is inadequate for multi-factor investigations.*

*4.7.44g: FRB members under investigation for misconduct should not serve as voting members until internal affairs investigations are fully adjudicated. APD should ensure a sufficient number of trained personnel exist, at the correct level and positions, to serve on the FRB.*

### 4.7.66 Assessing Compliance with Paragraph 79:  Annual Use of Force Reporting

Paragraph 79 states:

> **"At least annually, APD shall publish a Use of Force Annual Report. At a minimum, the following information should be included in the Annual Use of Force Report:**
>
> **a) number of calls for service;**
>
> **b) number of officer-initiated actions;**
>
> **c) number of aggregate uses of force, and uses of force by Level;**
>
> **d) number of arrests;**
>
> **e) number of custodial arrests that involved use of force;**
>
> **f) number of SWAT deployments by type of call out;**
>
> **g) number of incidents involving officers shooting at or from moving vehicles;**

**h) number of individuals armed with weapons;**

**i) number of individuals unarmed;**

**j) number of individuals injured during arrest, including APD and other law enforcement personnel;**

**k) number of individuals requiring hospitalization, including APD and other law enforcement personnel;**

**l) demographic category; and**

**m) geographic data, including street, location, or Area Command."**

## Methodology

Paragraph 79 of the CASA addresses requirements APD must meet by publishing a Use of Force Annual Report.

During past site visits, the monitoring team has previously spent time providing perspective, feedback, and technical assistance to APD regarding Paragraph 79.  As evidenced in each monitor's report to date, there are instances in which APD personnel failed to properly report or investigate uses of force, which obviously impacted data integrity in the Use of Force Annual Reports.  We saw evidence again during this reporting period of deficiencies in use of force classification, accuracy of reports, defective force investigations, and instances in which the problem cases were approved by APD's chain of command.

As we noted in IMR-12, reporting errors have been historically prevalent in the Field Services Bureau, and we believed that as APD transitioned to a new three-tiered reporting structure (beginning on January 11, 2020), they would be vulnerable to mistakes by field supervisors.  Without close scrutiny and legitimate consequences for reporting or investigatory failures, there is little confidence that APD will reach Operational Compliance with critical CASA paragraphs in the near future.  Further, the integrity of data used to prepare the Annual Use of Force Report will continue to be compromised.  As noted earlier in this report, APD has emerged from the year 2020 with another large backlog of use of force cases.  Most of these cases will be reviewed and approved by chains of command, up to and including the FRB, long after the event actually occurred.  Along those pathways, uses of force will likely be found that were not initially reported, and therefore APD will be increasingly vulnerable to issues with data integrity.  The methods to capture, analyze, and report accurate use of force data are fractured and will be stressed in the coming months.  Many cases from the year 2020 are incomplete and will likely not be completed for an extended period of time.  That will impact APD's ability to report data from those cases, which will in turn impact APD's ability to maintain its compliance standing with Paragraph 79.  These are major failures in oversight of uses of force.  These failures will also affect discipline and the department's ability to correct known aberrant behavior.

As noted in IMR-10, 11 and 12, APD published its 2016 and 2017 Annual Reports[73] in March of 2019, having not published an Annual Use of Force Report since 2015.  The "Use of Force Report for the Years 2016/2017" was eventually published in March of 2019.   We were provided a draft of an updated Use of Force Annual Report during IMR-12 and reported favorably about the draft we reviewed.  During IMR-13, APD published its final Annual Use of Force Report, inclusive of the years 2016-2019.  APD again decided to organize use of force data from multiple years, believing the aggregation of year-over-year data gave the department better context to the information they were assembling.  This also provides readers of the report more information upon which to make judgments of APD's progress, so the monitoring team found this approach to be appropriate under the circumstances.  We encourage APD to keep pace with the Annual Use of Force Report in 2021 by pulling forward the 2020 data in as timely a manner as possible.  This will require APD executives to address the reporting and investigative failures that are contributing to the current backlog of cases. A lack of diligence in past years has left APD with a great deal of work remaining to be done, and since the Annual Report is a requirement in other CASA paragraphs, APD risks the loss of its compliance standing on multiple paragraphs.  APD needs to refocus, recalibrate, and regarding compliance planning and actions.

Finally, we know through case reviews that policy violations, including failures to report and properly investigate uses of force, extended up to and including the 13th reporting period.  We highly encourage those responsible for collecting, aggregating, and analyzing data for the Annual Use of Force Report to work with the PMU supervisor to devise strategies for increasing the integrity and reliability of those data.

We have determined that APD achieved Secondary Compliance status for Paragraph 79.  Unfortunately, as we mention elsewhere in this report, it is clear that APD continues to exhibit a marginal appetite for supervising, overseeing, assessing uses of force.

**Results**

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not in Compliance**

*Recommendations for Paragraph 79:*

*Recommendation 4.7.66a: APD should monitor use of force, serious use of force, and show of force reporting discrepancies that are found. Reporting errors must be reconciled to ensure that statistics published in its Annual Use of Force Reports are accurate.*

*Recommendation 4.7.66b: Now that APD transitioned to a three-tiered use of force reporting system, they should create an auditing process for tier-one uses of force to ensure proper categorization is taking place.  Data*

---

[73] The report was dated February 2019 and was published on March 14, 2019.

*collected from these audits should feed the Annual Use of Force reports, and when appropriate referred to IA and the Academy.*

*Recommendation 4.7.66c: APD should devise ways to scrutinize data presented by the department individual units, and coordinate with PMU to ensure that there are common methods to handle, analyze and present data.*

### 4.7.67 Assessing Compliance with Paragraph 80

Paragraph 80 states:

> **"APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by the Force Investigation Section, Internal Affairs Division, or Multi-Agency Task Force; and all force reviews conducted by the Performance Review Unit of the Compliance Bureau and the Force Review Board. APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary."**

**Results**

Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 80:*

*4.7.67a:  APD should re-visit the requirements of this paragraph viz a viz its planned early intervention system and ensure that each element required by Paragraph 80 is extant in the planned system.*

### 4.7.68 – 4.7.72 Assessing Compliance with Paragraph 81-85: Multi-Agency Task Force (MATF) Participation by APD

Paragraphs 81- 85 of the CASA address requirements that APD continues to participate in the MATF, consult with the participating jurisdictions to establish investigative protocols for the task force, and generally consult and coordinate with the participating agencies regarding investigative briefings and the release of information relevant to MATF investigations.

APD members from the Violent Crimes Division are assigned to the MATF to investigate officer-involved shootings, in-custody deaths (now inclusive of deaths at the Bernalillo County Jail), felonious force against officers, and criminal conduct cases resulting from a use of force by officers. This is reflected in a review of documentation provided to members of the monitoring team. APD continuously ensures personnel assigned to the MATF are full-time detectives or supervisors with member agencies, ensures a representative of each member of the MATF is present during interviews of involved personnel (absent extenuating operational constraints), addresses perceived deficiencies in a MATF investigation, and maintains the confidentiality of MATF investigations.

A review of sign-in sheets continues to confirm a robust response to MATF callouts, especially officer-involved shootings that often have multiple crime scenes necessitating numerous investigative resources. During this reporting period (current through early December 2020), the MATF responded to four officer-involved shootings, an in-custody death, and a criminal referral case (Case IMR-12-16). In December 2020, the Bernalillo County District Attorney's Office asked members of the MATF to review and consider for adoption proposed language to prevent potential conflicts of interest. The proposed language for the MOA focuses on any event in which a law enforcement officer who is under investigation for use of deadly force or serious force and that officer has a familial relationship with anyone in the lead investigative agency. The proposed language seeks that, in such cases, the lead agency will relinquish its lead agency role and other associated investigative duties and that the lead agency role will be determined by the Office of the District Attorney.

As noted in IMR-11, the MATF has identified officers working to assist the MATF (MATF Collateral Positions) in their succession plan and identified appropriate trainings to provide to these officers. The purpose of this generalized investigative training is to better equip these officers with the knowledge, skills, and abilities to conduct criminal investigations during MATF call outs while not formally assigned to the MATF. This "Umbrella Training," which can also serve as a career path to assist members being assigned to the Criminal Investigations Division, includes training on the following topics: interview and interrogation, crime scene management/control, search and arrest warrants, case preparation for felony investigations, court preparation and testimony, cell phone and electronic devices, and CACU for CARE course.

Based on our review, we have determined operational compliance is continued for Paragraphs 81 through 85.

### 4.7.68 Assessing Compliance with Paragraph 81:  MATF Participation by APD

Paragraph 81 of the CASA stipulates:

> **"APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist. APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that**

> **govern the Multi-Agency Task Force are current and effective. APD shall ensure that the inter-governmental agreements are consistent with this CASA."**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.69 Assessing Compliance with Paragraph 82: Investigative Protocols for the MATF

Paragraph 82 stipulates that:

> **"APD agrees to consult with participating jurisdictions to establish investigative protocols for the Multi-Agency Task Force. The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities."**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.70 Assessing Compliance with Paragraph 83: Coordination with MATF

Paragraph 83 stipulates:

> **"APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel."**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.71 Assessing Compliance with Paragraph 84: Briefing with MATF

Paragraph 84 of the CASA stipulates:

> **"APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.72 Assessing Compliance with Paragraph 85:  Expiration of MOU re MATF

Paragraph 85 stipulates:

> **"If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding. This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in-custody deaths."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.73 – 4.7.75 Assessing Compliance with Paragraph 86-88: Review of Use of Force Policies and Training; Use of Force Training Based on Constitutional Principles; and Annual Supervisory In-Service Training.

During the IMR-13 reporting period, APD continued to struggle implementing a system of training capable of sustaining itself, and as a consequence, has failed to sustain its Secondary Compliance with Paragraphs 86-88.  That failure has a cascading effect on numerous other CASA paragraphs centered on the use, reporting, supervision, and investigation of force events, which is reflected earlier in this report.  Throughout the year 2020, the monitoring team attempted to prompt APD into action by discussing the situation on several occasions, with additional cautionary language in both IMR-11 and IMR-12.  In short, APD has failed to perform its training responsibilities in any reasonable and meaningful way.[74] There is no subtle way to express the significance of

---

[74] To be clear, its uncertain what influence APD could have had on this outcome if they explored alternate approaches to their training requirements.  The Monitor and monitoring team were not presented with a cogent, lucid plan to address any dilemma they were facing.  As with many other

APD's failure other than to document here they have again self-inflicted a two-year loss of time because of their lack of attention to basic organizational training needs.  Given the issues APD has experienced with its use, reporting, supervision, and investigation of uses of force since the inception of the CASA, and the positive narrative they received as recently as IMR-11, it is incomprehensible that the leadership of APD would allow such a lapse of momentum.[75]

In the past, APD has pointed to deficiencies with their policies and training when attempting to explain away problems of performance and misconduct in the field.  As we noted in IMR-11 and IMR-12, after nearly two years, APD had finally developed and implemented new use of force policies and training they believed were capable of steering better outcomes in the field.  The adjustment of the use of force suite of policies and the resulting 4 Tiers of training were conceptualized by APD, who thought that training would resolve lingering issues in the field.  The process took extensive technical assistance and feedback by DOJ and the monitoring team, and that guidance continued as the training was being delivered so adjustments could be considered by instructors in real time.  In the end, it was believed that the 4-Tiered use of force training APD was delivering to the department (throughout 2019) was its best effort, to date, to provide meaningful instruction on department policies.[76]

We were encouraged with the direction of APD's 4-Tiered use of force training, and by the close of IMR-11, the only training remaining to be delivered was the Tier 4, Reality-Based Training (RBT) portion of the program.  We previously noted that while each part of training is important, Tier 4 is critical since APD would have the opportunity to collect data from the field to determine if and how training from Tiers 1-3 were being applied.  Since we continued to see failures in the field related to the use and investigation of force throughout 2020, that collection of information would be key to quickly remediating specific issues that are being encountered.  This is how an agency should use the 7-Step Training Cycle to its advantage to attain and retain Operational Compliance.  During Tier 4 training, officers and supervisors would be able to seek clarity on the proper application of policies and, in some cases, make recommendations for policy revisions.  We recognized that the Tier 4 training if properly executed, would require a commitment of resources from several organizational commands, as it is heavy in practical scenarios, which we consider beneficial.  In IMR-12, we noted a sense of tension between commands in this regard since staffing Tier 4 needed to meet proper instructor/student ratios.  We highly encouraged APD executives to support the Academy's efforts with Tier 4 or its Secondary Compliance in several CASA paragraphs would be adversely impacted.  In short, since APD devised and presented the training's

---

situations of regression APD has experienced, APD needs look nowhere other than at themselves for blame.

[75] In IMR-12 we stated, "Without concerted effort, a thorough review of points of under-performance at the Academy, and a common-sense approach to remediate areas of under-performance, APD risks a serious and difficult-to-remedy loss of compliance in the training requirements identified in the CASA." (Page 166)

[76] Use of force case reviews conducted during IMR-12 continued to reveal issues in the field (post-training) relating to the use and investigation of uses of force.  This is one reason Tier 4 was crucial to APD's future success.

methodology, structure, and content for Monitor approval, any deviation could put APD's training efforts at risk.

At the end of IMR-11, it was our determination that APD's Tier 4 curriculum was reasonably organized, thoughtful, and provided a degree of confidence that once delivered, officers would be better positioned to succeed in the field.  The Academy received Secondary Compliance in IMR-11, based on the Tier 4 materials we were provided and the expectation that the final phase would be completed during the IMR-12 reporting period.  It is important to note that by that same time, APD had not achieved Secondary Compliance with Paragraphs 86-88 until IMR-11. Numerous other CASA paragraphs related to the use, reporting, supervision, and investigation of uses of force remained operationally non-compliant.  All those additional paragraphs were in jeopardy of losing Secondary Compliance if APD failed to follow through with its training obligations.  Again, the monitoring team communicated this issue to APD on more than one occasion, especially in light of events that were affecting the agency related to COVID.[77]

During our June 2020 virtual site visit, we again met with the Academy staff responsible for the tasks associated with Paragraphs 86 – 88.  At that time, the Academy still expected that Tier 4 could be started and delivered to the department before the end of the IMR-12 reporting period.  APD was unable to meet that expectation.  We cautioned APD, at the time, that in spite of external factors impacting the department, nothing had been presented to the monitoring team to call out issues with completing Tier 4 or its 2020 annual use of force training requirements.[78]  The monitoring team was particularly vocal about its concern since Secondary Compliance with Paragraphs 86-88 was linked to several other CASA paragraphs. We stressed the importance of addressing this potential issue as soon as possible.  If there were alternate approaches to training that could be presented to the monitoring team to be assessed, we were willing to entertain a cogent plan.

While there is some overlap of topics between the Tiered training and 2020 annual use of force training requirements, it was obvious in June 2020 that APD had been so hyper focused on completing Tier 4 training, the Academy did not contemplate their 2020 annual training requirements.  The monitoring team expressed its understanding of the issues facing the department as a consequence of the pandemic, but the Academy did not appear to have even explored new options to address this requirement.[79]  We also

---

[77] An example is found on Page 159 of IMR-12 where we stated, "While issues related to the Pandemic certainly contributed to the lack of training, we identified significant gaps that should receive serious consideration in order to avoid causing a reversal to the progress APD has achieved relevant to sustaining Secondary Compliance for training practices."

[78] By June 2020, the country was dealing with instances of civil unrest following controversial uses of force by police agencies in other cities, and the Covid-19 pandemic.  In IMR-11 on Page 166 we recommended, "4.7.73-75a-c:  APD should produce a draft training-related covid-19 response document, identifying salient training-related problems-issues-needs-solutions (PINS) related to covid-19, viz a viz training-related issues."  That Recommendation was repeated in IMR-12 on Page 168 of IMR-12.

[79] We discussed this issue and provided our perspective on how APD can accomplish the task through different delivery methods.

reminded APD that efforts to complete the Tier 4 training did not absolve the department of its other annual use of force training requirements.  For most officers, by the end of IMR-13, it has been nearly two years since they attended Tier 1, and it will be over a year since Tiers 2 and 3 were attended by APD officers and supervisors.  It's reasonable to expect that those factors, coupled with the type of issues that were revealed in IMR-12, would create an extreme sense of urgency up through the Chief of Police to ensure training was addressed in an expedient and meaningful manner.  We have not observed that urgency to date.

During our December 2020 virtual site visit, we again met with Academy personnel responsible for the provisions of Paragraphs 86-88.  Mid-way through the IMR-13 reporting period, APD had terminated the Academy Director who had occupied that position for the previous two years.  We met staff members who were familiar with the use of force training requirements and had been present for our June 2020 conversations.  They were forthcoming with a self-assessment that they failed to accomplish their training requirements in 2020.  It was during this meeting we learned with certainty that APD would be incapable of delivering either Tier 4 or 2020 annual use of force curriculum before the close of IMR-13.[80]  In fact, it is likely that Tier 4 will not be completed before the end of IMR-14, which would be more than 18 months after it first received provisional approval.  Little more can be said to adequately describe the lost opportunity by APD.  This is a major blow to APD's compliance efforts related to training and almost certainly impact operations in the field.

During this reporting period, the monitoring team reviewed a training program entitled "Use of Force Response to Resistance Simulator Training" that was intended to be a short, 2-hour training session with APD's officers and supervisors.  The monitoring team found several issues with the content, testing mechanisms, and structure of the curriculum and scheduled a meeting with the Academy to gain perspective from the staff and provide technical assistance.  The Academy staff was receptive to the feedback, made adjustments, and resubmitted the training to the monitoring team.  In response, the Academy was provided minor additional comments on their remedies but received approval from the monitoring team to deliver the training.  Since that approval occurred on January 31, 2021, the outcomes of the training will be reported in IMR-14.

In January 2021, the monitoring team received another training program to review entitled "Foot Pursuit," which will be assessed in IMR-14 for CASA Paragraph 87h.  If APD simply adhered to its 7-Step Training Cycle and technical assistance provided in past training submissions, the issues we found with this course would be avoided.  Instead, this creates inefficiencies for the Academy and the monitoring team and delays what should be a reasonably simple topic to deliver.  By now, APD is aware that when assessing training, the monitoring team considers the likely effectiveness of the program since that impacts APD's operational compliance efforts.  An example of the type of issues we saw with this training includes the needs assessment and lesson plan dating back to early-mid 2019.  Since that time, a great number of issues have been

---

[80] We sensed significant frustration with the former Academy Director, Chief of Police and communication break downs across the organization.

encountered—and carefully documented in our monitoring reports-- so it is likely more contemporary needs exist that should be included in the training.  Alternatively, APD may have found there were not more contemporary needs and simply could have freshened the documentation to demonstrate they considered the many lessons that have been learned in the past 18 months.  Also, the lesson plan was initially meant to be 2 hours in length, but the monitoring team was presented a 15:46 in length video, in which the instructor quickly reads the lesson plan.  Remote learning is highly likely in the immediate and moderate terms, but this lesson plan (and the testing instrument) and video had all the appearance of "going through the motions" as opposed to teaching officers something valuable.  We have seen a much higher quality effort by APD in their video presentations, so it is not a question of capability.  We provided feedback and expect to report on this training program in IMR-14 once the curriculum is resubmitted to the monitoring team.  In the monitor's opinion, we are simply too far along in this compliance project to be finding these kinds of lapses in training practice.

Since the beginning of this project, APD has had unreasonable turnover in its leadership at the Academy.  Likewise, in our opinion, the decisions APD makes when choosing people to lead such an important function of the reform process have been poor.  We have often called out the importance of the position of Academy Director in the reform process, but time and again, APD chooses people to lead the academy who do not possess the requisite skill set to succeed, in particular in a CASA environment.  As one illustration, two of their choices have been dismissed entirely from the organization, including the last Academy Director (Terminated during the IMR-13 reporting period) who helped conceptualize the 4-Tiers of use of force training.  Another former Academy Director is now an Area Commander who, during IMR-13, was referred to IA for misconduct for failing to take appropriate action while sitting as a voting member of the Force Review Board.[81]

We have called out on numerous occasions in the past that developing training under the circumstances of the CASA requires true leadership and department level support, unlike traditional training approaches.  With the ultimate goal of positively affecting performance in the field, it is unlikely APD will succeed in that endeavor until the top executives embrace the need to establish excellence at the Academy Director position and support that person's efforts with the full weight of the Office of the Chief of Police and the Superintendent of Police Reform.  It starts by assigning someone as the training commander who has legitimate training credentials-- a person with a deep understanding of contemporary training systems and how training impacts performance in the field, and someone who can apply their knowledge in a department navigating its way through a cultural reform process.  If properly staffed and supported, the Academy will be better positioned for success.

We routinely call out that staff at the Academy are committed to their work, but routinely applying technical assistance provided by the monitoring team is still deficient.  At this point, commitment and will to succeed are not enough.  It is time for APD executives to

---

[81] We also note that use of force cases reviewed from this Commander's area of responsibility revealed significant deficiencies.

create an environment for success at the Academy and demand results.  At this point in the reform effort, we expect to see a better retention of the technical assistance the monitoring team has provided.  As noted in each of the last several IMR's, we see variable adherence to APD's 7-Step Training Cycle, which, when properly implemented, is specifically designed to provide a framework so the department will be capable of maintaining acceptable levels of professional training.  The 7-Step Cycle in action is not complicated when developing organization-wide training programs.  We commonly hear different commands referencing the 7-Step Cycle, which is encouraging to the monitoring team.  That said, APD's most significant struggle seems to reside in their comprehension of the basic principles of the system, including the ability to collect baseline data throughout the organization that calls out performance deficiencies and successes, properly aggregate and document specific needs that training must address, developing the training to address those needs, and then collecting field implementation data that can inform future training programs so proper adjustments can be made to future iterations of the curriculum.

We see evidence of information being shared with the Academy from outside commands, but the Academy still struggles to create its own pathways of collecting and collating information and then translating identified needs into specific training objectives.[82]  Over the course of this project, we have commented extensively on this point.  When developing training, APD must begin with the end in mind, with an eye on the specific behaviors or performance deficiencies they are attempting to influence.  As illustrated in the past, there are a plethora of performance gaps still occurring in the field that the academy can analyze.  Likewise, we have discussed a "training committee" and provided our perspective of what should be expected of the people who are liaisons with individual commands.  For IMR-13, we requested documentation related to training committee meetings, and having reviewed the data; our impression is that the formation of a relevant training committee does not exist in any meaningful manner. As noted in the past, a fully functioning training committee could be a good pathway to remediating performance issues in the field.  The monitoring team remains willing to help APD in this endeavor, but, quite frankly, the establishment of a legitimate training committee is painfully simple.  At this point, we are left with the impression that APD either does not understand the value of a training committee, does not believe in the value, or is being thwarted in its attempts to initiate it.

Frequently, in the past, the monitoring team cautioned APD regarding the importance of choosing skilled trainers in a number capable of meeting the organization-wide responsibilities and assigning an Academy leader who understood professional training operations.  We originally called this out as APD began to finalize new policies that would require training.  Since then, the Academy's workload continues to grow, and CASA training requirements are not being addressed.  We continue to stress the need for Academy staff to seek out and attend training courses focused on training

---

[82] The monitoring team has provided exhaustive guidance on curriculum development.  Basic tenets of training lesson plans should no longer exist, yet we continue to see issues.  We've commented in the past that properly constructed lesson plans and testing instruments are not simply administrative exercises and instead provide the framework to build officer competencies.

development and the measurement of performance outcomes.[83]  This type of continuing education will greatly benefit the whole organization and should not be confined to Academy staff alone.  Any command personnel responsible for curriculum development should receive advanced training in these areas. We were told that APD had advertised a position as a "Curriculum Development Manager" and that the selection process was still being finalized as of our December site visit.  Someone being hired from outside the organization, who is fully qualified in curriculum development, could be a positive influence on training materials the Academy produces.

APD's compliance standing for Paragraphs 86-88 has reverted to Primary Compliance until such time as the department delivers an up-to-date Tier 4 training and its 2021 annual use of force requirements for officers and supervisors.  The monitoring team remains committed to continuing its technical assistance to help guide APD toward success, but that guidance is without meaning if APD does not own the responsibilities themselves.  With a coordinated and concerted effort across APD commands and the leadership and support by APD executives, regaining Secondary Compliance is an achievable goal in 2021.  We cannot overemphasize the seriousness of this loss of CASA compliant processes at the Academy.

### 4.7.73 Assessing Compliance with Paragraph 86:  Review of Use of Force Policies and Training

Paragraph 86 stipulates:

> **"Within 36 months of the Operational Date, APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and provisions of this Agreement. APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy."**

**Results**

Primary:       **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not in Compliance**

### 4.7.74 Assessing Compliance with Paragraph 87:  Use of Force Training Based on Constitutional Principles

Paragraph 87 stipulates:

---

[83] We reiterate the need to audit external training programs first to ensure they meet the needs of the department and do not conflict with the CASA.

**"APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:**

**a) search and seizure law, including the Fourth Amendment and related law;**

**b) APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;**

**c) use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;**

**d)  use of de-escalation strategies;**

**e)  scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;**

**f)  deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;**

**g)  crowd control; and**

**h)   Initiating and disengaging foot pursuits."**

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

## 4.7.75 Assessing Compliance with Paragraph 88:  Annual Supervisory In-Service Training

Paragraph 88 stipulates:

**"Supervisors of all ranks, including those assigned to the Internal Affairs Division, as part of their initial and annual in-service supervisory training, shall receive additional training that includes: a)  conducting use of force investigations, including evaluating officer, subject, and witness credibility; b)  strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force; c)  incident management; and d)  supporting officers who report unreasonable or unreported force, or who are retaliated against for**

> using only reasonable force or attempting to prevent
> unreasonable force. "

## Results

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### Recommendations for Paragraphs 86-88

*4.7.73-75a: APD should immediately devise and implement a cogent plan to address use of force training requirements. Curriculum developed for Tier 4 and the annual use of force training should incorporate specific needs of officers and supervisors in the field.*

*4.7.73-75b: The Academy staff should be properly augmented to ensure the quality of training curriculum and training systems are not negatively impacted due to staffing shortages.*

*4.7.73-75c: APD Academy Staff should seek out and attend training courses focused on the proper development of training curriculum and how to connect that curriculum to the measurement of performance outcomes. Likewise, proper test question construction should be emphasized in Academy personnel's future training plans. The latter is a "critical path" issue.*

*4.7.73-75d:  APD personnel assigned to non-academy commands that carry significant training requirements should receive training commensurate with the Academy staff. This will ensure continuity in curriculum development across the organization.*

*4.7.73-75e: Ensure that the Academy is the central point for review and approval of all training development and delivery processes for APD.*

*4.7.73-75f: APD must properly supervise the delivery of training that is developed from outside sources before it is delivered to the department, regardless of its origin. Training programs should be developed based on best practices, APD policy and must adhere to the requirements of the CASA.*

*4.7.73-75g: APD must protect the training environment from lectures that may be perceived as inappropriate or are contrary to APD policy or the CASA. This is a critical path issue.*

## 4.7.76 Assessing Compliance with Paragraph 89:  Annual Firearms Training

Paragraph 89 stipulates:

**"Included in the use of force training set out above, APD shall deliver firearms training that comports with constitutional principles and APD policy to all officers within 12 months of the Operational Date and at least yearly thereafter. APD firearms training shall:**

**a)  require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms as necessary, on an annual basis;**

**b)  require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;**

**c) incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program; and**

**d) ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times."**

## Methodology

The methodology outlined in Paragraphs 17-20 serves as the baseline for compliance determinations for paragraph 89.

The 2020 Firearms Training cycle was completed during this reporting period, with 99.8% of active sworn personnel attending.  Standard operating procedure ensures that as members return to duty after an absence due to disability, military duty, FMLA, etc., they are immediately assigned to the Training Academy for Firearms Qualification and any other updates necessary for their return to duty.

APD is required to provide sufficient training courses to allow officers to gain proficiency and meet firearms qualification requirements.  During past site visits, members of the monitoring team attended firearms training.  APD Range Staff have added range hours to enable officers to practice firearms in both daylight and low-light environment. In reviewing data related to failures to qualify, firearms staff continue to document the referral to additional training for poorly performing shooters and have taken giant steps in automating the process with the modified Enterprise Learning Management database to capture data related to remedial qualifications.

With the completion of the required Firearms training cycle for 2020, APD should be commended for overcoming the delays and obstructions to completing the task during a time of severe restrictions due to a global pandemic.

**Results**

      Primary:      **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

### 4.7.73 - 4.7.75 Assessing Compliance with Paragraph 90-105: Management of Specialized Units, and accompanying paragraphs focused on the Special Operations Division.

Paragraphs 90-105 of the CASA address requirements that APD must meet related to management and supervision of functions inside the Special Operations Section (SOD) as follows:

      Paragraph 90: Management of Specialized Units;
      Paragraph 91: Composition of Specialized Tactical Units;
      Paragraph 92: Training of Specialized Tactical Units;
      Paragraph 93: Tactical Unit Missions and Policies;
      Paragraph 94: Tactical Units Policy and Procedure;
      Paragraph 95: Annual Review of Tactical Policies;
      Paragraph 96: Documentation of Tactical Activities;
      Paragraph 97: Tactical Mission Briefings;
      Paragraph 98: Tactical Uniforms;
      Paragraph 99: Force Review Board Assessments;
      Paragraph 100: Eligibility Requirements for Tactical Teams;
      Paragraph 101: Tactical Team Training;
      Paragraph 102: K9 Post Deployment Reviews;
      Paragraph 103: Tracking K9 Deployments;
      Paragraph 104: Tracking K9 Bite Ratios; and
      Paragraph 105: Analyzing Tactical Deployments.

As with other reporting periods, the monitoring team spent time providing perspective and feedback to APD's Special Operations Division (SOD) personnel and met with personnel responsible for the tasks associated with these paragraphs during our December 2020 virtual site visit.  SOD now has a Deputy Chief closely overseeing their operations, and a new Commander was assigned to the Division during the second half of the reporting period.  Our observation is that these moves occurred chiefly due to serious problems that were revealed with SOD uses of force during IMR-13 Force Review Board (FRB) meetings.  The FRB uncovered a force deployment technique SOD was using called a "layered response" that, as implemented, violated the CASA and APD policy.  We discuss the problems identified in greater detail below but note that APD self-identifying the issues and setting in motion remedial efforts are the key reasons Operational Compliance in certain paragraphs in this area of the CASA was not

affected.  While errors were made, APD's FRB noted these issues and took corrective action.  But for the (current) strong response by APD, SOD would likely have been taken out of Operational Compliance for IMR-13.  We have consistently encouraged APD to self-correct, and in this instance, they did exactly that—self-correcting before the monitoring team found the errors.

The monitor notes that APD previously had been failing to report uses of force related to chemical munitions and NFDDs during SOD deployments.  That failure had multiple causes, including a former executive leadership team that demonstrated an apathy toward compliance.  In that particular instance, the issue revealed by the monitoring team caused use of force data to be incorrect and left numerous uses of force unreported and not investigated in accordance with the CASA.  After months of review, APD finally adjusted its practices with respect to reporting and investigating those uses of force.  That said, there have now been two significant issues with SOD in the past three years.  It will be incumbent upon the top echelon of APD to supervise SOD more closely, as will the monitoring team, to ensure they are adjusting practices appropriately.  As noted above, a failure to do so will carry consequences for Operational Compliance with certain CASA paragraphs related to SOD.

The following paragraphs represent our findings related to Paragraphs 90-105.

The increase in quality of reviews by the FRB during the IMR-13 reporting period (discussed in greater detail in Paragraph 78) was exemplified when it revealed a force deployment technique used by the Special Operations Division (SOD) called a "layered response."  In short, a "layered response" is a pre-planned, coordinated, and simultaneous deployment of multiple force options without the independent assessment of the effectiveness of each use of force.  Notwithstanding rare instances where such a technique may be objectively reasonable, and within APD policy and the requirements of the CASA, as implemented by SOD, the FRB determined SOD was violating APD policy.  The monitoring team attended FRB meetings where these cases were discussed and agrees with the assessment of the FRB.  Parenthetically, we see this as a watershed moment for APD.  Self-analysis and self-correction are processes we have long encouraged at APD, and it appears these are processes that are taking hold in some units.

In several instances, the FRB made recommendations for Internal Affairs investigations and began to examine the genesis of the technique within SOD.  The fact that the FRB was first to identify this issue is an important moment in time for APD.  Typically, the monitoring team or DOJ has been first to identify such issues. Now having a member of APD command staff self-identify, address, and remediate such an important issue is exactly the type of activity the CASA is attempting to entice.  It should be emulated by other commands at APD.  That said, the underlying uses of force were highly problematic and occurred in more than one instance.  In one instance that occurred in February 2020 (heard by the FRB in November 2020), the subject of the force was a 65-year-old woman suffering from mental illness who had reportedly threatened her boyfriend with a knife.  After a lengthy standoff with officers stationed outside her

residence, she exited.  She was a distance from the officers and not exhibiting threatening or aggressive behaviors at the time SOD deployed a "layered response." SOD simultaneously deployed a 40mm beanbag round and K9.  The FRB determined the force was not objectively reasonable and was unjustified and subsequently initiated an internal affairs investigation.  The monitoring team agreed with the IAFD assessment of the case.  IAFD presented the case to the FRB and did not note a single policy, training, supervision, or tactical issues with the case (Case IMR-13-12).  We recognize the importance of the FRB identifying this issue, and APD's current response to remediate the issue contributed heavily to SOD retaining Operational Compliance, with the provision noted above.  We do note, parenthetically, that remedial measures should have been taken within IAFD for this critical oversight during the following reporting period.  We will assess these actions, or the lack thereof, in IMR-14.

The "layered response" emerged as an issue in several SOD deployment cases that the FRB reviewed during IMR-13, where they observed the simultaneous uses of a 40mm, less-lethal shotgun and release of a K9 on individuals that were not within policy.[84]   The FRB noted instances in which insufficient cause existed to use a "layered response" and that people were not being given the opportunity to respond to the 40mm because, within seconds, the K9 was upon them since it was released simultaneously with the 40mm.  FRB executives commented openly and affirmatively, stating they did not believe the justification for that force existed where a "layered response" was used.  This type of critical analysis has not been observed in the past but was evident during more recent FRB meetings, particularly in the second half of the reporting period.  These findings set in motion a series of events by APD to address the issues they uncovered, including reassigning the SOD Commander, convening meetings with SOD personnel, initiating internal affairs investigations, and disciplining officers who improperly used force.  The monitoring team has been proactively contacted and regularly updated by APD on the status of efforts to remediate the issues within SOD.  We also learned that they are now dealing with a reduced sense of morale in SOD and officers wanting to transfer out of the Division, which has stressed SOD operations.  We urge APD to stand its ground on these issues.  Officers unhappy with policy and operational procedures are no reason for an immediate, unconsidered change to policy: the CASA is controlling.

In each instance, an internal affairs case was initiated against the officers involved, and discipline is now pending.  The K9 officer involved, and Commander of SOD, have both been moved from SOD.

The monitoring team was provided a comprehensive and well-thought-through report entitled "Special Operations Tactical Threat Assessment and Force Deployment

---

[84] We recognize that, as implemented, this technique was flawed but essentially endorsed by the Commander of SOD at the time.  Had there been proper oversight and had use of force investigations been completed and presented to the FRB in a timely manner this issue may have been remediated sooner, and the officers' actions would have been adjusted before multiple disciplinary matters were initiated.  This does not absolve officers from adhering to APD policies that are in place but demonstrates how the convergence of officer and organizational problems can result in bad outcomes for everyone.

Analysis."  Likewise, the Deputy Chief and Commander now responsible for SOD assembled training records in an attempt to cast a light on where this "layered response" technique originated within SOD (and provided those records to the monitoring team as well).[85]  Following several conversations on this issue with the Deputy Chief and Commander, we are confident they are personally overseeing the remediation of the issue and organizing SOD efforts to establish guidelines for when a "layered response" may be necessary.[86]

Building upon observations made in past Monitor's reports, SOD will now require an "overt action" on the part of a subject before force is used, particularly regarding "target glancing."  Among several other steps of remediation, in their Plan of Action, SOD has instituted the following:

> "The Tactical Section shall not use force for the sole purpose of preventing an individual's predicted action as the result of "target glancing." An overt action following the physical cue of "target glancing" will be required to justify APD's Standard Operating Procedures (SOP) concerning the deployment of force against someone who is an immediate threat or actively resisting."[87] (page 6); and

> "Multiple simultaneous force deployments are permitted only under exceptional circumstances…"[88] (page 8).

The use of SOD K9s emerged as an issue of concern during IMR-13 by APD (by way of FRB observations), DOJ, and the monitoring team, beyond only the "layered response." A sharp example was a February 15, 2020 Level 3 use of force that the FRB did not hear until November 12, 2020 (Case IMR-13-13).  Officers responded to a 911 hang-up call at a residence and, after arriving, encountered a female subject that appeared to be battered.  There were two structures on the property, later found to be connected by a crawl space.  Additional investigation revealed a male subject in one of the residential structures had two felony warrants for his arrest.  When he refused to exit the house, a perimeter was set up, and public safety announcements (PSAs) commenced to entice the male subject to exit the house.  The PSAs continued for several hours without

---

[85] The training materials we reviewed failed to demonstrate a clear connection to the "layered response" as implemented by SOD.  However, the materials were provided by APD as a representation of where they best believed the concept originated.

[86] As noted earlier, the Deputy Chief and Commander who now oversee SOD have shared their efforts and sought advice from the monitoring team on several occasions.

[87] We have expressed concern with the use of "target glancing" as a justification for force in other areas of the organization.  We will discuss with APD if this type of guidance will be provided to the Academy for training all APD officers, and whether an adjustment will be made to wider use of force policies.

[88] "Layered response" is distinguished from other types of events in which multiple force options are deployed.  Instances can occur in which officers from multiple positions or vantage points react, without pre-planning, to a subject's actions.  Likewise, an emerging need to use force commonly occurs when officers are hands-on with a subject and have to resort to other types of force that do not constitute a "layered response."  "Layered response" is also distinguished from a force array, the latter of which is meant to provide different force options that are on stand-by in volatile situations.

success, and eventually, the homeowner allowed officers access to the primary residence.  A male and female subject were located in the crawl space, which was flooded with water prior to the officers' arrival.  The female subject surrendered and exited the crawl space, but the male subject refused to come out.  A PSD was released into the crawl space, and the subject sustained serious bite injuries over the course of approximately seven minutes.  The FRB closely scrutinized this case and questioned the justification for releasing the PSD into the crawl space as opposed to allowing more time since they knew where the subject was located.[89]  The case was also criticized because there was no apparent plan to take the subject into custody once he was located by the PSD and the fact that the subject was located within a confined, water-filled space.  The crawl space reportedly had obstacles that would have made it difficult to extract the suspect if he refused to exit even after being contacted by the PSD.  As it was, the PSD did locate the subject and maintained a bite on the subject while efforts were made to get the subject out of the crawl space.  The injuries sustained by the suspect were significant. Following the FRB, the incident was referred to IAPS for investigation of misconduct on the part of the PSD sergeant related to the uses of force.

At the latter part of IMR-13, the Deputy Chief and Commander now overseeing SOD have been interacting with DOJ and the monitoring team regarding SOD's use of PSDs and attempting to identify best practices from other like agencies that they can evaluate. In the intervening time, measures are being taken to reassign SOD personnel, adjusting practices, and training new PSD handlers to be assigned to SOD.  Frankly, better supervision, using APD's current use of force policies, and applying common sense would have likely guided SOD away from a decision to release the K9 into the crawl space in the manner it was in that moment.  As with all exigent police operations, fighting "tunnel vision" is essential in SOD operations.

During IMR-14, the monitoring team will assess how these findings are inculcated into policy and then developed into training that supports the intent of the SOD "Special Operations Tactical Threat Assessment and Force Deployment Analysis" report.  We will also continue to provide technical assistance to SOD as they address decision-making by PSD handlers during calls for assistance.  In past monitor reports, we cautioned SOD not to be complacent due to its previous Operational Compliance standing and to ensure close supervision of deployments occurred.  Their concern needed to be focused on how SOD's (potentially unjustified) actions could impact compliance efforts elsewhere in the CASA, with regard to use, reporting, and investigations of force.  The examples provided of "layered response" and problematic uses of PSDs are exactly the type of situations about which we were concerned.

As we reported in previous monitor reports, SOD officers and civilian staff established administrative business processes that help them sustain Operational Compliance, and we found that continuity of information in the Division has remained stable during this reporting period.  That said, the new Commander is refining those administrative systems to better capture and report SOD data.  In the past, we have commented on

[89] Similar scrutiny of the PSD Sergeant's decision-making was documented in a November 12, 2020 memorandum prepared by the (then) SOD Commander.

the need for strong systems and policies across APD since they help ensure that reform efforts are not impacted as a consequence of Command level changes.  From the outset of the CASA, we stressed the importance of selecting Commanders for SOD who have demonstrated mature, sophisticated thought processes and people who respect the reform that has been achieved.  Many SOD deployments provide opportunities to slow events and be more contemplative when making decisions. That is why poor decisions become amplified since the supervisors who may authorize questionable force options are seldom corrected by the agency.  This is not meant to deny the good work SOD has done in the past or the volatile situations they many times are called upon to address.  Notwithstanding recent transfers related to SOD, APD has generally attempted to make good command-level selections, and in our opinion, that has served them well in retaining operational compliance.[90]

In past Monitor reports, APD's SWAT has been commended for the quality of their activations and the After-Action Reports (AAR) they generate.  SOD reports have always shown significant detail, and readers can easily follow and understand the sequence of their movements and decisions during events.  For this reporting period, the monitoring team was provided seventy (70) SOD AARs resulting from tactical activations, some of which were centered on First Amendment gatherings.  The Field Services Bureau prepared an additional three AARs.  The quality of AARs continued to be good during the IMR-13 reporting period, and SOD continues to document (in great detail) the thought processes a supervisor goes through when decisions are made.  We also noted that in January 2021 (the last month of the reporting period), AAR's now include "Tactical Activation Packet" and "Tactical Assist" cover sheets to capture standardize administrative timelines and ensure relevant documentation has been added to case files and digitally scanned.[91]  We want to note observations and provide the following feedback for the AARs and Pre-Operational Plans we reviewed:[92]

1. We reiterate here that with IAFD taking a greater responsibility to investigate uses of force associated with tactical activations, SOD should ensure that IAFD receives final versions of AARs as a part of their investigation.  We saw instances where AARs received final approvals months following an event.[93]  Because AARs are typically prepared by

---

[90] The monitoring team shares the concern of the Deputy Chief and current SOD Commander that the outgoing SOD Commander failed to self-identify issues with the "layered response" and PSD deployments discussed in this report.  That said, APD command and executive leadership shares responsibility because cases heard by the FRB should be much more contemporaneous to events, not 9-12 months after an event.  If FRB had been more effective elsewhere the department, APD would have been in a position to change behaviors much earlier.

[91] Similar cover sheets were created for deployments for First Amendment Assemblies and Pre-Planned Activations.  The current SOD Commander conducted a briefing with SOD to go over SOD policy and other relevant Division issues, including these cover sheets in January 2021.

[92] We also recommend that the current SOD Commander reflect on observations that are called out in past Monitor reports.

[93] We reviewed memorandums prepared by the Deputy Chief to the Chief of police regarding five AARs that were not reviewed and approved by the previous SOD Commander prior to his reassignment.  The Deputy Chief documented that when asked to review the AARs the previous SOD Commander, who is

SOD lieutenants and commanders, the volume of call-outs and the length and detail in the average AAR, we are not surprised with the delay. We mention the timeliness because the AAR is an important component of comprehensive use of force investigation, and IAFD should have access to the AAR at the earliest point possible. Likewise, delays with K9 reviews following uses of force need to be timely and should be provided to IAFD. Otherwise, inconsistencies and gaps of information may arise between two commands when documenting actions for the same event. With APD exploring the use of an External Force Investigation Team (EFIT), this will become even more critical to the collective success of APD.

2. During the IMR-12 reporting period, APD promulgated Special Order (SO) 20-16 on February 24, 2020, which was amended on June 1, 2020, entitled "Incidents requiring an After-Action Review by Field Services Bureau Personnel." The SO required FSB incident commanders to prepare After Action Reports for the following events:

   a. Tactical activations;
   b. Response to individuals in crisis and are threatening to jump from an elevated position such as a bridge or a building;
   c. Response to an active shooter; and
   d. Any other significant event at the request of the area commander or responding specialized unit's division commander.

The After-Action Report's listed purpose is to provide feedback to FSB supervisors and specialized units regarding trends and areas of improvement. The monitoring team was provided and reviewed one (1) AAR prepared by the Field Service Bureau. The AAR was directed to the SOD Commander for his review and approval. As more of these types of AARs become available, we will assess the value and efficacy of the AARs completed by the Field Services Bureau and any feedback SOD is providing them regarding the documentation.

In IMR-13, we called out the fact that a separate issue was identified following protest deployments relating to the proper timelines for reporting and documenting uses of force. The police department handled numerous protests in short periods of time, with IAFD responding to investigate accompanying uses of force. We learned there was "substantial disagreement" between commands as to the proper timelines to apply for use of force reporting during protests. We noted that balancing the need for timely use of force investigations with chaotic emerging events will require the department to consider the relevant issues, devise a proper response to those issues and advance their proposal to the Monitor for consideration.[94]  In a January 10, 2021 memorandum

---

now an FSB Area Commander, refused. The Deputy Chief reviewed and approved the AARs and initiated internal affairs complaints against the previous SOD Commander.

[94] For instance, APD should be considering how IAFD will follow up investigations of incidents in which an officer uses a type of force, but the person(s) on which the force was used run from the scene or are

entitled, "Emergency Response Team – ERT/SOD/IAFD Coordination," APD documented its acknowledgment of the issue and the intention to advance recommendations for SOP revisions.  We appreciate that APD is attempting to address this important issue and encourage them not to allow the effort to carry too far into the future before advancing a proposed policy change to the monitor and the Parties for consideration.  In the past, even when APD acknowledges such issues, it takes elongated periods of time for them to implement new initiatives that should be simple.

The January 10, 2021 memo we reviewed addressed other topics of concern the monitoring team called out in IMR-12 regarding the coordination of effort between SOD and ERT during events.  APD has documented the start of a training plan and is in the 7 Step Training Cycle's early stages while attempting to create cross-training between the two units.  We noted these items to help APD avoid issues in the future, and the memo we reviewed demonstrated APD is taking cognizance of our feedback.  We will follow up on these items during IMR-14 to determine if ERT is continuing to remediate the issues.  We note that these issues were initially called out internally by SOD and not the monitoring team, so we would expect an even greater sense of urgency to get them resolved.

The monitoring team previously reviewed documentation for the delivery of organization-wide training on the proper use of the SOD Risk Assessment Matrix (RAM) and approved it being delivered to the department.  SID consults with SOD for specific types of search warrants and is required to fill out a Risk Assessment Matrix (RAM)[95] to determine if they are required to call out SOD.  During the IMR-10 reporting period, we noted that APD unearthed an important issue that required a resolution when the SID Commander disagreed with SOD's opinion of a particular RAM score.  SOD and SID worked together and developed protocols to reconcile this type of event should it occur in the future.  SOD established a "RAM Audit Remediation Process" that was approved by the agency.  If there is a discrepancy found during a RAM audit, and the affected unit Commander disagrees with the finding, that Commander will document their position and forward it through the chain of command.  SOD will make the final decision.

On August 12, 2020, SOD provided an audit memorandum citing one "seriously deficient" RAM and how the search warrant risk profile was incorrectly scored by a SID detective.  It appears that in the change of SID Commanders, the response to the memo carried past the given timeline.  The issue centered on information that was provided by a confidential informant and whether that information "confirmed" a suspect was armed with a firearm.  The detective, in the opinion of SOD, failed to properly apply the scoring criteria, and the SID Commander disagreed.  In a November 4, 2020

---

dispersed through other types of force.  The monitoring team has not been provided with a proposal on how that circumstance should be handled, or proposed policy revisions outlining the expectations of IAFD under those circumstances.  Having this linger may create burdens on IAFD that may be otherwise resolved among the parties.

[95] There are pre-set and scored categories APD units must consider when filling out a RAM, and a score of 25 or more requires a SOD call out.  Units are also required to append proofs that they made inquiries for specific risk categories (i.e. An assessment as to whether the suspect has a violent history requires criminal histories to be attached).

memorandum, the SID Commander drew a distinction between information that was "told" to a detective and information that is "confirmed" by a detective.  The purpose of the RAM Audit Remediation Process was to provide a method of closing the loop on such disagreements. Still, we see no such reconciliation in the information we were provided.  While both commands continued a healthy written dialogue, simply documenting their positions fails to bring the issue to a conclusion.  Additionally, the SID commander called out a potentially bad question on the RAM, one that could be misinterpreted, and we agree.  To their credit, SID addressed the issue with the detective in the normal course of business through counseling and provided a remediation plan that included obtaining video versions of the RAM training to be uploaded and provided to SID.   We will follow up on this with both SID and SOD during the IMR-14 reporting period.

The monitoring team reviewed SOD audits of SID RAM records and observed the SOD RAM audit reports continue to be a routine business practice.  It is clear that APD implementing these audits is valuable for long-term sustainability and helps ensure that problems can be quickly self-identified.  This type of internal oversight and response between SID and SOD is indicative of a system that has taken hold and can be relied upon in the future.  SOD RAM Audits summarize an event and include the documentation that was reviewed by the auditor, provides audit findings, and also notes areas for improvement.

The monitoring team reviewed SOD records related to selecting APD personnel into the unit and found those records to be sufficient.  During the IMR-12 reporting period, we learned that SOD was in the process of expanding the use of handbooks.  We recommend the new SOD Commander review the handbooks for each of the SOD units and ensure they are current to issues that have been identified.  The onboarding of SOD personnel includes on the job training that should include the preemptive addressing of those issues to ensure there are no residual effects of past practices the FRB found to be problematic.  Records we reviewed for IMR-13 included Department Personnel Circulars with job descriptions, Transfer Orders, and Unit Handbooks for SWAT, K9, and the Bomb Unit.   SOD continues to maintain strong records that track the selection process from the posting of an opening through the selection of an officer for assignment to SOD.

We reviewed internal SOD training records for the SWAT, K9, and Bomb Units.  In the past, we recommended SOD review its lesson plans and enhance them to reflect new Academy standards.[96]  In the past, the monitoring team has cautioned APD about

---

[96] During the IMR-13 reporting period we were provided a lesson plan for a course entitled, "Tactics and Techniques for Search Warrant Service", and APD requested the lesson plan be reviewed for Monitor approval.  The monitoring team provided feedback in July 2020 but have not been provided with an updated copy of the training for review.  The purpose of the training was to provide basic skills for investigative personnel when executing a search warrant.  We have noted many times in the past that distinguishing the threat level between a RAM score of 24 and 25 is a grey area and APD may prefer to have SOD execute a warrant even when a RAM score is below the scoring threshold.  We have had discussions with the current SID Commander, and we believe he shares our opinion.  We will follow up with APD in IMR-14.

training programs their personnel attends that are hosted by third party vendors and the potential risk that is associated with APD officers receiving training that may be inconsistent with their policies or the CASA.  We reviewed training materials provided by an outside source that APD believed may be the genesis of the "layered response" technique detailed earlier.  We have repeatedly recommended that close scrutiny be given to such operations. Those recommendations have fallen on deaf ears.

Attending outside training provides legitimate opportunities to keep up on new techniques and best practices in a particular law enforcement discipline. However, when opportunities present themselves for SOD to attend outside training, we again recommend that it be a person of supervisory rank who then compares the curriculum against APD policy and the CASA before committing additional officers to the training. This will put APD in a better position to avoid issues and fewer people that have to be counseled following training to ensure they do not purposely or inadvertently implement problematic practices.  We also recommend that the new SOD Commander conduct an audit of all routine training that is conducted to ensure other issues inconsistent with APD policy do not exist.[97]  The training SOD conducts at the Division level includes a standardized form that included goals, objectives, and measures for training they provide, but the lack of detail for these routine training sessions can provide an environment for problematic concepts to be inserted.  (P91-92; 101).  Greater clarity and a more robust APD review are called for.

Based on our review of the existing SOD policy requirements and other related documentation, we determined that SOD remains in Operational Compliance with respect to tactical unit missions and policies and annual reviews of policies. (P93–95; 100).  That said, we will look to see what adjustments are made, either directly within SOPs or through Special Orders, that address the issues APD uncovered during IMR-13.  During the IMR-12 reporting period, SOD revised SOP 1-92, "Specialized Tactical Units" (Formerly 6-8), effective July 9, 2020.  The work prepared by the SOD Commander took nearly all recommendations made by the monitoring team.  Ironically, the only pending concern the monitoring had pertained to ambiguous wording in the policy related to the type and length of training supervisors and commanders within SOD must attend.  We noted that, as presented, supervisors and commanders are able to attend programs of different lengths, topics, and quality.  In response to our recommendation that the training contains more specific criteria and be linked to a national organization, like the NTOA, APD inserted language that SOD supervisors and commanders would have to attend a "nationally recognized" training course.  We still feel that is still too ambiguous and will likely create issues for SOD in the future.  This is exactly the type of training disparity we are hoping to guide APD away from with all training.  The monitoring team also reviewed SOD handbooks prepared during IMR-13, which demonstrated that SOD is continuing the routine "onboarding" practice established by previous Commanders.  We repeat here the need for the new SOD

---

[97] SOD can reflect on advice given in past IMRs not only in this series of paragraphs but in Paragraphs 86-88.  We worked with SOD throughout the IMR-13 reporting period to provide additional technical assistance to the new Commander.

Commander to review the onboarding documentation to ensure it reflects recent lessons learned.

We also reviewed Monthly Inspection Reports that were completed for the months of August 2020 through January 2021 and determined that SOD continues to capture information regarding uniform cleanliness and completeness, equipment, as well as proper identification markings, and whether an officer's Taser video recorder is working properly.  (P98)

APD resumed conducting Force Review Board (FRB) sessions related to SOD Tactical Deployments during IMR-11, and regular hearings of SOD cases have occurred throughout the IMR-13 reporting period.  Historically, SOD tracked their activations closely and ensured the cases were presented to the FRB.  With FRB backlogs growing exponentially worse, SOD may want to consider alternate, intermediate methods of reviewing cases internally to self-identify issues in a more timely manner.  This review could come in many forms, and this recommendation is not meant to absolve APD of the responsibilities of the FRB with respect to reviews of tactical activations and force that accompanies those events.  However, it is reasonably predictable that the FRB will be behind reviewing cases for the foreseeable future, so a proactive approach will be to the benefit of APD generally, and SOD specifically, in terms of maintaining its compliance standing.  Tardy incident reviews and assessments expose APD to liability.

In the past, we commented that the scope of review by the FRB of SOD tactical activations was too narrow when cases have an accompanying use of force, and a full analysis of protocols and policy, training, equipment, or tactical concerns may not be possible without a comprehensive review that includes the use of force at the same time.[98]  The presentations provided by SOD of tactical activations are comprehensive, but the conversation is stunted in cases of use of force.  Generally, the presentation is a retelling of the circumstances that led to the activation, when certain events occurred during an event, and the thought process behind Commander decisions on the scene at the time.  During the IMR-13 reporting period, members of the monitoring team sat in on a virtual session of the FRB and the presentation of a SOD tactical activation with an accompanying use of force.  The FRB finally recognized the gap in information that existed when the tactical activation and accompanying use of force are not heard together, and we saw a more robust conversation about the given cases.  It is our understanding that the two elements of SOD activations will be heard together moving forward.

SOD tracks deployments through their Activation Data Reports, and we reviewed records that capture the year 2020 FRB presentations by SOD, meeting agendas, and

---

[98] Historically, SOD uses of force were not discussed in any detail during the tactical presentations.  If there was an accompanying use of force with a case, that element of the activation would only be presented and scrutinized by the FRB if that specific case was picked during a 10% random sample or if it included a serious use of force that would be presented to IAFD.  In our opinion, this contributed to SOD's use of a "layered response" to not be identified earlier.

referrals.  We will continue to assess how current SOD tactical activation cases are being reviewed by the FRB in the IMR-14 reporting period.  (P99)

For IMR-13, we reviewed Annual Assessment Reports that were completed for each SOD unit. We also examined examples of Performance Work Plans for officers and found that SOD completed Annual Assessments for its personnel.  We find Performance Work Plans to be poorly structured, but this is not a product of SOD, but instead the platform APD use.  We encourage APD to look deeper at Division and Unit level policy provisions to ensure their personnel are being assessed by correlating predetermined criteria.

APD continues to track canine deployments and bite ratios consistent with monitor approved methodology.  The monitoring team reviewed canine Bite Ratio reports and tracking ledgers documenting SOD canine handlers and canine bite ratios for this reporting period.  During the year 2020, one canine handler was reported as having a bite ratio that exceeded 20% in seven out of 12 months (on a six-month rolling average).  We first documented the issue with bite ratios with this canine team in IMR-11, and as it turns out, this K9 team was also involved in problematic cases related to "layered response" uncovered by the FRB (noted earlier). The monitoring team reviewed supervisory Interoffice Memorandums that documented the reviews of the data and interviews with the K-9 handler from August 2020.  The SOD Commander reviewed materials related to the K9 team, conducted reviews with the handler, and determined that the bite ratios were not problematic and that the K-9 uses were within APD policy.  In IMR-12 (prior to the FRB revealing "layered responses" as an issue), we recommended that APD monitor this K9 team's activities carefully to not place the organization or the K-9 team into a precarious situation.  Deficient reviews of use of force incidents by direct supervisors and Commanders do more than miss opportunities to counsel an officer and have the effect of tacitly endorsing poor performance across an entire Division.

As noted elsewhere, as a consequence of more thorough reviews being conducted by the FRB, this K9 handler was found to have been out of policy with uses of force and is no longer assigned to SOD. For bite ratios and reviews of those bite ratios to be meaningful, SOD cannot conduct *pro forma* reviews of K9 team deployments.  The new Commander must set and maintain superior standards and become immersed in SOP and CASA provisions relevant to use of force and how it corresponds to K9 deployments and correct errant behaviors more contemporaneous to an event.  The monitoring team will spend additional time in this area during the IMR-14 reporting period to assess how SOD is adjusting its approach to K9 assessments when a handler's bite ratio exceeds 20% for a given period of time.

The monitoring team reviewed SOD Tactical Unit Deployment Tracking Sheets for the reporting period.  APD continues to monitor and analyze the number, type, and characteristics of deployments and states a clear reason for each tactical deployment, as well as the number of arrestees in each deployment. (P102 - P105)

Based on concerns we have documented in IMR-13, we reiterate the importance of SOD remaining vigilant with its self-assessments and ensure it collaborates closely with IAFD in terms of use of force reporting, so SOD is not the source of non-compliance determinations for other CASA paragraphs in the future.  The consequence will be clear in future assessments of SOD compliance determinations if APD does not follow through.  While recent events have impacted morale within SOD, the Division Commander, Assistant Commander, and Deputy Chief overseeing SOD are demonstrating a commitment to remediating issues that they encounter and are demonstrating a positive attitude toward CASA compliance.  Likewise, they are making efforts to ensure the attitudes of officers within SOD remain positive as adjustments are made.  We have determined Operational Compliance should be continued for Paragraphs 90 through 105 but will closely monitoring SOD's actions throughout IMR-14.

### 4.7.77 Assessing Compliance with Paragraph 90:  Management of Specialized Units

Paragraph 90 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances, provides for effective command-level accountability, and ensures force is used in strict compliance with applicable law, best practices, and this Agreement. To achieve these outcomes, APD shall implement the requirements set out below."**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.78 Assessing Compliance with Paragraph 91:  Composition of Specialized Tactical Units

Paragraph 91 stipulates:

> **"APD's specialized tactical units shall be comprised of law enforcement officers who are selected, trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units. The specialized tactical units shall consist of SWAT,**

153

**Canine, and Bomb Squad/EOD."**

## Methodology

The below listed material was reviewed by the monitoring team. The material examined is data required for APD to maintain compliance with paragraph 91 for the reporting period (August 1, 2021, thru January 31, 2021), in the forms of policy, programs, and results. As in the previous IMR period, due to the COVID-19 Pandemic, training was modified to ensure the proper safety measures. Training was delivered in smaller groups while maintaining the requirements of the CASA to ensure the best safety and success on activations.

Specialized Weapons and Tactics:

- Containment;
- Rescue;
- Command and Control;
- Apprehension:
- Weapons Proficiency;
- Use of Force;
- Crisis Intervention;
- Defensive Tactics.

Bomb Squad:

- Render Safe Procedures;
- CBRNE Event;
- Disposal Operations;
- Tactical Support;
- IED Concepts;
- Weapons Proficiency;
- Equipment Proficiency;
- Explosives Familiarity.

K9 Unit:

- Containment;
- Rescue;
- Command and Control;
- Apprehension:
- Weapons Proficiency;
- Use of Force;
- Crisis Intervention;
- Defensive Tactics;

- Obedience;
- Building Searches.

Joint SWAT Training (Bomb, Swat, and K9) was also conducted throughout this reporting period, encompassing all aspects of operational functions. SOD's documentation on all training continues to be well documented in their monthly reports with detailed aspects of all training received by the unit. SOD supplied the monitoring team with the ledgers for each month detailing the training information (date, location, overview) the unit receiving the training (swat, bomb, K9) and operational functions trained (containment, rescue, command, and control, etc.) as well as joint training ledgers.

This reporting period, we received and reviewed the "SWAT Officer Field Training and Evaluation Program SWAT Manual" for individuals in the process of completing the program. The progress of these individuals in the training program will continue to be assessed by the monitoring team during the next reporting period.

**Results**

　　　Primary:　　**In Compliance**
　　　Secondary:　**In Compliance**
　　　Operational:　**In Compliance**

**4.7.79 Assessing Compliance with Paragraph 92:  Training of Specialized Tactical Units**

Paragraph 92 stipulates:

> **"APD shall ensure that specialized tactical units are sufficiently trained to complete the following basic operational functions: Command and Control; Containment; and Entry, Apprehension, and Rescue."**

**Methodology**

APD provided COB data, contemporaneous Special Operations Division Tactical Section training sheets for their SWAT Unit, Bomb Squad, and K9 Unit that displays training by officer, by unit, and by operational function trained that correspond to the requirements of the paragraph. SOD's documentation of all training continues to be well documented on their monthly reports with detailed aspects of all training received by the unit. SOD supplied the monitoring team with the ledgers for each month, detailing the training information (date, location, overview) the unit receiving the training (swat, bomb, K9), and operational functions trained (containment, rescue, command, and control, etc.) as well as joint training ledgers.

**Results**

> Primary:  **In Compliance**
> Secondary:  **In Compliance**
> Operational:  **In Compliance**

## 4.7.80 Assessing Compliance with Paragraph 93:  Tactical Unit Missions and Policies

Paragraph 93 stipulates:

> **"Each specialized tactical unit shall have clearly defined missions and duties. Each specialized tactical unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

**Results**

> Primary:  **In Compliance**
> Secondary:  **In Compliance**
> Operational:  **In Compliance**

## 4.7.81 Assessing Compliance with Paragraph 94:  Tactical Units Policy and Procedure

Paragraph 94 stipulates:

**"APD policies and procedures on specialized tactical units shall include the following topics:**

> **a) Team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility;**
> **b) Coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed;**
> **c) Personnel selection and retention criteria and mandated physical and tactical competency of team members, team leaders, and unit commanders;**
> **d) Training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training;**
> **e) Equipment appropriation, maintenance, care, and inventory;**

**f) Activation and deployment protocols, including when to notify and request additional services;**
**g) Conducting threat assessments to determine the appropriate responses and necessary resources;**
**h) Command and control issues, including a clearly defined command structure; and**
**i) Documented after-action reviews and reports."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.82 Assessing Compliance with Paragraph 95:  Annual Review of Tactical Policies

**"The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually, and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.83 Assessing Compliance with Paragraph 96:  Documentation of Tactical Activities

Paragraph 96 stipulates:

**"In addition to Use of Force Reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations. After-action reports shall address any areas of concern related to policy, training, equipment, or tactics."**

## Methodology

The monitoring team was provided COB documentation for this reporting period (August 1, 2020, through January 31, 2021). The documentation reviewed by the monitoring team consisted of thirty (30) After Action Reports and four (4) Operational Plans.

157

The monitoring team reviewed the After-Action Reports and Operational Plans for compliance with the CASA provisions of this paragraph. As with all documentation supplied by SOD, the information contained within the reports prepared is a detailed synopsis of their involvement in the events, and the deployment is analyzed for policy, training, equipment, and tactical issues/concerns. The review of the After-Action Reports Based for concerns related to Policy, Training, Equipment, and Tactics were all negative for this reporting period. The monitoring team notes that minor communication issues were addressed during this review period in four (4) After Action Reports, mainly pertaining to equipment. SOD utilizes the results and findings of previous After-Action Reports to train in future training sessions.

SOD continues to demonstrate a positive attitude toward CASA compliance.

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

**4.7.84 Assessing Compliance with Paragraph 97:  Tactical Mission Briefings**

Paragraph 97 stipulates:

> **"APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment. APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations. All specialized tactical team members should have an understanding of operational planning."**

**Methodology**

For this reporting period, the monitoring team reviewed Four Operational Plans;

- Protest against the Presidential Election
- Defund Albuquerque Public Schools Police
- First Amendment Assembly
- Protest against racial injustices and police brutality

This documentation was assessed for Operational Compliance with the requirements of this paragraph. The Operational Plans contains all information delivered to the specialized tactical unit(s) that include but is not limited to;

- Location(s)
- Rescue Teams
- Explosive Ordinance Disposal (EOD)

158

- Crisis Negotiations Team (CNT)/Tactical Emergency Medical Support (TEMS)
- Plans/Purpose of Operation
- Rules of engagement
- Entry / Arrest / Search Teams
- Other Units
- Suspects
- Other Considerations
- Additional Information
- Briefing and Debriefing Location
- Danger signal
- Radio Frequency
- Nearest Hospital

The monitoring team will continue to monitor any training affected by changes in future site visits and review of data from APD. The monitoring team verified that Tactical Sectional commanders, supervisors, and officers have a working knowledge of operational planning and routinely applied that understanding and skill to actual operations. Special Operations continues to conduct extensive training at all levels and conforms to best practices nationwide and to the specifics of this paragraph.

**Results**

Primary:          **In Compliance**
Secondary:     **In Compliance**
Operational:    **In Compliance**

### 4.7.85 Assessing Compliance with Paragraph 98:  Tactical Uniforms

Paragraph 98 stipulates:

> **"All specialized tactical units shall wear uniforms that clearly identify them as law enforcement officers."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.86 Assessing Compliance with Paragraph 99:  Force Review Board Assessments

Paragraph 99 stipulates:

> **"All specialized tactical unit deployments shall be reviewed by the Force Review Board in order to analyze and critique specialized response protocols and identify**

> **any policy, training, equipment, or tactical concerns raised by the action. The Force Review Board shall identify areas of concern or particular successes and implement the appropriate response, including modifications to policy, training, equipment, or tactics."**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.87 Assessing Compliance with Paragraph 100: Eligibility Requirements for Tactical Teams

Paragraph 100 stipulates:

> **"APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria."**

### Methodology

The monitoring team requested and received data from SOD for the reporting period August 1, 2020, through January 31, 2021. The Annual Assessments for APD SWAT Unit, K9 Unit, and Bomb Unit were received and reviewed by the monitoring team. These assessments include part are not limited to:

- Firearms Qualifications
- Biannual fitness testing
- City Goals
- Mission Statements
- APD Strategy
- Career Goals
- Constitutional Policing
- Integrity
- Community policing
- Critical Police Functions
- Use of Force
- Inventory

The reports reflect that members from the tactical units continue displaying exemplary work in constitutional policing, integrity, community policing, and critical police functions. APD's SOD remains in compliance with the requirements of this paragraph and constitutes, in the monitoring team's assessment, a best practice in the management of

160

tactical units and personnel.

**Results**

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

### 4.7.88 Assessing Compliance with Paragraph 101: Tactical Team Training

Paragraph 101 stipulates:

> **"APD shall train specialized tactical units conducting barricaded gunman operations on competencies and procedures that include: threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders."**

**Methodology:**

The monitoring team collected and reviewed training documentation for this reporting period (August 1, 2020, through January 31, 2021). SOD continues to be conducted on a regular basis, in accordance with national standards (National Tactical Officers Association) for high-risk tactical operations.

The training documented throughout this report's SOD paragraphs covers all subjects required in this paragraph in a wide array of training contexts. The goals and objectives are well defined and trained on by all units of SOD on a continual basis.

CNT continues to be an essential operational component in tactical activations; during this reporting period, training was conducted for all active CNT members integrated with Tactical members and were reviewed by the monitoring team for compliance with this paragraph. Due to the COVID-19 Pandemic restrictions, training was modified for social distancing but conducted to meet the requirements of this paragraph. The participants were trained in the following processes:

- High element suicide and how to de-escalate
- Communication between CNT and Tactical
- CNT negotiators to CNT team lead
- Communications Procedures;
- Integration CNT/CIT/CITO; and
- Barricaded Subjects.

161

The training received during the exercises was based on actual APD Tactical Activations where Tactical Units and CNT have previously integrated their operations in a critical incident environment. The monitoring team will continue to monitor SOD's operation in future site visits.

**Results**

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

### 4.7.89 Assessing Compliance with Paragraph 102:  K-9 Post Deployment Reviews

Paragraph 102 stipulates:

> **"APD shall continue to require the Canine Unit to complete thorough post- deployment reviews of all canine deployments."**

**Results**

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

### 4.7.90 Assessing Compliance with Paragraph 103:  Tracking K-9 Deployments

Paragraph 103 stipulates:

> **"APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams."**

**Results**

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

### 4.7.91 Assessing Compliance with Paragraph 104:  Tracking K-9 Bite Ratios

Paragraph 104 stipulates:

> **"APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the**

162

> **review, pursuant to the protocol for that system, of the
> performance of any handler whose bite ratio exceeds 20
> percent during a six-month period, or the entire unit if
> the unit's bite ratio exceeds that threshold and require
> interventions as appropriate. Canine data and analysis
> shall be included in APD Use of Force Annual Report."**

## Results

Primary:         **In Compliance**
Secondary:     **In Compliance**
Operational:   **In Compliance**

### 4.7.92 Assessing Compliance with Paragraph 105: Analyzing Tactical Deployments

Paragraph 105 stipulates:

> **"APD agrees to track and analyze the number of
> specialized tactical unit deployments. The analysis
> shall include the reason for each tactical deployment
> and the result of each deployment, to include: (a) the
> location; (b) the number of arrests; (c) whether a
> forcible entry was required; (d) whether a weapon was
> discharged by a specialized tactical unit member; (e)
> whether a person or domestic animal was injured or
> killed; and (f) the type of tactical equipment deployed.
> This data analysis shall be entered into the Early
> Intervention System and included in APD's annual
> reports."**

## Methodology

The SWAT Activation Data for the time period (August 1, 2020, thru January 31, 2021) consisted of thirty (30) activations. Training of Specialized Tactical Units is well covered and documented in paragraphs 90 thru 105. SOD attention to detail, monitoring, and analysis of the requirements of these activations has allowed them to succeed and maintain the quantity, type, and characteristics of deployments. As in previous IMR's the documentation reviewed by the monitoring team is evidence of the success, oversight, and accountability norms within the APD. The monitoring team will continue to monitor SOD's operation in future site visits.

## Results

Primary:         **In Compliance**
Secondary:     **In Compliance**
Operational:   **In Compliance**

163

**4.7.93 – 4.7.96 Assessing Compliance with Paragraphs 106-109: Special Unit Policies, and accompanying paragraphs focused on the Special Investigation Division.**

Paragraphs 106 – 109 of the CASA address requirements that APD must meet related to management and supervision of functions inside the Special Investigation Division (SID) as follow:

Paragraph 106: Specialized Unit Policies
Paragraph 107: High Risk Situation Protocols
Paragraph 108: Inspection of Specialized Units
Paragraph 109: Tracking Specialized Unit Responses

Generally, CASA paragraphs centered on SID are designed to help the agency create an administrative foundation that ensures investigative activities are organized and documented in a manner that supports wider changes in the department. The administrative underpinnings were sustained throughout the IMR-13 reporting period. In IMR-12, we noted that APD would be wise to examine all investigative Divisions to ensure they too are properly conditioned to support wider reform efforts and not become complacent with SID's compliance standing. Whether in response to the monitoring team's comments or as a matter of expanded efforts by the Performance Metrics Unit (PMU), an audit was conducted of SID similar to the Field Services Bureau's Area Commander, and certain concerns were raised regarding the proper use of OBRD's.[99] In response, SID included these findings in their Annual Report for 2020 and conducted internal refresher training with the affected unit. The acknowledgment and remedial action by SID are a positive sign and will hopefully result in better compliance standing during the next PMU compliance audit.

We reiterate that with Operational Compliance determinations related to force reporting and investigations, every corner of the organization will play a role in creating a successful outcome. As investigative roles have evolved and policies have been cast and recast over the past several years, APD should remain vigilant and closely examine its entire investigative apparatus to protect against activities that may negatively influence CASA compliance elsewhere. In past reports, we profiled SID cases where uses of force were improperly reported and investigated. New leadership has taken over at SID, and we highly recommend they not only review the narrative of past Monitor reports and comments made about SID uses of force but to explore the cases themselves for lessons learned that could be used as illustrations during routine training and unit briefings.

---

[99] The monitoring team noted these findings when reviewing numerous PMU audits for this reporting period.

During our December 2020 virtual site visit, we met with a newly assigned SID Commander responsible for the tasks associated with CASA compliance.[100]  As we have experienced during past visits, the new Commander came prepared to discuss SID compliance and was respectful of the processes the CASA has influenced APD to adopt.  At his request, we attended a separate meeting between SID and SOD to discuss the interplay between the Divisions with respect to SOD call out protocols.  The SID Commander wanted the monitoring teams' perspective on SOD providing services in circumstances that may pose elevated risk but may not specifically fall within the SOD call out protocols.  We took part in the conversation and provided perspective we felt would benefit the internal discussions APD was having.  Following the meeting, we learned that SOD might have been reluctant to provide their services in certain circumstances, but the issue was resolved, and the two units appear to be in synch.

Following the site visit, we requested and were provided with data to review that APD believed would demonstrate their continued compliance with Paragraphs 106-109.

The monitoring team was provided documentation to demonstrate that the business processes that helped establish Operational Compliance continue to exist.  Specifically, we reviewed the following documentation for this reporting period:

1. SID SharePoint Records;
2. SID Unit Handbooks;
3. SID Training Records;
4. SID Inspection Forms;
5. Operational Plans / After Action Reports;
6. Internal Memorandums and Department Circulars for Transfers, and Transfer In and Out Forms; and
7. Risk Assessment Matrix (RAM) forms and Ledgers, and SOD Audit Memorandums

The following represents our findings related to Paragraphs 106-109.

As we have noted in the past, SID consults with SOD for specific types of search warrants and is required to fill out a Risk Assessment Matrix (RAM)[101] to determine if they are required to call out SOD.  During the IMR-10 reporting period, in its normal course of business, SOD audited the RAM records for SID and found they assembled the correct documentation for one particular case but mis-scored the event.  In the past three Monitor reports, we noted that APD unearthed an important issue that required a resolution since the SID Commander disagreed with SOD's opinion of the score.  SOD

---

[100] The Commander had been in position for a couple of months.  When he first took the command, he proactively reached out to members of the monitoring team to gain perspective on SID's compliance standing and to share his initial activities with the Division.

[101] There are pre-set and scored categories APD units must consider when filling out a RAM, and a score of 25 or more requires a SOD call out.  Units are also required to append proofs that they made inquiries for specific risk categories (i.e., An assessment as to whether the suspect has a violent history requires criminal histories to be attached).

and SID worked together, and developed protocols to reconcile this type of event should it occur, and established a "RAM Audit Remediation Process."  In our review of documentation for IMR-13, we encountered an instance where the two commands were required to use their Remediation Process to resolve disagreements with a specific RAM Audit result, but it's unclear how the issue was resolved in the documentation we were provided.

On August 12, 2020, SOD provided an audit memorandum citing one "seriously deficient" RAM and how the search warrant risk profile was incorrectly scored by an SID detective.  It appears that in the change of SID Commanders, the response to the memo carried past the given timeline.  The issue centered on information that was provided by a confidential informant and whether that information "confirmed" a suspect was armed with a firearm.  The detective, in the opinion of SOD, failed to properly apply the scoring criteria, and the SID Commander disagreed.  In a November 4, 2020 memorandum, the SID Commander drew a distinction between information that was "told" to a detective and information that is "confirmed" by a detective.  The purpose of the RAM Audit Remediation Process was to provide a method of closing the loop on such disagreements, but we see no such reconciliation in the information we were provided.  While both commands continued a healthy written dialogue, simply documenting their positions fails to bring the issue to a conclusion.  Additionally, the SID commander called out a potentially bad question on the RAM, one that could be misinterpreted, and we agree.  To its credit, SID addressed the issue with the detective in the normal course of business through counseling.  We will follow up on this with both SID and SOD during the IMR-14 reporting period.

SID previously developed and implemented unit-level handbooks that set forth the unique standards, missions, and duties for each of its subordinate units, which have been updated and standardized in format across all SID units.  The handbooks from each unit serve several purposes, including SID incorporating and reinforcing APD's use of force policies and including the provisions of the CASA.  The monitoring team was provided course of business documentation that allowed us to track an initial Department Circular announcing an opening in SID, through to an officer's assignment and initial training.  We specifically looked at records of three officers that were transferred into SID, and seven officers that either transferred out, retired, or resigned from SID (and APD) during this reporting period.  As we noted in the past, SID created a "SID Transfer In and Transfer Out" form, which was in direct response to issues they self-identified related to CASA compliance.  We reviewed "Transfer In and Out Forms" that were completed and were able to cross reference those forms against the same SID personnel who were transferred into or out of the Division during this reporting period.  These forms assist in the proper tracking of equipment assigned to detectives.

SID previously implemented a procedure where they self-audit SharePoint records to ensure that proper information is being captured related to CASA compliance.  We reviewed a December 9, 2021 "SharePoint Audit" memorandum prepared by SID Commander that we felt created good internal oversight.  The monitoring team reviewed

eleven (11) SharePoint records between August 1, 2020, and January 21, 2021, and found they contained the required information.

We requested training records for SID and were provided several examples of training that occurred during the reporting period.  As we have noted with ERT and SOD, to be timely, some topics that would be considered routine, unit level training could become too burdensome if run through the Academy's 7 Step Training Cycle.  That said, in some instances, SID should expand the quality of documented information within the training materials and form clear learning objectives.  The materials we were provided were structured more like agenda items for a meeting than training.  If questioned later, SID may only be able to recall generalized topics covered rather than specific information that was communicated related to those topics.  An example of training was when an SID unit convened a meeting to discuss the proper use of OBRD's and compared APD SOP 2-8 to New Mexico Senate Bill 8.  Aside from knowing there was a comparison made, it is unclear what specific points were communicated by the supervisor to the unit and the key take-a-ways each attendee should have retained.  On a related matter, we saw a reference to training that was attended by an SID unit that was provided by a third-party vendor.  The actual training materials were not provided, but we saw that a topic that centered on search warrants was covered.  We call this out as an area SID should always remain on alert to, since outside training may contain guidance that is inconsistent with APD requirements.  We are not asserting that is the case here, only that close scrutiny by the SID Commander would be wise to avoid issues in the future.

The monitoring team reviewed SID RAM records for two separate and distinct cases that occurred during this reporting period and SOD memorandums for RAM audits they conducted of those cases.  SOD RAM audit reports continue to be routine, and we were able to review those audits against the records SID provided.  SOD RAM Audits summarizes an event and includes the documentation that was reviewed by the auditor, provides audit findings, and also notes areas for improvement.

During the past several reporting periods, we commented that SID Operational Plans and After-Action Reports need improvement.  When we discussed this with the new SID Commander, he acknowledged the Division could improve in its documentation in these areas.  For IMR-13, we reviewed fifty-five (55) Operational Plans and After-Action Reports.  The documentation we were provided contained examples with better documentation; however, records we reviewed still contained scarce information, in particular with the After-Action Reports, which are a brief check list and narrative section.[102]  In Pre-Operation plans, under the section "Additional Information," we still see "To be discussed during briefing," which could leave open the possibility for gaps of

---

[102] While the narrative section could be used to document a wide range of important information, records we reviewed were commonly as brief as a few words or a couple of brief hand-written sentences. Presumably, more information is contained in investigative reports, but this leaves open the possibility that gaps in information can occur.

information or disagreements of expectations following an investigation.[103]  We continue to see this as an area of improvement and again encourage SID to treat Operational Plans and After-Action Reviews as essential tools for compliance and safety.

The monitoring team was provided with the SID 2020 Annual Review, which was a comprehensive report of relevant information related to SID during the year.  It's clear a considerable amount of time went into the development of this report.  SID collected a great deal of information related to the CASA and organized it with sections that correspond to the CASA paragraphs that SID is responsible for maintaining.

Based on our review of documentation, we determined that Operational Compliance should be maintained by SID for paragraphs 106-109 for this reporting period.

### 4.7.93 Assessing Compliance with Paragraph 106:  Specialized Unit Policies

Paragraph 106 stipulates:

> **"Each specialized investigative unit shall have a clearly defined mission and duties. Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force, force reporting, and force investigations."**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.94 Compliance with Paragraph 107:  High Risk Situation Protocols

Paragraph 107 stipulates:

> **"APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required. APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response. The protocols shall include communicating high-risk situations and threats**

---

[103] We again recognize that the questions related to "Bust Signal", "Danger Signal" and "Debriefing Location" which are likely left ambiguous for the safety of future operations in the event this documentation is presented in a discovery request.  If SID personnel react to a situation where the safety of an officer is in question, and there is a related use of force, we call this out to ensure the information can be provided elsewhere, when necessary, to assess the actions and reactions of detectives during an operation.

> **promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident."**

## Results

Primary:    **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.95 Compliance with Paragraph 108:  Inspection of Specialized Units

Paragraph 108 stipulates:

> **"Within three months of the Operational Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training. APD shall conduct re-inspections on at least an annual basis."**

## Methodology

The monitoring team reviewed and examined the data required for APD to maintain compliance with paragraphs 108 for the reporting period (August 1, 2020, through January 31, 2021). The monitoring team conducted the site visit via a virtual platform during this period due to the circumstances created by the COVID-19 Pandemic and received the final results at the end of the reporting period. The Investigative Services Division (ISD) implemented a policy of monthly inspections to better monitor their personnel and issued equipment. During this reporting period, APD Compliance and Oversight began a pilot program with regard to monthly inspections. Two units from ISD were audited for two months during this reporting period. Several issues were uncovered, as documented in the data reviewed, resulted in less than ninety-five percent compliance for that time period. The commander of ISD met with the supervisors under his command and impressed upon them the importance of conducting thorough and detailed inspections on a monthly basis. The data clearly showed marked improvement in the subsequent months. The monitoring team requested that a twenty percent sample be randomly inspected from ISD for this report. The sample inspected maintained a ninety-five percent compliance score. ISD also supplied documentation identifying all serial numbers for weapons currently stored in the ISD gun safes; photographs were taken for comparison on the supplied inventory spreadsheet. Documentation was also received showing all vehicles and status within ISD.

An Interoffice Memorandum completed during normal course of business for this reporting period was also submitted to the monitoring team for review. The Memorandum, completed during the normal course of daily business, stated in part that

all sworn personnel were in compliance with the requirements of this agreement. It corresponded with the findings of the monitoring team.

The monitoring of these inspections is set to continue on at least an annual basis, and as previously stated in this report, on a monthly basis as well.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.96 Assessing Compliance with Paragraph 109:  Tracking Specialized Unit Responses

Paragraph 109 stipulates:

> **"APD agrees to track and analyze the number of specialized investigative unit responses. The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include: (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the Early Intervention System and included in APD's annual reports."**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

Monitor's Notes:  SID should continue to monitor the adoption of use of force policies and ensure that they properly operationalize those policies when a member of their Division uses any type of force.

APD should conduct independent audits of arrests and Level 1 uses of force reported by members of SID to ensure they are properly classified.

SID should review the quality of Operational Plans and After-Action Reports to ensure they are completed properly and are used as a tool for safety and compliance.

SID and SOD should continue to work together to ensure that RAM records are accurate and that SID properly uses SOD for search warrants.

### 4.7.97 Assessing Compliance with Paragraph 110: Individuals in Crisis and Related Issues

Paragraph 110 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below."**

This overarching paragraph encompasses the entire Crisis Intervention section of the CASA. As such, this paragraph will not be in compliance until such time that other related required paragraphs are found to be fully in compliance, including those addressing APD's use of force related to individuals experiencing mental health crises.

During the prior reporting period (see IMR-12), the monitoring team worked with members of the CIU to address some troubling trends with regard to APD's use of force against people in crisis and people with mental illness. We are concerned about APD's lack of progress toward the requirements of this paragraph, among others. In the Use of Force section of this report, we provide additional updates on these issues. While we were heartened by APD's responsiveness to our recommendations in IMR-12, the agency has a great deal to accomplish in order to gain compliance with Paragraph 110.

The monitoring team also notes the complexities that may arise from the City of Albuquerque's intention to create a separate, non-sworn department to respond to some of the calls for service that are currently addressed by APD. Separate entities may create confusion, unclear lines of responsibilities, and disparate "systems" for responses to mental health issues in Albuquerque's various communities.[104] The new

---

[104] June 15, 2020. "Mayor Keller announces new Albuquerque Community Safety Department," KQRE may be accessed at https://www.krqe.com/health/coronavirus-new-mexico/mayor-keller-to-announce-new-step-in-albuquerque-public-safety-on-monday/.

Albuquerque Community Safety Department (ACS) still seems to be in the early stages of its development. The monitoring team has reviewed the ACS *Community Engagement Report,*[105] which summarizes the City's work on the ACS and what they heard during their community outreach activities. The monitoring team will continue to assess its development closely and how it may affect APD's levels of compliance throughout this section of the CASA, including our reviews of related policies.

The monitoring team assessed information included in the relevant policies, which guide the requirements of the Crisis Intervention section of the CASA, as noted in the table below.

**Results**

While many reviews and revisions are underway, some of the policies in this suite are past-due for review and revision. Without appropriately updated policies, training is not feasible, and operational compliance is not attainable. In the monitoring team's experience, mental health practices are in a reasonably regular state of flux. New practices are developed, and old practices are revised, updated, and re-crafted – a notion that holds particularly true as the City plans for reform in this area. APD is in primary compliance for this paragraph—it has policies in place. Until these policies are updated regularly, we caution APD to be circumspect about re-training its officers regarding mental health practices, absent these updates. However, we note that the policy review processes, as they are currently implemented, allow for comment periods from stakeholders within the Albuquerque community and robust discussion with members of the MHRAC. For example, the MHRAC reviewed SOP 1-28 "Downtown Unit" during this reporting period and offered suggestions for improvement. The monitoring team notes that delays in policies generate delays in training, which lead to delays in forming CASA-congruent supervisory processes, which are the very definition of non-compliance.

For a more detailed assessment of the status of critical policies related to this paragraph, see Table 4.7.97.

---

[105] January 2021. Albuquerque Community Safety, The Right Response at the Right Time, Community Engagement Report. Accessible at https://documents.cabq.gov/acs/acs-community-engagement-report-v9.pdf.

**Table 4.7.97 Policy Renewal Status for Behavioral Health Policies**

| Policy | Policy name (Relevance to 110) |
|---|---|
| SOP 1-20 | BEHAVIORAL SCIENCES SECTION –This policy was reviewed, updated, and published during this reporting period, albeit past articulated timelines. The version of this policy on the City's website is now up-to-date, showing Effective 11/30/20 and due for Review on 11/31/21. |
| SOP 1-28 | DOWNTOWN UNIT – This policy includes some guidance for APD officers interacting with people experiencing homelessness in the downtown area, instructing them to provide information on available resources and programs and to conduct outreach in coordination with other organizations. |
| SOP 1-37 | CRISIS INTERVENTION SECTION AND PROGRAM -- This policy underwent review during this reporting period, with the IMT reviewing and commenting on drafts, but reviews and revisions were still underway as of the close of this reporting period. |
| SOP 2-19 | RESPONSE TO BEHAVIORAL HEALTH ISSUES-- This policy underwent review during this reporting period, with the IMT reviewing drafts, but reviews and revisions were still underway as of the close of this reporting period. This policy is overdue for review, update, promulgation, and training. |
| SOP 2-20 | HOSTAGE SITUATIONS, BARRICADED INDIVIDUALS, AND TACTICAL THREAT ASSESSMENTS--Effective August 5, 2019; was due for Review August 5, 2020. This policy is overdue for review, update, promulgation, and training. |
| SOP 2-8 | USE OF ON-BODY RECORDING DEVICES (contains reference to "Incidents involving individuals known to have a behavioral health disorder or who are in a behavioral health crisis). |

**Results**

> Primary:     **In Compliance**
> Secondary: **Not In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraph 110:*

*4.7.97a: APD should conduct a complete and thorough review of its policies related to in-field responses to incidents involving individuals in mental distress and ensure that the entirety of those policies are congruent with CASA requirements and have been vetted through the review process by the Amici stakeholders.*

**4.7.98 – 4.7.115 Assessing Compliance with Paragraphs 111- 128: Mental Health Response Issues.**

Paragraphs 111-128 address how APD is required to respond to calls involving mental health. In determining compliance outcomes for these paragraphs, the monitoring team reviewed normal course-of-business documentation related to mental health response practices by APD. We discuss our findings below.

We note that APD has met, and in many cases far exceeded, the requirements of the CASA as it relates to mental health response planning, crisis intervention, and service delivery. Our review indicates that APD crisis outreach services personnel have worked diligently with the advisory committee to assess, improve, and serve the target communities. However, while we also note that while APD's crisis intervention system has produced work that consistently demonstrates creativity and community responsiveness, the same is not true of the Field Services Bureau. In short, to be effective, specialized units, and to a lesser extend FSB elements need to take note of the specialized needs of some communities and tailor overall response processes to better protect and serve these communities, as well as the community as a whole. The monitoring team will continue to explore those disconnects in future reports.

In assessing APD's compliance with these paragraphs, we reviewed APD processes designed to:

- Structure and improve mental health processes in the community;
- Foster close coordination between APD and mental health leaders; and
- Create meaningful, flexible, and effective mental health services throughout the communities served by the APD.

**4.7.98 Assessing Compliance with Paragraph 111: Mental Health Response Advisory Committee**

Paragraph 111 stipulates:

> **"Within six months of the Operational Date, APD and the City shall establish a Mental Health Response Advisory Committee (Advisory Committee) with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness."**

**Methodology**

The community's Mental Health Response Advisory Committee (MHRAC) continued its success during this reporting period. Their meetings often involve highly detailed discussions of problems, issues, needs, and solutions. MHRAC's reports, recommendations, communications, and assessment processes during this reporting period continue to be a source of valuable insight for APD's mental health, crisis intervention, and homelessness operational strategies, especially during the COVID-19 Pandemic.

In assessing compliance with this paragraph, the monitoring team attended online MHRAC meetings via Zoom and reviewed the following documentation:

- MHRAC's reports, recommendations, communications, and processes during this reporting period;
- Meeting agendas and minutes for MHRAC meetings;[106]
- Meeting agendas, minutes, and recordings for subcommittee meetings;
- MHRAC's Annual Report, comprised of a letter from the Co-Chairs,[107] the Training Subcommittee Report,[108] and the Information Sharing / Resources Subcommittee Report;[109] and
- Various communications regarding policy reviews between APD and MHRAC.

The monitor remains encouraged by the robust membership of MHRAC and the substantial number of new participants in MHRAC meetings during this reporting period. There was some confusion, however, about membership status and MHRAC's bylaws during this reporting period. While there were several discussions about MHRAC's bylaws throughout the reporting period, they have not yet been formally updated or amended.  This issue requires attention.

Since the meetings have been taking place online via Zoom (due to the COVID-19 Pandemic), participation has increased substantially. The monitoring team observed the online MHRAC meetings in August--December of 2020, and January 2021. We believe the MHRAC continues to be on the right path, which will lead MHRAC to sustainability, stability, and the ability to withstand leadership changes, should they occur. The MHRAC continues to address emerging issues within sub-committees, including the Training Subcommittee and the Information Sharing/Resources Subcommittee.

---

[106] Available at https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-agendas-minutes

[107] Available at https://www.cabq.gov/mental-health-response-advisory-committee/documents/2020-mhrac-co-chair-report.pdf

[108] Available at https://www.cabq.gov/mental-health-response-advisory-committee/documents/2020-mhrac-training-subcommittee-annual-report.pdf

[109] Available at  https://www.cabq.gov/mental-health-response-advisory-committee/documents/2020-mhrac-information-sharing-resource-subcommittee-annual-report.pdf

MHRAC meetings occurred monthly during this reporting period. Due to the COVID-19 Pandemic, the MHRAC meetings have been held online via Zoom throughout this reporting period. The two MHRAC subcommittees met fairly regularly during this reporting period as well. Table 4.7.98a briefly describes major topics covered during the MHRAC meetings and subcommittee meetings. In addition to the topics discussed during MHRAC meetings, a review of emails and other communications demonstrates that MHRAC members also addressed a variety of other issues during this reporting period.

**Table 4.7.98a Dates and Topics of IMR-13 Reporting Period MHRAC Meetings**

| Reporting period month | Meeting date | Issues discussed |
|---|---|---|
| August 2020 | 8/18/20 | ACS updates; New shelter updates; Wellness Check program (AFR); APD updates on COAST and CIU. |
| September 2020 | 9/15/20 | ACS updates; New shelter updates; Certified peer support workers; Social Dispatch Program; MHRAC bylaws; APD updates on COAST and CIU. |
| October 2020 | 10/20/20 | ACS updates; New shelter updates; COVID-19 outbreaks; MHRAC bylaws; APD reports on COAST and CIU. |
| November 2020 | 11/17/20 | ACS updates; New shelter updates; Mobile Crisis Team update; APD Crisis Intervention Data Book Fall 2020; APD reports on COAST and CIU. |
| December 2020 | 12/15/20 | ACS updates; New shelter updates; HIPAA discussion with AFR; APD Crisis Intervention Data Book Fall 2020; APD reports on COAST and CIU. |
| January 2021 | 1/19/21 | Body Camera legislation update; ACS update; Shelter update; APD CIT Data; APD reports on COAST and CIU. |

**Table 4.7.98b: MHRAC Subcommittee Meeting Dates and Topics**

| Subcommittee | Issues discussed |
|---|---|
| *Information Sharing & Resources:* 8/11/20; 9/8/20;  10/13/20; 11/10/20**;** 12/8/20; | Resource card update; annual report; Review of MHRAC bylaws; Introduction to APD Policy and Procedures Section; Updates on 1-37 and 2-19; Proactive Response Team policy discussion; LEAD discussion; MOUs and the way forward discussion. |
| *Training:* 10/26/20; 1/25/21 | CNT Training Collaboration and Coordination; CIU training; Updates to BSS Handbook; ACS implications for training; ECIT updates; Annual Report; LEAD program training. |

**Results**

    Primary:   **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

**4.7.99 Assessing Compliance with Paragraph 112**

Paragraph 112 stipulates:

> **"The Advisory Committee shall include representation from APD command staff, crisis intervention certified responders, Crisis Intervention Unit (CIU), Crisis Outreach and Support Team (COAST), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups."**

**Methodology**

The monitoring team reviewed MHRAC's membership rosters, agendas, and meeting minutes (which include attendee names and affiliations) for monthly meetings that occurred during this reporting period. Members of the monitoring team attended all MHRAC meetings during this reporting period, which took place online via Zoom.

**Results**

All specified groups named in this paragraph regularly participated in MHRAC meetings during this reporting period, and minutes reflected discussions of agenda items designed to facilitate the goals of MHRAC.

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.100 Assessing Compliance with Paragraph 113**

Paragraph 113 stipulates:

> **"The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event."**

**Methodology**

The monitoring team reviewed MHRAC's reports, recommendations, communications, and processes. In addition, we reviewed MHRAC monthly meeting agendas and minutes, and MHRAC subcommittee meeting minutes, various email communications, and memos. Members of the monitoring team also attended all MHRAC meetings via Zoom during this reporting period.

**Results**

The MHRAC continued to guide the City and APD regarding developing and expanding the number of CIT-certified responders and response strategies for interacting effectively with homeless individuals and people with mental illness. In particular, during this reporting period, members of the MHRAC continued to discuss the impacts of COVID-19 on people experiencing homelessness, engaging in intensive collaborative problem solving as they identified available resources.  The MHRAC also continued to engage in robust discussions with APD and other City entities regarding the creation of a new homeless shelter and the new Albuquerque Community Safety Department. The conversations around these issues were thoughtful and anchored in principles of collaboration and problem-solving.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.101 Assessing Compliance with Paragraph 114:

Paragraph 114 stipulates:

> **"APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality."**

**Methodology**

The monitoring team reviewed all of MHRAC's reports, recommendations, communications, and processes during the reporting period, assessing these documents for compliance with Paragraph 114. The MOU between APD's CIU and the University of New Mexico Health Sciences Center/UNM Health Systems remains in place and has not been updated since the monitoring team's previous reviews (signed and dated October 16, 2017). We noted in the last reporting period that there had been discussion about information sharing with the Bernalillo County Criminal Justice Coordinating Council's Diversion and Re-entry Subcommittee. Those conversations continued during this reporting period, with the City and the County both participating. An MOU has not yet been signed. The monitoring team compliments this new level of coordination among City and County leaders. We will continue to observe the development of this partnership.

**Results**

A review of email communications indicates that the working relationships between UNM staff and CIU staff seem to be evolving positively.  Emails indicate that processes between the two entities continue to be clarified collaboratively.

We note that APD's existing mental health training courses continue to contain content regarding the MOU between APD and the University of New Mexico. The MHRAC and APD continue to have important discussions around protected health information and HIPAA concerns. We note that as Albuquerque's new Department of Community Safety (ACS) continues to take shape, the monitoring team will determine whether and how that necessitates changes to the MOU(s) or protocols concerning sharing information collaboratively across stakeholders.

Internally, APD clarified its processes for sharing information as well. During this reporting period, APD produced a document clearly explaining the process for sharing information between hospitals that serve specific communities to operationalize the MOU with UNM and emails supporting the necessary communications.  This document

will be included in the next updated CIU Handbook (expected in late 2021). APD also produced an updated version of its Behavioral Sciences Section Handbook, which states, "The clinical work of the CIU and BSS clinicians will be separate; BSS clinicians will not share any information about their patients with CIU clinicians without the permission of the client or in situations where confidentiality can be breached, e.g., imminent danger to self or others" (p.22).

In our last report, we noted a recurring issue regarding wait times for admissions at local hospitals. APD officers articulated concerns and complaints about wait times at local hospitals when they brought patients to emergency rooms as resolutions to calls for service, during other interactions with people in crisis, or people with mental illness. While that problem seems to have improved during this reporting period, an additional problem has emerged regarding APD's role and relationships with local hospitals. At times when officers are transporting patients to hospitals and making initial contact with hospital staff in sally port areas, hospital staff request assistance from APD officers with immediately administering medication.  In essence, some intake staff are requesting that APD officers go "hands-on" with patients in these situations. APD is currently working on a protocol that will be applicable at all hospitals in these situations and should facilitate collaboration with hospital officials regarding such a protocol. Establishing and maintaining constructive and collaborative working relationships is crucial to sharing information appropriately. In the next reporting period, we hope to see that APD and local hospitals have made progress toward a resolution to this latest issue.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 114:***

***4.7.101a:  Complete proposed protocols as soon as practicable and share draft versions with the monitoring team for comment.***

### 4.7.102 Assessing Compliance with Paragraph 115

Paragraph 115 stipulates:

> **"Within nine months of the Operational Date, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 129 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also, within nine months of the Operational Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on**

**scenario-based training involving typical situations that occur when mental illness is a factor.**

## Methodology

The monitoring team reviewed data provided to MHRAC by APD relating to provisions of Paragraph 115, including data assessments in the form of PowerPoint slides. We also reviewed MHRAC and subcommittee meeting agendas and minutes.

## Results

APD continues to work on producing meaningful analyses of the data elements specified in paragraphs 129 and 137 and to think analytically about what those data reveal about operational decisions (i.e., deployment, staffing, etc.) as well as gather input from MHRAC. APD presented these data to the MHRAC during the meeting on November 17, 2020. During this reporting period, APD finalized a partnership agreement with UNM's Institute for Social Research and the New Mexico Sentencing Commission, which is affiliated with UNM. Please see Paragraph 129 for additional details about data analysis.

APD continues to provide all behavioral health training curricula (including updates and changes) to the MHRAC for review, and the feedback processes between the MHRAC and APD have been improving, particularly since the introduction of the MHRAC feedback map. The map assists in the flow of communication and timing of information, feedback, and reviews.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.103 Assessing Compliance with Paragraph 116

Paragraph 116 stipulates:

> **"The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services."**

## Methodology

The monitoring team reviewed data provided to MHRAC by APD relating to enhancing coordination within and among MHRAC's service base. This review included memos, emails, and MHRAC meeting and subcommittee meeting minutes.

**Results**

The MHRAC continued its work to enhance coordination of services for chronically homeless individuals and individuals experiencing mental health crises, which has been challenging during the COVID-19 Pandemic. APD and MHRAC regularly provided updated cards listing community resources to APD officers for them to provide to people with whom they interact while on patrol. CIU detectives, COAST members, and MCT members also regularly distribute the resource cards. The resource cards were updated during this reporting period to reflect changes to resources due to the COVID-19 Pandemic. The most recent version is dated January 28, 2021.

The monitoring team's review shows a substantial and tangible degree of interaction and cooperation between local behavioral health systems and the APD on these issues, as well as tangible results in systems improvement recommendations. Further, during this reporting period, and because of the ease of accessibility of MHRAC meetings online via Zoom, many more community members have continued attending MHRAC meetings.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.104 Assessing Compliance with Paragraph 117

Paragraph 117 stipulates:

> **"Within 12 months of the Operational Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources."**

**Methodology**

The MHRAC produced its annual report during this reporting period, and it is available on the City's website. The report consists of a letter from the MHRAC Co-Chairs along with the Information Sharing and Resource Subcommittee's annual report and the Training Subcommittee's annual report. Overall, the reports summarize the MHRAC's activities for 2020, including policy reviews and training curricula recommendations. The report also notes topic areas under discussion during 2020, including Certificates for Evaluation, interactions with local hospitals, the LEAD program, local mental health resources, the future of APD's COAST, the development of the City's ACS, and the impact of COVID-19 on people experiencing homelessness.  MHRAC has become a vital resource for APD.

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.105 Assessing Compliance with Paragraph 118 Behavioral Health Training

Paragraph 118 stipulates:

> **"APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment."**

No evaluation methodology was developed for paragraph 118, as it is not a "requirement" for APD or City action but simply states facts**.**

### 4.7.106 Assessing Compliance with Paragraph 119 Behavioral Health Training for all Cadets

Paragraph 119 stipulates:

> **"APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by July 15, 2016."**

### Methodology

The monitoring team reviewed training records maintained by APD relating to basic behavioral health training, including pre-tests and post-tests of training participants and other documentation related to training activities.

In the last reporting period, we noted our concern that a previous 2-hour training session (typically offered to cadets and officers during APD's Maintenance of Effort (MOE) training) had been reduced to a 30-minute training video distributed via PowerDMS. We echoed the concerns raised by the MHRAC when they reviewed the training entitled "Interaction with Persons with Mental Illness." We noted that the curriculum did not go through proper MHRAC review processes until *after* it was developed and distributed to officers via PowerDMS, nor did the Academy staff collaborate or consult with the Crisis Intervention Section on the creation of this curriculum. Further, while not required, APD has long been able to submit proposed training to members of the monitoring team for comment and review before execution. No such procedure was followed in the case of the MOE training offered by APD.

183

Our last report concluded with a recommendation.[110] In response, APD has provided (1) some information on how this training mishap occurred and (2) some reassurance that they have refined processes to prevent such an occurrence in the future.

First, the monitoring team reviewed a memo written by a member of the Training Academy addressing how the training mishap occurred, which describes a decision by the Academy Commander (who has since been terminated[111]) to move ahead with the shortened training video in part due to the necessity of delivering training online during the COVID-19 Pandemic. Second, the monitoring team reviewed the "CIU State Mandated Lesson Plan Process," a one-page memo produced jointly by the CIU and the Training Academy that will be included in the next updated iteration of the CIU Handbook. The memo outlines 11 required steps to be taken by various APD employees to ensure proper MHRAC and CIU review of the state-mandated mental health course in the future.

Finally, the monitoring team reviewed a memo written by a member of the Training Academy indicating that as of November 2, 2020, 1,003 APD employees watched the 28-minute training video entitled "Interactions with Persons with Mental Illness." To date, no re-training has occurred. It is our understanding that the material required by the state-mandated, basic behavioral health training will be included in the APD's 2021 maintenance of effort (MOE) training efforts, which will include both telecommunicators (see Paragraph 122) and cadets.

APD continues to provide the 40-hour basic CIT training to all field officers as well. The monitoring team has confirmed, through review of curricula, that the quality of 40- hour CIT training remains strong. CIT training uses hands-on, scenario-based learning, and its use of talented actors, specifically trained to lead scenarios, continues to enhance the learning experience for participating officers and to improve in-field performance. During this reporting period, during the COVID-19 Pandemic, APD continued to utilize the services of actors to work through scenarios with officers in person, but those scenarios were conducted outside on the grounds of the Academy so proper social distancing could be achieved.

**Results**

       Primary:      **In Compliance**
       Secondary:  **Not In Compliance**
       Operational: **Not In Compliance**

---

[110] From IMR-12, Recommendation 4.7.106a: APD should implement a complete inquiry into the rationale and modality changes resulting in this training gap. Responsibilities and rationalities for the change need to be identified, as well as who was in the approval loops, that allowed a CASA-specific training program to be manipulated into non-compliance.

[111] October 30, 2020.  "APD terminates Academy Commander for retaliation against whistleblowers." KOB4, accessible at https://www.kob.com/albuquerque-news/apd-terminates-academy-commander-for-retaliation-against-whistleblowers/5911567/

*Recommendation for Paragraph 119:*

*4.7.106a:  Ensure that all APD officers assigned to patrol duty, and all supervisors who supervise patrol operations, are given refresher training regarding crisis intervention policies and techniques.*

## 4.7.107 Assessing Compliance with Paragraph 120

Paragraph 120 stipulates:

> **"The behavioral health and crisis intervention training provided to all officers will continue to address field assessment and identification, suicide intervention, crisis de-escalation, scenario-based exercises, and community mental health resources. APD training shall include interaction with individuals with a mental illness and coordination with advocacy groups that protect the rights of individuals with disabilities or those who are chronically homeless. Additionally, the behavioral health and crisis intervention training will provide clear guidance as to when an officer may detain an individual solely because of his or her crisis and refer them for further services when needed."**

### Methodology

The monitoring team reviewed APD's training curricula relating to behavioral health. Despite the monitoring team's significant concern raised in Paragraph 119 immediately above, APD continues to provide acceptable training that addresses field assessment and identification, suicide intervention, crisis de-escalation, community mental health participation, scenario-based exercises, and role-play exercises. All training (except for our concerns, as noted in Paragraph 119) emphasizes the importance of community partnerships and appropriate referrals to services. APD also continues to update their behavioral health curricula appropriately, for example, by updating scenarios in which professional actors interact with training participants.

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.108 Assessing Compliance with Paragraph 121

Paragraph 121 stipulates:

> **"APD shall ensure that new tele-communicators receive 20 hours of behavioral health training. This training shall include: telephonic suicide intervention; crisis management and de-escalation; interactions with**

> **individuals with mental illness; descriptive information
> that should be gathered when tele-communicators
> suspect that a call involves someone with mental
> illness; the roles and functions of COAST, crisis
> intervention certified responders, and CIU; the types of
> calls that should be directed to particular officers or
> teams; and recording information in the dispatch
> database about calls in which mental illness may be a
> factor."**

## Methodology

The monitoring team reviewed APD's training records relating to basic behavioral health training for telecommunicators and noted that behavioral health training for telecommunicators took place on October 7-9, 2020. During this training, eight APD telecommunicators participated, with all eight completing the training.

## Results

APD's 20 hours of behavioral health training for telecommunicators includes all topics noted in paragraph 121 and role-play scenarios drawn from actual 911 calls fielded by APD telecommunicator personnel.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.109 Assessing Compliance with Paragraph 122

Paragraph 122 stipulates:

> **"APD shall provide two hours of in-service training to
> all existing officers and tele-communicators on
> behavioral health-related topics biannually."**

The monitoring team reviewed APD's training records relating to behavioral health training for officers and telecommunicators and, during the last reporting period, noted our concerns with a state-mandated 2-hour training session that was reduced to 30 minutes (see our updated review of Paragraph 119). This is yet another instance in which APD has ignored CASA-mandated training requirements by arbitrarily reducing CASA required training protocols without explanation or notice to the monitoring team. While no retraining has yet occurred, we understand that APD's planned MOE training for 2021 will address these issues.  We will continue to monitor these processes closely.

**Results**

APD has lost compliance with the requirement of bi-annual training, according to training records. In response to our recommendations,[112] the APD produced a memo dated November 2020 indicating that 1,003 people completed the 2020 MOE training video entitled "Interactions with Persons with Mental Illness." The monitoring team had concerns with this training outline, and these concerns were articulated in IMR-12 (see additional information in Paragraph 119). The memo does not, however, break down the 1,003 people by assignment or role.

We look forward to reviewing the curriculum that addresses behavioral health, mental health, and crisis intervention for the 2021 MOE during the next reporting period.

We note, however, that during this reporting period, APD's CIU conducted several training courses that meet these requirements, including ECIT refresher courses, which are 8 hours in length. ECIT courses were held in October 2020 and January 2021.

> Primary:       **In Compliance**
> Secondary:  **Not In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 122:***

***4.7.109a:  Continue work on the department's behavior health, mental health, and crisis intervention training, ensuring that the topics covered fit with the requirements of this paragraph and the feedback provided by the monitoring team.  Ensure that officers who received training that was not appropriately designed, critiqued, and revised are retrained using the appropriate training processes.***

**4.7.110 Assessing Compliance with Paragraph 123: Crisis Intervention Certified Responders and Crisis Intervention Unit**

Paragraph 123 stipulates:

> **"APD shall maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis. APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives housed at the Family Advocacy Center whose primary**

---

[112] IMR-12 Recommendation 4.7.109a: APD must review its training records to identify specifically who attended the truncated training sessions noted in section 4.7.108, above. Those officers will need to be re-trained, using a CASA-compliant training processes.

IMR-12 Recommendation 4.7.109b: Conduct a thorough internal investigation to identify who changes this training, why it was changed, and exactly what changes were made.

> **responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future. APD agrees to expand both the number of crisis intervention certified responders and CIU."**

## Methodology

The monitoring team reviewed training and assignment records for CIU officers for the reporting period. According to APD records, as of the end of this reporting period, 197 field officers or 46% were ECIT trained, making them "certified responders" per this paragraph. With very few exceptions, APD officers who become ECIT trained maintain their certification status by enrolling in recertification courses at appropriate times. APD maintains a Crisis Intervention Unit staffed with detectives. The number of detectives in the CIU is currently 12, meeting the recommended number of detectives noted in the "Albuquerque Police Department Comprehensive Staffing Assessment and Resources Study" conducted in 2015 by Alexander Weiss Consulting, which was twelve.  We have advised APD that a six-year-old management study cannot possibly be considered up to date and that new data need to be generated and assessed to determine staffing needs of field-based personnel.  To date, we have seen no response that has generated proposed staffing numbers.

We note here, as we have elsewhere in this report that staffing studies such as that conducted by Weiss Consulting have relatively short "half- lives," thus the reliability of those numbers tends to decrease as time passes.  A seven-year-old staffing study, in the monitor's experience, is virtually useless.

During the last reporting period, APD continued its strides in work toward compliance with the requirements of this paragraph with regard to determining what "sufficient number" means to APD. APD's CIU has worked diligently on its ECIT workload analysis, and members of APD created an ECIT workload analysis and staffing model "to ensure a sufficient number of Enhanced Crisis Intervention Team (ECIT) officers city-wide." The model considers a number of behavioral health calls for service by shift and area command; the number of Field Services officers by shift and area command; the average length of a behavioral health call for service; the yearly shift bid; and the APD requirement for 70% minimum staffing (which considers vacation time, sick time, other circumstances that may affect staffing on any given day). APD data indicate that, on average, ECIT trained officers respond to about 60% of calls for service involving behavioral health elements. The percentage of ECIT responses to these calls for service varied across shifts and area commands (ranging roughly between 44% and 76%) during this reporting period. The monitoring team does, however, have some concerns about the validity and reliability of the data used to calculate these percentages. We look forward to learning more about the strategies to remedy some of the data glitches encountered during this reporting period.

While the model is certainly a work in progress and will likely be refined over time, as the CIU continues to revisit and recalculate it monthly, we are encouraged by this work.

The CIU notes consistent improvement in response rates of ECIT officers responding to mental health-related calls for service. At this time, the monitoring team has no tangible information to indicate that the ECIT workload analysis and staffing model has been embraced by APD leadership and is actively being used to guide staffing decisions. We are encouraged, however, by a meeting that occurred on January 19 among Deputy Chiefs and members of the CIU in which a path forward for the requirements of this paragraph were discussed in detail. Furthermore, the CIU intends to begin sharing data regarding the percentage of officers ECIT trained with field Commanders on a monthly basis. We look forward to reviewing those communications in future reporting periods.

We remain concerned, however, that a failure to be attentive to actual staffing needs may attenuate CIU's effectiveness in an area critical to the CASA. We repeat our recommendation from the last report period.  While the monitor's recommendations are not specifically binding on APD, persistent failure to either implement monitoring team recommendations or to explain in detail why the recommendations were not implemented constitutes, in the monitor's opinion, deliberate indifference to the requirements of the CASA.

**Results**

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 123:***

***4.7.110a: We continue to recommend that APD implement the data-driven, methodologically appropriate workload, staffing planning, and analysis protocol developed by CIU that ensures that reliable "staffing levels" for ECIT officers are regularly calculated, reported, set as staffing goals, and attained.***

**4.7.111 Assessing Compliance with Paragraph 124**

Paragraph 124 stipulates:

> **"The number of crisis intervention certified responders will be driven by the demand for crisis intervention services, with an initial goal of 40% of Field Services officers who volunteer to take on specialized crisis intervention duties in the field. Within one year of the Operational Date, APD shall reassess the number of crisis intervention certified responders, following the staffing assessment and resource study required by Paragraph 204 of this Agreement."**

**Methodology**

The monitoring team reviewed training records for the ECIT officers, who meet the definition of "field services officers who volunteer to take on specialized crisis intervention duties in the field," along with the ECIT workload analysis and staffing model (see Paragraph 123). The APD's analysis indicates that during this reporting period, 46 percent of Field Services officers who are ECIT trained to respond to 60 percent of calls for service that have a behavioral health component.

**Results**

The current staffing levels of crisis intervention "certified responders" consistently met the 40 percent goal during this reporting period, varying from 49.6 to 52.1 percent. Table 4.7.111 below notes the percentages by month. Please see the above comments related to paragraph 123 for further information about APD CIU's reassessment of the number of ECIT certified responders and their assessment of compliance with the 40 percent requirement.  See Table 4.7.111 below. The CIU held both Enhanced CIT courses as well as ECIT Refresher courses during this reporting period.
We note that many of the *amici* contend that, based on current experience, the 40 percent goal is not sufficient to ensure that critical program goals are met.  The monitor agrees and suggests that APD re-evaluate that goal, based on a review of the number of negative outcomes per month of crisis intervention events handled by non-CIT trained officers.  As Table 4.7.11 indicates, that number varies in a very tight distribution (from 44 percent to 46 percent), well above the CASA-required 40 percent. Nonetheless, we continue to see fatal and non-fatal outcomes in cases that were obviously CIT qualified but were not handled by CIT officers.

**Table 4.7.111 Staffing Level of Enhanced CIT- Certified Responders**

| Percentage of APD Officers who are Enhanced CIT Certified Responders | |
|---|---|
| August 2020 | 46.6% |
| September 2020 | 46.5% |
| October 2020 | 45.8% |
| November 2020 | 46.5% |
| December 2020 | 44.0% |
| January 2021 | 46.2% |

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

Monitor's suggestion:

APD and the amici should re-evaluate the CASA requirement regarding ECIT-trained officers and the (apparently burgeoning) number of calls that fit the defined characteristics suitable for an ECIT response.  It appears from recent negative results of behavioral health incidents handled by non-ECIT trained officers would militate for reconsideration by the Parties and the Amici of what constitutes a reasonable number of ECIT officers.  We note that nothing in the CASA prohibits APD from doing more than what is required by the CASA.

APD and the amici should come to a conclusion, based on a review of the data, as to what constitutes an adequate number of ECIT officers and should work to attain that number.  The monitor stands ready to assist in this endeavor if needed.

### 4.7.112 Assessing Compliance with Paragraph 125

Paragraph 125 stipulates:

> **"During basic crisis intervention training for field officers provided to new and current officers, training facilitators shall recommend officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals with mental illness to serve as crisis intervention certified responders."**

The monitoring team reviewed recommendations obtained and assessed by training facilitators during this reporting period.

**Results**

The APD CIU instructors routinely identify and recommend field officers who are well suited for the Enhanced CIT (ECIT) course. Members of the CIU routinely reach out to those officers via email and recommend that they enroll in an upcoming ECIT course.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.113 Assessing Compliance with Paragraph 126

Paragraph 126 stipulates:

> **"Within 18 months of the Operational Date, APD shall require crisis intervention certified responders and CIU to undergo at least eight hours of in-service crisis intervention training biannually."**

**Methodology**

The monitoring team reviewed training records for CIU and field services personnel, including certificates of completion, as well as updates to the training curriculum.

**Results**

APD provided 8-hours of "re-certification" training to its certified responders via ECIT refresher training during this reporting period.

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.114 Assessing Compliance with Paragraph 127**

Paragraph 127 stipulates:

> **"Within 18 months of the Operational Date, APD will ensure that there is sufficient coverage of crisis intervention certified responders to maximize the availability of specialized responses to incidents and calls for service involving individuals in mental health crisis; and warrant service, tactical deployments, and welfare checks involving individuals with known mental illness."**

**Methodology**

During this reporting period, the APD CIU continued to analyze data designed to determine whether the initial goal of 40 percent is "sufficient coverage" for Albuquerque (see our related discussion in paragraphs 123 above). Our recommendation that APD "implement the data-driven, methodologically appropriate workload, staffing planning and analysis protocol developed by CIU that ensures that reliable 'staffing levels' for ECIT officers are regularly calculated, reported, set as staffing goals, and attained" has been well received by APD. The agency is moving toward implementing these refinements. We will continue to monitor APD's progress on this paragraph during each monitor's report.

**Results**

As noted above, APD's CIU has previously determined that 40 percent is a proportion they are comfortable with when they calculated their ECIT response rates to behavioral health calls for service. During this reporting period, the proportion of APD officers maintaining ECIT training certification was consistently above 40 percent. Given the frequency of critical events, it is critical, in the monitor's opinion, that APD re-assess the percentage of ECIT officers available in each area command and on each shift to adequately handle "persons in crisis" calls.

192

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 127:*

*4.7.114a:  APD should re-assess its 40 percent guideline for CIU-trained officers, in light of recent incidents involving individuals suffering mental health crises, and determine if the 40 percent staffing level continues to meet community needs.*

**4.7.115 Assessing Compliance with Paragraph 128**

Paragraph 128 stipulates:

> **"APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so."**

**Methodology**

The monitoring team reviewed documentation of APD's reviews of field interactions between officers and people in crisis, which APD launched in response to our recommendations on this paragraph in IMR-12.[113] To date, APD has addressed our recommendation 4.7.115a, conducting a thorough review of the officer identified by the monitoring team during the last reporting period.

We reviewed a memo outlining the trends that were uncovered by the reviewer and the individual review forms that were used to capture information about each incident reviewed through OBRD video, incident reports, and CIT reports. We also reviewed the proposal detailing a methodology for conducting the reviews and all processes used to identify relevant incidents within voluminous APD data.

---

[113]IMR-12, Recommendation 4.7.115a: Conduct a complete assessment of all CIT/CIU responses involving the officer identified in the events outlined above.
IMR-12, Recommendation 4.7.115b: Conduct a random sample of all CIT/CIU responses to ensure that the issues identified above have not been replicated in other CIT/CIU responses by other officers.
IMR-12, Recommendation 4.7.115c: Provide the monitor the results of the inquiry outlined above for inclusion in IMR-13.

**Results**

The monitoring team has some substantial concerns regarding whether the requirements of this paragraph are routinely met in the field; based on several outcomes during calls for service during over three consecutive reporting periods, we suggest that APD assess current protocols and oversight process related to field responses to crisis and mental health-related calls for service, uses of force and surreptitious, unreported uses of force during those calls.

In short, APD worked with their internal data experts to craft an inquiry within the CAD system for key words to find interactions between the officer under review and people in crisis, which allowed for the identification of mental health components that may have been "hidden" within other call types. The APD searched the officer's call responses during 2020, from January 1 to December 31. The calls returned by the search were further vetted to determine whether they were mental health or crisis-related using CAD and report data. APD is conducting this narrow review (focused on one officer), and the responses of other officers who were on scene with the officer under review were also included in the overall trends memo.

Once relevant calls were identified, APD conducted a thorough review of 27 of that officer's calls for service, which involved watching OBRD video and reviewing all related reports. An additional 26 calls for service were specifically reviewed to determine if they met the criteria for mental health or crisis-related call. Throughout the review process, a total of five officers were referred to APD's Internal Affairs Division for further review. This type of process is the key to compliance in many of the outstanding areas noted in this report.  Gentle pressure, relentlessly applied by APD, will most certainly avert potentially disastrous situations.

Our review revealed several trends that warrant immediate attention from APD, including officers misunderstanding when pat-downs are legal and a policy and training deficiency regarding car doors.[114]

The monitoring team appreciates this initial pilot review focused on one officer's interactions with people with mental illness and people in crisis. We look forward to APD's continued reviews as they address our Recommendation 4.7.115b from IMR-12, which calls for a review of randomly selected mental health-related calls for service citywide. Furthermore, we encourage the City to consider (a) the sustainability of this review process (i.e., should it continue, its processes should be formally memorialized in an SOP) and (b) where this type of review process fits into the City's and the APD's existing oversight and accountability mechanisms.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**

---

[114] The reviewers noted in their Trends Memo that APD officers "need clear direction on what to do when they accidentally close vehicle doors on individuals in their custody. Is there a complaint of injury? Is this force? How should this be reported and under what protocol?"

Operational: **Not In Compliance**

***Recommendation for Paragraph 128:***

***4.7.115b: Conduct a random sample of all CIT/CIU responses to ensure that the issues identified above have not been replicated in other CIT/CIU responses by other officers.***

### 4.7.116 – 4.7.124 Assessing Compliance with Paragraphs 129-137

Monitoring team members reviewed (via reports) the APD's current activities related to provision of policing services to individuals with mental illness and individuals in behavioral crises (paragraphs 129 through 137). Our observations indicate that, overall, the behavioral health paragraphs of the CASA have received careful and meaningful attention during the reporting period.

The data and processes we reviewed indicate that APD's outreach and support efforts to those in the communities served by CIT processes are resilient, effective, and problem-oriented. Data collection, analysis, and reporting processes and protocols have been updated with improved accuracy and reliability, and training remains a strong point of this effort.

As we indicate in Paragraph 128, however, there are some substantial issues with some of APD's crisis response tactics. While these instances are relatively rare, they are serious and deeply non-compliant with the requirements of the CASA. See paragraph 128 above for more detail. The reader should note that our random sample of COAST/CIU responses was just that, a sample. As such, the lessons learned from that sample are more likely than not applicable to crisis response tactics as a whole.

We are reasonably sure, given our assessment methodologies, that we have not uncovered all of the problematic incidents related to CIT responses. A thorough internal review at APD of recent CIT/CIU responses is essential. Further, we have already identified officers who have been involved in these unwarranted events. Those officers should be subjected to a 100 percent review of CIT/CIU responses in which they were involved in any way. Salient information was provided to APD and city leadership shortly after it was uncovered by the monitoring team. The CASA violations we noted were not "errors." They were deliberate (and surreptitious) violations of CASA requirements, policy, and training. More importantly, we note that it was the monitoring team who noticed and sounded the warning on these actions, not the APD. Immediate, direct, and effective assessments are required by APD to determine the scope and nature of these deliberate counter-CASA actions. Linked failures of supervisory, command, and executive oversight (including FRB failures) should be identified, cataloged, assessed, and ameliorated.

### 4.7.116 Assessing Compliance with Paragraph 129

Paragraph 129 stipulates:

> **"APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:**
> **a) date, shift, and area command of the incident;**
> **b) subject's age, race/ethnicity, and gender;**
> **c) whether the subject was armed and the type of weapon;**
> **d) whether the subject claims to be a U.S. military veteran;**
> **e) name and badge number of crisis intervention certified responder or CIU detective on the scene;**
> **f) whether a supervisor responded to the scene;**
> **g) techniques or equipment used;**
> **h) any injuries to officers, subjects, or others;**
> **i) disposition of the encounter (e.g., arrest, citation, referral); and**
> **j) a brief narrative of the event (if not included in any other document)."**

### Results

During this reporting period, UNM's Institute for Social Research produced an updated data book per their agreement with the APD to analyze the data required by this paragraph.

APD's partnership with UNM's Institute for Social Research was designed to advance its data analysis efforts, but that has not materialized. In our observation, this partnership has not advanced the thinking of the APD about these data. The UNM Sentencing Commission (which is affiliated with the Institute for Social Research) produced an updated Databook that included data from January to September 2020- (not the entirety of this reporting period), which depicts data from all required categories except for "c) whether the subject was armed and the type of weapon" and "f) whether a supervisor responded to the scene." The monitoring team is concerned about the lack of complete data submitted for review and looks forward to reviewing a complete dataset during the next reporting period.  Admittedly, these are complex tasks for any police department and especially difficult for APD, given its previous history with complex data analytics.  An external agent may be necessary to facilitate the needed data analysis processes.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

*Recommendation for Paragraph 129:*

*4.7.116a:  APD should update its data collection, and analysis capacities related to paragraph 129 and ensure that all data required by Paragraph 129 are collected, analyzed, reported, and are used to guide the department's decision making regarding the requirements of Paragraph 129.*

### 4.7.117 Assessing Compliance with Paragraph 130

Paragraph 130 stipulates:

> **"APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis."**

**Results**

APD's behavioral health units continue to innovate and address the requirements of this paragraph, including utilizing actual encounters to inform training. APD has analyzed the most recent data available during this reporting period. This analysis is critically important to the agency's decision-making. It is used to "develop new response strategies for repeat calls for service" and to "identify systemic issues that impede APD's ability to provide an appropriate response."

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

### 4.7.118 Assessing Compliance with Paragraph 131

Paragraph 131 stipulates:

> **"Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services."**

197

**Results**

APD did not update this policy during this reporting APD's Progress Report,[115] even though this policy is "in the policy development process" but has not been updated in a timely fashion, so it is now overdue. As we stated in our last report, APD's efforts to identify and implement a collaborative approach to policy, training, and implementation around this important issue continue to evolve, and we encourage the APD command staff and leadership to focus their efforts on these issues during the next reporting period (see IMR-12 recommendation 4.7.118c). We look forward to both reviewing the feedback provided by the MHRAC on the policy revisions and the APD's review of best practices (IMR-12 recommendation 4.7.118a) in the near future.

As in the last reporting period, the monitoring team saw some positive signs of increased collaboration across the department, including some increased collaborative problem solving regarding a specific incident in which a person living with mental illness was involved in a tactical situation that resulted in constructive conversations among CIU and SWAT about how to handle similar issues in the future. We also reviewed email referrals to CIU from SOD for assignment to a CIU detective for follow up in SWAT activation cases involving people with mental illness.

Training regarding these important issues also remained in flux during this reporting period, with some training that is related to barricaded suicidal subjects taking place, but no training regarding an updated policy occurred. For example, training for supervisors that took place in November 2020 entitled "2020 Supervisor Incident Command and Control"  mentions "coordinated withdrawal" in some cases of a "suicidal subject." While some training is better than no training, we note that APD still struggles to update policies regularly, which means APD loses the ability to "learn" from others in the field, to adapt to and adopt new "best practices," and to peer-test current APD response modalities.

     Primary:    **In Compliance**
     Secondary: **Not In Compliance**
     Operational: **Not In Compliance**

***Recommendations for Paragraph 131:***

***4.7.118a: Work with advisory committees to ensure the protocols are updated and that related policy and protocols are reflective of "best practices." Develop appropriate training strategies, deliver training, implement the policy, and evaluate results.***

---

[115] "Progress and Status Summary of the United States Department of Justice Settlement Agreement, Entered into by the United States of America and the City of Albuquerque, Regarding the Albuquerque Police Department, Thirteenth Report, August 1, 2020 – January 31, 2021," available at https://documents.cabq.gov/police/reports/department-of-justice/thirteenth-apd-progress-report.pdf

***4.7.118b: APD command staff should require cooperative approaches between CIU, CNT, and SOD, establishing timelines for assessments as to why inter-unit cooperation on the issue of barricaded suicidal individuals has lagged, and follow-up on findings and recommendations at regular intervals.***

***4.7.118c: APD executive leadership should pay particular attention to the results of the implementation of cooperative approaches between CIU, CNT, and SOD. This project should be goal-driven, should include the production of specifically articulated tangible objectives and measurable timelines to ensure progress is made.***

### 4.7.119 Assessing Compliance with Paragraph 132 Crisis Prevention

Paragraph 132 stipulates:

> **"APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers."**

**Results**

Based on our review of program documentation, it is apparent from in-field reports, data analysis, and real-time response to identified issues that APD's COAST and CIU routinely follow up with members of the community who would benefit from COAST and CIU services. During this reporting period, COAST members continued to use creativity and solid problem-solving approaches to address persistent issues. In the last reporting period, some COAST members were temporarily reassigned to the City's Department of Family and Community Services to assist with COVID-19 placements. They have since returned to their duties at APD. Due to retirements, there are currently three COAST members who cover the six area commands, down from five. During this reporting period, CIU, MCT, and COAST conducted numerous home visits. Beyond that, COAST and CIU function as a referral and assistance mechanism for those in the community confronted by persistent mental health issues.  APD must be attentive to staffing in these critical areas.  Staffing has decreased 60 percent since our last monitor's report. Few units, even the strong ones, like CIU and COAST, can survive such draconian cuts in staffing and continue to provide adequate service.  We will revisit this issue in IMR-14, and if staffing has not increased, APD will suffer a loss of compliance for this paragraph.

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.120 Assessing Compliance with Paragraph 133

Paragraph 133 stipulates:

> **"COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at risk of experiencing a mental health crisis and assist with follow-up calls or visits."**

## Results

Based on our review of program documentation, including weekly and monthly summaries of CIU activities, it is apparent from in-field reports, data analyses, and real-time response to identified issues that APD's COAST and CIU routinely follow up with people who would benefit from COAST and CIU services. The work done this reporting period by COAST and the CIU was compassionate and productive. They worked to establish and maintain relationships with people and connected them to needed services such as food boxes and transportation to medical appointments. In one case, CIU detectives assisted a community member with locating a new apartment and coordinating with an insurance company. These efforts are becoming a further bulwark for those members of the Albuquerque community living with mental illness. However, we caution APD to be cognizant of issues with staffing, as even the best of systems will eventually fail in the face of continual under-staffing.

We also note the work CIU has done on its LEAD (Law Enforcement Assisted Diversion) program, which serves to divert people away from the criminal justice system, in certain circumstances, before they are arrested. We appreciate the creative thinking and problem-solving that goes into creating and maintaining such a program.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.121 Assessing Compliance with Paragraph 134

Paragraph 134 stipulates:

> **"APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options."**

200

**Results**

Based on our review of program documentation, including in-field reports, data analysis, and real-time response to identified issues, it is clear that APD's COAST and CIU routinely follow up with critical elements of the population who would benefit from COAST and CIU services. The weekly and monthly reports of COAST and CIU members indicate a wide variety of referrals, connections, and coordination with services and treatment options.

Again, we appreciate the CIU's work to establish the LEAD program and train APD officers about it.

>Primary:      **In Compliance**
>Secondary:  **In Compliance**
>Operational: **In Compliance**

**4.7.122 Assessing Compliance with Paragraph 135**

Paragraph 135 stipulates:

>**"APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement. Within three months of completing the staffing assessment and resource study required by Paragraph 204 of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less."**

**Results**

APD provided the monitoring team with a detailed tracking report for all COAST members and detectives within the CIU. The number of COAST clinicians declined in the last reporting period, leaving only 3 COAST specialists to serve the City. The Crisis Intervention Section has no plans to replace the two COAST members who left during the last reporting period due to the new and evolving Albuquerque Department of Community Safety (ACS). The City envisions that ACS will become the agency responsible for non-sworn responses to community members in crisis or living with mental illness.  We remind the City that transference issues in such complicated processes require a great deal of forethought and planning to ensure that programs are discontinued in the former "parent agencies" are picked up without a significant dilution of service levels.

As of January 31, 2021, the number of CIU detectives was 12 (not including two sergeants and two lieutenants). We note that an additional lieutenant was added to the unit during this reporting period, which we find encouraging. The monitoring team also

notes that having two sergeants and two lieutenants in this unit are working nicely in terms of supervision, division of labor, and morale.

We note parenthetically that the use of a data-driven, methodologically appropriate workload and staffing planning and analysis to ensure expansion (or contraction) of CIU staffing based on workload and other factors could positively affect the COAST and the MCTs. This would ensure reliable staffing levels for mental health professionals in COAST and in the MCTs are attained. At this point, the data exist to support this analysis, and such an analysis is something that APD should consider carefully and update regularly.

>Primary:      **In Compliance**
>Secondary:  **In Compliance**
>Operational: **In Compliance**

## 4.7.123 Assessing Compliance with Paragraph 136

Paragraph 136 stipulates:

> **"COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources."**

## Results

COAST and CIU have developed and continue to develop robust relationships with service providers, including local hospitals, throughout the city and interact with them regularly to discuss new ideas and solutions. In fact, APD CIU members have been active in recruiting new members of MHRAC and encouraging new partners to attend MHRAC meetings, which serve as exercises in problem-solving, brainstorming, and coordinating local services. As we have noted elsewhere in this report, community participation in MHRAC meetings has increased over the course of the last year, and participating COAST and CIU members engaged in creative problem solving during this reporting period, especially regarding the COVID-19 Pandemic.

>Primary:      **In Compliance**
>Secondary:  **In Compliance**
>Operational: **In Compliance**

## 4.7.124 Assessing Compliance with Paragraph 137

Paragraph 137 stipulates:

> **"APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal**

202

**identifying information of subjects or complainants. APD shall collect the following data:**
**a) number of individuals in the COAST and CIU caseloads;**
**b) number of individuals receiving crisis prevention services;**
**c) date, shift, and area command of incidents or follow up encounters;**
**d) subject's age, race/ethnicity, and gender;**
**e) whether the subject claims to be a U.S. military veteran;**
**f) techniques or equipment used;**
**g) any injuries to officers, subjects, or others;**
**h) disposition of the encounter (e.g., arrest, citation, referral); and**
**i) a brief narrative of the event (if not included in any other document)."**

**Results**

During this reporting period, UNM's Institute for Social Research produced an updated data book per their agreement with the APD to analyze the data required by this paragraph. APD continues to update its "CIU Data Book" entitled Police Response to Behavioral Health Incidents in Albuquerque, regularly, but it did not update it with 2020 data during this reporting period. The most recent version of the data analysis appears in the 2019 APD Crisis Intervention Annual Report, which is available on the City's website and reflects all of the elements required by this paragraph.

APD's partnership with UNM's Institute for Social Research was designed to advance its data analysis efforts, but that has not materialized. In our observation, this partnership has not advanced the thinking of the APD about these data. The UNM Sentencing Commission (which is affiliated with the Institute for Social Research) produced an updated Databook that included data from 1/1/20-9/1/20 (not the entirety of this reporting period), which depicts data from all required categories except for "c) whether the subject was armed and the type of weapon" and "f) whether a supervisor responded to the scene." The monitoring team is concerned about the lack of complete data submitted for review and looks forward to reviewing a complete set of data during the next reporting period.

      Primary:    **In Compliance**
      Secondary:  **In Compliance**
      Operational: **Not In Compliance (see also paragraph 129)**

**4.7.125 Assessing Compliance with Paragraph 139[116]**

Paragraph 139 stipulates that:

---

[116] Paragraph 138 is judged to be prefatory to the following section on training, and as such established goals, but not quantifiable objectives.  These are dealt with in paragraphs 139-148.

> **"APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices. APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically."**

## Results

The APD and City routinely submit new policies and suggested revisions to existing policies to the monitoring team (and DOJ) for review and comment. We continue to find APD's responses to concerns voiced during these policy reviews to be meaningful and effective.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.126 Assessing Compliance with Paragraph 140

Paragraph 140 stipulates:

> **"APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference. APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format."**

## Results

The APD continues to conform to accepted practice agreed to by the Parties and the monitor relating to policy development, archiving, and oversight.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.127 Assessing Compliance with Paragraph 141

Paragraph 141 stipulates:

> **"Within three months of the Operational Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures."**

## Results

The APD continues to conform to accepted practice agreed to by the Parties and the monitor relating to policy development, review by officers, and oversight.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.128 Assessing Compliance with Paragraph 142

Paragraph 142 stipulates:

> **"Within three months of the Operational Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities. The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014)."**

**Results**

The APD continues to conform to accepted practice agreed to by the Parties and the monitor relating to the Policy Review Board.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.129 Assessing Compliance with Paragraph 143

Paragraph 143 stipulates:

> **"Within nine months of the Operational Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement. The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division."**

**Results**

The APD continues to conform to accepted practice agreed to by the Parties and the monitor relating to the Policy Review Board.

Primary:      **In Compliance**

Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.130 Assessing Compliance with Paragraph 144

Paragraph 144 stipulates:

> **"Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Operational Date. APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility. There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations."**

### Results

The APD continues to conform to accepted practice agreed to by the Parties and the monitor relating to the policy documentation and access procedures.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.131 Assessing Compliance with Paragraph 145

Paragraph 145 stipulates:

> **"The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law. The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews."**

### Results

Policies are routinely reviewed and updated as a normal course of business at APD.

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.132 Assessing Compliance with Paragraph 146

Paragraph 146 stipulates:

> **"APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure."**

**Results**

The monitoring team, over the last several reports, has noted issues regarding compliance with this paragraph and has initiated detailed discussions with APD related to the requirements of paragraph 146, both with the former chief of police and the current (for the IMR-13 reporting period) acting chief of police. We have noted, in those conversations, problems with the implementation of remedial measures upon a finding of policy violations and have noted APD's continuing penchant for holding significant portions of discipline "in abeyance." The abeyance issue is, in the monitor's opinion, a device designed to meet the requirements of the CASA by, for example, assigning discipline that fits the requirements of the discipline matrix and then holding a substantial portion of the discipline "in abeyance." These abeyance findings often reduce discipline required by the discipline matrix by half or more. For example, in a case in which the discipline matrix requires 30-90 days suspension, APD's final finding may institute a 30-day suspension, then holds 20 days in abeyance, resulting in only a 10-day suspension for a violation requiring a 30–90-day suspension.

The monitor has personally had detailed conversations concerning this issue with both the previous chief and the current chief, who have both indicated their understanding that this process violates the tenants of effective discipline. Nonetheless, the process continues unabated to this day. Based on our discussions and the failure to address this issue by two separate chiefs of police, it is the monitor's conclusion that the department is deliberately indifferent to the requirements of this paragraph.

> Primary:        **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraph 146:*

*4.7.132a:  APD should consult with the monitoring team regarding solutions for the problems related to holding discipline "in abeyance" and come to an agreement on how this issue will be remediated.*

*4.7.132b:  Ensure, via training, inter-office memoranda, or other methods, that all command-level personnel involved in assessing*

*disciplinary outcomes are trained in monitor-approved (revised) policies regarding the use of the disciplinary matrix.*

*4.7.132c:  APD should directly notify the monitor, in writing, in each and every event in which discipline assigned by the department is held in abeyance or otherwise results in a violation of recommended discipline stipulated in the disciplinary matrix.*

### 4.7.133 Assessing Compliance with Paragraph 147

Paragraph 147 stipulates:

> **"APD shall submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ for review and comment before publication and implementation. If the Monitor or DOJ objects to the proposed new or revised policy, procedure, manual, or other administrative order or directive, because it does not incorporate the requirements of this Agreement or is inconsistent with this Agreement or the law, the Monitor or DOJ shall note this objection in writing to all parties within 15 business days of the receipt of the policy, procedure, manual, or directive from APD. If neither the Monitor nor DOJ objects to the new or revised policy, procedure, manual, or directive, APD agrees to implement it within one month of it being provided to DOJ and the Monitor."**

## Methodology

Members of the monitoring team continue to routinely review policies, procedures, administrative orders, and special orders for compliance with this paragraph.  APD's practice regarding special orders (temporary instructive mechanisms designed to revise workflow, review, and or decision-making processes at APD) are now routinely routed through the monitoring team for review and comment.

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.134 Assessing Compliance with Paragraph 148

Paragraph 148 stipulates:

> **"APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions. If,**

**after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection. If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter. The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies. Factors to consider in making this determination include: 1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor. In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review. Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion."**

## Methodology

The provisions of this paragraph seldom need to be invoked.  The Parties and the APOA have tended to be mutually supportive in getting policies moved through the approval process.

## Results

    Primary:       **In Compliance**
    Secondary:   **In Compliance**
    Operational:  **In Compliance**

## 4.7.135 Assessing Compliance with Paragraphs 149

Paragraph 149 stipulates:

> **"Within two months of the Operational Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement."**

## Methodology

Paragraph 149 identifies requirements for action by APD early on in the compliance process. This paragraph references the briefing of all officers on the requirements of the CASA, as well as the briefing and training of officers relating to their compliance methodology.

The monitoring team reviewed records from the department's PowerDMS system to

209

ensure all personnel signed off and acknowledged that the material was reviewed and received. The class schedule and roster were reviewed by the monitoring team to ensure the dates of delivery of the material and attendance by the members. During this reporting period, only a lateral class graduated. Records reviewed by the monitoring team show that the lateral class was briefed and presented the terms of the Agreement, and all members of the class completed the review/signature for this reporting period. The City remains in compliance with this paragraph based on earlier performance.

**Results**

|             |                   |
|-------------|-------------------|
| Primary:    | **In Compliance** |
| Secondary:  | **In Compliance** |
| Operational:| **In Compliance** |

### 4.7.136 Assessing Compliance with Paragraph 150

Paragraph 150 stipulates:

> **"Within three months of issuing a policy or procedure pursuant to this Agreement, APD agrees to ensure that all relevant APD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations. APD agrees to document that each relevant APD officer or other employee has received and read the policy. Training beyond roll-call or similar training will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy."**

### Methodology

APD suffered a major setback in their compliance processes for this reporting period. After reviewing APD's training calendars for the reporting period, we noted that major elements of required training were simply not implemented during this reporting period. When we discussed this issue with the then-assigned training commander, the response we received was, in effect, "we forgot." Major blocks of required refresher training required by the CASA (in this paragraph and others) were simply not implemented. We are more than disappointed at this lapse. Members of the monitoring team had spent an inordinate amount of time working with APD training command over the past three monitor's reports and noted, at one time, that the training process and product had improved substantially over earlier APD efforts. For a major command to simply "forget" to do its job is inexplicable and points to a complete lack of oversight from the previous chief of police. That lack of oversight has resulted in a finding of non-compliance that must be immediately remediated by the newly appointed

chief of police.

**Results**

      Primary:     **In Compliance**
      Secondary:  **Not In Compliance**
      Operational: **Not In Compliance**

**Recommendations for Paragraph 150:**

***4.7.136a:  Executive staff should maintain a "living document" that identifies critical milestones and processes required by the CASA and clearly identifies dates and responsibilities for all critical path processes required by the CASA and identifies critical milestones and due dates.  This document should be the touchstone of project management tool for APD in the future.***

**4.7.137 Assessing Compliance with Paragraph 151**

Paragraph 151 stipulates:

> **"Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Operational Date, and annually thereafter. Within six months of the Operational Date, APD shall set out a schedule for delivering all training required by this Agreement."**

**Methodology**

As we have noted elsewhere in this report, the training function at APD suffered a major failure during the IMR-12 and IMR-13 reporting periods.  Numerous changes to the schedule have taken place and will continue to take place into the next reporting period, due, in part, to the COVID-19 Pandemic. The monitoring team will continue to monitor new policies and changes to the policy that are pending approval, to ensure that the requirements of this paragraph are maintained and that all training required by this agreement is delivered and followed. The academy supplied the monitoring team with documentation of the following training that was conducted during this reporting period and training that is scheduled to continue into the next reporting period. Compliance for the below-listed courses will be determined once all members have attended courses scheduled for the next reporting period:

- FTO Basic and Recertification Class;
- COP/POP two-day training;
- 123 APD Cadet Class;
- 24th Lateral Class;
- Metro Court Class;
- 38th PSA Class;
- FTO Basic Class;

- Day and Night Low Light Firearms Qualification;
- Supervision Training; and
- Firearms/Rifle Class.

## Results

Primary:       **In Compliance**
Secondary:  **Not In Compliance**
Operational:  **Not In Compliance**

**Recommendations for Paragraph 151:**

**4.7.137a:  APD should conduct monthly update reports on the status of the training elements noted by this paragraph (above) to be out of compliance.  The report should contain:**

> **Due dates for scheduled completion of each training class currently "past due;."**
> **Dates training elements are trained; and**
> **Written tabulations of scores trained officers achieved at the end of the training process.**

**4.7.138 Assessing Compliance with Paragraph 152**

Paragraph 152 stipulates:

> **"APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty."**

## Methodology

The monitoring team requested from APD copies of COB documentation related to this paragraph. The monitoring team reviewed the Training History Reports for all the lateral hires for the 24th Lateral Class to ensure they are certified law enforcement officers. The academy class schedule for the lateral class was reviewed by the monitoring team to ensure all training required by the CASA was received prior to entry to duty. As documented by APD training records, all members of the 24th Lateral Class were briefed and presented the terms of the Agreement, all members of the class completed the review/signature for this reporting period. The monitoring team will continue to monitor the lateral hire program in future site visits.

## Results

Primary:       **In Compliance**
Secondary:  **In Compliance**

Operational:  **In Compliance**

### 4.7.139 Assessing Compliance with Paragraph 153

Paragraph 153 stipulates:

> **"APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records. APD shall also maintain complete and accurate records of any audit, review, assessment, or evaluation of the sufficiency or effectiveness of its training programs. APD shall make these records available for inspection by the Monitor and DOJ."**

### Methodology

During this reporting period (August 1, 2020, thru January 31, 2021), the monitoring team's requests for and subsequent review of, records responsive to Paragraph 153 produce ample evidence that the requirements of the paragraph are being met by APD. The material reviewed for this reporting period included, but was not limited to:

- 2020 Day and Night Low Light Firearms Qualification;
- Behavioral Science training for supervisors;
- 2020 Mandatory Supervision;
- Behavioral Science training for Cadet Class; and
- 2020 Top/Cop Two Day Training.

Based on our experience, APD continues to maintain compliance by making records available for inspection by the monitoring team during site visits.

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.140 Assessing Compliance with Paragraph 154

Paragraph 154 stipulates:

> **"APD shall ensure that changes in relevant case law and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and pre- service training."**

**Methodology**

No changes to relevant case law and statutes were noted during this reporting period (August 1, 2020, thru January 31, 2021). Based on past performance by the Advanced Training Unit, APD remains in compliance.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

**4.7.141 – 4.7.147 Assessing Compliance with Paragraphs 155-161: Field Training and Evaluation Program**

The monitoring team reviewed and examined the data required for APD to maintain compliance with paragraphs 155 through 161 for this reporting period (August 1, 2020, thru January 31, 2021) in the forms of policy, programs, and results. Due to the circumstances created by the COVID-19 Pandemic, the site visit for this reporting period was conducted via a virtual platform. Based on this visit and review, APD remains in Operational Compliance with the paragraphs in the CASA that relate to the Field Training and Evaluation Program.

During the virtual platform site visit, the monitoring team spoke with the APD Academy personnel responsible for maintaining the program development and implementation as per SOP 6-1 "Training Division." As in the previous reporting period, no known applicable changes to case law, core principles, or values had taken place, but, as in the previous reporting period, revisions to SOP 1-46 Field Training and Evaluation Program (FTEP) had been submitted and are on hold until the FTEP Operational Manual updates are completed.  These are pending approval. The monitoring team has received a draft copy of submitted revisions to the Field Training and Evaluation Program. Those revisions remain under review in the chain of command and will be assessed for compliance by the monitoring team once they are finalized.  The FTEP requires that academy graduates receive sixteen (16) weeks of field training and that recruits not be released from the program without completing the sixteen-week program.

The monitoring team reviewed Special Orders for the FTO Classes to ensure compliance for this reporting period. The 122nd Cadet Class graduated in July of 2020, and Phase One of the OJT commenced on July 20, 2020, and completed December 2020. They are as follows:

Field Service Bureau Special Orders

- 122nd Cadet Class SO 20-45 Phase I;
- 122nd Cadet Class SO 20-53 Phase II;
- 122nd Cadet Class SO 20-62 Phase III;

- 122nd Cadet Class SO 20-63 Phase III;
- 122nd Cadet Class SO 20-71,72,74,76,79, 85 Final Phase;
- 23rd Lateral Class SO 20-49,50 and 52;
- 23rd Lateral Class SO 20-82, 21-07, 09,10,11; and
- 122nd Cadet Class SO 21-08 Phase III (member was out on administrative leave will complete program during next reporting period).

These Field Services Bureau Special Orders maintain APD's 100% compliance with the program's requirement of sixteen weeks of field training and no early release from the program.

For this reporting period, the monitoring team reviewed the vetting process for the applications and backgrounds of the nine new individuals (FTO application, written test, basic final test, EWP's, oral board notes and results, board recordings, and certificates). The monitoring team review of the documentation indicated that all requirements of the CASA were met. APD submits background checks and applications (on an on-going basis) to the monitoring team for review to ensure compliance. The FTO program has continued to expand, largely due to the efforts the supervisor of the program has taken to reach compliance with the requirements of the CASA. The supervisor and the FTEP have maintained a close relationship with recent graduates from the program and have seen a high level of interest in these members becoming FTO's.

The FTEP conducted three FTO Basic Courses during this reporting period and supplied the monitoring team with the requisite documentation. Documentation for each course reviewed consisted of the following:

- Class roster;
- Participant's folder (pre-test, final test, practical DOR, and certificate);
- Critiques;
- Schedule.

During this reporting period, the FTEP continued to maintain compliance in the following areas:

1) Recruits are trained in multiple Area Commands;
2) Recruits are trained in different shifts; and
3) Recruits are introduced to different Field Training Officers.

As reflected in the supporting documentation (Special Orders listed above), APD maintains compliance with these requirements.

Members of the monitoring team also requested COB documentation to ensure APD continues to afford recruits with:

- A mechanism for confidential feedback regarding the quality of field training;

- Consistency between instructional processes developed in field training and at the training academy; and
- APD's consideration of feedback and what, if any, changes are made as a result of a given recruit.

Anonymous surveys conducted by the FTEP during this reporting period were reviewed by the monitoring team, as in previous reporting periods, to ensure compliance with the requirements of the CASA. The overwhelming responses reviewed by the monitoring team are positive in nature. The monitoring team did acknowledge negative responses in four of the critiques reviewed from this reporting period. The negative responses were in the areas of interpersonal skills, training skills, and core values. The FTEP supplied the monitoring team with historical documentation on the FTOs that received negative responses for this reporting period. A review of these documents showed no history of negative responses. As a matter of fact, three of the FTOs had extremely positive responses in previous critiques, except for one FTO who previously had a negative response in the same category as in this reporting period. The APD Academy continues to closely monitor the surveys and submit course-of-business memoranda covering these areas and any actions taken as a response to the surveys. It should also be noted that no specific incidents are mentioned in any negative responses on the surveys. Any FTO that receives negative responses meet with FTEP personnel and the meeting documentation is put in FTO's personnel file.

Current FTEP staffing levels:

- One Lieutenant;
- One Acting Lieutenant;
- Three additional police officers and one civilian administrative staff;
- Seventy-six (76) Active FTO's; and
- Five inactive (Administrative Leave);

The FTEP program added an administration officer during this reporting period to assist with the recruiting of FTO's. The FTEP is also in the process of producing a video to be launched in the PowerDMS system to bolster recruiting efforts.  During IMR-12, the FTEP implemented a "Final Phase Pilot Program" in the last two weeks of the program in which the FTOs would wear a modified yet approved uniform with all mandatory equipment to distinguish themselves from the recruit. The theory behind the different uniforms is that the general public tends to gravitate towards the senior officer, thus not allowing the junior officer (recruit) to be the lead. The FTO would still be present, continuing with his/her duties as an FTO, and would be available to address any issues as mandated by the current approved policy. Surveys were conducted of the program with good reviews, but the FTEP has decided to utilize it during the next OJT cycle to better measure its effectiveness.

The monitoring team will follow up in future site visits on the progress of the program with this latest addition to measure the impact on the program.

### 4.7.141 Assessing Compliance with Paragraph 155

Paragraph 155 stipulates:

> **"APD shall supervise and manage its field-training program to ensure that new officers develop the necessary technical and practical skills required to use force in accordance with APD policy and applicable law. The field-training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community. Field-Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.142 Assessing Compliance with Paragraph 156

Paragraph 156 stipulates:

> **"APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field-training program early."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.143 Assessing Compliance with Paragraph 157

Paragraph 157 stipulates:

> **"APD shall revise the qualifications for Field Training Officers to require three (3) years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism."**

217

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.144 Assessing Compliance with Paragraph 158

Paragraph 158 stipulates:

> **"New Field Training Officers and Area Sergeant Coordinators shall receive at least forty (40) hours of initial supervisory-level training and annual in-service training in the following areas: management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques. Field Training Officers and Area Sergeant Coordinators shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de- escalation techniques; and effective problem solving. APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.145 Assessing Compliance with Paragraph 159

Paragraph 159 stipulates:

> **"Recruits in the field-training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.146 Assessing Compliance with Paragraph 160

Paragraph 160 stipulates:

> **"APD shall provide a mechanism for recruits to provide**

> **confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the field-training program. APD shall consider feedback and document its response, including the rationale behind any responsive action taken or decision to take no action."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.147 Assessing Compliance with Paragraph 161

Paragraph 161 stipulates:

> **"The City shall provide APD with the necessary support and resources to designate a sufficient number of Field Training Officers to meet the requirements of this Agreement."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.148 Assessing Compliance with Paragraph 162

Paragraph 162 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system. To achieve these outcomes, APD and the Civilian Police Oversight Agency shall implement the requirements below."**

This Paragraph is an introductory paragraph for IAPS (formerly IAPS --Misconduct Division) and CPOA-related CASA requirements. As such, it requires no direct evaluation but is subsumed by the IAPS and CPOA-related individual requirements below.

### 4.7.149 Assessing Compliance with Paragraph 163:  Duty to Report Misconduct

Paragraph 163 stipulates:

> **"APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs Division for review and investigation. Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Division. Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment.**

## Methodology

Paragraph 163 of the CASA pertains to the duty of all APD officers and employees to report misconduct by APD officers and employees, and the duty of supervisors to document information regarding the misconduct of subordinates and to report same to IAPS. It also requires failure to comply to be grounds for discipline.

During the reporting period and the 13th virtual site visit, members of the monitoring reviewed sixteen investigations for which IAPS was responsible – four completed by IAPS and twelve referred to and completed by the Area Commands. The monitoring team also reviewed eight investigations completed by CPOA and two appeals completed by the CPOA Board. The four IAPS investigations are [IMR-13-14, IMR-13-15, IMR-13-16, and IMR-13-17]. The twelve cases completed by Area Commands are [IMR-13-18, IMR-13-19, IMR-13-20,  IMR-13-21, IMR-13-22, IMR-13-23,  IMR-13-24, IMR-13-25, IMR-13-26, IMR-13-27, IMR-13-28, and IMR-13-29]. The eight CPOA investigations are [IMR-13-30, IMR-13-31, IMR-13-32, IMR-13-33, IMR-13-34, IMR-13-35, IMR-13-36, and IMR-13-37]. The two appeals are [IMR-13-38 and IMR-13-39].

The monitoring team also reviewed APD regulations and had meetings with the IAPS Misconduct Commander and staff and the CPOA Director and staff.

## Results

The findings related to Paragraph163 indicate the following CASA-related outcomes. SOP 3-41-4 incorporates and mandates the reporting requirements of paragraph 163. Also, Special Order (SO) 21-15, Internal Affairs Request Through BlueTeam, which rescinded a similar SO 19-25 Second Amendment, specifies that reporting of misconduct by an APD member must take place within 24 hours of when the member has the knowledge or reasonably should have knowledge of, the misconduct, via an Internal Affairs Request within the IA database web application. This brings uniformity to

not only the time period in which reporting must take place but also the method of reporting.

During this reporting period, we found that all sixteen of the IAPS Misconduct cases implicated the tasks of paragraph 163. With 24 hours as a guideline, the monitoring team continues to interpret the term "immediately document and report" in the context of the factual scenario of each case.  In the four cases investigated by IAPS noted above, we found the referral time to IAPS to be satisfactory. In the twelve matters that were referred to Area Command for investigations, the monitoring team determined that five cases had satisfactory referral time. Of the remaining seven, the investigative files of six 5cases contained insufficient information to determine whether the referral to IAPS was timely:  [IMR-13-20, IMR-13-22, IMR-13-23, IMR-13-24, IMR-13-25, IMR-13-26, and IMR-13-27]. One matter, [IMR-13-29] involved an untimely referral. That case involved an allegation of failure to complete a CIT worksheet after mental health detention and transport. A review caught the error, but the referral to IAPS was made six days later, constituting an untimely referral. Therefore, we can find definitive proof of timely referrals in only 50% of the sixteen cases implicating this paragraph.

The monitor discusses the scarcity of information and quality of investigations conducted by the Area Commands more fully in the Investigation of Complaints section (paragraphs 183-194) of this report. Here, the monitor strongly recommends that IAPS ensure that the investigations conducted by the Area Commands contain adequate information to determine compliance with all applicable CASA requirements. If they do contain the requisite information, the monitor would expect APD to regain operational compliance with paragraph 163.

The monitor also continues to see issues pertaining to the timeliness of referrals to IAPS Misconduct regarding cases now being completed that were originally referred to IAPS. The timeliness of referral issues is linked to the Use of Force backlog reduction initiative and an ongoing interpretation issue of when a referral to IAPS should be made during a Use of Force review (when the review is complete or when reasonable indications of misconduct first arise). The monitor is of the opinion that the referral should be made by the latter.

The backlog and interpretive issues arising out of Use of Force reviews are more fully discussed in paragraphs 60-77 of this IMR. It is important that APD continues to emphasize and monitor the duty of supervisors closely to identify and timely report to IAPS instances of misconduct.

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

***Recommendation for Paragraph 163:***

***Recommendation 4.7.149a:  IAPS should build into the IAR template the requirement to document how and when the referring supervisor became aware of the alleged misconduct, to determine whether documentation and referral of the alleged misconduct is made in accordance with paragraph 163.***

**4.7.150 – 4.7.154 Assessing Compliance with Paragraphs 164-168: Public Information on Civilian Complaints**

Paragraphs 164 through 168 of the CASA pertain to the informational program required of APD and CPOA to make the public aware of the procedures for making civilian complaints against APD personnel. These paragraphs also direct that APD and CPOA provide information, in Spanish and English, and in different informational forums that increase the public's accessibility to complaint forms and facilitates the reporting of misconduct.  These paragraphs also require the acceptance of civilian complaints and require that officers identify themselves upon request. APD and CPOA have had longstanding compliance with this section of the CASA.

In addition to meetings with IAPS and CPOA during the 13th site visit, members of the monitoring team continued to review the APD and CPOA websites for information regarding procedures to make civilian complaints.  Due to the "virtual" nature of the 13th site visit, the monitoring team was unable to make unscheduled visits to APD substations and to City libraries and community centers for the purpose of determining whether informational brochures and Complaint and Commendation forms were available. In its past visits to APD, CPOA, and City properties, the monitoring team consistently found the informational brochures and Civilian and Commendation forms to be available, as well as visibly displayed for easy public access. Even though this aspect was non-observable during this site visit, due to the prior superlative performance with these public information requirements, full operational compliance has been maintained by APD, CPOA, and the City with Paragraphs 164 through 168 of the CASA.

The monitoring team continues to find the informational program to be effective. Information on complaint filing is available on the APD and CPOA websites and in informational materials, brochures, and posters. This information and the actual complaint forms were available online (in English and Spanish) on both the APD and CPOA websites.  CPOA has implemented the use of a new brochure, which provides a tear-off of a postage pre-paid complaint and commendation form, thereby making it easier for the public to engage the agency. The information clearly explains the "mechanisms" for filing complaints and includes complaint and commendation forms that can be filed electronically or downloaded. Complaint forms are readily accessible in hard copy at APD, CPOA, City buildings, as well as from individual patrol vehicles. Like the website, information on the hard copy forms is in Spanish and English. The information does not discourage the filing of complaints and makes clear that complaints can be filed anonymously or by third parties.

Further, based on our review of a stratified random sample of 16 IAPS and CPOA investigations, we found no instances of allegations of refusal to provide name and badge numbers when requested.

### 4.7.150 Assessing Compliance with Paragraph 164: Public Information on Civilian Complaints

Paragraph 164 stipulates:

> **"Within six months of the Operational Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.151 Assessing Compliance with Paragraph 165:  Availability of Complaint Forms

Paragraph 165 stipulates:

> **"APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall, public libraries, community centers, and the office of the Civilian Police Oversight Agency. Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints.  Complaint forms, informational materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person.  Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |

Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.152 Assessing Compliance with Paragraph 166:  Public Information on Complaint Process

Paragraph 166 stipulates:

> **"APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites.  The placard shall specify that complaints may be submitted anonymously or on behalf of another person.  APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles.  Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request.  If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint."**

### Results

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.153 Assessing Compliance with Paragraph 167:  Duty to Accept Citizen Complaints

Paragraph 167 stipulates:

> **"APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints**."

### Results

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.154 Assessing Compliance with Paragraph 168:  Multi-Lingual Complaint Forms

Paragraph 168 stipulates:

> **"Complaint forms and related informational materials shall be made available and posted in English and Spanish."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.155 – 4.7.168 Assessing Compliance with Paragraphs 169-182:  Training Regarding Complaint Intake

Paragraphs 169 through 182 of the CASA pertain to the steps necessary in the receipt, acceptance, and processing of complaints. These paragraphs require APD and CPOA to receive all complaints, regardless of whether they are made internally or externally, and regardless of whether they are made in a timely manner. They require an effective and uniform system that is allegation-based for classifying complaints, and internal referrals, and appropriate assignment of complaints for investigation.

During the reporting period and the virtual site visit, members of the monitoring team utilized the same methodology as prior periods, meeting via Zoom with the IAPS Commander and members of his staff, and the CPOA Executive Director and members of his staff.  We reviewed complaint log-in and classification records, selected (by way of a stratified random sample), and reviewed 4 IAPS, 12 Area Command, and 8 CPOA investigations completed during the reporting period. The monitoring team also reviewed the APD and CPOA websites and CPOA Board minutes relative to approval of investigations.

Except for paragraph 181, which addresses the requirements for proper classification and assignment of complaints, the monitoring team continues to find full compliance in regard to paragraphs 169 through 182. Accordingly, the findings related to Paragraphs 169 through 182 indicate the following outcomes related to the requirements of the CASA.

In prior IMR findings, the monitoring team consistently found that internal and civilian (external) complaints were accepted, reviewed, classified, and assigned for investigation according to CASA requirements and approved policy. However, based on our present review, out of 24 total investigations in our random sample, we found three instances in which the requirements of a proper classification protocol for purposes of assigning an investigation were not complied with [IMR-13-20, IMR-13-21, and IMR-13-

225

22]. These three cases all involved referral to the respective Area Commands for investigation where at least one of the allegations contained a sanction level of 5 or a sanction range that included a level 5. The policy requires only cases involving allegations that are sanction level 6 or 7 (complaints involving allegations of minor misconduct) are appropriate for Area Command investigations. This equals a compliance rate of 87.5%, well below the 95% required for operational compliance. The practice of referring allegations above a level 6 to Area Commands for investigation must cease in order for APD to regain operational compliance with paragraph 181.

Regarding acceptance of complaints, in our review of the stratified random sample of investigations as well as IAPS and CPOA processes, we found no instances of a refusal or even a hesitation by APD or CPOA to accept a citizen's complaint. Further, we are not aware of any information received formally through our report review processes or informally, through our contacts with *amici* and other interested persons, that suggest this is an issue. It has been, and continues to be, a long-standing policy among APD personnel that refusing to accept a complaint or the discouraging of a complaint, are grounds for discipline. Although timely complaints are encouraged, untimely complaints are accepted, as well as anonymous and third-party complaints. The monitoring team has also seen annual written requests from APD to relevant judicial officials requesting that APD be made aware of all allegations of officer misconduct made by judicial officials.

APD has developed and continues to use, a centralized numbering and tracking system that assigns unique identification numbers to all received complaints. Complaints are received and classified according to allegations and not potential outcomes.

The tracking system is being used correctly and appears to maintain accurate data, based on our comparisons with "known data." APD's Blue Team management software enables the tracking of allegations of misconduct by homeless or those who have a mental illness. Our reviews of the relevant log and investigations continue to show that complaints referred or made to APD and IAPS that are within the jurisdiction of the CPOA are referred to CPOA within three (3) business days.

In regard to the requirements to accept anonymous and third-party complaints per paragraph 172 of the total investigations reviewed by the monitoring team this reporting period, we found none which implicated these requirements. However, our review of the IAPS log of civilian complaints referred to CPOA shows that "anonymous complaints" are accepted by IAPS and forwarded to CPOA. Notwithstanding that our random sample for IMR-13 did not contain cases that were based on anonymous or third-party complaints and thus were non-observable this reporting period, based on past operational compliance, APD and CPOA continue to be in full compliance with paragraph 172.

Moreover, we continue to find no cases in which APD received a civilian complaint of misconduct and failed to timely inform supervisors or failed to timely refer a complaint to IAPS. Thus, we continue to find operational compliance with paragraphs 173 and 178.

Our stratified random sample found no instances in which a supervisor conducted an investigation of an incident in which the supervisor was involved as a participant or as a witness. Therefore, operational compliance by APD for paragraph 182 continues.

We note that APD is in the process of revising SOP AO 3-41, Complaints Involving Department Policy or Personnel, which addresses the procedures for accepting, processing, and investigating allegations of employee misconduct. We also note that IAPS started in the IMR-13 period to work with the monitoring team in receiving extensive technical assistance in overhauling its complaint intake function.

A properly revised AO 3-41 and an improved complaint intake function will enhance and facilitate compliance with this section of the CASA. In IMR-12, the monitoring team stated that it expected the revised AO 3-41 would be implemented no later than the expiration of the IMR-13 review period. Although we have seen a draft of the revision and progress has been made, a revised 3-41 has still not been implemented. The monitoring team will revisit the issue in IMR-14.

### 4.7.155 Assessing Compliance with Paragraph 169:  Training on Complaint Intake

Paragraph 169 stipulates:

> **"Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake**."

**Results**

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.156 Assessing Compliance with Paragraph 170:  Complaint Receipt Process

Paragraph 170 stipulates:

> **"APD shall accept complaints regardless of when they are filed.  The City shall encourage civilians to promptly report police misconduct so that full investigations can be made expeditiously, and the full range of disciplinary and corrective action be made available."**

**Results**

|  |  |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.157 Assessing Compliance with Paragraph 171:  Prohibition of Refusal to Take Complaints

Paragraph 171 stipulates:

> **"The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint shall be grounds for discipline."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.158 Assessing Compliance with Paragraph 172:  Acceptance of Anonymous Complaints

Paragraph 172 stipulates:

> **"APD and the Civilian Police Oversight Agency shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation.  Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail.  Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be provided with a complaint form in Spanish to ensure that the individual is able to make a complaint.  Such complaints will be investigated in accordance with this Agreement."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.159 Assessing Compliance with Paragraph 173:  Inform Supervisors of Citizen Complaints

Paragraph 173 stipulates:

> **"All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint.  All misconduct complaints shall be submitted to the**

228

> **Internal Affairs Division by the end of the shift
> following the shift in which it was received**."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.160 Assessing Compliance with Paragraph 174:  Allegation by Judicial Officers

Paragraph 174 stipulates:

> **"APD and the Civilian Police Oversight Agency shall
> develop a system to ensure that allegations by a
> judicial officer of officer misconduct made during a
> civil or criminal proceeding are identified and assessed
> for further investigation.  Any decision to decline
> investigation shall be documented."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.161 Assessing Compliance with Paragraph 175:  Allegations Made by the Homeless or the Mentally Ill

Paragraph 175 stipulates:

> **"APD and the Civilian Police Oversight Agency shall
> track allegations regarding misconduct involving
> individuals who are known to be homeless or have a
> mental illness, even if the complainant does not
> specifically label the misconduct as such."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.162 Assessing Compliance with Paragraph 176:  Centralized Complaint Numbering System

Paragraph 176 stipulates:

229

**"Within six months of the Operational Date, the Internal Affairs Division, in coordination with the Civilian Police Oversight Agency, shall develop and implement a centralized numbering and tracking system for all misconduct complaints.  Upon the receipt of a complaint, the Internal Affairs Division shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant."**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.163 Assessing Compliance with Paragraph 177:  IAD Complaint Data Management

Paragraph 177 stipulates:

**The Internal Affairs Division's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.  This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.**

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.164 Assessing Compliance with Paragraph 178:  Supervisors to Provide Complaint Information

Paragraph 178 stipulates:

**"Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal**

> **Affairs Division.  All information should be referred to the Internal Affairs Division by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.165 Assessing Compliance with Paragraph 179:  Referral of Complaints to CPOA

Paragraph 179 stipulates:

> **"Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Division shall refer the complaint to the Civilian Police Oversight Agency."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.166 Assessing Compliance with Paragraph 180:  Handling of Internal Complaints by IAD

Paragraph 180 stipulates:

> **"Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Division for review and classification.  The Internal Affairs Division shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Division for investigation.  In consultation with the Chief, the commanding officer of the Internal Affairs Division shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Division, the Multi- Agency Task Force, and/or referred to the appropriate federal law enforcement agency.**"

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**

Operational:  **In Compliance**

### 4.7.167 Assessing Compliance with Paragraph 181:  IAD Classification Protocol

Paragraph 181 stipulates:

> **"APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Division in determining where an internal complaint should be assigned."**

**Results**

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 181:*

*4.7.167a:  APD should consult with the monitor after providing a detailed internal complaint classification protocol and should incorporate the necessary changes to the protocol after feedback from the monitor.*

### 4.7.168 Assessing Compliance with Paragraph 182:  Prohibition from Self-Investigation

Paragraph 182 stipulates:

> **"An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct."**

**Results**

Primary:       **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

**4.7.169--4.7.180 Assessing Compliance with Paragraphs 183-194: Investigation of Complaints**

Paragraphs 183 through 194 of the CASA pertain to requirements for thoroughness, timeliness, reliability of findings, and overall quality in regard to the investigation of misconduct complaints. For example, these paragraphs require that all relevant evidence be considered and that those investigations are fair, impartial, and reach reliable findings. They also require time limits for completion of investigations, designated permissible findings with the corresponding standard of proof, and an assessment regarding whether the facts of an investigation indicate a need for change in policy, procedure, or training. In addition, requirements are set forth regarding the situations in which there may be simultaneous criminal and administrative investigations of the same subject matter.

In regard to paragraphs 183 through 194, during the 13th reporting period, members of the monitoring team reviewed a stratified random sampling of 16 investigations for which IAPS was responsible (four completed by IAPS and 12 completed by the Area Commands) and eight completed by CPOA. The monitoring team also met with the Acting Chief and the City Attorney, the CPOA Director and CPOA Legal Counsel, the IAPS Commander, attended a virtual meeting with CPOA Board members, and reviewed CPOA Board meetings, agenda, minutes, and findings on the CPOA website.

First, we take this opportunity to repeat and supplement what we pointed out in IMR 12 regarding IA processing procedures improvements. The Commander of IAPS now requires supervisory reviews of investigations at marks of 10, 20, and 40 days after assignment. Also, investigations are required to be complete within 70 days of assignment, and any extension must be approved by the Commander of IAPS. Requests for the chief's approval for an extension beyond 90 days must likewise be approved by the Commander of IAPS. The Commander also performs a weekly "timeline check" on every open IAPS investigation, and investigations surpassing 60 days are automatically flagged for the Commander's review. Approval of completed investigations is electronically signed by the Commander, leaving no room for the challenge of when the investigation was actually completed. The timeline for review of a completed investigation by the chain of command through the chief is also tracked.

Organizational changes have also been implemented that will improve the quality of investigations as well as timeliness. The first crucial steps in the IA process – proper intake/preliminary assessment/assignment are now a separate area of focus led by an Acting Deputy Commander. This position will be converted to a Civilian Intake Manager position.[117] This individual also decides which allegations to forward to the Area Command for investigations and is available if called upon for guidance and quality control for those minor investigations assigned out to the Area Commands. Once investigations are assigned to IAPS investigators, the quality of those investigations is the area of supervisory focus of a separate Deputy Commander of Investigations.  As

---

[117] This is the civilian equivalent of a deputy commander.

we pointed out in the discussion of paragraphs 169-182, the monitoring continues to provide extensive technical assistance in the upgrading of the Complaint Intake function. There is also an improved communications process among the parties and monitoring team regarding intake and discipline, as discussed in the Discipline and Transparency section (paragraphs 201-202) of this report.

The findings related to Paragraphs 183 through 194 address the following requirements of the CASA.

Regarding the availability of an effective mediation program and compliance with paragraph 184, it should be noted that a new Mediation Protocol, in the form of a Memorandum of Understanding between the City, APD, APOA, and CPOA, was filed with the Court along with a *"SECOND JOINT STIPULATION SUSPENDING, IN PART, PARAGRAPH 184 OF THE COURT-APPROVED SETTLEMENT AGREEMENT AND JOINT BRIEF EXPLAINING THE BASIS FOR PARTIAL SUSPENSION."* at the initiation of the IMR-13 review period (on the final day of the IMR-12 review period). The purpose of this document was to make it possible for allegations of less serious or minor misconduct to be the subject of mediation and to test the efficacy of this expanded mediation program. An Order was signed and filed by the Court on August 6, 2020, approving the Second Joint Stipulation.

The monitoring team recognizes that City and CPOA have expended considerable good faith efforts to carry out the mediation of complaints under paragraph 184. Initial indications are that the Joint Stipulation, allowing for an expansion of complaints that are eligible for mediation, will prove to be the catalyst for an effective mediation program. To date, 27 cases have been referred to mediation (both identified as acceptable for mediation and for which the respective complainants have consented to mediation), and five of those have been successfully mediated. None have been returned for investigation as unsuccessfully mediated.

The monitoring team continues to emphasize that a viable mediation policy, and effective use thereof, are important in the overall disciplinary process and could prove to be instrumental in alleviating CPOA's investigative burden, as well as enhancing public confidence in the APD. The mediation policy and its implementation, along with a full complement of six CPOA investigative staff, and the collective impact on case resolution and timeliness of same, will be a focus of the monitoring team in the next IMR.

APD personnel are required by policy and practice to cooperate with the internal affairs system.  This cooperation is required by regulation and practice. As in the past IMRs, we continued to find one instance in our random sample of investigations where a member of APD refused to cooperate with an investigation [IMR-13-14].In that case, the subject officer was terminated based on his refusal to cooperate. Thus, APD continues to demonstrate operational compliance with the task of requiring cooperation in internal affairs investigations.

Based on past reviews, we have found that non-use of force investigations conducted by IAPS, and investigations conducted by CPOA, generally have contained reliable findings. As we stated in IMR 12, the monitoring team is now focusing also on the investigations of minor misconduct allegations conducted by the Area Commands and division commands. As more fully explained below in this section of the thirteenth report in the Discipline and Transparency section (paragraphs 201 and 202) of this IMR, we note serious concerns about the quality of these investigations and/or the documentation of investigative steps, as well as the discipline imposed at the Area Command level. We believe the lack of training for the Area Commanders regarding how to conduct an IA investigation and the principles of progressive discipline are largely responsible for this state of affairs.

Again, this reporting period, our stratified random sample revealed investigations that we deem to be deficient.  These are discussed below.

First, our review revealed five investigations that were administratively closed or had allegations that were partially administratively closed: [IMR-13-31, IMR-13-32, IMR-13-33, IMR-13-34, and IMR-13-36].  Of these five, we find that one, specifically [IMR-13-36], was not a proper administrative closure.

[IMR-13-36] was an investigation based on a complaint from an employee at the UNMH Cimarron Clinic concerning the handling of a certificate of evaluation for a mental health patient (described as suicidal). The certificate was faxed to the SW Station on July 9, 2020. On Monday, July 13th, the patient had still not been transported. After calling several times, the complainant (health care worker) was finally able to connect with the station, and the faxed evaluation was found at the station. She was told that a specific Sergeant would follow up. Again, the patient was not picked up and transported. The complainant called the next morning again and spoke to a person identified only by their first name, and as a result, the certificate was faxed over again. An officer responded later that day (Tuesday) to the patient's home. The officer called the psychiatrist who conducted the evaluation and questioned the medical necessity of the order. After discussing the medical necessity, the officer transported the patient.

The gist of the complaint was that the evaluation was faxed on a Thursday morning and not acted on until a Tuesday. The investigation correctly pointed out that SOP 2-19 requires an officer in such a situation to verify the certificate. The investigation focused on the process for receiving and acting on certificates of evaluation. It appropriately identified confusion and the need for more specific policy. The investigator was told that revisions to the policy are pending monitor review. The investigation found that a Lieutenant of the CIT unit spoke with the complainant and offered suggestions to her regarding improvement of the process for requesting evaluations. The investigation pointed out that the Lieutenant thought that employee accountability would be difficult to assess unless the policy is revised and fixed. The investigator attempted to contact the complainant at the work number she supplied but could not do so as she no longer worked at the UNMH Cimarron Clinic, which was the only contact information that was

available. The matter was administratively closed as having been informally resolved between the Lieutenant and the complainant.

Regarding the officer who responded and questioned the validity of the complaint, the administrative closure was proper. The policy requires questioning the validity of the certificate, and the investigation correctly determined that the officer's actions were within policy. However, the complaint also focused on the delay in responding between Thursday and Tuesday of the following week. Three names (two full names and one first name) of APD employees at the relevant substation were available in the complaint as leads for questioning to determine if any individual liability was warranted for the delay. Instead, the investigation was administratively closed based on insufficient guidance in SOP 2-19, the expected revisions to the policy, and fact that the Lieutenant and the complainant had a conversation on how to improve the system. Adherence to policy cannot be "assumed."  Administratively closing a compliant investigation because CPOA "expects" revisions to policy in inappropriate.  In addition, the investigation focused on SOP 2-19, whereas other policies dealing with efficiency and best efforts – most notably GO 1-1-4 D(1) and (4) – were also implicated by the complaint. Simply put, it should not take a substation of a police department from a Thursday until a Tuesday to act on a certificate of evaluation for a suicidal patient. We find that reasonable efforts to contact the other leads were not made to determine if and where inefficiencies existed and whether any individual was responsible for not acting on the certificate in a timelier manner. Perhaps an administrative closure would have still been the proper ultimate outcome, but we find that the investigation did not go far enough and was closed too early. Thus, we find the use of an administrative closure in [IMR-13-36] without the attempted questioning of the additional leads to be deficient.

Regarding CPOA investigations in which administrative closure was not utilized, we found one investigation [IMR-13-35] in which improper analysis was applied and which was not thorough enough to ensure the reliability of the investigation. That case involved a complaint received via the website about the improper handling of an assault by two APD officers. The matter involved an altercation between the complainant (an adult male) and a neighbor and her friend (adult females). The complainant had a tooth knocked out and a small charcoal grill pushed over on him. The complainant called in the assault, and the officer's arrived and heard the stories. The complainant, despite his injuries, was later charged, and the two females were not. The complainant alleged bias on the responding officer's part because one of the females claimed her father was in law enforcement.

The investigation was deficient for several reasons. First, notice letters were sent to both officers informing them of the complaint and the CPOA investigation, yet the investigation contains findings against only one officer. Findings regarding the other officer are inexplicably missing from the investigation materials forwarded to the monitoring team.  This is an issue requiring follow-up by APD to determine the cause for this "oversight."

Second, the CPOA investigation considered an inapplicable SOP and failed to consider more applicable SOPs. The investigation considered two potential SOP violations, 1-1-4-D.14 (P*ersonnel must not act officiously, abuse their lawful authority, or permit their personal feelings, animosities, or friendships to influence their official decisions*), sanction level 6-7, and SOP 1-1-4-G.1(*Personnel will not offer special consideration, privilege, or professional courtesy to other Department or City personnel or to personnel from other law enforcement or public safety agencies when such individuals are alleged to be involved in a violation of any law or Department or City policy*), sanction level 7. The investigation thus focused on whether special consideration or preferential treatment was given to the females. What should have also been considered was whether the police investigation of the operation was proper regardless of motivation and/or bias. Other Code of Conduct subsections, such as SOP 1-1-4-D.1(best efforts),1-1-4-D.4, (meeting standards of efficiency), or 1-1-4-D.17 (taking appropriate action) should have been considered. This would have also put the focus on the quality of the police performance in addition to the motivation of the police performance.

In regard to the allegation involving 1-1-4-G.1, a plain reading of that regulation shows that it only applies to situations where members of law enforcement or City employees are alleged to have received special consideration for a violation of any law or public policy. Here, no allegation was ever made that the father (ex-law enforcement) of one of the females was involved in any wrongdoing for which he received special consideration from the responding officers. Thus, this SOP should not have been considered. If it were to be considered, the appropriate finding should have been exonerated, as opposed to the finding of unfounded, which simply was not applicable.

The SOP 1-1-4-D.14 was sustained against one of the officers based on a finding by the CPOA investigator that the officer (a female officer) was biased in favor of the females involved in the altercation. This appears to be based on "the banter" between the officer and the two females and their common gender. Based on our review of the same video, we do not see how that inference is supported by adequate proof. The reasoning of the CPOA investigator was shallow and conclusory. Lastly, although there was a sustained finding, no retention card or disciplinary action was present in the monitoring team's materials. For all of these reasons, we find this investigation and its case file to be deficient.

Regarding the four investigations completed by IAPS in our random sample, we find none that are unreliable in findings. Any deficiencies in the imposition of discipline in these matters are discussed more fully in the Discipline and Transparency section (paragraphs 201-202) of this report.

In regard to those investigations conducted by the Area Commands, we have serious concerns regarding the uniformity and thoroughness of these investigations. First, we make some general observations. The case file materials usually reflect reviews of allegations and summaries as opposed to actual investigations. In most of these matters, it cannot be determined if the subject officer was actually interviewed. When the officer is interviewed, there is only a short synopsis of what the officer stated. In

some cases, a factual description of the alleged misconduct is missing, and only conclusory references to SOP violations are contained in the investigative materials. Several of the cases involved allegations with a sanction level 5, that is, investigations not involving minor allegations. Examples of these observations are as follows:

[IMR-13-18] involved the failure to upload old OBRD video into evidence.com. It was unclear whether it also involved a failure to activate the recording. A lieutenant inquired of the officer by email as to the whereabouts of the video footage and received no response. There is no indication of an officer interview or questioning in the IA investigation. The matter was sustained apparently on a summary of the allegation and proof of the email requesting the whereabouts of the video footage. The subject officer's reason, excuse, or lack of excuse would have been relevant to determining the finding and/or mitigating/aggravating circumstances.   These were not noted in the investigative materials.

[IMR-13-19] involved sustained allegations of failure to record an incident, violating the rights of onlookers, and personal conduct, failing to treat the public with respect. The investigative materials show no questioning of the subject officers and no factual description of the alleged code of conduct and violating the rights of onlookers' violations.

[IMR-13-20] involved an allegation that had a Sanction Level 5. The Disciplinary matrix shows that Class 5, first offense has a range of 8-32 hours suspension. Thus, it was not a minor offense and was inappropriate to refer to the Area Commands for investigation. In addition, an unfounded finding was reached that was unsupported by a "clear and convincing" standard. If a sustained finding was not reached, then the finding should have been not sustained.

[IMR-13-21] involved a squad gathering whose participants exceeded the Governor's Public Health Order. It involved allegations that contained a range, including sanction level 5. The investigative memo reflects that the subject officer was questioned, and based on her admission, the matter was sustained. However, the SOP utilized was 1-1-1-4-B.7, (*Personnel will conduct themselves in a manner that reflects favorably on the Department*), sanction 5-6, whereas the more appropriate SOP was 1-1-4-B.2 (*Personnel will obey all federal, state, and local laws,),* sanction level 1-7. All allegations that contain potential level 5 sanctions, by policy, should be investigated by IAPS.

[IMR-13-22] properly reached a sustained finding on an allegation of failure to report a use of force. The investigation also identified mitigating factors that the officer mistakenly believed he did not have a reportable use of force and was inexperienced with the use of force policy. The "mistake" mitigation, which led to a deviation from the chart of sanctions, was based on a statement the officer made to a supervisor. Confirmation and clarification of the mitigation, by speaking directly with the officer, should have been made by the Area Command investigator. The investigation referred to a sanction level 7, but the relevant SOP and letter of discipline authority listed it as a 5. The retention card reflected it as a 7, and an 8-hour suspension was imposed per the

238

retention card, which reflects a sanction level 5. Therefore, the investigative materials are contradictory as to the sanction level.  Such ambiguous meanderings in a disciplinary process are unacceptable.

[IMR-13-24] involved an allegation of failure to give Miranda warnings during an acting Sergeant's first use of force investigation, resulting in a sustained finding. The investigating Lieutenant referred to his review of the incident as a basis for the finding, but it is not clear exactly what was considered in the review, i.e., the evidence considered. The case is so poorly documented, it will be virtually useless should any additional disciplinary actions need to have penalties calculated.

[IMR-13-25] involved the arrest of an individual in order to effectuate an emergency mental health transport. The individual grazed his head as he was getting into the police vehicle. The individual was transported to mental health, and then the officer notified his supervisor of the use of force. The critical issue for determination was whether the definition of "immediately notify supervisor" was met. The investigation reached a finding of unfounded based on a rationale of no use of force, and officer actions did not cause any injury. However, the regulation requires immediate notification of a supervisor if there is "prisoner injury" and does not require the officer's actions to cause the injury in order to trigger the notification process. This issue was missed in the area command's analysis.

[IMR-13-26] involved an allegation of failure to perform quarterly evaluations. The investigative memorandum reached a finding of exoneration, apparently based on the fact that the subject officer was on military leave. However, the memo also stated that the officer "could have complied with the timeline requirements." What is not clear from the investigative materials is how the officer could have complied with the timeline requirements if he is on military leave; either he is on military leave, or he is not. The investigative packet lacked clarification.  The ambiguity and failure to carefully investigate and evaluate the proposed infraction were not noted by any level of review at APD.

[IMR-13-28] involved a sustained allegation of a Sanction level 6 violation for a supervisor (sergeant) failing to approve a summons within five working days per special order. The investigation did not involve an interview of the subject officer. Although the finding was based on adequate proof, a deviation from the matrix occurred as only a verbal reprimand was imposed. It is difficult to determine how a deviation from the matrix can occur without knowing the officer's explanation for failing to meet the requirement.

If we were to consider only those investigations conducted by IAPS and CPOA, the findings by the monitoring team would indicate two deficient investigations of the total of 12  investigations (4 IAPS and 8 CPOA) cases we reviewed by way of a stratified random sample. This yields a collective compliance rate of 83% relative to the "quality requirements" set forth in paragraphs 183 and 190 of the CASA, a very slight decrease from the 85% exhibited in IMR-12, and still short of the 95% required for operational

compliance. However, when one considers the nine (9) deficient investigations conducted by the Area Commands, the total would be 11 deficient investigations out of 24, and the compliance rate plummets to 54%. It is not clear whether the deficiencies noted in these Area Command investigations are caused by a failure to uniformly document the evidence considered and the investigative steps taken uniformly or due to summary and inadequate investigations. What is clear is that, despite the fact that Area Command investigations should involve only minor allegations (Sanction level 6-7), these investigations must still meet the CASA requirements pertaining to the quality of investigations.

APD must pay immediate attention to completing the training required for the Area Command investigators and must immediately act to standardize and upgrade the Area Command investigations, as well as the Area Command imposition of discipline (more fully discussed in the Discipline and Transparency, paragraphs 201-202, section of this report). Moreover, the IA investigations conducted by the Area Commands will continue to receive scrutiny from the monitoring team.

We found one other matter in which investigative processes or findings shortcomings must be pointed out, but since we do not feel they adversely affected the overall reliability or disposition of the investigation, we do not calculate them as deficient for compliance (reliability of investigation) purposes.   [IMR-13-16] involved an allegation of sexual assault that was unfounded. The finding was abundantly correct,  based on the clear and convincing standard. Although it did not affect the reliability of the investigation or the finding, a more appropriate SOP should have been utilized as an issue of concern. Here, the SOP considered was a Code of Conduct violation, 1-1-4D.2, (*Personnel will not engage in any activity or conduct any personal business that may cause them to neglect or be inattentive to their official duties . . .),* sanction level 6-7. When investigating such a serious allegation of unlawful conduct, SOP 1-1-4B.2, (*Personnel will obey all federal, state, and local laws, all applicable rules, and regulations . . .*), sanction levels 1-7,   is more appropriate. An SOP with a sanction level of only 6-7 should not be utilized as the sole SOP in an investigation involving an allegation, which, if true, would constitute a crime.

We strongly suggest that APD conduct a thorough quality review of all cases which we found to be deficient or in which we identified shortcomings to determine how these shortfalls made it through supervisory and command review at IAPS.

In IMR-12, we stated that it was not uncommon for APD to assign individuals to task-specific assignments without prior training to build the requisite knowledge, skills, and abilities (KSAs) required in that assignment, and we therefore suggested appropriate external training. In that regard, we have been informed that APD has made inquiries with the Southern Police Institute of the University of Louisville (louisville.edu/SPI) during IMR-13, but no concrete arrangements have yet been reached. We applaud the efforts of IAPS and the improvements that have been forthcoming to date but continue to stress the need for competent, task-specific training to bring IAPS to acceptable levels of performance.  Suggesting competent training for APD personnel assigned to

technical areas is merely suggesting that APD do what hundreds of other agencies do: train their personnel to perform specific critical tasks.  By now, it should be abundantly clear to APD that the national standard requiring task-specific training for specialized positions, such as internal affairs investigators, is also binding on APD.

The advisements to complainants regarding the reopening of administratively closed cases and of appealing CPOA findings, as well the actual practices related to these advisements, are firmly in place. Although appeals of the findings and recommendations of the Executive Director are not commonly granted, they do occur, as evidenced by the minutes of the CPOA Board (CPOAB) meetings. In our review of a stratified random sample of appeals, we considered two appeals from the random sample of investigations.  [IMR-13-38 and IMR-13-39]. The appeals in both matters were properly denied. However, in addition to appeals allowed under paragraph 287 of the CASA, paragraph 193 allows for the reopening of administratively closed matters when "additional evidence" is provided. The reopening is discretionary, not mandatory. In [IMR-13-39], the primary allegation was that the officers failed to investigate information given to them by the complainant of a sexual assault. The matter was "administratively closed," based on a review of the lapel videos and an assessment of the complainant's lack of credibility. A close reading of the complainant's "appeal statement" shows that the issue of new evidence was raised (the complainant alleged in the appeal letter that the officer stated in court he was aware of the allegation of sexual assault made by the complainant).

The matter was handled as an appeal and not as an issue of new evidence and whether further investigation was therefore warranted. We cannot say that the use of discretion in denying the reopening of the matter for further investigation would be unreasonable based on the facts of this case. It does appear, however, that the issue of reopening based on new evidence was not noticed, and instead, the matter was analyzed solely as an appeal. CPOAB should be mindful that appeals and requests for reopening are different considerations and appeal statements have to be scrutinized to determine remedy or both are actually being requested. As more fully discussed in the section pertaining to the Civilian Police Oversight Agency (paragraphs 271-292), the CPOAB continues to honor a complainant's right to appeal the findings of the Executive Director.

In addition to the CASA criteria for administratively closing cases, the monitoring team, in the past IMRs, agreed that IAPS and CPOA might also use an administrative closure disposition in cases in which a preliminary investigation reveals the allegations cannot be minimally sustained, the monitoring team approved the use of a finding of "unfounded" in lieu of administrative closure in such situations. As with the prior use of administrative closures based on a preliminary investigation, we again caution CPOA and IAPS not to utilize this disposition for the sake of expediency to counter the effect of an increased workload and present staffing levels.

In the cases reviewed by the monitoring team during this reporting period, we found one case that had preliminary indications of criminal conduct [IMR-13-16]. This case involved an allegation of sexual assault that was concluded with an appropriate

administrative finding of unfounded. It was first investigated criminally, and no probable cause or even a lesser standard of reasonable suspicion was found. We find the coordination between the criminal and administrative aspects of this matter to be proper.

We again point out in this IMR that paragraphs 186 through 188 of the CASA do not allow for *carte blanche* delays of administrative investigations *in toto* during the investigation of a related criminal investigation. In such cases, all aspects of the administrative investigation are to continue, except the taking of statements from witnesses who may incriminate themselves. When that situation occurs, a timely request to the relevant prosecutorial authority must be made before the taking of statements from witnesses who IAPS believes may incriminate themselves.  We have found no cases where this principle was violated.

We likewise found no cases in which an officer failed to submit a public safety statement by claiming that the statement would be self-incriminating. However, we did note a related case in which an officer refused to cooperate with the IA investigation and was terminated based on this and other pending discipline [IMR-13-14].  Given APD's performance related to this requirement over the past four reporting periods, the monitor continues to find APD in full compliance with the requirements of Paragraph 189.

In regard to the time requirements contained in Paragraph 191, the past performance of IAPS and CPOA generally have been consistent in terms of timely completion of investigations once they are assigned. However, in our current stratified random sample of sixteen investigations, we have identified five investigations [IMR-13-30; IMR-13-31, IMR-13-35, IMR-13-36, and IMR-13-37] that did not proceed as expeditiously as possible or otherwise are out of compliance with time requirements expressed in paragraphs 191 and 281 of the CASA. These timeline deficiencies are more fully discussed in the section pertaining to the Civilian Police Oversight Agency (paragraphs 271-292) of this report. It appears from this and past reviews that CPOA is conducting an initial triage, and those cases involving strong initial indications of provable misconduct are fast-tracked as they are likely to result in discipline, and those that do not have strong initial indications of provable misconduct are not fast-tracked, resulting in our findings of untimeliness. We further believe that this practice has occurred because of the CPOA workload and present staffing, which, as we point elsewhere in this IMR, appear to require additional staffing.

We note that the untimeliness of these CPOA matters did not result in the failure to impose discipline due to being time-barred.  However, regardless of whether the untimeliness does or does not bar the imposition of discipline, the CASA requires all internal affairs and CPOA investigations to meet certain time requirements. The City and APD must therefore staff accordingly.

Although not part of the stratified random sample discussed above, in regard to the time requirements of paragraph 191, we pointed out in IMR-11 that the monitoring team learned of 28 untimely investigations discovered at IAPS that had missed their time

deadline for the imposition of discipline, and of the discovery of 50 unprocessed files at CPOA that are likewise out of line with CASA and CBA time requirements. Although not part of the compliance calculation set forth in this report, it bears repeating that blunders of this sort cannot be repeated if operational compliance is to be achieved with the time requirements of paragraphs 191 and 281 and the disciplinary requirements of paragraph 202. Internal self-audit of cases received and investigative timelines should become a routine part of IA and CPOA operations.  Weekly, monthly and quarterly tracking reports are necessary.  Improved "interim oversight" is warranted (weekly checkpoints, status meetings, timeline management practices, training, and perhaps staffing need to be initiated and processed). We commend those efforts that have already been undertaken, and we urge that they continue and that new and improved practices be continually explored.

The ability, capacity, and demonstrated performance to investigate, in a timely manner, allegations of misconduct, and to review completed investigations in a timely and effective manner to determine whether discipline is warranted, are crucial to the success of compliance efforts. Exact timelines are not only required under paragraphs 191 and 281 of the CASA but are also required by virtue of the application of the Collective Bargaining Agreement (CBA). These timeline deficiencies directly impact APD's obligation to provide consistent, fair, and progressive discipline on sustained charges, as required by paragraphs 201 and 202 of the CASA.

APD and CPOA performances, from taking a complaint of alleged misconduct, to the imposition of discipline (when warranted), in a timeframe that is not barred by the CBA, will continue to be an area of scrutiny by the monitoring team in future IMRs.  During this reporting period, 75 percent of the completed CPOA cases selected in our random sample were untimely.  Normally, such failures are attributable to staffing shortages, which we believe to be the case as it relates to CPOA, as opposed to management deficiencies.  APD and CPOA need to redouble their efforts to meet CASA requirements, and full, data-based assessments of staffing requirements for both units are necessary.

### 4.7.169 Compliance with Paragraph 183: Investigations Reach Reliable Conclusions

Paragraph 183 stipulates:

> **"APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident or involved in any significant event before or after the original incident, shall provide a written statement regarding**

their observations, even to state that they did not
observe anything.

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraph 183:*

*4.7.169a:  City Legal should appoint an independent review and approval authority for all external APD IA investigations that are conducted by an independent investigator. The appropriateness of selection of this independent investigator should be documented in writing.*

*4.7.169b: In investigations in which the complainant or logical witnesses are not interviewed or in matters that are administratively closed, the investigation should include a clear explanation of why the interviews were not conducted and or why further investigation steps were not warranted.*

*4.7.169c: APD must ensure that investigations conducted by the Area Commands are held to the same standards that apply to IAPS and CPOA and are CASA compliant.*

### 4.7.170 Assessing Compliance with Paragraph 184:  Investigations Documented in Writing

Paragraph 184 stipulates:

> **"APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing.  APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation. Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

244

### 4.7.171 Assessing Compliance with Paragraph 185:  Required Cooperation with IAD/CPOA

Paragraph 185 stipulates:

> **"APD shall require personnel to cooperate with Internal Affairs Division and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control.  Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances."**

#### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.172 Assessing Compliance with Paragraph 186:  Separate Administrative and Criminal Investigations

Paragraph 186 stipulates:

> **"APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment.  When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement**."

#### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.173 Assessing Compliance with Paragraph 187:  Advisement of Officer Rights

Paragraph 187 stipulates:

> **"Advisements by the Internal Affairs Division or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee**."

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.174 Assessing Compliance with Paragraph 188:  Notification of Criminal Misconduct

Paragraph 188 stipulates:

> **"If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the Internal Affairs Division commanding officer. If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Division.  The Internal Affairs Division commanding officer shall immediately notify the Chief.  The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, the Internal Affairs Division shall continue with the administrative investigation of the allegation.  Consistent with Paragraph 186, the Internal Affairs Division may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Division deems such interviews appropriate**."

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.175 Assessing Compliance with Paragraph 189:  Provision of Public Safety Statements

Paragraph 189 stipulates:

246

> **"Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including Use of Force Reports and incident reports. APD shall make clear that all statements by personnel in incident reports, arrest reports, Use of Force Reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements.  Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief**."

**Results**

No instances of officers refusing to provide a public safety statement were noted during this reporting or in previous reporting periods.

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

## 4.7.176 Assessing Compliance with Paragraph 190:  Considering All Relevant Evidence

Paragraph 190 stipulates:

> **"In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to be deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements."**

**Results**

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraph 190:*

*4.7.176a: For investigations found to be deficient, follow up on any deficiencies noted by this IMR, and analyze, discuss, and use teaching points and policies to further refine investigative quality.*

*4.7.176b: APD should identify a cadre of investigators at the Area Commands, who will conduct investigations of minor misconduct and provide appropriate training to them in internal affairs investigations and CASA requirements.*

**4.7.177 Assessing Compliance with Paragraph 191:  90 Days to Complete Administrative Investigations**

Paragraph 191 stipulates:

> **"All administrative investigations conducted by the Internal Affairs Division or the Civilian Police Oversight Agency shall be completed within 90 days of the initiation of the complaint investigation.  The 90-day period shall not include time for review.  An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief.  Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation.  To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations of the officer, and extended absences."**

**Results**

> Primary:       **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

*Recommendations for Paragraph 191:*

*4.7.177a: APD and CPOA should refocus their efforts related to this paragraph by conducting a quantitative analysis of the reasons that cause any case to be delayed past 90 days.*

*4.7.177b: Once causes for these delays are identified, develop recommendations for changes to policy, staffing, procedure, or practice that are designed to eliminate such delays.*

*4.7.177c: All investigations should include a clear timeline that delineates the date of the incident, date of receipt of the complaint, date of assignment, date of extension if applicable, date investigation is completed, dates review period begins and ends, and date of notice of intent to discipline if applicable.*

*4.7.177d: In regard to matters initiated by internal complaints, investigations should include a clear timeline that delineates when the APD employee who made the referral to IAPS first became aware of the alleged misconduct and when all employees in the chain of referral became aware of the misconduct so that the time or receipt of information of potential misconduct to referral to IAPS can be accurately gauged.*

## 4.7.178 Assessing Compliance with Paragraph 192:  Case Dispositions

Paragraph 192 stipulates:

**"APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:**

> **a) "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer;**
> **b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;**
> **c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;**
> **d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training;**
> **e) "Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or**
> **f) "Administratively closed," where the policy violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint."**

249

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational:  **Not In Compliance**

*Recommendation for Paragraph 192* :

**4.7.178:  *Although the monitoring team has approved the closing of an investigation and the use of an "unfounded' finding in lieu of "administrative closure" where a preliminary investigation shows by clear and convincing evidence that the conduct which is the subject of the complaint did not occur, and shows no indication of any other violation (misconduct not based on the original complaint), we caution APD and CPOA not to utilize this disposition for expediency sake where the complaint, in conjunction with the underlying facts, calls for a fuller investigation with findings that resolve the issue of whether the allegations were sustained or not sustained.***

**4.7.179 Assessing Compliance with Paragraph 193:  Reopening Administrative Investigations**

Paragraph 193 stipulates:

> **"All administratively closed complaints may be re-opened if additional information becomes available. The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational:  **In Compliance**

**4.7.180 Assessing Compliance with Paragraph 194:  Training and Legal Standards**

Paragraph 194 stipulates:

> **"In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether: (a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-**

**disciplinary corrective measures.  This information shall be shared with the relevant commander(s)."**

## Results

Primary:         **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

Monitor's Note:

The parties and the monitor have discussed potential issues related to the requirement in paragraph 188 of the CASA that the IAPS Commander coordinate with the chief when consulting with the relevant prosecuting agency in instances where a misconduct complaint intake or investigation reveals "there may have been criminal conduct by any APD personnel."

The practical problem with a strict interpretation of this language is that prosecutors are reluctant to discuss cases where there is less than probable cause or less than at least reasonable suspicion that a crime has been committed, whereas the phrase "may have been" alludes to a mere suspicion standard.  This is a tension that needs to be addressed. Accordingly, the parties have reached a negotiated solution agreeable to the monitor that will allow a preliminary or continued administrative investigation to take place and a determination of probable cause that a crime was committed to being developed before the coordination with the relevant prosecuting agency is required under paragraph 188. Despite our urging since IMR-9, this refinement of process has still not been agreed to in writing.

As also noted in the Civilian Police Oversight section of this report, CPOA has utilized the Administratively Closed disposition in situations in which a preliminary investigation cannot minimally sustain the allegations contained in a complaint. In such cases, based on this initial evidence, the investigation is cut short and administratively closed without necessarily interviewing all relevant witnesses or even the complainant in some instances. The monitor realizes the need to wisely and economically deploy resources and thus has not disapproved of this practice in theory. Based on a request from CPOA, during the IMR-12 review period, the monitor approved the closing of an investigation and the use of an "unfounded' finding in lieu of "administrative closure' where a preliminary investigation shows by clear and convincing evidence that the conduct which is the subject of the complaint did not occur and showed no indication of any other violation.  However, we reiterate that in following this practice, care must be taken not to miss other policy violations that are not contained in the initial complaint. Therefore, we put CPOA and APD on notice that this practice should only be utilized where the preliminary investigation shows by clear and convincing evidence that the allegations of misconduct did not occur, and also shows no indication of misconduct not related to the original complaint that would require further investigation.  Findings of "administrative closure" should not be used for expediency's sake in tackling investigative burdens.

As stated earlier in this IMR with regard to staffing of IAFD, and later in paragraphs 271-292 regarding CPOA, full staffing of IAPS must be commensurate with when the investigative timeline begins for complaint investigations and resulting deadlines, workload analyses, and data projections. This is crucial to the ability of APD and its civilian oversight to conduct effective, thorough, and efficient investigations that result in fair and progressive discipline when required, and corrective actions when allegations are sustained. Particular attention must be paid to CASA-related violations, which for consistency and importance to the CASA compliance process should be investigated by IAPS *only* and not by Area Commands, nor should they be resolved by way of administrative closure.  The "shedding" of allegations of violations of CASA paragraphs to the area and division commands should be avoided under all circumstances.  We strongly suggest that APD's IAPS carefully review cases returned from Area Commands for consistency, investigative rigor, and reasonableness.

### 4.7.181 – 4.7.183 Assessing Compliance with Paragraphs 195-197: Preventing Retaliation

Paragraphs 195 through 197 of the CASA pertain to the City's requirement to prevent retaliation against anyone who reports misconduct or cooperates in a misconduct investigation, by any employee of the City, including of course APD members, and making it a ground for discipline**.**

Members of the monitoring team have reviewed both City and APD policies regarding the prohibition of retaliation, and they remain unchanged. The monitoring team also selected and reviewed a stratified random sample of IA and CPOA cases completed during the 13th IMR review period. They also met with members of IAPS and CPOA during the site visit and received updates on the practices of each agency.

Retaliation is clearly prohibited both as a matter of City and APD policy. The Albuquerque Code of Ordinances prohibits retaliation for reporting improper governmental action, and APD policy prohibiting retaliation and/or making it grounds for discipline is found in SOP (AO 3-41-4-A, GO 1-1-4-E-10 and 11, GO1-4-3-C-2, and GO 1-5-4-B-4).

The monitoring team has received an attestation showing that the annual meeting requirement between CPOA and IAD, in which APD's anti-retaliation policy is reviewed, occurred shortly after the initiation of the IMR 13 period. During that meeting, the Commander of IAPS and the Executive Director of CPOA concurred that the anti-retaliation policy in its present form met the needs of the APD and CPOA.

The monitoring team found no investigation in its review of the random sample of IAPS, Area Command, and CPOA cases that involved an allegation of retaliation. Although this random sample did not provide cases that allow us to judge operational compliance with the principle of prohibiting retaliation, given APD's past performance with retaliation investigations, as well as all data reviewed and observations made by the monitoring

team for this reporting period, the City, APD, and CPOA continue to demonstrate compliance for the tasks in paragraphs 195-197.

### 4.7.181 Assessing Compliance with Paragraph 195: Retaliation Prohibited

Paragraph 195 stipulates:

> **"The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct."**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.182 Assessing Compliance with Paragraph 196: Review of Anti-Retaliation Statements

Paragraph 196 stipulates:

> **"Within six months of the Operational Date, and annually thereafter, the Internal Affairs Division and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation. This review shall consider the alleged incidents of retaliation that occurred or were investigated during the reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation. Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct."**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.183 Assessing Compliance with Paragraph 197: Retaliation Grounds for Discipline

Paragraph 197 stipulates:

> **Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds**

253

**for discipline, up to and including termination of employment.**

Results

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational:  **In Compliance**

### 4.7.184 – 4.7.186 Assessing Compliance with Paragraphs 198–200: Staffing and Training Requirements

Paragraphs 198 through 200 of the CASA require the City to adequately fund and resource internal affairs functions (IAPS and CPOA and the CPOA Board) and require that APD personnel who conduct misconduct investigations and CPOA investigators receive a baseline amount of initial and annual training.

Consistent with past site visits, the monitoring team met with IAPS and CPOA separately, albeit virtually. Their respective offices and physical spaces have remained the same. The monitoring team discussed staffing needs and training, reviewed staffing charts and training records, and assessed the timelines of processing complaints and information of potential misconduct in investigations that were randomly selected, and assessed the quality of the investigations. The findings related to Paragraphs 198 through 200 indicate the following outcomes related to the requirements of the CASA.

At the present time, IAPS has six investigative positions in addition to a Deputy Commander position.  The Deputy Commander position will be converted to a civilian intake manager position and is in the process of being filled.  The intake manager will oversee the complaint intake function. Despite the fact that IAPS, as discussed more fully in the Investigations of Complaints section (paragraphs 183-194) of this IMR, has made strides in improving its processes, it bears repeating that additional staff may still be required to complete thorough investigations in a timely manner, as required by the time constraints of the CASA and Collective Bargaining Agreement.  The CASA and the CBA utilize the same timeline (90 days or 120 days with an extension approved by the chief). The CASA specifies the investigative timeline begins with "the initiation of the complaint investigation" (paragraph 191), whereas the CBA is silent on when the timeline begins. Compliance with the CBA time constraints obviously impacts the APD's ability to impose discipline on sustained charges (compliance with CASA paragraphs 201 and 202).

Thus, it is essential that IAPS and CPOA be staffed sufficiently to meet their timeline responsibilities so that CASA and CBA timelines are met, and discipline for sustained charges is not "time-barred." Compliance with the CBA in cases in which discipline is

time-barred by the CBA  does not absolve the City of its failure to comply with the progressive discipline requirements of CASA[118].

The CPOA Ordinance and the CASA require that CPOA and the CPOA Board be given staff sufficient to carry out the agency functions contained in the Ordinance.  CPOA had a dedicated and independent source of funding equal to, at a minimum, ½ of 1% of the APD annual operational budget. This funding was adequate in the past; however, the ½ of 1% requirement has since been removed. Although we cannot definitively state that the present CPOA budget was less than adequate during the IMR-13 period (as set forth more fully in this IMR in our discussion regarding paragraphs 278 and 279), we continue to observe strong indications of insufficient investigative personnel as evidenced by the number CPOA cases in which the requisite timelines are not met. The number of untimely cases revealed by our stratified random sample are discussed more fully in conjunction with paragraphs 191 and 281 of this report. We expect that the number of filled investigative slots will increase from three to six during the IMR-14 period. This anticipated increase, and the correlation with CPOA's ability to comply with its investigative timeline requirements, will be a focus of the monitoring team in IMR-14.

The data analyst position discussed in IMRs 10 through 12 is filled and now firmly ensconced in CPOA. As a result, the data and trend analyses are now conducted internally, and both the quality of CPOA's public information and its ability to meet its semi-annual report timelines has improved.

As we have pointed out since IMR-8, in regard to paragraph 199 of the CASA, we are satisfied that the training requirement is met for those members of IAPS who are doing the investigations involving allegations of other than minor misconduct.  Both the 24-hour preliminary, and the 8-hour in-service training, address the requirements of this paragraph. However, the paragraph requires annual training of at least 8 hours, not only for IAPS personnel but also for members of the Area Commands who may be assigned internal affairs investigations to conduct.

There is a practice of assigning IA investigations to members of an Area Command, at the rank of sergeant or higher, to conduct investigations alleging minor misconduct against an APD member of the same command. Since IMR-9, we have put IAPS on notice that a satisfactory training policy must be developed for this cadre, or APD risks a finding of "willful indifference" to this task contained within paragraph 199.  This training is crucial. As pointed out in the section of this report dealing with the quality of investigations (paragraphs 183-194), the quality of investigations being conducted at the Area Commands is of great concern. The cause of this state of internal affairs investigations conducted by Area Command investigations is directly linked to this lack of effective training.  APD is not in compliance with these paragraphs due to failures to train.

---

[118] After the close of the reporting period, the City approved the budget for additional CPOA investigators.

APD has made progress in regard to this training, and toward the end of the IMR-12 review period, submitted an annual training plan that, once approved, would meet the 8-hour annual requirement for these personnel. This policy was preliminarily reviewed by the monitoring team and returned for restructuring of content.  The monitoring team was satisfied that enough progress had been made that a finding of "willful indifference" to this task was not warranted, despite it being a highlighted issue since IMR-9 (over two years). This training plan was slated to be finalized and approved before the end of this reporting period (January 31, 2021). Once again, APD missed this deliverable as the training plan was not submitted to the monitor by this date. The APD is not in compliance with the requirements.

Also, in regard to CPOA investigator training requirements, since IMR-8, we have noted that the initial training provided by CPOA's legal counsel was well organized and delivered.  It addresses all salient points of the CASA and of internal complaint investigations.  The annual training for the past years for CPOA investigators involved the annual NACOLE (National Association of Civilian Oversight of Law Enforcement) conference.  The agenda for the NACOLE training can be found online.  CPOA members completed the 2020 Annual NACOLE Conference which was conducted virtually in more than 30 webinars.

Our prior criticisms of CPOA external training have focused on the lack of testing measures. Since the NACOLE basic investigator training does not involve testing measures, the monitor has approved the utilization of a written exercise on the subject of the NACOLE training and how it relates to the mission and job of CPOA members as an appropriate measure of comprehension this training.  The CPOA investigators have submitted written essays relative to the NACOLE training in the IMR-13 review period. These essays demonstrate the relevancy of the training to the core mission and job of the CPOA. Thus, we find CPOA to be in full compliance with the paragraph 200 requirements of investigator training. We again recommend that scoring factors and processes for this assessment of learning be established to better measure the efficacy of external training and that high-risk, critical CPOA tasks be methodically tested.

We further discuss the CPOA and CPOAB training requirements in the Civilian Police Oversight Agency section (paragraphs 271-292) in this IMR.

### 4.7.184 Assessing Compliance with Paragraph 198:  CPOA Staffing

Paragraph 198 stipulates:

> **"The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement. The City shall re-assess the staffing of the Internal Affairs Division after the completion of the staffing study to be conducted pursuant to Paragraph 204.  The City further shall ensure sufficient resources and**

> **equipment to conduct thorough and timely investigations."**

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.185 Assessing Compliance with Paragraph 199:  IA Initial and Annual Training

Paragraph 199 stipulates:

> **"All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Division, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraphs 199:***

***4.7.185-186a: Identify the members of the Area Commands who may be assigned misconduct investigations and develop an annual IA training program for them. Ensure they complete the same on an annual basis. Annual training for those members of the Area Commands conducting internal affairs investigations of allegations of minor misconduct is an urgent priority for the internal affairs process.***

***4.7.185-186b: Do not assign a misconduct investigation to any APD personnel who have not met the annual training requirement.***

***4.7.185-186c: CPOA should develop an assessment mechanism to measure the effectiveness of outside training, such as the NACOLE conference. That can easily be done through "testing" by CPOA once the CPOA investigators have completed the NACOLE training.***

*4.7.185-186d: Investigations involving allegations that are CASA related should remain with IAPS and not be transferred to Area Command personnel.*

*4.7.185-186e: Investigations involving allegations that have sanction levels of 5 or below (levels 1-5) should remain with IAPS for investigation and not be transferred to Area Command personnel.*

### 4.7.186 Assessing Compliance with Paragraph 200:  CPOA Training

Paragraph 200 stipulates:

> **"Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Operational Date and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations."**

### Results

Primary:     **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.187 – 4.7.188 Assessing Compliance with Paragraphs 201- 202:  Discipline and Transparency

Paragraphs 201-202 require discipline to be fact-based and imposed for sustained violations based on appropriate, articulated consideration of aggravating and mitigating circumstances. These paragraphs also require the use of a disciplinary matrix in imposing discipline and sets forth required elements for the disciplinary matrix. Read together. These paragraphs require progressive discipline that is fair, consistent, and commensurate with a balancing of the aggravating and mitigating factors.

The monitoring team reviewed a stratified random sample of cases investigated during this review period, some of which resulted in sustained charges. We also met with the Chief of Police, the City Attorney, the CPOA Director, and the IAPS Commander and reviewed APD discipline processes.

As we have noted since IMR-8, marked improvements have been made in the APD disciplinary system. However, improvements in processes have not yet yielded the desired improvement in outcomes related to progressive discipline.

The increased and ongoing communication regarding the status of disciplinary matters between APD, DOJ, and the monitoring team, put in place during the IMR-12 period, has continued.  First, there is a bi-monthly IAPS update telephone conference between

the parties. Secondly, IAPS shares with DOJ and the monitoring team weekly reports that track complaint intake and processing, as well as disciplinary recommendations, including proposed discipline and discipline imposed after the pre-disciplinary hearing (PDH) and appeal stages. At the initiation of the current review period, at the request of the monitoring team, APD also began to share a weekly report regarding officers who have been relieved of duty or put on special assignments pending the investigation of misconduct allegations. The IMR-13 review period has seen the addition of IAPS providing, on a monthly basis, the disciplinary results of the minor misconduct allegations investigated at the Area Commands.

Several other procedural changes, which should have a positive impact on the quality of disciplinary decisions, were implemented during the IMR-12 period and continued through the current period. On several occasions, the monitoring team has made recommendations that APD should adopt the practice of having a representative of IAPS attend PDHs and represent the findings and recommendations set forth in the investigation. In accordance therewith, we note that PDHs are now usually attended by the Commander or a representative of IAPS. We recommend that no PDH be scheduled by a disciplinary authority without notifying and scheduling an IAPS representative to be present. To have a representative of the investigation on hand during a PDH, in addition to the written investigation, should prove to be a marked improvement for the clarity and quality of the disciplinary decisions.

As pointed out in past IMRs, the continued use of the "Disciplinary Action Packet" (DAP) is an enhancement in the disciplinary process.  The DAP serves as a guideline by giving the subject officer's supervisory chain and the disciplinary authority an encapsulation of relevant factors pertinent to progressive discipline in each disciplinary matter in which major discipline can be imposed. The following information elements are included in the DAP:

> a. Recommendations regarding the class designation of the policy violations under consideration;

> b. An accurate "snapshot" of the subject's disciplinary record and prior offenses; and

> c. A recommended or preliminary disciplinary calculation, based on the appropriate elements in the disciplinary matrix, setting forth the range (minimum and maximum) of discipline.

In addition, retention cards are being updated to provide the classification of any prior sustained offenses and dates of imposition of discipline. Classification levels for SOP violations continue to be reviewed and updated. This greatly facilitates the calculation of the appropriate offense level, the identification of applicable prior offenses, and the selection of the appropriate range within the disciplinary matrix. The initiation of another improvement in updating the retention cards occurred during the IMR 13 period. The date that discipline is imposed – as opposed to the date of occurrence of the offense –

is now being entered on the retention card. This makes for an easier and more accurate calculation in determining a prior offense. In addition, the classification of sanction level for all potential SOP violations has continued to the point where the clear majority of potential violations now have a classification level or range of levels associated with the potential violation. The exact percentage of SOPs violation with an associated sanction levels will be a focus of the monitoring team in IMR-14.

Although the DAP is a definite improvement, it is being utilized only in cases that are investigated by IAPS. A similar format is not yet utilized by CPOA, which makes its recommendations on the Command Review sheet of an investigative packet. This results in the disciplinary authority receiving sustained charges with recommendations of discipline in two different formats, which is not an ideal situation. Since IMR-11, we strongly urged a uniform system and recommended that CPOA adopt the IAPS practice of utilizing the DAP for investigations with sustained charges. We note that CPOA still has not adopted the practice of utilizing a DAP. We recommend a meeting between CPOA and IAPS to develop a uniform format for synopsizing the relevant factors for the imposition of discipline.

Since IMR-6, we have noted discrepancies with AO 3-46. First, we note that a draft of the revised SOP AO 3-46 ("*Discipline System*") with its Appended Chart of Sanctions (*Discipline Matrix*) was distributed to the monitoring team for review during the IMR 13 review period. The draft was a noted improvement, and it was obvious that much effort and thought was put into it. Extensive comments and technical assistance were provided by the IMT regarding the proposed revision.  Although the draft constitutes a solid step forward in the improvement of the disciplinary process, a finalized version has not been completed as if the end of this reporting period.

It bears repeating that although AO 3-46 correctly requires that any deviation from the presumptive range of discipline (range per Class level and per first, second or third offense calculation) as established by the Chart of Sanctions, be justified in writing (3-46-5B4).  As currently written, AO 3-46 is confusing in that it does not allow for a clear and uniform way of calculating progressive discipline. Since IMR-6, we have noted that a discrepancy exists between paragraphs 5c2 and 5c4, which allows for different interpretations of what constitutes a prior offense, based on whether the prior offense is, or is not, in the same class as the present offense. APD has yet to address that issue. We are unaware of any reason for this apparent refusal, and at this point, we consider APD deliberately non-compliant with the CASA requirements related to this specific issue.  We have also noted that SOP 3-46-5G allows for the imposition of non-disciplinary corrective action in addition to applicable discipline, but it does not contain notice that non-disciplinary corrective action should not be the only resolution if the matrix calls for the imposition of discipline. We have been advised that these past recommendations will be addressed in the current revision of the "Discipline System" policy. We will review the proposed changes carefully to ensure that they are indeed improvements to the disciplinary system and not a continuation of gaps in policy that allow the requirement for progressive discipline to be circumvented.

Further, we continue to be extremely concerned about the lack of policy and guidance on the APD disciplinary practice of holding discipline "in abeyance."   This "abeyance" process has been very impactful, as it routinely reduced actual discipline by half or more.  Justifications for such reductions in actual discipline were seldom explained or justified. We repeat our prior urging that AO 3-46  should contain criteria for, and guidance on, holding discipline in abeyance (which in reality is a departure from the disciplinary matrix) and for allowing a resignation in lieu of imposing discipline.  Both of these factors, used frequently in the past, served to eviscerate the discipline-related practices of APD.  We have had multiple conversations with the current chief of police about this issue and have never met any form of push-back indicating that our recommendations are problematic.  Instead, APD simply refuses to address internally the "held in abeyance" issue, and it continues unabated.

As emphasized in IMR-11, we reiterate that it is crucial to the disciplinary process, and thus to CASA compliance, that a new AO 3-46 be approved and implemented. APD has had more than ample time to improve and enhance AO 3-46, and a revised AO 3-46 is a deliverable for the IMR-14 period. APD risks a finding of "willful indifference" if it does finalize the revised version of SOP 3-46 and have it approved by the monitor and ready for implementation during the IMR-14 review period.

Although not as directly related to the imposition of discipline as SOP AO 3-46, it bears repeating that the contemplated revisions to AO 3-41 (*Complaints Involving Department Policy or Personnel)* should also be completed in the IMR-14 period. These revisions should contain specific criteria and guidance related to allegations that are appropriate for referral to Area Commands for investigation and allegations that must be handled by IAPS or IAFD.

We urge APD to continue its efforts in upgrading retention cards to reflect all prior sustained violations, the dates of imposition of prior discipline, and the corresponding levels of sanction classification. We continue to applaud the efforts to upgrade the classification of SOP violations. These efforts will enhance the disciplinary system by decreasing subjectivity in calculating the appropriate discipline while allowing the disciplinary authority to retain justifiable discretion in imposing discipline within the parameters of AO 3-46.

Notwithstanding the recent discussions for improvements in the disciplinary process, our review continues to note issues with elements related to the imposition of discipline. The monitoring team reviewed a stratified random sample of cases completed during the review period. In that review, we identified twelve cases in which discipline was imposed, or in which we can determine, based on the investigative materials, discipline should have been imposed [IMR-13-35, IMR-13-15, IMR-13-17, IMR-13-18, IMR-13-19, IMR-13-21, IMR-13-22, IMR-13-23, IMR-13-24, IMR-13-27, IMR-13-28, and IMR-13-29].

Of those twelve cases, we identified ten  [IMR-13-35, IMR-13-15, IMR-13-17, IMR-13-18, IMR-13-19, IMR-13-22, IMR-13-23, IMR-13-27, IMR-13-28, and IMR-13-29] in which discipline was deficient, either because discipline was not imposed, the tenets of the

progressive discipline (most notably the calculation of prior offenses) on the Chart of Sanctions (Disciplinary Matrix) were not followed, or the level of discipline was otherwise inappropriate. This equals a compliance rate of an abysmal 17% with the requirements of paragraphs 201and 202, a noticeable drop from the 65% compliance rate set forth in IMR-12. It is important to note that this compliance percentage is undoubtedly impacted by the focus of the monitor this reporting period on Area Command investigations of allegations of minor discipline and the imposition of discipline by the Area Command disciplinary authorities. These cases of deficient discipline are discussed below.

CPOA Cases

[IMR-13-35] involved two subject officers. The investigative file contained a sustained charge against one officer but no evidence of any disciplinary action and no findings against the other officer.

IAPS Cases

[IMR-13-15] involved an officer who was a member of the Special Operations Division/SWAT assigned on temporary duty (TDY) to the Special Investigations Division/Homeland Security (HS), that went beyond the allowed 45 days and without updated extensions or permanent assignment to HS for approximately two years. The officer was accused of collecting both hazardous duty pay as a SWAT Operator and declaring 6 hours compensation time per week as a member of HS. During the investigation, it was also discovered that the officer had an outside construction business for which he failed to obtain permission from APD on an annual basis. Specifically, the investigations sustained charges of SOP 1-1-4C.1 (*All personnel, including supervisors and command staff, will report for duty at the time and place required by assignment or order, and all personnel shall be physically and mentally fit to perform their assigned duties when reporting for duty and at all times when on duty*) sanction level 7; SOP 1-1-4D.19 (*Personnel will not alter, misrepresent, or make any false statement in any verbal or written report or in any other written document that has been completed in the course of their employment*), sanction level 1-7; SOP 1-1-4I.1 and 2, (*failing to get permission for outside employment on an annual basis*), sanction level 7; and SOP 2-10-3J.3 (*Required Use of MDT – failing to log on at the start of shift*), sanction level 6.

The investigation also involved sustained charges against a supervisor of the officer for basically allowing or failure to take appropriate steps to prevent a TDY assignment beyond the 45-day period. Specifically, charges were sustained against the supervisor for failing to properly process a TDY memorandum, 1-1-4B.6 (*Personnel will perform any act required by the City's or Department's rules, regulations, directives, orders or [the court-approved] settlement agreement*), sanction level 4; failing to take action to cancel the officer's hazardous duty pay, 3-14-4A.6 (*Evaluate subordinates for effectiveness, efficiency, and adherence to directives . . .*), sanction level 6-7; and 3-14-

4A.15 (*Review and forward as appropriate any reports or documents prepared by subordinates), sanction level 6-7.*

Regarding discipline imposed on the supervisor, there were no prior offenses within a time period that would require a second offense designation, and the three present offenses all merged as being the same course of conduct. Therefore, the appropriate calculation was a Class 4, First Offense, which carries a range of 40-80 hours suspension. IAPS recommended an 80-hour suspension, and the chain of command and pre-discipline notice recommended a 40-hour suspension. Based on mitigating factors found and articulated by the disciplinary authority – basically that individuals higher in the chain of command were responsible for converting the TDY position to a permanent position. The discipline imposed was 8 hours. However, the sanction level utilized was a Class 5, whereas the regulation only permits a Class 4 designation. The more appropriate way of explaining the discipline would be to determine the classification level as a Class 4, First Offense, 40-80 hours, and then justify an upward or downward departure based on a weighing of the aggravating and mitigating circumstances. We recognize that departing to an 8-hour suspension from a 40–80-hour disciplinary range is a substantial reduction, but the thought process of the disciplinary authority and the weight given to the mitigating factors were articulated, and his use of discretion was discernible and not beyond the bounds of reasonableness, particularly where the same course of conduct constitutes a violation of offenses that carry sanction levels less severe than a level 4.

On the other hand, we find the discipline imposed against the officer to be deficient. The four sustained violations were classified in the Disciplinary Action Packet as a level 6, (1-1-4C.1, a Level 5 (1-1-4D.19), a level 7 (1-1-4I.1and 2), and a level 7 (2-10-3.J). IAPS recommended in the DAP that an enhancement be added to the reporting for duty (1-1-4C.1) since at the time of the completion of the investigation, the TDY had lasted almost two years). Although there were no prior offenses that acted to enhance the present offenses, in light of the fact that the present offenses involved separate courses of conduct, IAPS calculated the matrix as a Class 5/Second Offense with a 40-80 suspension and recommended a 60-hour suspension and to pay back the hazardous duty pay.  The recommendation of the Chain of Command and the pre-discipline notice agreed with the 60-hour suspension recommendation.

A PDH was conducted in which the officer conducted himself well and admitted the violations of failing to update permission for outside employment and for habitually not logging in at the start of a shift. He denied the other two violations. The disciplinary authority (a Deputy Chief) did not sustain on failing to report for duty and unfounded the charge of unlawfully obtaining hazardous duty pay (misrepresenting duty status in Telestaff) and sustained on the two minor violations. A letter of reprimand was imposed.

Although we realize that disciplinary authorities have discretion in weighing the evidence and making findings, and we are careful to pay due deference to their interpretation of the evidence, in this case, we find fault with the unfounded finding and resulting lack of discipline. First, we agree with the finding of not sustained on the failure

to report for duty. The officer's duty, albeit a TDY that far exceeded the allowable 45 days, was with HS and not with SWAT. He worked for HS for approximately two years, and his place duty was well-known by his superiors. He reported to his place of duty at HS.

The unfounded finding on the misrepresenting of duty status resulting in hazardous duty pay is inconsistent with the finding of not sustained on failing to report for duty. The officer's place of duty was with HS. He no longer reported to SWAT, no longer responded to SWAT calls and indeed, the reason he was TDY to HS was because he allegedly no longer had the physical capabilities to perform SWAT duties. The disciplinary authority based its unfounded finding primarily on an email from an APD Payroll employee (not the payroll manager or a supervisor), which was provided after IAPS completed its investigation, stating that as long as the officer was assigned to the Special Operations Division, he was entitled to hazardous duty pay. However, this email and the unfounded finding are contradicted by a relevant portion of the CBA addressing Specialty Pay, which allows for $115.38 per pay period and 6 hours of compensatory time for each week of "On-Call Status."  This applies only to officers who are On-Call Status. The dispositive issue was not whether the officer was on the SWAT roster but rather whether he was on-call status for SWAT. He simply was not on-call for SWAT, particularly when he was claiming compensation time for being on-call for HS. We would also add that during the PDH, the APOA representative extensively participated in putting matters on the record, and there was no participation by IAPS to counter the defense case, as an IAPS representative was not present during the PDH.  Although we do not question the good faith of the disciplinary authority in striving for fairness, we nonetheless find, for the forgoing reasons, that the disciplinary process, in a case of an approximate 2-year TDY with hazardous duty pay from one unit and compensation time for another unit, resulting in a written reprimand, to be deficient.

[IMR-13-17] involved a factual allegation of having a squad get-together at the subject officer's residence where the number of persons present violated the Governor's Public Health Order. Two APD members who attended the gathering later felt ill, and one tested positive for Covid-19. As a result of the positive test, the subject officer was questioned by a Lieutenant regarding his contacts during a relevant period that included the date of the squad gathering. It was alleged that during this questioning, the officer failed to advise of the squad gathering. Specifically, two violations of the Code of Conduct,1-1-4B7(a-c) (*conduct unbecoming*) a sanction level 5-6, and a violation of 1-1-4D.19 (*Personnel will not alter, misrepresent, or make any false statement in any verbal or written report or in any other written document that has been completed in the course of their employment*), sanction level 1-7, were sustained in the investigation. It should be noted that initially, the matter was referred to the Area Command to be investigated but was pulled back and investigated by IAPS, apparently because of the inappropriate nature of having major misconduct investigated by the Area Command was recognized.

The officer's retention card showed two Class 7 violations within a year of the present matter. IAPS in the DAP properly identified these prior offenses and recommended classification levels of 5 on the 1-1-4B7(a-c) and a level 4 on the 1-1-4D19. The DAP

calculated the appropriate range at a suspension of 88 to 160 hours and recommended a suspension of 120 hours. The recommendations of the chain of command review were for an 80-hour suspension, and the PDH Notice also reflected proposed discipline of 80 hours.

A PDH was held and was professionally conducted by the disciplinary authority (Chief). The squad gathering was admitted to by the officer. Regarding the issue of not revealing to the Lieutenant the off-duty squad gathering, the officer stated that he never lied to any questions posed to him. However, the issue was not one of directly lying, which would fall under 1-1-4D20 (*Personnel will truthfully answer all questions specifically directed to them that are related to their employment and to all operations of the Department*), rather the issue here was one of evasiveness or lack of candor in responding to questions, which was appropriately considered in the investigation as a potential violation of 1-4D19 (*Personnel will not alter, misrepresent, or make any false statement in any verbal or written report or in any other written document that has been completed in the course of their employment*). The issue of whether the officer's failure to reveal the squad gathering, even though it was not an on-duty event, misrepresented or distorted the events leading up to a positive Covid test for a squad member, was not pressed nor really addressed during the PDH.

An 8-hour suspension was imposed, a substantial reduction from the proposed discipline. The final disposition memorandum of IAPS, as well as the final decision to discipline memorandum of the Chief, reflects that both allegations were sustained, and a 4-hour suspension was imposed on both.  However, a separate memorandum from the Chief to IAPS reflected that the Chief found the officer did not lie and opined that the 1-1-4D.19 allegation should have been unfounded. The memo also reflected concern regarding precedent discipline imposed in other IA cases involving Covid exposure.

We find the discipline in this matter to be deficient. Although the concern regarding consistency of discipline is certainly valid, the distinguishing factor, in this case, is that when questioned about his contacts during a Covid-related inquiry, the officer failed to reveal his squad gathering. This is relevant to discipline regardless of whether he directly lied to any posed question. This lack of candor was not pressed in the PDH and apparently was not recognized in the imposition of discipline. In addition, it is unclear whether the 1-1-4D19 was sustained. If it was sustained, then a suspension of significantly more than 8 hours was warranted. If it were not sustained, the PDH never really addressed the lack of candor issue, and the fact that a complete picture during a Covid-related inquiry was not given would still constitute a significant aggravating factor of the "conduct unbecoming" 1-1-4B7(a-c) violation.

In addition, a recurring concern is a discrepancy between discipline imposed on officer versus civilian staff. For example, [IMR-13-40], involving a civilian with a sustained finding for untruthfulness (Chart of Sanctions discipline range of 88-160 hours, the same discipline range for the officer in IMR-13-17, whose sustained violations included dishonesty (misrepresentation/false statement), but received an 8-hour suspension. Although the discipline has yet to be imposed on the civilian, the IAPS disciplinary

tracker reveals that APD regularly mitigates discipline for officers but imposes discipline on civilians within the Chart of Sanctions range.

Area Command Cases

[IMR-13-18] involved the failure to upload OBRD video of an event.  This is classified as a sanction level 6.  The matter was sustained, and a verbal reprimand was imposed. The retention card showed a prior sustained OBRD investigation within one year of the present offense. Also, an aggravating circumstance was present but not recognized in imposing discipline – that the subject officer failed to respond to an email inquiry from a Lieutenant. This matter should have been addressed as a sanction level 6, second offense, with a range of 8-32 hours with at least one aggravating factor unless a departure from the range is justified and articulated. As such, the discipline in this matter was deficient as it required an 8–32-hour suspension but resulted in a written reprimand.

[IMR-13-19] involved two officers investigated for OBRD violations, sanction level 7, failure to abide by regulation involving the handling of civilian witnesses at the scene, a sanction level 7, and on duty conduct - treating persons with respect and professionalism, sanction level 6-7. Both officers were sustained on all three violations, which were then administratively dismissed/non-discipline corrective action (NDCA). The corrective action was a review of the relevant SOPs. The investigation does not contain a description of the on-duty conduct or how or why the officers did not treat civilian witnesses appropriately, so aggravating/mitigating factors cannot be determined in the monitor's review. In addition, the one conduct violation is a sanction level 6 or 7, but the investigative papers did not make clear whether it was determined to be a 6 or 7.  Also, both officers' retention cards show a sustained violation for OBRD management, for which they received an NDCA within one year of the present violation. The current case, assuming the conduct violation was determined to be a level 6 sanction as opposed to level 7, should have been calculated as a second offense, for which a suspension of 8-32 hours is required unless there is a reasonable justification for departure from the chart of sanctions. In addition, 2 NCDA's in a row for the same basic offense within a year of each other disregards the tenets of progressive discipline. As such, the discipline in this matter is deficient.

[IMR-13-22] involved a failure to report a use of force (pointing a firearm), a sanction level 5 offense. The investigation found that the officer made a mistake in the interpretation of what constituted a reportable use of force and immediately reported the use of force upon learning of the mistake. A verbal reprimand was imposed, and there was no indication of additional training on the use of force regulation. The retention card revealed what purported to be a prior offense -- an administrative closure /non-disciplinary corrective action for failing to follow hospital in-custody procedures (leaving patient/defendant unattended) listed as the same date as the present case. These two matters actually arose out of the same incident and should have been one investigation. The present case and the retention card listed the violation as a sanction 7, but the relevant SOP subsection and letter of the discipline policy listed it as a 5. The retention

266

card also listed another Use of Force violation, sanction level 5, in which the conduct occurred before, but discipline was imposed after the present case, in which an 8-hour suspension was imposed. The mitigating factor in the present case was articulated, but the imposed discipline of only a verbal reprimand was inappropriate in light of the fact that both offenses arose out of the same incident and were separate violations (courses of conduct) that do not merge, and the SOP lists the violation as a sanction level 5 and not a 7. Again, allegations with a potential sanction level of 5 are not appropriate matters to be investigated and resolved at the Area Command level.  Once again, it was the monitoring team who noted these violations of progressive discipline, not the APD.

[IMR-13-23] involved OBRD Violation, sanction level 7. The matter was sustained and then administratively closed/non-disciplinary corrective action. The retention card showed two sustained sanction level 7 violations within one year - one conduct related and the other OBRD related. This should have been addressed as a sanction Level 7, third offense, with a range of 8-32 hours suspension unless a departure from the range is justified and articulated. As such, the discipline in this matter was deficient and reflected on APD's staff and command personnel being unable to interpret their own written guidance for discipline.

[IMR-13-27] involved the failure of supervising Sergeant to do two video reviews of a subordinate officer. Investigation revealed a good faith error as a mitigating factor. The allegation was sustained as a sanction level 7, and a verbal reprimand was imposed. The officer's retention card shows two prior sustained offenses for Supervisory Leadership, Level 6, one of which was within a year of the present offense. This matter should have been addressed as a 2nd offense, level 7, with a least a written reprimand imposed. As such, the discipline in this matter is deficient.

[IMR-13-28] involved an allegation against a supervising sergeant for failing to approve a summons within five working days, per special order. The allegation was sustained as a sanction level 6, and a verbal reprimand was imposed. The sergeant's retention card shows a prior OBRD related allegation sustained and two separate cases involving failure of supervisory responsibility, all of which were administratively closed with non-disciplinary corrective action within a year of the present offense. As such, the present offense should have been addressed as a sanction level 6, 3rd offense, which carries a range of 40-80 hours suspension. If a downward departure was warranted, then the justification should be well articulated based on a weighing of mitigated factors. A verbal reprimand, in this case, was inappropriate, and as such, the discipline is deficient.

[IMR-13-29] involved an allegation of a failure to complete a CIT worksheet after a mental health detention and transport. It was sustained as a sanction level 6, and a written reprimand was imposed. The investigation memo showed two priors within one year of the current incident, but the retention card shows three separate cases with sustained violations within the past year: one an OBRD related violation, sanction level 7; one a code of conduct violation, sanction level 7; and another code of conduct violation, sanction level 7. All of these prior offenses resulted in administrative closures/non disciplinary corrective action. Therefore, this case should have been

addressed as level 6, third offense with a range of 40-80 hours suspension. If a downward departure was appropriate, then mitigating circumstances justifying a departure should have been articulated in a memo. A verbal reprimand on a Class 6 offense, after three prior sustained matters resulting in non-disciplinary corrective action is grossly out of compliance with the principles of progressive discipline.

It is important to note that representations of APD and our review of the random sample of cases reveal that there were no cases completed during the IMR-13 period in which discipline was not imposed due to being "time-barred." Despite this very positive disciplinary outcome, it bears repeating that compliance with the CBA in not imposing discipline that is "time-barred" does not excuse APD's failure to meet the requirements of paragraphs 201 and 202 of the CASA to impose appropriate discipline on sustained charges. The CASA requires APD and CPOA to be staffed sufficiently to meet their investigative responsibilities in a timely manner, to operate efficiently, and to bring sustained charges to the command review process in time for the review process to run its normal course. The monitor also expects that the command review will take place in an efficient manner such that when discipline is appropriate, the Notice of Intent to Discipline letter will be issued within the requisite time period. Investigations ending with "failure to impose discipline on sustained charges due to time considerations" will be marked as deficient for purposes of paragraph 201 and 202 compliance, absent careful articulation and justifiable explanation by APD.

### 4.7.187 Assessing Compliance with Paragraph 201:  Fact Based Discipline

Paragraph 201 stipulates:

> **"APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendations for Paragraph 201:*

*4.7.187a:  Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix unless written reasons for departure from the matrix recommendations accompany the decision.*

*4.7.187b: Ensure that adequate explanation is given for the selection of a classification level where there is more than one level of classification associated with a regulation for which a sustained finding is made.*

268

*4.7.187c: APD should designate the Commander of IAPS or a Deputy Chief as the only person in the organization who has the authority to determine that discipline cannot be imposed due to time violations, and that designation should not be made without the approval of the City Attorney.*

*4.7.187d: All investigations involving sustained charges where discipline cannot be imposed due to violations of time constraints should be reported quarterly to the Chief, the City Attorney, DOJ, and the monitor.*

*4.7.187e: APD should adhere to the practice of having a representative of IAPS or an administrative prosecutor attend all PDHs and represent the findings and recommendations set forth in the investigation.*

*4.7.187f: Ensure uniformity in the amount and format of summarizing the information presented to the Chief with investigations, and thus CPOA should follow the IAPS practice and adopt the use of Disciplinary Action Packets to accompany its investigations in which charges are sustained.*

*4.7.187g: Ensure that all PDHs are recorded and preserved as part of the investigative file.*

*4.7.187h: IAPS should determine if there are any prior violations that count as prior offenses for all matters referred to the Area Commands for investigation and imposition of discipline where appropriate.*

*4.7.187i: Training in the administration of discipline per SOP 3-46 and the tenets of progressive discipline must be provided to the Area Command disciplinary authorities who impose discipline on sustained allegations of minor misconduct. Alternatively, one disciplinary authority – properly trained in SOP 3-46 and the principles of progressive discipline – should be designated for those sustained matters arising out of Area Command investigations.*

*4.7.187j:  Build specific training components, based on past failures, to ensure supervisory personnel are keenly aware of their responsibilities regarding the identification of aberrant behavior in the field, and begin the processes of progressive discipline for sergeants, lieutenants, and commanders who fail to implement the requirements of APD's policies regarding use of force and related policies.*

**4.7.188 Assessing Compliance with Paragraph 202: Discipline Matrix**

Paragraph 202 stipulates:

> **"APD shall establish a disciplinary matrix that:**

a)  establishes a presumptive range of discipline for
each type of rule violation;
b)  increases the presumptive discipline based on an
officer's prior violations of the same or other rules;
c)  sets out defined mitigating or aggravating factors;
d)  requires that any departure from the presumptive
range of discipline must be justified in writing;
e)  provides that APD shall not take only non-
disciplinary corrective action in cases in which the
disciplinary matrix calls for the imposition of discipline;
and
f)  provides that APD shall consider whether non-
disciplinary corrective action also is appropriate in a
case where discipline has been imposed."

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 202:*

*4.7.188a:  Ensure that all disciplinary decisions either conform to the recommended ranges included in APD's disciplinary matrix or that they are accompanied by written explanations for the departure from the recommendations of the disciplinary matrix.*

*4.7.188b: Ensure that all disciplinary decisions related to actions (or inactions) that are reasonably on the "critical path" regarding compliance with the CASA reflect a resolve to foster behaviors required by the CASA.*

*4.7.188c: Ensure that all disciplinary packets are complete and self-explanatory, including documentation that all steps in the investigation and disciplinary processes were completed as required by policy.*

*4.7.188d: Ensure a more exact calculation of prior offenses for purposes of calculating the presumptive range of the disciplinary matrix.*

*4.7188e: Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix unless cogent, written reasons for departure from the matrix recommendations accompany the decision.*

*4.7.188f:  A revised AO 3-46 must be adopted on a priority basis and must reflect the tenets of the CASA and principles of fair and consistent discipline, and clearly set forth the guidance necessary to calculate a prior offense and the appropriate range of the disciplinary matrix in accordance with the principles of progressive discipline.*

***4.7.188g:  Ensure that a revised AO 3-46 addresses when a suspension can be held in abeyance and the criteria for doing so and that a cogent explanation consistent with the tenets of progressive discipline be given whenever a suspension is held in abeyance.***

***4.7.188h: Insert an additional column in the disciplinary decision matrix that identifies whether the range of discipline is enhanced by prior offenses.***

***4.7.188i: Revise SOP 3-43 to contain guidance for when relief of duty is appropriate and warranted.***

***4.7.188.j: IAPS should provide training to Area Command disciplinary authorities on the principles of progressive discipline and the requirements of SOP 3-46, including the calculation of prior offenses and the appropriate range of discipline for sustained charges within the disciplinary matrix, the identification and weighing of aggravating and mitigating factors, and the justification of an upward or downward departure from the disciplinary matrix.***

Monitor's Note:

Holding a suspension in abeyance is in effect a departure from the appropriate range of the disciplinary range, requiring a reasonable and articulable justification for doing so, as set forth in Recommendation 4.7188e above.

We also underscore that the activation of the OBRD and the proper management of OBRD recordings are crucial to the success of CASA reforms, and that disciplinary decisions must always consider and reflect aggravating and mitigating circumstances and be commensurate with the organizational needs to deter and correct misconduct and reflect the record of the subject officer, particularly so where violations have a direct nexus to the CASA, as reflected in Recommendation 4.7.188b, above.

### 4.7.189 Assessing Compliance with Paragraph 203

Paragraph 203 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement the terms of this Agreement. APD shall also deploy a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally. APD shall revise and implement policies for supervision that set out clear requirements**

271

**for supervision and comport with best practices."**

## Methodology

The monitoring team has systematically reviewed random selections of in-field officer behavior and has spent hundreds of hours and pages outlining in detail the issues with in-field supervision and administrative review and response to in-field policy violations.

## Results

The monitoring team has provided specific and clear assessments of where and how APD personnel are non-compliant with the requirements of the CASA.  At this point, it is not a matter of APD not knowing what their critical problems are.  It is, instead, a matter of failure to have the will to correct aberrant behavior in the field.  Even when confronted with advanced notice of the monitor's opinions of problematic in-field behavior, APD has been, to date, virtually unwilling to confront this behavior with structured, progressive, and effective responses.  Based on our review this reporting period, these errors are not due to staffing irregularities but are due to a lack of will on the part of sergeants and command level personnel.  Merely adding additional personnel, who exhibit the same lack of will, simply will continue the issues outlined above.

## Results

      Primary:      **In Compliance**
      Secondary:  **In Compliance**
      Operational:  **Not In Compliance**

***Recommendations for Paragraph 203:***

***4.7.189a: Enforce existing policies that require supervisors to conform to the requirements of this paragraph.***

***4.7.189b: If necessary, revise supervision policies to ensure clarity of requirements. Then ensure enforcement of those policies.***

**4.7.190 Assessing Compliance with Paragraph 204:  Comprehensive Staffing Study**

Paragraph 204 requires:

> **"In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission. APD therefore shall conduct a comprehensive staffing assessment and resource study. The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with**

272

**community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques. The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands. This staffing assessment and resource study shall be completed within one year of the Operational Date. Within six months of the completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement."**

## Methodology

We have assessed in past reports the issues we have noted with the Alexander Weiss staffing study.  We note that City Council has commissioned a new staffing study to assess actual needs in the field and the number of oversight and review personnel necessary to comply with the requirements of Paragraph 204.  We look forward to reviewing this work and to working with APD as they plan implementation of the results of this review of staffing needs.  We will withhold recommendations for this paragraph until we have an opportunity to assess the new staffing study.

## Results

     Primary:      **In Compliance**
     Secondary:  **In Compliance**
     Operational:  **Not In Compliance**

## 4.7.191 – 4.7.194 Assessing Compliance with Paragraphs 205- 208: Supervision and Related Paragraphs

The monitoring team reviewed and examined the data required for APD to attain compliance with paragraphs 205 through 208 for this reporting period (August 1, 2020, thru January 31, 2021). That data is in the form of policy, programs, and results. For this reporting period (IMR-13), the monitoring team conducted the site visit via a virtual platform from November 9 through November 13, 2020, due to the circumstances created by the COVID-19 Pandemic. APD provided additional data throughout the reporting period. The paragraphs correspond to the Supervision and Related paragraphs as delineated in the CASA. These paragraphs address supervision requirements for First Line Supervisors, the required span of control and levels of supervision, and the close supervision by the lieutenants and commanders.

APD's Performance Metrics Unit (PMU) continues to conduct quantitative evaluations and audits on areas of the CASA as they relate to the supervisory aspects of the corresponding paragraphs. For this reporting period, the monitoring team reviewed detailed Monthly Inspection Reports for Field Services Bureau Area Commands and Special Services Bureau. These reports consist of, but are not limited to, the following;

- Detailed Scorecard on monthly basis containing the teams or units being monitored, the topic that each team or unit is measured on, and the compliance percentage attained;
- Detailed Scorecard by Topics (OBRD/Firearms/Supervision/72-hour extension);
- Detailed Scorecard sample size (number per team/unit and number per topic); and
- Detailed Explanation of Scorecard.

The field-wide inspections and audits continue to demonstrate improvement towards monthly activity reports, monthly check-off lists, monthly line inspections, arrest reports, monthly video inspections, and firearms. During IMR-13, the staff assigned to these paragraphs drafted Special Order 20-19 Approval of Adult Criminal Complaints/Juvenile Statements of probable cause. This order added the provision requiring supervisors to electronically approve the criminal complaints or juvenile statement of probable cause using the TraCS system (a state funded system that standardizes specific reports). The previous system allowed for hand signed criminal complaints that could not be effectively tracked for data collection and analysis. The TraCS system will now allow APD to electronically track the approval of criminal complaints and juvenile statements of probable cause. APD staff dedicated time to educate area commands and specialized units of the process that would be used to evaluate compliance approval of the criminal complaints in TraCS.  During this reporting period, a new process towards the implementation of new Line Inspection Forms was initiated through the City's People Soft Database. The goal is to develop a more comprehensive Line Inspection Form that can integrate data from multiple sources. This will eventually reduce data entry time and improve standardization and accuracy, resulting in thorough and complete monthly inspections. A pilot program was initiated during IMR-13 in three different areas. Minor errors were found during the pilot program, and these have been addressed. A Department Special Order (# 21-16) and a PowerDMS instructional video was published on January 31, 2021, and the new line inspection form will be utilized during the next reporting period.

The pilot program began during the previous reporting period for community engagement, and outreach application continued into this reporting period. As was noted by the monitoring team in previous reporting periods, IT issues have been a major obstacle in implementing this new system. APD has been working with the City of Albuquerque's Department of Technology and Innovation (DTI) to create appropriate workspace for certain applications. The Compliance and Oversight Division (COD) is in the process of testing the program through the Proactive Response Unit.

Documentation of processes related to these paragraphs received by the monitoring team includes:

- Random Line-up reports for six area commands (Verification for 8:1 Ratio);
- Random CAD entry reports for six Area Commands;
- Supervision Scorecards Status reports; and

274

- Random Sergeant CAD entry reports for each Area Command.

Due to the site visits being conducted on a virtual platform, the monitoring team's planned in-person site visitations have been temporarily suspended. The monitoring team relied on the above-mentioned reports to verify compliance with staffing levels, to confirm that first-line supervisors were on duty at all commands and that normal day-to-day operations of APD patrol units are supported and supervised at the required levels for the CASA.

The quality of assessment of use of force by APD supervisors as required by Section IV of the CASA is of serious concern to the monitoring team. The progress made by APD in these areas is a positive sign that the department is moving in the right direction. However, until the process is complete and fully implemented throughout the entire department, secondary or operational compliance cannot be attained. The monitoring team will continue to review audits and actions taken to reduce repetitive oversight errors during future reporting periods.  After six years of implementation efforts, new policies, new training, and heightened supervision at mid- and command levels, APD's field sergeants, to a substantial extent, have proven themselves incapable of or unwilling to professionally review subordinates' behavior and holding those subordinates to the higher standard required by the CASA.  This is a critical issue, and until it is resolved by APD, compliance will be difficult to attain and manage.

### 4.7.191 Assessing Compliance with Paragraph 205

Paragraph 205 stipulates:

> **"First-line supervisors shall investigate officers' use-of-force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy."**

### Results

Primary: **In Compliance**
Secondary: **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.192 Assessing Compliance with Paragraph 206

Paragraph 206 stipulates:

> **"All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command. First-line supervisors shall be responsible**

275

> **for closely and consistently supervising all officers under their primary command. Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department."**

## Results

Primary:          **In Compliance**
Secondary:     **Not In Compliance**
Operational:   **Not In Compliance**

Monitor's Note:

At this point, CASA congruent policy has been developed by APD.  Monitor-approved training has been provided to APD's sergeants and mid-level command. Responsibilities of sergeants and mid-level command have been clearly identified viz a viz review of officers' actions in the field.  Nonetheless, we continually find that the monitoring team is the last line of defense regarding in-field behaviors that violate policies and undermine the CASA.  It will be virtually impossible for APD to gain compliance with the requirements of the CASA until APD gets first-line supervisors involved in assessing, evaluating, and correcting policy violations in the field.  The monitor advised APD of the need for highly engaged supervision during the very first day of the monitoring process by a specifically tailored training for key command and supervisory personnel.  We have continued to note the criticality of supervisory review and control of in-field behavior in each of our reports.  To date, most field sergeants have failed to meet the requirements of effective supervision.  Until that happens—and we firmly believe it will not happen unless mid-level managers insist that it happen—APD will find full compliance elusive and difficult to attain.

### 4.7.193 Assessing Compliance with Paragraph 207

Paragraph 207 stipulates:

> **"First-line supervisors shall ordinarily be assigned as a primary supervisor to no more than eight officers. Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary."**

## Results

Primary:          **In Compliance**
Secondary:     **In Compliance**
Operational:   **In Compliance**

### 4.7.194 Assessing Compliance with Paragraph 208

Paragraph 208 stipulates:

> **"APD Commanders and lieutenants shall be
> responsible for close and effective supervision of
> officers under their command. APD Commanders and
> lieutenants shall ensure that all officers under their
> direct command comply with APD policy, federal, state
> and municipal law, and the requirements of this
> Agreement."**

### Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 205, 206, 208:*

*44.7.194a:  APD must insist that commanders and mid-level oversight personnel
(lieutenants and sergeants) accept their responsibilities for the day-to-day
management and supervisory control of line personnel.  Simply building high-
level oversight processes using automated systems or high-level reviews to
identify transgressions of line personnel will not be effective in the long run.*

*44.7.194b:  Moving forward, all high-level reviews (including automated systems
analyses, FRB, etc.) that identify field-level violations of policies, particularly
those related to use of force, that were not noted by sergeants, lieutenants, or
command-level personnel, should also include progressive discipline for
"upstream" personnel who also failed to note the issues found during high-level
reviews.*

### 4.7.195 - 4.7.197 Assessing Compliance with Paragraphs 209 - 211: Review of Sergeants' Training

Paragraphs 209 through 210 address various supervisory training requirements APD
must meet for the CASA. "Every sergeant shall receive 40 hours of mandatory
supervisory, management, leadership, and command accountability training before
assuming supervisory responsibilities." Data requested and received by the monitoring
team for this reporting period included:

- August 2020 eighty (Mandatory Supervision course;
- September 2020 eighty-hour Mandatory Supervision course;
- December 2020 eighty-hour Mandatory Supervision hour course;
- Student Evaluation for eighty-hour course;
- Critiques for eighty-hour course;

- Rosters for eighty-hour course;
- Test Results; and
- Certificates

Interwoven into the training, as required by the CASA, are the requirements of these two paragraphs, including:

- Techniques for effectively guiding and directing officers and promoting effective and ethical police practices;
- De-escalating conflict;
- Evaluating written reports;
- Investigating Use of Force
- Understanding supervisory tools (Early Intervention Systems (EIS), (OBRD) systems;
- Investigating officer misconduct;
- Officer performance;
- Disciplinary sanctions and non-punitive corrective action;
- Building community partnerships; and
- Legal update.

Data requested and received by the monitoring team indicate that these portions of the requirement have been addressed by APD in the supervisory course delivered during this reporting period.

The use of force training, as mentioned in IMR 12, will extend until the next reporting period. APD has completed Tier 3 training for supervisors during this reporting period, and the results of that training will be assessed next reporting period. Tier 4 training is currently being delivered, and the results will be reflected in the next reporting period.

As noted in the previous IMR, measuring the full impact of training recently delivered and currently being delivered by APD is not measurable during this reporting period. The monitoring team will closely monitor the impact of the training in future reporting periods.

### 4.7.195 Assessing Compliance with Paragraph 209

Paragraph 209 stipulates:

> **"Sergeant training is critical to effective first-line supervision. Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities."**

**Results**

Revised supervisory training has not been delivered this reporting period.

Primary:      **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.196 Assessing Compliance with Paragraph 210

Paragraph 210 stipulates:

> **"APD's sergeant training program shall include the following topics:**
>
> **a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;**
> **b) de-escalating conflict;**
> **c) evaluating written reports, including those that contain canned language;**
> **d) investigating officer uses of force;**
> **e) understanding supervisory tools such as the Early Intervention System and on-body recording systems;**
> **f)  responding to and investigating allegations of officer misconduct;**
> **g) evaluating officer performance;**
> **h) consistent disciplinary sanction and non-punitive corrective action;**
> **i)  monitoring use-of-force to ensure consistency with policies;**
> **j)  building community partnerships and guiding officers on this requirement;**
> **k) legal updates."**

**Results**

Secondary compliance has not been attained during this reporting period.

Primary:      **In Compliance**
Secondary:   **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.197 Assessing Compliance with Paragraph 211

Paragraph 211 stipulates:

> **"All sworn supervisors shall also receive a minimum of 32 hours of in-service management training, which may**

**include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement."**

## Results

During this reporting period, the monitoring team reviewed supervisory training delivered to all sworn supervisors from the rank of Sergeant and above. The monitoring team conducted the site visit via a virtual platform from November 9, 2020, through November 13, 2020, and reviewed subsequent data from requests submitted at the end of the reporting period. Department Special Order (SO) 20-73 was published in early October 2020 indicating training to be delivered during this reporting period labeled "2020 Twenty Hour Mandatory Supervisory Training" with dates of delivery October through December 2020. As of January 31, 2021, APD had combined a total of 312 A/Supervisory and Supervisors. Five officers are on administrative leave, six had to reschedule, and three hundred one received the training. Two hundred eighty-four (284) passed, and seventeen failed the training (94.35% pass rate. This paragraph requires a minimum of thirty-two hours of training, and APD failed to achieve this measurement during this reporting period and will remain in primary compliance only. The 2021 training schedule submitted by APD reflects that the requisite training for this paragraph is scheduled to be delivered. The monitoring team will closely monitor their progress in the next reporting period.  When APD fails to meet even the most modest of requirements for training, e.g., minimum number of hours of training on a given topic, it reflects a lack of care.  It is not a matter of skill; it is a lack of will.

Primary:         **In Compliance**
Secondary:    **Not In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraphs 209 – 211*

*4.7.195-4.7.197a:  APD should carefully review the requirements of Paragraphs 209-211; use this and past monitor's reports to determine exactly where they fall short and establish policies or protocols to ensure this issue does not occur again.*

## 4.7.198 – 4.7.205 Assessing Compliance with Paragraphs 212-219 EIS/EIRS/PMEDS

During the last reporting period (IMR-12), the Performance Evaluation and Management System (PEMS) policy 3-33 was approved by the Monitor. APD has come a long way toward understanding the value of an "early intervention system." At the end of that reporting period, the PEMS Supervisor Lesson Plan was submitted to the Training Academy for review and development for supervisor training. While this is a complicated plan, the CTU and PEMS development team meet weekly to improve the lesson plan and Power Point presentation.  The monitor notes that "planning" for an effective EIS has been "ongoing" for five years now, with little to show for the effort.  At some point in

the near, APD will need to stop "planning" and implement a workable (and monitor approvable EIS).  Continual delay such as this eventually becomes deliberate indifference.

As previously noted in IMR-11, the draft versions of policy, curriculum, and plans to move forward with a system that has the capability to meet or exceed CASA requirements have been established. PEMS is proposed to be a data-driven system with thresholds supported by data analysis and research, using a statistical process based on an 80/20 percentage principle to establish thresholds rather than arbitrarily assigned incident numbers (as we have long-recommended). The monitoring team spent additional time during the IMR-13 reporting period discussing APD's methodology for capturing Use of Force data and approved APD's request to implement and test their proposal for a couple of cycles to ensure the system is free of issues. Still at question is the methodology of comparing an individual's Use of Force to APD's Calls for Service data rather than the individual's Arrest data.  Members of the monitoring team have experienced the latter in other Early Intervention Systems, but APD has preliminary approval to test their proposal.

APD envisions the entire process as a significant project based upon policy approval, system selection, training, and implementation.  This is a major project which will require time, focus, input, and assessment from multiple levels of the organization.  The monitoring team believes this to be, of necessity, a long-term process based on prior experience with Early Intervention Systems in Pittsburgh and New Jersey.  While this timeline is problematic with regards to attaining compliance with the requirements of the CASA, the monitoring team believes that APD has finally grasped the importance of an Early Intervention System.  While approved policy guidance exists, it is highly probable that, when new systems are developed, policies will need to adapt and change.  Nonetheless, APD remains in primary compliance, as existing policies have been promulgated and approved.

### 4.7.198 Assessing Compliance with Paragraph 212

Paragraph 212 stipulates:

> **"Within nine months of the Operational Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers. APD supervisors shall be trained to proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.199 Assessing Compliance with Paragraph 213

Paragraph 213 stipulates:

> **"APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.200 Assessing Compliance Paragraph 214

Paragraph 214 stipulates:

> **"APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.201 Assessing Compliance Paragraph 215

Paragraph 215 stipulates:

> **"The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum:**
> **a) uses of force;**
> **b) injuries and deaths to persons in custody;**

282

**c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy;**
**d) all civilian or administrative complaints and their dispositions;**
**e) all judicial proceedings where an officer is the subject of a protective or restraining order;**
**f) all vehicle pursuits and traffic collisions involving APD equipment;**
**g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system;**
**h) all disciplinary action taken against employees;**
**i) all non-punitive corrective action required of employees;**
**j) all awards and commendations received by employees, including those received from civilians, as well as special acts performed by employees;**
**k) demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;**
**l) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and**
**m) all offense reports in which an officer is a suspect or offender."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.202 Assessing Compliance Paragraph 216

Paragraph 216 stipulates:

> **"APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it. The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.203 Assessing Compliance Paragraph 217

Paragraph 217 stipulates:

> **"APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law. Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System. On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

## 4.7.204 Assessing Compliance Paragraph 218

Paragraph 218 stipulates:

> **"APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system. APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command. Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior."**

**Results**

Primary:      **In Compliance**

284

Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.205 Assessing Compliance Paragraph 219

Paragraph 219 stipulates:

> **"Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate. The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement."**

**Results**

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 212 - 219:*

*4.7.198-205a:  Complete and submit for approval the curriculum for PEMS training for supervisors and ensure that the new PEMS system addresses all required components of paragraph 215 and the additional requirements of Paragraph 23 (Firearm discharges), Paragraph 38 (ECW data), and Paragraph 105 (Tactical Unit data).*

*4.7.198-205b: Document and demonstrate that the proposed "Pareto Principle" or 80/20 principle is a statistical tool that works effectively and can be used to demonstrate both acceptable and unacceptable behavior from officers as required by the CASA.*

*4.7.198-205c: Document learning assessment processes for the training provided for supervisors.*

*4.7.198-205d: Design and document audit protocols for supervisory review and reporting of PEMS processes.*

### 4.7.206 Assessing Compliance Paragraph 220

Paragraph 220 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems. Within six months of the Operational Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require:**
> **a) specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;**
> **b) officers to ensure that their on-body recording systems are working properly during police action;**
> **c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning;**
> **d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible;**
> **e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;**
> **f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits;**
> **g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and**
> **h) APD to retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved."**

### Results

APD has developed compliant policy for OBRD operations and has trained all appropriate personnel in the operation of OBRD units with respect to those policies. During prior reporting periods, we have noted that the pilot audits at the Area Commands illustrated compliance levels of in-field operations of OBRDs below the 95 percent level.  During the 13th reporting period, APD has shown great improvement in supervision and review by first-line supervisors and command cohorts in this area.  The important information, however, is that these audits were conducted internally by APD,

not externally by the Monitor.  Operational compliance will require demonstrable and effective internal responses to the issues noted by these internal (to APD) findings.  We note, parenthetically, that we have operationalized several "oversight" conversations with APD's Oversight Division relative to their internal audit processes, providing insight, feedback, and coaching.  Based on our review of their work this reporting period, the majority of our advice has been operationalized in COD's work related to internal auditing and reporting.  To attain operational compliance,  APD should seriously consider the recommendations listed in section 4.7.206 below.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 220:***

***4.7.206a: Prepare, quarterly, a written assessment of the results of the inspections and audit outcomes, identifying the top five areas of non-compliance with the requirements of OBRD field processes.***

***4.7.206b: Based on the quarterly audits, identify the top three reasons for non-compliance with OBRD policies and procedures, and develop specific, targeted responses to address and remediate each of the top three non-compliance areas.***

***4.7.206c: Repeat steps a and b until field OBRD error rates are below five percent.***

### 4.7.207 Assessing Compliance with Paragraph 221

Paragraph 221 stipulates:

> **"APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and implementation. Upon approval by the Monitor and DOJ, policies shall be implemented within two months."**

**Results**

Policies responsive to paragraph 221 have been developed and trained.  Supervisors have begun to document OBRD equipment failures, failures to upload required recordings, and failures to record.  These failures are beginning to be referred to Internal Affairs; however, the monitoring team is concerned that the final outcomes of policy violations are not commensurate with the violation. Only one of 91 violations resulted in a suspension, and that suspension was held in abeyance, reflecting once again APD's lackluster response to violations germane to the CASA.

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 221:***

***4.7.207a: Develop, implement, and assess supervisory protocols to ensure violations of applicable policy are identified by supervisors and are addressed and remediated, many of which have already been recommended to APD by the monitoring team.***

***4.7.207b: Publish quarterly "OBRD Failure" reports identifying the top five reasons for OBRD failure in the field and identifying the Area Command, shift, and supervisors associated with those failures.***

***4.7.207c: Discipline supervisors with repeated failures in noting, assessing, and correcting officers with repeated OBRD operations failures.***

***4.7.207d: Repeat until error rates on OBRD operation fall below five percent.***

**4.7.208 Assessing Compliance with Paragraph 222**

Paragraph 222 stipulates:

> **"The Parties recognize that training regarding on-body recording systems is necessary and critical. APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff. APD will develop a training curriculum, with input from the Monitor and DOJ that relies on national guidelines, standards, and best practices."**

**Results**

Monitor-approved supervisory training for OBRD operations in the field was implemented during the reporting period for IMR-11. Problems with supervision in past reports have not presented themselves this period. During the 13th reporting period, Internal Affairs received ninety-one referrals related to OBRD policy violations, which shows that APD has acknowledged the problem with in-field OBRD operations and has taken steps to improve performance in that area. The monitoring team, due to the COVID Pandemic, conducted this visit "virtually."

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 222:*

*4.7.208a: Reinforce the established clear, concise, and reasonable requirements for supervisory review of in-field activations of OBRDs, requiring field supervisors to review OBRD activations and recordings for compliance to established policy.*

*4.7.208b:  Ensure global retraining of supervisory and command personnel regarding these requirements.*

*4.7.208c:  Increase internal oversight related to OBRD usage and supervision and ensure that OBRD supervisory oversight is of sufficient scale and scrutiny to identify problematic issues related to OBRD usage.*

*4.7.208d: Establish a routinized process for command oversight of the OBRD review process, requiring lieutenants to assess, in a methodical way, the OBRD review processes of sergeants under their command, and commanders to assess the OBRD review performance of lieutenants under their command, to ensure compliance with reasonable assessments of actions in the field.*

*4.7.208e: Establish a routine administrative review, via Compliance Bureau Personnel, of Area Command OBRD review efficiency, including performance metrics such as overall review rates, error rates, and remediation protocols.  This review process should be ongoing and assigned to the Performance Metrics Unit.*

### 4.7.209 Assessing Compliance with Paragraph 223

Paragraph 223 stipulates:

> **"APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order. Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor."**

## Results

The monitoring team has reviewed the latest supervisors' monthly line inspection forms submitted online and assessed the OBRD related queries. During interviews with the monitoring team, supervisors reported several equipment failures and had replacements made immediately. APD is working with Axon to obtain comprehensive data to reach compliance with this requirement.  APD supervisors are beginning to properly document equipment checks at an acceptable level.  Effective supervision,

documentation of behaviors, and application of appropriate discipline to sustained policy violations are key to the elevation of compliance rates for this paragraph.

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

### 4.7.210 Assessing Compliance with Paragraph 224

Paragraph 224 stipulates:

> **"Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy. Supervisors shall report equipment problems and seek to have equipment repaired as needed. Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraphs 223 – 224:*

*4.7.209-210a: Ensure that supervisors who fail to note errors in OBRD operation are counseled, or for multiple offenders, retrained and/or disciplined for ineffective OBRD review processes. If, after counseling or retraining, supervisors continue to miss OBRD activation or usage violations, ensure appropriate discipline is imposed.*

*4.7.209-210b: Identify the top 20 supervisors who have substandard performance on OBRD activation review and assess the reasons for failure to enforce established process.  Place these supervisors "on notice" that their performance on this task will be routinely reviewed, and continued failures will result in discipline.*

*4.7.209-210c:  Follow up on these counseling sessions with discipline if necessary.*

*NOTE:  The monitor is cognizant that these are the same recommendations made for this paragraph as were made in IMR-12.  To the monitor's knowledge, no plans or processes are in place to implement these recommendations.*

### 4.7.211 Assessing Compliance with Paragraph 225

Paragraph 225 stipulates:

> **"At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed."**

### Results

During the virtual site visits to the various Area Commands in the 13th reporting period, APD supervisors were able to demonstrate that they understand the policy with regards to video reviews and have documented that they have, in fact, conducted these reviews. Those reviews demonstrate whether or not the officer is acting within policy and that the equipment was in working order.

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.212 Assessing Compliance with Paragraph 226
Paragraph 226 stipulates:

> **"APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent."**

### Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.213 Assessing Compliance with Paragraph 227

Paragraph 227 stipulates:

> **"APD shall ensure that on-body recording system videos are properly categorized and accessible. On-body recording system videos shall be classified according to the kind of incident or event captured in the footage."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.214 Assessing Compliance with Paragraph 228

Paragraph 228 stipulates:

> **"Officers who wear on-body recording systems shall be required to articulate on camera or provide in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded. Intentional or otherwise unjustified failure to activate an on-body recording system when required by APD policy shall subject the officer to discipline."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

## 4.7.215 Assessing Compliance with Paragraph 229

Paragraph 229 stipulates:

> **"APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties. On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room)."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **Not In Compliance**

Monitor's Note:

During this reporting period, the majority of past OBRD errors noted by the monitoring team (and APD's Force Backlog Review) indicated a failure of supervisors to assess

and act upon OBRD failures exhibited by line personnel.  Again, these were not policy or training errors, but errors in the implementation of approved and trained policy that were not noted by supervisors.  The errors were those of supervisory and management personnel failing to insist on compliance with the CASA. During this period, some supervisors were, in fact, discovering and referring policy violations to Internal Affairs for investigation, which is a marked improvement over past practice.  The final step in the process will be evidence of APD taking appropriate measures when violations are noted. As we note elsewhere in this report, as of IMR-13, APD remains seriously discipline averse.  Again, it is clear that APD has solidly signaled to its field personnel that adherence to OBRD policy is not important and will not be enforced.

This kind of organizational indifference to approved policy—particularly OBRD requirements-- appears to be widely internalized at APD.  To gain compliance, APD will need to ensure that policy violations result in a proportionate organizational response.  Parenthetically, we note that APD uses most frequently the corrective rubric of "retraining," instead of realizing that the training delivered was appropriate (all training that is CASA-related is approved by the monitoring team prior to training being delivered) but that officers simply are not implementing the training delivered.  Put simply, APD is discipline averse, and even when discipline is effectuated, it is nearly always softened by APD's tendency to hold significant portions of effectuated discipline "in abeyance."  We have advised the current chief on multiple occasions that routinely holding in abeyance large portions of discipline required by policy is a counter-CASA process.  Yet, it continues to happen routinely.  We conclude this unwillingness to adhere to the chart of sanctions is a deliberate violation of the requirements of the CASA paragraphs 201 and 202, which require consistently applied fair discipline based on factors included in the discipline matrix

### 4.7.216 Assessing Compliance with Paragraph 230

Paragraph 230 stipulates:

> **"APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift. All images and sounds recorded by on-body recording systems are the exclusive property of APD."**

### Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.217 Assessing Compliance with Paragraph 231

Paragraph 231 stipulates:

**"The Parties are committed to the effective use of on-body recording systems and to utilizing best practices. APD currently deploys several different platforms for on-body recording systems that have a range of technological capabilities and cost considerations. The City has engaged outside experts to conduct a study of its on-body recording system program. Given these issues, within one year of the Operational Date, APD shall consult with community stakeholders, officers, the police officer's union, and community residents to gather input on APD's on-body recording system policy and to revise the policy, as necessary, to ensure it complies with applicable law, this Agreement, and best practices."**

## Results

Primary:      **In Compliance**
Secondary:  **Not In Compliance**
Operational: **Not In Compliance**

### 4.7.217. Recommendations for Paragraphs 228, 229, and 231:

*4.7.217a: Conduct detailed failure analyses designed to identify the causes of incidents of "failure to record" and identify the true cause of these failures: equipment, training, supervision, or "other."*

*4.7.217b: Rank order the failure rates and develop action plans to eliminate the causes of failure, beginning with the most frequent and working to the least frequent.*

*4.7.217c: Identify a frequency-based list of supervisors who fail to enforce OBRD requirements and schedule these supervisors for retraining, counseling, or discipline, as appropriate.*

### 4.7.218 – 4.7.226 Assessing Compliance with Paragraphs 232-240 (Recruiting)

Members of the monitoring team reviewed APD data related to these requirements in the form of policy, programs, course of business documents, and results.  APD continues attracting and hiring qualified individuals, and therefore remains in Operational Compliance with each of these CASA paragraph requirements. APD Recruitment staff continue to provide an impressive array of strategies and concepts for recruiting police officers during the COVID Pandemic and at a time in history in which interest in the profession is down significantly nationwide. Nevertheless, APD has managed to increase interest in joining APD by focusing on critical-path issues in recruiting.  The recruiting unit has successfully utilized digital platforms to reach an applicant pool that now includes at least 43 states.

In response to COVID, the recruiting unit had to reconsider its standard methods and create innovative new ways to attend community events and gatherings to carry on its mission.  While having created a social media footprint for recruiting, APD has enhanced these social media sites by adding Facebook and Instagram accounts, including "live" events with the ability for live questions & answers.  Zoom meetings were conducted with current cadets and applicants both in-state and out-of-state.  APD has continued to produce videos including the Academy Campus video which provided an Academy tour, Physical Training demonstrations, Cadet interviews, and Specialty Assignments.   Both TV and radio have been utilized with the "Stand Alone" videos broadcast by all the local stations and "live" radio segments with call-ins for Questions & Answers.  During the reporting period, the recruiting unit attended events related to transitioning military to civilian life with the Air Force, Army, and National Guard.  Virtual events have continued through the COVID restrictions.

The monitoring team again applauds the recruiting unit's innovative solutions to COVID restrictions. Recruiting flyers have been included in ABQ water bills.  Recruiting flyers and posters have been delivered to the unemployment offices. The unit has done "in-person" recruiting at specific locations with displaced workers and utilizes an SUV as a mobile recruiting "billboard." They have also been targeting places such as gyms and jogging trails for the highest visibility to prospective applicants. Car shows and truck shows have also been attended, as these events draw large numbers.

The results of these efforts can be seen in the significant increase in phone queries, submission of interest cards, and new applicants.  All areas have shown substantial increases over the prior years' numbers. In recording the videos for recruitment purposes, APD has utilized diversity in the on-camera personnel, and this has had a positive effect on recruitment as the numbers of diverse applicants have surged over prior years.  Recognizing and celebrating diverse holidays such as MLK birthday, Chinese New Year, and Black History month have all shown to be effective.

The online marketing company, Boomtime, has been used to reach possible applicants more effectively.  APD continues to engage interested people who have withdrawn, failed, or missed a testing date.  Testing continues to be offered on weekends and evenings to expand the pool of possible applicants, along with PT testing without scores and mock interviews to assist interested candidates.

The monitoring team reviewed course-of-business documentation to confirm continued rigorous "outreach" by APD to the communities that have been productive sources of recruitment in the past, and with the easing of restrictions, the Recruiting Unit is planning once again to interact directly with community leaders and stakeholders to ensure their involvement with the Albuquerque Police Department's selection process.

For the requirement of random drug-testing of current officers (Paragraph 237), APD submitted course of business documentation of testing for current APD officers during this reporting period.  The testing was at an acceptable level, as agreed to in previous reporting periods, with the exception of the month of November.  Only six APD officers

were tested due to an apparent failure in communication between Internal Affairs and APD supervisors.  All months prior to and after November had adequate random testing, so at this point, a reduction in compliance would not be appropriate.  APD should ensure that this is an anomaly rather than a regular occurrence.  We will monitor this provision of the CASA with enhanced focus in the coming reporting period, e.g., IMR-14.

APD submitted the 2020 Annual Report and 2021 Strategic Recruitment Plan as required by Paragraph 233.

APD has met or exceeded all established requirements for Paragraphs 232-240.

### 4.7.218 Assessing Compliance with Paragraph 232

Paragraph 232 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts."**

**Results**

    Primary:    **In Compliance**
   Secondary:  **In Compliance**
  Operational: **In Compliance**

### 4.7.219 Assessing Compliance with Paragraph 233

Paragraph 233 stipulates:

> **"APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross section of the community. The recruitment plan shall establish and clearly identify the goals of APD's recruitment efforts and the duties of officers and staff implementing the plan."**

**Results**

    Primary:    **In Compliance**
  Secondary:  **In Compliance**
  Operational: **In Compliance**

296

### 4.7.220 Assessing Compliance with Paragraph 234

Paragraph 234 stipulates:

> **"APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community."**

### Results

Primary:　　**In Compliance**
Secondary:　**In Compliance**
Operational: **In Compliance**

### 4.7.221 Assessing Compliance with Paragraph 235

Paragraph 235 stipulates:

> **"APD's recruitment plan will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. APD shall create and maintain sustained relationships with community stakeholders to enhance recruitment efforts."**

### Results

Primary:　　**In Compliance**
Secondary:　**In Compliance**
Operational: **In Compliance**

### 4.7.222 Assessing Compliance with Paragraph 236

Paragraph 236 stipulates:

> **"APD shall develop and implement an objective system for hiring and selecting recruits. The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws."**

### Results

Primary:　　**In Compliance**

297

Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.223 Assessing Compliance with Paragraph 237

Paragraph 237 stipulates:

> **"APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and polygraph examination to determine their fitness for employment. APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers. The program shall continue to be designed to detect the use of banned or illegal substances, including steroids."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.224 Assessing Compliance with Paragraph 238

Paragraph 238 stipulates:

> **"APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws. APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities."**

**Results**

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.225 Assessing Compliance with Paragraph 239

Paragraph 239 stipulates:

> **"APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires.**

298

> **APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement."**

## Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.226 Assessing Compliance with Paragraph 240

Paragraph 240 stipulates:

> **"APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants."**

## Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.227 – 4.7.229 Assessing Compliance with CASA Paragraphs 241-243: Promotions

APD provided members of the monitoring team the Human Resources Department's Police Department Promotional Procedures Policy (dated January 31, 2019). This policy was adopted after approval by the monitor.

During this reporting period, only three promotions occurred. The monitoring team reviewed information relevant to these promotions. Based on this review and APD's ongoing compliance in this area, Operational Compliance is continued.

## 4.7.227 Assessing Compliance with Paragraph 241

Paragraph 241 stipulates:

> **"APD shall develop and implement fair and consistent promotion practices that comport with best practices**

**and federal anti-discrimination laws. APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant. APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions. These criteria should account for experience, protection of civil rights, discipline history, and previous performance evaluations."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.228 Assessing Compliance with Paragraph 242

Paragraph 242 stipulates:

**"APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties in core substantive areas."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.229 Assessing Compliance with Paragraph 243

Paragraph 243 stipulates:

**"Within six months of the Operational Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

**4.7.230 – 4.7.232 Assessing Compliance with CASA Paragraphs 244-246 (Performance Evaluations and Promotional Policies)**

During the 11th reporting period, APD completed policy 3-32, "Employees Work Plan/Performance Evaluations. The policy provides guidance on use of the system, lists criteria to be used to assess achievement of performance goals and outlines corrective action required if performance goals are not met.  Additionally, it outlines actions for the supervisor, should the software issues that have plagued the current system continue.

During past site visits, members of the monitoring team visited Area Commands and several other duty locations, including Investigations Divisions.  Supervisors demonstrated the Talent Management System to the monitoring team.  All supervisors assessed were fluent in their use of the system and were able to show examples of work plans and achievements of subordinates.  Supervisors had completed the requirements of the policy, the CASA, and the system functions.

APD plans to implement a replacement for the current Talent Management System. The Acting Lieutenant responsible for compliance with these requirements has been working diligently on revising policy and training and has implemented a pilot program regarding the requirement to hold supervisors accountable for their performance evaluations regarding their Use of Force Investigations. This was one element missing from the current Talent Management System.  Specific processes are required by the CASA. It is especially noteworthy that APD is discovering its own weaknesses/errors and developing solutions rather than waiting for the monitoring team to find weaknesses in APD systems.  This is a positive outcome for APD as it works toward compliance. Once the policy changes have been trained and implemented, Operational Compliance for related Paragraph 47 will be reassessed.

APD has created a new notification system to alert supervisors when the performance evaluations are due.  It is set to automatically send out notifications 30, 10, and 5 days prior to the due date of the checkpoint. The 30-day notification enables supervisors to resolve issues of any missing or additional personnel incorrectly assigned to them.

The monitoring team was provided with a course of business documentation indicating that the APD Acting Lieutenant responsible for the Performance Evaluation requirements continues to refer supervisors to Internal Affairs for administrative investigations regarding the failure to complete their checkpoints in a timely manner. The January 2021 checkpoint showed a success rate of 98.96% completed evaluations, with five supervisors referred for investigations to resolve nine missing evaluations.

**4.7.230 Assessing Compliance with Paragraph 244**

Paragraph 244 stipulates:

> **"APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing,**

> **integrity, community policing, and critical police functions on both an ongoing and annual basis. APD shall develop objective criteria to assess whether officers meet performance goals. The evaluation system shall provide for appropriate corrective action, if such action is necessary."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.231 Assessing Compliance with Paragraph 245

Paragraph 245 stipulates:

> **"As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.232 Assessing Compliance with Paragraph 246

Paragraph 246 stipulates:

> **"As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

**4.7.233 – 4.7.239 Assessing Compliance with CASA Paragraphs 247-253: Officer Assistance and Support**

Paragraphs 247 through 253 of the CASA pertain to the City's requirements to offer an Officer Assistance and Support Program to all employees and their family members.

For this reporting period, the monitoring team conducted the site visit via Zoom from November 9, 2020 through November 13, 2020. This platform was again utilized as it was for IMR-12 due to the circumstances created by the COVID-19 Pandemic. The reporting period for this report was August 1, 2020, through January 31, 2021. The monitoring team requested and received all documentation from the Director and the BSS staff in a timely manner and as a complete package outlining all processes of the program.

Critical Incident Service, Therapy Service, and a Training Component continued through this reporting period as in previous reporting periods and were readily available to all APD personnel as required by the CASA. Documentation for these services confirms that the material reviewed contains and illustrates the work being conducted for Behavior Science Service (BSS) program.

The Officer Assistance and Support Program is offered to all APD employees and families via the HIPAA compliant *doxy.me*, Facetime, Zoom, and/or by phone. During this reporting period, BSS moved to an online Electronic Health Record (EHR) system. Therapists will keep track of and document sessions via Therapy Notes. This enables the BSS program to securely share electronic information with patients and other clinicians, help reduce medical errors, and provide safer and more convenient health care. The Therapy Notes are HIPPA-protected and cloud-based and allows user data to be tracked easily, based on the number of notes written by each therapist.

The BSS program posted an addendum to consent for treatment (Informed Consent for Telehealth Services) so that patients understand the use of electronic communications to enable mental health professionals to connect with individuals via interactive video and audio communication.

Revisions to the BSS process are ongoing and reviewed at regularly scheduled meetings to maintain the most current best practices in the industry.

BSS continues to explore and work on areas to improve the program.  These include, but are not limited to:

- The Director continues to be part of UNM's Project ECHO First Responder Program (the BSS Director has helped lead discussions about first responders and their ability to cope with stress related to the COVID-19 Pandemic);
- Self-Care Interactive Online Network (SCION);
- Department-wide email link to anonymous survey data (the link also contained a reminder that BSS services are running during the Pandemic and seeing personnel via video conferencing and included contact information);

- Wellness SOP moving through the chain of command; and
- Collaboration between APD, UNM, and Pacific University (Portland) to promote mindfulness and stress reduction research continues.

On-site inspections of the BSS facilities are normally conducted by the monitoring team to ensure security and confidentiality in the program and to ensure that only BSS staff has access to all records maintained within the program. As was conducted in IMR-12, APD facilitated a virtual tour of the premises. As a result of the electronic inspection, and to the best of the monitoring team's ability to conduct the inspection, APD continues to meet all requirements with CASA.

During this reporting period, the BSS program delivered supervision training to APD personnel.

Also, during this reporting period, Peer Support SOP 1-10 was published into PowerDMS. Peer Support supplied COB documentation for this reporting period to the monitoring team for review, and the documentation included:

- Peer Support Activity Data (date/times, method of contact, initiating party, referral, personnel from peer support group);
- Peer Support survey reports; and
- Needs assessment for Peer Support Member Training

The Peer Support Program activities for this reporting period continue to show diligent work and dedication from Peer Support members. During this period, Peer Support addressed the newest Cadet class, incoming telecommunicators, and members of the acting supervisor classes. The topics covered included but were not limited to peer support, stress management, and personal experiences at APD.  Peer Support involvement created an opportunity for each cadet, employee, and supervisor to put faces to names. Peer Support continues to work closely with the APD academy on the delivery of training to APD personnel. The Self Care Interactive Online Network (SCION) was initiated during the IMR-12 reporting period.  The self-care initiative covers mental health challenges continues to grow in terms of issues covered and outreach. The program continues to explore and work on areas to improve service levels.

The material viewed by the monitoring team, as it relates to this program, is highly confidential, and operational compliance assessment is difficult. APD's BSS programs continue to be industry-standard and compliant with the relevant paragraphs of the CASA.

During this reporting period, BSS continued to maintain updated Excel spreadsheets of available health professionals and flyers that were reviewed (remotely) during the electronic site visits at all APD's Area Commands. Material for the BSS programs is documented on their "Daily 49" system in APD briefing rooms throughout the department, with the most current information for the program.

The monitoring team maintains, as in previous IMRs, that the nature of the

documentation is highly confidential, and again, as in previous site visits, although this site visit was conducted via a virtual platform, aggregate data was reviewed where it was deemed practical. In other cases, notes taken by the monitoring team were devoid of any direct or circumstantial information that would allow an individual to be identified.

As a result of the hard work, time, and dedication that has been invested in this program, APD maintains full compliance with the requirements of the CASA regarding these paragraphs. The monitoring team will continue to monitor closely this process in future site visits and through reviews of COB documentation.

### 4.7.233 Assessing Compliance with Paragraph 247

Paragraph 247 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources. To achieve this outcome, APD agrees to implement the requirements below."**

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.234 Assessing Compliance with Paragraph 248

Paragraph 248 stipulates:

> **"APD agrees to develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, including: readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations."**

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.235 Assessing Compliance with Paragraph 249

Paragraph 249 stipulates:

>**"APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.236 Assessing Compliance with Paragraph 250

Paragraph 250 stipulates:

>**"APD shall ensure that any mental health counseling services provided APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.237 Assessing Compliance with Paragraph 251

Paragraph 251 stipulates:

>**"APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.238 Assessing Compliance with Paragraph 252

Paragraph 252 stipulates:

306

> **"APD shall develop and implement policies that require and specify a mental health evaluation before allowing an officer back on full duty following a traumatic incident (e.g., officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death) or as directed by the Chief."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.239 Assessing Compliance with Paragraph 253

Paragraph 253 stipulates:

> **"APD agrees to compile and distribute a list of internal and external available mental health services to all officers and employees. APD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.240 – 4.7.255 Assessing Compliance with Paragraphs 255 -270: Community Policing and Community Engagement

## 4.7.240 Assessing Compliance with Paragraph 255

Paragraph 255 stipulates:

> **"APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-solving policing principles into its management, policies, procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."**

**Methodology**

Paragraph 255 requires APD to develop policy guidance and mission statements reflecting its commitment to the community, problem-oriented policing and supporting administrative systems. APD, in prior reporting periods, revised its mission statement, reflecting its commitment to community-oriented policing. Paragraph 255 also requires that APD integrate community policing and problem-solving principles into all aspects of its operations.

In October 2018, in conjunction with community members, APD developed the following mission statement, " The mission of the Albuquerque Police Department is to preserve the peace and protect our community through community-oriented policing, with fairness, integrity, pride, and respect."  The APD vision statement includes the following language, which does appear on their website. "Help provide a safe and secure community where the rights, history, and culture of all are respected."

- During previous report periods, APD made progress integrating community policing principles into its management practices (policies, procedures, recruitment, training, deployment, tactics, and accountability systems). Most notable is the increased connectivity to community partners and resources in APD enforcement activity as evidenced by the City's violent reduction crime strategy, which included community partners, resources, and an emphasis on social service intervention to help deter future violence. Progress in this reporting period continued to be impacted by COVID-19 with the canceling of summer youth camps held for the past two years with the support of the USAO, AFR, DEA, and the National Guard. These camps were growing in participation and programming before their cancellation. APD did replace the youth summer camps with a virtual version launched July 2020 that included 31 videos. APD continued its investment in its IMPRINT Program, designed to engage police officers with First Graders from Title I schools, by expanding its participation during this reporting period from 16 to 24 schools using a virtual platform.

During the prior reporting period, APD reported two sets of findings from its culture survey; the first was completed in July 2019. The second in February 2020, prior to the COVID-19 impact and before protests associated with high visibility incidents became prevalent.  The six-month comparison showed little change in the items reported. Most troubling was the finding that nearly 25 percent of officers surveyed indicated  that "APD's work is not positively impacting citizens in the community." This perception by significant numbers of officers suggested a lack of belief in current APD policing practices designed to impact positively the communities they serve. This belief or lack of confidence in delivering on the APD mission of securing communities through community policing principles as currently practiced by APD. This concern raises questions about the efficacy of current approaches, the buy-in of officers, or both, and may indicate a need to further re-think overall policing strategies.

APD's primary response to this culture survey was to challenge the reliability and validity of findings, noting issues with the way questions were framed and inconsistencies in response patterns. APD, while noting deficiencies in the survey, did acknowledge that some of these findings may have revealed issues that still need to be addressed by APD. APD is considering using a 360-degree evaluation process which provides opportunities for officers to assess the adequacy of their supervision. The monitoring team expects APD to address findings that suggest that many officers simply lack confidence in APD's efforts to "positively impact citizens in the community."

APD highlighted its efforts to integrate community policing into its operations, noting the following:

- Sworn personnel are completing the biannual COP/POP training;

- The department has incorporated community policing practices into numerous APD policies and procedures;

- Recruitment efforts are beginning to result in a workforce that closely mirrors City demographics;

- Personnel evaluations now include a community policing component;

- Deployment of PRT officers in each of the six Area Commands augmenting community policing activities;

- The assignment of crime prevention specialists in each Area Command; and

- Enhancing the School Resource Officer program by reaching out to the National Association of School Resource Officers for training and assistance.

The COVD-19 impact, multiple social protests, and other long-standing factors have transformed policing environments across the nation, including Albuquerque. Elected officials and community members in Albuquerque are actively considering establishing a Department of Community Safety to realign some current policing services and re-shape policing priorities. The monitor is pleased to note that, during this reporting period, the City continued to involve residents in these discussions through presentations of the concept to the Community Policing Councils. The monitor continues to encourage these discussions to further garner input about the range of APD policing strategies and activities to make them both more effective and responsive to community needs.

The monitor also encourages APD to consider hiring an independent contractor with the expertise to continue the climate surveys, which remain an important assessment and management tool to gauge workforce perceptions and attitudes. The internalization of the core principles of community policing through the training and supervisory process by APD officers needs to be tracked so adjustments can be made if there are

challenges in ensuring the internalization of these principles by the APD workforce. Finally, the monitor continues to encourage APD to scale up programming for youth, having more APD officers and other adults support a wider range of activities.

The monitor also expects APD to regain momentum in its outreach efforts, step up its community consultations, and together take this opportunity to "re-think" the delivery of policing and other community safety services to the residents of Albuquerque.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 255:***

***4.7.240a: Continue to develop a remediation plan to culture survey findings and seek outside assistance to revamp the culture survey ;***

***4.7.240b: Continue efforts to provide training that meets national standards for School Resource Officer Unit;***

***4.7.240c: Continue to work with USAO and other community partners to expand and reach significantly higher numbers of high-risk youth through various engagement programming.***

**4.7.241 Assessing Compliance with Paragraph 256:  APD Response to Staffing Plan**

Paragraph 256 stipulates:

> **"As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing."**

**Methodology**

Paragraph 256 requires APD to realign its staffing allocations and deployment and review its recruitment and hiring goals to ensure they support community and problem-oriented policing. APD has struggled with addressing the requirements of this paragraph.  APD's PACT (Police and Community Together) plan was approved on December 27, 2016, and staff re-alignment responsive to the plan was continued during the seventh reporting period.  Implementation of the PACT plan was terminated during the eighth reporting period and replaced with the deployment of Problem Response Teams (PRT) to all six area commands.  The PRTs represented a marked improvement

to the old PACT process, with strong goals related to problem-solving policing processes, as opposed to PACT's enforcement-based processes.  Progress in implementation and meeting the requirements of this paragraph has slowed, with APD now needing to bring this re-deployment to completion. APD is currently preparing to engage in another staffing study to better assess and improve deployment strategies and practices.  For current PRTs, training is also being updated, including updating lesson plans to address making better use of referral tools and to engender a better understanding of roles and responsibilities.

During this reporting period, APD also has met with community stakeholders regularly to gain community input on the placement and activities of the PRT officers assigned to their area command. APD also reports finalizing a policy directive that articulates goals, objectives, and outcome measures. APD provided the monitoring team with a process map that shows how data is used in conjunction with community input to determine area command zone assignments. APD reports the following PRT assignments by area command:

- Foothills-      5
- Northeast -    5
- Northwest-    4
- Southeast-    4
- Southwest -   6
- Valley-        5

The monitor makes a note of the progress APD has made during this reporting period in assigning PRT officers to all six area commands and working with community stakeholders on how best to deploy the PRTs. The monitor is looking forward to finalizing the policy directive that articulates goals, objectives, and outcome measures. Once the policy is finalized, the monitoring team would expect APD to develop, deliver and complete development, deliver requisite training, and fully staff all area commands.

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 256:*

**4.7.241a:  *Continue to make new staffing allocation and deployment plan a priority, and take the necessary steps to gain important input and support from settlement partners and community stakeholders, including CPCs;***

**4.7.241b:  *Finalize policy directive that ensures the staffing plan has clearly articulated and defined goals, objectives, and outcome measures, and consider a***

*partnership with a local university to assist in developing specific performance metrics.*

*4.7.241c:  Ensure that PRT activity is expanded as needed, fielding adequate numbers of specifically trained PRT officers guided by specific, tangible, and quantitative goals and objectives.*

**4.7.242 Assessing Compliance with Paragraph 257:  Geographic Familiarity of Officers**

Paragraph 257 stipulates:

> **"APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders, engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality of life issues."**

**Methodology**

In previous reporting periods, The monitor reviewed documentation from APD outlining the newly implemented  "digitized"  bid packet process, including information about areas assigned to police officers, and to create better utility, tracking, and accountability within the department.  APD previously reported completing the digitized process test phases and, as a result, identified issues and took corrective actions.  In the prior reporting period, APD pledged to archive all bid packets on August 27, 2020, and initiate a clean start beginning on August 29, 2020.

In the previous reporting period, APD also began updating beat maps and identifying and sorting out Area Command community leaders. APD also worked on developing some level of supervision outside the bid process to ensure that officers are effectively using the information. APD expects that once this new process is fully operationalized, it would house important information about the area assigned to an officer and create a beat discussion forum providing officers assigned to an area the opportunity to share information about trends or emerging problems with the community.  Officers will also be able to download information about the communities they serve, including community leaders, neighborhood associations, etc. Officers will also be tested on their knowledge of bid packet information, which will now be updated quarterly.

APD had also developed and provided instructional videos for all officers receiving and updating bid packets to understand the new process fully. The department plans to have additional instructional videos covering the gathering and reporting of beat information to be shared among officers working in the same geographical areas.

During this reporting period, APD experienced a major setback in its efforts to digitize the bid packet process. As APD began to expand implementation, more troublesome

technical issues emerged concerning factoring seniority lists into the bidding process, and more importantly, the system's capacity to handle the volume of bids generated by APD.  As a result, APD concludes that "until the City servers are designed to handle this kind of traffic, we will not be able to digitize the bid process itself." This issue is obviously a technological issue beyond APDs control.  APD should ensure the needed changes are noticed to the Chief of Police, so appropriate inter-agency cooperation is assured.

The monitor is disappointed by these developments, given the fact that APD has had six years to address these issues. Current procedures absent this capability are inadequate in fully addressing the requirements of this paragraph. The monitor strongly encourages APD to work with City to find a resolution to these technical issues.  Operational compliance still requires full implementation of these digitized processes and evidence of application in community policing practices.

**Results**

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 257:***

***4.7.242a:  Ensure that the City systems involved in these data-related problems noted with supporting electronic processes are noticed to the other City departments involved, and also are noticed to the COA so that inter-department problem solving, and cooperation are enhanced to the point that solutions are identified and actualized.***

**4.7.243 Assessing Compliance with Paragraph 258: Officer Outreach Training**

Paragraph 258 stipulates:

> **"Within 12 months of the Operational Date, APD agrees to provide 16 hours of initial structured training on community and problem oriented policing methods and skills for all officers, including supervisors, commanders, and executives   this training shall include:**
>
> **a)  Methods and strategies to improve public safety and crime prevention through community engagement;**
> **b)  Leadership, ethics, and interpersonal skills;**
> **c) Community engagement, including how to establish formal partnerships, and actively engage   community organizations, including youth, homeless, and mental health communities;**
> **d) Problem-oriented policing tactics, including a review of the principles behind the problem-solving framework**

313

**developed under the "SARA Model", which promotes a collaborative, systematic process to address issues of the community. Safety, and the quality of life;**
**e) Conflict resolution and verbal de-escalation of conflict and;**
**f)  Cultural awareness and sensitivity training.**

**These topics should be included in APD annual in-service training."**

## Methodology

During this reporting period, APD continued delivering the COP training to its sworn personnel. Out of the 955 sworn officers, 941 have attended the training. The number of officers completing the course examination was 931, with 913 receiving a passing score. During the prior reporting period, APD completed restructuring of its required 16 hours of Community Oriented Policing (COP) training that better reflects the department's 21st-century community policing philosophy, incorporates into training new and evolving departmental policies and orders, and better aligns with COP training requirements. APD submitted its revised training to the monitoring team for review.  The monitor noted several deficiencies which were addressed by APD training staff.  The monitor subsequently approved the COP training, allowing for its first delivery during 2020. The COP training was developed using a documented seven-step process and covered all of the required elements outlined in paragraph 258.

APD's decision in prior reporting periods to overhaul the required 16 hours of COP training was initially necessitated by a paradigm shift in the department's policing philosophy, placing a much greater emphasis on community policing and engagement. The approved curriculum and its eventual delivery in some form to all APD officers represented a major milestone for APD in their transformation journey. The training helps officers internalize a different way to perceive their relationship with the community members they serve and to assess alternative ways of interacting with the community. This allows APD to bring "change" to the forefront of its community policing processes.  The monitor believes that the delivery of the COP training curriculum is key to achieving some of the most important elements of the CASA agreement. These further investments in improving the quality and relevance of this training will be instrumental in driving culture change throughout APD.

The monitor expects APD to continue to adjust in this training as its community policing and engagement processes continue to expand and evolve. The monitor also expects APD to develop measures to assess training impact to determine if it is achieving attended goals. The monitor acknowledges the adjustments made by APD  to ensure that nearly all APD officers received this training and now expects APD to develop assessment processes to measure the impact of training on-field practices.

## Results

Primary:    **In Compliance**

Secondary:   **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 258:***

**4.7.243a:  *Ensure that supervisory processes are oriented with the COP training and new COP goals and objectives.***

**4.7243b:   *Ensure future training schedules that provide annualized refresher training.***

**4.7243c:  *Develop assessment processes to measure the impact of training on-field practices.***

**4.7.244 Assessing Compliance with Paragraph 259:  Measuring Officer Outreach**

Paragraph 259 stipulates:

> **"Within six months of the Operational Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross section of stakeholders."**

## Methodology

In the previous reporting period, APD made some progress developing its capability to track officer community engagement and outreach activity goals.  Previously, APD standardized and simplified the collection of non-enforcement contact data by revising the non-enforcement contact form in the TRaCS system (which tracks officer activity) and creating standardized tracking spreadsheets for all Area Commands. The new form also required documentation of APD follow-up on community concerns that surface during these contacts. APD also indicated that the revised TRaCS form is complete and in full use. They also acknowledged that supervision and possibly additional training are required to ensure correct use by officers.

APD in the prior reporting period also initiated the development of an "app' that will further assist in tracking community events and officer response.  In this reporting period, APD increasingly recognized the limitations of using the TRaCs system for this purpose because of its inability to track community concerns raised during these citizen contacts. Furthermore, because of some complexities in using the TRaCS for tracking purposes, an internal audit revealed only 52.5 percent compliance in its use by officers. APD has now committed to a web-based application to replace TRaCS as the primary means to track community contacts and outreach. The web-based app was field-tested

using PRTs during this reporting period.  As part of the field test, officers received training on how to install and use the app to enter information  from community contacts and assigning a "75-4" code  when applicable for  concerns or requests made during these contacts and capturing as "call for service."  Officers use the "75-10" for community events. APD acknowledges the importance of finishing development, and subsequently, the training for the use of this app, which will give APD a robust capability to track community events, contacts, and follow up on community concerns.

APD responded to the need for developing standard reporting protocols for documenting and tracking partnerships during this reporting period. APD has not provided evidence of identifying and effectively networking with a range of community service organizations and advocacy groups as was recommended. The monitor recognizes the progress made with the development and field testing of an app that officers will be trained to utilize to document and track a range of community contacts and expects APD to implement fully this tracking process during the next reporting period. The monitor recognizes that the current method of tracking partnerships will require a more robust data tacking method that best captures information about the more significant and formal partnerships. The new app and other related processes hopefully will address this need as well. The monitor continues to urge APD to finalize the tracking and reporting requirements of its work with community partners[119] and develop standing reporting protocols for its community contacts and outcomes. APD must also continue with plans to move quickly to provide any additional training and supervisory controls to ensure adherence to policy and effective implementation of these new processes.

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

***Recommendations for Paragraph 259:***

***4.7.244a:  Complete development of new web-based tracking system and implement department-wide during the next reporting period.***

***4.7.244b Identify community service organizations and advocacy groups that serve and represent high-risk populations and better document those partnerships, including background, referral arrangements, resource sharing, decision-making, roles, and responsibilities parties.***

**Assessing Compliance with Paragraph 260:  PIO Programs in Area Commands**

Paragraph 260 stipulates:

---

[119] We note, parenthetically, that we have been making similar recommendations for several reporting periods, now, yet these issues persist.

**"APD shall develop a Community Outreach and Public Information program in each area command."**

**Methodology**

During the prior reporting periods, APD reported developing a process that allows each Area Command to post relevant and timely information about their area command. Crime prevention specialists from each area command develop a monthly events calendar with information about past events and photos. This information is shared with the Senior Crime Prevention Specialist, who then screens and forwards to the APD Social Media Director. Information submitted is then posted on an area command-specific group page. Each Area Command also maintains its own website, which typically captures crime information, agendas for upcoming CPC meetings, schedules of upcoming events, other news items, information on how to report crimes, and information regarding how to file complaints.  The monitor's review of the area command web pages during this reporting period continues to reveal limited messaging about police activity in the Area Command, with many web pages not having listings of monthly events calendars. The website suggests the continued absence of any coherent community outreach and public information program.  In this reporting period, APD reports only that the department's marketing and outreach director has begun updating the websites and providing biographical sketches of each area commander. While this is progress, we question the public relations approach v. a problem-oriented approach and suggest that police-community outreach is more than public relations.  It requires community outreach to identify problems and issues germane to the policing domain and collaborative approaches to solving identified problems and issues. Anything less is simply public relations.

The CASA requires that APD have community outreach and public information program that is customized for each Area Command. APD continues to fail to make any significant progress in fully meeting this requirement. The monitor again asks that APD seek immediate assistance to fully develop a program description that has program goals, processes, key activities, resource requirements, and implementation methods to assess effectiveness.  The Area Command-based public information plans and programs should specifically address community outreach, messaging, outreach to marginalized segments of the population, and use social media to enhance community engagement. The monitor also suggests that APD consult with the area command CPCs when developing these public information and outreach plans.

**Results**

     Primary:    **In Compliance**
     Secondary:  **In Compliance**
     Operational: **Not In Compliance**

*Recommendations for Paragraph 260:*

**4.7.245a:** *Further develop and document area command public information strategies and programming by developing a planning template and aiding command areas in formulating customized approaches for each command area.*

*4.7245b:  Seek outside assistance to help formulate effective community outreach and public information plans for each Area Command that fully utilizes up-to-date engagement tools and processes.*

**4.7.246 Assessing Compliance with Paragraph 261:  Community Outreach in Area Commands**

Paragraph 261 stipulates:

> **"The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command   that is open to the public. During the meetings, APD officers from the Area command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings."**

**Methodology**

In prior reporting periods, APD used the CPCs as a platform to share information about the implementation of CASA requirements. For this reporting period, APD provided presentations on IMR 12  at several, but not all, CPCs. There were other presentations concerning changes in the use of force policy and related CASA requirements.  For this reporting period, several CPCs have requested presentations from both APD and the monitor regarding IMR 12.  Paragraph 312 of the CASA prohibits the monitor from making public comments or statements about CASA processes or outcomes without the consent of the DOJ and the City.

APD has six functioning CPCs that provide a community platform for APD to convey and receive relevant and timely information to community stakeholders and members. The CPCs are now being utilized as conduits for updates on policy change, new training, policing strategies, and tactics, and addressing residents' community safety concerns. The monitor suggests that APD continue to use CPCs to update the community on CASA progress and challenges. The monitor recommends APD work with the monitoring team to plan routine briefings to CPCs on APD progress in achieving CASA compliance.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In  Compliance**

## 4.7.247 Assessing Compliance with Paragraph 262:  Community Outreach Meetings

Paragraph 262 stipulates:

> **"The Community Outreach and Public Information meeting shall, with appropriate safeguards to protect sensitive information, include summaries, of all audits and reports pursuant to this Agreement and any policy changes and other significant action taken as a result of this Agreement. The meetings shall include public information on an individual's right and responsibilities during a police encounter."**

## Methodology

We noted in IMR12 that all "CASA-related reports are posted on the APD website. Further, APD has information on an individual's rights and responsibilities during a police encounter."  We noted no changes to these processes during IMR-13.

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.248 Assessing Compliance with Paragraph 263: APD Attendance at Community Meetings

Paragraph 263 stipulates:

> **"For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area command shall attend at least two community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned."**

## Methodology

In the previous reporting period, APD fully operationalized TRaCS and recognized its limitations and the need to ensure adequate supervisory controls and additional training.

APD previously reported that commanders are submitting all non-enforcement contact information in a standardized format on a spreadsheet to command staff for tracking purposes. We note that APD previously established, through SOP-3-02-1, the requirement and tracking mechanisms to implement this task.  APD reports that the form used has the officer document any issues raised at meetings, actions for the officer to consider in response. The TRaCS system was successful in documenting participation in meetings. Still, it was inadequate in other ways, including its complexity in the application as evidenced by fairly low officer compliance rates and an inability to track community concerns and APD follow-up.

APD must finalize its work on this tracking system for community contacts to inform managers better and guide targeted adjustments in operations. The monitor expects APD to put in place standard data reporting protocols on a monthly basis and share findings with commanders and managers.  The monitor also expects these reports on non-enforcement contacts to be used to target engagement efforts and promote community policing practices. The monitor urges APD to move quickly to put in place the necessary supervisory controls and provided any additional training as required to ensure full implementation of these processes.

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### Assessing Compliance with Paragraph 264:  Crime Statistics Dissemination

Paragraph 264 stipulates:

> **"APD shall continue to maintain and publicly disseminate accurate and updated crime statistics on a monthly basis."**

**Methodology**

During this reporting period, APD reports and posts monthly crime statistics for each Area Command and also city-wide crime trends as well.  The monthly data are posted roughly two to three months after the reporting period. The data sets are a complete reporting on FBI index crimes and other categories as well. They are generally timely, easy to follow, and now meet CASA requirements. APD also continues its contract with a service that provides up-to-date crime mapping services based on "calls for service" that can be accessed on APD's website. This has proven to be a very useful tool for members of the community.

**Results**

Primary:      **In Compliance**

Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.250 Assessing Compliance with Paragraph 265:  Posting Monitor's Reports

Paragraph 265 stipulates:

> **"APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD website with reasonable exceptions for materials that are legally exempt or protected from disclosure."**

### Methodology

All requirements stipulated by this paragraph continue to be met by the APD and the City.  Further, APD has developed guidelines for determining any reasonable exceptions to posting audits and reports relating to the CASA. During this reporting period, APD continued to post monitoring team reports on the APD website in a timely fashion.

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.251 Assessing Compliance with Paragraph 266:  CPCs in Each Area Command

Paragraph 266 stipulates:

> **"The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level. The Community Policing Councils shall meet, at a minimum, every six months."**

### Methodology

CPCs have been established in each of the six Area Commands since November 2014. During this and prior reporting periods, each of the six Councils tended to meet once a month, far exceeding the once every six-month requirement.  Since their establishment nearly six years ago, there has been a remarkable consistency and adaptability displayed over time.  At times, many CPCs struggled with attendance, maintaining records, functioning in a transparent and inclusive manner, and having a diverse membership. They often struggled with inadequate support and guidance from APD.

321

Nevertheless, CPCs, often through the commitment of CPC leaders, forged ahead and are now have achieved a long-held objective of permanently establishing the CPCs as part of the City's governance framework by enacting an ordinance that statutorily provides for their ongoing operations.

During this reporting period, the transfer of administrative oversight from APD to CPOA was finalized, including the transfer of authorities and resources. This transfer continued to yield benefits for CPC operations, including ongoing virtual meeting support, program guidance, and outreach. As a result, both the number of voting members for each CPC and attendance at CPC meetings improved in spite of the continuation of the Corona Virus public health emergency. City-wide CPCs added 17 new members during this period bringing the total to 50 by the end of the reporting period. During this reporting period, CPCs continued to build on the progress from the previous reporting period, experiencing across-the-board increases in interest and participation, with meetings often attracting more than 50 participants. The monitor continues to note the continued evolvement of CPCs, providing a meaningful outlet for community members to share their views and concerns about APD's policing practices and to make meaningful recommendations for consideration by APD. The CPCs Council of Chairs firmed up their role in helping to coordinate CPC activity, and the CPOA provided much-needed support and leadership. The CPC program is now providing a national model for other cities and departments to replicate as an effective community engagement method.

## Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

### 4.7.252 Assessing Compliance with Paragraph 267: Selection of Members of the CPCs

Paragraph 267 stipulates:

> **"In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross section of community members and APD officers, including for example representatives of social services providers and diverse neighborhoods, leaders in faith, business, or academic communities, and youth. Members of the Community Policing Councils shall possess qualifications necessary to perform their duties, including successful completion of the Citizen Police Academy."**

**Methodology**

CPC membership criteria and selection processes came under criticism and scrutiny in previous reporting periods. This criticism continued at the onset of this reporting period. It included APD initiated arbitrary and unexplained changes in exclusionary criteria related to criminal backgrounds and continued confusion concerning the ride along and completion of the citizens' police academy membership requirement for CPCs.

The Council of Chairs comprised of the Chairs of each of the six CPCs took a leadership role in re-visiting the guidance for CPC membership selection. Working closely with the CPOA Executive Director and the DOJ, they began this work by requesting technical assistance from the monitor in helping to re-engineer the recruitment, the selection criteria, the selection process, the removal of members, and other considerations. The revised and updated guidance was approved in July 2020 by the City's newly designated manager of this program, the CPOA Executive Director, and included the following:

- Citizen's Police Academy – moving forward, The CPA 12-week course will not be required but recommended.  (This requires an amendment to the CASA, which has the support of the City, the USAO, the Civil Rights Division of DOJ, and the monitor);
- Ride alongs – not required but recommended;
- Background Checks – not required. However, if one chooses to do a ride-along, then the background check is conducted using APD stipulated criteria.
- Criminal history- a criminal history will not exclude a person from serving on a CPC. However, current active felony warrants or criminal charges will disqualify a person from membership.

Pending approval of the CASA amendment, the parties agreed to continue to suspend the CPA and ride along with the requirements and the criminal history disqualification. The July 2020 revisions to the CPC guidance were not posted on the APD website during this reporting period, thus limiting public awareness of these changes.   In fact, misinformation was posted indicating that any felony conviction disqualified applicants from CPC voting membership absent a police chief's waiver.  This is not consistent with what was approved by CPOA and the City's new designated program manager. This is especially troubling since APD has had over seven months to update this change.

The rationale for these changes offered by the CPC Council of Chairs and the CASA Parties included removing barriers to membership, with many prospective members simply being unable to meet the onerous time requirements of completing the CPA training, and criminal histories possibly limiting others who now could make significant contributions having already answered for any past criminal conduct. They noted that adhering presently to the CPC membership code of conduct held more relevance than any past behavior.

With the transfer of program authority from APD to CPOA and the corresponding work with the City Attorney's Office and the DOJ, and the CPC leadership, extensive progress continued in both expanding membership and in greater diversification of that membership. These improvements were apparent in meetings attended virtually by the monitor in January  2021.

The monitor remains encouraged that under the leadership of CPOA and an increasingly active Council of Chairs, the CPC expansion and diversification will continue. In spite of the limitations posed by the Coronavirus public health emergency, CPC virtual meetings during this reporting period demonstrated substantial participation with as many as 70 people in virtual attendance. The CPC program is beginning to realize its potential and becoming a vital element to APD community engagement and movement toward the implementation of a collaborative policing model. The monitor is also very disappointed that APD did not update changes in selection criteria on its website, given the past concerns noted.

The monitor cannot in good conscience find APD in operational compliance, given the posted misinformation concerning the fact that the July 2020 revisions to the CPC guidance were not posted on the APD website during this reporting period, thus limiting public awareness of these changes.   In fact, misinformation was posted indicating that any felony conviction disqualified applicants from CPC voting membership absent a police chief's waiver.  This is not consistent with what was approved by CPOA and the City's new designated program manager. This is especially troubling since APD has had over seven months to update this change.   Further, the monitoring team takes serious exception to the continued misinformation campaign relating to felony convictions being a barrier to participation in CPCs.  It would behoove APD to find out who specifically inserted these restrictions for CPC voting membership and to clarify how the misinformation continues to be propagated among the CPCs.

 **Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 267:***

***4.7.252a: Ensure that no misinformation is posted. If any misinformation is discovered, take steps to determine who posted the misinformation and follow established discipline protocols.***

**4.7.253 Assessing Compliance with Paragraph 268:  Resourcing the CPCs**

Paragraph 268 stipulates:

> **"The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the**

**means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, APD shall appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure."**

## Methodology

During the previous reporting period (IMR-12), the City finalized the transfer of the CPC program to CPOA. This has proven to be an important milestone in the evolution of CPCs. The City provided funding for a CPC liaison position, liaison assistant position, and an additional $25,000 of non-personnel funding.  During this reporting period, CPOA staff provided technical support in helping the CPCs from each District host well over 30 virtual meetings. CPOA also helped with outreach activities contributing to the increased membership numbers. CPOA  leadership also continued to make a significant difference in both coordinating support for CPCs and providing guidance and leadership in working through CPC membership issues. The monitor also takes notice that the meeting agendas and minutes from the CPC meetings have been posted, with annual reports currently being finalized for 2020.  This constitutes significant positive change regarding CPCs and speaks volumes for CPOA oversight and coordination of CPC functions.

The most important resource to CPCs continues to be the members themselves. Volunteers have devoted their time and effort to build the foundation for the successful operations of CPCs.  During this reporting period, CPC voting members updated program guidance and demonstrated flexibility by fully adapting to hosting meetings virtually.  The current leadership of CPCs was instrumental in expanding and diversifying membership and finalizing the enactment of the City Ordinance codifying CPC operations. The monitor believes that it is essential that the City continue to find ways to celebrate and honor this volunteerism that contributes to community safety and advances reform efforts. Their tireless efforts on behalf of the residents of Albuquerque are helping to create a national model for engaging community members with the police officers that serve them and providing opportunities for meaningful information sharing and dialogue.

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.254 Assessing Compliance with Paragraph 269:  APD-CPC Relationships

Paragraph 269 stipulates:

> **"APD shall seek the Community Policing Councils assistance, counsel, recommendations, or participation in areas including:**
>
> **a) Reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;**
> **b)  Reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;**
> **c)  Providing information to the community and conveying feedback from the community;**
> **d) Advising the chief on recruiting a diversified work force**
> **e) Advising the Chief on ways to collect and publicly disseminate data and information including information about APDs compliance with this Agreement, in a transparent and public –friendly format to the greatest extent allowable by law."**

## Methodology

In July of the last reporting period, all six CPCs returned to hosting public meetings, the first since January of 2020 for most of them. These meetings successfully used virtual platforms, and all were well attended. One session drew over 70 participants. One topic covered at several meetings included a discussion of the City's proposed Department of Community Safety. During this reporting period, CPCs enjoyed tremendous success in converting to virtual platforms to host meetings. Meeting invites are posted and announced using social media platforms. A participatory webinar format allows for exchanges among voting members and Q and A from other meeting participants. These sessions, in many instances, included over 60 participants. The range of topics covered expanded  in this reporting period and included, for example:

-   Court Supervision Diversion Programs;
-   IMR 12 report findings;
-   Changes in Use of Force Policy;
-   Updates on the Police Chief Selection; and
-   Updates from the APD Compliance Bureau.

Since June 2020, the CPCs have also generated 19 recommendations for APD consideration ranging from increasing policing visibility to crosswalk additions. CPCs continue to mature and actualize their vision as a significant linchpin in the APD engagement with the community members they serve. These formalized and highly active advisory bodies in each of the six Area Commands need to institutionalize their successful practices and further strengthen sustainment efforts. We recommend that CPOA encourage CPCs to "track" their recommendations in terms of timelines

regarding efforts to have CPC recommendations recognized, vetted, planned, and implemented by APD and/or the City.

 **Results**

       Primary:     **In Compliance**
       Secondary:  **In Compliance**
       Operational: **In Compliance**

### 4.7.255 Assessing Compliance with Paragraph 270:  CPC Annual Reports

Paragraph 270 stipulates:

> **"The Community Policing Councils shall memorialize their recommendations in annual public report that shall be posted on the City website. The report shall include appropriate safeguards not to disclose information that is legally exempt or protected from disclosure."**

### Methodology

During the prior reporting period, APD posted all of its 2019 CPC annual reports. In the previous reporting period, all six CPCs produced 2018 annual reports and, for the first time, presented in a standard format and often captured CPC annual activities and achievements.  APD held training during a prior reporting period, which helped to promote standardization in annual reports among CPCs. CPOA reports that all six CPCs are finalizing their 2020 annual reports and, upon completion, will be posted on the CPC website.

### Results

       Primary:     **In Compliance**
       Secondary:  **In Compliance**
       Operational: **In Compliance**

### 4.7.256 through 4.7.277 Assessing Compliance with Paragraphs 271-292: Community Police Oversight Agency

Paragraphs 271 through 292 of the CASA pertain to the Civilian Police Oversight Agency (CPOA), including the Civilian Police Oversight Board (CPOAB or the Board). These paragraphs require an independent, impartial, effective, and transparent civilian oversight process, one that investigates not only civilian complaints but also renders disciplinary and policy recommendations, trend analysis, and conducts community outreach, including the publishing of reports.

During the reporting period and the November 2020 virtual site visit, members of the monitoring team held Zoom meetings with the CPOA Executive Director and members

of his staff, with the CPOA Attorney, with members of the CPOAB, reviewed relevant training records, and selected (by way of a stratified random sample) and reviewed, eight CPOA investigations completed during the reporting period.  The CPOA also identified and reviewed one letter in the interim chief's response to disciplinary recommendations made by CPOA.

The findings related to Paragraphs 271 through 292 indicate the following outcomes related to the requirements of the CASA.

The CPOA Board continues to demonstrate itself to be an impartial and productive body that strives to provide effective civilian oversight of APD. It is an independent agency whose appointed members are dedicated individuals of diverse backgrounds drawn from a cross-section of the community. They are committed to the goals of the CASA, as are non-appointed members of the CPOA. Based on our meetings with the CPOA Executive Director, members of the CPOAB, and our review of CPOAB meetings, agenda, and minutes, we are satisfied that the current Board and the agency recognize the need to be fair, objective, impartial, and to be perceived by the public as such.

That notwithstanding, the nine-member Board has been operating with only six (6) members during the IMR-13 period. Since IMR-9, the monitoring team has consistently expressed concern over the Board's ability to meet its workload and carry out its many tasks and overall mission while at less than full strength. A review of the relevant timeline is in order.

In IMR-9, we found the Board to be operating with only six of its nine members, and we revoked operational compliance to paragraph 271. In IMR-10, we found that the Board operated for most of the review period with eight of nine members. However, due to a finding by the monitoring team of anti-police bias, or the reasonable appearance thereof by a Board member, we continued our finding of Not in Compliance (operational) to paragraph 271 and also revoked operational compliance to paragraph 273. In IMR-11, we found that the Board operated primarily with seven members during the period. Moreover, based on meetings between the monitoring team and the Council Director, and also with some Council members, we were convinced that City Councill was committed to the civilian oversight process and recognized the importance of the Board operating at full membership. We also found that the Board had taken affirmative steps to demonstrate its commitment to ethics and impartiality. Thus, we restored operational compliance for both paragraphs 271 and 273. In IMR-12, despite the Board once again operating primarily with only seven of nine members, we continued operational compliance for paragraphs 271 and 273 but urged Council to bring the Board up to full strength.

The monitoring team is troubled that despite signaling its concerns - since IMR-9 - about the effectiveness of the Board in meeting its workload with less than a full complement, the Board is still not at full membership. In fact, during the IMR-13 reporting period, the CPOA board had only 2/3 of its required membership. We were encouraged to see documents produced by the City Council at the end of the IMR-13 period, in response to

328

a DOJ request that demonstrated a vetting process for new Board members. Based on this production and our prior meetings with Council members and Council Director on the subject of the Board, we continue to believe that City Council is dedicated to the principle of effective civilian oversight of the APD. However, six members simply cannot continue to adequately meet the workload demand of a properly functioning and effective Board. Therefore, we again find that the City is out of operational compliance with paragraph 271. Moreover, absent extraordinary circumstances, if the Board is not brought to full membership in the next review period, the City risks a finding of "willful indifference" being stipulated in the following Monitor's report.  We have recently met with members of the City Council to discuss the membership needs of the CPOA board. The issues being confronted by the City are not unlike what the monitor has observed elsewhere regarding public boards and commission.  Volunteer members are, at times, both highly necessary and difficult to recruit.

It appears that a systems analysis study may be needed to identify problems, issues, needs, and solutions related to recruiting and retaining CPC board membership and support.

The monitoring team continues to find the Board to be in compliance with paragraph 273 of the CASA due to the Board's dedication to impartiality and the principles of constitutional policing. However, as stated above, with only 66 percent of the "required" Board membership, "meaningful oversight" becomes compromised. In the monitor's opinion, the Board must be restored to its full complement in order for the City to regain operational compliance for paragraph 271.

Not only does the Board need to be at full strength, under paragraphs 278 and 279 of the CASA, the CPOA must have an adequate budget and staff (non-appointed members of the agency) to perform its roles. As we noted in IMR-10, the CPOA budget was required by Ordinance to be ½ of 1% of the APD budget. This requirement has since been removed, and the ordinance now states:

"The CPOA shall recommend and propose its budget to the Mayor and City Council during the city's budget process to carry out the powers and duties under §§ 9-4-1-1 through 9-4-1-14, including itemized listings for the funding for staff and all necessary operating expenses." Revised Ordinances of Albuquerque, New Mexico, 1994, Section 9-4-1-4(A)(2)."

Although we cannot definitively state that the present CPOA budget is insufficient for purposes of minimal CASA compliance, we are convinced, based on our review of the CPOA work performance, that more staffing is required. First, CPOA currently has four approved investigative positions (one lead investigator and three investigators). However, only three of these positions (one lead investigator and two investigators) were filled at the expiration of the IMR-13 reporting period.  CPOA  requested an additional two investigative positions and a policy analyst position in its 2021 budget request, and the two investigative positions were approved.  The monitoring team has been informed that the application process has identified 11 viable candidates for the

three open positions and that these positions should be filled midway through the IMR-14 period.

We reiterate in this IMR that we believe CPOA is operating in a relatively efficient manner within the confines of its present staffing and number of complaints it receives, but as set forth in this and past IMRs regarding the timeliness of completion of investigations, the CPOA ability to meet CASA requirements is at the breaking point.

As pointed out below in this section of the IMR, the performance regarding the timeliness of investigations in this IMR period, as well as past IMR periods, and the current CPOA staffing, we revoked operational compliance with paragraph 279. There simply are not enough investigative personnel to complete investigations in a timely fashion. Once the investigative positions have been increased to six, and all of them are filled, we would expect the City to regain operational compliance with paragraph 279.

Again, it is evident to the monitoring team that the CPOA must increase its investigative capacity to keep abreast of its workload within the requirements of the CASA and the investigative time requirements of the CBA. We look forward to observing how CPOA performs once it operates with six investigative personnel. If the expected increase to six investigative personnel does not result in substantial improvements in the timeliness of investigations, a staffing and time-management study may be in order for CPOA.

Despite its personnel shortcomings, the CPOA Board has continued to make admirable strides. As we pointed out in the previous IMR, at the end of the IMR-12 reporting period the CPOA Board approved substantial revisions to the CPOA Policies and Procedures at its July 9, 2020 meeting. These revisions deal primarily with the ethics, code of conduct, and impartiality incumbent upon Board members, as well as discipline of Board members. These revisions or additions to the Policies and Procedures were approved by the monitoring team and implemented during the current review period. They are a further illustration of the CPOAB's proactive commitment to its mission and responsibilities, which will prove to be enhanced by the ethics guidance for its members.

The Board has also commendably added to its workload in the IMR-13 review period in going beyond the review and approval of CPOA investigations and input into APD policy by finalizing its processes for the review of use of force incidents. The Board now reviews FRB presentations and findings and reserves the right to request, on a case-by-case basis, more underlying investigative information than the information presented to the FRB. It has started to issue findings letters in accordance with these reviews. This CPOAB review of FRB actions, and the underlying use of force incidents, is in a relatively nascent stage, and this process, as well as any APD response to any adverse Board findings will be a focus of the monitoring team in future reports.

The initial and annual training requirements for the Board members are contained in paragraphs 274 and 275 of the CASA. The requirement of two semi-annual ride-a-longs has been suspended during the pandemic. Although non-observable for IMR-13, the CPOAB continues to be operationally compliant with paragraph 276 due to its

longstanding adherence to the ride-a-long requirement. Regarding the 8-hour annual training requirement, under paragraph 275, of the CASA, Board members attended (virtually) the annual 2020 National Association for Civilian Oversight of Law Enforcement (NACOLE) conference. The monitor has approved the NACOLE training as adequate for Board members to meet their annual training requirement. However, our prior criticisms of CPOA and CPOAB external training have focused on the lack of testing measures. The monitor has approved the utilization of a written exercise on the subject of the NACOLE training and how it relates to the mission of Board members as an appropriate measure of comprehension of this training. To date, only two of the Board members have submitted written essays relative to the NACOLE training, and thus CPOAB is no longer operationally compliant with paragraph 275. Either future annual training will have to contain internal testing measures, or external testing measures as approved by the monitor will need to be conducted in order for the Board to regain compliance with paragraph 275.

In past IMRs, Board members received Use of Force training and had changes to the CPOA Ordinance addressed by CPOA legal counsel. A Board Post Training Examination for Board members was developed and administered by the Executive Director. We reiterate our concurrence with these past trainings of Board members and continue to urge the CPOAB to diversify its training methodologies that address the topics contained in paragraph 275.  Needs-focused training is essential to the effectiveness of the CPOA Board.

As we noted in the past several IMRs, the investigations produced by CPOA, once complaints are assigned, are generally thorough. (This IMR review period's random sample has produced two CPOA investigations in which we found issues, and which we discuss in more detail in the Investigation of Complaints section, paragraphs 183-194, of this report). The Executive Director has the authority to recommend disciplinary action in the cases that involve investigations of civilian complaints and make recommendations in use of force and officer involved shooting cases as well as recommendations on policy and trends, and the Board has a mechanism for approving the recommendations of the Executive Director. The chief or his designee retains the discretion to impose discipline.

As noted since IMR-10, the Board's Complaint Review Committee (CRC) has been restored. A review of their meeting agenda and minutes shows that they are active and productive. This subcommittee met seven times during 2020, and in the IMR-13 review period has met in October 2020 and January 2021. We are unaware of any issues with the new auditing function of the CRC, which to date appears to strike the appropriate balance between the Board's approval authority over the investigative findings/ recommendations of the Executive Director and the realistic challenges of an in-depth review of every case file.

Satisfactory cooperation between CPOA and IAPS has been long-standing. In general, both agencies continue to respect each other's role and realize it is in their best interests, and that of the CASA, to cooperate and facilitate their intertwined missions

and related areas of responsibility. CPOA has the necessary access to information and facilities reasonably necessary to investigate complaints and review serious use of force and officer-involved shootings.

CPOA and the CPOAB continue to debate policies and policy changes as an entire body and have adequate time to provide input on the policy-making process. A Policy Analyst position for CPOA was requested by CPOA for the 2021 budgetary process, but due to a lack of investigative personnel, a decision was made to approve additional investigative positions instead of a Policy Analyst. We expect that the request for a policy analyst will be renewed in the 2022 budgetary process. If approved and filled, this position should significantly enhance the Board's ability to conduct trend analysis and bring meaningful insight to the policy-making process.

There were no non-concurrence letters by the Chief during the IMR-13 period. Although a non-observable task this period, based on our past findings of adequate articulation of the disciplinary authority's thought processes and reasons for the level of imposed discipline, APD remains in operational compliance with paragraph 285.

CPOA continues to have an active community outreach program, which also utilizes social media, in addition to other media. The CPOA's outreach efforts are addressed and itemized in its semi-annual reports. The bulk of CPOA's outreach efforts in the IMR-13 review period was spent assimilating CPCs into the COPA. However, other efforts also continued, such as conducting oversight trainings with the APD Cadet class, Lateral APD Academy class, and addressing various ABQ community groups and stakeholder groups.

The Executive Director and representatives of CPOA have continued to have quarterly meetings with City Council, and they also attend the monthly meetings of the Public Safety Committee of City Council. At the initiation of the IMR-13 review period,  the Public Safety Committee of City Council and then City Council approved an Ordinance that realigns the CPC function under CPOA. As more fully addressed in the discussion pertaining to paragraphs 266 through 270 of this report, this integration of CPC with CPOA, under the direction of CPOA, is proving to be a significant enhancement to the CPC mission as well as the community outreach function of the CPOA. As we pointed out in IMR-12, critical to its success will be whether CPOA will be provided the necessary resources to effectively administer the CPCs. In that regard, we report that CPOA recently hired a CPC Liaison. The monitoring team finds the CPOA to have robust community outreach efforts, and therefore, operational compliance is maintained for paragraph 291 of the CASA.

We reported in IMR-11 on the positive development regarding the use of a facilitator to conduct meetings between the CPOA (agency personnel) and members of the CPOA Board, for the purpose of enhancing understanding and respect for the different roles of the agency and the Board, as well as to strengthen the relationship between them and to improve the working environment. The professional working relationship between the Board and CPOA improved in the IMR-12 and IMR-13 periods, and we have been

informed that one additional meeting with a facilitator took place during the IMR-13 review period. It appears to the monitoring team that equilibrium is being reached with the oversight responsibilities of the Board regarding the investigative function of the CPOA and the realistic workload challenges of the CPOA.

In regard to the task of permitting a meaningful opportunity to appeal CPOA findings to the Board, we examined two appeals this review period along with the underlying investigations [IMR-13-38 and IMR-13-39].  These appeals were both denied, and we did not find the denials to be improper. The Board has consistently demonstrated its willingness to entertain appeals and to give complainants a meaningful opportunity to be heard, thus, it maintains in operational compliance with this CASA requirement contained in paragraph 287.

As we pointed out in previous IMRs, a new mediation policy was developed that was an apparent improvement and was expected to enable CPOA to make greater use of this effective complaint remedy and disposition tool. However, this revised policy did not prove to be successful. As we noted in IMR-10, unfortunately, complainants did not take advantage of the mediation program and have, for the most part, opted not to pursue mediation. As a result, during the 12th IMR reporting period, a second revised version of the mediation program was completed, and at the initiation of the IMR-13 period, the new Mediation Protocol, in the form of a Memorandum of Understanding between the City, APD, APOA, and CPOA, was approved by the Court. As discussed more fully in reference to paragraph 184 herein, the new program has made a promising start. It is expected that a viable mediation program will emerge and will prove to be an effective case resolution tool that will also promote understanding and positive relations between the public and APD.

As the monitoring team has noted since IMR-8, when reviewing random samples of investigations, regarding the requirement of "expeditiously as possible" processing of complaints contained in paragraph 281 of the CASA, and the time requirement for completing investigations contained in paragraph 191, we look for and determine the following dates: complaint received, complaint assigned for investigation, initiation of investigation after assignment, completion of investigation, and chain of command review and notification of intent to impose discipline (where applicable).

The monitoring team discussed with the parties in past site visits the issue of delay between the date a complaint is received and the date it is assigned for investigation. Although the CASA does not deal directly with the issue of time to assign, the parties and the monitor agreed that a delay of more than seven working days for assignment is unreasonable and would affect the "expeditious" requirement of Paragraph 281 and the time requirement of Paragraph 191.  We agreed this timeline requirement would be assessed in IMR-8 and in all following IMRs.

We sampled eight CPOA investigations completed during this reporting period. Despite the positive development of CPOA's use of a new internal tracking system of complaints and the making and management of investigative assignments, we note that in five

333

cases [IMR-13-30; IMR-13-31, IMR-13-35, IMR-13-36, and IMR-13-37], there is evidence the investigation did not comply with timeline requirements:

In [IMR-13-30], the complaint was made via the CPOA website. Although the investigative report and related documents do not reveal the date the investigation was completed, the findings letter addressed to the complainant was more than ten months later.

[IMR-13-31] involved a website complaint, and although the investigative report and related documents do not reveal the date the investigation was completed, the findings letter addressed to the complainant was more than nine months later.

In [IMR-13-35], the complaint was made via the CPOA website, and although the investigative report does not reveal the date of completion of the investigation, the findings letter administratively closing this matter was addressed to the complainant more than five months later.

In [IMR-13-36], the complaint was made via website and was not assigned for investigation until 23 days later, beyond the seven working days timeline for assignment.

[IMR-13-37] involved a website complaint received on July 9, 2020. Allowing for up to seven working days for assignment, the investigation was completed at the 120-day mark, but there is no evidence of an approved extension in the investigative materials.

Since none of these untimely investigations resulted in sustained findings, the non-sustained findings did not result in an inability to impose discipline due to time constraints.  However, the CASA timelines apply regardless of the findings. Thus, operational compliance for timely CPOA investigations remains at 38% compliance rate for this IMR. Given a 95 % requirement for compliance, these timeliness failure rates are seriously concerning.

CPOA continues to be non-compliant with the requirements of paragraph 281 related to timeliness. We are satisfied that the Executive Director has assigned the complaint assignment process exclusively to the lead investigator, and with this mechanism in place for review and assignment of all complaints, and the expected filing of the full complement of six investigative positions, we expect that CPOA will be able to complete all investigations within required CASA timelines.

In our review of the public information required for CPOA and the Board, we found that issues we have had in the past with the timeliness of the release of public reports are being addressed. In regard to paragraph 292 of the CASA requiring the CPOA to file semi-annual reports with the City Council, CPOA previously attempted to meet this requirement by filing one semi-annual and one annual report per year and quarterly reports verbally with City Council. They have now implemented a process of filing two semi-annual written reports per year.

With the hiring of the data analyst, CPOA has made noticeable improvements in the reporting and analysis of data and statistics, as well as its ability to timely file semi-annual reports such that the data contained therein is not stale for purposes of public consumption. Both semi-annual reports for 2019 were filed before the end of the IMR-13 period, and a draft of the first semi-annual report for 2020 has been completed shortly after the expiration of the IMR-13 period. It is also expected that both the first and second semi-annual report for 2020 will be completed, approved by the CPOAB and City Council, and filed before the end of the IMR-14 period, meeting the goal of filing the report within 120 days of the expiration of the relevant semiannual period.

Based on our observations and interaction with CPOA staff, we believe that the CPOA operations are relatively efficient within the confines of its present workload and staffing. However, the ability of the CPOA to meet its investigative responsibilities is impacted by the availability of necessary staff. At the same time, we are cognizant of the fact that funding is always a central issue.  Nonetheless, as demonstrated by our analysis of CPOA's ability to meet its timeliness of investigation requirements, either investigative staff needs to be increased, or new efficiencies need to be found in the CPOA process. Otherwise, CPOA will continue to be severely challenged in meeting the requirements of the CASA pertaining to the timeliness and quality of investigations.

### 4.7.256 Compliance with Paragraph 271:  CPOA Implementation

Paragraph 271 stipulates:

> **"The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD. The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force."**

### Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

We consider the recommendations below to be on the critical path to compliance with this paragraph.

### Recommendation for Paragraph 271:

### 4.7.256a:  CPOA Board must be filled promptly.

335

**4.7.256b:  The City should develop an efficient ongoing screening process that considers CPOA and Board input regarding the qualifications of applicants for vacant Board positions.**

**4.7.256c:  The City should ensure that process is both effective and efficient and leads to timely appointments of new CPOA Board members.**

**4.7.257 Assessing Compliance with Paragraph 272:  Independence and Accountability of CPOA**

Paragraph 272 stipulates:

> **"The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.258 Assessing Compliance with Paragraph 273:  Requirements for Service of CPOA Members**

Paragraph 273 stipulates:

> **"The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

Monitor's Note:

The CPOA Board must continue to reinforce the need for its members to commit to sections § 9-4-1-5 (B) (4) and (5) of the Albuquerque Police Oversight Ordinance and

336

paragraph 273 of the CASA requiring its members to demonstrate an ability to engage in mature, impartial decision-making; a commitment to transparency and impartial decision making; and to the impartial, transparent and objective adjudication of civilian complaints, as well as the importance of public perception of impartiality by CPOA Board members.

City Council should ensure that appointments and reappointments of CPOA Board members meet the qualification requirements set forth in § 9-4-1-5 (B) of the Albuquerque Police Oversight Ordinance and paragraph 273 of the CASA, and take appropriate action if Council determines that sitting members have not met those standards.

### 4.7.259 Assessing Compliance with Paragraph 274:  CPOA Pre-Service Training

Paragraph 274 stipulates:

> **"Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:**
>
> **a)  This Agreement and the United States' Findings Letter of April 10, 2014;**
> **b)  The City ordinance under which the agency is created;**
> **c)  State and local laws regarding public meetings and the conduct of public officials;**
> **d)  Civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;**
> **e)  All APD policies related to use of force, including policies related to APD's internal review of force incidents; and**
> **f)  Training provided to APD officers on use of force."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendation for Paragraph 274:*

*4.7.259a: Ensure that newly appointed CPOA members receive the necessary 24 hours of training within the required six-month time period.*

### 4.7.260 Assessing Compliance with Paragraph 275:  CPOA Annual Training

Paragraph 275 stipulates:

> **"The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

**Recommendation for Paragraph 275:**

**4.7.260a: Ensure that current board members fulfill the agreed-upon assessment requirements as soon as practicable.**

**4.7.260b: For future training, ensure that current board members complete the agreed-upon assessment requirements within an established time frame.**

### 4.7.261 Assessing Compliance with Paragraph 276:  CPOA Ride-Alongs

Paragraph 276 stipulates:

> **"The City shall require those appointed to the agency to perform at least two ride-alongs with APD officers every six months."**

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.262 Assessing Compliance with Paragraph 277:  CPOA Authority and Resources to Make Recommendations

Paragraph 277 stipulates:

> **"The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer-involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force.**"

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.263 Assessing Compliance with Paragraph 278:  CPOA Budget and Authority**

Paragraph 278 stipulates:

> **"The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws.  The agency shall have the authority to hire staff and retain independent legal counsel as necessary**."

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

Monitor's Note:

CPOA should be provided increased investigative staff to meet its CASA requirements pertaining to timeliness and thoroughness of investigations and adequate resources to effectively meet its new responsibilities pertaining to the integration with and administration of CPCs.

**4.7.264 Assessing Compliance with Paragraph 279:  Full-Time CPOA Investigative Staff**

Paragraph 279 stipulates:

> **"The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review of serious uses of force and officer-involved shootings. The investigative staff shall be selected by and placed under the supervision of the Executive Director. The Executive Director will be selected by and work under the supervision of the agency.  The City shall provide the agency with adequate funding to ensure that the agency's investigative staff is sufficient to investigate civilian complaints and review serious uses of force and officer-involved shootings in a timely manner."**

339

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 279:***

***4.7.264a: Fully staff the CPOA investigative unit, as required by the CASA.***

**4.7.265 Assessing Compliance with Paragraph 280:  Receipt and Review of Complaints by CPOA**

Paragraph 280 stipulates:

> **"The Executive Director will receive all APD civilian complaints, reports of serious uses of force, and reports of officer-involved shootings.  The Executive Director will review these materials and assign them for investigation or review to those on the investigative staff.  The Executive Director will oversee, monitor, and review all such investigations or reviews and make findings for each.  All findings will be forwarded to the agency through reports that will be made available to the public on the agency's website."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

Monitor's Note:

CPOA and IAPS should avoid conducting independent investigations on the same alleged misconduct. Jurisdiction should lie with one office or the other. In the rare instance where an external complaint and an internal complaint address the same subject matter, an agreement should be made regarding which office will conduct the investigation, or a joint investigation with one set of findings should be conducted.

**4.7.266 Assessing Compliance with Paragraph 281:  Prompt and Expeditious Investigation of Complaints**

Paragraph 281 stipulates:

> **"Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 281:*

*4.7.266a: Continue to develop and refine an internal tracking system or other processes that ensure all complaints are either assigned for investigation, referred to mediation, or administratively closed within seven working days of receipt of the complaint, and once assigned for investigation, proceed according to the timelines set forth in the CASA and CBA.*

*4.7.266b: Ensure that tardy assignments of investigations and tardy investigations are noted and discussed with the involved CPOA personnel.*

*4.7.266c: Ensure the inclusion of an investigative timeline clarifying each investigative time point so that assessment of CPOA's timeliness requirements under the CASA and CBA are clear and not subject to interpretation.*

**4.7.267 Assessing Compliance with Paragraph 282:  CPOA Access to Files**

Paragraph 282 stipulates:

> **"The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:**
>
> **a)  all civilian complaints, including those submitted anonymously or by a third party;**
> **b)  the identities of officers involved in incidents under review;**
> **c)  the complete disciplinary history of the officers involved in incidents under review;**
> **d)  if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);**
> **e)  all APD policies and training; and**
> **f)  if requested, documents, reports, and other materials for incidents that may evince an overall trend**

**in APD's use of force, internal accountability, policies, or training."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.268 Assessing Compliance with Paragraph 283:  Access to Premises by CPOA

Paragraph 283 stipulates:

> **"The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director upon reasonable notice. The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement.**"

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.269 Assessing Compliance with Paragraph 284:  Ensuring Confidentiality of Investigative Files

Paragraph 284 stipulates:

> **"The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.270 Assessing Compliance with Paragraph 285:  Authority to Recommend Discipline

Paragraph 285 stipulates:

342

> **"The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.271 Assessing Compliance with Paragraph 286:  Documenting Executive Director's Findings

Paragraph 286 stipulates:

> **"Findings of the Executive Director shall be documented by APD's Internal Affairs Division for tracking and analysis."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.272 Assessing Compliance with Paragraph 287:  Opportunity to Appeal Findings

Paragraph 287 stipulates:

> **"The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency."**

## Results

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

343

Monitor's Note:

The CPOA Board must respect and follow the appeals process set forth in its Ordinance and apply it equally to all members of the public. The functional equivalent of allowing an appeal before the end of an investigation should be avoided at all costs.

When the CPOA Board grants an appeal before sustaining any violations that were not determined by CPOA or otherwise altering CPOA findings, its first threshold question should be whether the investigation needs to be returned to the CPOA investigative staff for additional investigation. If the CPOA Board makes findings that were not noted by CPOA or otherwise alters CPOA findings, it should do so only if the record of investigation sufficiently supports its findings and additional investigation is not warranted.

When the CPOA Board grants an appeal and sustains violations that were not found by CPOA or otherwise alters CPOA findings, disciplinary recommendations should be made, and training/policy issues addressed to better enable the chief to reach an appropriate decision.

### 4.7.273 Assessing Compliance with Paragraph 288:  CPOA Recommendations Regarding APD Policies

Paragraph 288 stipulates:

> **"The agency shall make recommendations to the Chief regarding APD policy and training.  APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes."**

**Results**

Primary:        **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.274 Assessing Compliance with Paragraph 289:  Explanation for not Following CPOA Recommendations

> **"For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.275 Assessing Compliance with Paragraph 290:  Regular Public Meetings

Paragraph 290 stipulates:

> **"The agency shall conduct regular public meetings in compliance with state and local law.  The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.276 Assessing Compliance with Paragraph 291:  Community Outreach for the CPOA

Paragraph 291 stipulates:

> **"The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

## 4.7.277 Assessing Compliance with Paragraph 292:  Semi Annual Reports to Council

Paragraph 292 stipulates:

> **"The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:**

**a)  number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
**b)  demographic category of complainants;**
**c)  number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
**d)  number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief;**
**e) policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;**
**f)  policy changes recommended by the agency, including any dispositions by the Chief;**
**g)  public outreach efforts undertaken by the agency and/or Executive   Director; and**
**h)  trends or issues with APD's use of force, policies, or training."**

## Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

*Recommendations for Paragraph 292:*

*4.7.277a: CPOA should specifically identify the pressure points causing non-compliance with this paragraph and work with APD, the City and the monitoring team to decide upon processes that will move it back into compliance.*

**4.7.278 Assessing Compliance with Paragraph 320: Notice to Monitor of Officer Involved Shootings**

Paragraph 320 stipulates:

"**To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings. APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer."**

346

**Methodology**

APD has routinely provided notice of the requirements of this paragraph to the monitor and the DOJ within 12 hours.  The monitor then compares those notices to events already known to have occurred, for example, by scanning media reports related to OIS in the sources that the monitor routinely uses to validate this section of the CASA, e.g., media reports, *amici* discussions and notices, and routine operational reports and processes such as FRB, etc.

**Results**

Generally, the City is exceptionally good at informing the monitor and DOJ when an OIS, in-custody death, or arrest of an officer occurs.  On September 4, 2020, an APD officer had an accidental discharge, and the City reported the event on October 29, 2020.  To their credit, the City "self-reported" their oversight.  Nonetheless, this constitutes a failure to report an accidental discharge by an officer.  There are few enough officer-involved shootings and accidental discharges to make even one mistake in reporting a significant issue, statistically.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **Not In Compliance**

***Recommendation for Paragraph 320:***

***4.7.278a:  The City should ensure that critical incidents are noted, and where required by the CASA, are reported to the monitor and DOJ.***

**5.0 Summary**

The criticality of APD's diminished performance this reporting period is best understood by an assessment of Figure 5.1 on the following page.  Overall, operational compliance has regressed to such a substantial degree that compliance rates for IMR-13 are lower than those seen in IMR-8, with IMR-8's compliance rate at 59.2 percent and IMR-13's at 59.1 percent.

To put it simply, APD needs to go back to the drafting table and rebuild its compliance processes, ensuring that policy, training, and activities in the field are CASA compliant, are consistently reviewed and assessed by the agency, and are at the forefront of critical management, manpower deployment, training, supervision, and operational decision-making.

Longitudinal Compliance Levels, IMR-1 through IMR-13

