Progress and Status Summary of the USDOJ Settlement Agreement Entered

into by the United States of America and the City of Albuquerque

Regarding the Albuquerque Police Department

Fourteenth Report

February 1, 2021 – July 31, 2021

Prepared by the Albuquerque Police Department

## Table of Contents

I. Introduction ..........................................................................................................................................................4

II. Acronym ..............................................................................................................................................................4

III. Executive Summary ...........................................................................................................................................5

IV. Progress Report Organization...........................................................................................................................8

V. Compliance Levels and the CASA's Measurable Paragraphs............................................................................8

VI. Key Steps Taken by the Administration .........................................................................................................10

VII. Section Progress on the CASA's measurable paragraphs .............................................................................11

    Section 1:  Use of Force:  Internal Controls and Accountability (Paragraphs 14-89)....................................12

        A. Use of Force Principles........................................................................................................................12

        B. Use of Firearms...................................................................................................................................14

        C. Electronic Control Weapons................................................................................................................16

        D. Crowd Control and Incident Management..........................................................................................23

        E. Use of Force Reporting .......................................................................................................................24

        F. Force Reviews and Investigations .......................................................................................................26

        F1. Supervisory Force Reviews ...............................................................................................................28

        F2.  Force Investigations by the Internal Affairs Division.......................................................................34

        G. Force Review Board .............................................................................................................................43

        H. Multi-Agency Task Force......................................................................................................................47

        I. Use of Force Training............................................................................................................................49

    Section 2:  Specialized Units (Paragraphs 90 – 109) ......................................................................................52

        A. Specialized Tactical Units (SOD)..........................................................................................................52

        B. Specialized Investigative Units (SID)....................................................................................................56

    Section 3:  Crisis Intervention (Paragraphs 110 – 137)..................................................................................58

        A.  Mental Health Response Advisory Committee (Paragraphs 110-117).............................................58

        B.  Behavioral Health Training (Paragraphs 118-122) ............................................................................61

        B. Training on Revised Policies, Procedures, and Practices ....................................................................73

        C. Field Training Officer Program ............................................................................................................75

    Section 5:  Misconduct Complaint Intake, Investigation, and Adjudication (Paragraphs 162 – 202).........79

        A. Reporting Misconduct.........................................................................................................................79

        B. Public Information on Civilian Complaints ..........................................................................................79

        C.  Complaint Intake, Classification, and Tracking..................................................................................81

        D.  Investigation of Complaints...............................................................................................................85

        E. Preventing Retaliation.........................................................................................................................90

        F. Staffing and Training Requirements ...................................................................................................91

**Section 6:  Staffing, Management, and Supervision (Paragraphs 203 – 231)** ................................................................. 94

   **A. Staffing** ................................................................................................................................................................ 95

   **B. Duties of Supervisors** ........................................................................................................................................... 96

   **C. Supervisor Training** .............................................................................................................................................. 97

   **D. Early Intervention System (212-219)** ..................................................................................................................... 99

   **E. On-Body Recording Systems for Documenting Police Activities** ........................................................................ 102

**Section 7:  Recruitment, Selection and Promotions (Paragraphs 232 – 246)** .............................................................. 110

   **A.  Recruitment Plan** ............................................................................................................................................... 110

   **B.  Hiring Practices** .................................................................................................................................................. 112

   **C.  Promotions** ........................................................................................................................................................ 114

   **D.  Performance Evaluation** ..................................................................................................................................... 115

**Section 8:  Officers Assistance and Support (Paragraphs 247 – 253)** ......................................................................... 116

**Section 9:  Community Engagement and Oversight (Paragraphs 254 – 293)** ............................................................... 119

   **A.  Community & Problem-Oriented Policing (Paragraphs 254-259)** ....................................................................... 119

   **B.  Community Meetings & Public Information (Paragraphs 260-265)** ..................................................................... 123

   **C.  Community Policing Councils (Paragraphs 266-270)** .......................................................................................... 125

   **D.  Civilian Police Oversight Agency (CPOA) (Paragraphs 271-292)** ........................................................................ 126

**Section 10:  Assessing Compliance (Paragraph 320)** ................................................................................................. 133

   **A.  Access and Confidentiality** ................................................................................................................................. 133

**VIII.  Conclusion** ......................................................................................................................................................... 134

**IX.  Appendix** ............................................................................................................................................................. 135

# I. Introduction

The Albuquerque Police Department (APD) and the City of Albuquerque (City) continue to work with the Department of Justice (DOJ) and the Independent Monitor (IM) to improve the overall functioning of the Department and work toward meeting the requirements of the Court Approved Settlement Agreement (CASA) No. CIV 14-1025-JB-SMV.

APD has received guided feedback from the IM, the City, and the DOJ for the reporting period of February 1 to July 31, 2021. In accordance with CASA paragraph 319, APD has prepared this progress report to delineate key steps taken, gauge progress, communicate correction plan status, and respond to concerns raised in the Monitor reports to implement the agreement.

# II. Acronym List

AAR After Action Report
ACS Albuquerque Community Safety
BSS Behavioral Sciences Section
BNMM Black New Mexico Movement
CAC Crimes Against Children
CAD Computer Aided Dispatch
CARE Child Abuse Response Evaluators
CASA Court Approved Settlement Agreement
CIS Crisis Intervention Section
CIU Crisis Intervention Unit
CJCC Criminal Justice Coordinating Council
CNT Crisis Negotiation Team
COA City of Albuquerque
COAST Crisis Outreach and Support Team
COD Compliance and Oversight Division
CEU Community Engagement Unit
COP Community Oriented Policing
CPC Civilian Police Complaint (IAPS and CPOA)
CPCs Community Policing Councils
CPOA Civilian Police Oversight Agency
CTU Comprehensive Training Unit
DAP Discipline Action Packet
DOJ Department of Justice
DTI Department of Technology and Innovation
ECC Emergency Communication Center
ECIT Enhanced Crisis Intervention Team
ECW Electronic Control Weapon (Taser)
EIRS Early Intervention and Recognition System
ELMS Enterprise Learning Management System
ERP Enterprise Resource Planning
ERT Emergency Response Team
FRB Force Review Board
FSB Field Service Bureau
FTAL Field Training Area Lieutenant
FTAS Field Training Area Sergeant
FTEP Field Training Evaluation Program
FTO Field Training Officer
GVRU Gun Violence Reduction Unit
HIPAA Health Insurance Portability and Accountability Act

IADLEST International Association of Directors of Law Enforcement Standards and Training
IAFD Internal Affairs Force Division
IAPS Internal Affairs Professional Standards
IAR Internal Affairs Request
IM Independent Monitor
IMR Independent Monitor's Report
IMT Independent Monitoring Team
MATF Multi-Agency Task Force
MHRAC Mental Health Response Advisory Committee
MOE Maintenance of Effort
MOU Memorandum of Understanding
NASRO National Association of School Resource Officers
NCP National Certification Program
NNSC National Network for Safe Communities
OBRD On-Body Recording Device
OIS Officer Involved Shooting
OJT On the Job Training
OPA Office of Policy Analysis
PDH Pre-Determination Hearing
PEMS Performance Evaluation Management System
PIA Process Improvement Analyst
PMU Performance Metrics Unit
POP Problem Oriented Policing
PPRB Policy and Procedures Review Board
PRT Proactive Response Team
PRU Performance Review Unit
RAD Rapid Accountability Diversion
RAM Risk Assessment Matrix
SID Special Investigation Division
SOD Special Operations Division
SOP Standard Operating Procedure
SRO School Resource Officer
TDY Temporary Duty
TraCs Traffic and Criminal software
TRU Telephone Reporting Unit
USDOJ United States Department of Justice
VIP Violence Intervention Program

## III.  Executive Summary

The City and Albuquerque Police Department (APD) consider the Court-Approved Settlement Agreement (CASA) compliance of paramount importance and remain committed to addressing CASA paragraph requirements at all Department levels. The purpose of this progress report, which APD releases in connection with each reporting period, is to document the Thirteenth Independent Monitor's Report (IMR), the Independent Monitoring Team's (IMT) recommendations, APD's actions in response to the IMT recommendations, individual paragraph compliance status, and other transformational efforts that occurred from February 1 to July 31, 2021.

There are two hundred seventy-six (276) paragraphs in ten sections within the CASA with measurable requirements. Compliance is measured by three levels (primary, secondary, and operational). In this reporting period, key efforts to meet compliance requirements have been addressed by APD throughout all ten sections of the CASA including: Use of Force; Specialized Units; Crisis Intervention; Policies and Training; Misconduct Complaint Intake; Investigation and Adjudication; Staffing, Management and Supervision; Recruitment Selection and Promotion; Community Engagement and Oversight, and Assessing Compliance.

As of the end of the IMR-13 reporting period, APD's compliance levels were:
Primary Compliance 100%;
Secondary Compliance 82%; and
Operational Compliance 59%.

In February 2021, a joint motion was filed with the Court establishing a temporary External Force Investigation Team (EFIT) to assist APD in conducting quality and timely investigations of Level 2 and Level 3 uses of force by APD officers.  In April 2021, the City had advertised a Request for Letters of Interest outlining requirements for potential vendors, worked closely with the Department of Justice in the selection process, and selected a vendor.  EFIT is designed to assist, evaluate and provide guidance to IAFD personnel.  EFIT's work will be evaluated in the same manner as APD by the IMT and DOJ for the duration of the contract term.  EFIT went live on July 16, 2021, and will continue at least through April 2022.

In March 2021, the City Administration appointed two executive positions to oversee the Albuquerque Police Department and named the Chief of Police and the Superintendent of Police Reform/Deputy Chief Administrative Officer (Superintendent).  The Chief of Police retired as a commander from APD in 2014, became Chief of Police in the Pueblo of Laguna and returned back to APD in 2017 as the Deputy Chief of Police over the Field Services Bureau.  The Superintendent is a four-time police chief who is responsible for key pieces of the reform effort.  The Superintendent oversees the Training Academy Division, the Internal Affairs Professional Standards Division, Internal Affairs Force Division, Crisis Intervention Division and Behavioral Health Section.

APD has made significant progress by transforming leadership at the Training Academy.  After restructuring the Department to put the Training Academy under the Superintendent of Police Reform in March 2021, APD hired two key personnel into the Training Academy, the Training Academy commander and the Training Academy curriculum development manager.  In May 2021, an experienced, civilian educator was hired to manage the Comprehensive Training Unit (CTU) which is responsible for all APD curricula.  The curriculum development manager earned a Ph.D. in political science and has over eleven years of experience in education as a trainer and in the development and design of training.  In July 2021, APD hired

the commander of the Training Academy Division.  The Training Academy commander retired from the Federal Bureau of Investigations (FBI) and served as both the deputy director and assistant director of the FBI Academy the last three years. Training is a necessary component, in point of fact, training equals secondary compliance for measurable paragraphs throughout the CASA.

APD has made significant progress in Tier 4 Use of Force training.  APD did not complete Tier 4 Use of Force training in 2020, resulting in a decrease in compliance rates for numerous, interrelated paragraphs.  Tier 4 is comprised of two days of training.  The first day of Tier 4, Use of Force training was approved by the DOJ and IMT in February 2021, training began in March 2021 and was completed in May 2021 with a compliance rate of 98%.  The second day of Tier 4 training was approved by the DOJ and IMT in July 2021, which is currently being delivered to all sworn officers and expected to be completed by December 2021, meeting the annual use of force training requirement.

APD has already made progress on Use of Force investigations, another key problem area in IMR-13.  In April 2021, APD continued to improve the process of tracking policy violations relating to use of force investigations.  To ensure use of force reviews are consistently factored into supervisor's performance evaluations, APD has included an additional evaluation process.  Based on available data, the process includes the verification of employee performance documents reviews by commanders to confirm any violations related to SOP 2-57 Use of Force – Review and Investigation by Department Personnel, are documented within officer performance evaluations.  This is a much needed feature to ensure the quality of supervisory work is evaluated and documented.

APD has expressed to the Court and the IMT the need to clarify the use of progressive discipline and abeyance, and took major steps to this end during the 14th monitoring period. Standard Operating Procedure (SOP) 3-46 Discipline System was revised and published in July 2021.  On multiple occasions, APD worked with both the IMT and DOJ in this policy's revision, accepting feedback and making the necessary changes to develop a stronger policy.  SOP 3-46 is a CASA-related policy the department recognizes as having a significant impact on personnel, establishing requirements for progressive discipline and the use of abeyance as recommended.

APD has worked diligently on an early intervention system since 2018 and has come a long way in the development of an in-house system while APD continues with an outside vendor to tailor an early intervention system to meet the department's needs and requirements.  The Pareto Principle method, or 80/20 Rule, which means that 80% of successes or failures are caused by the actions of 20% of employees. The method was approved by the IMT in February 2021 as the statistical application that will be used to measure both acceptable and unacceptable behaviors from officers as outlined in the CASA.  The Performance Evaluation and Management System (PEMS) training plan was approved by the IMT and the DOJ.  Training will begin in August 2021, and is scheduled to be completed in December 2021.

APD has continued with the Ethical Policing is Courageous (EPIC) program, which was brought to APD by the New Orleans Police Department in 2019.  During this reporting period, APD experienced numerous known examples of EPIC through APD employee interventions.   EPIC has evolved into the Active Bystander for Law Enforcement (ABLE) project, which trains officers to support peer intervention.  ABLE aims to create a police culture in which officers routinely intervene to prevent misconduct, avoid police mistakes, and promote officer health and wellness.  In July 2021, APD was accepted as a member of the ABLE project.  Members of the APD executive staff are scheduled in August 2021 to attend an ABLE

conference.  Additionally, in August 2021, APD will be participating in ABLE's train-the-trainer session by sending five officers to become ABLE instructors in order to train APD employees.

In July, 2021, APD was awarded two national School Resource Officer (SRO) awards.  An APD SRO is a department officer assigned to a local high school working in a community-oriented policing capacity.  They work with students, teachers, school administrators, and typically are assigned to one or more schools.  APD earned the "Model SRO Program of the Year Award", which annually recognizes SRO programs that made specific and significant contributions to their local communities and school districts.  In addition, an APD officer earned the "SRO of the Year Award".   The officer was nominated by the principal for Manzano High School for the officer's years of engagement and carrying out duties that kept the youth and staff alike safe.

Community engagement efforts continued through numerous collaborations with a cross section of community members and organizations.  APD instituted an Ambassador Unit, which is designed to facilitate clear, consistent lines of communication between the department and different groups within the community who have not previously had a voice with law enforcement.  The program represents a commitment to find solutions that work for the Albuquerque community to focus on the dual challenges of crime and meaningful reform.  The City's Office of Equity and Inclusion provided two intensive trainings to officers assigned as Ambassadors and introduced them to community organizations that serve specific populations to help build relationships. The Ambassadors work with Native American, African American, Hispanic, Asian, Refugee, LGBTQI, Faith, Senior Citizen, Veteran, and Americans with Disabilities communities.

APD Behavioral Sciences Section teamed up with the APD Training Academy Wellness Program, the City of Albuquerque Wellness Program, APD Peer Support, and APD Chaplains to build a comprehensive wellness program.  The goal is to have a wide range of easily accessible mental, emotional, and physical health and wellness resources.  Mindfulness and resilience training is a component dedicated to the wellness of police officers and their families.  This comprehensive wellness program aims to encourage officers to seek professional help when dealing with the complexity of the profession.

APD contracted with Benchmark Analytics in January of 2020 to design and tailor a management system across eight areas of focus: Personnel Management, Use of Force, Internal Affairs, Early Intervention System, Supervision and Performance Evaluations, Community Engagement & Outreach, and Training.  APD continues to work with the City of Albuquerque Department of Technology and Innovation and Benchmark Analytics to move this project forward.  Testing for the Personnel Management and Internal Affairs modules is scheduled for the third quarter of 2021.  Further data mapping and module development continues for Use of Force, Early Intervention, Supervision and Performance Evaluations.  The Training module is scheduled to begin development in September 2021, followed by the Community Engagement and Outreach module.

APD remains dedicated to improving the department's overall operations and meeting the requirements outlined in the CASA.  The City will continue to work with the IMT and the DOJ, taking key steps towards operational compliance.

## IV.  Progress Report Organization

This progress report aligns with the ten (10) CASA sections in response to recommendations set forth by the Monitor's Thirteenth Report (IMR-13).  Each Section contains subsections and respective paragraphs. Each paragraph of the CASA is listed and is followed by the corresponding IMR-13 recommendations (if any), APD's response to the recommendations, and in some cases APD's response to the paragraph in general. The full CASA, Independent Monitor Reports (IMR's), past APD Progress Reports and other CASA-related documents can be located at:
http://www.cabq.gov/police/documents-related-to-apds-settlement-agreement.


## V.  Compliance Levels and the CASA's Measurable Paragraphs

There are two hundred seventy-six (276) paragraphs within the CASA with measurable requirements.  As defined in IMR-1, compliance measurements in APD's monitoring process consists of three parts: primary, secondary, and operational as defined below:

1. **Primary** *compliance is the "policy" part of compliance. To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA. As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.*

2. **Secondary** *compliance can be attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the Department for doing so. By definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the agency).*

3. **Operational** *compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and Sergeants are routinely held accountable for compliance by their lieutenants and command staff. In other words, APD "owns and enforces its own policies".*

As of the release of IMR-13, APD's overall compliance rates compared to IMR - 12 were as follows:

| Compliance Level | IMR 12 Percentage Compliant | IMR 13 Percentage Compliant | % Change in Compliance Rate from IMR 12 to IMR 13 |
|---|---|---|---|
| Primary (policy) | 100% | 100% | No change |
| Secondary (training) | 91% | 82% | A loss of 9.9% |
| Operational compliance (day to day operations) | 64% | 59% | A loss of 7.8% |

The following table shows paragraph compliance rates, from IMR – 1 through IMR-13 (no IMR – 7)[1]. The red represents the number of paragraphs in Primary Compliance, yellow represents the number in Secondary Compliance, and green represents the number of paragraphs in Operational Compliance. The next IMR will be filed with the court in November 2021.



---

[1] There was no IMR – 7 by agreement between the DOJ, City, and Monitor with the approval of the Court.

# VI.  Key Steps Taken by the Administration

At the end of the last reporting period, APD presented the IMT with a plan to address the use of force training requirements. The Tier 4 training for all sworn officers was approved by the IMT and the DOJ.  The first day of Tier 4 training was completed in May 2021 and the second day of Tier 4 training is currently being delivered and scheduled to be completed in December 2021.

The Academy was granted four temporary instructor positions to ensure adequate staffing for Tier 4 Use of Force training delivery.

In May 2021, APD Academy hired an experienced civilian curriculum development manager.  Since her start, she has led new strategies to meet curriculum design, development timelines, and tracking requirements.  She has also created a new method for tracking courses in development which delivers daily status of lesson plans for the IMT, APD personnel, and the DOJ.   APD also hired a new curriculum training manager in June 2021, to oversee the curriculum specialists who collaborate with Department personnel who carry significant training responsibilities on the 7-Step curriculum development process.  Courses continue to be developed and delivered to Academy personnel.

In March 2021, APD appointed a Superintendent of Police Reform/Deputy Chief Administrative Officer, and assigned the 2nd Deputy Chief for the Police Reform Bureau under that command.  This command structure includes Internal Affairs Professional Standards Division (IAPS), Internal Affairs Force Division (IAFD), Behavioral Health Section, Training Academy Division, and the Crisis Intervention Division.

The APD Training Academy developed and published an online training calendar which delivers real time updates to the academy schedule, the associated CASA paragraphs, and what aspects of training are impacted.  The IMT and DOJ have access to the training calendar.

The Special Operations Division (SOD) K9 home kennel inspections were instituted to document the condition of the home environment to ensure the safety and security of the canine.  Home visits will be conducted by a supervisor, bi-annually for every handler.

The Special Investigations Division (SID) continues to utilize written operational plans, Risk Assessment Matrix (RAMs), and After Action Reviews (AARs) to examine the need to involve the SOD Tactical Units, to communicate any risks, hazards, or high-risk situations and threats.  SID and SOD continue to work well together to improve overall operations between the two divisions.

SOP 3-46, Discipline System was revised and published in July 2021.   APD worked well with both the IMT and DOJ in this policy's revision, accepting feedback and making the necessary changes to develop a stronger policy. SOP 3-46 is a CASA-related policy the department recognizes as having a significant impact on personnel, establishing requirements for progressive discipline and the use of abeyance as recommended.

APD continued to improve the process of tracking policy violations relating to the use of force investigations.  To ensure use of force reviews are consistently factored into supervisor's performance evaluations, an evaluation process is occurring.  Based on available data, the process will verify employee performance documents are reviewed by commanders to confirm any violations related to SOP 2-57 Use of Force – Review and Investigation by Department Personnel, are documented within the evaluation.  The evaluation process includes a determination as to whether a policy violation was documented within the

evaluation, and if not, that an internal affairs request was submitted and that the supervisor identified how the policy violation was addressed. A pre-determined percentage of documents are reviewed each month and the parameters for repeat violations and progressive discipline will be included in the overall process.

The Pareto Principle was approved by the IMT in February 2021 as the statistical application that will be used to measure both acceptable and unacceptable behaviors from officers as defined in the CASA.  The Performance Evaluation and Management System (PEMS) training plan was approved by the IMT and DOJ and training will begin in August 2021, scheduled to be completed in December 2021.

APD collects a massive amount of data and is working with the DOJ to operationalize the data in a meaningful way.   An organization-wide data gap analysis report and assessment conducted by AH Datalytics on behalf of the DOJ was approved and conducted; the finding were reported in the Albuquerque Police Department Gap Analysis report in January 2021 (See Appendix 1).  Recommendations from the report included:  to apply data and analytics to identify problems and develop solutions, use data to inform how resources are allocated, and create a change management process to guide APD through the transition. APD continues to work regularly with AH Datalytics and the DOJ to address the recommendations outlined in the gap analysis.

## VII.  Section Progress on the CASA's measurable paragraphs

The Section portions of this report provide detailed information about the progress APD has made with the measurable CASA paragraphs during the reporting period from February 1, 2021 to July 31, 2021, and includes progress made, plans to correct any problems, APD responses to IMR recommendations and general updates.  The reader should be aware all recommendations listed throughout this progress report are from IMR-13 and each recommendation has a corresponding recommendation number.  IMR-13 may be located at:
https://www.cabq.gov/police/documents-related-to-apds-settlement-agreement

Compliance history tables are provided for each of the paragraphs.  The red represents Primary Compliance, yellow represents Secondary Compliance, and green represents Operational Compliance.



## Section 1:  Use of Force:  Internal Controls and Accountability (Paragraphs 14-89)

### A. Use of Force Principles

**14.**  Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:

   a.  officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;

   b.  force shall be de-escalated immediately as resistance decreases;

   c.  officers shall allow individuals time to submit to arrest before force is used whenever possible;

   d.  APD shall explicitly prohibit neck holds, except where lethal force is authorized;

   e.  APD shall explicitly prohibit using leg sweeps, arm-bar takedowns, or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the subject;

   f.  APD shall explicitly prohibit using force against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;

   g.  officers shall not use force to attempt to effect compliance with a command that is unlawful;

   h.  pointing a firearm at a person shall be reported as a Level 1 use of force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and

   i.  immediately following a use of force, officers, and, upon arrival, a supervisor, shall inspect and observe subjects of force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care.  This may require an officer to provide emergency first aid until professional medical care providers arrive on scene.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations for paragraph 14 after paragraph 16.**

**APD response:**  Please see APD response after paragraph 16.

**15.**  APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices.  The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units.  The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate.  The use of force policy will incorporate the use of force principles and factors Case articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations for paragraph 14 after paragraph 16.**

**16.** In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below.  The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | P     | S     | S      | S      | S      | P      |

**Recommendations for Paragraphs 14 – 16:**
**4.7.1-3a:**  Complete a full assessment of training requirements identified as out of compliance in IMR-13, and devise a clear, concise plan of action, including goals and milestones, designed to remediate lapses in training, and submit that plan to the monitor for comment.

**APD Response:**   The Performance Metrics Unit (PMU) began audit testing in April 2021 to address areas of risk surrounding potential unreported uses of force.  Audit testing consists of assessing skills, evaluating data, and methodology development.    Both IMR-13 and APD's Gap Analysis by AH Datalytics, recommended that PMU review calls for service where an individual was charged with resisting arrest, but no accompanying use of force report was found.  PMU receives a report from IAFD monthly that includes a list of all individuals charged with resisting arrest or assault on police officer and no accompanying use of force report.  Auditors review OBRD video(s) to identify potential unreported uses of force on individuals. Before PMU can begin an inspections pilot, APD needs to address policy gaps.  APD is in the process of addressing the policy gap surrounding the notification of unreported uses of force.   A special order has been drafted and is in the approval stage. Once that is approved, PMU will begin the inspections pilot.

Additionally, the AH Datalytics Gap Analysis recommends that PMU expand inspections on use of force timeliness. Currently, PMU inspects adherence to Paragraph 53 to determine whether supervisors are submitting extension requests timely when a Level 1 use of force investigation cannot be completed within 72 hours. PMU is in the planning phase to develop a methodology to review investigative timeliness for Level 2 and Level 3 use of force.

**4.7.3b:**  Appoint an executive oversight authority at the deputy chief level to oversee implementation and evaluation of the plan of action by assessing and reporting achievement of process milestones and deliverables.
**4.7.3c:**  Ensure executive oversight of this process at the deputy chief and chief of police levels, and monitor milestone dates and product quality.

**APD Response:**  The Academy developed and presented training plans to the IMT and DOJ for their review, feedback and approval in the last reporting period. These plans included prearranged delivery methods and COVID adjustment plans.  APD also developed an online training calendar at the end of the previous reporting period, which the IMT and DOJ have access.   The calendar delivers real time updates to the academy schedule, the associated CASA paragraphs, and what aspects of training are impacted.

During this reporting period, APD appointed a Superintendent of Police Reform/Deputy Chief Administrative Officer who has executive oversight of the Training Academy's operations.

**17.** Officers shall carry only those weapons that have been authorized by the Department.  Modifications or additions to weapons shall only be performed by the Department's Armorer as approved by the Chief. APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | S      |

**Please see IMR-13 Recommendations and APD's response for paragraph 17 after paragraph 19.**

## B. Use of Firearms

**18.** Officers shall carry or use only agency-approved firearms and ammunition while on duty.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
| P     | P     |       | S     | P     | P     | P     | P     | P      | S      | S      | S      |

**Please see IMR-13 Recommendations and APD's response for paragraph 18 after paragraph 19.**

**19.** APD issued Special Order 14-32 requiring all officers to carry a Department issued handgun while on duty.  APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides:
   a. a timetable for implementation;
   b. sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period;
   c. protocols to track and control the inventory and issuance of handguns.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations for Paragraphs 17-19:**
**4.7.4-6a:** Move forward with established plans regarding execution and reporting of inspections results and documentation and evaluation of remedial measures implemented.

**APD Response:**  Improvements were made to the sergeant's monthly line inspection form in APD's software system.  These improvements include auto populating the employee information, their assigned weapon information, and their current qualification with each assigned weapon.  There are queries for management to view line inspection reports.  These improvements aide in alleviating issues and concerns with officers carrying the authorized firearms and the reduction of human entry errors.

As a second level of review, a process was developed for lieutenants to verify sergeants are visually inspecting firearms and ammunition during the monthly line inspection.  A pilot process ran from January 2021 through March 2021 in the Valley Area Command and SOD.  The lieutenants from the testing divisions

were required to visually inspect firearms and ammunition of two officers per month for each sergeant assigned to their Watch/Section. The Compliance and Oversight Division (COD) Lieutenant reviewed the results of the monthly inspections. One hundred percent compliance was reached during the pilot phase illustrating an improvement in the line inspection process. The lieutenant inspection of weapons and ammunition is a second level review to ensure officers are carrying agency approved firearms and ammunition. The process was incorporated into SOP 3-30 Line Inspections and a Special Order was developed in order to move the process forward pending the revision of the policy. The Special Order is in the approval stage with the IMT and DOJ. Once approved, the Lieutenant Weapon Inspection will be implemented department-wide.

The Enterprise Learning Management (ELM) system was modified to capture pertinent information regarding firearm remedial qualifications. The modifications allow APD to create reports, summarize and analyze data, make policy and training decisions based on that data, and locate and analyze firearms remedial information. A close out document of remedial firearms training information was prepared by academy staff. This information will be analyzed to determine if changes to policy or training need to occur.

**20.** Officers shall be required to successfully qualify with each firearm that they are authorized to use or carry on-duty at least once each year. Officers who fail to qualify on their primary weapon system shall complete immediate remedial training. Those officers who still fail to qualify after remedial training shall immediately relinquish APD-issued firearms on which they failed to qualify. Those officers who still fail to qualify within a reasonable time shall immediately be placed in an administrative assignment and will be subject to administrative and/or disciplinary action, up to and including termination of employment.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       | P     |       |       | P     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations for paragraph 20.**

**APD Response:** The Academy continues to require annual firearms qualifications and to improve process to ensure information is clear for reporting and transparency. Firearms qualifications took place in March and April of this year and 98.42% of active sworn officers were qualified on their primary weapon system at that time. Training sessions continue at this time for those who were not able to attend in March and April and those officers returning from leave such as military or medical leave will complete their training before they return to duty.

**21.** APD training shall continue to require and instruct proper techniques for unholstering, drawing, or exhibiting a firearm.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       | P     |       | P     | P     | P     | P     | S     | S      | O      | O      | P      |

**Please see IMR-13 Recommendation for paragraph 21 after paragraph 22.**

**APD Response:**  The basic firearms block of instruction continues to cover proper techniques for un-holstering, drawing, or exhibiting a firearm, which are reinforced in all other firearms training that is conducted.  The annual firearms qualifications include techniques in firearms holstering, drawing and exhibiting a firearm.  Officers must use these techniques throughout the firearms qualification.

**22.**  APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another person, and such action is necessary for self-defense, defense of other officers, or to protect another person.  Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | P     | S     | P     | P     | P     | S     | S      | O      | O      | P      |

**IMR-13 Recommendation for paragraph 21 and 22:**
**4.7.8-9a:** Complete required Tier 4 and annual Use of Force training.

**APD Response:**  Tier 4 Use of Force training has been scheduled to be completed December 2021, and will include classroom instruction, known high-risk traffic stop training and practice, Taser 7 re-certification, Defensive Tactics review and two new scenarios.

**23.** APD shall track all critical firearm discharges.  APD shall include all critical firearm discharges and discharges at animals in its Early Intervention System and document such discharges in its Use of Force Annual Report.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | P      | P      | S      |

**IMR-13 Recommendations:**
**4.7.10a:** Cycle forward 2020 data related to Paragraph 23 to ensure the Annual Use of Force Report remains up to date.

**APD Response:**    APD tracks all firearm discharges to include firearm discharges at animals in its annual force report. The PEMS does track firearm discharges within the Early Intervention System (EIS).

The EIS captures paragraph 23 information in two ways:  1) Under the use of force performance measure for any event that was considered a use of force and 2) Under the complaints against officers' performance measure for any incident that violated SOP 3-46.

## C. Electronic Control Weapons

**24.** ECWs shall not be used solely as a compliance technique or to overcome passive resistance.  Officers may use ECWs only when such force is necessary to protect the officer, the subject, or another person from physical harm and after considering less intrusive means based on the threat or resistance encountered.

Officers are authorized to use ECWs to control an actively resistant person when attempts to subdue the person by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the person within contact range.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | S     | S      | O      | O      | S      |

**IMR-13 Recommendations:**

**4.7.11a:** APD should assess the data related to out-of-policy ECW applications by implementing a detailed review of a broader sample of ECW applications and identifying the top five reasons/fact patterns leading to out-of-policy applications. Once those reasons are identified, determine if individual or broad-scale interventions are necessary.

**4.7.11b:** Once the determination of intervention type is made, plan, organize, deliver and assess if the intervention has been effective.

**4.7.11c:** Continue this process until out-of-policy ECW applications are less than five percent of all ECW applications.

**APD Response:**  Data for out of policy ECW deployments is gathered in IAFD. A method to evaluate this data needs to be developed in conjunction with IAFD and COD. Once this method is developed a plan of action for training would need to be evaluated.

**25.** Unless doing so would place any person at risk, officers shall issue a verbal warning to the subject that the ECW will be used prior to discharging an ECW on the subject.  Where feasible, the officer will defer ECW application for a reasonable time to allow the subject to comply with the warning.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | S     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:**  APD continues to allow necessary time for subjects to comply with officer requests prior to deployment of the ECW.  Officers use verbal advisements when feasible to allow individuals to comply with their orders prior to ECW deployment.  APD does have this requirement included in use of force investigations.

**26.** ECWs will not be used where such deployment poses a substantial risk of serious physical injury or death from situational hazards, except where lethal force would be permitted.  Situational hazards include falling from an elevated position, drowning, losing control of a moving motor vehicle or bicycle, or the known presence of an explosive or flammable material or substance.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:**  APD remains in operational compliance for these requirements.  Situational hazards are included in the use of force investigations involving an ECW.

**27.** Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff a subject under power.  Officers shall be trained to attempt hands-on control tactics during ECW applications, including handcuffing the subject during ECW application (i.e., handcuffing under power).  After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.  Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury.  Officers shall also weigh the risks of subsequent or continuous cycles against other force options.   Officers shall independently justify each cycle or continuous cycle of five seconds against the subject in use of force reports.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | S     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:**   APD remains in operational compliance for these requirements.  Continuous ECW cycles are included in the use of force investigations involving an ECW.

**28.** ECWs shall not be used solely in drive-stun mode as a pain compliance technique.  ECWs may be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject, so that officers can consider another force option.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:**   APD remains in operational compliance for these requirements.  This requirement is included in ECW use of force investigations.

**29.** Officers shall determine the reasonableness of ECW use based upon all circumstances, including the subject's age, size, physical condition, and the feasibility of lesser force options.  ECWs should generally not be used against visibly pregnant women, elderly persons, young children, or visibly frail persons.  In some cases, other control techniques may be more appropriate as determined by the subject's threat level to themselves or others.  Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | S     | S      | O      | O      | S      |

**IMR-13 Recommendations:**
**4.7.16a:** Review a broader sample of ECW usages to determine the effective rate of failure and the causes of those failures, e.g., policy, training, supervision, etc.
**4.7.16b:** Address the top five reasons for failure by appropriate means (individual counseling and retraining, roll-call training).

**APD Response:** The data for failure rate and ECW misses is collected during the use of force investigation. APD is developing a method to evaluate the data in order to meet the requirements outlines in paragraph 29.

**30.** Officers shall not intentionally target a subject's head, neck, or genitalia, except where lethal force would be permitted, or where the officer has reasonable cause to believe there is an imminent risk of serious physical injury.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:** APD remains in operational compliance for these requirements. This requirement continues to be included in use of force investigations.

**31.** ECWs shall not be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and if lesser attempts of control have been ineffective.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response**: APD remains in operational compliance for these requirements. Use of force investigations include the use of ECWs on handcuffed subjects.

**32.** Officers shall keep ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | S     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:** APD officers are taught in the Training Academy the specifics of the duty belt and where weapons are to be placed. In compliance with paragraph 32, officer ECW's are held in their holster, on

their weak side as required in SOP 2-54. Verification of compliance is also captured on the monthly line inspection form by supervisors.

**33.** Officers shall receive annual ECW certifications, which should consist of physical competency; weapon retention; APD policy, including any policy changes; technology changes; and scenario- and judgment-based training.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:** In compliance with paragraph 33, APD officers who are assigned an ECW attended the first portion of the re-certification for ECW's in March of 2021 during a 10 hour in-person training. There were a total of 897 officers training during this portion of the ECW re-certification. This accounts for over 95 percent of APD officers. This number also included the Prisoners Transport Officers who also carry ECWs. Officers not recertified were either on FMLA or on military leave. The second portion of the re-certification of the ECW is included in day two of Tier 4 training.

**34.** Officers shall be trained in and follow protocols developed by APD, in conjunction with medical professionals, on their responsibilities following ECW use, including:
   a. removing ECW probes, including the requirements described in Paragraph 35;
   b. understanding risks of positional asphyxia, and training officers to use restraint techniques that do not impair the subject's respiration following an ECW application;
   c. monitoring all subjects of force who have received an ECW application while in police custody; and
   d. informing medical personnel of all subjects who: have been subjected to ECW applications, including prolonged applications (more than 15 seconds); are under the influence of drugs and/or exhibiting symptoms associated with excited delirium; or were kept in prone restraints after ECW use.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:** Sworn officers are trained as cadets in the Academy, and during the annual re-certification class as stipulated in the CASA and in SOP 2-54 Intermediate Weapons Systems.

**35.** The City shall ensure that all subjects who have been exposed to ECW application shall receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will only be removed from a subject's skin by medical personnel.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:** APD remains in operational compliance for this paragraph. This requirement is included in use of force investigations.

**36.** Officers shall immediately notify their supervisor and the communications command center of all ECW discharges (except for training discharges).

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:** APD remains in operational compliance for this paragraph. Per SOP 2-56, officers must notify supervisors in all instances of ECW deployment, to include accidental discharges. Supervisors respond to the scene to investigate.

**37.** APD agrees to develop and implement integrity safeguards on the use of ECWs to ensure compliance with APD policy. APD agrees to implement a protocol for quarterly downloads and audits of all ECWs. APD agrees to conduct random and directed audits of ECW deployment data. The audits should compare the downloaded data to the officer's use of force reports. Discrepancies within the audit should be addressed and appropriately investigated.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:** APD remains in operational compliance for this paragraph. APD conducts quarterly ECW downloads and audits are conducted to monitor ECW compliance.

**38.** APD agrees to include the number of ECWs in operation and assigned to officers, and the number of ECW uses, as elements of the Early Intervention System. Analysis of this data shall include a determination of whether ECWs result in an increase in the use of force and whether officer and subject injuries are affected by the rate of ECW use. Probe deployments, except those described in Paragraph 30, shall not be considered injuries. APD shall track all ECW laser painting and arcing and their effects on compliance rates as part of its data collection and analysis. ECW data analysis shall be included in APD's Use of Force Annual Report.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | S      |

**IMR-13 Recommendations:**

**4.7.25a1:** We highly recommend that APD continue to involve the monitoring team in its ECW-reporting, planning and implementation processes.  APD advises that it has been incapable, in the past, of finding an external vendor capable of meeting its EIS requirements and has decided to craft its own system.  At this time, this continues to be a work in progress. This process has trundled onward for six years without substantial success.

**APD Response:**

APD has an early intervention policy and program that was approved by DOJ and the IMT which went into effect in October 2017.  APD realized that there was a need to have personnel solely responsible for an early intervention program and a unit was created and dedicated to early intervention in Summer 2018. This unit began researching potential systems to improve upon the current program.  Many vendors and off-the-shelf products exist; however, all the requirements needed were not included and many not customizable.

In 2019, APD began advertising for a comprehensive system that would include many modules in one system, to include early intervention.  In the meantime, while a vendor was being selected and contracted, APD began researching, developing and testing a system in-house to fill the gaps of missing requirements components.  APD created an early intervention program called the Performance Evaluation and Management System (PEMS) which will be incorporated as a separate module with Benchmark Analytics. The PEMS policy and training has been approved by the IMT and DOJ with training scheduled to begin in August 2021.

Once Benchmark is launched it will collect data migrated from multiple City data collection sources and will provide APD the ability to analyze and operationalize officer-related performance data to include the requirements of paragraph 38.  The PEMS module in the Benchmark system is expected to launch in 2022. APD will continue to work with the DOJ and the IMT for these processes.

**4.7.25a2:** APD must identify reasonable timelines for the process, defining step- by-step processes and dates of expected completion of those processes; identifying key milestones and task responsibilities due dates; define operational systems to be developed, with key milestones for each involved systems; and clearly articulate who is responsible for each pending action. Bi-annual reports should be published that identify the status for each key milestone. When milestones are missed, complete documentation of why, who was responsible, and anticipated length of the delay caused by missing the milestone deadlines should be reported.
**4.7.25a3:** Quarterly reports should be provided to the Chief of Police and the monitor updating project progress, i.e., objectives due for the quarter; objectives accomplished for the quarter; problems, issues, needs and solutions designed to move forward on a specific timeline.

**APD Response:**  Currently APD collects various categories of force data including ECW's in operation and the number and type of interactions, however, analyzing and drawing critical solutions regarding ECW use has proven challenging. APD continues to work with the IMT and DOJ to address these recommendations in order to meet the requirements of paragraph 38.

At the recommendation of the IM, the Chief, IM and the DOJ have had update meetings beginning August 2021 to work through challenges APD is experiencing while attempting to meet requirements not yet in operational compliance.  The first focus is PEMS which will include the action plan and progress, identifying step-by-step milestones with proposed and actual start and end dates to manage the progress of projects. APD has utilized action plans since 2018; however, want to incorporate the feedback by the IMT and DOJ into this process.

## D. Crowd Control and Incident Management

**39.** APD shall maintain crowd control and incident management policies that comply with applicable law and best practices.  At a minimum, the incident management policies shall:
   a.  define APD's mission during mass demonstrations, civil disturbances, or other crowded situations;
   b.  encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses;
   c.  require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and
   d.  continue to prohibit the use of canines for crowd control.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | P      | P      | P      |

**Please see recommendations and APD Response after Paragraph 40.**

**40.** APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       | P     | P     | P     | P     | P     | P     | P     | P      | P      | P      | P      |

**IMR-13 Recommendations for Paragraphs 39 and 40:**
**2.7.26-27a:** APD must develop and deliver a meaningful training program to its ERT and Field Services members that is centered on crowd control policies. That training should include scenarios, practical exercises, and lessons learned from previous APD responses to events. Training must meet the instructional objectives documented within APD lesson plans. Training should incorporate lessons learned from recent ERT activations and contemplate best practices developed by police agencies facing similar social unrest across the country.
**4.7.26-27b:** APD must continue to ensure its After-Action Reports follow a standard structure and include mechanisms for communicating needed revisions to policy, training, or operational rubric within the agency. We encourage APD's ERT Commanders to review past reports and to incorporate AAR procedures and forms (previously agreed upon) into SOPs.
**4.7.26-27c:** Any recommendations made from After-Action reporting should follow a logical and repetitive cycle wherein APD can demonstrate it adequately "closes the loop" on lessons learned.

**4.7.26-27d:** APD should continue its effort to coordinate with IAFD to devise workable solutions to ensure reasonable and timely use of force reporting and investigations occur in circumstances where multiple planned and unplanned protests are being addressed. Solutions should be advanced to the monitoring team in the form of Special Orders and/or SOP revisions related to the proper investigation of uses of force during mass gatherings.

**4.7.26-27e:** ERT should continue to work with SOD to create a schedule for routine multi-disciplinary training. The training should be coordinated with the Academy and there include standards of curriculum development.

**4.7.26-27f:** ERT should address standard language contained within Event Plans regarding when the use of 40mm munitions is authorized to provide the proper context and ensure erroneous uses of 40mm munitions do not occur.

**APD Response:**

Curricula for ERT training is in the final development stage with the Training Academy.  Stage one training will be through a video distributed on PowerDMS for the department to view and have for reference.  This information will be updated as needed.  Stages two and three will be combined to ensure all ERT personnel and supervisors understand roles and responsibilities, instructional objectives, tactics, maneuvers, scenarios and lessons learned from previous responses.  This training is scheduled to be completed by the end of 2021.

After Action Reports (AAR), and ERT forms, follow a standard structure and are housed in the ERT manual which is updated on a quarterly basis. The ERT manual is noted in the ERT policy and reviewed on a yearly basis.

Recommendations that come out of AARs are included in the ERT newsletter and incorporated into ERT quarterly trainings to ensure communication across the teams and adequately "closes the loop".

In January 2021 an inter-office memo was created by ERT/IAFD/SOD in response to IMR recommendation 4.7.26-27d outlining the efforts to coordinate workable solutions ensuring timely use of force reporting and investigations occur.  This memo is stipulated in a special order and will be incorporated into the ERT policy during policy review beginning in August 2021.  As mentioned in the memo, ERT/SOD trainings will be scheduled by the end of 2021 and maintained on a regular schedule going forward.

Language contained in the event plans regarding 40mm munitions has been standardized and defined in detail to minimize confusion.


## E.  Use of Force Reporting

**Recommendations and responses for paragraphs 41-58 are below after paragraph 58.**

**41.** Uses of force will be divided into three levels for reporting, investigating, and reviewing purposes.  APD shall develop and implement a use of force reporting policy and use of force report form that comply with applicable law and comport with best practices.  The use of force reporting policy will require officers to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force.  Personnel who have knowledge of a use of force by another officer will immediately report the incident to an on-duty supervisor.  This reporting requirement also applies to off-duty officers engaged in enforcement action.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**42.** The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the supervisor conducting the review or the APD officer conducting the investigation.  The written or recorded narrative will include:
   a. a detailed account of the incident from the officer's perspective;
   b. the reason for the initial police presence;
   c. a specific description of the acts that led to the use of force including the subject's behavior;
   d. the level of resistance encountered; and
   e. a description of each type of force used and justification for each use of force.  Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**43.** Failure to report a use of force or prisoner injury by an APD officer shall subject officers to disciplinary action.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**44.** APD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force.  The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility.  The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**45.** APD shall require officers to activate on-body recording systems and record all use of force encounters. Consistent with Paragraph 228 below, officers who do not record use of force encounters shall be subject to discipline, up to and including termination.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | P     | P     | P     | P     | P      | P      | S      | S      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

## F. Force Reviews and Investigations

**46.**  The three levels of use of force will have different kinds of departmental review.  All uses of force by APD shall be subject to supervisory review, and Level 2 and Level 3 uses of force are subject to force investigations as set forth below.  All force reviews and investigations shall comply with applicable law and comport with best practices.  All force reviews and investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**47.** The quality of supervisory force reviews shall be taken into account in the performance evaluations of the officers performing such reviews.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**APD Response:**   Significant progress was accomplished during this reporting period specific to paragraph 47. SOP 3-32 Employee Work Plan/Performance Evaluations is in the process of being amended to create a formal auditing procedure to ensure compliance with this paragraph.  While the SOP is being revised, a special order was published for department personnel in order to start a pilot program.  The process involves performance documents being selected for random audits when personnel have violations of SOP 2-57, Use of Force Review and Investigation by Department Personnel.  Any document selected for the audit will be sent to the employee's commander to ensure the use of force investigation was noted in the evaluation.  Additionally, a "how-to" guide was provided to all commanders to assist them.

The audit process, as part of the pilot program, was conducted on performance evaluations for the recent reporting period ending in June 2021.  The program will stay in the pilot stage until the end of August 2021. The entire process should be ready for full implementation for Checkpoint 1 of the new performance cycle.

**48.** APD agrees to develop and implement force classification procedures that include at least three categories of types of force that will determine the force review or investigation required. The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force. The goal is to promote greater efficiency and reduce burdens on first-line supervisors, while optimizing critical investigative resources on higher-risk uses of force. The levels of force are defined as follow:

    a.   Level 1 is force that is likely to cause only transitory pain, disorientation, or discomfort during its application as a means of gaining compliance. This includes techniques which are not reasonably expected to cause injury, do not result in actual injury, and are not likely to result in a complaint of injury (i.e., pain compliance techniques and resisted handcuffing). Pointing a firearm, beanbag shotgun, or 40 millimeter launcher at a subject, or using an ECW to "paint" a subject with the laser sight, as a show of force are reportable as Level 1 force. Level 1 force does not include interaction meant to guide, assist, or control a subject who is offering minimal resistance.

    b.   Level 2 is force that causes injury, could reasonably be expected to cause injury, or results in a complaint of injury. Level 2 force includes use of an ECW, including where an ECW is fired at a subject but misses; use of a beanbag shotgun or 40 millimeter launcher, including where it is fired at a subject but misses; OC Spray application; empty hand techniques (i.e., strikes, kicks, takedowns, distraction techniques, or leg sweeps); and strikes with impact weapons, except strikes to the head, neck, or throat, which would be considered a Level 3 use of force.

    c.   Level 3 is force that results in, or could reasonably result in, serious physical injury, hospitalization, or death. Level 3 force includes all lethal force; critical firearms discharges; all head, neck, and throat strikes with an object; neck holds; canine bites; three or more uses of an ECW on an individual during a single interaction regardless of mode or duration or an ECW application for longer than 15 seconds, whether continuous or consecutive; four or more strikes with a baton; any strike, blow, kick, ECW application, or similar use of force against a handcuffed subject; and uses of force resulting in a loss of consciousness. As set forth in Paragraphs 81-85 below, APD shall continue to participate in the Multi-Agency Task Force, pursuant to its Memorandum of Understanding, in order to conduct criminal investigations of at least the following types of force or incidents:

        i.   Officer-involved shootings;

        ii.   Serious uses of force as defined by the Memorandum of Understanding;

        iii.   In-custody deaths; and

        iv.   other incidents resulting in death at the discretion of the Chief.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**49.** Under the force classification procedures, officers who use Level 1 force shall report the force to their supervisor as required by Paragraph 42; Level 1 uses of force that do not indicate apparent criminal conduct by an officer will be reviewed by the chain of command of the officer using force. Level 2 and 3 uses of force shall be investigated by the Internal Affairs Division, as described below. When a use of force or other incident is under criminal investigation by the Multi-Agency Task Force, APD's Internal Affairs Division will conduct the administrative investigation. Pursuant to its Memorandum of Understanding, the Multi-Agency Case Task Force shall periodically share information and coordinate with the Internal Affairs

Division, as appropriate and in accordance with applicable laws, to ensure timely and thorough administrative investigations of uses of force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

## F1. Supervisory Force Reviews

50. The supervisor of an officer using force shall respond to the scene of all Level 1, 2, and 3 uses of force to ensure that the use of force is classified according to APD's force classification procedures.  For Level 2 and Level 3 uses of force, the supervisor shall ensure that the Force Investigation Section of the Internal Affairs Division is immediately notified and dispatched to the scene of the incident to initiate the force investigation.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

51. A supervisor who was involved in a reportable use of force including by participating in or ordering the force being reviewed, shall not review the incident or use of force reports for approval.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

52. For all supervisory reviews of Level 1 uses of force, the supervisor shall:
   a. respond to the scene and immediately identify the officer(s) involved in Level 1 use of force;
   b. review the involved officer's lapel video, determining whether the incident involves a Level 1 use of force;
   c. review the lapel video of other officers on-scene where uncertainty remains about whether the incident rises to a Level 2 or Level 3 use of force;
   d. examine personnel and the subject for injuries and request medical attention where appropriate;
   e. contact the Internal Affairs Division to conduct a Level 2 or Level 3 use of force investigation if lapel video does not affirm a Level 1 use of force;
   f. gather any evidence located at the scene of the Level 1 use of force;
   g. capture photographs of the officer(s) and subject involved in the Level 1 use of force;
   h. require the submission of a use of force report from the involved officer by the end of shift; and
   i. conduct any other fact-gathering activities while on-scene, as necessary, to reach reliable conclusions regarding the officer's use of Level 1 force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**53.** Each supervisor shall complete and document a supervisory force review of a Level 1 use of force within 72 hours of the use of force.  Any extension of this 72-hour deadline must be authorized by a Commander. This review shall include:
   a. all written or recorded use of force narratives or statements provided by personnel or others;
   b. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report shall specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why.  The report should also include all available identifying information for anyone who refuses to provide a statement;
   c. the names of all other APD employees witnessing the use of force;
   d. the supervisor's narrative evaluating the use of force, based on the supervisor's analysis of the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques and
   e. documentation that additional issues of concern not related to the use of force incident have been identified and addressed by separate memorandum.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | O     | P     | P      | O      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**54.** Upon completion of the review, the reviewing supervisor shall forward the review through his or her chain of command to the Commander, who shall review the entry to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard.  The Commander shall order additional review when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  These reviews shall be completed electronically and tracked in an automated database within the Internal Affairs Division.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**55.** Where the findings of the supervisory review are not supported by a preponderance of the evidence, the supervisor's Commander shall document the reasons for this determination and shall include this documentation as an addendum to the original review.  The supervisor's superior shall take appropriate

action to address the inadequately supported determination and any deficiencies that led to it. Commanders shall be responsible for the accuracy and completeness of the Level 1 force reviews prepared by supervisors under their command.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**56.** Where a supervisor repeatedly conducts deficient supervisory force reviews, the supervisor shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or removal from a supervisory position in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules. Whenever a supervisor or Commander finds evidence of a use of force indicating apparent criminal conduct by an officer, the supervisor or Commander shall suspend the supervisory force review immediately and notify the Internal Affairs Division and the Chief. The Force Investigation Section of the Internal Affairs Division shall immediately initiate the administrative and criminal investigation.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**57.** When the Commander finds that the supervisory force review is complete and the findings are supported by the evidence, the file shall be forwarded to the Performance Review Unit of the Compliance Bureau. The Performance Review Unit shall review the supervisory force review to ensure that it is complete and that the findings are supported by the evidence. The Performance Review Unit shall ensure that the file is forwarded to the Internal Affairs Division for recordkeeping. Where the Performance Review Unit of the Compliance Bureau determines that a supervisory force review, which has been completed by the supervisor and reviewed by the chain of command, is deficient, the Performance Review Unit shall forward the review to the supervisor for correction. Any performance deficiencies in the investigation or review will be noted in the affected Commander's performance records.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | S      | S      | S      | P      |

**Please see IMR-13 Recommendations and APD's Response after paragraph 58.**

**58.** At the discretion of the Chief, a supervisory force review may be assigned or reassigned to another supervisor, whether within or outside of the Command in which the incident occurred, or may be returned to the original supervisor for further review or analysis. This assignment or re-assignment shall be explained in writing.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**IMR-13 Recommendations for paragraphs 41-58:**

**4.7.45a:** APD should conduct a comprehensive review of extant processes designed to meet the requirements of the CASA regarding paragraphs 41-58 and ensure that operations personnel are processing force-review functions in a meaningful and forthright manner.

**APD Response:**   In October 2020, APD began working with the DOJ and the IMT on the Joint Motion for Entry of Stipulated Order Establishing an External Force Investigation Team (Case 1:14-cv-01025-JB-SMV Document 692) which was filed with the Court on February 5, 2021 (See Appendix 2). The joint motion was developed to "require the City to establish, on a temporary basis, an External Force Investigation Team (EFIT) to assist the Albuquerque Police Department (APD) in conducting investigations of Level 2 and Level 3 uses of force by APD officers, while also assisting APD with improving the quality of its force investigations."  The goals of the joint stipulated order were, "to make immediate improvements in the quality and timeliness of investigations of Level 2 and Level 3 uses of force; to ensure that APD can hold officers accountable when they violate APD policies during force incidents; and to make significant, durable improvements in APD's systems for investigating Level 2 and Level 3 uses of force.

By the end of April 2021, the City had advertised a Request for Letters of Interest outlining requirements for potential vendors, worked closely with the DOJ in the selection process, and selected a vendor.  DLG, LLC Accounting and Advisory Services was selected as the External Force Investigation Team (EFIT).  EFIT is designed to assist, evaluate and provide guidance to IAFD personnel.  EFIT's work will be evaluated by the IMT and DOJ for the duration of the contract term, which is through April 2022.  Documenting the use of force investigative process was included in the stipulated order.

In February 2021, a commander was temporarily assigned to IAFD and was aware of the need to document the investigative process.  While APD had previously developed process maps of use of force investigative processes, that process map obtained limited information and was in need of improvement.  IAFD and IAPS commanders began working with the IMT to outline a more detailed process for use of force investigations, to include any misconduct that occurred in the course of those investigations.  This continued once EFIT was on board in April 2021.  The process was refined, approved by the IMT and DOJ, and filed with the Court in July 2021.  This process will likely be further revised upon the identification of areas of improvement in the investigative process.

In preparation for the June 2021 site visit and at the recommendation of the IMT, APD developed a force investigation review process to measure if the investigation and its review met the requirements outlined in the CASA.  During the site visit, a case was introduced using this approach and appears to be a positive tool for APD to prove compliance in a meaningful way and clear manner, illustrating that APD understands the requirements of the CASA which it is evaluated for compliance.

**4.7.45b:**   Timelines must be established for effective investigations that will meet the requirements for efficient discipline viz a viz the APOA contract.

**APD Response:**   As outlined in IMR-13, APD was not meeting use of force investigative timelines.  One of the goals outlined and required in the joint stipulated order requires that use of force investigations be

completed within sixty days. As stated earlier, the work with EFIT began in April 2021 and EFIT went live on July 16, 2021. By meeting the requirements in APD policies, APD will meet the requirements within the APOA contract and CASA as well. An additional requirement of the EFIT stipulated order is to staff IAFD with (25) force investigators in order to conduct level 2 and level 3 use of force investigations.

APD has taken numerous steps to improve the timeliness of case completion, one of those is increased staffing. APD upgraded two lieutenants to deputy commander positions in order to facilitate the closure of cases within timelines. APD created civilian investigator positions for the purpose of investigating force and misconduct cases within timelines and nine positions were opened through the City. These positions will remain open until all vacant positions are filled. Four positions were filled by July 31, 2021.

APD also opened numerous sworn investigator positions with the intent of fully staffing IAFD. When APD struggled to meet the (25) investigator requirement, both sworn and civilian, APD created positions for the Internal Affairs Force Division in the annual bid process. Seven positions were opened to the bid process which allowed officers to voluntarily bid into the division. After the bid, there were remaining vacancies and the department mandated personnel into the division to meet the staffing requirement. This, along with EFIT, will increase timely case completions.

**47.45c:** Develop an early intervention system that triggers alerts when clusters of poorly investigated use of force incidents arise, and address these issues early with Area Command staff, requiring Commanders affected to develop and implement written "Intervention Plans" designed to identify the causes of failure and remediate those causes systematically.
**4.7.45d:** Routinely monitor the intervention process for compliance with the proffered plans.

**APD Response:** APD recognizes a specific alert for deficient investigations does not exist; however, once the PEMS training is conducted and the policy is published, APD will have the ability to identify deficiencies and track performance improvement plans.

APD has received approval by the IMT and DOJ of the SOP 3-33 Performance Evaluation and Management System (PEMS) and the associated training. The CASA states that APD identifies "poorly investigated use of force incidents" and APD outlines this in policy as a deficient investigation. The PEMS policy mandates an assessment when a use of force investigation is found to be deficient. There are two ways to insure that PEMS Unit identifies any deficient investigations:

1) If IAFD or the Commander reviewing a level 1 use of force completes a request of internal affairs investigation for a deficient investigation, and they use the same SOP violation, then a data search can be utilized to find these cases.
2) Any command level officer can submit a Command-Initiated Assessment request when they identify a deficient investigation.

As previously stated, PEMS policy and training are scheduled to begin August 2021 with scheduled completion in December 2021.

**4.7.5e:** Monitor use of force incident responsibilities at the sergeant's level and ensure that sergeants who will be on leave are not assigned critical use of force incidents. APD will need to assess staffing and determine how best to handle these issues. This is another case of "a bit of forethought" helping to avoid compliance losses, as occurred during this reporting period.

**APD Response:** Currently reassignment of level 1 use of force cases are the responsibility of the chain of command investigating the use of force incident. APD will evaluate how to measure compliance to determine appropriate tracking for this requirement.

**59.** Where, after a supervisory force review, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | P      | S      | S      | P      |

**IMR-13 Recommendations:**

**4.4.46a:** APD should revisit its disciplinary practices to ensure integrity with the tenets of effective progressive discipline.

**4.4.46b:** Clarify operational process requirements of the violated policy in each and every incident of a known violation with the involved employee(s);

**4.4.46c:** Insist on consistent disciplinary decisions based on employee acts or omissions, including a table of infractions with disciplinary ranges for each potential level of infractions;

**4.4.46d:** Insist on consistency, and ensure the consistency is calibrated to the level of infractions;

**4.4.46e:** Establish an available escalation process, from minor to major interventions.

**4.4.46f:** Require appropriate escalation if given classes of infractions are repeated;

**4.4.46g:** Document all disciplinary interventions;

**4.4.46h:** Ensure that all disciplinary findings and comments fit established departmental documentation protocols.

**4.4.46i:** Include "fact statements" based on the department's investigative findings, ensuring that all infractions are clearly explained;

**4.4.46j:** Increase the corrective measures as violations are more serious;

**4.4.46k:** Provide a process in which disciplined employees are given an opportunity to respond to allegations and decisions re: discipline; and

**4.4.46l:** Follow through on consequences, e.g., establish progressive disciplinary standards, and ensure that requirements are enforced and followed up; and

**4.4.46m:** As we have advised two consecutive chiefs of police, APD should put a full-stop on holding discipline in "abeyance." Such practices hold no value except to potentially give the "appearance" of effective discipline and are in fact, in most cases, departures from the discipline matrix.

**APD Response:** APD recently revised the SOP 3-46 Discipline System which was approved by the IMT and the DOJ. The revised policy was published in July 2021. In this change, the chart of sanctions was improved to ensure the tenets of effective progressive discipline. A chart of sanctions includes disciplinary ranges for each potential level of infractions to be used for consistent disciplinary decisions. Corrective measures increase for repeated violations similar in nature and/or the seriousness of the violation. For every policy violation that occurs an Internal Affairs investigation is requested. All disciplinary interventions are documented in the misconduct case and reflected on personnel retention cards.

APD's disciplinary process includes the ability to request a pre-determination hearing for discipline that results in suspension. For those misconduct cases that do not have the pre-determination hearing, officers are required to sign their discipline memo acknowledging receipt of the violation with their supervisor.

Included in SOP 3-46 are restrictions for suspensions held in abeyance limiting the amount of time and amount that can be held in abeyance. There were no IAPS cases held in abeyance for this reporting period. It should be further noted; IAFD and IAPS will be receiving internal affairs training in August, 2021. The training specifically addresses internal investigations, interviews, documentation and other areas designed to conduct fact-based investigations.

## F2.  Force Investigations by the Internal Affairs Division

**60.** The Force Investigation Section of the Internal Affairs Division shall respond to the scene and conduct investigations of Level 2 and Level 3 uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, or uses of force reassigned to the Internal Affairs Division by the Chief.  In cases where an investigator in the Force Investigation Section initiates a Level 2 or Level 3 use of force investigation and identifies indications of apparent criminal conduct, the Section shall refer the use of force to an investigator in the Section, with no involvement in the initial administrative investigation into the Level 2 or 3 use of force, to conduct a criminal investigation. The criminal investigation shall remain separate from and independent of any administrative investigation. In instances where the Multi-Agency Task Force is conducting the criminal investigation of a use of force, the Internal Affairs Division shall conduct the administrative investigation.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
**4.7.47a:**  Conduct a complete review of recent IA case investigations and identify all similar or related violations of the CASA. Where appropriate, re-open and re-investigate those cases;
**4.7.47b:**  Organize from that review, a list of behaviors that are counter-CASA and ensure that those behaviors are restricted by a revised IA policy, detailed re-training, supervision and discipline.

**APD Response:**  IAFD pulls weekly cases for review prior to submission to the Force Review Board (FRB). After the cases are pulled for investigation and presentation, any identified misconduct is reported and investigated per policy and any out of policy force is identified and addressed.   The case is then presented to the FRB who may identify additional misconduct or out of policy force.  The FRB may then make a referral for further investigation and/or, re-training of the individual(s). IAFD is in process of developing a matrix capable of identifying deficient investigations and processes are in development to re-integrate these findings back into training and the on-boarding of detectives.  However, as discussed with the IMT and DOJ, the purpose of FRB is and has always been to develop policy and training recommendations, rather than to initiate new discipline cases or re-start investigations that have been completed.

IAFD collects and reports on all policy violations identified in the course of any use of force investigation. APD does need to improve upon how to use that data to effect policy, training, supervision and discipline. APD, through the FRB, does review and evaluate case investigations.  Many times, the FRB has identified policy violations not identified in the original investigation, training needs, policy deficiencies and refer for corrective action once those identifications are made.  There is an opportunity for other areas within APD to drive the same organizational change.   There have been referrals made for CASA-centric concerns such as search and seizure training and a policy revision for de-escalation.

**61.** The Force Investigation Section of the Internal Affairs Division will be responsible for conducting both criminal and administrative investigations, except as stated in Paragraph 60.  The Force Investigation Section of the Internal Affairs Division shall include sufficient personnel who are specially trained in both criminal and administrative investigations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.48a:**   Continue to self-monitor the progress of Internal Affairs in conducting effective intake, assessment, assignment, investigation, and resolution processes for criminal and civil investigations in order to ensure that staffing levels are appropriate and processes are effective in producing acceptable and timely results.

**APD Response:**  IAFD does not conduct criminal investigations into use of force incidents.  When a case is identified with apparent criminal misconduct, IAFD makes a referral to the Multi-Agency Task Force to conduct the criminal investigation.  On February 5, 2021 the stipulated order previously discussed was filed with the court.  The stipulated order requires APD to staff IAFD to at least twenty-five force investigators.  APD continues to work towards achieving the required (25) investigators.  This increase in staffing in conjunction with the implementation of EFIT are likely to produce effective, acceptable and timely results.

**62.** Within six months from the Operational Date, APD shall revise the Internal Affairs Division manual to include the following:
   a. definitions of all relevant terms;
   b. procedures on report writing;
   c. procedures for collecting and processing evidence;
   d. procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;
   e. procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;
   f. scene management procedures; and
   g. management procedures.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.49a:**   Continue work on revision and update of the IAB manuals, ensuring they comply with the updated CASA, the new use of force policies that became operational on January 11, 2020, as well as the new investigation procedures for Level 1, 2, and 3 uses of force, and known best practices in the field.

**APD Response:**  APD continues to revise the IAFD manual to ensure the manual includes the requirements outlined in the IMT recommendation.  As IAFD develops and conducts training, the manual is being revised to reflect those improvements and changes.   For example, the interview portion of IAFD's 40-hour investigator training was conducted on June 15, 2021, and that information was included in the revised manual.  The remainder of the training topics (report writing, collecting and processing evidence, separation of criminal and administrative investigations, case law, scene management, management procedures, and relevant terms) are in the curriculum development process at the Training Academy.   Ultimately, the training will have four phases.  The IAFD manual will align with the training topics, APD policies, Level 1, 2, and 3 uses of force procedures, and best practices in the field.

**63.** Within 39 months from the Operational Date, APD shall ensure that there are sufficient trained personnel assigned to the Internal Affairs Division and Force Investigation Section to fulfill the requirements of this Agreement.  APD shall ensure that all Level 2 and Level 3 uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary.  At the discretion of the Chief, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Division or Force Investigation Section.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
4.7.50a: Identify the department's expected milestone date for staffing at IAD based on data related to incoming cases, average time for case completion, and calculations of the number of staff needed to effectively investigate incoming cases within established parameters.

**APD Response:**  On February 5, 2021 a Stipulated Order was filed in U.S. District Court requiring the City to establish, on a temporary basis, an External Force Investigation Team (EFIT) to assist the APD in conducting investigations of Level 2 and Level 3 uses of force by APD officers, while also assisting with improving the quality of Internal Affairs (IA) force investigations.  The EFIT investigators will be on-site and accompanying the IAFD investigators to crime scenes; coaching and mentoring them throughout the force investigation.

**64.** Before performing force investigations, Force Investigation Section personnel shall receive force investigation training that includes, at a minimum, the following areas:  force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques.   Force Investigation Section personnel shall also receive force investigation annual in-service training.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | O     | O      | O      | O      | S      |

**IMR-13 Recommendations:**

**4.7.51a:** Modify the 40-hour training program for IAFD investigators and supervisors that was reviewed during this reporting period and make the appropriate revisions based upon the written and oral feedback on the program provided by the monitoring team.

**4.7.51b:** Modify the 40-hour training program for IAFD investigators and supervisors based upon the monitor's critical assessment of IAFD investigations and supervisory reviews provided in this report.

**APD Response:**  Ten hours of the forty hours has been approved by the monitoring team, and the training was conducted in June 2021.  The remaining thirty hours are in development and will be sent to the IMT and DOJ for final approval.

Included in the stipulated order is the requirement to contract with an outside vendor to work with IAFD and the Training Academy to "develop and provide training to IAFD personnel on conducting high-quality and timely force investigations".  The contract is being finalized and APD looks forward to receiving dedicated assistance in use of force investigation training development and implementation.

**65.** Where appropriate to ensure the fact and appearance of impartiality and with the authorization of the Chief, APD may refer a use of force indicating apparent criminal conduct by an officer to the Multi-Agency Task Force for criminal investigation.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**66.** To ensure that criminal and administrative investigations remain separate, APD's Violent Crimes Section may support the Force Investigation Section of the Internal Affairs Division or the Multi-Agency Task Force in the investigation of any Level 2 or Level 3 use of force, as defined by this Agreement, including critical firearm discharges, in-custody deaths, or police-initiated actions in which a death or serious physical injury occurs.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**67.** The Chief shall notify and consult with the District Attorney's Office, the Federal Bureau of Investigation, and/or the USAO, as appropriate, regarding any use of force indicating apparent criminal conduct by an officer or evidence of criminal conduct by an officer discovered during a misconduct investigation.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  Paragraphs 65, 66, & 67 have remained in operational compliance since May 2019.

**68.** If APD initiates a criminal investigation, or where APD requests a criminal prosecution, the Force Investigation Section will delay any compelled interview of the target officer(s) pending consultation with the District Attorney's Office or the USAO, consistent with Paragraph 186.  No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | O     | P      | S      | S      | S      |

**4.7.55a:** APD should move forward with process design, policy development, and training related to investigations regarding potential criminal prosecutions and compelled interviews of officers.

**APD Response:**  The IAFD criminal investigation procedures are in the process of being added to SOP 2-56 Use of Force and IAFD Training.  The investigative process narrative that was filed with the Court in February 2021 also includes the process when potential criminal misconduct is identified that clearly separates the investigation processes.  The IAFD criminal investigation procedures are in the process of being added to SOP 2-56 Use of Force and IAFD Training to include compelled statements.

**69.** In conducting its investigations of Level 2 or Level 3 uses of force, as defined in this Agreement, the Force Investigation Section shall:
   a.  respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that the use of force has been classified according to APD's classification procedures, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;
   b.  ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;
   c.  ensure that a canvass for, and interview of, witnesses is conducted.  In addition, witnesses should be encouraged to provide and sign a written statement in their own words;
   d.  ensure, consistent with applicable law, that all officers witnessing a Level 2 or Level 3 use of force by another officer provide a use of force narrative of the facts leading to the use of force;
   e.  provide a written admonishment to involved and witness officer(s) to the use of force that they are not to speak about the force incident with anyone until they are interviewed by the investigator of the Force Investigation Section;
   f.  conduct only one-on-one interviews with involved and witness officers;
   g.  review all use of force reports to ensure that these statements include the information required by this Agreement and APD policy;
   h.  ensure that all use of force reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;
   i.  conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;
   j.  record all interviews;

k. consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible;

l. make all reasonable efforts to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or subjects; and

m. train all Internal Affairs Division force investigators on the factors to consider when evaluating credibility, incorporating credibility instructions provided to jurors.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations for Paragraphs 68 and 69:**

**4.7.56a:** Conduct detailed failure analyses for all IAFD investigations deemed improperly completed or delayed. This report provides a workable starting point for that analysis.

**4.7.56b:** Using these failure analyses, routinely modify training, procedures, practice, and supervision/oversight until IAFD findings are greater than 94 percent complete and adequate on each of the elements addressed in paragraph 69.

**4.7.56c:** Resolve IA administrative (use of force) and misconduct investigative timelines to ensure they are practicable and allow corrective and disciplinary actions to routinely occur within those timelines.

**APD Response:** EFIT started working with IAFD personnel in April 2021 and went live with their own team in July 2021. While EFIT will not conduct a failure analysis, the goal for EFIT is to assist IAFD personnel in conducting quality and timely investigations that meet the expectations of the IMT and DOJ. Part of timely and quality investigations include modifying processes, investigative planning, and direct supervision to improve overall. In addition, APD is contracting with an outside vendor that will work with both IAFD and the Training Academy to develop and conduct meaningful training to investigators.

**70.** The Force Investigation Section shall complete an initial use of force Data Report through the chain of command to the Chief as soon as possible, but in no circumstances later than 24 hours after learning of the use of force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.57a:** Conduct data analysis of Use of Force Data reports to determine why they take longer than 24 hours to process and develop recommendations to relieve the major bottlenecks affecting this process.

**APD Response:** When a use of force case is entered into BlueTeam, an email is auto-generated to the Chief of Police and Superintendent. In the last reporting period, an indicator was added to BlueTeam to track these auto-generated emails. During the current reporting period of February 1 to July 31, 2021, data was tracked and analyzed. The 24-Hour Notice to the Chief of Police and Superintendent was completed 93.1% of the time. APD will conduct further analysis to determine the reason why this requirement is not always being met and make the necessary corrections to increase the compliance rate to above 95%.

**71.** The Force Investigation Section shall complete Level 2 or Level 3 administrative investigations within three months after learning of the use of force.  Any request for an extension to this time limit must be approved by the commanding officer of the Force Investigation Section through consultation with the Chief or by the Chief.  At the conclusion of each use of force investigation, the Force Investigation Section shall prepare an investigation report.  The report shall include:

a. a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Force Investigation Section's independent review of the facts and circumstances of the incident;

b. documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying use of force Data Reports.  In situations in which there are no known witnesses, the report shall specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why.  The report should also include all available identifying information for anyone who refuses to provide a statement;

c. the names of all other APD officers or employees witnessing the use of force;

d. the Force Investigation Section's narrative evaluating the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including whether the use of force could have been avoided through the use of de-escalation techniques or lesser force options;

e. if a weapon was used by an officer, documentation that the officer's certification and training for the weapon were current at the time of the incident; and

f. the complete disciplinary history of the target officers involved in the use of force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.58a:** Conduct a review of a sample of cases completed by IAFD in the past 3-6 months that failed to meet established timelines by reviewing the key failure points causing the delay. The review should:

a. Identify key causes of failure;

b. Identify where the failure points were in the IAFD process related to Paragraph 71;

c. Identify the cause of the failures;

d. Identify who is responsible for the cause of the delays;

e. Recommend actions to remedy the top five causes of failure to meet the established timelines; and

f. Repeat this process until failures re Paragraph 71 are less than 95 percent.

**4.7.58b:** Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established timelines.

**4.7.58c:** Determine if these processes need to be revised, expanded, or refocused given our comments regarding supervisory reviews and IAFD failures contained in paragraphs 24-36, 41-59, and 60-77.

**4.7.58d:** Repeat until >94% of cases completed meet established requirements for quality of IA investigations.

**4.7.59e:** APD should carefully review the changes in its use of force policy viz a viz this paragraph to ensure that in-field systems related to this paragraph are in compliance with all aspects of the new use of force policy suite and the new IA investigations rubric.

**APD Response:**  IAFD is creating a matrix capable of identifying failure points of an investigation completed by IAFD detectives. IAFD will use the data extrapolated from the matrix to identify weaknesses in training, causes for untimely investigations and when utilized throughout the approval process, it will identify who is responsible for delays and failures in process.   The design of the Matrix utilizes CASA paragraphs associated with force in a comparative matrix designed to work side by side with the investigation, which enables the reviewer to enter a brief narrative for each paragraph completed and fulfilled by the investigation. If the paragraph data is missing or incomplete, this is captured as well as a possible deficiency and is recorded. If a deficiency is noted to be repetitive within a unit or division, this information could be utilized to improve training on systemic problems identified throughout this process. By capturing timeline data in the Matrix detailing the date and time of the force, investigation, completion and chain of command reviews, IAFD will be able to identify where any timeline issues lie, whether the investigation phase or approval phase. By adding data capture points in the Matrix, a data analyst will identify trends or weaknesses in training.  IAFD will implement the remedies identified and continue with the evaluation process to determine success and failures.  The Matrix is in the development process currently.

**72.** Upon completion of the Force Investigation Section investigation report, the Force Investigation Section investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Division.  The Internal Affairs Division commanding officer shall review the report to ensure that it is complete and that, for administrative investigations, the findings are supported using the preponderance of the evidence standard.  The Internal Affairs Division commanding officer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | S      | S      | S      |

**Please see response after paragraph 75.**

**73.** For administrative investigations, where the findings of the Force Investigation Section investigation are not supported by a preponderance of the evidence, the Internal Affairs Division commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report.  The commanding officer of the Internal Affairs Division shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it.  The Internal Affairs Division commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Division.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | S      | S      | S      | S      |

**Please see response after paragraph 75.**

**74.** Where a member of the Force Investigation Section repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal

from the Force Investigation Section in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | P     | P     | S      | S      | S      | S      |

**Please see response after paragraph 75.**

**75.** When the commanding officer of the Internal Affairs Division determines that the force investigation is complete and the findings are supported by the evidence, the investigation report file shall be forwarded to the Force Review Board with a copy to the Chief.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | O     | S     | P     | P      | S      | S      | S      |

**4.7.62a:** Conduct a review of a sample of cases completed by IAD in the past 3-6 months that failed to meet the requirement to forward the case to the FRB by reviewing the key failure points causing incomplete cases to be forwarded to the FRB. The review should:
>    a. Identify key causes of failure;
>    b. Identify where in the IAD process related to Paragraph 75 the failure points were; and
>    d. Recommend actions to remedy the top five causes of failure to meet the established protocols, e.g., training, supervision, staffing, etc.

**4.7.62b:** Implement recommended actions and conduct a follow-up assessment to determine what impact, if any, the implemented actions had on failures to meet established evidentiary and quality standards.

**4.7.62c:** Repeat until 95% of cases completed meet established evidentiary and quality standards.

**APD Response to paragraphs 72 to 75:** IAFD is creating a matrix capable of identifying failure points of an investigation completed by IAFD detectives. IAFD will use the data extrapolated from the matrix to identify weaknesses in training, causes for untimely investigations and when utilized throughout the approval process, it will identify who is responsible for delays and failures in process. The design of the Matrix utilizes CASA paragraphs associated with force in a comparative matrix designed to work side by side with the investigation, which enables the reviewer to enter a brief narrative for each paragraph completed and fulfilled by the investigation. If the paragraph data is missing or incomplete, this is captured as well as a possible deficiency and is recorded. If a deficiency is noted to be repetitive within a unit or division, this information could be utilized to improve training on systemic problems identified throughout this process. By capturing timeline data in the Matrix detailing the date and time of the force, investigation, completion and chain of command reviews, IAFD will be able to identify where any timeline issues lie, whether the investigation phase or approval phase. By adding data capture points in the Matrix, a data analyst will identify trends or weaknesses in training. IAFD will implement the remedies identified and continue with the evaluation process to determine success and failures. The Matrix is currently in the development process.

**76.** At the discretion of the Chief, a force investigation may be assigned or reassigned for investigation to the Multi-Agency Task Force or the Federal Bureau of Investigations, or may be returned to the Force Investigation Section for further investigation or analysis.   This assignment or re-assignment shall be confirmed in writing.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | S     | S      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  APD continues to comply with the requirements of this paragraph.

**77.** Where, after an administrative force investigation, a use of force is found to violate policy, the Chief shall direct and ensure appropriate discipline and/or corrective action.   Where a force investigation indicates apparent criminal conduct by an officer, the Chief shall ensure that the Internal Affairs Division or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate. The Chief need not delay the imposition of discipline until the outcome of the criminal investigation.   In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | S     | S     | O     | O      | O      | S      | S      |

**IMR-13 Recommendations:**
**4.7.64a:**  Make declarative, finite, and transparent decisions on discipline and discontinue the questionable and ineffective practice of holding large proportions of assigned discipline "in abeyance."

**APD Response:**  SOP 3-46, Discipline System was revised and published in July 2021.  On multiple occasions, APD worked with both the IMT and DOJ in this policy's revision, accepting feedback and making the necessary changes to develop a stronger policy.  Abeyance, in and of itself, is not a problem and is expressly permitted by policy, and APD did not hold "large proportions of assigned discipline" in abeyance during the 14th monitoring period.  SOP 3-46 is a CASA-related policy the department recognizes as having a significant impact on personnel, establishing requirements for progressive discipline and the use of abeyance as recommended.

## G. Force Review Board

**78.** APD shall develop and implement a Force Review Board to review Level 2 and Level 3 uses of force. The Force Review Board shall be comprised of at least the following members:   Deputy Chief of the Administrative Support Bureau, Deputy Chief of the Field Services Bureau, the Deputy Chief of the Investigative Bureau, a Field Services Commander, the Academy Division Commander, and the Legal Advisor.  The Force Review Board shall conduct timely, comprehensive, and reliable reviews of Level 2 and Level 3 use of force investigations.  The Force Review Board shall:

a. review each use of force investigation completed by the Force Investigation Section within 30 days of receiving the investigation report to ensure that it is complete and, for administrative investigations, that the findings are supported by a preponderance of the evidence;

b. hear the case presentation from the lead investigator and discuss the case as necessary with the investigator to gain a full understanding of the facts of the incident.  The officer(s) who used the force subject to investigation, or who are otherwise the subject(s) of the Internal Affairs Division investigation, shall not be present;

c. order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation findings.  For administrative investigations, where the findings are not supported by a preponderance of the evidence, the Force Review Board shall document the reasons for this determination, which shall be included as an addendum to the original force investigation, including the specific evidence or analysis supporting their conclusions;

d. determine whether the use of force violated APD policy.  If the use of force violated APD policy, the Force Review Board shall refer it to the Chief for appropriate disciplinary and/or corrective action;

e. determine whether the incident raises policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;

f. document its findings and recommendations in a Force Review Board Report within 45 days of receiving the completed use of force investigation and within 15 days of the Force Review Board case presentation; and g) review and analyze use of force data, on at least a quarterly basis, to determine significant trends and to identify and correct deficiencies revealed by this analysis.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.44a:** Report regularly on progress on the established goals and objectives related to the FRB process.

**APD Response:**  APD continues to document the FRB's findings and referrals, which is provided to the Chief of Police and the Executive Director of the CPOA for each meeting.  In November 2020, the Interim Chief of Police initiated updates by the FRB project lead to provide a high-level overview and updates on FRB progress.  In January 2021, the Interim Chief of Police (now Chief of Police) assigned a Deputy Chief of Police as the full-time FRB Chair.

Trends involving search and seizure issues were identified by the FRB and department-wide training is being developed to correct the issues. As stated in IMR-13, APD self-identified and ceased the use of "layered response" by SOD.  These two examples illustrate the FRB's ability to meet established goals and objectives.

**4.7.44b:** FRB should focus attention on Level 1 uses of force to ensure field supervisors are properly classifying cases.

**APD Response:**  APD is evaluating how to incorporate proper force classification in Level 1 uses of force into the FRB process.

**4.7.44c:** Closely monitor referrals made from the FRB to ensure that each referral is clear and followed through by the impacted command.

**APD Response:**  Every referral is still tracked within the post meeting documentation, the Chief's Report and the voting sheets. A tracking sheet is maintained by FRB administrative staff and referrals are closed when the Board determines the requirements have been met. A process for updates on more long term projects will be incorporated. Weekly updates are provided to the FRB on open referrals. Closed and implemented referrals are being evaluated for a positive impact on department operations.

**4.7.44d:** APD should organize its pre and post FRB meeting documentation in a manner that clearly demonstrates how it meets each of the relevant provisions of the CASA.

**APD Response:**  Since August 2020, paragraph markers have been added to the meeting minutes as well as the voting sheets to confirm the pre and post FRB meeting documentation meets each relevant provision of the CASA.  For cases involving multiple uses of force in a single incident, voting will reflect whether each independent use of force met the relevant provisions of the CASA.

**4.7.44e:**  Work to ensure that use of force cases is (sic) completed in the field and then received and reviewed by the FRB in a timely manner.

**APD Response:**  During this reporting period one case was heard within 30 days. The case was completed on April 23, 2021, and presented to FRB on May 13, 2021.  Another case was completed on May 3, 2021 and presented on June 3, 2021.  This case was presented in 31 days only as a result of the schedule for FRB meetings.  While these achievements may seem minor, this was the first time this has been accomplished by APD and demonstrates an improving process.  Cases are tracked for timeliness for presentation to the FRB.

**4.7.44f:** Review FRB documents to ensure they are capable of capturing data related to each use of force by each officer in a particular case. The current "yes" "no" structure is inadequate for multi-factor investigations.

**APD Response:**  Data collection has been changed to accommodate multiple uses of force that are now being voted on individually.

**4.7.44g:** FRB members under investigation for misconduct should not serve as voting members until internal affairs investigations are fully adjudicated. APD should ensure a sufficient number of trained personnel exist, at the correct level and positions, to serve on the FRB.

**APD Response:**  FRB members who was under investigation for an FRB-related allegation will not serve on the board until the case is adjudicated. Training for FRB is being updated to reflect current process and policy so that the number of personnel available for FRB meetings can be expanded.

**79.** At least annually, APD shall publish a Use of Force Annual Report.  At a minimum, the following information should be included in the Annual Use of Force Report:
    a.   number of calls for service;
    b.   number of officer-initiated actions;
    c.   number of aggregate uses of force, and uses of force by Level;
    d.   number of arrests;
    e.   number of custodial arrests that involved use of force;
    f.   number of SWAT deployments by type of call out;
    g.   number of incidents involving officers shooting at or from moving vehicles;

h. number of individuals armed with weapons;
i. number of individuals unarmed;
j. number of individuals injured during arrest, including APD and other law enforcement personnel;
k. number of individuals requiring hospitalization, including APD and other law enforcement personnel;
l. demographic category; and
m. geographic data, including street, location, or Area Command.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | S      |

**IMR-13 Recommendations:**

**4.7.66a:** APD should monitor use of force, serious use of force, and show of force reporting discrepancies that are found. Reporting errors must be reconciled to ensure that statistics published in its Annual Use of Force Reports are accurate.

**4.7.66b:** Now that APD transitioned to a three-tiered use of force reporting system, they should create an auditing process for tier-one uses of force to ensure proper categorization is taking place. Data collected from these audits should feed the Annual Use of Force reports, and when appropriate referred to IA and the Academy.

**4.7.66c:** APD should devise ways to scrutinize data presented by the department individual units, and coordinate with PMU to ensure that there are common methods to handle, analyze and present data.

**APD Response:** As APD reconciles use of force data, that reconciliation will be reflected in future annual use of force reports to accurately report the department's use of force incidents.

The Performance Review Unit serves as the auditing function for Level 1 uses of force, which includes determining if a level 1 use of force was properly classified by the on-scene supervisor.

APD is in the process of creating and advertising a Data Director position within the Accountability and Analytics Bureau. The director will oversee and coordinate data analysis efforts to assist the department in not only reporting data in a cohesive manner, but using that data to drive decisions. The Performance Metrics Unit (PMU) is also positioned within the Accountability and Analytics Bureau, allowing for easy and streamlined coordination between auditing and data analysis.

In July 2021, APD published a 2020 Preliminary Annual Use of Force Report. APD has a backlog of levels 2 and 3 2020 use of force cases; however, in the sake of transparency, the incomplete report was published to illustrate the 2020 use of force data. A complete annual use of force report will be published when the investigations are completed. The information is available on the City website: https://www.cabq.gov/police/public-reports/crime-statistics-public-reports

**80.** APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by the Force Investigation Section, Internal Affairs Division, or Multi-Agency Task Force; and all force reviews conducted by the Performance Review Unit of the Compliance Bureau and the Force Review Board. APD shall integrate the use of force tracking system with the Early Intervention System database and shall utilize the

tracking system to collect and analyze use of force data to prepare the Use of Force Annual Report and other reports, as necessary.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | P      |

**IMR-13 Recommendations:**

4.7.67a: APD should re-visit the requirements of this paragraph viz a viz its planned early intervention system and ensure that each element required by Paragraph 80 is extant in the planned system.

**APD Response:**  APD currently uses BlueTeam and IAPro to track reported uses of force and use of force investigations.  Since 2018, APD has worked diligently on an early intervention system and have come a long way in the development of an in-house system while APD continues with an outside vendor to tailor an early intervention system to meet the department's needs.  The Pareto Principle, or 80/20 rule which means that 80% of our successes of failures are caused by the actions of 20% of our employees, was approved by the IMT in February 2021 as the statistical application that will be used to measure both acceptable and unacceptable behaviors from officers as outlined in the CASA.  The Performance Evaluation and Management System (PEMS) training plan was approved by the IMT and the DOJ and training will begin in August 2021.  Training for use of this system is scheduled to begin in August, 2021 and with a planned training completion date of December 31, 2021.


## H. Multi-Agency Task Force

**Please see APD responses to paragraphs 81-85 after paragraph 85 below.**

**81.** APD shall continue to participate in the Multi-Agency Task Force for as long as the Memorandum of Understanding continues to exist.  APD agrees to confer with participating jurisdictions to ensure that inter-governmental agreements that govern the Multi-Agency Task Force are current and effective.  APD shall ensure that the inter-governmental agreements are consistent with this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**Please see APD responses to paragraphs 81-85 after paragraph 85 below.**

**82.** APD agrees to consult with participating jurisdictions to establish investigative protocols for the Multi-Agency Task Force.  The protocols shall clearly define the purpose of the Multi-Agency Task Force; describe the roles and responsibilities of participating agencies, including the role of the lead investigative agency; and provide for ongoing coordination among participating agencies and consultation with pertinent prosecuting authorities.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 Recommendations.

**Please see APD responses to paragraphs 81-85 after paragraph 85 below.**

**83.** APD agrees to consult and coordinate with the Multi-Agency Task Force on the release of evidence, including video recordings of uses of force, and dissemination of information to preserve the integrity of active criminal investigations involving APD personnel.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 Recommendations.

**Please see APD responses to paragraphs 81-85 after paragraph 85 below.**

**84.** APD agrees to participate in all briefings of incidents involving APD personnel that are investigated by the Multi-Agency Task Force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 Recommendations.

**Please see APD responses to paragraphs 81-85 after paragraph 85 below.**

**85.** If the Memorandum of Understanding governing the Multi-Agency Task Force expires or otherwise terminates, or APD withdraws from the Multi-Agency Task Force, APD shall perform all investigations that would have otherwise been conducted pursuant to the Memorandum of Understanding.  This Agreement does not prevent APD from entering into other investigative Memoranda of Understanding with other law enforcement agencies to conduct criminal investigation of officer-involved shootings, serious uses of force, and in-custody deaths.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 Recommendations.

**APD Response to paragraphs 81-85:**    The Multi-Agency Task Force (MATF) continues to have full and versatile personnel at call-outs regarding officer involved shootings (OIS's) and in-custody deaths.  The unit

is in the final stages of adding the Rio Rancho Police Department to outside agencies to assist in these investigations. As of July 30, 2021, the Memorandum of Agreement (MOA) is with the New Mexico State Police, Bernalillo County Sheriff's Office, and the Rio Rancho Police Department for their signatures. The 2nd Judicial District Attorney's Office will be the final signature on the MOA.

MATF shifted their public-facing briefings to include even more detail of the incidents, including 911 recordings and the dispatch recordings, giving a more immersive review of all the officer's information and when they had it.

The capabilities of the entire Violent Crimes Section that MATF Detectives are under has received more digital forensic resources, including three specialists that now assist full-time on the identification and review of digital media. The work of the Digital Intelligence Team includes video surveillance, cellular extractions, and social media of involved parties.

A new policy has been drafted for the MATF. The policy includes language to allow the Internal Affairs Force Division to observe the criminal briefings that occur immediately following a critical incident OIS or custody death and for MATF members to immediately notify IAFD for their administrative investigation of any discovery or evidence that comes into their criminal investigation. This new SOP is scheduled to be presented in September 2021. All MATF paragraphs remain in operational compliance.


## I. Use of Force Training

**86.** Within 36 months of the Operational Date, APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and provisions of this Agreement. APD shall also provide all APD officers with 40 hours of use of force training within 13 months of the Operational Date, and 24 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | O     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR13 recommendations and APD responses after paragraph 88.**

**87.** APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:
   a. search and seizure law, including the Fourth Amendment and related law;
   b. APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;
   c. Use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;
   d. use of de-escalation strategies;
   e. scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;
   f. deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;

    g.  crowd control; and
    h.  initiating and disengaging foot pursuits.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | S      | S      | P      |

**Please see IMR13 recommendations and APD responses after paragraph 88.**

**88.** Supervisors of all ranks, including those assigned to the Internal Affairs Division, as part of their initial and annual in-service supervisory training, shall receive additional training that includes:
    a.  conducting use of force reviews or investigations, including evaluating officer, subject, and witness credibility;
    b.  strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force;
    c.  incident management; and
    d.  supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | S      | S      | P      |

**IMR-13 Recommendations for paragraphs 86-88:**

**4.7.73-75a:** APD should immediately devise and implement a cogent plan to address use of force training requirements. Curriculum developed for Tier 4 and the annual use of force training should incorporate specific needs of officers and supervisors in the field.

**APD Response:** APD developed a plan to deliver all Tier 4 training by the end of 2021. The first day of Tier 4 Use of Force training was approved by the DOJ and IMT in February 2021, training began in March 2021 and was completed in May 2021 with a compliance rate of 98%. The second day of Tier 4 training was approved by the DOJ and the IMT in July 2021, which is currently being delivered to all sworn officers to be completed in December 2021.

**4.7.73-75b:** The Academy staff should be properly augmented to ensure the quality of training curriculum and training systems are not negatively impacted due to staffing shortages.

**APD Response:** The Academy was granted 4 temporary instructor positions to ensure adequate staffing for Tier 4 delivery. In March 2021, APD hired a curriculum development manager with the expertise necessary to develop training on curriculum development and course facilitation.

**4.7.73-75c:** APD Academy Staff should seek out and attend training courses focused on the proper development of training curriculum and how to connect that curriculum to the measurement of performance outcomes. Likewise, proper test question construction should be emphasized in Academy personnel's future training plans. The latter is a "critical path" issue.

**APD Response:** The EFIT stipulated order mandated that APD hire an external vendor to assist the Training Academy in the training development and implementation.  With that and in the addition of hiring an experienced, civilian curriculum developer with an extensive training background, APD's training course will be designed and implemented to measure performance outcomes.

**4.7.73-75d:** APD personnel assigned to non-academy commands that carry significant training requirements should receive training commensurate with the Academy staff. This will ensure continuity in curriculum development across the organization.

**4.7.73-75e:** Ensure that the Academy is the central point for review and approval of all training development and delivery processes for APD.

**4.7.73-75f:** APD must properly supervise the delivery of training that is developed from outside sources before it is delivered to the department, regardless of its origin. Training programs should be developed based on best practices, APD policy and must adhere to the requirements of the CASA.

**4.7.73-75g:** APD must protect the training environment from lectures that may be perceived as inappropriate or are contrary to APD policy or the CASA. This is a critical path issue.

**APD Response:**  Courses are being developed and delivered to Academy personnel, as well as other Department personnel who carry significant training responsibilities.   APD has review and approval protocols in place for outside training and lectures.  The IMT had an opportunity to witness this process during the development and adoption of the Detective Academy.  In her short with APD, the Training Academy curriculum manager started meeting with non-academy personnel carrying significant training requirements and developing a working relationship to ensure continuity of training development and modes for delivery.

89. Included in the use of force training set out above, APD shall deliver firearms training that comports with constitutional principles and APD policy to all officers within 13 months of the Operational Date and at least yearly thereafter.  APD firearms training shall:
   a. require officers to complete and satisfactorily pass firearms training and qualify for regulation and other service firearms, as necessary, on an annual basis;
   b. require recruits, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms before such personnel are permitted to carry and use firearms;
   c. incorporate professional low-light training, stress training (e.g., training in using a firearm after undergoing physical exertion), and proper use of force decision making training, including continuous threat assessment techniques, in the annual in-service training program; and
   d. ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  Firearms training is on track to be completed within the 12-month period of 2021.

## Section 2:  Specialized Units (Paragraphs 90 – 109)

### A.  Specialized Tactical Units (SOD)

**90.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall operate and manage its specialized units in a manner that increases the likelihood of safely resolving critical incidents and high-risk situations, prioritizes saving lives in accordance with the totality of the circumstances, provides for effective command-level accountability, and ensures force is used in strict compliance with applicable law, best practices, and this Agreement.  To achieve these outcomes, APD shall implement the requirements set out below.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**91.**  APD's specialized tactical units shall be comprised of law enforcement officers who are selected, trained, and equipped to respond as a coordinated team to resolve critical incidents that exceed the capabilities of first responders or investigative units.  The specialized tactical units shall consist of SWAT, Canine, and Bomb Squad/EOD.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**92.**  APD shall ensure that specialized tactical units are sufficiently trained to complete the following basic operational functions:  Command and Control; Containment; and Entry, Apprehension, and Rescue.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**93.**  Each specialized tactical unit shall have clearly defined missions and duties.  Each specialized tactical unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force reporting, and force investigations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**94.** APD policies and procedures on specialized tactical units shall include the following topics: a) team organization and function, including command relationships with the incident commander, Field Services Bureau, other specialized investigative units, Crisis Negotiation Team, Crisis Intervention Unit, crisis intervention certified responders, and any other joint or support elements to ensure clear lines of responsibility; b) coordinating and implementing tactical operations in emergency life-threatening situations, including situations where an officer's view may be obstructed; c) personnel selection and retention criteria and mandated physical and tactical competency of team members, team leaders, and unit commanders; d) training requirements with minimum time periods to develop and maintain critical skills to include new member initial training, monthly training, special assignment training, and annual training; e) equipment appropriation, maintenance, care, and inventory; f) activation and deployment protocols, including when to notify and request additional services;  g) conducting threat assessments to determine the appropriate responses and necessary resources; h) command and control issues, including a clearly defined command structure; and i) documented after-action reviews and reports.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       | P     |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**95.** The policies and standard operating procedures of specialized tactical units shall be reviewed at least annually and revisions shall be based, at a minimum, on legal developments, training updates, operational evaluations examining actual practice from after-action reviews, and reviews by the Force Review Board or other advisory or oversight entities established by this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**96.** In addition to use of force reports, APD shall require specialized tactical units to document their activities in detail, including written operational plans and after-action reports created after call-outs and deployments to critical situations.  After-action reports shall address any areas of concern related to policy, training, equipment, or tactics.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**97.** APD shall require specialized tactical units to conduct mission briefings before an operation, unless exigent circumstances require an immediate deployment.  APD shall also ensure that specialized tactical team members designate personnel to develop and implement operational and tactical plans before and during tactical operations.  All specialized tactical team members should have an understanding of operational planning.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD updates after Paragraph 98.**

**98.** All specialized tactical units shall wear uniforms that clearly identify them as law enforcement officers.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**APD Response:** Tactical Action Analysis and Activation data was obtained from February to May 2021. During this time tactical activation case files had new activation cover sheets.  These sheets note if a deficiency was identified regarding timeliness of pertinent or necessary details involved in tactical activations/uses of force that should be contained in completed tactical activation files.  Beginning 2021, SOD also began tracking all denials for tactical assistance requests. The tactical Lieutenant assesses tactical requests to determine whether a request meets the activation criteria as required in policy.  All denials are communicated via email to the affected chain of command, outlining the reason for the denial.  Also started in the beginning of 2021, K9 home kennel inspections document the condition of the home environment to ensure the safety and security of the canine.  Home visits will be conducted by a supervisor, bi-annually for every handler.  The same inspection will be conducted for all EOD canine handers and documented on the new kennel inspection sheet.

**99.** All specialized tactical unit deployments shall be reviewed by the Force Review Board in order to analyze and critique specialized response protocols and identify any policy, training, equipment, or tactical concerns raised by the action.  The Force Review Board shall identify areas of concern or particular successes and implement the appropriate response, including modifications to policy, training, equipment, or tactics.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     |       | S      | O      | S      | O      |

**APD Response:** SOD continues to present all tactical activations to the FRB.

**100.** APD shall establish eligibility criteria for all team members, team leaders, and supervisors assigned to tactical units and conduct at least annual reviews of unit team members to ensure that they meet delineated criteria.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**APD Response:** To maintain compliance in paragraph 100, SOD continues to complete annual assessments of each tactical unit, and annual assessments of each officer to include performance and inventory reviews.

**101.** APD shall train specialized tactical units conducting barricaded gunman operations on competencies and procedures that include: threat assessment to determine the appropriate response and resources necessary, mission analysis, determination of criminal offense, determination of mental illness, requirements for search warrant prior to entry, communication procedures, and integration of the Crisis Negotiation Team, the Crisis Intervention Unit, and crisis intervention certified responders.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**IMR-13 Recommendations:** There were no recommendations for Paragraph 101.

**APD Response:** SOD line ups include current vacancies in SOD, number of working K9's, and full and part time positions. SOD also started tracking weekly stats on staffing levels, type of force utilized during tactical activations, total number of activations, tactical denials and year to year comparison of K9 apprehensions in order to provide real time updates, progress, deficiencies or concerns.

**102.** APD shall continue to require the Canine Unit to complete thorough post deployment reviews of all canine deployments.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**103.** APD shall continue to track canine deployments and canine apprehensions, and to calculate and track canine bite ratios on a monthly basis to assess its Canine Unit and individual Canine teams.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**104.** APD shall include canine bite ratios as an element of the Early Intervention System and shall provide for the review, pursuant to the protocol for that system, of the performance of any handler whose bite ratio exceeds 20 percent during a six-month period, or the entire unit if the unit's bite ratio exceeds that threshold, and require interventions as appropriate. Canine data and analysis shall be included in APD Use of Force Annual Report.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**105.**  APD agrees to track and analyze the number of specialized tactical unit deployments.  The analysis shall include the reason for each tactical deployment and the result of each deployment, to include: (a) the location; (b) the number of arrests; (c) whether a forcible entry was required; (d) whether a weapon was discharged by a specialized tactical unit member; (e) whether a person or domestic animal was injured or killed; and (f) the type of tactical equipment deployed.  This data analysis shall be entered into the Early Intervention System and included in APD's Annual Reports.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  SOD continues to track processes approved by the IMT and remain in operational compliance for SOD paragraphs.

## B. Specialized Investigative Units (SID)

In July 2021, the Department reassigned commanders to different bureaus and divisions and a new commander was assigned to the Special Investigations Division (SID). The commander was formerly assigned to SID as a first-line supervisor in the Narcotics Section during the Independent Monitoring Reporting (IMR) periods of IMR 4, 5, and 6, when SID did obtain operational compliance by introducing the Risk Assessment Matrix and audits, the Narcotics Section Handbook which developed into the division handbook, and the SharePoint which tracked investigative responses. The commander also brought his civilian division coordinator to SID. Both will undergo the division's new personnel orientation training, and the commander will review and re-familiarize himself with each unit's handbook.

**106.**  Each specialized investigative unit shall have a clearly defined mission and duties.  Each specialized investigative unit shall develop and implement policies and standard operating procedures that incorporate APD's agency-wide policies on use of force reporting, and force investigations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  SID continues to ensure that division policies include defined mission and duties while adhering to departmental use of force policies.  SID continues to utilize the unit handbooks which further details each unit's missions and duties, and proficiencies needed to be operational. The Gun Violence Reduction Unit policy was published during this reporting period, and the SID policy will be up for revision in August 2021.  SID is taking the learned lessons from use of force investigations and force review board and revising division policies to be consistent and adhere to the department's use of force policies and SID policies. The SID Deputy Commander and Commander have taken the responsibility to conduct the annual

revisions on these additional policies. In addition, each position's job description is being updated to ensure each job duty adheres to all updated policies and procedures.

**107.** APD shall prohibit specialized investigative units from providing tactical responses to critical situations where a specialized tactical unit is required. APD shall establish protocols that require communication and coordination by specialized investigative units when encountering a situation that requires a specialized tactical response. The protocols shall include communicating high-risk situations and threats promptly, coordinating effectively with specialized tactical units, and providing support that increases the likelihood of safely resolving a critical incident.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:** SID continues to utilize written operational plans, Risk Assessment Matrix (RAMs), and After Action Reviews (AARs) to examine the need to involve the Special Operation Division's (SOD) Tactical Units, to communicate any risks, hazards, or high-risk situations and threats. During this reporting period SID had RAM Logs for the months of March and May where SOD conducted audits on SID RAMS and did not note any deficiencies in the RAM scoring.

**108.** Within three months of the Operational Date, APD shall conduct an inspection of specialized investigative units to determine whether weapons and equipment assigned or accessible to specialized investigative units are consistent with the units' mission and training. APD shall conduct re-inspections on at least an annual basis.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       | O     |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:** SID continues to be compliant with the department's monthly inspections which include OBRD video reviews and all weapons being inspected and verified. SID continues to conduct additional annual inspections of each unit's equipment. Additionally, as personnel transfer in and out of the division, in-processing forms and out-processing forms are utilized to account for individually assigned equipment and unit assigned equipment.

**109.** APD agrees to track and analyze the number of specialized investigative unit responses. The analysis shall include the reason for each investigative response, the legal authority, type of warrant (if applicable), and the result of each investigative response, to include: (a) the location; (b) the number of arrests; (c) the type of evidence or property seized; (d) whether a forcible entry was required; (e) whether a weapon was discharged by a specialized investigative unit member; (f) whether the person attempted to flee from officers; and (g) whether a person or domestic animal was injured or killed. This data analysis shall be entered into the Early Intervention System and included in APD's Annual Reports.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       | P     |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  SID continues to remain in operational compliance and is critically thinking and improving upon current processes.  For example, SID received feedback from a DOJ data team about data collection.  SID took that information and are evaluating the current tracking system in SharePoint and will make the recommended modifications to improve data collection and reporting.

# Section 3:  Crisis Intervention (Paragraphs 110 – 137)

## A.  Mental Health Response Advisory Committee (Paragraphs 110-117)

**110.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement, and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals. To achieve these outcomes, APD agrees to implement the requirements below.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | S      | P      |

**IMR-13 Recommendations:**

**4.7.97a:**  APD should conduct a complete and thorough review of its policies related to in-field responses to incidents involving individuals in mental distress and ensure that the entirety of those policies are congruent with CASA requirements and have been vetted through the review process by the Amici stakeholders.

**APD Response:**  During this monitoring period revisions to 2-19 Response to Behavioral Issues and 1-37 Crisis Intervention Section and Program were finalized.  SOP 2-19 was published in April 2021, and SOP 1-37 was published in February 2021.  Both of these policies were vetted completely through the Mental Health Response Advisory Committee (MHRAC), Amici stakeholders, and approved by the DOJ and IMT. SOP 1-28 Downtown Unit and SOP 2-20 Hostage Situations, Barricaded Individuals, and Tactical Threat Assessments have been forwarded to MHRAC for comment.

**111.**  Within six months of the Operational Date, APD and the City shall establish a Mental Health Response Advisory Committee ("Advisory Committee") with subject matter expertise and experience that will assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health

crisis. The Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       | P     | P     | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 111.**

**APD Response:**  The MHRAC continues to meet monthly in compliance with this paragraph.

**112.** The Advisory Committee shall include representation form APD command staff, crisis intervention certified responders, Crisis Intervention Unit (CIU), Crisis Outreach and Support Team (COAST), and City-contracted mental health professionals. APD shall also seek representation from the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services (such as the National Alliance on Mental Illness and Disability Rights New Mexico), mental health service providers, homeless service providers, interested community members designated by the Forensic Intervention Consortium, and other similar groups.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
| P     | P     | O     | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 112.**

**APD Response:**  The MHRAC board continues to reflect requirements of paragraph 112

**113.**  The Advisory Committee shall provide guidance to assist the City in developing and expanding the number of crisis intervention certified responders, CIU, and COAST. The Advisory Committee shall also be responsible for considering new and current response strategies for dealing with chronically homeless individuals or individuals perceived to be or actually suffering from a mental illness, identifying training needs, and providing guidance on effective responses to a behavioral crisis event.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
| P     | P     | P     | S     | S     | S     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 113.**

**APD Response:**   APD continues to forward all special orders, policies, and training dealing with homeless and mental health to MHRAC for review.

**114.**  APD, with guidance from the Advisory Committee, shall develop protocols that govern the release and exchange of information about individuals with known mental illness to facilitate necessary and appropriate communication while protecting their confidentiality.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       |       | P     | P     | S      | S      | S      | S      |

**IMR-13 recommendation:**

**4.7.101a:** Complete proposed protocols as soon as practicable and share draft versions with the monitoring team for comment.

**APD Response:** A department memorandum discussing the protocol for individuals APD transports for an emergency mental health evaluation transfer of custody between APD and area hospitals was developed this monitoring period. The memo was circulated through MHRAC, approved by DOJ and the IMT and published in June 2021.  This memo included clear custody transfer between APD to the receiving hospital based on three conditions:

- The removal of any officer restraints such as handcuffs, if needed;
- Completion of a written intake report, if applicable; and
- Verbal report explaining the need of the evaluation from the officer to the facility.

**115.** Within nine months of the Operational Date, APD shall provide the Advisory Committee with data collected by crisis intervention certified responders, CIU, and COAST pursuant to Paragraphs 139 and 137 of this Agreement for the sole purpose of facilitating program guidance. Also within nine months of the Operational Date, the Advisory Committee shall review the behavioral health training curriculum; identify mental health resources that may be available to APD; network and build more relationships; and provide guidance on scenario-based training involving typical situations that occur when mental illness is a factor.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | S     |       | S     | S     | S     | S     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 115.**

**APD Response:**  At the January 2021 MHRAC meeting, the APD CIU data book was presented to the board.  APD continues to send all behavioral health curriculum to the MHRAC training subcommittee.

For the first time, the 2020 Annual CIT Report used two different metrics to gauge use of force involving people in a behavioral health crisis.  In the past APD only used strict call types that indicated a possible behavioral health factor.  In this report both that analysis and a new metric, if the officer felt a behavioral health concern was present during the incident when force was used, were included.  This concept of broadening our use of force analysis had been suggested by MHRAC during a previous data presentation.  The 2020 Annual Report can be found at: https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents/mhrac-2020-annual-databook.pdf/view

**116.** The Advisory Committee shall seek to enhance coordination with local behavioral health systems, with the goal of connecting chronically homeless individuals and individuals experiencing mental health crisis with available services.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 116.**

**APD Response:** The Resources and Information Sharing subcommittee of MHRAC worked on developing a new resource card meant to be helpful during COVID, a time where providers are continually adjusting hours and services due to the virus. The resource card redesign was finalized in January 2021 and to date APD has distributed over 2,000 cards to providers and people in crisis. The demand for resource cards has been so great, APD recently had to order a second run of 2021's card, a first for the department. A copy of the redesigned resource card is available at:
https://www.cabq.gov/help/documents/abq-resource-card.pdf

**117.** Within 13 months of the Operational Date, and annually thereafter, the Advisory Committee will provide a public report to APD that will be made available on APD's website, which shall include recommendations for improvement, training priorities, changes in policies and procedures, and identifying available mental health resources.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | P     | S     | S     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 117.**

**APD Response:** No annual reports were due this monitoring period however 2020's reports, and reports from previous years, are available at:
https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents/mental-health-response-advisory-committee-documents

## B. Behavioral Health Training (Paragraphs 118-122)

**118.** APD has undertaken an aggressive program to provide behavioral health training to its officers. This Agreement is designed to support and leverage that commitment.
**Paragraph 118 is not a measurable paragraph.**

**119.** APD agrees to continue providing state-mandated, basic behavioral health training to all cadets in the academy. APD also agrees to provide 40 hours of basic crisis intervention training for field officers to all academy graduates upon their completion of the field training program. APD is also providing 40 hours of basic crisis intervention training for field officers to all current officers, which APD agrees to complete by July 15, 2016.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | P      | P      |

**IMR-13 Recommendations:**

**4.7.106a:** Ensure that all APD officers assigned to patrol duty, and all supervisors who supervise patrol operations, are given refresher training regarding crisis intervention policies and techniques.

**APD Response:**  During this reporting period APD Crisis Intervention taught two 40-hour CIT classes, one in February and another in April, certifying 79 APD officers and six students from outside agencies including Cuba Police, Santa Fe Security, and two officers from the Veteran's Affairs administration.  Seven Albuquerque Community Safety Department and Bernalillo County Mobile Crisis Team clinicians/responders were also certified.

To remedy the issues created by unapproved training provided by APD during a previous reporting period, Crisis Intervention Instructors with the help of MHRAC, developed a new two-hour block of instruction to satisfy the requirements set forth in this paragraph.  This monitoring period, the IMT and DOJ approved this training.  The two-hour block of instruction will be delivered to all sworn personnel and Emergency Communication Center employees at the second half of Maintenance of Effort (MOE) training before the end of 2021.

**120.**  The behavioral health and crisis intervention training provided to all officers will continue to address field assessment and identification, suicide intervention, crisis de-escalation, scenario-based exercises, and community mental health resources. APD training shall include interaction with individuals with a mental illness and coordination with advocacy groups that protect the rights of individuals with disabilities or those who are chronically homeless.
Additionally, the behavioral health and crisis intervention training will provide clear guidance as to when an officer may detain an individual solely because of his or her crisis and refer them for further services when needed.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  In this monitoring period APD Crisis Intervention taught two-40 hour CIT classes, one in February and another in April, certifying 79 APD officers and six students from outside agencies including Cuba Police, Santa Fe Security, and two officers from the Veteran's Affairs administration.  Seven Albuquerque Community Safety Department and Bernalillo County Mobile Crisis Team clinicians/responders were also certified.

**121.**  APD shall ensure that new telecommunicators receive 20 hours of behavioral health training. This training shall include: telephonic suicide intervention; crisis management and de-escalation; interactions with individuals with mental illness; descriptive information that should be gathered when telecommunicators suspect that a call involves someone with mental illness; the roles and functions of COAST, crisis intervention certified responders, and CIU; the types of calls that should be directed to particular officers or teams; and recording information in the dispatch database about calls in which mental illness may be a factor.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  In February 2021, APD CIU provided one tele-communicator class in which five new Emergency Communications Center employees became certified.

**122.**  APD shall provide two hours of in-service training to all existing officers and telecommunicators on behavioral health-related topics biannually.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | P      | P      |

**IMR-13 Recommendations:**
**4.7.109a:** Continue work on the department's behavior health, mental health, and crisis intervention training, ensuring that the topics covered fit with the requirements of this paragraph and the feedback provided by the monitoring team. Ensure that officers who received training that was not appropriately designed, critiqued, and revised are retrained using the appropriate training processes.

**APD Response:**
To remedy the issues created by unapproved training provided by APD during a previous reporting period, Crisis Intervention Instructors with the help of MHRAC, developed a new two-hour block of instruction to satisfy the requirements set forth in this paragraph.  This monitoring period, the IMT and DOJ approved this training.  The two-hour block of instruction will be delivered to all sworn personnel and Emergency Communication Center employees at the second half of Maintenance of Effort (MOE) training before the end of 2021.

## C.  Crisis Intervention Certified Responders and Crisis Intervention Unit

**123.**  APD shall maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis. APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives housed at the Family Advocacy Center whose primary responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future. APD agrees to expand both the number of crisis intervention certified responders and CIU.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       |       | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.110a:** We continue to recommend that APD implement the data-driven, methodologically appropriate workload, staffing planning, and analysis protocol developed by CIU that ensures that reliable "staffing levels" for ECIT officers are regularly calculated, reported, set as staffing goals, and attained.

**APD Response:** During this reporting period crisis intervention unit personnel began monthly comparisons between a list of behavioral health calls to a monthly updated list of ECIT certified officers. This analysis includes every shift in every area command, and is sent to area commanders every month. Additionally, MHRAC was provided with a presentation which asked MHRAC what the appropriate percentage of ECIT officers is for APD. Finally, in preparation for August 2021 field services shift bid, a workload analysis was completed for ECIT officers based on how often officers in a certain beat contact people with behavioral health issues. In the next monitoring period this information will help guide officer assignment at the beat level.

**124.** The number of crisis intervention certified responders will be driven by the demand for crisis intervention services, with an initial goal of 40% of Field Services officers who volunteer to take on specialized crisis intervention duties in the field. Within one year of the Operational Date, APD shall reassess the number of crisis intervention certified responders, following the staffing assessment and resource study required by Paragraph 204 of this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:** MHRAC has been asked to weigh in on what the appropriate percentage of ECIT officers is for APD.  MHRAC is reviewing information and will provide feedback.  During this monitoring period, ECIT officers in the field varied between 41% and 46%, with new certification classes being offered monthly.

**125.** During basic crisis intervention training for field officers provided to new and current officers, training facilitators shall recommend officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals with mental illness to serve as crisis intervention certified responders.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:** During the 40-hour classes in February and April 2021, 38 ECIT candidates were identified as exceling in crisis scenarios and de-escalation. These officers were encouraged to apply to be ECIT officers.  ECIT is a voluntary program within APD.

**126.** Within 18 months of the Operational Date, APD shall require crisis intervention certified responders and CIU to undergo at least eight hours of in-service crisis intervention training biannually.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       |       | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:** ECIT recertification classes were held during this monitoring period.

**127.** Within 18 months of the Operational Date, APD will ensure that there is sufficient coverage of crisis intervention certified responders to maximize the availability of specialized responses to incidents and calls for service involving individuals in mental health crisis; and warrant service, tactical deployments, and welfare checks involving individuals with known mental illness.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | S     | O     | O      | O      | O      | S      |

**IMR-13 Recommendations:**
**4.7.114a:** APD should re-assess its 40 percent guideline for CIU-trained officers, in light of recent incidents involving individuals suffering mental health crises, and determine if the 40 percent staffing level continues to meet community needs.

**APD Response:** During this reporting period crisis intervention unit personnel began monthly comparisons between a list of behavioral health calls to a monthly updated list of ECIT certified officers. This analysis includes every shift in every area command, and is sent to area commanders every month. Additionally, MHRAC was provided with a presentation which asked MHRAC what the appropriate percentage of ECIT officers is for APD. Finally, in preparation for August 2021 field services shift bid, a workload analysis was completed for ECIT officers based on how often officers in a certain beat contact people with behavioral health issues. In the next monitoring period this information will help guide officer assignment at the beat level.

**128.** APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | O     | O     | O      | O      | S      | S      |

**IMR-13 Recommendations:**

**4.7.115b:** Conduct a random sample of all CIT/CIU responses to ensure that the issues identified above have not been replicated in other CIT/CIU responses by other officers.

**APD Response:** This reporting period the random sample of APD's interactions with people in behavioral health crisis, resulted in several job well done commendations and the creation of a new monthly award for de-escalation. One of these calls will be incorporated into the 40-hour CIT class due to the exceptional job of the officer when interacting with a person in mental health crisis holding a hatchet. Three Internal Affairs requests were also created for minor policy violations.

**129.** APD shall collect data on the use of crisis intervention certified responders and CIU. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:

   a. date, shift, and area command of the incident;
   b. subject's age, race/ethnicity, and gender;
   c. whether the subject was armed and the type of weapon;
   d. whether the subject claims to be a U.S. military veteran;
   e. name and badge number of crisis intervention certified responder or CIU detective on the scene;
   f. whether a supervisor responded to the scene;
   g. techniques or equipment used;
   h. any injuries to officers, subjects, or others;
   i. disposition of the encounter (e.g., arrest, citation, referral); and
   j. a brief narrative of the event (if not included in any other document).

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | O     | O     | O      | O      | O      | S      |

**IMR-13 Recommendations:**
**4.7.116a:** APD should update its data collection, and analysis capacities related to paragraph 129 and ensure that all data required by Paragraph 129 are collected, analyzed, reported, and are used to guide the department's decision making regarding the requirements of Paragraph 129.

**APD Response:** An annual report for APD's 2020 interactions with individuals in mental health crisis was completed by the New Mexico Sentencing Commission which contained all required CASA data. This report was presented at the July 2021 MHRAC meeting and can be found on the City website:
https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents/mhrac-2020-annual-databook.pdf/view

**130.** APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations:**

**APD Response:** During this reporting period the contract with CWORX was renegotiated for another year in order to provide realistic scenarios, performed by professional actors, to train officers in response to behavioral health crisis. These scenarios are based on actual calls for service APD have responded to in the past.

**131.** Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal subjects who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal subjects while providing suicidal subjects with access to mental health services.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     |       |       |       | P     | P      | P      | S      | P      |

**IMR-13 Recommendations:**
**4.7.118a:** Work with advisory committees to ensure the protocols are updated and that related policy and protocols are reflective of "best practices." Develop appropriate training strategies, deliver training, implement the policy, and evaluate results.
**4.7.118b:** APD command staff should require cooperative approaches between CIU, CNT, and SOD, establishing timelines for assessments as to why inter-unit cooperation on the issue of barricaded suicidal individuals has lagged, and follow-up on findings and recommendations at regular intervals.
**4.7.118c:** APD executive leadership should pay particular attention to the results of the implementation of cooperative approaches between CIU, CNT, and SOD. This project should be goal-driven, should include the production of specifically articulated tangible objectives and measurable timelines to ensure progress is made.

**APD Response:** During this reporting period SOP 2-20 Hostage Situations, Barricaded Individuals and Tactical Threat Assessments was revised with the assistance of MHRAC. This policy is tentatively scheduled for publication by the end of the next reporting period. Once the policy is approved, training will be provided to all officers regarding barricaded individuals who are a threat only to themselves.

**132.** APD shall continue to utilize COAST and CIU to follow up with chronically homeless individuals and individuals with a known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations. See APD Response after paragraph 136.**

C. Crisis Intervention Certified Responders & Crisis Intervention Unit (Paragraphs 133-131)

**133.** COAST and CIU shall provide crisis prevention services and disposition and treatment options to chronically homeless individuals and individuals with a known mental illness who are at risk of experiencing a mental health crisis and assist with follow-up calls or visits.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:**   This reporting period members of the Crisis Intervention Unit conducted 513 follow up home visits to assist people living with behavioral health diagnoses.  These visits included connections to long term mental health providers, emergency food and utility assistance and help with temporary housing.

**134.** APD shall continue to utilize protocols for when officers should make referrals to and coordinate with COAST and CIU to provide prevention services and disposition and treatment options.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.  See APD Response after paragraph 136.**

**135.** APD shall maintain a sufficient number of trained and qualified mental health professionals in COAST and full-time detectives in CIU to satisfy its obligations under this Agreement. Within three months of completing the staffing assessment and resource study required by Paragraph 204 of this Agreement, APD shall develop a recruitment, selection, and training plan to assign, within 24 months of the study, 12 full-time detectives to the CIU, or the target number of detectives identified by the study, whichever is less.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response for paragraphs 132 to 136:**  In this reporting period the Mobile Crisis Team clinicians made the transition from an area provider to city employment in the Albuquerque Community Safety Department.  APD now has four operational Mobile Crisis Teams.  Twelve detectives are assigned to the Mobile Crisis Unit.

**136.** COAST and CIU shall continue to look for opportunities to coordinate in developing initiatives to improve outreach, service delivery, crisis prevention, and referrals to community health resources.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | S     | S     | O     | O     | O      | O      | O      | O      |

**There were no IMR13 recommendations.**

**APD Response:**  This reporting period CIU re-instituted monthly meetings with the University of New Mexico Hospital (UNMH) Psychiatric Emergency Services (PES) via Zoom to improve communication.  UNM PES has historically been the number one mental health transportation destination for people taken in for mental health evaluations by APD.  CIU also took part in multiple briefings with various Managed Care Organizations (MCO) to coordinate care for individuals that are on both of the MCO and APD CIU caseload.

**137.** APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services. This data will be collected for management purposes only and shall not include personal identifying information of subjects or complainants. APD shall collect the following data:

   a.  number of individuals in the COAST and CIU caseloads;
   b.  number of individuals receiving crisis prevention services;
   c.  date, shift, and area command of incidents or follow up encounters;
   d.  subject's age, race/ethnicity, and gender;
   e.  whether the subject claims to be a U.S. military veteran;
   f.  techniques or equipment used;
   g.  any injuries to officers, subjects, or others;
   h.  disposition of the encounter (e.g., arrest, citation, referral); and
   i.  a brief narrative of the event (if not included in any other document).

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | O     | O     | O      | O      | O      | S      |

**There were no IMR-13 Recommendations.**

**APD Response:**  An annual report for APD's 2020 interactions with individuals in mental health crisis was completed by the New Mexico Sentencing Commission which contained all required CASA data.  The report was presented during the July 2021 MHRAC meeting.  This report can be located at: https://www.cabq.gov/mental-health-response-advisory-committee/mental-health-response-advisory-committee-resources-links-documents

**138.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD's policies and procedures shall reflect and express the Department's core values and priorities and shall provide clear direction to ensure that officers and civilian employees deliver effective and constitutional policing services.  APD shall ensure that officers and civilian employees are trained to understand and carry out consistently and competently the duties and responsibilities specified in APD policies and procedures.  To achieve these outcomes, APD agrees to implement the requirements below. PD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so.  **Paragraph 138 is not a measurable paragraph.**

**139.** APD shall review, develop, and implement policies and procedures that fully implement the terms of this Agreement, comply with applicable law, and comport with best practices. APD policies and procedures shall use terms that are defined clearly, shall be written plainly, and shall be organized logically.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**140.**  APD policies and procedures shall be indexed and maintained in an organized manner using a uniform numbering system for ease of reference.  APD policies and procedures shall be accessible to all APD officers and civilian employees at all times in hard copy or electronic format.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**141.** Within three months of the Operational Date, APD shall provide officers from varying ranks and units with a meaningful opportunity to review and comment on new or existing policies and procedures.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**142.** Within three months of the Operational Date, APD shall ensure that the Policy and Procedures Review Board is functional and its members are notified of the Board's duties and responsibilities.  The Policy and Procedures Review Board shall include a representative of the Technology Services Division in addition to members currently required under Administrative Order 3-65-2 (2014).

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**143.** Within nine months of the Operational Date, the Policy and Procedures Review Board shall review, develop, and revise policies and procedures that are necessary to implement this Agreement.  The Policy and Procedures Review Board shall submit its formal recommendations to the Chief through the Planning and Policy Division.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | P     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**144.** Unless otherwise noted, all new and revised policies and procedures that are necessary to implement this Agreement shall be approved and issued within one year of the Operational Date.  APD shall continue to post approved policies, procedures, and administrative orders on the City website to ensure public accessibility.  There shall be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures on undercover officers or operations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**145.** The Policy and Procedures Review Board shall review each policy or procedure six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to APD personnel and remains consistent with this Agreement, best practices, and current law.  The Policy and Procedures Review Board shall review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | S     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**146.**  APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | P     | P     | O     | O     | P      | P      | O      | S      |

**IMR-13 Recommendations:**
**4.7.132a:** APD should consult with the monitoring team regarding solutions for the problems related to holding discipline "in abeyance" and come to an agreement on how this issue will be remediated.
**4.7.132b:** Ensure, via training, inter-office memoranda, or other methods, that all command-level personnel involved in assessing disciplinary outcomes are trained in monitor-approved (revised) policies regarding the use of the disciplinary matrix.
**4.7.132c:** APD should directly notify the monitor, in writing, in each and every event in which discipline assigned by the department is held in abeyance or otherwise results in a violation of recommended discipline stipulated in the disciplinary matrix.

**APD Response:**  Revisions in SOP 3-46 Discipline System have addressed issues with abeyance.   SOP 3-46, Discipline System was revised and published in July 2021.   On multiple occasions, APD worked with both the IMT and DOJ in this policy's revision, accepting feedback and making the necessary changes to develop a stronger policy.   SOP 3-46 is a CASA-related policy the department recognizes as having a significant impact on personnel, establishing requirements for progressive discipline and the use of abeyance as recommended.   APD is adding the newly published SOP 3-46 into the required 8-hour IA training, which is currently with CTU at the Training Academy.

**147.** APD shall submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ for review and comment before publication and implementation.  If the Monitor or DOJ objects to the proposed new or revised policy, procedure, manual, or other administrative order or directive, because it does not incorporate the requirements of this Agreement or is inconsistent with this Agreement or the law, the Monitor or DOJ shall note this objection in writing to all parties within 15 business days of the receipt of the policy, procedure, manual, or directive from APD.  If neither the Monitor nor DOJ objects to the new or revised policy, procedure, manual, or directive, APD agrees to implement it within one month of it being provided to DOJ and the Monitor.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see APD's response after paragraph 148.**

**148.**  APD shall have 15 days to resolve any objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions.  If, after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection.  If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter.  The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies.  Factors to consider in making this determination include:  1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor.  In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review.  Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**APD Response to paragraphs 138-146, 147 & 148:**  Over the last six months, APD's Policy and Procedure Unit successfully has published/republished twenty-eight Standard Operating Procedures (SOP).  Eight of which were SOPs the department categorized as being related to the CASA.  This is approximately a 200% increase when compared to the same reporting period in 2020.

Consistent with SOP 3-52, Policy Development Process, the Policy and Procedure Unit is required to host some of its meetings in a public forum in order to encourage community members to participate in the

policy development process.  Because of the increase in volume of policy drafts that the Unit advanced through the process, Unit personnel hosted several off-cycle Policy and Procedure Unit meetings. Furthermore, the Unit and APD's Policy and Procedures Review Board (PPRB) worked together to conduct several off-cycle PPRB meetings in response to the increase in volume of drafts going through the process. Conducting off-cycle meetings enabled the Policy and Procedure Unit to advance a greater number of policy drafts to the next step in the process.

Other notable accomplishments included the advancement of the policy drafts for SOP 3-52, Policy Development Process, and four out of six use of force policy drafts (SOPs 2-52 through 2-55) in July 2021. The Policy Owners for these SOPS presented their policy drafts at a Policy and Procedure Unit meeting. The most recent accomplishment by the Policy and Procedure Unit was the revision and publication of SOP 3-46, Discipline System, in July 2021.  SOP 3-46 is a CASA-related SOP the department recognizes as having a significant impact on APD personnel, establishing requirements for progressive discipline and abeyance.

## B. Training on Revised Policies, Procedures, and Practices

**149.** Within two months of the Operational Date, APD shall ensure that all officers are briefed and presented the terms of the Agreement, together with the goals and implementation process of the Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  APD continues to present the CASA to all new cadet classes.

**150.** Within three months of issuing a policy or procedure pursuant to this Agreement, APD agrees to ensure that all relevant APD personnel have received and read their responsibilities pursuant to the policy or procedure, including the requirement that each officer or employee report violations of policy; that supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel will be held accountable for policy and procedure violations.  APD agrees to document that each relevant APD officer or other employee has received and read the policy.  Training beyond roll-call or similar training will be necessary for many new policies to ensure officers understand and can perform their duties pursuant to the policy.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | P      |

**IMR-13 Recommendations:**

**4.7.136a:** Executive staff should maintain a "living document" that identifies critical milestones and processes required by the CASA and clearly identifies dates and responsibilities for all critical path processes

required by the CASA and identifies critical milestones and due dates. This document should be the touchstone of project management tool for APD in the future.

**APD Response:**   This requirement has been met.   APD continues to utilize PowerDMS to distribute all policies and special orders.   Officers e-sign the document once published which documents receipt with a date and time stamp of the e-signature.   The APD Compliance Implementation Unit has maintained action plans on numerous paragraphs not in operational compliance since 2018.   The action plans identify compliance levels, assess paragraph needs, identify core problems, identify critical dependencies, lay out stepwise actions, identify responsible parties, inputs & outputs, start and completion dates, as well as proof of compliance delivery.   Action plans have been revised over time while APD determines the best and most efficient way to track compliance progress and identify challenges in reaching operational compliance.

Additionally, APD developed an online training calendar in December 2020, and has provided access to the DOJ and IMT.   This document delivers real time updates to the academy schedule and what aspects of training are impacted.   Both Action Plans and the calendar provide detailed information that is utilized to track training activities and compliance efforts.

SOP 3-46, Discipline System was revised and published in July 2021.   On multiple occasions, APD worked with both the IMT and DOJ in this policy's revision, accepting feedback and making the necessary changes to develop a stronger policy.   SOP 3-46 is a CASA-related policy the department recognizes as having a significant impact on personnel, establishing requirements for progressive discipline and the use of abeyance as recommended.

**151.** Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Operational Date, and annually thereafter.  Within six months of the Operational Date, APD shall set out a schedule for delivering all training required by this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | P      |

**There were no IMR-13 Recommendations.**

**APD Response:**  APD developed an online training calendar in December 2020, and has provided access to the DOJ and IMT.   APD did not complete Tier 4 Use of Force training in 2020, resulting in a decrease in compliance rates for numerous, interrelated paragraphs.  The first day of Tier 4 Use of Force training was approved by the DOJ and IMT in February 2021, training began in March 2021 and was completed in May 2021 with a compliance rate of 98%.   The second day of Tier 4 training was approved by the DOJ and the IMT in July 2021, which is currently being delivered to all sworn officers and expected to be completed by December 2021.

The Crisis Intervention Division has worked with the Training Academy and MHRAC to develop two hours of in-service training to all existing officers and telecommunicators on behavioral health-related topics and that training will be conducted by the end of 2021.  APD will then have corrected the lapse in compliance by conducting this training requirement.

**152.** APD shall ensure that all new lateral hires are certified law enforcement officers and that they receive all training required by this Agreement prior to entry onto duty.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations:**

**APD Response**:   APD verifies lateral hires are sworn law enforcement officers and trains lateral hires prior to entry on duty.  All training is uploaded to ELM as with other Department training such as firearm qualifications.

**153.** APD shall maintain complete and accurate records of all training provided to sworn APD officers during pre-service and in-service training programs, including curricula, course materials, lesson plans, classroom presentations, handouts, videos, slides, recordings, and attendance records.  APD shall also maintain complete and accurate records of any audit, review, assessment, or evaluation of the sufficiency or effectiveness of its training programs.  APD shall make these records available for inspection by the Monitor and DOJ.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  APD continues to maintain complete and accurate records of all training, which is tracked uploaded in the Enterprise Learning Management system (ELM).

**154.** APD shall ensure that changes in relevant case law and statutes are disseminated to APD personnel in a timely manner and incorporated, as appropriate, into annual and preservice training.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  During the two-year Maintenance of Effort training, the Training Academy provides legal updates.  Occasionally, legal updates have been provided as a block of instruction in PowerDMS, APD's policy and training management program.

## C. Field Training Officer Program

**155.** APD shall supervise and manage its field training program to ensure that new officers develop the necessary technical and practical skills required to use force in accordance with APD policy and applicable

law.  The field training program should reinforce, rather than circumvent, the agency's values, core principles, and expectations on use of force and engagement with the community.  Field Training Officers should demonstrate the highest levels of competence, professionalism, impartiality, and ethics.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The FTEP continues to work on completing the updates to SOP 1-46 Field Training and Evaluation Program.  The policy has been delayed in order to update the FTEP Operations Manual to reflect the current structure and to match SOP 1-46.  The Operations Manual has been updated and is currently undergoing its secondary review. Once approved, it will be sent to the IMT and DOJ for review and approval.

The FTEP has not issued any memos during this reporting period addressing FTEP supervisory issues. However, the FTEP has been made aware of two issues with separate FTOs. One notification came from FRB and the second came from a FTO critique by a recruit officer.  Both of these cases are being reviewed, and awaiting final disposition of the internal affairs investigations.  Both FTOs have been placed in an inactive status and are not being used for training.  These developments occurred in the end of May 2021 and beginning of June 2021 and are in the early stages of the review but they will be presented to the FTEP Board in accordance with the FTEP Operations Manual.

**156.** APD shall revise the policies applicable to its field-training program to provide that academy graduates will receive 16 weeks of field training following the training academy and that recruits will not be released from the field training program early.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  FTEP provided the IMT documentation showing that no recruit or lateral officers were released from OJT without completing the entire OJT program and its corresponding time requirements. APD remains in operational compliance of paragraph 156.

**157.** APD shall revise the qualifications for Field Training Officers to require three years of non-probationary experience as a sworn police officer and to ensure that Field Training Officers have a demonstrated commitment to constitutional policing, ethics, and professionalism.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The FTEP conducted two FTO testing process during this reporting period, one in March and one in April of 2021.  Twenty-five applicants (twenty officers and five sergeants) applied for the test and they were all vetted through the backgrounds process as currently established by the FTEP.  One of the applicants did not meet the criteria established under paragraph 155 and was removed from the process.  The remaining applicants tested for the positions and were successful in their efforts.  Three of the officers who tested where not eligible (due to being short a few months of the three years' non-probationary requirement) and they were placed in an inactive status until they reached their three-year requirement.  None of those three officers were assigned or took part in any recruit training before they reached their time requirement and were authorized to train recruits by FTEP staff.

**158.**  New Field Training Officers and Area Sergeant Coordinators shall receive at least 40 hours of initial supervisory-level training and annual in-service training in the following areas:  management and supervision; constitutional, community-oriented policing; de-escalation techniques; and effective problem-solving techniques.  Field Training Officers and Area Sergeant Coordinators shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, as well as practicing and teaching constitutional, community-oriented policing; de-escalation techniques; and effective problem solving.  APD shall maintain records of all evaluations and training of Field Training Officers and Area Sergeant Coordinators.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The FTEP conducted additional FTO Recertification courses for FTOs who were on leave or returning to the program after transferring back to the field from other positions.  These were done via a combination of in-person and video review from the previously delivered 2020 Recertification sessions.  The recertification trainings were conducted in February, March and May 2021.  All personnel completed their recertification before taking a new recruit officer and at this time all person are current with FTEP certifications.

The FTEP conducted four FTO Basic Courses during this reporting period.  In February 2021, the FTO Basic Course had ten officers and one sergeant in attendance. In April 2021, the class had ten officers in attendance.  In May 2021, the class had five officers attend.  Lastly, in June-July 2021, the class had eight officers, one sergeant, and one lieutenant.

**159.**  Recruits in the field training program shall be trained in multiple Area Commands and shifts and with several Field Training Officers.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The FTEP provided the IMT documents showing that all recruit officers did complete their OJT with different FTOs; working different shifts and in different area commands if possible. Documents were provided for the 24th Lateral Class, 121st Cadet Class, 122nd Cadet Class and the first three phases of the 123rd Cadet Class. All Recruit Officers did switch area commands, watches and FTO's with each phase.

**160.** APD shall provide a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the field training program.  APD shall consider feedback and document its response, including the rationale behind any responsive action taken or decision to take no action.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**   FTEP completed the FTO Critiques Response Memo, the OJT Survey Critique, The FTAS Critique by Sergeant Trainee and the FTEP Response to FTAS Critique Memo.  In total the FTEP received twenty-seven responses to the FTAS by the Sergeant Trainee which were all positive critiques.  There were forty-six responses to the FTAS by FTO Critique which also showed positive reviews of our FTAS. The FTEP did again notice a decrease in response from 51% to 34% (-17%) from the last reporting period. The FTEP is continuing to advocate for FTOs to complete this survey. The FTO Critique from the Recruit Officers (RO) continues to have a strong response of 76 surveys with five negative critiques on four FTO's.  Out of those negative critiques action was taken against one FTO.   This information was shared with IAFD and the Advanced Training Section for future follow-up action by those units.

**161.** The City shall provide APD with the necessary support and resources to designate a sufficient number of Field Training Officers to meet the requirements of this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | O     | O     | S     | O      | S      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  In June 2021, one Sergeant transferred out of the FTEP.  The Department realizing the need to quickly fill this vacated position, posted the FTEP Operations Sergeant for qualified sergeants.  A FTEP sergeant was selected in July 2021.

The FTEP Administrative Officer conducted two recruiting events at different squad field briefings in order to further recruitment efforts for the FTEP. In February 2021, the FTEP produced a short recruitment videos that were launched in the PowerDMS system to bolster FTO recruiting efforts.
In April 2021, the FTEP Unit attended a two-day Managing the FTO Unit Class taught by the National Association of Field Training Officers Association.

## Section 5:  Misconduct Complaint Intake, Investigation, and Adjudication (Paragraphs 162 – 202)

**162.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system.  To achieve these outcomes, APD and the Civilian Police Oversight Agency shall implement the requirements below.

**APD Response:**  This Paragraph serves as an introductory paragraph and is not evaluated for compliance.

### A.  Reporting Misconduct

**163.**  APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs Division for review and investigation.  Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Division.  Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | O     | O     | O     | O      | O      | O      | S      |

**IMR-13 Recommendations:**
**4.7.149a:** IAPS should build into the IAR template the requirement to document how and when the referring supervisor became aware of the alleged misconduct, to determine whether documentation and referral of the alleged misconduct is made in accordance with paragraph 163.

**APD Response:**  APD will revise the existing IAR template to reflect how and when a referring supervisor became aware of the alleged misconduct.  In July 2021, APD hired an IAPS intake manager who reviews incoming allegations to ensure proper classification and assignment for investigation.

### B.  Public Information on Civilian Complaints

**164.**  Within six months of the Operational Date, APD and the Civilian Police Oversight Agency shall develop and implement a program to ensure the Albuquerque community is aware of the procedures to make civilian complaints against APD personnel and the availability of effective mechanisms for making civilian complaints.  The requirements below shall be incorporated into this program.

**165.** APD and the Civilian Police Oversight Agency shall make complaint forms and informational materials, including brochures and posters, available at appropriate government properties, including APD headquarters, Area stations, APD and City websites, City Hall, public libraries, community centers, and the office of the Civilian Police Oversight Agency.  Individuals shall be able to submit civilian complaints through the APD and City websites and these websites shall include, in an identifiable and accessible form, complaint forms and information regarding how to file civilian complaints.  Complaint forms, informational

materials, and the APD and City websites shall specify that complaints may be submitted anonymously or on behalf of another person. Nothing in this Agreement prohibits APD from soliciting officer commendations or other feedback through the same process and methods as above.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 165.**

**APD Response:** All police officers, city buildings as well as city website have information on how to file civilian complaints.

**166.** APD shall post and maintain a permanent placard describing the civilian complaint process that includes relevant contact information, such as telephone numbers, email addresses, and Internet sites. The placard shall specify that complaints may be submitted anonymously or on behalf of another person. APD shall require all officers to carry complaint forms, containing basic complaint information, in their Department vehicles. Officers shall also provide the officer's name, officer's identification number, and, if applicable, badge number upon request. If an individual indicates that he or she would like to make a misconduct complaint or requests a complaint form for alleged misconduct, the officer shall immediately inform his or her supervisor who, if available, will respond to the scene to assist the individual in providing and accepting appropriate forms and/or other available mechanisms for filing a misconduct complaint.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 166.**

**APD Response:** Officers continue to carry complaint forms and provides details for civilian complaints.

**167.** APD agrees to accept all civilian complaints and shall revise any forms and instructions on the civilian complaint process that could be construed as discouraging civilians from submitting complaints.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 167.**

**APD Response:** APD continues to accept all complaints.

**168.** Complaint forms and related informational materials shall be made available and posted in English and Spanish.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 recommendations for paragraph 168.

**APD Response:**  All city buildings as well as city website have information on how to file civilian complaints in English and Spanish.

## C.  Complaint Intake, Classification, and Tracking

**169.**   Within six months of the Operational Date, APD shall train all personnel in handling civilian complaint intake.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 169.  Please see APD Response after paragraph 173.**

**170.**   APD shall accept complaints regardless of when they are filed.  The City shall encourage civilians to promptly report police misconduct so that full investigations can be made expeditiously and the full range of disciplinary and corrective action be made available.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 170.  Please see APD Response after paragraph 173.**

**171.**   The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint shall be grounds for discipline.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 171.  Please see APD Response after paragraph 173.**

**172.**    APD and the Civilian Police Oversight Agency shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation.  Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail.  Any Spanish-speaking individual with limited English proficiency who wishes to file a complaint about APD personnel shall be

provided with a complaint form in Spanish to ensure that the individual is able to make a complaint.  Such complaints will be investigated in accordance with this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 172.  Please see APD Response after paragraph 173.**

**173.**  All APD personnel who receive a misconduct complaint shall immediately inform a supervisor of the misconduct complaint so that the supervisor can ensure proper intake of the misconduct complaint.  All misconduct complaints shall be submitted to the Internal Affairs Division by the end of the shift following the shift in which it was received.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 173.**

**APD Response for paragraphs 169-173:**  The department continues to follow policy that outlines the process and guides employees on handling civilian complaints.

**174.**  APD and the Civilian Police Oversight Agency shall develop a system to ensure that allegations by a judicial officer of officer misconduct made during a civil or criminal proceeding are identified and assessed for further investigation.  Any decision to decline investigation shall be documented.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | S     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 174.**

**APD Response:**  Department policy outlines the process and guides employees on handling judicial complaints.

**175.**  APD and the Civilian Police Oversight Agency shall track allegations regarding misconduct involving individuals who are known to be homeless or have a mental illness, even if the complainant does not specifically label the misconduct as such.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 175.**

**APD Response:**  APD and CPOA forms capture demographic information.

**176.**  Within six months of the Operational Date, the Internal Affairs Division, in coordination with the Civilian Police Oversight Agency, shall develop and implement a centralized numbering and tracking system for all misconduct complaints.  Upon the receipt of a complaint, the Internal Affairs Division shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant at the time the numerical identifier is assigned when contact information is available for the complainant.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 176.**

**APD Response:**  All complaints receive a unique numerical identifier and that identifier is provided to the complainant in accordance with paragraph 176.

**177.**  The Internal Affairs Division's tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.  This system shall be used to determine the status of complaints and to confirm that a complaint was received, as well as for periodic assessment of compliance with APD policies and procedures and this Agreement, including requirements on the timeliness of administrative investigations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 177.**

**APD Response:** APD maintains an internal affairs database to track all relevant information regarding complaints and provides regular case updates to the DOJ and the IMT.

**178.**  Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Division.  All information should be referred to the Internal Affairs Division by the end of the shift following the shift in which the misconduct complaint was received, absent exceptional circumstances.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 178.**

**APD Response:**  Department policy outlines the process and guides employees on handling complaints.  There were no violations found where a complaint was received and not forwarded to Internal Affairs.

**179.**   Within three business days of the receipt of a misconduct complaint from a civilian, the Internal Affairs Division shall refer the complaint to the Civilian Police Oversight Agency.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 179.**

**APD Response:** Internal Affairs track all misconduct complaints from civilians and refers complaints to the CPOA within (3) business days.

**180.**   Internal misconduct complaints submitted by APD personnel shall remain with the Internal Affairs Division for review and classification.  The Internal Affairs Division shall determine whether the internal complaint will be assigned to a supervisor for investigation or retained by the Internal Affairs Division for investigation.  In consultation with the Chief, the commanding officer of the Internal Affairs Division shall also determine whether a civilian or internal complaint will be investigated criminally by the Internal Affairs Division, the Multi-Agency Task Force, and/or referred to the appropriate federal law enforcement agency.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 180.**

**APD Response:**   In July 2021, APD hired an IAPS intake manager who screens incoming allegations to include proper classification and assignment for investigation based on current allegations.

**181.**   APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Division in determining where an internal complaint should be assigned.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**IMR-13 Recommendations:**

**4.7.167a:** APD should consult with the monitor after providing a detailed internal complaint classification protocol and should incorporate the necessary changes to the protocol after feedback from the monitor.

**APD Response:**   APD received feedback by the IMT while revising SOP 3-41 Complaints Involving Department Policy or Personnel, to properly address intake classification and assignment.  The IMT and DOJ provided comments to APD and the department will make the necessary revisions and resubmit the policy for approval.

**182.**   An internal complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury of a person; who authorized the conduct that led to the

reported incident or complaint; or who witnessed or was involved in the incident leading to the allegation of misconduct.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 182.**

**APD Response:**  APD remains in operational compliance with the requirements outlined in paragraph 182. Supervisors who meet the criteria in this paragraph do not conduct internal complaint investigations.

## D.  Investigation of Complaints

**183.**   APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant. All officers in a position to observe an incident, or involved in any significant event before or after the original incident, shall provide a written statement regarding their observations, even to state that they did not observe anything.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
**4.7.169a:** City Legal should appoint an independent review and approval authority for all external APD IA investigations that are conducted by an independent investigator. The appropriateness of selection of this independent investigator should be documented in writing.
**4.7.169b:** In investigations in which the complainant or logical witnesses are not interviewed or in matters that are administratively closed, the investigation should include a clear explanation of why the interviews were not conducted and or why further investigation steps were not warranted.
**4.7.169c:** APD must ensure that investigations conducted by the Area Commands are held to the same standards that apply to IAPS and CPOA and are CASA compliant.

**APD Response:**  The current IAPS practice is for investigators to interview all complainants and witnesses of an incident.  Area command investigations are being reviewed by IAPS to ensure proper adjudication and documentation.   If further information is needed, the investigations are sent back to the area commands for completion.

**184.**   APD and the Civilian Police Oversight Agency shall investigate all misconduct complaints and document the investigation, its findings, and its conclusions in writing.   APD and the Civilian Police Oversight Agency shall develop and implement a policy that specifies those complaints other than misconduct that may be resolved informally or through mediation.  Administrative closing or inactivation of a complaint investigation shall be used for the most minor policy violations that do not constitute a

pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | O     | P     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 184.**

**APD Response:**  The provisions set forth in this paragraph are addressed in SOP 3-41 Complaints Involving Department Policy and Personnel.

**185.**   APD shall require personnel to cooperate with Internal Affairs Division and Civilian Police Oversight Agency investigations, including appearing for an interview when requested by an APD or Civilian Police Oversight Agency investigator and providing all requested documents and evidence under the person's custody and control.  Supervisors shall be notified when a person under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the person's appearance, absent extraordinary and documented circumstances.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | O     | P     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 185.**

**APD Response:**  APD policy requires cooperation with investigations and identifies sanctions for failure to cooperate.  There have not been any instances of failure to cooperate during this reporting period.

**186.**   APD and the City shall develop and implement protocols to ensure that criminal and administrative investigations of APD personnel are kept appropriately separate, to protect APD personnel's rights under the Fifth Amendment.  When an APD employee affirmatively refuses to give a voluntary statement and APD has probable cause to believe the person has committed a crime, APD shall consult with the prosecuting agency (e.g., District Attorney's Office or USAO) and seek the approval of the Chief before taking a compelled statement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 186.**

**APD Response:**  APD continues to follow policy and protocols separating criminal and administrative investigations.  Prior to obtaining a compelled statement from an employee where there is a likelihood of criminal prosecution, APD receives permission from the Chief of Police and the prosecuting authority.

**187.**  Advisements by the Internal Affairs Division or the Civilian Police Oversight Agency to APD personnel of their Fifth Amendment rights shall only be given where there is a reasonable likelihood of a criminal investigation or prosecution of the subject employee.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 187.**

**APD Response:**  APD policy outlines use of 5th amendment rights and compelled statements.

**188.**  If at any time during misconduct complaint intake or investigation the investigator determines that there may have been criminal conduct by any APD personnel, the investigator shall immediately notify the Internal Affairs Division commanding officer.  If the complaint is being investigated by the Civilian Police Oversight Agency, the investigator shall transfer the administrative investigation to the Internal Affairs Division.  The Internal Affairs Division commanding officer shall immediately notify the Chief.  The Chief shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation.  Where an allegation is investigated criminally, the Internal Affairs Division shall continue with the administrative investigation of the allegation.  Consistent with Paragraph 186, the Internal Affairs Division may delay or decline to conduct an interview of the subject personnel or other witnesses until completion of the criminal investigation unless, after consultation with the prosecuting agency and the Chief, the Internal Affairs Division deems such interviews appropriate.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 188.**

**APD Response:**  APD continues to comply with the requirements of paragraph 188.  The Chief of Police is notified of possible criminal conduct.

**189.**  Nothing in this Agreement or APD policy shall hamper APD personnel's obligation to provide a public safety statement regarding a work-related incident or activity, including use of force reports and incident reports.  APD shall make clear that all statements by personnel in incident reports, arrest reports, use of force reports and similar documents, and statements made in interviews such as those conducted in conjunction with APD's routine use of force investigation process, are part of each employee's routine professional duties and are not compelled statements.  Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without prior consultation with the prosecuting agency (e.g., District Attorney's Office or USAO), and approval by the Chief.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 189.**

**APD Response:** APD remains in compliance with the requirements outlines in paragraph 189 and comply with the employee's routine professional duties.

**190.** In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence.  There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into account any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
**4.7.176a:** For investigations found to be deficient, follow up on any deficiencies noted by this IMR, and analyze, discuss, and use teaching points and policies to further refine investigative quality.
**4.7.176b:** APD should identify a cadre of investigators at the Area Commands, who will conduct investigations of minor misconduct and provide appropriate training to them in internal affairs investigations and CASA requirements.

**APD Response:** IAPS investigator, IAFD investigators, and Area Commander are scheduled to attend a 40-hour introduction into internal affairs training in August 2021.  In addition, IAPS has been working with the newly hired curriculum development manager to complete the 8-hour Internal Affairs Administrative Investigations training.  This training is in Step-2 of the 7-Step curriculum development process with the Training Academy's CTU.

**191.**  All administrative investigations conducted by the Internal Affairs Division or the Civilian Police Oversight Agency shall be completed within 90 days of the initiation of the complaint investigation.  The 90-day period shall not include time for review.  An extension of the investigation of up to 30 days may be granted but only if the request for an extension is in writing and is approved by the Chief.  Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 30 days of the completion of the investigation.  To the extent permitted by state and city law, extensions may also be granted in extenuating circumstances, such as military deployments, hospitalizations of the officer, and extended absences.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | O     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.177a:** APD and CPOA should refocus their efforts related to this paragraph by conducting a quantitative analysis of the reasons that cause any case to be delayed past 90 days.

**4.7.177b:** Once causes for these delays are identified, develop recommendations for changes to policy, staffing, procedure, or practice that are designed to eliminate such delays.

**4.7.177c:** All investigations should include a clear timeline that delineates the date of the incident, date of receipt of the complaint, date of assignment, date of extension if applicable, date investigation is completed, dates review period begins and ends, and date of notice of intent to discipline if applicable.

**4.7.177d:** In regard to matters initiated by internal complaints, investigations should include a clear timeline that delineates when the APD employee who made the referral to IAPS first became aware of the alleged misconduct and when all employees in the chain of referral became aware of the misconduct so that the time or receipt of information of potential misconduct to referral to IAPS can be accurately gauged.

**APD Response:** During this reporting period, IAPS has completed all investigations within timelines. IAPS continues to provide a weekly case update to the IMT and DOJ. IAPS includes clear timelines from beginning to end to accurately document the timelines within each case.

**192.** The APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation: a) "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer; b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur; c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; d) "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training; e) "Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or f) "Administratively closed," where the policy violations are minor, the allegations are duplicative, or investigation cannot be conducted because of the lack of information in the complaint.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | S     | S     | O     | O     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.178:** Although the monitoring team has approved the closing of an investigation and the use of an "unfounded" finding in lieu of "administrative closure" where a preliminary investigation shows by clear and convincing evidence that the conduct which is the subject of the complaint did not occur, and shows no indication of any other violation (misconduct not based on the original complaint), we caution APD and CPOA not to utilize this disposition for expediency sake where the complaint, in conjunction with the underlying facts, calls for a fuller investigation with findings that resolve the issue of whether the allegations were sustained or not sustained.

**APD Response:** In July 2021, APD hired an IAPS intake manager who screens incoming allegations to include proper classification and assignment for investigation based on current allegations. This includes conducting a preliminary investigation, when appropriate, to determine if the allegation calls for a fuller investigation.

**193.** Administratively closed complaints may be re-opened if additional information becomes available. The deadlines contained in Paragraph 191 shall run from when the complaint is re-opened.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 recommendations for paragraph 193.

**APD Response:**  Paragraphs 193 remains in operational compliance. SOP 3-41 Complaints Involving Department Policy or Personnel limits the use of administratively closed to specific circumstances and states that such complaints may be reopened if additional information becomes available.  There were no instances of an IA case being administratively closed and being re-opened during this reporting period.

**194.** In addition to determining whether APD personnel committed the alleged misconduct, administrative investigations shall assess and document whether the action was in compliance with training and legal standards and whether the incident suggests the need for a change in policy, procedure, or training.  In reviewing completed administrative investigations, APD shall also assess and document whether: (a) the incident suggests that APD should revise strategies and tactics; and (b) the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures.  This information shall be shared with the relevant commander(s).

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 recommendations for paragraph 194.

E. Preventing Retaliation

**195.**  The City shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 recommendations for paragraph 195.  Please see APD response after paragraph 197.

**196.**  Within six months of the Operational Date, and annually thereafter, the Internal Affairs Division and the Civilian Police Oversight Agency shall review APD's anti-retaliation policy and its implementation.  This review shall consider the alleged incidents of retaliation that occurred or were investigated during the

reporting period, the discipline imposed for retaliation, and supervisors' performance in addressing and preventing retaliation. Following such review, the City shall modify its policy and practice, as necessary, to protect individuals, including other APD personnel, from retaliation for reporting misconduct.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 195. Please see APD response after paragraph 197.**

**197.** Retaliation for reporting misconduct or for cooperating with an investigation of misconduct shall be grounds for discipline, up to and including termination of employment.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 197.**

**APD Response:** APD continues to expressly prohibit retaliation. Internal Affairs Professional Standards and CPOA meet yearly to review SOP 3-41 Complaints Involving Department Policy and Personnel and SOP 1-1 Code of Conduct, both of which includes the prohibition of retaliation. Any retaliation case has and will be fully investigated.

## F. Staffing and Training Requirements

**198.** The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement. The City shall re-assess the staffing of the Internal Affairs Division after the completion of the staffing study to be conducted pursuant to Paragraph 204. The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations for paragraph 198.**

**APD Response:** Current Internal Affairs staffing has allowed for completion of investigations in a timely manner.

**199.** All APD personnel conducting misconduct investigations, whether assigned to the Internal Affairs Division, an Area Command, or elsewhere, shall receive at least 24 hours of initial training in conducting

misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | S     | S     | S      | S      | S      | S      |

**IMR-13 recommendations:**

**4.7.185-186a:** Identify the members of the Area Commands who may be assigned misconduct investigations and develop an annual IA training program for them. Ensure they complete the same on an annual basis. Annual training for those members of the Area Commands conducting internal affairs investigations of allegations of minor misconduct is an urgent priority for the internal affairs process.

**4.7.185-186b:** Do not assign a misconduct investigation to any APD personnel who have not met the annual training requirement.

**4.7.185-186c:** CPOA should develop an assessment mechanism to measure the effectiveness of outside training, such as the NACOLE conference. That can easily be done through "testing" by CPOA once the CPOA investigators have completed the NACOLE training.

**4.7.185-186d:** Investigations involving allegations that are CASA related should remain with IAPS and not be transferred to Area Command personnel.

**4.7.185-186e:** Investigations involving allegations that have sanction levels of 5 or below (levels 1-5) should remain with IAPS for investigation and not be transferred to Area Command personnel.

**APD Response**:  An eight-hour Internal Affairs Administrative Investigations training is being developed with the newly hired Training Academy curriculum development manager for APD supervisors and investigators who conduct administrative misconduct investigations. The training is in Step-2 of the 7-Step curriculum development process with the Training Academy's CTU.  Using the newly hired IAPS intake manager who screens incoming allegations, assigns allegations of a level 5 or below to IAPS for investigation.

**200.**  Investigators from the Civilian Police Oversight Agency shall receive at least 40 hours of initial training in conducting misconduct investigations within one year of the Operational Date, and shall receive at least eight hours of training each year.  The training shall include instruction on APD's policies and protocols on taking compelled statements and conducting parallel administrative and criminal investigations. G. Discipline Process and Transparency.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | S     | S      | S      | S      | O      |

**There were no IMR-13 recommendations for paragraph 200.**

**201.**  APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 recommendations:**

**4.7.187a:** Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix unless written reasons for departure from the matrix recommendations accompany the decision.

**4.7.187b:** Ensure that adequate explanation is given for the selection of a classification level where there is more than one level of classification associated with a regulation for which a sustained finding is made.

**4.7.187c:** APD should designate the Commander of IAPS or a Deputy Chief as the only person in the organization who has the authority to determine that discipline cannot be imposed due to time violations, and that designation should not be made without the approval of the City Attorney.

**4.7.187d:** All investigations involving sustained charges where discipline cannot be imposed due to violations of time constraints should be reported quarterly to the Chief, the City Attorney, DOJ, and the monitor.

**4.7.187e:** APD should adhere to the practice of having a representative of IAPS or an administrative prosecutor attend all PDHs and represent the findings and recommendations set forth in the investigation.

**4.7.187f:** Ensure uniformity in the content and format of summarizing the information presented to the Chief with investigations, and thus CPOA should follow the IAPS practice and adopt the use of Disciplinary Action Packets to accompany its investigations in which charges are sustained.

**4.7.187g:** Ensure that all PDHs are recorded and preserved as part of the investigative file.

**4.7.187h:** IAPS should determine if there are any prior violations that count as prior offenses for all matters referred to the Area Commands for investigation and imposition of discipline where appropriate.

**4.7.187i:** Training in the administration of discipline per SOP 3-46 and the tenets of progressive discipline must be provided to the Area Command disciplinary authorities who impose discipline on sustained allegations of minor misconduct. Alternatively, one disciplinary authority – properly trained in SOP 3-46 and the principles of progressive discipline – should be designated for those sustained matters arising out of Area Command investigations.

**4.7.187j:** Build specific training components, based on past failures, to ensure supervisory personnel are keenly aware of their responsibilities regarding the identification of aberrant behavior in the field, and begin the processes of progressive discipline for sergeants, lieutenants, and commanders who fail to implement the requirements of APD's policies regarding use of force and related policies.


**APD Response:** APD regularly applies the presumptive range of discipline and utilizes the current discipline matrix for all recommendations from IAPS consistent with the range classification of sanctions. The IAPS Commander is the representative in pre-determination hearings to ensure correct evidence is presented. IAPS uses the Disciplinary Action Packet consistently to promote fair and consistent application of discipline. SOP 3-46, Discipline System was revised and published in July 2021. On multiple occasions, APD worked with both the IMT and DOJ in this policy's revision, accepting feedback and making the necessary changes to develop a stronger policy. SOP 3-46 is a CASA-related policy the department recognizes as having a significant impact on personnel, establishing requirements for progressive discipline and the use of abeyance as recommended.


**202.** APD shall establish a disciplinary matrix that: a) establishes a presumptive range of discipline for each type of rule violation; b) increases the presumptive discipline based on an officer's prior violations of the same or other rules; c) sets out defined mitigating or aggravating factors; d) requires that any departure from the presumptive range of discipline must be justified in writing; e) provides that APD shall not take

only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and f) provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     |       |       | S     | S     | S      | S      | S      | S      |

**IMR-13 recommendations:**

**4.7.188a:** Ensure that all disciplinary decisions either conform to the recommended ranges included in APD's disciplinary matrix or that they are accompanied by written explanations for the departure from the recommendations of the disciplinary matrix.

**4.7.188b:** Ensure that all disciplinary decisions related to actions (or inactions) that are reasonably on the "critical path" regarding compliance with the CASA reflect a resolve to foster behaviors required by the CASA.

**4.7.188c:** Ensure that all disciplinary packets are complete and self-explanatory, including documentation that all steps in the investigation and disciplinary processes were completed as required by policy.

**4.7.188d:** Ensure a more exact calculation of prior offenses for purposes of calculating the presumptive range of the disciplinary matrix.

**4.7188e:** Ensure that all disciplinary decisions address the presumptive range of the disciplinary matrix unless cogent, written reasons for departure from the matrix recommendations accompany the decision.

**4.7.188f:** A revised AO 3-46 must be adopted on a priority basis and must reflect the tenets of the CASA and principles of fair and consistent discipline, and clearly set forth the guidance necessary to calculate a prior offense and the appropriate range of the disciplinary matrix in accordance with the principles of progressive discipline.

**4.7.188g:** Ensure that a revised AO 3-46 addresses when a suspension can be held in abeyance and the criteria for doing so and that a cogent explanation consistent with the tenets of progressive discipline be given whenever a suspension is held in abeyance.

**4.7.188h:** Insert an additional column in the disciplinary decision matrix that identifies whether the range of discipline is enhanced by prior offenses.

**4.7.188i:** Revise SOP 3-43 to contain guidance for when relief of duty is appropriate and warranted.

**4.7.188.j:** IAPS should provide training to Area Command disciplinary authorities on the principles of progressive discipline and the requirements of SOP 3-46, including the calculation of prior offenses and the appropriate range of discipline for sustained charges within the disciplinary matrix, the identification and weighing of aggravating and mitigating factors, and the justification of an upward or downward departure from the disciplinary matrix.

**APD Response:** The IMT provided technical assistance in the revision of SOP 3-46, received feedback and approval by the IMT and the DOJ, and SOP 3-46 Discipline System was published in July 2021. The recent revision to SOP 3-46 provides guidance on the use of abeyance. In the recently published SOP 3-46, revisions were made to the disciplinary matrix for easier calculation of progressive discipline. SOP 3-43 Relief of Duty is the next policy to be revised.

## Section 6:  Staffing, Management, and Supervision (Paragraphs 203 – 231)

**203.** To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, the City shall ensure that APD has the staffing necessary to implement

the terms of this Agreement.  APD shall also deploy a sufficient number of first-line supervisors to respond to scenes of uses of force; investigate thoroughly each use of force to identify, correct, and prevent misconduct; and provide close and effective supervision necessary for officers to improve and develop professionally.  APD shall revise and implement policies for supervision that set out clear requirements for supervision and comport with best practices.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | P     | O     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
**4.7.189a:** Enforce existing policies that require supervisors to conform to the requirements of this paragraph.
 **4.7.189b:** If necessary, revise supervision policies to ensure clarity of requirements. Then ensure enforcement of those policies.

**APD Response:**   During this reporting period, APD revised three policies that impact supervision and discipline.  SOP 3-14, Supervisory Leadership, and SOP 3-41 Complaints Involving Department Policy or Personnel remain in the revision process.  The revised version of SOP 3-46 Discipline System was published July 2021.  These policy updates will increase and enhance the clarity of requirements for supervisors and all employees.

There has been increased focus on the investigatory process for levels 2 and 3 use of force cases.  As noted earlier in this report, IAFD and IAPS commanders worked with the IMT to outline a more detailed process for use of force investigations, to include any misconduct that occurred in the course of those investigations.  This continued on upon bringing EFIT on board in April 2021.  The process was refined, approved, and filed with the Court in July 2021.  This process will likely be further revised upon the identification of areas of improvement in the investigative process.  In addition, while the EFIT investigators are on-site and accompanying the IAFD investigators to crime scenes, they will be coaching and mentoring them from the scene throughout the force investigation in order to aid in the improvement of the investigator's skills. EFIT will also provide guidance to supervisors both on-scene and assigned to IAFD.

## A. Staffing

**204.**   In order to successfully implement the provisions of this Agreement, APD shall assess the appropriate number of sworn and civilian personnel to perform the different Department functions necessary to fulfill its mission.  APD therefore shall conduct a comprehensive staffing assessment and resource study.  The study shall be the predicate for determining appropriate staffing and resource levels that are consistent with community-oriented policing principles and support the systematic use of partnerships and problem-solving techniques.  The study shall also consider the distribution of officers to patrol functions as opposed to specialized units, as well as the distribution of officers with less than three years of experience across shifts and Area Commands.  This staffing assessment and resource study shall be completed within one year of the Operational Date.  Within six months of the completion of the staffing assessment and resource study, the Parties shall assess its results and jointly develop a staffing plan to ensure that APD can meet its obligations under this Agreement.

**APD Response:** This paragraph is a one-time requirement and continues to be fully operational. APD continues to evaluate the allocation of resources to ensure the department can meet the obligations under this Agreement while reducing crime.

## B. Duties of Supervisors

**205.** First-line supervisors shall investigate officers' use of force as described in Section IV of this Agreement, ensure that officers are working actively to engage the community and increase public trust and safety, review each arrest report, and perform all other duties as assigned and as described in departmental policy.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | S     | P      | S      | P      | P      |

**Please see IMR-13 recommendations and APD response after paragraph 208.**

**206.** All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command. First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary command. Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | P     | P     | P      | S      | P      | P      |

**Please see IMR-13 recommendations and APD response after paragraph 208.**

**207.** First-line supervisors shall ordinarily be assigned as primary supervisor to no more than eight officers. Task complexity will also play a significant role in determining the span of control and whether an increase in the level of supervision is necessary.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for Paragraph 207.**

**APD Response:** The PMU scorecards reflect that supervisors are adhering to this policy and requirement.

**208.** APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command. APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | P     | P     | P      | S      | P      | P      |

**IMR-13 Recommendations:**

**44.7.194a:** APD must insist that commanders and mid-level oversight personnel (lieutenants and sergeants) accept their responsibilities for the day-to-day management and supervisory control of line personnel. Simply building high-level oversight processes using automated systems or high-level reviews to identify transgressions of line personnel will not be effective in the long run.

**APD Response:** One project worked on during this reporting period to address day-to-day management and supervisory control is improvements upon the supervisory line inspection. APD made improvements to the sergeant's monthly line inspection form in APD's software system. These improvements include auto-populating the employee information, their assigned weapon information, and their current qualification with each assigned weapon. There are queries for management to view line inspection reports. These improvements alleviated problems that allowed supervisors to continue through the inspection form without completing each section, resulting in inaccurate reporting specifically in the requirement with officers carrying the authorized firearms.

As a second level of review, a secondary review was developed for lieutenants to verify sergeants visually inspecting firearms and ammunition during the monthly line inspection. A pilot occurred from January 2021 through March 2021 in the Valley Area Command and the Special Operations Division. The lieutenants from pilot divisions were required to visually inspect firearms and ammunition for two officers per month for each sergeant assigned to their Watch/Section. The COD Lieutenant reviewed the results of the monthly inspections. One hundred percent compliance was reached during the pilot phase. The lieutenant inspection of weapons and ammunition is a second level review to ensure officers are carrying agency-approved firearms and ammunition. In June 2021, the addition of a lieutenant level review was incorporated into the revisions of SOP 3-30 Line Inspections and a special order was drafted in order to move the process forward pending the revision of the SOP. The special order has been submitted to the DOJ and IMT to for approval. Upon approval, the Lieutenant Weapon Inspection will be implemented department-wide.

**44.7.194b:** Moving forward, all high-level reviews (including automated systems analyses, FRB, etc.) that identify field-level violations of policies, particularly those related to use of force, that were not noted by sergeants, lieutenants, or command-level personnel, should also include progressive discipline for "upstream" personnel who also failed to note the issues found during high-level reviews.

**APD Response:** During this reporting period, APD improved the process of tracking policy violations relating to the use of force investigations, specifically level 1 use of force incidents. APD continues to track policy violations related to levels 2 and 3 use of force investigations. There have been administrative investigations of use of force incidents, which include all ranks from officer to commander.

## C. Supervisor Training

**209.** Sergeant training is critical to effective first-line supervision. Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | P     | P      | S      | P      | P      |

**Please see APD Response after paragraph 211.**

**210.**  APD's sergeant training program shall include the following topics: a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices; b) de-escalating conflict; c) evaluating written reports, including those that contain canned language; d) categorizing and reviewing officer uses of force; e) understanding supervisory tools such as the Early Intervention System and onbody recording systems; f) responding to and investigating allegations of officer misconduct;  g) evaluating officer performance; h) consistent disciplinary sanction and non-punitive corrective action; i) monitoring use of force to ensure consistency with policies; j) building community partnerships and guiding officers on this requirement; and k) legal updates.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | P     | P      | S      | P      | P      |

**Please see APD Response after paragraph 211.**

**211.**  All sworn supervisors shall also receive a minimum of 32 hours of in-service management training, which may include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | P     | S      | P      | P      | P      |

**IMR-13 Recommendation for Paragraphs 209 – 211:**
**4.7.195-4.7.197a:** APD should carefully review the requirements of Paragraphs 209-211; use this and past monitor's reports to determine exactly where they fall short and establish policies or protocols to ensure this issue does not occur again.

**APD Response:**  The Academy was hindered during 2020-2021 due to the pandemic, which resulted in multiple New Mexico Department of Health "Rapid Responses" and significantly decreased the availability of training staff.  Early on, Academy staff scrambled to convert as many in-person trainings to virtual trainings as possible, which caused numerous delays, including preapproval of lesson plans by the IMT. Those courses that were required to be taught in-person, such as reality-based training (Use of Force Tier 4 Training) had to be delayed until the state's emergency public health order was lifted.  These adjustments had a cascading effect on the overall training calendar, fully disrupting the annual schedule.  All provisions of paragraphs 209 and 210 were met and documentation of such was provided to the IMT.  The training required under paragraph 211 was not delivered during IMR 13, but has been approved by the IMT and DOJ and is scheduled for delivery in 2021.

## D. Early Intervention System (212-219)

**212.** Within nine months of the Operational Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers.  APD supervisors shall be trained to proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     |       | P     | P     | P      | P      | P      | P      |

**Please see IMR-13 Recommendations and APD Responses after paragraph 219.**

**213.** APD shall review and adjust, where appropriate, the threshold levels for each Early Identification System indicator to allow for peer-group comparisons between officers with similar assignments and duties.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | P     | P      | P      | P      | P      |

**Please see IMR-13 Recommendations and APD Responses after paragraph 219.**

**214.** APD shall implement rolling thresholds so that an officer who has received an intervention of use of force should not be permitted to engage in additional uses of force before again triggering a review.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | P      |

**Please see IMR-13 Recommendations and APD Responses after paragraph 219.**

**215.** The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding, at a minimum: a) uses of force; b) injuries and deaths to persons in custody; c) failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy; d) all civilian or administrative complaints and their dispositions; e) all judicial proceedings where an officer is the subject of a protective or restraining order; f) all vehicle pursuits and traffic collisions involving APD equipment; g) all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system; h) all disciplinary action taken against employees; i) all non-punitive corrective action required of employees; j) all awards and commendations received by employees, including those received from civilians, as well as special acts

performed by employees; k) demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;  l) all criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and m) all offense reports in which an officer is a suspect or offender.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | P      |

**Please see IMR-13 Recommendations and APD Responses after paragraph 219.**

**216.**  APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it.  The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information.  The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | P      |

**Please see IMR-13 Recommendations and APD Responses after paragraph 219.**

**217.**  APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law.  Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System.  On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | S     | S     | P     | P     | P      | P      | P      | P      |

**Please see IMR-13 Recommendations and APD Responses after paragraph 219.**

**218.**  APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 213-215 to ensure proper understanding and use of the system. APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command.  Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | P      |

**Please see IMR-13 Recommendations and APD Responses after paragraph 219.**

**219.** Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate.  The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | P     | P      | P      | P      | P      |

**IMR-13 Recommendations for paragraphs 212-219:**

**4.7.198-205a:**  Complete and submit for approval the curriculum for PEMS training for supervisors and ensure that the new PEMS system addresses all required components of paragraph 215 and the additional requirements of Paragraph 23 (Firearm discharges), Paragraph 38 (ECW data), and Paragraph 105 (Tactical Unit data).

**4.7.198-205b:**  Document and demonstrate that the proposed "Pareto Principle" or 80/20 principle is a statistical tool that works effectively and can be used to demonstrate both acceptable and unacceptable behavior from officers as required by the CASA.

**4.7.198-205c:**  Document learning assessment processes for the training provided for supervisors.

**4.7.198-205d:**  Design and document audit protocols for supervisory review and reporting of PEMS processes.

**APD Response:**  APD has an early intervention policy and program that was approved by DOJ and the IMT which went into effect in October 2017.  APD realized that there was a need to have personnel solely responsible for an early intervention program and a unit was created and dedicated to early intervention in Summer 2018.  This unit began researching potential systems to improve upon the current program. Many vendors and off-the-shelf products exist; however, all the requirements needed were not included and many not customizable.  In 2019, APD began advertising for a comprehensive system that would include many modules in one system, to include early intervention. While a vendor was being selected and contracted, APD began researching, developing and testing a system in-house to fill the gaps of missing requirements components.  APD created an early intervention program called the Performance Evaluation and Management System (PEMS) which will be incorporated as a separate module with Benchmark Analytics. The PEMS policy and training has been approved by the IMT and DOJ with training scheduled to begin in August 2021.

The Pareto Principle was approved by the IMT in February 2021 as the statistical application that will be used to measure both acceptable and unacceptable behaviors from officers as defined in the CASA.   Once Benchmark is launched it will collect data migrated from multiple City data collection sources and will provide APD the ability to analyze and operationalize officer-related performance data.

The PEMS training plan was submitted and approved by the IMT and the DOJ.  Training is scheduled to begin in August 2021 and scheduled to be completed in December 2021.  Audit protocols will be developed as training is conducted and APD will work with the IMT and DOJ to ensure those protocols meet the requirements of PEMs-related paragraphs.


## E. On-Body Recording Systems for Documenting Police Activities

**220.**   To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems.  Within six months of the Operational Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require: a) specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;  b) officers to ensure that their on-body recording systems are working properly during police action; c) officers to notify their supervisors when they learn that their on-body recording systems are not functioning;  d) officers are required to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible; e) activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving subjects known to have mental illness;  f) supervisors to review recordings of all officers listed in any misconduct complaints made directly to the supervisor or APD report regarding any incident involving injuries to an officer, uses of force, or foot pursuits; g) supervisors to review recordings regularly and to incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers; and h) APD to retain and preserve non-evidentiary recordings for at least 60 days and consistent with state disclosure laws, and evidentiary recordings for at least one year, or, if a case remains in investigation or litigation, until the case is resolved.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.206a:**  Prepare, quarterly, a written assessment of the results of the inspections and audit outcomes, identifying the top five areas of non-compliance with the requirements of OBRD field processes.

**APD Response:**  The Performance Metrics Unit (PMU) completes a monthly and quarterly written assessment to include results from audit outcomes in regards to OBRD performance. This audit is currently conducted for all six area commands in Field Services Bureau (FSB) and the following units within the Support Services Bureau: Motors, DWI, Auto Theft, Impact, Gangs, Investigative Support Unit, SWAT, and K-9. Additionally, the FSB written report is broken down to teams; this is information which can be used by first line supervisors to aid in supervision and monitor compliance.

These reports were reviewed during this monitoring period in an attempt to determine the top areas of non-compliance. These scorecards accurately measure whether a video is uploaded by the subsequent shift and whether mandatory recording events are captured by OBRD. From February 2021 through July 2021 PMU conducted over 1,900 audits on FSB. The results for the reporting period are as follows:

- FSB – All area commands had over 95% compliance in uploading by end of next shift;
- FSB – All area commands had over 95% compliance in mandatory recording of incidents.
- Audits were conducted on the Support Services Bureau. The following data was derived:
- SSB – The lowest level of compliance for this reporting period was 83% in February 2021 in regards to uploading by the end of the next shift. It should be noted these numbers were up to 100% by May 2021 by this same unit (K-9). Three other units (Motors, Impact, and Gangs) were at 90%, 91%, and 91% in compliance, respectively. These number also increased to 100% compliance by May 2021. APD did see Impact, Gangs, and SWAT have a reported 90%, 92%, and 92% respectively for the month of July (see Appendix 3).
- SSB – All mandatory recording events were above 95% for compliance.

Additionally, IAPro data from February through July 2021 was reviewed to identify trends in other OBRD policy.  111 unique IA requests with OBRD allegations were made during this monitoring period. This includes 132 allegations and 122 distinct employees.  Of these 111 IA requests, 31 were made by PMU as a result of PMU scorecards.

Thirty-one (31) Internal Affairs requests were made as a result of these audits.  Monthly email reminders are automatically sent to supervisors to remind them their video reviews are due. Job aides exist and all supervisors are trained on their responsibilities in regards to OBRD in the supervisor class.

**4.7.206b:**  Based on the quarterly audits, identify the top three reasons for non-compliance with OBRD policies and procedures, and develop specific, targeted responses to address and remediate each of the top three non-compliance areas.

**APD Response:**  Data gathered from the scorecard system was reviewed.  The 2021 quarterly OBRD scorecard was analyzed to determine if data was uploaded by the end of the subsequent shift and whether mandatory recording events were recorded.  The results are 100% compliance in both categories among all six FSB Area Commands (see Appendix 3 2021 Quarterly OBRD Scorecard).

A scorecard is also generated which tracks supervision; specifically, OBRD equipment inspections and whether supervisors are reviewing two videos per assigned officer.  In FSB, APD found during the months of May and April for quarter two APD was 98% compliant for both months.  In the first quarter of the year, January, February, and March APD saw 99%, 100% and 97% compliance respectively.  These numbers are all above the 95% threshold for the entire FSB.  In this five-month period we did observe four scores which caught APD's attention, ranging from 88% to 93% (see 2021 Quarterly Supervision Scorecard).  There were corresponding IAPro entries for these areas, indicating the issue was addressed by the Accountability and Analytics Bureau in the form an internal affairs referral.

No non-compliance trends were found using the scorecards process.  It does appear the scorecards are successful in raising in awareness and properly holding individuals accountable when it comes to uploads and mandatory recording events.  This automated process removes as much human error as possible.  The rebuttal process, discussed in detail in the paragraph 221 response, gives an opportunity to discover technological errors and thus account for some of the causes of non-compliance. This unintended consequence is positive and prevents errors in the future from occurring.

**4.7.206c:**  Repeat steps a and b until field OBRD error rates are below five percent.

**APD Response:**  There were no tracked error rates consistently below ninety-five percent in any category. APD plans to keep the same methods in place to verify these trends.

**221.**  APD shall submit all new or revised on-body recording system policies and procedures to the Monitor and DOJ for review, comment, and approval prior to publication and implementation.  Upon approval by the Monitor and DOJ, policies shall be implemented within two months.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       |       | S | S | S | S | S | S |

**IMR-13 Recommendations:**
4.7.207a: Develop, implement, and assess supervisory protocols to ensure violations of applicable policy are identified by supervisors and are addressed and remediated, many of which have already been recommended to APD by the monitoring team.

**APD Response:**  Policy regarding supervisory review is a multi-prong approach:  Supervisors are mandated to review OBRD for defined events (use of force, foot pursuits, or officer injury, for example).  Supervisors are required to conduct monthly video reviews. The videos are chosen at random from the computer aided dispatch system in an effort to verify mandatory recording events are indeed being captured.   The Performance Metrics Unit conducts monthly audits to verify these actions are being completed. Compliance is monitored using the aforementioned scorecards.

**4.7.207b:** Publish quarterly "OBRD Failure" reports identifying the top five reasons for OBRD failure in the field and identifying the Area Command, shift, and supervisors associated with those failures.
**4.7.207c:** Discipline supervisors with repeated failures in noting, assessing, and correcting officers with repeated OBRD operations failures.
**4.7.207d:** Repeat until error rates on OBRD operation fall below five percent.
**4.7.207d:** Repeat until error rates on OBRD operation fall below five percent.

**APD Response:**  PMU scorecards, implemented in October 2019, identify OBRD failures on a monthly basis. These scorecards do determine the Area Command, shift, and assigned supervisor when failures are observed. These scorecards are distributed to the Area Commander for review.

It is important to note these scorecards are not immutable and there is a rebuttal process in place. This allows supervisors to provide a reason as to why a scorecard assessment may not be accurate. Having such a mechanism in place is invaluable as it can alert supervisors and management of issues which otherwise could go unnoticed for an extended periods of time. Such procedures allow the department to not only critique itself but also be self-aware of issues or concerns on a grander scale.

These quarterly reports are reviewed to look for trends. When a unit is first added to the scorecard system, there can be some lower compliance numbers issued in regards to OBRD and uploading recordings by the end of the next shift. For example, the K-9 Unit initially had compliance of 83% in February 2021. As awareness was raised and direct supervision was made aware of the issue, compliance numbers increase significantly. In the K-9 example, K-9 improved to 100% by May 2021.

It should also be noted units in Support Services Bureau such as K-9 and SWAT have a much smaller sample size. When evaluating a watch within an area command, supervisors are reviewing video uploads from up to 40 officers who respond to numerous calls for service every day. SWAT, on the other hand, has much fewer assigned officers who do not respond to nearly as many calls for service. It is important to make this distinction, but nonetheless the department strives for 100% compliance regardless of assignment or unit size.

**222.** The Parties recognize that training regarding on-body recording systems is necessary and critical. APD shall develop and provide training regarding on-body recording systems for all patrol officers, supervisors, and command staff. APD will develop a training curriculum, with input from the Monitor and DOJ, that relies on national guidelines, standards, and best practices.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.208a:** Reinforce the established clear, concise, and reasonable requirements for supervisory review of in-field activations of OBRDs, requiring field supervisors to review OBRD activations and recordings for compliance to established policy.

**APD Response:** The requirements for supervisory review are reinforced in clear, concise, and reasonable policy. Many of these metrics are tracked and monitored by PMU to aid supervisors with such duties.

**4.7.208b:** Ensure global retraining of supervisory and command personnel regarding these requirements.

**APD Response:** When an officer has been identified as needing retraining, a training referral is submitted to the Advanced Training Unit by the officer's chain of command. APD trains newly promoted sergeants specifically on their roles and responsibilities for supervision and OBRD requirements. In April 2021, there was one training for acting sergeants.

**4.7.208c:** Increase internal oversight related to OBRD usage and supervision and ensure that OBRD supervisory oversight is of sufficient scale and scrutiny to identify problematic issues related to OBRD usage.

**APD Response:** Internal oversight is currently accomplished using multiple methods, such as, PMU scorecards, supervisory OBRD monthly inspections, use of force investigations, and the Force Review Board. PMU scorecards are automated and conducted the same way each month so the system is repeatable and could be duplicated. This ensures data gathered is not only consistent but reliable and accurate. The supervisory monthly line inspections are also automated and data is collected more efficiently and easier to report. Use of Force investigations do collect OBRD data and APD is working on reporting that data easily for all use of force levels.

Please see the response to paragraph 224 for a new program to supplement the routinized process for command oversight in the OBRD review process.

**4.7.208d:**  Establish a routinized process for command oversight of the OBRD review process, requiring lieutenants to assess, in a methodical way, the OBRD review processes of sergeants under their command, and commanders to assess the OBRD review performance of lieutenants under their command, to ensure compliance with reasonable assessments of actions in the field.

**4.7.208e:**  Establish a routine administrative review, via Compliance Bureau Personnel, of Area Command OBRD review efficiency, including performance metrics such as overall review rates, error rates, and remediation protocols. This review process should be on-going and assigned to the Performance Metrics Unit.

**APD Response:**  Commanders are given monthly and quarterly reports as to the performance of their subordinates in regards to the OBRD review process.  Monthly line inspections require video review by each sergeant and the lieutenant is made aware of any non-compliance via request for internal affairs investigations.  These scorecards are methodical and conducted the same way each month.  For level 1 use of force incidents, commanders do have to ensure the case is thorough and complete, which does include OBRD.

Please see the response to paragraph 224 for a new program to supplement the routinized process for command oversight in the OBRD review process.

**223.**  APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order.  Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P | P | S | S | S | S | S | S |

**IMR-13 Recommendations are listed with paragraph 224 below.**

**APD Response:** Officers are required to check the function of their OBRD at the beginning and end of each shift. Any malfunction should be reported immediately to a supervisor. Should a malfunction be found, the Crime Lab is open 24-hours a day to provide replacements, if needed. Additionally, monthly line inspections require supervisors to check the functionality themselves as well as conducting video reviews, thus ensuring compliance. Inspections are audited on a monthly basis as a validation measurement ensuring supervisors are conducting those inspections.

**224.** Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy.  Supervisors shall report equipment problems and seek to have equipment repaired as needed.  Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P | P | S | S | S | S | S |

**IMR-13 Recommendations:**

**4.7.209-210a:**  Ensure that supervisors who fail to note errors in OBRD operation are counseled, or for multiple offenders, retrained and/or disciplined for ineffective OBRD review processes. If, after counseling or retraining, supervisors continue to miss OBRD activation or usage violations, ensure appropriate discipline is imposed.

**APD Response:**  After a review of the current pilot program in regards to review of line inspections by lieutenants, APD is evaluating whether to expand this program to include OBRD review. The Accountability and Analytics Bureau has set up a program to verify if sergeants are conducting proper inspections of officers in regards to their handguns. The lieutenant is required to select two random officers and verify the sergeant's findings. APD is working to potentially implement this same type of program for OBRD review.

This approach is beneficial in a few ways.  First, it provides more direct supervision over sergeants.  Second, it allows these direct supervisors the ability to note errors in OBRD operation and properly counsel and/or request of investigation and discipline, if necessary.

**4.7.209-210b:**  Identify the top 20 supervisors who have substandard performance on OBRD activation review and assess the reasons for failure to enforce established process.  Place these supervisors "on notice" that their performance on this task will be routinely reviewed, and continued failures will result in discipline.

**APD Response:**  A data analyst assigned to the Accountability and Analytics Bureau performed a comprehensive analysis of data obtained from IAPro for the current reporting period and found no significant trend of supervisors who were notably deficient in regards to OBRD activation review.  This analysis included not only looking for individuals who were deficient, but the analyst also scrutinized demographic categories, including age, time of service within the department, and whether or not the supervisor was a lateral or APD basic trained hire.

**4.7.209-210c:**  Follow up on these counseling sessions with discipline if necessary.

**APD Response:**  APD continues to follow approved discipline policy regarding counseling and discipline for all violations of OBRD policy.

**225.**  At least on a monthly basis, APD shall review on-body recording system videos to ensure that the equipment is operating properly and that officers are using the systems appropriately and in accordance with APD policy and to identify areas in which additional training or guidance is needed.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P | P | S | S | O | O | O | O |

**There were no IMR-13 Recommendations.**

**APD Response:**  Supervisors continue to perform monthly line inspections. These line inspections require video reviews are completed when applicable. Performance Metric Unit scorecards reflect compliance with this requirement.

**226.**  APD policies shall comply with all existing laws and regulations, including those governing evidence collection and retention, public disclosure of information, and consent.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | P     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  SOP 2-8 Use of On-Body Recording Devices complies with existing laws and regulations.

**227**.  APD shall ensure that on-body recording system videos are properly categorized and accessible.  On-body recording system videos shall be classified according to the kind of incident or event captured in the footage.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | P     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The integration of the Computer Aided Dispatch and Axon camera system continues to work in automatically categorizing and assigning case or CAD numbers to video files.

**228.**  Officers who wear on-body recording systems shall be required to articulate on camera or in writing their reasoning if they fail to record an activity that is required by APD policy to be recorded.  Intentional or otherwise unjustified failure to activate an on-body recording system when required by APD policy shall subject the officer to discipline.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | S     | S      | S      | S      | S      |

**Please see APD Response after paragraph 231.**

**APD Response:**   During this reporting period, 111 unique requests of internal affairs investigations were initiated with OBRD allegations were made during this reporting period. Each case is investigated and if the findings are sustained, corrective action up to discipline is imposed.  These requests for internal affairs investigations may come from supervisors, use of force investigations, or PMU.

**229.**  APD shall ensure that on-body recording systems are only used in conjunction with official law enforcement duties.  On-body recording systems shall not be used to record encounters with known undercover officers or confidential informants; when officers are engaged in personal activities; when officers are having conversations with other Department personnel that involve case strategy or tactics; and in any location where individuals have a reasonable expectation of privacy (e.g., restroom or locker room).

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | S     | S      | S      | S      | S      |

**Please see APD Response after paragraph 231.**

**230.** APD shall ensure that all on-body recording system recordings are properly stored by the end of each officer's subsequent shift. All images and sounds recorded by on-body recording systems are the exclusive property of APD.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | S     | S     | S     | O     | O      | O      | O      | O      |

**231.** The Parties are committed to the effective use of on-body recording systems and to utilizing best practices. APD currently deploys several different platforms for on-body recording systems that have a range of technological capabilities and cost considerations. The City has engaged outside experts to conduct a study of its on-body recording system program. Given these issues, within one year of the Operational Date, APD shall consult with community stakeholders, officers, the police officer's union, and community residents to gather input on APD's on-body recording system policy and to revise the policy, as necessary, to ensure it complies with applicable law, this Agreement, and best practices.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | P     | P     | P      | P      | P      | P      |

**IMR-13 Recommendations:**

**4.7.217a:** Conduct detailed failure analyses designed to identify the causes of incidents of "failure to record" and identify the true cause of these failures: equipment, training, supervision, or "other."

**4.7.217b:** Rank order the failure rates and develop action plans to eliminate the causes of failure, beginning with the most frequent and working to the least frequent.

**4.7.217c:** Identify a frequency-based list of supervisors who fail to enforce OBRD requirements and schedule these supervisors for retraining, counseling, or discipline, as appropriate.

**APD Response for paragraphs 228, 229, and 231:** A review by a data analyst within the Accountability and Analysis Bureau found there is not a long-term trend of failure to record mandatory incident per policy. Compliance rates are 95% or above in all reporting units for this reporting period.

IAPro data was also reviewed to determine how many reported violations of mandatory recording. The policy mandates which events must be recorded. These also include referrals made by the Internal Affairs Force Division as well as those made by supervisors or otherwise submitted to Internal Affairs Professional Standards Division. The following Internal Affairs referrals related to SOP 2-8-5 Mandatory Recording were identified for the months of February through July 2021:

- SOP 2-8-5 (Mandatory Recording) - one IA referral;
- SOP 2-8-5-A (shall activate prior to any law enforcement contact) – 11 IA referrals;

- SOP 2-8-5-B (shall activate prior to contact; emergency exception) – 15 IA referrals;
- SOP 2-8-5-D (shall record the entire encounter) – four IA referrals, and;
- SOP 2-8-5-E-1 (when entirety of contact not captured, shall document in report or CAD) – 1 IA referral.

Regarding officers who faced multiple disciplinary actions on SOP 2-8-5 Mandatory Recording during this same period, two officers were disciplined for a subsequent offense of this section.

Utilizing the scorecard rebuttal system, at least one technological error was identified due to camera docks not uploading properly.  Once management was made aware of the issue, the docks were immediately replaced.

**Performance Review Metrics (PMU) responses for Paragraphs 220, 221, 222, 223, 224, 228, 229 and 231:** PMU continues to conduct audits in several CASA paragraphs, to include OBRD and supervision of OBRD. The scorecards measure video uploads by the end of next shift, mandatory recording events, and supervisory responsibilities.  All Divisions audited during this reporting period include the six Area Commands, Metro Traffic, Criminal Enforcement, SWAT Units, K-9 Units, and Investigative Services. For each policy violation, a request for internal affairs investigation is submitted to the IAPS.  APD added the FSB quarterly OBRD scorecards to see the data in quarters as recommended by the IMT in IMR-12.  For FSB, over 1,800 inspections rated to OBRD use were conducted from February 2021 to May 2021 and all 6 Area Commands combined reached an overall compliance rate of 99%.  For some specialized and investigative units, compliance is inconsistent with video uploads by the end of the next shift.  The majority of the videos are being uploaded 1 to 2 days late.

Since October 2019, PMU distributes draft inspection reports before finalizing the results. Commanders can refute a finding and provide a reason for the OBRD failure.  Auditors review the rebuttal and determine if the supervisor provided enough evidence to overturn an inspection finding. PMU can pull this report at any time (monthly, quarterly, and semi-annually) for management to review potential reasons for OBRD failures for specific area commands, teams, and officers. PMU provides a written response to each rebuttal documented on the Amended Inspections Report. This report lists which rebuttals were accepted and which rebuttals were denied and the reason for denial. There are varied reasons for non-compliance, but failure to upload by subsequent shift is still the most common violation.  APD's monthly scorecards are a routine audit process and will continue indefinitely.  OBRD compliance rates will continue to be assessed and corrective action will be taken as needed for failure to follow policy requirements.


## Section 7:  Recruitment, Selection and Promotions (Paragraphs 232 – 246)

### A.  Recruitment Plan

**232.**  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals.  APD shall develop a recruitment policy and program that provides clear guidance and objectives for recruiting police officers and that clearly allocates responsibilities for recruitment efforts.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:** APD has been utilizing the marketing agency known as "Boomtime" to target specific areas of the state and country for online advertising.  Boomtime has been placing ads on Facebook, Instagram, Facebook, and Google.  These ads are continuously evaluated for relevance and success and are showing to be successful in attracting applicants to APD.  Advertising has also been placed on Radio, and new physical advertising such as pamphlets, posters, billboards, etc. will feature scan able "QR" codes that will direct interested person's to our text messaging application and recruiting social media.  Recruiting is also researching improvements to tracking advertising by using QR codes to identify which form of physical ad is most successful and where those ads are being scanned geographically.  Once launched this may provide valuable insight about where we should focus in person hiring efforts and digital advertising.

Recruiting has transitioned text messaging service providers from "Signalvine" to "Interview-Now", which is a specific service designed for police recruitment.  Text messaging has shown to be a much more influential way to interface with candidates. Interview-now also offers automated responses to interested persons wanting to know more about APD. An interested person can also be routed directly to a recruiter for a phone conversation or live text conversation.

Recruiters have been responsible for providing content in the form of pictures and videos for advertising and responding to queries from interested persons that are sent over social media platforms.  Additionally, APD recruiters respond to phone calls, emails, and receive walk-in candidates.  Finally, recruiters attend in person and virtual hiring events to attract candidates.  The Recruiting SOP is currently being reviewed and will go through the respective approval process for any suggested changes.

**233.**  APD shall develop a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross section of the community.  The recruitment plan shall establish and clearly identify the goals of APD's recruitment efforts and the duties of officers and staff implementing the plan.  234. APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The 2021 Strategic Recruitment Plan and 2020 Analysis report were submitted to the IMT and DOJ in February 2021.

**234.**  APD's recruitment plan shall include specific strategies for attracting a diverse group of applicants who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The 2021 Strategic Recruitment Plan and 2020 Analysis report were submitted to the IMT and DOJ in February 2021.  APD continues to use the recruitment measures laid out in the strategic plan and will analyze the results at year end.

**235.**  APD's recruitment plan will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants.  APD shall create and maintain sustained relationships with community stakeholders to enhance recruitment efforts.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  APD recruiting has been attending monthly Community Policing Counsel meetings across the city to provide updates and seek input from the community.  During the reporting period, the unit has attended 14 CPC meetings.  During several meetings, the community has indicated that they are supportive of the new advertising that APD has been placing and feel the ads present APD in a positive light (Choose One ads).  APD recruiting also attended the unveiling of the APD Low-rider which was significant amongst a large cross section of community members especially those in the Hispanic/Latino culture.  Recruiting also attended a virtual event from an organization known as "Hire X".  The event was labeled as "Diversity X" and was focused on offering employment to minority groups.   163 attendees were present and eight specifically expressed interest in APD.  3 of the 8 applied during the event, and many others were sent "virtual invites" to be interviewed virtually.

Recruiting has been assigned to Community Engagement and are working hand and hand with the Ambassador Unit.  Recruiting has committed to provide handouts, vehicles, and personnel to ambassadors that would like a recruiting presence in diverse communities.  To date, Recruiting has attended the following Ambassador Events; Cleanup at the Kirt (predominantly Black Community), Meet and Greet at Muslim Community Center (Muslim Community), Senior Center Directors Meeting (Senior Community). Although these events may not have been specifically to offer jobs, it is believed that having a recruiter/recruiting present removes barriers between APD and minority groups.

## B.  Hiring Practices

**236.**  APD shall develop and implement an objective system for hiring and selecting recruits.  The system shall establish minimum standards for recruiting and an objective process for selecting recruits that employs reliable and valid selection devices that comport with best practices and anti-discrimination laws.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  APD will continue using the online automated application system. This is an automated system that qualifies based off minimum state/APD hiring standards.

**237.**  APD shall continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological, medical, and polygraph examination to determine their fitness for employment.  APD shall maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers.  The program shall continue to be designed to detect the use of banned or illegal substances, including steroids.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**238.**  APD shall ensure that thorough, objective, and timely background investigations of candidates for sworn positions are conducted in accordance with best practices and federal anti-discrimination laws. APD's suitability determination shall include assessing a candidate's credit history, criminal history, employment history, use of controlled substances, and ability to work with diverse communities.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  In an ongoing effort to strengthen the background process APD has begun preliminary discussions to determine the feasibility of utilizing the city's Human Resource Department in the screening of applicants.  The intent is to incorporate the background capabilities of that department at the beginning stages of the background process in order to eliminate unqualified applicants before undertaking a full, comprehensive background investigation. The goal is to reduce cost associated with background investigations, and to process only those applicants who are most qualified.

**239.**  APD shall complete thorough, objective, and timely pre-employment investigations of all lateral hires. APD's pre-employment investigations shall include reviewing a lateral hire's history of using lethal and less lethal force, determining whether the lateral hire has been named in a civil or criminal action; assessing the lateral hire's use of force training records and complaint history, and requiring that all lateral hires are provided training and orientation in APD's policies, procedures, and this Agreement

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  APD will continue to complete thorough and objective backgrounds to include assessing laterals above mentioned categories, and continue to look for ways to streamline the process without compromising the integrity of the background.

**240.**  APD shall annually report its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, and the extent to which APD has been able to recruit applicants with needed skills and a discussion of any challenges to recruiting high-quality applicants.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response:**  The 2021 strategic recruitment plan and 2020 analysis were submitted to the IMT and the DOJ. Upon years' end APD will evaluate 2021 and begin work on the 2022 recruitment plan based upon the analysis of that report.


## C.  Promotions

**241.**  APD shall develop and implement fair and consistent promotion practices that comport with best practices and federal anti-discrimination laws.  APD shall utilize multiple methods of evaluation for promotions to the ranks of Sergeant and Lieutenant.  APD shall provide clear guidance on promotional criteria and prioritize effective, constitutional, and community-oriented policing as criteria for all promotions.  These criteria should account for experience, protection of civil rights, discipline history, and previous performance evaluations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for IMR-13.  Please see APD response after paragraph 243.**

**242.**  APD shall develop objective criteria to ensure that promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties in core substantive areas.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for IMR-13.  Please see APD response after paragraph 243.**

**243.**  Within six months of the Operational Date, APD shall develop and implement procedures that govern the removal of officers from consideration from promotion for pending or final disciplinary action related to misconduct that has resulted or may result in a suspension greater than 24 hours

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response to paragraphs 241-243:**  For both Sergeant and Lieutenant 33% (33 of 100 questions) of written exams are focused solely on constitutional policing.  This reinforces emphasis on better constitutional policing among supervisors which touches many aspects of the CASA.  Supervisory candidates are required to attend an 8-hour constitutional policing class where before taking the written exam.  Court precedents, search and seizure, legal basis for force, etc., are stressed.

APD now utilizes practical exercises in the assessment center.  Candidates conduct Reality-Based Training in uniform and are given a specific fact set and then they interact with role players to add as much realism and artificial stress to replicate real world conditions (typically four scenarios).  The scenarios focus on areas developed from identified supervisor trends from the previous year.  The scenarios include a constitutional policing dilemma, use of force, discipline, and other critical incident events.  Actual OBRD footage one would see on a scene is utilized.  APD feels this is the best possible way to assess a candidate's real-world ability to make decisions in real time and test knowledge of the CASA, SOP and proper procedures with a focus on high liability activities.  (A driving simulator is used for one scenario as if a candidate was in their car when a pursuit began in their Area Command for another example.)

Candidates were removed from a recent sergeant process due to sustained discipline that eliminated eligibility.  APD is very particular in determining eligibility.  Candidates are screened via review of their application packet and experience.  In one case, a candidate was properly given conditional approval to complete the process pending the outcome of final disciplinary action, but was later removed.  This was done in the event that discipline was not sustained.  APD is solid when it comes to ensuring candidates remain fully eligible as they navigate the process.

## D.  Performance Evaluation

**244.**  APD shall develop and implement fair and consistent practices to accurately evaluate the performance of all APD officers in areas related to constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis.  APD shall develop objective criteria to assess whether officers meet performance goals.  The evaluation system shall provide for appropriate corrective action, if such action is necessary.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for IMR-13.  Please see response after paragraph 246.**

**245.**  As part of this system, APD shall maintain a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor.  APD shall hold supervisors accountable for submitting timely, accurate, and complete performance evaluations of their subordinates.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.  Please see response after paragraph 246.**

**246.**  As part of the annual performance review process, supervisors shall meet with the employee whose performance is being evaluated to discuss the evaluation and develop work plans that address performance expectations, areas in which performance needs improvement, and areas of particular growth and achievement during the rating period.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**APD Response for paragraphs 244-246:**  Between February 1, 2021 and June 30, 2021, APD completed two evaluation cycle checkpoints.  The second evaluation checkpoint of this cycle was in March 2021.  The total number of sworn personnel required to complete the checkpoint was 868 officers of which 868 were completed on time. The completion percentage for this checkpoint was 100%.

The third checkpoint of this cycle was due in June 2021.  The total number of sworn personnel required to complete the checkpoint was 806 officers.  From this number 800 officers or 99.25% have been documented as completing the checkpoint on time.  Three supervisors failed to complete the six documents on time.  After a thorough analysis on why outstanding evaluations were not completed, the appropriate corrective action for documents which were not completed were submitted for administrative investigation by internal affairs personnel.

## Section 8:  Officers Assistance and Support (Paragraphs 247 – 253)

**247**.  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD agrees to provide officers and employees ready access to mental health and support resources.  To achieve this outcome, APD agrees to implement the requirements below.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 Recommendations.

**APD Response:**  APD has continued with the Ethical Policing is Courageous (EPIC) program, which was brought to APD by the New Orleans Police Department in 2019.  During this reporting period, APD experienced numerous known examples of EPIC through APD employee interventions.

EPIC has evolved into the Active Bystander for Law Enforcement (ABLE) project, which trains officers to support peer intervention.  ABLE aims to create a police culture in which officers routinely intervene to prevent misconduct, avoid police mistakes, and promote officer health and wellness.

In July 2021, APD was accepted as a member of the ABLE project.  Members of the APD executive staff are scheduled in August 2021 to attend an ABLE conference.  Additionally, in August 2021, APD will be participating in ABLE's train-the-trainer session by sending five officers to become ABLE instructors in order to train APD employees.

**248.**  APD agrees to develop and offer a centralized and comprehensive range of mental health services that comports with best practices and current professional standards, including:  readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; peer support; stress management training; and mental health evaluations.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 Recommendations.

**APD response:**  APD Behavioral Sciences Section teamed up with the APD Training Academy Wellness Program, the City of Albuquerque Wellness Program, APD Peer Support, and APD Chaplains to build a comprehensive wellness program.  The goal is to have a wide range of easily accessible mental, emotional, and physical health and wellness resources.  Mindfulness and resilience training is a component dedicated to the wellness of police officers and their families.  This comprehensive wellness program aims to encourage officers to seek professional help when dealing with the complexity of the profession.

A research protocol is being developed to study the wellness program. Behavioral Health continues to collaborate with doctors from the University of New Mexico on this proposed researched to track any potential impacts of the new wellness unit on officer wellbeing.  The research will likely start in October 2021. This would potentially be first of its kind research in the United States.

**249.**  APD shall provide training to management and supervisory personnel in officer support protocols to ensure support services are accessible to officers in a manner that minimizes stigma.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

There were no IMR-13 Recommendations.

**APD response:**  In addition to the regular training offered to supervisors, BSS has other projects such as the Self Care Interactive Online Network (SCION. The SCION project continues to hold meetings and has recently upgraded its website (www.goSCION.org). This upgraded website now has lectures and presentations available to the public, helping to destigmatize mental health issues and challenges.   SCION recently applied for a COPS grant, which would pay for a coordinator to expand the program and add a podcast.

The Chief of Police is a big supporter of BSS, and has mandated that all upper level sworn personnel Commanders and above seek biannual appointments with a BSS therapist.  He wants to normalize and model help seeking behavior for all of their subordinates and front line officers.  This will also be an effective "training" in what BSS has to offer, and how to access services.

UNM's Project ECHO's First Responder Resiliency program is an online training available to all sworn personnel.

**250.**  APD shall ensure that any mental health counseling services provided to APD employees remain confidential in accordance with federal law and generally accepted practices in the field of mental health care.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for IMR-13.**

**APD response:**  BSS has made a successful transition to an online electronic health record (EHR). The EHR is HIPAA compliant and offers higher level of confidentiality than paper charts.  Each therapist uses TherapyNotes to keep track of documentation and utilization data.  An additional benefit is that BSS can easily track internal information because each time there's a patient contacted, a note is created, and data is captured.  There is no need for a second step of, after seeing a patient, returning to a SharePoint site to log in utilization.  NM Solutions gives us overview data without any identifying patient information.  NM Solutions' data is then added to the Electronic Medical Record (EMR) by us so we can track their data without specific patient information.  Having a mutual EHR for all the therapists has allowed easier care coordination.

Not using an EMR to input data will eliminate a potential point of breaches in confidentiality and will improve patient care.

**251.**  APD shall involve mental health professionals in developing and providing academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for IMR-13.**

**APD response:** BSS continues to teach at CIT and the Training Academy.  We are pleased that a local Mixed Martial Arts expert and celebrity, continues to teach mindfulness in the CIT class, which is a great opportunity for BSS to promote mindfulness. He has also agreed to be a guest on our SCION podcast.
Via grant funding, BSS has received hardware to build a podcast and promotional material for mindfulness, which will create online, on demand training on wellness for any APD employee.

**252.**  APD shall develop and implement policies that require and specify a mental health evaluation before allowing an officer back on full duty following a traumatic incident (e.g., officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death) or as directed by the Chief.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for IMR-13.**

**APD response:**  BSS continues to see all officers immediately after an OIS, and BSS is available on request for any critical incident. In addition, the new SOP being approved will expand who will be mandated to see BSS after a critical incent, will better define levels of critical incidents, and will provide more proactive responses from BSS and Peer support to those who have gone through a critical incident.

**253.**  APD agrees to compile and distribute a list of internal and external available mental health services to all officers and employees.  APD should periodically consult with community and other outside service providers to maintain a current and accurate list of available providers.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no recommendations for IMR-13.**

**APD response:**  BSS continues to offer referrals to people who request a different level of care or want to be seen by an outside provider. APD keeps an updated list of referral sources and have the mental health response advisory committee (MHRAC) review it periodically for updates or changes.

## Section 9:  Community Engagement and Oversight (Paragraphs 254 – 293)

### A.  Community & Problem-Oriented Policing (Paragraphs 254-259)

**254**.  To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD shall promote the sustainability of reforms by supporting strong community participation and creating formal and informal mechanisms that facilitate ongoing and constructive communication between APD and the many communities that make up Albuquerque. APD shall take an active role in generating broad community support and mutual respect with the diverse communities it serves by adopting greater transparency, forming problem-solving and goal-oriented

partnerships, and sharing responsibility for positive outcomes and continuous improvement through meaningful civilian oversight. To achieve these objectives, APD shall implement the provisions below. **Paragraph 254 is not a measurable paragraph.**

**255.** APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
**4.7.240a:** Continue to develop a remediation plan to culture survey findings and seek outside assistance to revamp the culture survey;
**4.7.240b:** Continue efforts to provide training that meets national standards for School Resource Officer Unit;
**4.7.240c:** Continue to work with USAO and other community partners to expand and reach significantly higher numbers of high-risk youth through various engagement programming.
**APD Response:** Four questions in the APD Sworn Personnel Culture Survey lead to a negative response by APD officers. These four negative responses were addressed in the following way:
1. Since officers do not feel respected by their chain of command, Leadership training is being developed for Supervisors to include communicating with and respect of employees.
2. COP POP training has been delivered to all APD sworn personnel and continues with each new recruit class to show how APD's work is set up to positively impact citizens in the community.
3. A video explaining how to address a problem with an APD policy was delivered through Power DMS to all sworn personnel informing them how to address policy issues with the Policy Unit.

APD performance reviews have never been received well by APD personnel. Therefore, they are being revamped including a 360 view to include an officer review of their supervisor.

All APD School Resources Officer's (SRO) have been trained by the National Association of School Resource Officers and received NASRO certification.

In July, 2021, APD was awarded two national School Resource Officer (SRO) awards. An APD SRO is a department officer assigned to a local high school working in a community-oriented policing capacity. They work with students, teachers, school administrators, and typically are assigned to one or more schools. APD earned the "Model SRO Program of the Year Award", which annually recognizes SRO programs that made specific and significant contributions to their local communities and school districts. In addition, an APD officer earned the "SRO of the Year Award". The officer was nominated by the principal for Manzano High School for the officer's years of engagement and carrying out duties that kept the youth and staff alike safe.

APD works with a variety of community partners including but not limited to, United States Attorney's Office (USAO), Violent Intervention Program (VIP), Rapid Accountability Diversion (RAD) program, APS

IMPACT program, Drug Enforcement Administration (DEA), National Guard, Young Adult Core, and District Court representatives to reach high risk youth through various engagement programming.

**256.** As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | P     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
**4.7.241a:** Continue to make new staffing allocation and deployment plan a priority, and take the necessary steps to gain important input and support from settlement partners and community stakeholders, including CPCs;
**4.7.241b:** Finalize policy directive that ensures the staffing plan has clearly articulated and defined goals, objectives, and outcome measures, and consider a partnership with a local university to assist in developing specific performance metrics.
**4.7.241c:** Ensure that PRT activity is expanded as needed, fielding adequate numbers of specifically trained PRT officers guided by specific, tangible, and quantitative goals and objectives.

**APD Response:**  To continue making new staffing allocations and deployment plans a priority, APD has been working in cooperation with the Performance and Innovation Office to complete a staffing study for Proactive Response Team (PRT).  The lead worked with the area commands, officers and community stakeholders to complete.

Based on policy process and PRT staffing study, data will be collected over the next reporting period to adequately field and expand numbers of PRT officers around the city.

**257.** APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality-of-life issues.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**
**4.7.242a:** Ensure that the City systems involved in these data-related problems noted with supporting electronic processes are noticed to the other City departments involved, and also are noticed to the COA so that inter-department problem solving, and cooperation are enhanced to the point that solutions are identified and actualized.

**APD Response:**  APD contacted multiple venders regarding electronic bid software, as well as multiple police departments from around the country regarding their bid processes.  This research was presented

to the IMT who agreed APD had done their due diligence on this topic to find an electronic bid cannot be done.

**258.** Within 13 months of the Operational Date, APD agrees to provide 16 hours of initial structured training on community and problem-oriented policing methods and skills for all officers, including supervisors, commanders, and executives.  This training shall include:

    a)  methods and strategies to improve public safety and crime prevention through community engagement;

    b)  leadership, ethics, and interpersonal skills;

    c)  community engagement, including how to establish formal partnerships and actively engage community organizations, including youth, homeless, and mental health communities;

    d)  problem-oriented policing tactics, including a review of the principles behind the problem solving framework developed under the "SARA Model" (Scanning, Analysis, Response, Assessment), which promotes a collaborative, systematic process to address issues of the community, safety, and quality of life;

    e)  conflict resolution and verbal de-escalation of conflict; and

    f)  cultural awareness and sensitivity training.   These topics shall also be included in APD's annual in-service training.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | P     | P     | P      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.243a:** Ensure that supervisory processes are oriented with the COP training and new COP goals and objectives.
**4.7243b:** Ensure future training schedules that provide annualized refresher training.
**4.7243c:** Develop assessment processes to measure the impact of training on-field practices.

**APD Response:**  The Problem-Oriented Policing (POP) form is in place and utilized in all area commands to ensure supervisory processes are oriented with Community Oriented Policing (COP) goals and objectives. The lead is working with the Training Academy to develop training schedules to cover updates and changes, or to address specific areas in COP processes.

To measure the impact of COP training, APD is evaluating development of a focus group to include the community.  Current measures are part of the employee work plan, and POP projects.

**259.** Within six months of the Operational Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross-section of stakeholders.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | P     | P     | P     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.244a:** Complete development of new web-based tracking system and implement department-wide during the next reporting period.

**4.7.244b**: Identify community service organizations and advocacy groups that serve and represent high-risk populations and better document those partnerships, including background, referral arrangements, resource sharing, decision-making, roles, and responsibilities parties.

**APD Response:**  During this reporting period, APD has finalized development for a tracking system that will become operational throughout the department in August 2021.

Development of the APD ambassador program, during this reporting period, provides a direct line to APD for community organizations. Through these partnerships, APD works in cooperation with these organizations to reduce issues affecting those areas of our community.

## B.  Community Meetings & Public Information (Paragraphs 260-265)

**260.** APD shall develop a Community Outreach and Public Information program in each Area Command.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | O     | O     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.245a:** Further develop and document area command public information strategies and programming by developing a planning template and aiding command areas in formulating customized approaches for each command area.

**4.7245b:** Seek outside assistance to help formulate effective community outreach and public information plans for each Area Command that fully utilizes up-to-date engagement tools and processes.

**APD Response:**   A Public Information Program template was created in coordination with the IMT. Rickman.   Using this template, ach area command will develop their own strategies customizing approaches for distributing command specific information.

APD is working with the Public Information Officer (PIO's) office to update area command websites on a regular basis. APD is also using other platforms to provide information to the community in response to feedback that was given from community members as to how they would like to see their area command information distributed.

**261.** The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command that is open to the public.  During the meetings, APD officers from the Area Command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | S | O | O | O | O | O | O | S | O |

**There were no IMR-13 recommendations.**

**APD Response:**  Area Command officers are required to attend community meetings on a regular basis to include CPC's, block captains, neighborhood associations, etc.

**262.** The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's rights and responsibilities during a police encounter.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | O | O | O | O | O | O | O | O | O |

**There were no IMR-13 recommendations.**

**APD Response:**  APD collects information from community meetings and incorporated into APD processes, as applicable.

**263.** For at least the first two years of this Agreement, every APD officer and supervisor assigned to an Area Command shall attend at least two community meetings or other meetings with residential, business, religious, civic or other community-based groups per year in the geographic area to which the officer is assigned.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P | P | P | S | S | S | O | O | O | O |

**There were no IMR-13 recommendations.**

**APD Response:**  Area Command officers attend community meetings on a regular basis to include CPC's, block captains, neighborhood associations, etc.

**264.** APD shall continue to maintain and publicly disseminate accurate and updated crime statistics on a monthly basis.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P | S | S | S | O | O | O | O | O | O |

**There were no IMR-13 recommendations.**

**APD Response:**  Crime statistics are posted to the city website with a 2-month delay.  Information is also provided at Community Policing Councils (CPC) and neighborhood association meetings regarding crime trends.  During this reporting period, APD completed a town hall on crime answering questions sent in by community members.

**265.** APD audits and reports related to the implementation of this Agreement shall be posted on the City or APD's website, with reasonable exceptions for materials that are legally exempt or protected from disclosure.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**APD Response:**  APD continues to conduct audits and post reports to the city website on a regular basis.

## C.  Community Policing Councils (Paragraphs 266-270)

**266.** The City shall establish Community Policing Councils in each of the six Area Commands with volunteers from the community to facilitate regular communication and cooperation between APD and community leaders at the local level.  The Community Policing Councils shall meet, at a minimum, every six months.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**267.** In conjunction with community representatives, the City shall develop a mechanism to select the members of the Community Policing Councils, which shall include a representative cross-section of community members and APD officers, including, for example, representatives of social services providers and diverse neighborhoods; leaders in faith, business, or academic communities; and youth.  Members of the Community Policing Councils shall possess qualifications necessary to perform their duties, including successful completion of the Citizens Police Academy.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | P     | S     | S     | O      | O      | O      | O      |

**IMR-13 recommendations:**

**4.7.252a:** Ensure that no misinformation is posted. If any misinformation is discovered, take steps to determine who posted the misinformation and follow established discipline protocols.

**CPOA Response**:  The CPCs are now under the CPOA have hired a CPC Liaison and Office Assistant to ensure the website is accurate and current.

**268.** The City shall allocate sufficient resources to ensure that the Community Policing Councils possess the means, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement.  APD shall work closely with the Community Policing Councils to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues.  In order to foster this collaboration, APD shall share appropriate information and documents with the Community Policing Councils, provided adequate safeguards are taken not to disclose information that is legally exempt or protected from disclosure.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | P     | S     | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**269.** APD shall seek the Community Policing Councils' assistance, counsel, recommendations, or participation in areas including:
   a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;
   b) reviewing and assessing concerns or recommendations about specific APD policing tactics and initiatives;
   c) providing information to the community and conveying feedback from the community to APD;
   d) advising the Chief on recruiting a qualified, diverse workforce; and
   e) advising the Chief on ways to collect and publicly disseminate data and information, including information about APD's compliance with this Agreement, in a transparent and public-friendly format to the greatest extent allowable by law.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       |       | S     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**270.** The Community Policing Councils shall memorialize their recommendations in an annual public report that shall be posted on the City's website.  The report shall include appropriate safeguards not to disclose information that is legally exempt or protected from disclosure.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       |       | S     | P     | S     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

D.  Civilian Police Oversight Agency (CPOA) (Paragraphs 271-292)

**271.** The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all citizen complaints, serious uses of force, and officer-involved shootings by APD. The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | O     | O     | S     | S      | O      | O      | S      |

**IMR-13 Recommendations:**

**4.7.256a:** CPOA Board must be filled promptly.
**4.7.256b:** The City should develop an efficient ongoing screening process that considers CPOA and Board input regarding the qualifications of applicants for vacant Board positions.
**4.7.256c:** The City should ensure that process is both effective and efficient and leads to timely appointments of new CPOA Board members.

**CPOA Response:**   The CPOA Board is currently full.  The CPOA and its counsel continue to work with City Council Staff to reform the application and selection process of Board members.

**APD Response:** This paragraph is not within the control of APD or the Mayor's administration, and requires the City Council to address compliance.
**272.** The City shall ensure that the agency remains accountable to, but independent from, the Mayor, the City Attorney's Office, the City Council, and APD.  None of these entities shall have the authority to alter the agency's findings, operations, or processes, except by amendment to the agency's enabling ordinance.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 recommendations.**

**273.** The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | S     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**274.** Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:
   a) this Agreement and the United States' Findings Letter of April 10, 2014;
   b) the City ordinance under which the agency is created;
   c) state and local laws regarding public meetings and the conduct of public officials;

d) civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;

e) all APD policies related to use of force, including policies related to APD's internal review of force incidents; and f) training provided to APD officers on use of force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**Recommendations IMR – 13:**

**4.7.259a:** Ensure that newly appointed CPOA members receive the necessary 24 hours of training within the required six-month time period.

**CPOA Response:** The CPOA Director developed a training checklist (provided to board members) and made it available to members through SharePoint.  Board members have access to this training 24/7.

**275.** The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**Recommendations IMR – 13:**

**4.7.260a:** Ensure that current board members fulfill the agreed-upon assessment requirements as soon as practicable.

**4.7.260b:** For future training, ensure that current board members complete the agreed-upon assessment requirements within an established time frame.

**CPOA Response:**   The CPOA Director and Chair of the CPOA Board met with members to remind them of the on-going obligations regarding this requirement.

**276.** The City shall require those appointed to the agency to perform at least two ridealongs with APD officers every six months.   There were no IMR-13 recommendations for Paragraph 276, which remains in Operational Compliance.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**277.**   The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | P     | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**278.** The City shall provide the agency a dedicated budget and grant the agency the authority to administer its budget in compliance with state and local laws. The agency shall have the authority to hire staff and retain independent legal counsel as necessary.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | O     | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**279.** The agency shall retain a full-time, qualified investigative staff to conduct thorough, independent investigations of APD's civilian complaints and review of serious uses of force and officer-involved shootings. The investigative staff shall be selected by and placed under the supervision of the Executive Director. The Executive Director will be selected by and work under the supervision of the agency. The City shall provide the agency with adequate funding to ensure that the agency's investigative staff is sufficient to investigate civilian complaints and review serious uses of force and officer-involved shootings in a timely manner.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | P     | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**Recommendations IMR – 13:**
4.7.264a: Fully staff the CPOA investigative unit, as required by the CASA.

**CPOA Response:**   The FY/22 budget expands the investigative staff at the CPOA to 7, including 1 Lead Investigator.

**APD Response:** The Keller Administration has granted all requests for increased funding that the CPOA has requested since 2019. City Council ultimately determines the CPOA's budget, which in turn affects the staffing levels.

**280.** The Executive Director will receive all APD civilian complaints, reports of serious uses of force, and reports of officer-involved shootings. The Executive Director will review these materials and assign them for investigation or review to those on the investigative staff. The Executive Director will oversee, monitor, and review all such investigations or reviews and make findings for each. All findings will be forwarded to the agency through reports that will be made available to the public on the agency's website.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | O     | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 recommendations.**

**281.** Investigation of all civilian complaints shall begin as soon as possible after assignment to an investigator and shall proceed as expeditiously as possible.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | P     | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**Recommendations IMR – 13:**

**4.7.266a:** Continue to develop and refine an internal tracking system or other processes that ensure all complaints are either assigned for investigation, referred to mediation, or administratively closed within seven working days of receipt of the complaint, and once assigned for investigation, proceed according to the timelines set forth in the CASA and CBA.

**4.7.266b:** Ensure that tardy assignments of investigations and tardy investigations are noted and discussed with the involved CPOA personnel.

**4.7.266c:** Ensure the inclusion of an investigative timeline clarifying each investigative time point so that assessment of CPOA's timeliness requirements under the CASA and CBA are clear and not subject to interpretation.

**CPOA Response:**   The CPOA reassigned the in-take duties for new complaints.  In, addition the CPOA ask the CPOA Board to amend APD Policy 3-41 to allow "minor" complaints be investigated by the Area Command.

**282.** The City shall ensure that the agency, including its investigative staff and the Executive Director, have access to all APD documents, reports, and other materials that are reasonably necessary for the agency to perform thorough, independent investigations of civilian complaints and reviews of serious uses of force and officer-involved shootings.  At a minimum, the City shall provide the agency, its investigative staff, and the Executive Director access to:

    a) all civilian complaints, including those submitted anonymously or by a third party;

    b) the identities of officers involved in incidents under review;

    c) the complete disciplinary history of the officers involved in incidents under review;

    d) if requested, documents, reports, and other materials for incidents related to those under review, such as incidents involving the same officer(s);

    e) all APD policies and training; and

    f) if requested, documents, reports, and other materials for incidents that may evince an overall trend in APD's use of force, internal accountability, policies, or training.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | O     | S     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**283.** The City shall provide reasonable access to APD premises, files, documents, reports, and other materials for inspection by those appointed to the agency, its investigative staff, and the Executive Director

upon reasonable notice.  The City shall grant the agency the authority to subpoena such documents and witnesses as may be necessary to carry out the agency functions identified in this Agreement.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       | O     | O     | O     | O     | O     | O     | O      | O      | O      | O      |

**There were no IMR-13 Recommendations.**

**284.** The City, APD, and the agency shall develop protocols to ensure the confidentiality of internal investigation files and to ensure that materials protected from disclosure remain within the custody and control of APD at all times.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**285.** The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Chief shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Chief decides to impose discipline other than what the agency recommends, the Chief must provide a written report to the agency articulating the reasons its recommendations were not followed.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**286.** The findings of the Executive Director shall be documented by APD's Internal Affairs Division for tracking and analysis.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**287.** The City shall permit complainants a meaningful opportunity to appeal the Executive Director's findings to the agency.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**288.** The agency shall make recommendations to the Chief regarding APD policy and training.  APD shall submit all changes to policy related to this Agreement (i.e., use of force, specialized units, crisis intervention, civilian complaints, supervision, discipline, and community engagement) to the agency for review, and the agency shall report any concerns it may have to the Chief regarding policy changes.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**289.** For any of the agency's policy recommendations that the Chief decides not to follow, or any concerns that the agency has regarding changes to policy that Chief finds unfounded, the Chief shall provide a written report to the agency explaining any reasons why such policy recommendations will not be followed or why the agency's concerns are unfounded.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**290.** The agency shall conduct regular public meetings in compliance with state and local law.  The City shall make agendas of these meetings available in advance on websites of the City, the City Council, the agency, and APD.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**291.** The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**There were no IMR-13 Recommendations.**

**292.** The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:

a) number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Chief;

b) demographic category of complainants;

c) number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Chief;

d) number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief;

e) policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;

f) policy changes recommended by the agency, including any dispositions by the Chief;

g) public outreach efforts undertaken by the agency and/or Executive Director; and

h) trends or issues with APD's use of force, policies, or training.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**Recommendations IMR – 13:**

**4.7.277a:** CPOA should specifically identify the pressure points causing non-compliance with this paragraph and work with APD, the City and the monitoring team to decide upon processes that will move it back into compliance.

**APD Response:** The CPOA and its Counsel continue to negotiate an MOU with the City and the APOA to allow for more efficient access to materials for the review of Level 3 use of force cases.


## Section 10:  Assessing Compliance (Paragraph 320)

### A.  Access and Confidentiality

**320.** To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City.  The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings.  APD shall notify the Monitor as soon as practicable, and in any case within 13 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.

**Compliance Level History:**

| IMR 1 | IMR 2 | IMR 3 | IMR 4 | IMR 5 | IMR 6 | IMR 8 | IMR 9 | IMR 10 | IMR 11 | IMR 12 | IMR 13 |
|-------|-------|-------|-------|-------|-------|-------|-------|--------|--------|--------|--------|
|       |       |       | S     | S     | S     | S     | S     | S      | S      | S      | S      |

**IMR-13 Recommendations:**

**4.7.278a:** The City should ensure that critical incidents are noted, and where required by the CASA, are reported to the monitor and DOJ.

**APD Response:**  The City has continued to notify the DOJ and the IMT within 12 hours of the incident.  In any instance of delay in notification, the City has contacted the IMT and DOJ to provide a reason for the delay where both the IMT and DOJ have worked with APD on rare occasion.  This is the exception not the rule and APD will continue to provide timely notification.


## VIII.  Conclusion

As stated earlier in this report, as of the end of the IMR-13 reporting period, APD's compliance levels were:
    Primary Compliance 100%;
    Secondary Compliance 82%; and
    Operational Compliance 59%.

Several appointments for key positions occurred during this reporting period.  In March 2021, APD appointed a Superintendent of Police Reform/Deputy Chief Administrative Officer, and placed the 2nd Deputy Chief for the Police Reform Bureau under that command.  This command structure includes Internal Affairs Professional Standards (IAPS), Internal Affairs Force Division (IAFD), Behavioral Health, Training Academy and the Crisis Intervention Section. The Training Academy has two new personnel, the commander and the curriculum development manager, both with extensive education and experience.  In July 2021, APD hired an intake manager for the Internal Affairs Professional Standards Division to assist with the intake of allegations who is responsible for screening and assignment of investigations.

While APD did not conduct annual use of force training in 2020, the City is dedicated to completing use of force training in 2021.  By July 2021, day one of two was completed in this reporting period with a compliance rate over 95%.  By completing this training, APD's annual requirement will be fulfilled.

The Crisis Intervention Division has worked with the Training Academy and MHRAC to develop two hours of in-service training to all existing officers and telecommunicators on behavioral health-related topics and that training will be conducted by the end of 2021.  APD will then have corrected the lapse in compliance by conducting this training requirement.

While APD experienced a decrease in both secondary and operational compliance in numerous paragraphs, APD has taken steps to recover those compliance rates.  Many paragraphs are interrelated and when APD obtains higher compliance in one paragraph, there is an expectation that others will follow suit due to those interrelations.

APD learned during the June 2021 hearing before Judge Browning that the IMT had not reviewed the IMR 13 Progress Report (Docket Number 723), when the Monitor commented that APD had not prepared a document that responded to each IMT recommendation, as this document so clearly does. APD believes that it should be a fundamental obligation of the IMT to review this progress report, to discuss with APD any misunderstandings of their recommendations that become apparent, and to communicate to APD if any of the proposed actions are insufficient.

The City has taken and will continue to take key steps to increase overall compliance with the Court-Approved Settlement Agreement.   APD remains committed to implementing and sustaining the requirements of the CASA.  The progress made during this reporting period highlights the Department's

ability to work collaboratively with stakeholders to implement positive change.  Through guidance and feedback from the IMT and DOJ, APD will continue to work towards full operational compliance in all CASA paragraphs.


## IX. Appendix



# Albuquerque Police Department
# Gap Analysis



Summary of Findings                                                                                      3

Organization-wide Data Status and Assessment                                                             7

   Analytics Culture                                                                     7

   Human Capital & Organizational Structure                                               8

   Data and IT Infrastructure                                                             9

   Duke City CompStat and Analytical Capabilities                                        11

CASA-Specific Data Status and Assessment                                                               12

   Use of Force: Internal Controls and Accountability (¶ 13-89)                           12

   Specialized Units (¶ 90-109)                                                          17

   Crisis Intervention (¶ 110-137)                                                       21

   Policies and Training Generally (¶ 138-161)                                           24

   Misconduct Complaint Intake, Investigation, and Adjudication (¶ 162-202)              24

   Staffing, Management, and Supervision (¶ 203-231)                                     25

   Early Intervention System (¶ 212-219)                                                 25

   Community Engagement and Oversight (¶ 254-293)                                        27

   Implementation, Compliance Assessment, and Enforcement (¶ 294-344)                    29

Appendix A: CASA Requirements within Scope                                                              34

## Summary of Findings

| | Findings | Recommendations |
| --- | --- | --- |
| **Analytics Culture** | APD typically collects data for monitoring purposes but does not operationalize it.<br><br>Efforts to incorporate data-driven decision-making are largely siloed and ineffective.<br><br>The lack of a data-driven culture creates barriers to CASA compliance. | Create an Analytics Unit to help APD's leadership to embrace and promote data-driven decision-making.<br><br>Apply data and analytics to identify problems and develop solutions.<br><br>Use data to inform how resources are allocated, how IT infrastructure is improved, and how management decisions are made.<br><br>Create a change management process to effectively guide APD throughout this transition. |
| **Human Capital & Organizational Structure** | APD's current organizational structure is impeding the implementation of data-driven management despite a willingness to accept it within APD.<br><br>This structure has led to data silos, data quality issues, and gaps in institutional knowledge. | The Analytics Unit should be hierarchically placed at the top of APD's organizational structure.<br><br>APD should create a new Director of Analytics position to lead the Analytics Unit.<br><br>APD should increase the size of the Performance Metrics Unit to expand the impact of performance auditing. |
| **Data & IT Infrastructure** | APD is procuring a new Record Management System and a new Human Resource system. These systems will encompass training, misconduct, use of force, and other information.<br><br>APD has access to software such as ArcGIS and Peregrine to build data analytics as well as their own data warehouse fed by their data systems. | Integrate data analytics personnel into the planning, development, and implementation of new data systems.<br><br>Include analytics on management topics in the CASA.<br><br>Create data products (visualizations, customized reporting, and dashboards) to |

| | Data integrity issues related to the records room and crime reports have been mitigated. | analyze data internally and inform the public. |
|---|---|---|
| **Use of Force: Internal Controls & Accountability** | Electronic Control Weapon data is well-managed and is ready to integrate in an Early Intervention System.<br><br>A system deficiency exists in IAPro miscalculates use of force data. To remedy this issue, APD policy requires a separate report for each citizen involved in a use of force event. This can lead to underreporting and incongruent data.<br><br>APD is likely underreporting uses of force. These reports are often late, incomplete, or miscategorizing force.<br><br>APD's Annual Use of Force Report was poorly organized and provided little analysis of APD's use of force. | Continue the transition to Benchmark Analytics software.<br><br>Identify underreporting of uses of forces by comparing use of force data to resisting arrest charges.<br><br>Create reports to monitor use of force reporting timeliness and conduct regular use of force data audit through the Performance Metrics Unit.<br><br>Publish raw use of force data to the department's website as well as timely, accurate, and objective annual reports. |
| **Specialized Units** | Canine deployment data is inconsistent, incomplete, and stored in various places.<br><br>Canine Unit deployments are significantly higher than that of other comparably-sized police departments.<br><br>Tactical Unit data has severe gaps and inconsistencies. This unit is not analyzing its use of force data in any meaningful way.<br><br>CASA-required data elements are absent from the data collection and reporting of the Tactical Unit and Investigative Unit.<br><br>Data quality issues in specialized units lower the integrity of all data at APD. | Limit data entry by the Canine Unit to the BlueTeam report.<br><br>Perform data analysis within specialized units with the goal of understanding and improving operations.<br><br>Ensure that all CASA-requirements from Paragraph 105 and 109 are included in Unit's Annual Reports and APD's Annual Use of Force Report.<br><br>All units must modify data collection methods and practices to ensure data quality is high. |

| Crisis Intervention | Crisis intervention contact sheets address data collection gaps in mental/behavioral health calls. | Ensure that contact sheets are part of the new Record Management System. |
|---|---|---|
| | The Crisis Intervention Unit's partnership with UNM does not build needed analytical skills within APD. | Make staffing and resource allocation decisions to allow the CIU Databook to be produced internally. |
| | The ECIT Workload and Staffing Model is not driving staffing decisions. The model does not incorporate contact sheets which depict the total demand for crisis intervention certified responders. | Incorporate the ECIT Workload and Staffing Model in staffing decisions. Include contact sheets in this analysis. |
| Policies & Training | APD is in the process of procuring Benchmark Analytics to capture all the data needed to manage their training. | APD should store training data in a single database. |
| Misconduct Complaint Tracking | Misconduct data entry is inconsistent. | Continue the procurement of a data system that will allow for the reporting and management of workflows. |
| | Current data system does not allow for the tracking of workflows. | |
| | Leadership is involved in remedying these issues and procuring a new data system. | Ensure Internal Affairs and Civilian Police Oversight Agency are regularly cooperating and comparing data analyses. |
| Staffing, Management, & Supervision | Leadership does not use staffing assessments or workload models in staffing and resource decisions. | Use staffing assessment findings to drive staffing and resource allocation decisions. |
| Early Intervention System | The Early Intervention Unit is creating a manual early intervention system. This is unsustainable, likely to produce errors, and fails to meet the CASA requirement for an automated system. | Cease the creation of a manual entry system. |
| | | Relocate the Early Intervention Unit into the proposed Analytics Unit. |
| | The Early Intervention Unit is not actively involved in the procurement of new data systems. | Include the Monitoring Team and Department of Justice in the development of peer groups and indicators. |

| | | |
|---|---|---|
| | The Monitoring Team and Department of Justice have not been involved in the development of peer groups and indicators.<br><br>There is no change management plan for the implementation of the system. | Create a change management plan for the implementation of the early intervention system. |
| **Community Engagement & Oversight** | Crime data reporting issues within the Records Unit have impacted APD's ability to report crime statistics accurately and in a timely manner.<br><br>Credit for public reports is often given to the analysts who produced them.<br><br>Recommendations made by the CPOA are all handled by paper. It is unclear whether APD regularly analyzes the differences between CPOA recommendations and what is implemented by APD. | Implement organization-wide recommendations to ensure accurate and timely reporting. Use a data visualization product to display crime statistics online.<br><br>Publicly disseminated reports should be corporate products authored by the entire department.<br><br>Track the recommendations made by the CPOA and analyze the differences between those recommendations and what is implemented by APD. |
| **Implementation, Compliance Assessment, & Enforcement** | The Compliance Unit does not have immediate access to unit-specific data. The unit spends a considerable amount of time trying to gain access to, understand, and validate data. Much of this data contradicts what is stored in the data warehouse.<br><br>Gaps in institutional knowledge further impede the Compliance Units efforts and result in duplicative work. | Implement recommendations to develop holistic, integrated approaches to collecting and reporting data. Involve the Compliance Unit in these efforts.<br><br>The Compliance Unit should have full, unfettered access to the needed data systems. |

## Organization-wide Data Status and Assessment

Organizations cannot take advantage of analytics without a supportive culture which embraces it, personnel who can implement it, and sufficient data systems to build it. APD has several units responsible for conducting data analysis or using analytical rigor in the course of their work. In some instances, these units produce impactful products that guide how APD allocates resources and manage the Department's performance. But poorly structured data systems are unable to report data accurately, and these units often operate in a silo without organizational support leading to work that is not operationalized.

APD has efforts underway to remedy these concerns by procuring new data systems, enhancing data collection instruments, and improving data queries. The promise of the new data systems will not have a lasting impact on APD's Court Approved Settlement Agreement (CASA)-related efforts, however, without improvements to APD's organizational culture, structure, and processes.

APD's Performance Metric Unit (PMU) exemplifies this concern.

PMU collects and reports data on the performance of APD which the Department uses to improve specific areas of focus. The Monitoring Team made critical findings regarding APD's reporting of force, but PMU has not been tasked with auditing performance in this critical area. PMU has also not been intimately involved in the holistic implementation of the new data systems in development (Mark43; Peregrine; Benchmark Analytics) despite being a key unit that uses APD data systems and considers the collection and use of data when auditing for CASA compliance.

The work of PMU is clearly valued by APD's leadership, but it is not integrated into strategic and management decision-making. This disconnect demonstrates that, even regarding its most critical issues, APD is not operating as a data-driven agency.

### Analytics Culture

APD described the Department's analytics culture by saying the Department is "not opening up and thinking about how to solve processes and problems." As a result, the Department is practicing "whack a mole policing" in their words. APD's culture would best be described as in between a data-aware and data-informed organization.

APD's Crisis Intervention Unit (CIU), for example, collects and reports data on its operations, yet there is no evidence to suggest that this data is informing organizational decisions such as staffing allocation. The training academy does not use internal data – such as administrative complaints, use of force, and policy violation data – to inform its curricula and priorities.

APD officers are aware that the data exists and is collected regularly, but this information is rarely incorporated into organizational decision-making. The Department has embraced data to support crime intelligence efforts at Duke City CompStat as well as PMU's auditing functions. This highlights how APD clearly has the capacity to use data to drive decision-making, they just do so selectively.

APD frequently seemed focused on demonstrating CASA compliance at a superficial level rather than using data to drive change efforts and decision-making. The current failure to do so has created significant barriers to operational compliance. The CASA requires staffing decisions be driven by a staffing assessment. APD has conducted the required study but there is no evidence that the study's findings have been incorporated into staffing and resource allocation decisions. Data-driven management cannot be a siloed process. Many of the processes APD must institutionalize to achieve operational compliance span multiple units and decision-makers.

APD's use of analysts and data has improved substantially in the last few years, however, as evidenced by the PMU and the publication of their Annual Use of Force report. The analysts and those charged with conducting analysis have a clear interest in improving their work products. The promise of new data systems such as Benchmark Analytics, Mark43, and Peregrine can be a catalyst for further improvements within APD. APD is in a strong position to take existing strengths, capitalize on forthcoming improvements, and recommendations herein to become an analytically-driven organization.

> APD should better embrace the use of data in decision-making. The Department's leadership should place analytics front and center with how decisions are made by creating an Analytics Unit central to the organization. Becoming data-driven requires not only the use of data but applying data and analytics to identify problems and develop solutions to those problems.
>
> AH Datalytics found that data analysis, when performed, was spread across the organization in siloed units and was not central to APD's operations. Leadership needs to use data and analysis to inform how resources are allocated, how IT infrastructure is improved, and how management decisions are made.
>
> The role of change management is essential to transitioning to data-driven decision-making. Change management creates a process to help APD develop their own culture around data-driven decisions, train personnel in understanding how to use it, and sustain the culture shift once it begins.

## Human Capital & Organizational Structure

APD's current organizational structure is impeding the implementation of data-driven management despite evidence of a willingness to accept it.

APD's organizational structure has led to the following interrelated issues:

- **Data silos:** Data systems and reports do not communicate.

- **Data quality:** Data systems lack a full and accurate representation of all APD activity and often collect data in a fractured or incongruent manner. Poor data quality impedes APD and other stakeholders from operationalizing the data presenting a key obstacle to becoming a data-driven agency.

- **Institutional knowledge:** Gaps in institutional knowledge and ability develop when personnel leave the Department.

APD's data analysts are spread throughout the Department in the following divisions: Real Time Crime Center, Records Division, Internal Affairs Division, and the Compliance and Oversight Division (Audit and Analysis Section, and the Performance Evaluation and Management System Section). APD relies on the City of Albuquerque's data architect and partners at New Mexico University (UNM) for data and IT assistance.

The data architect has become a critical actor in ensuring accurate queries from the data systems, revising, and refining the queries and data structures for arrests, crime, Early Intervention System (EIS), Crisis Intervention Unit (CIU), and others. The data architect recently stepped into this role after a previous employee left leaving minimal documentation and institutional knowledge. The data architect has not been involved in the procurement and development of new data systems.

These partnerships are piecemeal responses which do not address APD's systemic data gaps. APD must focus on institutionalizing data skills and abilities. Successful procurement and implementation of new data and IT systems is threatened by APD's lack of dedicated personnel and an appropriate organizational structure to manage these systems.

> APD should create an Analytics Unit hierarchically located at the top of the organization to inform decision-making. This unit could provide a structured way to conduct analyses of longitudinal data, compliance data, as well as strategic, resource, and management data department wide. The Director of Analytics should be a member of APD's leadership team with the ability to inform the development and implementation of strategy and resource allocation.
>
> The creation of an Analytics Unit would also institutionalize relevant knowledge and skills. This can address the observed pattern of relying heavily on select individuals for data analysis, and consequently losing gained CASA compliance when those individuals leave the Department.
>
> The Analytics Unit should be involved in the procurement and development of information systems to ensure these systems can collect and report the necessary data to comply with the CASA. The unit should also be used to evaluate APD processes, implementation of policies, and the allocation and use of resources to improve organizational efficiency.
>
> The Performance Metrics Unit's responsibility should be expanded to audit use of force data regularly. At least 4 additional auditors will likely be needed though the Performance Metrics Unit supervisor may have additional insights into the staffing needs of the unit.

## Data and IT Infrastructure

A review of APD's data and IT infrastructure presents evidence of both promise and concern. APD's issues related to its Record Management System's (RMS) data accuracy with regards to crime and arrest numbers falls on the concerning end of the ledger. The reported data was not consistent due to historically inaccurate queries from the data systems and poorly constructed processes to push data across multiple systems.

APD has identified and remediated this specific risk by working with City IT staff and enhancing the size of the Records Unit though the underlying problematic structure still exists. The risk mediation strategies are currently working and should prevent the same issues from occurring again.

APD is also working towards the implementation of a new RMS by Mark43 that should significantly address the flow of data throughout the system. While APD is hoping the system will be up and running before June 30, 2021, it is more likely not going to be live until later in 2021.

The Real-Time Crime Center (RTCC) uses two notable data tools: Peregrine and ArcGIS. Peregrine is used to access the newly created "Data Lake" by APD to analyze data out of the RMS and computer-aided dispatch (CAD). According to the RTCC, it will also eventually hold all the information currently in their data warehouse which includes IAPro (use of force and misconduct data), TraCs (CIU data), and other data sources.

The lack of an integrated Analytics Unit means that the personnel who play a critical role in understanding what data should be collected and analyzed were not involved in the development and deployment of Peregrine and, to some degree, the RMS. The Peregrine system does hold promise because of its ability to visualize data across data systems and allow for a dynamic display of critical information.

The RTCC uses the ArcGIS platform to collect data related to community policing which can be integrated into the Duke City CompStat to evaluate community problem solving. It is unclear who else from the Department has been involved in developing this approach and whether the Monitoring Team has reviewed this approach.

The most recent Monitoring Team's report strongly praised the Compliance and Oversight Division on PMU's audits. The Monitoring Team expresses concern, however, about the integration of audits into the organization's culture and using that data to drive decision-making. The audits are integrated into Duke City CompStat and accepted in a very narrow perspective, but a Department-wide embrace of data to improve performance is lacking.

Concerns around timeliness of misconduct or use of force reports and the lack of delivery of annual training were repeatedly expressed to AH Datalytics. These concerns would all be significantly mitigated by data-driven management in those areas.

> APD should integrate data analytics personnel across the planning, development, and

implementation of new data systems. It is critical that, as APD procures new systems, that these systems are aligned with all of the data collection and reporting needs of the Department and considered collectively as a mechanism to move APD to become data-driven.

APD should include data analytics on critical management topics pertaining to the CASA. This should include building in-depth visualizations, customized reporting, and dashboards as the primary mechanism for analyzing data internally and informing the public. These data products would facilitate raw data analysis by different stakeholders, improve monitoring compliance, and greatly improve the Department's ability to use analytics to drive change.

APD should maintain a larger Records Unit to ensure timely approval of NIBRS reported crime, ensure all historical SQL queries are modified with City Hall IT to ensure the proper reporting of data, and develop new processes to standardize how data is accessed and reported to continue mitigating risk effectively.

### Duke City CompStat and Analytical Capabilities

APD has a wide array of analytic needs in addition to those that would specifically support the CASA. APD uses a wide variety of data to support a crime and intelligence focused conversation at the Duke City CompStat. The meeting includes a review of crime statistics as well as discussion of specific cases. The meeting focuses on two divisions each week to ensure that they can be properly thorough.

Analysts are working to improve the meeting with Peregrine, a dashboard tool discussed briefly above, and the development of internal portal tools to share crime statistics and information throughout the Department. This framework is seen as working by those involved and is an example of a data-driven accountability framework.

This successful integration of analytics in the Department demonstrates that APD has the potential to expand its use of analytics into other areas.

APD should expand the data-driven accountability framework incorporated into compliance audits into other management data, community, and problem-oriented policing work. APD must balance the need to conduct detailed crime-focused conversations with the need to manage the full operations of the Department from a data-driven perspective. Tools such as Peregrine or standard SQL reporting should be integrated into the CompStat meeting to develop reports on workflow processes.

## CASA-Specific Data Status and Assessment

The following sections evaluate APD's performance with respect to each CASA paragraph's data requirements with recommendations provided to address issues as appropriate.

### Use of Force: Internal Controls and Accountability (¶ 13-89)

The CASA requires APD to track the inventory and issuance of handguns, critical firearm discharges, electronic control weapon (ECW) discharge data, and all uses of force. The CASA also requires APD to publish an Annual Use of Force Report, review and audit ECW data, and incorporate use of force data into an EIS.

### Firearm Discharge Data

Firearm discharge information is stored in the BlueTeam module of IAPro. AH Datalytics has concerns related to the handling and storage of data in IAPro which is discussed in depth in the use of force data collection and management section below.

### Handgun Inventory and Issuance Data

AH Datalytics received the handgun inventory data. The data provided shows that 1,038 officers have been issued a total of 1,161 handguns. From the data provided, it appears this data is kept and stored in an orderly manner; however, AH Datalytics would like confirmation on the number of sworn personnel to compare to the number of officers issued handguns.

### Electronic Control Weapons Data

APD policy considers both the show and the use of an ECW to be a force event. Officers who show or deploy an ECW are required to report the force incident using the force reporting process on BlueTeam.

APD's ECW batteries collect and store its usage data. This includes information on how many times the device is discharged and the length of each discharge cycle. After each ECW deployment, APD officers are required to upload their ECWs battery to Evidence.com prior to the end of their shift. Officers are further required to upload their ECWs battery monthly, regardless of deployment, and conduct weekly function tests on their tasers.

To validate the integrity of APD's ECW data, PMU compares uploaded ECW data in Evidence.com with use of force records in BlueTeam. This auditing process allows APD to identify unreported uses of an ECW and there are no known issues or concerns with these processes.

ECW data should be easily included in APD's Annual Use of Force Report and future EIS.

### Use of Force Data Collection and Management

APD uses IAPro and their BlueTeam module to collect data pertaining to uses of force. The Monitoring Team has expressed concern regarding the integrity of the use of force data in two main ways. First, some uses of force are not being reported at all and their reports have highlighted examples of this occurring.

Second, during the gap analysis, AH Datalytics was informed about a critical issue pertaining to how IAPro stores use of force information in all police departments. IAPro associates each distinct use of force *only* to the officer that used it, and *not* to the citizen that received it. The system cannot distinguish upon whom each force was used in events in which more than one citizen is involved.

For example, if one officer uses a separate type of force on three distinct subjects during an incident then the data from IAPro should show a single use of force event with three total uses of force. The output from IAPro in this instance, however, would show three uses of force on each of the three citizens for a total of nine uses of force. This data error is unlikely to impede the use of force data from an early intervention perspective, but it can result in a gross miscalculation of the number of uses of force by APD or any police department nationwide using this data.

*Figure 1 - How IAPro should store use of force data (diagram from APD's Annual Use of Force Report)*



*Figure 2 - How IAPro stores use of force data (diagram from APD's Annual Use of Force Report)*



[1]

---

[1] Albuquerque Police Department, "Annual Use of Force Report 2016-2019", page 8.

APD's use of force analyst brought this issue to our attention. The analyst manually corrected the data for all instances in which force was used upon multiple citizens in APD's Annual Use of Force Report.

APD's current policy is that any use of force event involving more than one citizen must create a separate report for each citizen involved. This will mitigate the specific miscalculation issue described above but it may result in other issues. Requiring multiple reports for each use of force event may create a disincentive to report, something that is already a concern for low-level uses of force. It may also lead to a data quality issue if there is incongruent data between multiple reports.

> Both AH Datalytics and the Monitoring Team recommend that at a minimum, APD should regularly compare arrest data of those charged with resisting arrest related charges and use of force reports. The resulting comparison would help identify potential cases that were not reported and could be set-up to be a regularly running query that is provided to management to ensure uses of force are not missed.
>
> The Monitoring Team has highlighted several cases in which the force that was reported was either categorized incorrectly or did not fully capture all uses of force in the event. This resulting data integrity issue means that subsequent analysis cannot be seen as accurate. It is essential that APD lean on PMU to ensure the quality of use of force data being reported.
>
> A second concern raised by the Monitoring Team – and validated from our interviews – is a lack of timeliness in use of force reporting. APD should create reports to monitor use of force report timeliness like what the Internal Affairs (IA) section uses. These reports should contain necessary deadlines and be distributed to all appropriate personnel so that reports are submitted in a timely fashion.
>
> APD should ensure that multiple citizens can be listed on an event and have each use of force used upon that citizen accurately reported. APD is planning to transition to Benchmark Analytics for use of force reporting. It is unlikely that the issue should continue to be a problem with Benchmark Analytics based on the experiences of other departments using it, but APD should ensure the issue is solved under the new system.

## Force Review Board

The Force Review Board (FRB) is a critical component for effective data-driven management. During the Monitoring Team virtual site visit, the Monitoring Team engaged in a thorough discussion with APD on the deficiencies of the FRB's current processes and methods to improve upon it. One component involves PMU developing a sampling methodology to ensure the FRB reviews more lower level uses of force.

> AH Datalytics recommends that PMU is regularly involved in ensuring the quality of the force data being reported. It is understandable that the FRB does not have the capacity to review all low level uses of force, but this should be a priority given the profound concern noted by the Monitoring Team on the non-reporting or misreporting of low-level uses of force.

## Annual Use of Force Reporting

APD's Annual Use of Force Report is written and authored by a data analyst within the Internal Affairs Force Division (IAFD). We observed four key issues in the most recent Annual Use of Force Report, which encapsulates data from 2016 - 2019:

(1) **Timeliness:** The most recent report was submitted to the court in October 2020. From our interviews we learned that the report was almost completed a year prior, by November 2019, and was seemingly on track to be published in a timely manner. Extensive issues surrounding arrest data (which have been attributed to APD's gaps in its human capacity, institutional knowledge, and organizational structure) delayed the report's release. This resulted in APD being out of compliance with CASA Paragraph 79.

(2) **Data integrity:** We identified data discrepancies between the data in the Annual Use of Force Report and the data in the Monitoring Team's Third "298 Report". These discrepancies were likely caused by APD's data quality issues addressed earlier.

(3) **Data analysis:** Annual reports should be clear, concise, and easily accessible to the public which may not have expertise in law enforcement rather than data dumps on topics of importance. The analysis is poorly organized and provides little assessment of the Department's use of force. The most recent report provides data on use of force in the order spelled out in the CASA but provides little overarching context or analysis for better understanding the data. There is no executive summary for easy digestion of the report's most important conclusions and data analysis does not begin until page 9 making the report challenging to digest. The report does delve into deeper analysis in some places – such as showing a steady increase in cases from 2016 to 2019 – but writes off this potentially important change by saying "more proactive policing strategies, better reporting of force incidents and other initiatives may account for this increase." Rather than evaluate cases over time at a more granular level, the report simply says the increase may reflect a "regression to the mean."[2]

(4) **Corporate product:** The Annual Use of Force Report should be a corporate product by the entire Department and should not identify the analyst who prepared the report on the cover. Acknowledgements, when deemed necessary, should be placed at the end rather than beginning of the report.

> These key issues are caused by organizational and data flow failures. All of these issues could be resolved by creating a central analytics unit that is responsible for all data collection, management, and reporting.
>
> An analytics unit that is charged with creating management analytics can create the requisite reports needed to ensure the timely submission of reports. Second, the unit can conduct regular analyses or create regular reporting to address the issue of non-reported uses of force. Third, by utilizing a centralized unit to write the analyses it can ensure as much objectivity within the organization as possible and that there is a broad understanding of the data that may be useful for other streams of work within APD, such as outcome measures or an early intervention system.
>
> We suggest that all demographic data be broken down by race and ethnicity simultaneously. It is indeed good practice to make the distinction between race and ethnicity in data collection. However, to fully represent the demographics of individuals involved in use of force events, information on ethnicity must distinguish between racial identities. This poses a potential and significant risk of not identifying and addressing critical trends. We further recommend that APD extend its 'Hispanic' ethnic category to include 'Hispanic or Latino'.

---

[2]  Albuquerque Police Department, "Annual Use of Force Report 2016-2019", page 17.

## Specialized Units (¶ 90-109)

The CASA requires APD to track and assess canine deployments, canine apprehensions, canine bite ratios, and the number of specialized tactical unit and specialized investigative unit deployments. APD is required to include this data in its annual reports. The CASA also requires APD to document operational plans and after-action reports for all specialized tactical units' callouts and deployments.

### Canine Data Collection and Management

The Special Operations Division (SOD) Canine Unit uses multiple systems to track canine deployment. The result is inconsistent data requiring significant work to ensure all canine deployments are captured.

The Canine Unit generates a CAD signal for any directed canine deployment while canine handlers maintain their own log of each use of their canines. This information is provided to the unit supervisor monthly who compiles the information into a separate log for the whole unit.

Each deployment also requires the completion of a special BlueTeam report which has been modified to capture all the required information. Finally, a standard use of force BlueTeam report is created when a use of force happens during a canine deployment. This results in deployment data being entered and stored in five distinct areas.

Review of the data provided by the SOD unit demonstrates significant areas of concern.

- The data from SOD shows a total of 740 canine deployments but SOD's 2019 Annual Review and APD's 2019 Annual Use of Force Report state that there were 927 deployments.

- It is not clearly indicated when an apprehension was made, or a bite occurred.

- The file numbers are not in numeric order when sorted by the date of occurrence. The case numbering system appears to begin in July 2019 creating concerns about the data's quality.

- The data does not indicate which call the canine deployment was deployed on, why the Canine Unit was deployed, and what happened on the call.

- Information provided by the Department of Justice (DOJ) indicates that half of all canine bites are associated with worker's compensation claims. It is unclear if these bites are considered uses of force or how they are documented.

While not strictly within our expertise, AH Datalytics notes that the stated 927 canine deployments in 2019 and the 1,037 canine deployments in 2018 appear to be significantly higher than those reported by other departments listed below for similar time periods.

- The New Orleans Police Department reported 22 deployments in 2017 and 16 deployments in 2018.[3]

- The Seattle Police Department reported 9 deployments in 2018.[4]

- The Tucson Police Department reported 34 deployments in 2019.[5]

> The Canine Unit should cease the use of spreadsheets to capture canine deployments. Conversations with the Compliance Team suggest that the special canine BlueTeam report is sufficient for all deployment data capture. APD needs to streamline this data process to ensure consistent quality data from the Canine Unit.

### Specialized Tactical Units Data Collection, Management, and Reporting

Data on STU deployments was provided via an Excel file titled "P.105 Tactical Activation Analysis 2018-2020". This file contained a picture image of each year's spreadsheet rather than the source spreadsheets. The resulting image was pixelated and made it difficult to confirm that all required CASA elements are there and if data entry is consistent.

Because of the way the data was provided, AH Datalytics was unable to conduct data analysis to confirm the numbers reported by SOD's Annual Review or APD's Annual Use of Force Report. Our review of the tables provided for 2019 and 2020 revealed major deficiencies exist. For one, the data reporting mechanism is inconsistent and difficult to parse throughout the document.

Second, many of the CASA-required fields are blank, including fields on at least 14 activations in 2020 and 17 activations in 2019. It is unclear if a blank value means that the value should be 0 or if the field was skipped.

Our review showed the following data was missing. Each record corresponds to one activation.

- **Criteria for tactical deployment:** Missing in 4 records from 2019 and 2020.

- **Number of arrests:** Missing in 5 records from 2020.

- **Forcible entry:** Missing in 8 records from 2019 and 4 records from 2020. Additionally, there are 2 records from 2020 which indicate that forcible entry was and was not required, simultaneously.

---

[3] New Orleans Police Department, "2018 Use of Force Report", https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/2018-Use-of-Force-Annual-Report-(1).pdf/?lang=en-US
[4] Seattle Police Department, 'Use of Force Annual Report", January 2019, https://www.seattle.gov/Documents/Departments/Police/Publications/2019_Annual_UoF_Report.pdf
[5] Tucson Police Department, "Methods of Force" , January 2019, https://qlikapps.tucsonaz.gov/sense/app/d9940d02-7edc-4a05-9d49-4c8fec425638/sheet/dc953074-a58c-47f4-87e9-b01c93fe8ca2/state/analysis

- **Injuries and deaths for persons and animals:** Both tables include fields for whether persons or animals were injured. There is no separate field for fatalities. 'Animals injured' is missing in 6 records from 2019 and 2020, respectively. 'Persons injured' is missing 1 record from 2019 and 3 records from 2020.

- **Type of tactical equipment deployed**: Several activations in 2020 indicate all "N" for no. This is unlikely given the nature of tactical activations. This field is missing in 12 records from 2019 and at least 2 records from 2020.

The core elements of Paragraph 105 of the CASA stipulates annual reporting requirements for STU activations which are not included in SOD's 2019 Annual Review. The elements of Paragraph 105 should also be included in APD's Annual Use of Force Reports and publicly reported to the community.

Mutual aid assistance requests from outside agencies are included in the count of 'Total Activations' but they are excluded from the subsequent analyses of total activations. In 2019, there were 11 tactical activations at the request of a mutual aid assistance meaning 18% of total activations are not included in the annual analysis of the data points required by Paragraph 105.

It should also be noted that Paragraph 105 refers to "tactical deployments" and SOD's Annual Review and Tactical Activation Analysis Table only speaks to "tactical activations". The Monitoring Team said that "SOD identified data discrepancies where the terms SOD 'activation' and 'deployment were being misapplied'".[6] It is unclear what the correct internal use of these terms are and how this affects CASA-compliance.

The graph for tactical activations in SOD's 2019 Annual Review uses 'utilized' rather than 'deployed', as is used in the CASA text. The tracking ledger also uses 'utilized'. It is unclear whether 'deployed' and 'utilized' can be used interchangeably or if they have different meanings.

The report measures 'Use of Force' by the number of SOD activations involving a use of force which "may have involved one force type or multiple force types in the same activations".[7] SOD may want to reconsider this practice considering that tactical activations are likely to involve multiple uses of force involving different tactics, techniques, and equipment. It is unclear how this type of reporting or analysis is valuable to SOD or APD at large.

Data collection and integrity issues aside, this is another example of APD collecting and reporting data without considering how it may be operationalized. Examples such as these demonstrate how in some instances data efforts lack meaning and significance for the larger organization.

> All data should be stored and communicated in machine readable format. Data should be tracked using data validations to ensure quality. Blank values should be replaced

---

[6] Public Management Resources, Inc., "Monitor's Twelfth Report", published November 2020, page 165.
[7] Commander Arturo Sanchez, "APD Special Operations División 2019 Annual Review", page 12.

with Boolean values or a value of 0 if necessary.

The SOD Annual Review should include all required elements in Paragraph 105 and the whole report should be made available to the community. While the CASA may provide the opportunity to report SOD data on its own, we strongly recommend that this data be included in the annual use of force report. Inclusion in this report will make it easier for the public to see how force is used in a comprehensive manner.

Mutual aid assistance requests were 18% of SOD's tactical activations in 2019. Not including them in analysis erodes the quality of SOD's analysis and reporting. SOD should include them in all the data analysis required by the CASA.

It is commendable that SOD clearly reported what activations were and were not included in their analysis. SOD should ensure its visualizations are titled accurately or with a caption to clarify the definition or calculation of the information being represented. Visualizations should always include the year its data is from as well. These are general best practices that apply to all of APD.

There is evidence to suggest severe data integrity issues in the reporting of tactical activation units uses of force and use of equipment. Remedying these issues should be a top priority for SOD.

## Special Investigative Units Data Collection, Management, and Reporting

The Specialized Investigative Division (SID) tracks its deployments internally in the unit through a SharePoint list. The information is entered through a form and can be analyzed within the native SharePoint application or exported to Excel.

We reviewed an export file of all SID's SharePoint records for this assessment. SID collects all the data points required by Paragraph 109 though there were a few data quality concerns. All the records referenced below are from 2020.

- **Number of arrests**: 2 records indicated that more than 11 arrests were made during one incident, but these records did not give a specific number of arrests.

- **Type of evidence or property seized:** 5 records indicated the types of narcotics that were seized but did not give a quantity while one record indicated seizure of 'narcotic' with no further details.

- **Warrant type:** 3 records indicating that a warrant was the legal authority yet were missing the warrant type.

We had concerns with non-CASA specific data points that are worth mentioning as well:

- **Total firearms seized:** There are firearms listed under 'Type of Evidence or Property Seized' which are not reflected under 'Total Firearms Seized'. This results in numerous missing firearms for this data point.

- **Case number:** missing in 15 records. It is unclear how an entry could lack a case number.

These data entry errors may appear to be minor though they reflect the overall data quality within APD. Data quality concerns are important to successfully operationalize data within the Department (such as being able to use this data in a future EIS system), and building and maintaining integrity with the Monitoring Team, the court, and the public.

SID's 2019 Annual Review did not mention the following CASA-required items: warrant types, the result of each investigative response, forcible entries were required, weapons discharged by SID members, attempted flees from officers, as well as people and domestic animals that were injured or killed (Paragraph 109). The elements of Paragraph 109 should be included in APD's Annual Use of Force Report and publicly reported to the community.

> SID should modify its SharePoint form to create mandatory fields and enforce reporting on specific data types. The reporting form should not allow an entry without a case number to be submitted. The reporting form should similarly mandate that a 'warrant type' be entered when 'warrant' is chosen as the 'legal authority type'.
>
> SID should ensure that its annual report includes all the items required by the CASA and that their annual report is integrated into APD's Annual Use of Force Report.

## Crisis Intervention (¶ 110-137)

The CASA requires APD to maintain the number of crisis intervention certified responders deemed necessary by APD's staffing assessment and resource study. APD must collect specific data on the use of crisis intervention certified responders and the Crisis Intervention Unit (CIU). APD is required to use this data and subsequent analysis to inform its decision-making regarding its crisis prevention services.

### Crisis Intervention Unit's Data Collection and Management

CIU's ability to collect and report on CASA-required data points is hindered by APD's data and IT infrastructure. Only a few people have the institutional knowledge of where the information is stored, who to contact to modify the form, and how to report data out of the system.

Queries built to generate reports out of the system have historically been inaccurate and required City Hall IT to fix. CIU and the City Hall IT staff have tried to reconcile data gaps through manual data collection and reporting, unsurprisingly resulting in significant delays.

The implementation of Mark43 should address these issues, but deployment of a new mental/behavioral health form may not be part of the initial deployment. This is another area where the lack of a holistic approach to the development of data systems may impede APD's ability to collect required data.

The current contact sheet lacks some useful information that should be collected such as techniques or equipment used, injuries to the officer or citizens, and the disposition of the call.

Collecting this information would improve the efficiency and quality of APD's data collection and analysis efforts.

APD can also capture mental/behavioral health calls through CAD. Mental/behavioral health events are often not identified until after an incident is initiated and entered into CAD under different call codes. Many police departments struggle with clearly denoting when mental/behavioral health is impacting an event. Completion of the contact sheets, therefore, is critical for understanding a full picture of mental/behavioral health.

APD collects information on cases requiring follow-up associated with COAST through a robust SharePoint application. The application enables tracking of case status and follow-up notes from home visits or phone calls. The list allows the unit to appropriately track and manage the COAST program.

> Modify the contact sheets to capture all the elements required by Paragraph 129. This will simplify data collection and improve data quality. Use contact sheets, in addition to the number of behavioral health CAD calls, to analyze and understand mental/behavioral health events and services. Ensure the modified contact sheets are part of the new RMS as quickly as possible.

## Crisis Intervention Unit's Data Analysis and Reporting

We reviewed the CIU's 2019 Annual Report ("Response to Behavioral Health Incidents") and Databook for 2019 and 2020. Our main observations are:

(1) **Format and presentation:** The documents were mainly visualizations with minimal amounts of text. Annual reports should be a written discussion with analysis of pertinent data points. The charts and graphs should be a supplement rather than a focal point.

(2) **Operationalization of data:** There is no discussion of how the data presented can inform "modifications to crisis prevention services" as required by the CASA.[8] We believe that APD likely does not use data to this end providing another example of the lack of data-driven management and culture at APD.

(3) **Corporate product:** The annual report should be a corporate product published by the entire Department and, as such, should not identify the analysts or partners who prepared the report on the cover. Acknowledgements, when deemed necessary, should be placed at the end rather than beginning of the report.

The 2020 Databook was produced in collaboration with UNM's Institute for Social Research. This partnership was intended to advance the unit's data analysis efforts.

---

[8] Second Amended and Restated Court-Approved Settlement Agreement, Paragraph 137, page 47.

That the partnership with UNM appears to have only minimally advanced data analysis efforts and has not institutionalized data-driven practices and management within APD. Short-term steps like this partnership highlight APD's need to more fully transform into a data-driven organization.

> The 2019 Databook and report contain the requisite information, but the lack of analysis highlights the need for a centralized Analytics Unit. These products should be used to develop insights that can further improve CIU's and APD's response to crisis intervention incidents.
>
> The 2020 Databook did not fully capture the CASA-required data point "techniques or equipment used." The product only reports techniques and equipment used during use of force events that have taken place during CIU encounters. APD may find it useful to capture the full spectrum of techniques and equipment used during all crisis intervention encounters as it could inform policy and training decisions.
>
> We suggest that all demographic data be broken down by race and ethnicity simultaneously. It is good practice to make the distinction between race and ethnicity in data collection. But to fully represent the demographics of individuals involved in use of force events, information on ethnicity must distinguish between racial identities. This poses a potential and significant risk of not identifying and addressing critical trends. We further recommend that APD extend its 'Hispanic' ethnic category to include 'Hispanic or Latino'.

### Crisis Intervention Unit Certified Responders

Paragraph 123 requires APD to "maintain a sufficient number of crisis intervention certified responders who are specifically trained officers across the Department who retain their normal duties and responsibilities, and also respond to calls involving those in a mental health crisis".[9] The workload analysis and staffing model developed by APD's CIU concluded that approximately 63 certified officers in each area command would be "sufficient". CIU provided a synopsis of the model's findings to APD's area commanders that clearly outlines how many crisis intervention certified responders are needed in each area during each shift.

Area commanders make staffing decisions through a bid process. Evaluating this process was not part of the scope of this analysis, but we assess that it likely acts as a barrier to fully implementing a data-informed strategy to personnel allocation.

Currently, crisis intervention certified staffing levels at each area command are more than sufficient. Our interviews and analyses suggest that this outcome is due to the sheer number of APD officers that are certified, rather than the inclusion of the staffing analysis and workload study in staffing decisions.

---

[9] Second Amended and Restated Court-Approved Settlement Agreement, Paragraph 123, page 43.

The CIT Workload Model is a positive example of APD attempting to use data to drive decision-making. The accuracy of this model will further improve as data collection gaps are identified and mitigated.

> APD leadership must incorporate the results of the ECIT Workload Model into its staffing and resource allocation decisions. The ECIT Workload Model currently uses Behavioral/Mental Health CAD calls to determine demand. APD should consider incorporating CIU Contact Sheets in the model to address known data collection gaps and refine the results of its analyses.

### Policies and Training Generally (¶ 138-161)

The CASA requires APD to maintain complete and accurate training records. APD currently stores this information in multiple locations:

- PowerDMS is utilized for online learning.
- Enterprise Learning Management Software maintains most in-person training.
- BlueTeam is used to track mandatory training referrals.
- LEFTA is used to track field training for recruit and lateral hires.
- Sergeant and lieutenant training is stored using paper files.

Benchmark Analytics will be used to replace all of these data systems to create one system for training records, however, the project does not have a known completion date at this time.

No information is captured on outside training received by APD employees other than documentation of a certificate if one is issued. This is not explicitly required by the CASA, but a lack of data on training conducted outside APD results in an incomplete picture of training given to APD personnel.

> Training information should be kept in one database with the sole potential exception of the unique needs of field training data. Training data should be used to not only annually report information but manage the delivery of training to all personnel. Training information should include mandatory training as a result of use of force reviews, the Force Review Board, the Early Intervention Training, and other sources.

### Misconduct Complaint Intake, Investigation, and Adjudication (¶ 162-202)

The CASA requires APD to track all officer and employee misconduct through a centralized numbering and tracking system. This system must maintain accurate complaint data and notify complainants of their complaint's status. The CASA further requires the City of Albuquerque to ensure that APD and the Civilian Police Oversight Agency (CPOA) are adequately staffed to conduct misconduct investigations in the thorough and timely manner that is stipulated in the agreement.

Complaint Tracking

IA currently tracks all complaints within IAPro. Data entry on specific complaint fields has been inconsistent which impedes their ability to use the data meaningfully and report on it adequately. This issue has improved over the past year with the new commander.

IAPro is unable to demonstrate where investigations are in the workflow. As a result, misconduct complaints suffer from issues related to timeliness. The IA commander has tried to track the workflow by exporting data from IAPro and entering it manually into a usable format, but this process was too cumbersome and time consuming to be sustainable. The IA commander has been intimately involved in the procurement and creation of Benchmark Analytics to resolve this issue.

> IA and CPOA do not actively collaborate as it pertains to data analysis. IA readily acknowledges that regularly analyzing APD's data alongside CPOA's would enable APD to better understand trends and issues pertaining to misconduct within the Department. The transition to the new system should facilitate data reporting and thus provide a platform for better integrated reporting. Without addressing these changes, IA will continue to lack a full understanding of its complaint data.
>
> The commander's involvement in the procurement of Benchmark Analytics is a positive example of how personnel with perspective on what data should be collected and reported should be involved in the development of data systems.

## Staffing, Management, and Supervision (¶ 203-231)

The CASA requires APD to conduct a staffing assessment and resource study as well as to implement and maintain an EIS.

Staffing Assessment and Resource Study

APD received a proposal from Alexander Weiss Consulting (AWC) to conduct a staffing assessment and resource study in 2021.

> APD should include the eventual findings of the proposed study in staffing and resource allocation decisions into management and resource allocation decisions. The proposed Analytics Unit could assist in communicating the results and implications of the staffing study to the necessary personnel within APD.

## Early Intervention System (¶ 212-219)

The CASA requires APD to implement an EIS. Unfortunately, at this stage in the CASA, APD does not have true EIS and does not appear to be close to implementing one.  APD's EIS Unit was initially a component of IA though it is now a more independent unit under the Compliance Division. It is important that EIS be seen by APD as a tool to assist with supervisory duties and

responsibilities and thus the EIS Unit should remain unassociated with disciplinary units or processes at APD.

APD's EIS Unit is creating a manual early intervention system and is not anticipating the incorporation into Benchmark Analytics for 18 to 24 months. This is of profound concern. The unit has three personnel assigned to it and currently access information out of the data warehouse to run their own custom reports. The unit then manually reviews these reports to determine if thresholds have been crossed with BlueTeam used as a mechanism only to track interventions. This process is not sustainable, is likely to produce errors, and should be avoided by APD.

The EIS Unit clearly has insight into the available data and has thought critically about the potential indicators and thresholds it should use. But the flawed data collection system will invariably result in a flawed early intervention system.

It is also unclear to what degree the Monitoring Team and DOJ have been involved in the development of the peer groups and indicators upon which the EIS triggers are built. These are important components of an EIS and require buy-in from all critical stakeholders (including personnel within APD).

We assess that the EIS is overly focused on triggers and peer groups. In our experience, the best practice holds that comprehensive information on an officer's performance, regardless of the thresholds, is often the most important component of an EIS. Having all of an officer's information in one place for a supervisor to regularly review is an essential part of an EIS.

Reviewing the EIS calculations highlighted are a few potential issues of concern:

- Vehicle crashes are only considered as part of a ratio of total contacts. While it is understandable to want to contextualize the crashes, it may be that a threshold of a certain number of crashes is more apt with respect to each peer group.

- The lack of pursuit data is concerning. The EIS Unit noted this issue during their interview but it is worth reiterating.

- The indicator called arrest factors attempts to provide a numeric score to the type of an arrest an officer makes by applying a multiplier for each type of arrest. For example, felony arrest has a multiplier of 6 while a citation has a multiplier of 1. It is not clear how the multipliers for the arrest factor calculation were developed or if they were approved by the Monitoring Team.

- The 80/20 rule makes sense compared to only looking at those in the top 5%, but there are some limitations. An officer in the 75th percentile in a lot of indicators would go unnoticed as would an officer that jumps from the 10th to the 75th percentile.

The EIS Unit appears to be using data straight from the data warehouse which has been noted several times due to questions of data quality. The same City Hall data architect has created a data flow diagram, entity-relationship diagrams, queries, and documentation. This provides

some assurance that the queries used by the EIS Unit are the same as those used elsewhere in the Department.

The EIS Unit is not intricately involved in the development or modification of data systems, so changes to how data is collected will greatly impact their ability to pull data. This once again highlights the need to incorporate how data will be used into the planning of data systems and the utility of a centralized Analytics Unit.

It is unclear whether the EIS captures data on the following:

- ECW (Paragraph 38) assignment information for each officer. The EIS appears to only capture ECW information through use of force reporting.

- Specialized tactical deployments (Paragraph 105).

- Specialized investigative responses (Paragraph 109).

- Demographic data of each civilian involved in a use force event or a search and seizure incident (Paragraph 215).

The EIS is designed to capture all "serious injuries (as defined in the Use of Force Appendix)."[10] APD's Use of Force policy states that serious injury "refers to physical injury that creates a substantial risk of death; causes death or serious and protracted disfigurement; or impairment of the function of any bodily organ or limb."[11] APD and the DOJ should determine whether this is sufficient to fulfill CASA-Paragraph 215(b). The inclusion of all injuries to persons in custody may identify a broader set of trends.

> The EIS Unit has limited guidance, support, and expertise, reflecting the structural issues with how data analytics is approached within APD. The EIS Unit should be located within an Analytics Unit rather than in the Compliance Division. This would help alleviate the perception of the EIS as a disciplinary tool. This structure would also facilitate centralized planning, modifications, and usage of APDs data systems. APD should avoid manual entry data systems for its EIS as much as practically possible.

## Community Engagement and Oversight (¶ 254-293)

The CASA requires APD to provide the public with updated and accurate crime statistics, audits and reports, and provide the CPOA with access to civilian complaints as well as any necessary accompanying documentation. The CASA further requires APD to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members.

---

[10] Albuquerque Police Department, "SOP 3-33 Early Intervention and Recognition System (EIRS)", Accessed January 2021, page 3. File was provided by APD.
[11] Albuquerque Police Department, "SOP 2-53 Use of Force Definitions", Accessed January 2021, http://documents.cabq.gov/police/standard-operating-procedures/2-53-use-of-force-definitions.pdf.

## Community Meetings and Public Information

APD is required to publicly report accurate and updated crime statistics monthly. APD does not appear to do so currently and the issues regarding crime data reporting within the Records Unit likely impacts this requirement as well.

APD produces semiannual crime data in public reports though these are often not published until months after the end of the quarter (data through June 2020 is currently available as of this writing in January 2021). APD has also begun producing a weekly homicide data.

APD's public reports are often authored by the analysts who produced them.

> APD should invest in publicly available data visualizations to display crime statistics clearly and easily to the community. The information presented is hard to find online and should be made to be digested easily by members of the public.
>
> All public reports should be considered corporate products that are authored by the entire Department and should not identify the analyst who prepared the report on the cover. Acknowledgements, when deemed necessary, should be placed at the end rather than beginning of the report. APD should include information on the number of year-to-date homicides in the previous year on its publicly available homicide report to enable the public to better compare this year's trend to previous years.

## Community and Problem-Oriented Policing and Metrics

APD demonstrated their data collection mechanism for community policing during the interview with RTCC. They are developing an application on the ArcGIS platform to collect data related to community policing by individual officers and then integrate and summarize the work done by community policing officers for presentation into the CompStat meeting. This product is a great example in terms of collecting and reporting critical data in an easy-to-use manner. It also demonstrates how APD worked with APD community policing officers and the Monitoring Team to define objectives. Training, implementation management, and using feedback to inform a strategic response is essential to long-term success.

## Community Policing Councils Annual Reporting

We reviewed the 2019 Community Policing Council's (CPC) Annual Reports for all five areas: Northeast, Northwest, Southeast, Southwest, and Foothills.

## Civilian Police Oversight Agency

Many of the findings related to IAPro for misconduct complaints were validated during the interview with CPOA. CPOA is interested in better data sharing with APD, but they expressed concerns related to data quality validation. Recommendations made by CPOA to IA are done by paper and it is not clear that APD is regularly analyzing the differences between CPOA recommendations and what is implemented by APD.

> The CPC's may want to consider looking at APD's public reports to help identify area specific trends. The CIU Databook, 'Area Command Comparison' Crime Statistics, and APD's Annual Use of Force Reports all offer area specific data points.
>
> APD should electronically track CPOA recommendations as well as the outcomes of those recommendations and analyze the differences between those recommendations and what is implemented by APD.

## Implementation, Compliance Assessment, and Enforcement (¶ 294-344)

### Outcome Measurements Data Collection and Reporting

AH Datalytics discussed outcome measure reporting with the Compliance Team responsible for the work. The team is relatively new having all started since March and have had to develop relationships in the Department and get used to the data and data systems during a pandemic.

Use of force data is collected and reported by the analyst assigned to IAFD. The analysts working on the other outcome measures do not "own" the data to the degree that the use of force analyst does, and as such, must work with other units to get access to the data. The unit spends a considerable amount of time tracking down data and determining its validity. Data being maintained by stand-alone units highlights the lack of integrated data thinking into the design, collection, and use of these data systems.

Comparison of the data provided by individual units and what is stored in the data warehouse has resulted in data quality concerns. As such, the team spends considerable time determining what is the true and accurate number on any given subject. In addition, a lack of documentation hinders APD in terms of how outcome measures were previously defined and measured, how data flows within APD's data systems, and how data is being queried from the system.

The Compliance Team used the Canine Unit example to highlight a system in which data is stored in multiple places, the difficulty in ascertaining an accurate set of numbers, and the need for a better way to collect information. The Compliance Team has been involved to some degree with the implementation of new data systems such as Benchmark Analytics, but less so on the RMS and on Peregrine.

> The Compliance Team's findings are consistent with our overall findings and the bulk of our recommendations are included throughout this report. The Compliance Team should continue to receive full, unfettered access to data systems, and help APD develop holistic, integrated approaches to collecting and reporting data. The team should also be involved in the development of new data systems and new data reporting mechanisms, and be integrated into a newly formed Analytics Unit.

## Outcome Measurements Data Quality Assessment

The assessment of outcome measures seeks to answer the following questions for each measure:

- How are they defining and operationalizing the outcome measures?
- Are they sufficiently collecting the requisite data?
- Are there data quality concerns from the gap analysis that should be rearticulated here?
- Can the data provided be appropriately analyzed?

Data provided to AH Datalytics from the data warehouse includes the query used to produce the data. While ongoing work is being done to improve the data warehouse, at present, the methodology for how data is stored and accessed is not standardized. This results in individual analysts writing their own queries and potentially leading them to pull data in different ways.

## Use of Force Measurements (¶ 298.a)

AH Datalytics has general concerns about the quality of use of force data particularly around underreporting, as noted by the Monitoring Team, and issues stemming from IAPro database design limitations.

Use of force data provided by APD covers the time period of 2016-2019 mirrors the annual use of force report and includes a methodology to facilitate a common understanding of how the data was retrieved and could be interpreted.

APD has modified all historical use of force reports from 2016 to 2019 in which more than one citizen is on a single event to ensure the proper counting of force applications used upon citizens. The result is that all historical data provided for the 298 report reflects the data used in the 2016-2019 annual use of force report and can be used for an analysis of use of force applications by subject demographics.

The use of force data provided by APD included all of the requisite details except for type of arrest. Data on force complaints, including those that violate policy violations, contains all the requisite details.

It is unclear how APD can determine the number of administrative investigations of use of force that are supported by a preponderance of evidence. APD should believe that all of their findings are supported by a preponderance of evidence unless the findings have been overturned by a civil service commission. In New Orleans, for example, these outcome measures were considered subjective and left to the Monitoring Team's observation and audits.

Data on injuries to officers was provided by APD with all the necessary details for analysis. Data on citizen injuries, however, did not identify whether the injuries were caused by APD or another source. Data for the 2016 to 2019 report does capture whether injuries were self-inflicted or if they occurred prior to law enforcement interaction.

If a citizen has only one injury type then who caused the injury can be determined. But if the citizen has more than one injury type then all of them are counted as if caused by APD because they cannot distinguish the cause of the injury for each injury type. APD has mitigated this risk moving forward by modifying the injury type selections to include whether it was caused or not caused by law enforcement. APD's new methodology for capturing use of force data will enable APD to accurately report how many injuries were caused by APD.

Data was available for comparing use of force with calls for service and complaints though arrest data was not provided.

## Specialized Units (¶ 298.b)

It is unclear if the specialized unit data should include data on both the specialized tactical unit, as is specified in 298.b.i, as well as specialized investigative units.

The provided data covered 2018-2019 though ideally more years of data would have been available. The activation and deployment data includes the location and number of cases but does not include the disposition. Disposition information would be useful to gain a better understanding of how cases were resolved.

The canine unit only provided monthly summary data by dog as opposed to raw data showing each deployment and the outcome of that deployment (apprehension, bites, etc.). The raw data provided for general analysis (unrelated to the outcome measure data) shows a discrepancy with the reported numbers in the annual use of force report. This is another example of the canine unit's significant data issues and severely impacts APD's ability to conduct analyses of this information.

Use of force data for the tactical unit includes the necessary data and a disclaimer regarding two specific data issues that were highlighted in the annual use of force report. The disclaimer refers to two cases in which the tactical activation data is not included in the regular use of force dataset because a use of force report does not exist. Additionally, AH Datalytics found a number of citizens identified as being subjects of the tactical team activation without a corresponding BlueTeam dataset for that individual.

## Crisis Intervention (¶ 298.c)

Data provided by APD includes all items summarized in paragraph 129.

Paragraph 137 data refers to COAST participant data. COAST participants are captured in a SharePoint list, but all other data from CASA-related interactions with COAST participants is captured in TraCs similar to paragraph 129 data.

It appears that the full raw dataset from TraCs is provided, but the data delineating who is a COAST participant was not. This can be provided easily from APD if needed though.

Information on crisis intervention techniques and equipment used are not captured in the contact sheets in TraCs. APD relies on the use of force data to demonstrate techniques and equipment used. It is important to collect data on and analyze which mental health calls result in

uses of force, but there are other techniques and equipment used on these calls that should be documented.

## Recruitment Measurements (¶ 298.d)

All relevant recruitment data was provided to AH Datalytics though the data only covered 2019. Longitudinal data would be necessary in order to identify any potential trends in recruitment practices. Over half of the records for recruitment activities were missing information such as the event location, number of individuals contacted, or number of attendees.

The data defines "well-qualified recruit applicants" as applicants that are "seated". This definition appears contradictory to the language in item 298.d.ii which suggests that there are recruits identified as well-qualified that then fail to advance in the selection process.[12]

The data separates "all recruits" and "all lateral recruits". Lateral recruits are not included in the analyses of items i - iv, or vi. It is misleading, therefore, to refer to those analyses as having included "all recruits".

The data provided did not include any demographic information. While longitudinal data and demographic data is not required by the CASA, APD would find their inclusion critical for identifying any potential trends in recruitment practices.

## Force Reviews and Investigations (¶ 298.e)

APD provided data for the force review board dating to when the board was reconvened in August 2019. The data mostly covered tactical activations though very few tactical activations were noted as having policy violations, policy deficiencies, training deficiencies, or tactical concerns.

The data also appears to be incomplete. There are Force Review Board cases noted in the Monitoring Team's IMR-11 Report that are not present in the data provided to AH Datalytics.[13] The data also shows cases that were *not* included in the Monitoring Team's Report, even though the review dates were within the IMR-11 monitoring period.

| Case Review Type | Data Provided | IMR-11 Report |
|---|---|---|
| Tactical Deployment | 33 | 36 |
| Serious UOF | 2 | 7 |
| Non-Serious UOF | 0 | 4 |
| Officer Involved Shootings | 0 | 3 |
| Supervisory | 1 | 0 |

---

[12] "the number of recruit applicants who failed to advance through the selection process after having been identified as well qualified, grouped by the reason for the failure to advance (this provision does not apply to those who fail to pre-qualify through APD's online recruiting or other pre-screening system)" (CASA, page 87).

[13] Public Management Resources, Inc., "Monitor's Eleventh Report", published May 2020, page 71.

### Training Data (¶ 298.f)

The training data provided includes all data from the Enterprise Learning Management system and PowerDMS. Training deficiency data identified through the various mechanisms was provided as well.

The 'number of officers trained' measures officers multiple times - once for each training. It also includes non-officer APD and non-APD civilians. In lieu of an officer number descriptions are written in its place such as "Finance Administration", "Fire Department", "Legal", and "Municipal Development". APD should make sure to exclude these trainings when reporting the number of officers trained.

The data provided for identified training deficiencies is incomplete. There are dozens of records in the data provided for civilian complaints which indicated 'Training' was the action taken yet those records do not appear to be present in the training deficiency data provided. There is also a referral from the FRB indicated in the FRB's data file but not in the training data file. APD should ensure that all identified training deficiencies are kept in one place and use this information to inform the academy's curriculum development.

### Officer Assistance and Support Measurements (¶ 298.g)

Behavioral health service usage data was provided for 2019 and behavioral health service survey data was provided for 2016-2019. The data offers sufficient detail on the 'use' of officer assistance though there is no information on the 'availability' of these services.

### Supervision Measurements (¶ 298.h)

Supervision measurements likely require additional collaboration with the Monitoring Team and the DOJ to identify the set of metrics that can be used to identify close and effective supervision. APD provided performance evaluation and inspection data. While this data captures a component of supervision, it does not provide all the mechanisms that supervisors can use to identify problems. The PMU findings should also be considered for inclusion for these measures.

### Civilian Complaints, Internal Investigations, and Discipline (¶ 298.i)

Civilian complaint data was provided for 2019. Review of this data indicates that it also includes data captured by the Civilian Police Oversight Agency. The underlying data needed for analysis is provided though it is unclear how APD counts complaints. The data provided includes the file number for the case, the involved officer(s), and each unique allegation. It is not clear if each allegation should be counted as a distinct complaint, but that is the only approach that can be applied with a consistent methodology across the dataset.

It is unclear how APD can determine the number of misconduct complaint allegations supported by a preponderance of evidence. APD should believe that all of their findings are supported by the preponderance of the evidence unless the findings have been overturned by a civil service commission. In New Orleans, for example, these outcome measures were considered subjective and left to the Monitoring Team's observation and audits.

## Appendix A: CASA Requirements within Scope

### Use of Force

Firearms                                                      19, 23
Electronic Control Weapons (ECW)                              27, 37-38
Reporting                                                     42
IAD Investigations                                            70
Review Board                                                  78-80

### Specialized Units

Tactical Units                                                103-105
Investigative Units                                           109

### Crisis Intervention

Certified Responders and Intervention Unit                    123-124, 129
Crisis Prevention                                             137

### Misconduct Complaint Intake, Investigation, and Adjudication

Complaint Intake, Classification, and Tracking                176-177
Preventing Retaliation                                        198

### Staffing, Management, and Supervision

Staffing                                                      204
Early Intervention System                                     213-215, 217, 219

### Community Engagement and Oversight

Community and Problem-Oriented Policing                        259
Community Meetings and Public Information                      264-265
Community Policing Councils                                    270
Civilian Police Oversight Agency                              282, 286, 292

### Implementation, Compliance Assessment, and Enforcement

Outcome Assessments                                           298-299

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

THE CITY OF ALBUQUERQUE,               No. CIV. 14-1025 JB\SMV

        Defendant,

vs.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

        Intervenor.

**JOINT MOTION FOR ENTRY OF STIPULATED ORDER
ESTABLISHING AN EXTERNAL FORCE INVESTIGATION TEAM**

Plaintiff United States of America and Defendant City of Albuquerque (the Parties), with the concurrence of Independent Monitor James D. Ginger, jointly move the Court to approve and enter the proposed Stipulated Order Establishing an External Force Investigation Team which is attached hereto as Exhibit A. The proposed Stipulated Order would require the City to establish, on a temporary basis, an External Force Investigation Team (EFIT) to assist the Albuquerque Police Department (APD) in conducting investigations of Level 2 and Level 3 uses of force by APD officers, while also assisting APD with improving the quality of its force investigations. The proposed Order also requires the City to improve its internal affairs process, increase the number of internal affairs force investigators, and provide additional training to those investigators. The Parties intend these measures to ensure high-quality, timely investigations of Level 2 and Level 3 uses of force and to address investigative deficiencies in APD's force investigations, as identified in the Independent Monitor's Twelfth Report (IMR-12), Doc. 652.

# I. BACKGROUND

The United States filed this action on November 12, 2014, seeking to remedy a pattern or practice of excessive force by APD officers. Doc. 1. On November 14, 2014, the Parties agreed to a Court-Approved Settlement Agreement (CASA), requiring the City to implement comprehensive reforms at APD to address deficiencies in the areas of use of force, crisis intervention, deployment of specialized units, supervision, management, misconduct investigations, and data collection and analysis. *See* Doc. 9-1. This Court approved the CASA in June 2015. Doc. 134.

Over the past six years, the Independent Monitor and his team have conducted more than a dozen onsite and virtual inspections and other visits to APD, provided extensive technical assistance, and filed more than a dozen Monitor's Compliance Reports, documenting the City's efforts to achieve compliance with the provisions of the CASA. *See, e.g.,* Independent Monitor's Reports (IMRs) at Doc. 183 (IMR-3, July 1, 2016); Doc. 223 (IMR-4, November 1, 2016); Doc. 274 (IMR-5, May 2, 2017); Doc. 313 (IMR-6, November 1, 2017); Doc. 416 (IMR-8, November 2, 2018); Doc. 444 (IMR-9, May 1, 2019); Doc. 493 (IMR-10, November 1, 2019); Doc. 578 (IMR-11, May 4, 2020); and Doc. 652 (IMR-12, November 2, 2020).

In his most recent report, the Independent Monitor raised serious concerns about the quality of APD's force investigations and the lack of accountability for officers who violated APD policies during the course of incidents in which they used force. *See* IMR-12, Doc. 652. According to the Independent Monitor, excessive force and the lack of accountability for it have been persistent problems at APD that have outlasted a number of previous efforts to address them. Twice APD has revised its entire suite of use of force policies. Twice APD has revamped its entire training program on the use of force and provided that training to all APD officers. In

2

the last round of policy and training changes to improve APD's systems for managing the use of force, APD created a system for force investigations that divides force into three levels. To briefly summarize those levels, Level 1 is force that does not result in injury or complaint of injury; Level 2 is force that does result in injury or complaint of injury; and Level 3 is force that results in serious injury, hospitalization, or death. *See* Doc. 465-1 at 19-20, ¶ 48 (providing complete definitions for Level 1, 2, and 3 uses of force). Level 1 uses of force are reviewed by officers' supervisors. Level 2 and Level 3 uses of force are investigated by the Internal Affairs Force Division (IAFD),[1] a centralized unit of specialized force investigators.

The Parties' intention in centralizing investigations of the most serious force incidents in IAFD was to ensure high-quality investigations, consistency in APD's application of its use of force policy, and direct oversight of force investigations by APD's executive staff. The Parties expected these changes to result in positive, measurable improvements in the quality of force investigations and the reliability of systems for holding officers accountable for misconduct committed during force incidents. But these improvements have not occurred as quickly as intended or to the level required by the CASA.

To improve the functioning of the Internal Affairs Division, the Parties agree that the City will seek additional resources to ensure that force investigations are adequate and timely, and to bring APD's systems for investigating force into compliance with the CASA.

---

[1] APD's force investigations are handled by Internal Affairs Force Division. Misconduct investigations not related to the use of force are handled by Internal Affairs Professional Standards Division. Each is overseen by a commander. APD is likely to combine the two divisions into one, overseen by a single commander. The new internal affairs division will consist of two sections, one for force investigations and the other for non-force misconduct investigations. In anticipation of the reorganization, the Parties will refer in this Motion and in the Stipulated Order to the Internal Affairs Division.

## II.     DISCUSSION

In late October 2020, after reviewing the draft of IMR-12, the Parties initiated a series of negotiations that have resulted in the proposed Stipulated Order. The goals of the Order are: to make immediate improvements in the quality and timeliness of investigations of Level 2 and Level 3 uses of force; to ensure that APD can hold officers accountable when they violate APD policies during force incidents; and to make significant, durable improvements in APD's systems for investigating Level 2 and Level 3 uses of force. The Order accomplishes these goals by enlisting an outside team—the External Force Investigation Team (EFIT)—and by requiring the City to implement new force investigations systems, dedicate additional personnel to investigating force, and provide those personnel with better training on how to investigate force.

EFIT, an entity made up of outside investigators that will be funded by the City and run by an outside Administrator, will guide, direct, and, if necessary, take over investigations of Level 2 and Level 3 uses of force. Exhibit A at 2, ¶ 1.  The outside investigators who will make up EFIT will be required to have experience and expertise in conducting force investigations. *Id.* at 2, ¶ 4.  By working directly with APD's investigators, EFIT investigators will be able to ensure that each investigation is conducted with integrity and within investigatory deadlines. When those force investigations are complete, APD's command and executive staff will review their findings and hold officers accountable for force that violates APD policy.  *Id.* at 9, ¶ 27.

EFIT will also provide day-to-day, on-the-job instruction to APD investigators and supervisors and assess the work of APD investigators and supervisors at each step of the investigation process. Exhibit A at 7, ¶ 22. APD and EFIT will use these assessments to conduct quarterly evaluations of APD investigators and supervisors to determine whether individual investigators and supervisors have become proficient at force investigations.  *Id.* at

4

13-14, ¶ 34. Once APD investigators and supervisors have demonstrated their proficiency, they may take on the full responsibility of investigating Level 2 and Level 3 uses of force, without the involvement of EFIT. *Id.* at 14, ¶ 35. EFIT will become unnecessary, and the Parties will move to terminate this Order, when enough APD investigators and supervisors have demonstrated their proficiency that APD is able to conduct high-quality, timely investigations of all Level 2 and Level 3 uses of force on its own. *Id.* at 15, ¶ 39.

In the first months following the entry of the Stipulated Order, the Order requires the City to make three key improvements, in addition to establishing EFIT, to bring its force investigations into compliance with the CASA and to maintain compliance after EFIT is gone. First, within two months of the entry of the Order, the Order requires the City to submit to the United States and the Independent Monitor a proposal for redesigning its internal affairs investigation process. Exhibit A at 5, ¶ 14. After the Parties and Monitor have agreed on the proposal, the City will receive guidance and technical assistance from the Independent Monitor to implement the proposal. *Id.* The Parties expect that the redesigned process will result in changes to APD's policies that are long overdue. Second, the Order requires the City to increase the number of force investigators at APD, a commitment of resources that is necessary to ensure that APD can investigate all force incidents in a timely manner. *Id.* at 4, ¶ 12. The Parties anticipate that staffing will increase over time and may fluctuate as EFIT and APD determine whether individual force investigators have the relevant investigative skills. Third, the Order requires APD to develop new training for force investigators within three months of the entry of the Order. *Id.* at 12-13, ¶ 33. These improvements are necessary to ensure that APD can make positive and durable changes to its force investigations.

As a way to consolidate and track all of the initiatives required by the Stipulated Order, the Order requires the City to develop and file with the Court, within five months of the entry of the Order, a remedial action plan that "will identify concrete actions that the City and EFIT will take to improve the quality and timeliness of investigations of Level 2 and Level 3 uses of force." Exhibit A at 10-11, ¶ 31. After filing the plan, the City will report to the Court quarterly on its progress in implementing the plan, including metrics that will indicate whether APD is making progress toward regaining full responsibility for conducting investigations of Level 2 and Level 3 uses of force. *Id.* at 11, ¶ 32.[2]

### III.  CONCLUSION

The attached Stipulated Order will address deficiencies in APD's investigations of Level 2 and Level 3 uses of force. Improving these investigations is necessary to ensure that APD identifies and holds officers accountable for uses of force that do not comply with APD policy or the CASA. The Parties anticipate the changes required by the Order will lead to APD reaching compliance with the relevant paragraphs of the CASA.

For the reasons stated above, the Parties respectfully move the Court to enter the proposed Stipulated Order as an Order of the Court.

---

[2] The proposed Stipulated Order does not conflict with the Collective Bargaining Agreement between the City and the Albuquerque Police Officers' Association. In fact, Paragraph 16 of the Order states, "Nothing in this order requires the City to violate the Labor Management Relations Ordinance or any collective bargaining agreement." Exhibit A at 5, ¶ 16.

Respectfully submitted this 5th day of February 2021,

Plaintiff UNITED STATES OF AMERICA

FRED J. FEDERICI
Acting United States Attorney
District of New Mexico

*/s/ Elizabeth M. Martinez 02/05/2021*
ELIZABETH M. MARTINEZ
Assistant United States Attorney
U.S. Attorney's Office
District of New Mexico
P.O. Box 607
Albuquerque, NM  87103
Telephone: (505) 346-7274
Email: Elizabeth.Martinez@usdoj.gov

GREGORY B. FRIEL
Deputy Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Special Litigation Section
PAUL KILLEBREW
Special Counsel
COREY M. SANDERS
STEPHEN M. RYALS
PATRICK KENT
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
Telephone: (202) 305-3229
Facsimile: (202) 514-4883

Defendant CITY OF ALBUQUERQUE:

ESTEBAN AGUILAR
CITY ATTORNEY

*Approved by email on 02/05/2021*
LINDSAY VAN METER
Managing Assistant City Attorney
ROBYN ROSE
Assistant City Attorney
P.O. Box 2248
Albuquerque, NM 87103
(505) 768-4500
eaj@cabq.gov
lvanmeter@cabq.gov
rrose@cabq.gov

7

Approved by:

INDEPENDENT MONITOR
JAMES D. GINGER, Ph.D.

*Telephonically approved on 02/05/2021*
JAMES D. GINGER, Ph.D.
Public Management Resources, Inc.
6877 Francis Marion Road
Pamplico, SC 29583
Telephone: (843) 493-6293
pmrinc@mac.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2021, I filed the foregoing pleading electronically through the CM/ECF system which caused all parties or counsel and the Independent Monitor to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ Elizabeth M. Martinez 02/05/2021*
ELIZABETH M. MARTINEZ
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

  vs.

THE CITY OF ALBUQUERQUE,             No. CIV. 14-1025 JB\SMV

        Defendant,

  vs.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

        Intervenor.

**STIPULATED ORDER ESTABLISHING AN
<u>EXTERNAL FORCE INVESTIGATION TEAM</u>**

This matter comes before the Court on the Joint Motion of Plaintiff United States of America and Defendant City of Albuquerque (collectively, the Parties), with the concurrence of the Independent Monitor, for entry of this Stipulated Order, which requires the City to establish, on a temporary basis, an External Force Investigation Team (EFIT) to assist the Albuquerque Police Department (APD) in conducting investigations of Level 2 and Level 3 uses of force by APD officers, while also assisting APD with improving the quality of its own Internal Affairs (IA) force investigations. This Stipulated Order also requires the City to improve APD's IA processes, increase the number APD IA force investigators, and provide additional training to APD's IA force investigators. The Parties intend the measures in this Stipulated Order to ensure high-quality, timely investigations of Level 2 and Level 3 force incidents, and to address the investigative deficiencies in APD's IA force investigations identified in the Independent

Monitor's Twelfth Report, Doc. 652. The Court approves this Stipulated Order and enters it as an Order of the Court.

## A. Establishment of the External Force Investigation Team

1. The City shall establish an EFIT to guide and direct IA force personnel, and when necessary, conduct investigations of Level 2 and Level 3 uses of force; provide written assessments of IA investigations carried out by IA force personnel; and provide written feedback on IA force personnel's work product. *See* Doc. 465-1 ¶ 48 (defining Level 2 and Level 3 uses of force).

2. For the purposes of this Order, "IA force personnel" includes IA force investigators and supervisors, other than IA Commanding Officers; "investigations of Level 2 and Level 3 uses of force" include both investigations and the review of investigations by supervisors; and "Independent Monitor" may include members of the Independent Monitoring Team.

3. EFIT shall be overseen by an Administrator. The City shall empower the EFIT Administrator to hire and retain the staff necessary to fulfill the requirements of this Order. It is anticipated that the EFIT Administrator will hire and retain a number of Investigators, as well as administrative support staff and Supervisors, as necessary to fulfill the duties under the EFIT Administrator's contract with the City. The EFIT Administrator shall ensure that a sufficient number of EFIT Investigators to meet the requirements of Paragraph 17 of this Order are physically present in Albuquerque and able to respond to the scene of Level 2 and Level 3 uses of force.

4. The EFIT Administrator shall have experience and expertise in investigating law enforcement misconduct, the constitutional standards for police officers' use of force, and systems reform litigation.  The EFIT Supervisors and Investigators shall have experience

2

**EXHIBIT A - Proposed Stipulated Order**

and expertise in investigating law enforcement misconduct and the constitutional

standards for police officers' use of force. Neither the EFIT Administrator, Supervisors,

nor Investigators shall have any current or previous employment relationship or contract

for services with APD or the City.

5. The City shall contract with the EFIT Administrator and fund the operations of EFIT in

accordance with its Public Purchases Ordinance, specifically, ROA 1994, § 5-5-20(U)

(exempting "[c]ontracts and expenditures in connection with court or administrative

proceedings, including, but not limited to, experts, mediators, interpreters, translators,

court reporters, process servers, witness fees, and printing and duplicating of materials

for filing" from competitive requirements of the article), or any other appropriate

provision of the Public Purchases Ordinance.

6. The City shall widely publish a request for letters of interest for the EFIT Administrator

no later than March 1, 2021.

7. The City shall accept input from the United States Department of Justice (DOJ) as the

City solicits EFIT Administrator candidates and on the candidate that the City ultimately

selects. DOJ shall provide input within two (2) weeks of receiving information about the

candidates, unless otherwise agreed by the City and DOJ.

8. The contract between the EFIT Administrator and the City shall include all standard

terms for City contracts.

9. Within two weeks of the EFIT Administrator's selection, the City and DOJ shall file a

notice with the Court to inform the Court of the Administrator's identity and professional

background.

**EXHIBIT A - Proposed
Stipulated Order**

10. The City shall enter into a contract with an EFIT Administrator no later than May 3, 2021.

11. Within one month of the EFIT Administrator's selection, the City and the EFIT Administrator shall establish protocols for how APD IA and EFIT will coordinate on investigations of Level 2 and Level 3 uses of force. At a minimum, the protocols will specify procedures for coordinating the work of IA force personnel and EFIT personnel; and how APD IA will transmit investigative files to EFIT. The protocols will specify that EFIT shall not assist APD IA with investigations of Level 2 and Level 3 uses of force for which the investigatory deadlines established by the Court-Approved Settlement Agreement (CASA), APD policy, and the Collective Bargaining Agreement between the City and the Albuquerque Police Officers' Association (CBA) have expired at the time that EFIT begins providing services. The protocols shall be submitted to DOJ and the Independent Monitor for review and comment pursuant to the procedures of Paragraphs 147 and 148 of the CASA.  Doc. 465-1 at 49-50.

**B. Staffing of IA Force Investigators; Technical Assistance**

12. The City shall ensure that APD maintains at least twenty-five (25) force investigators assigned to IA, unless and until APD can demonstrate by an internal staffing analysis that fewer investigators are necessary to timely investigate all Level 2 and Level 3 uses of force.

13. The Independent Monitor has provided and will continue to provide extensive technical to the City regarding IA processes, including the period before an EFIT administrator is selected.

4

14. Based on the technical assistance set forth in Paragraph 13, within two months of the entry of this Order, the City will submit a proposed written IA investigative process to DOJ and the Independent Monitor. DOJ and the Independent Monitor will have 14 days to submit proposed revisions to the written IA investigative process. The City will have seven days to agree to or reject any proposed revisions. After the City, DOJ, and the Independent Monitor reach agreement on the proposed written IA investigative process, the written IA investigative process shall be filed with the Court. If the City, DOJ, and the Independent Monitor cannot reach an agreement on the proposed written IA investigative process, the City or DOJ may submit the matter to the Court for resolution.

15. After APD implements the written IA investigative process, the Independent Monitor will spend an additional week providing intensive technical assistance, in addition to the extensive technical assistance provided to date.

16. The City shall endeavor to negotiate longer investigative deadlines with the recognized exclusive representatives of relevant bargaining agreements. Nothing in this order requires the City to violate the Labor Management Relations Ordinance or any collective bargaining agreement.

## C. Investigations of Level 2 and Level 3 Uses of Force

17. From the date the EFIT contractor begins services and subject to EFIT staffing levels, APD and EFIT will both deploy investigators to the scene for every Level 2 and Level 3 use of force, unless APD deploys an APD IA investigator who has satisfied the requirements of Paragraph 35.

18. APD IA investigators shall act as the lead on-scene investigators for all Level 2 and Level 3 uses of force and shall be primarily responsible for conducting the on-scene

**EXHIBIT A - Proposed
Stipulated Order**

requirements of CASA Paragraphs 69(a), (b), (c), (d), and (e) (Doc. 465-1 at 27), including but not limited to:

    a.   respond to the scene and consult with the on-scene supervisor to ensure that all personnel and subject(s) of use of force have been examined for injuries, that the use of force has been classified according to APD's classification procedures, that subject(s) have been interviewed for complaints of pain after advising the subject(s) of his or her rights, and that all officers and/or subject(s) have received medical attention, if applicable;

    b.   ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;

    c.   ensure that a canvass for, and interview of, witnesses is conducted. In addition, witnesses should be encouraged to provide and sign a written statement in their own words;

    d.   ensure, consistent with applicable law, that all officers witnessing a Level 2 or Level 3 use of force by another officer provide a use of force narrative of the facts leading to the use of force;

    e.   provide a written admonishment to involved and witness officer(s) to the use of force that they are not to speak about the force incident with anyone until they are interviewed by [an] . . . investigator . . ..

19. The City shall transmit all documents, evidence, and investigative notes created or obtained by the on-scene investigator(s) to EFIT within 72 hours of the use of force, and

6

**EXHIBIT A - Proposed Stipulated Order**

on an ongoing basis as additional evidence is provided. EFIT will acknowledge receiving all forwarded investigative documents, evidence, and notes.

20. IA force personnel and EFIT personnel shall jointly conduct investigations of all Level 2 and Level 3 uses of force, subject to the exception in Paragraph 23. IA force personnel and EFIT personnel shall jointly investigate and review all Level 2 and Level 3 uses of force in a manner that is consistent with the requirements of the CASA, APD policy, and the CBA.

21. EFIT shall have full, direct, and timely access to APD staff, employees, facilities, documents, data, and evidence to the extent necessary to fulfill the requirements of this Order. EFIT shall coordinate with APD and its legal counsel to access personnel, facilities, and documents in a reasonable manner. Should APD or its legal counsel decline to provide EFIT with access to documents or data based on privilege, APD shall inform EFIT, DOJ, and the Independent Monitor that it is withholding documents or data on this basis, and shall provide EFIT, DOJ, and the Independent Monitor with a log describing the documents or data and the basis of the privilege.

22. For each use of force investigation, EFIT shall evaluate the quality of IA force personnel's investigations and immediately notify APD and APD's legal counsel of any deficiencies or misconduct by IA force personnel related to their investigations. APD shall promptly address these deficiencies or misconduct through corrective action or discipline, consistent with the CASA, APD policy, and the CBA.

23. EFIT shall be authorized to complete investigations and supervisory reviews of investigations of Level 2 and Level 3 uses of force without the involvement of IA force personnel if either of the following conditions are met:

**EXHIBIT A - Proposed
Stipulated Order**

a. EFIT or APD has alleged that the IA force personnel assigned to the investigation has committed misconduct in the course of the investigation, and EFIT believes that the IA force personnel's continued participation in the investigation is likely to undermine the integrity of the investigation; or

b. EFIT or APD believes that deficiencies in the tactics or work product of the IA force personnel assigned to the investigation is likely to prevent the investigation from being completed within the deadlines provided for in the CASA, APD policy, and the CBA.

24. EFIT shall provide written notice to DOJ, APD, and the Independent Monitor when EFIT exercises its authority under Paragraph 23 to complete investigations of Level 2 and Level 3 uses of force without the involvement of IA force personnel. EFIT's notice shall explain in writing the grounds for its actions. If DOJ or the City believes that EFIT's actions were improper, they will seek to resolve the matter with EFIT and the other party. If DOJ, APD, and EFIT cannot reach a resolution, DOJ or the City may bring the matter before the Court for resolution.

25. APD and EFIT shall identify all misconduct that occurred during the course of each use of force incident and provide information about all misconduct that it identifies to APD, for the purposes of screening, assigning an internal affairs number, and tracking by APD IA. IA force personnel and EFIT personnel shall complete the investigation of all misconduct related to the use of force, and APD IA shall complete the investigation of all misconduct not related to the use of force.

26. EFIT shall complete its investigations within 60 days of receiving on-scene investigation materials from APD.  At the conclusion of each investigation, IA force personnel and

8

**EXHIBIT A - Proposed**
**Stipulated Order**

EFIT personnel shall prepare a joint investigative report, consistent with the requirements of the CASA and APD policy. In the report, IA force personnel and EFIT personnel shall recommend a determination of whether each use of force complied with APD policy and state and federal law. For any use of force for which the investigation determines that an officer violated APD policy or state or federal law, IA force personnel and EFIT shall recommend appropriate corrective and/or disciplinary action, consistent with the CASA and APD policy.

27. An IA Commanding Officer shall review each investigative report and recommendation, and state in writing whether he or she concurs with the report and recommendation's findings of whether the use of force complied with policy; the recommended disposition of any misconduct allegations; and any recommended corrective and/or disciplinary action. The IA Commanding Officer shall explain any concurrence or non-concurrence in writing. Any recommended discipline resulting from an investigation will be reviewed by APD's executive staff consistent with APD policy.

**D. Role of the Independent Monitor with Regard to EFIT**

28. The Independent Monitor shall assist APD, DOJ, and the EFIT Administrator as the EFIT is established by, at a minimum:

   a. orienting EFIT regarding CASA requirements and relevant CASA compliance deficiencies by APD;

   b. providing technical assistance to EFIT regarding the Independent Monitor's compliance assessment methodology; expectations regarding EFIT's processes, work product, and records production; and other relevant matters, as the EFIT Administrator and the Independent Monitor deem appropriate; and

9

**EXHIBIT A - Proposed**
**Stipulated Order**

c. conducting informal assessments of force investigations completed with EFIT's involvement, particularly in the early stages of EFIT's implementation, to ensure that investigations completed with EFIT's involvement comply with CASA requirements regarding the quality of force investigations. The Independent Monitor shall convey the outcome of these informal assessments to the EFIT Administrator, APD, and DOJ.

29. The City recognizes that the requirements of Paragraph 28 of this Order are beyond the scope of the Independent Monitor's duties under the CASA and the City's annual budgets for the Independent Monitor's services under the CASA. The City shall therefore enter into separate compensation agreements with the Independent Monitor for the provision of the services required by Paragraph 28 of this Order, as described in Paragraph 334 of the CASA.

30. The Independent Monitor shall conduct formal compliance assessments of force investigations completed with EFIT's involvement as it would investigations completed by APD. Except for the requirements of Paragraph 28 of this Order, this Order is not intended to, and does not, alter the responsibilities or authority of the Independent Monitor under the CASA.

**E. Remedial Action Plan**

31. Within five months of the start date of the contract with EFIT, the City shall draft a remedial action plan for IA force investigations and submit it to DOJ, the Independent Monitor, and the EFIT Administrator. The plan will identify concrete actions that the City and EFIT will take to improve the quality and timeliness of investigations of Level 2 and Level 3 uses of force by IA. The Independent Monitor may recommend changes or

10

**EXHIBIT A - Proposed Stipulated Order**

approve the plan consistent with the requirements of Paragraph 147 of the CASA. After the Independent Monitor approves of the plan, the City shall file it with the Court. If either the City, DOJ, or both disagree with the Monitor's recommendations, such party or parties may file the plan with the Court and move for its approval.

32. After filing a joint remedial action plan or after the Court approves the plan, and until the plan has been fully implemented, the City shall file brief reports to the Court, due every three months from the date the remedial action plan was filed, to inform the Court of progress in implementing the plan, any barriers to implementation that it has faced, and any modifications to the plan that may be necessary. The City's quarterly reports will include, at a minimum:

   a. a summary of the City's progress regarding the implementation of the written IA investigative process required by Paragraph 14, including a summary of the intensive technical assistance provided by the Independent Monitor;

   b. a summary of written evaluations by EFIT of the quality of IA force investigators' investigations during the previous quarter;

   c. a summary of written feedback by EFIT of IA force investigators' work product during the previous quarter;

   d. any formal training that IA force investigators received during the previous quarter;

   e. the number of force investigators assigned to IA and, if APD has not yet retained 25 force investigators, the steps that APD will take in the next quarter to achieve full staffing;

11

**EXHIBIT A - Proposed Stipulated Order**

f. the number of investigations or reviews of investigations that EFIT completed without the involvement of IA force personnel, pursuant to Paragraph 23;

g. the number of IA force investigators conducting investigations independent of the EFIT, pursuant to Paragraph 35; and

h. for Level 2 and Level 3 force investigations:

   i. the number of investigations initiated during the previous quarter;

   ii. the number of investigations completed during the previous quarter;

   iii. the average and mean number of days from initiation to completion for the investigations completed during the previous quarter;

   iv. the number of investigations during the previous quarter that were completed within the deadlines required by the CASA, APD policy, and the CBA; and

   v. the number of investigations during the previous quarter that were not completed within the deadlines required by the CASA, APD policy, and the CBA.

**F. Training of IA Force Personnel**

33. Subject to extensions necessary due to COVID-19-related restrictions and availability, and subject to the approval of the proposed contractor by the by the Monitoring Team and DOJ, within three months of the entry of this Order, APD shall identify and hire a contractor to who shall, in concert with APD's Academy, develop and provide training to IA force personnel on conducting high-quality and timely force investigations. This training shall be developed, approved, and provided consistent with APD policy and the CASA, and shall incorporate problem-solving, experiential adult-learning principles.

12

**EXHIBIT A - Proposed
Stipulated Order**

This training shall be subject to review and approval by the Independent Monitor and DOJ.

**G. Returning Responsibility for Full Investigations of Level 2 and Level 3 Uses of Force to APD**

34. An IA Commanding Officer and EFIT shall prepare written evaluations of each investigator and supervisor who are assigned as IA force personnel on a quarterly basis. These evaluations shall be considered confidential consistent with City Personnel Rules and Regulations and state law, but shall be provided to the Monitor and DOJ upon request and shall be kept confidential pursuant to the requirements of Paragraph 326 of the CASA. These evaluations shall include, at a minimum:

    a. a description of the nature and extent of all training provided to the IA force investigator or supervisor during the previous quarter;

    b. a summary of written assessments by EFIT of the quality of the IA force investigator's or supervisor's investigations;

    c. a summary of written feedback by EFIT on the IA force investigator's or supervisor's work product;

    d. a description of any allegations that the IA force investigator or supervisor committed misconduct related to their investigations during the previous quarter, including how the allegation was ultimately resolved;

    e. the number of the IA force investigator's or supervisor's investigations from the previous quarter in which the IA force investigator or supervisor failed to satisfy CASA requirements for investigations, compared to the number of investigations that the IA force investigator or supervisor conducted during the previous quarter;

13

    f.   an evaluation of the IA force investigator's or supervisor's overall performance; and

    g.   any actions that will be taken during the following quarter to improve the IA force investigator's or supervisor's performance.

35. APD may transfer responsibility for conducting full investigations of Level 2 and Level 3 uses of force from EFIT to IA force personnel only after a quarterly evaluation demonstrates:

    a.   that the IA force investigator or supervisor has received training on all aspects of Level 2 and Level 3 force investigations;

    b.   that the IA force investigator or supervisor has regularly conducted high-quality investigations for at least two months, as demonstrated by EFIT's written assessments of the investigations;

    c.   that the IA force investigator or supervisor regularly produces high-quality work product, as demonstrated by EFIT's written feedback;

    d.   that the IA force investigator or supervisor has not committed misconduct during the course of investigations; and

    e.   that 95% of the IA force investigator's or supervisor's investigations from the previous quarter satisfied all CASA requirements for investigations.

36. APD shall notify the EFIT Administrator in writing two weeks before APD intends to transfer sole responsibility for conducting full investigations of Level 2 and Level 3 uses of force from EFIT to an IA force investigator or supervisor. The EFIT Administrator shall promptly notify the City, APD, DOJ, and the Independent Monitor in writing if the EFIT Administrator determines that the IA force investigator or supervisor does not meet

**EXHIBIT A - Proposed Stipulated Order**

the qualifications identified in Paragraph 35 of this Order. The City, APD, DOJ, the Independent Monitor, and the EFIT Administrator shall confer about any disagreements between APD and the EFIT Administrator regarding the qualifications of any IA force investigator or supervisor to take responsibility for conducing full investigations of Level 2 and Level 3 uses of force. The City and DOJ shall seek to resolve any such disagreements. If the City and DOJ are unable to resolve such disagreements, they may bring the matter before the Court for resolution.

37. The City and DOJ anticipate that APD will take responsibility for conducting full investigations of Level 2 and Level 3 uses of force over time as individual IA force investigators and supervisors meet the qualifications identified in Paragraph 35.

38. The City will endeavor to ensure that the responsibility for conducting full investigations of Level 2 and Level 3 uses of force returns entirely to APD within nine (9) months of EFIT beginning to provide services. Within six (6) months of the EFIT beginning to provide services, the Parties will evaluate the progress of APD, to include considering whether the EFIT is contributing to improvements in the progress of APD to meet the requirements of the CASA. Based on this evaluation, the Parties will file a status report with the Court within seven (7) months of the EFIT beginning to provide services, indicating whether the services of the EFIT should extend beyond nine (9) months.

39. The City and DOJ agree to jointly ask the Court to terminate this Order once there are a sufficient number of IA force personnel who have met the qualifications identified in Paragraph 35 to complete all full investigations of Level 2 and Level 3 uses of force within the timelines required by the CASA, APD policy, and the CBA.

**EXHIBIT A - Proposed Stipulated Order**

40. Notwithstanding Paragraph 39 of this Order, if the Independent Monitor, after conducting the informal assessments required by Paragraph 28(c) of this Order, or the formal assessments required by the CASA, determines that EFIT regularly fails to conduct investigations consistent with CASA requirements and APD policy, the City, with the concurrence of DOJ, may seek to terminate its contract with EFIT, and the Parties may seek to modify this Order accordingly.

41. If the City and DOJ are unable to reach agreement about asking the Court to terminate this Order, either Party may seek to terminate this Order. In the case of termination sought by the City, prior to filing a motion to terminate, the City agrees to notify DOJ in writing when the City has determined that there are grounds for termination of this Order. Thereafter, the City and DOJ shall promptly confer about the City's assertions. If, after a reasonable period of consultation and the completion of any audit or evaluation that DOJ and/or the Independent Monitor may wish to undertake, the City and DOJ cannot resolve any disagreements, the City may file a motion to terminate this Order. If the City moves for termination of this Order, DOJ will have 60 days after the receipt of the City's motion to object to the motion. If DOJ does not object, the Court may grant the City's motion. If DOJ objects, the Court will hold a hearing on the motion, and the burden shall be on the City to demonstrate that it has fully complied with this Order and that the grounds for termination of this Order are supported by a preponderance of the evidence.

The Court recognizes and approves of the measures in the Stipulated Order as good faith efforts by the Parties to address investigative deficiencies in APD's force investigations, as identified by the Independent Monitor in his Twelfth Report, and therefore approves this Stipulated Order as an Order of the Court.

**EXHIBIT A - Proposed
Stipulated Order**

**THEREFORE,**

**IT IS ORDERED** that the Parties' Joint Motion for Entry of Stipulated Order

Establishing an External Force Investigation Team is approved, and the Stipulated Order is

hereby entered as an Order of the Court.

**IT IS FURTHER ORDERED** that that the Court will retain jurisdiction to enforce the

provisions of the Order.


_____
HON. JAMES O. BROWNING
United States District Judge


*Counsel:*

Fred J. Federici
  Acting United States Attorney
Elizabeth M. Martinez
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

 --and--

Paul Killebrew
  Special Counsel
Corey M. Sanders
  Trial Attorney
Stephen M. Ryals
  Trial Attorney
Patrick Kent
  Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
Washington, D.C.

   *Attorneys for the United States*

17

**EXHIBIT A - Proposed
Stipulated Order**

Esteban A. Aguilar, Jr.
  City Attorney
Lindsay Van Meter
  Managing Assistant City Attorney
Robyn Rose
  Assistant City Attorney
City of Albuquerque
Albuquerque, New Mexico

    *Attorneys for the City of Albuquerque*

**EXHIBIT A - Proposed**
**Stipulated Order**

# Detailed Scorecard



Review Month: February 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% |
| ⊞ ECW | | | | | | | | 85-94% |
| ⊟ OBRD | | | | | | | | ≤ 84% |
| (P230) Video Uploaded by the end of subsequent shift | 99% | 100% | 97% | 100% | 100% | 100% | 99% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| (P18) Inspection of carrying agency approved ammunition | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 5.5 | 5.0 | 4.3 | 5.5 | 6 | 5 | 5.2 | |
| (P32) ECW is carried on weak-side holster | 96% | 97% | 100% | 100% | 100% | 100% | 99% | |
| (P225) Equipment inspection | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 97% | 100% | 100% | 100% | 99% | |
| 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | | 100% | | 100% | 100% | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 60% | | 100% | | 100% | 90% | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | | 100% | | 100% | 100% | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| ⊟ ECW (Next Inspection: April 2021) | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| ⊟ Firearms (March 2021 for 2020 Firearm Quals) | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | |
| | | | | | | | | |
| Month/Year | 2 | 2021 | | | | | | |

# Detailed Scorecard



Review Month: March 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P18) Inspection of carrying agency approved ammunition | 96% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 4.5 | 5.0 | 4.0 | 5.5 | 6 | 7 | 5.3 | | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P225) Equipment inspection | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 50% | 100% | 100% | 100% | 100% | 92% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: April 2021) | | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (May 2021 for 2020 Firearm Quals) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P20) Successfully qualify on other authorized firearm | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | | |
| | | | | | | | | | |
| Month/Year | 3 | 2021 | | | | | | | |

# Detailed Scorecard



Review Month: April 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 98% | 100% | 100% | 99% | 99% | 100% | 99% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 88% | 100% | 100% | 100% | 100% | 98% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 88% | 100% | 100% | 100% | 100% | 98% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 5 | 4.0 | 7.5 | 6.0 | 5 | 4 | 5.3 | | |
| (P32) ECW is carried on weak-side holster | 100% | 88% | 100% | 100% | 100% | 100% | 98% | | |
| (P225) Equipment inspection | 100% | 88% | 100% | 100% | 100% | 100% | 98% | | |
| (P225) Two video reviews per officer completed by the sergeant | 93% | 88% | 100% | 100% | 100% | 100% | 97% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | 100% | 100% | 100% | 100% | | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | | 100% | 100% | 100% | 100% | | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | | 100% | 100% | 100% | 100% | | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: July 2021) | | | | | | | | | |
| (P37) Quarterly ECW upload | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (May 2021 for 2020 Firearm Quals) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | | |
| | | | | | | | | | |
| Month/Year | 4 | 2021 | | | | | | | |

# Detailed Scorecard



Review Month: May 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 99% | 100% | 100% | 100% | 100% | 100% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 93% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| (P18) Inspection of carrying agency approved ammunition | 93% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 7 | 5.0 | 3.0 | 5.0 | 5 | 7 | 5.3 | | |
| (P32) ECW is carried on weak-side holster | 93% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| (P225) Equipment inspection | 93% | 100% | 100% | 100% | 100% | 100% | 99% | | |
| (P225) Two video reviews per officer completed by the sergeant | 89% | 100% | 100% | 100% | 100% | 100% | 98% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: July 2021) | | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (May 2021 for 2020 Firearm Quals) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | 100% | 100% | 100% | 100% | 100% | 100% | | | |
| (P20) Successfully qualify on other authorized firearm | 100% | 100% | 100% | 100% | 100% | 100% | | | |
| ⊞ Citizen Complaint Forms (Postponed until further notice. On-site locations are closed) | | | | | | | | | |
| Month/Year | 5 | 2021 | | | | | | | |

# Detailed Scorecard



Review Month: June 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend | |
|---|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% | |
| ⊞ ECW | | | | | | | | 85-94% | |
| ⊟ OBRD | | | | | | | | ≤ 84% | |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| ⊟ Firearms | | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| ⊟ Supervision | | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 5 | 4.5 | 4.0 | 4.0 | 7 | 5 | 4.9 | | |
| (P32) ECW is carried on weak-side holster | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| (P225) Equipment inspection | 100% | 91% | 100% | 91% | 100% | 100% | 97% | | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 91% | 88% | 88% | 96% | 100% | 94% | | |
| ⊟ 72 Hour Extension | | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| **QUARTERLY INSPECTIONS** | | | | | | | | | |
| ⊟ ECW (Next Inspection: July 2021) | | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | | |
| ⊟ Firearms (Next Inspection: 2022) | | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | | |
| ⊞ Citizen Complaint Forms (Next Inspection: July 2021) | | | | | | | | | |
| | | | | | | | | | |
| **Month/Year** | 6 | 2021 | | | | | | | |

# Detailed Scorecard



Review Month: July 2021
GOAL: 100%

Attachments:
Detailed Scorecard
Scorecards by Topic
Scorecard Sample Size
Scorecards Explained

Contact apdmetrics@cabq.gov with questions or comments

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| **MONTHLY INSPECTIONS** | | | | | | | | 95-100% |
| ⊞ ECW | | | | | | | | 85-94% |
| ⊟ OBRD | | | | | | | | ≤ 84% |
| (P230) Video Uploaded by the end of subsequent shift | 100% | 99% | 100% | 98% | 100% | 100% | 100% | |
| (P224) Mandatory recording incidents under APD policy | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| (P18) Inspection of carrying agency approved ammunition | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| ⊟ Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | 4.5 | 4.5 | 5.5 | 6.5 | 4.5 | 6 | 5.3 | |
| (P32) ECW is carried on weak-side holster | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| (P225) Equipment inspection | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| (P225) Two video reviews per officer completed by the sergeant | 100% | 100% | 100% | 97% | 96% | 100% | 99% | |
| ⊟ 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P53) Documentation present of a Commander approving an extension request | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P53) Complete supervisory force review within 72 hours of incident unless a Commander authorized an extension | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| ⊟ ECW (Next Inspection: October 2021) | | | | | | | | |
| (P37) Quarterly ECW upload | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| **SEMI-ANNUALLY INSPECTIONS** | | | | | | | | |
| ⊞ Firearms (Next Inspection: 2022) | | | | | | | | |
| ⊟ Citizen Complaint Forms (Next Inspection: January 2022) | | | | | | | | |
| (P165) English brochures are available at government properties. | 100% | 100% | 100% | 100% | 0% | 100% | 83% | |
| (P165) Spanish brochures are available at government properties. | 100% | 100% | 100% | 100% | 0% | 100% | 83% | |
| (P165) English posters are available at government properties. | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P165) Spanish posters are available at government properties. | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P168) Complaint forms shall be made available and posted in English. | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P168) Complaint forms shall be made available and posted in Spanish. | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| | | | | | | | | |
| **Month/Year** | **7** | **2021** | | | | | | |

# 2021 Quarterly Detailed Scorecard



| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **95-100%** |
| ⊞ MONTHLY INSPECTIONS | | | | | | | | **85-94%** |
| OBRD | | | | | | | | **≤ 84%** |
| (P230) Video Uploaded by the end of subsequent shift | | | | | | | | |
| ⊟ Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| ⊟ Quarter 3 | **98%** | **100%** | **100%** | **99%** | **99%** | **99%** | **99%** | |
| September | | | | | | | | |
| August | 96% | 100% | 100% | 100% | 97% | 98% | 99% | |
| July | 100% | 99% | 100% | 98% | 100% | 100% | 100% | |
| ⊟ Quarter 2 | **99%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| June | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| May | 100% | 99% | 100% | 100% | 100% | 100% | 100% | |
| April | 98% | 100% | 100% | 100% | 99% | 100% | 99% | |
| ⊟ Quarter 1 | **100%** | **100%** | **98%** | **100%** | **100%** | **100%** | **100%** | |
| March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| February | 99% | 100% | 97% | 100% | 100% | 100% | 99% | |
| January | 100% | 100% | 98% | 100% | 100% | 100% | 100% | |
| (P224) Mandatory recording incidents under APD policy | | | | | | | | |
| ⊟ Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| ⊟ Quarter 3 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| September | | | | | | | | |
| August | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| July | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Quarter 2 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| June | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| May | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| April | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊟ Quarter 1 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| February | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| January | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Firearms | | | | | | | | |
| (P18) Inspection of carrying agency approved firearms | | | | | | | | |
| ⊟ Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| ⊟ Quarter 3 | **100%** | **98%** | **100%** | **98%** | **100%** | **100%** | **99%** | |
| September | | | | | | | | |
| August | 100% | 97% | 100% | 100% | 100% | 100% | 99% | |
| July | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| ⊟ Quarter 2 | **98%** | **93%** | **100%** | **97%** | **100%** | **100%** | **98%** | |

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| June | 100% | 91% | 100% | 91% | 100% | 100% | 97% | |
| May | 93% | 100% | 100% | 100% | 100% | 100% | 99% | |
| April | 100% | 88% | 100% | 100% | 100% | 100% | 98% | |
| − Quarter 1 | 99% | 100% | 100% | 100% | 100% | 100% | 100% | |
| March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| February | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| January | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P18) Inspection of carrying agency approved ammunition | | | | | | | | |
| − Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| − Quarter 3 | 100% | 98% | 100% | 98% | 100% | 100% | 99% | |
| September | | | | | | | | |
| August | 100% | 97% | 100% | 100% | 100% | 100% | 99% | |
| July | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| − Quarter 2 | 98% | 93% | 100% | 97% | 100% | 100% | 98% | |
| June | 100% | 91% | 100% | 91% | 100% | 100% | 97% | |
| May | 93% | 100% | 100% | 100% | 100% | 100% | 99% | |
| April | 100% | 88% | 100% | 100% | 100% | 100% | 98% | |
| − Quarter 1 | 98% | 100% | 100% | 100% | 100% | 100% | 100% | |
| March | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| February | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| January | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Supervision | | | | | | | | |
| (P207) Supervision 8:1 Ratio for a day | | | | | | | | |
| − Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| − Quarter 3 | 4.5 | 4.3 | 5.3 | 5.0 | 4.5 | 4.5 | 467% | |
| September | | | | | | | | |
| August | 4.5 | 4.0 | 5.0 | 3.5 | 4.5 | 3.0 | 408% | |
| July | 4.5 | 4.5 | 5.5 | 6.5 | 4.5 | 6.0 | 525% | |
| − Quarter 2 | 5.7 | 4.5 | 4.8 | 5.0 | 5.7 | 5.3 | | |
| June | 5 | 4.5 | 4.0 | 4.0 | 7.0 | 5.0 | 4.9 | |
| May | 7 | 5.0 | 3.0 | 5.0 | 5.0 | 7.0 | 5.3 | |
| April | 5 | 4.0 | 7.5 | 6.0 | 5.0 | 4.0 | 5.3 | |
| − Quarter 1 | 5.3 | 4.7 | 4.8 | 5.2 | 5.5 | 5.2 | 5.1 | |
| March | 4.5 | 5.0 | 4.0 | 5.5 | 6.0 | 7.0 | 5.3 | |
| February | 5.5 | 5.0 | 4.3 | 5.5 | 6.0 | 5.0 | 5.2 | |
| January | 6.0 | 4.0 | 6.0 | 4.5 | 4.5 | 3.5 | 4.8 | |
| (P32) ECW is carried on weak-side holster | | | | | | | | |
| − Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| − Quarter 3 | 100% | 100% | 100% | 98% | 100% | 100% | 100% | |
| September | | | | | | | | |
| August | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| July | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| Quarter 2 | 98% | 93% | 100% | 97% | 100% | 100% | 98% | |
| June | 100% | 91% | 100% | 91% | 100% | 100% | 97% | |
| May | 93% | 100% | 100% | 100% | 100% | 100% | 99% | |
| April | 100% | 88% | 100% | 100% | 100% | 100% | 98% | |
| Quarter 1 | 99% | 99% | 100% | 100% | 100% | 100% | 100% | |
| March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| February | 96% | 97% | 100% | 100% | 100% | 100% | 99% | |
| January | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) OBRD Equipment inspection | | | | | | | | |
| Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| Quarter 3 | 100% | 100% | 100% | 98% | 100% | 100% | 100% | |
| September | | | | | | | | |
| August | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| July | 100% | 100% | 100% | 97% | 100% | 100% | 99% | |
| Quarter 2 | 98% | 93% | 100% | 97% | 100% | 100% | 98% | |
| June | 100% | 91% | 100% | 91% | 100% | 100% | 97% | |
| May | 93% | 100% | 100% | 100% | 100% | 100% | 99% | |
| April | 100% | 88% | 100% | 100% | 100% | 100% | 98% | |
| Quarter 1 | 99% | 100% | 100% | 100% | 100% | 100% | 100% | |
| March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| February | 96% | 100% | 100% | 100% | 100% | 100% | 99% | |
| January | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P225) Two video reviews per officer completed by the sergeant | | | | | | | | |
| Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| Quarter 3 | 96% | 98% | 100% | 98% | 98% | 100% | 99% | |
| September | | | | | | | | |
| August | 93% | 97% | 100% | 100% | 100% | 100% | 98% | |
| July | 100% | 100% | 100% | 97% | 96% | 100% | 99% | |
| Quarter 2 | 94% | 93% | 96% | 96% | 99% | 100% | 96% | |
| June | 100% | 91% | 88% | 88% | 96% | 100% | 94% | |
| May | 89% | 100% | 100% | 100% | 100% | 100% | 98% | |
| April | 93% | 88% | 100% | 100% | 100% | 100% | 97% | |
| Quarter 1 | 99% | 99% | 99% | 100% | 100% | 99% | 99% | |
| March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| February | 100% | 100% | 97% | 100% | 100% | 100% | 99% | |
| January | 96% | 97% | 100% | 100% | 100% | 96% | 98% | |
| 72 Hour Extension | | | | | | | | |
| (P53) Documentation present requesting an extension of the 72 hour deadline | | | | | | | | |
| Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| Quarter 3 | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| September | | | | | | | | |
| August | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| July | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| − Quarter 2 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| June | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| May | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| April | | 100% | 100% | 100% | 100% | | 100% | |
| − Quarter 1 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| March | 100% | 100% | 100% | 100% | 100% | 100% | | |
| February | 100% | 100% | | 100% | | 100% | 100% | |
| January | 100% | 100% | | 100% | 100% | 100% | 100% | |
| (P53) Documentation present of a Commander approving an extension request | | | | | | | | |
| − Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| − Quarter 3 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| September | | | | | | | | |
| August | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| July | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| − Quarter 2 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| June | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| May | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| April | | 100% | 100% | 100% | 100% | | 100% | |
| − Quarter 1 | **100%** | **70%** | **100%** | **100%** | **100%** | **100%** | **95%** | |
| March | 100% | 50% | 100% | 100% | 100% | 100% | 92% | |
| February | 100% | 60% | | 100% | | 100% | 90% | |
| January | 100% | 100% | | 100% | 100% | 100% | 100% | |
| (P53) Complete supervisory force review within 72 hours of incident | | | | | | | | |
| − Quarter 4 | | | | | | | | |
| December | | | | | | | | |
| November | | | | | | | | |
| October | | | | | | | | |
| − Quarter 3 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| September | | | | | | | | |
| August | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| July | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| − Quarter 2 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| June | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| May | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| April | | 100% | 100% | 100% | 100% | | 100% | |
| − Quarter 1 | | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| March | 100% | 100% | 100% | | | | | |
| February | 100% | 100% | | 100% | 100% | 100% | 100% | |
| January | 100% | 100% | | 100% | 100% | 100% | 100% | |
| **QUARTERLY INSPECTIONS** | | | | | | | | |
| **ECW** | | | | | | | | |
| (P37) Quarterly ECW upload | | | | | | | | |
| + Quarter 4 | | | | | | | | |
| October | | | | | | | | |

| Scorecard | Southwest | Valley | Southeast | Northeast | Foothills | Northwest | Total | Legend |
|---|---|---|---|---|---|---|---|---|
| ⊞ Quarter 3 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| July | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊞ Quarter 2 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| April | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊞ Quarter 1 | **100%** | **100%** | **100%** | **99%** | **100%** | **100%** | **100%** | |
| January | 100% | 100% | 100% | 99% | 100% | 100% | 100% | |
| SEMI-ANNUALLY INSPECTIONS | | | | | | | | |
| Firearms (2020 Firearm Quals) | | | | | | | | |
| (P20) Successfully qualify on primary duty weapon | | | | | | | | |
| ⊞ Semi-Annual 2 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| ⊞ May | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Semi-Annual 1 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| ⊞ March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| (P20) Successfully qualify on other authorized firearm | | | | | | | | |
| ⊞ Semi-Annual 2 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| ⊞ May | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Semi-Annual 1 | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | |
| ⊞ March | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| ⊞ Citizen Complaint Forms | | | | | | | | |
| | | | | | | | | |
| ⊞ Month/Year | **Jan - Aug** | **2021** | | | | | | |