## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.              No. CIV 14-1025 JB/SMV

CITY OF ALBUQUERQUE,

   Defendant.

## **MEMORANDUM OPINION**[1]

**THIS MATTER** comes before the Court on: (i) the Joint Motion for Order Establishing an External Force Investigation Team, filed February 5, 2021 (Doc. 692)("Joint Motion for External Team"); (ii) the accompanying Stipulated Order, filed February 5, 2021 (Doc. 692-1)("Stipulated Order"); (iii) APOA Issues and Concerns (Relating to Document No. 692), filed February 19, 2021 (Doc. 707)("Objections"); and (iv) Albuquerque Police Officers Association's Motion Opposing Motion and Final Order, filed February 22, 2021 (Doc. 714)("Opposition Motion").  The Court held a hearing on the Joint Motion on February 26, 2021.  See Clerk's Minutes at 1, filed February 26, 2021 (Doc. 722)("February 26, Clerk's Minutes").  The primary issue is whether the Stipulated Order establishing an External Force Investigation Team impacts the Albuquerque Police Officers Association's Collective Bargaining Agreement ("CBA") with Defendant City of Albuquerque, so that the Officers Association properly can object.  The Court

---

[1]This Memorandum Opinion follows the Court's Order, filed on September 16, 2021 (Doc. 853), disposing of: (i) APOA Issues and Concerns (Relating to Document No. 692), filed February 19, 2021 (Doc. 707); and (ii) Albuquerque Police Officers Association's Motion Opposing Motion and Final Order, filed February 22, 2021 (Doc. 714).  In the Order, the Court indicated that it would, at a later date, issue a Memorandum Opinion more fully detailing its rationale for this decision. Order at 1.  This Memorandum Opinion is the promised opinion.

concludes that the Joint Motion and Stipulated Order do not impact the Officers Association's CBA and, consequently, the Officers Association's Objections are not good grounds for the Court not to grant the Stipulated Order.  For the reasons discussed below, the Court overrules the Officers Association's Objections, and denies the Officers Association's Opposition Motion.

## FACTUAL BACKGROUND

In November, 2012, Plaintiff United States of America opened an investigation into the Albuquerque Police Department's ("APD") law enforcement officers' use of force.  See Joint Motion Requesting Approval and Entry of the Settlement Agreement as an Order at 2, filed November 14, 2014 (Doc. 9)("Joint Motion for Settlement").  The United States began investigating APD after several high-profile fatal shootings garnered attention about APD's unwarranted uses of force.  See Letter from Jocelyn Samuels, Acting Assistant Attorney General, Civil Rights Division, to Richard J. Berry, Mayor, at 5 (dated April 10, 2014), filed November 12, 2014 (Doc. 1-1)("APD Investigation")(citing Michael Haederle, In Albuquerque, An Uproar Over Shootings by Police, Los Angeles Times, April 14, 2012, available at http://articles.latimes.com/2012/apr/14/nation/la-na-albuquerque-police-20120415 (last visited December 10, 2021)("Uproar in Albuquerque")).  Between January, 2010, and April, 2012, APD had twenty-three officer-involved shootings, seventeen of which were fatal.  See Uproar in Albuquerque.  Some of these shootings required APD to pay hundreds of thousands of dollars in wrongful death lawsuits, including APD's shooting of Roderick Jones in 2009, which required APD to pay $950,000.00 in a wrongful death lawsuit.  See Uproar in Albuquerque.  While the United States acknowledged that APD started to institute reforms to address the United States' findings, it also noted that then-APD Chief Gorden Eden's remarks after officers shot James Boyd, a homeless man camping in the Sandia foothills who attempted to cooperate with police when he

was shot, "demonstrate that more work is needed to change the culture of APD."   APD Investigation at 4 (citing Dan McKay, Camper Turning from Officers When Shot, Albuquerque Journal, Mar. 22, 2014, http://www.abqjournal.com/372844/news/video-camper-turning-away.html (last visited December 14, 2021)).[2]

In April, 2014, the United States issued the results of its investigation, in which it "concluded that it had reasonable cause to believe that the Albuquerque Police Department engages in a pattern or practice of use of excessive force, in violation of the Fourth Amendment and Section 14141" of Title 42 of the United States Code.   APD Investigation at 1.   The APD Investigation concludes that APD police officers shot and killed approximately twenty individuals from 2009 to 2012.   See APD Investigation at 2.   The APD Investigation concluded that the "majority of these shootings were unconstitutional."   APD Investigation at 2-3.   Moreover, the APD Investigation concludes that APD police officers used deadly force: (i) "against persons with mental illness and in crisis"; (ii) "in circumstances where there is no imminent threat of deadly or serious bodily harm"; (iii) where persons pose only a "minimal threat" to officers and others; and (iv) "where officers escalate situations in which force could have been avoided had they instead used de-escalation measures."   APD Investigation at 2-3.   The APD Investigation also concludes that APD engaged in a pattern or practice of using force that is less than lethal in an unconstitutional manner.   See APD Investigation at 3.   Finally, the APD Investigation concludes that "[f]orce incidents are not properly investigated, documented, or addressed with corrective measures."   APD Investigation at 3.

---

[2]While the James Boyd shooting garnered national media attention, the United States noted that, at the time it submitted the APD Investigation in April, 2014, "The Boyd shooting is under criminal investigation and is not addressed in this letter."   APD Investigation at 4 n. 4.

Soon after the United States issued the results of its APD Investigation, the United States entered discussions with Albuquerque.  See Joint Motion for Settlement at 2; Memorandum Opinion and Order at 2, 2015 WL 13747186, at *1, filed June 2, 2015 (Doc.134)(Brack, J.)("Original Settlement Agreement MOO").  After receiving input from the public and subject-matter experts, the United States and Albuquerque announced an agreement on October 31, 2014.  See Joint Motion for Settlement at 2; Original Settlement Agreement MOO at 2 (Brack, J.).  The Albuquerque City Council, in a unanimous vote, endorsed the Original Settlement Agreement.  See Joint Motion for Settlement at 2; Original Settlement Agreement MOO at 2 (Brack, J.).

Albuquerque and the Officers Association have a CBA, https://www.cabq.gov/humanresources/documents/apoa-jul-9-2016.pdf/view (last visited December 2, 2021).  See Memorandum Opinion and Order, filed November 30, 2016 (Doc. 238)(Brack, J.)("Promotional Policy MOO").  The first iteration of the CBA went into effect in July, 2014.  See Police Contracts Database, https://www.checkthepolice.org/database (last visited December 8, 2021)("2014 CBA").  The current operative CBA went into effect in July, 2018, and expired on June 30, 2020.  See CBA at 1.  Generally, the CBA discusses officers' pay, leave, assignments, health and safety, procedures and policies, investigation and discipline, and conditions of employment.  See CBA at 2.   The CBA states:

> If the City anticipates the implementation of policies or directives related to its agreement discussions with the DOJ that impacts Officers' terms or conditions of employment, the City will notify the APOA of its anticipated changes and provide the APOA the opportunity to meet and confer with the City in a timely manner on the anticipated changes.

CBA § 2.5, at 6. The CBA further states: "The commitment will not prevent the APOA from submitting the changes for negotiations when the parties negotiate a successor collective bargaining agreement." CBA § 2.5, at 6.

The CBA also discusses procedures that the APD should use when investigating an officer. See CBA § 20, at 29. The investigatory guidelines "ensure that investigations are conducted in a manner conducive to public confidence, good order, discipline, good management practices, and recognizing the individual rights of each member of the force." CBA § 20.1, at 29. In conjunction with providing the procedural protections involved in investigations, the CBA specifically provides that any administrative investigation must be completed within 90 days. See CBA § 20.1.16, at 33.

## PROCEDURAL HISTORY

On November 12, 2014 the United States filed a lawsuit against Albuquerque. See Complaint at 1, filed November 12, 2014 (Doc. 1). In the Complaint, the United States alleges a "pattern or practice of use of excessive force by APD officers that deprives persons of rights, privileges, or immunities, secured and protected by the Fourth Amendment." Complaint at 1. In its Prayer for Relief, the United States seeks to prevent Albuquerque from using excessive force, require Albuquerque to "adopt and implement policies, procedures, and practices to remedy the pattern or practice of use of excessive force," and require Albuquerque to "adopt systems that identify, correct, and prevent the use of excessive force." Complaint ¶ 28, at 7.

1. **Joint Motion for Settlement.**

Two days after the United States filed its Complaint, the United States and Albuquerque submitted a Joint Motion to the Honorable Robert C. Brack, United States District Judge for the United States District Court for the District of New Mexico, to approve the parties' Settlement

Agreement, filed November 14, 2014 (Doc. 9-1)("Original Settlement Agreement").  See Joint

Motion for Settlement at 1.  Although Albuquerque joined the Motion, it clarified that it denied

any pattern or practice of unconstitutional use of force by APD or any of its agents.  See Joint

Motion for Settlement at 3.  In their Joint Motion, the United States and Albuquerque asked the

Court to approve the Original Settlement Agreement, to "retain jurisdiction over the Agreement

for the purpose of enforcing its terms until the City has achieved full and effective compliance

with the Agreement," and to allow "community members and other stakeholders to express their

views as amici curiae to assist the Court in its consideration of the Agreement."  Joint Motion for

Settlement at 3.  After provisionally approving the Original Settlement Agreement, Judge Brack

set a fairness hearing so interested parties could provide their opinions on the Original Settlement

Agreement.  See Order Inviting the Submission of Briefs by Amicus Curiae, filed December 17,

2014 (Doc. 35).  Seven groups spoke at the fairness hearing.  See Clerk's Minutes at 1, filed

January 21, 2015 (Doc. 90).  After the fairness hearing, Judge Brack approved the Original

Settlement Agreement, entering it as a court order.  See Original Settlement Agreement MOO at

1.

> 2.    **Original Settlement Agreement**.

The Original Settlement Agreement "sets up a comprehensive framework for reform with

proposed 'revisions, policies, procedures, and practices to address the allegations in the United

States' Complaint," Original Settlement Agreement MOO at 2 (Brack, J.)(quoting Joint Motion

for Settlement at 6), and has provisions pertaining "to the use of force, specialized units, crisis

intervention, training, misconduct investigations, supervision, recruitment, officer health, and

community engagement,"  Original Settlement Agreement MOO at 2 (Brack, J.)(citing Original

Settlement Agreement).   The Original Settlement Agreement includes a "management-rights" provision that states:

> The Association (APOA) agrees that the employees shall be bound by and obey such directives, r[u]les, and regulations insofar as the same do not conflict with this Agreement, the laws of the United States, the laws of the State of New Mexico and/or the laws of the City of Albuquerque.   Under normal circumstances, the Association will be given written notice of proposed changes to Department directives, rules and regulations that directly affect the wages, hours, and working conditions of bargaining unit member[s] and may submit written input to the Chief within fourteen (14) days.

Original Settlement Agreement ¶ 147, at 51-52.   The Original Settlement Agreement also provides a procedure for objections:

> APD shall have 15 days to resolve any [of the United States Department of Justice ("DOJ") or the Monitor's] objections to new or revised policies, procedures, manuals, or directives implementing the specified provisions.   If, after this 15-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 15 days to resolve the objection.   If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter.   The Monitor shall determine whether in some instances an additional amount of time is necessary to ensure full and proper review of policies.   Factors to consider in making this determination include: 1) complexity of the policy; 2) extent of disagreement regarding the policy; 3) number of policies provided simultaneously; and 4) extraordinary circumstances delaying review by DOJ or the Monitor.   In determining whether these factors warrant additional time for review, the Monitor shall fully consider the importance of prompt implementation of policies and shall allow additional time for policy review only where it is clear that additional time is necessary to ensure a full and proper review.   Any extension to the above timelines by the Monitor shall also toll APD's deadline for policy completion.

Original Settlement Agreement ¶ 148, at 52.

The Original Settlement Agreement requires "compliance within two years [of November 14, 2014], and sustained and full effective compliance for four years" by November 14, 2018. Memorandum Opinion and Order, filed September 24, 2015 (Doc. 143)(Brack, J.)(citing Original Settlement Agreement ¶ 342, at 103).   The United States and Albuquerque selected Dr. James

Ginger as the independent monitor of the Original Settlement Agreement; Dr. Ginger is a former police officer who "function[s] as the eyes and ears of the Court."  Original Settlement Agreement MOO at 3 (Brack, J.).  Dr. Ginger periodically submits progress reports to the Court in compliance with the Original Settlement Agreement and its later iterations.  See, e.g., Report, filed August 18, 2017 (Doc. 295); Report, filed November 1, 2019 (Doc. 493).

### 3.    Officers Association's Involvement.

On December 18, 2014, the Officers' Association filed a Motion to Intervene.  See Motion to Intervene, filed December 18, 2014 (Doc. 40)("MTI").  The Officers Association represents APD's "sworn, certified" employees. MTI at 1.  As these employees' representatives, the Officers Association entered into the CBA, which "governs the terms and conditions of employment for the bargaining unit," with Albuquerque over forty years ago.  See MTI at 1.  The Officers Association notes that the New Mexico Public Employee Bargaining Act, N.M.S.A. § 10-7E-1 to -26 ("PEBA"),[3]  and the City of Albuquerque Labor-Management Relations Ordinance,

---

[3]N.M.S.A. § 10-7E-17 states, in relevant part:

A.    Except for retirement programs provided pursuant to the Public Employees Retirement Act [10-11-1 NMSA 1978] or the Educational Retirement Act [22-11-1 NMSA 1978], public employers and exclusive representatives:

(1)    shall bargain in good faith on wages, hours and all other terms and conditions of employment and other issues agreed to by the parties. However, neither the public employer nor the exclusive representative shall be required to agree to a proposal or to make a concession; and

(2)    shall enter into written collective bargaining agreements covering employment relations.

B.    The obligation to bargain collectively imposed by the Public Employee Bargaining Act [10-7E-1 NMSA 1978] shall not be construed as authorizing a public employer and an exclusive representative to enter into an agreement that is in conflict with the provisions of any other statute of this state. In the event of

Albuquerque, N.M. Rev. Ordinances, ch. 3, art. II, § 3-2-1 to -18 ("Labor Ordinance")[4] require

Albuquerque and the Officers Association to bargain in good faith.   The Officers Association

---

conflict between the provisions of any other statute of this state and an agreement entered into by the public employer and the exclusive representative in collective bargaining, the statutes of this state shall prevail.

