CIV 14-1025 JB/SMV

**James Browning**

**From:** Pete Dinelli <pdinelli@aol.com>
**Sent:** Tuesday, March 22, 2022 11:43 AM
**To:** NMDml_Judge Browning's Chambers nmd.uscourts.gov; pmrinc@mac.com
**Subject:** Link to Dinelli blog article "City Council Resolution To Renegotiate "To The Extent Advisable" APD Consent Degree Reflects Ignorance By Council Of APD Reform Mandates And Court Process; Resolution Sponsorship By City Councilor Dan Lewis Reflects Hi

CAUTION - EXTERNAL:

Link to Dinelli blog article "City Council Resolution To Renegotiate "To The Extent Advisable" APD Consent Degree Reflects Ignorance By Council Of APD Reform Mandates And Court Process; Resolution Sponsorship By City Councilor Dan Lewis Reflects His Past Failures To Oversee APD"

https://www.petedinelli.com/2022/03/22/city-council-resolution-to-renegotiate-to-the-extent-advisable-apd-consent-degree-reflects-ignorance-by-council-of-apd-reform-mandates-and-court-process-resolution-sponsorship-by-c/

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

*[Handwritten annotations:]*

Print out and return this sheet w/ article to me. JB 4/20/22

PLEASE SEE ATTACHED. RAB 4/20/22

File this cover sheet : the attach article on cm/ECF (APD consent decree case). JB 4/20/22

cc: 3Jd All Dep [signatures] 4/20/22 4/20/22 DONE 4/20/22

1

NEWS AND COMMENTARY

# City Council Resolution To Renegotiate "To The Extent Advisable" APD Consent Degree Reflects Ignorance By Council Of APD Reform Mandates And Court Process; Resolution Sponsorship By City Councilor Dan Lewis Reflects His Past Failures To Oversee APD

Posted on **March 22, 2022**

On March 10, 2022 the Albuquerque City Council passed a resolution directing city officials "to the extent advisable" to "petition" to reopen and renegotiate the Court Approved Settlement Agreement mandating the reforms of the Albuquerque Police Department. The council resolution passed on an 8-to-1 vote with City Councilor Tammy Fiebelkorn the only councilor to vote against the resolution. Fiebelkorn is to be commended for not voting for such an ill advised resolution only meant for show and press coverage.

The city council resolution says the "petition" should address recommendations contained in a released by U.S. Attorney General Merrick Garland on September 13, 2021, including putting a cap on how much an independent monitor overseeing court-mandated reforms can be paid and assessing ending the monitorship after 5 years.

During the March 10 council meeting, City attorneys would not answer questions about the

process to renegotiate the agreement and what factors are being considered. Instead, all questions were referred to APD.

APD Chief Harold Medina for his part said he wanted to wait to see what the next Federal Monitors report looks like and if the city has gained momentum before trying to renegotiate the agreement. The next Federal monitor's report is expected in May.

Police Chief Harold Medina said he had been assured by the Federal Monitor that the next report on APD's progress would be different than recent ones that have been harshly critical of the department's progress. Medina had this to say:

*"I want to keep all options on the table. ... I want the support of the council — as I have the support of the mayor's office and the administration — in the fact that if we have to move in the direction of asking for modification or movements in this process that we are all united as one city moving forward."*

Gilbert Gallegos, one of APD's spokesman had this to say:

*"I can reiterate that we have been working on related issues with the DOJ and the monitor. ... We anticipate taking some actions in the coming weeks to improve the reform process and ensure it reflects what is best for Albuquerque."*

Councilor Pat Davis said he supported the resolution but not because he wants the city to *"kick the DOJ out of town"* and Davis said:

*"I think it's important to recognize the goal posts haven't changed, but there are some ways we can improve our relationship. ... I appreciate this is the way to do that."*

## NEW RULES GOVERNING FEDERAL MONITORS

The city council resolution enacted makes reference and quotes to the new rules and guidelines issued by Attorney General Garland on consent decrees and for that reason those guidelines merit review.

