Monitor's 18th Report

Compliance Levels of the Albuquerque Police
Department and the City of Albuquerque with
Requirements of the Court-Approved Settlement
Agreement

No. 14-CV-1025-JB-JFR

November 8, 2023

Prepared by: Public Management Resources, Inc.

James D. Ginger, Ph.D., Independent Monitor

**Table of Contents**

| Topic | Page |
|---|---|
| 1.0 Introduction | 1 |
| 2.0 Executive Summary | 1 |
| 3.0 Synopsis of Findings | 2 |
| 4.0 Current Status | 3 |
| 4.1 Overall Status Assessment | 3 |
| 4.2 Dates of Project Deliverables | 3 |
| 4.3 Format for Compliance Assessment | 3 |
| 4.4 Compliance Assessment | 4 |
| 4.5 Operational Definition of Compliance | 5 |
| 4.6 Operational Assessment | 5 |
| 4.6.1 Methodology | 6 |
| 4.7 Assessing Compliance with Individual Tasks | 6 |
| 5.0 Summary | 160 |

## 1.0 Introduction

This Independent Monitor's Report (IMR) follows the same format as all previous reports. That format is organized into five sections:

    1.0  Introduction;
    2.0  Executive Summary;
    3.0  Synopsis of Findings;
    4.0  Compliance Findings; and
    5.0  Summary.

The purpose of the monitor's periodic compliance reports is to inform the Court of the monitor's findings related to the progress made by APD in achieving compliance with the individual requirements of the Court Approved Settlement Agreement (CASA). This report covers the compliance efforts made by APD during the 18th reporting period, which covers February 1, 2023, through July 31, 2023.

## 2.0 Executive Summary

APD continued to make steady progress again this reporting period. The agency has achieved 100 percent Primary Compliance. Secondary Compliance was also strong, at 99 percent. APD achieved 94 percent Operational Compliance. See Figure 2.0, below, for a graphic depiction of longitudinal compliance levels over the life of the CASA project.



Figure 2.0: APD Compliance Levels, IMR-1 through IMR-18

We note the steady upward trend in Operational Compliance starting in IMR-14 and continuing through IMR-18.  During this reporting period, we noted that training processes have remained strong, reflecting "best-standards" of training needs, curricula development, and delivery of CASA-congruent training programs.  Importantly, during this reporting period, with the approval of the Parties and the concurrence of the monitor, APD is now self-monitoring 157 specific paragraphs.   APD continues to develop the ability to independently self-monitor with review by the monitoring team.

As we have noted in the past, compliance findings began improving markedly during the IMR-14 reporting period.  APD has continued to make gains for five consecutive monitoring periods.  We believe this compliance surge is due mostly to APD's finally understanding the change process, and focused APD leadership *vis a vis* compliance issues.

During this reporting period, we reviewed eight cases completed by EFIT graduates and found each case to be thorough, accurate, well-documented, and congruent with APD policy and national standards.  This is a major milestone.

Further, all CIU paragraphs comply in terms of policy, training, and in-field performance.  As the frequent readers of the monitor's reports are aware, this is a central "reform requirement" of the CASA.  We also found APD's disciplinary findings and practices continue to improve during this reporting period; however, they are not yet at the 95 percent compliance level.  During this reporting period, we found that all on-body recording devices (OBRD) usage standards followed CASA requirements.

We also noted some other critical compliance issues this reporting period. These include a continuing issue of adequately staffing the CPOA board and providing adequate training for board members and reconstituting the process of strong CPOA oversight.  Also lagging is the process of appointing a contract compliance officer, a qualified permanent executive director of CPOA, and a deputy executive director of CPOA.  We also note a continuing issue with CPOA investigators meeting articulated timelines.  We again recommend a formal external assessment of CPOA workload and staffing.

We also identify a concern about the trend during IMR-17 and IMR-18 with FRB's mishandling of some officer-involved shootings.  We note it is extremely difficult for an agency to function well, absent strong oversight processes related to high-risk critical tasks, particularly when these tasks are a major reason for the existence of the CASA.  We call out these issues due to our awareness of the fact that one of the major reasons for the existence of the CASA was questionable APD officer-involved shootings over a protracted period.

## 3.0 Synopsis of Findings for the 18th Reporting Period

As of the end of the IMR-18 reporting period, APD's compliance levels are as follows:

2

Primary Compliance            100%
Secondary Compliance      99% and
Operational Compliance      94%

## 4.0 Current Compliance Assessments

As part of the monitoring team's normal course of business, it established a baseline assessment of all paragraphs of the CASA for the Independent Monitor's first report (IMR-1)[1].  This was an attempt to provide the Parties with a snapshot of existing compliance levels and, more importantly, to identify issues confronting compliance as APD continues to work toward full compliance. As such, the baseline analysis was considered critical to future performance in APD's reform effort, as it clearly depicts the issues standing between the APD and full compliance.  This report, IMR-18, provides a similar assessment and establishes a picture of progress on APD goals and objectives since the last monitor's report.

## 4.1 Overall Status Assessment

APD remained consistent with its Primary Compliance, and Secondary Compliance was determined to be 99 percent.  During this reporting period, APD's Operational Compliance increased to 94 percent.

## 4.2 Project Deliverables

The 3rd Amended Court-Approved Settlement Agreement defines the project deliverables of the CASA.  Each deliverable is identified in detail in section 4.7, beginning on page 6.

## 4.3 Format for Compliance Assessment

There are 114 paragraphs monitored in this report.  Three paragraphs in the 3rd Amended CASA were intentionally left blank, and two were updated to indicate they were non-rated introductory paragraphs.  One hundred fifty-seven paragraphs are under self-monitoring by APD and the City of Albuquerque.  We note these CASA paragraphs have been moved to APD self-monitoring based on the agreement of the Parties and the concurrence of the monitor[2].

The monitor's reports are structured into nine major sections, following the structure of the CASA:

        I.       Use of Force;

---

[1] Available at www.AbqMonitor.org/documents/Appendix, pp. 1-306.
[2] Final 3rd Amended CASA, paragraph 302.

II.        Specialized Units;

III.       Crisis Intervention;

IV.       Policies and Training;

V.        Misconduct Complaint Intake, Investigation, and Adjudication;

VI.       Staffing, Management, and Supervision;

VII.      Recruitment, Selection, and Promotions;

VIII.     Officer Assistance and Support; and

IX.       Community Engagement and Oversight;

The eighteenth monitor's report does not address in detail items II, Specialized Units, VII, Recruitment, Selection, and Promotions, or VIII, Officer Assistance and Support, as APD is in full compliance with the requirements of these sections of the CASA.  This report addresses the remaining six of these nine major areas, in turn, beginning with APD's response and performance regarding reporting, supervising, and managing its officers' use of force during the performance of their duties and ending with APD's efforts at community engagement and its ability to facilitate community oversight of its policing efforts.

## 4.4 Structure of the Monitoring Assessment Process

Members of the monitoring team have collected data concerning APD's compliance levels in several ways:  through on-site observation, review, and data retrieval; through off-site review of more complex items, such as policies, procedures, testing results, etc.; and through review of documentation provided by APD or the City which constituted documents prepared contemporaneously during the normal daily course of business. While the monitoring team did collect information provided directly by APD in response to the requirements of the CASA, those data were never used as a sole source of determining compliance.  Still, they were used by the monitoring team as an explanation or clarification of process.  All data collected by the monitoring team were one of two types:

- •   Data that were collected by using a structured random sampling process; or

- •   Selecting *all* available records of a given source for the "effective dates."

Under no circumstances were data selected by the monitoring team based on provision of records of preference by personnel from the City or APD.  In every selection of random samples, APD personnel were provided lists of specific items, date ranges, and other specific selection rules.  The samples were drawn throughout the monitoring period and on-site by the monitor or his staff. The same process continues for all following reports until the final report is written.

4

**4.5 Operational Definition of Compliance**

For the purposes of the APD monitoring process, "compliance" consists of three parts:  primary, secondary, and operational.  These compliance levels are described below.

- **Primary Compliance**:  Primary compliance is the "policy" part of compliance.  To attain primary compliance, APD must have in place operational policies and procedures designed to guide officers, supervisors, and managers in the performance of the tasks outlined in the CASA.  As a matter of course, the policies must be reflective of the requirements of the CASA, must comply with national standards for effective policing policy, and must demonstrate trainable and evaluable policy components.

- **Secondary Compliance**:  Secondary compliance is attained by providing acceptable training related to supervisory, managerial, and executive practices designed to (and effective in) implementing the policy as written, e.g., sergeants routinely enforce the policies among field personnel and are held accountable by managerial and executive levels of the department for doing so.  By definition, there should be operational artifacts such as reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies if necessary, indicating that the policies developed in the first stage of compliance are known to, followed by, and important to supervisory and managerial levels of the department.

- **Operational Compliance**: Operational compliance is attained at the point that the adherence to policies is apparent in the day-to-day operation of the agency, e.g., line personnel are routinely held accountable for compliance, not by the monitoring staff, but by their sergeants, and sergeants are routinely held accountable for compliance by their lieutenants and command staff.  In other words, the APD "owns" and enforces its policies.

**4.6 Operational Assessment**

APD and the City (including the CPOA and CPOA Board) have agreed to comply with each articulated element of the CASA.  The monitoring team provided the Parties with copies of the team's monitoring methodology (a 299-page document), asking for comment.  That document was then revised based on comments by the Parties.  This document reflects the monitor's decisions relative to the Parties' comments and suggestions on the proposed methodology and is congruent with the final methodology included in Appendix One of the monitor's first report[3].  The first operational paragraph,

---

[3] Available at: https://www.justice.gov/usao-nm/file/796891/download

under this rubric, is paragraph 14, as paragraph 13 is subsumed under paragraph 14's requirements.  We note that some paragraphs have changed in the 3rd Amended CASA.

### 4.6.1 Methodology

The monitor assessed the City and APD's compliance efforts during the 18th reporting period using the *Monitor's Manual*, included as Appendix A in the monitor's first report (see footnote 3 for a link to that methodology).  We note that the original methodology was sometimes revised based on the availability of records (or lack thereof) and related organizational processes.  The manual identifies each task required by the CASA and stipulates the methodology used to assess compliance.  The reader will note that, as of IMR-18, additional CASA Paragraphs are being monitored by APD, as provided for by the CASA, once long-term compliance is established by APD, as per monitor's findings.

### 4.7 Assessing Compliance with Individual Tasks

APD's compliance with individual tasks for the 18th reporting is described in the following sections.

### 4.7.1- 4.7.3   Assessing Compliance with Paragraphs 14 -16

### 4.7.1   Assessing Compliance with Paragraph 14

Paragraph 14 stipulates:

> **"Use of force by APD officers, regardless of the type of force, tactics, or weapon used, shall abide by the following requirements:**
>
> a) **Officers shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force;**
> b) **Force shall be de-escalated immediately as resistance decreases;**
> c) **Officers shall allow individuals time to submit to arrest before force is used whenever possible;**
> d) **APD shall explicitly prohibit neck holds, except where lethal force is authorized;**
> e) **APD shall explicitly prohibit using leg sweeps or prone restraints, except as objectively reasonable to prevent imminent bodily harm to the officer or another individual; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance and handcuff the individual;**
> f) **APD shall explicitly prohibit using force against individuals in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another individual; to overcome active resistance; or as objectively reasonable where physical removal is necessary to overcome passive resistance;**

6

g) **Officers shall not use force to attempt to effect compliance with a command that is unlawful;**

h) **pointing a firearm at an individual shall be reported as a Level 1 Use of Force, and shall be done only as objectively reasonable to accomplish a lawful police objective; and**

i) **once a scene is secure following a use of force, officers, and, upon arrival, a supervisor, shall immediately inspect and observe individuals subjected to force for injury or complaints of pain resulting from the use of force and immediately obtain any necessary medical care. This may require an officer to provide emergency first aid consistent with their training until professional medical care providers arrive on scene."**

## Methodology

CASA requirements stipulate that the use and investigation of force shall comply with applicable laws and comport to best practices. Central to these investigations shall be a determination of each involved officer's conduct to determine if the conduct was legally justified and compliant with APD policy. Throughout 2022, APD worked to revise its force policies, and on January 26, 2023, they issued monitor-approved policies to the department.

SOP 2-52 Use of Force – General (1/26/2023)
SOP 2-53 Use of Force – Definitions (1/26/2023)
SOP 2-54 Use of Force – Intermediate Weapon Systems (1/26/2023)
SOP 2-55 Use of Force – De-escalation (1/26/2023)
SOP 2-56 Use of Force – Reporting by Department Personnel (1/26/2023)
SOP 2-57 Use of Force – Review and Investigation by Department Personnel (1/26/2023)

As the policies were being developed, APD began devising training programs to help officers in the field apply the provisions of the new policies. This monitoring period saw APD commit significant time and resources to that endeavor. The monitoring team worked with Academy personnel and provided technical assistance as they created two training days, each 10 hours in length. The curriculum for the two days received approval from the monitoring team in the first half of the monitoring period. The first day was in-person, classroom training that was held at the APD Academy. The training included group discussions, scenarios, and a practical exercise, with instruction noting the differences between the old and new policies. The second day of training was 10 hours of practical application of APD's use of force policies through their Reality-Based Training (RBT) program. A monitoring team member conducted an in-person review of both days of training to ensure the quality of the delivery was appropriate and consistent with the approved curriculum. In our opinion, both training days' coordination and delivery were well organized and professional. We

7

report more thoroughly in Paragraphs 86-88 on the training of the new use of force policy suite.

In preparation for this monitor report, we collected data relevant to making reliable assessments of APD's progress with Paragraph 14, along with many additional paragraphs centered on uses of force, the reporting and supervision of force investigations, and the oversight of uses of force by the Force Review Board (FRB). Among the data we reviewed were a sample of incidents reported as low-level control tactics (LLCT) by officers in the field, investigative files of reported uses of force applications of Level 1, Level 2, and Level 3, and files reviewed by the FRB. We report extensively on our compliance findings of these use of force events in Paragraphs 24-29 (ECW), 41-59, 60-78.

**Results**

The monitoring team documents its compliance findings regarding the aforementioned CASA paragraphs later in this report. Notwithstanding the significant concern we detail with the FRB in Paragraph 78, it is our assessment that APD has sustained Operational Compliance with Paragraph 14.

> Primary:        **In Compliance**
> Secondary:    **In Compliance**
> Operational:  **In Compliance**

### 4.7.2  Assessing Compliance with Paragraph 15:  Use of Force Policy Requirements

Paragraph 15 stipulates:

> **"APD shall develop and implement an overarching agency-wide use of force policy that complies with applicable law and comports with best practices. The use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal, that are available to APD officers, including authorized weapons, and weapons that are made available only to specialized units. The use of force policy shall clearly define and describe each force option and the factors officers should consider in determining which use of such force is appropriate. The use of force policy will incorporate the use of force principles and factors articulated above and shall specify that the use of unreasonable force will subject officers to discipline, possible criminal prosecution, and/or civil liability**."

**Methodology**

Throughout 2022, APD worked to revise its force policies, and on January 26, 2023, they issued monitor-approved policies to the department.  Those policies were trained thoroughly throughout this monitoring period.

**Results**

We detail how APD developed and delivered new training for the use of force suite of policies in Paragraphs 86-88.  Their training during the IMR-18 monitoring period was thorough and professional, resulting in APD retaining Operational Compliance.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

**4.7.3 Assessing Compliance with Paragraph 16:  Weapons Protocols**

Paragraph 16 stipulates:

> **"In addition to the overarching use of force policy, APD agrees to develop and implement protocols for each weapon, tactic, or use of force authorized by APD, including procedures for each of the types of force addressed below. The specific use of force protocols shall be consistent with the use of force principles in Paragraph 14 and the overarching use of force policy."**

**Results**

The training delivered during the IMR-18 monitoring period was thorough and professional and met the requirements of this paragraph.  We report in greater detail in Paragraphs 86-88.

APD has met the requirements of Paragraph 16 for this monitoring period.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

**4.7.4 – 4.7.10 Assessing Compliance with Paragraphs 17 - 20**

The 2023 Firearms Training cycle will be completed after the IMR-18 close of the reporting period. The latest Firearms Qualification SOP was approved by the Monitoring Team as this reporting period was ending.

While visiting every area command and many other units during this monitoring period, members of the monitoring team met with 18 supervisors (ten sergeants and eight

lieutenants).  On-site inspections by the monitoring team indicate that sergeants documented their monthly inspections of firearms and ammunition issued to their personnel.  Lieutenants also documented their review of the monthly inspections conducted by sergeants and additional secondary reviews of other assigned officers. The records we reviewed supported the validity of this process.  On-going tracking of the inspection process through Monthly Scorecards is provided by the Performance Management Unit (PMU).  Based on the completed inspections (and secondary reviews of these inspections), APD remains in operational compliance for these paragraphs.

Additionally, monitoring team members visited the APD firearms range and observed the process that APD personnel use to practice with their issued firearms.  Firearms staff can track and analyze these data, allowing APD to make informed decisions relating to policy, training, and inventory/purchasing.

### 4.7.4 Assessing Compliance with Paragraphs 17

Paragraph 17 stipulates:

> **"Officers shall carry only those weapons that have been authorized by the Department. Modifications or additions to weapons shall only be performed by the Department's Armorer, as approved by the Chief. APD use of force policies shall include training and certification requirements that each officer must meet before being permitted to carry and use authorized weapons."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.5 Assessing Compliance with Paragraph 18:  On-duty Weapons

**Paragraph 18 is self-monitored by APD.**

### 4.7.5--4.7.6 Assessing Compliance with Paragraph 19:  On Duty Weapons

Paragraph 19 stipulates:

> **"APD issued Special Order 14-32 requiring all officers to carry a Department- issued handgun while on duty. APD shall revise its force policies and protocols to reflect this requirement and shall implement a plan that provides: (a) a timetable for implementation; (b) sufficient training courses to allow officers to gain proficiency and meet qualification requirements within a specified period; and (c) protocols to track and control the inventory and issuance of handguns."**

10

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.7 Assessing Compliance with Paragraph 20:  Weapons Qualifications**

**Paragraph 20 is self-monitored by APD.**

**4.7.8 Assessing Compliance with Paragraph 21:  Firearms Training**

Paragraph 21 stipulates:

> **"APD training shall continue to require and instruct
> proper techniques for un-holstering, drawing, or
> exhibiting a firearm."**

**Methodology**

APD revised its use of force suite of policies, which were approved by the monitor and went into effect on January 26, 2023.  The monitoring team requested and was provided training data relevant to assessing APD's compliance with Paragraph 21.

**Results**

On February 28, 2023, Special Order 23-28 was issued, requiring all APD personnel to attend the "2023 Firearms Training Day and Low Light Firearms Qualifications" course, which will be held between September 11 and October 26, 2023.  In addition to target qualifications, officers will train on the proper techniques of unholstering, drawing, and exhibiting a firearm as part of those training programs.  We will report on attendance and qualification outcomes in IMR-19.

The monitoring team reviewed training materials for APD's 2023 RBT (Reality-Based Training) and, in May 2023, made a specific trip to observe the training on-site.  Special Order 23-41 was issued on March 14, 2023, requiring all officers to attend the training between May 9 and July 27, 2023.  Based on an in-person review, the RBT training was well organized, delivered and supervised, and relevant to compliance with Paragraph 21.  We reviewed a July 28, 2023, Close Out Memo indicating that of 829 available APD officers, 816 attended the RBT sessions for a 98 percent attendance rate.[4]  As part of the training, officers are assessed in active scenarios using real-life actors, during which they must

---

[4] There were 44 officers on extended and approved leaves of absence (i.e. Military and FMLA leave).  At the close of the monitoring period there were 13 active and available officers who had not attended the training.

11

demonstrate their proficiency with their handgun and ECW.  We reviewed a July 28, 2023, Memo, "Status Update on 2023 Taser 7 Re-Certification", that resulted from APD's efforts to recertify its members with the Taser 7 ECW.  Training records and the Closeout Memo documented that 98.4 percent of APD officers recertified with their ECW during this monitoring period.  The training outcomes are discussed in greater detail in Paragraphs 86-88.

The monitoring team has determined that APD has sustained Operational Compliance with Paragraph 21 during this monitoring period.  We will compile final training records at the close of the next monitoring period and continue monitoring performance in the field through use-of-force case reviews.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.9 Assessing Compliance with Paragraph 22:  Firearm Discharges from Moving Vehicles

Paragraph 22 stipulates:

> **"APD shall adopt a policy that prohibits officers from discharging a firearm from a moving vehicle or at a moving vehicle, including shooting to disable a moving vehicle, unless an occupant of the vehicle is using lethal force, other than the vehicle itself, against the officer or another individual, and such action is necessary for self-defense, defense of other officers, or to protect another individual. Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle."**

**Methodology**

As noted in Paragraph 21, APD substantially advanced training relative to firearms usage throughout 2022 and 2023 through the close of IMR-18.

**Results**

As noted, although use-of-force incidents related to Paragraph 22 are rare, we encourage APD to regularly assess its policies and training to ensure they keep up to date with legal standards and best practices.  Low frequency-high risk events should be of particular concern to APD executive staff.  We highly recommend all future use-of-force training programs include components that reinforce the CASA and policy requirements related to weapons discharges and officer interactions with suspects in vehicles.  The monitoring team randomly selected and reviewed 30 separate and distinct Level 2 and 3 use of force cases,

nine of which were also reviewed by the Force Review Board.  None of those cases involved the types of actions Paragraph 22 is designed to address.

We have determined that Paragraph 22 remains in Operational Compliance for this reporting period.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

## 4.7.10 Assessing Compliance with Paragraph 23:  Tracking Firearm Discharges

Paragraph 23 stipulates:

> **"APD shall track all critical firearm discharges."**

**Results**

APD currently tracks firearm discharges in its IAPro system.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

## 4.7.11-4.7.18 and 4.7.21-4.7.25 Assessing Compliance with Paragraphs 24-31 and 34-38 (Electronic Control Weapons)

Paragraphs 24-31 and 34-36 address requirements for APD's use of Electronic Control Weapons (ECWs) as follows:

Paragraph 24: Use of ECWs;
Paragraph 25: ECW Verbal Warnings;
Paragraph 26: ECW Limitations;
Paragraph 27: ECW Cycling;
Paragraph 28: ECW Drive-Stun Mode;
Paragraph 29: ECW Reasonableness Factors;
Paragraph 30: ECW Targeting;
Paragraph 31: ECW Restrictions;
Paragraph 32: ECW Weak-side Holster;
Paragraph 33: ECW Annual Certification;
Paragraph 34: ECW Medical Protocols;
Paragraph 35: ECW Medical Evaluation; and
Paragraph 36: ECW Notifications.

During this reporting period, the monitoring team continued its analysis of APD's use of force cases involving the use of Electronic Control Weapons (ECWs).  Over the past

several monitoring periods, operational compliance has fluctuated due to varying degrees of in-field ECW compliance.

During this monitoring period, APD case ledgers revealed 35 distinct cases in which an ECW was utilized, inclusive of nine Level 1 ECW Shows of Force where no higher level of force was utilized.[5]  This means that these nine cases consisted of just an ECW show of force that was not accompanied by an ECW application, miss, or any other higher-level use of force.  There were 26 cases in which an ECW was utilized that were investigated as a Level 2 or Level 3 use of force.

During IMR-16 and IMR-17, the monitoring team noted that all ECW cases investigated by area commands had been completed within specified timeframes.  The same is true during this monitoring period: All Level 1 ECW cases reviewed by the area commands (as well as the pilot group reviewing Level 1 cases) were completed within 30 days.  In fact, no case came within six days of the 30-day mark.  These data are set forth in Table 4.7.11 on the following page.

Table 4.7.11a

| Monitoring Period (MP) | ECW Cases Opened during the Monitoring Period | ECW Cases Opened AND Completed During the Same Monitoring Period | % of ECW Cases Opened and Completed During the Same Monitoring Period |
|---|---|---|---|
| IMR-11 | 53 | 33 | 62% |
| IMR-12 | 99 | 30 | 30% |
| IMR-13 | 67 | 3 | 4% |
| IMR-14 | 40 | 11 | 28% |
| IMR-15 | 20 | 11 | 55% |
| IMR-16 | 36 | 21 | 58% |
| IMR-17 | 28 | 19 | 68% |
| IMR-18 | 35 | 19 | 54%[6] |

Table (4.7.11b) contains the monitoring team's review results of 12 ECW cases (five Level 1 cases, four Level 2 cases, and three Level 3 cases).  The Level 1 cases are further examined within Paragraphs 41-59 for Supervisory Review of Use of Force

---

[5] In IMR-17, eight of the 28 ECW cases included only ECW Shows of Force (cases in which an actual ECW application did not occur). In IMR-16, nine of the 36 ECW cases (25%) included only ECW Shows of Force (cases in which an actual ECW application did not occur). In IMR-15, four of the 20 ECW cases (20%) included only ECW Shows of Force. In IMR-14, 19 of the 40 ECW cases (48%) included only ECW Shows of Force. In IMR-13, 29 of the 67 ECW cases (43%) included only ECW Shows of Force. In IMR-12, 64 of the 99 ECW cases (65%) included only ECW Shows of Force. In IMR-11, ten of the 53 ECW cases (19%) included only ECW Shows of Force.

[6] More than half of the ECW cases occurred after the midpoint of the monitoring period. Thus, the 90-day deadline for these cases investigated by IAFD actually falls within IMR-19.

Reporting.  The Level 2 and Level 3 cases are further examined within Paragraphs 60-77, which address Force Investigations by the Internal Affairs Division (IAFD).[7]

Table 4.7.11b

| Para | Paragraph Provision | IMR-18-01 | IMR-18-02 | IMR-18-03 | IMR-18-04 | IMR-18-05 | IMR-18-11 | IMR-18-12 | IMR-18-13 | IMR-18-14 | IMR-18-15 | IMR-18-16[8] | IMR-18-17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | ECW - shall not be used solely as a compliance technique | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 24 | ECW - shall not be used to overcome passive resistance | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 24 | ECW - protect officer, subject, 3rd party from physical harm | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 24 | ECW - consider less intrusive means based on threat/resistance | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 24 | ECW - control actively resistant person based on safety/effective | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 25 | ECW - verbal warning prior to discharge | N/A | N/A | N/A | N/A | N/A | N/A | N[9] | Y | Y | Y | Y[10] | Y |
| 25 | ECW - defer reasonable time to allow compliance with warning | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y |
| 27 | ECW - continuous cycling only under exceptional circumstances | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

[7] One of the Level 3 ECW cases is also discussed in Paragraph 78 regarding the Force Review Board.

[8] Investigated by an EFIT graduate.

[9] No appropriate verbal warning was provided to the subject or to others in the force array.

[10] The event rapidly evolved into an ECW use of force (standoff mode) while physically removing an actively resisting subject (armed with a firearm) from a vehicle.  One officer deployed their ECW before making an initial announcement of "Taser, taser, taser", but then warned the subject that failing to comply with handcuffing would result in an additional charging of the ECW.  The subject complied.  In our opinion the timing of the sequence of events did not allow for a warning to the subject prior to the initial deployment of the ECW.

15

| 27 | Officers shall independently justify each cycle of 5 seconds | N/A | N/A | N/A | N/A | N/A | N/A | Y | Y | Y | Y | Y | Y |
| 29[11] | Determine the reasonableness of ECW use based on circumstances | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |

No discernible problematic ECW trends have been noted during this monitoring period; however, we do note that of the 12 cases reviewed for IMR-18, one case (IMR-18-12) had issues with ECW usage actions.  One case does not constitute a trend.

### 4.7.11 Assessing Compliance with Paragraph 24

Paragraph 24 stipulates:

> **"ECWs shall not be discharged solely as a compliance technique or to overcome passive resistance.  Officers may use ECWs only when such force is necessary to protect the officer or any other individual from physical harm and after considering less intrusive means based on the threat or resistance encountered.  Officers are authorized to use ECWs to control an actively resistant individual when attempts to subdue the individual by other tactics have been, or will likely be, ineffective and there is a reasonable expectation that it will be unsafe for officers to approach the individual within contact range."**

**Results**

APD was in compliance with all provisions of this paragraph 100 percent of the time in the cases reviewed by the monitoring team during this monitoring period.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.12 Assessing Compliance with Paragraph 25:  ECW Verbal Warnings

Paragraph 25 stipulates:

> **"Unless doing so would place any individual at risk, officers shall issue a verbal warning to the individual that the ECW will be used prior to discharging an ECW**

---

[11] Paragraphs 26 and 28 is in Self-Assessment.

16

**on the individual. Where feasible, the officer will defer ECW discharge for a reasonable time to allow the individual to comply with the warning."**

## Results

In IMR-17, we noted that APD has reduced its ECW usage to the point that even one instance of failing to issue a verbal warning and not allowing time for the individual to comply would hold them out of compliance. Therefore, we find APD in compliance due to the reduction of ECW events.[12]

Primary:          **In Compliance**
Secondary:        **In Compliance**
Operational:      **In Compliance**

## 4.7.13 Assessing Compliance with Paragraph 26:  ECW Limitations

**Paragraph 26 is being self-monitored by APD.**

## 4.7.14 Assessing Compliance with Paragraph 27: ECW Cycling

Paragraph 27 stipulates:

> **"Continuous cycling of ECWs is permitted only under exceptional circumstances where it is necessary to handcuff an individual under power.  Officers shall be trained to attempt hands-on control tactics during ECW discharges, including handcuffing the individual during ECW discharge (i.e., handcuffing under power).  After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary.  Officers shall consider that exposure to the ECW for longer than 15 seconds (whether due to multiple discharges or continuous cycling) may increase the risk of death or serious injury.  Officers shall also weigh the risks of subsequent or continuous cycles against other force options.   Officers shall independently justify each cycle or continuous cycle of five seconds against the individual in Use of Force Reports."**

## Results

APD was in compliance with the provisions of this paragraph in 100 percent of the cases reviewed.

Primary:          **In Compliance**
Secondary:        **In Compliance**

---

[12] See Paragraph 78 for a discussion of ECW usage for IMR 18-12.

Operational:  **In Compliance**

**4.7.15 Assessing Compliance with Paragraph 28:  ECW Drive-Stun Mode**

**Paragraph 28 is being self-monitored by APD.**

**4.7.16 Assessing Compliance with Paragraph 29:  ECW Reasonableness Factors**

Paragraph 29 stipulates:

> **"Officers shall determine the reasonableness of ECW use based upon all circumstances, including the individual's age, size, physical condition, and the feasibility of lesser force options. ECWs should generally not be used against visibly pregnant women, elderly individuals, young children, or visibly frail persons. In some cases, other control techniques may be more appropriate as determined by the individual's threat level to themselves or others. Officers shall be trained on the increased risks that ECWs may present to the above-listed vulnerable populations."**

APD complied with this paragraph's provisions in 100 percent of the cases reviewed.

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

**4.7.17 – 4.7.24 Assessing Compliance with Paragraphs 30 – 37**

**Paragraphs 30 – 37 are self-monitored by APD.**

**4.7.25 Paragraph 38:**

**[THIS PARAGRAPH INTENTIONALLY LEFT BLANK.]**

**4.7.26– 4.7.27 Assessing Compliance with Paragraphs 38-40: Crowd Control Policies and After-Action Reviews.**

Paragraphs 39-40 of the CASA address requirements that APD must meet related to crowd control policies and the management and supervision of APD responses to events involving mass demonstrations, civil disturbances, and other crowd situations. Previously, ERT achieved Operational Compliance with the successful delivery of three stages of training that have been discussed in prior monitor reports.

As in the past, monitoring team members met with ERT command personnel during our June 2023 site visit to discuss ERT-centric issues.  ERT came prepared to the meeting and provided a PowerPoint presentation outlining its work to address its compliance

efforts.  Like interactions we have had with ERT over the past several monitoring periods, we found the ERT representatives conversant with their responsibilities and receptive to feedback.

A data request was made to obtain training records, the current ERT policy, and Event/Incident Action Plans (E/IAP) and After-Action Reports (AAR) completed during the monitoring period.  As noted in the past two monitor's reports, the SOP 2-35 "Emergency Response Team (ERT)" was approved by the monitor, became effective June 20, 2022, and is due for review on June 20, 2023.  Likewise, SOP 2-39, "FSB Response to Demonstrations, Incidents, and Events", was due for revision as of February 16, 2023.  At the close of IMR-18, both SOPs were still working their way through the steps of APD approval.  The length of time policies take for revision within an annual schedule is something APD should consider closely.  At this point in the reform process, revising, training, and implementing policies should be timelier.

The following represents our findings related to Paragraphs 39-40 for this monitoring period:

The monitoring team requested that APD provide documentation for any mobilizations to mass gatherings during the IMR-18 monitoring period and were provided Emergency Action Plans and After-Action Reports for two separate and distinct activations that occurred on May 27, 2023, and June 11, 2023.  We found the reports well organized, detailed, and appropriate for compliance with Paragraph 40.  The key element of ongoing compliance with Paragraph 40 is that After-Action reviews "ensure compliance with applicable laws, best practices, and APD policies and procedures."  Reviewing one After-Action Report, we noted that APD called attention to camera issues at the Real Time Crime Center (RTCC).  Still, there is no listed resolution to the issues they encountered.  We call attention to this for future reference since if issues arise that implicate provisions of Paragraph 40, organizationally, it's not valuable to identify an issue without resolving it.  That may have occurred, but it is not detailed in the After-Action Report we reviewed.[13]

During our June 2023 site visit, ERT representatives advised that they seek information and lessons learned from events encountered by similar agencies through an interagency, information-sharing network that includes more than 120 police agencies from across the country.  This network allows them to apply best practices in their own ERT responses.  We encourage APD to catalog information they apply from this network so they can reference it for policy and training development and other organizational needs.

We have determined that APD remains in Operational Compliance for Paragraphs 39 through 40.  The ERT requirement for these paragraphs for policy maintenance, training,

---

[13] The report we reviewed, dated June 11, 2023, noted that the issue was brought to the attention of a RTCC representative and that in future events they will preview the camera view prior to an event.  That does not resolve whether there was an underlying issue with the technology that could be fixed prior to future events.

and after-action reviews is an ongoing requirement, so with the achievement of Operational Compliance, it is important for ERT to be diligent to retain that compliance level.

### 4.7.26 Assessing Compliance with Paragraph 39: Crowd Control Policies

Paragraph 39 stipulates:

> **"APD shall maintain crowd control and incident management policies that comply with applicable law and best practices.  At a minimum, the incident management policies shall:**
>
> **a) define APD's mission during mass demonstrations, civil disturbances, or other crowded situations;**
>
> **b) encourage the peaceful and lawful gathering of individuals and include strategies for crowd containment, crowd redirecting, and planned responses;**
>
> **c) require the use of crowd control techniques that safeguard the fundamental rights of individuals who gather or speak out legally; and**
>
> **d) continue to prohibit the use of canines for crowd control."**

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

### 4.7.27 Assessing Compliance with Paragraph 40

Paragraph 40 stipulates:

> **"APD shall require an after-action review of law enforcement activities following each response to mass demonstrations, civil disturbances, or other crowded situations to ensure compliance with applicable laws, best practices, and APD policies and procedures."**

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.28 – 4.7.46 Assessing Compliance with Paragraphs 41-59:
Supervisory Review of Use of Force Reporting**

The related Paragraphs (41 through 59) encompass requirements for reporting,
classifying, investigating, and reviewing Level 1 uses of force that require a supervisory-
level response based on the type and extent of force used.  The CASA delineates this
larger group of paragraphs into three sub-groups: Use of Force Reporting – Paragraphs
41-45; Force Reviews and Investigations – Paragraphs 46-49; and Supervisory Force
Reviews – Paragraphs 50-59.  The following represents our findings relative to this
series of paragraphs.

The CASA requirements stipulate that the use of force and reviews/investigations of
force shall comply with applicable laws and comport with best practices.  Central to these
reviews and investigations shall be an assessment and determination of each involved
officer's conduct to determine if the conduct was legally justified and compliant with APD
policy.  We have commented extensively in the past when APD's reporting and
investigation of uses of force have demonstrated serious deficiencies that have hindered
compliance efforts, e.g., IMR-14.  As with other reporting periods, the monitoring team
spent time in consultative processes during the IMR-18 reporting period.  We provided
perspective, feedback, and technical assistance to APD personnel regarding force
investigations.

Over the past two monitoring periods, APD has seen improved results in its reviews of
Level 1 uses of force.  During this monitoring period, the reviews generally improved,
and the investigations were conducted in a more timely manner.  Requests for
extensions to complete the reviews have continued to decline.

Area Commands still conduct their own reviews and have also reduced the number of
cases needing an extension to complete the cases and the number of reviews exceeding
their respective deadlines.  Despite these gains in efficiency, the monitoring team
occasionally finds cases that are misclassified in the field.  This results in compliance
issues related to several CASA paragraphs.  Additionally, gaps in supervisory oversight
also continue to provide challenges for attaining and/or maintaining CASA compliance.

