IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                     **1:14-cv-1025 JB/SMV**

THE CITY OF ALBUQUERQUE,

        Defendant,

    v.

THE ALBUQUERQUE POLICE
OFFICERS' ASSOCIATION,

        Intervenor.

## JOINT MOTION FOR TERMINATION

Plaintiff, the United States of America and Defendant, City of Albuquerque, by and through undersigned counsel, pursuant to Fed. R. Civ. P. 41 and the terms of the Court Approved Settlement Agreement ("CASA"), hereby request that the Court terminate the CASA for the following reasons.

## BACKGROUND

This lawsuit was filed in 2014 after the United States determined that the Albuquerque Police Department ("APD") had engaged in a pattern or practice of use of excessive force, including deadly force, in violation of the Fourth Amendment to the United States Constitution. See Findings Letter 1 (Doc. No. 1-1). The Parties worked together to craft a solution to the issues identified by the United States and agreed on the terms of a settlement agreement–the Court Approved Settlement Agreement or CASA–which was submitted to the Court for approval

on November 14, 2014.  See Joint Mot. Requesting Approval and Entry of Settlement Agrmt. (Doc. No. 9).

The purpose of the CASA is to "ensure that [APD] delivers police services that comply with the Constitution and laws of the United States and to further their mutual interests." Third Amended and Restated CASA ("3d Am. CASA") at 1 (Doc. No. 988-2).[1]  "The provisions of [the] Agreement are designed to ensure police integrity, protect officer safety, and prevent the use of excessive force, including unreasonable use of deadly force, by APD."  Id.  To achieve these goals, APD was required to "implement force policies, training, and accountability systems to ensure that force is used in accordance with the Constitution and laws of the United States, and that any use of unreasonable force is identified and responded to appropriately." Id. ¶13.  In addition, APD was required to "ensure that officers use non-force techniques to effectively police, use force only when objectively reasonable under the circumstances, and de-escalate the use of force at the earliest possible moment." Id.

Primarily, the CASA establishes requirements related to the use of force by APD officers. In particular, Paragraph 14 of the CASA establishes specific parameters for the use of force, including requirements for de-escalation and prohibitions on specific types of force. 3d Am. CASA ¶ 14 (Doc. No. 988-2).  Paragraph 15 requires APD to adopt an overarching use of force policy. Id. ¶ 15.  In addition to these general concepts, the use of force section includes specific requirements and guidelines for the use of firearms, the use of electronic control weapons, crowd

---

[1] All references herein to the CASA are to the Parties' requested Third Amended and Restated Court-Approved Settlement Agreement, filed on April 12, 2023 (Doc. 988-2), and approved by Court order on June 2, 2023 (Doc. 996).

control, use of force reporting, and force review and investigation. The CASA also includes

sections:

- governing specialized units, including APD's specialized tactical and canine units;

- establishing requirements for crisis intervention;

- establishing procedures for the development of policies and requirements for officer training;

- governing the handling of complaints of misconduct;

- establishing requirements for staffing, management and supervision;

- establishing requirements for recruitment, selection and promotion of officers; and

- establishing requirements for officer assistance, community engagement, and civilian oversight.

See 3d Am. CASA at ii-iii (Doc. No. 988-2).

From the outset, the Parties contemplated the use of an Independent Monitor to determine

compliance with the CASA. See Joint Mot. Requesting Approval and Entry of Settlement

Agrmt. at 88 (Doc. No. 9-1). In order to facilitate selection of an Independent Monitor, the

Parties jointly published a Request for Information on October 31, 2014. See Joint Mot.

Requesting Order Appointing Dr. James Ginger as the Monitor at 1 (Doc. No. 76). After an

exhaustive review of multiple highly qualified candidates, the parties stipulated to the

appointment of Dr. James Ginger. See id.