N.M.S.A. § 10-7E-17.

[4]Section 3-2-4 of Albuquerque, N.M. Rev. Ordinances states:

(A)     City employees have the right to form, join and otherwise participate in the activities of an employee organization of their own choosing for the purpose of bargaining collectively with the city government, and for other lawful reasons.  City employees also have the right to refuse to join and participate in the activities of employee organizations.  An employee organization which has been certified by the Mayor as the exclusive bargain representative for an appropriate bargaining unit of the city employees may bargain collectively with the city government concerning hours, salary, wages, working conditions, and all terms and conditions of employment.

(B)     Nothing contained in this article shall be construed to limit, impair, or affect the rights of any individual city employee to the expression or communication of a view, grievance, complaint, or opinion on any matter related to the conditions or compensation of city employment or their betterment aside from the method described herein, so long as the same is not designed to and does not interfere with the full, faithful and proper performance of the duties of his employment.

(C)     No organization, its representative or other individual, shall be allowed to solicit membership for an employee organization or labor union during such employees' duty hours.

Albuquerque, N.M. Rev. Ordinances ch. 3, art. II, § 3-2-4.  Regarding management rights, the City Ordinance states:

Subject to existing law, the Mayor and his administrative staff shall have the following rights:

(A)     To direct the work of its employees;

(B)     To hire, promote, evaluate, transfer and assign employees;

(C)     To demote, suspend, discharge or terminate employees for just cause;

argues that the Original Settlement Agreement violates the CBA, and allows Albuquerque

unilaterally to alter the CBA's terms and conditions of employment without bargaining in good

faith with the Officers Association.   See MTI at 3.   Thus, the Officers Association contends,

because the Original Settlement Agreement affects its CBA rights, the Court should permit the

Officers Association to intervene.   See MTI at 3.

On February 19, 2015, Judge Brack granted the Officers Association's MTI, holding that

the Officers Association could intervene as a matter of right in the litigation between the United

---

> (D)   To determine staffing requirements;
>
> (E)   To maintain the efficiency of the city government and ensure the carrying out of normal management functions;
>
> (F)   To take actions as may be necessary to carry out the mission of the city government in emergencies; and
>
> (G)   To manage and to exercise judgment on all matters not specifically prohibited by this article or by a collective bargaining agreement in effect between the city employer and an employee organization.

Albuquerque, N.M. Rev. Ordinances ch. 3, art. II, § 3-2-5.   The ordinance also sets out the following legal obligations surrounding the City's duty to bargain:

> The city government and any employee organization recognized as the exclusive representative for a unit, through their designated agents, shall bargain concerning hours, salary, wages, working conditions and other terms and conditions of employment not in violation of law or local ordinance and not in conflict with the provisions of §§ 3-1-1 et seq., the Merit System; Personnel Regulations, establishing classified and unclassified service, methods of service rating of classified employees, methods of initial employment, promotion recognizing efficiency and ability as applicable standards, discharge of employees, and grievance and appeal procedures for classified employees; provided, however, that the provisions of a collective bargaining agreement which has been ratified and approved by the Mayor shall, where in conflict with any other provision of §§ 3-1-1 et seq. govern.   This duty includes an obligation to confer in good faith with respect to terms and conditions of employment.

Albuquerque, N.M. Rev. Ordinances ch. 3, art. II, § 3-2-7.

States and Albuquerque.  See Memorandum Opinion and Order at 3-4, 13, 2015 WL 13747185 at

*2-6, filed February 19, 2015 (Doc. 102)(Brack, J.)("MTI MOO").  In the MTI MOO, Judge Brack

concludes that the Officers Association has a sufficient interest in the case, because the "order

must apply to the officers for any injunction to be effective."  MTI MOO at 6, 2015 WL 13747185

at *3 (Brack, J.).  Further, the MTI MOO notes that the litigation could impair the officers' interest,

so "their representative should be permitted to intervene."  MTI MOO at 6, 2015 WL 13747185 at

*3.  Moreover, the MTI MOO states that the Officers Association has an interest in "ensuring the

integrity of its CBA."  MTI MOO at 6, 2015 WL 13747185 at *3 (Brack, J.).  Judge Brack also

concludes that the United States and Albuquerque's argument that the Court should deny the MTI,

because the Officers Association's CBA "is only temporary and will expire in July 2015," is

unpersuasive, because "well-established labor law precepts" means that the expired CBA will

remain in effect until a new CBA is negotiated, and "the parties may be contending with the

requirements of the current CBA for the entire duration of the consent decree."  MTI MOO at 9,

2015 WL 13747185 at *5 (Brack, J.).  Finally, the MTI MOO concludes that the litigation could

impair the Officer Association's rights and grants the Officer Association's MTI.  See MTI MOO

at 7, 9, 2015 WL 13747185 at *3-5 (Brack, J.).

     **4.**     **First and Second Amended Settlement Agreements.**

     The continuous monitoring resulted in the parties replacing the Original Settlement

Agreement with the First Amended and Restated Court-Approved Settlement Agreement, filed

February 19, 2017 (Doc. 247-1)("First Amended Settlement Agreement").  In implementing the

First Amended Settlement Agreement, the parties note that the First Amended Settlement

Agreement incorporates five Joint Stipulations between the parties, which modify thirty-six

paragraphs of the Original Settlement Agreement.  See Notice of Parties' Submission of First

Amended and Restated Court-Approved Settl[e]ment Agreement at 2, filed February 9, 2017 (Doc. 247)("Notice of First Amended Settlement Agreement").   On July 30, 2019, the parties suspended the First Amended Settlement Agreement and replaced it with the Second Amended and Restated Court-Approved Settlement Agreement, filed July 30, 2019 (Doc. 465)("Second Amended Settlement Agreement").   After the parties adopted the First Amended Settlement Agreement in February, 2017, the United States, Albuquerque, and the Officers Association jointly stipulated to modify the First Amended Settlement Agreement several times, with the Court's approval.   See Notice of Submission of Second Amended and Restated Court-Approved Settl[e]ment Agreement, filed July 30, 2019 (Doc. 465-1)("Notice of Second Amended Settlement Agreement").   The Second Amended Settlement Agreement modified 112 paragraphs of the First Amended Settlement Agreement.   See Second Amended Settlement Agreement at 2.   The Second Amended Settlement Agreement is the current operative Settlement Agreement.

### 5. Officers Association's Use-of-Force Objection and August 13, 2019 Hearing.

The Original Settlement Agreement required APD to revise its use-of-force Standard Operating Procedures ("SOP") in 2017.   See Defendant City of Albuquerque's Response to Intervenor's Objections to Use of Force Policy (§ 2-57-2, Standard Operating Procedure) at 3, filed July 15, 2019 (Doc. 462)("Albuquerque Objections Response").   Dr. Ginger criticized portions of the revised use-of-force SOP, so APD recrafted the policies through 2018 into January, 2019.   See Albuquerque Objections Response at 3.   The United States and Albuquerque did not approve of the new policies, so on January 31, 2019, with Dr. Ginger's consent, the United States and Albuquerque adopted Albuquerque's proposed SOP language.   See Albuquerque Objections Response at 7-8.   That language is the basis for the Officers Association's objections.

- 12 -

On May 28, 2019, the Officers Association filed its Intervenor's Notice of Objection to Use of Force Policy (§ 2-57-2, Standard Operating Procedure), filed May 28, 2019 (Doc. 447)("Use-of-Force Objection").  The Officers Association objects to one provision in the "Use of Force -- Review and Investigation by the Department" SOP § 2-57, which states: "'Supervisors and FIS detectives shall consider the facts that a reasonable officer on the scene would have known at the time the officer used force.'"  Use-of-Force Objection at 5 (quoting Albuquerque Police Department Procedural Orders, filed May 28, 2019 (Doc. 447-1)).  The Officers Association argues that the provision promotes a subjective review, in contrast to the other policies' objective reviews, and that the provision is "vague" and "undefined."  Use-of-Force Objection at 5.  Further, the Officers Association contends that the SOP's application would be problematic, because it would be difficult to train personnel to determine "what an officer would have known," and there is a lack of published lesson plans about this topic.  Use-of-Force Objection at 6 (quoting SOP § 2-57-2).  The Officers Association also argues that this provision's application will result in more information-gathering at the investigative stage, which will "expose[] investigators to discipline," Use-of-Force Objection at 6, and the provision will cause "personal views [to] arbitrarily infect the established standard of review," Use-of-Force Objection at 7.

The Court held a hearing on the Officers Association's Use-of-Force Objection on August 13, 2019.  See Transcript of Proceedings at 1 (taken August 13, 2019), filed September 4, 2019 (Doc. 481)("Aug. 13 Tr.").  At the hearing, the United States, Albuquerque, and the Officers Association argued on the timeliness and merits of the Officers Association's Use-of-Force Objection.  See Aug. 13 Tr. at 11:1-20:25 (Court, D'Amato, Ryals, Van Meter); 24:10-82:17 (Court, D'Amato, Van Meter, Ginger, Haidle, Harness).  The Court summarized the hearing in its

Memorandum Opinion and Order, 2020 WL 3129825, filed June 12, 2020 (Doc. 605)("Use-of-Force MOO").[5]  The Court incorporates the relevant portions of that recitation here.

The Court then turned to Albuquerque and asked whether the Court should consider the Officers Association's Objection.  See Aug. 13 Tr. at 45:4-6 (Court).  Albuquerque responded that the Court should not consider the Officers Association's Objections, because other mechanisms are available to the Officers Association to resolve issues.  See Aug. 13 Tr. at 45:10-12 (Van Meter).  Taking issue with the United States' characterization of Judge Brack's order, Albuquerque explained that Judge Brack ruled on the Officers Association's intervention before he approved Settlement Agreement, and thus, the Officers Association already had an opportunity to ask Judge Brack to modify Settlement Agreement ¶¶ 147 and 148.  See Aug. 13 Tr. at 47:1-12 (Van Meter).  Albuquerque noted that Judge Brack ruled on several Officers Association objections, using as his authority the fact that the Officers Association argued that the Settlement Agreement violates the CBA.  See Aug. 13 Tr. at 47:13-17; id. at 48:1-8 (Court, Van Meter).  The Court acknowledged that it had a similar thought: if a party entered into another agreement that violates the CBA, that issue would be a separate one over which the Court does not have any authority.  See Aug. 13 Tr. at 48:16-20 (Court).  Albuquerque noted that the Officers Association has three opportunities to comment on the policy's language as well as the opportunity to dispute issues with Albuquerque at the bargaining table.  See Aug. 13 Tr. at 49:8-11 (Van Meter).  Albuquerque emphasized that, although it has the final say on all issues besides wages or issues related to the CBA, the Officers Association has "every opportunity to have input in the policy development process."  Aug. 13 Tr. at 49:12-13 (Van Meter).  See id. at 49:11-17 (Van Meter).  Albuquerque further noted that, because Judge Brack approved the Settlement Agreement after he ruled on the Officers Association's intervention, the Settlement Agreement's language "either party" refers only to the City and the United States.  Aug. 13 Tr. at 49:22 (Court).  See id. at 49:20-50:6 (Court, Van Meter).  Albuquerque explained to the Court that the objection process is meant for the United States and Albuquerque only to dispute the Monitor's resolution, and the Court's role in the process is to decide disputes between the United States and Albuquerque about the settlement's implementation.  See Aug. 13 Tr. at 50:12-51:23 (Court, Van Meter).  Albuquerque agreed with the Court that it is concerned that parties will appeal to the Court to "micromanage" the process, which will result in delays.  Aug. 13 Tr. at 52:15 (Court).  See id. at 52:9-19 (Van Meter, Court).

. . . .

---

[5]For a complete summary of the hearing, see Memorandum Opinion and Order at 66-81, 2020 WL 3129825 at *28-34, filed June 12, 2020 (Doc. 605).

- 14 -

The Officers Association reiterated that Judge Brack granted it full intervenor status and that thus the Officers Association should be treated the same as the other parties. See Aug. 13 Tr. at 80:25-81:1 (D'Amato)(citing Reply at 6 (citing Wright & Miller, 7C Fed. Prac. & Proc. Civ)). The Officers Association explained that the McClendon Subclass Members[6] "represented, and the Court will see on its second amended Settlement Agreement, that, in fact Officers Association is a signatory to the Settlement Agreement." Aug. 13 Tr. at 81:8-10 (D'Amato). Thus, the Officers Association argued, Albuquerque is incorrect that the Officers Association has standing only as to issues involving the CBA. See Aug. 13 Tr. at 81:10-13 (D'Amato). The Officers Association noted that it has "been quite amenable to resolution through Dr. Ginger's process." See Aug. 13 Tr. at 81:16-18 (D'Amato). The Officers Association urged the Court to see the importance of the use-of-force policy for the Officers Association, even if the Court concludes that the Officers Association has no standing to object to anything outside of the CBA. See Aug. 13 Tr. at 82:1-8 (D'Amato). The Officers Association concluded by asking the Court to "at least give us standing to argue that which affects our membership." Aug. 13 Tr. at 82:12-15 (D'Amato).

Use-of-Force MOO at 74-75, 80, 2020 WL 3129825, at *31-33.

### 6.      Status Memo. and Use-of-Force MOO.

On December 6, 2019, the Officers' Association filed a Memorandum in Support of Albuquerque Police Officers Association's Party Status at 1, 9, filed December 6, 2019 (Doc. 498)("Status Memo."). The Officers Association filed its Status Memo, because the Officers Association says that, at the hearing on August 13, 2019, the Court questioned whether the Officers Association had standing to file an objection under ¶ 148 of the Original Settlement Agreement, which states that "either party" may ask the Court to resolve a matter. See Status Memo. at 2. The Officers Association contends that, at the August 13, 2019, hearing, the United States "admitted to the Court" that the Officers Association was not yet a party to the case when ¶ 148 was written,

---

[6]The McClendon Subclass is an amicus curiae comprised of individuals who are part of the McClendon, et al. v. City of Albuquerque, et al., No. 95-24 JAP/KBM, lawsuit. See Entry of Appearance at 1, filed January 14, 2015 (Doc. 52). The members are "people who have mental and/or developmental disabilities who are detained by the Albuquerque police department."

and thus ¶ 148 does not contemplate the Officers Association as a party.  See Status Memo. at 2. Further, the Officers Association acknowledged that the United States noted that, "while the APOA has been fully participating as a party in development of the use of force policies, . . . this may not have elevated its standing to object under the Court's Order."  Status Memo. at 2.