It was on Monday, September 13, that United States Attorney General Merrick Garland, unveiled the new rules governing federal monitors responsible for overseeing police reforms and implementation of court approved settlement reform measures. The new rules include setting limits on federal court appointed monitor's tenure, budgets for their services and requiring them to undergo more training.

The Department of Justice said in a press release:

*"The department has found that – while consent decrees and monitors are important tools to increase transparency and accountability – the department can and should do*

*more to improve their efficiency and efficacy. The Associate Attorney General [Vanita Gupta] has recommended – and I have accepted – a set of 19 actions that the department will take to address those concerns."*

Associate Attorney General Gupta for his part had this to say:

*"Consent decrees have proven to be vital tools in upholding the rule of law and promoting transformational change in the state and local governmental entities where they are used. ... The department must do everything it can to guarantee that they remain so by working to ensure that the monitors who help implement these decrees do so efficiently, consistently and with meaningful input and participation from the communities they serve."*

The 19 actions are outlined in the memo released by the DOJ. There are 5 major principals outlined in Gupta's memo that will require future monitorships of state and local governmental to meet. Those principals are:

**1. Monitorships should be designed to minimize cost to jurisdictions and avoid any appearance of a conflict of interest.**

**2. Monitors must be accountable to the court, the parties and the public.**

**3. Monitors should assess compliance consistently across jurisdictions.**

**4. Sustained, meaningful engagement with the community is critical to the success of the monitors.**

**5. Monitoring must be structured to efficiently move jurisdictions into compliance.**

The steps the department will take going forward in all monitor agreements to ensure that these principles are outlined as follows:

1. **Budget Caps:** Future consent decrees will include an annual cap on monitors' fees to increase transparency and help contain costs.

2. **No Double Dipping:** To dispel any perception that monitoring is a cottage industry, lead monitors in future consent decrees will no longer be able to serve on more than one monitoring team at a time. Editor's Note: The APD Federal Monitor has served in the past as a consent decree monitor in other cities, but only one at a time.

3. **Monitors Should Prioritize Stakeholder Input:** To ensure that monitors selected are able to understand of a variety of interests and perspectives of the stakeholders in the process, including impacted communities, law enforcement and victims of official misconduct.

4. **Term Limits:** To ensure that monitors are being held accountable, consent decrees will impose specific terms for monitors that can only be renewed after a process of judicial evaluation and reappointment.

5. **Effective Practices Guide, Assessment Tools and Training Materials:** To ensure that monitorships are being conducted consistently across jurisdictions, the department will convene a group of stakeholders to create a set of effective practices for monitors, training programs for new monitors and judges overseeing monitorships and assessment tools for monitors to use to evaluate jurisdictions.

6. **Termination Hearing After No More than Five Years:** To ensure that monitorships are designed to incentivize monitors and jurisdictions to move towards compliance as efficiently as possible, future consent decrees will require a hearing after five years so that jurisdictions can demonstrate the progress it has made, and if possible, to move for termination. To the extent that full compliance has not yet been reached by five years, the hearing will be used to solidify the plan for getting over the finish line in short order.

The problem with the City of Albuquerque's and APD's Court Approved Settlement is that the new rules are directive from the Department of Justice meant for future consent decrees, not ones that are already underway like the one in Albuquerque. Now that a Court Approved Settlement Agreement has been filed in the form of a Court Order, the Federal Judge has no obligation to follow the new DOJ rules. After a full 7 years of the city's Court Approved Settlement Agreement, there is very little next to nothing of new rules that can be applied to Albuquerque's settlement.

The above outlined changes will not automatically impact the city of Albuquerque's court-mandated reform effort. In fact, many of the proposals in fact already exist in one form or another when it comes to APD's court approved settlement agreement. Those include the monitor being accountable to the court, prioritizing stakeholder input and being accountable to the court and subject to judicial oversight and termination.