Case reviews and random checks of use of force reviews and investigations by the
monitoring team reflect numerous examples of personnel requesting IA investigations
related to policy violations.  These requests have historically been referred to as an
Internal Affairs Request (IAR).  Several use-of-force cases (Levels 1, 2, and 3) reviewed
during this reporting period contained requests for IARs for alleged policy violations.
These IARs continue to be examined by the monitoring team to the point of their logical
conclusions in order to determine if APD is properly administering its IA oversight
functions.  During IMR-18, APD's tracking data indicated that IAFD issued 170 requests
for IA review of alleged policy violations associated with the use of force reviews and
investigations.[14]

---

[14] The IARs are for cases that occurred during IMR-18 as well as for cases occurring in previous
monitoring periods.

Table 4.7.28a illustrates the trend of IARs originating from the use of force cases.

Table 4.7.28a
Comparison of Use of Force Cases with Internal Affairs Requests (IARs)

| Reporting Period (RP) | Level 1 UoF | Level 2 UoF | Level 3 UoF | Total UoF | Internal Affairs Requests (IARs) |
|---|---|---|---|---|---|
| IMR-12 | 173 | 232 | 79 | 484 | 534 |
| IMR-13 | 111 | 244 | 54 | 409 | 424 |
| IMR-14 | 116 | 216 | 91 | 423 | 199 |
| IMR-15 | 79 | 169 | 43 | 291 | 90[15] |
| IMR-16 | 83 | 161 | 51 | 295 | 154 |
| IMR-17 | 52[16] | 185 | 47 | 284 | 153 |
| IMR-18 | 45 | 190 | 44 | 279 | 170 |

Since APD has changed how it records requests for misconduct investigations associated with use of force reviews and investigations, more details are available for internal analysis. Since all potential policy violations observed during use of force incidents have been reported to IAPS via IARs, this aggregate data provides a rich resource for APD to analyze to determine alleged misconduct trends. Much of the training conducted by the APD Academy now utilizes these data as contextually appropriate for the course being designed as part of its needs assessment phase of curriculum development.

During this reporting period, APD opened 45 Level 1 use of force cases for supervisory review. In contrast, APD opened 52 Level 1 use of force cases for supervisory review during IMR-17, 83 during IMR-16, 79 during IMR-15, 116 during IMR-14, 111 during IMR-13, and 173 during IMR-12. In these previous monitoring periods, APD had numerous cases that exceeded their timelines for completing case reviews. These case reviews ranged from 60 days to complete to more than 150 days. The number of cases exceeding their deadlines has steadily declined over the past two monitoring periods. The number of cases exceeding their deadlines continued this downward trend for this reporting period.

During IMR-18, APD completed 44 of the 45 cases opened within the cases' respective deadlines. Forty-two cases were investigated by Area Commands or investigators assigned to the Pilot Project and completed within deadlines. Two cases were investigated by IAFD, which has a 90-day window for completing cases. These two cases were completed after the close of the monitoring period but within their respective

---

[15] The 90 IARs for IMR-15 reflect IARs between the period of August 1, 2021, and December 31, 2021.

[16] The 52 Level 1 UoF cases opened during IMR-17 represent a 37% decrease from the 83 Level 1 UoF cases opened during IMR-16. This is the largest percentage decrease in Level 1 cases since the category of Level 1 cases was created in January 2020.

90-day deadlines.  One case investigated by an Area Command was suspended due to an officer being on extended FMLA leave.  Still, the case was effectively completed in 40 days when factoring out the FMLA leave days.  As noted in Table 4.7.28b, 98 percent of the Level 1 cases opened during IMR-18 were completed within their respective timelines.  This is the highest 30-day case completion rate the monitoring team has observed to date.[17]

During IMR-17, APD completed 50 of the 52 Level 1 cases opened within 30 days, and in IMR-16, the amount of time it took APD to complete the 83 Level 1 use of force cases opened for supervisory review ranged between 13 and 87 days. We have noted continued improvement in the timeliness of Level 1 cases.

During IMR-18, APD also completed cases that originated during the IMR-17 reporting period.  APD completed 46 Level 1 cases, including cases carried over from the previous monitoring period.  All 46 of these cases were within their respective timelines.  During IMR-17, APD completed a total of 63 Level 1 cases, including cases carried over from previous monitoring periods.  One of the 63 cases APD completed during IMR-17 was from IMR-15.  This case took 300 days to complete due to the assigned reviewer retiring and no other APD member being assigned to complete the review by an APD supervisor or executive.  During IMR-16, APD also completed cases that originated during the IMR-15 reporting period.  Four of those cases exceeded 100 days for the Area Commands to complete.

As noted in the last two monitoring reports, the monitoring team provided technical assistance (with feedback from the DOJ) to APD in developing a proposal for a pilot program to change how it handles Level 1 use of force cases.  This initiative, which commenced in August 2022, utilizes a dedicated group of APD personnel to conduct Level 1 reviews.  During the last monitoring period, the monitoring team performed a preliminary review of the smaller number of cases reviewed by this group, and no major shortcomings were found in the review.  The monitoring team also noted a rather significant increase in efficiency in completing these cases.  Due to the smaller number of cases reviewed by this group, APD extended the pilot program period to facilitate a more robust sample of Level 1 cases to review.  During this monitoring period, the dedicated group of APD personnel conducting Level 1 reviews as part of the pilot program completed 14 reviews.[18] The average completion time for these case reviews was 9.7 days.  Compared to the historical average amount of time to conduct Level 1 reviews over the past several monitoring periods, this represents a significant savings in the amount of time expended on these cases.  Expansion of this program (if appropriately staffed) to other Area Commands can significantly reduce the amount of time spent on these reviews, which will, amongst other advantages, free more time for Area Command personnel to focus on supervising and leading personnel at the moment as opposed to focusing their attention on past events.

---

[17] The 96% completion rate during IMR-17 was the highest completion rate for Level 1 reviews observed by the monitoring team before this monitoring period.

[18] One of these 14 cases occurred during IMR-17 but was completed during IMR-18.  The other 13 Level 1 cases occurred during IMR-18 and were all completed during IMR-18.

The monitoring team will work with APD and DOJ to review the original goals and results of this project to help facilitate ways to leverage these results to improve CASA compliance.

As the table below indicates, during the first three months (February through April) of the reporting period, 19 supervisory reviews were initiated, and 95 percent (18 cases) of the cases were completed within their respective deadlines.  This is the highest 30-day case completion rate for cases initiated during the first three months of a monitoring period that the monitoring team has observed to date.[19]  This is obviously very encouraging data in terms of completion rates.

This analysis provides a snapshot of how APD continues to improve in completing these investigations in a timely manner.  See Table 4.7.28b.

Table 4.7.28b:  Timely Investigations of Supervisory
Level 1 Use of Force Investigations for IMR-16

| Reporting Period | # of Sup.  UoF Cases Initiated (Months 1-3) of the Rep. Period | # of Sup.  UoF Cases (Months 1-3) Completed within 30 days | Total # of Sup.  UoF Cases Initiated during the Rep. Period | Total # of Sup.  UoF Cases Completed within 30 days |
|---|---|---|---|---|
| IMR-18 | 19 | 18 (95%) | 45 | 44 (98%) |
| IMR-17 | 31 | 29 (94%) | 52 | 50 (96%) |
| IMR-16 | 44 | 39 (89%) | 83 | 70 (84%) |
| IMR-15 | 42 | 38 (90%) | 79 | 46 (58%) |
| IMR-14 | 49 | 34 (69%) | 116 | 66 (57%) |
| IMR-13 | 52 | 41 (79%) | 111 | 67 (60%) |
| IMR-12 | 99 | 76 (77%) | 173 | 117 (68%) |
|  |  |  |  |  |

The monitoring team conducted a review of Level 1 uses of force drawn from samples taken throughout the reporting period.  Level 1 uses of force often occur with Level 2 and Level 3 uses of force.  Therefore, some Level 1 uses of force are also assessed in the next section of this report, which focuses on Level 2 and Level 3 uses of force.

***See Appendix A for data related to the monitoring team's review of 10 Level 1 use of force cases.***

Observations and Comments

As noted in the data presented in Paragraphs 60-77, Field Services supervisors continue on occasion to initially misclassify Level 2 uses of force as Level 1 uses of force.  This

---

[19] The highest previously observed rate was 94% (which occurred last monitoring period).

ultimately impedes IAFD's mandated goal of completing cases assigned to them within 90 days.  Thus, while IAFD may complete cases within 90 days[20] of receiving the cases (after the misclassification is primarily noticed by upper levels of Field Services supervisors and referred to IAFD), the resultant impact is that the cases are completed after 90 days of the date of the use of force.[21]

Similar to the adverse impact of having Field Services supervisors initially misclassify Level 2 uses of force as Level 1 uses of force is the action of supervisors incorrectly assessing Level 1 uses of force as low-level control tactics (or officers not notifying supervisors of their use of what they perceive to be low-level control tactics (LLCT).

During IMR-17, the monitoring team requested data regarding APD officers' reporting of the use of LLCTs when taking people into custody.  We have long recommended that APD focus attention on officer actions at the lower end of their force reporting responsibilities since, in those instances, there is a greater reliance on an officer's self-assessment of their actions, and specifically, whether those actions rise to the level of a reportable use of force.  In these instances, officers are required to document the use of LLCTs in their reports but not notify the chain of command following the use of LLCTs during an arrest.  Therefore, an officer's actions are not routinely supervised as closely as incidents in which Level 1 Use of Force (or above) is reported.  For these reasons, the monitoring team requested incident case numbers in the last monitoring period in which officers reported LLCTs during an arrest, but there was no accompanying reported use of force.[22]

We learned that current APD systems did not flag cases or allow for easy queries to identify all instances in which LLCTs are used.  APD had to conduct a free-text search in their systems, during which they located approximately 200 individual instances in which the term "low-level control tactics" or "LLCT" was used by officers in their reports for actions they took during IMR-17.  A more refined search identified 16 separate and distinct instances where the term LLCT was used and was also associated with an arrest.[23]  We see this as a significant gap in APD's force oversight processes, and we communicated this perspective to those responsible for administrating APD's reform efforts.  APD agreed that something should be implemented to close this supervisory gap.

---

[20] Although the CBA allows for 120 days to complete a UoF investigation, we use 90 days here as the timeline stipulated in the IAFD/EFIT Process Narratives filed with the Court on July 16, 2021 (Doc. 839-1) and September 27, 2021 (Doc.862-1), respectively.
[21] We note that the 2nd Amended CASA allowed for a 90-day investigation with a 30 extension. The 3rd Amended CASA allows for a 120-day investigation with no extensions.
[22] Based on previous technical assistance, PMU began pilot audits of such cases in which an arrest occurs for resisting arrest or assault of a police officer, since these types of events would have a higher probability of force being used.  This is not to say they can't occur without force being applied, but some measure of audit of these cases would mitigate the risk of force not being properly reported.
[23] The number 200 does not mean there are 200 events or uses of LLCTs, since the term may occur multiple times and/or by multiple officers in the same event.

The monitoring team randomly selected four LLCT cases from the 16 cases APD provided from IMR-17, representing a 25 percent sample of this group of LLCTs.  We were provided reports and relevant OBRDs for those cases and conducted reviews to confirm that the officers' reported actions were LLCTs, not a higher level of force.

Of the four cases reviewed, the monitoring team determined that in one case, two officers failed to report Level 1 uses of force.[24]  We noted at the time that this was a small sample based on the population of 16 cases; thus, we did not find APD out of compliance and instead suggested a renewed focus on this issue by supervisory, command, and administrative staff.  However, we recommended that APD self-assess a larger sample of LLCT cases for a critical internal review to assess whether there are issues with LLCTs.

As a result, APD conducted an assessment and noted that the Performance Metrics Unit (PMU) is comprised of professional staff who currently review all video footage from OBRDs of random calls for service where the department reported no use of force, and the individual(s) were arrested for resisting arrest or battery on a police officer.  Since PMU previously did not specifically view video footage of officers who reported using LLCT, APD should begin expanding PMU's population of random calls for service to include calls where an officer documents in a police report utilizing LLCT and no other force was used.  The Compliance and Oversight Commander would verify the PMU review.

During this monitoring period, the monitoring team reviewed six cases out of a population of 13 (46%) as self-reported by APD, representing distinct instances where the term LLCT was used and associated with an arrest and no other force was reported.[25] The results of this review revealed one case in which an auto burglary suspect was arrested, and officers reported using LLCT.[26] The review revealed unreported Level 1 and Level 2 uses of force where the arrestee was injured and consistently yelled in pain.  The subject, who demonstrated several indicators of being under the influence of intoxicants and/or suffering from some type of emotional disturbance, was transported to the hospital after being sedated at the scene.  Based upon anomalies in the documentation provided, the monitoring team requested additional documents, including additional OBRD evidence.  None of the subsequent documents/videos provided by APD indicated

---

[24] LLCT Case #1 (IMR-17-42). The reporting of the event was deficient by two officers, and a proper supervisory response and review did not occur.  A supervisor responded to the scene and reportedly reviewed officer OBRDs but failed to properly categorize the actions of the officers as uses of force. The force used by both officers was objectively reasonable, proportional, and the minimum amount necessary. The only errors we noted with this event were in the reporting requirements related to use of force.

[25] The cases available were drawn from APD's CAD system and were those made available from the dates of February 1 – April 30, 2023 (the first half of this monitoring period). Two cases on the ledger provided by APD noted force was reported in the event so they were not included in the sample we considered.

[26] LLCT Case #2 (IMR-18-39). The force used by the officers was objectively reasonable, proportional, and the minimum amount necessary. To date, the only errors we noted with this event were in the supervisory assessment of the force used and the proper initiation of the required investigation of the force.

there was an investigation for any uses of force identified in the original video footage reviewed by the monitoring team.

APD fully cooperated with the review of this case.  APD reclassified the incident as a Level 2 Use of Force and initiated an IAFD investigation.  Additionally, APD will use this incident as a case study for all personnel who investigate uses of force (IAFD and the Level 1 Unit) and PMU.  In this particular case, OBRD footage from this incident was reviewed by PMU during an audit, and PMU personnel did not uncover the noted uses of force.  APD will also utilize this case as an exemplar during the next annual use of force in-service training because it involved low-level control tactics (LLCT) and Level 1 and Level 2 uses of force, inclusive of an injury to an arrestee.  Finally, during their assessment and investigation of this case, APD will determine if IARs will be initiated for the officers or supervisors due to the failure to report force and properly classify this case.  This will be revisited by the monitoring team in IMR-19.

For these reasons, the monitoring team again recommends implementing a long-term solution.  In the near term, APD should consider mandating that when personnel assigned to Field Services or Investigations report using LLCTs, the event (e.g., incident number) be communicated to the APD compliance office regularly (e.g., weekly/bi-monthly/monthly).  APD could implement additional or different short-term solutions, but we recommend they be instituted as quickly as practicable.  We recommend that APD institute its own auditing schedule of reported LLCTs to avoid additional unreported uses of force.  Accordingly, we suggest that APD implement a detailed review to determine current issues with LLCTs and change policy, training, and practice as appropriate.

### 4.7.28 Assessing Compliance with Paragraph 41:  Use of Force Reporting Policy

Paragraph 41 stipulates:

> **"Uses of force will be divided into three levels for reporting, investigating, and reviewing purposes. APD shall develop and implement a use of force reporting policy and Use of Force Report Form that comply with applicable law and comport with best practices.  The use of force reporting policy will require officers, once the scene is secure, to immediately notify their immediate, on-duty supervisor within their chain of command following any use of force, prisoner injury, or allegation of any use of force.  Personnel who have knowledge of an unreported use of force by another officer will immediately report the incident to an on-duty supervisor.  This reporting requirement also applies to off-duty officers engaged in enforcement action."**

**Results**

Primary:      **In Compliance**

27

Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.29 Assessing Compliance with Paragraph 42:  Force Reporting Policy

Paragraph 42 stipulates:

> **"The use of force reporting policy shall require all officers to provide a written or recorded use of force narrative of the facts leading to the use of force to the force reviewer or investigator.  The written or recorded narrative will include:  (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the individual's behavior; (d) the level of resistance encountered; and (e) a description of each type of force used and justification for each use of force.  Officers shall not merely use boilerplate or conclusory language but must include specific facts and circumstances that led to the use of force."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.30 Assessing Compliance with Paragraph 43

Paragraph 43 stipulates:

> **"APD officers' failure to report incidents involving use of force or prisoner injury shall subject officers to disciplinary action."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.31 Assessing Compliance with Paragraph 44:  Medical Services and Force Injuries

Paragraph 44 stipulates:

> **"Once the scene is secure, officers shall immediately request medical services when an individual is injured or complains of injury following a use of force.  The**

28

> **policy shall also require officers who transport a civilian**
> **to a medical facility for treatment to take the safest and**
> **most direct route to the medical facility. The policy shall**
> **further require that officers notify the communications**
> **command center of the starting and ending mileage on**
> **the transporting vehicle."**

**Results**

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

### 4.7.32 Assessing Compliance with Paragraph 45:  OBRD Recording Regimens

Paragraph 45 stipulates:

> **"APD shall require officers to activate on-body**
> **recording systems and record all use of force**
> **encounters.  Consistent with Paragraph 228 below,**
> **officers who do not record use of force encounters shall**
> **be subject to discipline, up to and including**
> **termination."**

**Results**

A complete discussion of this topic is found in Paragraphs 220 - 231 below.  During IMR-17, APD revised SOP 3-46 regarding discipline.  They made a distinction between attendance, misconduct, and performance violations.  Violations must be of the same category to be considered in progressive discipline procedures.  An example of this would be that a failure to record a mandatory recording incident is considered a misconduct violation.  Failing to upload OBRD footage within the required timeline is a performance violation.  Based on APD practice, these distinct OBRD violations would not be compounded when factoring in progressive discipline, according to APD policy.

During the monitoring period for IMR-18, APD's PMU has continued actively auditing OBRD-related activities.  PMU referred 84 cases to Internal Affairs for policy violations.  The findings so far have yielded enough information to conclude that significant strides have been made concerning APD's execution and training related to the CASA's OBRD requirements.  APD's internal audit processes again showed an overall compliance rate of 96 percent or higher in all six area commands for OBRD requirements, which include:

- Upload by the end of subsequent shift (98%);
- Two video reviews by sergeant (99%);
- OBRD equipment inspection (99%);
- Video review showing no unreported force (100%); and
- Full recording of mandatory recording incidents (96%).

During IMR-18, 175 cases were referred for investigation, with a potential 180 violations of SOP 2-8.  Of the 175 cases, 122 were closed.  Ninety-two cases were sustained with 3 NDCA (Non-Disciplinary Corrective Action), 29 Verbal Reprimands, 49 Written Reprimands, and 11 incidents resulted in recommendations for suspension[27].

       Primary:        **In Compliance**
       Secondary:   **In Compliance**
       Operational: **In Compliance**

### 4.7.33 Assessing Compliance with Paragraph 46:  Force Investigations

Paragraph 46 stipulates:

> **"The three levels of use of force will have different kinds of departmental review.  All uses of force by APD shall be subject to supervisory review, and Level 2 and Level 3 uses of force are subject to force investigations as set forth below.  All force reviews and investigations shall comply with applicable law and comport with best practices.  All force reviews and investigations shall determine whether each involved officer's conduct was legally justified and complied with APD policy."**

**Results**

       Primary:        **In Compliance**
       Secondary:   **In Compliance**
       Operational: **In Compliance**

### 4.7.34 Assessing Compliance with Paragraph 47:  Quality of Supervisory Force Investigations

Paragraph 47 stipulates:

> **"The quality of force reviews shall be taken into account in the performance evaluations of personnel performing such reviews.**"

**Results**

The Compliance and Oversight Division has implemented a program regarding the requirement to hold supervisors accountable for the quality of use-of-force investigations by using their performance evaluation processes to assess their use-of-force reviews. Ongoing audits determine whether supervisors properly document failures to conduct force investigations during their performance evaluations of line officers.  APD submitted a supervisory training program to ensure all requirements were understood, and this

---

[27] Records may contain more than one allegation, or more than one officer involved.

process was approved by the monitor and completed during the IMR-17 monitoring period.  The Performance Evaluation and Management System (PEMS) unit developed the audit process to analyze the number of deficient use of force investigations.

During Checkpoint 2 of this reporting period, two investigations into deficient use of force investigations were completed, resulting in sustained violations.  Dispositions included a written reprimand and a Non-Disciplinary Corrective Action (NDCA).  One Lieutenant failed to document the sustained violation in the employee work plan, resulting in a referral to Internal Affairs.

During Checkpoint 3 of this reporting period, APD submitted documentation that there was no deficient use of force investigations of the 110 cases investigated by IAFD, the Level 1 Team, and the Area Commands/Division.

>     Primary:       **In Compliance**
>     Secondary:   **In Compliance**
>     Operational: **In Compliance**

## 4.7.35 Assessing Compliance with Paragraph 48:  Force Classification Procedures

Paragraph 48 stipulates:

> **"APD agrees to develop and implement force classification procedures that include at least three categories of types of force that will determine the force review or investigation required.  The categories or types of force shall be based on the level of force used and the risk of injury or actual injury from the use of force.  The goal is to promote greater efficiency and reduce burdens on first-line supervisors, while optimizing critical investigative resources on higher-risk uses of force.  The levels of force are defined as follow:**
>
> a.  **Level 1 is force that is likely to cause only temporary pain, disorientation, or discomfort during its application as a means of gaining compliance.  This includes techniques which are not reasonably expected to cause injury, do not result in actual injury, and are not likely to result in a complaint of injury (i.e., pain compliance techniques and resisted handcuffing).  Empty-hand takedowns that do not result in injury or complaint of injury are reportable as Level 1 force.  Pointing a firearm, beanbag shotgun, or 40 millimeter launcher, or ECW at an individual as a show of force are reportable as Level 1 force.  Level 1 force does not include interaction meant to guide, assist, or control an individual who is offering minimal resistance.**
>
> b.  **Level 2 is force that causes injury, could reasonably be expected to cause injury, or results in a complaint of injury greater than temporary pain.  Level 2 force includes:  discharge of an ECW, including where an**

ECW is fired at an individual  but misses; use of a
beanbag shotgun or 40 millimeter launcher, including
where it is fired at an individual but misses; OC Spray
application; takedowns that result in injury or
complaint of injury; other empty-hand techniques
(i.e., strikes, kicks,  or leg sweeps); and strikes with
impact weapons, except strikes to the head, neck, or
throat, which would be considered a Level 3 use of
force.

c. Level 3 is force that results in, or could reasonably
result in, serious physical injury, hospitalization, or
death.  Level 3 force includes all lethal force; critical
firearms discharges; all head, neck, and throat
strikes with an object; neck holds; canine bites;
three or more uses of an ECW on an individual
during a single interaction regardless of mode or
duration or an ECW discharge for longer than 15
seconds, whether continuous or consecutive; four
or more strikes with a baton; any strike, blow, kick,
ECW discharge, or similar use of force against a
handcuffed individual; and uses of force resulting in
a loss of consciousness."

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.36 Assessing Compliance with Paragraph 49

Paragraph 49 stipulates:

"Level 1 uses of force that do not indicate apparent
criminal conduct by an officer will be reviewed by the
chain of command of the officer using force or by
personnel assigned to conduct those reviews.   Level 2
and 3 uses of force shall be investigated by the Internal
Affairs Division, as described below.  In cases where
there are indications of apparent criminal conduct, the
reviewer or investigator shall refer the use of force to the
Multi-Agency Task Force to conduct a criminal
investigation.  When a use of force or other incident is
under criminal investigation by the Multi-Agency Task
Force, APD's Internal Affairs Division will conduct the
administrative investigation.  Pursuant to its
Memorandum of Understanding, the Multi-Agency Task
Force shall periodically share information and coordinate
with the Internal Affairs Division, as appropriate and in
accordance with applicable laws, to ensure timely and
thorough administrative investigations of uses of force.
Refer to Paragraphs 81-85 and the Multi-Agency Task
Force Memorandum of Understanding for referrals of

**officer-involved shootings to the Multi-Agency Task Force."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.37 Assessing Compliance with Paragraph 50:  Supervisory Response to Use of Force

Paragraph 50 stipulates:

> **"The supervisor of an officer using force shall respond to the scene of all Level 1, 2, and 3 uses of force to ensure that the use of force is classified according to APD's force classification procedures.  For Level 2 and Level 3 uses of force, the supervisor shall ensure that the Force Investigation Section of the Internal Affairs Division is immediately notified and dispatched to the scene of the incident to initiate the force investigation.  The supervisor shall also provide a written order instructing involved and witness officer(s) to the use of force that they are not to speak about the force incident with other officers until they are interviewed and/or provide a statement about the force incident.**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.38 Assessing Compliance with Paragraph 51:  Self-Review of Use of Force

Paragraph 51 stipulates:

> **"A supervisor who was involved in a reportable use of force, including by participating in or ordering the force being reviewed, shall not review the incident or Use of Force Reports for approval."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.39 Assessing Compliance with Paragraph 52:  Supervisory Force Review

Paragraph 52 stipulates:

> **"For all reviews of Level 1 uses of force, the supervisor or reviewer shall:**
> **a)   respond to the scene and immediately identify the officer(s) involved in Level 1 use of force;**
>
> **b)   review the involved officer's OBRD video to verify that the incident involves a Level 1 use of force;**
>
> **c)   review the OBRD video of other officers on-scene where uncertainty remains about whether the incident rises to a Level 2 or Level 3 use of force;**
>
> **d)   examine personnel and the individual for injuries and request medical attention where appropriate.;**
>
> **e)   contact the Internal Affairs Division to conduct a Level 2 or Level 3 use of force investigation if OBRD video does not affirm a Level 1 use of force;**
>
> **f)   gather any evidence located at the scene of the Level 1 use of force;**
>
> **g)   capture photographs of the officer(s) and individual involved in the Level 1 use of force;**
>
> **h)   require the submission of a Use of Force Report from the involved officer by the end of shift; and**
>
> **i)   conduct any other fact-gathering activities while on-scene, as necessary, to reach reliable conclusions regarding the officer's use of Level 1 force."**

### Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.40 Assessing Compliance with Paragraph 53:  Force Review Timelines

Paragraph 53 stipulates:

> **"The Level 1 Use of Force reviews will be completed within one week after the day the use of force occurred. Any extension of this deadline must be authorized by a**

Commander or their designee prior to the expiration of the deadline.  This review shall include:

a) all written or recorded use of force narratives or statements provided by personnel or others;

b) viewing available on-body recording device video of the initial contact with the individual against whom force was used up to the point at which the individual is in custody on-scene.  If an officer used force after an individual was in custody, the reviewer shall also review available OBRD video of any in-custody uses of force.  The reviewer shall have discretion not to review video that is irrelevant to the determination of whether the use of force complied with APD policy.  This provision does not preclude the reviewer from looking at additional video if necessary;

c) documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report shall specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of the witnesses, the report shall state the reasons why.  The report should also include all available identifying information for anyone who refuses to provide a statement;

d) the names of all other APD employees witnessing the use of force;

e) the reviewer's evaluation and analysis of the use of force, based on the evidence gathered, including a determination of whether the officer's actions complied with APD policy and state and federal law; and an assessment of the incident for tactical and training implications, including  the use of de-escalation techniques; and

f) documentation of any policy, training, equipment, or tactical concerns."

## Results

Primary:      **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.41 Assessing Compliance with Paragraph 54:  Command Review of Force

Paragraph stipulates:

> **"Upon completion of the review, the reviewer will submit it up the chain of command.  The unit supervisor shall review the entry to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard.  The unit supervisor shall order additional review when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  These reviews shall be completed electronically and tracked in an automated database within the Internal Affairs Division."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.42 Assessing Compliance with Paragraph 55:  Force Review Evidence Standard

Paragraph 55 stipulates:

> **"Unit supervisors or Commanders shall be responsible for the accuracy and completeness of Level 1 force reviews."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**[28]

## 4.7.43 Assessing Compliance with Paragraph 56:  Force Review Quality

Paragraph 56 stipulates:

> **"Where a reviewer repeatedly conducts deficient force reviews, the reviewer shall receive the appropriate corrective and/or disciplinary action, including training, demotion, and/or reassignment, in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel**

---

[28] Of the ten cases reviewed, one improperly supervised case did not drop compliance rates to the level reflecting non-compliance.

> rules, Labor Management Relations Ordinance, Merit
> System Ordinance, regulations, or administrative rules.
> Whenever a reviewer, unit supervisor, or Commander
> finds evidence of a use of force indicating apparent
> criminal conduct by an officer, the reviewer, unit
> supervisor, or Commander shall suspend the supervisory
> force review immediately and notify the Internal Affairs
> Division and the Chief.  The Force Investigation Section of
> the Internal Affairs Division shall immediately initiate the
> administrative and criminal investigation."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.44 Assessing Compliance with Paragraph 57

Paragraph 57 stipulates that:

> "When the Commander or the reviewer's supervisor
> finds that the force review is complete and the findings
> are supported by the evidence, the file shall be
> forwarded to the Compliance and Oversight Division.
> APD shall periodically conduct audits of Level 1 force
> reviews.  These audits shall assess adherence to APD
> policy, training, equipment, or tactical concerns. APD
> shall refer any policy, training, equipment, or tactical
> concerns to the appropriate unit within APD to ensure
> that the concerns are resolved."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.45 Assessing Compliance with Paragraph 58:  Reassignment of Force Review

Paragraph 58 stipulates that:

> "At the discretion of the Chief, a force review may be
> assigned or re-assigned to another reviewer, whether
> within or outside of the Command in which the
> incident occurred, or may be returned to the original reviewer for
> further review or analysis. This assignment or re-
> assignment shall be explained in writing."

37

**Results**

> Primary:          **In Compliance**
> Secondary:     **In Compliance**
> Operational:  **In Compliance**

### 4.7.46 Assessing Compliance with Paragraph 59:  Abuse of Force Discipline

Paragraph 59 stipulates:

> **"Where, after a force review, a use of force is found to violate policy, the Bureau of Police Reform shall direct and ensure appropriate discipline and/or corrective action.  Where the use of force indicates policy, training, tactical, or equipment concerns, the Bureau of Police Reform or Chief shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.**

**Results**

> Primary:          **In Compliance**
> Secondary:     **In Compliance**
> Operational:  **In Compliance**

### 4.7.47 - 4.7.64 Assessing Compliance with Paragraphs 60-77:  Force Investigations by the Internal Affairs Division

Since July 2021, the external force investigation team (EFIT) has been working with APD's Internal Affairs Force Division (IAFD) members to conduct Level 2 and Level 3 force investigations involving APD personnel.  Under the Stipulated Order approved by the Court in 2021, EFIT may conduct these force investigations with or, if certain conditions are present, independent of APD personnel.  EFIT began responding to Level 2 and Level 3 force investigations on July 16, 2021[29].  The monitoring team met with and worked closely with members of the EFIT executive team during their preliminary processes.  While the latter part of this section and appendices will critically examine the cases investigated by IAFD/EFIT during this monitoring period, the monitoring team takes cognizance of the significantly improved progress (in both punctuality and quality) achieved by EFIT and APD in investigating and managing Level 2 and Level 3 use of force cases.

During the IMR-18 reporting period (data current through August 2023), APD recorded a combined 234 Level 2 and Level 3 use of force cases, an increase of two cases from IMR-17.  During IMR-17, APD recorded a combined 232 Level 2 and Level 3 use of force cases, an increase of 20 cases from IMR-16.  During IMR-16, APD recorded a combined 212 Level 2 and Level 3 use of force cases: the same number of cases as in IMR-15.

---

[29] The fourteenth monitoring period ended on July 31, 2021.

Figure 4.7.47 below depicts the numbers of Level 2 and Level 3 cases generated by APD during the IMR-12 through IMR-18 reporting periods.  These data indicate a significant reduction in the levels of more serious uses of force by APD over a multi-year period.  Data for this multi-year period indicate that for the IMR 12-14 reporting periods, the number of uses of force held relatively steady between 298-311 uses of force.  The number of reported uses of force by APD personnel decreased dramatically, dropping by 95 cases to 212 uses of force in the 15th and 16th reporting periods, compared to 307 uses of force in the 14th reporting period.  This continues to be a welcome change to the earlier data, which held steady in the 300+ range.  These data are depicted in Figure 4.7.47.



Figure 4.7.47 Reported Level 2 and Level 3 Uses of Force by IMR Reporting Period

Reported Level 2 and Level 3 uses of force for IMR-18 are down 25 percent since the monitor's 12th report.  We consider these numbers significant.

One of the CASA implementation requirements to reach an operational compliance finding is that use of force cases must be completed within 120 days.  While APD has historically struggled to complete cases within time, the past four monitoring periods generated excellent completed case timelines.

During IMR-18, IAFD opened 190 Level 2 cases and 44 Level 3 cases.  IAFD, working alongside EFIT, completed 169 Level 2 cases, with 166 of the cases completed within 90[30] days of the use of force.[31]  Two of the three cases not completed within 90 days of

---

[30] Again, we use 90 days as outlined in the IAFD/EFIT Process Narratives indicated in footnote 20.

[31] During IMR-17, IAFD completed 180 Level 2 cases, with 177 of the cases completed within 90 days of the use of force. The three cases not completed within 90 days were misclassified initially by Field

the use of force were misclassified initially by Field Services personnel.[32] Area Command personnel discovered the misclassification of force in one of the cases approximately two weeks after the use of force.  The misclassification of the other case was discovered during a random audit by the Performance Metrics Unit (PMU) a few months after the use of force occurred.  This case was sent to IAFD and was completed approximately six months after the actual use of force occurred.  The third case was not a matter of misclassification of force but a case of alleged unreported force.  This case was discovered due to an Inspection of Public Records Act (IPRA) request alleging excessive force.  APD appropriately initiated an Internal Affairs investigation to examine this matter, and it was ultimately determined that the officers utilized appropriate low-level control tactics and not any Level 1, 2, or 3 use of force.  However, one officer was disciplined for an OBRD violation.  It should be noted that regardless of when IAFD received these three cases, each of these cases was completed within 90 days of IAFD's receipt of the cases.

At the close of the 18th monitoring period, IAFD had completed 85 of the 190 Level 2 use of force cases opened during the 18th monitoring period.  There were still 105 open Level 2 cases that had not been completed when the monitoring period closed on July 31, 2023.  These cases will be examined during the 19th reporting period.  It should be noted that at the close of IMR-17, there were still 84 open Level 2 cases (opened during IMR-17 and not completed during that monitoring period).  The monitoring team reviewed those 84 open cases during IMR-18 and noted that all of the cases were closed during this reporting period and within 90 days of the occurrence of the use of force.

The same holds for Level 3 use of force cases.  During this 18th monitoring period, EFIT and APD completed 37 Level 3 cases, with all 37 completed within 90 days of using force.  We note that at the close of the 18th monitoring period, IAFD completed 18 of the 44 Level 3 use of force cases opened during the 18th monitoring period.  There were still 26 cases opened during the monitoring period that had not been completed.  These cases will be examined during the 19th reporting period.  It should be noted that at the close of IMR-17, 19 Level 3 cases remained open (cases opened during IMR-17 and not completed during that monitoring period).  The monitoring team reviewed those 19 open cases during IMR-18 and noted that all of the cases were closed during this reporting period and within 90 days of the occurrence of the use of force.

These data are shown in tabular form in Table 4.7.47a on the following page.

---

Services personnel, which contributed to the cases not being completed within 90 days of the occurrence of the use of force. During IMR-16, IAFD completed 151 Level 2 cases, with 148 of the cases being completed within 90 days of the use of force. The three cases not completed within 90 days were misclassified initially by Field Services personnel, which contributed to the case not being completed within 90 days of the occurrence of the use of force.

[32] Internal Affairs Requests (IARs) were opened on both of these cases.

Table 4.7.47a Investigations of
Level 2 Use of Force Investigations: IMR-12 – IMR-18

| Reporting period | # of Level 2 UoF Cases Initiated (Months 1-3) of the Rep. Period | # of Level 2 UoF Cases (Months 1-3) Completed within 90 days | Total # of Level 2 UoF Cases Initiated during the Rep. Period | Total # of Level 2 UoF Cases Opened, Investigated, and Completed within 90 days |
|---|---|---|---|---|
| IMR-18 | 79 | 79 (100%) | 190 | 85 (45%)[33] |
| IMR-17 | 96 | 96 (100%) | 185 | 101 (55%)[34] |
| IMR-16 | 79 | 79 (100%)[35] | 161 | 81 (50%)[36] |
| IMR-15 | 99 | 97 (98%)[37] | 169 | 101 (60%)[38] |
| IMR-14 | 117 | 1 (0.9%) | 216 | 1 (0.5%) |
| IMR-13 | 126 | 3 (2%) | 244 | 3 (1%) |
| IMR-12 | 108 | 97 (90%) | 232 | 106 (46%) |

[33] IAFD completed a total of 169 cases during IMR-18 (regardless of when the cases were opened) with 166 of the cases completed within 90 days of the use of force. Two of the three cases not completed within 90 days of the use of force occurring were misclassified initially by Field Services personnel. The third case was not a matter of a misclassification of force, but a case of alleged unreported force. It should be noted that irrespective of when IAFD received these three cases, each of these cases were completed within 90 days of IAFD's receipt of the cases.