The original version of the CASA had 276 paragraphs that were rated by the Monitor.[2]
As contemplated by the Parties' agreement, Dr. Ginger proposed a methodology for evaluating
compliance with the rated requirements of the CASA.  See CASA ¶¶ 300-303 (Doc. No. 9-1).
The Monitor's methodology utilizes three levels to assess the City's compliance with the
requirements of the CASA – primary, secondary, and operational.  "To obtain primary
compliance, APD must have in place operational policies and procedures designed to guide
officers, supervisors, and managers in the performance of the tasks outlined in the CASA."  See,
e.g., Monitor's 21st Rep. at 6 ("IMR-21") (Doc. No. 1095).[3]  "Secondary compliance is attained
by providing acceptable training related to supervisory, managerial, and executive practices
designed to (and effective in) implementing the policy as written."  Id.  "Operational compliance
is attained at the point that the adherence to policies is apparent in the day-to-day operation of
the agency."  Id. at 6-7.  The Monitor has imposed a 95% compliance threshold for operational
compliance for those paragraphs that are susceptible to quantitative evaluation. See
Methodology, available at https://www.justice.gov/usao-nm/file/796891/dl?inline=.

**A.  History of CASA Compliance Up to the Monitor's Eighteenth Report.**

Although the City rather quickly attained high levels of primary and secondary
compliance, the City initially faced several difficulties in achieving operational compliance with

---

[2] Through various iterations of the CASA, several requirements were removed and some were
modified to be non-rated.  In 2017, 2019, and 2023, the Parties submitted the First, Second, and
Third Amended CASAs, respectively.  See First Amended and Restated Court-Approved
Settlement Agreement (Doc. No. 247-1), Second Amended and Restated Court-Approved
Settlement Agreement (Doc. No. 365-1), 3d Amended CASA (Doc. No. 988-2).  The Third
Amended CASA reduced the number of rated paragraphs to 271.
[3] Page citations refer to ECF numbering.

CASA requirements.  Additionally, the City struggled to sufficiently and timely complete use of force investigations.  This led to an agreement under which the City brought in an External Force Investigation Team ("EFIT") to assist APD with completing Level 2 and 3 force investigations and improve the overall quality of APD's force investigations, as well as to investigate a backlog of force incidents that APD had failed to investigate itself.[4]  See Am. Stipulated Order Est. EFIT (Doc. No. 906).  However, beginning with the Monitor's 14th Report ("IMR-14"), the City made consistent progress toward achieving operational compliance, achieving 62% operational compliance in IMR-14, increasing to 70% in IMR-15, 80% in IMR-16, 92% in IMR-17, and 94% in IMR-18.

Between IMR-13 and IMR-14, the City improved in the areas of firearms training and tracking and began to benefit from the work of APD's Performance Metrics Unit.  See IMR-14 at 329-330 (Doc. No. 872). Between IMR-14 and IMR-15, the City strengthened its efforts on training and policy development.  See IMR-15 at 331 (Doc. No. 910). Between IMR-15 and IMR-16, the Monitor noted significant improvements in the Special Operations Division, the Special Investigations Division, Citizen Policing Councils, and community outreach, as well as officer-focused initiatives such as recruitment and behavioral support. See IMR-16 at 312 (Doc. No. 959).   Moreover, nearly all requirements related to On-Body Recording Devices ("OBRDs") reached operational compliance in IMR-16.  Overall, in IMR-16, the Monitor noted a marked change within APD:

---

[4] The EFIT team was later tasked with investigating backlog cases.

> The monitoring team is acutely aware of the effort APD undertook to generate these positive findings.  We also detect a substantial shift in the mind-set and vision at the executive and command levels at APD related to the oversight of use of force and in-field delivery of policing services.

Id. at 312.

In IMR-17, the Monitor made several observations regarding APD's progress.  The Monitor noted APD had moved "several of the more difficult compliance processes" into operational compliance.  IMR-17 at 3 (Doc. No. 990).  It also noted that all training requirements, as well as all paragraphs regarding the Crisis Intervention Unit, were now in operational compliance.  Id.  The Monitor further stated that "IAFD [Internal Affairs Force Division] and EFIT [External Force Investigation Team] continue to generate industry-standard force investigations, and the rate of uses of force has remained relatively stable over the last three reporting periods, with these levels significantly lower than three years ago."  Id.  The Monitor commented that since IMR-14, APD had demonstrated "a new attitude" towards CASA compliance, indicating that the agency "is committed to full compliance with the CASA."  Id. at 194.  The Monitor concluded that APD has reached a "significant milestone" in this litigation, with primary and secondary compliance findings at 100% and operational compliance "at a new high" of 92%.  Id. at 193.  In IMR-17, the City also achieved operational compliance with all paragraphs related to behavioral health training, id. at 86-94, as well as duties of supervisors, id. at 132-140.