In its Use-of-Force MOO, the Court considered the Officer Association's party status and their ability to file objections.  In the Use-of-Force MOO, the Court concluded that "the Officers Association's intervenor status gives it only the ability to object when the Settlement Agreement may impair its rights under the CBA, and intervenor status does not give the Officers Association the right to defend its members against allegations in the Complaint."  Use-of-Force MOO at 148, 2020 WL 3129825, at *64.   The Court considered the Officers Association's two asserted protectable interests: "(i) protecting its officers from the allegations that its members have committed unconstitutional acts, because Albuquerque has allowed its officers to engage in a pattern or practice of excessive force resulting in a deprivation of civil rights; and (ii) preserving its CBA from conflicting provisions in the Settlement Agreement."  Use-of-Force MOO at 152, 2020 WL 3129825, at *66.  The Court concluded that the Officer Association's second interest -- preserving its CBA -- is the only legally protectable, direct, and substantial interest that the Officers Association has in the litigation.  See Use-of-Force MOO at 154, 2020 WL 3129825, at *66. Further, the Court concluded, "The Officers Association, therefore, may make Objections regarding the First Proposed Settlement Agreement before the Court finalizes it, and the Officers Association may make Objections regarding the finalized Settlement Agreement after the Court enters it, as long as all of these Objections arise out of conflict with the CBA."  Use-of-Force MOO at 181, 2020 WL 3129825, at *77.  In the Use-of-Force MOO, the Court also noted that it is "less suited to resolve collective bargaining disputes than the mechanisms established specifically for

these disputes," such as a state court lawsuit for a breach-of-contract.  Use-of-Force MOO at 186, 2020 WL 3129825, at *79.  Notably, the Court also acknowledged that, "although the Court concludes that limited intervention is appropriate under controlling Tenth Circuit caselaw, if it were not so bound, and if the Court were writing on a clean slate, it would hold that alternate mechanisms specifically tailored towards these disputes are better fora to handle them and deny the Officers Association's MTI, as other courts have done in similar circumstances."  Use-of-Force MOO at 186, 2020 WL 3129825, at *79.

The Court then declines to interfere with SOP § 2-57-2, to which the United States and Albuquerque agree, because of the Officers Association's Objections.  First, the Court concludes that the Second Amended Settlement Agreement authorizes the Court to rule on objections, but only if there is a Constitutional, federal law, or Settlement Agreement violation.  See Use-of-Force MOO at 188, 2020 WL 3129825, at *79 (citing United States v. Hardage, 982 F.2d at 1496 (citing Tiernan v. Devoe, 923 F.2d 1024, 1031 (3rd Cir. 1991); Millner v. Norfolk & W.R. Co., 643 F.2d 1005, 1009 (4th Cir.1981)(recognizing the court's "inherent equitable power summarily to enforce a settlement agreement when the practical effect is merely to enter a judgment by consent")).  The Court then concludes that it should not rule on the Officers Association's Objection that the use-of-force SOP is "vague," because there is no Second Amended Settlement Agreement provision or law that requires a use-of-force standard not to be vague.  Use-of-Force MOO at 189, 2020 WL 3129825, at *79-80.  The Court also determines that, if the Court were to decide the vagueness issue, it would overrule the Officers Association's Objection, because the use-of-force SOP is consistent with the Constitution, federal law, and the Second Amended Settlement Agreement. See Use-of-Force MOO at 190-207, 2020 WL 3129825, at *81-86.

7.    **IMR-12.**

On November 2, 2020, Dr. Ginger filed the  Twelfth Independent Monitor Report.  See Monitor's Twelfth Report, filed November 2, 2020 (Doc. 652)("IMR-12").   IMR-12 is Dr. Ginger's Report for the period covering February, 2020, through July, 2020.  See IMR-12 at 1. First, IMR-12 notes that APD had effective compliance processes, APD's Special Operations practices exhibited "strong filed-based activities, as well as industry-standard processes of after-action documentation, review and assessment," and Behavior Health practices and crisis intervention practices met the industry standard.  IMR-12 at 2.  Additionally, APD's recruiting practices were working to increase the number and quality of recruits to APD.  See IMR-12 at 2.

IMR-12 also notes, however, that "APD's compliance efforts have exhibited serious shortfalls."  IMR-12 at 2.  Specifically, the shortfalls include "management and oversight of the APD Training Academy, significant and deleterious failures relating to oversight and discipline; and executive-level failures regarding oversight, command and control, discipline, supervision, and training."  IMR-12 at 2.  IMR-12 attributes the shortfalls to leadership failures within APD. See IMR-12 at 2.  Moreover, IMR-12 notes that, in previous Independent Monitor Reports, Dr. Ginger identified an exhaustive recommendations list that APD could adopt to address the issues which the Reports identify, but IMR-12 states that the "vast majority of these recommendations appear to have been filed away, rather than actualized."  IMR-12 at 2.  IMR-12 continues, stating: "At this stage of the process most of those discussions at the executive level have fallen on deaf ears. After six years of suggestions, recommendations, and problem-solving meetings, as of the end of the IMR-12 reporting period, much remains to be done." IMR-12 at 2.  Dr. Ginger also states: "APD is on a path that reflects deliberate indifference to the requirements of the CASA." IMR-12 at 3.

IMR-12 next recommends specific steps to ensure that APD complies with the Settlement Agreement:

- APD's new leadership, which assumed leadership responsibilities after the close of this reporting period, must step up and insist on compliance.

- Management needs to design simple, effective, trackable systems for process improvement.

- Supervision needs to leave behind its dark traits of myopia, passive resistance, and outright support for, and implementation of, counter-CASA processes.

- Most importantly, line officers need to engage in actions as designed by policy, law, and best practice, not past customs.

IMR-12 at 3.   IMR-12 assesses APD as having sixty-four percent Operational Compliance[7] with the Settlement Agreement, which means that "64 percent of the time, field personnel either perform tasks as required by the CASA, or that, when they fail, supervisory personnel note and correct in-field behavior that is not compliant with the requirements of the CASA."   IMR-12 at 3-4.   The Monitoring Team reviewed cases that APD's Force Review Board ("FRB") reviewed and witnessed:

Instances where obvious uses of force went unreported and investigated; evidence of supervisory failures; and one instance of misconduct in which unjustified force was used on a handcuffed person who was likely suffering from a form of mental disability (IMR-12-01).   Particularly troubling is that this case was investigated by [Internal Affairs Force Division ("IAFD")] and, as it progressed, the entire use of force system.   Those investigations failed, including the FRB

---

[7]IMR-12 describes Operational Compliance as:

Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff. In other words, the APD "owns" and enforces its policies.

IMR-12 at 7 (no citation for quotation).

> assessment.  What this means is simple: that after two years of conceptualizing,
> recasting, and implementing new use of force policies; delivering meaningful
> training of those policies; training IAFD personnel to properly investigate uses of
> force; putting a video review unit in place; exhaustive technical assistance from the
> monitoring team; and reconstituting the FRB under new policies and training; the
> system is still ineffective in providing oversight of uses of force.  We provide more
> regarding our assessment of the FRB in Paragraph 78.

IMR-12 at 10-11 (footnote omitted).  This finding led to IMR-12 concluding that "APD continued

to struggle to establish a system of force oversight and the accountability for officer conduct."

IMR-12 at 12.  Moreover, IMR-12 determines that APD has systemic failures that allow for

excessive uses of force to occur and to go unaddressed by officials.  See IMR-12 at 12.  Indeed,

IMR-12 determines that APD's inability to establish a system of force oversight and officer

accountability has had "a significant impact and influence on the organization's efforts to achieve

Operational Compliance across several CASA paragraphs."  IMR-12 at 14.  IMR-12 notes

instances where APD supervisors fail to "notice" serious violations of APD policy, and by the time

the violations are addressed, the CBA time-bars investigations.  See IMR-12 at 14.  IMR-12

contends that Operational Compliance will be reached only if APD supervisors begin "identifying

and stopping supervisory and mid-level command usurpation of executive authority by

overlooking, incorrectly characterizing, or delaying blatant policy violations."  IMR-12 at 15.

Additionally, IMR-12 notes that, "[w]hile IAFD still has to improve its efficiency rate for

completing Level 2 and 3 cases, . . . IAFD must focus specifically on the effectiveness of its

investigations and oversight processes to achieve operational compliance."  IMR-12 at 100.

In IMR-12's Summary, the Dr. Ginger again emphasizes the issues with investigations and

oversight.  See IMR-12 at 353-54.  IMR-12 concludes by noting that, "when internal fact-finding

processes such as Internal Affairs can routinely permit officers and union representatives to hijack

internal fact-finding, and no one notices except the monitoring team, there are serious, meaningful, and near terminal problems with leadership at internal investigative commands."

> When critical oversight elements such as the Force Review Board can miss critical violations regarding use of force and visible evidence of open, overt, and reprehensible mistreatment of arrestees by APD field personnel, there are serious, meaningful and near terminal problems with executive review processes specifically designed to note these types of problems and posit solutions to ensure they do not re-occur, there are serious, meaningful, and near-terminal problems with departmental command and leadership at the highest levels.

IMR-12 at 354.

### 8. Joint Motion for Entry of Stipulated Order Establishing an External Force Investigation Team.

On February 5, 2021, the United States and Albuquerque, with concurrence of the Independent Monitor James D. Ginger, filed their Joint Motion for Entry of Stipulated Order Establishing an External Force Investigation Team, filed February 5, 2021 (Doc. 692)("Joint Motion").  The parties moved to have the Court enter a Stipulated Order establishing an "External Force Investigation Team (EFIT) to assist the Albuquerque Police Department (APD) in conducting investigations of Level 2 and Level 3[8] uses of force by APD officers, while also assisting APD with improving the quality of its force investigations."  Joint Motion at 1.  The Stipulated Order also "requires the City to improve its internal affairs process, increase the number of internal affairs force investigators, and provide additional training to those investigators."  Joint Motion at 1.  The parties filed the Joint Motion, because, "[i]n his most recent report, the Independent Monitor raised serious concerns about the quality of APD's force investigations and the lack of accountability for officers who violated APD policies during the course of incidents in

---

[8]In its Joint Motion, the parties explain that "Level 1 is force that does not result in injury or complaint of injury; Level 2 is force that does result in injury or complaint of injury; and Level 3 is force that results in serious injury, hospitalization, or death."  Joint Motion at 3.

which they used force." Joint Motion at 2. In establishing the External Team, the parties' goal is to bring APD in compliance with the Settlement Agreement. See Joint Motion at 3.

9. **Officers Association's Objection and Motion Opposing Motion and Final Order.**

In its Objections, the Officers Association raises several concerns that it has with the External Team, and with the internal affairs investigations that the United States and Albuquerque detail in the Stipulated Order. See Objections at 1. First, the Officers Association identifies its concern that the United States' and Albuquerque's goal of having twenty-five detectives in the IAFD is unrealistic and financially burdensome. See Objections ¶ 1, at 1-2. Second, the Officers Association contends that the External Team Administrator should coordinate with an administrator or contractor who Albuquerque hires to implement consistent concepts and principles in Police Academy training. See Objections ¶ 2, at 2. Third, the Officers Association requests that Internal Affairs develop an investigative process "in unison with the hiring of the EFIT Administrator and the Contractor at the Academy." Objections ¶ 3, at 2-3. Fourth, the Officers Association objects to the Stipulated Order's request that the External Team Administrator and detectives working under him recommend possible discipline against APD officers for improperly investigating use of force incidents. See Objections ¶ 4, at 3. Instead, the Officers Association contends that Internal Affairs and command staff of the individual officers should be responsible for discipline. See Objections ¶ 4, at 3. Additionally, the Officers Association objects to the Stipulated Order's request that the Internal Affairs Commanding Officer review investigative reports and respond in writing whether the Commanding Officer concurs with the recommendations and findings concerning the use of force and proposed discipline, because it "inhibits the Department from properly evaluating and disciplining its Officers as has been shown

from the past."  Objections ¶ 4, at 3.  Fifth, the Officers Association raises a concern that the

Stipulated Order's proposed changes will be cost prohibitive.  See Objections ¶ 5, at 3-4.  Sixth,

and, finally, the Officers Association

> does not believe it is appropriate that any disagreement between the parties
> concerning an employee's ability to conduct these investigations or having the
> proper qualifications should be brought before this Court for resolution. . . .  Such
> issues should be dealt with Administratively within the processes already provided
> for by the City of Albuquerque.

Objections ¶ 6, at 4.  In its Opposition Motion, the Officers Association states: "Pursuant to the

Court Order of February 20, 2021 the Officers Association . . . opposes the Entry of the Motion

and Final Order."  Opposition Motion at 1.  The Officers Association "requests the Court to adopt

its filing, Issues and Concerns, as its Response in opposition to the Motion and Final Order."

Opposition Motion at 1.

### 10.   The February 26, 2021 Hearing.

The Court held a hearing on the Joint Motion on February 26, 2021.  See February 26,

Clerk's Minutes at 1.  At the hearing, the United States began by noting that the Settlement

Agreement's primary requirement is "the timely and thorough investigation of force incidents and

APD holding officers accountable for unlawful force."  Draft Transcript of Hearing at 11:8-10

(taken February 26, 2021)(Killebrew)("Tr.").[9]  In defending the cost of the proposed External

Team program, the United States noted that, because Albuquerque is not making progress in

complying with the Settlement Agreement, it risks being put under receivership, which is costly,

and the cost of settlements and judgments in cases where officers are sued for using excessive

force outweighs the cost of implementing an External Team program to prevent the excessive use

---

[9]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

of force.  See Tr. at 15:16-16:19 (Killebrew).  When the Court asked the United States about the

External Team program's cost, the United States further explained that, for many years, APD did

not spend money on an internal affairs structure or accountability of its officers, so now

Albuquerque must face a large up-front investment to fix the issues APD has been neglecting for

many years.  See Tr. at 17:24-21:16 (Court, Killebrew).