Notwithstanding, Mayor Tim Keller said in a statement that his administration *"will approach the U.S. District Court in New Mexico to ensure the same standards are applied to [the Albuquerque Police Department's] settlement agreement."*

**DOJ INVESTIGATION**

It was in 2013 that the Department of Justice (DOJ) conducted an investigation of the Albuquerque Police Department. The DOJ found that APD engaged in a pattern of **"excessive use of force"** and **"deadly force"** and a **"culture of aggression" existed within APD.** The DOJ investigation of APD resulted in a Court Approved Settlement Agreement (CASA) entered into by the City and the DOJ mandating 271 police reforms.

It was April 10, 2014, the United States Department of Justice (DOJ), Civil Rights Division,

released a scathing 46-page investigation report on an 18-month civil rights investigation of the Albuquerque Police Department (APD). You can read the entire report here.

https://www.justice.gov/sites/default/files/crt/legacy/2014/04/10/apd_findings_4-10-14.pdf

A significant number of the use of force cases reviewed involved persons suffering from acute mental illness and who were in crisis. The investigation found APD's policies, training, and supervision did not ensure that officers encountering people with mental illness were respected and police did not act in a manner that was safe for all involve.

What differentiates the DOJ's investigation of APD from the other federal investigations of police departments and consent decrees is that the other consent decrees involve in one form or another the finding of **"racial profiling"** and use of excessive force or deadly force against minorities. The DOJ's finding of a **"culture of aggression"** within APD dealt with APD's interactions and responses to suspects that were mentally ill and that were having psychotic episodes.

**COURT APPROVED SETTLEMENT AGREEMENT**

The biggest and most pervasive complaints involving the settlement agreements are that they go on, and on for on years, they harm police morale and frustrate community residents. Monitoring teams, such as what Albuquerque has, are usually composed of former police officials, lawyers, academics and police-reform consultants.

The monitoring teams typically bill local taxpayers between $1 million and $2 million per year. In Albuquerque, Federal Court Appointed Monitor James Ginger has been paid upwards of $8 million over the last 7 years and his team has prepared 14 Independent Monitor's Reports filed with the federal court. Each time a report is released, the Federal Court has an all day briefing in the case.

It was on November 16, 2014, that the City and the Department of Justice (DOJ) entered into the Court Approved Settlement Agreement (CASA). The agreement contains 276 requirements for reforming the police department. The settlement required the appointment of a Federal Court Monitor to perform audits on the progress of the all reform. Thus far, 14 federal monitor reports have been filed. The link to the CASA is here:

https://www.cabq.gov/mental-health-response-advisory-committee/documents/court-approved-settlement-agreement-final.pdf

**TERMINATION PROVISIONS**

Certain provisions of the settlement need to be reviewed when it comes to any attempt by the city to **"renegotiate to the extent advisable"** the Consent Degree. The CASA contains the following suspension and termination provisions:

*"Termination of the Agreement*

*342. The City will endeavor to reach full and effective compliance with this Agreement within four years of its Effective Date. The Parties agree to jointly ask the Court to terminate this Agreement after this date, provided that the City has been in full and effective compliance with this Agreement for two years. "Full and Effective Compliance" shall be defined to require sustained compliance with all material requirements of this Agreement or sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures.*

*343. If after six years from the Effective Date the Parties disagree whether the City has been in full and effective compliance for two years, either Party may seek to terminate this Agreement. In the case of termination sought by the City, prior to filing a motion to terminate, the City agrees to notify DOJ in writing when the City has determined that it is in full and effective compliance with this Agreement and that such compliance has been maintained for no less than two years."*

The CASA does have a provision that allows suspension of the monitoring. Specifically, Paragraph 302 of the CASA provides:

*"302. Where the Parties agree, the Monitor shall refrain from conducting a compliance review of a requirement previously found by the Monitor to be in sustained compliance for at least two years pursuant to audits or reviews, or where outcome assessments or other information indicate that the outcome intended by the requirement has been achieved."*

The link to the full 106-page CASA containing 276 mandated reforms can be read here:

https://www.cabq.gov/mental-health-response-advisory-committee/documents/court-approved-settlement-agreement-final.pdf

Under the CASA, the federal monitor evaluates compliance in three specific areas:

*1. PRIMARY COMPLIANCE: Primary compliance is the "policy" part of compliance. To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors and managers in the performance of the tasks outlined in the CASA. As a matter of course, the policies must be reflective of the requirements of the CASA; must comply with national standards for effective policing policy; and must demonstrate trainable and evaluable policy components.*

*2. SECONDARY COMPLIANCE: Secondary compliance is attained by implementing supervisory, managerial and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the department for doing so. By*

definition, there should be operational artifacts (reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the department.