[34] IAFD completed a total of 180 cases during the IMR-17 reporting period (regardless of when the case was opened), and 177 were closed within 90 days. The three cases not completed within 90 days were misclassified initially by Field Services personnel, which contributed to the case not being completed within 90 days of the occurrence of the use of force. IAFD completed the cases within 90 days of receiving the cases. This is addressed pursuant to Paragraph 50.

[35] IAFD closed one case within 90 days of receiving the case, but a classification error made by Field Services personnel contributed to the case not being completed within 90 days of the occurrence of the use of force. This is addressed pursuant to Paragraph 50.

[36] IAFD completed a total of 151 cases during IMR-16 (regardless of when the case was opened) and 148 were closed within 90 days. The three cases not completed within 90 days were misclassified initially by Field Services personnel, which contributed to the case not being completed within 90 days of the occurrence of the use of force. This is addressed pursuant to Paragraph 50.

[37] One case was determined to not be a force case and one case involved a criminal referral handled by IAPS from the onset outside of the purview of IAFD and EFIT.

[38] Sixty-eight of the seventy-three cases that were still active (not completed) at the end of the monitoring period had not yet reached their respective 90-day threshold.

41

Table 4.7.47b Investigations of
Level 3 Use of Force Investigations: IMR-12 – IMR-18

| Reporting period | # of Level 3 UoF Cases Initiated (Months 1-3) of the Rep. Period | # of Level 3 UoF Cases (Months 1-3) Completed within 90 days | Total # of Level 3 UoF Cases Initiated during the Rep. Period | Total # of Level 3 UoF Cases Opened, Investigated, and Completed within 90 days |
|---|---|---|---|---|
| IMR-18 | 18 | 18 (100%) | 44 | 18 (41%)[39] |
| IMR-17 | 27 | 27 (100%)[40] | 47 | 28 (60%)[41] |
| IMR-16 | 26 | 26 (100%)[42] | 51 | 26 (49%)[43] |
| IMR-15 | 30 | 30 (100%) | 43 | 30 (80%)[44] |
| IMR-14 | 42 | 0 (0%) | 91 | 0 (0%) |
| IMR-13 | 37 | 2 (5%) | 54 | 2 (4%) |
| IMR-12 | 25 | 21 (84%) | 79 | 24 (30%) |

As noted, evidence reveals that productivity levels from earlier monitoring periods have completely reversed and continue to stabilize at acceptable levels for case completion. We are aware that this reversal was achieved with external assistance provided by EFIT. Nonetheless, the progress made during IMR-15, IMR-16, and IMR-17 has been maintained during this reporting period.  The issue that has been a significant concern for the monitor is how APD plans to adapt to workloads, case quality, and case management practices once EFIT is no longer a part of the case workload function.  Now that EFIT is focusing more on the backlogged IAFD investigations than it is actively focused on managing contemporary cases, the monitoring team is seeing an IAFD staff keeping pace with the current workload demands.  Thus, we continue to urge APD to "think ahead" to the processes that need to be internalized and to identify the training and oversight necessary to facilitate those processes in preparation for the day when the EFIT engagement ends and the full burden of processing force investigation cases falls

---

[39] IAFD completed a total of 37 Level 3 cases during IMR-18 (regardless of when the cases were opened).

[40] IAFD closed two cases within 90 days of receiving them, but the classification errors made by Field Services personnel contributed to one case not being completed within 90 days of the occurrence of the use of force, and the other case was originally closed within 90 days by IAFD, but was reopened, which resulted in its actual completion date extending to 125 days after the use of force occurred.

[41] IAFD completed a total of 54 Level 3 cases during IMR-17 (regardless of when the case was opened).

[42] IAFD closed one case within 90 days of receiving the case, but a classification error made by Field Services personnel contributed to the case not being completed within 90 days of the occurrence of the use of force. This is addressed pursuant to Paragraph 50.

[43] IAFD completed a total of 37 cases during IMR-16 (regardless of when the case was opened).

[44] One case was delayed due to an involved officer being injured and unable to be interviewed and another case involved a criminal referral handled by IAPS from the onset outside of the purview of IAFD and EFIT.  Neither of these cases were counted against IAFD/EFIT.

once again on APD.  As always, the monitoring team is available to assist APD in that process.

We reported in prior periods that APD personnel have not been ensuring compliance alone.  EFIT has been providing close supervision and assessment of line personnel's use of force.  However, as previously discussed, EFIT is now focusing more on the backlogged IAFD investigations than actively managing contemporary cases.  The monitoring team notes that the current IAFD staff primarily manages the current use-of-force workload demands.

The monitoring team conducted a review of Level 2 and Level 3 uses of force drawn from samples taken throughout the reporting period.  For cases involving an ECW, those cases are evaluated here as well as in Paragraphs 24-29 of this report.  Level 1 uses of force often occur with Level 2 and Level 3 uses of force.  Therefore, some Level 1 uses of force are also assessed in the section of this report that focuses on Level 2 and Level 3 uses of force.  One IAFD investigation of an officer-involved shooting completed during this monitoring period will be discussed in Paragraph 78 as a means of discussing the matter's numerous shortcomings, from the handling of the decedent through the Force Review Board's handling of the matter.

**Appendix B contains the results of the monitoring team's review of 21 Level 2 and Level 3 UoF cases.**

Observations and Comments

A review of [IMR-18-07] revealed that APD investigative personnel were surveilling a stolen vehicle before deploying a Grappler device to disable the vehicle.  Once deployed, the vehicle made a sharp turn and flipped onto its side.  Detectives approached the vehicle and its two occupants, and one detective had what has been construed as a show of force with a rifle.  IAFD responded to the scene and conducted the investigation because of the use of the Grappler device and the minor injuries sustained by the two suspects.  One suspect was transported to the hospital by detectives, while the other was transported via ambulance.  After conducting a review of the Grappler device's training and technical information, IAFD determined the use of the Grappler system is not a use of force.  The monitoring team does not concur with this determination.  While the monitoring team did not enter an adverse compliance determination on the investigation of this case due to the novelty of the system and the conscientiousness of APD personnel to report the incident, the monitoring team notes that launching a tethering device at the moving wheels of a vehicle traveling on a roadway to halt the vehicle is a use of force.  This is especially evident when the vehicle's movement is interrupted by the employment of such a device, and this interruption plays a role in causing the injuries of the vehicle's occupants.  Any determination by APD that the resultant accident and injuries occurring after the deployment of such a device are solely attributed to the vehicle's operator is not appropriate.

A review of [IMR-18-11] revealed numerous deficiencies with the IAFD investigation conducted by the IAFD investigator.  The first-line supervisory review caught all of the

problems, and the deficiencies were corrected.  The monitoring team noted that the IAFD investigator, in this case, separated from APD shortly after this investigation was submitted for supervisory review.

No discernible trends in the review of current cases have been noted during this monitoring period.

During IMR-16, the Stipulated Order approved by the Court in 2021 was amended to authorize a secondary EFIT team to address the backlog of Level 2 and Level 3 cases accumulated primarily during 2020 and 2021.  EFIT-2 (the team designated to handle these cases) was operationalized during the latter part of the 16th monitoring period. During the review period for IMR-17, the monitoring team reviewed a sample of the backlogged cases reviewed by EFIT and commented on them in IMR-17.  Two weeks after the close of IMR-17, EFIT prepared its sixth Quarterly Report to the Court.  That report noted that approximately 15 percent of the backlogged cases had been completed.  One day before the close of the IMR-18 reporting period, EFIT reported that 242 (36%) of the 667 backlogged cases had been completed and that approximately 6 percent of the completed cases had an out-of-policy use of force.  It is noted that before the completion and closure of the backlogged cases, each is reviewed by the EFIT Executive Team and forwarded to APD and DOJ.

During the IMR-19 reporting period, the monitoring team will draw samples of EFIT-completed backlog cases for review.

### 4.7.47 Assessing Compliance with Paragraph 60:  IAFD Force Review

Paragraph 60 stipulates that:

> **"The Internal Affairs Force Division shall respond to the scene and conduct investigations of Level 2 and Level 3 uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by APD personnel of a rank higher than sergeant, critical firearms discharges, or uses of force reassigned to the Internal Affairs Force Division by the Bureau of Police Reform.  In cases where an investigator in the Internal Affairs Force Division initiates a Level 2 or Level 3 use of force investigation and identifies indications of apparent criminal conduct, the Division shall refer the apparent criminal conduct to the Criminal Investigations Division.  The criminal investigation shall remain separate from and independent of any administrative investigation.  In instances where the Multi-Agency Task Force is conducting the criminal investigation of a use of force, the Internal Affairs Division shall conduct the administrative investigation."**

### Results

Primary:        **In Compliance**

44

Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.48 Assessing Compliance with Paragraph 61

Paragraph 61 stipulates:

> **"The Internal Affairs Force Division shall include sufficient personnel who are specially trained in administrative investigations."**

## Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.49 Assessing Compliance with Paragraph 62:  Revision of Internal Affairs Manual

Paragraph 62 stipulates:

> **"Within six months from the Operational Date, APD shall revise the Internal Affairs Division manual to include the following:**
> a)    **definitions of all relevant terms;**
> b)    **procedures on report writing;**
> c)    **procedures for collecting and processing evidence;**
> d)    **procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;**
> e)    **procedures for consulting with the District Attorney's Office or the USAO, as appropriate, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending;**
> f)    **scene management procedures; and**
> g)    **management procedures."**

## Results

Primary:      **In Compliance**
Secondary: **In Compliance**
Operational: **In Compliance**

## 4.7.50 Assessing Compliance with Paragraph 63:  Investigating Level 2 and Level 3 Uses of Force

Paragraph 63 stipulates:

> **"APD shall ensure that all Level 2 and Level 3 uses of force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills so that uses of force that are contrary to law or policy are identified and appropriately resolved; that policy, training, equipment, or tactical deficiencies related to the use of force are identified and corrected; and that investigations of sufficient quality are conducted so that officers can be held accountable, if necessary. At the discretion of the Chief or Bureau of Police Reform, APD may hire and retain personnel, or reassign current APD employees, with sufficient expertise and skills to the Internal Affairs Division."**

## Results

There is no question that APD's processes of case management and investigation have improved during the engagement of EFIT with APD force investigations.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.51 Assessing Compliance with Paragraph 64:  Training Force Division Personnel

Paragraph 64 stipulates:

> **"Before performing force investigations, Internal Affairs Force Division personnel shall receive force investigation training that includes, at a minimum, the following areas:  force investigation procedures; call-out and investigative protocols; proper roles of on-scene counterparts such as crime scene technicians, the Office of the Medical Investigator, District Attorney staff, the Multi-Agency Task Force, City Attorney staff, and Civilian Police Oversight Agency staff; and investigative equipment and techniques.  Force Investigation Section personnel shall also receive force investigation annual in-service training."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.52 - 4.7.55 Assessing Compliance with Paragraphs 65 - 68:  Referral of Force Investigations to MATF

46

**Paragraphs 65 – 68 are self-monitored by APD.**

**4.7.56 Assessing Compliance with Paragraph 69:  IAFD Responsibilities in Serious Uses of Force**

Paragraph 69 stipulates:

> In conducting its investigations of Level 2 or Level 3 uses of force, as defined in this Agreement, the Internal Affairs Force Division shall:
>
> a)      respond to the scene and consult with the on-scene supervisor to ensure that all personnel and individuals on whom force was used have been examined for injuries, that the use of force has been classified according to APD's classification procedures, that individuals on whom force was used have been given the opportunity to indicate whether they are in pain or have injuries,  and that all officers and/or individuals have received medical attention, if applicable;
>
> b)      review available on-body recording device video of the initial contact with the individual against whom force was used up to the point at which the individual is in custody on-scene.  If an officer used force after an individual was in custody, the reviewer shall also review available OBRD video of any in-custody uses of force.  The investigator shall have discretion not to review video that is irrelevant to the determination of whether the use of force complied with APD policy.  This provision does not preclude the investigator from looking at additional video if necessary;
>
> c)      ensure that all evidence to establish material facts related to the use of force, including but not limited to audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;
>
> d)      ensure that a canvass for, and interview of, witnesses is conducted.  In addition, witnesses should be requested to provide a video-recorded or signed written statement in their own words;
>
> e)      ensure, consistent with applicable law, that all officers witnessing a Level 2 or Level 3 use of force by another officer provide a use of force narrative of the facts leading to the use of force;

47

**f)      ensure that involved and witness officer(s) to the use of force have completed and signed a written order directing them not to speak about the force incident with other officers until they are interviewed by the investigator of the Internal Affairs Force Division;**

**g)      conduct only one-on-one interviews with involved and witness officers;**

**h)      review all Use of Force Reports to ensure that these statements include the information required by this Agreement and APD policy;**

**i)      ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;**

**j)      conduct investigations in a rigorous manner designed to determine the facts and, when conducting interviews, avoid asking leading questions and never ask officers or other witnesses any questions that may suggest legal justifications for the officers' conduct;**

**k)      record all interviews;**

**l)      consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible; and**

**m)      make all reasonable efforts to resolve material inconsistencies among the officer, individual, and witness statements, as well as inconsistencies between the level of force described by the officer and any injuries to personnel or individuals.**

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.57 Assessing Compliance with Paragraph 70:  Use of Force Data Reports

Paragraph 70 stipulates:

**"The Internal Affairs Force Division shall complete an initial report of the use of force through the chain of command within the Bureau of Police Reform as soon as**

48

> **possible, but in no circumstances later than 24 hours after learning of the use of force.**

## Methodology

For IMR-18, monitoring team members requested a random sample of 21 Level 2 and Level 3 uses of force cases that IAFD investigated.  The monitoring team reviewed those cases to assess the appropriateness of the force used by APD officers and the quality of the investigation into the force.  During those assessments, the monitoring team also assessed compliance with the terms of Paragraph 70.

APD is required to submit the initial Use of Force Data Report within 24 hours of the event and does so through its BlueTeam system.  For the 21 use-of-force events that the monitoring team reviewed this reporting period, a BlueTeam entry was available for each case.  Our review of the BlueTeam entries showed that an entry was made within 24 hours of learning of the force in all 21 cases, a 100 percent compliance rate based on our random sample.

Based on these data, we have determined that for IMR-18, APD has retained Operational Compliance with Paragraph 70.

## Results

    Primary:      **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**


### 4.7.58 Assessing Compliance with Paragraph 71:  FIS Investigative Timelines

Paragraph 71 stipulates:

> **"The Internal Affairs Force Division shall complete Level 2 or Level 3 administrative investigations within the applicable deadlines in the Collective Bargaining Agreement between the City and Intervenor.  Any request for an extension to this time limit must be approved by the commanding officer of the Internal Affairs Force Division through consultation within the chain of command of the Bureau of Police Reform.  At the conclusion of each use of force investigation, the Internal Affairs Force Division shall prepare an investigation report.  The report shall include:**
> **a)  a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the Internal Affairs Force Division's independent review of the facts and circumstances of the incident;**

b)  documentation of all evidence that was gathered, including names, phone numbers, addresses of witnesses to the incident, and all underlying Use of Force Reports.  In situations in which there are no known witnesses, the report shall specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report shall state the reasons why.  The report should also include all available identifying information for anyone who refuses to provide a statement;

c)  the names of all other APD officers or employees witnessing the use of force;

d)  the Internal Affairs Force Division's narrative evaluating the use of force, based on the evidence gathered; and an assessment of the incident for tactical and training implications, including the use of de-escalation techniques or lesser force options;

e)  if a weapon was used by an officer, documentation that the officer's certification and training for the weapon were current at the time of the incident; and

f)  the complete officer history in the Internal Affairs Division database for the past five years.

## Results

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

## 4.7.59 Assessing Compliance with Paragraph 72:  FIS Report Review

Paragraph 72 stipulates:

"Upon completion of the Internal Affairs Force Division investigation report, the Force Investigation Section investigator shall forward the report through his or her chain of command to the commanding officer of the Internal Affairs Division.  An Internal Affairs Division supervisor shall determine whether the officer's actions complied with APD policy and state and federal law.  An Internal Affairs Division commanding officer shall review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard.  An Internal Affairs Division commanding officer shall order additional investigation when it appears that there is additional relevant

50

> evidence that may assist in resolving inconsistencies or
> improve the reliability or credibility of the findings."

## Results

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.60 Compliance with Paragraph 73:  FIS Findings Not Supported by Preponderance of the Evidence

Paragraph 73 stipulates:

> **"For administrative investigations, where the findings of the Force Investigation Section investigation are not supported by a preponderance of the evidence, the Internal Affairs Division commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report.  The commanding officer of the Internal Affairs Division shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it.  The Internal Affairs Division commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Division. "**

## Results

Based on our analysis, APD was 91 percent compliant with the requirements of this paragraph (related to assessments of IAFD findings).  We do note that none of EFIT graduates submitted problematic cases.

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **Not In Compliance**

### *Recommendations for Paragraph 73:*

### *4.7.60a:  Conduct a data-based evaluation of the causes of completed investigations that did not use the "preponderance of the evidence" standard and determine if the issues are caused by policy, training, or implementation.*

### *4.7.60b:  Once the problems with compliance are identified, develop planning processes (Goals-Objectives-Measures-Analysis-Plans-Processes) designed to overcome extant problems.*

## 4.7.61 Assessing Compliance with Paragraph 74: IAFD Quality Control

Paragraph 74 stipulates:

> **"Where a member of the Internal Affairs Force Division repeatedly conducts deficient force investigations, the member shall receive the appropriate corrective and/or disciplinary action, including training or removal from the Internal Affairs Force Division in accordance with performance evaluation procedures and consistent with any existing collective bargaining agreements, personnel rules, Labor Management Relations Ordinance, Merit System Ordinance, regulations, or administrative rules."**

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.62 Assessing Compliance with Paragraph 75:  IAD Quality Control

Paragraph 75 stipulates:

> **"When a commanding officer of the Internal Affairs Division determines that the force investigation is complete and the findings are supported by the evidence, the investigation report file shall be forwarded to the Force Review Board unit."**

### Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.63 Assessing Compliance with Paragraph 76:  Force Investigations by MATF or FBI

**Paragraph 76 is self-monitored by APD.**

## 4.7.64 Assessing Compliance with Paragraph 77:  Discipline on Sustained Investigations

Paragraph 77 stipulates:

> **"Where, after an administrative force investigation, a use of force is found to violate policy, the Bureau of Police Reform shall direct and ensure appropriate discipline**

52

**and/or corrective action.  Where a force investigation indicates apparent criminal conduct by an officer, the Bureau of Police Reform shall ensure that the Internal Affairs Division or the Multi-Agency Task Force consults with the District Attorney's Office or the USAO, as appropriate.  The Bureau of Police Reform need not delay the imposition of discipline until the outcome of the criminal investigation.  In use of force investigations, where the incident indicates policy, training, tactical, or equipment concerns, the Chief or Bureau of Police Reform shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved."**

## Results

Please refer to the discussion on discipline found in paragraphs 201-202.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.65 Assessing Compliance with Paragraph 78:  Force Review Board Responsibilities

Paragraph 78 stipulates that:

**"APD shall develop and implement a Force Review Board to provide management oversight of tactical activations and Level 2 and Level 3 uses of force.  The Chief or their designee shall appoint the Force Review Board members.   The Force Review Board shall:**

**a)   review all uses of lethal force, all in-custody deaths, and samples of other Level 3 uses of force, Level 2 uses of force, and tactical activations within 60 days of receiving the completed reports.**

**b)   hear the presentation from the Internal Affairs Division or Special Operations Division chain of command and discuss as necessary to gain a full understanding of the facts of the incident.;**

**c)   determine whether the incident raises misconduct, policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;**

**d)   document its findings and recommendations within 15 business days of the Force Review Board presentation; and**

  e) **review and analyze use of force data, on at least a quarterly basis, to determine significant trends and take management action.**

## Methodology

In preparation for this report, the monitoring team attended meetings to ensure they were being conducted in a manner that meets the requirements of this paragraph. We also reviewed nine specific cases that the FRB heard,[45] discussed the FRB with APD personnel responsible for administering the meetings during our June 2023 site visit, and requested additional relevant data that the department provided.

## Results

In May 2022, APD updated its Force Review Board SOP 2-58 (Formerly 2-56), and the SOP review was due in May 2023. The monitoring team requested the updated SOP 2-58 version and was provided with the May 2022 version. We confirmed with APD that the policy has been moving through the approval process and that some of the delay has been linked to APD addressing the 3rd Amended CASA requirements and the desire to incorporate an approved methodology for selecting cases for the FRB. APD's requirement to maintain its policies is linked to higher levels of CASA compliance. Elsewhere, we comment that APD's cycle of review for SOPs lacks timeliness and impacts the efficiency by which policy revisions are addressed administratively and communicated to officers through training. We encourage the parties to work with APD to help shorten the timelines of the review process. We also note that paragraph 147, which relates to the development and promulgation of policies, is among the CASA paragraphs that are currently in self-assessment by APD. We assert that allowing policies to "go stale" is a critical threat to continued compliance. Policies related to high-risk critical tasks, e.g., use of force, powers of arrest, etc., must be monitored by APD on a routine basis and updated as required.

As noted in IMR-17, APD and its Academy created a two-day training program for new FRB members. This training was reviewed and approved by the monitoring team. That training initiative is meant for new APD personnel who may be called upon to serve as members of the FRB. In preparation for this report, we requested copies of training records for any APD executives who attended the training during this reporting period. We reviewed Department Memorandum – DM 23-72, dated July 13, 2023, that mandated three APD executives to attend the FRB training on July 17 and 18, 2023.[46] Before the delivery of the course, APD requested that the attendees of this course not be required to attend Day 2 (centered on SWAT operations) due to their relative positions and experiences at APD. We discussed and approved the request based on the

---

[45] On May 29, 2023, the monitoring team requested a ledger of cases that the FRB had heard (to that date) during this reporting period. The ledger listed 34 separate Level 2/3 cases (including two officer involved shooting cases) that were available for our review at that time. The monitoring team chose nine cases, including the two OIS incidents, representing a 26% sample of all the available cases.

[46] Ultimately, four APD executives attended the training. The monitoring team was made aware of the additional attendee prior to the training.

justification in this specific instance.  We were told that APD is reviewing and revising the second day of the FRB training to make it more reflective of the needs of current FRB members.  Based on representations made to the monitoring team, we advised APD that future course offerings would require all executives to attend the updated second day of training regardless of their positions in the organization.  We reviewed an August 15, 2023, post-course Status Update memorandum documenting the four APD executives who successfully completed the FRB training.

The FRB administrator documents referrals generated during meetings, assigns deadlines for their completion, and tracks them until they are considered closed by the FRB.  Meetings continued to have standard and professional opening comments, discussion of past referrals, and, when necessary, new due dates were assigned for referrals that are still pending.  The monitoring team was provided ledgers for Primary and Secondary FRB cases heard between February 1, 2023, and July 31, 2023.  During this monitoring period, the FRB meetings generated 21 separate referrals sent out for follow-up by the relevant organizational units.

To achieve compliance with Paragraph 78, APD must meet each of several requirements contained within the introductory paragraph and sub-paragraphs 78a – 78e.  The introductory section of this paragraph includes two parts:

1.  APD shall develop and implement a Force Review Board to provide management oversight of tactical activations and Level 2 and Level 3 uses of force.
2.  The Chief or the Chief's designee shall appoint the Force Review Board members.

With respect to Item 1 above, APD has developed and implemented a Force Review Board (FRB) as required by this paragraph.  This has been true for the past several years.  Meetings we attended during the 18th monitoring period had the same features as we reported in the past, with scripted opening remarks and procedures to confirm that meeting procedures are standardized.  The Chair of the FRB asks each voting member if they have reviewed the case file materials in preparation for the meeting.  Each member is required to acknowledge if they have reviewed the materials verbally.

Likewise, APD has met the requirement of Item 2 above by empaneling both a Primary and Secondary FRB to review tactical activations and Level 2 and Level 3 uses of force.  Implementing the FRBs has allowed the agency to achieve many of the requirements of Paragraph 78.

Whether the FRB met the additional requirement to "…provide management oversight" during those meetings has been a matter of discussion throughout the term of the CASA.  This requirement is key to compliance and is the centerpiece of what the FRB is designed to accomplish.  Holding meetings and providing management oversight are not synonymous.  In short, establishing whether the FRB is providing management oversight of uses of force by APD officers is the essence of this paragraph.  We have chronicled major advances in APD's efforts in this regard over the past two years, but we have also

illuminated serious concerns as recently as IMR-17.  Our assessment of APD's FRB during this reporting period includes several areas of strong performance and additional areas of concern related to the FRB's responsibility to provide management oversight, particularly with the use of deadly force.  We detail our observations below, which build upon similar issues we observed with the FRB during IMR-17.

In preparation for this report, the monitoring team chose nine cases that were heard by the FRB during the first three months of the monitoring period. For purposes of this report, our compliance assessment of APD's performance to "…provide management oversight" of tactical and use of force cases, as well as Paragraphs 78a, 78b, 78c ,and 78d were included in our case reviews.  While the majority of CASA provisions in the table were followed, most notable are issues with the handling of the more serious OIS cases that reached the FRB.  We note that APD met the requirements of 78e, which are not case-specific and, therefore, not included in the chart.  78e findings were included in the calculations for Operational Compliance.  These calculations result in 91 percent Operational Compliance for Paragraph 78.

Table 4.7.65, on the following page, summarizes our reviews of the use of force cases discussed above.

Table 4.7.65

| Para | Paragraph Provision | IMR-18-37 | IMR-18-35 | IMR-18-36 | IMR-18-44 | IMR-18-18[47] | IMR-18-12[48] | IMR-18-32 | IMR-18-33 | IMR-18-34 |
|---|---|---|---|---|---|---|---|---|---|---|
| 78 | Provide management oversight of tactical activations and Level 2 and Level 3 uses of force. | Y | Y | Y | Y | N | N | Y | Y | Y |
| 78a | Review all uses of lethal force, all in-custody deaths, and samples of other Level 3 uses of force, Level 2 uses of force, and tactical activations within 60 days of receiving the completed reports. | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 78b | Hear the presentation from the Internal Affairs Division or Special Operations Division chain of command. | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 78b | Discuss as necessary to gain a full understanding of the facts of the incident. | Y | Y | Y | Y | N | N | Y | Y | Y |
| 78c | Determine whether the incident raises misconduct, | Y[49] | Y | Y | Y | N | N | Y | Y | Y |

[47] Members of the monitoring team reviewed the OIS and agreed with the findings that the force was in policy.  As documented in the IAFD investigation, an IAFD investigator made a key observation that the suspect (while sitting in the driver's seat of a disabled vehicle) discharged a round with a firearm while inside the vehicle.  This action occurred immediately prior to the officer responding by discharging his weapon at the suspect.  The suspect's discharged round traveled through the inside of his left thigh and out the opposite side, lodging in the floor of the vehicle.  Despite keeping the vehicle and suspect at the scene for several hours, APD crime scene investigators failed to find and document this important detail, and the observation by IAFD occurred only after the vehicle was released from APD custody.  This failure is not reasonable or excusable in an investigation of such high priority.  We documented failings by APD crime scene detectives in IMR-17 and believe failures of this nature could lead to significant issues when making decisions on the lawfulness of force that is used by APD officers.  We also note that the IAFD investigator sought approval from the District Attorney's Office to interview the officer involved in this shooting.  However, the request was not precise, meaning the request and approval did not make clear that there was a prosecutorial declination that allowed the interview.  During the review of this case at the FRB, only the CPOA representative thought to question the crime scene issues, and an explanation by the IAFD Commander did not address the concern raised.  There was no referral for policy or training issues for the crime scene investigation, which was necessary in this situation.

[48] For an explanation of concerns with the handling of this OIS case by the FRB, details are provided in the narrative portion of Paragraph 78.

[49] One FRB voting member commented on the way an arresting officer spoke with the suspect who was placed under arrest.  The monitoring team observed the same concerning tone.  The monitoring team took note that this same officer's tone was concerning in another case reviewed for this report (IMR-18-30), wherein the officer was heard using vulgar language and screaming at a suspect he arrested.  A member of the monitoring team immediately brought these cases to the attention of APD for their consideration.  APD inquired, and we were provided an APD's Performance Evaluation Metric System (PEMS) report that identified the officer as an "actionable" risk level on July 1, 2023, meaning the officer's risk level was "high"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | policy, training, equipment, or tactical concerns, | | | | | | | | | |
| 78c | Refer such incidents to the appropriate unit within APD to ensure the concerns are resolved; | Y | Y | Y | Y | N | N | Y | Y | Y[50] |
| 78d | Document its findings and recommendations within 15 business days of the Force Review Board presentation; | Y | Y | Y | Y | Y | Y | Y | Y | Y |

As with the past several monitoring periods, during this reporting period, we continued to see strong attendance by FRB members appointed by the Chief. During IMR-17, APD's Secondary FRB became fully operational, and we saw equally strong attendance at the secondary board. The effect of the Secondary FRB on APD's ability to review the use of force cases became clear during this monitoring period. The work contributed by the Secondary FRB eliminated the backlog of FRB cases. This allowed APD to hear contemporary use of force cases within 60 days of the cases being approved by the IAFD Commander, putting APD in compliance with Paragraph 78a. This is a significant achievement for APD's FRB, and it is noteworthy that most cases were heard in 30 days or less during this reporting period.

Consequently, APD was able to suspend the Secondary FRB meetings and rely on the scheduling of contemporary cases with the Primary FRB.[51] APD began devising a methodology for identifying and scheduling cases to be heard by the FRB, considering the new provisions of the 3rd Amended CASA. Parenthetically, we worked with APD on this matter following the close of this monitoring period, and a new methodology is being implemented for the FRB to meet the requirements of Paragraph 78a. We agreed with the final methodology APD presented and will comment further in IMR-19.

The process of administratively scheduling cases for the FRB begins with the transmission of closed Level 2 and Level 3 force investigations by the IAFD to the FRB administrative staff after the IAFD Commander approves cases. During this monitoring period, APD held 25 separate and distinct meetings by the Primary or Secondary FRB.[52]

---

in numerous categories related to force relative to his peer group. This status level requires a supervisor to document a closer review of the officer's performance. The monitoring team will follow up during the next reporting period, as the review was still pending at the time this report was being prepared. While PEMS identifying the officer's conduct is positive, the supervisory response is equally important. In the view of the monitoring team, the officer's conduct in the two cases we reviewed warrants supervisory intervention.

[50] The CPOA Executive Director raised an issue about an arrestee fleeing the hospital. The monitoring team also has raised this issue in past monitor's reports.

[51] The need to refer to one of the boards as "primary" will be eliminated moving forward, and instead we will refer only to the FRB as in years past.

[52] Only four of the meetings were by the Secondary FRB, since APD suspended that Board due to cases being heard in a timely manner.

The following are relevant statistics related to the performance of the FRB during the IMR-18 reporting period:

- A total of 125 use of force and tactical activation cases were reviewed by either the Primary or Secondary Boards.
- Of the 125 cases reviewed, 52 were tactical activations.
- Of the 125 cases reviewed, 73[53] cases were uses of force, including:

  - 20 Level 2 use of force cases;
  - 50 Level 3 use of force cases;
  - 3 Level 3 officer-involved shooting (OIS) cases;
  - 10 FRB backlog cases;
  - 4 IAFD backlog cases; and
  - Only 3 cases went beyond 30 days, and none were beyond 60 days. The most days for a case to be heard by the FRB was 39 once it was made available following the IAFD Commander's Review and Approval.

The statistics and APD's ability to hear cases in such a timely manner is significant. For years, the monitoring team has commented that having cases heard quickly enables several key organizational processes, for instance: (1) Identifying problematic trends related to uses of force or tactics; (2) Identifying problematic officers; (3) Identifying training needs; and (4) Identifying misconduct to allow accountability within contractual timelines. Diligent work has been put forward to reach this point, and we encourage APD to put measures in place to monitor its case presentation schedule closely. With diligent oversight, APD should be able to maintain its compliance with Paragraph 78a.

Paragraph 78d requires the FRB to document its findings and recommendations within 15 business days of the FRB presentation. We reviewed data in the form of meeting minutes that captured the information required by the CASA. As such, APD complied with the requirement of Paragraph 78d during this reporting period.

During the IMR-17 monitoring period, we were provided quarterly trend reports presented to the Primary FRB for the 3rd and 4th quarters of 2022. We found the presentations to be professional and inclusive of significant data. The monitoring team reviewed the presentation materials for the 2023 Q1 Force Data Trend Review presented to the FRB on May 4, 2023, and found them to be equally detailed with relevant information and statistics. The monitoring team provided technical assistance in the past and recommended that information provided to the FRB analyze their statistics more deeply. To be more valuable, the documentation of statistics should illuminate information that allows FRB members to draw inferences that inform potential policy, training, or tactical modifications. Notwithstanding our technical assistance, we believe the FRB's performance with respect to reviewing and analyzing the use of force data complies with Paragraph 78e.

---

[53] The reader should note that an individual use of force event can involve multiple uses of force.

Members of the monitoring team reviewed the OIS and agreed with the findings that the force was in policy.  As documented in the IAFD investigation, an IAFD investigator made a key observation that the suspect (while sitting in the driver's seat of a disabled vehicle) discharged a round with a firearm while inside the vehicle.  This action occurred immediately prior to the officer responding by discharging his weapon at the suspect.  The suspect's discharged round traveled through the inside of his left thigh and out the opposite side, lodging in the floor of the vehicle.  Despite keeping the vehicle and suspect at the scene for several hours, APD crime scene investigators failed to find and document this important detail, and the observation by IAFD occurred only after the vehicle was released from APD custody.  This failure is not reasonable or excusable in an investigation of such high priority.  We documented failings by APD crime scene detectives in IMR-17 and believe failures of this nature could lead to significant issues when making decisions on the lawfulness of force that is used by APD officers.  We also note that the IAFD investigator sought approval from the District Attorney's Office to interview the officer involved in this shooting.  However, the request was not precise, meaning the request and approval did not make clear that there was a prosecutorial declination that allowed the interview.  During the review of this case at the FRB, only the CPOA representative thought to question the crime scene issues, and an explanation by the IAFD Commander did not address the concern raised.  There was no referral for policy or training issues for the crime scene investigation, which was necessary in this situation.

**Review and Observations of OIS Case [IMR-18-12][54]**

In IMR-17, we documented concerns with the FRB and the handling of certain cases that were presented to them.  We also reflected on IMR-16 when we stated the following:

> "…we caution the FRB to remain vigilant in its review of cases and continue to embrace its executive role over the accountability system through the FRB.  The monitoring team was impressed with the degree of engagement over the past 20 months and that sustained energy will become more important as IAFD sworn detectives and civilian investigators are released to conduct Level 2 and 3 uses of force without the oversight of an EFIT investigator.  Likewise, there will be a time that IAFD assumes all investigations without EFIT's supervision, *at which time the culture established within the FRB will be crucial.*" (Emphasis Added).

As we have since the inception of the CASA, in IMR-17, we reiterated how the FRB sets the example for APD's oversight of uses of force and stated, "We have previously commented that the responsibility to be successful with the FRB rests squarely with the top echelon of APD.  When the transition occurs back to APD supervising IAFD alone, commitment to current standards and the executive level resolve to ensure the sustainability of those standards will be tested."[55]   We cited several observations we made during the IMR-17 monitoring period that are exemplars of the types of issues that may forecast APD's ability to sustain its performance with the FRB.  We direct readers to

---

[54] Observations of OIS Case [IMR-18-18] are included in footnote 47.
[55] IMR-17, Pgs. 67-68.

Paragraph 78 of IMR-17 for full details of our observations but provide the following summaries:

- During an August 2022 FRB meeting, an IAFD representative presented a Level 3 use of force case that involved a K9 deployment (IMR-17-43). Though the case and findings of the FRB resulted in a concurring out-of-policy determination, the tone and explanation of the event by the IAFD representative left the distinct impression that the use of force was actually *in policy*. It was surprising that no FRB voting members challenged the findings based on the presentation. We were not alone in our observations and learned that the IAFD commander felt the same and counseled the IAFD presenter following the meeting. Still, the failure of the FRB to question the presentation stood out to a monitoring team member who attended the meeting.

- During an October 2022 FRB meeting, EFIT presented a Level 2 use of force involving a 40mm deployment (IMR-17-44). The investigation into the force resulted in findings that the use of the 40mm deployment was out of policy. When the voting occurred, only one FRB member voted that the use of force was in policy. This prompted the FRB Chair to question the vote and ask the rationale for finding the use of force in policy. The FRB member being questioned was confused and became flustered when answering.[56] Before moving on to another matter, the issue was not truly resolved, nor was there an overt statement by this dissenting FRB member to change their vote from "in policy" to "out of policy". Yet when the meeting minutes were presented at the next meeting, that member's vote had been changed and was then consistent with the other voting members.

  A member of the monitoring team accessed Evidence.com and reviewed the relevant OBRDs audit reports associated with the use of force. They indicated that the OBRDs were not viewed by the FRB member who voted that the force was in policy. Those same OBRDs were also not viewed by one other FRB member. The audit report indicated that an additional voting member of the FRB was accessing one of the relevant OBRD videos during the meeting. When the Evidence.com OBRD audits for three additional use of force cases (being heard that same day) were checked, similar results were found. We conducted additional reviews of Evidence.com OBRD audit reports for cases heard in two different October 2022 meetings and found similar results. These observations were brought to the attention of APD and the City Attorney's Office during our November 2022 site visit.