At the same time the City was reaching operational compliance in new areas, it was also maintaining operational compliance it had previously achieved in other areas. Starting in August

2022 and pursuant to Paragraph 302 of the CASA[5], the Parties agreed that the Monitor no longer

needed to assess paragraphs with which the City had sustained operational compliance for two or

more years.  The Parties' first such agreement included some or all of the CASA paragraphs

related to the Multi-Agency Task Force, Specialized Units, Behavioral Health Training, Field

Training Evaluation Program, Public Information on Citizen Complaints, Recruiting, Hiring,

Performance Evaluations and Promotions, and Officer Assistance and Support.  See Joint Notice

of the Parties' Agrmt. for the Monitor to Refrain from Conducting Compliance Reviews of

Certain CASA Rqmts. (Doc. No. 948). Instead of the Monitor, APD began conducting self-

monitoring for the identified paragraphs.  Id. at 4.  Thereafter, the parties agreed to suspend

monitoring for many additional paragraphs. See Am. Joint Notice of the Parties' Second Agrmt.

for the Monitor to Refrain from Conducting Compliance Reviews of Certain CASA Rqmts.

(Doc. No. 979) (suspending monitoring of certain paragraphs regarding use of firearms and

electronic control devices, certain paragraphs regarding specialized tactical units, policy and

training, and nearly all paragraphs regarding Crisis Intervention, Crisis Prevention, Policy

Implementation, and the Mental Health Response Advisory Committee); Joint Notice of Parties'

Third Agrmt. for the Monitor to Refrain from Conducting Compliance Reviews of Certain

CASA Rqmts. (Doc. No. 1009) (suspending monitoring of various paragraphs regarding use of

force investigations, Community Engagement and Oversight, and OBRDs); Joint Notice of the

Parties' Fourth Agrmt. for the Monitor to Refrain from Conducting Compliance Reviews of

---

[5] Paragraph 302 states: "[w]here the Parties agree, the Monitor shall refrain from conducting a compliance review of a requirement previously found by the Monitor to be in sustained compliance for at least two years pursuant to audits or reviews, or where outcome assessments or other information indicate that the outcome intended by the requirement has been achieved."  3d Amended CASA ¶ 302 (Doc. No. 988-2).

Certain CASA Rqmts. (Doc. No. 1041) (suspending monitoring of certain elements of use of force reporting, reporting misconduct, Electronic Control Weapons, and OBRDs); Joint Notice of the Parties' Fifth Agrmt. for the Monitor to Refrain from Conducting Compliance Reviews of Certain CASA Rqmts. (Doc. No. 1065) (suspending monitoring of certain crisis prevention and intervention paragraphs and certain paragraphs regarding use of force investigations); Joint Notice of the Parties' Sixth Agrmt. for the Monitor to Refrain from Conducting Compliance Reviews of Certain CASA Rqmts. (Doc. No. 1074) (suspending monitoring of additional investigation paragraphs as well as paragraphs regarding the Early Intervention System ("EIS")); Joint Notice of the Parties' Seventh Agrmt. for the Monitor to Refrain from Conducting Compliance Reviews of Certain CASA Rqmts. (Doc. No. 1085) (suspending monitoring of APD's misconduct investigations); Joint Notice of the Parties' Eighth Agrmt. for the Monitor to Refrain from Conducting Compliance Reviews of Certain CASA Rqmts. (Doc. No. 1097) (suspending monitoring of certain use of force requirements and remaining EIS paragraphs). Based upon the Parties' agreement, the City assesses its own compliance with these CASA requirements and reports the results to the Court, the United States, and the public. See, e.g., City's Notice of Filing Self-Assessment Report (Doc. No. 974). Currently, approximately 85% of the CASA's original rated paragraphs are in self-monitoring.

Based on the City demonstrating continued compliance with paragraphs in self-assessment, on October 27, 2023, the Parties jointly moved for the Court to terminate certain portions of the CASA. See Joint Mot. for Partial Termination (Doc. No. 1022); see also Order Granting Joint Mot. (Dec. 8, 2023) (Doc. No. 1027). In the Joint Motion, the United States stated, "[t]he City has demonstrated that it has implemented sustainable reforms in the sections

and subsections of the CASA identified in the joint motion." See Joint Mot. at 6 (Doc. No. 1022). The Monitor noted, "[t]he City of Albuquerque continues to exhibit behavior that indicates a commitment to full compliance with the requirements of the CASA, resulting in strong progress during the most recent reporting periods." Id. at 8. The Monitor further noted the newly compliant paragraphs were "key elements of long term 'full and effective compliance.'" Id. After their first Joint Motion for Partial Termination, the Parties identified additional sub-sections appropriate for termination. See Second Joint Mot. for Partial Termination (Doc. No.1055); Third Joint Mot. for Partial Termination (Doc. No. 1075); Fourth Joint Motion for Partial Termination (Doc. No. 1096). As of today's date, the Court has granted the Parties' motions and terminated over two-hundred paragraphs, or approximately 75% of the CASA.