Next, Albuquerque argued in favor of the Joint Motion.  See Tr. at 24:8-9 (Van Meter).

Albuquerque noted that the Stipulated Order requires APD to increase the number of force

investigators to twenty-five, to develop a process for investigating internal affairs and use-of-force

cases, and to develop a training for current and future APD use of force investigators.  See Tr. at

24:24-25:15 (Van Meter).  Albuquerque further explained that the Stipulated Order would require

an External Team investigator to go to the scene of an unreasonable use of force to investigate in

collaboration with APD.  See Tr. at 26:17-27:2 (Van Meter).  The Court then asked Albuquerque

how the parties would continue to work with the Officers Association.  See Tr. at 29:9-17 (Court).

Albuquerque responded, stating that it hopes "to work with APOA with regard to filling the

number of investigators that are required by . . . the [Settlement Agreement] to complete the

investigations within a timely manner." Tr. at 29:20-23 (Van Meter).  Further, Albuquerque stated

that the interaction of APD and the External Team investigators is necessary to make sure that

APD is meeting the Settlement Agreement's requirements.  See Tr. at 30:12-22 (Van Meter).

Albuquerque concluded by noting that, although the parties have met with and discussed the

Stipulated Order with the Officers Association,

> the issues that they raise don't have anything to do with the requirements of the
> collective bargaining agreement, and as per the Court's order with regard to the
> objection to the APD use-of-force policy, frankly, these arguments really don't
> impact the CASA and don't impact their rights and actually should not be
> considered by the Court.

Tr. at 30:23-31:8 (Van Meter).

Next, Dr. Ginger, the Independent Monitor, provided the Court with an update on the independent monitoring report.  Dr. Ginger noted that "APD has proven either incapable of or unwilling to identify, classify, assess, and oversee investigations of serious use of force."  Tr. at 32:2-5 (Ginger).   Dr. Ginger emphasized that APD is least compliant with the Settlement Agreement in the area of the supervisory review and classification of use-of-force cases.  See Tr. at 33:3-6 (Ginger).  When the Court asked Dr. Ginger if the External Team's costs are justified, Dr. Ginger explained that, while the upfront External Team cost is large, APD currently spends a significant amount in litigation suits, because APD cannot show that it has meaningful functions to control excessive use of force.  See Tr. at 36:10-37:22 (Court, Ginger).

The Court then heard from the Officers Association on their Objections.  See Tr. at 40:12 (Court).  The Officers Association first noted that it played no role in the negotiations between the United States and Albuquerque for the Stipulated Order, but the Officers Association met with the parties to discuss its concerns.  See Tr. at 40:22-41:2 (Mowrer).  The Officers Association further stated that it was "not sure of what impact" the Stipulated Order would have on "the members of the association as protected by the collective bargaining agreement."  Tr. at 41:7-11 (Mowrer). The Officers Association reiterated that its main concern with the Stipulated Order is the program's cost and extent.  See Tr. at 41:15-17 (Mowrer).  The Officers Association also acknowledged that its Objections may be premature, but stated that it wants to raise issues that it anticipated the Stipulated Order may create.  See Tr. at 43:3-10 (Mowrer).  When the Court asked the Officers Association if the Settlement Agreement and proposed External Team's cost was contributing to increasing crime rates in Albuquerque, see Tr. at 43:11-24 (Court), the Officers Association stated

that it could not be sure that the costs were increasing crime, but that it could be a contributing factor, because APD is having to redistribute resources from its personnel in other crime fighting units, see Tr. at 44:8-23 (Mowrer). The Court also asked the Officers Association directly: "And you don't see anything in this at the present time that interferes with the CBA?" Tr. at 46:21-23 (Court). The Officers Association responded that it was unsure whether the External Team proposal would have an impact on the CBA. See Tr. at 47:2-17 (Mowrer).

The United States responded to the Officers Association, first by noting that the Officers Association is an important stakeholder in the litigation, and it values the participation of the Officers Association throughout the process. See Tr. at 48:3-25 (Killebrew). The United States also noted, however, that the Court has been very clear that Officers Association's legal rights as an intervenor extend only to situations where there is a conflict between the Settlement Agreement and the CBA. See Tr. at 49:7-16 (Killebrew). Accordingly, the United States notes that, in its Objections, the Officers Association does not raise any concerns with the CBA, and therefore, the Court does not have authority to grant relief on the motions. See Tr. at 49:17-24 (Killebrew). Albuquerque then responded to the Officers Association, noting that the United States and Albuquerque have been taking some of the steps that the Officers Association suggests, such as staffing the Internal Affairs Division with civilians to free up officers to work on criminal investigations. See Tr. at 57:19-58:5 (Van Meter). At the conclusion of the hearing, the Court signed and entered the Stipulated Order, but noted that it would issue an opinion at a later point. See Tr. at 62:1-5 (Court). The Court also indicated that the Stipulated Order does not interfere with the CBA. See Tr. at 62:7-11 (Court). Moreover, the Court noted:

> This is a lawsuit between the Department of Justice, the United States, and the City. And if they feel like there are issues that could lead to contempt proceedings against the City, which Dr. Ginger has identified in his reports and his oral statements here,

then we have a dispute that needs to be settled.  They have presented the Court with a settlement that does not appear to affect the CBA.  It also appears to address the concerns that the United States is concerned about.  The City is willing to undertake those to resolve it and avoid contempt proceedings.  So I will sign the order and have it entered and I will issue an opinion at a future date.

Tr. at 62:15-63:4 (Court).

## LAW REGARDING INTERVENTION AS A MATTER OF RIGHT

Rule 24(a) of the Federal Rules of Civil Procedure provides that, on a timely motion, a court "must permit anyone to intervene who":

> (1) is given an unconditional right to intervene by a federal statute; or

> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  The movant bears the burden of establishing its right to intervene.  See United States v. Texas E. Transmission Corp., 923 F.2d 410, 414 (5th Cir. 1991).  Rule 24(a)(2) entitles a movant to intervene as a matter of right if: (i) the motion is timely; (ii) the movant claims an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) the movant's interest is not adequately represented by existing parties.  See WildEarth Guardians v. National Park Serv., 604 F.3d 1192, 1198 (10th Cir. 2010).

A motion's timeliness is determined "in light of all the circumstances."  Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d 1223, 1232 (10th Cir. 2010).  The United States Court of Appeals for the Tenth Circuit explains that three non-exhaustive factors are "particularly important" to determine timeliness:  (1) the length of time since the movant knew of their interests in the case; (2) prejudice to the existing parties; and (3) prejudice to the movants.  Okla. ex rel.

- 27 -

Edmonson v. Tyson Foods, Inc., 619 F.3d at 1232.  See Western Energy All. v. Zinke, 877 F.3d 1157, 1164 (10th Cir. 2017).  Determining whether a movant has an interest in the subject of the litigation is "a highly fact-specific determination." Western Energy All. v. Zinke, 877 F.3d at 1164 (quoting Coal. of Ariz./N.M. Cntys. For Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 841).  Though federal courts have had difficulty defining what constitutes a sufficient interest to satisfy rule 24(a), the Supreme Court of the United States has said that, at a minimum, it must be "significantly protectable." Donaldson v. United States, 400 U.S. 517, 531 (1971).  The "interest" element is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."  Utah Ass'n of Cntys. v. Clinton, 255 F.3d 1246, 1251-52 (10th Cir. 2001)(quoting In re Kaiser Steel Corp, 998 F.2d 783, 841 (10th Cir. 1993)).  Though the Tenth Circuit "tend[s] to follow a somewhat liberal line in allowing intervention," Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d 1111, 1115 (10th Cir. 2002), it does requires that the interest be "direct, substantial, and legally protectable." Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1251 (quoting In re Kaiser Steel Corp, 998 F.2d 783, 791 (10th Cir. 1993)).[10]  The Tenth Circuit has noted, however, that the "direct, substantial, and legally protectable" standard is "problematic" because it is vague and "malleable." San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1192-93 (10th Cir. 2007)(en banc)(abrogated on other grounds by Hollingsworth v. Perry, 570 U.S. 693 (2013)).  A movant has a protectable interest if the interest "would be 'impeded by the disposition of the action.'"  Western Energy All. v. Zinke,

---

[10]The United States Courts of Appeals for the Ninth Circuit takes a somewhat different approach. See Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 837 (9th Cir. 1996) ("'[n]o specific legal or equitable interest need be established.'")(quoting Greene v. United States, 996 F.2d 973, 976 (9th Cir. 1993)).

877 F.3d at 1165 (quoting San Juan Cnty., Utah v. United States, 503 F.3d at 1203). A relationship to the original plaintiff is not required "if the claims or interest of the two parties are related or share a common question of law or fact." United States ex rel. Precision Co. v. Koch Industries, Inc., 31 F.3d 1015, 1017 (10th Cir. 1994).

Whether an economic injury dependent on the outcome of the litigation is a sufficient interest to satisfy rule 24(a) has divided the courts. The United States Court of Appeals for the Third Circuit, for example, holds that "a mere economic interest in the outcome of litigation is insufficient to support a motion to intervene." Liberty Mut. Ins. Co. v. Treesdale, Inc., 419 F.3d 216, 220 (3d Cir. 2005). See Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, 72 F.3d 361, 366 (3d Cir. 1995). Similarly, the Eighth Circuit also finds that "an economic interest in the outcome of the litigation is not itself sufficient to warrant mandatory intervention." Medical Liability Mut. Ins. Co. v. Alan Curtis, LLC, 485 F.3d 1006, 1008 (8th Cir. 2007).[11] In the Tenth Circuit, however, the mere "threat of economic injury" is sufficient to satisfy this rule 24(a) element. Utahns for Better Transp. v. U.S. Dept. of Transp., 295 F.3d at 1115. See Payne v. Tri-State Careflight, LLC, No. CIV 14-1044-JB/KBM, 2016 WL 9738302, at * 24 (D.N.M. July 12, 2016)(Browning, J.). The interest cannot be "wholly remote and speculative," but it can be

---

[11]The United States Court of Appeals for the Eighth Circuit, however, has conflicting precedents. See United States v. Union Elec. Co., 64 F.3d 1152 (8th Cir. 1995). In United States v. Union Elec. Co., the Eighth Circuit wrote that intervention "may be based on an interest that is contingent upon the outcome of the litigation." 64 F.3d at 1162. While it may appear that the conclusion of Medical Liability, 485 F.3d, 1006, that an economic interest in the litigation's outcome is not "sufficient" is a reference to the other rule 24(a)'s requirements, the prior sentence begins, "[a]n interest is cognizable under Rule 24(a) . . .," Medical Liability Mut. Ins. Co. v. Alan Curtis, LLC, 485 F.3d, 1006, 1008 (8th Cir. 2007), suggests that "sufficient" refers to fulfilling the "sufficient interest" requirement and not to entirety of rule 24(a)(2) in its entirety. 485 F.3d at 1008.

"contingent upon the outcome of the litigation." San Juan Cnty., Utah, v. United States, 503 F.3d at 1203.

To demonstrate that their interest may be impaired or impeded, movants must show "it is 'possible' that the interests they identify will be impaired." Western Energy All. v. Zinke, 877 F.3d at 1167 (quoting WildEarth Guardians v. National Park Serv., 604 F.3d at 1199). This element "presents a minimal burden." WildEarth Guardians v. National Park Serv., 604 F.3d at 1200, and is "intertwined" with the sufficient-interest requirement, Federal Deposit Ins. Corp. v. Jennings, 816 F.2d 1488, 1492 (10th Cir. 1987). A movant is entitled to intervene if the movant's interest "'would be substantially affected in a practical sense by the determination made in an action.'" WildEarth Guardians v. U.S. Forest Service, 573 F.3d at 995 (quoting San Juan Cnty., Utah, v. United States, 503 F.3d at 1195. A movant's interest may be sufficiently impaired to satisfy rule 24(a) "when the resolution of the legal questions in the case effectively foreclose the rights of the proposed intervenor in later proceedings, whether through res judicata, collateral estoppel, or stare decisis." Ute Distrib. Corp. v. Norton, 43 F. App'x 272, 279 (10th Cir. 2002)(unpublished).[12] See Payne v. Tri-State Careflight, LLC, 2016 WL 9738302, at * 25.

---

[12]Ute Distrib. Corp. v. Norton, 43 F. App'x 272, 279 (10th Cir. 2002)(unpublished), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

A qualifying interest in the litigation on its own, however, is insufficient to establish intervention as a matter of right.  See Statewide Masonry v. Anderson, 511 F. App'x 801, 806 (10th Cir. 2013).  The nonparty attempting to intervene also "bears the burden of demonstrating that no existing party adequately represents its interest."  Statewide Masonry v. Anderson, 511 F. App'x at 806.  See also Coal. of Ariz./N.M. Cntys. For Stable Econ. Growth v. Dep't of Interior, 100 F.3d at 844.  This requirement is satisfied if the applicant "shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal."  Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n. 1 (1972)(no citation for quotation)(citing 3B J. Moore, Federal Practice 24.09 - 1(4) (1969)).  Representation is usually adequate for Rule 24(a) purposes when the movant's objective is "identical to that of one of the parties."  Bottoms v. Dresser Indus., Inc., 797 F.2d 869, 872 (10th Cir. 1986).  The divergence of interest between the movant and a party "'need not be great'" to meet rule 24(a)'s threshold.  Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1117 (quoting Natural Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n, 578 U.S. 1341, 1346 (10th Cir. 2002).