3. **OPERATIONAL COMPLIANCE:** Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff. In other words, the APD "owns" and enforces its policies.

The CASA was negotiated to be fully implemented over a four-year period. However, because of the previous Republican City Administration's **"delay, do little and deflect"** tactics, which was found by the Federal Monitor in his second report, it has taken much longer to implement the agreed to and mandated reforms.

http://documents.cabq.gov/police/reports/department-of-justice/independent-monitors-second-report.pdf

Under the terms and conditions of the CASA, once APD achieves a 95% compliance rate in all 3 of the compliance areas, and maintains compliance for 2 years, the case can be dismissed.

**MOST RECENT COMPLIANCE LEVELS**

In the November 12, 2021 IMR-14 report, the Federal Monitor reported the 3 compliance levels as follows:

**Primary Compliance: 100 %; (No change)**
**Secondary Compliance: 82 %; (No change)**
**Operational Compliance: 62 % (An increase 3% points)**

Regarding the compliance levels, the Federal Monitor wrote:

*"These data depict an organization that is willing to 'chip away' at the margins, completing expeditiously tasks that improve efficiency – and even effectiveness – but steadfastly refusing to make meaningful reform to processes involving use of force, excessive use of force, the processes of police-community interactions on the street, supervision, command, and discipline."*

*These data indicate that over the last seven reporting periods (three years), APD has virtually held constant in its compliance outcomes. There has been remarkably little change in operational compliance levels since IMR-8 in 2013. Compliance figures have held steady over that period of time, with operational compliance registering 59 percent in IMR-8 and 62 percent in IMR-14.*

*When one considers the vast amounts of technical assistance, coaching, and problem-solving provided to APD by the monitoring team over the past seven reporting periods, a 3 percentage point increase in overall compliance is evidence that APD is unwilling or unable to meet the requirements of the CASA related to supervision and oversight of in-field operations. The data [collected] ... indicate no meaningful improvement in operational compliance at APD since IMR-8. In the monitor's experience, this represents a question."*

https://documents.cabq.gov/police/reports/department-of-justice/independent-monitors-fourteenth-report-nov-2021.pdf

**WHAT HAS BEEN ACCOMPLISHED UNDER THE CASA**

On November 16, 2021, a full 7 years expired since the city entered into the CASA with the DOJ. From all appearances and practical purposes, and from review of the Federal Monitor's reports, the City and APD have completed the following mandated reforms under the Court Approved Settlement Agreement:

1. After a full year of negotiations, new **"use of force"** and **"use of deadly force"** policies have been written, implemented and all APD sworn have received training on the policies.

2. All sworn police officers have received crisis management intervention training.

3. APD has created a **"Use of Force Review Board"** that oversees all internal affairs investigations of use of force and deadly force.

4. The Internal Affairs Unit has been divided into two sections, one dealing with general complaints and the other dealing with use of force incidents.

5. Sweeping changes ranging from APD's SWAT team protocols, to banning choke-holds, to auditing the use of every Taser carried by officers and re-writing and implementation of new use of force and deadly force policies have been completed.

6. **"Constitutional policing"** practices and methods, and mandatory crisis intervention techniques an de-escalation tactics with the mentally ill have been implemented at the APD police academy with all sworn police having received the training.

7. APD has adopted a new system to hold officers and supervisors accountable for all use of force incidents with personnel procedures implemented detailing how use of force cases are investigated.