- During a December 2022 FRB meeting, EFIT presented a backlog Level 3 use of force case that involved an officer-involved shooting (IMR-17-45). The events captured in the EFIT investigation occurred in April 2021. A member of the monitoring team attended the meeting. We believe EFIT completed a comprehensive and objective investigation of the event, with a well-reasoned assessment of the available evidence that found the shooting to be out of policy.

---

[56] We note that the discussion portion of the meeting minutes do not capture this exchange.

By a majority vote,[57] the FRB disagreed with the findings of EFIT and found the shooting to be *in policy*. We reviewed a December 30, 2022, memorandum entitled "Force Review Board Non-Concurrence Addendum #210029185" to the Chief of Police. As we documented in IMR-17, that memorandum sent to the Chief did not accurately represent the EFIT investigation or the analysis made before reaching its findings. It also ignored the objective evidence presented to the Board, specifically the external audio/video recording of the subject's actions immediately before the shooting. We considered the facts and circumstances surrounding the event and reviewed the investigation conducted by EFIT, as well as the questioning of EFIT by the FRB members. We did not concur with the FRB findings and believe that the force used was not objectively reasonable, proportional, the minimum amount of force necessary, or within APD policy.

- During a January 2023 Primary FRB meeting, we observed an IAFD presentation of a Level 3 use of force investigation that included an officer-involved shooting (IMR-17-46). That investigation occurred within the IMR-17 monitoring period and was investigated by IAFD. The case involved a commercial burglary suspect who was confronted by an officer in a nearby parking area. The suspect threw a rock at the officer, who responded by discharging his weapon a total of ten (10) times, striking the suspect once.

  IAFD found that the first firearm discharge was *in policy,* and the remaining nine were *out of policy*. An internal affairs request was made for the out-of-policy firearm discharges, as well as a failure to use de-escalation (time, distance, cover).[58] When presented to the FRB, the voting members agreed with the IAFD findings. The monitoring team reviewed the investigation and did not concur that by a preponderance of the evidence, the first discharge was objectively reasonable, proportional, or the minimum amount of force necessary. We noted that it was unconvincing that the first discharge of the firearm at the subject was a reasonable response, considering the threat he posed to the officer.

We provide the preceding examples to set the context for our observations and findings regarding another officer-involved shooting case that occurred on November 10, 2022, and was heard by the FRB on March 2, 2023 (IMR-18-12). In our opinion, this case sits among the more obvious mishandlings of organizational oversight by IAFD[59] and the FRB that we have seen since the inception of the CASA. The case is replete with issues, from the shooting itself through the handling of the case by an IAFD Deputy Commander and the members of the FRB. In our opinion, the failures are of such significance that APD should consider whether the IAFD Deputy Commander, and any member of the FRB who was present for the meeting are competent to review cases of this significance. We will focus on the more significant observations of this case for this monitor's report. The summary of the event is as follows:

---

[57] One member of the FRB agreed with EFIT's finding that the lethal force was not objectively reasonable, proportional, the minimum amount of force necessary, or within APD policy.

[58] The officer has since been terminated from the department.

[59] We include serious use of force cases handled by APD units prior to the creation of IAFD here.

In the early morning hours of November 10, 2022, APD officers encountered a 41-year-old male in the vicinity of the PTC and APD main headquarters.  Officers confronted the man, who was clearly exhibiting signs of a mental health crisis and/or was under the influence of alcohol and/or drugs.  At least one officer was personally familiar with the individual, and they decided to detain the subject for a criminal trespass infraction.[60]  The individual was told he was not free to leave, but he began to walk away with the officers following.  The individual was not cooperative with the officers' orders to stop.  Attempts were made to take custody of the individual, and at one point, he was observed with an object (a pair of nail clippers with the file extended) in his hand.[61]  The individual maintained the object in his hand for the remainder of the interaction, up to the point of the officer-involved shooting.

Several additional officers converged on the area, and the subject stopped and was confronted by at least five officers in a parking lot near police headquarters.  The subject's irrational behavior continued for several minutes while maintaining control of the pair of nail clippers.

Officers maintained an unsafe distance from the subject while giving multiple orders to the subject over several minutes.  Two officers were armed with their issued ECWs, and three officers with their issued firearms.  Another officer arrived on the scene and was close by, armed with a 40mm launcher.  The subject made short shuffling motions toward the officers with his feet on at least three occasions.  Leading up to the shooting, the officers told the subject to "drop the knife" several times, and the subject made statements about "dying", and the officers stated they didn't want him to die.  The last time the subject made the same short shuffling motion, the officers with their ECWs drawn deployed their weapons.  The weapon(s) appeared in OBRDs to have had the desired effect of neuromuscular incapacitation.  The subject appears to tense and turn away from the officers while falling toward the ground.  Nearly simultaneously, two officers discharged their firearms at the subject.  One officer discharged his firearm four times and the other seven times.[62]  The first shots from each officer occurred when the subject's back was turned, and six rounds were fired at the subject while he was on the ground.[63]

IAFD responded, and an investigation into the matter ensued while MATF conducted a criminal review of the matter.  The investigation determined that there were 15 separate

---

[60] Officer reports also noted a prior offence for felony vandalism by the subject on November 8, 2022, but it's unclear its relevance to this use of force event other than mere knowledge of a prior offense by the subject.

[61] In his IAFD Commanding Officer Force Review dissenting opinion that the shooting of the subject was out of policy, the Deputy Commander stated, "For the purpose of maintaining the accuracy of the officers' perspective at the time force was utilized, the bladed object that the individual utilized will be referred to as a knife."  We find this problematic and in fact, even in his conclusion the Deputy Commander stated, "The individual lunged at the officers, while armed with a knife."  This statement is simply untrue.

[62] The third officer with his firearm drawn and pointed toward the subject was between the two officers who discharged their weapons, and the third officer did not discharge his weapon.

[63] OBRD footage from officers clearly depicts each shot from each officer.

uses of force as follows: two Level 1 ECW shows of force by two officers; two ECW discharges in standoff mode by two officers; and a total of 11 firearms discharges – four by one officer and seven by another officer.  The IAFD investigator completed his investigation and concluded there were multiple failures with tactics and supervision and that officers failed to use proper de-escalation throughout the event, among other issues.  The investigator also concluded that the uses of the ECW were objectively reasonable, the minimum amount of force necessary, and *within APD policy*.  Finally, the IAFD investigator concluded that the shooting of the subject *was neither objectively reasonable*, the minimum amount of force necessary, n*or within APD policy*.  The investigator's supervisor reviewed the case and concurred with the investigator's findings.  When the investigation reached an IAFD Deputy Commander, the Deputy Commander reversed the EFIT investigator and supervisor, finding that all eleven firearms discharges were *within policy*.[64]  The Deputy Commander acknowledged but ignored the documented failures of officers' tactics and de-escalation.  Most notably, he did not mention the subject being shot multiple times while on the ground.  The Deputy Commander's review was dated February 3, 2023.

The IAFD investigator made several internal affairs requests for concerns with tactics, supervision, and failures to de-escalate by officers at the scene of this officer-involved shooting.[65]  From an accountability perspective, the most any officer or supervisor received in this case as discipline was an 8-hour suspension.[66]

On February 7, 2023, the EFIT Administrator submitted a memorandum to the monitor, United States Department of Justice, the US Attorney's Office, and certain executives within APD and the City Attorney's Office.  The memorandum outlined EFIT's disagreement with the (ultimate) findings of *in policy* by IAFD regarding this officer-involved shooting.  We reviewed the EFIT memorandum and found the justifications clear, reasonable, and objective.  Some relevant excerpts from the memorandum include:

- "EFIT does not agree with IAFD's findings that the Officer Involved Shooting ("OIS") that occurred on November 10, 2022, at 0150 Hrs. was reasonable, necessary, proportionate, and minimal and within APD SOPs and guidelines."
- "Although both Officers stated that they believed the individual was armed with a knife, the evidence reveals that they witnessed a small metal object in the

---

[64] The Deputy Commander documented in his report, "the investigation was inaccurate based on the objective evidence that I analyzed, and the contradictions observed in both Det. (name omitted) and Sgt. (name omitted) review. Det. (name omitted) report had contradictory statements which will be addressed in the conclusion of this report", and "The Division's solution will be to have a roundtable meeting will (sic) all investigating and reviewing parties within Det. and Sgt. (names omitted) chain of command."

[65] A Mandatory Training Form, dated March 14, 2023, documented training the Academy provided officers who were involved in this use of force.  On page 6, it noted, "During the classroom presentations and discussions addressing the training concerns, participants acknowledged the following: There were several instances where the Taser or 40 mm could have been utilized to stop/detain the individual. Participants could have created more distance for their own safety and utilized police vehicles as cover/barriers. The participants did not properly communicate with each other or with the individual during the incident."

[66] One officer who shot his firearm received a written reprimand and the other received 8 hours suspension for two separate violations of failing to use de-escalation and proper responses to high threat situations.

individual's hand.  Indeed, the object was so small that, after the shooting, the object was actually found to be nail clippers with the file extended."

- "The Individual made no verbal threats to harm any Officer.  At the time the shooting took place, the individual simply side-shuffled his feet a very short distance toward the Officers.  Most importantly, the individual was closer to the Officers at the beginning of the encounter when he did the same side-shuffle movement, but the Officers apparently did not consider this as a "significant threat" and the Officers did not shoot at the individual at that time."

- "There is simply no evidence that the Individual did anything to elevate the threat level at the time that the Officers utilized deadly force."

- "When the Officers appropriately discharged their ECWs at the Individual 1 minute and 51 seconds later, Officers (names omitted) immediately discharged their firearms without allowing time to evaluate the effectiveness of the ECWs.  In fact, the ECW application had the desired effect and the individual experienced neuromuscular incapacitation throughout the ECW cycle, which made the use of deadly force unnecessary."

- "For the last minutes of his life the individual was standing in an empty parking lot where Officers (names omitted) and others moved to within ten feet of him.  Moments before the shooting, Officer (name omitted) actually closed further distance on the individual, thus increasing any threat from the individual."

- "Along with failing to utilize distance, as required by policy, the Officers failed to utilize available intermediate barriers required by policy.  Numerous police vehicles were available on scene, but none were moved into a position to provide cover or an intermediate barrier."

- "When the Individual was struck with the first ECW and/or bullet he immediately turned to his right facing away from all Officers and fell face down on the pavement.  With the individual immediately turning away from the Officers and falling on the pavement, the individual was no longer a threat to anyone.  Despite this fact, Officers (names omitted) continued to fire multiple rounds at the individual."

- "Even if the Officers had probable cause to believe the Individual was a threat when they first opened fire, the Officers are accountable for each round fired thereafter and they clearly did not meet their mandated obligation to stop their use of force when the threat ceased."

- "Based upon the aforementioned.  EFIT concludes that the use of deadly force was unnecessary and unreasonable and that this OIS is OUT of APD Policy."

A member of the monitoring team attended the March 2, 2023, FRB when this case was heard.  Also present were members of the DOJ and the City Attorney's Office.[67]  In our opinion, the FRB presentation lacked balance and comprehensiveness and omitted important relevant facts.  Notwithstanding this failure, the FRB voting members had at

---

[67] When APD's FRB began to perform at a higher level approximately two years ago, we believe that performance improvement could be attributed to three specific Deputy Chiefs.  One of those Deputy Chiefs retired.  We note that neither of the two remaining Deputy Chiefs were a part of this meeting, despite their regular involvement with FRB meetings.  We have commented in the past that reforms cannot exist as a result of specific people, and instead have to be woven into the fabric of APD's culture.

their disposal all the relevant information prior to the meeting to properly assess this case.  Likewise, the FRB could make any inquiry into the case that would provide them with the perspective necessary to reach reliable findings regarding the force used in this case.

During the meeting, the EFIT Administrator interjected to ensure the FRB was aware that they disagreed with the findings of the case (related to the use of deadly force) and advised that they submitted a memo on February 7, 2023.  Despite this, not a single question was directed to EFIT from any member of the FRB to seek their perspective on the fatal shooting.  Likewise, not a single question was asked by any member of the FRB about the multiple shots (by both officers) when the subject was on the ground.  Only one voting member of the FRB asked insightful questions regarding the appropriateness of deadly force in this case.  As noted earlier, immediately prior to the shooting, the individual made small shuffling motions with his feet (referred to as "lunges" by APD), and the FRB member called attention to the fact that the victim of the shooting had made similar motions on three earlier occasions that did not result in a shooting.  The same FRB member voted that they did not view the use of deadly force as proportional to the threat.  Despite disciplinary findings that de-escalation did not occur and an overabundance of clear evidence that the deadly force in this case was not objectively reasonable, necessary, and was not the minimum amount of force necessary, this one FRB member was outvoted by the rest of the FRB.  The ultimate finding was that all the uses of force, including the deadly force (and more specifically the rounds fired at the subject when he was on the ground and already incapacitated), were all *in policy*.

We also note that the CPOA representative opined that the shooting was out of policy.  CPOA is independent to express dissention in a finding.

In preparation of this report, members of the monitoring team reviewed this investigation in detail.  We are not enumerating all the problematic issues with the use of force, the investigation of that force, the IAFD command level review, and the oversight failures by the FRB.  Suffice it to say an unbiased and competent review of this case would determine that the weight of evidence in this case was overwhelming and that the use of deadly force in this case was unnecessary and excessive.[68]  Also, this case marks the second time in as many monitoring periods that EFIT has provided a compelling justification of findings for an *out-of-policy* officer-involved shooting that was ignored by the FRB.  Most troubling is that in this case, the IAFD investigator and supervisor did what was required, and the deficiencies began at the IAFD command level and were endorsed by the FRB.  We are gravely concerned with the trend of the FRB mishandling officer-involved shootings.  We saw issues with both OIS cases we reviewed for this monitoring period, coupled with observations documented in IMR-17.  We are equally concerned with the chilling effect a case like this can have on IAFD investigators and supervisors who will be called to make difficult, honest, and accurate findings in the future.  In our opinion, all parties should be concerned if any IAFD personnel believe, or were led to believe, that the use of deadly force by officers, in this case, was appropriate

---

[68] In our opinion, like the IAFD investigator and EFIT, officers were justified when they used their ECWs immediately prior to the uses of deadly force.

or that the actions of the IAFD Deputy Commander and FRB were correct.  In the monitor's opinion, this case represents grave and substantial malfeasance on the part of the IAFD and FRB.

We considered the facts and circumstances surrounding the event, assessed the underlying investigation, and reviewed the findings by the IAFD and the FRB.  The IAFD and FRB findings were incorrect, and the deadly force used was not objectively reasonable, proportional, nor the minimum amount of force necessary, and was not within APD policy.

**Results**

Like IMR-17, we commend the staff responsible for the administrative movement of cases for the FRB.  We continue to acknowledge the importance of attendance at the FRB and APD's commitment to having executives as voting members of the FRB.

Based on our review, we have determined Secondary Compliance is continued for Paragraph 78.  Central to APD achieving Operation Compliance is that APD reliably provides management oversight of tactical activations and Level 2 and 3 uses of force. We will continue to provide technical assistance to facilitate Operational Compliance.

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **Not In Compliance**

***Recommendations for Paragraph 78:***

***4.7.65a: FRB should focus critical attention on reviews of uses of deadly force.***

***4.7.65b: APD should continue to analyze trend data and where appropriate provide their analysis with recommendations to inform decisions and ensure policy and training are properly addressing performance in the field.***

***4.7.65c: As this improper use of deadly force represents a failure of multiple CASA-related paragraphs involving supervision, mid- and upper-level command, and internal assessment and control processes, we strongly suggest that APD convene an internal panel of experienced high-level command personnel to assess:***

> ***a.  How this improper use of deadly force managed to slip past multiple levels of "oversight" and "review;"***

> ***b.  Identify each failure point in this OIS's assessment and review and:***

67

***1.  Counsel, retrain and/or discipline each level of oversight of this incident that failed properly to identify and process an obviously bad shooting;***

***2.  Assess internally what revisions to policy, training, supervision, command oversight, and executive oversight need to occur to ensure:***

***i.  All personnel who engaged in this improper OIS; all personnel who supervised, reviewed, assessed, or otherwise processed this improper use of deadly force, are aware of their failures to adequately investigate, oversee, and otherwise correctly process the internal review of this use of force; and***

***ii.  Specific steps are taken to prevent similar failures to properly investigate, oversee, and correctly process OIS events.***

## 4.7.66 Assessing Compliance with Paragraph 79:  Annual Use of Force Reporting

Paragraph 79 states:

> **"At least annually, APD shall publish a Use of Force Annual Report.  At a minimum, the following information should be included in the Annual Use of Force Report:**
> a)   **number of calls for service;**
>
> b)   **number of officer-initiated actions;**
>
> c)   **number of aggregate uses of force, and uses of force by Level;**
>
> d)   **number of arrests;**
>
> e)   **number of arrests that involved use of force;**
>
> f)   **number of SWAT deployments by type of call out;**
>
> g)   **number of incidents involving officers shooting at or from moving vehicles;**
>
> h)   **number of ECWs in operation and assigned to officers;**
>
> i)   **number of incidents involving ECW discharges;**
>
> j)   **analysis of ECW trends in ECW discharges, ECW shows of force, officer injuries, and injuries to others. Probe deployments, except those described in Paragraph 30, shall not be considered injuries;**
>
> k)   **critical firearm discharges;**

l)   number of individuals armed with weapons;

m)  number of individuals unarmed;

n)   number of individuals injured during arrest, including APD and other law enforcement personnel;

o)   number of individuals requiring hospitalization as a result of use of force, including APD and other law enforcement personnel;

p)   demographic category; and

q)   geographic data, including street, location, or Area Command."

## Methodology

Paragraph 79 of the CASA addresses the requirements APD must meet by publishing a Use of Force Annual Report.  The monitoring team requested course-of-business documentation that demonstrated provisions within the paragraph had been met. Specifically, we asked APD to produce the following:

> "Copy of the updated APD Preliminary Annual Use of Force Report that includes 2022 data and any finalized Annual Use of Force Report for 2016-2021."

In IMR-17, we provided APD with a brief historical summary of events that led to their current compliance standing with Paragraph 79 and the steps necessary to achieve Operational Compliance.  We will not repeat that guidance here and recommend that APD reflect on IMR-17 to determine their next steps toward compliance with the requirements of this paragraph.

APD published its 2022 Annual Use of Force Report during this monitoring period.[69]  As with other recent submissions, we reviewed the 2022 Annual Use of Force Report and found it an extremely professional and well-organized document containing the data required by Paragraph 79.  Due to APD's publishing of the 2022 Annual Use of Force Report, we have determined that APD has earned Operational Compliance status for Paragraph 79.

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

---

[69] This Annual report did not include the designation "Preliminary", presumably because 2022 represented the first full year of data that fell under the conditions of EFIT assistance and more reliable use of force investigations being finalized by IAFD.

Monitor's Notes for Paragraph 79:

APD should ensure the use of force investigation backlog is reconciled accurately, and the complete data required by Paragraph 79 should be incorporated into the final 2020 and 2021 Annual Use of Force Reports.

APD should continue to monitor the uses of force, serious uses of force, and shows of force reporting discrepancies that are found.  Reporting errors must be reconciled to ensure that statistics published in APD's Annual Use of Force Reports are accurate.

APD should assess its auditing processes for reports of Level 1 uses of force and Low-Level Control Tactics to ensure proper categorization is taking place.  Data collected from these audits should feed the Annual Use of Force reports, and when appropriate, problematic cases should be referred to IA and the Academy.

APD should devise ways to scrutinize data presented by the individual department units and continue to coordinate with PMU to ensure that there are common methods to handle, analyze, process, and present data.

### 4.7.67 Assessing Compliance with Paragraph 80

Paragraph 80 states:

> **"APD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all Level 1 use of force reviews; all force investigations carried out by the Internal Affairs Division or Multi-Agency Task Force; and all force reviews conducted by the Compliance and Oversight Division and the Force Review Board.  The purpose of the use of force tracking system is to serve as a repository of force data for the Use of Force Annual Report and the Early Intervention System.**

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.68 – 4.7.72 Assessing Compliance with Paragraphs 81 - 85: Multi-Agency Task Force (MATF) Participation by APD

**Paragraphs 81 - 85 are self-monitored by APD.**

### 4.7.73 – 4.7.75 Assessing Compliance with Paragraphs 86-88: Review of Use of Force Policies and Training; Use of Force Training Based on Constitutional Principles; and Annual Supervisory In-Service Training.

During this reporting period, the monitoring team corresponded with APD personnel responsible for the tasks associated with Paragraphs 86-88 and met with them during our June 2023 site visit.  Additionally, a monitoring team member visited APD and attended the two days of 2023 Use of Force and Reality-based Training (RBT).  Over the past several monitoring periods, APD has made significant strides administratively and operationally to professionalize its approach to CASA compliance.  Their efforts were fully realized during IMR-16 and IMR-17, with APD achieving Operational Compliance with Paragraphs 86, 87, and 88.  Based on our review of available data, APD has sustained its Operational Compliance with those paragraphs during IMR-18.

At the close of the IMR-17 reporting period, APD promulgated its new use of force policies.[70]  That event allowed the Academy to develop and deliver training that reflected those new policies during its 2023 use-of-force programs.  APD sought to meet that requirement by delivering twenty (20) hours of curriculum across two training days.[71]  Prior to the delivery of the training, APD provided the curriculum to the monitoring team. We found the training materials to be thoughtful, professional, well-organized, and thorough.  We provided feedback that we believed would help APD in its efforts, both in substance and style, all of which APD adopted into the curriculum.  The training was approved by the monitoring team on April 13, 2023.

The training addressed changes for the following policies[72]:

SOP 2-52 Use of Force – General (1/26/2023);
SOP 2-53 Use of Force – Definitions (1/26/2023);
SOP 2-54 Use of Force – Intermediate Weapon Systems (1/26/2023);
SOP 2-55 Use of Force – De-escalation (1/26/2023);
SOP 2-56 Use of Force – Reporting by Department Personnel (1/26/2023); and
SOP 2-57 Use of Force – Review and Investigation by Department Personnel (1/26/2023).

APD's Academy continues to be receptive to the monitoring team's feedback, and the technical assistance we share is quickly understood and implemented.  As with past site visits, the Academy staff came prepared for the meeting and provided a presentation to communicate their efforts since the end of IMR-17.  Among the many items discussed were their specific attempts to address each monitor's recommendation from the last report.  The Academy's Commander and managerial staff have been instrumental in moving APD into Operational Compliance over the past two years.  However, in June 2023, APD replaced the Academy Commander.  At our request, we met with the

---

[70] The use of force policies (SOPs 2-52 through 2-58) were negotiated among the parties and approved by the monitor, and then enacted on January 26, 2023.

[71] Day 1 of the training was 10 hours of in-person, classroom training wherein the new use of force policies would be instructed.  That training was a prerequisite to attending the Day 2 Reality-based Training (RBT), which was 10 hours of practical application of training through a series of scenarios.

[72] We note that SOP 2-8 "Use of On-Body Recording Devices (5/3/2022) was also addressed in the course.

incoming Commander during our June 2023 site visit.  While he does not possess Command experience in a training environment, APD believes his organizational experience will be a benefit to the Academy.  We found the new Commander to be open and very receptive to our perspectives.  We extended the offer to provide technical assistance to the extent he believed it would help his transition to the new role.

Parenthetically, the new Commander requested a virtual meeting with us following our site visit to discuss various topics.  We gave him our perspective on the history of the Academy's CASA journey and what we believed helped and hurt APD's compliance efforts over the past several years.  He was extremely receptive to our feedback.  APD requested additional technical assistance, so two members of the monitoring team scheduled an in-person technical assistance meeting at the end of September 2023.  We will report on that meeting in IMR-19.

The Commander position at the Academy provides oversight, guidance, and stability with respect to setting Academy expectations and the standards instructors must adhere to when developing and delivering training.  We cannot underscore enough the importance of APD marshaling its efforts to assist the Academy Commander as he leans into and learns his new responsibilities.  The team around him will provide great support, but continued success will require Executive level interaction.

As noted above, a monitoring team member attended the 2023 Use of Force and RBT training on May 8 and 9, 2023.  The goal was to attend the training as early as possible so that timely feedback could be given if any course corrections were necessary.  The training delivery was professional and extremely well done.

The curriculum for Day 1 included the class being broken into groups, and exercises and scenarios were presented to the group throughout the day.  The day concluded with a practical exercise in which all participants took part.  Participants were challenged to apply concepts they learned throughout the day.  The curriculum was lengthy and lasted the entire day, but the instructor moved the day along at an appropriate pace while keeping the class's attention.  During the day, we interacted with the instructor, gave real-time feedback, and suggested ways to either articulate or illustrate a particular point so the class's understanding was clear.  The instructor was extremely receptive and knowledgeable on the topics, and he did an excellent job presenting the information.  It was important for him to explain the changes (sometimes subtle) in the new use of force suite of policies.  We believe he did this very effectively and represented the language and spirit of the 3rd Amended CASA well.

The curriculum for the Day 2 RBT training included updated Taser training held in a classroom, followed by each participant taking part in a series of challenging scenarios.  They were tested against pre-established scoring metrics and expected to properly apply CASA-related use of force principles in a simulated live setting.  We have come to appreciate the attention to detail APD demonstrates during its annual RBT training.  The degree of management that is necessary to coordinate a multitude of moving parts is impressive.  We observed each scenario and saw very professional and substantive feedback given to class participants during scenario debriefs.  Whether the class

participants executed their responsibilities well or not, the Academy instructors provided meaningful perspectives.  While there were several examples of good instruction, we observed one that stood out among the rest.  The scenario included a suspicious vehicle complaint, where each class participant was teamed with an Academy actor.  In the suspicious vehicle was another actor.  After the scenario began, the Academy actor (teamed with the class participant) was told to react suddenly, yell "gun" and begin firing simulated rounds toward the vehicle.  The scenario evaluated the class participant's reaction to what he could see and hear.  During one scenario, we observed a class participant react incorrectly, which allowed for a very important instructional moment for that officer.  We find these training experiences invaluable to officers and credit the Academy for devising this particular scenario.[73]

The two days of training described above were intended to meet the requirements of several CASA-related training requirements as described below.  On March 24, 2023, APD promulgated SO 23-40 for the "2023 Mandatory UOF Policy Suite Training", which listed training dates between April 25 and July 7, 2023.  On March 14, 2023, SO 23-41, "2023 Mandatory UOF Policy Suite Realty Based Training" was promulgated, which listed training dates between May 9 and July 27, 2023.

- Day 1 – We reviewed an August 22, 2023, Academy Closeout Memorandum that captured the outcome data necessary to assess compliance.  Of 864 sworn and available officers, 99 percent successfully completed the training.  We noted a significant increase in passing scores between the Pre and Post-tests that were given to the attendees.  Measuring the transfer of knowledge is a key element of the training.  It allows APD to track field implementation better and isolate areas within the training that can be reinforced if future issues are seen in the field.
- Day 2 – We reviewed a September 1, 2023, Academy Closeout Memorandum that captured the outcome data necessary to assess compliance.  Of 829 sworn and available officers, 98 percent successfully completed the training.  We note that the Closeout Memos we have reviewed over the past two years have continued to expand in scope and are routinely refined.  The Closeout Memo for Day 2 had excellent information that can inform future training programs.

We reviewed the July 24, 2023, Interoffice Memorandum demonstrating that 98-99 percent of all available and sworn officers have verified receipt of the current use of force suite of policies through APD's learning management system (LMS).  The percentage slightly varied because the policies were accessed and signed for on different dates.  Since the number of available officers varies due to retirements and authorized leaves of absence, the percentage changed minimally depending on each policy.

---

[73] While talking with the RBT coordinator we learned that the notion of "sympathetic fire" being included in the training originated from a real incident in the field.  That is exactly how the development of training should occur, by drawing inspiration from issues in the field.  We were familiar with the case the instructor cited, but the connection to the curriculum was not overtly documented in the course materials.  We highly recommended they include such information in the needs assessment in the future.

We also reviewed a July 26, 2023, Interoffice Memorandum entitled "Status Update on 2023 Clarification of Use of Force Policy Briefing Video". The video's purpose was to clarify a few areas following the completion of the annual use of force training. The memorandum showed that 96 percent of all sworn and available officers viewed the video.

The following represents our findings related to Paragraphs 86-88 for this monitoring period.

**Paragraph 87a:**

At the close of IMR-18, APD was preparing a curriculum to address the requirements of Paragraph 87a. We spoke with an Academy representative, and we are confident the training will be submitted for approval and delivered before the close of IMR-19. We will report our findings at that time.

**Paragraph 87b:**

APD achieved compliance with Paragraph 87b with its successful completion of the 2023 annual use of force training as noted above.

**Paragraph 87c:**

APD achieved compliance with Paragraph 87c with its successful completion of the 2023 RBT, as noted above.

**Paragraph 87d:**

APD achieved compliance with Paragraph 87d with its successful completion of the 2023 RBT, as noted above.

We also reviewed training materials entitled, "2023 Mental Health and De-escalation", approved by a monitoring team member on April 5, 2023. Training was held between April 17 and June 22, 2023. A July 31, 2023, Closeout Memorandum documented that 96 percent of sworn and available officers successfully completed the training.

**Paragraph 87e:**

APD achieved compliance with Paragraph 87e with its successful completion of the 2023 RBT, as noted above.

**Paragraph 87f**

APD achieved compliance with Paragraph 87f with its successful completion of the 2023 RBT, as noted above.

**Paragraph 87g:**

At the close of IMR-18, APD was preparing a curriculum to address the requirements of Paragraph 87g.  We spoke with an Academy representative and were advised the training will be submitted for approval and delivered before the close of IMR-19.  We will report our findings at that time.

**Paragraph 87h**

Paragraph 87h requires annual training centered on initiating and disengaging from foot pursuits.  Previously, the monitoring team approved the use of training materials on this topic that were used in successive years (2021-2022) under the agreement that new materials would be created for 2023.  As agreed, APD submitted training materials that address its 2023 training requirements for Paragraph 87h early in this monitoring period.  The materials, which included in-person training sessions, were reviewed, and approved by the monitoring team on March 24, 2023.  APD promulgated Special Order 23-32 on February 28, 2023, ordering APD officers to attend its Phase II Biennial Training, which was scheduled across multiple dates between April 17 and June 22, 2023.  We reviewed a comprehensive Closeout Memorandum dated July 31, 2023, which documented that of 830 officers on full duty and available to attend the training, 97 percent attended and successfully completed the course.[74]

**Paragraph 88a**

APD achieved compliance with Paragraph 88a with its successful completion of the Day 1 - 2023 Use of Force training, as noted above.  We reviewed a July 28, 2023, Closeout Memorandum that isolated data for APD supervisors who attended the training.  Of the 330 available supervisors, only one had not attended the training at the close of IMR-18, resulting in a 99.7 percent compliance rate.

**Paragraph 88b**

APD achieved compliance with Paragraph 88b with its successful completion of the Day 1 - 2023 Use of Force training, as noted above.  We reviewed a July 28, 2023, Closeout Memorandum that isolated data for APD supervisors who attended the training.  Of the 330 available supervisors, only one had not attended the training at the close of IMR-18, resulting in a 99.7 percent compliance rate.

**Paragraph 88c**

---

[74] Some officers are on authorized leaves of absence (e.g. Military or FMLA leave).  We noted in this Closeout memo APD included officers who were "Retiring" and recent academy graduates who were attending "on-the-job training".  Moving forward, if APD includes these categories of people as not available, we will require more detail such as the scheduled dates of retirement and organizational documentation that verifies that date of retirement.  In our opinion, absent extenuating circumstances the retiring officers should attend the training.  We believe the timing of officers graduating and the approval of the training materials did not give the academy the opportunity to include the topic during the academy training.  Presumably, the officers' FTOs are attending the training.  To avoid conflicts and inefficiencies it makes more sense to have officers taking part in on-the-job training to attend with their FTO.

At the close of IMR-18, APD was preparing a curriculum to address the requirements of Paragraph 88c.  We spoke with an Academy representative who advised that the training will be submitted for approval and delivered before the close of IMR-19.  We will report our findings at that time.

**Paragraph 88d**

APD achieved compliance with Paragraph 88d with its successful completion of the Day 1 - 2023 Use of Force training, as noted above.  We reviewed a July 28, 2023, Closeout Memorandum that isolated data for APD supervisors who attended the training.  Of the 330 available supervisors, only one had not attended the training at the close of IMR-18, resulting in a 99.7 percent compliance rate.

Although we have commented on this previously, since there is a new Commander at the Academy, it is important to reiterate here a couple of general factors he should consider when submitting materials to the monitoring team and how we assess training. The following should inform how training should be assessed by APD, similar to how the monitoring team will assess it: (1) Content and quality of training materials relative to CASA requirements; and (2) Content and quality of instruction of materials that were reviewed by the monitoring team.  We continue to encourage the Academy's leadership and supervisors to routinely and randomly audit training courses to protect the integrity of classroom instruction and not jeopardize Operational Compliance.[75]  For the APD Executive Staff, we want to be clear that it is irrelevant to the monitoring team where an instructor's primary assignment is when they are covering CASA-related topics. Therefore, when people from outside the Academy are asked to instruct, the department should only choose qualified people interested in teaching.

**Additional Observations**

The monitoring team has encouraged APD's Academy to implement a Training Committee that would draw together stakeholders from across the organization to help them identify specific needs from the field.  We reviewed the only available information for a meeting that was scheduled for May 3, 2023.  We noted a significant drop in attendance, and the information available provided no value in identifying and documenting needs that can inform training development.  While not required by the CASA, using a Training Committee to collect information during the 7-Step Training Cycle is important to APD.  APD has acknowledged the value of the Training Committee many times in the past.  In this endeavor, we believe the Academy Commander can be successful only through sustained support from the top echelon of the organization.  If the Chief and Deputy Chiefs do not understand the value of a Training Committee and message that to their respective chains of command, there is virtually no chance of it being a successful tool to assist Academy compliance efforts.

---

[75] We did not note issues of concern during this reporting period but call this out as a general oversight recommendation of instructor performance.

APD's compliance standing for Paragraphs 86, 87, and 88 has been sustained at Operational Compliance for this reporting period.

### 4.7.73 Assessing Compliance with Paragraph 86:  Review of Use of Force Policies and Training

Paragraph 86 stipulates:

> **"Within 36 months of the Operational Date, APD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and provisions of this Agreement.  APD shall also provide all APD officers with 40 hours of use of force training within 12 months of the Operational Date, and 16 hours of use of force training on at least an annual basis thereafter, including, as necessary, training on developments in applicable law and APD policy."**

**Results**

Primary:        **In Compliance**
Secondary:    **In Compliance**
Operational:  **In Compliance**

### 4.7.74 Assessing Compliance with Paragraph 87:  Use of Force Training Based on Constitutional Principles

Paragraph 87 stipulates:

> **"APD's use of force training for all officers shall be based upon constitutional principles and APD policy and shall include the following topics:**
> **a)  search and seizure law, including the Fourth Amendment and related law;**
>
> **b)    APD's use of force policy, use of force reporting requirements, and the importance of properly documenting use of force incidents;**
>
> **c)    use of force decision-making, based upon constitutional principles and APD policy, including interactions with individuals who are intoxicated, or who have a mental, intellectual, or physical disability;**
>
> **d)    use of de-escalation strategies;**
>
> **e)    scenario-based training and interactive exercises that demonstrate use of force decision-making and de-escalation strategies;**

      **f)**      **deployment and use of all weapons or technologies, including firearms, ECWs, and on-body recording systems;**

      **g)**      **crowd control;**

      **h)**      **and initiating and disengaging foot pursuits.**

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.75 Assessing Compliance with Paragraph 88:  Annual Supervisory In-Service Training

Paragraph 88 stipulates:

> **"Supervisors of all ranks, including those assigned to the Internal Affairs Division, as part of their initial and annual in-service supervisory training, shall receive additional training that includes:**
>
>     **a)**    **conducting use of force reviews or investigations, including evaluating officer, individual, and witness credibility;**
>
>     **b)**    **strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force;**
>
>     **c)**    **incident management; and**
>
>     **d)**    **supporting officers who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force."**

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

Monitor's Notes:

Academy staff should always contemplate the ongoing, annual training responsibilities relevant to numerous CASA requirements.

APD personnel assigned to non-academy commands with significant training requirements should receive training commensurate with the Academy staff.  This will ensure continuity in curriculum development and delivery of that curriculum across the organization.

APD's executive staff should prioritize APD's Training Committee meetings, and departmental liaisons should be required to attend meetings and submit data and specific, tangible needs that will inform learning objectives in the Academy curriculum.

Continue to ensure that the Academy is the central point for reviewing and approving all training development and delivery processes for APD.

APD should continue to scrutinize training developed from outside sources before it is delivered to the department, regardless of its origin.  Training programs should be developed based on best practices and APD policy and must adhere to the requirements of the CASA.