In addition, the City has shown its ability to conduct its own use of force investigations without outside assistance. See Notice Regarding Transition of Investigation of All New Level 2 and Level 3 Force Investigations from [EFIT] Back to the [APD IAFD] ("Notice Re: Transition") (Doc. No. 1029). As noted above, pursuant to an agreement between the Parties set forth in a Stipulated Order, EFIT served as a contractor with the City. See Am. Stipulated Order Est. [EFIT] (Doc. No. 906). EFIT jointly conducted active investigations with IAFD investigators, provided training and mentoring to IAFD investigators, and gave feedback on when IAFD investigators were ready to conduct independent investigations. In addition, EFIT completed a backlog of force investigations that APD had failed to do itself. In the Notice, the Parties agreed, along with approval by EFIT and the IMT, "that IAFD had demonstrated its

capacity to complete investigations in a timely, thorough, and fair manner." Notice Re: Transition at 6 (Doc. No. 1029).

**B. The Monitor's Eighteenth Report**

On November 8, 2023, the Monitor filed IMR-18, which covered the City and APD's compliance efforts from February 1, 2023, to July 31, 2023. See IMR-18 (Doc. No. 1023). In IMR-18, the City achieved operational compliance with 256, or 94%, of the CASA's ratable paragraphs. See id. at 3. Most notably, the City achieved operational compliance with all of the requirements that measure use of force *outcomes* (Paragraphs 14, 15, 24-29). Id. at 10, 11, 18-20. The City also achieved operational compliance with paragraphs that set benchmarks for OBRD use. Further, the City achieved operational compliance with paragraphs that help recruit, retain, train, and care for high-quality officers. Additionally, the City established systems for reliable, timely, and fair investigation of lower-level force, higher-level force, and misconduct. In IMR-18, the City also achieved operational compliance with paragraphs regarding application of discipline, including implementation of a disciplinary matrix. Finally, the City achieved operational compliance with paragraphs related to non-force issues such as citizen and community engagement, as well as paragraphs addressing officers' response to especially vulnerable citizens through behavioral health training and specialized units.

IMR-18 acknowledged the "steady upward trend in Operational Compliance starting in IMR-14 and continuing through IMR-18." See IMR-18 at 4 (Doc. No. 1023). The Monitor noted training reflected "'best standards' of training needs," and praised the force investigations conducted by APD independent of its external contractor. Id.

In IMR-18, 13 paragraphs remained in secondary compliance and two in primary compliance. Three paragraphs in secondary compliance directly related to APD: Paragraphs 73, 78, and 201.

Paragraph 73 provides:

> For administrative investigations, where the findings of the Force Investigation Section investigation are not supported by a preponderance of the evidence, the Internal Affairs Division commanding officer shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation report. The commanding officer of the Internal Affairs Division shall take appropriate action to address any inadequately supported determination and any investigative deficiencies that led to it. The Internal Affairs Division commanding officer shall be responsible for the accuracy and completeness of investigation reports prepared by the Internal Affairs Division.

3d Am. CASA ¶ 73 (Doc. No. 988-2).  The IMT found APD complied with all requirements of Paragraph 73 in all but one of the 21 cases sampled for IMR-18, resulting in a compliance rating of just below the 95% threshold imposed by the Monitor's methodology.  See IMR-18 at 53.

Paragraph 78 establishes requirements for the operation of APD's Force Review Board, as follows:

> APD shall develop and implement a Force Review Board to provide management oversight of tactical activations and Level 2 and Level 3 uses of force. The Chief or their designee shall appoint the Force Review Board members. The Force Review Board shall:
> a) review all uses of lethal force, all in-custody deaths, and samples of other Level 3 uses of force, Level 2 uses of force, and tactical activations within 60 days of receiving the completed reports;
> b) hear the presentation from the Internal Affairs Division or Special Operations Division chain of command and discuss as necessary to gain a full understanding of the facts of the incident;
> c) determine whether the incident raises misconduct, policy, training, equipment, or tactical concerns, and refer such incidents to the appropriate unit within APD to ensure the concerns are resolved;
> d) document its findings and recommendations within 15 business days of the Force Review Board presentation; and

> e) review and analyze use of force data, on at least a quarterly basis, to determine significant trends and take management action.