The movant's burden to show inadequate representation is further reduced when the government is supposed to adequately represent the movant's interest.  Movants can show inadequate representation when the movant "has expertise the government may not."  Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1246, at 1255.  This showing is particularly common, because

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Ute Distrib. Corp. v. Norton, 43 F. App'x 272, 279 (10th Cir. 2002)(unpublished), Poche v. Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished), and Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010)(unpublished) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

typically the government cannot both adequately represent the interests of the public it represents and those of a private intervenor.  See Western Energy All. v. Zinke, 877 F.3d at 1167 ("we have held that the government cannot adequately represent the interests of a private intervenor *and* the interests of the public" (emphasis in original)).  As the Tenth Circuit has explained, the government's "representation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same posture in the litigation." Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1255-56. Representation may be inadequate if the government and private party "would only be aligned if the district court ruled in a particular way." Western Energy All. v. Zinke, 877 F.3d at 1168. Thus, the burden of demonstrating inadequate representation is met when the prospective intervenor "shows that the 'public interest the government is obligated to represent may differ from the would-be intervenor's particular interest.'" Payne v. Tri-State Careflight, LLC 2016 WL 9738302, at *16 (quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1255).  See United States v. City of Albuquerque, No. CIV 14-1025 JB\SMV, 2020 WL 3129825, at *44 (D.N.M. June 12, 2020)(Browning, J.).

**LAW REGARDING ARTICLE III STANDING**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies." San Juan Cnty. v. United States, 503 F.3d at 1171.  See U.S. Const. art. III, § 2. "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(Ebel, J.)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007))(internal quotation marks omitted). "[A] suit does not present a Case or

Controversy unless the plaintiff satisfies the requirements of Article III standing." San Juan Cnty. v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(Hartz, J.)(internal quotation marks omitted).  Finally, "[s]tanding is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(Seymour, J.)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).

## LAW REGARDING STANDING AND INTERVENTION

Because "standing implicates a court's jurisdiction, [and] requires a court itself to raise and address standing before reaching the merits of the case before it," the requirements of standing under Article III must be resolved by the court.  San Juan Cnty. v. United States, 503 F.3d at 1172 (quoting San Juan Cnty. v. United States, 420 F.3d 1197, 1205 n.3 (10th Cir. 2005)).  The Tenth Circuit held that "parties seeking to intervene under rule 24(a) or (b) need not establish Article III standing 'so long as another party with constitutional standing on the same side as the intervenor remains in the case.'" San Juan Cty. v. United States, 503 F.3d at 1172 (quoting San Juan Cty. v. United States, 420 F.3d at 1206).

Since the Tenth Circuit decided San Juan County v. United States, "the Supreme Court modified our 'piggyback standing' rule, holding that an intervenor as of right must 'meet the requirements of Article III if the intervenor wishes to pursue relief not requested' by an existing party."  Kane Cnty. v. United States, 928 F.3d 877, 886-87 (10th Cir. 2019)(quoting Town of

Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1648 (2017)).  In <u>Town of Chester, New York v. Laroe Estates, Inc.</u>, "the record was ambiguous whether the intervening plaintiff was seeking a different form of relief from the existing plaintiff: a separate award of money damages against the same defendant in its own name.  137 S. Ct. at 1651-52.  Because "[a]t least one [litigant] must have standing to seek each form of relief requested," the Supreme Court of the United States remanded the case for the United States Court of Appeals for the Second Circuit to determine whether the intervenor, in fact, sought "additional relief beyond" what the plaintiff requested.  <u>Kane Cnty. v. United States</u>, 928 F.3d at 886-87 (quoting Town of Chester, New York v. Laroe Estates, Inc., 137 S. Ct. at 1651-52).  With regard to a settlement agreement, the Court has held that "if the original parties to the case settle all the claims between them and the intervenor wishes to challenge the settlement, however, the intervenor is then required to establish independent standing under Article III of the United States Constitution."  <u>WildEarth Guardians v. United States Forest Serv.</u>, 778 F. Supp. 2d 1143, 1151 (D.N.M. 2011)(Browning, J.)(citing <u>City of Colo. Springs v. Climax Molybdenum Co.</u>, 587 F.3d 1071, 1081 (10th Cir. 2009)("Intervenors must show independent standing to continue a suit if the original parties on whose behalf intervention was sought settle or otherwise do not remain adverse parties in the litigation.")(quoting <u>Dillard v. Chilton County Comm'n</u>, 495 F.3d 1324, 1330, 1336 (11th Cir. 2007)(internal quotation marks omitted)).

## **LAW REGARDING INTERVENORS IN CONSENT DECREES**

A "consent decree," which is "'also termed a consent order,'" is "'[a] court decree that all parties agree to.'"  <u>Macias v. N.M. Dep't of Labor</u>, 300 F.R.D. 529, 563 n.29 (D.N.M. 2014)(Browning, J.)(quoting Black's Law Dictionary at 471 (9th ed. 2009)).  Consent decrees are a way for parties to settle the issues "without having to bear the financial and other costs of

litigating. It has never been supposed that one party -- whether an original party, a party that was joined later, or an intervenor -- could preclude other parties from settling their own disputes and thereby withdrawing from litigation."   Local No. 93 v. Cleveland, 478 U.S. at 528-29.   An intervenor, therefore, is entitled to "present evidence and have its objections heard at the hearings on whether to approve a consent decree," but "it does not have power to block the decree merely by withholding its consent."  Local No. 93 v. Cleveland, 478 U.S. at 529.  "Allowing [a party] to intervene does not mean that it can veto the settlement . . .  The district court can still approve the consent decree if it finds that the settlement is reasonable, fair and consistent with [federal law]."  WildEarth Guardians v. United States Forest Serv., 778 F. Supp. 2d at 1149 (quoting United States v. Albert Inv. Co., 585 F.3d 1386, 1398 (10th Cir. 2009)(internal citations omitted)).  Nonetheless,

> parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement.  A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor.

Local No. 93 v. Cleveland, 478 U.S. at 529.

## **LAW REGARDING INTERVENORS IN SETTLEMENT AGREEMENTS**

A "consent decree," which is " also termed a consent order,'" is "'[a] court decree that all parties agree to.'"  Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 563 n. 29 (D.N.M. 2014)(Browning, J.)(quoting Black's Law Dictionary 471 (9th ed. 2009)).   Consent decrees are a way for parties to settle the issues "without having to bear the financial and other costs of litigating. It has never been supposed that one party – whether an original party, a party that was joined later, or an intervenor – could preclude other parties from settling their own disputes and thereby withdrawing from litigation."  Local No. 93, 478 U.S. at 528-529.  An intervenor, therefore, is

entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree," but "it does not have power to block the decree merely by withholding its consent." Local No. 93 v. Cleveland, 478 U.S. at 529.  "Allowing [a party] to intervene does not mean that it can veto the settlement . . . The district court can still approve the consent decree if it finds that the settlement is reasonable, fair and consistent with [federal law]." WildEarth Guardians v. United States Forest Serv., 778 F. Supp. 2d at 1149 (quoting United States v. Albert Inv. Co., 585 F.3d at 1398 (internal citations omitted)).  Nonetheless, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor." Local No. 93 v. Cleveland, 478 U.S. at 529.

## LAW REGARDING A POLICE UNION INTERVENING IN A CONSENT DECREE

There are cases in many other districts in which the United States and a City resolve a police-related lawsuit by entering into a settlement agreement.  The police union sometimes responds by filing a motion to intervene.  The Court has surveyed caselaw to determine how other courts have ruled on police unions' motions to intervene.

In State v. City of Chicago, 912 F.3d 979 (2019), the United States Court of Appeals for the Seventh Circuit affirmed the district court's decision concluding that the police union's motion to intervene was untimely.  See State v. City of Chicago., 912 F.3d at 989.  Two days after the State of Illinois filed a lawsuit against the City of Chicago that alleged that the Chicago Police Department had use-of-force policies and practices that violated constitutional and Illinois law,

Illinois and Chicago filed a motion to stay the proceedings while they negotiated a settlement agreement. See State v. City of Chicago, 912 F.3d at 982. The Fraternal Order of Police, Lodge No. 7 "[a]lmost immediately" "publicly indicated its opposition to any consent decree," because of the possibility of the settlement agreement impairing its rights under its CBA, but did not file its motion to intervene until more than nine months had passed. State v. City of Chicago, 912 F.3d at 982. Although the district court concluded that Lodge No. 7 satisfied three of the four factors for interventions as of right, the district court denied Lodge No. 7's motion, because it did not meet the fourth factor -- timeliness. See State v. City of Chicago, 912 F.3d at 982, 984.

Because the district court denied Lodge No. 7's motion solely based on timeliness, the Seventh Circuit assessed only timeliness in its opinion. See State v. City of Chicago, 912 F.3d at 982, 984. The Seventh Circuit first assessed Lodge No. 7's knowledge of interest in the suit, noting that the Seventh Circuit measured knowledge of interest from the time when the proposed intervenor "has reason to know its interests *might* be adversely affected, not from when it knows for certain that they will be." State v. City of Chicago, 912 F.3d at 985 (citing e.g. Heartwood, Inc. v. U.S. Forest Serv., Inc., 316 F.3d 694, 701 (7th Cir. 2003)(italics in State v. City of Chicago). Thus, the Seventh Circuit concluded, Lodge No. 97's timeliness was measured from its public opposition to the consent decree immediately after the suit was filed, and not when Lodge No. 97 was shut out of negotiations later. See State v. City of Chicago, 912 F.3d at 984-85 (emphasizing that the inherent relationship between Lodge No. 97 and Chicago makes the knowledge that the two entities do not share interests "hardly remarkable"). The Seventh Circuit then assessed whether the motion's delay would prejudice Illinois and Chicago, noting that the "settlement negotiations were complex and well-publicized." State v. City of Chicago, 912 F.3d at 986. The Seventh Circuit concluded that the delay would prejudice Illinois and Chicago, because "'[o]nce

parties have invested time and effort into settling a case it would be prejudicial to allow intervention.'" State v. City of Chicago, 912 F.3d at 986-87 (citing Ragsdale v. Turnock, 941 F.2d 501, 504 (7th Cir. 1991)).

The Seventh Circuit next looked at whether denying intervention would prejudice Lodge No. 97, noting that "the inability to appeal the entry of a consent decree does not always mandate intervention." State v. City of Chicago, 912 F.3d at 987. Instead, the Seventh Circuit concluded that Lodge No. 97 would be, at most, only "minimal[ly]" prejudiced, because it "has enjoyed repeated (and continuing) opportunities" to express its concerns to the district court during fairness hearings. State v. City of Chicago, 912 F.3d at 987. It also concludes that Lodge No. 97's rights in its CBA are protected, because the settlement agreement contains "carve-out language" that "makes clear that the parties do not intend for the consent decree to be interpreted as impairing CBA rights." State v. City of Chicago, 912 F.3d at 987. Further, the Seventh Circuit noted that "the Lodge's assertion of prejudice is largely speculative. As things stand now, the consent decree cannot impair the CBA or state law rights enjoyed by Chicago police officers." State v. City of Chicago, 912 F.3d at 988. The Seventh Circuit concluded that the Lodge No. 97's "allegations of prejudice are presently speculative, and the other factors counsel against intervention," but the Seventh Circuit noted that the district court can reexamine intervention if Lodge No. 97's speculations are realized. See State v. City of Chicago, 912 F.3d at 988. Finally, the Seventh Circuit concluded that, although the district court did not consider unusual circumstances, Lodge No. 97 "never squarely presented that legal theory to the district court" and "the district court considered the facts underlying the argument but found them unpersuasive," and thus the district court did "not err in focusing on the disputed factors." See State v. City of Chicago, 912 F.3d at

- 38 -

989 (citing Illinois v. City of Chicago, No. 17-6260, 2018 WL 3920816, at *5-6(N.D. Ill. 2018)(Dow, J.)).

In United States v. City of Miami, 278 F.3d 1174 (11th Cir. 2002), the United States Court of Appeals for the Eleventh Circuit affirmed the district court's denial of the Miami Community Police Benevolent Association's ("MCPBA") motion to intervene in a settlement agreement between the United States and the City of Miami, Florida.  See 278 F.3d at 1175-177.  The United States originally filed a complaint against the City of Miami and the Fraternal Order of Police ("FOP") FOP, alleging employment discrimination under Title VII of the Civil Rights Act of 1964. See 278 F.3d at 1176.  In 1977, the district court approved the settlement agreement over the FOP's objections.  See 278 F.3d at 1176.  The FOP then appealed, and the Eleventh Circuit remanded the case with instructions for the district court to alter the decree so that it did "not affect the promotion of members of the Police Department."  278 F.3d at 1176 (citing United States v. Miami, 664 F.2d 435 (5th Cir. 1981)).

Twenty-two years later -- after the demographic makeup of the police department had changed considerably -- the United States moved to supersede the 1977 settlement agreement with a settlement agreement that ensured Miami would continue to improve upon its discriminatory hiring procedures.  See 278 F.3d. at 1177.  Two months later, the MCPBA sought to intervene on the basis the FOP did not adequately represent the MCPBA's interests, which the MCPBA argued were "'diabolically [sic] opposed'" to the FOP's interests.  278 F.3d at 1177 (quoting the MCPBA's Brief)(alteration in United States v. Miami).  The Eleventh Circuit affirmed the lower court's denial of the MCPBA's motion to intervene, because it could "discern no difference between the objectives that the United States seeks to fulfill in this case and those of the MCPBA,"

and believed that the United States would adequately represent the MCPBA's interests.  278 F.3d. at 1179.

In <u>Johnson v. Lodge No. 93 of the Fraternal Order of Police</u>, although the Tenth Circuit did not rule on a police union's motion to intervene, it opined on the limits of a police-union-intervenor's position.  The Tenth Circuit affirmed the district court's approval of a consent decree between the City of Tulsa and African-American members of the Tulsa Police Department.  393 F.3d at 1098-1099.  The FOP had intervened in the consent decree and appealed the district court's approval of the consent decree, arguing that it violated its CBA and the Oklahoma Fire and Police Arbitration Act.  393 F.3d at 1098-99 (citing Okla. Stat. tit. 11, § 51-101 et seq. (2001)).