8. APD has revised and updated its policies on the mandatory use of lapel cameras by all sworn police officers.

9. The Repeat Offenders Project, known as ROP, has been abolished.

10. Civilian Police Oversight Agency has been created, funded, fully staffed and a director hired.

11. The Community Policing Counsels (CPCs) have been created in all area commands and the CPCs meet monthly.

12. The Mental Health Advisory Committee has been implemented.

13. The CASA identified that APD was understaffed. The City and APD are in the process of spending $88 million dollars, over a four-year period, with 32 million dollars of recurring expenditures, to hire 322 sworn officers and grow the department to 1,200 officers. As of January 1, 2020, APD has 949 full time police officers, up from 878 sworn police. The expansion initially included hiring from other departments and returning to work APD retirees.

15. According to the Use of Force Report for the years 2017 and 2018, APD's **"use of force"** and **"deadly force"** is down, which was one of the primary objectives of the CASA reforms.

**COMMENTARY AND ANALYSIS**

The resolution enacted by the city council for the city to renegotiate *"to the extent advisable"* the Court Approved Settlement Agreement is a reflection of sure ignorance on the part of the City Council and the reforms mandated. It reflects that the city council does not have a basic understanding of the court process nor the true meaning of a federal court order.

The fact that the City Attorney would not answer any questions about the process to renegotiate the settlement agreement and what factors can be considered at best was an ignorance of the practice of law on the part of the city attorney office and at worst legal malpractice for the city attorney's failure to properly advise its client the City Council.

Chief Medina either made it up or lied when he told the city council that he had been *"assured by the Federal Monitor"* that the next report on APD's progress would be different than recent ones and not as harshly critical of the department's progress. The Federal Monitor is an officer of the court, does not and cannot report to Medina and as such can not give any such assurances. The Federal Monitor must follow the evidence dealing with compliance levels. Chief Medina's comment *"I want to keep all options on the table"* likewise is laughable. Medina has no options at this point in time other than bringing his department into compliance with the settlement terms and conditions.

Simply put, there is nothing to negotiate. The city and the DOJ entered into a binding court order settlement agreement on what APD needs to do to come into compliance before the case can be dismissed. Because the settlement is a court approved order, any and all changes, even if agreed to by the Department of Justice and the city, must be approved by the Federal Judge.

At this point in the process, the city has essentially only two options under the CASA:

1. File a motion to dismiss alleging that the city is in compliance with the settlement, which it is not. The city's non compliance became so bad last year when it came to investigating police use of force cases that the Department of Justice felt it had enough to file a Motion for Contempt of Court. The City fearing such a motion and having APD forced into a receivership, agreed to the creation of External Force Investigation Team (EFIT) consisting of privately contracted investigators to teach APD how to investigate use of force cases and assist in handling of 660 backlogged use of force cases that APD unilaterally decided not to investigate.

2. File a motion to suspend and modify the terms of the CASA. The city in fact filed such a motion last year, but quickly withdrew it when it was objected to by the Department of Justice and others participating as friends of the court.

After over 7 years of implementing the mandating DOJ reforms, and millions spent on training, APD is still struggling mightily with **Operational Compliance** at 62% compliance. Operational compliance is the single most important compliance level of all 3 and it is where the rubber hits the road with respect to the reforms.

Operational compliance is the hardest to attain. Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency. It is achieved when line personnel are routinely held accountable for compliance by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff. In other words, the APD **"owns"** and enforces its policies. The problem is that the Federal Monitor has repeatedly found that APD sergeants and lieutenants are resisting the reforms.

Whatever attempts the city takes **"to the extent advisable"** to renegotiate the Court approved settlement will require a court hearing for approval and in all likely an evidentiary hearing. Ultimately it will be the Federal Judge who will decide if new settlement terms will be adopted.

### RESOLUTION REFLECTTION OF DAN LEWIS PRIOR FAILURE AS A CITY COUNCILOR

Monday, January 10, 2022 was the very first meeting of the new year for the new City Council. It was during that meeting that City Councilor Dan Lewis introduced the resolution directing the city administration to consider and **"to the extent advisable,"** push to renegotiate the terms of the federal Court Approved Settlement Agreement (CASA). What City Councilor Dan Lewis wants the City Council and the genal public to forget is that he was a failure during his second full term on the city from 2013 to 2017 when it came to police oversight and the Court Approved Settlement Agreement.