**4.7.76 – 4.7.96 Assessing Compliance with Paragraphs 89 - 109: Annual Firearms Training**

**Paragraphs 89-109 are self-monitored by APD.**

**4.7.97 Assessing Compliance with Paragraph 110: Individuals in Crisis and Related Issues**

**This paragraph is a Non-Rated Paragraph.**

**4.7.98 – 4.7.115 Assessing Compliance with Paragraphs 111- 128: Mental Health Response Issues.**

Paragraphs 111-128 address the processes required by the CASA for APD and the City when responding to calls for service involving mental health, crisis, and homelessness.  In determining compliance outcomes for these paragraphs, the monitoring team reviewed normal course-of-business documentation related to the City's responses to individuals in crisis and individuals who are unsheltered.

We note that APD has met, and in many cases, far exceeded, the requirements of the CASA as it relates to mental health response planning, crisis intervention, training development and delivery, and service delivery.  Our review indicates that APD crisis outreach services personnel have continued to work diligently with MHRAC to assess, improve, and serve affected communities.

We also note that APD's CIT program serves as a national model.  Members of the CIU regularly consult with peers in other law enforcement agencies across the country. At the CIT International Conference (held in August 2022), several APD crisis

intervention unit members were featured presenters.[76]  APD's crisis intervention system has produced work that consistently demonstrates creativity and community responsiveness.

In assessing the City's compliance with these paragraphs, we reviewed City processes designed to:

- Structure and improve mental health processes in the community;
- Foster close coordination between APD, other City resources, and mental health community leaders, including MHRAC; and
- Create meaningful, flexible, and effective mental health services throughout the communities served by the City and APD.

### 4.7.98 - 4.7.100 Assessing Compliance with Paragraphs 111 - 113

**Paragraphs 111 - 113 are self-monitored by APD.**

### 4.7.101 Assessing Compliance with Paragraph 114:

Paragraph 114 stipulates:

> **"APD, with guidance from the Advisory Committee, shall develop protocols that protect the confidentiality of information about individuals with known mental illness."**

**Methodology**

During the reporting period, the monitoring team reviewed MHRAC's reports, recommendations, communications, processes, and key APD memoranda, assessing these documents for compliance with Paragraph 114.  Specifically, we reviewed weekly email communications between the APD and UNM related to the memorandum of understanding (MOU).

**Results**

The MOU between APD's CIU and the University of New Mexico Health Sciences Center/UNM Health Systems remains in place.  It has not been updated since the monitoring team's previous reviews (signed and dated October 16, 2017).  According to the City's Legal Department, the MOU is in effect until September 30, 2099.  The CIU continues to share information via email with UNM on a weekly basis, as required by the MOU.

---

[76] *See* 2022 CIT International Conference Workshop Schedule at
https://www.citinternational.org/resources/CITI%20Conference%20Folder/2022%20Conference/Workshop_Presenter%20Schedule_Website.pdf

Throughout this monitoring period, the monitoring team has also tracked information sharing between the City/APD and UNM Hospital, in which CIU clinicians have shared information weekly.

We note that APD's existing mental health training courses contain content regarding the MOU between APD and the University of New Mexico.  Further, the CIU Commander reviewed APD's internal affairs records to ascertain whether any APD violations of the existing confidentiality processes had been reported.  There were no such complaints or requests to investigate violations of confidentiality during this reporting period.  Finally, the monitoring team reminds APD that confidentiality issues should be discussed with the MHRAC's Policy, Information Sharing, and Resources sub-committee when appropriate.

> Primary:     **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.102 – 4.7.108 Assessing Compliance with Paragraphs 115 - 121

**Paragraphs 115 – 121 are self-monitored by APD.**

## 4.7.109 Assessing Compliance with Paragraph 122

Paragraph 122 stipulates:

> **"APD shall provide two hours of in-service training to all existing officers and tele-communicators on behavioral health-related topics biannually."**

## Methodology

During this reporting period, the monitoring team reviewed the curriculum and all relevant training documents related to attendance for officers and telecommunicators, including the APD's "2023 Mental Health and De-escalation" training.

## Results

APD sworn officers and telecommunicators participated in the required 2-hour block of training referenced above between April 17 and June 22, 2023.  The monitoring team tracked the course's development throughout this monitoring period, including a review of the draft curriculum.  We also note that APD held an in-service training day for their Mobile Crisis Teams in June 2023; the agenda included refreshers on policy, individual first aid kits, and scenario training.

Moreover, early in the reporting period, upon recognizing a trend regarding service delivery to people in crisis regarding mandated transports, the APD CIU prepared and delivered a briefing to all Area Commands to refresh officers on relevant policies and

procedures.  The monitoring team notes APD's heightened attention to tracking trends through data and acting upon findings promptly.

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.110 Assessing Compliance with Paragraph 123: Crisis Intervention Certified Responders and Crisis Intervention Unit

Paragraph 123 stipulates:

> **"APD shall maintain crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis.  APD shall also maintain a Crisis Intervention Unit ("CIU") composed of specially trained detectives whose primary responsibilities are to respond to mental health crisis calls and maintain contact with mentally ill individuals who have posed a danger to themselves or others in the past or are likely to do so in the future."**

**Methodology**

The monitoring team reviewed training and assignment records for crisis intervention certified responder officers (ECIT officers) and the CIU for the reporting period.  We also reviewed data and analysis regarding ECIT-officer response rates to calls for service, as well as the continued efforts of the CIU to maintain ECIT officers by recruiting officers who demonstrate de-escalation skills during routine performance reviews.

**Results**

During this reporting period, APD data indicated that, on average, ECIT-trained officers respond to about 81 percent of calls for service involving behavioral health elements. The percentage of ECIT responses to these calls for service varied a bit across shifts and area commands during this reporting period.  The details by month are depicted on the following page.

### 4.7.110 Percentage of ECIT Responses to Mental Health Calls for Service

| Month | % ECIT responses to mental health calls for service |
|---|---|
| February | 81% |
| March | 80% |
| April | 81% |
| May | 80% |
| June | 84% |
| July | 80% |
| Average | 81% |

The monitoring team notes the consistent response rates of ECIT officers responding to mental health-related calls for service.  Response rates hovered between 79 percent and 82 percent through the last several reporting periods.  Moreover, in February 2023, the APD achieved an important first regarding ECIT staffing, with an ECIT officer or sergeant in every squad city-wide.  We appreciate the CIU's continuous efforts to recruit officers into ECIT.  The CIU offered ECIT training courses in March and April during this reporting period.  Moreover, the monitoring team notes that all Crisis Negotiation Team member officers must have ECIT certification, per the Chief's February 15, 2023, memo.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

### 4.7.111 - 4.7.113 Assessing Compliance with Paragraphs 124 - 126

**Paragraphs 124 – 126 are self-monitored by APD.**

### 4.7.114 Assessing Compliance with Paragraph 127

**[THIS PARAGRAPH INTENTIONALLY LEFT BLANK.]**

### 4.7.115 Assessing Compliance with Paragraph 128

Paragraph 128 stipulates:

> **"APD will ensure that crisis intervention certified responders or CIU will take the lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so."**

**Methodology**

The monitoring team reviewed documentation of APD's reviews of city-wide field interactions between officers and individuals in crisis, which APD launched in response to our recommendations for this paragraph in IMR-12.[77] These reviews are designed to understand officers' interactions with people in crisis on-scene, including which responding officers are (ECIT) certified crisis responders and whether those officers take the lead-scene, as required by APD policy SOP 2-19.[78] APD CIU personnel conducting these reviews fill out a standard review form ("Crisis Intervention Call Review" form) to capture such information and take appropriate action to refer potential policy violations to the proper accountability channels.

**Results**

APD CIU has continued to address our recommendation to conduct assessments of a random sample of crisis intervention responses throughout the Field Services Bureau.  In all, 25 thorough reviews were conducted by APD during this reporting period, with the reviewers drawing upon CAD data, OBRD video, incident reports, and CIT reports.  The reviewers noted one instance in which an ECIT officer did not take the lead on scene because an ECIT officer was not present.  We note that in its recent revision to its *Behavioral Health Division Crisis Intervention Division Handbook (CID Handbook)*, the section entitled "Item 20: CIT Supervisor Call Reviews" details the process by which such reviews shall be conducted.  We note that this review process is continual and demonstrates APD's willingness to regularly review officers' behavior in the field, correct deficiencies, and problems early, and make proper referrals when necessary.

The monitoring team appreciates this ongoing review based on sampling field services officers' interactions with people with mental illness and people in crisis.  APD's processes identify deficiencies (if any) and address them promptly.  We look forward to APD's actions in response to our Recommendation 4.7.115b from IMR-12, which calls for reviewing and assessing randomly selected mental health-related calls for service city-wide.

Primary:    **In Compliance**
Secondary:  **In Compliance**

[77]IMR-12, Recommendation 4.7.115a: Conduct a complete assessment of all CIT/CIU responses involving the officer identified in the events outlined above. IMR-12, Recommendation 4.7.115b: Conduct a random sample of all CIT/CIU responses to ensure that the issues identified above have not been replicated in other CIT/CIU responses by other officers. IMR-12, Recommendation 4.7.115c: Provide the monitor the results of the inquiry outlined above for inclusion in IMR-13.

[78] APD's SOP 2-19 states in 2-19-6 Response, C.1. "When on scene, ECIT sworn personnel, MCT, or CIU detectives shall take the lead in interacting with individuals in a behavioral health crisis. If a supervisor has assumed responsibility for the scene, the supervisor shall seek input from ECIT, MCT or CIU on strategies for de-escalating, calming and resolving the crisis, when the situation allows such consultation safely. Supervisors are encouraged to become ECIT trained in order to better evaluate the ECIT sworn personnel they oversee or assist in situations where an ECIT officer is unavailable." APD policies are available at https://www.cabq.gov/police/standard-operating-procedures.

Operational: **In Compliance**

**4.7.116 – 4.7.124 Assessing Compliance with Paragraphs 129 - 137**

Monitoring team members reviewed documentation detailing APD's current activities related to policing service delivery for people with mental illness and people in behavioral crises (paragraphs 129 through 137).  Our observations indicate that, overall, the behavioral health paragraphs of the CASA have received careful and meaningful attention during this reporting period.

The data and processes we reviewed indicate that APD's outreach and support efforts to those in the communities served by CIT processes are effective and problem-oriented.  CIU Training and field reviews remain a strong point of this effort.

**4.7.116 Assessing Compliance with Paragraph 129**

Paragraph 129 stipulates:

> **"APD shall collect data on the use of crisis intervention certified responders and CIU.  This data will be collected for management purposes only and shall not include personal identifying information.  APD shall collect the following data:**
> **a) date, shift, and area command of the incident;**
>
> **b)  individual's age, race/ethnicity, and gender;**
>
> **c)  whether the individual was armed and the type of weapon;**
>
> **d)  name and badge number of crisis intervention certified responder or CIU detective on the scene;**
>
> **e)  techniques or equipment used;**
>
> **f)  any injuries to officers or others;**
>
> **g)  disposition of the encounter (e.g., arrest, citation, referral); and**
>
> **h)  a brief narrative of the event (if not included in any other document)."**

**Methodology**

The monitoring team reviewed the relevant data and most recent data analysis, including data from December 2021 through June 2022 (prior to this reporting period).  The analysis was completed and made public in October 2022.  The analysis was to determine whether APD is collecting all the required elements of this paragraph and to

assess documentation about staffing and analytics capabilities to determine whether APD can use the data for "management purposes," as this paragraph requires.

**Results**

Our review of the documentation submitted by APD, including some analysis of responses to calls for service by supervisors, ECIT officers, or MCTs, indicates that APD continued to collect appropriate data on all required elements of this paragraph and continued its attempts to analyze it meaningfully.

While the monitoring team is encouraged by the management and timely analyses of these data, we have seen improvements evidenced by the collaboration between CIU and the APD's Accountability and Analytics Bureau to review mental-health-related calls for service that resulted in officers using force.

We remain concerned about the sheer number of officer-involved shootings of people in crisis or people with mental illness.  APD's "2022 OIS Review" indicated that six of the 18 OIS incidents in 2022 (or 33%) involved people in crisis.[79] We appreciate the CIU's efforts to continuously review officer behavior in the field and take appropriate corrective actions when necessary.  Still, APD leadership and accountability structures must also effectively address these issues.

> Primary:       **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.117 Assessing Compliance with Paragraph 130**

Paragraph 130 stipulates:

> **"APD will utilize incident information from actual encounters to develop case studies and teaching scenarios for roll-call, behavioral health, and crisis intervention training; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; to identify training needs for in-service behavioral health or crisis intervention training; to make behavioral health or crisis intervention training curriculum changes; and to identify systemic issues that impede APD's ability to provide an appropriate response to an incident involving an individual experiencing a mental health crisis."**

---

[79] Albuquerque Police Department. "2022 OIS Review, Completed March 2023," accessible at: cabq.gov/police/documents/apd-2022-ois-review-report.pdf. *See also* Matthew Reisen, "APD reviewed every 2022 police shooting. Here are the proposed reforms that came of that study." Albuquerque Journal, 3/26/23. https://www.abqjournal.com/news/local/apd-reviewed-every-2022-police-shooting-here-are-the-proposed-reforms-that-came-out-of/article_ff8c462a-4622-5fa3-ad67-c693f7b750d0.html

**Methodology**

The monitoring team reviewed CIU training curricula, commendations issued, incident reviews, data analysis, and APD's work to "develop new response strategies for repeat calls for service."

**Results**

APD's behavioral health units continue to innovate and address the requirements of this paragraph, including utilizing actual, recent encounters to inform training. APD has analyzed the most recent data available during this reporting period. This analysis is important to the agency's decision-making. It is used to "develop new response strategies for repeat calls for service" and to "identify systemic issues that impede APD's ability to provide an appropriate response." Moreover, the CIU continues to make appropriate and timely changes to its behavioral health curricula, drawing from its monthly case reviews and thoughtfully considering the feedback it receives from MHRAC. The CIU identified an incident in July 2023 for which the video will be incorporated into training updates.

      Primary:    **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

**4.7.118 Assessing Compliance with Paragraph 131**

Paragraph 131 stipulates:

> **"Working in collaboration with the Advisory Committee, the City shall develop and implement a protocol that addresses situations involving barricaded, suicidal individuals who are not posing an imminent risk of harm to anyone except themselves. The protocol will have the goal of protecting the safety of officers and suicidal individuals while providing suicidal individuals with access to mental health services."**

**Methodology**

The monitoring team reviewed the most recent draft of SOP 2-20 *Hostage Situations, Barricaded Individuals, and Tactical Threat,* which was under review during this reporting period (MHRAC Draft 5/11/23). We also reviewed the training curriculum, which appropriately emphasizes disengagement, as well as the review processes corresponding to this policy and training.

**Results**

This policy began making its way through proper review channels during this reporting period – including MHRAC. Having commented on the proposed policy, we await the

finalization of this policy in the next reporting period.[80] Moreover, the SOD reported no tactical activations resulting from suicidal barricaded individuals during this reporting period, keeping with SOP 2-20 and SOP 2-19.

      Primary:     **In Compliance**
      Secondary:  **In Compliance**
      Operational: **In Compliance**

## 4.7.119 - 4.7.121 Assessing Compliance with Paragraphs 132 – 134

**Paragraphs 132 - 134 are self-monitored by APD.**

## 4.7.122 Assessing Compliance with Paragraph 135

Paragraph 135 stipulates:

> **"APD shall maintain 12 full-time detectives in the CIU, or the target number of detectives identified by any future staffing study, whichever is fewer."**

## Methodology

The monitoring team reviewed CIU rosters and relevant programmatic records related to current caseloads.  We also reviewed the APD's long-awaited "Crisis Intervention Division Staffing Study, March 28, 2023."

## Results

The CIU was fully staffed with detectives during this reporting period,  maintaining 12 detectives throughout the reporting period.  The CIU also maintained its four supervisors (one commander, one lieutenant, and two sergeants).  We note that the CIU maintained four officers assigned to its mobile crisis teams.  The monitoring team continues to appreciate the significance of a Commander overseeing this important unit.

APD's work related to CID staffing continued during this reporting period.  As we have noted consistently, the APD should analyze and revisit their staffing needs regularly.  The study carefully analyzed CID workloads by role (i.e., clinicians, home visit detectives, coordinating detectives) and other relevant variables such as APD's shift relief factors.  Further, the study addressed how Albuquerque's Community Safety Department (ACS) impacts APD.  We applaud this work and encourage the APD to keep these analyses updated on a regular cadence.

      Primary:     **In Compliance**

---

[80] Per the APD's online SOP system, the current version of SOP 2-20 has an effective date of 4/13/22 and is due for review on 4/13/23; that review is in process. Accessible at: https://documents.cabq.gov/police/standard-operating-procedures/2-20-hostage-situations-barricaded-individuals-and-tactical-%20threat-assessments.pdf

Secondary:  **In Compliance**
Operational: **In Compliance**

**4.7.123 Assessing Compliance with Paragraph 136**

**Paragraph 136 is self-monitored by APD.**

**4.7.124 Assessing Compliance with Paragraph 137**

Paragraph 137 stipulates:

> **"APD shall collect and analyze data to demonstrate the impact of and inform modifications to crisis prevention services.  This data will be collected for management purposes only and shall not include personal identifying information.  APD shall collect data regarding the number of calls for service routed to ACS, the number of calls for service flagged for an ECIT response, and the number of calls for service flagged for an ECIT response that do not receive an ECIT response.  APD shall report this data on a regular basis, broken out in various ways, such as by race and ethnicity, location, time of day, and whether force was used.  APD shall analyze this data to assess the City's crisis response efforts, including evaluating calls for service that did not receive an ECIT response.."**

**Methodology**

The monitoring team reviewed relevant data and recent data analyses to determine whether APD is collecting all the required elements of this paragraph, as well as documentation about staffing and analytics capabilities to determine whether APD can use the data to "demonstrate the impact of, and inform modifications to, crisis prevention services," as this paragraph requires.  We also reviewed APD's new SOP 1-97 Data Analysis Division.

**Results**

As we mentioned in Paragraph 129 of this report, the monitoring team is increasingly encouraged by the collection, management, and analyses of these data and APD's capacity to use them for management purposes and to "demonstrate the impact of and inform modifications to crisis prevention services," as this paragraph requires.

We understand that analyzing data well is a complex task for any police department, but APD's Accountability and Analytics Bureau has taken steps to move these requirements forward.  We note the completion of the "Crisis Intervention Division Staffing Study, March 28, 2023."

As noted in paragraph 129, we see evidence that APD is harnessing these data in new ways to examine force incidents, including shootings, through the lens of crisis intervention unit data.  We remain concerned about the number of officer-involved shootings – 18 in 2022, six of which involved people in crisis.  We encourage APD leadership and the City's accountability systems to work to understand and learn from these incidents, use these data to reduce Officer-Involved Shootings in the future, and hold officers accountable when necessary.

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.125 – 131 Assessing Compliance with Paragraphs 139 – 145**

**Paragraphs 139 – 145 are self-monitored by APD.**

**4.7.132 Assessing Compliance with Paragraph 146**

Paragraph 146 stipulates:

**"APD shall apply policies uniformly and hold officers accountable for complying with APD policy and procedure.**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.133 - 136 Assessing Compliance with Paragraphs 147 - 150**

**Paragraphs 147 – 150 are self-monitored by APD.**

**4.7.137 Assessing Compliance with Paragraph 151**

Paragraph 151 stipulates:

**"Unless otherwise noted, the training required under this Agreement shall be delivered within 18 months of the Operational Date, and annually thereafter.  Within six months of the Operational Date, APD shall set out a schedule for delivering all training required by this Agreement."**

**Methodology**

APD delivered the training as per the 2023 schedule and continues to update its

90

schedule with changes to the schedule that extend into the next reporting period. The monitoring team will continue to monitor new policies and changes to the policy that are pending approval to ensure that the requirements of this paragraph are maintained and that all training required by this agreement is delivered and followed. The Academy supplied the monitoring team with documentation of the training conducted during this reporting period (details demonstrated in paragraphs 209 -211 and training to be delivered during the next reporting period to fulfill the requirements of the paragraphs.

- Interoffice Memorandum July 28th, 2023 (2023 Mandatory Traffic Incident and Crime Scene Management and Supervisory Leadership Training for Supervisors);
- Interoffice Memorandum July 28th, 2023 (UoF Policy Suite Training (Supervisors only);

APD maintains compliance with this paragraph.  The monitoring team also notes that any changes to the training calendar are given to the monitoring team almost as soon as the changes are made, keeping the monitoring team apprised of all changes on a current basis.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

**4.7.138 - 148 Assessing Compliance with Paragraphs 152 - 161**

**Paragraphs 152 – 161 are self-monitored by APD.**

**4.7.148 Assessing Compliance with Paragraph 162**

Paragraph 162 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD and the Civilian Police Oversight Agency shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all findings in administrative investigations are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a fair and consistent disciplinary system.  To achieve these outcomes, APD and the Civilian Police Oversight Agency shall implement the requirements below."**

This Paragraph is an introductory paragraph for the Internal Affairs Professional Standards (IAPS) unit (formerly IAPS -Misconduct Division) and the Civilian Police Oversight Agency (CPOA) related CASA requirements.  As such, it requires no direct

evaluation but is subsumed by the IAPS- and CPOA-related individual requirements below.

**4.7.149 Assessing Compliance with Paragraph 163:  Duty to Report Misconduct**

Paragraph 163 stipulates:

> **"APD shall require that all officers and employees report misconduct by any APD officer or employee, including themselves, to a supervisor or directly to the Internal Affairs Division for review and investigation.  Where alleged misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to the Internal Affairs Division.  Failure to report or document alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment."**

**Methodology**

Paragraph 163 of the CASA pertains to the duty of all APD officers and employees to report misconduct by APD officers and employees and the duty of supervisors to document information regarding the misconduct of subordinates and to report the same to IAPS. It also requires failure to comply to be grounds for discipline.

During the reporting period and the June 2023 site visit, members of the monitoring team reviewed a stratified random sampling of 10 investigations for which IAPS was responsible.[81] The monitoring team also reviewed APD regulations and met with the IAPS Commander and staff.

**Results**

SOP 3-41-4 incorporates and mandates the reporting requirements of paragraph 163. Special Order (SO) 21-15, Internal Affairs Request Through BlueTeam, rescinded a similar SO 19-25 Second Amendment.  SOP 3-41-4 specifies that reporting of misconduct by an APD member must take place within 24 hours of when the member has the knowledge of, or reasonably should have knowledge of the misconduct.  This notice must be completed by an Internal Affairs Request within the IA database web application.  This process is designed to bring uniformity to the time period in which reporting must occur and to the reporting method.

During this reporting period, we found that all ten of the IAPS Misconduct cases handled by APD fulfilled the requirements of paragraph 163.  Using 24 hours as a guideline, the

---

[81] These included: seven completed by IAPS [IMR-18-45], [IMR-18-46], [IMR-18-47], [IMR-18-48], [IMR-18-49], [IMR-18-50], and [IMR-18-51], and three referred to and completed by the area commands [IMR-18-52], [IMR-18-53], and [IMR-18-54].

monitoring team continues to interpret the term "immediately document and report" in the context of the factual scenario of each case.  In the ten cases investigated by IAPS noted above, we found the referral time to IAPS to be satisfactory in all cases.
We find definitive proof of timely referrals in 100 percent of the cases reviewed implicating this paragraph.  This is an improvement from IMR-17 and reveals full Operational Compliance with this paragraph.

**Results**

      Primary:      **In Compliance**
      Secondary:   **In Compliance**
      Operational: **In Compliance**

**4.7.150 – 4.7.168 Assessing Compliance with Paragraphs 164 -177**

**Paragraphs 164 - 177 are self-monitored by APD.**

**4.7.164 Assessing Compliance with Paragraph 178:  Supervisors to Provide Complaint Information**

Paragraph 178 stipulates:

> **"Where a supervisor receives a complaint alleging that misconduct has just occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the Internal Affairs Division.  All information should be referred to the Internal Affairs Division within 48 hours, absent exceptional circumstances."**

**Methodology**

Paragraph 178 of the CASA pertains to a supervisor's responsibility to gather pertinent documentation and evidence when receiving a complaint against another officer and forwarding those items to the IAPS office.

During the reporting period and the June 2023 site visit, monitoring team members utilized the same methodology as in prior reporting periods.  We also met with the IAPS Commander and members of his staff.  We reviewed complaint log-in and classification records, selected (through a stratified random sample), and reviewed seven IAPS and three Area Command investigations.

In this monitoring period, we found the following results through our review of the stratified random sampling of ten cases for which IAPS was responsible.  All cases reviewed indicated that all allegations of policy violations were reported within the required time limit.  All of the cases complied with paragraph 178.  APD is in operational compliance with paragraph 178.

**Results**

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

**4.7.165- 4.7.166 Assessing Compliance with Paragraphs 179 and 180:**

**Paragraphs 178 and 180 are self-monitored by APD.**

**4.7.167 Assessing Compliance with Paragraph 181:  IAD Classification Protocol**

Paragraph 181 stipulates:

> **"APD shall continue to maintain an internal complaint classification protocol that is allegation-based rather than anticipated-outcome-based to guide the Internal Affairs Division in determining where an internal complaint should be assigned."**

**Methodology**

Paragraph 181 pertains to the requirement of a protocol to classify complaints based on the allegation, not the predicted outcome, for proper investigatory assignment.  APD hired an Intake Manager to ameliorate misclassifications of complaints and complaints with a discipline sanction level of "5" or above being assigned to area commands.  This step standardized the intake and classification of all complaints.

**Results**

During this monitoring period, none of the ten IAPS reviewed were found to have been improperly classified for assignment based on the level of sanctions.  APD has developed and continues to use a centralized numbering and tracking system that assigns unique identification numbers to all received complaints.  Complaints are received and classified according to allegations and not potential outcomes.  APD currently utilizes the IA Pro records management system to manage its internal affairs complaints.

Adherence to the revised AO 3-41, effective October 19, 2021, and the improved complaint intake function has enabled APD to maintain compliance with this section. APD was in 100 percent compliance with Paragraph 181.

> Primary:        **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

**4.7.168 Assessing Compliance with Paragraph 182:  Prohibition from Self-Investigation**

**Paragraph 182 is self-monitored by APD.**

**4.7.169 - 4.7.180 Assessing Compliance with Paragraphs 183 - 194: Investigation of Complaints**

Paragraphs 183 and 190 through 192 of the CASA pertain to requirements for thoroughness, timeliness, reliability of findings, and overall quality regarding investigating misconduct complaints.  These paragraphs require that all relevant evidence be considered and that those investigations are fair, impartial, and reach reliable findings.  They also require time limits for the completion of investigations, designation of permissible findings with the corresponding standard of proof, and assessment of whether the facts of an investigation indicate a need for change in policy, procedure, or training.  In addition, requirements are set forth regarding situations in which there may be simultaneous criminal and administrative investigations of the same subject matter.

Regarding paragraphs 183 and 190 through 192, during the 18th reporting period, monitoring team members reviewed a stratified random sampling of ten investigations for which IAPS was responsible (seven completed by IAPS and three completed by the area commands).  In addition, a stratified sampling of 20 investigations completed by CPOA was reviewed.  The monitoring team also met with the Chief of Police, the City Attorney, the CPOA Executive Director, and the IAPS Commander.  The monitoring team attended virtual meetings with CPOA Board members and reviewed CPOA Board meetings, agenda minutes, and findings on the CPOA website.  It should be noted that the City Council abolished the CPOA Board in February 2023.  A process has been slowly proceeding to replace and train new members of a new board, but as of the writing of this report, the new board has not been established.  Therefore, no CPOA Board action has been taken since the previous board's disbandment.

The commander of IAPS continues to require supervisory reviews of investigations at ten, 20, and 40-day marks after assignment. Also, investigations must be completed within 70 days of assignment, and the commander must approve any extension.  The commander must likewise approve requests for the Chief's (or designee's) approval for an extension of IAPS cases beyond 90 days.   The commander also performs a weekly "timeline check" on every open IAPS investigation, and investigations surpassing 60 days are automatically flagged for the commander's review.  Approval of completed investigations is electronically signed by the commander, leaving no room for the challenge as to when the investigation was completed.  The timeline for reviewing a completed investigation by the chain of command through the Chief/Superintendent of Reform or their designee is also tracked.

The organizational changes made in June of 2021 have been maintained and continue to ensure the quality of investigations and timeliness.  The Civilian Intake Manager continues to intake and classify all incoming complaints.  This position has allowed the lieutenant to oversee area command investigations and the IAPS commander to focus on the quality and thoroughness of investigations.  The Civilian Intake Manager decides which allegations to forward to the area command for investigations and is available if

called upon for guidance and quality control for those minor investigations assigned to the area commands.  Once investigations are assigned to IAPS investigators, the quality of those investigations is the purview of the supervisory focus of a separate investigations manager.  The monitoring team continues to provide technical assistance in the complaint intake function.  It should be noted that IAPS has needed less technical assistance, but the communication process among the parties and monitoring team regarding intake and discipline has been maintained.  It should also be noted that during this monitoring period, APD implemented an electronic Dashboard system to allow supervisors within APD/IAPS to monitor various aspects of investigations and their timelines in a user-friendly format.  This provides greater oversight of those investigations.  The new Dashboard system provides leading-edge technology, allowing for better accountability.

The findings related to Paragraphs 183 and 190 through 194 are outlined below.

Based on past reviews, we have found that non-use of force investigations conducted by IAPS and investigations conducted by CPOA generally have contained reliable findings. The monitoring team has reviewed minor misconduct allegations conducted by the area and division commands.  Over the last several monitoring periods, APD has retrained all personnel responsible for conducting internal affairs investigations, and this has resulted in substantial increases in the quality of the investigations conducted by the Area Commanders.  APD consistently requires its agency training for all newly assigned personnel mandated to conduct these investigations.  During this monitoring period, it was reported that no cases were conducted by outside investigative entities.  It was also reported that the current protocols established by City Legal remain in effect should any cases be referred to outside entities.

During this reporting period, our stratified random sample of investigations completed by APD revealed no investigations that were deemed deficient.

Regarding those investigations conducted by the area commands, we continue to see a vast improvement from prior reporting periods.  All three cases reviewed during this period were found to be in operational compliance with the requirements of paragraphs 183 and 190 through 192.   We find this to be a significant outcome for APD.

This yields a 100 percent operational compliance rate, an improvement since IMR-17, where there was 95 percent operational compliance.  The increase in operational compliance is attributed to all the investigations completed by IAPS personnel and the area commands.  At this point, policies and training regarding investigative processes for internal "complaints" exist.  All agency members responsible for conducting or supervising internal affairs investigations have now been trained, except for any newly hired or transferred members.  The IAPS Commander is responsible for ensuring any newly assigned members receive the requisite training as soon as practicable.  It is incumbent on the IAPS command to ensure all investigations are conducted within the requirements and timelines of their policies and the CASA.

In IMR-13 through IMR-15, we noted that "APD must pay immediate attention to completing the training required for the area command investigators and must immediately act to standardize and upgrade the area command investigations, as well as the area command imposition of discipline (more fully discussed in the Discipline and Transparency section, paragraphs 201-202, of this report)".  APD has heeded this recommendation and has reaped the rewards.  The area command reviews have been standardized and are operating much more efficiently and effectively.

During this period, the review of the stratified random sampling of the ten investigations found no cases that were classified other than Level 6 and Level 7, which were assigned to Area Commands for investigation.  This continues to be a positive sign that more consideration is made during the classification of complaints.

CPOA findings and advisements are discussed in greater detail in paragraphs 271-292. We note that of the 20 CPOA[82] cases reviewed, we found deficiencies in six cases.  The deficiencies in two cases were determined to be related to incomplete interviews. Six cases were also found to have deficiencies in the timeliness of completion.  Two of the aforementioned cases were deficient in both an incomplete interview and not completed within the required time period.

During this period, IAPS administratively closed three cases during the intake process after a preliminary review, which determined that there was no violation of policy.  The remaining 20 Administratively Closed cases were the result of duplicate cases for the same allegations.  It should be noted that the total number of cases that were Administratively Closed during this period was half the number in IMR-17.

Regarding the time requirements contained in Paragraph 191, the past performance of IAPS and CPOA generally have been consistent in terms of timely completion of investigations once they are assigned.  In our current stratified random sample of the investigations for which IAPS was responsible, all cases were completed within mandated time frames.  Regarding the requirements relating to the timeliness of CPOA investigations contained in the paragraphs 271-292 section of this report, CPOA had six of the 20 cases that exceeded the time requirements for investigations.  This equates to a 70 percent compliance rate for paragraph 191.  Thus, we find CPOA not in compliance with the requirements of Paragraph 191.  In the monitor's opinion, this is most likely a result of understaffing of the Agency.

Although no instances of IAPS investigations completed this reporting period are outside the required time limit for completeness, CPOA continues to struggle with this area.  The timeliness of CPOA investigations is addressed in detail in paragraphs 271-292.

### 4.7.169 Compliance with Paragraph 183: Investigations Reach Reliable Conclusions

---

[82] The 20 CPOA cases are labeled as [IMR-18-55], [IMR-18-56], [IMR-18-57], [IMR-18-58], [IMR-18-59], [IMR-18-60], [IMR-18-61], [IMR-18-62], [IMR-18-63], [IMR-18-64], [IMR-18-65], [IMR-18-66], [IMR-18-67], [IMR-18-68], [IMR-18-69], [IMR-18-70], [IMR-18-71], [IMR-18-72], [IMR-18-73], and [IMR-18-74].

Paragraph 183 stipulates:

> **"APD and the Civilian Police Oversight Agency shall ensure that investigations of officer misconduct complaints shall be as thorough as necessary to reach reliable and complete findings.  The misconduct complaint investigator shall interview each complainant in person, absent exceptional circumstances, and this interview shall be recorded in its entirety, absent specific, documented objection by the complainant.  All officers in a position to observe an incident, or involved in any significant event before or after the original incident, shall provide a statement regarding their observations, even to state that they did not observe anything.**

## Results

Our review indicated that only CPOA experienced issues with compliance with this paragraph during this reporting period.

Primary:         **In Compliance**
Secondary:     **In Compliance**
Operational:  **Not In Compliance**

***Recommendation for Paragraph 183:***

***4.7.169a: CPOA should ensure that all interviews are complete, including the investigator identifying themselves and all parties on the record, including the date, time, and location, and ask pertinent questions designed to solicit all pertinent information.***

**4.7.170 – 4.7.175 Assessing Compliance with Paragraphs 184 - 189:**

**Paragraphs 184 – 189 are self-monitored by APD.**

**4.7.176 Assessing Compliance with Paragraph 190:  Considering All Relevant Evidence**

Paragraph 190 stipulates:

> **"In each investigation, APD and the Civilian Police Oversight Agency shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will APD or the Civilian Police Oversight Agency disregard a witness's statement merely because the witness has**

**some connection to the complainant or because of any criminal history.  During their investigation, APD and the Civilian Police Oversight Agency shall take into account any convictions for crimes of dishonesty of the complainant or any witness.  APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  APD and the Civilian Police Oversight Agency shall make efforts to resolve material inconsistencies between witness statements."**

Our review indicated that only CPOA experienced issues with compliance with Paragraph 190 during this reporting period.

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 190:*

*4.7.176a: CPOA should require all pertinent information to be obtained during interviews and properly documented so that it may be considered in determining the appropriate conclusion.*

**4.7.177 Assessing Compliance with Paragraph 191:  90 Days to Complete Administrative Investigations**

Paragraph 191 stipulates:

**"All administrative investigations conducted by the Internal Affairs Division or the Civilian Police Oversight Agency shall be completed within the applicable deadlines in the Collective Bargaining Agreement between the City and Intervenor.  Review and final approval of the investigation, and the determination and imposition of the appropriate discipline, shall be completed within 40 days of the completion of the investigation.  Extensions may also be granted to the extent permitted by state and city law or the Collective Bargaining Agreement between the City and Intervenor."**

**Results**

CPOA failed to meet this objective regarding timelines.

Primary:        **In Compliance**
Secondary:   **In Compliance**

Operational:  **Not In Compliance**

***Recommendations for Paragraph 191:***

***4.7.177a: The City should refocus its efforts related to this paragraph by conducting a quantitative analysis of the reasons that cause any case to be delayed past 120 days.***

***4.7.177b: Once causes for these delays are identified, develop recommendations for changes to policy, staffing, procedure, or practice that are designed to eliminate such delays.***

***4.7.177c: All investigations should include a clear timeline that delineates the date of the incident, date of receipt of the complaint, date of assignment, date of extension if applicable, date investigation is completed, dates the review period begins and ends, and date of notice of intent to discipline where applicable.***

### 4.7.178 Assessing Compliance with Paragraph 192:  Case Dispositions

Paragraph 192 stipulates:

> **"The APD or Civilian Police Oversight Agency investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:**
> a) **"Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject officer;**
>
> b) **"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;**
>
> c) **"Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;**
>
> d) **"Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate APD policies, procedures, or training;**
>
> e) **"Sustained violation not based on original complaint," where the investigation determines, by a preponderance of the evidence, that misconduct did occur that was not alleged in the original complaint but that was discovered during the misconduct investigation; or**
>
> f) **"Administratively closed," where the policy violations are minor, the allegations are duplicative, or**

> **investigation cannot be conducted because of the
> lack of information in the complaint."**

**Results**

    Primary:    **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

**4.7.179 – 4.7.183 Assessing Compliance with Paragraph 193 - 197**

**Paragraphs 179 – 197 are self-monitored by APD.**

**4.7.184 – 4.7.186 Assessing Compliance with Paragraphs 198–200:
Staffing and Training Requirements**

Paragraphs 198 and 199 of the CASA require the City to adequately fund and resource internal affairs functions (IAPS, CPOA, and the CPOA Board) and require that APD personnel who conduct misconduct investigations receive a baseline amount of initial and annual training.