3d Am. CASA ¶ 78 (Doc. No. 988-2).  In IMR-18 the Monitor found that FRB had "several areas of strong performance," but also "additional areas of concern related to [its] responsibility to provide management oversight, particularly with the use of deadly force."  IMR-18 at 58 (Doc. No. 1023).  The Monitor's criticism focused on the FRB's handling of particular force incidents.

Paragraph 201 provides:

> APD shall ensure that discipline for sustained allegations of misconduct is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently.

3d Am. CASA ¶ 201 (Doc. No. 988-2).  In IMR-18, the Monitor reviewed 32 discipline cases and found three to be deficient, leading to a rating of 91% operational compliance—just below the 95% requirement.  See IMR-18 at 107-118 (Doc. No. 1023).

The remaining paragraphs in secondary compliance in IMR-18 (Paragraphs 183, 190, 191, 198, 271, 273, 274, 276, 277, 279, 281, 292)[6]—all related to the Civilian Police Oversight Agency ("CPOA") and Civilian Police Oversight Advisory Board ("the Board").  The CPOA is an independent agency responsible for investigating civilian complaints against the City.  The Board and its functions are incorporated into City ordinance.  See Albuquerque City Ordinance

---

[6] Several of these paragraphs contain requirements as to APD; however, the IMT specifically found APD was compliant with its responsibilities under these paragraphs.  See, e.g., IMR-18 at 100 (Doc. No. 1023) ("Our review indicated that only CPOA experienced issues with compliance with this paragraph [183] during this reporting period.").

Section 9-4-1-1.[7]  In IMR-18, the Monitor found that CPOA investigations generally produced "reliable findings."  See IMR-18 at 98 (Doc. No. 1023).  Secondary compliance for CPOA paragraphs was largely based on failures to meet timelines for investigation and not the quality of the investigations.  See id. at 99.

IMR-18 is an important benchmark for this case, because it marks a period of sustained compliance with the terms of the CASA that APD has maintained until the present time.  In the Monitor's Nineteenth Report ("IMR-19"), all paragraphs directly related to APD were found to be in operational compliance, along with several paragraphs regarding the CPOA and the CPOAB.  See IMR-19 (Doc. No. 1054).  In the Monitor's Twentieth Report ("IMR-20"), the City achieved 99% operational compliance, with only four paragraphs in secondary compliance, all of which related to the timeliness of CPOA investigations.  See IMR-20 (Doc. No. 1073). Notably, the Monitor continued to recognize the quality and adequacy of CPOA investigations, despite continued timeliness issues.

### C. The Monitor's Twenty-First Report

In the Monitor's Twenty-First Report ("IMR-21"), filed on April 14, 2025 (Doc. No. 1095), all paragraphs previously rated as in operational compliance remained so, but the paragraphs regarding timeliness of CPOA investigations continued to be in only secondary compliance.  The Monitor noted, however, that the CPOA had developed a "triage" protocol,

---

[7] In January 2023, the City abolished the current Board and re-established it under a new ordinance. See IMR-18 at 149 (Doc. No. 1023).  Throughout 2023, the City worked to reconstitute the Board. As of January 2024 (after the filing of IMR-18), the Board was fully staffed.  See IMR-19 at 104 ("As of the end of this monitoring period, the City Council has appointed all five members to the new board.").

whereby it prioritized cases more likely to have sustained findings.  Id. at 27.  Because of this

protocol, no opportunities to take corrective action were lost due to a failure to complete the

investigation of a sustained case within required timelines.  Id.  Thus, the untimeliness of some

CPOA investigations did not preclude officers from being disciplined. All four paragraphs that

remain in secondary compliance today stem from the same issue of untimely CPOA

investigations.