The case originated in 1994 as a class action by African-American police officers against Tulsa, in which the officers alleged that the Tulsa Police Department engaged in "systemic and long-standing racial discrimination . . . in the areas of hiring, promotions, discipline, training, and assignments."  393 F.3d at 1099.  The district court tried to end a three-year "costly litigation battle" with settlement negotiations, but these negotiations stalled after the FOP moved to intervene, and the City withdrew its support for the proposed consent decree.  393 F.3d at 1099-1100.  The district court granted the FOP's motion to intervene and appointed a settlement judge to facilitate negotiations between the parties and the FOP.  <u>See</u> 393 F.3d at 1100.  The court finally approved the consent decree over the FOP's objections in May 2003.  <u>See</u> 393 F.3d at 1101.  In pertinent part, the FOP argued that the consent decree (i) "violates Oklahoma labor law and the CBA because it prevents the City from bargaining in good faith with FOP regarding issues that fall within FOP's purview as the 'exclusive bargaining agent' for [Tulsa Police Department] members," and (ii) "adversely affects the third-party legal rights of FOP and its members without their consent."  393 F.3d at 1101 (alteration added and not in original).

The Tenth Circuit identified the issue as "whether the consent decree conflicts with state law or the CBA turns on whether the CBA's management rights or other provisions precluded the City from adopting the employment provisions embodied in the consent decree."   393 F.3d at 1103.   Applying Oklahoma law, the Tenth Circuit disagreed with FOP's contention that the "clear and unmistakable waiver" interpretation standard applied to the interpretation of the CBA's management rights provision, and it instead concluded that the "contract coverage" standard applied.  393 F.3d at 1103.   Under the clear-and-unmistakable standard that the FOP advanced, the "plaintiffs and the City would be required to show specific intent by FOP to waive its right to bargain over each particular subjection of the consent decree."   393 F.3d at 1103.   The Tenth Circuit disagreed with the FOP, and it instead applied the "contract coverage" standard to the CBA's management-rights provision, reasoning that the FOP relied on cases that were outdated or inapposite.  393 F.3d at 1104.   Applying the contract-coverage standard, which is "'when [an] employer and union bargain about a subject and memorialize that bargain in a collective bargaining agreement, . . . there is no continuous duty to bargain during the term of an agreement with respect to a matter covered by the [CBA],'" the Tenth Circuit concluded that the "CBA did not bar the City from entering the consent decree without bargaining with FOP, and thus the consent decree does not violate state labor law or the CBA."   393 F.3d at 1104 (quoting NLRB v. United States Postal Serv., 8 F.3d 832, 836 (D.C. Cir. 1993)(citations omitted).   When explaining the contract-coverage standard, the Tenth Circuit cited decisions by the Oklahoma Public Employees Relations Board ("PERB") relied on by the district court:

> An employer does not violate any duty to bargain when it alters subjects such as . . . a change in the system of progressive discipline when the management rights clause of the collective bargaining agreement negotiated between the employer and the union gives the employer the right to make, issue and enforce such policies or practices.

- 41 -

393 F.3d at 1104 (citing Fraternal Order of Police, Lodge No. 151 v. City of El Reno, PERB No. 353 (1998); Lodge No. 103, Fraternal Order of Police v. City of Ponca City, PERB No. 349 (1997)).  The management-rights provision in the FOP's CBA states that Tulsa "'retains' the rights to 'manage the affairs of the Police Department in all respects,' to 'establish and enforce Police Department rules, regulations, and orders,' and to 'introduce new, improved, or different methods and techniques of Police Department operation.'"  393 F.3d at 1104 (quoting the FOP's CBA). The Tenth Circuit also found that "the CBA's management rights clause specifically retains for the City the right to . . . discipline employees."  393 F.3d at 1104.  As a result, the Tenth Circuit disagreed with the FOP's "assertion that these topics are subject to mandatory bargaining under the CBA."  393 F.3d at 1104.

The Tenth Circuit also rejected the FOP's argument that the consent decree violated its rights "with respect to future collective bargaining agreements," because it would prohibit the city from "bargaining in good faith with respect to the terms of future collective bargaining agreements."  393 F.3d at 1104-05.  The Tenth Circuit reasoned that this argument was speculative, that "[t]he consent decree itself acknowledges the continuing validity of the CBA," and that the decree should be read "in accordance with language in the CBA."  393 F.3d at 1105.  The Tenth Circuit also commented that the FOP's position would give intervenors in federal employment discrimination cases "plenary power to veto all settlements which touch on terms and conditions of employment," and this power would "neuter[] the CBA's management rights provision" and "frustrate Congress's preference for achieving Title VII compliance by voluntary means."  393 F.3d at 1105.

The Tenth Circuit disagreed with the FOP's assertion that the consent decree "binds" it and "imposes legal obligations without its consent."  393 F.3d at 1106 (citing <u>Local No. 93</u>, 478 U.S. at 529-530).  The Tenth Circuit dismissed those concerns, because the consent decree binds only the parties to the consent decree.  <u>See</u> 393 F.3d at 1107 (citing <u>Local No. 93</u>, 478 U.S. at 529-30).  The Court then addressed the FOP's concerns that the consent-decree-created "Dispute Avoidance and Resolution Committee" changed the FOP's arbitration rights.  393 F.3d at 1107.  The Tenth Circuit stated that the "FOP retains the rights to arbitrate issues arising under the CBA," and thus the Dispute Avoidance and Resolution Committee did not infringe on those rights.  393 F.3d at 1108.  The Tenth Circuit also dismissed the FOP's fears that the court itself would usurp the "traditional role of the labor arbitrator" and become a "gatekeeper" for union grievances.  393 F.3d at 1108.

Turning to the FOP's assertion that it could force a trial on the racial discrimination claims to decide its contract rights under the CBA, the Tenth Circuit distinguished precedents the FOP relied on for that argument.  393 F.3d at 1108.  For instance, in <u>Sanguine, Ltd. v. United States Department of Interior</u>, 798 F.3d 389 (10th Cir. 1986), the Tenth Circuit set aside a consent decree in favor of litigation on the merits, because the intervenors, who were granted intervention status after the consent decree's entry and thus unable to present their objections, would be prejudiced otherwise.  <u>See</u> 393 F.3d at 1108-09 (citing <u>Sanguine, Ltd. v. U.S. Dep't of Interior</u>, 798 F.2d 389).  The Tenth Circuit concluded that a trial on the merits was not needed, because the FOP was included in the consent decree process and its objections were heard, and because "the consent decree [did] not alter the FOP's rights under the CBA."  393 F.3d at 1109.

In <u>United States v. City of New Orleans</u>, 2012 WL 12990388 (E.D. La. Aug. 31, 2012)(Morgan, J.), the FOP and the Police Association of New Orleans moved to intervene in

litigation between the United States and the City of New Orleans arising from "an alleged pattern or practice of conduct by the New Orleans Police Department that subjects individuals to excessive force [and] . . . unlawful searches and seizures in violation of the Fourth Amendment" as well as "discriminatory policing practices in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI." 2012 WL 12990388, at *1. The district court denied the Fraternal Order of Police's and the Police Association of New Orleans' motions to intervene as of right and permissively. 2012 WL 12990388, at *9-12.

Analyzing the two unions' motions together, the Honorable Susie Morgan, Senior United States District Judge for the United States District Court for the Eastern District of Louisiana, reasoned that the unions did not have a "legally protectable interest *in the subject matter of this litigation* required for intervention as of right." 2012 WL 12990388, at *7 (emphasis in original). Judge Morgan distinguished the unions' assertion of protectable property interest in the civil service jobs from the police in Edwards v. City of Houston, 78 F.3d 983 (5th Cir. 1996), which was an employment discrimination case. 2012 WL 12990388, at *7-9. There, the court granted intervention, because Title VII's preclusive effect "would prohibit the non-party officers -- if they were not allowed to intervene -- from collaterally challenging the consent decree after the district court approved it." United States v. City of New Orleans, 2012 WL 12990388, at *8 (citing Edwards v. City of Houston, 78 F.3d at999, 1004; 42 U.S.C. § 2000e-2(n)). Judge Morgan found Edwards v. City of Houston inapposite, because the consent decree between the United States and New Orleans "remedied . . . Title VI . . . claims having to do with the NOPD's practices with respect to citizens" and did not remedy Title VII employment discrimination claims. United States v. City of New Orleans 2012 WL 12990388, at *9. Comparing the FOP and the Police Association of New Orleans with the police union in United States v. City of L.A., Judge Morgan found that

the unions did not have a CBA or memorandum of understanding with New Orleans, and so the consent decree could not threaten or impair any contractual rights.  See United States v. City of New Orleans, 2012 WL 12990388, at *10.

In United States v. City of Hialeah, the Eleventh Circuit concluded that the United States District Court for the Southern District of Florida properly refused to approve part of a consent decree between the United States Department of Justice and the City of Hialeah, Florida, which arose from allegations of employment discrimination in both the police and fire departments.  See 140 F.3d at 971.  The Dade County Police Benevolent Association and a firefighters' union were joined as defendants shortly after the United States and Hialeah entered a proposed consent decree, but the United States and Hialeah did not invite either union to participate in the consent decree's formulation.  See 140 F.3d at 972.  At a fairness hearing two months later, the court also allowed a group of approximately 200 individual police officers to intervene.  See 140 F.3d at 972.

Although the district court approved a consent decree resulting from negotiations with the unions and intervenors, it did not approve a provision that would have imposed "retroactive competitive seniority" for minority applicants who applied for promotion, because such a provision "would violate contractual seniority rights of the incumbent employees, rights guaranteed to them in the unions' collective bargaining agreements with the City."  140 F.3d at 971.  The district court "therefore refused to enter that part of the proposed consent decree over the objections of those whose legally enforceable seniority rights would be adversely affected."  140 F.3d at 971.  The Eleventh Circuit affirmed the district court's decision, stating that, because the police and firefighters were unable to participate in negotiations, "[t]he district court correctly rejected the Department of Justice's request to ram the proposed settlement agreement down the

throats of the unions and individual objectors without affording them a fair adjudication of their rights." 140 F.3d at 984.

In United States v. City of L.A., the Los Angeles Police Protective League moved to intervene in consent decree litigation between the United States and the City of Los Angeles, the Los Angeles Police Department, and the Board of Police Commissioners of the City of Los Angeles. See 288 F.3d at 396. The proposed consent decree sought to address the police department's "pattern or practice of depriving individuals of constitutional rights through the use of excessive force, false arrests and improper searches and seizures in violation of 42 U.S.C. § 14141." United States v. City of L.A., 288 F.3d at 396. The Ninth Circuit reversed the district court's denial of the Los Angeles Police Protective League's motion to intervene, reasoning that the Los Angeles Police Protective League had a protectable interest not only in the remedial phase, but in the liability phase of the litigation as well. See United States v. City of L.A., 288 F.3d at 398-399. The Ninth Circuit concluded that the Los Angeles Police Protective League had a protectable interest in the liability phase of the litigation, because the district court had not finally approved the consent decree when it denied the Police League's motion, and the United States had "not unequivocally and completely disclaim[ed] the remedies sought in its complaint against the Police League's member officers." United States v. City of L.A., 288 F.3d at 399. Furthermore, the decree contained a provision that allowed the United States to "dissolve the decree and proceed with the suit if the Los Angeles Police Department, and the Board of Police Commissioners and the Los Angeles Police Protective League were unable to resolve a collective bargaining issue." United States v. City of L.A., 288 F.3d at 400.

Additionally, the Los Angeles Police Protective League had "a protectable interest in the remedy," because of "state-law rights to negotiate about the terms and conditions of its members'

employment" and the right to "rely on the collective bargaining agreement that is a result of those negotiations." 288 F.3d at 400.  The Ninth Circuit added that

> to the extent that [the consent decree] contains or might contain provisions that contradict terms of the officers' MOU, the Police League has the right to present its views on the subject to the district court and have them fully considered in conjunction with the district court's decision to approve the consent decree.

288 F.3d at 400.

In United States v. City of Portland, No. 3:12-cv-02265-SI, 2013 WL 1230978, (D. Or. Feb. 19, 2013)(Simon, J.), the United States filed a complaint against the City of Portland alleging a "pattern or practice of conduct by the Portland Police Bureau that subjects individuals with actual or perceived mental illness to excessive force." 2013 U.S. Dist. LEXIS 188465, at *2.  The parties filed a joint motion to enter a negotiated settlement agreement, and, the next day, the Portland Police Association moved to intervene.  2013 U.S. Dist. LEXIS 188465, at *3.  The district court granted the PPA's motion to intervene "for remedy purposes" and deferred ruling on the PPA's motion "for liability purposes."  2013 U.S. Dist. LEXIS 188465, at *4.

The Honorable Michael Simon, United States District Judge for the United States District Court for the District of Oregon, granted the Portland Police Association's motion to intervene, reasoning that "the broad enforcement provisions in the proposed Settlement Agreement still allow the United States to seek judicial enforcement in this Court of any provision of the proposed Settlement Agreement (after mediation), without providing any exception for those provisions that implicate the PPA's collective bargaining rights." 2013 U.S. Dist. LEXIS 188465, at *15.  The court concluded that the settlement agreement may impair or impede the Portland Police Association's protectable interest, because the court may resolve implementation of the consent decree's terms through injunctive relief.  See 2013 U.S. Dist. LEXIS 188465, at *15.

In evaluating the adequacy of representation by existing parties, the court held that none of the parties would adequately represent the Portland Police Association, because the "general presumption of adequate representation when the government is acting on behalf of a constituency that it represents" did not apply "when the governmental body acts as an employer, such as the City is to the members of the PPA, or when the parties 'are antagonists in the collective bargaining process.'" 2013 U.S. Dist. LEXIS 188465, at *15-16.

The Court acknowledges that these cases are varied: some cases are employment discrimination claims under Title VII, while other cases are excessive-force claims; some cases involve a detailed collective bargaining agreement, while other cases involve no collective bargaining agreement; and some cases involve the scope of a union that already has intervened, while other cases involve a union seeking to intervene. Moreover, only one of these cases, Johnson v. Lodge #93 of the Fraternal Order of Police, binds the Court. Regardless, the Court has presented this survey to give a "lay of the land" and give context to the Officers Association status as an intervenor.