https://www.abqjournal.com/2478117/council-wants-city-to-re-negotiate-reform-agreement.html

The Albuquerque City Council plays a crucial oversight role of the Albuquerque Police Department (APD) including controlling its budget. Dan Lewis did nothing when he was on the

city council before when it comes to Albuquerque Police Department (APD)reforms. Lewis never challenged the Republican Berry Administration nor the APD command staff in public in any meaningful way demanding compliance with the Department of Justice (DOJ) consent decree reforms. Each time the Federal Court appointed Monitor presented his critical reports of APD to the City Council, Lewis remained silent. Lewis declined to demand accountability from Mayor Berry and hold the APD command staff responsible for dragging their feet on the reforms.

When Federal Monitor James Ginger made a presentation to a city council committee Lewis was presiding over, then City Council President Dan Lewis asked Dr. Ginger *"Who is ultimately responsible for failure to implement the reforms an overseeing APD?"* When Ginger said *"The City Council"* Lewis chortled uncomfortably with other counselors with a stupid expression of disbelief on his face.

Lewis often likes to take credit for bringing the DOJ to the city with his sponsorship of a resolution enacted by the City Council. The truth is Lewis had very little to do with it or nothing at all to bring the Department of Justice to the city.

The DOJ came to the city because minority community stakeholders who had been victimized by APD and lobbied aggressively and effectively to get the DOJ to come to the city. Even as a City Councilor, Lewis did not attend a single federal court hearing on the Federal Monitor's reports to find out what APD's position was on the monitor's reports.

**CONCLUSION**

Before City Councilor Dan Lewis introduces any more meaningless resolutions to deal with the Court Approved Settlement that are a waste of time and grandstanding on his part before the Council, and that will have no impact on the process, Lewis needs to educate himself on the contents of the Court Approved Settlement Agreement. To that end, all documents related to APD's settlement agreement can be downloaded and reviewed at this city web site link:

https://www.cabq.gov/police/documents-related-to-apds-settlement-agreement

The documents include:

The Settlement Agreement between City and the DOJ
APD Progress Reports
Independent Monitor's Reports
Compliance Reports
Use of Force Annual Reports
Use of Force Reports
Studies
Audits

This entry was posted in **Opinions**. Bookmark the **permalink [https://www.petedinelli.com/2022/03/22/city-council-resolution-to-renegotiate-to-the-extent-advisable-apd-consent-degree-reflects-ignorance-by-council-of-apd-reform-mandates-and-court-process-resolution-sponsorship-by-c/]** .

### About

Pete Dinelli was born and raised in Albuquerque, New Mexico. He is of Italian and Hispanic descent. He is a 1970 graduate of Del Norte High School, a 1974 graduate of Eastern New Mexico University with a Bachelor's Degree in Business Administration and a 1977 graduate of St. Mary's School of Law, San Antonio, Texas. Pete has a 40 year history of community involvement and service as an elected and appointed official and as a practicing attorney in Albuquerque. Pete and his wife Betty Case Dinelli have been married since 1984 and they have two adult sons, Mark, who is an attorney and George, who is an Emergency Medical Technician (EMT). Pete has been a licensed New Mexico attorney since 1978. Pete has over 27 years of municipal and state government service. Pete's service to Albuquerque has been extensive. He has been an elected Albuquerque City Councilor, serving as Vice President. He has served as a Worker's Compensation Judge with Statewide jurisdiction. Pete has been a prosecutor for 15 years and has served as a Bernalillo County Chief Deputy District Attorney, as an Assistant Attorney General and Assistant District Attorney and as a Deputy City Attorney. For eight years, Pete was employed with the City of Albuquerque both as a Deputy City Attorney and Chief Public Safety Officer overseeing the city departments of police, fire, 911 emergency call center and the emergency operations center. While with the City of Albuquerque Legal Department, Pete served as Director of the Safe City Strike Force and Interim Director of the 911 Emergency Operations Center. Pete's community involvement includes being a past President of the Albuquerque Kiwanis Club, past President of the Our Lady of Fatima School Board, and Board of Directors of the Albuquerque Museum Foundation.

View all posts by →