Consistent with past site visits, the monitoring team met with IAPS and CPOA. Their respective offices and physical spaces have remained the same. The monitoring team discussed staffing needs and training, reviewed staffing charts and training records, and assessed the timelines of processing complaints and information of potential misconduct in investigations that were randomly selected, assessing the quality of the investigations. The findings related to Paragraphs 198 and 199 indicate the following outcomes related to the requirements of the CASA.

At the present time, IAPS has a Commander, a Deputy Commander, a civilian Investigation Manager, a civilian Intake Manager, one lieutenant, two sergeants, one Administrative Coordinator, ten investigators (five detectives and five civilian personnel), and three administrative assistants. The current staffing includes recently filled supervisor positions, a vast improvement from the last reporting period. IAPS has continued to investigate all complaints within the time constraints of policy and the CASA, indicating that a proper staffing level likely has been reached, given current caseloads.

During this period, the Superintendent of Reform's contract expired and is reportedly in negotiations. In the interim, the Deputy Superintendent of Reform has performed all required functions and has overseen the disciplinary process. A civilian intake manager oversees the complaint intake function. Despite the fact that IAPS, as discussed more fully in the Investigations of Complaints section (paragraphs 183-192) of this report, has made additional strides in improving its processes, careful supervision should continuously monitor the incoming caseload to ensure adequate staff exists to continue to complete thorough investigations in a timely manner, as required by the time constraints of the CASA and Collective Bargaining Agreement (CBA).

Thus, IAPS and CPOA should be staffed sufficiently to meet their timeline responsibilities so that CASA and CBA timelines are met, and discipline for sustained charges is not "time-barred."  Compliance with the CBA in cases in which discipline is time-barred by the CBA does not absolve the City of its failure to comply with the progressive discipline requirements of CASA.

All current CPOA investigative positions have been filled, and the City Council is in the process of approving one additional investigator position.

During this reporting, the Interim Executive Director addressed all investigations that resulted in sustained findings and appropriately forwarded them to the APD.  In this monitoring period, the results of the reviews of the stratified random sampling of 20 CPOA investigations indicated that 70 percent of those cases were investigated and completed within the required time limit, a vast improvement from the previous reporting period, where 22.5 percent of cases reviewed were completed within the time constraints.  Although this was a significant improvement, it is again indicative that staffing and supervision deficiencies are troublesome.   Given the continued apparent difficulties CPOA is encountering in its attempt to achieve CASA requirements, the City should re-evaluate staffing levels and operational protocols at CPOA vis a vis CASA requirements.

As previously mentioned, the Albuquerque City Council passed a new city ordinance, disbanding the CPOA Board on January 19, 2023. As of the writing of this report, the City of Albuquerque is in the process of re-constituting a new "advisory" board.  We do note that CPOA still has an unfilled funded position for a Policy Analyst.  The new City ordinance removed the position of Community Engagement Specialist, which is still funded but vacant.  The ordinance also created a new position of Contract Compliance Officer, which remains vacant.

The number of untimely cases revealed by our stratified random sample is discussed more fully in conjunction with paragraphs 191 and 281 of this report.

A brief review of the staffing of the CPOA revealed that there is currently a lead investigator, who is also the Interim Executive Director, and six investigators assigned.  The underlying issue of adequate staffing rests with the ability of each investigator to complete investigations within the time requirements.  According to the Lead Investigator, CPOA receives over 600 complaints yearly, and nearly half of those were determined to require full investigations.  To put this in perspective, each CPOA investigator would need to complete more than one investigation per week, including identifying salient witnesses, scheduling witness interviews, conducting witness interviews, conducting officer interviews, analyzing witness and officer "testimony," developing findings, fully documenting their investigations, and writing and proofing case reports.  Also, during this reporting period, the CPOA was additionally short of investigative staff due to FMLA and extended leaves.  In short, it appears to the monitoring team that CPOA has a shortage of trained investigators.

Not surprisingly, there was a deficiency noted in the timely completion of investigations by CPOA, which may be attributed to an excessive caseload by each investigator and a lack of adequate supervision.  Each investigator routinely has 20 or more active investigations assigned, which, based on the monitoring team's experience, likely leads to poor outcomes regarding timelines, quality, and effectiveness.  The Lead Investigator advised that they attempt to triage cases and prioritize the cases they believe may be sustained to adhere to the CASA and CBA timelines.  Unfortunately, the cases that are presumed less likely to be sustained often extend past due dates, and some of those cases end up with sustained findings that cannot be disciplined due to CBA timelines.

From the monitor's perspective, CPOA is in crisis.  This crisis was birthed by understaffing, the need for the City to fill supervisory and oversight positions, and the need to improve the organizational structure of the agency.

In addition, only one supervisor, the Lead Investigator, does the intake of the 600-plus complaints and has acted as the Interim Executive Director during this monitoring period. The Lead Investigator/Interim Executive Director was responsible for training the two newly hired investigators and conducting a first-level review of all completed investigations.  The workload on the Lead Investigator/Interim Executive Director is excessive and is unsustainable.  Staffing is critical, considering the time requirements established by the CASA and the CBA.  The new City ordinance established a Deputy Director's position, which may assist in creating adequate supervision.  Still, it remains vacant, as the Executive Director will create and hire for this position.  According to the Lead Investigator/Interim Executive Director, the City has initiated "some type" of city-wide staffing study, but no recommendations have been made concerning CPOA staffing.

As we have pointed out in prior reports regarding paragraph 199 of the CASA, we are satisfied that the training requirement is met for those members of APD who conduct investigations involving allegations of misconduct.  Both the 24-hour preliminary and 8-hour in-service training addressed the requirements of this paragraph.  Currently, all members, except the newest members, who may be tasked with conducting an internal affairs investigation, have received the requisite hours of training.  Any newly promoted members who have not received the training are scheduled to attend an upcoming training session.

There has been a practice of assigning IA investigations to members of an area command, at the rank of sergeant or higher, to conduct investigations alleging minor misconduct against an APD member of the same area command. This practice is currently in effect. A recommendation was made during IMR-14 to assign all CASA-related violations to IAPS.  During this period, IAPS was assigned most CASA-related violations to investigate, except for OBRD violations, which are still being investigated by area commands, as they are classified as Level 6 and Level 7 violations.  The predominant OBRD violation is failing to upload recordings by the end of the member's following shift.  The violation is usually able to be established by the technical data audit produced by the electronic system.  The area commanders have routinely made findings based on the audit logs.  During this period, all area command investigations were

conducted within the requirements of the CASA.  Therefore, we find that both the APD and the CPOA are in operational compliance with paragraph 199.

We further discuss the CPOA and CPOAB training requirements in the Civilian Police Oversight Agency section (paragraphs 271-292) in this report.

**4.7.184 Assessing Compliance with Paragraph 198:  CPOA Staffing**

Paragraph 198 stipulates:

> **"The City shall ensure that APD and the Civilian Police Oversight Agency have a sufficient number of well-trained staff assigned and available to complete and review thorough and timely misconduct investigations in accordance with the requirements of this Agreement. The City shall re-assess the staffing of the Internal Affairs Professional Standards Division after the completion of the staffing study to be conducted pursuant to Paragraph 204.  The City further shall ensure sufficient resources and equipment to conduct thorough and timely investigations."**

**Results**

Only CPOA appears to be understaffed, as they cannot meet the requirements to fully investigate all cases promptly.

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

***Recommendations for Paragraph 198:***

***4.7.184a: The City should adequately staff CPOA for its investigative responsibilities, using effective measures of workload, the time needed to complete the "average" CPOA investigation, and the time needed to assess and perform quality control processes.***

***4.7.184b:  A comprehensive staffing study should be conducted to establish realistic expectations on the number of investigations an investigator can complete appropriately.  That number should be utilized in establishing mandatory staffing levels to enable the CPOA to complete its investigations within the time requirements.***

***4.7.184c:  A comprehensive work-flow and productivity assessment is needed to identify bottle-necks and possibly underproductive work processes.***

**4.7.185 Assessing Compliance with Paragraph 199:  IA Initial and Annual Training**

Paragraph 199 stipulates:

> **"All APD personnel conducting misconduct
> investigations, whether assigned to the Internal Affairs
> Division, an Area Command, or elsewhere, shall receive
> at least 24 hours of initial training in conducting
> misconduct investigations within one year of the
> Operational Date, and shall receive at least eight hours of
> training each year.  The training shall include instruction
> on APD's policies and protocols on taking compelled
> statements and conducting parallel administrative and
> criminal investigations."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.186 Assessing Compliance with Paragraph 200:  CPOA Training

**Paragraph 200 is self-monitored by the City.**

### 4.7.187 – 4.7.188 Assessing Compliance with Paragraphs 201- 202:  Discipline and Transparency

Paragraphs 201-202 require discipline to be fact-based and imposed for sustained violations based on appropriate and articulated consideration of aggravating and mitigating circumstances.  These paragraphs also require the use of a disciplinary matrix in imposing discipline and the use of the analytical elements of the disciplinary regulation SOP 3-46.  Read together, these paragraphs require progressive discipline that is fair, consistent, and commensurate with the violation committed and a balancing of aggravating and mitigating factors.

During this review period, the monitoring team reviewed a stratified random sample of 32 disciplinary cases in which allegations were sustained and discipline imposed.  We also met with the Chief of Police; the Disciplinary Authorities consisting of the Executive Director of Reform, the Deputy Directors of Police Reform, the Professional Integrity Commander (PIC); the City Attorney; and the CPOA Lead Investigator.  We also reviewed APD and CPOA discipline processes.

**Processes**

As we documented in past monitor's reports, marked improvements have been made in the processes of the APD disciplinary system.  These improvements have persisted in the IMR-18 period and need not be detailed again in this report.  However, two recent

improvements of note are the development of the IAPS Dashboard and revisions made to the disciplinary regulation, SOP 3-46.

The IAPS Dashboard is a comprehensive data source developed by APD for tracking all internal affairs cases, both active and closed.  It contains case tracking for the following internal affairs processes:

> Number and type of case intakes;
> Sergeant-level reviews; and
> Major discipline and area command discipline.

It also generates reports such as the Intake Weekly Report, Active Cases by Investigator Report, Administrative Status Report, Area Command/Division Status Report, and the Investigations Completed During the Last Ten Days Report.  The IAPS contains information on investigative due dates and cases needing increased IAPS supervisory scrutiny once they pass the 70-day mark.  The Dashboard aggregates data and depicts trends, such as:

- Allegations by sanction level;
- Investigations per area command;
- Unit assignment, rank of subject officer/APD employee;
- Investigative outcomes, including final findings and disposition;
- A breakdown of primary SOP violations charged, number of allegations per category (attendance, driving behavior, misconduct, or performance);
- Source of allegation referral; and
- Comparison of cases closed and opened per month.

In short, it is a very efficient and effective tool for tracking timelines, exercising quality control of investigative efforts, and identifying statistical deviations and trend analysis.  Implementing this dashboard is a significant milestone in the evolution of APD's accountability efforts.

During the IMR-18 period, revisions were made to SOP 3-46.  Revisions included clarifications regarding calculating discipline, particularly timeline guidance on calculating prior offenses for purposes of progressive discipline.

The revisions also included:

- Changes to processes for the imposition of discipline on multiple violations in the same matter that are based on distinct acts or omissions;
- Clarification on pre-determination hearing procedures;
- The rights of subject officers in a PDH;
- A reasonable cap (once in a rolling twelve-month period) on the number of NDCAs an officer may receive for minor offenses; and
- The completion of the matrix by filling in blank areas with appropriate ranges, and creating a new category of offenses for on-the-job improper driving conduct.

At the end of the IMR-18 period, the APD disciplinary system continued to function with four disciplinary authorities.  This is a vast improvement in consistency of process and resulting outcomes compared to the past practice of utilizing Deputy Chiefs, Area Commanders, and Special Unit Commanders as individual disciplinary authorities.  The disciplinary authorities at APD consist of the Executive Director of Police Reform, two Deputy Directors of Police Reform, and the PIC.

During this monitoring period, in matters with sustained allegation(s) where the proposed discipline is more than 40 hours, the PIC is the first line of review of the investigation and recommended discipline.  The non-ranking Deputy Director of Police Reform completes the second review.  The Executive Director of Police Reform presides over PDHs.  The appropriate board, the Personnel Board or the Labor Management Relations Board, hears appeals of those matters.

In major disciplinary actions in which the proposed discipline is 40 hours or less, the first line of review is the PIC, the second line is the non-ranking Deputy Director of Police Reform, and the ranking Deputy Directors of Police Reform hear the PDH.   The Executive Director of Police Reform hears the appeal of such matters.

PDHs are not heard in minor disciplinary matters; instead, the PIC imposes discipline.  If there is a disagreement between the recommendation of the area commander and the PIC on the level of discipline, the non-ranking Deputy Director of Police Reform designates the appropriate discipline.

**Disciplinary Case Review**

The monitoring team reviewed a stratified random sample of 32 cases in which discipline was imposed during the review period.  In that review, we identified eleven cases investigated by IAPS in which charges were sustained, and there was the potential for major discipline: [IMR-18-75], [IMR-18-76], [IMR-18-77], [IMR-18-78], [IMR-18-79], [IMR-18-80],  [IMR-18-81], [IMR-18-82],[IMR-18-83], [IMR-18-84], and [IMR-18-85].  We reviewed fourteen cases investigated by IAPS in which charges were sustained and which can be described as minor disciplinary cases, [IMR-18-86], [IMR-18-87], [IMR-18-88], [IMR-18-89], [IMR-18-90], [IMR-18-91], [IMR-18-92], [IMR-18-93], [IMR-18-94], [IMR-18-95], [IMR-18-96], [IMR-18-97], [IMR-18-98], and [IMR-18-99].  We reviewed seven cases investigated by CPOA in which charges were sustained, one of which had the potential for major discipline [IMR-18-100], and six cases that would be categorized as minor discipline cases: [IMR-18-101], [IMR-18-102], [IMR-18-103], [IMR-18-104], [IMR-18-68], and [IMR-18-106].

The above-noted improvements in the process have yielded noticeable improvements in compliance with the tenets of progressive discipline and a steadily increasing compliance rate.  Notwithstanding, we have found three cases in which discipline was deficient.

[IMR-18-82]  involved a sustained violation for  2-8-5.A, (failing to activate OBRD), a class 6 sanction level /misconduct category violation, by a supervisor during a UoF

107

investigation that involved a pursuit, establishment of a perimeter, the apprehension of one suspect with a show of force and the fleeing by another suspect.  The officer had two prior sanction level 6 misconduct category violations within time limitations, dealing with OBRD policy.  Discipline was calculated properly as a sanction level 6, misconduct category, 3rd offense.  The applicable range was a suspension of 8-24 hours, and 16 hours was appropriately proposed as a discipline.  The subject was exonerated after the PDH.

The primary issue in the case was properly identified and framed in the PDH by the subject's union representative as what constitutes a "law enforcement encounter".  In that regard, the prior version of 2-8-5A applied to the date of the violation.  That version stated:

> A. Department personnel shall activate their OBRD for any call for service that involves a *law enforcement encounter*, for any other law enforcement encounters that involve contact with community members, and for any investigative encounters involving community members.  (Emphasis supplied).

In addition, the applicable version of 2-8-3J, describes a law enforcement encounter as:

> J. Law Enforcement Encounter: Any interaction by Department personnel with individuals who are the subject of stops, detentions, and/or pat-downs based on reasonable suspicion or probable cause; *any action by Department personnel for the purposes of enforcing laws and/or maintaining order*; and any time Department personnel are acting pursuant to the community caretaker doctrine. (Emphasis supplied).

The disciplinary authority concluded that a "law enforcement encounter" required a situation that involved subjects of stops, detentions and/or pat-downs, and that since suspect was already arrested and in a squad car, and that the suspect's supervisor had contact only with the officer involved in the "show of force", the definition of law enforcement encounter was not met and therefore the mandatory recording situation of 2-8-5.A was not implicated and entered an exoneration.

We find the PDH and post-PDH analysis by the disciplinary authority to be conducted in good faith, but nonetheless, the conclusion was erroneous.  As a matter of regulatory interpretation, 2-8-3J has three distinct clauses separated by semi-colons.  The second clause, "any action by Department personnel for the purposes of enforcing laws and/or maintaining order" does not require interaction with suspects or members of the public.  The UoF investigation by the supervisor meets the definition contained in that second clause since it is required by regulation to determine the level of the force used and then to communicate with the appropriate team to investigate the UoF.

We also note that the issue of interpreting the meaning of "law enforcement encounter" per the applicable regulation at the time is a matter about which the disciplinary authority could have sought guidance from City Legal.  In addition, the facts that the disciplinary authority used in its analysis to exonerate could have been cited as mitigation in

imposing discipline, but they do not show the inapplicability of the definition of "law enforcement encounter" to this matter.  An exoneration under these facts was a deficient outcome.

[IMR-18-90] involved a sustained violation of 2-8-5A, (a failure to activate the OBRD for a law enforcement encounter), a class 6 sanction level/misconduct category.  There were no applicable prior offenses for progressive discipline (increasing the range of discipline to be considered), and there were mitigating factors in that it was a self-reported violation that occurred during a fluid foot pursuit and during which the subject was focused on radio transmissions.  A verbal reprimand was imposed, within range of the minimum discipline for a class 6 / first offense violation.

Although, due to time limitations or other categories of prior offenses, there were no applicable prior offenses that would increase the range of discipline, the retention card indicated an extensive prior disciplinary history stretching almost 20 years, which consisted of ten prior written reprimands, five verbal reprimands (one with sensitivity training), three NDCAs, four of what was formerly labeled as "counseling," and a prior 16-hour suspension eight hours of which were held in abeyance).  Several prior offenses were related to driving conduct.  Still, the prior offenses also included OBRD Recording, UoF Procedures, Code of Conduct (promptly obey written or oral orders), and Supervisory Responsibility violations.

The Command and PIC reviews both made mention of no prior offenses that were applicable for purposes of progressive discipline but did not mention the numerous violations and attempts at corrective action shown on the retention card.  APD is reminded that the entire record should be considered when selecting the exact discipline within a range (minimal, presumptive, or maximum).  Here, the "minimal or within range discipline" ignored the requirements of 3-46-4C 1&2:

> C. Aggravating and Mitigating Circumstances
>   1.  Disciplinary authority shall take into account aggravating and mitigating circumstances when determining final discipline.
>   2.  Aggravating circumstances may include, but are not limited to:
>       a. Prior disciplinary history;
>       b. Lack of remorse; or
>       c.  Lack of acceptance of responsibility.

Simply put, considering the history of violations and prior attempts at corrective action, and despite the mitigation found by the disciplinary authority, the minimum discipline within the applicable range cannot be justified.  The record in this matter militates for the maximum discipline within the applicable range (eight-hour suspension).  If the disciplinary authority would believe that the presumptive discipline within the range (less than maximum but more than minimum) was appropriate, then a cogent explanation of why the mitigating factors far outweighed the disciplinary history should have been supplied.

[IMR-18-80] involved sustained charges against a supervising lieutenant and a supervising sergeant for failing to report an officer's self-reported failure to activate an OBRD.

The disciplinary authority converted a sustained violation of 1-1-8B against the lieutenant to a more appropriate 3-41-4A.1, which, like the 1-1-8B, is a class 5 sanction-level, misconduct category violation.  Minimum discipline within the applicable range, a written reprimand, was imposed.

In this case, the deficiency lies with the discipline imposed on the sergeant.  A violation of 1-1-8B was also sustained against the sergeant and properly converted by the disciplinary authority to the more specific and applicable regulation, 3-41-4A-1, a class 5 sanction level, misconduct category violation.  The sergeant admitted learning from the officer that the officer did not activate his OBRD, admitted not reporting the officer's failure to activate the OBRD, but stated that he instructed the officer to document the failure to activate in the officer's report, which would then be turned over to IAFD.  He further stated he believed that he was responsible for ensuring IAFD was notified and that IAFD would then report the failure to activate.  The minimum of the applicable range for a sanction level 5 first offense, a written reprimand, was imposed.

The sergeant had prior sustained violations for 3-41-7A.2 (internal complaints-reporting), a class 6 sanction level, performance category violation, and 3-14-A-B (supervision – rules and regulation), a class 7 sanction level, misconduct category violation, imposed within a year of the date of the incident for the violation under consideration.  They were not counted for purposes of progressive discipline, presumably because they were of a different category and a less serious sanction-level violation than the considered violation.  However, 3-41-4A.1 and 3-41-7A.2 are overlapping violations, the first being a failure to report a violation in the generic sense and the latter failing to report within 24 hours via an IA database.  Extensive mitigation was offered during the subject's interview and PDH findings were consistent therewith regarding the subject's misunderstanding of the reporting policy.  The prior offenses, particularly the 3-41-7A.2 violation could undercut the nature of the mitigation (misunderstanding of policy) offered in this case since it shows a prior offense dealing with the overall reporting requirements.  The knowledge of the reporting policies the subject acquired or should have acquired from the prior case and how such knowledge weighed in considering the proffered mitigation was not addressed in the subject's interview or the PDH findings.  More than the minimum penalty within the applicable range should have been imposed, or a cogent explanation should have been given explaining why the prior violation of reporting requirements did not contradict the mitigation in this case.

The above three disciplinary cases that we find to be deficient, out of a total of thirty-two in our random sample of cases involving sustained investigative findings, equals a compliance rate of 91 percent, representing an increase in compliance rate from 88 percent in the last monitor's report.  The efforts of the disciplinary authorities in handling their reviews of cases and imposing discipline in accordance with SOP 3-46 have shown a remarkable improvement from the early stages of the CASA.

Despite APD's successful improvement in this area, we would be remiss if we did not sound a note of caution.  Outside of our random sample of cases referred to above, in reviewing appeals, we found an appeal in which discipline was overturned against three subjects for violation of CBA timeline requirements [IMR-18-107], addressed below in the Appeals part of this section of this report.  Here, it bears repeating that compliance with the CBA in not imposing discipline that is "time-barred" does not excuse APD's failure to meet the requirements of paragraph 201 of the CASA to impose appropriate discipline on sustained charges.  The CASA requires APD and CPOA to be staffed sufficiently to meet their investigative and notification responsibilities in a timely manner, operate efficiently, and bring sustained charges to the command review process in time for the review process to run its normal course.  Notwithstanding the marked improvements made in terms of timely efforts, APD and CPOA must remain ever vigilant to ensure that investigative efforts comply with the CASA and applicable CBA timelines.  Operational compliance for paragraph 201 will be unrealistic, if not practically unattainable, as long as there are instances of discipline being time-barred due to CBA violations.

In addition to the three cases in which we found disciplinary deficiencies, there are additional cases we reviewed that, although we found under the totality of circumstances that the discipline imposed or decision to not discipline was appropriate, there were shortcomings or areas of improvement that warrant pointing out.

[IMR-18-88] involved a sustained violation of 2-8-8A.8 for a sergeant for not complying with the supervisor's responsibilities by failing to conduct a mandatory monthly audit of a subordinate's recordings, a class 6 sanction level, performance category violation.  The sergeant accepted responsibility and admitted to not streaming the relevant video despite previously indicating that he had reviewed the video.  He was not logged onto a call at the time the review was opened and could not explain failing to stream the video other than it was an oversight.  An NDCA was imposed, within range as the minimum discipline for a class 6 sanction level, first offense.  An appropriate NDCA form was completed, reflecting the counseling and review of policy that was conducted.

The sergeant had a prior sustained violation for 1-1-6A.1 A, "Honesty, Integrity, and Accountability", a class 5 sanction level, misconduct category violation, for which a written reprimand (minimum discipline for a class 5 sanction, level first offense) was imposed just six months before the date of the incident in question.  Although this prior offense is of a different category than the violation in question and thus would not be utilized in calculating the applicable range, per Paragraph 190 of the CASA, a violation involving dishonesty must be considered:

> "APD and the Civilian Police Oversight Agency shall also take into account the record of any involved officers who have been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation."

1-1-6A.1 states:

A. Honesty, Integrity, and Accountability 1.  All Department personnel, whether on- or off-duty, shall act in a manner that is above reproach.  This includes avoiding behavior that:
    a. May cast doubt on their integrity, or honesty,
    b. Brings discredit to the department, or
    c. Impairs the Department's efficient and effective operation.

There is no indication in the investigative case file whether the prior violation was for subsection A.1a (a violation that would indicate deception or untruthfulness) or subsections A.1b & c (not per se indicators of deception or untruthfulness).  Thus, there was no indication of whether the prior offense triggered a Paragraph 190 analysis and whether, how, and to what degree the prior offense was considered when weighing the subject's explanation.  Upon further inquiry by the monitoring team, it was determined that the prior offense did not indicate deception or untruthfulness.  Thus, we do not find discipline or disciplinary analysis deficient in this case.  However, APD is advised that when a retention card indicates a prior offense for a violation of 1-1-6A.1, the exact subsection and nature of the offense should be addressed so a determination can be made whether the prior violation involves dishonesty, thus requiring a Paragraph 190 analysis.  If the analysis is required, then the disciplinary authority should explain how and to what extent the prior offense involving deception or untruthfulness was considered, that is, what weight, if any, the prior offense was given in the analysis.

[IMR-18-102] and [IMR-18-108] both involve a Chief's letter back to the complainant that contradicted the findings of the disciplinary authority.  These cases, and similar cases we have noted in the past, lead us to recommend that the Chief's letter to a complainant should wait and reflect the disciplinary authority's decision before forwarding it to the complainant.  In [IMR-18-102], the investigative findings sustained a violation of 1-1-6C.1, a class 6 sanction level, performance category (overpromised in dialogue with the complainant, failure to meet the role) and exonerated on a 2-60-4A.5 a,b,e,& f (failure to conduct a complete investigation).  The Chief's letter to the complainant, dated the same date as the disciplinary authority's non-concurrence letter to CPOA, stated agreement with the sustained investigative findings but did not mention the updated development of the exoneration by the disciplinary authority.  In [IMR-18-104], investigative findings sustained a violation 2-60-4A.5b & f, a class 7 sanction level, performance category (failing to complete and provide a police report to complainant).  The CPOA recommended the presumptive discipline, but the disciplinary authority imposed an NDCA, citing mitigation of the officer's relative inexperience and lack of disciplinary history in the non-concurrence letter.  The NDCA shows relevant policies were reviewed and that the officer was receptive to correction.  The Chief's letter was dated before discipline was imposed and reflected that the allegation was sustained and the officer was "disciplined in accordance with department guidelines."  Since an NDCA is not considered discipline by APD, technically, the letter would have been more accurate if it stated that the outcome was a policy review conducted with the officer or that the allegation was "sustained and resolved in accordance with department guidelines."

[IMR-18-103] involved investigative findings of an exoneration on a code of conduct demeanor allegation, 1-1-5A, and a sustained violation "not based on original complaint"

for a 3-41-5B.1 class 6 sanction level, performance category (failure to explain procedures for filing a complaint).  The disciplinary authority overturned the sustained violation and entered a finding of "unfounded", and the non-concurrence letter gave an adequate explanation.  In this case, the decision between sustained or non-sustained was a "close call" where reasonable minds could differ.  As such, the evidence did not reach the "clear and convincing" standard required for a finding of "unfounded." The more appropriate finding should have been "not sustained."

[IMR-18-94] involved a sustained allegation of 2-8-5B class 6 sanction level, misconduct category.  There were two prior offenses for purposes of progressive discipline, and a 16-hour suspension was imposed (the presumptive discipline for a class 6, third offense sanction level).  Under the facts of the case, we find the discipline to be sufficient but point out that during the PDH, the subject stated words to the effect that this case was his first OBRD violation and he had no other misconduct.  The inaccurate representation of his prior record was not addressed by the IAPS representative or the disciplinary authority during the PDH nor in the PDH outcome analysis.  From the PDH recording, it appeared the subject officer was unprepared, lax, and inaccurate in his PDH statement as opposed to intentionally lying.  Nonetheless, inaccurate information offered by a subject in a PDH should be an instant matter of inquiry by the IAPS representative and the disciplinary authority, including pointed questioning by the disciplinary authority to determine the degree of inaccuracy and the reason for the inaccurate statement (which could be determined to be an aggravating factor or even the basis for an additional charge if determined to be an intentional mistruth or candor violation).

## Appeals[83]

We noted in IMR-16 that appeals of disciplinary decisions would be an area of future review.  In this regard, there were a total of 24 appeals completed during the IMR-18 period, all of which were internal appeals considered by the  Executive Director of Police Reform: [IMR-18-109], [IMR-18-110],  [IMR-18-111], [IMR-18-112], [IMR-18-113], [IMR-18-114], [IMR-18-115], [IMR-18-116], [IMR-18-117], [IMR-18-118], [IMR-18-119],  [IMR-18-120], [IMR-18-121], [IMR-18-107], [IMR-18-123], IMR-18-124], [IMR-18-125], [IMR-18-83], [IMR-18-126], [IMR-18-127], [IMR-18-128], [IMR-18-129], [IMR-18-130], and IMR-18-131].  There were no external appeals reported by APD that were completed during the IMR-18 period.

In all of these internal appeals, except two, the exact discipline imposed was upheld and imposed on appeal.  In one, [IMR-18-102], a written reprimand was lowered to a verbal reprimand on appeal.  In [IMR-18-107], discipline was overturned on appeal due to failure to notify the officers of the PDH findings within the 20-day requirement as set forth in the CBA.  There, violations had been sustained against two sergeants for 3-14-4A.1.g.ii  (a supervisor shall develop strategies and employ tactics for effectively directing subordinates to minimize uses of force) and against an officer for 2-55-4A.2.(de-escalation techniques), and 2-52-6B.1 (absent an immediate need to act,

---

[83] The monitoring team looked at the appeals but did not review the disciplinary process used to arrive at discipline.

officers should take time to plan how they will respond to the situation).  Discipline of 8-hour suspensions was imposed against the three subjects after PDHs.  The applicable collective bargaining agreement between the City and the APOA required that the findings of the PDH be sent to the involved officer within 20 days of the PDH.  The disciplinary authority uploaded his findings from the PDH to IAPRO a week before the notice needed to be sent.  It was the responsibility of an administrative assistant to ensure timely notification of those findings was made to the subjects.  In sending out notices, the administrative assistant missed the deadline by one day.  Because of this violation of the timeline, it was determined by the appellate disciplinary authority that discipline could not be imposed on the officers.

Consequently, an investigation was opened in which the administrative assistant took responsibility for missing the deadline, and a violation of SOP 1-1-6C.1 (failure to meet responsibilities of the position) was sustained.  This was the first timeline missed by the assistant in more than a year of employment at APD.  A written reprimand (presumptive discipline on the matrix) was properly imposed for this first offense, a class 6 violation.  This incident also prompted the development of a spreadsheet with populating timelines for use in notice requirements, resulting in improved processes to prevent such a reoccurrence.

In light of the prompt and appropriate handling of the administrative shortcoming identified in and emanating from the appeal in [IMR-18-107], and our findings in IMR-17 relative to appeals, and our review of the twenty-four appeals in this report, we continue to find that the City's and APD's efforts in appeals to be appropriate.

**Non-Concurrence Letters**

The monitoring team reviewed three non-concurrence letters issued during the IMR-18 period: [IMR-18-102], [IMR-18-103], and [IMR-18-104].  These three cases have been addressed in our case review set forth above.  We find [IMR-18-104] to be an appropriate explanation for the imposition of an NCDA in lieu of the recommended presumptive discipline of a verbal reprimand.  Although not robust in explanation, we find the non-concurrence letters in [IMR-18-102] and [IMR-18-103] to be minimally adequate in explaining the thought process of the disciplinary authority in disagreeing with sustained findings.  We point out that where the explanation of the disciplinary authority incorporates or refers to the findings of the PIC, those lower review-level comments should be repeated or paraphrased in the non-concurrence letter.  We repeat that an explanation robust enough to clearly understand the disciplinary authority's thought process must be provided, particularly when the non-concurrence is with an investigative finding; in short, the greater the non-concurrence, the more detailed the explanation should be.

**4.7.187 Assessing Compliance with Paragraph 201:  Fact Based Discipline**

Paragraph 201 stipulates:

> **"APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently."**

## Results

Primary: **In Compliance**
Secondary: **In Compliance**
Operational: **Not In Compliance**

### Recommendations for Paragraph 201:

**4.7.187a: Ensure that adequate explanation is given for selecting a classification level where there is more than one level of classification associated with a regulation for which a sustained finding is made.**

**4.7.187b: All investigations involving sustained charges where discipline cannot be imposed due to violations of time constraints should be reported quarterly to the Chief, the City Attorney, DOJ, and the monitor.**

**4.7.187c: The counting of prior offenses for purposes calculating the applicable range of discipline to be considered by a disciplinary authority should be uniformly understood, documented, and followed in DAP calculations and by the disciplinary authorities.**

**4.7.187d: We encourage APD to continue its efforts to update retention cards by clearly entering the date of incident, the date discipline is imposed, the sanction level of offenses and the category of offenses (misconduct, performance, attendance, or driving behaviors) on the retention cards.  We further recommend that the date of conduct under review be clearly set forth in the recommended findings and conclusions section of investigative reports, that is, entering an "on or about" date for the conduct referenced in each specification.**

**4.7.187e: When a NDCA is imposed, the investigative packet should include an NDCA form setting forth the measure that was taken such as coaching, review of policy, additional training, etc., as well as the officer's acceptance of or reception to the corrective measures, or lack thereof.**

**4.7.187f: Where two or more SOPs govern conduct that seemingly is the same or overlaps to a noticeable degree, consolidate the conduct in one regulatory section, with appropriate violation categories tailored to the degree of culpability of the violations, e.g., consolidate the failure to report requirements of 3-41-7A.2 and 3-41-4A.1.**

*4.7.187g: Response letters to civilian complainants must be accurate; the Chief's response to an external complainant should await the outcome of the decision by the disciplinary authority and accurately reflect the same.*

*4.7.187h: Continue the use of the IAPS Dashboard for trend analysis and implement coordination with APD policy development and training efforts based on the trend analysis.*

### 4.7.188 Assessing Compliance with Paragraph 202: Discipline Matrix

Paragraph 202 stipulates:

> **"APD shall establish a disciplinary matrix that:**
>
> **a) establishes a presumptive range of discipline for each type of rule violation;**
> **b) increases the presumptive discipline based on an officer's prior violations of the same or other rules;**
> **c) sets out defined mitigating or aggravating factors;**
> **d) requires that any departure from the presumptive range of discipline must be justified in writing;**
> **e) provides that APD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and**
> **f) provides that APD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed."**

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational:  **In Compliance**

MONITOR'S NOTE:

In our disciplinary reviews, we have noticed external complaints against APD officers that are associated with an officer not charging a suspect for a misdemeanor committed outside the presence of the officer.  These types of encounters, where citizen complainants often do not understand or react negatively to an officer's decision not to arrest or charge a suspect for a misdemeanor relayed to the officer by the citizen but committed outside the presence of the officer, are not uncommon.  APD should consider addressing this problematic area in more detail in training, including updates on the law in charging misdemeanors and exact advisements to be given to a citizen/victim on why the officer will not make an arrest and how and where to file a misdemeanor charge directly with the appropriate court.

### 4.7.189 Assessing Compliance with Paragraph 203

116

**This is a Non-Rated Paragraph.**

**4.7.190 Assessing Compliance with Paragraph 204:  Comprehensive Staffing Study**

**Paragraph 204 is self-monitored by APD.**

**4.7.191 – 4.7.194 Assessing Compliance with Paragraphs 205 - 208: Supervision and Related Paragraphs**

During this reporting period, the monitoring team worked with APD personnel responsible for the requirements associated with Paragraphs 205, 206, and 208 and met with them during the June 2023 site visit.  In the last monitor's report, the monitoring team documented the positive strides the APD has taken toward compliance for this paragraph.  As a result, APD achieved Operational Compliance with Paragraphs 205, 206, and 208.  For this reporting period (February 1, 2023, through July 31, 2023), the monitoring team requested and reviewed APD data related to these requirements in the form of policy, programs, course of business documents, and results.  Our requests included:

- COB documentation for first-line supervision review of officers as described in Section IV of the CASA;
- Daily worksheet schedules with CAD entry indicating sergeants log in and log-out times for that shift;
- Commanders' and Lieutenants' correspondence, reports, analysis, and other relevant documents prepared during normal COB.  COB supervisory reports were also requested and reviewed to assess quantitative and qualitative reviews of supervision.