<strong>LEGAL ANALYSIS</strong>

Paragraph 342 of the CASA governs termination of the instant lawsuit and provides:

> The City will endeavor to reach full and effective compliance with this Agreement
> within four years of its Effective Date. The Parties agree to jointly ask the Court to
> terminate this Agreement after this date, provided that the City has been in full and
> effective compliance with this Agreement for two years. "Full and Effective
> Compliance" shall be defined to require sustained compliance with all material
> requirements of this Agreement or sustained and continuing improvement in
> constitutional policing, as demonstrated pursuant to the Agreement's outcome
> measures.

3d Am. CASA ¶ 342 (Doc. No. 988-2).  The Parties agree that the City has achieved sustained

and continuing improvement in constitutional policing for two years, such that termination is

appropriate at this time.

**I.     AS OF IMR-18, THE CITY HAD ACHIEVED FULL AND EFFECTIVE
COMPLIANCE BY DEMONSTRATING SUSTAINED AND CONTIUING
IMPROVEMENT IN CONSTITUTIONAL POLICING.**

The CASA provides for a finding of full and effective compliance where the City

demonstrates "sustained and continuing improvement in constitutional policing, as demonstrated

pursuant to the Agreement's outcome measures." See 3d Am. CASA ¶ 342 (Doc. No. 988-2).

The CASA's outcome measures are identified in Paragraph 298, which requires measurement of

14

data related to use of force encounters, specialized unit activations, crisis intervention measures, recruitment, force reviews, training, officer assistance, supervision, citizen complaints, internal investigation, and discipline.  See id. ¶ 298.  APD reports on these outcomes and publishes this data on its website.  See https://www.cabq.gov/police/documents-related-to-apds-settlement-agreement.  The data establishes that APD has demonstrated sustained and continuing improvement in constitutional policing in all areas deemed material by the CASA.

*298(a)- Use of Force Encounters:*

The heart of this case has always been officers' use of force, and the CASA is explicitly aimed at "prevent[ing] the use of excessive force, including unreasonable use of deadly force." 3d Am. CASA at 6 (Doc. 988-2).  Recent data shows that APD has vastly improved its use of force in a constitutional manner since the start of this case, and it continues to do so.

In 2022, the number of force interactions by APD declined 18% from 2021 and 35% from 2020.  See Annual Use of Force Report 2022 at 3, available at https://www.cabq.gov/police/documents/298a-b-e-apd-2022-annual-use-of-force-report-corrected-2023-10-3.pdf.  The rate of force per every 1,000 calls for service in 2022 was down 16.7% from 2021, and the rate of force used per every 100 custodial arrests declined by 20% from 2021.  Over 60% of force encounters in 2022 involved the lowest levels of force, and the most common injuries caused by officers were "abrasions" and "complaint of injury."  See id. at 15, 25. More serious injuries such as broken bones, gunshots, or death occurred in less than 5% of the incidents in which an officer injured someone.  See id. at 26.  Ultimately, only 4% of both force cases and force interactions in 2022 were deemed out of policy and were subject to appropriate correction.  See id.  *298(b)-Specialized Unit activations*

APD continues to track and analyze specialized unit activations.  In 2022, Police Service Dogs were deployed a total of 269 times.  Suspects were bitten in 16 out of 89 apprehensions for an 18% bite-ratio.  See id. at 19.  Notably, this is below the bite ratio value set by the CASA as requiring intervention.  See 3d Am. CASA ¶ 104 (Doc. No. 988-2) (stating that a bite ratio of over 20% requires intervention).

The majority of the 69 Special Weapons and Tactics activations in 2022 were for domestic disputes, warrant service, and wanted individuals.  See id. at 20. Only a handful of SWAT activations were generated due to suicide or behavioral health issues, indicating that the SWAT team is not routinely being used to address mental health calls.  Id.

*Paragraph 298(c)- Crisis Intervention Measures*

The City has in many ways transformed its crisis intervention and response over the lifetime of the CASA.  Within APD, recent data shows that only 4.5% of CIT encounters ended with a law enforcement action.  *See* Crisis Intervention Union Annual Report 2022 at 8, available at https://www.cabq.gov/police/documents/298c-ciu_2022_annual_report_final.pdf.  Over 50% of CIT encounters ended in a mental health transport (either voluntary or involuntary), and over 30% ended with no police action at all.  *Id.*  Additionally, in 2022, 77% of calls for service beginning or ending as "Behavioral Health" or "Suicide" had an ECIT certified officer arrive on scene.  See id. at 10.  APD officers used force in less than 1% of behavioral health and suicide calls in 2022 and of these uses of force, only 3% were found to violate APD's use of force policy.  See id. at 23, 31.