## LAW REGARDING LAW-OF-THE-CASE DOCTRINE

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Poche v. Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished)(quoting Dobbs v. Anthem, 600 F.3d 1275, 1279 (10th Cir. 2010)). The Tenth Circuit recognizes that the doctrine "serves 'important' functions. 'Without something like it, an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again.'" Fish v. Schwab, 957 F.3d 1105, 1139 (10th Cir. 2020)(quoting Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1240 (10th Cir. 2016)). The doctrine

applies "both to rulings by district courts, see, e.g., Clark v. State Farm Mut. Auto. Ins. Co., 590 F.3d 1134, 1140 (10th Cir. 2009), and . . . by previous panels in prior appeals in the same litigation, see, e.g., United States v. Wardell, 591 F.3d 1279, 1300 (10th Cir. 2009)." Bishop v. Smith, 760 F.3d 1070, 1082 (10th Cir. 2014). The Tenth Circuit also has "acknowledged, however, that 'the rule [of law-of-the-case] is a flexible one that allows courts to depart from an erroneous prior ruling, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'" Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007)(citing Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 823 (10th Cir. 2007)). The doctrine is inapplicable where "a ruling remains subject to reconsideration." Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010)(unpublished)(quoting In re Unioil, Inc., 962 F.2d 988, 993 (10th Cir. 1992)). This means that "district courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., Inc., 495 F.3d at 1255 (citing Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005); United States v. Smith, 389 F.3d 944, 949 (9th Cir. 2004)(explaining that a district court may review its prior rulings so long as it retains jurisdiction over the case)). Although "discretionary rather than mandatory," Sinfuego v. Curry Cnty. Board of Comm'rs, No. CIV 15-0563 JB\GF, 2018 WL 6047438, at *14 (D.N.M. 2018)(Browning, J.)(quoting Homans v. City of Albuquerque, 366 F.3d 900, 904 (10th Cir. 2004)), the Tenth Circuit has noted that, "it takes 'exceptionally narrow circumstances' for the court not to follow the law of the case when the doctrine applies." Bishop v. Smith, 760 F.3d 1070, 1082 (10th Cir. 2014)(quoting United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)).

"Policies supporting the [law-of-the-case] doctrine apply with even greater force to transfer decisions than to decisions of substantive law." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988). The Tenth Circuit has held that application of "[t]raditional principles of

law of the case counsel against the transferee court reevaluating the rulings of the transferor court, including its transfer order." Chrysler Credit Corp., 928 F.2d at 1516.  The Supreme Court has cautioned against courts engaging in a "perpetual game of jurisdictional ping-pong," resolving the issue by holding that "courts will rarely transfer cases over which they have clear jurisdiction, and close questions, by definition, never have clearly correct answers. Under law-of-the-case principles, if the transferee court can find the transfer decision plausible, its jurisdictional inquiry is at an end." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 819 (1988)(citing Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981)).  The Tenth Circuit has maintained that transferee courts are allowed flexibility in reevaluating decisions made by transferor courts "when the governing law has been changed by the subsequent decision of a higher court, when new evidence becomes available, when a clear error has been committed or to prevent manifest injustice." Chrysler Credit Corp., 928 F.2d at 1516 (citations omitted).

"Under [the Tenth Circuit]'s law of the case doctrine, '[a] legal decision made at one stage of litigation unchallenged in a subsequent appeal when the opportunity to do so existed, [generally] becomes the law of the case.'" Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1242 (10th Cir. 2016)(Gorsuch, J.)(quoting Concrete Works of Colo., Inc. v. Cty. Of Denver, 321 F.3d 950, 992 (10th Cir. 2003)).  Regarding transfer decisions, then,

> [t]he date the papers in the transferred case are docketed in the transferee court also forms the effective date that appellate jurisdiction in the transferor circuit is terminated; the transfer order becomes unreviewable as of that date. Because an appeal from a transfer order filed after the physical transfer of the record would be futile, the preferred approach is to delay physical transfer of the papers in the transferred case for a long enough time to allow the aggrieved party to file a mandamus petition.

Chrysler Credit Corp., 928 F.2d at 1517.

In Chrysler Credit Corp., claims were brought against a local Chrysler dealer in the

Western District of Oklahoma, who subsequently filed a number of counterclaims and third-party complaints.  928 F.2d at 1513.  The Western District of Oklahoma concluded that the claims from the various parties could be appropriately bifurcated under Fed. R. Civ. P. 42(b), and granted summary judgment against the defendants on the original claim while transferring the remaining counterclaims and third-party claims to the Eastern District of Michigan.  See Chrysler Credit Corp., 928 F.2d at 1513.  The Eastern District of Michigan granted summary judgment against the defendants on a number of claims and dismissed the remaining, upon which the plaintiff asked the court to certify the money judgment from the Western District of Oklahoma.  See Chrysler Credit Corp., 928 F.2d at 1514.  The Eastern District of Michigan declined to certify the Oklahoma judgment and upon appeal contended that "jurisdiction over the Oklahoma judgment remained in Oklahoma," which the United States Court of Appeals for the Sixth Circuit agreed with.  Chrysler Credit Corp., 928 F.2d at 1514.

The Tenth Circuit determined that the Western District of Oklahoma had not severed the claims correctly under rule 21 of the Federal Rules of Civil Procedure, and thus, the transfer of the case to the Eastern District of Michigan transferred all the claims, including the claim which the Oklahoma court had decided in favor of the plaintiffs.  See Chrysler Credit Corp., 928 F.2d at 1519-20.  The transfer from Oklahoma to the Eastern District of Michigan, therefore, made the Oklahoma judgment the law of the case, from which the Sixth Circuit allowed "sufficiently flexible [discretion] to permit departure from rulings in the transferor circuit where clearly warranted." Chrysler Credit Corp., 928 F.2d at 1520 (citing Skil Corp. v. Millers Falls Co., 541 F.2d 554, 558 (6th Cir. 1976)).  The Tenth Circuit ruled that, upon docketing the case in the Eastern District of Michigan, the Western District of Oklahoma lost jurisdiction over all claims and was unable to certify the judgment at a later date.  See Chrysler Credit Corp., 928 F.2d at 1520-21.  From that

point onward, the Tenth Circuit concluded, the Sixth Circuit retained "appellate review of a [Eastern District of Michigan's] application of the law of the case doctrine governed by the limited standard of clear error and manifest injustice." Chrysler Credit Corp., 928 F.2d at 1518.

## ANALYSIS

The Officers Association's CBA with Albuquerque expired on June 30, 2020.  The Court previously has determined that the Officers Association may intervene in the litigation only to protect its rights under the CBA.  Consequently, the Court first must analyze whether the Officers Association has a CBA in effect with Albuquerque.  After determining that the Officers Association has an effective CBA, the Court considers whether the Stipulated Order and the CBA conflict.  If there is no conflict between the Stipulated Order and the CBA, then the Officers Association does not have a basis to Object to the Stipulated Order.  Finding no conflict between the Stipulated Order and the CBA, the Court concludes that the Officers Association cannot prevent the Stipulated Order's implementation.  Second, the Court considers whether the Court should enter the Stipulated Order as the United States and Albuquerque request.  The Court concludes that, based on IMR-12 and the parties' Joint Motion, the Court should enter the Stipulated Order as written.

## I.     THE CBA IS STILL IN EFFECT UNTIL A NEW ONE IS NEGOTIATED, BUT THE STIPULATED ORDER DOES NOT CONFLICT WITH THE CBA, SO THE COURT WILL NOT ALLOW THE OFFICERS ASSOCIATION TO PREVENT THE STIPULATED ORDER'S IMPLEMENTATION.

The Officers Association's most recent CBA with Albuquerque stated that it was effective from July 7, 2018, through June 30, 2020.  See CBA at 1.  In the MTI MOO, Judge Brack noted that the Officers Association took "four to five years" to negotiate a CBA with the effective dates from July, 2014, to July, 2015.  See MTI MOO at 2-3, 9, 2015 WL 13747185 at *2, 5 (Brack, J.).

Judge Brack declined to accept the United States and Albuquerque's arguments that the Officers Association did not have the right to intervene, given that the CBA expired in July, 2015, because, according to Judge Brack, "well-established labor law precepts" indicate that Albuquerque could not unilaterally impose new conditions of employment upon the CBA's expiration. See MTI MOO at 9, 2015 WL 13747185 at *5 (citing Am. Fed. of State v. City of Albuquerque, 2013-NMCA-063, 304 P.3d 443 and N.M.S.A § 10-7E-26[13] for the proposition that expired CBAs must remain

---

[13]The New Mexico State Legislature repealed N.M.S.A. § 10-7E-26, effective July 1, 2020. Before its repeal, it read:

> A.    A public employer other than the state that prior to October 1, 1991 adopted by ordinance, resolution or charter amendment a system of provisions and procedures permitting employees to form, join or assist a labor organization for the purpose of bargaining collectively through exclusive representatives may continue to operate under those provisions and procedures. Any substantial change after January 1, 2003 to any ordinance, resolution or charter amendment shall subject the public employer to full compliance with the provisions of Subsection B of Section 26 of the Public Employee Bargaining Act.

> B.    A public employer other than the state that subsequent to October 1, 1991 adopts by ordinance, resolution or charter amendment a system of provisions and procedures permitting employees to form, join or assist a labor organization for the purpose of bargaining collectively through exclusive representatives freely chosen by its employees may operate under those provisions and procedures rather than those set forth in the Public Employee Bargaining Act; provided that the employer shall comply with the provisions of Sections 8 through 12 and Subsection D of Section 17 of that act and provided the following provisions and procedures are included in each ordinance, resolution or charter amendment:

>> (1)    the right of public employees to form, join or assist employee organizations for the purpose of achieving collective bargaining;

>> (2)    procedures for the identification of appropriate bargaining units, certification elections and decertification elections equivalent to those set forth in the Public Employee Bargaining Act;

in effect until new agreements are reached)(Brack, J.).   Moreover, the Court analyzes Judge

Brack's MTI MOO in its Use-of-Force MOO.   See Use-of-Force MOO at 156-57, 2020 WL

3129825, at *68.   In the Use-of Force MOO, the Court affirms Judge Brack's reasoning that the

Officers Association's CBA is a protectable interest, even though the CBA may expire.   See Use-

of-Force MOO at 156-57, 2020 WL 3129825, at *68.   In so holding, the Court relied on the fact

that the 2014 CBA had a provision, § 35.4.1, that states: "Should neither party to the Agreement

---

<table>
<tr><td>(3)</td><td>the right of a labor organization to be certified as an exclusive representative;</td></tr>
<tr><td>(4)</td><td>the right of an exclusive representative to negotiate all wages, hours and other terms and conditions of employment for public employees in the appropriate bargaining unit;</td></tr>
<tr><td>(5)</td><td>the obligation to incorporate agreements reached by the public employer and the exclusive representative into a collective bargaining agreement;</td></tr>
<tr><td>(6)</td><td>a requirement that grievance procedures culminating with binding arbitration be negotiated;</td></tr>
<tr><td>(7)</td><td>a requirement that payroll deductions for the exclusive representative's membership dues be negotiated if requested by the exclusive representative;</td></tr>
<tr><td>(8)</td><td>impasse resolution procedures equivalent to those set forth in Section 18 of the Public Employee Bargaining Act; and</td></tr>
<tr><td>(9)</td><td>prohibited practices for the public employer, public employees and labor organizations that promote the principles established in Sections 19 through 21 of the Public Employee Bargaining Act.</td></tr>
</table>

N.M.S.A. § 10-7E-26 (repealed July 1, 2020).

request opening of negotiations as provided in the Labor-Management Relations Ordinance 67-1977, as amended, this Agreement and the conditions herein shall continue in effect from year to year." 2014 CBA § 35.4.1, at 43.  The Use-of-Force MOO therefore concludes that "the possibility remains that neither party will open negotiations, and the CBA will continue," and the existence of the Settlement Agreement "could impede the Officers Association's interest."  Use-of-Force MOO at 157, 2020 WL 3129825, at *68.  The current CBA, however, includes no such provision stating explicitly that the CBA shall continue from year to year.

The New Mexico Legislature enacted PEBA, N.M.S.A. § 10-7E-2, to "guarantee public employees the right to organize and bargain collectively with their employers, to promote harmonious and cooperative relationships between public employers and public employees and to protect the public interest by ensuring, at all times, the orderly operation and functioning of the state and its political subdivisions." N.M.S.A. § 10-7E-2.  In American Federal of State v. City of Albuquerque, 2013-NMCA-063, 304 P.3d 443, the Court of Appeals of New Mexico explained that, N.M.S.A. § 10-7E-26(B)

> requires public employers that adopted their collective bargaining systems after October 1, 1991, to include in those systems additional provisions and procedures in order to be otherwise exempt from the PEBA.  See Section 10-7E-26(B)(1) to (9).  Among the provisions that must be included are "impasse resolution procedures equivalent to those set forth in [Section 10-7E-18]."

Am. Fed. of State v. City of Albuquerque, 2013-NMCA-063 ¶ 10, 304 P.3d at 446-47[14] (quoting

---

[14]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's analysis in American Federation of State v. City of Albuquerque, because American Federal of State v. City of Albuquerque conducts a statutory construction analysis of PEBA to determine that the grandfather clause in N.M.S.A. § 10-7E-26(A) means that § 10-7E-18 does not apply to collective bargaining systems that were in place before October 1, 1991.  See Am. Fed. of State v. City of Albuquerque, 2013-NMCA-063 ¶ 13, 304 P.3d at 447.  The Supreme Court of New Mexico, in Regents of University of New Mexico v. New Mexico Federation of Teachers, 1998-NMSC-020, 125 N.M. 401, 962 P.2d 1236, conducts a similar

N.M.S.A. § 10-7E-26(B)(8)).  Section 10-7E-18 also is referred to as "the evergreen clause."  <u>Am. Fed. of State v. City of Albuquerque</u>, 2013-NMCA-063 ¶ 10, 304 P.3d at 446-47.  Consequently, the Court of Appeals of New Mexico reads § 10-7E-26 to require CBAs enacted after October 1, 1991, to include a provision equivalent to those in § 10-7E-18.  <u>Am. Fed. of State v. City of Albuquerque</u>, 2013-NMCA-063 ¶ 10, 304 P.3d at 446-47.  N.M.S.A. § 10-7E-18 sets out the procedures for impasse resolution.  <u>See</u> N.M.S.A. § 10-7E-18.  In relevant part, § 10-7E-18(D) reads: "In the event that an impasse continues after the expiration of a contract, the existing contract will continue in full force and effect until it is replaced by a subsequent written agreement."  Effective July, 2020, the New Mexico Legislature repealed § 10-7E-26.  <u>See</u> N.M.S.A. § 10-7E-26. Repealed by L. 2020, Ch. 48, § 13, eff. July 01, 2020.  While the Court of Appeals of New Mexico reads § 10-7E-26 to require CBAs to include an evergreen provision consistent with § 10-7E-18, the Court understands § 10-7E-26's repeal to mean that § 10-7E-18's evergreen provision applies to CBAs that have expired, but where negotiations are at an impasse. The Court believes the Supreme Court of New Mexico would agree with this reading of PEBA, because any other reading would essentially nullify § 10-7E-18, as well as other the provisions of PEBA.