The paragraphs for this section consist of supervision requirements for First-Line Supervisors and the close oversight by the lieutenants and commanders.

The reports the monitoring team reviewed consist of, but were not limited to, the following:

- Detailed Scorecard monthly containing:
  - teams or units being monitored,
  - topic that each team or unit is measured on,
  - the compliance percentage attained;
- Detailed Scorecard by Topics;
  - ECW,
  - OBRDs,
  - Firearms,
  - Supervision,
  - Seven-day extensions,

- o Inspection Summaries,
- o Citizen Complaint Forms;
- Detailed Scorecard
  - o sample size (number per team);
  - o unit and number per topic);
- Detailed Explanation
  - o Scorecard, and
  - o rebuttals.

The monitoring team notes continual compliance with respect to monthly activity reports, monthly check-off lists, monthly line inspections, monthly video inspections, and firearms (approved weapons and ammunition).  It should be noted that any rebuttals about scorecard documents are scrutinized and supported with detailed explanations for approval of compliance or non-compliance with the category being disputed.  During this reporting period, the monitoring team observed detailed descriptions of rebuttals and a strong commitment by supervisors to resolve matters that could lead to non-compliance.

In addition, ReformStat continues to be utilized as a driving force to improve supervisory processes, and meetings are held weekly.  APD delivered the supervisory course to sworn personnel, as we note in paragraphs 209 through 211.

The monitoring team reviewed the following data for this reporting period:

- Random Line-up reports for area commands;
- Monthly Inspection Reports;
- Random CAD entry reports for:
  - o Area Commands so that the monitoring team can verify identifiable first-line supervisor;
  - o  If acting as first-line supervisor, an "A" is used to log on CAD to signify to all officers clearly who the supervisor is for the shift;
- Detailed Supervision Scorecards Status reports;
  - o Topics;
  - o Sample size;
  - o Explanation of scorecard findings;
  - o Team Scorecards); and
- Random Sergeant CAD entry reports for Area Command.

APD supplied the monitoring team with documentation to support the requirement in the supervision paragraphs regarding working actively to engage the community and increase public trust.  APD continued to expand usage in the Community Event Tracker (CET) and supplied the monitoring team with data documenting over 1,400 events during this reporting period.  The Community Event Tracker 75-1 and 75-4 app supplies statistics by categories, including Division, Community Engagement Section, and Tactical.  The event types include Non-law enforcement, Scheduled Community, and self-initiated.  These community event trackers are submitted by event title and division/section of officers.  These events are broken down into separate categories, with

categories of concern noted for follow-up.  APD continues to update these apps.  During this reporting period, three additional fields were added to cover whether the event was virtual to indicate the event's name and the employee number.

The monitoring team is encouraged by the processes APD has put in place to capture supervisory shortfalls experienced in previous reporting periods.  The documentation also illustrates that supervisory deficiencies are identified in the reviewing chain of command.  The systems that have been established and implemented should assist APD in meeting and exceeding the CASA requirements in these supervision paragraphs.  While conducting area command visits during the June 2023 visit, the monitoring team found that supervisors were more comfortable with the requirements of the agreement and the processes in place.

### 4.7.191 Assessing Compliance with Paragraph 205

Paragraph 205 stipulates:

> **"First-line supervisors shall ensure that officers are working actively to engage the community and increase public trust and safety, and perform all other duties as assigned and as described in departmental policy."**

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.192 Assessing Compliance with Paragraph 206

Paragraph 206 stipulates:

> **"All field officers shall be assigned to a primary, clearly identified first-line supervisor and shall also report to any other first-line supervisor within the chain of command.  First-line supervisors shall be responsible for closely and consistently supervising all officers under their primary command.  Supervisors shall also be responsible for supervising all officers under their chain of command on any shift to which they are assigned to ensure accountability across the Department."**

**Results**

> Primary:      **In Compliance**
> Secondary:   **In Compliance**
> Operational: **In Compliance**

### 4.7.193 Assessing Compliance with Paragraph 207

**Paragraph 207 is self-monitored by APD.**

### 4.7.194 Assessing Compliance with Paragraph 208

Paragraph 208 stipulates:

> **"APD Commanders and lieutenants shall be responsible for close and effective supervision of officers under their command.  APD Commanders and lieutenants shall ensure that all officers under their direct command comply with APD policy, federal, state and municipal law, and the requirements of this Agreement."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **In Compliance** |

### 4.7.195 - 4.7.197 Assessing Compliance with Paragraphs 209 - 211: Review of Sergeants' Training

Paragraphs 209 through 211 address various supervisory training requirements APD must meet for the CASA. "Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities."

For this reporting period (February 1, 2023 through July 31, 2023), the monitoring team reviewed the following data:

- March 2023 First Line Supervisor Training course (Department Special Order 23-30) delivered in two forty hour sessions followed by two ten hour days of reality-Based Training Scenarios;
- Schedule / Rosters for the 100-hour First Line Supervisor Training Course (March 6, 2023 through March 10, 2023), (March 13, 2023 through March 16, 2023), and (March 20th and 21st, 2023) for Reality-Based Scenarios;
- Instructors Evaluation by students for 100-hour course[84]
- First Line Supervisors Rosters and sign-in sheets:
- Critiques for 100-hour course;
- Test Results; and

---

[84] The monitoring teams review of course evaluations indicated that students gave high remarks for the delivery of materials by instructors.

- Certificates.

The requirements for paragraph 210 are interwoven throughout the 100-hour course. The requirements of this paragraph stipulate that the course shall include the following:

- Techniques for effectively guiding and directing officers and promoting effective and ethical police practices;
- De-escalating conflict;
- Evaluating written reports;
- Investigating Use of Force
- Understanding supervisory tools (Early Intervention Systems (EIS), (OBRD) systems;
- Investigating officer misconduct;
- Officer performance;
- Disciplinary sanctions and non-punitive corrective action;
- Monitoring uses of force to ensure consistency with policies;
- Building community partnerships; and
- Legal update.

Data requested and received by the monitoring team indicated that these portions of the requirement had been addressed by APD in the supervisory course delivered during this reporting period. APD Academy is in the process of updating the First Line Supervisory Course, which will continue to address the requirements of the affected paragraphs.

Additionally, APD delivered during this reporting period the Traffic Incident Management and Supervisory Leadership for Supervisors Training to:

- Sworn Supervisors / Acting Supervisors                                        338;
- Authorized Leave                                                                                    8;
- Active Sworn Supervisors / Acting                                                  330;
- Total number of sworn completed as of 5/24/2023               240;
- Personnel scheduled for upcoming session                              70;
- Active personnel that need to be scheduled for upcoming session    20;
- Total percentage attended                                                           71.01;
- Total percentage of active attendees                                        72.73.

The monitoring team notes that the remainder of this training is scheduled during the next reporting period. Upon completion and review by the monitoring team, the 95 percent compliance threshold will be measured during the next reporting period. Also, during the next reporting period (September through November 2023), APD is scheduled to deliver an Officer Involved Shooting Scene Management and Follow-up Responsibilities course to fulfill the requirements of the CASA.

During this reporting period, APD delivered the 2023 UOF Policy Suite Training for Supervisors:

- Sworn Supervisors / Acting Supervisors                              338;
- Authorized Leave                                                             8;
- Active Sworn Supervisors / Acting                                   330;
- Total Number Sworn/Acting Supervisors completed as of 5/24/2023   329;
- Need to schedule                                                           1;
- Total percentage attended                                        99.34%;
- Total percentage active attended                                 99.70%.
- Need to schedule                                                           6.

APD plans to fulfill the requirements of the above-listed paragraphs by delivering the requisite training as required by the agreement.  APD has set up a training schedule and adhered to it to achieve this goal.  APD has also set up its training calendar for 2023, including the courses needed to comply with the above-mentioned paragraphs.  Based on the data reviewed by the monitoring team, APD remains in operational compliance.

## 4.7.195 Assessing Compliance with Paragraph 209

Paragraph 209 stipulates:

> **"Sergeant training is critical to effective first-line supervision.  Every sergeant shall receive 40 hours of mandatory supervisory, management, leadership, and command accountability training before assuming supervisory responsibilities."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.196 Assessing Compliance with Paragraph 210

Paragraph 210 stipulates:

> **"APD's sergeant training program shall include the following topics:**
>
> **a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;**
> **b) de-escalating conflict;**
> **c) evaluating written reports, including those that contain canned language;**
> **d) categorizing and reviewing officer uses of force;**
> **e) understanding supervisory tools such as the Early Intervention System and on-body recording systems;**
> **f)  responding to and investigating allegations of officer misconduct;**

g) evaluating officer performance;
h) consistent disciplinary sanction and non-punitive corrective action;
i)  monitoring use of force to ensure consistency with policies;
j)  building community partnerships and guiding officers on this requirement; and
k) legal updates."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.197 Assessing Compliance with Paragraph 211

Paragraph 211 stipulates:

"All sworn supervisors shall also receive a minimum of 24 hours of in-service management training, which may include updates and lessons learned related to the topics covered in the sergeant training and other areas covered by this Agreement."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.198-4.7.205 Assessing Compliance with Paragraphs 212-219 EIS/EIRS/PMEDS

The policy, curriculum, and plans to move forward with an Early Intervention System that can meet or exceed CASA requirements have been established.  As we have long recommended, PEMS is proposed to be a data-driven system with thresholds supported by data analysis and research, using standard deviations to establish thresholds rather than arbitrarily assigned numbers of incidents.

During the monitoring period for IMR-16, Special Order SO 22-23 announced the rollout of PEMS.  Supervisors were instructed that assessment notifications would be distributed via Blue Team and reminded to check their Blue Team inboxes daily.  Further instructions for the required timelines for completing a performance assessment were provided.

At the close of the monitoring period for IMR-17, the course of business documentation from APD indicated that all supervisors had completed training regarding using the PEMS system and that the PEMS system was in use in all APD Bureaus.

During the June 2023 site visit, the team spent time with 18 supervisors at all area commands and several other duty locations to assess their abilities to demonstrate the use of the system.  All supervisors stated that they had received the training and were comfortable knowing what to do if they received an alert or where to go with any questions.  Only three supervisors (of the 18 interviewed) had received an alert, and one was in error.

APD documented that there were 51 data-driven assessments during the monitoring period.  This consisted of 28 Actionable Assessments and 23 Advisable Assessments.  Of these, 22 assessments identified a need for improvement.  Eleven of the 22 assessments resulted in a monitoring plan.  The remaining 11 resulted in counseling for improvement.  The monitoring team will contact additional Field Services Bureau supervisors during the next site visit, over several shifts if necessary, to observe a more representative sample of PEMS alerts.

While approved policy guidance exists, it is highly probable that existing policies will need to change when new systems or risk factors are integrated.  Additionally, APD needs to continually monitor the thresholds in order to obtain a representative sample and ensure that the system can function as an Early Warning System.  Currently, APD plans to alert at the rate of five to seven percent annually.  We have consistently discussed with APD the CASA requirements related to data retention and threshold changes.

### 4.7.198 Assessing Compliance with Paragraph 212

Paragraph 212 stipulates:

> **"Within nine months of the Operational Date, APD shall revise and update its Early Intervention System to enhance its effectiveness as a management tool that promotes supervisory awareness and proactive identification of both potentially problematic as well as commendable behavior among officers.  APD supervisors shall be trained to proficiency in the interpretation of Early Intervention System data and the range of non-punitive corrective action to modify behavior and improve performance; manage risk and liability; and address underlying stressors to promote officer well-being."**

**Results**

With the completion of the approved PEMS supervisory training for all active sworn supervisors and the on-going of training for new supervisors, the requirements for secondary compliance relating to Paragraph 212 have been met.  The latest training curriculum, which contains the protocols for the EIS, has been approved, and training is scheduled to begin (and conclude) during the monitoring period for IMR-19.

During the June 2023 site visit, our interviews with supervisors who are tasked with using PEMS indicated that the supervisors were comfortable in using the system or knowing where to go for help if they had questions. Several mentioned that the system was slow in loading and that there were routing errors.  APD provided documentation that they discovered the routing issue and corrected the problem prior to the end of the monitoring period.

As mentioned in the narrative section above, 51 data-driven assessments were flagged during the monitoring period.  These consisted of 28 Actionable Assessments and 23 Advisable Assessments.  Of these, 22 assessments identified a need for improvement. Eleven of the 22 assessments resulted in a monitoring plan.  The remaining 11 resulted in counseling for improvement.

During the next site visit, the monitoring team will continue to assess whether APD supervisors are using the PEMS/Benchmark system appropriately and whether or not they use the system as an evaluation and "early warning" system.

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.199 Assessing Compliance with Paragraph 213

Paragraph 213 stipulates:

> **"The Early Identification System shall allow for peer-group comparisons between officers with similar assignments and duties."**

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.200 Assessing Compliance Paragraph 214

**[THIS PARAGRAPH INTENTIONALLY LEFT BLANK.]**

## 4.7.201 Assessing Compliance Paragraph 215

Paragraph 215 stipulates:

> **"The Early Intervention System shall be a component of an integrated employee management system and shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve data**

**department-wide and for each officer regarding, at a minimum:**

a)  **uses of force;**

b)  **injuries and deaths to persons in custody;**

c)  **all critical firearms discharges;**

d)  **failures to record incidents with on-body recording systems that are required to be recorded under APD policy, whether or not corrective action was taken, and cited violations of the APD's on-body recording policy;**

e)  **all civilian or administrative complaints and their dispositions;**

f)  **all judicial proceedings where an officer is the subject of a protective or restraining order of which APD has notice;**

g)  **all vehicle pursuits and traffic collisions involving APD equipment;**

h)  **all instances in which APD is informed by a prosecuting authority that a declination to prosecute any crime occurred, in whole or in part, because the officer failed to activate his or her on-body recording system;**

i)  **all disciplinary action taken against employees;**

j)  **all non-punitive corrective action required of employees;**

k)  **all awards and commendations received by employees, including those received from civilians, as well as special acts performed by employees;**

l)  **demographic category for each civilian involved in a use of force or search and seizure incident sufficient to assess bias;**

m) **all criminal proceedings initiated against an officer of which APD has notice, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City and/or its officers or agents, allegedly resulting from APD operations or the actions of APD personnel; and**

n)  **all offense reports in which an officer is a suspect or offender of which APD has notice."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.202 Assessing Compliance Paragraph 216

Paragraph 216 stipulates:

> **"APD shall develop and implement a protocol for using the updated Early Intervention System and information obtained from it.  The protocol for using the Early Intervention System shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review Early Intervention System data for officers under their command."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.203 Assessing Compliance Paragraph 217

Paragraph 217 stipulates:

> **"APD shall maintain all personally identifying information about an officer included in the Early Intervention System for at least five years following the officer's separation from the agency except where prohibited by law.  Information necessary for aggregate statistical analysis will be maintained indefinitely in the Early Intervention System.  On an ongoing basis, APD will enter information into the Early Intervention System in a timely, accurate, and complete manner and shall maintain the data in a secure and confidential manner."**

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.204 Assessing Compliance Paragraph 218

127

Paragraph 218 stipulates:

> **"APD shall provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated Early Intervention System protocols within six months of the system improvements specified in Paragraphs 212-215 to ensure proper understanding and use of the system. APD supervisors shall be trained to use the Early Intervention System as designed and to help improve the performance of officers under their command. Commanders and supervisors shall be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns of behavior."**

**Results**

> Primary:       **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.205 Assessing Compliance Paragraph 219

Paragraph 219 stipulates:

> **"Following the initial implementation of the updated Early Intervention System, and as experience and the availability of new technology may warrant, the City may add, subtract, or modify thresholds, data tables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports and queries as appropriate.  The Parties shall jointly review all proposals that limit the functions of the Early Intervention System that are required by this Agreement before such proposals are implemented to ensure they continue to comply with the intent of this Agreement."**

**Results**

> Primary:       **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

## 4.7.206 – 4.7.217 Assessing Compliance with Paragraphs 220-231

During the monitoring period for IMR-18, APD's PMU has continued actively auditing OBRD-related activities.  PMU referred 84 cases to Internal Affairs for policy violations. The findings so far have yielded enough information to conclude that significant strides

have been made concerning APD's execution and training related to the CASA's OBRD requirements. APD's internal audit processes again showed an overall compliance rate of 96 percent or higher in all six area commands for OBRD requirements, which include:

- Upload by the end of subsequent shift (98%);
- Two video reviews by sergeant (99%);
- OBRD equipment inspection (99%);
- Video review showing no unreported force (100%); and
- Full recording of mandatory recording incidents (96%).

Prior reporting of the monitoring team noted that APD had not yet documented where an OBRD complaint originated. During this period, APD had provided Course of Business documentation that OBRD referrals to Internal Affairs originated from PMU (84), IAPS (20), immediate supervisors (25), IAFD (16), and the chain of command (nine). While the preferred method of policy violation discovery is with the immediate supervisor, it is encouraging that APD has numerous systems in place to discover and report violations. Operationally, the monitoring team would recommend that immediate supervisors are held accountable when others find violations that immediate supervisors have overlooked. APD's internal audits and the monitoring team's assessments are similar, indicating the reliability and validity of APD's internal audit functions.

During IMR-16, a Professional Integrity Commander was assigned to review all cases and is now the disciplinarian on all "minor misconduct" investigations conducted at the Area Command or Division level. This change is designed to create a more consistent and fair disciplinary process, removed from supervisory biases. In addition, all IA supervisors were trained during IMR-16 to assist supervisors outside of Internal Affairs in conducting a misconduct investigation when it is returned to their unit. APD continues this training for new supervisors during the Supervisor Class. Again, this action was necessary to create a consistent and fair disciplinary process throughout APD.

In prior reports, the monitoring team expressed concern for accountability and APD's response to the OBRD policy requirements violations. Clarifications were made to the OBRD policy, and definitions were added. Additionally, changes were made to the Disciplinary Matrix, separating policy violations into a performance or misconduct category. Within these categories, a performance violation would not add to the progressive discipline of a misconduct violation.

During this period, 175 records were created in Blue Team for 180 potential OBRD violations. Cases were created by PMU, the officer's direct supervisor, IAFD, IAPS, and "other" supervisors, including the chain of command. Among those records, 118 had been closed, citing 122 potential SOP 2-8 (OBRD) violations. (Note: Records may contain more than one allegation or more than one involved officer). The monitor notes that, ideally, these OBRD issues should be noted and corrected at the supervisory or command level. For this reporting period, most of these field-based OBRD errors were noted by PMU or supervisors.

The findings of the closed cases are described below:

> Sustained:  91
> Not Sustained: 1
> Unfounded:  7
> Exonerated: 22
> Sustained/NBOOC:1 (Not Based On Original Complaint)

Sustained Findings/Actions/Discipline:

> Administratively Closed-Non-Disciplinary Corrective Action: 3
> Verbal Reprimand: 29
> Written Reprimand: 49
> Suspension: 11

Overall, we note that OBRD policy requirements are central elements of CASA compliance, as OBRD usage is a necessary tool for assessing officer actions in the field.  As such, it requires serious oversight by command staff, who should hold first-line supervisors accountable for ensuring policy adherence.

During IMR-16, APD made policy changes to SOP 2-8.  A new policy version is being revised and is expected to be published during the IMR-19 reporting period.  The new structure within IAPS has been in place since IMR-17.  APD documents state that the Professional Integrity Commander now reviews all cases and is the disciplinarian on all "minor misconduct" investigations conducted at the Area Command or Division level. During the next site visit by the monitoring team, IA records will be reviewed to ensure that violations of Failure to Record are properly investigated and have appropriate dispositions.  Five officers had two or more sustained violations of SOP 2-8.  While two officers received suspensions (progressively), three other officers received only verbal or written reprimands, one for violating the same policy section twice.

The monitoring team visited all Area Commands and many investigative and administrative units during the IMR-18 on-site visit.  We expanded the discussions to include lieutenants and sergeants to document fully CASA OBRD requirements.  A total of eighteen supervisors were interviewed by the monitoring team.  All supervisors could explain the updated policy requirements, were fluent in using the various supervisory systems, and demonstrated that they had completed the required video reviews.  Three supervisors discovered violations of the OBRD policy (failure to upload), and all referred the officers to Internal Affairs.  The PMU discovered an additional two failures to upload. OBRD equipment issues reported included battery life due to 12-hour shifts, citywide Wi-Fi, and docking problems.

The monitoring team views well-trained and engaged supervisors as the lynchpin to function properly for this entire process.  Internal Affairs has worked to standardize the review of cases returned to the Area Commands for investigation, including training for the first-line supervisors concerning investigating internal cases, with the intended

results being a more appropriate and consistent response to policy violations.  Training and supervising the line supervisors in this area is critical for maintaining compliance.

Advanced technology discussions underway to build the capability of "blue toothing" or "geo-fencing" by AXON have been postponed due to technical issues.  This capability, when available, will (theoretically) eliminate failure to record by officers on scene by turning on all cameras within a prescribed distance when one is activated.

### 4.7.206 Assessing Compliance Paragraph 220

Paragraph 220 stipulates:

> **"To maintain high-level, quality service; to ensure officer safety and accountability; and to promote constitutional, effective policing, APD is committed to the consistent and effective use of on-body recording systems.  Within six months of the Operational Date, APD agrees to revise and update its policies and procedures regarding on-body recording systems to require:**
>
> **a)  specific and clear guidance when on-body recording systems are used, including who will be assigned to wear the cameras and where on the body the cameras are authorized to be placed;**
>
> **b)  officers to ensure that their on-body recording systems are working properly during police action;**
>
> **c)  officers to notify their supervisors when they learn that their on-body recording systems are not functioning;**
>
> **d)  officers to inform arrestees when they are recording, unless doing so would be unsafe, impractical, or impossible;**
>
> **e)  activation of on-body recording systems before all encounters with individuals who are the subject of a stop based on reasonable suspicion or probable cause, arrest, or vehicle search, as well as police action involving individuals known to have mental illness;**
>
> **f)  supervisors to review relevant recordings regarding misconduct complaints made to them about their supervisees;**
>
> **g)  supervisors to review relevant recordings regarding injuries to their supervisees, or uses of force or foot pursuits conducted by their supervisees;**
>
> **h)  supervisors to review recordings regularly and to incorporate the knowledge gained from this review**

into their ongoing evaluation and supervision of
officers; and

i) APD to retain and preserve non-evidentiary
recordings for at least 60 days and consistent with
state disclosure laws, and evidentiary recordings for
at least one year, or, if a case remains in investigation
or litigation, until the case is resolved."

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.207 Assessing Compliance with Paragraph 221

Paragraph 221 stipulates:

**"APD shall submit all new or revised on-body recording
system policies and procedures to the Monitor and DOJ
for review, comment, and approval prior to publication
and implementation. Upon approval by the Monitor and
DOJ, policies shall be implemented within two months."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.208 Assessing Compliance with Paragraph 222

Paragraph 222 stipulates:

**"The Parties recognize that training regarding on-body
recording systems is necessary and critical.  APD shall
develop and provide training regarding on-body
recording systems for all patrol officers, supervisors,
and command staff.  APD will develop a training
curriculum, with input from the Monitor and DOJ, that
relies on national guidelines, standards, and best
practices."**

## Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.209 Assessing Compliance with Paragraph 223

Paragraph 223 stipulates:

> **"APD agrees to develop and implement a schedule for testing on-body recording systems to confirm that they are in proper working order.  Officers shall be responsible for ensuring that on-body recording systems assigned to them are functioning properly at the beginning and end of each shift according to the guidance of their system's manufacturer and shall report immediately any improperly functioning equipment to a supervisor."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.210 Assessing Compliance with Paragraph 224

Paragraph 224 stipulates:

> **"Supervisors shall be responsible for ensuring that officers under their command use on-body recording systems as required by APD policy.  Supervisors shall report equipment problems and seek to have equipment repaired as needed.  Supervisors shall refer for investigation any officer who intentionally fails to activate his or her on-body recording system before incidents required to be recorded by APD policy."**

### Results

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.211 – 4.7.213 Assessing Compliance with Paragraphs 225 - 227

**Paragraphs 225 - 227 are self-monitored by APD.**

## 4.7.214 Assessing Compliance with Paragraph 228

Paragraph 228 stipulates:

> **"Officers who wear on-body recording systems shall be required to articulate on camera or in writing their reasoning if they fail to record an activity that is required**

133

by APD policy to be recorded.  Intentional or otherwise
unjustified failure to activate an on-body recording
system when required by APD policy shall subject the
officer to discipline."

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.215 Assessing Compliance with Paragraph 229

Paragraph 229 stipulates:

"APD shall ensure that on-body recording systems are
only used in conjunction with official law enforcement
duties.  On-body recording systems shall not be used to
record encounters with known undercover officers or
confidential informants; when officers are engaged in
personal activities; when officers are having
conversations with other Department personnel that
involve case strategy or tactics; and in any location
where individuals have a reasonable expectation of
privacy (e.g., restroom or locker room)."

## Results

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.216 Assessing Compliance with Paragraph 230

**Paragraph 230 is self-monitored by APD.**

## 4.7.217 Assessing Compliance with Paragraph 231

Paragraph 231 stipulates:

"The Parties are committed to the effective use of on-
body recording systems and to utilizing best practices.
APD currently deploys several different platforms for on-
body recording systems that have a range of
technological capabilities and cost considerations.  The
City has engaged outside experts to conduct a study of
its on-body recording system program.  Given these
issues, within one year of the Operational Date, APD
shall consult with community stakeholders, officers, the
police officer's union, and community residents to gather
input on APD's on-body recording system policy and to

> revise the policy, as necessary, to ensure it complies
> with applicable law, this Agreement, and best practices."

## Results

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **In Compliance**

## 4.7.218-239 Assessing Compliance with Paragraphs 232 - 253

## Paragraphs 232 – 253 are self-monitored by APD.[85]

## 4.7.240 – 4.7.255 Assessing Compliance with Paragraphs 255 -270: Community Policing and Community Engagement

## 4.7.240 Assessing Compliance with Paragraph 255

Paragraph 255 stipulates:

> **"APD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."**

## Methodology

Paragraph 255 of the CASA represents the foundational requirements for developing, implementing, and sustaining a department that uses community policing principles as the primary driver.  To effectively implement this requirement, APD would need to develop policy guidance and mission statements reflecting its commitment to the community, engage in problem-oriented policing, and field administrative systems that support community policing practices.  APD, over time, has made progress in integrating community policing concepts into its policies, operations, and practices.  In prior reporting periods, APD revised its mission statement, updated its community-oriented policing training curriculum, expanded community partnerships, established an Ambassador Program that assigns officers to conduct ongoing outreach with community groups, and launched a Youth Working Group comprised of local youth-serving agencies and non-profits to leverage resources to expand services to high-risk youth.

In the prior reporting period, APD administered a new and updated culture survey, developed with the support of the New Mexico State University (NMSU), to capture information about officers' knowledge and attitudes regarding community policing. These surveys are a primary means to measure culture change and the extent to which

---

[85] Paragraph 254 is an introductory paragraph and is not monitored.

officers are internalizing community policing principles and applying them in their daily activities.  The monitoring team suggests that APD use these findings to determine any additional steps needed to fill knowledge gaps, improve supervision, and enhance community policing practices.  APD also continued to expand its partnerships, especially those involving services for at-risk youth and continued to implement its Ambassador Program, increasing contacts with members of traditionally marginalized communities.

 In October 2018, in conjunction with community members, APD developed the following mission statement, "The mission of the Albuquerque Police Department is to preserve the peace and protect our community through community-oriented policing, with fairness, integrity, pride, and respect."  The APD vision statement includes the following language on its website: "Help provide a safe and secure community where the rights, history, and culture of all are respected."  The City and APD have also become national leaders in exploring ways to effectively partner with other city agencies in responding to calls for service requiring non-law enforcement responses.  This has been accomplished by establishing the Albuquerque Community Safety Department (ACS).  The ACS dispatches trained behavioral health specialists and social workers to non-violent and non-medical calls, reducing workloads for uniformed APD staff and providing responders who are better equipped to serve those experiencing a mental health/behavioral health crisis.  ACS has contributed to recent crime reductions because of the off-loading of calls from APD, allowing officers to engage in more proactive policing and reducing the use of force against those experiencing a behavioral crisis.  ACS plans to expand to provide 24-hour coverage.[86]

In the previous and current reporting period, APD efforts to integrate community policing and practices into operations have included the following:

- Training sworn personnel in community policing practices and principles;
- Recruitment efforts to have a workforce that more closely mirrors the populations served;
- Personnel evaluations that include community policing components;
-  Deployment of PRT officers in all area commands augmenting community policing activities;
- The assignment of crime prevention specialists to each area command;
- Enhancements for School Resource Officer training;
- Implementing outreach strategies for each area command;
- Establishing a Youth Working Group to leverage resources and partnerships for expanding services to at-risk youth;
- Completion of updated and revised climate survey assessing officers' knowledge of community principles, and
- Implementation of the Ambassador Program, through which APD conducts specific outreach to marginalized groups.

---

[86] ACS expanded to 24-hour service on August 26, 2023.

In this reporting period, APD reviewed the results of the survey and developed a plan of action to address the findings.  These action items included:

- Improve communication between the administration and rank-and-file officers;
- Ensure that low-scoring areas from the survey involving knowledge and application of community policing principles are an area of focus for the upcoming COP/POP training; and
- Share information with department staff on the improvements and trends in the disciplinary process over the past six months.

APD reported other youth-focused outreach activities in this reporting period that included the following:

- 'Raising Highly Capable Kids" in the community, a program that provided parents with specific educational tools involving 37 parents over 13 weeks;
- IMPRINT (program for young school-aged children) reached 1,489 students, with ten officers participating in the program;
- Camp Fearless involved six four-day summer camps for youth 8-13, targeting at-risk youth with programming including mentoring and a range of recreational activities; and
- Junior Police Academy program held at the APD Police Academy for youth aged 14 to 17 years involving 21 youth.

During this reporting period, The APD Youth Working Group, comprised of 22 members from city agencies and community-based non-profits, continued to further assist in expanding community partnerships and leveraging resources to provide additional prevention programming and other services to the thousands of at-risk youth in Albuquerque.  APD also increased and expanded youth programming to help mitigate current and future criminal conduct, build community trust, and enhance community safety.

Other APD outreach and community engagement activities included the following:

- APD continues to work with the Violence Intervention Program, increasing the number of custom notifications delivered during this reporting period to 145.
- The Downtown Public Safety Extension of Community Healthcare Outcomes (ECHO), Nob Hill-University Public Safety ECHO, and the CIT ECHO projects continue to host regular sessions; and
- The Ambassador Program added youth to one of the community groups it serves. It hosted a Meet and Greet in the Nob Hill District, an LGBTQ town hall meeting that was also live-streamed, and hosted the second Tribal and Metro Public Safety summit.

The monitoring team acknowledges the significant progress in recent years by APD in expanding its community engagement and outreach activities and forming meaningful partnerships with other city agencies and community-based non-profit service agencies.

Much remains to be done to leverage all city and community resources and fully implement a broad community safety strategy.

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.241 Assessing Compliance with Paragraph 256:  APD Response to Staffing Plan

Paragraph 256 stipulates:

> **"As part of the Parties' staffing plan described in Paragraph 204, APD shall realign its staffing allocations and deployment, as indicated, and review its recruitment and hiring goals to ensure they support community and problem-oriented policing."**

**Methodology**

APD is committed to fully staffing the Problem Response Teams (PRTs) that provide area commanders with staffing flexibility to assign officers where they have the most impact.  The number of PRT members is discussed in Paragraph 255 above.

APD sometimes struggles with realigning staffing resources to support community policing goals.  The first attempt to comply with this requirement was APD's PACT (Police and Community Together) plan, approved on December 27, 2016.  Staff realignment responsive to the plan was continued during the seventh reporting period.  Implementation of the PACT plan was terminated during the eighth reporting period and replaced with the deployment of PRT to all six area commands.  The PRTs continue to represent a marked improvement to the old PACT process, with goals more related to problem-solving policing processes instead of PACT's enforcement-based processes.  PRTs are well received by community members and provide Commanders with the flexibility to focus crime prevention and enforcement in areas of most concern to community members.

Recommendations from a previous APD staffing analysis included:

- Formalizing a hybrid approach that requires field officers to engage in some level of community policing while the specialized PRTs spend more time engaging in community policing activities such as addressing problem areas or conditions, relationship-building activities, and showing additional police presence as required;

- Analysis revealed that patrol officers would have about 20 minutes of each hour or about 33 percent of unobligated time that should be used in community policing activities;
- APD should adopt a community policing performance standard objective of 33 percent of available time for community engagement during the key hours of 7 a.m. to 8 p.m.

APD reports that PRTs will continue proactive enforcement and community engagement and assist Crime Prevention Specialists with site visits to problem properties and re-inspections.  PRTs, according to APD, will continue to focus on quality-of-life concerns and conduct weekly warrant round-up events.  APD has established a goal of a 70/30 (Law Enforcement /Community Engagement) ratio as a good balance to address proactive enforcement and community engagement requirements.

For this reporting period, staffing levels remained relatively stable, with only one change from the previous reporting period, the addition of 5 staff assigned to the newly formed University Area Command.  At the end of this reporting period, PRT staffing deployments by area command were as follows:

- Foothills        5
- Northeast      6
- Northwest     5
- Southeast      7
- Southwest     4
- Valley          11 (two teams)
- UNM area     5

These numbers include supervisory staff.  The Valley Area Command has two teams because of its higher numbers of calls for service, a higher concentration of people experiencing homelessness, and persons with mental disabilities.   APD reports it will backfill PRT positions, replacing officers promoted to other assignments.

The monitoring team expects ongoing consultations with community stakeholders, including CPCs, in developing policies necessary to implement the staffing analysis recommendations regarding deployment decisions and ongoing analysis to assess the effectiveness of deployments to inform any required adjustments.

**Results**

Primary:      **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

### 4.7.242 Assessing Compliance with Paragraph 257:  Geographic Familiarity of Officers

Paragraph 257 stipulates:

139

**"APD shall ensure that officers are familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively with other city departments to address quality-of-life issues."**

## Methodology

APD's Bid process includes information about geographic areas served, including ongoing and current issues and lists of community leaders.  APD developed and began utilizing a Beat Familiarity Questionnaire that included command area-specific information about community stakeholders and resources.  APD reported that the 2023 Field Services Bureau Bid took effect on February 11, 2023, and sworn personnel completed the "appropriate packages."  APD also reported that the Bid Packet for all sworn personnel was updated on May 23, 2023, to reflect changes in area commands. To further encourage officers to remain in the same area command, APD officers receive incentive pay of $1,300.00 per year for each year served in the same command area, which is capped at $5,200.00 after four years.

 APD previously reported completing the digitized Bid process; however, APD identified issues and attempted corrective actions in the test phases.  APD was eventually unable to adequately address the technical issues that surfaced during the piloting phase of implementation, leading to the abandonment of the effort to digitize the Bid process.

APD previously established and provided the monitoring team with a delineated process used for the Field Services Bureau Bid process, sample Bid packets, and Beat Familiarity Packets for Field Services Bureau staff.  Information related to the officer's assigned area is updated quarterly and includes the Beat Familiarity Questionnaire as part of the process.

The monitoring team strongly encourages APD to update the contents of the Questionnaire at least quarterly as planned by APD, for officers to utilize packet information fully and to work with other city agencies to address a range of community safety issues.  APD may find it helpful to consider a greater emphasis on training and supervision in strengthening coordinative processes with other city agencies and non-profit community-based service providers.

## Results

Primary:     **In Compliance**
Secondary:  **In Compliance**
Operational: **In Compliance**

## 4.7.243 Assessing Compliance with Paragraph 258: Officer Outreach Training

Paragraph 258 stipulates:

> **"Within 12 months of the Operational Date, APD agrees to provide 16 hours of initial structured training on community and problem-oriented policing methods and skills for all officers, including supervisors, commanders, and executives. This training shall include:**
>
> **a)  Methods and strategies to improve public safety and crime prevention through community engagement.**
> **b)  Leadership, ethics, and interpersonal skills.**
> **c) Community engagement, including how to establish formal partnerships, and actively engage community organizations, including youth, homeless, and mental health communities.**
> **d) Problem-oriented policing tactics, including a review of the principles behind the problem-solving framework developed under the "SARA Model" (Scanning, Analysis, Response, Assessment), which promotes a collaborative, systematic process to address issues of the community, safety, and the quality of life;**
> **e) Conflict resolution and verbal de-escalation of conflict and;**
> **f)  Cultural awareness and sensitivity training.**
>
> **These topics should be included in APD annual in-service training."**

## Methodology

APD reported that the 2023 maintenance of effort activities began on July 10, 2023.  The Community Oriented Policing/Problem-Oriented Policing refresher training is included in this phase.  APD, with the consent of the monitor, has divided the MOE COP/POP training into three segments as part of a three-year rotation, with a different segment taught each year.  This year's segment focused on implicit bias and cultural sensitivity. The monitoring team reviewed the curriculum and found that it met compliance thresholds.  However, the monitoring team also recommended some future improvements, including:

- More examination of stereotypes and fallacious assumptions about community members with mental health/behavioral health disabilities;
- More discussion about the source of community bias and the misperceptions of APD officers; and
- Greater emphasis on the role community policing practices can play in mitigating community bias by having APD officers work diligently to ensure that all community members are treated with dignity and respect.