Perhaps more significantly, in 2020, the City created Albuquerque Community Safety ("ACS"), a third branch of the first responder system that responds to behavioral health,

substance use, homelessness, and quality-of-life concerns. See https://www.cabq.gov/acs/services/overview. The City diverted the first 911 call to ACS in September 2021. https://www.cabq.gov/acs/services/history. In just its first two years of existence, ACS diverted over 28,000 calls for service from APD. ACS Two-Year Anniversary Two-Pager, available at https://www.cabq.gov/mayor/documents/redefining-public-safety_acs-2-year-anniversary.pdf. In the last three months of 2024, ACS responded to nearly 11,000 calls for service, over a 10% increase from the same time period the previous year. ACS Quarterly Report: FY25-Q1 at 5, available at https://www.cabq.gov/acs/documents/quarterly-report-q2-2025fy-final.pdf. The Parties expect that ACS will continue to grow and that more calls that would have previously been sent to APD for an armed police response will be diverted to ACS responders instead.

*Paragraph 298 (d)- Recruitment*

APD publishes a Recruiting Data Analysis report that contains data mandated by Paragraph 298. See, e.g., APD Recruiting Data Analysis 2022, available at https://www.cabq.gov/police/documents/298d-recruitment-report-final-pdf.pdf.

*Paragraph 298(e)- Force Reviews*

APD reviews every use of force, with the depth of the investigation dictated by the force category (Level 1, 2 or 3). See 2022 Use of Force Report, available at https://www.cabq.gov/police/documents/298a-b-e-apd-2022-annual-use-of-force-report-corrected-2023-10-3.pdf, p. 33. Twenty-nine officers applied an out-of-policy use of force in the 26 out-of-policy force interactions in 2022. Four officers who applied an out-of-policy use of force in 2022 are no

longer employed by the department, with two of them terminated as a result of APD's disciplinary process due to the out-of-policy use of force. See id.

The Force Review Board reviewed 142 cases in 2022. See id. at 34. The majority of the cases reviewed by the FRB (120 out of 142, or nearly 85%) did not lead to additional policy, training, or equipment referrals not already identified during the initial investigation. See id.

*Paragraph 298(f)- Training Data*

All APD cadets completing training in 2022 were provided with 32 courses directly related to provisions in the CASA. See APD Training Data Analysis 2022 at 3, *available at* https://www.cabq.gov/police/documents/298f-training-final.pdf. A further 133 training referrals were completed spanning 28 topic areas to correct training deficiencies identified through force investigations, force reviews, internal affairs investigations, and other sources in APD. See id.

*Paragraph 298(g)- Officer Assistance*

APD's Behavioral Sciences Section ("BSS") provides comprehensive behavioral health services to APD employees and their families including, but not limited to, counseling services, critical incident debriefings, pre-employment screenings, and mental health evaluations. In 2022, APD officers participated in 2,650 appointments through the BSS, with the majority (2,086) being individual therapy sessions. See BSS 2022 Annual Report at 9, available at https://www.cabq.gov/police/documents/298g-behavioral-sciences-section-2022-report-final.pdf. APD conducted a survey of officers to determine perception of behavioral health services. See id. at 15. 54% of officers were confident their discussion would be kept confidential—the highest level of confidence reported by officers since such data started being collected in 2016.

See id. at 17.  65% of officers felt confident in the ease of access to services, and 61% of officers felt they would receive high-quality services.  See id. 18, 19.

*Paragraph 298(h)- Supervision Measures*

APD publishes a Supervision Measurements Report that assesses how well APD supervisors manage their subordinates and initiate the disciplinary process when necessary.  The 2022 report found that supervisors have effectively used the tools at their disposal to identify and respond to performance issues among the officers they supervise.  See APD Supervision Measurements Report 2022, available at https://www.cabq.gov/police/documents/298h-2022-supervision-measurements-final.pdf.