Here, Albuquerque and the Officers Association's CBA expired on June 30, 2020.  The 2014 CBA included a provision that stated: "Should neither party to the Agreement request opening of negotiations as provided in the Labor-Management Relations Ordinance 67-1977, as

---

analysis of PEBA's grandfather clause, relying, as does <u>American Federation of State v. City of Albuquerque</u>, on the legislative intent in enacting the grandfather clause provision.  <u>See</u> <u>Regents of Univ. of New Mexico v. New Mexico Fed'n of Teachers</u>, 1998-NMSC-020 ¶ 46, 125 N.M. 401, 414, 962 P.2d 1236, 1249 (1998).

amended, this Agreement and the conditions herein shall continue in effect from year to year."
2014 CBA, § 35.4.1 at 43.  The current CBA contains no such provision.  Although the current
CBA contains no provision stating explicitly that the CBA continues from year to year, no party
contends that the CBA is no longer in effect.  Because Court reads N.M.S.A. § 10-7E-18 to apply
to expired CBAs in light of § 10-7E-26's repeal, the Court concludes that the current CBA is still
in effect.

Because the Court concludes that the CBA is still in effect, the Court must next consider
whether the Stipulated Order and CBA conflict.  In its Use-of-Force MOO, the Court determines
that the Officers Association is a proper intervenor in the litigation.  See Use-of-Force MOO at
154-56, 2020 WL 3129825, at *67.  The Court determines that the Officers Association has a
protectable interest in preserving its CBA.  See Use-of-Force MOO at 154-56, 2020 WL 3129825,
at *67.  The Court concludes that it "has the authority to restrict the scope of the Officers
Association's intervenor status" and that it would "allow the Officers Association to intervene only
to protect its interest under the CBA."  Use-of-Force MOO at 181, 2020 WL 3129825, at *77.  The
Court emphasizes that it will "strictly limit the Officers Association's status as an intervenor to
protect its interest in its CBA."  Use-of-Force MOO at 171, 2020 WL 3129825, at *74.  The Court
sees no sound reason to revisit this conclusion.  The Court reiterates here that the Officers
Association's only rationale for being in this litigation is to protect its interest in the CBA, and,
therefore, the Court has the authority to consider the Officers Association's Objections only to the
extent that the Objections present conflicts between the Stipulated Order and the CBA.

Having reviewed the CBA, the Court does not find any provision of the CBA that conflicts
with the Stipulated Order, nor has the Officers Association pointed to one.  In its Objections, the
Officers Association: (i) objects to the United States and Albuquerque's goal of having twenty-

five detectives in the IAFD, because it is unrealistic and financially burdensome, see Objections ¶ 1, at 1-2; (ii) argues that the External Team Administrator should coordinate with an administrator or contractor who Albuquerque hires to implement consistent principles in Police Academy training, see Objections ¶ 2, at 2; (iii) requests that IAFD develop an investigative process in conjunction with the External Team Administrator and the contractor at the Police Academy, see Objections ¶ 3, at 2-3; (iv) objects to the External Team Administrator recommending discipline against APD officers for improperly investigating use-of-force incidents, see Objections ¶ 4, at 3; (v) raises a concern that the Stipulated Order will be cost prohibitive, see Objections ¶ 5, at 3-4; and (vi) contends that disagreements between the parties concerning an APD officer's ability to conduct investigations should not be brought before the Court for resolution, but that the administrative processes already in place should be used to deal with these investigations, see Objections ¶ 6, at 4.   In its Objections, the Officers Association does not point to specific CBA portions with which the Stipulated Order conflicts.   Indeed, at the February, 26, 2021, hearing, the Officers Association acknowledged that it was "not sure of what impact" the Stipulated Order would have on "the members of the association as protected by the collective bargaining agreement."  Tr. at 41:7-11 (Mowrer).  The Court asked the Officers Association: "And you don't see anything in this at the present time that interferes with the CBA?"  Tr. at 46:21-23 (Court).  The Officers Association responded that it is unsure whether the Stipulated Order would have an impact on the CBA.  See Tr. at 47:2-17 (Mowrer).   Moreover, the United States acknowledged that the Court has been clear that the Officers Association's position as an intervenor extends only to situations where there is a conflict between the Settlement Agreement and the CBA.  See Tr. at 49:7-16 (Killebrew).  The United States took the position that, because the Officers Association does not raise any conflicts with the CBA, the Court does not have any

authority to grant relief to the Officers Association on its Objections or Objections Motion.  See Tr. at 49:17-24 (Killebrew).  The Court indicated at the February 26, 2021, hearing's conclusion that it does not believe the Stipulated Order conflicts with the CBA.  See Tr. at 62:7-11 (Court).  Because the United States, Albuquerque, Officers Association, and the Court agree that, as it is written, the Stipulated Order does not interfere with the CBA, the Court declines to allow the Officers Association to prevent the Stipulated Order's implementation.  The Court allowed the Officers Association to submit its Objections to the Court, and the Court held a hearing on the Objections.  The Court has been generous to the Officers Association, whose only role in this litigation is to protect its CBA rights.  The Court, therefore, will overrule the Objections and deny the Opposition Motion.

## II.   THERE IS NO SOUND REASON TO DECLINE TO ENTER THE STIPULATED ORDER.

The Second Amended Settlement Agreement ¶¶ 337 and 338, at 100, read:

> 337.    To ensure that the requirements of this Agreement are properly and timely implemented, the Court will retain jurisdiction of this action for all purposes until such time as full and effective compliance with this Agreement and compliance is maintained for no less than two years.  At all times, the City shall bear the burden of demonstrating full and effective compliance with this Agreement.  The United States acknowledges the good faith of the City of Albuquerque in trying to address measures that are needed to maintain high-level, quality service; to ensure officer safety and accountability; and promote effective, constitutional policing.  The United States, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that the City has failed to fully comply with any provision of this Agreement.  The United States agrees to consult with officials from the City of Albuquerque and its counsel before instituting enforcement proceedings.

> 338.    The Parties may jointly stipulate to make changes, modifications, and amendments to this Agreement, which shall be effective, absent further action from the Court, 45 days after a joint motion has been filed with the Court. Such changes, modifications, and amendments to this Agreement shall be encouraged when the Parties agree, or where the reviews, assessments, and/or audits of the Monitor demonstrate that the Agreement provision as drafted is not furthering the

purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose. Where the Parties or the Monitor are uncertain whether a change to the Agreement is advisable, the Parties may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension. During this suspension, the Parties may agree to temporarily implement an alternative requirement. The Monitor shall assess whether the suspension of the requirement, and the implementation of any alternative provision, is as, or more, effective at achieving the purpose as the original or current Agreement requirement, and the Parties shall consider this assessment in determining whether to jointly stipulate to make the suggested change, modification, or amendment.

Second Amended Settlement Agreement ¶¶ 337-38, at 100.

In the Joint Motion, the United States and Albuquerque request that the Court approve the Stipulated Order establishing an External Team. See Joint Motion at 1. The United States and Albuquerque note that, in IMR-12, Dr. Ginger raised "serious concerns about the quality of APD's force investigations and the lack of accountability for officers who violated APD policies during the course of incidents in which they used force." Joint Motion at 2. The United States and Albuquerque acknowledge that APD has revised twice all of its use-of-force policies and its entire training program on use-of-force, but APD still is not complying with the Second Amended Settlement Agreement. See Joint Motion at 2-3. The United States and Albuquerque state that the Stipulated Order's goals are: (i) "to make immediate improvements in the quality and timeliness of investigations of Level 2 and Level 3 uses of force"; (ii) "to ensure that APD can hold officers accountable when they violate APD policies during force incidents"; and (iii) "to make significant, durable improvements in APD's systems for investigating Level 2 and Level 3 uses of force." Joint Motion at 4. The External Team is intended to ensure investigations are conducted with integrity in a timely manner. See Joint Motion at 4. Moreover, the External Team will provide instruction to and assessment of APD investigators and supervisors, with the goal of APD investigators and supervisors becoming proficient and eliminating the need for the External Team.

See Joint Motion at 5.

The United States and Albuquerque's Joint Motion comes on the IMR-12's heels; IMR-12 cautioned that "APD's compliance efforts have exhibited serious shortfalls," especially regarding use-of-force investigations.   IMR-12 at 2.   Moreover, IMR-12 states that "APD continued to struggle to establish a system of force oversight and the accountability for officer conduct."  IMR-12 at 12.   IMR-12 concludes that, "when internal fact-finding processes such as Internal Affairs can routinely permit officers and union representatives to hijack internal fact-finding, and no one notices except the monitoring team, there are serious, meaningful, and near terminal problems with leadership at internal investigative commands."  IMR-12 at 354.   IMR-12 repeatedly emphasizes APD's ongoing struggle to adequately address use-of-force investigations and contends that this problem reflects failures within APD that only systemic reform of internal investigations will cure. See IMR-12 at 354.  IMR-12's prognosis for APD's compliance with the Settlement Agreement - - absent intervention -- is concerning.

At the February 26, 2021, Hearing, the United States emphasized that APD is not in compliance with the Second Amended Settlement Agreement, and that one potential intervention the United States could seek is asking the Court to hold Albuquerque in contempt and asking the Court to implement a receivership, which would allow the Court to appoint a receiver to run APD. See Feb. 26 Tr. at 13:21-14:7 (Killebrew).  The United States noted that, after reading IMR-12, it believes it has possible grounds to invoke contempt proceedings, at least with regard to serious force investigations.  See Feb. 26 Tr. at 14:6-12 (Killebrew).   Rather than seeking receivership, however, the United States negotiated the Stipulated Order to work with Albuquerque to bring APD into compliance with the Second Amended Settlement Agreement.  See Feb. 26 Tr. at 14:13-19.

The Court acknowledges the United States' concerns about APD's consistently low compliance metric regarding Operational Compliance with the Second Amended Settlement Agreement. The Court also is not excited about the prospect of the United States seeking the path of receivership. The Court has no desire -- nor is it well-suited -- to run APD through receivership. The proposed Stipulated Order is the United States and Albuquerque's negotiated agreement to attempt to bring APD into compliance with the Second Amended Settlement Agreement. As the Stipulated Order states, the Stipulated Order is a "good faith effort[] by the Parties to address investigative deficiencies in APD's force investigations, as identified by the Independent Monitor in his Twelfth Report." Stipulated Order at 16. Moreover, the Court has the authority to enter the Stipulated Order pursuant to the Second Amended Settlement Agreement ¶ 338, which permits the parties jointly to stipulate to make changes, modifications, and amendments to the Agreement, and, indeed, encourages it "when the Parties agree, or where the reviews, assessments, and/or audits of the Monitor" demonstrate its necessity. Second Amended Settlement Agreement ¶ 338, at 100. As the Court concludes above, the Stipulated Order does not conflict with the Officers Association's CBA, and, thus, the Court declines to prevent the Stipulated Order's implementation on the grounds of the Officers Association's Objections. The parties provide no sound reason, and the Court on its own finds none, to deny the Joint Motion or to decline to enter the Stipulated Order. Consequently, the Court will grant the Joint Motion and enter the Stipulated Order.

**IT IS ORDERED** that: (i) the Joint Motion for Order Establishing an External Force Investigation Team, filed February 5, 2021 (Doc. 692), is granted; (ii) the accompanying Stipulated Order, filed February 5, 2021 (Doc. 692-1), is entered; (iii) the Objections in APOA Issues and Concerns (Relating to Document No. 692), filed February 19, 2021 (Doc. 707), are

overruled; and (iv) the Albuquerque Police Officers Association's Motion Opposing Motion and

Final Order, filed February 22, 2021 (Doc. 714), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Fred J. Federici
   Acting United States Attorney
Jared Hager
Michael H. Hoses
Elizabeth M. Martinez
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Kristen Clarke
   Assistant Attorney General
Steven H. Rosenbaum
   Chief Special Litigation Section
Paul Killebrew
   Deputy Chief
Luis E. Saucedo
   Counselor to the Chief
Corey M. Sanders
Patrick Kent
Special Litigation Section
Civil Rights Division
United States Department of Justice
Washington, D.C.

   *Attorneys for the Plaintiff*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

- 63 -

-- and --

Esteban Angel Aguilar, Jr.
  City Attorney
Samantha M. Hults
  Deputy City Attorney
Carlos F. Pacheco
Trever Adam Rigler
City of Albuquerque
Albuquerque, New Mexico

     *Attorneys for the Defendant*

John James D'Amato, Jr.
The D'Amato Law Firm, PC
Albuquerque, New Mexico

-- and --

Frederick M. Mowrer
The Law Office of Sanchez, Mowrer & Desiderio P.C.
Albuquerque, New Mexico

-- and --

John James D'Amato, Jr.
D'Amato Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Intervenor Albuquerque Police Officers Association*

Nancy Koenigsberg
Disability Rights New Mexico
Albuquerque, New Mexico

-- and --

Phillip B. Davis
Nicholas T. Davis
Law Office of Phillip B. Davis
Albuquerque, New Mexico

-- and --

Maria Martinez Sanchez
Steven Robert Allen
American Civil Liberties Union of New Mexico
Albuquerque, New Mexico

*Attorneys for Amicus Curiae American Civil Liberties Union of New Mexico*

Peter Cubra
Law Office of Peter Cubra
Albuquerque, New Mexico

*Attorney for Amicus Curiae McClendon Subclass*

Andres Valdez
Albuquerque, New Mexico

*Amicus Curiae Pro se*

Thomas Dent
Albuquerque, New Mexico

*Amicus Curiae Pro se*