In previous COP/POP training, officers in their evaluations reported the following:

- Officers liked the organization, length, and interactive participation of the training;

- Officers felt that the content did not always apply to the average field officer and asked for specific examples of where COP/POP strategies were successful or unsuccessful in Albuquerque.

During previous reporting periods, APD has made continuous adjustments and improvements in content and the delivery of COP training to its sworn personnel.  APD also completed restructuring the required 16 hours of COP training that better reflects the department's community policing philosophy, incorporating new and evolving departmental policies and orders that better align with COP training requirements.  The monitoring team subsequently approved the COP training, which was first delivered in 2020.  The COP training was developed using a documented seven-step process and covered all the required elements outlined in paragraph 258.

The COP/POP training is an important lynchpin to APD reform efforts, helping officers internalize a different way to perceive their relationship with the community members they serve and to assess alternative ways of interacting with the community.  This allows APD to bring "change" to the forefront of its community policing processes.  Evidence of the desired training impact may be assessed in culture surveys that can inform adjustments in training approaches.

In this calendar year, APD plans to deliver its 16 hours of Basic Training to the most recent Cadet class (achieving the 95 percent threshold).  In addition to the Basic Training, cadets will receive a full day of training on Cultural Diversity /Community Engagement, including presentations by community members from various cultural/ethnic backgrounds.  Also, previously added to cadet training was a requirement to perform community outreach.

Because of the breadth of the CASA training content requirements, APD envisions dividing the content into multiple trainings to allow each topic to be covered more comprehensively.   The sessions will be organized as follows:

- Cultural Sensitivity and Implicit Bias;
- COP Basics and POP Projects and Examples; and
- Community Engagement Strategies and Activities.

The monitoring team suggests that APD continue to adjust this training based on findings from Culture Surveys and feedback from field supervisors.  The monitoring team would expect changes to the training content as APD's community policing and engagement processes continue to expand and evolve.  The monitoring team also encourages APD to develop assessment processes to measure the impact of training relative to in-field practices.

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational: **In Compliance**

## 4.7.244 Assessing Compliance with Paragraph 259:  Measuring Officer Outreach

Paragraph 259 stipulates:

> **"Within six months of the Operational Date, APD agrees to develop and implement mechanisms to measure officer outreach to a broad cross-section of community members, with an emphasis on mental health, to establish extensive problem-solving partnerships and develop and implement cooperative strategies that build mutual respect and trusting relationships with this broader cross section of stakeholders."**

## Methodology

During previous reporting periods, APD reported making significant investments in improving the consistency in usage of the Community Event Tracker (CET) and enhancing capabilities to accurately track and measure officer outreach through involvement in community events and activities.   Data provided for usage of CET from January 2022 through November 2022 indicated that 851 staff members submitted data through the CET.   APD also analyzed submitted data with engagement activity tracked for each command area.  Data covering nearly all of this reporting period, from January 1, 2023, to June 30, 2023, indicated 1,046 Trackers submitted for 641 events.  APD also reported only 173 officers and 13 professional staff submitted trackers.  APD previously conducted audits of the data and conducted cross-comparisons with CAD data to identify gaps and errors in usage.  APD developed additional guidance for sworn personnel to address deficiencies in CET entries.  These steps indicated that APD is becoming a "learning organization."

Training regarding using the tracker was approved and published on Power DMS in January 2022 and requires both specific sworn and specific non-sworn department personnel to create an entry into the system for tracking.  Further analysis by APD during this reporting period revealed that there were often multiple CAD numbers for a single event, and officers and staff may be submitting Trackers for the same event with different CAD numbers.  To remediate this issue, APD  developed a process to create a unique identifier for events.  APD, however, indicated that their solution may result in a potential undercount of community events.  Using a different methodology to measure participation and events may explain the significant difference in utilization reported from the prior reporting period.

The monitoring team continues to view CET as a critical management tool in measuring and expanding community events and contacts by systematically capturing and reporting this information to inform decision-making and facilitating APD's efforts to enhance community outreach.  The monitoring team recognizes that field officers' tracking and measuring community outreach encourages more outreach activities by officers and problem-solving with community-based service providers.  The monitoring team strongly encourages APD to continue making CET refinements and expand utilization by all

143

officers and staff interacting with community members.  APD should also determine additional training needs and supervisory controls to ensure adherence to policy, CASA requirements, and effective implementation of these emerging processes.

**Results**

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational:  **In Compliance**

**Assessing Compliance with Paragraph 260:  PIO Programs in Area Commands**

Paragraph 260 stipulates:

> **"APD shall develop a Community Outreach and Public Information program in each area command."**

**Methodology**

One of the significant impacts of the CASA has been the greatly enhanced efforts of each area command in public information programs and outreach to community members.  Before the CASA, there was little evidence of ongoing outreach and public information programming.  In this reporting period, APD continued the progress made in the previous reporting period in implementing and expanding outreach and public information programming and activities in all its command areas.  Five of the six area commands developed and posted monthly newsletters for this reporting period and began regularly posting upcoming events on their monthly calendar.  The monitoring team reviewed the area command web pages for this reporting period.  We were impressed by the range of information provided regarding upcoming events in their area commands, crime trends, crime prevention tips, and Community Policing Council (CPC) meetings.

In an earlier reporting period, each of the six area commands completed a Community Outreach and Public Information Strategy that outlines goals/ objectives and key activities.  In the current reporting period, APD updated biographical sketches for area commanders and posted monthly and annualized crime data for the specific area commands.  During this calendar year, the monitoring team expects APD to have area commands update their Outreach and Public Information Strategy.  It is also important that area commanders continue to provide the necessary oversight and supervision to implement the Outreach and Public Information Strategy, including updating their respective websites.

An impressive aspect of the APD outreach strategy is the regular participation of Command staff in CPC meetings, making monthly presentations to community members, and answering questions about their operations.  They often provide information on crime trends and share crime prevention tips and information with community members.

Another significant development is that this is becoming a standardized organizational behavior.

One of the goals of area command-based public information plans and strategies is to specifically address community outreach, messaging, and outreach to marginalized segments of the population and to use social media to accomplish this goal.  The monitoring team believes that APD can increase progress using these social media tools to reach marginalized groups.

**Results**

> Primary:      **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**4.7.246 Assessing Compliance with Paragraph 261:  Community Outreach in Area Commands**

Paragraph 261 stipulates:

> **"The Community Outreach and Public Information program shall require at least one semi-annual meeting in each Area Command that is open to the public.  During the meetings, APD officers from the Area command and the APD compliance coordinator or his or her designee shall inform the public about the requirements of this Agreement, update the public on APD's progress meeting these requirements, and address areas of community concern.  At least one week before such meetings, APD shall widely publicize the meetings."**

**Methodology**

In this reporting period, APD made presentations to communities in all six Area Commands, informing the public about CASA requirements and updating its progress in meeting them.  APD continues to use CPCs as a platform to share information about implementing CASA requirements.

CPCs provide a community platform for APD to convey and receive relevant and timely information from community stakeholders and members.  The monitoring team notes APD's increased acknowledgments of the work of the CPCs, raising awareness of specific community safety issues and helping facilitate a response from APD and other city agencies.  APD personnel continue to participate regularly in CPC meetings, addressing community concerns, sharing crime prevention information, and discussing crime reduction approaches.  Recent changes to the City's Civilian Police Oversight Agency authorizing ordinance now require APD to provide opportunities for CPCs to comment on significant policy changes.  The monitoring team encourages APD to continue using CPCs as conduits for updates on policy changes, new training, policing strategies and tactics, and addressing residents' community safety concerns.

**Results**

    Primary:     **In Compliance**
    Secondary:  **In Compliance**
    Operational: **In Compliance**

**4.7.247 Assessing Compliance with Paragraphs 262 - 270**

**Paragraphs 262 - 270 are self-monitored by APD.**

**4.7.256 through 4.7.277 Assessing Compliance with Paragraphs 271-292: Community Police Oversight Agency**

Paragraphs 271 through 292 of the CASA pertain to the Civilian Police Oversight Agency (CPOA), including the Civilian Police Oversight Agency Board (CPOAB or the Board). These paragraphs require an independent, impartial, effective, and transparent civilian oversight process that investigates civilian complaints, renders disciplinary and policy recommendations and trend analysis, and conducts community outreach, including publishing semi-annual reports.

During the monitoring period and the June 2023 site visit, members of the monitoring team held meetings with the CPOA Interim Executive Director and her staff.  We reviewed relevant training records selected (by way of a stratified random sample) and reviewed 20 CPOA investigations and appeals.  The CPOA investigations reviewed were [IMR-18-55], [IMR-18-56], [IMR-18-57], [IMR-18-58], [IMR-18-59], [IMR-18-60], [IMR-18-61], [IMR-18-62], [IMR-18-63], [IMR-18-64], [IMR-18-65], [IMR-18-66], [IMR-18-67], [IMR-18-68], [IMR-18-69], [IMR-18-70], [IMR-18-71], [IMR-18-72], [IMR-18-73], and [IMR-18-74].

The findings related to Paragraphs 271 through 292 indicate the following outcomes related to the requirements of the CASA.

CPOA Budget and Staffing

The CPOA Ordinance presently states:

    "The CPOA shall recommend and propose its budget to the Mayor and City Council during the City's budget process to carry out the powers and duties under §§ 9-4-1-1 through 9-4-1-14, including itemized listings for the funding for staff and all necessary operating expenses." Section 9-4-1-4(A)(2).

In past reports, we found the CPOA budget and approved staffing were adequate to meet the CPOA mission but emphasized the importance of filling vacant positions.  We were encouraged to note that during the IMR-15 reporting period, all approved investigative positions had been filled.  With the Lead Investigator's return to a full-time

role, the CPOA currently has all seven approved investigative positions occupied.  This was a major milestone. Unfortunately, on December 9, 2022, near the end of the last monitoring period, the Executive Director resigned, leaving the investigative agency without a supervisor, until February 6, 2023, when the Lead Investigator was again appointed as the Interim Executive Director, while also in the Lead Investigator's position.  Vacancies in a relatively small agency such as the CPOA often create serious issues.  The City and CPOA should be aware of developing issues created by this understaffing.  The City approved the hiring of an additional investigator position but has not authorized the posting of that position as of the writing of this report.

Most investigators are relatively new and going through a normal learning curve, gaining experience during recent reporting periods.  However, unfilled CPOA supervisory positions and the review of the stratified random sample of investigations make it clear that a staffing and time-management study is warranted for CPOA.

On January 19, 2023, near the end of the IMR-17 period, the City Council passed a new City Ordinance governing the Citizen Police Oversight Board, abolishing the board and ordering the re-constitution of a new "advisory" board to replace the existing board.  Based on our information, we anticipate that another approach will be tested, creating a more efficient working agency in the future.  We will continue to monitor closely these processes for issues and/or problems. As of the writing of this report, three new board members had been selected to serve, but one quickly resigned.  To date, the board has not sat for hearings, as they must establish a quorum, and they must be trained.  Neither requirement has been met.

CPOA had openings for two other approved and funded positions, a Community Engagement Specialist and a Policy Analyst.  The new City Ordinance removed the requirement for a Community Engagement Specialist position, which is still funded, and a new position of Deputy Director was established.  Another position, Contract Compliance Officer, was also created.  As of the end of this monitoring period, these positions remain vacant.  Filling these positions should be a priority.

Investigations and Reliability of Findings

Satisfactory cooperation between the CPOA and IAPS has been firmly rooted since the early days of the CASA.  In general, both agencies continue to respect each other's role and realize it is in their best interests and that of the CASA to cooperate and facilitate their intertwined missions and related areas of responsibility.  The CPOA has access to information and facilities reasonably necessary to investigate civilian complaints.

CPOA has the authority to recommend findings and disciplinary action in cases involving civilian complaint investigations.  The Superintendent of Reform, or a designated disciplinary authority, retains the discretion to impose discipline but is tasked with writing a non-concurrence letter to the CPOAB when there is disagreement with the CPOA recommendations.

As we noted in past IMRs, the investigations produced by the CPOA, once complaints are assigned, are generally thorough.  However, again this monitoring period, our stratified random sample revealed investigations that we deem to be deficient.  We discuss those below.

First, our review revealed that the sample of twenty CPOA cases included nine investigations that were administratively closed [IMR-18-57], [IMR-18-60], [IMR-18-62], [IMR-18-64], [IMR-18-67], [IMR-18-69], [IMR-18-70], [IMR-18-72], and [IMR-18-73].  We find those cases administratively closed to be appropriate.

That positive finding notwithstanding, we believe it is worth reiterating that the monitor has approved of the use of administrative closure in situations in which a preliminary investigation cannot minimally sustain the allegations contained in a complaint.  In a subsequent modification of that approval, the monitor allowed the use of an "unfounded" finding in lieu of "administrative closure" in cases in which a preliminary investigation shows, by clear and convincing evidence, that the conduct that is the subject of the complaint did not occur.

Regarding CPOA investigations, we found two to be deficient in that the investigative record was not sufficiently thorough because proper investigative steps were not taken or documented and/or the analysis of evidence was lacking [IMR-18-55], and [IMR-18-57].

The first case, [IMR-18-55], was the result of a third-party citizen complaint alleging that several officers mishandled a call for service.  The investigation was the result of three calls for service.  Apparently, the complainant, a postal carrier, and a female occupant of a specific apartment all called for service.  The complainant called and then requested that the mail carrier call to report a burglary of his residence, which was in progress.  It was reported that the burglars were still inside the apartment.  The third call was from a woman inside the apartment who reported a domestic dispute.  Upon arrival, the officers met with the male complainant, who advised that when he returned to his apartment, he found an unknown woman inside.  He alleged that he ordered her to leave but instead, she locked him outside and remained inside.  The police secured the complainant in a safe location a short distance from the residence and then approached tactically.  The officers knocked on the door, and the female who called the police answered the door and let the officers in.  The female provided a statement that the male was being evicted at the end of the month and that he allowed her and her boyfriend to stay there for the last week.  She advised her boyfriend contacted the landlord and made an application to assume the lease once the complainant was evicted.  She advised that today, the male came in and yelled that she owed him money and then started throwing her belongings outside.  She alleged he was aggressive, so when he took her plants and threw them outside, she locked the entrance door and then hid in the bathroom.  When the complainant was confronted with her statement, he advised he doesn't know the woman and that she doesn't live there.  He claimed she broke in when he was out.

The officers checked the door for damage consistent with breaking in, but none was observed.  The officers noted that the woman knew the complainant's name, the

particulars of his eviction, including the date of notices, and the fact that his landlord lives in Arizona.  Officers also noted that it appeared as though she moved her belongings into the residence.  They noted the couch was set up for sleeping, and several bags were stacked neatly next to the couch with female clothing and personal belongings, which she stated were hers.  The officers spoke with both parties separately, and their stories were diametrically in opposition.  However, because of the physical evidence and the fact that the woman knew specific facts that she shouldn't have if she broke into a residence, a credibility assessment was conducted.  The complainant's statement was less credible, as no physical evidence supported his claim.  The woman presented herself as calm and cooperative, and the complainant presented himself as agitated and uncooperative.  The officers convinced the female to take her belongings and go to a shelter.  She took the bags of things that she stated were hers and departed.

The complainant alleged that the officers treated him poorly by not allowing him inside his apartment to confront the woman and that they allowed her to take anything she wanted, including his money and personal property.  The investigation revealed that the officers had OBRDs recording during the entire situation, and at no time did they allow her to take anything but the bags that were undisputedly hers.  Those bags were already packed prior to the officers' arrival.  The investigation revealed that no policy violations were committed by any of the officers, as the manner in which they handled the call was appropriate and reasonable.  The CPOA investigation was extensive and considered most evidence.  During the investigation, the recording of the interview of the complainant started mid-sentence by the complainant.  Nothing in the recording or in the investigation documented that deficiency.  It can be reasonably assumed that the complainant called the investigator on the phone unexpectedly.  Therefore, the investigator was not prepared to have the interview recorded.  The investigator began recording the interview as quickly as possible.  It was previously recommended that in an unexpected event like this, the investigator should remedy the facts on the same record by explaining what occurred.  The purpose and importance of including information on the record, such as the date, time, who the participants are, and how the interview is being conducted, provides the credibility descriptors necessary to validate that recording.  The CPOA established a protocol to address this situation, but not until after the last site visit and after this statement had already been taken.  The investigation also failed to comply with the timelines established to complete an administrative investigation.  In this case, the complaint was assigned to the investigator on April 19, 2022, and was not completed until November 28, 2022, over 220 days.  This investigation was extensive, but the report documents that the first investigative step did not occur for over 90 days.  It is assumed that the investigator gathered supporting documentation and evidence during that 90 days, but there was no documentation to indicate the same, other than a document request dated April 19, 2022.  It should be noted that there were no sustained violations.  Therefore, the opportunity to discipline was not lost.  This investigation failed to comply with paragraphs 190 and 191 for the cited issues.

As discussed in IMR-17 and again in this report, the CPOA's caseload is excessive, and it does not appear reasonable that six investigators can thoroughly and timely investigate over 660 citizen complaints in a year.  We continue to recommend that a staffing study be conducted to establish a minimum staffing standard.

149

[IMR-18-57] This case was initiated as the result of a citizen complaint dated September 12, 2022.  A marked police vehicle, reportedly marked with the number 1804, cut the complainant off and almost hit her vehicle at an intersection.  She advised she honked her horn at the police vehicle.  She stated that her window was down, and the officer activated his overhead lights.  She reported that the officer rolled down his window and allegedly yelled and cursed at her.  The investigator contacted the complainant and conducted a recorded interview of the complainant via telephone.  It should be noted that the recording did not include any questions to the complainant as to the date and time this alleged incident occurred.  The original complaint was submitted via an online portal, and the date and time listed appear to be the specifics of when the complaint was made, not when the incident occurred.  No information was documented that the investigator asked or obtained that pertinent information, contrary to paragraph 190.  The investigator attempted to identify the vehicle by the provided number.  However, the APD Fleet Management Department indicated they do not have a vehicle with that number.  The complainant advised she was sure the vehicle was APD during a follow-up phone call.  Due to the fact that the investigator did not have enough information to investigate further, this case was Administratively Closed.  This investigation was reported on September 12, 2022, received September 16, 2022, assigned September 23, 2022, and was completed December 13, 2022.  The investigation considered all available evidence/information and was adequately documented.  Due to the fact that the Executive Director resigned on December 15, 2022, the final determination of this case was not completed until March 27, 2023, after an Interim Executive Director was installed in February 2023.  The review of this case is not in compliance with paragraph 191.

In summary, our analysis reveals investigations generally of appropriate quality.  Two of the 20 cases needed to be more thorough and to cover each salient point in question to meet the CASA's thoroughness and reliability requirements.  This represents a CPOA compliance rate of 90 percent, a vast improvement from the 50 percent compliance rate in IMR-17 but still short of the 95 percent required for compliance.

It may be that the deficiencies and shortcomings noted are related to the CPOA workload, the current staffing level of investigative personnel, the fact that the Executive Director resigned during the last reporting period, or the fact that the Interim Executive Director/Lead Investigator was the only supervisor.  The City should review these issues and implement changes (training, supervision, intervention, or other processes) designed to ameliorate similar issues in the future.

Timeliness of Investigations

As the monitoring team has noted since IMR-8, during our reviews of random samples of investigations, we look for and determine the following dates: complaint received, complaint assigned for investigation, initiation of investigation after assignment; completion of investigation, and chain of command review and notification of intent to impose discipline (where applicable).   During past site visits, the monitoring team has discussed with the CPOA the issue of delays between the date a complaint is received and the date it is assigned for investigation.  Although the CASA does not deal directly

with the issue of time to assign, the parties and the monitor agreed that a delay of more than seven working days for assignment is unreasonable and would affect the "expeditious" requirement of Paragraph 281.

During this reporting period, the monitoring team found six out of 20 randomly sampled investigations [IMR-18-55], [IMR-18-56], [IMR-18-57], [IMR-18-58], [IMR-18-61], and IMR-18-71], that exceeded the 120-day limit or the supervisory review period.  In [IMR-18-55], the investigation was completed 223 days after assignment and not reviewed for 70 additional days; in [IMR-18-56 ] the investigation was completed in 179 days and reviewed 101 days later; in [IMR-18-57] the investigation was completed in 84 days, but not reviewed until 104 days later; in [IMR-18-58] the investigation was completed in 124 days and reviewed 45 days later; in [IMR-18-61] the investigation was completed in 126 days and reviewed 56 days later; and [IMR-18-71] the investigation was completed in 124 days and reviewed three days later.  This constitutes a 70% compliance rate with investigative timelines, the same rate as in the last reporting period for the stratified random sample of cases.

The Executive Director of CPOA resigned effective December 9, 2022.  As of that date, the CPOA Investigative Agency maintained the Lead Investigator, as a supervisor but not as the person in charge.  As such, all investigations completed from December 9, 2022, through February 6, 2023, were placed in limbo, pending the appointment of an interim or permanent executive director.  An interim executive director was appointed February 6, 2023.  The interim Executive Director is also the Lead Investigator.  This situation led to a backlog of 43 cases, of which eight had recommended sustained allegations.  During a review of the electronic records of the 43 cases that were completed during this time, we noted there was no Executive Director.  Prior to the current Interim Executive Director's appointment, it was discovered that 11 of the 43 cases submitted during that time exceeded the 120 day investigative time limits.  The original backlog cases were reviewed and approved by the Interim Executive Director during this monitoring period.  The Interim Executive Director remains the only supervisor within the agency, so she continues to triage investigations that she believes initially show some merit.

A review of the electronic intake records indicated that numerous investigations that were active for more than 120 days from the end of this monitoring period are still pending.  According to the records provided, there are 51 cases pending that have exceeded the 120-day time limit (noted as a backlog by the monitoring team) and 57 cases in the review process.  In addition, there is also a current caseload of an additional 85 investigations, still within the time limit.  The current caseload for the CPOA investigators stands at 193.  As previously stated, staffing at CPOA is currently one supervisor, the Interim Executive Director, who is also the Lead Investigator, and six investigators.  Two of those investigators have taken extended time off for medical and military reasons, effectively further reducing the staffing personnel.  During this period, the staff that was present completed 172 investigations.  With current staffing, CPOA was only able to complete approximately one-half of the active caseload, which puts a great deal of stress on the investigators and reduces the agency's ability to address citizens' complaints.  We note that the City is working toward re-instituting an Advisory

Review Board and has approved the hiring of the Contract Compliance Officer, as well as the Executive Director and a Deputy Executive Director position.  However, these positions remain unfilled as of the writing of this report.  Supervision remains paramount in the proper management of any agency and is especially crucial in the process of complying with the CASA.  Proper supervision will be necessary to ensure the CPOA is operating at optimal efficiency.  It is predicted that the backlog will continue to increase until proper supervision and staffing are achieved.  The review of the CPOA Agency's timeliness in completing citizen complaint investigations demonstrates a significant deficiency in operational compliance with paragraph 181, more likely than not attributable in large part to staffing deficiencies.

Monitor's Note: The resignation of the Executive Director of CPOA during this period further added to the agency's inability to re-establish the mediation program, which should be considered a priority for the new administration and board once they are re-constituted.

### 4.7.256 Compliance with Paragraph 271:  CPOA Implementation

Paragraph 271 stipulates:

> **"The City shall implement a civilian police oversight agency ("the agency") that provides meaningful, independent review of all civilian complaints, serious uses of force, and officer-involved shootings by APD. The agency shall also review and recommend changes to APD policy and monitor long-term trends in APD's use of force."**

**Results**

| | |
|---|---|
| Primary: | **In Compliance** |
| Secondary: | **In Compliance** |
| Operational: | **Not In Compliance** |

***Recommendation for Paragraph 271:***

***4.7.256a: Reconstitute the CPOA Board.***

### 4.7.257 Assessing Compliance with Paragraph 272:  Independence and Accountability of CPOA

**Paragraph 272 is self-monitored by the City.**

### 4.7.258 Assessing Compliance with Paragraph 273:  Requirements for Service of CPOA Members

Paragraph 273 stipulates:

**"The City shall ensure that the individuals appointed to serve on the agency are drawn from a broad cross-section of Albuquerque and have a demonstrated commitment to impartial, transparent, and objective adjudication of civilian complaints and effective and constitutional policing in Albuquerque."**

## Methodology

In a recently enacted city ordinance governing the Board selection process, the prior Board was abolished, and modifications were made to criteria for Board members to better align with CASA requirements.  The ordinance change also restricts employment of Board members by APD for up to three years before Board membership appointment, successfully passing a background check, and a residency within the City of Albuquerque.  During this reporting period, three of the required five Board members were selected by a vetting process formulated and managed by staff from the Albuquerque City Council (one later resigned, leaving only two members).  There is no established timeline for completing Board selection.

The monitoring team urges the City to move forward expeditiously and finalize selections for remaining Board members, and in their selection, give serious and careful consideration to selecting  Board members demonstrating diversity, representativeness, understanding of Board member duties and responsibilities, and capacity to perform Board member functions equitably and fairly.

**Results:**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 273:*

*4.7.258a: Council staff should move quickly to select remaining Board members and apply selection processes for CPOA Board members to ensure diversity and qualifications of members prepared to perform Board duties.*

**4.7.259 Assessing Compliance with Paragraph 274:  CPOA Pre-Service Training**

Paragraph 274 stipulates:

**"Within six months of their appointment, the City shall provide 24 hours of training to each individual appointed to serve on the agency that covers, at a minimum, the following topics:**

**a)  This Agreement and the United States' Findings Letter of April 10, 2014;**

153

**b)  The City ordinance under which the agency is created;**
**c)  State and local laws regarding public meetings and the conduct of public officials;**
**d)  Civil rights, including the Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable uses of force;**
**e)  All APD policies related to use of force, including policies related to APD's internal review of force incidents; and**
**f)  Training provided to APD officers on use of force."**

## Methodology

During this reporting period, because the Board appointments were not completed in a timely manner, limited training was provided to meet this paragraph's requirements. However, staff completed a revised curriculum covering a significant portion of these training requirements.

The monitoring team appreciates the progress made by the Interim CPOA Director, in consultation with APD, to revise the 24 hours of required training to better align with the duties and responsibilities of CPOA Board members and to incorporate changes into training resulting from the new ordinance.  The monitoring team understands these efforts are ongoing, working cooperatively with APD, the City Attorney's Office, and the City Council staff to complete all required curricula.  Once Board appointments are completed, the monitoring team strongly encourages CPOA staff to have a timeline to fully implement training and update tracking and reporting mechanisms for Board training completion.

Primary:        **In Compliance**
Secondary:   **Not In Compliance**
Operational:  **Not In Compliance**

### Recommendation for Paragraph 274:

### 4.7.259a: The CPOA director and City Attorney should continue completing revisions to the 24-hour training to align with Board member roles and responsibilities as defined in the CASA and the revised city ordinance governing CPOA operations.

### 4.7.260 Assessing Compliance with Paragraph 275:  CPOA Annual Training

Paragraph 275 stipulates:

**"The City shall provide eight hours of training annually to those appointed to serve on the agency on any changes in law, policy, or training in the above areas, as well as developments in the implementation of this Agreement."**

**Methodology:**

This requirement was not addressed during this reporting period because the required new Board appointments were not completed. The City submitted a draft revision of this 8-hour training, and the monitoring team provided feedback. The monitoring team urges the City and CPOA to finalize curriculum changes and be prepared to deliver the training promptly once new Board member appointments are completed. The monitoring team was advised that the training will include quarterly briefings by the APD Academy Commander on changes in law, policy training, and procedures and that legal updates will be provided through the Document Management System (Power DMS). Board members are also scheduled to attend training offered by the National Association of Civilian Oversight Law Enforcement (NACOLE).

Primary:        **In Compliance**
Secondary:  **Not In Compliance**
Operational**: Not In Compliance**

*Recommendation for Paragraph 275:*

*4.7.260a:The City Attorney should complete revisions to the 8-hour required training to better align with Board roles and responsibilities with the CASA and the revised city ordinance governing CPOA. Once Board members are appointed, the City should move quickly to deliver the required training.*

**4.7.261 Assessing Compliance with Paragraph 276:  CPOA Ride-Alongs**

Paragraph 276 stipulates:

> **"The City shall require those appointed to the agency to perform at least two ride-alongs with APD officers every six months."**

**Methodology:**

Because Board appointments were not completed, the ride-along requirements were not addressed. Two of the three appointed members completed one ride-along during this reporting period. The monitoring team expects the CPOA Director and the soon-to-be-appointed Contracts Compliance Officer to develop adequate tracking and reporting mechanisms to ensure compliance with this paragraph once all Board members are appointed, and training is finalized.

Primary**:        In Compliance**
Secondary:  **In Compliance**
Operational**: Not In Compliance**

*Recommendations for Paragraph 276:*

*4.7.261a: The City should move as quickly as possible to fill positions at the CPOA and the CPOA Board.*

*4.7.261b: Board members, once appointed, should complete the requirements of this paragraph.*

**4.7.262 Assessing Compliance with Paragraph 277:  CPOA Authority and Resources to Make Recommendations**

Paragraph 277 stipulates:

> **"The City shall provide the agency sufficient resources and support to assess and make recommendations regarding APD's civilian complaints, serious uses of force, and officer-involved shootings; and to review and make recommendations about changes to APD policy and long-term trends in APD's use of force.  Nothing in this paragraph prohibits the City from requiring the Board and the Agency to comply with City budgeting, contracting, procurement, and employment regulations, policies, and practices**."

**Results**

Primary:       **In Compliance**
Secondary:   **In Compliance**
Operational:  **Not In Compliance**

*Recommendation for Paragraph 277:*

*4.7.262a: A Memorandum of Understanding (MOU) between the City, CPOA/CPOAB, and the APOA on access to OIS/SUOF materials should be finalized and implemented, or some other solution reached in order to allow the CPOAB more timely access to materials needed for review of OIS and SUOF incidents/investigations.  This is a central component of the CASA's community oversight processes, and the monitor notes that this recommendation has been made in multiple monitor's reports and has yet to be addressed.*

**4.7.263 Assessing Compliance with Paragraph 278:  CPOA Budget and Authority**

**Paragraph 278 is self-monitored by APD.**

**4.7.264 Assessing Compliance with Paragraph 279:  Full-Time CPOA Investigative Staff**

Paragraph 279 stipulates:

156

> **"The agency shall retain a full-time, qualified
> investigative staff to conduct thorough, independent
> investigations of APD's civilian complaints and review
> of serious uses of force and officer-involved shootings.
> The investigative staff shall be selected by and placed
> under the supervision of the Executive Director.  The
> Executive Director will be selected by and work under
> the supervision of the agency.  The City shall provide
> the agency with adequate funding to ensure that the
> agency's investigative staff is sufficient to investigate
> civilian complaints and review serious uses of force and
> officer-involved shootings in a timely manner."**

## Results

The monitoring team notes that CPOA continues to struggle to meet CASA-
required investigative timelines.  Based on our experience, this is most
probably a staffing issue; however, a professional staffing assessment would
be required to validate this opinion.  We recommend that the City consider
such a staffing assessment at its earliest convenience.

Primary:       **In Compliance**
Secondary:  **In Compliance**
Operational**:  Not In Compliance**[87]

***Recommendation for Paragraph 279:***

***4.7.264a: Complete a valid and reliable staffing study of CPOA, and
staff accordingly.***

**4.7.265 Assessing Compliance with Paragraph 280:  Receipt and Review of
Complaints by CPOA**

**Paragraph 280 is self-monitored by APD.**

**4.7.266 Assessing Compliance with Paragraph 281:  Prompt and Expeditious
Investigation of Complaints**

Paragraph 281 stipulates:

> **"Investigation of all civilian complaints shall begin as
> soon as possible after assignment to an investigator
> and shall proceed as expeditiously as possible."**

## Results

---

[87] The investigative staff continues to struggle to meet CASA requirements.  At this point, we cannot state
it is specifically because of too few staff, but it is something the City should consider looking into as
operational compliance is impacted.

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational**:  Not In Compliance**

***Recommendations for Paragraph 281:***

***4.7.266a: Ensure all investigations are assigned within the agreed-upon seven days.***

***4.7.266b: Ensure investigation reports adequately document the date the case is assigned to the investigator, as well as all investigative steps.***

***4.7.266c: Immediate action should be taken to adequately staff the CPOA agency and special attention must be taken to complete all the delinquent investigations currently assigned, along with all the new complaints.***

***4.7.266d: Immediate action should be taken to fill the vacant supervisory positions to enhance the overall efficiency of the Agency.***

***4.7.266e: Efforts should be made to eliminate the backlog of cases that have exceeded the 120-day time limit for investigations to be completed as soon as possible.***

**4.7.267 Assessing Compliance with Paragraph 282 - 284**

**Paragraphs 282 – 284 are self-monitored by APD.**

**4.7.270 Assessing Compliance with Paragraph 285:  Authority to Recommend Discipline**

Paragraph 285 stipulates:

> **"The Executive Director, with approval of the agency, shall have the authority to recommend disciplinary action against officers involved in the incidents it reviews.  The Bureau of Police Reform shall retain discretion over whether to impose discipline and the level of discipline to be imposed.  If the Bureau of Police Reform decides to impose discipline other than what the agency recommends, the Bureau of Police Reform must provide a written report to the agency articulating the reasons its recommendations were not followed."**

**Results**

Primary:      **In Compliance**
Secondary:   **In Compliance**
Operational**:  In Compliance**

**4.7.271 – 4.7.275 Assessing Compliance with Paragraph 286 - 290**

**Paragraphs 286 – 290 are self-monitored by APD.**

**4.7.276 Assessing Compliance with Paragraph 291:  Community Outreach for the CPOA**

Paragraph 291 stipulates:

> **"The City shall require the agency and the Executive Director to implement a program of community outreach aimed at soliciting public input from broad segments of the community in terms of geography, race, ethnicity, and socio-economic status."**

**Results**

Primary:        **In Compliance**
Secondary:   **In Compliance**
Operational**:  In Compliance**

**4.7.277 Assessing Compliance with Paragraph 292:  Semi Annual Reports to Council**

Paragraph 292 stipulates:

> **"The City shall require the agency to submit semi-annual reports to the City Council on its activities, including:**
>
> **a)  number and type of complaints received and considered, including any dispositions by the Executive Director, the agency, and the Bureau of Police Reform;**
> **b)  demographic category of complainants;**
> **c)  number and type of serious force incidents received and considered, including any dispositions by the Executive Director, the agency, and the Bureau of Police Reform;**
> **d)  number of officer-involved shootings received and considered, including any dispositions by the Executive Director, the agency, and the Chief Bureau of Police Reform;**
> **e) policy changes submitted by APD, including any dispositions by the Executive Director, the agency, and the Chief;**
> **f)  policy changes recommended by the agency, including any dispositions by the Chief;**
> **g)  public outreach efforts undertaken by the agency and/or Executive Director; and**
> **h)  trends or issues with APD's use of force, policies, or training."**

159

**Methodology**

Due to staffing changes and shortfalls and a vacuum in leadership at the onset of this reporting period, CPOA could not complete the semi-annual report.  The monitoring team expects the City to provide the requisite staffing resources to ensure CPOA can meet these related requirements moving forward.

**Results**

> **Primary:        In Compliance**
> **Secondary:    In Compliance**
> **Operational:  Not In Compliance**

***Recommendation for Paragraph 292:***

***4.7.277 (a) The City and the City Council should address staffing shortages and appoint a permanent CPOA Director to provide the resources needed for the CPOA to carry out its mission and comply with CASA requirements.***

**4.7.278 Assessing Compliance with Paragraph 320: Notice to Monitor of Officer Involved Shootings**

Paragraph 320 stipulates:

> **"To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident review and disciplinary hearings. APD shall notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer."**

**Results**

> Primary:        **In Compliance**
> Secondary:  **In Compliance**
> Operational: **In Compliance**

**5.0 Summary**

APD continues to make steady operational compliance gains, with "new highs" in Operational Compliance since IMR-14.  Operational Compliance for IMR-18 is at 94 percent.  Our review of IAFD investigations by EFIT graduates showed no issues with the requirements of the CASA during this reporting period.  This bodes well for the

160

eventual ability of APD to produce professionally standard force investigations.  Training standards at APD continue to meet the requirements of the CASA.  Further, APD personnel continued to perform all OBRD requirements in compliance with the CASA.

As noted in our Executive Summary, issues are evident at the CPOA and the CPOA Executive Board.  These issues require careful assessment and well-thought-out solutions related to staffing, training, and process-oriented change.  We also have identified critical lapses in the quality of the review of OISs at the APD command level, including at the FRB, during the last two reporting periods (IMR-17 and IMR-18).  These high-risk critical tasks are the epicenter of the CASA's change mandate.  A renewed focus relating to oversight of OIS incidents is required.  We note that we have approved APD's policies and training processes related to use of force events.  What remains to be achieved is a high-level internal focus on OIS review and oversight capable of routinely assessing OIS events and establishing factual and policy-based decision-making. As in the past, we look forward to working with APD on these outstanding issues.