*Paragraph 298(i)- Citizen Complaints, Internal Investigations and Discipline*

The Internal Affairs Professional Standards Division ("IAPS") publishes a yearly report that provides data regarding misconduct investigations and discipline within APD.[8]  See, e.g., APD IAPS Annual Report 2022, available at  https://www.cabq.gov/police/documents/298i-iaps-report-q4-annual-2022-updated-2-3-23.pdf.  In 2022, out of 1,294 allegations of misconduct received by APD, 709 resulted in sustained findings, 233 were exonerated, 229 were unfounded, 46 were not sustained, 40 included sustained misconduct not based upon the complaint, and 37 were administratively closed.  See id. at 17.  Eleven investigations in 2022 involved criminal allegations against nine officers.  See id. at 19.

The Civilian Police Oversight Agency, which is responsible for investigating civilian complaints, publishes a semi-annual report, with the most recent report covering the first half of

---

[8] IAPS does not investigate force incidents.  Information on discipline for use of force is noted in the Annual Use of Force Report.

2022.  CPOA Semi-Annual Report 2022, underline available at https://www.cabq.gov/cpoa/documents/2022-jan-june-final-version.pdf.  In the first half of 2022, the CPOA received 305 complaint notifications and opened 141 investigations, compared to 135 cases opened in the prior reporting period.  While CPOA investigations are not always completed by the timelines established in the CASA, as noted above, CPOA uses a triage process to ensure that meritorious cases are timely investigated such that corrective action can be imposed as appropriate.  Further, 2022 data showed that 86% of police complaints were closed within the required time period in the first half of the year, which represented more than a 30% increase over the previous reporting period.  See id. at 4.

****

The foregoing data indicate that APD has become a self-assessing and self-correcting agency.  These characteristics have enabled APD to demonstrate sustained and continuing improvement in constitutional policing.  In the most critical area covered by the CASA—force— the data shows that APD uses force at a much lower rate than when this case began, and that the vast majority of force used meets constitutional standards.  When it does not, APD has the systems and processes in place to ensure that the necessary review, training, and discipline take place.  The other data and statistics outlined above, and laid out in more detail in APD's various annual reports, demonstrate APD's sustained and continuing improvement in all material areas of the CASA.

## CONCLUSION

The Parties agree that the City has achieved full and effective compliance with the CASA by demonstrating sustained and continuing improvement in constitutional policing. The Monitor's reports since at least IMR-18 show that the City has consistently increased its compliance with the material terms of the CASA, and that APD is now in 100% operational compliance with all paragraphs relevant to the agency. Accordingly, pursuant to paragraph 302 of the CASA, the Parties respectfully request that the Court grant this Joint Motion, terminate the CASA, and dismiss this lawsuit with prejudice.

The Monitor and Intervenor concur in the relief sought herein.


Respectfully submitted May 9, 2025,

Defendant CITY OF ALBUQUERQUE:

*/s/ Lauren Keefe*
Lauren Keefe, City Attorney
Lindsey Rosebrough, Managing Attorney APD
P.O. Box 2248
Albuquerque, NM 87103
(505) 768-4500
lrosebrough@cabq.gov
lkeefe@cabq.gov


*/s/ Taylor S. Rahn*
TAYLOR RAHN
Robles, Rael & Anaya, P.C.
500 Marquette NW, Suite 100
Albuquerque, NM 87102
(505) 242-2228
taylor@roblesrael.com

Plaintiff UNITED STATES OF AMERICA:

RYAN ELLISON                                   HARMEET K. DHILLON
United States Attorney                         Assistant Attorney General
District of New Mexico                         Civil Rights Division

AJA BROOKS                                     ANDREW DARLINGTON
Executive Assistant U.S. Attorney              Acting Chief

/s/ Ruth Keegan                                /s/ Jeffrey R. Murray
RUTH F. KEEGAN                                 JEFFREY R. MURRAY
Assistant U.S. Attorney                        Trial Attorney
U.S. Attorney's Office                         Special Litigation Section
District of New Mexico                         Civil Rights Division
201 3rd Street NW, Suite 900                   U.S. Department of Justice
Albuquerque, NM 87102                          150 M Street, NE, Rm 10.1126
(505) 346-7274                                 Washington, D.C. 20002
ruth.f.keegan@usdoj.gov                        (202) 353-5535
                                               jeff.murray@usdoj.gov


Intervenor ALBUQUERQUE POLICE OFFICERS' ASSOCIATION

/s/ Frederick M. Mowrer
Frederick M. Mowrer, Esq.
Sanchez, Mowrer & Desiderio, P.C.
115 Eighth Street SW
PO Box 1966
Albuquerque, NM 87103
Telephone 505-242-8810

22